# EXHIBIT
# A



🇺🇸 Official website of the Department of Homeland Security

U.S. Department of
Homeland Security

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied

the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons

stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# EXHIBIT B

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
                   Acting Commissioner, U.S. Customs and Border Protection

                   Alejandro Mayorkas
                   Director, U.S. Citizenship and Immigration Services

                   John Morton
                   Director, U.S. Immigration and Customs Enforcement

FROM:              Janet Napolitano
                   Secretary of Homeland Security

SUBJECT:           Exercising Prosecutorial Discretion with Respect to Individuals
                   Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

# EXHIBIT C



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

December 30, 2016

The Honorable Judy Chu
U.S. House of Representatives
Washington, DC  20515

Dear Representative Chu:

On behalf of the Administration, I write in response to the letter you and 110 other members of Congress sent the President on December 5.  In your letter, you ask us "to do everything within [our] power to safeguard the personal identifying information of DACA enrollees."  We share your concerns.

Today there are 750,000 young people enrolled in DACA who, when they applied for enrollment, relied on the U.S. government's representations about the use of their personal identifying information.  Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes.  More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.

For decades, even dating back before DACA, it has been the long-standing and consistent practice of DHS (and its predecessor INS) to use information submitted by people seeking deferred action or other benefits for the limited purpose of adjudicating their requests, and not for immigration enforcement purposes except in the kinds of specified circumstances described above.  This was true, for example, under the deferred action policies extended to victims of human trafficking, to foreign students affected by Hurricane Katrina, to battered immigrants under the Violence Against Women Act, and to widows and widowers of American citizens.  Accordingly, people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others.

The Honorable Judy Chu
Page 2

The U.S. government's practice of adhering to the assurances it makes to applicants for deferred action is also consistent with the way USCIS (and the INS before it) has long protected information submitted by those seeking other benefits or relief. This includes but is not limited to individuals requesting temporary protected status, deferred enforced departure, or extended voluntary departure. In these circumstances, as with deferred action requests, USCIS and INS have abided by a longstanding and consistent practice of using information to adjudicate specific applications, but not for immigration enforcement purposes absent the limited circumstances described above.

Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books. We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.

The co-signers of your letter will receive separate, identical responses. Should you wish to discuss this further, please do not hesitate to contact me.

Sincerely,

Jeh Charles Johnson

# EXHIBIT
# D

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31)**

| Period | Intake[1] | | | | Biometrics[6] | Case Review[8] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests | Average Accepted/Da[4][5] | Biometrics Scheduled[7] | Requests Under[9] | Approved[10] | Denied[11] | Pending[12] |
| **Fiscal Year - Total[6]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,684 | - | 150,747 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,524 | 470,521 | 11,025 | 96,817 |
| 2014 | 238,899 | 24,888 | 263,787 | 952 | 209,670 | 101,568 | 158,397 | 21,087 | 156,232 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | - | | 136,161 | 21,084 | 61,996 |
| 2014 Renewal | 116,475 | 5,761 | 122,236 | 464 | - | | 22,236 | D | 94,236 |
| 2015 | 448,850 | 35,479 | 484,329 | 1,781 | 525,499 | 48,355 | 510,289 | 21,452 | 73,341 |
| 2015 Initial | 85,300 | 7,481 | 92,781 | 338 | - | | 90,746 | 19,158 | 37,392 |
| 2015 Renewal | 363,550 | 27,998 | 391,548 | 1,443 | - | | 419,543 | 2,294 | 35,949 |
| 2016 | 260,700 | 12,325 | 273,025 | 1,035 | 68,140 | - | 198,916 | 14,503 | 120,622 |
| 2016 Initial | 73,387 | 1,205 | 74,592 | 291 | - | | 52,882 | 11,445 | 46,452 |
| 2016 Renewal | 187,313 | 11,120 | 198,433 | 743 | - | | 146,034 | 3,058 | 74,170 |
| 2017 | 242,979 | 23,398 | 266,377 | 1,960 | - | | 246,850 | 6,930 | 109,821 |
| 2017 Initial | 25,656 | 21 | 25,677 | 207 | - | | 35,586 | 5,155 | 31,367 |
| 2017 Renewal | 217,323 | 23,377 | 240,700 | 1,753 | - | | 211,264 | 1,775 | 78,454 |
| Total Cumulative | 1,771,475 | 117,836 | 1,889,311 | 1,510 | 1,372,377 | - | 1,586,657 | 74,997 | 109,821 |
| Total Cumulative Initial | 886,814 | 49,580 | 936,394 | 756 | - | | 787,580 | 67,867 | 31,367 |
| Total Cumulative Renewal | 884,661 | 68,256 | 952,917 | 754 | - | | 799,077 | 7,130 | 78,454 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,189 | 4,138 | 114,327 | 1,777 | - | - | 122,051 | 2,754 | 109,821 |
| Q1. October - December Initial | 15,294 | 15 | 15,309 | 247 | - | - | 18,311 | 2,106 | 31,367 |
| Q1. October - December Renewal | 94,895 | 4,123 | 99,018 | 1,531 | - | - | 103,740 | 648 | 78,454 |
| Q2. January - March | 132,790 | 19,260 | 152,050 | 2,142 | - | - | 124,799 | 4,176 | 124,437 |
| Q2. January - March Initial | 10,362 | D | 10,368 | 167 | - | - | 17,275 | 3,049 | 36,490 |
| Q2. January - March Renewal | 122,428 | 19,254 | 141,682 | 1,975 | - | - | 107,524 | 1,127 | 87,947 |
| Q3. April - June | | | | | | | | | |
| Q3. April - June Initial | | | | | | | | | |
| Q3. April - June Renewal | | | | | | | | | |
| Q4. July - September | | | | | | | | | |
| Q4. July - September Initial | | | | | | | | | |
| Q4. July - September Renewal | | | | | | | | | |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

Each request is considered on a case-by-case basis.

See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period.

Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.

2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), December 31, 2016

## Top Countries of Origin

| Top Countries of Origin | Accepted to Date [1] | | | Approved to Date [2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Mexico | 689,029 | 689,235 | 1,378,264 | 618,342 | 622,170 | 1,240,512 |
| El Salvador | 33,661 | 33,787 | 67,448 | 28,371 | 30,262 | 58,633 |
| Guatemala | 24,247 | 21,837 | 46,084 | 19,792 | 19,466 | 39,258 |
| Honduras | 22,114 | 21,107 | 43,221 | 18,262 | 18,526 | 36,788 |
| Peru | 9,721 | 11,061 | 20,782 | 9,066 | 10,245 | 19,311 |
| South Korea | 7,813 | 11,038 | 18,851 | 7,250 | 10,375 | 17,625 |
| Brazil | 8,447 | 8,251 | 16,698 | 7,361 | 7,542 | 14,903 |
| Ecuador | 7,649 | 7,787 | 15,436 | 6,696 | 7,037 | 13,733 |
| Colombia | 7,217 | 7,776 | 14,993 | 6,591 | 7,100 | 13,691 |
| Philippines | 5,055 | 5,774 | 10,829 | 4,655 | 5,444 | 10,099 |
| Argentina | 5,180 | 5,112 | 10,292 | 4,774 | 4,723 | 9,497 |
| India | 3,741 | 4,140 | 7,881 | 3,182 | 3,846 | 7,028 |
| Jamaica | 4,375 | 3,581 | 7,956 | 3,435 | 3,192 | 6,627 |
| Venezuela | 3,441 | 3,523 | 6,964 | 3,099 | 3,240 | 6,339 |
| Dominican Republic | 3,744 | 3,050 | 6,794 | 3,115 | 2,722 | 5,837 |
| Uruguay | 2,556 | 2,419 | 4,975 | 2,361 | 2,201 | 4,562 |
| Unknown | 2,589 | 2,535 | 5,124 | 1,960 | 2,238 | 4,198 |
| Bolivia | 2,202 | 2,469 | 4,671 | 2,062 | 2,246 | 4,308 |
| Costa Rica | 2,262 | 2,387 | 4,649 | 2,047 | 2,169 | 4,216 |
| Trinidad & Tobago | 2,440 | 1,707 | 4,147 | 2,096 | 1,691 | 3,787 |
| Poland | 1,951 | 1,997 | 3,948 | 1,782 | 1,827 | 3,609 |
| Chile | 1,874 | 2,009 | 3,883 | 1,736 | 1,854 | 3,590 |
| Pakistan | 1,927 | 1,975 | 3,902 | 1,685 | 1,791 | 3,476 |
| Nicaragua | 1,860 | 1,730 | 3,590 | 1,576 | 1,565 | 3,141 |
| Guyana | 1,467 | 1,462 | 2,929 | 1,266 | 1,347 | 2,613 |

## Residence

| Residence | Accepted to Date [1] | | | Approved to Date [2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| California | 242,339 | 217,023 | 459,362 | 222,795 | 202,200 | 424,995 |
| Texas | 140,688 | 117,309 | 257,997 | 124,300 | 110,050 | 234,350 |
| New York | 49,710 | 61,523 | 111,233 | 41,970 | 53,693 | 95,663 |
| Illinois | 45,663 | 39,602 | 85,265 | 42,376 | 37,039 | 79,415 |
| Florida | 39,843 | 48,460 | 88,303 | 32,795 | 41,526 | 74,321 |
| Arizona | 30,652 | 25,314 | 55,966 | 27,865 | 23,638 | 51,503 |
| North Carolina | 29,584 | 23,576 | 53,160 | 27,385 | 22,327 | 49,712 |
| New Jersey | 25,650 | 28,580 | 54,230 | 22,024 | 25,106 | 47,130 |
| Georgia | 28,589 | 23,521 | 52,110 | 24,135 | 21,804 | 45,939 |
| Washington | 19,581 | 17,696 | 37,277 | 17,843 | 16,275 | 34,118 |
| Colorado | 19,103 | 15,321 | 34,424 | 17,258 | 14,302 | 31,560 |
| Virginia | 13,967 | 14,995 | 28,962 | 12,134 | 13,272 | 25,406 |
| Nevada | 14,139 | 12,587 | 26,726 | 13,070 | 11,771 | 24,841 |
| Maryland | 11,513 | 12,357 | 23,870 | 9,785 | 10,917 | 20,702 |
| Oregon | 12,049 | 10,185 | 22,234 | 11,281 | 9,610 | 20,891 |
| Massachusetts | 9,517 | 12,449 | 21,966 | 7,934 | 10,854 | 18,788 |
| Indiana | 10,709 | 8,559 | 19,268 | 9,840 | 8,076 | 17,916 |
| Utah | 10,512 | 7,897 | 18,409 | 9,711 | 7,474 | 17,185 |
| Tennessee | 9,321 | 7,416 | 16,737 | 8,340 | 6,950 | 15,290 |
| Pennsylvania | 7,339 | 8,450 | 15,789 | 6,430 | 7,443 | 13,873 |
| Michigan | 8,144 | 6,679 | 14,823 | 7,339 | 6,524 | 13,863 |
| Wisconsin | 6,930 | 6,898 | 13,828 | 6,255 | 6,236 | 12,491 |
| Minnesota | 6,157 | 7,488 | 13,645 | 5,771 | 6,790 | 12,561 |
| Oklahoma | 7,301 | 5,997 | 13,298 | 6,803 | 5,647 | 12,450 |
| Kansas | 7,410 | 5,547 | 12,957 | 6,815 | 5,236 | 12,051 |
| New Mexico | 7,150 | 5,702 | 12,852 | 6,406 | 5,382 | 11,788 |
| South Carolina | 7,150 | 5,702 | 12,852 | 6,406 | 5,382 | 11,788 |

## Residence

| Residence | Accepted to Date [1] | | | Approved to Date [2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Connecticut | 5,676 | 6,675 | 12,351 | 4,929 | 5,882 | 10,811 |
| Ohio | 5,249 | 5,895 | 11,144 | 4,442 | 5,124 | 9,566 |
| Arkansas | 5,606 | 4,475 | 10,081 | 5,099 | 4,255 | 9,354 |
| Alabama | 4,803 | 3,844 | 8,647 | 4,270 | 3,584 | 7,854 |
| Missouri | 3,883 | 3,747 | 7,630 | 3,524 | 3,407 | 6,931 |
| Nebraska | 3,759 | 3,223 | 6,982 | 3,371 | 2,970 | 6,341 |
| Kentucky | 3,448 | 3,056 | 6,504 | 3,062 | 2,786 | 5,848 |
| Idaho | 3,383 | 2,845 | 6,228 | 3,132 | 2,694 | 5,826 |
| Iowa | 3,131 | 3,074 | 6,205 | 2,798 | 2,780 | 5,578 |
| Louisiana | 2,421 | 2,499 | 4,920 | 2,049 | 2,219 | 4,268 |
| Rhode Island | 1,460 | 1,979 | 3,439 | 1,229 | 1,733 | 2,962 |
| Delaware | 1,603 | 1,561 | 3,164 | 1,444 | 1,417 | 2,861 |
| Mississippi | 1,693 | 1,421 | 3,114 | 1,460 | 1,326 | 2,786 |
| Hawaii | 774 | 2,096 | 2,870 | 558 | 1,740 | 2,298 |
| District of Columbia | 943 | 1,240 | 2,183 | 764 | 1,049 | 1,813 |
| Puerto Rico | 519 | 1,275 | 1,794 | 325 | 1,080 | 1,405 |
| Wyoming | 694 | 563 | 1,257 | 621 | 520 | 1,141 |
| New Hampshire | 185 | 1,197 | 1,382 | 104 | 952 | 1,056 |
| Unknown | 450 | 729 | 1,179 | 367 | 599 | 966 |
| Alaska | 195 | 508 | 703 | 138 | 419 | 557 |
| South Dakota | 305 | 377 | 682 | 252 | 311 | 563 |
| Maine | 134 | 410 | 544 | 95 | 334 | 429 |
| Guam | 96 | 413 | 509 | 59 | 352 | 411 |
| North Dakota | 130 | 322 | 452 | 98 | 260 | 358 |
| Virgin Islands | 159 | 252 | 411 | 94 | 204 | 298 |
| West Virginia | 144 | 232 | 376 | 117 | 200 | 317 |
| Montana | 89 | 186 | 275 | 72 | 164 | 236 |
| Vermont | 56 | 192 | 248 | 42 | 162 | 204 |

D  Data withheld to protect requestors' privacy.

-  Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.
2) The report reflects the most up-to-date estimate data available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), March 2017

# EXHIBIT E



# Center for American Progress

IMMIGRATION

# DACA Recipients' Economic and Educational Gains Continue to Grow

By Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin  |  Posted on August 28, 2017, 9:01 am



AP/Craig Ruttle

Activists supporting Deferred Action for Childhood Arrivals (DACA) and other immigration issues gather near Trump Tower in New York, August 2017.

*Note: The survey results can be found here. For more information on the survey, please contact Tom K. Wong.*

Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals (DACA) policy has provided temporary relief from deportation as well as work authorization to approximately 800,000 undocumented young people across the country. As research has consistently shown, DACA has not only improved the lives of undocumented young people and their families but has also positively affected the economy more generally, which benefits all Americans.

From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia.

The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans. In addition, DACA recipients are buying cars, purchasing their first homes, and even creating new businesses. The survey's results also show that at least 72 percent of the top 25 Fortune 500 companies employ DACA recipients. Moreover, 97 percent of respondents are currently employed or enrolled in school.

# DACA's impact on employment

Work authorization is critical in helping DACA recipients participate more fully in the labor force. The data show that 91 percent of respondents are currently employed. Among respondents age 25 and older, employment jumps to 93 percent.

After receiving DACA, 69 percent of respondents reported moving to a job with better pay; 54 percent moved to a job that "better fits my education and training"; 54 percent moved to a job that "better fits my long-term career goals"; and 56 percent moved to a job with better working conditions.

We also see that 5 percent of respondents started their own business after receiving DACA. Among respondents 25 years and older, this climbs to 8 percent. As the 2016 survey noted, among the American public as a whole, the rate of starting a business is 3.1 percent, meaning that DACA recipients are outpacing the general population in terms of business creation.

As one respondent stated, "I started a bookkeeping business which gives me the opportunity to help our Hispanic community be in compliance with tax law [...] If DACA ended, I will not be able to keep

my small business and help my community."

Another respondent stated, "Because of DACA, I opened a restaurant. We are contributing to the economic growth of our local community. We pay our fair share of taxes and hire employees […] It will be hard to maintain my business if DACA ended. I depend on my [social security number] for a lot of my business, such as when getting licenses, permits, leases, and credit."

## DACA's impact on earnings

The data make clear that DACA is having a positive and significant effect on wages. The average hourly wage of respondents increased by 69 percent since receiving DACA, rising from $10.29 per hour to $17.46 per hour. Among respondents 25 years and older, the average hourly wage increased by 84 percent since receiving DACA.

The data also show that respondents' average annual earnings come out to $36,232, and their median annual earnings total $32,000. Among respondents 25 years and older, the figures are $41,621 and $37,595, respectively. These higher wages are not just important for recipients and their families but also for tax revenues and economic growth at the local, state, and federal levels.

Last year, we noted that further research is needed to parse out the short- and long-run wage effects of DACA as well as whether short-run gains represent a plateau in earnings or if more robust long-run wage effects may exist. This remains true. However, as DACA recipients are now further along in their careers, and as we continue to see growth in their earnings, it is likely there is even more room for recipients' wages to grow.

The immediate impact of wage increases is evident in 69 percent of survey respondents reporting that their increased earnings have "helped me become financially independent" and 71 percent reporting that their increased earnings have "helped my family financially." Among respondents 25 years and older, these percentages rise to 73 percent and 74 percent, respectively.

## DACA's impact on the economy

The purchasing power of DACA recipients continues to increase. In the 2017 study, nearly two-thirds of respondents, or 65 percent, reported purchasing their first car. The average cost paid was $16,469. As we have noted previously, these large purchases matter in terms of state revenue, as most states collect a percentage of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The data also show that 16 percent of respondents purchased their first home after receiving DACA. Among respondents 25 years and older, this percentage rises to 24 percent. The broader positive economic effects of home purchases include the creation of jobs and the infusion of new spending in local economies.

Additionally—and importantly—the data show that at least 72 percent of the top 25 Fortune 500 companies—including Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others—employ DACA recipients. All told, these companies account for $2.8 trillion in annual revenue.

## DACA's impact on education

Overall, 45 percent of respondents are currently in school. Among those currently in school, 72 percent are pursuing a bachelor's degree or higher. The majors and specializations that respondents report include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few.

When it comes to educational attainment, 36 percent of respondents 25 years and older have a bachelor's degree or higher. Importantly, among those who are currently in school, a robust 94 percent said that, because of DACA, "I pursued educational opportunities that I previously could not."

## Conclusion

Our findings could not paint a clearer picture: DACA has been unreservedly good for the U.S. economy and for U.S. society more generally. Previous research has shown that DACA beneficiaries will contribute $460.3 billion to the U.S. gross domestic product over the next decade—economic growth that would be lost were DACA to be eliminated.

As our results show, the inclusion of these young people has contributed to more prosperous local, state and national economies; to safer and stronger communities through increased access to cars and home ownership; and to a more prepared and educated workforce for the future. Ending DACA now would be counterproductive at best and, at worst, cruel. At present, 800,000 lives—as well as the lives of their families and friends—hang in the balance. At a time when the continuing existence of DACA is facing its most serious threat ever, understanding the benefits of the program for recipients; their families and communities; and to the nation as a whole is all the more important.

*Tom K. Wong is associate professor of political science at the University of California, San Diego. Greisa Martinez Rosas is advocacy and policy director, Adam Luna is senior advisor for communications, Henry Manning is research fellow, and Adrian Reyna is director of membership and technology strategies at United We Dream. Patrick O'Shea is Mellon/ACLS public fellow at the National Immigration Law Center. Tom Jawetz is vice president for Immigration Policy and Philip E. Wolgin is managing director for Immigration Policy at the Center for American Progress.*

*The authors thank all those who took the survey for their time and effort in helping to bring these stories to light.*

## Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning, people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.



© 2017 - Center for American Progress

# EXHIBIT F



Center for American Progress

☰

IMMIGRATION

# Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact

By Tom K. Wong, Kelly K. Richter, Ignacia Rodriguez, and Philip E. Wolgin   | Posted on July 9, 2015, 12:01 am



AP/Alex Brandon

DREAMers and parents take an oath in a mock citizenship ceremony in Washington, D.C., on July 10, 2013.

*Note: The 2017 version of this survey can be found here.*

In June, the Deferred Action for Childhood Arrivals, or DACA, program—which allows eligible unauthorized immigrants who entered the country at a young age to apply for temporary deferrals of deportations and work permits—marked its third anniversary. To date, roughly 665,000 people have received DACA. A number of early surveys illustrate that DACA has improved the lives of its

recipients, and economic impact analyses have found that wages rise as recipients gain work authorization, get jobs that better match their skills and training, and invest more in higher education.

Following up on these studies, the National Immigration Law Center, or NILC, the Center for American Progress, and Tom K. Wong of the University of California, San Diego, conducted a national survey to analyze the economic and educational outcomes of DACA recipients. The survey is part of a broader ongoing study by Wong called the Administrative Relief Impact and Implementation Study. The results add to a growing body of research that illustrates how DACA significantly affects recipients. (see Figure 1) A full 96 percent of respondents are currently employed or in school. Many are getting better, higher-paying jobs than they had before they received DACA. They are buying cars at high rates, and many are pursuing educational opportunities previously unavailable to them.



FIGURE 1
**DACA is significantly improving the lives of recipients**
Topline survey results

69% "Got a job with better pay"

89% Got a driver's license or state ID

92% Of those in school, have "pursued educational opportunities [they] previously could not"

45% Average wage increase after DACA

57% Are "able to earn more money, which has helped [their] family financially"

21% "Bought [their] first car"

40% Have parents eligible for DAPA

Source: Wong/NILC/CAP survey of DACA recipients, June 2015.

The survey is also one of the first to systematically quantify the wage effect of having deferred action. The data show that DACA has increased recipients' average hourly wages 45 percent. Given that higher wages translate into more tax revenue and more economic growth, these findings suggest that DACA benefits all Americans.

# Methodology

The survey was fielded online during June 2015 with a sample size of 546 respondents. Of these respondents, we can be confident that 467 are DACA recipients. Following the standards set forth by Wong and Valdiva in 2014, the survey included multiple features to enhance confidence in the validity of its findings. First, it included a unique validation test for undocumented status, which excluded some individuals from the sample based on their responses to questions about their immigration history. Moreover, no financial incentives for participation were provided; this was to further protect against responses from documented individuals. The survey addressed the issue of ballot stuffing, or one person taking the survey multiple times, by using a state-of-the-art online survey platform that prevents any single internet protocol, or IP, address from submitting multiple responses. The data were also checked for duplicate responses. While the survey utilized a peer-to-peer sampling strategy to identify DACA recipients, Facebook advertisements were also used in recruitment. This helped create a wider respondent base.

The survey respondents live in 34 states and the District of Columbia and have a median age of 22. Overall, 73 percent are female and 26 percent are male. The higher proportion of females is a recurring trend in online surveys of undocumented young people.

The vast majority of respondents—84 percent—identify as Hispanic/Latino, while another 9 percent identify as Asian, 2 percent identify as black, 2 percent identify as white, and 2 percent identify as other. Compared with the latest estimates of the DACA-eligible population, Hispanic/Latino respondents are slightly overrepresented in this sample. Nonetheless, given the demographic breakdown of approved applications—with 78 percent of DACA recipients born in Mexico and at least another 9 percent born in Central America*— the data likely track with the racial and ethnic distribution of the program.

# DACA's impact on employment

The survey finds that DACA has significantly helped recipients participate in the labor force. Seventy-six percent of respondents are currently employed, with an additional 20 percent not working but in school. As Figure 2 shows, after receiving DACA, 69 percent of respondents report moving to a job

with better pay; 57 percent report moving to a job that "better fits my education and training;" and 54 percent report moving to a job with better working conditions.

## DACA's impact on earnings

Nearly two-thirds of respondents—62 percent—"have been able to earn more money, which has helped me become financially independent." Additionally, 57 percent say that earning more money "has helped my family financially."

As Figure 3 indicates, DACA has increased average wages 45 percent, moving from $11.92 per hour before receiving DACA to $17.29 per hour after receiving it. This means an average of $5.27 more per hour and a median increase of $4. Because the baseline hourly wage is modest, and many of these individuals are new to the labor force, even relatively small wage bumps result in large percentage increases.

The findings make clear that DACA has created a way for undocumented youth to find better-paying jobs. Future research will help better assess the short- and long-term nature of DACA wage effects as recipients gain more work experience and progress in their careers. Importantly, future research should identify whether short-run wage effects represent a plateau in earnings or whether an even more robust longer-run wage effect exists.

## DACA's impact on education

Overall, 65 percent of respondents are currently in school. Of these, 70 percent are currently working as well. As Figure 4 illustrates, the majority are pursuing undergraduate degrees, and 17 percent are pursuing advanced degrees. Ninety-two percent of the respondents who are currently in school say that, because of DACA, "I pursued educational opportunities that I previously could not."

## DACA recipients on the road

The survey finds that 89 percent of respondents have obtained a driver's license or state ID for the first time after receiving DACA. Moreover, 21 percent of respondents report buying their first car after receiving DACA, with 26 percent buying a new car and 74 percent buying a used car. A full 96 percent of the people who bought a car have purchased auto insurance.

The average cost of car purchases in the sample was $22,559 for new cars and $9,607 for used cars. This matters for state revenue, as most states collect between 3 percent and 6 percent of the purchase price in sales tax, as well as registration and title fees. This added revenue comes in addition to the inherent safety benefits—to all Americans—of having more licensed and insured drivers on the roads.

These results help inform one of the central premises in the legal challenge brought by Texas and other states to the legality of the deferred action programs—the DACA expansion and Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA—that President Barack Obama announced in November 2014. Texas claimed harm from DAPA because Texas charges less in driver's license fees than it costs the state to issue them.

However, Texas did not take into account any of the new tax revenue that would accrue from people gaining deferred action: The survey data show that 33 percent of Texas respondents bought a car after receiving DACA at an average cost of $10,346. At a tax rate of 6.25 percent, this translates to an average state tax payment of $647 per car, not counting registration and title fees. Although one should take caution when extrapolating from a sample to a population, the findings are clear: Texas stands to gain significant amounts of new tax revenue from individuals who gain deferred action, get driver's licenses, and buy cars.

## Families of DACA recipients

The survey underscores the deep ties that DACA recipients have to U.S. citizens and illustrates the diverse legal statuses that members of the same family can have. Forty-five percent of respondents have siblings who are citizens, while 40 percent have a parent who is eligible to apply for deferred action under DAPA.

## Conclusion

From new jobs and better earnings to more education and car purchases, DACA is having a major impact on individual lives. But it is only one piece of the puzzle: While up to 1.17 million individuals are currently eligible to apply for DACA, an additional 4 million or so people would be eligible to apply for the 2014 deferred action programs, which remain on hold in the wake of the Texas lawsuit.

Given DACA's broad economic and societal benefits, allowing deferred action to move forward would reap even larger rewards. Deferred action provides only temporary protections, however, and a more permanent solution in the form of comprehensive immigration reform legislation—anchored

by a pathway to citizenship for undocumented immigrants—would yield even greater benefits and provide increased prosperity for all Americans.

* Authors' note: 8.7 percent of applicants were born in Costa Rica, El Salvador, Guatemala, and Honduras. Figures for Nicaragua, Panama, and Belize are not available.

*Tom K. Wong is an assistant professor of political science at the University of California, San Diego. Kelly K. Richter is the executive action policy fellow and Ignacia Rodriguez is the equal justice works fellow, sponsored by Greenberg Traurig, at the National Immigration Law Center. Philip E. Wolgin is the Associate Director for Immigration Policy at the Center for American Progress.*

Center for American Progress

© 2017 - Center for American Progress