## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, <br><br> *Defendants*. | **SECOND AMENDED COMPLAINT** <br><br> Case No. 1:16-cv-04756 (NGG) (JO) |

## INTRODUCTION

Plaintiffs Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas,

Mariano Mondragon, and Carolina Fung Feng ("Individual Plaintiffs"), on behalf of themselves

and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf

of itself, its members and clients, and all similarly situated individuals (collectively "Plaintiffs"

or "Named Plaintiffs"), bring this action to challenge the Trump Administration's unlawful

termination of the Deferred Action for Childhood Arrivals ("DACA") program. Nearly one

million young immigrants rely on DACA to work, study, hold driver's licenses, serve in the

military, support their families, and live securely in the only country they know as home.

Defendants' arbitrary decision to terminate this established and successful program upends the

lives of these individuals and threatens to destabilize their families, communities, and

1

workplaces. The termination of DACA violates federal statutes and the Constitution, necessitating this Court's intervention to protect against imminent and devastating harm.

The termination of DACA will prevent Mr. Batalla Vidal from caring for patients at the nursing home where he works. It will prohibit Ms. Fernandez from working to support her two U.S.-citizen children, making her mortgage payments, and paying for health insurance for her family. It will throw into disarray the lives of Mr. Mondragon's two young children and pregnant wife, who depend on his ability to make a living wage. It will bar Mr. Vargas, who recently started attending night classes at City University of New York School of Law, from fulfilling his dream of becoming a lawyer. Defendants' decision to abruptly end the program will force nearly 800,000 people to live with the persistent fear of being separated from their families.

Defendants impose these harms in violation of the procedural requirements meant to protect individuals from arbitrary government action. The termination of DACA binds the Department of Homeland Security to categorically deny deferred action to new applicants as of September 5, 2017, and to deny all renewal applications as of October 5, 2017, without following public notice-and-comment procedures required by the Administrative Procedure Act ("APA"), and without the analysis required by the Regulatory Flexibility Act.

Separately, Defendants' DACA termination reverses longstanding agency policy on which nearly 800,000 people have relied, including assurances to DACA applicants that the information they provided would not be used against them or their loved ones. Under the APA, Defendants must provide a reasoned explanation for choosing to terminate this program. Rather than do so, Defendants have justified the reversal based on fear of a hypothetical lawsuit, the legally erroneous claim that DACA is unlawful, and a variety of inaccurate factual assertions.

Defendants' termination of DACA additionally violates the Fifth Amendment. Defendants have failed to correct misleading notices previously sent to many DACA recipients who are now required to submit renewal applications by October 5, 2017, in violation of procedural due process requirements. Finally, Defendants' contradictory, illogical, and false explanations for terminating DACA evidence that the true reasons for ending this highly successful program are pretextual, in violation of the guarantee of equal protection under law.

Because Plaintiffs and other similarly situated individuals face the imminent loss of their eligibility for DACA status due to Defendants' unlawful actions, Plaintiffs ask this Court to declare the termination of DACA unlawful and to enjoin its enforcement.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et seq.*

2.      Venue properly lies in this district because Individual Plaintiffs reside in the district, and Plaintiff Make the Road New York ("MRNY") operates community centers in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. *Id.* § 1391(b).

## PARTIES

**Plaintiff Martín Batalla Vidal**

3.      Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA. He has resided in Queens, New York for twenty years.

3

4.      Mr. Batalla Vidal was born in Mexico and raised in New York since he was a young child. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived in since he was a child.

5.      Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York from September 2004 until his graduation in June 2008.

6.      After graduating from high school, Mr. Batalla Vidal hoped to attend a nursing program at a school such as the City University of New York ("CUNY"), but could not seriously consider these programs because those universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also stressed the difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

7.      In November 2012, the Obama Administration created DACA. In November 2014, Mr. Batalla Vidal applied for DACA with the assistance of MRNY. To prepare his application, Mr. Batalla Vidal attended a workshop at MRNY's Brooklyn office, where he made follow-up visits. To prove his eligibility for DACA, Mr. Batalla Vidal spent many hours over the course of several months gathering paperwork and obtaining documents from his high school, hospital, and bank. On February 17, 2015, DHS approved Mr. Batalla Vidal's application.

8.      Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to raise money for school and support his mother and younger siblings. He worked two jobs at the same time, full time at Bocca Catering and part time at the New York Sports Club. He currently works full time at Park Terrace

Rehabilitation and Nursing Center, where he cares for patients with serious health needs. Mr. Batalla Vidal also received a scholarship for DACA recipients from ASA College.

9.      Defendants approved Mr. Batalla Vidal's DACA renewal on February 16, 2017. His current grant will expire on February 15, 2019. Because of Defendants' termination of DACA, Mr. Batalla Vidal is ineligible to apply to renew DACA.

10.     Through employment he was able to obtain with DACA, Mr. Batalla Vidal can financially support himself, his mother, and his younger siblings. Mr. Batalla Vidal's ability to pursue his career and provide for his family has been thrown into jeopardy due to Defendants' termination of DACA. Without Mr. Batalla Vidal's income, he and his family will face significant financial hardship. If Mr. Batalla Vidal is deported, his family will also lose his emotional support and be irreparably harmed.

**Plaintiff Antonio Alarcon**

11.     Plaintiff Antonio Alarcon ("Mr. Alarcon") is a recipient of DACA. He resides in Queens, New York.

12.     Mr. Alarcon was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed behind in Mexico with their grandparents. When Mr. Alarcon was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcon moved in with his aunt and uncle.

13.     Mr. Alarcon received DACA on March 26, 2013, with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcon to financially support himself, his aunt, and his uncle as he pursued his education.

14.     Mr. Alarcon graduated from Flushing High School, and received his associate's

degree from LaGuardia Community College in 2015. He is currently pursuing a Bachelor of Arts

degree in Film Studies from Queens College, where he is on track to graduate in December 2017.

15.     Through his employment and volunteer activities, Mr. Alarcon has become a

leading voice for youth in his community and beyond. From facilitating local youth meetings and

retreats, to serving as a regional coordinator on national campaigns, he has worked to expand

educational opportunities for immigrant youth throughout New York and the United States.

16.     Defendants granted Mr. Alarcon DACA renewals on March 6, 2015 and again on

January 26, 2017. His current grant will expire on January 25, 2019. He is ineligible to renew

DACA because of Defendants' termination of the program, thereby jeopardizing his and his

family's wellbeing.

**Plaintiff Eliana Fernandez**

17.     Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides

in Suffolk County, New York.

18.     Ms. Fernandez was born in Ecuador and came to the United States at the age of

fourteen, where she was finally able to reunite with her parents after not seeing them for many

years. She has lived in New York since she was fourteen years old. She has two New York-born,

U.S. citizen, children of elementary-school age, whom she is raising.

19.     Ms. Fernandez first received DACA on December 11, 2012 and renewed her

status on November 4, 2016. Her current grant will expire on November 20, 2018, and so she is

no longer eligible to renew DACA as a result of Defendants' termination of the program.

20.     Ms. Fernandez has worked hard to build a life for herself and her family. Despite

being ineligible for financial aid and other types of support, she attended St. Joseph's College,

where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She

now works as an Immigration Case Manager in MRNY's Long Island office. This semester she

started graduate school at CUNY School of Professional Studies to obtain an Advanced

Certificate on Immigration Law.

21.     Ms. Fernandez is a mother and homeowner who contributes every day to the state

of New York by working, studying, and giving back to her community. She was able to achieve

these goals because of DACA, which allowed her to go back to school, earn a living wage, and

purchase a home in which her children can grow up.

22.     Without DACA, Ms. Fernandez would no longer have a driver's license to drive

her children to the doctor or to school. Without the employment authorization that her DACA

status provides, she could not afford her mortgage or her family's health insurance. Defendants'

termination of the DACA program puts Ms. Fernandez at risk of being separated from her

children, as she was from her parents as a child.

**Plaintiff Carlos Vargas**

23.     Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in

Staten Island, New York.

24.     Mr. Vargas was born in Puebla, Mexico. He came to the United States with his

mother, who was struggling to raise Mr. Vargas and his siblings after Mr. Vargas's father passed

away two months before he was born. Mr. Vargas has lived in New York City since he was four,

and in Staten Island since he was sixteen.

25.     Mr. Vargas began working in restaurants at age thirteen to help his family,

leaving school at 3 P.M. and working shifts from 4 P.M. to midnight, five days a week. He had

hoped to attend college but was told by a school counselor that he could not attend because he was undocumented.

26.     After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree. Mr. Vargas learned that his undocumented status would not prevent him from enrolling in CUNY College of Staten Island ("CUNY CSI"), provided he could pay his tuition without government loans. He applied for admission and was accepted. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business in 2014.

27.     Mr. Vargas applied for DACA in August 2012. His application was granted on December 13, 2012. DHS renewed his DACA on November 14, 2014 and again on September 14, 2016, with his current grant expiring on September 13, 2018. Mr. Vargas is no longer eligible to renew DACA as a result of Defendants' termination of the program.

28.     DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities.

29.     After volunteering for many years in Staten Island for Make the Road New York, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases.

30.     Mr. Vargas now works at MRNY, where he screens individuals and provides assistance applying for DACA and other forms of immigration relief. He plans to become a

lawyer so that he can be a more effective advocate for his community. Last month, he began

attending evening classes at CUNY School of Law.

**Plaintiff Mariano Mondragon**

31.     Plaintiff Mariano Mondragon ("Mr. Mondragon") is a recipient of DACA. He

resides in Queens, New York.

32.     Mr. Mondragon was born in Mexico and first came to the United States with his

father in 1999, when he was fourteen years old. Six months after they arrived, his father returned

to Mexico while Mr. Mondragon remained in the United States with his aunt. He has not seen his

parents in seventeen years.

33.     Mr. Mondragon began working at the age of sixteen. Since graduating from

Flushing High School in 2005, he has worked in the restaurant industry.

34.     Mr. Mondragon has been married for five years. He and his wife have two U.S.-

born children together, ages eight and one, and his wife is pregnant with their third child.

35.     Mr. Mondragon also has a ten-year-old daughter from a previous relationship. Her

mother moved to Mexico when she was pregnant. While Mr. Mondragon has never met his

daughter in person, he provides financial support for her.

36.     Mr. Mondragon received DACA on April 14, 2014 and renewed it on February

25, 2016. His DACA status will expire on February 24, 2018. In addition, two of Mr.

Mondragon's brothers are DACA recipients.

37.     DACA has allowed Mr. Mondragon to support his family by working as a

bartender in Manhattan and it has provided assurance that he will not be separated from his

children and wife.

38.     At the time of filing this complaint, Mr. Mondragon is making every effort to renew his DACA status before the October 5, 2017 deadline.

**Plaintiff Carolina Fung Feng**

39.     Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

40.     Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. She has not seen her father—her only living parent—since she left Costa Rica sixteen years ago. Ms. Fung Feng first applied for DACA around September 2012 and was approved around December 2012. She has successfully renewed DACA twice, in July 2014 and June 2016. Her status expires in September 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

41.     Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015.

42.     Ms. Fung Feng has worked for MRNY since 2015 as a Program Assistant for the Adult Literacy Program. She supports her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study.

**Plaintiff Make the Road New York**

43.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, as well as on behalf of its clients and members and all similarly situated individuals. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, and Suffolk County, MRNY integrates adult and youth education, legal

and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

44.     MRNY has a legal department staffed by twenty-three attorneys and eleven advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as in affirmative applications for immigration relief. MRNY also directly assists individuals prepare the documentation and paperwork necessary for DACA applications and renewals. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

45.     MRNY currently offers weekly DACA clinics in large group settings in Queens and assists DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers. MRNY also provides assistance with DACA renewals in its Brooklyn, Staten Island, and Long Island offices. Since fall 2012, MRNY has conducted approximately 392 DACA clinics and has submitted more than 2,582 DACA applications on behalf of its clients. MRNY assists its DACA-eligible clients with initial applications as well as renewals.

46.     MRNY has more than 20,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcon, Fernandez, Vargas, Mondragon, and Fung Feng, along with many other members who will lose their DACA status as a result of Defendants' termination of the program.

47.     At least eleven current MRNY employees have DACA, including Plaintiffs Alarcon, Fernandez, Fung Feng, and Vargas.

48.     Approximately forty MRNY members, and a significant additional number of MRNY clients, have DACA that expires between September 5, 2017 and March 5, 2018 and are therefore subject to the mandatory October 5, 2017 renewal deadline. Of these members, MRNY has not been able to reach four DACA recipients to inform them they need to renew now. Some of these MRNY members and clients have received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires. Defendants' notices have made no mention of the October 5, 2017 deadline. None of these MRNY members or clients have received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

49.     At least seven MRNY members, and an additional number of clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications. Most of them were in the process of assembling the documentation necessary to satisfy the DACA eligibility requirements.

50.     Still, other youth members of MRNY, and an additional number of clients, were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance. One member received a letter from her GED course indicating she met the education requirement of DACA on September 7, 2017—two days after she lost the ability to apply for DACA.

51.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved by Defendants' final agency action and have exhausted their administrative remedies.

52.     The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program terminated unlawfully, and in having their DACA applications and renewals considered, are germane to MRNY's purpose of advocating for the rights of low-income

immigrant communities, to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

53.    MRNY's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

54.    Defendants' planned unlawful termination of the DACA program has already directly harmed MRNY by causing the organization to divert its resources from other time-sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, and to conduct additional screenings of its clients (members and non-members) to determine whether they are eligible for other forms of immigration relief.

55.    Since September 5, 2017, MRNY has already hosted twelve workshops on DACA renewal that they would not have had to host if Defendants had not terminated the program. MRNY's ActionNYC program in Queens, part of an initiative co-sponsored by the N.Y.C. Office of Immigrant Affairs and CUNY that connects New Yorkers with free and safe immigration services, has had to be put on hold for a month. Five Department of Justice Accredited Representative staff members who each do screenings and immigration application assistance had to cancel all of their September appointments and reschedule them for October and later, in order to schedule DACA renewal applications in their September slots. This has also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on their other active cases.

56.    In addition, MRNY's legal team has expended its limited resources creating Know-Your-Rights materials, answering calls, addressing walk-in questions, mailing renewal

applications, and coordinating an emergency support plan, including mental health support, for members, clients, and staff due to the termination.

57.     MRNY has spent additional money on application fees for individuals who have received scholarships that would not be granted until after their applications needed to be submitted, as well as on priority shipping fees for renewal applications, to ensure they arrive by the October 5 deadline.

58.     MRNY will sustain further injuries if its DACA employees lose work authorization as a result of the Defendants' actions.

59.     MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

60.     These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

61.     As a New York-focused, non-profit organization, MRNY is a "small organization" under the RFA. 5 U.S.C. § 601(4). MRNY is directly affected by Defendants' termination of DACA, as the Agency's final action has adversely affected it. *Id.* § 611(a)(1).

**Defendants**

62.     Defendant Elaine C. Duke is the Acting Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

63.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the head of the U.S. Department of Justice. He is sued in his official capacity.

64.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

## STATEMENT OF FACTS

**The 2012 DACA Memorandum**

65.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano ("the Secretary") announced the creation of the DACA program, which set out guidelines for U.S. Citizenship and Immigration Services ("USCIS") to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("DACA Memorandum") (attached hereto as Exhibit A). Those granted deferred action also became eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).

66.     The DACA Memorandum states that individuals who came to the United States as children, lack a serious criminal history, attend school or participate in the Armed Services, and meet other criteria may request that the Secretary grant deferred action, a discretionary form of relief from removal, for a period of two years, subject to renewal. Those granted deferred action in this manner could also obtain employment authorization and a social security card. *See* Ex. A, DACA Memorandum.

67.     The Secretary made findings that the individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." *Id.* at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

68.     Individuals who met the criteria listed in the DACA Memorandum did not automatically receive deferred action. Instead, DHS was directed to exercise its discretion to consider grants of deferred action "on a case by case basis." *Id*.

69.     Pursuant to the DACA Memorandum, USCIS established an application and background-check procedure to evaluate whether individuals would qualify for deferred action. Applicants were required to disclose extensive sensitive and personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, current and previous mailing addresses, country of birth, dates of initial and subsequent entries, and contact information. *See* USCIS Form I-821D and Instructions (attached hereto as Exhibit B).

70.     In order to prove that they met the eligibility criteria, DACA applicants also routinely provided Defendants documents containing personal information, including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records.

71.     The information and records DACA applicants provided Defendants frequently included sensitive and personal information about third parties as well, including family members of DACA applicants.

72.     Defendants consistently represented to DACA applicants that the information they provided would be protected from disclosure to U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances. *Id.* at 20; U.S. Citizenship & Immigration Servs.: Frequently Asked Questions (excerpt attached hereto as Exhibit C); Letter from Jeh Johnson, Sec'y of Homeland Sec., to Judy Chu, U.S. House Representative (Dec. 30, 2016) ("[T]he U.S. government represented to [DACA] applicants that the personal information they provided will not later be used for

immigration enforcement purposes. . . . We believe these representations . . . must continue to be honored.") (attached hereto as Exhibit D). These assurances allowed applicants to apply for deferred action without fear that the information they provided would later be used by Defendants to deport them or their families.

**Impact of the DACA Program**

73.     Since the program was first introduced in 2012, nearly 800,000 individuals have received deferred action and employment authorization under DACA. Close to 42,000 DACA recipients live in New York State alone.

74.     As a result of the DACA program, these young immigrants have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients have come to rely on the program to allow them to work, study, and live without the constant threat of deportation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

75.     They have also relied on the availability of renewing DACA. New York DACA recipients have submitted more than 53,000 renewal applications since DACA began—10,000 more than initial applications, meaning that some recipients have renewed more than once.

76.     This reliance has continued since Defendant President Trump took office, because he maintained the program for nearly eight months, accepting both first-time applications and renewals while assuring DACA-eligible immigrants that he would "take care of" them.

77.     The Trump Administration's arbitrary decision to terminate DACA reverberates well beyond the nearly 800,000 DACA recipients. The opportunities DACA recipients acquired and created as a result of the program benefitted their families, communities, and employers, as well. All of these groups stand to lose these gains, on which they have come to rely, if Defendants' arbitrary decision to end DACA stands.

78.     For example, Ms. Fernandez works as an immigration advocate with MRNY and is enrolled in a graduate program at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law. Without DACA, she will be forced to leave her job and cease her studies. If Ms. Fernandez is deported, her two U.S.-citizen sons will be left without their primary caretaker. Like Ms. Fernandez, many DACA recipients depend on their work authorization to financially support family members, including U.S.-citizen children and siblings.

79.     The positive impact DACA has made on the overall U.S. economy would disappear if the Administration's arbitrary decision to terminate the program holds. Economists calculate that DACA has boosted labor-force participation, raised DACA recipients' purchasing power, and increased state and federal tax revenues.

80.     Economists estimate that the U.S. economy would lose tens of billions of dollars if the program is terminated. New York state alone stands to lose nearly $2.6 billion if DACA recipients leave the workforce. Terminating the program would have a significant fiscal and economic cost—estimated to be more than $60 billion—borne by the entire U.S. population.

**The Trump Administration's Animus Toward Individuals of Latino and Mexican Heritage**

81.     A hallmark of Defendant Trump's campaign and presidency has been unabashed nativism, in both words and deeds, rarely seen in this country's recent history. As part of that

nativist platform, Defendant Trump and some members of his Administration have portrayed immigrants as imminent threats to the health, safety, and wellbeing of the United States.

82.     One group that Defendant Trump has repeatedly targeted is Latinos, especially those of Mexican heritage. When Defendant Trump announced his candidacy in June 2015, he labeled Latinos and Mexicans as "criminals," a characterization he used to justify his harsh immigration proposals.

83.     In his presidential announcement speech, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

84.     Defending these remarks, then-candidate Trump explained: "I can't apologize for the truth. I said tremendous crime is coming across." He later added: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, [and] rapists . . . ."

85.     A few weeks after he announced his candidacy, Defendant Trump again described Mexicans as murderers and rapists, stating, "I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad." He labeled the people who were coming in as "killers and rapists."

86.     During a Republican presidential debate in August 2015, then-candidate Trump again characterized Mexicans as criminals. He stated that "the Mexican government is much smarter, much sharper, much more cunning and they send the bad ones over because they don't want to pay for them, they don't want to take care of them."

87.     Later that same month, Defendant Trump criticized fellow-candidate Jeb Bush because his wife is Latina, retweeting a post criticizing Governor Bush, which told him to stop speaking "Mexican" and instead speak English.

*88.*     In May 2016, then-candidate Trump criticized U.S. District Judge Gonzalo Curiel for his Mexican heritage. Judge Curiel was born a U.S. citizen in Indiana. While Judge Curiel was presiding over a lawsuit against Trump University, then-candidate Trump complained that the jurist would not be able to fairly adjudicate the case because of his ancestry: "He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings—rulings that people can't even believe."

89.     Since his inauguration, Defendant Trump has continued to express animus toward Mexicans and Latinos through both his words and actions. In August 2017, in a speech in Arizona, Defendant Trump described some undocumented immigrants as "animals."

90.     That same month, Defendant Trump pardoned former Sheriff Joe Arpaio for contempt of court. Sheriff Arpaio had violated an injunction barring the Maricopa County Sheriff's Office from implementing a policy that allowed officers to arrest someone on suspicion of illegal presence and directed officers to consider "race or 'Mexican ancestry'" as a factor. *United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. 2017). By pardoning Sheriff Arpaio, Defendant Trump implicitly approved of unconstitutional discrimination against Latinos and Mexicans, and stated that Sheriff Arpaio was convicted merely for "doing his job."

91.     In his speeches since the Inauguration, when discussing the undocumented Latino community, Defendant Trump has characterized them as criminals and gang members.

92.     In his April 2017 prepared remarks announcing the Department of Justice's

"Renewed Commitment to Criminal Immigration Enforcement," Defendant Sessions argued for

securing the borders by taking a stand against "filth."

**The Trump Administration's Decision to Terminate the DACA Program**

93.     On June 29, 2017, Texas Attorney General Ken Paxton, along with the attorneys

general of nine other states, wrote Defendant Sessions threatening to amend their complaint in

*Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), to challenge the DACA program if

Defendants did not terminate DACA by September 5, 2017.

94.     On September 5, 2017, Defendant Duke issued a memorandum announcing that

DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of

Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration

Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5,

2017 ("DACA Termination") (attached hereto as Exhibit E).

95.     Defendants Sessions, Duke, and Trump jointly made the decision to end DACA

and jointly prepared the DACA Termination.

96.     The DACA Termination directs DHS to categorically reject all new DACA

applications received after September 5, 2017. DHS will consider renewal applications from

existing DACA recipients whose status expires on or before March 5, 2018, but only if such

renewal applications are received by October 5, 2017. DHS will categorically reject renewal

applications from DACA recipients whose status expires after March 5, 2018.

97.     Defendant Duke stated that the decision was based on two reasons: (1) the

preliminary injunction issued against a separate program, *see Texas v. United States*, 86 F. Supp.

3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*,

136 S. Ct. 2271 (2016) (per curiam); and (2) Defendant Sessions' opinion that DACA "was an

unconstitutional exercise of authority by the Executive Branch," *see* Ex. E, DACA Termination.

98.     DHS provided no other explanation for its decision to terminate DACA.

99.     The preliminary injunction issued by a Texas court does not reach the original

DACA program. Rather, it enjoins the Deferred Action for Parents of Americans and Lawful

Permanent Residents program, a different program which is no longer in force.

100.     On September 5, 2017, Defendant Sessions held a press conference, falsely

asserting that DACA "contributed to a surge of unaccompanied minors on the southern border

that yielded terrible humanitarian consequences." He stated further, "It also denied jobs to

hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."

*Attorney General Sessions Delivers Remarks on DACA*, Dep't of Justice (Sept. 5, 2017)

(attached hereto as Exhibit F).

101.     While Defendant Duke based the decision to terminate DACA on the legally

erroneous conclusion that DHS lacks authority to exercise its discretion in granting deferred

action under DACA, Defendant Trump has made contradictory statements that suggest he

believes it is within his executive authority. On September 5, 2017, shortly after the DACA

Termination was published, Defendant Trump tweeted that if Congress did not act before March

5, 2018, he would "revisit this issue." If the unlawfulness of DACA were the true reason for

terminating the program, then the President would lack authority to "revisit" ending DACA.

102.     In addition, on September 14, 2017, a week after the Administration's

announcement terminating DACA, and facing multiple suits challenging his actions, Defendant

Trump tweeted, "Does anybody really want to throw out good, educated and accomplished

young people who have jobs, some serving in the military? Really!....." This statement is

inconsistent with previous statements by Defendant Trump and the Trump Administration, and reflects the arbitrariness of the Administration's decision to end the program.

103.    The DACA status of more than 150,000 DACA recipients will expire before March 5, 2018. Many of those individuals have received the standard DHS renewal notice directing the recipient to submit a renewal application "as soon as possible," and to avoid a lapse in status by submitting the renewal application 120 to 150 days before expiration. *See* Dep't Homeland Sec., I-797C Notice of Action, July 15, 2017 (attached hereto as Exhibit G).

104.    Defendants' renewal notices do not advise recipients whose status will expire before March 5, 2018 that they, in fact, must submit a renewal application by the October 5, 2017 deadline.

105.    On information and belief, DHS has not provided and does not plan to provide accurate or corrected individualized notices to those DACA recipients who must renew by October 5, 2017, including those individuals whom Defendants have previously advised to renew "as soon as possible" but without mention of the October 5, 2017 deadline.

**Impact of the DACA Termination on Named Plaintiffs and the Putative Class**

106.    The DACA Termination will upend the lives of the nearly 800,000 DACA recipients, as well as those of their families, communities, and employers. Without DACA, the Individual Plaintiffs will lose their work authorization, preventing them from supporting themselves and their families. MRNY will lose approximately a dozen highly valued employees.

107.    For example, Mr. Batalla Vidal relies on his work authorization through DACA to work at a rehabilitation center caring for elderly and disabled patients; he supports himself, his mother, and his younger siblings. Without Mr. Batalla Vidal's income, he and his family will face substantial financial hardship.

108.    Ms. Fernandez depends on her work authorization to support herself and her two

U.S.-citizen children.

109.    Additionally, the DACA Termination will prevent DACA recipients from

enrolling in university and graduate programs since they will be unable to secure employment

after graduating, blocking all future opportunities for professional or educational advancement.

Similarly, their inability to secure employment while in school would severely hinder their

financial ability to afford their education.

110.    For example, Mr. Alarcon relies on DACA to allow him to enroll as a Bachelor of

Arts candidate at Queens College, where he is on track to graduate in December 2017.

111.    Ms. Fernandez has also relied on DACA to graduate from college and has just

enrolled in graduate school at CUNY School of Professional Studies to obtain an Advanced

Certificate on Immigration Law.

112.    The October 5, 2017 renewal deadline imposed on DACA recipients whose

deferred action and work permit expire before March 5, 2018 is untenable for many DACA

recipients for various reasons, including financial ones.

113.    For example, eighteen-year-old DACA recipient Guendi Castro and her nineteen-

year-old brother Edgar Castro, also a DACA recipient, came to the United States from Mexico as

toddlers. They currently live in New Mexico with their parents. Their DACA permits expire in

early December 2017, and both must renew by October 5th or risk losing the protections of

deferred action.

114.    Ms. Castro and her brother are struggling to muster the funds to pay the renewal

fees by October 5th.  She, her brother, and both of their parents work full time so they can pay

for the family's household expenses, leaving little income to pay for both DACA renewal fees,

which add up to approximately $1,000. Ms. Castro and her brother are actively fundraising to pay the renewal fees, but at this moment still lack sufficient funds to file their renewals.

115.     In addition, the September 5, 2017, cutoff for initial applicants has inflicted severe harm on those who were unable to file by September 5, 2017.

116.     For example, Jose Rangel is DACA eligible, lives in Houston, Texas, and is thirty-four years old. He arrived in the United States from Mexico when he was six. He is married and has a seven-year-old U.S.-citizen daughter.

117.     Mr. Rangel did not apply for DACA in 2012 because he received erroneous legal advice that he was not eligible. Years later, a friend insisted he was eligible and encouraged him to apply.

118.     In mid-to-late August 2017, Mr. Rangel and his lawyer completed his initial application, which was ready to be finalized and mailed. On September 5, 2017, when Mr. Rangel heard Defendant Sessions' announcement, he was relieved that he had finished his DACA application two-weeks earlier and assumed it had been submitted.

119.     After calling his lawyer to confirm, Mr. Rangel found out that due to Hurricane Harvey, his lawyer's office had been closed and they were behind on mailing out applications—preventing his initial DACA application from being filed by September 5, 2017 and depriving him of the opportunity to receive the status.

120.     Similarly, M.J. is an eighteen-year-old Mexican national who has lived in the United States for almost all of her life. M.J.'s U.S.-citizen stepfather had been in the process of petitioning for her to receive permanent resident status. However, her stepfather became abusive and recently abandoned the family petition, leaving M.J. without status.

121.    M.J. met with non-profit attorneys who advised her to apply for DACA. The attorneys started work on the case, but Hurricane Harvey prevented them from completing the application because their homes and offices were flooded and closed.

122.    On the day Harvey landed, the attorneys tried to work with M.J. to get documents together and file for DACA prior to the expected announcement of the program's termination, but Houston was largely under water and the schools were closed, preventing M.J. from getting the requisite documents, the attorneys from getting into the office, and the postal service from sending any mail. There was no viable way for M.J. to file her DACA before September 5th.

123.    The DACA Termination, in most states, including New York, will prevent individuals from obtaining driver's licenses or state identification cards. For example, Ms. Fernandez relies on her driver's license to bring her children to school every day and the doctor when needed. Many DACA recipients rely on a driver's licenses or state identification cards as a form of photo identification for banking, insurance, notarizations, and other everyday services.

124.    Moreover, the DACA Termination places these individuals at risk of immediate apprehension and deportation. Under Defendant Trump, DHS has significantly increased its targeting of DACA recipients whose statuses have lapsed for deportation.

125.    The Trump Administration's new enforcement priorities, which are so all encompassing that they cannot in earnest be called "priorities," target individuals who would qualify for DACA. Trump has directed DHS to prioritize for removal anyone present in the United States without admission or parole, including those eligible for DACA.

126.    In fact, at the same time the DACA Termination was announced, the government issued "talking points" stating, *inter alia*, that: "The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorization to prepare for and

arrange their departure from the United States . . . ." Similarly, a DHS "Frequently Asked Questions" document issued the same day refers to the time period prior to March 5, 2018 as a "grace period for DACA recipients" whose grants of deferred action will soon expire "to make appropriate plans to leave the country."

127.    DHS can easily deport the Plaintiffs because the Department already has their personal information. Plaintiffs and other DACA recipients provided extensive personal information to DHS in reliance on the agency's repeated promises to use the information only to grant them protection from deportation, and not to use that information for immigration-enforcement purposes except in narrow, delineated circumstances.

128.    Notwithstanding those prior assurances, DHS has changed its policy regarding the permissible uses of the information provided by DACA applicants to remove the limitations on using that information for immigration-enforcement purposes.  This policy change constitutes final agency action.

129.    If they are deported from the United States, Plaintiffs and others similarly situated face grievous harm. The Individual Plaintiffs, as well as the members and clients of MRNY, will be forced to leave the only country that many of them have known as home; they have grown up in American neighborhoods, attended American schools, and have structured their lives around living in the United States.

130.    The termination of DACA is already having profound impacts on the lives of DACA recipients. DACA recipients, including Individual Plaintiffs, fear deportation. Some have started to make provisions for what happens if they were deported, such as having difficult conversations with their parents and children about emergency plans.

131.    Faced with the loss of their work authorization, many DACA recipients have taken on additional jobs while they still have work authorization.

## CLASS ACTION ALLEGATIONS

132.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs seek to represent a certified Plaintiff class consisting of (1) all persons with DACA as of September 5, 2017; and (2) all persons who are or will be eligible for DACA under the terms of the 2012 Guidance.

133.    Plaintiffs seek to represent the above-described class for all claims except that under the Regulatory Flexibility Act.

134.    This action meets all the Rule 23(a) prerequisites for maintaining a class action.

135.    The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1). Defendants' decision to terminate the DACA program without providing adequate reasons and based on legal error, without going through the proper notice-and-comment procedure, without providing corrected notices to individual recipients subject to the October 5, 2017 renewal deadline, and based on animus toward individuals of Latino and Mexican origin, harms millions of individuals residing throughout the United States. In addition, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights and rights under the APA.

136.    This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

        a.      whether the DACA Termination constituted a substantive rule, such that notice-and-comment rulemaking was required under 5 U.S.C. § 706(2)(D);

28

b.      whether Defendants' termination of DACA and change in the policy regarding the permissible uses of the sensitive information DACA applicants provided was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A);

c.      whether Defendants failed to provide corrected notices to individuals whom Defendants had previously written advising them to renew "as soon as possible" but without mention of the October 5, 2017 deadline, in violation of procedural due process; and

d.      whether the termination of DACA was substantially motivated by animus toward individuals of Latino and Mexican origin, and whether it had a disparate impact on such individuals in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

137.    The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3). Like the other members of the class, the Defendants' termination of the DACA program and change to the confidentiality policy without providing adequate reasons, in violation of 5 U.S.C. § 706(2)(A); failure to go through the proper notice-and-comment procedure, in violation of 5 U.S.C. § 706(2)(D); having its decision substantially motivated by animus, in violation of the equal protection guarantee of the Fifth Amendment; and failure to provide adequate notice to individuals who must renew by October 5, 2017, in violation of the Due Process Clause of the Fifth Amendment, harms the Named Plaintiffs.

138.    The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4).

139.    The Named Plaintiffs' interests do not conflict with other members of the class. Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subjected to agency rules that are promulgated without adequate basis, without undergoing the required notice-and-comment procedure, and that are implemented without fair notice and based on animus towards individuals of Latino and Mexican origin.

140.    The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class would rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

141.    With respect to Rule 23(a)(4) adequacy, undersigned counsel are qualified, experienced, and able to conduct the litigation. The attorneys have the necessary knowledge, experience, and resources to litigate this matter. In addition, attorneys have expended the time and effort necessary to identify the class.

142.    Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

143.    This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' unlawful termination of the DACA program and changes to the confidentiality policy pose a real and immediate threat generally applicable to each member of the class, thus making final declaratory and injunctive relief with respect to the class as a whole appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action Without Observance of
Procedure Required By Law
By all Plaintiffs against Defendants Duke and Sessions**

144.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.   The APA requires that agency action that is substantive in nature follow notice-and-comment procedures. 5 U.S.C. § 706(2)(D).

146.   The DACA Termination constitutes a substantive rule, as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria.

147.   It is undisputed that Defendants failed to follow notice-and-comment rulemaking procedures prior to issuing the DACA Termination.

148.   Defendants' termination of DACA violated the APA.

### SECOND CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action that is Arbitrary and Capricious, An Abuse
of Discretion, and Otherwise Not In Accordance with Law
By all Plaintiffs against Defendants Duke and Sessions**

149.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

150.   The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.   Defendants' DACA Termination and its change to the confidentiality of DACA applicant information constitute final agency action, and are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law because they (a) lack a rational

explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors.

152.    Defendants justified the DACA Termination on the grounds of litigation risk and the legal conclusion that the program is unlawful. These grounds are inadequate to justify termination, are legally erroneous, and fail to address the government's previous conclusion that the DACA program was lawful. These justifications are also contradicted by Defendant Trump's own subsequent statement that he would "revisit" the termination if necessary.

153.    Defendants provided no justification for many of the details of the DACA Termination, including the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file renewal applications; the March 5, 2018 cut-off for renewal eligibility; and changes to the confidentiality of applicant information.

154.    Defendants' termination of DACA and changes to the confidentiality of DACA-applicant information violated the APA.

**THIRD CLAIM FOR RELIEF**
**Regulatory Flexibility Act**
**By Plaintiff MRNY against Defendants Duke and Sessions**

155.    Plaintiff repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    DHS failed to conduct any regulatory flexibility analysis to determine how the DACA Termination will affect small entities, such as MRNY, in violation of the Regulatory Flexibility Act. 5 U.S.C. §§ 601 *et seq.*

157.    MRNY, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the DACA Termination, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

158.    It is undisputed that Defendants failed to conduct a regulatory flexibility analysis.

159.    Defendants' termination of DACA violated the RFA.

**FOURTH CLAIM FOR RELIEF**
**Fifth Amendment (Procedural Due Process)**
**By all Plaintiffs against Defendants Duke and Sessions**

160.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    The hallmark of due process is notice and a meaningful opportunity to be heard.

162.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

163.    Defendants have not provided DACA recipients with the process to which they are entitled.

164.    Defendants, in individualized written notices, have advised many DACA recipients whose status expires by March 5, 2018 to apply to renew "as soon as possible" and, to ensure no lapse in status, to renew between 120 to 150 days before expiration.

165.    Defendants have not sent corrected notices to these DACA recipients advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status. Nor do Defendants intend to issue such corrected notices, on information and belief.

166.    Defendants' failure to issue corrected notices advising of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

## FIFTH CLAIM FOR RELIEF
### Fifth Amendment (Equal Protection)
### By all Plaintiffs against All Defendants

167.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

168.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

169.    The DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups.

170.    Defendants Sessions, Duke, and Trump have violated the equal protection guarantee of the Fifth Amendment because the DACA Termination was substantially motivated by animus toward Latinos and, in particular, Mexicans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

171.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are void and without legal force or effect;

(a) Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702–706;

(b) Declare that the DACA Termination and actions taken by Defendants to terminate DACA are in violation of the equal protection and due process guarantees of the Fifth Amendment of the U.S. Constitution and contrary to the law of the United States;

(c)  Vacate and set aside the DACA Termination and any other action taken by Defendants to terminate DACA, including the change to the confidentiality of DACA-applicant information;

(d)  Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from implementing or enforcing the DACA Termination and the change in confidentiality of DACA-applicant information, and from taking any other action to terminate DACA that is not in compliance with applicable law or the U.S. Constitution; and

(e)  Grant such other relief as this Court deems just and proper.

Dated: September 19, 2017

Respectfully submitted,

/s/ Michael J. Wishnie

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearance forthcoming
[†] Motion for *pro hac vice* admission pending

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2017, a true and correct copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Michael Wishnie
Michael Wishnie, Supervising Attorney (MW 1952)
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06511
Tel: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org