```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    -------------------------------x
 3                                 :
    MARTIN JONATHAN BATALLA VIDAL,  :     16-CV-4756 (NGG)(JO)
 4                                 :
                 Plaintiff,         :     United States Courthouse
 5                                 :     Brooklyn, New York
                 -against-          :
 6                                 :     October 11, 2017
    KATHY A. BARAN, ET AL.,         :     2:00 p.m.
 7                                 :
                 Defendants.        :
 8  -------------------------------x
 9                                 :
    STATE OF NEW YORK, ET AL.,      :     17-CV-5228 (NGG)(JO)
10                                 :
                 Plaintiffs,        :
11                                 :
                 -against-          :
12                                 :
    DONALD J. TRUMP, ET AL.,        :
13                                 :
                 Defendants.        :
14  -------------------------------x
15        TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
16          BEFORE THE HONORABLE JAMES ORENSTEIN
            UNITED STATES MAGISTRATE DISTRICT JUDGE
17
18  APPEARANCES
19  For Badalla Vidal:     NATIONAL IMMIGRATION LAW CENTER
                           1121 14th Street - Suite 200
20                         Washington, D.C. 20005
21                    BY:  JOSHUA ROSENTHAL, ESQ.
                           MARISOL ORIHUELA, ESQ.
22
23                         JEROME N. FRANK LEGAL SVCS. ORG.
                           P.O. BOX 209090
24                         New Haven, Connecticut 06520
25                    BY:  VICTORIA ROECK, Law Student/Intern
```

```
 1    APPEARANCES (continued)

 2

 3    For States:              STATE OF NEW YORK
                               OFFICE OF THE ATTORNEY GENERAL
 4                                 120 Broadway
                                   New York, New York 10271
 5
                               BY:  SANIA KHAN, ESQ.
 6                                  DIANE LUCAS, ESQ.

 7
      For Defendants:          U.S. DEPARTMENT OF JUSTICE
 8                             CIVIL DIVISION-FEDERAL PROGRAMS BRANCH
                                   950 Pennsylvania Avenue, N.W.
 9                                 Washington, D.C. 20530

10                             BY:  STEPHEN PEZZI, ESQ.

11

12    Telephonic appearance:  MARSHA CHIEN

13                             JUSTIN COX

14                             SUSANNA EVARTS

15                             JESSICA HANSON

16                             MAYRA JOACHIN

17                             GENEVIEVE NADEAU

18                             ABIGAIL TAYLOR

19                             KAREN TUMLIN

20                             MICHAEL WISHNIE

21

22    Court Reporter:          LINDA A. MARINO, RPR
                               225 Cadman Plaza East
23                             Brooklyn, NY 10021
                               (718) 613-2484
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

Proceedings

1          THE COURT:  Good afternoon, everybody.  Have a seat,

2     please.

3          THE COURTROOM DEPUTY:  Civil cause for a status

4     conference, Batalla Vidal v. Baron, et al., Docket No.

5     16-CV-4756; and State of New York, et al., v. Donald Trump, et

6     al., Docket No. 17-CV-5228.

7          Will the parties please state your appearances for

8     the record?

9          THE COURT:  There are so many.  We'll dispense with

10    going through the list.  We have a sign-in, which I'll include

11    with the minute order.  But please, each time you speak, just

12    identify yourself for the record.

13         Good to see you all.  Thank you for your status

14    report and the supplemental letters.  So I've got a few things

15    on the agenda and I'll hear from you about the discovery

16    disputes.  Before we get to that, two housekeeping matters I

17    wanted to raise with you.

18         First, just as a scheduling matter, we have one of

19    our biweekly conferences scheduled for November 29, which it

20    turns out -- I'm doing my best to accommodate my schedule to

21    yours because there are a lot of moving pieces here.

22    November 29 may be difficult for me.

23         Does anybody have any reason to think that moving

24    that either to November 30 or December 1 would present a

25    problem?

Proceedings

1          November 30, do you think that's a problem?

2          MR. PEZZI:  That's the Thursday and Friday after?

3          THE COURT:  Yes.

4          MR. PEZZI:  Not from the Government's perspective.

5          THE COURT:  From the Plaintiffs, anybody think that

6     will present a problem?

7          MR. ROSENTHAL:  We're not aware of any issues with

8     that.

9          THE COURT:  I won't set it in stone, but let's plan

10    on the following day, November 30.  Just caucus among

11    yourselves and your colleagues and let me know by tomorrow if

12    that's going to be a problem.  I'd greatly appreciate moving

13    that.

14          Second thing, and this is, again, something I want

15    you to consider, not necessarily react immediately.  The

16    States plaintiffs filing of the amended complaint last week

17    prompted me to consider something I hadn't really given any

18    thought to.

19          One of the declarations, Exhibit 170, was by the

20    general counsel of Univision, Jonathan Schwartz, who -- and it

21    occurs to me I should have considered this earlier -- who,

22    like Ms. Rohde, the U.S. Attorney, is an old colleague and an

23    old friend of mine.  We've socialized together in the past,

24    I'm sure we will in the future.  I've canceled some upcoming

25    plans with Mr. Schwartz.

Proceedings

1     Nothing about the relationship on either side

2 prompts me to think that I need to recuse, but I thought it

3 was worth a disclosure, especially since Mr. Schwartz wouldn't

4 be public record the way that my former association with

5 Ms. Rohde would be.

6     Again, I may have missed something in thinking about

7 it, but I want to make sure I apprised all of you.  If any of

8 you think that that's basis for, on either side, a motion to

9 recuse, please make that within a week or I'll consider it

10 behind us and waived.

11     Those are the two housekeeping things.

12     You've raised in your status report and the

13 follow-on letter two specific disputes regarding depositions.

14 Let me ask you first to take up Mr. Neufeld, the Associate

15 Director of Service Center Operations at USCIS.

16     As I understand, Mr. Pezzi the objection is just

17 based on, basically, the status of Judge Garaufis' order and

18 your objection to any nonrecord discovery.

19     MR. PEZZI:  That's right, your Honor.

20     THE COURT:  Okay.

21     MR. PEZZI:  The Hamilton deposition we have more

22 specific issues with.

23     THE COURT:  We'll get to that, but I just wanted to

24 get this behind us.

25     MR. PEZZI:  You're correct.

Proceedings

1      THE COURT:  You've given me your positions on that.

2   I'm happy to hear, frankly, briefly further argument, but I

3   don't want to keep you from saying something you haven't

4   already told me.

5      Mr. Pezzi?

6      MR. PEZZI:  I don't have anything particular to add

7   to that.

8      THE COURT:  Plaintiffs?

9      MR. ROSENTHAL:  We don't have much in particular.

10  It's our position that the order before -- the matter before

11  Judge Garaufis is limited to Section 2C of your Honor's order.

12      THE COURT:  All right.  I do agree, I think that

13  Judge Garaufis' ruling didn't have any other effect on my

14  discovery order.  And you know, the Government continually and

15  somewhat insistently refers to this as an APA case.  There is

16  certainly that in the case, but there are other claims and

17  those claims are not necessarily limited to the administrative

18  record.

19      So, I don't think there's a basis for holding off on

20  Mr. Neufeld's deposition.  So, that objection is overruled.

21      Let's go on to Mr. Hamilton.  He's a senior

22  counselor in the Office of the Secretary.  Again, I have read

23  your respective positions, but I'll give both sides an

24  opportunity to be herd.

25      Mr. Pezzi?

Proceedings

1          MR. PEZZI:  Your Honor, our position, like you said,

2     is laid forth in the status report we filed.  That's our

3     objection and that's our position.  Unless you have any

4     particular questions about it --

5          THE COURT:  I do.

6          You saw the plaintiffs' response citing some case

7     law.  I've done my own research, and in particular -- you can

8     have a seat.  I don't want anybody to get uncomfortable.

9          In particular, in the Southern District of New York,

10    the SEC against the House Weighs and Means Committee from

11    2015, which sort of summarizes the application of the apex

12    doctrine, and, really, there's no one comparable to

13    Mr. Hamilton in that survey of cases that have been deemed

14    sufficiently high-ranking government officials to apply the

15    apex doctrine.  The apex doctrine takes it's name for a

16    particular reason:  It refers to people at the apex.

17          Do you have any authority, besides the ones you've

18    cited, that would suggest somebody at Mr. Hamilton's level of

19    responsibility is subject to that doctrine?

20          MR. PEZZI:  Your Honor, I mean, the only thing I

21    have to say to that is that there certainly is not an

22    overwhelming amount of case law on this issue --

23          THE COURT:  No, no, whether it's overwhelming or

24    not, is there any case that supports your position?

25          MR. PEZZI:  I do think the Letterman case in the

Proceedings

1    Second Circuit in 2013, which adopts the standard that had

2    been adopted in several other circuits, does set out

3    requirements of exceptional circumstances that have to be

4    shown --

5              THE COURT:  Letterman applied to the Mayor or Deputy

6    Mayor of New York City.

7              MR. PEZZI:  That's right, your Honor.

8              THE COURT:  And I've read Letterman.  Nothing in it

9    suggests that the doctrine applies to somebody like

10   Mr. Hamilton.

11             What am I missing here?

12             MR. PEZZI:  Your Honor, I have nothing to add upon

13   that point, other than --

14             THE COURT:  But you have a case, Mr. Pezzi, that

15   actually does support the position?

16             MR. PEZZI:  On the precise point of someone at

17   Mr. Hamilton's specific level, I don't have a specific case

18   that addresses someone in that particular responsibility

19   within the chain of command.

20             The only thing I would add to that is that

21   Mr. Hamilton does not fit neatly on the DHS work chart,

22   frankly, which makes this a more awkward fit, but he is a very

23   senior member of the Secretary of Homeland Security's

24   immediate staff and in many ways functions akin to a chief of

25   staff to the Secretary of Homeland Security --

Proceedings

1          THE COURT:  But he's not chief of staff and there is

2    one; right, Chad Wolf?

3          MR. PEZZI:  Your Honor, that may be right --

4          THE COURT:  It is according to the Department of

5    Homeland Security's website.

6          MR. PEZZI:  I don't doubt that, your Honor.

7          THE COURT:  So, he's not the chief of staff.

8          MR. PEZZI:  His title is senior counsel.

9          THE COURT:  Right.  Let me ask you the question this

10   way, perhaps:  Is he considered a leader, Mr. Hamilton, a

11   leader of the Department of Homeland Security?

12         MR. PEZZI:  I'm not sure I'd describe him as a

13   leader.  I do think he's a member of the senior leadership

14   staff.

15         THE COURT:  But he's a staff member.  Look, I was,

16   myself, Associate Deputy Attorney General, nice big title.

17   But it's a staff position.

18         MR. PEZZI:  I don't disagree.

19         THE COURT:  The apex doctrine doesn't protect staff

20   members.  Is there some case law that suggests otherwise?

21         MR. PEZZI:  I'm not sure I would agree that the apex

22   doctrine doesn't protect staff members.  I believe one of the

23   cases is, for example, is about the Vice President's Chief of

24   Staff --

25         THE COURT:  Yes, in exceptional circumstances the

Proceedings

1   chief of staff.  That's not Mr. Hamilton either, but --

2           MR. PEZZI:  If your Honor is asking me whether we

3   have some other cases that do not appear in the papers that

4   apply more directly, the answer is no.

5           THE COURT:  And you don't consider him leader of the

6   department.

7           MR. PEZZI:  I'm not sure I'd characterize him as a

8   leader of the department.  I'm not exactly sure what you mean

9   by "leader."

10          THE COURT:  I'll adopt the Department's definition.

11          MR. PEZZI:  Again, your Honor --

12          THE COURT:  No, you can tell me.  I will adopt your

13  position.

14          Do you believe that he's a leader?

15          MR. PEZZI:  I'm not sure I could tell you whether or

16  not I believe he's a leader.

17          THE COURT:  Do you want to check your client's

18  website.

19          MR. PEZZI:  Your Honor, I do not doubt if you're

20  telling me that the website says that he's not a leader --

21          THE COURT:  The website lists 57 people by name who

22  are considered leadership.  It's on a page called leadership.

23  It has 57 people by name and two positions that are vacant.

24  Mr. Hamilton, I'm sure it will not surprise you to hear, is

25  not on it.

Proceedings

 1          MR. PEZZI:  That may be right, your Honor --

 2          THE COURT:  It may be?  I will take the time for you

 3   to pause, go to a computer, and look it up.

 4          MR. PEZZI:  I'm sure that is right, your Honor.

 5          THE COURT:  Now, the one case in your status report

 6   that suggested otherwise, at least by the parenthetical

 7   description of it, was the citation to In Re:  SEC ex rel

 8   Glotzer, which was about counsel.

 9          MR. PEZZI:  That's right.

10          THE COURT:  Which I also read that, which had

11   nothing to do with the apex doctrine.  It was decided on the

12   basis of the failure to follow certain required administrative

13   procedures before seeking depositions.

14          Do you want to explain how that came to be in your

15   list of cases that you thought were on point about whether the

16   apex doctrine applies?

17          MR. PEZZI:  Your Honor, I don't have the precise

18   parenthetical in front of me.  My understanding is that one of

19   the important components of --

20          THE COURT:  You have it there, right?  You can pause

21   to look it up.  I don't want to catch you unawares or put you

22   at a disadvantage.

23          MR. PEZZI:  Yes.

24          THE COURT:  And there are lots of ways a written

25   mandamus may issue to achieve particular results, but it has

Proceedings

1   nothing, as I'm sure you know because you must have read it

2   before you put it in your document, it has nothing to do with

3   the issue now before me, right?

4          MR. PEZZI:  I'm not sure I would say it has nothing

5   to do with the issue now before you.  And the reason I say

6   that an important part of the apex doctrine, as I understand

7   it, is that there is a sort of exhaustion-like requirement

8   built in that plaintiffs first seek the sort of evidence and

9   testimony they're looking for from less senior officials, and

10  my assumption is that that is the basis for that citation.

11         THE COURT:  You don't know?

12         MR. PEZZI:  Your Honor, for these reasons mandamus

13  is often granted to present senior officials from the burden

14  of providing testimony and --

15         THE COURT:  If that's the reasoning to put it there,

16  it's at a level of subtlety that greatly exceeds my abilities

17  to discern.  So, I won't attribute an intent to mislead to you

18  there, but I will tell you that it is such a subtle path of

19  reasoning to justify its position in the status report that

20  it's entirely lost on me.  And I'll ask you to consider that

21  in future submissions.

22         MR. PEZZI:  Understood.

23         THE COURT:  Thank you.

24         Anything else on Mr. Hamilton?

25         MR. ROSENTHAL:  If I could, your Honor.

Proceedings

 1          THE COURT:  Yes.

 2          MR. ROSENTHAL:  As plaintiffs noted in our

 3  submission with regard to Mr. Hamilton, we believe that there

 4  may be certain privilege-based objections raised during the

 5  deposition.  And in the interest of using Mr. Hamilton's time

 6  efficiently, we think that it may be helpful if the Court were

 7  able to make itself available on the 20th during the

 8  deposition and would be curious to know the Court' preferred

 9  practices on these kind of issues.

10          THE COURT:  Okay.  First, let me take a look at the

11  20th.

12          I have some conferences in court, but through the

13  day, at least until just before 4 o'clock, I'll be at your

14  disposal.  What I'll ask you to do is confer in advance, try

15  to figure out the area --

16          I suppose before we get to that, you seem to have

17  inferred correctly from my colloquy with Mr. Pezzi that the

18  objection to Mr. Neufeld's deposition is overruled.  So, let

19  me just make that clear.

20          In terms of the deposition schedule, look, I get it

21  that there are any number of privileges used that may quite

22  legitimately arise.  So, try to identify them as best you can

23  in advance and either agree to put them off to have them

24  resolved later; if possible, key them up to a resolution in

25  advance.  That may be more difficult because you can't really

Proceedings

1    anticipate the flow of the questions.

2            During the deposition, if you find yourself with a

3    dispute, do your best to sort of collect them all for a

4    convenient break -- the lunch hour or the end of the day --

5    leaving time for me to resolve them and get back to your

6    deposition before 4 o'clock so that we don't have a lot of

7    calls that interrupt the flow of your deposition and that,

8    frankly, interrupt my day more than necessary.

9            So, just do your best to manage the time

10   efficiently.  But, yes, just call chambers and let them know

11   you've got an issue and take it from there.

12           MS. LUCAS:  Your Honor, the plaintiff States have

13   one thing to add.

14           THE COURT:  I'm sorry, Ms.?

15           MS. LUCAS:  Diane Lucas.

16           We join on in the Batalla Vidal plaintiff arguments

17   related to the apex doctrine and that it does not apply to the

18   deposition of Gene Hamilton.

19           We also wanted to note that this is equally

20   applicable to depositions that we would note in the future,

21   and we request that these arguments be applied to depositions

22   we noticed in the future.

23           We also wanted to inform the Court that we are

24   planning on taking part in the deposition for a limited

25   period, for about 20 minutes.

Proceedings

1          THE COURT:  On the last one, I completely expect --

2    and if that's not been clear, I want to make it clear.

3          You know, it's one thing to say Mr. Hamilton doesn't

4    qualify for the apex doctrine.  That's quite a different thing

5    to say that he should get deposed separately in the two cases.

6    You folks need to coordinate so that people avoid duplicate

7    depositions whether they're high-, middle-, low-ranking

8    officials or anyone else.

9          In terms of applying arguments to future issues,

10   each one will arise on its own merits, so I'm not prejudging.

11   But I understand this is something that will come up again.

12         All right.  I think your status report mentioned

13   some other issues that you might have to raise for today.

14         MR. ROSENTHAL:  Excuse me, your Honor, before we

15   leave the matter of depositions, I also wanted to check your

16   availability on the 18th for the deposition of Mr. Neufeld, to

17   the extent that similar issues arise then.

18         THE COURT:  I'll do my best but, again, you guys

19   have to do your best to sort of collect things up and then try

20   to make an appointment with folks in my chambers to get with

21   me if I'm not available at that time and move on to other

22   topics so that you're not just sitting around waiting for me

23   if I'm not available.  That's a day that on I'm on arraignment

24   duty here at the court, which is unpredictable and may take up

25   a lot of my time or very little.

LAM        OCR        RPR

16

Proceedings

1      We're all sort of still at the early stages of the

2 litigation.  I've had little to no experience with the cast of

3 characters here so I don't know you, you don't know me.  But I

4 hope as we go through the litigation, my approach to issues

5 will become predictable because that will help you avoid the

6 disputes that will cause you to interrupt your depositions for

7 a phone call.  If you can make a pretty good guess of how it's

8 going to turn out, you can resolve it on your own.  I'm not

9 going to discourage you from calling me as needed, but I am

10 going to encourage you to try to figure out if it's a good use

11 of your time.

12      Am I right that your status report mentions some

13 other disputes that were brewing in discovery?

14      MS. ROECK:  Yes, your Honor.  This is Victoria

15 Roeck, law student/intern with Jerome N. Frank Legal Services

16 Organization.

17      THE COURT:  Yes, ma'am.

18      MS. ROECK:  We would like to address deficiencies in

19 the administrative record and respectfully request through an

20 oral motion that the Court order defendants to complete it.

21      We received the administrative record on Friday, as

22 did the Court.  In its current state, it is not complete.

23 Defendants have assembled the administrative record according

24 to an erroneously narrow standard, which they stated in a

25 filing with the Court yesterday, which is they claim the

LAM        OCR        RPR

Proceedings

1    administrative record encompasses all nonprivileged documents

2    that the agency decision maker actually considered.

3            But we respectfully request the Court to order

4    defendants to compile the administrative record, such as in

5    accordance with the correct standard, which is all documents

6    before the agency decision makers at the time of the decision.

7            THE COURT:  Okay.  I understand the request.

8            Mr. Pezzi?

9            MR. PEZZI:  Your Honor, I'd say a few things.

10           First of all, with the exception of privilege issue,

11   which it does sound like we have a disagreement --

12           THE COURT:  Yes.

13           MR. PEZZI:  I'm not sure that the standard that was

14   just announced by counsel for plaintiffs is different in any

15   meaningful sense from the standard that we applied, but it's

16   possible that I misheard it.

17           THE COURT:  Just in terms of the right formulation,

18   is Ms. Roeck correct in your view?

19           MR. PEZZI:  Our position --

20           THE COURT:  No, no, not your position, just is she

21   right?  Did she accurately quote the applicable standard?

22           MR. PEZZI:  I believe the applicable standard are

23   the documents that were actually considered by the relevant

24   agency decision maker.

25           THE COURT:  All right.  I'm not going to resolve

Proceedings

1   this by shooting from the hip.  I don't know off the top of my

2   head what the applicable standard is.  My strong suspicion is

3   it's not hard to determine.

4          And there is absolutely daylight between the

5   standard you've identified and the that one Ms. Roeck has.

6   So, you guys all know what the right standard is, I will, and

7   somebody is going to be wrong.  That's exactly the sort of

8   dispute you shouldn't need me to resolve.  So, talk to each

9   other, but I'm not going to resolve today because I'm just not

10  equipped to do so.  Tee it up in letters quickly because

11  that's obviously a hugely important matter to get behind us

12  quickly.

13         MS. ROECK:  Your Honor, we're prepared to submit

14  briefing on this issue by Friday.  We'd like a shortened

15  schedule so it can be addressed.

16         THE COURT:  Okay.  Friday and Monday, please.

17         MS. ROECK:  Thank you.

18         MS. LUCAS:  And your Honor --

19         THE COURT:  Just give me a moment to make a

20  notation.

21         I'm sorry, who was speaking?

22         MS. LUCAS:  Diane Lucas, on behalf of plaintiff

23  States.

24         I wanted to note that the plaintiff States join on

25  that oral motion from the Batalla Vidal plaintiffs.  And we

Proceedings

1   also want to highlight a Southern District of New York case

2   that defines complete administrative record as including all

3   materials that the agency directly or indirectly considered in

4   rendering its decision.  This is Comprehensive Community

5   Development Corp. v. Sebelius, 890 F. Supp 2d 305.

6              THE COURT:  For future reference, I'm not going to

7   remember it –– this is exactly why I want a letter –– and I

8   haven't read it.

9              Folks, there is, I'm sure, a certain value that you

10  might perceive on either side in saying on the public record

11  something that won't help me get to a decision.  I'm going to

12  ask you to try to avoid that and let's use our time

13  profitably.

14             This is nothing I can decide.  I'll hear from you

15  both in your letters and I'll make a decision.

16             MS. LUCAS:  Understood.  Thank you.

17             MR. PEZZI:  Your Honor?

18             THE COURT:  Yes.

19             MR. PEZZI:  Can I ask whether there's any particular

20  page limitation you'd like to apply to these filings and

21  whether plaintiffs could file a joint filing rather than

22  responding to two letters on the same issue?

23             THE COURT:  Look, this is not a routine case.

24  Typically on a letter motion, I would limit everybody to three

25  pages, single–spaced.  I've had cases where I've had to go

Proceedings

1  beyond that and give very specific formating directives

2  because people why were trying to evade the spirit of it.  I

3  don't anticipate that's going to be a problem.

4         Use your judgment.  I'm not going to limit you.  In

5  terms of duplication of effort among the several plaintiffs,

6  you know, I assume that all the plaintiffs are essentially on

7  the same page unless they tell me otherwise.  They don't have

8  to file something that just doesn't need to.

9         I won't make it a requirement that the two sets of

10 plaintiffs file a single document because it may be that they

11 don't have quite agreement on how to present an issue.  I'll

12 encourage you folks to do a single document where you can;

13 where you can't, you don't it.

14        But you can respond to all the arguments that you

15 have to respond to.

16        MR. PEZZI:  Absolutely.

17        THE COURT:  I'm not going to impose artificial

18 limits unless the lack of more specific guidance starts to be

19 a problem.  I'm counting on that not happening.

20        Was there another issue?  No?

21        Folks, before I let you go, I know you have a lot on

22 your plate --

23        MS. LUCAS:  I'm sorry, your Honor, we do have one

24 other issue.

25        THE COURT:  Yes, go ahead.

Proceedings

1          MS. KHAN:  Good afternoon, your Honor.  My name is

2   Sania Khan, from the New York State Attorney General Office on

3   behalf of plaintiff States.

4          Plaintiff States were hoping that -- well, first, as

5   the Court's aware, plaintiff States did serve their discovery

6   request on September 29, 2017.  The joint status report was

7   then filed on October 6.  After the joint status report was

8   filed, defendants actually served us with objections.

9          So, in the interest of saving the Court time and

10   potential motion practice, we were hoping that we could

11   highlight a few of those objections today to try to resolve

12   them on the record if possible.

13          THE COURT:  I won't stop you.  If I don't feel I can

14   resolve it, I'll let you know that.  If I think I can give you

15   some guidance that may help you resolve it on your own, I'll

16   let you know that.

17          MS. KHAN:  Thank you, your Honor.

18          THE COURT:  Take a shot.

19          MS. KHAN:  Thank you.

20          So, for context, we had served a discovery request

21   with regard to notices that were served to DACA applicants and

22   grantees.  The government has responded with an objection

23   stating this is publicly-available information, specifically

24   with regard to the notices, and, therefore, they won't be

25   produced.

Proceedings

1      We just want a clarification at this point that if

2  defendants are stating that no notices were sent beyond the

3  standard renewal notices and if those notices weren't sent

4  after August 2017, which is relevant to our procedural and due

5  process claims and equitable estoppel claims, then that is an

6  answer and we just want a clarification as to that point.

7           THE COURT:  Do you want to respond?

8           MR. PEZZI:  Yes, your Honor.  I'd like to respond

9  most importantly by noting that we served these objections

10 some of them on Friday, some yesterday.  We're still owed

11 responses to some on Friday and some from Monday.  We haven't

12 heard from the plaintiffs about any problem with our objection

13 until hearing about it now.

14          THE COURT:  I will get to this before we close, but

15 to the extent you're complaining about being sandbagged, I

16 will have something to say about that as well with respect to

17 the apex issue that I've already resolved.

18          MR. PEZZI:  Understood, your Honor.  And I'm not

19 complaining, I'm just trying to be realistic about teeing up

20 these issues in a way that's efficient for your Honor.

21          Also, I think I have a hard time seeing how we can

22 have a productive conversation about specific objections --

23          THE COURT:  I did not ask for a speech, Mr. Pezzi, I

24 really just wanted response to the issue that was raised.  If

25 you're not prepared to give me one, you're not; but if you

Proceedings

1    are, let's hear it.

2              MR. PEZZI:  On that precise factual issue, I'm not

3    prepared to offer a particular response.  And I think once we

4    serve our responses and we can meet with plaintiffs we can tee

5    up any issues for your Honor that you can decide.

6              THE COURT:  Okay.  If the basis for the objection

7    was this is publicly-available, that's not going to fly.  You

8    have it, it's discovery.  Or, rather, if it's discoverable and

9    in your possession, the fact that they might be able to get it

10   from somebody else isn't a reason not to produce it okay.

11             MR. PEZZI:  Yes, sir.

12             THE COURT:  I'm sure as you confer on this, you'll

13   keep that in mine.

14             What was next?

15             MS. KHAN:  Thank you, your Honor.  Just one

16   clarification:  The objections to us were actually served on

17   Friday and the Batalla Vidal plaintiffs were served yesterday.

18             With regard to -- the second objection deals with

19   information regarding families or guardians of DACA applicants

20   and grantees.  It's the defendants' position that this not

21   relevant to this litigation.  It's plaintiff State's position

22   that this is wholly relevant to this litigation since the

23   termination of DACA does impact not only applicants and

24   grantees --

25             THE COURT:  Sorry, please, what is the "it" that is

Proceedings

1    relevant?

2           MS. KHAN:  The information regarding families or

3    guardians of DACA applicants and grantees.  So, this is in the

4    context of our requests with regard to the information that

5    the government has on these individuals.

6           THE COURT:  Look, I think that's one where I'm just

7    not going to be in a position today to tell you if it is or

8    isn't relevant.  Go ahead.

9           MS. KHAN:  I guess that's it's own thing, but the

10   issue on the record that we were hoping to get was just

11   confirmation that that information, the information of the

12   families and the guardians, is kept with the information of

13   the DACA applicants and grantees, if that information is in

14   one place.

15          THE COURT:  Do you know that, Mr. Pezzi?

16          MR. PEZZI:  Again, that's something that I would

17   need to confer with my client and, again it's something our

18   response --

19          THE COURT:  Look, it's going to be really important,

20   and I'll come back to this to explain in a coherent way my

21   concern here, but it's going to be really important on all

22   sides that you come prepared.  If you know you've got a

23   disagreement about an issue, you at least need to know

24   factually what's at stake here.

25          In fairness, a discovery request that your opponent

Proceedings

1    has made, on either side; a discovery request that your

2    opponent has made and you have not responded to it yet, I will

3    expect you to come to court knowing at a minimum what there is

4    that is responsive to the request and not to say I need to

5    confer with my client further about that.

6              Understood, everybody?

7              (A chorus of yes, your Honors.)

8              THE COURT:  Okay.  And now that you're on notice I

9    will enforce it.

10             MS. LUCAS:  Your Honor, two other things we wanted

11   bring up on that point related to the defendants' objections.

12             They also objected to two requests for admissions

13   related to the use of information from DACA applications and

14   that they would not be used for immigration enforcement

15   purposes.

16             THE COURT:  That's one of the new claims in the

17   complaint, right?

18             MS. LUCAS:  Yes, it's related to our due process

19   claim as well as our equitable estoppel claim.

20             THE COURT:  Right.

21             MS. LUCAS:  Defendants objected, saying that this

22   was a mischaracterization of policy in addition to some other

23   objections.  However, this was a policy that was stated on the

24   record in the Northern District of California case, it has

25   been -- it's was on the defendants' website --

Proceedings

1          THE COURT:  Sorry, what's the asserted policy?

2          MS. LUCAS:  The policy is related to -- I can

3     actually read it to you.

4          THE COURT:  Okay.

5          MS. LUCAS:  This was our RFA, but it was taken from

6     the -- the language was taken from the USCIS website.

7          THE COURT:  Okay.

8          MS. LUCAS:  And our RFA was:  Since September 5,

9     2017, it has been and continues to be the policy of DHS that

10    information provided to United States Citizenship and

11    Immigration Services as part of a DACA application, including

12    information about the applicant's family members or guardians,

13    shall not be used by DHS or any entity within DHS, including

14    Immigrations and Customs Enforcement and/or Customs and Border

15    Protection, for the purposes of immigration enforcement unless

16    the DACA applicant or grantee meets the criteria for the

17    issuance of a notice to appear or a referral to ICE under the

18    criteria set forth in USCIS' notice to appear or the applicant

19    or grantee poses a risk to national security or public safety.

20          So, as I noted, this was taken from the website.  It

21    was also mostly stated in the Northern District of California

22    case.

23          THE COURT:  Question, if I may.  Is the RFA asking

24    the defendants to admit that that was, in fact, their policy

25    or is it asking them to admit that was what they said their

Proceedings

1    policy was at certain times and places.

2              MS. LUCAS:  That since September 5, that it has been

3    and continues to be their policy.

4              THE COURT:  That's the request for admission.

5              MS. LUCAS:  Yes.

6              THE COURT:  And what's the concern with their

7    response?

8              MS. LUCAS:  They just say it's a mischaracterization

9    without more.

10             And this is problematic, particularly because, as I

11   stated, this was a policy they stated on the record in the

12   California -- Northern District of California case --

13             THE COURT:  And Mr. Pezzi, I'm happy to hear from

14   you.  Do you have anything to say?

15             MR. PEZZI:  We have objected, but we'll respond to

16   the request for admission.  I think the reason for the

17   objection was that that was a summary rather than a precise

18   quotation to policy from the website.

19             THE COURT:  You can explain however you like, and I

20   understand that there is often nuance to these things, but I

21   think the beginning of the response has to be yes, we admitted

22   or no, we deny it.

23             MR. PEZZI:  That may very well be, your Honor --

24             THE COURT:  No, it very well will be because if it's

25   not, again, you'll have a ruling that says otherwise.

Proceedings

1    MR. PEZZI:  Absolutely.  We understand our

2    obligations to respond to the --

3    THE COURT:  And to respond in the manner required by

4    the Federal Rules of Civil Procedure.

5    MR. PEZZI:  Understood.

6    MS. LUCAS:  Just to be clear for the record, there's

7    also the second related RFA that just says during the pendency

8    of this litigation, that there will be no changes to the

9    policies stated in RFA number one.

10   THE COURT:  You're asking them to admit something

11   about what will happen in the future?

12   MS. LUCAS:  What will happen during the pendency of

13   this litigation.

14   THE COURT:  I have to take a look at it, but that

15   strikes me as being not quite what an RFA is for.  I will

16   start an RFA, basically ask the opposing party to confirm or

17   deny your description of the state of the world as it is or

18   was at some point in the past, not to commit to a course of

19   action.

20   MS. LUCAS:  The purpose of an RFA is to determine

21   what is their current stance as to what they plan to do during

22   the pendency of litigation, so what is their policy as to what

23   their --

24   THE COURT:  All right.  I have to take a look, but

25   it strikes plea as not exactly what an RFA is designed to do.

Proceedings

1   But if there's dispute, I'll hear.

2           Anything else?

3           MS. LUCAS:  Yes.

4           THE COURT:  I need to be able to rely on you when

5   you say one more thing.  You're at least two past your one

6   more thing.

7           MS. LUCAS:  Sorry, the RFAs were related.  That

8   constitutes one.

9           The second thing that we wanted to bring up with

10  respect to this is with respect to the defendants' objection

11  to our discovery request to the extent that they're related to

12  APA claims.  They said that they should only be based upon the

13  administrative record compiled by DHS.

14          First, we take issue with them limiting it to

15  documents compiled by the DHS, but, also, what we want to talk

16  about now is that our discovery requests are focused on other

17  claims as we talked about, the equitable estoppel claim and

18  due process claim, and are not limited.

19          THE COURT:  That's my understanding.

20          MS. LUCAS:  We wanted to make that clear so we could

21  actually resolve that issue.

22          THE COURT:  You understand that, right?

23          This isn't just an APA case, there are other claims

24  here that you're litigating that unless Judge Garaufis orders

25  otherwise are subject to discovery, correct?

Proceedings

1      MR. PEZZI:  Your Honor, we're absolutely currently

2  compliant with your Honor's discovery order --

3      THE COURT:  Mr. Pezzi, I'm going to really ask you

4  to consider pursuing a course where when I ask a question you

5  respond to the question I've asked.  I know I discussed this

6  with you last time.  It's going to become more and more

7  problematic if you continue to resist doing that.

8      So, let me phrase the question one more time and see

9  if I have better luck with it.  You understand that discovery

10  is proceeding now and will continue to proceed unless

11  otherwise ordered by Judge Garaufis on claims other than just

12  the APA claims; you understand that, correct?

13      MR. PEZZI:  Understood, your Honor.

14      THE COURT:  And that discovery is not limited to the

15  record on claims that are not raised in the APA, correct?

16      MR. PEZZI:  That's not our position.  We have

17  obviously lost on that position thus far --

18      THE COURT:  Correct.

19      MR. PEZZI:  -- so unless something changes, of

20  course discovery will proceed.

21      THE COURT:  Very good.

22      Anything else, Mr. Pezzi, on your side?

23      MR. PEZZI:  No, your Honor.

24      THE COURT:  Mr. Pezzi, I'm going to direct this to

25  your side of the case but not to you personally.  I have been

Proceedings

1    in the position myself as a litigator where I was what we used

2    to call the stunt lawyer.  Not saying that's what you are, but

3    the one that had to show up to be the face of the position

4    that wasn't doing well.  But I have to raise this concern, and

5    it's about the overall stance of the government and the

6    government clients to this litigation so far.

7              I've seen the government raise arguments on an

8    appeal of my decision to Judge Garaufis that weren't raised to

9    me.  Terribly inefficient.

10             The litigation over the application of the apex

11   doctrine appears to have been conducted in such a way as to

12   get your views before the Court in a way that didn't allow the

13   plaintiffs fair time to get their views in front of the Court

14   in what was supposed to be a joint submission.  I was able to

15   accommodate that by allowing a later submission, but there's

16   not how it's supposed to work.

17             We've already discussed my concerns about your

18   citation of the Glotzer case in a way that I thought was,

19   frankly, wholly inappropriate.

20             And we've had the continuing problem of responses

21   that charitably would be described as not directly addressing

22   the inquiry.  I'm hearing a lot of responses along the lines

23   of well, I have to go back and check with my client.  There's

24   lot of running out the clock going on here.

25             Now, you have some of your colleagues from the U.S.

Proceedings

1   Attorney's Office here, and I know I deal with them all the

2   time and I know I can rely on their good faith, through long

3   and happy experience with them.  I don't know you and your

4   colleagues from main Justice, but I'm beginning to have a

5   concern that the main Justice attorneys who are taking the

6   lead in this litigation are less concerned with maintaining

7   that very high standard.

8          Now, I say this not because I'm considering any

9   sanctions for what's gone on before, because I'm not, but it's

10  going -- a continuation of these practices is going to shape

11  my view of disputes as they arise in the future.  And, most

12  significantly -- and it's worth emphasizing -- one of the

13  criteria for expanding the scope of review beyond the

14  administrative record on the APA claims:  The strong

15  preliminary showing of bad faith and improper behavior, which

16  can include -- and I'm citing an Eastern District case from

17  2006, Tummino v. Von Eschenbach, 427 F. Supp 2d. 212.  That

18  shows that improper behavior can include a calculated

19  filibuster to avoid judicial review.

20         And there's no reason that the way the defendants

21  choose to litigate this case, including their insistence on

22  deadlines that serve to frustrate the orderly resolution of

23  the claims before the Court, can't be taken into account in

24  making that determination.

25         I say that because I don't attribute bad faith to

Proceedings

1   anyone at this point, but the record is building in a way that

2   may support that inference.  And I want you to be on notice of

3   that so that you can consider it and consider whether you want

4   to change the way you're approaching some of these disputes

5   that are arising so that I won't have cause to consider that

6   this is a judicial filibuster.

7          MR. PEZZI:  Your Honor, can I respond to that very

8   quickly?

9          THE COURT:  Yes, of course.

10          MR. PEZZI:  I just want to be a hundred percent

11   crystal clear about this:  I take extremely seriously

12   everything that you just said and I know my colleagues at

13   Department of Justice, in D.C., New York, and elsewhere, take

14   it extremely seriously as well.  Our obligation to present

15   arguments to the Court and factual statements in good faith is

16   absolutely critical to the credibility of the Department of

17   Justice and it's not something that I or any of my colleagues

18   would ever fool around with.

19          So, I understand the issue that your Honor has

20   raised.  Just be aware that we take them very seriously, as we

21   always do, our obligations to proceed in good faith in any

22   litigation matter, including a matter of this importance.

23          There are some specific issues with some of the

24   other points your Honor made that I won't get into on a

25   point-by-point basis, but I suspect that's not what you're

Proceedings

1    looking for right now, but I want make sure you understand we

2    take that very seriously.

3            THE COURT:  I'm delighted to hear it and I'm sure

4    those words will be reflected by future actions and I look

5    forward to that.

6            Anything else for today?  All right.  Thank you all.

7    Have a good day.

8

9            (Matter concluded.)

10

11                            *  *  *  *  *

12

13

14   I certify that the foregoing is a correct transcript from the

15   record of proceedings in the above-entitled matter.

16

17       /s/ Linda A. Marino                October 11, 2017

         _____        _____

18          LINDA A. MARINO                       DATE

19

20

21

22

23

24

25

LAM      OCR      RPR