**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*, | |
| Plaintiffs, | |
| v. | No. 16-cv-4756 (NGG) (JO) |
| ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | No. 17-cv-5228 (NGG) (JO) |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

    A.    Deferred Action Generally ............................................................... 4

    B.    DAPA and DACA ............................................................................. 6

    C.    The *Texas* Litigation ....................................................................... 7

    D.    Rescission of DACA ........................................................................ 9

    E.    These Actions ................................................................................. 10

LEGAL STANDARDS ................................................................................... 11

ARGUMENT .................................................................................................. 12

I.     THIS CASE IS NOT JUSTICIABLE ................................................... 12

    A.    The Rescission Policy Is Not Justiciable Because this Immigration
           Enforcement Policy Is a Matter Committed to Agency Discretion by Law ......... 12

    B.    The INA Deprives District Courts of Jurisdiction over Challenges to
           Denials of Deferred Action ................................................................... 17

    C.    The State Plaintiffs' And Advocacy Organizations' Claims Are Not
           Cognizable ........................................................................................ 19

          1.    The State Plaintiffs Lack Article III Standing .......................... 19

          2.    The States And Advocacy Organizations Lack a Cause of Action
                Under the APA ......................................................................... 20

    D.    The Government's Justiciability Objections Are Not Inconsistent with the
           Acting Secretary's Reliance on the Fifth Circuit's Decision ................................ 21

II.    PLAINTIFFS FAIL TO STATE A CLAIM ....................................................... 22

    A.    The Acting Secretary Rationally Explained Her Decision To Wind Down
           DACA, Particularly Given the Imminent Risk of A Nationwide Injunction ........ 22

    B.    The Rescission Policy Is Exempt from Notice and Comment ............................ 28

    C.    Plaintiffs Fail to State an Equal Protection Claim ................................. 31

    D.    Plaintiffs Fail to State a Procedural Due Process Claim ....................... 34

      E.        Plaintiffs Fail to State a Substantive Due Process Claim ...................................... 36

      F.        Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required ............................................................. 39

III.     NATIONWIDE INJUNCTIVE RELIEF IS IMPERMISSIBLE ..................................... 40

CONCLUSION ................................................................................................................................ 40

## TABLE OF AUTHORITIES

**CASES**

*Alfred L. Snapp & Son , Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................. 20

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
    436 F.3d 82 (2d Cir. 2006) ......................................................................... 11

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ................................................................................. 35

*Arizona v. United States,*
    567 U.S. 387 (2012) ......................................................................... 5, 14, 34

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ............................................................... *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................... 12, 40

*Bates v. Donley,*
    935 F. Supp. 2d 14 (D.D.C. 2013) .................................................................. 12

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ................................................................................. 35

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................... 11, 12

*Botezatu v. INS,*
    195 F.3d 311 (7th Cir. 1999) ................................................................. 18, 19

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
    419 U.S. 281 (1974) ........................................................................... 25, 26

*Camp v. Pitts,*
    411 U.S. 138 (1973) ................................................................................. 23

*Chaudhry v. Holder,*
    705 F.3d 289 (7th Cir. 2013) ........................................................................ 6

*Chavez v. Martinez,*
    538 U.S. 760 (2003) ................................................................................. 38

*Chevron U.S.A. Inc. v. Echazabal,*
    536 U.S. 73 (2002) ................................................................................. 25

iv

*Chrysler Corp. v. Braun*,
  441 U.S. 281 (1979)...............................................................................29

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971).........................................................................14, 23

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987)...............................................................................21

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987).............................................................30

*Consumer Energy Council v. FERC*,
  673 F.2d 425 (D.C. Cir. 1982).............................................................29

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998)...............................................................................38

*Cunney v. Bd. of Trs. of Grand View*,
  660 F.3d 612 (2d Cir. 2011)..................................................................38

*De Silva v. Smith*,
  773 F.2d 1021 (9th Cir. 1985)..............................................................36

*Elgharib v. Napolitano*,
  600 F.3d 597 (6th Cir. 2010).................................................................18

*Estate of Landers v. Leavitt*,
  545 F.3d 98 (2d Cir. Jan. 15, 2009)......................................................23

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009).........................................................................23, 24

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996)................................................................21

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..................................................................... *passim*

*ICC v. Bhd. of Locomotive Eng'rs, (BLE)*,
  482 U.S. 270 (1987)..................................................................13, 16, 17

*Johnson v. Newburgh Enlarged Sch. Dist.*,
  239 F.3d 246 (2d Cir. 2001)..................................................................38

*Ky. Dep't of Corrs. v. Thompson*,
  490 U.S. 454 (1989).........................................................................35, 36

*Lewis* v. Casey,
    518 U.S. 343 (1996).................................................................................... 40

*Lincoln v. Vigil*,
    508 U.S. 182 (1993).................................................................................... 13

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973).................................................................................... 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................ *passim*

*Lunney v. United States*,
    319 F.3d 550 (2d Cir. 2003)........................................................................ 13

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987)..................................................................... 15

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).................................................................................... 40

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923).................................................................................... 20

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ...................................................................... 21

*MLC Fishing, Inc. v. Velez*,
    667 F.3d 140 (2d Cir. 2011)........................................................................ 11

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).................................................................................... 40

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983)...................................................................................... 23

*N.W. Mining Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998).................................................................... 39

*Nat'l Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988)................................................................... 31

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)..................................................................... 29

*Natale v. Town of Ridgefield*,
    170 F.3d 258 (2d Cir. 1999)........................................................................ 39

*Omar v. McHugh*,
   646 F.3d 13 (D.C. Cir. 2011) ............................................................. 36

*Pac. Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) ....................................................... 29, 30

*Perales v. Casillas*,
   903 F.2d 1043 (5th Cir. 1990) .......................................................... 15

*Perry v. NYSARC, Inc.*,
   424 F. App'x 23 (2d Cir. 2011) ........................................................ 38

*Rajah v. Mukasey*,
   544 F.3d  (2d Cir. 2008) ................................................................... 33

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) .......................................................... 12

*Reno v. Am.-Arab Anti-Discrimination Comm., (AADC)*,
   525 U.S. 471 (1999) ............................................................... *passim*

*San Luis Obispo Mothers for Peace*,
   789 F.2d 26 (D.C. Cir. 1986) ............................................................ 24

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ............................................................ 30

*Syracuse Peace Council v. FCC*,
   867 F.2d 654 (D.C. Cir. 1989) .......................................................... 26

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ...................................................... *passim*

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ........................................................................ 35

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ..................................................................... 40

*Troy Corp. v. Browner*,
   120 F.3d 277 (D.C. Cir. 1997) .......................................................... 24

*U.S. Telecom Ass'n v. FCC*,
   400 F.3d 29 (D.C. Cir. 2005) ............................................................ 39

*United States v. Armstrong*,
   517 U.S. 456 (1996) ................................................... 14, 31, 32, 33

*United States v. Morgan*,
  304 U.S. 1 (1938) ............................................................................ 24

*United States v. Morgan*,
  313 U.S. 409 (1941) ......................................................................... 24

*United States v. Texas*,
  136 S. Ct. 2271 (2016), *reh'g denied*, 137 S. Ct. 285 (2016) ............ 8

*Vasquez v. Aviles*,
  639 F. App'x 898 (3d Cir. 2016) ...................................................... 18

*Velasco-Gutierrez v. Crossland*,
  732 F.2d 792 (10th Cir. 1984) ......................................................... 36

*Velez v. Levy*,
  401 F.3d 75 (2d Cir. 2005) ............................................................... 38

*Washington v. Davis*,
  426 U.S. 229 (1976) ......................................................................... 33

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ......................................................................... 38

**STATUTES**

5 U.S.C. § 553 ........................................................................... 3, 28, 29

5 U.S.C. § 601 ................................................................................... 39

5 U.S.C. § 604 ................................................................................... 39

5 U.S.C. § 611 ................................................................................... 39

5 U.S.C. § 701 ............................................................................... 13, 19

5 U.S.C. § 702 ................................................................................... 21

5 U.S.C. § 706 ................................................................................... 23

6 U.S.C. § 202 ................................................................................... 18

6 U.S.C. § 251 ................................................................................... 18

6 U.S.C. § 557 ................................................................................... 18

8 U.S.C. § 1103 ................................................................................... 5

8 U.S.C. § 1154 ................................................................................... 5

8 U.S.C. § 1158 ............................................................................................................... 5

8 U.S.C. § 1182 ............................................................................................................... 5

8 U.S.C. § 1227 ............................................................................................................... 5

8 U.S.C. § 1229b .............................................................................................................. 5

8 U.S.C. § 1252 ..................................................................................................... 2, 18, 19

**REGULATIONS**

8 C.F.R. § 247a.12 ....................................................................................................... 5, 6

**CONSTITUTION**

U.S. Const. amend. V ..................................................................................................... 35

**OTHER AUTHORITIES**

Attorney General's Manual on the Administrative Procedure Act 30 (1947) .............................. 29

DHS DACA FAQ,
   *available at* https://go.usa.gov/xngCd ................................................... 7, 36, 37, 39

Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border
   Protection, et al., from John F. Kelly, Secretary of Homeland Security, *Re: Rescission of
   November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans
   and Lawful Permanent Residents* (June 15, 2017),
   *available at* https://go.usa.gov/xncr3 ......................................................................... 9

U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's
   Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C.
   (Nov. 19, 2014),
   *available at* https://www.justice.gov/file/179206/download .................................................. 28

USCIS, Policy Memorandum (Nov. 7, 2011),
   *available at* https://go.usa.gov/xncPK. ........................................................................ 7

**INTRODUCTION**

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time— available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA made deferred action available to a class of unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states. Although the then-Secretary of Homeland Security vigorously defended the policy, he was rebuffed at every turn: the district court issued a nationwide preliminary injunction; the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act; and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities. In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's opinion that DACA was in fact unlawful, the current Acting Secretary of Homeland Security was faced with two options. On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients. On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his deferred action abruptly terminated; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this pair of related cases, Plaintiffs, a collection of states, an advocacy organization, and DACA recipients, challenge the Rescission Policy on a variety of statutory and constitutional grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g).  At a minimum, the State Plaintiffs cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to

2

change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Importantly, because this claim can be resolved now based on the complaint, the documents attached or incorporated by reference in the complaint, and other judicially noticeable materials (including those in the administrative record), the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, the Department of Homeland Security (DHS) and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years.  Few have gone through notice and comment, and there is no warrant for those procedures here.  Nor does the Fifth Circuit's ruling that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands.  Plaintiffs' Regulatory Flexibility Act claim fails for the same reason, as that Act applies only where notice and comment is required.  And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its enactment would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claim, which alleges the Rescission Policy was motivated by

3

discriminatory animus toward Mexican nationals, gets them no further.  To the extent such a claim can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, a rigorous factual showing (or at least plausible allegations) of discriminatory intent and effect would be necessary to proceed beyond the pleading stage.  Plaintiffs have made no such showing of extraordinary circumstances here.

Plaintiffs' due process claims also cannot survive a motion to dismiss.  DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time.  That the Rescission Policy did not further limit the sharing of DACA-related information across DHS components for enforcement purposes—that is, beyond the limitations already in effect under the existing policy, which was unchanged by the rescission—does not run afoul of any substantive due process guarantee.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal.  DAPA—including its expansion of DACA—was enjoined as unlawful by the Fifth Circuit, and that holding was affirmed by the Supreme Court.  The original DACA policy is materially indistinguishable as a legal matter.  At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts.  To state the premise of this claim is to refute it.  The case should be dismissed.

## BACKGROUND

### A.  Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act (INA) along with "all other laws relating to the

immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at

16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus generally has absolute discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

### B.    DAPA and DACA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3, *Batalla Vidal* ECF No. 77-1 (DACA Memo). DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through

6

its legislative authority, can confer these rights." *Id*. at 3 (AR 3).

In public guidance published on its website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to ICE and CBP for the purpose of immigration proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added), https://go.usa.gov/xngCd (quoted in part at *New York* Compl. ¶ 89, ECF No. 54); *see* USCIS, Policy Memorandum (Nov. 7, 2011) (Notice to Appear Guidance), *available at* https://go.usa.gov/xncPK.   DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from 2 to 3 years.  *Id.* at 3–4 (AR 39-40).

## C.     The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was

justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Id.* at 178 n.156.  And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one."  *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place.  On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]."  Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 14-254 (S.D. Tex. Nov. 18, 2016) (ECF No. 430).

Faced with continued litigation over a policy that had been ruled unlawful and enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See* Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John F. Kelly, Secretary of Homeland Security, *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and*

*Lawful Permanent Residents* (June 15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

### D.    Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion.  *See* AR 252–56 (Rescission Policy or Policy).  As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and Fifth Circuit's ruling in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy at 4 (AR 255).  Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 4 (AR 254).  Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* (AR 255), and instructed that deferred action should instead be provided "only on an individualized, case-by-case basis," *id*. at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods."  *Id.* at 5 (AR 255)

9

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id*.

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018, that have been accepted by the Department as of October 5, 2017." *Id*.

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id*. at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id*. at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy.

### E.    These Actions

Together, Plaintiffs in this pair of related cases raise six claims. First, they allege that the Rescission Policy violates the APA because it constitutes a change in agency policy without an adequate explanation. *Batalla Vidal* Compl. ¶¶ 149–54 (Count 2), ECF No. 60; *New York* Compl. ¶¶ 253–56 (Count 4). Second, they argue that the policy violates the APA because it was issued without notice and comment. *Batalla Vidal* Compl. ¶¶ 144–48 (Count 1); *New York* Compl. ¶¶ 257-65 (Count 5). Third, they contend that the policy violates equal protection because it was allegedly motivated by discriminatory animus toward Mexicans or Latinos. *Batalla Vidal* Compl. ¶¶ 167–70 (Count 5); *New York* Compl. ¶¶ 233–39 (Count 1). Fourth, they claim that the policy violates procedural due process because DACA recipients were not sent "individualized written

10

notices" advising them of the October 5, 2017, renewal deadline. *Batalla Vidal* Compl. ¶ 164; *see id.* ¶¶ 160–66 (Count 4). Fifth, they suggest that the Rescission Policy violates substantive due process because the government's "refusal to prohibit" the use of information in DACA applications for enforcement purposes is "fundamentally unfair." *New York* Compl. ¶ 243; *see id.* ¶¶ 240–45 (Count 2). Sixth, they submit that policy violates the Regulatory Flexibility Act because it was unaccompanied by a regulatory flexibility analysis assessing its impact on small businesses. *Batalla Vidal* Compl. ¶¶ 155–59 (Count 3); *New York* Compl. ¶¶ 266–73 (Count 6). Plaintiffs ask the Court to declare the Rescission Policy unlawful and to "[e]njoin Defendants from terminating the DACA" policy. *New York* Compl. ¶ 281(e); *see id.* ¶ 281(a)–(h); *Batalla Vidal* Compl. ¶ 171(a)–(e).

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In deciding a Rule 12(b)(1) motion, the district court may refer to evidence outside the pleadings, such as documents or affidavits, without converting the motion to one for summary judgment. *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), "when faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment," *Bates v.*

11

*Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citing *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).[1]

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and thus unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one here. At a minimum, the State Plaintiffs lack standing and a cause of action. And in all events, Plaintiffs fail to state a claim. This case should be dismissed.

## I.   THIS CASE IS NOT JUSTICIABLE

### A.   The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law

**1.** The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (quoting 5 U.S.C. § 701(a)(2)). These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. *Chaney*, 470 U.S. at 830; *see also Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003) (§ 701(a)(2)'s "limitation on the APA's waiver of immunity means that there is no jurisdiction if the statute or regulation said to govern the challenged agency action 'is drawn so that a court would

---

[1] Indeed, as the administrative-record documents cited by Defendants are incorporated by reference into Plaintiffs' complaints or otherwise publicly available and judicially noticeable, they are properly considered on a motion to dismiss. *United States ex rel Coyne v. Amgen, Inc.*, 229 F. Supp. 3d 159, 162 (E.D.N.Y. 2017). In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

have *no meaningful standard* against which to judge the agency's exercise of discretion'"). This bar applies, moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

Among the decisions committed to executive discretion are "an agency's exercise of enforcement power." *Chaney*, 470 U.S. at 831. Such judgments involve "a complicated balancing of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular

13

enforcement action requested best fits the agency's overall priorities" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers").

This presumption of nonreviewability applies with particular force when it comes to immigration.  On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97.  Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396.  One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 4–6.  Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 831.  Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations").  Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges

14

may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable).  To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former.  *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.**  As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone.  Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.  For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 5 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16.  Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "'potentially imminent litigation'" that could throw DACA into immediate turmoil, on the other.  Rescission Policy at 4 (AR 254).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, Rescission Policy at 2–5 (AR 253-55), but that does not render it justiciable.  That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.  For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which,

15

much like the question of the underlying legality of DACA, "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," *id.* at 488, subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by selective-enforcement and discriminatory motive claims "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as

well. *Id.* at 490–91.  Finally, the idea that "an ongoing violation of United States law must be allowed to continue because it has been improperly selected is not powerfully appealing."  *Id.* at 491 (emphasis omitted).

**B.      The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action**

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation where" the Executive had "chose[n] *not* to exercise it."  525 U.S. at 484.  Specifically, some courts had entertained challenges to "'the refusal to exercise such discretion'" on various bases such as "'selective prosecution,'" the use of "'arbitrary or unconstitutional criteria, or other grounds constituting abuse of discretion.'"  *Id.* at 485 (citation omitted).  To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *Id.* at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[2]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar

---

[2] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding.  *AADC*, 525 U.S. at 485.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts.  *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point.  The denial of continued deferred action is a necessary step in commencing enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge.  Indeed, if aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse.  Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period.  There is no indication that Congress sought to enact such a nonsensical regime.  Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy.

Moreover, at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal

orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation proceedings." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

## C.     The State Plaintiffs' And Advocacy Organizations' Claims Are Not Cognizable

### 1.     The State Plaintiffs Lack Article III Standing

At a minimum, the Court should dismiss the States' action for lack of standing.[3] To establish Article III standing, the States must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (brackets, internal quotation marks, and citations omitted). They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or

---

[3] Because only the States assert a substantive due process claim, the Court must address their standing, even if other Plaintiffs may have standing to bring other claims.

lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id.* at 562. That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, a State is relying on the incidental effects of federal immigration policies—*i.e.*, alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities. *See New York* Compl. ¶¶ 2, 5, 9–201. It would be extraordinary to find Article III standing based on such assertions by a State, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects on a State or its residents does not give it carte blanche to challenge such enforcement decisions whenever it happens to disagree with federal immigration policy.[4]

### 2. The States And Advocacy Organizations Lack a Cause of Action Under the APA

Even if the States could establish Article III standing, they (and the advocacy organizations) would lack a cause of action under the APA. The APA does not "allow suit by every person suffering an injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense,

---

[4] Plaintiffs cannot overcome their failure to establish standing in their own right by invoking the asserted rights of their citizens or residents as parens patriae. *See id.* ¶ 8. "A State does not have standing as parens patriae to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citation omitted), as "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government," *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923).

"the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 395 (brackets and citation omitted).  Here, no provision of the INA even arguably protects the States and advocacy organizations from bearing any incidental effects of a denial of deferred action.  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### D.    The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.  First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.  Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.  *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch).  Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.  After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement

21

policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.  Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.[5]

## II.   PLAINTIFFS FAIL TO STATE A CLAIM

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety for failure to state a claim.

### A.   The Acting Secretary Rationally Explained Her Decision To Wind Down DACA, Particularly Given the Imminent Risk of A Nationwide Injunction

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.  *Batalla Vidal* Compl. ¶¶ 149–54 (Count 2); *New York* Compl. ¶¶ 253–56 (Count 4).  That argument misunderstands the nature of the inquiry under the APA.  It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.**  Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear

---

[5] Similarly, the fact that the Fifth Circuit held that Texas had standing because it specifically demonstrated that "it would incur significant costs in issuing driver's licenses to DAPA beneficiaries," has no bearing on the States' standing in this case.  *Texas*, 809 F.3d at 155.  The States here have failed to point to analogous injury similarly traceable to the Rescission Policy.

error of judgment." *Overton Park*, 401 U.S. at 416.  A decision may be held arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id.*  And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*

In assessing whether a decision was arbitrary and capricious, "the task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court."  *Id.*; *see also Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. Jan. 15, 2009) (as revised) (holding that interrogatories could not be considered because the court "must uphold or set aside the agency's action on the grounds that the agency has articulated").  If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration."  *Camp v. Pitts*, 411 U.S.138, 143 (1973).  This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced.  This Court cannot consider additional materials concerning her deliberative process.  It is "not the function of the court to probe the mental processes" of the agency. *United States v. Morgan*, 304 U.S. 1, 18 (1938).  "Just as a judge cannot

be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941).   Deliberative materials are therefore not merely protected from disclosure—they do not form part of the administrative record at all.  *See San Luis Obispo Mothers for Peace*, 789 F.2d 26 (D.C. Cir. 1986) (en banc).  Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

    **2.**   The Rescission Policy amply meets the "minimal standards of rationality" required by the APA.  *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).  Plaintiffs do not deny that "the new policy is permissible under the [INA]."  *Fox*, 556 U.S. at 515.  And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*.  In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and Fifth Circuit's ruling in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy at 5 (AR 255).  Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 4 (AR 254).  The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

    The Acting Secretary was then "faced with two options:  wind the program down in an

orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."  DHS, Press Release, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), *available at* https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option."  *Id.*

There is nothing at all irrational about this choice or that explanation.  *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability").  Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked.  *See Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").  The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly manner" accounting for the interests of DACA recipients.  Rescission Policy at 4 (AR 254).  She reasonably explained her reasonable decision to rescind DACA, and the APA requires no more.  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.** Although Plaintiffs acknowledge that the Acting Secretary's "fear of a hypothetical lawsuit" drove her decision, they contend that it was nevertheless arbitrary and capricious because she also considered what they assert was the Attorney General's "legally erroneous conclusion"

that DACA was in fact unlawful.  *See Batalla Vidal* Compl. ¶¶ 2, 22; *see also New York* Compl. ¶¶ 83-84; 253-56.  That argument suffers from four independent flaws.

First, the Acting Secretary did not solely, or even primarily, rely on the Attorney General's September 4 letter for its determination that DACA was unlawful.  Instead, as discussed above, she referred to his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 4 (AR 254).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision whether or not DACA was actually unlawful.  *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General concluded that DACA was unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected.  Rescission Policy at 4 (AR 254).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's conclusion that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court.  The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator").  Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id*. at 172.  On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice:  Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73.  Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's conclusion that DACA was unlawful.  And it seems likely that at least four Justices of the Supreme Court agree.

Regardless of whether the Office of Legal Counsel was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in

practice as found by the Fifth Circuit.[6]  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  *Id.*  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria").  Further, the original DACA program largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.  Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

## B.    The Rescission Policy Is Exempt from Notice and Comment

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment.  *Batalla Vidal* Compl. ¶¶ 144–48 (Count 1); *New York* Compl. ¶¶ 257-65 (Count 5); *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not adopted through notice and comment.  So

---

[6] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, at 18 n.8 (Nov. 19, 2014) (OLC Op.), *available at* https://www.justice.gov/file/179206/download

even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy. That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing).[7]

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Braun*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  *Id.* at 252.  It serves to "appris[e] the regulated community of the agency's

---

[7] To be sure, the D.C. Circuit has rejected "the argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 5 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. It does not immediately deprive any DACA recipients of their current deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 5 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 6 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 16—as with the 20-odd deferred action or

similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice and comment and process.[8]

That is as it should be.  An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 39).  Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied:  it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters that have "long been regarded as the exclusive province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

## C.    Plaintiffs Fail to State an Equal Protection Claim

If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal protection challenges under *AADC*, *but see supra* § I.A, B, it nonetheless should dismiss them for failure to state a claim.  In *Armstrong*, the Supreme Court considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim arising under the Equal Protection Clause.  517 U.S. at 463–64.  The Court recognized that such claims, like the discriminatory motive claim here, "ask[] a court to exercise judicial power over a 'special

---

[8] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule.  Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

province' of the Executive," specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* at 464 (citations omitted).   Accordingly, a "presumption of regularity supports" such enforcement decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* (citation omitted).   To "obtain discovery"—or, in the context of civil litigation, to survive a motion to dismiss—a claimant alleging discriminatory enforcement thus must satisfy a "rigorous standard" requiring him to produce (or at least plausibly allege the existence of) "'evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* at 468 (citation omitted).   At a minimum, *AADC* underscores that Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that government actors harbored a hidden discriminatory motive.

In fact, the only allegations Plaintiffs have made are (1) the fact that most DACA recipients are Mexican nationals, *New York* Compl. ¶¶ 6, 57; and (2) references to statements by the President, generally unrelated to DACA, relating to Mexicans, *id.* ¶¶ 257-72; *Batalla Vidal* Compl. ¶¶ 81–92.   Neither overcomes the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that more than 78 percent of DACA recipients are Mexican nationals is an unsurprising accident of geography, not evidence of discrimination; this raw statistic fails to show either discriminatory intent or discriminatory effect.   Indeed, in light of the heightened deference owed to the political Branches on immigration matters, where sensitive considerations of relations and proximity to particular foreign nations necessarily play a role, a court should not lightly intrude upon discretionary administration of the immigration laws based on such an impact.   As to intent, a disparate impact of a facially neutral rule such as the Rescission Policy,

standing alone, cannot establish discriminatory intent even in a domestic equal protection setting. *See Washington v. Davis*, 426 U.S. 229, 242 (1976).  And in the context of discriminatory-motive allegations, even in the domestic setting it is not even enough to suggest discriminatory effect. In *Armstrong*, for example, the Supreme Court refused to allow discovery in support of a selective-enforcement claim that was supported by evidence that in every federal drug case prosecuted within a single year, *all* 24 defendants charged with a drug-trafficking offense were African-American. *Id.* at 459.  The Court explained that to provide "'some evidence tending to show the existence' of the discriminatory effect element" necessary for discovery, the claimants had "to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id.* at 469.  Here, Plaintiffs acknowledge that more than 20% of DACA recipients are not Mexican nationals—which, again, is not surprising given that the policy draws no distinctions based on race, nationality, or any protected characteristic.

In *Rajah v. Mukasey*, 544 F.3d 527 (2d Cir. 2008), the Second Circuit rejected a similar discriminatory-enforcement challenge to the removal of individuals required to register under a program that facially singled out aliens from certain identified countries. *Id.* at 433, 439.  It happened that almost all of the selected countries were "predominantly Muslim," but the court dismissed the contention that that fact alone was evidence that "the Program was motivated by an improper animus." *Id.* at 439.  As it explained, because adherents to other religions "from the designated countries were [also] subject to" the policy, there was "no basis for [the aliens'] claim." *Id.*  The same analysis applies here.

As to the second piece of evidence, the President's statements—almost all made before he took the oath of office and none made in connection with the Rescission Policy—do not tend to show the existence of both discriminatory intent and discriminatory effect necessary to state

33

a claim.  As a threshold matter, there is no conceivable way that these statements, standing alone, tend to show discriminatory effect, and that suffices to end the inquiry.

In any event, Plaintiffs' attempt to use these remarks to establish discriminatory intent come up short, as they point to nothing that would suggest Acting Secretary Duke—the decisionmaker ultimately responsible for the Rescission Policy—chose to wind-down DACA due to animus towards Mexican nationals.  Given that the statements at issue have no connection to either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration laws in a way that has a statistically significant disparate impact on Mexican nationals, the agency would be subject to intrusive discovery on allegations of a violation of the Equal Protection Clause.  That would set a dangerous precedent, and it would freeze the enforcement discretion of the entire Executive Branch.  That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397.

### D.      Plaintiffs Fail to State a Procedural Due Process Claim

The *Batalla Vidal* Plaintiffs claim that the Rescission Policy violates procedural due process because DACA recipients were not sent "individualized written notices" advising them of the October 5, 2017, renewal deadline.  *Batalla Vidal* Compl. ¶ 164.  That deadline, they allege, conflicts with notices previously sent to some DACA recipients advising that they "submit [a] renewal request 'as soon as possible,'" and to do so "between 150 days and 120 days before the expiration" of their DACA status "to avoid a lapse in [their] period of deferred action."  *Id.* Ex. G at 1; *see id.* ¶¶ 103–05, 160–66.  But no Plaintiff alleges that he missed the October 5, 2017,

34

deadline because of this alleged due process violation, and thus none can show that he was actually harmed by it, much less that more process would remedy any injury. Plaintiffs thus lack standing to raise this claim, and it should be dismissed for that reason alone. *See Lujan*, 504 U.S. at 561.

In any event, this claim fails on the merits for the simple reason that DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections. The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

A benefit "is not a protected entitlement" for due process purposes where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756. For due process purposes, statutes or regulations limit discretion only when they contain "'explicitly mandatory language'"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted). The DACA policy contains no such

35

"explicitly mandatory language."  *Id.*  The policy is codified in no statute or regulation.  Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion."  DACA Memo at 2 (AR 3); *see Omar v. McHugh*, 646 F.3d 13, 22 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'").  And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DACA FAQ No. 27 (cited in *New York* Compl. Ex. 14).

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (quoting DACA Memo).  "Only the Congress, acting through its legislative authority, can confer those rights."  DACA Memo at 3 (AR 3).  Thus, deferred action is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action . . . vests the regional commissioner with unfettered discretion . . . it creates no protectible liberty interest in deferred action").

### E.    Plaintiffs Fail to State a Substantive Due Process Claim

Taking a different tack, the *New York* Plaintiffs claim that the Rescission Policy violates substantive due process because the agency's "refusal to prohibit" the use of information in DACA applications for enforcement purposes is "fundamentally unfair."  *New York* Compl. ¶ 243; *see id.* ¶¶ 240-45 (Count 2).   The States have no protected due process interest or other judicially

36

cognizable claim concerning information supplied by aliens to the federal government. And, indeed, no Plaintiff alleges any harm from the agency's supposed "refusal" to adopt a blanket ban on the use of such information, which would not state a substantive due process claim in any event.

While Plaintiffs' theory is a bit unclear, they allege that DHS made "unequivocal" assurances that "information provided by a DACA grantee would not be used against him . . . for later immigration enforcement proceedings." *Id*. ¶ 44. Even if it were true that DHS had made such a promise, Plaintiffs stop conspicuously short of alleging that the agency has broken it: No Plaintiff plausibly alleges that the agency has in fact used his DACA information for any enforcement purpose, much less initiated enforcement proceedings against him as a result, or that there is any imminent threat of this occurring (either with respect to any individual plaintiff, or to DACA recipients writ large). *See id.* ¶¶ 240–45; 246–52. That alone deprives them of standing to press this claim.

Moreover, Plaintiffs' selective quotation of the relevant policy mischaracterizes its content, as documents incorporated by reference into the complaint make clear. Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of DACA information for enforcement purposes, the agency's information-sharing policy in fact contains (and has always contained) a number of exceptions. For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No.

19, nothing in the Rescission Policy purports to change it, and it currently remains in effect. Plaintiffs, however, repeatedly quote only those portions of the information-sharing policy that they find helpful, minimizing or ignoring the exceptions.  *See, e.g.*, *New York* Compl. ¶¶ 239–44. The Court should not defer to these facially contradicted allegations, particularly in light of Plaintiffs' failure to allege any cognizable harm.  *See e.g.*, *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011).

In any event, the state Plaintiffs fail to state a substantive due process claim.  Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising a such a claim.  *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003).  "Vague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice."  *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998).  That scenario arises "largely in the context of excessive force claims," *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005), and is typically reserved for "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose," *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001).  It does not, by contrast, reach "government action that is [merely] incorrect or ill advised,'" *Cunney v. Bd. of Trs.*

*of Grand View*, 660 F.3d 612, 626 (2d Cir. 2011) (citation omitted), nor does it "forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a … lawsuit seeking review of administrative action," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

Nothing about the Rescission Policy meets this extraordinarily high standard, and certainly not with respect to the subject of information sharing. DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be modified, superseded, or rescinded at any time" and it therefore creates no judicially enforceable rights. DHS DACA FAQ No. 19. And, most importantly, the Rescission Policy nowhere purports to alter DHS's information-sharing policy, and even if it did, Plaintiffs were on notice that it could change at any time.

### F. Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required

Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reasons as its notice-and-comment claim, and it can be quickly dispatched. *See Batalla Vidal* Compl. ¶¶ 155–59 (Count 3); *New York* Compl. ¶¶ 266–73 (Count 6). The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "'when an agency promulgates a final rule under section 553 of … title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking,'" *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required. Because those procedures were not required here, *see supra* § III.B., the RFA does

not apply.[9]

## III.   NATIONWIDE INJUNCTIVE RELIEF IS IMPERMISSIBLE

Finally, to the extent this Court ultimately concluded that Plaintiffs were entitled to any injunction, it should dismiss the request for nationwide relief.  Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996).  "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration."  *Id*.  And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").  Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

---

[9] Plaintiffs also lack standing to raise an RFA claim for an additional reason:  They allege no facts to demonstrate that they are "small entities" entitled to seek judicial review under the RFA.  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id*. § 611 (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also*, *e.g.*, *N.W. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'").  Plaintiffs' conclusory assertions on this score, *see, e.g.*, *New York* Compl. ¶ 211-16, 228, 273; *Batalla Vidal* Compl. ¶¶ 61, 156-57, should not be taken as true on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678, 681.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case.

Dated: October 27, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           BRIDGET M. ROHDE
                                           Acting United States Attorney

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director, Federal Programs Branch

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           BRAD P. ROSENBERG
                                           Senior Trial Counsel

                                           */s/ Stephen M. Pezzi*
                                           STEPHEN M. PEZZI (D.C. Bar #995500)
                                           KATE BAILEY
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel.:  (202) 305-8576
                                           Fax:  (202) 616-8470
                                           Email: stephen.pezzi@usdoj.gov

                                           JOSEPH A. MARUTOLLO
                                           Assistant U.S. Attorney
                                           United States Attorney's Office
                                           Eastern District of New York
                                           271-A Cadman Plaza East, 7th Floor
                                           Brooklyn, NY  11201
                                           Tel:  (718) 254-6288
                                           Fax:  (718) 254-7489
                                           Email:  joseph.marutollo@usdoj.gov

41

*Counsel for Defendants*