## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL,
ANTONIO ALARCON, ELIANA FERNANDEZ,
CARLOS VARGAS, MARIANO
MONDRAGON, and CAROLINA FUNG FENG,
on behalf of themselves and all other similarly
situated individuals, and MAKE THE ROAD
NEW YORK, on behalf of itself, its members, its
clients, and all similarly situated individuals,

*Plaintiffs*,

*v.*

KIRSTJEN M. NIELSEN,[1] Secretary, Department
of Homeland Security, JEFFERSON
BEAUREGARD SESSIONS III, Attorney General
of the United States, and DONALD J. TRUMP,
President of the United States,

*Defendants.*

**THIRD AMENDED
COMPLAINT**

Case No. 1:16-cv-04756 (NGG) (JO)

## INTRODUCTION

Plaintiffs Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas,

Mariano Mondragon, and Carolina Fung Feng ("Individual Plaintiffs"), on behalf of themselves

and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf

of itself, its members and clients, and all other similarly situated individuals (collectively

"Plaintiffs" or "Named Plaintiffs"), bring this action to challenge the Trump Administration's

unlawful termination of the Deferred Action for Childhood Arrivals ("DACA") program. Nearly

one million young immigrants rely on DACA to work, study, hold driver's licenses, serve in the

military, support their families, and live securely in the only country they know as home.

Defendants' arbitrary decision to terminate this established and successful program upends the

---

[1] Kirstjen M. Nielsen was sworn in as Secretary of Homeland Security on December 6, 2017 and is
automatically substituted for Acting Secretary Duke as a defendant in this action. Fed. R. Civ. P. 25(d).

lives of these individuals and threatens to destabilize their families, communities, and workplaces. The termination of DACA violates federal statutes and the Constitution, necessitating this Court's intervention to protect against imminent and devastating harm.

The termination of DACA will prevent Mr. Batalla Vidal from caring for patients at the nursing home where he works. It will prohibit Ms. Fernandez from working to support her two U.S. citizen children, making her mortgage payments, and paying for health insurance for her family. It will throw into disarray the lives of Mr. Mondragon's two young children and pregnant wife, who depend on his ability to make a living wage. It will bar Mr. Vargas, who recently started attending night classes at City University of New York School of Law, from fulfilling his dream of becoming a lawyer. Defendants' decision to abruptly end the program will force nearly 800,000 people to live with the persistent fear of being separated from their families.

Defendants impose these harms in violation of the procedural requirements meant to protect individuals from arbitrary government action. The termination of DACA binds the Department of Homeland Security ("DHS") to categorically deny deferred action to new applicants as of September 5, 2017, and to deny all renewal applications received after October 5, 2017, without following public notice-and-comment procedures required by the Administrative Procedure Act ("APA"), and without the analysis required by the Regulatory Flexibility Act ("RFA").

Separately, Defendants' DACA termination reverses longstanding agency policy on which nearly 800,000 people have relied, including assurances to DACA applicants that the information they provided would not be used against them or their loved ones. Under the APA, Defendants must provide a reasoned explanation for choosing to terminate this program. Rather than do so, Defendants have justified the reversal based on fear of a hypothetical lawsuit, the

legally erroneous claim that DACA is unlawful, and a variety of inaccurate factual assertions.

Defendants' termination of DACA additionally violates the Fifth Amendment. Defendants failed to correct misleading notices previously sent to many DACA recipients who were required to submit renewal applications by October 5, 2017, in violation of procedural due process requirements. Defendants further deprived DACA renewal applicants of procedural due process in their implementation of the DACA termination, particularly in their arbitrary and haphazard implementation of the October 5 deadline. Finally, Defendants' contradictory, illogical, and false explanations for terminating DACA evidence that the true reasons for ending this highly successful program are pretextual, in violation of the guarantee of equal protection under law.

Because Plaintiffs and other similarly situated individuals are already beginning to lose eligibility for DACA status due to Defendants' unlawful actions, Plaintiffs ask this Court to declare the termination of DACA unlawful and to enjoin its enforcement.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution, the APA, 5 U.S.C. §§ 551 *et seq*., and the RFA, 5 U.S.C. §§ 601 *et seq.*

2.      Venue properly lies in this district because Individual Plaintiffs reside in the district, and Plaintiff Make the Road New York ("MRNY") operates community centers in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. *Id*. § 1391(b).

3

## PARTIES

**Plaintiff Martín Batalla Vidal**

3.      Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA. He has resided in Queens, New York for twenty years.

4.      Mr. Batalla Vidal was born in Mexico and raised in New York since he was a young child. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived in since he was a child.

5.      Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York from September 2004 until his graduation in June 2008.

6.      After graduating from high school, Mr. Batalla Vidal hoped to attend a nursing program at a school such as the City University of New York ("CUNY"), but could not seriously consider these programs because those universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also stressed the difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

7.      In November 2012, the Obama Administration created DACA. In November 2014, Mr. Batalla Vidal applied for DACA with the assistance of MRNY. To prepare his application, Mr. Batalla Vidal attended a workshop at MRNY's Brooklyn office, where he made follow-up visits. To prove his eligibility for DACA, Mr. Batalla Vidal spent many hours over the course of several months gathering paperwork and obtaining documents from his high school, hospital, and bank. On February 17, 2015, DHS approved Mr. Batalla Vidal's application.

8.      Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to raise money for school and support his mother and younger siblings. He worked two jobs at the same time, full time at Bocca Catering and part time at the New York Sports Club. He currently works full time at Park Terrace Rehabilitation and Nursing Center, where he cares for patients with serious health needs. Mr. Batalla Vidal also received a scholarship for DACA recipients from ASA College.

9.      Defendants approved Mr. Batalla Vidal's DACA renewal on February 16, 2017. His current grant will expire on February 15, 2019. Because of Defendants' termination of DACA, Mr. Batalla Vidal is ineligible to apply to renew DACA.

10.     When Mr. Batalla Vidal found out about the termination of the DACA program, he obtained a third job in order to save money prior to the expiration of his period of deferred action and work authorization.

11.     Through employment he was able to obtain with DACA, Mr. Batalla Vidal can financially support himself, his mother, and his younger siblings. Since his mother has severe arthritis and cannot work, Mr. Batalla Vidal pays the rent and the majority of the bills for his household. Mr. Batalla Vidal's ability to pursue his career and provide for his family has been thrown into jeopardy due to Defendants' termination of DACA. Without Mr. Batalla Vidal's income, he and his family will face significant financial hardship. Mr. Batalla Vidal has also developed anxiety and stress related to the termination of the DACA program. If Mr. Batalla Vidal is deported, his family will also lose his emotional support and be irreparably harmed.

**Plaintiff Antonio Alarcon**

12.     Plaintiff Antonio Alarcon ("Mr. Alarcon") is a recipient of DACA. He resides in Queens, New York.

13.     Mr. Alarcon was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed behind in Mexico with their grandparents. When Mr. Alarcon was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcon moved in with his aunt and uncle.

14.     Mr. Alarcon received DACA on March 26, 2013, with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcon to financially support himself, his aunt, and his uncle as he pursued his education.

15.     Mr. Alarcon graduated from Flushing High School, and received his associate's degree from LaGuardia Community College in 2015. He is currently pursuing a Bachelor of Arts degree in Film Studies from Queens College, where he is on track to graduate in December 2017.

16.     Through his employment and volunteer activities, Mr. Alarcon has become a leading voice for youth in his community and beyond. From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States.

17.     Defendants granted Mr. Alarcon DACA renewals on March 6, 2015 and again on January 26, 2017. His current grant will expire on January 25, 2019. He is ineligible to renew his

DACA because of Defendants' termination of the program, thereby jeopardizing his and his family's wellbeing.

**Plaintiff Eliana Fernandez**

18.     Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides in Suffolk County, New York.

19.     Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years. She has lived in New York since she was fourteen years old. She has two New York-born, U.S. citizen, children of elementary-school age, whom she is raising.

20.     Ms. Fernandez first received DACA on December 11, 2012 and renewed her status on November 4, 2016. Her current grant will expire on November 20, 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

21.     Ms. Fernandez has worked hard to build a life for herself and her family. Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College, where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She now works as an Immigration Case Manager in MRNY's Long Island office. This semester she started graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

22.     Ms. Fernandez is a mother and homeowner who contributes every day to the state of New York by working, studying, and giving back to her community. She was able to achieve these goals because of DACA, which allowed her to go back to school, earn a living wage, and purchase a home in which her children can grow up.

23.     Without DACA, Ms. Fernandez would no longer have a driver's license to drive her children to the doctor or to school. Without the employment authorization that her DACA status provides, she could not afford her mortgage or her family's health insurance. Defendants' termination of the DACA program puts Ms. Fernandez at risk of being separated from her children, as she was from her parents as a child. As a result, Ms. Fernandez has developed anxiety and stress, as well as physical ailments.  She was recently diagnosed with migraines for the first time and has developed severe neck pain which she attributes to the stress and emotional toll of her uncertain future.

**Plaintiff Carlos Vargas**

24.     Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in Staten Island, New York.

25.     Mr. Vargas was born in Puebla, Mexico. He came to the United States with his mother, who was struggling to raise Mr. Vargas and his siblings after Mr. Vargas's father passed away two months before he was born. Mr. Vargas has lived in New York City since he was four, and in Staten Island since he was sixteen.

26.     Mr. Vargas began working in restaurants at age thirteen to help his family, leaving school at 3 P.M. and working shifts from 4 P.M. to midnight, five days a week. He had hoped to attend college but was told by a school counselor that he could not attend because he was undocumented.

27.     After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree. Mr. Vargas learned that his undocumented status would not prevent him from enrolling in CUNY College of Staten Island ("CUNY CSI"), provided he

could pay his tuition without government loans. He applied for admission and was accepted. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business in 2014.

28.     Mr. Vargas applied for DACA in August 2012. His application was granted on December 13, 2012. DHS renewed his DACA on November 14, 2014 and again on September 14, 2016, with his current grant expiring on September 13, 2018. Mr. Vargas is no longer eligible to renew DACA as a result of Defendants' termination of the program.

29.     DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities.

30.     After volunteering for many years in Staten Island for Make the Road New York, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases.

31.     Mr. Vargas now works at MRNY, where he screens individuals and provides assistance applying for DACA and other forms of immigration relief. He plans to become a lawyer so that he can be a more effective advocate for his community. In fall 2017, he began attending evening classes at CUNY School of Law.

32.     Mr. Vargas financially supports himself and his elderly mother who is unable to work due to depression, anxiety, vision and other medical issues. Mr. Vargas is the primary person who cares for his mother, accompanies her to her many medical appointments, and pays

for her medical expenses. He is also financially responsible for multiple mortgages on homes he owns with his brother.

**Plaintiff Mariano Mondragon**

33.     Plaintiff Mariano Mondragon ("Mr. Mondragon") is a recipient of DACA. He resides in Queens, New York.

34.     Mr. Mondragon was born in Mexico and first came to the United States with his father in 1999, when he was fourteen years old. Six months after they arrived, his father returned to Mexico while Mr. Mondragon remained in the United States with his aunt. He has not seen his parents in seventeen years.

35.     Mr. Mondragon began working at the age of sixteen. Since graduating from Flushing High School in 2005, he has worked in the restaurant industry.

36.     Mr. Mondragon has been married for five years. He and his wife have two U.S.-born children together, ages eight and eighteen months, and his wife is six months pregnant with their third child.

37.     Mr. Mondragon also has a ten-year-old daughter from a previous relationship. Her mother moved to Mexico when she was pregnant. While Mr. Mondragon has never met his daughter in person, he provides financial support for her.

38.     Mr. Mondragon received DACA on April 14, 2014 and renewed it on February 25, 2016. His DACA status will expire on February 24, 2018. In addition, two of Mr. Mondragon's brothers are DACA recipients.

39.     DACA has allowed Mr. Mondragon to support his family by working as a bartender in Manhattan and it has provided assurance that he will not be separated from his children and wife.

40.     Mr. Mondragon applied to renew his deferred action under DACA in September 2017. He had to rush to get his application completed and submitted because the September 5, 2017, announcement only gave him until October 5, 2017 to apply.

**Plaintiff Carolina Fung Feng**

41.     Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

42.     Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. She has not seen her father—her only living parent— since she left Costa Rica sixteen years ago. Ms. Fung Feng first applied for DACA around September 2012 and was approved around December 2012. She has successfully renewed DACA twice, in July 2014 and June 2016. Her status expires in August 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

43.     Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015.

44.     Ms. Fung Feng has worked for MRNY since 2015 as a Program Assistant for the Adult Literacy Program. She supports her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study. Ms. Fung Feng recently enrolled in a GRE prep class in order to eventually attend graduate school.

**Plaintiff Make the Road New York**

45.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, as well as on behalf of its clients and members and all similarly situated individuals. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering

immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, and Suffolk County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

46.     MRNY has a legal department staffed by twenty-three attorneys and eleven advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as in affirmative applications for immigration relief. MRNY also directly assists individuals prepare the documentation and paperwork necessary for DACA applications and renewals. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

47.     Consistently from June of 2012 until the last day that DACA renewal applications were accepted, MRNY held weekly DACA screening workshops at its Queens office and similar services at its other sites on an as-needed basis, escalating the number of workshops, screenings, and appointments in the final month that U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, accepted DACA renewal applications.

48.     MRNY also assisted DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers. In addition, MRNY provided assistance with DACA renewals in its Brooklyn, Staten Island, and Long Island offices, and continues to provide ongoing assistance to its clients and members whose initial and renewal applications were rejected by DHS. Since fall 2012, MRNY has conducted approximately 392 DACA clinics and has opened 4,560 DACA cases for clients, assisting a total

of 3,323 individuals. MRNY assisted its DACA-eligible clients with initial applications as well as renewals.

49.     MRNY has more than 21,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcon, Fernandez, Vargas, Mondragon, and Fung Feng, along with many other members who are already beginning to lose their DACA status as a result of Defendants' termination of the program.

50.     Approximately twelve current MRNY employees have DACA, including Plaintiffs Alarcon, Fernandez, Fung Feng, and Vargas.

51.     Approximately forty MRNY members, and a significant additional number of MRNY clients, have DACA that expires between September 5, 2017 and March 5, 2018 and were therefore subject to the mandatory October 5, 2017 renewal deadline. Of these members, MRNY was unable to reach four DACA recipients to inform them they needed to renew before October 5. Some MRNY members and clients had received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires. Defendants' notices made no mention of the October 5, 2017 deadline. None of these MRNY members or clients received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

52.     At least seven MRNY members, and an additional number of clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications. Most of them were in the process of assembling the documentation necessary to satisfy the DACA eligibility requirements.

53.     Still other youth members of MRNY, and an additional number of clients, were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance. One client received a letter from his high school indicating he met the education requirement of DACA on September 7, 2017—two days after he lost the ability to apply for DACA.

54.     At least nine members and/or clients of MRNY submitted renewal applications that arrived on October 5, 2017 at the Post Office Box designated by DHS, but DHS rejected these applications as untimely because DHS or its agents did not retrieve the applications from the U.S. Postal Service facility until the next day.

55.     In addition, DHS rejected the renewal applications of at least three members and/or clients of MRNY due to unexpected mail delivery delays, notwithstanding that the applications were mailed well in advance of the October 5 deadline.

56.     DHS rejected at least one MRNY member (Maria Santamaria Rivas)'s timely renewal application on the ground that a DHS employee misread the date on the accompanying $495 check as "2012," when actually it read "2017."  By the time DHS returned the rejected application, it was past October 5.  The MRNY member resubmitted her renewal application with an explanation of DHS's mistake in reviewing her original timely-submitted renewal, but DHS rejected the resubmission as untimely.

57.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved by Defendants' final agency action and have exhausted their administrative remedies.

58.     The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program terminated unlawfully, and in having their DACA applications and renewals considered, are germane to MRNY's purpose of advocating for the rights of low-income

immigrant communities, to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

59.     MRNY's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

60.     Defendants' unlawful termination of the DACA program has already directly harmed MRNY by causing the organization to divert its resources from other time-sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, to conduct additional screenings of its clients who are DACA recipients (members and non-members) to determine whether they are eligible for other forms of immigration relief, and to manage the fallout of the October 5 deadline—including advocating on behalf of its clients whose renewal applications were rejected despite being timely filed.

61.     Since September 5, 2017, MRNY hosted twelve workshops on DACA renewal that they would not have had to host if Defendants had not terminated the program. MRNY's ActionNYC program in Queens, part of an initiative co-sponsored by the N.Y.C. Office of Immigrant Affairs and CUNY that connects New Yorkers with free and safe immigration services, has had to significantly shift its focus to addressing the needs of DACA-eligible clients above all others. Five Accredited Representative staff members who each do screenings and immigration application assistance had to cancel all of their September appointments and reschedule them for October and later, in order to schedule DACA renewal applications in their September slots. This also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on their other active cases.

62. MRNY has also expended significant resources since the October 5 deadline because its clients' and members' applications were rejected by DHS. This has included: tracking the packages; investigating mail delays; contacting USCIS (the component of DHS that adjudicates requests for deferred action under DACA) about each individual application to request reconsideration of the rejection; and communicating with anxious clients about advocacy efforts and next steps.

63. In addition, MRNY's legal team has expended its limited resources creating Know-Your-Rights materials, answering calls, addressing walk-in questions, mailing renewal applications, and coordinating an emergency support plan, including mental health support, for members, clients, and staff due to the DACA Termination.

64. MRNY spent additional money on priority and overnight shipping fees for renewal applications to ensure they would arrive by the October 5 deadline. Notwithstanding these expenditures, some renewal applications did not arrive by the October 5 deadline because of unreasonable U.S. Postal Service delays.

65. MRNY expended time and resources advocating on several members' and clients' behalf to ask USCIS to reconsider their applications that were rejected unreasonably.

66. MRNY will sustain further injuries when its DACA employees lose work authorization as a result of the Defendants' actions.

67. MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

68. These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

69.     As a New York-focused, non-profit organization, MRNY is a "small organization" under the RFA. 5 U.S.C. § 601(4). MRNY is directly affected by Defendants' termination of DACA, as the Agency's final action has adversely affected it. *Id.* § 611(a)(1).

**Defendants**

70.     Defendant Kirstjen M. Nielsen is the Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

71.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the head of the U.S. Department of Justice. He is sued in his official capacity.

72.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

**STATEMENT OF FACTS**

**The 2012 DACA Memorandum**

73.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano ("the Secretary") announced the creation of the DACA program, which set out guidelines for U.S. Citizenship and Immigration Services ("USCIS") to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("DACA Memorandum") (attached hereto as Exhibit A). Those granted deferred action also became eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).

74.     The DACA Memorandum states that individuals who came to the United States as children, lack a serious criminal history, attend school or participate in the Armed Services, and

meet other criteria may request that the Secretary grant deferred action, a discretionary form of relief from removal, for a period of two years, subject to renewal. Those granted deferred action in this manner could also obtain employment authorization and a social security card. *See* Ex. A, DACA Memorandum.

75.     The Secretary made findings that the individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." *Id.* at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

76.     Individuals who met the criteria listed in the DACA Memorandum did not automatically receive deferred action. Instead, DHS was directed to exercise its discretion to consider grants of deferred action "on a case by case basis." *Id.*

77.     Pursuant to the DACA Memorandum, USCIS established an application and background-check procedure to evaluate whether individuals would qualify for deferred action. Applicants were required to disclose extensive sensitive and personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, current and previous mailing addresses, country of birth, dates of initial and subsequent entries, and contact information. *See* USCIS Form I-821D and Instructions (attached hereto as Exhibit B).

78.     In order to prove that they met the eligibility criteria, DACA applicants also routinely provided Defendants documents containing personal information, including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records.

79.     The information and records DACA applicants provided Defendants frequently included sensitive and personal information about third parties as well, including family members of DACA applicants.

80.     Defendants consistently represented to DACA applicants that the information they provided would be protected from disclosure to U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances. *Id.* at 20; U.S. Citizenship & Immigration Servs.: Frequently Asked Questions (excerpt attached hereto as Exhibit C); Letter from Jeh Johnson, Sec'y of Homeland Sec., to Judy Chu, U.S. House Representative (Dec. 30, 2016) ("[T]he U.S. government represented to [DACA] applicants that the personal information they provided will not later be used for immigration enforcement purposes. . . . We believe these representations . . . must continue to be honored.") (attached hereto as Exhibit D). These assurances allowed applicants to apply for deferred action without fear that the information they provided would later be used by Defendants to deport them or their families.

**Impact of the DACA Program**

81.     Since the program was first introduced in 2012, nearly 800,000 individuals have received deferred action and employment authorization under DACA. Close to 42,000 DACA recipients live in New York State alone.

82.     As a result of the DACA program, these young immigrants have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients have come to rely on the program to allow them to work, study, and live without the constant threat of

deportation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

83.     They have also relied on the availability of renewing DACA. New York DACA recipients have submitted more than 53,000 renewal applications since DACA began—10,000 more than initial applications, meaning that some recipients have renewed more than once.

84.     This reliance has continued since Defendant President Trump took office, because he maintained the program for nearly eight months, accepting both first-time applications and renewals while assuring DACA-eligible immigrants that he would "take care of" them.

85.     The Trump Administration's arbitrary decision to terminate DACA reverberates well beyond the nearly 800,000 DACA recipients. The opportunities DACA recipients acquired and created as a result of the program benefitted their families, communities, and employers, as well. All of these groups stand to lose these gains, on which they have come to rely, if Defendants' arbitrary decision to end DACA stands.

86.     For example, Ms. Fernandez works as an immigration advocate with MRNY and is enrolled in a graduate program at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law. Without DACA, she will be forced to leave her job and cease her studies. If Ms. Fernandez is deported, her two U.S.-citizen sons will be left without their primary caretaker. Like Ms. Fernandez, many DACA recipients depend on their work authorization to financially support family members, including U.S.-citizen children and siblings.

87.     The positive impact DACA has made on the overall U.S. economy would disappear if the Administration's arbitrary decision to terminate the program holds. Economists

calculate that DACA has boosted labor-force participation, raised DACA recipients' purchasing power, and increased state and federal tax revenues.

88.    Economists estimate that the U.S. economy would lose tens of billions of dollars if the program is terminated. New York state alone stands to lose nearly $2.6 billion if DACA recipients leave the workforce. Terminating the program will have a significant fiscal and economic cost—estimated to be more than $60 billion—borne by the entire U.S. population.

**The Trump Administration's Animus Toward Individuals of Latino and Mexican Heritage**

89.    A hallmark of Defendant Trump's campaign and presidency has been unabashed nativism, in both words and deeds, rarely seen in this country's recent history. As part of that nativist platform, Defendant Trump and some members of his Administration have portrayed immigrants as imminent threats to the health, safety, and wellbeing of the United States.

90.    One group that Defendant Trump has repeatedly targeted is Latinos, especially those of Mexican heritage. When Defendant Trump announced his candidacy in June 2015, he labeled Latinos and Mexicans as "criminals," a characterization he used to justify his harsh immigration proposals.

91.    In his presidential announcement speech, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

92.    Defending these remarks, then-candidate Trump explained: "I can't apologize for the truth. I said tremendous crime is coming across." He later added: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, [and] rapists . . . ."

93.     A few weeks after he announced his candidacy, Defendant Trump again described

Mexicans as murderers and rapists, stating, "I do business with the Mexican people, but you have

people coming through the border that are from all over. And they're bad. They're really bad."

He labeled the people who were coming in as "killers and rapists."

94.     During a Republican presidential debate in August 2015, then-candidate Trump

again characterized Mexicans as criminals. He stated that "the Mexican government is much

smarter, much sharper, much more cunning and they send the bad ones over because they don't

want to pay for them, they don't want to take care of them."

95.     Later that same month, Defendant Trump criticized fellow-candidate Jeb Bush

because his wife is Latina, retweeting a post criticizing Governor Bush, which told him to stop

speaking "Mexican" and instead speak English.

96.     In May 2016, then-candidate Trump criticized U.S. District Judge Gonzalo Curiel

for his Mexican heritage. Judge Curiel was born a U.S. citizen in Indiana. While Judge Curiel

was presiding over a lawsuit against Trump University, then-candidate Trump complained that

the jurist would not be able to fairly adjudicate the case because of his ancestry: "He's a

Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very

unfair rulings—rulings that people can't even believe."

97.     Since his inauguration, Defendant Trump has continued to express animus toward

Mexicans and Latinos through both his words and actions. In August 2017, in a speech in

Arizona, Defendant Trump described some undocumented immigrants as "animals."

98.     That same month, Defendant Trump pardoned former Sheriff Joe Arpaio for

contempt of court. Sheriff Arpaio had violated an injunction barring the Maricopa County

Sheriff's Office from implementing a policy that allowed officers to arrest someone on suspicion

of illegal presence and directed officers to consider "race or 'Mexican ancestry'" as a factor. *United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. 2017). By pardoning Sheriff Arpaio, Defendant Trump implicitly approved of unconstitutional discrimination against Latinos and Mexicans, and stated that Sheriff Arpaio was convicted merely for "doing his job."

99.     In his speeches since the Inauguration, when discussing the undocumented Latino community, Defendant Trump has characterized them as criminals and gang members.

100.     In his April 2017 prepared remarks announcing the Department of Justice's "Renewed Commitment to Criminal Immigration Enforcement," Defendant Sessions argued for securing the borders by taking a stand against "filth."

**The Trump Administration's Decision to Terminate the DACA Program**

101.     On June 29, 2017, Texas Attorney General Ken Paxton, along with the attorneys general of nine other states, wrote Defendant Sessions threatening to amend their complaint in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), to challenge the DACA program if Defendants did not terminate DACA by September 5, 2017.

102.     On September 5, 2017, Elaine Duke, then-Acting Secretary of DHS, issued a memorandum announcing that DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5, 2017 ("Duke Memorandum") (attached hereto as Exhibit E).

103.     Defendants Sessions and Trump and the Acting Secretary jointly made the decision to end DACA and jointly prepared the Duke Memorandum.

104.     The Duke Memorandum directed DHS to categorically reject all new applications for deferred action received after September 5, 2017. It also directed DHS to only consider

deferred action renewal applications from existing DACA recipients whose status expires on or before March 5, 2018, but only if such renewal applications were received by October 5, 2017. DHS is categorically rejecting deferred action renewal applications from DACA recipients whose deferred action expires after March 5, 2018 and has already started categorically rejecting renewal applications received after October 5, 2017.

105.    The Acting Secretary stated that the decision was based on two reasons: (1) the preliminary injunction issued against a separate program, *see Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam); and (2) Defendant Sessions' opinion that DACA "was an unconstitutional exercise of authority by the Executive Branch," *see* Ex. E, Duke Memorandum.

106.    DHS provided no other explanation for its decision to terminate DACA.

107.    The preliminary injunction issued by a Texas court does not reach the original DACA program. Rather, it enjoins the Deferred Action for Parents of Americans and Lawful Permanent Residents program, a different program that was never implemented.

108.    On September 5, 2017, Defendant Sessions held a press conference, falsely asserting that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." He stated further, "It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Attorney General Sessions Delivers Remarks on DACA*, Dep't of Justice (Sept. 5, 2017) (attached hereto as Exhibit F).

109.    While then-Secretary Duke based the decision to terminate DACA on the legally erroneous conclusion that DHS lacks authority to exercise its discretion in granting deferred action under DACA, Defendant Trump has made contradictory statements that suggest he

believes it is within his executive authority. On September 5, 2017, shortly after the DACA

Termination was published, Defendant Trump tweeted that if Congress did not act before March

5, 2018, he would "revisit this issue." If the unlawfulness of DACA were the true reason for

terminating the program, then the President would lack authority to "revisit" ending DACA.

110.    In addition, on September 14, 2017, a week after the Administration's

announcement terminating DACA, and facing multiple suits challenging his actions, Defendant

Trump tweeted, "Does anybody really want to throw out good, educated and accomplished

young people who have jobs, some serving in the military? Really!....." This statement is

inconsistent with previous statements by Defendant Trump and the Trump Administration, and

reflects the arbitrariness of the Administration's decision to end the program.

111.    The DACA status of more than 150,000 DACA recipients will expire before

March 5, 2018. Many of those individuals received the standard DHS renewal notice directing

the recipient to submit a renewal application "as soon as possible," and to avoid a lapse in status

by submitting the renewal application 120 to 150 days before expiration. *See* Dep't Homeland

Sec., I-797C Notice of Action, July 15, 2017 (attached hereto as Exhibit G).

112.    Defendants' renewal notices did not advise recipients whose status will expire

before March 5, 2018 that they, in fact, had to submit a renewal application by the October 5,

2017 deadline.

113.    On information and belief, DHS did not provide accurate or corrected

individualized notices to those DACA recipients who had to renew by October 5, 2017,

including those individuals whom Defendants had previously advised to renew "as soon as

possible" but without mention of the October 5, 2017 deadline.

**The Trump Administration's Unfair and Arbitrary Implementation of the DACA "Wind Down" Process**

114.    The Duke Memorandum provided that DHS would consider renewal applications from DACA recipients whose status was set to expire on or before March 5, 2018 and had not already expired before the date of the announcement, if DHS received the application by October 5. However, DHS refused to consider many renewal applications on the basis of factors over which the renewal applicants had no control, and without providing notice of the additional grounds for rejection.

115.    USCIS directed DACA renewal applicants to send applications to one of three "Lockboxes," located in Chicago, Dallas, and Phoenix. Each "Lockbox" has an address that receives applications sent via the U.S. Postal Service (a Post Office box) and a separate address that receives applications sent via FedEx, UPS, and DHL. DACA renewal applicants were each given one designated address to which to mail their renewal application based on their home address; this was the exclusive address to which they could mail their renewal application and no hand-delivered applications were accepted.

116.    At each Lockbox, upon information and belief, government agents retrieve applications, collect applicable fees, and verify that the applications do not have any facial clerical errors. Upon information and belief, USCIS staff then either forwards an application to a Service Center for adjudication or rejects the application and returns it to the applicant. New York DACA recipients were directed to send their renewal applications to the Chicago Lockbox, with a Chicago Post Office box address.

117.    USCIS never announced a time on October 5 by which renewal applications had to be delivered to the Lockbox. However, on information and belief, Lockbox staff stopped retrieving renewal applications from the designated Post Office box locations at some point in

the afternoon or evening of October 5. USCIS did not collect renewal applications that arrived at the Post Office boxes after that point until October 6, and USCIS subsequently rejected them as untimely.

118.    For example, Varlene Cooper is a DACA recipient and a member of MRNY. She came to the United States when she was about 12 years old and works two jobs, as an EMT and a dialysis technician, in order to support her two children and her ill mother. Ms. Cooper's renewal application arrived at the Chicago Lockbox's Post Office box address at 6:01 PM local time on October 5 and was available for pickup by 6:38 PM. However, the Lockbox staff did not retrieve the application until 7:21 the next morning. DHS rejected her renewal application as untimely, refusing to adjudicate it even though it arrived at the designated Post Office box on October 5. Ms. Cooper's deferred action grant expired on November 24, 2017.

119.    MRNY has eight other clients whose renewal applications arrived at the designated Post Office box address on October 5, but were not retrieved by USCIS staff until the next day and were subsequently rejected by USCIS as untimely.

120.    After MRNY sent a letter to Counsel for Defendants in this case, USCIS decided to reconsider Ms. Cooper's renewal application, and it was approved on November 30, 2017.

121.    Other DACA recipients mailed their renewal applications well in advance of the October 5 deadline, but the U.S. Postal Service unreasonably delayed the delivery of those applications. As a result, their applications arrived after October 5, and USCIS rejected them as untimely. *See* Liz Robbins, *Post Office Fails to Deliver on Time, and DACA Applications Get Rejected*, N.Y. TIMES (Nov. 11, 2017), attached hereto as Exhibit H.

122.    For example, Jorge Gonzalez Alvarado is a MRNY member and Staten Island resident who has lived in the United States since he was two years old. DACA has enabled him

to obtain a driver's license and begin a career in plumbing, through which he can support his parents. He just finished the first year of a plumbing apprenticeship program. Mr. Gonzalez Alvarado mailed his renewal application on September 14, 2017, but due to unforeseeable U.S. Postal Service delays, the renewal application was not delivered to the designated Post Office box until October 6, and USCIS did not retrieve the application until October 10. USCIS rejected Mr. Gonzalez Alvarado's application as untimely. Plaintiffs' counsel informed Counsel for Defendants of Mr. Gonzalez Alvarado's circumstances, but has yet to receive a response.

123.    DHS also rejected renewal applications that originally had been received by the October 5 deadline, but had been returned to the applicant due to real or perceived clerical errors. The rejection notices contained a sentence inviting the applicant to correct the error and re-file. In addition, many of these individuals received a separate document with their rejection notice and rejected applications, printed on a green piece of paper, inviting them to correct the error and re-apply with the green sheet on top of their re-submission packet, even if the applicant did not receive their rejection itself until after October 5. *See, e.g.*, Sample Invitation to Reapply, attached hereto as Exhibit I. Previous to Defendants' DACA Termination, individuals whose applications were rejected for minor clerical errors were allowed to correct those errors and re-submit, or in some cases, instead of outright rejecting an application, USCIS would issue a Request for Further Evidence ("RFE") and allow the applicant to provide that evidence within a designated period of time. However, in all cases rejected between September 6 and October 5, 2017, by the time applicants received their rejected applications and were able to resubmit with corrections, USCIS rejected their applications as untimely as having been filed after October 5. Upon information and belief, USCIS did not issue any RFEs to correct these minor errors, instead outright rejecting entire application filings.

124.    For example, Maria Santamaria Rivas is a MRNY member who has lived in the United States since she was 3 years old. She timely submitted her DACA renewal application after the announcement of the DACA Termination, with a check for her fees that was dated September 28, 2017. USCIS received the application on October 2, but a USCIS employee misread her check and rejected her entire application on that basis, stating, "The date on the check/money order is not current." Ms. Rivas's attorney received the Rejection Notice on October 10, 2017, and provided a new check as requested. USCIS rejected the resubmitted application as untimely. She was not considered for renewal of her DACA status. On November 17, 2017, a MRNY attorney emailed the USCIS Lockbox Support email to request that USCIS consider the corrected application with the original received date of October 2, 2017. *See* Copy of Email Exchange between Alexandra S. Lee, Esq., and Hillary, attached hereto as Exhibit J. On November 22, 2017, a USCIS Lockbox Support staff member, Hillary, responded in relevant part: "The original received date cannot be assigned to a resubmission. . . . USCIS is *currently not accepting* initial or renewal filings for DACA requests." *Id.* (emphasis in original). Subsequently, undersigned counsel requested reconsideration of Ms. Rivas's case, along with thirteen other individuals whose cases were rejected for minor perceived or actual clerical errors, on December 4, 2017, but have yet to receive a response from USCIS.

125.    In addition, some applications were affected by both the U.S. Postal Service delays and also contained real or perceived clerical errors, and were therefore rejected for either or both reasons, and not allowed to reapply.

126.    USCIS's arbitrary and unfair rejections of deferred action renewal applications were not limited to the Chicago Lockbox.

127.    The Phoenix Lockbox rejected at least seven California applicants whose applications were received before October 5 on the basis of perceived or actual clerical errors. At least one of these applicants received a separate document printed on a green piece of paper, inviting them to correct the error and re-submit their application, with no deadline for the re-submission. *See* Ex. I (Sample Invitation to Reapply). All of these individuals' re-submissions were subsequently rejected as untimely despite their attempts to resubmit corrected applications.

128.    Twelve applicants from Texas mailed their renewal applications to the Dallas Lockbox's designated Post Office box address on September 25 via certified mail, but the U.S. Postal Service delayed the delivery until October 6, 2017.  USCIS rejected the applications as untimely. The attorney for those twelve clients has contacted their Congress member and has attempted to re-submit them with USCIS, but has not yet received any response from USCIS.

129.    On November 15, 2017, counsel for Defendants announced that USCIS would, in fact, reconsider some DACA renewal applications that had been rejected, if they were delayed unreasonably by the U.S. Postal Service and the individual could provide "individualized proof" of the mail delay, or if the application was improperly rejected. *See* ECF No. 108, attached hereto as Exhibit K. While USCIS announced it would release further guidance on November 20, it did not do so until November 30.

130.    The November 30 USCIS website publication—a paragraph and a Frequently Asked Questions ("FAQs") on Rejected DACA Requests—was incomplete and still did not explain how individuals were supposed to re-submit their applications.  *See* U.S. Citizenship and Immigr. Servs., *Frequently Asked Questions: Rejected DACA Requests* (Nov. 30, 2017) ("Specific guidance will be provided soon about the steps that a DACA recipient must take to resubmit his or her renewal request to USCIS if the filing was rejected due to U.S. Postal Service

mail-service delays.") ("Nov. 30 FAQs"), attached hereto as Exhibit L. The Nov. 30 FAQs state that USCIS will directly contact individuals whose applications were received and erroneously rejected on October 5, and provides a 33-day period for resubmission once contacted by USCIS.

131.    On December 7, 2017, USCIS updated its FAQs to include information stating that individuals who were affected by mail delays will be contacted by USCIS by mid-December, and providing instructions on what to submit when they are invited to reapply. *See* U.S. Citizenship and Immigr. Servs., *Frequently Asked Questions: Rejected DACA Requests* (Dec. 7, 2017) ("Dec. 7 FAQs"), attached hereto as Exhibit M.

132.    The Nov. 30 FAQs and Dec. 7 FAQs do not address applications that were rejected for minor perceived or actual clerical errors. Both documents state, "If USCIS rejected your timely filed renewal request because it was not properly filed, that is a valid reason for rejection and it will not be reconsidered." Nov. 30 FAQs; Dec. 7 FAQs. These individuals, as well as individuals whose applications were affected by both mail delays and minor perceived or actual clerical errors, remain without relief.

133.    Because USCIS's November 15 and November 30 announcements did not provide guidance on how rejected applicants could re-submit and did not provide any relief for those rejected for real or perceived minor clerical errors, undersigned counsel sent a letter to Defendants' counsel on December 4, 2017, bringing the cases of 16 individuals to USCIS's attention and requesting reconsideration. While USCIS's subsequent December 7 FAQs provide some guidance to individuals whose applications were rejected due to mail delays, it still does not address individuals whose applications were rejected due to minor clerical errors or those affected both by mail delays and minor clerical errors.

134.     Individuals who had their applications rejected for perceived or actual minor clerical errors, including Ms. Rivas, are currently being harmed because USCIS is not accepting re-submission of their applications.

**Impact of the DACA Termination on Named Plaintiffs and the Putative Class**

135.     The DACA Termination has already begun to upend the lives of the nearly 800,000 DACA recipients, as well as those of their families, communities, and employers. Without DACA, the Individual Plaintiffs will soon lose their work authorization, preventing them from supporting themselves and their families. MRNY will lose approximately a dozen highly valued employees.

136.     For example, Mr. Batalla Vidal relies on his work authorization through DACA to work at a rehabilitation center caring for elderly and disabled patients; he supports himself, his mother, and his younger siblings. Without Mr. Batalla Vidal's income, he and his family will face substantial financial hardship.

137.     Ms. Fernandez depends on her work authorization to support herself and her two U.S.-citizen children.

138.     Additionally, the DACA Termination will prevent DACA recipients from enrolling in university and graduate programs since they will be unable to secure employment after graduating, blocking all future opportunities for professional or educational advancement. Similarly, their inability to secure employment while in school will severely hinder their financial ability to afford their education.

139.     For example, Mr. Alarcon relies on DACA to allow him to enroll as a Bachelor of Arts candidate at Queens College, where he is on track to graduate in December 2017.

140.    Ms. Fernandez has also relied on DACA to graduate from college and in September 2017 enrolled in graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

141.    The October 5, 2017 renewal deadline imposed on DACA recipients whose deferred action and work permit expire before March 5, 2018 was untenable for many DACA recipients for various reasons, including financial ones. The rush to file an important application on less than a month's notice also led to many individuals making minor errors, such as forgetting to check a box, forgetting to sign or signing in the wrong place, or submitting a check for what applicants previously had to pay for DACA renewal—$465, instead of the new fee of $495—or for some other erroneous amount.

142.    The October 5, 2017 renewal deadline imposed on DACA recipients was also administered in an arbitrary manner. Many DACA recipients submitted their renewal applications as soon as they could before the October 5 deadline, but were nonetheless rejected for reasons outside of their control. The harms of this are already beginning to be felt: for example, four MRNY members' current grants of DACA expire in December 2017: a father of five U.S. citizen children; a twenty-one-year-old who has lived in the U.S. since he was six years old; a young man who is both working and going to college full time; and a nineteen-year-old college student who has been in the U.S. since she was three years old. These four individuals— along with many others across the country—stand to lose everything they have worked for in the only country they know as home.

143.    In addition, the September 5, 2017 cutoff for initial applicants has inflicted severe harm on those who were unable to file by September 5, 2017.

144.    For example, Jose Rangel is DACA eligible, lives in Houston, Texas, and is thirty-four years old. He arrived in the United States from Mexico when he was six. He is married and has a seven-year-old U.S.-citizen daughter.

145.    Mr. Rangel did not apply for DACA in 2012 because he received erroneous legal advice that he was not eligible. Years later, a friend insisted he was eligible and encouraged him to apply.

146.    In mid-to-late August 2017, Mr. Rangel and his lawyer completed his initial application, which was ready to be finalized and mailed. On September 5, 2017, when Mr. Rangel heard Defendant Sessions' announcement, he was relieved that he had finished his DACA application two-weeks earlier and assumed it had been submitted.

147.    After calling his lawyer to confirm, Mr. Rangel found out that due to Hurricane Harvey, his lawyer's office had been closed and they were behind on mailing out applications— preventing his initial DACA application from being filed by September 5, 2017 and depriving him of the opportunity to receive deferred action.

148.    Similarly, M.J. is an eighteen-year-old Mexican national who has lived in the United States for almost all of her life. M.J.'s U.S.-citizen stepfather had been in the process of petitioning for her to receive permanent resident status. However, her stepfather became abusive and recently abandoned the family petition, leaving M.J. without status.

149.    M.J. met with non-profit attorneys who advised her to apply for DACA. The attorneys started work on the case, but Hurricane Harvey prevented them from completing the application because their homes and offices were flooded and closed.

150.    On the day Harvey landed, the attorneys tried to work with M.J. to get documents together and file for DACA prior to the expected announcement of the program's termination,

but Houston was largely under water and the schools were closed, preventing M.J. from getting the requisite documents, the attorneys from getting into the office, and the postal service from sending any mail. There was no viable way for M.J. to file her DACA before September 5th.

151.    The DACA Termination, in most states, including New York, will prevent individuals from obtaining driver's licenses or state identification cards. For example, Ms. Fernandez relies on her driver's license to bring her children to school every day and the doctor when needed. Many DACA recipients rely on driver's licenses or state identification cards as a form of photo identification for banking, insurance, notarizations, and other everyday services.

152.    Moreover, the DACA Termination places these individuals at risk of immediate apprehension and deportation. Under Defendant Trump, DHS has significantly increased its targeting of DACA recipients whose statuses have lapsed for deportation.

153.    The Trump Administration's new enforcement priorities, which are so all encompassing that they cannot in earnest be called "priorities," target individuals who would qualify for DACA. Trump has directed DHS to prioritize for removal anyone present in the United States without admission or parole, including those eligible for DACA under the 2012 guidance.

154.    In fact, at the same time the DACA Termination was announced, the government issued "talking points" stating, *inter alia*, that: "The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorization to prepare for and arrange their departure from the United States . . . ." Similarly, a DHS "Frequently Asked Questions" document issued the same day refers to the time period prior to March 5, 2018 as a "grace period for DACA recipients" whose grants of deferred action will soon expire "to make appropriate plans to leave the country."

155.     DHS can easily deport the Plaintiffs because the Department already has their

personal information. Plaintiffs and other DACA recipients provided extensive personal

information to DHS in reliance on the agency's repeated promises to use the information only to

grant them protection from deportation, and not to use that information for immigration-

enforcement purposes except in narrow, delineated circumstances.

156.     Notwithstanding those prior assurances, DHS has changed its policy regarding the

permissible uses of the information provided by DACA applicants to remove the limitations on

using that information for immigration-enforcement purposes.  This policy change constitutes

final agency action.

157.     If they are deported from the United States, Plaintiffs and others similarly situated

face grievous harm. The Individual Plaintiffs, as well as the members and clients of MRNY, will

be forced to leave the only country that many of them have known as home; they have grown up

in American neighborhoods, attended American schools, and have structured their lives around

living in the United States.

158.     The termination of DACA is already having profound impacts on the lives of

DACA recipients. DACA recipients, including Individual Plaintiffs, fear deportation. Some have

started to make provisions for what happens if they were deported, such as having difficult

conversations with their parents and children about emergency plans.

159.     Faced with the loss of their work authorization, many DACA recipients, including

Mr. Batalla Vidal, have taken on additional jobs while they still have work authorization.

## **CLASS ACTION ALLEGATIONS**

160.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Named

Plaintiffs seek to represent a certified Plaintiff class consisting of (1) all persons with deferred

action through DACA as of September 5, 2017; and (2) all persons who are or will be eligible for deferred action under the terms of the original DACA guidance issued by the Department of Homeland Security ("DHS") in 2012; (3) *except* the individual recipients of, or applicants for, deferred action through DACA who are Plaintiffs in other actions challenging the DACA Termination in a U.S. District Court as of December 11, 2017.[2]

161.    Plaintiffs seek to represent the above-described class for all claims except that under the Regulatory Flexibility Act.

162.    This action meets all the Rule 23(a) prerequisites for maintaining a class action.

163.    The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1). Defendants' decision to terminate the DACA program without providing adequate reasons and based on legal error, without going through the proper notice-and-comment procedure, without providing corrected notices to individual recipients subject to the October 5, 2017 renewal deadline, and based on animus toward individuals of Latino and Mexican origin, harms millions of individuals residing throughout the United States. In addition, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights and rights under the APA.

164.    This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

---

[2] Other cases challenging the DACA termination currently before a U.S. district court as of December 11, 2017 include *New York v. Trump*, No. 17-cv-5228 (E.D.N.Y. filed Sept. 6, 2017); *Regents of Univ. of California v. DHS*, No. 17-cv-05211 (N.D. Cal. filed Sept. 8, 2017); *State of California v. DHS*, No. 17-cv-05235 (N.D. Cal. filed Sept. 11, 2017); *City of San Jose v. Trump*, No. 17-cv-05329 (N.D. Cal. filed Sept. 14, 2017); *Garcia v. United States of America*, No 17-cv-05380 (N.D. Cal. filed Sept. 18, 2017); *County of Santa Clara v. Trump*, No. 17-cv-05813 (N.D.Cal. filed Oct. 10, 2017); *CASA de Maryland v. DHS*, No. 17-cv-02942 (D. Md. filed Oct. 5, 2017); *NAACP v. Trump*, No. 17-v-01907 (D.D.C. filed Sept. 18, 2017); and *Park v. Sessions*, No. 17-cv-01332 (E.D. Va. filed Nov. 21, 2017).

a.  whether the DACA Termination constituted a substantive rule, such that notice-and-comment rulemaking was required under 5 U.S.C. § 706(2)(D);

b.  whether Defendants' DACA Termination and change in the policy regarding the permissible uses of the sensitive information DACA applicants provided was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A);

c.  whether Defendants failed to provide corrected notices to individuals whom Defendants had previously written advising them to renew "as soon as possible" but without mention of the October 5, 2017 deadline, in violation of procedural due process;

d.  whether Defendants unfairly and arbitrarily rejected deferred action renewal applications in violation of procedural due process; and

e.  whether the termination of DACA was substantially motivated by animus toward individuals of Latino and Mexican origin, and whether it had a disparate impact on such individuals in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

165.    The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3). Like the other members of the class, the Defendants' termination of the DACA program and change to the confidentiality policy without providing adequate reasons, in violation of 5 U.S.C. § 706(2)(A); failure to go through the proper notice-and-comment procedure, in violation of 5 U.S.C. § 706(2)(D); having its decision substantially motivated by animus, in violation of the equal protection guarantee of the Fifth Amendment; failure to provide adequate notice to individuals who were obligated to renew by October 5, 2017, in violation of the Due Process Clause of the Fifth Amendment; and arbitrarily and unfairly rejecting renewal

applications, in violation of the Due Process Clause of the Fifth Amendment, harms the Named Plaintiffs.

166.    The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4).

167.    The Named Plaintiffs' interests do not conflict with other members of the class. Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subjected to agency rules that are promulgated without adequate basis, without undergoing the required notice-and-comment procedure, and that are implemented without fair notice and based on animus toward individuals of Latino and Mexican origin.

168.    The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class would rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

169.    With respect to Rule 23(a)(4) adequacy, undersigned counsel are qualified, experienced, and able to conduct the litigation. The attorneys have the necessary knowledge, experience, and resources to litigate this matter. In addition, attorneys have expended the time and effort necessary to identify the class.

170.    Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

171.    This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' unlawful termination of the DACA program and changes to the confidentiality policy pose a real and immediate threat generally applicable to each member of

the class, thus making final declaratory and injunctive relief with respect to the class as a whole appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action Without Observance of Procedure Required By Law**
**By all Plaintiffs against Defendants Nielsen and Sessions**

172.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

173.    The APA requires that agency action that is substantive in nature follow notice-and-comment procedures. 5 U.S.C. § 706(2)(D).

174.    The DACA Termination constitutes a substantive rule, as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria.

175.    It is undisputed that Defendants failed to follow notice-and-comment rulemaking procedures prior to issuing the DACA Termination.

176.    Defendants' termination of DACA violated the APA.

### SECOND CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action that is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law**
**By all Plaintiffs against Defendants Nielsen and Sessions**

177.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.    The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

179.     Defendants' DACA Termination and its change to the confidentiality of DACA applicant information constitute final agency action, and are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law because they (a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors.

180.     Defendants justified the DACA Termination on the grounds of litigation risk and the legal conclusion that the program is unlawful. These grounds are inadequate to justify termination, are legally erroneous, and fail to address the government's previous conclusion that the DACA program was lawful. These justifications are also contradicted by Defendant Trump's own subsequent statement that he would "revisit" the termination if necessary.

181.     Defendants provided no justification for many of the details of the DACA Termination, including the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file renewal applications; the March 5, 2018 cut-off for renewal eligibility; and changes to the confidentiality of applicant information.

182.     Defendants' termination of DACA and changes to the confidentiality of DACA-applicant information violated the APA.

### THIRD CLAIM FOR RELIEF
### Regulatory Flexibility Act
### By Plaintiff MRNY against Defendants Nielsen and Sessions

183.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.     DHS failed to conduct any regulatory flexibility analysis to determine how the DACA Termination will affect small entities, such as MRNY, in violation of the Regulatory Flexibility Act. 5 U.S.C. §§ 601 *et seq.*

185.    MRNY, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the DACA Termination, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

186.    It is undisputed that Defendants failed to conduct a regulatory flexibility analysis.

187.    Defendants' termination of DACA violated the RFA.

### FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Nielsen and Sessions

188.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.    The hallmark of due process is notice and a meaningful opportunity to be heard.

190.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

191.    Defendants have not provided DACA recipients with the process to which they are entitled.

192.    Defendants, in individualized written notices, advised many DACA recipients whose status expires by March 5, 2018 to apply to renew "as soon as possible" and, to ensure no lapse in status, to renew between 120 to 150 days before expiration.

193.    Defendants did not send corrected notices to these DACA recipients advising them that they needed to apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status.

194.    Defendants' failure to issue corrected notices advising of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

## FIFTH CLAIM FOR RELIEF
### Fifth Amendment (Equal Protection)
### By all Plaintiffs against All Defendants

195.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

196.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

197.    The DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups.

198.    Defendants Sessions, Nielsen, and Trump have violated the equal protection guarantee of the Fifth Amendment because the DACA Termination was substantially motivated by animus toward Latinos and, in particular, Mexicans.

## SIXTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By Plaintiff MRNY against Defendants Nielsen and Sessions

199.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

200.    The hallmark of due process is notice and a meaningful opportunity to be heard.

201.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

202.    In the implementation of the October 5 deadline for renewal applications, Defendants have not provided DACA recipients with the process to which they are entitled.

203.    Defendants did not provide any notice of additional specific requirements that USCIS imposed for receiving and rejecting renewal applications or their resubmissions under the

November 15 and November 30 USCIS guidance and FAQs. While the December 7 FAQs add some instructions for individuals who were affected by unreasonable mail delay, they still do not address individuals whose applications were rejected unfairly for minor perceived or actual clerical errors, or who were affected both by U.S. Postal Service mail delays and minor perceived or actual clerical errors.

204.    For example, Defendants rejected renewal applications that arrived at the designated Post Office box in the late afternoon and evening of October 5 without notifying DACA recipients of a specific time deadline other than the date of October 5. Defendants failed to specify that applications that arrived at their Post Office box would not be considered "received" until the applications had been transferred to the appropriate Lockbox or service center, such that the address Defendants provided for applicants to meet the October 5 deadline was not actually an address that allowed a person to meet the "received by" deadline imposed by DHS. Defendants likewise ignored the postmark dates on renewal applications, notwithstanding that the postmarks showed significant delays that were attributable to the U.S. Postal Service and not the applicants themselves. Moreover, Defendants rejected renewal applications on the basis of real or perceived clerical errors, and in many cases provided rejected applicants with a green document inviting them to correct the error and reapply; yet Defendants again rejected as untimely applicants' resubmitted renewal applications that had corrected or clarified those errors.

205.    Defendants' arbitrary and unfair implementation of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

206.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are void and without legal force or effect;

207.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702–706;

208.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA are in violation of the equal protection and due process guarantees of the Fifth Amendment of the U.S. Constitution and contrary to the law of the United States;

209.    Vacate and set aside the DACA Termination and any other action taken by Defendants to terminate DACA, including the change to the confidentiality of DACA-applicant information;

210.    Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from implementing or enforcing the DACA Termination and the change in confidentiality of DACA-applicant information, and from taking any other action to terminate DACA that is not in compliance with applicable law or the U.S. Constitution;

211.    Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from denying individuals who were eligible to renew their deferred action under the terms of the DACA Termination Memo the opportunity to re-submit their renewal applications; and

212.    Grant such other relief as this Court deems just and proper.

Dated: December 11, 2017

    Respectfully submitted,

    /s/ Jessica R. Hanson

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern
Healy Ko, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
Phone: (203) 432-4800


Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.*
Alexia Schapira, Esq.*
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. [†]
Mayra B. Joachin, Esq. [†]
Karen C. Tumlin, Esq.[†]
Trudy S. Rebert, Esq.*+
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd, #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900


Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441


Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[†] *Appearing* pro hac vice
* *Pro hac vice* motion forthcoming
+Admitted only in Louisiana

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2017, a true and correct copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Jessica R. Hanson

Jessica R. Hanson, Esq.
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90070
Phone: (213) 639-3900