## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals.

*Plaintiffs*,

*v.*

KIRSTJEN M. NIELSEN, Secretary of the Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,

*Defendants.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Case No. 1:16-cv-04756 (NGG) (JO)

Dated: December 15, 2017

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.    The Benefits of DACA ......................................................................................... 2

    II.    The Termination of DACA ................................................................................... 6

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ..................................................................................................................... 9

I.       The DACA Termination Is Arbitrary and Capricious ..................................................... 10

    A.    Defendants failed to adequately explain the reasons for the DACA Termination ......... 11

    B.    Defendants failed to provide a reasoned explanation for their policy reversal, particularly in light of the serious reliance interests at stake ................................................ 15

    C.    Defendants failed to consider all factors relevant to the DACA Termination .............. 19

    D.    Defendants' proffered reasoning is inadequate to justify the DACA Termination ........ 20

        1.  "Litigation Risk" cannot justify the DACA Termination ……………………..……20

        2.  Any reliance on a determination that DACA is unlawful is legally erroneous ….   23

    E.    Defendants' proffered reasons for the DACA Termination were pretextual and given in bad faith ................................................................................................................. 26

II.      DHS Did Not Comply with the APA's Notice and Comment Requirements ................. 28

III.    Plaintiffs Are Likely to Prevail on Their Regulatory Flexibility Act Claim ................... 33

IV.    Plaintiffs Satisfy Other Requirements to Obtain Preliminary Relief ............................... 35

    A.    Plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief ............................................................................... 35

    B.    The balance of equities & public interest weigh heavily in favor of provisional relief . 38

CONCLUSION .................................................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

*Abdi v. Duke*,
  No. 1:17–CV–0721 EAW, 2017 WL 5599521 (W.D.N.Y. Nov. 17, 2017)............................ 39

*Aeronautical Radio, Inc. v. FCC*,
  928 F.2d 428 (D.C. Cir. 1991) ................................................................................... 11

*Am. Fed'n of Labor v. Chertoff*,
  552 F. Supp. 2d 999 (N.D. Cal. 2007) ....................................................................... 35

*Am. Forest Res. Council v. Ashe*,
  946 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................... 32

*Amerijet Intern'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ................................................................... 13, 14, 15

*Ariz. Dream Act Coal. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) ............................................................................... 18, 37

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................................................... 24

*Arpaio v. Obama*,
  797 F.3d 11 (DC Cir. 2015) …………………………………………………………….. 7

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ................................................................................... 30

*Bowen v. Am. Hosp. Ass'n*,
  476 U.S. 610 (1986)............................................................................................ 11, 13

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)................................................................................................... 21

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)................................................................................................... 21

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)............................................................................................ 10, 26

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ............................................................................ 30, 31

*Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n.*,
  673 F.2d 425 (D.C. Cir. 1982) ......................................................... 25, 32

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ................................................................ 7

*Delgadillo v. Carmichael*,
  332 U.S. 388 (1947) ........................................................................... 14

*Dickson v. Sec'y of Def.*,
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................ 13

*E.E.O.C. v. Ethan Allen, Inc.*,
  44 F.3d 116 (2d. Cir. 1994) ................................................................ 27

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .............................................................. *passim*

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) ............................................................ 38

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) .............................................................. 38

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................. *passim*

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................... 26

*FTC v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972) ........................................................................... 13

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ............................................................ 30

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ................................................................. 36

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
  853 F. Supp. 2d 138 (D.D.C. 2012) ................................................... 32

*Int'l Refugee Assistance Project v. Trump*, CV TDC-17-0361,
  2017 WL 4674314 (D. Md. Oct. 17, 2017) ......................................... 27

*Islander E. Pipeline Co. v. Conn. Dep't of Envtl Protection*,
    482 F.3d 79 (2d Cir. 2006)..................................................................... 21

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ............................................................ 29

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ............................................................ 16

*Jones v. Nat'l Conf. of Bar Exam'rs*,
    801 F. Supp. 2d 270 (D. Vt. 2011)................................................. 35, 38

*Judulang v. Holder*,
    565 U.S. 42 (2011).................................................................. 10, 11, 14

*Lewis-Mota v. Sec'y of Labor*,
    469 F.2d 478 (2d Cir. 1972)................................................................. 30

*Long Island Head Start Child Dev. Servs. v. NLRB*,
    460 F.3d 254 (2d Cir. 2006)................................................................. 19

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)............................................................................. 23

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................... 29

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................................. 21

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)......................................................................... 19

*Mo. Pub. Serv. Comm'n v. Fed. Energy Regulatory Comm'n*,
    337 F.3d 1066 (D.C. Cir. 2003) ........................................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).......................................................................*passim*

*Nat. Res. Def. Council v. EPA*,
    676 F. Supp. 2d 307 (S.D.N.Y. 2009)................................................... 32

*NLRB v. Columbia Univ.*,
    541 F.2d 922 (2d Cir. 1976)................................................................. 21

*Nw. Mining Ass'n v. Babbitt,*
  5 F. Supp. 2d 9 (D.D.C. 1998) ................................................................. 34

*Nat'l Audubon Soc'y v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) ....................................................................... 26

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  417 F.3d 1272 (D.C. Cir. 2005) ............................................................... 33

*Neil v. Biggers,*
  409 U.S. 188 (1972) ............................................................................... 24

*New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n,*
  727 F.2d 1127 (D.C. Cir. 1984) ............................................................... 11

*N.Y. Pathological & X-Ray Labs., Inc. v. Immigration & Naturalization Serv.,*
  523 F.2d 79 (2d Cir. 1975) ....................................................................... 36

*N.Y. Progress & Prot. PAC v. Walsh,*
  733 F.3d 483 (2d Cir. 2013) ................................................................. 9, 38

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) ................................................................... 22

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) .................................................................... *passim*

*Pollis v. New Sch. for Soc. Research,*
  829 F. Supp. 584 (S.D.N.Y. 1993) ........................................................... 36

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.,*
  463 U.S. 1216 (1983) ........................................................................ 26, 32

*Pub. Citizen v. Heckler,*
  653 F. Supp. 1229 (D.D.C. 1986) ........................................................... 26

*Pub. Citizen v. Steed,*
  733 F.2d 93 (D.C. Cir. 1984) ................................................................... 20

*Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  940 F.2d 679 (D.C. Cir. 1991) ............................................................... 30

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ............................................................................... 23

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999) .................................................................. 36

*SEC v. Chenery Corp.*,
   (*Chenery I*), 318 U.S. 80 (1943) ....................................................... 13, 23

*SEC v. Chenery Corp.*,
   (*Chenery II*), 332 U.S. 194 (1947) ......................................................... 12

*Shapiro v. Cadman Towers, Inc.*,
   844 F. Supp. 116 (E.D.N.Y. 1994) ........................................................ 36

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2012) ......................................................... 22

*Squaw Transit Co. v. United States*,
   574 F.2d 492 (10th Cir. 1978) .............................................................. 26

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................ 22, 25, 32

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ................................................................ 25

*Time Warner Cable Inc. v. FCC*,
   729 F.3d 137 (2d Cir. 2013) ................................................................. 29

*Time, Inc. v. U.S. Postal Serv.*,
   685 F.2d 760 (2d Cir. 1982) ................................................................. 13

*Tummino v. Hamburg*,
   936 F. Supp. 2d 162 (E.D.N.Y. 2013) ............................................... 11, 28

*Tummino v. Torti*,
   603 F. Supp. 2d 519 (E.D.N.Y. 2009) .................................................... 28

*U.S. Telecom Ass'n v. FCC*,
   400 F.3d 29 (D.C. Cir. 2005) ................................................................ 34

*United Mine Works of Am. v. U.S. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ................................................................ 22

*United States v. Lott*,
   750 F.3d 214 (2d Cir. 2014) ................................................................. 29

vi

*United States v. Picciotto*,
  875 F.2d 345 (D.C. Cir. 1989) ........................................................................ 29

*United States v. Texas*,
  136 S. Ct. 2271 (2016) ............................................................................... 24, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................... 9, 35

*Yale-New Haven Hosp. v. Leavitt*,
  470 F.3d 71 (2d. Cir. 2006) ...................................................................... 10, 20

*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d. Cir. 2013) ......................................................................... 27

**Federal Statutes and Regulations**

5 U.S.C. § 551(4)-(5) ................................................................................ 28, 31

5 U.S.C. § 553, (b)(3)(A) ...................................................................... 28, 29, 33

5 U.S.C. § 604(a)(3) ...................................................................................... 34

5 U.S.C. § 611(a)(1) ...................................................................................... 33

5 U.S.C. § 706(2)(A), (2)(D) ................................................................. *passim*

5 U.S.C. §§ 601-612 ...................................................................................... 33

6 U.S.C. § 202(5) .................................................................................... 23, 27

8 U.S.C. §§ 1324(a)-(c) ................................................................................. 38

8 U.S.C. § 1324a(a)(1)-(2) ............................................................................. 34

8 C.F.R. § 274a.12(c)(2014) ..................................................................... 3, 23

Retention of EB-1, EB-2, & EB-3 Immigrant Workers and Program Improvements Affecting
  High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82,893 (Nov. 18, 2016)......................35

Chinese Student Protection Act of 1992, Pub. L. 102-404, 106 Stat. 1969.................................. 3

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 .................................................. 3

Section 568(c) of the Department of Homeland Security Appropriations Act, Pub. L. No. 111-83,
  123 Stat. 2142, 2186 (2009)......................................................................... 3

## INTRODUCTION

The Deferred Action for Childhood Arrivals ("DACA") program provided a channel for nearly 800,000 young people—Americans in all but formal status—to request deferred action, a form of prosecutorial discretion that removed the otherwise ever-present threat of deportation. Access to deferred action transformed the lives of these young people, enabling them to attain work authorization, secure better paying jobs, pursue higher education, support their families, and plan for their future. DACA's impact goes far beyond the individuals who received deferred action: their families, schools, employers, and communities across the country have benefitted from and relied on the opportunities DACA made possible. On September 5, 2017, Defendants abruptly terminated the program, upending the lives of millions across the country.

Defendants claim that this sweeping decision, taken without public consultation, has been sufficiently justified by a five-page memorandum (the "Duke Memo") containing one sentence of conclusory reasoning. Defendants are wrong. Regardless of one's views on the wisdom of DACA, the Administrative Procedure Act's demand for accountability and transparency are violated when agencies make such a momentous decision, and upend the lives of so many, with such a scant and ambiguous explanation.  So unclear is the reason for ending DACA, in fact, that the government attorneys defend the action by invoking a phrase ("litigation risk"), itself opaque, that nowhere appears in the Duke Memo or the administrative record, and then present that phrase as a talismanic incantation that dispenses entirely with the APA's most basic requirement that agencies demonstrate that their decisions are the product of reason.  Not so.  Nor, for that matter, does that alleged risk obviate the need for agencies to go through notice and comment when imposing binding rules, as the Duke Memo unquestionably did.

Defendants' decision to terminate DACA is already having widespread and catastrophic impact. Since September 5, 2017, over 11,000 DACA recipients have lost deferred action and the

1

ability to work lawfully in this country—a number that grows by an estimated 122 individuals daily. By March 5, 2018, approximately 22,000 young people who were unable to renew by October 5 will permanently lose their deferred action and employment authorization. Countless other individuals, businesses, and organizations have also already been affected. Without relief from this Court, nearly one million young people will lose their ability to legally work and will be at immediate risk of deportation. The impact of Defendants' decision to terminate DACA will fall disproportionately on communities of color—93% of individuals with deferred action under DACA are Latino. *See* Wong Decl., Ex. KKK ¶ 5.

Unless this Court grants preliminary relief, DACA recipients, their families, and communities will suffer irreparable harm *each* day that Defendants' unlawful actions are permitted to remain in place. The imminent harms facing Plaintiffs and the Plaintiff class warrant relief, and both the balance of equities and the public interest weigh in favor of granting it.

## BACKGROUND

### I.    The Benefits of DACA

The individual Plaintiffs ("DACA Plaintiffs"), like nearly 800,000 other young people granted deferred action through the DACA program, have lived in the United States since they were children and know this country as their only home. *See* Ex. A; Galicia Decl., Ex. CCC ¶ 2; Vargas Decl., Ex. EEE ¶ 1. As they grew up, professional and life opportunities available to their classmates were unattainable for them by virtue of their lack of immigration status. *See* Yoshikawa Decl., Ex. FFF ¶¶ 14-16; R. Gonzales Decl., Ex. B ¶¶ 6-8. Plaintiff Mariano Mondragon, for example, could not obtain a driver's license because he lacked a Social Security number. Mondragon Decl., Ex. GGG ¶ 10. Similarly, Plaintiff Martín Batalla Vidal was advised not to attend college because his lack of status would make it virtually impossible for him to obtain a job after graduation. Batalla Vidal Decl., Ex. HHH ¶ 11.

In 2012, the Department of Homeland Security ("DHS") created DACA, which provided a streamlined way for people who arrived in the United States as children and who met other eligibility criteria to request deferred action. Deferred action long has been recognized as a lawful exercise of the executive branch's prosecutorial discretion that allows DHS to "temporarily defer[] the removal of an alien unlawfully present in the United States." Administrative Record ("AR") 12-15. Pursuant to longstanding regulation, and upon a showing of economic necessity, deferred action recipients can apply for work authorization. *See* 8 C.F.R. § 274a.12(c)(14).

DACA program built on more than a half century of discretionary programs exercising deferred action for immigrants whose removal represented little value to the executive branch, including: certain refugees; family members of U.S. residents who had lawful status; and certain trafficking and crime victims and their families, among others. *See* AR 15-18. Most of the prior deferred action programs that benefitted individuals from a group of similarly situated people remained in place until Congress passed legislation regularizing the status of immigrants in the respective class.[1] DACA is legally no different from these other uses of deferred action.

DACA allowed young people to request a two-year period of deferred action if they met certain criteria.[2] DHS determined that utilizing its limited enforcement resources on these individuals was nonsensical because DACA-eligible individuals posed no national security or

---

[1] *See, e.g.*, Chinese Student Protection Act of 1992, Pub. L. 102-404, 106 Stat. 1969 (superseding Executive Order 12711 by allowing adjustment of status of certain Chinese nationals who received a form of deferred action after the Tiananmen Square massacre); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (superseding the Family Fairness program by allowing relatives of individuals eligible to adjust status under the Immigration Reform and Control Act of 1986); Section 568(c) of the Department of Homeland Security Appropriations Act, Pub. L. No. 111-83, 123 Stat. 2142, 2186 (2009) (allowing certain surviving spouses to adjust status based on their deceased U.S. citizen spouses).

[2] Applicants were required to demonstrate that they: (1) came to the U.S. before turning sixteen years old; (2) resided in the United States continuously since June 15, 2007 and were present in the United States on the day of the announcement of the program in June 2012; (3) were currently in school, had graduated high school or obtained a General Equivalency Diploma, or were an honorably discharged military veteran; (4) had not been convicted of any felony or significant misdemeanor, three misdemeanors, or otherwise posed a security threat to the United States; and (5) were not above the age of thirty on the day the program was announced. *See* AR 1.

3

safety risk, "know only this country as home," and "have already contributed to our country in significant ways." AR 1-2.

Under the 2012 guidance creating DACA (hereinafter, the "2012 DACA Memo"), DACA-eligible youth submitted requests for deferred action, with supporting documentation and requisite fees, to U.S. Citizenship and Immigration Services ("USCIS"). Ex. C, 23:22-31:22; Ex. D, 40:13-22, 48:2-17, 182:11-24; Ex. E. USCIS adjudicators then verified the applicant's eligibility and performed a background check. *Id.* If the applicant met the criteria and passed the background check, the adjudicator exercised her discretion to determine on a case-by-case basis whether to grant deferred action.[3] *Id.* As the first set of DACA recipients' deferred action grants neared expiration, USCIS developed guidelines for a streamlined renewal process, under which applicants needed only to submit an updated background check and offer renewed proof of necessity for work authorization. *Id.*

DACA transformed the lives of those granted deferred action and opened doors to countless professional, economic, and personal opportunities for the DACA Plaintiffs and hundreds of thousands of other young people. After receiving deferred action, Plaintiff Carolina Fung Feng obtained her teaching certificate and began her teaching career. Fung Feng Decl., Ex. III ¶ 21. DACA enabled Plaintiff Antonio Alarcon to pursue his political aspirations and he has become a leading advocate for youth in his community. Alarcon Decl., Ex. JJJ ¶¶ 27-31. With deferred action, Plaintiff Carlos Vargas was able to finish his undergraduate degree and enroll in CUNY Law School, while working as a Department of Justice Accredited Representative. Ex. EEE ¶¶ 17-18. Plaintiff Batalla Vidal, after working two jobs to afford college, is now a physical therapist

---

[3] Because the criteria for DACA eligibility included factors that would merit a favorable exercise of discretion, most DACA applicants were approved. DHS nonetheless denied deferred action to some individuals who met the DACA eligibility criteria as a matter of discretion. Ex. F, p. 34, Resp. to Request for Admission No. 73.

4

aide, caring for patients with serious health needs at a rehabilitation and nursing center in Queens, New York. Ex. HHH ¶ 34. Thanks to DACA, Plaintiff Eliana Fernandez could afford her dream of home ownership. Fernandez Decl., Ex. LLL ¶¶ 3, 8; *see also* Wong Decl., Ex. KKK ¶ 14(e) (noting that 16% of DACA recipients could purchase a home due to increased earnings). Overall, DACA enabled 54% of recipients to obtain a job that better fit their education, and 69% of recipients to obtain better paying employment. *Id.* ¶ 10(b)-(c).

For hundreds of thousands of young people, DACA also removed the constant threat of deportation that induced stress and limited mobility and access to services that others often take for granted. For example, Ms. Fernandez's driver's license, which she obtained because of DACA, allowed her to drive her children to school, activities, and necessary medical appointments without fear. Ex. LLL ¶¶ 13-14; *see also* Ex. KKK ¶ 25(a), (c) (90% of DACA recipients obtained their first driver's licenses due to DACA, and many were able to open their first bank account); Ex. FFF ¶¶ 9-10, 24-34 (describing DACA's mental health benefits).

Deferred action also allowed the DACA Plaintiffs, and the nearly 800,000 DACA recipients, to support their families and their communities in and around New York City and the country. *See, e.g.*, Wong Decl. ¶¶ 1, 27; Legomsky Decl., Ex. OOO ¶ 25. Several DACA Plaintiffs support family members—some of whom are United States citizens—with their increased earnings DACA facilitated. *See* Ex. HHH ¶¶ 31, 36, 44; Ex. III ¶ 24; Ex. LLL ¶¶ 1, 3, 8; *see also* Ex. KKK ¶¶ 14, 26 (73% of DACA recipients have a U.S. citizen family member and 71% provide their families financial support due to DACA). As noted above, the DACA Plaintiffs include a physical therapist aide, a legal services provider, a community organizer, a case manager, and a teacher. Ex. EEE ¶ 17; Ex. HHH ¶ 34; Ex. III ¶ 21; Ex. JJJ ¶ 27-28; Ex. LLL ¶ 6; *see also* Ex. KKK ¶¶ 8-9 (approximately 30% of DACA holders are in health, education, legal, or social-service

occupations, compared to 16.6% of native-born workers). The DACA program has also enabled Make the Road New York ("MRNY"), and other organizations, to hire culturally competent and well-qualified staff. Valdes Decl., Ex. MMM ¶¶ 6-7, 43; *see also* Carrizales Decl., Ex. I ¶ 11; O'Brien Decl., Ex. J ¶¶ 3-4; Schwartz Decl., Ex. K ¶ 8. Moreover, the DACA Plaintiffs' and putative class members' improved career prospects have provided significant tax revenue to federal and state tax rolls. Essig, Wiehe & Hill Decl., Ex. L ¶ 7; Ex. KKK ¶ 15; Brannon Decl., Ex. NNN ¶ 14.

## II.     The Termination of DACA

On September 5, 2017, Attorney General Sessions announced at a press conference the decision to end DACA (hereinafter, the "DACA Termination"). In his prepared remarks, Sessions asserted, without evidence, that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." Ex. N. He also stated, again without evidence, that DACA "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Id.* The same day, Defendants released a letter Sessions had sent the day before to then-Acting Secretary of Homeland Security Duke, in which he asserts that DACA was an unconstitutional exercise of executive authority. AR 251. Sessions' letter claims, without any analysis, that the DACA program shares "legal and constitutional defects" with a deferred action program (known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA") preliminary enjoined in a case led by the State of Texas, such that "potentially imminent litigation would yield similar results." *Id.* The Sessions Letter recommended terminating the DACA program and rescinding the 2012 DACA Memo. *Id.*

Also on September 5, then-Acting Secretary Duke issued a memorandum terminating DACA. AR 252-56 ("Duke Memo"). The five-page Duke Memo included two pages of

background, recounting the *Texas* litigation concerning DAPA. AR 253-54. The Duke Memo stated that, in consideration of decisions in the *Texas* litigation regarding DAPA and the Sessions' letter sent the day before, it was "clear" that DACA "should" be terminated. AR 254. The Duke Memo proceeded to issue a series of directives instructing USCIS to "reject" any initial DACA applications received after September 5, 2017, and any newly filed renewal applications from individuals whose deferred action would expire after March 5, 2018, or whose deferred action had already expired as of September 5. AR 255. USCIS was instructed to accept and adjudicate renewal applications from individuals whose DACA expired on or before March 5, 2018, only if they were received on or before October 5, 2017—a one-month window from the September 5 announcement. *Id.* As implemented, DACA renewals that did not meet these criteria were categorically "rejected" without any exercise of discretion. Ex C, 25:8-11.

The Duke Memo contains numerous glaring omissions. It does not explain why DHS reversed then-Secretary of Homeland Security John Kelly's explicit decision to retain the DACA program in February 2017. AR 230. It does not explain whether (or why) it considered the DACA program unlawful. The Duke Memo likewise does not explain how or whether the agency considered the reliance interests that the program has engendered, or the benefits of the DACA program to 800,000 young people and their families, employers, and communities. Nor does it acknowledge that no court has held that the 2012 DACA program unlawful, despite legal challenges to it. *See, e.g.*, *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015); *Arpaio v. Obama*, 797 F.3d 11, 24 (DC Cir. 2015), *cert denied*, 136 S.Ct. (2016), *reh'g denied*, 136 S.Ct. 1250 (2016). The Duke Memo does not explain whether the agency considered alternatives to terminating the program entirely. And it does not explain how the agency weighed the threat of litigation from rescission of the program even as it references a threat of litigation if it were to retain the program.

Since September, more than 11,000 people have already lost the deferred action they obtained through DACA, Ex. A; some 11,000 more were unable to renew by October 5, and their periods of deferred action will expire no later than March 5, 2018. Ex. O (approximately 851 people lose DACA each week). USCIS initially rejected more than 900 renewal applications that were received on October 5, and thousands more that arrived after that date due to unreasonable postal delays. Exs. P, Q. USCIS has continued rejecting applicants who attempted to refile renewal applications that USCIS received timely but rejected for real or perceived minor clerical errors. *See, e.g.*, Ex. WW. After March 5, thousands more individuals will lose deferred action each month, having been denied the opportunity to renew. Ex. R.

DACA recipients, their families, employers, and communities have started to and will continue to experience immediate harms as soon as their periods of deferred action expire. If unable to renew, Plaintiff Batalla Vidal will no longer be able to provide medical care to his seriously ill patients and will lose his ability to support his family. Ex. HHH ¶¶ 44-46. He has taken on a second job to save money for when his deferred action lapses, and is consequently working nearly 60 hours a week in preparation for that dreaded day. *Id.* ¶ 45. As their periods of deferred action expire, recipients will experience the psychological toll of feeling unwelcome in the country they call home, and the constant anxiety and worry that they may be deported and separated from their families. Ex. B ¶¶ 33-37; Suarez-Orozco Decl., Ex. T ¶¶ 12-15; Ex. FFF ¶¶ 24-34; Ex. KKK ¶ 22.

MRNY, like many small and large employers, from technology to healthcare, will be forced to fire numerous skilled and culturally competent staff members who cannot be adequately or easily replaced by non-DACA recipients. Ex. MMM ¶¶ 6-7, 43-44, 47-61; *see also* Ex. K ¶¶ 3, 7-9; Nishi Decl., Ex. U ¶ 4; Stobo Decl., Ex. V ¶¶ 6, 10-12; Tellefson Decl., Ex. EE ¶ 11. MRNY's

8

productivity as a whole would suffer if it is forced to replace its staff members who have deferred action through DACA, as those staff are "fully integrated" into MRNY's "staff community." Ex. MMM ¶ 45. In addition, MRNY's immigration legal team had to put aside much of their active casework to prioritize assistance for DACA recipients eligible to renew, and many of them continue to work evenings and weekends to catch up on the work they had to set aside in September. *Id.* ¶ 38. MRNY staff have also expended significant time to provide mental health support to members, clients, and other staff due to the destructive consequences of the DACA Termination. *Id.* ¶ 39. MRNY's health team staff have also had to deprioritize active work to prevent current DACA recipients from losing access to health care. *Id.* ¶ 41.

## LEGAL STANDARD

Preliminary injunctive relief is warranted where plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) an injunction is "in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

The decision to terminate DACA was hugely consequential, profoundly affecting countless individuals, families, employers, and educational and governmental institutions across the country. Through the safeguards of the APA, Congress has mandated that when federal agencies exercise their considerable delegated power to make decisions of this nature, they do so on an informed basis. Agencies are required to consider the multitude of relevant factors and after going through all appropriate procedures; clearly articulate a reasoned basis for their choice, including an explanation for departures from prior findings or conclusions; and ground their justifications on

neutral and rational principles. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). To ensure that they satisfy these requirements, Congress subjected such decisions to "searching and careful" review by the courts, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), which are to "set aside" agency action that falls short of the APA's procedural or substantive requirements, 5 U.S.C. § 706(2)(A), even if the same ultimate action could have been taken had the agency met those requirements.

Defendants have failed to meet these requirements. Instead, the profoundly important decision at issue here was made without process, factfinding, or even explanation.  The DACA Termination's imposition of a binding norm, moreover, made it a substantive (or "legislative") rule that was required to go through notice-and-comment rulemaking, and its effects on small businesses and other small entities mandated an analysis under the RFA as well. For each of these reasons, the decision to terminate DACA must be set aside.

## I.    The DACA Termination Is Arbitrary and Capricious

The APA authorizes reviewing courts to enjoin final agency action that is "arbitrary [or] capricious." [4] *Judulang v. Holder*, 565 U.S. 42, 52 (2011) (quoting 5 U.S.C. § 706(2)(A) (alteration in original)). This standard of review is relatively "narrow," in that it does not permit a court "to substitute its judgment for that of the agency." *Id.* at 52-53 (citation and quotation marks omitted). But courts nonetheless "retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *id.* at 53, by enforcing the "basic procedural requirement[]" that an

---

[4] Final agency action is subject to arbitrary and capricious review even if it was taken through informal processes. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (noting arbitrary and capricious review is available to rules issued through informal rulemaking); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d. Cir. 2006) (applying arbitrary and capricious review to agency manual not promulgated through notice and comment).

agency "give adequate reasons for its decision[]." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626-27 (1986) (plurality). When conducting this review, courts must assess whether the agency has considered the relevant factors and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang*, 565 U.S. at 53 (citation omitted). Where the agency fails to provide the requisite "level of analysis," its action is arbitrary and capricious, *Encino Motorcars*, 136 S. Ct. at 2125; so, too, when the purported rationale for the agency action is pretextual or given in bad faith, *see, e.g.*, *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 448 (D.C. Cir. 1991); *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984); *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 185 (E.D.N.Y. 2013).

The DACA Termination is arbitrary and capricious for five independent reasons—each of which is sufficient to find the termination arbitrary and capricious. First, Defendants failed to adequately explain why they decided to terminate DACA. Second, they failed to provide a reasoned explanation for disregarding prior factual findings and legal conclusions, particularly given the serious reliance interests at stake. Third, Defendants failed to consider all relevant factors, including the benefits DACA has provided or alternatives to terminating the program altogether. Fourth, Defendants' proffered justifications are inadequate to justify the DACA Termination. Finally, Defendants' reasons are pretextual and given in bad faith.

A.   Defendants failed to adequately explain the reasons for the DACA Termination

DHS explained the decision to terminate DACA in one sentence: "Taking into

11

consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." AR 255.[5] Thus, DHS represents that three documents were considered—the Fifth Circuit decision in *Texas v. United States*; the Supreme Court's one-sentence, non-precedential affirmance in the same case; and the Sessions Letter sent to the agency the day before—but makes no effort to explain *why* "consideration" of those documents made it "clear" that DACA "should be terminated." The Acting Secretary never stated, for example, whether she agreed with or adopted (in whole or in part) the facts found or conclusions drawn in those documents; whether she agrees with or adopts the Attorney General's determination that DACA is unlawful (and, if so, on which of the ground(s) referenced by the Attorney General); or whether, as Defendants claim, DACA was terminated due to litigation risk. The Duke Memo, in fact, does not even state that the Acting Secretary herself decided *anything*.[6]

In the absence of any articulated reasoning, it is not this Court's role "to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196-97 (1947); *see also Encino Motorcars*, 136 S. Ct. at 2127 ("It is not the role of the courts to speculate on reasons that might have supported an agency's decision."). To the contrary, "the orderly functioning of the process of review requires that the grounds upon which the

---

[5] The Duke Memo consists of five pages. Two of those five pages are a "Background" section, which recites a stylized account of the history of the DACA program and the litigation concerning DAPA, as well as a summary of Attorney General Sessions' one-page letter DHS received the day before. AR 252–56.

[6] As discussed below in the discussion regarding pretext, Defendants have stated publicly that the decision to end DACA was actually made by President Trump. At the first post-Termination appearance before this Court, meanwhile, Defendants repeatedly and unequivocally represented that Attorney General Sessions—who actually announced Acting Secretary Duke's rescission of the 2012 DACA Memo—was a joint decisionmaker in ending DACA. *See* Tr. of Sept. 14, 2017 Pre-Mot. Conference at 13-14, 24, 26. Defendants have sought to recant those statements, *see, e.g.*, Ex. M, p. 9, Resp. to Request for Admission No. 5, but have provided no explanation or reconciliation of the conflicting representations.

administrative agency acted be clearly disclosed and adequately sustained." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 249 (1972) (quoting *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 94 (1943) (alteration omitted)). Courts cannot ensure that the agency's factual findings are sufficiently supported, for example, or that the agency considered the relevant factors, when the agency abdicates its "responsibility . . . to explain the rationale and factual basis for its decision." *Bowen*, 476 U.S. at 627 (plurality); *see also Amerijet Intern'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). Accordingly, where, as here, the court "is left to guess as to the agency's findings or reasons," the agency's action "simply cannot be upheld." *Time, Inc. v. U.S. Postal Serv.*, 685 F.2d 760, 773 (2d Cir. 1982) (quotation marks omitted); *see also Encino Motorcars*, 136 S. Ct. at 2127 (same); *State Farm*, 463 U.S. at 48 ("There are no findings and no analysis here to justify the choice made, no indication of the basis on which the [agency] exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such . . . practice." (citation and quotation marks omitted, alterations in original)).

This conclusion is not altered even were the Court to accept Defendants' textually unsupported claim that the Duke Memo identifies perceived legal vulnerability of DACA as the reason for its termination. At a minimum, the Acting Secretary would have needed to identify and explain the basis for that perceived legal risk, as well as a "rational connection" between it and the decision to terminate DACA. *Encino Motorcars*, 136 S. Ct. at 2125 (citation omitted). If, for example, the agency found that DACA was not truly discretionary and therefore constituted a substantive rule, that issue could have been addressed in other, far less disruptive ways, such as engaging in formal rulemaking or altering the way the program was administered. But "[w]hatever potential reasons the Department might have given, the agency in fact gave almost no reasons at

all." *Id.* at 2127. "This lack of a reasoned explication" renders the DACA Termination arbitrary and capricious. *Id.*; *see also Amerijet*, 753 F.3d at 1350 ("[A] 'fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.'" (citation omitted)).

Defendants similarly fail to explain adequately their decision to terminate DACA in the manner chosen, which imposed arbitrary deadlines regarding deferred action, including: the September 5, 2017 deadline for receipt of new deferred action requests from those who fall within the DACA eligibility criteria; the October 5, 2017 deadline for receipt of renewal requests; and the decision not to accept renewal requests at all from individuals whose periods of deferred action expire after March 5, 2018. AR 255. This compressed timeframe had easily foreseeable consequences; it significantly contributed to USCIS improperly rejecting renewal applications and imposed a crushing burden on legal services organizations (like MRNY), which were forced to divert resources from their other activities to respond to the massive, unexpected, and immediate need. *See* Ex. MMM ¶ 23.  Yet the Duke Memo's solitary explanation for these deadlines— including the decision to make the individual with a period of deferred action that expires on March 5, 2018 eligible to renew for two more years, but denying that same opportunity to the individual whose deferred action expires the following day—is to reference to unidentified "complexities associated with winding down the program."[7] AR 255.

Nor do Defendants explain the change to their information-sharing policy. Prior to the DACA Termination, DHS assured individuals applying for deferred action through DACA that information they provided to USCIS was "protected from disclosure to ICE and [CBP] for the

---

[7] *But cf. Judulang*, 565 U.S. at 487 ("In a foundational deportation case, this Court recognized the high stakes for an alien who has long resided in this country, and reversed an agency decision that would 'make his right to remain here dependent on circumstances so fortuitous and capricious.'" (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947)).

purpose of immigration enforcement proceedings unless the [deferred action] requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance." ECF No. 60-1 (Instructions for Form I-821D). Applicants were further assured, in bold type, that this information sharing policy "covers family members and guardians, in addition to the requestor." *Id.* The same day DACA was terminated, however, USCIS announced that it "[g]enerally" would not "proactively provide[]" such information for immigration enforcement purposes unless the requestor meets the aforementioned Notice to Appear guidance *or* "poses a risk to national security or public safety," and with no assurances at all regarding parents or guardians. Tumlin Decl., Ex. W.[8] DHS has made no effort to explain these changes, much less justify applying the new information sharing policy retroactively, to individuals who had provided their information to the government pursuant to its express assurance that their information would be "protected from disclosure." ECF No. 60-1.

In sum, and at most, Defendants' explanation for deciding to terminate DACA, and to do so in the manner it chose, consists of a bald conclusion.  The DACA Termination must therefore be set aside. *Encino Motorcars*, 136 S. Ct. at 2127; *Amerijet*, 753 F.3d at 1350 ("[C]onclusory statements will not do; an agency's statement must be one of reasoning." (quotation marks and internal citations omitted)).

B.   Defendants failed to provide a reasoned explanation for their policy reversal, particularly in light of the serious reliance interests at stake

When an agency reverses an existing policy, the APA "requires the agency to acknowledge

---

[8] In guidance issued on November 30, 2017, eighty-six days after the Duke Memo was issued, DHS claims that its "information-sharing policy has not changed in any way since it was first announced," Ex. RR, but it has made no attempt to explain inconsistencies between its most recent articulation of the policy (which, unlike the pre-Termination policy, does *not* say that the information is protected from disclosure, and makes no mention of family members or guardians); the description of the policy it released on September 5, 2017 (which remains on USCIS' website as of the date of this filing); and the policy prior to the Duke Memo.

and provide an adequate explanation for its departure from established precedent." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010). The Supreme Court recently emphasized:

> As we held in *Fox Television Stations*, and underscore again today, the APA requires an agency to provide more substantial justification when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters."

*Perez*, 135 S. Ct. at 1209 (quoting *Fox Television Stations*, 556 U.S. at 515); *see also Encino Motorcars*, 136 S. Ct. at 2125-26.

The DACA Termination reverses the government's policy and legal positions toward deferred action for childhood arrivals, and contradicts its prior factual findings upon which DACA was based, with scarcely an acknowledgment—much less a justification—and notwithstanding the substantial reliance interests that the program has engendered over the past five years. The APA does not categorically preclude DHS from changing its policies, even to end DACA; it *does*, however, require DHS to give "good reasons for the new policy," to include a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515-16. Particularly when "serious reliance interests [are] at stake, [an agency's] conclusory statements do not suffice to explain its decision." *Encino Motorcars*, 136 S. Ct. at 2127.

Since its announcement in 2012, DACA has engendered serious reliance interests by individuals, employers, and institutions. Relying on DACA, nearly 800,000 young people have raised families, invested in their education, purchased homes and cars, and started careers. Ex. KKK ¶¶ 6-15; Ex. B ¶¶ 20, 23, 25, 33. The President publicly reassured these individuals that he would "deal with DACA with heart" and that individuals who received deferred action through

16

DACA should "rest easy." Exs. Y, Z. Even as the Trump Administration ended other immigration programs, it expressly left DACA in place. AR 236. Individuals who obtained deferred action through DACA have structured their lives "against [the] background understanding," *Encino Motorcars*, 136 S. Ct. at 2126, that DACA would continue to provide them relief from deportation and maintain avenues to gainful employment and higher education. *See also* Ex. B ¶¶ 20, 23, 25, 33. Educational institutions have admitted students who obtained deferred action through DACA, relying on them to be able to complete their degrees and use their education toward productive careers in the United States. Braddock Decl., Ex. AA ¶¶ 3-10; Brick Decl., Ex. BB ¶¶ 2-3; Holmes-Sullivan Decl., Ex. CC ¶¶ 18-19; Napolitano Decl., Ex. DD ¶ 11. Employers have hired, trained, and invested in deferred action recipients with the expectation they can continue to be valued employees. Ex. I ¶ 11; Ex. J ¶ 3; Ex. K ¶ 3; Ex. EE ¶ 11; Cardenas Decl., Ex. FF ¶¶ 9-10; Eidmann Decl., Ex. GG ¶¶ 9-10.

The Termination abruptly upends the settled expectations of deferred action recipients and their families, and forces "systemic, significant changes," *Encino Motorcars*, 136 S. Ct. at 2126, on the institutions with which they have become interdependent. Individuals will have to abandon jobs and schooling, disrupting education, health care, and the many other sectors in which deferred action recipients work, based on the DACA Termination. Yet nothing in the Duke Memo or the administrative record evinces any consideration of these reliance interests. As the Supreme Court has squarely held, it is arbitrary and capricious "to ignore such matters." *Mortg. Bankers Ass'n*, 135 S. Ct. at 1209 (quoting *Fox Television Stations*, 556 U.S. at 515); *see also Encino Motorcars*, 136 S. Ct. at 2126.

Defendants additionally fail to explain their decision to depart from the factual findings that underlay DACA. Indeed, and as with the reliance interests, Defendants fail even to

*acknowledge* the factual findings in the 2012 DACA Memo, including that young immigrants "lacked the intent to violate the law" and that the program was "necessary to ensure that [DHS] enforcement resources are not expended on these low priority cases." AR 1. DHS additionally found, just five years ago:

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

AR 2. Defendants' failure to acknowledge and explain the departure from these factual findings makes the DACA Termination arbitrary and capricious. *See Mortg. Bankers Ass'n*, 135 S. Ct. at 1209; *see also Fox Television Stations*, 556 U.S. at 538 (Kennedy, J., concurring) (noting that in *State Farm*, the Court held an agency's reversal after a change in presidential administration to be arbitrary and capricious "because the agency did not address its prior factual findings").

Defendants' reversal also requires a reasoned explanation of the departure from their prior view regarding DACA's legality. In 2014, the Office of Legal Counsel for the Department of Justice issued a legal memorandum—which has not been rescinded—opining that DACA is a lawful and permissible exercise of executive authority. AR 4-36. As late as June 15, 2017, the Trump Administration affirmatively decided to maintain DACA. AR 236. Moreover, the government has consistently defended the legality of DACA at every level of the federal judiciary, stating that the program was "a valid exercise of the Secretary's broad authority and discretion to set policies for enforcing the immigration laws . . . in light of real-world resource constraints and weighty humanitarian concerns." Br. for United States as Amicus Curiae, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), 2015 WL 5120846 at *1; *see also* Ex. TT. Defendants abrupt reversal, without a reasoned explanation for that change, is arbitrary and capricious. *Mortg.*

18

*Bankers Ass'n*, 135 S. Ct. at 1209.

C.    Defendants failed to consider all factors relevant to the DACA Termination

Agencies must "consider[] all relevant issues and factors" to withstand arbitrary-and-capricious review. *Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 258 (2d Cir. 2006). In terminating DACA, however, Defendants entirely ignored one of the most important aspects of that decision—the impact on real lives, both of DACA and of its termination. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem").

DACA has enabled nearly 800,000 young people to support family members (many of whom are U.S. citizens), obtain higher education, serve in the military, enrich their local communities, and contribute to the economy. Ex. HHH ¶¶ 28-41; Ex. JJJ ¶¶ 22-31; Ex. III ¶¶ 21-22; Ex. I ¶¶ 6-13; Ex. AA ¶¶ 3-10; Abrams Decl., Ex. HH ¶¶ 9-13; Beckwith Decl., Ex. II ¶¶ 5-8; Blazar Decl., Ex. JJ ¶¶ 2-5; Feldblum Decl., Ex. KK ¶¶ 11-13. Terminating DACA will upend families by cutting off their primary means of financial support, disrupt businesses that employ DACA recipients, Ex. MMM ¶¶ 42-61; *see also* Ex. J ¶¶ 3, 5-8; Ex. K ¶¶ 3, 7-9; Ex. U ¶ 4; Ex. V ¶¶ 6, 10-12, and cost the country billions of dollars in tax revenue, Brannon Decl., Ex. NNN ¶ 14; *see also* Ex. L ¶¶ 8-10, 12-14; Ex. JJ ¶¶ 3-5; Duenas Decl., Ex. LL ¶¶ 7-13. Defendants utterly fail to acknowledge, let alone consider, these and other factors.  To withstand review, an agency decision requires analysis of "the costs as well as the benefits." *State Farm*, 463 U.S. at 54; *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706-07 (2015) (holding that an agency could not ignore costs as part of its requirement to engage in "reasoned decisionmaking").  Defendants failure to consider the benefits of DACA and the impact of terminating it renders their decision arbitrary and capricious.

Defendants' similarly failed to consider alternatives to terminating DACA, including but

19

not limited to changing the way the program is administered and formal rulemaking.  Their failure

to do so is yet another reason why the termination was arbitrary and capricious.  *See State Farm*,

463 U.S. at 46-51 (holding arbitrary and capricious the agency's failure to consider an alternative

method to achieving its objective); *Yale-New Haven Hosp.*, 470 F.3d at 80 ("[T]he agency must

consider reasonably obvious alternatives and, if it rejects those alternatives, it must give reasons

for the rejection, sufficient to allow for meaningful judicial review" (citation omitted)); *Pub.

Citizen v. Steed*, 733 F.2d 93, 99 (D.C. Cir. 1984) (same).

D.  Defendants' proffered reasoning is inadequate to justify the DACA Termination

*1.  "Litigation Risk" cannot justify the DACA Termination*

In defending this litigation, Defendants no longer assert that DACA was unlawful, but

instead retreat to the position that the Termination was justified based upon "litigation risk" that

the program would be struck down in the future *Texas* litigation. Such rationalization is merely an

attempt to feign reasoned decision-making and evade meaningful APA review, and cannot stand.

As an initial matter, Defendants offer post-hoc reasoning not present in the administrative

record, which this Court must disregard. Defendants speculate for the first time in this case that

the "litigation[risk]" supporting the termination of DACA would "plung[e] [DACA], and its nearly

800,000 recipients, into uncertainty." Defs.' Mot. to Dismiss at 24, ECF No. 95-1. But nowhere

does the Duke Memo or the administrative record reference any negative impact that ending the

program (be it through litigation or otherwise) would have *on DACA recipients*. To the extent that

the administrative record references "litigation risk" at all, it is the Attorney General's mention of

"costs and burdens that will be imposed on *DHS* associated with rescinding this policy," AR 251

(emphasis added), which the Acting Secretary refers to as "administrative complexities," AR 254.

Under the APA, courts can neither "accept appellate counsel's *post hoc* rationalizations for agency

20

action," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); nor "supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Any concern for individuals who received deferred action through DACA is a post-hoc rationalization that cannot be considered. *State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *Islander E. Pipeline Co. v. Conn. Dep't of Envtl Protection*, 482 F.3d 79, 95 (2d Cir. 2006); *NLRB v. Columbia Univ.*, 541 F.2d 922, 931 (2d Cir. 1976).[9]

Moreover, citing "litigation risk" cannot suffice as reasoned decisionmaking. Virtually all agency actions are potentially subject to legal challenges. If agencies could simply cite the possibility that a court *might* hold unlawful a policy in order to summarily reverse it, they would be entirely free to circumvent the APA's requirement that agencies engage in reasoned decision-making. Such an end-run around the APA would set a dangerous precedent that would allow agencies to insulate themselves from meaningful judicial review by merely citing the possibility of adverse litigation. Indeed, the D.C. Circuit specifically rejected similar reasoning when it concluded that "[i]f an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015).

Even if litigation risk could be *relevant* to agency decisionmaking, it cannot be the talismanic incantation that Defendants contend, wiping away the APA's requirement that the agency demonstrate that it has engaged in reasoned decisionmaking. As discussed above,

---

[9] Defendants' only evidence that Acting Secretary Duke based the termination decision at all on concern for DACA recipients is contained in documents that are not in the Administrative Record and that were published after the decision was made. *See* Defs.' Mot. to Dismiss at 24-25, ECF No. 95-1 (quoting Acting Secretary Duke's press release).

Defendants have not even identified the legal ground on which they believe DACA is vulnerable, much less explain why that legal vulnerability cannot be addressed except through wholesale termination. Nor have Defendants explained why they believe that the court in the threatened litigation would *enjoin* DACA (as opposed to other possible remedies), which would turn on non-merits factors that would weigh heavily against the kind of immediate and disruptive injunction Defendants badly assert was inevitable.[10]  Moreover, and perhaps most obviously, Defendants have never explained why its "wind-down" is any better—for the agency, for the DACA-eligible population, or for the millions of other people this decision affects—than would be the hypothetical injunction.

Finally, rather than avoid "litigation risk," the Termination has precipitated lawsuits across the country challenging that decision,[11] illustrating the arbitrariness of Defendants' proffered rationale; "At most, the [agency] deliberately traded one lawsuit for another." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc); *see also United Mine Works of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk not a legitimate reason for agency action); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (same). Even government officials realize the extraordinary and unprecedented nature of their rationalization. As Gene Hamilton, a former senior DHS official and principal drafter of the Duke Memo, testified responding to "litigation risk" produces the "craziest policy you could ever have"

---

[10] For example, in the *Texas. v. United States* litigation, the court stopped short of requiring revocation of three-year Employment Authorization Documents issued to DACA recipients pursuant to the Memorandum that created DAPA prior to that memorandum being enjoined. *Texas v. United States,* 86 F. Supp. 3d 591, 677 (S.D. Tex. 2015).

[11] Other cases challenging the DACA termination currently before a U.S. district court include *New York v. Trump*, No. 17-cv-5228 (E.D.N.Y. filed Sept. 6, 2017); *Regents of Univ. of California v. DHS*, No. 17-cv-05211 (N.D. Cal. filed Sept. 8, 2017); *State of California v. DHS*, No. 17-cv-05235 (N.D. Cal. filed Sept. 11, 2017); *City of San Jose v. Trump*, No. 17-cv-05329 (N.D. Cal. filed Sept. 14, 2017); *Garcia v. United States*, No 17-cv-05380 (N.D. Cal. filed Sept. 18, 2017); *County of Santa Clara v. Trump*, No. 17-cv-05813 (N.D. Cal. filed Oct. 10, 2017); *CASA de Maryland v. DHS*, No. 17-cv-02942 (D. Md. filed Oct. 5, 2017); *NAACP v. Trump*, No. 17-cv-01907 (D.D.C. filed Sept. 18, 2017); and *Park v. Sessions*, No. 17-cv-01332 (E.D. Va. filed Nov. 21, 2017).

because the agency "could never do anything." Ex. MM, 205:2-5, 207:20-208:11; *see also* Ex. NN, 154:23-155:11 (not aware of other policies rescinded due to litigation risk).

       2.   *Any reliance on a determination that DACA is unlawful is legally erroneous*

The Duke Memo nowhere states that Defendants decided to terminate DACA because it was unlawful. To the extent that the Termination relied on the Attorney General's determination that DACA is unlawful,[12] it is wrong and cannot stand. *See Massachusetts v. EPA*, 549 U.S. 497, 532, 534 (2007) (holding agency action arbitrary, capricious, and otherwise not in accordance with law because it was based on an incorrect legal conclusion); *Chenery I*, 318 U.S. at 94 ("[A]n order may not stand if the agency has misconceived the law."). DACA is a lawful use of prosecutorial discretion, which no court has found to be unlawful. Nor was the decision in *Texas*—on a separate program—controlling or persuasive as a basis to evaluate the legality of DACA.

Despite Attorney General Sessions' unsupported legal conclusion to the contrary, the use of deferred action as part of the government's exercise of enforcement discretion is both well established and authorized by Congress and through regulation. *See* 6 U.S.C. § 202(5) ("The Secretary shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."); 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some cases lower priority"). The DACA policy fits squarely within the Secretary's authority as part of his or her responsibility to establish immigration-enforcement priorities. *See* Ex. OOO ¶ 6.

Prosecutorial discretion writ large is not only an accepted and longstanding practice, its importance is "greatly magnified" in the immigration-enforcement context. *Reno v. Am.-Arab*

---

[12] Defendant Attorney General Sessions, in his one-page letter to Defendant Acting Secretary Duke, asserted that DACA "was an unconstitutional exercise of authority by the Executive Branch." AR 251.

*Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). Equally integral to deciding which groups of individuals should be targeted for removal is "whether it makes sense to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Indeed, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* One reason for this discretion is necessity: DHS simply lacks the resources to enforce every immigration law.[13] Another reason for discretion in immigration law is that it "embraces immediate human concerns," and may turn on factors such as whether the individual has "long ties to the community." *Id.* The DACA program was consistent with this type of discretion long sanctioned under immigration law and by the Supreme Court.

The Duke Memo and Sessions Letter fail to explain why DACA, a program rooted in policies whose legality and necessity have been recognized for over sixty years, should now suddenly be deemed unlawful and unconstitutional. This misconception of law cannot form the basis on which a long-standing policy is suddenly terminated.[14]

The Attorney General cites a Fifth Circuit decision affirming a preliminary injunction of DAPA, an entirely separate program, to extrapolate without further analysis that "the DACA policy has the same legal and constitutional defects." AR 251.[15] To the extent that Acting Secretary Duke relied on this conclusion, it constitutes a misconception of law.

---

[13] The impossibility of enforcing every immigration law has been recognized, repeatedly, by immigration authorities for decades, and has been the basis for guidance to officials on which cases to prioritize for removal. *See, e.g.*, Ex. OO ("Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process."); Ex. PP ("There simply are not enough resources to enforce all of the rules and regulations presently on the books. As a practical matter, therefore, law enforcement officials have to make policy choices as to the most effective and desirable way in which to deploy their limited resources.").

[14] Whether or not this Court accepts the bald conclusion presented in the Attorney General's advisory letter, such a drastic change in legal analysis and policy requires greater consideration than a one-page letter cursorily dismissing decades of established practice.

[15] The Fifth Circuit's decision, which is not binding on the Second Circuit, was left in place by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016), in a non-precedential decision. *See Neil v. Biggers*, 409 U.S. 188, 192 (1972) ("Nor is an affirmance by an equally divided Court entitled to precedential weight.").

First, it cannot be correct that DACA has the "same legal and constitutional defects that the courts recognized as to DAPA," *id.*, because no court has "recognized" any constitutional defects with DAPA; neither the district court nor the Fifth Circuit in the *Texas* litigation ever reached the constitutional claims.[16] An agency's "[r]eliance on facts that [it] knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Mo. Pub. Serv. Comm'n v. Fed. Energy Regulatory Comm'n.*, 337 F.3d 1066, 1075 (D.C. Cir. 2003). The *Texas* case explicitly avoids this question, providing no basis for Defendants to rely on the false premise that the *Texas* litigation has *any* bearing on DACA's constitutionality.

Likewise, the Fifth Circuit's holding that DAPA violated substantive portions of the Immigration and Nationality Act ("INA") was explicitly premised on an element unique to DAPA: DAPA was only was available to individuals with U.S. citizen or Lawful Permanent Resident children. *Texas*, 809 F.3d at 178-86. The court reasoned that since there was already "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status" in the INA, DAPA undermined Congress's already stated objectives. *Id.* at 179.[17] That reasoning is inapplicable to DACA, as eligibility for DACA is not dependent on the immigration status of family members.[18]

---

[16] *See Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided court,* 136 S. Ct. 2271 (2016) ("Despite full briefing, the [district] court did not rule on the 'Plaintiffs' likelihood of success on their substantive APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine.'") (quoting *Texas v. United States*, 86 F. Supp. 3d 591, 677 (S.D. Tex.), *aff'd,* 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided court,* 136 S. Ct. 2271 (2016)); *id.* at 154 ("We decide this appeal, however, without resolving the constitutional claim.").

[17] In reaching its substantive holding on DAPA, the Fifth Circuit erroneously conflated lawful presence and legal status—terms of art in immigration law with very distinct meanings—to conclude that DAPA granted a legal status that the INA foreclosed. DAPA never purported to grant legal status, which only Congress may do; at most it granted lawful presence through a discretionary grant of deferred action.

[18] The only factual finding made by the Fifth Circuit arguably relevant to DACA actually undermines the government's position in this case. The Fifth Circuit upheld the district court's finding that DAPA was subject to the APA's notice-and-comment requirements—a finding that "was partly informed by analysis of the implementation of DACA." *Texas*, 809 F.3d at 172. However, the government conveniently ignores this distinction, since it would require DHS to undergo notice-and-comment rulemaking to rescind DACA. *See Consumer Energy Council of Am. v. Fed. Energy*

25

E.    Defendants' proffered reasons for the DACA Termination were pretextual and given in bad faith

Defendants have regularly contradicted their own purported justifications for terminating DACA, essentially saying one thing and doing another. Such pretextual reasoning is impermissible under the APA. *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing . . . and do another . . . is the essence of arbitrary action …. [and] indicates that the Secretary's stated reason may very well be pretextual." (citation omitted)); *see also Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978) ("While the Commission would have the power to adopt either of two different approaches to deciding these cases, it cannot adopt one and apply the other.").

Defendants have, on numerous occasions, given conflicting explanations for the termination of the program.[19]

- On September 5, 2017, six hours after the Attorney General announced the decision to terminate DACA because it was "an unconstitutional exercise of authority by the Executive Branch,"[20] President Trump tweeted that "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this

---

[19] *Regulatory Comm'n.*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) ("The Commission's argument that notice and comment requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect . . . ."), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983); *see also infra* 28-32.

[19] It is appropriate to consider deposition evidence in this case. While APA review is generally confined to the administrative record, consideration of extra-record evidence is appropriate "when the agency has not considered all relevant factors, or when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Defendants' failure to consider the policy impact of terminating DACA, *see supra* 21-22, as well as only providing brief conclusory statements for its reasons for doing so, *see supra* 18-21, frustrate meaningful review and warrant consideration of deposition testimony. Moreover, "a strong showing of bad faith or improper behavior" may justify supplementing the record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). Here Defendants' contradictory reasoning and their decision to continue granting DACA permits despite determining that doing so is unconstitutional serve as strong evidence of pretext warranting consideration of extra-record evidence.

[20] Ex. N.

issue!"[21] If the Administration truly believed DACA was unconstitutional, President Trump would not have the authority to "revisit" it. Rather, the President's statement suggests the Administration terminated DACA to gain political leverage over Congress.

- Gene Hamilton, the Senior Counselor to Acting Secretary Duke who was a principal drafter of the Termination Memo, testified that acting on "litigation risk" is the "craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued." Ex. MM, 205:2-5, 207:20-208:11.

- If the DACA program was "an unconstitutional exercise of authority" as Attorney General Sessions claimed, AR 251, then Defendants would also lack the authority to "provide a limited window in which it will adjudicate certain requests for DACA," as it has done by allowing renewals from DACA recipients whose status expires before March 5, 2018. AR 255.

The termination of DACA cannot stand on pretextual reasons. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d. Cir. 2013) (conflicting explanations are evidence that the reason provided was pretextual); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d. Cir. 1994) (same).

Relatedly, there is significant evidence that Defendants have acted in bad faith by obscuring the actual decisionmaker for the DACA Termination and his reasons.[22] In the Duke Memo and before the judiciary, Defendants have represented the DACA Termination as Acting Secretary Duke's decision.[23] And understandably so, given that the Termination was premised on *her* statutory authority to "establish[] national immigration policies and priorities," AR 255; *see* 6 U.S.C. § 202(5). Outside of the courtroom, however, Defendants have made it clear that the decision, in fact, was made by President Trump, who "[d]irect[ed]" the "Ending of DACA." Ex. QQQ. This was made explicit in a "Talking Points" document distributed to the press at the

---

[21] Ex. QQ. The Department of Justice has repeatedly conceded that tweets from the President's official Twitter handle constitute official statements of the White House. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 2017 WL 4674314, at *36-37 (D. Md. Oct. 17, 2017).

[22] The Court need not determine who the actual decisionmaker or joint decisionmakers were to hold that Plaintiffs are likely to succeed on their arbitrary and capricious claim based on a showing of pretext or bad faith, which are independent bases for holding that Defendants' actions were arbitrary or capricious.

[23] *But see* note 6, *supra* 12.

September 5 press conference at which the DACA Termination was announced by Attorney General Sessions. *Id.* At a press briefing later that same day—which was a Tuesday—the White House Press Secretary similarly stated that President Trump had made the decision to terminate DACA, and explained that he had come to that decision the weekend prior to its announcement. *See* Ex. RRR. That fact and timeline is amply corroborated by, *inter alia*, the President's tweet promising to "revisit" the issue; the timing and brevity of the Sessions Letter (which was sent on Monday, September 4); the conciseness and phrasing of the operative language in the Duke Memo; the announcement of the Duke Memo by the Attorney General, rather than the Acting Secretary; the complete absence of evidence that DHS engaged in a reasoned decisionmaking process; and Defendants' representations and conduct in this and related litigation. But neither the Duke Memo nor the administrative record acknowledge that the decision to end DACA was actually made by the President, much less explain how that fact affected the agency's ostensible decisionmaking process. An agency that obfuscates to obscure the political pressure that operated on its own decisionmaking process from the courts and the public acts in bad faith. *See generally, e.g.*, *Tummino v. Hamburg*, 936 F. Supp. 2d at 169-71, 184-87; *Tummino v. Torti*, 603 F. Supp. 2d 519, 544-49 (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-CV-366 ERK VVP, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013).

## II. DHS Did Not Comply with the APA's Notice and Comment Requirements

DHS's issuance of the Duke Memo failed to follow the notice-and-comment procedures required by the APA. 5 U.S.C. § 553. The APA requires agencies to publish a general notice of proposed rulemaking, *id.* § 553(b), and to publish a substantive rule "not less than 30 days before its effective date." *Id.* § 553(d). Notice-and-comment requirements are "designed (1) to ensure that agency regulations are tested via exposure to public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support

their objections to the rule and thereby enhance the quality of judicial review." *United States v. Lott*, 750 F.3d 214, 219 (2d Cir. 2014); *accord Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir. 1983), *on reh'g,* 727 F.2d 957 (11th Cir. 1984), *aff'd,* 472 U.S. 846 (1985) ("This public participation assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions. Public rulemaking procedures increase the likelihood of administrative responsiveness to the needs and concerns of those affected.").

In keeping with these public participation goals, the APA provides for limited exceptions to notice-and-comment requirements, none of which apply to the DACA Termination; accordingly, it must be set aside. 5 U.S.C. § 706(2)(D).

The APA defines rule-making broadly to include "formulating, amending, *or repealing* a rule." 5 U.S.C. § 551(5) (emphasis added). A rule includes "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Notice-and-comment requirements apply to all substantive rules, which include rules that "effect[] a substantive change in existing law or policy," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (citation omitted), and provide exceptions only for "interpretative rules, general statements of policy, or rules of agency organization, procedures or practice." 5 U.S.C. § 553(b)(3)(A). Exceptions are narrowly construed. *See Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 168 (2d Cir. 2013) (citation omitted); *Mendoza*, 754 F.3d at 1023; *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989).

Defendants argue that the DACA Termination "is a quintessential policy statement." Mot. to Dismiss, ECF No. 95-1, at 30. They are incorrect; the DACA Termination created a binding rule by barring consideration of deferred action requests (or renewal thereof) from the category of

29

young people who met the criteria outlined in the 2012 DACA Memo, except in the narrow circumstances outlined in the Duke Memo. *See* AR 1-3. For that reason, it was required to go through notice-and-comment.

In distinguishing between a general statement of policy and a substantive rule, the "ultimate issue is the agency's intent to be bound." *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*, 940 F.2d 679, 681-82 (D.C. Cir. 1991) (citation omitted). "Substantive rules are ones treated as binding by the agency, while true policy statements are not." *Id.* at 682; *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980) ("[Substantive rules] narrowly construct the discretion of agency officials by largely determining the issue addressed."). A true policy statement "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (citation omitted).[24] To determine if agency action is a general statement of policy or a substantive rule, courts first look to the document itself. Second, "[w]here the language and context of the statement are inconclusive, [courts] have turned to the agency's actual applications." *Pub. Citizen*, 940 F.2d at 682; *see also See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-83 (D.C. Cir. 2002) (agency action will be considered binding if it appears on its face to be binding or the agency's application indicates it is binding).

Here, both the text and DHS's application of the Duke Memo show that it does not fall into the exception for general policy statements. First, the Duke Memo uses mandatory, definitive language to establish blanket, binding rules that leave no room for an agency's discretion in handling deferred action requests received from childhood arrivals. The Duke Memo directs that DHS "*[w]ill* reject" all initial requests for deferred action submitted by childhood arrivals after the

---

[24] An agency's characterization of its own action is not determinative. *See Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481–82 (2d Cir. 1972).

date of the memo; "*[w]ill* reject" all renewal requests received after October 5, 2017, and those from individuals whose current period of deferred action expires after March 5, 2018; and "*[w]ill* administratively close" pending requests for advance parole associated with DACA. AR 255 (emphasis added). The language is categorical and permits no case-by-case review. *See, e.g.*, *Young*, 818 F.2d at 946 ("[W]e have, for example, found decisive the choice between the words 'will' and 'may.' . . . use of 'will' indicates statement is in fact a binding norm . . . use of 'may' indicates statement is a 'general statement of policy.'") (internal citations omitted). These binding directives therefore constitute a substantive rule.

Second, DHS's treatment of initial DACA requests submitted after September 5, 2017, and DACA renewal requests submitted after to the October 5 deadline confirms the agency's intention that the Duke Memo act as a substantive rule with binding effect. These applications were, substantively, individual requests for deferred action. Rather than evaluate them on a case-by-case basis, individuals' requests were, as directed in the Duke Memo, categorically rejected solely on the basis of the Duke Memo. Exs. X, RR, SS. Decisions to adjudicate "on an individual, case by case basis," or reject outright a request for deferred action from a childhood arrival, were made purely by determining whether an application arrived on or before the arbitrarily selected dates of September 5 or October 5, 2017. *Id.*[25] The Duke Memo removed agents' ability to use prosecutorial discretion for individuals who met the DACA eligibility criteria, regardless of individual circumstance, therefore rendering it a substantive rule. *See Young*, 818 F.2d at 948.

Because the Duke Memo functionally created a binding norm that severely limited the agency's discretion, DHS was required to comply with notice-and-comment procedures even if it

---

[25] DHS officials, as a result of this litigation, decided to accept requests that arrived at the USCIS Lockbox by October 5, 2017 and those that arrived late due to documented USPS error. *See* Exs. X, RR. These applications fall within the terms of the Duke Memo. Maintaining the categorical approach in the Duke Memo, USCIS continues to refuse to accept entire applications rejected for minor clerical errors. Exs. X, RR, SS.

believed that the original agency action was defective in some way.[26] *Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("Furthermore, the argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided."), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983); *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013) (same), *judgment entered*, 301 F.R.D. 14 (D.D.C. 2014), *aff'd,* 601 Fed. Appx. 1 (D.C. Cir. 2015) (unpublished). DHS cannot evade APA requirements by recasting its original action as a substantive rule that should have gone through notice and comment, and then rescinding it without going through the notice and comment the APA requires for repealing a substantive rule. *See* 5 U.S.C. § 551(5). To hold otherwise would create perverse incentives, allowing the agency to evade notice-and-comment by simply declaring their belief that a prior rule was unlawfully promulgated. *See, e.g.*, *Consumer Energy Council*, 673 F.2d at 447 n.79.

Because it was issued without the proper procedure, the Duke Memo must be set aside. *See* 5 U.S.C. § 706(2)(D). DHS's failure to comply with its obligation to go through notice-and-comment "constitutes a serious deficiency" for which vacatur is appropriate. *Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) ("The lack of notice and comment is a fundamental flaw that normally requires vacatur of the rule.") (internal quotations omitted); *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 853 F. Supp. 2d 138, 144 (D.D.C. 2012), *aff'd,* 751 F.3d 629 (D.C. Cir. 2014).

---

[26] The government previously argued that the creation of the DACA program was not subject to notice-and-comment. *See Texas v. United States*, 86 F. Supp. 3d 591, 647 (S.D. Tex. 2015); Ex. TT. The Duke Memo appears to rely on an opinion that the DACA program was unlawful. The Duke Memo explains, "[b]oth the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking." AR 253-54. *See also id.* 251 ("DACA was effectuated . . . through executive action, without proper statutory authority," and "has the same legal and constitutional defects that the courts recognized as to DAPA."). The APA requirements apply to rescission regardless of how the program was initially created.

## III.     Plaintiffs Are Likely to Prevail on Their Regulatory Flexibility Act Claim

Defendants' failure to undertake the analysis required by the Regulatory Flexibility Act ("RFA") before terminating DACA requires the decision to be set aside. Here, Defendants admit that they did not conduct *any* RFA analysis before ending the program. Ex. F, pp. 25-31, Resps. to Requests for Admissions Nos. 52-56. Defendants' termination of the DACA program is already having a profound impact on small entities, such as Plaintiff MRNY, in violation of the RFA.

The RFA, 5 U.S.C. §§ 601-612, requires federal agencies to analyze the impact of rules they promulgate through notice-and-comment on small entities and publish initial and final versions of those analyses for public comment. *Id.* §§ 603-604. Plaintiff MRNY qualifies as a "small entity" and is therefore entitled to judicial review under the RFA. *See id.* § 601(6) (including 'small organization' in definition of 'small entity'); *id.* § 601(4) (defining a 'small organization' as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field"); Ex. MMM ¶¶ 2-3, 6, 42-50; 5 U.S.C. § 611(a)(1). The Act allows agencies to bypass the requirement for a final regulatory flexibility analysis only if the agency head certifies that the rule will not have a significant impact on a substantial number of small entities and provides a factual basis for such certification. *Id.* § 605(b). Defendants made no such certification.

Because, as discussed above, the agency's promulgation of the Duke Memo required notice-and-comment rulemaking pursuant to 5 U.S.C. § 553, the RFA's analysis requirements were triggered and none of the statutory exemptions apply. *Id.* § 603. Defendants' own failure to conduct the requisite notice-and-comment rulemaking is no defense. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005).

When faced with cases like this—where an agency utterly fails to conduct any RFA analysis, the appropriate remedy is to set aside the agency action until the statutorily required

analysis is complete. *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (staying enforcement of the rule as to small entities and remanding to the agency to conduct a regulatory flexibility analysis when no analysis or certification had been made); *see also Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 15-16 (D.D.C. 1998) (remanding rule to agency due to invalid certification).

The real-world impact of Defendants' flouting of the RFA's requirements is significant. Had Defendants conducted even the most cursory analysis of the impact of the Duke Memo on small entities, the analysis would have revealed serious economic impacts.[27] As one example, the termination of DACA will have an enormous direct and indirect impact on small businesses and all other small entities that hire DACA grantees, such as Plaintiff MRNY. Ex. MMM ¶¶ 42-61. Because the termination of DACA means DACA recipients have lost or will lose work authorization, employers have no choice but to terminate them or risk civil and criminal liability for the hiring or continued employment of noncitizens who are not authorized to work. *See* 8 U.S.C. § 1324a(a)(1)-(2). This forced termination deprives these entities of valuable employees and will impose turnover costs associated with replacing DACA beneficiary employees, resulting in loss of productivity and competitiveness, and costs associated with finding, hiring, and training new employees. *See* Ex. MMM ¶¶ 42-46; Ex. EE ¶ 11; Ex. UU at 9 (Amicus Br. of 108 Companies noting that once DACA begins to expire in March 2018, "companies will face an estimated $6.3 billion in costs to replace Dreamers" and that these costs will be "particularly burdensome for small businesses"). And yet there is no evidence in the administrative record that DHS afforded any consideration to the effect of the termination on small entities.[28]

---

[27] *See U.S. Telecom Ass'n*, 400 F.3d at 42 (agency's RFA analysis "must include an explanation for the rejection of alternatives designed to minimize significant economic impact on small entities") (citing 5 U.S.C. § 604(a)(3)).

[28] Courts regularly apply the RFA to the immigration context, even though DHS substantive rules generally regulate individuals. Regulatory flexibility analyses are still required when the immigration rule has an indirect effect on the

For each of these reasons, Defendants' failure to conduct any RFA analysis for DACA Termination requires a stay of the agency action until the required RFA analysis is complete.

## IV. Plaintiffs Satisfy Other Requirements to Obtain Preliminary Relief

Plaintiffs and members of the putative class are suffering and will continue to suffer irreparable harm absent the Court's provision of preliminary relief. Preliminary relief is also warranted because the balance of equities and the public interest weigh in Plaintiffs' favor. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (discussing necessary non-merits requirements for preliminary relief).

### A. Plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief

Each day, 122 young people who call this country home lose their deferred action and employment authorization previously obtained pursuant to DACA. Ex A. Since the DACA Termination, young people with deferred action through DACA, along with their families, reside in a state of uncertainty and fear. Ex. B ¶¶ 33-37; Ex. T ¶¶ 12-15; Ex. CC ¶¶ 3, 13-15; L. Gonzales Decl., Ex. VV ¶ 10. Without this Court's intervention, they stand to lose their employment, houses, the ability to pursue further education, employer-provided health insurance, and their ability to perform various essential life tasks, such as driving their children to school or simply enjoying the comfort of living with their families. *Id.* Each of these harms has been recognized as irreparable by courts in this circuit.

The "single most important prerequisite for issuance of a preliminary injunction" is irreparable harm. *Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp. 2d 270, 286 (D. Vt. 2011)

---

operations of small entities. *See Am. Fed'n of Labor v. Chertoff*, 552 F. Supp. 999, 1013, 1015 (N.D. Cal. 2007) (preliminarily enjoining DHS safe harbor rule for employers due to failure to comply with the RFA); *see also* Retention of EB-1, EB-2, & EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82,398, 82,479 (Nov. 18, 2016).

(quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). To establish irreparable harm, Plaintiffs must show that they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Irreparable harm can also be found "where money damages cannot provide adequate compensation." *N.Y. Pathological & X-Ray Labs., Inc. v. Immigration & Naturalization Serv.*, 523 F.2d 79, 81 (2d Cir. 1975).

Defendants' DACA Termination has directly and abruptly removed a critical protection from Plaintiffs by eliminating the two-year deferral from removal that deferred action grants DACA recipients. As a result, Plaintiffs and members of the putative class are suffering mental, emotional, and even physical harm due to a fear that they could be torn from their homes and families by deportation, using the very information they provided Defendants when requesting DACA. *See generally* Ex. B ¶¶ 33-37; Ex. T ¶¶ 12-15; Ex. CC ¶¶ 3, 13-15; Ex. VV ¶ 10; Ex. WW. For example, Plaintiff Fung Feng, who is "scared of being deported," is working hard to avoid "sink[ing] into depression." Ex. III ¶ 25; *see also* Ex. HHH ¶ 43; Ex. GGG ¶¶ 16, 23; Ex. EEE ¶ 19, 35-38; Ex. CC ¶¶ 3, 13-15; Ex. FFF ¶ 21, 24-28. Similarly, Plaintiff Fernandez had to start physical therapy due to the stress and anxiety caused by the fear of being separated from her young U.S.-citizen children. *See* Ex. LLL ¶¶ 1, 12, 15-16; *Pollis v. New Sch. for Soc. Research*, 829 F. Supp. 584, 598-99 (S.D.N.Y. 1993) (rejecting notion that "claims such as emotional or psychological damage can never, as a matter of law, demonstrate irreparable harm"); *see also Shapiro v. Cadman Towers, Inc.*, 844 F. Supp. 116, 122 (E.D.N.Y. 1994).

Like many DACA recipients, Plaintiff Fernandez has health insurance through her employer, covering her two U.S. citizen children. She fears that her loss of employment will impact

36

her family, by not only compromising her earnings, but also leading to her children's loss of health insurance. Ex. LLL ¶ 13. DACA recipient and putative class member Gustavo Galicia similarly fears that if he loses his job, he will no longer be able to access the life-preserving medical treatment he needs for his transplanted kidney under his employer-provided health insurance. Ex. CCC ¶ 36; *see generally* Ku Decl., Ex. PPP ¶ 12.

Thousands of putative class members' academic pursuits will be severely interrupted or halted due to Defendants' DACA Termination. Plaintiff Fung Feng's dream of attending graduate school is now threatened by uncertainty about whether she will be able to afford its costs. Ex. III ¶ 26; *see also Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (loss of opportunity to pursue one's chosen profession constitutes irreparable harm).

Many DACA recipients were able to secure mortgages on homes through their deferred action, and now those homes and financial commitments are in jeopardy. Plaintiff Fernandez fears that her loss of employment will cause her to lose the home she recently purchased. Ex. LLL ¶¶ 8, 13. Plaintiff Carlos Vargas helps pay the mortgages on two homes and an apartment with his brother who also has benefited from DACA; their ability to keep their assets would be in danger if they lost the employment they have through DACA. Ex. EEE ¶¶ 26-27.

Defendants' continued imposition of these harms, which Plaintiffs and putative class members are already experiencing, is actual and ongoing. Defendants stated that under the DACA Termination, former DACA recipients are subject to "apprehension, removal proceedings, where applicable, and deportation," Ex. F, p. 21, Resp. to Request for Admission No. 41, and that the information DACA recipients provided when requesting deferred action under DACA can be shared with immigration agents affirmatively. Collectively, these harms are causing severe disruptions in the lives of Plaintiffs and the putative class—not only on a day-to-day basis, but also

in their abilities to plan for the future and make commitments, whether familial, career-based, academic, or otherwise. This concrete "loss of the chance to engage in normal life activity," such as by pursuing educational opportunities or a "chosen profession," constitutes irreparable harm. *Jones*, 801 F. Supp. 2d at 286-87 (quoting *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,* 630 F.3d 1153, 1165 (9th Cir. 2011)). These harms have and will continue to extend to the U.S.-citizen children and relatives of thousands of DACA recipients until relief is granted. *See* Ex. LLL ¶¶ 1, 3, 8; Ex. GGG ¶¶ 23, 26; Hainmueller & Lawrence Decl., Ex. H ¶¶ 11-13; Mendoza Decl., Ex. G ¶ 4.

Moreover, Plaintiff MRNY faces the imminent loss of twelve employees who will soon start to lose their deferred action and work authorization under DACA. The dilemma presently facing MRNY and employers nationwide is that when the grants of deferred action through DACA and work authorization of their valued employees expire, MRNY and other employers will either have to let them go or risk federal criminal and financial liability. *See* 8 U.S.C. §§ 1324(a)-(c). The loss of twelve carefully selected staff members, and its resulting diversion of resources and frustration to its mission, is an irreparable injury to a small organization like MRNY. Ex. MMM ¶¶ 42-62. *See also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

B. The balance of equities and public interest weigh heavily in favor of provisional relief

The final requirements for a preliminary relief are that "the balance of equities tips in [the moving party's] favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).

Given the size and success of the DACA program, it is no surprise that the costs to the public and nation from its termination would be staggering, swift, and significant. For this reason, the balance of equities and public interest overwhelmingly weigh toward injunctive relief. Without an injunction, DACA's Termination will have devastating familial, health, and economic impacts

not just on the hundreds of thousands of individuals who rely on the program for protection from deportation and work authorization, but also on their families, employers, communities, and the U.S. economy as a whole. *See* Ex. NNN ¶ 14.

The public bears enormous costs as the harms from the DACA Termination materialize. For instance, the DACA Termination stands to adversely impact important institutions across the nation, including law enforcement. Law enforcement leaders have testified that the DACA Termination will be detrimental to local police forces' "ability to maintain public safety and enforce the law," as it will "perpetuate mistrust of law enforcement authorities and further depress cooperation among immigrant communities with police," leading to increases in unreported crime. Gascón Decl., Ex. YY ¶¶ 5-6, 12; *see also id.*, Garcia Decl., Ex. XX ¶ 9; O'Malley Decl., Ex. ZZ ¶ 14; Rosen Decl., Ex. AAA ¶¶ 5, 8-10; Smith Decl., Ex. BBB ¶¶ 6-8. In addition, the Social Security and Medicare programs would lose an estimated $39.3 billion in contributions from DACA recipients over a ten-year period. *See* Ex. KKK ¶ 15. The loss of DACA recipients' income would "cost the federal government $60 billion in lost revenue, and the economy as a whole $215 in lost GDP" over a ten-year period. *See* Ex. NNN ¶ 14.

In sharp contrast, Defendants face no articulable harm from continuing the DACA program—a program with documented successes that the Defendants did, in fact, continue for the first eight months of the administration—pending a final judgment. Ex. OOO ¶¶ 25-30. Furthermore, the federal government cannot suffer harm from an injunction that simply requires them to follow their legal obligations. *See Abdi v. Duke*, No. 1:17–CV–0721 EAW, 2017 WL 5599521, at *27 (W.D.N.Y. Nov. 17, 2017). Accordingly, the balance of the equities and the public interest favor provisional relief.

## CONCLUSION

Plaintiffs have demonstrated they are likely to succeed on the merits of their claims, and

have established they are suffering—and will continue to suffer—irreparable harm if the DACA

Termination proceeds. Similarly, Plaintiffs have established that the balance of equities and the

public interest strongly support the conclusion that preliminary relief is necessary.

For the reasons set forth above, this Court should enjoin the termination of the DACA and

award provisional relief directing Defendants to restore the DACA program pending final

adjudication on the merits.


Dated: December 15, 2017                    Respectfully submitted,

                                            /s/ Karen C. Tumlin


David Chen, Law Student Intern              Jessica R. Hanson, Esq. †
Susanna D. Evarts, Law Student Intern       Mayra B. Joachin, Esq. †
Victoria Roeck, Law Student Intern          Trudy S. Rebert, Esq.* +
Healy Ko, Law Student Intern                Karen C. Tumlin, Esq. †
Hannah Schoen, Law Student Intern           NATIONAL IMMIGRATION LAW CENTER
Emily Villano, Law Student Intern           3450 Wilshire Blvd., #108-62
Muneer I. Ahmad, Esq. †                     Los Angeles, CA 90070
Marisol Orihuela, Esq. †                    Phone: (213) 639-3900
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.            Justin B. Cox, Esq.†
Phone: (203) 432-4800                       NATIONAL IMMIGRATION LAW CENTER
                                            PO Box 170208
Amy S. Taylor, Esq. (AT 2056)               Atlanta, GA 30317
Deborah Axt, Esq. (DA 4885)                 Phone: (678) 279-5441
Scott Foletta, Esq. (SF 9452)
Alexia Schapira, Esq. (AS 8222)             Joshua A. Rosenthal, Esq.†
Natalia Renta, Esq. **                      NATIONAL IMMIGRATION LAW CENTER
MAKE THE ROAD NEW YORK                      1121 14th Street NW, Suite 200
301 Grove Street                            Washington, DC 20005
Brooklyn, NY 11237                          Phone: (202) 216-0261
Phone: (718) 418-7690
                                            *Attorneys for Plaintiffs*


† Appearing *pro hac vice*
* *Pro hac vice* motion forthcoming
+Admitted only in Louisiana, application pending in New York
** Application pending in EDNY