# EXHIBIT F

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,<br><br>Defendants. | CIVIL ACTION NO. 16-cv-4756<br><br>**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO ELAINE DUKE, ACTING SECRETARY OF HOMELAND SECURITY**<br><br>(Garaufis, J.)<br>(Orenstein, M.J.) |

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of this Court Defendant Elaine Duke, in her official capacity as the Acting Secretary of the Department of Homeland Security ("Defendant"), by and through counsel, provides the following Objections and Responses to Plaintiffs' First Set of Requests for Admission. Defendant's Objections and Responses are based on information known to Defendant at this time, and are made without prejudice to additional objections should Defendant subsequently identify additional grounds for objection. The information submitted

1

herewith is being provided in accordance with the Federal Rules of Civil Procedure, which generally permit discovery of matters not privileged that are relevant to the claims or defenses in this civil action. Fed. R. Civ. P. 26(b)(l).  Accordingly, Defendant does not, by providing such information, waive any objection to its admissibility on the grounds of relevance, materiality, privilege, competency, or any other appropriate ground.

### OBJECTIONS WHICH APPLY TO ALL REQUESTS FOR ADMISSION

1.      Separate and apart from the specific objections set forth below, Defendant objects to any discovery taking place in this case to the extent such discovery is brought pursuant to claims purportedly under the Administrative Procedure Act, as resolution of any such claims should be based upon the administrative record compiled by the Department of Homeland Security.

2.      Defendant objects to any discovery taking place before resolution of Defendants' forthcoming dispositive motions.

3.      Defendant objects to Plaintiffs' Requests for Admission to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.

4.      Defendant objects to Plaintiffs' Requests for Admission to the extent they assume that certain types of information exist.  By providing these objections, Defendant does not hereby imply that information exists that is responsive to Plaintiffs' Requests for

Admission.  Each and every response contained herein is subject to the above objections, which apply to each and every response, regardless of whether a specific objection is interposed in a specific response.  The making of a specific objection in response to a particular request is not intended to constitute a waiver of any other objection not specifically referenced in the particular response.

5.      Defendant specifically reserves the right to make further objections as necessary to the extent that additional issues arise as to the meaning of and/or information sought by discovery.

## OBJECTIONS TO DEFINITIONS

6.      Defendant objects to the definition of "Defendant" as overly broad and outside of the scope of discovery.  Fed. R. Civ. P. 26(b)(1).  Defendant interpret the definition of Defendant to mean Elaine C. Duke, Acting Secretary of Homeland Security (DHS), in her official capacity, as well as the following components of DHS: Headquarters, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS).  The components listed are relevant as those in which searches for responsive information relevant to decisions about the exercise of DHS's prosecutorial discretion in the form of deferred action could conceivably be proportional to the likelihood of locating such information and its likely benefit to the litigation.

7.      Defendant objects to the definition of "Defendants" as overly broad and outside of the scope of discovery.  Fed. R. Civ. P. 26(b)(1).  Defendant interpret the definition of Defendants to mean Attorney General Jefferson B. Sessions, III, in his official capacity, as well as the following components of the Department of Justice:  the Office of

the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of the Associate Attorney General (OASG), the Office of Legal Counsel (OLC), the Civil Rights Division (CRT), the Civil Division (CIV), the Office of the Solicitor General (OSG); and Elaine C. Duke, Acting Secretary of Homeland Security (DHS), in her official capacity, as well as the following components of DHS:  Headquarters, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS).  The components listed are relevant as those in which searches for responsive information relevant to decisions about the exercise of DHS's prosecutorial discretion in the form of deferred action could conceivably be proportional to the likelihood of locating such information and its likely benefit to the litigation.

8.      Defendant objects to the definition of "date" as overbroad and unduly burdensome.  Defendant interprets date to mean "the exact date, month, and year, if ascertainable."  To the extent an approximation is required, it will be provided and will be designated as such.  The approximation will not include a description about "relationship to other events."

9.      Defendant objects to the definition of "identify" in reference to an individual as improperly requiring the disclosure of material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation.

10.     Defendant objects to the definition of "identify" in reference to a document because that definition is unduly burdensome and going beyond the requirements of Fed. R. Civ. P. 34 and Local Rule 26.3(c)(4).

11.     Defendant objects to the definition of "Department of Homeland Security" as overly broad.  Defendant will construe Department of Homeland Security to mean the relevant offices within the following relevant components of the Department of Homeland Security: Headquarters, CBP, ICE and USCIS, which are the components of DHS which are likely to have responsive information.

12.     Defendant objects to the definition of "DHS employee" or "DHS employees" as overly broad.  DHS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DHS employee, of a relevant office within a relevant component of DHS:  Headquarters, CBP, ICE, and USCIS.

13.     Defendant objects to the definition of "DOJ employee" or "DOJ employees" as overly broad.  DOJ employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DOJ employee, of OAG, ODAG, OASG, OLC, OSG, CRT, CIV, or ExecSec.

14.     Defendant objects to the definition of "USCIS employee" or "USCIS employees" as overly broad.  USCIS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a USCIS employee, of a relevant office within USCIS.

15.     Defendant objects to the definition of "Trump Administration" on the basis that it is overbroad.  Defendant will interpret Trump Administration to mean President Donald Trump in his official capacity as President, as well as any other current or former employee, in his/her official capacity, of the Executive Office of the President since January 20, 2017.

16.     Defendant objects to the definition of the phrase "DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

17.     Defendant objects to the definition of the phrase "DAPA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DAPA policy had it been implemented, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

18.     Defendant objects to the definition of the phrase "expanded-DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

19.     Defendant objects to the definition of "DACA termination" as misleading to the extent it includes the actions of the Department of Justice as it relates to the DACA policy, which was administered by another agency.  Defendant also objects to the extent the definition purports to "include all actions within the defendants' agencies to implement the end of DACA," regardless of context or when those activities may have taken place.

20.     Defendant objects to the inclusion of a definition of "present for" as vague in its inclusion of "telephone presence" and "any form of electronic presence."  Defendant will interpret the term "present for" to mean "a participant in a meeting, conversation, or discussion, whether in person, by telephone, by videoconference, or by other live communications method."

21.     Defendant objects to the definition of "discussion" or "discussions" as vague and overbroad to the extent it includes "any communication" in addition to the specified methods set forth in the definition.

22.     Defendant objects to the definition of "relating to" and "relate to" as overly broad, particularly in their inclusion of the terms "Setting forth," "mentioning," and "referring to."  Defendant will construe "relate to" or "relating to" based on the context of potentially responsive documents to include only those documents "describing," "discussing," "commenting upon," "supporting" or "contradicting" the topic in question to a sufficient extent as to shed light on the parties' claims or defenses.

23.     Defendant objects to the definitions in paragraphs 23-25 as overly broad. Defendant will interpret the requests in accordance with the definitions in Local Rule 26.3(d), or, for terms not defined in the Local Rules, using the plain meaning of the words included in the request.

## OBJECTIONS TO INSTRUCTIONS

24.     Defendant objects to Instructions 1-2 to the extent they purport to impose requirements beyond those set forth in Fed. R. Civ. P. 36.

25.     Defendant objects to Instruction No. 7 to the extent it purports to require Defendant to produce "responsive documents."

## OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

**REQUEST NO. 1:**  Admit that USCIS is aware of the expiration date for the DACA status of every DACA recipient.

**OBJECTION TO REQUEST NO. 1:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs seek to impute "awareness" to a governmental

agency.  Defendant further objects to this request to the extent that it assumes a recipient of DACA has a lawful immigration "status," which is inaccurate.

**RESPONSE TO REQUEST NO. 1:**  Defendant admits Request for Admission ("RFA") No. 1 only to the extent that USCIS's routine business practice is to maintain the date that each DACA recipient's deferred action under DACA has expired, has been terminated, or will expire in either USCIS's Computer Linked Application Information Management System (CLAIMS 3) database or USCIS's Electronic Immigration System (ELIS) database.  Defendant further states that on occasion, an error may be discovered in the system regarding a recipient's DACA expiration date, and USCIS corrects such errors as soon as possible following their discovery.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 2:**  Admit that USCIS has a policy and practice of mailing individualized renewal notices to DACA recipients approximately 180 days before their DACA status expires.

**OBJECTION TO REQUEST NO. 2:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it assumes a recipient of DACA has a lawful immigration "status," which is inaccurate. Defendant objects to this request as vague and undefined to the extent the request is compound, seeking information both about a "policy" and a "practice."  Defendant objects to this request as vague as "individualized" is undefined.  The term can be fairly construed as either referring to notices with substantive content that is individually tailored to each recipient, or as referring to notices provided to DACA recipients on an individual basis, without substantive individually tailored content.  Defendant will construe this request in the conjunctive.  Defendant objects to this request to the extent that it does not define a relevant time period.  Defendant will therefore construe this request to apply as of the service date of the requests.

**RESPONSE TO REQUEST NO. 2:**  Defendant denies RFA No. 2.

**REQUEST NO. 3:**  Admit that the policy and practice in #2 has been in place since at least 2015.

**OBJECTION TO REQUEST NO. 3:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent the request is compound, seeking information both about a "policy" and a "practice."   Defendant will construe this request in the conjunctive. Defendant objects to this request to the extent that, as in cross-referenced Request No. 2, it assumes a recipient of DACA has a lawful immigration "status," which is inaccurate. Defendant objects to this request to the extent that it does not define a relevant time period. Defendant will therefore construe this request to apply as of the service date of the requests. Defendant objects to the request to the extent that it assumes facts not in evidence regarding whether a "policy and practice" has been in place.

8

**RESPONSE TO REQUEST NO. 3:**  Defendant denies RFA No. 3.

**REQUEST NO. 4:**  Admit that prior to September 5, 2017, USCIS provided individualized renewal notices to some individuals whose DACA eligibility will expire between September  5, 2017 and March 5, 2018.

**OBJECTION TO REQUEST NO. 4:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague as "individualized" is undefined.  The term can be fairly construed as either referring to notices with substantive content that is individually tailored to each recipient, or as referring to notices provided to DACA recipients on an individual basis, without substantive individually tailored content.  Defendant objects to this request to the extent that it does not define a relevant time period, including that it is vague and confusing to the extent it implies that USCIS provided individualized renewal notices to DACA recipients relating to the expiration of their DACA between September 5, 2017 and March 5, 2018, when the request can also fairly be construed to be seeking information about whether USCIS ever provided individualized renewal notices to individuals at any time in the past whose DACA renewal status also happens to be expiring between September 5, 2017 and March 5, 2018.  Defendant objects to the use of the term "eligibility" in this request to the extent that it implies or assumes that DACA is an immigration benefit as opposed to an exercise of deferral of immigration enforcement action.  Defendant will construe this request to be seeking an admission of whether USCIS ever provided renewal notices on an individual basis, but not with substantive content individually tailored, to individuals at any time in the past whose DACA also happens to be expiring between September 5, 2017 and March 5, 2018.

**RESPONSE TO REQUEST NO. 4:**  Defendant admits RFA No. 4 only to the extent that until approximately July 15, 2017, USCIS provided a renewal reminder notice on an individual basis to DACA recipients, including some whose DACA also happens to be expiring between September 5, 2017 and March 5, 2018.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 5:**  Admit that the renewal notices sent by USCIS to the individuals described in #4 did not state that the deadline for submitting a renewal application is October 5, 2017.

**OBJECTION TO REQUEST NO. 5:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague as "individualized" is undefined.  The term can be fairly construed as either referring to notices with substantive content that is individually tailored to each recipient, or as referring to notices provided to DACA recipients on an individual basis, without substantive individually tailored content.  Defendant objects to this request to the extent that it does not define a relevant time period, including that it is vague and confusing to the extent it implies that USCIS provided individualized renewal notices to DACA recipients relating to the expiration of their DACA eligibility between September 5, 2017 and March

9

5, 2018, when the request can also fairly be construed to be seeking information about whether USCIS ever provided individualized renewal notices to individuals at any time in the past whose DACA renewal status also happens to be expiring between September 5, 2017 and March 5, 2018.  Defendant further objects to this request to the extent that it uses terms, such as "application," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.  Defendant will construe this request to be seeking an admission of whether renewal notices that USCIS has ever provided to DACA recipients at any time in the past did not state that a deadline for submitting a DACA renewal request is October 5, 2017.

**RESPONSE TO REQUEST NO. 5:**  Defendant admits RFA No. 5 only to the extent that the renewal notices described in Defendant's Response to RFA No. 4 did not state October 5, 2017 as the deadline for DACA renewal requests because the memorandum entitled, "*Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'*" ("DACA Rescission Memorandum"), dated September 5, 2017, that set October 5, 2017 as the deadline for receipt of certain DACA renewal requests had not yet been issued by Acting Secretary of Homeland Security Elaine Duke.  Defendant denies RFA No. 5 to the extent that it suggests that the agency had an affirmative duty to state in the renewal notices sent by USCIS to the individuals described in RFA No. 4 that the deadline for USCIS to receive a renewal request is October 5, 2017.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 6:**  Admit that USCIS has not provided corrected renewal notices to the individuals described in #4 stating that the deadline for submitting a renewal application is October 5, 2017.

**OBJECTION TO REQUEST NO. 6:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "application," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise o prosecutorial discretion to defer immigration enforcement action.  Defendant objects to this request to the extent that it does not define a relevant time period, including that it is vague and confusing to the extent it implies that USCIS provided individualized renewal notices to DACA recipients relating to the expiration of their DACA between September 5, 2017 and March 5, 2018, when the request can also fairly be construed to be seeking information about whether USCIS ever provided individualized renewal notices to individuals at any time in the past whose DACA also happens to be expiring between September 5, 2017 and March 5, 2018.  Defendant objects to this request to the extent that it assumes facts not in evidence that any prior USCIS notices were incorrect or otherwise necessitated the provision of a "corrected renewal notice[ ]."

**RESPONSE TO REQUEST NO. 6:**  Defendant denies RFA No. 6 to the extent that it erroneously assumes that USCIS issued incorrect renewal notices to DACA recipients and that any "correction" to the notices was required.  Defendant is without sufficient

10

information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 7:**  Admit that USCIS has provided no individual renewal notice to some individuals whose DACA eligibility will expire before March 5, 2018.

**OBJECTION TO REQUEST NO. 7:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the use of the term "eligibility" in this request to the extent that it implies or assumes that DACA is an immigration benefit as opposed to an exercise of deferral of immigration enforcement action.

**RESPONSE TO REQUEST NO. 7:** Defendant admits RFA No. 7 to the extent that some individuals whose DACA will expire before March 5, 2018 did not receive individual renewal notices.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 8:**  Admit that providing no individual written notice for DACA renewal is a departure from prior practice.

**OBJECTION TO REQUEST NO. 8:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it does not define a relevant time period, either for the time period where USCIS did not provide individual notice or for the time period referenced as "prior practice."

**RESPONSE TO REQUEST NO. 8:**  Defendant admits RFA No. 8 only to the extent that USCIS provided individual renewal notices to certain DACA recipients through approximately mid July 2017, but stopped providing such renewal notices to any DACA recipients on or about July 15, 2017.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 9:**  Admit that providing only 30 days' notice of a DACA renewal deadline is a departure from prior practice.

**OBJECTION TO REQUEST NO. 9:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it assumes facts not in evidence, that USCIS provided only 30 days' notice.  Defendant objects to this request to the extent that it does not define a relevant time period referenced as "prior practice."  Defendant objects to this request as vague, confusing, and misleading to the extent that it implies that the multiple forms of notice that the government provided regarding the rescission of DACA is equivalent to the individual renewal notice that certain DACA recipients received in the past while the DACA policy was still in effect.

**RESPONSE TO REQUEST NO. 9:**  Defendant admits RFA No. 9 only to the extent that USCIS generally provided a renewal reminder notice to certain DACA recipients approximately 178-180 days in advance of the most recent expiration date of their DACA

11

until USCIS ceased issuing such notices to all DACA recipients on approximately July 15, 2017.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST  NO.  10:**   Admit that Defendants did not mail the DACA termination memorandum to DACA recipients.

**OBJECTION TO REQUEST NO. 10:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 10:**  Defendant admits RFA No. 10 only to the extent that USCIS did not mail the DHS DACA Rescission Memorandum, dated September 5, 2017, to DACA recipients, but Defendant denies that it had an affirmative duty to mail the Memorandum to every current DACA recipient.  Defendant further admits that a Notice of Availability of the DACA Rescission Memorandum was published in the Federal Register.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST  NO.  11:**   Admit that Defendants did not mail any explanatory material concerning the DACA termination to DACA recipients.

**OBJECTION TO REQUEST NO. 11:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory material."  Defendant further objects to this Request to the extent that it is not limited in time and does not clarify whether "DACA recipients" includes only current such individuals or past DACA recipients as well.

**RESPONSE  TO  REQUEST  NO.  11:**  Defendant denies RFA No. 11 because USCIS mailed notices to DACA recipients who either had a pending Form I-131, *Application for Travel Document,* based on DACA on September 5, 2017, or who filed such a Form I-131 after September 5, 2017, and such notices explain that the Form I-131 is being administratively closed or rejected and the fee refunded in accordance with the DACA Rescission Memorandum.  Defendant also denies RFA No. 11 to the extent that it erroneously assumes that Defendant had a legal obligation to send DACA recipients such information on DACA rescission.  Defendant admits that a Notice of Availability of the DACA Rescission Memorandum was published in the Federal Register.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST  NO.  12:**   Admit that Defendants did not translate the DACA termination memorandum into Spanish.

**OBJECTION TO REQUEST NO. 12:**  Defendant incorporates by reference the above objections to the definitions and instructions.

12

**RESPONSE TO REQUEST NO. 12:**  Defendant admits RFA No. 12 only to the extent that DHS did not issue a Spanish language translation of the DACA Rescission Memorandum, dated September 5, 2017.  Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Spanish.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 13:**  Admit that, if the DACA termination memorandum was translated into Spanish, such Spanish translation was not posted publicly on DHS's website.

**OBJECTION TO REQUEST NO. 13:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 13:**  Defendant admits RFA No. 13 only to the extent that DHS did not translate the DACA Rescission Memorandum into Spanish.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 14:**  Admit that the only information about the DACA termination that Defendants provided in Spanish were a "Frequently Asked Questions" document and a press release.

**OBJECTION TO REQUEST NO. 14:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 14:** Defendant denies RFA No. 14 to the extent that the only information about the DACA rescission that Defendant provided in Spanish were a "Frequently Asked Questions" document and a press release, as USCIS provided information in Spanish about the rescission of DACA on its website and in social media. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 15:**  Admit that the Spanish translations of the materials referenced in #14 were not immediately available when the English-language materials were published on September 5, 2017.

**OBJECTION TO REQUEST NO. 15:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define the phrase "immediately available."

**RESPONSE TO REQUEST NO. 15:**  Defendant denies RFA No. 15 to the extent that it states that information in Spanish about the rescission of DACA on the USCIS and DHS websites was not available on September 5.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 16:**   Admit that Defendant did not translate the DACA termination memorandum into Korean.

**OBJECTION TO REQUEST NO. 16:**   Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 16:**   Defendant admits RFA No. 16 to the extent that DHS did not translate the DACA Rescission Memorandum into Korean.   Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Korean.   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 17:**   Admit that Defendants did not translate explanatory materials regarding the DACA termination into Korean.

**OBJECTION TO REQUEST NO. 17:**   Defendant incorporates by reference the above objections to the definitions and instructions.   Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory materials."

**RESPONSE TO REQUEST NO. 17:**   Defendant admits RFA No. 17 only to the extent that DHS did not translate any materials regarding DACA Rescission into Korean. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate any DACA-related materials into Korean.   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 18:**   Admit that Defendants did not translate the DACA termination memorandum into Chinese.

**OBJECTION TO REQUEST NO. 18:**   Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 18:**   Defendant admits RFA No. 18 to the extent that DHS did not translate the DACA Rescission Memorandum into Chinese.   Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Chinese.   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 19:**   Admit that Defendants did not translate explanatory materials regarding the DACA termination into Chinese.

**OBJECTION TO REQUEST NO. 19:**   Defendant incorporates by reference the above objections to the definitions and instructions.   Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory materials."

14

**RESPONSE TO REQUEST NO. 19:**  Defendant admits RFA No. 19 only to the extent that DHS did not translate any materials regarding DACA Rescission into Chinese. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate any DACA-related materials into Chinese.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 20:**  Admit that Defendants did not translate the DACA termination memorandum into Tagalog.

**OBJECTION TO REQUEST NO. 20:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 20:**  Defendant admits RFA No. 20 to the extent that DHS did not translate the DACA Rescission Memorandum into Tagalog.  Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Tagalog.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 21:**  Admit that Defendants did not translate explanatory materials regarding the DACA termination into Tagalog.

**OBJECTION TO REQUEST NO. 21:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory materials."

**RESPONSE TO REQUEST NO. 21:** Defendant admits RFA No. 21 only to the extent that DHS did not translate any materials regarding DACA Rescission into Tagalog. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate any DACA-related materials into Tagalog.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 22:**  Admit that Defendants did not translate the DACA termination memorandum into Vietnamese.

**OBJECTION TO REQUEST NO. 22:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 22:** Defendant admits RFA No. 22 only to the extent that DHS did not translate the DACA Rescission Memorandum into Vietnamese. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Vietnamese.  Defendant

is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 23:**   Admit that Defendants did not translate explanatory materials regarding the DACA termination into Vietnamese.

**OBJECTION TO REQUEST NO. 23:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory materials."

**RESPONSE TO REQUEST NO. 23:** Defendant admits RFA No. 23 only to the extent that DHS did not translate any materials regarding DACA Rescission into Vietnamese. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate any DACA-related materials into Vietnamese.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 24:**   Admit that Defendants did not translate the DACA termination memorandum into Portuguese.

**OBJECTION TO REQUEST NO. 24:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 24:**  Defendant admits RFA No. 24 only to the extent that DHS did not translate the DACA Rescission memorandum into Portuguese. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate the DACA Rescission Memorandum into Portuguese.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 25:**   Admit that Defendants did not translate explanatory materials regarding the DACA termination into Portuguese.

**OBJECTION TO REQUEST NO. 25:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent plaintiffs have failed to define "explanatory materials."

**RESPONSE TO REQUEST NO. 25:**  Defendant admits RFA No. 25 only to the extent that DHS did not translate any materials regarding DACA Rescission into Portuguese. Defendants further deny this request to the extent that it assumes DHS had a legal obligation to translate any DACA-related materials into Portuguese.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 26:**   Admit that a notice of availability of the DACA termination memorandum was not published in the Federal Register until September 18, 2017.

**OBJECTION TO REQUEST NO. 26:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 26:**  Defendant admits RFA No. 26 to the extent that a notice of availability of the DACA Rescission Memorandum was not published in the Federal Register until September 18, 2017.  Defendant denies this request to the extent that it assumes DHS had a legal obligation to publish the Notice of Availability of the DACA Rescission Memorandum in the Federal Register.

**REQUEST NO. 27:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to terminate the DACA program.

**OBJECTION TO REQUEST NO. 27:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 27:**  Defendant denies RFA No. 27.

**REQUEST NO. 28:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to announce the DACA termination on September 5, 2017.

**OBJECTION TO REQUEST NO. 28:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent it can be construed to apply either to the decision to announce the DACA termination or to announce that termination on September 5, 2017.

**RESPONSE TO REQUEST NO. 28:**  Defendant denies RFA No. 28.

**REQUEST NO. 29:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA applications from individuals without valid DACA as of September 5, 2017.

**OBJECTION TO REQUEST NO. 29:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 29:**  Defendant denies RFA No. 29.

**REQUEST NO. 30:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA renewals from individuals whose DACA will expire on or after March 6, 2018.

**OBJECTION TO REQUEST NO. 30:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 30:**  Defendant denies RFA No. 30.

**REQUEST NO. 31:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to set a deadline of October 5, 2017, for DACA renewal applications.

**OBJECTION TO REQUEST NO. 31:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 31:**  Defendant denies RFA No. 31.

**REQUEST NO. 32:**  Admit that the DACA termination decision is not under continued consideration by DHS.

**OBJECTION TO REQUEST NO. 32:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "continued consideration" as vague and undefined, as well as calling for a legal conclusion.

**RESPONSE TO REQUEST NO. 32:**  Defendant admits RFA No. 32 only to the extent that the DACA Rescission Memorandum reflects Acting Secretary Duke's final decision to rescind former Secretary of Homeland Security Janet Napolitano's June 15, 2012 Memorandum entitled "*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*" (June 15, 2012 DACA memorandum), Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 33:**  Admit that the DACA termination reflects the end of the agency decision-making process concerning the DACA program.

**OBJECTION TO REQUEST NO. 33:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the request to the extent it calls for a legal conclusion.  Defendant objects to the request to as vague and undefined as, even with the rescission of the DACA policy, there are numerous agency decisions that will continue to need to be made regarding the DACA policy.

**RESPONSE TO REQUEST NO. 33:**  Defendant admits RFA No. 33 only to the extent that the DHS DACA Rescission Memorandum, dated September 5, 2017, reflects final agency action rescinding the June 15, 2012 DACA memorandum.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 34:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA applications from individuals who do not hold DACA as of September 5, 2017.

**OBJECTION TO REQUEST NO. 34:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 34:**  Defendant denies RFA No. 34.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 35:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA renewal applications after October 5, 2017.

**OBJECTION TO REQUEST NO. 35:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.  Defendant objects to this request as vague and undefined to the extent that it fails to distinguish between decisions made after October 5, 2017 for renewal requests submitted before October 5, 2017 and decisions made after October 5, 2017 for renewal requests submitted after October 5, 2017. Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 35:**  Defendant admits RFA No. 35 only to the extent that the DHS DACA Rescission Memorandum provides that DHS will reject DACA renewal requests received after October 5, 2017; and states that DHS has further directed USCIS to consider on a case-by-case basis DACA renewal requests that are received after October 5, 2017, from residents of Puerto Rico and the U.S. Virgin Islands whose DACA expires between September 5, 2017 and March 5, 2018. Defendant denies that the DACA Rescission Memorandum requires USCIS to deny all DACA renewal requests adjudicated after October 5, 2017.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 36:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum limits DACA renewals to those individuals with DACA as of September 5, 2017 whose DACA would expire between September 6, 2017 and March 5, 2018.

**OBJECTION TO REQUEST NO. 36:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.

**RESPONSE TO REQUEST NO. 36:**  Defendant denies RFA No. 36.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 37:**  Admit that prior to September 5, 2017, it was the publicly stated policy of DHS to allow DACA applicants to submit renewal applications, rather than full DACA applications, within one year of their expiration date.

**OBJECTION TO REQUEST NO. 37:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "DACA applicants" and "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.  Defendants object to the phrase "full DACA applications" as vague and undefined.

**RESPONSE TO REQUEST NO. 37:** Defendant admits RFA No. 37 only to the extent that from the time USCIS revised the Form I-821D to begin accepting DACA renewal requests in approximately June 2014, the publicly-stated policy of DHS prior to September 6, 2017 was to allow DACA recipients to submit renewal requests up to one year after their DACA expiration dates.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 38:**  Admit that prior to September 5, 2017, USCIS accepted and adjudicated renewal applications from DACA applicants whose DACA status had lapsed within one year of their expiration date.

**OBJECTION TO REQUEST NO. 38:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.  Defendant further objects to this request to the extent that it is vague and ambiguous to the extent that it is unclear whether the phrase "within one year of their expiration date" applies to "accepted and adjudicated" or only to "whose DACA status had lapsed."

**RESPONSE TO REQUEST NO. 38:** Defendant admits RFA No. 38 to the extent that prior to September 6 , 2017, USCIS had a general practice of accepting DACA renewal requests up to one year after an individual's period of deferred action had expired. Defendant denies RFA No. 38 to the extent that it may be construed to mean that USCIS also adjudicated all such DACA renewal requests within one year after the lapse of a recipient's DACA. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 39:**  Admit that prior to September 5, 2017, it was the publicly stated policy of DHS to allow initial DACA applicants to be accepted and adjudicated without regard to how long the applicant had been eligible to apply for DACA.

**OBJECTION TO REQUEST NO. 39:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "applicants," that do not apply to a request for DACA which is

not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 39:** Defendant only admits RFA No. 39 to the extent that USCIS had a practice prior to September 6, 2017 of accepting initial DACA requests without regard to how long the requestor may have been able to meet the threshold criteria to request consideration for DACA.  Defendant neither admits nor denies that this practice was publicly stated as a policy prior to September 5, 2017.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 40:**   Admit that prior to September 5, 2017, USCIS accepted and adjudicated initial DACA applications without regard to how long the applicant had been eligible to apply for DACA.

**OBJECTION TO REQUEST NO. 40:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 40:** Defendant admits RFA No. 40 to the extent that prior to September 6, 2017, USCIS accepted and adjudicated initial DACA requests from requestors without regard to how long the individual may have met the threshold criteria to request consideration of DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 41:**  Admit that DACA recipients are immediately subject to apprehension and deportation upon expiration of their DACA status.

**OBJECTION TO REQUEST NO. 41:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague, undefined, and misleading to the extent that it implies that the expiration of DACA provides, by itself, a basis for an individual to be apprehended and/or deported.  Defendant objects to the extent the request implies that no DACA recipient could have received a lawful immigration status prior to the expiration of his or her DACA and thus not be deportable.

**RESPONSE TO REQUEST NO. 41:**  Defendant admits RFA No. 41 only to the extent that any alien who is  unlawfully present in the United States is potentially subject to apprehension, removal proceedings, where applicable, and deportation.  Defendant further denies this request to the extent that it may be construed to refer to certain DACA requestors who have attained and are maintaining a lawful immigration status by the time their DACA expires or otherwise is terminated.   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 42:**   Admit that, since September 5, 2017, DHS has increased its apprehension and deportation of DACA recipients whose statuses have lapsed.

**OBJECTION TO REQUEST NO. 42:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague, undefined, and misleading to the extent that it implies that the expiration of DACA status provides, by itself, a basis for an individual to be apprehended and/or deported.  Defendant also objects to the request as vague and undefined to the extent it fails to identify the relevant time period being compared to.  Defendant objects to the use of the term "apprehension" as undefined to the extent it conflates enforcement actions of the relevant DHS components.  Defendant also objects to the phrase "increased its apprehension" as mischaracterizing or failing to fully describe the manner in which individuals with expired DACA are encountered.  Defendant further objects to this request to the extent that it assumes a recipient of DACA has a lawful immigration "status," which is inaccurate.

**RESPONSE TO REQUEST NO. 42:**  Defendant denies RFA No. 42.

**REQUEST NO. 43:**  Admit that an individual who loses DACA status is no longer eligible to apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(14).

**OBJECTION TO REQUEST NO. 43:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent it calls for a legal conclusion.  Defendant also objects to this request to the extent it conflates DACA with deferred action.  Defendant further objects to this request to the extent that it assumes a recipient of DACA has a lawful immigration "status," which is inaccurate. DACA is an exercise of prosecutorial discretion to defer immigration enforcement action against an individual, not a "status."

**RESPONSE TO REQUEST NO. 43:**   Defendant admits RFA No. 43 only to the extent that an individual who is not a recipient of DACA or deferred action by means other than the DACA policy would not be eligible to apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(14).  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 44:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least one small non-profit.

**OBJECTION TO REQUEST NO. 44:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimis economic impact" or "small non-profit."  Defendant objects to this request to the extent it calls for speculation.

22

**RESPONSE TO REQUEST NO. 44:**  Defendant is without sufficient information to admit or deny RFA No. 44.

**REQUEST NO. 45:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 100 small non-profits.

**OBJECTION TO REQUEST NO. 45:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small non-profits."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 45:**  Defendant is without sufficient information to admit or deny RFA No. 45.

**REQUEST NO. 46:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 500 small non-profits.

**OBJECTION TO REQUEST NO. 46:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small non-profit."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 46:**  Defendant is without sufficient information to admit or deny RFA No. 46.

**REQUEST NO. 47:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small business.

**OBJECTION TO REQUEST NO. 47:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 47:**  Defendant is without sufficient information to admit or deny RFA No. 47.

**REQUEST NO. 48:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 100 small businesses.

**OBJECTION TO REQUEST NO. 48:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small businesses."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 48:**  Defendant is without sufficient information to admit or deny RFA No. 48.

**REQUEST NO. 49:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 1000 small businesses.

**OBJECTION TO REQUEST NO. 49:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 49:**  Defendant is without sufficient information to admit or deny RFA No. 49.

**REQUEST NO. 50:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 5000 small businesses.

**OBJECTION TO REQUEST NO. 50:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 50:**  Defendant is without sufficient information to admit or deny RFA No. 50.

**REQUEST NO. 51:**  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small governmental jurisdiction.

**OBJECTION TO REQUEST NO. 51:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimis economic impact" or "small governmental jurisdiction."  Defendant objects to this request to the extent it calls for speculation.

24

**RESPONSE TO REQUEST NO. 51:**  Defendant is without sufficient information to admit or deny RFA No. 51.

**REQUEST NO. 52:**  Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small non-profits.

**OBJECTION TO REQUEST NO. 52:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits."

**RESPONSE TO REQUEST NO. 52:**  Defendant admits RFA No. 52 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the economic impact of terminating DACA on small non-profits.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 53:**  Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small businesses.

**OBJECTION TO REQUEST NO. 53:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small businesses."

**RESPONSE TO REQUEST NO. 53:**  Defendant admits RFA No. 53 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the economic impact of terminating DACA on small businesses.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 54:**  Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 54:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 54:**  Defendant admits RFA No. 54 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the economic impact of terminating DACA on small governmental jurisdictions.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 55:**  Admit that prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small non-profits.

**OBJECTION TO REQUEST NO. 55:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider regulatory alternatives to the action being challenged in this lawsuit.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits."

**RESPONSE TO REQUEST NO. 55:**  Defendant admits RFA No. 55 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the regulatory alternatives of terminating DACA on small non-profits.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 56:**  Admit that prior to prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small businesses.

**OBJECTION TO REQUEST NO. 56:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant

26

was required to consider regulatory alternatives to the action being challenged in this lawsuit. Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small businesses."

**RESPONSE TO REQUEST NO. 56:** Defendant admits RFA No. 56 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum. Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the regulatory alternatives of terminating DACA on small businesses. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 57:** Admit that prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 57:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act. Defendant objects to this request to the extent it implies that Defendant was required to consider regulatory alternatives to the action being challenged in this lawsuit. Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 57:** Defendant admits RFA No. 57 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum. Defendant denies this request to the extent that it suggests that DHS had a legal obligation to evaluate the regulatory alternatives of terminating DACA on small governmental jurisdictions. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 58:** Admit that prior to September 5, 2017, former Secretary Kelly did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 58:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act. Defendant objects to this request to the extent it implies that Defendant was required to "certify" as set forth in the request. Defendant objects to the request as

being compound and confusing.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits," "small businesses," or "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 58:**  Defendant admits RFA No. 58 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 59:**  Admit that prior to September 5, 2017, Acting Secretary Duke did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 59:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "certify" as set forth in the request.  Defendant objects to the request as being compound and confusing.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits," "small businesses," or "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 59:**  Defendant admits RFA No. 59 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 60:**  Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small non-profits to assist their clients in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 60:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling

for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "sufficient time" or "small non-profits."

**RESPONSE TO REQUEST NO. 60:**  Defendant admits RFA No. 60 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to consider whether one month was a sufficient time for small non-profits to assist their clients in submitting renewal applications.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 61:**  Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small non-profits to assist their members in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 61:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "sufficient time" or "small non-profits."

**RESPONSE TO REQUEST NO. 61:**  Defendant admits RFA No. 61 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to consider whether one month was a sufficient time for small non-profits to assist their members in submitting renewal applications.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 62:**  Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small businesses, small non-profits, and small governmental jurisdictions to assist their employees in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 62:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory

Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "sufficient time," "small businesses," "small non-profits," and "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 62:**  Defendant admits RFA No. 62 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to consider whether one month was a sufficient time for small businesses, small non-profits, and small governmental jurisdictions to assist their employees in submitting renewal applications.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 63:**  Admit that prior to September 5, 2017, DHS made no effort to determine the cost to small businesses, small non-profits, or small governmental jurisdictions of employees who will lose work authorization due to the end of the DACA program.

**OBJECTION TO REQUEST NO. 63:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "determine" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "small businesses," "small non-profits," and "small governmental jurisdictions."

**RESPONSE TO REQUEST NO. 63:**  Defendant admits RFA No. 63 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to determine the cost to small businesses, small non-profits, or small governmental jurisdictions of employees who will lose work authorization due to the end of the DACA program.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 64:**  Admit that prior to September 5, 2017, DHS did not assess the costs of rehiring or replacing employees who lose work authorization due to the termination of the DACA program.

**OBJECTION TO REQUEST NO. 64:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "assess" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to identify "employees who lose work authorization due to the termination of the DACA program."

**RESPONSE TO REQUEST NO. 64:**  Defendant admits RFA No. 64 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to assess the costs of rehiring or replacing employees who lose work authorization due to the termination of the DACA program.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 65:**  Admit that prior to September 5, 2017, DHS did not assess the potential costs to small businesses, small non-profits, and small governmental jurisdictions of losing experienced employees due to the termination of the DACA program.

**OBJECTION TO REQUEST NO. 65:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "assess" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "small businesses," "small non-profits," "small governmental jurisdictions," and "experienced employees."

**RESPONSE TO REQUEST NO. 65:**  Defendant admits RFA No. 65 only to the extent Defendant did not conduct an analysis of the rescission of DACA under the Regulatory Flexibility Act prior to September 5, 2017; and further admits that Defendant did not conduct an analysis of the establishment of DACA under the Regulatory Flexibility Act prior to issuance of the June 15, 2012 DACA memorandum.  Defendant denies this request to the extent that it suggests that DHS had a legal obligation to assess the potential costs to small businesses, small non-profits, and small governmental jurisdictions of losing experienced employees due to the termination of the DACA program.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 66:** Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their lack of immigration status as of June 15, 2012, as a condition of consideration for DACA.

**OBJECTION TO REQUEST NO. 66:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA status is not an immigration benefit.

**RESPONSE TO REQUEST NO. 66:**  Defendant admits RFA No. 66 only to the extent that the Form I-821D, Form I-765, Form I-765 Worksheet, and the associated instructions for these forms state the information DACA requestors are required to submit in order to request DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 67:**  Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their current and previous mailing addresses as a condition of consideration for DACA.

**OBJECTION TO REQUEST NO. 67:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

**RESPONSE TO REQUEST NO. 67:**  Defendant admits RFA No. 67 only to the extent that the Form I-821D, Form I-765, Form I-765 Worksheet, and the associated instructions for these forms state the information DACA requestors are required to submit in order to request DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 68:**  Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their country of birth as a condition of consideration for DACA.

**OBJECTION TO REQUEST NO. 68:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

**RESPONSE TO REQUEST NO. 68:**  Defendant admits RFA No. 68 only to the extent that the Form I-821D, Form I-765, Form I-765 Worksheet, and the associated instructions for these forms state the information DACA requestors are required to submit in order to request DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 69:**  Admit that pursuant to the 2012 DACA memorandum, certain applicants for DACA were required to disclose criminal arrests, charges, or convictions as a condition of consideration for DACA.

**OBJECTION TO REQUEST NO. 69:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.  Defendant

objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "certain applicants for DACA."

**RESPONSE TO REQUEST NO. 69:** Defendant admits RFA No. 69 only to the extent that the Form I-821D, Form I-765, Form I-765 Worksheet, and the associated instructions for these forms state the information DACA requestors are required to submit in order to request DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 70:**  Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their means of entering the United States as a condition of consideration for DACA.

**OBJECTION TO REQUEST NO. 70:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

**RESPONSE TO REQUEST NO. 70:**  Defendant admits RFA No. 70 only to the extent that the Form I-821D, Form I-765, Form I-765 Worksheet, and the associated instructions for these forms state the information DACA requestors are required to submit in order to request DACA.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 71:**  Admit that the information DACA applicants provided with their applications sometimes includes the immigration status, or lack thereof, of third parties, including family members.

**OBJECTION TO REQUEST NO. 71:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.  Defendant objects to the request as vague and undefined to the extent plaintiffs failed to provide a definition for the phrase "third parties."

**RESPONSE TO REQUEST NO. 71:**  Defendant admits RFA No. 71 only to the extent that certain DACA requestors may have submitted supplementary documentation that contains information about third parties, including family members and that such information, on occasion, may have concerned the immigration status of such other individuals.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 72:**  Admit that the information DACA applicants provided with their applications sometimes includes the country of birth of third parties, including family members.

**OBJECTION TO REQUEST NO. 72:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants

33

for DACA" as misleading to the extent DACA is not an immigration benefit.  Defendant objects to the request as vague and undefined to the extent plaintiffs failed to provide a definition for the phrase "third parties."

**RESPONSE TO REQUEST NO. 72:** Defendant admits RFA No. 72 only to the extent that certain DACA requestors may have submitted supplementary documentation that contains information about third parties, including family members and that such information, on occasion, may have concerned the country of birth information of such other individuals.  Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 73:**  Admit that at least one DACA applicant who met the guidelines of the 2012 DACA memorandum was nonetheless denied DACA.

**OBJECTION TO REQUEST NO. 73:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

**RESPONSE TO REQUEST NO. 73:**  Defendant admits only that USCIS has denied a DACA request from at least one DACA requestor who met the threshold criteria for consideration for DACA outlined in the June 15, 2012 memorandum from former Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* and the USCIS DACA FAQs archived at https://www.uscis.gov/archive/frequently-asked-questions (last visited October 17, 2017)). Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 74:**  Admit that DHS policy before September 5, 2017 was not to use the information provided in DACA applications for immigration-enforcement purposes except in narrow circumstances, including to identify fraudulent claims, for national security purposes, to adjudicate DACA requests, or for the investigation or prosecution of a criminal offense.

**OBJECTION TO REQUEST NO. 74:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the extent the request mischaracterizes or otherwise fails to fully describe the policy at issue.  Defendant objects to the request as vague and confusing to the extent plaintiffs have failed to define the phrase "immigration-enforcement purposes," and "narrow circumstances."

**RESPONSE TO REQUEST NO. 74:**  Defendant admits RFA No. 74 only to the extent that that the current policy on sharing information provided by DACA requestors and recipients is reflected in USCIS DACA FAQs numbers 19, 20, and 26 (archived at https://www.uscis.gov/archive/frequently-asked-questions (last visited October 17, 2017)), DHS DACA FAQs numbers 7 and 8 (at https://www.dhs.gov/news/2017/09/05/frequentlyasked-

questions-rescission-deferred-action-childhood-arrivals-daca (last visited October 17, 2017)), and the Form I-821D (*Consideration for Deferred Action for Childhood Arrivals*) instructions. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 75:** Admit that DHS has changed its policy, since September 2017, regarding the permissible uses of the information provided in DACA applications.

**OBJECTION TO REQUEST NO. 75:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the extent that "applications" is vague and undefined.

**RESPONSE TO REQUEST NO. 75:** Defendant denies RFA No. 75. Defendant admits only that the current policy is reflected in USCIS DACA FAQs numbers 19, 20, and 26 (archived at https://www.uscis.gov/archive/frequently-asked-questions (last visited October 17, 2017)), DHS DACA FAQs numbers 7 and 8 (at https://www.dhs.gov/news/2017/09/05/frequentlyasked-questions-rescission-deferred-action-childhood-arrivals-daca (last visited October 17, 2017)), and the Form I-821D instructions. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

Dated: October 18, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-3374
Fax:  (202) 616-8460
Email: brad.rosenberg@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2017, I caused to be served the

foregoing DEFENDANT'S OBJECTIONS TO PLAINTIFFS' FIRST SET OF

REQUESTS FOR ADMISSION TO ELAINE DUKE, ACTING SECRETARY OF

HOMELAND SECURITY, via e-mail upon:

| | |
|---|---|
| Lourdes Rosado | lourdes.rosado@ag.ny.gov |
| Diane Lucas | diane.lucas@ag.ny.gov |
| Abigail Taylor | abigail.taylor@state.ma.us |
| Genevieve Nadeau | Genevieve.Nadeau@MassMail.State.MA.US |
| Colleen Melody | ColleenM1@ATG.WA.GOV |
| Marsha Chien | MarshaC@ATG.WA.GOV |
| Jerome Frank Legal Servs. Org. | BatallaVidal_LSO@mailman.yale.edu |
| Batalla | Batalla@nilc.org |
| Amy Taylor | amy.taylor@maketheroadny.org |
| Scott Foletta | scott.foletta@maketheroadny.org |
| Alexa Schapira | Alexia.Schapira@maketheroadny.org |
| Justin Cox | cox@nilc.org |

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG

# EXHIBIT G

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF FERNANDO S. MENDOZA** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and | CASE NO. 17-CV-05235-WHA |
| 2 | STATE OF MINNESOTA, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official | |
| 6 | capacity as Acting Secretary of the Department of Homeland Security, and the UNITED | |
| 7 | STATES OF AMERICA, | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. | |
| 13 | DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, | CASE NO. 17-CV-05380-WHA |
| 17 | VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT | |
| 18 | LATTHIVONGSKORN, | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President | |
| 22 | of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE | |
| 23 | DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  COUNTY OF SANTA CLARA and                        CASE NO. 17-CV-05813-WHA
   SERVICE EMPLOYEES INTERNATIONAL
2  UNION LOCAL 521,

3                    Plaintiffs,

4         v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10                   Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, FERNANDO S. MENDOZA, declare and state as follows:

1.   I am the Associate Dean of Minority Advising and Programs and Professor of Pediatrics (General Pediatrics) at the Lucile Salter Packard Children's Hospital. I write this declaration as a doctor and an expert in pediatric medicine in support of all Plaintiffs in the related-lawsuits regarding the Deferred Action for Childhood Arrivals program, commonly known as DACA. I have been an academic general pediatrician at Stanford University School of Medicine for 36 years, and have held the rank of Professor for the past 16 years. During that time, I also have held the position of Associate Dean of Minority Advising and Programs (1983 to present), and Chief of the Division of General Pediatrics at the Lucile Packard Children's Hospital (1996-2014). I received my MD in 1975 from Stanford University, School of Medicine, and my Masters of Public Health from Harvard University in 1979. My training in pediatrics was at Stanford University, School of Medicine as a resident from 1975 to 1978, and as a fellow in academic general pediatrics from 1979-1981. Relevant to this declaration is also my experience as a member of the Committee on the Health and Adjustment of Immigrant Children and Families, National Research Council, Institute of Medicine (1996-98).

2.   Throughout my career of 36 years, I have focused in particular on the physical and mental well-being of immigrant and Mexican-American children. I have taught courses on delivering health care to diverse populations, and promoting well-being in immigrant children and youth. I have published numerous peer-reviewed publications on these issues. A copy of my curriculum vitae is attached (Exhibit A).

3.   As a faculty member in the Pediatrics Department, I have spent my clinical time treating children and youth in the outpatient and inpatient settings at the Lucile Packard Children's Hospital. Most recently, my clinical time has been as an attending physician in the outpatient clinic of the Gardner-Packard Children's Health Center, a Federally Qualified Health Center run by the Gardner Family Care Corporation in partnership with Lucile Packard Children's Hospital. This clinic serves primarily children and youth from low-income families in our region; many of them come from immigrant families. Overall, my clinical experiences for the past 36 years has been with this population of children and youth, treating acute and chronic illness, providing well child care, and working with families on issues of child wellness.

4. In 2017, I co-authored a peer-reviewed study titled "Protecting unauthorized immigrant mothers improves their children's mental health," which was published in *Science*. A copy of that study is attached (Exhibit B). Using Medicaid claims data from the state of Oregon, we found that mothers' DACA eligibility decreased adjustment and anxiety disorder diagnoses by 50% among their U.S. born children. This study suggests that intergenerational benefits can occur when an immigration policy (DACA) positively impacts one generation (mother) in such a way that the impact on the parent's health and wellbeing is felt by the next generation (children), resulting in their improved development and well-being. More specifically, the results of this study indicated that parents' unauthorized status is a substantial stressor to children because of the daily uncertainty of deportation. When this stress is alleviated by a policy such as DACA, normal child development is more likely to occur leading to a lower prevalence of anxiety and adjustment disorders. DACA can prevent a health disparity among U.S. children (a high level of chronic stress) by eliminating a parental disadvantage (fear of deportation) that can impact their U.S. children.

5. As a pediatric practitioner, I am familiar with the short-term and long-term health effects of adjustment and anxiety disorder diagnoses for children. A child diagnosed with these disorders can be depressed and withdrawn, be unable to complete schoolwork, lash out at classmates and teachers, behave recklessly, and have trouble sleeping. These are conditions that significantly impair daily functioning and interfere with children's psychological and emotional development. If the cause of the anxiety is not addressed, the subsequent impairment can have long-term effects for school performance and general mental health, including an increased risk for substance abuse (The Effects of Childhood Stress on Health Across the Lifespan, Centers for Disease Control and Prevention, 2008).

6. One of the greatest stressors to children is the loss of a parent by death, divorce, or in this case, deportation. However, in the case of deportation, the level of stress is heightened by the uncertainty of the event. Think about a young child going to school one day and returning home and not finding their mother. Or having the father leave in the morning, and always thinking, "will this be the last time I see him?" This is the current status of 4 million children who have one undocumented parent. This is the stress and uncertainty that DACA was able to relieve.

2

DECLARATION OF FERNANDO S. MENDOZA
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

7.  Childhood mental health problems are associated with serious challenges later in life. Struggles in school can lead to limited job prospects and long-term reliance on welfare, and adults who experienced trauma during these formative years have higher rates of substance abuse and chronic health problems (CDC: 2008). By curbing acute anxiety in young children, programs like DACA could have cascading effects in improving health and other outcomes across the lifespan. In addition, there are significant implications for cost savings given that it is estimated that at present, we spend $247 billion for U.S. youth in providing mental health and health services, and dealing with their lost productivity and crime (Preventing mental, emotional, and behavioral disorders among young people: Progress and possibilities. National Research Council and the Institute of Medicine of the National Academies, Washington, DC: National Academies Press; 2009).

8.  Over the past 12 months, I have observed the effects that uncertainty about parental immigration status has on children. I have been asked to write letters for undocumented parents who have a U.S. child with chronic illness to be used for their request to stay with them in the U.S. I also had to discuss with parents the situation of being deported and not being able to return home to care for their U.S. children. In this situation, I have learned that parents are engaged in obtaining legal documents to entrust their children to other family members or friends, rather than have their children be placed in foster care. I cannot think of anything more stressful for parents and children than having to go through the process of dealing with the breakup of a family. As a pediatrician, my role is to care for all children, including those who have undocumented parents. This involves not only providing health care, but also advocating for children and their families. As such, I believe bringing to light the situation that children with undocumented parents face with regard to their health and wellbeing is important, and a vital first step toward addressing these public health concerns.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on [Date] in Stanford, California.

FERNANDO S. MENDOZA

3

# EXHIBIT A

CURRICULUM VITAE
October 2017

## FERNANDO S. MENDOZA, M.D., M.P.H.

Current Title:             Professor of Pediatrics at the Lucile Salter Packard
                           Children's Hospital, Division of General Pediatrics,
                           Department of Pediatrics,
                           and
                           Associate Dean of Minority Advising and Programs
                           Stanford University, School of Medicine


Business Address:          Division of General Pediatrics
                           Department of Pediatrics
                           School of Medicine
                           Stanford University
                           1265 Welch Road, MSOB 238
                           Stanford, CA, 94305-5459
                           (650) 725-8289

## EDUCATION AND TRAINING

B.A., 1971                          San Jose State University
                                    San Jose, California

M.D., 1975                          Stanford University School of Medicine
                                    Stanford, California

Internship and                      Stanford University School of Medicine
Residency in                        Stanford, California
Pediatrics (PL 1,2,3)
1975-1978

M.P.H., 1979                        Harvard University School of Public Health
                                    Boston, Massachusetts

Robert Wood Johnson                 Stanford University School of Medicine
Academic General Pediatrics         Stanford, California
Fellowship, 1979-1981

## FACULTY APPOINTMENTS

Assistant Professor of Pediatrics   Stanford University
September 1981 to 1990              School of Medicine Stanford, California

| | |
|---|---|
| Assistant Dean of Student Affairs | Stanford University |
| September 1983 to August 1993 | School of Medicine Stanford, California |
| | |
| Associate Professor of Pediatrics | Stanford University |
| July 1990 to May 2001 | School of Medicine Stanford, California |
| | |
| Associate Dean of Minority | Stanford University |
| Advising and Programs | School of Medicine Stanford, California |
| September 1993 to present | |
| | |
| Division and Service Chief, | Stanford University |
| General Pediatrics | School of Medicine Stanford, CA |
| (Acting 9/95-8/96) | Lucile Packard Children's Hospital |
| September 1996-2014 | |
| | |
| Professor of Pediatrics | Stanford University |
| June 2001-present | School of Medicine Stanford, CA |

**BOARD CERTIFICATION**

American Board of Pediatrics, December 7, 1980, Certificate# 25342

**HONORS**

Dean's Scholar, San Jose State University, 1968-1971

Recognition Award, Chicano Latino Medical Student Association, April 1986

Research Excellence Award, National Coalition of Hispanic Health and Human Services Organizations (COSSMHO), September 1986

Henry J. Kaiser Award for Outstanding and Innovation Contribution In Medical Education, Stanford University School of Medicine, June 1990

Honors Award, Latino Health Affairs Council, March 1992

Outstanding Research Advisor, The Stanford Society of Chicano/Latino Engineers and Scientists, May 1993

Recognition Award, Stanford University Minority Medical Alliance, April 2000

Top Doctor in Silicon Valley in General Pediatrics.  San Jose Magazine, 1999-07 Best Doctors in America, 2007-2009

KGO Channel 7, (ABC Affiliate in San Francisco), Hispanic Profile of Excellence

*Fernando S. Mendoza, MD, MPH*                                                          *3*

October 2002

Selected as one of the 100 most influential Hispanics in the United States by Hispanic Business Magazine, November 2002

National Hispanic Medical Association, Leadership Award, March 20, 2004

Juan Villagomez Humanitarian Award, California Latino Medical Association, September 2004

Establishment of the Dr. Fernando S. Mendoza Award for exemplary leadership, service and commitment to minority community awarded by LSMA, SNMA, SAIMS; May 2005

Group on Student Affairs-Minority Affairs Section, Service Award, November 2005

100 Most Influential Latinos in Silicon Valley, Mexican American Community Services Agency, June 30, 2007

The Gardner Community Spirit Award, and resolutions of commendations from the City of San Jose, County of Santa Clara, California State Senate, and U.S. Congress, September 2008.

Best Doctors in America 2009-2014

Visiting Professor, Harvard Medical School, October 2009

Visiting Professor, University of Calfiornia, San Francisco, Philip R. Lee Instititue for Health Policy Studies, January 2010

Outstanding Leadership Award for Community Pediatric Services, Ravenswood Family Health Center, March 2012

JE Wallace Sterling "Muleshoe" Alumni Lifetime Achievement Award, May 2012

President's Award for Excellence through Diversity, Stanford University, June 2012

CDC's Health Equity Champion, Fall 2012

Visiting Professor, University of Puerto Rico Health Services Schools, February 2014

Leonard P. Rome CATCH Visiting Professor, Children's National Medical Center April 2014

Ravenswood Family Health Center, Community Service Award, August 2014.

Lucile Packard Children's Hospital Medical Staff Distinguish Service Award, April 2015

*Fernando S. Mendoza, MD, MPH*                                          *4*

Dr. Augustus A. White III and Family Faculty Professionalism Award, Stanford University School of Medicine, June 2015

Dr. Phil DeChavez Mentor of the Year Award, National Latino Medical Student Association April 2016

**ACADEMIC ACTIVITIES AND SERVICES**

Member, Stanford Center for the Study of Families,
Children and Youth, 1983 to 1992

Child Health Advisory Committee
Youth Law Center National Center for Youth Law
1987 to 1992

Director, Stanford Center for Chicano Research
September, 1990 to April, 1993

Co-Director, Inter-University Program for Latino Research
September, 1990 to April, 1993

Co-Director, UCSF/Stanford Academic General Pediatric Fellowship
July 1997 - 2005

**PROFESSIONAL MEMBERSHIP**

Academic Pediatric Association
American Academy of Pediatrics, Fellow
Association of American Medical Colleges
American Pediatric Society

**EDITORIAL MEMBERSHIP**
Journal of Medical Education, January 1986 - September 1989

**REVIEWER**
Pediatrics
Journal of Pediatrics
Archives of Pediatrics and Adolescent Medicine (JAMA Pediatrics)
Academic Pediatrics

**PAST AD HOC REVIEWER -**
American Journal of Diseases of Children
American Journal of Human Biology
American Journal of Public Health
Child Development
Human Development

*Fernando S. Mendoza, MD, MPH*                                    *5*

Hispanic Journal of Behavioral Sciences
Journal of Adolescent Health
The Journal of the American Medical Association
Public Health Reports

## MEDICAL SCHOOL AND HOSPITAL COMMITTEES

Co-Chairman, Minority Admissions Advisory Panel,
Admissions Office, Stanford Medical School, 1983-1990

Committee on Student Performance, Stanford University, School of Medicine, 1983 to present

Co-Chairman, CPR Committee, Children's Hospital at Stanford, 1986-1989

Member, Utilization Review Committee, Children's Hospital at Stanford, 1986-1990

Member, Medical Executive Committee, Lucile Packard Children's Hospital, 1996- 2014

Co-Chair, Dean's Task Force on Diversity and Societal Citizenship, 2015-2017

Co-Chair, Diversity Cabinet, Stanford University, Medical School 2010-present

## NATIONAL and STATE COMMITTEES

**Research**
Member, National Institutes of Health, Human Development and
Aging Study Section (Subcommittee 1), Division of Research
Grants, 1988-1989; 1993-97

Member, Social Science Advisory Board for Poverty and Race
Research Action Council, 1991 to 1994

Member, Committee on Culture, Health and Society, Social Science
Research Council, 1991

Chairperson, Scientific Advisory Committee to the Interamerican College of Physician
and Surgeons project, "Vacune a Nuestros Niños", 1996

Member, The Committee on the Health and Adjustment of Immigrant Children and
Families, National Research Council, Institute of Medicine, and the Commission on
Behavioral and Social Science and Education.  March 26, 1996 through February 26,
1998.

Chair, California Health Interview Survey (CHIS), Child Technical Advisory Committee, UCLA Center for Health Policy Research 1999-2016.

National Advisory Council on Minority Health and Health Disparities, NIMHD, 2016-2020

**Medical Education and Public Service**

Chairperson, Group on Student Affairs - Minority Affairs Section, Association of American Medical Colleges, Western Region, 1986-1987.

Member, Association of American Medical Colleges, MCAT Evaluation Panel, 1989 to 1996.

Member, National Commission on Substance Abuse on College and University Campuses: Center on Addiction and Substance Abuse at Columbia University; Director, Joseph A. Califano, Jr. January 1993 to 2000.

Member, Health Resources and Services Administration, Bureau of Health Professions' Planning Committee on Minority Faculty Development.  September 1994.

Chairperson, 13 School Consortium Minority Affairs Section. 1995-2000.

Vice-President, Hispanic-Serving Health Professions Schools, Inc., 1996-2001

President, Hispanic Serving Health Professions School, Inc., 2001-03

Past President and Executive Board Member, Hispanic Serving Health Professions Schools, Inc. 2003-2013

Board Member, Stanford Medical Alumni Association 2004-10

Board Member and Secretary, Pan American Health and Education Foundation. 2006-2010; Chair, Research Committee 2008-2012

Co-Chair, Vision Council, KIDS IN COMMON, Santa Clara County 2008-present

Member, Diversity Taskforce of the American Pediatric Society, 2011-2016

Co-Chair, Diversity Taskforce, Federation of Pediatric Organizations, 2012- 2014

Member, AAP Task Force on Addressing Bias & Discrimination 2017- present

# BIBLIOGRAPHY

## JOURNAL ARTICLES

1.  **Mendoza FS**, Castillo RO.  Growth abnormalities in Mexican-American children in the United States: The NHANES I Study.  *Nutrition Research,* 1986;6:1247-1257.

2.  Malina RM, Martorell R, **Mendoza FS.**  Growth status of Mexican American Children and Youths: Historical trends and contemporary issues.  *Yearbook of Physical Anthropology,* 1986;29:45-79.

3.  Martorell R, **Mendoza FS**, Castillo RO, Pawson IG, Budge CC.  Short and plump physique of Mexican-American Children.  *American Journal of Physical Anthropology,* 1987;73:475-487.

4.  **Mendoza FS**, Atiba JO, Krensky AK, Scannell LM.  Rhabdomyolysis complicating doxylamine overdose.  *Clinical Pediatrics,* 1987;26(11):595-597.

5.  **Mendoza FS**, Johnson F, Kerner JA, Tune BM, Shochat SJ.  Vitamin A intoxication presenting with ascites and a normal vitamin A level.  *The Western Journal of Medicine*, 1988;148(1):88-90.

6.  Friedman IM, Kraemer HC, **Mendoza FS**, Hammer LD.  Elevated serum iron concentration in adolescent alcohol users.  *American Journal of Diseases of Children*, 1988;142(2):156-159.

7.  Martorell R, Malina RM, Castillo RO, **Mendoza FS**, Pawson IG.  Body proportions in three ethnic groups: Children and youths 2-17 years in NHANES II and HHANES.  *Human Biology*, 1988;60(2):205-222.

8.  Villarreal SF, Martorell R, **Mendoza FS**.  Sexual maturation in Mexican-American adolescents.  *American Journal of Human Biology*, 1989;1:87-95.

9.  Martorell R, **Mendoza FS,** Castillo RO.  Genetic and environmental determinants of growth in Mexican-Americans.  *Pediatrics*, 1989;84(5):864-871.

10. Kaplowitz H, Martorell R, **Mendoza FS**.  Fatness and fat distribution in Mexican American children and youths from the Hispanic Health and Nutrition Examination Survey.  *American Journal of Human Biology*, 1989;1:631-648.

*Fernando S. Mendoza, MD, MPH*                                                        *8*

11.   Murphy SP, Castillo RO, Martorell R, **Mendoza FS**.  An evaluation of four food group intakes by Mexican-American children.  *The Journal of the American Dietetic Association*, 1990;90(3):388-393.

12.   **Mendoza FS**, Ventura SJ, Valdez RB, Castillo RO, Saldivar LE, Baisden K, Martorell R.  Selected measures of health status for Mexican-American, Mainland Puerto Rican, and Cuban-American children.  *Journal of the American Medical Association*, 1991;265(2):227-232.

13.   Pollick HF, Pawson IG, Martorell R, **Mendoza FS**.  The estimated cost of treating unmet dental restorative needs of Mexican-American children from southwestern US HHANES, 1982-83.  *Journal of Public Health Dentistry*, Fall 1991;51(4):195-204.

14.   Pawson IG, Martorell R, **Mendoza FS**.  Prevalence of overweight and obesity in US Hispanic Populations.  *American Journal of Clinic Nutrition*, 1991;53:1522S-1528S.

15.   **Mendoza FS**. Latino child health policy issues.  *The Future of Children. Center for the Future of Children, The David and Lucile Packard Foundation,*  Volume 4, Number 3, Winter 1994, pages 43-72.

16.   **Mendoza FS**. The health of Latino children in the United States.  *Current Problems in Pediatrics*, November-December 1995 pg. 314-335.

17.   **Mendoza FS**. and Fuentes-Afflick, E.  Latino children's health and the family-community health promotion model. *Western Journal of Medicine*, 1999;170(2):85-92.

18.   Sanders LM, Gershon TD, Huffman LC, **Mendoza FS**.  Prescribing books for immigrant children:  A pilot study to promote emergent literacy among the children of Mexican-American immigrants.  *Archives of Pediatrics and Adolescent Medicine*, 2000;154(8):771-7.

19.   Romero AJ, Robinson TN, Kraemer HC, Erickson SJ, Haydel KF, **Mendoza FS**, Killen J,.  Are perceived neighborhood hazards a barrier to physical activity in children? *Archives of Pediatrics and Adolescent Medicine*, 2001;155:1143-1148.

20.   Flores G, Fuentes-Afflick E, Carter-Pokras O, et al.  Why ethnicity and race are so important in child health services research today.  *Archives of Pediatrics and Adolescent Medicine*, 2001;155:1178-79.

21.   Flores G, Fuentes-Afflick E, Barbot O, et al.  The health of Latino children:  Urgent priorities, unanswered questions, and a research agenda.  *Journal of the American Medical Association*, 2002;288:82-90.

*Fernando S. Mendoza, MD, MPH*                                                                9

22.     Kelly NR, Huffman LC, **Mendoza FS,** Robinson TN.  Effects of a videotape to increase use of poison control centers by low-income and Spanish-speaking families: a randomized controlled trial.  *Pediatrics,* 2003;111(1):21-26.

23.     Jutte DP, Burgos A, **Mendoza FS**, Blasey C. and Huffman LC**.**  Use of the Pediatric Symptom Checklist in a low-income, Mexican American population. *Archives of Pediatric and Adolescent Medicine,* 2003;157:1169-76.

24.     Romero AJ, Robinson TN, Haydel KF, **Mendoza FS**, and Killen JD. Associations among familism, language preference, and education in Mexican-American mothers and their children.  *Developmental and Behavioral Pediatrics,* 2004;25(1):34-40.

25.     Burgos AE, Schetzina KE, Dixon LB, **Mendoza FS**. Importance of generational status in examining access to and utilization of health care services by Mexican American children.  *Pediatrics*. 2005 Mar;115(3):e322-30

26.     Javier, JR, Huffman, LC, **Mendoza, FS**. Filipino Child Health in the United States: Do Health and Health Care Disparities Exist? *Preventing Chronic Disease: Public Health Research, Practice, and Policy*, 2007;4 (2): 1-20.

27.     Javier, J., Wise, P., **Mendoza, FS**.  The Relationship of Immigrant Status With Access, Utilization, and Health Status for Children with Asthma. Ambulatory Pediatrics, Vol. 7, No. 6, 421-430, Nov-Dec 2007.

28.     **Mendoza, F**., Health Disparities and Children in Immigrant Families: A Research Agenda. Pediatrics November 2009, 124 Supplement 3 S187-95

29.     Javier, J., Huffman, L., **Mendoza, F**., Wise, P. Access, Utilization, and health Status of Children with Special Health Care Needs in Immigrant Families. Maternal and Child Health Journal 14 (4): 567-79: 2010

30.     Javier JR, Chamberlain LJ, Rivera KK, Gonzalez SE, **Mendoza FS**, Huffman LC. Lessons Learned from a Community-Academic Partnership Addressing Adolescent Pregnancy Prevention in Filipino-American Families. Progress in Community Health Partnerships: Research, Education, and Action. Prog. Community Health Partnership. 2010 Winter, 4(4): 305-13

31.     Frintner, M.P., **Mendoza, F.S**., Dreyer, B.P. Cull, W.L., Laraque, D. Resident Cross-Cultural Training, Satisfaction and Preparedness. Academic Pediatrics Jan-Feb 2013: 13 (1): 65-71

32.     **Mendoza, F.S**., Festa, N. New American Children: Supporting the Health and Well-being of Immigrant Populations. Archives of Pediatrics & Adolescent Medicine (JAMA Pediatrics) January 2013: 167 (1): 12-1.

*Fernando S. Mendoza, MD, MPH*                                    *10*

33.   Bogetz J, Gabhart J, Rassbach C, Sanders L, **Mendoza F**, Bergman D, Blankenburg R. Special Care Optimization for Patients and Education (SCOPE): Training Pediatric Residents About Children With Special Health Care Needs. *MedEdPORTAL*; 2013. Available from:www.mededportal.org/publication/962

34.   Eneriz-Wiemer, M., Sanders, L. M., Barr, D.A., **Mendoza, F. S.**, Parental Limited English Proficiency and Health Outcomes for Children with Special Health Care Needs: A Systematic Review.  Academic Pediatrics, March/April 2014, Vol. 12, no. 2, pg.128-136.

35.   Horn, I.B. and **Mendoza, F. S.**, Reframing the Disparities Agenda: A Time to Rethink, A Time to Focus.  Academic Pediatrics, March/April 2014, Vol. 12, no. 2, pg.115-116.

36.   Festa, N., Loftus-Gagli, P., Cullen, M., **Mendoza, F. S.**, Disparities in Early Exposure to Book Sharing within Immigrant Families. Pediatrics, Vol. 134, No. 1. July 2014, e162-168.

37.   Dunlap, J.L., Jaramillo, J.D., Koppolu, R., Wright, R., **Mendoza, F.**, Bruzoni M., The Effects of Language Concordant Care on Patient Satisfaction and Clinical Understanding for Hispanic Pediatric Surgery Patients. Journal of American College of Surgeons, September 2014, Vol. 219, No. 3, S106

38.   Bogetz, Jori, Julia Gabhart, Caroline Rassbach, Lee Sanders, **Fernando Mendoza**, David Bergman and Rebecca Blankenburg. Outcomes of A Randomized Controlled Intervention to Train Pediatric Residents on Caring for Children With Special Health Care Needs. Clinical Pediatrics June 2015, Vol. 54 (7), 659-666).

39.   **Fernando S. Mendoza**, MD, MPH[1], Leslie R. Walker, MD[2], Barbara J. Stoll MD[3], Elena Fuentes-Afflick, MD, MPH[4], Joseph W. St. Geme III, MD[5], Tina L. Cheng, MD, MPH[6], Javier A. Gonzalez del Rey, MD, M.Ed [7], Christopher E. Harris, MD[8], Mary E. Rimsza, MD[9], Jie Li, Ph.D[1], and Theodore C. Sectish, MD[10]. Diversity and Inclusion Training in Departments of Pediatrics. Pediatrics, Vol. 135, No. 4, April 2015, pg. 707-713.

40.   Theodore C. Sectish[1], M.D., William W. Hay, Jr.[2], M.D., John D. Mahan[3], M.D., **Fernando S. Mendoza[4]**, M.D., M.P.H., Nancy D. Spector[5], M.D., Bonita Stanton[6], M.D., Peter G. Szilagyi[7], M.D., M.P.H., Teri L. Turner[8], M.D., M.P.H., M.Ed., Leslie R. Walker[9], M.D., Kenneth Slaw M.Ed., PhD[10], and the Federation of Pediatric Organizations' Visioning Summit Working Groups and Planning Committee[11]. Future of the Pediatric Workforce. June 2015 doi: 10.1542/peds.2008-153

*Fernando S. Mendoza, MD, MPH*                                              *11*

41.  Jori Bogetz, Caroline Rassbach, Sylvia Bereknyei, **Fernando Mendoza**, Lee Sanders, Clarence Braddock. Training 21st Century Healthcare Professionals: A Systematic Review of Educational Interventions on Chronic Care. Academic Medicine July 15, 2015

42.  Joshua Jaramillo BA, Elizabeth Snyder MA, Jonathan L Dunlap MD, Rajashree Koppolu RN, MS, CPNP, Robert Wright MA, **Fernando Mendoza MD**, Matias Bruzoni MD-FACS, The impact of language concordant care for Hispanic pediatric surgery patients: Disparities in question asking and communication. Journal of Pediatric Surgery 50 (2015) 1586-89.

43.  Jaramillo, J., Snyder, E., Dunlap, J. L., Wright, R**., Mendoza, F**., Bruzoni, M. The Hispanic Clinic for Pediatric Surgery: A model to improve parent-provider communication for Hispanic pediatric surgery patients Journal of Pediatric Surgery, 2016; 51 (4): 670-674

44.  Glenn Flores, M.D.; **Fernando Mendoza**; Elena Fuentes-Afflick; Jayson Mendoza; Lee Pachter; Juan Espinoza; Christopher Russell; Cristina Fernandez; Danielle Arnold; Nicole Brown; Kymberly Gonzalez; Cynthia Lopez; Mikah Owen; Kenya Parks; Kimberly Reynolds. Hot Topics, Urgent Priorities, and Ensuring Success for Racial/Ethnic Minority Young Investigators in Academic Pediatrics.  International Journal for Equity in Health, (2016) 15:201. DOI 10.1186/s12939-016-0494-6

45.  Khan, A., Coffey, M., Litterer, K. P., Baird, J. D., Furtak, S. L., Garcia, B. M., Ashland, M. A., Calaman, S., Kuzma, N. C., O'Toole, J. K., Patel, A., Rosenbluth, G., Destino, L. A., Everhart, J. L., Good, B. P., Hepps, J. H., Dalal, A. K., Lipsitz, S. R., Yoon, C. S., Zigmont, K. R., Srivastava, R., Starmer, A. J., Sectish, T. C., Spector, N. D., West, D. C., Landrigan, C. P., Allair, B. K., Alminde, C., Alvarado-Little, W., Atsatt, M., Aylor, M. E., Bale, J. F., Balmer, D., Barton, K. T., Beck, C., Bismilla, Z., Blankenberg, R. L., Chandler, D., Choudhary, A., Christensen, E., Coghlan-McDonald, S., Cole, F. S., Corless, E., Cray, S., Da Silva, R., Dahale, D., Dreyer, B., Growdon, A. S., Gubler, L., Guiot, A., Harris, R., Haskell, H., Kocolas, I., Kruvand, E., Lane, M. M., Langrish, K., Ledford, C. J., Lewis, K., Lopreiato, J. O., Maloney, C. G., Mangan, A., Markle, P., **Mendoza, F**., Micalizzi, D. A., Mittal, V., Obermeyer, M., O'Donnell, K. A., Ottolini, M., Patel, S. J., Pickler, R., Rogers, J. E., Sanders, L. M., Sauder, K., Shah, S. S., Sharma, M., Simpkin, A., Subramony, A., Thompson, E. D., Trueman, L., Trujillo, T., Turmelle, M. P., Warnick, C., Welch, C., White, A. J., Wien, M. F., Winn, A. S., Winch, S., Wolf, M., Yin, H. S., Yu, C. E.Hide. Families as Partners in Hospital Error and Adverse Event Surveillance. JAMA Pediatrics 2017;171(4):372-381.

*Fernando S. Mendoza, MD, MPH*                                             *12*

46.  Jens Hainmueller, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás Jiménez, **Fernando Mendoza**, Maria Rodriguez, Jonas J. Swartz, and David Latin, "Protecting unauthorized immigrant mothers improves their children's mental health", Science, 357: September 8, 2017, 1041-1044, S

## BOOK CHAPTERS, EDITORIALS, and COMMENTARIES

1.  **Mendoza FS**.  Increasing minorities in academia: The faculty role model, Editorial.  *Journal of Medical Education*, 1986;61(10):850-851.

2.  Prieto DO, **Mendoza FS**.  Minority admissions: Quo vadis?, Editorial.  *Journal of Medical Education,* 1987;62:698-700.

3.  Martorell R, **Mendoza FS**, Mueller WH, Pawson IG.  Which Side to Measure: Right or Left?  In TG Lohman, AF Roche, and R. Martorell (eds.), Anthropometry Standardization Reference Manual, 1988 (pp. 87-91). Champaign, Illinois: Human Kinetics Publishers, Inc.

4.  Martorell R, **Mendoza FS**, Castillo R.  Poverty and Stature in Children.  In John C. Waterlow (ed.), Linear Growth Retardation in Less Developed Countries, Nestle Nutrition Workshop Series, Vol 14, 1988 (pp. 57-73). New York: Vavey/Raven Press.

5.  **Mendoza FS**, Ventura S, Saldivar L, Baisden K, Martorell R.  Health Status of U.S. Hispanic Children.  In Antonio Furino (ed.), Health Policy and the Hispanic, 1992. Boulder, Colorado: Westview Press.

6.  **Mendoza FA**, Takata G.  Measures of Health Status and Health Care Access for Mainland Puerto Rican Children: Results from the Hispanic Health and Nutrition Examination Survey.  In Cynthia Garcia Cole and Gontran Lamberty (eds.), Health and Development of Puerto Rican Mothers and Children in the Mainland, New York, New York: Plenum Publication Corporation, 1994.

7.  Martorell R, **Mendoza F**, Baisden K, Pawson I.  Physical Growth, Sexual Maturation, and Obesity in Puerto Rican Children.  In Cynthia Garcia Cole and Gontran Lamberty (eds.), Health and Development of Puerto Rican Mothers and Children in the Mainland, New York, New York: Plenum Publication Corporation,1994.

8.  **Mendoza FS**.  Stanford Medical School's Minority Faculty Development and the Center of Excellence.  In L. Bergeisen (ed) Minority Faculty in the Health

*Fernando S. Mendoza, MD, MPH*                                                        *13*

Professions For the 21st Century.  Selected Proceedings, Leesburg, Virginia, September 6-8, 1995.

9.     **Mendoza FS**.  Socioeconomic, Cultural, and Ethical Issues in Pediatrics.  In Daniel Bernstein and Steven Shelov (eds), Pediatrics for Medical Students. Baltimore, MD: Williams and Wilkins pg. 99-105, 1996.

10.    **Mendoza FS**.  My Obligation to Others: A Tradition Carried Forward.  In Ellen Bassuk (ed.), The Doctor Activist: Physician Fighting For Social Change.  New York, New York: Plenum Publication Corporation.  1996

11.    **Mendoza FS** and Villarreal S. Our Nation's Challenge, Vaccinating Latino Children; Can We Do It?  *Medico InterAmericano*, 1996;15(1):7-8.

12.    **Mendoza FS** and Rosales N., Health Issues of Immigrant Children of Color. In H. Fitzgerald, B. Lester, and B. Zuckerman (ed), Children of Color, Research, Health, and Policy Issues. Garland Publishing, Inc. New York and London, 1997 pg.141-158.

13.    Committee member and Contributor, From Generation to Generation: The Health and Well-Being of Children in Immigrant Families.  Board on Children, Youth, and Families, National Research Council, Institute of Medicine, National Academy Press, 1998.

14.    **Mendoza FS** and Dixon LB.  The Health and Nutritional Status of Immigrant Hispanic Children: Analyses of the Hispanic Health and Nutrition Examination Survey.  In D Hernandez (ed) Children of Immigrants. Washington, D.C.: National Academy Press, 1999.

15.    **Mendoza FS**, Nutritional Status of Immigrant Children, In Children in Immigrant Families: Issues for California's Future. California Policy Research Center, California Program on Access to Care and the UCLA Center for Health Policy Research, pages 11-12. 2000

16.    **Mendoza FS**, Health Risk Profiles and Race, Culture, and Socioeconomic Status in the 31st Ross Roundtable, Child Health in the Multicultural Environment, September 2000, pages 5-26.

17.    Orr JE, Baker S, Shirling E, Sanders L, Huffman LC, **Mendoza FS**.  A book a day keeps the doctor away: A look at the implementation and effects of reach out and read, a pediatric clinic-based early literacy promotion program. Resources in Education, 2001. (electronic publication)

18.    Flores G, **Mendoza FS**.  ¿Dolor Aquí? ¿Fiebre?  Editorial.  *Arch Pediatr Adolesc Med,* 2002;(156):638-640.

*Fernando S. Mendoza, MD, MPH*                                                                                   *14*

19.   **Mendoza, FS**, Socioeconomic and Cultural Issues in Pediatrics.  In Daniel Bernstein and Steven Shelov (eds), <u>Pediatrics for Medical Students, 2nd Edition</u>. Baltimore, MD: Williams and Wilkins pg. 112-120, 2003.

20.   Javier JR, Chamberlain L, Huffman L, **Mendoza F**.  Parent-adolescent communication about sex in Filipino American families: A demonstration of community-based participatory research.  Letter to the editor.  *Ambulatory Pediatrics*. 2006 Mar-Apr;6(2):120.

21.   Trowbridge, R. and **Mendoza, F**. Preventing Obesity in Mexican-American Children and Adolescents. In <u>Joint U.S.-Mexico Workshop on Preventing Obesity in Children and Youth of Mexican Origin</u>.  Institute of Medicine of the National Academies. The National Academies Press, Washington, D.C., pg 128-186, 2007

22.   **Mendoza, FS**, Javier, JR. and Burgos, AE.  Health of Children in Immigrant Families.  In Lansford, JE, Deater-Deckard, K, and Bornsten, MH, (eds) Immigrant Families in Contemporary Society. Guilford Press May 2007

23.   **Mendoza, FS,** Socioeconomic and Cultural Issues in Pediatrics.  In Daniel Bernstein and Steven Shelov (eds), <u>Pediatrics for Medical Students, 3nd Edition</u>. Baltimore, MD: Lippincott Williams and Wilkins pg. 120-130, 2012.

24.   Javier, J., Festa, N., Florendo, E., **Mendoza, F.S.**  Children in Immigrant Families: The Foundation of America's Future. Advances in Pediatrics 65 (2015) pg. 105-136.

25.   **Mendoza, FS**. Commnentary on New Century Scholars, Year Book of Pediatrics 2016, pg 467-469.

26.   Julie M. Linton M.D.[a*]; Ricky Choi M.D., M.P.H.[b]; **Fernando Mendoza M.D., M.P.H.**[c] Caring for Immigrant Families: Vulnerabilities, Resilience, and Opportunities. Pediatric Clinics of North America, February 2016, pg115-130.

27.   **Mendoza, FS.** Another reason to save DACA: Lessen childhood fears. Sacramento Bee Editorial, September 18, 2017

**TECHNICAL REPORTS**

1.   Litt IF, **Mendoza FS**.  Final Report -- Transactions of Pregnant Adolescents in Prenatal Care.  Bureau of Health Care Delivery and Assistance, Maternal and Child Health Research, Grant No. MCJ-060495, 1987.

*Fernando S. Mendoza, MD, MPH*                                                    *15*

2.   **Mendoza FS**, Villarreal S, Valdez R.  Health Issues for Hispanic Children, prepared for The National Coalition of Hispanic Health and Human Services Organizations (COSSMHO), 1987.

3.   **Mendoza FS**, Martorell R, Castillo RO.  Interim Report -- Health and Nutritional Status of Mexican-American Children.  The Maternal and Child Health Research Program, Bureau of Maternal and Child Health and Resources Development, Grant No. MCJ-060518, 1989.

## ABSTRACTS

1.   **Mendoza FS**, Martin J, Gross R, Litt IF, Lewiston N, Blessing-Moore J.  Social support and stress in mothers of asthmatic children: Relationship to morbidity. *Pediatric Research*, 1981, 15:4:2(452).

2.   **Mendoza FS,** Martin J, Gross R, Litt IF, Lewiston N, Blessing-Moore J.  The effect of maternal social support and stress in the prospective morbidity of asthmatic children.  *Pediatric Research*, 1982, 16:4:2(90A).

3.   Willoughby A, **Mendoza FS**, Duke P, Williams J, Gross R.  Assessment of adolescent mother-child interactions.  *Pediatric Research*, 1983, 17:4:2.

4.   **Mendoza FS**, Castillo R.  Nutritional status of Mexican-American children: HANES I Survey.  International Inventory of Current Mexico Related Research, Volume 3, December, 1983.  Published by the Center of US-Mexican Studies, University of California, San Diego.

5.   **Mendoza FS,** Castillo RO.  Growth deficiencies in Mexican-American children in the United States.  *Pediatric Research*, April 1984.

6.   Willoughby A, **Mendoza FS**, Duke PM, Williams J, Gross RT.  Assessment of teenage parenting.  *Pediatric Research*, April 1984.

7.   Castillo RO, **Mendoza FS**.  Nutritional status of Mexican-American children in the United States.  International Inventory of Current Mexico-Related Research, Volume 4, December, 1984.

8.   Martorell R, **Mendoza FS**, Castillo R.  The short and plump syndrome of Mexican-American children.  American Association of Physical Anthropologists, 55th Annual Meeting, 1986.

9.   Valdez RB, **Mendoza FS**.  Health status of Mexican-American Children.  Vth International Congress of the World Federation of Public Health Associations, March 25, 1987.

*Fernando S. Mendoza, MD, MPH*                                                                    *16*

10.     Castillo RO, Pawson IG, **Mendoza FS**, Martorell R.  Iron status of Mexican-American children: The Hispanic HANES.  Federation of American Societies for Experimental Biology, March 31, 1987.

11.     Martorell R, Figueroa Y, **Mendoza FS**, Castillo R, Pawson IG.  Overweight and fatness in Mexican American Children.  71st Annual Meeting of the Federation of American Societies for Experimental Biology (FASEB), Washington DC, April 1987.  Federation Proceedings 36(3):876 (abstract 3264).  Also, Translated and published in full as "Sobrepeso y Gordura en Ninos Mexico-Americanos," Monografia Sobre Crecimiento y Desarrollo del Nino.  Instituto de Nutricion de Centro America y Panama (INCAP).  Guatemala, 1988.

12.     Martorell R, Pawson IG, **Mendoza FS**, Castillo R.  Explanations for the short stature of Mexican American Children.  56th Annual Meeting of the American Association of Physical Anthropologists, New York, April 1987.  Also, translated and published in full as "Explicacion de la Baja Estature de los Ninos Mexico-Americanos," Monografia Sobre Crecimiento y Desarrollo del Nino.  Instituto de Nutricion de Centro America y Panama (INCAP).  Guatemala, 1988.

13.     **Mendoza FS**, Litt IF, Moss N, Brown E, Kraemer HC, DeAnda A.  Ethnic differences in Patient-Provider interactions in Prenatal Care.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):176A (abstract 21).

14.     Villarreal SF, **Mendoza FS,** Martorell R.  Sexual maturation in Mexican-American adolescents: Hispanic Health and Nutrition Examination Survey.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):178A (abstract 32).

15.     **Mendoza FS**, Saldivar LE, Valdez RO, Castillo RO, Martorell R, Baisden C.  Chronic medical conditions and perceived health status among Mexican-American children.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Pediatric Research 21(4):259A (abstract 512).

16.     Murphy SP, Castillo RO, Martorell R, **Mendoza FS**.  An evaluation of basic four food group intakes by Mexican American children in Hispanic HANES.  70th Annual Meeting, The American Dietetic Association, Atlanta, Georgia, October 19-23, 1987.

17.     Pollick H, Pawson IG, Martorell R, **Mendoza FS.**  Dental restorative treatment needs in Mexican-American children.  115th Annual Meeting, American Public Health Association, New Orleans, Louisiana, October 18-22, 1987.

18.     **Mendoza FS**, Helms B, Martorell R.  School absenteeism among Mexican-American children and its relationship to health status and health perception.

Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February  5, 1990.

19.    Castillo RO, Garcia M, Pawson IG, Baisden K, Martorell R, **Mendoza FS**.  Iron (FE) status of U.S. Hispanic children.  Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):189A.

20.    Saldivar LE, **Mendoza FS**, Martorell R, Pawson IG, Castillo RO.  Blood pressure in Hispanic children.  Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):214A.

21.    Takata GS, **Mendoza FS**, Martorell R, Castillo RO.  Health care access problems of Mexican-American children.  Western Society for Pediatric Research, February 8, 1990, Clinical Research, 38(1):179A.

22.    Pawson IG, **Mendoza FS**, Martorell R, Baisden K.  Maternal perception of offspring size among Hispanics.  AJDC, 1990, 144:437-38

23.    **Mendoza FS**, Takata G, Baisden K, Herrera L, Martorell R.  The relationship between maternal self-reported health status and maternal report of children's health status among Hispanics.  Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February 4, 1991.

24.    Takata GS, Baisden KL, **Mendoza FS** (introduced by Barbara Korsch).  Regional disparities in Mexican-American children's health care access.  Western Society for Pediatric Research, Carmel, California, February 5, 1992.

25.    Duran-Guarino, M.R., Hlatky, M., and **Mendoza  FS**.  Access to Preventive Health Care Services for Hispanic Women.  Presented at APHA national meeting October 1994

26.    Garcia R., Carrillo, M., **Mendoza FS**. Ethnicity and Medicine: Teaching Cultural Competency.  Presented at the Cultural Competency and Women's Health Conference sponsored by the Office of Minority Health in Washington D.C., Sept 1995.

27.    **Mendoza FS**, Garcia R, Cross P, and Rhodes, C.  The Stanford Early Matriculation Program: Creating Minority Faculty for the Future.  Presented at the Annual National Meeting of the Association of American Medical Colleges. Washington D.C. Sept 1995.

28.    **Mendoza FS** and Dixon LB.  The Health and Nutritional Status of Immigrant Hispanic Children: Analyses of the Hispanic Health and Nutrition Examination Survey.  Presented at the Western Regional Ambulatory Pediatric Association Meeting, Carmel Feb. 1998

*Fernando S. Mendoza, MD, MPH*                                                           *18*

29.     Agredano YZ, Dixon LB, and **Mendoza FS**. Comparison of Growth Patterns of First, Second, and Third Generation Mexican American Children to African American and Non-Hispanic White Children Ages 2-16. The medical student forum, WSPR 1999

30.     Burgos AE, Dixon LB, and **Mendoza FS**. Health Care Access and Utilization for First, Second, Third and Later Generation Mexican American Children: Data from NHANES III. Western Regional and National Ambulatory Pediatric 1999 Meeting.

31.     Sanders, L, Hard, K. , **Mendoza FS**. Can a Videogame Improve Asthma Management? A randomized, controlled trial. Ambulatory Pediatric Association April 2001 annual meetings.

32.     Sanders, L., **Mendoza FS**. Asthma Management Self Efficacy. Ambulatory Pediatric Association April 2001 annual meetings.

33.     Chamberlain, L., Huffman, L., Sectish, T., **Mendoza FS**, Takayama J. Impact of Child Advocacy Training on Pediatric Residents. Ambulatory Pediatric Association April 2001 annual meetings.

34.     Chamberlain, L., Huffman, L., Sectish, T., **Mendoza FS**, Shochet, S., Takayama, J.. Pediatric Child Advocacy Training: Does It Make a Difference? Ambulatory Pediatric Association, Region IX and X, February 2002 annual meeting in Carmel, CA.

35.     Klaudt Monte, Schetzina Karen, **Mendoza FS,** Robinson Thomas. Racial/Ethnic Differences in Maternal Perception of Children's Weight. Ambulatory Pediatric Association, Region IX and X, February 2002 annual meeting in Carmel, CA

36.     Javier, JR, Wise, PH, **Mendoza, F**. Examining the Immigrant Paradox in Children with Asthma: Findings from the California Health Interview Survey. Annual American Public Health Association Meeting November 2006, Boston

37.     Javier, JR, Huffman, LC, Wise, PH, **Mendoza, FS**. Examining the Immigrant Paradox in Children with Special Health Care Needs. 2007 Pediatric Academic Societies' Annual Meeting, Toronto Canada.

38.     Festa, N., Loftus-Gagli, P., Cullen, M., **Mendoza, F. S**., Disparities in Early Exposure to Book Sharing within Immigrant Families. 2014 Pediatric Academic Societies' Annual Meeting, Vancouver, Canada.

**PRESENTATIONS**

1. Social support of mothers of asthmatic children and its relationship to functional morbidity.  Second Annual Robert Wood Johnson General Pediatrics Academic Development Conference, June, 1980, and Society of Pediatric Research, San Francisco, May, 1981.

2. Health status of Hispanic children.  Bay Area Latino Health Conference. University of California, Berkeley, April, 1983.

3. Nutritional status of Mexican-American children - The HANES I Survey. Stanford HANES User Conference, August, 1983.

4. Hearings before the Select Committee on Hunger, House of Representatives, Ninety-Eighth Congress.  San Francisco, July 23, 1984.

5. Health needs of Hispanics in the United Sates.  National Coalition of Hispanic Mental Health and Human Services Organization's Fifth National Hispanic Conference on Health and Human Services and National Hispanic Youth Symposium, Los Angeles, September 1984.

6. Health status of minority children and its relationship to their behavior and development.  National Institute of Child Health and Human Development Workshop, Minority Families and Children, Bethesda, Maryland, May 28-29, 1986.

7. Maternal and child health: Research issues and priorities for the nation's youngest population.  Sixth Biennial National Hispanic Conference on Health and Human Services (COSSMHO), New York City, September 4-7, 1986.

8. Mendoza F, Saldivar L, Valdez R, Castillo R, Martorell R.  Chronic conditions and perceived health status among Mexican-American children.  Ambulatory Pediatric Association Day at Carmel, February 2, 1987.

9. Mendoza FS, Litt IF, Moss N, Brown E, Kraemer HC, DeAnda A.  Ethnic differences in patient-provider interactions in prenatal care.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987.

10. The health and nutritional status of Mexican-American children.  Testimony to the House Select Committee on Hunger, Washington, D.C., March 30, 1988.

11. Mendoza FS, Litt IF, Moss N.  Transactions of pregnant adolescents in prenatal care.  1988 Tri-Regional Conference on Completed Maternal and Child Health Research, Bureau of Maternal and Child Health and Resources Development, Washington, DC, October 3, 1988.

*Fernando S. Mendoza, MD, MPH*                                                                 *20*

12.   Hispanic health status - adolescent health.  Hispanic Health Leadership Program (COSSMHO), Harvard University, July 4-5, 1989.

13.   Health status of Mexican-American children.  National Action Forum on Health Policy and the Hispanic, San Antonio, Texas, October 6-7, 1989.

14.   Mendoza FS, Helms B, Martorell R.  School absenteeism among Mexican-American children and its relationship to health status and health perception. Ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, 1990.

15.   Readiness in and out of school: A Hispanic perspective.  School Readiness: Scientific Perspectives, sponsored by the Bureau of Maternal and Child Health, Columbia, Maryland, January 24, 1992.

16.   Health Issues of Immigrant Children of Color.  Proceedings of the Second Round Table: Children of Color,  Society for Research on Child Development. March 29, 1994.

17.   Health Status of Minority School Age Children.  MacArthur Network on Successful Pathways Through Middle Childhood. Sponsored by the John D. and Catherine T. MacArthur Foundation.  Oakland, California, September 9, 1994.

18.   Minority Faculty in the Health Professions For the 21st Century.  Association of American Medical Colleges and Health Resources Services Administration. Leesburg, Virginia, September 6, 1995.

19.   Children Youth and Families: Building on Cultural Strengths of Hispanic and Latino Communities.  Center for Children with Chronic Illness and Disability, Phoenix, Arizona, June 28, 1996.

20.   Children in Immigrant Families: Issues for California's Future.  Board on Children, Youth, and Families of the National Research Council/Institute of Medicine and the UCLA Center for Health Policy Research.  Sacramento, California, December 10-11, 1998.

21.   Visiting Professor: Immigrant Children's Health Needs.  University of California, San Francisco School of Medicine, Office of Postgraduate Education.  Fresno, California, February 25, 1999

22.   Child Health in the Multicultural Environment, the 31st Ross Roundtable On Critical Approaches to Common Pediatric Problems.  Washington, DC, November 13-14, 1999.

23.   Grand Rounds Presentation at Children's Hospital Oakland, "Health Risk Profiles and Race, Culture, and Socioeconomic Status".  Oakland, CA, August 13, 2002.

24. Childhood Obesity Conference: A Public Health Crisis-A Common Sense Approach-Reshaping the Future for Overweight Kids.  Watsonville Community Hospital, Februay 22, 2003.

25. Hispanic Serving Health Professions Schools Congressional Briefing on Hispanic Obesity and Diabetes, July 15, 2004

26. Children and Health Disparities: The Effects of Social, Race, Ethnic and Immigrant Status.  COPR, American Academy of Pediatrics, Elk Grove Village, Ill, April 13, 2006

27. Preventing Obesity in Mexican American Children and Adolescents. Joint U.S.-Mexico Workshop on Preventing Obesity in Children and Youth of Mexican Origin sponsored by the Institute of Medicine, Kaiser Permanente, Instituto Nacional de la Salud Publica, Cuernavaca, Mexico, May 2006.

28. Health of Children in Immigrant Families. Conference on Immigrant Families in America. Duke University, North Carolina, May 2006

29. Overcoming Physicians and Latino/Hispanic Patients Communication Barriers. Keynote address for Conference on Physicians and Latino/Hispanic Patients Communication Barriers, America Medical Association, Chicago, Ill., August 2006

30. Comparison of the Magnitude of Obesity Among Mexican and Mexican American Children.  12th biannual congress for Research in Public Health, Instituto Nacional De Salud Publica, March 2007

31. Comparing the Problem of Obesity Among Mexican and Mexican American Children,  NICHQ WebQ conference December 2007

32. Comparing the Problem of Childhood Obesity in Mexican American and Mexican Children.  Binational Health Meeting, U.S. and Mexico, Santa Fe October 2009

33. Latino Children: Their Health and the Future of the United States. Visiting Diversity Professor, Harvard Medical School October 2009

34. Latino Children: Their Health and the Future of California. Visiting Professor UCSF, Child Health Policy. January 2010.

35. Immigration: Current Issues and the Effect on Children.  Invited speaker for the American Academy of Pediatrics Districts V and VII Meeting, New Orleans, July 16, 2011

36.     Reducing Immigrant Child Health Disparities.  Invite speaker for Pediatrics for the 21st Century Series at the Annual American Academy of Pediatric National Conference, New Orleans, October 2012

37.     New American Children: Supporting the Health and Well-Being of Immigrant Children at the Annual American Academy of Pediatric National Conference, New Orleans, October 2012

38.     Diversity: Past, Present, and Future. Visiting Professor Grand Rounds, Mount Sinai, Department of Pediatrics, New York, April 2013

39.     Immigrant Children: Changing Pediatric Demographics and Practice. Visiting Professor, Texas Children's Hospital, Texas Southwestern Medical Center, May 2013

40.     Meeting the Challenge of Diversity Through Organizational Change. Pediatric Academic Society Meeting, May 2013, Washington DC.

41.     Training the future generation of minority scholars in the USA: The RAPID model: Building training capacity for addressing the obesity epidemic in the Americas. PACO III June 2013

42.     Linking Data Sets and Career Advancement.  Hispanic Serving Health Professions School- NIH Workshop on National Data Sets, July 2013

43.     Diversity and Inclusion Working Group, Federation of Pediatric Organizations Pediatric Workforce Summit, September 2013.

44.     Hispanic Child Health. Visiting Professor, University of Puerto Rico. February 26-28, 2014

45.     American's New Children: Supporting the Health and Wellbeing of Children in Immigrant Families. Rome Visiting Professor, Children's National, April 22-24, 2014.

46.     FOPO Symposium on the Future of the Pediatric Workforce, Diversity and Inclusion Working Group.  Federation of Pediatric Organizations, PAS, May 3 2014 Vancouver, Canada

47.     Disparities in early exposure to book sharing within immigrant families. AAP Presidential Plenary Session, May 4, 2014.  Vancouver Canada

48.     Hispanic Serving Health Professions Schools, Inc. Faculty Development Conference. NIH Bethesda, MD, July 2014

49.     Immigrant Children's Health: Key Concepts and Treads. 2014 AAP National Conference and Exhibition, San Diego, CA October 2014

*Fernando S. Mendoza, MD, MPH* 23

50. Health and Health care Challenges Faced by US Immigrant Children and their Families. APS State of the Art Plenary: The Health and Healthcare of Immigrant Children: Innovative Approaches, Immigration Reform, and Humanitarian Crisis of Unaccompanied Minors Crossing the Border.  PAS San Diego April 2015

51. Cultural Competency Training as a Tool to Lessen Unconscious Bias and Improve Health Disparities. Topic Symposium: Health Disparities and Unconscious Bias in the Clinical Setting: An Action-Oriented Approach. PAS San Diego April 2015

52. Unaccompanied Immigrant Children: A Primer for Pediatric Providers. Workshop PAS San Diego 2015.

53. Immigrant Health Update: From Border Crisis to Policy Challenges.  AAP District II and VII joint meeting, Fort Worth, Texas June 2015

54. By Focusing on "Diversity" Do We Risk Abandoning Efforts to Increase Underrepresented Minorities in Medicine. AAMC/GDI Annual Meeting, Puerto Rico, San Juan, June 2015

55. "Diversity: Why is it important to Pediatrics."  Keynote Academic Pediatric Association Western Region Meeting, Monterey California, January 16, 2016.

56. "Diversity: Why is it important to Pediatrics", Grand Rounds, Texas Children's Hospital, Baylor University School of Medicine. February 12, 2016.

57. "Diversity: Why is it important to Pediatrics", Grand Rounds, Duke University Department of Pediatrics, October 4, 2016.

58. "How Should Race and Ethnicity Be Used to Report Genetic Variation in Non-Research Setting" Panel Moderator, Workshop on the Use of Race and Ethnicity in Genomics and Biomedical Research, NIH October 24, 2016.

59. Diversity at Stanford Medical School: Past, Present, and Future. Department of Medicine Grand Rounds, Stanford University, School of Medicine. January 2017

**POSTERS**

1. Mendoza FS, Castillo RO.  Growth deficiencies in Mexican-American children in the United States.  Society of Pediatric Research, April, 1984, San Francisco, California

2. Willoughby A, Mendoza FS, Duke PM, Williams J, Gross RT.  Assessment of teenage parenting.  American Pediatric Society, April, 1984, San Francisco, California.

*Fernando S. Mendoza, MD, MPH*                                                                 24

3. Mendoza FS, Saldivar LE, Valdez RO, Castillo RO, Martorell R, Baisden C. Chronic medical conditions and perceived health status among Mexican-American children.  The American Pediatric Society/The Society for Pediatric Research, April 30, 1987, Anaheim, California.

4. Takata GS, Mendoza FS, Martorell R, Castillo RO.  Health care access problems of Mexican-American children.  Western Society for Pediatric Research, February 8, 1990.

5. Pawson IG, Mendoza FS, Martorell R, Baisden K.  Maternal perception of offspring size among Hispanics.  Ambulatory Pediatric Association, 30th Annual Meeting, May 7-11, 1990, Anaheim, California.

6. Mendoza F, Takata G, Baisden K, Herrera L, Martorell R.  The relationship between maternal self-reported health status and maternal report of children's health status among Hispanics.  ambulatory Pediatric Association Bi-Regional Meeting, Carmel, California, February 4, 1991.

7. Takata GS, Baisden KL, Mendoza FS .  Regional disparities in Mexican-American children's health care access.  Western Society for Pediatric Research, Carmel, California, February 5, 1992

8. Lopez, QR, Schetzina, Haiman, A., Mendoza, F. Barriers to Obtaining Health Insurance Among Patients Served by a Mobile Community Health Van.  Ambulatory Pediatric Association, May 2003, annual meeting.

9. Laraque D. **Mendoza F**, Dreyer B, Frintner MP, Cull W.  Graduating pediatric residents: Who plans to work in underserved areas?  Poster presentation at the Pediatric Academic Societies Meeting, Vancouver Canada, (abstract # 754414) May 1-4, 2010.

10. Laraque D. **Mendoza F**, Dreyer B, Frintner MP, Cull W.  Cross cultural and linguistic appropriate care.  Pediatric residents preparedness. Poster presentation at the Pediatric Academic Societies Meeting, Vancouver Canada, (abstract # 753038) May 1-4, 2010

**GRANTS AND AWARDS**

Co-Investigator                           $5,000 award from the Stanford Center for the Study of Youth Development, for the Study of Teenage Parenting
June 1982 - September 1982

*Fernando S. Mendoza, MD, MPH*                                                25

| | |
|---|---|
| Principal Investigator | $1,000 award from the Stanford Center for the Study of Youth Development, for the Study of Nutritional Status of Hispanic Children<br>July 1983 - September 1983 |
| Principal Investigator | $6,000 award from Kaiser Hospital Foundation for Development of Hispanic Health Database<br>March 1983 - February 1984 |
| Co-Investigator | $215,285.  "The Transactions of Pregnant Adolescents in Prenatal Care"  IF Litt, FS Mendoza, WL Heinrichs.  Bureau of Health Care Delivery and Assistance - Maternal and Child Health and Crippled Children's Research Grants Program<br>February 1984 - April 1986 |
| Co-Investigator | $325,044.  "Health and Nutritional Status of Mexican-American Children"<br>R Martorell, F Mendoza<br>The Maternal and Child Health and Crippled Children's Services Research Grants Program<br>April 1985 - March 1988 |
| Principal Investigator | $331,093.  "Health Careers Opportunity Program (HCOP)"<br>September 1985 - August 1988 |
| Principal Investigator | $5,000.  "Hispanic Health Database"<br>Area Health Education Center<br>March 1986 - September 1986 |
| Principal Investigator | $50,000.  "The Effects of Poverty on the Health and School Performance of Mexican-American Children"<br>Inter-University Program for Latino Research<br>June 1, 1987 - May 31, 1988 |
| Principal Investigator | $494,000.  "Health and Nutritional Status of U.S. Hispanic Children"<br>FS Mendoza, R Martorell, R Castillo.  Continuation Grant of Bureau of Maternal and Child Health and Resources Development<br>April 1, 1988 - March 31, 1993 |
| Principal Investigator | $20,000.  "Chicano/Latino Maternal and Child Health Project"<br>Inter-University Program for Latino Research |

*Fernando S. Mendoza, MD, MPH*                                                          26

January 1, 1992 - June 30, 1993

Principal Investigator            $140,358.  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1992 - August 31, 1993

Principal Investigator            $1,503,760  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1993- August 31, 1996

Principal Investigator            $162,000  "COE Bilingual and Bicultural Minority
                                  Pre-faculty Fellowship"
                                  Health Resources and Services Admin.
                                  Office of Minority Health
                                  July 1, 1995 to June 30, 1997

Principal Investigator            $1,500,000  "Centers of Excellence"
                                  Health Resources and Services Admin.
                                  Division of Disadvantaged Assistance
                                  September 1, 1996- August 31, 1999

Principal Investigator            $714,711 "Health Careers Opportunity Program."
                                  Health Resources and Services Admin., Division of
                                  Disadvantaged Assistance,
                                  September 1, 1996 - August 31, 1999.

Co-Principal Investigator         $563,651 "Faculty Development in General Internal
                                  Medicine and General Pediatrics." Bureau of Health
                                  Professions, Health Resources and Services
                                  Administration, Public Health Service.  7/1/97-
                                  8/31/00

Co-Principal Investigator         $2,326,352 "Cancer Risk Factor Prevention for
                                  High Risk Children." National Institute of Health,
                                  National Cancer Institute.  9/19/97-7/31/01.  (P.I.
                                  Joel D. Killen, Ph.D.).

Principal Investigator            $93,219 "Reach Out and Read Program." David and
                                  Lucile Packard Foundation. 1998-99.

Principal Investigator            $1,561,925 "Hispanic Center of Excellence." Health
                                  Resources and Services Admin.  Division of
                                  Disadvantaged Assistance.  September 1, 1999-
                                  August 31, 2002.

*Fernando S. Mendoza, MD, MPH*                                                    *27*

| | |
|---|---|
| Principal Investigator | $1,277,087 "Stanford Regional Comprehensive HCOP" Health Resources and Services Admin. Division of Disadvantaged Assistance.  September 1, 1999-August 31, 2002. |
| Principal Investigator | $98,000 "Reach Out and Read Program." Lucile S. Packard Foundation for Children. 1999. |
| Co-Principal Investigator | $500,000 "Faculty Development in General Internal Medicine and General Pediatrics." Bureau of Health Professions, Health Resources and Services Administration, Public Health Service. (P.I. Robert Pantell, M.D., UCSF) 7/1/00-6/30/03. |
| Principal Investigator | $ 135,000   "Reach Out and Read Program." Peninsula Community Foundation June 1, 2000 - May 31, 2001. |
| Principal Investigator | $25,000 "Child Advocacy Fellowship."  David and Lucile Packard Foundation.  2000-2001. |
| Principal Investigator | "Grant Writing Workshop for Hispanic Researchers" Health Care Financing Administration. 5/14/01 |
| Principal Investigator | $2,270,878 "Center of Excellence." Health Resources and Services Admin.  Division of Disadvantaged Assistance.  September 15, 2002-August 31, 2005. |
| Co-Principal Investigator | $1,629,789 "Stanford Regional Comprehensive HCOP" Health Resources and Services Admin. Division of Disadvantaged Assistance.  September 1, 2002-August 31, 2005. |
| Principal Investigator | Hispanic Center of Excellence." Health Resources and Services Admin.  Division of Disadvantaged Assistance.  September 15, 2005-August 31, 2006. |
| Co-Principal Investigator | "Stanford Regional Comprehensive HCOP" Health Resources and Services Admin.  Division of Disadvantaged Assistance.  September 1, 2005-August 31, 2006. |

*Fernando S. Mendoza, MD, MPH* *28*

| | |
|---|---|
| Co-Principal Investigator | "Family-based Nutrition Intervention for Latino Children" National Heart Lung Blood Institute, NIH 2003-07. (P.I. Joel D. Killen, Ph.D.). |
| Co-Principal Investigator | "Home-based Nutrition Intervention and play Group Exercise for Low Income Latinas" NIH 2006-2010.  (P.I. Donna Matheson, Ph.D) |
| Co-Principal Investigator | "Ethnic Dance and Screen Time Reduction to Prevent Weight Gain in Latina Girls" NIH 2006-2011. (P.I. Thomas Robinson, M.D., M.P.H.) |
| Principal Investigator | D34 HP16047  Hispanic Center of Excellence, Health Services and Resources Administration, Bureau of Health Professions.  July 2009 to June 2012 |
| Principal Investigator | D34HP16047A0 Hispanic Center of Excellence, Health Services and Resources Administration, Bureau of Health Professions. July 2012-June 2017 |
| Co-Principal Investigator | 1 R25 DK96944-01 Research in Academic Pediatrics Initiative on Diversity. NIDDK September 2012- August 2017. P.I. G. Flores, Texas Southwestern University |
| Co-Principal Investigator | "Undocumented Stauts and Immigrant Families: An Interdisciplinary Impact Evaluation of Deferred Action" Russell Sage Foundation, July 1, 2016- December 31, 2017. P.I. Jens Hainmueller, Ph.D., Stanford University, School of Business. |
| Principal Investigator | "An Educational Intervention Design to Decrease Implicit Bias in the Practice of Medicine." Teaching and Mentoring Academy Innovations Grant Program, Stanford University School of Medicine. September 2016- July2017. |
| Principal Investigator | "The Health and Well-Being of Children in Immigrant Families."  Stanford Child Health Research Institute.   May 1, 2017- April 30, 2019. |
| Principal Investigator | D34HP16047A0 Hispanic Center of Excellence, Health Services and Resources Administration, |

Bureau of Health Professions; July 2017 to June 2022

# Fellows Trained

1. Glenn Takata, M.D., M.S., Associate Professor of Clinical Pediatric, Children Hospital Los Angeles, USC
2. Noel Rosales, M.D., Associate Clinical Professor, UCSF
3. Anthony Burgos, M.D., M.P.H., Director of Newborn Services, Kaiser Permanente, Long Beach (Assistant Professor of Pediatrics, Division of General Pediatrics, Stanford University, School of Medicine 1997-2011)
4. Lee Sanders, M.D., M.P.H., Associate Professor of Pediatrics, Chief of the Division of General Pediatrics, Stanford University, School of Medicine
5. Elizabeth Stuart, M.D., M.S., Clinical Professor of Pediatrics, Division of General Pediatrics, and Director of Clerkship, Stanford University School of Medicine.
6. Lisa Chamberlain, M.D., M.P.H., Associate Professor of Pediatrics, Division of General Pediatrics, Stanford University, School of Medicine
7. Monte Klaudt, M.D. Kaiser Permanente, San Marcos, California
8. Dana Weintraub, M.D., Clinical Assistant Professor, Division of General Pediatrics, Stanford University, School of Medicine
9. Joyce Javier, M.D., M.P.H., Assistant Professor of Clinical Pediatrics, Division of General Pediatrics, Children's Hospital of Los Angeles, USC School of Medicine.
10. Leticia Pelayo, MD, Santa Clara Valley Medical Center
11. Monica Eneriz Weimer, MD. Palo Alto Medical Foundation
12. Jori Bogetz, MD.  Assistant Professor, UCSF
13. Victor Cueto, MD Clinical Instructor, Division of General Pediatrics, Stanford

# EXHIBIT B

*RESEARCH*

## SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[7] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent child separations can be harmful to children's health, economic security, and long term development. Virtually all of these studies have been qualitative or correla

tional because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference…has been lacking to date in studies of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreign born, Hispanic, or Spanish speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2 year (renewable) deferred action status, while also allow

ing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action through this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized immigrants (25, 26). In addition, because U.S. born children of unauthorized immigrants are U.S. citizens, they are eligible for full scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention to treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

**RESEARCH** | REPORT



**Fig. 1. Results from applying the regression discontinuity design.** (**Top**) In the post DACA period (2013 to 2015), children of DACA eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose mothers' birthdates were within ±150 days of the DACA eligibility cutoff ($n = 2260$), and circles are average diagnosis rates within each 15 day birthdate interval. (**Bottom left**) There was no such difference in children's diagnosis rates in the pre DACA period (2003 to 2012). (**Bottom right**) There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well being could have improved (4, 6). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long term health issues, low education, and welfare dependence, which generate considerable private and social costs (32, 34).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except where otherwise noted, in a pre registered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of

adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD 9) categories 309, 308, and 300 (35).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (36, 37). Acute stress disorder can be a precursor to a diagnosis of a more lasting post traumatic stress disorder (included in the ICD 9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (36). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (36).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (32). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi experimental nature of the RD design. The percent of children diagnosed with adjustment or anxiety disorders during the post DACA period (2013 to 2015) dropped by about 4.5 percentage points ($P = 0.037$; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points ($P = 0.817$; local linear regression). Figure 1, bottom right, shows the distribution of $P$ values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre DACA health care utilization (tables S3 and S4). The distribution of $P$ values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention to treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined measure and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birth dates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff (38).

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit with a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked only at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, 0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post DACA period (fig. S6 and table S8), redefining the post DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A non prespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non prespecified sub group analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These

mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low income U.S. citizens and long term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of con founders associated with having a mother who is born just before or after the cutoff date that could explain the observed post DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status (9), we also checked for the possibility that the drop in diagnoses reflects a DACA induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well being and development of children in immigrant families (4, 6). Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the

mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring parental disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of un authorized immigrants' children, most of whom are U.S. citizens (2). Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity (32, 34, 39, 40). Treatment of mental disorders also carries con siderable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions (41) and are as sociated with poor long term outcomes for school performance and welfare reliance (33, 42). By reducing mental health problems, deferred ac tion has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immi grant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health.** (**Left**) Mothers' DACA eligibility reduced child mental health disorders in the post DACA period. (**Right**) There were no systematic, preexisting differences in the pre DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

health and well being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a path way to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evalu ating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an ef fective way to overcome some of the challenges in collecting systematic data from the unautho rized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that af fect unauthorized immigrant parents and that may have health consequences for their children.

## REFERENCES AND NOTES

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014 09 03_ Unauthorized Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470 477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291 297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348 385 (2011).
8. C. Suárez Orozco, H. Yoshikawa, R. Teranishi, M. Suárez Orozco, *Harv. Educ. Rev.* **81**, 438 473 (2011).
9. K. Yun, E. Fuentes Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913 1921 (2013).
10. T. M. Caballero et al., *Clin. Pediatr.* **6**, 648 658 (2017).
11. F. L. Rivera Batiz, *J. Popul. Econ.* **12**, 91 116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203 233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258 1268 (2007).
14. H. Yoshikawa, C. Suárez Orozco, R. G. Gonzales, *J. Res. Adolesc.* **27**, 4 19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO 10 99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329 354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57 67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I 821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012 2016); www.uscis.gov/tools/reports studies/ immigration forms data/data set form i 821d deferred action childhood arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852 1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98 114 (2016).
22. C. Amuedo Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339 373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175 e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/ j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085 1092 (2007).
26. C. H. C. Foundation, *Medi Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615 635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, V. C. Wong, *J. Policy Anal. Manage.* **27**, 724 750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 191 208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483 524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517 548 (2010).
34. J. P. Shonkoff et al., *Pediatrics* **129**, e232 e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD 9 categories
300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (post traumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295 2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056 1067 (2012).
40. K. R. Merikangas et al., *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980 989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0 17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

## ACKNOWLEDGMENTS

This research was funded by a grant from the Russell Sage Foundation (grant no. 93 16 12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi: 10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design registrations). The analysis plan is also reprinted in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

## SUPPLEMENTARY MATERIALS

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (43, 44)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893

Downloaded from http://science.sciencemag.org/ on October 23, 2017

# EXHIBIT H

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JENS HAINMUELLER AND DUNCAN LAWRENCE** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                    Defendants. | CASE NO. 17-CV-05813-WHA |

We, Jens Hainmueller and Duncan Lawrence, declare and state as follows:

1. Jens Hainmueller is a Professor of Political Science and Faculty Co-director of the Immigration Policy Lab ("IPL") at Stanford University, Stanford, California. Duncan Lawrence is the Executive Director of IPL. We write this declaration in our personal capacity as experts in support of all Plaintiffs in the related lawsuits regarding the Deferred Action for Childhood Arrivals program, commonly known as DACA.

    a. Jens Hainmueller is a Professor of Political Science at Stanford University and is the Co-founder and Faculty Co-director of IPL. Mr. Hainmueller received his PhD from Harvard University and also studied at the London School of Economics, Brown University, and the University of Tübingen. Before joining Stanford, he served on the faculty of the Massachusetts Institute of Technology. He has published more than 40 articles in peer-reviewed journals. A copy of his curriculum vitae is attached (Exhibit A).

    b. Duncan Lawrence is the Executive Director of IPL. Mr. Lawrence received his PhD in political science from the University of Colorado Boulder, and has published several peer-reviewed articles on immigration. A copy of his curriculum vitae is attached (Exhibit B).

2. In 2017, we (along with other colleagues) co-authored a peer-reviewed study about the intergenerational effects of parental immigration status on children's health. This study was published in *Science*, and a copy is attached to this declaration (Exhibit C).

3. Our study focused on the Deferred Action Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. It builds on prior studies that have found that DACA is related to higher rates of employment and improved health outcomes.

4. Our study used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low-income individuals who are not eligible for Medicaid. The program serves unauthorized immigrants and lawful permanent residents with less than 5 years of residency. Estimates from states such as California indicate that 90 to 99%

NMUELLER AND DUNCAN LAWRENCE
11, 17-5235, 17-5329, 17-5380, 17-5813)

of Emergency Medicaid recipients are unauthorized immigrants.  In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits (if meeting all requirements) and can be tracked with Medicaid claims data.  We limited our sample to children whose mothers were under age 31 as of June 15, 2012—a date tied to the DACA eligibility criterion announced when DACA was adopted on June 15, 2012.  Our data did not reflect whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children.

5.    Using this sampling criteria, we used Medicaid claims data from Oregon to identify 5,653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8,610 children between 2003 and 2015.  We then tracked the children's mental health outcomes by using their Medicaid claims.  The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015.

6.    Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental health.  Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them.  Therefore, the children's mental well-being could have improved.  Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs.  Our main child outcome is a broad measure of any diagnoses of adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300:

> a.    Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally.  It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in

NMUELLER AND DUNCAN LAWRENCE
11, 17-5235, 17-5329, 17-5380, 17-5813)

1        important areas of functioning, such as social activities, school performance, and

2        sleep.

3        b.    Acute stress disorder can be a precursor to a diagnosis of a more lasting

4        posttraumatic stress disorder (included in the ICD-9 category 309, adjustment

5        disorder).  It is characterized by symptoms or behaviors similar to those that arise

6        from exposure to a traumatic or stressful event, but acute stress disorders cannot (by

7        definition) last longer than 1 month.

8        c.    Anxiety disorders are characterized by excessive fear, anxiety, and related

9        behavioral disturbances that can lead to substantial distress or impairment.  An

10        external stressor might not be clearly identified, and anxiety disorders can be caused

11        by environmental, genetic, or physiological factors.

12  These mental health disorders in childhood are associated with considerable developmental,

13  psychosocial, and psycho-pathological complications for children and their families.

14     7.    We found that mothers' eligibility for DACA protection led to a significant improvement

15  in their children's mental health.  Specifically, Mothers' DACA eligibility reduced adjustment and

16  anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate

17  of 7.9% among children of ineligible mothers at the threshold.  This reduction represents more than a

18  50% drop in the rate of these disorders (albeit with a wide 95% confidence interval (CI) for the

19  magnitude of the estimated effect) and provides evidence that mothers' DACA eligibility sharply

20  improved their children's mental health.

21     8.    The causal link between parental DACA eligibility and positive child mental health

22  outcomes is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore,

23  children of ineligible mothers born just before the birthdate cutoff should be similar in all respects,

24  including in possible confounding characteristics, to children of DACA-eligible mothers born just

25  after the cutoff.  We corroborated this continuity assumption by testing for differences in the

26  prevalence of disorder diagnoses in the children during a similar time period pre-DACA (2003 to

27  quarter 2, 2012) and at the cutoff date. We confirmed that there were no discernible difference in the

28  prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period. The difference in

1  diagnosis rates at the cutoff was a statistically insignificant 0.4 percentage points.  All our tests

2  suggested that we can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

3      9.  We also confirmed that there were no discernible differences in diagnoses at the same

4  birthdate cutoff among children of mothers who were covered by standard Medicaid at the time they

5  gave birth.  These mothers should not be affected by DACA eligibility, given that standard Medicaid

6  in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents.  This

7  check again underscores that, in the absence of changes in DACA eligibility, there is no evidence of

8  confounders associated with having a mother who is born just before or after the cutoff date that

9  could explain the observed post-DACA difference in child mental health outcomes.

10      10.  Because health care utilization could be affected by immigration status, we also checked

11  for the possibility that the drop in diagnoses reflects a DACA-induced change in health care visits,

12  which could affect the probability of detection of mental health disorders.  We found no support for

13  this.  Mothers' DACA eligibility had no discernible impact on their children's health care utilization

14  during the post-DACA period, as measured either by the total number of visits, the number of

15  emergency room (ER) and urgent care visits, or the number of outpatient visits.  Consistent with this,

16  in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child

17  mental health were similar when we restricted the sample to children who had at least one health care

18  visit in the post-DACA period.

19      11.  Our results provide causal evidence supporting the theory that parental unauthorized

20  immigration status has important intergenerational effects on the well-being and development of

21  children in immigrant families.  Protecting unauthorized immigrants from deportation led to

22  immediate and sizable improvements in the mental health of their U.S. citizen children.  This

23  suggests that parents' unauthorized status is a substantial stressor that stymies normal child

24  development and perpetuates health inequalities by transferring parental disadvantages to children.

25      12.  Our findings have important implications for immigration and health care policy.  Prior

26  research has suggested that early childhood exposure to stress and adversity does not only cause poor

27  health and impaired development in the short term; the issues can also persist into adulthood.

28  Anxiety and psychosocial stress have been identified as risk factors for depression, substance abuse,

cardiovascular diseases, and obesity.  Treatment of mental disorders also carries considerable

economic costs. Prior research indicates that they account for the highest total health care

expenditures of all children's medical conditions and that they are associated with poor long-term

outcomes for school performance and welfare reliance.  By reducing mental health problems,

deferred action can therefore have important multiplier effects through improving the future

prospects of the children of unauthorized immigrants.

13.  Conversely, the termination of DACA is likely to erode the mental health gains we

measured and lead to corresponding economic and public health costs in both the short-term and long

term.


We declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct and that this declaration was executed on October 23, 2017 in Stanford, California.


JENS HAINMUELLER


DUNCAN LAWRENCE

NMUELLER AND DUNCAN LAWRENCE
11, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT A

# Curriculum Vitae
## Jens Hainmueller

**Office**:
Department of Political Science, Stanford University, Encina Hall West, Room 440, 616 Serra Street, Stanford, CA 94305-6044
jhain@stanford.edu, http://www.stanford.edu/~jhain

**Current Positions**
  Full Professor, Department of Political Science, Stanford University, 2016-present.
  Full Professor (by courtesy), Graduate School of Business, Stanford University, 2016-present

**Academic Affiliations**
  Founder and Faculty Co-Director, Stanford Immigration Policy Lab, 2014-present
  Faculty Associate, Institute for Quantitative Social Science, Harvard University, 2009-present
  Faculty Fellow, WZB Berlin Social Research Center, 2013-15
  Faculty Fellow, Centre for Research and Analysis of Migration, University College London, 2013-present
  Faculty Affiliate, Stanford Europe Center, 2014-present
  Faculty Affiliate, Stanford Center for Comparative Studies in Race and Ethnicity, 2015-present
  Member, Experiments on Governance and Politics (EGAP)

**Previous Positions**
  Associate Professor, Department of Political Science, Stanford University, 2014-2016.
  Associate Professor (by courtesy), Graduate School of Business, Stanford University, 2014-2016.
  Associate Professor, Department of Political Science, Massachusetts Institute of Technology, 2012-2013.
  Assistant Professor, Department of Political Science, Massachusetts Institute of Technology, 2009–2012.

**Education**
  Ph.D., Government, Harvard University, 2009.
  M.P.A., Master of Public Administration, Harvard University, Kennedy School of Government, 2005.
  M.Sc., International Political Economy (with Distinction), London School of Economics, 2003.
  DAAD Research Fellow, Political Science Department, Brown University, 2001–2002.
  B.A., *Zwischenprüfung* (Summa Cum Laude), Tübingen University, 2001.

**Impact Factor**
  Google Scholar Citations: 6,248
  Google Scholar h-index: 29
  Google Scholar i10-index: 47

**Selected Awards and Honors**
  *Andrew Carnegie Fellow* 2016-2017. Awarded by the Carnegie Corporation of New York to the country?s most creative thinkers to support research on challenges to democracy and international order.
  *Halbert White Info-Metrics Prize* 2016. Awarded by the Info-Metrics Institute for scholars across disciplines who have creatively used info-metrics methods in their respective disciplines, with the potential for significant impact in those disciplines.
  *Warren Miller Prize* 2015. Awarded by the Society of Political Methodology for the best work appearing in *Political Analysis* the preceding year.
  *Emerging Scholar Award* 2014. Awarded by the Society for Political Methodology to honor a researcher, within ten years of their PhD, who is making notable contributions to the field of political methodology.
  *Political Analysis Editors' Choice Award* 2014. Given to papers that the Editors see as providing an especially significant contribution to political methodology.
  *Warren Miller Prize* 2013. Awarded by the Society of Political Methodology for the best work appearing in *Political Analysis* the preceding year.
  *Best Paper on the study of elections, public opinion, and voting behavior* 2013. Awarded by the American Political Science Association.
  *Best Paper on the study of labor in politics* 2012. Awarded by the American Political Science Association.

*Robert H. Durr Award* 2012 awarded by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science.

*Senator Charles Sumner Prize* 2009. Awarded by Harvard faculty for the best dissertation from the legal, political, historical, economic, social, or ethnic approach.

*Robert H. Durr Award* 2008 awarded by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science.

*Gosnell Prize for Excellence in Political Methodology* 2007. Awarded by the Society of Political Methodology for the best work in political methodology presented at any political science conference during the preceding year.

## Publications

*Peer Reviewed Articles*

43. "Protecting Unauthorized Immigrant Mothers Improves their Children's Mental Health" (with D. Lawrence, L. Martén, B. Black, L. Figueroa, M. Hotard, T. Jiménez, F. Mendoza, M. Rodriguez, J. Swartz, D. Laitin. *Science.* doi.org/10.1126/science.aan5893

42. "The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments" (with K. Bansak, D. Hopkins, and T. Yamamoto). *Political Analysis.* (forthcoming).

41. "Expanding prenatal care to unauthorized immigrant women and the effects on infant health" (with J. Swartz, D. Lawrence, and M. Rodriguez). *Obstetrics & Gynecology.* (forthcoming).

40. "Europeans Would Support a Proportional Allocation of Asylum Seekers" (with K. Bansak and D. Hangartner). *Nature Human Behaviour.* doi:10.1038/s41562-017-0133.

39. "Providing driver's licenses to unauthorized immigrants in California improves traffic safety" (with D. Lawrence and H. Lueders). *Proceedings of the National Academy of Sciences.* doi: 10.1073/pnas.1618991114.

38. "Policy Design and Domestic Support for International Bailouts" (with M. Bechtel and Y. Margalit). *European Journal of Political Research.* 10.1111/1475-6765.12210.

37. "How Economic, Humanitarian, and Religious Concerns Shape European Attitudes toward Asylum-Seekers"' (with K. Bansak and D. Hangartner). *Science.* doi: 10.1126/science.aag2147.

36. "When lives are put on hold: Lengthy asylum processes decrease employment among refugees" (with D. Hangartner and D. Lawrence). *Science Advances.* 2(8), e1600432.

35. "Catalyst or Crown: Does Naturalization Promote the Long-Term Social Integration of Immigrants?" (with D. Hangartner and G. Pietrantuono). *American Political Science Review.* pp. 1-21. doi: 10.1017/S0003055416000745.

34. "krls: A Stata Package for Kernel-Based Regularized Least Squares" (with J. Ferwerda and C. Hazlett). *Journal of Statistical Software.* doi: 10.18637/jss.v079.i03.

33. "Naturalization fosters the long-term political integration of immigrants" (with D. Hangartner and G. Pietrantuono). *Proceedings of the National Academy of Sciences.* doi: 10.1073/pnas.1418794112.

32. "Does Lean Improve Labor Standards? Management and Social Performance in the Nike Supply Chain" (with Distelhorst, G. and R. Locke). *Management Science.* doi: http://dx.doi.org/10.1287/mnsc.2015.2369

31. "Do Lower Caseloads Improve the Performance of Public Employment Services? New Evidence from German Employment Offices" (with B. Hofmann, G. Krug, and K. Wolf). *Scandinavian Journal of Economics.* doi: 10.1111/sjoe.12166

30. "'Does Direct Democracy Hurt Immigrant Minorities? Evidence from Naturalization Decisions in Switzerland" (with D. Hangartner). *American Journal of Political Science.* (Forthcoming 2015).

29. "'Validating vignette and conjoint survey experiments against real-world behavior" (with D. Hangartner and T. Yamamoto). *Proceedings of the National Academy of Sciences.* 112 (8): 2395-2400. 2015.

28. "'Assessing the External Validity of Election RD Estimates: An Investigation of the Incumbency Advantage" (with A. Hall and J. Snyder). *Journal of Politics.* 77(3): 707-720. 2015.

27. "'Do Concerns about Labour Market Competition Shape Attitudes Toward Immigration? New Evidence from U.S. Workers" (with M. Hiscox and Y. Margalit). *Journal of International Economics.* 97: 193-207. 2015.

26. "'The Hidden American Immigration Consensus: A Conjoint Analysis of Attitudes Toward Immigrants" (with D. Hopkins). *American Journal of Political Science.* 59(3): 529-548. 2015. Winner of the American Political Science Association's Best Paper Award for the study of Elections, Public Opinion, and Voting Behavior.

25. "'On the Validity of the Regression Discontinuity Design for Estimating Electoral Effects: New Evidence from Over 40,000 Close Races" (with A. Eggers, A. Fowler, A. Hall, and J. Snyder). *American Journal of Political Science.* 59 (1): 259-274. 2015.

24. "Consumer Demand for the Fair Trade Label: Evidence from a Field Experiment" (with M. Hiscox and S. Sequeira). *Review of Economics and Statistics.* 97(2): 242-256. 2015.

23. "'Reality Bites: The Limits of Framing Effects for Salient and Contested Policy Issues" (with M. Bechtel, D. Hangartner, and M. Helbling). *Political Science Research and Methods.* 3 (3): 683-695. 2015.

22. "'Comparative Politics and the Synthetic Control Method" (with A. Abadie and A. Diamond). *American Journal of Political Science.* 59 (2): 495-510. 2015.

21. "'Political Capital: Corporate Connections and Stock Investments in the U.S. Congress, 2004-2008" (with A. Eggers). *Quarterly Journal of Political Science.* 9 (2): 169-202. 2014.

20. "'Causal Inference in Conjoint Analysis: Understanding Multi-Dimensional Choices via Stated Preference Experiments" (with D. Hopkins and T. Yamamoto). *Political Analysis.* 22 (1): 1-30. 2014. Winner of the *Editors' Choice Award* given to papers that the Editors see as providing an especially significant contribution to political methodology. Winner of the 2015 Warren Miller Prize for the best work appearing in *Political Analysis* the preceding year.

19. "'Public Attitudes toward Immigration" (with D. Hopkins). *Annual Review of Political Science.* 17: 225-249. 2014

18. "'Kernel Regularized Least Squares: Reducing Misspecification Bias with a Flexible and Interpretable Machine Learning Approach" (with C. Hazlett). *Political Analysis.* 22 (2): 143-168. 2014.

17. "'Preferences for International Redistribution: The Divide Over the Eurozone Bailouts" (with M. Bechtel and Y. Margalit). *American Journal of Political Science.* 58 (4): 835-856. 2014.

16. "'Capitol Losses: The Mediocre Performance of Congressional Stock Portfolios, 2004-2008" (with A. Eggers). *Journal of Politics.* 75(2): 535-551. 2013.

15. "'Who Gets a Swiss Passport? A Natural Experiment in Immigrant Discrimination" (with D. Hangartner). *American Political Science Review.* 107(1): 159-187. 2013. Winner of the Robert H. Durr 2012 award for the best paper applying quantitative methods to a substantive problem in political science.

14. "ebalance: A Stata Package for Entropy Balancing" (with Y. Xu). *Journal of Statistical Software.* 54(7). 2013.

13. "'Entropy Balancing: A Multivariate Reweighting Method to Produce Balanced Samples in Observational Studies" *Political Analysis.* 20 (1): 25-46. 2012. Winner of the 2013 Warren Miller Prize for the best work appearing in *Political Analysis* the preceding year.

12. "'How Lasting is Voter Gratitude? An Analysis of the Short- and Long-term Electoral Returns to Beneficial Policy" (with M. Bechtel). *American Journal of Political Science.* 55 (4): 852-868. 2011.

11. "'Synth: An R Package for Synthetic Control Methods in Comparative Case Studies" (with A. Abadie and A. Diamond). *Journal of Statistical Software.* 42 (13): 1-13. 2011.

10. "'Attitudes toward Highly Skilled and Low Skilled Immigration: Evidence from a Survey Experiment" (with M. Hiscox). *American Political Science Review.* 104 (1): 61-84. 2010.

9. "'MPs for Sale: Estimating Returns to Office in Post-War British Politics" (with A. Eggers). *American Political Science Review.* 103 (4): 513-533. 2009. Winner of the Robert H. Durr 2008 award for the best paper applying quantitative methods to a substantive problem in political science.

8. "'Synthetic Control Methods for Comparative Case Studies of Aggregate Interventions: Estimating the Effect of California's Tobacco Control Program" (with A. Abadie and A. Diamond). *Journal of the American Statistical Association.* 105(490): 493-505. 2010. Winner of the Gosnell Prize for Excellence in Political Methodology. Among JASA's 10 most cited articles in 2009-11.

7. "Opium for the Masses: How Free Foreign Media can Stabilize Authoritarian Regimes" (with H. Kern). *Political Analysis.* 17: 377-399. 2009.

6. "Incumbency as a Source of Spillover Effects in Mixed Electoral Systems: Evidence from a Regression-Discontinuity Design" (with H. Kern). *Electoral Studies.* 27 (2): 213-227. 2008.

5. "Phylogenetic analysis and structural predictions of human adenovirus penton proteins as a basis for tissue-specific adenovirus vector design" (with I. Madisch, S. Hofmayer, C. Moritz, A. Grintzalis, P. Pring-Akerblom, and A. Heim) *Journal of Virology* 81(15): 8270-81. 2007.

4. "Educated Preferences: Explaining Individual Attitudes Toward Immigration in Europe" (with M. Hiscox). *International Organization.* 61(2): 399-442. 2007.

3. "Electoral Balancing, Divided Government, and Midterm Loss in German Elections" (with H. Kern). *Journal of Legislative Studies.* 12 (2): 127-149. 2006.

2. "Learning to Love Globalization: The Effects of Education on Individual Attitudes Toward International Trade" (with M. Hiscox). *International Organization.* 60 (2) 469-498. 2006.

1. "Why do Europeans fly safer? The politics of airport security in Europe and the US" (with M. Lemnitzer). *Terrorism and Political Violence.* 15 (4): 1-36. 2003.

*Book Chapters*

B.2 "Voter Attitudes towards High- and Low-Skilled Immigrants: Evidence from Survey Experiments" (with M. Hiscox, reprinted APSR manuscript) in *Immigration and Public Opinion in Liberal Democracies.* G. P. Freeman, R. Hansen, D. L. Leal (eds.). Routledge Research in Comparative Politics. 2012.

B.1 "Wahlkreisarbeit zahlt sich doppelt aus - Zur Wirkung des Amtsinhaberstatus einer Partei auf ihren Zweitstimmenanteil bei den Bundestagswahlen 1949 bis 1998" (with H. Kern und M. Bechtel) in *Jahrbuch für Handlungs- und Entscheidungstheorie.* 11-47. 2006. T. Bräuninger and J. Behnke (eds.). Wiesbaden: Verlag für Sozialwissenschaft.

*Software*

S.6 *interflex Package* (with Y. Xu and J. Mummolo). *interflex* is a statistical software that implements multiplicative interaction models with diagnostics and visualization. *interflex* is available as an R library and a Stata routine.

S.5 *Synth Package* (with A. Abadie and A. Diamond). *Synth* is a statistical software that implements synthetic control methods for causal inference in comparative case studies. *Synth* is available as an R library, MATLAB code, and a Stata routine.

S.4 *ebalance Package.* *ebalance* is a statistical software that implements entropy balancing. *ebalance* is available as an R library and as a Stata routine.

S.3 *KRLS Package* (with C. Hazlett). *KRLS* is a statistical software that implements Kernel Regularized Least Squares. *KRLS* is available as an R library, MATLAB code, and a Stata routine.

S.2 *Conjoint Survey Design Tool* (with A. Strezhnev, D. Hopkins, and T. Yamamoto). The Conjoint Survey Design Tool assists researchers in creating conjoint experiments that can be readily incorporated into pre-existing web survey software.

S.1 *cjoint* (with A. Strezhnev, E. Berwick, D. Hopkins, and T. Yamamoto). The *cjoint* R package implements the Average Marginal Component-specific Effects (AMCE) estimator for conjoint experiments.

**Work in Progress**

*Under Review*

"How Much Should We Trust Estimates from Multiplicative Interaction Models? Simple Tools to Improve Empirical Practice" (with J. Mummolo and Y. Xu)

"The Ideological Basis of the Grexit Debate" (with K. Bansak, M. Bechtel and Y. Margalit). 2015.

"The Socially Conscious Consumer? Field Experimental Tests of Consumer Support for Fair Labor Standards" (with M. Hiscox). 2014. Winner of the American Political Science Association's Labor Project Best Paper award for the best paper on the study of labor in politics.

"Buying Green? Field Experimental Tests of Consumer Support for Environmentalism" (with M. Hiscox). 2014.

**Selected Grants**

Robert Wood Johnson Foundation $70,150. Assessing the fiscal and health consequences of providing prenatal care to undocumented and recently arrived immigrants.

Russell Sage Foundation $109,065. Impact of Undocumented Status.

Ford Foundation $800,000. Core Support Immigration Policy Lab.

Andrew Carnegie Fellow $200,000.

Swiss National Science Foundation, Impact of Asylum Policies on Refugee Integration $280,000.

New York Community Trust $300,000.

Robin Hood Foundation $800,000.

UPS Endowment Fund $60,000.

FSI Policy Implementation Lab Seed Funding $35,000.

Time Sharing Experiments in the Social Sciences, Conjoint Voting Study.

Swiss National Science Foundation, Mass Support for Financial Bailouts $245,000.

Swiss National Science Foundation, Effects of Citizenship Project $200,000.

Russell Sage Foundation, Value of Citizenship Pilot Project $35,000.

WZB Research Grant, Wissenschaftszentrum Berlin EUR 35'000.

Swiss National Science Foundation, Local Xenophobia Project $220,000.

NBER Africa Project $65,000.

Humanity United Foundation, Fair Trade Project $235,000.

Humanity United Foundation, Consumer Demand for Ethical Products $20,000.

**Professional Experience**

Statistical consultant, International Finance Corporation, The World Bank Group.

Statistical consultant, German Federal Labor Market Agency.

Statistical consultant, German Research Institute for Labor Market Policy (IAB).

**Advising Ph.D. Students**

*Main Dissertation Advisor*

Yiqing Xu, Assistant Professor, University of California San Diego (graduated 2015)

Chad Hazlett, Assistant Professor, University of California Los Angeles (graduated 2013)

Mathilde Emeriau, ongoing

Kirk Bansak, ongoing

*Dissertation Committee Member*

Francisco Garfias, Assistant Professor, University of California San Diego (graduated 2016)

Jeremy Ferwerda, Assistant Professor, Dartmouth College (graduated 2015)

Greg Distelhorst, Assistant Professor, Oxford University Said Business School (graduated 2013)

Michael Sances, Assistant Professor, University of Memphis (graduated 2013)

Lucas Puente, Policy Analyst, Thumbtack, Inc (graduated 2015)

Tannis Thorlakson, ongoing

**Teaching**

Political Methodology I: Regression, Stanford

- Autumn 2015-16 (Overall Rating: 4.8 out of 5)
- Autumn 2014-15 (Overall Rating: 4.5 out of 5)

Political Methodology II: Causal Inference, Stanford

- Winter 2015-16 (Overall Rating: 4.7 out of 5)
- Winter 2014-15 (Overall Rating: 4.4 out of 5)
- Spring 2013-14 (Overall Rating: 4.8 out of 5)

Empirical Methods in Political Economy, Fall 2013, MIT

Quantitative Research Methods II: Advanced Empirical Methods, MIT

- Spring 2012 (Overall Rating: 6.9 out of 7)
- Spring 2011 (Overall Rating: 4.7 out of 5)
- Spring 2010 (Overall Rating: 4.9 out of 5)

Quantitative Research Methods I: Regression, MIT

- Fall 2011 (Overall Rating: 6.4 out of 7)
- Fall 2010 (Overall Rating: 4.8 out of 5)
- Fall 2009 (Overall Rating: 4.0 out of 5)

Designing and Implementing Field Experiments, 2012, MIT. Overall rating: 4.8 out of 5.

# EXHIBIT B

# Duncan Lawrence

*Curriculum Vitae*

## Education

| | |
|---|---|
| 2007–2013 | **PhD/MA**, *University of Colorado*, Boulder, *CO*. <br> Political Science |
| 2000–2004 | **BA**, *Hamilton College*, Clinton, *NY*. <br> World Politics |

## Professional Experience

| | |
|---|---|
| 2014–Present | **Executive Director**, Immigration Policy Lab, Stanford University, Stanford, CA. |
| 2012–2017 | **Co-Founder**, Telluride Research Group, LLC, Denver, CO. |
| 2013–2014 | **Associate**, Rocky Mountain Institute, Boulder, CO. |
| 2011–2012 | **Graduate Instructor**, University of Colorado, Boulder, CO. |
| 2011 | **Research Methods Mentor/Field Survey Coordinator**, University of Colorado, Arequipa, Peru. |
| 2008–2011 | **Research Assistant**, University of Colorado, Boulder, CO. |
| 2007–2011 | **Teaching Assistant**, University of Colorado, Boulder, CO. |
| 2006–2007 | **Medical Interpreter**, El Puente, Jackson, WY. |

## Publications

### Peer Reviewed Articles

8. "Expanding Prenatal Care to Unauthorized Immigrant Women and the Effects on Infant Health" (with J. Swartz, J. Hainmueller, and M. Rodriguez) *Obstetrics and Gynecology*. 2017.

7. "Protecting unauthorized immigrant mothers improves their children's mental health" (with J. Hainmueller et al.) *Science*. 2017.

6. "Providing driver's licenses to unauthorized immigrants in California improves traffic safety." (with H. Leuders and J. Hainmueller) *Proceedings of the National Academy of Sciences*. 114(16):4111-4116, 2017.

5. "When lives are put on hold: Lengthy asylum processes decrease employment among refugees." (with D. Hangartner and J. Hainmueller) *Science Advances*, 2(8):e1600432, 2016.

4. "More trees, more poverty? The socioeconomic effects of tree plantations in Chile, 2001–2011." (with K. Andersson, J. Zavaleta, and M. R. Guariguata) *Environmental Management*, 57(1):123–136, 2016.

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361* • ✉ *duncan.lawrence@stanford.edu*
🖰 *www.immigrationlab.org*                     *1/3*

3. "Crossing the cordillera: Immigrant attributes and Chilean attitudes." *Latin American Research Review*, 50(4):154–177, 2015.

2. "Local cohesion and radical right support: The case of the Swiss People's Party." (with J. Fitzgerald) *Electoral Studies*, 30(4):834–847, 2011.

1. "Immigration Attitudes in Latin America: Culture, Economics, and the Catholic Church." *The Latin Americanist*, 55(4), 143-170, 2011.

## Grants

### Co-Principal Investigator

| | |
|---|---|
| 2017 | STANFORD CHILD HEALTH RESEARCH INSTITUTE, $100,000. |
| 2017 | STANFORD CENTER FOR CLINICAL AND TRANSLATIONAL RESEARCH AND EDUCATION, $20,000. |
| 2016 | ROBERT WOOD JOHNSON FOUNDATION - EVIDENCE FOR ACTION, $70,150. |
| 2016 | RUSSELL SAGE FOUNDATION, $109,065. |

### Lab Research/Core Support

| | |
|---|---|
| 2016 | FORD FOUNDATION, $400,000. |
| 2016 | NATIONAL SCIENCE FOUNDATION, $149,978. |
| 2016 | ROBIN HOOD FOUNDATION, $800,000. |
| 2016 | NEW YORK COMMUNITY TRUST, $350,000. |
| 2015 | UPS ENDOWMENT FUND, $60,110. |

## Fellowships

| | |
|---|---|
| 2013 | Fulbright Scholar – Chile |
| 2011 | University of Colorado Department of Recreation Services Graduate Fellowship |
| 2008–2011 | University of Colorado Department of Political Science Summer Research Fellowship |
| 2009 | CARTSS Scholars Grant (co-investigator) |
| 2005 | Fulbright English Teaching Fellowship – Argentina |

## Awards and Honors

| | |
|---|---|
| 2012 | Best Graduate Instructor, Department of Political Science, University of Colorado Boulder |
| 2004 | Phi Beta Kappa Honor Society |
| 2004 | Pi Sigma Alpha Honor Society |
| 2004 | Constantine Karamanlis Award – Outstanding Senior Concentrator in World Politics |
| 200–2004 | Dean's List |

## Teaching Experience

| | |
|---|---|
| Instructor | International Political Economy (2011,2012); Global Development (2012) |

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361*   •   ✉ *duncan.lawrence@stanford.edu*
🖥 *www.immigrationlab.org*                    *2/3*

| Teaching Assistant | Comparative Politics (2007–2010); Topics in Political Data Analysis (2010) |
| Experiential Education Instructor | Hamilton College Outdoor Leadership Program (2001–2004); Hulbert Outdoor Center (2004); Wilderness Ventures (2004, 2006) |

## Skills

| Intermediate | LaTeX, R, Smartsheets, Asana |
| Advanced | Google Apps, Microsoft Office, Stata, Zotero |

*Immigration Policy Lab, Stanford University 616 Serra St. Stanford, CA 94305*
☎ *(650) 736 7361* ● ✉ *duncan.lawrence@stanford.edu*
⌣🖰 *www.immigrationlab.org*      *3/3*

# EXHIBIT C

*RESEARCH*

## SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[7] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent child separations can be harmful to children's health, economic security, and long term development. Virtually all of these studies have been qualitative or correlational because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference...has been lacking to date in studies of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreign born, Hispanic, or Spanish speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2 year (renewable) deferred action status, while also allowing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action through this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized immigrants (25, 26). In addition, because U.S. born children of unauthorized immigrants are U.S. citizens, they are eligible for full scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention to treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

Downloaded from http://science.sciencemag.org/ on October 23, 2017



**Fig. 1. Results from applying the regression discontinuity design. (Top)** In the post DACA period (2013 to 2015), children of DACA eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose mothers' birthdates were within ±150 days of the DACA eligibility cutoff ($n = 2260$), and circles are average diagnosis rates within each 15 day birthdate interval. **(Bottom left)** There was no such difference in children's diagnosis rates in the pre DACA period (2003 to 2012). **(Bottom right)** There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well being could have improved (4, 6). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long term health issues, low education, and welfare dependence, which generate considerable private and social costs (32 34).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except where otherwise noted, in a pre registered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of

adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD 9) categories 309, 308, and 300 (35).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (36, 37). Acute stress disorder can be a precursor to a diagnosis of a more lasting post traumatic stress disorder (included in the ICD 9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (36). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (36).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (32). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi experimental nature of the RD design. The per cent of children diagnosed with adjustment or anxiety disorders during the post DACA period (2013 to 2015) dropped by about 4.5 percentage points ($P = 0.037$; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points ($P = 0.817$; local linear regression). Figure 1, bottom right, shows the distribution of $P$ values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre DACA health care utilization (tables S3 and S4). The distribution of $P$ values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

Downloaded from http://science.sciencemag.org/ on October 23, 2017

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention to treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined measure and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birth dates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff (38).

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit with a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked only at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, 0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post DACA period (fig. S6 and table S8), redefining the post DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A non-prespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non prespecified subgroup analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low income U.S. citizens and long term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of confounders associated with having a mother who is born just before or after the cutoff date that could explain the observed post DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status (9), we also checked for the possibility that the drop in diagnoses reflects a DACA induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well being and development of children in immigrant families (4, 6). Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring parental disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of unauthorized immigrants' children, most of whom are U.S. citizens (2). Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity (32, 34, 39, 40). Treatment of mental disorders also carries considerable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions (41) and are associated with poor long term outcomes for school performance and welfare reliance (33, 42). By reducing mental health problems, deferred action has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immigrant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health.** (**Left**) Mothers' DACA eligibility reduced child mental health disorders in the post DACA period. (**Right**) There were no systematic, preexisting differences in the pre DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

Downloaded from http://science.sciencemag.org/ on October 23, 2017

health and well being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a path way to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evaluating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an effective way to overcome some of the challenges in collecting systematic data from the unauthorized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that affect unauthorized immigrant parents and that may have health consequences for their children.

**REFERENCES AND NOTES**

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014 09 03_ Unauthorized Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470 477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291 297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348 385 (2011).
8. C. Suárez Orozco, H. Yoshikawa, R. Teranishi, M. Suárez Orozco, *Harv. Educ. Rev.* **81**, 438 473 (2011).
9. K. Yun, E. Fuentes Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913 1921 (2013).
10. T. M. Caballero *et al.*, *Clin. Pediatr.* **6**, 648 658 (2017).
11. F. L. Rivera Batiz, *J. Popul. Econ.* **12**, 91 116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203 233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258 1268 (2007).
14. H. Yoshikawa, C. Suárez Orozco, R. G. Gonzales, *J. Res. Adolesc.* **27**, 4 19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO 10 99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329 354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57 67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I 821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012 2016); www.uscis.gov/tools/reports studies/ immigration forms data/data set form i 821d deferred action childhood arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852 1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98 114 (2016).
22. C. Amuedo Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339 373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175 e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/ j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085 1092 (2007).
26. C. H. C. Foundation, *Medi Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615 635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, V. C. Wong, *J. Policy Anal. Manage.* **27**, 724 750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 190 208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483 524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517 548 (2010).
34. J. P. Shonkoff *et al.*, *Pediatrics* **129**, e232 e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD 9 categories 300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (post traumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295 2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056 1067 (2012).
40. K. R. Merikangas *et al.*, *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980 989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0 17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

**ACKNOWLEDGMENTS**

This research was funded by a grant from the Russell Sage Foundation (grant no. 93 16 12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi: 10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design registrations). The analysis plan is also reprinted in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

**SUPPLEMENTARY MATERIALS**

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (43, 44)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893

Downloaded from http://science.sciencemag.org/ on October 23, 2017

# EXHIBIT I

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF VIRIDIANA CARRIZALES** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF VIRIDIANA CARRIZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>                    Plaintiffs,<br><br>         v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                    Defendants. | CASE NO. 17-CV-05813-WHA |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    I, Viridiana Carrizales, declare and state as follows:

2        1.    I am over the age of 18. I have personal knowledge of the matters stated herein, and if

3    called as a witness, I could and would testify competently thereto.

4        2.    I am the Managing Director of DACA Corps Member Support at Teach For America

5    (TFA).

6        3.    Teach For America finds, develops, and supports a diverse network of leaders who

7    expand opportunity for children from classrooms, schools, and every sector and field that shapes the

8    broader systems in which schools operate. We recruit remarkable and diverse individuals to become

9    teachers in low-income communities. They commit to teach for two years and are hired by our partner

10   public schools across the country. During these two years, they are called TFA corps members. Since

11   1990, when our program began, we have brought over 56,000 talented teachers and leaders to

12   classrooms in low-income communities across America, including in the States of California,

13   Maryland, and Minnesota.

14       4.    Teach For America is a tax-exempt organization under section 501(c)(3) of the Internal

15   Revenue Code. While we operate in 53 regions within 36 states and the District of Columbia, and are

16   qualified to do business in 42 states and D.C., we are only incorporated in one state, Connecticut,

17   where we were incorporated as a nonprofit corporation in 1989. TFA is managed and controlled by a

18   Board of Directors; a Chief Executive Officer supervises, manages and controls the general day-to-

19   day administration of TFA, subject to the oversight of the Board. Our headquarters is in New York

20   City.

21       5.    Deferred Action For Childhood Arrivals (DACA) allows qualified young adults to apply

22   for DACA status and receive renewable, two-year work permits and temporary relief from

23   deportation. DACA is life-altering for young immigrants, who are able to work, obtain driver's

24   licenses, get health insurance, open bank accounts and provide for their families.

25       6.    As one of our nation's leading recruiters of teachers in receipt of DACA for public

26   schools, Teach For America has an interest in maintaining DACA because it allows talented, diverse

27   college graduates to serve as teachers and leaders.

28

1

7.    In 2013, Teach For America was among the first organizations to recruit college graduates with DACA status into the workforce. Our first DACA cohort consisted of two teachers hired in one district.

8.    Since 2013, our DACA cohort has grown. Nationwide, as of the first day of school in 2017, 188 Teach For America alumni and corps members with DACA status are working in classrooms to expand educational opportunities for more than 10,000 students in 11 states, including California. Another 10 DACA alumni are promoting equity in the nonprofit, corporate, and higher education sectors, including one enrolled in medical school and four on staff at Teach For America.

9.    In the State of California, there are currently 28 DACA TFA corps members and 25 DACA TFA alumni. All 53 corps members and alumni impact thousands of students in California.

10.   In keeping with TFA's mission, our DACA teachers work in shortage-area subjects and hard-to-staff schools.  Some examples: Miriam teaches reading and math at a STEM-focused middle school in Los Angeles, where she uses project-based lessons to instill a love of STEM learning in her students. Her aim is to help more students from low-income communities graduate prepared for STEM colleges and careers by providing them early opportunities to learn and apply math and science in age-appropriate, real-life scenarios. For example, in a recent lesson on ratios, students used applied STEM skills to make homemade ice cream.  Jose teaches 7th grade math in Los Angeles. He works to instill a love for math in his students on a daily basis, and aims to incorporate its relevance to their lives in his lessons.  For example, last year, students in Jose's class read about women and people of color in STEM, researched a STEM career they would be interested in pursuing in the future, and applied rational number concepts they had learned throughout the trimester to argue the importance of diversity in STEM related fields.  These are just two examples--many of our DACA teachers are bilingual, focused on STEM, or they bring Ivy League educations to the classroom. Many others serve as role models and navigators for students who face the intersecting challenges of poverty and undocumented status.

11.   If DACA ends, or the administration stops approving or renewing DACA applications, DACA teachers and leaders, including over 200 TFA alumni and corps members with DACA status, would lose their ability to work and would be at risk of deportation—a far cry from the pathway to

2

citizenship these individuals deserve. Ending DACA would severely undercut TFA's national effort to increase academic success among all students, but particularly undocumented students, since we've learned that DACA teachers provide tremendous help to undocumented youth as they navigate the barriers they face; students would lose the chance to connect with teachers who mirror their life experiences and act as remarkable role models.

12.   Ending DACA without a solution in place would have other far-reaching impacts on our students and communities. Many K-12 students in the United States are undocumented or have one undocumented parent at home. If DACA is rescinded, they will lose the legal pathway to driver's licenses, jobs, and higher education. They could be separated from their families or deported to countries they've never known as home.

13.   Teach For America is proud of the impact our DACA leaders have made on our corps, communities, and country. We will continue to provide them legal assistance and financial support during this time of uncertainty.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 11, 2017 in San Antonio, Texas.



_____

VIRIDIANA CARRIZALES

3

# EXHIBIT J

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DEIRDRE O'BRIEN** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Deirdre O'Brien, declare and state as follows:

1. I am the vice president of People at Apple Inc. ("Apple") and have worked at the company for nearly 30 years. The vice president of People is responsible for leading all human resource functions, including talent development and analytics, recruiting, benefits, compensation, business support, and employee training. I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would testify to these facts.

2. Apple employs nearly 40,000 people in California and over 81,000 people across the United States. These figures do not include temporary employees or contractors.

3. Apple and its customers have benefited and continue to benefit in many ways from the Deferred Action for Childhood Arrivals ("DACA") program. Apple currently employs over 250 DACA holders in 28 states. These talented and entrepreneurial people fill important and varied roles across the company, including in operations, research and development, administration, sales and marketing, and retail. Apple and its customers have benefitted greatly from their intelligence, ambition, creativity, resilience, and hard work. These employees are important contributors to Apple's unique culture. That unique culture enables employees throughout Apple to do the best work of their lives and excel at creating the most innovative products and providing the very best customer service.

4. Many of Apple's DACA holder employees also possess language skills, insight, and cultural knowledge that are essential to allowing Apple to serve its diverse customer base in the best way possible. For example, AppleCare provides support to more than 100 million customers each year in more than 30 languages. AppleCare's U.S.-based employees support 11 languages with 160 skills related to Apple's products and services. AppleCare employees, including DACA recipients, are critical to ensuring Apple's customers get the most out of the products they have grown to love and depend upon. Aside from speaking to customers directly, AppleCare teams help to create and deliver training programs, pilot new and innovative approaches to customer support, provide important feedback on internal and customer-facing tools, and ensure that product feedback is provided to Apple's engineering teams.

DECLARATION OF DEIRDRE O'BRIEN__

5.      Apple currently employs 70 DACA recipients in California.  These employees work in a wide variety of roles, including as Hardware Development Engineers, Software Engineers, Software Technicians, Retail Store Geniuses, Technical Specialists, Technical Customer Service and Support Specialists, Operations Specialists, Quality Assurance/Quality Control Engineers, and iAd Account Managers.

6.      Apple has invested heavily in recruiting, training, and retaining employees with DACA status.

7.      Apple will be harmed significantly if it can no longer benefit from the hard work, creativity, and intelligence of its employees with DACA status.  From a practical standpoint, Apple will be forced to incur the cost, disruption, and delays associated with reallocating human resources; searching for, recruiting, interviewing, and hiring new employees; training new employees; and integrating new hires into Apple's unique culture.  Apple will also be deprived of the benefits of the considerable investments that it made in recruiting, hiring, and training these talented young people.

8.      But if Apple could no longer employ its people with DACA status, Apple would be hurt in ways that go far beyond these practical harms.  Inclusion and diversity are part of Apple's core values and fundamental to its ability to innovate.  By virtue of their personal experiences, employees with DACA status bring with them unique skills, knowledge, perspectives, and cultural understandings.  By excluding DACA holders and other immigrants, Apple and our nation as a whole will be harmed—in ways big and small—and deprived of these important benefits.

9.      Indeed, rescinding DACA attacks one of Apple's core values as a business—the belief that equal opportunities should be available for all, regardless of background.  As Apple's CEO Tim Cook recently explained, "More than any country in the world, this country is strong because of our immigrant background and our capacity and ability . . . to welcome people from all kinds of backgrounds." Apple believes that inclusivity and diversity are essential to recruiting and retaining a talented workforce, fostering innovation, and developing the highest-quality products for consumers around the world.  Rescinding DACA makes the United States and companies based here, including Apple, less attractive to the talented and ambitious people who come here to find success and build successful careers.  In the same way, rescinding DACA interferes with Apple's ability to accomplish

its important business goals and uphold its core values, harming both Apple and its hard-working and talented employees and partners.

10.     Because rescinding DACA causes such significant harms to Apple's values, its business, and its customers, Tim Cook joined hundreds of America's leading executives on August 31, 2017, and sent a letter to President Trump emphasizing the benefits of DACA and urging him to preserve the program.  That letter explains, among other things, that "Dreamers are vital to the future of our companies and our economy" and part of America's "global competitive advantage."  A copy of this letter is attached to this declaration as "Exhibit A."

11.     The "Dreamers" who work at Apple embody the American Dream and the best aspects of our American values.  They were brought to this country as young children, and most cannot remember a time when they did not call our nation home.  We have been told by the Dreamers that they deeply love our country.  They grew up in our cities and towns, and earned degrees from colleges and universities across the country.  They work hard and they pay taxes.  They contribute tremendously to Apple and its success, to our customers and communities, and to the American economy.  Their determination, resilience, and hard work inspire me and countless other Apple employees who are privileged to call them coworkers and friends.  It is essential that we not only allow the Dreamers to stay in this country, but that we welcome them and tell them that we want them to be here.  Their lives and their stories embody what is best about our country.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration was executed on September 21, 2017 in Cupertino, California.

_____

Deirdre O'Brien

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

# OPEN LETTER FROM
# Leaders of American Industry

*August 31, 2017*
*To: President Donald J. Trump*
*To: Speaker Paul Ryan; Leader Nancy Pelosi; Leader Mitch McConnell; and Leader Charles E. Schumer*

As entrepreneurs and business leaders, we are concerned about new developments in immigration policy that threaten the future of young undocumented immigrants brought to America as children.

The Deferred Action for Childhood Arrivals (DACA) program, which allows nearly 800,000 Dreamers the basic opportunity to work and study without the threat of deportation, is in jeopardy. All DACA recipients grew up in America, registered with our government, submitted to extensive background checks, and are diligently giving back to our communities and paying income taxes. More than 97 percent are in school or in the workforce, 5 percent started their own business, 65 percent have purchased a vehicle, and 16 percent have purchased their first home. At least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees.

Unless we act now to preserve the DACA program, all 780,000 hardworking young people will lose their ability to work legally in this country, and every one of them will be at immediate risk of deportation. Our economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions.

Dreamers are vital to the future of our companies and our economy. With them, we grow and create jobs. They are part of why we will continue to have a global competitive advantage.

We call on President Trump to preserve the DACA program. We call on Congress to pass the bipartisan DREAM Act or legislation that provides these young people raised in our country the permanent solution they deserve.

Business leaders wishing to add their name to this letter can do so by registering here.

## SIGNATORIES

| Name | Title | Company |
| --- | --- | --- |
| Audley Logan Sr. | President | 3-C Technology, LLC |
| Paul Fox | Partner | 310 Architects & Interiors, Inc. |
| Joe Thomas | Owner | 4t Management and Maintenance |
| Angela Stergis | CEO | 92Seven |
| Jack Armstong | President | Acumen, LLC |
| Rob Dhoble | CEO | Adherent Health |
| Aaron Bell | CEO | AdRoll |
| Francisco Torres-Aranda, Jr. | Founder & President | Advanced-Tec Materials, LLC |
| Max Levchin | Chairman & CEO | Affirm |

| Name | Title | Company |
| --- | --- | --- |
| Jeffrey S. Collins | Vice President and General Counsel | After School App |
| Martin H. Richenhagen | President & CEO | AGCO Corporation |
| Shamilla Mansingh | President | AHM Contractors Corp |
| Brian Chesky | Co-Founder, CEO, Head of Community | Airbnb |
| Kevin P. Ryan | Chairman & CEO | Alleycorp and MongoDB |
| Jeff Bezos | CEO | Amazon |
| Tim Sullivan | President & CEO | Ancestry.com |
| Magdalena I. King | General Manager | Antlers at Vail |
| Myles Kleeger | President | Appboy |
| Tim Cook | | Apple |
| Alden Bruce Badger | Chairman and CEO | Aqueous Solutions Global |
| Nia Ogletree | CEO | Arielle Management Group, LLC |
| Gonzalo de la Melena Jr. | President & CEO | Arizona Hispanic Chamber of Commerce |
| Steven Zylstra | President & CEO | Arizona Technology Council |
| Jack Davis | Owner | Audit Resources, LLC |
| Andrew Anagnost | President and Chief Executive Officer | AutoDesk Inc. |

| Name | Title | Company |
| --- | --- | --- |
| Zaheer Faruqi | Owner | Aventure Aviation |
| Andrea Guzman | Owner | Ayuda Hispana LLC |
| Robert Cheetham | CEO | Azavea |
| Jay Steinmetz | CEO | Barcoding Inc. |
| Ujjwal Gupta | Co-Founder/COO | BenchPrep |
| Jeremy Levine (Partner, Bessemer Ventures) | | |
| Tamara Drangstveit | DOJ Accredited Rep | Bethany Immigration Services |
| Rosalyn Ryan | CEO | Bicgen Foundation |
| RIchard Basile | CEO | BioPontis Alliance for Rare Diseases |
| Bernard Yoo | CEO | Bombfell Inc. |
| Elyse D. Cherry | CEO | Boston Community Capital, Inc |
| Henrik Johansson | CEO | Boundless Network |
| Aaron Levie | CEO | Box |
| Jim Breyer | Founder and CEO | Breyer Capital |
| Andy Feinberg | CEO | Brightcove Inc. |
| Brit Morin | Founder and CEO | Brit + Co |
| Charlie O'Donnell | Partner | Brooklyn Bridge Ventures |

| Name | Title | Company |
| --- | --- | --- |
| Warren E. Buffett | | |
| Alex Torrenegra | CEO | Bunny, Inc |
| Gary Chahil | CEO | C.C.I Inc |
| Dr. Andrew P Mallon PhD GPharmC | CEO | Calista Therapeutics |
| Stas Gayshan | Managing Director | Cambridge Innovation Center |
| Timothy Rowe | CEO | Cambridge Innovation Center |
| Brian Dacey | President | Cambridge Innovation Center |
| Thomas Karwaki | President | Capital Dynamics LLC |
| Fred Schmidt | Director of International Affairs | Capital Factory |
| Kevin Jones | CEO | Cardinal Resources Inc |
| Jonathan Schwartz | CEO | CareZone Inc. |
| Carl Young | Owner | Carl Young Floral |
| Philip Krim | CEO | Casper |
| Bill Kunkler | Executive Vice President | CC Industries |
| Ira Combs | CEO | CCH Inc. |
| Ellen Shaffer | Co-Director | Center for Policy Analysis |
| Geoffrey Hueter | CTO | Certona Corporation |

| Name | Title | Company |
| --- | --- | --- |
| Daniel Yanisse | CEO | Checkr |
| Dave Borders Jr. | GC | Chegg |
| Samuel C. Scott III | Chairman | Chicago Sister Cities International Program |
| Melanie Chischilly | CEO | Chischilly Designs |
| Chuck Robbins | CEO | Cisco Systems |
| Andrew Rasiej | Co-Founder | Civic Hall |
| Fritz Lanman | CEO | ClassPass Inc. |
| Joseph Bollin | President | Clean Energy Solutions |
| Gayle Gaines | President | Clean Energy Solutions |
| Dr Renee Entzminger | CEO | Clinical Alliance Partners |
| Mike Olson | Founder and Chief Strategy Officer | Cloudera |
| Hila Raz | CEO & Co-Founder | Coalition |
| Wendy Jameson | Co-Founder & CEO | Colnatec |
| Othman Laraki | President | Color Genomics |
| Jeff Wasden | President | Colorado Business Roundtable |
| Lindsay Baker | President | Comfy |
| Robert Bertrand | President/CEO | Concord Servicing Corporation |

| Name | Title | Company |
|------|-------|---------|
| Patty Johnson | President | Connections Marketing & Communications |
| Javier Cota | CEO | Cotax LLC DBA SuperTax Svc |
| Joyce Nelson | Owner | Coz |
| Carole and Gordon Segal | Co-Founders, Crate and Barrel | Crate and Barrel |
| Dr. Thomas Ross | CEO | Critical Medical Solutions Inc |
| Courtney Spence | Founder & CEO | CSpence Group |
| John Reing | Chief Human Resources Officer | CSRA |
| Robert Glaser | Principal | Cushman & Wakefield \| PICOR |
| Brook Kohn | Co-Founder & CEO | DACA Time |
| Marie McGrath | CEO | Demand Lighting USA |
| Jeff Bleich | CEO | Dentons Diplomatic Solutions |
| A. Gabriel Esteban, PhD | President | DePaul University |
| Michael Guthrie | CEO | Detroit Chassis LLC |
| Diana Bello | Creative Director and Owner | Diana Bello Studio LLC |
| Dan Springer | CEO | DocuSign |
| Donna M. Carroll | President | Dominican University |
| Drew Houston | CEO & Co-Founder | Dropbox |

| Name | Title | Company |
| --- | --- | --- |
| Michael Giles | Owner | Dynamic Capabilities LLC |
| Andy Wildenberg | President | E3 Power |
| David Wenig | President & CEO | eBay |
| Robert West | CEO | Echelon One |
| Vibhu Mittal | CEO | Edmodo |
| Jacob Schatz | SVP & General Counsel | Electronic Arts |
| Trini Garibay | President | ELITE |
| Anthony E. Hargrove | CEO | Ella Austin Community Center |
| Laurene Powell Jobs | | Emerson Collective |
| William Recker | Chair Emeritus | Energy Innovation Center |
| Nanxi Li | CEO/Founder | Enplug |
| Mahi Inampudi | Vice President of Product and Technology | ENVOY Global |
| Edward Doughty | Managing Director | Epic Capital Wealth Management |
| Kathleen Cook | Owner | Esso Skin Care |
| Jose Luis Prado | President and CEO | Evans Food Group |
| Seth Cassel | President and Partner | EveryMundo |
| Anton Diego | Founder | EveryMundo |

| Name | Title | Company |
| --- | --- | --- |
| John Rowe | Chairman Emeritus | Excelon Corporation |
| Mark Zuckerberg | Founder & CEO | Facebook |
| Sheryl Sandberg | COO | Facebook |
| Christina Shatzen | Director of Marketing and Communications | Fast Forward |
| Craig Gaylord | CEO | Fiesta Foods |
| Kami Hinger | Partner | FireTest Company |
| James Park | CEO | Fitbit |
| Julio Fuentes | President & CEO | Florida State Hispanic Chamber of Commerce |
| John Dohm | President | Florida Transatlantic Holdings |
| Jeff Bussgang | Partner | Flybridge |
| Bruce Heyman | Ambassador | Former US Ambassador to Canada |
| Trevor Cornwell | President | Forum280, Inc. |
| Ivye Allen | President & CEO | Foundation for the Mid South |
| Jeff Glueck | CEO | Foursquare |
| Scott Osborn | President and Co-Owner | Fox Run Vineyards |
| Glen Popple | CEO | Fractured Imagination, LLC |
| Dilawar Syed | President | Freshworks |

| Name | Title | Company |
| --- | --- | --- |
| Ryan Matzner | Co-Founder | Fueled Collective |
| Todd Schulte | President | FWD.us |
| Jake Schwartz | CEO | General Assembly |
| Steven A. Denning | Chairman | General Atlantic |
| Mary Barra | CEO | General Motors |
| Robert Hohman | CEO | Glassdoor |
| Arthur H. JacksonJr.MBA | CEO | Global AHJ Group |
| John Csaszar | CEO | Global Capital Funding Group, LLC |
| Patrice Iverson-Summer | President | Global Trading Resources, Inc. |
| Saeid Kamalpour | President | Globink |
| Rob Solomon | CEO | GoFundMe |
| Sundar Pichai | CEO | Google Inc. |
| Donald Graham | Chairman | Graham Holdings Company |
| Tim O'Shaughnessy | CEO | Graham Holdings Company |
| Cris Mercado | Founder | Grant Answers |
| Luis A. Rodriguez | President & CEO | Greater Austin Hispanic Chamber of Comme |
| Loren Kruger | CEO | Green Plastic Pallets |

| Name | Title | Company |
| --- | --- | --- |
| Mark M. Greenough | President | Greenough Consulting Group |
| Reid Hoffman | Partner | Greylock Partners |
| Deborah Quazzo | President | GSV Acceleration Fund |
| Yenvy Truong | Co-Founder | HealthSnap Solutions |
| Keith Alperin | CEO | Helium Foot Software |
| Meg Whitman | CEO | Hewlett-Packard Enterprise |
| Mary C Howe | President | Howe Corporation |
| M. S. Hunter | President | Hunter Hawk Inc |
| Charles Blum | President | IAS Group Ltd. |
| Terrie Hellman | President | ICHC |
| Alan W. Cramb | President | Illinois Institute of Technology |
| Mark Harris | President & CEO | Illinois Science & Technology Coalition |
| Fred Hoch | CEO | Illinois Technology Association |
| Alan Schaaf | CEO | Imgur Inc |
| Geoff Mamlet | Executive Chairman | Impact Hub Boston |
| Ed Moore | President | Independent Colleges & Universities of Flor |
| David Mandelbrot | CEO | Indiegogo |

| Name | Title | Company |
|------|-------|---------|
| James Bost | CEO | Insight Research |
| Amy Rao | CEO | Integrated Archive Systems, Inc. |
| Mary Motsenbocker | President | International Tourism Marketing |
| Sinan Kanatsiz | Chairman | Internet Marketing Association (IMA) |
| Don Swift | President | iON Oklahoma Publishing |
| Ken Blow | President & CEO | ISG Illumination Systems, LLC |
| Trisha Degg | VP, Talent Programs & Executive Director | ITA and TechForward |
| Anurag Kumar | CEO | iTexico |
| Steve Jones | President | Jaap-Orr/Green Energy Enterprises |
| Jason Finkelman | Owner | Jason Finkelman Law |
| Harry Kargman | CEO | Kargo Global |
| Brook Byers | Partner | Kleiner Perkins |
| John Doerr | Partner | Kleiner Perkins |
| Amol Sarva | CEO | Knotel |
| Jeff Kurz | Principal | Kurz Group, Inc. |
| Martin B. Anstice | President and CEO | Lam Research Corporation |
| Louise noeth | President | LandSpeed Productions |

| Name | Title | Company |
|------|-------|---------|
| Raul Font | Executive Director | Latino Community Development Agency |
| Daniel Stewart | Managing Partner | Law Office of Daniel Stewart, PLLC |
| Michael R. Jarecki | Principal | Law Office of Michael R. Jarecki, LLC |
| Robert D. Ahlgren | Owner | Law Office of Robert D Ahlgren and Associ |
| Leah Duckett | Owner | Law Office of Robert D Ahlgren and Associ |
| Kathleen M. Vannucci | Owner | Law Office of Robert D Ahlgren and Associ |
| Kate Lincoln-Goldfinch | Owner | Lincoln-Goldfinch Law |
| Jed Smith | Chairman of the Board | Linden Lab |
| Jeff Weiner | CEO | LinkedIn |
| David Suarez | Vice President | Los Comales Restaurants |
| John Zimmer | Co-Founder | Lyft |
| Logan Green | Co-Founder | Lyft |
| Jason Rosenthal | CEO | Lytro, Inc. |
| Delano Wilson | CEO | M*A*C*S* LLC |
| Pompello D. Rivera | President & Owner | M&L Contractor LLC |
| Julian Martinez | COO | MaestroConference |
| Noramay | Co-Founder & General Partner | Make in LA |

| Name | Title | Company |
| --- | --- | --- |
| James Corrigan | CEO | Manage Operations |
| Eric Gundersen | CEO | Mapbox |
| Chris Lien | Chief Executive Officer | Marin Software Incorporated |
| Arne Sorenson | President and CEO | Marriott International |
| Mike Fernandez | Chairman | MBF Healthcare Partners |
| Fiona McEntee | Managing Attorney | McEntee Law Group |
| Scott Heiferman | Co-Founder & CEO | Meetup |
| Matthew Meltzer | Partner | Meltzer Hellrung LLC |
| Brad Smith | President & Chief Legal Officer | Microsoft Corporation |
| Satya Nadella | CEO | Microsoft Corporation |
| Sarah Miyazawa LaFleur | Founder & CEO | MMLaFleur |
| Mark O'Neill | CTO | MMLaFleur |
| Sameer Soleja | CEO | Molecule Software |
| Michael Townsend | President & Owner | MRT Management Group |
| Michael Kempner | CEO | MWWPR |
| Faquiry Diaz-Cala | Executive Chairman | mxHero Inc |
| Alex Nogales | President and CEO | National Hispanic Media Coalition |

| Name | Title | Company |
|------|-------|---------|
| Reed Hastings | CEO | Netflix |
| Patrick Lo | CEO/Chairman | NETGEAR |
| Shafqat Islam | CEO | NewsCred |
| Jared Kalmanson | General Counsel | NewsCred |
| Sergio Suarez | President and Co-Founder | North American Institute for Mexican Advan |
| Morton Schapiro | President | Northwestern University |
| Jacob Babcock | Founder & CEO | NuCurrent |
| Erik K. Grimmelmann | President | NY Tech Alliance |
| Boyede O. Sobitan | Co-Founder/CEO | Oja Express |
| David Castillo | President | Oklahoma City Hispanic Chamber of Comm |
| Tom Hurvis | Founder and Chairman | Old World Industries, LLC |
| Alex Kazerani | Chairman and CEO | OpenPath Security Inc |
| Mark Orlando | Owner | Orlando Network Services |
| Kay Ospital | Owner | Ospital Farms |
| Shradha Agarwal | President & Founder | Outcome Health |
| Rishi Shah | CEO & Founder | Outcome Health |
| Paul Metselaar | Chairman and CEO | Ovation Travel |

| Name | Title | Company |
|------|-------|---------|
| Elie Gordis | Executive Vice President and General Counsel | Ovation Travel |
| David Zalesne | President | Owen Steel Company |
| Elliott Ozment | Founder and Managing Attorney | Ozment Law |
| Kristen Sonday | COO | Paladin |
| Naveen Chopra | CFO and Interim CFO | Pandora Media |
| Amir Rubin | CEO | Paracosm |
| Frances Arazi | President & CEO | Pastourelle, LLC |
| Jack Conte | CEO | Patreon |
| Dan Schulman | CEO | PayPal Holdings, Inc. |
| W Mark Clark | President & CEO | Pima Council on Aging |
| Russ Yelton | CEO | Pinnacle Transplant Technologies |
| Katie Bethell | Founder and Executive Director | PL+US |
| Brian Sugar, Lisa Sugar | Lisa and Brian Sugar, Founders, President and CEO of POPSUGAR Inc. | POPSUGAR Inc. |
| Rosemarie Withee | President & CEO | Portal Integrators LLC |
| Bastian Lehmann | Co-Founder and CEO | Postmates |
| Penny Pritzker | Chairman | PSP Capital and Former US Secretary of Co |

| Name | Title | Company |
| --- | --- | --- |
| Konrad Feldman | CEO & Co-Founder | Quantcast |
| John Palizzi | President & CEO | Quantum Renewable Energy, Inc. |
| Patti Smith | Co-Founder and Chief Marketing Officer | Querium |
| Kim Scott | Author and Co-Founder | Radical Candor |
| George Bousis | Founder & CEO | Raise |
| David Wilcox | CEO | ReachScale |
| Rob Glaser | Founder, Chairman and CEO | RealNetworks, Inc. |
| Ric Elias | Co-Founder/CEO | Red Ventures |
| Yamili Quezada | Owner | Rising Time Investments |
| John Paul Demirdjian | COO | Road to Status |
| John Bauschard | Founder | Road to Status |
| Javad Khazaeli | Co-Founder | Road to Status |
| Robert Acquaye | CEO | Robden Enterprises |
| David D. Hiller | President and CEO | Robert R. McCormick Foundation |
| Robert Roche | Founder & President | Roche Enterprises |
| Edi Demaj | Co-Founder, COO & Managing Partner | RocketFiber |

| Name | Title | Company |
|------|-------|---------|
| Cathy Rodriguez | CEO | Sacramento Hispanic Chamber of Commerce |
| Marc Benioff | Chairman & CEO | Salesforce |
| Amy Weaver | President, Legal & General Council | Salesforce |
| Alison Phillips | Communications Director | San Diego Regional Chamber of Commerce |
| Edgar Rincon | Owner | Servicios Latinos LLC |
| Blanca Rincon | Services Specialist/Manager | Servicios Latinos LLC |
| Jon Oringer | CEO | Shutterstock |
| Samir Mayekar | Co-Founder and CEO | SiNode Systems |
| Greg Siskind | Partner | Siskind Susser, PC |
| Lynn Susser | Partner | Siskind Susser, PC |
| Jamie Alford | Founder and CEO | Ski White Diamond |
| Jennifer Smith | Managing Partner | Smith Immigration |
| Greg Smith | President | Smith Sterling |
| Evan Spiegel | CEO | Snap |
| James Harrison | President | Soda Strippers International |
| Roy Lee | CEO & President | Solutions Learning, Inc. |
| Bijan Sabet | Co-Founder and General Partner | Spark Capital |

| Name | Title | Company |
| --- | --- | --- |
| Felicia Bruce | CEO | Spirit Enterprises |
| Harrison Tang | CEO | Spokeo |
| Rob Shepardson | Partner and Co-Founder | SS+K |
| Kevin Johnson | president & chief executive officer | Starbucks Coffee Company |
| Erika Lucas | Founder & CEO | StitchCrew |
| James Quarles | CEO | Strava |
| Patrick Collison | CEO | Stripe |
| John Nahm | Managing Partner | Strong Ventures |
| Nikolay Borisov | Founder & CEO | SuBB | Startup Business Box |
| Larry Augustin | CEO | SugarCRM |
| Winthrop H. Smith, Jr. | Chairman & CEO | Summit Ventures NE, LLC |
| Kiin Yang | CEO | Superior Carbontech and Solutions Sdn Bhd |
| Francisco Ibarra | CEO | Supermercados Morelos |
| Zander Lurie | CEO | SurveyMonkey Inc. |
| Susan Crown | Chairman & Founder | Susan Crown Exchange Inc. |
| Ron Conway | Founder | SV Angel |
| Christine Swanson | Attorney at Law | Swanson Law Offices |

| Name | Title | Company |
| --- | --- | --- |
| Jatin Nahar | CEO | SynergyTop LLC |
| Daniel James Scott | Executive Director | Tampa Bay Tech Forum |
| Brenda Hernandez | VP of Operations | Tango Public Relations |
| Jorge Hernandez | President | Tango Public Relations |
| Stacy Bown-Philpot | CEO | TaskRabbit |
| Gregory Alfred Stevens | Managing Director | TechBridge Project |
| Linda Moore | President and CEO | TechNet |
| Terry Howerton | CEO | TechNexus |
| David Brown | Co-CEO | Techstars |
| Jill Salzman | Founder | The Founding Moms - IL |
| Laurie L. Bergner | Board Member | The Immigration Project |
| Millie Herrera | President | The Miami Group & Associates |
| Alex Nogales | CEO | The National Hispanic Media Coalition |
| JB Pritzker | Co-Founder and Managing Director | The Pritzker Group |
| Dr. Bryan Traubert | Chairman | The Pritzker Traubert Family Foundation (P |
| Steve Townsend | President & CEO | The Record Xchange |
| Michelle Stevens | Founder | The Refill Shoppe, Inc. |

| Name | Title | Company |
|------|-------|---------|
| | | Slack |
| Paola Mendoza | Co-Founder | The Soze Agency |
| Michael Skolnik | Co-Founder | The Soze Agency |
| John M. Lynn | Managing Partner | The Studio Project |
| Ann Marchant | CEO | The Walker Marchant Group (WMG) |
| Robert Mitchell | Partner | Three Rivers Energy Development |
| Marco Zappacosta | CEO | Thumbtack |
| David Cascino | CEO | Thunderclap, Inc. |
| Christie Hubley | Owner | Tinker Art Studio |
| Richard Barnard | President & CEO | Tio Chuy's Autosales |
| Lamine Zarrad | CEO | Tokken |
| Gregory E. Torrez | President | Torrez International |
| Tracy Dinunzio | Founder/CEO | Tradesy |
| Stephen Kaufer | President and Chief Executive Officer | TripAdvisor Inc. |
| Peter Reichard | Partner | Tryon Capital LLC |
| David Karp | CEO | Tumblr |
| Andre Haddad | CEO | Turo, Inc. |

| Name | Title | Company |
|------|-------|---------|
| Jeff Lawson | Co-Founder & CEO | Twilio Inc. |
| Jack Dorsey | CEO | Twitter |
| Thuan Pham | Chief Technology Officer | Uber |
| Glenn F. Tilton | Former Chairman | United Airlines |
| Stephane Kasriel | CEO | Upwork |
| | | Utah Hotel and Lodging Association |
| | | Utah Restaurant Association |
| Chris Romer | President & CEO | Vail Valley Partnership |
| Ronald Garcia | CEO | Vardex Laser Solutions LLC |
| Brian Frumberg | Founder | Venture Out |
| Erin Abrams | VP of Legal Affairs | Via |
| Daniel Ramot | CEO | Via |
| Sandy Hessler | CEO | Vibrancy Consulting |
| John Saylor | Chairman | Virginia-Washington, DC District Export Co |
| Alfred F. Kelly, Jr. | CEO | Visa Inc. |
| Barbara Steinfeld | President | Visit Tri-Valley |
| Diane von Furstenburg | | |

| Name | Title | Company |
|------|-------|---------|
| Barbara Grogan | Founder and former CEO | Western Industrial Contractors |
| Bettina Bennett | CEO | Whichbox Media |
| John Atkinson | Managing Partner | Willis Towers Watson |
| Lindsey McNeny | President | Window to the Wild |
| Robert Wist | President | Wist Office Products |
| Claudia Williams | CEO | WonderWorld |
| Mohan Ramaswamy | Partner, Strategy | Work & Co |
| Aneel Bhusri | CEO | Workday |
| James P. Shaughnessy | Senior Vice President, General Counsel & Secretary | Workday |
| Sam Altman | Co-Founder | Y Combinator |
| Zab Mendez | Owner | Z's Marketing Alliance |
| Sumithra Jagannath | President | ZED Digital |

# EXHIBIT K

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

18

19 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**

20
   THE REGENTS OF THE UNIVERSITY OF
21 CALIFORNIA and JANET NAPOLITANO,
   in her official capacity as President of the
22 University of California,

23            Plaintiffs,

24      v.

25 U.S. DEPARTMENT OF HOMELAND
   SECURITY and ELAINE DUKE, in her
26 official capacity as Acting Secretary of the
   Department of Homeland Security,
27
              Defendants.
28

CASE NO. 17-CV-05211-WHA

**DECLARATION OF JONATHAN SCHWARTZ**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF JONATHAN SCHWARTZ
ALL DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

DECLARATION OF JONATHAN SCHWARTZ

I, Jonathan Schwartz, declare:

1.     I am over the age of eighteen and competent to testify.

2.     I am the Chief Legal & Corporate Affairs Officer at Univision Communications Inc. (Univision). I have been employed by Univision since 2012. In my role, I oversee the Legal & Corporate Affairs Department, which includes the following areas: Legal and Business Affairs, Corporate Compliance, Government Relations, Corporate Social Responsibility, Community Empowerment, Global Security, Media Rights Management & Content Protection, Standards & Practices, and Advertising Review.

3.     Univision is the leading media company serving Hispanic America and the rising multicultural mainstream of the United States. Univision's workforce reflects the audience it serves, including DACA beneficiaries, their families, and their communities. The government's decision to terminate DACA means that a segment of Univision's employees will eventually lose their work authorization. As a direct consequence of the government's decision, therefore, Univision will lose the benefit of these employees' immeasurable contributions to the Company. And because these employees uniquely contribute to Univision's operations, the Company cannot adequately replace them. Moreover, in hiring and training replacements, Univision will incur both business disruptions and financial losses. Additionally, the loss of DACA beneficiaries in our workforce will result in significant harm in the form of diminished connection with the communities we serve and reduced diversity of thought and point of view in the content we produce.

4.     Univision employs approximately 660 employees in the state of California, and a total of approximately 4,630 employees across the country in our corporate, network, local TV, radio, and digital operations. Univision's mission is to inform, empower, and entertain the Hispanic American population and rising multicultural mainstream.

5.     Univision began as a small Spanish-language TV station in San Antonio, Texas. Over its more than 50-year history, Univision's broadcast and cable TV, digital, and radio offerings have grown to become the foremost destination for Hispanic America and the rising multicultural mainstream, reaching an estimated 108 million average monthly-unduplicated media consumers. We engage audiences via our portfolio of 123 local TV and radio stations (in Arizona, California, Florida, Illinois,

New York, North Carolina and Texas, among other states), and 17 broadcast, cable and digital networks and partnerships.  In recent years, we have expanded our efforts to reach English speaking Hispanics and young multicultural audiences through our investment in the El Rey network and the launch of the Fusion Media Group, which includes such properties as FusionTV, the Gizmodo Media Group (and its digital-first platforms Gizmodo, Jalopnik, Jezebel, Deadspin, Lifehacker, Kotaku, Splinter, and the Root), and a stake in The Onion.

6.    Univision has a unique relationship with its audience, whose members rely on us for news and information on critical matters such as immigration and DACA.  Univision's news content has often been described as a "lifeline" for the Hispanic community.  In addition, Univision provides a platform for—and gives a voice to—traditionally underrepresented communities in America.  We do this through not only our media properties, but also through our Corporate Social Responsibility (CSR) and Social Impact initiatives.  Among Univision's CSR priorities are several projects focused on education and youth development, informing and empowering Hispanic America through a multitude of health and wellness initiatives, increasing diversity in media, and providing training opportunities for young people to learn coding and other necessary skills to enter STEAM (science, technology, engineering, art, and math) careers.

7.    Univision may have up to 60 employees, ranging across our entire company, who are beneficiaries of the DACA program and affected by the government's decision.  (Like many other companies, Univision has not yet been able to confirm the exact number of its employees who have DACA status.)  From the talent in front of and behind the camera, to the sharp creative minds that make our business run, to energized interns who are the Company's future – hard-working DACA beneficiaries are essential to creating and disseminating the news, entertainment, and services that Univision provides to millions of Americans every day.

8.    Univision engages in expressive activity and depends on the unique perspectives and creative contributions of its content producers and the employees who support them.  Some of Univision's DACA beneficiary employees are directly involved in producing content that helps shape Univision's expressive activity.  These employees provide a distinct perspective both as individual voices and because their experiences as individuals who first came to the United States as children give

them valuable insights into the culture and issues of interest to many of Univision's viewers. Their experiences as young immigrants help Univision better serve both the immigrant and non-immigrant communities that make up Univision's core audiences. The value of these employees to Univision thus goes well beyond their economic contributions.

9.      As a news operation, Univision will be harmed by the elimination of DACA. The ending of the program will make DACA beneficiaries, including DACA beneficiaries with family members who may be in the United States without status, less likely to come forward to appear on news programs, provide commentary on public affairs, and otherwise speak up on such issues as social justice and community affairs for fear that they or their families may be deported. This would not only hamper news coverage but, as seen in other countries, create a dearth of reliable information, lead to the dissemination of misinformation, and stifle the award-winning efforts of Univision's investigative journalism teams.

10.      Congress has recognized the unique importance of having the world's most talented journalists working in the United States, regardless of their country of birth, in providing for media and employment-based visas. Univision can avail itself of these visa processes if it seeks to hire a journalist from any other country in the world. But with the rescission of DACA, Univision will not be able to avail itself of these processes with respect to the skilled young persons who are already living in the United States with DACA status, even though they have unique talents and abilities and have been trained at our colleges and universities and have received U.S. journalism degrees. Without DACA, Univision would be unable to hire journalists from this talented set of individuals.

11.      For all these reasons, Univision stands by the hundreds of thousands of young people—including our own DACA beneficiary employees—who are impacted by the government's decision to terminate DACA. They have done everything asked of them by the government under DACA; they are active and contributing members of society who go to school, serve in the military, and work in thousands of civilian jobs—including at Univision—across our nation. Simply put, they should be able to stay in the United States—the only country most of them have ever known.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October ___, 2017, at New York, New York.

_____
Jonathan Schwartz, Esq.

# EXHIBIT L

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY and ELAINE DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

CASE NO. 17-CV-05211-WHA

**DECLARATION OF ALAN ESSIG, MEG
WIEHE, AND MISHA HILL**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |

We, Alan Essig, Meg Wiehe, and Misha Hill, declare:

1.      We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP).  ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies.  ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure, and public safety.  ITEP researchers use a microsimulation tax model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

2.      Alan Essig has been the Executive Director of ITEP since April 2017.  He holds a master's degree from the Nelson A. Rockefeller College of Public Affairs and Policy at the State University of New York at Albany and an undergraduate degree from the State University of New York at Buffalo.  Attached as Exhibit A is a true and correct copy of Alan Essig's curriculum vitae.

3.      Meg Wiehe is the Deputy Director of ITEP.  She has worked with ITEP since 2010.  Meg is nationally recognized expert on state and local taxation.  She studies, writes, and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy.  In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local governments' ability to fund basic public priorities, including education, infrastructure, and health care.  Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*  Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.  Attached as Exhibit B is a true and correct copy of Meg Wiehe's curriculum vitae.

4.      Misha Hill has been a State Policy Fellow at ITEP since 2016.  She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.  Attached as Exhibit C is a true and correct copy of Misha Hill's curriculum vitae.

1

5.      According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of September 4, 2017, approximately 689,800 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1]  This population estimate from USCIS takes into account the latest estimates of former DACA recipients who have become lawful permanent resident (about 40,000) and those who were granted DACA but failed to reapply or whose reapplication was denied (about 70,000). The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide, estimates an additional 617,000 individuals are eligible for DACA but not currently enrolled.[2]

6.      We used the above estimates of the current population receiving and eligible for, but not receiving DACA, in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.[3]

7.      Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes.  We estimate that the population currently enrolled in DACA contributes more than $1.25 billion in state and local taxes.  Further, the population eligible for DACA but not currently enrolled contributes an additional $497.6 million in state and local taxes.  This brings the total contribution of the DACA-eligible population to just under $1.8 billion annually in state and local taxes. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

       a.  Taxpaying units and employment status:

---

[1] "Approximate Active DACA Recipients." Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[2] Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." Available: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events.

[3] ITEP released a report in April 2017 that used USCIS data from September 2016.  This analysis uses the same methodology with the most currently available population figures.

  i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

  ii. The employment rate of immigrants depends on legal status.

  iii. A 2017 national survey of 3,063 DACA recipients found that 91.4 percent of respondents were employed.[4]  DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals.  DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks.

  iv. The previously mentioned national survey also found that prior to obtaining DACA, only 44% of survey respondents were employed.  Our analysis assumes that 44% of the population that is eligible for DACA but not currently enrolled are employed.

b. Income of DACA-eligible population

  i. Immigrant wages change depending on legal status.  Undocumented workers earn $22,029 a year on average and granting DACA increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[5]  The average wages applied to the estimated DACA working population in ITEP's analysis are:

  - $23,901 for the DACA-eligible population working and enrolled in the program.

---

[4] "Results of Tom K. Wong et al., 2017 National DACA Study." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

The April 2017 ITEP report used employment figures from the 2016 survey.

[5] Wong's 2017 survey found a higher average salary for the DACA-eligible population enrolled and working ($36,232) than the Center for American Progress report.  Thus, by using an average salary of $23,901, this analysis provides a conservative tax contribution estimate.

- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c.  Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i.  ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law.  In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population with some modifications in states with major tax changes since *Who Pays?* was published.

d.  The methodology used to calculate the contributions of the DACA-eligible population differs from the methodology used to calculate the contributions of all undocumented immigrants.  The primary differences are that we assume a higher average income and employment rate for the DACA-eligible population.  Thus the state and local tax contributions of the DACA-eligible population are not proportional to their share of the undocumented population.

8.  We estimate that the population currently enrolled in DACA contribute $242.4 million in state and local income taxes annually. The population that is eligible for but not enrolled in DACA contributes an additional $44.5 million bringing the total contributions of the DACA-eligible population to $286.9 million in state and local income taxes annually.

a.  Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number.  Thus, this study assumes the 626,437 DACA-enrolled workers are fully complying with state personal income taxes.  Personal income tax effective rates in each state were applied accordingly.  Various studies have estimated

4

between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.  This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost.  Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

    b.   Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers.  The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

9.   We estimate the population currently enrolled in DACA contributes $281.1 million in state and local property taxes.  The population eligible for not enrolled in DACA contributes an additional $131.9 million bringing the total $413 million annually in state and local property taxes.  The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

    a.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state.  This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.  The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

10.   We estimate the population currently enrolled in DACA contributes $726.1 million state and local sales and excise taxes.  The population eligible but not enrolled in DACA contributes an additional $321.2 million bringing the total contributions of the DACA-eligible population to over $1 billion annually in state and local sales and excise taxes.  The DACA-eligible population, like anyone

purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    a.  Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service.  It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes, thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

11.    A useful way to compare taxes paid across income levels is the effective tax rate.  This is the total of all taxes paid - income, property, and sales and excise - as a share of income.  The DACA-eligible population pays an average effective tax rate of 8.3%.  ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.4%, and the top 1% of taxpayers pays just 5.4% of their income in taxes.[6]  This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

12.    We also estimate that if DACA protections were lost, the population would continue to contribute to state and local revenues, but at much lower levels.  We estimate a total loss of $696 million in state and local tax revenues.

    a.  DACA protections increase state and local tax contributions because they increase employment rates, increase average salaries, and increase the share paying state personal income taxes from 50 to 100 percent.  Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages.  This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers.  Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

13.    There are residents of every state who are eligible for or enrolled in DACA, which means

---

[6] Carl Davis, et al., *Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.*, Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

every state revenue stream could be harmed by the loss of DACA protections.  Some examples relevant to this case are below:

a.   In California, approximately 197,900 residents are currently enrolled in DACA.  They contribute $358.3 million in state and local taxes.  An additional 181,100 residents are eligible for but not enrolled in DACA.  They contribute $136.8 million bringing the total contributions of the 379,000 DACA-eligible California residents to $495.1 million in state and local taxes annually.  If DACA protections were lost, the contributions of California's total DACA-eligible population would decrease by $208.7 million to $286.4 million.

i.   Those currently enrolled in DACA in California contribute $222.9 million in sales and excise taxes.  Those eligible for but not enrolled in DACA contribute an additional $90.3 million bringing the total sales and excise tax contributions of California's total DACA-eligible population to $313.2 million.

ii.   Those currently enrolled in DACA contribute $41 million in state personal income taxes.  Those eligible for but not enrolled in DACA contribute an additional $8.3 million bringing the total personal income tax contribution of California's total DACA-eligible population to $49.3 million.

iii.   Those currently enrolled in DACA contribute $94.3 million in property taxes. Those eligible for but not enrolled in DACA contribute an additional $38.2 million bringing the total property tax contributions of California's total DACA-eligible population to $132.5 million.

iv.   Santa Clara County has the twelfth largest DACA-eligible population of counties nationwide.  Approximately 15,000 Santa Clara residents are currently enrolled in DACA.[7]  They contribute $14.8 million in state taxes (personal income tax and state sales tax) and $12.4 million to local taxes (property taxes and local sales taxes).  An additional 13,700 are eligible but not enrolled bringing the total

_____

[7] "State and County Estimates of DACA-Eligible Populations," Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

DACA-eligible population to 28,700.  The population that is eligible but not enrolled contributes $5.4 million in state and $5 million in local taxes.  Altogether, the total DACA-eligible population in Santa Clara County contributes $20.2 million in state and $17.4 million in local taxes.

b.   In Maine, approximately 40 residents are currently enrolled in DACA.  They contribute over $67,600 in state and local taxes.  An additional 60 residents are eligible for but not enrolled in DACA.  They contribute over $41,100 bringing the total contributions of the 100 DACA-eligible Maine residents to over $108,700 in state and local taxes annually.  If DACA protections were lost, their contributions would decrease by $40,300 to $68,400.

    i.   Those currently enrolled in DACA contribute $32,000 in sales and excise taxes.  Those eligible but not enrolled contribute an additional $26,000 in sales and excise taxes bringing the total sales and excise tax contributions of Maine's DACA-eligible population to $58,000.

    ii.   Those currently enrolled in DACA contribute $23,000 in state personal income taxes.  Those eligible but not enrolled contribute an additional $5,000 in personal income taxes bringing the total personal income tax contributions of Maine's DACA-eligible population to $28,000.

    iii.   Those currently enrolled in DACA contribute $11,000 in property taxes.  Those eligible but not enrolled contribute an additional $9,000 in property taxes bringing the total property tax contributions of Maine's DACA-eligible population to $20,000.

c.   In Maryland, approximately 8,100 residents are currently enrolled in DACA.  They contribute $18.1 million in state and local taxes.  An additional 15,900 residents are eligible for but not enrolled in DACA.  They contribute $15.5 million bringing the total contributions of the 24,000 DACA-eligible Maryland residents to $33.6 million in state and local taxes annually.  If DACA protections were lost, their contributions would

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

decrease by $10.3 million to $23.3 million.

    i.  Those currently enrolled in DACA contribute $7.5 million in sales and excise taxes.  Those eligible but not enrolled contribute an additional $8.5 million in sales and excise taxes bringing the total sales and excise tax contributions of Maryland's DACA-eligible population to $16 million in sales and excise taxes.

    ii.  Those currently enrolled in DACA contribute $7.4 million in state income taxes. Those eligible but not enrolled contribute an additional $2.3 million in income taxes bringing the total state income tax contributions of Maryland's DACA-eligible population to $9.7 million.

    iii.  Those currently enrolled in DACA contribute $3.2 million in property taxes. Those eligible but not enrolled contribute an additional $4.4 million in property taxes bringing the total property tax contributions of Maryland's DACA-eligible population to $7.6 million.

d.  In Minnesota, approximately 5,550 residents are currently enrolled in DACA.  They contribute $10.8 million in state and local taxes.  An additional 4,500 residents are eligible for but not enrolled in DACA.  They contribute $3.3 million bringing the total contributions of the 10,000 DACA-eligible residents to $14.1 million in state and local taxes annually.  If DACA protections were lost, their contributions would decrease by $6.8 million to $7.3 million.

    i.  Those currently enrolled in DACA contribute $5.5 million in sales and excise taxes.  Those eligible but not enrolled contribute an additional $2 million bringing the total sales and excise tax contributions of Minnesota's DACA-eligible population to $7.5 million.

    ii.  Those currently enrolled in DACA contribute $3.5 million in state income taxes. Those eligible but not enrolled contribute an additional $640,000 bringing the total state income tax contributions of Minnesota's DACA-eligible population to $4.1 million.

iii. Those currently enrolled in DACA contribute $1.8 million in property taxes. Those eligible but not enrolled contribute an additional $671,000 bringing the total property tax contributions of Minnesota's DACA-eligible population to just under $2.5 million.

14.    For all the foregoing reasons, in our professional opinions, rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by at least half.  This would hamper state and local revenues and hurt their economies.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Executed on October 26, 2017, at Washington, DC.

_____

Alan Essig

_____

Meg Wiehe

_____

Misha Hill

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT A

**Alan Essig**
5914 Highgate Avenue
East Lansing, Michigan 48823
770-402-4630
aessig1959@gmail.com

**WORK EXPERIENCE**

**Executive Director**                                                     **2017-Present**
Institute on Taxation and Economic Policy

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan research organization that provides timely, in-depth analyses on the effects of federal, state, and local tax policies.  Responsibilities include building and managing an annual budget of over $1.8 million and a staff of twelve, including analysts, communication staff, and administrative staff.

**Principal**                                                                        **2016-2017**
Essig Gehl Consulting

Essig Gehl Consulting worked with non-profits to maximize their policy and advocacy impact through high-quality policy research and effective advocacy strategies. Responsibilities included the research and writing of policy reports as well as developing educational materials for a public education campaign.

**Executive Director**                                                              **2015**
Michigan Consumers for Healthcare

Michigan Consumers for Healthcare (MCH) was a nonprofit organization with a statewide mission focused on making affordable, quality healthcare a reality for all in Michigan. Upon taking over leadership of MCH it became apparent that the organization was not financially viable. Working with the Board of Directors, and to save the underlying mission of MCH, it was decided to merge MCH with an organization (Michigan League for Public Policy (MLPP)) with a similar mission and a stronger financial base. Working with the Executive Director and board of MLPP and the board of MCH, the merger was successfully completed by January 1, 2016.

**Founding Executive Director**                                                  **2004-2015**
Georgia Budget and Policy Institute

The Georgia Budget and Policy Institute (GBPI) is an independent, nonprofit, nonpartisan organization that engages in research and education on the fiscal and economic health of the state of Georgia.  GBPI studies tax and budget issues with an emphasis on the impact on low and moderate income Georgians. Areas of policy focus include healthcare (Medicaid, public health, implementation of Affordable Care Act), education (early childhood, K-12, higher education), anti-poverty and social safety net, economic development, and tax policy.
Responsibilities included building and managing an annual budget of over $1 million and a staff

of ten, including policy analysts, communication staff, development staff, and administrative staff.

Specific responsibilities included:

- Establishment of GBPI's research priorities and agenda.
- Researched and wrote policy reports and briefs concerning overall tax and budget policy.
- Oversaw organizational development and strategic planning, including capacity building.
- Worked with Development Director and appropriate Board committee to craft GBPI's long-term and annual development plan. Cultivated relationships with foundation representatives and other major donors, including foundations, corporations, and individuals.
- Write and delivered speeches and presentations in various venues, as well as represented GBPI at conferences and other relevant functions.
- In conjunction with Communications Director, implemented communications strategic plan by serving as main press spokesperson for organization and writing Op-Ed's and blogs.
- Built and maintained relationships with various politicians, policymakers, opinion leaders, and others involved in the legislative process. Wrote and presented legislative analysis, critique, and testimony.
- Built and maintained relationships with advocacy partner organizations, as well as coalitions.
- Ensured effective involvement of Board of Directors and brought appropriate matters before the Board for input, review, and/or approval.

**Senior Research Associate**                                                    **2000-2004**
Georgia State University
Andrew Young School of Policy Studies
Fiscal Research Center

Researched and prepared public policy research reports and briefs in regards to taxes, state budget policy and process, economic development, Medicaid and other social welfare issues.

**Committee Aide**                                                                        **2003**
Georgia House of Representatives Appropriations Committee

During 4-month legislative session was loaned as staff to Georgia House of Representatives. Responsibilities included advising Speaker and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with emphasis on the Department of Community Health and the Department of Human Resources.

**Deputy Policy Director**                                                        **2001-2002**
Office of the Governor
State of Georgia

As loaned senior staff to the Governor, helped formulate policy in the areas of health and human services,  including child welfare, public health, mental health, developmental disabilities, aging, Medicaid, economic development, taxes, and technology.  Provided oversight to the Departments of Human Resources, Community Health, Industry Trade and Tourism, Community Affairs, Labor, and the Georgia Technology Authority.

**Committee Aide**                                                       **2000 and 2001**
Georgia State Senate Appropriations Committee

During 4 month legislative session in 2000 and 2001 was loaned as staff to Georgia State Senate. Responsibilities included advising Lt. Governor and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with a specific emphasis on the Department of Community Health and the Department of Human Resources.

**Assistant Commissioner**                                               **1997-1999**
Office of Policy and Government Services
Georgia Department of Human Resources (DHR)

The Office of Policy and Government Services consists of the Office of Communications, Office of Fraud and Abuse, Office of Legal Services, and Office of Constituent Services and Intergovernmental Relations. Provided overall supervision to directors of the Offices and responsible for over 120 employees.

Legislative liaison to Georgia General Assembly and managed DHR legislation. Worked with the Commissioner and Division Directors to define the Department's position on legislation. Represented DHR with legislators and at legislative committee meetings.  Liaison for DHR with Governor's Office on policy and legislative matters.

Assisted the Commissioner on policy related areas.  Identified the issues involved for each policy area and worked on strategies to resolve the issues.

**Director, Deputy Director and Policy Analyst**                         **1993 -1997**
Georgia State Senate Research Office

Deputy Director (1996 - 1997) assisted the Director in the day to day operations of the office and staffed the Appropriations Committee.

Director during the 1996 legislative session, responsible for the day to day operations of office with staff of 10, and staffed the Appropriations Committee.

Policy Analyst (1993 - 1995) conducted research and analysis for the following committees: Appropriations, Finance and Public Utilities, and Retirement.  Advised the Lieutenant Governor and the Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget.

**Deputy Director**                                                      **1995**
Budgetary Responsibility Oversight Committee (BROC)

Asked by Lieutenant Governor to serve in the newly created BROC office.  BROC was created to assist the Governor's Office of Planning and Budget and the Department of Audits in the performance of legislatively required program and policy evaluations.  Assisted the Director in hiring of initial staff and organizing initial evaluation projects.

**Operations Analyst**                                                    1989 - 1993
Georgia Department of Labor

Performed evaluations of the effectiveness of programs funded under the Job Training Partnership Act including program design, program participation, coordination of services and impact of program policy.  Designed mechanism to analyze state's return on investment for job training programs, created internal tracking system used to monitor job training programs, and managed ongoing $2.5 million contract for survey research.

**Policy Consultant**                                                              1991
Governor's Commission on Effectiveness and Economy in Government

Selected by the Commissioner of the Department of Labor to comply with the Governor's directive to serve on the Governor's Commission as Policy Consultant for the Economic Development Task Force. Recommended organizational and policy changes to save over $2 million, provided implementation plan to reorganize the Governor's Economic Development Council, and provided analytical and administrative support to task force.

**Legislative Budget Analyst**                                            1986 - 1989
New York State Senate Finance Committee (Minority Staff)

Analyzed budgetary and legislative issues for the New York State Departments of Labor, Civil Service, Economic Development and the Public Employees' Pension System.  Analyzed the New York City budget and made recommendations to Senate Minority Leader regarding state aid and tax issues affecting New York City. Assisted Senators and staff on agency appropriations, grants in aid, and state and federal legislation.

## EDUCATION

**Masters of Public Administration**                                      1985
Rockefeller College of Public Affairs and Policy
State University of New York at Albany
Major: Public Management

**Bachelor of Arts**                                                              1981
State University of New York at Buffalo
Major: History

## AWARDS

Named one of the 100 Most Influential Georgians by *Georgia Trend Magazine* in 2011, 2012, 2013, and 2014.

**EXHIBIT B**

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 ● megwiehe@gmail.com

## EDUCATION

**Maxwell School of Syracuse University,** *Masters of Public Administration, June 2006*

**University of Virginia,** *Bachelor of Arts, Anthropology, May 1998.  Graduated with High Distinction*

## WORK EXPERIENCE

**Institute on Taxation and Economic Policy (ITEP)**                              **Durham, NC/Washington, DC**
*Deputy Director (2016-present); State Tax Policy Director (2010-2016t)*

- Responsible for planning, managing, and implementing ITEP's state and federal tax policy programmatic work.  This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- Serve as a spokesperson for ITEP, elevating the organization's profile through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform.  Co-author on ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

**North Carolina Justice Center**                              **Raleigh, NC**
*Senior Policy Analyst/Outreach Director; NC Budget and Tax Center (2006-2010)*
- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

**Boston Museum Project**                              **Boston, MA**
*Special Projects Coordinator/Project Coordinator (2002-2005)*
- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

**MASSPIRG**                              **Amherst and Boston, MA**
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*
- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives
*Mass Student PIRG Campus Organizer (1998-2000)*
- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

**EXHIBIT C**

# Misha E. Hill

| (C) 609.234.5931 | 804 Green St., Apt D-2, Durham, NC 27701 | hill.misha@gmail.com |

## EDUCATION

**Master of Public Policy Candidate,** concentration in Health Policy                    May 2016
*The George Washington University* | Washington, DC
- ❖ Women's Leadership Fellow: A highly selective leadership program

**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts        May 2010
*University of Pennsylvania* | Philadelphia, PA
- ❖ Academic Research: Critical analysis of Spanish literature

## POLICY RESEARCH EXPERIENCE

**State Policy Fellow**                                              Sept 2016—Present
*Institute on Taxation and Economic Policy* | Durham, NC
- ❖ Drafted blog posts on various state tax policy issues including taxes paid by undocumented immigrants, soda taxes, and state budgets
- ❖ Researched and drafted reports in collaboration with senior staff on various state policy issues including taxes paid by undocumented immigrants and soda taxes
- ❖ Analyzed existing and proposed state tax policies
- ❖ Tracked state legislative action related to tax policies

**Family Income Support Research Assistant**                        Nov 2015—Sept 2016
*Center on Budget and Policy Priorities* | Washington, DC
- ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related to TANF policies
- ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from HHS and state agencies to inform internal analyses and future work
- ❖ Tracked state and federal legislative action related to income support programs

**Women's Health Policy Internship**                                Jun 2015—Aug 2015
*The Henry J. Kaiser Family Foundation* | Washington, DC
- ❖ Peter G. Peterson Foundation Fiscal Policy Intern
- ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
- ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US

**Family Income Support Internship**                                Sep 2014—May 2015
*Center on Budget and Policy Priorities* | Washington, DC
- ❖ Co-authored a report on state General Assistance programs and updated background research
- ❖ Drafted briefs for an advocacy tool kit distributed to 80 participants at a conference on expanding TANF work programs
- ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
- ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for CBPP website used by advocates, experts, and civil society
- ❖ Monitored and summarized media on state and federal legislative and policy changes to income support programs
- ❖ Performed literature reviews of prior research related to various income support strategies

## LANGUAGES AND TECHNOLOGY SKILLS

**Language:**  Spanish, Fluent in written and oral
**Technology:** SPSS and STATA (academic training), Adobe Illustrator, WordPress, MailChimp, and The Raiser's Edge

# EXHIBIT M

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, <br><br> Defendants. | CIVIL ACTION NO. 16-cv-4756 <br><br> **DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** <br><br> (Garaufis, J.) <br> (Orenstein, M.J.) |

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, in accordance with the Order of the Honorable James Orenstein, U.S. Magistrate Judge, dated September 27, 2017, Defendant Jefferson Beauregard Sessions III, in his official capacity as the Attorney General of the United States ("Defendant"), by and through counsel, provides the following Objections and Responses to Plaintiffs' First Set of Requests for Admission.  Defendant's Objections and Responses are based on information known to Defendant at this time, and are made without prejudice to additional objections should Defendant subsequently identify additional grounds for objection.  The information submitted herewith is being provided in accordance with the Federal

1

Rules of Civil Procedure, which generally permit discovery of matters not privileged that are relevant to the claims or defenses in this civil action and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(l). Accordingly, Defendant does not, by providing such information, waive any objection to its admissibility on the grounds of relevance, materiality, privilege, competency, or any other appropriate ground.  Defendant reserves the right to amend, supplement, or alter these objections and responses at any time.

## OBJECTIONS WHICH APPLY TO ALL REQUESTS FOR ADMISSION

1.      Separate and apart from the specific objections set forth below, Defendant objects to any discovery taking place in this case to the extent such discovery is brought pursuant to claims purportedly under the Administrative Procedure Act, as resolution of any such claims should be based upon the administrative record compiled by the Department of Homeland Security.

2.      Defendant objects to any discovery taking place before resolution of Defendants' forthcoming dispositive motions.

3.      Defendant objects to Plaintiffs' Requests for Admission to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.  Defendant objects to Plaintiffs' Requests for Admission to the extent they assume that certain types of information exist.  By providing these objections, Defendant does not hereby imply that information exists that is responsive to Plaintiffs' Requests for Admission.

2

4.      Each and every response contained herein is subject to the above objections, which apply to each and every response, regardless of whether a specific objection is interposed in a specific response.  The making of a specific objection in response to a particular request is not intended to constitute a waiver of any other objection not specifically referenced in the particular response.

5.      Defendant specifically reserves the right to make further objections as necessary to the extent that additional issues arise as to the meaning of and/or information sought by discovery.

6.      Defendants object to the extent that any request is contrary to any future and further order(s) of the Court.

## OBJECTIONS TO DEFINITIONS

7.      Defendant objects to the inclusion of definitions for any term not relied on in these Requests for Admission.  Any requirement that Defendants respond to such definitions in the abstract is not proportional to the needs of the case and the burden of such a response outweighs its likely benefit, which is none.  Defendants do not hereby waive any future objection to the definition of such terms, or waive the right to employment of Defendants' own definition of such terms.  Defendant objects to the definition of "Defendant" as overly broad and outside of the scope of discovery.  Fed. R. Civ. P. 26(b)(1).  Defendant interprets the definition of "Defendant" in the substance of these Requests for Admission and responses to mean Attorney General Jefferson B. Sessions, III, in his official capacity, as well as the following components of the Department of Justice: the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of the Associate Attorney General (OASG), the Office of

3

Legal Counsel (OLC), the Civil Rights Division (CRT), the Civil Division (CIV), and the Office of the Solicitor General (OSG). The components listed are relevant as those in which searches for responsive information relevant to decisions about the exercise of DHS's prosecutorial discretion in the form of deferred action could conceivably be proportional to the likelihood of locating such information and its likely benefit to the litigation.

8.    Defendant object to the definition of "Defendants" as overly broad and outside of the scope of discovery. Fed. R. Civ. P. 26(b)(1). Defendant interpret the definition of Defendants to mean Attorney General Jefferson B. Sessions, III, in his official capacity, as well as the following components of the Department of Justice: the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of the Associate Attorney General (OASG), the Office of Legal Counsel (OLC), the Civil Rights Division (CRT), the Civil Division (CIV), the Office of the Solicitor General (OSG); and Elaine C. Duke, Acting Secretary of Homeland Security (DHS), in her official capacity, as well as the following components of DHS: Headquarters, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS). The components listed are relevant as those in which searches for responsive information relevant to decisions about the exercise of DHS's prosecutorial discretion in the form of deferred action could conceivably be proportional to the likelihood of locating such information and its likely benefit to the litigation. Information from the Executive Office of the President will not be provided in response to these Requests for Admission. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

4

9.      Defendant objects to the definition of "date" as overbroad and unduly burdensome.  Defendant interprets date to mean "the exact date, month, and year, if ascertainable."  To the extent an approximation is required, it will be provided and will be designated as such.  The approximation will not include a description about "relationship to other events."

10.     Defendant objects to the definition of "identify" in reference to an individual as improperly requiring the disclosure of material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation.

11.     Defendant objects to the definition of "identify" in reference to a document because that definition is unduly burdensome and going beyond the requirements of Fed. R. Civ. P. 34 and Local Rule 26.3(c)(4).

12.     Defendant objects to the definition of "Department of Homeland Security" as overly broad.  Defendant will construe Department of Homeland Security to mean the relevant offices within the following relevant components of the Department of Homeland Security: Headquarters, CBP, ICE and USCIS, which are the components of DHS which are likely to have responsive information.

13.     Defendant objects to the definition of "DHS employee" or "DHS employees" as overly broad.  DHS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DHS employee, of a relevant office within a relevant component of DHS:  Headquarters, CBP, ICE, and USCIS.

14.     Defendant objects to the definition of "DOJ employee" or "DOJ employees" as overly broad.  DOJ employee or employees will be construed to mean any

5

current or former employee, in his or her official capacity as a DOJ employee, of OAG, ODAG, OASG, OLC, OSG, CRT, CIV, or ExecSec.

15.     Defendant objects to the definition of "USCIS employee" or "USCIS employees" as overly broad.  USCIS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a USCIS employee, of a relevant office within USCIS.

16.     Defendant objects to the definition of "Trump Administration" on the basis that it is overbroad.  Defendant will interpret Trump Administration to mean President Donald Trump in his official capacity as President, as well as any other current or former employee, in his/her official capacity, of the Executive Office of the President since January 20, 2017.

17.     Defendant objects to the definition of the phrase "DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

18.     Defendant objects to the definition of the phrase "DAPA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DAPA policy had it been implemented, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

19.     Defendant objects to the definition of the phrase "expanded-DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

6

20.     Defendant objects to the definition of "DACA termination" as misleading to the extent it includes the actions of the Department of Justice as it relates to the DACA policy, which was administered by another agency.  Defendant also objects to the extent the definition purports to "include all actions within the defendants' agencies to implement the end of DACA," regardless of context or when those activities may have taken place.

21.     Defendant objects to the inclusion of a definition of "present for" as vague in its inclusion of "telephone presence" and "any form of electronic presence."  Defendant will interpret the term "present for" to mean "a participant in a meeting, conversation, or discussion, whether in person, by telephone, by videoconference, or by other live communications method."

22.     Defendant objects to the definition of "discussion" or "discussions" as vague and overbroad to the extent it includes "any communication" in addition to the specified methods set forth in the definition.

23.     Defendant objects to the definition of "relating to" and "relate to" as overly broad, particularly in their inclusion of the terms "Setting forth," "mentioning," and "referring to."  Defendant will construe "relate to" or "relating to" based on the context of potentially responsive documents to include only those documents "describing," "discussing," "commenting upon," "supporting" or "contradicting" the topic in question to a sufficient extent as to shed light on the parties' claims or defenses.

24.     Defendant objects to the definitions in paragraphs 23-25 as overly broad. Defendant will interpret the requests in accordance with the definitions in Local Rule 26.3(d), or, for terms not defined in the Local Rules, using the plain meaning of the words included in the request.

## OBJECTIONS TO INSTRUCTIONS

25.     Defendant objects to Instructions 1-2 to the extent it purports to impose

requirements beyond those set forth in Fed. R. Civ. P. 36.

26.     Defendant objects to Instruction No. 7 to the extent it purports to require

Defendant to produce "responsive documents."

## OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

**REQUEST NO. 1:**   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to terminate the DACA program.

**OBJECTION TO REQUEST NO. 1:**   Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 1:**  Defendant denies RFA No. 1.

**REQUEST NO. 2:**   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to announce the DACA termination on September 5, 2017.

**OBJECTION TO REQUEST NO. 2:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as vague and undefined to the extent it can be construed to apply either to the decision to announce the DACA termination or to announce that termination on September 5, 2017.

**RESPONSE TO REQUEST NO. 2:** Defendant denies RFA No. 2.

**REQUEST NO. 3:**   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA applications from individuals without valid DACA as of September 5, 2017.

**OBJECTION TO REQUEST NO. 3:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 3:** Defendant denies RFA No. 3.

8

**REQUEST NO. 4:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA renewals from individuals whose DACA will expire on or after March 6, 2018.

**OBJECTION TO REQUEST NO. 4:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 4:** Defendant denies RFA No. 4.


**REQUEST NO. 5:**  Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to set a deadline of October 5, 2017, for DACA renewal applications.

**OBJECTION TO REQUEST NO. 5:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 5:** Defendant denies RFA No. 5.

**REQUEST NO. 6:**  Admit that the DACA termination decision is not under continued consideration by DOJ.

**OBJECTION TO REQUEST NO. 6:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the phrase "continued consideration" as vague and undefined, as well as calling for a legal conclusion.  Defendant objects to the request to the extent that it assumes facts not in evidence as it implies that DOJ was responsible for the DACA termination decision or had otherwise once considered it.

**RESPONSE TO REQUEST NO. 6:** Defendant denies RFA No. 6.

**REQUEST NO. 7:**  Admit that the DACA termination reflects the end of the agency decision-making process concerning the DACA program.

**OBJECTION TO REQUEST NO. 7:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the request to the extent it calls for a legal conclusion.  Defendant objects to the request to as vague and undefined as, even with the rescission of the DACA policy, there are numerous agency decisions that will continue to need to be made regarding the DACA policy.  Defendant objects to the request to the extent that it assumes facts not in evidence as it implies that DOJ engaged in an agency decision-making process concerning the DACA program.

**RESPONSE TO REQUEST NO. 7:** Defendant denies RFA No. 7.

9

**REQUEST NO. 8:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA applications from individuals who do not hold DACA as of September 5, 2017.

**OBJECTION TO REQUEST NO. 8:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 8:** Defendant denies RFA No. 8, except admits that the parameters of the DACA rescission, including all pertinent deadlines, are set forth in the September 5, 2017 DHS Memorandum.

**REQUEST NO. 9:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA renewal applications after October 5, 2017.

**OBJECTION TO REQUEST NO. 9:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.  Defendant objects to this request as vague and undefined to the extent that it fails to distinguish between decisions made after October 5, 2017 for renewal requests submitted before October 5, 2017 and decisions made after October 5, 2017 for renewal requests submitted after October 5, 2017.  Defendant objects to this request to the extent that it uses terms, such as "applications," that do not apply to a request for DACA which is not an immigration benefit, but rather an exercise of prosecutorial discretion to defer immigration enforcement action.

**RESPONSE TO REQUEST NO. 9:** Defendant denies RFA No. 9, except admits that the parameters of the DACA rescission, including all pertinent deadlines, are set forth in the September 5, 2017 DHS Memorandum; and further admits that on October 3, 2017, Acting Secretary Duke stated that "[w]ith respect to the devastation of Hurricane Maria and the lack of communications and infrastructure for a prolonged period of time, I have directed USCIS to consider on a case-by-case basis DACA requests received from U.S. Virgin Islands and Puerto Rico residents" (https://www.dhs.gov/news/2017/10/03/department-homeland-security-acting-secretary-elaine-duke-reminds-eligible-daca)  (last visited October 18, 2017).

**REQUEST NO. 10:**  Admit that Acting Secretary Duke's September 5, 2017 memorandum limits DACA renewals to those individuals with DACA as of September 5, 2017 whose DACA would expire between September 6, 2017 and March 5, 2018.

**OBJECTION TO REQUEST NO. 10:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request to the extent that it conflates the DACA policy and deferred action generally.

10

**RESPONSE TO REQUEST NO. 10:**, Defendant denies RFA No. 10, except admits that the parameters of the DACA rescission, including all pertinent deadlines, are set forth in the September 5, 2017 DHS Memorandum.

**REQUEST NO. 11:** Admit that DACA recipients are immediately subject to apprehension and deportation upon expiration of their DACA status.

**OBJECTION TO REQUEST NO. 11:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to this request as vague, undefined, and misleading to the extent that it implies that the expiration of DACA provides, by itself, a basis for an individual to be apprehended and/or deported. Defendant objects to the extent the request implies that no DACA recipient could have received a lawful immigration status prior to the expiration of his or her DACA and thus not be deportable.

**RESPONSE TO REQUEST NO. 11:** Defendant denies RFA No. 11, except admits that the parameters of the DACA rescission are set forth in the September 5, 2017 DHS Memorandum.

**REQUEST NO. 12:** Admit that an individual who loses DACA status is no longer eligible to apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(14).

**OBJECTION TO REQUEST NO. 12:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to this request to the extent it calls for a legal conclusion. Defendant also objects to this request to the extent it conflates DACA with deferred action.

**RESPONSE TO REQUEST NO. 12:** Defendant denies RFA No. 12, except admits that the parameters of the DACA rescission are set forth in the September 5, 2017 DHS Memorandum.

**REQUEST NO. 13:** Admit that the DACA termination is likely to have a more than de minimis economic impact on at least one small non-profit.

**OBJECTION TO REQUEST NO. 13:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act. Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimis economic impact" or "small non-profit." Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 13:** After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 13, and on this basis, denies.

11

**REQUEST NO. 14:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 100 small non-profits.

**OBJECTION TO REQUEST NO. 14:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimis economic impact" or "small non-profits."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 14:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 14, and on this basis, denies.

**REQUEST NO. 15:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 500 small non-profits.

**OBJECTION TO REQUEST NO. 15:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimis economic impact" or "small non-profit."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 15:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 15, and on this basis, denies.

**REQUEST NO. 16:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least one small business.

**OBJECTION TO REQUEST NO. 16:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 16:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 16, and on this basis, denies.

**REQUEST NO. 17:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 100 small businesses.

**OBJECTION TO REQUEST NO. 17:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimus economic impact" or "small businesses."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 17:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 17, and on this basis, denies.

**REQUEST NO. 18:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 1000 small businesses.

**OBJECTION TO REQUEST NO. 18:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 18:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 18, and on this basis, denies.

**REQUEST NO. 19:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least 5000 small businesses.

**OBJECTION TO REQUEST NO. 19:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de minimus economic impact" or "small business."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 19:**  After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 19, and on this basis, denies.

**REQUEST NO. 20:**  Admit that the DACA termination is likely to have a more than de minimis economic impact on at least one small governmental jurisdiction.

**OBJECTION TO REQUEST NO. 20:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory

13

Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "de mimimus economic impact" or "small governmental jurisdiction."  Defendant objects to this request to the extent it calls for speculation.

**RESPONSE TO REQUEST NO. 20:** After a reasonable inquiry, Defendant lacks knowledge or information sufficient to truthfully admit or deny RFA No. 20, and on this basis, denies.

**REQUEST NO. 21:**  Admit that prior to September 5, 2017, DOJ [(the Department of Justice)] did not evaluate the economic impact of terminating DACA on small non-profits.

**OBJECTION TO REQUEST NO. 21:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 21:** Defendant admits RFA No. 21, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 22:**  Admit that prior to September 5, 2017, DOJ did not evaluate the economic impact of terminating DACA on small businesses.

**OBJECTION TO REQUEST NO. 22:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small businesses."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 22:** Defendant admits RFA No. 22, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 23:**  Admit that prior to September 5, 2017, DOJ did not evaluate the economic impact of terminating DACA on small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 23:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small governmental jurisdictions."  Defendant

14

objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 23:** Defendant admits RFA No. 23, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 24:**   Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small non-profits.

**OBJECTION TO REQUEST NO. 24:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider regulatory alternatives to the action being challenged in this lawsuit.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits."   Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 24:** Defendant admits RFA No. 24, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 25:**   Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small businesses.

**OBJECTION TO REQUEST NO. 25:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider regulatory alternatives to the action being challenged in this lawsuit.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small businesses."   Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 25:** Defendant admits RFA No. 25, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 26:**   Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 26:**   Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling

15

for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider regulatory alternatives to the action being challenged in this lawsuit.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small governmental jurisdictions."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 26:** Defendant admits RFA No. 26, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 27:**  Admit that prior to September 5, 2017, Attorney General Sessions did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

**OBJECTION TO REQUEST NO. 27:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "certify" as set forth in the request.  Defendant objects to the request as being compound and confusing.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits," "small businesses," or "small governmental jurisdictions."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 27:** Defendant admits RFA No. 27, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 28:**  Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small non-profits to assist their clients in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 28:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "certify" as set forth in the request.  Defendant objects to the request as being compound and confusing.  Defendant objects to this request as vague and undefined to the extent plaintiffs have not defined the phrase "small non-profits," "small businesses," or "small governmental jurisdictions."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 28:** Defendant admits RFA No. 28, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 29:**  Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small non-profits to assist their members in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 29:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "sufficient time" or "small non-profits."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 29:** Defendant admits RFA No. 29, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 30:**  Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small businesses, small non-profits, and small governmental jurisdictions to assist their employees in submitting renewal applications for the DACA program.

**OBJECTION TO REQUEST NO. 30:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to consider the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "sufficient time," "small businesses," "small non-profits," and "small governmental jurisdictions."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 30:** Defendant admits RFA No. 30, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 31:**  Admit that prior to September 5, 2017, DOJ made no effort to determine the cost to small businesses, small non-profits, or small governmental jurisdictions of employees who will lose work authorization due to the end of the DACA program.

**OBJECTION TO REQUEST NO. 31:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory

Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "determine" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "small businesses," "small non-profits," and "small governmental jurisdictions." Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 31:** Defendant admits RFA No. 31, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 32:**  Admit that prior to September 5, 2017, DOJ did not assess the costs of rehiring or replacing employees who lose work authorization due to the termination of the DACA program.

**OBJECTION TO REQUEST NO. 32:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "assess" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to identify "employees who lose work authorization due to the termination of the DACA program."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 32:** Defendant admits RFA No. 32, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 33:**  Admit that prior to September 5, 2017, DOJ did not assess the potential costs to small businesses, small non-profits, and small governmental jurisdictions of losing experienced employees due to the termination of the DACA program.

**OBJECTION TO REQUEST NO. 33:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for a legal conclusion to the extent it is intended to, but does not cite, the Regulatory Flexibility Act.  Defendant objects to this request to the extent it implies that Defendant was required to "assess" the topic identified in this request.  Defendant objects to this request as vague and confusing to the extent plaintiffs have failed to define the phrase "small businesses," "small non-profits," "small governmental jurisdictions," and "experienced employees."  Defendant objects to the request as assuming facts not in evidence to the extent it infers that DOJ was responsible for the termination of DACA.

**RESPONSE TO REQUEST NO. 33:**  Defendant admits RFA No. 33, as the decision to rescind DACA was made by DHS, not DOJ.

**REQUEST NO. 34:**  Admit that the November 19, 2014, Department of Justice, Office of Legal Counsel memorandum on legality of DAPA remains operative.  *See* Dep't of

18

Homeland Sec.'s Auth. To Prioritize Removal of Certain Aliens Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677 (O.L.C. Nov. 19, 2014).

**OBJECTION TO REQUEST NO. 34:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the request as vague to the extent plaintiffs have failed to define the term "operative." Defendant objects to the request as calling for a legal conclusion.

**RESPONSE TO REQUEST NO. 34:** Defendant admits RFA No. 34 to the extent that the Office of Legal Counsel has not published a memorandum on the legality of DAPA subsequent to November 19, 2014. Defendant cannot provide a further, truthful response to this RFA without revealing information protected by the attorney-client privilege and the deliberative process privilege.

**REQUEST NO. 35:** Admit that the November 19, 2014, Department of Justice, Office of Legal Counsel memorandum on the legality of DAPA has not been superseded by any subsequent OLC memorandum. *See* Dep't of Homeland Sec.'s Auth. To Prioritize Removal of Certain Aliens Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677 (O.L.C. Nov. 19, 2014).

**OBJECTION TO REQUEST NO. 35:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the request as vague to the extent plaintiffs have failed to define the phrase "superseded by any subsequent OLC memorandum." Defendant objects to the request as calling for a legal conclusion.

**RESPONSE TO REQUEST NO. 35:** Defendant admits RFA No. 35 to the extent that the Office of Legal Counsel has not published a memorandum on the legality of DAPA subsequent to November 19, 2014. Defendant cannot provide a further, truthful response to this RFA without revealing information protected by the attorney-client privilege and the deliberative process privilege

**REQUEST NO. 36:** Admit that Office of Legal Counsel has not drafted a written memorandum on the legality of DACA.

**OBJECTION TO REQUEST NO. 36:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the request as vague to the extent plaintiffs have failed to define the term "drafted."

**RESPONSE TO REQUEST NO. 36:** Defendant admits RFA No. 36 to the extent that an Office of Legal Counsel written memorandum to the files, dated December 7, 2012, memorializes the Office's oral advice regarding its preliminary view, conveyed before DACA was announced, that a program resembling DACA would be permissible subject to certain caveats concerning its implementation. Defendant cannot provide a further, truthful response to this RFA without revealing information protected by the attorney-client privilege, the work product doctrine, and the deliberative process privilege.

19

**REQUEST NO. 37:**  Admit that Office of Legal Counsel has orally opined that DACA was a lawful exercise of executive authority.

**OBJECTION TO REQUEST NO. 37:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to the request as vague to the extent plaintiffs have failed to define the phrase "orally opined."

**RESPONSE TO REQUEST NO. 37:**  Defendant denies RFA No. 37 with respect to the Office of Legal Counsel's oral advice before DACA's announcement, and further states that in a written memorandum to the files, dated December 7, 2012, the Office of Legal Counsel noted that it was "asked . . . whether the Administration could rely on the long-standing practice of deferred action to grant a form of temporary relief to the class of aliens who would be covered by the proposed DREAM Act," and that the Office had "orally advised . . . of [its] preliminary view that . . . it would be permissible to use deferred action in the categorical manner being contemplated, on the theory that it would constitute an appropriate exercise of prosecutorial discretion, subject to certain caveats concerning its implementation."  A 2014 published opinion of the Office of Legal Counsel regarding DAPA elaborated (at 18 n.8):

> Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

Defendant cannot provide a further, truthful response to this RFA without revealing information protected by the attorney-client privilege, the work product doctrine, and the deliberative process privilege.

**REQUEST NO. 38:**  Admit that DOJ employees had discussions with plaintiffs in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), regarding the decision to terminate the DACA program before the DACA termination.

**OBJECTION TO REQUEST NO. 38:**  Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 38:** Defendant admits RFA No. 38, to the extent that the possibility of terminating the DACA program was raised in conversations with counsel for plaintiffs in *Texas v. United States*, No. 14-cv-254 (S.D. Tex.).

**REQUEST NO. 39:**  Admit that DOJ considered the arguments raised by plaintiffs in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), in terminating the DACA program.

**OBJECTION TO REQUEST NO. 39:**  Defendant incorporates by reference the above objections to the definitions and instructions.  Defendant objects to this request as calling for information protected by the attorney work product doctrine.

**RESPONSE TO REQUEST NO. 39**: Defendant admits RFA No. 39, to the extent that, in arriving at its opinion on the lawfulness of DACA, DOJ considered arguments raised by plaintiffs to the extent those arguments were adopted by the United States District Court of the Southern District of Texas, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court in their respective opinions in the *Texas v. United States* litigation, except states that DHS, not DOJ, rescinded the DACA program.


Dated: October 18, 2017                          Respectfully submitted,

                                                 CHAD A. READLER
                                                 Acting Assistant Attorney General

                                                 BRIDGET M. ROHDE
                                                 Acting United States Attorney

                                                 BRETT A. SHUMATE
                                                 Deputy Assistant Attorney General

                                                 JENNIFER D. RICKETTS
                                                 Director

                                                 JOHN R. TYLER
                                                 Assistant Branch Director


                                                 /s/ *Brad P. Rosenberg*
                                                 BRAD P. ROSENBERG (DC Bar #467513)

21

Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-3374
Fax:  (202) 616-8460
Email: brad.rosenberg@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 18, 2017, I caused to be served the

foregoing DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS'

FIRST SET OF REQUESTS FOR ADMISSION TO JEFFERSON BEAUREGARD

SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES, via e-mail

upon:

| | |
|---|---|
| Lourdes Rosado | lourdes.rosado@ag.ny.gov |
| Diane Lucas | diane.lucas@ag.ny.gov |
| Abigail Taylor | abigail.taylor@state.ma.us |
| Genevieve Nadeau | Genevieve.Nadeau@MassMail.State.MA.US |
| Colleen Melody | ColleenM1@ATG.WA.GOV |
| Marsha Chien | MarshaC@ATG.WA.GOV |
| Jerome Frank Legal Servs. Org. | BatallaVidal_LSO@mailman.yale.edu |
| Batalla | Batalla@nilc.org |
| Amy Taylor | amy.taylor@maketheroadny.org |
| Scott Foletta | scott.foletta@maketheroadny.org |
| Alexa Schapira | Alexia.Schapira@maketheroadny.org |
| Justin Cox | cox@nilc.org |

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG

23