# EXHIBIT AA

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF DR. CLARENCE BRADDOCK III** |

| | |
|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF |
| | MAINE, STATE OF MARYLAND, and |
| 2 | STATE OF MINNESOTA, |

CASE NO. 17-CV-05235-WHA

 3                    Plaintiffs,

 4                    v.

 5  U.S. DEPARTMENT OF HOMELAND
    SECURITY, ELAINE DUKE, in her official
 6  capacity as Acting Secretary of the
    Department of Homeland Security, and the
 7  UNITED STATES OF AMERICA,

 8                    Defendants.

 9  CITY OF SAN JOSE, a municipal corporation,       CASE NO. 17-CV-05329-WHA

10                    Plaintiffs,

11                    v.

12  DONALD J. TRUMP, President of the United
    States, in his official capacity, ELAINE C.
13  DUKE, in her official capacity, and the
    UNITED STATES OF AMERICA,
14
                      Defendants.
15
16  DULCE GARCIA, MIRIAM GONZALEZ             CASE NO. 17-CV-05380-WHA
    AVILA, SAUL JIMENEZ SUAREZ,
17  VIRIDIANA CHABOLLA MENDOZA,
    NORMA RAMIREZ, and JIRAYUT
18  LATTHIVONGSKORN,

19                    Plaintiffs,

20                    v.

21  UNITED STATES OF AMERICA, DONALD
    J. TRUMP, in his official capacity as President
22  of the United States, U.S. DEPARTMENT OF
    HOMELAND SECURITY, and ELAINE
23  DUKE, in her official capacity as Acting
    Secretary of Homeland Security,
24
                      Defendants.
25

26

27

28

DECLARATION OF DR. CLARENCE BRADDOCK III
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and<br>SERVICE EMPLOYEES INTERNATIONAL | CASE NO. 17-CV-05813-WHA |
| 2 | UNION LOCAL 521, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity | |
| 6 | as President of the United States, JEFFERSON<br>BEAUREGARD SESSIONS, in his official | |
| 7 | capacity as Attorney General of the United<br>States; ELAINE DUKE, in her official | |
| 8 | capacity as Acting Secretary of the Department<br>of Homeland Security; and U.S. | |
| 9 | DEPARTMENT OF HOMELAND<br>SECURITY, | |
| 10 | Defendants. | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

I, CLARENCE BRADDOCK III, DECLARE:

1.      I am Vice Dean of Education at the David Geffen School of Medicine at the University of California Los Angeles ("UCLA Medicine").  The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      I have been Vice Dean of Education at UCLA Medicine for nearly four years.  In my position, I oversee all aspects of medical education, including undergraduate, graduate, and postgraduate medical programs.  I develop, manage, and implement strategies, initiatives and programs to promote and support education and training.

3.      We have several Deferred Action for Childhood Arrivals ("DACA") status medical students at UCLA Medicine, including 4th year medical students. The David Geffen School of Medicine, like the wider University of California system, is dedicated to providing a place for students who are the most qualified, meritorious and committed to their medical training and future patient care. The DACA students currently enrolled at the David Geffen School of Medicine exemplify these qualities. They are emblematic of our fundamental role as an institution of higher learning: to train the most talented, hard-working, passionate young scholars to become the doctors and biomedical researchers of tomorrow, regardless of gender, race, ethnicity or citizenship. These students are here not because of their DACA status, but because they are exceptionally qualified and share a genuine desire to care for, and heal, the sick.

4.      If these UCLA medical student and residents lose their DACA status, they become unemployable as physicians. They will not be able to practice medicine or even complete their residency in the United States as both require employment authorization. Without DACA, these students and residents would have no choice but to leave the United States in order to become practicing physicians. This would result in a loss of promising young doctors from our medical care system.

5.      The DACA policy rescission has also created the specific risk that our fourth year students will not be offered medical residency positions. Because they will lose their employment authorization without DACA status, they will be unable to complete or potentially even start their residency programs. Our faculty and UCLA residency program advisors have shared with me their significant concern about DACA students losing their status before or during residency, which means

1

DECLARATION OF DR. CLARENCE BRADDOCK III
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

that our hard-working and bright DACA students might not be offered residency interviews and/or positions at all. This concern has become so acute that UCLA Medicine has offered to include language in the Dean's Letter for our fourth year students explaining DACA status and expressing our support for our DACA students. A Dean's Letter is provided to fourth year students applying for residency to describe each student's potential as a doctor and encourage their acceptance into a residency program. This language is being included in hopes it might help DACA students be considered for residency programs.

      6.      Our DACA students have played an important role in enriching UCLA Medicine's educational environment and curriculum. At UCLA Medicine, we consider cultivating a diverse academic community as a way to drive excellence. A significant part of a medical student's training as a future physician is cultural sensitivity and a thoughtful, candid, respectful connection with patients, community members, and peers. Our DACA students come from incredibly diverse backgrounds and in my experience have helped their peers to build a more culturally sensitive and competent educational environment by sharing their perspectives and shaping our curriculum. For example, DACA students have provided unique insight on delivering care to immigrant populations, stemming from their understanding of both the American health system and the challenges immigrant families and communities often face. Our DACA students are often able to draw on their own and their family's experiences—in a way their peers cannot easily do—to provide context for the patient's choices and the right approach to delivering health care to that patient. As a medical educator, I believe that first-hand perspectives help all of our students to develop essential empathy and cross-cultural understanding that makes them better doctors for California's diverse population.

      7.      Our DACA students' unique perspectives have also driven specific improvements in our curriculum. Among the foundational concepts of our medical curriculum are understanding concepts like implicit bias, stereotype threat, and micro-aggressions. Our DACA students brought to UCLA Medicine's attention that some of our own case studies contained stereotypical descriptions and bias in the terms used to describe a minority patient and, in another case, a migrant worker. This started conversations about the existence of stereotypes and bias in the healthcare environment led by DACA students, which sparked changes to these cases in our curriculum.

DECLARATION OF DR. CLARENCE BRADDOCK III
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

8.      Because of the DACA policy rescission, I believe we will see fewer diverse applicants to our programs from students who would otherwise have received DACA. This frustrates UCLA Medicine's concerted effort to recruit diverse students through programs like Programs in Medical Education ("PRIME"). UCLA PRIME is a five-year concurrent/dual degree program focusing on the development of leaders in medicine by addressing policy, care and research in healthcare for medically underserved communities. We look for candidates who have leadership experience and are experienced with and committed to working with underserved populations. DACA students often have all of these qualifications. About one third of our current UCLA Medical DACA students are also PRIME program students. The rescission of the DACA policy frustrates UCLA Medicine's efforts to select and train these talented future leaders of medical care for Californians.

9.      Finally, I am concerned that the rescission of the DACA policy will have a broader negative impact on the UCLA community, particularly if any DACA recipients become the target of immigration enforcement. Recent news reports of immigration agents arresting undocumented individuals in courthouses and hospitals or near schools have already caused concern among our community. Our undocumented patients may choose to stay at home rather than seek the medical help they need in the face of this heightened immigration enforcement risk.

10.     The decision to rescind the DACA policy harms our DACA recipient students, their peers, UCLA Medicine, their future patients and our broader community.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017 in Los Angeles.

<br>

CLARENCE BRADDOCK III

# EXHIBIT BB

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF SHAWN BRICK** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and | CASE NO. 17-CV-05235-WHA |
| 2 | STATE OF MINNESOTA, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official | |
| 6 | capacity as Acting Secretary of the Department of Homeland Security, and the UNITED | |
| 7 | STATES OF AMERICA, | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. | |
| 13 | DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, | CASE NO. 17-CV-05380-WHA |
| 17 | VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT | |
| 18 | LATTHIVONGSKORN, | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President | |
| 22 | of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE | |
| 23 | DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 1 | COUNTY OF SANTA CLARA and |
| | SERVICE EMPLOYEES INTERNATIONAL |
| 2 | UNION LOCAL 521, |

CASE NO. 17-CV-05813-WHA

3                    Plaintiffs,

4             v.

5    DONALD J. TRUMP, in his official capacity
     as President of the United States, JEFFERSON
6    BEAUREGARD SESSIONS, in his official
     capacity as Attorney General of the United
7    States; ELAINE DUKE, in her official
     capacity as Acting Secretary of the Department
8    of Homeland Security; and U.S.
     DEPARTMENT OF HOMELAND
9    SECURITY,

10                    Defendants.

1 | I, SHAWN BRICK, DECLARE:

2 |     1.     I am the Associate Director for Student Financial Support at the University of California

3 | Office of the President ("UCOP"). The matters set forth herein are true and correct of my own personal

4 | knowledge and, if called as a witness, I could and would testify competently thereto.

5 | I have held various positions in student financial aid and admissions in the University of California

6 | ("UC") system for fifteen years and am currently the Associate Director for Student Financial Support at

7 | the UCOP. As Associate Director for Student Financial Support, my duties include policy analysis,

8 | development, and implementation. I am responsible for producing complex analyses, executive

9 | summaries, and talking points on UC enrollment and affordability of UC education.

10 |     2.     This declaration describes UC's population of undocumented students and students who

11 | have Deferred Action for Childhood Arrivals status ("DACA students"), and the financial investment

12 | UC has made in those students. It then explains the investment that UC expects undocumented and

13 | DACA students (and their families) to make in their own education. It then provides figures on UC's

14 | investment in graduate students. Finally, it provides the average debt of professional students upon

15 | graduation from UC. The rescission of the DACA program puts at risk the financial investment that UC

16 | and these students and families have made in their education.

17 |     3.     UC's mission includes provision of public undergraduate, graduate, and professional

18 | education. A key measure of our success is the percentage of entering students who complete their

19 | degrees. DACA students have earned their positions in programs at UC through their academic merit

20 | and accomplishments. UC invests in all its students, including DACA students, to enable them to

21 | continue their programs, complete their degree(s), graduate and become contributing members of

22 | society, including pursuing the careers for which UC trained them.

23 |     4.     As described below, the University has provided financial support to its DACA and

24 | undocumented students enrolled as of the 2016-2017 academic year in the cumulative amount of

25 | between approximately $87 million to $252 million since 2013. The same students and their parents

26 | would have to have invested approximately $73 million to $180 million over the same period.

27 |

28 |

**UC's Undocumented and DACA Students**

5.      As of the 2016-2017 academic year, UC had approximately 4,200 potentially undocumented students, of which approximately 1,700 students are likely to be DACA recipients.

6.      This assessment is based on an analysis of several criteria in our financial aid data that suggest students are undocumented, and additional criteria suggesting that they have DACA status. To approximate the 4,200 undocumented student population, I considered that undocumented students are not eligible for federal financial aid, but, if they are eligible for the California nonresident tuition exemption under California Assembly Bill 540 ("AB540") then undocumented students (and only undocumented students) may choose to file a California DREAM (Development, Relief, and Education for Alien Minors) financial aid application. For the 4,200 students who meet this criteria, I then applied additional criteria to approximate the subset of 1,700 students who appear to have DACA work authorization.

7.      This approach is likely to underestimate the number of undocumented students and, therefore, the number of students with DACA status at UC. For example, this figure would not include students who do not or cannot submit a California DREAM Act application for various reasons, or for whom we cannot identify likely work authorization for various reasons. It also excludes many graduate and professional students because the same criteria cannot be applied to accurately identify these students.

**UC and State Investment in DACA Students**

8.      Based on my assessments of undocumented and DACA student populations, I approximate UC's financial investment in these students cumulatively from 2013 to the 2016-2017 academic year, including state grants and other sources. UC awards financial aid to students on a non-discriminatory basis according to students' financial need, as they demonstrate that need by submitting a Free Application for Federal Student Aid ("FAFSA") (not applicable to undocumented students or DACA students, who are ineligible for federal aid) or a California DREAM Act application.

9.      UC has invested cumulatively between $87 million (based on the DACA only estimate of 1,700 students) and $252 million (based on the 4,200 undocumented estimate) in the DACA students

1   who were pursuing degrees at UC as of the 2016-2017 academic year (based on dollar figures from

2   preliminary 2016-2017 data). This is the approximate, cumulative investment in the cohort of

3   undocumented and DACA students enrolled as of 2016-2017 at UC, over the course of their enrollment

4   at UC from 2013 to the 2016-2017 academic year. The estimates are from 2013 onward because this was

5   the earliest year that California DREAM Act data was received by UC, and it was this data that enabled

6   me to assess the populations of undocumented and DACA student populations as described above.

7

8                    **UC Expectation of Student and Parent Investment in DACA Students' Education**

9          10.     All students and their parents are expected to invest in paying for the student's college

10  education. UC's financial aid policy for undergraduates approaches paying for the total cost of

11  attendance (tuition, fees, living expenses, books and supplies) as a partnership between parents, students,

12  state and federal governments, and UC. Parents and students are expected to contribute based on their

13  resources as reported on either the FAFSA (not applicable to undocumented students or DACA students,

14  who are ineligible for federal aid) or the California DREAM Act application. UC then uses the same

15  formula for all students to determine financial aid, based on demonstrated financial need. The average

16  expected parent contribution for the 4,200 undocumented students was roughly $700 per year, as

17  calculated using this same formula for all students, based on financial need.

18         11.     UC also expects all students that are financial aid recipients to contribute "self-help"

19  amounts to their education through work or loans in the amount of $10,000 per year. Many students

20  who have DACA work authorization hold jobs to satisfy this portion of their financial obligation.

21  Without DACA work authorization, it will be much more difficult for undocumented students to satisfy

22  the self-help contribution that UC expects of all students.

23         12.     The combined expected family investment is therefore $10,700 per year by students and

24  parents, or $42,800 for a completion of a four-year undergraduate degree. For our DACA and

25  undocumented students, this totals between approximately $73 million (based on the DACA-only

26  estimate of 1,700 students) and $180 million (based on the 4,200 potentially undocumented estimate).

27

28

**Average Investment Graduate Academic and Professional Students**

13.     Because financial aid often works differently in UC graduate and professional programs, I am unable to accurately estimate our population of undocumented or DACA graduate and professional students based on financial aid records. However, UC believes that there are enrolled graduate and professional students who are DACA students.

14.     The University invests heavily in its graduate academic and professional students. In 2015-2016, UC paid $523 million in University-funded fellowships to all of its graduate and professional students.

15.     Graduate students are primarily supported through fellowships and employment as research and teaching assistants. In 2015-2016, UC's graduate academic students received an average combined fellowship and assistanceship award of more than $37,000 per student per year, including any graduate DACA students.

16.     By contrast, professional degree students primarily finance their degree by investing themselves through student loans. The UCOP tracks student loan borrowing patterns by professional students to estimate students' debt incurred for their own degrees. The average student loan debt for professional students is as follows, by program:

**Average Professional Student Debt Upon Graduation**

| Degree Type | Cumulative Borrowing, 2015-2016 Graduating Cohort |
|---|---|
| Law | $124,000 |
| MBA | $81,000 |
| Medicine | $154,000 |
| Education | $37,000 |
| Other Health Professions | $112,000 |
| Other Non-Health | $54,000 |

17.     Without DACA, it will be difficult if not impossible for many of these graduate and professional students to complete their degrees and then to repay their significant debt from those degrees. Some of these degrees require work experience as a condition of graduation, such as a researcher or graduate student instructor. Further, without DACA, these students will lose the

4

1  employment authorization that enabled them to work in their chosen profession at a salary

2  commensurate with the debt incurred for their advanced degree.

3

4  **Conclusion**

5      18.    As indicated above, this assessment of investments of UC and its students in their

6  education are conservative in many respects and the actual investment in undocumented and DACA

7  students is likely greater.

8      19.    The rescission of DACA puts in jeopardy the cumulative financial investments in the

9  education of these talented students by the UC, the State of California, their families and the students

10  themselves, as well as the ability of students to repay the debt incurred to pursue their education.

11      I declare under penalty of perjury under the laws of the United States that the foregoing is true

12  and correct.

13      Executed on October 23, 2017 in Oakland, California.

14

15

16

17                             SHAWN BRICK

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT CC

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DR. ROBIN HOLMES-SULLIVAN** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

I, ROBIN HOLMES-SULLIVAN, DECLARE:

1.      I am the Vice President for Student Affairs at the University of California ("UC"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      In my role as Vice President, I oversee the overall student experience across UC's campuses, and I work closely with the UC President and Provost in efforts to enhance the diversity, experiences, and successes of UC students, especially undergraduate students. This includes not only overseeing the UC undergraduate application process for admissions and financial support program, but also monitoring diversity and campus climate, overseeing student mental health and wellness, overseeing policies guiding student conduct, student activities, admissions and financial aid, and also serving as an intermediary between UC campuses, UC Office of the President, and student groups/leadership. In my role, I visit all UC campuses on a regular basis, where I meet and talk with faculty, staff and students. My office provides overall guidance and support to a plethora of Presidential Initiatives carried out on each of the campuses, including the President's Advisory Council on Undocumented Students, Student Veterans, LGBT Students, Faculty and Staff, the Global Climate Leadership Council, the California Community College Transfer Initiative, and the Global Food Initiative, to name a few. I enjoy a close working relationship with different individuals across our campuses, including student leaders and each Vice Chancellor of Student Affairs.

3.      In my role, I have observed and heard firsthand about the abilities and experiences of DACA students, as well as how the announced rescission of the DACA policy has affected them. UC data shows that with the implementation of DACA in 2012, the first-year persistence rate (i.e., percent of students continuing on to the second year) increased significantly for these students who could count on receiving financial aid, and no longer feared deportation.

4.      Our DACA students are very talented and make important contributions to the State of California and the United States as a whole. From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest

1

study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia. The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans (https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/).

5. Additionally, our undocumented and DACA graduate students make amazing contributions to medicine and technology, including through discoveries that have the potential to help communities throughout California. For instance, one of our former DACA PhD students researched the indicators for sudden cardiac death—the leading natural cause of death in Americans. This vital research has the potential to save countless lives.

6. Due to their talent and chosen fields of study, DACA students serve as academic role models to other students across UC's campuses. DACA students at all 10 of the campuses serve as teaching assistants ("TAs"). There are, for instance, four DACA-recipient PhD students at UC Merced who work as TAs. At UC Merced, 55 percent of the baccalaureate degrees awarded are in science, technology, and math, and several of the DACA PhD students' focuses lie in those fields. The industries that students and graduate students with science, technology, or math degrees enter are among the least diverse sectors of the economy (http://www.air.org/sites/default/files/downloads/report/AGEP_Lit_Review_10-26-09_0.pdf), and part of both the University and UC Merced's mission to diversify historically non-diverse industries. Our DACA-recipient TAs not only promise to diversify those fields upon entering the workforce, but they also serve as inspiration to the diverse undergraduate students in their classes that careers in those fields are attainable for them, too.

7. Our undocumented and DACA students' influence is not limited to the classroom. Many serve as role models in the broader community. Some of our campuses are located in regions of the state where a fair percentage of K-12 students are undocumented youth or members of the migrant farm community. We have DACA-recipients who volunteer at these K-12 schools, showing local children that a college education is attainable and worthwhile.

8.      UC values diversity, and exposure to other perspectives is a critical part of a complete education. Developing robust cultural competency requires exposure to different cultures and viewpoints, and exposing others to the viewpoints of DACA recipients is an important component of that. Indeed, our undocumented and DACA students are vital members of our community. We have DACA students who serve as leaders of local chapters of national Greek Societies and in various student clubs, are influential student leaders and serve in student government, and are heavily involved in important events, such as performing the national anthem at school commencements. Through this engagement—both in the classroom and around campus—DACA students interact with many people and are able to share their unique perspectives with them. This enriches the social and educational environment for all. The valuable cultural exchange would be impoverished if undocumented students—including DACA recipients—were not on campus or were not as willing to share their stories and perspectives.

9.      DACA recipients are often model students on campus and are valuable to UC. Not only do undocumented students perform very well academically, but also they are highly involved in other aspects of student life and have few disciplinary issues.  For example, at UC Santa Barbara, University Service Awards are given each year to recognize the contributions and achievements of outstanding graduating seniors and graduate students who have performed above and beyond the call of duty in service to the University, the student body, and the community or have succeeded while facing extraordinary challenges.  For the 2016-17 year, several of the annual University Service Awards were given to DACA recipients.

10.      The announcement to rescind the DACA policy has created several harms. Our students report stressors ranging from a fear of deportation, increased discrimination, and the possibility of being unable to continue their studies. The most instantly recognizable impact for me—other than the various psychological and emotional strains our DACA recipients report—is our current inability to provide our students with the counseling resources they need.

11.      I have spoken with DACA students who are afraid that they or their family members will be detained or deported. One DACA student explained that she did not feel safe driving from campus to her parents' house because doing so required passing through an immigration checkpoint. She is afraid

3

that immigration officers will learn her identity and follow her home or to campus. Not only is she scared, but her fear is preventing her from visiting her family, a valuable support network for her. This is not a unique story. This climate of fear has intensified since the announcement to rescind the DACA policy.

12.     We have observed an increase in anti-immigrant incidents on campus following the 2016 presidential election and the announcement to rescind DACA. On multiple occasions, racist posters targeted at immigrants have been put up on campuses overnight. There have also been several incidents where UC students are presumed to be immigrants and yelled at that they "do not belong" and that they should "go home." Our DACA students are afraid that they will be harassed or attacked because of their immigration status or the fact that they "look like immigrants."

13.     The uncertainty of being able to pay for school is also a significant source of stress for our students. Financial aid often covers part of the full tuition for DACA students, but students are expected to pay for some of the cost—approximately $10,000—out of their own pockets. Many DACA recipients thus rely on their ability to work, pursuant to work authorization, to pay for this cost of attendance. Beyond the need to support themselves, some DACA recipients work to provide for their families. When this is the case, some DACA students view school as a lower priority than working to earn as much as possible before their DACA status—and consequently their work authorization—ends.

14.     One consequence of all these stressors is that DACA students are presently unable to focus on their studies with the same intensity that they have in the past. I have heard from academic counselors who have observed a dip in the academic performance of DACA recipients since the rescission was announced. Professors are also concerned and report that many DACA students have reached out to them to report difficulty studying, completing assignments or focusing on their school work due to the stress they are experiencing. Our campus support staff have received a flood of emails from faculty who are concerned for their DACA students and are unsure how best to support them. We are working diligently to train our teachers about what resources exist and what they can do personally to help our DACA students.

15.     The stress caused by rescission of the DACA policy has resulted in a dramatic increase in the number of requests from DACA students for mental health services. For example, at UC Merced,

over the weeks following the announcement to rescind DACA, demand for counseling services more than doubled from 11% of the total student population to 23% of the student population. At UC Berkeley, the number of appointments and walk-ins for mental health counseling increased by 90% following the announcement.

16.     I have also heard from my staff and from DACA students themselves that we need psychologists and other experts who are familiar with the challenges faced by undocumented individuals. Again, we are devoting time and rerouting resources to address this. Doing so undoubtedly places more demands on these services by the campus community as a whole. On some campuses we have increased the number of full-time staff members and hired more peer counselors to staff our mental health facilities. We have also reached out to our local contacts and brought in attorneys to run "know your rights" workshops. We have also invested time and money into our UndocuAlly training program, through which we teach our counselors and some of our faculty about what it means to be undocumented in this country. This better prepares our staff to provide our DACA students the services they need.

17.     Our staff is working tirelessly to address the acute demand for services following the announcement to rescind the DACA policy. I have observed the increased hours and emotional toll that this has had on our staff as they try to provide DACA students with information and support, and I am concerned that staff members will burn out and seek employment elsewhere.

18.     I and some of my colleagues are also concerned that the uncertainty surrounding the DACA policy will result in a loss of current and future students. For example, I have heard that two undergraduate students at UCLA called to cancel their enrollment after DACA's rescission was announced. I have heard from several Vice Chancellors who are preparing for the possibility that DACA students will leave on an upcoming break from classes and will not return to school. Some of these students may decide not to return due to a desire to work and support their families while they can or to minimize the student debt they accrue before their DACA status expires. For others, though, the choice is out of their hands. Some families are deciding to leave the country and are taking their children with them. Still others depend on their DACA status for basic necessities. We have at least one DACA student who serves as a resident advisor, a position that comes with room and board but requires work

authorization. If this student loses their work authorization—which they will when their DACA status expires—they will lose their home.

19.     Our PhD students and others will not be able to continue as TAs without work authorization. Being a TA is a full-year commitment, and part of a TA's compensation is graduate school tuition reduction. When these students lose DACA status, they can no longer be employed as TAs, and their tuition will be higher, directly impacting their ability to pay for graduate school. UC will also have to scramble to find replacement TAs to take over teaching responsibilities mid-term. This, like our other efforts, will require time, energy, and money on UC's part. But beyond the administrative costs, losing our DACA TAs also deprives us of their impact as role models to diverse undergraduates who might be considering advanced degrees in historically non-diverse fields. Accordingly, if we lose these diverse PhD candidates, then our commitment to diversifying these fields is harmed.

20.     I, my staff, and the high school counselors we interact with are all concerned about a possible decrease in the number of undocumented applicants to UC as a result of the uncertainty created by the rescission of DACA. High school students are concerned about whether they will be accepted by their peers and the institution. They are also worried about the financial burden. As discussed, UC students need to cover some of the cost of attendance, and high school students are worried that, without work authorization, they will be unable to support themselves through school.

21.     We are trying to respond to the possible loss of both current and future students by creating focused communication campaigns. Currently, we are ramping up our efforts to convince our current students that they belong here and that we are doing all we can to provide them the institutional support they need. One of our staff members is spending time writing and sending out weekly updates discussing DACA-related news and campus resources. Vice Chancellors are spending time personally reaching out to donors, trying to raise money that we can provide to undocumented students and DACA-recipients as stipends or grants.

22.     In addition to diverting money, we are also spending time and energy making sure that qualified high school students who would normally apply to UC still do so this year. We have hosted outreach conferences around the state in order to provide information to address the current confusion and concern that exists among high school counselors and their students. Nevertheless, the fear and

uncertainty looms large and, according to our outreach counselors, is having a negative impact on the recruitment of students who have DACA, despite our positive messages.

23.     We are also trying to secure replacement housing for the DACA RA who faces the looming threat of losing their home. Thus, we are rapidly diverting resources to address these serious, imminent harms.

24.     We are not the only institution that has recognized these pending harms, but we are quickly deploying our resources to address them. Other educational institutions like local community colleges and high schools are concerned about the same issues and have reached out to us for help and advice creating their own resources or borrowing from our approach.

25.     UC recognizes that the institution and broader community are harmed if we lose current students and qualified future students. By losing our undergraduate and graduate DACA students and by missing out on qualified students who would otherwise attend, we are losing inspiring individuals who have served as role models to various kinds of students, brilliant minds, and a source of diversity that is important to building cultural competency and diversifying traditionally non-diverse professions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017 in Oakland, California.


DR. ROBIN HOLMES-SULLIVAN

# EXHIBIT DD

Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the University
of California*

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (SBN 132099)
tboutrous@gibsondunn.com
ETHAN D. DETTMER (SBN 196046)
edettmer@gibsondunn.com
JESSE S. GABRIEL (SBN 263137)
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone:  (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara
and Service Employees International Union
Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JANET NAPOLITANO** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | Defendants. | |
| 15 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 16 | | |
| 17 | | |
| 18 | Plaintiffs, | |
| 19 | v. | |
| 20 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  COUNTY OF SANTA CLARA and                    CASE NO. 17-CV-05813-WHA
   SERVICE EMPLOYEES INTERNATIONAL
2  UNION LOCAL 521,

3              Plaintiffs,

4          v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10             Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1 | I, JANET NAPOLITANO, DECLARE:

2 |     1.    I am President of the University of California ("UC") and have served in that
3 | position since September 2013; before that, I served as the United States Secretary of Homeland
4 | Security under President Barack Obama from 2009-2013. Unless otherwise explicitly stated, I
5 | have personal knowledge of the matters set forth in this Declaration and could competently testify
6 | to them if called as a witness.

7 |     2.    As Governor of Arizona, Secretary of the U.S. Department of Homeland Security
8 | ("DHS"), and now president of the largest public research university system in the world, I have
9 | seen the consequences of our broken immigration system at every level. Understanding these
10 | problems and recognizing that our nation's immigration laws were not designed to be blindly
11 | enforced without consideration given to the individual circumstances of each case, on June 15,
12 | 2012, I launched a new policy at DHS to establish a clear and efficient process for exercising
13 | prosecutorial discretion, on an individual basis, by deferring action against individuals who passed
14 | an extensive background check and met other exacting criteria. This policy was Deferred Action
15 | for Childhood Arrivals (DACA).

16 |     3.    The policy put in place a rigorous application and security review
17 | process. Applicants for DACA were only approved if they were in or had graduated from high
18 | school or college, were in the military, or were an honorably discharged veteran. They cannot have
19 | been convicted of a felony or significant misdemeanor or otherwise posed a threat to national
20 | security or public safety to receive DACA. To date, DACA has protected from deportation nearly
21 | 800,000 individuals (referred to as "Dreamers") who qualify under the terms of the policy.

22 |     4.    Protecting these Dreamers, who were brought as children to the United States and
23 | in many cases do not know the country where they were born or speak its language, has, in my
24 | view, proven to be a smart, effective policy. It directs the U.S. Government's limited law
25 | enforcement resources to be spent on those who pose a risk to our communities, not on those who
26 | contribute to our state and national economies.

27 |

28 |

1

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1 **DACA Student and Staff Contributions to the University**

2      5.      UC admits undergraduate and graduate students on the basis of their individual
3 achievements and without regard to their immigration status. I understand that UC currently has
4 approximately 4,000 undocumented students who have earned their place in the UC student body.
5 Most of these students are the first in their families to attend college, and a substantial number of
6 them are DACA recipients. I understand that UC also has employees who are DACA recipients
7 who are not students.

8      6.      As an institution whose core mission is serving the interests of the State of
9 California, the University seeks "to achieve diversity among its student bodies and among its
10 employees." *See* Academic Senate of the Univ. of Cal., Regents Policy 4400: Policy of University
11 of California Diversity Statement, UNIV. OF CAL.: BOARD OF REGENTS,
12 http://regents.universityofcalifornia.edu/governance/policies/4400.html. The University recognizes
13 the importance of diversity to its academic mission, as it allows "students and faculty [to] learn to
14 interact effectively with each other, preparing them to participate in an increasingly complex and
15 pluralistic society." *Id.* The educational experience of all University students is fuller and more
16 enriching when ideas are "born and nurtured in a diverse community." *Id.*

17      7.      DACA students at the University are an integral part of our community. Their
18 talent, perspectives, and experiences are invaluable contributions to University life.

19      8.      DACA recipients also make significant contributions to University life in their role
20 as employees. They fill crucial roles at UC campuses and in UC medical centers as teaching
21 assistants, research assistants, post-docs, and health care providers. DACA recipients often possess
22 valuable foreign language skills.

23      9.      By allowing DACA recipients to work lawfully, DACA moved recipients out of the
24 informal economy, increasing the pool of talent from which UC could fill positions at the
25 University.

26      10.      DACA recipients who are enrolled as students rely on their earnings to support
27 themselves and cover a portion of their tuition and total costs of attendance through their part-time

2

28                      DECLARATION OF JANET NAPOLITANO
             All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   work. UC expects all of its students to contribute some funding to their studies in this way. For
2   many of these students, DACA work authorization plays a significant role in their ability to attend
3   UC and to continue each year with their chosen program of study.

4       11.     The University has invested considerable resources in recruiting and retaining these
5   individuals—as students and employees. It has made scarce enrollment space available to these
6   students on the basis of their individual achievements. It also has invested substantial time,
7   financial aid, research dollars, housing benefits, and other resources in them on the expectation
8   that these students—like other students—will complete their course of study and become
9   productive members of the communities in which the University operates, and other communities
10  throughout the nation. The University has significant interests in retaining this wealth of talent and
11  in continuing to enjoy the many benefits of their participation in University life.

12      12.     Furthermore, by allowing recipients to receive deferred action and obtain work
13  authorization, DACA opened myriad opportunities to them. As noted above, DACA recipients
14  became eligible for federal work authorization, which significantly improved their opportunities
15  for employment and higher paying jobs. Under the program, DACA recipients received social
16  security numbers and therefore were able to open bank accounts. DACA also enabled recipients to
17  obtain driver's licenses in a number of states where they otherwise could not. It also protected
18  these individuals' right to travel freely by making them eligible to receive "advance parole,"
19  which allowed them to travel abroad temporarily for humanitarian, educational, or employment
20  purposes, and to return to the United States lawfully. *See* 8 C.F.R. § 212.5(f); USCIS FAQs.
21  DACA students rely on their ability to travel freely (domestically and abroad) to take full
22  advantage of the opportunities UC offers its students and to expand the contributions they make to
23  the education, research and service mission of the University.

24  **Negative Impact of DACA's Rescission**

25      13.     Defendants' decision to rescind the program will have immense and devastating
26  effects on the University and all of its students. As a result of the termination of the program, the
27  University and its students will lose the vital contributions that DACA recipients have made as

3

28                          DECLARATION OF JANET NAPOLITANO
                   All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1    students and employees. The civic life of the school will be diminished, the exchange of ideas will

2    be reduced, teaching and research will be impaired, and diversity of viewpoints and experiences

3    will be reduced. The University and its students benefit from cohesive family units, robust civic

4    participation, and the strength of social and educational communities. The rescission damages

5    each of these interests, in California and nationwide.

6        14.      The University also will lose the resources it has spent educating students who

7    ultimately are unable to graduate.

8        15.      As a result of the rescission, DACA students will be unable to work to pay their

9    tuition and other expenses. Students subject to these hardships may be forced to withdraw from

10   UC altogether.

11       16. ·     DACA recipients also will be at risk of removal. Indeed, in a set of "Talking

12   Points" released the same day of the rescission, DHS "urge[d] DACA recipients to use the time

13   remaining on their work authorizations to prepare for and arrange their departure from the United

14   States." *See* Talking Points—DACA Rescission. Removal will self-evidently result in the loss of

15   employment, education, and relationships with others in the United States.

16             I declare under penalty of perjury under the laws of the United States that the

17   foregoing is true and correct.

18             Executed on *Oct*. 23, 2017, at Oakland California.

19

20                                 JANET NAPOLITANO

21

22

23

24

25

26

27                                    4

28                DECLARATION OF JANET NAPOLITANO
            All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT EE

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF DIANA TELLEFSON** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | CASE NO. 17-CV-05813-WHA |

I, Diana Tellefson, declare and state as follows:

1. I am the Executive Director of the UFW Foundation, a nonprofit, § 501(c)(3) organization dedicated to serving farm workers and immigrants in some of the most isolated and underserved communities in California. The UFW Foundation's mission is to open the doors of opportunity to working people and their communities. The UFW Foundation has 5 offices in California in the cities of Los Angeles, Bakersfield, Fresno, Salinas, and Oxnard. The UFW Foundation has been working for over 10 years on immigration policy, advocacy, legal services, and grassroots community education.

2. The UFW Foundation has a Service Center program staffed by twenty-two Department of Justice, Office of Legal Access Programs ("OLAP") Accredited Representatives who provide immigration legal services to immigrant Californians. The UFW Foundation is the nonprofit with the largest number of OLAP accredited representatives in agricultural regions in California, and serves over 60,000 immigrants annually.

3. The UFW Foundation's immigration team has focused on assisting individuals prepare the documentation and paperwork necessary for DACA applications and renewals. Given the isolated communities that the UFW Foundation serves, the organization's limited staff and resources is unable to fully meet the high demand for its services.

4. UFW Foundation currently offers regular DACA clinics and in-office appointments throughout California and assists DACA-eligible individuals by providing comprehensive immigration screenings to Californians. Since 2012, the UFW Foundation has assisted with over 4,140 DACA applications on behalf of its clients. The UFW Foundation assists its DACA-eligible clients with initial applications as well as renewals.

5. Over 250 UFW Foundation clients have DACA that expires between September 5, 2017 and March 5, 2018 and are therefore subject to the mandatory October 5, 2017 renewal deadline. Some of these UFW Foundation clients have received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires. Defendants' notices have made no mention of the October 5, 2017

2

deadline. None of these UFW Foundation members or clients have received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

6. Several UFW Foundation clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications. Most of them were in the process of assembling the documentation and filing fees necessary to satisfy the DACA eligibility requirements. Other youth clients of UFW Foundation were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance.

7. UFW Foundation's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources. Defendants' planned unlawful termination of the DACA program has already directly harmed UFW Foundation by causing the organization to divert its resources from other time sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, and to conduct additional screenings of its clients (members and non-members) to determine whether they are eligible for other forms of immigration relief.

8. Since September 5, 2017, the UFW Foundation has extended its hours and accommodated all potential applicants that walked into its offices to be able to assist DACA renewal applicants that would not be needed if Defendants had not terminated the program. Our staff had to divert our already limited resources and staff to be able to help as many people as possible with such a short timeline. This has also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on other active cases.

9. In addition, UFW Foundation's Service Center team has expended its limited resources creating know-your-rights materials, answering calls, addressing walk-in questions, and mailing renewal applications.

3

Declaration of Diana Tellefson
Case #17-5235

10. UFW Foundation has spent additional money on priority shipping fees for renewal applications to ensure they arrive by the October 5 deadline. Additionally, to complete the applications, the organization has incurred other unexpected administrative costs.

11. The rescission of DACA also impacts my organization in a different way. Because my organization employs four (4) DACA recipients, the organization will need to incur the administrative burden of terminating the employment of these individuals when their DACA expires, and expending resources to find, hire, and train replacement employees. The loss of these valued employees and associated costs will impact the productivity of our organization.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 10, 2017 in Los Angeles, CA.

DIANA TELLEFSON

4

Declaration of Diana Tellefson
Case #17-5235

# EXHIBIT FF

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF NATALIE CARDENAS** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and | CASE NO. 17-CV-05235-WHA |
| 2 | STATE OF MINNESOTA, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official | |
| 6 | capacity as Acting Secretary of the Department of Homeland Security, and the UNITED | |
| 7 | STATES OF AMERICA, | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. | |
| 13 | DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, | CASE NO. 17-CV-05380-WHA |
| 17 | VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT | |
| 18 | LATTHIVONGSKORN, | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President | |
| 22 | of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE | |
| 23 | DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF NATALIE CARDENAS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and | CASE NO. 17-CV-05813-WHA |
| 2 | SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON | |
| 6 | BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United | |
| 7 | States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department | |
| 8 | of Homeland Security; and U.S. DEPARTMENT OF HOMELAND | |
| 9 | SECURITY, | |
| 10 | Defendants. | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF NATALIE CARDENAS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**DECLARATION OF NATALIE CARDENAS**

I, NATALIE CARDENAS, declare as follows:

1.      I am a legal assistant at the Garcia Law Firm in Chula Vista, California.  The Garcia Law Firm, headed by Dulce Garcia, offers representation to clients in immigration, civil litigation, and criminal defense cases.  I have had this position since July 31, 2017, and my responsibilities include assisting Dulce with drafting declarations, client intake, correspondence and accounting, and various discovery-related tasks, such as production of documents.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

3.      I graduated from San Diego State University in May of 2017, with a bachelor's degree in criminal justice and a minor in psychology.  I plan to go to law school to realize my life-long dream of becoming a lawyer.

4.      I have come to know Dulce quite well because I work with her on a daily basis.  She supervises my work and I regularly observe her interacting with clients and potential clients.  I consider her a mentor because we have had numerous conversations about my career ambitions.  I admire her and find her truly inspiring.  She has shown me that my dream of becoming a lawyer is within reach.

5.      As an aspiring lawyer, I have been fortunate to observe Dulce and learn how a lawyer should carry herself and what it means to be an effective advocate.  Dulce is also a role model for me because she comes from a disadvantaged background, just like I do, and yet she has overcome this and other obstacles to be where she is now—a successful lawyer with her own thriving law practice.

6.      Dulce has a unique ability to connect to her clients, and the manner and competence with which she communicates with them have taught me what it means to be a good lawyer.  Moreover, the fact that she herself is a Latina immigrant enables her to foster trust with clients from similar backgrounds who come to her for help with immigration issues.

7.      Dulce is selfless.  Even with her busy schedule, she always finds time for community service and pro bono work.  For example, despite the fact that she has been going through a lot of stress herself as a DACA recipient who may lose her status due to the government's announcement that it will rescind DACA, she held two free informational workshops for other DACA recipients.  At these

1   workshops, which were held on September 16 and September 23, 2017 at our office in Chula Vista,
2   Dulce assisted DACA recipients with filling out their DACA renewal applications for free. I assisted
3   Dulce during one of these workshops.
4          8.      I have had numerous and lengthy conversations with Dulce about the many hardships she
5   has experienced as an undocumented immigrant and what it has meant for her to have DACA status.
6   Dulce has explained to me that, because she did not have legal status growing up, she struggled to obtain
7   things that were easily accessible to others. For example, because Dulce did not have a social security
8   number, she told me that she was not eligible to obtain a California driver's license and therefore could
9   not drive. She told me that her high school guidance counselor told her to give up her dreams of going
10  to college because she was an illegal immigrant. She also told me that not having valid work
11  authorization prevented her from obtaining internships and jobs, like the rest of her peers were doing
12  around her. Despite these obstacles—and on top of growing up poor—Dulce told me how she worked
13  her way through college and law school.
14         9.      Since getting her DACA status, Dulce has established her own law firm with two
15  offices—one in San Diego and another in Chula Vista, which she recently opened. Between the two
16  offices, Dulce currently has over 70 active cases. Over half of these pending cases are immigration-
17  related. The majority of the firm's clients are native Spanish speakers. Dulce has told me that, as an
18  immigrant, she feels an obligation to practice immigration law to help individuals in her community. In
19  fact, she told me that she opened her second office in Chula Vista because Chula Vista has a larger
20  concentration of immigrants than San Diego, and therefore there is a greater need for immigration
21  lawyers.
22         10.     During our numerous conversations, Dulce has also told me that she relied on her DACA
23  status and the ability to renew that status to invest her time and resources into establishing her law firm
24  in San Diego. In connection with opening her own law practice, Dulce has hired employees and has
25  made obligations to represent clients. Dulce currently has over 70 active cases, so over 70 clients are
26  relying on Dulce to represent them in their legal disputes.
27         11.     It is devastating for me to think that if Dulce's DACA status is rescinded, she may be
28  deported and lose everything she has accomplished, including her law practice, which is her livelihood

1   and the culmination of her lifetime dream.  If she were to be deported to Mexico, she would also lose her

2   family, friends, and community in the United States.  She has also told me that she has no family or

3   friends in Mexico, so she will have to start a new life there from scratch and without any support.

4       12.     If Dulce's DACA status is terminated, I also fear that I will lose my job.  The majority of

5   Dulce's clients are those with immigration cases and Dulce would be putting herself at risk for

6   detention by immigration authorities if she attended her client's immigration hearings.  Therefore, my

7   understanding is that a significant portion of Dulce's clients will have to find other lawyers to represent

8   them if Dulce loses her DACA status.  Since Dulce pays me my salary out of the fees she collects from

9   paying clients, Dulce will be unable to pay my salary if she does not have enough clients.

10       13.     If Dulce loses her DACA status, not only would I lose a job I love and that provides me

11   with a good income, but I would lose an important mentor and friend who has already enriched my life

12   in so many ways.

14      I declare under penalty of perjury under the laws of the United States of America that the

15   foregoing is true and correct.

16      Executed on October 27, 2017, in San Diego, California.

18

19                          *Natalie Cardenas*

                             NATALIE CARDENAS

3

DECLARATION OF NATALIE CARDENAS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)