# EXHIBIT NN

1             UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4

THE REGENTS OF THE UNIVERSITY OF   ) Case No.
5    CALIFORNIA and JANET NAPOLITANO,  ) 17-CV-05211-WHA
in her official capacity as        )
6    President of the University of     )
California,                        )
7                                       )
Plaintiffs,              )
8                                       )
v.                  )
9                                       )
U.S. DEPARTMENT OF HOMELAND         )
10   SECURITY and ELAINE DUKE, in her   )
official capacity as Acting        )
11   Secretary of the Department of     )
Homeland Security,                 )
12                                       )
Defendants.              )
13   ----------------------------------)
14
15                    - - -
16            Friday, October 13, 2017
17                    - - -
18
19       Videotaped deposition of JAMES D. NEALON,
20   taken at the offices of Covington & Burling,
21   850 Tenth Street NW, One City Center,
22   Washington, D.C., beginning at 7:32 a.m., before
23   Nancy J. Martin, a Registered Merit Reporter,
24   Certified Shorthand Reporter.
25

```
                                              Page 154
 1   process privilege.

 2           I instruct the witness not to answer.

 3           MR. BERENGAUT:  Sorry.  I was receiving a

 4   note to adjust the microphone on my tie.

 5           MR. GARDNER:  Everyone's a critic.

 6           MR. BERENGAUT:  Is that better?

 7           THE VIDEOGRAPHER:  Yes.  Thank you.

 8           MR. BERENGAUT:  Thank you.

 9       Q.  Let me ask you about some other policy

10   benefits of DACA.  Are you aware that DACA recipients

11   serve in this country's armed forces?

12       A.  Yes.

13       Q.  Would you say their service is a policy

14   benefit of DACA?

15       A.  We certainly thank them for their service,

16   and anyone who serves in our military deserves our

17   gratitude.

18   BY MR. BERENGAUT:

19       Q.  Can you think of any other -- now that we've

20   had a couple of other examples, any other policy

21   benefits of DACA?

22       A.  Not off the top of my head.

23       Q.  Do you have an understanding of what

24   "litigation risk" is?

25       A.  Some understanding.
```

1      Q.   What is your understanding?

2      A.   Simply that.  That policy may be at the risk

3  of litigation.

4      Q.   And when you earlier described what you

5  called the "threat to DACA," would that be an example

6  of litigation risk, in your understanding?

7      A.   That's what I was referring to.

8      Q.   Setting aside DACA, are you aware of any

9  other existing policy in your service in government

10  that was rescinded because of litigation risk?

11      A.   Nothing occurs to me.

12      Q.   Are you aware of administration policy goals

13  in the immigration context apart from the rescission

14  of DACA?

15      A.   Yes.

16      Q.   What understanding do you have of those

17  goals?

18      A.   I think the administration's general goals

19  related to administration emphasize the enforcement of

20  our laws.  That's the best way to describe the

21  administration's approach towards immigration.

22      Q.   Are you aware of an administrative --

23  administration policy goal of constructing a wall on

24  the border between the United States and Mexico?

25      A.   I am.

Page 198

1              C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15                    _____

                     Nancy J. Martin, RMR, CSR

16

17   Dated:  October 16, 2017

18

19

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying shorthand reporter.)

24

25

# EXHIBIT OO



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

_____

Office of the Commissioner                   *425 I Street NW*
                                              *Washington, DC 20536*


NOV 17 2000



MEMORANDUM TO REGIONAL DIRECTORS
                              DISTRICT DIRECTORS
                              CHIEF PATROL AGENTS
                              REGIONAL AND DISTRICT COUNSEL

FROM:        Doris Meissner
             Commissioner
             Immigration and Naturalization Service

SUBJECT:     Exercising Prosecutorial Discretion

      Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion. This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions. <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position. In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

      More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

_____

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

Memorandum for Regional Directors, et al.                                    Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's <u>United States Attorneys' Manual</u> (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings. INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

Memorandum for Regional Directors, et al.                                           Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or
officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive
any legal requirements that apply to the action itself.  For example, an enforcement decision to
focus on certain types of immigration violators for arrest and removal does not mean that the INS
may arrest any person without probable cause to do so for an offense within its jurisdiction.
Service officers who are in doubt whether a particular action complies with applicable
constitutional, statutory, or case law requirements should consult with their supervisor and obtain
advice from the district or sector counsel or representative of the Office of General Counsel to
the extent necessary.

        Finally, exercising prosecutorial discretion does not lessen the INS' commitment to
enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore
the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our
mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

        Like all law enforcement agencies, the INS has finite resources, and it is not possible to
investigate and prosecute all immigration violations.  The INS historically has responded to this
limitation by setting priorities in order to achieve a variety of goals.  These goals include
protecting public safety, promoting the integrity of the legal immigration system, and deterring
violations of the immigration law.

        It is an appropriate exercise of prosecutorial discretion to give priority to investigating,
charging, and prosecuting those immigration violations that will have the greatest impact on
achieving these goals.  The INS has used this principle in the design and execution of its border
enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing
benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under
appropriate principles, rather than devoting resources to cases that will do less to advance these
overall interests, is a crucial element in effective law enforcement management.

        The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the
concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution
if "*no substantial Federal interest would be served by prosecution*."  This principle provides a
useful frame of reference for the INS, although applying it presents challenges that differ from
those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal
responsibility, the option of an adequate alternative remedy under state law is not available.  In
an immigration case, the interest at stake will always be Federal.  Therefore, we must place
particular emphasis on the element of substantiality.  <u>How important is the Federal interest in the
case, as compared to other cases and priorities</u>?  That is the overriding question, and answering it
requires examining a number of factors that may differ according to the stage of the case.

As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4] The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

*Investigations*

Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious offenders will be identified.  Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention.  Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.

[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.

[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                    Page 6
Subject:  Exercising Prosecutorial Discretion


Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion.  Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources.  As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens.  Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

### _Initiating and Pursuing Proceedings_

Aliens who are subject to removal may come to the Service's attention in a variety of ways.  For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry.  While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case.  This is true even when an alien is removable based on his or her criminal history and when the alien–if served with an NTA–would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law.  As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration.  However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation.  It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

- <u>Likelihood of ultimately removing the alien</u>:  Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- <u>Likelihood of achieving enforcement goal by other means</u>:  In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- <u>Whether the alien is eligible or is likely to become eligible for other relief</u>:  Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States.  The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- <u>Effect of action on future admissibility</u>:  The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- <u>Current or past cooperation with law enforcement authorities</u>:  Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- <u>Honorable U.S. military service</u>:  Military service with an honorable discharge should be considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- <u>Community attention</u>:  Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS.  Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds.  Public and professional responsibility will sometimes require the choice of an unpopular course.
- <u>Resources available to the INS</u>:  As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative.  For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.  There may be other factors, not on the list above, that are appropriate to consider.  The decision should be based on the totality of the circumstances, not on any one factor considered in isolation.  General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case.  In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may not be considered.  Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later.  It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways.  For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum).  In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly, the fact that an alien has <u>not</u> requested prosecutorial discretion should not influence the analysis of the case.  Whether, and to what extent, any request should be considered is also a matter of discretion.  Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

## Process for Decisions

### *Identification of Suitable Cases*

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise.  Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law.  Different offices face different conditions and have different requirements.  Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8]  In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                    Page 11
Subject:  Exercising Prosecutorial Discretion

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the favorable exercise of discretion to their attention for appropriate resolution.  To assist in exercising their authority, DDs and CPAs may wish to convene a group to provide advice on difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion.  These cases should then be reviewed at a supervisory level where a decision can be made as to whether to proceed in the ordinary course of business, to develop additional facts, or to recommend a favorable exercise of discretion.  Such triggers could include the following facts (whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly both within and between INS offices, this list of possible trigger factors for supervisory review is intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to suggest that the presence or absence of "trigger" facts should itself determine whether prosecutorial discretion should be exercised, as compared to review of all the relevant factors as discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended solely as a suggested means of facilitating identification of potential cases that may be suitable for prosecutorial review as early as possible in the process.

*Documenting Decisions*

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision should be clearly documented in the alien file, including the specific decision taken and its factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial discretion favorably, such as not placing him or her in removal proceedings or not pursuing a case.  This normally should be done by letter to the alien and/or his or her attorney of record, briefly stating the decision made and its consequences.  It is not necessary to recite the facts of the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed.  For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing.  This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

*Future Impact*

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion.  An alien may come to the attention of the INS in the future through seeking admission or in other ways.  An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances.  However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account.  In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

Memorandum for Regional Directors, et al.                                    Page 13
Subject:  Exercising Prosecutorial Discretion

**Legal Liability and Enforceability**

The question of liability may arise in the implementation of this memorandum.  Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision.  We cannot promise INS officers that they will never be sued.  However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Training and Implementation**

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level.  This training will include discussion of accountability and periodic feedback on implementation issues.  In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated.  The regions will report to the Office of Field Operations when this training has been completed.

# EXHIBIT PP

CO 241.11-P

TO : Commissioner

DATE: 15 JUL 1976

FROM : Sam Bernsen
General Counsel

SUBJECT: Legal Opinion Regarding Service Exercise of Prosecutorial Discretion

You have asked for my opinion regarding the authority of the Service to exercise prosecutorial discretion in administrative proceedings arising under the Immigration and Nationality Act. You have also asked for my opinion regarding the appropriate time and manner for the exercise of such discretion.

Prosecutorial discretion refers to the power of a law enforcement official to decide whether or not to commence or proceed with action against a possible law violator. See generally, K. Davis, Administrative Law Treatise, 1970 Supp., §4.08, at 188. This power is not restricted to those termed prosecutors, but is also exercised by others with law enforcement functions such as police and officials of various administrative agencies. 1/ The power extends to both civil and criminal cases. 38 Op. Att'y Gen. 98, 102 (1934)

The reasons for the exercise of prosecutorial discretion are both practical and humanitarian. There simply are not enough resources to enforce all of the rules and regulations presently on the books. As a practical matter, therefore, law enforcement officials have to make policy choices as to the most effective and desirable way in which to deploy their limited resources. Thus, for example, police and prosecutors may choose to concentrate on apprehension and prosecution of perpetrators of violent crimes, while choosing not to proceed against those committing so-called "victimless crimes," such as certain consensual sex acts and possession of small amounts of marihuana. In addition, there are times when defects in the quality, quantity, or method of gathering evidence will make it difficult to prove the matter before a court.

Aside from purely practical considerations, it is also obvious that in enacting a statute the legislature cannot possibly contemplate all of the possible circumstances in which the statute may be applied. In some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose. For instance, a prosecutor may well decide not to proceed against a terminally ill individual, even in the presence of overwhelming evidence of guilt.

1/ See e.g., *Vaca v. Sipes*, 386 U.S. 171, 182 (1967) (General Counsel of NLRB has unreviewable discretion to refuse to institute unfair labor practice complaint).

*Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan*

-2-

## General Authority of Executive Branch

The ultimate source for the exercise of prosecutorial discretion in the Federal Government is the power of the President.  Under Article II, Section 1 of the Constitution, the executive power is vested in the President.  Article II, Section 3, states that the President "shall take care that the laws be faithfully executed."

Most discussions of the exercise of prosecutorial discretion on the federal level center on the Attorney General, since he is the chief legal officer of the Federal Government.  Nevertheless, prosecutorial discretion is also exercised by a wide variety of other government officials with law-enforcement responsibilities. 2/

The Attorney General has the authority "to determine when the United States shall sue, to decide for what it shall sue, and to be responsible that such suits shall be brought in appropriate cases." U.S. v. San Jacinto Tin Co., 125 U.S. 273, 279 (1888).  The power of the Attorney General to exercise his prosecutorial discretion does not end with the entry of judgment, but also embraces execution of the judgment. U.S. v. Morris, 23 U.S. (10 Wheat.) 246 (1825); 38 Op. Att'y Gen. 98, 102 (1934).

In a 1934 opinion, Attorney General Cummings pointed to three sources for the Attorney General's exercise of prosecutorial discretion: (1) inherent authority, (2) court decisions, and (3) various statutory enactments.  38 Op. Att'y Gen. 98 (1934). 3/

The inherent authority can be traced to the common law, where a prosecuting attorney had authority to terminate a suit at any time.  See Confiscation Cases, 74 U.S. (7 Wall.) 454 (1868).  As Attorney General Taney stated in 2 Op. Att'y Gen. 482, 486 (1831):

> An attorney conducting a suit for a party has, in the absence of that party, a right to discontinue it whenever, in his judgment, the interest of his client requires it to be done.  If he abuses this power, he is liable to the client whom he injures.... An attorney of the United States, except in so far as his power may be restrained by particular acts of Congress, has the same authority and control over the suits which he is conducting.

---

2/ Id.

3/ See also 2 Op. Att'y Gen. 482, 486 (1831); 22 Op. Att'y Gen. 491, 494 (1899); 23 Op. Att'y Gen. 507, 508-09 (1901).  See generally Schwartz, Federal Criminal Jurisdiction and Prosecutors Discretion, 13 Law & Contemp. Prob. 64 (1948).

-3-

Numerous Supreme Court decisions have confirmed the power of the Attorney
General to exercise his discretion in the institution, control, and settle-
ment of suits in behalf of the United States. See e.g., Confiscation Cases,
supra; U.S. v. San Jacinto Tin Co., supra; U.S. v. Throckmorton, 98 U.S. 61,
70 (1878); In re Neagle, 135 U.S. 1, 67 (1890); New York v. New Jersey, 256
U.S. 296, 308 (1921); Kern River Co. v. U.S., 257 U.S. 147, 155 (1921);
Ponzi v. Fessenden, 258 U.S. 254, 262 (1922); Petite v. U.S., 361 U.S. 529
(1960). 4/

There is also a long line of lower court cases recognizing this authority.
See e.g., U.S. v. Alessio, 528 F.2d 1079 (9 Cir. 1976); U.S. v. Cawley, 481
F.2d 702 (5 Cir. 1973); Inmates of Attica Correctional Facility v.
Rockefeller, 477 F.2d 375, 379 (2 Cir. 1973); U.S. v. Kysar, 459 F.2d 422,
424 (10 Cir. 1972); Spillman v. U.S., 413 F.2d 527, 530 (9 Cir. 1969);
Newman v. U.S., 382 F.2d 479 (D.C. Cir. 1967); U.S. v. Cox, 342 F.2d 167
(5 Cir. 1965), cert. denied, Cox v. Hauberg, 381 U.S. 935 (1965); Goldberg
v. Hoffman, 225 F.2d 463 (7 Cir. 1955); District of Columbia v. Buckley,
128 F.2d 17, 20-21 (D.C. Cir. 1942); Pugach v. Klein, 193 F. Supp. 630, 635
(S.D.N.Y. 1961); U.S. v. Woody, 2 F.2d 263 (D. Mont. 1924).

A final source for the Attorney General's authority to exercise prosecutorial
discretion can be found in the various statutes creating his office and con-
ferring upon him the power to supervise and conduct the litigation and other
legal affairs of the United States. 28 U.S.C. §§515-519, 547; Judiciary Act
of 1789, Ch. 20, §35, 1 Stat. 92; Act of June 22, 1870, Ch. 150, 16 Stat. 162.

Most of the aforementioned federal cases dealing with prosecutorial discretion
state that the power of the executive authorities is plenary and may not be
reviewed by the judiciary. Nevertheless, dicta in several court decisions
has indicated that selective prosecution based upon certain suspect classifi-
cations may violate the Constitution. 5/ Courts have also indicated that they
will not tolerate an arbitrary exercise of prosecutorial discretion by an ad-

---

4/ See also Oyler v. Boles, 368 U.S. 448 (1962) (selective prosecution by state
authorities not a violation of constitutional rights where not based upon un-
justifiable standard); Linda R.S. v. Richard D., 410 U.S. 614 (1973) (private
party has no standing to compel prosecution by state authorities).

5/ Oyler v. Boles, supra at note 4 (selection not based on unjustifiable
standard such as race, religion, or other arbitrary classification); Nader v.
Saxbe, 497 F.2d 676, 679 n. 19 (D.C. Cir. 1974) (exercise of prosecutorial
discretion, like any other exercise of executive discretion, subject to statutory
and constitutional limits enforceable through judicial review); U.S. v. Sacco,
428 F.2d 264, 271 (9 Cir. 1970), cert. denied, 400 U.S. 903 (1970) (selective
prosecution not a constitutional violation where no allegation that it was
based on constitutionally suspect classification).

-4-

ministrative agency. 6/

### Prosecutorial Discretion in Immigration Cases

It has been pointed out that prosecutorial discretion may be exercised in administrative, as well as criminal contexts. 7/ One of the earliest manifestations of prosecutorial discretion in an immigration-related field is Department of Justice Circular Letter Number 107, dated September 20, 1909, dealing with the institution of proceedings to cancel naturalization. That letter states:

> In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.

This policy still governs denaturalization cases. See Interp. 340.1(f).

The Attorney General has exercised prosecutorial discretion in the immigration area in the cases of aliens deportable under §241(a)(4) of the Immigration and Nationality Act who are eligible to receive state court expungements at a future date. In a letter to the Commissioner of Immigration, dated January 17, 1961, Attorney General Rogers stated that the Service should "withhold or terminate proceedings under section 241(a)(4) of the Immigration and Nationality Act in the cases of youthful offenders who are eligible for an honorable discharge from the control of the California Youth Authority."

6/ Moog Industries, Inc. v. F.T.C., 355 U.S. 411 (1958) and F.T.C. v. Universal Rundle Corp., 387 U.S. 244, 251 (1967) (FTC does not have unbridled power to institute proceedings that will arbitrarily destroy one of many law violators in an industry); Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975) (dictum) (courts will not condone selective prosecution based upon secret political grounds); Lennon v. United States, 387 F. Supp. 651, 564 (S.D.N.Y. 1975) (Government cannot institute deportation proceedings solely as penalty for exercise of constitutional rights). See also U.S. v. Berrios, 501 F.2d 1207, 1209 (2 Cir. 1974). See generally K. Davis, Administrative Law Treatise §28.16, at 982 (1958); Note, Reviewability of Prosecutorial Discretion: Failure to Prosecute, 75 Colum. L. Rev. 130 (1975).

7/ See e.g., Vaca v. Sipes, supra note 1. See also Bachowski v. Brennan, 502 F.2d 79, 87 (3 Cir. 1974), reversed on other grounds, Dunlop v. Bachowski, 421 U.S. 560 (1975), where the court stated that prosecutorial discretion could be exercised in administrative contexts, "which, like criminal prosecutions, involve the vindication of societal or governmental interest, rather than the protection of individual rights."

-5-

Numerous administrative decisions have affirmed the power of Service officers to exercise prosecutorial discretion. For instance, in Matter of Vizcarra-Delgadilio, 13 I&N Dec. 51, 53 (BIA 1968), the Board of Immigration Appeals upheld the authority of the District Director to move that proceedings be terminated as improvidently begun. The Board commented on the nature of the District Director's authority:

> Those charged with responsibility for enforcing the criminal laws
> have prosecutive discretion in determining whether to initiate
> criminal prosecution in a given case. A similar discretion not to
> proceed in a given case must be accorded to those responsible for
> immigration law enforcement. And where, following the formal start
> of deportation proceedings, additional facts or policy considera-
> tions arise which lead those responsible to conclude that this is
> not the sort of case in which such proceedings should have been
> started in the first place, 8 CFR 242.7 wisely provides the
> mechanics for termination on the ground that the proceeding was
> "improvidently begun." (Footnotes omitted)

Another case, Matter of Andrade, I.D. 2276 (BIA 1964), dealt with a minor who had been convicted of a marihuana violation which was expunged under a state law comparable to the Federal Youth Corrections Act. An order of deportation was initially entered. Thereafter, however, in connection with a petition for certiorari filed in the United States Supreme Court, the Solicitor General urged the Service to reconsider its policy with respect to such expungements and to administratively set aside the order of deportation. In response to this suggestion, the Service moved for termination of the deportation pro-ceedings. The Board granted the Service's motion stating that, "the Service's determination not to initiate or press deportation proceedings in a given case or class of cases is a matter of prosecutorial judgment which we do not review."

Many other administrative decisions recognize and affirm the Service's power to exercise prosecutorial discretion. See e.g., Matter of Geronimo, 13 I&N Dec. 680 (BIA 1971); Matter of Wong, 13 I&N Dec. 701 (BIA 1971); Matter of Gallares, I.D. 2177 (BIA 1972); Matter of Merced, I.D. 2273 (BIA 1974), aff'd per curiam Merced v. INS, 514 F.2d 1070 (5 Cir. 1975); Matter of Lennon, I.D. 2304 (BIA 1974), rev'd on other grounds, Lennon v. INS, 527 F.2d 187 (2 Cir. 1975). See also Matter of Anaya, I.D. 2243 (BIA 1973), aff'd per curiam, Anaya v. INS, 500 F.2d 574 (5 Cir. 1974); Matter of Felix, I.D. 2149 (BIA 1972). See also Roberts, The Exercise of Administrative Discretion Under the Immigration Laws, 13 San Diego L. Rev. 144, 149-52 (1975).

The Service's power to exercise prosecutorial discretion is inherent in the nature of its enforcement function and does not depend upon any specific pro-vision of the Immigration and Nationality Act. The Service has nevertheless promulgated regulations and operations instructions dealing with the exercise of prosecutorial discretion.

-6-

8 CFR 242.7(a) sets forth the authority of the District Director to cancel or move for cancellation of deportation proceedings if "he is satisfied that the respondent is actually a national of the United States, or is not deportable under the immigration laws, or is deceased, or is not in the United States, or that the proceeding was improvidently begun." (underscoring supplied).

It is obvious that the "improvidently begun" ground is in addition to the "not deportable" ground and includes individuals who are deportable, but whose departure the Service, for policy or humanitarian reasons, does not choose to enforce.  Operations Instruction 103.1(c)(1)(ii) lists various factors to be considered in determining whether to place an alien in the "deferred action" (formerly "nonpriority") category, meaning that deportation proceedings will not be instituted or continued against the alien. 8/

In addition to the discretion not to institute deportation proceedings, prosecutorial discretion may be exercised in connection with various other discretionary remedies, such as voluntary departure, 9/  and stays of deportation. 10/

Courts have acknowledged that a determination whether or not to enforce a deportable alien's departure in a particular case is normally within the sound discretion of the Service officer having responsibility over the case.  See e.g., Balanos v. Kiley, 509 F.2d 1023 (2 Cir. 1975); Vassiliou v. INS, 461 F.2d 1193 (10 Cir. 1972); Spata v. INS, 442 F.2d 1013 (2 Cir. 1971), cert. denied, 404 U.S. 857 (1971); Armstrong v. INS, 445 F.2d 1395 (9 Cir. 1971); Bowes v. District Director, 443 F.2d 30 (9 Cir. 1971); Nanantan v. INS, 425 F.2d 693 (7 Cir. 1970); Discaya v. INS, 339 F. Supp. 1034 (N.D. Ill. 1972).  See also Pignatello v. Attorney General, 350 F.2d 719, 725 (2 Cir. 1965).  However, in Lennon v. U.S., 387 F. Supp. 561 (S.D.N.Y. 1975), the court indicated that a claim of selective deportation presents a proper issue for judicial review, and in Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975), the court indicated in dictum that selective deportation based on political motives will not be tolerated. See also Lennon v. Richardson, 378 F. Supp. 39 (S.D.N.Y. 1974).

In Vergel v. INS, _____ F.2d _____, Civ. No. 75-1526 (8 Cir. June 2, 1976), the court sustained an order of deportation, but noted that there was a substantial

8/ See also Wildes, The Nonpriority Program of the Immigration and Naturalization Service - A Measure of the Attorney General's Concern for Aliens, (two parts) 53 Interpreter Releases 25, 33 (1976).

9/ 8 CFR 244.1, 244.2.  See Matter of Anaya, I.D. 2243 (BIA 1973), aff'd per curiam, 500 F.2d 574 (5 Cir. 1974); Matter of Felix, I.D. 2149 (BIA 1972)

10/ 8 CFR 243.4.

-7-

basis for allowing the alien to remain in the United States in the "deferred action category" under O.I. 103.1(a)(J)(ii).  The court stated that it would be "appropriate for the District Director to make further inquiry to that end," and stayed its mandate for 90 days in order to allow the District Director to consider the alien's claim.

In several other cases, courts have upheld deportation orders while suggesting that the Service might appropriately exercise prosecutorial discretion to stay execution of the orders.  See e.g., U.S. v. McAlister, 395 F.2d 852 (3 Cir. 1968); 11/  Lieggi v. INS, Civ. No. 75-1393 (7 Cir. January 27, 1976), reversing 389 F. Supp. 12 (N.D. Ill. 1975); 12/  Dunn v. INS, Civ. No. 72-2186 (9 Cir. February 20, 1974), cert. denied 419 U.S. 919 (1974). 13/

### Proper Time for Exercise

Normally the appropriate time for the exercise of prosecutorial discretion is prior to the institution of proceedings.  The primary reason for this is the humanitarian factor; it makes little sense to put an alien through the ordeal and expense of a deportation proceeding when his actual removal will not be sought.

In addition, there are practical considerations.  Deportation proceedings tie up Government manpower and resources that could be used in performing other important functions.  Given the present illegal alien problem such a use of scarce resources on aliens whom the Service does not ultimately intend to deport is indefensible.  Moreover, once a final administrative order of deportation is issued, the Service cannot prevent the alien from seeking judicial review.  When a case with extremely appealing factors goes to court, it may place the Service in an unfavorable light, both before the court and in the forum of public opinion.

There are some situations, however, where prosecutorial discretion is properly exercised after the institution or completion of deportation proceedings.  The sympathetic or humanitarian factors may not arise or become apparent until after the case has been started.  In other cases  involving aliens who may have committed serious offenses but are allowed to remain on the representation that

---

11/  "Therefore, we think it would be appropriate for the Department to make further inquiry to the end that, if justified, appellant's deportation at least be stayed during his good behavior."

12/  "We agree...that this is a hardship case.  Therefore the Government should afford petitioner any administrative remedy that may still be available...."

13/  "While this is a case in which the administrative discretion of the INS might have been exercised with greater compassion the scope of our review in this area is extremely narrow."

-8-

they are the sole support of United States citizen families, it may be desirable to have a final order of deportation outstanding for immediate execution in the event of any further misconduct.

### Conclusion

The power of various officers of the Executive Branch to exercise prosecutorial discretion is inherent and does not depend on express statutory authorization. Officers of the Service have been recognized as possessing such power, and provision for its exercise has been made in both the regulations and the operations instructions.

Although there is authority for the plenary nature of prosecutorial discretion, the trend, especially in administrative contexts, is towards judicial review of prosecutorial discretion to ascertain that it is not being exercised in a way that would be constitutionally suspect or grossly unfair. Consequently, the Service's attempts to set forth some standards for the exercise of prosecutorial discretion are particularly appropriate.

Finally, prosecutorial discretion may be exercised before, during, or after the completion of deportation proceedings. Normally, however, such discretion is best exercised prior to the institution of proceedings.

CC: W/F - Opinions of the General Counsel, 1976

CC: CO 840-P

FWS:anb

# EXHIBIT QQ

 **Donald J. Trump**
@realDonaldTrump

 Foll w

Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!

5:38 PM - 5 Sep 2017

**23,972** Retweets **91,497** Likes



3 K          2 K          91K

# EXHIBIT RR Supporting Declaration of Karen C. Tumlin



**U.S. Citizenship and
Immigration Services**

## Guidance on Rejected DACA Requests

<u>Versión en español</u>

U.S. Citizenship and Immigration Services (USCIS) has received reports that the U.S. Postal Service (USPS) has identified USPS mail service delays that affected a number of DACA renewal requests. Because the DACA policy has been rescinded and individuals can no longer request deferred action under DACA, and in light of the mail service delays identified by USPS, Acting Secretary of Homeland Security Elaine Duke has directed USCIS to accept DACA renewal requests from individuals who resubmit their DACA renewal request with individualized proof that the request was originally mailed in a timely manner and that the cause for receipt after the Oct. 5, 2017, deadline was the result of USPS mail service error. Affected DACA requestors who do not have such proof may contact USPS, which will review the cases on an individual basis and provide a letter if appropriate. USCIS will not accept requests that do not include individualized proof that the request was originally mailed in a timely manner to be received by the October 5 deadline, and that the cause for receipt after the Oct. 5, 2017, deadline was the result of USPS mail service error.

In addition, USCIS had discovered certain cases in which the DACA requests were received at the designated filing location (*e.g.*, at the applicable P.O. Box) by the filing deadline, but were rejected. USCIS will proactively reach out to those DACA requestors to inform them that they may resubmit their DACA request. If a DACA requestor does not receive such a notification and believes that his or her DACA request was received at the designated filing location by the filing deadline, he or she may resubmit his or her DACA request with proof that the request was previously received at the designated filing location on or before the filing deadline.

# Frequently Asked Questions

**Q1: Are any new DACA requests being accepted?**
A1: No. The DACA policy for accepting new, initial DACA requests ended on Sept. 5, 2017.

**Q2: Can I still submit a DACA renewal request?**
A2: No. The due date for DACA renewal requests was Sept. 5, 2017 for recipients whose DACA expired before Sept. 5, 2017, and Oct. 5, 2017 for recipients whose DACA expired between Sept. 5, 2017 and March 5, 2018.

**Q3: I believe that my DACA request was delivered by the deadline, but since it wasn't officially "received" by USCIS until the following day, my request was rejected and returned to me. What do I need to do to have my DACA request reconsidered?**
A3: USCIS will identify you and will send you a letter inviting you to resubmit your DACA request. You will have 33 days from the date of the letter to resubmit your request. You may wish to keep a copy of all materials included in your resubmission.  USCIS expects to be able to identify and send letters to all persons in this situation.

**Q4: I believe that my DACA request was delivered by the deadline, but since it wasn't officially "received" by USCIS until the following day, my request was rejected and returned to me.  However, I haven't been contacted by USCIS to resubmit my DACA request.  What should I do?**

A4: If you believe your DACA request was delivered by the filing deadline but have not been contacted by USCIS to resubmit your request, you may contact Lockbox Support and explain your situation prior to resubmitting your package for reconsideration. To contact Lockbox Support please email lockboxsupport@uscis.dhs.gov. Provide any information you feel is relevant to your belief that your DACA request was received by USCIS in a timely manner.

**Q5: What will happen if my current DACA expires before my renewal is processed? Will I be at risk of removal while this issue is being resolved?**
A5: Consistent with longstanding USCIS policy, you will not have deferred action if there is a gap of time between the end of your current DACA and the agency's adjudication of your renewal request. Therefore it is very important for you to resubmit your renewal request as soon as possible.

Information provided to USCIS for the DACA process will not make you an immigration priority for that reason alone. That information will only be proactively provided to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). This information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy. This policy, which may be modified, superseded, or rescinded at any time with or without notice (as has always been the case, and is noted in the archived USCIS DACA FAQs), is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Q6: If my DACA renewal request is approved after expiration of my current DACA, will the renewed deferred action apply retroactively?**
A6: No. In accordance with longstanding policy, an approved DACA request will not apply retroactively. An individual's deferred action under the DACA policy begins the day USCIS approves the renewal request and is generally valid for two years from the date of issuance.

**Q7: I submitted my renewal request on time, but it was rejected by USCIS for other reasons. Can I resubmit it again?**
A7: If USCIS rejected your timely filed renewal request because it was not properly filed, that is a valid reason for rejection and it will not be reconsidered. However, if you believe your request was improperly rejected, *i.e.*, it did include all required documents and information, and was properly signed and accompanied by the required fee or approved fee exemption, you may contact Lockbox Support for more information. The email address for Lockbox Support is lockboxsupport@uscis.dhs.gov. Please be prepared to identify and provide a detailed description of the error you believe was made. If you identify a clear error by USCIS in the processing of your renewal request, USCIS may exercise its discretion to review your request again.

**Q8: I believe that my DACA request was delivered to the USCIS designated filing location after the deadline because of U.S. Postal Service (USPS) mail-service delays. What do I need to do to have my DACA request reconsidered?**
A8: The USPS is working with USCIS to identify DACA requests that were received after the deadline due to USPS mail-service delays. As soon as USPS completes its assessment, identifies such requests, and provides this information to USCIS, USCIS will send affected DACA requestors a letter inviting them to resubmit their DACA request. If you receive such a letter, you will have 33 calendar days from the date of the letter to resubmit your request. You may wish to keep a copy of all materials included in your resubmission.

**Q9: When will USPS complete its assessment?**
A9: USPS anticipates that it will be able to identify DACA requests that were received after the deadline due to USPS mail-service delays and provide this information to USCIS by mid-December 2017.

**Q10: When will USCIS send letters informing DACA requestors that they were affected by USPS mail-service delays?**

A10:  USCIS anticipates that it will be able to send letters to affected individuals approximately one week after USPS provides information to USCIS identifying the impacted requests.

**Q11: Will individuals who resubmit their DACA request need to resubmit the required fee?**
A11: Yes, unless they previously submitted evidence that USCIS had approved their request for a fee exemption, DACA requestors will need to resubmit the required fee. USCIS did not accept or process the fees for individuals whose DACA requests were rejected. When the agency rejected DACA requests, USCIS returned the entire package, including the fee if one was submitted.

**Q12: What should I include in my resubmission package?**
A12: Your resubmission package should include:

- Your original DACA request, including your completed and properly signed Form I-821D, Form I-765, Form I-765 Worksheet, if your originally submitted forms are still available to you, or you may submit newly completed forms; the correct filing fee or approved fee exemption request; and any required supporting evidence as described in the Instructions to the forms; and,
- The letter from USCIS inviting you to resubmit your DACA request.

**Q13: What is the deadline for resubmitting DACA requests?**
A13: Affected individuals will receive a letter from USCIS, and the resubmitted request must be properly filed and received by USCIS at the designated filing location within 33 calendar days of the date of USCIS' letter in order to be considered.  You may wish to send your request with tracking information and/or take other steps to ensure your request is received by USCIS within the required timeframe.

******

As soon as USPS completes its assessment and USCIS sends DACA requestors affected by USPS mail service delays a letter inviting them to resubmit their DACA request, further guidance will be provided about how you may contact USPS and/or USCIS if you believe you were affected but you did not receive a letter from USCIS inviting you to resubmit your request.

The above FAQs, which may be modified, superseded, or rescinded at any time with or without notice, are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

Last Reviewed/Updated: 12/14/2017

# EXHIBIT SS Supporting Declaration of Karen C. Tumlin



December 4, 2017

**VIA EMAIL**
Stephen Pezzi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
stephen.pezzi@usdoj.gov

**RE:     Follow Up on Rejected DACA Renewal Applications**

Dear Mr. Pezzi,

We write about two pressing matters: (1) to request the expedited adjudication of DACA renewal applications for four Make the Road New York clients whose DACA expires this month, and (2) to urge USCIS to reconsider its decision to not accept timely filed applications that were rejected due to real or perceived minor clerical errors.

**Expedited Adjudication of DACA Renewal Applications**

Four Make the Road New York clients have DACA that expires this month.  USCIS has yet to set up and implement a procedure for accepting rejected DACA renewal applications.  If USCIS does not accept and adjudicate these four clients' renewal applications shortly, they stand to lose their protection from deportation and employment authorization.  We therefore request both that USCIS accept and adjudicate these four applications in an expedited manner, and that USCIS develop and implement a procedure for accepting rejected DACA renewal applications immediately.

- **Fernando** ███████████'s DACA expires on December 21, 2017.  His application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Mr. ██████ is thirty three years old and has five United States children who depend on him financially.
- **Cristhian** ██████'s DACA expires on December 28, 2017.  His application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Mr. █████ is twenty one years old and has been in the United States since he was nine years old.

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
TEL  718 418 7690
FAX  718 418 9635

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
TEL  718 565 8500
FAX  718 565 0646

**STATEN ISLAND**
479 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
TEL  718 727 1222
FAX  718 981 8077

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
TEL  631 231 2220
FAX  631 231 2229

WWW.MAKETHEROADNY.ORG

1

- **Jonathan** ███████'s DACA expires on December 28, 2017.  Due to USPS mail delays, his renewal application arrived on October 10th even though he mailed it on September 28th.  Mr. ████ has been in the United States since he was six years old.  He is gainfully employed and in college.
- **Valeria** ███████'s DACA expires on December 29, 2017.  Her application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Ms. ████ a nineteen-year-old college student who has been in the United States since she was three years old.

## DACA Renewal Applications Rejected Due to Real or Perceived Minor Clerical Errors

The *Batalla Vidal* Plaintiffs are deeply concerned by USCIS's position, elaborated in their "Frequently Asked Questions: Rejected DACA Requests" page, that it will not consider DACA renewal applications that were submitted before the October 5th deadline but rejected due to real or perceived minor clerical errors.  USCIS's refusal to accept these applications as timely violates the due process rights of these DACA recipients.  Additionally, the deadline itself and its implementation were arbitrary and capricious.

As discussed at the pre-motion conference on November 16, 2017, Plaintiffs are prepared to seek the intervention of the court to rectify this due process violation.  However, we write first to determine whether the parties can reach agreement on these issues without court intervention.  **We urge USCIS to reconsider their position and issue guidance so that DACA recipients whose timely filed applications were rejected due to minor alleged clerical errors can resubmit their applications for full consideration.**

On November 16, 2017, Judge Garaufis expressed both concern about DACA recipients whose renewal applications were rejected due to minor alleged clerical errors, and hope that these issues could be resolved without further litigation.  You represented to the court that you believed "it would be appropriate to continue further conversations . . . before plaintiffs proceeded with additional litigation."  Judge Garaufis agreed with you that "the best initial course is . . . to get together, try to work it through . . . without litigation," and if that was not possible, to amend the complaint.

Besides Maria Rivas, the Make the Road New York client discussed at the pre-motion conference, counsel has identified eighteen DACA recipients whose renewal applications were filed timely and received by or shortly after the October 5th deadline but rejected due to minor alleged clerical errors.  Their summarized information is below, and individual situations here (with additional documentation attached):

- **Ana** ███████ submitted her DACA renewal on September 5, 2017 via FedEx. Two women from a local church assisted Ana in preparing her application, and paid the renewal fee for her.  Unfortunately, the women submitted $465 instead of $495, so the application was rejected and mailed back to Ana on September 20, 2017 and directed her to resubmit her application with a corrected fee.  Ana was not aware there was any deadline, as the rejection letter did not mention a deadline and although she heard news about the DACA rescission, she was not sure the renewal deadline applied to

2

her.  On October 5th, Ana contacted the church women about the return of her application, and the women contacted an attorney, Linda ███, on October 6th to assist Ana to resubmit her application with a corrected fee.  After gathering the necessary information and documents, Ms. ███ mailed Ana's DACA renewal packet the following week.  On October 27th, USCIS sent Ana a rejection notice, stating that her renewal request was submitted on an outdated form and received untimely, although the form was the correct version.  Ana is a 25-year-old resident of Oakland, California, and mother to a seven-month-old U.S. citizen baby.  Ana is afraid that she will lose her retail job as a result of losing DACA and will be unable to support her baby.  **Her DACA expired on December 1, 2017.**

- **Johana** ████████████████ filed her DACA renewal application on her own. Due to the short one-month deadline for filing, she was rushed, and had her sister help her fill out the forms. As she was going to sign the form, she realized her sister had forgotten to fill in one field regarding a prior visa number. Johana fixed that field and re-printed her finalized application, but this time, as she was nervous and in a rush, she forgot to sign it. She mailed her application to the Phoenix Lockbox and it was received timely on October 3, 2017. However, USCIS rejected the entire application because of the missing signature. USCIS returned the application to Johana on October 5. She sent the packet a second time on October 12, 2017 with the missing signature, but it was again rejected by USCIS as untimely. She then retained an attorney, who re-submitted the packet again with a cover letter on November 22, 2017, explaining what happened and advocating that the application should be considered since it was first received on October 3. Johana and her attorney have not yet received any response from USCIS since resubmitting a third time. **Johana's current DACA grant and work permit expire on December 6, 2017.** Johana needs her DACA and work permit because she is currently going to school and needs a job to pay for her books and supplies, not to mention to provide for her two young children as a single mother.

- After learning of the DACA Termination, **Crystal** ████████ sought to renew her DACA but was slowed down by Hurricane Irma and the need to find a new lawyer.  She found legal assistance and was able to submit her renewal application before October 5, but the lawyer neglected to check a box in the criminal history attestations.  USCIS rejected her application, with instructions to resubmit (attached), but when Ms. ████████ resubmitted the application, USCIS rejected it as untimely.  Ms. ████████ is currently on unpaid maternity leave after giving birth to a baby girl.  **She had hoped to return to work on December 13, but that plan is jeopardized because her EAD and DACA expire on December 4.**

- **Brittany** ████████ filed her DACA renewal on September 21, 2017 via USPS priority express mail, and it was received on September 22. On October 5, Brittany received the application back in the mail. It was sent back to her because she forgot to sign her name in one place. She fixed this issue and sent it back on October 6, 2017, again via express mail. It arrived on October 7, but because that was a Saturday, it was not signed for until October 10, a Tuesday. (Monday was the Columbus Day holiday.) On November 10, Brittany received a rejection. Her application was rejected as untimely because it was

received after October 5, even though she originally sent it on September 21. It would be devastating to Brittany to be forced to return to Trinidad, a country she left behind when she was 3 years old and where she has no close family members or friends. In addition, it would also be disastrous for the family of Brittany's employer if she does not regain her DACA permit and work authorization. Brittany is the full-time caretaker for the family's two 14-month old twins, one of whom has special needs and requires physical therapy. Her employer's family is devastated at the thought that she may not be able to continue to work in this country and know they won't find another caregiver who is as reliable, nurturing, and unshakable as Brittany. **Brittany's current grant of DACA and work authorization expires on December 7, 2017.**

- **Mayron** ⬛⬛⬛ submitted his DACA renewal application before the deadline, and it arrived on October 2, 2017. He accidentally submitted the processing fee for $465 instead of $495, because the last time he renewed the fee was $465, and his entire case was sent back for that reason. With his rejection, he received a green document (attached) stating, "You are invited to resubmit your application package after you have corrected the reasons for rejection. . . . Place this letter on top of your application package." Mayron fixed the processing fee and re-submitted his application with the green document on top of his application package. On October 31st, he received his entire package in the mail with a rejection notice dated October 24th that stated that USCIS is no longer accepting DACA applications. Mayron, originally from Honduras, has lived in the U.S. since he was 11 years old and knows no other country as home. He has overcome lots of obstacles to be who he is today: He is a successful entrepreneur and owns three businesses. Mayron has been a DACA applicant for the last three years and is devastated by the Department of Homeland Security's actions in rejecting the renewal of his DACA. **Mayron's current grant of DACA expires on December 22, 2017.**

- **Carlos** ⬛⬛⬛'s lawyer mailed his DACA renewal application on September 18, 2017 via first-class mail. His lawyer received a rejection notice from USCIS that was dated October 29, 2017, stating that his application was received on October 11, 2017 but rejected because his current DACA expiration date was not listed in the form. While this field was missing on the application itself, the relevant date was included on the cover letter to the packet (attached). Carlos's lawyer was waiting to re-submit Carlos's application when USCIS released its guidance, but the guidance released on November 30, 2017 appears to foreclose Carlos's case because it involves not only unreasonable USPS mail delay, but also a small clerical error in a form.

- **Ana** ⬛⬛⬛⬛ filed her DACA renewal application on September 28, 2017 via U.S. Certified mail with return receipt and it arrived to USCIS on September 29, 2017. USCIS rejected her application because of a minor clerical error that anyone could have missed, a check box was the only thing not checked off. All other information on the application was there and correct, including the correct payment, signatures, and dates. Having DACA has given Ana the opportunity to better herself and gave her a sense of hope because with it she was able to work. It has helped her support her family. Losing DACA would take away her opportunity to work and with it the opportunity for her to

4

continue to support her family. She has a spouse and step-kids that count on her to help better their lives. **Her current grant of DACA expires on January 14, 2018.**

- **Yatziri** ▮▮▮▮▮▮▮▮ mailed her DACA renewal application on October 4 via Fedex, and it was received on October 5. Her application was returned due to missing signatures. When she submitted the packet, she accidentally submitted the copy that was given to her to keep and that was not signed. The original document her processor gave her to send to USCIS *was* signed. Because of the deadline and the confusion and misinformation that surrounded DACA being terminated, she was in a panic to submit her application on time. Due to this she was too focused on sending it in and did not realize that she sent out her unsigned copy, instead of the signed original packet. After receiving the returned application, she realized her mistake and went back to the processor and signed the returned application and sent it back to USCIS. She sent the packet with the correction on November 14, 2017, before USCIS's announcement. It was rejected again as untimely and sent back to her on November 22. DACA has given Yatziri the opportunity to work and save money to continue her education. Her goal is to work in the medical field and working has allowed her to continue to pursue this goal. Losing DACA would detour her future goals and career aspirations. This would bring a hardship to her family because they count on her to not only support them but also to support herself. **Yatziri's current grant of DACA expires on January 26, 2018.**
- **Luigi** ▮▮▮▮▮ mailed his DACA renewal application on September 23, 2017 via UPS-2 Day delivery. The application arrived to USCIS's offices on Tuesday, September 26th. On Wednesday, October 4th, USCIS sent back the entire package due to one box being unchecked in Part 4 of the application. Luigi did not receive the package until Saturday, October 7, 2017, by which time the October 5 deadline had passed. However, the package contained a green paper instructing him to make the correction on that part of the application and proceed to send it back. He did so, but his application was rejected as untimely. DACA truly has changed Luigi's life. It has given him so many possibilities that he did not have before—not just material but the ability to have peace of mind anywhere he goes. He was able to obtain his license, get a job, pay his taxes, and most importantly, do everything the way it is supposed to be. If Luigi loses his DACA, he will lose his driver's license and maybe even his job. He recently had a son and he needs to be able to provide for him the way he is doing now. **Luigi's current grant of DACA expires on January 19, 2018.**
- USCIS received **David** ▮▮▮▮▮▮▮'s DACA renewal application on October 4, 2017. However, it was rejected because form I-765 was not signed.  Mr. ▮▮▮▮'s application was returned to him with a green sheet inviting him to resubmit his application.  Mr.▮▮▮▮ resubmitted his application, but USCIS rejected it as untimely.  Mr. ▮▮▮ is gainfully employed.
- On September 29, 2017, **Maria** ▮▮▮▮ applied to renew her DACA status and sent a check dated September 28, 2017.  Ms. ▮▮▮▮ qualified for financial support from United We Dream and her attorney at Westchester Hispanic Coalition wrote out her check for $495.00 on September 28, 2017.  USCIS sent a Rejection Notice dated October 4, 2017. The stated reason for the rejection was "The date on the check/money order is not

5

current. The check date either occurred more than a year ago or it is in the future." The receipt date of Ms. █████'s renewal application was listed as October 2, 2017. Ms. █████'s attorney received the Rejection Notice on October 10, 2017 and despite the September 28, 2017 date on the original check, her attorney sent back the application and provided a new check as requested with the date of October 10, 2017. Despite Ms. █████'s and her attorney's request to process the application with a receipt date of October 2, 2017, USCIS rejected the application and stated "USCIS no longer accepts requests for Consideration of Deferred Action for Childhood Arrivals." Ms. █████'s attorney emailed Lockbox Support about this issue and on November 22nd, a representative responded refusing to allow Ms. █████ to resubmit her application.

- **Deisy █████████████'s** DACA renewal was received by USCIS on October 3, 2017, ahead of the October 5th deadline. An attorney at her university assisted her to prepare her renewal forms remotely, since she is studying in DC for the fall semester. In addition, a nonprofit organization agreed to help her with the renewal fee. Unfortunately, the organization provided a check made out to Deisy herself rather than USCIS, and in the amount of $500 rather than $495. Deisy attached the check to her application and submitted them by the October 5th deadline. USCIS rejected her renewal on October 10, 2017, stating, "The payment amount is incorrect, or has not been provided," and both on the rejection notice and on a separate green document, instructed her to resubmit with the appropriate fees. As instructed, Deisy resubmitted her renewal with the correct fees, but USCIS rejected her application, stating that it no longer accepts DACA renewals. Deisy is a 20-year-old student at the University of Colorado at Boulder.


As Judge Garaufis said at the pre-motion conference, "there should be a rule of reason utilized here." In rushing to meet the arbitrary and capricious October 5th deadline, DACA recipients and overburdened attorneys were prone to make minor mistakes. DACA recipients who were not able to find representation in the short time period between the announcement and the deadline were particularly prone to making small mistakes as they saw their protection from deportation, their livelihood, and for many, their way of supporting their family, be put in imminent jeopardy. It would be unconscionable for USCIS to deny these DACA recipients, who met the arbitrary and capricious deadline, the chance to have their DACA renewals adjudicated because of an alleged minor mistake.

We await your response.

Sincerely,

Natalia Renta

| Type of alleged reason for rejection | Case-specific details |
|---|---|
| "The payment amount is incorrect, or has not been provided." | - Paid $465 (previous DACA renewal fee that has increased since the last time these DACA recipients had to renew) instead of $495 (this applies to two |

| | |
|---|---|
| | • individuals)<br>• Submitted payment for $500 instead of $495<br>• Check was written out to wrong entity |
| Lack of signature | • One of the forms (I-821D or I-765) was not signed (this applies to two applicants)<br>• Forms were not signed because she accidentally mailed the copies instead of the original |
| Unanswered fields (various) | • DACA expiration date field was blank on the I-821D form<br>• One or more of the yes/no questions was not answered (this applies to five applicants)<br>• In some cases, this information *was* answered in the attorney or representative's cover letter, but the entire packet was still rejected. |
| Other | • Initially filed form I-821D, but not I-765; upon resubmission (received by USCIS on 10/5), submitted $45 more than the required fee |

Sincerely,

/s/ Amy Taylor

Amy Taylor, Esq.
Co-Legal Director
Make the Road New York
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690 x 1280
amy.taylor@maketheroadny.org

David Chen, Law Student Intern          Jessica R. Hanson, Esq.[†]
Susanna D. Evarts, Law Student Intern   Mayra B. Joachin, Esq.[†]
Healy Ko, Law Student Intern            Karen C. Tumlin, Esq.[†]
Victoria Roeck, Law Student Intern      NATIONAL IMMIGRATION LAW CENTER

Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.[*]
Natalia Renta, Esq.[*]
Alexia Schapira, Esq.[*]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Batalla Vidal et al. Plaintiffs*

[†] Appearing *pro hac vice*
[*] *Pro hac vice* motion forthcoming

8

# EXHIBIT TT

**No.**

# In the Supreme Court of the United States

---

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

STATE OF TEXAS, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
BENJAMIN C. MIZER
  *Principal Deputy Assistant
    Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
BETH S. BRINKMANN
  *Deputy Assistant Attorney
    General*
ZACHARY D. TRIPP
  *Assistant to the Solicitor
    General*
DOUGLAS N. LETTER
SCOTT R. MCINTOSH
JEFFREY CLAIR
WILLIAM E. HAVEMANN
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

STEVAN E. BUNNELL
  *General Counsel
  U.S. Department of
    Homeland Security
    Washington, D.C. 20528*

## QUESTIONS PRESENTED

The Department of Homeland Security has long engaged in "a regular practice * * * known as 'deferred action,'" in which the Secretary "exercis[es] [his] discretion" to forbear, "for humanitarian reasons or simply for [his] own convenience," from removing particular aliens from the United States. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-484 (1999). On November 20, 2014, the Secretary issued a memorandum (Guidance) directing his subordinates to establish a process for considering deferred action for certain aliens who have lived in the United States for five years and either came here as children or already have children who are U.S. citizens or permanent residents.

The questions presented are:

1. Whether a State that voluntarily provides a subsidy to all aliens with deferred action has Article III standing and a justiciable cause of action under the Administrative Procedure Act (APA), 5 U.S.C. 500 *et seq.*, to challenge the Guidance because it will lead to more aliens having deferred action.

2. Whether the Guidance is arbitrary and capricious or otherwise not in accordance with law.

3. Whether the Guidance was subject to the APA's notice-and-comment procedures.

(I)

### PARTIES TO THE PROCEEDING

Petitioners were appellants in the court of appeals. They are:  the United States of America; Jeh Charles Johnson, in his official capacity as Secretary of Homeland Security; R. Gil Kerlikowske, in his official capacity as Commissioner of U.S. Customs and Border Protection; Ronald D. Vitiello, in his official capacity as Deputy Chief of U.S. Border Patrol, U.S. Customs and Border Protection; Sarah R. Saldaña, in her official capacity as Director of U.S. Immigration and Customs Enforcement; and León Rodríguez, in his official capacity as Director of U.S. Citizenship and Immigration Services.

Respondents were appellees in the court of appeals. They are:  The State of Texas; State of Alabama; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of South Carolina; State of South Dakota; State of Utah; State of West Virginia; State of Wisconsin; Paul R. LePage, Governor, State of Maine; Patrick L. McCrory, Governor, State of North Carolina; C.L. "Butch" Otter, Governor, State of Idaho; Phil Bryant, Governor, State of Mississippi; State of North Dakota; State of Ohio; State of Oklahoma; State of Florida; State of Arizona; State of Arkansas; Bill Schuette, Attorney General, State of Michigan; State of Nevada; and the State of Tennessee.[*]

---

[*] Several putative beneficiaries of the Guidance moved to intervene as defendants in the district court.  The court denied the motion, but the court of appeals reversed that order.  See 2015 WL 6876054.

(II)

## TABLE OF CONTENTS

Page

Opinions below ................................................................ 1
Jurisdiction ..................................................................... 1
Statutory and regulatory provisions involved ......................... 2
Statement:
    A.  Legal framework .................................................. 2
    B.  Factual and procedural background .................... 8
Reasons for granting the petition ......................................... 11
  I.  Respondents do not have Article III standing or a cognizable claim under the APA .............................. 14
    A.  A State's voluntary decision to extend a subsidy to aliens accorded deferred action does not give it standing to challenge federal deferred-action policies ..................................... 14
    B.  Respondents lack a cognizable APA claim ........ 18
  II.  The Secretary had ample statutory authority to issue the Guidance ...................................... 24
  III.  The Guidance is exempt from notice-and-comment requirements ........................................ 29
  IV.  This case warrants immediate review .................... 32
Conclusion ...................................................................... 35
Appendix A ..................................................................... 1a
Appendix B ..................................................................... 156a
Appendix C ..................................................................... 244a
Appendix D ..................................................................... 407a
Appendix E ..................................................................... 411a
Appendix F ..................................................................... 420a
Appendix G ..................................................................... 430a

## TABLE OF AUTHORITIES

Cases:                              Page

    *Arizona* v. *United States*, 132 S. Ct. 2492 (2012) ...... *passim*
    *Arizona Christian Sch. Tuition Org.* v. *Winn*, 131 S. Ct. 1436 (2011) ......................................... 15

(III)

IV

Cases—Continued:                                    Page

*Arpaio* v. *Obama*, 797 F.3d 11 (D.C. Cir. 2015),
  petition for cert. pending, No. 15-643
  (filed Nov. 12, 2015) .................................................. 34, 35

*Block* v. *Community Nutrition Inst.*, 467 U.S. 340
  (1984) .......................................................................... 23

*Clapper* v. *Amnesty Int'l USA*, 133 S. Ct. 1138
  (2013) .......................................................................... 17

*Clarke* v. *Securities Indus. Ass'n*, 479 U.S. 388
  (1987) .................................................................... 18, 19

*DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332 (2006) ........ 15

*Heckler* v. *Chaney*, 470 U.S. 821 (1985) .................... 3, 12, 20

*Johns* v. *Department of Justice*, 653 F.2d 884
  (5th Cir. 1981) ............................................................ 20

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) .................. 4, 20, 29, 30

*Linda R.S.* v. *Richard D.*, 410 U.S. 614 (1973) .................. 14

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555
  (1992) .......................................................................... 14

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) ............... 15, 16

*Mathews* v. *Diaz*, 426 U.S. 67 (1976) .................................. 19

*Pennsylvania* v. *New Jersey*, 426 U.S. 660 (1976) ....... 16, 17

*Reno* v. *American-Arab Anti-Discrimination
  Comm.*, 525 U.S. 471 (1999) .................................... passim

*Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883 (1984) ................... 14

*Truax* v. *Raich*, 239 U.S. 33 (1915) .................................. 2, 23

*Vermont Yankee Nuclear Power Corp.* v. *Natural
  Res. Def. Council, Inc.*, 435 U.S. 519 (1978) .................... 32

*Wayte* v. *United States*, 470 U.S. 598 (1985) ...................... 30

*Whitman* v. *American Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) .................................................... 24

*Wyoming* v. *Oklahoma*, 502 U.S. 437 (1992) ...................... 17

V

Constitution, statutes and regulations:                Page

U.S. Const.:

Art. II, § 3, Cl. 5............................................... 10

Art. III................................................. 11, 12, 14

Administrative Procedure Act, 5 U.S.C. 500

*et seq.*....................................................... 10

5 U.S.C. 553.................................... 10, 430a

5 U.S.C. 553(a)(2).......................... 31, 430a

5 U.S.C. 553(b)(A) ......................... 29, 431a

5 U.S.C. 701(a)(1).......................... 23, 432a

5 U.S.C. 701(a)(2).......................... 20, 432a

5 U.S.C. 702.................................... 18, 432a

5 U.S.C. 706.................................... 10, 433a

Consolidated Appropriations Act, 2014, Pub. L.

No. 113-76, Div. F, Tit. II, 128 Stat. 250............ 4

Department of Homeland Security Appropriations

Act, 2015, Pub. L. No. 114-4, 129 Stat. 39:

Tit. II:

129 Stat. 42 .................................... 4, 450a

129 Stat. 42-43 ............................. 25, 450a

129 Stat. 43 .................................... 4, 451a

Immigration and Nationality Act, 8 U.S.C. 1101

*et seq.*........................................................ 2

8 U.S.C. 1103(a) ............................. 26, 436a

8 U.S.C. 1103(a)(1)..................... 2, 20, 436a

8 U.S.C. 1103(a)(1)-(3)............. 25, 30, 436a

8 U.S.C. 1103(a)(2)....................... 3, 436a

8 U.S.C. 1103(a)(3)................... 3, 20, 436a

8 U.S.C. 1154(a)(1)(D)(i)(II) ..................... 8

8 U.S.C. 1154(a)(1)(D)(i)(IV) .................... 8

VI

Statutes and regulations—Continued:        Page

8 U.S.C. 1182 .................................................... 22, 437a

8 U.S.C. 1182(a) ..................................................... 2, 437a

8 U.S.C. 1182(a)(9)(B) ......................................... 6, 437a

8 U.S.C. 1182(a)(9)(B)(i) ...................................... 6, 437a

8 U.S.C. 1182(a)(9)(B)(ii) ............................ 6, 22, 32, 438a

8 U.S.C. 1226(a)(3) .......................................................... 22

8 U.S.C. 1226(c) ............................................................... 25

8 U.S.C. 1227(a) ............................................................. 2, 5

8 U.S.C. 1229b ................................................................. 28

8 U.S.C. 1231(a)(7) .......................................................... 22

8 U.S.C. 1252 ................................................................... 23

8 U.S.C. 1252(a)(2)(B) .................................................... 27

8 U.S.C. 1252(a)(2)(B)(ii) ............................................... 22

8 U.S.C. 1252(g) ........................................... 8, 23, 26, 27

8 U.S.C. 1324a ............................................................ 22, 439a

8 U.S.C. 1324a(a) ....................................................... 27, 439a

8 U.S.C. 1324a(a)(1) .................................................... 5, 439a

8 U.S.C. 1324a(h)(3) ....................... 5, 13, 22, 23, 27, 440a

Immigration Reform and Control Act of 1986,
Pub. L. No. 99-603, 100 Stat. 3359 ..................................... 5

National Defense Authorization Act for Fiscal Year
2004, Pub. L. No. 108-136, § 1703(c)-(d),
117 Stat. 1694-1695 ............................................................. 8

Omnibus Consolidated Appropriations Act, 1997,
Pub. L. No. 104-208, 110 Stat. 3009-3010 ........................ 27

Personal Responsibility and Work Opportunity Rec-
onciliation Act of 1996, Pub. L. No. 104-193,
§ 411, 110 Stat. 2268 (8 U.S.C. 1601 *et seq.*) ................... 19

8 U.S.C. 1611 ............................................................. 20, 441a

8 U.S.C. 1611(a) ......................................................... 6, 441a

8 U.S.C. 1611(b) ....................................................... 20, 441a

VII

Statutes and regulations—Continued:                    Page

8 U.S.C. 1611(b)(2) ................................................. 22, 443a
8 U.S.C. 1611(b)(2)-(b)(4) ........................................ 6, 443a
8 U.S.C. 1611(b)(3) ................................................. 22, 443a
8 U.S.C. 1611(c) ..................................................... 20, 444a
8 U.S.C. 1621 ............................................................. 19, 445a
8 U.S.C. 1621(a) ............................................... 7, 19, 445a
8 U.S.C. 1621(b) ............................................... 7, 19, 446a
8 U.S.C. 1621(c) ..................................................... 19, 447a
8 U.S.C. 1621(c)(1)(B) ......................................... 20, 447a
8 U.S.C. 1621(d) ..........................................7, 19, 20, 448a
8 U.S.C. 1641(b) ..................................................... 6, 449a
REAL ID Act of 2005, Pub. L. No. 109-13, Div. B,
  119 Stat. 302 ..........................................................8
    49 U.S.C. 30301 note ......................................8
USA PATRIOT Act, Pub. L. No. 107-56, § 423(b),
  115 Stat. 361 ..........................................................8
Violence Against Women Act of 1994, Pub. L.
  No. 103-322, Tit. V, 108 Stat. 1092. ....................8
6 U.S.C. 202(3) .............................................. 2, 435a
6 U.S.C. 202(5) ...............................2, 20, 25, 30, 435a
6 U.S.C. 271(b) ...........................................................2
6 U.S.C. 557 ..................................................................2
Ariz. Rev. Stat. Ann. § 43-1001(2) (2013) ............................ 18
Tex. Transp. Code Ann. § 521.421(a-3) (West 2013) .......... 15
8 C.F.R.:
    Section 1.3(a)......................................... 20, 473a
    Section 1.3(a)(4)(vi) ......................... 7, 32, 474a
    Section 274a.12(a).................................. 5, 452a
    Section 274a.12(b).................................. 5, 456a
    Section 274a.12(c).................................. 5, 465a
    Section 274a.12(c)(14) ...................... 5, 32, 469a

VIII

Miscellaneous:                                        Page

Adam B. Cox & Cristina M. Rodríguez,
   *The President and Immigration Law*,
   119 Yale L.J. 458 (2009) ........................................ 25

Dep't of Justice, *Attorney General's Manual on the
   Administrative Procedure Act* (1947) ............................ 29

Dep't of Homeland Sec., *Yearbook of Immigration
   Statistics: 2013 Enforcement Actions, Tbl. 39,
   Aliens Removed or Returned: Fiscal Years 1892
   to 2013* (2014), http://www.dhs.gov/publication/
   yearbook-immigration-statistics-2013-enforcement-
   actions ......................................................... 4

44 Fed. Reg. 43,480 (July 25, 1979) ........................... 23, 27

46 Fed. Reg. 25,080 (May 5, 1981) ........................... 6, 27, 32

61 Fed. Reg. 47,041 (Sept. 6, 1996) ............................ 7, 32

6 Charles Gordon et al., *Immigration Law and
   Procedure* (1998) ............................................... 5

Memorandum from Gene McNary, Comm'r, to Reg'l
   Comm'rs, *Family Fairness, reprinted as* 67 No. 6
   Interpreter Releases 153, App. I (Feb. 2, 1990) ................ 30

Memorandum from Doris Meissner, Immigration
   & Naturalization Serv. Comm'r, to Reg'l Dirs.
   et al., *Exercising Prosecutorial Discretion, re-
   printed as* 77 No. 46 Interpreter Releases 1661,
   App. I  (Nov. 17, 2000) ......................................... 3

Memorandum from Donald Neufeld, Acting Assoc.
   Dir., to Field Leadership, *Consolidation of Guid-
   ance Concerning Unlawful Presence for Purposes
   of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of
   the Act* 42 (May 6, 2009), http://www.uscis.gov/sites/
   default/files/USCIS/Laws/Memoranda/Static_
   Files_Memoranda/2009/revision_redesign_
   AFM.PDF ........................................................ 6

IX

Miscellaneous—Continued:                                    Page

    Manuel Pastor et al., *The Kids Aren't Alright – But
    They Could Be: The Impact of Deferred Action for
    Parents of Americans and Lawful Permanent Res-
    idents (DAPA) on Children* (Mar. 2015),
    https://dornsife.usc.edu/assets/sites/731/docs/DAP
    A_Impact_on_Children_CSII_Brief_Final_01.pdf ........ 33

    Tex. Dep't of Pub. Safety, *Verifying Lawful Pres-
    ence* (July 2013), http://www.txdps.state.tx.us/
    DriverLiense/documents/verifyingLawful
    Presence.pdf....................................................................... 17

    *The Department of Homeland Security's Authority
    to Prioritize Removal of Certain Aliens Unlawful-
    ly Present in the United States and to Defer Re-
    moval of Others*, 38 Op. O.L.C. __
    (Nov. 19, 2014)........................................................... 7, 8, 33

# In the Supreme Court of the United States

———

No.

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

STATE OF TEXAS, ET AL.

———

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FIFTH CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

The Solicitor General, on behalf of the federal parties, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. (App.) 1a-155a) is not yet published but is available at 2015 WL 6873190. The opinion of the court of appeals denying a stay pending appeal (App. 156a-243a) is reported at 787 F.3d 733. The opinion of the district court (App. 244a-406a) is reported at 86 F. Supp. 3d 591.

## JURISDICTION

The judgment of the court of appeals was entered on November 9, 2015. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

### STATUTORY AND REGULATORY PROVISIONS INVOLVED

Pertinent statutory and regulatory provisions are reproduced in the appendix to this petition.   App. 430a-475a.

### STATEMENT

#### A.  Legal Framework

1. The "authority to control immigration  *  *  *  is vested solely in the Federal Government."  *Truax* v. *Raich*, 239 U.S. 33, 42 (1915).  Pursuant to that authority, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq*.  The INA charges the Secretary of Homeland Security "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. 1103(a)(1).[1]

Congress has expressly assigned the Secretary the responsibility for "[e]stablishing national immigration enforcement policies and priorities."  6 U.S.C. 202(5).  One of the enforcement matters over which the Secretary has authority is the removal of aliens if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona* v. *United States*, 132 S. Ct. 2492, 2499 (2012); see 8 U.S.C. 1182(a), 1227(a).  In this and other matters, the Secretary is vested with the authority to "establish such regulations;  *  *  *   issue such instructions; and perform

---

[1]  Congress has transferred to the Department of Homeland Security (DHS) most of the functions of the former Immigration and Naturalization Service (INS).  *E.g.*, 6 U.S.C. 202(3), 271(b), 557.  Unless otherwise indicated, references to the actions of DHS and the Secretary include actions by their predecessors.

3

such other acts as he deems necessary," and to have "control, direction, and supervision" of all DHS employees. 8 U.S.C. 1103(a)(2) and (3).

2. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. When they encounter a removable alien, immigration officials, "as an initial matter, must decide whether it makes sense to pursue removal at all." *Ibid.* They decide whether to "[f]ocus[] investigative resources on particular offenses or conduct"; "to issue, serve, or file a Notice to Appear"; to oppose a request for relief; to settle or dismiss a proceeding; to appeal an adverse ruling; and to execute a removal order. Memorandum from Doris Meissner, INS Comm'r, *Exercising Prosecutorial Discretion* 2, *reprinted as* 77 No. 46 Interpreter Releases 1661, App. I (Nov. 17, 2000). "At each stage the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*).

Like other agencies exercising enforcement discretion, DHS balances "a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Those factors include "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all," *ibid.*, as well as "immediate human concerns," such as "whether the alien has children born in the United States [or] long ties to the community," *Arizona*, 132 S. Ct. at 2499.

The Secretary faces resource constraints that require the exercise of enforcement discretion. More than 11 million removable aliens are estimated to live

4

in the United States. App. 5a. But Congress has appropriated the funds to remove only a fraction of that population in any given year. The number of removals has varied depending on circumstances, but DHS has not been able to remove more than four percent of the estimated removable population in any year. See DHS, *Yearbook of Immigration Statistics: 2013 Enforcement Actions, Tbl. 39, Aliens Removed or Returned: Fiscal Years 1892 to 2013* (2014). And more aliens enter unlawfully or otherwise become removable each year.

Recognizing that DHS cannot actually remove the vast majority of removable aliens, Congress has directed U.S. Immigration and Customs Enforcement (ICE), the relevant DHS component, to use at least $1.6 billion to identify and remove aliens convicted of crimes, and to prioritize removals of criminal aliens "by the severity of th[e] crime." DHS Appropriations Act, 2015 (Appropriations Act), Pub. L. No. 114-4, Tit. II, 129 Stat. 43. But as relevant here, Congress has otherwise committed to DHS's discretion the choice of how to allocate its lump-sum appropriation for "necessary expenses for enforcement of immigration and customs laws, detention and removals, and investigations." *Id.* at 42; see Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F, Tit. II, 128 Stat. 250 (same); *Lincoln* v. *Vigil*, 508 U.S. 182, 191-194 (1993).

3. For decades, DHS has engaged in "a regular practice * * * known as 'deferred action,'" in which the Secretary "exercis[es] [his] discretion" to forbear, "for humanitarian reasons or simply for [his] own convenience," from removing particular aliens from the United States for a designated period of time. *AADC*, 525 U.S. at 483-484. Deferred action thus

5

memorializes a decision "[t]o ameliorate a harsh and unjust outcome" through forbearance. *Id.* at 484 (quoting 6 Charles Gordon et al. *Immigration Law and Procedure* § 72.03[2][h] (1998)). Through "[t]his commendable exercise in administrative discretion, developed without express statutory authorization," *ibid.* (citation omitted), a removable alien is able to remain in the country for the duration of the agency's forbearance. That person's continued presence does not violate any criminal law, because "[r]emoval is a civil, not criminal, matter," and "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2499, 2505; see 8 U.S.C. 1227(a). But deferred action provides no defense to the civil consequence of continued presence: The alien remains removable, and DHS has discretion to revoke deferred action at any time. See *AADC*, 525 U.S. at 484-485.

Under other longstanding federal law, according aliens deferred action has several consequences. First, aliens with deferred action—like many other aliens whose presence is temporarily countenanced— become eligible for work authorization. 8 C.F.R. 274a.12(a), (b), (c), and (14). As amended by the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, the INA makes it unlawful to knowingly hire an "unauthorized alien." 8 U.S.C. 1324a(a)(1). Aliens are "unauthorized" to be hired if they are not permanent residents or not "authorized to be so employed by [the INA] or by the [Secretary]." 8 U.S.C. 1324a(h)(3). Pursuant to a regulation in place when Congress enacted IRCA, aliens with deferred action and economic need may apply for work authorization. 8 C.F.R. 274a.12(c)(14);

6

see 46 Fed. Reg. 25,080 (May 5, 1981).   Otherwise, during the period the government has countenanced an alien's presence, that person would have no lawful way to make ends meet and would be vulnerable to exploitation by unscrupulous employers.

Second, like many other aliens, aliens accorded deferred action cease accruing time for purposes of the admissibility bars in 8 U.S.C. 1182(a)(9)(B).   That provision makes an alien inadmissible for three or ten years if she departs the United States after being "unlawfully present" for six months or a year.   8 U.S.C. 1182(a)(9)(B)(i).   "For purposes of this paragraph," an alien is "unlawfully present" if she is present "after the expiration of the period of stay authorized by the [Secretary]."   8 U.S.C. 1182(a)(9)(B)(ii). The Secretary has long considered deferred action to toll accrual of time for purposes of that calculation. See Memorandum from Donald Neufeld, Acting Assoc. Dir., *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* 42 (May 6, 2009).

Third, aliens with deferred action become potentially eligible for certain federal public benefits.   For most such benefits, only "qualified alien[s]" are eligible, and aliens with deferred action are not "qualified."   8 U.S.C. 1611(a); see 8 U.S.C. 1641(b) (defining "qualified alien").   But that limitation does not apply to some Social Security, Medicare, and railroad-retirement benefits when a non-qualified alien is "lawfully present in the United States as determined by the [Secretary]."   8 U.S.C. 1611(b)(2)-(4).   Under longstanding regulations, deferred action makes an alien eligible for some Social Security benefits under this

7

provision.  8 C.F.R. 1.3(a)(4)(vi); 61 Fed. Reg. 47,041 (Sept. 6, 1996).

As a matter of federal law, deferred action has no impact on whether an alien is eligible for any state public benefit.  States may provide certain minimal benefits to all aliens.  See 8 U.S.C. 1621(b).  But non-"qualified" aliens (who are also not parolees or nonimmigrants) are prohibited from receiving any additional state public benefits, unless the State has affirmatively chosen after August 22, 1996 to provide them.  8 U.S.C. 1621(a) and (d).  Deferred action does not make an alien "qualified" (or a parolee or nonimmigrant).  See 8 U.S.C. 1641(b).  Deferred action thus does not trigger eligibility for any state public benefit, unless a State voluntarily chooses to provide such a benefit on that basis.

4. DHS has repeatedly accorded deferred action and exercised similar forms of discretion on the basis of the Secretary's general authority to administer the immigration laws.  *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. ___, *14-*20 (Nov. 19, 2014) (OLC Op.) (collecting examples). For example, in 1990, INS expanded a "Family Fairness" policy to provide extended voluntary departure to spouses or children of aliens with legalized status, and some estimates were that 1.5 million people—about 40% of the total removable population at the time—could be eligible.  *Id.* at *31.  In 2005, DHS implemented a policy of according deferred action to foreign students affected by Hurricane Katrina.  *Id.* at *16-*17.  And in 2012, DHS implemented the Deferred Action for Childhood Arrivals (DACA) policy

8

for certain aliens who were brought or came to this country as children and have lived here for years. *Id.* at *17-*18. More than 600,000 people have been accorded deferred action via that policy. App. 4a.

Congress has repeatedly recognized in legislation that DHS has inherent authority to defer action. For example, without defining or codifying the term, Congress has made aliens who petition for relief under the Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat. 1092, eligible to request "deferred action." 8 U.S.C. 1154(a)(1)(D)(i)(II) and (IV). Similarly, certain family members of lawful permanent residents killed on September 11, 2001, or of citizens killed in combat, are "eligible for deferred action." USA PATRIOT Act, Pub. L. No. 107-56, § 423(b), 115 Stat. 361; National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1694-1695. Congress has also provided that, if a State participates in the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302, it may issue compliant driver's licenses to aliens with "approved deferred action status." 49 U.S.C. 30301 note. And 8 U.S.C. 1252(g) bars judicial review of "no deferred action" decisions. *AADC*, 525 U.S. at 485.

### B. Factual And Procedural Background

1. On November 20, 2014, the Secretary issued two memoranda relevant here. The first directs DHS to focus "to the greatest degree possible" on removing serious criminals, terrorists, aliens who recently crossed the border, and aliens who have abused the immigration system. App. 426a; see App. 420a-429a.

The second announces "new policies for the use of deferred action." App. 412a (Guidance); see App. 411a-419a. The Guidance directs U.S. Citizenship and

9

Immigration Services (USCIS) to expand eligibility under the 2012 DACA policy to aliens with a wider range of ages and arrival dates, and extends the period of deferred action from two years to three. App. 415a-416a. The Guidance also directs USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident." App. 416a-417a. This process is known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). App. 2a. To request consideration for deferred action via DAPA, an applicant must: (1) as of November 20, 2014, be the parent of a son or daughter who is a U.S. citizen or permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." App. 417a.

The Secretary explained that the new policy would reach "hard-working people who have become integrated members of American society," have not committed serious crimes, and "are extremely unlikely to be deported given * * * limited enforcement resources." App. 415a. Deferring action for these individuals, the Secretary continued, supports "this Nation's security and economic interests and make[s] common sense, because [it] encourage[s] these people to come out of the shadows, submit to background

10

checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted." *Ibid*.  The Guidance emphasizes that it does not establish any right to deferred action, that deferred action "does not confer any form of legal status in this country," and that deferred action "may be terminated at any time at the agency's discretion."  App. 413a.

Under the Guidance, DHS was to begin accepting requests under the expanded DACA criteria no later than February 18, 2015, and for DAPA no later than May 19, 2015.  App. 416a, 418a.

2.  On December 3, 2014, respondent States sued in district court, seeking declaratory and injunctive relief against implementing the Guidance.  Respondents alleged that the Guidance violates the Take Care Clause, U.S. Const. Art. II, § 3, Cl. 5; is arbitrary and capricious, 5 U.S.C. 706; and could only be adopted through notice-and-comment procedures, 5 U.S.C. 553.  App. 9a.

On February 16, 2015, the district court entered a nationwide preliminary injunction against implementing the Guidance.  App. 407a-410a.  The court held that respondents were likely to succeed in establishing that they had standing and a cause of action under the Administrative Procedure Act (APA), 5 U.S.C. 500 *et seq.*, and that the Secretary was required to conduct notice-and-comment rulemaking before issuing the Guidance.  App. 405a.  The court did not reach respondents' substantive APA and constitutional claims. App. 403a-405a.

The government appealed, moved to expedite, and moved for a stay pending appeal.  App. 2a.  The court of appeals expedited the appeal.  On May 26, 2015, a divided panel declined to stay the injunction pending

11

appeal.  App. 156a-210a.  Judge Higginson dissented.
App. 211a-243a.

On November 9, 2015, a divided panel affirmed the
preliminary injunction.  App. 1a-90a.  The majority,
consisting of the same two judges who were in the
stay-panel majority, held that "[a]t least one state"—
Texas—had Article III standing and a justiciable
cause of action under the APA, and that respondents
were substantially likely to establish that notice-and-
comment rulemaking was required.   App. 20a; see
App. 11a-69a.  Although the district court had not
addressed the issue, the majority further held that the
Guidance is "manifestly contrary" to the INA.  App.
76a; see App. 69a-86a.

The new panel member, Judge King, dissented.
App. 91a-155a.  Like Judge Higginson, she concluded
that the Guidance involves non-reviewable matters
that are committed to agency discretion by law, and
that, if the Guidance "is implemented in the truly
discretionary, case-by-case manner it contemplates, it
is not subject to the APA's notice-and-comment re-
quirements."  App. 92a-93a.  She also found it inap-
propriate to rule on the substantive validity of the
Guidance but stated that, if she were to reach the
question, she would not have found the Guidance un-
lawful.  App. 146a-155a.

**REASONS FOR GRANTING THE PETITION**

A divided court of appeals has upheld an unprece-
dented nationwide injunction against implementing a
federal immigration enforcement policy of great na-
tional importance, and has done so in violation of es-
tablished limits on the judicial power.  If left undis-
turbed, that ruling will allow States to frustrate the
federal government's enforcement of the Nation's

12

immigration laws. It will force millions of people—who are not removal priorities under criteria the court conceded are valid, and who are parents of U.S. citizens and permanent residents—to continue to work off the books, without the option of lawful employment to provide for their families. And it will place a cloud over the lives of hundreds of thousands of people who came to the United States as children, have lived here for years, and been accorded deferred action under the 2012 DACA policy, which respondents have never challenged. The decision warrants immediate review.

The court of appeals' justiciability rulings threaten a vast expansion of the judicial power that would entangle federal courts in policy disputes that are properly resolved through the political process. The court erroneously permitted any State to create Article III standing to challenge a federal policy, based on the State's voluntary decision to provide a state subsidy to the aliens that policy would benefit. But the Guidance does not bar a State from eliminating that subsidy if it believes that federal policy choices no longer align with its interests. The court compounded that error by rewriting the established limits on APA review in disregard of this Court's admonition that an "agency is far better equipped than the courts to deal with the many variables involved" in setting enforcement policies. *Heckler* v. *Chaney*, 470 U.S. 821, 831-832 (1985).

The court of appeals' merits rulings warrant review because they strip DHS of authority it has long exercised to provide deferred action to categories of aliens. The majority acknowledged that DHS could lawfully exercise enforcement discretion to forbear from removing the parents and children covered by the Guid-

13

ance, who have lived here for years. App. 44a. It nevertheless believed that the INA forbade the government from according those same parents and children deferred action. But "deferred action" itself is simply the name in immigration parlance for when DHS memorializes a decision to forbear from removing an alien, as a matter of enforcement discretion, for a designated time.

To be sure, deferred action has several other consequences for the alien under longstanding federal law, including eligibility to apply for work authorization. But the Secretary has discretion under the INA to grant that work authorization, which is closely bound up with his exercise of discretion over removals. Indeed, the INA for decades has made clear that the determination of which aliens are authorized to be hired lawfully may be made "by the [Secretary]." 8 U.S.C. 1324a(h)(3). The INA thus authorizes the Secretary to accord deferred action to the parents here—and to have them come forward, submit to a background check, and support their U.S.-citizen and permanent-resident children by working lawfully.

The court of appeals also fundamentally erred in holding that the Guidance was subject to the APA's notice-and-comment requirements. The Guidance is a classic example of a "general statement of policy" that is expressly exempt from those requirements. The court's contrary ruling threatens to deprive agencies throughout the government of the flexibility that is essential in fashioning and revising policies for enforcement and other discretionary practices.

The court of appeals thus committed manifold and significant errors in affirming the unprecedented nationwide injunction barring implementation of an

14

important federal policy affecting the parents and children here.  This Court should grant certiorari and reverse.

## I.  RESPONDENTS DO NOT HAVE ARTICLE III STANDING OR A COGNIZABLE CLAIM UNDER THE APA

### A.  A State's Voluntary Decision To Extend A Subsidy To Aliens Accorded Deferred Action Does Not Give It Standing To Challenge Federal Deferred-Action Policies

1.  Like a member of the public, a State generally lacks standing to challenge the Executive's policy choices about how to enforce federal laws, including the immigration laws.  In the context of criminal proceedings, "a citizen lacks standing to contest the policies of [a] prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 619 (1973). Private parties similarly "have no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else.  *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984).  And because "the removal process is entrusted to the discretion of the Federal Government" to the exclusion of the States, *Arizona* v. *United States*, 132 S. Ct. 2492, 2506 (2012), it is not a process in which a State inherently has a sovereign or quasi-sovereign interest.

Nor does a State obtain standing to challenge a federal immigration policy by virtue of the collateral consequences for aliens who are the policy's beneficiaries.  See p. 7, *supra*.  "[M]uch more is needed" to establish standing than a mere assertion of "the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan* v. *Defenders*

15

*of Wildlife*, 504 U.S. 555, 562 (1992); see, *e.g.*, *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 346 (2006). Indeed, the Constitution's assignment of immigration responsibilities exclusively to the national government renders States particularly unlikely candidates for invoking the jurisdiction of federal courts to interfere with the relationship between the national government and aliens.

2. If a State could ever have standing to challenge a federal deferred-action policy despite these structural bars, at a minimum it would have to show a cognizable injury that affects it in an "*individual* way" that is "fairly . . . traceable" to the policy. *Arizona Christian Sch. Tuition Org.* v. *Winn*, 131 S. Ct. 1436, 1442 (2011) (emphasis added; brackets and citations omitted). Respondents cannot make that showing because the Guidance does not regulate States or require States to do (or not do) anything.

The court of appeals nonetheless held that Texas had standing by extending *Massachusetts* v. *EPA*, 549 U.S. 497 (2007). App. 12a. According Texas "special solicitude," *ibid.*, the majority found standing based on an injury that results from Texas's own decisions (1) to subsidize the costs of its alien "temporary visitor" driver's licenses; and (2) to allow aliens with deferred action to apply for those subsidized licenses. See App. 11a-36a; App. 105a (King, J., dissenting) (dissent); see also Tex. Transp. Code Ann. § 521.421(a-3) (West 2013). By increasing the number of aliens in Texas with deferred action, the majority reasoned, the Guidance will increase the subsidy's overall cost. See App. 20a-21a. The majority recognized that "Texas could avoid financial loss by requiring applicants to pay the full costs of [those] licenses."

16

App. 24a. But in the majority's view, Texas still suffered an actionable harm because the Guidance imposed "substantial pressure" on Texas to change its state laws. App. 16a, 20a. Ultimately, therefore, it was not the prospect of increased costs that provided standing; it was the prospect that Texas might want to change its laws to avoid those costs. *Ibid.*

Unlike in *Massachusetts*, however, the INA does not grant Texas any special "procedural right" to challenge federal immigration policy. 549 U.S. at 517. And the interest Texas asserts is nothing like the sovereign interest in *Massachusetts*. There, the State was threatened with a loss of sovereign territory—a literal loss of sovereignty—it could not unilaterally avoid. See *id.* at 519-520. Here, the Guidance causes no loss of sovereignty. Texas has chosen to link the availability of state-subsidized licenses to a federal immigration category that the State believed suited its sovereign interests. Nothing in the Guidance affects Texas's freedom to alter or eliminate its subsidy at any time. Any "pressure" here is thus self-created and fundamentally unlike preemption, where a federal law overrides a duly-enacted state law.

The decision below is therefore at odds with *Pennsylvania* v. *New Jersey*, 426 U.S. 660 (1976). That decision holds that a State's choice to extend a subsidy on the basis of another sovereign's actions is not a proper basis for standing when the other sovereign's policies change and thus increase the cost of the subsidy. In *Pennsylvania*, the Court concluded that Pennsylvania lacked standing to challenge a New Jersey tax that triggered a tax credit under Pennsylvania law and thereby reduced Pennsylvania's tax revenue. *Id.* at 662-664. The Court explained that

17

"[n]o State can be heard to complain about damage inflicted by its own hand" and that "nothing prevents Pennsylvania from withdrawing [the] credit." *Id.* at 664; cf. *Clapper* v. *Amnesty Int'l USA*, 133 S. Ct. 1138, 1152-1153 (2013). So too here.

The panel majority instead relied on *Wyoming* v. *Oklahoma*, 502 U.S. 437 (1992), but that case is inapposite. It held that Wyoming had standing to challenge a discriminatory Oklahoma law targeted at reducing sales of Wyoming coal in Oklahoma, when the effect was to reduce Wyoming's revenues from its neutral tax on coal extraction. *Id.* at 442-446, 454. Wyoming, however, did not "tie[] its law to that of another sovereign." App. 106a n.16 (dissent). Wyoming's tax depended solely on activity in Wyoming. It was the defendant (Oklahoma) that reached out to connect the two sovereigns' policies by targeting Wyoming coal for particular burdens. Here, as in *Pennsylvania* but unlike in *Wyoming*, the link has been created by the plaintiff State. But to the extent *Pennsylvania* and *Wyoming* can be read to point in different directions, that only underscores the need for this Court's review.

3. As the dissent recognized, "[t]he majority's breathtaking expansion of state standing would inject the courts into far more federal-state disputes and review of the political branches than is now the case." App. 103a. For example, Texas provides the same subsidy to myriad other aliens, including those with parole, asylum, temporary protected status, deferred enforced departure, and extended voluntary departure. See Tex. Dep't of Pub. Safety, *Verifying Lawful Presence* 1-5 (July 2013). Under the majority's reasoning, Texas could claim standing to sue the govern-

18

ment for making an individual decision to grant asylum—and would clearly have standing to sue the government any time it adopted immigration policies providing relief to a substantial number of aliens in Texas in any of these categories.

The harms of the majority's theory also could extend well beyond immigration. For example, a State that voluntarily incorporates the federal definition of "adjusted gross income" in computing state income taxes—as many States do, see, *e.g.*, Ariz. Rev. Stat. Ann. § 43-1001(2) (2013)—could have standing to challenge an IRS revenue ruling that lowered adjusted gross income under federal law, and thereby incidentally decreased state revenues. But the consequences of the majority's theory are particularly acute in a case, like this one, where a State seeks to leverage its own policy choices to insert itself—and the federal courts—into discretionary immigration policy decisions that Congress and the Constitution have committed exclusively to the national government.

**B. Respondents Lack A Cognizable APA Claim**

The court of appeals' decision also warrants review because it vastly expands what qualifies as a cognizable cause of action under the APA and impermissibly subjects the federal government's exercise of enforcement discretion to judicial oversight.

1. The APA does not "allow suit by every person suffering injury in fact." *Clarke* v. *Securities Indus. Ass'n*, 479 U.S. 388, 395 (1987). It limits the right of judicial review to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. 702. That provision requires that "the interest sought to be protected by the complainant be arguably within the zone of interests

19

to be protected or regulated by the statute * * * in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, Texas's asserted interest in avoiding costs flowing from a voluntary state-law subsidy falls far outside the zone of interests of the INA's removal provisions. The INA "regulat[es] the relationship between the United States and our alien visitors," *Mathews* v. *Diaz*, 426 U.S. 67, 81 (1976), not between aliens and third-party States.

Relying on 8 U.S.C. 1621, the court of appeals concluded that the INA protected Texas's interest in "participat[ing] in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." App. 37a-38a. Section 1621 is part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, § 411, 110 Stat. 2268, not the INA, and it does not cover Texas's driver's-license subsidy, which is not a state "public benefit." See 8 U.S.C. 1621(c). Under PRWORA, deferred action does not trigger eligibility for any state public benefit, unless a State voluntarily chooses after PRWORA's effective date to confer such benefits on that basis. See 8 U.S.C. 1621(a), (b), and (d); 8 U.S.C. 1641(b). It thus is up to each State—and each State alone—to *protect itself* from the costs of providing such benefits to aliens with deferred action.[2]

---

[2] The majority also erred in assuming (App. 8a-9a, 44a-45a) that deferred action makes aliens eligible for Texas unemployment compensation. That is a state public benefit, so aliens with deferred action cannot receive it unless Texas affirmatively opted to extend that benefit after PRWORA became effective. See 8 U.S.C.

20

The INA also contains no notice-and-comment provision or other procedure granting States a special right to "participate" before the Secretary changes immigration policies that may have incidental consequences for a State, including on any voluntary state-law subsidies. App. 37a-38a. Rather, the INA gives the Secretary authority to set immigration enforcement policies himself. *Arizona*, 132 S. Ct. at 2506; see 8 U.S.C. 1103(a)(1) and (3); see also 6 U.S.C. 202(5).

2. The APA also bars respondents' suit because, as both dissents concluded, App. 93a; App. 213a-214a, it challenges actions that are "committed to agency discretion by law." 5 U.S.C. 701(a)(2). That exception "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" and decisions under statutes that furnish "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993) (citations omitted). In *Heckler*, this Court held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." 470 U.S. at 832; accord *Vigil*, 508 U.S. at 191. That principle applies to deferred-action policies because they involve nonbinding and revocable determinations to forbear from removing particular aliens for a period of time. See *AADC*, 525 U.S. at 484-485; cf. *Johns* v. *Department of Justice*,

---

1621(a), (c)(1)(B), and (d). Texas has not done so. Texas's alleged injury is also neither fairly traceable to nor within the zone of interests of Section 1611, under which deferred-action recipients may become eligible for some *federal* benefits. 8 U.S.C. 1611(b) and (c); 8 C.F.R. 1.3(a).

21

653 F.2d 884, 893 (5th Cir. 1981) ("Th[e] discretion [to commence deportation proceedings] is, like prosecutorial discretion, immune from review.").

The majority nonetheless concluded that deferred-action policies are reviewable under the APA because "[d]eferred action" is "much more than nonenforcement:  It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." App. 44a.  But insofar as deferred action itself is concerned, "lawful presence" is simply the label for the consequence of memorializing a decision to forbear from enforcement action for a designated time:  A decision to forbear from removing a person results in "lawful presence" in the sense that DHS has decided to countenance that person's continued presence in the United States so long as DHS continues to forbear.  See App. 113a-114a (dissent).  Under *Heckler*, a deferred-action policy is presumptively unreviewable, whether a litigant chooses to focus on the choice itself (to forbear from enforcement) or its effect (to countenance the activity that could be the subject of enforcement).  Either way, the discretion is the same.

Deferred action also has several consequences under different provisions of federal law, but they do not make a deferred-action policy reviewable.  Those consequences "are not new"; they "are a function of statutes and regulations that were enacted by Congresses and administrations long past." App. 109a-110a (dissent).  "That a prior statute or regulation ties a benefit to the exercise of prosecutorial discretion does not make that ordinarily unreviewable exercise of prosecutorial discretion reviewable." App. 115a. Indeed, many exercises of discretion have collateral

22

benefits, such as drug treatment following pretrial diversion. App. 117a.

In any event, Congress also has committed to the Secretary's discretion each of the consequences that result from deferred action under federal law. In PRWORA, Congress gave the Secretary discretion to decide which non-qualified aliens are eligible for Social Security and certain other federal benefits. 8 U.S.C. 1611(b)(2) and (3) ("as determined by the [Secretary]"). In the INA, Congress similarly specified that the Secretary has discretion to decide whether aliens with deferred action accrue time for purposes of the three- and ten-year bars, see 8 U.S.C. 1182(a)(9)(B)(ii) (after "period of stay authorized by the [Secretary]"), and whether to authorize aliens to be lawfully hired, 8 U.S.C. 1324a(h)(3) ("authorized to be so employed * * * by the [Secretary]"). No statute contains a relevant justiciable limit on the Secretary's ability to do so for the parents and children covered by the Guidance.[3] Moreover, the INA expressly prohibits review of any "decision or action of the [Secretary]" "the authority for which is specified under [INA subchapter II] to be in the discretion of the [Secretary]." 8 U.S.C. 1252(a)(2)(B)(ii). Sections 1182 and 1324a are both in that Subchapter. This statutory shield from judicial interference underscores that the Secretary's exercise of discretion re-

_____

[3] Congress has prohibited the Secretary from giving work authorization on the basis that an alien has been released on bond during removal proceedings, 8 U.S.C. 1226(a)(3), and has limited work authorization for aliens released on orders of supervision following entry of a final order of removal, 8 U.S.C. 1231(a)(7). The Guidance implicates neither limitation.

23

lating to these benefits—including work authorization—is not reviewable in a suit by third-party States.

Authorizing aliens to be hired is also closely bound up with the Secretary's discretion over removals. When DHS accords deferred action to an alien, that alien will continue living here, and "in ordinary cases [aliens] cannot live where they cannot work." *Truax* v. *Raich*, 239 U.S. 33, 42 (1915). Accordingly, authorizing aliens to be hired has long been considered a "necessary incident of [the Secretary's] authority to administer the [INA]." 44 Fed. Reg. 43,480 (July 25, 1979). And IRCA reinforces that point by confirming that "the [Secretary]" may decide whether an alien may be lawfully hired. 8 U.S.C. 1324a(h)(3).

The INA's text provides additional confirmation that the Guidance is not subject to review. The INA provides a cause of action solely to aliens to challenge individual orders of removal, 8 U.S.C. 1252—but no cause of action at all to third-parties, including States. If Congress had intended to allow suits based on the consequences of deferred action, one would expect that the most impacted parties—aliens denied deferred action—could sue. Instead, 8 U.S.C. 1252(g) squarely prohibits such suits. As this Court explained in *AADC*, Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." 525 U.S. at 486 n.9. That is just what respondents seek in this suit.[4]

---

[4] The INA's provisions not only confirm that the Guidance involves actions that are committed to agency discretion by law, but also they are part of a broader statutory framework establishing that a challenge by third-party States to a deferred-action policy is precluded by the INA under 5 U.S.C. 701(a)(1). See *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[T]he

24

## II. THE SECRETARY HAD AMPLE STATUTORY AU-THORITY TO ISSUE THE GUIDANCE

The court of appeals' ruling that the Secretary lacked substantive authority to adopt the Guidance is wrong, unduly restricts DHS's enforcement discretion, precludes implementation of a national policy of great importance, and places a cloud over a longstanding DHS practice that affects hundreds of thousands of people.

"[D]eferred action—whether *ad hoc* or through DAPA—is not an effort by DHS to 'hide elephants in mouseholes.'" App. 153a (dissent) (quoting *Whitman* v. *American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). To the contrary, it manifests the discretion that is "[a] principal feature of the removal system." *Ibid.* (quoting *Arizona*, 132 S. Ct. at 2499). As this Court recognized in *Arizona*, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." 132 S. Ct. at 2499. These officials exercise discretion knowing that "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 2498.

Deferred action—which the Court described in *AADC* as a "regular practice" of forbearing, as a matter of discretion, from removing an alien, 525 U.S. at 483-484—is a decades-old species of this removal discretion. Like other forms of immigration discretion, it is grounded in expansive statutory authority,

---

presumption favoring judicial review of administrative action may be overcome by inferences of intent drawn from the statutory scheme as a whole.").

25

see 6 U.S.C. 202(5); 8 U.S.C. 1103(a)(1)-(3), and historical practice by both the Executive and Congress, see pp. 7-8, *supra*. It also reflects the reality that Congress has enacted laws under which a huge population of aliens is removable, but has appropriated the funds to remove only a small fraction of that population. See p. 3, *supra*. Congress has thus necessarily delegated to the Secretary "tremendous authority" to decide that large classes of aliens do not warrant immediate removal efforts. Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 463 (2009); see *id.* at 510–511. In particular instances, Congress has channeled the exercise of that discretion by directing the Secretary to prioritize the removal of serious criminals, see Appropriations Act, 129 Stat. 42-43, and by requiring DHS to apprehend and detain certain criminal and terrorist aliens pending their removal, 8 U.S.C. 1226(c). But Congress has not disturbed the broad discretion the Secretary otherwise exercises in this area—and in particular his ability to establish policies for deferring action for the parents and children here.

The court of appeals majority acknowledged that the Secretary has discretion to decide to forbear from removing every alien who could benefit under the Guidance. App. 44a. But the majority nonetheless concluded that the Guidance is unlawful, based on two inferences: (1) that the Secretary cannot defer action or confer work authorization, except to classes of aliens the INA itself identifies; and (2) that the INA implicitly precludes the Secretary from deferring action for parents under more forgiving standards than would apply if those parents were seeking to become permanent residents or to obtain cancellation

26

of removal.   App. 85a-86a; see App. 71a-76a.   The result is that the Secretary can forbear from removing each alien covered by the Guidance and thus enable them to remain present for a period of time—but is barred from enabling them to work lawfully to support themselves and their families while they are here. Congress did not constrain the Secretary's broad discretion to such half measures.

First, the Secretary may decide whether a class of aliens warrants deferred action.   Congress has long been aware of DHS's "regular practice" of granting deferred action, *AADC*, 525 U.S. at 483-484, including for classes of aliens.   But Congress has done nothing that would prevent the Secretary from deferring action for the class of parents and children here.   App. 149a-150a (dissent).   To the contrary, Congress has protected deferred-action decisions from judicial intervention, see 8 U.S.C. 1252(g); *AADC*, 525 U.S. at 485 & n.9, and repeatedly recognized that the Secretary has authority to defer action for classes of aliens by directing him to use that authority for additional classes of aliens, see p. 8, *supra*.   Contrary to the majority's stilted inference, statutes encouraging the Secretary to use this preexisting authority in *more* circumstances do not prevent him from using it elsewhere.

The Secretary has similarly longstanding authority to decide whether a class of aliens should be eligible to be lawfully employed.   See pp. 22-23, *supra*.   In 1952, Congress authorized the Secretary to issue regulations for the administration of the INA.   8 U.S.C. 1103(a).   And since 1981, regulations governing work authorization—including for deferred-action recipients—have been in place as a "necessary incident"

27

of that authority.  44 Fed. Reg. at 43,480; see 46 Fed.
Reg. at 25,080.   Otherwise, aliens whose presence
DHS has officially countenanced would be unable to
support themselves through lawful work.

In IRCA, Congress imposed penalties on employ-
ers who knowingly employ an "unauthorized" alien.  8
U.S.C. 1324a(a).  And in that same statute, Congress
provided that this proscription does not apply to hir-
ing aliens who are "authorized to be so employed by
[the INA] *or* by the [Secretary]."  8 U.S.C. 1324a(h)(3)
(emphasis added).  The "or" confirms that work au-
thorization is not conferred solely by the INA itself:
"the [Secretary]" may also authorize categories of
aliens to be lawfully hired.  *Ibid*.  This language thus
signals that Congress "implicit[ly] approv[ed]" the
"longstanding" work-authorization regulation.  App.
152a (dissent).  Since Congress enacted IRCA, DHS
has repeatedly provided deferred action and other
similar relief—as well as work authorization—to cate-
gories of aliens as a matter of discretion, including to
substantial populations. See pp. 7-8, *supra* (collecting
examples).   And although Congress has amended
Section 1324a six times, *e.g.*, Pub. L. No. 104-208, 110
Stat. 3009-3010, it has not limited the Secretary's
authority in any way relevant here.  Instead, it has
further shielded the Secretary's discretion from judi-
cial interference.  See 8 U.S.C. 1252(a)(2)(B) and (g).

Second, according deferred action and work au-
thorization for the parents here is consistent with the
INA.   The majority noted that parents who could
obtain deferred action are not currently entitled to
become lawful permanent residents or seek cancella-
tion of removal under the INA.  App. 71a-74a.  But by
definition, deferred action is relevant *only* when aliens

28

lack lawful status or are otherwise removable, and thus when the Secretary could exercise discretion to pursue removal. His choice instead to defer action is consistent with the INA both because that discretion is a "principal feature" of immigration enforcement, *Arizona*, 132 S. Ct. at 2499, and because deferred action provides lesser relief. *Permanent* residents and aliens who receive *cancellation* of removal under 8 U.S.C. 1229b are no longer removable and have legal rights to remain in the United States. Aliens with deferred action, by contrast, are removable and may remain present only so long as DHS continues to forbear. See App. 413a (Deferred action "does not confer any form of legal status.").

Granting deferred action and work authorization to the parents of children who are U.S. citizens or permanent residents is also consistent with the INA's longstanding aims of protecting family unity and self-reliance. Indeed, these parents must work to support themselves and their children—who are U.S. citizens and permanent residents. See *Arizona*, 132 S. Ct. at 2499 (enforcement discretion may "embrace[] immediate human concerns," including "whether the alien has children born in the United States"). And because the Guidance only covers parents and children who have "long ties to the community," *ibid.*, deferred action and work authorization will make these individuals more likely to be self-reliant and pay taxes, and less likely to harm American workers by working for below-market wages. See App. 96a (dissent); Wash. State et al. C.A. Amicus Br. 4-8 (anticipating that the Guidance will benefit States).

29

### III. THE GUIDANCE IS EXEMPT FROM NOTICE-AND-COMMENT REQUIREMENTS

The court of appeals' notice-and-comment ruling warrants this Court's review because it threatens far-reaching consequences by constraining needed flexibility to adapt enforcement policies to changing circumstances and priorities. The APA exempts from notice-and-comment all "general statements of policy." 5 U.S.C. 553(b)(A). Those are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197 (quoting Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 30 n.3 (1947)). Enforcement policies lie at the heart of this exception, as they inform the public how an agency will exercise its discretion to enforce (or forbear from enforcing) the law. *E.g.*, App. 231a-232a (Higginson, J., dissenting). And the Guidance fits the bill: It embodies "the Secretary's tentative decision, based on an assessment of the best uses of DHS's limited resources and under his congressionally delegated authority to '[e]stablish[] national immigration enforcement policies and priorities,' not to remove qualifying applicants for a certain period of time." App. 108a (dissent) (citation omitted; brackets in original).

The majority nonetheless concluded that respondents were likely to establish that the Secretary could not issue the Guidance without notice-and-comment rulemaking, because the Guidance "would not genuinely leave the agency and its employees free to exercise discretion." App. 64a; see App. 54a-64a. But the majority's speculation about how individual DHS agents might act in the future overlooks that the dis-

30

cretion being exercised belongs in the first instance *to the Secretary*. See 6 U.S.C. 202(5); 8 U.S.C. 1103(a)(1)-(3). The Guidance reflects the Secretary's discretionary judgment that the stated threshold criteria describe individuals who, in his view, are likely to warrant deferred action as a matter of discretion. App. 414a-415a.

The APA does not require senior officials to use notice-and-comment procedures whenever their discretionary policies preclude subordinates from exercising their discretion in a different way. For example, the memorandum in *Vigil* announced a decision about resource allocation from which agency employees could not deviate. See 508 U.S. at 188. The "passive enforcement" policy in *Wayte* v. *United States*, 470 U.S. 598, 601 (1985), categorically exempted all but 286 of a possible 674,000 violators—99.96% of the total—from prosecution for the continuing offense of failing to register for the draft. *Id*. at 604 & n.3. And the expanded Family Fairness policy in 1990 directed that officials "will" grant relief when an applicant satisfied stated criteria, without mentioning case-by-case deviation. Memorandum from Gene McNary, Comm'r, *Family Fairness* 1-2, *reprinted as* 67 No. 6 Interpreter Releases 153, App. I (Feb. 2, 1990).

In any event, the Guidance expressly requires agents to make discretionary case-by-case decisions. "[A]pplying the[] threshold criteria itself involves an exercise of discretion." App. 124a (dissent). For example, USCIS must determine whether the applicant is an enforcement priority, App. 417a, which depends on whether the alien is "a threat to national security, border security, or public safety" or has "significantly abused" a visa program. App. 425a. Agents also must

31

exercise discretion whether to deny an application for deferred action even when those criteria are satisfied. App. 122a (dissent). Indeed, DAPA's stated criteria require agents to determine that a request "present[s] no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." App. 417a. The majority viewed all this discretion as "merely pretext." App. 56a. But as both dissenting judges concluded, it is plainly wrong to conclude that the discretion apparent on the Guidance's face is "pretextual" when, among other things, this is a facial challenge to a policy that "has yet to be implemented." App. 131a; see App. 234a-242a.

It is also immaterial that, under preexisting law, deferred action triggers "eligibility for [certain] federal benefits—for example, under title II and XVIII of the Social Security Act." App. 44a. The APA does not impose procedural roadblocks before an agency can adopt policies that have this consequence. Indeed, it *exempts* from notice-and-comment requirements agency action on any "matter relating to * * * benefits." 5 U.S.C. 553(a)(2). Many agencies have waived the APA's benefits exception, but DHS has not. App. 68a & n.155. Accordingly, if the Guidance were reviewable because deferred action renders aliens eligible for benefits, see App. 44a-45a, it would be exempt from notice-and-comment because it would "relat[e] to" those same benefits.

Moreover, the consequences of deferred action result from pre-existing regulations that are independent of the Guidance and were adopted through notice-and-comment rulemaking. App. 111a-113a (dissent). DHS's predecessor followed notice-and-comment procedures when adopting the regulations providing

32

that aliens with deferred action may obtain work authorization, 8 C.F.R. 274a.12(c)(14); 46 Fed. Reg. at 25,080, and that they may become eligible for Social Security, 8 C.F.R. 1.3(4)(vi); 61 Fed. Reg. at 47,041.[5] Under the APA, once is enough. See *Vermont Yankee Nuclear Power Corp.* v. *Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978).

## IV. THIS CASE WARRANTS IMMEDIATE REVIEW

The court of appeals' judgment enjoins nationwide a federal policy of great importance to federal law enforcement, to many States, and to millions of families with longstanding and close connections with this country. A twice-divided court of appeals should not have the last word on whether that policy can be implemented.

A. As set forth above, the majority has permitted some States (over the objection of others) and a federal court to interfere with the Secretary's exercise of discretion in establishing policies regarding enforcement of the federal immigration laws. That is unprecedented and momentous. Moreover, the majority's decision is "very damaging to DHS's immigration enforcement policy, which has operated, from time to time, on a class-wide basis." App. 111a (dissent).

---

[5] DHS's policy that aliens with deferred action cease accruing time for the three- and ten-year bars, see p. 6, *supra*, was not adopted through notice-and-comment rulemaking. But that policy has no bearing on respondents' asserted injury. It is relevant only "[f]or purposes of" DHS's computation of a barrier to admissibility if aliens depart the country. 8 U.S.C. 1182(a)(9)(B)(ii). Tolling also will not help "[m]ost adult beneficiaries" of the Guidance because they already face the maximum barrier if they depart. App. 44a n.99.

33

The nationwide injunction also has far-reaching and irreparable humanitarian impact. It bars approximately 4 million parents—who have lived in this country for years, would pass a background check, are not priorities for removal, and have "a son or daughter who is a U.S. citizen or lawful permanent resident," App. 417a—from requesting deferred action under the Guidance and receiving authorization to work lawfully. See OLC Op. *30. In so doing, it has a profound effect not only on those parents but also on their children. One study estimated that "there are 6.3 million children who live in a household with a DAPA eligible mom or dad, and of that, 5.5 million are U.S. citizens." Manuel Pastor et al., *The Kids Aren't Alright – But They Could Be: The Impact of [DAPA] on Children* 1 (Mar. 2015). And although respondents have not challenged the Secretary's 2012 DACA memorandum for providing deferred action, the majority's expansive reasoning places a cloud over the deferred action accorded to more than 600,000 people under that policy, all of whom came here as children and many of whom have never known another home. App. 4a.

Most of the parents and children the Guidance would affect "are hard-working people who have become integrated members of American society," lived here for years, have not committed serious crimes, and "are extremely unlikely to be deported given * * * limited enforcement resources." App. 415a. Deferred action would give these parents and children the dignity of coming forward and "be[ing] counted." *Ibid.* Without work authorization, they are more likely to work for employers who will hire them illegally, often at below-market wages, thereby hurting

34

American workers and giving unscrupulous employers an unfair advantage.

The injunction also undermines the Secretary's efforts to "focus [DHS's] resources on removing those undocumented aliens most disruptive to the public safety and national security of the United States." *Arpaio* v. *Obama*, 797 F.3d 11, 24 (D.C. Cir. 2015), petition for cert. pending, No. 15-643 (filed Nov. 12, 2015). The Guidance would complement those priorities by having millions of low-priority aliens pay for and pass a background check. App. 417a. If law-enforcement officials later encountered such an individual, ICE could "quickly confirm the alien's identity through a biometric match" and confirm that he or she does not warrant the effort of removal. D. Ct. Doc. 150-1 ¶ 15 (Feb. 23, 2015); see id. ¶¶ 14-17. But without the Guidance, ICE would have to do the underlying legwork every time—and it would be ICE footing the bill, thus depleting its already-limited resources. See *id.* ¶¶ 14-17; D. Ct. Doc. 150-2 ¶¶ 7-13 (Feb. 23, 2015).

B. This Court's review is warranted now. Although the court of appeals ruled in the context of a preliminary injunction, this Court decided *Arizona* in the same posture. 132 S. Ct. at 2498. The court of appeals held that Texas's "standing is plain"; that Texas "satisfies the zone-of-interests test"; that the Guidance "is not an unreviewable agency action . . . committed to agency discretion by law"; that Texas is likely to establish that it must go through notice-and-comment; and that it is "manifestly contrary to the INA." App. 11a, 37a, 50a, 68a, 76a.

It is unlikely any other court of appeals will address the questions presented here. The injunction

35

has prevented DHS from putting the Guidance into operation anywhere in the country, including in States that have actively supported the Guidance in this litigation.  The only other pre-enforcement challenge to the Guidance was brought by a county sheriff and was dismissed for his lack of standing, without reaching any question under the APA.  See *Arpaio*, 797 F.3d at 15.

The great and immediate significance of the Secretary's Guidance, the irreparable injury to the many families affected by delay in its implementation, and the broad importance of the questions presented, counsel strongly in favor of certiorari now.

### CONCLUSION

This Court should grant the petition for a writ of certiorari.

Respectfully submitted.

DONALD B. VERRILLI, JR.
  *Solicitor General*
BENJAMIN C. MIZER
  *Principal Deputy Assistant*
    *Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
BETH S. BRINKMANN
  *Deputy Assistant Attorney*
    *General*
ZACHARY D. TRIPP
  *Assistant to the Solicitor*
    *General*
DOUGLAS N. LETTER
SCOTT R. MCINTOSH
JEFFREY CLAIR
WILLIAM E. HAVEMANN
  *Attorneys*

STEVAN E. BUNNELL
  *General Counsel*
  *U.S. Department of*
    *Homeland Security*

NOVEMBER 2015

# EXHIBIT UU

1   MAYER BROWN LLP

2   John Nadolenco (SBN 181128)
    350 South Grand Avenue
3   Los Angeles, CA 90071-1503
    Telephone: (213) 229-5173
4   jnadolenco@mayerbrown.com

5   Andrew J. Pincus (*pro hac vice* pending)
    1999 K Street, N.W.
6   Washington, D.C. 20006-1101
    Telephone: (202) 263-3000
7   apincus@mayerbrown.com

8   [Additional counsel on signature page]

9   *Counsel for* Amici Curiae

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15

16  THE REGENTS OF THE UNIVERSITY OF
    CALIFORNIA and JANET NAPOLITANO, in
17  her official capacity as President of the
    University of California,                        Case No. 17-CV-05211-WHA
18
                Plaintiffs,
19                                                   ***AMICUS* BRIEF OF 108 COMPANIES IN
                                                     SUPPORT OF PLAINTIFFS' MOTION**
20        v.                                         **FOR PROVISIONAL RELIEF**

21  UNITED STATES DEPARTMENT OF
    HOMELAND SECURITY and ELAINE
22  DUKE, in her official capacity as Acting
    Secretary of the Department of Homeland
23  Security,

24                Defendants.

25

26

27

28
                                              *AMICUS* BRIEF OF 108 COMPANIES;
    CASE NOS. 17-CV-05211; 17-CV-05235; 17-CV-05329; 17-CV-05380; 17-CV-05813

1  STATE OF CALIFORNIA, STATE OF
   MAINE, STATE OF MARYLAND, and
2  STATE OF MINNESOTA,                          Case No. 17-CV-05235-WHA

3              Plaintiffs,

4      v.

5  U.S. DEPARTMENT OF HOMELAND
   SECURITY, ELAINE DUKE, in her official
6  capacity as Acting Secretary of the Department
   of Homeland Security, and the UNITED
7  STATES OF AMERICA

8              Defendants.

9
   CITY OF SAN JOSE, a municipal corporation,
10
                Plaintiff,
11                                              Case No. 17-CV-05329-WHA

12     v.

13 DONALD J. TRUMP, President of the United
   States, in his official capacity, ELAINE C.
14 DUKE, in her official capacity, and the
   UNITED STATES OF AMERICA,
15
                Defendants.
16

17 DULCE GARCIA, MIRIAM GONZALEZ
   AVILA, SAUL JIMENEZ SUAREZ,
18 VIRIDIANA CHABOLLA MENDOZA,                  Case No. 17-CV-05380-WHA
   NORMAL RAMIREZ, and JIRAYUT
19 LATTHIVONGSKORN,

20              Plaintiffs,

21     v.

22 UNITED STATES OR AMERICA, DONALD
   J. TRUMP, in his official capacity as President
23 of the United States, U.S. DEPARTMENT OF
   HOMELAND SECURITY, and ELAINE
24 DUKE, in her official capacity as Acting
   Secretary of Homeland Security,
25
                Defendants.
26

27

28
                                        *AMICUS* BRIEF OF 108 COMPANIES;
                      CASE NOS. 17-CV-05211; 17-CV-05235; 17-CV-05329; 17-CV-05380; 17-CV-05813

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and the U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                    Defendants. | Case No. 17-CV-05813-WHA |

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................ 2

I.     DACA'S RESCISSION WILL INFLICT SIGNIFICANT HARM ON U.S. COMPANIES AND THE ENTIRE ECONOMY .............................................. 2

     A.    Dreamers Contribute Directly to Our Nation's Economic Growth ...................... 3

     B.    Dreamers Help Grow The Economy by Filling Jobs for Which There Otherwise Would Not Be a Sufficient Supply of Workers .................................. 4

          1.    Permitting Dreamers to participate in the workforce expands, rather than reduces, the number of jobs .................................. 4

          2.    Dreamers fill critical labor shortages ......................................... 6

     C.    Rescinding DACA Will Inflict Enormous Harm on Individuals, Companies, and the Economy .................................................... 8

II.    THE DECISION TO RESCIND DACA IS INVALID, BECAUSE IT IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW .............................. 10

     A.    Rescission of DACA Is a "Final Agency Action" Subject to Review Under the APA ............................................................................... 11

     B.    Rescission of DACA Is Arbitrary and Capricious ............................. 13

CONCLUSION ........................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012).............................................................................13

*Barahona-Gomez v. Reno*,
  236 F.3d 1115 (9th Cir. 2001) ............................................................12

*Bonilla v. Lynch*,
  840 F.3d 575 (9th Cir. 2016) ..............................................................12

*Bowrin v. INS*,
  194 F.3d 483 (4th Cir. 1999) ..............................................................11

*Edison Elec. Inst. v. EPA*,
  996 F.2d 326 (D.C. Cir. 1993).............................................................13

*F.C.C. v. Fox Television Stations*,
  556 U.S. 502 (2009).............................................................................11

*Heckler v. Chaney*,
  470 U.S. 821 (1985)........................................................................11, 12

*INS v. St. Cyr*,
  533 U.S. 289 .......................................................................................12

*Johns v. DOJ*,
  653 F.2d 884 (5th Cir. 1981) ..............................................................14

*Kenney v. Glickman*,
  96 F.3d 1118 (8th Cir. 1996) .........................................................12-13

*Kucana v. Holder*,
  558 U.S. 233 (2010).............................................................................12

*Mach Mining, LLC v. EEOC*,
  135 S.Ct. 1645 (2015).........................................................................12

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011).................................................................11

*Montana Air Chapter No. 29 v. Fed. Labor Relations Auth.*,
  898 F.2d 753 (9th Cir. 1990) ..............................................................12

*Nat'l Wildlife Fed'n v. EPA,*
    980 F.2d 765 (D.C. Cir. 1992) ............................................................12

*Reno v. American Arab Anti-Discrimination Committee,*
    525 U.S. 471 (1999) ..........................................................11, 13, 14

*Safe Air For Everyone v. EPA,*
    488 F.3d 1088 (9th Cir. 2007) ...........................................................13

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................12, 15

**Constitution, Statutes, and Regulations**

U.S. Const. art. II, § 3 ...........................................................................14

5 U.S.C. § 551 ...................................................................................11

5 U.S.C. § 701 ...................................................................................11

5 U.S.C. § 706 ...................................................................................13

6 U.S.C. § 202 ...................................................................................14

8 U.S.C. § 1103 ..................................................................................14

8 U.S.C. § 1154 ..................................................................................14

8 U.S.C. § 1252 ..............................................................................11, 14

8 U.S.C. § 1324 ..................................................................................15

49 U.S.C. § 30301 ...............................................................................15

National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136,
    § 1703(c)-(d), 117 Stat. 1392, 1694-1695 (2003) ................................14

USA PATRIOT Act, Pub. L. No. 7 107-56, § 423(b), 115 Stat. 272, 361 (2001) .......................14

Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat.
    1092 ...........................................................................................14

**Other Authorities**

8 C.F.R. § 274a.12(c)(14) ......................................................................14

Am. Farm Bureau Federation, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e;.................................................................................7

Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum, May 5, 2016, https://goo.gl/UAt3dJ.................................................................................10

Bob Davis, *The Thorny Economics of Illegal Immigration*, Wall St. J., Feb. 9, 2010, https://goo.gl/j4dd7J.................................................................................9

Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our* Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communites Stronger*, Aug. 31, 2017, https://goo.gl/kJYDT3 ....................7

Buttonwood, *Keep on Trucking*, The Economist, Feb. 11, 2012 ....................................5

Charles Gordon et al., 6-72 Immigration Law & Proc. rev. ed. (1981) .............................13

Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* (2016), https://goo.gl/pe2i17.................................................................................6, 7

Ctr. for Am. Progress & FWD.us, *Study:  The Impact of Deferred Action for Childhood Arrivals (DACA) Program* (2017), https://goo.gl/P3DgPz ....................................8

David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute, Sept. 1, 2017, https://goo.gl/1FMidk; ...............................................9

David Bier, *Five Myths About DACA*, Cato Institue, Sept. 7, 2017, https://goo.gl/y1e8gb .................................................................................5

Economics A-Z Terms Beginning With L, The Economist, https://goo.gl/BvRwKU .................................................................................4, 5

Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Economic Letter, Aug. 30, 2010, https://goo.gl/jK17fc .................................................................................5, 7

H.R. Rep. No. 11-157 (2009).................................................................................14

Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress, Nov. 16, 2012, https://goo.gl/ZSmRLq .................................................................................9

*I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog, Oct. 9, 2017, https://goo.gl/oV9P7h.................................................................................7

iv

Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Institute, Jan. 18, 2017, https://goo.gl/jFXw4g .................................................. 4, 8

Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, American Action Forum, Mar. 20, 2017, https://goo.gl/ovHQEh ............................. 5

Jose Magana-Salgado, Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* (2016), https://goo.gl/3ZwGVJ; ............................... 8, 9

Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney, July 1, 2005, https://goo.gl/jq2Y1C ................................. 3

Kenneth Megan, *Immigration and the Labor Force*, Bipartisan Policy Ctr., Aug. 25, 2015, https://goo.gl/8p3SP8; ........................................................................... 4, 5

ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results*, https://goo.gl/rJTKs6 ...................................................................................... 6

Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. Off. Legal Counsel 1 (Nov. 19, 2014), https://www.justice.gov/file/179206/download ...................................................... 13

Memorandum from Elaine C. Duke, Acting Secretary, Dep't of Homeland Security, on Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) .................................................... 12

Memorandum from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ...................................................................... 10

Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants*, Ctr. for Global Dev. Brief, Apr. 2013, https://goo.gl/p9NLuc .................................... 4, 7

Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine, Feb. 15, 2017, https://goo.gl/XwLj1x ................................................ 10

Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages* 1-2, The Hamilton Project (2012), https://goo.gl/bvC7AE; ................................................................................... 4

Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Review (Nov. 2002) ....................................................................................... 4

*My American Dream, Minus the Paperwork*, THINKPolicy Blog, Oct. 3, 2017, https://goo.gl/876JDm .................................................................................. 7

Nat'l Conference of State Legislatures, National Employment Monthly Update, https://goo.gl/wZBJh8 (last accessed Oct. 31, 2017) .................................................5

Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, Los Angeles Times, Mar. 17, 2017 ...................................7

Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress, July 21, 2017, https://goo.gl/7udtFu; ................8

Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money, Sept. 29, 2016, https://goo.gl/ZF2Tdx ....................................................................7

P'ship for a New Am. Economy, *Open for Business: How Immigrants Are Driving Business Creation in the United States* 12 (Aug. 2012), https://goo.gl/3mFkVz ...................................................................................................2

Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times, Oct. 7, 2003 ............................5

President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* (Feb. 2012), https://goo.gl/v2YRVD .................................................6

Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* (2015), https://goo.gl/gokfJW .......................................................................6

Sarah Bohn et al., *Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* 17-18 (2014), https://goo.gl/7UihSE .............................................................................................9

Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic, Mar. 22, 2017, https://goo.gl/qDgeRf .......................................................9

Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA*, Ctr. for Am. Progress, Apr. 2, 2015, https://goo.gl/wxxek1 ...............................................................................................4

Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI's The World, Aug. 22, 2017, https://goo.gl/WLXMZ4; ..........................................................................................8

Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow* Ctr. for Am. Progress, Aug. 28, 2017, https://goo.gl/dYJV1s ...................................................................................................3

Tom K. Wong et al., *Results from 2017 National DACA Study*, https://goo.gl/eyZ3VT...................................................................................3, 4, 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA,* Recode.net, Sept. 19, 2017, https://goo.gl/NQeJUc; ....................................................7

U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release Table A-14 (Oct. 6, 2017), https://goo.gl/o8t39g; ...........................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017  (Oct. 11, 2017), https://goo.gl/H28XkL ...........................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey, https://goo.gl/g4n9Ag (last accessed Oct. 31, 2017) ...................................5

The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* (2015), https://goo.gl/sEpx1K ...........................................................7

World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut ........................................ 8-9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTEREST OF *AMICI CURIAE***

*Amici* are 108 U.S.-based companies from every sector of the economy that collectively contribute hundreds of billions of dollars in annual revenue to the American economy. Many *amici* employ Dreamers—the young people who, under the Deferred Action for Childhood Arrivals (DACA) program, are able to live and work in the country that has been their home for most of their young lives. In addition, *amici*'s customers and end users are Dreamers; and *amici*'s businesses benefit from Dreamers' contributions to the overall economy through their tax payments, spending, and investments. Accordingly, *amici* have a strong interest in Dreamers' continued ability to work and participate in our country's economy and in society generally. A list of the *amici* is set forth in the Appendix.

**INTRODUCTION**

The intangible benefits of the DACA program are undeniable and substantial: nearly 800,000 young people (Dreamers) who "were brought to this country as children and know only this country as home" may for the first time live in America and participate fully in all aspects of our society without the constant and crippling fear of deportation. Memorandum from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). DACA is a concrete and essential example of America fulfilling its centuries-old promise to welcome people from around the world seeking a better and a freer life. And no group is more deserving of that welcome than the Dreamers.

In addition to these invaluable intangible benefits, DACA has produced—and is continuing to produce—important benefits for America's companies and for our economy as a whole. Most notably, DACA permits Dreamers to obtain work authorizations, thereby enabling them to obtain jobs. Employment is not a zero-sum game. Dreamers are filling vacancies at companies that cannot find enough workers to fill their needs. And Dreamers' wages lead to higher tax revenues and expansion of our national GDP—producing new jobs for all Americans.

DACA's rescission will inflict serious harm on U.S. companies, all workers, and the American economy as a whole. Indeed, our national GDP will lose $460.3 billion, and Social Security and Medicare tax contributions will be reduced by $24.6 billion, over the next decade.

The decision to rescind DACA did not rest on a policy choice by the Department of Homeland Security (DHS). Rather, DHS concluded that DACA exceeds DHS's statutory authority. That conclusion is plainly reviewable under the Administrative Procedure Act: Courts every day determine the scope of federal agencies' power under the applicable laws and regulations. And DHS's legal conclusion is wrong: DACA closely resembles deferred action programs adopted in the past, and complies fully with the applicable statute. The agency's rescission of DACA, predicated entirely on that erroneous legal conclusion, therefore cannot stand.

## ARGUMENT

## I. DACA'S RESCISSION WILL INFLICT SIGNIFICANT HARM ON U.S. COMPANIES AND THE ENTIRE ECONOMY.

Since the nation's founding, immigrants have been an integral part of the fabric of our country, enhancing the lives and prosperity of all Americans. Immigrants' contributions to the U.S. economy are well-recognized: For example, the businesses they own alone generate over $775 billion in revenue and employ one out of every 10 workers.[1] DACA enabled Dreamers—immigrants who were brought to the U.S. as children—to come out of the shadows, participate in the economy, and contribute to U.S. companies, which benefits all of us. Rescinding DACA harms not only individual Dreamers and their families, friends, and co-workers; but also the many U.S. businesses that count on them to help fuel continued innovation and economic growth.

---

[1]   P'ship for a New Am. Economy, *Open for Business: How Immigrants Are Driving Business Creation in the United States* 12, 14 (Aug. 2012), https://goo.gl/3mFkVz.

### A.     Dreamers Contribute Directly to Our Nation's Economic Growth.

In the five years since DACA was implemented, Dreamers have become essential contributors to American companies and the American economy. Prior to the DACA program, these young people—who have obtained at least a high school degree and, in many cases have finished college and obtained graduate degrees—would have been unable to obtain work authorization, and therefore unable to put their education and skills to use. DACA changed that, and as a result over 91% of the almost 800,000 Dreamers are employed and earn wages commensurate with their skill levels.[2] Permitting Dreamers to stay and work in the country in which they grew up not only benefits those individuals, but also benefits American companies and the American economy as a whole.

*First*, Dreamers directly contribute to the success of numerous U.S. companies. At least 72 percent of the top 25 Fortune 500 companies employ Dreamers—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, Wells Fargo, among others. Those companies alone generate almost $3 trillion in annual revenue.[3]

Many Dreamers are entrepreneurs who have created their own businesses: According to one survey, five percent of Dreamers started their own businesses after receiving DACA status. Among those respondents 25 years and older, the figure is eight percent—well above the 3.1% for all Americans.[4] These businesses create new jobs and provide goods and services that expand the economy.[5]

---

[2]     Tom K. Wong et al., *Results from 2017 National DACA Study* 3-4 ("Wong 2017 Results"), https://goo.gl/eyZ3VT.

[3]     *Id.*

[4]     Wong 2017 Results, *supra* n.2, at 3; Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress, Aug. 28, 2017, https://goo.gl/dYJV1s.

[5]     *See* Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney, July 1, 2005, https://goo.gl/jq2Y1C.

*Second*, Dreamers pay taxes to federal, state, and local governments.[6] The Cato Institute estimated that over 10 years, DACA recipients will increase tax revenues by $60 billion.[7]

*Third*, Dreamers have used their earnings—and the increased stability and security resulting from their DACA status—to make purchases and investments that grow our nation's economy. Nearly two-thirds of Dreamers reported purchasing their first car in 2017, and 16% reported purchasing a first home.[8] These and other types of personal consumption expenditures are important drivers of the economy: they "account[] for the largest share of GDP [and] are the main generator of employment in the economy."[9]

> **B.    Dreamers Help Grow The Economy by Filling Jobs for Which There Otherwise Would Not Be a Sufficient Supply Of Workers.**

Studies have consistently found that immigrants do not displace U.S.-born workers. They instead help grow the economy and create more opportunities for U.S.-born workers by filling positions that otherwise would remain vacant because of a shortage of qualified workers.[10]

> **1.    Permitting Dreamers to participate in the workforce expands, rather than reduces, the number of jobs.**

"[O]ne of the best-known fallacies in economics" is the "lump of labour fallacy."[11] Economists from across the policy and political spectrum have discredited the notion that "there

---

[6]    *See* Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA*, Ctr. for Am. Progress, Apr. 2, 2015, https://goo.gl/wxxek1.

[7]    Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Institute, Jan. 18, 2017, https://goo.gl/jFXw4g.

[8]    Wong 2017 Results, *supra* n.2, at 3.

[9]    Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Review 12 (Nov. 2002), https://goo.gl/iyTkdR.

[10]    *See* Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages* 1-2, The Hamilton Project (2012), https://goo.gl/bvC7AE; Kenneth Megan, *Immigration and the Labor Force*, Bipartisan Policy Ctr., Aug. 25, 2015, https://goo.gl/8p3SP8; Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants* 4, Ctr. for Global Dev. Brief, Apr. 2013, https://goo.gl/p9NLuc.

[11]    Economics A-Z Terms Beginning With L, The Economist, https://goo.gl/BvRwKU.

---

4

is a fixed amount of work to be done—a lump of labour"—such that an increase in the number of workers reduces the number of available jobs.[12] Rather, the clear reality is that jobs beget more jobs. "[W]hen people work for a living they earn money. They spend that money on goods and services that are produced by other people, young and old, male and female."[13] The greater demand for goods and services creates new jobs.

The facts are indisputable. "From 1970 to 2017, the U.S. labor force doubled.  Rather than ending up with a 50 percent unemployment rate, U.S. employment doubled."[14] Another study showed that countries with high employment levels of older workers also had high employment levels of young workers; in other words, high employment levels in one group benefited the other group, rather than depriving the other of employment opportunities.[15] And yet other studies have shown that increased immigration levels in the U.S. in the past have had largely *positive* impacts on the employment levels and income of U.S.-born workers.[16]

These findings hold true today. The unemployment rate has been cut almost in half since 2012, when DACA was created.[17] The number of total job openings has increased.[18] And Dreamers are spending money and starting businesses—which help grow the economy and create more jobs.

[12]    *Id.*; *see also* Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times, Oct. 7, 2003, https://goo.gl/GyYTG5.

[13]    Buttonwood, *Keep on Trucking*, The Economist, Feb. 11, 2012, https://goo.gl/x8vqaL; *see also* Megan, *supra* n.10 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Economic Letter, Aug. 30, 2010, https://goo.gl/jK17fc.

[14]    David Bier, *Five Myths About DACA*, Cato Inst., Sept. 7, 2017, https://goo.gl/y1e8gb.

[15]    Buttonwood, *supra* n.13.

[16]    *See* Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, American Action Forum, Mar. 20, 2017, https://goo.gl/ovHQEh.

[17]    *See* Nat'l Conference of State Legislatures, National Employment Monthly Update, https://goo.gl/wZBJh8 (last accessed Oct. 31, 2017).

[18]    U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey, https://goo.gl/g4n9Ag (last accessed Oct. 31, 2017).

### 2.    Dreamers fill critical labor shortages.

The jobs being filled by Dreamers post-DACA are largely jobs for which there is a shortage of qualified workers—*not* the jobs that are or could be filled by U.S.-born workers. In a recent survey of U.S. employers, 46 percent of respondents reported difficulty filling jobs—particularly in skilled labor positions, such as teachers, accounting and finance staff, nurses, and engineers.[19] Almost a quarter of employers reported a lack of available applicants; another 34 percent cited a shortage of applicants with necessary skills.[20] In 2012, the President's Council of Advisors on Science and Technology warned that within ten years, the U.S. could face a shortfall of nearly one million professionals in the science, technology, engineering, and mathematics (STEM) fields.[21] Even putting aside the skills mismatch, it is unlikely that there are enough available workers to fill the openings: The U.S. unemployment rate is currently quite low, and the number of job openings is high.[22]

Dreamers help fill this gap. They all have a high school degree or equivalent—and a large percentage of Dreamers are pursuing or have received college or post-college degrees and therefore qualify for highly-skilled jobs.[23] In 2016, almost a quarter of Dreamers were employed in the educational or health services industry.[24] Many others work in technology, science, and

---

[19]    *See* ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results* ("ManpowerGroup 2016/2017"), https://goo.gl/rJTKs6; *see also* Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* 3-4 (2015), https://goo.gl/gokfJW ("In 2012, middle-skill jobs accounted for 54 percent of the U.S. labor market, but only 44 percent of the country's workers were trained to the middle-skill level.").

[20]    ManpowerGroup 2016/2017, *supra* n.19.

[21]    President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[22]    *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release Table A-14 (Oct. 6, 2017), https://goo.gl/o8t39g; U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017 charts 1 & 2 (Oct. 11, 2017), https://goo.gl/H28XkL.

[23]    Wong 2017 Results, *supra* n.2, at 7-8.

[24]    Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

finance,[25] and more still are majoring in STEM fields.[26] *Amici*'s experiences confirm this: For example, Microsoft employs 27 Dreamers as "software engineers with top technical skills; finance professionals driving [its] business ambitions forward; and retail and sales associates connecting customers to [its] technologies."[27] IBM has identified at least 31 Dreamers within the company who work in areas such as software development and client support.[28] One IBM Dreamer provided critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston. Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.

Even Dreamers with lesser-skilled jobs are filling positions for which there is an insufficient labor supply. "Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[29] The latter industries in particular "face[] a critical shortage of workers every year, as citizens are largely unwilling to engage in these physically demanding activities"[30]— even when companies increase wages the maximum amount financially feasible.[31]

---

[25]    *Id.*

[26]    The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://goo.gl/sEpx1K.

[27]    Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger*, Aug. 31, 2017, https://goo.gl/kJYDT3.

[28]    *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA,* Recode.net, Sept. 19, 2017, https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog, Oct. 3, 2017, https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog, Oct. 9, 2017, https://goo.gl/oV9P7h.

[29]    Peri, *supra* n.13.

[30]    Am. Farm Bureau Federation, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e; *see also* Clemens & Pritchett, *supra* n.10, at 3, (predicting that increase in low-skill jobs in the care industry will be more than the total increase in the 25-54 labor force).

[31]    *See, e.g.,* Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, Los Angeles Times, Mar. 17, 2017, https://goo.gl/r1cH9Z; Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money, Sept. 29, 2016, https://goo.gl/ZF2Tdx.

1    In sum, Dreamers are filling jobs that otherwise would remain vacant and are increasing

2    demand for goods and services, which helps to grow the entire economy.

3    **C.    Rescinding DACA Will Inflict Enormous Harm on Individuals, Companies, and the Economy.**

4

5    All of the above benefits—and more—will be lost if DACA's rescission is permitted to

6    stand. Over the next decade, our country's GDP will lose $460.3 billion; and Social Security and

7    Medicare tax receipts will drop $24.6 billion.[32]

8    This economic contraction results directly from Dreamers' loss of work authorization.

9    The approximately 700,000 employed Dreamers would all lose their jobs over the next two

10   years—an average of 1,400 people losing jobs every single business day.[33] In addition to the

11   obvious harm to Dreamers themselves, the loss of so many workers will have severe

12   repercussions for U.S. companies and workers.

13   The impending March 2018 deadline—and threat of job loss and being forced into a life

14   in the shadows, unable to participate in society, and facing forced removal from the only country

15   they have ever known—is already impacting Dreamers and, by extension, the companies for

16   which they work. The fear for the future that is now a daily part of life for Dreamers and their

17   families affects both physical and mental health.[34] That, in turn, negatively affects employee

18   productivity and performance, illness and absenteeism, accidents, and turnover.[35]

19   [32]    *See* Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of

20   Dollars*, Ctr. for Am. Progress, July 21, 2017, https://goo.gl/7udtFu; Jose Magana-Salgado, Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* 4,

21   6-7 (2016), https://goo.gl/3ZwGVJ; *see also* Brannon & Albright, *supra* n.7 (estimating cost of "immediately eliminating the DACA program and deporting its participants" to be $283 billion

22   reduction in economic growth and over $60 billion reduction to tax revenues over 10 years).

23   [33]    Ctr. for Am. Progress & FWD.us, *Study: The Impact of Deferred Action for Childhood Arrivals (DACA) Program* 3 (2017), https://goo.gl/P3DgPz.

24   [34]    *See* Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also

25   a Mental Health Issue*, PRI's The World, Aug. 22, 2017, https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic, Mar. 22,

26   2017, https://goo.gl/qDgeRf.

27   [35]    *See* World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and*

28

Once Dreamers' work authorizations begin expiring in March 2018, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can find new employees to fill the empty positions.[36] Companies will forfeit the money they invested in training those employees, and will incur costs recruiting and training new employees, who will be less experienced and therefore less productive.[37] These costs are particularly burdensome for small businesses.

The numbers are relevant, but numbers alone do not come close to capturing Dreamers' contributions and the tremendous harm that will result from their loss. People are the heart of every business; and every company's goal is to create teams that work seamlessly together—teams in which colleagues support each other both within and outside the workplace. Ripping Dreamers out of their jobs hurts not only Dreamers, but other employees who lose friends and colleagues, and companies that lose trusted members of their teams.

History shows that forcing Dreamers out of the workforce and into the shadows will also reduce job growth and harm the U.S. economy. After Arizona passed the Legal Arizona Workers Act in 2007, which targeted the use of unauthorized workers, its population of undocumented workers dropped by 40%. Economic growth fell, reducing job opportunities: The state's total employment was 2.5% less than what it would have been without the laws, and its GDP was reduced by an average of 2% a year between 2008 and 2015.[38]

Similarly, in 1964, the U.S. expelled Mexican *braceros*, who were previously permitted to work temporarily in the U.S., mostly on farms. A recent study revealed that excluding the

*Good Practices* 1 (2000), https://goo.gl/ecH1Ut.

[36]    *See* David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute, Sept. 1, 2017, https://goo.gl/1FMidk; *see also* Magana-Salgado, *supra* n.32, at 4, (estimating turnover costs due to DACA termination to be $3.4 billion).

[37]    Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress, Nov. 16, 2012, https://goo.gl/ZSmRLq.

[38]    *See* Bob Davis, *The Thorny Economics of Illegal Immigration*, Wall St. J., Feb. 9, 2010, https://goo.gl/j4dd7J; *see also* Sarah Bohn et al., *Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* 17-18, 21, 24-25 (2014), https://goo.gl/7UihSE (finding that employment rates of U.S.-born men—both Hispanic and non-Hispanic white men—dropped post-LAWA).

1   Mexican *braceros* "did not affect the wages or employment of U.S. farmworkers."[39] Instead,

2   farms responded by *eliminating* the jobs—often by moving production abroad or going out of

3   business.[40]

4   Removing Dreamers from the workforce is likely to have the very same negative effect

5   on U.S. employment levels as companies are unable to fill critical jobs. That effect will be

6   exacerbated as Dreamers are forced to shutter businesses that employ other workers and other

7   companies lose the income that has helped drive demand and production of goods and services

8   provided by U.S.-born workers.[41] And the harm will be much more far-reaching: Just as DACA

9   sent a powerful message of inclusion, its rescission tells the immigrants who have been integral

10  to the growth and development of our society and economy for decades that they are no longer

11  welcome here. As a result, DACA's rescission will reduce the future ability of U.S. companies to

12  attract individuals from around the world to support America's continued economic growth and

13  prosperity.

14  **II.   THE  DECISION  TO  RESCIND  DACA  IS  INVALID,  BECAUSE  IT  IS**

15  **ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.**

16  DHS's decision to rescind DACA rested solely on its conclusion that the DACA program

17  is unlawful. That legal conclusion is wrong, and DHS's rescission of DACA based on it is

18  therefore arbitrary and capricious in violation of the APA.

19

20

21  _____

22  [39]   Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine, Feb. 15, 2017, https://goo.gl/XwLj1x.

23  [40]   *Id.*

24  [41]   *Cf.* Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum, May 5, 2016, https://goo.gl/UAt3dJ (concluding

25  that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by

26  $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

27

28

### A.   Rescission of DACA Is a "Final Agency Action" Subject to Review Under the APA.

The rescission of DACA is unquestionably a final agency action—it is "an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe . . . [DHS's] policy." 5 U.S.C. § 551(4).[42]  As such, it is subject to judicial review under the APA unless it falls within one of two narrow exceptions: "(1) statutes preclude judicial review; or (2) [the] agency action is committed to agency discretion by law." *Id.* § 701(a); *accord Heckler v. Chaney*, 470 U.S. 821, 828-29 (1985). Neither exception applies.

First, there is no statute precluding judicial review of the rescission of DACA. The government has previously argued that 8 U.S.C. § 1252(g)[43] barred review of its creation of a related program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). *See* Br. for Pet'rs at 41, *United States v. Texas*, No. 15-674 (2017). But the Supreme Court explained in *Reno v. American Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) *("AAADC")*, that 8 U.S.C. § 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Id.* at 479 (emphases in original). Plaintiffs in these cases challenges no such action, and Section 1252(g) therefore does not apply.[44]

---

[42]     *See, e.g.*, *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009) (applying APA to rescission of prior action); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247-48 (3d Cir. 2011) (U.S. Forest Service's change in policy to impose a moratorium on drilling was a "final agency action").

[43]     Section 1252(g) provides that, subject to certain exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

[44]     *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 293 & 311 n.34 (2001) (holding that § 1252(g) did not apply to challenge to "Attorney General['s] interpret[ion]" of statutes); *United States v. Texas*, 809 F.3d 134, 165 (5th Cir. 2015) (§ 1252(g) did not apply to challenge to DAPA); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1118-19 (9th Cir. 2001) (§ 1252(g) did not apply and bar judicial review of a challenge to directives issued by the BIA Chairman and the Chief Immigration Judge that were based on legal interpretations); *Bowrin v. INS*, 194 F.3d 483, 488 (4th Cir. 1999) ("We read the Court's *AADC II* ruling . . . to hold that § 1252(g) does not apply

---

11

1    Second, the rescission of DACA does not fall within the "very narrow" exception for

2    actions committed to agency discretion by law. *Chaney*, 470 U.S. at 830 (internal quotation

3    marks omitted). The rescission decision did not rest on fact-specific exercise of enforcement

4    discretion, as in *Heckler v. Chaney*, 470 U.S. 821 (1985). Rather, revocation is predicated on the

5    legal conclusion that DACA "was effectuated . . . without proper statutory authority" and

6    therefore "was an unconstitutional exercise of authority by the Executive Branch." Memorandum

7    from Elaine C. Duke, Acting Secretary, Dep't of Homeland Security, on Rescission of the June

8    15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion With Respect to

9    Individuals Who Came to the United States as Children" (Sept. 5, 2017).

10    Several courts, including the Ninth Circuit, have held that agency action resting solely on

11    such a legal determination is reviewable. Such actions do not implicate the "complicated

12    balancing of a number of factors which are peculiarly within [the agency's] expertise," nor do

13    they present a situation where there is "no law to apply." *Chaney*, 470 U.S. at 831. There

14    accordingly is no basis for disregarding the "strong" and "well-settled presumption" favoring

15    review of executive determinations like the rescission of DACA. *Mach Mining, LLC v. EEOC*,

16    135 S.Ct. 1645, 1651 (2015); *Kucana v. Holder*, 558 U.S. 233, 251 (2010).[45]

17

18    to agency interpretations of statutes as these decisions do not fall into any of the three categories enumerated in § 1252(g).").

19    [45]    *See, e.g.*, *Bonilla v. Lynch*, 840 F.3d 575, 587 (9th Cir. 2016) (holding reviewable BIA's

20    decision not to exercise its *sua sponte* authority to open the petitioner's motion to reopen his order of removal where the BIA did not deny the motion "as an exercise of discretion," but rather

21    based on the "conclu[sion] that it lacked the *authority* to reopen"); *Montana Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 898 F.2d 753 (9th Cir. 1990) (holding *Chaney* does not apply to

22    decisions "based on a belief that the agency lacks jurisdiction" and "agency statutory interpretations made in the course of nonenforcement decisions"); *Edison Elec. Inst. v. EPA*, 996

23    F.2d 326, 333 (D.C. Cir. 1993) ("[I]nterpretation [of] the substantive requirements of the law . . . is not the type of discretionary judgment concerning the allocation of enforcement resources that

24    [*Chaney*] shields from review."); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 773 (D.C. Cir.

25    1992) (holding reviewable EPA's nonenforcement decision where plaintiff challenged agency's "statutory interpretation embodied in [the regulation], and does not contest a particular

26    enforcement decision"); *see also Chaney*, 470 U.S. at 833 n.4 (suggesting exception would not apply if case involved "a refusal by the agency to institute proceedings based solely on the belief

27    that it lacks jurisdiction"); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (interpreting

28

**B.     Rescission of DACA Is Arbitrary and Capricious.**

Because DACA's rescission rests solely on a legal question—the interpretation of the relevant statutes—DHS's decision stands or falls on the correctness of that legal determination. If DHS got the law wrong, its action is not supported by a valid justification and therefore is arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A); *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) ("Because [EPA's flawed legal interpretation] is fundamental to EPA's determination that [the State] did not contravene [the Clean Air Act], EPA's outcome on those statutory interpretation questions is 'arbitrary, capricious, or otherwise not in accordance with law' for the purposes of our review."). DHS's legal interpretation was plainly erroneous.

DACA confers two related benefits: deferral of government action to remove the individual from the United States (known as "deferred action") and eligibility for work authorization.  Both elements have long been recognized in U.S. immigration law.

*First*, granting "deferred action" is a long-established practice engaged in by Administrations of both parties and expressly recognized by the Supreme Court. *See AAADC*, 525 U.S. at 483-85 (describing "regular practice" of "deferred action").[46] The decision to defer removal proceedings is an exercise of prosecutorial discretion that falls squarely within the Executive Branch's constitutional authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

In the immigration context, moreover, Congress has codified that discretion. Until 1940, "the deportation statute unyieldingly demanded that an alien illegally in the United States be deported." *Johns v. DOJ*, 653 F.2d 884, 890 n.12 (5th Cir. 1981). Now, however, the *Chaney* as applying "to individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards").

[46] *See also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); CHARLES GORDON ET AL., 6-72 IMMIGRATION LAW AND PROC. § 72.03 (Matthew Bender, rev. ed.); Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. Off. Legal Counsel 1, 13-18 (Nov. 19, 2014), https://www.justice.gov/file/179206/download.

immigration laws specifically charge the secretary of Homeland Security with "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a); *see also* H.R. Rep. No. 11-157, at 8 (2009) ("[R]ather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer.").

Congress has on several occasions *expanded* deferred action to certain categories of individuals.[47] And it enacted 8 U.S.C. § 1252(g), which the Supreme Court explained was intended to preserve the INS's exercise of discretion in granting deferred action while "giv[ing] some measure of protection to 'no deferred action' decisions." *AAADC*, 525 U.S. at 484-85.

*Second*, conferring eligibility for work authorization has a similarly lengthy pedigree. A regulation promulgated in the 1980s provides that individuals who receive deferred action are eligible to apply for work authorization. *See* 8 C.F.R. § 274a.12(c)(14) (providing eligibility to apply for work authorization to "[a]n alien who has been granted deferred action"). Congress has legislated on the basis of this regulation, enacting a law prohibiting employers from hiring unauthorized aliens, but expressly excluded from that category individuals "authorized to be so employed by . . . the Attorney General." 8 U.S.C. § 1324a(h)(3); *cf.* 49 U.S.C. § 30301 note (providing that certain states may issue driver's licenses to aliens with "approved deferred action status.").

---

[47]     *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain aliens who self-petition for relief under the Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat. 1092, are eligible to request "deferred action"); USA PATRIOT Act, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (2001) (providing that certain family members of lawful permanent residents killed on September 11, 2001, or of citizens killed in combat, are "eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-1695 (2003) (same).

---

14

In concluding that DACA was an unconstitutional exercise of authority, DHS claimed that DACA suffered from the defect identified by the Fifth Circuit in a case challenging a separate deferred action program, DAPA. But the plaintiffs in that earlier case did *not* challenge the authority of the Executive Branch to exercise its discretion to defer removal with respect to certain undocumented immigrants, even on a categorical basis. Instead, the dispute centered on a statement in the memorandum implementing DAPA that "for a specified period of time, an individual [covered by DAPA] is permitted to be lawfully present in the United States." *See Texas v. United States*, 809 F.3d 134, 147-49, 166, 179-84 (5th Cir. 2015). The claim was that DHS lacked the authority to confer "lawful[] presen[ce]" and the Fifth Circuit agreed. The memorandum establishing DACA contains no such language, and the Fifth Circuit's rationale is therefore inapplicable.

In short, ample constitutional and statutory authority exists for DACA. DHS's rescission of DACA based on a contrary legal conclusion is accordingly unfounded and should be vacated.

## CONCLUSION

For the foregoing reasons, *amici* urge the Court to grant the relief requested in Plaintiffs' motions.

Dated:  November 1, 2017

Of Counsel:

WILMER CUTLER PICKERING
   HALE AND DORR LLP

Seth P. Waxman (*pro hac vice* pending)
Patrick J. Carome (*pro hac vice* pending)
Ari Holtzblatt (*pro hac vice* pending)
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
seth.waxman@wilmerhale.com
patrick.carome@wilmerhale.com
ari.holtzblatt@wilmerhale.com

Janine M. Lopez (*pro hac vice* to be filed)

MAYER BROWN LLP

By: */s/ John Nadolenco*

John Nadolenco
350 South Grand Avenue
Los Angeles, CA 90071-1503
Telephone: (213) 229-5173
jnadolenco@mayerbrown.com

Andrew J. Pincus (*pro hac vice* pending)
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman (*pro hac vice* pending)
Karen W. Lin (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1001

60 State Street
Boston, MA  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000
janine.lopez@wilmerhale.com

*Counsel for* Amici Curiae *Airbnb, Inc., Square, Inc., Twitter, Inc., and Yelp Inc.*

Telephone: (212) 506-2500
lrgoldman@mayerbrown.com
kwlin@mayerbrown.com

*Counsel for* Amici Curiae

1                             **APPENDIX:  LIST OF *AMICI***

2      1.       6Sense Insights, Inc.

3      2.       A Medium Corporation

4      3.       Adobe Systems Incorporated

5      4.       AdRoll, Inc.

6      5.       Affirm, Inc.

7      6.       Airbnb, Inc.

8      7.       Alation, Inc.

9      8.       Ampush Media, Inc.

10     9.       Andela, Inc.

11    10.      Appboy, Inc.

12    11.      AppNexus, Inc.

13    12.      Asana, Inc.

14    13.      Atlassian Corp. Plc

15    14.      Azavea Inc.

16    15.      Bigtooth Ventures

17    16.      Box, Inc.

18    17.      Brightcove Inc.

19    18.      Brocade Communications Systems,  Inc.

20    19.      CareZone Inc.

21    20.      CartoDB Inc.

22    21.      Casper Sleep Inc.

23    22.      Castlight Health, Inc.

24    23.      Cavium, Inc.

25    24.      Chegg, Inc.

26    25.      Chobani, LLC

27

28

| 1 | 26. | Civis Analytics, Inc. |
| 2 | 27. | Citrix Systems, Inc. |
| 3 | 28. | ClassPass Inc. |
| 4 | 29. | Cloudera, Inc. |
| 5 | 30. | Cloudflare Inc. |
| 6 | 31. | Codecademy |
| 7 | 32. | Color Genomics, Inc. |
| 8 | 33. | Credit Karma, Inc. |
| 9 | 34. | Disqus, Inc. |
| 10 | 35. | DoorDash, Inc. |
| 11 | 36. | Dropbox, Inc. |
| 12 | 37. | eBay Inc. |
| 13 | 38. | Edmodo, Inc. |
| 14 | 39. | EquityZen Inc. |
| 15 | 40. | Facebook, Inc. |
| 16 | 41. | General Assembly Space, Inc. |
| 17 | 42. | Glassdoor, Inc. |
| 18 | 43. | Google Inc. |
| 19 | 44. | Greenhouse Software, Inc. |
| 20 | 45. | Hewlett Packard Enterprise |
| 21 | 46. | Homer Logistics, Inc. |
| 22 | 47. | IBM Corporation |
| 23 | 48. | IDEO LP |
| 24 | 49. | Imgur Inc. |
| 25 | 50. | Indiegogo, Inc. |
| 26 | 51. | Kargo |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | 52. | Knotel |
| 2 | 53. | Lam Research Corporation |
| 3 | 54. | Levi Strauss & Co. |
| 4 | 55. | LinkedIn Corporation |
| 5 | 56. | Lithium Technologies, LLC |
| 6 | 57. | Lyft, Inc. |
| 7 | 58. | Lytro, Inc. |
| 8 | 59. | Mapbox |
| 9 | 60. | Marin Software Incorporated |
| 10 | 61. | Medidata Solutions, Inc. |
| 11 | 62. | Microsoft Corporation |
| 12 | 63. | Molecule Software, Inc. |
| 13 | 64. | MongoDB, Inc. |
| 14 | 65. | Motivate International Inc. |
| 15 | 66. | NETGEAR, Inc. |
| 16 | 67. | NewsCred, Inc. |
| 17 | 68. | NIO U.S. |
| 18 | 69. | Oath Inc. |
| 19 | 70. | Patreon, Inc. |
| 20 | 71. | PayPal Holdings, Inc. |
| 21 | 72. | Pinterest, Inc. |
| 22 | 73. | Pixability, Inc. |
| 23 | 74. | Postmates Inc. |
| 24 | 75. | Quantcast Corp. |
| 25 | 76. | RealNetworks, Inc. |
| 26 | 77. | Reddit, Inc. |
| 27 | | |
| 28 | | |

3

| | | |
|---|---|---|
| 1 | 78. | Redfin Corporation |
| 2 | 79. | salesforce.com inc. |
| 3 | 80. | Scopely, Inc. |
| 4 | 81. | Shutterstock, Inc. |
| 5 | 82. | Singularity University |
| 6 | 83. | Sizmek, Inc. |
| 7 | 84. | SpaceX |
| 8 | 85. | Spokeo, Inc. |
| 9 | 86. | Spotify USA Inc. |
| 10 | 87. | Square, Inc. |
| 11 | 88. | Squarespace, Inc. |
| 12 | 89. | Strava, Inc. |
| 13 | 90. | SurveyMonkey Inc. |
| 14 | 91. | Tesla, Inc. |
| 15 | 92. | The Copia Institute |
| 16 | 93. | Thumbtack |
| 17 | 94. | TripAdvisor, Inc. |
| 18 | 95. | Tumblr, Inc. |
| 19 | 96. | Turo Inc. |
| 20 | 97. | Twilio Inc. |
| 21 | 98. | Twitter Inc. |
| 22 | 99. | Uber Technologies, Inc. |
| 23 | 100. | Udacity Inc. |
| 24 | 101. | Upwork Inc. |
| 25 | 102. | Verizon Communications Inc. |
| 26 | 103. | Via |
| 27 | | |
| 28 | | |

104.   Warby Parker

105.   Work & Co.

106.   Workday, Inc.

107.   Yelp Inc.

108.   Zendesk, Inc.

5

# EXHIBIT VV

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

   XAVIER BECERRA
   Attorney General of California
   MICHAEL L. NEWMAN
   Supervising Deputy Attorney General
   JAMES F. ZAHRADKA II (SBN 196822)
   1515 Clay Street, 20th Floor
   P.O. Box 70550
   Oakland, CA 94612-0550
   Telephone: (510) 879-1247
   Email: James.Zahradka@doj.ca.gov
   *Attorneys for Plaintiff State of California*

   JOSEPH W. COTCHETT (SBN 36324)
   NANCY L. FINEMAN (SBN 124870)
   COTCHETT, PITRE & McCARTHY, LLP
   San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
   Burlingame, CA 94010
   Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
   Email: nfineman@cpmlegal.com
   *Attorneys for Plaintiff City of San Jose*

   JONATHAN WEISSGLASS (SBN 185008)
   STACEY M. LEYTON (SBN 203827)
   ERIC P. BROWN (SBN 284245)
   ALTSHULER BERZON LLP
   177 Post Street, Suite 300
   San Francisco, CA 94108
   Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
   Email: jweissglass@altber.com
   *Attorneys for Plaintiffs County of Santa Clara and*
   *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF LISA M. GONZALES** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

I, Lisa M. Gonzales, declare:

1.      I am the Assistant Superintendent of Educational Services at Dublin Unified School District, and my prior experience includes working as a superintendent, principal, and math/science teacher.  I am also currently the President of the Association of California School Administrators (ACSA), and in that capacity I have had the opportunity to speak with educators around the State of California regarding the impact of the federal government's decision to terminate the Deferred Action for Childhood Arrivals (DACA) program.  I am providing this declaration in my individual capacity based on my personal knowledge and experience, which includes conversations with students, parents and educators around the state.

2.      One of the responsibilities of my current job is to create the best possible teaching and learning environment for all the students and staff at Dublin USD.  Although there are many factors involved in creating an optimal learning environment, without question schools must be considered safe places where students and parents feel welcome.  In California, one of the ways we ensure that students feel safe and are ready to learn is that we promise them that the simple act of coming to school will not expose them or their families to federal immigration enforcement action.  This is not a matter of taking a position on immigration policy, it is a basic necessity for a school environment where all students can learn and thrive.

3.      My understanding is that the point of the DACA program is to provide security and stability for the "Dreamers," young people who were brought to this country as children and who have demonstrated they will be productive contributors to our society by succeeding in school and in the workforce.  Dreamers include college students and young working adults, but within the K-12 public school system they also include high school students, teachers and other school staff, and the parents of our students.  As school officials we do not ask our students or parents about their federal immigration status, and do not always know which students and parents are in the DACA program.  But we are keenly aware of the school environment in all of our schools, including those serving largely immigrant populations.

4.      Since the beginning of this year, I have noticed an increasing amount of uncertainty and fear among students, parents and staff due to statements and actions by federal officials related to immigration policy.  From my perspective, there appears to be a cumulative impact of the threat that many members of our community may face deportation, followed by announcements that the federal government would retaliate against state and local entities that declare themselves "sanctuary" jurisdictions, and now the decision to terminate the DACA program.

5.      I am aware of many examples of harm to students, parents and staff from the general actions of the federal government related to immigration enforcement, threatening statements of federal officials, and more specifically, from the decision to terminate the DACA program.  Most of the information I have gathered is from fellow educators from different regions of the state who, like me, are constantly interacting with students, parents and staff in our schools.  The common denominator in these stories is that many California students are effectively being denied an education because threats to their security, and the security of their peers and families, have stolen their hope for the future and left them unwilling or unable to continue to engage and thrive in school.

6.      For example, a colleague and superintendent from Monterey County, has collected some heartbreaking stories about students, former students, parents and teachers who are in the DACA program.  One Dreamer comes from a family in severe poverty and has worked to help support the family while attending high school.  She was recently accepted to the University of California and wants to study medicine and, given her 4.1 GPA, tenacity and work ethic, she was poised to succeed.  The announcement that DACA will be terminated has left her feeling abandoned and she has fallen into depression.  Her grades are falling and she is afraid to commit to a future that may no longer be available for her.

7.      Another student in high school in Salinas, California, dreams of joining the Air Force and studying electronics.  A local teacher describes him as a passionate patriot who wants to serve this country, the only country he has ever known.  She believes the DACA decision could make or break this young man, and potentially deprive our armed forces of an amazing and intelligent talent.

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

8.      I was provided details of an interview with a parent who, for obvious reasons, wished to remain anonymous.  She came to the United States 13 years ago and has three children in the public school system; the eldest is a citizen and the other two are in the DACA program.  Although her youngest son has been a straight "A" student and hopes to go to college to study the sciences, his future is now uncertain, his grades are falling, and he has withdrawn from his family and friends.

9.      Finally, a principal of a middle school in Riverside County told me that she reviewed the parent sign-in sheets from parent-teacher conferences that were conducted just a couple weeks ago, and found she had 67% less parent participation compared to last year.  She also discussed a major drop in parents attending the school's English-Learner Advisory Council, with monthly meetings that used to average about 130 parents down to only 20 to 30 parents during the last two months.  She noted that many of the families that do still attend school events are no longer willing to sign-in, and have spoken to her about concerns regarding their safety going to and from school events.  I heard a similar account from an elementary school principal in Yolo County.

10.      These stories are just a few illustrations of the broad and harmful impact of the termination of DACA on students and parents.  Students are showing increased anxiety and fear, decreased engagement and attendance, increased behavioral issues, and a general disillusionment and lack of motivation to complete school and/or continue to progress toward their former goals of attending college or joining the workforce.  Parents are no longer participating in classroom and school activities, sometimes not even enrolling their children in free and reduced lunch programs.  Many of the students and parents are afraid that their families will be separated in the process of deportation.

11.      Many California students attend schools serving largely immigrant populations.  But it is important to note that the deteriorating school environment impacts all of our students, not just those threatened by the elimination of DACA.  An optimal teaching and learning environment requires a vibrant and diverse community of students, parents and staff.  Targeting some members of the community for exclusion harms the entire community.  As an educator, I know that we must restore a

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1    healthy school environment for all our kids if we hope to ensure our social, economic and political

2    future.

3         I declare under penalty of perjury under the laws of the United States that the foregoing is true

4    and correct.

5         Executed on October 26, 2017, at Alameda County, California.

6

7

8                          Lisa M. Gonzales

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# EXHIBIT WW Supporting Declaration of Karen C. Tumlin

Case 1:16-cv-04756-NGG-VMS Document 122-10 Filed 12/15/17 Page 131 of 149 PageID #: 2321

*Vox*

# Exclusive: the Postal Service kept him from renewing his DACA. Now he's in immigration detention.

Pennsylvania father Osman Enriquez was waiting for a letter telling him to reapply.

*By Dara Lind* | *dara@vox.com* | Dec 13, 2017, 4:00pm EST



A former DACA recipient who was waiting to reapply for deportation protections, after his initial application was rejected due to postal service delays, is currently in the custody of Immigration and Customs Enforcement in Pennsylvania, Vox has exclusively learned.

Osman Enriquez, who was picked up by ICE Monday morning after a routine traffic stop, is one of the estimated 12,000 immigrants who have lost their DACA protections since the Trump administration started winding down the program in September.

In theory, these immigrants were given a chance to apply for one last two-year extension of their protections and work permits. But many missed the tight deadline imposed by the administration — just one month from the day they announced the sunsetting of the program — and **others saw their applications rejected by the government for being late, after languishing for weeks at a United States Postal Service processing center in Chicago**.

Enriquez is among those immigrants. According to the Trump administration, he's supposed to wait to be invited to reapply by US Citizenship and Immigration Services. Instead, he's being put on the road to deportation. (DHS did not respond to a request for comment.)

Enriquez might be the first known case of an immigrant getting detained by ICE after his DACA expired under the administration's new rules. He's almost certainly the first known case of an immigrant getting detained while waiting to reapply for DACA renewal.

His presence there is perhaps the most vivid reminder yet that as Congress drags out what to do about DACA recipients, it will probably be too late for some.

---

RELATED

**The Trump administration rejected 4,000 "late" DACA renewals. Some were sitting in its mailbox at the deadline.**

**Hundreds of immigrants will get to resubmit DACA renewals originally rejected as "late"**

**Thousands of immigrants are losing their DACA protections already**

**Senate Republicans' DACA counterproposal doesn't look like much of a compromise**

---

## A typical DACA recipient becomes a detainee

Osman Enriquez is a pretty typical DACA recipient. He's a 27-year-old from Guatemala who graduated from a Lancaster, Pennsylvania, high school and now works in stonemasonry. He was convicted of a "summary offense" (a minor crime) as a juvenile, but it wasn't enough to stop him from qualifying for, and getting, protection under DACA. His fiancée has a green card, and their son, who's not quite a year old, was born in the United States.



CONTINUE FOR MORE CONTENT

When the Trump administration announced on September 5 that it would end DACA, Enriquez's work permit was set to expire in a little over a month — on October 15.

According to the administration, that made him (and 154,000 other DACA recipients whose work permits were set to expire before March 5, 2018) eligible to apply for a two-year renewal of protections — but **only if they got their applications in by October 5**.

Enriquez went to the Lancaster office of immigrant advocacy and legal services organization Church World Service for help with his renewal application. According to Carrie Carranza of CWS, his application was mailed September 18. "His application was mailed out at same time as many other DACA applications that have now been approved," she told Vox on Wednesday.

But Enriquez wasn't so lucky. His application arrived at the USCIS service center in Chicago on October 10 — three weeks after he mailed it, and five days after the deadline. It was rejected.

At the time, Carranza says, they didn't really understand what had happened; "We told him, 'We're so sorry this happened; you did everything right; it was just a fluke, a debacle, out of your control.'"

It turns out the scope of the "debacle" was beyond anything she could imagine. It is likely that thousands of DACA renewal applications were mailed in advance of the deadline but were slowed down by USPS delays — including many that were received at government dropboxes on October 5 but were rejected because they were not picked up until the next day.

When reports from the **New York Times** and **Vox** highlighted the problem in November, **USCIS reversed itself**, declaring that immigrants whose DACA renewals had been mailed on time would be given the chance to reapply.

In guidance issued at the end of November (and included in the current **FAQs about DACA on the USCIS website**), the government says, "The USPS is working with USCIS to identify DACA requests that were received after the deadline due to USPS mail-service delays" — like Enriquez's.

"As soon as USPS completes its assessment, identifies such requests, and provides this information to USCIS, USCIS will send affected DACA requestors a letter inviting them to resubmit their DACA request. If you receive such a letter, you will have 33 calendar days from the date of the letter to resubmit your request."

The FAQ estimates that the Postal Service assessment will be done by "mid-December," and that USCIS will send invitations to reapply about a week after that.

But in the meantime, Enriquez was in limbo. His work permit had expired, but he still had to work to support his family; his driver's license had expired, because it was only valid as long as he had DACA, but he still needed to drive to get to work.

On Monday morning — six days before his son's first birthday — as Enriquez drove down Route 83 to his contracting job, he was pulled over by a Pennsylvania State Police officer. The officer told him his vehicle registration had expired. Enriquez's fiancée says the family thought they had kept their registration current; since Pennsylvania doesn't put registration-date stickers on license plates, Carranza speculates that the only way the trooper would have known Enriquez's registration had lapsed would be if she'd run his license plates when he drove by.

Enriquez was ultimately issued a ticket not for the expired registration, but for his expired driver's license. But in the meantime, Carranza says, the state police officer had called Immigration and Customs Enforcement to come pick up Enriquez. ICE agents took him to the York detention center and served him with a notice to appear in immigration court — formally starting deportation proceedings against him.

Two days later, Enriquez is still in detention. Unless something changes, he'll miss his son's birthday on Saturday.

**The Trump administration made this inevitable, and only Congress can stop it from getting worse**

Advocates and Democrats, extrapolating from USCIS numbers, have estimated that 122 immigrants will lose their DACA protections every day between October 5 and March 5. (That doesn't count the immigrants arrested by ICE despite still having DACA, or whose DACA protections have been stripped from them after an arrest.)

AD

But despite fears that ICE would use the information contained in DACA applications to track down and arrest immigrants, there don't appear to have been any cases (at least, not

any known to the public) in which immigrants who have lost DACA after September have actually been detained. Until now.

But what happened to Enriquez is the inevitable outcome of the way the Trump administration wound down DACA. It gave immigrants an unusually short amount of time to apply for renewal, then enforced stricter-than-usual rules about what counted as a timely application. Their current plan to allow some immigrants affected by mail delays to reapply still puts many immigrants at risk of a gap between one work permit expiring and a new one being issued. And during that time, working, driving, and existing in the US put DACA-eligible immigrants at just as much risk of deportation as any other unauthorized immigrant.

You can't understand the current debate in Congress over how and when to help DACA recipients without understanding this phenomenon. Elected Democrats are extremely aware that people are losing DACA every day, and many moderate Republicans also note that the program is less effective the longer it's allowed to wind down. But Republican leadership isn't thinking about the program's efficacy; it's focused on the March 5 "deadline" set by the White House, and sees no need to take action before then.

At present, Democrats are trying to figure out if the urgency of DACA is enough to withhold votes on a must-pass government funding bill days before Christmas — risking a government shutdown — or whether to allow the issue to fall into 2018. If they pick the latter, they'll have to hope that Republicans see the March 5 deadline as a serious deadline, like a government funding bill, and not a "deadline" like funding the Children's Health Insurance Program (which Congress has allowed to lapse for 73 days and counting).

And in the meantime, Osman Enriquez, and perhaps others like him, will be waiting in a detention cell for Congress to make up its mind.

**CORRECTION:** This article originally identified the CWS staffer in Lancaster as "Carrie Hussein," a name she no longer goes by. Her name is now Carrie Carranza.

Was this article helpful? 

## *IN THIS STORYSTREAM*

# Trump administration ends the Deferred Action for Childhood Arrivals (DACA) program

Exclusive: the Postal Service kept him from renewing his DACA. Now he's in immigration detention.

Immigration activists are pressuring Democrats to pass the DREAM Act, even if it means a government shutdown

**VIEW ALL  57  STORIES**

FROM OUR SPONSOR  CONTINUE FOR MORE CONTENT



AD

Case 1:16-cv-04756-NGG-VMS Document 122-16 Filed 12/15/17 Page 138 of 149 PageID #: 2328

Case 1:16-cv-04756-NGG-VMS Document 122-16 Filed 12/15/17 Page 139 of 149 PageID #: 2329

# EXHIBIT XX

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

16

17

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

18

19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

20

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF EDGARDO GARCIA** <br><br> Date: December 20, 2017 <br> Time: 8:00 a.m. <br> Judge: Honorable William Alsup <br> Dept.: Courtroom 8 <br><br> Complaint Filed: September 14, 2017 <br> Trial Date: February 05, 2018 |

21

22

23

24

25

26

27

28

DECLARATION OF EDGARDO GARCIA

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and | CASE NO. 17-CV-05235-WHA |
| 2 | STATE OF MINNESOTA, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official | |
| 6 | capacity as Acting Secretary of the Department of Homeland Security, and the UNITED | |
| 7 | STATES OF AMERICA, | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. | |
| 13 | DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 14 | | |
| | Defendants. | |
| 15 | | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, | CASE NO. 17-CV-05380-WHA |
| 17 | VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT | |
| 18 | LATTHIVONGSKORN, | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President | |
| 22 | of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE | |
| 23 | DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF EDGARDO GARCIA

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity | |
| 6 | as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official | |
| 7 | capacity as Attorney General of the United States; ELAINE DUKE, in her official | |
| 8 | capacity as Acting Secretary of the Department of Homeland Security; and U.S. | |
| 9 | DEPARTMENT OF HOMELAND SECURITY, | |
| 10 | Defendants. | |

11

12    I, **EDGARDO GARCIA**, declare and state as follows:

13         1.    I have personal knowledge of the facts set forth in this declaration and, if called as a

14    witness, could and would testify competently thereto.

15         2.    I am the Chief of Police of the San Jose Police Department ("SJPD") of the City of San

16    Jose, California ("San Jose"). I have served as a police officer since 1992, including as a patrolman,

17    sergeant, lieutenant, captain, deputy chief, assistant chief, and now chief of police. I have a Bachelor's

18    Degree from Union Institute and University after having moved to San Jose from San Juan, Puerto Rico

19    at a young age.

20         3.    As stated on its website, http://www.sjpd.org/COP/MissionStatement.html, the "San Jose

21    Police Department is a dynamic, progressive and professional organization dedicated to maintaining

22    community partnerships which promote a high quality of life for the City's diverse population. The

23    Department is committed to treating all people with dignity, fairness and respect, protecting their rights

24    and providing equal protection under the law." The website can be translated into 40 languages, which

25    demonstrates the diversity of our city.

26         4.    SJPD's mission is: "To promote public safety; To prevent, suppress, and investigate

27    crimes; To provide emergency and non-emergency services; To create and maintain strong community

28

1

DECLARATION OF EDGARDO GARCIA

1   partnerships; To adapt a multidisciplinary approach to solving community problems; To develop and

2   promote a diverse, professional workforce."

3          5.      To fulfill its mission, the SJPD engages in community policing.  The community policing

4   model requires active, engaged, and empowered neighborhood residents who freely interact with police

5   without reservations.  It is critical that all residents, no matter their immigration status, are able to report

6   crimes and assist in criminal investigations without fear that their immigration status will also be

7   investigated.

8          6.      San Jose has consistently been rated one of the "Safest Big Cities" in the nation.  I

9   believe that part of the reason for our low crime rate is the trust that the SJPD has with all segments of

10   our community.

11          7.      As part of SJPD's mission to keep San Jose safe, I and the entire SJPD engage in

12   community outreach. Among the activities we undertake as part of that mission are "Coffee with a Cop,"

13   regular informal neighborhood meetings, "day walks" and "night walks" with officers,

14   community/police workshops, neighborhood watch, and others. These events are particularly

15   concentrated in the most diverse neighborhoods, where the immigrant population is dominant. The City

16   also has created the role of community liaison officer with the Mexican Consulate for the specific

17   purpose of reaching out to new immigrant communities.

18          8.      Additionally, the SJPD during the course of its investigations routinely deals with

19   immigrants.  Our officers are explicit in telling those who participate in these investigations that

20   immigration status does not matter, and we encourage victims and witnesses, even those who may be

21   undocumented, not to be afraid to report crimes and deal with law enforcement.

22          9.      My officers and I have already seen in the community fear and uncertainty in the

23   immigrant community since the election of President Donald Trump and the announcement of the

24   DACA's rescission.  This presence of fear and uncertainty makes it harder for the SJPD to fulfill its

25   mission to protect the public and also imposes obstacles in the focus on treating all people equally.  It

26   has been my experience that the SJPD that increases in federal immigration enforcement invariably

27   require police officers to work even harder to make clear the distinction between immigration

28

1   enforcement and local law enforcement, which is necessary to maintain trust and cooperation in

2   immigrant communities.

3      I declare under the penalty of perjury under the laws of the United States that the foregoing is

4   true and correct and that this declaration was executed on October 26, 2017 at SAN JOSE,

5   California.

6

7

8                    EDGARDO GARCIA

# EXHIBIT YY

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF SAN FRANCISCO DISTRICT ATTORNEY GEORGE GASCÓN** |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 | | |
| 18 | | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.