# EXHIBIT AAA

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JEFFREY F. ROSEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT** |

| | |
|---|---|
| 1 STATE OF CALIFORNIA, STATE OF<br>MAINE, STATE OF MARYLAND, and<br>2 STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 3 Plaintiffs, | |
| 4 v. | |
| 5 U.S. DEPARTMENT OF HOMELAND<br>SECURITY, ELAINE DUKE, in her official<br>6 capacity as Acting Secretary of the Department<br>of Homeland Security, and the UNITED<br>7 STATES OF AMERICA, | |
| 8 Defendants. | |
| 9 CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 Plaintiffs, | |
| 11 v. | |
| 12 DONALD J. TRUMP, President of the United<br>States, in his official capacity, ELAINE C.<br>13 DUKE, in her official capacity, and the<br>UNITED STATES OF AMERICA, | |
| 14 Defendants. | |
| 15 | |
| DULCE GARCIA, MIRIAM GONZALEZ<br>16 AVILA, SAUL JIMENEZ SUAREZ,<br>VIRIDIANA CHABOLLA MENDOZA,<br>17 NORMA RAMIREZ, and JIRAYUT<br>LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 18 | |
| 19 Plaintiffs, | |
| 20 v. | |
| 21 UNITED STATES OF AMERICA, DONALD<br>J. TRUMP, in his official capacity as President<br>of the United States, U.S. DEPARTMENT OF<br>22 HOMELAND SECURITY, and ELAINE<br>DUKE, in her official capacity as Acting<br>23 Secretary of Homeland Security, | |
| 24 Defendants. | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>               Plaintiffs,<br><br>         v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>            Defendants. | CASE NO. 17-CV-05813-WHA |

1    I, JEFFREY F. ROSEN, declare:

2        1.      I am the District Attorney of Santa Clara County.  Santa Clara County is the sixth largest

3    county in California.  The City of San José is the largest city within Santa Clara County.

4        2.      I have held this office since January 2011.  Prior to being elected District Attorney, I

5    served as a Deputy District Attorney for 15 years and prosecuted a variety of criminal cases including

6    burglary, robbery, domestic violence, sexual assault, and murder.

7        3.      Justice and public safety are central to our mission, and we achieve both by working

8    collaboratively with the communities that we serve.  We only know about crimes because community

9    members call the police.  We only secure evidence because community members tell us what they know.

10   We only prosecute successfully when community members cooperate with us and show up in court.  We

11   only determine just resolutions because community members talk to us freely and without fear.

12   Accordingly, cooperation and trust between our office and the community that we serve is of vital

13   importance to our mission.  Historically, we have struggled with criminal defendants who try and

14   dissuade witnesses and victims from testifying, but now we struggle when Federal authorities,

15   effectively do the same in service of immigration politics by making immigrant communities fearful of

16   the government, going to court, or cooperating with law enforcement.

17       4.      Immigrants make up close to 40 percent of the population of Santa Clara County.  They

18   are a vital, dynamic and major part of our community.  Most of these immigrants are documented.  Of

19   those who are undocumented, most are living with citizens and many are living with their own citizen

20   children.  While I understand that immigration is in the purview of the federal government, these federal

21   actions can have devastating impacts on my office's ability to pursue justice and promote public safety

22   for Santa Clara County residents.  For example, when immigrants, particularly undocumented

23   immigrants, fear interaction with law enforcement or government officials, then they fail to report

24   crimes, they are victims of violence and exploitation, they are frightened to show up and testify.  Of

25   course, a mugger doesn't ask for your papers before mugging you, so our failure to protect our

26   immigrants means all of our community members are less safe.  As part of my core mission, both I

27   personally and my deputies cultivate rich connections between my office and the immigrant community.

28

1

I know from this experience firsthand that recent federal actions and rhetoric have triggered unprecedented fear of law enforcement and government in this community.

5.      When immigrants in our community, and their friends and family members, fear and distrust our police and prosecutors, they can no longer cooperate freely with us. This is devastating to our mission.

6.      My office does a large amount of work to foster trust with immigrant communities.

* We conduct frequent outreach to community and church groups, and through the media to send the message that we will prosecute crimes to protect victims, without regard to whether the victim, or any witness is documented. Moreover, we have conducted outreach to state to the public that our office does not collect or share information on immigration status.

* The District Attorney's Office has taken a lead role in Santa Clara County to foster trust and cooperation with our immigrant communities and law enforcement agencies. In 2017, I, and my community prosecutors, spoke before thousands of Latino residents at the area's most respected and populous churches: Sacred Heart, Our Lady of Guadalupe and St. Joseph's Cathedral, all located within the City of San José. The message, delivered in Spanish and English, emphasized that the DA's Office does not ask about or need to know the immigration status of crime witnesses and victims. I quoted The Rev. Martin Luther King: "It is not possible to be in favor of justice for some people and not be in favor of justice for all people." Echoing the civil rights leader, I told them: "Nothing is more important than Justice, and one person cannot be above or beneath its protection. As the District Attorney of Santa Clara County, I say to everyone in this community that we will do our duty to fight for you as a victim of a crime regardless of your legal status. Human dignity requires no less." My Office has held more than 30 "notario" fraud presentations in Spanish and Vietnamese; participated in an Immigration Forum at Santa Clara Law School; participated in a series of immigration resource fairs; sits on the county's Immigration Task Force, and has vigorously prosecuted and publicized cases of "notario" and immigration fraud.

2

- We evaluate cases that are not serious or violent to determine whether there is a collateral consequence that outweighs the regular criminal punishment. In those instances, where a severe immigration, employment, military or educational consequence to a certain kind of criminal conviction would result, we offer to change the charge and INCREASE the punishment for the new charge so that the defendant can avoid that collateral consequence. All such offers of resolution are also available to someone who does not have a collateral consequence.

- For several years we have evaluated our prosecutions for driving on a suspended license for failure to pay DMV fines and fees, to change some of those where the accused had little or no criminal record, to the infraction of driving on a suspended license (fines and fees but no jail time) rather than a misdemeanor (where jail time is possible) to prevent the incarceration of people who had their licenses suspended largely for failure to pay a fine or fee. Many of those individuals, like so many residents in our County, are immigrants for whom the fear of incarceration was assuaged.

- My office works closely with the San José Police Department, which likewise conducts outreach intended to foster a close and productive relationship with the immigrant community. San José police officers do not collect or share information about the immigration status of members of the public who report crimes.

7.     The District Attorney's Office employs at least one DACA recipient who makes vital contributions to the office's efforts to connect with Santa Clara County residents and to promote safety and justice for all county residents.

8.     Despite these efforts, establishing and maintaining trust with the immigrant community remains a challenge. This is because I cannot guarantee their safety or the integrity of their families when the threat of indiscriminate deportation remains a constant threat. Casting our DACA youth from the embrace of our community back into the shadows only increases the number of community members who will fear working with us and will inevitably harm the trust we have worked so hard to build.

DECLARATION OF JEFFREY F. ROSEN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

9.      Accordingly, the core mission of my office in pursuing justice and protecting the public is compromised when immigrants live in fear of the government. The rescission of DACA will only heighten this fear and vitiate the mission of my office.

10.     Therefore, rescinding DACA is detrimental to the ability of the Office of the District Attorney to provide for public safety and enforce the law in Santa Clara County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___10/2 7___, 2017, in San José, California.

JEFFREY F. ROSEN

# EXHIBIT BBB

1 | JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
2 | COVINGTON & BURLING LLP
One Front Street, 35th Floor
3 | San Francisco, CA 94111-5356
Telephone: (415) 591-6000
4 | Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
5 | abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
6 | *University of California and Janet Napolitano, in*
*her official capacity as President of the*
7 | *University of California*

8 | THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
9 | JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
10 | 333 South Grand Avenue
Los Angeles, CA 90071-3197
11 | Telephone: (213) 229-7000
Facsimile: (213) 229-7520
12 | Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
13 | jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 | *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 | *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

18

**UNITED STATES DISTRICT COURT**
19 | **NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

20

THE REGENTS OF THE UNIVERSITY OF
21 | CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
22 | University of California,

23 | Plaintiffs,

24 | v.

25 | U.S. DEPARTMENT OF HOMELAND
SECURITY and ELAINE DUKE, in her
26 | official capacity as Acting Secretary of the
Department of Homeland Security,

27 |

Defendants.

28

CASE NO. 17-CV-05211-WHA

**DECLARATION OF SHERIFF LAURIE**
**SMITH**

---

DECLARATION OF SHERIFF LAURIE SMITH
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and | CASE NO. 17-CV-05235-WHA |
| 2 | STATE OF MINNESOTA, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official | |
| 6 | capacity as Acting Secretary of the Department of Homeland Security, and the UNITED | |
| 7 | STATES OF AMERICA, | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. | |
| 13 | DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 14 | Defendants. | |
| 15 | | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, | CASE NO. 17-CV-05380-WHA |
| 17 | VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | |
| 18 | Plaintiffs, | |
| 19 | v. | |
| 20 | UNITED STATES OF AMERICA, DONALD | |
| 21 | J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF | |
| 22 | HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting | |
| 23 | Secretary of Homeland Security, | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF SHERIFF LAURIE SMITH
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL | CASE NO. 17-CV-05813-WHA |
| 2 | UNION LOCAL 521, | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON | |
| 6 | BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United | |
| 7 | States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department | |
| 8 | of Homeland Security; and U.S. DEPARTMENT OF HOMELAND | |
| 9 | SECURITY, | |
| 10 | Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   I, LAURIE SMITH, declare:

2       1.      I am a resident of the State of California. I have personal knowledge of the facts set forth

3   this declaration. If called as a witness, I could and would testify competently to the matters set forth

4   herein.

5       2.      I am the elected Sheriff of Santa Clara County (the "County"). I have worked in the

6   Sheriff's Office for over 43 years, and have served as Sheriff since 1998.

7       3.      The Sheriff's Office serves the entire Santa Clara County area, enforcing criminal laws in

8   the unincorporated area of the County, which spans approximately 600 square miles; serving as the

9   municipal police department in three cities within the County; and offering contractual law enforcement

10  services to Stanford University, the Santa Clara County Superior Court, the Santa Clara Valley

11  Transportation Authority, and other local agencies.

12      4.      The Sheriff's Office has more than 1,700 employees, including 1,300 sworn peace

13  officers. It investigates thousands of suspected crimes each year. The core function of the Sheriff's

14  Office is to maintain peace in the County, prevent and respond to unlawful disturbances, make arrests as

15  needed, protect victims, and investigate criminal offenses. Community trust is the foundation of my

16  office's public safety work.

17      5.      The County of Santa Clara Board of Supervisors adopted a resolution in 2010 that set out

18  County policy restricting County employees from questioning, investigating, or arresting members of

19  the public solely because of their immigration status or an actual or suspected violation of civil

20  immigration law. Based on my experience and my opinion about the law enforcement needs and

21  priorities of the community I serve, I agreed with this resolution, which aligned with my office's

22  longstanding practices, and which assists my office in investigating suspected criminal offenses.

23      6.      My office relies on County residents – without regard to immigration status – on a daily

24  basis to report crimes and disturbances, serve as witnesses, and assist in investigations. Without the

25  assistance of community members, we would be severely hindered in learning about crimes, locating

26  evidence, and carrying out our investigative work. For example, when the Sheriff's Office was

27  investigating a high-profile murder of a teenage girl who disappeared on her way to school in 2012,

28  farmworkers in the neighborhood where she lived actively cooperated with the Sheriff's Office. Had

1  they feared that my office would question their immigration status, or the status of their loved ones, it is

2  very unlikely they would have cooperated. With the Sheriff's Office's focus on investigating state and

3  local crimes, it does not matter to us if a victim or a witness assisting us has lawful immigration status or

4  not – *all* community members deserve to be protected from crime, and all can contribute to the criminal

5  justice process.

6       7.    The Sheriff's Office Notario Fraud Unit ("NFU") is another good example of the critical

7  role that trust and relationships with the community play in fulfilling our public safety mandate. The

8  Sheriff's Office formed the NFU to address the problem of "notarios," who represent themselves as

9  legal professionals to vulnerable clients needing immigration legal services, but who have no legal

10  qualifications and often take clients' money without providing any services of value. The Sheriff's

11  Office has worked diligently to build relationships and trust with immigrant communities in the County

12  to help conduct successful notario investigations. In many cases, the NFU has relied on complaints from

13  victims who we believe would not have been as forthcoming if they feared investigation of their

14  immigration status. These victims have provided critical information about alleged abuses, allowing the

15  NFU to obtain search warrants. In one case, a victim contacted the NFU to report a suspected notario

16  for fraudulent services. We obtained a search warrant, seized approximately 1,000 client files, and, due

17  to our public outreach on the case, received over 40 phone calls from immigrant victims willing to serve

18  as witnesses. The District Attorney's Office then filed four felony charges and one misdemeanor charge

19  against the suspect.

20       8.    The Sheriff's Office would be less likely to receive this kind of assistance from the

21  community if the DACA program was rescinded. The rescission of DACA would likely cause DACA

22  recipients and their families to feel uncertainty as to their legal status and fear of deportation. When

23  immigrant communities fear or lose trust in the government, they are less likely to cooperate with the

24  Sheriff's Office.

25  ///

26  ///

27  ///

28

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct and that this declaration was executed on _____ *Oct 27* _____, 2017 in San

3    José, California.

4

5                                                        LAURIE SMITH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SHERIFF LAURIE SMITH
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT CCC

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BATALLA VIDAL et al., | ) | |
| *Plaintiffs,* | ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* | ) | |
| NIELSEN et al., | ) | |
| *Defendants.* | ) | December 12, 2017 |

### DECLARATION OF GUSTAVO GALICIA

I, Gustavo Galicia, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.     My name is Gustavo Galicia and I am a recipient of deferred action under DACA. I reside in Ontario, California.

2.     I am 30 years old. I came to the United States from Mexico when I was about two and a half years old and have lived here in California ever since. I have never been back to Mexico and have no memory of that country at all. As far as I am concerned, California is my home.

3.     I live with my parents and my brother in Ontario, California, where we have lived for most of my life.

4.     Around October 2006, when I was nineteen years old, I had a strep throat infection and did some blood work. My doctor told me I needed to eat healthier, but my bloodwork looked fine, and I started taking medicine for strep throat. I noticed that during the day I would feel so tired and cold, and thought it was because of the work I did. But I got to the point where I started vomiting a lot.

1

5.      I went back to the doctor and asked to do some more tests, and he said my tests were recent and still fine.  But a few weeks passed and things got even worse.  I was vomiting more and more, and my skin was covered in rashes.  I went back to the doctor.  He told me he could give me another medicine but it would be bad for me or I could do acupuncture.  I decided to do acupuncture and I felt a little better, but by December I was worse.  I could not even drink water without vomiting.

6.      Around January 23, 2007, it was so bad that I started crying, and I was in really bad shape.  My brother told me we should go to another doctor, so we did.  As they drew my blood, the nurse ran to the doctor and said something was wrong.  My parents were with me, and the doctor told me that he did not know what I had, but I needed to go to the hospital right now, or else I was going to die.  He said my blood was not the right color.  It was almost orange, not completely red.

7.      I went to the hospital with a lot of fear.  My parents and I were not sure what was going to happen.  We did not want to go to the hospital, because my parents and I were afraid that if I went and got treatment, I would get deported.  I thought maybe I should get a different opinion.  But we ended up going because the doctor was very adamant.  He told my parents that if I did not go to the hospital, I would die within a few days.

8.      When we went to the hospital, I did not have health insurance.  I was in the ER waiting, they ran some tests, and the doctors said I had severe anemia and did not have enough blood.  According to the tests, my kidneys were not working and thus were not producing a hormone my body needed to stay healthy.

9.      I told the doctor I did not want to be there anymore, just give me the medicine to go, because I was scared of getting deported.  But I was too sick to leave the hospital.  Shortly

2

after admitting me, they told me I was being diagnosed with Stage 5 or "end stage" renal failure – the very last stage before death. I would either need a kidney transplant or dialysis.

10.     The doctors explained I could do dialysis to clean the toxins in my body, and take the necessary medications. I was in the hospital for about a month. When I got to the hospital, I weighed 210 pounds, but when I left the hospital I weighed 95 pounds. In less than a month I had lost over half of my body weight. The doctors said since I could not eat for a month, my body was using up the fat I had to stay alive.

11.     Most dialysis patients, once they start dialysis, apply for social security to help financially. I could not apply for that help because I did not have a Social Security Number due to my immigration status. I was able to obtain help with dialysis, however, with state-funded health coverage through Medi-Cal. Coming from a low-income background, I would not have been able to pay for that otherwise and my life would have been in jeopardy.

12.     In 2007, after being released from the hospital, I went to the transplant center in Loma Linda, California, and disclosed my situation. Because I was a minor and covered at the time by the state health coverage, I was placed on the kidney transplant list in 2007. My undocumented status was not an issue at that point. But once I turned 21 and aged out of the program, that was when the problem began.

13.     The transplant center told me I needed to find a job with good health insurance or get a legal immigration status, because not having a legal status would delay a transplant. They did not take me completely off the list for not having legal status, but they put me on a financial hold, which meant that even if a kidney became available, I would not be able to get it.

**The Impact of DACA in My Life**

3

14.    With Stage 5 renal failure and dialysis, and being undocumented, it was very difficult for me to get ahead in life.  I spent so much time tending to my health and I stretched myself thin with everything I had to take care of that I could barely get by.  DACA changed everything.

15.    In June 2012, my dad woke me up that morning to tell me there was something for me to see in the news.  I saw the news and I did not know what to think of it.  It was a bittersweet moment, because I saw in front of me the potential to get a job with health insurance and potentially get a kidney transplant, and to be able to finally fulfill my dreams and goals.  But I was not sure if it was real.  We waited for the instructions to come out to see what was going to happen.

16.    The government started taking applications in August, and I was one of the first people to turn in my application.  I did the application myself, because I had saved my papers my whole life, so I had everything ready.  My application looked like a book.  I remember I paid over eighty dollars to mail it express, and I thought, *I hope this is for real*.

17.    One month later, in September, I went to my appointment in Loma Linda and got some bad news from the transplant center.  They told me that because I did not have legal status, I had to pay the full amount for a transplant up front within a week, or they were going to take me off the transplant list.  I started crying after hearing this news.

18.    I felt at the edge of depression after that.  I was so overwhelmed with everything going on in my life and my inability to live normally.  But I told myself I could not give up after everything I had been through.  At this point, I was in my first year as a full time student at Chaffey Community College in Rancho Cucamonga.  Around that time, one of my professors asked me why I was sad, and I told her that I was having issues with my transplant.  She said maybe we

4

could do something through my school.  They asked the school body president of the community college.

19.     Meanwhile the transplant center kept asking me whether I had the money or not. The hospital referred me to a nonprofit that could hold the money for me if I raised it.  I applied for that program with the nonprofit, started fundraising, and updated the transplant center with my progress. I then began fundraising through Chaffey Community College.  I raised $5,000 through the school bookstores and an email to faculty and staff.

20.     One of my uncles also donated some money.  My dad's boss did a dinner and a dance in my honor and raised money.  And other people donated to the account at the nonprofit. Ultimately, I raised a sum that was close to the amount needed for the transplant, but when I told the center that I had most of the money, the center told me I still needed to reach the full amount. I almost gave up.

21.     Then I found out that my deferred action had been approved! When I told the transplant center that I had deferred action and was finally able to work, they put me back on the transplant list.  I continued going to school while receiving dialysis treatments three times per week.

22.     When I got my work permit through DACA, I thought, *nothing will stop me now*. I needed to get a stable job so I could pay for good health benefits.

23.     Shortly after receiving my deferred action, I went to the DMV to get my driver's license.  I went with a lot of fear, because it was another place that had excluded me before I had DACA.

24.     When I went to the DMV and took my test, I told myself that I knew I would work there someday, as that was my next goal.  There was something about working for the government,

even if local or state, that felt not only like true inclusion in this country but also a prestigious career, and I knew employment there would provide health insurance as well.

25.     Once I had my deferred action, work permit, and driver's license, the first thing my brother and I did was buy an airplane ticket. We had always dreamed of going somewhere in an airplane. We live right next to the local airport. As kids, we would see and hear airplanes fly over every day since we moved to Ontario from La Puente, California, and always wanted to be able to go somewhere in an airplane. But since the time we were young, we knew that we could not ever travel in one.

26.     We booked a flight to go to Sacramento, California for a weekend. It is only about a one hour flight, but for someone wanting to be able to go in an airplane for so long and not being able to do it, it meant so much more than just being on an airplane.

27.     In December 2013, Chaffey College (where I was still studying) was recruiting volunteers to help out in the bookstore. I applied and got the job. I worked part time at the bookstore, helping students get their books, cleaning up, and putting books away while doing dialysis as well. I still did dialysis from 7pm-1am at the clinic, three times per week, six hours per treatment, while working and going to school during the day.

28.     Then, once the bookstore died down because students were on break, there was a position open at my local city library. I applied and was interviewed. What impressed them was that I worked for the community college bookstore. I got a call the next day and was offered the job. I felt so accomplished, not only for myself but also for my parents. Who would have thought that someone like myself would be able to reach their dream of working for a government agency?

29.     I worked there for about two years, while also going to Chaffey College as well. Meanwhile, my brother got a job at a school district, working with special education students.

6

Having medical issues like I do, you learn to truly appreciate your life, and I thought that working with special education students would be a meaningful experience for me. I applied there and was hired to work with young children with severe disabilities for a year.

30. It is heartbreaking seeing what the kids have to go through, but it was also something special for me. Even just seeing how the little kids look at you is something I will never forget. After that position, I went to a different program within the same district and worked as a resource program specialist. I helped students who had different goals to meet their goals, from kindergarten to sixth grade. I worked this job, while still keeping my job at the library, taking 2 classes at Chaffey, and doing dialysis three times per week.

31. During this time, I always kept my eye out for jobs at the DMV, since that was my goal. One day I saw there was a job opening at the DMV, so I applied for it. The closest DMV to where I live in Ontario was in Rancho Cucamonga. I got an interview. About three and a half weeks after the interview, they told me I was tentatively being offered the job pending an FBI, DOJ, and reference check. After that check, I got the job! In July of 2015, I became a state employee. I was actually there! I made that happen!

32. Working for the DMV, it got to the point where a driver's license was just a piece of plastic to me. But prior to that, when I got my first driver's license, not only for me but for my parents, it was a really big deal. When I had started high school, all my friends were talking about getting their instruction permit or provisional driver's license and going to college. My high school had a driver's education class. I was so excited to take it and I tried to get into that class, but I could not because you needed to disclose your Social Security Number, so I gave up on that.

33. People like me, people who are dreamers, people who come from different countries, we value a lot of things more than people who are born here. I have family members

7

who were born here—they are in their 30s or 40s—and they do not even have a driver's license. And it is not that they are not eligible, they just do not want it. But it was so difficult for me to get those things and I will never take them for granted.

34.     I worked at the DMV part time, not full time yet, and my next goal was to get health benefits, since I did not have health benefits as a part time employee. I realized while working for the DMV that it would take years for me to become full time in the position that I had.

35.     I searched for other state jobs and found a job opening at California Employment Development Department (EDD), a clerical position. I applied, took the test, got an interview in mid-October 2015, and was hired. I only worked for the DMV for 6 months, but it was still a huge milestone for me. I told my managers I did not want to leave, but they knew about my health issues and they were supportive of me looking for a job that was more stable so that I could get permanent and comprehensive health insurance.

36.     On my first day at EDD, I went in and they had me do paperwork. One of the papers was to choose what health plan I wanted. That was when I realized, *this is it. I have finally accomplished everything I wanted and now, I am finally going to get that kidney. No doubt about it.* Throughout this period starting from when I worked at the DMV, I had to stop going to school because I had to focus on my work. Between my new job and my ongoing dialysis treatments, I did not have time to take classes.

37.     Being at that young of an age, with this poor of health, a lot of people get thoughts of suicide because they cannot process it psychologically. My health fluctuated a lot. But I had such a positive attitude about it that I felt like I was doing okay compared to how bad things could have been. I remember when I was younger my social worker would check up on me and ask me

if I ever had thoughts of suicide. But I told my social worker, "You do not have to worry about me, I am going to continue fighting and will not give up."

38.     In early 2016 I saw that the EDD opened up a couple positions for examiners. Instead of being clerical staff, I would actually be the one processing applications for disability. I applied, interviewed, and was not hired for the position, but they gave me feedback. A month and a half later some more positions opened up, and I applied. I incorporated the feedback, and I got the job! I felt excited. I told myself, *I am in a higher position, I have good health insurance, this is working out perfect*. I was confident that I would be able to keep renewing my request for deferred action under DACA and get a transplant.

39.     Then the 2016 elections came. The night of the election, I was in the dialysis clinic hooked up to the dialysis machine and watching the little TV they have there. When they announced the winner, I broke down crying for about 30 minutes while receiving my dialysis. A deep uncertainty started again in me about whether I would be okay.

40.     I know that if I got deported, and had to go to dialysis in Mexico, I would not be able to receive the treatment I need to survive. The conditions over there are really bad. I had an uncle who had to start dialysis and he died after six months. They do not have enough resources in Mexico, so you can only do it for once a week for a couple hours. Because I have Stage 5 renal failure, I need more care than that. I know that I would not survive in Mexico. So a couple weeks after the elections, I consulted with lawyers to see if there was any immigration status I could apply for. There is not. I even read the immigration code myself, the Immigration and Naturalization Act, just to see if there is any possible thing I could apply for, but there is not.

41.     I thought, *what if I got a call for a kidney? Should I even take it?* A kidney transplant is a very dangerous operation, and the aftercare requires a lot of medication. It is sad to say, but

9

our health system depends on one being able to pay for the service, especially for a kidney transplant. If you do not have money and health insurance, you cannot keep your organ healthy after a transplant. The first thing hospitals check is whether your health insurance is valid. That is why it is so important for me to keep my job, even up to this day. The medication I take is very expensive and I need to keep my job to maintain the insurance I currently have, which covers most of my necessary medical expenses. I could not afford my medical expenses without my job at the EDD, and I could not work at the EDD without deferred action under DACA.

42.     Even losing my work permit for a brief period would hurt my chances of continuing my medical treatment. It is not easy to get a government job. When they opened up the position I have right now, they opened up 13 positions, and about 90 people applied, including from within my job. It is a really competitive position, and I worked so hard to get it. If I were to lose DACA, even if only for a temporary period, I do not know that I would be able to return to that position.

**My Kidney Transplant**

43.     On February 28, 2017, after waiting for ten years, I finally got the call for a kidney transplant. At first, when the kidney was offered to me, I feared just exactly what is happening right now—that I might lose my deferred action and be unable to afford ongoing treatment required to maintain my transplant. But I recall the President saying that dreamers were safe, so I accepted the kidney transplant, knowing that my life would dramatically change. I had the surgery on March 1, 2017.

44.     The doctors told me that I would need to take medicine for the rest of my life in order for my body to not reject the organ transplant. I am only able to afford the daily immune system suppressing medicine I need because the medications are covered by my health insurance through my employment.

45.     With DACA, I have been able to work for the State of California, and have gone from the brink of death at age 19 to now having a kidney transplant and a more regular life.  I am also back in college trying to finish up my degree in business.  Before DACA, I could not even imagine being able to fulfill my potential in this way, but DACA allowed me to do it, and I know I can achieve my degree with DACA.

**The Announcement to Terminate DACA**

46.     When I heard the September 5th announcement to terminate the DACA program, I was devastated and taken aback because I did not think President Trump was going to do this to us.  He was very outspoken in the news that he was going to do something good for people with DACA and he was not going to leave us out in the cold.

47.     Because my current deferred action grant under DACA expires on August 17, 2018, I was not eligible to renew under the DACA Termination memo.  From the day that the DACA termination was announced, I knew that my time with DACA could end and I started suffering from a horrible and ever-present sense of uncertainty.  My worst fears from when I found out I was getting a kidney transplant were coming true.

48.     I do not know what I am going to do when my deferred action expires.  But I am very hopeful that something will happen for us dreamers like this lawsuit or the Dream Act.

49.     When my grant of DACA ends, I will certainly lose my job.  The EDD has to go by the laws of the state legislature and the federal government and not employ people who do not have authorization to work.  Not only will I lose my income, but I rely on the health insurance I have from my job in order to survive with an organ transplant.

11

50.      If I lose my DACA in August, I will have to focus a lot more on my health, primarily trying to find some way to continue paying for my medication.  Even now, I am on the edge of having too much on my plate, so I know losing DACA would throw my life into chaos.

51.      With the kidney transplant, I need to take expensive medication for the rest of my life or risk losing my kidney and starting again on dialysis.  But even if I go back to dialysis, I would have to be eligible for state insurance or some program to afford it.  And I could not have that a job that would help me pay for it or that would offer me health benefits.

52.      I have always pursued my dreams and fought to be better.  Having deferred action under DACA allowed me to get a transplant when I was 30, and now with DACA I do not have to worry about being tied to a machine. Now I can pursue my dreams.  But that is easier said than done, because now even though I am not tied to a machine, I am tied to my job's health insurance.

53.      Without this benefit, I risk losing my transplant and going back to dialysis, which is all-consuming because if I missed one treatment I could die within days or hours.  The thought of losing my transplant, and seeing it fail before my eyes because of the end of the DACA program, has impacted my life in the past three months more than I can even express.  Knowing that I could potentially lose a kidney someone opted to donate is really hard on me.

54.      I took two and a half years off school to focus on paying my medical bills.  With DACA, my jobs with DACA and their health benefits, and finally my transplant this year which took away my need for dialysis, I was able to start taking classes again and working toward a degree in business.  If I lose my DACA in August, I would have to stop school again and focus on staying alive.

55.     As I have described, losing deferred action would have devastating effects on me. I am not only afraid, anxious, and sad for myself, but I am upset about what is happening and will happen to my fellow dreamers with such a complex situation.

I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED December 12, 2017 in Ontario, California

_____
GUSTAVO GALICIA

# EXHIBIT DDD

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals.<br><br>*Plaintiffs*,<br><br>*v.*<br><br>KIRSTJEN M. NIELSEN, Secretary of the Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,<br><br>*Defendants.* | **DECLARATION OF KAREN C. TUMLIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 1:16-cv-04756 (NGG) (JO) |

I, Karen C. Tumlin, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am one of the attorneys for Plaintiffs in the above-captioned action. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2. I make this Declaration based on my own personal knowledge and based upon the sources described, true and correct copies of which are attached hereto.

3. Attached as **Exhibit A**: Tom Jawetz & Nicole Prchal Svajlenka, *Thousands of DACA Recipients Are Already Losing Their Protection From Deportation*, Center for American Progress (Nov. 9, 2017), http://ampr.gs/2ma0uYQ.

4. Attached as **Exhibit O**:  Jill Colvin, *Thousands Eligible For DACA Renewals Failed To Apply In Time*, Assoc. Press, Oct. 19, 2017, *available at* http://bit.ly/2kzKgEq.

5.   Attached as **Exhibit P**:  Liz Robbins, *Post Office Fails to Deliver on Time, and DACA Applications Get Rejected*, N.Y. Times, Nov. 10, 2017, at A17, *available at* http://nyti.ms/2zvOoyd.

6.   Attached as **Exhibit Q**:  Liz Robbins, *Number of DACA Applications Stuck in the Mail Tops 900*, N.Y. Times, Nov. 30, 2017, at A23, *available at* http://nyti.ms/2AiDXhP.

7.   Attached as **Exhibit R**:  Maya Rhodan, *She's Planning for College. But She'll Miss President Trump's Deadline to Avoid Deportation*, Time, Sept. 22, 2017, *available at* http://ti.me/2fEx1Ra.

8.   Attached as **Exhibit S**:  Jonathan Blitzer, *A DACA Recipient Describes the Feeling of Watching Her Legal Status Expire*, The New Yorker, Dec. 8, 2017, *available at* http://bit.ly/2Bo02wO.

9.   Attached as **Exhibit X**:  U.S. Citizenship and Immigration Services, *Guidance on Rejected DACA Requests and Frequently Asked Questions* (Nov. 30, 2017).

10.  Attached as **Exhibit Z**:  Assoc. Press, *Transcript of AP Interview With Trump*, Apr. 23, 2017, http://bit.ly/2uwsUzg.

11.  Attached as **Exhibit RR**:  U.S. Citizenship and Immigration Services, *Guidance on Rejected DACA Requests and Frequently Asked Questions* (Dec. 7, 2017).

12.  Attached as **Exhibit SS**:  [Redacted] Letter from Plaintiffs' Counsel Amy Taylor to Defendants' Counsel Stephen Pezzi, *Re:  Follow Up on Rejected DACA Renewal Applications*, Dec. 4, 2017.

//

//

//

2

13. Attached as **Exhibit WW**: Dara Lind, *EXCLUSIVE: The Postal Service Kept Him From Renewing His DACA. Now He's In Immigration Detention*, Vox, Dec. 13, 2017, http://bit.ly/2o6MGiM.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed in Los Angeles, California on December 15, 2017.

/s/ *Karen C. Tumlin*

# EXHIBIT EEE

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL et al.,

    *Plaintiffs,*

     *v.*

NIELSEN et al.,

    *Defendants.*

)
)
)
)
)
)
)
)
)

Case No. 1:16 cv 04756 (NGG) (JO)

December 13, 2017

## DECLARATION OF CARLOS VARGAS

I, Carlos Vargas, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

  1.  I was born in Puebla, Mexico, but the United States is the only country I know.  I came to New York City at age four and have been a New Yorker ever since.

  2.  I am the youngest of seven siblings.  One of us is a U.S. citizen and three are lawful permanent residents.  My brother who is closest to me in age, Cesar Vargas, and I are both DACA recipients.

  3.  I currently work full-time at Make the Road New York ("MRNY") where I provide pro bono legal services to low-income immigrant New Yorkers.  I was first granted deferred action through DACA in December 13, 2012.  I have renewed twice, and my current grant expires on September 13, 2018.

**Background and Moving to the United States**

  4.  Unlike some other DACA recipients, I always knew that I was undocumented because I remember leaving Mexico for the United States.  My father had passed away just two months before I was born, which put my mother in a difficult situation.  She had inherited our

home, but my uncle, who was envious, threatened her until she signed away all of our assets. We had no means of surviving in Mexico, so she made the hard decision to give us a better life in the United States.

5.     At the time, I thought that we were going to Disneyland. We took no luggage. We left everything behind except for a plastic bag with all of our important documents such as vaccination records.

6.     Because of my immigration status, my mother told me to work hard in school and stay out of trouble. I was very timid. When my friends would go out, I would stay at home. We spoke among ourselves about how to get papers and thankfully some of my relatives were eligible, and eventually able, to successfully adjust status.

7.     Fortunately, my family has not had to face deportation, but the fear of separation was always present because we lived in an immigrant community, so would hear stories about immigration raids at factories and knew other families who were impacted. I want to become a lawyer and create systemic change so that no one else experiences what we experienced.

**Advocacy on Behalf of Dreamers and Impact of DACA**

8.     My brother Cesar joined the Dream movement before me. In December 2010, I accompanied him to Washington D.C. for the vote on the DREAM Act, which was a path to lawful immigration status for certain immigrant youth. At the time, I did not fully understand what the DREAM Act was, but I vividly remember walking into a room filled with undocumented youth who were crying. The DREAM Act had just failed to survive the Senate by five votes. That is when I realized that if I wanted change, I needed to do my part.

9.     I started helping Cesar by joining him on trips to Arizona, Nevada, Texas, and California to organize undocumented youth around the DREAM Act. I would assist with the

2

logistics and phone bank. Back at home in Staten Island, I volunteered with MRNY and El Centro del Inmigrante, which are both community organizations working with immigrants.

10. I was at a restaurant on June 15, 2012 when President Obama announced DACA. Cesar had given me a head's up that an announcement was coming and so I watched on a small black and white television screen. At the time, I did not know what deferred action was, but I heard loud and clear that I would be eligible for a work permit. I thought wow – a social security card and a driver's license—this will change my life.

11. That same day, I went home, read as much as I could about what the requirements were likely to be, and started collecting my paperwork. Both Cesar and I applied as soon as we could in August 2012.

12. Cesar graduated from law school in 2011, but he was not admitted to the New York bar until over four years later. This is because when he applied for admission, a subcommittee of the Committee on Character and Fitness for the Second Judicial Department found that he "appears to have stellar character," yet recommended against admission "for the purpose of having the Court make a decision based on immigration status." The Supreme Court of the State of New York, Second Appellate division ruled in his favor on June 3, 2015. He had been advised to fly under the radar during the admissions process and yet he chose to take the difficult path and create the precedent for others. In so doing, he opened doors not only for other undocumented law graduates, but also other licensed professionals such as teachers and nurses, to pursue their chosen careers.

13. By the time that we applied for DACA, Cesar had graduated from law school, but his admission was still in limbo. One of his peers reviewed our applications and entered an appearance as an attorney on our behalf. I was grateful that she was willing to help, but it

3

seemed unfair that my brother had to ask a friend for assistance with what he was equally capable of doing.

14.     Receiving DACA had an immediate and significant impact on my quality of life. I worked as a contractor at the time and was able to obtain a higher wage because I had a work permit under DACA. I was able to do new things, such as make deliveries now that I had a driver's license. Shortly thereafter I was able to switch jobs and worked in a restaurant within Brookdale Hospital in Brooklyn. I started as a dish washer, but then worked up through bus boy, waiter and eventually was managing some shifts. With DACA, I was finally able to make some money to cover my expenses, and began earning approximately $25,000 a year.

15.     In 2014, I graduated from CUNY College of Staten Island with a Bachelor's of Science degree in Business (economics and finance). It had taken me seven years to earn my degree. Since I was undocumented, I was not eligible for financial aid, so I worked full-time to be able to afford a few units each semester while continuing to meet my financial obligations to my family. I would wake up at 5:30 or 6:00 A.M. to commute from Staten Island to work in Brooklyn.

16.     From there, I travelled back to Staten Island for class, which started at 6:30 P.M. Sometimes I would stay late after class to study, but otherwise, I was limited to time spent commuting on buses and trains, as well as weekends, to complete all of my assignments. The pay increase that I received after DACA enabled me to afford to finish my degree, while the work authorization offered me options for employment after graduation.

17.     I currently work full-time at MRNY where I provide pro bono legal services to low-income immigrant New Yorkers. The Department of Justice awarded me full accreditation, which means that within the immigration realm, I can do most things that attorneys can do,

4

including appear in immigration court. To become accredited, I had to complete an eighty-hour immigration law course and was tested on dozens of subjects. Thus far in this year alone, I have assisted more than 200 people, including those who have survived domestic violence and family members of people who have been detained by immigration.

18.    In August of this year, I went back to CUNY – this time to earn a law degree. Seeing how Cesar was able to push through the barriers motivated me. My experiences as an undocumented immigrant and an advocate within a low-wage workplace have solidified my commitment to becoming a lawyer and changing the ways that legal systems are unjust. I want to do advocacy work.

19.    The termination of DACA has filled my life with uncertainty. My DACA will expire on September 13, 2018. My job, chosen career, financial stability (including the ability to financially support my elderly mother), and physical and emotional well-being all hang in the balance.

**Devastating Effects of Losing DACA**

20.    If I were to lose deferred action under DACA, I would lose my job. My ability to retain my accreditation and be admitted to the New York bar would both also be put into question.

21.    Losing my job would be psychologically and financially devastating. Even though I still work hard, coming into the office at 8:00 A.M. and finishing with school at 10 P.M., I have energy because I am using my mind, not my physical strength, while also developing skills related to the career that I am invested in.

22.    I am financially responsible for both myself and my mother, who, at age seventy-four, is unable to work and has increasing medical needs. In addition to my everyday expenses, I

5

am responsible for multiple mortgages, a car payment, insurance, and annual law school costs. My mother, who lives with me, has struggled with depression and anxiety as well as has vision, dental, and high blood pressure issues. She has quarterly check-ups and gets her blood work done every six months.

23.    My mother recently had cataract surgery and is going to need a second surgery. She has old dentures that need to be replaced at cost of anywhere from $600 to $1,000. Since she does not read or write in English, someone has to accompany her to every visit. While I have some help from siblings, I am the primary person who takes her to her appointments and covers her medical expenses.

24.    I fear that losing deferred action under DACA may also prevent me from pursuing my dream of becoming a lawyer. While dicta in Cesar's case reaches other undocumented people, the holding only explicitly protects DACA recipients. Without DACA, my ability to be admitted to the New York bar may come into question.

25.    If I am unable to practice law, I will be harmed in many ways. I will lose my investment of time learning the trade while at MRNY, the time and expense of attending law school, and the ability to have the impact that I want to achieve in the world: I want to change unjust immigration laws.

26.    My brother and I now own two homes in Staten Island as well as an apartment in Washington D.C. Before I had DACA we always rented and had housing problems. Either the neighborhoods were unsafe or the landlords did not take good care of the buildings, so the living conditions were bad. For example, there were cold winter months when we had no hot water or heat.

6

27.     To be able to purchase property felt like having achieved the American dream, but like so many other things, it was more difficult for us because of our lack of lawful immigration status.  Our lack of status meant that we were not eligible for a home loan.  We had to set up a Limited Liability Corporation and put one of the homes in my sister's name in order to successfully complete the transactions.  After DACA, we made plans to transfer the properties into our own names, but now that our futures are uncertain, it might not make sense.  If either of us were deported, we could lose our assets.

28.     Before DACA, I did not have a driver's license.  If I had to use my passport, which was my only form of government issued photo identification, to enter a hotel or government building, I would hide it because it outed me as different.  When I passed by a police officer I was scared.  Being able to drive is essential to maintaining my busy work, school, and family responsibility schedule because I regularly travel between Staten Island, Brooklyn, and Queens.  It would be devastating to lose my license.

29.     When my grandfather passed away in Mexico, my sister who is a U.S. citizen was able to attend his burial, but I could not leave the country.  After DACA, I was able to apply for advanced parole, which is permission from United States Citizenship and Immigration Services to return to the United States after having left.  Advanced parole enabled me to visit Mexico for the first time since leaving at age four.

30.     I first traveled alongside Cesar and other colleagues in the movement for immigrants' rights around the time of Thanksgiving 2015.  The customs declaration form I was given on the plane asked if I was a Mexican citizen.  I had to ask myself that question because while I was born in Mexico, the United States is my home.  When we arrived in Mexico there were two lines: visitors and citizens.  We stood in the line for visitors and were turned away

7

because we had Mexican passports. The most impactful part of the trip for me was visiting where my father is buried because I was never able to meet him. I took a picture of his tombstone. It struck me that he passed away on June 15, 1985 – thirteen years to the day before DACA was announced.

31.     I traveled with advanced parole for the second time from December 2016 to January 2017. My aunt's husband was very sick, and his own children were unable to visit him. I sent photos and was able to connect the father to his children with FaceTime.

32.     If I were to lose the ability to travel, it would be very difficult for me. Even though I feel more American than Mexican, and when I travel to Mexico I feel homesick for the United States, I still want to be able to learn more about my roots. I also want to travel throughout the world – I have never seen Europe or Asia.

**Burden of Being a Public Advocate**

33.     It takes time and energy to fight for what is right. Since the announcement terminating DACA, I have been asked with increased frequency to tell my story to the press and speak at rallies. Even participation in this lawsuit has required significant time. It has been good to see momentum in the Dream movement and know that we have allies, but it is not always rainbows and sunshine. Because I am a recognizable public figure, I sometimes experience harassment.

34.     For example, I was at the gym with Cesar recently when another patron said: "Why do you guys feel like you're entitled? You're illegals!" Speaking up takes a toll, but I know that DACA was not won overnight and that if I want justice, I have to be on the frontlines. Now that I face the possibility of losing protection from deportation, the risk of speaking up is greater.

8

**Psychological Impact**

35.     The psychological impact is real.  I work out, bike, and have conversations with family and friends to manage the stress, but the uncertainty in my own life feels overwhelming when I am serving a family that was just torn apart by deportation.   Sometimes I cannot concentrate, feel like I am in a fog, or I lose the drive to get up in the morning.  When I feel those symptoms, I know it is time to take a break or go for a walk.  I am resilient, but it still takes a toll.

36.     I think back to 2011, when an undocumented high school student, Joaquin Luna, was ready to graduate and apply for college, but he committed suicide because he saw no other way out.  He wrote a suicide note saying that he wanted to be an engineer, but since he would not be able to fulfil his dreams on earth, he would construct a new temple in heaven.   His story became big in the Dream movement: it inspired a song called "Dream to Belong" and was featured in the film "The Dream is Now."

37.     I am a bit older and stronger, but I think of all of the young DACA recipients who have never known trying to go to college without work authorization or a Social Security Number.   For me, every Dreamer, including myself, has a piece of Joaquin inside.  It is so important that something happens to protect us, not just for me, but for our entire community.


\\\

\\\

\\\

\\\

38.     The United States is the only country I know.  For me, DACA is not only work authorization and the chance to achieve the American dream, it is a part of my identity.  Having papers through DACA is recognition that I am here and I am an American.  If taken away, I will lose a part of who I am.


I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED December 13, 2017 in Staten Island, NY

CARLOS VARGAS

10

# EXHIBIT FFF

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al*., | ) ) ) | |
| *Plaintiffs*, | ) ) | **DECLARATION OF** **HIROKAZU YOSHIKAWA** |
| *v*. | ) ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| KIRSTJEN NIELSEN, Secretary, Department of Homeland Security, *et al*., | ) ) ) | |
| *Defendants*. | ) ) | |

I, Hirokazu Yoshikawa, declare:

1.      I serve as the Courtney Sale Ross Professor of Globalization and Education at New York University's Steinhardt School of Culture, Education and Human Development. I also serve as a tenured University Professor at New York University (NYU). At NYU, I am affiliated with the Metropolitan Center on Equity and Transformation in Schools, the Institute on Human Development and Social Change, and within the Steinhardt School Department of Applied Psychology, the Doctoral Program in Psychology and Social Intervention and the master's program in Human Development and Social Intervention.

2.      I write this declaration in support of all Plaintiffs in the lawsuit regarding the Deferred Action for Childhood Arrivals program ("DACA").

3.      I am a developmental and community psychologist with a Ph.D. in clinical psychology from New York University. Prior to my current position, I was the Walter H. Gale Professor of Education at Harvard University and served as the Academic Dean of the Harvard

Graduate School of Education, which was ranked by U.S. News and World Report as the top graduate school of education.

4.     I conduct research on programs and policies related to immigration, child and youth development, and poverty reduction in the United States and in low- and middle-income countries. In addition, I co-direct a research center, Global TIES for Children, at New York University that leverages the sciences of human development and its contexts to improve the evaluation of programs and policies aimed at child and youth development in low-income and conflict-affected countries. I have been studying immigration for the last 19 years. I have been conducting research on undocumented status in particular, with a focus on its effects on families and children, for the last ten years. My work on undocumented status and its consequences across generations has resulted in one book[1] and several articles, chapters, and policy reports. I have in the course of this work provided consultation to the Migration Policy Institute, the New York Immigration Coalition, the City Council of New York City, and other organizations. My full curriculum vitae is included as an addendum to this declaration.

5.      My most recent review of the literature on undocumented status and youth development was commissioned and peer reviewed by the Society for Research on Adolescence, the leading research association focused on youth development in the United States.[2]

6.     I also served in 2014-15 as a member of the U.S. National Academy of Sciences' consensus committee on the incorporation of immigrants into American society, the most comprehensive review on that topic issued by the National Academies in the last 20 years.

---

[1] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN (2011).

[2] Hirokazu Yoshikawa, Carola Suárez Orozco, & Roberto G. Gonzales, *Undocumented Status And Youth Development In The United States: Consensus Statement Of The Society For Research On Adolescence*, 27 J. RES. ADOLESCENCE 4-19 (2017).

**7.**     I have also testified on the issue of immigration policies related to legal status before the U.S. House of Representatives (May 29, 2014, hearing on "The Impact of Current Immigration Policy on Women and Children").[3]

8.     For my work on this case, I am being paid $5,000 by the William T. Grant Foundation. This represents my only compensation for my work on this case.

## Summary

9.     Multiple studies conducted across the United States in the last ten years suggest the nearly 800,000 undocumented youth and young adults who enrolled in DACA have increased their educational and economic mobility, as well as improved their mental and physical health. Following the termination of DACA, these benefits would be reversed: each of these life-course domains and the mental health and ability of these young people to contribute to American society would be harmed. Using the available evidence on DACA's impacts—overwhelmingly positive in nature from the existing studies—we can estimate the *loss of benefits or harm* that ending DACA would cause. The resulting lower well-being and social mobility of the DACA population suggest economic, educational and mental-health-related costs of ending the program.

10.     Moreover, associated effects on family members of DACA enrollees, such as their children, parents, and other relatives, would also be negative. The negative effects of DACA termination thus pertain not only to the enrollees directly affected, but a much wider segment of adults, youth and children in immigrant families in the United States.

---

[3] Hirokazu Yoshikawa, Jenya Kholoptseva, & Carola Suarez-Orozco, *The Role of Public Policies and Community-Based Organizations in the Developmental Consequences of Parent Undocumented Status*, 27 SOCIAL POLICY REPORTS OF THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT 1 (2013).

## Background

11.     DACA has provided both work authorization and temporary reprieve from deportation to individuals who met certain eligibility criteria (i.e., that individuals be between the ages of fifteen and thirty-one as of June 15, 2012; arrived in the United States before age sixteen; maintained at least five years of continuous U.S. residence; provided proof of high-school graduation or current participation in formal qualifying education; and had no felony convictions or significant misdemeanors). Nearly 800,000 (793,026) undocumented immigrants were approved for DACA between August 15, 2012 and June 30, 2017. Of these, eighty-seven percent, or 689,800 individuals, were still enrolled on September 5, 2017 when the Trump Administration announced it was terminating the program.[4] The Administration stated it would no longer accept any new applications after September 5, 2017, and that individuals whose DACA status expired on or before March 5, 2018 were required to reapply to be considered for renewal by October 5, 2017. The Migration Policy Institute estimates that beginning on March 6, 2018, each day over 900 DACA recipients will lose their work authorization and protection from deportation.[5] Based on existing research, this declaration focuses on the likely impacts that terminating DACA will have on this population, as well as their households and families.

---

[4] Jie Zong et al., A Profile of Current DACA Recipients by Education, Industry and Occupation 1 (2017).
[5] Id. at 2.

## Before DACA

12.     Several large-scale studies in the United States conducted before DACA was implemented showed that relative to other immigrant youth, undocumented youth experienced higher levels of mental health problems, social isolation, and reduced educational attainment.[6]

13.     Many in this population did not know they were undocumented upon immigration, as many came as young children.  Usually at some point during their adolescence these youth "awakened" to their status (either by hearing from a parent or other family member in the context of family discussions; or in the course of an expected transition, such as getting a driver's license or applying for colleges, that was suddenly blocked).  Professor Roberto Gonzales of Harvard University has termed this awakening "learning to be illegal," and has documented the extensive barriers to well-being and normative development this group experiences across the transition from adolescence to young adulthood.[7]

14.     Before DACA, undocumented youth reported barriers to accessing higher education, which, when coupled with pressures to contribute to family income, often required them to enter the underground economy. During this period, a minority of undocumented youth reported accessing higher education through the support of state policies and mentorship supports.[8]

---

[6] Carola Suárez-Orozco et al., *Growing Up In The Shadows: The Developmental Implications Of Undocumented Status*, 81 HARV. EDUC. REV. 438 (2011); Yoshikawa et al., *supra* note 2, at 4–19.
[7] ROBERTO G. GONZALES, LIVES IN LIMBO: UNDOCUMENTED AND COMING OF AGE IN AMERICA (2016)
[8] *Id.*

15.     "Learning to be illegal" for these youth was accompanied by declines in their psychological well-being and mental health.  Youth reported withdrawing from friendships as they were not able to join in talking about or planning for their first jobs, learning how to drive, or thinking about and applying to college.  The social isolation and stigma of being undocumented can be heightened during this developmental period of adolescence, when social identity is being forged and both peer and adult relationships are in flux.[9] The critical sense of belonging – in school; in social networks; and in community settings – was lacking for many of these youth.

16.     When undocumented youth experience the full awakening to their status and what it means for their life goals, many experience mental-health problems and social isolation.  They often realize all at once their lack of eligibility for formal employment, drivers' licenses, in-state tuition assistance, federal financial support for higher education, and publicly subsidized health care—a massive downgrading of their sense of integration into community and American life that can lead to these declines in well-being.[10]

17.     Barriers to health- and mental-health-care access worsened these higher depression, anxiety and other mental health problems among undocumented youth prior to DACA.  Youth in California in one study reported that providers often lacked knowledge about what the youth were eligible for in terms of services.[11] It is likely that youth in other states

---

[9] Diane Hughes et al., *Received Ethnic-Racial Socialization Messages And Youths' Academic And Behavioral Outcomes: Examining The Mediating Role Of Ethnic Identity And Self-Esteem*. 15 CULT. DIVERSITY AND ETHNIC MIN. PSYCH. 112 (2009).

[10] GONZALES, *supra* note 7.

[11] Marissa Raymond-Flesch et al., "*There Is No Help Out There And If There Is, It's Really Hard To Find": A Qualitative Study Of The Health Concerns And Health Care Access Of Latino "Dreamers*, 55 J. OF ADOL. HEALTH 323 (2014); Roberto G. Gonzales et al., *DACA at Year Three: Challenges and Opportunities in Assessing Higher Education and Employment, New Evidence from the UnDACAmented Research Project*, AM. IMMIGRATION COUNCIL (Feb. 1,

experienced even greater barriers, given California's relative generosity in extending state-level health benefits (e.g., MediCal) to low-income undocumented immigrants.

18.   The research literature on the effects of parental undocumented status are also relevant to research on DACA, as a segment of the DACA-eligible are parents (typically of young children, given the eligibility criterion of age younger than 31).   Several studies have shown that relative to children whose parents are LPRs or U.S. citizens, children with at least one undocumented parent suffer on several dimensions. In early childhood and middle childhood, they show lower cognitive skills and school achievement.[12] By adolescence, they report higher levels of depressive symptoms.[13] And by early adulthood, children with at least one undocumented parent report between 1.25 and 1.5 fewer years of education, relative to their counterparts with authorized parents.[14]

**Impacts of DACA Enrollment on Mental Health and Well-Being**

19.   DACA appears to have improved psychological well-being and mental health for undocumented youth who enrolled.   Youth in several qualitative studies reported substantially greater feelings of belonging and peer support following DACA enrollment.   The social isolation, anxiety and depression that was the norm for youth struggling with undocumented

---

[12] Kalina M. Brabeck et al., *The Influence Of Immigrant Parent Legal Status On U.S.-Born Children's Academic Abilities: The Moderating Effects Of Social Service Use*, 41 APPLIED DEVELOPMENTAL SCI. 1 (2016); Yoshikawa, *supra* note 1.

[13] Susan Potochnick & Krista M. Perreira, *Depression and Anxiety Among First-Generation Immigrant Latino Youth: Key Correlates And Implications For Future Research*, 198 J. NERVOUS & MENTAL DISEASE 470 (2010).

[14] FRANK D. BEAN, SUSAN K. BROWN & JAMES D. BACHMEIER, PARENTS WITHOUT PAPERS: THE PROGRESS AND PITFALLS OF MEXICAN AMERICAN INTEGRATION (2015).

2016), http://www.americanimmigrationcouncil.org/research/daca-year-three-challenges-and-opportunities-accessing-higher-education-and-employment.

status was alleviated.[15]  However, worry about non-DACA-eligible undocumented relatives appeared to continue to be of concern to these youth.[16]

20.     The mental-health benefits of DACA appear to extend to the U.S.-born children of enrollees. A causal study published in 2017 in *Science* on DACA's effects showed that mental health among children of the DACA-eligible were improved by the program, as reflected in lower Medicaid diagnoses for child adjustment and anxiety disorders. Rates of these disorders were a full fifty-percent lower due to DACA's implementation.[17]  This study also showed that parents' stress levels declined as a result of DACA – an important demonstration of how the stresses of immigration status can be transmitted across generations.

21.     One explanation for the improved mental health outcomes of DACA recipients and their children may be greater access to health and mental health care services. One large, multi-state study found that twenty-one percent of DACA-enrolled respondents reported accessing health insurance and other health coverage programs for the first time after receiving DACA.[18]

22.     The other chief mechanism for improved mental health among DACA enrollees is the  greater integration into mainstream U.S. society that Deferred Action brought about.[19]  For example, in Roberto Gonzales's multi-state survey and interview study, fifty-nine percent of

---

[15] Rachel Siemons et al., *"Coming Of Age On The Margins: Mental Health And Wellbeing Among Latino Immigrant Young Adults Eligible For Deferred Action For Childhood Arrivals (DACA)"* 19 J. OF IMMIG AND MIN HEALTH 543 (2017); Roberto G. Gonzales et al., *supra* note 11; ROBERT TERANISHI ET AL., IN THE SHADOWS OF THE IVORY TOWER: UNDOCUMENTED UNDERGRADUATES AND THE LIMINAL STATE OF IMMIGRATION REFORM (2015).
[16] Teranishi et al., *supra* note 14.
[17] Jens Hainmueller et al., *Protecting Undocumented Immigrant Mothers Improves Their Children's Mental Health*, 357 SCIENCE 1041 (2017).
[18] Gonzales et al., *supra* note 11.
[19] *Id*.

enrollees reported obtaining a new job within sixteen months of receiving DACA.[20] Perhaps more importantly, DACA appears to have increased higher-wage and white-collar employment. Specifically, DACA-eligible in national data report nearly triple the levels of sales jobs as those ineligible and undocumented (15 compared to 6 percent); and over double the rates of office-based jobs (12 compared to 5 percent).[21]  Rates of employment in manual and more hazardous occupational sectors appear to have declined dramatically.  The DACA-eligible are half as likely as those ineligible to report working in construction (10 vs. 20 percent) and building maintenance or cleaning (6 vs. 13 percent).[22]

23.    Other indicators of greater integration into American society include accessing financial institutions and higher education. Close to fifty percent of Gonzales's multi-state sample of DACA recipients reported opening their first bank account after receiving DACA and one third reported obtaining their first credit card, enabling them to build credit histories for the first time in their lives.[23] Finally, although DACA did not provide access to federal financial aid for higher education, enrollees reported greater ability to pay for college due to their increased earnings. Currently, rates of enrollment in higher education are indistinguishable between DACA recipients and individuals of similar ages in the U.S. population as a whole (roughly twenty percent).[24]

---

[20] *Id*.

[21] Randy Capps, Michael Fix & Jie Zong, The Education and Work Profiles of the DACA Population (2017).

[22] *Id*.

[23] Roberto G. Gonzales et al., Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark (2017).

[24] Zong, *supra* note 4.

### Likely Impacts of Terminating DACA on Mental Health and Well-Being

24.   Terminating DACA would substantially increase mental health problems and compromise the well-being of current enrollees, their children, and other members of their communities. Essentially the benefits of DACA reviewed above would be erased, with even greater harm resulting than the situation prior to DACA due to harsher enforcement policies.

25.   Specifically, terminating DACA is likely to result in substantial increases in mental-health problems, such as anxiety and depression, social isolation, and withdrawal from participation in community and civic life.  The strongest causal study of the effects of DACA on mental health, by Jens Hainmueller and colleagues showed that rates of child adjustment and anxiety disorders were cut in half following implementation of the program, among young children of undocumented mothers. This suggests that rates of these disorders would double following termination of DACA. For youth enrolled, the levels of withdrawal, perceived stigma, and social isolation are likely to return to at least pre-DACA levels.

26.   The likely mechanisms of worsened mental health and psychological well-being include exclusion from employment, educational and community contexts that DACA provided access to.  Jobs would revert back to the lowest-wage and most hazardous job sector, with double the rates in manual labor such as construction and cleaning.[25] Underemployment is likely as the impact of loss of permit for formal employment would be essentially similar to that of job loss. Joblessness and job loss have been extensively linked to greater mental health problems, such as higher depressive symptoms.[26] Undocumented workers and those with temporary immigration

---

[25] Capps et al., *supra* note 20.

[26] Ariel Kalil, *Joblessness, Family Relations, And Children's Development*, *in* 83 FAM MATTERS 15, 22; HIROKAZU YOSHIKAWA, THOMAS S. WEISNER, & EDWARD LOWE, MAKING IT WORK: LOW-WAGE EMPLOYMENT, FAMILY LIFE, AND CHILD DEVELOPMENT (2006).

status have substantially lower wages and higher rates of wage theft (wages below the legal minimum for a particular state or city) than Lawful Permanent Residents (LPRs) or U.S.-citizen workers with equivalent educational backgrounds.[27] If they were to lose work authorization and become undocumented, former DACA recipients would be at much greater risk of wage theft by their employers. DACA enrollees' participation in higher education will likely decline when the program is terminated as well from current levels of parity from the rest of the American population of the same ages.[28]  Finally, access to health care will likely be lower due to loss of access to acceptable and accessible forms of identification (e.g., driver's licenses) and proof of formal employment and earnings.

27.     For DACA-enrolled parents, terminating the program would result not only in poorer educational, economic, and mental-health outcomes for those individuals, but also in substantially poorer outcomes for their children, spanning academic, educational, and mental-health outcomes for years to come. The higher stress that undocumented parents experience, relative to their DACA-enrolled counterparts, would be transmitted to their children.[29]

28.     Awareness of the end of DACA and foreseeing lowered prospects for economic and educational advancement are likely to lead to dread and depression.  Depressive symptoms, according to decades of clinical research, are powerfully driven by hopelessness about the future. [30] With declines in access to jobs, further education, and engaged community life a certainty following loss of the temporary protected status provided by DACA, increased hopelessness about the future and associated higher depression is just as certain to occur.

---

[27] ANNETTE BERNHARDT ET AL., BROKEN LAWS, UNPROTECTED WORKERS: VIOLATIONS OF EMPLOYMENT AND LABOR LAWS IN AMERICA'S CITIES (2009).
[28] Zong, *supra* note 4.
[29] Hainmueller et al., *supra* note 17.
[30] Aaron T. Beck et al., *An Inventory for Measuring Depression,* 4 Archives of Gen Psych 561.

**Exacerbated Harm Due to Current Immigration Enforcement**

29.     One substantial difference between the pre-DACA period and a possible post-DACA period is the harsher climate of immigration enforcement that has occurred as a result of the Trump administration's policies. Shifts in federal policy have expanded the criteria that local and federal enforcement use to initiate detention and removal proceedings.  Under the Obama Administration's last set of guidelines, serious crimes (violent offenses and felonies) were prioritized as the basis for initiating such proceedings, especially for detentions and removals that stemmed from interior enforcement.  Currently the criteria have expanded to include those who have committed misdemeanors or lesser infractions such as traffic tickets, or those who happen to be present when a targeted person is being detained. The new criteria also include "abuse of any program related to public benefits."  The current administration has thus indicated the use of any public program by someone foreign-born as a criterion for prioritizing detention and removal, comparable to threats to national security and criminal charges. Finally, prior guidelines to use prosecutorial discretion for parents and legal guardians have been revised to no longer consider minimizing the harm to U.S.-citizen children as a criterion for prosecutorial discretion.[31]

30.     The current national enforcement climate is therefore likely to exacerbate harm to mental health that results from the termination of DACA.  The policy climate is not simply the one that preceded implementation of DACA, but one in which the risk of removal proceedings

---

[31] U.S. Department of Homeland Security, *Enforcement of The Immigration Laws to Serve The National Interest* (2017).
https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf

has been heightened nationwide. In an *American Economic Review* article, Catalina Amuedo-Dorantes and Mary J. Lopezin document how exposure to harsher local enforcement activities is causally related to higher rates of being held back a grade as well as dropout among students ages six to thirteen.[32]  Awareness of risk for deportation has been linked to greater mental health problems and lower well-being.  For example, a study in Arizona showed that awareness of harsh immigration policies is linked to higher classroom behavior problems and anxiety among children as young as primary-school age.[33]   These findings suggest that effects on mental health and educational outcomes are likely to be exacerbated in today's generally harsher policy environment, relative to the pre-DACA period.

31.     In addition to the more general impact of immigration-policy climate, immigrants directly affected by detention and removal proceedings experience severe increases in hardship and subsequent mental health problems. Studies of the impact of detention show immediate effects in substantially reduced household income; large increases in anxiety among remaining caregivers as well as children; social isolation and withdrawal from public spaces as well as schooling; and increased behavior problems among children and youth.[34]  Housing foreclosures, have been shown to rise disproportionately among Latino populations affected by local enforcement.[35] Even those not directly affected nevertheless appear to reduce their use of

---

[32] Catalina Amuedo-Dorantes & Mary J. Lopez, *Falling Through The Cracks? Grade Retention And School Dropout Among Children Of Likely Undocumented Immigrants*, 105 AM. ECON. REV. 598 (2015).

[33] Carlos E. Santos, Cecilia Menjívar, Rachel A. VanDaalen, Olga Kornienko, Kimberly A. Updegraff, & Samantha Cruz, *Awareness of Arizona's Immigration Law SB1070 Predicts Classroom Behavioural Problems Among Latino Youths During Early Adolescence*, 2017 ETHNIC & RACIAL STUDIES 1.

[34] Ajay Chaudry et al., *Facing Our Future: Children in the Aftermath of Immigration Enforcement* (2010); Joanna Dreby, *U.S. Immigration Policy And Family Separation: The Consequences For Children's Well-Being*, 132 SOC. SCI. & MED. 245 (2015).

[35] Jacob S. Rugh & Matthew Hall, *Deporting The American Dream: Immigration Enforcement*

essential health and social services for which their children are eligible, such as Medicaid and the Women, Infants, and Children (WIC) program.[36]

32.    Thus, upon termination of DACA, enrollees would become subject to the current enforcement policies that all other undocumented immigrants have been experiencing. The increases in community-level effects of enforcement on low-income immigrants are likely to be substantial. As resources for their families—for example, access to drivers' licenses; access to formal employment and associated earnings; or providing support and access to mainstream institutions for undocumented family members—DACA enrollees have played critical support roles in communities with high proportions of undocumented individuals. With the loss of DACA, exposure to everyday risk for removal will become the routine experience of these hundreds of thousands of youth, their families, and their communities.

33.    In sum, terminating DACA would result in sharp increases in mental health problems and psychological and economic distress among DACA enrollees, their families, and their networks and communities. The evidence appears strongest for anxiety and depression, although few other mental health outcomes have ever been studied linked to DACA or undocumented status.

34.    The severe impacts, concentrated among those enrolled with DACA, would extend to the larger population of mixed-status families and low-income immigrants in the

---

*and Latino Foreclosures*, 3 Soc. Sci. 1053 (2016).
[36] Susan Potochnick, Jen-Hao Chen & Krista Perreira, *Local-Level Immigration Enforcement And Food Insecurity Risk Among Hispanic Immigrant Families With Children: National-Level Evidence*, J. Immigrant & Minority Health 1 (2016); Emily Vargas & Maureen A. Pirog, *Mixed-Status Families And WIC Uptake: The Effects Of Risk Of Deportation On Program Use*, 97 Soc. Sci. Quarterly 555 (2016); Emily D. Vargas, *Immigration Enforcement And Mixed-Status Families: The Effects of Risk of Deportation on Medicaid Use*, 57 Child. & Youth Servs. Rev. 83 (2015).

United States, thus harming a much higher number of individuals than the 800,000 current DACA enrollees. The impacts on mental-health, social-mobility, and health-access outcomes for these young people and their households would be severe, with reduced economic and social contributions to society for coming decades. The loss of economic and human potential is likely to be great.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED December 11 , 2017 in Chicago, IL

_____
HIROKAZU YOSHIKAWA

15

# EXHIBIT GGG

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

BATALLA VIDAL et al.,

               *Plaintiffs*,

        *v.*

NIELSEN et al.,

               *Defendants.*

Case No. 1:16-cv-04756 (NGG) (JO)

December 13, 2017

## DECLARATION OF MARIANO MONDRAGON

I, Mariano Mondragon, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.      My name is Mariano Mondragon and I am a recipient of Deferred Action for Childhood Arrivals ("DACA"). I was born in Mexico and have resided in Queens, New York, since I was fifteen years old. I have now been separated from my parents for seventeen years, but am supporting my own family in the United States, including two U.S. citizen children and a third child due in February.

2.      I was an undocumented immigrant until I was granted DACA in April 2014. I renewed my status once in 2016. I was able to submit a renewal application by the October 5, 2017 deadline, as my current grant will expire on February 24, 2018. My renewal application was acknowledged as timely filed, and I am waiting to hear back about whether it was approved.

**Childhood in Mexico**

3.      I was born in La Magdalena Yancuitlalpan, Tochimilco, Puebla on January 17, 1985. I am the second oldest of ten siblings. I have five brothers and four sisters.

1

4.      My parents were farmers in Mexico who made their living growing corn and other crops and raising goats and sheep. As I grew up, I would help them with the crops and the animals after school. We made enough to survive but once I finished primary school at age 14, my parents could not afford to keep me in school.

5.      I did not want to quit school and work on the farm; I wanted to finish my education and to have better opportunities in life.

6.      I arrived to Queens, New York, where my aunt lived, in 2000.

**Starting a New Life in the United States**

7.      Starting a new life in the United States, I was full of mixed emotions. I was excited to have the opportunity to seek a better future, but sad to leave my family behind. I spoke with my parents every week, but I had no idea that I would not see my family again over the next seventeen years.

8.      While I lived with my aunt and her husband, I started attending high school.

9.      School was tough in the first months and the adjustment was hard. Everything about the class structure was different. In Mexico we stayed in one classroom and the teachers rotated, but in the United States the students had to switch classes and go all over the campus. I took English as a second language courses for a year or two.

10.     In high school, I also learned that I did not have many of the same opportunities as my classmates. A lot of other students were talking about getting their driver's licenses, but I knew I could not get one without a Social Security Number. It was a big limitation because many jobs required having a driver's license.

11.     I wanted to go to college and tried to save some money to do so, but in my last year of high school, I found out that college would be too expensive, even after all my hard

2

work. A lot of other students were talking about what they were doing to apply for college. There were sometimes college recruiters on campus and I asked them how much the tuition cost. I was shocked and immediately realized I would not be able to afford to go to college. I did not even know about loans at that time, but I would not have qualified because of my immigration status. I graduated from Flushing High School in 2005.

12.     In 2006, a woman I had been dating since 2004 became pregnant. We planned to raise our daughter together, but she was living with her brother and they were having problems. Without telling me, she bought a flight and returned to Mexico to live with her mother a couple months before she gave birth.

13.     I was heartbroken because I knew I might not ever be able to see her or my daughter again unless I left the United State, and since my daughter was born outside the United States, she would not likely be able to come see me. We are separated by a national border. I have regularly sent money to support her over the years, and I speak with her just about every other week, but to this day—eleven years later—we have never met in person, which is very difficult for me.

14.     Around 2008, I met my wife who was working at a restaurant near where I live. We fell in love and got married in 2009. Our first child, a beautiful daughter, was born in 2009 and is now eight years old and in third grade.

### The Impact of DACA on My Life

15.     In 2012, I remember watching President Obama announce the DACA program on TV and being excited. As he spoke about the requirements for the program, I knew that they applied to me and felt like I would finally have an opportunity to find the kind of security in my life that I never had to support and raise my family.

3

16.     I was worried about giving my personal information to the government, but trusted the government's promise not to use it to deport me. A big part of the decision for me was that I could apply for renewal every two years; I would not have applied and given my information if the program was not renewable.

17.     The notary who helped my family file our taxes told me she could help me apply for DACA. We gave her many documents and I paid her about $500, but she never filed the application.

18.     In 2013 an immigration attorney helped me apply for DACA, and actually filed the application. I was granted DACA on April 14, 2014. I was so excited; I immediately applied for a Social Security Number and a driver's license, and within two months bought an old truck that my family started to use to take trips to the lake and water parks.

19.     I felt like many doors were opened to me as a result of obtaining deferred action and work authorization through DACA; I did not have to worry anymore about being denied or losing a job because of my status. I could get a license and drive without fear – it was like the world was opened to us because suddenly I was able to take my family to the zoo, the lake, or the beach, which we hadn't been able to do before because it was too difficult to go that far on public transportation with a small child. We were finally able to drive to big box stores to buy food and necessities in bulk which helped us save money, and for the first time we were able to build up a little bit of savings. I also got a credit card so I could build my credit rating, and having credit gave us some leeway to cover our expenses so we wouldn't have to worry about having enough for bills at the end of the month. Having credit was also important because it is necessary to apply to many jobs, apartments, or even cell phone plans, and it opened up the possibility for us to buy a home someday. I have a good job and can support my family. But

4

most important of all, I no longer had to worry when I went to work in the morning that I could be arrested and not be able to return to my wife and daughter at night.

20. The American Dream for us is to have a family, own a house someday, and to be able to send our children to college. DACA has helped me to pursue my American Dream without fear.

21. In 2016, my wife and I were blessed with a son. He is now 18 months old. My wife is currently pregnant and we are expecting another daughter in February.

22. In 2016 when my DACA expired, I returned to the immigration lawyer who had helped me the first time, but he said he would charge me double for a DACA renewal which did not make sense to me. My brother told me about a nonprofit called Make the Road New York so I went there and they helped me renew for free. My DACA was renewed on February 25, 2016 and expires on February 24, 2018.

**The Announcement to Terminate DACA**

23. When I heard the September 5th announcement to terminate the DACA program, my heart sank. I worried that everything we had worked to achieve for years, the family we had built, could be torn apart. After being able to live a stable and secure life for years, I could lose my job – which is the primary support for my family – as well as my driver's license. Without my job, we would quickly go through the savings we have painstakingly put together for years, and I don't know how I would be able to support my wife and three children. With the future of DACA at stake, it is like our life is on hold. I have been stressed because of not knowing what will happen, and my family can sense when I am stressed and it worries them too. When I see what is happening It is very difficult not being able to plan for our children's future because we don't know what is going to happen, whether I will even be able to keep working or drive in two

5

years, when my children will be ten, three, and two years old. Worst of all, I will once again have to worry every time I leave work each day that I will be arrested and not be able to come home to my wife and children.

24.     I have never applied for Advance Parole. Queens is my home and I am settled here with my family, but I wish I could see my family members in Mexico, if I knew I was able to return to my family in the U.S. afterwards. I am worried that I will never be able to travel with Advance Parole now that the DACA program is being terminated. My grandfather suffered a stroke about two years ago and has never fully recovered. I wish I could visit him, see my parents and siblings for the first time in seventeen years, and see my daughter for the first time ever. I didn't apply for Advance Parole then because I was afraid that I would not be able to come back to the U.S. After I saw many other people had done so and had returned safely, I started to consider traveling – but now that is not a possibility.

25.     Since my DACA is expiring on February 24, 2018, I applied for renewal in September 2017. I had to rush to get my application completed and submitted because the September 5, 2017, announcement only gave me until October 5, 2017 to apply. While I hope my renewal application is approved, it will only temporarily set back the expiration of my DACA, and I am still very worried for my family's future.

26.     My family would not be where we are without DACA. I am worried that after finally being able to work towards our American Dream, that it can be taken away from us in a moment.

6

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED December 13, 2017 in Queens, NY

MARIANO MONDRAGON

Jackson Heights, NY
Sworn to before me this 13th
day of December, 2017

SCOTT ALLEN FOLETTA
Notary Public, State of New York
Registration #02FO6338859
Qualified In Kings County
Commission Expires March 21, 2020

7

# EXHIBIT HHH

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| BATALLA VIDAL et al., | ) | |
| *Plaintiffs*, | ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* | ) | |
| NIELSEN et al., | ) | |
| *Defendants*. | ) | December 13, 2017 |

## <u>DECLARATION OF MARTIN BATALLA VIDAL</u>

I, Martín Batalla Vidal, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.      I was born in Mexico and have lived in the United States since May 1997, when I was four years old.  This country is my home.

2.      I am currently studying Criminal Justice at LaGuardia Community College ("LaGuardia").  I have had DACA since 2015 and renewed DACA one time.  My current grant expires February 15, 2019.

**Early Life**

3.      I grew up in Bushwick, a low-income, working-class neighborhood in Brooklyn, New York with my mother and three younger siblings.  We shared a two-bedroom apartment, where my siblings and I slept in one bedroom while my mother slept in the other.  We moved around many times because our landlords sold the buildings and kicked us. In total, I remember moving six times.  The constant change took a toll on our family, but I tried my best to support my mother who raised us by herself.

1

4.      I helped my mother take care of my siblings as the oldest of her four children.  As soon as school ended, I would go home and look after my siblings while my mom was working. I spent most of this time doing my homework and getting ready for the next school day.

5.      My favorite subject growing up was English.  I loved these classes because I could write about anything I felt. I could express how I felt in many different forms.  But school was tough because kids fought every day.  It seemed that any disagreement in school could turn into a fistfight and, unfortunately, many times it did.  I tried my hardest to stay out of trouble and keep a clean record, especially when I got to high school where there were police officers.

6.      I had a teacher in middle school that made me and the rest of my classmates believe in ourselves.  He told us that life in our neighborhood was hard and that we all struggled. He emphasized that we should not give up and instead should continue to pursue our dreams because our parents were also struggling and making sacrifices for us.  These words keep me going even after all these years.

7.      My mother always told me I was different from the other kids, but she never told me why.  I now know that she was referring to my immigration status.

8.      When I was a teenager my paternal grandparents passed away in Mexico one month apart, first my grandmother, then my grandfather.  I was the last person my grandmother spoke to before she passed away and I really wanted to say goodbye to her in person.  When I told my mom that I wanted to say goodbye to my grandmother before she was buried, she told me I could not go because of my status.  My grandparents raised me when I was in Mexico and not being able to attend the funerals of loved ones is something I do not wish upon anyone.

9.      I am the oldest of four children.  I have three brothers; the two youngest are U.S. citizens.  My other brother was a DACA recipient too, who now has a green card: so all of my brothers have status or are citizens now

10.      My closest relationship is with my mother.  She no longer works due to severe arthritis so I take care of her.  We live together and I pay rent and most of our bills.  My brothers help with the remaining bills.

11.      I first learned exactly how my immigration status affected me when I was in high school.  My interest in college grew when I entered the tenth grade and I was eager to know more about the process of going to a university.  I was most interested in what options were available to me and I reached out to my school counselor.  Sadly, she informed me that I was not eligible for any scholarships or grants due to my undocumented status.  She also explained to me that not many resources for undocumented students existed and that my options were so limited that it would be almost impossible for me to go to college.  I remember feeling extremely, deeply disappointed.  This was a huge blow to me; my dreams of attending a university seemed too far outside of my reach.

12.      The next big implication of my immigration status also came in high school.  Our school helped students get a work permit so they could work part-time during weekends.  With the money earned, my classmates and friends could afford to have a phone, go to the movies, and other things that I could not do.  I wanted to work so badly, but I did not have a Social Security Number and the school would not help me get a work permit.  I lost out on this opportunity to lead a life similar to those of my friends and classmates and I felt like a loser.

13.     I wanted to have a normal life, go to the movies, own a phone so I could communicate with my friends, but I could not afford these things because of my immigration status and all the obstacles it placed in front of me.

**Getting My Education: Struggles and Pauses**

14.     I graduated high school in 2008. Without any scholarships or grants, I had to save money to go to college. As an undocumented student, I did not know how to navigate my way into college; I just knew that I had to save as much money as I could. Eventually, I was able to save up enough to apply and attend LaGuardia Community College in 2010.

15.     Despite my savings, I could not pay for school in full because I paid out-of-state tuition due to my immigrations status. However, LaGuardia offered a payment plan and I signed up for it. As a college freshman, I started studying business administration.

16.      Soon after I started college, however, my mom became very ill and I had to quit school to be with her in the hospital. It took a long time before I managed to go back to school. My mother recovered slowly and I had to care for her while working to support her, myself, and my younger siblings.

17.     In 2015, I was able to finally return to school. At that time, I was able to attend ASA College because I received DACA and qualified for a scholarship for DACA recipients. My mother recovered and returned to work. However, her health suffered again after she began working and I had to leave college again to take care after her.

18.     I started attending LaGuardia again in the Fall of 2017. I changed my major from Medicine to Criminal Justice because of what is happening in my community due to the current Administration and because I firmly believe everyone should know their rights.

19.     If I had had the opportunities afforded to me by DACA right after my high school graduation, I believe I would have graduated college already.  It is very tough for me to attend school now because I still have to work full-time and take care of my mother.

**The DACA Program**

20.     I remember President Obama announced the DACA program in 2012 when I was not attending school.  My feelings were a mixture of excitement, happiness, and fear.  I was home when I watched the announcement and I was happy, but scared at the same time because I did not know how long this program would last.

21.     My mother was very happy when she heard the news.  She knew that my brother and I could get a Social Security Number, a work permit, and a state identification card with this program.  She was also happy that we could enroll in health insurance, and go back to college.

22.     Before I applied for DACA, I studied all the requirements and felt unsure about my eligibility since the guidelines stated one had to be enrolled in school.  I was not enrolled in any school at the time and it took me about one year before I decided to apply.  I wanted to go back to school and knew that having something like DACA would allow me to study again, but I could not go back right away.  I had to take care of my mother and work.

23.     I remember feeling afraid that this program would be taken away and I was especially worried about the consequences of immigration authorities having all my information.  I did not want to get my hopes up for this program only to be denied or have it ripped away from me.

24.     My brother encouraged me to go speak with a lawyer.  I consulted with an attorney in Manhattan who was charging $2,000 for DACA applications, not including filing and

other fees.  The decision before me was: pay rent or apply for DACA.  I decided to pay rent so that I could keep a roof over my mother's head.

25.     One day a friend told me about Make the Road New York ("MRNY") and the help they were offering to people who wanted to apply for deferred action through DACA. When I reached out for help at MRNY, they screened me and gave me a list of documents to collect for my application.  Obtaining these documents and proof of my presence in this country was a difficult task because it is often hard to get these types of official documents.  I started from scratch and had to look for these documents at my old schools, my bank, my dentist's office, and on Facebook.

26.     I submitted my initial DACA application in December 2014 with the help of MRNY after finally collecting all the documents required.  MRNY also helped me obtain a grant to pay the filing and other fees of my submission.

27.     My initial request for deferred action under DACA was approved in February 2015.  I applied for renewal of my deferred action under DACA and work authorization on October 11, 2016.  My DACA request was approved and I received work authorization from February 16, 2017 to February 15, 2019.

28.     When my DACA renewal request was granted, I decided to go back to school because DACA opened doors for me and made it easier to stay in school.  With DACA, I could apply to more scholarships.  After my brother was granted deferred action through DACA shortly after the program's implementation, he was promoted at his workplace to the position of manager and was relocated to a store in Washington, D.C., a job he absolutely loves.  With my brother realizing his potential through DACA, I dreamt even bigger than before.

**My American Dream**

29.     In simple terms, DACA has allowed me to live a more fulfilling and proactive life.  Growing up in this country has been a struggle, but my mother taught me and my siblings from an early age that we came to this country to search for a better life and achieve our dreams.  Without DACA, this opportunity might not be available to me.

30.     With my initial DACA approval, and the knowledge that I could continue to renew it, came a sense of control over my future and enough stability to build my career.  DACA has impacted my life significantly and has allowed me to see myself and my family in a better place as we move forward.

*Daily Life*

31.     DACA allowed me to obtain a Social Security Number, a driver's license, scholarships to pay for school, the ability to travel outside of the United States, the means to continue to provide for my mother and myself, and the tranquility of protection from deportation.

32.     I am currently attending LaGuardia.  I pay my tuition with the money I earn as a physical therapist aide and scholarships.  I would not be eligible for some of my scholarships without DACA.  If I lose my DACA my scholarship options will be severely limited.  Because DACA has been around for years now, most of the scholarships available to undocumented students are for those with deferred action under DACA.  I run the risk of losing my opportunity at higher education if I lose my DACA.

33.     I travelled to Mexico to visit my grandmother due to her ailing health.  I hate to think that the next time I will be allowed to go see her she will be underground—just like my other grandmother.  I wish I could see my family in Mexico more often because I am close to three cousins and my great-grandmother.  However, without deferred action under DACA, I might not be able to see them at all.

34.     I currently work at Park Terrace Rehabilitation and Nursing Center as a physical therapist aide.  I could have only done this with the reinvigorated passion for the medical profession that having a grant of DACA awoke in me.  I love my work because I get to help and support people in difficult situations who are experiencing serious health needs.  My patients led normal lives before they suffered strokes or had traumatic brain injuries due to something like an accident.  I take care of them as if they were my own family because often this is how they perceive me and how I think of them.  The care and support I offer my patients has an effect that reaches their families because their families trust me and my co-workers to care and protect their loved ones.

35.     Being a part of the support system that people rely on to return to their normal lives is an incredibly fulfilling experience and one that I cherish every day.  I speak to my patients' families regularly and  they always express how my helping their loved ones is reassuring for them.  Whether it is a hug or a smile, they feel the support.

36.     Our monthly rent is $2,300 for a small, 2-bedroom apartment in Ridgewood that I share with my mother.  My payments help my landlord pay property taxes and I see this as another way that I support my community.

*Peace of Mind*

37.     DACA has given me the tranquility and peace of mind that I will not face the threat of deportation as long as my DACA grant is valid.  I now have the ability to travel within this great country, but if I lose my DACA, I will no longer have that peace of mind that my family and I will not be ripped apart.  My mother needs me and if I were to be detained or deported, my mother would have an incredibly tough time getting by without me.

38.     The work permit I received under DACA has allowed me to work and earn enough to take care of my sick mother.  This stability has allowed me to apply myself at work and try to be the best physical therapist aide I can be.

39.     Not having to worry about deportation has also allowed me to provide the best support I can to my patients at work.  The simple and important fact that I am protected from removal through DACA helps me through the day and allows me to focus on my work and build relationships with my patients without the fear that we could be ripped apart.

*My Dream Career*

40.     Since my return to college, I have decided to change my major from Medicine to Criminal Justice.  This change in career paths came as a result of the current Administration's game of playing with the lives of DACA recipients.  Is it my hope that majoring in Criminal Justice will allow me to help my community, by learning about and teaching others about the rights that we have.  I firmly believe we are all entitled to be well informed of our relationship with the law and the decisions made by those in power.

41.     I ultimately want to pursue a law degree and become a lawyer.  I believe this will be the best way for me to contribute to my community and to the country I call home.  DACA has allowed me to dream bigger and reach for goals that seemed unattainable before.

**Devastating Impact of the DACA Rescission**

42.     When I heard that the President would deal with DACA recipients "with great heart," I felt an uneasy assurance.  It was difficult, but I believed that the President would deal with the issue in good faith and not rescind the DACA program.  However, on September 5, 2017, when Attorney General Jeff Sessions announced the rescission of the program, I felt lied to and betrayed.

43.     The Administration's rescission has taken a physical and emotional toll on my family and me.  The uncertainty has caused me to have high levels of stress and anxiety that stem solely from the DACA termination.

44.     If I lose my work permit, I will lose my job.  One of my worries is that I will not be able to provide for my mother, who has severe arthritis and cannot work.  I pay our rent and a majority of our bills and my mother depends on me to provide her food, shelter, and other things.

45.     Once I learned about the termination of the DACA program, I became very worried about my ability to provide for myself and my mom.  I picked up an additional job, in addition to my work as a physical therapist aide, in order to save money to try to continue to support my mother and myself after my work permit expires.  I currently work approximately 57 hours a week in addition to being a full-time student.

46.     Another worry for me is that my patients will lose the support system that I provide for them and their families.  My patients depend on me to get through the rough patches they are going through and if I lose DACA, this would have a negative impact on them.  I have spent my time building relationships with my patients to best be able to help them and even if my workplace could employ someone else, that person would not have the foundations of trust and support that I share with my patients.

47.     When my DACA grant expires, I will lose eligibility for most scholarships and grants that I can receive now.  It would be impossible for me to continue studying and obtain my degree in Criminal Justice.  Not only would I lose my job, but I would also be indebted as well to LaGuardia.  My educational prospects seemed bright due to the fact that I can work legally and not worry about deportation, but now my prospects seem bleak and dark because without DACA I will have trouble navigating access to higher education.

48.     Without DACA, my dreams will have to be put on hold once again.  My mother and my family cannot afford this.  I want to contribute to this country and to my community, the only place that I know as home.

49.     I have feelings of betrayal, disappointment, uncertainty, and worry due to Administration's decision to terminate DACA.  In order to have DACA, you need to have a clean record, and I have kept a clean record, and also thrived under DACA.  Because there seems to be no other good reason to terminate DACA, it makes me feel like we are being punished for doing so well.  This is a terrible reason deprive us of the stability, opportunities, and peace of mind that this program offers.

50.     I am afraid that immigration authorities will target me for removal once my DACA grant expires.  I stand to lose my job and my mother will lose her principal provider for almost everything.  I do not know how I could continue to pay my rent or the rest of my bills.

51.     For now, I am trying to stay positive about what will happen next, but it is difficult to think that way because this Administration continues to ramp up attacks against immigrants.  I do not want to put my life on hold again, I want to live a fulfilling life and give back to my community and this country.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

11

52.     I do not know what will happen next or if Congress will act to provide us with the protection that DACA gave us.  However, I believe that this country will do the right thing and finally accept us as its own.  This is the country I know as home and this is the country I want to contribute to.   I believe in the American Dream and that belief is stronger than this Administration's attacks on immigrant communities, the DACA program, and me.  I am putting my faith in this country's judicial system to act in the name of the ideals that make this country great.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED December 13, 2017 in Queens, NY

MARTIN BATALLA VIDAL

# EXHIBIT III

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BATALLA VIDAL et al., <br>      *Plaintiffs*, <br><br>     *v.* <br><br> NIELSEN et al., <br>      *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No.   1:16-cv-04756  (NGG) (JO)

December 13, 2017

### DECLARATION OF CAROLINA FUNG FENG

I, Carolina Fung Feng, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1. I was born and raised in Costa Rica to Chinese parents, and came to the United States on my own when I was twelve years old.  It has been sixteen years since I left my home country and made New York City my new home.

2. I lived in New York as an undocumented immigrant until December 6, 2012, when I received deferred action through the Deferred Action for Childhood Arrivals program ("DACA").  My current grant will expire in August 2018, and I am no longer eligible to renew DACA as a result of Defendants' termination of the program.

**Childhood and the Beginning of a New Life in a Foreign Land**

3. When I was four years old, my mother passed away, and I was sent to live with my dad's younger sister in another city in Costa Rica.  Since then, I have not lived with my immediate family, and I only ever saw them during holidays and school closings.

4. On one of those family visits, we went on a trip to China to visit my grandparents. That was my first trip outside of Costa Rica, and I thought it would be my last since my family

1

was not financially stable at the time.  However, to my surprise, a few years later, my father told me I was going to New York City to visit his older sister, my Big Aunt.

5.      My dad sent me to live with my aunt in New York City to give me a better life, and opportunities that he did not think I would have if I remained in Costa Rica.  He convinced me to go, and in early December 2001 I boarded a plane to New York.  I did not know at the time how difficult this decision was for my father or the difficulties I would face because of it.

**Life in New York City as an Undocumented Young Person**

6.      Growing up in New York City was difficult.  I did not quite fit in with any group, but I was not shunned either.  I grew up in Washington Heights, a community that was familiar yet foreign to me.  At the time, there were not many Asian families and it felt like my family was the only one in that Latino community.  That was not any different from my life in Costa Rica. However, the language barrier was difficult to overcome, and I was constantly bullied my first year of school in the United States.

7.      I remember that I cried a lot that first year because I was homesick and could not adjust to life in the United States.  The bullying from my peers did not make it any easier, and I hated learning English with a passion.

8.      Living as an undocumented youth was hard.  I was in seventh grade, and was a member of the Boost Project, my middle school's honor group.  We were given the opportunity to work with NASA, and the school had planned a trip for us to go to Turkey and visit their space camp.  Everyone was excited to go and was preparing for the trip.  I was the only one who could not participate, and while the school tried to help me they could not do anything about it. It was just too risky to leave the country without the guarantee that I would be able to come back. That was the first time I was denied an opportunity as a result of my legal status, and it would

2

not be the last.  I resented my father because of it.  After all, he sent me to this country so I could have opportunities, yet I was missing out on those opportunities because I was undocumented.

9.      I did not know other kids like me who were in the same position.  I was too scared to say anything to any of my friends.  Only a select group of teachers knew of my situation, and tried their best to help me solve it without success.  I had support from the counselors in my school which helped me feel that I was not alone and that I had people who were looking out for me.

10.      My teachers and counselors helped me gain entry to a good high school.  They encouraged me to apply for the Student Sponsor Partners program, and I did.  I was accepted into a private Catholic high school in Manhattan.  And while it was not my first choice, it was the best four years of my school life in New York. Things did not get easier for me, but I was lucky to have a sponsor pay for my high school education.  When I was preparing to graduate, I was once again faced with the hard decision of where to go from there.

11.      I did not know if I wanted to go back to Costa Rica or continue with my education here in the United States.  I still missed my country a lot, but I was already accustomed to the American way of life.  It took me a while to decide, and I waited until the last possible moment to apply for college in New York.  I thought about my father's decision to send me here to study, and decided to honor it because it gave me the life I have now.  I may not have thought of it as something good, but now I do.

12.      Paying for college was hard.  I could not apply for financial aid, and the few scholarships I received I could not accept because I could not provide them with a Social Security Number.  I also had to show proof of my residency status in order to get in-state tuition. I had done my research, and I knew that I qualified for in-state tuition because I had graduated

3

from a NYC high school. Even so, my university refused to give it to me at first because the power of attorney that I had submitted did not state in the English translation that my Big Aunt was my legal guardian. I could not believe that such a tiny error in the English translation of such an important legal document was going to set me back. However, I was prepared to argue my case, and pointed out that the original Spanish document did contain the phrase they were looking for. They had no choice but to make the change and let me pay in-state tuition. That was the first time I was able to win something for myself.

13.     Since I could not get financial aid, my father had to help me pay for my college education. I felt guilty because I was not the only child he had that was still in school. I had four younger siblings who were still in school, and I felt bad that he had to work so hard to help me. I could not work because I did not have work authorization and because my dad wanted me to focus on school. But I also could not get any scholarships.

**14.**     Whenever I won a monetary award, I could not accept it. I could only accept the paper certificate that said I was being honored for my academic performance. It was frustrating to me because I wanted to be able to pay for my own college education but I could not. It was not until my last semester of college, when I had moved out of my aunt's house with my younger brother, that a new opportunity was available to me: DACA.

**Life with Deferred Action Through DACA**

15.     When President Obama made the announcement that he created the deferred action under DACA program to provide relief and protection for undocumented youth, I was skeptical. I did not trust that the program was going to be helpful, and I was scared that the information I provided would be used against me. It was a college friend who was undocumented like me that encouraged me to apply.

4

16.     I was still unsure, and did not know if the benefits of the program outweighed the risks.  I looked for free legal help, and came across a Legal Aid Society flyer for free DACA workshops.  I took advantage of it and showed up on the last day.  I went alone and brought all the documents they mentioned in the flyer.  It was the first time I saw so many people who wanted the help.  I did not know if their stories were similar to mine or not, but I was glad to know I was not the only one there.

17.     The process was not difficult for me. I had all the documents needed to prove I qualified for DACA, and my dad had sent some money to pay for the application fee.  In fact, he was the first one to tell me to apply when he heard the news on TV, but I was more reluctant and hesitant about it.

18.     I felt uncomfortable with the Legal Aid lawyers who asked me a lot of questions, some of which I could not answer.  It was the first time that I was exposing so much of my life to anyone.  I remember I kept holding my breath and I could not stop shaking from all the nervousness I felt until I dropped off my application at the post office.

19.     When I started receiving letters from U.S. Citizenship and Immigration Services, I was too scared to open them at first.  I was scared that they would reject my application and would come looking for me.  The day I received the approval notice I felt relief and happy that I was finally going to be able to start living my life to its greatest potential.  I started planning for my future and thinking about what my next steps were going to be.

20.     The first thing I did after I got my employment authorization card in the mail was go to the social security office and get my own number.  I was finally able to get that coveted number that everyone seemed to ask for.  Then I went to the DMV and got my New York State ID.

21.     I got my first job in December 2013, and have worked in several jobs since then. I have been able to financially support myself and my younger brother.  I took driving lessons and got my driver's license in 2015.  I obtained a teaching certification and started my teaching career.

**22.**     I later successfully renewed my request for deferred action under DACA two more times.  And when I heard the news about the termination of the program, I could not see what my future was going to look like.

**The Uncertainty of the Future**

23.     My dad's younger sister, Little Aunt, passed away recently, and her daughter, my cousin, came to live with my brother and me.  Unlike her or any of my family members here in New York, I am the only one who is undocumented.  Everyone else was either born here or came with a green card.

24.     Since my aunt's passing, I have been financially supporting my younger brother and my cousin.  It has been very stressful, and I have not come to terms with any of it.  My family does not seem to understand the uncertainty and worry I feel.

25.     I will not be able to work once my DACA grant expires at the end of August 2018, and while I am scared of being deported and I cannot see what the future holds, I cannot let myself sink into depression.

26.     I cannot just sit back and do nothing.  I have always wanted to go back to school to get a master's degree or a doctorate.  I recently decided to take GRE prep classes and will apply for graduate school next year.  I do not know if I will be able to finish my graduate studies, if I will face deportation, or how I will be able to financially support myself.

27.     I am scared of not being able to live an independent life, and that I will have to once again rely on my family to support me. I am going to continue with my life plans even after my DACA grant expires, because I know that through this lawsuit we will be able to find a solution. I and many Dreamers out there cannot go back. We will make change happen, and I want to be there to make it happen.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED December 13, 2017 in Queens, NY

Carolina Fung Feng
CAROLINA FUNG FENG

7

# EXHIBIT JJJ

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL et al.,

*Plaintiffs*,

*v.*

NIELSEN et al.,

*Defendants.*

)
)
)
)
)
)
)
)

Case No. 1:16-cv-04756 (NGG) (JO)

December 13, 2017

## DECLARATION OF ANTONIO ALARCON

I, Antonio Alarcon, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.      I was born in Mexico and came to the United States when I was eleven years old. I have lived in Queens, New York ever since.

2.      I have worked as a Youth Organizer at Make the Road New York ("MRNY") since I first received Deferred Action for Childhood Arrivals ("DACA") in March 2013. I renewed my DACA in March 2015, and again in January 2017. My current grant will expire on January 25, 2019. I am not eligible to apply to extend it under the announced DACA termination.

**Background and Moving to the United States**

3.      I was born on July 4, 1994, in Veracruz, Mexico, and lived there until I was eleven. Even though my parents only had two children, they could not provide for us well from what they earned in our small agricultural town. As a result, my parents left home when I was a small child to look for better-paying work elsewhere. My brother, Salvador, and I stayed with my paternal grandparents while my parents traveled to various other Mexican states to work. For

a time, they settled in Tamaulipas and worked in factories. They travelled to visit us every two months or so. It was too expensive and far to do so more often.

4.      Despite their hard work and sacrifice, my parents felt like what they earned as factory workers was still not enough. They had bigger dreams for us than simply to put food on the table. They wanted to build us a solid home and provide us a quality education, so that we would not have to struggle like they had to. When I was six, my parents therefore made the difficult decision to come to the United States. I did not see them again until I was eleven.

5.      My grandparents continued to take care of us, and my brother and I were so young that they basically became our parents. When I turned eleven, my parents decided that I should be in the United States, where I would have better opportunities. My little brother, Salvador, stayed behind in Mexico with my grandparents because he was so little.

6.      I can still remember the last time I saw my brother before leaving. I thought to myself that I would see him soon. Instead, nine years passed before I did – and it was only possible as a result of DACA.

7.      I remember the trip to the United States vividly. We took a bus and a plane, hid in a house in the middle of nowhere, and walked in the desert to get here. Everyone seemed afraid. Adults were given two water bottles, and children were given one, plus a few cans of tuna and corn. I remember thinking over and over that I had to be careful to stay with the group, not to fall behind, that we could risk getting lost. At one point, we ran out of water and food. We found an irrigation ditch in the middle of the desert which we used to refill our water, not caring that it seemed dirty because we were so thirsty.

8.      Once I arrived in the United States, New York became my new home.  Arriving in New York felt like a dream.  It was like being in a world for giants because there were skyscrapers everywhere.

9.      I loved my new city but also struggled to get used to it.  I had to learn English and adapt to a different culture.  The hardest part, however, was living without my grandparents and brother.  It also took a year for me to get into school.  My parents tried to enroll me in 2005, but the school turned us away because they did not have English as a second language programming.

10.     They referred us to a school that was far from where we lived.  My parents were unaware that children have the right to a K-12 education here no matter their status or language and did not know where to turn.  They were working a lot, so it was my aunt who helped them find a school for me, where I started the following year.

11.     Once I started school, I was determined to excel.  I thought of my grandfather, who valued school above all.  I saw how my parents worked all the time to provide for my brother and me.  Their work ethic inspired me to overcome the barriers in my path.  I dedicated, and continue to dedicate, all my academic achievements to them.

12.     In 2011-2012, my grandparents passed away, just several months apart.  Because of my immigration status, I could not go back to Mexico and say goodbye to the people who raised me.  I was devastated.  It was a terrible time for my family and me.

13.     The most painful part of it was seeing my father cry about his own parents.  After the second of these deaths, my dad became inconsolable.  He seemed to abandon his dreams and goals.  He seemed to forget that he wanted to build his own business in this country so that he could work without being exploited, and that my mother planned to be a housewife and was

hoping to have my entire family together in the United States.  They had worked for their dreams and for all of us to be together for years, and suddenly, all my father could talk about was going back to Mexico and paying respects to his parents.  I think that he was probably experiencing depression, as many undocumented people do in this type of situation.

14.    My parents then made another impossibly difficult decision: they decided to return to Mexico to take care of my younger brother.  Once again, my family was separated, in yet another way.  I was about to graduate from high school, and despite my lack of status, we all believed I would be better off in the United States.

15.    After my parents left, I stayed with my aunt and uncle.  I was 17 years old.  My parents left me $1,500 dollars, and said goodbye, not knowing when we would next see each other, and under what circumstances.

**Activism and Receiving DACA**

16.    In 2010, I started volunteering at MRNY, the only place I found where I could complete my community service hours for high school as an undocumented person.  I remember that on my first day, the facilitator talked about the importance of the DREAM Act.  I knew what it was, but I was afraid to share my own story with the group because I was new.  However, I immediately felt this was the right place for me to be in.

17.    In December 2010, I watched the vote on the DREAM Act on television.  I had such high hopes that it would pass.  When it did not, I turned off the television, crushed.  I could not even talk about it.

18.    After the vote, I started to get more involved in community organizing.  In February 2011, we channeled our anger and sorrow into power and determination to fight for solutions other than a Congressional fix.  Other Dreamers and I started the "Education Not

Deportation" campaign. We started to publicly highlight and elevate the stories of our community members and the injustices the administration was inflicting on Dreamers, including arrests and deportations. We showed how in some cases people had arrived as babies, not even as children, and literally knew no other home.

19.     At the beginning, President Obama seemed skeptical. Many people refused to believe how many of us there were, and how we were suffering. As we made more information available and public, the President responded, but only to say that the Administration could not do anything. However, we were now organized, and we were gathering support, and developing leadership. Many of us had "come out" as undocumented and put the fear that keeps so many undocumented people quiet behind us. I spoke publicly in a number of places, and wrote an article about my experience, and my parents' and my own sacrifices and dreams, which appeared in the New York Times Op-Ed section, called "Do It Yourself Deportation". New York Times, Feb 1, 2012, http://www.nytimes.com/2012/02/02/opinion/do-it-yourself-deportation.html.

20.     The attention that comes with this work can be time-consuming and tiring, but we persevered, and our movement has grown more skilled at using social media, press and other tools to communicate our plight. Inspired in part by the civil rights activists of the 1960's, we also started to escalate our actions despite the personal risk, engaging in civil disobedience. I helped coordinate some of these actions both at local district offices, and in D.C.

21.     All of the work, the risk, the exposure, and the late nights paid off on June 15, 2012. I received a call from Natalia, our youth organizer at the time, telling me to run to the MRNY office because something big was going to happen. On my way I checked the news and learned that President Obama was going to announce a program to give relief to some Dreamers.

22.     This was only months after my parents had left the country.  I was about to graduate from high school and desperate to discover whether I would be included in the relief being announced, so that I could work lawfully and continue to study.  When I arrived at MRNY, friends of mine and other community members had already gathered to watch the announcement.  President Obama spoke for about ten to fifteen minutes, and the words he shared in those minutes inspired many of us with hope that we had not felt in years.  Personally, I felt that I was finally being recognized by the country I call home.

23.     In the following weeks, we held workshops for hundreds of youth who came to our office asking for information about the announcement and how they could apply to the DACA program.  I graduated from Flushing High School at that time, and spent the summer coming to the office early and staying late.  By the time I would reach the office, people would already be outside, hoping to be the first in line.

24.     On August 15, 2012, the actual application was released, and we were even busier, helping thousands of people to fill out their applications and collect documents.  Many people had concerns about sharing their information with the government, but USCIS provided information saying that it would not share this information or use it against people except for in very limited circumstances.

25.     I was not able to apply myself until October 2012 because of the cost of the application.  I had a small stipend from MRNY, sold chocolates to students, and was going through my parents' $1,500 as slowly as I could.

26.     I remember the day I received my employment authorization card:  I cried for at least an hour, and looked at the card for another two hours.  The next week, I went to the social security office and applied for my Social Security Number; finally, I said to myself, I was going

to get those magic numbers.  Two or three weeks later I received my Social Security Number, and it changed my life.  I could now work lawfully, get a driver's license, and apply for certain scholarships.

27.     I started working at MRNY as a Youth Organizer—a position I still hold today.  In that position, I have facilitated meetings, organized workshops and, together with my colleagues and our members, decided on campaigns and policy changes we wanted to effectuate.  I was a national coordinator for a nationwide network called United We Dream, and coordinated organizations advocating for Dreamers in seven eastern states.  I have also helped cultivate new leaders and engaged in communications work.

28.     Recently, I helped MRNY launch a new office in Nevada.  Other than promoting legislative and administrative solutions for undocumented youth, I have focused on educational opportunities for that community.  And, while my focus as a youth organizer is on issues affecting youth, I always promote an inclusive set of strategies, which includes adults—the original Dreamers.

29.     I have worked in this position since I first received deferred action through DACA in March 2013.  I renewed my DACA in March 2015, and again in January 2017.  My current grant will expire on January 25, 2019.  I am not eligible to apply to extend it under the announced DACA termination.

30.     After graduating from Flushing High School, I received my Associate's Degree from LaGuardia Community College in 2015.  I went to school full-time while working part-time, and received a scholarship for the tuition that I was only eligible for because of being a DACA recipient.  I am now completing my Bachelor of Arts from Queens College.

31.     Beyond job and educational opportunities and the feeling of freedom and safety in the United States, DACA has given me two other gifts.  One is the feeling of belonging, and of having a real future here.  One of the many opportunities I seized due to this feeling, for example, was applying for and attending a three-month program at Hunter College at the Latino Institute, which helps young people learn about and prepare to run for elected office.  This suddenly became a possibility and a goal for me.

32.     The second gift was the ability to travel outside of the United States.  In 2014, the U.S. Citizenship and Immigration Services granted me special permission to travel to Mexico for a research project.  During that visit, I would have some time to see family.  I had not been to Mexico for ten years.  There are no words to describe the joy I felt when I received the approval.  On August 9th, 2014, I landed in Mexico.  While I was there I visited the Basilica de Guadalupe, where I prayed for my fellow Dreamers, and for all immigrants.

33.     I had to prepare myself mentally and emotionally to see my mom, dad, and brother.  I was practicing meditation, to keep calm, but when I arrived I was so excited to see my mom that I forgot all about it.  I also went to visit my grandparents' graves.  Seeing their graves was very hard and something that no amount of preparation helped with.

**The Termination of the DACA Program**

34.     When the DACA termination was announced, I was shocked by the manner of the announcement.  To have the Attorney General, a man who has spoken out against immigrants and demonized immigrant communities, make a public announcement that seemed catered to the increasingly anti-immigrant faction of the Trump administration, felt like an assault.

35.     My first reaction after this shock was to be devastated that I will not be able to travel outside the country again.  Since my first visit to Mexico, I had returned twice more, with

special permission each time, once to take a course and another as an invited lecturer.  Each occasion was a professional and educational opportunity for me, and on each, I had also been able to see my parents and Salvador.  Not knowing when I will next be able to travel again, and see them again, is very upsetting.  I had looked forward, in particular, to showing them my college diploma on a future visit.

36.     Losing my DACA status will mean that I will no longer be able to work lawfully.  I worry about returning to a more precarious economic situation.  At the moment, I make a good living and can not only provide for myself, but also help out my uncle and aunt, with whom I live.  And, I would be losing a job that I love.

37.     Losing DACA also means that my ability to pursue further educational and training opportunities will be reduced, as few such opportunities exist at the post-secondary level for undocumented people.

38.     Losing DACA will also end the possibility of my running for office.  The time and money I have spent in a variety of educational and training programs and my training as an activist, all of which would lend itself to a career in politics, will not be enough to allow me to fulfill my dream of holding public office if I do not have work authorization.

///

///

///

///

///

///

39.     DACA is not a perfect long-term solution for my immigration status, and I intend to keep fighting, as I have for years, for comprehensive immigration reform. Until then, however, I hope that deferred action under DACA is restored.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED December 13, 2017 in Queens, NY

ANTONIO ALARCON

# EXHIBIT KKK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

        Plaintiffs,

    v.

DONALD TRUMP, *et. al.*,

        Defendants,

No. 1:17-CV-5228

## Declaration of Tom K. Wong

I, Tom K. Wong, declare as follows:

1. My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3. I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4. I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the

political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5.  I previously testified as an expert witness in the case, City of El Cenizo, et. al. v. State of Texas, et. al.

6.  I am being compensated by the State of Washington in the amount of $5,000.

7.  I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.


**DACA**

1.  Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. See: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

### 2017 National Survey of DACA Recipients

2. From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

3. Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of

undocumented immigrants from which to randomly sample from, researchers need to partner with organizations that interact with undocumented immigrants to conduct such surveys. The outreach partners were United We Dream (UWD), the National Immigration Law Center (NILC), and the Center for American Progress (CAP). These partners distributed the survey link to their respective email lists. Given the nature of online opt-in surveys, it is not possible to construct a valid margin of error. Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-reviewed academic journal on DACA based on survey results obtained using the methods described above is forthcoming in a top sociology journal.

4. Evaluating the representativeness of the survey sample requires current and complete data on the characteristics of DACA recipients. The only publicly available data provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA statistics that are both current and complete is the geographic breakdown of DACA recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-S) test of equality of distributions can be run to evaluate how well the survey sample

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. See: https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

matches the actual distribution of DACA recipients by state. The results of the K-S test

of equality of distributions shows that the state-by-state breakdown of the survey

sample is representative of the state-by-state breakdown of all DACA recipients ($p$ =

.570).[4]

### Characteristics of DACA Recipients

5.   The average age of respondents is 25.2.[5] The average age that respondents first arrived

in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S.

is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino,

4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as

Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or

transgender (LGBT).

### DACA and Economic Integration

6.   DACA has been critical in improving the economic integration of DACA recipients,

---

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.

[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

---

DECLARATION OF TOM K. WONG                   5                   ATTORNEY GENERAL OF WASHINGTON
                                                                 800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA 98104-3188
                                                                 (206) 464-7744

which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

7. Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

8. DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are used to distinguish between types of occupations.[9] Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

| | DACA |
|---|---|
| Office and Administrative Support Occupations | 16.5% |
| Sales and Related Occupations | 11.6% |
| Management, Business, Science, and Arts Occupations | 10.8% |
| Education, Training, and Library Occupations | 9.6% |
| Food Preparation and Serving Occupations | 6.8% |
| Healthcare Support Occupations | 6.4% |
| Healthcare Practitioners and Technical Occupations | 4.6% |
| Community and Social Services Occupations | 4.3% |
| Financial Specialists | 3.4% |
| Legal Occupations | 3.0% |
| Computer and Mathematical Occupations | 3.0% |
| Other | 19.9% |

9. Table 2 below compares the occupations of DACA recipients to native-born workers

---

[9] For detailed occupation listing, see here: https://usa.ipums.org/usa/volii/c2ssoccup.shtml

between the ages of sixteen and thirty-five. As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, H*ealthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

Table 2

| | DACA | Native Born | Diff |
|---|---|---|---|
| Management, Business, Science, and Arts Occupations | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | 16.5% | 13.9% | +2.6% |
| Legal Occupations | 3.0% | 0.9% | +2.2% |
| Financial Specialists | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | 1.2% | 0.8% | +0.4% |
| Extraction Workers | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | 2.0% | 4.4% | -2.4% |
| Production Occupations | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

10. Moreover, after receiving DACA:

    a.   54% got their first job;

    b.   69% got a job with better pay;

    c.   54% got a job that better fits their education and training;

    d.   54% got a job that better fits their long-term career goals;

    e.   57% got a job with health insurance or other benefits;[10]

    f.   56% got a job with improved work conditions; and

    g.   5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

| | | | ≥ 25 |
|---|---|---|---|
| Got my first job | ........................................ | 54.2% | 35.3% |
| Got a job with better pay | ........................................ | 68.5% | 77.7% |
| Got a job that better fits my education and training | ........................................ | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ........................................ | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ........................................ | 57.3% | 66.9% |
| Got a job with improved work conditions | ........................................ | 56.2% | 64.4% |
| Started my own business | ........................................ | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

11. Regarding earnings, the data make clear that DACA is having a positive and significant

---

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."

[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

effect on the wages of DACA recipients.

12. The average hourly wage of DACA recipients has increased by 69% since receiving DACA. Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA. I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist. This continues to be true. However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even more room for wage growth as DACA recipients move further along in their careers. These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

13. The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

14. Higher wages have meant greater financial independence and consumer purchasing

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

DECLARATION OF TOM K. WONG          9          ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

power for DACA recipients:

   a.  69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

   b.  71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

   c.  Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

   d.  65% purchased their first car after their DACA application was approved; and

   e.  16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 4

| | | ≥ 25 |
|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | ....................................... 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ....................................... 70.8% | 73.7% |
| Paid off some/all of my student loans | ....................................... 27.1% | 27.4% |
| Bought my first car | ....................................... 64.5% | 67.2% |
| Bought a home | ....................................... 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

15. Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

16. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse. This would […] make it impossible for my family to afford to pay our mortgage. I would lose my home." Another DACA recipient writes, "I will lose my job and the associated health/retirement benefits I have been paying into. Right now my family depends on the income that I make working […] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now." Another DACA recipient writes, "I will lose my job, which then would have a trickle effect […] losing my vehicle for

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see here: https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf

[14] Higher wages also translate into more in federal income taxes paid, more in state income taxes paid. Large purchases such as cars add to state tax revenues, as most states collect a percentage of the car purchase in sales tax, along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new spending in local economies. For job creation, see here: https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase. For spending in local economies, see here: https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html

non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards." Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization." A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT." Another DACA recipient writes, "If DACA ends […] My students would be left without a teacher for the rest of the year." Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018." Another DACA recipient writes, "I will not be able to practice medicine when I graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

**DACA and Education**

17. DACA improves educational outcomes for DACA recipients.

18. Regarding education, 45% of DACA recipients are currently in school.[15]

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are

19. Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

20. Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing to the development of a better prepared and more competitive college-educated workforce.

21. Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

22. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked

---

more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same. It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted to be. DACA opened the door, it gave a lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering degree." Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for PhD programs. I have wanted to be a scientist since I was nine years old, staring out of my first telescope. DACA allows that dream to not be hindered. I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well." Another DACA recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher […] and will not be able to fulfill my dreams of being an educator." Another DACA recipient writes, "I will be unable to continue my education in computer science." Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

**DACA and Normality in Day-to-Day Life**

23. The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and,

in some cases, improved mental health.

24. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the only country I have truly ever known." Another DACA recipient writes, "I would lose my sense of belonging. For the first time I feel safe without fear." Another DACA recipient writes, "Having DACA has changed my life completely, I feel like I have purpose again. I can go to school and work. I can strive now for a better life. Things are more manageable. Before DACA, I lost all hope of ever becoming anything or accomplishing anything. I've regained a lot of that hope and now I have a strong drive to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could have if I had papers and it made me love this country more." Another DACA recipient writes, "DACA has allowed me to feel a sense of hope and security within the nation I grew up in […] its existence provides me with the reassurance that someone cares, that someone is listening, and that we are not alone." Another DACA recipient writes, "I will lose feeling safe and protected." Another DACA recipient writes, "I will lose the independence and freedom I had to wait so many years to have." Another DACA recipient writes, "I will no longer be able to drive to school or work." Another DACA recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety, and uncertainty about my future before DACA was passed. I'm worried all of that will come flooding back. Aside from the practical things, like losing my license, my job, my independence, I really don't want to feel that way again. I have become more open with people since DACA, and I don't want to go back to having to worry about what I say

and to who."

25. Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

    a.  61% opened a bank account;

    b.  66% got their first credit card;

    c.  90% got a driver's license or state identification card for the first time; and

    d.  49% became organ donors.

Table 5 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 5

|  |  |  | ≥ 25 |
|---|---|---|---|
| Opened a bank account | ........................................ | 61.0% | 47.3% |
| Got my first credit card | ........................................ | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ........................................ | 90.3% | 88.3% |
| Became an organ donor | ........................................ | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

**DACA Recipients and American Citizen Family Members**

26. The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children. Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

    a.  59% reported having an American citizen sibling;

    b.  17% reported having an American citizen spouse; and

    c.   26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| | | |
|---|---|---|
| American citizen spouse | ....................................... | 16.6% |
| American citizen child | ....................................... | 25.7% |
| American citizen sibling | ....................................... | 58.9% |
| American citizen spouse, child, or sibling | ....................................... | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

27. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if

DACA ends I will not be able to do so." Another DACA recipient writes, "we risk

being homeless with a new-born child if DACA ends." Another DACA recipient

writes, "My kids are U.S. citizens […] I will lose my job, I will lose the opportunity to

give my kids a better life […] Please, I beg to continue to have DACA. It is not just

about being legal, but is also about having a better life for my kids." Another DACA

recipient writes, "we would struggle providing for our kids who are all citizens […] I

hope this never happens because our family has so much riding on whether my next

permit is approved or not." Another DACA recipient writes, "I have a 3 year old

daughter who is heading to Head Start this year and I am currently pregnant. I would

miss out on my kid's lives, as they would most likely stay in the U.S. with their dad."

Another DACA recipient writes, "I would lose healthcare coverage for me and my

son." Another DACA recipient writes, "having my driver's license taken away would

be a devastating blow […] I take my sons to school and childcare almost every day."

Another DACA recipient writes, "without my driver's license I won't be able to drive

to school or any of my son's doctor's appointments." Another DACA recipient writes,

"How do you tell your 5 year old mommy can't bring food to the table because of a

simple paper? How do you explain to your child that there will be no more sports

because we can no longer drive?" Another DACA recipient writes, "I would lose my

job first of all and if I lose my job I will lose my apartment. I will have to stay with

family or other people and hopefully find a way to make some money in order to take

care of my 3 year old. I will definitely end up in debt without a way to pay my bills and

I will have to ask for public assistance to feed my son. It sounds extreme but that's

what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

28. Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

29. In the 2017 DACA survey, respondents were asked to describe "what you will lose if

DACA ends." One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law." Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day." Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost. I will lose my current employment, the health insurance provided by my employer, and driver's license for starters. Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information." Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer. Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away. This is the only place that I call home and people want to take that away from me. It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way." Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back too. I would live in fear." Another DACA recipient writes, "I will live in fear and hiding, again." Another DACA recipient writes, "what hurts most is losing my ability to live without fear. To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules." Another DACA recipient writes, "losing DACA would make me lose faith in a government [that] asked

us to come fourth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

30. Moreover, when given a scenario in which they no longer had DACA[17]:

    a.   53% reported that they would be less likely to report a crime they witnessed;

    b.   47% reported that they would be less likely to report a crime even if they were the victim;

    c.   48% reported that they would be less likely to go to the hospital if they suffered an injury; and

    d.   60% reported that they would be less likely to report wage theft by their employer.

31. Moreover, many DACA recipients fear what the government will do with their personal information.

32. Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

    a.   18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

    b.   26% reported that fear that the government will use the information provided in

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following…"

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application reported that that fear of providing updated information to the government was a prohibitive factor.

the renewal application for immigration enforcement purposes was a prohibitive factor.

33. Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

34. The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

35. In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

   a. 79% reported being concerned about what would happen if DACA ended;

   b. 59% reported being concerned about letting the government know they were undocumented;

   c. 49% reported being concerned about revealing their personal information;

   d. 59% reported being concerned about revealing information about their family;

   e. 59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

   f.  32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention

---

[20] This represents 46.9% of respondents.

or deportation)."

## DACA Recipients by State

36. Below are examples of state-specific profiles of DACA recipients. Data from the

survey are used to construct these profiles.[21]

## DACA Recipients in the State of Colorado

37. As of September 4, 2017, there were 15,500 active DACA recipients in the State of

Colorado.[22]

38. Regarding employment and earnings:

    a.  An estimated 14,167 DACA recipients in the State of Colorado are currently

        employed[23];

    b.  An estimated 837 DACA recipients in the State of Colorado are business

        owners[24]; and

    c.  The State of Colorado's DACA recipients earn an estimated $513.3 million

---

[21] To construct state-specific profiles, a previous version of this declaration used USCIS quarterly statistics (published on September 20, 2017 for the 3rd quarter of 2017) on the total number of individuals who received DACA as of June 30, 2017. Recently, USCIS published statistics on the total number of individuals with DACA as of September 4, 2017 (https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf). The state-specific profiles herein use the most up-to-date information at the time of this writing, which is information on the total number of individuals with DACA as of September 4, 2017.

[22] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[23] 91.4% of 15,500.

[24] 5.4% of 15,500.

annually.[25]

39. Regarding education:

    a. An estimated 6,960 DACA recipients in the State of Colorado are currently in school[26];

    b. Among those currently in school, an estimated 6,514 have "pursued educational opportunities that I previously could not" because of DACA[27]; and

    c. An estimated 4,976 DACA recipients in the State of Colorado are currently pursuing a bachelor's degree or higher.[28]

40. Regarding American citizen family members:

    a. An estimated 11,269 DACA recipients in the State of Colorado have an American citizen sibling, spouse, or child.[29]

**DACA Recipients in the State of Connecticut**

41. As of September 4, 2017, there were 3,800 active DACA recipients in the State of Connecticut.[30]

42. Regarding employment and earnings:

    a. An estimated 3,473 DACA recipients in the State of Connecticut are currently

---

[25] 14,167 multiplied by $36,231.91. This translates into $31.8 million annually in Social Security contributions (6.2% per FICA) and $7.4 million annually in Medicare contributions (1.45% per FICA).
[26] 44.9% of 15,500.
[27] 93.6 % of 6,960.
[28] 71.5% of 6,960.
[29] 72.7% of 15,500.
[30] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

employed[31];

b. An estimated 205 DACA recipients in the State of Connecticut are business

owners[32]; and

c. The State of Connecticut's DACA recipients earn an estimated $125.8 million

annually.[33]

43. Regarding education:

a. An estimated 1,706 DACA recipients in the State of Connecticut are currently

in school[34];

b. Among those currently in school, an estimated 1,597 have "pursued educational

opportunities that I previously could not" because of DACA[35]; and

c. An estimated 1,220 DACA recipients in the State of Connecticut are currently

pursuing a bachelor's degree or higher.[36]

44. Regarding American citizen family members:

a. An estimated 2,763 DACA recipients in the State of Connecticut have an

American citizen sibling, spouse, or child.[37]


**DACA Recipients in the State of Delaware**

45. As of September 4, 2017, there were 1,100 active DACA recipients in the State of

---

[31] 91.4% of 3,800.
[32] 5.4% of 3,800.
[33] 3,473 multiplied by $36,231.91. This translates into $7.8 million annually in Social Security contributions (6.2% per FICA) and $1.8 million annually in Medicare contributions (1.45% per FICA).
[34] 44.9% of 3,800.
[35] 93.6 % of 1,706.
[36] 71.5% of 1,706.
[37] 72.7% of 3,800.

DECLARATION OF TOM K. WONG                25                ATTORNEY GENERAL OF WASHINGTON
                                                            800 Fifth Avenue, Suite 2000
                                                            Seattle, WA 98104-3188
                                                            (206) 464-7744

Delaware.[38]

46. Regarding employment and earnings:

    a.   An estimated 1,005 DACA recipients in the State of Delaware are currently employed[39]; and

    b.   The State of Delaware's DACA recipients earn an estimated $36.4 million annually.[40]

47. Regarding education:

    a.   An estimated 494 DACA recipients in the State of Delaware are currently in school[41];

    b.   Among those currently in school, an estimated 462 have "pursued educational opportunities that I previously could not" because of DACA[42]; and

    c.   An estimated 353 DACA recipients in the State of Delaware are currently pursuing a bachelor's degree or higher.[43]

48. Regarding American citizen family members:

    a.   An estimated 800 DACA recipients in the State of Delaware have an American citizen sibling, spouse, or child.[44]

---

[38] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[39] 91.4% of 1,100.
[40] 1,005 multiplied by $36,231.91. This translates into $2.3 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).
[41] 44.9% of 1,100.
[42] 93.6 % of 494.
[43] 71.5% of 494.
[44] 72.7% of 1,100.

**DACA Recipients in the District of Columbia**

49. As of September 4, 2017, there were 920 active DACA recipients in the District of Columbia.[45]

50. Regarding employment and earnings:

    a. An estimated 841 DACA recipients in the District of Columbia are currently employed[46]; and

    b. The District of Columbia's DACA recipients earn an estimated $30.5 million annually.[47]

51. Regarding education:

    a. An estimated 413 DACA recipients in the District of Columbia are currently in school[48];

    b. Among those currently in school, an estimated 387 have "pursued educational opportunities that I previously could not" because of DACA[49]; and

    c. An estimated 295 DACA recipients in the District of Columbia are currently pursuing a bachelor's degree or higher.[50]

52. Regarding American citizen family members:

    a. An estimated 669 DACA recipients in the District of Columbia have an

---

[45] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[46] 91.4% of 920.

[47] 841 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.4 million annually in Medicare contributions (1.45% per FICA).

[48] 44.9% of 920.

[49] 93.6 % of 413.

[50] 71.5% of 413.

American citizen sibling, spouse, or child.[51]

### DACA Recipients in the State of Hawaii

53. As of September 4, 2017, there were 320 active DACA recipients in the State of Hawaii.[52]

54. Regarding employment and earnings:

    a. An estimated 292 DACA recipients in the State of Hawaii are currently employed[53]; and

    b. The State of Hawaii's DACA recipients earn an estimated $10.6 million annually.[54]

55. Regarding education:

    a. An estimated 144 DACA recipients in the State of Hawaii are currently in school[55];

    b. Among those currently in school, an estimated 134 have "pursued educational opportunities that I previously could not" because of DACA[56]; and

    c. An estimated 103 DACA recipients in the State of Hawaii are currently pursuing a bachelor's degree or higher.[57]

---

[51] 72.7% of 920.

[52] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[53] 91.4% of 320.

[54] 292 multiplied by $36,231.91. This translates into approximately $0.7 million annually in Social Security contributions (6.2% per FICA) and $0.2 million annually in Medicare contributions (1.45% per FICA).

[55] 44.9% of 320.

[56] 93.6 % of 144.

[57] 71.5% of 144.

28                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

56. Regarding American citizen family members:

    a. An estimated 233 DACA recipients in the State of Hawaii have an American citizen sibling, spouse, or child.[58]

### DACA Recipients in the State of Illinois

57. As of September 4, 2017, there were 35,600 active DACA recipients in the State of Illinois.[59]

58. Regarding employment and earnings:

    a. An estimated 32,538 DACA recipients in the State of Illinois are currently employed[60];

    b. An estimated 1,922 DACA recipients in the State of Illinois are business owners[61]; and

    c. The State of Illinois's DACA recipients earn an estimated $1.2 billion annually.[62]

59. Regarding education:

    a. An estimated 15,984 DACA recipients in the State of Illinois are currently in school[63];

    b. Among those currently in school, an estimated 14,961 have "pursued

---

[58] 72.7% of 320.

[59] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[60] 91.4% of 35,600.

[61] 5.4% of 35,600.

[62] 32,538 multiplied by $36,231.91. This translates into $73.1 million annually in Social Security contributions (6.2% per FICA) and $17.1 million annually in Medicare contributions (1.45% per FICA).

[63] 44.9% of 35,600.

educational opportunities that I previously could not" because of DACA[64]; and

   c.  An estimated 11,429 DACA recipients in the State of Illinois are currently pursuing a bachelor's degree or higher.[65]

60. Regarding American citizen family members:

   a.  An estimated 25,881 DACA recipients in the State of Illinois have an American citizen sibling, spouse, or child.[66]

### DACA Recipients in the State of Iowa

61. As of September 4, 2017, there were 2,500 active DACA recipients in the State of Iowa.[67]

62. Regarding employment and earnings:

   a.  An estimated 2,285 DACA recipients in the State of Iowa are currently employed[68];

   b.  An estimated 135 DACA recipients in the State of Iowa are business owners[69]; and

   c.  The State of Iowa's DACA recipients earn an estimated $82.8 million annually.[70]

---

[64] 93.6 % of 15,984.
[65] 71.5% of 15,984.
[66] 72.7% of 35,600.
[67] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[68] 91.4% of 2,500.
[69] 5.4% of 2,500.
[70] 2,285 multiplied by $36,231.91. This translates into $5.1 million annually in Social Security contributions (6.2% per FICA) and $1.2 million annually in Medicare contributions (1.45% per FICA).

63. Regarding education:

    a.   An estimated 1,123 DACA recipients in the State of Iowa are currently in school[71];

    b.   Among those currently in school, an estimated 1,051 have "pursued educational opportunities that I previously could not" because of DACA[72]; and

    c.   An estimated 803 DACA recipients in the State of Iowa are currently pursuing a bachelor's degree or higher.[73]

64. Regarding American citizen family members:

    a.   An estimated 1,818 DACA recipients in the State of Iowa have an American citizen sibling, spouse, or child.[74]

**DACA Recipients in the State of Massachusetts**

65. As of September 4, 2017, there were 5,900 active DACA recipients in the State of Massachusetts.[75]

66. Regarding employment and earnings:

    a.   An estimated 5,393 DACA recipients in the State of Massachusetts are currently employed[76];

    b.   An estimated 319 DACA recipients in the State of Massachusetts are business

---

[71] 44.9% of 2,500.
[72] 93.6 % of 1,123.
[73] 71.5% of 1,123.
[74] 72.7% of 2,500.
[75] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[76] 91.4% of 5,900.

    31    

owners[77]; and

   c.  The State of Massachusetts's DACA recipients earn an estimated $195.4 million annually.[78]

67. Regarding education:

   a.  An estimated 2,649 DACA recipients in the State of Massachusetts are currently in school[79];

   b.  Among those currently in school, an estimated 2,480 have "pursued educational opportunities that I previously could not" because of DACA[80]; and

   c.  An estimated 1,894 DACA recipients in the State of Massachusetts are currently pursuing a bachelor's degree or higher.[81]

68. Regarding American citizen family members:

   a.  An estimated 4,289 DACA recipients in the State of Massachusetts have an American citizen sibling, spouse, or child.[82]

### DACA Recipients in the State of New Mexico

69. As of September 4, 2017, there were 6,000 active DACA recipients in the State of New Mexico.[83]

---

[77] 5.4% of 5,900.

[78] 5,393 multiplied by $36,231.91. This translates into $12.1 million annually in Social Security contributions (6.2% per FICA) and $2.8 million annually in Medicare contributions (1.45% per FICA).

[79] 44.9% of 5,900.

[80] 93.6 % of 2,649.

[81] 71.5% of 2,649.

[82] 72.7% of 5,900.

[83]

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

70. Regarding employment and earnings:

    a. An estimated 5,484 DACA recipients in the State of New Mexico are currently employed[84];

    b. An estimated 324 DACA recipients in the State of New Mexico are business owners[85]; and

    c. The State of New Mexico's DACA recipients earn an estimated $198.7 million annually.[86]

71. Regarding education:

    a. An estimated 2,694 DACA recipients in the State of New Mexico are currently in school[87];

    b. Among those currently in school, an estimated 2,522 have "pursued educational opportunities that I previously could not" because of DACA[88]; and

    c. An estimated 1,926 DACA recipients in the State of New Mexico are currently pursuing a bachelor's degree or higher.[89]

72. Regarding American citizen family members:

    a. An estimated 4,362 DACA recipients in the State of New Mexico have an American citizen sibling, spouse, or child.[90]

---

[84] 91.4% of 6,000.
[85] 5.4% of 6,000.
[86] 5,484 multiplied by $36,231.91. This translates into $12.3 million annually in Social Security contributions (6.2% per FICA) and $2.9 million annually in Medicare contributions (1.45% per FICA).
[87] 44.9% of 6,000.
[88] 93.6 % of 2,694.
[89] 71.5% of 2,694.
[90] 72.7% of 6,000.

### DACA Recipients in the State of New York

73. As of September 4, 2017, there were 32,900 active DACA recipients in the State of New York.[91]

74. Regarding employment and earnings:

    a. An estimated 30,071 DACA recipients in the State of New York are currently employed[92];

    b. An estimated 1,777 DACA recipients in the State of New York are business owners[93]; and

    c. The State of New York's DACA recipients earn an estimated $1.1 billion annually.[94]

75. Regarding education:

    a. An estimated 14,772 DACA recipients in the State of New York are currently in school[95];

    b. Among those currently in school, an estimated 13,827 have "pursued educational opportunities that I previously could not" because of DACA[96]; and

    c. An estimated 10,562 are currently pursuing a bachelor's degree or higher.[97]

76. Regarding American citizen family members:

---

[91] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[92] 91.4% of 32,900.
[93] 5.4% of 32,900.
[94] 30,071 multiplied by $36,231.91. This translates into $67.5 million annually in Social Security contributions (6.2% per FICA) and $15.8 million annually in Medicare contributions (1.45% per FICA).
[95] 44.9% of 32,900.
[96] 93.6 % of 14,772.
[97] 71.5% of 14,772.

a.   An estimated 23,918 DACA recipients in the State of New York have an American citizen sibling, spouse, or child.[98]

**DACA Recipients in the State of North Carolina**

77. As of September 4, 2017, there were 25,100 active DACA recipients in the State of North Carolina.[99]

78. Regarding employment and earnings:

a.   An estimated 22,941 DACA recipients in the State of North Carolina are currently employed[100];

b.   An estimated 1,355 DACA recipients in the State of North Carolina are business owners[101]; and

c.   The State of North Carolina's DACA recipients earn an estimated $831.2 million annually.[102]

79. Regarding education:

a.   An estimated 11,270 DACA recipients in the State of North Carolina are currently in school[103];

b.   Among those currently in school, an estimated 10,549 have "pursued

---

[98] 72.7% of 32,900.

[99] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[100] 91.4% of 25,100.

[101] 5.4% of 25,100.

[102] 22,941 multiplied by $36,231.91. This translates into $51.5 million annually in Social Security contributions (6.2% per FICA) and $12.1 million annually in Medicare contributions (1.45% per FICA).

[103] 44.9% of 25,100.

educational opportunities that I previously could not" because of DACA[104]; and

   c. An estimated 8,058 DACA recipients in the State of North Carolina are currently pursuing a bachelor's degree or higher.[105]

80. Regarding American citizen family members:

   a. An estimated 18,248 DACA recipients in the State of North Carolina have an American citizen sibling, spouse, or child.[106]

### DACA Recipients in the State of Oregon

81. As of September 4, 2017, there were 10,200 active DACA recipients in the State of Oregon.[107]

82. Regarding employment and earnings:

   a. An estimated 9,323 DACA recipients in the State of Oregon are currently employed[108];

   b. An estimated 551 DACA recipients in the State of Oregon are business owners[109]; and

   c. The State of Oregon's DACA recipients earn an estimated $337.8 million annually.[110]

---

[104] 93.6 % of 11,270.
[105] 71.5% of 11,270.
[106] 72.7% of 25,100.
[107] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[108] 91.4% of 10,200.
[109] 5.4% of 10,200.
[110] 9,323 multiplied by $36,231.91. This translates into $20.9 million annually in Social Security contributions (6.2% per FICA) and $4.9 million annually in Medicare contributions (1.45% per FICA).

DECLARATION OF TOM K. WONG 36

83. Regarding education:

    a.   An estimated 4,580 DACA recipients in the State of Oregon are currently in school[111];

    b.   Among those currently in school, an estimated 4,287 have "pursued educational opportunities that I previously could not" because of DACA[112]; and

    c.   An estimated 3,275 DACA recipients in the State of Oregon are currently pursuing a bachelor's degree or higher.[113]

84. Regarding American citizen family members:

    a.   An estimated 7,415 DACA recipients in the State of Oregon have an American citizen sibling, spouse, or child.[114]

### DACA Recipients in the State of Pennsylvania

85. As of September 4, 2017, there were 4,900 active DACA recipients in the State of Pennsylvania.[115]

86. Regarding employment and earnings:

    a.   An estimated 4,479 DACA recipients in the State of Pennsylvania are currently employed[116];

    b.   An estimated 265 DACA recipients in the State of Pennsylvania are business

---

[111] 44.9% of 10,200.
[112] 93.6 % of 4,580.
[113] 71.5% of 4,580.
[114] 72.7% of 10,200.
[115]
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[116] 91.4% of 4,900.

owners[117]; and

    c.  The State of Pennsylvania's DACA recipients earn an estimated $162.3 million annually.[118]

87. Regarding education:

    a.  An estimated 2,200 DACA recipients in the State of Pennsylvania are currently in school[119];

    b.  Among those currently in school, an estimated 2,059 have "pursued educational opportunities that I previously could not" because of DACA[120]; and

    c.  An estimated 1,573 DACA recipients in the State of Pennsylvania are currently pursuing a bachelor's degree or higher.[121]

88. Regarding American citizen family members:

    a.  An estimated 3,562 DACA recipients in the State of Pennsylvania have an American citizen sibling, spouse, or child.[122]

### DACA Recipients in the State of Rhode Island

89. As of September 4, 2017, there were 970 active DACA recipients in the State of Rhode Island.[123]

---

[117] 5.4% of 4,900.

[118] 4,479 multiplied by $36,231.91. This translates into $10.1 million annually in Social Security contributions (6.2% per FICA) and $2.4 million annually in Medicare contributions (1.45% per FICA).

[119] 44.9% of 4,900.

[120] 93.6 % of 2,200.

[121] 71.5% of 2,200.

[122] 72.7% of 4,900.

[123] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

90. Regarding employment and earnings:

    a. An estimated 887 DACA recipients in the State of Rhode Island are currently employed[124]; and

    b. The State of Rhode Island's DACA recipients earn an estimated $32.1 million annually.[125]

91. Regarding education:

    a. An estimated 436 DACA recipients in the State of Rhode Island are currently in school[126];

    b. Among those currently in school, an estimated 408 have "pursued educational opportunities that I previously could not" because of DACA[127]; and

    c. An estimated 311 DACA recipients in the State of Rhode Island are currently pursuing a bachelor's degree or higher.[128]

92. Regarding American citizen family members:

    a. An estimated 705 DACA recipients in the State of Rhode Island have an American citizen sibling, spouse, or child.[129]

**DACA Recipients in the State of Virginia**

93. As of September 4, 2017, there were 10,100 active DACA recipients in the State of

---

[124] 91.4% of 970.
[125] 887 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).
[126] 44.9% of 970.
[127] 93.6% of 436.
[128] 71.5% of 436.
[129] 72.7% of 970.

Virginia.[130]

94. Regarding employment and earnings:

    a. An estimated 9,231 DACA recipients in the State of Virginia are currently employed[131];

    b. An estimated 545 DACA recipients in the State of Virginia are business owners[132]; and

    c. The State of Virginia's DACA recipients earn an estimated $334.5 million annually.[133]

95. Regarding education:

    a. An estimated 4,535 DACA recipients in the State of Virginia are currently in school[134];

    b. Among those currently in school, an estimated 4,245 have "pursued educational opportunities that I previously could not" because of DACA[135]; and

    c. An estimated 3,242 DACA recipients in the State of Virginia are currently pursuing a bachelor's degree or higher.[136]

96. Regarding American citizen family members:

    a. An estimated 7,343 DACA recipients in the State of Virginia have an American

---

[130] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[131] 91.4% of 10,100.

[132] 5.4% of 10,100.

[133] 9,231 multiplied by $36,231.91. This translates into $20.7 million annually in Social Security contributions (6.2% per FICA) and $4.8 million annually in Medicare contributions (1.45% per FICA).

[134] 44.9% of 10,100.

[135] 93.6 % of 4,535.

[136] 71.5% of 4,535.

citizen sibling, spouse, or child.[137]

### DACA Recipients in the State of Washington

97. As of September 4, 2017, there were 16,300 active DACA recipients in the State of Washington.[138]

98. Regarding employment and earnings:

    a. An estimated 14,898 DACA recipients in the State of Washington are currently employed[139];

    b. An estimated 880 DACA recipients in the State of Washington are business owners[140]; and

    c. The State of Washington's DACA recipients earn an estimated $539.8 million annually.[141]

99. Regarding education:

    a. An estimated 7,319 DACA recipients in the State of Washington are currently in school[142];

    b. Among those currently in school, an estimated 6,850 have "pursued educational opportunities that I previously could not" because of DACA[143]; and

---

[137] 72.7% of 10,100.

[138] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[139] 91.4% of 16,300.

[140] 5.4% of 16,300.

[141] 14,898 multiplied by $36,231.91. This translates into $33.5 million annually in Social Security contributions (6.2% per FICA) and $7.8 million annually in Medicare contributions (1.45% per FICA).

[142] 44.9% of 16,300.

[143] 93.6 % of 7,319.

41                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

c.  An estimated 5,233 DACA recipients in the State of Washington are currently pursuing a bachelor's degree or higher.[144]

100.  Regarding American citizen family members:

a.  An estimated 11,850 DACA recipients in the State of Washington have an American citizen sibling, spouse, or child.[145]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____

Dr. Tom K. Wong

10/23/2017

_____

Date

---

[144] 71.5% of 7,319.
[145] 72.7% of 16,300.

# EXHIBIT LLL

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| BATALLA VIDAL et al., | ) | |
| *Plaintiffs*, | ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* | ) | |
| NIELSEN et al., | ) | |
| *Defendants.* | ) | December 13, 2017 |

### DECLARATION OF ELIANA FERNANDEZ

I, Eliana Fernandez, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.      I was born in Ecuador and came to the United States when I was fourteen years old. Coming to the United States meant that I was finally able to reunite with my parents whom I had not seen for many years.  I have lived in New York ever since, where I am now raising two U.S. citizen children of elementary-school age.

2.      I lived in New York as an undocumented immigrant until 2012, when Deferred Action for Childhood Arrivals ("DACA") was announced.  I applied as soon as I could and obtained DACA on December 11, 2012.  I have renewed my status twice.  My current grant will expire on November 20, 2018, and so I am no longer eligible to renew DACA as a result of Defendants' termination of the program.

**How DACA Changed My Life and My Family's Trajectory**

3.      Having a grant of deferred action under DACA changed my life.  After many years of living in uncertainty and fear, I finally gained temporary peace of mind.  Having DACA

1

allowed me to go back to school, earn a living wage, and purchase a home in which my children can grow up.

4.      Despite being ineligible for financial aid and other types of support because of my immigration status, I attended St. Joseph's College and earned a degree in Sociology in 2015. While attending school full-time, I also worked full-time.  My family and I made many sacrifices in order for me to be able to pursue a higher education, including hours away from my children and financial challenges due to the fact that most of my paycheck was going toward my college tuition, books, and transportation.

5.      Having a work permit allowed me to obtain a driver's license.  I remember being so excited about obtaining a driver's license because it meant that I could drive to other cities, fly, and take out-of-state vacations.  But most importantly, it meant that I could drive my children wherever they needed to go, including to medical appointments.

6.      I now work as an Immigration Case Manager at Make the Road New York's Long Island office.  Until recently, an important part of my job was helping DACA recipients like myself renew their status.  Through my job, I also help clients with other immigration matters, most frequently with their citizenship applications.

7.      I am always looking for opportunities to further my professional development. To that end, I started graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate in Immigration Law.  I also applied to become a Department of Justice accredited representative in order to be able to represent people in their immigration matters.

8.      By opening the door to increased educational and professional opportunities, having deferred action under DACA ultimately allowed me to become a homeowner.  For me,

this meant securing permanent housing for my children where they can thrive and build their childhood memories.  As a tenant, I was not able to have pets, something my children always wanted.  But as a homeowner, I was able to grant my children's wish for a pet.

**How DACA Turned Me into an Advocate**

9.      Through DACA, I gained hope that through activism, change could happen.  After receiving my first work permit, I became so empowered by witnessing the power of people to effect change, that I decided to become an advocate and join the immigrants' rights movement.  My spirit, desire for a better future, and professional ambitions grew stronger at that moment.

10.     Thanks to DACA, I have been able to develop a stronger voice and become a community leader.  I frequently reach out to and talk to youth to motivate them to consider pursuing higher education.  I also connect people to social programs and educate them about their rights.  I have volunteered in many places including schools, churches, and community organizations with the purpose of helping families improve their lives.  I have been recognized by several elected officials and schools for my work and commitment to the community.  They include: Congressman Lee Zeldin, Town Supervisor Ed Romaine, County Legislator Gregory DuWayne, and St. Joseph's College.

11.     I strive to transmit this spirit of activism and community engagement to my children.  In November of this year, I brought my daughter to a meeting with Senator Schumer in Washington, D.C., where we advocated for the passage of a clean Dream Act.  I was so proud to be able to share that moment with my daughter.

**Devastating Effects of the Termination of DACA**

12.     Ever since Attorney General Jeff Sessions announced the termination of DACA on September 5th, my life has been a rollercoaster of emotions.  I constantly worry about my children, their future, and my future.  The thought of being separated from my children gives me a lot of anxiety and stress.

13.     When I think about my life without DACA, I think about not being able to afford my mortgage, not being able earn a decent living and provide for my children, losing my family's health insurance, and losing my driver's license.

14.     I live in the New York suburbs, where you need a car to get around.  Without a driver's license, I will not be able to drive my children to school or to their medical appointments.  My youngest child suffers from asthma, while my oldest suffers from severe allergies.  During the winter, my youngest child's asthma tends to worsen, while my oldest child's allergies worsen during the spring.  In case of an emergency, or if they need to see their specialist, I would not be able to drive them to the necessary medical appointments.

15.     The anxiety and stress of losing DACA, with all its implications, has had a physical impact on my body.  For example, I recently went to an urgent care clinic to get treated for severe headaches, and I was diagnosed with migraines for the first time.  I have also been experiencing extreme neck pain, for which I recently started physical therapy.

16.     I have lived most of my life here in United States, and the thought of having to return to Ecuador terrifies me.  Most of my immediate family members and friends currently reside in the United States.  Both of my children are currently attending school here, they barely speak Spanish, and all their family and friends live here.  I would not want my children to experience any type of trauma by being separated from me, their family, or their friends.

**Hope for the Future**

17.     I sincerely hope that I, and Dreamers like me, can gain a pathway to citizenship—

it would be life changing for us, our families, and our communities.

I declare under penalty of perjury under the laws of the United States and the State of New York

that the foregoing is true and correct.


     EXECUTED December 13, 2017 in Suffolk County, NY


                    ELIANA FERNANDEZ

5

# EXHIBIT MMM

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BATALLA VIDAL et al., | ) |
| *Plaintiffs*, | ) |
| | ) Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* | ) |
| | ) |
| NIELSEN et al., | ) |
| *Defendants.* | ) December 14, 2017 |
| | ) |

## DECLARATION OF JAVIER VALDES

I, Javier Valdes, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

### Introduction

1.    I have been Co-Executive Director at Make the Road New York ("MRNY"), a plaintiff in this case, since 2012. Before that time, I held the position of Deputy Director at MRNY for over three years.

2.    MRNY is a nonprofit membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income immigrant New Yorkers improve their lives and neighborhoods. MRNY currently has 203 employees and a total operating budget of $17.5 million dollars.

3.    MRNY currently has four office locations: Port Richmond, Staten Island; Bushwick, Brooklyn; Jackson Heights, Queens; and Brentwood, Long Island. In January, we are opening a fifth site in Westchester.

1

4. MRNY has more than 21,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Each member pays an initial membership fee of $120 over two years, and then $20 in dues on an annual basis.

5. MRNY members have the right to participate in membership and leadership committees, access leadership development opportunities, and seek a position on the board of directors.

6. MRNY currently has, according to our best estimate, approximately twelve staff members who are Deferred Action for Childhood Arrivals ("DACA") recipients. These staff members work on our organizing team, in our legal department, in our adult literacy department, on our health team, and on our administrative team. These individuals have job titles including Attorney, Paralegal (including DOJ accredited representatives), Office Manager, Immigrant Youth Organizer, and Adult Literacy Program Administration Coordinator, among others. All of these staff members perform core functions that serve our mission to build the power of Latino and working class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services.

7. Some of these individuals have worked at MRNY for over four years. Antonio Alarcon, for example, a plaintiff in this case, has worked at MRNY since 2013. Additionally, several other current staff members used to be DACA recipients but have since qualified for and been granted other immigration relief.

8. Prior to the creation of the DACA program in 2012, MRNY and its members expended significant time and resources advocating for protection from

2

deportation for young immigrants. As an institution we have been fighting for legislative reform for undocumented immigrants since 2002. MRNY is one of the founding organizations of Fair Immigration Reform Movement ("FIRM") and United We Dream ("UWD"), lead national advocacy entities fighting for immigration reform. Since its creation, preserving DACA and its benefits to our community have been a core priority for MRNY. DACA is also central to our organization's staff structure. Our Youth Power Project, for example, is made up of thousands of members, many of whom are DACA recipients, fought for DACA, or have family members with DACA.

9.     Since DACA was established by executive order in June of 2012, MRNY has provided legal assistance to thousands of DACA-eligible individuals. DACA legal screenings, representation, and advocacy have been a significant part of our Legal Services Department's work at MRNY since that time. MRNY's DACA-related services have taken place at our Staten Island, Brooklyn, Queens, and Long Island offices. As of September 2013, we had two full-time attorneys focusing almost exclusively on DACA-related services, a full-time advocate in Queens and Brooklyn holding workshops, completing screenings, and assisting in document collection, and an advocate spending half her time doing the same in Staten Island. During the first two years of DACA, we routinely held weekly screening workshops and weekend clinics, which were staffed by our attorneys, advocates, administrative staff, and volunteers.

10.     MRNY's organizing team held consistent Know Your Rights trainings during this period as well. These KYR sessions covered information and eligibility for the DACA program and information on how to apply. These sessions were held weekly, daily

3

and sometimes up to three times a day to respond to the demand for information in our communities.

11. In the summer of 2014, when initial DACA applicants first became eligible for renewal, MRNY again created a model for services to ensure that those eligible to renew did so timely and correctly. Once again, we offered weekly screening workshops and clinics as well as weekend clinics. MRNY also offered regular KYR sessions for community members.

12. Consistently from June of 2012 until the last day that DACA renewal applications were accepted, we held weekly DACA screening workshops at our Queens office and similar services at our other sites on an as-needed basis, escalating the number of workshops, screenings, and appointments in the final month that USCIS accepted DACA renewal applications.

13. Since the creation of the DACA program, MRNY has provided legal assistance to thousands of DACA eligible individuals. Since the inception of DACA, we have opened 4,560 DACA or DACA Renewal cases, assisting a total of 3,323 individuals. Since there are approximately 42,000 DACA recipients in New York State, MRNY has served nearly 8% of DACA recipients in New York.

14. Due to our deep expertise on DACA-related issues, our staff members have advised countless other advocates and attorneys in New York and across the country. MRNY has become known locally as an organization with expertise in this area.

15. Our DACA legal services have become a large part of our budget planning since MRNY has received significant government-funded resources to provide services to DACA-eligible individuals. Since USCIS is no longer accepting DACA applications, we

4

have had to work internally to shift resources to other types of legal work in order to ensure grant compliance.

**Defendants' Termination of the DACA Program**

16. Since Attorney General Jeff Sessions announced the DACA Termination on September 5, 2017, MRNY has expended significant resources responding to community needs in the wake of the decision to end the DACA program. Our response has included activities such as: massive outreach efforts to DACA recipients to inform them of the policy change (including robo calls to our members, conference calls with our staff and members in both English and Spanish, and mass emails), educational workshops, individual outreach to DACA recipients eligible to renew prior to October 5, 2017 sometimes including multiple calls to individuals hard to reach, emergency legal services provided to 175 individuals eligible to renew their DACA, and community support. MRNY also conducted street outreach at all four of our sites handing out informational flyers and inviting people to attend KYR sessions.

17. Our response to the September 5th announcement has also included advocacy and mobilization in support of a congressional response focused on the passage of a "clean DREAM act." We have mobilized thousands of New Yorkers either in NYC, Long Island, or in Washington D.C. in support of a clean DREAM act over the past few months. This work has intensified as the March 5 deadline draws near and no legislative solution has come. We have organized and mobilized hundreds of members to multiple events since September of 2017. MRNY also brought over 300 of our staff and members to Washington D.C. on December 6th, 2017 for a national rally to protect "Dreamers."

5

18. MRNY's legal response to the September 5th announcement has been extensive. Our work on this litigation has included the active involvement of four members of our legal department, as well as five of our staff members who participate as individual plaintiffs in the case. Four attorneys, including one of our Co-Directors of the Legal Department, have spent many hours working on this litigation and thus deprioritizing other legal work. In addition, as a result of Defendants' challenged conduct, MRNY has expended resources in this litigation in the form of communications, organizing, and administrative staff time, as well as court fees and administrative fees related to federal court litigation.

19. Shortly after September 5, 2017, MRNY staff drafted an advisory about the DACA announcement in English and Spanish, which was posted in all MRNY offices, and made copies available for distribution at the reception areas.

20. The September 5th DACA announcement has also required MRNY to expend staff resources to respond to media inquiries, educating members of the public, and communicating around public events and the *Batalla Vidal* lawsuit. We have drafted and issued several advisories and press statements or releases each week related to the DACA announcement, worked to prepare several members each week for media interviews, and supported our members to tell their stories through opinion articles.

21. MRNY staff also individually called every client eligible to renew their DACA in order to schedule them for an appointment with enough time to complete their application under the short deadline.

22. Additionally, since many of our clients would have been unable to pay the $495 renewal application fee with such short notice, MRNY coordinated with

6

organizations such as UWD and the Hispanic Federation who offered to provide the fee for DACA recipients who were unable to pay. The coordination of this effort required significant resources from MRNY, including significant staff time, since there is paperwork involved with each application for scholarships. Since the Hispanic Federation funds were not immediately available to applicants in need, which jeopardized the applicants' ability to file a timely renewal, MRNY paid the fee upfront for some applicants and was then reimbursed by the Hispanic Federation, placing a temporary strain on MRNY's finances.

23. Since October 5, 2017, our staff have been monitoring issues related to the October 5 deadline including applications that were rejected due to postal service delays and clerical errors, as well as applications that were timestamped as arriving in the USCIS lockbox on October 5th itself. Our staff has been in touch with other legal service providers to monitor these issues, and has consistently been in touch with our opposing counsel to seek remedies for the cases we have identified as having been wrongfully rejected by USCIS. Our staff has worked with individuals whose applications were rejected to help them seek a legal remedy, and has prepped many individuals to speak with press about their stories.

24. As a result of our increased staff resources spent challenging the DACA decision, through litigation, advocacy, and otherwise, we have had to shift work away from other priorities. For example, in the month between September 5 and October 5, 2017, many of our immigration legal team members rescheduled non-DACA renewal appointments for after October 5 in order to prioritize DACA renewal appointments.

**DACA-eligible individuals who were unable to meet the September 5th deadline**

25.     Some MRNY members and clients, as well as individuals who have consulted with our immigration attorneys, missed the September 5th deadline to submit an initial DACA application.

26.     Since one of the DACA requirements was to be fifteen years old at the time of application, every year, there was a group of youth newly eligible for DACA. Our Youth Power Project ("YPP") is a very active part of our membership base, and every year, some members aged into the program.

27.     YPP reaches low-income youth and supports them in becoming effective thinkers, leaders, and decision-makers. YPP supports youth in leading campaigns to educate and mobilize community members.

28.     YPP members are generally between the ages of 14-21.

29.     YPP is a central part of MRNY's membership. YPP members hold two seats at the board of directors and several key staff members are former YPP members.

30.     MRNY youth members are exempt from paying membership dues until they turn twenty-one years old.

31.     MRNY does not maintain a list of its youth members, and as noted, youth members are exempt from dues. As a result, I am unable to give an exact count of current youth members. Nevertheless, I have deep familiarity with the Youth Power Project, and have attended YPP meetings and events over the years, and spoken on many occasions with YPP members and leaders. Upon information and belief, I estimate that we have approximately 3500 youth members.

8

32.     Some MRNY youth members meet DACA eligibility requirements except for the requirement than an applicant be fifteen years old. Had DACA not been rescinded, these MRNY youth members would have continued to become eligible for the program upon their fifteenth birthday.

33.     Youth members expected to be able to have the opportunity to apply and obtain DACA and the accompanying work permit upon their fifteenth birthday. Obtaining DACA would have enabled them to have more opportunities to pursue higher education, more professional opportunities to obtain employment that pays a living wage and is less susceptible to exploitation, and the opportunity to obtain a driver's license. Youth members' parents had the hope that their children would be able to have these opportunities facilitated by DACA.

34.     At the time of the DACA rescission announcement on September 5th, MRNY had several clients with open cases for initial DACA applications. These clients were still gathering the proofs necessary to apply for DACA.

35.     The mother of one of these clients obtained a letter from his school, evidencing his current enrollment, two days after the announcement. She was waiting on her son's school to produce that letter in order for him to apply, as they had already gathered all the other necessary documentation. There was a delay because the school was closed at the time his mother was attempting to obtain the letter. The rest of the application packet had already been prepared by MRNY legal staff and was otherwise ready to be mailed to USCIS.

36.     This client is sixteen years old and has been in the United States since he was two years old. He has lost the opportunity to be protected from deportation from the

9

only country he knows, the ability to apply for many scholarships to pursue higher education, and the ability to work lawfully through DACA. He is not currently eligible for any other immigration relief and therefore does not have another avenue to get protection from deportation and employment authorization.

37. As recently as December 1, 2017, a DACA eligible individual came to our Queens office for an immigration legal consult. She came to the consult believing she could still apply for DACA. She was surprised and disheartened that this was no longer an option. She had recently met the DACA educational requirement and was looking forward to applying. The United States has been her home since she was seven years old. She is now twenty-six years old. Because she was only able to obtain an immigration legal consult once she has met the educational requirement, and it was after the it September 5th deadline, she lost the chance to pursue better employment opportunities and to obtain a driver's license. She is not currently eligible for any other immigration relief and therefore does not have another avenue to get protection from deportation and employment authorization.

**The DACA Termination's impact on the mental health of MRNY's clients and staff**

38. The need to provide assistance to such a large number of clients and community members in the short one-month period between September 5 and October 5 put significant stress on our immigration legal team. The immigration legal team had to put other casework aside in order to prioritize assistance for DACA recipients eligible to renew. Many of our staff members worked extra hours, including evenings and weekends, in order to provide this assistance. Many of our staff members continue working longer hours to catch up on work that had to be deprioritized.

10

39. Since September 5, MRNY staff has been providing support to our members, clients, and staff who are DACA recipients and who are in need of mental health services relating to the termination of DACA and the consequences this termination is already having on their lives. MRNY has invited mental health professionals into our offices to meet with our staff and has begun compiling resources for outside services as requested.

40. Shortly after the October 5, 2017 deadline, MRNY began to hear from clients whose DACA applications were rejected by USCIS either because they allegedly arrived after the deadline or because of "clerical errors" such as allegedly misdated checks or missing pages of their applications. MRNY compiled these cases and brought them to the attention of the Department of Justice who informed us that DHS was considering a response. When DHS refused to respond within a reasonable time, MRNY, as part of the *Batalla Vidal* litigation team, brought these issues to the court's attention. To date, MRNY has identified and counseled 15 individuals in this situation.

41. As a result, MRNY's health team has been prioritizing work to prevent current DACA recipients in New York State from losing access to healthcare if the DACA program is not restored. MRNY, along with the Coverage 4 All Coalition and partner organizations including the New York Immigration Coalition, the Community Service Society, and New York Lawyers for the Public Interest, have been working to ensure that DACA recipients continue to remain eligible for Medicaid assuming they meet the income requirements of the program. MRNY Health Team staff members have been working to educate and inform DACA recipients of their rights related to Medicaid coverage. MRNY is also closely monitoring access to Medicaid following the termination of DACA. All of

11

this work has required MRNY's Health Department to divert resources from other priorities.

**Defendants' Revocation of DACA will cause irreparable harm to Make the Road New York**

42.     As our individual staff, members, and clients begin to lose their protection from deportation under DACA, we will need to provide additional screening and counseling to these individuals to assess whether they have become eligible for any other forms of immigration relief. As these individuals begin to approach the expiration dates on their work authorizations, many will be in need of supportive services and mental health counseling.

43.     Additionally, since the creation of the DACA program in 2012, MRNY has hired a significant number of valuable staff members with DACA status from our membership and from the communities we serve. The ability to hire DACA recipients has increased the diversity of our staff and has helped MRNY work toward its goal of hiring staff members from the communities we serve. The termination of the DACA program would harm our ability to make such future hires and to further our commitment toward diversity and inclusivity.

44.     If our staff members with DACA were unable to continue to work at MRNY, our organization would suffer extreme harm. Each one these staff members performs a job for which they have been trained and have developed expertise. MRNY would need to expend significant staff resources on recruitment and training of new staff to fill these positions. MRNY would also lose valuable cultural competency and awareness without these employees on staff.

12

45. Furthermore, MRNY's productivity would suffer if we were forced to replace all of our staff members with DACA. All of our 203 employees would suffer as a result of this change since our staff with DACA are fully integrated into our staff community.

46. The DACA termination announcement has impacted practically every person on our staff. Many of our staff members have family members or friends with DACA, and all of them have colleagues with DACA.

## Defendant's revocation of DACA will impact MRNY through the loss of valuable staff members who are DACA recipients

47. Eliana Fernandez is a paralegal with pending DOJ accreditation status on the immigration legal team at our Brentwood office in Suffolk County. Over the two and a half years Ms. Fernandez has worked at MRNY, she has developed an expertise in naturalization services and has worked on approximately 282 legal cases during her time at MRNY. Ms. Fernandez is supervised by our only immigration attorney at our Brentwood office, Jacqueline Saavedra, who is also a DACA recipient.

48. Ms. Saavedra handles a large caseload, including complex removal defense cases, U non-immigrant status cases, and asylum cases. Ms. Saavedra handles a monthly clinic at our Brentwood office to screen people for immigration relief and provides advice and counsel to hundreds of immigrants at our Brentwood office every year. Since her arrival at MRNY, Ms. Saavedra has handled 231 legal cases at MRNY.

49. Both Ms. Saavedra and Ms. Fernandez are highly qualified for their jobs with extensive expertise in immigration law and work in a community where job applicants with their level of expertise are scarce. If they were to lose their work authorization, MRNY would face difficulty in rehiring for their positions. Additionally, Ms. Fernandez and Ms.

13

Saavedra are responsible for all of the legal work on a government grant from New York State. If they were to leave MRNY, the organization would likely fail to complete its obligations under this grant.

50. Gustavo Madrigal is a paralegal on our immigration legal team working out of our Staten Island and Brooklyn offices to support immigration attorneys in their casework. Mr. Madrigal has developed substantial expertise in immigration law during the time he has worked for MRNY. Mr. Madrigal is also in the process of becoming a DOJ accredited representative, which will allow him to handle many more cases on his own with the supervision of an attorney, greatly increasing our capacity to help individuals in need. Because Mr. Madrigal has experienced life as an undocumented person and as someone with DACA, he has been able to build strong connections and develop trust with his clients.

51. Mr. Madrigal has also spent time making presentations to our members to discuss the DACA decision, and his personal experience and perspective has been invaluable. If he were to lose his work authorization, it would be an incredible loss to our members and our organization as a whole. It would be very difficult to hire someone for his position who could do the job as well and bring the perspective and passion that he does to the job.

52. Rocio Salazar is a DOJ partially-accredited representative working as a paralegal on our immigration legal team. Specifically, she works screening immigrant clients for immigration relief as part of the Action NYC program funded by the City of New York. Ms. Salazar assists hundreds of clients a month and has handled 473 cases since she began working at MRNY. Her ability to connect with her clients and build trust with

14

them is deepened by her experience living as an undocumented person and as someone with DACA. Furthermore, MRNY would face obstacles in meeting our grant requirements under Action NYC if Ms. Salazar were to lose her work authorization.

53.     Carolina Fung Feng is an Adult Literacy Program Administration Coordinator who manages all adult literacy program outreach, intake, student assessment, and grant compliance at MRNY's Brooklyn and Staten Island offices. In her role, Ms. Fung Feng also collaborates closely with MRNY's administrative and operations teams and supervises part time administrative assistants who help with MRNY's outreach, intake, and testing efforts. In the two years that Ms. Fung Feng has worked at MRNY, she has developed excellent skills as a program manager and has enrolled and kept approximately 600 students a year engaged in English and Citizenship classes.

54.     Ms. Fung Feng is very qualified for her job and has developed deep expertise in the areas of adult education program management and grant compliance and reporting. If her work authorization was lost, MRNY would find it difficult to hire a replacement candidate with the personal experience and level of skill that Ms. Fung Feng has developed. Additionally, Ms. Fung Feng is responsible for a great part of the administrative responsibilities associated with at least three New York City grants, two New York State grants, and one federal grant. If she were to leave, we would struggle tremendously to complete our obligations for these grants.

55.     Nuve Puma is a Community Health Worker ("CHW") at MRNY in our Bushwick office. She participated in our CHW training in 2014, and started working as a CHW at MRNY several months later. As the first CHW hired on staff at MRNY, Nuve helped us launch our CHW asthma program in partnership with Wyckoff Heights Medical

15

Center. She has developed expertise in asthma, and conducts home visits to over 275 families a year, helping them manage their asthma, and also identifying triggers in the home and working intensively with the family to mitigate those triggers.

56.     In addition, Nuve does outreach and presentations about asthma to hundreds of individuals a year. Nuve also worked on a pilot project where we did home visits for patients who were at risk of having or already had dental disease, helping the families improve their oral health. Our funding for the asthma project is based on the number of home visits we conduct. Without Nuve's leadership and ability to connect with and relate to families, which enable her to conduct a high volume of home visits, MRNY would receive less funding for the work. Decreased funding for this work will have a negative impact on the communities we work with who need and depend on these services.

57.     Sonia Molina is an Office Manager for the busiest MRNY site in Jackson Heights, Queens. She started with us as a receptionist four years ago and has shown tremendous leadership and skills in her area of work. As a result, we promoted her once she graduated with her Bachelor's in Hospitality in 2016. The office Ms. Molina manages has fourteen ESOL classes and fifteen to thirty community meetings per week, as well as a number of regularly scheduled services, all of which Ms. Molina helps coordinate. She supervises a department with eight people and helps us keep that office running smoothly. Ms. Molina is a highly-valued member of the MRNY Operations Department, as she is from our community and membership base, and is very skilled at what she does. It would be very difficult if not impossible to replace her.

58.     Antonio Alarcon is MRNY's Immigrant Youth Organizer in Queens. Mr. Alarcon has been on staff since 2013. Mr. Alarcon's job responsibilities include his work

16

with the Youth Power Project building a base of young people from our community and engaging them around issues that they care about. He helps lead our summer youth program. He leads workshops and outreach in schools.

59.     Mr. Alarcon also engages in policy work at the state and federal level that impact our community. Mr. Alarcon's experiences living as an undocumented person and as a DACA recipient have been invaluable in his work to support and train our youth members to advocate for change. Without DACA, it would be extremely difficult for MRNY to recruit, hire and train someone with the same combination of extensive knowledge, experience, and ability to connect with undocumented youth.

60.     Carlos Vargas is a DOJ accredited representative working as a paralegal with the immigration legal team at MRNY's office in Port Richmond, Staten Island. Mr. Vargas currently conducts all of the intakes and screenings for immigration relief at that office. Mr. Vargas has handled 585 legal cases since he began working at MRNY. The services Mr. Vargas offers are some of the only free immigration legal services available in Port Richmond, a community with a large Mexican population, and on Staten Island as a whole. Mr. Vargas is also MRNY's sole staff member working under a City-funded contract at that office.

61.     Mr. Vargas has gained significant expertise in immigration law in the two years he has worked at MRNY. Mr. Vargas routinely works with immigrant community members who have been affected by the brutal enforcement tactics of the current administration to support them in speaking publically, including at city council hearings and press conferences. Mr. Vargas has spoken on behalf of MRNY as a DACA recipient himself at numerous press conferences. If Mr. Vargas were to lose his work authorization,

17

MRNY's ability to further its mission and continue our services in an underserved Staten Island community would be substantially altered. MRNY's ability to sufficiently perform under a government grant would be in jeopardy. Without DACA, it would be extremely difficult for MRNY to recruit, hire, and train someone with the same experience and ability to connect with undocumented clients.

62.     If the DACA Termination is permitted to move forward, we anticipate a continued increase in requests for mental health support from our staff, members, and clients. Currently, MRNY receives routine requests for mental health support from our staff members, a marked increase since the September 5th announcement. MRNY will expend resources to ensure that our staff, members, and clients who are affected by the decision have the support they need through counseling and support services.

63.     MRNY has prioritized and will continue to prioritize advocacy for legislative changes in Congress to protect DACA eligible individuals. Our advocacy has included a shift away from other activities in order to prioritize fighting for protections for this newly vulnerable population. MRNY has already had to deprioritize other work in order to make room for the new work necessary to respond to the DACA announcement.

///

///

///

///

///

///

///

18

64. A favorable decision in this case would allow MRNY to use critical resources to further our mission and serve communities in need. Furthermore, the end of the DACA program would cause irreparable harm to our organization through the loss of valuable staff and the deep emotional toll on our current staff and membership.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED December 14, 2017 in Queens, NY

JAVIER VALDES

19

# EXHIBIT NNN

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

        Plaintiffs,

   v.

DONALD TRUMP, *et. al.*,

        Defendants,

No. 1:17-CV-5228

## **Declaration of Ike Brannon**

I, Ike Brannon, declare as follows:

1. I am currently an economist who is president of the consulting firm Capital Policy Analytics. I also have an affiliation with the Cato Institute.

2. I received my MA and Ph.D. in Economics from Indiana University.

3. I was an economics professor in the University of Wisconsin System from 1994-2002. In 2001 I was given tenure and promoted to associate professor.

4. Since then I have worked in Washington DC, for (in order) the Office of Management and Budget, the Congressional Joint Economic Committee, THe Senate Finance Committee, The U.S. Treasury, and the House Energy and Commerce Committee.

5. In 2008 I was chief economist for the John McCain for president campaign.

6. My coauthor, Logan Albright, received his Master's Degree in economics in 2011 from Georgia State University, and has worked as a policy analyst in Washington, DC for the last five years, including positions at think tanks and policy organizations such as the American Action Forum, FreedomWorks, Free the People, and Capital Policy Analytics.

7. Whereas the President has expressed a desire to end Deferred Action for Childhood Arrivals (DACA) program, we conducted a thorough investigation of the economic and fiscal costs that such action would impose on the federal government, and to the economy as a whole and published that research in January 2017.

8. We recently updated this analysis to break down these costs by state, using survey data from DACA recipients.

9. My co-author Logan Albright and I began our analysis by comparing DACA recipients to those immigrants who hold H-1B visas. These are high-skilled, well-educated immigrants who are demographically analogous to DACA students, all of whom must necessarily enroll in higher education programs in order to be eligible.

Declaration of Ike Brannon                    1                ATTORNEY GENERAL OF WASHINGTON
                                                                        Civil Rights Unit
                                                                    800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA 98104
                                                                        (206) 442-4492

10. The average DACA recipient is 22 years old, employed, and a student. 17 percent of them are  on track to complete an advanced degree. The college attrition rate of DACA recipients is miniscule compared to domestic students, an indication of the exceptional caliber of the DACA students. H-1B holders are generally between 25 and 34, employed, and most have completed degrees. In short, we posit that they look like what DACA recipients will look like in a few years' time.

11. We begin our analysis by using a study from the Hoover Institute[1] on the economic impact of expanding the H-1B visa program as our baseline. We adjusted that estimate by the difference in the number of recipients and the difference in income. To conform to Congressional budget procedures we compiled a ten year aggregate cost.

12. We determined that, if DACA recipients were completely analogous to H-1B holders, their removal would constitute a budgetary loss of $127 billion and a GDP loss of $512 billion.

13. We adjusted for the fact that DACA recipients, being younger and not completely done with their education, earn on average roughly 43 percent of what H-1B holders earn. What's more, the population of DACA recipients is about 750,000, compared to the 660,000 H-1B holders the Hoover study examined, so we adjusted for these differences.

14. From this, we determined that, over a ten-year window, a repeal of DACA would cost the federal government $60 billion in lost revenue, and the economy as a whole $215 billion in lost GDP.

15. As a way of confirming our result, we consulted a study from the National Research Council that estimated the average long-term fiscal impact for immigrants who remain in the country for an extended period of time. This result coincided with our own nearly perfectly ($59.3 billion versus our $60 billion).

---

[1]http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

16. There are DACA recipients in 35 states and the District of Columbia. Using survey data from the Center for American Progress,[2] we estimated the total cost of repealing DACA for each of the relevant states, based on the proportion of DACA recipients who live locally.

17. Of the 50 states, California will bear the highest cost, with over 30 percent of DACA recipients. Factoring in budgetary and economic effects, California's total cost over a ten year window would be $84.2 billion (See Table 1).

18.  It is important to note that these estimates are conservative, as DACA recipients will likely end up being more productive than their current salaries indicate, as they age and complete their degrees. Nor does this analysis factor in the enforcement cost of physically deporting recipients, should the program be eliminated.

19. In summary, the repeal or rollback of the DACA program would have a significant and negative fiscal and economic impact on the country, and would disproportionately affect the various states in which DACA recipients are most prevalent.

20. Accompanying this statement is a list of my publications over the past decade.

21. The state of Washington paid us $3,000 for completing this statement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and complete to the best of my knowledge.

Executed on the 6th of December, 2017.


_____
Ike Brannon, Ph.D.


_____
Logan Albright, M.A.


---

[2]https://cdn.americanprogress.org/wp-content/uploads/2015/07/DACA-Wong_NILC_CAP-Codebook-PDF.pdf

**Table 1: Cost of DACA Repeal By State 2018-2028**

| State | Budget Cost (Millions $) | Economic Cost (Millions $) | Total Cost (Millions $) |
|-------|--------------------------|----------------------------|-------------------------|
| AL | 258 | 924.5 | 1,182.5 |
| AZ | 2,826 | 10,126.5 | 12,952.5 |
| CA | 18,372 | 65,833 | 84,205 |
| CO | 768 | 2,752 | 3,520 |
| CT | 642 | 2,300.5 | 2,942.5 |
| DC | 900 | 3,225 | 4,125 |
| DE | 258 | 924.5 | 1,182.5 |
| FL | 5,910 | 21,177.5 | 27,087.5 |
| GA | 1,158 | 4,149.5 | 5,307.5 |
| HI | 126 | 451.5 | 577.5 |
| IA | 258 | 924.5 | 1,182.5 |
| IL | 1,926 | 6,901.5 | 8,827.5 |
| IN | 642 | 2,300.5 | 2,942.5 |
| KS | 384 | 1,376 | 1,760 |
| MA | 258 | 924.5 | 1,182.5 |
| MD | 642 | 2,300.5 | 2,942.5 |
| MI | 768 | 2,752 | 3,520 |
| MN | 126 | 451.5 | 577.5 |
| MO | 126 | 451.5 | 577.5 |
| NE | 126 | 451.5 | 577.5 |
| NJ | 384 | 1376 | 1760 |

| | | | |
|---|---|---|---|
| NM | 258 | 924.5 | 1,182.5 |
| NV | 126 | 451.5 | 577.5 |
| NY | 10,794 | 38,678.5 | 49,472.5 |
| NC | 2,184 | 7,826 | 10,010 |
| OH | 126 | 451.5 | 577.5 |
| OK | 126 | 451.5 | 577.5 |
| OR | 384 | 1,376 | 1,760 |
| PA | 258 | 924.5 | 1,182.5 |
| SC | 258 | 924.5 | 1,182.5 |
| TN | 258 | 924.5 | 1,182.5 |
| TX | 5,142 | 18,425.5 | 23,567.5 |
| UT | 384 | 1,376 | 1,760 |
| VA | 1,026 | 3,676.5 | 4,702.5 |
| WA | 1,800 | 6,450 | 8,250 |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Cato Institute | "When Does Antitrust Activity Stifle Innovation?" | Winter 2017-2017 | Article | | Antitrust |
| Regulation | "What Is a Life Worth?" | Winter 2004 | Journal Article | | Life's Worth |
| Regulation | "How the Packers Lost Out" | Winter 2002 | Journal Article | Michael F. Gorman | Economy |
| Regulation | "Obfuscation at the EPA" | Summer 2011 | Journal Article | | EPA |
| Regulation | "Lure of the Big City" | Summer 2011 | Book Review | Edward Glaeser | The allure of big cities |
| Regulation | "When DC Freezes Over" | Summer 2010 | Journal Article | | Snow Clearance |
| Regulation | "Yet Another Pop Econ Book" | Summer 2008 | Book Review | Tim Harford | Economics |
| Cato Institute | "A Liberal Heretic Contradicts Piketty" | Spring 2015 | Article | | Smalltown USA |
| Cato Institute | "Income Inequality and the NBA" | Spring 2014 | Article | | Income |
| National Affairs | "Rethinking Tax Benefits for Home Owners" | Spring 2014 | Journal Article | | Tax Reform |
| Regulation | "Remembering the Man Behind Rational Expectations" | Spring 2006 | Journal ARticle | | John Muth |
| Regulation | "A Collapsing Housing Bubble?" | Spring 2006 | Journal Article | Suzanne Stewart | Housing Bubble |
| Regulation | "Treating the Unserious Seriously" | Spring 2005 | Book Review | Robert Hahn | Economic Regulation |
| Cato Journal | "Nudge: Improving Decisions about Health, Wealth, | Fall 2008 | Book Review | Richard H. Thaler and | Improving Economic Decisions |
| Regulation | "FDR at Breakfast" | Fall 2007 | Book Review | Amity Shlaes | Great Depression |
| The Weekly Standard | "Tax Reform Must Not Keep Tax Breaks for Real Estate" | 11/8/17 | Article | | Tax Reform |
| Forbes Online | "Hugh Hewitt's Phony Budget Accounting In Defense | 11/7/17 | Op-Ed | | Mortgage Interest Deduction |
| Forbes Online | "How State Pension Funds--And 401k Managers-- | 11/2/17 | Op-Ed | | State Pension Funds and 401Ks |
| Forbes Online | "What Do Manufacturers Want from Tax Reform? | 10/24/17 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Kevin Warsh, Candidate for Federal Reserve Chair, Is | 10/6/17 | Article | | Federal Reserve |
| The Weekly Standard | "How We Tax Employee-Ownership is One Thing our | 10/4/17 | Article | | Tax Reform |
| Cato At Liberty | "The Dubious Defense of the Jones Act" | 9/28/17 | Blog Post | | Jones Act |
| Forbes Online | "A System On Trial: South Korean Political Reform | 9/28/17 | Op-ed | Jared Whitley | South Korean political reform |
| The Weekly Standard | "In Pursuit of the Second Best Policy" | 9/21/17 | Article | | Flood Insurance |
| Cato At Liberty | "The Green Investment Pension Con" | 9/19/17 | Blog Post | | Green Investment |
| Daily Record (NC) | "Employer Tax Cuts Help Employees" | 9/19/17 | Op-ed | | Employer tax cuts |
| Newsweek | "RESCINDING DACA WILL COST THE US ECONOMY | 9/17/17 | Article | | Immigration |
| The Weekly Standard | "Cutting the Corporate Tax Can Help Workers. Really." | 9/13/17 | Article | | Tax Reform |
| Weekly Standard | "Cutting the Corporate Tax Can Help Workers. Really." | 9/13/17 | Op-ed | | Corporate tax rate |
| The Weekly Standard | "Bring on the Hurricane Irma Bowl!" | 9/7/17 | Article | | NFL |
| The Weekly Standard | "How Not to Fix Fannie Mae and Freddie Mac" | 9/5/17 | Article | | Financial Crisis |
| Time Magazine | "Hurricane Harvey Proved We Need More Flood | 9/5/17 | Op-ed | Ari Blask | NFIP |
| Cato At Liberty | "The Economic and Budgetary Cost of Repealing DACA | 8/31/17 | Blog Post | | DACA |
| Cato At Liberty | "Will Harvey Reform Flood Insurance" | 8/31/17 | Blog Post | | Flood Insurance |
| SSRN | "Corporate Income Taxes and Labor: An Investigation | 8/30/17 | Policy Analysis | | Income Tax |
| The Weekly Standard | "The Sordid Prosecution of Aaron Schock" | 8/25/17 | Article | | Aaron Schock |
| The Weekly Standard | "Ode to a Couch" | 8/21/17 | Article | | Garbage |
| Forbes Online | "President Moon's Anti-Corporate Policies Jeopardize | 8/14/17 | Op-ed | | South Korea's anti-corporate |
| The Weekly Standard | "Remembering Glen Campbell" | 8/9/17 | Article | | Glenn Campbell |
| Politico | "The government's hidden housing subsidy for the | 8/8/17 | Op-ed | Ari Blask | Federal flood insurance |
| The Weekly Standard | "Rename the Rose Fitzgerald Greenway" | 8/4/17 | Article | | Rose Fitzgerald Greenway |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "The Deep State Takes on Tillerson" | 8/3/17 | Article | | Rex Tillerson |
| The Weekly Standard | "A Tough But Telling Race in Virginia" | 8/2/17 | Article | | Virginia Elections |
| Forbes Online | "Puerto Rico's Fuzzy Economics" | 7/31/17 | Op-ed | | Puerto Rico |
| The Weekly Standard | "Will Illinois Need a Federal Bailout?" | 7/27/17 | Article | | Illinois' debt crisis |
| The Weekly Standard | "Still Stupid" | 7/27/17 | Article | | Economy |
| The Hill | "The private alternative to the National Flood | 7/20/17 | Op-ed | Ari Blask | Flood Insurance |
| The Hill Online | "The private alternative to the National Flood | 7/20/17 | Op-ed | Ari Blask | Federal flood insurance |
| Cato Institute | "Reforming the National Flood Insurance Program: | 7/19/17 | Policy Analysis | Ari Black | Flood Insurance |
| Hudson Institute | "Tax Reform and the Republican Manufacturing and | 7/10/17 | Policy Analysis | Thomas J. | Tax Reform |
| Peoria Journal Star | "Brannon: Hello Uncle Sam, goodbye Illinois | 6/29/17 | Op-Ed | | Illinois |
| Peoria Journal Star (IL) | "Brannon: Hello Uncle Sam, goodbye Illinois | 6/29/17 | Op-Ed | | Illinois' debt crisis |
| Weekly Standard | "Will Illinois Need a Federal Bailout?" | 6/27/17 | Op-ed | | Whether Illinois will need a |
| Cato At Liberty | "Towards a Private Flood Insurance Market" | 6/20/17 | Blog Post | | Private Flood insurance |
| Cato At Liberty | "The Impetus for GSE Reform" | 6/15/17 | Blog Post | | GSE Reform |
| The Weekly Standard | "The Solar Power Market Is Under Threat--From One of | 6/9/17 | Article | | Solar Power |
| Weekly Standard | "The Solar Power Market Is Under Threat--From One of | 6/9/17 | Op-ed | | The solar power industry |
| The Weekly Standard | "David Malpass, Treasury's Conservative Standard | 6/6/17 | Article | | Department of Treasury |
| The Weekly Standard | "Never Eat Lunch at Your Desk" | 6/5/17 | Article | | Lunch |
| Cato At Liberty | "The Wall Street Journal Declares "Creditor Emptor"" | 5/24/17 | Blog Post | | Puerto Rico |
| The Weekly Standard | "Puerto Rico's Faux Pension Reform" | 5/24/17 | Article | | Puerto Rico |
| Weekly Standard | "Puerto Rico's Faux Pension Reform" | 5/24/17 | Article | | Puerto Rico Pension Plan |
| Forbes Online | "How Would Corporate Tax Reform Benefit Workers?" | 5/22/17 | Op-ed | | Corporate tax reform |
| Investor's Business Daily | "The High Cost Of Not Paying Your Bills: Puerto Rico's | 5/22/17 | Op-ed | | Puerto Rico |
| The Weekly Standard | "Take a Hike" | 5/22/17 | Article | | Government Subsidies |
| Milwaukee Wisconsin Journal | "Flanders, Brannon: Repeal minimum markup law" | 5/21/17 | Op-ed | | Minimum markup laws |
| The Weekly Standard | "No, Dems Haven't Cracked the Code for Winning Over | 5/15/17 | Article | | National Election |
| The Hill | "Beryllium broadside: Obama's last-minute rulemaking | 5/10/17 | Op-Ed | | Economy |
| The Hill Online | "Beryllium broadside: Obama's last-minute rulemaking | 5/10/17 | Op-ed | | Workplace regulations |
| Cato At Liberty | "A New Approach for Occupational Licensing in | 5/8/17 | Blog Post | | Occupational Licensing |
| The Weekly Standard | "The Wheels of Change Turn Slowly" | 4/27/17 | Article | | Economy |
| The Weekly Standard | "Oxfam Is Opposing Corporate Tax Reform That Would | 4/18/17 | Article | | Tax Reform |
| Weekly Standard | "Oxfam Is Opposing Corporate Tax Reform That Would | 4/18/17 | Op-ed | | Corporate tax reform |
| The Weekly Standard | "Time to Fix Fannie and Freddie" | 4/10/17 | Article | | Financial Crisis |
| The Weekly Standard | "How Tax Reform Could Hasten Housing-Finance | 4/6/17 | Article | | Tax Reform |
| Cato At Liberty | "Puerto Rico Continues to Ignore Congress" | 4/5/17 | Blog Post | | Puerto Rico |
| The Weekly Standard | "Rock and Roll Hall of Fame Hoochie Coo" | 4/5/17 | Article | | Rock and Roll Hall of Fame |
| Cato At Liberty | "Marketplace Radio Laments Uber's Victims: | 4/4/17 | Blog Post | | Investment Banks |
| Cato At Liberty | "Puerto Rico's Half-Hearted Stab at Fiscal Reform | 3/20/17 | Blog Post | | Puerto Rico |
| Forbes Online | "Rushed Beryllium Rule Deserves A Second Look" | 3/15/17 | Op-Ed | | Beryllium |
| National Review | "The Ture-Kennedy Blueprint" | 3/15/17 | Book Review | | "JFK and the Reagan Revolution: |
| Forbes Online | "Improve, Don't Destroy, The Gig Economy" | 2/27/17 | Op-Ed | | Gig Economy |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Weekly Standard | "The House Tax Reform Plan Is Not a Fundraising Ploy" | 2/24/17 | Op-ed | | Tax reform |
| Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/23/17 | Op-ed | | Perfidy in America |
| Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/23/17 | Op-ed | | Perfidy in America |
| The Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/22/17 | Article | | Corporate Finances |
| Forbes Online | "It's More Important To Get Puerto Rican Pension | 2/21/17 | Op-ed | | Puerto Rican pension reform |
| Forbes Online | "It's More Important To Get Puerto Rican Pension | 2/21/17 | Op-ed | | Puerto Rican pension reform |
| The Weekly Standard | "Bob Michel, House GOP Statesman Across Five | 2/17/17 | Article | | Bob Michael |
| The Weekly Standard | "Revenge of the Nerds" | 2/14/17 | Article | | Tax Reform |
| The Weekly Standard | "Let's Boost Building" | 2/13/17 | Article | | Infrastructure |
| The Weekly Standard | "Housing's Drag on the Economy" | 2/13/17 | Article | | Economy |
| The Weekly Standard | "How the NFL Can Make a Bigger Investment to | 2/1/17 | Article | | NFL |
| The Weekly Standard | "What Dow 20,000 Means" | 1/25/17 | Article | | Economy |
| The Weekly Standard | "The Pro Bowl Takes a Step Toward Resembling a Real | 1/24/17 | Article | | NFL |
| The Weekly Standard | "Liberal Opposition to New Housing Reaches its | 1/23/17 | Article | | Infrastrcture |
| Cato At Liberty | "The Economic and Fiscal Impact of Repealing DACA" | 1/18/17 | Blog Post | | DACA |
| Forbes Online | "The High Costs Of An Immediate Repeal Of DACA" | 1/18/17 | Op-ed | | Repealing DACA |
| The Weekly Standard | "Puerto Rico's New Governor Should be Given Time to | 1/16/17 | Article | | Puerto Rico |
| The Weekly Standard | "How Trump Can Repeal and Replace DACA" | 12/22/16 | Article | | Immigration |
| Weekly Standard | "How Trump Can Repeal and Replace DACA" | 12/22/16 | Op-ed | | Trump repealing DACA |
| The Hill | "Will Trump let the EU kill a US manufacturing deal?" | 12/20/16 | Op-Ed | | Economy |
| The Weekly Standard | "The FDA--Finally--Sees the Light on Chantix" | 12/20/16 | Article | | FDA |
| The Hill | "Puerto Rico's path forward shouldn't include old | 12/13/16 | Op-Ed | Logan Albright | Puerto Rico |
| Peoria Journal Star | "Spotlight: Cutting corporate tax rates would help | 12/9/16 | Op-Ed | | Tax Reform |
| Peoria Journal Star (IL) | "Cutting corporate tax rates would help Peoria" | 12/9/16 | Op-ed | | Cutting corporate taxes |
| The Weekly Standard | "Puerto Rico Is Using a Phony Pension Crisis to | 12/7/16 | Article | | Puerto Rico |
| Cato At Liberty | "Problems with Paid Family Leave Redux" | 12/5/16 | Blog Post | | Family Leave |
| Desert Sun | "Column: Here's how to begin fixing colleges" | 12/4/16 | Column | | Education |
| Forbes Online | "How And Why We Should Fix The Biodiesel Tax Credit" | 12/4/16 | Op-Ed | | Tax Credits |
| Cato At Liberty | "DC's Paid Family Leave Bucks the Trend--and | 11/28/16 | Blog Post | | Economy |
| The Weekly Standard | "The Dangerous Ideological Roots of Climate | 11/18/16 | Article | | Environment |
| The Weekly Standard | "Puerto Rico's Oversight Board May Be on the Verge of | 11/17/16 | Article | | Puerto Rico |
| Cato At Liberty | "Washington DC Progressives Fight to Preserve Gas | 11/4/16 | Blog Post | | Gas Stations |
| The Weekly Standard | "The 'Unofficial' Gear of Major League Baseball" | 11/1/16 | Article | | MLB |
| Foundation for Economic | "Is Parking Really "Free" If You Can't Find Any?" | 10/28/16 | Article | | Transportation |
| Cato At Liberty | "Why Don't We Allow Markets to Dictate Parking | 10/27/16 | Blog Post | | Parking Policy |
| The Weekly Standard | "Harry Caray Is My Wingman" | 10/24/16 | Article | | MLB |
| Weekly Standard | "Harry Caray Is My Wingman" | 10/24/16 | Op-ed | | Harry Caray |
| The Weekly Standard | "A Chicago Cubs Love Story" | 10/17/16 | Article | | MLB |
| The Hill | "How Puerto Rico's oversight board can follow others' | 10/13/16 | Op-Ed | | Puetro Rico |
| The Weekly Standard | "As Goes Puerto Rico So Go the States?" | 10/10/16 | Article | | MLB |
| Cato At Liberty | "Ending the Tax Breaks for Real Estate" | 10/7/16 | Blog Post | | Tax Policy |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Incompetence Is No Reason for a Government Agency | 10/7/16 | Article | | FDA |
| Cato At Liberty | "The Answer Is a New Government Program. What's | 10/4/16 | Blog Post | | Limited Government |
| The Weekly Standard | "The Complicated Dynamics of Insurance Companies | 10/3/16 | Article | | Insurance |
| Weekly Standard | "The Complicated Dynamics of Insurance Companies | 10/3/16 | Op-ed | | Obamacare |
| Lincoln Times-News (NC) | "The reason why the poverty rate fell" | 9/16/16 | Op-ed | | Poverty |
| Cato At Liberty | "The Reason Why the Poverty Rate Fell" | 9/13/16 | Blog Post | | Poverty |
| The Weekly Standard | "Up in Smoke" | 9/12/16 | Article | | FDA |
| Weekly Standard | "Up in Smoke" | 9/12/16 | Op-ed | | FDA warning labels and smoking |
| Cato At Liberty | "Tentative Steps Away from the Gas Tax and towards a | 9/6/16 | Blog Post | | Tax Policy |
| Cato At Liberty | "It's Time to End the Government's Outsized Role in | 8/4/16 | Blog Post | | Finance |
| Cato At Liberty | "How Growth Can Impact Spending and Why Spending | 8/3/16 | Blog Post | | Economy |
| Cato At Liberty | "Sales Tax Holidays Make for Terrible Tax Policy" | 7/28/16 | Blog Post | | Tax Policy |
| Cato At Liberty | "The Tyranny of Free Parking" | 7/19/16 | Blog Post | | Free Parking |
| The Hill | "Global Warming Alarmist Reveals The Anti-Science | 7/8/16 | Op-ed | | Reducing drug deaths through |
| The Hill | "Legalize marijuana and reduce deaths from drug | 7/8/16 | Op-Ed | | Marijuana |
| The Weekly Standard | "Puerto Rico's False Deadline" | 6/28/16 | Article | | Puerto Rico |
| The Weekly Standard | "For Whom the Bridge Tolls" | 6/24/16 | Article | | Infrastructure |
| The Weekly Standard | "Treasury's Tax Regulations Will Dampen Domestic | 6/21/16 | Article | | Department of Treasury |
| Weekly Standard | "Treasury's Tax Regulations Will Dampen Domestic | 6/21/16 | Op-ed | | Tax regulations |
| The Hill | "How the Puerto Rico rescue makes state pensioners | 6/13/16 | Op-Ed | | Puerto Rico |
| The Hill Online | "How the Puerto Rico rescue makes state pensioners | 6/13/16 | Op-ed | | State pensions |
| The Weekly Standard | "Fixing Regulatory Overreach" | 6/13/16 | Article | | Federal Regulation |
| Weekly Standard | "Fixing Regulatory Overreach" | 6/13/16 | Op-ed | | Financial regulatory overreach |
| The Weekly Standard | "How to Change Bankruptcy Law" | 6/6/16 | Article | | Bankruptcy |
| Weekly Standard | "How to Change Bankruptcy Law" | 6/6/16 | Op-ed | | Bankruptcy laws |
| The Weekly Standard | "The Gig Is Up" | 5/30/16 | Article | | Economy |
| Weekly Standard | "The Gig Is Up" | 5/30/16 | Op-ed | | U.S. economy |
| RealClearMarkets | "The 'Gig' Economy Is Great For the U.S. Economy" | 5/26/16 | Article | | Economy |
| The Weekly Standard | "Treasury Pretends Not to Know What a 'Bailout' Is" | 5/20/16 | Article | | Department of Treasury |
| Weekly Standard | "Treasury Pretends Not to Know What a 'Bailout' Is" | 5/20/16 | Op-ed | | Puerto Rico's debt crisis |
| The Hill | "What we do in Puerto Rico sets a precedent, like it or | 5/5/16 | Op-Ed | | Puerto Rico |
| The Hill Online | "What we do in Puerto Rico sets a precedent, like it or | 5/5/16 | Op-ed | | Puerto Rico's debt problems |
| RealClearMarkets | "Puerto Rico Contagion Will Cost Taxpayers" | 5/2/16 | Article | | Puerto Rico |
| RealClearMarkets | "Treasury and Fed Team Up to Create the Next | 4/28/16 | Article | | Department of Treasury |
| Cato At Liberty | "Who Are the Victims of the Volkswagen Scandal? Not | 4/26/16 | Blog Post | | Volkswagon Scandal |
| TribTalk | "Texas' strong economic growth is a cause — and | 4/26/16 | Article | | Immigration |
| The Weekly Standard | "We Need a Serious Approach to International Tax | 4/25/16 | Article | | Tax Reform |
| Cato At Liberty | "Food Labeling Regulations Are Bad for Your Health" | 4/22/16 | Blog Post | | Food Labels |
| Cato At Liberty | "Let's Name Something Cool after Prince. And Stop | 4/22/16 | Blog Post | | Naming Rights |
| Peoria Journal Star | "Op-Ed: Who would benefit from a per-mile fee? | 4/22/16 | Op-Ed | | Transportation |
| The Weekly Standard | "Luck o' the Turkish" | 4/20/16 | Article | | Turkey |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Andrew Ross Sorkin's Misplaced Faith in the Non- | 4/15/16 | Article | | FSOC |
| Cato At Liberty | "If the Laws are Inconvenient, Just Change Them: The | 4/14/16 | Blog Post | | Puerto Rico |
| The Hill | "Let Obama have his Supreme Court justice, in | 4/14/16 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Government Takes Aim at Fitness Instructors" | 4/11/16 | Article | | Department of Labor |
| The Weekly Standard | "The Proposed Puerto Rico Bailout is Good on Rhetoric | 4/8/16 | Article | | Puerto Rico |
| Foundation for Economic | "Feds' Crazy Plan: Make Risky Loans, Don't Charge for | 3/18/16 | Article | | Federal Regulation |
| The Weekly Standard | "Tax Policy, Not Luck of the Irish, Is Responsible For | 3/17/16 | Article | | Tax Reform |
| Cato At Liberty | "Government-Directed Lending Comes to America" | 3/16/16 | Blog Post | | Government Lending |
| The Weekly Standard | "Higher Ed, Higher Prices" | 3/14/16 | Article | | Education |
| Cato At Liberty | "Stop Encouraging Homeownership" | 3/10/16 | Blog Post | | Homeownership |
| Cato At Liberty | "The Administration's Puerto Rico Jujitsu Threatens the | 3/3/16 | Blog Post | | State's Rights/Puerto Rico |
| The Weekly Standard | "Dusty Agonistes" | 3/2/16 | Article | | MLB |
| The Hill | "What would a Puerto Rican bankruptcy look like?" | 2/24/16 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Let Them Go Bankrupt" | 2/22/16 | Article | | Student Loans |
| Cato At Liberty | "Using Congressional Budget Rules To (Not) Save | 2/5/16 | Blog Post | | Congressional Budget |
| The Weekly Standard | "Why It's So Important To Get Puerto Rico's Reform | 2/2/16 | Article | | Puerto Rico |
| The Weekly Standard | "Retire This Idea" | 2/1/16 | Article | | State Debt |
| The Weekly Standard | "The Pro Bowl Should At Least Resemble an Actual | 1/30/16 | Article | | NFL |
| The Weekly Standard | "Don't Abandon All Hope" | 1/25/16 | Article | | Tax Reform |
| The Weekly Standard | "Oxfam, Schmoxfam" | 1/19/16 | Article | | Wealth Distribution |
| The Weekly Standard | "D.C. Bobos Sabotage Housing Construction to Protect | 1/13/16 | Article | | DC Construction |
| Cato At Liberty | "Will the Natural Monopoly in Energy Distribution | 1/6/16 | Blog Post | | Energy Distribution |
| Cato At Liberty | "The States Have No Business Creating Their Own | 12/18/15 | Blog Post | | State's Rights/Economy |
| The Weekly Standard | "Pulling Away Punch Bowls" | 12/16/15 | Article | | Economy |
| The Weekly Standard | "The Unending Morass of Housing Finance Reform" | 12/9/15 | Article | | Housing Finance |
| Cato At Liberty | Inequality Delenda Est | 12/8/15 | Blog Post | | Inequality |
| The Weekly Standard | "The Reform Next Time" | 12/4/15 | Article | | Social Security |
| Cato At Liberty | "Food Labels Kill" | 12/1/15 | Blog Post | | Food Labels/FDA |
| The Hill | "US should respond to OECD tax project with an | 11/30/15 | Op-Ed | | Tax Reform |
| The Weekly Standard | "The Paris Trap" | 11/29/15 | Article | | Environment |
| The Weekly Standard | "Princeton Protestors Hand College Fundraisers a | 11/23/15 | Article | | Education |
| The Weekly Standard | "Liz Warren Moves to Sabotage Tax Reform" | 11/20/15 | Article | | Tax Reform |
| The Weekly Standard | "Goldman's Inexplicable Grip on the Fed" | 11/12/15 | Article | | Federal Reserve |
| The Hill | "A politically viable Puerto Rico reform plan" | 11/9/15 | Op-Ed | | Puerto Rico |
| The Weekly Standard | "Bill Walker 'Alters the Deal,' and Threatens Alaska's | 10/27/15 | Article | Jared Whitley | Economy |
| The Weekly Standard | "Patently Ridiculous" | 10/21/15 | Article | | Patents |
| The Weekly Standard | "How to Succeed in the Hinterland" | 10/12/15 | Article | | Economy |
| The Weekly Standard | "A Brief Exegesis of the Central Illinois Music Scene" | 10/2/15 | Article | | Illinois |
| The Weekly Standard | "Saving Puerto Rico from the Federal Government" | 9/28/15 | Article | | Puerto Rico |
| The Hill | "How investment in transportation infrastructure | 9/23/15 | Op-Ed | | Transportation |
| The Weekly Standard | "Yellen Punts" | 9/18/15 | Article | | Federal Reserve |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Bloomberg BNA | "U.S. Business Loses Big From Lack of Transportation | 9/17/15 | Article | Mike Gorman | Infrastructure |
| The Weekly Standard | "No More Denali Commissions" | 9/14/15 | Article | | Environment |
| The Weekly Standard | "Labor's Wishful Thinking" | 9/14/15 | Article | | Department of Labor |
| The Weekly Standard | "In Amending the EB-5 Program, First Do No Harm" | 9/10/15 | Article | | Immigration |
| The Weekly Standard | "The Food Truck Farce, Continued" | 9/9/15 | Article | | Public Property |
| The Weekly Standard | "In Defense of the 'Cadillac Tax" | 9/3/15 | Article | | Tax |
| The Weekly Standard | "Fixing the Grid and Improving Energy Policy" | 8/26/15 | Article | | Energy Policy |
| The Weekly Standard | "In Washington, D.C., Parking Policy Dictates Housing | 8/25/15 | Article | | Housing Policy |
| The Weekly Standard | "Stock Markets Have the China Syndrome" | 8/24/15 | Article | | Economy |
| The Weekly Standard | "Pathetic Spin from Goldman Sachs" | 8/19/15 | Article | | Economy |
| The Weekly Standard | "Even Economists Can't Invest" | 8/17/15 | Article | | Economy |
| City Journal | "Parking for a Price" | 8/13/15 | Article | Bryan Weaver | Transportation |
| The Weekly Standard | "Kill the Coins" | 8/13/15 | Article | | Monetary Policy |
| The Hill | "Is retirement planning about to become more | 8/10/15 | Op-Ed | | Retirement |
| The Hill | "A problem Congress can't solve" | 6/30/15 | Op-Ed | | Congress |
| Peoria Journal Star | "Op-Ed: Central Illinois needs Uber" | 6/12/15 | Op-Ed | | Economy |
| The Hill | "How Obama could hijack tax reform" | 5/26/15 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Fixing Puerto Rico" | 5/25/15 | Article | | Puerto Rico |
| The Weekly Standard | "Jamaal Strikes Blow for Diversity in NPR Fantasyland" | 5/6/15 | Article | | Race |
| The Weekly Standard | "India Needs to Enforce Its Trade Agreements" | 5/4/15 | Article | | India |
| The Weekly Standard | "Housing Subsidies: A Play in One Act" | 4/29/15 | Article | | Housing Subsidies |
| American Enterprise Institute | "The case for 'an innovation box'" | 4/28/15 | Article | | Economy |
| The Hill | "When a Chinese 'anti-corruption' drive is anything | 4/21/15 | Op-Ed | Jared Whitley | China |
| The Hill | "Can there be a role for the government in the advent | 4/16/15 | Op-Ed | | Crypto Currency |
| RealClearMarkets | "Jeff Bezos May Have Found Amazon's Latest Money | 4/15/15 | Article | | Amazon |
| The Federalists | "Ivy Leagues Shame Kids For Making Their Way In The | 4/10/15 | Article | | Education |
| The Weekly Standard | "How Chinese Regulatory Authorities Impose | 3/30/15 | Article | | China |
| Peoria Journal Star | "In the Spotlight: Peoria should auction food trucks to | 3/27/15 | Op-Ed | | Food Trucks |
| The Hill | "More must be done to improve access to biosimilar | 3/19/15 | Op-Ed | | Health |
| The Weekly Standard | "Republicans Appoint Keith Hall to Head CBO" | 3/2/15 | Article | | CBO |
| CNBC | "Puerto Rico's economic woes are only short-term" | 2/11/15 | Article | | Puerto Rico |
| The Weekly Standard | "The Food Truck Farce" | 2/4/15 | Article | | DC Subsidies |
| The Weekly Standard | "An Epic Fail from the New York Times" | 1/29/15 | Article | | Journalism |
| The Weekly Standard | "Obama's Latest Giveaway . . ." | 1/26/15 | Article | | Federal Subsidies |
| The Weekly Standard | "Conservatives Should Buy Obama's Tax Increase—If | 1/21/15 | Article | | Tax Reform |
| The Weekly Standard | "Federal Regs Making it Difficult for Members of | 1/14/15 | Article | | Federal Regulation |
| The Weekly Standard | "Get Biosimilars to the Market Place" | 1/9/15 | Article | | Health |
| American Enterprise Institute | "Congress should help small communities by amending | 1/6/15 | Article | | Dodd-Frank |
| The Weekly Standard | "A Year Later, the Exchanges Still Stink" | 12/29/14 | Article | | Economy |
| The Weekly Standard | "The White House's College Report Card Will | 12/24/14 | Article | | Education |
| The Weekly Standard | "Why Are Urban Hospitals Closing Everywhere, but | 11/25/14 | Article | Devorah Goldman | Health |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "How to Make the Inversion Problem Even Worse" | 10/21/14 | Article | | Department of Treasury |
| The Weekly Standard | "A Legislative Sleight of Hand for Fannie Mae and | 9/30/14 | Article | | Financial Crisis |
| George W. Bush Institute | "When a Minimum Wage is Not a Minimum Wage" | 9/23/14 | Blog Post | | Minimum Wage |
| American Enterprise Institute | "Why the Government Won't Let Colleges Reduce | 9/17/14 | Article | | Education |
| George W. Bush Institute | "Paying for paving: Tax driving, not gas" | 9/16/14 | Blog Post | | Tax Reform |
| George W. Bush Institute | "How Britain's Tax Reform Boosted Economic Growth" | 9/15/14 | Blog Post | | British Tax Reform |
| The Weekly Standard | "A Peorian Makes Sense of Turkey" | 9/8/14 | Article | | Turkey |
| American Enterprise Institute | "The Minimum Wage Can Never Be High Enough" | 9/7/14 | Article | | Minimum Wage |
| The Weekly Standard | "The Costs of a Miscarriage of Justice" | 9/4/14 | Article | | Legal |
| The Weekly Standard | "Paying for Paving" | 8/11/14 | Article | | Transportation |
| The Weekly Standard | "Detroit Hard Luck City" | 7/25/14 | Article | | Detroit |
| The Weekly Standard | "The Administration's Cynical Fight Against Corporate | 7/23/14 | Article | | Tax Reform |
| George W. Bush Institute | "The tax inversion manufactured crisis" | 7/22/14 | Blog Post | | Tax Inversion |
| The Federalists | "No, Corporate Tax Inversions Are Not An Unpatriotic | 7/22/14 | Article | | Tax Reform |
| The Weekly Standard | "'Student Loan Relief Now'" | 6/30/14 | Article | | Education |
| George W. Bush Institute | "More Economic Growth is Possible and Will Soon | 6/23/14 | Blog Post | | Economy |
| The Weekly Standard | "PAYGO Begone" | 6/16/14 | Article | | Federal Budget |
| George W. Bush Institute | "Tax Policy the Texas Way--in Washington, D.C." | 6/6/14 | Blog Post | | Tax Policy |
| The Weekly Standard | "Tax Policy the Texas Way—in Washington, D.C." | 6/3/14 | Article | | Tax Reform |
| American Enterprise Institute | "New Flight Rules Are a Heavy Load" | 5/25/14 | Article | | Transportation |
| The Hill | "Why Fannie and Freddie's failed stress test proves | 5/22/14 | Op-Ed | | Financial Crisis |
| George W. Bush Institute | "Is the Time Ripe for a Revolution in Transportation | 4/28/14 | Blog Post | | Transportation Funding |
| George W. Bush Institute | "Rule of Law for me but not for Thee" | 4/28/14 | Blog Post | | Rule of Law |
| The Weekly Standard | "Rule of Law For Me, Not For Thee" | 4/28/14 | Article | | Property Laws |
| R Street Institute | "Rethinking tax benefits for home owners" | 4/24/14 | Policy Analysis | Zackary Hawley, | Tax Reform |
| R Street Institute | "Homesick: How housing tax breaks benefit the | 4/22/14 | Policy Analysis | Andrew Hanson | Tax Reform |
| George W. Bush Institute | "Sisyphus and Tax Reform" | 3/28/14 | Blog Post | | Tax Reform |
| RealClearMarkets | "Economic Sanctions On Russia Would Be Worse Than | 3/23/14 | Article | | Russia |
| Cato Institute | "The Paths to Mortgage Finance Reform and Their | 3/18/14 | Policy Analysis | Mark A. Calabria | Mortgage Finance Reform |
| The Weekly Standard | "Don't Guarini Me, Bro!" | 3/17/14 | Article | | Tax Reform |
| The Weekly Standard | "I've Saved Thousands of Dollars Waiting to Get on | 3/10/14 | Article | | Healthcare |
| The Weekly Standard | "I've Been Trying Since November—But I Still Can't Sign | 2/7/14 | Article | | Healthcare |
| George W. Bush Institute | "Innovation and Productivity Go Hand in Hand" | 1/30/14 | Blog Post | | Economy |
| The Weekly Standard | "How to Fix the Pro Bowl" | 1/25/14 | Article | | NFL |
| National Review | "How the Obama Administration Stole Fannie and | 1/22/14 | Article | | Financial Crisis |
| George W. Bush Institute | "Praise for French Policy Reforms" | 1/17/14 | Blog Post | | French Policy |
| George W. Bush Institute | "Immigration and the Texas Boom" | 1/7/14 | Blog Post | | Immigration |
| George W. Bush Institute | "The Tax Reform Chasm Widens" | 12/26/13 | Blog Post | | Tax Reform |
| The Weekly Standard | "After a Month of Trying, I Still Can't Sign Up for | 12/26/13 | Article | | Healthcare |
| George W. Bush Institute | "Environmental Solutions by Fiat" | 12/23/13 | Blog Post | | Environment |
| The Weekly Standard | "Subsidizing Rich and Poor" | 12/23/13 | Article | | Government Subsidies |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| George W. Bush Institute | "Tax Reform: Break-Up Edition" | 12/12/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Homer Simpson's Bear Tax: DC Edition" | 11/21/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Growth Won't Save Entitlements" | 10/31/13 | Blog Post | | Economy |
| The Weekly Standard | "Europe Leads the Way?" | 10/14/13 | Article | | Economy |
| George W. Bush Institute | "A Better Way to Measure Growth" | 10/8/13 | Blog Post | | Economy |
| George W. Bush Institute | "California's Perfect Tax Scam" | 9/30/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "The Rich Are Different. So What?" | 9/23/13 | Blog Post | | Economy |
| George W. Bush Institute | "Who Should be Teaching College?" | 8/17/13 | Blog Post | | Education |
| George W. Bush Institute | "Making Policy the Wrong Way" | 8/13/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Baby Steps to Tax Reform" | 8/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "The Death of Growth Has Been Greatly Exaggerated" | 7/29/13 | Blog Post | | Economy |
| George W. Bush Institute | "Stopping the Mandarins" | 7/23/13 | Blog Post | | China |
| George W. Bush Institute | "Tax Reform Would Play Well in Peoria" | 7/19/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Capitalism & Chocolate-Chip Cookies" | 7/8/13 | Blog Post | | Economy |
| George W. Bush Institute | "The Case for a Carbon Tax" | 6/27/13 | Blog Post | | Environment/Tax Reform |
| American Enterprise Institute | "Warning Pollution" | 6/26/13 | Article | | Environment |
| George W. Bush Institute | "Patent Wars Restrain Growth" | 6/14/13 | Blog Post | | Patents |
| George W. Bush Institute | "Is There a Future for Driverless Cars?" | 6/7/13 | Blog Post | | Technology |
| George W. Bush Institute | "Changing How We Pay Teachers" | 5/22/13 | Blog Post | | Education |
| The Weekly Standard | "A Glimmer of Hope for the Illinois GOP" | 5/22/13 | Article | | Illinois |
| Salon | "How a fight with Rick Santorum made an IRS" | 5/17/13 | Article | | IRS |
| RealClearMarkets | "Why You Just May Come to Like a Carbon Tax" | 5/14/13 | Article | | Environment |
| George W. Bush Institute | "Taxes Hurt Competitiveness Abroad" | 5/13/13 | Blog Post | | Tax Reform |
| R Street Institute | "We're Already Paying a Carbon Tax in Disaster Relief" | 5/13/13 | Op-Ed | | Environment |
| George W. Bush Institute | "Saving on Snacks, the Washington Way" | 5/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Spending Without Stimulus" | 4/23/13 | Blog Post | | Economy |
| George W. Bush Institute | "Time for a Carbon Tax?" | 4/22/13 | Blog Post | | Environment/Tax Reform |
| RealClearMarkets | "It's time to ask Cyprus for a real concession" | 4/22/13 | Op-Ed | | Cyprus |
| The Weekly Standard | "Waiting for Obama" | 4/22/13 | Article | | Tax Reform |
| The Weekly Standard | "Not Worth the Paper It's Printed On" | 4/19/13 | Article | | OMB |
| The Weekly Standard | "Waiting for Obama" | 4/13/13 | Op-Ed | | Executive Branch |
| George W. Bush Institute | "Haircuts for the Wrong Heads" | 4/4/13 | Blog Post | | Banking |
| George W. Bush Institute | "Striking a Deal on Social Security" | 3/22/13 | Blog Post | | Social Security |
| RealClearMarkets | "It's Time To Ask Cyprus for a Real Concession" | 3/22/13 | Article | | Cyprus |
| George W. Bush Institute | "What 4% Growth Would Mean For America" | 3/21/13 | Blog Post | | Economy |
| Salon | "How Republicans really view Social Security" | 3/18/13 | Article | | Social Security |
| George W. Bush Institute | "Silver Linings Playbook" | 3/13/13 | Blog Post | | Economy |
| George W. Bush Institute | "Sequester: In Search Of Leadership" | 2/27/13 | Blog Post | | Legislative Branch |
| George W. Bush Institute | | 2/13/13 | Blog Post | | Government Lending |
| George W. Bush Institute | "The True Cost of the Fiscal Cliff Deal" | 2/13/13 | Blog Post | | Legislative Branch |
| George W. Bush Institute | "Canada Turns the Tables on the U.S." | 2/13/13 | Blog Post | | Canada |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Why We Might Get Tax Reform" | 2/11/13 | Article | | Tax Reform |
| George W. Bush Institute | "No Canary in the Coal Mine … Yet" | 2/6/13 | Blog Post | | Economy |
| George W. Bush Institute | "Resisting Automatic Savings" | 2/1/13 | Blog Post | | Banking |
| George W. Bush Institute | "Tax Cuts Require Entitlement Reform" | 2/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Why Keynesian Economics Died" | 2/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Public Pension Plans Face Insolvency" | 2/1/13 | Blog Post | | Pension |
| George W. Bush Institute | "Backing Away from the Cliff" | 2/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Moving the Growth Debate Beyond Taxes" | 2/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Pension Shortfalls: A Bipartisan Opportunity?" | 2/1/13 | Blog Post | | Pension |
| George W. Bush Institute | "The Hidden Cost of Unreliable Transportation" | 9/25/12 | Blog Post | | Transportation |
| George W. Bush Institute | "Productivity Growth: The Numbers and the Reality" | 9/11/12 | Blog Post | ` | Economy |
| George W. Bush Institute | "Growth Fuels Turkey's Promise" | 8/31/12 | Blog Post | | Turkey |
| George W. Bush Institute | "The Battle Over the Regulatory State" | 8/14/12 | Blog Post | | Regulation |
| George W. Bush Institute | "Quarterbacks, Vigilantes, and Economic Growth" | 8/9/12 | Blog Post | | Economy |
| George W. Bush Institute | "The Wrong Reason for the Right Policy" | 8/1/12 | Blog Post | | Economy |
| George W. Bush Institute | "Counting on Living Longer" | 7/30/12 | Blog Post | | Age and Economy |
| George W. Bush Institute | "The Benefits of Growth: Slow but Inexorable" | 7/12/12 | Blog Post | | Economy |
| George W. Bush Institute | "The Italian Job: Improving Productivity and | 7/8/12 | Blog Post | | Economy |
| George W. Bush Institute | "In Defense of Finance" | 6/29/12 | Blog Post | | Finance |
| American Enterprise Institute | "The Costliest Regulation You've Never Heard Of" | 6/21/12 | Article | | Federal Regulation |
| George W. Bush Institute | "Problems with Productivity … or Not" | 6/19/12 | Blog Post | | Economy |
| George W. Bush Institute | "A Tax Deal That Is No Bargain" | 6/15/12 | Blog Post | | Tax Reform |
| The Weekly Standard | "Another Bad Sign: Productivity Falls by .9 Percent" | 6/8/12 | Article | | Economy |
| George W. Bush Institute | "Letting Innovators Innovate" | 6/7/12 | Blog Post | | Regulation |
| George W. Bush Institute | "Luddites, Lumps of Labor, and a Laundry List of Illogic" | 5/31/12 | Blog Post | | Economy |
| George W. Bush Institute | "Real Investment Instead of Short-Term Stimulus" | 5/24/12 | Blog Post | | Investments |
| George W. Bush Institute | "The Importance of Productivity" | 5/18/12 | Blog Post | | Economy |
| George W. Bush Institute | "Short Run Productivity Measures Tell Us Little" | 5/10/12 | Blog Post | | Economy |
| George W. Bush Institute | "Enjoying Every Sandwich: Life Expectancy and | 5/4/12 | Blog Post | | Age and Economy |
| The Weekly Standard | "OECD's Prescription to Raise Taxes Is the Wrong | 4/30/12 | Article | | Tax Reform |
| George W. Bush Institute | "Lessons from the 1%: How to Get Ahead in Life" | 4/27/12 | Blog Post | | Economy |
| The Weekly Standard | "Obama Administration Stops Foreigners from Clogging | 4/24/12 | Article | | Immigration |
| American Enterprise Institute | "About Those Better Roads in China" | 4/18/12 | Article | | China |
| George W. Bush Institute | "The Cost of Increasing Tax Rates On Capital Gains and | 4/16/12 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Making Future Generations Foot the Bill" | 4/10/12 | Blog Post | | Economy |
| The Weekly Standard | "Year 104 and Counting: A Cubs Fan Survival Strategy" | 4/4/12 | Article | | MLB |
| National Review | "Domestic Oil Policies Do Impact Oil Prices" | 3/29/12 | Article | | Oil |
| The Weekly Standard | "O Canada!" | 3/28/12 | Article | Logan Albright | Canada |
| George W. Bush Institute | "How Growth Benefits Us All — the 1990s vs. the | 3/23/12 | Blog Post | | Economy |
| The Weekly Standard | "Ryan's Tax Plan Moves the Ball" | 3/21/12 | Article | | Tax Reform |
| George W. Bush Institute | "Should Peorians Care about Corporate Tax Reform? | 3/15/12 | Blog Post | | Tax Reform |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| George W. Bush Institute | "China's Retreat from State-Directed Capitalism" | 3/9/12 | Blog Post | | China |
| George W. Bush Institute | "Material Progress and the Plight of the Poor" | 3/1/12 | Blog Post | | Economy |
| The Weekly Standard | "Obama Burdens the Banks" | 1/23/12 | Article | Sam Batkins | Banking |
| The Weekly Standard | "À la Gloire de L'économie Française" | 1/20/12 | Article | | France |
| The Weekly Standard | "Mortgaging Our Future" | 12/26/11 | Article | Eli Lehrer | Economy |
| The Weekly Standard | "Who Benefits from the Mortgage Interest | 12/21/11 | Article | Andrew Hanson, Zach | Mortgage |
| American Enterprise Institute | "Why Unemployment Is Worse Than You Think" | 12/13/11 | Article | Matt Thoman | Unemployment |
| The Weekly Standard | "A Cure for the Housing Blues" | 11/7/11 | Article | | Housing |
| The Weekly Standard | "Privatizing the Liquor Market" | 11/4/11 | Article | Elizabeth Lowell | Privitization |
| National Review | "Halloween on the Hill" | 10/31/11 | Article | | Washington,D.C. |
| The Hill | "Zeroing in on simplifying the tax system" | 10/17/11 | Op-Ed | Eli Lehrer | Tax Reform |
| The Weekly Standard | "Let's Start All Over Again" | 10/17/11 | Article | Eli Lehrer | Tax Reform |
| National Review | "Increasing Foreign Investment, the Chicago Way" | 10/12/11 | Article | | Foreign Investment |
| American Action Forum | "European Disunion" | 9/26/11 | Article | | Europe |
| American Enterprise Institute | "European Disunion" | 9/22/11 | Article | Matt Thoman | Europe |
| The Weekly Standard | "Time for an Honest Accounting of Our Disaster | 9/13/11 | Article | | Federal Budget |
| National Review | "Let's Have Infrastructure Investment, But the Right | 9/8/11 | Article | | Infrastructure |
| National Review | "Stimulus Still Creating Jobs?" | 9/6/11 | Article | | Economy |
| The Weekly Standard | "The Mortgage Interest Boondoggle" | 8/15/11 | Article | Benjamin Gitis | Mortgage |
| American Action Forum | "THE DOWNGRADE: WHAT IT IS AND WHAT IT ISN'T" | 8/6/11 | Article | | Economy |
| National Review | "The Downgrade: What It Is And What It Isn't" | 8/5/11 | Article | | Economy |
| American Action Forum | "Dodd-Frank Turns One" | 7/22/11 | Article | Sam Batkins | Legislation |
| American Action Forum | "NEW URBANISM ISN'T GOING TO SAVE THE | 7/21/11 | Article | | Economy |
| American Action Forum | "HOW REFORM OF THE U.S. CORPORATE TAX CODE | 7/19/11 | Article | Doug Holtz-Eakin, | Tax Reform |
| American Action Forum | "Obfuscation At The EPA" | 6/30/11 | Article | Sam Batkins | EPA |
| American Action Forum | "Lure Of The Big City" | 6/29/11 | Book Review | | "Triumph of the City: How Our |
| American Action Forum | "EMPLOYMENT EFFECTS OF REDUCING CAPITAL GAINS | 6/28/11 | Article | Willam Melick, Eric | Tax Reform |
| American Enterprise Institute | "The Upside of Voter ID Initiatives" | 6/16/11 | Article | | Voter ID |
| American Action Forum | "A DIFFERENT ROUTE TO REDEMPTION FOR ANTHONY | 6/14/11 | Article | | Anthony Weiner |
| American Action Forum | "Blaming The Speculators And Other Fairy Tales" | 5/17/11 | Article | | Oil |
| American Enterprise Institute | "Who Really Stands to Win in the Union Fights?" | 5/11/11 | Article | | Union |
| American Action Forum | "Export-Import Bank: Obstacles and Options for | 5/1/11 | White Paper | Elizabeth Lowell | Export-Import Bank |
| The Weekly Standard | "All Benefits, No Costs" | 4/11/11 | Article | Sam Batkins | Federal Regulations |
| American Action Forum | "The Disaster Playbook For Investors" | 4/1/11 | Article | Ken Solow | Investing |
| The Weekly Standard | "What Happened to Loeb's Deli?" | 3/14/11 | Article | | Economy |
| The Weekly Standard | "Hop Aboard the Nanny Train" | 3/12/10 | Article | | DC Metro |
| Cato Institute | "The Troubling Return of Keynesianism" | 1/1/09 | Policy Analysis | Chris Edwards | Keynesianism |

# EXHIBIT OOO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL et al.,

               *Plaintiffs,*

        *v.*

NIELSEN et al.,

               *Defendants.*

Case No. 1:16-cv-04756 (NGG) (JO)

December 11, 2017

## DECLARATION OF STEPHEN H. LEGOMSKY

I, Stephen H. Legomsky, declare:

1.     I am currently the John S. Lehmann University Professor Emeritus at Washington University School of Law, where I have taught courses in immigration law and international human rights law, among others. My coursebook, *Immigration and Refugee Law and Policy*, has been the required textbook at 185 law schools since its inception.

2.     I write this declaration in support of all Plaintiffs in the lawsuit in the Eastern District of New York regarding the Deferred Action for Childhood Arrivals program ("DACA").

3.     From October of 2011 to October of 2013, I served as Chief Counsel of U.S. Citizenship and Immigration Services ("USCIS"). In that capacity, I provided policy and legal advice to the USCIS Director on matters pertaining to deferred action programs such as DACA. I was part of the team that provided policy and legal advice on its implementation.

4.     After leaving USCIS, I served as Senior Counselor to the then-Secretary of Homeland Security, Jeh Johnson, from July to October of 2015, where I again worked on the program's implementation. Through this role, I also gained a unique perspective into the many benefits provided by the DACA program.

5.      I have also testified before Congress on numerous occasions and served as a consultant on immigration and refugee policies to the transition teams of President Obama and President Clinton and to the Commissioner of the Immigration and Naturalization Service in the George H.W. Bush Administration.

6.      Based on my experiences, I believe creating the DACA program was sound immigration policy resulting in significant and quantifiable benefits to the United States, and that the program remains sound immigration policy for this country. Moreover, I strongly believe that large-scale deferred action programs such as DACA are well within the legal authority of the executive branch, for reasons that are laid out comprehensively in my February 25, 2015 written testimony before the Judiciary Committee of the U.S. House of Representatives. That testimony can be found at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

**The Creation, Requirements, and Functioning of the DACA Program**

7.      DACA, which was announced on June 15, 2012 by then-Secretary of Homeland Security Janet Napolitano, allowed certain undocumented individuals living in the United States to seek deferred action. To be eligible, these individuals had to have arrived in the United States under the age of sixteen, lived in the United States continuously since at least June 15, 2007, satisfied an educational or armed services requirement, not pose a threat to national security or public safety, and be 30 years of age or younger.

8.      The program's eligibility criteria mean that all current DACA recipients have been in the United States at least ten years. Many have been here far longer, and many reside within households or are members of families where one or more other family members are either U.S. citizens or legal permanent residents.

9.  Requests for deferred action through DACA were all subject to case-by-case analysis and extensive background checks, in addition to the explicit requirements. Notwithstanding this intense scrutiny, a relatively low number were denied,[1] since very few undocumented immigrants who did not meet the published criteria applied. The DACA process was designed to exclude those who might be a threat to public safety and/or national security.

10.  When individuals filed their requests for deferred action through DACA or requests for renewal of such deferred action, these requests were initially reviewed to ensure that they were complete and were accompanied by the appropriate fee. Originally, this fee was $465, but it was raised to $495 as part of a new fee schedule late in 2016.

11.  Among other things, the applications asked whether the applicants had traveled outside the United States and under what authority, as well as whether they had been convicted of crimes or were gang members.

12.  Key data were then input into the USCIS adjudication system, and the applicant notified to schedule an appointment for biometric information where they were fingerprinted and photographed. Once this process was complete, the individual's information was run through various criminal justice and law enforcement databases, which would reveal the individual's criminal history, whether they were named in a federal law enforcement investigation, and whether investigations had revealed them to be associated with a criminal gang.

13.  Once this portion of the process was complete, the cases were assigned to adjudications officers, who would review the files and then most typically either grant the application, deny the application, or issue a Request for Evidence to the requestor if additional

---

[1] The term "denials" refers to applications for deferred action that fail on the merits, while the term "rejections" refers to applications that fail to get past the Lockbox stage for reasons such as forgetting to sign the application or enclose the check.

information was needed to reach a decision on the application. A Request for Evidence could seek information about discrepancies in the request, information about criminal conduct or gang membership, other information that would make the individual ineligible for deferred action under DACA, or information about travel with proper USCIS permission, known as advance parole.[2]

14.     If the responses were not satisfactory, either an additional Request for Evidence would issue or the request would be denied. If the responses were satisfactory and the outstanding issues were resolved, then the case-by-case analysis moved forward. To receive DACA, applicants had to satisfy the adjudicator that the required criteria were met and that the applicant deserved the favorable exercise of discretion. In most cases, deferred action under DACA was granted. The adjudicator would then decide whether to grant temporary permission to work, as authorized by 8 CFR 274a.12(c)(14).

**The Policy Reasons Behind the Creation of the DACA Program**

15.     The DACA program's continued success is tied to the underlying policy reasons leading to its creation.

16.     First, DHS determined that permitting these individuals to live in the United States with the opportunity to apply for deferred action and to qualify for work authorization would promote public safety and security. We understood that effective law enforcement depends on the trust of the communities served.     In immigrant communities, this means encouraging undocumented victims of crime and witnesses to crime to report those crimes to the police without fear of being routinely arrested and referred to ICE for removal proceedings.

17.     Second, the DACA program reflected a recognition that the United States has limited resources to enforce immigration laws. There are approximately 11 million undocumented

---

[2] Applicants for advance parole were required to demonstrate either a compelling humanitarian reason or a significant public interest to justify a request for being allowed to re-enter the United States after travelling abroad.

individuals residing in the United States, and Congress does not appropriate sufficient funds for the Department of Homeland Security ("DHS") to remove more than a small percentage of the individuals who are removable under the law.

18.     It is therefore necessary, if DHS is to implement its mandate of promoting the safety and security of the United States, to focus its limited enforcement resources where they will have the greatest impact on safety and security. This means deprioritizing removal of certain categories of immigrants.

19.     Thus, DHS created priorities for immigration enforcement in order to ensure that it used its limited resources in a manner that increased public safety. The agency determined that individuals who met the DACA eligibility criteria were not a priority for removal. The agency determined that individuals who meet specific criteria having to do with age, manner of entry into the United States, and absence of serious crimes on their criminal records were low priorities for removal because deporting them would not promote the nation's interests in public safety and national security.

20.     Third, to request DACA, applicants had to provide their names, addresses, and histories to USCIS. We believed that encouraging them to come out of the shadows and report their presence to USCIS was healthy for everyone.

21.     Fourth, we determined that providing deferred action and work authorization to these individuals would provide economic benefits not only to the recipients themselves, but also to their communities, employers, and the larger American community. The DACA-eligible population consists of individuals who arrived in the United States as children, have lived in the United States for many years, and attended academic institutions in this country. They are without fault, call the United States their home, and have built their lives in this country.

22. Before DACA, their educational success made it highly likely that they would be economically successful if given the opportunity to work legally. Individuals consigned to the margins of our society, such as those living in fear of deportation activity, are not able to optimally contribute to the communities where they live and to the country as a whole.

23. This population could thus better contribute to our society if they were able to take advantage of educational and professional opportunities; since DACA this has been demonstrably true.

24. Additionally, without permission to work, DACA-eligible undocumented immigrants were highly vulnerable to unscrupulous employers, who knew they could be hired at low, exploitative wages. This gave these employers an incentive to hire unauthorized workers over US workers. Work permits for DACA recipients largely eliminated that perverse incentive.

## The DACA Program Benefits Recipients and Society in General

25. The results of the implementation of DACA strongly show that DACA recipients themselves have benefitted, along with their families, communities, employers, and the larger country as a whole. Their economic and social contributions benefit the nation as a whole.

26. Since the inception of the program, DACA recipients have proven to be extremely successful. They have a very high success rate in pursuing their education and finishing school. After investing in the education of these young people, it does not make economic sense to send them away and allow another country to reap the benefits of these productive individuals.

27. In addition to their educational success, DACA recipients have succeeded professionally as well. This population has exhibited a high degree of motivation and contributes to various sectors of society. Indeed, employers across various industries rely on DACA recipients as part of their workforces.

6

28.     Therefore, when DACA deferred action recipients lose their work authorization, not only are they personally and devastatingly harmed, but their employers are also harmed. For this reason, not only do DACA recipients stand to lose with the termination of the DACA program; the entire country loses as well.

29.     At the time of my departure from USCIS and later DHS, DACA remained a strong and sensible program that had proven a success for DACA recipients, the community, employers, and law enforcement officials tasked with enforcing the nation's immigration policies. Indeed, DACA continues to be a sensible program.

30.     There is nothing to gain from terminating DACA, while the repercussions of doing so will extend well beyond those directly affected.

31.     Subjecting DACA recipients to deportation wastes the resources that the United States has invested in providing an education to these individuals as they grew up in the United States. Removing these young people at the very moment at which they are poised to make economic and professional contributions is only harmful to the United States.

32.     Based on my past experiences as the Chief Counsel of USCIS and Senior Counselor to the Secretary of Homeland Security, as well as my several decades of experience teaching and writing in the field of immigration law, I can identify no sound policy reason to terminate the program.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December  11 , 2017, in  St Louis , Missouri

Stephen H. Legomsky

7

# EXHIBIT PPP

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

         Plaintiffs,

   v.

DONALD TRUMP, *et. al.*,

         Defendants,

No. 1:17-CV-5228

NOV 22, 2017

1        **Declaration of Leighton Ku**

2    I, Leighton Ku, declare as follows:

3    1. My name is Leighton Ku and I am over eighteen years of age.  I have personal

4       knowledge of and could testify in Court concerning the following statements of fact.

5    2. I am a Professor of Health Policy and Management and Director of the Center for Health

6       Policy Research at the Milken Institute School of Public Health, George Washington

7       University in Washington, DC.

8    3. I am a health policy researcher and expert with over 25 years of experience.  I have

9       conducted substantial research about immigrant health, health care, and costs.  I have

10      authored or co-authored more than a dozen articles and reports about immigrant health

11      issues, including articles in peer-reviewed journals such as Health Affairs and American

12      Journal of Public Health, as well as reports published by diverse non-profit organizations

13      including the Migration Policy Institute, the Cato Institute, the Center on Budget and

14      Policy Priorities and the Commonwealth Fund, as well as many more articles and reports

15      on other subjects.  I have testified before the U.S. Senate Finance Committee about

16      immigrant health issues and provided analyses and advice to state governments and non-

17      governmental organizations in many states about immigrant health.   I have taught

18      research methods and statistics at the graduate level for over 20 years.  I also am a

19      voluntary (unpaid) Executive Board member for the District of Columbia's Health

20      Benefits Exchange Authority, which governs the District's health insurance marketplace,

21      formed under the federal Affordable Care Act.

22   4. I have a PhD. in Health Policy from Boston University (1990) and Master of Public

23      Health and Master of Science degrees from the University of California at Berkeley

1

NOV 22, 2017

1      (1979).  Prior to becoming a faculty member at George Washington University, I was on

2      the staff of the Urban Institute and the Center on Budget and Policy Priorities.

3    5.  I have attached my Curriculum Vitae as Exhibit B to this Declaration.

4

5                      **Deferred Action for Childhood Arrivals**

6    6.  My declaration describes the potential effects of the termination of the Deferred Action

7      for Childhood Arrivals (DACA) program on health and health care access and the

8      implications and costs of the loss of DACA status on states.

9    7.  In this declaration I provide (a) general background about health insurance coverage and

10      health care services use of and by DACA recipients and undocumented immigrants, (b) a

11      brief review of research about how DACA improves mental health and how the loss of

12      DACA could worsen it, (c) estimates of potential state-level costs due to the loss of

13      DACA status and (d) a brief discussion of the role of DACA recipients as health care

14      providers and the potential effects of loss of this component of the health workforce.

15

16                      **Background Information**

17    8.  Under DACA, recipients are protected from deportation, can receive authorization to

18      work legally and can engage in other activities of civil society, such as continue their

19      education, obtain drivers' licenses, etc.  Without DACA, they could lose these benefits

20      and privileges.  Work authorization is a particularly important benefit under DACA.  The

21      survey and analysis conducted by Professor Tom Wong reveals that 91% of DACA

NOV 22, 2017

1      recipients are employed.  His data indicate that 57% of the DACA recipients have private

2      health insurance or other benefits through their employment.[1]

3    9.    Although DACA recipients have certain privileges, federal law and policy does not

4      accord them eligibility for federal health insurance benefits, including Medicaid, the

5      health insurance program for low-income populations. Nor are they permitted to enroll in

6      the health insurance marketplaces (or exchanges) formed under the Affordable Care Act

7      or to receive federal health insurance premium tax credits that are designed to make this

8      insurance more affordable.  Despite their protected status, DACA recipients are barred

9      from federal health insurance assistance, like other undocumented immigrants.  State or

10      local governments may opt to offer public insurance coverage for certain undocumented

11      immigrants, including DACA recipients, using state or local funds without federal

12      funding support.[2]  For example, the District of Columbia supports a state-funded Health

13      Care Alliance, which provides medical assistance to low-income adults not eligible for

14      Medicaid including undocumented immigrants and DACA recipients; no federal funding

15      is used.[3]  New York State provides Medicaid coverage to DACA recipients, but not other

16      undocumented immigrants, without federal funding support.[4]

---

[1] Declaration of Tom K. Wong, University of California, San Diego, Sept. 27, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-5).
[2] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.
[3] District of Columbia Department of Health Care Finance.  Health Care Alliance. https://dhcf.dc.gov/service/health-care-alliance
[4] New York State Department of Health.  GIS 13 MA/011:Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens. https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.

NOV 22, 2017

1       The only federal health insurance benefit available to low-income undocumented

2       immigrants is very limited emergency Medicaid coverage (42 USC § 1396b (v)).[5]  The

3       costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be

4       covered under Medicaid.  However, this limited benefit does not provide broader

5       coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It

6       provides reimbursement to providers for emergency care rendered to low-income

7       undocumented immigrants for acute conditions that could jeopardize the life or health of

8       the person, including labor and delivery costs for children born to undocumented

9       immigrant mothers.  Hospitals are separately required to provide emergency care, to at

10       least screen and stabilize their emergency medical conditions, to all potential patients

11       regardless of insurance coverage or citizenship status, under the Emergency Medical

12       Treatment and Active Labor Act (EMTALA, 42 USC § 1395dd).  The Medicaid

13       emergency care benefit essentially provides a mechanism to reimburse providers for the

14       emergency care they are otherwise required to offer to low-income undocumented

15       immigrants.

16     10. In addition, many community-based health care providers provide free- or subsidized

17       ambulatory health care services to undocumented aliens, including those who are

18       uninsured.  Perhaps most important, community health centers that receive federal grants

19       under Section 330 of the Public Health Service Act, sometimes also called Federally

20       Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that

21       focus on care for migrant workers, are required to provide primary health care to all

---

[5] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

NOV 22, 2017

1 patients regardless of insurance or immigration status.  Many other "safety net providers"

2 – including non-profit, charitable and state or local public clinics – often provide free or

3 subsidized uncompensated care to uninsured persons, including undocumented

4 immigrants, although the basis for providing that care varies.  In some cases, state or

5 local laws or policies require them to provide care to the uninsured.  In other cases it is a

6 matter of clinical practice and a belief in charitable mission.

7 11. Because of the barriers they face in securing health insurance coverage, non-citizen

8 immigrants, which include DACA recipients, undocumented immigrants and other

9 immigrants who have been legally admitted but are not citizens, are much more likely to

10 be uninsured than U.S. born or naturalized citizens and to have less private insurance and

11 less Medicaid coverage, even when one compares low-income (below 200% of the

12 poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates

13 financial barriers and as a result non-citizens have substantially less access to and use of

14 medical services, including primary health care services, emergency medical care,

15 hospital care and most other forms of health care, than citizens.[6]

16 12. DACA status enables recipients to work and many are thereby able to obtain

17 employment-based private health insurance, which is the dominant form of insurance in

18 the United States.  If DACA protections are lost, the former DACA recipients would lose

19 their work authorization and, as a result, would lose their jobs and their employer-based

20 health insurance.  If they are not working they have few other options to obtain health

21 insurance, other than emergency Medicaid.  Moreover, if the breadwinner in a family

22 loses his or her job and private health insurance, his or her dependents may also lose their

---

[6] See, for example, Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues. Migration Policy Institute, June 2013.  www.migrationpolicy.org

NOV 22, 2017

1    insurance coverage, even if they are U.S. born citizens.  In principle, a person without

2    employer-based health insurance, Medicaid, or other publicly subsidized coverage, could

3    purchase individual (non-group) health insurance on the private market.  The sad reality,

4    however, is that individual health insurance is expensive and a person who is no longer

5    employed or who has low income generally cannot afford individual health insurance

6    premiums.  Thus, the health insurance prospects for undocumented immigrants without

7    DACA status and employment are bleak.

8

9    **Mental Health Consequences of the Loss of DACA Protections**

10   **13.** States have an inherent interest in the well-being, public health and safety of their

11   residents; terminating DACA protections undermines the interests of states.  Even though

12   DACA does not generally provide health insurance benefits, research indicates that

13   DACA improves the mental health of recipients, by reducing stress related to their

14   undocumented status and the fear of adverse actions, such as deportation, loss of work,

15   loss of educational opportunities, separation from their families, etc.  Research, including

16   studies published in peer-review journals by investigators at Harvard Medical School,[7] [8]

17   the University of California at Davis,[9] and the Universities of California at Berkeley and

---

[7] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.* 2017; 2(4): e175-e181.

[8] Venkataramani AS, Tsai AC.  Dreams Deferred: the Public Health Consequences of Rescinding DACA.  *New Eng J Med.* 2017; 377(18):1707-9.

[9] Patler C, Laster, Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Soc Sci Med* 2017 March 9 (Epub ahead of print).

NOV 22, 2017

1    at San Francisco,[10] show that the receipt of DACA has significantly reduced

2    psychological stress and improves mental health status.  The researchers warn that the

3    loss of DACA protections will lead to higher stress and additional mental health

4    problems for hundreds of thousands of people. In addition, a study by Stanford

5    University researchers found that the DACA status that protected mothers also led to

6    better mental health status for their US-born citizen children; children feel more secure

7    when their parents have legal status.  This shows the broader repercussions of changes in

8    DACA policy which can even affect citizen children.[11] The stress caused by loss of

9    DACA protections could compound the harmful effects of employment and economic

10   loss and could result in additional demands placed on our mental health and social

11   welfare systems system and, in some cases, may lead to increased risk of disruptive

12   behavior that could pose broader risks and further tax our social, educational and criminal

13   justice systems. DACA helped many youth and young adults "come out of the shadows."

14   Loss of legal status will push them back into the shadows and jeopardizes the mental

15   health of DACA recipients and their families, with broader societal effects within states.

16

17              **Estimates of Potential Health Costs at State Levels Due to the Loss of DACA**

18   14. The loss of DACA protections would harm states because the loss of private health

19   insurance coverage will increase public expenditures for emergency Medicaid and other

---

10 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA).  *J Immigr Minor Health*. 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.
11 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

NOV 22, 2017

1    uncompensated care for those who become uninsured, creating additional financial

2    burdens on the state.  In this section, I describe how the loss of employment and

3    employer-based health insurance would push former DACA recipients to emergency

4    medical care reimbursed by Medicaid and other community-based uncompensated care.

5    Even though they may still be able to get these services, these are not optimal forms of

6    health care and would still leave many former DACA recipients with reduced access to

7    medical care, which could endanger their health.  The limited nature of these benefits is

8    unlikely to be adequate to accommodate the additional mental health stress caused by the

9    loss of DACA status, described above, as well as other illnesses, accidents and diseases

10   that could afflict any individual, citizen or immigrant alike.

11   15. In this section, I estimate potential financial costs for each state if DACA protections are

12      lost.  DACA status provides work authorization to young adults who would otherwise be

13      without legal status and thereby enables them to work legally.  A majority of working

14      DACA recipients get private health insurance through their jobs.  Loss of work

15      authorization would cause them to lose their jobs.  Even if they get jobs without work

16      authorization, they are subject to exploitation and are unlikely to be offered job benefits

17      like health insurance or pension benefits.  The loss of or degradation of employment

18      would trigger the loss of employment benefits, like health insurance coverage for them

19      and their dependents.  In principle, some of those losing employment-based insurance

20      might be able to purchase individual (non-group) health insurance on the private market,

21      but without the income of a job, the cost of individual health insurance would be

22      prohibitive and essentially unaffordable.  As noted earlier, undocumented immigrants are

23      ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax

8

NOV 22, 2017

1        credits.  As a result, they must instead resort to reliance on emergency Medicaid coverage

2        and/or community-based care for those without insurance, such as that provided by

3        community health centers or state or local public health clinics.

4    16. I use recent data from national survey data to estimate the costs of emergency Medicaid

5        costs and community-based care in each of the states that are plaintiffs in this case

6        (Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Iowa,

7        Massachusetts, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode

8        Island, Vermont, Virginia and Washington), as well as for the nation, if DACA recipients

9        lose their status and, as a result, lose employment and private health insurance coverage.

10   17. For estimates of the number of people affected, I draw on estimates of employment and

11       private insurance coverage in the Plaintiff States, provided in the Declaration of Professor

12       Tom Wong of the University of California at San Diego,[12] based on his survey of DACA

13       recipients, to estimate the effects of potential loss of employment and private insurance

14       coverage. Professor Wong's survey indicated that 91% of DACA recipients were

15       currently employed and 57% had a job with private health insurance.  I also provide an

16       estimate of the overall national effects (including states not on the list of plaintiffs), based

17       on data reported by the U.S. Citizenship and Immigration Services, the agency which

18       administers DACA.  As of June 30, 2017, 793,026 young people who were brought to the

19       U.S. as children without documentation were approved under DACA across the overall

20       United States.[13]

---

[12] Declaration of Tom K. Wong, University of California, San Diego, Sept. 27, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-5).
[13] U.S. Citizenship and Immigration Services.  Deferred Action for Childhood Arrivals Data (Through June 30, 2017), :

NOV 22, 2017

1    18. For estimates of the implications and costs of alternative sources of medical care that

2    former DACA recipients are likely to use I draw on my own analyses of the Center for

3    Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the

4    Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey

5    (MEPS). I am an experienced analyst of these data and have published numerous studies

6    using these nationally representative health survey data.

7    19. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an

8    estimate of DACA eligibility, based on the criteria of being non-citizen immigrants

9    between the ages of 18 and 36 in the U.S. for more than 5 years who are not participating

10    in Medicaid.  (I exclude Medicaid recipients since DACA recipients are not eligible for

11    Medicaid, except emergency Medicaid coverage).  I use Prof. Wong's estimate that 57%

12    of employed DACA recipients get insurance through work.  (My analysis of NHIS data

13    show that 55% of the DACA group who are working have private insurance, about the

14    same as Prof. Wong's estimate of employer-based insurance coverage among DACA

15    recipients.  Two separate data sources yield almost the same estimate, corroborating each

16    other). The loss of DACA status and work authorization would trigger the loss of their

17    jobs and therefore their private health insurance.

18    20. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19

19    percent probability of using emergency room care in the last 12 months.  Since the loss of

20    DACA coverage would result in the loss of work authorization, legal work and

21    employment-based insurance, it is reasonable to assume that about 19% of former DACA

22    recipients would need to rely on emergency Medicaid to pay their emergency medical

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

NOV 22, 2017

1    bills.  To estimate the costs of emergency medical care, I relied on analyses of MEPS

2    data and estimated that the average annual cost of emergency room care received by an

3    18-36 year old immigrant who had been in the U.S. for more than five years was $1,275

4    in 2015.  I used estimates of national health expenditure price increases per capita from

5    2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services[14], to

6    estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults

7    who had previously been privately-insured working DACA recipients in each state, but

8    who would now be uninsured.

9    21. I estimated the costs of community-based uncompensated care that would be received by

10   the newly uninsured immigrant adults, due to the loss of DACA status.  For this, I drew

11   on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[15]  That study

12   estimated that in 2013, the average uninsured person received uncompensated medical

13   care costing $1,702 per person, of which 26% was provided as uncompensated care at

14   publicly-supported state or local community-based ambulatory sites, such as community

15   health centers or state or local clinics; this is equal to $449 in community-based

16   ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for

17   health care cost inflation between 2013 and 2018 to $559 per uninsured person.  I

18   multiplied this amount by the number of former DACA recipients who would lose their

19   jobs and private health insurance in each state.

---

[14] Centers for Medicare and Medicaid Services.  National Health Expenditures.
https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html
[15] Coughlin T, Holahan J, Caswell K, McGrath M.  *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.*  Kaiser Commission on Medicaid and the Uninsured.  May 2014.
https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

NOV 22, 2017

1   22. The additional public costs that would be borne at state levels in 2018 are shown in Table

2        1 below, based on the methods and sources described above.  These are annual costs in

3        2018; the cumulative costs over several years would be substantially higher.  These

4        estimates are conservative, since they do not include the additional costs that might be

5        borne by states if dependents of DACA recipients – their spouses or children – lose

6        private health insurance if the DACA recipient loses his or her job.

**Table 1.  Estimates of Additional State-Level Costs Due to the Loss of DACA Status, 2018**

| State | Number DACA Recipients Currently Employed | Number Who Could Become Uninsured If They Lose Their Jobs | Number Who Could Require Emergency Room Care If Uninsured | 2018 Costs of Additional Medicaid Emergency Room Care Due to Loss of DACA | 2018 Costs of Additional Community-Based Uncompensated Care Due to Loss of DACA | Sum: Total 2018 Additional Public Health Costs Due to Loss of DACA |
|---|---|---|---|---|---|---|
| Colorado | 15,281 | 8,710 | 1,655 | $2,399,114 | $4,872,939 | **$7,272,053** |
| Connecticut | 4,560 | 2,599 | 494 | $715,919 | $1,454,133 | **$2,170,052** |
| Delaware | 1,326 | 756 | 144 | $208,182 | $422,847 | **$631,028** |
| Dist Columbia | 707 | 403 | 77 | $110,999 | $225,454 | **$336,453** |
| Hawaii | 532 | 303 | 58 | $83,524 | $169,649 | **$253,173** |
| Illinois | 42,537 | 24,246 | 4,607 | $6,678,301 | $13,564,572 | **$20,242,873** |
| Iowa | 2,570 | 1,465 | 278 | $403,489 | $819,544 | **$1,223,034** |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,519 | $2,347,021 | **$3,502,540** |
| New Mexico | 6,250 | 3,563 | 677 | $981,249 | $1,993,055 | **$2,974,304** |
| New York | 38,848 | 22,143 | 4,207 | $6,099,128 | $12,388,191 | **$18,487,320** |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,753 | $8,002,195 | **$11,941,948** |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,477 | $3,299,542 | **$4,924,019** |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,475 | $1,743,684 | **$2,602,159** |
| Rhode Island | 1,141 | 650 | 124 | $179,137 | $363,852 | **$542,989** |
| Vermont | 221 | 126 | 24 | $34,717 | $70,516 | **$105,233** |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,613 | $3,569,960 | **$5,327,573** |
| Washington | 16,394 | 9,345 | 1,775 | $2,573,855 | $5,227,863 | **$7,801,717** |
| **Subtotal** | **189,831** | **108,204** | **20,559** | **$29,803,450** | **$60,535,017** | **$90,338,467** |
| **US Total** | **721,654** | **411,343** | **78,155** | **$113,299,482** | **$230,127,255** | **$343,426,737** |

Source: Estimates by Leighton Ku, November 2017 using methods and data described in the text.

13

23. Estimates of additional costs that would be borne by the Plaintiff States and for the overall nation in 2018 are presented below.  These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

24. For Colorado, the loss of DACA status could increase public health care costs by $7.3 million in 2018, including $2.4 million in Medicaid emergency room costs and $4.9 million in community-based uncompensated care costs.

25. For Connecticut, the loss of DACA status could increase public health care costs by $2.2 million in 2018, including $0.7 million in Medicaid emergency room costs and $1.5 million in community-based uncompensated care costs.

26. For Delaware, the loss of DACA status could increase public health care costs by $0.6 million in 2018, including $0.2 million in Medicaid emergency room costs and $0.4 million in community-based uncompensated care costs.

27. For the District of Columbia, the estimates described above indicate that the loss of DACA status could increase public health care costs by $0.3 million in 2018, including $0.1 million in Medicaid emergency room costs and $0.2 million in community-based uncompensated care costs.  However, circumstances could differ for the District, compared to other states.  The District of Columbia has a Health Care Alliance program which is supported by state funds and that provides limited coverage for low-income people ineligible for Medicaid, including the undocumented.  The District estimated that

the loss of DACA protections could increase enrollment and costs in the Alliance, costing the District $283,000 per month in 2018.[16]

28. For Hawaii, the loss of DACA status could increase public health care costs by $0.3 million in 2018, including $0.1 million in Medicaid emergency room costs and $0.2 million in community-based uncompensated care costs.

29. For Illinois, the loss of DACA status could increase public health care costs by $20.2 million in 2018, including $6.7 million in Medicaid emergency room costs and $13.6 million in community-based uncompensated care costs.

30. For Iowa, the loss of DACA status could increase public health care costs by $1.2 million in 2018, including $0.4 million in Medicaid emergency room costs and $0.8 million in community-based uncompensated care costs.

31. For Massachusetts, the loss of DACA status could increase public health care costs by $3.5 million in 2018, including $1.1 million in Medicaid emergency room costs and $2.3 million in community-based uncompensated care costs.  Massachusetts has other state-funded health programs, including MassHealth and the Health Safety Net Program, which could also provide limited coverage; the costs of providing care in these programs could be higher than my estimate.

32. For New Mexico, the loss of DACA status could increase public health care costs by $3.0 million in 2018, including $1.0 million in Medicaid emergency room costs and $2.0 million in community-based uncompensated care costs.

33. For New York, the loss of private insurance due to the rescission of DACA status could increase public health care costs by $18.5 million in 2018, including $6.1 million in

---

[16] Declaration of Claudia Schlosberg, District of Columbia Dept. of Health Care Finance, Sept. 26, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-110).

15

Medicaid emergency room costs and $12.4 million in community-based uncompensated care costs.  New York currently provides Medicaid to DACA recipients, as it does to certain other legal non-citizen immigrants, but it uses state funds only, without federal matching, to cover DACA recipients.  Under current law, the loss of DACA status would mean that current DACA recipients would need to use emergency Medicaid and community-based uncompensated care, as estimated above.  It is possible that New York might choose to amend its state rules and extend Medicaid to former DACA recipients; this would impose additional costs to the state which are higher than those that I estimate above.

34.  For North Carolina, the loss of DACA status could increase public health care costs by $11.9 million in 2018, including $3.9 million in Medicaid emergency room costs and $8.0 million in community-based uncompensated care costs.

35. For Oregon, the loss of DACA status could increase public health care costs by $4.9 million in 2018, including $1.6 million in Medicaid emergency room costs and $3.3 million in community-based uncompensated care costs.

36. For Pennsylvania, the loss of DACA status could increase public health care costs by $2.6 million in 2018, including $0.9 million in Medicaid emergency room costs and $1.7 million in community-based uncompensated care costs.

37. For Rhode Island, the loss of DACA status could increase public health care costs by $0.5 million in 2018, including $0.2 million in Medicaid emergency room costs and $0.4 million in community-based uncompensated care costs.

38. For Vermont, the loss of DACA status could increase public health care costs by $0.1 million in 2018, including $0.03 million in Medicaid emergency room costs and $0.07

million in community-based uncompensated care costs.  (Tom Wong's analysis did not include employment effects for Vermont, so I used data from the U.S. Citizenship and Immigration Services[17] to identify the number of DACA recipients in Vermont and then used methods similar to those described above.)

39. For Virginia, the loss of DACA status could increase public health care costs by $5.3 million in 2018, including $1.8 million in Medicaid emergency room costs and $3.6 million in community-based uncompensated care costs.

40. For Washington State, the loss of DACA status could increase public health care costs by $7.8 million in 2018, including $2.6 million in Medicaid emergency room costs and $5.2 million in community-based uncompensated care costs.

41. In total, I estimate that the Plaintiff States could experience at least $90 million more in public expenditures in 2018 due to the loss of DACA protections for residents of their states, including $30 million in emergency Medicaid costs and $61 million in community-based uncompensated care costs.  As noted, because of special programs that exist in certain states, the actual cost could be higher.  Over multiple years, the cumulative cost would be far higher.

42. Using similar methods for the overall United States (50 states and the District of Columbia), the total estimated impact of the loss of DACA status is at least $343 million in 2018, of which $113 million is for Medicaid emergency room costs and $230 million is for community-based uncompensated care costs. All told, this could lead more than 400,000 individuals to lose private health insurance coverage and to become uninsured.

---

[17] U.S. Citizenship and Immigration Services.  Deferred Action for Childhood Arrivals Data (Through June 30, 2017), :
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

**Effects of the Loss of DACA Recipients as Health Care Providers**

43. DACA recipients are not only patients who use health care services; many are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide needed manpower for patient care, they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA status would lead them to lose work authorization, which would lead to the loss of their jobs and the loss of the service that they render to the community.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  The loss of DACA status would create hardships for the organizations that employ current and future health care professionals, as well as the patients for whom they care.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

44. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support staff (e.g., medical aides, home health staff, etc.).[18]  Health professionals typically provide care to hundreds of patients in a year, so the loss of several thousand health

---

[18] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.

professionals would disrupt care for hundreds of thousands of patients living in states across the country.  More are engaged in other positions in health care organizations, such as management, computer services, food service, etc.  The Migration Policy Institute support estimated that 40,700 DACA recipients work in the education, health care or social services industry.  Health care executives representing numerous hospitals have written President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[19]

45. In addition, large numbers of DACA recipients are training to become future health care professionals, including physicians, nurses, etc.; the loss of status would short-circuit their dreams and the service they would render to others in the future.  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[20]  Even after a DACA recipient has completed medical school, he or she must typically complete post-graduate medical residency to become a fully qualified physician, but the loss of work authorization would endanger their residencies.[21]  Similar problems are likely to occur for those in training for nursing and other health professions.

---

[19] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf

[20] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.*  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06

[21] Weinstein D, Saldana F.  DACA and the Dream of Becoming a Physician.  *New Eng J Med.* 2017; 377:1913-1915.

46. The loss of immigrant health workers could have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing community-based care to senior citizens and those with disabilities in their homes.[22]  Reductions in the number of health workers through the cancellation of DACA would create hardships for the health facilities that employ them and the patients who rely on them for care.  It is particularly worth noting that the Medicaid program is the leading payer for long-term care services in the U.S.  The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

November 22, 2017

---

[22] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported.  *New York Times.  S*ept. 7, 2017.

20

# EXHIBIT QQQ

**Talking Points – DACA Rescission**

**BACKGROUND**

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," establishing an administrative program that permitted certain individuals who came to the United States as juveniles and met several criteria—including lacking any lawful immigration status—to request consideration of deferred action for a period of two years, subject to renewal and eligibility for work authorization.

Recognizing the complexities associated with terminating the program, the Department will provide a limited window during which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below.

**TALKING POINTS: President Trump Directs Phased Ending of DACA**

- Acting Secretary Duke issued a memo rescinding the June 15, 2012 memorandum that created the Deferred Action for Childhood Arrivals (DACA) program.

- President Donald J. Trump, in close coordination with the Department of Homeland Security and the Department of Justice, considered a number of factors, including the legality of the DACA program, the likely outcome of imminent litigation, and the administrative complexities associated with ending the program.

- We are a nation of laws. DACA was an unconstitutional, unwarranted exercise of authority by the Executive Branch. Only the U.S. Congress has the authority to pass legislation to provide immigration benefits to individuals.

- President Obama noted repeatedly in the months and years leading up to the creation of DACA that the President of the United States does not have the authority to create such a an open-ended, wide-ranging program without Congressional authorization.

- DACA will be phased out. All DACA benefits are provided on a two-year basis, so individuals who currently have DACA will be _allowed to retain both DACA and their work authorizations (EADs) until they expire_.

- U.S. Citizenship and Immigration Services will adjudicate—on an individual, case-by-case basis—properly filed pending DACA _initial requests_ and associated applications for Employment Authorization Documents that have been accepted as of September 5, 2017.

- USCIS will adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.

- Individuals who have not submitted a request by September 5th, for an *initial grant* under DACA may no longer do so. All requests for initial grants received after September 5th will be rejected.

- In general, individuals who will no longer have DACA will not proactively be referred to ICE and placed in removal proceedings unless they satisfy one of the Department's enforcement priorities.

- The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States—including proactively seeking travel documentation—or to apply for other immigration benefits for which they may be eligible.

- As of September 4, 2017, there are 689,821 individuals with current valid DACA.

- It should be noted that DACA was not intended to be available to persons who entered illegally after 2007.  Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

# EXHIBIT RRR

**PRESS BRIEFINGS**

# Press Briefing by Press Secretary Sarah Sanders

Issued on: September 5, 2017

— ☐☐☐ —

🔲 ALL NEWS

James S. Brady Press Briefing Room

1:54 P.M. EDT

MS. SANDERS:  Good afternoon.  This morning, faced with the very real possibility of a potential immediate shutdown of the entire DACA program by a federal court, President Trump took the responsible and constitutional step of announcing that the administration will be phasing out the program over the next two years.

Today's September 5th deadline was set by the plaintiffs presenting the administration with two, and only two, real options to choose from:  the likely sudden cancellation of the program by a judge or an orderly wind-down that preserves the rule of law and returns the question to the legislative branch where it belongs.  The President chose the latter of the two options.

The President made the best decision in light of the fact that the system was set up by the Obama administration, in clear violation of federal law.  President Obama even admitted this himself when announcing the program, calling it a "temporary stopgap measure" and calling on Congress to act.

DACA was initiated after Congress explicitly rejected the same proposal in legislative form.  In other words, President Obama didn't just suspend federal law, but implemented a policy Congress had explicitly rejected.

There is a misconception that DACA primarily serves as a shield from deportation.  This is misleading.  DACA grants work authorization to nearly 800,000 individuals who are not legally authorized to work.  DACA recipients, whose average age is in their 20s, were not an enforcement

priority before, and they certainly won't become a priority now.  The priorities remain the same:  criminals, security threats, and those who repeatedly violate our immigration laws.

The main effect of today's announcement is that work permits and other government benefits are being gradually phased out.  But rather than leave DACA recipients and men and women of immigration enforcement in confusing limbo, while the DACA program was challenged by states in the same court that struck down another of the previous administration's unlawful immigration orders earlier this year, President Obama [sic] is laying out a responsible 24-month phase-out — sorry, President Trump.  (Laughter.)

No permits will be expiring for another six months, and permits will remain active for up to two full years.  The President was elected partly on his promise to deliver meaningful immigration reform that puts the jobs, wages, and security of the American people first.  He is delivering on that promise every day, and he has put forward serious proposals to Congress that would responsibly end illegal immigration, prevent visa overstays, remove dangerous criminals, protect American jobs and wages, and create a merit-based system that grows our middle class.

These are not just President Trump's priorities; they are the American people's priorities.  For decades now, the American people, immigrant and U.S.-born, have asked Congress to establish a lawful immigration system that protects our country.  They've asked for strong, secure borders, they've asked us to protect American security and American jobs, and they've asked us to have compassion, not only for those who are here illegally, but for unemployed American citizens, including millions of unemployed African American and Hispanic citizens who continue to suffer under a broken system.

The President's DACA decision today brings us closer to a safer, fairer, and legal immigration system.  Now that he has ended this unsustainable and unconstitutional program imposed by the previous administration, the President is calling on the men and women in Congress to fulfill their duty to the American people by truly reforming our immigration system for the good of all people.

And with that, I'll take your questions.  John.

Q    Sarah, one question that went unanswered today was, some 359 members of the DACA program enlisted in the U.S. Army in 2016.  Their tour of duty would run the standard four years, I would assume, but their DACA status would only last two years.  If there's no fix by Congress

before March the 5th, do you know what will happen to those people?  Will they become ineligible to remain in the military, or will there be special dispensation?  Has that been worked out?

MS. SANDERS:  We have confidence that Congress is going to step up and do their job.  This is something that needs to be fixed legislatively, and we have confidence that they're going to do that.  And we stand ready and willing to work with them in order to accomplish responsible immigration reform, and that would include — DACA is certainly part of that process.

Q    There are many Republicans who believe that getting something on the Republican side is not going to be easy; that the divisions that we see between the center and the right in the Republican Party will become only deeper.  What gives you confidence that this will actually happen?

MS. SANDERS:  With all due respect, I don't think the American people elected Congress to do things that were easy.  They elected them to make a government that works, to work properly, and to work for American people.  And that's their job.  And if they can't do it, then they need to get out of the way and let somebody else who can take on a heavy lift and get things accomplished.

Major.

Q    Sarah, in the context of DACA as a piece of legislation, would the President be willing to sign only something that addresses that?  Or would it also be to have components of the RAISE Act?  Would there need to be funding for the border wall?  Or would he be willing to sign something that simply addresses DACA legislatively?

MS. SANDERS:  The President wants to see responsible immigration reform, and he wants that to be part of it.  But again, we can't take just a one-piece fix.  We've got to do an overall immigration reform that's responsible and, frankly, that's lawful.  And that's what the President wants to see Congress do.

Q    What would be the priorities for him in a comprehensive reform package?  It would be DACA and what else?

MS. SANDERS:  And certainly to control the border, to improve vetting and immigration security, enforce our laws, and do things that protect American workers.

Q    Let me ask you a question on North Korea.  In the President's mind, is it an option to simply contain a North Korea that possess nuclear weapons?

MS. SANDERS:  Certainly the priority of the administration is to have denuclearization of the Korean Peninsula, and it's also to protect American citizens.  But certainly the priority would be that.

Phil.

Q    Sarah, you're talking about a comprehensive immigration fix from Congress in a span of six months, and much to the President's frustration, Congress hasn't been able to really do much at all this year.  What gives him confidence that they're going to be able to act on immigration?  Has he spoken to any congressional leaders since making this DACA decision?

MS. SANDERS:  He's spoken to a number of leaders, but hopefully, as you guys all know, they just came back from a three-week vacation.  I think that they should be rested and ready to take on some big challenges that America faces.

Q    Why put the fate of the lives of 800,000 DREAMers, people —

MS. SANDERS:  Because it's Congress's job to legislate.  It's not the President's job to create law.  It's Congress's job to create legislation.  I think that's something we all learned in 8th grade civics; I know I certainly did.  And I think that every member of Congress should know that that is their duty, and we're asking them to fulfill it.  It's pretty simple.

Q    Do you think they'll be able to do it?

MS. SANDERS:  I think that the American people elected them to do it.  And again, if they can't, then they should get out of the way and let somebody else take their job that can actually get something done.

Steve.

Q    What consideration are you giving to negotiations with North Korea, over the nuclear program?

MS. SANDERS:  Look, I think in the terms of negotiations, we're looking at putting aggressive measures, both diplomatically, economically.  And as we've said, all options are on the table and we're going to continue to push for a safer and denuclearized Korean Peninsula.  And that's the priority here.

Jim.

Q    It sounds the President is saying, and your saying, that if we're going to allow the DREAMers to stay in this country, we want a wall.  Is that accurate?

MS. SANDERS:  I don't think that the President has been shy about the fact that he wants a wall, and certainly something that he feels is an important part of a responsible immigration reform package.

Q    Can I ask you one follow-up question?  Why did the President not come out and make this announcement himself today?  Why did he leave it to his Attorney General?  It's his decision.  These kids — their lives are on the line because of what he is doing.  Why not have him come out and make this call?

MS. SANDERS:  It's in large part a big part of the legal process.  This was deemed illegal by, I think, just about every legal expert that you can find in the country, including many of Obama's own attorneys said that this was not a lawful program.  And therefore it would be the Department of Justice to make a legal recommendation, and that's what they did.

Q    Thank you, Sarah.  Quick question, yes or no, and then a follow-up.  Would the President sign a standalone DACA extension?

MS. SANDERS:  Again, I have addressed this.  The President is hoping to work with Congress on responsible immigration reform, and I laid out the priorities that the administration has on that front.

Q    So the President has voiced, and you've voiced, some objections to the constitutionality of DACA.   Where does the President stand on the program itself?

MS. SANDERS:  I think that in the answers that I have given, is that the President has been — and I think part of the reason that this is complicated, and one of the reasons he's wrestled with this

back and forth, in large part is because this is not an easy one, and certainly something where he wants to be able to make a decision with compassion, but at the same time you can't allow emotion to govern.  And this has to be something where the law is put in place and it's something that he would support if Congress puts it before him.

Q    You would support it, if it came with — I am just trying to get the specifics

MS. SANDERS:  Again, responsible immigration reform.  We can't just have one tweet to the immigration system; we need really big fixes and big reform in this process.  And we've laid out the principles that we feel are important in that.

John Decker.

Q    Thank you, Sarah.  Is this a position — what?

MS. SANDERS:  Sorry, John Decker.

Q    Thanks, Sarah.  The President had, recently as February, expressed sympathy for the DACA recipients.  Today we heard in a statement from House Speaker Paul Ryan, who said that these so-called DREAMers have done nothing wrong.  Was this a difficult decision for the President to take this drastic action, given what he's said as recently as February?  And does he agree with House Speaker Paul Ryan that these individuals — 800,000 individuals — have done nothing wrong?

MS. SANDERS:  I think largely, yes, and that's why I said it was one of the things that the President wrestled with this decision all throughout the weekend.  So I kind of addressed that, so I think that's pretty clear.

Q    It was just this weekend that he wrestled with it?  It wasn't leading up to it?

MS. SANDERS:  Well, no — I mean, I think we've been clear throughout the process.  There wasn't a final decision made until over the weekend because of the back-and-forth and the complexity of the issue, and the ability to make the right decision, and allow Congress to actually do their job and provide a fix, instead of just stopping the program.  And that was a big point for the President.

Jordan.

Q    Thanks, Sarah.  I want to drill down a little more on what you mean when you say the President wants to act with heart and compassion in regard to these DACA recipients.  Does that mean offering them a pathway to citizenship?

MS. SANDERS:  I think it means providing a more permanent solution that's done through the legislative process; done legally and responsibly, unlike the previous administration.

Q    A permanent solution — does that mean you're giving them legal status, legislatively?  Like, what is the permanent solution that the President —

MS. SANDERS:  I think that's something we want to work with Congress to determine exactly what that looks like.  But there has to be — something needs to be done.  It's Congress's job to do that, and we want to be part of that process.  And make sure that there is a fix put in place and that this isn't ignored, like it has been for the last five years.

Q    If Congress doesn't get it done by the March 5th deadline, considering the President's personal feelings about these DACA recipients, would he consider giving them additional time to get a solution passed?

MS. SANDERS:  We'd like to have confidence that Congress will actually do their job.  We're going ask that they do that and that they allow us to work with them and be part of that process.  But again, if Congress doesn't want to do the job that they were elected to do, then maybe they should get out of the way and let someone else do it.

Steven.

Q    Sarah, when we heard from the Attorney General this morning, he repeatedly referred to DACA recipients as illegal aliens.  And at one point he intimated that hundreds of thousands of Americans did not get jobs that were taken by DACA recipients.  Does the President share that view?

MS. SANDERS:  I think that it's a known fact that there are over 4 million unemployed Americans in the same age group as those that are DACA recipients; that over 950,000 of those are African Americans in the same age group; over 870,000 unemployed Hispanics in the same age group.  Those are large groups of people that are unemployed that could possibly have those jobs.

But again, we're looking for fixes.  We're not looking for complaints but we're looking for solutions.  And that's our focus moving forward.

Q    How do you reconcile those statistics with the idea that hundreds of thousands of people, if the President gets what he wants, could achieve legal status?  How do you reconcile those two competing interests?

MS. SANDERS:  Well, I think one of the first things is, the President is looking to create a whole lot more jobs in America so that it addresses both problems.  There's a reason he's focused largely, since day one of taking office, in creating a better market for businesses to create jobs, to hire more people, higher wages.

He's gotten rid of over 800 regulations that have helped do just that.  1.2 million jobs have been created since he came into office, and every single day we're looking for more ways to grow that number.  And so we're doing our part to address and create an environment that allows people to have more jobs.  And we're going to continue doing that.

Kristen.

Q    Sarah, thanks.  The President vowed to treat DREAMers with "great heart."  How is this move treating them with great heart?

MS. SANDERS:  I think by allowing an orderly process to take place.  You know, there's a lot of people that I've seen attacking the President for not showing the level of compassion that they feel like he should.  To me, the most heartless thing that I've seen all day today is that Democrats, like Nancy Pelosi, are using this decision today for fundraising while the President is trying to fix this situation.  They are politicizing an issue instead of actually doing their job.

If they would spend less time fundraising and more time focusing on solutions, we wouldn't even be in this problem in the first place.

Q    But keeping it on the President's decision, where all of this stems from, the DREAMers, the supporters of DREAMers says this is cold-hearted; you're leaving the future of 800,000 people uncertain, up in the air.  What's your message to them?

MS. SANDERS:  It's not cold-hearted for the President to uphold the law.  We are a nation of law

Case 1:16-cv-04756-NGG-VMS   Document 123-13   Filed 12/15/17   Page 230 of 236 PageID #: 2584

and order.  And the day that we start to ignore the fact that we are that, then we throw away everything that gives these people a reason to want to come to our country.  If we stop becoming the country that we were envisioned to be, then we throw away what makes us special, what makes America unique.  This President is not willing to do that.  The previous administration was; this one isn't.

But we want to have real solutions.  We want to have laws that address these problems, but it's Congress's job to legislate, not the President's.  And we actually want to uphold the Constitution, and I think people across this country should be celebrating the fact that they have a President that is standing up and upholding the Constitution as he was elected to do.

Margaret.

Q    I'd like to ask you about North Korea.  But quickly on DACA, is the President committed to honoring the will of Congress, essentially whatever Congress passes on DACA?  Or does he reserve the right to veto a DACA fix if he feels that it doesn't kind of holistically do what you're talking about — a bigger-picture thing that touches on some of these things?

MS. SANDERS:  As I've said, we want responsible immigration reform, and that would be part of that package and part of that process.

Q    And then on North Korea, if I could just ask.  Vladimir Putin has said that he doesn't believe that sanctions are going to work at all against North Korea.  And I'm wondering whether the President himself is coming around to that perspective, or whether he still believes sanctions can be effective, and if he has any plans that you could share with us to talk with the Chinese President or the Russian President himself.

MS. SANDERS:  Look, we've been clear about what our priorities are; that now is not the time for us to spend a lot of time focused on talking with North Korea, but putting all measures of pressure that we can.  And we're going to continue through that process.

We've also said that everybody, including Russia, including China, need to do more to address the threat.  This is a global threat, and everybody needs to take part in putting pressure on North Korea.  And as we've said many times before, both Secretary Mattis and the President, that all options are on the table, and we're going to continue to keep them on the table until we get the results that we're looking for.

Q    Sarah, the President has said that the DACA recipient should "rest easy." He's also said on several occasions that he loves them. Is he giving them his personal assurance that at the end of six months they will not be deported?

MS. SANDERS: I think he is giving Congress the ability to do their job. I've said that earlier —

Q    What does "rest easy" mean when he said they should rest easy?

MS. SANDERS: Look, the President gave the ability for us to have a six-month process for Congress to actually step up and fix this problem. And they certainly have the ability to, and certainly should take that opportunity.

Q    One other question about — during the other immigration moves that the administration has made, you made the argument that the President's powers over immigration are very, very broad and unquestioned. Why in this case does he feel he can't do anything by himself and he has to turn it over to Congress?

MS. SANDERS: That was a specific statute within the Constitution that allows the President to take action to protect Americans. These are two very different things and certainly not apples to apples.

John Gizzi.

Q    Thank you, Sarah. Two questions. On DACA —

MS. SANDERS: Two-question Tuesday.

Q    Kansas Secretary of State Kris Kobach, a close ally of the President's, denounced the decision because of the six-month delay in it, and said there should be no phase-out; it should have been implemented immediately. What's your response to that criticism from a strong supporter and ally of the President?

MS. SANDERS: I think our response is pretty clear. The President made a decision, and we feel very much that it was the right one.

Q    The other thing is that you talk about 4 million jobs that could go to other people. Has the President ever discussed this part of DACA with some of the leaders of organized labor to try to

involve them in the process — President Trumka of the AFL-CIO, President Hoffa of the Teamsters, and others that they work with?

MS. SANDERS:  I'm not sure about specific conversations on that exact figure, but I do know that he has had conversations with individuals and relevant stakeholders in this process on both sides that know that that is an issue.

Whether DACA existed or not, the fact that there are 4 million people in this age group that are unemployed and certainly why creating a better job market is a priority for the administration.

Francesca.

Q    Thank you, Sarah.  I wanted to follow up on what Jim asked.  I don't know that we heard back here the rest of your answer.

You said that the reason that Attorney General Jeff Sessions put out the earlier statement on camera was because it was a legal argument.  But a lot of what we've been talking about in here is a legislative argument.  Why have we not heard from the President directly on this day?  And can we expect to hear from him later today on this?

MS. SANDERS:  You have heard directly from the President.  He issued a pretty lengthy statement directly from the President.

Q    Why was it Attorney General Jeff Sessions that went on camera when the President hasn't gone on camera to make this case today about what a big heart he has and how compassionate he is, and how he wants Congress to take legislative action on this to essentially save DACA?

MS. SANDERS:  The President has spoken about this numerous times in the past.  But at the same time, this was a legal issue because there was a court decision that had to be made with a timeline not placed — that the administration created, but a timeline that was created by the attorney generals in those states that were forcing this issue and this decision to take place by today.  It was a legal decision, and that would fall to the Attorney General, and that's why he would be the one making the announcement.

Peter.

Q    Talking about stakeholders, has the President met any enrollees in the DACA program?

MS. SANDERS:  I believe he has had several conversations with enrollees and those that have been part of the program.

Q    Can you tell us anything about that — in what context, and what he got out of those conversations?

MS. SANDERS:  Look, again, I think that the President's goal was to talk to a lot of people on both sides of the issue, and, one, do what it takes to uphold the law, uphold the Constitution, but also allow Congress to create a permanent solution and fix the problem, which he's done by allowing for that six-month period.

Q    He's had those conversations recently as part of this recent deliberation?

MS. SANDERS:  Again, I'm not sure on the exact timeline, but I know he has had many conversations with people on both sides of this issue, certainly people that support keeping it as is and those that support getting rid of it.

Q    (Inaudible) people will be affected by it, though, right?

MS. SANDERS:  Right.  Again, like I said, he's, I know, had conversations with people that have been part of the program.

Catherine.

Q    Sarah, you said the President wrestled with the decision all weekend.  Can he walk us through any of the process he went through to get to this — when did he make this decision, who was he consulting with, and how this came about?

MS. SANDERS:  He made the final decision over the weekend.  And as I said, he spoke to many relevant stakeholders and individuals that support a variety of positions on this program.

Q    Sarah, can you tell us anything about the meeting today — the Big 6, what are you expecting out of that?  Is there anything you're hoping to get out of that?

MS. SANDERS:  We'll continue to keep you guys posted.  I think the ultimate goal is, as Congress

is coming back into session, to talk about some of the big priorities — certainly tax reform, immigration reform, among many other things that are going to be on the agenda for the fall.

Noah.  I'll go here, and then I'll come back to you.

Q    The President has basically told Congress to do this, but he hasn't written any legislation, similar to how he approached —

MS. SANDERS:  I didn't know it was the President's job to write out specific details of legislation. (Laughter.)  I think that's exactly what the —

Q    Well, other Presidents with their major initiatives have taken a greater role in helping to craft that legislation.  They found friendly allies in Congress to actually be the ones to propose it, but this President has not.  Why hasn't he made that shift?  And does he think it's — is he reconsidering it in light of the fact that some of the other major pushes he's tried to make have not been successful legislatively?

MS. SANDERS:  We've laid out detailed principles, and we have worked with members of Congress on specific pieces of the legislation, and we'll continue to do that.

Q    Thank you, Sarah.  Quick international question.  The situation in Myanmar is quickly escalating to a major humanitarian crisis.  Has the President been briefed on the situation in Myanmar?  If so, is he planning to speak to any of the leaders during the upcoming meeting about this situation?

MS. SANDERS:  I know this is something that we're monitoring closely, but I'm not aware of any specific conversations that are planned at this time.  But as always, in calls like that, we will keep you guys posted and put a readout after.

Cecilia.

Q    The President says that DREAMers won't be a priority for enforcement, but that's not a guarantee of protection.  Is this White House willing to offer one?

MS. SANDERS:  Again, they're not a targeted priority.  But the goal here is that Congress actually fixes the problem, and then that isn't an issue.  And so that's the focus over the next six months, is making sure that something takes place, that Congress does their job, and a real solution is

implemented.

Q   But is there a way to put this in writing so that these 800,000 people who are very fearful of ending up in a country that they don't know have some guarantee that, in fact, they won't be deported in, say, 6 months?

MS. SANDERS:  I think that the statement that the President put out earlier today lays out what the priorities are and lays out what the focus of the administration is, and that they are not targets — they are certainly not priority targets of this administration.  They weren't before, and they won't be now.

And again, Congress has six months, which is a pretty long time to get something done.  And we hope they do, and there's a solution in that so that this isn't a problem moving forward.

Anita.

Q   I was wondering — you mentioned that the President had spoken over the weekend or in recent days to various stakeholders.  We had talked to the attorney general's office in Texas and they had said that they did not get a heads up or nobody conferring with them about this.  Did you all talk to the 10 states, and are you positive that they are not suing?

MS. SANDERS:  I know that various members of the administration have been in contact with individuals in those states.

I'm going to wrap here, but I have one note — I have one thing I'd like to just add.  The President will be announcing the donations that he will be personally making to the various charities.  And thank you to those who have submitted; we had several people put in submissions, and he'll be doing that tomorrow.

And again, I know there were a lot of questions over the weekend.  That will be a personal donation of $1 million from the President to various organizations and charities, many of which came from this room.  So thank you again for that.

Hope you have a good day.

END

2:20 P.M. EDT



The White House

JOBS          GET INVOLVED          COPYRIGHT POLICY          PRIVACY POLICY