# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN M. NIELSEN, Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States<br><br>Defendants. | Civil Action No.<br>1:16-cv-04756<br><br>(Garaufis, J.) |

## BRIEF OF 40 HISTORIANS AND THE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY**

Robert S. Chang (admitted *pro hac vice*)
Ronald A. Peterson Law Clinic
Seattle University School of Law
1215 E. Columbia
Seattle, WA 98122
Telephone: (206) 398-4025
Facsimile: (206) 398-4036
changro@seattleu.edu

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTEREST OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ........................................................................................................ 5

    I.   History is Replete with Instances in Which Racially Coded Expressions Have Strongly Evidenced Animus, Such As "Wetback," Used During the Mass Repatriation and Deportation of Persons of Mexican Ancestry in 1954 ......... 8

    II.  Code Word Analysis Is a Widely Accepted Methodology that Historians Employ to Discern Racial Animus and Give Context to Government Action ............... 11

    III. Courts Routinely Recognize the Evidentiary Value of Coded Language in Discerning Racial Animus .............................................................................. 12

    IV. A Sensitive Inquiry into the Historical Background of the Decision to Rescind DACA, with Particular Attention Paid to Contemporaneous Statements Made by Decisionmakers, Reveals the Use of Code Words Reflecting Animus Against Persons of Mexican Ancestry and Latinos .................................................... 17

CONCLUSION ................................................................................................... 19

APPENDIX - List of Individual *Amici* ............................................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aman v. Cort Furniture Rental Corp.*,
   85 F.3d 1074 (3d Cir. 1996) ............................................................... 12, 14

*Arnold v. U.S. Postal Serv.*,
   863 F.2d 994 (D.C. Cir. 1988) .................................................................. 15

*Avenue 6E Invs., LLC v. City of Yuma, Ariz.*,
   818 F.3d 493 (9th Cir. 2016) .................................................................... 15

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ......................................................................... 6

*City of Memphis v. Greene*,
   451 U.S. 100 (1981) ................................................................................. 14

*E.E.O.C. v. Bd. of Regents of U. of Wisc. Sys.*,
   288 F.3d 296 (7th Cir. 2002) .................................................................... 15

*González v. Douglas*,
   No. CV 10-623 TUC AWT, 2017 WL 3611658 (D. Ariz. Aug. 22, 2017)............... 2, 13, 14

*Jenkins v. Methodist Hosps. of Dallas, Inc.*,
   478 F.3d 255 (5th Cir. 2007) .................................................................... 14

*Keyes v. Sch. Dist. No. 1, Denver, Colo.*,
   413 U.S. 189 (1973) ................................................................................. 14

*MHANY Mgmt., Inc. v. Cnty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ........................................................... 7, 12, 13, 14

*Plyler v. Doe*,
   457 U.S. 202 (1982) ................................................................................. 10

*Smith v. Fairview Ridges Hosp.*,
   625 F.3d 1076 (8th Cir. 2010), *abrogated on other grounds by Torgerson v.
   City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) ....................................... 12, 15

*Smith v. Town of Clarkton, N.C.*,
   682 F.2d 1055 (4th Cir. 1982) .................................................................. 14

*Soto v. Flores*,
   103 F.3d 1056 (1st Cir. 1997) ............................................................................ 14

*Star Sci., Inc. v. R.J. Reynolds Tobacco, Co.*,
   537 F.3d 1357 (Fed. Cir. 2008) ......................................................................... 14

*Underwood v. Hunter*,
   730 F.2d 614 (11th Cir. 1984), *aff'd*, *Hunter v. Underwood*, 471 U.S. 222 (1985) ............. 15

*United States v. City of Birmingham, Mich.*,
   727 F.2d 560 (6th Cir. 1984) .............................................................................. 14

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017) ................................ 16, 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .......................................................................................... 7

*Villanueva v. Carere*,
   85 F.3d 481 (10th Cir. 1996) .............................................................................. 15

**Other Authorities**

*150,000 "Wetbacks" Taken in Round-Up*, N.Y. TIMES, July 30, 1954, at 7,
   https://timesmachine.nytimes.com/timesmachine/1954/07/30/84128756.
   html?pageNumber=7 .......................................................................................... 8

FRANCISCO E. BALDERRAMA & RAYMOND RODRÍGUEZ, DECADE OF BETRAYAL: MEXICAN
   REPATRIATION IN THE 1930S (1995) .................................................................. 3, 4

William J. Brennan, Conference Notes, Plyler v. Doe (Nos. 80-1538, 80-1934)
   (Dec. 8 1981) (on file with the Library of Congress, Manuscript Division,
   William J. Brennan Papers, Part I: Box 572) ...................................................... 10

*Brownell Maps Trip for "Wetback" Study*, N.Y. TIMES, Aug. 8, 1953, at 13,
   https://timesmachine.nytimes.com/timesmachine/1953/08/08/84417640.html?page
   Number=13 .................................................................................................... 10

Statement of Honorable Herbert Brownell, Jr., Attorney General of the United States,
   Testimony before Subcommittee on Immigration of the Committee on the Judiciary,
   April 13, 1956, https://www.justice.gov/sites/default/files/ag/legacy/2011/09/12/04
   -13-1956%20pro.pdf.......................................................................................... 10

Philip Bump, *Donald Trump Endorsed "Operation Wetback" – But Not by Name*, WASH. POST, Nov. 11, 2015, https://www.washingtonpost.com/news/the-fix/wp/2015/11/11/donald-trump-endorsed-operation-wetback-but-notbyname/?utm_term=.eb2b0a6f2955 .......................................................................................... 4

KITTY CALAVITA, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. (1992) ............................................................................................. 10

Keith Cunningham-Parmeter, *Alien Language: Immigration Metaphors and the Jurisprudence of Otherness*, 79 FORDHAM L. REV. 1545 (2011) .............................. 10

John Dillin, *How Eisenhower Solved Illegal Border Crossings from Mexico*, CHRISTIAN SCI. MONITOR, July 6, 2006, https://www.csmonitor.com/2006/0706/p09s01-coop.html ..... 9

*Drive on Wetbacks Termed a Success*, N.Y. TIMES, Mar. 10, 1955, at 28, https://timesmachine.nytimes.com/timesmachine/1955/03/10/93729836.html?pageNumber=28 ................................................................................................................. 10

Dwight D. Eisenhower, DDE Personal Diary Jan.-Nov. 1954 (1)(2) ("notes on Bricker Amendment; school construction; wetbacks; Brazilian coffee"), Eisenhower, Dwight D.: Papers as President; DDE Diary Series, at 5, https://www.eisenhower.archives.gov/research/finding_aids/pdf/Eisenhower_Dwight_Papers_as_President/DDE_Diary_Series.pdf ................................................................................................ 9

*Fifteen News Questions*, N.Y. TIMES, Apr. 2, 1950, at E2 and E9, https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214886.html?pageNumber=142 and https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214988.html?pageNumber=149 .............................................................................................................. 9

JUAN RAMÓN GARCÍA, OPERATION WETBACK: THE MASS DEPORTATION OF MEXICAN UNDOCUMENTED WORKERS IN 1954 (1980) ...................................................... 8

Celeste Gómez et al., *The President's Intent: Preliminary Findings of a Critical Discourse Analysis of Trump's Speeches and Tweets from the Date of his Candidacy to Mid-September 2017*, https://www.thepresidentsintent.com/full-report/... 5, 17

JOHN HIGHAM, STRANGERS IN THE LAND: PATTERNS OF AMERICAN NATIVISM, 1860-1925 (rev. ed. 2002) .............................................................................................. 3

Kate Linthicum, *The Dark, Complex History of Trump's Model for His Mass Deportation Plan*, L.A. TIMES, Nov. 13, 2015, http://www.latimes.com/nation/la-na-trump-deportation-20151113-story.html ....................................................................... 4

MAI NGAI, IMPOSSIBLE SUBJECTS, ILLEGAL ALIENS AND ALIEN CITIZENS (2004) ...................... 4

Rick Perlstein, *Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy*, THE NATION, Nov. 13, 2012, https://www.thenation.com/article/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/ .................................................. 11

LUCY SALYER, LAWS HARSH AS TIGERS: CHINESE IMMIGRANTS AND THE SHAPING OF MODERN IMMIGRATION LAW (1995) ........................................................................... 4

ALEXANDER SAXTON, THE INDISPENSABLE ENEMY: LABOR AND THE ANTI-CHINESE MOVEMENT IN CALIFORNIA (1975) ...................................................................... 3

Sunshine Summit, "Thank You," http://www.sunshinesummit.gop/thank-you ...............18

*The President's News Conference*, July 14, 1954, http://www.presidency.ucsb.edu/ws/index.php?pid=9947&st=wetback&st1= .................... 9

*The President's News Conference*, July 21, 1954, http://www.presidency.ucsb.edu/ws/index.php?pid=9950&st=wetback&st1= .................... 9

*Transcript: Republican Presidential Debate*, N.Y. TIMES, Nov. 11, 2015, https://www.nytimes.com/2015/11/11/us/politics/transcript-republican-presidential-debate.html. ................................................. 18

Harry S. Truman, *Special Message to the Congress on the Employment of Agricultural Workers from Mexico*, July 13, 1951, https://www.trumanlibrary.org/publicpapers/index.php?pid=368 ....................................................................................... 9

Statement from President Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-7/ ........................................................................................... 19

Donald J. Trump, Remarks at 2015 Sunshine Summit (Nov. 13, 2015), https://www.c-span.org/video/?400325-10/donald-trump-remarks-2015-sunshine-summit ............................................................................... 18

Donald J. Trump, Remarks at the Charlotte Convention Center in Charlotte, North Carolina (Aug. 18, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119175 .............................................................................. 18

Donald J. Trump, Remarks at the Mississippi Coliseum in Jackson, Mississippi (Aug. 24, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=123198 .............................................. 18

Donald J. Trump, Remarks on Signing a Proclamation on the National Day of Prayer for the Victims of Hurricane Harvey and for Our National Response and Recovery Efforts and an Exchange with Reporters (Sept. 1, 2017), http://www.presidency.ucsb.edu/ws/index.php?pid=128160&st=dreamers&st1 ............... 19

U.S. Citizenship and Immigration Servs., *Approximate Active DACA Recipients: Country of Birth (As of Sept. 4, 2017)*, https://www.uscis.gov/sites/default/files/ USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/ All%20Form%20Types/DACA/daca_population_data.pdf .................................................. 7

## INTEREST OF *AMICI CURIAE*[1]

The 40 individual *amici* are academics trained in the field of history who study, teach, and write about United States history.[2] Collectively, *amici* have written or edited 178 books and nearly 700 book chapters and peer-reviewed journal articles. *Amici* are keenly aware of the role that discrimination on the basis of race, ethnicity, and nationality has played in this nation's history. *Amici* have a special interest in ensuring that the Court has the benefit of their expertise when it draws its conclusions with regard to the role that animus may have played in the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program. *Amici* have reviewed the Declaration of Dr. Stephen Pitti submitted in support of the parallel legal challenge brought by New York and fourteen other states and the District of Columbia, No. 1:17-cv-5229, Dkt. 97-2, Ex. 38 (Pitti Decl.). After reviewing his Declaration, *amici* agree that Dr. Pitti used research methods that are widely accepted as valid in the field of history. These methods include a specific interpretive methodology that looks at public discourse to discern the use of racially coded expressions or code words by government officials, politicians, and members of the public to advance discriminatory political objectives. *Amici* agree with Dr. Pitti's summative opinion:

> When properly understood within the context of the history and contemporary discrimination directed against Mexicans, Mexican Americans, and Latinos, . . . President Trump and others who worked for his campaign and in his Administration have long expressed animus towards ethnic Mexicans and other Latinos. President Trump and others associated with his presidential campaign and Administration have drawn upon and used racial code words, and have benefitted from racism against Latinos. Racial animus against ethnic Mexicans shaped their decision to terminate DACA.

Pitti Decl. ¶ 17, Dkt. 97-2 at 14.

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a non-profit organization based at the Seattle University School of Law. The Korematsu Center works to

---

[1] *Amici curiae* file this brief pursuant to the Court's Order entered on Dec. 20, 2017, granting their motion for leave to file.
[2] Their names, titles, and institutional affiliations are appended, *infra* Appendix at A-1.

1

advance justice through research, advocacy, and education. Inspired by the legacy of Fred

Korematsu, who defied military orders during World War II that ultimately led to the unlawful

incarceration of 120,000 Japanese Americans, the Korematsu Center works to advance social

justice for all. The Korematsu Center has a special interest in addressing government action

targeted at classes of persons based on race, nationality, or religion. The Korematsu Center has

developed an expertise with regard to the use of racial code words in its role as co-counsel to

high school students who successfully challenged a facially neutral Arizona statute that was

enacted and enforced to terminate the Mexican American Studies Program in the Tucson Unified

School District. *González v. Douglas*, No. CV 10-623 TUC AWT, 2017 WL 3611658 (D. Ariz.,

Aug. 22, 2017). In addition, the Korematsu Center is keenly aware of the use of direct and

racially coded language used to justify the discriminatory treatment of Japanese Americans

before, during, and after World War II. Drawing on its experience and expertise, the Korematsu

Center seeks to ensure that courts understand the way that racially coded language is used to

achieve discriminatory outcomes.[3]

## INTRODUCTION AND SUMMARY OF ARGUMENT

History teaches us that the institution of slavery, the dispossession and removal of Native

Americans, the exclusion of Asian immigrants, the incarceration of Japanese Americans during

World War II, and the mass repatriation and deportation of persons of Mexican ancestry were not

accidents but instead were the product of deliberate decisions made by government officials. The

historical record demonstrates that these decisions were informed by an explicit racial ideology

that defined groups along racial lines; that justified discriminatory treatment based on notions of

group superiority/inferiority and group desirability/undesirability; and that often posed the

---

[3] The Korematsu Center does not, in this brief or otherwise, represent the official views of Seattle University.

2

discriminatory treatment as necessary for the security of the nation and for the prosperity of its citizenry.

During earlier periods, government officials, politicians, and members of the public expressed, much more nakedly, this racial ideology used to justify and advance discrimination. As social norms changed and it became, increasingly, less acceptable to express publicly these same sentiments, racially coded language was used by politicians to garner public support and gain elected office and by government officials to justify and advance discriminatory political objectives. Historians and other academics have observed and documented this phenomenon, the shift from explicit racial language to coded racial expressions. Examination of public discourse for the use of code words has become a widely accepted interpretive methodology used by historians and other academics to discern the role that discrimination may have played with regard to particular events, as well as for the broader course of United States history.

History is replete with examples in which explicit and coded language has been used to justify and advance discrimination against a particular group. During severe economic downturns, populist leaders and politicians exploited racial nativism to scapegoat outsider immigrant groups who were blamed for taking away the rightful opportunities of an anxious citizenry.[4] During the 1880s, the Chinese were blamed; during the 1920s, racialized white ethnic groups from southern and eastern Europe as well as immigrants from Asia were blamed; and during the height of the Great Depression in the 1930s, migrants from Mexico were blamed.[5] In each instance, targeted anti-immigrant sentiment led to the various Chinese Exclusion Acts, the

---

[4] *See generally* JOHN HIGHAM, STRANGERS IN THE LAND: PATTERNS OF AMERICAN NATIVISM, 1860-1925 (rev. ed. 2002).
[5] *See generally* ALEXANDER SAXTON, THE INDISPENSABLE ENEMY: LABOR AND THE ANTI-CHINESE MOVEMENT IN CALIFORNIA (1975); HIGHAM, *supra* note 4; FRANCISCO E. BALDERRAMA & RAYMOND RODRÍGUEZ, DECADE OF BETRAYAL: MEXICAN REPATRIATION IN THE 1930S (1995).

1924 Immigration and Nationality Act, which barred Asian immigration and put into place per country quotas for immigration based on the national origin composition of this country as reflected in the 1890 Census, and the 1930s mass deportation of Mexican migrants and U.S. citizens of Mexican ancestry.[6] Of the nearly 1.5 million deported during this period, upwards of 60% were U.S. citizens.[7] These various immigration measures were fostered by both explicit and coded racial nativist expressions that relied on themes of invasion and labeling Americans as victims with certain immigrant groups as undeserving and as threats to this nation's security and prosperity.

This amicus brief will focus on the use of code words in one historic example—the 1954 mass deportation program called Operation Wetback—before turning to the use of code words associated with the rescission of DACA. Understanding how government officials, politicians, and members of the public used the word "wetback," along with notions of threat to national security and national prosperity, in the period leading up to Operation Wetback provides an instructive example for understanding how various code words operate today with regard to immigration enforcement, including the decision to rescind DACA.

Further, Operation Wetback is particularly relevant because in November 2015 then-candidate Donald Trump invoked the 1954 deportation program, without using its name, as a successful model that he would seek to emulate.[8] Though the rescission of DACA does not, at

---

[6] *See* LUCY SALYER, LAWS HARSH AS TIGERS: CHINESE IMMIGRANTS AND THE SHAPING OF MODERN IMMIGRATION LAW 6-23 (1995) (discussing anti-Chinese sentiment and the various Chinese Exclusion Acts); MAE NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND ALIEN CITIZENS 18-54 (discussing the impetus of the Immigration Act of 1924) and 71-75 (discussing anti-Mexican hostility and the 1930s mass deportations).

[7] BALDERRAMA & RODRÍGUEZ, *supra* note 5, at 216; NGAI, *supra* note 6, at 72.

[8] Philip Bump, *Donald Trump Endorsed "Operation Wetback" – But Not by Name*, WASH. POST, Nov. 11, 2015, https://www.washingtonpost.com/news/the-fix/wp/2015/11/11/donald-trump-endorsed-operation-wetback-but-not-by-name/?utm_term=.eb2b0a6f2955; Kate Linthicum, *The Dark, Complex History of Trump's Model for His Mass Deportation Plan*, L.A. TIMES, Nov. 13, 2015, http://www.latimes.com/nation/la-na-trump-deportation-20151113-story.html (discussing Trump's endorsement during the Nov. 11, 2015, Republican primary debate in which Trump described the "deportation force" he would deploy to emulate Operation Wetback).

present, involve a mass deportation plan, the rescission of DACA is best understood as part of a set of immigration measures that is intended to accomplish then-candidate Trump's promises to his electorate. Promising to emulate this mass deportation program while omitting its name is itself an example of a camouflaged expression—an example of how, during the campaign and after the election, President Trump employed racially coded expressions or "code words," language that evinces and appeals to racial animus and is intended to invoke racial fear but which permits plausible deniability that the speech is about race. His use of these code words while seeking elected office and after assuming the presidency presents strong evidence of animus.[9]

To assist the court in analyzing whether Plaintiffs' Administrative Procedure Act claims merit preliminary injunctive relief, and more specifically in assessing the weight to be given to the Declaration of Dr. Stephen Pitti, *Amici* historians and the Fred T. Korematsu Center for Law and Equality submit this *amicus* brief to demonstrate that racial animus can be discerned by a code word analysis, and that such an analysis is a widely accepted methodology in the field of history. Further, a survey of federal circuit courts demonstrates that code word analysis has been adopted into legal frameworks as providing important direct and circumstantial evidence supporting a showing of animus or discriminatory intent.

## ARGUMENT

Plaintiffs' claims in this litigation have alleged that President Trump's decision to rescind DACA was motivated by animus toward Mexicans, and more generally towards Latinos, in violation of the Fifth Amendment and the Administrative Procedures Act ("APA"). *See* Third Am. Compl., *Batalla Vidal, et al. v. Nielsen, et al.*, No: 1:16-cv-04756, Dkt. 113 at 40-41, 43;

---

[9] In addition to the examples provided in the Pitti Declaration *passim*, No. 1:17-cv-05228, Dkt. 97-2 at 10-56, the case for discriminatory intent is made forcefully in a recently issued report. *See* Celeste Gómez et al., *The President's Intent: Preliminary Findings of a Critical Discourse Analysis of Trump's Speeches and Tweets from the Date of his Candidacy to Mid-September 2017*, https://www.thepresidentsintent.com/full-report/ (analyzing over 300 speeches and 5000 tweets) [hereinafter *The President's Intent*].

First Am. Compl., *State of New York, et al., v. Trump, et al.*, No. 1:17-cv-05228, Dkt. 54 at 69, 71-72. Plaintiffs have moved for a preliminary injunction on their APA claims, arguing that the proffered reasons for termination of DACA were pretextual and therefore impermissible under the APA. Dkt. 123-1 at 26-28. *Amici* offer support for Plaintiffs' assertions in their complaint that DACA's termination was instead motivated by racial animus toward Latinos, No 1:16-cv-04756, Dkt. 113 at 21-23, although not explicitly referenced in their motion for a preliminary injunction.

To obtain a preliminary injunction, Plaintiffs must demonstrate that they will suffer irreparable harm absent injunctive relief and either (1) that they are likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010). In support of Plaintiffs' true basis APA claims, *Amici* demonstrate that code word analysis is an accepted historical methodology for discerning racial animus and an accepted category of evidence that both the Second Circuit and other circuits have used to discern animus in equal protection claims and in other contexts in which discriminatory intent must be shown.

Of special note is the Second Circuit's recent observation and admonition that "[b]ecause discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). This sensitive inquiry examines the following non-exhaustive factors:

6

- whether "[t]he impact of the official action . . . bears more heavily on one race than another";

- "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes";

- "[d]epartures from the normal procedural sequence";

- "[s]ubstantive departures"; and

- "[t]he legislative or administrative history . . . especially where there are contemporary statements made by members of the decisionmaking body, minutes of its meetings, or reports."

*MHANY*, 819 F.3d at 606 (quoting *Arlington Heights*, 429 U.S. at 266-68).

It is indisputable that the rescission of DACA falls most heavily on persons of Mexican ancestry, who make up 79.4% of DACA recipients.[10] Further, as Plaintiffs demonstrate in their respective APA claims, the decision to rescind DACA was plagued by a host of procedural and substantive departures. *See* Memorandum of Law in Support of Plaintiffs' [Batalla Vidal et al.] Motion for Preliminary Injunction, 1:16-cv-04756, Dkt. 123-1, at 26-28; State of New York et al. Memorandum of Law in Support of Plaintiff States' Motion for Preliminary Injunction, 1:17-cv-05228, Dkt. 96-1, at 12-20. Added to this, a sensitive inquiry into the historical background of the decision to rescind DACA, especially the contemporaneous statements made by decisionmakers, makes code word analysis especially important when examining facially neutral governmental action under an *Arlington Heights* analysis to determine discriminatory intent. *See Arlington Heights*, 429 U.S. at 266-68. The existence of discriminatory intent is pertinent to the APA claims, including that the existence of animus strongly supports a finding of pretext or bad faith.

---

[10] U.S. Citizenship and Immigration Servs., *Approximate Active DACA Recipients: Country of Birth (As of Sept. 4, 2017)* 1, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

I.   **History Is Replete with Instances In Which Racially Coded Expressions Have Strongly Evidenced Animus, Such As "Wetback," Used During the Mass Repatriation and Deportation of Persons of Mexican Ancestry in 1954.**

Operation Wetback. That was the official name given by the program undertaken in 1954 to forcibly repatriate hundreds of thousands of Mexican migrants.[11] The massive scope of the program and lack of procedural safeguards resulted in many Americans citizens of Mexican ancestry being swept up in its dragnet and removed to remote areas of Mexico.[12] In addition to those detained and deported, hundreds of thousands of Mexican migrants left voluntarily in order to avoid brutal conditions endured by those detained and forcibly removed. The decision to institute this mass deportation program was informed by the use of the racially coded expression, "wetback."

Viewed from today's perspective, many might say that "wetback" is not racially coded language, but rather an explicit expression of animus. While "wetback" may today be recognized as an epithet or slur, that was certainly not the case in the 1950s. The original mundaneness of the term "wetback" is evidenced in a 1950 Sunday edition of the New York Times, which included in its "Fifteen News Questions," the following question: "'Wetbacks' were reported last week to be entering California at a rate of 10,000 a month. What are 'wetbacks'?" The answer is supplied several pages later: "Mexican immigrants who cross the border by stealth to seek work. The term 'wetback' was originally applied to Mexicans who entered the U.S. farther east by swimming the Rio Grande."[13] It is of note that the New York Times did not ask "*Who* are

---

[11] *See* JUAN RAMÓN GARCÍA, OPERATION WETBACK: THE MASS DEPORTATION OF MEXICAN UNDOCUMENTED WORKERS IN 1954, at 228 (1980); *see also 150,000 "Wetbacks" Taken in Round-Up*, N.Y. TIMES, 1954, at 7 (reporting numbers apprehended approximately two months after the beginning of Operation Wetback), https://timesmachine.nytimes.com/timesmachine/1954/07/30/84128756.html?pageNumber=7.
[12] GARCÍA, *supra* note 11, at 228.
[13] *Fifteen News Questions*, N.Y. TIMES, Apr. 2, 1950, at E2 and E9, https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214886.html?pageNumber=142 and https://timesmachine.nytimes.com/timesmachine/1950/04/02/96214988.html?pageNumber=149.

8

'wetbacks'?" but instead, "*What* are 'wetbacks'?"

Further, "wetback," originally a term used to describe those who swam across the Rio
Grande River, becomes a metonym for all unauthorized Mexican migrants. President Harry
Truman used the term in precisely this way in his July 13, 1951, address to Congress that called
for a more comprehensive solution to address "the steady stream of illegal immigrants from
Mexico, the so-called 'wetbacks,' who cross the Rio Grande or the western stretches of our long
border."[14] Likewise, General Dwight D. Eisenhower, getting ready to run for president in 1951,
in private correspondence with Senator William Fulbright "quoted a report in the New York
Times," and highlighted a paragraph that discussed "[t]he rise in illegal border-crossing by
Mexican 'wetbacks.'"[15]

Though there is no record of President Eisenhower using the term in public, he responded to
questions from reporters who used the term and affirmed his support of legislation intended to
address what the press characterized as the "wetback problem."[16] Further, he did use the term at
least once in his personal diaries.[17] And members of his administration, including the two
primary architects of Operation Wetback, General Joseph Swing who became the Commissioner
of Immigration and Naturalization in 1954 and Attorney General Herbert Brownell, Jr., both

---

[14] President Harry S. Truman, Special Message to the Congress on the Employment of Agricultural Workers from Mexico, July 13, 1951, https://www.trumanlibrary.org/publicpapers/index.php?pid=368.
[15] John Dillin, *How Eisenhower Solved Illegal Border Crossings from Mexico*, CHRISTIAN SCI. MONITOR, July 6, 2006, https://www.csmonitor.com/2006/0706/p09s01-coop.html.
[16] *See* The President's News Conference, July 14, 1954, http://www.presidency.ucsb.edu/ws/index.php?pid=9947&st=wetback&st1= (question by Sarah McClendon, El Paso Times, about two Senate bills "designed to curb the hundreds of thousands of wetbacks coming into this country"); The President's News Conference, July 21, 1954, http://www.presidency.ucsb.edu/ws/index.php?pid=9950&st=wetback&st1= (question by John Herling, Editors Syndicate, asking about "the wetback legislation prepared by Attorney General Brownell"). President Eisenhower's response to these questions expressed support for the legislation and other efforts to address the issue.
[17] DDE Personal Diary Jan.-Nov. 1954 (1)(2) ("notes on Bricker Amendment; school construction; wetbacks; Brazilian coffee"), Eisenhower, Dwight D.: Papers as President; DDE Diary Series, at 5, https://www.eisenhower.archives.gov/research/finding_aids/pdf/Eisenhower_Dwight_Papers_as_President/DDE_Diary_Series.pdf.

used the term openly, including in statements to Congress.[18] Before Operation Wetback, Brownell announced that he "would go to California next week to study the 'wetback' problem."[19] General Swing, upon taking charge as Commissioner, announced that he would "stop this horde of invaders."[20]

Though it may not have been apparent at the time to government officials, members of the mainstream press, or the public, "wetback" was a racially coded expression that has since come to be recognized as an epithet or slur.[21] Facially descriptive, it is pejorative and diminishing, reducing a person to a characteristic associated with a part of the body. Further, this term does not accurately describe those whose backs did not literally get wet from crossing the border, yet it stands in as a metonym for all unauthorized border crossers from Mexico, and eventually became a term that is used by some for all Mexican migrants and Mexican Americans. Historians today, employing code word analysis, would draw the conclusion that the direct use of the term by President Truman, the private use and public acquiescence to the term by President Eisenhower, and the repeated use by members of Eisenhower's administration is strong evidence of animus that may have affected government policies and immigration enforcement.

---

[18] *See, e.g., Drive on Wetbacks Termed a Success*, N.Y. TIMES, Mar. 10, 1955, at 28, https://timesmachine.nytimes.com/timesmachine/1955/03/10/93729836.html?pageNumber=28 (reporting on Swing's testimony to a House Government Operations subcommittee); Statement of Honorable Herbert Brownell, Jr., Attorney General of the United States, Testimony before Subcommittee on Immigration of the Committee on the Judiciary, April 13, 1956, https://www.justice.gov/sites/default/files/ag/legacy/2011/09/12/04-13-1956%20pro.pdf (discussing the "Mexican wetback problem" and Operation Wetback).

[19] *Brownell Maps Trip for "Wetback" Study*, N.Y. TIMES, Aug. 8, 1953, at 13, https://timesmachine.nytimes.com/timesmachine/1953/08/08/84417640.html?pageNumber=13.

[20] KITTY CALAVITA, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. 51 (1992).

[21] Whether it was a slur expressing animus was contested among Supreme Court justices as late as 1981. Justice William Rehnquist used the term during the justices' private weekly conference when they were discussing *Plyler v. Doe*. Justice William Rehnquist referred to schoolchildren of Mexican ancestry as "wetbacks." When Justice Thurgood Marshall protested, likening the word to the n-word, Justice Rehnquist defended his use of the term, saying that the term still had "currency" in his part of the country. Keith Cunningham-Parmeter, *Alien Language: Immigration Metaphors and the Jurisprudence of Otherness*, 79 FORDHAM L. REV. 1545, 1547 (2011) (citing Justice William J. Brennan, Conference Notes, *Plyler v. Doe* (Nos. 80-1538, 80-1934) (Dec. 8 1981) (on file with the Library of Congress, Manuscript Division, William J. Brennan Papers, Part I: Box 572)). It is of note that Justice Rehnquist joined Chief Justice Burger's dissent in *Plyler v. Doe*, 457 U.S. 202, 242 (1982) (Burger, C.J., dissenting).

II.     **Code Word Analysis Is a Widely Accepted Methodology that Historians Employ to Discern Racial Animus and Give Context to Government Action.**

While the use of "wetback" in the 1950s presents an easier case of discerning racially coded expressions, code word analysis becomes increasingly important when political strategists recognize the need to develop code words whose racial character is less obvious. The most explicit description is provided in a surprisingly candid confession by Republican political strategist Lee Atwater in 1981:

> You start out in 1954 by saying, "Nigger, nigger, nigger." By 1968 you can't say "nigger" – that hurts you. Backfires. So you say stuff like . . . forced busing, states' rights, and all that stuff, and you're getting abstract. Now, you're talking about cutting taxes, and all these things you're talking about are totally economic things and a byproduct of them is, blacks get hurt worse than whites . . . "We want to cut this," is much more abstract than even the busing thing . . . and a hell of a lot more abstract than "Nigger, nigger."[22]

As Dr. Stephen Pitti sets forth in his Declaration:

> Historians and other academic experts recognize that animus does not require explicit, public declarations of racial ideology that racism has persisted across the centuries. An attention to history and careful analysis of the use of coded racial appeals in contemporary political discourse provide the keys to understanding the links between racial animus and politics in the twenty-first century.

Pitti Decl. ¶ 20, No. 1:17-cv-05228, Dkt. 97-2 at 15.

This understanding and appreciation of the operation of code words by historians is precisely the reason the analysis and expert opinions expressed by historians examining current events can be helpful to the Court, especially when they are able to demonstrate how careful study of certain past events may inform our understanding of current events.

---

[22] Rick Perlstein, *Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy*, THE NATION, Nov. 13, 2012, https://www.thenation.com/article/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/.

III.   **Courts Routinely Recognize the Evidentiary Value of Coded Language in Discerning Racial Animus.**

Courts have come to rely on code words as evidence in determining whether alleged discriminatory acts are racially motivated. Unlike times past, today people are rarely explicit about their intent or motivation in expressing or acting on racial bias. The Second Circuit has recognized this evolution:

> "Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare… Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms." . . . "[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications."

*MHANY*, 819 F.3d at 609 (quoting, respectively, *Aman v. Cort. Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996) and *Smith v. Fairview Ridges Hosp.* 625 F.3d 1076, 1085 (8th Cir. 2010), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)) (citations omitted).

In *MHANY*, plaintiffs alleged disparate treatment under the Fair Housing Act and Equal Protection Clause based, in part, on code word evidence. In that case, the local government reversed course on a plan to build multifamily housing in a predominately white community after community members complained at a series of public meetings. *MHANY*, 819 F.3d at 596. The complaints began in earnest after one official suggested that the development might include some percentage of affordable housing. *Id.* at 592-95. Knowing that this was likely to increase the number of people of color in the community, the residents raised concerns about how the development would impact the "character" and "flavor" of the community. *Id.* at 593. Other neighbors wanted assurances that the development would be "upscale." *Id.* at 592. They were also vocal about potential negative impacts on traffic and schools, despite studies showing that

traffic would decrease from current levels and that multi-family housing was likely to result in fewer children than the single family housing the dissenters were advocating for. *Id.* at 590-95. Residents worried that this community would become similar to other nearby majority-minority communities, *id.* at 594, and one urged the officials to "just keep Garden City what it is," *id.* at 596. After the barrage of complaints, the officials abruptly changed course, capitulating to the demands of community members that the site be zoned for single family housing only. *Id.* at 596-97. The court upheld the trial court's finding that "citizen opposition to [multi-family] zoning utilized code words to communicate their race-based animus to Garden City officials" and that "Garden City's abrupt shift in zoning in the face of vocal citizen opposition to changing the character of Garden City represented acquiescence to race-based animus." *Id.* at 610-11.

The District Court in Arizona recently held that public officials used code words with regard to Mexican Americans, and that this constituted evidence of discriminatory intent in violation of the Equal Protection Clause. *Gonzalez*, 2017 WL 3611658, at *16. In that case, plaintiffs successfully claimed that a facially neutral Arizona statute used to eliminate a highly successful Mexican American Studies program was the product of racial animus. The court noted that the officials involved in the enactment and enforcement of the statute frequently used certain terms to stand in for Mexican Americans, such as "'Raza,' 'un-American,' 'radical,' 'communist,' 'Aztlán,' and 'M.E.Ch.A.'" *Id.* The court found these to be derogatory code words because they "[drew] on negative mischaracterizations that had little to no basis in fact," and found that "[t]hese particular words were effective codewords with Arizona voters because they drew on people's … concerns about illegal immigration' and the 'Mexicanization' of Arizona that were prominent" at the time. *Id.* (internal quotations omitted).

Nearly every circuit court has recognized that code words or camouflaged expressions can be

considered as evidence of discriminatory intent:[23]

First Circuit:  *Soto v. Flores*, 103 F.3d 1056, 1067 n.12 (1st Cir. 1997) ("It is rare that discrimination wears its garb openly and it more often comes 'masked in subtle forms.' Triers of fact may recognize those more subtle forms for what they are and coded comments may raise inferences of discrimination.") (quoting *Aman*, 85 F.3d at 1082));

Second Circuit:  *MHANY*, 819 F.3d at 608-12 (upholding district court's finding that opponents used racially charged code words to communicate animus and that city officials acquiesced to this animus in its shift in zoning);

Third Circuit:  *Aman*, 85 F.3d at 1082-83 (holding that use of "inherently racist" code words can constitute evidence of a hostile work environment and an intent to discriminate);

Fourth Circuit:  *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066 (4th Cir. 1982) (concern evinced about the influx of "undesirables" and dilution of public schools and threat to public safety constituted "evidence … which in a different context might not illustrate racial bigotry, but, against the background of the housing project in Clarkton and the considerable opposition to it, were interpreted by the trial court as 'camouflaged' racial expressions");

Fifth Circuit:  *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 265 (5th Cir. 2007) (recognizing that code words may provide basis of discriminatory intent);

Sixth Circuit:  *United States v. City of Birmingham, Mich.*, 727 F.2d 560, 563 (6th Cir. 1984) (affirming injunctive relief on a Fair Housing Act claim based in part on statements that proposed housing would introduce "harmful elements" and bring "those people" to Birmingham, which led trial court to specifically conclude the language was in reference to "[B]lack people");

Seventh Circuit:  *E.E.O.C. v. Bd. of Regents of U. of Wis. Sys.*, 288 F.3d 296, 303 (7th Cir. 2002) (finding that a reasonable jury could find use of code words such as "'pre-electronic' era and that he would have to be brought 'up to speed' on 'new trends of advertising via electronic means'" a reflection of age bias

---

[23] The only circuit that appears not to have directly addressed this issue is the Federal Circuit, though that court does recognize that "because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." *Star Sci., Inc. v. R.J. Reynolds Tobacco, Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008) (citation omitted). At least two Supreme Court justices have referenced the concept of code words as a mask for racial discrimination. *See City of Memphis v. Greene*, 451 U.S. 100, 135 (1981) (Marshall, J., dissenting) (recognizing the use of "code phrases" for racial discrimination in city's explanation for closure of road from predominately white area of the city to predominately black area); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 243 n.23 (1973) (Powell, J. concurring in part, dissenting in part) (noting argument that "neighborhood education is now but a code word for racial segregation").

in ADEA case);

Eighth Circuit:    *Smith*, 625 F.3d at 1085-86 (finding that "[t]he picture of Buckwheat, the comment about fried chicken, and the reference to the ghetto … carry some inferences that they were racially motivated" and discussing variety of instances in which code words may serve as evidence of racial animus);

Ninth Circuit:    *Avenue 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 506-07 (9th Cir. 2016) (finding that use of code words consisting of stereotypes of Latinos, along with other evidence, "provide plausible circumstantial evidence that community opposition to Developers' proposed development was motivated in part by animus, and that the City Council was fully aware of these concerns" when it voted against the zoning commission's recommendations);

Tenth Circuit:    *Villanueva v. Carere*, 85 F.3d 481, 488 (10th Cir. 1996) (sharing concern over use of "culture" in response to argument that use of term is a code word for "ethnic minority");

Eleventh Circuit:    *Underwood v. Hunter*, 730 F.2d 614, 621 (11th Cir. 1984), *aff'd, Hunter v. Underwood*, 471 U.S. 222 (1985) (holding that a provision of the Alabama constitution disenfranchised voters in violation of the Fourteenth Amendment, noting that "the avowed objective of the suffrage committee was to deny the vote to *the corrupt and the ignorant*," which the defendant's expert admitted "referred specifically to blacks and lower-class whites") (emphasis added); and

D.C. Circuit    *Arnold v. U.S. Postal Serv.*, 863 F.2d 994, 1000 (D.C. Cir. 1988) (recognizing that "[t]here may well be cases in which seniority is simply a code word or age discrimination" in an ADEA case).

A recent case under the Voting Rights Act is particularly instructive, especially with regard to the role that an expert can play in assisting a court to discern "that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence." *Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017). As the court reviewed the evidence "that could support a finding of discriminatory intent," 830 F.3d at 235, it contrasted the stated purpose of SB 14—deterring "voter fraud"—with evidence that the drafters and proponents likely knew of the law's disproportionate effect on minorities, *id.* at 236. The Deputy General Counsel to the Lieutenant Governor testified that he

sent an email "urg[ing] senators to emphasize the detection and deterrence of fraud and protect[ing] public confidence in elections" as "the goal" of SB 14, "to remind people what the point of the bill was" for their speeches on the floor of the Texas Senate. *Id.* at 236 n.19; *see also id.* at 288 n.17 (Jones, J., dissenting) (cataloguing statements of proponents of SB 14 about the purpose of the bill being to deter "voter fraud" and "protect the integrity of the ballot box").

In examining the stated purpose of deterring "voter fraud," the court gave special attention to the testimony from plaintiffs' expert on race relations, a history professor, which placed the "voter fraud" language in historical context. *Id.* at 237 (noting the record showed that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity). The court quoted directly from the expert's testimony about the stated rationale for devices Texas had used to deny minorities the vote, including the all-White primary, the secret ballot, and the use of illiteracy, poll tax, re-registration, and purging. *Id.*

> Q  What, in your opinion, was the stated rationale for the enactment of all [-]White primaries in Texas?
>
> A  The stated rationale was voter fraud.
>
> Q  What was the stated rationale, in your opinion, for the use of secret ballot provisions in Texas?
>
> A  The stated rationale was to prevent voter fraud.
>
> Q  And what was the stated rationale, in your opinion, for the use of the poll tax in Texas?
>
> A  The stated rationale by the State was to prevent voter fraud.
>
> Q  And how about the stated rationale for the use in Texas of re-registration requirements and voter purges?
>
> A  The stated rationale was voter fraud.
>
> Q  Dr. Burton, in your expert opinion, did these devices actually respond to sincere concerns or incidents—incidences of voter fraud?
>
> A  No.

*Id.* The court remanded the discriminatory intent issue, instructing the trial court to reweigh the *Arlington Heights* factors, noting "there is evidence that could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual," *id.*, and that "there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose," *id.* at 241; *id.* at 242 (remand).

### IV. A Sensitive Inquiry into the Historical Background of the Decision to Rescind DACA, with Particular Attention Paid to Contemporaneous Statements Made by Decisionmakers, Reveals the Use of Code Words Reflecting Animus Against Persons of Mexican Ancestry and Latinos.

The 96-page Expert Report of Stephen J. Pitti, No. 1:17-cv-05228, Dkt. 97-2 at 76-174 ("Pitti Report"), provides comprehensive documentation and analysis of contemporaneous statements made by Donald Trump as candidate and as President as well as statements made by key advisers and administration officials, including Senator and later Attorney General Jefferson Beauregard Sessions III and policy adviser Stephen Miller. *Id.* at 113-63. A comprehensive discourse analysis issued Dec. 21, 2017, reviews 300 speeches and 5000 tweets of Donald Trump as candidate and President. *See The President's Intent*, *supra* note 9. Each finds numerous, consistent, and persistent statements that are racially coded expressions and code words that provide strong evidence of animus. Pitti Report, No. 1:17-cv-05228, Dkt. 97-2 at 113-63; *The President's Intent*, *supra* note 9 at *passim*.

Of special note is the manner in which Trump talks about DACA recipients and the way he contests and subverts the name by which they are commonly referred: "Dreamers." On November 13, 2015, in a forum called the Sunshine Summit hosted by the Republican Party of Florida intended to "electrify the Republican grassroots movement,"[24] then-candidate Donald Trump stated: "We are going to hire Americans first. We're going to take care of our workers.

---

[24] Sunshine Summit, "Thank You," http://www.sunshinesummit.gop/thank-you (stating mission).

Did you ever hear of the Dream Act? It is not for our children. The Dream Act is for other children that come into the country. I want the Dream Act to be for our children."[25] Two days earlier at the fourth Republican presidential primary debate, Trump had promised a "deportation force" based on President Eisenhower's enforcement of the border that included deportation efforts such as the 1954 Operation Wetback. In particular, he lauded Eisenhower's program of deporting people deep into Mexico, saying, "Moved them way south. They never came back."[26] Rescinding DACA exposes DACA recipients to this "deportation force."

These relatively early primary campaign statements are repeated during the general election campaign after Trump garners the Republican party nomination. In a speech on August 24, 2016, Trump juxtaposes truly deserving American children against DACA recipients: "Where is the sanctuary city for American children? Where is that sanctuary? The dreamers we never talk about are the young Americans. Why aren't young Americans dreamers also? I want my dreamers to be young Americans."[27] In another general campaign speech, he implores, "Let our children be dreamers too."[28]

On September 1, 2017, when asked by reporters whether Dreamers should be worried, he responded, "We love the DREAMers . . . We think the DREAMers are terrific."[29] Mere days later, on September 5, the Trump administration ended DACA. In doing so, President Trump repeated, "Above all else, we must remember that young Americans have dreams too. . . . Our

---

[25] Donald J. Trump, Remarks at 2015 Sunshine Summit (Nov. 13, 2015), https://www.c-span.org/video/?400325-10/donald-trump-remarks-2015-sunshine-summit.

[26] *Transcript: Republican Presidential Debate*, N.Y. TIMES, Nov. 11, 2015, https://www.nytimes.com/2015/11/11/us/politics/transcript-republican-presidential-debate.html.

[27] Donald J. Trump, Remarks at the Mississippi Coliseum in Jackson, Mississippi (Aug. 24, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=123198.

[28] Donald J. Trump, Remarks at the Charlotte Convention Center in Charlotte, North Carolina (Aug. 18, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119175.

[29] Donald J. Trump, Remarks on Signing a Proclamation on the National Day of Prayer for the Victims of Hurricane Harvey and for Our National Response and Recovery Efforts and an Exchange with Reporters (Sept. 1, 2017), http://www.presidency.ucsb.edu/ws/index.php?pid=128160&st=dreamers&st1=.

first and highest priority must be to improve jobs, wages and security for American workers and their families."[30]

In this usage, Trump has co-opted "dreamer" and uses it instead to paint DACA recipients as interlopers whose unlawful presence threatens the rightful economic opportunities of "American" children. "Dreamer" itself becomes a code word that is intended to inflame and exploit negative sentiment based on people's economic anxieties.

Taken together, the Pitti Report and *The President's Intent* show that Plaintiffs have a strong likelihood of proving animus and prevailing on their APA claims.

## CONCLUSION

For the foregoing reasons, this Court should grant the relief sought by Plaintiffs.


Dated:  December 21, 2017                    Respectfully submitted,

                                            **FRED T. KOREMATSU CENTER FOR
                                            LAW AND EQUALITY**

                                            */s Robert S. Chang*

                                            Robert S. Chang (admitted *pro hac vice*)
                                            Seattle University School of Law
                                            901 12th Avenue
                                            Seattle, WA 98122
                                            Telephone: (206) 398-4025
                                            Facsimile: (206) 398-4036
                                            changro@seattleu.edu

                                            *Attorney for Amici Curiae*

---

[30] Statement from President Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-7/.

## APPENDIX

### List of Individual *Amici Curiae* with
### Title and Institutional Affiliation Listed for Identification Purposes[31]

| Name | Title | Institutional affiliation |
|------|-------|---------------------------|
| Lauren Araiza | Associate Professor and Chair, Department of History | Denison University |
| Rick Baldoz | Associate Professor and Chair of Sociology | Oberlin College |
| Carlos Kevin Blanton | Professor of History | Texas A & M University, College Station |
| Laura Briggs | Chair and Professor, Women, Gender, Sexuality Studies; Affiliate Professor, Department of History | University of Massachusetts Amherst |
| Geraldo L. Cadava | Associate Professor of History and Latina/o Studies | Northwestern University |
| Maria Raquel Casas | Associate Professor, Department of History | University of Nevada, Las Vegas |
| Lori Flores | Associate Professor, Department of History | Stony Brook University (SUNY) |
| Glenda E. Gilmore | Peter V. and C. Vann Woodward Professor of History | Yale University |
| Ariela Gross | John B. & Alice R. Sharp Professor of Law & History | University of Southern California |
| Thomas Guglielmo | Associate Professor of American Studies | George Washington University |
| Matthew Pratt Guterl | Professor of Africana Studies and American Studies | Brown University |
| Leslie M. Harris | Professor, History and African American Studies | Northwestern University |

---

[31] None of the individual amici speak for or represent the official views of their respective institutions or departments.

| Kelly Lytle Hernandez | Professor, Departments of History and African-American Studies and Interim Director, Ralphe Bunche Center for African American Studies | University of California, Los Angeles |
|---|---|---|
| Daniel HoSang | Associate Professor of Ethnicity, Race & Migration and American Studies | Yale University |
| Madeline Y. Hsu | Professor, Department of History and Center for Asian American Studies | The University of Texas at Austin |
| Michael D. Innis-Jiménez | Associate Professor of American Studies and Director of Graduate Studies | University of Alabama |
| Matthew Frye Jacobson | William Robertson Coe Professor of American Studies and History | Yale University |
| Karl Jacoby | Professor of History | Columbia University |
| Ari Kelman | Chancellor's Leadership Professor of History | The University of California, Davis |
| Erika Lee | Director, Immigration History Research Center, and Distinguished McKnight University Professor, Department of History | University of Minnesota |
| Shelley S. Lee | Associate Professor of History and Director of Comparative American Studies | Oberlin College |
| Mary Ting Yi Lui | Professor of American Studies and History | Yale University |
| Joseph Lowndes | Associate Professor, Political Science Department | University of Oregon |
| Nancy MacLean | William H. Chafe Professor of History and Public Policy | Duke University |
| Kate Masur | Associate Professor of History | Northwestern University |
| John Mckiernan-Gonzalez | Associate Professor of History | Texas State University |

A-2

| | | |
|---|---|---|
| Ronald L. Mize | Associate Professor of Language, Culture and Society | Oregon State University |
| Natalia Molina | Professor of History | University of California, San Diego |
| Gary Y. Okihiro | Visiting Professor, American Studies | Yale University |
| Leigh Raiford | Associate Professor, African American Studies | University of California, Berkeley |
| David Roediger | Foundation Professor of American Studies | University of Kansas |
| Renee C. Romano | Robert S. Danforth Professor of Humanities; Chair, Department of History; and Professor of Comparative American Studies and Africana Studies | Oberlin College |
| Vicki L. Ruiz | Distinguished Professor Emerita, History and Chicano/Latino Studies | University of California, Irvine |
| Rachel St. John | Associate Professor, Department of History | University of California, Davis |
| Virginia J. Scharff | Distinguished Professor of History and Director, Center for the Southwest | University of New Mexico |
| Alexandra Minna Stern | Chair and Professor, Department of American Culture and History | University of Michigan |
| Timothy Stewart-Winter | Associate Professor of History | Rutgers University – Newark |
| Penny Von Eschen | L. Sanford and Jo Mills Reis Professor of Humanities, Department of History | Cornell University |
| Julie M. Weise | Associate Professor of History | University of Oregon |
| Judy Tzu-Chun Wu | Professor and Chair, Asian American Studies Department | University of California, Irvine |

## CERTIFICATE OF SERVICE

I hereby certify that, on December 21, 2017, I electronically filed the foregoing with the

Clerk of Court for the United States District Court for the Eastern District of New York by using

the CM/ECF system. I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system.


Dated: December 21, 2017

/s/ Robert S. Chang

Robert S. Chang (admitted pro hac vice)
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122
Telephone: (206) 398-4025
Facsimile: (206) 398-4036
changro@seattleu.edu

*Attorney for Amici Curiae*