# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,

    Plaintiffs,

   v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,

    Defendants.

CIVIL ACTION NO. 1:17-cv-05228-NGG-JO

---

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals; and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals

    Plaintiffs,

   v.

KIRSTJEN M. NIELSEN, Secretary, Department of Homeland Security; JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States; and DONALD J. TRUMP, President of the United States,

    Defendants.

CIVIL ACTION NO. 1:16-cv-04756-NGG-JO

## BRIEF OF NEW YORK UNIVERSITY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

OF COUNSEL:

Terrance Nolan
General Counsel and Secretary
New York University
70 Washington Square South, 11th floor
New York, New York  10012

PROSKAUER ROSE LLP
Steven E. Obus
Seth D. Fiur (*pro hac vice*)
Tiffany M. Woo
Melissa D. DiGrande (*pro hac vice pending*)
Ashley Ferguson (*pro hac vice*)
Shiloh A. Rainwater (*pro hac vice*)
Eleven Times Square
New York, New York 10036
(212) 969-3000
SObus@proskauer.com
SFiur@proskauer.com
TWoo@proskauer.com
MDigrande@proskauer.com
AFerguson@proskauer.com
SRainwater@proskauer.com

Counsel for *Amicus Curiae*
New York University

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICUS* ............................................................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................................2

ARGUMENT .................................................................................................................................4

I.      A Diverse Community is Critical to NYU's Identity and Mission......................................4

II.     Implementation of The DHS Memorandum Would Significantly Harm NYU and Its Constituents.....................................................................................................................8

        A.     Harm to the NYU Community.................................................................................9

        B.     Harm to Educational Interests of DACA Beneficiaries at NYU ...........................11

III.    DACA Is A Constitutional Program ..................................................................................14

IV.   The Termination of DACA Violated the Administrative Procedure Act ...........................16

        A.     DHS's Decision to Terminate DACA Was Arbitrary and Capricious Under the APA.......................................................................................................17

        B.     DHS's DACA Termination Failed to Comply with the APA's Notice-and-Comment Procedures.............................................................................................19

V.     The Failure to Issue An Analysis of the DACA Termination's Impact On Small Entities Violates the Regulatory Flexibility Act................................................................20

CONCLUSION...........................................................................................................................211

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015) ...................................................................................9

*Arizona v. United States,*
   567 U.S. 387 (2012).............................................................................................14

*Associated Fisheries of Me., Inc. v. Daley,*
   127 F.3d 104 (1st Cir. 1997)..............................................................................21

*Bery v. City of N.Y.,*
   97 F.3d 689 (2d Cir. 1996).................................................................................10

*Central Florida Enterprises, Inc. v. FCC,*
   598 F.2d 37 (D.C. Cir. 1978) .............................................................................19

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971).............................................................................................17

*Donovan v. Red Star Marine Servs., Inc.,*
   739 F.2d 774 (2d Cir. 1984)...............................................................................19

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009).......................................................................................18, 19

*Fisher v. Univ. of Tex. at Austin,*
   133 S. Ct. 2411 (2013)......................................................................................9, 10

*General Chemical Corp. v. United States,*
   817 F.2d 844 (D.C. Cir. 1987) ...........................................................................19

*Grutter v. Bollinger,*
   539 U.S. 306 (2003).........................................................................................9, 10

*Heckler v. Chaney,*
   470 U.S. 821 ........................................................................................................15

*Jana-Rock Const., Inc., v. N.Y. State Dep't of Econ. Dev.,*
   438 F.3d 195 (2d Cir. 2006).................................................................................8

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
   385 U.S. 589 (1967).............................................................................................9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................17

*N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
    267 F.3d 128 (2d Cir. 2001)...............................................................................19

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978).........................................................................................9, 10

*Reno v. Flores*,
    507 U.S. 292 (1993)............................................................................................16

*Texas v. United States*,
    809 F.3d 134 (2015)......................................................................................14, 20

*Time Warner Cable Inc. v. FCC*,
    729 F.3d 137 (2d Cir. 2013)...............................................................................19

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................................................8

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .............................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)............................................................................................14

**STATUTES**

5 U.S.C. § 551.............................................................................................................19

5 U.S.C. § 553........................................................................................................19, 20

6 U.S.C. § 202(5)..................................................................................................14, 17

5 U.S.C. § 706(2)(A) .................................................................................................17

Administrative Procedure Act................................................................................ passim

Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ................................................. passim

## INTEREST OF *AMICUS*

*Amicus* New York University ("NYU" or the "University") is an institution of higher learning headquartered in New York City, one of the most diverse cities in the world. A critical component of NYU's global mission is to create an intellectually rich educational environment encompassing a wide range of perspectives. By welcoming and engaging students and scholars from a broad range of backgrounds, NYU is able to advance that mission.

As a global university centered in New York City, NYU has a vital interest in the proper administration of the immigration laws of the United States. NYU is deeply concerned that the rescission of the Deferred Action for Childhood Arrivals ("DACA") program, as contemplated in the Memorandum from Elaine C. Duke, Acting Secretary of the Department of Homeland Security, to James W. McCament, Acting Director of U.S. Citizenship and Immigration Services et al., *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* (September 5, 2017), *available at* https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (the "DHS Memorandum"), would, in addition to imposing grievous harm on DACA beneficiaries, compromise NYU's mission by impairing the educational opportunities NYU provides to all of its constituents and undermine the values that NYU champions. Because the DHS Memorandum was promulgated without any of the reasoned consideration and review that is statutorily required, even for far less intrusive and detrimental government actions, NYU respectfully submits that implementation of the DHS Memorandum should be enjoined.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Every year, thousands of prospective students apply to NYU, seeking the opportunity to study at one of the world's most internationally diverse universities. At the core of NYU's institutional mission are the twin aims of providing an exceptional academic experience and fostering world-class international scholarship. To support these goals, NYU has invested significant resources in developing an environment in which students and faculty from all backgrounds have the opportunity not only to take advantage of its unique educational environment, but also to contribute to a University community that enriches all of its members. There is no question that enrolling DACA beneficiaries provides significant benefits to the University as well. NYU's DACA students, both former and present, have succeeded academically and meaningfully contributed to campus life through participation in numerous student organizations.

By rescinding DACA, DHS does more than expose hundreds of thousands of people to potential removal from the United States. It interferes with the ability of those individuals to obtain an education and positively contribute to society, and it weakens NYU and institutions like it, because they lose hard-working students and unique voices on campus. If allowed to go into effect, the DHS Memorandum will make NYU less diverse and obstruct its ability to provide all of its students with the educational benefits that flow from a fully diverse student body and faculty.

The DHS Memorandum also suffers from significant legal defects. While DACA constitutes a constitutional and permissible exercise of DHS's authority, the same cannot be said for its rescission. In addition to significant constitutional issues, the DHS Memorandum failed to comply with the Administrative Procedure Act, because it provided none of the required reasoned analysis or justification for rescinding the DACA program, and because it provided no

2

public notice and opportunity for comment on the rescission.  The lack of reasoned analysis and opportunity for public comment similarly violates the Regulatory Flexibility Act.

Because DACA's rescission is unlawful, would cause harm to institutions like NYU, and would upend hundreds of thousands of lives nationwide, this Court should enjoin the DHS Memorandum.

## ARGUMENT

### I.  A Diverse Community is Critical to NYU's Identity and Mission

Diversity, inclusion and equity are "indispensable elements of an NYU education," "vital for advancing knowledge, sparking innovation, and creating sustainable communities."[1]  More than just stated values, these ideals are a part of everything the University does, as it strives to be a place where people gather from all over the world "to teach, perform, create, and study in a place where everyone belongs."[2]  NYU accomplishes these goals by creating an intellectually rich environment for its students and scholars—taking academic and cultural advantage of its location, and embracing diversity among faculty, staff and students to ensure a wide range of perspectives in the educational experience.  *See id.*

As part of its pledge to further the values of diversity, inclusion and equity on its campuses, NYU has committed to:

- fostering intellectual inquiry, research, and artistic practices that respectfully and rigorously take account of a wide range of opinions, perspectives, and experiences;

- promoting an inclusive community in which diversity is valued and every member feels they have a rightful place, is welcome and respected, and is supported in their endeavors;

- developing and supporting programs and policies that measurably improve NYU's record of attracting and retaining students, as well as hiring and promoting faculty, administrators, and staff from historically underrepresented communities; and

- building structures that promote inclusiveness and equity for all members of the NYU community, especially our colleagues from marginalized groups.[3]

---

[1] NYU Diversity Statement, *available at* www.nyu.edu/life/diversity-nyu.html.

[2] https://www.nyu.edu/about/leadership-university-administration/office-of-the-president/president-message.html.

[3] *See* NYU Diversity Statement, *supra* n.1.

NYU's commitment to diversity, inclusion and equity is also manifested in the actions of its administration.  Recognizing that sustaining NYU's values means more than having "as diverse a student body, a faculty, and a staff as possible," in September 2016, NYU's provost Katherine Fleming observed that, although each of those goals individually is important, the true reflection of NYU's values comes from creating a community where everyone seeks to have "the broadest possible understanding that we can have about what humankind is," an understanding that comes only when people feel comfortable in the community itself.[4]

NYU has consistently supported programs like DACA, recognizing that they further values that are paramount to the NYU community.  In 2014, in recognition of the distinct challenges and circumstances that undocumented immigrants face, NYU became the first university to offer financial aid applications specifically tailored to undocumented immigrants.[5] As NYU's then-president noted, "[w]hether the next Einstein is documented or not shouldn't matter when it comes to access to college."  *Id.*

More recently, when the Attorney General of Texas threatened to bring litigation unless DACA was rescinded by September 5, 2017,[6] NYU's President, Andrew Hamilton, wrote to President Trump urging that DACA be kept in place.[7]  In his letter, President Hamilton described his own history as an immigrant, and the great extent to which immigrants love their adopted country, embrace its values and contribute to its society.  *Id.*  "As an educator," President

---

[4] *See* NYU Diversity Statement, *supra* n.1.

[5] *See* Mike Vilensky, *NYU Will Offer Financial Aid to Illegal Immigrants,* THE WALL STREET JOURNAL (Nov. 20, 2014), https://www.wsj.com/articles/nyu-will-offer-financial-aid-to-illegal-immigrants-1416536236.

[6] *See* Letter from K. Paxton, Attorney General of Texas, to J. Sessions, Attorney General of the United States, dated June 29, 2017, *available at* https://www.texasattorneygeneral.gov/files/epress/DACA_letter_6_29_2017.pdf.

[7] Available at https://www.nyu.edu/content/dam/nyu/president/documents/09-01-17-daca-letter.pdf; *see also* https://www.nyu.edu/about/leadership-university-administration/office-of-the-president/communications/letter-to-president-trump-urging-him-to-preserve-daca.html.

Hamilton wrote, "I can attest to the vibrancy, talent, and ambition that the Dreamers bring to the classroom, the laboratory, and the campus. . . .  Few things would be more at odds with our national ideals than punishing the innocent.  And compassion is a particularly potent and noble American quality."  *Id.*  Emphasizing the status of DACA beneficiaries as important members of the NYU family—and the broader American family—President Hamilton sounded the themes of NYU's mission for diversity, inclusion and equity: to provide for a richer educational environment by inviting, welcoming and accepting a wide range of diverse perspectives; and to do what is fair and just.[8]

To help every student, faculty member and employee at NYU feel like they are an integral part of the University community, NYU provides a variety of programs, services and centers to support its diversity efforts.  Among these programs is the University's Center for Multicultural Education and Programs ("CMEP"), which hosts diversity education and training, cultural events and social justice events.[9]  CMEP publishes a weekly newsletter and has a large staff, including nine senior and professional staff members, six graduate staff members and eight undergraduate and design student staff members.[10]  CMEP "enhances the NYU experience by fostering a more inclusive, aware, and socially just community," through dialogue that explores "issues of identity, diversity, and social justice"; support for the diverse NYU community in their

---

[8] President Hamilton also joined over 700 other college and university presidents in signing onto a statement in support of DACA, highlighting its "highly positive impacts" on educational institutions.  *See* Statement in Support of the Deferred Action for Childhood Arrivals (DACA) Program and our Undocumented Immigrant Students, https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca.  The statement further touted the accomplishments of DACA beneficiaries, who "have been exemplary student scholars and student leaders, working across campus and in the community," allowing them to "pursue opportunities in business, education, high tech, and the non-profit sector," and "actively contributing to their local communities and economies."  *Id.*

[9] *See* NYU CMEP website, http://www.nyu.edu/students/communities-and-groups/student-diversity/multicultural-education-and-programs.html.

[10] NYU CMEP, *Who We Are*, http://www.nyu.edu/students/communities-and-groups/student-diversity/multicultural-education-and-programs/who-we-are.html; *see also* NYU CMEP Events Calendar, https://www.eventbrite.com/o/nyu-cmep-1875770117.

personal, professional and academic lives; educational initiatives and campus-wide programming

that engages the NYU community; and the cultivation of allies and advocates to create and

promote positive change.  *Id.*

NYU also offers a variety of academic programs and student groups focused on exploring

and celebrating the culture and heritage of the Latino community—the group that would be most

impacted by DACA's rescission.[11]  For example, NYU's School of Arts and Science offers a

Latino Studies Program, "dedicated to the study of the historical, social and cultural experience

of Latino communities, with a strong interest in the transnational dimensions of U.S. Latino

life."[12]  The Latino Studies program explores "early colonialism and pre-colonial times" in

combination "with the study of contemporary developments such as recent Mexican and South

American immigration to New York City."[13]  NYU is also home to "Latinos Unidos Con Honor

y Amistad," or "LUCHA," a student-run group that was originally founded in 1971 to give a

voice to NYU's growing Latino population.[14]  In addition, the Latino Law Students Association

("LALSA") at NYU Law School offers a support system within the law school for Latino

students; LALSA also provides "public service to the large and diverse Latino community, from

mentoring Latino children in lower income neighborhoods to providing bilingual assistance to

adults."[15]  This list reflects just a small sample of programs and groups that support NYU's

Latino students and foster an appreciation for the unique contributions of the Latino community

---

[11] *See* USCIS, *Number of I-821D Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics, and Case Status: 2012-2016 (June 30)*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2016_qtr3.pdf.

[12] NYU Arts & Science website, *Latino Studies*, http://as.nyu.edu/latinostudies/about.html.

[13] *Id.*

[14] NYU LUCHA, www.facebook.com/nyulucha/.

[15] NYU Law website, *Latino Law Students Association*, http://www.law.nyu.edu/studentorganizations/latinolawstudentsassociation.

to NYU and New York City. [16]  These programs, among countless others, support the elements of diversity, inclusion and equity that are "indispensable" to an NYU education.[17]  Fostering these values is critical not simply because it is the right thing to do, but because an educational environment that encompasses a wealth of varying perspectives gives rise to a campus community that sees further and more clearly, as such a community is far more than the sum of its parts.

## II.  Implementation of The DHS Memorandum Would Significantly Harm NYU and Its Constituents

By rescinding DACA without a legislative or other replacement in place, the DHS Memorandum threatens a foundational piece of the puzzle that makes diverse educational institutions such as NYU and its peers beacons of worldwide academic excellence.  Rescission threatens not only to tear individual members of the NYU community away from their families, the NYU family and the country they call home, but to deprive NYU's community—and the country as a whole—of DACA beneficiaries' unique voices, and the significant contributions that they make.[18]

---

[16] Similarly, NYU's Office of Global Spiritual Life offers a vibrant and diverse community at the "forefront of international conversations on religion and spirituality."  *See* NYU Office of Global Spiritual Life website, https://www.nyu.edu/students/communities-and-groups/student-diversity/spiritual-life.html.

[17] *Id.*; *supra* notes 8 and 9; *see also, e.g.*, NYU Diverse & Inclusive Virtual Environment, http://www.nyu.edu/life/diversity-nyu/dive.html.

[18] While it is not the focus of this brief, NYU is also deeply concerned about the constitutional implications of terminating DACA, particularly because the rescission of the program appears to have been motivated in substantial part by animus towards Latinos and Mexicans.  The most fundamental abuse of government authority prohibited by the equal protection doctrine is discrimination against a protected class, especially when that discrimination is overt.  *See Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."); *Jana-Rock Const., Inc., v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) ("Government action . . . violates principles of equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.") (internal quotation marks and citations omitted).  A law may fail to withstand scrutiny even if discrimination is not "the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (internal citation omitted). Here, while the class impacted by the DHS Memorandum—i.e., DACA recipients—may be neutral on its face, there is little question that terminating DACA will have a disproportionate impact on Latinos and Mexicans, who make up the majority of DACA beneficiaries.  Moreover, it is clear that the DHS Memorandum was motivated at least in part

A.    Harm to the NYU Community

Courts have long emphasized the importance of promoting diversity and freedom in educational environments, recognizing that, due to the classroom's vital role as a "marketplace of ideas," constitutional protections are "nowhere more vital than in the community of American schools."  *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).  "The nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection."  *Id.* (internal citation and quotation marks omitted).

Diversity similarly "helps to break down racial stereotypes, and enables [students] to better understand" those with different backgrounds.  *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).  As a result, diversity in education fosters the "skills needed in today's increasingly global marketplace" by "expos[ing] [students] to widely diverse people, cultures, ideas, and viewpoints."  *Id.* at 330; *see also Keyishian*, 385 U.S. at 603.  Recognizing these benefits, the Supreme Court has held that the Constitution protects a school's "right to select those students who will contribute the most to the 'robust exchange of ideas . . . .'"  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978); *see also Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2417 (2013) (recognizing compelling governmental interest in "the educational benefits that flow from a diverse student body"); *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (recognizing a school's ability to assert harm on behalf of its students, including harm to the university's ability to accomplish its global mission).

Universities around the country have recognized the benefits that come with the unique perspective offered by DACA students.  These students are passionate and driven to excel.  As

_____

by animus towards individuals who are of Mexican national origin, as reflected in President Trump's own statements about Latinos and Mexicans.

NYU President Hamilton and 700 other college and university presidents wrote, since DACA began, "we have seen the critical benefits of this program for our students, and the highly positive impacts on our institutions and communities.  DACA beneficiaries on our campuses have been exemplary student scholars and student leaders, working across campus and in the community."[19]  The DHS Memorandum threatens the constitutionally-protected benefits of diversity that have been realized through DACA.  *See Fisher*, 133 S. Ct. at 2417; *Grutter*, 539 U.S. at 328 (observing that a school's "educational judgment that such diversity is essential to its educational mission is one to which we defer"); *Bakke*, 438 U.S. at 313; *see also Bery v. City of N.Y.*, 97 F.3d 689, 694 (2d Cir. 1996) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (quoting 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948, at 440 (1973)).  The DHS Memorandum would deprive NYU's campuses of DACA beneficiaries' unique perspectives; all students suffer when the diversity of ideas and backgrounds to which they are exposed is diminished.  *See Fisher*, 133 S. Ct. at 2417.  Forcing NYU's undocumented students to retreat into the shadows will harm the University and the community it serves.

If allowed to stand, the DHS Memorandum would also have the detrimental effect of deterring young, undocumented immigrants from pursuing higher education opportunities, including at NYU.  An integral part of "the business of a university [is] to provide that atmosphere which is most conducive to speculation, experiment, and creation."  *Bakke,* 438 U.S. at 312 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in judgment)).  To protect NYU's ability to provide its students and scholars with the

---

[19] *See* Statement, *supra* n.8.

constitutionally-protected benefits of diversity and the free exchange of ideas, the DHS Memorandum's rescission of DACA should be enjoined.

B.    Harm to Educational Interests of DACA Beneficiaries at NYU

Apart from the harm to NYU, implementing the DHS Memorandum would of course strip away the educational opportunities that DACA provides at NYU and elsewhere—of which DACA beneficiaries have taken full advantage.  One of DACA's overarching objectives was to foster educational opportunities for young immigrants.  As President Obama noted in remarks given contemporaneously with its implementation, DACA beneficiaries are "young people who study in our schools, they play in our neighborhoods, they're friends with our kids, they pledge allegiance to our flag."[20]  Often, DACA beneficiaries had "no idea that [they were] undocumented until they appl[ied] for a job or a driver's license, or a college scholarship."  *Id.* DACA was put in place to improve the allocation of immigration enforcement resources, in recognition of the fact that "students who are earning their education," and who pose no risk to national security or public safety, deserve to have the chance to pursue their intellectual goals in this country.  *Id.*

The importance of education to DACA recipients is underscored by the fact that the pursuit of education is one of the threshold requirements for DACA eligibility.  Among the requirements to be eligible for DACA is that the individual "currently [be] in school, ha[ve] graduated from high school, ha[ve] obtained a general education development certificate, or [be] an honorably discharged veteran of the Coast Guard or Armed Forces of the United States."[21]

---

[20] *See* Office of the Press Secretary, *Remarks by the President on Immigration*, The White House (Archives), June 15, 2012, https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

[21] *See* Memorandum from Janet Napolitano, Sec'y of DHS, to David Y. Aguilar, Acting Comm'r, CBP, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012).

Indeed, a recent national survey of DACA recipients found that a staggering *94%* of survey respondents who were currently in school stated that they "pursued educational opportunities that [they] previously could not" because of DACA.[22]  One study showed that 45% of survey respondents overall were currently in school.  *Id.*  Among those in school, 72% were pursuing a bachelor's degree or higher.  *Id.*  Approximately 241,000 DACA-eligible students had enrolled in college as of 2014.[23]  The number has surely increased since.  Thus, in addition to meaningfully contributing to the institutions they attend and to the education of their fellow students, DACA directly leads to hundreds of thousands of educated young men and women entering the workforce where they make positive contributions to society.

These results stand in stark contrast to the circumstances of most undocumented immigrants, who end their schooling before entering college.[24]  "Due to a combination of scarce family resources, exclusion from financial aid at the state and federal levels, and depressed motivations, the majority of unauthorized students pursuing higher education attend community colleges and struggle to persist and graduate."  *Id.*  But with DACA, which allows for legal employment and diminished fear of deportation, many DACA beneficiaries report newfound motivation and much greater success.  *Id.*

---

[22] *See* Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue To Grow*, Center for American Progress (Aug. 28, 2017), *available at* https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[23] *See* Isabel Fatta, *What DACA's End Could Mean For Colleges*, The Atlantic (Sep. 18, 2017), https://www.theatlantc.com/education/archive/2017/09/what-dacas-end-could-mean-for-colleges/540024 (citing Randy Capps et al., *Issue Brief: The Education and Work Profiles of the DACA Population*, Migration Policy Institute, August 2017, *available at* https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population, at 4 (Table 1)).

[24] *See* Roberto G. Gonzales, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, Center for American Progress (June 22, 2017), *available at* https://www.americanprogress.org/issues/immigration/reports/2017/06/22/434822/taking-giant-leaps-forward/.

While this has salutary effects for educational institutions nationwide, its effect is especially pronounced at NYU.  DACA works in tandem with NYU's own core values, allowing NYU to support undocumented immigrant students who were brought to the United States as children and who wish to pursue their education in a safe and welcoming environment.[25]  The passion for learning and desire to contribute to society that DACA students exhibit makes NYU a stronger institution, and makes the entire NYU community a better place.

While it is no surprise that educators recognize the benefits of enrolling DACA beneficiaries, they are far from the only ones who see the positive impact the program has had on education in the United States and on DACA beneficiaries in particular.  Numerous members of Congress—from both parties—have spoken out against DHS's decision to rescind DACA without a legislative or regulatory replacement in place, and have highlighted the educational benefits that DACA, or a path to citizenship for undocumented children, would provide.  Senator Jeff Flake recognized the need "to lawfully ensure that children who were brought here . . . by their parents, through no fault of their own, are able to stay and finish their education and continue to contribute to society."[26]  Senator Thom Tillis described his vision for legislation that provided a "path . . . to earn legal status" tied to a requirement to "pursue higher education."[27]  And U.S. Representative Ileana Ros-Lehtinen wrote that the administration's decision to end DACA was "heartbreaking, reckless and wrong.  For too long, Dreamers have been living with fear and unable to plan their futures.  DACA was necessary to provide a migratory safe harbor

---

[25] *See* Elizabeth A. Harris, *Financial Aid for Undocumented Students Is Losing Its Stigma*, NYTimes (Feb. 26, 2015), *available at* https://www.nytimes.com/2015/02/27/nyregion/financial-aid-for-undocumented-students-no-longer-discussed-in-hushed-tones.html (describing and interviewing an undocumented then-freshman at NYU).

[26] Press Release: *Flake Statement on DACA*, https://www.flake.senate.gov/public/index.cfm/press-releases?ID=7EE60ADE-5BBF-43CF-A3A1-BC0F0311CEA1 (Sept. 5, 2017).

[27] Press Release: *Tillis to Introduce Legislation Addressing Legal Status of Undocumented Children*, https://www.tillis.senate.gov/public/index.cfm/press-releases?ID=675243B8-B3A1-434D-9359-9130E3CA77AD (Sept. 5, 2017).

and it is cruel to take away the opportunities to work and go to school currently afforded to them."[28]

## III.    DACA Is A Constitutional Program

While DACA has been politically controversial since its inception, its creation was well within the bounds of both the Constitution and DHS's authority.  Since its creation in 2002, DHS has had the express authority to "[e]stablish[] national immigration enforcement policies and priorities."  *See* 6 U.S.C. § 202(5).  As part of the Executive Branch, it has significant discretion in exercising its authority, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952), including in exercising its removal powers, *see Arizona v. United States*, 567 U.S. 387, 396 (2012) (discussing the "broad discretion" possessed by immigration officials).

At its heart, DACA is a program of resource allocation.  More than 11 million undocumented immigrants currently live in the United States, yet Congress only provides resources for the removal of approximately 400,000 undocumented immigrants each year.[29]  As a result, DHS has historically prioritized the removal of "those who represent threats to national security, public safety, and border security."  *See Texas v. United States*, 809 F.3d 134, 188 (2015).

The United States Citizenship and Immigration Services ("USCIS") defines "deferred action" as "a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion."[30]  It is "an act of administrative convenience to the government which

---

[28] Press Release: *Ros-Lehtinen Statement on Elimination of DACA*, https://ros-lehtinen.house.gov/press-release/ros-lehtinen-statement-elimination-daca (Sept. 5, 2017).

[29] *See* Ian Millhiser, *DACA is Not Unconstitutional* (Sep. 5, 2017), https://thinkprogress.org/trump-admin-constitutional-case-daca-a3134e0059e3/.

[30] See *Frequently Asked Questions – DHS DACA FAQs*, https://www.uscis.gov/archive/frequently-asked-questions.

gives some cases lower priority."[31]  Thus, DHS's election to enforce removal laws against some undocumented immigrants but not against others is well within its discretion, and is merely a form of "deferred action."  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").  Deferred action is not unique to DACA, but has been applied in a number of other immigration contexts, including with respect to survivors of domestic violence, victims of human trafficking, and surviving spouses of U.S. citizens.[32]

Because deportation takes place through removal proceedings, DHS's determination whether to bring proceedings against an individual is effectively an exercise in prosecutorial discretion.[33]  In the case of DACA, DHS determined that, for individuals who met specified prerequisites, including the lack of a significant criminal history[34] and the requisite educational or military status, it would favorably exercise its discretion to de-prioritize removal of those individuals.

The Obama administration's decision to extend certain benefits to DACA beneficiaries, such as the ability to obtain a social security card, was similarly lawful.  Immigration statutes and rules have long included carveouts to make those subject to deferred action eligible for such benefits.  For example, regulations promulgated in 1981 outlining the "classes of aliens

---

[31] 8 C.F.R. § 274a.12(c)(14).

[32] *See* Michael Tan, *DACA Is And Always Will Be* Constitutional (Aug. 15, 2017), https://www.aclu.org/blog/immigrants-rights/road-citizenship/daca-and-will-always-be-constitutional

[33] *See Understanding Prosecutorial Discretion in Immigration Law* (May 26, 2011), https://www.americanimmigrationcouncil.org/research/understanding-prosecutorial-discretion-immigration-law

[34] Undocumented individuals who have been convicted of a felony, a significant misdemeanor, or three or more other misdemeanors are prohibited from receiving benefits under DACA.  *See* Memorandum, *supra* n.21, at 1.

authorized to accept employment" include "an alien who has been granted deferred action."[35]  In 1986, Congress also enacted a comprehensive scheme that prohibits the employment of "illegal aliens," but includes an exception for non-citizens who are "authorized to be employed . . . by the Attorney General"—authority that was thereafter transferred to the Secretary of Homeland Security.[36]  The Supreme Court has applied similar standards when assessing an agency's discretionary authority in the immigration context.  In *Reno v. Flores*, 507 U.S. 292 (1993), the Court considered an Immigration and Naturalization Service policy that "juvenile aliens" detained without their parents could not be released to other "responsible adults."  It held that applying additional rules to a seemingly "blanket" policy provided sufficient "particularization" to allow for the constitutional exercise of discretion.  *Id.* at 314-15.  DACA's benefits, which include the ability to get a driver's license, to obtain employment and have access to health benefits, and ultimately to live without fear of removal, are all similarly lawful benefits conferred upon individuals who have attained deferred-action status.

## IV. The Termination of DACA Violated the Administrative Procedure Act

The Administrative Procedure Act ("APA") outlines the procedures that federal agencies must follow when promulgating, amending or repealing a rule.  DHS's termination of DACA failed to comply with these requirements in two ways.  First, DHS failed to demonstrate that its decision to repeal DACA was the product of reasoned decision-making, rendering it arbitrary and capricious under the APA.  Second, despite significantly altering DACA beneficiaries' existing legal rights, the DACA repeal failed to comply with the notice and comment procedures that the APA prescribes for substantive rules.

---

[35] 8 C.F.R. § 274a.12(c)(14).

[36] *See* Millhiser, *supra* n.29.

A.    DHS's Decision to Terminate DACA Was Arbitrary and Capricious Under the APA

Governmental agencies are accorded significant latitude in administering the programs for which they are responsible, but they do not have unfettered discretion to rescind their own rules.  Rather, "[i]n all cases" a rule rescission—like a rule promulgation—is invalid under the APA if it is "arbitrary" or "capricious."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citing 5 U.S.C. § 706(2)(A)); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (noting that the APA's arbitrary-and-capricious test applies equally to rule promulgations and to rule rescissions).  Such an action is only valid if the agency supplies a "reasoned analysis for the change," *State Farm*, 463 U.S. at 42, including a consideration of all "relevant factors," *Overton Park*, 401 U.S. at 416.  Thus, a rule rescission is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

In terminating DACA, DHS failed to supply even a cursory analysis of several important considerations.  For example, the DHS Memorandum failed to address the basic rationale underlying the DACA program: the use of prosecutorial discretion to focus limited agency resources on high-priority cases.  Nor did DHS address the legal justification for the exercise of such discretion, *i.e.*, the Secretary of Homeland Security's express statutory authority to "[e]stablish[] national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  Finally—and of particular importance to *amicus curiae*—DHS entirely ignored its earlier policy determinations regarding the promotion of education and of DACA recipients' contributions to society.  The 2012 memorandum creating DACA specifically noted that U.S. immigration law is not designed to remove such "productive young people," many of whom "have already

17

contributed to our country in significant ways."[37]  That the DHS Memorandum failed to mention, let alone substantively address these goals when it terminated DACA and upended the lives of nearly a million people, many of whom are students, demonstrates the arbitrary and capricious nature of DHS's action.

If anything, DHS was obligated in this context to supply a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  When an agency's policy has created "serious reliance interests," the agency must provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516 (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  There are few reliance interests more substantial than those of DACA beneficiaries, who have built their entire lives upon the premise that they can live openly and legally within the United States, and attend school, work and travel, due to their DACA status.  In eradicating that premise and throwing the lives of DACA beneficiaries into utter disarray, DHS was, at a minimum, obligated to explain in detail— certainly beyond expressing the mere desire to avoid a lawsuit—its justification for ignoring the facts and circumstances that led to DACA's implementation in the first place.  *See Fox*, 556 U.S. at 516.

Finally, to the limited extent DHS supplied any explanation for its decision to repeal DACA, that explanation is both legally flawed and incoherent.  According to the DHS Memorandum, DHS cannot grant deferred-action status to immigrants who arrive in the U.S. before age 16 because Congress supposedly has not authorized the practice.[38]  At the same time, the Memorandum provides that DHS will continue renewing applications for deferrals over the

---

[37] Memorandum, *supra* n.21, at 2.

[38] *See* DHS Memorandum, *supra*.

next month, allowing eligible immigrants to remain in the country for another two years.  *Id.*  In short, DHS asserts that it can keep doing what it erroneously claims it lacks statutory authority to do.  This "internally inconsistent and inadequately explained" analysis, *General Chemical Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987), falls "somewhere on the distant side of arbitrary."  *Central Florida Enterprises, Inc. v. FCC*, 598 F.2d 37, 50 (D.C. Cir. 1978).

B.   <u>DHS's DACA Termination Failed to Comply with the APA's Notice-and-Comment Procedures</u>

With certain narrow exceptions, the APA requires that agencies engaged in rulemaking—which includes repealing an existing rule—provide notice and an opportunity for public comment.  *See* 5 U.S.C. § 553(b), (c); *see also id.* § 551(5) (defining "rulemaking" to include both promulgating and repealing a rule).  Section 553's notice-and-comment provisions apply to "substantive" or "legislative" rules, *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 168 (2d Cir. 2013) (citation omitted), not to "interpretive rules" or "general statements of policy," 5 U.S.C. § 553(b)(3)(A).  Whether a rule is substantive turns not on its label, but on whether it in fact "create[s] new law, right[s], or duties."  *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001); *see Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 783 (2d Cir. 1984) (stating that substantive rules "changed existing rights and obligations").

Here, the revocation of deferred-action status unquestionably significantly alters DACA beneficiaries' legal rights.  *See Saranac Power*, 267 F.3d at 131.  For example, DACA recipients may obtain social security numbers and photo identification cards, which in turn enables them to apply for financial aid and to secure credit to fund education-related expenses.  DACA recipients also are eligible for work authorization, which enables them to work their way through school and to secure legitimate jobs following graduation.  Further in the future, DACA recipients are

19

eligible for Social Security and Medicare benefits.  DHS's termination of DACA revokes

recipients' eligibility for these and other benefits on a non-discretionary, categorical basis.

Accordingly, DHS' decision to rescind DACA was a substantive rule to which § 553's notice-

and-comment requirements apply.  By rendering its decision in the DHS Memorandum with no

public notice or comment, DHS failed to adhere to these basic requirements and thus violated the

APA.  *Cf. Texas*, 809 F.3d at 170 (holding that states should have an opportunity to be heard, via

notice and comment, on DAPA's substantive grant of lawful presence and eligibility for

benefits).[39]

## V.     The Failure to Issue An Analysis of the DACA Termination's Impact On Small Entities Violates the Regulatory Flexibility Act

Under the Regulatory Flexibility Act of 1980, 5 U.S.C. §§ 601-612 ("RFA"), all federal

agencies, as part of the rulemaking process, must conduct a "regulatory flexibility analysis" for

any rule that has "a significant economic impact on a substantial number of small entities."  5

U.S.C. § 605(b).  In an initial analysis, an agency must, among other things, describe the effects

of a proposed rule on small businesses, discuss "significant alternatives" that would "minimize

any significant economic impact of the rule" on small businesses, and explain "why each one of

such alternatives was rejected."  *Id.* § 604(a)(3); *see id.* § 603 (describing the "initial regulatory

flexibility analysis").  When promulgating a final rule, the agency must publish a final analysis

for public comment.  *See id.* § 4.  An agency must, at a minimum, make a "reasonable, good-

faith effort" to comply with these requirements.  *Associated Fisheries of Me., Inc. v. Daley*, 127

F.3d 104, 114 (1st Cir. 1997).

---

[39] "DAPA" stands for "Deferred Actions for Parents of Americans," a program created in 2014 to provide a path to citizenship for certain immigrants whose children are American citizens or Lawful Permanent Residents. *See Texas*, 809 F.3d at 146-47.  On June 15, 2017, then-Secretary Kelly rescinded the DAPA program in its entirety. *See* John Kelly, *Rescission of Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), available at https://www.dhs.gov/news/2017/06/15/rescission-memorandum-providing-deferred-action-parents-americans-and-lawful.

As an initial matter, the DACA repeal is certain to have a significant impact on small businesses.  DACA recipients who have obtained work authorization are not only employed at thousands of small businesses, but they are entrepreneurs who start small businesses.  Indeed, immigrants such as DACA beneficiaries are twice as likely to start a business as the average person,[40] making them significant drivers of job creation and contributors to the country's economic vitality.  Repealing DACA, therefore, will cause a significant reduction in the country's workforce as well as shutter small business entities whose owners require deferred-action status to stay in business.  DHS, however, did not even mention these impacts, much less discuss "significant alternatives" to repealing DACA, as the RFA requires.  *See* 5 U.S.C. § 604(a)(3).  In short, DHS failed to make a "good-faith effort" to comply with the RFA's requirements.  *See Associated Fisheries*, 127 F.3d at 114.  Accordingly, the DACA repeal violates the RFA.

## CONCLUSION

For the foregoing reasons, DHS's decision to terminate DACA via the DHS Memorandum is unlawful, and will impair important interests of DACA beneficiaries as well as educational institutions, including NYU.  Implementation of the DHS Memorandum should therefore be enjoined and the DACA program reinstated in full.

---

[40] *See* Tom K. Wong et al., *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress (Oct. 18, 2017), *available at* https://www.americanimmigrationcouncil. org/research/value-added-immigrants-create-jobs-and-businesses-boost-wages-native-born-workers.

Dated: December 22, 2017

**OF COUNSEL:**

Terrance Nolan
General Counsel and Secretary
New York University
70 Washington Square South, 11th floor
New York, New York 10012

Respectfully submitted,

**PROSKAUER ROSE LLP**

By:  /s/ Steven E. Obus
Steven E. Obus
Seth D. Fiur (*pro hac vice*)
Tiffany M. Woo
Melissa D. DiGrande (*pro hac vice pending*)
Ashley Ferguson (*pro hac vice*)
Shiloh A. Rainwater (*pro hac vice*)
Eleven Times Square
New York, New York 10036
(212) 969-3000
SObus@proskauer.com
SFiur@proskauer.com
TWoo@proskauer.com
MDigrande@proskauer.com
AFerguson@proskauer.com
SRainwater@proskauer.com

Counsel for *Amicus Curiae*
New York University