UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| **MARTÍN JONATHAN BATALLA VIDAL,** ) | |
| **ANTONIO ALARCON, ELIANA** ) | |
| **FERNANDEZ, CARLOS VARGAS,** ) | |
| **MARIANO MONDRAGON,** and **CAROLINA** ) | |
| **FUNG FENG,** on behalf of themselves and all ) | |
| other similarly situated individuals, and **MAKE** ) | |
| **THE ROAD NEW YORK,** on behalf of itself, its ) | |
| members, its clients, and all similarly situated ) | |
| individuals, ) | |
| ) | |
| *Plaintiffs,* ) | Case No. 1:16cv4756 |
| ) | |
| **v.** ) | |
| ) | |
| **KIRSTJEN M. NIELSEN,** Secretary, ) | |
| Department of Homeland Security, **JEFFERSON** ) | |
| **BEAUREGARD SESSIONS III,** Attorney ) | |
| General of the United States, and **DONALD J.** ) | |
| **TRUMP,** President of the United States, ) | |
| ) | |
| *Defendants.* ) | |

_____

**BRIEF OF FORMER FEDERAL IMMIGRATION AND HOMELAND SECURITY
OFFICIALS AS AMICI CURIAE IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES .............................................................................. ii

INTEREST OF AMICI CURIAE ...................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 2

ARGUMENT ....................................................................................................... 5

I.     DEFERRED ACTION POLICIES HAVE BEEN AN INTEGRAL
COMPONENT OF IMMIGRATION ENFORCEMENT FOR DECADES ............... 5

II.    DEFERRED ACTION POLICIES EFFECTIVELY ENFORCE FEDERAL
IMMIGRATION LAWS AND ADVANCE IMPORTANT POLICY
OBJECTIVES ........................................................................................ 11

      A.    Deferred Action Policies Make the Most Efficient Use of Limited
Enforcement Resources ........................................................................ 11

      B.    Deferred Action Policies Promote Humanitarian Values ..................... 14

      C.    Deferred Action Policies Ensure Consistent Enforcement of Federal
Immigration Law ................................................................................. 16

CONCLUSION ................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Hotel & Rest. Employees Union, Local 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) ................. 7

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .............................................. 4, 5

*United States v. Texas*, 136 S. Ct. 2271 (2016) ........................................................ 4

**Statutes**

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) ...................................... 10

Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986) ...................... 7

**Executive Actions**

Bo Cooper, *INS Exercise of Prosecutorial Discretion* (July 11, 2000) .................................. 13, 17

Doris Meissner, *Exercising Prosecutorial Discretion* (Nov. 17, 2000), *reprinted as* 77
    No. 46 Interpreter Releases 1661 ................................................................... 12, 16

Elaine Duke, *Memorandum on Rescission of Deferred Action for Childhood Arrivals*
    (Sept. 5, 2017) ....................................................................................... 4

Gene McNary, *Family Fairness* (Feb. 2, 1990), *reprinted as* 67 No. 6 Interpreter
    Releases 153 ...................................................................................... 9, 14, 16

Janet A. Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals
    Who Came to the United States as Children* (Jun. 15, 2012) ................................ 3, 12, 14, 15

Jeff Weiss, *Guidelines for Children's Asylum Claims* (Dec. 10, 1998) ....................................... 15

Jeh C. Johnson, *Exercising Prosecutorial Discretion* (Nov. 20, 2014) .................................. 12, 14

John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil
    Immigration Enforcement Priorities of the Agency for the Apprehension,
    Detention, and Removal of Aliens* (June 17, 2011) .................................................. 15

Julie L. Myers, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) ..................................... 14

Paul W. Virtue, *Supplemental Guidance on Battered Alien Self-Petitioning Process
    and Related Issues* (May 6, 1997) .................................................................. 10

President Dwight D. Eisenhower, *Statement by the President Concerning the Entry
    into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956) .............................. 6

President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990) ........................................................................................... 10

President Ronald Reagan, *Statement on Signing the Immigration Reform and Control Act of 1986* (Nov. 6, 1986) ........................................................................... 16

Sam Bernsen, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (Jul. 15, 1976) ................................................................................. 11, 12

U.S. Dep't of Justice, Circular Letter No. 107 (Sep. 20, 1909) ................................. 11

William J. Howard, *Prosecutorial Discretion* (Oct. 24, 2005) ............................ 13, 17

**Secondary Sources**

Alan C. Nelson, *Legalization and Family Fairness: An Analysis* (Oct. 21, 1987), *reprinted as* 64 No. 41 Interpreter Releases 1191 ................................... 8

American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014) .................................................................... 6, 7

Andorra Bruno *et al.*, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, Cong. Research Serv. (July 13, 2012) .................. 6, 7

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 6:28 AM) ............... 3

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 6:35 AM) ............... 3

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM) ................ 4

Elise Viebeck *et al.*, *Trump's Immigration Talks with Democrats Attract Cautious Support*, Wash. Post (Sept. 14, 2017) ................................................... 3

*INS Reverses Family Fairness Policy,* 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990) ............................................................................................... 7

Jeffrey S. Passel *et al.*, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, Pew Research Center (Sept. 2014) ...................... 9

Michael D. Shear & Julie Hirschfeld Davis, *Trump Moves to End DACA and Calls on Congress to Act*, N.Y. Times (Sept. 5, 2017) ..................................... 4

Tal Kopan, *Trump Ends DACA But Gives Congress Window to Save It*, CNN (Sept. 5, 2017) ............................................................................................ 4

U.S. Citizenship and Immig. Serv., *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina, Frequently Asked Questions* (Nov. 25, 2005) ..................................................................... 11

**Regulations**

46 Fed. Reg. 25,080 (May 5, 1981) ................................................................................. 7

72 Fed. Reg. 53,596 (Sept. 19, 2007) ........................................................................... 11

8 C.F.R. § 274a.12(a)(11) ............................................................................................... 7

8 C.F.R. § 274a.12(c)(14) ............................................................................................... 7

**Legislative History**

*Immigration Act of 1989: Hearing before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary*, 101st Cong. (Feb. 21, 1990) ......................................................................................................................... 9

Written Testimony of Stephen H. Legomsky before the Committee on the Judiciary, U.S. House of Representatives (Feb. 25, 2015) .................................................. 9, 10, 14

## INTEREST OF AMICI CURIAE

Amici served in senior positions in the federal agencies charged with enforcement of U.S. immigration laws under both Democratic and Republican Administrations.

T. Alexander Aleinikoff served as the General Counsel, and then the executive associate commissioner for programs, of the Immigration and Naturalization Service ("INS") from 1994 to 1997.

Roxana Bacon served as Chief Counsel of U.S. Citizenship and Immigration Services ("USCIS") from 2009 to 2011.

Seth Grossman served as Chief of Staff to the General Counsel of the U.S. Department of Homeland Security ("DHS") from 2010 to 2011, Deputy General Counsel of DHS from 2011 to 2013, and as Counselor to the Secretary at the same agency in 2013.

Stephen H. Legomsky served as Chief Counsel of USCIS from 2011 to 2013 and as Senior Counselor to the Secretary of DHS on immigration issues from July to October 2015.

John R. Sandweg served as Acting Director of Immigration and Customs Enforcement ("ICE") from 2013 to 2014, as Acting General Counsel of DHS from 2012 to 2013, as Senior Counselor to the Secretary of DHS from 2010 to 2012, and as Chief of Staff to the General Counsel of the same agency from 2009 to 2010.

Paul Virtue served as General Counsel of INS from 1998 to 1999. INS is the predecessor agency to the federal offices within DHS that now have responsibility for enforcing the nation's immigration laws. He also served as Executive Associate Commissioner of INS from 1997 until 1998 and as Deputy General Counsel from 1988 until 1997.

As former leaders of the nation's primary immigration enforcement agencies, amici are familiar with the historical underpinnings of deferred action policies like DACA. Amici's relevant experience includes first-hand administration of other deferred action policies and

testimony before Congress explaining these policies and their benefits. Amici's experience reveals the vital role that these policies play in facilitating the rational and humane enforcement of federal immigration law, which has historically established laudable policy objectives that have been backed with inadequate resources; because the Executive Branch has lacked the resources to take action against every person residing in the United States who may be removable, it has seen fit to prioritize enforcement against those who pose threats to public safety or national security over enforcement as to others. Amici's experience thereby teaches that reasoned use of deferred action policies in the immigration context can further the national security interests, humanitarian values, and rule of law principles underlying federal immigration legislation.

## SUMMARY OF ARGUMENT

For more than half of a century, Administrations of both Republican and Democratic Presidents have implemented policies designed to delay—in many cases indefinitely—the enforcement of deportation and other requirements created by federal immigration legislation. The Executive Branch has relied on these "deferred action" policies to enforce federal immigration laws in a manner that is rational, humane, and in furtherance of important national interests. These deferred action policies also allow for the most efficient and effective enforcement of the immigration laws by focusing scarce resources on the highest-priority cases.

The Deferred Action for Childhood Arrivals ("DACA") program is a prime example of such a policy. Announced in a June 15, 2012 memorandum from then-Secretary of Homeland Security Janet Napolitano, DACA has deferred deportation and other enforcement proceedings for children and young adults who have lived in this country continuously since mid-2007 and who have met certain other conditions. *See* Janet A. Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (Jun. 15,

2012), *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf ("Napolitano Memorandum"). As Secretary Napolitano explained in her memorandum, the "exercise of prosecutorial discretion" is "especially justified" as to these young people—widely known as Dreamers—because they "were brought to this country as children and know only this country as home" and generally "lacked the intent to violate the law," and as such are "low priority cases[.]" *Id.* at 1–2. The Napolitano Memorandum also explains that "many of these young people have already contributed to our country in significant ways." *Id.* at 2.

President Donald J. Trump apparently agrees. Consistent with the Napolitano Memorandum, President Trump has publicly recognized that Dreamers were brought into the United States at a young age through no fault of their own, that they have contributed to our nation as students, employees, and military personnel, and that they deserve protection from deportation and other enforcement actions. *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 6:28 AM), *available at* https://goo.gl/x8BicA ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....."); Donald J. Trump (@realDonaldTrump), Twitter (Sept. 14, 2017, 6:35 AM), *available at* https://goo.gl/oGpm54 ("...They have been in our country for many years through no fault of their own - brought in by parents at young age[.]"); Elise Viebeck *et al.*, *Trump's Immigration Talks with Democrats Attract Cautious Support*, Wash. Post (Sept. 14, 2017), *available at* https://goo.gl/P8UVct (statement of Donald J. Trump) ("We're talking about taking care of people, people who were brought here, people who've done a good job."); *id.* (statement of Donald J. Trump) ("Look, 92 percent of the people agree on DACA[.]").

The only objection that President Trump has lodged publicly against DACA is not one of *policy* but rather of *process*: he apparently believes that DACA should be codified in statute through legislation passed by Congress. *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM), *available at* https://goo.gl/2xtSey (calling on "Congress" to "legalize DACA" within "6 months").[1]

Then-acting Secretary of Homeland Security Elaine Duke purported to rescind DACA in a September 5, 2017 memorandum, arguing *inter alia* that DACA lacked legal authority. *See* Elaine Duke, *Memorandum on Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017), *available at* https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca ("Duke Memorandum"). According to the Duke Memorandum, "it is clear that the . . . DACA program should be terminated" based on: (i) a one-page letter from the Attorney General dated the day before the Duke Memorandum arguing that DACA was "effectuated . . . through executive action, without proper statutory authority" and (ii) "the Supreme Court's and the Fifth Circuit's rulings" in *Texas v. United States*, in which an equally divided Supreme Court issued a one-sentence opinion affirming a split decision by the Fifth Circuit which concluded that an entirely different deferred-action program announced years after DACA was not supported by statute. 809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016).[2]

---

[1] *See also* Michael D. Shear & Julie Hirschfeld Davis, *Trump Moves to End DACA and Calls on Congress to Act*, N.Y. Times (Sept. 5, 2017), *available at* https://goo.gl/UzemAv (statement of Donald J. Trump) ("I have a love for these people, and hopefully now Congress will be able to help them and do it properly[.]"); Tal Kopan, *Trump Ends DACA But Gives Congress Window to Save It*, CNN (Sept. 5, 2017), *available at* https://goo.gl/v2uSiY (statement of Donald J. Trump) ("It is now time for Congress to act! . . . As I've said before, we will resolve the DACA issue with heart and compassion – but through the lawful Democratic process[.]").

[2] While the legal merits of *Texas v. United States* are outside the scope of this amicus curiae brief, it is worth nothing that the Duke Memorandum fails to mention that the Fifth Circuit was careful to distinguish the deferred action program at issue there (Deferred Action for Parents of

As the brief will show, however, DACA is well within the legal authority of the Executive Branch, and therefore the government has failed to assert a valid reason for this highly significant policy change. The Duke Memorandum and the Fifth Circuit decision on which it relies cannot be squared with historical precedent, in which deferred action programs are well-rooted. The Executive Branch in both Republican and Democratic Administrations repeatedly has implemented deferred action policies, like DACA, based on the common-sense proposition that federal authorities should focus their limited resources on apprehending and deporting those who are a threat to national security, public safety, or the employment markets—not those who pose no such threats and, indeed, are making meaningful contributions to American society. This brief places DACA within that historical context, which demonstrates that the rescission of DACA is arbitrary and capricious and should be enjoined on that ground.

## ARGUMENT

## I.    DEFERRED ACTION POLICIES HAVE BEEN AN INTEGRAL COMPONENT OF IMMIGRATION ENFORCEMENT FOR DECADES

For more than half a century, federal immigration officials have carefully exercised enforcement discretion for various classes of non-citizens through policies that recommend "deferred action," "extended voluntary departure," "parole," or "deferred enforced departure." Notwithstanding the variation in terminology, these programs are fundamentally alike: all enable certain classes of otherwise deportable people to remain in (or, in the case of parole, to enter) the United States and, in most cases, to support themselves while they are present by working lawfully. Amici have identified dozens of examples of such policies. *See, e.g.*, Andorra Bruno *et*

---

Americans and Lawful Permanent Residents ("DAPA")) from the one at issue in this case (DACA, which was not challenged in *Texas v. United States*). 809 F.3d at 173–74 (noting material differences between DACA and DAPA and cautioning that "any extrapolation from DACA must be done carefully").

*al.*, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20–23, Cong. Research Serv. (July 13, 2012), *available at* https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ("CRS Analysis"). Amici highlight here a handful of salient examples.

   ***Eisenhower Administration.*** In 1956, President Eisenhower "paroled" approximately one thousand foreign-born children who had been adopted by American citizens overseas but who were barred entry into the United States by statutory quotas. *See* American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* at 3 (Oct. 2014), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf ("AIC Report"); President Dwight D. Eisenhower, *Statement by the President Concerning the Entry into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956), *available at* https://goo.gl/Ff9nCL ("Eisenhower Statement"). The President explained that he had been "particularly concerned over the hardship" the quotas imposed, especially on members of the Armed Forces who were "forced to leave their adopted children behind" after completing tours of duty. Eisenhower Statement. The President adopted the parole policy "pending action by Congress to amend the law." *Id.*

   As the Cold War entered its second decade, the Eisenhower Administration began to use the parole power as an instrument of foreign policy. For example, President Eisenhower ordered the parole of Cubans fleeing their country's oppressive communist regime. The Kennedy, Johnson, and Nixon Administrations continued that parole program, which ultimately permitted

over six hundred thousand otherwise ineligible persons to enter the United States. *See* AIC Report at 3.

  ***Ford & Carter Administrations.*** The Ford and Carter Administrations each granted "extended voluntary departure" to certain classes of immigrants, many of whom came from war-torn or communist countries. Under the Ford and Carter Administrations' deferred action policies, immigration officials "temporarily suspend[ed] enforcement" of the immigration laws for "particular group[s] of aliens." *Hotel & Rest. Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc); *accord* AIC Report at 3–5; CRS Analysis at 20–21.

  ***Reagan Administration.*** The Reagan Administration continued and broadened the use of deferred action. CRS Analysis at 21–22. Under the Reagan Administration, the Immigration and Naturalization Service ("INS") promulgated a regulation enabling beneficiaries of deferred action to apply for work authorization. 46 Fed. Reg. 25,080, 25,081 (May 5, 1981). This regulation remains in effect and applies to present-day deferred action recipients. 8 C.F.R. § 274a.12(c)(14); *see also* 8 C.F.R. § 274a.12(a)(11) (allowing work authorization for persons "whose enforced departure from the United States has been deferred").

  President Reagan's Administration also recognized the distinction between the withholding of deportation enforcement and the affirmative granting of immigration status, in its establishment of the "Family Fairness" program following passage of the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, § 201, 100 Stat. 3359, 3445 (1986). At the time, IRCA had established a pathway to lawful status for certain people who otherwise were illegally present in the United States, *see id.*, but was silent as to whether INS should continue to deport the relatives of people who might qualify for lawful status under the new law. *See INS Reverses Family Fairness Policy,* 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990), *available at*

https://www.prwatch.org/files/interpreter_releases_feb_5_1990.pdf ("What to do when some but not all members of an alien family qualify for legalization has been a controversial issue since the beginning of the amnesty program."). Confronted with that issue, INS Commissioner Alan Nelson acknowledged that there was "nothing in [IRCA or the legislative history] that would indicate Congress wanted to provide immigration benefits to others who didn't meet the basic criteria, including the families of legalized aliens." Alan C. Nelson, *Legalization and Family Fairness: An Analysis* (Oct. 21, 1987), *reprinted as* 64 No. 41 Interpreter Releases 1191, 1201 ("Nelson Statement"). INS therefore lacked express statutory authority to grant resident status to anyone who did not qualify for it on their own merits. *Id*. Under the reasoning of the Duke Memorandum, this would have been the end of the inquiry.

However, the Reagan Administration knew that INS was not legally required to deport all such persons, even if INS was prohibited from granting them permission to work. The Reagan Administration recognized a distinction between granting individuals permanent resident status, which the Attorney General could not do without express statutory authorization, and merely deferring removal actions against certain persons unlawfully present, which the Attorney General was empowered to do by law. *See* Nelson Statement. As Commissioner Nelson stated:

> INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations.

*Id*.

**G.H.W. Bush Administration.** President George H.W. Bush's Administration expanded the Family Fairness Program in 1990, when INS Commissioner Gene McNary instructed that "[v]oluntary departure will be granted to the spouse and to unmarried children under 18 years of

age, living with the legalized alien, who can establish" that they meet certain criteria, including residence in the United States for a specified period of time and the lack of a felony conviction. Gene McNary, *Family Fairness* at 1 (Feb. 2, 1990), *reprinted as* 67 No. 6 Interpreter Releases 153, 165 App'x I ("McNary Memorandum"). The INS also made clear that anyone who qualified under the Family Fairness program was eligible to work. *Id*. Contemporaneous government estimates indicated that as many as 1.5 million people were expected to be eligible under the expanded program. *See Immigration Act of 1989: Hearing before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary* at 49, 101st Cong. (Feb. 21, 1990) (Mr. McCollum: "Do you have any idea, any estimates of how many people we are talking about who are the immediate relatives legalized under the IRCA Act? . . . ." Mr. McNary: "Well, we are talking about 1.5 million under IRCA."); *see also id.* at 56 (Mr. Morrison: "Mr. McNary, you used the number 1.5 million IRCA relatives who are undocumented but who are covered by your family fairness policy. Do I have that number right?" Mr. McNary: "Yes."). Publicly available estimates indicate that this figure equates to approximately 40% of undocumented immigrants in the United States at the time. *See* Jeffrey S. Passel *et al.*, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* at 4 & 7, Pew Research Center (Sept. 2014), *available at* http://assets.pewresearch.org/wp-content/uploads/sites/7/2014/09/2014-09-03_Unauthorized-Final.pdf (estimating that 3.5 million unauthorized immigrants lived in the United States in 1990).[3]

---

[3] Although fewer people ultimately applied for Family Fairness than the Administration predicted – largely because the subsequently-enacted Immigration Act of 1990 offered preferable remedies – neither the Administration nor Congress viewed the anticipated scale of the program as undermining its legality. *See* Written Testimony of Stephen H. Legomsky before the Committee on the Judiciary, U.S. House of Representatives, at 24–25 (Feb. 25, 2015), *available at* https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf ("Legomsky

After overseeing this expansion of Family Fairness, President Bush re-emphasized the existence of prosecutorial discretion in immigration enforcement in a signing statement accompanying his approval of the Immigration Act of 1990. The underlying Act authorized the Attorney General power to grant "temporary protected status" to allow otherwise deportable persons to remain in the United States "because of their particular nationality or region of foreign state of nationality." Pub. L. No. 101-649, § 302, 104 Stat. 4978 (1990). President Bush objected to language purporting to make this the "exclusive" avenue for providing such relief, stating: "I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions." *See* President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990), *available at* https://goo.gl/utuLxg.

***Clinton Administration.*** President Clinton's Administration continued to employ deferred action policies by authorizing deferred action for undocumented persons who might prove eligible for permanent relief through the Violence Against Women Act. *See* Paul W. Virtue, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997), *available at* http://library.niwap.org/wp-content/uploads/2015/pdf/CONF-VAWA-Gov-SuppltlGuidanceSec384-05.06.1997.pdf ("Virtue Memorandum") (noting that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action"). President Clinton also directed the Attorney General to grant deferred enforced departure to Liberian nationals who had received temporary protected status and were living in the United States. CRS Analysis at 23.

---

Testimony"). Professor Legomsky's testimony, *id.* at 23–24, also rebuts the criticism that the Family Fairness program as administered by the G.H.W. Bush Administration was merely an attempt to fill an inadvertent statutory gap.

***G.W. Bush Administration.*** President George W. Bush continued the Clinton Administration's deferred action policy toward certain Liberians by directing the Secretary of Homeland Security to defer the enforced departure of Liberian nationals and certain habitual residents of Liberia who were present in the United States under temporary protected status as of September 12, 2007. 72 Fed. Reg. 53,596 (Sept. 19, 2007). President Bush also provided deferred action for foreign students affected by Hurricane Katrina who were unable to fulfill their F-1 visa full-time student requirement, and he simultaneously suspended employer verification requirements for those students, as well. U.S. Citizenship and Immig. Serv., *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina, Frequently Asked Questions* (Nov. 25, 2005), *available at* https://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_FAQ.pdf.

## II.   DEFERRED ACTION POLICIES EFFECTIVELY ENFORCE FEDERAL IMMIGRATION LAWS AND ADVANCE IMPORTANT POLICY OBJECTIVES

Over the past several decades, Administrations of both political parties have repeatedly defended deferred action policies by invoking straightforward and consistent legal and policy arguments. As executive officials charged with enforcing U.S. immigration laws have explained, deferred action policies make the most efficient use of limited enforcement resources, promote humanitarian values, and achieve consistent enforcement of federal immigration law.

### A.   Deferred Action Policies Make the Most Efficient Use of Limited Enforcement Resources

As early as 1909, a DOJ circular advised officers not to proceed in immigration cases unless "some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country." *See* U.S. Dep't of Justice, Circular Letter No. 107 (Sep. 20, 1909), *quoted in* Sam Bernsen, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* at 4 (Jul. 15, 1976), *available at* https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-

exercise-pd.pdf ("Bernsen Memorandum"). Other deferred action policies reflect a similar judgment. *See* Napolitano Memorandum at 1 ("[A]dditional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities."); Doris Meissner, *Exercising Prosecutorial Discretion* at 4 (Nov. 17, 2000), *reprinted as* 77 No. 46 Interpreter Releases 1661, App. I, *available at* http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf ("Meissner Memorandum") ("Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law. . . . An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.").

DACA, too, reflects a choice to focus law enforcement resources on the highest priority cases, a choice that is necessary because Congress has not allocated to DHS and DOJ sufficient resources to remove *every single person* who has violated our nation's immigration laws. *See* Jeh C. Johnson, *Exercising Prosecutorial Discretion*, at 1 (Nov. 20, 2014), *available at* https://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf ("Johnson Memorandum") ("Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States."); Bernsen Memorandum at 1 ("There simply are not enough resources to enforce all of the rules and regulations presently on the books."); Bo Cooper, *INS Exercise of Prosecutorial Discretion* at 2

(July 11, 2000), *available at* http://library.niwap.org/wp-content/uploads/2015/IMM-Gov-ProsDisc-07.11.00.pdf ("Cooper Memorandum") ("[L]imitations in available enforcement resources . . . make it impossible for a law enforcement agency to prosecute all offenses that come to its attention."). Thus, like its predecessors, DACA directs the government's limited resources to prosecuting individuals who pose the greatest threats to public safety instead of those who do not pose such threats, who belong to families residing in the United States, who often have come to the United States through no fault of their own, and who have developed strong ties to this country and to their communities.

The need for deliberate resource management and prioritization has grown more acute as increasingly sophisticated threats to the United States have emerged, and thus the number of potential targets for enforcement actions has surged. In the years after the September 11, 2001 terrorist attacks, the Principal Legal Advisor of Immigration and Customs Enforcement ("ICE") under President George W. Bush, William J. Howard, emphasized that "we must prioritize our cases to allow us to place greatest emphasis on our national security and criminal alien dockets[.]" William J. Howard, *Prosecutorial Discretion* at 1 (Oct. 24, 2005), *available at* http://library.niwap.org/wp-content/uploads/IMM-Gov-ICEMemoProsDiscretion-10.24.05.pdf ("Howard Memorandum"). He elaborated:

> It is clearly DHS policy that national security violators, human rights abusers, spies, traffickers in both narcotics and people, sexual predators and other criminals are removal priorities. It is wise to remember that cases that do not fall within these categories sometimes require that we balance the cost of an action versus the value of the result. Our reasoned determination in making prosecutorial discretion decisions can be a significant benefit to the efficiency and fairness of the removal process.

*Id*. at 8.

Deferred action policies advance homeland security and public safety objectives by drawing the recipients out of the shadows and into the open. "These individuals provide their names, addresses, and histories, and the government performs background checks to assure public safety." Legomsky Testimony at 29. Communities are safer when undocumented immigrants who are either victims of crimes or witnesses to crimes "feel secure enough to report the crimes to the police rather than avoid contact for fear of being deported." *See id.* DACA, which prioritizes "threats to national security, public safety, and border security," is consistent with this approach. Johnson Memorandum at 3.

B.    Deferred Action Policies Promote Humanitarian Values

Sound enforcement of the immigration laws also requires attention to humanitarian values. As Gene McNary, the INS Commissioner under President George H.W. Bush, explained: "It is vital that we enforce the law against illegal entry. However, we can enforce the law humanely." 67 No. 6 Interpreter Releases at 154. DACA was created out of a similar recognition:

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language.

Napolitano Memorandum at 2. Immigration officials at all levels have been called upon for decades to exercise prosecutorial discretion in a manner that is effective, humane, and faithful to the rule of law. *See, e.g.*, Julie L. Myers, *Prosecutorial and Custody Discretion* at 1 (Nov. 7, 2007), *available at* http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-MyersCustody.pdf ("Myers Memorandum") (discussing treatment of nursing mothers and stating that "[f]ield agents and officers are not only authorized by law to exercise discretion within the

14

authority of the agency, but are expected to do so in a judicious manner at all stages of the enforcement process"); *see supra* Part I (discussing the Family Fairness program).

Children, in particular, have been the subject of special treatment in the enforcement of immigration laws. *See, e.g.*, John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* at 5 (June 17, 2011), *available at* http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-MortonProsDiscretion.pdf (noting that "individuals present in the United States since childhood" warrant "particular care and consideration"); *see also* Jeff Weiss, *Guidelines for Children's Asylum Claims* at 2 (Dec. 10, 1998), *available at* https://www.uscis.gov/sites/default/files/USCIS/Laws%20and%20Regulations/Memoranda/Anci ent%20History/ChildrensGuidelines121098.pdf (providing "guidance on adjudicating children's asylum claims" because of "the unique vulnerability and circumstances of children").

DACA, too, was based on a recognition that there are "certain young people who were brought to this country as children and know only this country as home" and that these young people generally "lacked the intent to violate the law" and thus represented a "low priority" for enforcement. Napolitano Memorandum at 1; *see also id.* (excluding from consideration any individual "convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or [who] otherwise poses a threat to national security or public safety"). In amici's experience, the best approach to achieving rational and effective enforcement of our immigration laws is to prioritize threats to public safety and national security, while simultaneously demonstrating compassion for young people who pose no substantial risks and who have developed ties to the communities in which they have lived for most of their lives.

C.     Deferred Action Policies Ensure Consistent Enforcement of Federal Immigration Law

The U.S. immigration system depends on the dedicated efforts of tens of thousands of federal employees—from border patrol agents and career prosecutors to the Attorney General and the Secretary of Homeland Security. These employees are frequently called upon to make important decisions that shape the implementation and enforcement of the law, the security of the nation, the safety of the public, and the future of families. *See* Cooper Memorandum at 3 ("INS . . . exercises prosecutorial discretion thousands of times every day.").

Policy statements setting forth the Administration's enforcement priorities are necessary to coordinate these efforts in service of a common objective, namely, "to establish a reasonable, fair, orderly, and secure system of immigration into this country and not to discriminate in any way against particular nations or people." President Ronald Reagan, *Statement on Signing the Immigration Reform and Control Act of 1986* (Nov. 6, 1986), *available at* http://www.presidency.ucsb.edu/ws/?pid=36699. Amici's experience is that policy statements such as those contained in DACA are necessary to avoid the U.S. immigration system treating similarly situated people differently based solely on happenstance.

Policy statements that guide enforcement discretion have played an important role in promoting consistency in the treatment of individuals in the immigration system. When the Family Fairness program was created, the INS Commissioner explained that a policy statement was necessary "to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens." McNary Memorandum at 1. Senior officials in subsequent Administrations have similarly noted the importance of deferred action policy statements as an effective tool to promote uniformity and consistency in the enforcement of the law. *See, e.g.*, Meissner Memorandum at 2 ("A statement of principles

16

concerning discretion . . . contribute[s] to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices[.]"); Howard Memorandum at 3 ("[I]t is important that we all apply sound principles of prosecutorial discretion, uniformly throughout our offices and in all of our cases, to ensure that the cases we litigate on behalf of the United States, whether at the administrative level or in the federal courts, are truly worth litigating."); Cooper Memorandum at 8 ("[A]ppropriate policy guidance, reinforced by training, is necessary in order for a law enforcement agency to carry out an enforcement function properly. Such guidance serves a variety of policy goals, including promoting public confidence in the fairness and consistency of the agency's enforcement action[.]").

## CONCLUSION

For the foregoing reasons, *amici* believe that DACA is well within the legal authority of the Executive Branch, and the government has failed to assert a valid reason for this highly significant policy change. The rescission of DACA is arbitrary and capricious and should be enjoined on that ground.

Respectfully submitted,

Dated: December 22, 2017                    */s/ J. Wells Harrell* _____

Albert Giang                                Joshua Riley
BOIES SCHILLER FLEXNER LLP                  Isra Bhatty
725 South Figueroa Street                   J. Wells Harrell (*pro hac vice* to be filed)
Los Angeles, CA 90017                       BOIES SCHILLER FLEXNER LLP
(213) 629-9040                              1401 New York Avenue NW
                                            Washington, DC 20005
Juan P. Valdivieso                          (202) 237-2727
BOIES SCHILLER FLEXNER LLP
1999 Harrison Street                        *Counsel for Amici Curiae*
Oakland, CA 94612
(510) 874-1000