# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL,
ANTONIO ALARCON, ELIANA FERNANDEZ,
CARLOS VARGAS, MARIANO MONDRAGON,
and CAROLINA FUNG FENG, on behalf of
themselves and all other similarly situated
individuals, and MAKE THE ROAD NEW YORK,
on behalf of itself, its members, its clients, and all
similarly situated individuals.

Case No. 1:16-cv-04756 (NGG) (JO)

*Plaintiffs*,

*v.*

KIRSTJEN M. NIELSEN, Secretary of the
Department of Homeland Security, JEFFERSON
BEAUREGARD SESSIONS III, Attorney General
of the United States, and DONALD J. TRUMP,
President of the United States,

*Defendants*

## BRIEF OF LATINOJUSTICE PRLDEF, ET AL.
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

Fernando A. Bohorquez, Jr.
Anat Maytal
Madiha M. Zuberi
Pedro J. Perez*
BAKER & HOSTETLER, LLP
45 Rockefeller Plaza
New York, N.Y. 10111
T: 212.589.4200 / F: 212.589.4201

Of Counsel:

Alan Friel*
BAKER & HOSTETLER, LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025
T: 301.820.8800 / F: 310.820.8859

Juan Cartagena
Jose Perez
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
T: 212.219.3360 / F: 212.431.4276

**\* Pro Hac Vice application pending.*

*Attorneys for Amicus Curiae*
LATINOJUSTICE PRLDEF, *et al*

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................... 1

II. ARGUMENT ................................................................................................................ 5

A.    PRIVACY PRINCIPLES PROVIDE THAT THE GOVERNMENT IS LIMITED
      TO USING PERSONAL INFORMATION FOR THE PURPOSE
      REPRESENTED IN THE COLLECTION OF THAT PERSONAL
      INFORMATION ................................................................................................. 5

      1.    The Fair Information Practice Principles and DHS Endorsement of the
            Purpose Specification and Use Limitation Principles ............................... 5

      2.    The Privacy Act's Routine Use Exception Requires That the
            Government's Use of Information Be Compatible with the Original
            Purpose of its Collection ......................................................................... 8

      3.    Under Long-Standing Federal Trade Commission Policy, Entities Must
            Provide Consumers with Notice of Data Use Practices and Obtain Consent
            When Such Use is Materially Different from When Initially Collected ............. 10

B.    APPLYING PRIVACY PRINCIPLES, DHS'S MATERIAL CHANGE IN
      POLICY TO DISCLOSE DACA PERSONAL INFORMATION TO ICE FOR
      REMOVAL PURPOSES IS ARBITRARY AND CAPRICIOUS .................................... 12

C.    CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G.*,
  215 F.3d 219 (2d. Cir. 2000) ................................................................15

*Berkson v. Gogo LLC*,
  97 F.Supp.3d 359 (E.D.N.Y. 2015) .......................................................15

*Britt v Naval Investigative Service*,
  886 F.2d 544 (3rd Cir. 1989) ..............................................................8, 9

*Covert v. Harrington*,
  876 F.2d 751 (9th Cir. 1989) ..............................................................9, 10

*Douglas v. Talk America*,
  495 F.3d 1062 (9th Cir. 2007) ..............................................................15

*In re Facebook, Inc.*
  FTC File No. 0923184, No. C4365 (F.T.C. July 27, 2012) ....................15

*Swenson v. U.S. Postal Serv.*,
  890 F.2d 1075 (9th Cir.1989) .................................................................10

*U.S. State Dep't v. Ray*,
  502 U.S. 164 (1991) ...............................................................................16

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
  530 F.3d 925 (D.C. Cir. 2008) ...............................................................14

**Statutes**

5 U.S.C. § 552a (a)(5) ...................................................................................8

5 U.S.C. § 552a (a)(7) ................................................................................8, 9

5 U.S.C. § 552a (b) .......................................................................................9

5 U.S.C. § 552a (e)(4)(D) .............................................................................8

5 U.S.C. §§ 601-612 .....................................................................................1

5 U.S.C. § 706 ..............................................................................................1

5 U.S.C. § 706(2)(D) ....................................................................................1

6 U.S.C. § 142 ....................................................................................................5

**Other Authorities**

114 AM. JUR. TRIALS 89 (2009) ............................................................................8

Executive Order: Enhancing Public Safety in the Interior of the United States, The
White House Press Secretary (Jan. 25, 2017), *available at*
   https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-
   public-safety-interior-united-states/ ..............................................................6

FED. TRADE COMM'N, PRIVACY ONLINE: FAIR INFORMATION IN THE ELECTRONIC
   MARKETPLACE, A REPORT TO CONGRESS (May 2000), *available at*
   https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-fair-
   information-practices-electronic-marketplace-federal-trade-commission-
   report/privacy2000.pdf.................................................................................11

FED. TRADE COMM'N, PROTECTING CONSUMER PRIVACY IN AN ERA OF RAPID
   CHANGE: RECOMMENDATIONS FOR BUSINESSES AND POLICYMAKERS (March
   2012), *available at*
   https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-
   commission-report-protecting-consumer-privacy-era-rapid-change-
   recommendations/ 120326privacyreport.pdf ...........................................11

Jonathan R. Cantor, Acting Chief Privacy Officer, U.S. DEP'T OF HOMELAND
   SEC., PRIVACY POLICY GUIDANCE MEMORANDUM NO. 2017-01 (April 25,
   2017), *available at*
   https://www.dhs.gov/sites/default/files/publications/PPGM%202017-
   01%20Signed _0.pdf....................................................................................6

Letter from Fed. Trade Comm'n to Cullen and Dykman LLP (July 1, 2010),
   *available at* https://www.ftc.gov/system/files/documents/closing_letters/
   letter-xy-magazine-xy.com-regarding-use-sale-or-transfer-personal-
   information-obtained-during-bankruptcy-proceeding/100712xy.pdf.....................12

Memorandum from John Kelly, Secretary, U.S. DEP'T OF HOMELAND SEC.,
   ENFORCEMENT OF THE IMMIGRATION LAWS TO SERVE THE NATIONAL
   INTEREST (February 20, 2017), *available at*
   https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcemen
   t-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf. ...........................4, 6

Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF
   HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM NO. 2007-1
   (January 7, 2009) (as amended from January 19, 2007), *available at*
   https://www.dhs.gov/xlibrary/assets/privacy/privacy_policyguide_2007-1.pdf. ....................6

Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM No. 2008-01 (December 29, 2008), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-policy-guidance-memorandum-2008-01.pdf ................................................................................................5, 7

Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM No. 2008-02 (Dec. 30, 2008) *available at* https://www.dhs.gov/sites/default/files/publications/privacy_policyguide_2008-02_0.pdf................................................................................................................7

*Overview of the Privacy Act of 1974*, U.S. DEP'T OF JUSTICE (2015 Edition), *available at* https://www.justice.gov/opcl/file/793026/download. ...........................................8

*Protecting Consumer Privacy*, Fed. Trade Comm'n, *available at* https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy...........................................................................................................................10

## I. <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This brief presents the legal and policy privacy concerns of *Amici* LatinoJustice

PRLDEF, Alianza Americas, the Arab American Institute, the Asian American Legal Defense

and Education Fund, Asian Americans Advancing Justice – AAJC, AAJC – Asian Law Caucus,

the Asian American Bar Association of New York, ASPIRA, the Council on American-Islamic

Relations, CUNY DREAMers, Dream Action Coalition, The Hispanic Association of Colleges

and Universities, the Hispanic National Bar Association, the Hispanic Federation, Inc., League

of United Latin American Citizens, The New York State Youth Leadership Council,

Presente.org, RU Dreamers, and UnidosUS (collectively, *Amicus Curiae"*) regarding the

September 5, 2017 memorandum, issued by then-Acting Secretary Elaine C. Duke of the

Department of Homeland Security of the United States ("DHS"), rescinding the Deferred Action

for Childhood Arrivals ("DACA") program established by DHS in 2012 ("Duke

Memorandum"). (*See* Plaintiffs' Third Amended Complaint ("TAC")). (Docket Entry ("DE")

113 ¶ 102; Exhibit E.)

*Amicus Curiae* submit this brief in support of Plaintiffs' Motion For Preliminary

Injunction ("Motion or Mot.") (DE 123-1). The Motion details at length the constitutional and

statutory violations of the Duke Memorandum. Plaintiffs seek relief under the Administrative

Procedure Act, 5 U.S.C. ("APA") that DHS's decision to rescind DACA was arbitrary and

capricious (Mot. at 10-28), without the observance of proper procedure (Mot. at 28-32), and

without any regulatory flexibility analysis (Mot. at 33-35). *See also* APA 5 U.S.C. §§ 706,

706(2)(D), and 601-612, respectively.  Among other things, the Motion alleges that without any

justification or reasoned rationale, the Duke Memorandum and its implementation materially

deviate from DHS's prior representations concerning the government's solicitation, collection

and use of personal information ("PI") provided by DACA recipients as well as applicants

("Dreamers") to DHS in their DACA applications. (*See* Mot. at 14-15.)  The Motion establishes

(1) Dreamers relied on DHS's repeated assurances that the PI collected for the purpose of

providing DACA relief would be protected from disclosure to U.S. Immigration and Customs

Enforcement ("ICE") and not be used for law enforcement purposes, absent exceptional circumstances; and (2) the Duke Memorandum removes those protections and now allows Dreamers' PI to be shared with ICE and used against them for the purposes of removal—the precise opposite of DHS's representations to the Dreamers at the time DHS solicited their PI. (*See* Mot. at 14-15, 36-38.)  As demonstrated below, DHS's retroactive material change in its data usage policy concerning the use of Dreamers' previously collected PI violates long-standing privacy principles—including the DHS's own policies—and therefore violates the APA as arbitrary and capricious.

Dreamers—including many of the leaders and members of several *Amici*—provided an exhaustive list of PI in their DACA applications including but not limited to date and place of birth, alien registration number, U.S. home address, school name and location, a detailed history of any minor criminal offenses, including arrests or convictions, and biometric information such as fingerprints and photos. (*See* Mot. at 4, Exhibit D; TAC ¶¶ 77-80, Exhibit B.)[1]  DHS made repeated assurances on its online DACA "Frequently Asked Questions" ("DACA FAQs"), that PI would "be protected from disclosure to ICE … for the purpose of immigration enforcement" with limited exceptions where "the requestor meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria." (Mot. at 14-15; TAC ¶ 80, Exhibit C.)[2]  The DACA FAQs also represented that, except in limited circumstances, "[i]f you have submitted a request for consideration of DACA and USCIS decides not to defer your case . . . your case **will not** be referred to ICE for purposes of removal proceedings." (TAC ¶ 80, Exhibit C (emphasis added)).  The DACA FAQs further represented that DHS's "information sharing policy covers family members and guardians, in addition to the requestor."  (Mot. at 15;

---

[1] Dreamers had significant incentives to err on the side of providing too much information, rather than too little in their DACA applications. The instructions for Form I-821D, which is the program file Dreamers were required to use to apply for DACA status, warned of criminal and immigration consequences for "knowingly and willfully provid[ing] material false information on Form I-821D," and advised further that although "[t]he information you provide is voluntary," the "failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your request." (*See* Mot. at 4, Exhibit D; TAC ¶¶ 77-80, Exhibit B.)

[2] DHS also made these repeated assurances in its Instructions for Form I-821D. (*See* Mot. at 4, Exhibit D; TAC ¶¶ 77-80, Exhibit B.)

TAC ¶ 80, Exhibit C.) Relying on these assurances, Dreamers provided their PI to DHS in their DACA applications. Additionally, Dreamers provided sensitive arrest and misdemeanor records only under assurances that DHS did not view such information as a bar to DACA qualification, or as a threat for removal as they were of the lowest enforcement priority. (*See* TAC ¶ 80, Exhibit C.)  Importantly, after DACA's implementation, and consistent with U.S. government privacy principles, then-DHS Secretary Jeh C. Johnson wrote to Congress on December 30, 2016 that "these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  (*Id.* ¶ 80, Exhibit D.)

On September 5, 2017, DHS rescinded the DACA program without notice, consent, or the opportunity for comment from Dreamers or the public. (Mot. at 1, 6-7; TAC at ¶¶ 102-105, 108-110, Exhibit E.)  The Duke Memorandum does not reflect any consideration of the impact DHS's action may have on the Dreamers' privacy interests, much less reference any privacy impact assessment or other DHS compliance with any internal privacy policies or practices.  *Id*.

DHS simultaneously posted revised "Frequently Asked Questions," (the "Rescission FAQs") that materially changed the prior policy as to the treatment of PI provided by Dreamers, and applied this new policy retroactively. (*See* Motion at 15, Exhibit W.) The Rescission FAQs removed the prior affirmative language protecting the PI of both Dreamers and their relatives, and instead state: "Generally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria." (*Id*.; *see also* TAC ¶¶ 155-156.)

On November 30, 2017, DHS yet again updated its FAQs (the "Rejected DACA" FAQs) to purportedly insist that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." (*See* Mot. at 15, n.8, Exhibit RR.)  Similar to the original DACA FAQs and the Rescission FAQs, DHS included in the Rejected DACA FAQs the boilerplate disclaimer: "This

3

policy, which may be modified, superseded, or rescinded at any time with or without notice (as has always been the case, and is noted in the archived USCIS DACA FAQs), is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter." *Id.*

To make matters worse, DHS radically broadened the categories of people to be prioritized for removal as stated in the Enforcement Priorities Memorandum that then-DHS Secretary John F. Kelly issued on February 20, 2017.[3] Previously, DHS prioritized removing individuals who had been convicted of felonies or serious (or multiple less serious) misdemeanors, but the Enforcement Priorities Memorandum expanded the categories to include those who "(1) have been convicted of **any** criminal offense; (2) have been **charged** with any criminal offense that has not been resolved; [and] (3) have **committed acts** which constitute a chargeable criminal offense." *Id.* at 2 (emphasis added). In other words, individuals not convicted of, but only charged with, any criminal offense are now prioritized for immigration enforcement. This includes various lower-level offenses that Dreamers freely disclosed as part of their DACA applications based on assurances it would not be used against them.[4]

Given the Duke Memorandum, the material change in the plain language concerning data usage protection afforded DACA PI in the Rescission FAQs, and DHS's broadened enforcement priorities, Dreamers have a well-founded fear that their PI will be disclosed to ICE and used against them for removal.  As shown below, the disclosure of Dreamers' PI to ICE for deportation purposes contravenes the fair information practice principles that DHS has historically adopted and endorsed as part of its privacy policies and practices. These principles—

---

[3] Memorandum from John Kelly, Secretary, U.S. DEP'T OF HOMELAND SEC., Enforcement of the Immigration Laws to Serve the National Interest (February 20, 2017) ("Enforcement Priorities Memorandum"), *available at* https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf. This court may take judicial notice of publicly available documents including reports and materials retrieved from official government websites. *See* Fed. R. Evid. 201; *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 015). Courts may also take judicial notice of information contained on websites where "the authenticity of the site has not been questioned." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002).
[4] Although the Enforcement Priorities Memorandum exempted the DACA program, the Duke Memorandum is silent on whether the exemption applies after DACA ends.

reflected in DHS privacy policy memoranda, the Privacy Act of 1974, and the privacy policy reports and enforcement actions of the Federal Trade Commission—hold that the government is limited to using personal information it collects from individuals for its original purpose, stated at the point of collection, and cannot subsequently use such personal information for purposes incompatible with its representations. As applied to DACA, Dreamers provided their PI to DHS for the purposes of obtaining temporary lawful status and work authorization for two years, and DHS promised that such information would not be used to remove them. Yet, that is precisely what DHS threatens to do now. This threat violates the fundamental privacy principle that the government cannot collect information for one purpose and later use it for a materially different one, much less for a purpose it expressly promised the data would not be used. Accordingly, *Amicus Curiae* respectfully urge the Court to grant Plaintiffs' stated relief in the Motion; to enjoin the termination of DACA and award provisional relief directing Defendants to restore the DACA program, which includes barring the use of PI provided by Dreamers for immigration enforcement purposes.

## II.
## ARGUMENT

A.  **PRIVACY PRINCIPLES PROVIDE THAT THE GOVERNMENT IS LIMITED TO USING PERSONAL INFORMATION FOR THE PURPOSE REPRESENTED IN THE COLLECTION OF THAT PERSONAL INFORMATION.**

    1.  **The Fair Information Practice Principles and DHS Endorsement of the Purpose Specification and Use Limitation Principles**

DHS has explicitly adopted the long-standing and widely accepted privacy principles known as the Fair Information Practice Principles ("FIPPs") as the framework for its privacy compliance policies and procedures.[5] Since their origin in the 1970s, FIPPs have informed the privacy regulatory frameworks of numerous countries and international regulatory organizations, formed the backbone of privacy and data protection laws in the United States, and are embodied

---

[5] Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM NO. 2008-01 (December 29, 2008) ("2008 Privacy Policy Memorandum"), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-policy-guidance-memorandum-2008-01.pdf.

in the Privacy Act of 1974, 5 U.S.C. § 552a (2012) (the "Privacy Act").[6]  The eight principles address the manner in which PI is collected and used, and provide safeguards to assure those practices are fair, non-deceptive, and adequately protect PI. The most relevant FIPPs here, as explained by DHS, are:

- **Transparency** – Transparency should be provided as to how PI is handled via various mechanisms, including general notices, reports, investigations, public meetings, Privacy Impact Assessments ("PIA"), System of Records Notices ("SORN"), and the Freedom of Information Act ("FOIA").[7]

- **Purpose Specification –** The purposes for which PI is collected must be clearly specified at the time of collection and the subsequent use of the PI must be compatible with the fulfillment of those purposes.[8]

- **Use Limitation –** PI should only be used for the purposes specified at the time of collection, and not be disclosed, made available, or otherwise used for any other purposes, in accordance with the Purpose Specification Principle.[9]

In January 2009, DHS issued an amended version of its privacy policy guidance memorandum making it clear that any PI "collected, used, maintained, and/or disseminated by DHS" would be "subject to the Privacy Act regardless of whether the information pertain[ed] to a U.S. citizen, legal permanent resident, visitor, or alien."[10] However, this policy materially changed on January 25, 2017, when President Donald J. Trump issued an executive order directing federal agencies "to the extent consistent with applicable law," to ensure that "their privacy policies *exclude[d]* persons who are not United States citizens or Lawful Permanent Residents ("LPRs") from the protections of the Privacy Act regarding personally identifiable information."[11] To that end, then-DHS Secretary John F. Kelly issued the Enforcement Priorities

---

[6] Privacy Act of 1974, 5 U.S.C. § 552a, as amended; Homeland Security Act of 2002, as amended, 6 U.S.C. § 142. *See also* Memorandum from Jonathan R. Cantor, Acting Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM NO. 2017-01 at *3 (April 25, 2017) ("2017 Privacy Policy Memorandum"), *available at* https://www.dhs.gov/sites/default/files/publications/PPGM%202017-01%20Signed _0.pdf; *see also* https://www.dhs.gov/sites/default/files/publications/consolidated-powerpoint-final.pdf.
[7] 2017 Privacy Policy Memorandum at *3.
[8] *Id.*
[9] *Id.* at *5-6.
[10] Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM NO. 2007-1 at *2 (January 7, 2009) (as amended from January 19, 2007) ("2009 Privacy Policy Memorandum"), *available at* https://www.dhs.gov/xlibrary/assets/privacy/privacy_policyguide_2007-1.pdf.
[11] Executive Order: Enhancing Public Safety in the Interior of the United States, The White House Press Secretary (Jan. 25, 2017), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-public-safety-interior-united-states/

Memorandum on February 20, 2017, stating that DHS would no longer extend Privacy Act rights and protections to individuals who are neither U.S. citizens nor lawful permanent residents while explicitly excluding DACA recipients.[12] The Enforcement Priorities Memorandum further directed the DHS Privacy Office to rescind the 2009 Privacy Policy Memorandum and to develop new guidance on the agency's collection, use, retention, and dissemination of PI.[13]

On April 27, 2017, DHS issued a memorandum updating its PI privacy policies and procedures (the "2017 Privacy Policy Memorandum").[14]  While the rights and protections of the Privacy Act were no longer extended to non-citizens other than Dreamers, the 2017 Privacy Policy Memorandum reiterated DHS's commitment to the FIPPs, stating that DHS would still "treat all persons, regardless of immigration status" in a manner "consistent with the [FIPPs] and applicable law."[15]  As explained in the 2017 Privacy Policy Memorandum, with respect to the "Transparency" principle, the agency "must provide transparency for how it handles PI through various mechanisms, including Privacy Impact Assessments (PIA), Privacy Act Statements, [and] general notices …"[16] DHS has held itself to the traditional privacy practice of providing "notice to [an] individual regarding its collection, use, dissemination, and maintenance of personally identifiable information."[17]

Consistent with the principle of "Purpose Specification," DHS adopted the position that it "must also clearly state the purpose for which information is intended to be used in applicable … notices [and] [p]lanned uses *must be compatible with the purpose for which the Department originally collected the information; the PIA must identify and explain this compatibility.*"[18] Similarly, when endorsing the "Use Limitation" principle, DHS explained "any sharing of such

---

[12] *See supra,* n. 3.
[13] *Id.*
[14] 2017 Privacy Policy Guidance Memorandum at *1.
[15] *Id.*
[16] *Id.* at *3.
[17] 2008 Privacy Policy Memorandum at *3. DHS conducts PIAs whenever a program update implicates privacy concerns to identify and mitigate privacy risks and notify the public what PI DHS is collecting, why the PI is being collected, and how the PI will be used, shared, and stored. *See* Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. DEP'T OF HOMELAND SEC., PRIVACY POLICY GUIDANCE MEMORANDUM No. 2008-02 (Dec. 30, 2008) *available at* https://www.dhs.gov/sites/default/files/publications/privacy_policyguide_2008-02_0.pdf.
[18] 2017 Privacy Policy Memorandum at *4 (emphasis added).

information outside the agency must be *compatible with the purposes for which the information was originally collected*."[19]  Indeed, "ensur[ing] that such uses are compatible with the purpose for why the Department collected the records," complies with the "routine use" exception under the Privacy Act.[20]  Notably, it is DHS policy that "seeking consent is always a preferable privacy practice, and consent should be sought when practical."[21]  The Q & A to the 2017 Privacy Policy Memorandum states that DHS's privacy policies "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement," but require that "such sharing conform to an analysis based upon the [FIPPs] that demonstrates a consistent relationship between the purpose for collection of the information and intended use."[22]

## 2.   The Privacy Act's Routine Use Exception Requires That the Government's Use of Information Be Compatible with the Original Purpose of its Collection

The Privacy Act of 1974 is generally characterized as an omnibus "code of fair information practices" that attempts to regulate the collection, maintenance, use, and dissemination of PI by federal executive branch agencies.[23] The Privacy Act applies to any "system of records," which is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."[24] The purpose of the Privacy Act is "to balance the government's need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy stemming from federal agencies' collection, maintenance, use, and disclosure of personal information about them."[25]  Although the Dreamers do not have a cause of action under the Privacy Act, as the

---

[19] *Id.* at *5.
[20] *Id.* at *6 (citing 5 U.S.C. §§ 552a (a)(7), (e)(4)(D); *Britt v. Naval Investigative Service,* 886 F.2d 544 (3rd Cir. 1989)).
[21] 2017 Privacy Policy Memorandum at *6.
[22] *Id.*
[23] *Overview of the Privacy Act of 1974* at *4, U.S. DEP'T OF JUSTICE (2015 Edition), *available at* https://www.justice.gov/opcl/file/793026/download.
[24] 5 U.S.C. § 552a (a)(5).
[25] *Litigation Under the Privacy Act* at § 2, 114 AM. JUR. TRIALS 89 (2009).

statutory regime generally regulating the government's use of PI, certain guideposts of the Act are instructive in this case.

The Privacy Act explicitly prohibits the disclosure of PI collected by a federal agency without written consent.  The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."[26] The Privacy Act lists twelve exceptions that allow the disclosure of personal records without an individual's written consent. Of most relevance here is the "routine use" exemption, which provides that disclosure may be permitted when "the use of such record for *a purpose which is compatible with the purpose for which it was collected*."[27] (emphasis added). It was Congress's intent that the routine use exception "should serve as a caution to agencies to think out in advance what uses it (sic) will make of information."[28]

The courts have rigorously applied the compatibility requirement of the Privacy Act's routine use exception. For instance, in *Brit v. Naval Investigative Service,* the government asserted "disclosure need only be compatible with [the routine use] purpose" published in the Federal Register, but the Third Circuit made clear that the statutory requirement of compatibility is a strict one. 886 F.2d at 548-549.  Instead, compatibility "requires [] a dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Id.* (finding the collection of information for purposes of criminal investigation was not compatible with disclosure to government agency employer, for use by employer in evaluating employee's integrity).

Case law uniformly holds that "[t]here must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Id.* at 549-50. The Ninth Circuit's holding in *Covert v. Harrington* is particularly instructive here, finding that the Department of Energy ("DOE")'s

---

[26] 5 U.S.C. § 552a (b).
[27] 5 U.S.C. § 552a (a)(7).
[28] *Britt,* 886 F.2d at 548 (citations omitted).

disclosure of employee personnel security questions ("PSQs") to the Department of Justice ("DOJ") was unauthorized under the Privacy Act.[29] 876 F.2d 751, 755 (9th Cir. 1989). In *Covert*, the DOE had originally collected personal information from employees in the PSQ's to determine their eligibility for security clearances. *Id* at 752-53. The district court found that DOE's disclosure to DOJ of the employee's PSQs for law enforcement purposes was not a routine use, as it was not compatible with the use for which the information was originally collected. *Id.* at 753. The Ninth Circuit affirmed, finding the failure of the government to inform employees that their personal information would be used for purposes other than stated at the time of collection, was a violation of the Privacy Act. *Id.*

### 3. Under Long-Standing Federal Trade Commission Policy, Entities Must Provide Consumers with Notice of Data Use Practices and Obtain Consent When Such Use is Materially Different from When Initially Collected

The core privacy tenets of "Purpose Specification" and "Use Limitation" applied in the Privacy Act have been historically extended to other regulatory contexts. Perhaps the most important is the Federal Trade Commission ("FTC"), which has been the chief federal agency on consumer privacy policy, protection and enforcement since the 1970s. [30] While the FTC's jurisdiction is limited to acts affecting commerce, the agency's interpretation of FIPPs is persuasive authority for the application of FIPPs generally, as well as applied to the government. The FTC's focus on online privacy began in 1998 in its first report to Congress on the issue, in which the FTC endorsed the widely-accepted FIPPs of Notice, Choice, Access, and Security, as "essential to ensuring that the collection, use, and dissemination of personal information are conducted fairly and in a manner consistent with consumer privacy interests."[31] The 1998 FTC Report stated that "[t]hese core principles require that consumers be given *notice* of an entity's

---

[29] *See also Swenson v. U.S. Postal Serv.,* 890 F.2d 1075, 1078 (9th Cir.1989) (holding that collection of data for purposes of adjudicating EEOC charges was not compatible with disclosure to Congress investigating charges brought by an employee who had filed complaint that the U.S. Postal Service had undercounted its rural routes).
[30] *See Protecting Consumer Privacy,* Fed. Trade Comm'n (last visited Oct. 27, 2017), *available at* https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy.
[31] *See* FED. TRADE COMM'N, PRIVACY ONLINE: A REPORT TO CONGRESS, at *ii (June 1998) ("1998 FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-report-congress/priv-23a.pdf.

information practices; [and] that consumers be given *choice* with respect to the use and dissemination of information collected from or about them…."[32]

In its seminal 2000 Privacy Online Report to Congress, the FTC advised that organizations should provide consumers with "clear and conspicuous notice" of their privacy practices, including "what information they collect, how they collect it . . . how they use it, how they provide Choice, Access, and Security to consumers, [and] whether they disclose the information collected to other entities . .."[33]  The FTC has been especially concerned with privacy policies that "reserve[] the right to make changes to its information practices in the future" and require consumers to "check the policy often for such changes," because "[t]he chance that new, inconsistent policies may be applied to previously collected information is troubling and may undermine consumer confidence in the rest of the privacy policy."[34]  The FTC has made clear that consumers must be informed of any "material changes" to an organization's practices as to information collection, retention, and disclosure, and may even require their "affirmative" consent.[35]

In its 2012 Privacy Report, the FTC highlighted the privacy-related harms that might arise from unanticipated, unconsented uses of data as "more expansive than economic or physical harms," and may include "the unexpected revelation of previously private information, including both sensitive information (e.g., health information, precise geolocation information) and less sensitive information (e.g., purchase history, employment history) to unauthorized third parties."[36] To address these concerns, the FTC stated in no uncertain terms that "[c]ompanies should obtain affirmative express consent before (1) using consumer data in a *materially*

---

[32] *Id.*

[33] *See* FED. TRADE COMM'N, PRIVACY ONLINE: FAIR INFORMATION IN THE ELECTRONIC MARKETPLACE, A REPORT TO CONGRESS, at * 36 (May 2000) ("2000 Online Privacy Report to Congress"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-fair-information-practices-electronic-marketplace-federal-trade-commission-report/privacy2000.pdf.

[34] *Id.* at 26.

[35] *Id.*

[36] *See* FED. TRADE COMM'N, PROTECTING CONSUMER PRIVACY IN AN ERA OF RAPID CHANGE: RECOMMENDATIONS FOR BUSINESSES AND POLICYMAKERS, at *8 (March 2012) ("2012 Privacy Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/ 120326privacyreport.pdf.

*different manner* than claimed when the data was collected; or (2) collecting sensitive data for certain purposes."[37] These concerns are best illustrated in the FTC's enforcement actions and settlements against Google and Facebook for retroactive material change in use.[38] The settlement agreements require that the companies give their users clear and prominent notice and "obtain affirmative express consent prior to making certain *material retroactive changes to their privacy practices*."[39] The FTC has explained that a "material change" means "at a minimum, sharing consumer information with third parties after committing at the time of collection not to share the data."[40] In the bankruptcy context, the FTC has applied this principle to find that a company cannot transfer personal information, if it had previously represented to consumers that such information would not be transferred.[41]

**B.     APPLYING PRIVACY PRINCIPLES, DHS'S MATERIAL CHANGE IN POLICY TO DISCLOSE DACA PERSONAL INFORMATION TO ICE FOR REMOVAL PURPOSES IS ARBITRARY AND CAPRICIOUS.**

As adopted by DHS itself, the "Purpose Specification" and "Use Limitation" FIPPs stand for the common sense and equitable proposition that DHS is limited to using PI solely for the purposes specified when first collected, and any PI disclosure to another agency such as ICE, must be for a use compatible with the originally stated purpose. This basic principle is echoed in the Privacy Act regulating the government's collection and use of PI, which requires that use of information must be compatible with the purpose for which it was originally collected. In the consumer protection context, this privacy tenet has been historically applied by the FTC to find that companies should provide notice of their information use practices and obtain affirmative

---

[37] *Id.* at viii (emphasis added).
[38] The FTC alleged that Google improperly used the information provided by consumers when they signed up for Gmail to populate a new social network called "Google Buzz" without notice or consent. *Id*. at 8, n. 37. The FTC's complaint against Facebook alleged that the social network's sharing of users' personal information beyond consumer's initial privacy settings unfairly exposed potentially sensitive information to third parties. *Id.* at 8.
[39] *See* 2012 Privacy Report at 58 (emphasis added).
[40] *Id.*
[41] *See, e.g.,* Letter from Fed. Trade Comm'n to Cullen and Dykman LLP (July 1, 2010), *available at* https://www.ftc.gov/system/files/documents/closing_letters/ letter-xy-magazine-xy.com-regarding-use-sale-or-transfer-personal-information-obtained-during-bankruptcy-proceeding/100712xy.pdf.

consent when such use is materially different from when the data was first provided by the consumer.

The Duke Memorandum is a strikingly arbitrary departure from these privacy principles, including the agency's own practices. As part of the DACA application process, Dreamers provided DHS sensitive PI, including country of origin, date of entry, current U.S. home address, school location, misdemeanor and arrest information, and biometric identifiers, for the limited purposes of obtaining temporary lawful status and work authorization. The DACA FAQs constituted notice of use limitations at the time of collection and explicitly provided that Dreamers' PI would not be used for deportation absent extremely limited stated exceptions and that the PI provided would be used solely for the purpose of obtaining DACA relief. What is more, the DACA FAQs expressly stated that the PI provided for DACA purposes would not be shared with ICE for the purposes of removal. In other words, the stated purpose for DHS's collection of Dreamers' PI at the time of collection was to provide applicants assurances they would not to be deported.

Yet, the Duke Memorandum and the Rescission FAQs on their face allow for previously collected PI to now be used for the precise opposite use of its original collection—the arrest and removal of Dreamers. When DHS issued the Duke Memorandum on September 5, 2017, DHS did *not* affirm that PI provided by Dreamers in their DACA applications would not be used for any other purpose than for which it was originally collected. To the contrary, DHS posted online the Rescission FAQs, which not only failed to provide any assurances to Dreamers that their PI would not be used for immigration enforcement, but can be read to permit such use, especially against Dreamers with minor criminal offenses or even a single misdemeanor arrest.

Moreover, contrary to the Rejected DACA FAQs' statement that "[t]his information-sharing policy has not changed in anyway" (Motion at 15, n.8, Exhibit RR), the plain language of the Recession FAQs, states that PI "will not be proactively provided to other law enforcement entities (including ICE and CBP)," whereas before, the DACA FAQs stated that PI would "be protected from disclosure to ICE . . . for the purpose of immigration enforcement." *Id.* at Exhibit

W.  Therefore, Dreamers now have no confidence that DHS will honor its promise to safeguard their PI, as the government has changed its tune from "protecting" such information from disclosure to ICE, to merely not "proactively" providing it.

DHS's use of PI for the purpose of removal is fundamentally *not* compatible with the purpose for which the information was originally collected – namely immigration relief – and therefore clearly violates the agency's own Purpose Specification and Use Limitation FIPPs adopted in its 2017 Privacy Memorandum and the APA as arbitrary and capricious.  *See e.g., Venetian Casino Resort, L.L.C. v. E.E.O.C.,* 530 F.3d 925, 934–35 (D.C. Cir. 2008) (finding the Equal Employment Opportunity Commission's (EEOC) policy permitting agency employees to disclose employer's confidential information to potential ADEA plaintiffs without first notifying employer/submitter, was arbitrary and capricious under the APA because the policy conflicted with EEOC regulations). It also flies in the face of well-established court precedent interpreting the Privacy Act's routine use exception as requiring that agency use must be compatible with the purpose for which the information was collected.

Further, DHS's decision to rescind DACA without any notice, consent, or even the opportunity to comment violates the agency's adopted Transparency FIPP memorialized as recently as the 2017 Privacy Policy Memorandum. The Duke Memorandum does not remotely suggest that DHS even considered the impact on Dreamers' privacy interests, much less conducted a PIA on how the Dreamers' privacy rights may be affected. Moreover, DHS materially changed its data use policies to allow for the use of Dreamers' PI for enforcement purposes without notice and without consent from any Dreamers. The FTC, as the government's privacy watchdog, has traditionally held that entities must notify consumers and obtain affirmative consent when making material retroactive changes to their privacy practices. DHS fell far short of meeting FTC standards here. Indeed, it would not be an overstatement to say that if DHS were a private entity, the FTC would find that DHS's retroactive material change in use of Dreamers' previously collected PI to be a deceptive trade practice, which must be tantamount to an arbitrary and capricious agency action.

14

To the extent DHS attempts to rely on its boilerplate disclaimer reserving the right to amend its information-sharing policy at any time - without consequence - that argument should be summarily rejected by this Court.  (*See* Motion at 15, n.8; Exhibit RR) (DHS's information-sharing policy as applied to Dreamers' PI may be materially "modified, superseded, or rescinded at any time with or without notice").  DHS's boilerplate language is illusory, unconscionable and deceptive.  FTC jurisprudence suggests that material modifications to privacy policies without consumers' consent may qualify as an "unfair ... practice." *See generally* Complaint, *In re Facebook, Inc*. FTC File No. 0923184, No. C4365 (F.T.C. July 27, 2012) (finding Facebook committed a deceptive practice because it changed its privacy policy to increase the visibility of users' accounts to third parties). Courts in this circuit have defined a "material alteration" to a contract to be one that would render in "*surprise* or *hardship* if incorporated without express awareness to the other party." *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 393 (E.D.N.Y. 2015) (citing *Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G*., 215 F.3d 219, 224 (2d. Cir. 2000)).  And it is especially unconscionable and unenforceable where one party has overwhelming bargaining power and presents a "take-it-or-leave-it" contract.  *See Douglas v. Talk America*, 495 F.3d 1062 (9th Cir. 2007) (applying both New York and California law).

Clearly, a change to DHS's information sharing policy creates grave hardship on the 800,000 Dreamers who have relied on the government's promises, because DHS, as the party with more bargaining power, is able to make unilateral modifications of its policies as they relate to DACA. Even if Dreamers purportedly "assented" to the policy changes by virtue of applying again or renewing their DACA status after the Duke Memorandum was issued on September 5, 2017, such assent can only be inferred *after* they received proper notice of the proposed changes, which, as argued *supra*, they did not.

The ultimate issue in this case is one of fundamental fairness: The U.S. government's assurances should mean something.  DHS made promises to Dreamers regarding the confidentiality of their personal information when applying to DACA for the purposes of obtaining temporary lawful status and work authorization for two years, and now DHS wants to

abruptly break these promises that Dreamers so heavily relied upon. Dreamers are now suffering "mental, emotional, and even physical harm" due to a sincere fear that they could lose their homes, livelihood, and families by deportation, only because they put their confidence in DHS's promises to protect their PI from disclosure to ICE or CBP.  (Motion at 36.)

In *U.S. State Dep't v. Ray*, the Supreme Court agreed that the government's assurances in the context of protecting confidential personal information should be upheld. 502 U.S. 164 (1991) (finding, in the Freedom of Information Act context, that if the State Department released the names of Haitian nationals to a third party, it would be an unnecessary "invasion of privacy" for the Haitian nationals who had provided "highly personal information regarding marital and employment status, children, living conditions…").  The Court specifically highlighted the Court of Appeals' failure to give significant weight to the government's promises of confidentiality of information provided by Haitian nationals who had been refused entry to the U.S.:

> We agree that such a promise does not necessarily prohibit disclosure, but it has a special significance in this case. Not only is it apparent that an interviewee who had been given such an assurance might have been willing to discuss private matters that he or she would not otherwise expose to the public-and therefore would regard a subsequent interview by a third party armed with that information as a special affront to his or her privacy-but, as discussed above, it is also true that the risk of mistreatment gives this group of interviewees an additional interest in assuring that their anonymity is maintained.

*Id.* at 177.

*Ray* stands for the proposition that when the government provides assurances to individuals concerning the protected use of their confidential personal information, those assurances should weigh heavily in favor of the government honoring that privacy commitment. That principle applies with equal—if not more—force here. It would be fundamentally unfair for DHS to go back on its word and provide Dreamers' confidential PI to the very agency—and for the purpose—that DHS promised it would not.  This Court should enjoin DHS from breaking that promise.

16

C.      **CONCLUSION**

Accordingly, *Amicus Curiae* respectfully urge the Court to grant Plaintiffs' Motion for

Preliminary Injunction; to enjoin the termination of DACA and award provisional relief directing

Defendants to restore the DACA program.

Dated: December 22, 2017                    By:     _/s/ Fernando A. Bohorquez Jr.____
                                                    Fernando A. Bohorquez Jr.
                                                    Anat Maytal
                                                    Madiha M. Zuberi
                                                    Pedro J. Perez*
                                                    BAKER & HOSTETLER, LLP
                                                    45 Rockefeller Plaza
                                                    New York, N.Y. 10111
                                                    Telephone: (212) 589-4200
                                                    Facsimile: (212) 589-4201

Of Counsel:                                         Juan Cartagena
Alan Friel*                                         Jose Perez
BAKER & HOSTETLER, LLP                              LatinoJustice PRLDEF
11601 Wilshire Boulevard, Suite 1400               99 Hudson Street, 14th Floor
Los Angeles, CA 90025                               New York, NY 10013
Telephone: (301) 820-8800                           Telephone: (212) 219-3360
Facsimile: (310) 820-8859                           Facsimile: (212) 431-4276

                                                    Attorneys for *Amicus Curiae*
                                                    LATINOJUSTICE PRLDEF, et al.

                                                    * *Pro Hac Vice application pending.*