Steven A. Zalesin

Adeel A. Mangi

Michael N. Fresco

Zachary Kolodin

PATTERSON BELKNAP WEBB
  & TYLER LLP

1133 Avenue of the Americas

New York, New York 10036

Telephone:  (212) 336-2000

Facsimile: (212) 336-2222

Johnathan Smith

Sirine Shebaya

Juvaria Khan

MUSLIM ADVOCATES

P.O. Box 66408

Washington, DC 20035

(202) 897-2622

*Attorneys for Amici Curiae 87 Religious Organizations*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN JONATHAN BATALLA VIDAL, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security, *et al.*,<br><br>          Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, *et al.,*<br><br>          Defendants. | No. 17-cv-5228 (NGG) (JO) |

**MEMORANDUM OF LAW FILED ON BEHALF OF  87 RELIGIOUS ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS <u>FOR PRELIMINARY INJUNCTIONS</u>**

## TABLE OF CONTENTS

**Page**

INTERESTS OF *AMICI* ...................................................................................................1

INTRODUCTION ...........................................................................................................4

ARGUMENT ...................................................................................................................5

I.     RELIGIOUS ORGANIZATIONS SUPPORT DACA AS A JUST RESPONSE
       TO A HUMANITARIAN CRISIS ....................................................................6

II.    TERMINATION OF DACA WILL CAUSE AMICI, THEIR
       CONGREGATIONS, AND THEIR COMMUNITIES IRREPARABLE HARM
       AND POSES A GRAVE THREAT TO PUBLIC WELFARE ..........................9

       A.     Direct Harm to *Amici* and their Congregants.......................................10

       B.     Impairment of *Amici*'s Ability To Carry Out Their Missions ..............14

       C.     As Sensitive Locations for Immigration Enforcement Purposes, Some
              *Amici* Will be Called Upon to Provide Sanctuary While at the Same Time
              Risking Being Targeted for Immigration Raids.....................................15

III.   THIS COURT SHOULD ENJOIN THE TERMINATION MEMO IN FULL
       AND NATIONWIDE UNDER THE ADMINISTRATIVE PROCEDURES ACT .........19

CONCLUSION................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*First Step, Inc. v. City of New London*,
  247 F. Supp. 2d 135 (D. Conn. 2003) ...................................................................15

*Harmon v. Thornburgh*,
  878 F.2d 484 ( D.C. Cir. 1989) ...........................................................................20

*Immigration Assistance Project of Los Angeles Cty Fed'n of Labor (AFL-CIO) v.
  INS*,
  717 F. Supp. 1444 (W.D. Wash. 1989) .................................................................20

*Kalaw v. Ferro*,
  651 F. Supp. 1163 (W.D.N.Y. 1987) ....................................................................13

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...........................................................................................19

*Nat'l. Min. Ass'n. v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998) .....................................................................19, 20

*New York v. Schweiker*,
  557 F. Supp. 354 (S.D.N.Y. 1983) .........................................................................9

*Nunez v. Boldin*,
  537 F. Supp. 578 (S.D. Tex. 1982) .......................................................................13

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*,
  778 F. Supp. 2d 261 (E.D.N.Y. 2011) ....................................................................5

*Residents & Families United to Save Our Adult Homes v. Zucker*,
  No. 16-CV-1683 (NGG) (RER), 2017 U.S. Dist. LEXIS 127152 (E.D.N.Y.
  Aug. 9, 2017) .....................................................................................................9

*Step by Step, Inc. v. City of Ogdensburg*,
  176 F. Supp. 3d 112, 135 (N.D.N.Y. 2016) ..........................................................14

**Other Authorities**

Alex Emmons, The Intercept, *Targeting a Sanctuary: After ICE Stakes Out a
  Church Homeless Shelter, Charities Worry Immigrants Will Fear Getting
  Help*, https://theintercept.com/2017/02/27/after-ice-stakes-out-a-church-
  homeless-shelter-charities-worry-immigrants-will-fear-getting-help/ (Feb. 27,
  2017) ...............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

Council on American-Islamic Relations, *CAIR Condemns Trump's Termination of DACA Program as 'Pandering to Anti-Immigrant Extremists'*, https://www.cair.com/press-center/press-releases/14582-cair-condemns-trump-s-termination-of-daca-program-as-pandering-to-anti-immigrant-extremists.html (Sept. 5, 2017) ............................................................................................7

Julie Carey, NBC Washington, *ICE Agents Arrest Men Leaving Fairfax County Church Shelter*, https://www.nbcwashington.com/news/local/ICE-Agents-Arrest-Men-Leaving-Alexandria-Church-Shelter-413889013.html (Feb. 15, 2017) ................................................................................................................17

ABC-7 KVIA, *Which places are considered 'sensitive locations'?*, http://www.kvia.com/crime/which-places-are-considered-sensitive-locations/338319025 (Feb. 16, 2017) ............................................................18

Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement to Field Office Directors, Special Agents in Charge, and Chief Counsel (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf....................................................................15

Odette Yousef, WBEZ 95.1 Chicago, *Amid Deportation Push, Suburban Church Grapples with Loss*, https://www.wbez.org/shows/wbez-news/amid-deportation-push-suburban-church-grapples-with-loss/3d269fc3-04e7-4604-bae4-a376a37410c9 (Feb. 15, 2016)........................................................17

Qué Pasa Mi Gente, *Arrestos de ICE cerca de escuela elemental de mayoría hispana*, https://charlotte.quepasanoticias.com/noticias/ciudad/local/arrestos-de-ice-cerca-de-escuela-elemental-de-mayoria-hispana (Feb. 9, 2017) ................................18

Religious Action Center of Reform Judaism, *Reform Jewish Movement Assails White House Targeting of Immigrant Youth*, https://rac.org/reform-jewish-movement-assails-white-house-targeting-immigrant-youth (Sept. 5, 2017) ............................7

Sanctuary Movement, http://www.sanctuarynotdeportation.org/ ....................................................8

Tina Vasquez, Rewire, *Have Trump's Mass Deportations Begun? Immigration Arrests Reported Around the Country*, https://rewire.news/article/2017/02/10/trumps-mass-deportations-begin-immigration-arrests-reported-around-country/ (Feb. 10, 2017)................................................18

U.S. Dep't of Homeland Security, Statement by Secretary Jeh C. Johnson on Southwest Border Security, https://www.dhs.gov/news/2016/02/02/statement-secretary-jeh-c-johnson-southwest-border-security (Feb. 2, 2016) ........................................16

U.S. Immigration and Customs Enforcement, FAQ on Sensitive Locations and Courthouse Arrests: Does ICE's policy sensitive locations policy remain in effect?, https://www.ice.gov/ero/enforcement/sensitive-loc........................................16

## TABLE OF AUTHORITIES

**Page(s)**

United States Conference of Catholic Bishops, *USCCB President, Vice President and Committee Chairmen Denounce Administration's Decision to End DACA and Strongly Urge Congress to Find Legislative Solution*, http://www.usccb.org/news/2017/17-157.cfm (Sept. 5, 2017) ..................................................7

**INTERESTS OF *AMICI***

Led by the Muslim Bar Association of New York, *amici* are American religious or religiously-affiliated organizations who represent a wide array of faiths and denominations. *Amici* include congregations and houses of worship as well as professional, civil liberties, and immigrant rights groups who work with or represent faith communities ("Religious Organizations"). *Amici* have long supported Deferred Action for Childhood Arrivals ("DACA") as a compassionate and appropriate response to the humanitarian crisis posed by the hundreds of thousands of undocumented people brought to this country as children, before they could make choices of their own. *Amici* believe that the arbitrary rescission of DACA will indelibly harm the vitality of their spiritual communities by forcing committed members of their congregations and organizations to leave the country or return to the shadows. Indeed, certain *amici* have committed to providing sanctuary to those targeted for deportation. *Amici* are identified here by name, with a fuller description of their identities and interests attached to this memorandum at Appendix A.

*Amici* are: Albuquerque Insight Meditation Center; Albuquerque Monthly Meeting of the Religious Society of Friends (Quakers); The American Association of Jewish Lawyers and Jurists; American Friends Service Committee; Ansche Chesed, New York City; Arch Street United Methodist Church; Capital Area Muslim Bar Association; Catholic Charities Community Services of the Archdiocese of New York; Central Conference of American Rabbis; Central Pacific Conference of the United Church of Christ; Church Council of Greater Seattle; Church of Our Redeemer in Lexington, Massachusetts; Congregation B'nai Jeshurun (New York City); Congregation Beit Simchat Torah; Council of Churches of the City of New York; Council on American-Islamic Relations – Michigan Chapter; Council of American-Islamic Relations – New Jersey Chapter; Council of American-Islamic Relations – New York Chapter; Cuba Presbyterian

Church (Presbyterian Church, USA), Cuba, New Mexico; Degrees of Change; DMV Sanctuary Congregation Network; Dominican Development Center; East End Temple (New York City); Emgage Foundation; Episcopal City Mission; Episcopal Dioceses of Massachusetts; Episcopal Diocese of New York; Episcopal Dioceses of Western Massachusetts; Episcopal Society of Christ Church/The Christ Church Cathedral, Cincinnati, Ohio; Faith Action Network; First Christian Church (Disciples of Christ), Santa Fe, New Mexico; First Congregational United Church of Christ (Albuquerque, New Mexico); First Presbyterian Church of Santa Fe, New Mexico; First Presbyterian Church of Taos, New Mexico; First Unitarian Congregational Society in Brooklyn; First United Presbyterian Church of Las Vegas, New Mexico; Global Justice Institute; Immanuel Presbyterian Church (Albuquerque, New Mexico); Interfaith Alliance of Iowa; Iowa Conference of the United Church of Christ; Islamic Society of Basking Ridge; Islamic Society of Central Jersey; Lab/Shul; Legal Advocacy Project of Unitarian Universalist FaithAction of New Jersey; Lutheran Social Services of New York (LSSNY); Maryknoll Office for Global Concerns; Metropolitan New York Synod of the Evangelical Lutheran Church in America; Muslim Advocates; Muslim Bar Association of New York; Muslim Public Affairs Council; Muslim Urban Professionals (Muppies); Muslims for Peace, Inc.; Muslims for Progressive Values; National Council of Jewish Women; NETWORK Lobby for Catholic Social Justice; New Jersey Interfaith Coalition; New Mexico Conference of Churches; New Mexico Faith Coalition for Immigrant Justice; New Sanctuary Coalition of New York; New Sanctuary Movement of Philadelphia; New York Board of Rabbis; New York Conference United Church of Christ; Pacific Northwest Conference of the United Church of Christ; Presbytery of New York City; Queens Federation of Churches; Religious Institute; Romemu; Santa Fe Monthly Meeting of the Religious Society of Friends (Quakers); Second Presbyterian Church, Albuquerque, New

Mexico; Sikh Coalition; Sisterhood of Salaam Shalom; Society for the Advancement of Judaism;

St. Andrew Presbyterian Church in Albuquerque, New Mexico; St. Luke's Episcopal Church in

Long Beach;   St. Mark's Episcopal Church (Albuquerque, New Mexico); St. Stephens'

Episcopal Church in Boston; T'ruah: The Rabbinic Call for Human Rights; Temple Israel of the

City of New York; Temple Sinai (Washington, DC); Town and Village Synagogue, New York,

New York; Trinity Church Wall Street; Union for Reform Judaism, including Reform Jewish

Voice of New York State; Unitarian Universalist Mass Action Network; Visitation BVM Church

in Philadelphia, Pennsylvania; West End Synagogue (New York City); Westminster Presbyterian

Church of Santa Fe; and Women of Reform Judaism.

**INTRODUCTION**

Since DACA's inception in 2012, American religious communities of many faiths have supported the program as a just and compassionate response to a moral and humanitarian crisis. The children and young adults eligible for and currently receiving the benefits of DACA status (often referred to as "Dreamers") were, in most cases, brought to this country as children by their parents. They have lived most of their lives in the United States, typically with no memory of any other home. Only young people who have pursued education or served in our military, and have no significant criminal record, are eligible for DACA status. Yet they now face deportation to often dangerous and unfamiliar places, or a life in the undocumented shadows.

*Amici* believe, on the basis of faith and morality, that these children and young adults must be protected. *Amici* therefore offer this brief in support of the plaintiffs' motions for preliminary injunctions in order to address how, in their view, the Government's proposed termination of DACA (the "Termination Memo") would cause irreparable harm and constitute a severe detriment to the public. *Amici* have firsthand knowledge of the valuable contributions to faith and community made by DACA recipients and understand all too well the harm that the termination of DACA would cause. For example, ending DACA would put Nancy, an Associate Pastor at *amicus* St. Luke's Episcopal Church in Long Beach, California, who came to the United States from Mexico at age seven, at risk of deportation. *Amici* detail the stories of Nancy and others like her in Section II(A) below to provide the Court with a sample of the lives that are at risk of being upended. *Amici* also know, because of their religious and charitable work in Latin America and other regions, the challenges and dangers these young people face if they are deported.

*Amici* also have a direct stake in these issues beyond their religious concerns and the protection of their congregants. *First*, *amici* stand to lose the substantial benefits they currently

enjoy as a result of the varied contributions that DACA recipients make to their congregations and institutions.

*Second*, if the Termination Memo is carried out and DACA recipients and DACA-eligible individuals are forced into hiding, *amici* will suffer an impairment of their ability to carry out their core mission to provide spiritual guidance and general assistance to people of all backgrounds and faiths.

*Third*, many *amici* have and will continue to offer sanctuary to those facing deportation. *Amici*'s churches, mosques, and synagogues are ostensibly designated by U.S. Immigration and Customs Enforcement ("ICE") as sensitive locations to be avoided by enforcement officials, but ICE has shown a growing willingness to target and exploit, rather than avoid, sensitive locations. *Amici* will be on the front line of this conflict if DACA is rescinded:  honoring their convictions to protect DACA recipients will risk ICE raids on or around their houses of worship.

For the reasons set forth herein and in Plaintiffs' and other *amici*'s briefs, *amici* urge the Court to grant the preliminary injunctions restraining the Termination Memo in its entirety, rather than allowing any aspect of the Termination Memo to go into effect.  This is the appropriate remedy pursuant to the Administrative Procedures Act, as described in Section III below, and is necessary to prevent irreparable harm.

## ARGUMENT

Plaintiffs have filed motions asking the Court to enter a preliminary injunction suspending the Government's planned termination of DACA.  (*See* Dkt. 123 in Case No. 16-cv-4756 and Dkt. 96 in Case No. 17-cv-5228).  As set forth therein, to succeed on their applications, Plaintiffs must show, *inter alia,* that the Government's proposed actions would cause irreparable harm and constitute a severe detriment to the public.  *See, e.g., Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 264-65 (E.D.N.Y. 2011) (Garaufis, J.).  *Amici* endorse the

arguments set forth by Plaintiffs, and submit this brief to further illustrate the irreparable harm that implementation of the Termination Memo would cause, and to set forth the parameters of the appropriate relief this Court should grant.

## I.      RELIGIOUS ORGANIZATIONS SUPPORT DACA AS A JUST RESPONSE TO A HUMANITARIAN CRISIS

*Amici* object to the Government's arbitrary and ill-reasoned decision to rescind DACA on moral, spiritual, and religious grounds.   Although they represent different faiths and denominations, *amici* are in unequivocal agreement that DACA is a force for good in our society that should be protected.   As *amicus* Roman Catholic Archdiocese of New York explains, "DACA is an important first step to acknowledging and growing the human and social contributions and needs of young immigrants and of our own communities."[1]   Those who are eligible for DACA or who already benefit from it "were brought to the United States" by their parents, "now have established roots, have built families, have contributed to their communities of faith, work, and family," and their "energy, spirit, life, and heart are part of this nation, which can only benefit from their continued participation."

For many *amici*, these convictions are deeply rooted in their faith and moral principles. Temple Sinai of Washington D.C., for example, believes that "as a Jewish institution, Biblical texts and our Jewish history inform our position on modern day immigration policy.  Leviticus 19 explicitly says, 'When a stranger sojourns with you in your land, you shall do him no wrong.'"  St. Luke's Cathedral in Long Beach, California, similarly states that "for us, this is a biblical rather than a political issue."   And as the Catholic mission Maryknoll attests, "recognizing the hardships and struggles of immigrant families, and the tremendous economic

---

[1] Quotes from *amici* or individual congregants herein are drawn from interviews conducted by counsel to provide the Court with a fuller understanding of how DACA has impacted American religious communities.

and social contributions Dreamers make to the United States, we feel it is unethical to send Dreamers back to countries they hardly know, as well as a senseless loss to our nation."

For others still, supporting DACA is part of their social justice mission. Christ Church Cathedral in Cincinnati has, in light of the Government's immigration policy priorities, "focused its social justice concerns on matters of immigration and the impact that deportations or the repeal of DACA will have on God's children."

*Amici* and groups like them have, accordingly, objected vocally to the arbitrary repeal of the DACA program. On September 5, 2017, when the Government announced its decision to terminate DACA, countless religious groups and leaders released statements of condemnation. The United States Conference of Catholic Bishops publicly called the decision "reprehensible," "unacceptable," and "a heartbreaking moment in our history that shows the absence of mercy and good will."[2] The Council on American-Islamic Relations described the move as a "heartless action [that] will only serve to create fear and anxiety for the Dreamers and their loved ones, and will force them back to living in the shadows, rendering them unable to contribute to our nation's economy."[3] And *amici* Union for Reform Judaism and Central Conference of American Rabbis declared it "morally misguided and poor public policy," noting that "Judaism demands that we welcome the stranger and compels us to work for a just immigration system."[4]

---

[2] United States Conference of Catholic Bishops, *USCCB President, Vice President and Committee Chairmen Denounce Administration's Decision to End DACA and Strongly Urge Congress to Find Legislative Solution*, http://www.usccb.org/news/2017/17-157.cfm (Sept. 5, 2017).

[3] Council on American-Islamic Relations, *CAIR Condemns Trump's Termination of DACA Program as 'Pandering to Anti-Immigrant Extremists'*, https://www.cair.com/press-center/press-releases/14582-cair-condemns-trump-s-termination-of-daca-program-as-pandering-to-anti-immigrant-extremists.html (Sept. 5, 2017).

[4] Religious Action Center of Reform Judaism, *Reform Jewish Movement Assails White House Targeting of Immigrant Youth*, https://rac.org/reform-jewish-movement-assails-white-house-targeting-immigrant-youth (Sept. 5, 2017).

*Amici* agree wholeheartedly with these statements.  Rev. Robin Hynicka of *amicus* Arch Street United Methodist Church ("UMC") in Philadelphia, for example, describes the "mythology surrounding why people migrate" as a campaign to "criminalize immigration" and to paint all immigrants as "bad," when in fact the "the real reasons for these migrations are not listened to, considered, or understood."  He explains: "From a faith perspective, we take a baptismal vow that states we will resist evil, injustice, and oppression in any form in which it presents itself.  The current immigration system and the move to end DACA create unjust circumstances, made manifest in human suffering.  The attempt to crack down on Dreamers is a serious, cynical, evil action that has nothing to do with safety or justice. We have a theological and moral obligation to oppose these forces."

*Amici* include entities that have taken active steps to protect Dreamers.  A nation-wide, interfaith network of communities and congregations known as the New Sanctuary Movement, of which many *amici* are a part, have pledged to stand in solidarity with immigrants facing deportation.[5]  These groups provide preparedness training and legal counseling and referrals; accompany individuals to immigration hearings; run awareness programs and panel discussions; and conduct advocacy aimed at supporting immigrant communities through the lens of faith. *Amicus* New Mexico Faith Coalition for Immigrant Justice, for example, provides these services "in order to create better immigration laws and a more just system that supports the well-being of all," and employs two DACA recipients in their three-person office.  Similarly, *amicus* New Sanctuary Movement of Philadelphia is a network of diverse ministries that participate in trainings, workshops, campaigns and events, and accompany families facing deportation.  They believe that the Government's actions "violate the fundamental teachings of the Judeo-Christian traditions—to welcome the stranger and love your neighbor as yourself."  And *amicus* New

---

[5] *See* Sanctuary Movement, http://www.sanctuarynotdeportation.org/.

Sanctuary Coalition of NYC is an interfaith network working "to reform immigration enforcement practices and policies, both locally and nationally, with a special focus on preserving family unity." As explained below, many *amici* and congregations like them have offered themselves as places of sanctuary, providing shelter to those targeted for deportation actions.

*Amici* thus oppose with deep conviction the Government's arbitrary decision to terminate DACA. As institutions of faith with a special interest in servicing vulnerable immigrant populations, *amici* have direct knowledge of the harm that the Government's actions will cause to them and the people with whom they live, work, and worship.

## II.   TERMINATION OF DACA WILL CAUSE AMICI, THEIR CONGREGATIONS, AND THEIR COMMUNITIES IRREPARABLE HARM AND POSES A GRAVE THREAT TO PUBLIC WELFARE

The early and arbitrary termination of DACA will not only imperil Plaintiffs, it will directly harm *amici* and their congregants, clergy members, staff, clients, and communities.[6] In the words of *amicus* Church Council of Greater Seattle, "DACA-recipients are our brothers and sisters, relatives, service-providers, congregational members, initiators of small business, and protectors of our communities and nation," and the Government's actions would "deprive hopeful and patriotic men and women of the opportunity to exercise their hopes and dreams, to the detriment of the common good." Like our society at large, faith communities, according to the Albuquerque Monthly Meeting of the Religious Society of Friends (Quakers), "stand to lose

---

[6] Ordinarily, a party seeking a preliminary injunction must show that it—not a third party— will directly suffer harm if the injunction is not granted. *See Residents & Families United to Save Our Adult Homes v. Zucker*, No. 16-CV-1683 (NGG) (RER), 2017 U.S. Dist. LEXIS 127152, at *4-6 (E.D.N.Y. Aug. 9, 2017) (denying motion for preliminary injunction in part because plaintiff only alleged harm to non-parties). With regard to the States' case, however, harm to *amici* equates to harm to the Plaintiffs who, as *parens patriae*, are "the protectors of the health and welfare of [their] citizens" and who therefore sue on *amici*'s behalf. *See New York v. Schweiker*, 557 F. Supp. 354, 359 (S.D.N.Y. 1983) (granting State of New York's motion for preliminary injunction in part because of harm posed to New York residents). In the *Batalla Vidal* Plaintiffs' case, harm to *amici* is relevant to whether an injunction is in the public interest.

the tremendous investment made over many years to bring DACA recipients into adulthood with skills and multicultural perspectives that are sorely needed by the larger community and the nation."

The Government's planned actions would cause harm on various levels.  First, DACA recipients are vital members of *amici*'s congregations and workforces whose loss of status will not only disrupt their lives, but harm *amici* who benefit from their participation.  Second, termination of the DACA program will impair the ability of *amici* and other religiously-affiliated organizations to carry out their missions to help people of all backgrounds and faiths.  Third, as institutions of faith and sensitive locations for immigration enforcement purposes, many *amici* face the grim prospect that following their spiritual calling to provide sanctuary for targeted Dreamers will result in the religious entities themselves being targeted by immigration enforcement authorities, a concern that would increase dramatically with the termination of DACA.

### A.      Direct Harm to *Amici* and their Congregants

To illustrate the irreparable harm at issue on this motion, *amici* provide the Court with the following examples of individual DACA recipients brought to this country as children who have enriched their communities, organizations and congregations.

**Nancy.**[7]  Nancy, Associate Rector at *amicus* St. Luke's Episcopal Church in Long Beach, California, came to the United States from Mexico at age seven.  Like many Dreamers, Nancy did not know she was undocumented until her junior year of high school, when she applied to college and learned what a social security number was—and that she did not have one.  Nancy describes her life after learning her immigration status as "in the shadows"; she could not get a

---

[7] The last names of the individual DACA recipients discussed herein have been withheld to protect their privacy.

10

driver's license, and could not drive a car for fear of getting pulled over and risking deportation. For a teenager in Los Angeles, this was no idle fear.

Nonetheless, Nancy was active in her community. The Episcopal Church served as an extended family during her childhood, and by the time she turned 17 Nancy led the largest youth group in the Episcopal Diocese of Los Angeles.  So great was her dedication that the Church paid for her tuition to college and seminary school, where she obtained a Master's of Divinity degree.  After obtaining DACA status, Nancy was able to fulfill her dream of becoming an ordained Episcopal minister.  Today, Nancy is the associate rector at *amicus* St. Luke's Episcopal Church, and the Diocese of Los Angeles's first Latina leader to have grown up in a Spanish-speaking Episcopal Church and gone on to pursue ordination.  At St. Luke's, she is actively involved in immigrants' rights activism and education initiatives.

For Nancy, the Government's announcement on September 5, 2017 was "a moment of complete fear and hopelessness."  She and others like her have "made a life here, trusted the system and tried to do things the right way," but now "run the risk that we will be hunted down and sent to a country that we do not know."

**Rafael.**  Brought to Los Angeles at three years old, Rafael, an office assistant with *amicus* New Mexico Faith Coalition for Immigrant Justice, was born in Guanajuato, Mexico. Rafael's parents, having risked everything to bring him to the United States, sought to instill in him the values of hard work and education.  They succeeded.  Rafael completed a Bachelor's Degree with a double major in History and Chicano Studies from California State University Dominguez Hills while working full time to pay his tuition and support himself.  After obtaining DACA status, Rafael went on to obtain a Master's Degree in American Studies at the University of New Mexico, where he is now a Ph.D. candidate and an instructor.

11

Rafael's parents also instilled in him the values of Catholicism.  He believes that faith-based organizations "fill the gaps of social justice and service that many times nation-states do not offer."  As such, he works for *amicus* New Mexico Faith Coalition for Immigrant Justice as an office assistant.  Rafael is proud to contribute to their work, which he sees as fulfilling community needs and a natural expression of his Catholic faith.

For Rafael, the end of DACA represents drastic and dangerous change.  It spells the end of access to the work that he loves and a halt to his career after graduation.  Moreover, it means "going back to living in the reality of survival mode," forever uncertain of his place and permanence in his own home, and without opportunity to flourish and grow.

**Andrea.**   Andrea is a legal assistant at *amicus* American Friends Service Committee. Andrea was born and baptized in Ecuador, but brought to New Jersey by her parents when she was a year and a half old.  Andrea grew up in the Catholic Church.  She went to Sunday school, took First Communion, and received Confirmation at her church in the Newark area, where she continues to volunteer in youth groups and for fundraising activities.

Andrea's parents, like many parents of Dreamers, prioritized her education.  Knowing she could not obtain financial aid, Andrea's parents, both union members, carefully saved.  After Andrea earned a paralegal degree from community college, her parents put her through Rutgers University's undergraduate program.  Nonetheless, until DACA, Andrea's life was one of fear and constraint.  She kept her undocumented status secret, and had to refrain from the normal day-to-day activities and jobs that her friends freely engaged in.

Andrea graduated from Rutgers *summa cum laude*.  After she obtained DACA status, she was hired as a paralegal at a law firm, and was proud to have a job and a salary.  Andrea's dream is to go to law school in the United States.  For her, the end of DACA puts her dream to a halt

12

and threatens to send her to Ecuador, a place she has never set foot since she was an infant.  In the face of this peril, Andrea maintains, "I love this country and I can't imagine living elsewhere."

*　　*　　*

The harm that these individuals would suffer as a result of their loss of DACA status is readily apparent. *See Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."); *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987) (enjoining deportation proceeding and finding irreparable harm because "petitioner's deportation would make her ineligible for any subsequent application for legalization"). *Amici* would be harmed as well; not only do people like Nancy, Rafael and Andrea contribute richly to religious and faith-based organizations through their own individual efforts, they serve as mentors and inspire others to give back to institutions from which they have benefitted.  If the Termination Memo goes into effect, nearly 800,000 Dreamers—many with stories similar to the three detailed above—will be forced out of the country or into hiding.  *Amici* will suffer incalculable harm if they are deprived of the contributions and talents of these young congregants and community members.

Moreover, as *amici* know from their work in other parts of the world, Dreamers deported would face tremendous challenges and even physical danger.    For example, Gerry Lee and others from *amicus* Maryknoll Office for Global Concerns have lived and worked with impoverished families in Mexico, El Salvador, Guatemala, and other countries to which DACA recipients face deportation.  In Haiti, for example, "Maryknoll Sisters have witnessed the bare struggle for post-disaster survival in the massive slums of Cite Soleil, where they help residents subsist from gardens grown in discarded tires on turf fought over by rival gangs."   In El

13

Salvador, a Maryknoll Lay Missioner witnessed "the anger and pain that pervades communities preyed upon by powerful gangs, where immediate survival forces youth to face grim choices between lives of drugs and guns—or escape."  In Guatemala, a Maryknoll Father reports on the "rising rates of femicide" and sums up what motivates millions of rural migrants in a single word:  "desperation."  And  along the U.S.-Mexico border, Maryknoll Missioners hear daily the "stories of desperation from the countries to which many Dreamers might be returned," namely, that "poverty, starvation, extortion, sexual assault, gang violence, and political oppression are among the conditions cited as triggers to leave."  In one such encounter in Nogales, Sonora, "a man travelling north with his son from Honduras merely pointed south and said, 'There is no life there anymore.'"  Children raised in America knowing no other country should not have to face deportation into such conditions.

## B.    Impairment of *Amici*'s Ability To Carry Out Their Missions

It goes without saying that religious and faith-affiliated organizations such as *amici* play a vital role in society.  Countless lives have been uplifted and enriched by the spiritual guidance as well as the material and legal assistance these institutions provide.  Immigrants and their families—including children brought to this country at a young age—are among the groups that have benefitted most from the support furnished by *amici* and similar organizations.  By aiding such vulnerable individuals, faith-based organizations including *amici* have helped to make their entire communities more prosperous, united and civically engaged than they otherwise would be.

Implementation of the Termination Memo would undermine these efforts by making it virtually impossible for *amici* to continue their outreach to Dreamers and their families, causing *amici* irreparable harm.  *See Step by Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 135 (N.D.N.Y. 2016) (finding irreparable harm to not-for-profit provider of mental health support services because defendant city's denial of zoning approval of housing for the mentally ill

deprived plaintiff of its ability to pursue its mission); *First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135, 156-57 (D. Conn. 2003) (finding irreparable harm to not-for-profit group dedicated to assisting individuals with disabilities because "[b]y hindering First Step's attempts to relocate to a building that is handicapped accessible and that would better accommodate the programs First Step sought to offer, the defendants are preventing First Step from serving some clients and diminishing the quality and variety of First Step's programs, undermining First Step's purpose of 'educating and assisting individuals with disabilities to achieve independence and integrate into the larger community,' thus denying it "the ability to pursue its mission").

*Amici* cannot reach people in need if those people are hiding in the shadows or have been deported.  If the Termination Memo is implemented, *amici* and similarly-situated organizations will lose their ability carry out their core mission to assist those in the greatest need of help.  This will result in the needless suffering not only of at-risk individuals, but of their communities as a whole.

### C.   As Sensitive Locations for Immigration Enforcement Purposes, Some *Amici* Will be Called Upon to Provide Sanctuary While at the Same Time Risking Being Targeted for Immigration Raids

Finally, religiously-affiliated organizations like *amici* occupy a unique position in matters of immigration enforcement, particularly with respect to DACA.  Pursuant to an October 2011 memorandum by then-ICE Director John Morton, ICE is not to engage in immigration enforcement actions such as arrests, interviews, searches, or surveillance at churches, synagogues, mosques, or other houses of worship, unless exigent circumstances or other law enforcement purposes exist, or if prior approval is obtained (the "ICE sensitive locations policy").[8]  In 2016, while the prior administration was still in office, then-Secretary of Homeland

---

[8] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement to Field Office Directors, Special Agents in Charge, and Chief Counsel (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-

Security Jeh C. Johnson publicly reiterated that "when enforcing the immigration laws, our personnel will not, except in emergency circumstances, apprehend an individual at a place of worship, a school, a hospital or doctor's office or other sensitive location."[9]  The ICE sensitive locations policy remains in effect today, at least as an official matter.[10]

The ICE sensitive locations policy recognizes that houses of worship are sacred spaces of sanctuary and peace, where community members can go and be without fear of harassment or arrest.  Many *amici* and others like them proudly fulfill that role and have pledged to offer their churches, synagogues, and mosques as sanctuaries to those at risk of deportation.  Temple Sinai DC, Christ Church Cathedral in Cincinnati, St. Luke's in Long Beach, Arch Street UMC in Philadelphia, Albuquerque Friends Meeting, the many members of *amici* New Sanctuary Movement of Philadelphia, New Mexico Faith Coalition for Immigrant Justice, and New Sanctuary NYC, and others have publicly declared their status as sanctuary congregations. These organizations maintain dedicated, furnished space for visitors who need protection, and rely on their congregants for support in doing so.

In each case, the decision to become a sanctuary congregation is made after careful discussion among congregations and communities, and reflects broad religious consensus on this issue.  The Albuquerque Friends Meeting, for example, when called upon to respond to an urgent need for sanctuary by a community member, convened their members and attenders.  "Through a process of deep discernment together—and in commitment to our Quaker values of Equality and Community—we were led to a profound sense of Spiritual Unity, meaning we were 'One in the

---

policy.pdf.  The sensitive locations policy puts the same restrictions on raids at schools, hospitals, and other public settings.

[9] U.S. Dep't of Homeland Security, Statement by Secretary Jeh C. Johnson on Southwest Border Security, https://www.dhs.gov/news/2016/02/02/statement-secretary-jeh-c-johnson-southwest-border-security (Feb. 2, 2016).

[10] *See* U.S. Immigration and Customs Enforcement, FAQ on Sensitive Locations and Courthouse Arrests: Does ICE's policy sensitive locations policy remain in effect?, https://www.ice.gov/ero/enforcement/sensitive-loc.

Spirit,'" and the Meeting collectively committed to providing sanctuary. Many *amici* reported that these decisions, while weighty, were not difficult to make. When Arch Street UMC was called upon to house a man in danger of immigration detention, "the conversation among the congregation wasn't 'will we do this,' but how?" They provided sanctuary to the man in question for 11 months.

Under the current administration, however, the parameters and application of the ICE sensitive locations policy is increasingly in doubt. ICE has already begun to target areas adjacent to places of worship for enforcement actions, to worrisome effect. For example, earlier this year on a freezing cold morning in Alexandria, Virginia, a dozen ICE agents surrounded a group of Latino men as they emerged from a church hypothermia shelter where they had spent the night. Six men were arrested and taken away in vans.[11] After church leaders demanded and were refused the names and locations of the men taken, Governor Terry McAuliffe and Senator Tim Kaine both sent letters to ICE inquiring about the raid and their enforcement policies near churches. ICE responded to neither.[12] In suburban Illinois, ICE agents tricked a worshiper into leaving a church service—by texting him from his cousin's cell phone about a fictional car accident—and arrested him at a neighboring McDonald's. They arrived in unmarked cars and wore vests that said "Police." A retired ICE supervisor, interviewed after-the-fact, praised this strategy as "actually . . . quite creative."[13]

---

[11] Julie Carey, NBC Washington, *ICE Agents Arrest Men Leaving Fairfax County Church Shelter*, https://www.nbcwashington.com/news/local/ICE-Agents-Arrest-Men-Leaving-Alexandria-Church-Shelter-413889013.html (Feb. 15, 2017).

[12] Alex Emmons, The Intercept, *Targeting a Sanctuary: After ICE Stakes Out a Church Homeless Shelter, Charities Worry Immigrants Will Fear Getting Help*, https://theintercept.com/2017/02/27/after-ice-stakes-out-a-church-homeless-shelter-charities-worry-immigrants-will-fear-getting-help/ (Feb. 27, 2017).

[13] Odette Yousef, WBEZ 95.1 Chicago, *Amid Deportation Push, Suburban Church Grapples with Loss*, https://www.wbez.org/shows/wbez-news/amid-deportation-push-suburban-church-grapples-with-loss/3d269fc3-04e7-4604-bae4-a376a37410c9 (Feb. 15, 2016).

17

ICE has shown a propensity to target sensitive or controversial locations other than religious institutions as well. In Charlotte, North Carolina, ICE conducted raids and arrests within two miles of a predominantly Latino elementary school.[14] Students witnessed the arrests as they passed by in school busses.[15] In El Paso, Texas, a Latina woman was taken into custody by ICE agents dressed in plain clothes after she left a courtroom in a county courthouse. The criminal complaint filed against her indicates that ICE knew she was living at a domestic and sexual abuse resource center.[16]

These incidents indicate that instead of abiding by the spirit of the sensitive locations memorandum—that is, to *avoid* immigration enforcement at sensitive locations—ICE is using houses of worship and other locations as lures for easy, unsuspected surveillance and arrest. This puts *amici* in the untenable and unacceptable position of at once heeding their faith-based calling to provide sanctuary while at the same time attracting the attention of those who would do harm to the people *amici* seek to protect. This crisis of conscience has sewn fear and anxiety among *amici* and their congregants and supporters. These concerns will be greatly exacerbated if the Termination Memo goes into effect and the DACA program is terminated.

---

[14] Tina Vasquez, Rewire, *Have Trump's Mass Deportations Begun? Immigration Arrests Reported Around the Country*, https://rewire.news/article/2017/02/10/trumps-mass-deportations-begin-immigration-arrests-reported-around-country/ (Feb. 10, 2017).

[15] Qué Pasa Mi Gente, *Arrestos de ICE cerca de escuela elemental de mayoría hispana*, https://charlotte.quepasanoticias.com/noticias/ciudad/local/arrestos-de-ice-cerca-de-escuela-elemental-de-mayoria-hispana (Feb. 9, 2017), *translation available at* https://translate.google.com/translate?hl=en&sl=es&tl=en&u=https%3A%2F%2Fcharlotte.quepasanoticias.com%2Fnoticias%2Fciudad%2Flocal%2Farrestos-de-ice-cerca-de-escuela-elemental-de-mayoria-hispana.

[16] ABC-7 KVIA, *Which places are considered 'sensitive locations'?*, http://www.kvia.com/crime/which-places-are-considered-sensitive-locations/338319025 (Feb. 16, 2017).

**III.     THIS COURT SHOULD ENJOIN THE TERMINATION MEMO IN FULL AND NATIONWIDE UNDER THE ADMINISTRATIVE PROCEDURES ACT**

As illustrated by the stories detailed in the preceding sections, the Termination Memo will cause irreparable harm to individuals from all walks of life and across the entire United States. The Termination Memo will affect nearly 800,000 DACA grantees along with their family members, communities, and faith groups.  In order to address fully the scope of the harm the Termination Memo has inflicted and will continue to cause, this Court should enjoin implementation of the Memo nationwide and in its entirety.

Contrary to the Government's assertion, injunctive relief should not be limited to "particular individual Plaintiffs found to have cognizable claims."[17]  The "systemwide impact" the Termination Memo will have warrants a "systemwide remedy."  *Lewis v. Casey,* 518 U.S. 343, 359 (1996) (internal quotation marks omitted).  When a court determines that an executive action facially violates statutory constraints, a comprehensive injunction that sets aside the entire action is the "ordinary result."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir. 1998) (the "result is that [the action is] vacated—not that [its] application to the individual petitioners is proscribed") (internal quotation marks omitted).  This is especially appropriate where, as here, Plaintiffs challenge not only the application of an action "in an illegal manner on a particular occasion" but instead generally challenge the validity of a policy "of broad applicability."  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n.,* 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting on other grounds)).  Any other outcome would lead to the unjust result of halting the Termination Memo's effects  for only a fraction of persons impacted by it.

---

[17] Memorandum of Law in Support of Defendants' Motion to Dismiss, (Case No. 16-cv-4756 Dkt. 95-1; Case No. No. 17-cv-5228 Dkt. 71-1), at 40.

In fact, a limited injunction of this nature would "merely . . . generate a flood of duplicative litigation." *Id.*; *see also Harmon v. Thornburgh,* 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). The Termination Memo is precisely the type of agency action of "broad applicability" that should be enjoined in total, not least in order to avoid unnecessary and repetitive litigation and promote judicial economy. See *National Mining Ass'n*, 145 F.3d at 1409 (refusal to sustain broad injunction where adversely impacted individuals can each challenge the agency action "is likely merely to generate a flood of duplicative litigation"). In the *Batalla Vidal* case, a broad injunction would also eliminate the need to certify a class in order to grant comprehensive relief. *See Immigration Assistance Project of Los Angeles Cty Fed'n of Labor (AFL-CIO) v. INS,* 717 F. Supp. 1444, 1447 (W.D. Wash. 1989), *aff'd in part and rev'd in part,* 976 F.2d 1198 (9th Cir. 1992). By enjoining the implementation of the Termination Memo in its entirety, this Court would ensure, in the most efficient manner possible, that all who are harmed by this unlawful Government action are able to obtain the relief they deserve.

Accordingly, this Court should find that the Termination Memo is unlawful on its face and enjoin implementation of the Memo in full, not merely in its application to particular petitioners represented in this litigation.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge the Court to grant plaintiffs' motions for preliminary injunctions.

Dated:  December 22, 2017
        New York, New York

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP


By:   */s/ Steven A. Zalesin*
 Steven A. Zalesin
Adeel A. Mangi
Michael N. Fresco*
Zachary Kolodin*
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222
sazalesin@pbwt.com
aamangi@pbwt.com
mfresco@pbwt.com
zkoldin@pbwt.com

Johnathan Smith
Sirine Shebaya*
Juvaria Khan*
MUSLIM ADVOCATES
P.O. Box 66408
Washington, DC 20035
(202) 897-2622
johnathan@muslimadvocates.org
sirine@muslimadvocates.org
juvaria@muslimadvocates.org

* EDNY Admission Pending

*Attorneys for Plaintiffs Amici Curiae 87 Religious Organizations*

21