**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, et al., | |
| Plaintiffs, | |
| -against- | Case No. 1:16-cv-4756 (NGG) (JO) |
| KIRSTJEN M. NIELSEN, Secretary, Department of Homeland Security, et al., | |
| Defendants. | |
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| -against- | Case No. 1:17-cv-5228 (NGG) (JO) |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW OF *AMICI CURIAE*
PUBLIC INTEREST ORGANIZATIONS IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ..................................................................... 1

INTEREST OF *AMICI CURIAE* ................................................................. 2

BACKGROUND ........................................................................................... 2

    I.    The Role of PIOs Regarding DACA Applicants .......................... 3

    II.   The Response of PIOs to the Rescission of DACA ...................... 5

    III.  Recent Problems Renewing DACA Confronted by the Clients of PIOs ....... 7

ARGUMENT ................................................................................................ 9

    I.    The Rescission of DACA Has Caused and Will Continue to Cause Irreparable Harm to Clients Served by *Amici* PIOs ...................... 9

        A.   Dreamer Clients of *Amici* PIOs Have Limited Alternatives to DACA   9

        B.   By the Time the Duke Memo Was Released, It Was Too Late for Many Dreamers to Apply for or Renew Their DACA ........................ 9

        C.   Given the Arbitrary Rescission of DACA, Dreamers Are Forced to Live in Fear and Can Be Offered No Meaningful Assurances from PIOs ............................................ 10

    II.   The Rescission of DACA Has Caused and Will Continue to Cause Irreparable Harm to PIOs Themselves ........................................ 12

        A.   The Duke Memo Required PIOs to Devote Much More Time and Attention to Addressing the Needs of DACA Clients at the Expense of Other Clients ...................................... 12

        B.   Even Clients Who Met the October 5, 2017 Deadline Were Wrongly or Otherwise Improperly Denied Relief, Putting an Extraordinary Burden on PIOs ...................................... 14

        C.   PIOs Now Have to Help Dreamers Who Lost Their DACA Meet Basic Needs .................................................. 16

        D.   PIOs Will Lose Valuable Staff ........................................ 16

CONCLUSION ............................................................................................ 17

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Other Authorities**

*Alert: USCIS Guidance on DACA Renewal Requests Affected by Mail Service Issues*,
USCIS, https://www.uscis.gov/news/alerts/uscis-guidance-daca-
renewal-requests-affected-mail-service-issues (last updated Nov. 30, 2017) ................... 15

Designation of Nepal for Temporary Protected Status, 80 Fed. Reg. 36,346
(June 24, 2015)..................................................................................................................... 13

Extension and Redesignation of the Republic of Yemen for Temporary Protected Status,
82 Fed. Reg. 859 (Jan. 4, 2017) .......................................................................................... 13

Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg.
23,830 (May 24, 2017).......................................................................................................... 13

*Find Legal Services*, USCIS, https://www.uscis.gov/avoid-scams/find-legal-services
(last visited Dec. 22, 2017) ................................................................................................... 3

*Guidance for an Exemption from the Fee for a Form I-765 Filed with a Request for*
*Consideration of Deferred Action for Childhood Arrivals*, USCIS,
https://www.uscis.gov/forms/forms-and-fees/guidance-exemption-fee-form-i-765-
filed-request-consideration-deferred-action-childhood-arrivals
(last visited Dec. 22, 2017) ................................................................................................... 7

*Guidance on Rejected DACA Requests*, USCIS,
https://www.uscis.gov/daca2017/guidance-rejected-daca2017
(last updated Dec. 14, 2017) ................................................................................................. 8

*INS Issues Final Regulations for HRIFA*, Immigration & Naturalization Servs.
(Mar. 21, 2000), https://www.uscis.gov/sites/default/files/files/pressrelease/
FinalRegsHRIFA_032100.pdf .............................................................................................. 14

Letter from Martin Heinrich, U.S. Sen. for N.M., et al. to Elaine C. Duke, Acting Sec'y
of Homeland Sec. (Nov. 15, 2017), https://www.heinrich.senate.gov/download/letter-
to-dhs-on-daca-application-delays ........................................................................................ 15

Letter from Members of Congress to Elaine C. Duke, Acting Sec'y, Dep't Homeland
Sec. (Sept. 26, 2017), https://newhouse.house.gov/sites/newhouse.house.gov/files/
DACA%20Deadline%20Extension%20Letter_0.pdf ............................................................ 7

**Page(s)**

Memorandum from Elaine C. Duke, Acting Sec'y, U.S. Dep't of Homeland Sec.,
to James W. McCament, Acting Dir., USCIS, et al., https://www.dhs.gov/news/
2017/09/05/memorandum-rescission-daca ........................................................................ 5

Memorandum from Janet Napolitano, Sec'y of Homeland Sec., U.S. Dep't of
Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot.,
et al. (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-
discretion-individuals-who-came-to-us-as-children.pdf ................................................... 1

Press Release, Kamala D. Harris, *In HSGAC Hearing, Sen Harris Presses Acting
DHS Sec Duke on Puerto Rico Response and DACA* (Sept. 27, 2017),
https://www.harris.senate.gov/news/ press-releases/in-hsgac-hearing-sen-harris-presses-
acting-dhs-sec-duke-on-puerto-rico-response-and-dac .................................................... 7

Press Release, USCIS, *Frequently Asked Questions: Rescission Of Deferred Action For
Childhood Arrivals (DACA)* (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/
frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca .............. 10

Press Release, USCIS, *Frequently Asked Questions - #2: Employment-Based Adjustment
Applications* (July 27, 2007), https://www.uscis.gov/sites/default/files/files/
pressrelease/FAQ2.pdf ...................................................................................................... 14

Liz Robbins, *In Reversal, Immigration Agency Will Consider Delayed DACA Requests*,
N.Y. Times (Nov. 15, 2017) .............................................................................................. 15

Liz Robbins, *Number of DACA Applications Stuck in the Mail Tops 900*, N.Y. Times
(Nov. 30, 2017), https://www.nytimes.com/2017/11/30/nyregion/daca-applications-
immigrants.html ................................................................................................................. 15

Liz Robbins, *Post Office Fails to Deliver on Time, and DACA Applications
Get Rejected*, N.Y. Times (Nov. 10, 2017) ...................................................................... 15

Termination of the Designation of Sudan for Temporary Protected Status,
82 Fed. Reg. 47,228 (Oct. 11, 2017) ................................................................................. 13

*Undocumented immigrants line up for relief from deportation*, CNN.com
(Aug. 17, 2012) .................................................................................................................. 4

*USCIS Reminds Syrians to Register for Temporary Protected Status*, USCIS
(Sept. 25, 2012), https://www.uscis.gov/archive/archive-news/uscis-reminds-syrians-
register-temporary-protected-status ................................................................................... 14

iii

## PRELIMINARY STATEMENT

The undersigned organizations, as *amici curiae*, submit this brief in order to illustrate to the Court the widespread harm caused by the rescission of Deferred Action for Childhood Arrivals ("DACA") from the perspective of a particular segment of the legal community— organizations that provide free or low-cost legal services to DACA recipients.[1]  These organizations (referred to herein generally as "public interest organizations" or "PIOs") provide these services in a range of contexts, from large non-profit law firms, such as The Legal Aid Society, to small legal services and community-based organizations.  The rescission of DACA has not only caused harm to immigrants themselves, but also to their families and communities, including the many organizations (such as PIOs) that serve those communities, and thus underscores the need to grant Plaintiffs' motion for a preliminary injunction and restore DACA pending a final decision on the merits.

When DACA was adopted in 2012, young undocumented immigrants brought to the United States as children through no choice of their own (known as "Dreamers"), could apply to remain and work lawfully in the United States.  *See* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., U.S. Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., at 2–3 (June 15, 2012) ("2012 DACA Memo"), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.  They gained the opportunities—previously denied to them as undocumented immigrants—to live, attend U.S. colleges and universities, work for living wages

---

[1]  The Legal Aid Society, African Services Committee, College Confident, The Door—A Center for Alternatives, Empire Justice Center, The Immigrant and Non-Citizen Rights Clinic at the CUNY School of Law, Immigrant Justice Corps, MinKwon Center for Community Action, Northern Manhattan Improvement Corporation, Northwest Immigrant Rights Project, Safe Horizon, Sosa Law, South Bronx United, TODEC Legal Center, UnLocal and Volunteers of Legal Service.

and otherwise fully participate in their communities without fear of removal. PIOs saw it as their role to help unlock these opportunities for Dreamers and their families, and from the start dedicated many of their resources to assisting as many young people as possible to obtain and maintain DACA.

The termination of DACA five years later, on September 5, 2017, has upended the lives of Dreamers. It has stripped them of deferred action and with it the ability to remain and work in the United States. It has undermined the fabric of the communities in which they had been contributing so greatly. With no certainty about their futures in the only country they know as home, Dreamers are deeply fearful and concerned about their ability to support themselves and those who rely on them, including their parents, spouses and U.S.-citizen children.

Because there is so much at stake for so many, PIOs have likewise dedicated themselves to assisting as many Dreamers as possible to renew and maintain their status. The capacity of PIOs to manage the enormous impact of the rescission of DACA, however, is limited, and further illustrates the irreparable harm caused by the termination of DACA and the need for a preliminary injunction to prevent it.

## INTEREST OF *AMICI CURIAE*

The arbitrary rescission of DACA is detrimental to PIOs and their clients. It has not only burdened PIOs and unduly taxed their scarce resources but will also force these organizations, many of which employ individuals with DACA, to lay off valuable staff. Each of the *amici* therefore has a direct interest in challenging the unjustified rescission of DACA. *See* Addendum.

## BACKGROUND

On any typical day, there are simply not enough legal resources available to meet the legal needs of low-income non-citizens generally. That shortage has been exacerbated by the

arbitrary and abrupt rescission of DACA on September 5, 2017.  The impact was felt not only by

PIOs (and of course their Dreamer clients), but also by the partners of PIOs in the private bar, bar

associations and law schools.  Moreover, as described below, the rescission also impacted the

unrelated clients of PIOs with other immigration needs who depend on PIOs for assistance.

Finally, it affects the advocates who work around the clock to improve the lives of all

immigrants.

## I.      The Role of PIOs Regarding DACA Applicants

Since DACA's inception in 2012, PIOs have played a critical role in ensuring that

information on DACA reaches its intended beneficiaries.  Relying on multilingual staff, PIOs

have provided young immigrants with accessible and reliable information about DACA by, for

example, creating know-your-rights pamphlets, hosting clinics and information sessions,

promoting information through social media and counseling members of their communities.

For many clients, PIOs also provide step-by-step assistance to candidates applying for

DACA, including:

1.  *Screening*:  PIOs screen interested candidates to ensure that they meet eligibility
    criteria, including age, entry, residency and criminal history requirements.  They
    also provide legal advice on immigration law and United States Citizenship and
    Immigration Services ("USCIS") policies and practices tailored to each
    applicant's unique circumstances in order to confirm his or her eligibility for
    DACA.

2.  *Application*:  PIOs assist eligible candidates with completing and filing DACA
    applications, which is not a simple process.  The DACA application instructions
    alone are fourteen pages, and, at a minimum, applicants must complete three
    separate forms—Form I-821D, Form I-765 and Form I-765WS—and provide
    supporting documents.  It is therefore unsurprising that many applicants need
    legal assistance in preparing a DACA application, as USCIS itself has recognized.
    *See Find Legal Services*, USCIS, https://www.uscis.gov/avoid-scams/find-
    legal-services (last visited Dec. 22, 2017) ("If [applicants] are not sure . . . which
    USCIS forms to submit, then [they] may need immigration legal advice from an
    authorized service provider.").

3

3. *Monitoring and Follow-up*:  PIOs continue to provide DACA-related services even after their clients' applications have been submitted by monitoring the status of applications, reaching out to clients regarding updates and answering clients' questions about USCIS follow-up, such as biometric appointments to obtain fingerprints and facial scans, which are required each time DACA is granted or renewed.  If USCIS sends a request for evidence in order to further evaluate DACA eligibility or a rejection notice, PIOs generally assist clients in re-submitting an application and gathering any additional supporting documents or seeking alternative forms of immigration relief.

4. *Anticipating and Handling Renewals*:  PIOs reach out to clients prior to the expiration of their two-year work authorizations and provide assistance with renewal applications.  While the process is simpler than an initial application because all of the documentation needed to establish initial eligibility for DACA need not be re-submitted, each renewal application still requires applicants to re-file Form I-821D, Form I-765 and Form I-765WS; pay the $495 filing fee; and submit supporting documents.  PIOs work with clients to file their renewal applications, ensure that they are consistent with previous submissions and gather any necessary supporting documentation.  Because an applicant's circumstances may have changed since initially applying for DACA (due to, for example, travel outside of the country or an arrest since their initial application), applicants may need additional legal advice regarding renewal, which PIOs provide.

Thus, PIOs serve a critical function in helping potential candidates navigate DACA. Consequently, the demand for their legal services following the issuance of the 2012 DACA Memo was overwhelming:  prospective applicants slept on sidewalks outside of PIOs in order to be among the first to seek legal assistance in obtaining relief.  *See Undocumented immigrants line up for relief from deportation*, CNN.com (Aug. 17, 2012), http://www.cnn.com/2012/08/15/us/immigration-deferred-deportation/index.html.  For example, approximately 150 interested candidates waited outside of The Legal Aid Society's offices on each DACA clinic day in 2012. The Legal Aid Society met with approximately seventy-five eligible candidates per day after the announcement of DACA, and, even then, the need for services outstripped capacity.  PIOs worked to meet the demand.  Indeed, *amici* have collectively handled over 10,000 DACA cases.

In addition, many PIOs provide immigration services beyond assisting with DACA applications and often identify individuals eligible for permanent forms of immigration relief

through their DACA outreach efforts.  For example, The Legal Aid Society performs

comprehensive eligibility screening for DACA applicants in an effort to select the most

advantageous form of immigration relief available for each client, DACA or otherwise, such as

Adjustment of Status, U Nonimmigrant Status (for victims of domestic violence who have

cooperated with law enforcement) or asylum or other relief under the Convention Against

Torture, and assists clients with applying for that selected form of relief.  *See also* Brief of Legal

Services Organizations 3–12, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Dec. 22, 2017)

("LSO Br.").

## II.     The Response of PIOs to the Rescission of DACA

As explained in Plaintiffs' brief, in a sudden and unexpected change in policy, DACA

was rescinded in its entirety in a memorandum issued by Acting Department of Homeland

Security Secretary Elaine C. Duke on September 5, 2017 ("Duke Memo").  Memorandum from

Elaine C. Duke, Acting Sec'y, U.S. Dep't of Homeland Sec., to James W. McCament, Acting

Dir., USCIS, et al., https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.  The

Duke Memo provided an exception to this total withdrawal of DACA only for those people

whose DACA would expire between September 5, 2017 and March 5, 2018.  Individuals eligible

for this exception could renew their work authorization for an additional two years.  However,

USCIS set an unprecedented and arbitrary one-month window (from September 5, 2017 to

October 5, 2017) for those individuals to renew their DACA.  *Id*.  USCIS also required that

renewal applications be physically received by USCIS on or before October 5, 2017.  *Id.*

The termination of DACA and the arbitrary one-month window for renewal applications

caused PIOs—which serve as a critical bridge in communicating information from USCIS to

thousands of intended beneficiaries—to have to scramble.  Following the release of the Duke

Memo, PIOs had less than one month to develop and implement a comprehensive response. PIOs engaged in extensive community outreach and counseled candidates who were immediately and adversely impacted by the rescission, including those who had been eligible for DACA but had not yet applied as of September 5, 2017; who had let their status expire in reliance upon USCIS's past practice of allowing a one-year renewal grace period (which in many cases was because candidates were unable to afford the $495 filing fee); whose DACA would expire after March 5, 2018; and who were not eligible for DACA at the time but would have been in the future. Absent other circumstances that would qualify clients for alternative forms of immigration relief, PIOs could do nothing to reassure these individuals of their ability to remain, live and work in the United States.

As to candidates whose DACA was set to expire between September 5, 2017 and March 5, 2018, and thus were eligible for renewal, there was simply not enough time to reach all of the individuals affected by this abrupt policy change. Some PIOs attempted to meet demand by working more than twelve-hour days, including every weekend from September 5, 2017 through October 4, 2017, and putting many new and less time-sensitive cases on hold. For example, The Legal Aid Society typically partners with thirteen community-based organizations to conduct monthly immigration outreach clinics to provide advice and representation to eligible individuals, reaching over 140 new individuals each month. However, the Duke Memo's pronouncements substantially limited The Legal Aid Society's ability to conduct business as usual. Although The Legal Aid Society continued its outreach through partner organizations during that period, it held in abeyance all but the most urgent new and pending matters in order to meet the staffing needs associated with DACA renewal. In the short timeframe provided under the Duke Memo, The Legal Aid Society focused on reaching out individually to its prior

DACA clients to advise them of the renewal eligibility criteria and time period; meeting with

DACA renewal clients in the office; conducting DACA renewal clinics; participating in the New

York statewide DACA Day of Action sponsored by the Immigrant Active Response

Collaborative; and operating an immigration hotline.  PIOs with fewer resources than The Legal

Aid Society could only conduct limited outreach.  While some PIOs reviewed their client

databases and contacted all individuals eligible to renew their DACA during this limited

window, others did not have time to do so or simply could not reach all affected individuals.

Regarding eligible candidates whom they could reach, PIOs also recognized that many of

their clients could not raise the $495 renewal application fee during the one-month renewal

period.[2]  PIOs therefore sought to raise funds or drew on emergency funds in order to cover the

application and other fees, such as mailing fees.[3]

## III.    Recent Problems Renewing DACA Confronted by the Clients of PIOs

Aside from depriving qualified candidates of the ability to obtain and maintain DACA

relief going forward, USCIS's conduct to date regarding renewal applications has prevented

otherwise eligible candidates from successfully renewing and maintaining DACA in the short

---

[2]     Letter from Members of Congress to Elaine C. Duke, Acting Sec'y, Dep't Homeland Sec. (Sept. 26, 2017), https://www.uscis.gov/daca2017/guidance-rejected-daca2017 ("[T]he decision to require all DACA recipients whose permits expire in the next six months to have their renewal submitted by October 5th is a deadline that is arbitrary and puts an undue financial burden on many law abiding people within the program."); *see also* Press Release, Kamala D. Harris, *In HSGAC Hearing, Sen Harris Presses Acting DHS Sec Duke on Puerto Rico Response and DACA* (Sept. 27, 2017), https://www.harris.senate.gov/news/press-releases/in-hsgac-hearing-sen-harris-presses-acting-dhs-sec-duke-on-puerto-rico-response-and-daca (Senator Kamala Harris stated that the deadline requires applicants to "provide a $495 application fee within one month," and "supply two passport photographs, [which] cost between about 15–20 dollars" and observed that the "last time I looked federal minimum wage is about $7.25 an hour.").

[3]     Other PIOs advised clients regarding the process for obtaining a fee exemption.  However, applying for a fee exemption was risky because the exemption must be approved prior to filing a DACA renewal application, and as such there is no guarantee that applicants seeking a fee exemption would be able to renew before October 5, 2017.  *See Guidance for an Exemption from the Fee for a Form I-765 Filed with a Request for Consideration of Deferred Action for Childhood Arrivals*, USCIS, https://www.uscis.gov/forms/forms-and-fees/guidance-exemption-fee-form-i-765-filed-request-consideration-deferred-action-childhood-arrivals (last visited Dec. 22, 2017).

term.  USCIS has rejected many DACA renewal applications as a result of mail delays and minor clerical errors.  For example, USCIS rejected as untimely numerous renewal applications that had arrived at the proper USCIS post office boxes on October 5, 2017, the filing deadline, and were marked ready for pick-up on that day but that USCIS, with no credible justification, did not appear to have collected until the following day, after the deadline had passed.

Other clients' applications, which were mailed well in advance of the October 5, 2017 deadline, were inexplicably delayed by the United States Postal Service ("USPS") for weeks and in some cases over a month, as discussed below.  As a result of this admitted error by USPS, and through no fault of the applicants, these applications were not received by USCIS by the October 5, 2017 deadline and were subsequently rejected by USCIS as untimely.  *See Guidance on Rejected DACA Requests*, USCIS ("Q&A"), https://www.uscis.gov/daca2017/guidance-rejected-daca2017 (last updated Dec. 14, 2017).  For example, an Immigrant Justice Corps client mailed an application via USPS on September 15, 2017, but it was not received at USCIS's Chicago lockbox until October 18, 2017 and was rejected as untimely.  Although USCIS has stated that it will invite applicants affected by USPS mail delays to reapply, it will only do so where USPS can identify the individual or where the individual can otherwise prove to USCIS's Lockbox Support that there was a USPS error.  *See id.*

In addition, other applications appear to have been rejected by USCIS for alleged clerical errors, with no possibility for relief.  For example, a South Bronx United client mailed an application on September 18, 2017, which USCIS marked as received on October 11, 2017.  It was rejected not for untimely filing but erroneously for lacking the current DACA expiration date (even though proof of expiration was included in the materials).  When South Bronx United followed up on October 31, 2017, USCIS claimed that there was no record of receipt of the

application, despite having issued a rejection letter dated October 29, 2017, and reiterated its position that USCIS was no longer accepting DACA renewals.

As PIOs have become aware of the erroneous or arbitrary conduct of USCIS in relation to mail delays and clerical errors, PIOs have devoted significant time and attention to advocate on behalf of clients, who made every effort to comply with USCIS instructions and deadlines but whose applications were rejected through no fault of their own.  PIOs' advocacy has resulted in relief for certain applications rejected as a result of USPS's delays, but USCIS's refusal to reconsider other, equally compelling cases further justifies preliminary injunctive relief.

## ARGUMENT

### I.    The Rescission of DACA Has Caused and Will Continue to Cause Irreparable Harm to Clients Served by *Amici* PIOs

#### A.    Dreamer Clients of *Amici* PIOs Have Limited Alternatives to DACA

As set forth in Plaintiffs' brief, Dreamers have suffered and will continue to suffer grave harm each day until action is taken to rescind the Duke Memo.  As professionals with a wealth of experience screening and representing DACA applicants, PIOs nevertheless have few alternatives to offer most of their clients, who have lost or are at risk of losing their abilities to continue working, learning and caring for and supporting themselves and their families.  *See* LSO Br. 3–12.  The services that PIOs are able to provide under these circumstances are much more limited, and primarily relate to counseling, referrals and advocacy.  However, injunctive relief will allow Dreamers to return to school and/or work and will restore the ability of many PIOs to deliver the legal services to Dreamers required to access these opportunities.

#### B.    By the Time the Duke Memo Was Released, It Was Too Late for Many Dreamers to Apply for or Renew Their DACA

Although PIOs attempted to counsel their clients in person, via email and through

emergency hotlines once the Duke Memo was released, they could not provide meaningful answers and assurances to many clients.  For example, they could not help those who were ineligible for other forms of immigration relief and who were in the process of preparing initial DACA applications prior to September 5, 2017 but who suddenly became ineligible to apply as a result of the Duke Memo.  Nor could they assist clients who had been granted DACA but who had not yet renewed their status, acting in reliance upon the one-year filing grace period offered by USCIS until the issuance of the Duke Memo.  Without preliminary injunctive relief, these clients may never be eligible for a status that would enable them to obtain work authorization, enroll in and obtain financial aid for higher education and otherwise live outside of the shadow of the threat of removal.  Without preliminary relief, PIOs will likewise be unable to use legal resources to improve the lives of Dreamers and their families and better serve immigrant communities in pursuit of their missions.

### C.   Given the Arbitrary Rescission of DACA, Dreamers Are Forced to Live in Fear and Can Be Offered No Meaningful Assurances from PIOs

Based on USCIS's recent guidance, PIOs are no longer able to assure their clients that information they had already provided to the federal government in order to obtain DACA would not be used in removal proceedings against them or their family members.  *See* Press Release, USCIS, *Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA)* (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca.  *See also* LSO Br. at 12 n.26 (DACA recipients are at higher risk of deportation because they provided personal information to the government as part of the DACA application process).

Many PIOs believe that their inability to give such assurances also caused a reduction in the number of DACA clients willing to take advantage of the legal services offered by PIOs.  As

noted above, the Duke Memo provided one month for those with DACA expiring between September 5, 2017 through March 5, 2018 to submit renewal applications, so PIOs attempted to meet demand by holding all-day legal clinics, where individuals interested and/or eligible to renew their DACA could receive in-person assistance completing and filing their applications. In the experiences of many of the *amici*, some of these legal clinics were not filled, much less over-subscribed, and stood in stark contrast to the experiences of PIOs after the release of the 2012 DACA Memo, where PIOs could not meet the overwhelming demand for assistance. Based on conversations with community members, PIOs believe that this lack of demand is partly attributable to the very short timeframe available for outreach but also to fears surrounding the rescission of DACA and hostility toward immigrants under the Trump administration. *See* Third Am. Compl. ¶¶ 89-100, *Batalla Vidal*, ECF No. 113. *See also* LSO Br. at 12–17 (recognizing that the current political climate has led to fear in immigrant communities, as well as a corresponding reluctance to access public services such as medical care and law enforcement). As a result of well-founded fears in immigrant communities, DACA clients otherwise eligible to renew their status likely did not take advantage of services that could have resulted in at least a short-term extension of their DACA. The only remedy for such clients is preliminary injunctive relief, which will, in turn, allow PIOs to dispel any unreasonable fears in immigrant communities, lead to an increase in the uptake of free- or low-cost legal services and allow PIOs once again to provide the services that lead to material improvements for Dreamers and their families.

II.     **The Rescission of DACA Has Caused and Will Continue to Cause Irreparable
        Harm to PIOs Themselves**

        A.     **The Duke Memo Required PIOs to Devote Much More Time and Attention
               to Addressing the Needs of DACA Clients at the Expense of Other Clients**

PIOs are accustomed to adapting to changing legal landscapes, but the changes
introduced by the Duke Memo were unprecedented and continue to cause ongoing harm.  When
DACA was first announced, PIOs shifted resources to assisting as many qualifying immigrants
as possible to obtain DACA.  The private bar, bar associations and law schools likewise worked
to get the word out and assist Dreamers.  As those same clients became eligible for renewal of
their DACA or work authorization, PIOs in the ordinary course of business engaged in outreach
efforts to ensure that Dreamers were aware of upcoming deadlines and would be in a position to
renew their DACA, including assembling the necessary paperwork and fees, on time.  This also
allowed PIOs to organize their outreach efforts for DACA clients and balance the needs of
DACA clients against other matters.  In contrast, the arbitrary nature of the policies announced in
the Duke Memo—the extraordinarily short renewal period, combined with the failure to notify
affected individuals of all of the processes that would guide the adjudication of renewal
submissions—have meant that PIOs are struggling to pursue their work in an orderly and
efficient fashion and efforts to pursue their mission of serving their communities to the fullest
extent possible are being limited for reasons beyond their control.

PIOs were forced to make difficult choices in allocating their scarce resources upon the
issuance of the Duke Memo.  Many PIOs have limited staff with a wide range of responsibilities,
including but not limited to immigration services, and therefore PIOs had to triage among DACA
clients and other matters.  The only option for many PIOs was to put on hold non-DACA cases
that did not need immediate attention and return to those matters after October 5, 2017.  For

example, PIOs postponed client appointments or scheduled them for later dates, and attorneys and paralegals deferred drafting, research and advocacy on other issues until after October 5, 2017.

Smaller and less well-resourced organizations struggled under existing caseloads, including cases that could not be delayed. Some PIOs coped with the demand for assistance with DACA by referring non-DACA clients elsewhere at the expense of those client relationships. PIOs are also concerned that their inability to help all individuals, precisely at the time when those individuals turned to PIOs for assistance, has eroded the trust and confidence of their communities and undermined PIOs' ability to serve them in the future.

Moreover, large and small PIOs alike were pressed to conduct outreach and thoroughly counsel clients in an unprecedented, short timeframe,[4] and had to engage in time-consuming counseling sessions in order to screen former DACA candidates for alternative forms of affirmative immigration status. For example, attorneys for The Legal Aid Society spent approximately thirty minutes to an hour screening each DACA client for eligibility for other forms of relief.

Fear and distrust generated by the Duke Memo compounded these challenges, as

---

[4]     Moreover, the arbitrary, 30-day renewal timetable contrasts with deadlines for other forms of immigration relief. *See, e.g.,* Extension and Redesignation of the Republic of Yemen for Temporary Protected Status, 82 Fed. Reg. 859, 859 (Jan. 4, 2017); Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830, 23,830 (May 24, 2017). For example, temporary protected status ("TPS") temporarily defers removal and grants work authorization to citizens of countries where repatriation is unsafe or unworkable. When USCIS has rescinded TPS status for certain countries, it has provided twelve months' notice from the current designation, plus a 60-day re-registration period, in order "[t]o provide for an orderly transition." Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228, 47,228 (Oct. 11, 2017). DACA, on the other hand, was rescinded with only six months' notice following the end of the current designation, plus a 30-day renewal period. In addition, USCIS typically permits TPS applicants to re-submit applications that were submitted before the deadline and rejected for technical reasons, which contrasts with USCIS's refusal to allow the resubmission of DACA applications rejected for technical reasons, except for selected applicants affected by USPS error. *See, e.g.,* Designation of Nepal for Temporary Protected Status, 80 Fed. Reg. 36,346, 36,348 (June 24, 2015) (permitting applicants who filed application forms before the deadline and were denied a fee waiver by USCIS fewer than 45 days before the filing deadline to re-file the application within the 45-day period *after* the date of USCIS's fee waiver denial notice).

13

otherwise eligible individuals became reluctant to access legal services or provide information to USCIS.  For example, college counselors and social workers called The Legal Society with questions on behalf of DACA applicants too afraid to meet with staff and volunteers from a legal services organization.  Accordingly, PIOs in some cases had to liaise with intermediaries before they could even reach affected individuals by the rescission of DACA.

**B.      Even Clients Who Met the October 5, 2017 Deadline Were Wrongly or Otherwise Improperly Denied Relief, Putting an Extraordinary Burden on PIOs**

Despite the difficult circumstances following the arbitrary rescission of DACA and the fears it generated among clients, PIOs were able to submit many applications for renewed DACA by the October 5, 2017 deadline.  However, some of these applications were nevertheless wrongly rejected or rejected without any credible or justifiable basis.  For example, the Duke Memo did not specify a cutoff time for receipt of applications on the date of the renewal deadline (itself a departure from past USCIS practice, which only required applications to be postmarked by the published deadline, not physically received by that deadline).  *See*, *e.g.*, *USCIS Reminds Syrians to Register for Temporary Protected Status*, USCIS (Sept. 25, 2012), https://www.uscis.gov/archive/archive-news/uscis-reminds-syrians-register-temporary-protected-status; *see also* Press Release, USCIS, *Frequently Asked Questions - #2: Employment-Based Adjustment Applications* (July 27, 2007), https://www.uscis.gov/sites/default/files/files/ pressrelease/FAQ2.pdf.  In the absence of a specified cutoff time, it is common sense—and consistent with past practice—for USCIS to accept applications until 11:59 p.m. on the day of any deadline.  *See*, *e.g.*, *INS Issues Final Regulations for HRIFA*, Immigration & Naturalization Servs. (Mar. 21, 2000), https://www.uscis.gov/sites/default/files/files/pressrelease/ FinalRegsHRIFA_032100.pdf.  Indeed, the government has admitted in this case that "USCIS

14

applied a deadline of 11:59 PM on October 5, 2017." Letter from Defendants to Judge Garaufis Ex. 4 at 1, *Batalla Vidal*, ECF No. 106. However, some applications received at designated USCIS post office boxes after 6:00 p.m. but before 11:59 p.m. were rejected as untimely with no justification by USCIS.

Moreover, USCIS's *post hoc* attempts to remedy certain rejections—a response to advocacy efforts by PIOs[5]—were wholly inadequate. *First*, USCIS's attempts to date cast too narrow of a net. For instance, they do not necessarily allow all applications that were received on October 5, 2017 before 11:59 p.m. and were nevertheless rejected by USCIS to be re-filed,[6] meaning that PIOs need to continue devoting resources to challenging USCIS's arbitrary and unreasonable conduct.

---

[5]     Even after learning that USPS error affected over seventy applicants, USCIS initially took the position that applicants were responsible for the method of delivery selected by them. *See* Liz Robbins, *Post Office Fails to Deliver on Time, and DACA Applications Get Rejected*, N.Y. Times (Nov. 10, 2017), https://www.nytimes.com/2017/11/10/nyregion/post-office-mail-delays-daca-applications.html. It was only after significant advocacy by PIOs and congressional intervention that USCIS altered its position. *See, e.g.*, Letter from Martin Heinrich, U.S. Sen. for N.M., et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 15, 2017), https://www.heinrich.senate.gov/download/letter-to-dhs-on-daca-application-delays; Liz Robbins, *In Reversal, Immigration Agency Will Consider Delayed DACA Requests*, N.Y. Times (Nov. 15, 2017), https://www.nytimes.com/2017/11/15/nyregion/uscis-immigration-daca-requests.html.

On November 15, 2017, USCIS acknowledged USPS error and asked applicants to await further guidance. *Alert: USCIS Guidance on DACA Renewal Requests Affected by Mail Service Issues*, USCIS, https://www.uscis.gov/news/alerts/uscis-guidance-daca-renewal-requests-affected-mail-service-issues (last updated Nov. 30, 2017). Despite promising to publish detailed guidance on November 20, 2017, USCIS did not post additional details until November 30, 2017. *See* Q&A. When it posted the Q&A, USCIS acknowledged that over 900 applications had been affected by USPS error. Liz Robbins, *Number of DACA Applications Stuck in the Mail Tops 900*, N.Y. Times (Nov. 30, 2017), https://www.nytimes.com/2017/11/30/nyregion/daca-applications-immigrants.html.

Under this guidance, USCIS will individually reach out to applicants whom they unilaterally have deemed to be affected by USPS error. *See* Q&A. Those lucky enough to receive an invitation to apply for reconsideration will have thirty-three days to respond. *Id.* Meanwhile, the DACA of many of these same individuals has expired, and USCIS has refused to make retroactive the limited number of renewals it grants. *Id.* Once their DACA expires, individuals accrue "unlawful presence," which can result in strict time-bars to reentering the United States. *See* LSO Br. at 8–9. Additionally, lack of retroactivity forces employers to terminate these individuals, even while they await renewal decisions.

[6]     *See* Q&A ("If you identify a clear error by USCIS in the processing of your renewal request, USCIS may exercise its discretion to review your request again.").

*Second*, the guidance that USCIS has provided on wrongly rejected applicants whom it will invite to reapply is vague.  Without clear information from USCIS regarding the criteria it will apply in reconsidering rejected applications, the legal community does not know which cases will be automatically resolved by USCIS based on any applicable criteria and which cases will require individual advocacy (for matters that, for example, do not clearly fall under applicable criteria but may nevertheless still qualify for reconsideration).  Unable to rely on published agency protocols to advise their clients, PIOs have been forced to advocate on their clients' behalves using inefficient means and must dedicate outsize resources for every single case.

### C.      PIOs Now Have to Help Dreamers Who Lost Their DACA Meet Basic Needs

Because former DACA recipients have in many cases lost gainful employment, PIOs now must spend time and resources providing or referring former DACA candidates to community-based organizations for help, such as food pantries, free clinics and organizations that offer cash grants, which in turn strains limited charitable resources and diverts them to people who—but for USCIS's arbitrary conduct—did not previously need such support.

### D.      PIOs Will Lose Valuable Staff

Many *amici* PIOs are leanly staffed, have invested considerable time and resources in training their employees and stand to lose valuable team members solely as a result of the arbitrary rescission of DACA.  Because their Dreamer employees will lose their work authorization, many of the *amici* will be forced to lay off valuable employees.  For example, thirty percent of the staff of South Bronx United are DACA recipients.

The loss of DACA staff undermines the ability of the *amici* to fully serve their communities.  The Dreamer staff of *amici* PIOs have the desirable language skills and cultural

competency to work with immigrant communities and are therefore uniquely suited to leverage their experiences, knowledge, existing networks and trust of their communities to reach and meet the needs of immigrants, including vulnerable and marginalized people.  For example, Immigrant Justice Corps regularly grants fellowships to DACA recipients, who are then trained to work as immigrant specialists in PIOs and other community based organizations and become future leaders in immigration and other legal services.  Without DACA, such Dreamer fellows and graduates of the program will be unable to put their skills, training and experience to use in their communities.  Thus, the rescission of DACA forces the *amici* to lay off their DACA staff, reduces the already limited amount of free and low-cost legal services available and undermines the ability of the *amici* to carry out their missions.

## CONCLUSION

For the foregoing reasons, the Duke Memo impedes the ability of the undersigned *amici* to serve their communities, overburdens the scarce resources of PIOs to provide no- or low-cost legal aid and imposes a direct harm on their clients and employees, many of whom are DACA recipients.  Accordingly, the Court should grant Plaintiffs' request for provisional relief.

Dated: December 22, 2017
        New York, New York

Respectfully submitted,

Jonathan S. Kolodner
(jkolodner@cgsh.com)
Erica Klipper
(eklipper@cgsh.com)
Rikki S. Stern (Of Counsel)
Jessa DeGroote (Of Counsel)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Attorneys for Amici Curiae*
The Legal Aid Society, African Services Committee, College
Confident, The Door—A Center for Alternatives, Empire Justice
Center, The Immigrant and Non-Citizen Rights Clinic at the
CUNY School of Law, Immigrant Justice Corps, MinKwon
Center for Community Action, Northern Manhattan
Improvement Corporation, Northwest Immigrant Rights Project,
Safe Horizon, Sosa Law, South Bronx United, TODEC Legal
Center, UnLocal and Volunteers of Legal Service

Seymour James, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice (Of Counsel)
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit
Leena Khandawala, Supervising Attorney, Immigration Law
Unit (Of Counsel)
Judith Goldiner, Attorney-in-Charge, Law Reform Unit
Jennifer Levy, Supervising Attorney, Law Reform Unit
Susan Welber, Staff Attorney, Law Reform Unit (Of Counsel)
THE LEGAL AID SOCIETY
199 Water Street
New York, New York 10038
T: 212-577-3300

*In Pro Se as Amicus Curiae*

18

**<u>ADDENDUM</u>**

<u>Addendum</u>

1.      The Legal Aid Society in New York City is the nation's oldest and largest not-for-profit provider of legal services to low-income clients.  Through three major practice areas—Civil, Criminal and Juvenile Rights—The Legal Aid Society handles approximately 300,000 cases a year in city, state and federal courts and uses administrative, legislative and affirmative litigation to impact millions more.  The Legal Aid Society's Civil Practice addresses the diverse legal needs of New Yorkers and includes an Immigration Law Unit consisting of over sixty staff who provide comprehensive immigration representation, including challenging removal proceedings and detention to prevent the separation of immigrant families, and assisting clients with affirmative applications for assistance, including DACA.  In particular, The Legal Aid Society has advised and represented over 2,000 Dreamers since the inception of the DACA program.

2.      African Services Committee ("ASC") provides health, housing, legal, educational and social services to 6,500 immigrants, refugees and asylees from across the African Diaspora each year.  ASC's legal department provides a broad range of immigration and naturalization services, both for free and at a low cost, and historically handles approximately thirty DACA cases each year.

3.      College Confident is an innovative college access program servicing 3,000 young people through public high schools in all five boroughs of New York City.  College Confident increases application and matriculation rates for partnering high schools and fosters confidence and leadership skills in college-bound students.  College Confident's staff, including two staff members with DACA, assist immigrant families in navigating the college application and college enrollment process.

4.      The Door—A Center for Alternatives, Inc. ("The Door") empowers young people by providing comprehensive youth development services.  The Door's Legal Services Center represents young people in immigration matters and has historically handled fifty DACA cases per year.

5.      Empire Justice Center is a statewide, not-for-profit public interest law firm in New York with offices in Rochester, Albany, White Plains, Yonkers and Central Islip.  Established in 1973, Empire Justice Center's mission is to protect and strengthen the legal rights of people in New York State who are poor, disabled or disenfranchised through systems change advocacy, direct representation, as well as training and support to other advocates and organizations, in a range of substantive law areas, including immigration.  Empire Justice Center's immigration practice provides direct representation to low-income and indigent immigrants in the Hudson Valley and on Long Island.  Empire Justice Center provides representation to about 200 immigrants each year, in removal proceedings, family-based immigration, asylum, VAWA and other applications for humanitarian relief.  In addition, Empire Justice Center has historically represented fifty to 100 DACA applicants per year.

6.      The Immigrant and Non-Citizen Rights Clinic at the CUNY School of Law provides direct services, advocacy and educational resources for immigrants seeking either to be

free from U.S. custody or to live in the United States without fear, exploitation and subordination.  The CUNY School of Law represents and provides resources for undocumented students throughout and beyond the CUNY system, including those with DACA and Temporary Protected Status.  The CUNY School of Law also provides resources to immigrant students about deportation defense, work authorization and professional licensing, healthcare and other public benefits and advanced parental planning.

7.   Immigrant Justice Corps was the country's first immigration legal fellowship program and trains over seventy law school and college graduates as fellows, including Dreamers, to provide direct legal services in community-based organizations nationwide.  Immigrant Justice Corps' fellows handled approximately 500 DACA cases last year alone.

8.   MinKwon Center for Community Action ("MinKwon Center") has empowered the Korean American community and partnered with the wider Asian American and immigrant communities to provide a range of free social and legal services to more than 8,000 low-income individuals.  It has helped nearly 300 individuals file for DACA every year.  The MinKwon Center also employs two DACA recipients to run the Asian American Dreamers Collective, an immigrant rights advocacy group affiliated with the Center.

9.   Northern Manhattan Improvement Corporation ("NMIC") provides legal, social, educational and career services, as well as weatherization support, in order to deliver comprehensive assistance to New Yorkers.  NMIC provides full-service immigration representation and has historically handled thirty DACA cases each year.

10.   Northwest Immigrant Rights Project ("NWIRP") promotes justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy and community education.  NWIRP has provided direct representation and *pro se* assistance to hundreds of DACA applicants, including those in removal proceedings.  In collaboration with its community partners and volunteers, NWIRP has hosted monthly DACA clinics since 2012.

11.   Safe Horizon through its Immigration Law Project has provided legal services to immigrants who are victims of crime, abuse, domestic violence, trafficking and torture in immigration court and administrative applications.  Safe Horizon has handled over 160 DACA applications and has two Dreamers on its staff.

12.   Sosa Law is an immigration and litigation law practice based in New York City and is dedicated to providing high-quality and affordable immigration representation.  Sosa Law offers compassionate and culturally sensitive immigration representation in English and Spanish and has assisted DACA recipients on a *pro bono* basis.

13.   South Bronx United helps youth build character, teamwork and leadership skills and serves over 1,000 boys and girls each year through soccer programming and other social services, including immigration-related services.  South Bronx United employs three

individuals with DACA as leaders of its recreational soccer programming, and its sole staff attorney handles approximately ten DACA cases per year.

14.    TODEC Legal Center ("TODEC") empowers disenfranchised immigrant communities by providing community education, information and immigration legal services to limited- and non-English speaking people, including immigrants and migrant workers in Southern California, and serves over 20,000 participants each year.  TODEC employs three individuals with DACA and handles between 200 and 500 DACA applications, including renewals, per year.

15.    UnLocal serves the unmet legal needs of immigrant New Yorkers, with a focus on complex cases and low- to middle-income immigrants who do not qualify for free legal services but cannot afford an attorney.  UnLocal's immigration staff, including one DACA recipient, provide services ranging from removal defense to family-based petitions and last year handled nearly fifty DACA cases.

16.    Volunteers of Legal Service ("VLS") provide *pro bono* legal assistance to New Yorkers in partnership with New York City law firms.  VLS's three-person Immigration Project staff provide direct immigration assistance to students in nineteen public high schools across New York City and have historically provided full representation to over fifty DACA clients each year.