**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BATALLA VIDAL, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>    Defendants. | CASE No. 1:16-cv- 04756-NGG-JO |
| STATE OF NEW YORK, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD TRUMP, *et al.*,<br><br>    Defendants. | CASE No. 1:17-cv-05228-NGG-JO |

**_AMICUS_ BRIEF OF THE CITY OF LOS ANGELES, 27 ADDITIONAL CITIES
AND COUNTIES, THE NATIONAL LEAGUE OF CITIES AND
THE UNITED STATES CONFERENCE OF MAYORS IN SUPPORT OF
<u>PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................................................... 1

ARGUMENT ........................................................................................................................... 8

I.      This Court should grant a preliminary injunction prohibiting Defendants' from rescinding the DACA program because DHS acted arbitrarily and capriciously and failed to follow the notice and comment procedures in violation of the APA. ...................... 9

    A.      The Plaintiffs will prevail on the merits of their substantive APA claim because DHS's sole stated reason for ending the DACA program was conclusory and relies upon flawed legal analysis. .................................................................................. 9

    B.      The Attorney General's stated policy reasons for ending DACA have no basis in fact and are easily disproven by numerous research studies. ................................. 12

    C.      DHS failed to follow the APA's notice and comment requirements prior to moving to rescind DACA, which is why the Plaintiffs will prevail on the merits of their procedural APA claim. .................................................................................. 17

II.     Defendants' should be preliminarily enjoined from using DACA applicants' information for immigration-enforcement purposes. ......................................................... 18

    A.      The Plaintiffs will prevail on the merits of their APA claim against DHS's change to its confidential information policy because Defendants' failed to provide any explanation whatsoever for the policy change, let alone a basis that was not "arbitrary and capricious." ............................................................................ 18

    B.      DHS's change in its policy regarding the permissible uses of sensitive DACA information infringes upon Plaintiffs' due process rights and, therefore, violates the APA prohibition of federal agency action that is "contrary to constitutional right, power, privilege, or immunity." ...................................................................... 22

CONCLUSION ...................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**CASES**

Page(s)

*Am. Forest Resource Coun. v. Ashe,*
    946 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................................18

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ........................................................................................21

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................................................................11

*Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade,*
    412 U.S. 800 (1973) ........................................................................................................20

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ........................................................................................................23

*Community for Creative Non-Violence v. Pierce,*
    786 F.2d 1199 (D.C. Cir. 1986) ........................................................................................12

*Communs. & Control, Inc. v. FCC,*
    374 F.3d 1329 (D.C. Cir. 2004) ........................................................................................20

*Connell v. Higginbotham,*
    403 U.S. 207 (1971) ........................................................................................................23

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ........................................................................................................23

*Goldsmith v. Board of Tax Appeals,*
    270 U.S. 117 (1926) ........................................................................................................24

*Heckler v. Community Health Servs.,*
    467 U.S. 51 (1984) ........................................................................................................21

*Illinois v. Interstate Commerce Com.,*
    722 F.2d 1341 (7th Cir. 1983) ........................................................................................20

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ........................................................................................................13

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ........................................................................................................22

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................9, 17, 18

*National Ins. Co. v. Tidewater Co.*,
   337 U.S. 582 (1949) .................................................................22

*National Treasury Employees Union v. Cornelius*,
   617 F. Supp. 365 (D.D.C. 1985) ..............................................18

*Natural Resources Defense Council, Inc. v. Rauch*,
   244 F. Supp. 3d 66 (D.D.C. 2017) ............................................12

*Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*,
   400 U.S. 62 (1970) ...................................................................9

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .................................................................11

*Simons v. Bellinger*,
   643 F.2d 774 (1980) .................................................................11

*Sorenson Communs. v. FCC*,
   567 F.3d 1215 (10th Cir. 2009) ...............................................21

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..............................................11, 12

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ......................................10

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .................................................................22

## STATUTES & REGULATIONS

U.S. Code: Title 5

   section 551 .........................................................................9, 17
   section 553 ...............................................................................17
   section 704 .................................................................................9
   section 706 .......................................................10, 17, 18, 21, 22


Title 8: Code of Federal Regulations

   274a.12(a)(11) .........................................................................11

# OTHER AUTHORITIES

Baker, Scott R., *Effects of Immigrant Legalization on Crime: The 1986 Immigration Reform and Control Act*, Stanford Law and Econ. Olin Working Paper (July 28, 2014) available at https://goo.gl/MyX2oN ...........................................................6

Burnett, John, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, National Public Radio (May 25, 2017), available at https://goo.gl/62P1mN.....................................................................................................6

Carroll, Susan and Kriel, Lomi *Lost in Cypress Creek* HOUSTON CHRONICLE (September 9, 2017), available at: http://tinyurl.com/lost-in-cypress-creek....................................7

CATO Institute, *The DREAMer Incarceration Rate* (2017), Washington, D.C. available at: https://www.cato.org/publications/immigration-research-policy-brief/dreamer-incarceration-rate .......................................................................................6

CATO Institute, *The Economic and Fiscal Impact of Repealing DACA* (2017) http://tinyurl.com/CATODACAstudy ...........................................................................15

Center for American Progress, *A New Threat to DACA Could Cost States Billions of Dollars* (2017) Washington, D.C., available at http://tinyurl.com/CAPStatesGDP ............................................................................15

Center for American Progress, *DACA Recipients' Economic and Educational Gains Continue to Grow* (2017) Washington, D.C., available at: http://tinyurl.com/BLS-foreignborn............................................................................................................5, 14

DHS Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA), available at: http://tinyurl.com/DHS-DACA-FAQ..........................................20

DHS Memorandum titled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) available at: http://tinyurl.com/2012Memo;...................................................................................23

DHS Memorandum titled *Memorandum on Rescission of Deferred Action For Childhood Arrivals* (September 5, 2017), available at: http://tinyurl.com/2017Memo....................................................................................10

FEMA Declaration and Release form at: https://www.fema.gov/pdf/assistance/process/00903.pdf...........................................17

Flores, Adolfo, *This Paramedic Who Rescued Harvey Victims May Be Deported If Trump Ends DACA,* BUZZFEED (September 1, 2017) available at: http://tinyurl.com/paramedicstory...............................................................................7

iv

Institute on Taxation and Economic Policy, *State & Local Tax Contributions of Young Undocumented Immigrants* (2017) available at: http://tinyurl.com/ITEPDACAstudy.................................................................................4

Johnson, Kirk, *A DACA Recipient with an American Life Considers the Future,* THE NEW YORKER (September 13, 2017), available at: http://tinyurl.com/crimereporting..........................................................................16

Letter by Secretary Jeh Johnson dated December 30, 2016, to U.S. Rep. Judy Chu, available at: http://tinyurl.com/JehJohnsonLetter ...........................................19, 24

Letter from Attorney General Sessions to DHS Acting Secretary Elaine Duke on the Rescission of DACA (September 4, 2017) available at: http://tinyurl.com/AG-Duke-Letter;...............................................................................................................10

Moreno, Barry, *Children of Ellis Island* ARCADIA PUBLISHING (2005) ...................................3

New American Economy, *Immigrants and the economy in: California District 12* (2017) available at: http://www.newamericaneconomy.org/locations/california/california-district-12/......................14

New American Economy, *Immigrants and the economy in: Philadelphia Metro Area* (2017) available at: http://www.newamericaneconomy.org/city/philadelphia/ ....................14

New American Economy, *New Americans in Los Angeles* (2017) available at: http://www.newamericaneconomy.org/wp-content/uploads/2017/02/LA_Brief_V8.pdf .................................................................13

NYC Comptroller Report, *Our Immigrant Population Helps Power NYC Economy* (January 11, 2017), available at: http://tinyurl.com/NYC-Comptroller-Report.......................................................................................................................13

Remarks by Attorney General Sessions on DACA (Sessions Speech) (September 5, 2017), available at: http://tinyurl.com/Sessions-speech .................................................13

Remarks by President Obama. June 15, 2012. http://tinyurl.com/Obama-6-15-12....................8, 9

The Sentencing Project, *Immigration and Public Safety* (2017) Washington, D.C., available at http://www.sentencingproject.org/wp-content/uploads/2017/03/Immigration-and-Public-Safety.pdf ..................................................5, 6, 15

Shaban, Hamza, *CEO Tim Cook says he stands by Apple's 250 DACA-status employees,* THE WASHINGTON POST (September 3, 2017), available at: http://tinyurl.com/DACAFortune500.................................................................8

Special Correspondence, *Tots at Ellis Island*, THE WASHINGTON POST (June 5, 1904), available at: https://secure.pqarchiver.com/washingtonpost_historical/doc/144543811.html.............................3

Theodore, Nik, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), available at: http://tinyurl.com/ChicagoPoliceStudy..............................................................................15

Ulloa, Jazmine, *L.A. Police Chief Charlie Beck endorses 'sanctuary state' bill that Eric Holder hails as 'constitutional',* THE LOS ANGELES TIMES (June 19, 2017), available at: http://tinyurl.com/Beckstory .........................................................16

*United States v. Texas*, 2015 U.S. Briefs 674 (Initial Brief of Appellant-Petitioner at 5) (Mar. 1, 2016)...............................................................................................................12

U.S. Bureau of Labor Statistics 2016 foreign-born labor force statistics, available at: http://tinyurl.com/BLS-foreignborn ...................................................................................14

U.S. Citizenship and Immigration Services (USCIS) DACA Data dated "As of September 4, 2017" available at: http://tinyurl.com/USCIS-data ...............................................2, 14

USCIS DACA Frequently Asked Questions, available at: https://www.uscis.gov/archive/frequently-asked-questions ............................................4

USCIS Instructions for Consideration of Deferred Action for Childhood Arrivals, available at: http://tinyurl.com/USCISInstructions......................................................19

## STATEMENT OF INTEREST OF AMICI CURIAE

*Amici Curiae*[1] are located across the United States and include the City of Los Angeles, California; the City of Austin, Texas; the City of Boston, Massachusetts; the City of Cambridge, Massachusetts; the City of Chelsea, Massachusetts; the City of Chicago, Illinois; Cook County, Illinois; the City and County of Denver, Colorado; the City of Holyoke, Massachusetts; the City of Iowa City, Iowa; the City of Las Cruces, New Mexico; Los Angeles County, California; King County, Washington; the City of Minneapolis, Minnesota; the City of New York, New York; the City of Oakland, California; the City of Philadelphia, Pennsylvania; the City of Portland, Oregon; the City of Rochester, New York; the City of Sacramento, California; the City of San Diego, California; the City and County of San Francisco, California; the City of Santa Fe, New Mexico; the City of Santa Monica, California; the City of Seattle, Washington; the City of Somerville, Massachusetts; the City of Tucson, Arizona; the City of West Hollywood, California; the National League of Cities and the United States Conference of Mayors.

The National League of Cities (NLC) is dedicated to helping city leaders build better communities. NLC is a resource and advocate for 19,000 cities, towns and villages, representing more than 218 million Americans. The United States Conference of Mayors is the official non-partisan organization of cities with populations of 30,000 or more. There are 1,408 such cities in the country today. Each city is represented in the Conference by its chief elected official, the mayor.

This litigation is of significant interest to *Amici*, since 251,000, or more than 1 in 3, of all currently active recipients of the Deferred Action for Childhood Arrivals (DACA) program live in

---

[1] Counsel for *Amici* authored this brief in whole, and no party, no party's counsel, nor any other person has contributed money intended to fund preparation of this brief.  *See* Fed. R. App. P. 29(a)(4).

the metropolitan areas of the *Amici* cities and counties.[2]  Of equal importance is the fact that many *Amici* cities and counties are the primary population centers of many of the State Plaintiffs in this action, including the States of New York, Massachusetts, Washington, Iowa, Illinois, New Mexico, Oregon, and Pennsylvania.

The Los Angeles, New York, and Chicago metro regions have three of the largest DACA populations in the United States.  According to the United States Citizen and Immigration Service (USCIS), as of September 4, 2017, approximately 13% of all active DACA recipients reside in the Los Angeles metro area.  Another 6.8% and 5% of all active recipients reside in the New York and Chicago metro regions, respectively.  Austin, Denver, San Diego, the San Francisco Bay Area, and Seattle together account for another 9% of the active DACA population.  Collectively, more active DACA recipients reside in *Amici*'s metro areas than the combined active DACA populations of 43 states.[3]

Since obtaining deferred action, these DACA recipients – our residents – have made substantial contributions to our respective communities as business owners, educators, researchers, artists, journalists and civic leaders.  Tens of thousands more DACA enrollees are attending our local schools, studying to become our newest doctors and nurses, lawyers, and entrepreneurs. Many DACA recipients work directly for *Amici*, and play critical roles in our daily government operations.  No matter how DACA recipients choose to contribute, all of *Amici* are stronger and safer because of the DACA program.  Therefore, *Amici* profoundly object to Defendants' actions

---

[2] United States Citizen and Immigration Service data show that approximately 800,000 applicants have qualified for DACA since the start of the program.  Approximately 690,000 DACA recipients currently have active DACA status.  For purposes of this brief, residency in a "metropolitan area" is defined as residency in a Core Based Statistical Area (CBSA) at the time of the DACA recipient's most recent application.  CBSAs are defined by the United States Office of Management and Budget. *See* U.S. Citizenship and Immigration Services DACA Data dated "As of September 4, 2017" (USCIS DATA).  Available at: http://tinyurl.com/USCIS-data
[3] *Id.*

to eliminate DACA and weaken the protections for sensitive information obtained from DACA applicants.  Both of these actions are harmful and unlawful.

Since its inception more than two centuries ago, our nation has served as an adopted home for generations of migrant children.  Welcoming and protecting young immigrants is part and parcel of our DNA.  Over a century ago, in 1904, the *Washington Post* profiled eleven "matrons" whose job was to care for minor children arriving in the United States through New York Harbor and Ellis Island.  The head matron, Regina Stucklen, noted that the children under her care were "the sweetest things that grow."[4]

More than one million children passed through Ellis Island in its 62 years as an immigration station.  Some of those "sweetest things" grew to become laborers in our factories, warehouses and mills, driving our engines of economic growth.  Others chose lives in public service, becoming members of our military, teachers, social workers, firefighters, and police officers.  Many more were homeowners, parents, and taxpayers.  Included among those children who entered the United States via Ellis Island were renowned artists, athletes, musicians, and authors, like Irving Berlin, Bob Hope, Claudette Colbert, Knute Rockne, and Frank Capra and institutional leaders, like Los Angeles Archbishop Timothy Manning, San Francisco Mayor George Christopher, and Supreme Court Justice Felix Frankfurter.[5]

However these immigrants came to our country, those who arrived here as children helped to build the foundation of *Amici's* economic prosperity, military security, cultural artistry and civic society.  *Amici* are looking to a new generation of child migrants, especially those eligible for the DACA program, to help guide our financial and cultural success into the future.

---

[4] Special Correspondence, *Tots at Ellis Island*, THE WASHINGTON POST (June 5, 1904), available at: https://secure.pqarchiver.com/washingtonpost_historical/doc/144543811.html.
[5] Moreno, Barry, *Children of Ellis Island*, ARCADIA PUBLISHING (2005).

Stated in more detail, the DACA program is important to *Amici* for several reasons.

First, the DACA program promotes economic prosperity and benefits taxpayers, which means that *Amici* will suffer direct economic harm if DACA is rescinded.  *Amici* rely heavily upon the economic contributions of foreign-born residents and DACA recipients make up a statistically significant portion of *Amici*'s foreign-born labor force.  Collectively, the DACA recipients living in *Amici* cities and counties openly earn billions of dollars in taxable income because of the work authorization benefit provided by the DACA program.[6]

A 2017 study by The Institute on Taxation and Economic Policy found DACA recipients pay an estimated $1.6 billion in state and local taxes annually, giving them a higher effective tax rate than the average state and local tax rate paid by the top 1% of U.S. taxpayers.[7]  Because USCIS data show that DACA recipients are concentrated in *Amici*'s metro areas, those with deferred action are an important subset of the foreign-born populations critical to the economy of *Amici* cities.  This arbitrary and capricious action by Defendants to eliminate DACA will negatively impact *Amici* by removing hundreds of thousands of workers, business owners and taxpayers from our respective economies.

On a micro-economic level, the benefits gained through the DACA program have given recipients of deferred action the encouragement and comfort they needed to openly enter the work force, take on student loans, sign mortgages, and start businesses.  Studies show that DACA recipients have in fact made profound economic gains *because of* receiving deferred action.  In a representative survey, the Center for American Progress found that 69% of employed recipients

---

[6] USCIS DACA Frequently Asked Questions (USCIS DACA FAQ), at Question 1, available at: https://www.uscis.gov/archive/frequently-asked-questions (stating that "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'")

[7] Available on the ITEP website at: http://tinyurl.com/ITEPDACAstudy

moved to a higher-paying job after receiving deferred action and 5% of recipients started a new business after receiving deferred action, which is a rate of business creation greater than among the general public.[8]   The Center's study also found that the hourly wages of surveyed DACA recipients increased by an average of 42%; that 60% of those with increased earnings have become financially independent; and that 61% have started to contribute to their family's finances.  At least half of all DACA recipients surveyed by the Center reported that they have bought a car since receiving deferred action, 12% have bought their first home and 25% have a child who is an American citizen.

Terminating this program will not only roll back these financial and familial gains earned by DACA recipients, it will harm *Amici,* in that cities and counties operate – and our taxpayers fund – the social safety net that will be required to catch these families if the DACA recipients' work authorization is taken away and families are forced apart by ICE removals.

Second, DACA promotes public safety and public welfare.  A study by The Sentencing Project demonstrates that communities with larger immigrant populations, including *Amici*, have outpaced the public safety gains of their peers.  In 1990, the reported violent crime rate was 730 offenses per 100,000 residents.  That same year the number of foreign-born individuals living in the United States was roughly 19.8 million.  The violent crime rate began to fall in the mid-1990s and by 2014 it was half of its 1990 level, at 362 offenses per 100,000 residents.  By that year, the foreign-born population had more than doubled, reaching 42.2 million people.[9]

---

[8] Center for American Progress, *DACA Recipients' Economic and Educational Gains Continue to Grow* (2017) (CAP Study) Washington, D.C.  The CAP Study is available at: http://tinyurl.com/CAPDACAstudy.

[9] *Immigration and Public Safety* (2017), The Sentencing Project, Washington, D.C., available at http://www.sentencingproject.org/wp-content/uploads/2017/03/Immigration-and-Public-Safety.pdf

While The Sentencing Project report notes that these statistics are not definitive in proving causation, the trends establish "a critical fact about immigrants and public safety: crime rates have fallen to historic lows amidst the growth of the foreign-born population." [10]

Moreover, law enforcement agencies report that, as immigration enforcement and the threat of deportation increase, undocumented immigrants are substantially less likely to report crimes by others, including violent crimes.[11]  And studies estimate that granting legal status—such as the deferred action conferred by DACA—to only 1% of undocumented immigrants in a country can lower crime rates by 2 to 6%.[12]

Nevertheless, Attorney General Sessions, in announcing the elimination of the DACA program, stated without offer of proof that such action was needed to "save lives" and protect communities from a "risk of crime."  But DACA recipients are not criminals.  A study from the CATO Institute concluded that native-born Americans are 14% more likely than DACA-eligible immigrants with the same age and education to be incarcerated.[13]  To even qualify for deferred action, applicants must submit detailed personal histories and pass a rigorous background check. And, if they are arrested after obtaining deferred action, they can lose their DACA status.  Indeed, very few DACA recipients – only 0.25% – have been expelled from the program for criminal activity or other public safety concerns, which is a rate substantially lower than the general rate of criminality in American society.[14]

---

[10] *Id.*

[11] Burnett, John, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, National Public Radio (May 25, 2017), available at https://goo.gl/62P1mN.

[12] Baker, Scott R., *Effects of Immigrant Legalization on Crime: The 1986 Immigration Reform and Control Act*, Stanford Law and Econ. Olin Working Paper, at 25 (July 28, 2014) available at https://goo.gl/MyX2oN.

[13] *The DREAMer Incarceration Rate* (2017), CATO Institute, Washington, D.C. available at: https://www.cato.org/publications/immigration-research-policy-brief/dreamer-incarceration-rate

[14] *Id.*

What's more, DACA recipients – free to contribute openly to their communities – are being hailed as heroes.  Houston-area paramedic Jesus Contreras is a DACA recipient.  He worked six straight days after Hurricane Harvey hit southeast Texas, rescuing people from floodwaters and putting his own life in danger.  News reports show that had DACA been rescinded during those six days, Contreras could have immediately been pulled from his ambulance, reducing the number of available first responders.[15]  Similarly, many have praised the efforts of the countless volunteers who used their own boats, at their own peril, to rescue their neighbors during Hurricane Harvey.  One such Good Samaritan, Alonso Guillen, was a 31-year-old DACA recipient who, according to reports, drowned while trying to save others from the deadly floodwaters that inundated the Houston area.[16]

In addition, applicants who pass DACA's strict vetting process were allowed to sign up for U.S. military service as part of a Pentagon program called Military Accessions Vital to the National Interest, or MAVNI.  The day after Defendants moved to terminate DACA, the Pentagon announced that 900 DACA recipients are actively serving or have signed recruitment contracts to serve in the military.  This service to our country and our communities, along with others whose service stories have yet to be told, makes *Amici* safer.

Thus, and thirdly, DACA recipients bring many tangible and intangible benefits to *Amici* cities; benefits that improve upon, to quote Attorney General Sessions, "the well-being of our Republic."  Much like those children who passed through Ellis Island decades ago went on to become acclaimed actors, athletes, artists and leaders, today's DACA recipients are helping to

---

[15] Flores, Adolfo, *This Paramedic Who Rescued Harvey Victims May Be Deported If Trump Ends DACA,* BUZZFEED (September 1, 2017) available at: http://tinyurl.com/paramedicstory
[16] Carroll, Susan and Kriel, Lomi *Lost in Cypress Creek* HOUSTON CHRONICLE (September 9, 2017), available at: http://tinyurl.com/lost-in-cypress-creek

weave our modern-day social fabric. Active DACA recipients are employed by at least 72% of the *top 25* Fortune 500 companies, many of which are headquartered in *Amici*. There are 250 DACA beneficiaries alone working at Apple Inc., the world's most valuable company.[17]

Among the individual recipients of deferred action are a public school teacher in Austin, Texas with a master's degree in education focusing on hearing-impaired students; a Los Angeles-based graphic designer who has worked on marketing campaigns for *Star Wars: Rogue One* and *Game of Thrones*; a political organizer based in Washington D.C., who recently served as a press secretary for a 2016 presidential candidate; a producer for MSNBC's *Morning Joe* who helps shape the network's morning programming and, separately, a licensed attorney and the first member of the New York State Bar with DACA status, both of whom live in New York City. Turning our back on DACA recipients is turning our back on the future.

## ARGUMENT

This litigation is about protecting young people who were brought here by their parents, often as infants. These children typically know no country besides the United States and may speak no language besides English. They study in our schools, work in our economy and pledge allegiance to our flag. As President Obama stated the day the program was created, they "are Americans in their hearts, in their minds, in every single way but one: on paper."[18]

In terminating DACA, Defendants acted in an arbitrary and capricious manner, failing to comply with the Administrative Procedure Act (APA). Neither the Department of Homeland Security (DHS) nor the Attorney General exhibited reasoned decision-making in taking this action. To the contrary, Defendants provided no supportable rationale for their decision, which would

---

[17] Shaban, Hamza, *CEO Tim Cook says he stands by Apple's 250 DACA-status employees,* THE WASHINGTON POST (September 3, 2017), available at: http://tinyurl.com/DACAFortune500
[18] Remarks by President Obama. June 15, 2012. http://tinyurl.com/Obama-6-15-12

have been exposed but for Defendants failure to follow the APA's required notice and comment process.  To the extent Defendants did cite reasons for ending DACA, those are disproven by compelling evidence.

Moreover, in creating the DACA program, DHS announced that it would defer action against those eligible because it could find no reason to expel innocent young people, at the expense of other departmental enforcement priorities.  President Obama emphasized DACA would "lift the shadow of deportation."[19]  In other words, DHS made a promise – i.e. sign up for DACA and turn over sensitive information to authorities in return for protection from deportation – upon which each and every DACA recipient relied.  The principles of Due Process and require Defendants to honor that promise and favor the Plaintiffs' prayer for relief.

**I.      This Court should grant a preliminary injunction prohibiting Defendants' from rescinding the DACA program because DHS acted arbitrarily and capriciously and failed to follow the notice and comment procedures in violation of the APA.**

**A.      The Plaintiffs will prevail on the merits of their substantive APA claim because DHS's sole stated reason for ending the DACA program was conclusory and relies upon flawed legal analysis.**

DHS is an "agency" under the APA, 5 U.S.C. § 551(1), and the September 5, 2017 memorandum from Acting DHS Secretary Elaine Duke rescinding DACA is an "agency action" subject to judicial review.  5 U.S.C. §§ 551(13), 704.  Accordingly, DHS must employ "reasoned decisionmaking" when taking a final agency action.  *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  An agency action is final when "rights or obligations have been determined or legal consequences will flow from the agency action."  *Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970).  Any action taken "without observance of procedure required by law" or that is "arbitrary" or "capricious" is

---

[19] *Id.*

"unlawful" and must be "set aside" by the court.  5 U.S.C. § 706(2)(A)-(D).

In the DHS memo rescinding DACA, Defendants state in a conclusory manner that it was "clear" DACA "should be terminated."[20]  The memo presumes that because a Texas district court preliminarily enjoined a separate DHS program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) in 2015, DACA must suffer from "the same legal and constitutional defects."[21]  In justifying this legal conclusion, the Rescission Memo leans entirely on a 362-word letter from Attorney General Sessions.

In this short letter, the Attorney General asserts – by fiat – that: (1) DACA is just like DAPA; (2) DAPA was preliminarily enjoined on "multiple legal grounds," and that injunction was affirmed by the Fifth Circuit; therefore, (3) DACA is "likely" to be similarly enjoined, so DHS should rescind the program immediately.[22]

DHS's sudden retreat from DACA was arbitrary and capricious and violates the APA. As a threshold issue, Defendants' embrace of the Fifth Circuit's opinion declaring DAPA subject to judicial review is wholly inconsistent with the position they have presented to this Court in their Motion to Dismiss – *i.e.* a court may, under no circumstances, review the agency's exercise of prosecutorial discretion.[23]  If Defendants believe that no court may review DHS's purported exercise of prosecutorial discretion, or that no one has standing to challenge such a decision, they should not have advanced the Fifth Circuit's opinion as the basis for terminating DACA.

---

[20] DHS Memorandum titled *Memorandum on Rescission of Deferred Action For Childhood Arrivals* (Rescission Memo)(September 5, 2017), available at: http://tinyurl.com/2017Memo.

[21] *Id.*, quoting Letter from Attorney General Sessions to DHS Acting Secretary Elaine Duke on the Rescission of DACA (September 4, 2017) (Sessions Letter), available at: http://tinyurl.com/AG-Duke-Letter; *see also Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[22] Sessions Letter, supra, note 21.

[23] See Memorandum Of Law In Support Of Defendants' Motion To Dismiss, Case No. 1:17-cv-05228-NGG-JO, Document 71-1, at pg. 12.

Next, the Fifth Circuit was mistaken when it suggested, in dictum, that DAPA is contrary to the INA. *Texas v. United States*, 809 F.3d 134, 186, 214-215 (5th Cir. 2015).[24]  The dissent's reasoning should instead guide this Court's analysis. *Id.* at 214-218 (King, J., dissenting).

Despite DHS's current position, all three branches of the Federal government have long embraced deferred action as a part of the immigration landscape.  In fact, "deferred action" is one of the well-established ways in which DHS prioritizes enforcement.[25]  The Supreme Court has recognized that deferred action is "a regular practice" in which DHS exercises "discretion for humanitarian reasons or simply for its own convenience."  *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) (stating "a principal feature of the removal system is the broad discretion exercised by immigration officials.  Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

Congress, meanwhile, has enacted legislation explicitly recognizing the DHS practice of granting deferred action.  For example, the REAL ID Act of 2005, Pub. L. No. 109-13, allows states to issue driver's licenses to those undocumented immigrants with "approved deferred action status."  Similarly, since 1981, federal regulations – created by notice and comment rulemaking - allow those "granted deferred action" to "apply for employment authorization."  8 C.F.R. § 274a.12(a)(11).  And Congress has yet to disturb this regulation in three-plus decades.

More practically, Congress has never appropriated funding sufficient to remove all undocumented immigrants.  This is why DHS, and its predecessors, have implemented more than

---

[24] *See* also *Simons v. Bellinger*, 643 F.2d 774, 809, n.48 (1980) (Wilkey, J., dissenting) (a "determination was an alternative basis for dismissal, and to that extent the language may be regarded as dictum").

[25] *See also* Plaintiffs' Memorandum in Support, 1:17-cv-05228-NGG-JO, Document 96-1, at 8.

20 deferred action policies over the last 50 years.[26]  Programs like DAPA and DACA enable DHS to focus limited resources on removing serious criminals by deferring action on low priority immigrants.  As the D.C. Circuit Court wrote in *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), "[t]he power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws." Moreover, "Congress has never prohibited or limited ad hoc deferred action, which is no different than DAPA other than scale."  *Texas*, 809 F.3d at 216 (King, J., dissenting).

Finally, even if DAPA were, as the Fifth Circuit concluded, "contrary" to the INA, *Texas*, 809 F.3d at 179, that rationale is inapplicable to DACA.  Despite the Attorney General's assertion, DACA is not just like DAPA.  The Fifth Circuit's opinion itself specifically notes "DACA and DAPA are not identical."  *Id.* at 174 (finding "eligibility for DACA was restricted to a younger and less numerous population," and DAPA had different "discretionary criteria").

In sum, the only reason DHS gave for rescinding DACA was that the program was "likely" to be unlawful.  But DACA is lawful,[27] which means that Defendants' actions are in violation of the APA given there is no other proffered agency justification for the rescission by DHS.  *See Natural Resources Defense Council, Inc. v. Rauch*, 244 F. Supp.  3d 66, 96 (D.D.C. 2017) (stating "suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong.").

B.     **The Attorney General's stated policy reasons for ending DACA have no basis in fact and are easily disproven by numerous research studies.**

Outside of the Rescission Memo, the only other basis Defendants offer to justify the DACA termination are remarks Attorney General Sessions in a speech delivered the same day DHS took

---

[26] *United States v. Texas*, 2015 U.S. Briefs 674 (Initial Brief of Appellant-Petitioner at 5) (Mar. 1, 2016).
[27] *See also* Plaintiffs' Memorandum in Support, 1:17-cv-05228-NGG-JO, Document 96-1, at 5.

action.[28]  In that speech, the Attorney General asserted that eliminating DACA was necessary to "protect the overall health and well-being of our Republic" and to "save lives, protect communities and taxpayers, and prevent human suffering."

Not only do the Attorney General's misstatements undermine the core values of *Amici* cities and counties, the true facts contradict his own stated purposes for this action.  For example, foreign-born residents make up almost half of Los Angeles' workforce; they contribute over $3 billion in state and local taxes yearly; they own businesses that generate $3.5 billion in annual income for city residents; and, they have local spending power of almost $30 billion a year.[29]  Ending DACA will negatively impact all American citizens living in Los Angeles by removing tens of thousands of foreign-born workers, business owners and taxpayers from the city's economy.

The same economic harm would befall other *Amici*.  More than 51% of all of New York City's business owners are foreign-born and foreign-born residents are responsible for 32% ($100 billion) of all income earned by New York City residents.  New York City families that include immigrant members pay an estimated $8 billion in city and state personal income taxes and approximately $2 billion in city property taxes.[30]  Similarly, 35% of business owners in San

---

[28] It is unclear whether the Attorney General was speaking for DHS and *Amici* do not concede he was or that Defendants may rely on his remarks to defend their actions.  In stating "[w]e at Department of Justice are proud and honored to work to advance this vision for America," it appears his comments were on behalf of the Department of Justice only.  Remarks by Attorney General Sessions on DACA (Sessions Speech) (September 5, 2017), available at: http://tinyurl.com/Sessions-speech.  And while the Rescission Memo adopted the Sessions Letter's legal analysis of the DAPA litigation, neither the Rescission Memo nor the Sessions Letter made any mention of Mr.  Session's fiscal and public safety policy rationale from his speech.  "A court may uphold agency action only on the grounds that the agency invoked when it took the action."  *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015).

[29] New American Economy, *New Americans in Los Angeles* (2017) available at: http://www.newamericaneconomy.org/wp-content/uploads/2017/02/LA_Brief_V8.pdf

[30] NYC Comptroller Report, *Our Immigrant Population Helps Power NYC Economy* (January 11, 2017), available at: http://tinyurl.com/NYC-Comptroller-Report

Francisco are immigrants, including 12,756 foreign-born entrepreneurs.[31]  Entrepreneurs in the Philadelphia metro region, of which 40,171 are foreign-born, are 43.1% more likely to be immigrants than native-born.[32]  This entrepreneurship creates jobs and increases the tax base.

Comparable statistics can be shown for other *Amici* and these statistics cannot be discounted as generalizations.  DACA recipients are a vital and thriving subset of the large foreign-born populations, critical to the economy of *Amici* cities and counties.  The DACA program has provided deferred action to some 800,000 applicants, 91% of whom are employed, which equates to 1 in 33 (3%) of *all foreign-born persons* in the United States labor force.[33]

Studies show that DACA recipients across the board obtain higher earnings and have a higher employment rate, and higher tax compliance rate than similarly-situated undocumented immigrants.[34]  Therefore, it is clear that the best way to "protect taxpayers" – a stated purpose of the Attorney General – is to maintain DACA.  Eliminating the program will result in decreased tax contributions, reduced employment rates and lower effective tax rates for our resident populations.  There is a sociological term for this type of economic retrenchment by high achieving young immigrant populations; the "transition to illegality."

According to Harvard Assistant Professor Roberto Gonzales, author of the book "Lives in Limbo: Undocumented and Coming of Age in America," terminating the DACA program and

---

[31] United States Census Bureau.  Survey of Business Owners 2007-2012; New American Economy, *Immigrants and the economy in: California District 12* (2017) available at: http://www.newamericaneconomy.org/locations/california/california-district-12/

[32] New American Economy, *Immigrants and the economy in: Philadelphia Metro Area* (2017) available at: http://www.newamericaneconomy.org/city/philadelphia/

[33] *See* U.S. Citizenship and Immigration Services DACA Data dated "As of September 4, 2017" (USCIS DATA), available at: http://tinyurl.com/USCIS-data; Center for American Progress.  *DACA Recipients' Economic and Educational Gains Continue to Grow* (2017) (CAP Study) Washington, D.C., available at: http://tinyurl.com/CAPDACAstudy; US Bureau of Labor Statistics 2016 foreign-born labor force statistics, available at: http://tinyurl.com/BLS-foreignborn

[34] CAP Study, supra, note 33.

returning people to undocumented status, will force DACA recipients to negatively adjust their expectations of what they can achieve in life.  Gonzales' own studies show that most will regress (i.e. move backward) in their schooling and careers, in part because they will have been disavowed by the only government they have ever known.  Put in economic terms, ending DACA will sow an economic slowdown, as estimates show DACA recipients would otherwise contribute $460 billion to the United States gross domestic product over the next ten years (a contribution of $114 billion to State Respondents' cumulative GDP alone).[35]  In fiscal terms, this equates to $60 billion in lost federal, state and local tax revenues over the next decade.[36]  These figures directly contradict the Attorney General's claims and herald a negative impact on *Amici*.

Moreover, despite the Attorney General's assertion that terminating DACA will "save lives," ending the program will make communities less safe by pushing recipients underground. Further, numerous academic studies examining the impact of immigrants on their adopted communities reveal that communities with large immigrant populations, like *Amici*, have, at a bare minimum, shared in and, often, outpaced the nationwide crime drop over the past 30 years.[37]

Also, because DACA applicants had to provide personal and biometric data to DHS to qualify for DACA, recipients will fear deportation at any moment, making them statistically less likely to identify themselves to law enforcement, including *Amici's* sheriffs and police departments, to report crimes or assist in criminal investigations.[38]  The same fear can result in

---

[35] Center for American Progress, *A New Threat to DACA Could Cost States Billions of Dollars* (2017) Washington, D.C., available at: http://tinyurl.com/CAPStatesGDP.
[36] CATO Institute, *The Economic and Fiscal Impact of Repealing DACA* (2017) Washington, D.C, available at: http://tinyurl.com/CATODACAstudy
[37] *Immigration and Public Safety* (2017), The Sentencing Project, Washington, D.C., available at http://www.sentencingproject.org/wp-content/uploads/2017/03/Immigration-and-Public-Safety.pdf
[38] *See, e.g.,* Theodore, Nik, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), available at: http://tinyurl.com/ChicagoPoliceStudy

unreported code enforcement and wage theft violations, crimes which are enforced by *Amici*. Slum landlords and sweatshop owners are likely to prey upon former DACA recipients if the program is terminated, resulting in unsafe and unhealthy conditions in the workplace and at home. And there is the added risk of human trafficking as well.

*Amici*'s law enforcement leadership consistently reminds us that all communities are safer when victims and witnesses of crime, irrespective of immigration status, cooperate with law enforcement. For example, Los Angeles Police Department (LAPD) Chief Charlie Beck has routinely stated that his department depends on "immigrant communities, not only to keep them safe but to keep [the public] safe. Without that cooperation we all suffer."[39]

In fact, DACA recipients have consistently demonstrated important contributions to public safety. In May 2014, a DACA recipient residing in Los Angeles confronted an armed intruder in her apartment complex, who struck her in the head with a steel baton.[40] Afterwards, the DACA recipient helped LAPD identify and arrest the intruder. LAPD then learned that associates of the intruder were looking for the victim, which resulted in her being placed in witness protection. *Id.* Without the protection of DACA, the intruder's associates could have silenced the victim by simply reporting her to Immigration and Customs Enforcement (ICE) for removal.

Likewise, the removal of DACA's protections endangers already vulnerable immigrant communities in the wake of natural disasters. After this year's devastating California wildfires, many immigrants avoided applying for aid to which they and their families were entitled because FEMA's form states that application information "*may be subject to sharing within the Department*

---

[39] Ulloa, Jazmine, *L.A. Police Chief Charlie Beck endorses 'sanctuary state' bill that Eric Holder hails as 'constitutional',* THE LOS ANGELES TIMES (June 19, 2017), available at: http://tinyurl.com/Beckstory

[40] Johnson, Kirk, *A DACA Recipient with an American Life Considers the Future,* THE NEW YORKER (September 13, 2017), available at: http://tinyurl.com/crimereporting

*of Homeland Security*, including but not limited to, the Bureau of Immigration and Customs Enforcement."[41]   The Government's arbitrary repeal of DACA has therefore only exacerbated fears that those who ask for help to save property or lives will expose themselves, family members, or neighbors to immigration enforcement, or worse, forgo necessary assistance in order to avoid deportation.

Ending DACA will make recipients much less likely to report criminal activity to law enforcement for fear they could place themselves at risk of deportation.   That will cause crimes to go unreported and limit the success of police investigations, thereby greatly undermining public safety for all of our residents in each our communities.   An agency rule is arbitrary and capricious "if the agency … offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.   The explanations offered by Defendants in seeking to end DACA are just "so implausible."

### C.   DHS failed to follow the APA's notice and comment requirements prior to moving to rescind DACA, which is why the Plaintiffs will prevail on the merits of their procedural APA claim.

The APA requires that federal agencies conduct a rulemaking process before engaging in action that impacts substantive rights.   *See* 5 U.S.C. §§ 553 and 706(2)(D).   The Rescission Memo and the resulting actions taken to implement the Rescission Memorandum are "rules" under the APA.   *See* 5 U.S.C. § 551(1), (4).   And defendants are not absolved of their responsibility to use the rulemaking process simply because DACA was enacted without notice and comment rulemaking in 2012.   Because, even if creating DACA required notice and comment rulemaking prior to implementation, DHS would, at the very least, be required to engage in a similar notice

---

[41] FEMA Declaration and Release form (emphasis added), available at:
https://www.fema.gov/pdf/assistance/process/00903.pdf

and comment process to rescind the program. *See, e.g., Am. Forest Resource Coun. v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013) ("[O]rdinarily an agency rule may not be repealed unless certain procedures, including public notice and comment, are followed, and that this is true even where the rule at issue may be defective."); *National Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985) ("There is some superficial appeal to the government's argument that a provision which was promulgated in error is void *ab initio* and can be deleted without more ado. . . . Such a holding would ignore the fact that the question whether the regulations are indeed defective is one worthy of notice and an opportunity to comment." (citation omitted)).

II. **Defendants' should be preliminarily enjoined from using DACA applicants' information for immigration-enforcement purposes.**

A. **The Plaintiffs will prevail on the merits of their APA claim against DHS's change to its confidential information policy because Defendants' failed to provide any explanation whatsoever for the policy change, let alone a basis that was not "arbitrary and capricious."**

Any final agency action taken that is "arbitrary" or "capricious" is "unlawful" and must be "set aside" by the court. 5 U.S.C. § 706(2)(A). The United States Supreme Court, in interpreting this section of the APA, holds that an agency action is arbitrary and capricious if the agency entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to evidence before agency, or offers an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n.*, 463 US at 43.

In creating the DACA program, Defendants made promises that information provided by DACA applicants about themselves or their family members would not, absent special circumstances, be used for immigration enforcement purposes. This promise was written into USCIS's official instructions regarding the application process. Those instructions provide:

18

Information provided in this request *is protected from disclosure to ICE and U.S. Customs and Border Protection* (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.[42]

This confidentiality promise was not something Defendants created from whole cloth just for the DACA program. In promoting DACA, numerous government officials highlighted DHS's practice of protecting confidential information obtained through other deferred action programs over the years. As then-Secretary of Homeland Security Jeh Johnson explained in a letter to Congresswoman Judy Chu, protecting information "submitted by people seeking deferred action" was the "long-standing and consistent practice of DHS (and its predecessor INS)" for many "decades."[43]

Yet, in terminating the DACA program, the Rescission Memo provides no rationale for the change to the confidential information policy in DACA. In fact, the Rescission Memo is completely silent on whether information provided in connection with DACA applications will now be used for immigration enforcement purposes.

The only reference to the change in information sharing practices appears in DHS guidance posted on its website on the same day that the Rescission Memo was issued. The prior language promising that information provided by a DACA applicant will be "protected from disclosure to

---

[42] USCIS Instructions for Consideration of Deferred Action for Childhood Arrivals (USCIS Instructions), at pg. 13 (emphasis added), available at: http://tinyurl.com/USCISInstructions

[43] Letter by Secretary Jeh Johnson dated December 30, 2016, to U.S. Rep. Judy Chu, available at: http://tinyurl.com/JehJohnsonLetter

ICE and [CBP]"[44] is gone.  Instead, Defendants now assert that "[g]enerally, information will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings."[45] The use of the qualifiers "generally" and "not be proactively provided" are substantial shifts in policy.  And the very next sentence in the guidance indicates that further watering down of the confidential information policy should be expected in the near future or, frankly, may have already occurred without notice.  It reads: "This [confidential information] policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter."[46]

When an agency gives no explanation for its action, as is the case here with DHS's change to the confidential information policy, a reviewing court's decision is made easy and it must be made in the Plaintiffs' favor.  Put simply, failure to give a reason for a change of course renders administrative behavior arbitrary and capricious and in violation of the APA.  *See Illinois v. Interstate Commerce Com.*, 722 F.2d 1341, 1348 (7th Cir. 1983) (citing *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807-08 (1973)) (finding that an agency "may not make major policy changes by pure fiat, with no explanation" of why the change is being made.); *Communs. & Control, Inc. v. FCC*, 374 F.3d 1329, 1336-37 (D.C. Cir. 2004) (finding that because the FCC offered "no explanation" for deciding that a broadcaster's typographical error rendered its license being void *ab initio*, the action was "arbitrary and capricious," especially in light of the FCC's past practice of correcting, "without much ado, typographical errors such as the one at

---

[44] USCIS Instructions, supra note 42.
[45] DHS Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA) (DHS Rescission FAQs), at Question 8, available at: http://tinyurl.com/DHS-DACA-FAQ
[46] *Id.*

issue."); *Sorenson Communs. v. FCC*, 567 F.3d 1215, 1222 (10th Cir. 2009) (finding that, because the FCC "failed to provide any reason why" federal funds given to a provider of telephone transmission services enabling disabled individuals to communicate could not be used for lobbying expenses, the FCC's prohibition on the use of the funds was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).)

To be sure, the original DACA memorandum included a statement that applicants had no right to rely on statements made therein, but such boilerplate disclaimers do not always carry the day when they clash with guidance's broader substance and purpose. *See, e.g., Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). Here, the recipients were highly vulnerable parties whose substantial reliance on the Memorandum's assurances was all but certain – and indeed intended – as a practical matter. The federal government persuaded them to "come out of the shadows" and hand over sensitive information – including biometic data – to ICE in exchange for DACA status.

DACA applicants responded by irrevocably rearranging their lives, funding college educations, enrolling in the military, having American citizen children, buying homes and cars. These acts were not the just the foreseeable effects of the federal government program inducement but rather what the program was at its core designed to induce. Under these exceptional circumstances, the government must have some reasonable purpose for changing a policy to allow the government to use recipients' confidential information. Thus, an injunction is necessary to ensure "some minimum standard of decency, honor and reliability in … dealing with the Government." *Heckler v. Community Health Servs.*, 467 U.S. 51, 59-61 (1984).

**B.     DHS's change in its policy regarding the permissible uses of sensitive DACA information infringes upon Plaintiffs' due process rights and, therefore, violates the APA prohibition of federal agency action that is "contrary to constitutional right, power, privilege, or immunity."**

The APA prohibits federal agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Here, the DHS Rescission FAQs issued alongside the Rescission Memo drastically and substantially changes DHS's confidential information policy without providing DACA applicants with any form of due process.

To quote Justice Frankfurter, "due process of law" and "liberty" are among the "great [constitutional] concepts . . . purposely left to gather meaning from experience. . . .  They relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged."  *National Ins. Co. v. Tidewater Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting).

DHS's alteration of its DACA confidential information policy sends a message to our immigrant residents that their government, including *Amici*, is not to be trusted – when in reality *Amici* are fighting to protect these basic rights, because any person present in the United States, including every DACA recipient living in our respective cities and counties, is guaranteed due process before he or she may be deprived of a liberty interest.  U.S. Const. amend. V; *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (noting that liberty includes the ability to form the "enduring attachments of normal life").

The operational success of the entire DACA program flows from a core promise, i.e., the prohibition on use of personal information for immigration enforcement.  But for this promise, the risks to a DACA-eligible person of identifying oneself to the nation's immigration enforcement agency would have far outweighed any short-term benefit earned, which is why the official USCIS form application instructions state that "information provided" is "protected from disclosure to

22

ICE and U.S Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance."[47]

DHS's detailed DACA policies, together with the Napolitano Memo and remarks of the President of the United States – delivered with the purpose of "lifting the shadow of deportation" – gave DACA recipients a liberty interest in the promise of the DACA program (i.e., confidentiality).  Consistently, Supreme Court cases have found liberty interests in the continued receipt of welfare payments or of a public school teaching position despite lack of tenure protections or employment contract because of an "implied promised of continued employment." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (citing *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) and *Connell v. Higginbotham*, 403 U.S. 207, 208 (1971)).

In *Bd. of Regents v. Roth*, the Supreme Court wrote that to have a protected interest in a benefit, a person clearly must have "more than an abstract need."  The person "must, instead, have a legitimate claim of entitlement to it."  *Id.*  DACA recipients have earned their "claim of entitlement" to confidentiality.  Put plainly, DACA recipients' self-identification to DHS was likely an *irreversible* action taken at the encouragement of the federal government.  DACA applicants would not have taken the risk of sharing intimate details and biometric data about themselves and their families – serving up removal of themselves and their families on a platter – without the promises made by Defendants.  Former Secretary of Homeland Security Jeh Johnson confirmed as much in a letter to Congresswoman Judy Chu when he wrote, "DACA applicants

---

[47] DHS Memorandum titled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) (Napolitano Memo), available at: http://tinyurl.com/2012Memo; *see* also USCIS Instructions, supra note 42.

most assuredly relied" upon the "representations made by the U.S. government."[48]

Defendants may choose to highlight the fact that USCIS retained "discretion" in acting on the DACA program."[49]  But the fact that DHS retained "discretion" in reviewing applications and granting DACA status cannot cure Defendants' unconstitutional actions.  The Supreme Court has held that having discretion over the issuance of benefits does not eliminate the need to provide Due Process.  *See Goldsmith v. Board of Tax Appeals*, 270 U.S. 117, 123 (1926).

In *Goldsmith,* the petitioner was a lawyer who had been refused admission to practice before the United States Board of Tax Appeals.  The Board had published rules for admission of persons entitled to practice before it, which provided "that the Board may in its discretion deny admission to any applicant, or suspend or disbar any person after admission."  *Id*. at 119.  Under its discretionary power, the Board denied admission to the petitioner without a hearing or stating a reason for the denial.  The Supreme Court stated that the posted rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied.  Specifically, the Board's discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Id*., at 123.

Even assuming arguendo that Defendants are correct in stating that the Napolitano Memo did not grant any substantive rights (*i.e.*, the memo simply set forth the criteria under which DHS had the discretion to grant deferred action on a case-by-case basis) this does not justify Defendants' attempt to casually rewrite DHS confidentiality rules protecting some 900,000 DACA applicants in blanket fashion..  If the Napolitano Memo did not grant substantive rights, the information-

---

[48] Letter by Secretary Jeh Johnson dated December 30, 2016, to U.S. Rep. Judy Chu, available at: http://tinyurl.com/JehJohnsonLetter
[49] USCIS DACA FAQ, at Question 51, supra note 6.

sharing policy created by action separate from the Napolitano Memo certainly did, and DHS's across-the-board change to that policy violates basic principles of fairness.  Therefore, Defendants' actions in opening recipients' personal information to use by ICE and CBP in removal proceedings, violates the Due Process rights of Plaintiffs in this action.  Because the actions violate Due Process, they are also unlawful under the APA and should be enjoined.

## CONCLUSION

*Amici* respectfully urge the Court to issue a nationwide injunction preventing Defendants from terminating DACA or using information obtained from DACA recipients for removal proceedings.  If the federal government is allowed to renege on a promise it made to 800,000 recipients and their family members, a damaging message would be delivered that the United States government cannot be trusted to act in a decent, honorable or reliable manner, and it would impose significant adverse consequences on *Amici*.

Dated: December 22, 2017               Respectfully submitted,

By:___*Michael J. Dundas*_____

    Michael N. Feuer
      City Attorney
    James P. Clark
    Leela Kapur
    Valerie Flores
    Michael Dundas
    Matthew Scherb
    Alexander Freedman
    200 North Main Street, City Hall East Suite 800
    Los Angeles, California 90012
    Telephone: (213) 978-8130

    *Attorneys for Amicus Curiae City of Los Angeles, California*

    *Additional Counsel for Amici Curiae Listed in Appendix*

# APPENDIX
## *Additional Counsel for Amici Curiae*

ANNE L. MORGAN
City Attorney, City of Austin
MICHAEL SIEGEL
Assistant City Attorney, City of Austin
PO Box 1546
Austin, TX 78767
*Attorneys for the City of Austin*

EUGENE O'FLAHERTY
Corporation Counsel for the City of Boston
One City Hall Square, Room 615
Boston, MA 02201
*Attorney for the City of Boston*

NANCY E. GLOWA
City Solicitor
795 Massachusetts Avenue
Cambridge, MA  02139
*Attorney for the City of Cambridge*

CHERYL WATSON FISHER
City Solicitor of the City of Chelsea
500 Broadway, Room 307
Chelsea, MA 02150
*Attorney for the City of Chelsea*

EDWARD N. SISKEL
Corporation Counsel of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
*Attorney for the City of Chicago*

KIMBERLY M. FOXX
States Attorney for Cook County
69 W. Washington, 32nd Floor
Chicago, IL 60602
*Attorney for Cook County*

KRISTIN M. BRONSON
City Attorney of the City and County of Denver
1437 Bannock St., Room 353
Denver, CO 80202
*Attorney for the City and County of Denver*

PAUL PAYER
City Solicitor, City of Holyoke, MA
20 Korean Veterans Plaza, #204
Holyoke, MA 01040
*Attorney for the City of Holyoke*

ELEANOR M. DILKES
City Attorney
410 East Washington Street
Iowa City, IA 52240
*Attorney for the City of Iowa City*

JENNIFER VEGA-BROWN
City Attorney of the City of Las Cruces
700 North Main
Las Cruces, NM 88001
*Attorney for the City of Las Cruces*

MARGARET L. CARTER
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071
*Attorney for the County of Los Angeles*

DANIEL T. SATTERBERG
King County Prosecuting Attorney
516 Fourth Avenue, W400
Seattle, WA 98104
*Attorney for King County*

26

SUSAN SEGAL
Minneapolis City Attorney
350 S. Fifth St. - Room #210
Minneapolis, MN 55415
*Attorney for the City of Minneapolis*

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
*Attorney for the City of New York*

BARBARA J. PARKER
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, CA 94612
*Attorney for the City of Oakland*

SOZI PEDRO TULANTE
City Solicitor of the City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
*Attorney for the City of Philadelphia*

TRACY P. REEVE
City Attorney of the City of Portland
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240
*Attorney for the City of Portland*

BRIAN F. CURRAN
Corporation Counsel of the City of
Rochester
30 Church Street, Room 400A
Rochester, NY 14614
*Attorney for the City of Rochester*

MATTHEW D. RUYAK
Interim City Attorney of the City of
Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for the City of Sacramento*

MARA W. ELLIOTT
San Diego City Attorney
1200 Third Avenue, Suite 1620
San Diego, CA 92101
*Attorney for the City of San Diego*

DENNIS J. HERRERA
City Attorney for the City and County of
San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
*Attorney for the City and County of San Francisco*

KELLEY A. BRENNAN
City Attorney of the City of Santa Fe
200 Lincoln Avenue
Santa Fe, NM 98501
*Attorney for the City of Santa Fe*

LANE DILG
City Attorney of the City of Santa Monica
1685 Main Street
Santa Monica, CA 90401
*Attorney for the City of Santa Monica*

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
*Attorney for the City of Seattle*

FRANCIS X. WRIGHT, JR.
City Solicitor of the City of Somerville
93 Highland Avenue
Somerville, MA 02143
*Attorney for the City of Somerville*

MIKE RANKIN
City Attorney of the City of Tucson
P.O. Box 27210
Tucson, AZ 85726
*Attorney for the City of Tucson*

27

MICHAEL JENKINS
City Attorney of the City of West
Hollywood
Jenkins & Hogin LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266
*Attorney for the City of West Hollywood*

JOHN DANIEL REAVES
General Counsel
The U.S. Conference of Mayors
1200 New Hampshire Avenue NW, Suite 800
Washington, DC 20036
*Attorney for the U.S. Conference of Mayors*

28

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2017, a copy of the foregoing Amicus Brief of the City Of Los Angeles, 27 Additional Cities and Counties, the National League Of Cities and the United States Conference of Mayors In Support of Plaintiffs' Motions for Preliminary Injunction was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system.

*/s/     Michael J. Dundas*
Michael J. Dundas