**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    Defendants. | No. 16-cv-4756 (NGG) (JO) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

LEGAL STANDARDS ..................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

I.      THIS CASE IS NOT JUSTICIABLE.................................................................... 6

     A.      The Presumption of Nonreviewability and § 1252(g) Bar Judicial
          Review of the Rescission Policy............................................................... 6

     B.      Plaintiffs Lack Standing to Bring Their Procedural Due Process Claims ............. 9

     C.      MRNY Lacks A Cause of Action Under the APA ............................................. 12

II.     PLAINTIFFS FAIL TO STATE A CLAIM....................................................... 12

     A.      Then-Acting Secretary Duke Rationally Explained Her Decision To Wind
          Down DACA Given the Imminent Risk of A Nationwide Injunction.................. 13

     B.      The Rescission Policy Is Exempt from Notice and Comment............................. 18

     C.      Plaintiffs Fail to State an Equal Protection Claim ................................................. 20

     D.      Plaintiffs Fail to State a Procedural Due Process Claim....................................... 22

     E.      Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-
          Comment Procedures Were Not Required.......................................................... 25

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ................................................................................ 23

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ........................................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................. 6, 21, 25

*Bates v. Donely*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ......................................................... 6

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) ............................................................................ 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................. 6

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
   239 U.S. 441 (1915) ............................................................................ 24

*Botezatu v. INS*,
   195 F.3d 311 (7th Cir. 1999) ................................................................. 8

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ............................................................................ 15

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................... 7, 19, 20

*Chevron U.S.A. Inc. v. Echazabal*,
   536 U.S. 73 (2002) .............................................................................. 14

*Chrysler Corp. v. Braun*,
   441 U.S. 281 (1979) ............................................................................ 19

*Clarke v. Secs. Indus. Ass'n*,
   479 U.S. 388 (1987) ............................................................................ 12

*Consumer Energy Council v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ............................................................. 18

*Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006) ........................................................................... 6

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................... 13, 14

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ........................................................................... 12

*Hunt v. Wash. Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ........................................................................... 10

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989) ........................................................................... 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 6, 18

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ........................................................................... 18

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) ........................................................................... 12

*McKart v. United States*,
    395 U.S. 185 (1969) ........................................................................... 12

*Meney v. Seterus, Inc.*,
    No. 13-CV-6149T, 2014 WL 1516583 (W.D.N.Y. Apr. 17, 2014) ........................................ 18

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) ........................................................................... 13

*Nw. Mining Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) ........................................................................... 25

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) ........................................................................... 20

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ........................................................................... 19

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ........................................................................... 24

*Pac. Gas & Elec. Co. v. FPC,*
    506 F.2d 33 (D.C. Cir. 1974) ............................................................... 18

*Romeiro De Silva v. Smith,*
    773 F.2d 1021 (9th Cir. 1985) ............................................................ 24

*Syracuse Peace Council v. FCC,*
    867 F.2d 654 (D.C. Cir. 1989) ............................................................ 16

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ....................................................... *passim*

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005) ........................................................................... 23

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997) ............................................................ 14

*U.S. Telecomm. Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2005) .............................................................. 25

*United States ex rel Coyne v. Amgen, Inc.,*
    229 F. Supp. 3d 159 (E.D.N.Y. 2017) .................................................. 6

*United States v. Armstrong,*
    517 U.S. 456 (1996) ................................................................ 7, 20, 21

*United States v. Texas,*
    136 S. Ct. 2271 (2016) ......................................................................... 4

*Velasco-Gutierrez v. Crossland,*
    732 F.2d 792 (10th Cir. 1984) .......................................................... 24

*Washington v. Davis,*
    426 U.S. 229 (1976) ........................................................................... 21

*Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*),
    525 U.S. 471 (1999) ................................................................... 3, 7, 9

*Woodford v. Ngo,*
    548 U.S. 81 (2006) ............................................................................ 11

**STATUTES**

5 U.S.C. § 553 ............................................................... 2, 18, 19, 25

5 U.S.C. § 604 ................................................................................... 25

5 U.S.C. § 701 ............................................................................................................... 7

5 U.S.C. § 702 ............................................................................................................. 12

8 U.S.C. § 1103 ........................................................................................................... 22

8 U.S.C. § 1252 ........................................................................................................ 8, 9

8 U.S.C. § 1252(g) ............................................................................................ 2, 6, 8, 9

## CONSTITUTION

U.S. Const. amend. V ................................................................................................. 23

## OTHER AUTHORITIES

Attorney General's Manual on the Administrative Procedure Act (1947) .................................... 19

DHS, Press Release, Statement from Acting Secretary Duke on the Rescission of DACA
    (Sept. 5, 2017), https://go.usa.gov/xngCd ................................................................. 14

U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's
Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C.
(Nov. 19, 2014), https://www.justice.gov/file/179206/download ........................................... 17

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the Deferred Action for Childhood Arrivals (DACA) policy, which made deferred action available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded DACA and adopted the Deferred Action for Parents of Americans (DAPA) policy, which made deferred action available to a class of unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.  A coalition of twenty-six states promptly challenged DAPA and the expansion of DACA, and successfully obtained a nationwide preliminary injunction of both policies.  First the Fifth Circuit, and then the Supreme Court (by an equally divided court) affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA and expanded-DACA, but the original DACA policy, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the policies, significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's opinion that DACA was in fact unlawful, then-Acting Secretary Duke decided to wind down DACA in an orderly fashion, minimizing disruption to recipients while avoiding the risk of another nationwide injunction, which could have plunged the policy's nearly 800,000 recipients into uncertainty.

Plaintiffs, six individual DACA recipients and Make the Road New York (MRNY), challenge the agency's memo announcing a wind down of the DACA policy (the Rescission Policy) on a variety of statutory and constitutional grounds, urging the Court to invalidate the agency's decision and enjoin the Secretary from rescinding DACA.  There is no basis to do so.  As set forth in Defendants' prior motion to dismiss (ECF No. 95), this case is not justiciable. Notwithstanding the Court's prior order regarding justiciability (Mem. & Order, ECF No. 104),

the Rescission Policy was an exercise of prosecutorial discretion to deny deferred action that is presumptively non-reviewable.  Moreover, this Court's conclusion regarding the applicability of 8 U.S.C. § 1252(g), conflicts with precedent from the Seventh Circuit and misconstrues the operation of deferred action (including decisions *not* to continue deferred action) within the overall removal process.  Plaintiffs also lack standing to bring their procedural due process claims, and Plaintiff MRNY lacks a cause of action under the Administrative Procedure Act (APA).

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the APA fails because Plaintiffs do not, and cannot, identify any source of law against which to judge whether the policy is arbitrary or capricious.  And, in any event, agencies are always free to change course on policy matters so long as they provide a rational explanation—a deferential standard amply satisfied in this case.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b)(3)(A), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Plaintiffs' Regulatory Flexibility Act claim fails for the same reason, as that Act applies only where notice and comment is required.  And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its enactment would also have required notice and comment *a fortiori*.  Plaintiffs' challenge to the alleged "change" in DHS's information-sharing policy also fails because no change has taken place—as confirmed by Plaintiffs' own exhibits.

Plaintiffs' equal protection claim, which alleges the Rescission Policy was motivated by discriminatory animus toward Latinos and Mexicans, gets them no further.  To the extent such a claim can ever be brought in a context like this one, Plaintiffs must plausibly allege a rigorous factual basis for discriminatory intent and effect to proceed beyond the pleading stage.  Plaintiffs

2

have made no such showing of extraordinary circumstances here.

Plaintiffs' procedural due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, any particular form of notice regarding the agency's policy about deferred action, or any discretionary exceptions to such a program. DHS has always made clear that DACA was an exercise of prosecutorial discretion that conferred no rights and was revocable at any time.

In sum, even if Plaintiffs' challenge were justiciable, all of their claims merit dismissal. The Fifth Circuit enjoined DAPA and the expansion of DACA as unlawful, and the Supreme Court affirmed by an equally divided court. The original DACA policy is materially indistinguishable. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the rulings and reasoning of federal courts. To state the premise of this claim is to refute it. Plaintiffs' Third Amended Complaint (TAC) should be dismissed.

## BACKGROUND

Deferred action is a form of discretionary relief that "entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015). Through it, the Secretary of Homeland Security exercises her "discretion to abandon" the removal process, and to notify an alien of a non-binding decision to forbear from seeking his removal for a set period. *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999). Though a variety of consequences may flow from a decision to defer removal action, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted).

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA. *See* Admin. R. (AR) 1–3, ECF No. 77-1; TAC Ex. A, ECF No. 113-1 (DACA Memo). DACA

made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws.  DACA Memo at 1 (AR 1).  The memo announcing DACA stated that deferred action was an "exercise of prosecutorial discretion," *id*. (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2).

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as DAPA.  *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from 2 to 3 years.  *Id.* at 3–4 (AR 39-40).

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of twenty-six states, led by Texas.  Affirming the district court, the Fifth Circuit upheld a nationwide injunction enjoining implementation of the DAPA Memo and the expansion of DACA.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).  DHS rescinded the DAPA Memo, including its provisions expanding DACA.  *See* Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John F. Kelly, Secretary of Homeland Security, *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235–37.  On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

Faced with the prospect of another nationwide injunction, then-Acting Secretary Duke decided to wind down the DACA policy in an orderly fashion.  *See* AR 252–56.  As she explained,

4

"[t]aking into consideration the Supreme Court's and Fifth Circuit's ruling in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy at 4 (AR 255).  Specifically, she quoted the Attorney General's recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).  The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy.

Plaintiffs raise six claims challenging the Rescission Policy.  First, they argue it violates the APA because it constitutes a change in agency policy without an adequate explanation.  TAC ¶¶ 177–82 (Count 2), ECF No. 113.  Second, they contend the policy violates the APA because it was issued without notice and comment.  *Id*. ¶¶ 172–76 (Count 1).  Third, they assert that the policy violates equal protection because it was allegedly motivated by discriminatory animus toward Mexicans or Latinos.  *Id*. ¶¶ 195–98 (Count 5).  Fourth, they claim the policy violates procedural due process because DACA recipients were not sent "individualized written notices" advising them of the October 5, 2017 renewal deadline.  *Id*. ¶ 192; *see also id.* ¶¶ 188–94 (Count 4).  Fifth, they contend that the agency's implementation of the October 5, 2017 renewal deadline violated procedural due process.  *Id*. ¶¶ 199–205 (Count 6).  Sixth, they submit that policy violates the Regulatory Flexibility Act because it was unaccompanied by a regulatory flexibility analysis assessing its impact on small entities.  *Id*. ¶¶ 183–87 (Count 3).

**LEGAL STANDARDS**

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In deciding a Rule 12(b)(1) motion, the district court may refer to evidence outside the pleadings, such as documents or affidavits, without converting the motion into one for summary judgment. *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]hen faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment."[1] *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citation omitted).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override then-Acting Secretary Duke's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. At a minimum, Plaintiffs lack standing to bring their procedural due process claims, and MRNY lacks a cause of action under the APA. And in all events, Plaintiffs fail to state a claim. This case should be dismissed.

## I.     THIS CASE IS NOT JUSTICIABLE

### A.     The Presumption of Nonreviewability and § 1252(g) Bar Judicial Review of the Rescission Policy

---

[1] As the administrative record documents cited herein are incorporated by reference into Plaintiffs' Third Amended Complaint or otherwise publicly available and judicially noticeable, they are properly considered on a motion to dismiss. *See United States ex rel Coyne v. Amgen, Inc.*, 229 F. Supp. 3d 159, 162 (E.D.N.Y. 2017). In the alternative, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17.

The Court need not consider any of Plaintiffs' claims because this case is not justiciable, as set forth in greater detail in Defendants' memorandum of law in support of their motion to dismiss the second amended complaint.  *See* ECF No. 95-1.  Although Defendants acknowledge the Court's ruling regarding the jurisdictional and justiciability arguments presented in that motion, *see* Mem. & Order, Defendants reassert and incorporate their previous arguments by reference to ensure that all prior arguments are fully preserved (and to avoid burdening the Court with repetitive papers).  Defendants do, however, wish to clarify and supplement certain of their arguments.

The Court concluded that the decision to rescind DACA was not "committed to agency discretion by law" under the APA.  *See* 5 U.S.C. § 701(a)(2); Mem. & Order at 20.  Respectfully, the decision by then-Acting Secretary Duke was not, as the Court found, agency action that "constrain[ed]" DHS's prosecutorial discretion with respect to DACA recipients and subjected "individuals who previously enjoyed some protection from removal to coercive state authority." Mem. & Order at 24–25.  Rather, the Rescission Policy was an act of discretion in and of itself insofar as it simply reordered the agency's enforcement priorities in light of litigation risk stemming from the *Texas* litigation.  *See Arpaio*, 797 F.3d at 17 (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'"). And as was true before implementation of the DACA Policy in 2012, deferred action remains available on an individualized basis.  The Rescission Policy is thus entitled to a presumption of nonreviewability, just like the enforcement and non-enforcement cases that the Supreme Court has found to be committed to executive discretion.  *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985); *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *AADC*, 525 U.S. at 485.

In assessing reviewability, the Court deemed the Rescission Policy reviewable on the basis that then-Acting Secretary Duke "exclusively" relied on a legal determination that DACA was

unlawful—a rationale for which the Court held there was "law to apply."  Mem. & Order at 22.  But, as the Rescission Policy makes clear, then-Acting Secretary Duke also relied on the history of the *Texas* litigation and the litigation risk it posed, as well as the self-evident complexities associated with any abrupt end to DACA, in deciding to proceed with an "orderly" wind down.  Rescission Policy at 2-4 (AR 253-55).  The balancing of those considerations is not amenable to review, and certainly not through application of the "law to apply" identified by the Court— namely, "the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion."  Mem. & Order at 22.

The Court also found § 1252(g) inapplicable on the basis that Plaintiffs' challenge to the Rescission Policy does not arise from any of the three textually specified immigration actions.  Mem. & Order at 28–31.  This conclusion conflicts with case law from at least the Seventh Circuit, which found § 1252(g) applicable to actions that are "not . . . on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"— to effectuate the object of the statute's jurisdictional bar.  *See Botezatu v. INS*, 195 F.3d 311, 313–14 (7th Cir. 1999).  The conclusion also misconstrues the manner in which a decision *not* to continue deferred action operates within the larger removal process.  A decision *not* to continue deferred action is a step towards the commencement of enforcement proceedings at some future date, and a person cannot circumvent § 1252(g)'s jurisdictional bar by singling out that particular step for a preemptive challenge.  Indeed, the Second Circuit recently emphasized—in an opinion issued after the Court's prior decision regarding justiciability—that a related provision, § 1252(a)(5), restricts challenges to removal orders that do so "directly" or "indirectly."  *Singh v. USCIS*, No. 16-1729, slip op. at 9 (2d Cir. Dec. 22, 2017).  The court thus held that § 1252(a)(5) barred the petitioner's claim regarding his adjustment-of-status application because it constituted "the first step in

adjusting his status to that of a lawful permanent resident," which was effectively an indirect challenge to his pending removal order. *Id.* at 10.

The two provisions serve similar goals. Section 1252(g) was "clearly designed" to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions through "separate rounds of judicial intervention," outside the process designed by Congress. *AADC*, 525 U.S. at 485. And § 1252(a)(5) was intended to "streamline judicial scrutiny of removal orders by . . . eliminat[ing] the possibility of piecemeal challenges." *Singh*, No. 16-1729, slip op. at 10. Section 1252(g) is thus best read as precluding review of challenges, such as Plaintiffs' here, to a "decision or action" by the agency "to commence proceedings," which encompasses the Rescission Policy.

### B. Plaintiffs Lack Standing to Bring Their Procedural Due Process Claims

Plaintiffs bring two procedural due process claims. First, they contend that the Rescission Policy violates procedural due process because DACA recipients were not sent "individualized written notices" advising them of the October 5, 2017 renewal deadline. TAC ¶¶ 192, 194. Second, MRNY challenges the agency's "implementation of the October 5 deadline" as providing insufficient notice of alleged "specific requirements" for renewal requests and resubmissions, including a "time deadline" for receipt and the possibility that requests rendered untimely due to postal service "delays" or that contain "real or perceived clerical errors" would be rejected. *Id.* ¶¶ 202–04. Both claims should be dismissed, as Plaintiffs lack standing to bring them.

The Court previously concluded that Plaintiffs lacked standing to raise their procedural due process claim regarding an alleged failure to provide "individualized [written] notices" about the October 5, 2017 deadline, noting that the individual Plaintiffs had "not alleged that any of them missed the . . . deadline" and there was no "showing that anyone," including MRNY, "ha[d] been

harmed by a failure to receive notice of the change."  Mem. & Order at 37–38.  Nothing in the

Third Amended Complaint alters that result.  Plaintiffs still point to no individual who missed the

October 5, 2017 deadline due to a lack of notice.  Of the six individual Plaintiffs, five are ineligible

to renew because their current DACA does not expire until at least August 2018, *see* TAC ¶ 42;

*see also id.* ¶¶ 9, 17, 20, 28, and the sixth *had notice* and submitted a timely request, *see id.* ¶ 40.

And while MRNY continues to allege that it was "unable to reach four DACA recipients" to inform

them of the deadline, *id.* ¶ 51, it does not assert that any of those members actually missed the

deadline.  MRNY thus offers no reason for the Court to second-guess its finding that no basis

exists for the "inferences either that those individuals failed to apply for renewal or that such failure

was 'fairly traceable' to Defendants' actions."[2]  Mem. & Order at 37.

Plaintiffs also lack standing to challenge the agency's "implementation of the October 5

deadline," as the injuries on which MRNY (the only named plaintiff for that claim) relies have

been remedied—a point made clear by Plaintiffs' own exhibits.  Plaintiffs allege that nine members

and/or clients of MRNY submitted renewal requests that arrived in the agency's designated post

office lockbox, but which were not physically retrieved until the following day and thus rejected

as untimely.  TAC ¶ 54; *see also id.* ¶¶ 118–19.  As the agency's December 7, 2017 FAQ (attached

as Exhibit M to Plaintiffs' Third Amended Complaint) states, however, the agency will identify

those individuals affected and invite them to resubmit their DACA requests.[3]  TAC Ex. M, Q3.

For those not yet contacted, they may affirmatively reach out to the agency, explain their situation,

and resubmit their request for reconsideration.  *Id.* at Q4.

---

[2] MRNY also lacks standing to raise this claim on behalf of its members, as the Court has already suggested.  *See* Mem. & Order at 37 n.15.  Representational standing requires an organization to show that at least one of its members has standing to sue in his own right.  *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  MRNY fails, however, to name any member who missed the October 5 deadline due to insufficient notice.

[3] The only identified MRNY member allegedly in this situation has already had her renewal request approved.  *See* TAC ¶ 120.

Plaintiffs further allege that the requests of three members and/or clients were subject to "unexpected delivery mail delays" that resulted in their requests "arriv[ing] after October 5" and thus being rejected as untimely. TAC ¶¶ 55, 121. Again, however, the agency's December 7, 2017 FAQs set forth the process applicable to those requests, stating that "USPS is working with USCIS to identify DACA requests that were received after the deadline due to USPS mail-service delays." TAC Ex. M, Q8. After USPS "completes its assessment, identifies such requests, and provides this information to USCIS, USCIS will send affected DACA requestors a letter inviting them to resubmit their DACA request." *Id*.

Finally, Plaintiffs include allegations regarding individuals whose requests were rejected for "real or perceived clerical errors," TAC ¶ 123, but identify only one member of MRNY allegedly in such a situation—specifically, a DHS employee allegedly "misread the date" on the requestor's check and rejected it as "not current." *Id*. ¶¶ 56, 124. The agency has set forth a process for challenging such a rejection—a requestor who believes a request "was improperly rejected" may contact the agency and explain the error believed to have been made. TAC Ex. M, Q7. Identification of "clear error . . . in the processing of [a] renewal request" may result in the agency "exercis[ing] its discretion to review [the] request again."[4] *Id*.

The agency has thus set forth processes by which members and clients of MRNY may challenge the rejections of their renewal requests identified in the Complaint. Accordingly, they lack a cognizable injury-in-fact sufficient to support MRNY's standing to bring its procedural due process claim. At the very least, MRNY's members should be required to pursue those processes before bringing suit in federal court. Exhaustion of available administrative remedies "serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). It "gives an agency 'an opportunity

---

[4] Plaintiffs speculate about requests that were "affected both by mail delays *and* minor clerical errors," TAC ¶ 133 (emphasis added), but identify no MRNY member or client in such a situation and lack standing to bring such a claim.

to correct its own mistakes with respect to the programs it administers'" and facilitates resolution of such disputes "much more quickly and economically . . . than in litigation in federal court." *Id*. (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  Accordingly, the "well established" doctrine of exhaustion of administrative remedies "provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"  *Id*. at 88–89 (quoting *McKart v. United States*, 395 U.S. 185, 193 (1969)).  To the extent that MRNY's members have not yet availed themselves of the processes the agency has provided, Plaintiffs cannot complain about any alleged lack of process.

### C.      MRNY Lacks A Cause of Action Under the APA

The APA does not "allow suit by every person suffering [an] injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 395 (brackets and citation omitted).  Here, no provision of the INA even arguably protects MRNY from bearing any direct or incidental effects of a denial of deferred action. *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).  Accordingly, MRNY lacks a cause of action under the APA.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety for failure to state a claim.

12

A.    **Then-Acting Secretary Duke Rationally Explained Her Decision To Wind Down DACA Given the Imminent Risk of A Nationwide Injunction**

Plaintiffs contend the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.  TAC ¶¶ 177–82.  This claim fails for numerous reasons.

**1.**  As an initial matter, Plaintiffs fail to identify any legal standard that would demonstrate how or why the Rescission Policy is arbitrary or capricious.  Under the APA, an agency's decision is arbitrary and capricious only when the agency "relie[s] on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As the Court noted in its prior Order, however, "Plaintiffs must identify some source of law, other than the APA's 'arbitrary and capricious' standard, against which the court can review their claims" in the context of these considerations.  Mem. & Order at 22.  Plaintiffs fail to do so, which dooms their claim as a facial matter.  The Court has previously suggested that possible "law to apply" would be that applicable to the "legal determination that [DACA] was unlawful."  *Id*.  But as discussed *supra*, then-Acting Secretary Duke did not simply rely on any such determination, but rather, considered a number of factors, including the history of the Texas litigation and the litigation risk it posed.  The sources of law applicable to determining the *legality* of DACA do not provide a standard by which to judge *litigation risk* associated with continuing the policy.

**2.**  Plaintiffs' reliance on the agency's change in policy fails to state a claim under the APA because an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 515 (2009).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better."  *Id.*

Here, the Rescission Policy amply meets the "minimal standards of rationality" required by the APA.  *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).  Plaintiffs do not deny that "the new policy is permissible under the [INA]."  *Fox*, 556 U.S. at 515.  And there are eminently "good reasons for it," *id*., particularly given the litigation risk posed by the proceedings in *Texas*.  In the Rescission Policy, then-Acting Secretary Duke explained that, "[t]aking into consideration the Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy at 4 (AR 255).  After summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Then-Acting Secretary Duke thus concluded that maintaining DACA would, in all likelihood, result in another, potentially disruptive, nationwide injunction.  Then-Acting Secretary Duke was thus "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."  DHS, Press Release, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option."  *Id*.

There is nothing at all irrational about this choice or that explanation.  *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about

subjecting parties to "possible . . . liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. *See Bowman Transp., Inc. v. Ark.- Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"). Then-Acting Secretary Duke balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion," accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She reasonably explained her decision to rescind DACA, and the APA requires no more. No matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary-and-capricious conclusion in light of the fact that the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was likely unlawful.

**3.** Although Plaintiffs acknowledge that then-Acting Secretary Duke's "fear of a hypothetical lawsuit" drove her decision, they contend it was nevertheless arbitrary and capricious because she also considered what they assert was the Attorney General's "legally erroneous claim" that DACA was unlawful. *See* TAC at 2–3. That argument suffers from three independent flaws.

First, then-Acting Secretary Duke did not solely, or even primarily, rely on the Attorney General's September 4 letter for its determination that DACA was unlawful. Rather, she referred to his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent. Rescission Policy at 3 (AR 254). That independent conclusion, based on a reasonable, predictive judgment about litigation risk, is a sufficient basis for upholding then-Acting Secretary Duke's decision, whether or not DACA was actually unlawful. *See Bowman*, 419 U.S. at 286.

15

Second, this Court need not agree that DACA was, in fact, unlawful to uphold the agency's decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General concluded that DACA was unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254).  But those concerns equally support a policy judgment that "deferred action" should "be applied only on an individualized case-by-case basis," and not used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court should sustain the agency's decision based on a reasonable policy judgment that immigration decisions of this sort should be left to Congress.

Third, the Attorney General's conclusion that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*, which was affirmed by the Supreme Court.  The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it.  *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language . . . equates the DACA and DAPA procedure[s]," making DACA an "apt comparator").  Indeed, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself.  *Id*. at 172.  On that score, while "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice:  Because relatively few DACA requests were denied, the

16

Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73.  From these findings, it would follow that DACA (like DAPA) did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's conclusion that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether the Office of Legal Counsel (OLC) was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful,[5] the reasoning in that opinion confirms the invalidity of DACA as implemented in practice, as found by the Fifth Circuit.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that . . . the DACA policy require immigration officials to evaluate each application for deferred action on a case-by-case basis."  OLC Op. at 18 n.8.  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Further, the original DACA policy largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new policy that it approved.

**4.**  Plaintiffs also challenge as arbitrary and capricious the agency's "*change* to the confidentiality of DACA applicant information."  TAC ¶ 179 (emphasis added); *see also id*. ¶¶ 181, 182.  Contrary to Plaintiffs' allegation, however, there has been no change to the agency's information-sharing policy, as Plaintiffs' own exhibits confirm.  In FAQs issued on November 30 and December 7, 2017, the agency made clear that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy."  TAC Ex. M, Q5; *see also id*. Ex. L, Q5.  While the policy "may be modified, superseded, or rescinded at any time"—which "ha[d] always been the case"—nothing

---

[5] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, at 18 n.8 (Nov. 19, 2014) ("OLC Op.").

in the Rescission Policy purports to change it.  *Id.* Ex. M, Q5.  It remains unchanged.

The Court cannot credit Plaintiffs' bare and unsupported allegation that any change actually occurred, especially when their own exhibits flatly contradict such a suggestion.  *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("If a plaintiff's allegations are contradicted by . . . a document [attached to a complaint as an exhibit], those allegations are insufficient to defeat a motion to dismiss."); *see also Meney v. Seterus, Inc.*, No. 13-CV-6149T, 2014 WL 1516583, at *2 (W.D.N.Y. Apr. 17, 2014).  Accordingly, this claim fails.

### B.      The Rescission Policy Is Exempt from Notice and Comment

Plaintiffs miss the mark in arguing that the Rescission Policy constitutes a substantive rule issued without notice and comment.  TAC ¶¶ 172–76; *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori*, so was enacting the policy in the first place.  The DACA Memo was not, however, adopted through notice and comment, so even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy.  That is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing).[6]

In any event, Plaintiffs' claim is erroneous.  A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those

---

[6] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect."  *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule, promulgated after notice and comment, which was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

obligations or requirements—is a legislative rule" that requires notice and comment. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250, 251 (D.C. Cir. 2014). In contrast, "general statements of policy" are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A). A statement of policy simply "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Chrysler Corp. v. Braun*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)), and explains "how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule," *McCarthy*, 758 F.3d at 252.

DHS and the former INS have adopted over twenty deferred action or similar policies over the past fifty years—rarely through notice and comment—because such policies do not constitute substantive rules, but rather are general statements of policy. The Rescission Policy reinforces this point repeatedly. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. It does not deprive any DACA recipients of their current deferred action, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid future grants of deferred action, but instead acknowledges deferred action as "an act of prosecutorial discretion" that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement . . . prerogatives." *Id.* at 2, 6 (AR 253, 256). Importantly, it explains that it "does not . . . create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* at 5 (AR 256). Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible." *Arpaio*, 797 F.3d

19

at 17.[7]

That is as it should be.  An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831. Indeed, DACA was originally adopted in part to set enforcement priorities in view of the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37).  Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied:  it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

## C.      Plaintiffs Fail to State an Equal Protection Claim

Plaintiffs fail to allege the type of clear evidence of discriminatory intent needed to sustain their equal protection claim.  The Supreme Court in *Armstrong* considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim under the Equal Protection Clause.  517 U.S. at 463–64.  The Court recognized that such claims, like the discriminatory-motive claim here, "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  *Id.* at 464 (citations omitted).  A "presumption of regularity supports" such enforcement decisions, and thus, "in the absence of clear evidence to the contrary,

---

[7] The Fifth Circuit's ruling that the adoption of DAPA required notice and comment does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Texas*, 809 F.3d at 178 n.156.  In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio*, and Plaintiffs lack a remedy.

courts presume that they have properly discharged their official duties." *Id.* (citation omitted). To "obtain discovery"—or to survive a motion to dismiss in civil litigation—a claimant alleging discriminatory enforcement must satisfy a "rigorous standard" requiring him to produce (or plausibly allege a rigorous factual basis for) "'evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* at 468 (citation omitted). Additionally, *AADC* underscores that parties shoulder a heavy burden to state a claim that government actors harbored a hidden discriminatory motive.

Plaintiffs fail to carry this heavy burden. As an initial matter, although Plaintiffs assert that the Rescission Policy was "substantially motivated by animus toward Latinos and, in particular, Mexicans," TAC ¶ 198, they offer no factual allegations to establish the existence of any disparate impact on that population as a result of the policy. Plaintiffs simply assert that such a disparate impact exists, *see id.*, but that barebones legal conclusion is not entitled to a presumption of truth on a motion to dismiss. *See Iqbal*, 556 U.S. at 678, 681. Plaintiffs also assert that the Rescission Policy "targets" those groups, TAC ¶ 197, even though the policy draws no distinctions at all based on race or nationality. Nonetheless, Plaintiffs supply no factual support for the purported *impact* of such alleged targeting.[8]

Plaintiffs' predominant factual support for their equal-protection claim comes in the form of allegations about statements by the President before he took the oath of office. *Id.* ¶¶ 89–100. These allegations do not constitute the sort of "clear evidence" of discriminatory motive sufficient to overcome the "significant barrier" to proceeding on the type of equal-protection claim brought by Plaintiffs. *Armstrong*, 517 U.S. at 464. The President's statements—almost

---

[8] Even assuming that such a disparate impact exists, that fact standing alone fails to establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also Armstrong*, 517 U.S. at 459 (refusing to allow discovery in support of a selective enforcement claim despite evidence that in every federal drug case prosecuted within a single year, all twenty-four defendants charged with a drug-trafficking offense were African-American).

all made before he took the oath of office and none made in connection with the Rescission Policy—do not plausibly establish discriminatory intent regarding the actual decision at issue.

In any event, Plaintiffs' focus on statements by the President is misplaced, as they provide no reasonable basis for finding a secret discriminatory motive by the relevant decisionmaker regarding the decision at issue.  None of the alleged statements were made by then-Acting Secretary Duke, who was the only official vested with authority under the INA to make the decision at issue.[9]  *See* 8 U.S.C. § 1103(a)(1).  And none of the allegations included in Plaintiffs' Complaint as evidence of discriminatory "[a]nimus" address the actual decision being challenged—the rescission of DACA.[10]  *See* TAC ¶¶ 89–100.

### D.    Plaintiffs Fail to State a Procedural Due Process Claim

Plaintiffs bring two procedural due process claims.  First, they contend the Rescission Policy violates procedural due process because DACA recipients were not sent "individualized written notices" advising them of the October 5, 2017 renewal deadline.  TAC ¶ 192.  Second, Plaintiff MRNY challenges the agency's "implementation of the October 5 deadline" as violating due process for not providing information regarding alleged "specific requirements" for renewal requests and resubmissions, such as a "time deadline" for receipt of requests and the possibility of that requests rendered untimely due to "delays . . . attributable to the U.S. Postal Service" or that contain "real or perceived clerical errors" would be rejected.  *Id*. ¶¶ 202–04.

As explained above, Plaintiffs lack standing to bring these challenges.  Nonetheless, both

---

[9] Plaintiffs allege that "Defendants Sessions and Trump and the Acting Secretary jointly made the decision to end DACA," TAC ¶ 103, but the identity of the relevant agency decisionmaker is not a question of fact, but rather, a settled issue of law.  *See* 8 U.S.C. § 1103(a)(1).  Consequently, Plaintiffs' assertion cannot be taken as true for purposes of this motion to dismiss.  This Court has interpreted prior statements by counsel for Defendants as making a representation to the contrary, but those statements were not intended to be binding admissions about the *legal* identity of the relevant agency decisionmaker, but merely an acknowledgement of the *factual* (and undisputed) reality that the Attorney General was involved in this decision (as is obvious from the administrative record).

[10] Indeed, certain statements cited by Plaintiffs—like the President's characterization of DACA recipients as "good, educated and accomplished young people," TAC ¶ 110—are inconsistent with their theory of animus.

22

claims fail on their merits for the simple reason that DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections. The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather[,] they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

A benefit "is not a protected entitlement" for due process purposes where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756. For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted). The DACA policy contains, however, no such language, and in fact includes explicit language to the contrary, and the policy is codified in no statute or regulation. Indeed, its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion" that "confers no substantive right." DACA Memo at 2-

23

3 (AR 2-3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'"). In short, under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo). Deferred action through DACA is therefore not a protected entitlement for due process purposes. *See Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action . . . vests the regional commissioner with unfettered discretion . . . it creates no protectible [sic] liberty interest in deferred action").

Plaintiffs' procedural due process claims thus fail as a matter of law. The Due Process Clause does not entitle any DACA recipient to any particular form of notice—"individualized written notices" regarding the October 5 renewal date, notice of a "specific time deadline," or otherwise, TAC ¶¶ 192, 204—before making a discretionary decision to allow for the submission of additional (and wholly discretionary) DACA renewal requests during the wind-down period. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (no individualized, pre-deprivation notice required where a government policy "applies to more than a few people").

Nor do Plaintiffs' remaining allegations set forth a viable claim. They argue that the agency "ignored the postmark dates" for requests that "arrived after October 5" due to delays "attributable to the U.S. Postal Service." TAC ¶¶ 121, 204. But even ignoring the fact that the agency has already announced a remedy for this issue, those requests were properly rejected in accordance with the Rescission Policy, which required that renewal requests be "accepted by the Department as of October 5, 2017," Rescission Policy at 4 (AR 255), and Plaintiffs identify no statute or

24

regulation that entitles them to an exception based on the postmark date of a request or the circumstances of its delivery.  The same is true of Plaintiffs allegations regarding requests rejected based on "real or perceived clerical errors," including those attributable to requestors such as "forgetting to check a box, forgetting to sign or signing in the wrong place, or submitting a check . . . for [an] erroneous amount."  TAC ¶¶ 141, 204.  Plaintiffs possess no protected procedural due process interest in being granted an exception to the October 5, 2017 submission deadline for "renewal applications . . . [that] correct[] or clarif[y] those errors."  *Id.* ¶ 204.  In any event, DHS has now *voluntarily* created a process by which Plaintiffs may obtain the relief they seek here.

**E.   Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required**

Plaintiff MRNY's Regulatory Flexibility Act (RFA) claim fails for the same reasons as Plaintiffs' notice-and-comment claim.[11]  *See* TAC ¶¶ 183–87.  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "when an agency promulgates a final rule under section 553 of . . . title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecomm. Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required.  Because those procedures were not required here, *see supra* § II.B, the RFA does not apply.[12]

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

---

[11] MRNY also lacks standing to raise this claim, as it alleges no facts to establish that it is a "small entit[y]" entitled to seek judicial review under the RFA.  *See e.g.*, *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'").  MRNY's conclusory, legal allegations on this score, *see* TAC ¶¶ 69, 184-85, do not suffice.  *See Iqbal*, 556 U.S. at 678, 681.

[12] If the Court concludes injunctive relief is merited, it should limit any injunction to particular, individual Plaintiffs found to have cognizable claims, for reasons explained in Defendants' prior motion to dismiss.  *See* ECF No. 95.

Dated: December 26, 2017        Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-8576
Fax:  (202) 616-8470
Email:  stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*