## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals.

*Plaintiffs*,

*v.*

KIRSTJEN M. NIELSEN, Secretary of the Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,

*Defendants.*

Case No. 1:16-cv-04756 (NGG) (JO)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.   The Creation of the DACA Program ................................................................. 2

    B.   Defendants' Termination of the DACA Program .............................................. 2

ARGUMENT ..................................................................................................................... 3

   I.    THIS CASE IS JUSTICIABLE ................................................................... 3

    A.   Plaintiffs Have Standing To Bring Their Procedural Due Process Claims. .................. 3

    B.   MRNY Has a Cause of Action Under the APA .................................................. 5

   II.   PLAINTIFFS STATE CLAIMS ON WHICH RELIEF MAY BE GRANTED ............... 7

    A.   The DACA Termination is Arbitrary and Capricious ........................................ 7

    B.   The Duke Memo Is a Substantive Rule Requiring Notice and Comment. ................. 12

    C.   Plaintiffs Properly Plead an RFA Claim. ........................................................ 16

    D.   Plaintiffs Adequately Plead the DACA Termination Violates Equal Protection. ........ 16

    E.   Plaintiffs State a Procedural Due Process Claim. ............................................ 21

    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
   815 F.3d 105 (2d Cir. 2016) .................................................................................. 4

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ............................................................................. 9

*Appalachian Power Co. v. E.P.A.*,
   208 F.3d 1015 (D.C. Cir. 2000) ............................................................................. 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 3, 17

*Augustin v. Sava*,
   735 F.2d 32 (2d Cir. 1984) .................................................................................... 23

*Barrows v. Burwell*,
   777 F.3d 106 (2d Cir. 2015) .................................................................................. 22

*Batterton v. Marshall*,
   648 F.2d 694 (D.C. Cir. 1980) ............................................................................... 13

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
   531 U.S. 356 (2001) .............................................................................................. 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 3

*Bell v. Burson*,
   402 U.S. 535 (1971) .............................................................................................. 23

*Bowman Dairy Co. v. U.S.*,
   341 U.S. 214 (1951) .............................................................................................. 17

*Brown v. City of Oneonta*,
   221 F.3d 329 (2d Cir. 2000) .................................................................................. 17

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ...................................................................................... 8, 9, 11

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .............................................................................................. 16

*Clarke v. Secs. Indus. Ass'n,*
  479 U.S. 388 (1987) ............................................................................... 6

*Cmty. Nutrition Inst. v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) ............................................................. 13

*Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n,*
  673 F.2d 425 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v.*
  *Consumer Energy Council of Am.*, 463 U.S. 1216 (1983) ................................. 15, 16

*Cty. of Los Angeles v. Davis,*
  440 U.S. 625 (1979) ............................................................................... 4

*Darby v. Cisneros,*
  509 U.S. 137 (1993) ............................................................................... 5

*De Jesus Ramirez v. Reich,*
  156 F.3d 1273 (D.C. Cir. 1998) ............................................................. 6

*Degen v. United States,*
  517 U.S. 820 (1996) ............................................................................. 17

*Doe 1 v. Trump,*
  2017 WL 4873042 (D.D.C. Oct. 30, 2017) ........................................... 20

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996) ................................................................. 7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................... 4

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*,
  589 F.2d 658 (D.C. Cir. 1978) ............................................................. 13

*Hayden v. Cty. of Nassau,*
  180 F.3d 42 (2d Cir. 1999) ............................................................. 16, 17

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ........................................................................... 3, 4

*In Re Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016) ............................................................... 23

*Int'l Refugee Assistance Project v. Trump,*
  265 F. Supp. 3d 570 (D. Md. 2017) ..................................................... 20

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554, 601 (4th Cir. 2017) (en banc), *vacated as moot*, 138 S.Ct. 353 (2017)....... 20, 21

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005) ............................................................................. 16

*Kurapati v. USCIS*,
    775 F.3d 1255 (11th Cir. 2014) .............................................................................. 6

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ................................................................................................ 23

*LeBlanc-Sternberg v. Fletcher*,
    67 F.3d 412 (2d Cir. 1995) ..................................................................................... 20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ........................................................................................... 5

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982) ............................................................................................... 23

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ............................................................................... 14

*Main Street Legal Servs., Inc. v. Nat'l Sec'y Council*,
    811 F.3d 542 (2d Cir. 2016) .................................................................................... 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)................................................................................................. 5

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................................... 24

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*,
    545 U.S. 844 (2005) ............................................................................................... 21

*Mexichem Specialty Resins, Inc. v. E.P.A.*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................................................... 10

*Montilla v. I.N.S.*,
    926 F.2d 162 (2d Cir. 1991) .............................................................................. 22, 25

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ............................................................................................... 24

*Nat'l Treasury Employees Union v. Cornelius,*
  617 F. Supp. 365 (D.D.C. 1985) .................................................................... 15

*Nolasco v. Holder,*
  637 F.3d 159 (2d Cir. 2011) ......................................................................... 25

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) (en banc) ........................................................ 9

*Palmore v. Sidoti,*
  466 U.S. 429 (1984) ...................................................................................... 16

*Pickus v. U.S. Bd. of Parole,*
  507 F.2d 1107 (D.C. Cir. 1974) .................................................................... 13

*Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  940 F.2d 679 (D.C. Cir. 1991) ................................................................. 12, 13

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
  Nos. 17-0521, 17-05235, 17-05329, 17-05380, 17-05813, slip op. (N.D. Cal. Jan. 12,
  2018) ........................................................................................................ 14, 18

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
  Nos. 17-0521, 17-05235, 17-05329, 17-05380, 17-05813, 2018 WL 339144 (N.D. Cal.
  Jan. 8, 2018) ......................................................................................... passim

*Rodriguez v. McLoughlin,*
  214 F.3d 328 (2d Cir. 2000) ......................................................................... 23

*Romer v. Evans,*
  517 U.S. 620 (1996) ...................................................................................... 16

*Scenic America, Inc. v. U.S. Dep't of Transp.,*
  836 F.3d 42 (D.C. Cir. 2016) ........................................................................ 15

*SEC v. Chenery Corp.* (*Chenery I*),
  318 U.S. 80 (1943) ........................................................................................ 12

*Spinelli v. City of New York,*
  579 F.3d 160 (2d Cir. 2009) ......................................................................... 23

*Strouchler v. Shah,*
  891 F. Supp. 2d 504 (S.D.N.Y. 2012) .......................................................... 24

*Syracuse Peace Council v. F.C.C.,*
  867 F.2d 654 (D.C. Cir. 1989) ...................................................................... 11

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) ........................................................................................ 11, 12

*Toussie v. Town Bd. of East Hampton*,
   874 F. Supp. 2d 135 (E.D.N.Y. 2012) ................................................................................ 19

*Tufariello v. Long Island R.R. Co.*,
   458 F.3d 80 (2d Cir. 2006) .................................................................................................. 18

*U.S. ex rel. Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) ....................................................................................... 15

*U.S. Gypsum Co. v. Muszynski*,
   161 F. Supp. 2d 289 (S.D.N.Y. 2001) ................................................................................ 13

*United Mine Workers of Am. v. U.S. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ................................................................................................ 9

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ............................................................................................................ 25

*United States v. Armstrong*,
   517 U.S. 456 (1996) ............................................................................................................ 17

*United States v. Copeland*,
   376 F.3d 61 (2d Cir. 2004) .................................................................................................. 23

*United States v. Texas*,
   136 S. Ct. 2271 (2016) ........................................................................................................ 11

*Victory v. Pataki*,
   814 F.3d 47 (2d Cir. 2016), *as amended* (Feb. 24, 2016) ............................................ 22, 23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................................ 20

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche L.L.P.*,
   549 F.3d 100 (2d Cir. 2008) ................................................................................................ 18

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ............................................................................................ 21

*Yuen Jin v. Mukasey*,
   538 F.3d 143 (2d Cir. 2008) ................................................................................................ 23

**Statutes**

5 U.S.C. § 551 ........................................................................................................ 15

5 U.S.C. § 553 ........................................................................................................ 16

5 U.S.C. §§ 601–612 .............................................................................................. 16

8 U.S.C. § 1103 ........................................................................................................ 8

8 U.S.C. § 1324 ........................................................................................................ 6

**Other Authorities**

Josh Dawsey, *Trump Attacks Protections for Immigrants From 'Shithole' Countries*, Wash. Post (Jan. 11, 2018), goo.gl/T7Wxja ............................................................................... 19

Oral Argument, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 14, 2017), http://www.ca2.uscourts.gov/decisions/isysquery/76fe6da8-ebaf-4dc5-b7ae-8f67f4b6856b/10/doc/17-3345%202.mp3 ................................................................ 9

USCIS, Consideration of Deferred Action for Childhood Arrivals – How to Renew DACA, https://www.uscis.gov/videos/consideration-deferred-action-childhood-arrivals-how-renew-daca (last updated Sept. 5, 2017) .................................................................... 22

**Rules**

Fed. R. Civ. P. 26 ................................................................................................... 17

Fed. R. Crim. P. 16 ................................................................................................. 17

Fed. R. of Evid. 201 ............................................................................................... 19

**INTRODUCTION**

Defendants' cruel decision to terminate Deferred Action for Childhood Arrivals ("DACA") has thrown millions of lives into turmoil. It also violates procedural and substantive requirements of the Administrative Procedure Act ("APA") and the Constitution. Defendants offer no reasoned explanation for their action, only empty pretextual statements intended to mask their intention to carry out the President's anti-Mexican and anti-Latino agenda, and to achieve a wish list of hardline campaign promises on immigration. Unlawful and unreasoned agency behavior of this magnitude, and on such scant reasoning, cannot escape the thorough and searching review mandated by Congress and our Constitution. Plaintiffs have pleaded facts more than sufficient to establish that Defendants' termination of DACA was arbitrary and capricious; lacked in process required by the APA, the Regulatory Flexibility Act ("RFA"), and the Constitution; and was substantially motivated by racial animus.

Defendants cannot justify their illegal conduct with post-hoc rationalizations, none of which validate the DACA Termination. Nor can they evade the APA's and RFA's procedural requirements by pretending that the Duke Memo does not bind the agency, when it is plainly a substantive rule for which notice-and-comment rule-making is mandatory. Plaintiffs have also adequately pleaded claims that Defendants' termination of DACA was impermissibly motivated by discriminatory animus and that Defendants wrongfully deprived thousands of individuals who timely submitted renewal applications, including members and clients of Plaintiff Make the Road New York, of fair consideration of their applications for deferred action. Defendants' motion to dismiss should be denied.

## BACKGROUND

### A.    The Creation of the DACA Program[1]

On June 15, 2012, then-Secretary of the Department of Homeland Security ("DHS") Janet Napolitano issued a memorandum creating DACA ("2012 DACA Memo"), which directed DHS to "exercise [its] discretion" by considering applications for deferred action "on an individual basis" to young people who satisfied specific eligibility criteria. Pls.' Third Am. Compl., Ex. A, ECF No. 113 [hereinafter "TAC"]. Since its creation, DACA has transformed the lives of nearly 800,000 individuals who have relied on the program to pursue educational and career opportunities, support their family members, and live without fear of being separated from their homes. TAC ¶¶ 81–82.

### B.    Defendants' Termination of the DACA Program

On September 5, 2017, Attorney General Sessions announced the DACA Termination. TAC, Ex. F. Later that day, then-Acting Secretary Duke issued the Duke Memo, which directed DHS officials to categorically reject all initial requests for deferred action received after September 5, 2017, and all renewal applications from recipients whose deferred action expires after March 5, 2018. TAC ¶ 104, Ex. E. The Memo also required that renewal applications from those whose deferred action expired on or before March 5, 2018 be received by DHS no later than October 5, 2017. *Id.* Defendants rejected nearly 4,000 renewal applications due to problems with United States Citizenship and Immigration Services ("USCIS") lockboxes, unreasonable delays by the U.S. Postal Service, and minor clerical errors, whether by the government reviewer or by the applicant. *See* TAC ¶¶ 203–04, Ex. H. Nearly 22,000 DACA recipients[2] did not meet the October

---

[1] A fuller description of the facts is set forth in Plaintiffs' motion for preliminary injunction. *See* Pls.' Mem. in Support of Prelim. Inj. 2–9, ECF No. 123-1 ("PI Mot.").
[2] The term "DACA recipient" refers to any individual who received deferred action through DACA.

5 deadline. *See* Ex. A. As a result, about 122 people lose their deferred action status under DACA each day. *Id.* On March 5, that number will rise to 915 people daily. *See* Ex. B.

## ARGUMENT[3]

### I.    THIS CASE IS JUSTICIABLE[4]

#### A.    Plaintiffs Have Standing To Bring Their Procedural Due Process Claims.

Make the Road New York ("MRNY") has standing, on behalf of itself, its members and clients, to challenge Defendants' violations of procedural due process. Defendants refused to consider the renewal applications of thousands of DACA recipients because of unusual mail delays and minor clerical errors, and without providing adequate notice of the grounds for rejection. TAC ¶¶ 114–18, 123–25. To plead associational standing, MRNY must establish that one of its members has standing for this claim, that the affected members' interests are germane to MRNY's organizational purpose, and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). MRNY satisfies these requirements. Defendants' purported voluntary cessation of improper conduct neither remedies nor moots their ongoing due process violations. Nor is MRNY required to exhaust any further administrative remedies. Defendants' motion to dismiss this claim for lack of standing must be rejected.

MRNY has identified specific members and clients who have been harmed by the government's procedural due process violations, including Ms. Rivas, whose renewal application Defendants rejected for a perceived clerical error, Taylor Decl. ¶¶ 48–58; Jhonathan Meruvia, whose application Defendants rejected because one page was inadvertently omitted, *see id.* ¶¶ 59–

---

[3] Plaintiffs assume this Court's familiarity with the legal standards for Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[4] In light of this Court's order certifying its November 9 Memorandum and Order for interlocutory appeal, Plaintiffs do not restate their response to Defendants' renewed jurisdiction and justiciability arguments.

67; and several members and clients whose applications Defendants rejected because of postal delays, TAC ¶¶ 121–22. These injuries are sufficient to establish the individual members' standing. *See Hunt*, 432 U.S. at 342–43. Defendants do not contest that immigration relief is germane to MRNY's organizational purpose or that the relief sought—a change in policy for USCIS to provide process to unfairly denied renewal applicants—does not require participation of individual plaintiffs. For these reasons, MRNY has standing to pursue the new procedural due process claim.[5]

Defendants nonetheless argue that MRNY lacks standing on these claims because Defendants' subsequent voluntary remedial efforts—taken after Plaintiffs' counsel raised these concerns—moot the claims. *See* Defs.' Mot. to Dismiss TAC 25 [hereinafter "MTD"] (claiming a process exists). This argument fails on both factual and legal grounds.

As a legal matter, "[t]he voluntary cessation of challenged conduct will not 'ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'" *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016). Accordingly, these claims are only mooted by Defendants' voluntary conduct if they can carry the "heavy burden" of persuading the Court it is "absolutely clear that the allegedly wrongly behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000), and that their efforts have "completely and irrevocably eradicated the effects of the alleged violation," *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *accord Am. Freedom Def. Initiative*, 815 F.3d at 109. Defendants scarcely attempt to carry, and fail to meet, these burdens.

Nor have Defendants even ceased the challenged conduct, as a factual matter. Defendants

---

[5] Plaintiffs restated their Fourth Claim for Relief, the separate procedural due process claim for inconsistent notice, TAC ¶¶ 188–94, to preserve it for appeal, but recognize that this Court's November 9 Memorandum and Order requires dismissal here.

purport to have created a process for applicants to report mistaken rejections by lockbox staff, but MRNY members, clients, and countless others have received no recourse from these claimed procedures. Undersigned counsel have repeatedly written requesting action on the improperly rejected applications of numerous individuals, *see* Taylor Decl. Ex. A, B, C, D, but Defendants have failed to agree to adjudicate most of these. This is true for applications delayed by postal mishaps as well as for those Defendants wrongly rejected for clerical errors, like that of Ms. Rivas. TAC ¶ 124, Ex. J. Even the plain text of Defendants' recently adopted procedures reveals that, if USCIS determines an application contained an actual, but easily correctible, clerical error, applicants have no process for recourse at all. TAC ¶ 133. Defendants' representations that their process for mistaken rejections factually addresses Plaintiffs' claim are simply misleading, and cannot be credited at a motion to dismiss stage.

Defendants' final argument, that Plaintiffs should have exhausted their claims through administrative remedies, also fails. MTD 11–12. Under § 704 of the APA, individuals are required to exhaust administrative remedies only where a statute or agency rule explicitly requires exhaustion through an inter-agency appeal. *Darby v. Cisneros*, 509 U.S. 137 (1993). That is not the case here, as Defendants do not and cannot point to any statute or agency rule requiring an inter-agency appeal prior to filing an APA claim.

### B.   MRNY Has a Cause of Action Under the APA.

The interests of MRNY, as well as of its members and clients, fall squarely within the zone of interests protected by the Immigration and Nationality Act ("INA"), such that MRNY has a cause of action under the APA.[6] Despite clear support for MRNY's claim to relief, *see* Pls.' Opp.

---

[6] A plaintiff has a cause of action as long as its interest is "arguably . . . protected or regulated" by the relevant statute. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation omitted). In light of the "generous review provisions of the APA," courts take a "lenient approach" to the zone of interests test in APA suits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014).

to Defs.' Mot. to Dismiss 16–18, ECF No. 102, Defendants continue to disregard applicable provisions of the INA and mischaracterize the test for a valid cause of action under the APA.

The interests of noncitizen members and clients of MRNY are clearly "regulated by" the provisions of the INA.[7] MRNY's thousands of clients and over 21,000 dues-paying members include current DACA recipients and those potentially eligible for deferred action under DACA. TAC ¶¶ 48–57. Because of the DACA Termination, these individuals are at imminent risk of losing, or have already begun to lose, work authorization, critical access to health-care services, educational and professional opportunities; and protection from deportation. *See* TAC ¶¶ 82, 85; 8 C.F.R. § 274a.12(c)(14). These interests—identical to those of the individual DACA Plaintiffs whose causes of action go unchallenged by Defendants—are plainly within the zone of interests of the INA. *See Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 401–03 (1987) (determining that an association has a cause of action because its members fall within the zone of interests); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, Nos. 17-0521, 17-05235, 17-05329, 17-05380, 17-05813, 2018 WL 339144, at *15–16 (N.D. Cal. Jan. 8, 2018).

MRNY is also within the INA's zone of interests by virtue of its status as an employer of DACA recipients. MRNY currently has twelve employees who will lose their work authorization under DACA, *see* TAC ¶ 50, forcing MRNY to either fire these employees or risk criminal and civil penalties. *See* 8 U.S.C. §§ 1324(a)–(c). MRNY's relationships with its DACA-recipient employees are regulated by the INA, putting the organization squarely within that statute's zone

---

[7] *See generally Kurapati v. USCIS*, 775 F.3d 1255, 1261 (11th Cir. 2014) (holding that even if the INA was intended to benefit American employers and protect jobs for American citizens, Congress also "acted with the intent to regulate or protect immigrants' interests"); *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998) ("[A]liens are obviously regulated by the [INA]").

of interests. *See Regents*, 2018 WL 339144, at *16–17.[8]

## II.   PLAINTIFFS STATE CLAIMS ON WHICH RELIEF MAY BE GRANTED

### A.   The DACA Termination is Arbitrary and Capricious.

Plaintiffs allege facts sufficient to support a claim that Defendants' termination of DACA is arbitrary and capricious. *See, e.g.*, TAC ¶¶ 81–88, 101–59. As Plaintiffs argue at length in their Motion for a Preliminary Injunction, Defendants have failed to adequately explain the reasons for terminating DACA; failed to provide a reasoned explanation for their policy reversal, which was particularly necessary in light of the serious reliance interests at stake; failed to consider all relevant factors, including DACA's benefits and alternatives to terminating it; relied on an erroneous legal conclusion to end the program; and have proffered pretextual reasons for ending DACA that indicate bad faith. *See* Pls.' Mem. 10–28; *see also Regents*, 2018 WL 339144, at *17–26. In moving to dismiss this claim, Defendants now provide reasons and reasoning that appear nowhere in the Duke Memo. They argue that an agency's invocation of "litigation risk" essentially precludes meaningful APA review, and then claim Attorney General Sessions' conclusion that DACA was unlawful is irrelevant to whether the Termination is arbitrary and capricious. MTD 13–15. These arguments are wholly unsupported by the case law.

#### 1.   *Litigation Risk Cannot Justify Defendants' Actions.*

This Court has already rejected Defendants' argument that terminating DACA was an attempt to avoid potentially imminent litigation and any "disruption" for DACA recipients it might bring. *Compare* Mem. & Order 22, ECF No. 104, *with* MTD 14. Even if this reason were not an

---

[8] Defendants' reliance on *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), is unavailing. MTD 12. Unlike MRNY, the would-be plaintiffs in that case—an anti-immigrant organization and its Miami-resident members—were in no way directly regulated by the INA, and only claimed injury from the "generic negative features of immigration," such as an allegedly crowded employment market. *Reno*, 93 F.3d at 902. MRNY's interests and those of its members, by contrast, are directly regulated by the INA, providing MRNY with a cognizable cause of action under the APA.

illicit post-hoc justification, Defendants' "litigation risk" argument is groundless.

First, Defendants' litigation-risk justification is a post-hoc rationalization rightly repudiated by this Court. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (under the APA, courts may not "accept appellate counsel's post hoc rationalizations for agency action"). The Duke Memo says nothing about an intent to "minimiz[e] disruption to recipients," MTD 1, nor does it elucidate the purportedly "self-evident complexities" associated with ending DACA, MTD 8, as Defendants now claim. To support their purported rationale, Defendants cite to a press release that was not even included in the administrative record. *See* MTD 14; *Regents*, 2018 WL 339144, at *25 ("This press release came after the fact and was not part of the administrative record, and therefore cannot now rescue the agency."). The Duke Memo itself states, quite opaquely, that upon "consideration [of] the Supreme Court's and the Fifth Circuit's rulings . . . and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." TAC, Ex. E. To the extent that she could have been suggesting litigation risk, it is only to quote Attorney General Sessions' letter speculating on the "likely" result of "potentially imminent litigation." *Id.* Yet then-Acting Secretary Duke also quotes the Attorney General's statement that DACA was "unconstitutional," a conclusion of law she was required to accept under the INA. *See* 8 U.S.C. § 1103(a)(1); *see also Regents*, 2018 WL 339144, at *23 (Defendants' "litigation risk" argument is "foreclosed by the INA itself"). Indeed, then-Acting Secretary Duke never provides a reasoned explanation for why it is "clear" DACA "should be terminated." TAC, Ex. E.[9] To conclude from the administrative record that she indeed meant

---

[9] This Court has repeatedly sought explanation of Defendants' representation at an early conference that Attorney General Sessions made the decision to end the DACA program, including as to the details of the termination of DACA. *See, e.g.,* ECF 104 at 8 n.4. Now, the Defendants admit that these statements were an accurate reflection of the "*factual* (and undisputed) reality" of the Attorney General's involvement in the DACA Termination. MTD at 22. They contend, however—and without any support whatsoever—that the factual reality should be subordinated to a

"litigation risk" would be to "substitute . . . counsel's discretion," which the Court cannot do. *Burlington*, 371 U.S. at 169; *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] 'fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.'").

Second, even if the Court were to entertain Defendants' "litigation risk" rationale, it does not pass muster under the APA. Affirmatively terminating a nationwide program to stave off possible judicial termination of that program makes no rational sense.[10] An agency making policy based on litigation risk "deliberately trade[s] one lawsuit for another." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (finding litigation risk an inadequate reason for the agency action); *see also United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004). Instead of avoiding litigation, Defendants have precipitated over ten lawsuits challenging the DACA Termination across the country. Far from preventing turmoil, Defendants' decision has disrupted both the lives of these young Americans and the agency's internal functions. This assumes, moreover, that Defendants made a proper litigation-risk calculation, which they did not. Defendants failed to consider the differences between DACA and DAPA, to weigh litigation risk against other policy considerations like the benefits and reliance interests DACA had generated, or to consider alternatives to terminating the program altogether. *See Regents*, 2018 WL 339144, at *24 (finding the "litigation-management

---

legal fiction based only on the official with statutory authority to make the decision, even if, as Defendants concede, that official did not alone exercise that authority. *See* MTD 22. This Court should reject Defendants' attempts to obscure the "factual" decision making process with their preferred legal fiction. *See* Pls.' Mem. in Support of Prelim. Inj., ECF 123-1 at 27–28.

[10] Judge Lynch aptly illustrated the irrationality behind Defendants' claimed reason for terminating DACA. *See* Oral Argument at 10:37–10:55, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 14, 2017), http://www.ca2.uscourts.gov/decisions/isysquery/76fe6da8-ebaf-4dc5-b7ae-8f67f4b6856b/10/doc/17-3345%202.mp3 ("If the litigation risk is the risk that the program will be terminated . . . I'm not sure I understand—what is the risk? It's like saying, well if I go this course, there's a forty percent chance that I'm going to drown, so I'll just drown myself." (Lynch, J.)).

assessment" constituted "serious error" and does not pass muster under arbitrary and capricious review); *see also* Pls.' Mem. 21–22.

Accepting Defendants' position would effectively insulate all agency action from meaningful judicial review. Indeed, Defendants claim as much, stating that because litigation risk motivated the DACA Termination there is no "law to apply" to its decision. According to Defendants, agencies can circumvent APA requirements simply by stating that they fear a lawsuit, without identifying the legal ground on which the agency action is vulnerable or explaining why that vulnerability requires wholesale rescission, and without regard to reasons that weigh *against* rescission (such as the reasons the agency itself gave when adopting the challenged policy). That is simply not the law. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("If an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter.").[11]

### 2. *Defendants' mistake in concluding DACA is unlawful is relevant.*

Defendants pivot from their claim that DACA is unlawful, instead arguing that determining "whether or not DACA was actually unlawful" is irrelevant to whether the DACA Termination was arbitrary and capricious. MTD 16. But Defendants' determination regarding the lawfulness of DACA was central to the DACA Termination, notwithstanding their attempts to invent post-hoc policy rationales. Moreover, this determination is based on legal error, including improper reliance on a distinguishable and non-controlling case. *See Regents*, 2018 WL 339144, at *17 (holding the

---

[11] Defendants have likewise failed to provide a reasonable explanation for the alteration to their information-sharing policy. First, in light of Defendants' inconsistent statements on the changes to this policy, the Court should not take their most recent unsworn representation that there has been "no change" to it on face value. This is particularly true given the continued differences between the original policy, which restricted sharing *any* information except in limited circumstances, to what Defendants now claim is the same policy, which restricts only *proactively* sharing information except for the same circumstances. *See* Pls.' Mem. 15 n.8; TAC ¶¶ 155–56, 179, 181. Second, even if Defendants have actually reverted to the prior policy, such action constitutes a classic case of voluntary cessation that does not moot Plaintiffs' claim. *See supra* Part I.A.

DACA Termination not in accordance with law "because it was based on the flawed legal premise that the agency lacked authority to implement DACA").

Defendants' attempt to cast Attorney General Sessions' conclusion that DACA was "an unconstitutional exercise of authority by the Executive Branch," AR 251, as both a constitutional *and* a "policy judgment" strains reason. MTD 16. The Administrative Record contains *no* basis for counsel's contention that concerns about DACA's constitutionality "equally support a policy judgment," *id.* The Court must reject Defendants' request that it divine a policy justification post-hoc when none was provided at the time the decision was made. *See Burlington Truck Lines*, 371 U.S. at 168. Furthermore, Defendants' argument that courts should analyze an agency's constitutional reasoning as a "policy judgment" is unsupported by law. The one case Defendants cite refutes this proposition. *See* MTD 16, *Syracuse Peace Council v. F.C.C.*, 867 F.2d 654, 659 (D.C. Cir. 1989) ("Of course, if the Commission had written its opinion in purely constitutional terms, we would have no choice but to address the constitutional issue.").

Next, Defendants' reliance on the Fifth Circuit's decision in *Texas v. United States* to bolster the Sessions Letter is entirely misplaced.[12] *See Regents*, 2018 WL 339144, at *22 ("the DAPA litigation was not a death knell for DACA" because DAPA interfered with an existing INA scheme and applied to four times as many individuals). It cannot be correct, as Attorney General Sessions' Letter claims, that "the DACA policy has the same legal and constitutional defects" as DAPA, AR 251, because no court has "recognized" any constitutional defects with DAPA. *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) ("We decide this appeal . . . without resolving the

---

[12] Defendants' statement that the Supreme Court "already held that [DAPA] was likely unlawful," MTD 15, is misleading. The Court merely left in place the Fifth Circuit's decision by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016), in a non-precedential decision which is not binding on the Second Circuit.

constitutional claim."). Moreover, contrary to Defendants' conclusory assertion, MTD 3, DACA

is materially distinguishable from DAPA. The Fifth Circuit's legal determination regarding DAPA

would not be applicable to DACA because it relies on a feature present only in the former: DAPA

was available only to persons with U.S. citizen or Lawful Permanent Resident children. *Id.* at 178–

86. Unlike DACA recipients, DAPA-eligible individuals were already subject to a "an intricate

process . . . to derive a lawful immigration classification from their children's immigration status"

in the INA. *Id.* at 179; *see also Regents*, 2018 WL 339144, at *22 ("An important criticism against

DAPA would not apply against DACA, namely the fact that Congress had already established a

pathway to lawful presence for alien parents of citizens."). DAPA was deemed unlawful because

of this alleged interference with the existing statutory scheme, not because of any similarity to

DACA. In fact, the Fifth Circuit took care in its decision not to conflate the DACA and DAPA

programs. *See Texas*, 809 F.3d at 173–74 (stating "[a]ny extrapolation from DACA must be done

carefully" and "DACA and DAPA are not identical"). Defendants' arguments distract from (but

do nothing to undermine the fact the DACA Termination was based on legal error, which makes

it arbitrary and capricious, which Plaintiffs have adequately alleged. *See, e.g.*, *SEC v. Chenery

Corp.* (*Chenery I*), 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has

misconceived the law.").

## B.   The Duke Memo Is a Substantive Rule Requiring Notice and Comment.

Plaintiffs have adequately pleaded the Duke Memo violates the APA's notice-and-

comment requirements. Substantive (or "legislative") rules "are ones treated as binding by the

agency." *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*, 940 F.2d 679, 682 (D.C. Cir.

1991). The Duke Memo creates a substantive rule by directing DHS to categorically deny all new

applications for deferred action from individuals who fit the original DACA eligibility criteria

received after September 5, 2017, and any renewal applications received after October 5, 2017.

TAC ¶ 104. The DACA Termination is thus a substantive rule, and Defendants failed to undergo the notice-and-comment procedures required by the APA. *See* TAC ¶¶ 102, 174–75.

In moving to dismiss this claim, Defendants make two arguments: that the Duke Memo is a statement of general policy exempt from the APA's notice-and-comment requirements; and that if the Duke Memo were a substantive rule it would make the Napolitano Memo one as well, making DACA "void *ab initio*" and "leaving Plaintiffs without a remedy." MTD 16–18. Both arguments fail.

First, the Duke Memo's binding language and effects make it a substantive rule. The key distinction between substantive rules and "general statements of policy" is "the agency's intent to be bound." *Pub. Citizen*, 940 F.2d at 681–82. Where an agency acts to narrowly restrict the discretion its officials otherwise would be free to exercise, and does so in a manner that binds those officials, that action is a substantive rule. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("[C]abining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule.").[13] To determine whether an action is a general statement of policy or a substantive rule, courts examine first the text of the statement itself. If "inconclusive," courts consider the agency's "actual applications" of the statement. *Pub. Citizen*, 940 F.2d at 682. If a "so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C. Cir. 1978).

---

[13] *See also, e.g.*, *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980) ("[Substantive rules] narrowly constrict the discretion of agency officials by largely determining the issue addressed."); *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974) (instruction directing use of weighted criteria in parole determinations was not a "general statement[] of policy" where the action had a "substantial effect" on ultimate parole decisions and "defin[ed] a fairly tight framework to circumscribe [a parole board's] statutorily broad power."); *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289, 291–92 (S.D.N.Y. 2001) ("such boilerplate [language] cannot render an otherwise final and binding agency action non-final and non-binding.").

Attempting to paint the Duke Memo as an "exercise [of] enforcement authority . . . adjudicate[d] . . . on an individual, case-by-case basis," Defendants misleadingly quote it to alter its actual meaning. MTD 19. The quoted "individual, case-by-case basis" language refers only to the narrow set of deferred action (and renewal) requests that the Duke Memo permits USCIS officials even to *consider*—initial requests *already pending* on September 5, 2017, and renewal requests (for a subset of DACA recipients) received by October 5, 2017. *See* TAC, Ex. E. The Memo goes on to provide that all requests falling outside the narrow parameters it sets out will be "rejecte[d]." *Id.* The language could not be clearer—or more clearly binding.[14]

Were that not enough, Defendants' application of the Duke Memo further confirms it is a substantive rule. Defendants concede they "rejected" renewal applications "in accordance with the [Duke Memo]," on the sole basis that the applications arrived after the October 5 deadline. MTD 24. Those rejections—of which there were at least 4,000, *see* TAC, Ex. H; *see also* TAC ¶¶ 118–19, 121–28, 134—illustrate the Memo's binding nature. Defendants admit the Memo directs agency officials to reject deferred-action requests from those previously eligible under DACA, *see* MTD 24, and cannot deny that agency officials are bound to act in accordance with it. As such, Defendants' observation that the Duke Memo "does not categorically forbid future grants of deferred action," MTD 18, irrelevant to whether it is a substantive rule.[15]

---

[14] Although the court in *Regents of the University of California* dismissed those plaintiffs' notice-and-comment claim, that court's reliance on *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987), to do so is misplaced. In *Mada-Luna*, the Ninth Circuit held an agency policy setting forth factors for it to consider in evaluating deferred action applications could be amended without notice and comment, and that both the initial policy and its subsequent amendment constituted general policy statements. *Id.* at 1014–17. *Mada-Luna* had no opportunity to address whether an agency action that "contains mandatory language on its face" and establishes a "binding norm" can nevertheless be excused from notice-and-comment procedures. That is exactly what the court in *Regents* concedes the Duke Memo does. *Regents*, slip op. at 4 (N.D. Cal. Jan. 12, 2018). Further, Plaintiffs here allege that the DACA Termination leaves no discretion, which requires notice and comment even when the policy being repealed is a non-substantive rule. *Parco*, 426 F. Supp. 976. For this reason, the *Regents* court's reasoning should not hold sway with this Court.

[15] Defendants also point to language in the Duke Memo indicating it was issued pursuant to the Secretary's statutory authority to set "immigration policy and priorities," as well as the Memo's boilerplate disclaimer, but neither is

Defendants "void *ab initio*" argument fares no better. Even if Defendants believed the 2012

DACA Memo was a substantive rule, which it was not,[16] that would not justify repealing it without

notice and comment. The APA's notice-and-comment requirement applies to "formulating,

amending, *or repealing*" a substantive rule. 5 U.S.C. § 551(5) (emphasis added). No exception

exists for substantive rules the agency belatedly claims were improperly promulgated. By the

APA's plain text, even if the 2012 DACA Memo were a substantive rule, the agency was required

to go through notice and comment to repeal it, whether or not it went through that process when

issued. *See Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425,

448 (D.C. Cir. 1982) ("[T]he argument that repeal was required because the regulations were

defective does not explain why notice and comment could not be provided."), *aff'd sub nom.*

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).[17] As

courts have recognized, such an exception would permit an agency to circumvent APA

_____

relevant to whether the Duke Memo created a binding rule, and Defendants do not articulate an argument to the contrary. *See, e.g.*, *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (inclusion of boilerplate language does not exempt agency action from notice-and-comment requirements where other factors show establishment of substantive rule); *Scenic America, Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) (same, where document represents final action "from which legal consequences will flow.").

[16] The contention that the 2012 DACA Memo and the Duke Memo are either both substantive rules or both general policy statements is simply wrong. The 2012 DACA Memo provided guidance to DHS officials on how to exercise their prosecutorial discretion, similar to all other group-based deferred-action programs, which Defendants concede are general statements of policy. *See* MTD 19. The Duke Memo, in contrast, specifies dates after which agency officials are prohibited from exercising any discretion. It is simply incorrect that the Duke Memo's binding nature converts the 2012 DACA Memo—a classic example of a general statement of policy—into a substantive rule. *See also U.S. ex rel. Parco v. Morris*, 426 F. Supp. 976, 984–85 (E.D. Pa. 1977) (repeal of agency guidance that removed agency discretion was a substantive rule subject to notice and comment even though original guidance had been issued without notice and comment).

[17] Defendants maintain that *Consumer Energy Council*, MTD 18 n.6, does not apply here, because in that case, the rule rescinded was initially promulgated after notice and comment. MTD 18 n.6. Defendants' argument fails. First, under the clear text of the APA, where an agency promulgates a substantive rule—such as the Duke Memo—an agency cannot evade notice and comment except in narrow circumstances not applicable here. *See* 5 U.S.C. § 553(b). Here, the agency did not include any finding of "good cause" that would exempt it from notice and comment. *Id.* Second, the basic reasoning of *Consumer Energy Council*, 673 F.2d at 447 n.79, still applies. In circumstances where an agency *creates* a substantive rule by repealing a prior policy, the agency cannot evade APA procedures. *See, e.g.*, *Nat'l Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985) ("It would significantly erode the usefulness of the APA if agencies were permitted unilaterally to repeal regulations . . . by declaring that the earlier regulations were just a mistake."); *see also Consumer Energy Council*, 673 F.2d at 447 n.79 (observing that "the question whether the regulations are indeed defective is one worthy of notice and an opportunity to comment").

15

requirements by unilaterally asserting a rule was improperly promulgated. *See, e.g.*, *id.* at 447 n.79. In addition to creating perverse incentives, such a rule would undermine the APA's values of democratic accountability, transparency, and fair play. *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

### C.     Plaintiffs Properly Plead an RFA Claim.

As Defendants rightly concede, MTD 25, if this Court holds Plaintiffs adequately plead a notice-and-comment claim, it follows Plaintiffs sufficiently plead a claim under the RFA, 5 U.S.C. §§ 601–612. Defendants' challenge to MRNY's standing under the RFA lacks merit. MTD 25, n.11. MRNY needs only allege it is a "small entity" under the Act, including that it is a non-profit, independently owned and operated, and not dominant in its field. MRNY's allegations are more than sufficient to meet this standard. TAC ¶¶ 45–46, 69, 185. Defendants make no argument for why MRNY does not meet this standard, nor could they.

### D.     Plaintiffs Adequately Plead the DACA Termination Violates Equal Protection.

Plaintiffs sufficiently plead that Defendants' DACA Termination violates the Fifth Amendment because it was substantially motivated by animus[18] toward, and will have a disparate impact on, Latinos and Mexicans. TAC ¶¶ 196–98. Intentional governmental discrimination on the basis of race and national origin violates equal protection. *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). A plaintiff may establish an equal protection violation by showing a "facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."

---

[18] "Animus" in this context does not require a showing of hatred or malice. As Justice Kennedy has observed, "[p]rejudice . . . rises not from malice or hostile animus alone." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). In addition to hatred, factors including stereotypes, fears, and private bias can constitute unconstitutional "animus," as can a mere desire to harm a particular disfavored group. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 633–35 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

*Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).[19] Plaintiffs have alleged so here.

Defendants first improperly import a standard from a case involving discovery in criminal proceedings to argue that Plaintiffs' claim is subject to a heightened pleading requirement. *See* MTD 20–21 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). But the "clear evidence" standard and the "presumption of regularity" articulated in *Armstrong* do not apply in the present context. *Armstrong* involved a plaintiff seeking discovery in a *criminal* selective-prosecution case, rather than a defendant seeking to dismiss a *civil* action. 517 U.S. at 458–59.[20] To survive a motion to dismiss, a court need find only that the factual allegations in the complaint are sufficient to support the necessary legal conclusions and that they plausibly suggest an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).[21] *Armstrong* has no relevance to this motion.

Defendants next argue Plaintiffs fail to demonstrate that then-Acting Secretary Duke harbored "a secret discriminatory motive" in terminating DACA. MTD 22. But as Defendants themselves concede, the Acting Secretary was not—as a matter of *fact*—the sole decision maker, MTD 22 n.9, and there is nothing in the administrative record even claiming the decision was hers. In fact, the President himself has said the decision was his, *see* Pls.' Mem. 27–28, and there is nothing "secret" or "hidden" about the President's desire to discriminate against Latinos and Mexicans.

---

[19] Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse effects* upon an identifiable group." *Hayden*, 180 F.3d at 50.

[20] Rule 16 of the Federal Rules of Criminal Procedure provides a highly circumscribed right to discovery in criminal cases, *see Bowman Dairy Co. v. U.S.*, 341 U.S. 214, 218–19 (1951), in contrast to the expansive right to discovery in civil litigation, *see* Fed. R. Civ. P. 26; *Degen v. United States*, 517 U.S. 820, 825–26 (1996) ("[a] criminal defendant is entitled to rather limited discovery," compared to that available in civil litigation).

[21] Any presumption of regularity properly attributable to *Armstrong* is now part of the *Iqbal* plausibility standard, *see Main Street Legal Servs., Inc. v. Nat'l Sec'y Council*, 811 F.3d 542, 564–65 (2d Cir. 2016), and in any event is more than rebutted by the allegations in the TAC.

The allegations of animus toward Latinos and Mexicans in the TAC are sufficient to withstand Defendants' motion to dismiss.[22] Throughout his presidential campaign, then-Candidate Trump made racially charged statements against Latinos and Mexicans, building support for his anti-immigrant agenda. TAC ¶¶ 89–100. Since June 2015, the President has characterized Latinos and Mexicans as "criminals," further generalizing that Mexicans are "bringing drugs [and] crime. They're rapists." TAC ¶¶ 90–91. He made inflammatory remarks about a U.S. District Judge of Mexican ancestry for his heritage, stating "He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings—rulings that people can't even believe." TAC ¶ 96. As President, he referred to undocumented immigrants as "animals" during a speech in August 2017, TAC ¶ 97, and has continued to characterize the undocumented Latino community as criminals and gang members, TAC ¶ 99.[23] And even if President Trump's expressions of racial animus "were not about the [DACA] rescission . . . they still have relevance to show animus against people south of our border." *Regents*, Nos. 17-05211, 17-05235, 17-05329, 17-05380, 17-05813, slip op. at 11 (N.D. Cal. Jan. 12, 2018). Defendants cite nothing to support their implied contention that the President's discriminatory intent can effectively be laundered by being implemented by an agency under his control.

---

[22] Indeed, one court has already properly rejected Defendants' motion to dismiss an indistinguishable equal protection claim, finding the plaintiffs "raise[d] a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA." *Regents*, Nos. 17-05211, 17-05235, 17-05329, 17-05380, 17-05813, slip op. at 12 (N.D. Cal. Jan. 12, 2018).

[23] Even though after the DACA Termination was announced President Trump tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs," TAC ¶ 110, this inconsistency does not nullify his previous slew of racially hostile statements. A UCLA study found that President Trump utilizes paralipssi and pre-emption rhetorical devices "to make strongly negatively claims about immigrants while insisting that he's 'fair' and 'fair-minded.'" Ex. F. His positive statements toward recipients of deferred action through DACA do not undermine the fact that its termination was motivated by racial animus. Moreover, this Court must read any ambiguities in the complaint in the light most favorable to the complaining party, and draw all reasonable inferences therefrom. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche L.L.P.*, 549 F.3d 100, 106 (2d Cir. 2008); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006); *Regents*, slip op. at 12 (N.D. Cal. Jan. 12, 2018) ("That President Trump has at other times shown support for DACA recipients cannot wipe the slate clean as a matter of law at the pleading stage.").

Defendants' attempt to disavow the Trump Administration's discriminatory intent particularly fails in light of the President's recent statements and actions.[24] On December 29, 2017, the President tweeted: "The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our Country at all cost!" Ex. C. This tweet connects terminating DACA to the Administration's plan to build a wall on the U.S.-Mexico border, a campaign promise that was advanced by racialized stereotypes of Mexicans and Latinos. It also demonstrates that President Trump's past statements supporting a legislative solution for DACA were pretextual, Ex. D, and that the Administration continues to use DACA recipients as bargaining chips to advance his anti-immigrant agenda, further dehumanizing these individuals for political gain. Additionally, President Trump has reportedly stated Haitian immigrants "all have AIDS," and Nigerian immigrants would never "go back to their huts." Ex. E. As recently as January 11, 2018, when he was asked about extending temporary protected status to immigrants from Haiti, El Salvador, and African countries, President Trump reportedly asked, "Why are we having all these people from shithole countries come here?" and went on to suggest that the United States instead should bring in more immigrants from Norway. Ex. G. These statements—which do not include the myriad bigoted remarks the President has made about other minority groups, such as Muslims, Native Americans, and transgender individuals— demonstrate that even after he took office, the President has continued his racially charged and discriminatory rhetoric against immigrants. Indeed, courts have recognized he has impermissibly

---

[24] Plaintiffs respectfully request this Court to take judicial notice of these facts pursuant to Federal Rules of Evidence 201(b)(2), as this fact is not subject to reasonable dispute since it can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned. *See Toussie v. Town Bd. of East Hampton*, 874 F. Supp. 2d 135, 142 (E.D.N.Y. 2012) (courts may "rely on matters of public record" in deciding a motion to dismiss).

adopted policies based on discriminatory animus.[25]

President Trump's clear discriminatory intent is sufficient to establish that Plaintiffs have adequately pleaded an equal protection violation, but it is nonetheless noteworthy that Attorney General Sessions, a key decision-maker in the DACA Termination, has also made discriminatory remarks regarding Latinos. For example, in April 2017, he referred to immigrants crossing the southern border as "filth." TAC ¶ 100. And when announcing the DACA Termination he falsely claimed DACA "contributed to a surge of unaccompanied minors on the southern border," and that it "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." TAC ¶ 108.  In these statements, Attorney General Sessions directly linked DACA to "terrible humanitarian consequences." *Id.*

Defendants contend, without authority, that the above statements are insufficient to plead an equal protection claim because the President's statements were made before he took the oath of office and that no statements are attributed to then-Acting Secretary Duke. MTD 21–22. Contrary to these assertions, Plaintiffs are permitted to rely on the historical background of the challenged decision, the sequence of events leading up the decision, contemporary statements of decision makers, and the position taken by those to whom the decision makers were knowingly responsive, to determine whether racial animus was a motivating factor in the decision. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977)*. Furthermore, it is appropriate for the Court to find that an official who responds to directives from biased superiors is enacting racial bias. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (finding the

---

[25] *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 601 (4th Cir. 2017) (en banc) (Candidate Trump's anti-Muslim statements supporting likelihood of success on Establishment Clause challenge to second Muslim ban), *vacated as moot*, 138 S.Ct. 353 (2017); *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 617, 628-29 (D. Md. 2017) (same, as to the third Muslim ban); *Doe 1 v. Trump*, 2017 WL 4873042, at *32 (D.D.C. Oct. 30, 2017) (plaintiffs likely to succeed on equal protection challenge to ban on military service by transgender persons).

position taken by those to whom the decision makers were knowingly responsive can assist in a showing of animus). Both the Ninth and Fourth Circuits have found it appropriate to consider President Trump's campaign statements as proof of a discriminatory motive for implementing his promised Muslim ban. *See Washington v. Trump*, 847 F.3d 1151, 1167-68 (9th Cir. 2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 601 (4th Cir. 2017); *see also McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) ("But the world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show."). This Court may properly consider Candidate Trump's campaign rhetoric and Attorney General Sessions' discriminatory statements in determining the plausibility of Plaintiffs' allegations.

In addition, Plaintiffs have provided sufficient factual allegations that terminating DACA has a disparate impact on Latinos, particularly those of Mexican descent. TAC ¶ 197; *contra* MTD 21. USCIS itself has published numerous statistics that confirm this argument. As of September 4, 2017, 548,000 individuals of Mexican origin had deferred action through DACA, constituting 79.4 percent of all active DACA recipients. *See* Pls.' Class Certification Mot., Ex. A, Attach. 2, ECF No. 124-2. Terminating DACA is guaranteed to harm hundreds of thousands of Latinos, particularly those of Mexican origin.

### E.    Plaintiffs State a Procedural Due Process Claim.

Plaintiffs' detailed allegations of the violations of the procedural due process rights of MRNY members, clients, and other putative class members, whose timely renewal applications Defendants improperly rejected, are sufficient to state a claim for relief. A procedural due process inquiry generally follows a two-step process. A court "first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so [it] ask[s] whether the procedures

followed by the State were constitutionally sufficient." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quotation marks omitted). Plaintiffs' allegations, that they hold a protected interest and that the process Defendants provided for renewal applications is inadequate, clearly establishes a claim under the Due Process Clause.

The Duke Memo announced that approximately 150,000 young people who had received deferred action through DACA suddenly had only one month to resubmit their DACA renewal forms or lose access to the program entirely.[26] As a result, individuals seeking to renew their deferred action through DACA raced to collect their documents and scrounged or fundraised the hundreds of dollars in applications fees to submit before the October 5 deadline. Defendants nevertheless rejected thousands of renewal applications that DACA recipients mailed well in advance of the deadline: some arrived late due to postal delays; others were delivered on October 5 but were collected by Defendants only on October 6; and still others were delivered *before* October 5 but rejected due to alleged clerical errors, without time to resubmit by the deadline. TAC ¶¶ 54–56, 117–25, 127–28, 132–34; TAC, Ex. I.[27] This confusing and arbitrary treatment of renewal applicants denied thousands of young persons the "fundamental notions of fair play underlying the concept of due process." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991).

### 1. The Complaint Plausibly Alleges Protected Liberty And Property Interests.

The due process clause protects liberty and property interests to which a person has a "legitimate claim of entitlement," *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015), arising either "directly from the Due Process Clause itself or from statutes, regulations, or policies enacted

---

[26] *See* TAC ¶¶ 104, 111.

[27] In some cases, the mistakes resulted from USCIS's own instructional materials. Some individuals submitted a fee of $465, rather than the new fee of $495. TAC ¶ 141. However, USCIS's website still contains an instructional video noting the earlier $465 fee. *See* USCIS, Consideration of Deferred Action for Childhood Arrivals – How to Renew DACA, at 2:22–24, 4:11–24, https://www.uscis.gov/videos/consideration-deferred-action-childhood-arrivals-how-renew-daca (last updated Sept. 5, 2017).

by the [government]," *Victory*, 814 F.3d at 59. Plaintiffs have properly pleaded protected liberty and property interests regarding the DACA Termination. DACA recipients have at least two sets of liberty and property interests that the government's defective procedures impaired: consideration for deferred action, and the inherent liberties granted by the due process clause.

First, individuals whose deferred action expired before March 6, 2018, held a legitimate claim of entitlement based on the Duke Memo that they would be considered for deferred action if USCIS received their renewal application by October 5. The Memo was clear: USCIS "*will* adjudicate" renewal applications from these individuals, and "will reject" all other applications. TAC, Ex. E (emphasis added). There was no suggestion that minor errors, insufficient under past USCIS processes to render an application "improperly filed," would disqualify timely received renewal applications resubmission, nor that Defendants would refuse to consider timely submitted but late-delivered or late-collected applications. TAC ¶¶ 54–56, 117–25, 127–28, Ex. I.[28]

Second, the loss of DACA implicates well-established liberty interests embodied in the due process clause. *See Victory*, 815 F.3d at 59. These include the interests in pursuing one's chosen career;[29] preservation of family ties;[30] presence in the United States;[31] and driver licensing[32]. Each of these interests is sufficient to require constitutionally adequate process.

-----

[28] This interest is analogous to the long-recognized property interest in a cause of action, which attaches despite the uncertainty of eventual relief. *See In Re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429–30 (1982). This interest is not extinguished, as Defendants suggest, because a grant of DACA is discretionary or reversible in the future. In the immigration context, the Second Circuit similarly recognized that Congress created a protected interest in the ability to petition for asylum, despite the discretionary nature of the underlying decision. *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984); *see also Yuen Jin v. Mukasey*, 538 F.3d 143, 161 n.1 (2d Cir. 2008) (Sack, J., concurring) ("[E]very asylum applicant is nonetheless entitled to due process in establishing her eligibility for that form of relief."); *see also United States v. Copeland*, 376 F.3d 61, 71–73 (2d Cir. 2004) (holding that failure to inform noncitizen facing deportation of right to seek discretionary relief is fundamentally unfair). The Duke Memo likewise promised that this set of DACA recipients was entitled to an adjudication.

[29] TAC ¶¶ 16, 21–22, 30-31, 39, 43, 82, 122, 136-40; *Spinelli v. City of New York*, 579 F.3d 160, 172 (2d Cir. 2009).

[30] TAC ¶¶ 11, 19, 22–23, 32, 36, 44; *Rodriguez v. McLoughlin*, 214 F.3d 328, 337 (2d Cir. 2000).

[31] *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

[32] TAC ¶¶ 23, 29, 82, 122, 151; *Bell v. Burson*, 402 U.S. 535, 539 (1971).

## 2.  *Defendants Deprived DACA Renewal Applicants of Adequate Process.*

Plaintiffs adequately plead that the government's implementation of the October 5 deadline was procedurally deficient, whether this Court looks to the fundamental requirements of procedural due process or applies the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "An elementary and fundamental requirement of due process in any proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiffs plead that USCIS misled applicants about the renewal application requirements by, for example, sending a notice inviting many applicants to resubmit materials that were rejected for minor errors, *see* TAC, Ex. I, only to ultimately reject those resubmissions as untimely, TAC ¶ 127. Nor was there notice to DACA recipients that delivery of their renewal application after a certain *time* of day would prevent consideration of their renewal application. TAC ¶ 117. Finally, maintaining incorrect information about the proper fee ($465 versus $495) on USCIS's website rendered notice of the fee amount inadequate under the *Mullane* standard. *See Strouchler v. Shah*, 891 F. Supp. 2d 504, 520–21 (S.D.N.Y. 2012) (conflicting notices undermine the notice's ability to "apprise" the individual and "increase the probability that a recipient will erroneously lose her benefits").

Defendants' procedures regarding clerical errors and postal/collection delays likewise fail the *Mathews* balancing test, which requires courts to consider the private and governmental interests at stake, the risk of an erroneous deprivation, and the probable value of additional or substitute procedural safeguards. *Mathews,* 424 U.S. at 335. Plaintiffs plead in detail the private interests affected by Defendants' inadequate policies, yet Defendants fail to identify the burdens or other interests that weigh against, for instance, applying a postmark rule to the October 5 deadline or allowing the resubmission of applications rejected for minor errors. Defendants'

policies increased the risk that eligible renewal applicants who applied before USCIS's arbitrary deadline had their applications rejected.

### 3.    *Defendants Violated Their Own Procedures.*

The government's refusal to consider resubmitted applications that had been denied because of minor errors also violates the due process because procedural due process requires that agencies must abide by their own policies and regulations, particularly where deviations therefrom would prejudice individuals. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954); *see also Montilla*, 926 F.2d at 166–67 (explaining that this theory of procedural due process "is not limited to rules attaining the status of formal regulations," and can include unpublished internal procedures). As Plaintiffs have alleged, the history of DACA's administration and USCIS' explicit invitations to resubmit applications with minor errors (be they real or merely perceived) demonstrate that USCIS had a policy of not rejecting applications solely on that basis.  *See* TAC ¶ 123, Ex. I.  Yet, in the very last month of DACA's existence— the very time when adherence to this policy mattered *most*—USCIS deviated from it, rejecting DACA renewal requests for minor (and sometimes illusory) clerical errors, many of which were a direct result of the extreme rush to file that the Duke Memo created.  *See* TAC ¶¶ 114–34. These deviations plainly prejudiced individuals; their direct result deprived individuals of the opportunity to have two more years of deferred action and work authorization. These pleadings are sufficient for Plaintiffs' due process claim to move forward.  *See, e.g.*, *Nolasco v. Holder*, 637 F.3d 159, 163 (2d Cir. 2011) (holding that noncompliance with agency policies prejudicing plaintiffs or inhibiting fundamental rights state a procedural due process claim).

### CONCLUSION

For the aforementioned reasons, this Court should deny Defendants' Motion to Dismiss.

/s/ Michael J. Wishnie
Dated: January 13, 2018

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern
Healy Ko, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (MA 9360)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq. (SF 9452)
Alexia Schapira, Esq. (AS 8222)
Natalia Renta, Esq.[†]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
Trudy S. Rebert, Esq.[†*]
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[†] Motion for pro hac vice forthcoming
* Admitted only in Louisiana, application pending in New York