# EXHIBIT A

 Center for American Progress

≡

IMMIGRATION

# Thousands of DACA Recipients Are Already Losing Their Protection From Deportation

By Tom Jawetz and Nicole Prchal Svajlenka   |   Posted on November 9, 2017, 6:00 am



AP/Reed Saxon

A ch  d s ts on a man s shou ders among demonstrators  n favor of Deferred Act on for Ch  dhood Arr va s dur ng a protest at the h stor c P aza de Los Ange es on September 5, 2017.

Each day that Congress delays acting on the Dream Act from now until March 5, 2018, approximately 122 people will lose their Deferred Action for Childhood Arrivals (DACA) protection. That is 851 people each week, and more than 7,900 since the announcement. The logic behind this number is straightforward: The 22,000 eligible DACA recipients who did not successfully apply to renew their DACA will, as a result, see their DACA protections expire in the 181 days between September 5, 2017 and March 5, 2018.

DACA has allowed nearly 800,000 young people who came to the United States as children to live, work, and study without fear of detention and deportation. When President Donald Trump terminated the program on September 5, 2017, he gave the 154,000 DACA recipients whose protections were set to expire between then and March 5, 2018, just 30 days to submit costly and arduous renewal applications. The administration presented its phase out approach as the "least disruptive" way forward and claimed that it would afford Congress six months to take action before current DACA recipients began to lose protection.

But the reality is that with every passing day, DACA recipients lose their protections and become vulnerable to a regime of enforcement overdrive. Shortly after the October 5 deadline, the U.S. Department of Homeland Security announced that 22,000 DACA recipients did not meet the Trump administration's arbitrary deadline for renewal. Much as the administration is currently attempting to sabotage open enrollment for Affordable Care Act coverage by shortening the enrollment period and pulling back from promotional efforts, the administration did nothing to encourage eligible DACA recipients to ensure that their renewal applications were received on or before October 5. Moreover, it ignored bipartisan requests to extend the enrollment period, particularly for people in hurricane stricken areas like Texas and Florida.

## Estimated number of young people that have lost DACA since September 5, 2017

 osing DACA comes with profound consequences.

Without DACA these young people will no longer be protected from detention and deportation. This is especially worrisome given that DACA recipients entrusted the federal government with personal identifying information for themselves and their family members long before the Trump administration expanded its deportation priorities to cover just about any unauthorized immigrant. In fact, months before the Trump administration terminated DACA it had already arrested and detained a series of DACA recipients, including Daniel Ramirez Medina, Riccy Enriquez Perdomo, and Daniela Vargas.

Once their DACA expires, these young people will lose their work authorization and likely be forced out of employment. The largest survey of DACA recipients found that 91 percent of those with DACA were employed. Losing their jobs will have repercussions for DACA recipients that reverberate with their families and their employers who will incur at least $3.4 billion in turnover costs.

Another consequence of losing DACA is that many of these young people will lose their access to a driver's license. While DACA recipients may obtain driver's licenses in every state, licenses are only available to the larger unauthorized population in 12 states and the District of Columbia.

Lastly, without DACA many young people will face new barriers to pursuing higher education. While at least 20 states offer in state tuition to unauthorized immigrants, other states extend in state tuition only to DACA recipients. Losing the ability to pay in state tuition could make it extremely difficult for some to afford tuition and enroll in the upcoming spring semester. One such state is Virginia. Ángel Cabrera, president of Virginia's George Mason University, estimates that, once their DACA expires, between 150 and 300 currently enrolled students may be unable to afford tuition and be forced to leave the university.

By March 5, 2018, approximately 22,000 DACA recipients already will have lost status and face the challenges listed above. But that number will only be the beginning. Come March 6, 2018, the number of people losing DACA each day will significantly increase, until no protections remain for the nearly 800,000 Dreamers who have been making enormous contributions since they first received DACA.

When members of Congress and the president talk about delaying consideration of the Dream Act until some time in the future, they are not only playing with the fears and anxieties of hundreds of thousands of DACA recipients who stand to lose protection beginning in March, but are discounting the real harms already taking place for tens of thousands of DACA recipients. Advocates that regularly call upon Congress to pass the #DreamActNow are focused not only on averting the crisis ahead of us, but also preventing the ongoing crisis from getting any worse.

*Tom Jawetz is the vice president of Immigration Policy at American Progress. Nicole Prchal Svajlenka is a senior policy analyst of Immigration Policy at American Progress.*



Center for American Progress

© 2018 - Center for American Progress

# EXHIBIT B



# Fact Sheet

November 2017

# A Profile of Current DACA Recipients by Education, Industry, and Occupation

By Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps

**DACA FACTS**

## Executive Summary

Amid years of protracted congressional gridlock over immigration reform, the Obama administration in 2012 created the Deferred Action for Childhood Arrivals (DACA) program to offer work authorization and a temporary reprieve from deportation to certain unauthorized immigrants brought to the United States as children. Implemented through executive action, DACA was viewed by critics as an unconstitutional overreach of presidential authority, and the Trump administration announced in September 2017 that it would wind down the program.

While approximately 793,000 unauthorized immigrants have ever received DACA status since the program was launched on August 15, 2012, nearly 690,000 were current recipients as of September 4, 2017, according to U.S. Citizenship and Immigration Services (USCIS), which stopped accepting new applications the following day. Program participants will continue to retain their protections until their two-year DACA grant expires—a date that will vary by individual based on when status was initially received or renewed.

*Data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-participating population.*

Using a unique Migration Policy Institute (MPI) methodology that assigns legal status in U.S. Census Bureau data, thus permitting the modeling of the size and characteristics of certain foreign-born groups including unauthorized immigrants, this fact sheet provides new data on key characteristics of DACA holders. Among the indicators examined: recipients' educational attainment, school enrollment, labor force participation, industries, and occupations. MPI previously released analysis of some of these characteristics for the DACA-*eligible* population,[1] but data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-*participating* population.

With DACA holders set to begin losing their protection in growing numbers starting early next year—MPI estimates about 915 people on average will fall out of DACA status each day beginning March 6, 2018—there is growing momentum in Congress to find a legislative solution for the population of young unauthorized immigrants referred to as DREAMers.

Among the fact sheet's top findings:

- DACA recipients are almost as likely as U.S. adults in the same age group (15-32) to be enrolled in college (18 percent versus 20 percent), but less likely to have completed college (4 percent versus 18 percent). Forty-four percent of DACA holders



have completed secondary education, but not enrolled in college. Another 20 percent remain in secondary school.

- Among DACA participants, women are more likely than men to be enrolled in college (20 percent versus 15 percent), but less likely to be working (48 percent versus 64 percent).

- Fifty-five percent of DACA holders are employed, amounting to 382,000 workers. They account for 0.25 percent of all U.S. workers. Most DACA participants (62 percent) who are not in the labor force are enrolled in school.

- One out of three DACA recipients who are enrolled in school also work—a rate roughly equivalent to that of the U.S. young adult population.

- DACA holders are much less likely than young unauthorized immigrants who are not eligible for deferred action to work in construction jobs and are more likely to work in office support jobs, showing that DACA can be a means to occupational mobility.

- There are about 9,000 DACA recipients employed as teachers or similar education professionals, and another 14,000 in health-care practitioner and support jobs.

- While MPI estimates an average 915 individuals will fall out of DACA status daily beginning in March, the peak period will be in January – March 2019, when around 50,000 individuals a month will lose their DACA protections. MPI projects that all recipients will have lost status by early March 2020.

The estimates of DACA holders' characteristics offered here, as well as earlier MPI modeling of the populations that could be covered under several legalization scenarios introduced in Congress,[2] could help inform the ongoing debate over the future of these unauthorized immigrants who came to the United States as children.

## I.   Introduction and Methodology

For more than a decade, Migration Policy Institute (MPI) researchers have offered estimates and described characteristics of the population of unauthorized immigrants referred to as DREAMers: those brought to the United States as children, and who have been largely educated in this country, with many now in the workforce. Following creation of the Deferred Action for Childhood Arrivals (DACA) program in 2012,[3] MPI has described the population potentially eligible to apply, via a number of publications and data tools.[4]

In 2017, MPI researchers estimated that 1.3 million unauthorized immigrants met all the eligibility requirements to apply for DACA;[5] 897,605 ultimately did apply as of June 30, 2017, for an application rate of 68 percent.[6]

As with the earlier MPI research, the findings in this fact sheet draw upon a unique MPI methodology that permits estimation of the unauthorized population meeting the criteria to apply for the DACA program, as well as their demographic and other characteristics. The method combines data from two U.S. Census Bureau datasets: a pooled five-year file of the American Community Survey (ACS), which contains detailed characteristics of noncitizen populations at national and state levels, and the Survey of Income and Program Participation (SIPP), which includes data identifying which noncitizens are legal permanent residents and which are not.[7] MPI uses the legal status information in the SIPP to identify noncitizens who are likely to be unauthorized in the ACS—which does not collect legal status information—and in turn identifies unauthorized immigrants who are DACA-eligible based on their age, year of U.S. entry, and educational attainment.[8]

This fact sheet first examines the rate at which current DACA recipients are expected to lose their status under the program termination outlines announced by the Trump administra-

## Fact Sheet

tion on September 5, 2017. It then uses a revised dataset of DACA-eligible immigrants—reweighted to the participating population by age, gender, origin country, and state of residence in 2017—to provide national and state-level portraits of DACA holders on additional characteristics such as education, industry, and occupations, which are either not collected or not released by U.S. Citizenship and Immigration Services (USCIS).[9]

Understanding the characteristics of DACA recipients is important to assess the impact of the loss of work authorization—and potential deportation—of students and middle- and high-skilled workers in schools, universities, businesses, and immigrant communities.

## II.   Losing DACA Protections: A Timeline

A total of 793,026 unauthorized immigrants were approved for DACA status between the program's launch on August 15, 2012 and June 30, 2017, according to the most recent data provided by USCIS.[10] Of these, nearly 689,800

(or 87 percent) still participated in the program as of September 4, 2017[11]—the day before the Trump administration announced a six-month wind-down of the program.[12] On September 5, USCIS stopped accepting applications from new applicants and restricted renewal to participants whose DACA eligibility would expire by March 5, 2018—six months later. October 5 was the last day renewal applications were accepted. According to the latest media accounts, USCIS estimated that 21,000 to 22,000 of the 154,000 individuals eligible to renew their status had failed to do so as of October 19, while 132,000 to 133,000 did apply for renewal.[13] Unless Congress, the administration, or federal courts take further action, DACA participants will begin to lose their status starting March 6, 2018.

MPI forecasts that on average approximately 915 DACA holders will lose their work authorization and protection from deportation each day between March 6, 2018 and March 5, 2020. When these immigrants fall back into unauthorized status and lose their work authorization, some employers may be forced to lay them off, and some may find themselves identified for deportation. Figure 1 shows the number of DACA holders expected to see their protections end by

**Figure 1. Predicted DACA Expirations from March 2018 through March 2020**



*Notes:* Expirations are based on U.S. Citizenship and Immigration Services (USCIS) reported data for March 2018 through August 2019 and Migration Policy Institute (MPI) estimates derived from USCIS data for September 2019 through March 2020. MPI's estimates assume that the distr bution of expirations from September 2019 through March 2020 matches the distr bution of renewal applications from September 2017 through March 2018, and that everyone who applied for renewal would be approved for benefits for a two-year period starting in the month when their prior eligibility period expired.
*Sources:* MPI calculations based on U.S. Citizenship and Immigration Services (USCIS) administrative data; USCIS, "Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)," accessed October 19, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_renewal_data.pdf.



month over this two-year period. The numbers are based on USCIS reporting that goes through August 2019 and MPI estimates of who is expected to lose protection from September 2019 onward through March 2020.

## III. Education and Labor Force Profile of Current DACA Participants

This section discusses the education and labor force characteristics of unauthorized immigrants participating in the DACA program as of September 2017. To develop these estimates, the researchers employed USCIS administrative data released in September on DACA participants by age, gender, origin country, and state of residence, and used these data to reweight MPI's database on the DACA-eligible population to provide a more refined view of those holding the status as of September 2017.[14]

### A.   The Educational Profile of Current Recipients

DACA has an educational requirement: to qualify for the program, participants must either be in school[15] or hold a high school diploma or GED. Yet DACA holders are somewhat less educated than the overall U.S. population of similar ages (15 to 32). MPI estimates that 20 percent of DACA participants are still enrolled in secondary school (see Table 1). Forty-four percent have completed secondary education but have not pursued a college education at the time of the survey, compared to 19 percent among the broader U.S. population of similar age. Additionally, 18 percent of DACA recipients have enrolled in college, but have not yet graduated. Four percent have completed a bachelor's degree versus 17 percent of the broader U.S. population. The overall U.S. population, however, includes 9 percent who had dropped out of high school, while the DACA program excludes high-school dropouts unless they were enrolled in an adult education program.[16]

**Table 1. Educational Attainment and School Enrollment of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

| Education and Enrollment Status | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
| | | Total | Female | Male |
| **Total** | **78,108,000** | **689,800** | **362,700** | **326,900** |
| Not enrolled and have not completed high school (%) | 9 | N/A | N/A | N/A |
| Enrolled in secondary school (%) | 19 | 20 | 20 | 20 |
| Completed high school and not in higher education (%) | 19 | 44 | 41 | 47 |
| Enrolled in college (%) | 20 | 18 | 20 | 15 |
| Completed some college, not enrolled (%) | 16 | 15 | 15 | 15 |
| Completed at least a bachelor's degree (%) | 17 | 4 | 4 | 3 |

*Note:* "N/A" refers to the fact that virtually all current DACA participants have either completed high school or are currently enrolled—consistent with the program's education requirement. Secondary school includes middle school and high school. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

## Fact Sheet

For school enrollment rates for the 34 states with the most DACA holders, see Appendix 1.[17]

Women participating in DACA are more likely to be enrolled in college than men (20 percent versus 15 percent) but have similar college completion rates (see Table 1.)

### B.    The Workforce Status of Current Recipients

Most DACA participants work, but they represent a very small share of the U.S. labor force. The majority of DACA participants (64 percent) are in the labor force: 55 percent are working, and 8 percent are unemployed and looking for work (see Table 2). The 442,000 DACA recipients in the labor force amounted to 0.27 percent of the total U.S. labor force of 161 million people in September 2017.[18]

Many DACA participants are enrolled in school—either secondary school or college—and one out of three enrollees attends school and works at the same time, similar to the U.S. young adult population (see Table 2). Among those not enrolled in school, 69 percent are employed, and 22 percent are not in the labor force.

DACA-recipient men are more likely to be employed than women (64 percent versus 48 percent), reflecting a pattern similar to the overall unauthorized population.[19] Most of this gender gap in employment occurs among those who are not enrolled in school: 81 percent of men holding DACA status work, compared to 58 percent of women. Some female DACA holders, like other young women, are likely to be out of school and out of the labor force due to child-care responsibilities. Lack of English skills could also be a barrier to their employment, as women with DACA status who are not in school

**Table 2. School Enrollment and Employment Rates of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

|  | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
|  |  | Total | Female | Male |
| **Total Number** | 78,108,400 | 689,800 | 362,700 | 326,900 |
| Employed (%) | 57 | 55 | 48 | 64 |
| Unemployed (%) | 9 | 8 | 8 | 8 |
| Not in labor force (%) | 35 | 36 | 44 | 27 |
| **Number Enrolled in School** | 33,303,500 | 261,200 | 145,100 | 116,100 |
| Employed (%) | 37 | 33 | 32 | 34 |
| Unemployed (%) | 7 | 8 | 8 | 8 |
| Not in labor force (%) | 56 | 59 | 60 | 58 |
| **Number Not Enrolled in School** | 44,804,900 | 428,600 | 217,600 | 210,800 |
| Employed (%) | 71 | 69 | 58 | 81 |
| Unemployed (%) | 10 | 9 | 9 | 9 |
| Not in labor force (%) | 19 | 22 | 33 | 11 |

*Notes:* School enrollment includes those in middle school, high school, or college. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients as of September 4, 2017. Percentages may not add up to 100 percent due to rounding.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.



and not in the labor force are more likely to have limited English proficiency than DACA men out of the labor force: 44 percent versus 32 percent.

See Appendix 2 for employment rates for the DACA population, both in and out of education, for the 34 states with the greatest numbers of participants.

### C. Major Industries and Occupations of Employment

DACA participants work in a wide variety of industries and occupations, including many in professional jobs. They are less likely than unauthorized workers who do not have DACA to work in outdoor, manual labor occupations such as construction.

1.   Top Industries of Employment

The most common industries of employment for DACA recipients are hospitality, retail trade, construction, education, health and social services, and professional services (see Table 3). Twenty-three percent of the estimated 382,000 employed DACA recipients (89,000 workers) are employed in the hospitality industry, i.e., arts, entertainment, recreation, accommodations, and food services. Fourteen

**Table 3. Employed Current DACA Recipients, by Major Industry Group**

|  | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** |  |  |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Industry Group** | **382,400** | **100** |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 88,900 | 23 |
| Retail Trade | 54,000 | 14 |
| Construction | 41,300 | 11 |
| Educational, Health, and Social Services | 40,700 | 11 |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 39,000 | 10 |
| Manufacturing | 36,100 | 9 |
| Other Services (except public administration) | 23,900 | 6 |
| Agriculture | 14,400 | 4 |
| Finance, Insurance, Real Estate, and Rental and Leasing | 13,600 | 4 |
| Wholesale | 11,300 | 3 |
| Transportation and Warehousing | 9,600 | 3 |
| Information and Communications | 4,100 | 1 |
| Public Administration | 2,300 | <1 |
| Mining | <2,000 | <1 |
| Utilities | <1,000 | <1 |
| Armed Forces | <500 | <1 |

*Note:* Major industry groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.

## Fact Sheet

percent (about 54,000) are employed in retail trade, while 11 percent (41,000) are employed in construction and a similar number in the education, health, and social services industry. One-tenth (39,000) are employed in professional scientific, management, administrative, and waste management services. Thus, DACA recipients are employed in a broad range of sectors, including many in industries with substantial numbers of professional jobs. Industry-level

**Table 4. Employed Current DACA Recipients, by Major Occupational Group**

| | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** | | |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Occupational Group** | **382,400** | **100** |
| Food Preparation and Serving | 59,500 | 16 |
| Sales | 53,500 | 14 |
| Office and Administrative Support | 47,000 | 12 |
| Construction | 38,700 | 10 |
| Building and Grounds Cleaning and Maintenance | 32,300 | 8 |
| Production | 31,200 | 8 |
| Transportation and Material Moving | 26,400 | 7 |
| Management | 14,200 | 4 |
| Personal Care and Service | 14,000 | 4 |
| Farming, Fishing, and Forestry | 12,300 | 3 |
| Installation, Maintenance, and Repair | 10,800 | 3 |
| Education, Training, and Library | 8,800 | 2 |
| Health-Care Support | 8,600 | 2 |
| Health-Care Practitioners and Technical | 5,300 | 1 |
| Arts, Design, Entertainment, Sports, and Media | 3,500 | <1 |
| Business Operations Specialists | 2,800 | <1 |
| Computer and Mathematical | 2,600 | <1 |
| Protective Service | 2,300 | <1 |
| Financial Specialists | 2,200 | <1 |
| Architecture and Engineering | <2,000 | <1 |
| Community and Social Services | <2,000 | <1 |
| Life, Physical, and Social Science | <1,500 | <1 |
| Legal | <1,000 | <1 |
| Extraction | <1,000 | <1 |
| Military Specific | <500 | <1 |

*Note:* Major occupational groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017. *Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.

Migration Policy Institute



data do not allow for analysis of the types of jobs that DACA recipients perform within each industry, however.

Appendix 3 provides data on the shares of employed DACA recipients working in the major industry groups for the 21 states with the most DACA workers.

2.    Top Occupations

Analysis of occupations allows for more precision in identifying the types of jobs in which DACA recipients work, though here also sample sizes limit MPI's analysis to the major groups provided by the Census Bureau. The occupations most commonly employing DACA holders are food preparation and serving (16 percent, or 60,000 workers), sales (14 percent, or 54,000 workers), and office and administrative support (12 percent, or 47,000 workers) (see Table 4). Among unauthorized immigrants in the same age range who are not eligible for DACA, a similar share is employed in food preparation, but the share of ineligible unauthorized immigrants working in sales and office jobs is lower.[20] DACA recipients are half as likely to work in construction as compared to their unauthorized counterparts not eligible for DACA (10 percent versus 20 percent), and the share working in production jobs is slightly lower: 8 percent versus 9 percent. These occupational distributions suggest that DACA recipients are substantially less likely to work in outdoor, manual-labor jobs than similarly aged unauthorized immigrants not eligible for DACA.

Significant numbers of DACA recipients are also employed in professional occupations. Approximately 14,000 are managers, while 9,000 are employed as teachers or related workers ("education, training, and library" occupations).[21] About 5,000 work as health-care practitioners and another 9,000 in health-care support occupations. Almost 3,000 each work in business operations and in computer or mathematical occupations.

See Appendix 4 for the shares of employed DACA recipients working in the major occupational

groups for the 21 states with the most DACA workers.

# IV.  Conclusions

Recent data from U.S. Citizenship and Immigration Services, offering more specifics on the population currently holding status under the Deferred Action for Childhood Arrivals program, have permitted the Migration Policy Institute to offer more detailed characteristics of those receiving DACA protections at the time the Trump administration placed the program on a six-month path to rescission in September 2017. These estimates should be useful for policymakers considering the potential impact at national and state levels of rescinding the program, as well as proposals to legalize DACA recipients and other DREAMers via legislation in Congress.

DACA has provided significant benefits to participants, which have been catalogued elsewhere.[22] The analysis in this fact sheet supports the notion that DACA recipients obtain better jobs than other unauthorized immigrants, with many employed in professional occupations.

The analysis presented here shows that DACA recipients are a largely middle-skilled population, either enrolled in school or working or both. DACA recipients are widely dispersed across industries and occupations, and so are integrated into many different parts of the nation's economy. While they represent a fraction of the U.S. millennial labor force, they have taken on prominence in the national immigration debate—by their own efforts as well as recognition in both parties that DREAMers here since childhood are a particularly sympathetic population.

As the DACA end date looms, with an average 915 young adults expected to begin losing their work authorization and protection from deportation daily beginning March 6, 2018 by MPI's count, resolving their futures undoubtedly will take on new urgency.

A Profile of Current DACA Recipients by Education, Industry, and Occupation



# Fact Sheet

## Appendices

**Appendix 1. School Enrollment Rates of Current DACA Recipients, Top States**

| | Current DACA Recipients | Enrolled in School | |
|---|---|---|---|
| | | **In Secondary School (%)** | **In Postsecondary Institution (%)** |
| **United States** | **689,800** | **20** | **18** |
| Alabama | 3,900 | 14 | 10 |
| Arizona | 25,500 | 19 | 14 |
| Arkansas | 4,700 | 31 | 9 |
| California | 197,900 | 18 | 20 |
| Colorado | 15,500 | 22 | 10 |
| Connecticut | 3,800 | 18 | 21 |
| Florida | 27,000 | 17 | 18 |
| Georgia | 21,600 | 22 | 13 |
| Illinois | 35,600 | 16 | 17 |
| Indiana | 9,000 | 22 | 15 |
| Kansas | 5,900 | 25 | 16 |
| Kentucky | 2,800 | 21 | 15 |
| Louisiana | 1,800 | 17 | 9 |
| Maryland | 8,100 | 23 | 23 |
| Massachusetts | 5,900 | 18 | 26 |
| Michigan | 5,400 | 19 | 21 |
| Minnesota | 5,500 | 28 | 21 |
| Missouri | 3,300 | 28 | 21 |
| Nevada | 12,400 | 25 | 12 |
| New Jersey | 17,400 | 20 | 16 |
| New Mexico | 6,000 | 24 | 20 |
| New York | 32,900 | 14 | 25 |
| North Carolina | 25,100 | 28 | 12 |
| Ohio | 4,000 | 22 | 16 |
| Oklahoma | 6,100 | 23 | 13 |
| Oregon | 10,200 | 18 | 17 |
| Pennsylvania | 4,900 | 21 | 24 |
| South Carolina | 6,000 | 25 | 11 |
| Tennessee | 7,900 | 27 | 7 |
| Texas | 113,000 | 22 | 17 |
| Utah | 8,900 | 22 | 18 |
| Virginia | 10,100 | 28 | 19 |
| Washington | 16,300 | 24 | 14 |
| Wisconsin | 6,700 | 24 | 16 |

*Notes:* The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by U.S. Citizenship and Immigration Services (USCIS) as of September 4, 2017. Only states with sufficient sample sizes are shown. Secondary school includes both middle school and high school.
*Sources:* Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2010-14 American Community Surveys (ACS) and 2008 Survey of Income and Program Participation (SIPP), with legal status assignments by James Bachmeier of Temple University and Jennifer Van Hook of the Pennsylvania State University, Population Research Institute.

MIGRATION POLICY INSTITUTE

Fact Sheet

Appendix 2. Employment Rates of Current DACA Recipients In and Out of Education, Top States

| | Current DACA Recipients | Employed | | | Unemployed | | | Not in Labor Force | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) |
| United States | 689,800 | 55 | 12 | 43 | 8 | 3 | 5 | 36 | 22 | 14 |
| Alabama | 3,900 | 52 | 7 | 45 | 10 | 2 | 8 | 37 | 15 | 22 |
| Arizona | 25,500 | 47 | 9 | 38 | 8 | 2 | 6 | 45 | 23 | 22 |
| Arkansas | 4,700 | 52 | 7 | 44 | 9 | 2 | 6 | 40 | 30 | 10 |
| California | 197,900 | 55 | 12 | 43 | 9 | 3 | 6 | 36 | 22 | 13 |
| Colorado | 15,500 | 60 | 10 | 50 | 6 | 3 | 3 | 34 | 20 | 15 |
| Connecticut | 3,800 | 65 | 18 | 48 | 8 | 3 | 5 | 27 | 19 | 8 |
| Florida | 27,000 | 59 | 12 | 47 | 8 | 3 | 5 | 33 | 21 | 12 |
| Georgia | 21,600 | 55 | 10 | 45 | 7 | 2 | 5 | 38 | 23 | 15 |
| Illinois | 35,600 | 60 | 12 | 48 | 9 | 3 | 6 | 31 | 18 | 13 |
| Indiana | 9,000 | 56 | 13 | 43 | 6 | 2 | 4 | 38 | 22 | 16 |
| Kansas | 5,900 | 57 | 16 | 41 | 6 | 2 | 4 | 37 | 21 | 16 |
| Kentucky | 2,800 | 55 | 11 | 44 | 10 | 6 | 4 | 34 | 19 | 16 |
| Louisiana | 1,800 | 66 | 10 | 56 | 4 | 1 | 3 | 30 | 15 | 15 |
| Maryland | 8,100 | 58 | 17 | 41 | 9 | 5 | 4 | 33 | 24 | 9 |
| Massachusetts | 5,900 | 58 | 17 | 40 | 10 | 4 | 6 | 32 | 23 | 10 |
| Michigan | 5,400 | 59 | 18 | 41 | 9 | 4 | 5 | 33 | 18 | 14 |
| Minnesota | 5,500 | 56 | 19 | 36 | 10 | 5 | 5 | 34 | 24 | 10 |
| Missouri | 3,300 | 58 | 20 | 39 | 6 | 3 | 2 | 36 | 26 | 10 |
| Nevada | 12,400 | 58 | 12 | 46 | 8 | 3 | 6 | 34 | 22 | 12 |
| New Jersey | 17,400 | 60 | 12 | 48 | 8 | 3 | 5 | 32 | 20 | 12 |
| New Mexico | 6,000 | 48 | 11 | 36 | 7 | 2 | 4 | 46 | 31 | 15 |
| New York | 32,900 | 55 | 13 | 42 | 10 | 4 | 6 | 35 | 23 | 13 |
| Nor'h Carolina | 25,100 | 53 | 12 | 41 | 9 | 4 | 6 | 38 | 25 | 13 |
| Ohio | 4,000 | 49 | 12 | 37 | 14 | 2 | 12 | 37 | 24 | 12 |
| Oklahoma | 6,100 | 56 | 12 | 43 | 7 | 3 | 4 | 37 | 21 | 16 |
| Oregon | 10,200 | 57 | 12 | 46 | 10 | 4 | 7 | 32 | 20 | 12 |
| Pennsylvania | 4,900 | 51 | 12 | 39 | 11 | 4 | 6 | 38 | 29 | 10 |
| South Carolina | 6,000 | 47 | 9 | 38 | 11 | 2 | 9 | 42 | 25 | 18 |
| Tennessee | 7,900 | 57 | 9 | 48 | 6 | 3 | 3 | 37 | 23 | 14 |
| Texas | 113,000 | 53 | 12 | 41 | 7 | 2 | 5 | 40 | 24 | 16 |
| Utah | 8,900 | 59 | 14 | 44 | 10 | 3 | 7 | 31 | 22 | 9 |
| Virginia | 10,100 | 62 | 20 | 42 | 6 | 3 | 4 | 32 | 24 | 8 |
| Washington | 16,300 | 57 | 12 | 46 | 8 | 2 | 6 | 35 | 24 | 10 |
| Wisconsin | 6,700 | 51 | 12 | 39 | 12 | 5 | 6 | 37 | 22 | 15 |

Notes: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients, whether in or out of education, and regardless of age. Those under age 16 are categorized as not in the labor force. Those enrolled in school include those enrolled in middle school, high school, or college/university. Only states with sufficient sample sizes are shown. Percentages may not add up to 100 due to rounding.

Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP with legal status assignments by Bachmeier and Van Hook.

MPI
MIGRATION POLICY INSTITUTE

Fact Sheet

## Appendix 3. Employed Current DACA Recipients by Major Industry Group, Top States

| Current DACA Recipients | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 59% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 47% | 44% | 43% | 49% | 43% | 47% | 41% | 38% | 43% |
| Employed Current DACA Recipients | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| **Share by Major Industry Group (%)** | | | | | | | | | | | | | | | | | | | | | | |
| Agriculture | 4% | 2% | 5% | 1% | 2% | 7% | 2% | <1% | <1% | <1% | 1% | <1% | <1% | 4% | 2% | 11% | 8% | 4% | 2% | 2% | 4% | 14% |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 23% | 19% | 22% | 29% | 28% | 21% | 21% | 27% | 19% | 27% | 32% | 25% | 24% | 26% | 29% | 21% | 23% | 20% | 21% | 30% | 28% | 19% |
| Construction | 11% | 14% | 7% | 13% | 12% | 8% | 21% | 5% | 14% | 5% | 11% | 7% | 7% | 17% | 18% | 8% | 15% | 25% | 15% | 9% | 15% | 9% |
| Educational, Health, and Social Services | 11% | 14% | 11% | 18% | 9% | 18% | 9% | 10% | 20% | 16% | 8% | 18% | 13% | 17% | 16% | 8% | 15% | 15% | 12% | 10% | 15% | 10% |
| Finance, Insurance, Real Estate, and Rental and Leasing | 4% | 6% | 3% | 5% | 3% | 4% | 6% | 4% | 3% | 2% | 6% | 3% | 4% | 1% | 5% | 4% | 1% | 3% | 4% | 10% | 2% | 3% |
| Information and Communications | 1% | 1% | 1% | <1% | <1% | <1% | <1% | 2% | <1% | 2% | 1% | <1% | 1% | <1% | <1% | 1% | 1% | 1% | <1% | <1% | <1% | 1% |
| Manufacturing | 9% | 3% | 9% | 5% | 5% | 3% | 12% | 16% | 4% | 11% | 5% | 7% | 5% | 17% | 11% | 6% | 6% | 8% | 8% | 17% | 4% | 7% |
| Mining | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 3% | <1% | <1% | 2% | 2% | <1% | <1% | <1% |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 10% | 13% | 10% | 13% | 16% | 13% | 10% | 12% | 16% | 9% | 9% | 13% | 10% | 8% | 5% | 21% | 8% | 18% | 8% | 5% | 9% | 11% |
| Public Administration | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% |
| Retail Trade | 14% | 15% | 16% | 12% | 17% | 19% | 9% | 14% | 12% | 18% | 15% | 15% | 16% | 8% | 9% | 17% | 11% | 6% | 15% | 11% | 15% | 12% |
| Transportation and Warehousing | 3% | 1% | 3% | 1% | <1% | 2% | 2% | 2% | 2% | 2% | 5% | 4% | 4% | 2% | 3% | <1% | 1% | 5% | 3% | 1% | 2% | 4% |
| Utilities | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Wholesale | 3% | 3% | 4% | 2% | 1% | 3% | 4% | 3% | 2% | 4% | 2% | 6% | <1% | 2% | 2% | 3% | 5% | 1% | 2% | 2% | 1% | 4% |
| Other Services (except public administration) | 6% | 8% | 7% | 8% | 4% | 7% | 3% | <1% | 6% | 3% | 4% | 9% | 9% | 6% | 9% | 3% | 4% | 4% | 7% | 5% | 7% | 5% |
| Armed Forces | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

Notes: The 2010–14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 15 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major industry groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Industry group percentages are of employed recipients.

Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010–14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

MPI MIGRATION POLICY INSTITUTE

Fact Sheet

## Appendix 4. Employed Current DACA Recipients by Major Occupational Group, Top States

| | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current DACA Recipients** | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 62% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 44% | 43% | 43% | 49% | 43% | 47% | 38% | 38% | 43% |
| **Employed Current DACA Recipients** | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| **Share by Major Occupational Group (%)** | | | | | | | | | | | | | | | | | | | | | | |
| Architecture and Engineering | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Arts, Design, Entertainment, Sports, and Media | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Building and Grounds Cleaning and Maintenance | 8% | 11% | 8% | 11% | 19% | 13% | 8% | 8% | 10% | 8% | 8% | 11% | 8% | 10% | 2% | 9% | 2% | 17% | 6% | 6% | 11% | 9% |
| Business Operations Specialists | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Community and Social Services | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% |
| Computer and Mathematical | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Construction Trades | 10% | 11% | 6% | 13% | 11% | 18% | 6% | 6% | 10% | <1% | 4% | 7% | 4% | 15% | 17% | 11% | 20% | 11% | 14% | 15% | 10% | 2% |
| Education, Training, and Library | 2% | 3% | 2% | 1% | <1% | <1% | 1% | 2% | <1% | 3% | <1% | 1% | 4% | 2% | 2% | 3% | 7% | <1% | 4% | 2% | 2% | <1% |
| Extraction Workers | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Farming, Fishing, and Forestry | 3% | <1% | 5% | 1% | 6% | 2% | 2% | <1% | <1% | 1% | 1% | 1% | 1% | 4% | <1% | 9% | 2% | 2% | 1% | 2% | 2% | 12% |
| Financial Specialists | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Food Preparation and Serving | 16% | 13% | 13% | 18% | 21% | 15% | 15% | 18% | 14% | 21% | 18% | 19% | 20% | 16% | 19% | 16% | 14% | 18% | 13% | 17% | 17% | 15% |
| Health-Care Practitioners and Technical | 1% | 1% | 1% | 1% | 1% | 1% | <1% | <1% | 1% | 1% | <1% | <1% | 1% | <1% | <1% | <1% | 2% | <1% | 1% | 2% | <1% | 1% |
| Health-Care Support | 2% | 2% | 3% | 3% | 1% | <1% | <1% | 2% | 5% | 3% | 3% | 2% | 2% | 1% | 1% | 3% | 3% | <1% | 2% | 2% | 3% | 2% |
| Installation, Maintenance, and Repair Workers | 3% | 4% | 3% | 3% | 3% | 3% | 2% | 2% | 2% | 2% | 4% | 3% | 2% | 2% | 2% | 3% | 2% | 5% | 4% | 3% | 3% | 3% |
| Legal | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Life, Physical, and Social Science | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Management | 4% | 3% | 4% | 4% | 1% | 4% | 4% | 4% | 3% | 2% | 7% | 4% | 3% | 2% | 5% | 3% | 4% | 2% | 4% | 5% | 3% | 3% |
| Office and Administrative Support | 12% | 13% | 14% | 9% | 12% | 16% | 10% | 16% | 11% | 15% | 12% | 12% | 12% | 11% | 12% | 9% | 8% | 6% | 12% | 12% | 7% | 7% |
| Personal Care and Service | 4% | 6% | 3% | 4% | 6% | 4% | <1% | 4% | 2% | 3% | 3% | 7% | 7% | 3% | 2% | 6% | 6% | <1% | 4% | 2% | 4% | 4% |
| Production | 8% | 5% | 7% | 4% | 4% | 4% | 14% | 13% | 5% | 5% | 5% | 5% | 5% | 12% | 9% | 6% | 7% | 10% | 8% | 13% | 8% | 8% |
| Protective Service | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | 2% | <1% | <1% | <1% | <1% | <1% |
| Sales | 14% | 16% | 16% | 16% | 16% | 16% | 14% | 13% | 13% | 13% | 12% | 14% | 14% | 8% | 10% | 10% | 12% | 6% | 15% | 10% | 20% | 12% |
| Transportation and Material Moving | 7% | 7% | 8% | 7% | 2% | 5% | 5% | 6% | 6% | 5% | 5% | 6% | 4% | 6% | 10% | 7% | 6% | 7% | 10% | 11% | 3% | 9% |
| Military Specific | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

Notes: The 2010–14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 16 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major occupational groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Occupational group percentages are of employed recipients.

Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010–14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.



## Endnotes

1    See Randy Capps, Michael Fix, and Jie Zong, *The Education and Work Profiles of the DACA Population* (Washington, DC: Migration Policy Institute, 2017), www.migrationpolicy.org/research/education-and-work-profiles-daca-population.

2    For Migration Policy Institute (MPI) estimates of populations that could qualify for legal status under a range of legislative proposals, see Jeanne Batalova, Ariel G. Ruiz Soto, Sarah Pierce, and Randy Capps, *Differing DREAMs: Estimating the Unauthorized Populations that Could Benefit under Different Legalization Bills* (Washington, DC: MPI, 2017), www.migrationpolicy.org/research/differing-dreams-estimating-unauthorized-populations-could-benefit-under-different.

3    The specific eligibility requirements for the Deferred Action for Childhood Arrivals (DACA) program were: (1) minimum age of 15 to apply; (2) arrival in the United States before age 16; (3) maximum age of 30 as of June 15, 2012 (when the program was announced); (4) physical presence and lack of lawful status in the United States on June 15, 2012; (5) continuous presence in the United States since June 15, 2007, five years before DACA was announced; (6) current school enrollment, completion of high school or its equivalent, or honorable discharge from the U.S. armed forces or Coast Guard; and (7) absence of a felony, significant misdemeanor, three or more misdemeanor convictions; and does not pose a threat to public safety or national security. See U.S. Citizenship and Immigration Services (USCIS), "Consideration of Deferred Action for Childhood Arrivals (DACA)," updated October 6, 2017, www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca#guidelines.

4    For a complete listing of MPI's work in this area, see MPI, "DREAM ACT/Deferred Action," www.migrationpolicy.org/topics/dream-actdeferred-action.

5    MPI estimated that as of 2017, there were 1.9 million unauthorized immigrants who met the age at entry and years of U.S. residence requirements constituting the minimum threshold to potentially be considered for DACA. Of that number, an estimated 1.3 million immediately met all eligibility requirements, another 408,000 could have met eligibility by enrolling in an adult education program leading to a high school degree or equivalent, while 120,000 would have aged into eligibility once they reached the program's minimum application age of 15. Because USCIS stopped accepting applications in September 2017, these last two groups can no longer age into eligibility or enroll in adult education to qualify for the program. Eligibility due to adult education program enrollment and ineligibility due to criminal background or lack of continuous U.S. presence were not modeled due to lack of data. For methodological details, see the appendix section in Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population.*

6    USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (June 30)," accessed October 30, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf.

7    MPI used data from the Census Bureau's 2010-14 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP). While the ACS is issued annually, the SIPP is released only every several years. MPI is in the process of adapting the methodology to the 2014 SIPP, which was issued earlier in 2017. By using the SIPP's numbers on legal permanent residents and naturalized citizens, MPI is able to look at the characteristics of the remaining foreign-born population, removing those likely to be on long-term nonimmigrant visas, Temporary Protected Status, or similar programs, leaving a residual population of those believed to be unauthorized. The characteristics of that population can then be assigned to the much larger and more recent ACS file. For more on MPI's methodology, see Jeanne Batalova, Sarah Hooker, and Randy Capps, *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington,

A Profile of Current DACA Recipients by Education, Industry, and Occupation

Fact Sheet

DC: MPI, 2014), www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

8     The SIPP and ACS data do not permit modeling enrollment in adult education programs that lead to a high school degree or equivalent, or to model criminal convictions or security-related disqualifications.

9     USCIS publication in September 2017 of new data on DACA recipients' age, gender, origin-country, and residence-state distributions permits MPI to describe the educational and employment characteristics of the DACA-*recipient* population. Previously, MPI could only model characteristics for the DACA-*eligible* population, in particular those meeting all criteria to apply. The characteristics detailed here for DACA recipients vary somewhat from those previously offered for the DACA-eligible population (see Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population*) because the DACA-recipient profile looks somewhat different than that of the DACA-eligible cohort, as individuals did not apply in similar proportions. Younger immigrants, for instance, are more likely to be enrolled in school and less likely to be employed. Women are more likely than men to be enrolled in school, less likely to be employed overall and in construction, and more likely to be employed in service industries.

10    USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals."

11    USCIS, "Approximate Active DACA Recipients: Country of Birth As of September 4," accessed October 28, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

12    Justice Department, "Attorney General Sessions Delivers Remarks on DACA," September 5, 2017, www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca. See also Department of Homeland Security (DHS), "Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)," last updated September 5, 2017, www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

13    Jill Colvin, "22,000 Young Immigrants Eligible for DACA Renewals Failed to Apply in Time," *Business Insider*, October 19, 2017, www.businessinsider.com/22000-daca-recipients-missed-renewal-deadline-2017-10; Alan Neuhauser, "DHS: 1 in 7 DACA Recipients Did Not Apply to Renew Status," *U.S. News and World Report, October 19, 2017, www.usnews.com/news/national-news/articles/2017-10-19/dhs-1-in-7-daca-recipients-did-not-apply-to-renew-status.*

14    MPI used the 2010-14 American Community Survey (ACS) to develop the database of the population eligible for DACA: five years of data were used to improve the precision of the analysis, allowing for estimates for a broader range of industries, occupations, and states than would be possible using the single-year 2014 ACS. MPI has not yet finalized a dataset of the unauthorized population using more recent years of the ACS.

15    Three types of schools are considered according to USCIS guidelines: 1) a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements; 2) an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where the enrollee is working to achieve such placement; or 3) an education program assisting students either in obtaining a regular high school diploma or its equivalent, or in passing a GED exam or other state-authorized exam. See USCIS, "Frequently Asked Questions," updated October 6, 2017, www.uscis.gov/archive/frequently-asked-questions.



16    The ACS data employed here do not identify individuals enrolled in adult education or career training programs, so unauthorized immigrants who meet other eligibility requirements but who have not completed high school and are not enrolled in school are excluded from the DACA-participating group. USCIS has not released data on participants' educational attainment or school enrollment.

17    This analysis was limited to 34 states because the other states did not have sufficiently large DACA populations to develop reliable estimates. In some cases, the data offered are limited to 21 states, for the same reason.

18    An estimated 382,000 DACA recipients are employed (see Table 2). This represents 0.25 percent of all U.S. workers (152 million) as of September See U.S. Department of Labor, Bureau of Labor Statistics, "The Employment Situation—September 2017" (news release USDL-17-1347, October 6, 2017), www.bls.gov/news.release/pdf/empsit.pdf.

19    MPI Data Hub, "Unauthorized Immigrant Population Profiles," accessed October 24, 2017, www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles.

20    Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population.* The population not eligible for DACA includes those who met all DACA eligibility criteria except for the educational requirement, those who arrived in the United States after 2012, those who arrived when they were over age 15, and those who were ages 31 or older in 2012.

21    Prior to publication of the more complete USCIS data on current DACA recipients in September 2017, MPI estimated that 20,000 unauthorized immigrants who were DACA-*eligible* were in the teaching occupation. This estimate included those who were eligible for DACA but not participating in the program as of September 2017, as well as those who reported a teaching occupation but were not employed at the time of the ACS survey in 2010-14. The lower estimate presented here is limited to those *participating* in the program and employed as teachers and similar education professionals at the time of the ACS survey.

22    See for instance, Tom K. Wong and Carolina Valdivia, *In Their Own Words: A Nationwide Survey of Undocumented Millennials* (United We Dream Network and Unbound Philanthropy, 2014), http://unitedwedream.org/wp-content/uploads/2014/05/Undocumented-Millennials-Survey-Summary.pdf; Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes* (Washington, DC: Center for American Progress, 2016), www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/; Roberto G. Gonzalez, *DACA at Year Three: Challenges and Opportunities in Accessing Higher Education and Employment* (Washington, DC: American Immigration Council, 2016), www.americanimmigrationcouncil.org/research/daca-year-three-challenges-and-opportunities-accessing-higher-education-and-employment.

## Fact Sheet

## About the Authors



**Jie Zong** is an Associate Policy Analyst at the Migration Policy Institute, where she provides quantitative research support across MPI programs, particularly the National Center on Immigrant Integration Policy. Her research areas include structural and cultural integration of first- and second-generation immigrants, protective factors for children in refugee families, and workforce development in the United States.

Previously, Ms. Zong interned with the Center for Migration Studies of New York, where she provided research support on U.S. refugee and asylum issues, as well as the U.S. immigration detention system.

She holds a master's degree of public administration from New York University's Wagner Graduate School of Public Service with a specialization in policy analysis, and a bachelor of the arts degree in international finance from the Central University of Finance and Economics in China.



**Ariel G. Ruiz Soto** is an Associate Policy Analyst at MPI, where he provides quantitative research support across MPI programs. His research areas focus on the impact of U.S. immigration policies on immigrants' experiences of socioeconomic integration across varying geographical and political contexts. More recently, Mr. Ruiz Soto has analyzed methodological approaches to estimate sociodemographic trends of the unauthorized immigrant population in the United States.

Mr. Ruiz Soto holds a master's degree from the University of Chicago's School of Social Service Administration with an emphasis on immigration policy and service provision, and a bachelor's degree in sociology from Whitman College.

**Jeanne Batalova** is a Senior Policy Analyst at MPI and Manager of the MPI Data Hub, a one-stop, online resource that provides instant access to the latest facts, stats, and maps covering U.S. and global data on immigration and immigrant integration. She is also a Nonresident Fellow with the Migration Policy Institute Europe.

Her areas of expertise include the impacts of immigrants on society and labor markets; social and economic mobility of first- and second-generation youth and young adults; and the policies and practices regulating immigration and integration of highly skilled workers and foreign students in the United States and other countries.

Dr. Batalova earned her PhD in sociology, with a specialization in demography, from the University of California-Irvine; an MBA from Roosevelt University; and bachelor of the arts in economics from the Academy of Economic Studies, Chisinau, Moldova.





**Julia Gelatt** is a Senior Policy Analyst at the MPI, working with the U.S. Immigration Policy Program. Her work focuses on the legal immigration system, demographic trends, and the implications of local, state, and federal U.S. immigration policy.

She previously worked as a Research Associate at the Urban Institute, where her mixed-methods research focused on state policies toward immigrants; barriers to and facilitators of immigrant families' access to public benefits and public prekindergarten programs; and identifying youth victims of human trafficking. She was a Research Assistant at MPI before graduate school.

Dr. Gelatt earned her PhD in sociology, with a specialization in demography, from Princeton University, where her work focused on the relationship between immigration status and children's health and well-being. She earned a bachelor of the arts in sociology/anthropology from Carleton College.



**Randy Capps** is Director of Research for U.S. Programs at MPI. His areas of expertise include immigration trends, the unauthorized population, immigrants in the U.S. labor force, the children of immigrants and their well-being, and immigrant health-care and public benefits access and use.

Dr. Capps, a demographer, has published widely on immigrant integration at the state and local level. He also has examined the impact of the detention and deportation of immigrant parents on children.

Prior to joining MPI, Dr. Capps was a researcher in the Immigration Studies Program at the Urban Institute (1993-96, and 2000-08).

He received his PhD in sociology from the University of Texas in 1999 and his Master of Public Affairs degree, also from the University of Texas, in 1992.

## Acknowledgments

This research was supported by the Ford Foundation, the Carnegie Corporation of New York, Unbound Philanthropy, and the Open Society Foundations.

© 2017 Migration Policy Institute.
All Rights Reserved.

Cover Design and Layout: Liz Heimann, MPI

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Zong, Jie, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps. 2017. *A Profile of Current DACA Recipients by Education, Industry, and Occupation*. Washington, DC: Migration Policy Institute.

The Migration Policy Institute (MPI) is an independent, nonpartisan, nonprofit think tank dedicated to the study of the movement of people worldwide. The Institute provides analysis, development, and evaluation of migration and refugee policies at the local, national, and international levels. It aims to meet the rising demand for pragmatic responses to the challenges and opportunities that migration presents in an ever more integrated world.

W W W . M I G R A T I O N P O L I C Y . O R G



1400 16th Street, NW, Suite 300, Washington, DC 20036
202-266-1940 (t)  |  202-266-1900 (f)



# EXHIBIT

# C

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 26 of 106 PageID #: 4009



**Donald J. Trump** ✔
@realDonaldTrump

Follow

The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our Country at all cost!

5:16 AM - 29 Dec 2017

**36,122** Retweets **147,332** Likes



💬 44K          🔁 36K          147K

# EXHIBIT D



**Donald J. Trump** ✔
@realDonaldTrump

Follow

Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!

5:38 PM - 5 Sep 2017

# EXHIBIT E

**The New York Times** | https://nyti.ms/2DCJqPP

TRUMP'S WAY

# STOKING FEARS, TRUMP DEFIED BUREAUCRACY TO ADVANCE IMMIGRATION AGENDA

The changes have had far-reaching consequences, both for the immigrants who have sought to make a new home in this country and for America's image in the world.

## Leer en español

By MICHAEL D. SHEAR and JULIE HIRSCHFELD DAVIS    DEC. 23, 2017

WASHINGTON — Late to his own meeting and waving a sheet of numbers, President Trump stormed into the Oval Office one day in June, plainly enraged.

Five months before, Mr. Trump had dispatched federal officers to the nation's airports to stop travelers from several Muslim countries from entering the United States in a dramatic demonstration of how he would deliver on his campaign promise to fortify the nation's borders.

But so many foreigners had flooded into the country since January, he vented

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 31 of 106 PageID #: 4014

to his national security team, that it was making a mockery of his pledge. Friends were calling to say he looked like a fool, Mr. Trump said.

According to six officials who attended or were briefed about the meeting, Mr. Trump then began reading aloud from the document, which his domestic policy adviser, Stephen Miller, had given him just before the meeting. The document listed how many immigrants had received visas to enter the United States in 2017.

More than 2,500 were from Afghanistan, a terrorist haven, the president complained.

Haiti had sent 15,000 people. They "all have AIDS," he grumbled, according to one person who attended the meeting and another person who was briefed about it by a different person who was there.

Forty thousand had come from Nigeria, Mr. Trump added. Once they had seen the United States, they would never "go back to their huts" in Africa, recalled the two officials, who asked for anonymity to discuss a sensitive conversation in the Oval Office.

As the meeting continued, John F. Kelly, then the secretary of homeland security, and Rex W. Tillerson, the secretary of state, tried to interject, explaining that many were short-term travelers making one-time visits. But as the president continued, Mr. Kelly and Mr. Miller turned their ire on Mr. Tillerson, blaming him for the influx of foreigners and prompting the secretary of state to throw up his arms in frustration. If he was so bad at his job, maybe he should stop issuing visas altogether, Mr. Tillerson fired back.

Tempers flared and Mr. Kelly asked that the room be cleared of staff members. But even after the door to the Oval Office was closed, aides could still hear the president berating his most senior advisers.

Sarah Huckabee Sanders, the White House press secretary, denied on Saturday morning that Mr. Trump had made derogatory statements about immigrants during the meeting.

"General Kelly, General McMaster, Secretary Tillerson, Secretary Nielsen and all other senior staff actually in the meeting deny these outrageous claims," she said, referring to the current White House chief of staff, the national security adviser and the secretaries of state and homeland security. "It's both sad and telling The New York Times would print the lies of their anonymous 'sources' anyway."

While the White House did not deny the overall description of the meeting, officials strenuously insisted that Mr. Trump never used the words "AIDS" or "huts" to describe people from any country. Several participants in the meeting told Times reporters that they did not recall the president using those words and did not think he had, but the two officials who described the comments found them so noteworthy that they related them to others at the time.

The meeting in June reflects Mr. Trump's visceral approach to an issue that defined his campaign and has indelibly shaped the first year of his presidency.

Seizing on immigration as the cause of countless social and economic problems, Mr. Trump entered office with an agenda of symbolic but incompletely thought-out goals, the product not of rigorous policy debate but of emotionally charged personal interactions and an instinct for tapping into the nativist views of white working-class Americans.

Like many of his initiatives, his effort to change American immigration policy has been executed through a disorderly and dysfunctional process that sought from the start to defy the bureaucracy charged with enforcing it, according to interviews with three dozen current and former administration officials, lawmakers and others close to the process, many of whom spoke on the condition of anonymity to detail private interactions.

But while Mr. Trump has been repeatedly frustrated by the limits of his power, his efforts to remake decades of immigration policy have gained increasing momentum as the White House became more disciplined and adept at either ignoring or undercutting the entrenched opposition of many parts of the

government. The resulting changes have had far-reaching consequences, not only for the immigrants who have sought to make a new home in this country, but also for the United States' image in the world.

"We have taken a giant steamliner barreling full speed," Mr. Miller said in a recent interview. "Slowed it, stopped it, begun to turn it around and started sailing in the other direction."

It is an assessment shared ruefully by Mr. Trump's harshest critics, who see a darker view of the past year. Frank Sharry, the executive director of America's Voice, a pro-immigration group, argues that the president's immigration agenda is motivated by racism.

"He's basically saying, 'You people of color coming to America seeking the American dream are a threat to the white people,'" said Mr. Sharry, an outspoken critic of the president. "He's come into office with an aggressive strategy of trying to reverse the demographic changes underway in America."

## A Pledge With Appeal

Those who know Mr. Trump say that his attitude toward immigrants long predates his entry into politics.

"He's always been fearful where other cultures are concerned and always had anxiety about food and safety when he travels," said Michael D'Antonio, who interviewed him for the biography "The Truth About Trump." "His objectification and demonization of people who are different has festered for decades."

Friends say Mr. Trump, a developer turned reality TV star, grew to see immigration as a zero-sum issue: What is good for immigrants is bad for America. In 2014, well before becoming a candidate, he tweeted: "Our government now imports illegal immigrants and deadly diseases. Our leaders are inept."



> **Donald J. Trump**
> @realDonaldTrump
>
> Our government now imports illegal immigrants and deadly diseases. Our leaders are inept.
>
> 7:55 AM - Aug 5, 2014
>
> 372      699      714

But he remained conflicted, viewing himself as benevolent and wanting to be liked by the many immigrants he employed.

Over time, the anti-immigrant tendencies hardened, and two of his early advisers, Roger J. Stone Jr. and Sam Nunberg, stoked that sentiment. But it was Mr. Trump who added an anti-immigrant screed to his Trump Tower campaign announcement in June 2015 in New York City without telling his aides.

"When do we beat Mexico at the border? They're laughing at us, at our stupidity," Mr. Trump ad-libbed. "They're sending people that have lots of problems, and they're bringing those problems," he continued. "They're bringing drugs; they're bringing crime; they're rapists."

During his campaign, he pushed a false story about Muslims celebrating in Jersey City as they watched the towers fall after the Sept. 11, 2001, attacks in New York. He said illegal immigrants were like "vomit" crossing the border. And he made pledges that he clearly could not fulfill.

"We will begin moving them out, Day 1," he said at a rally in August 2016, adding, "My first hour in office, those people are gone."

Democrats and some Republicans recoiled, calling Mr. Trump's messaging damaging and divisive. But for the candidate, the idea of securing the country against outsiders with a wall had intoxicating appeal, though privately, he acknowledged that it was a rhetorical device to whip up crowds when they became listless.

Senator Tom Cotton, Republican of Arkansas, whom Mr. Trump consults regularly on the matter, said it was not a stretch to attribute Mr. Trump's victory to issues where Mr. Trump broke with a Republican establishment orthodoxy that had disappointed anti-immigrant conservatives for decades.

"There's no issue on which he was more unorthodox than on immigration," Mr. Cotton said.

## Ban Restarts Enforcement

Mr. Trump came into office with a long list of campaign promises that included not only building the wall (and making Mexico pay for it), but creating a "deportation force," barring Muslims from entering the country and immediately deporting millions of immigrants with criminal records.

Mr. Miller and other aides had the task of turning those promises into a policy agenda that would also include an assault against a pro-immigration bureaucracy they viewed with suspicion and disdain. Working in secret, they drafted a half-dozen executive orders. One would crack down on so-called sanctuary cities. Another proposed changing the definition of a criminal alien so that it included people arrested — not just those convicted.

But mindful of his campaign promise to quickly impose "extreme vetting," Mr. Trump decided his first symbolic action would be an executive order to place a worldwide ban on travel from nations the White House considered compromised by terrorism.

With no policy experts in place, and deeply suspicious of career civil servants they regarded as spies for President Barack Obama, Mr. Miller and a small group of aides started with an Obama-era law that identified seven terror-prone "countries of concern." And then they skipped practically every step in the standard White House playbook for creating and introducing a major policy.

The National Security Council never convened to consider the travel ban

proposal. Sean Spicer, the White House press secretary at the time, did not see it ahead of time. Lawyers and policy experts at the White House, the Justice Department and the Homeland Security Department were not asked to weigh in. There were no talking points for friendly surrogates, no detailed briefings for reporters or lawmakers, no answers to frequently asked questions, such as whether green card holders would be affected.

The announcement of the travel ban on a Friday night, seven days after Mr. Trump's inauguration, created chaotic scenes at the nation's largest airports, as hundreds of people were stopped, and set off widespread confusion and loud protests. Lawyers for the government raced to defend the president's actions against court challenges, while aides struggled to explain the policy to perplexed lawmakers the next night at a black-tie dinner.

White House aides resorted to Google searches and frenzied scans of the United States Code to figure out which countries were affected.

But for the president, the chaos was the first, sharp evidence that he could exert power over the bureaucracy he criticized on the campaign trail.

"It's working out very nicely," Mr. Trump told reporters in the Oval Office the next day.

At a hastily called Saturday night meeting in the Situation Room, Mr. Miller told senior government officials that they should tune out the whining.

Sitting at the head of the table, across from Mr. Kelly, Mr. Miller repeated what he told the president: This is what we wanted — to turn immigration enforcement back on.

Mr. Kelly, who shared Mr. Trump's views about threats from abroad, was nonetheless livid that his employees at homeland security had been called into action with no guidance or preparation. He told angry lawmakers that responsibility for the rollout was "all on me." Privately, he told the White House, "That's not going to happen again."

## Forced to Back Down

Amid the turbulent first weeks, Mr. Trump's attempt to bend the government's immigration apparatus to his will began to take shape.

The ban's message of "keep out" helped drive down illegal border crossings as much as 70 percent, even without being formally put into effect.

Immigration officers rounded up 41,318 undocumented immigrants during the president's first 100 days, nearly a 40 percent increase. The Justice Department began hiring more immigration judges to speed up deportations. Officials threatened to hold back funds for sanctuary cities. The flow of refugees into the United States slowed.

Mr. Trump "has taken the handcuffs off," said Steven A. Camarota of the Center for Immigration Studies, an advocacy group that favors more limits on immigration.

Mr. Obama had been criticized by immigrant rights groups for excessive deportations, especially in his first term. But Mr. Camarota said that Mr. Trump's approach was "a distinct change, to look at what is immigration doing to us, rather than what is the benefit for the immigrant."

The president, however, remained frustrated that the shift was not yielding results.

By early March, judges across the country had blocked his travel ban. Immigrant rights activists were crowing that they had thwarted the new president. Even Mr. Trump's own lawyers told him he had to give up on defending the ban.

Attorney General Jeff Sessions and lawyers at the White House and Justice Department had decided that waging an uphill legal battle to defend the directive in the Supreme Court would fail. Instead, they wanted to devise a narrower one that could pass legal muster.

The president, though, was furious about what he saw as backing down to

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 38 of 106 PageID #: 4021

politically correct adversaries. He did not want a watered-down version of the travel ban, he yelled at Donald F. McGahn II, the White House counsel, as the issue came to a head on Friday, March 3, in the Oval Office.

It was a familiar moment for Mr. Trump's advisers. The president did not mind being told "no" in private, and would sometimes relent. But he could not abide a public turnabout, a retreat. At those moments, he often exploded at whoever was nearby.

As Marine One waited on the South Lawn for Mr. Trump to begin his weekend trip to Palm Beach, Fla., Mr. McGahn insisted that administration lawyers had already promised the court that Mr. Trump would issue a new order. There was no alternative, he said.

"This is bullshit," the president responded.

With nothing resolved, Mr. Trump, furious, left the White House. A senior aide emailed a blunt warning to a colleague waiting aboard Air Force One at Joint Base Andrews in Maryland: "He's coming in hot."

Already mad at Mr. Sessions, who the day before **had recused himself** in the Russia investigation, Mr. Trump refused to take his calls. Aides told Mr. Sessions he would have to fly down to Mar-a-Lago to plead with the president in person to sign the new order.

Over dinner that night with Mr. Sessions and Mr. McGahn, Mr. Trump relented. When he was back in Washington, he signed the new order. It was an indication that he had begun to understand — or at least, begrudgingly accept — the need to follow a process.

Still, one senior adviser later recalled never having seen a president so angry signing anything.

## Soft Spot for 'Dreamers'

As a candidate, Mr. Trump had repeatedly contradicted himself about the deportations he would pursue, and whether he was opposed to any kind of path to citizenship for undocumented immigrants. But he also courted conservative voters by describing an Obama-era policy as an illegal amnesty for the immigrants who had been brought to the United States as children.

During the transition, his aides drafted an executive order to end the program, known as Deferred Action for Childhood Arrivals. But the executive order was held back as the new president struggled with conflicted feelings about the young immigrants, known as Dreamers.

"We're going to take care of those kids," Mr. Trump had pledged to Senator Richard J. Durbin during a private exchange at his Inauguration Day luncheon.

The comment was a fleeting glimpse of the president's tendency to seek approval from whoever might be sitting across from him, and the power that personal interactions have in shaping his views.

In 2013, Mr. Trump met with a small group of Dreamers at Trump Tower, hoping to improve his standing with the Hispanic community. José Machado told Mr. Trump about waking up at the age of 15 to find his mother had vanished — deported, he later learned, back to Nicaragua.

"Honestly," Mr. Machado said of Mr. Trump, "he had no idea."

Mr. Trump appeared to be touched by the personal stories, and insisted that the Dreamers accompany him to his gift shop for watches, books and neckties to take home as souvenirs. In the elevator on the way down, he quietly nodded and said, "You convinced me."

Aware that the president was torn about the Dreamers, Jared Kushner, his son-in-law, quietly reached out in March to Mr. Durbin, who had championed legislation called the Dream Act to legalize the immigrants, to test the waters for a possible deal.

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 40 of 106 PageID #: 4023

After weeks of private meetings on Capitol Hill and telephone conversations with Mr. Durbin and Senator Lindsey Graham, a South Carolina Republican supportive of legalizing the Dreamers, Mr. Kushner invited them to dinner at the six-bedroom estate he shares with his wife, Ivanka Trump.

But Mr. Durbin's hope of a deal faded when he arrived to the house and saw who one of the guests would be.

"Stephen Miller's presence made it a much different experience than I expected," Mr. Durbin said later.

## Confronting the 'Deep State'

Even as the administration was engaged in a court battle over the travel ban, it began to turn its attention to another way of tightening the border — by limiting the number of refugees admitted each year to the United States. And if there was one "deep state" stronghold of Obama holdovers that Mr. Trump and his allies suspected of undermining them on immigration, it was the State Department, which administers the refugee program.

At the department's Bureau of Population, Refugees and Migration, there was a sense of foreboding about a president who had once warned that any refugee might be a "Trojan horse" or part of a "terrorist army."

Mr. Trump had already used the travel ban to cut the number of allowable refugees admitted to the United States in 2017 to 50,000, a fraction of the 110,000 set by Mr. Obama. Now, Mr. Trump would have to decide the level for 2018.

At an April meeting with top officials from the bureau in the West Wing's Roosevelt Room, Mr. Miller cited statistics from the restrictionist Center for Immigration Studies that indicated that resettling refugees in the United States was far costlier than helping them in their own region.

Mr. Miller was visibly displeased, according to people present, when State Department officials pushed back, citing another study that found refugees to be a

net benefit to the economy. He called the contention absurd and said it was exactly the wrong kind of thinking.

But the travel ban had been a lesson for Mr. Trump and his aides on the dangers of dictating a major policy change without involving the people who enforce it. This time, instead of shutting out those officials, they worked to tightly control the process.

In previous years, State Department officials had recommended a refugee level to the president. Now, Mr. Miller told officials the number would be determined by the Department of Homeland Security under a new policy that treated the issue as a security matter, not a diplomatic one.

When he got word that the Office of Refugee Resettlement had drafted a 55-page report showing that refugees were a net positive to the economy, Mr. Miller swiftly intervened, requesting a meeting to discuss it. The study never made it to the White House; it was shelved in favor of a three-page list of all the federal assistance programs that refugees used.

At the United Nations General Assembly in September, Mr. Trump cited the Center for Immigration Studies report, arguing that it was more cost-effective to keep refugees out than to bring them into the United States.

"Uncontrolled migration," Mr. Trump declared, "is deeply unfair to both the sending and receiving countries."

## More Disciplined Approach

Cecilia Muñoz, who served as Mr. Obama's chief domestic policy adviser, said she was alarmed by the speed with which Mr. Trump and his team have learned to put their immigration agenda into effect.

"The travel ban was a case of bureaucratic incompetence," she said. "They made rookie mistakes. But they clearly learned from that experience. For the moment, all of the momentum is in the direction of very ugly, very extreme, very

harmful policies."

By year's end, the chaos and disorganization that marked Mr. Trump's earliest actions on immigration had given way to a more disciplined approach that yielded concrete results, steered in large part by Mr. Kelly, a retired four-star Marine general. As secretary of homeland security, he had helped unleash immigration officers who felt constrained under Mr. Obama. They arrested 143,000 people in 2017, a sharp uptick, and deported more than 225,000.

Later, as White House chief of staff, Mr. Kelly quietly persuaded the president to drop his talk of Mexico paying for the wall. But he has advocated on behalf of the president's restrictionist vision, defying his reputation as a moderator of Mr. Trump's hard-line instincts.

In September, a third version of the president's travel ban was issued with little fanfare and new legal justifications. Then, Mr. Trump overruled objections from diplomats, capping refugee admissions at 45,000 for 2018, the lowest since 1986. In November, the president ended a humanitarian program that granted residency to 59,000 Haitians since a 2010 earthquake ravaged their country.

As the new year approached, officials began considering a plan to separate parents from their children when families are caught entering the country illegally, a move that immigrant groups called draconian.

At times, though, Mr. Trump has shown an openness to a different approach. In private discussions, he returns periodically to the idea of a "comprehensive immigration" compromise, though aides have warned him against using the phrase because it is seen by his core supporters as code for amnesty. During a fall dinner with Democratic leaders, Mr. Trump explored the possibility of a bargain to legalize Dreamers in exchange for border security.

Mr. Trump even told Republicans recently that he wanted to think bigger, envisioning a deal early next year that would include a wall, protection for Dreamers, work permits for their parents, a shift to merit-based immigration with tougher work site enforcement, and ultimately, legal status for some

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 43 of 106 PageID #: 4026

undocumented immigrants.

The idea would prevent Dreamers from sponsoring the parents who brought them illegally for citizenship, limiting what Mr. Trump refers to as "chain migration."

"He wants to make a deal," said Mr. Graham, who spoke with Mr. Trump about the issue last week. "He wants to fix the entire system."

Yet publicly, Mr. Trump has only employed the absolutist language that defined his campaign and has dominated his presidency.

After an Uzbek immigrant was arrested on suspicion of **plowing a truck into a bicycle path** in Lower Manhattan in October, killing eight people, the president seized on the episode.

Privately, in the Oval Office, the president expressed disbelief about the visa program that had admitted the suspect, confiding to a group of visiting senators that it was yet another piece of evidence that the United States' immigration policies were "a joke."

Even after a year of progress toward a country sealed off from foreign threats, the president still viewed the immigration system as plagued by complacency.

"We're so politically correct," he complained to reporters in the cabinet room, "that we're afraid to do anything."

Matthew Rosenberg and Maggie Haberman contributed reporting.

*Get politics and Washington news updates via* Facebook, Twitter *and* the Morning Briefing *newsletter.*

A version of this article appears in print on December 24, 2017, on Page A1 of the New York edition with the headline: Out of Chaos, Trump Reshapes Immigration.

© 2018 The New York Times Company

# EXHIBIT F

**THE PRESIDENT'S INTENT: Preliminary findings of a Critical Discourse Analysis of Trump's speeches and tweets from the date of his candidacy to mid-September 2017**

Celeste Gómez, Kimberly Cerón, Oscar Gaytán, Julia Isais, John Hernández, Susan Figueroa, Andy Aguiar, Carolina Armenta, Jennifer Bartelheim, Luís Ceja, Janet Chamu, Nicole Contreras, Fernanda Corral, Diana Adame, Ismael De Anda, Jazmín De La Torre, Victor Dealba, Moises Del Real Viramontes, Evelyn Escobar, Odalys Esquivel, Jackelyne García, Lissette García, Cristal Hernández, Lupita Hernández, Veronica Hernández, Jocelyne Herrera, Marco Antonio Juárez, Adan Martínez Ordáz, Stephanie Ochoa, Ruth Pérez, Magali Resendez, Ivone Santana, Jocelyn Teah, Eloy Torres, Yuina Hirose, & Otto Santa Ana

21 December 2017

SUMMARY: On the basis of a scientific study of over 300 speeches and 5000 tweets, we offer a report on Trump's public discourse about immigrants. The plotline of his immigration discourse is the classic AMERICA AS FORTRESS trope. Trump asserts that Fortress America is under attack; many of its cities and towns have been overrun by ruthless aggressors. Trump characterizes Mexico as the enemy that sent unauthorized immigrants as invaders. Trump represents himself as the hero, and Hillary Clinton represents the corrupt and sniveling politicians that let the nation come to this state of affairs.

In this preliminary[*] report we exemplify the major metaphors Trump uses to articulate his narrative. We find code-words that he uses to make his narrative more forceful and misleading: he associates *MS-13*, the notorious gang, with all Latino gangs and even all young Latinos who wear certain urban gear as a fashion statement. He extends the term *criminal alien*, namely immigrants who commit felonious crimes, to all unauthorized immigrants. He also refers by name to about twelve Americans who were the victims of major crimes, as representative of the imminent danger to all Americans and their family that immigrants pose. Finally, he expresses utter disdain toward US-born children of Latino immigrants, saying their increase should be halted, that they are not "our children," and that they are not entitled to US citizenship.

LINGUISTIC FINDINGS

Metonymy and Metaphor: All speakers use metaphor and metonymy to convey the intended message.

Metaphor

A metaphor is also a word that stands for another. Consider: "*But soft! What light through yonder window breaks? / It is the East and Juliet is the sun*" In it, we find a conceptual metaphor, "Juliette is the sun." The sentence is an obvious falsehood, but Romeo describes

---

[*] These preliminary finding are so robust, that we do not foresee major changes in the final analysis. The final tallies of metaphors will be conducted in the coming month. To speed your review of the materials, the data, methods are placed in an appendix

Juliet in terms of the properties of the sun's properties in various ways in this passage to allow the listener to understand Romeo's feelings toward Juliet.

Our study of Trump's metaphor usage reveals his world-view, since humans use metaphor to make sense of their world. Trump's metaphor usage creates a very simple, socially valorized and persuasive view, a political message.

Metonymy

A word or phrase that is used to stand in for another word. The metonymy stand-in is typically a well-known characteristic, or part of the body of the unstated concept. The metonyms in *Give him a hand* and *Lend me your ears* refer to parts of the human body which stands in for each person addressed.

## USING METONYMY TO CREATE CODE-WORDS

Trump uses metonymy to create code-words or to lump highly heterogeneous peoples into oversimplified groups to convey a political message. For political gain Trump uses metonymy to create three terms that lumps together very different kinds of people into large groups.

Trump's three metonyms:

Metonymy #1 Trump frequently refers to "MS-13" (a gang composed of 33% immigrants, 66% US citizens) as a metonymy for all Latino gangs and indeed young Latino people whose urban street apparel is a fashion statement rather than affiliation with gangs. This metonym attributes the incredibly violent behavior of a tiny subset to millions of Latino young people.

1. MS-13 is a prime target. They are bad people. And we've gotten many of them out already. You know, we're pretty much at the 50 percent mark. We're getting them out as fast as we can get them out, and we're freeing up towns. We're actually liberating towns, if you can believe that we have to do that in the United States of America. But we're doing it, and we're doing it fast. (062817 Remarks by President Trump During Meeting with Immigration Crime Victims.txt)

Metonymy #2 Trump very often refers to "criminal alien" (the 2% of unauthorized immigrants who are charged with felonies) to refer to all unauthorized immigrants, 98% who live productive otherwise lawful lives.

2. If I'm elected, we will impose tough new mandatory minimum federal prison sentences for anyone who illegally re-enters the country after previously being deported. And we will swiftly remove and deport all criminal aliens from this country, and dismantle the gangs and cartels preying on our citizens. Either we win

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 47 of 106 PageID #: 4030

this election, or we lose the country. (211016b—Remarks at the Newtown Athletic Club Sports Training Center in Newtown, Pennsylvania)

Metonymy #3 Trump repeatedly refers by name to twelve American individuals or their parents.[†] These individuals were killed by "criminal aliens." Trump uses each named person or family a metonym for the "countless Americans" or their families. This code-term projects the actions of twelve killers to all unauthorized immigrants, who victimize all (white) Americans.

Examples:

3. Countless innocent Americans have been killed by illegal immigrants. (221116b— Remarks at the Bayfront Park Amphitheater in Miami, Florida) [Trump repeated this phrase 8 times]

4. When Hillary Clinton was Secretary of State she allowed thousands of the most dangerous criminal aliens in the world to go free inside America because their home countries wouldn't take them back. These were people guilty of murder, assault, rape, and all manner of violent crime. Hillary has pledged "open borders," and supports Sanctuary Cities. Countless Americans are killed by illegal immigrants because our government won't do its job. These include amazing Americans like Sergeant Brandon Mendoza, of Mesa Arizona, who was killed by an illegal immigrant with a criminal record who should have been deported – but the government refused to act. I've spent time with his incredible mother. 28-year-old Park Ranger Kris Eggle was shot and killed by a drug cartel hit squad responsible for a number of murders. Kris died trying to protect our borders from drug and weapon trafficking into the Organ Pipe Cactus National Monument. 33-year-old Phoenix Police Officer Nick Erfle, a young cancer survivor, was murdered by a previously-deported illegal immigrant with a felony warrant. Nick was shot twice in the back of the head. 21-year-old Grant Ronnebeck, was working at a convenience store in Mesa Arizona when he was shot point blank by an illegal immigrant. His illegal immigrant killer, despite a criminal record, was out on bond, roaming free. (291016b—Remarks at the Phoenix Convention Center in Phoenix, Arizona)

RHETORICAL DEVICES

To obtain oratorical advantage, every speaker uses various rhetorical devices to better persuade their listeners to accept as their own the speaker's intended message.

---

[†] The frequently named victims are Earl Oldander, Casey Chadwick, Marilyn Pharis, Kate Steinle, Grant Ronneback, the son of Jamiel Shaw, Brandon Mendoza, the daughter of Sabine Durden, Sarah Root, Starlette Pitts, and the son of Laura Wilkerson. Law enforcement officers killed in the line of duty were also named, including Kris Eggle and Nick Erfle.

Trump uses two well-known rhetorical devices, pre-emption and paralipsis, to grant himself a line of deniability against his offensive statements about immigrants and Mexico. He uses these two rhetorical devises to avoid responsible for the plainly abusive statements he makes. He uses two rhetorical devises to make strongly negative claims about immigrants, while insisting that he's "fair" and "fair-minded." Both pre-emption and paralipsis are means for trying to avoid responsibility for making a controversial claim.

**Pre-emption**

Structurally pre-emption takes the form: positive claim, negative claim, negative claim, negative claim…

Trump begins a new topic in a speech or conversation by offering a contrived or insincere compliment about a group, followed with a stream of negative statements that make up the major claim in his speech.

Examples (tweets)
5. I love Mexico but not the unfair trade deals that the US so stupidly makes with them. Really bad for US jobs only good for Mexico. (6/25/15 14:27)
6. I love the Mexican people but Mexico is not our friend. They're killing us at the border and they're killing us on jobs and trade. FIGHT! (6/30/15 12:57)

**Paralipsis**

Structurally, paralipsis takes the form: Negative claim, negative claim…, a minor positive claim, then successive negative claims…

Trump inserts a weakly positive statement into a string of negative statements about immigrants or Mexico.

Examples (speeches)
On the day that he announced his run for the presidency, he excoriated Mexicans and immigrants. Here he injected a positive statement, a paralipsis (in *italics*), that might has seemed odd, given the major criticisms he made about Mexico and its emigrants:
7. The U.S. has become a dumping ground for everybody else's problems. Thank you. It's true, and these are the best and the finest. When Mexico sends its people, they're not sending their best. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And *some*, I assume, *are good people*. (061615 Washington Post, Trump announces a presidential bid.)
8. Mexico sends its people. They are not sending their best. They are not sending you. [pointing to audience] They are not sending you. [pointing to audience] They are

> sending people that have lots of problems, and they are bringing those problems to us. They are bringing drugs, they are bringing crime, their rapists, and *some* I assume *are good people* but I speak to border guards and they tell us what we are getting. and it only makes common sense. It only makes common sense. They are sending us not the right people get it's coming from more than Mexico. It's coming from all over South and Latin America, and it's coming probably probably from the Middle East. but we don't know because we have no protection and we have no confidence. We don't know what's happening. (160615—Trump presidential campaign announcement)

In these quotes drawn from his announcement to run for the presidency, he disparages Mexico for intentionally dispatching its worst people to the US, and casts slurs on 98 percent of Mexican and other Latin American immigrants. Trump hedges his revolting statements with paralipis, but even weakens his softener with *I assume*, suggesting he has not personally known any Mexican immigrant who is not a felon.

NOTE BENE: When the team counted up Trump's positive statements about Mexico and immigrants, and set aside his paraliptic and pre-emptive statements, only a few positives statements remained.

## TRUMP'S DISCOURSE ABOUT IMMIGRANTS

Thirty years of cognitive science has demonstrated that one fundamental mechanism by which human beings make sense of their social world is with the everyday metaphors that they use. Candidate and President Trump repeated states that the nation is imperiled by the presence of immigrants. His discussion of immigration revealed what we will call his leading metaphor, namely the fundamental organizing principle regarding immigration and the state that he expressed via his spoken and tweeted metaphors. Trump's leading metaphor is what he takes to be the state of affairs of the US. His leading analogy: NATION AS FORTRESS UNDER ATTACK. He repeatedly states that the US has a "broken border" or "open border" that imperils the American people. Whenever he speaks about immigrants, the underlying storyline in every speech and most tweets is of the US as a castle or fort that is under attack; that "American homes, cities, and towns" are "overrun" and "ravaged" by a murderous criminal enemy force. The enemy is Mexico. Mexico's government and its leaders "push" or "send" its worst people to attack America. He uses the metonym "criminal aliens" frequently to lump the two percent of unauthorized immigrants who commit felonious acts with the 98 percent of otherwise law-abiding unauthorized immigrants. These so-called "criminal aliens" constitute the dangerous alien force that Mexico sends through the broken border. This invading force wreaks havoc, rape, and all kinds of inhumane violence on all Americans. Trump repeatedly invokes by name eleven individuals who were victims. Trump invokes these unfortunate individuals and their families as stand-ins for all those "countless

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 50 of 106 PageID #: 4033

Americans" who he says are victims of the criminals and drugs that Mexico pours into through the open border.

All his characterizations of immigrants are linked to his narrowly defined leading analogy. His metaphors characterization for the unauthorized immigrant are: IMMIGRANT AS CRIMINAL, AS DANGER, and AS DISEASE. He stated that all unauthorized immigrants are fundamentally criminals. Beyond their having broken the law by crossing the border, the state expenditures they incurred for public safety, health and education, and the danger they pose to the citizenry, threaten the very fabric of the U.S., and the rule of law. Similarly, he uses metaphors for the heroes and the betrayers of the nation under siege follow the same leading analogy. For Trump, the linchpin of the survival of the nation is the "Great Wall" which will regain control of the border.

Conceptual metaphors guide and structure our understanding of the world. In this case, they are a part of the conceptual system shared by speakers of American English and encoded in part in the ways Americans use the English language. Conceptual metaphors of a given topic tend to organize themselves into constellations of concepts that the critical discourse analyst can prevent in various ways, such as in schematics, cloud maps, or as a narrative. It is important to recognize that the metaphors that Trump constantly employs the same negative metaphors for unauthorized immigrants, Mexico and his political opponent, Hillary Clinton. Since they are described in exactly the same terms, Trump characterizes them as the dangerous criminal enemies of the nation. The American people are victims of these enemies. On the other hand, Trump uses the same positive metaphors for himself that he uses for the US military, police and border patrol: brave strong defenders of the country.

In summary, the metaphors that Trump, as candidate and as president, uses for both immigrants and Mexico are the same: both immigrant and Mexico are criminal, killers, and dangerous. These enemies of the US have overrun major cities and town in the nation by pouring through the *open border*, that is to say the breach in the fortress, killing "countless innocent Americans" and poisoning the youth with drugs and violence. He represents himself and the US military, border patrol and police with heroic metaphors as savior, and strong protector. Within this narrative he promises to rid the country of all these invaders and to build a "Great Wall" that will bring order and peace to the country. The metaphors constructed a vision of the social world for his audience to embrace. The overt narrative of the President's speech, as revealed by those conceptual metaphors, is a as follows:

Trump's Narrative: The once great castle on the hill, America, is under siege by a foreign force. The walls of its fortress are broken; its cities and towns have been overrun by ruthless foreign invaders. "Criminal aliens" are the invading force destroying the country. The government of Mexico has been sending the worst of its people: violent criminals, drug

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 51 of 106 PageID #: 4034

cartels, gang members, drug pushers, and human traffickers. Meanwhile America has been governed by weak, stupid, and complicit politicians. The continued presence of illegals and criminal immigrants is a national existential crisis. Brave Trump vows to save the country by directing law enforcement officers to forcefully rid our nation of this invading force, and to build a Great Wall. Only Trump can "make America great again."

We will exemplify the metaphors that constitute his narrative (below).

TRUMP'S METAPHORS

**What is the state of the nation?**
According to Trump, unimpeded waves of criminal immigrants have poured into America, weakening its borders to the point where its very existence is threatened. The uncontrolled influx of a large immigration population is a result of the lax enforcement of immigration policy by stupid or complicit politicians.
Examples:
>      Catchphrase: A nation without borders is not a nation at all.
>      Tweets:
>>      9.  A nation WITHOUT BORDERS is not a nation at all. We must have a wall. The rule of law matters. Jeb just doesn't get it. (8/11/15 0:58)
>      Speeches:
>>      10.  We must also be a secure nation. Security begins at the border. A nation that doesn't control its borders is not a nation. A country that doesn't protect its people isn't a country. A government that doesn't put its own citizens first is a government unworthy and unfit to lead. Here are some heartbreaking examples of how our government has failed our citizens. Countless Americans who have died in recent years would be alive today if not for the open border policies of this Administration. This includes incredible Americans like 21-year-old Sarah Root. The man who killed her arrived at the border, entered federal custody, and then was released into a U.S. community under the policies of this White House. He was released again after the crime, and is now at large. (041016—Remarks at Prescott Valley Event Center in Prescott Valley, Arizona)
>>      11.  In terms of the border, it's a disgrace. Either we have a border or we don't have a country. You can't have a country without borders. [150706-Trump on Mexico Comments]
>>      12.  Without a border, we don't have a country. (161103- Remarks at the Bayfront Park Amphitheatre)
>>      13.  One by one we are finding the illegal gang members, drug dealers, thieves, robbers, criminals and killers. And we are sending them the hell back home

where they came from. And once they are gone, we will never let them back in. Believe me. The predators and criminal aliens who poison our communities with drugs and prey on innocent young people, these beautiful, beautiful, innocent young people will, will find no safe haven anywhere in our country. (170726-Trump Ohio Rally Speech) (repeated)

14. They never even mentioned her plan on immigration because she [Clinton] doesn't want to get into the quagmire. It's a tough one, she doesn't know what she's doing except open borders and let everybody come in and destroy our country by the way. (160831-Trump's AZ Immigration Policy Speech)

"Open Border" code-word for Obama/Chilton immigration policy: The President emphasizes that without a border, there is no nation, and that an open border leaves America vulnerable to danger. He expresses that American lives have been put in jeopardy because of open borders.

In order to justify his plans for the creation of a border wall, the President constantly denounces, "Open borders as dangerous." He argues that an open-border policy is detrimental to the well-being of American communities as it allows criminals, drugs, and murderers to pour into the nation without much resistance.

15. Politicians sent troops to protect the borders of foreign nations, but left America's borders wide open for all to violate. We've spent billions and billions of dollars on one global project after another, and yet, as gangs flooded into our country, we couldn't even provide safety for our own people. (290417b—Remarks by President Trump at Make America Great Again Rally Harrisburg, PA)

16. There are a lot of numbers in the immigration debate. But let me give you the most important number of all. That most important number of all is the number of American lives it is acceptable to lose in the name of illegal immigration. Let me tell you what that number is: ZERO. Our nation should not accept one lost American life because our country failed to enforce its laws. What do you tell to the mother, who just buried her daughter, because someone was released at the border who should have been sent home? What do you tell to the young boy, who will grow up without a dad, because a criminal was deported five times but was allowed to keep coming back into the country? What do you tell the wife, who has lost her husband, because a Sanctuary City released an illegal immigrant from behind bars? This must end. And it must end right now. Not one more American life should be given up in the name of open borders. (170916—Remarks at the Remembrance Project Luncheon at the Omni Houston, Texas)

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 53 of 106 PageID #: 4036

Open borders as weak, broken: Aside from labeling the border as dangerous, the President also vindicates his plan for a border wall on the basis that the current border in between the U.S. and Mexico is simply, "weak and broken." For the President, a weak and broken border leaves the nation vulnerable to crime and lawlessness.

Drugs pour in Open borders: As a means to legitimize his plans to build a border wall, the President explicitly argues that flow of drugs coming from the southern border (Mexico/Central America) into the United States is poisoning American communities with crime and death.

17. But I know that you want safe neighborhoods where the streets belong to families and communities, not gang members and drug dealers who are right now, as I speak, being thrown out of the country and they will not be let back in. (Applause.) We will have strong borders again. (Applause.) And I mean that. And you've seen it on television. You've seen it on television. General Kelly, now Secretary Kelly, he's really doing the job. You're seeing it. The gang members -- bad, bad people. I said it day one. And they're going out, or they're being put in prison. But for the most part, get them the hell out of there. Bring them back to where they came from. (Applause.) (180217—Remarks by President Trump and First Lady Melania Trump at Make America Great Again Rally)

18. For many years, they exploited America's weak borders and lax immigration enforcement to bring drugs and violence to cities and towns all across America. They're there right now because of weak political leadership, weak leadership, weak policing, and in many cases because the police weren't allowed to do their job. (170728-remarks by Trump to Law Enforcement on MS13)

19. Hillary has pledged totally open borders, meaning you don't have a country anymore. And she strongly supports sanctuary cities like in San Francisco where…Kate Steinle was killed by a five-time deported illegal immigrant. (161103- Remarks on the Bayfront Park Amphitheatre) [repeat]

Tweets:

20. El Chapo and the Mexican drug cartels use the border unimpeded like it was a vacuum cleaner sucking drugs and death right into the U.S... likewise billions of dollars gets brought into Mexico through the border. We get the killers drugs crime they get the money! (7/13/15 10:47)

21. We will stop heroin and other drugs from coming into New Hampshire from our open southern border. We will build a WALL and have security. (2/9/16 22:19)

Speeches:

22. We've defended the borders of other nations while leaving our own borders wide open for anyone to cross and for drugs to pour in at a now unprecedented rate. And we've spent trillions and trillions of dollars overseas, while our infrastructure at home has so badly crumbled. (280217b—Remarks by President Trump in Joint Address to Congress)

23. So, we will build the wall, and we will stop a lot of things, including the drug —the drugs are pouring in at levels like nobody has ever seen. We'll be able to stop them once the wall is up. (280817b--Remarks by President Trump and the president of Finland in Joint Press Conference)

24. A wall will not only keep out criminals, but it will also keep out the drugs and heroin poisoning our youth. Drugs overdoses in Maine are on a record pace. I have outlined a plan to stop the opioid crisis. My plan begins with a strong border, includes the prosecution of drug dealers, and dramatically expands access to life-saving treatments that will help people unchain themselves from this terrible addiction. (151016b—Remarks at Portsmouth, New Hampshire)

Disease: In addition to the inflow of drugs into the United States, the President also urges that building a border wall will bring an end to the "disease" inflicted on American communities. According to him, the wall would be instrumental in terminating the presence of immigrant "rapists and killers coming across the southern border." (**MISPLACED**)

Dangerous Immigration
Tweets:

25. Druggies drug dealers rapists and killers are coming across the southern border. When will the U.S. get smart and stop this travesty? (6/20/15 2:22)

26. Because the ban was lifted by a judge many very bad and dangerous people may be pouring into our country. A terrible decision (2/4/2017 9:44:49 PM)

27. Democrats used to support border security? now they want illegals to pour through our borders. (4/27/2017 2:39:04 PM)

Speeches:

28. We're committed to securing our borders to reduce crime, illegal drugs, human trafficking, especially in border counties. We have a lot of the border counties represented. (080217b—Remarks by President Trump in Roundtable with County Sheriffs)

29. The last, very weak administration allowed thousands and thousands of gang members to cross our borders and enter into our communities where they wreaked havoc on our citizens. As you know, the bloodthirsty cartel, known as MS-13, has infiltrated our schools, threatening innocent children. We've seen the horrible assaults and many killings all over Long Island, where I grew up. We have seen the vicious spread of transnational gangs into all 50 states, and the human suffering they bring with them. I've been with the parents; I've seen the parents. It's devastation. A very respected general recently told me that MS-13 are the equivalent in their meanness to al Qaeda. (290417—Remarks by President Trump at Make America Great Again Rally, Harrisburg, PA)

Wall as necessity: The President expressed urgency for the creation of a "Great Wall" in the Southern border, justifying this by stating that it was the only way to keep the "nation secure" and free of crime.

Tweets:

30. The Wall is a very important tool in stopping drugs from pouring into our country and poisoning our youth (and many others)! If....the wall is not built which it will be the drug situation will NEVER be fixed the way it should be! #BuildTheWall (4/24/2017 12:28:01 PM)

31. A country must enforce its borders. Respect for the rule of law is at our country's core. We must build a wall! (7/2/15 19:24)

32. Drugs are pouring into this country. If we have no border we have no country. That's why ICE endorsed me. #Debate #BigLeagueTruth (10/20/16 1:22)

Speeches:

33. We are going to build a great border wall to stop illegal immigration, to stop the gangs and the violence, and to stop the drugs from pouring into our communities. I have been honored to receive the endorsement of America's Border Patrol Agents, and will work directly with them to protect the integrity of our lawful, lawful, lawful immigration system. Lawful. (210716—Address Accepting the Presidential Nomination at the Republican National Convention in Cleveland, Ohio)

**Who is the enemy?**

Trump depicts Mexico as the enemy of the United States. He is able to construct this idea on the basis that Mexico is the, "second deadliest country in the world." With the claim that Mexico is dangerous and embattled in turmoil, the President pleads to the American public that building a wall will protect the United States from the risks that Mexico imposes on the well-being of the nation state.

Mexico as dangerous or deadly: The President portrays Mexico as a dangerous and deadly nation. He claims that Mexico is only second to, "Syria" in terms of "deadliest country in the world."

> Tweets:
> 34. RT @DRUDGE_REPORT: MEXICO 2ND DEADLIEST COUNTRY; TOPS AFGHAN IRAQ... (5/10/2017 11:21:02 AM)
> 35. Mexico was just ranked the second deadliest country in the world after only Syria. Drug trade is largely the cause. We will BUILD THE WALL! (6/22/2017 10:15:39 PM)
> 36. [RT @foxandfriends: Millions of gallons of Mexican waste threaten Border Patrol agents (8/9/2017 11:22:58 AM)] **INCOMPLETE**
> 37. With Mexico being one of the highest crime Nations in the world we must have THE WALL. Mexico will pay for it through reimbursement/other. (8/27/2017 1:44:11 PM)

Mexican politicians are smarter than Americans: The President also reassures that Mexico is an enemy of the United States by claiming that Mexico is, "killing the United States economically." Furthermore, he declares the leaders of Mexico to be, "far smarter than ours."

> Tweets:
> 38. Mexico is killing the United States economically because their leaders and negotiators are FAR smarter than ours. But nobody beats Trump! (6/20/15 1:54)
> 39. Only very stupid people think that the United States is making good trade deals with Mexico. Mexico is killing us at the border and at trade! (6/27/15 17:17

Mexico sends the worst elements of its society: In addition to the providing the United States with rapists and killers, Mexico is also a danger to the United States because it sends "the worst elements of society." The President condemns Mexico for the production of illegal drugs such as heroin. In order to rid the U.S. from these harmful drugs, he urges the public to support his plan for a border wall.

Mexican Leaders "push" or "send" their "worst" people to the United States. According to the President, these people are, "murders, drug dealers, and gang members."

> 40. People are flowing into this country. People in many cases, who are very bad. They are sending their criminals and they are not going to help us. I'm sure there's going to be some wonderful people, but for the most part those people are not going to be helping. We are getting criminals, gang members, the worst of the

worst, and were just letting them flow right in. And now they're going to be voting? The Democrats like this and they wanted to help. (200315—WMUR-TV Interview with Trump)

41. As Secretary of State, Hillary Clinton allowed thousands of the most dangerous and violent criminal aliens to go free because their home countries were intelligent, they wouldn't take them back. We bring them to their countries— murderers, drug dealers, gang members, we'd bring them to their countries and their countries would say: get them out, we're not taking them back. They call up the State Department, and the State Department under Hillary Clinton would say: oh, bring them back, we don't want to make waves. I guarantee you, whether it's four years or eight years, that will not happen once under a Trump administration. Hillary wants totally open borders and strongly supports sanctuary cities. (021116a—Remarks at the Central Florida Fairgrounds in Orlando, Florida)

**Who are the enemy soldiers?**

The President identifies the immigrants flowing south of the border as the primary soldiers that have contributed to the disease being inflicted on American communities. These immigrants constitute an army that is composed of "criminal gangs", who show no remorse to the American public.

42. It was this conviction that stirred the heart of a great American patriot on that day, April, 242 years ago. It was the day that Paul Revere spread his Lexington alarm -- the famous warning that "the British are coming, the British are coming." Right? You've all heard that, right? The British are coming. Now we have other people trying to come, but believe me, they're not going to be successful. That I can tell you. Nothing changes, right, folks? Nothing changes. They are not going to be successful. There will be serious hurt on them, not on us. (170428-Trump fires up the NRA)

43. Never again will America surrender the security of our people, the safety of our communities or the sovereignty of our nation. We are cracking down hard on the foreign criminal gangs that have brought illegal drugs, violence, horrible bloodshed to peaceful neighborhoods all across our country. We are throwing MS-13 the hell out of here so fast. You know, we're actually — hard to believe that we're talking about our great country. (170726-Trump Ohio Rally Speech)

**Immigrants (Mexican or Central American) as disease and dangerous:** The President is ignorant as he groups Mexican and Central American immigrants as being part of the enemy army that has brought a "disease" upon American communities. To him, the influx of these immigrants into the U.S. is a, "threat to the security and future" of our children and all "civilized people."

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 58 of 106 PageID #: 4041

44. We must also deal decisively with other threats to our security and the future of our children, such as criminal cartels, human smuggling, drugs, corruption, cybercrime, and territorial expansion. As I have said many times before: All civilized people must come together to drive out terrorists and extremists from our societies, stripping them of funding, territory, and ideological support. (101117—Remarks by President Trump at APEC CEO Summit)

Immigrants as criminals: The President proceeds to denounce Mexican and Central American immigrants as, "criminals, rapists, and thieves." He claims to be frustrated that these "killers" are simply able to "walk across the border", commit a crime, and still be eligible to, "receive free health care."

Tweets:

45. Again illegal immigrant is charged with the fatal bludgeoning of a wonderful and loved 64 year old woman. Get them out and build a WALL! (8/11/15 0:29)

46. It's a national embarrassment that an illegal immigrant can walk across the border and receive free health care and one of our Veterans that has served our country is put on a waiting list and gets no care. (7/18/15 18:16)

Speeches:

47. And we are protecting our families, schools, and cities by removing the gang members -- MS-13. MS-13. We're spreading them out, the drug dealers and criminals from our country, and cracking down on the sanctuary cities that protect them. (080617b—Remarks by President Trump at the Faith and Freedom Coalition's Road to Majority Conference)

48. One by one, we're finding the illegal immigrant drug dealers, gang members, and killers, and removing them from our country. And, once they are gone, folks -- you see what we're doing -- they will not let them back in. They're not coming back. (290417b—Remarks by President Trump at Make America Great Again Rally Harrisburg)

49. In Washington, D.C. region, at least 42 alien minors from the border surge have been recently implicated in MS-13-related violence, including 19 charged in killings or attempted killings. You say, what happened to the old days where people came into this country, they worked and they worked and they worked, and they had families, and they paid taxes, and they did all sorts of things, and their families got stronger, and they were closely knit? We don't see that. Failure to enforce our immigration laws had predictable results: drugs, gangs and violence. But that's all changing now. (280717b—Remarks by President Trump to Law Enforcement Officials on MS-13)

50. Mexico has a tremendous crime problem -- tremendous -- one of the number two or three in the world. And that's another reason we need it. And the -- just to add on, tremendous drugs are pouring into the United States at levels that nobody has

ever seen before. This happened over the last three to four years in particular. The wall will stop much of the drugs from pouring into this country and poisoning our youth. So, we need the wall. It's imperative. We may fund it through the United States. But ultimately, Mexico will pay for the wall. (280817~1. **INCOMPLETE**)

51. We will begin removing the more than 2 million criminal illegal immigrants from the country these are drug dealers, gang heads, gang members, killers, and cancel visas to foreign countries that won't take them back and when Hillary Clinton was Secretary of State and they had someone who was bad, really bad and they brought him back to the country and the country wouldn't take him. She said we'll bring him back; we don't want to force the country to take him. There won't be one such instance if I become president. (221016—Remarks on Proposals for the First 100 Days in Office at the Eisenhower Complex in Gettysburg Pennsylvania)

52. In California, a 64-year-old Air Force veteran, a great woman, according to everybody that knew her, Marilyn Pharis, was sexually assaulted and beaten to death with a hammer. Her killer had been arrested on multiple occasions but was never, ever deported, despite the fact that everybody wanted him out. (160831-Trump's AZ Immigration Policy Speech) (repeated)

53. Our enforcement priorities will include removing criminals, gang members, security threats, visa overstays, public charges. That is those relying on public welfare or straining the safety net along with millions of recent illegal arrivals and overstays who've come here under this current corrupt administration. (310816—Remarks on Immigration at the Phoenix Convention Center in Phoenix Arizona)

54. I'm going to fight for every mom who lost her child to illegal immigration, and drugs and gang violence. (161017–Remarks at KI Convention Center in Green Bay, Wisconsin)

55. We have illegal immigrants that are treated better by far than our veterans. That's not going to happen anymore. It's not going to happen. (150915 Presidential Candidate Trump on National Security.txt)

Immigrants as Animals: According to Trump the immigrants that are coming into the United States via the southern border are "animals." He claims that these immigrant gangs, "don't like shooting people because it's too quick." Instead he provides vivid and gruesome examples of several cases in which a U.S. citizen was murdered by one of these "animals" (i.e. Kate Steinle). Without the construction of a border wall, the President argues that the carnage of innocent American civilians will continue.

56. Together, we're going to restore safety to our streets and peace to our communities, and we're going to destroy the vile criminal cartel, MS-13, and many other gangs. But MS-13 is particularly violent. They don't like shooting

people because it's too quick, it's too fast. I was reading -- one of these animals was caught -- in explaining, they like to knife them and cut them, and let them die slowly because that way it's more painful, and they enjoy watching that much more. These are animals. (280717b—Remarks by President Trump to Law Enforcement Officials on MS-13)

57. I especially want to thank ICE Director Tom Homan, who has done an incredible job in just a short period of time. Tom, get up here. I know you just -- (applause) -- Tom is determined to rid our nation of cartels and criminals who are preying on our citizens. (170728-remarks by Trump to Law Enforcement on MS13)

58. Since January "16 -- think of this -- MS-13 gang members have brutally murdered 17 beautiful, young lives in this area on Long Island alone. Think of it. They butcher those little girls. They kidnap, they extort, they rape and they rob. They prey on children. They shouldn't be here. They stomp on their victims. They beat them with clubs. They slash them with machetes, and they stab them with knives. They have transformed peaceful parks and beautiful, quiet neighborhoods into bloodstained killing fields. They're animals. (280717b—Remarks by President Trump to Law Enforcement Officials on MS-13)

59. One by one we are finding the illegal gang members, drug dealers, thieves, robbers, criminals and killers. And we are sending them the hell back home where they came from. And once they are gone, we will never let them back in. Believe me. The predators and criminal aliens who poison our communities with drugs and prey on innocent young people, these beautiful, beautiful, innocent young people will, will find no safe haven anywhere in our country. (170726-Trump Ohio Rally Speech)

**Who are the victims?**

The President is convinced that it is American citizens who are the ones suffering from the absence of a border wall and poor immigration enforcement. He blames the rise of sanctuaries cities and the failure of past administrations in immigration policy as the primary reasons that have contributed to the chaos inflicted on American communities.

60. There are a lot of numbers in the immigration debate. But let me give you the most important number of all. That most important number of all is the number of American lives it is acceptable to lose in the name of illegal immigration. Let me tell you what that number is: ZERO. Our nation should not accept one lost American life because our country failed to enforce its laws. What do you tell to the mother, who just buried her daughter, because someone was released at the border who should have been sent home? What do you tell to the young boy, who will grow up without a dad, because a criminal was deported five times but was allowed to keep coming back into the country? What do you tell the wife, who has

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 61 of 106 PageID #: 4044

lost her husband, because a Sanctuary City released an illegal immigrant from behind bars? This must end. And it must end right now. Not one more American life should be given up in the name of open borders. (170916—Remarks at the Remembrance Project Lucheon at the Omni Houston, Texas)

61. All across our nation, innocent Americans have been killed by illegal immigrant criminals who should never have been in our country. Kate Steinle was gunned down in her father's arms in broad daylight on a San Francisco pier. Her killer had been deported 5 times before. Ninty-year-old Earl Olander was brutally beaten to death in his home by illegal immigrants with criminal records and left on the floor of his home to die. Laura Wilkerson's teenage son, Josh, was tortured and beaten to do by an illegal immigrant he offered to give a ride home. His body was viciously burned. The examples go on and on and on.(231016—Remarks at the Collier County Fairgrounds in Naples, Florida)

62. Countless Americans who have died in recent years would be alive today if not for the open border policies of this President Obama and Hillary Clinton. This includes incredible Americans like 21-year-old Sarah Root. The man who killed her arrived at the border, entered federal custody, and then was released into a U.S. community under the immigration policies of Obama-Clinton. He was released again after the crime, and is now at large. (051016—Remarks at Henderson Pavilion in Henderson, Nevada)

63. Countless innocent Americans have been killed by illegal immigrants. Last year, as an example, 17-year-old Starlett Pitts, her boyfriend and her mother were stabbed to death in their Lee High Acres home by an illegal immigrant. The killer had been convicted of assaulting a police officer and was wanted for double murder and robbery. And the people that knew him were begging that he be incarcerated. They were begging. He was released from custody pending his court appearance, enabling him to commit murder. A Trump administration will stop illegal immigration, deport all criminal aliens and save American lives. (021116b—Remarks at the Bayfront Park Amphitheater in Miami Florida)

64. One convicted criminal alien, she allowed to go free—totally free; killed a young girl named Casey Chadwick; beautiful young girl. The corrupt establishment in Washington wants to surrender America's borders, even as they send our troops overseas to protect the borders of other countries. She'll protect those borders, but not our borders. Casey Chadwick was a great example, and he was let free, and she should be alive today. Jamiel Shaw has a son—had a son, a great young man, killed violently. And I don't know if you know, but killed violently by an illegal immigrant, shot three times in the face for no reason; somebody that wasn't supposed to be here. (121016—Remarks at the Southeaster Livestock Pavilion in Ocala, Florida)

65. Every day our border remains open, innocent Americans are needlessly

victimized and killed. (160917- Trump at the Remembrance Project)

Americans as forgotten or ignored: The President denounces the actions of the political establishment as they have too often forgotten or ignored Americans. He claims that he will be different than those who have led before him by making it his priority to,

66. "work with communities, local police, state police and federal law enforcement to dismantle the gangs and to liberate [American] citizens from violence and poverty and fear." (083016 Remarks at the XFinity Arena in Everett, Washington.txt).

67. And we're going to take that fight to the drug cartels and work to liberate our communities from their terrible grip of violence. You have the power and knowledge to tell General Kelly -- now Secretary Kelly -- who the illegal immigrant gang members are. (080217 Remarks by President Trump at MCCA Winter Conference)

**Who is the hero?**

The President presents himself as a savior to the American public, as he vows, "Find, arrest, jail, and deport" every criminal alien in the United States. He also claims that he will bring justice to "every mom who has lost her child to illegal immigration", by defunding sanctuary cities of federal funds and building a wall in between the U.S. and Mexico border.

Catchphrase: "Take back our country"

Tweets:

68. We must stop the crime and killing machine that is illegal immigration. Rampant problems will only get worse. Take back our country! (8/11/15 0:58)

69. We will no longer be silent. We can take our country back! Let's Make America Great Again! (7/17/15 17:32)

Trump as savior

70. But I have a simple message today for every gang member and criminal alien that are threatening so violently our people: We will find you, we will arrest you, we will jail you, and we will deport you. (280717b—Remarks by President Trump to Law Enforcement Officials on MS-13)

71. When I become President, this crime wave ends. We are going to cancel all federal funding for Sanctuary Cities. We are going to impose tough prison sentences for illegal immigrants who return after a previous deportation. We will end illegal immigration, deport every last criminal alien, and save American lives. (291016b—Remarks at the Phoenix Convention Center in Phoenix, Arizona)

72. I'm going to fight for every mom who lost her child to illegal immigration, and drugs and gang violence. (161017–Remarks at KI Convention Center in Green Bay, Wisconsin) [repeated]

73. So, to every American who has been waiting for real change, your wait is over – your moment of liberation is at hand. A vote for Trump is a vote to restore Democracy, to heal our economy, and to bring millions of jobs back into every forgotten stretch of this country. (090616 Remarks at a Rally at the Greenville Convention Center in Greenville, North Carolina.txt)

74. The first task for our new Administration will be to liberate our citizens from the crime and terrorism and lawlessness that threatens their communities. (072116 Address Accepting the Presidential Nomination at the Republican National Convention in Cleveland, Ohio.txt)

75. It will be my priority to work with communities, local police, state police and federal law enforcement to dismantle the gangs and to liberate our citizens from violence and poverty and fear. (083016 Remarks at the XFinity Arena in Everett, Washington.txt).

Trump as strong provider: The President claims to be a provider for the United States, as a strong defender of the U.S. border and an endorser of law enforcement (i.e. ICE). As President, building a wall, "will bring back [American] dreams" by deporting illegal immigrants who have stolen American jobs.

76. We will bring back our jobs. We will bring back our borders. We will bring back our wealth. And we will bring back our dreams. (200117—Trump's Full Inauguration Speech Transcript)

77. A Trump Administration will also secure and defend the borders of the United States. And yes, we will build a wall. We have the endorsement of America's ICE and Border Patrol Officers, the first time they have ever made an endorsement. (291016b—Remarks at the Phoenix Convention Center in Phoenix, Arizona)

Trump as brave patriot: Trump continued to label himself as the "protector" of America, stating that there were "millions of criminal aliens" invading the country and vowing to "deport" these immigrants and bring safety back to the nation.

78. The first duty of the President of the United States is to protect the citizens of the United States – anyone who fails to understand that is unworthy to lead this nation. There are more than 2 million criminal aliens with convictions in the country right now, and many more criminal illegal immigrants who have committed severe offenses but escaped the law entirely – when I am President, we are getting them out, and we are getting them out quickly. At the same time, our country is being infiltrated by terrorists. Hundreds of immigrants from high-risk regions have been implicated in terrorism inside the United States since 9/11. (051016b—Remarks at the Reno-Sparks Convention Center in Reno, Nevada)

79. But I have a simple message today for every gang member and criminal alien that

are threatening so violently our people: We will find you, we will arrest you, we will jail you, and we will deport you. (170728-remarks by Trump to Law Enforcement on MS13)

80. One by one, we're liberating our American towns. Can you believe that I'm saying that? I'm talking about liberating our towns. This is like I'd see in a movie: They're liberating the town, like in the old Wild West, right? We're liberating our towns. I never thought I'd be standing up here talking about liberating the towns on Long Island where I grew up, but that's what you're doing. (072817 Remarks by President Trump to Law Enforcement Officials on MS-13.txt)

Police, Military, Border Patrol as brave protectors: The President praised law enforcement as the "protectors" of America and continued to label immigration as the biggest source of "crime" in the nation, urging Americans to take back the country that was allegedly "stolen by immigrants."

Arpaio as hero
   Tweets:
81. I am pleased to inform you that I have just granted a full Pardon to 85 year old American patriot Sheriff Joe Arpaio. He kept Arizona safe! (8/26/2017 2:00:33 AM)

**Who are the traitors?**
Politicians, Hillary, Obama, and Republicans who don't support Trump. The President attacked any politician who did not share his views on "illegal immigrants."
   Tweets:
82. The super Liberal Democrat in the Georgia Congressional race tomorrow wants to protect criminals allow illegal immigration and raise taxes! (4/17/17 13:31)
   Speeches:
83. It's a tough one, Hillary, doesn't know what she's doing except open borders and let everybody come in and destroy our country by the way. (310816—Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona)

Politicians as corrupt, weak: He continued to condemn all politicians, especially Hillary Clinton, as "corrupt" and "weak" based on their views on immigration policies. Additionally, Trump implied that these politicians were "complicit" with the "crime" and "devastation" that resulted from "illegal immigration."
   Tweets:
84. Remember that Carson Bush and Rubio are VERY weak on illegal immigration. They will do NOTHING to stop it. Our country will be overrun! (10/25/15 20:49)
   Speeches:

85. We will terminate the Obama administration's deadly, and it is deadly, non-enforcement policies that allow thousands of criminal aliens to freely roam our streets, walk around, do whatever they want to do, crime all over the place. (160831-Trump's AZ Immigration Policy Speech)

86. As Secretary of State, Hillary Clinton allowed thousands of criminal aliens to be released because their home countries wouldn't take them back. Among those she allowed to go free was a criminal alien who had previously been convicted for shooting a girl in the head – after his release, he viciously murdered a young girl name Casey Chadwick. A wall will not only keep out criminals, but it will also keep out the drugs and heroin poisoning our youth. Drugs overdoses in Maine are on a record pace. I have outlined a plan to stop the opioid crisis. My plan begins with a strong border, includes the prosecution of drug dealers, and dramatically expands access to life-saving treatments that will help people unchain themselves from this terrible addiction. (151016b—Remarks at Toyota of Postmouth in Portmouth, New Hampshire) (repeat)

87. In four years, there's no way. Hillary Clinton is the most corrupt person ever to seek the presidency. And if she were elected, it would create an unprecedented constitutional crisis. (161102-Remarks at Central Florida Fairgrounds)

88. Clinton made her money as a corrupt public official breaking the law and putting her government office up for sale. (161003-Trump's Rally in Pueblo, CO)

89. Hillary Clinton is the ringleader of a criminal enterprise that has corrupted our government at the highest levels and the American people have one chance to stop it by showing up and voting. (161003-Trump's Rally in Pueblo, CO)

Amnesty

The President constantly vilifies the idea of amnesty, expressing that this action towards immigration reform would ultimately be the downfall of America. Amnesty is unthinkable when immigrants are all considered felons.

90. We don't want crime coming in. I don't know, maybe I'm wasting my time. Am I wasting my time? I don't think so. She doesn't want to have any borders. Total amnesty tell you what, folks. This is the last time you'll ever have a chance to save our country. (121016—Remarks at the Southeastern Livestock Pavilion in Ocala, Florida)

## DRILLING DOWN TO LEGALLY PROTECED GROUPS

**Mexico**: We have already presented how Trump characterizes Mexico and (Mexican) immigrants respectively as the enemy state and its invading combatant within his NATION AS FORTRESS narrative.

**Children of immigrants**: Now we consider his statements on the two groups of these children. Trump is not careful to distinguish US citizens by birthright, and those who are unauthorized because they were brought to the US as children. He at times conflates these different groups of children, which suggests his concern is not their legal status, but rather their non-white race. Indeed, he repeatedly expresses hostility toward US Latino children, in particular that they are entitled to US citizenship because of the Birthright Citizenship clause of the 14th Amendment.

> Tweets:
> 91. How crazy - 7.5% of all births in U.S. are to illegal immigrants over 300000 babies per year. This must stop. Unaffordable and not right! (21/08/15)
> Speeches:
> 92. So, we have 300,000 babies a year that you will have to take care of, we all have to take care of your [it] in the case of other countries, including Mexico, they do not do that. It does not work that way. You do not walk up the border one day and all the sudden we have another American citizen. Mexico does not do not do it. Very few places do it. We are the only place just about that is stupid enough to do it. (210815--Presidential Candidate Trump Rally in Mobile, Alabama)

Anchor Babies. Trump employs the disparaging term, anchor babies, for US Latinos who are born to immigrants. Again, he expresses disdain for them as the children of immigrants, although by constitutional directive, they are US citizens. This is a display of his disdain for their heritage as Mexican-Americans, Salvadoran-Americans, and so forth.

> Speeches:
> 93. Unbelievable. The birthright citizenship, the Anchor Baby, the birthright citizenship, and it will not happen. [For] -- hundreds of thousands of people coming from all over the world. It is over. Not going to happen. (151112, Trump Remarks at 2015 Sunshine Summit)
> 94. You're going to see what we're going to do. You're going to see. But the whole thing with anchor babies I was right. A person has a baby, lives in Mexico, lives in Asia or -- has a baby, walks across the border, has the baby here. Now we're responsible for that person for the next 85 years. I don't think so. And by the way, I was right, they were wrong. The 14th Amendment does not give them clearance on that. (031115—Presidential Candidate Trump News Conference)
> 95. But the whole thing with anchor babies I was right. A person has a baby, lives in Mexico, lives in Asia or -- has a baby, walks across the border, has the baby here. Now we're responsible for that person for the next 85 years. I don't think so. And by the way, I was right, they were wrong. The 14th Amendment does not give them clearance on that. (031115--Candidate Trump News Conference)

96. Just what, I became an American citizen, and all of these suckers out here going to pay for me for the next 85 or 90 years. That is what is happening. So, they are told to [stay] on. When I'm there they are going to be told just the opposite. Believe me. And we are going to triple the number. With Eisenhower's Plan, a lot of people never heard of him. Now they found out I was right. Just like I am right about anchor babies. You can come into the country illegally, have your baby, and we take advantage -- take care of your baby for eighty-five years. (131112-- Trump Remarks at 2015 Sunshine Summit)

97. We have a situation a mother is pregnant. She goes to the border. She walks across the border in front of our border patrol. They are great people. They are not allowed to do their job. She lies down they have a baby they call anchor baby. She has a baby. Now we're responsible for the baby for 85 years. Okay? I don't think so. I don't think so. I don't think so. we can't do it. We owe $19 trillion. We owe a number that's almost inconceivable when you think about it. So, we owe $19 trillion. We can't be in a position where we're doing what we're doing anymore. (141015, Presidential Candidate Trump Rally in Richmond, Virginia)

DREAMers and Sanctuary City. We have already addressed Trump's vision that Sanctuary City are the sites where so-called criminal aliens, Mexico's foot soldiers, overrun and wreak havoc among innocent American citizens. Trump is ambivalent about the group of activists called the DREAMers, but he clearly expresses derision about the power of their self-describing term, DREAMer. He wants to appropriate this term for the families of his audience, what he calls "our children," namely the offspring of his constituency. Similarly, he tries to seize the notion of Sanctuary Cities, once again, for them:

98. Did you ever hear of the Dream Act? It is not for our children. The Dream Act is for other children that come into the country. I want The Dream Act to be for our children. (151112, Trump Remarks at 2015 Sunshine Summit)

99. I saw that they were having the illegal immigrants come in, time to do with children, The Dreamers. The [joys] of children. I said, what about our children, why can't our children be The Dreamers? No one ever talks about that. [Applause] They never talk about that. We talk about The Dreamers, who by the way are treated better than our vets. Our vets are incredible. Immigrants, in many cases, not in all cases, but in many cases -- and our veterans, our wounded warriors, these are the greatest people we have. (290815--Presidential Candidate Trump Speech in Nashville, Tennessee)

100. Where is the sanctuary for American children? Where is that sanctuary? The dreamers we never talk about are the young Americans. Why aren't young Americans dreamers also? I want my dreamers to be young Americans. (240816-- Remarks at the Mississippi Coliseum in Jackson, Mississippi)

101.    Our whole country loses when young people of limitless potential are denied the opportunity to contribute their talents because we failed to provide them the opportunities they deserved. Let our children be dreamers too. (180816--Remarks at the Charlotte Convention Center in Charlotte, North Carolina.)

Immigrants who become voters vote Democrat. Trump expresses another non-judicial concern that immigrants remain in the United States. This concern does not have to do with a national security issue, but is a partisan political concern. US Latinos will vote Democrat:

102.    It starts at the border. People are flowing into this country. People in many cases, who are very bad. They are sending their criminals and they are not going to help us. I'm sure there's going to be some wonderful people, but for the most part those people are not going to be helping. We are getting criminals, gang members, the worst of the worst, and were just letting them flow right in. And now they're going to be voting? The Democrats like this and they wanted to help. These people are going to be voting a hundred percent for Democrats. (200315--WMUR-TV Interview with Trump)

Judge Gonzalo Curiel. "The deliberate confusion of ethnicity for nationality is one of the most casually cruel rhetorical devices available in this country. It's a lie that, in being told, makes itself partly true. If, for instance, a national politician refers to a Mexican-American as a Mexican, in an attempt to discredit him, then a portion of that person's American-ness, as it is understood by some portion of his countrymen, degrades. This is, of course, precisely what Donald Trump did to the United States District Judge Gonzalo P. Curiel over the summer, when he repeatedly cited the Indiana-born Curiel's identity as a "Mexican" as evidence that Curiel could not be impartial in the California class-action lawsuit against Trump University. For a particularly unhinged stretch in May and June, Trump refused to stop. "I'm building a wall. It's an inherent conflict of interest," he said.[‡]

103.    "We have a very hostile judge because, to be honest with you, the judge should've thrown the case out on summary judgment. But because it was me and because there's a hostility towards me by the judge, tremendous hostility, beyond belief. I believe he happens to be Spanish, which is fine. He is Hispanic, which is fine. And we haven't asked for recusal, which we may do. But we have a judge who is very hostile. Should've been thrown out. Wasn't thrown out." (160227-Trump Rally in Bentonville, AR)

104.    "I'll tell you what it has to do. I've had ruling after ruling after ruling that's been bad rulings, OK? I've been treated very unfairly. Before him, we had another judge. If that judge was still there, this case would have been over two years ago.

---

[‡] Tolentino, Jia (September 20, 2016). Trump and the Truth: The "Mexican" Judge. *The New Yorker*

105.    Trump: "Let me just tell you, I've had horrible rulings, I've been treated very unfairly by this judge. Now, this judge is of Mexican heritage. I'm building a wall, OK? I'm building a wall." (160603-CNN Interview with Jake Tapper)

106.    Tapper: I don't care if you criticize him, that's fine. You can criticize every decision. What I'm saying, if you invoke his race as a reason why he can't do his job. Trump: "I think that's why he's doing it. I think that's why he's doing it." (160603 CNN Interview with Jake Tapper)

107.    Tapper: But you're saying you can't do his job because of that. Trump: "Look, he's proud of his heritage, OK? I'm building a wall. We are building a wall. He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings, rulings that people can't even believe. This case should have ended years ago in summary judgement." (160603 CNN Interview with Jake Tapper)

Denying Racism

108.    Mitt Romney had his chance to beat a failed president but he choked like a dog. Now he calls me racist—but I am least racist person there is (11/06/16)

# APPENDIX

DATA

Two types of discourse:

Speeches:

• 347 speeches, 824,207 words

• 11 speeches that were transcribed as given.  Source: http://www.presidency.ucsb.edu

Tweets

• 6,963 total tweets (from August 2015, when he announced his presidential candidacy to mid-September 2017, when he announced that Congress should address the DACA controversy).

• 297 relevant tweets (which referred to immigration or immigrant as selected by five readers working independently in teams of 2 and 3 and then comparing their results. Source: www.trumptwitterarchive.com

METHOD

Two methods:

• Qualitative inductive analysis: Critical Discourse Analysis, namely a careful and rigorous method to avoid interpretation and data source problems.

• Quantitative computer-assisted searches based on the findings of Critical Discourse Analysis.

Both methods employ rigorous research protocol to avoid common pitfalls of selection bias and interpretive bias. All data can be independently retrieved; the method replicated to compare results. This provides a high degree of reliability.

# EXHIBIT G

Trump derides protections for immigrants from 'shithole' countries | The Washington Post
Case 1:16-cv-04756-NGG-VMS Document 242 Filed 01/15/18 Page 72 of 106 PageID #: 4055
1/13/18, 8:08 PM

The Washington Post

**Politics**

# Trump derides protections for immigrants from 'shithole' countries

**By Josh Dawsey** January 12 at 7:52 AM

President Trump grew frustrated with lawmakers Thursday in the Oval Office when they discussed protecting immigrants from Haiti, El Salvador and African countries as part of a bipartisan immigration deal, according to several people briefed on the meeting.

"Why are we having all these people from shithole countries come here?" Trump said, according to these people, referring to countries mentioned by the lawmakers.

Trump then suggested that the United States should instead bring more people from countries such as Norway, whose prime minister he met with Wednesday. The president, according to a White House official, also suggested he would be open to more immigrants from Asian countries because he felt that they help the United States economically.

In addition, the president singled out Haiti, telling lawmakers that immigrants from that country must be left out of any deal, these people said.

"Why do we need more Haitians?" Trump said, according to people familiar

Case 1:16-cv-04756-NGG-VMS  Document 242  Filed 01/15/18  Page 73 of 106 PageID #: 4056

with the meeting. "Take them out."

In November, the Trump administration rescinded deportation protection granted to nearly 60,000 Haitians after the 2010 earthquake and told them to return home by July 2019.

Lawmakers were taken aback by the comments, according to people familiar with their reactions. Sens. Lindsey O. Graham (R-S.C.) and Richard J. Durbin (D-Ill.) had proposed cutting the visa lottery program by 50 percent and then prioritizing countries already in the system, a White House official said.

A White House spokesman defended Trump's position on immigration without directly addressing his remarks. White House officials did not dispute the account.

"Certain Washington politicians choose to fight for foreign countries, but President Trump will always fight for the American people," spokesman Raj Shah said in a statement issued after The Washington Post first reported Trump's remarks. ". . . Like other nations that have merit-based immigration, President Trump is fighting for permanent solutions that make our country stronger by welcoming those who can contribute to our society, grow our economy and assimilate into our great nation."

Trump built his candidacy and presidency around hard stances on immigration, vowing to build a wall along the Mexican border and cut legal immigration by half, among other positions. Officials at the Department of Homeland Security have increased immigration raids, including dozens this week at convenience stores across the country.

Trump's comments Thursday also put further scrutiny on his long-standing tendency to make racially charged remarks — including attacks on protesting black athletes and his claim that there were fine people "on both sides" after neo-Nazis rioted in Charlottesville, Va. Trump falsely claimed for years that Barack Obama was not born in the United States and took out advertisements calling for the death penalty for members of the Central Park Five — four

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 74 of 106 PageID #: 4057

black youths and a Hispanic youth who were accused of a brutal rape in New York and later exonerated.

The president's remarks were quickly met with scorn from Democrats and some Republicans and could throw another wrench into bipartisan discussions on immigration, which had shown promise in recent days, according to legislators.

Rep. Luis Gutiérrez (D-Ill.) said the comments "will shake the confidence that people have" in the ongoing immigration policy talks.

 "Democrats and Republicans in the Senate made a proposal. The answer is this racist outburst of the president. How can you take him seriously?" Gutiérrez said. "They [Republicans] don't believe in immigration — it's always been about people of color and keeping them out of this country."

Rep. Cedric L. Richmond (D-La.), chairman of the Congressional Black Caucus, said on Twitter that Trump's remarks "are further proof that his Make America Great Again Agenda is really a Make America White Again agenda."

Some Republicans also raised objections. Rep. Mia Love (R-Utah), whose family is from Haiti, said in a statement that Trump's remarks were "unkind, divisive, elitist, and fly in the face of our nation's values. This behavior is unacceptable from the leader of our nation."

"My grandmother used to say, 'Digame con quién caminas, y te diré quién eres.' 'Tell me who you walk with, and I'll tell you who you are,'" said Rep. Adriano Espaillat (D-N.Y.), who represents most of Harlem and is an immigrant from the Dominican Republic, which shares the island of Hispaniola with Haiti. "If he's walking around with white supremacists and supporting them, this kind of talk doesn't surprise me."

The New York Times also reported last year that Trump said immigrants from Haiti have AIDS. The White House denied that report.

Case 1:16-cv-04756-NGG-VMS  Document 242  Filed 01/15/18  Page 75 of 106 PageID #: 4058

In a statement condemning Thursday's remarks by Trump, Haiti's ambassador to the United States, Paul G. Altidor, said that "the president was either misinformed or miseducated about Haiti and its people." He said the Haitian Embassy was inundated with emails from Americans apologizing for what the president said.

Democrats were quick to note that Trump employs Haitians at his Mar-a-Lago resort in Florida and that he praised Haitian Americans during a roundtable in Miami in September.

"Whether you vote for me or don't vote for me, I really want to be your greatest champion, and I will be your champion," Trump said at the roundtable.

Alix Desulme, a city council member in North Miami, home to thousands of Haitian Americans, said the president's latest remarks were "disgusting."

"Oh, my God. Oh, my God Jesus," Desulme said. "I don't know how much worse it can get."

"This is very alarming. We know he's not presidential, but this is a low," he said. "It's disheartening that someone who is the leader of the free world would use such demeaning language to talk about other folks, referring to folks of color."

Trump's critics also said racially incendiary language could damage relationships with foreign allies.

For many of Trump's supporters, however, the comments may not prove to be particularly damaging. Trump came under fire from conservatives this week for seeming to suggest that he would be open to a comprehensive immigration reform deal without money for a border wall, before he quickly backtracked.

"He's trying to win me back," conservative author Ann Coulter, who has called

for harsh limits on immigration, wrote on Twitter.

Outlining a potential bipartisan deal, the lawmakers discussed restoring protections for countries that have been removed from the temporary protected status (TPS) program while committing $1.5 billion for a border wall and making changes to the visa lottery system. Lawmakers mentioned that members of the Congressional Black Caucus had requested that some African countries be included in a deal, according to a White House official, who spoke on the condition of anonymity to describe a private conversation.

The exchange was "salty" on all sides, this person said, with the president growing profane and animated while discussing immigrants from other countries. "It did not go well," this person said.

The administration announced this week that it was removing TPS status for citizens of El Salvador. Haitians were added to the TPS program because of a strong earthquake that devastated Haiti eight years ago.

Trump had seemed amenable to a deal earlier in the day during phone calls with lawmakers, aides said, but shifted his position in the meeting and did not seem interested in the bipartisan compromise.

The scene played out hurriedly in the morning. Graham and Durbin thought they would be meeting with Trump alone and were surprised to find immigration hard-liners such as Rep. Bob Goodlatte (R-Va.) and Sen. Tom Cotton (R-Ark.) at the meeting. White House and Capitol Hill aides say Stephen Miller, the president's top immigration official, was concerned there could be a deal proposed that was too liberal and made sure conservative lawmakers were present.

After the meeting, Marc Short, Trump's director of legislative affairs, said the White House was nowhere near a bipartisan agreement on immigration.

"We still think we can get there," White House press secretary Sarah Huckabee Sanders said at the daily White House news briefing.

Case 1:16-cv-04756-NGG-VMS   Document 242   Filed 01/15/18   Page 77 of 106 PageID #: 4060

*Ed O'Keefe, Maria Sacchetti and Erica Werner contributed to this report.*

💬 **19052 Comments**

Sign in to join the conversation



# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BATALLA VIDAL et al., ) | |
| *Plaintiffs,* ) | |
| ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* ) | |
| ) | |
| NIELSEN et al., ) | |
| *Defendants.* ) | January 14, 2017 |
| ) | |

## DECLARATION OF AMY TAYLOR

I, AMY TAYLOR, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

**Introduction**

1.    I have been the Legal Director at Make the Road New York (MRNY), a plaintiff in this case, since June of 2015.

2.    MRNY's Legal Department currently has 44 employees, including 25 members of our immigration legal team.

3.    Since its creation, preserving DACA and its benefits to our community has been a core priority for MRNY. Since DACA was established by executive order in June of 2012, MRNY has provided legal assistance to thousands of DACA-eligible individuals.

4.    Since the inception of DACA, we have opened 4,560 DACA or DACA Renewal cases, assisting a total of 3,323 individuals. Since there are approximately 42,000 DACA recipients in New York State, MRNY has served nearly 8% of DACA recipients in New York.

5.    Soon after the October 5, 2017 deadline, MRNY learned of many clients and members whose applications for renewal had been rejected due to pick up delays by the Chicago USICS lockbox, postal service delivery delays, and real or perceived clerical errors. MRNY staff has spent numerous hours counseling individuals on their applications, assisting these individuals with resubmission, and in cases of real or perceived clerical errors, contacting USCIS to argue that clients should be allowed to resubmit their applications for full consideration.

**Pickup Delays**

6. USCIS rejected the DACA renewal applications of eight MRNY clients, including 2 members, whose DACA renewal applications arrived to the Chicago USCIS lockbox on October 5, 2017, but were not picked up by USCIS until October 6 and were then rejected.

7. MRNY client Fernando Hernandez Cordero has lived in the United States for almost 20 years.

8. He mailed his DACA renewal application on September 28, 2017.

9. The renewal application was delivered to the P.O. Box for the Chicago Lockbox on October 5, 2017, but it was not picked up until the next day.

10. USCIS rejected Mr. Hernandez's renewal application as untimely.

11. Mr. Hernandez's deferred action and work authorization expired on December 21, 2017.

12. MRNY member Yesenia Fajardo has lived in the United States since she was nine years old.

13. Her DACA renewal application was delivered to the P.O. Box for the Chicago Lockbox on October 5, 2017, but it was not picked up until the next day.

14. USCIS rejected Ms. Fajardo's renewal application as untimely.

15. Ms. Fajardo's deferred action and work authorization expire on January 13, 2017, the date that this declaration is to be filed.

16. MRNY staff brought these cases to the attention of the Department of Justice, through this litigation. *See* Exhibit A (November 7, 2017 Letter).

17. As a result of this litigation and public outcry, USCIS announced that it would invite certain individuals whose renewal applications were rejected despite having been delivered on the October 5 deadline.

18. As of December 4, however, there was no mechanism for such individuals to resubmit their applications to USCIS.  MRNY contacted the Department of Justice to note that Mr. Hernandez's deferred action and work authorization were expiring in December. *See* Exhibit B (December 4, 2017 Letter)

19. Ultimately, USCIS sent letters to individuals whose applications had been delivered on October 5, but had not been picked up by USCIS until the next day.  The letters invited the individuals to resubmit their applications.

20. MRNY staff expended resources communicating with our opposing counsel, the court, and our clients regarding the postal service delays and the procedures for resubmitting their DACA renewal applications. MRNY staff has worked and continues to work with these individuals to resubmit their applications. MRNY legal department staff is coordinating with our Finance Department to issue checks for these applications from a scholarship created by United We Dream in support of DACA recipients.

21. Mr. Hernandez and Ms. Fajardo resubmitted their renewal applications.

22. As of today, however, USCIS has not adjudicated the DACA renewals for Mr. Hernandez or Ms. Fajardo.[1]

---

[1] USCIS did adjudicate the renewal application of one MRNY member on an expedited basis, after MRNY noted that her deferred action and work authorization expired in November.

**Postal Delays**

23.  USCIS rejected the DACA renewal applications of three MRNY clients, one of whom is a member, because of U.S. Postal Service delivery delays.

24.  MRNY client Andrea Diaz Zamora is 19 years old and has lived in the United States since she was two years old.

25.  MRNY member Jorge Gonzalez Alvarado has also lived in the United States since he was two years old.  Thanks to DACA, he was able to find gainful employment and support his family.

26.  MRNY mailed both of their DACA renewal applications together on September 14, 2017.

27.  The US Postal Service did not deliver the package with Ms. Diaz's and Mr. Gonzalez's DACA renewal applications to the P.O. Box for the Chicago Lockbox until the morning of October 6, 2017.

28.  MRNY client Jonathan Marin Juarez has lived in the United States since he was six years old.

29.  He mailed his DACA renewal application on September 28, 2017.

30.  The U.S. Postal Service did not deliver the application to the P.O. Box for the Chicago Lockbox until October 10, 2017.

31.  Mr. Marin's deferred action and work authorization expired on December 28, 2017.

32.  MRNY staff brought these cases to the attention of the Department of Justice, through this litigation.  *See* Exhibit A (November 7, 2017 Letter).

33.  Finally, as a result of this litigation and public outcry, USCIS announced that it would invite certain individuals to resubmit their applications, if the U.S. Postal Service identified that their applications had been affected by postal delay.

34.  However, as of December 4, 2017, there was no mechanism for such individuals to resubmit their applications to USCIS.  MRNY contacted the Department of Justice to note that Mr. Marin's deferred action and work authorization was set to expire in December. *See* Exhibit B (December 4, 2017 Letter).

35.  USCIS began inviting individuals who were rejected because of postal delay to resubmit their applications in late December, and noted the invitations on its website on December 27, 2017.

36.  USCIS has not adjudicated the renewal applications for Ms. Diaz, Mr. Gonzalez, or Mr. Marin.

37.  MRNY staff has expended resources communicating with our opposing counsel, the court, and our clients regarding the postal service delays and the procedures for resubmitting their DACA renewal applications. MRNY staff is now working with these individuals to resubmit their applications. MRNY legal department staff is coordinating with our Finance Department to issue checks for these applications from a scholarship created by United We Dream in support of DACA recipients.

**Real or Perceived Clerical Errors**

38. USCIS rejected the renewal applications of three MRNY clients, who were also members, because of a real or perceived clerical error.

39. Hagi Garcia Teliz is a member and client of MRNY.

40. He timely filed his DACA renewal application on September 27, 2017.

41. However, Mr. Garcia's renewal application was missing a signature. USCIS rejected Mr. Garcia's renewal application for this reason.

42. With the rejection notice, USCIS included a sheet of paper inviting Mr. Garcia to resubmit.

43. Mr. Garcia correspondingly resubmitted a corrected renewal application on October 20, 2017.

44. Despite the earlier invitation to resubmit, Mr. Garcia's resubmitted renewal application was rejected as untimely.

45. MRNY identified Mr. Garcia's case in its first correspondence with opposing counsel, and continued to alert opposing counsel to Mr. Garcia's situation in subsequent correspondence. *See* Exhibit A (November 7, 2017 Letter— Appendix A); Exhibit C (November 20, 2017 letter).

46. Neither USCIS nor opposing counsel have offered any means for Mr. Garcia to resubmit his renewal application.

47. Mr. Garcia's deferred action and work authorization are set to expire on February 16, 2018.

48. Maria Santamaria Rivas is a member and client of MRNY who was eligible to renew her deferred action under DACA, under the terms of the Duke Memorandum.

49. She timely submitted her complete DACA renewal application on September 27, 2017.

50. However, USCIS read the date on her check as 2012, rather than 2017. USCIS Lockbox staff rejected her renewal application because the date on her payment was purportedly not current.

51. Ms. Rivas's attorney received the rejection notice on October 10, 2017.

52. Ms. Rivas's attorney obtained a new check and resubmitted her application with next day delivery. The application arrived at the Lockbox on October 11, 2017.

53. USCIS rejected the resubmitted application as untimely.

54. MRNY raised Ms. Rivas's case with the court in its PMC letter seeking leave to file the Third Amended Complaint, ECF No. 105, and further identified her case in correspondence with opposing counsel. *See* Exhibit C (Nov. 20, 2017 Letter).

55. USCIS represented to the public that individuals whose timely filed applications had been incorrectly identified as containing clerical errors should contact the Lockbox Support email. *See* Frequently Asked Questions, Rejected DACA Requests, ECF No. 113 at 65.

56. Ms. Rivas's attorney contacted the Lockbox Support email to note the mistaken rejection of her renewal application, but the Lockbox Support staff refused to allow Ms. Rivas to resubmit her application.

57.   MRNY has repeatedly raised Ms. Rivas's case to opposing counsel. *See* Exhibit B (December 4, 2017 Letter); Exhibit D (December 26, 2017 Letter).

58.   USCIS still refuses to allow Ms. Rivas to resubmit her erroneously rejected application.

59.   Jhonathan Meruvia Sanchez is a member and client of MRNY.

60.   He has lived in the United States since he was six months old.  He is a full time student and also works part-time to support his parents and younger brother.

61.   Mr. Meruvia timely submitted his DACA renewal application to USCIS on October 2, 2017.

62.   However, the application was missing one page.  USCIS rejected his application for missing the page.

63.   USCIS did not put the rejection notice in the mail until October 10, 2017.

64.   Mr. Meruvia's attorney resubmitted his application on October 17, 2017. However, USCIS rejected this resubmitted application as untimely.

65.   MRNY raised Mr. Meruvia's case to opposing counsel.  *See* Exhibit D (December 26, 2017 Letter).

66.   USCIS still refuses to allow Mr. Meruvia to resubmit his application.

67.   Mr. Meruvia's deferred action and work authorization expire on February 9, 2018.

68.   MRNY continues communicating with and advocating for clients and members affected by clerical error rejections.


EXECUTED January 14, 2018 in Brooklyn, NY



    /s Amy Taylor
AMY TAYLOR

Declaration

# EXHIBIT

# A



November 7, 2017

Stephen Pezzi
Trial Attorney
United States Department of Justice
Civil Division - Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

Re: *Batalla Vidal et al. v. Duke et al.*,
No. 1:16-cv-04756 (NGG) (JO) (EDNY)

Dear Mr. Pezzi,

The *Batalla Vidal* Plaintiffs recently learned that thirteen DACA renewal applications prepared by Make the Road New York (MRNY) and its sister organization, Make the Road New Jersey (MRNJ), were improperly rejected by USCIS as untimely despite USCIS receiving the majority of these applications by the October 5, 2017 deadline. *See* Appendix A (providing details on each application). We write to request that Defendants reconsider their improper rejection of these applications. The rejections violate the due process rights of Plaintiffs and these putative class members on the grounds that: (1) none of these individuals received proper notice of the October 5th deadline, and (2) the deadline itself was arbitrary and capricious. If the parties cannot resolve this issue, Plaintiffs will have no choice but to seek assistance of the Court. We write first to confer regarding the disposition of these thirteen applications and to determine whether the parties can reach agreement regarding the appropriate processing of these applications without need for court intervention.

The imposition of the October 5th deadline was arbitrary and capricious and as such, burdensome to both DACA recipients and immigration legal service providers across the country. Because of the unfairly short timeline for renewal announced on September 5, 2017, many DACA recipients filed renewal applications before the October 5th deadline but, through no fault of their own, had their applications rejected by USCIS. These rejections have already caused significant harm to the individuals and their families, employers, and communities at large. *See* Appendix A.

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
TEL 718 418 7690
FAX 718 418 9635

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
TEL 718 565 8500
FAX 718 565 0646

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
TEL 718 727 1222
FAX 718 981 8077

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
TEL 631 231 2220
FAX 631 231 2229

WWW.MAKETHEROADNY.ORG

The October 5th deadline was unreasonably burdensome to plaintiff Make the Road New York, whose core legal services include counseling and application assistance for thousands of DACA recipients. Though the USCIS Chicago Lockbox, a P.O. box, received most of the twelve DACA renewal applications by October 5, 2017, they were still wrongfully rejected as untimely. *See* Exhibits A (USPS tracking information for a package containing seven DACA renewal applications) and B (USPS tracking information for a package containing one DACA renewal application).

Moreover, the DACA Termination Memo itself stated only that the deadline was October 5th, without a specific time designated. However, USCIS apparently rejected applications received after 6pm on that date, without sharing prior notice of a cutoff time on October 5 with the public, including DACA recipients and organizations like MRNY, in any way. *See* Appendix A (including 9 applications received after 6pm on October 5th, which were rejected as untimely).

As you are aware, Judge Garaufis expressed concern regarding the arbitrariness of the October 5th deadline on September 14, 2017:

> I'm more concerned about the October 5th deadline in terms of how it might prejudice the rights of certain persons who are already covered by the DACA certificates and permits, work permits and so on that have already been issued. . . If you are living in Oregon or Michigan or Vermont, you don't have a problem with the hurricane, you've got a problem with the fact that based on this deadline you may be preempted from making an application to extend the benefit that you received under DACA. (Sept. 14, 2017 Tr. at 11:9-19.)

Plaintiffs have previously raised concerns regarding the lack of notice for individuals impacted by the October 5th deadline to the Court. *See* Sept. 14, 2017 Tr. at 14-15 (8-25, 1-3). None of the individuals named below received notices informing them of the October 5th deadline prior to October 5, 2017. In fact, many of these individuals received only a standard renewal notice sent by USCIS directing them to submit a renewal application "as soon as possible," by submitting the renewal application 120 to 150 days before expiration. Acting Secretary Duke's Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA) ("DACA Termination Memo") issued on September 5, 2017 was never sent to any of these individuals, nor was any other notice sent correcting the prior, standard notice or informing DACA recipients of the new date or time established as a deadline. Thus, Defendants did not provide these individuals adequate notice of the abrupt change in policy regarding the required timing of the submission of their DACA renewal applications.

Before seeking relief from the court, we seek to confer with Defendants in an effort to resolve this issue. We respectfully request that USCIS reconsider the applications below. If we do not hear back from you by close of business on Monday, November 13th, we will take further action to seek relief for these individuals. Please let us know if you would like to discuss this request.

Respectfully,

David Chen, Law Student Intern
Susanna D. Evarts, Law Student
Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.
Marisol Orihuela, Esq.
Michael J. Wishnie, Esq.
Jerome N. Frank Legal Svcs. Org.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq.
Deborah Axt, Esq.
Scott Foletta, Esq.
Alexia Schapira, Esq.
Make The Road New York
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq.
Mayra B. Joachin, Esq.
Melissa Keaney, Esq.
Karen C. Tumlin, Esq.
National Immigration Law Center
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900
Justin B. Cox, Esq.
National Immigration Law Center
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441
Joshua A. Rosenthal, Esq.
National Immigration Law Center
3450 Wilshire Blvd, #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900
*Attorneys for Batalla Vidal Plaintiffs*

APPENDIX A

| Name | Date of Birth | A number | Date and time application arrived at the Chicago Lockbox | Notes |
|---|---|---|---|---|
| Geraldine ▮ | 22 years old | ▮ | 10/5/17, 6:01 pm | Been in the United States since age 11 |
| Varlene Cooper | 31 years old | ▮ | 10/5/17, 6:01 pm | Two United States citizen children who depend on her financially; been in the United States since age 11 |
| Andrea Diaz Zamora | 19 years old | ▮ | 10/6/17, 10:17 am | Been in the United States since age 2; gainfully employed and in college |
| Valeria Erazo Pantoja | 19 years old | ▮ | 10/5/17, 6:01 pm | Been in the United States since age 3; full time college student |
| Yesenia Fajardo | 24 years old | ▮ | 10/5/17, 6:01 pm | College graduate; been in the United States since age 9 |
| Jorge Gonzalez Alvarado | 20 years old | ▮ | 10/6/17, 10:17 am | Been in the United States since age 2; gainfully employed and supporting his family |
| Fernando Hernandez Cordero | 33 years old | ▮ | 10/5/17, 6:01 pm | Five United States citizen children who depend on him financially; been in the United States since age 14 |
| Jose Antonio ▮ | 23 years old | ▮ | 10/5/17, 6:14 pm | Been in the United States since age 7; gainfully employed |
| Jonathan Marin Juarez | 22 years old | ▮ | 10/10/17, 5:23 pm | Been in the United States since age 6; gainfully employed and in college |
| Heriberto ▮ | 29 years old | ▮ | 10/5/17, 6:01 pm | Been in the United States since age 7; gainfully employed |
| Marcelo ▮ | 25 years old | ▮ | 10/5/17, 6:20 pm | Been in the United States since age 5; gainfully employed and in school |
| Cristhian Seleita | 21 years old | ▮ | 10/5/17, 6:01 pm | Been in the United States since age 9 |
| Hagi Garcia Teliz | 19 years old | ▮ | 9/27/2017, resubmitted on 10/20/2017 | Been in the United States since age 4, in college |

**Declaration**

# EXHIBIT
# B



December 4, 2017

<u>**VIA EMAIL**</u>
Stephen Pezzi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
stephen.pezzi@usdoj.gov

RE:     **Follow Up on Rejected DACA Renewal Applications**

Dear Mr. Pezzi,

We write about two pressing matters: (1) to request the expedited adjudication of DACA renewal applications for four Make the Road New York clients whose DACA expires this month, and (2) to urge USCIS to reconsider its decision to not accept timely filed applications that were rejected due to real or perceived minor clerical errors.

**Expedited Adjudication of DACA Renewal Applications**

Four Make the Road New York clients have DACA that expires this month.  USCIS has yet to set up and implement a procedure for accepting rejected DACA renewal applications.  If USCIS does not accept and adjudicate these four clients' renewal applications shortly, they stand to lose their protection from deportation and employment authorization.  We therefore request both that USCIS accept and adjudicate these four applications in an expedited manner, and that USCIS develop and implement a procedure for accepting rejected DACA renewal applications immediately.

- **Fernando Hernandez Cordero**'s DACA expires on December 21, 2017.  His application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Mr. Hernandez is thirty three years old and has five United States children who depend on him financially.
- **Cristhian Seleita**'s DACA expires on December 28, 2017.  His application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Mr. Seleita is twenty one years old and has been in the United States since he was nine years old.

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
TEL  718 418 7690
FAX  718 418 9635

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
TEL  718 565 8500
FAX  718 565 0646

**STATEN ISLAND**
479 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
TEL  718 727 1222
FAX  718 981 8077

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
TEL  631 231 2220
FAX  631 231 2229

WWW.MAKETHEROADNY.ORG

1

- **Jonathan Marin Juarez**'s DACA expires on December 28, 2017.  Due to USPS mail delays, his renewal application arrived on October 10th even though he mailed it on September 28th.  Mr. Marin has been in the United States since he was six years old.  He is gainfully employed and in college.
- **Valeria Erazo Pantoja**'s DACA expires on December 29, 2017.  Her application arrived at the Chicago Lockbox on October 5th.  However, USCIS picked it up from the facility the next day and rejected it as allegedly untimely.  Ms. Erazo a nineteen-year-old college student who has been in the United States since she was three years old.

**DACA Renewal Applications Rejected Due to Real or Perceived Minor Clerical Errors**

The *Batalla Vidal* Plaintiffs are deeply concerned by USCIS's position, elaborated in their "Frequently Asked Questions: Rejected DACA Requests" page, that it will not consider DACA renewal applications that were submitted before the October 5th deadline but rejected due to real or perceived minor clerical errors.  USCIS's refusal to accept these applications as timely violates the due process rights of these DACA recipients.  Additionally, the deadline itself and its implementation were arbitrary and capricious.

As discussed at the pre-motion conference on November 16, 2017, Plaintiffs are prepared to seek the intervention of the court to rectify this due process violation.  However, we write first to determine whether the parties can reach agreement on these issues without court intervention. **We urge USCIS to reconsider their position and issue guidance so that DACA recipients whose timely filed applications were rejected due to minor alleged clerical errors can resubmit their applications for full consideration.**

On November 16, 2017, Judge Garaufis expressed both concern about DACA recipients whose renewal applications were rejected due to minor alleged clerical errors, and hope that these issues could be resolved without further litigation.  You represented to the court that you believed "it would be appropriate to continue further conversations . . . before plaintiffs proceeded with additional litigation."  Judge Garaufis agreed with you that "the best initial course is . . . to get together, try to work it through . . . without litigation," and if that was not possible, to amend the complaint.

Besides Maria Rivas, the Make the Road New York client discussed at the pre-motion conference, counsel has identified eighteen DACA recipients whose renewal applications were filed timely and received by or shortly after the October 5th deadline but rejected due to minor alleged clerical errors.  Their summarized information is below, and individual situations here (with additional documentation attached):

- **Ana** ▮▮▮▮▮▮▮▮▮▮▮▮ submitted her DACA renewal on September 5, 2017 via FedEx.  Two women from a local church assisted Ana in preparing her application, and paid the renewal fee for her.  Unfortunately, the women submitted $465 instead of $495, so the application was rejected and mailed back to Ana on September 20, 2017 and directed her to resubmit her application with a corrected fee.  Ana was not aware there was any deadline, as the rejection letter did not mention a deadline and although she heard news about the DACA rescission, she was not sure the renewal deadline applied to

2

her.  On October 5th, Ana contacted the church women about the return of her application, and the women contacted an attorney, Linda Tam, on October 6th to assist Ana to resubmit her application with a corrected fee.  After gathering the necessary information and documents, Ms. Tam mailed Ana's DACA renewal packet the following week.  On October 27th, USCIS sent Ana a rejection notice, stating that her renewal request was submitted on an outdated form and received untimely, although the form was the correct version.  Ana is a 25-year-old resident of Oakland, California, and mother to a seven-month-old U.S. citizen baby.  Ana is afraid that she will lose her retail job as a result of losing DACA and will be unable to support her baby.  **Her DACA expired on December 1, 2017.**

- **Johana** ███████████████ filed her DACA renewal application on her own. Due to the short one-month deadline for filing, she was rushed, and had her sister help her fill out the forms. As she was going to sign the form, she realized her sister had forgotten to fill in one field regarding a prior visa number. Johana fixed that field and re-printed her finalized application, but this time, as she was nervous and in a rush, she forgot to sign it. She mailed her application to the Phoenix Lockbox and it was received timely on October 3, 2017. However, USCIS rejected the entire application because of the missing signature. USCIS returned the application to Johana on October 5. She sent the packet a second time on October 12, 2017 with the missing signature, but it was again rejected by USCIS as untimely. She then retained an attorney, who re-submitted the packet again with a cover letter on November 22, 2017, explaining what happened and advocating that the application should be considered since it was first received on October 3. Johana and her attorney have not yet received any response from USCIS since resubmitting a third time. **Johana's current DACA grant and work permit expire on December 6, 2017.** Johana needs her DACA and work permit because she is currently going to school and needs a job to pay for her books and supplies, not to mention to provide for her two young children as a single mother.

- After learning of the DACA Termination, **Crystal** ███████ sought to renew her DACA but was slowed down by Hurricane Irma and the need to find a new lawyer.  She found legal assistance and was able to submit her renewal application before October 5, but the lawyer neglected to check a box in the criminal history attestations.  USCIS rejected her application, with instructions to resubmit (attached), but when Ms. ███████ resubmitted the application, USCIS rejected it as untimely.  Ms. ███████ is currently on unpaid maternity leave after giving birth to a baby girl.  **She had hoped to return to work on December 13, but that plan is jeopardized because her EAD and DACA expire on December 4.**

- **Brittany** ███████ filed her DACA renewal on September 21, 2017 via USPS priority express mail, and it was received on September 22. On October 5, Brittany received the application back in the mail. It was sent back to her because she forgot to sign her name in one place. She fixed this issue and sent it back on October 6, 2017, again via express mail. It arrived on October 7, but because that was a Saturday, it was not signed for until October 10, a Tuesday. (Monday was the Columbus Day holiday.) On November 10, Brittany received a rejection. Her application was rejected as untimely because it was

received after October 5, even though she originally sent it on September 21. It would be devastating to Brittany to be forced to return to Trinidad, a country she left behind when she was 3 years old and where she has no close family members or friends. In addition, it would also be disastrous for the family of Brittany's employer if she does not regain her DACA permit and work authorization. Brittany is the full-time caretaker for the family's two 14-month old twins, one of whom has special needs and requires physical therapy. Her employer's family is devastated at the thought that she may not be able to continue to work in this country and know they won't find another caregiver who is as reliable, nurturing, and unshakable as Brittany. **Brittany's current grant of DACA and work authorization expires on December 7, 2017.**

- **Mayron** ▮▮▮▮▮▮ submitted his DACA renewal application before the deadline, and it arrived on October 2, 2017. He accidentally submitted the processing fee for $465 instead of $495, because the last time he renewed the fee was $465, and his entire case was sent back for that reason. With his rejection, he received a green document (attached) stating, "You are invited to resubmit your application package after you have corrected the reasons for rejection. . . . Place this letter on top of your application package." Mayron fixed the processing fee and re-submitted his application with the green document on top of his application package. On October 31st, he received his entire package in the mail with a rejection notice dated October 24th that stated that USCIS is no longer accepting DACA applications. Mayron, originally from Honduras, has lived in the U.S. since he was 11 years old and knows no other country as home. He has overcome lots of obstacles to be who he is today: He is a successful entrepreneur and owns three businesses. Mayron has been a DACA applicant for the last three years and is devastated by the Department of Homeland Security's actions in rejecting the renewal of his DACA. **Mayron's current grant of DACA expires on December 22, 2017.**

- **Carlos** ▮▮▮▮▮▮ 's lawyer mailed his DACA renewal application on September 18, 2017 via first-class mail. His lawyer received a rejection notice from USCIS that was dated October 29, 2017, stating that his application was received on October 11, 2017 but rejected because his current DACA expiration date was not listed in the form. While this field was missing on the application itself, the relevant date was included on the cover letter to the packet (attached). Carlos's lawyer was waiting to re-submit Carlos's application when USCIS released its guidance, but the guidance released on November 30, 2017 appears to foreclose Carlos's case because it involves not only unreasonable USPS mail delay, but also a small clerical error in a form.

- **Ana** ▮▮▮▮▮▮▮▮ filed her DACA renewal application on September 28, 2017 via U.S. Certified mail with return receipt and it arrived to USCIS on September 29, 2017. USCIS rejected her application because of a minor clerical error that anyone could have missed, a check box was the only thing not checked off. All other information on the application was there and correct, including the correct payment, signatures, and dates. Having DACA has given Ana the opportunity to better herself and gave her a sense of hope because with it she was able to work. It has helped her support her family. Losing DACA would take away her opportunity to work and with it the opportunity for her to

4

continue to support her family. She has a spouse and step-kids that count on her to help better their lives. **Her current grant of DACA expires on January 14, 2018.**

- **Yatziri** [redacted] mailed her DACA renewal application on October 4 via Fedex, and it was received on October 5. Her application was returned due to missing signatures. When she submitted the packet, she accidentally submitted the copy that was given to her to keep and that was not signed. The original document her processor gave her to send to USCIS *was* signed. Because of the deadline and the confusion and misinformation that surrounded DACA being terminated, she was in a panic to submit her application on time. Due to this she was too focused on sending it in and did not realize that she sent out her unsigned copy, instead of the signed original packet. After receiving the returned application, she realized her mistake and went back to the processor and signed the returned application and sent it back to USCIS. She sent the packet with the correction on November 14, 2017, before USCIS's announcement. It was rejected again as untimely and sent back to her on November 22. DACA has given Yatziri the opportunity to work and save money to continue her education. Her goal is to work in the medical field and working has allowed her to continue to pursue this goal. Losing DACA would detour her future goals and career aspirations. This would bring a hardship to her family because they count on her to not only support them but also to support herself. **Yatziri's current grant of DACA expires on January 26, 2018.**

- **Luigi** [redacted] mailed his DACA renewal application on September 23, 2017 via UPS-2 Day delivery. The application arrived to USCIS's offices on Tuesday, September 26th. On Wednesday, October 4th, USCIS sent back the entire package due to one box being unchecked in Part 4 of the application. Luigi did not receive the package until Saturday, October 7, 2017, by which time the October 5 deadline had passed. However, the package contained a green paper instructing him to make the correction on that part of the application and proceed to send it back. He did so, but his application was rejected as untimely. DACA truly has changed Luigi's life. It has given him so many possibilities that he did not have before—not just material but the ability to have peace of mind anywhere he goes. He was able to obtain his license, get a job, pay his taxes, and most importantly, do everything the way it is supposed to be. If Luigi loses his DACA, he will lose his driver's license and maybe even his job. He recently had a son and he needs to be able to provide for him the way he is doing now. **Luigi's current grant of DACA expires on January 19, 2018.**

- USCIS received **David** [redacted]'s DACA renewal application on October 4, 2017. However, it was rejected because form I-765 was not signed. Mr. [redacted]'s application was returned to him with a green sheet inviting him to resubmit his application. Mr. [redacted] resubmitted his application, but USCIS rejected it as untimely. Mr. [redacted] is gainfully employed.

- On September 29, 2017, **Maria Rivas** applied to renew her DACA status and sent a check dated September 28, 2017. Ms. Rivas qualified for financial support from United We Dream and her attorney at Westchester Hispanic Coalition wrote out her check for $495.00 on September 28, 2017. USCIS sent a Rejection Notice dated October 4, 2017. The stated reason for the rejection was "The date on the check/money order is not

current. The check date either occurred more than a year ago or it is in the future." The receipt date of Ms. Rivas's renewal application was listed as October 2, 2017. Ms. Rivas's attorney received the Rejection Notice on October 10, 2017 and despite the September 28, 2017 date on the original check, her attorney sent back the application and provided a new check as requested with the date of October 10, 2017. Despite Ms. Rivas's and her attorney's request to process the application with a receipt date of October 2, 2017, USCIS rejected the application and stated "USCIS no longer accepts requests for Consideration of Deferred Action for Childhood Arrivals." Ms. Rivas's attorney emailed Lockbox Support about this issue and on November 22nd, a representative responded refusing to allow Ms. Rivas to resubmit her application.

- **Deisy** ███████████'s DACA renewal was received by USCIS on October 3, 2017, ahead of the October 5th deadline. An attorney at her university assisted her to prepare her renewal forms remotely, since she is studying in DC for the fall semester. In addition, a nonprofit organization agreed to help her with the renewal fee. Unfortunately, the organization provided a check made out to Deisy herself rather than USCIS, and in the amount of $500 rather than $495. Deisy attached the check to her application and submitted them by the October 5th deadline. USCIS rejected her renewal on October 10, 2017, stating, "The payment amount is incorrect, or has not been provided," and both on the rejection notice and on a separate green document, instructed her to resubmit with the appropriate fees. As instructed, Deisy resubmitted her renewal with the correct fees, but USCIS rejected her application, stating that it no longer accepts DACA renewals. Deisy is a 20-year-old student at the University of Colorado at Boulder.


As Judge Garaufis said at the pre-motion conference, "there should be a rule of reason utilized here." In rushing to meet the arbitrary and capricious October 5th deadline, DACA recipients and overburdened attorneys were prone to make minor mistakes. DACA recipients who were not able to find representation in the short time period between the announcement and the deadline were particularly prone to making small mistakes as they saw their protection from deportation, their livelihood, and for many, their way of supporting their family, be put in imminent jeopardy. It would be unconscionable for USCIS to deny these DACA recipients, who met the arbitrary and capricious deadline, the chance to have their DACA renewals adjudicated because of an alleged minor mistake.

We await your response.

Sincerely,

Natalia Renta

| Type of alleged reason for rejection | Case-specific details |
|---|---|
| "The payment amount is incorrect, or has not been provided." | • Paid $465 (previous DACA renewal fee that has increased since the last time these DACA recipients had to renew) instead of $495 (this applies to two |

|  | individuals)<br>• Submitted payment for $500 instead of $495<br>• Check was written out to wrong entity |
|---|---|
| Lack of signature | • One of the forms (I-821D or I-765) was not signed (this applies to two applicants)<br>• Forms were not signed because she accidentally mailed the copies instead of the original |
| Unanswered fields (various) | • DACA expiration date field was blank on the I-821D form<br>• One or more of the yes/no questions was not answered (this applies to five applicants)<br>• In some cases, this information *was* answered in the attorney or representative's cover letter, but the entire packet was still rejected. |
| Other | • Initially filed form I-821D, but not I-765; upon resubmission (received by USCIS on 10/5), submitted $45 more than the required fee |

Sincerely,

/s/ Amy Taylor

Amy Taylor, Esq.
Co-Legal Director
Make the Road New York
301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690 x 1280
amy.taylor@maketheroadny.org

David Chen, Law Student Intern          Jessica R. Hanson, Esq.[†]
Susanna D. Evarts, Law Student Intern   Mayra B. Joachin, Esq.[†]
Healy Ko, Law Student Intern            Karen C. Tumlin, Esq.[†]
Victoria Roeck, Law Student Intern      NATIONAL IMMIGRATION LAW CENTER

Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.[*]
Natalia Renta, Esq.[*]
Alexia Schapira, Esq.[*]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Batalla Vidal et al. Plaintiffs*

[†] Appearing *pro hac vice*
[*] *Pro hac vice* motion forthcoming

8

**Declaration**

# EXHIBIT

# C

# The Jerome N. Frank Legal Services Organization

YALE LAW SCHOOL

November 20, 2017

Stephen Pezzi
Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

Re:  Batalla Vidal et al. v. Baran et al.,
No. 1:16-cv-04756 (NGG) (JO) (EDNY)

Dear Mr. Pezzi:

We write to request an expedited process for the immediate resubmission and reconsideration of Ms. Varlene Cooper's improperly rejected DACA renewal application as her DACA status expires in 4 business days; to renew our request that USCIS reconsider DACA renewal applications received by October 5, 2017, but rejected for minor clerical errors; and to request additional information concerning the USCIS Guidance on DACA Renewal Requests Affected by Mail Service Issues ("USCIS Guidance") issued on November 15, 2017.[1]

First, we request an expedited process for the immediate resubmission and expedited processing of Ms. Varlene Cooper's improperly rejected DACA renewal application, as her DACA status expires on November 24, 2017, during the Thanksgiving holiday. As detailed in our November 7, 2017 letter to you and in our pre-motion conference letter to the court, ECF No. 105 at 2, Ms. Cooper is a 31-year-old DACA recipient and client of Plaintiff Make the Road New York ("MRNY") who supports her two U.S.-citizen children and her mother. Her renewal application was delivered to the Chicago Lockbox P.O. Box address at 6:01 pm on October 5, 2017, but was not picked up until the next day and therefore rejected. USCIS has agreed to contact those whose "DACA requests were received at the designated filing location (e.g., at the applicable P.O. Box) by the filing deadline, but were rejected" to allow them to resubmit their renewal applications. USCIS Guidance. Ms. Cooper's application indisputably falls within this category. Because Ms. Cooper will imminently lose her DACA status and her ability to continue working so she can financially support her family within a week, we request that she be able to resubmit her renewal application via overnight courier to the Chicago Lockbox or other specified address. We further request that USCIS adjudicate her renewal application expeditiously without waiting for USCIS to contact her to request resubmission. Ms. Cooper's submitted DACA renewal application and proof of delivery is attached as Appendix A.

Second, we write to reiterate our request that USCIS also reconsider DACA renewal applications that were delivered on or prior to October 5, 2017, but were rejected for actual or perceived minor clerical errors. For example, Maria K. Santamaria Rivas, a DACA recipient and MRNY client, filed her renewal application on October 2, 2017. However, a Lockbox employee rejected her renewal application because USCIS misread the date on her check as "2012" instead of "2017." Her DACA renewal application and rejection notice are attached as Appendix B. Similarly, Hagi Garcia Teliz, another DACA recipient and MRNY client, filed his renewal

---

[1] Available at https://www.uscis.gov/news/alerts/uscis-guidance-daca-renewal-requests-affected-mail-service-issues.

P.O. BOX 209090, NEW HAVEN, CT 06520-9090 • TELEPHONE 203 432-4800 • FACSIMILE 203 432-1426
COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CT 06511

application September 27, 2017, but it was rejected by USCIS due to a missing signature, and his resubmission in October was rejected. His DACA renewal application and rejection notice is attached as Appendix C.

USCIS has not yet announced that it would process renewal applications rejected based on clerical errors, real or perceived, such as the ones in Maria's and Hagi's cases. However, the government's processing of DACA renewal applications, particularly where it has imposed a tight deadline that will forever bar an applicant from receiving DACA status, should be governed by a "rule of reason." November 17, 2017 Pre-mot. Conf. Tr. 11:11. Rejections such as Maria's have left DACA applicants little to no time to refile their applications by the government's October 5, 2017 deadline. Denying timely filed applications and forever barring individuals from renewing their DACA status based on minor or merely perceived clerical errors is arbitrary and violates due process of law. Plaintiffs will continue to provide information on additional individuals, including putative class members, whose renewal applications were rejected for such errors.

Finally, we request the following additional information concerning the USCIS Guidance:

(1) The number of DACA renewal requests that USCIS has identified as "received at the designated filing location (e.g., at the applicable P.O. Box) by the filing deadline, but were rejected." USCIS Guidance.
(2) The state(s) from which each DACA renewal request identified above was filed and the month when the Employment Authorization Documents (EADs) associated with each renewal request identified above will expire.
(3) A copy of the notice that USCIS intends to send to the above individuals.

At the pre-motion conference on November 16, 2017, Judge Garaufis asked the parties to work together to resolve these issues. We are committed to doing so and hope we can resolve these issues without judicial intervention.


Respectfully,

/s/ Muneer I. Ahmad.

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.
Marisol Orihuela, Esq.
Michael J. Wishnie, Esq.
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Jessica R. Hanson, Esq.
Mayra B. Joachin, Esq.
Karen C. Tumlin, Esq.
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900


Justin Cox, Esq.
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317

Phone: (678) 279-5441

Amy S. Taylor, Esq.
Deborah Axt, Esq.                    Joshua A. Rosenthal, Esq.
Scott Foletta, Esq.                  NATIONAL IMMIGRATION LAW CENTER
Alexia Schapira, Esq.                1121 14th Street NW, Suite 200
MAKE THE ROAD NEW YORK               Washington, DC 20005
301 Grove Street                     Phone: (202) 216-0261
Brooklyn, NY 11237
Phone: (718) 418-7690                *Attorneys for Batalla Vidal et al. Plaintiffs*

**Declaration**

# EXHIBIT D

December 26, 2017

**VIA EMAIL**
Stephen Pezzi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Stephen.pezzi@usdoj.gov

RE:    **Follow Up on Rejected DACA Renewal Applications**

Dear Mr. Pezzi,

We write on two subjects: (1) to follow up on Make the Road New York clients whom we wrote you about on December 4 but whose cases the government has still not resolved, and (2) to alert you to additional Make the Road New York clients and other members of the putative class whose renewal applications were wrongfully rejected, due to real or perceived minor clerical errors. We request your prompt assistance in resolving these cases without need for judicial intervention.

The refusal of USCIS to consider DACA renewal applications that were submitted before the October 5, 2017 deadline but rejected due to real or perceived minor clerical errors violates the due process rights of these DACA recipients. *See Guidance on Rejected DACA Requests: Frequently Asked Questions*, https://www.uscis.gov/daca2017/guidance-rejected-daca2017, at A7 ("If USCIS rejected your timely filed renewal request because it was not properly filed, that is a valid reason for rejection and it will not be reconsidered."). Nevertheless, we raise these cases in the spirit of Judge Garaufis's encouragement that the parties "get together, try to work it through . . . without litigation."

Follow-Up Requests for Previously Raised Clients

**Varlene Cooper**

We appreciate that Varlene Cooper's DACA renewal (A# ███████) was approved in an expedited manner.  However, she has yet to receive her physical work permit.  As a result, her employers have not allowed her to return to work and she is now living in a shelter with her two U.S. citizen children and her mother.  We therefore request that her work permit be mailed to her as soon as possible so she can get back to work, support her children and her mother, and move out of the shelter.

BROOKLYN
301 GROVE STREET
BROOKLYN, NY 11237
TEL  718 418 7690
FAX  718 418 9635

QUEENS
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
TEL  718 565 8500
FAX  718 565 0646

STATEN ISLAND
479 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
TEL  718 727 1222
FAX  718 981 8077

LONG ISLAND
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
TEL  631 231 2220
FAX  631 231 2229

WWW.MAKETHEROADNY.ORG

**Maria Santamaria Rivas**

Maria Santamaria Rivas (A# ▮▮▮▮▮▮▮▮) is a Make the Road New York client.  Judge Garaufis expressed particular concern about her case on the pre-motion hearing on November 16, 2017, saying that USCIS reading the date of the check as 2012 instead of 2017 reminded him of a similar mix up between him and his grade school math teacher.  Following USCIS's release of additional guidance regarding rejected DACA renewals, Ms. Santamaria's attorney emailed lockboxsupport@uscis.dhs.gov requesting that Ms. Santamaria be allowed to resubmit her DACA renewal application.  However, on November 22, 2017, a USCIS customer service representative erroneously denied her request (see attached email correspondence).  We request USCIS allow Ms. Santamaria to resubmit her erroneously rejected DACA renewal application.

Additional Wrongfully Rejected Renewal Applications

In addition to the individuals raised in our December 4 letter, we have learned of several additional individuals whose renewal applications were wrongfully rejected as a result of real or perceived clerical errors.

- **Jhonathan Meruvia Sanchez** (A# ▮▮▮▮▮▮▮▮) is a Make the Road New York client. He has been in the United States since 1999, when he was six months old.  He is a full-time student at Norwalk Community College, where he is studying psychology.  He also works part-time, which allows him to support his parents and nine-year-old brother, whom he has helped raise.

  USCIS received his DACA renewal application on October 2, 2017.  However, USCIS rejected his application because one page was inadvertently left out of his application. Mr. Meruvia's attorney resubmitted his application, which USCIS rejected as untimely on October 17th.  Mr. Meruvia's DACA renewal application and rejection notices are included under separate cover.  We request USCIS allow Mr. Meruvia to resubmit his DACA renewal application.

- **Gabriela** ▮▮▮▮▮▮▮▮ (A# ▮▮▮▮▮▮▮▮) timely submitted her renewal application with a check for the incorrect amount of money, and her application was rejected.  When she attempted to resubmit her application with the correct amount, USCIS rejected the resubmitted application as untimely.

- **Kelly** ▮▮▮▮▮ (A# ▮▮▮▮▮▮▮▮) mailed her renewal application on September 26, 2017, but it was not delivered to the Post Office Box for the Chicago Lockbox until October 6.  Also, her application did not include her DACA expiration date.  The application was rejected for untimeliness and for the minor clerical error.  When she attempted to resubmit a corrected renewal application, the resubmission was rejected as untimely.  Ms. ▮▮▮▮▮'s DACA has expired.

- **Lizbeth** ▮▮▮▮▮▮▮▮'s renewal application (A# ▮▮▮▮▮▮▮▮) was rejected for purportedly missing a page of the I-765 form.  With the rejection notice, Ms. ▮▮▮▮▮ also received a cover sheet inviting her to resubmit.  When her attorney resubmitted a complete renewal application with an explanation that the complete I-765



had been filed originally, the resubmission was rejected as untimely. The attorney contacted Lockbox Support and was told that, notwithstanding the invitation to resubmit, USCIS would reject any resubmission as untimely. Ms. ███████ is represented by Griselle Garcia, whose contact information will follow under separate cover.

- **Joel** ███████ (A# ███████) timely filed his renewal application, but it was rejected because he had used an old version of the I-765 form, rather than the current version. With his rejection notice, Mr. ███████ received a cover sheet inviting him to resubmit, but his resubmission was rejected as untimely. Mr. ███████'s DACA has expired. Mr. ███████ is represented by Adonia Simpson of Americans for Immigrant Justice. AI Justice's phone number is 305-573-1106.

- **Kevin** (A# ███████) and **Luis** ███████ (A# ███████) are brothers who timely filed their renewal applications at the same time without the assistance of counsel or an accredited representative. Their applications were rejected because they had not signed their I-821D Forms, and Luis's was additionally rejected for not including his DACA expiration date. With the help of a legal services organization, the brothers resubmitted their applications, but those applications were rejected as untimely. Kevin's DACA expires on December 28, 2017, and Luis's expires on January 25, 2018.

- **Gilma** ███████ (A# ███████) timely submitted her DACA renewal, but it was rejected because on one page, she signed on the "preparer" line, rather than the "applicant" line. USCIS sent her a cover sheet inviting her to resubmit a corrected form, her resubmission was rejected as untimely. Her DACA expires on December 28, 2017.


As Judge Garaufis said at the pre-motion conference, "there should be a rule of reason utilized here." When USCIS publicized the arbitrary and capricious October 5, 2017 deadline, there was no additional notice that DACA recipients would also need to avoid all real and perceived clerical errors for their submissions to be timely filed—even if USCIS later invited resubmission. We urge USCIS to reconsider its policy on clerical errors and to accept these individuals' renewal applications, and those of similarly situated individuals, for consideration for deferred action.

We await your response.

Sincerely,

/s/ Natalia Renta

Natalia Renta, Esq.
Staff Attorney
Make the Road New York
92-10 Roosevelt Avenue
Jackson Heights, New York 11372
Phone: (718) 565-8500 ext. 4317

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800


Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq. (SF 9452)
Alexia Schapira, Esq. (AS 8222)
Natalia Renta, Esq[*]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690


Jessica R. Hanson, Esq.[†]
Mayra B. Joachin, Esq.[†]
Trudy S. Rebert, Esq.[*]/[†]
Karen C. Tumlin, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900


Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441


Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Batalla Vidal et al. Plaintiffs*

[†] Appearing *pro hac vice*
[*] *Pro hac vice* motion forthcoming