1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

2    --------------------------------x
                             16-CV-4756(NGG-JO)

3    MAKE THE ROAD NEW YORK and
     MARTIN JONATHAN BATALLA VIDAL,

4                           United States Courthouse
          Plaintiffs,          Brooklyn, New York

5          -against-           September 14, 2017

6                            2:30 p.m.
     KATHY A. BARAN, ET AL.,

7          Defendants.

8    --------------------------------x

9

10       TRANSCRIPT OF CIVIL CAUSE FOR PRE MOTION CONFERENCE
           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS

11          UNITED STATES SENIOR DISTRICT JUDGE
       UNITED STATES MAGISTRATE JUDGE JAMES ORENSTEIN

12

13    APPEARANCES

14    Attorneys for Plaintiff: JEROME N. FRANK LEGAL SVCS. ORG.
                           P.O. BOX 209090

15                      New Haven, Connecticut 06520
                      BY:  MICHAEL J. WISHNIE, ESQ.

16                      SUSANNA D. EVARTS(STUDENT INTERN)

17                      NATIONAL IMMIGRATION LAW CENTER
                      3435 Wilshire Boulevard, Suite 1600

18                      Los Angeles, California 90010
                      BY:  KAREN TUMLIN, ESQ.

19                          JUSTIN COX, ESQ.
                          MAYRA JOACHIN, ESQ.

20                          MARISOL ORIHUELA, ESQ.
                          MUNEER I. AHMAD, ESQ.

21                          JESSICA HANSON, ESQ.

22                      MAKE THE ROAD NEW YORK
                      301 Grove Street

23                      Brooklyn, New York 11237
                      BY:  AMY S. TAYLOR, ESQ.

24

25

```
 1
      Attorneys for Defendant:
 2                         U.S. DEPARTMENT OF JUSTICE
                           CIVIL DIVISION
 3                         FEDERAL PROGRAMS BRANCH
                           950 Pennsylvania Avenue, N.W.
 4                         Washington, D.C. 20530
                           BY  BRETT A. SHUMATE,
 5                             DEPUTY ASSISTANT ATTORNEY GENERAL
                               JOHN R. TYLER, ASSISTANT BRANCH DIR.
 6                             BRAD ROSENBERG, SR. TRIAL COUNSEL

 7                         UNITED STATES ATTORNEY'S OFFICE
                           Civil Division
 8                         271 Cadman Plaza East
                           Brooklyn, New York 11201
 9                         BY:  JOSEPH A. MARUTOLLO, AUSA
                               SUSAN L. RILEY, CHIEF CIVIL DIVISION
10

11

12

13

14

15

16

17

18

19    Court Reporter:           Georgette K. Betts, RPR, CSR, OCR
                                Phone:  (718)804-2777
20                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
21

22

23    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
24

25
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

```
 1              THE COURT:  You may be seated in the back and on the

 2    side.  Call the case, please.

 3              THE COURTROOM DEPUTY:  Everybody on the Vidal matter

 4    please state your appearances for the record.

 5              THE COURT:  All right.  For the plaintiff.

 6              MR. WISHNIE:  Good afternoon, Your Honor, for

 7    plaintiffs, Michael Wishnie, Jerome N. Frank Legal Services

 8    Organization, Yale Law School.  With me today is law student

 9    intern, Susanna Evarts.  Ms. Evarts will be prepared to

10    address the Court regarding the claims set forth in our

11    filings.

12              Attorney Karen Tumlin of the National Immigration

13    Law Center will be prepared to address the Court regarding

14    case management and scheduling, any matters like that.  I'll

15    invite everybody else to introduce themselves.

16              THE COURT:  That's fine, please go ahead.

17              MR. COX:  Justin Cox with the National Immigration

18    Law Center.

19              MS. JOACHIN:  Mayra Joachin, National Immigration

20    Law Center.

21              MS. HANSON:  Jessica Hanson, National Immigration

22    Law Center.

23              MS. TAYLOR:  Amy Taylor, Make The Road New York.

24              MS. ORIHUELA:  Marisol Orihuela, Jerome N. Frank

25    Legal Services Organization.
```

1          MR. AHMAD:  Muneer Ahmad, Jerome N. Frank Legal

2     Services Organization.

3          THE COURT:  Thank you.  Yes.

4          MS. RILEY:  Good afternoon, Your Honor, Susan Riley,

5     chief of the civil division in the U.S. Attorney's Office.

6          THE COURT:  Nice to see you again, Ms. Riley.

7          MS. RILEY:  Thank you, Your Honor.

8          I'd like to introduce to you our Deputy Assistant

9     Attorney General for the civil division in Washington, D.C.,

10     Brett Shumate.  He will be presenting the government's

11     arguments today.

12          Also at counsel table is John Tyler, an assistant

13     director in the Federal Programs Branch in the civil division

14     Department of Justice in Washington, D.C.  With us also is

15     Brad Rosenberg, also of the Federal Programs Branch of the

16     civil division in Washington, D.C.  Lastly, but not least, Joe

17     Marutollo of our offices, USAO office, chief of immigration

18     litigation.

19          THE COURT:  He has replaced Mr. Dunn?

20          MS. RILEY:  Yes, he has, Your Honor.

21          THE COURT:  Who has taken the bench in New York

22     City.

23          MS. RILEY:  Yes, he has.

24          THE COURT:  How nice for him.

25          MS. RILEY:  Yes, it is, Your Honor.

1                THE COURT:  All right.  It's nice to see every one

2      from out of town, New Haven and Washington.

3                With me is Magistrate Judge James Orenstein, who is

4      also assigned to this case and we thought for the purposes of

5      efficiency the two of us would preside over this proceeding.

6      You may be seated.

7                This case was brought last year and it was, in

8      effect, stayed while the political process continued and here

9      we are on September 14th, 2017, and we've been asked by the

10     plaintiffs to file a second amended complaint.

11               So why don't we start with the application made by

12     the plaintiff.

13               MS. EVARTS:  Good afternoon, Your Honor, thank you.

14     I would like to first start by introducing my client, Martin

15     Batalla Vidal and many members of Make the Road New York who

16     are with us today.

17               THE COURT:  Where is your client?

18               MR. VIDAL:  Right here, Your Honor.

19               THE COURT:  Nice to meet you.

20               MS. EVARTS:  Second, with your permission, I would

21     like to state the case briefly as we see it.

22               THE COURT:  Have you been keeping up with all the

23     news from Washington and Florida that's been articulated by

24     the President in the last 12 hours about this case -- not

25     about this case about the DACA situation?

1          MS. EVARTS:  Yes, I have, Your Honor.

2          THE COURT:  Okay, fine.  I'll be asking the other

3    side a few questions about that.  Go ahead.

4          MS. EVARTS:  The Trump administration's decision to

5    terminate the DACA program was both heartless and cruel and it

6    was also illegal.  The purpose of the Administrative Procedure

7    Act, the APA, is to ensure that when an agency undertakes

8    action that it think through its decision and it think through

9    the cost of taking that action and make a deliberate decision,

10   especially -- this is especially true when people's lives are

11   at stake.

12         THE COURT:  They didn't follow the Administrative

13   Procedure Act when the established DACA, did they?  That was

14   done without an opportunity for notice and comment, right?

15         MS. EVARTS:  That is correct, Your Honor.

16         THE COURT:  So going in there hasn't been -- the APA

17   wasn't followed but you're saying they should be following it

18   in connection with the rescission.

19         MS. EVARTS:  Yes.

20         THE COURT:  Is that it?

21         MS. EVARTS:  We are, Your Honor.

22         THE COURT:  Okay.

23         MS. EVARTS:  And while we fully acknowledge that an

24   agency can change its policy, when it does it needs to be

25   legal, it cannot be pretextual and it needs to be

1    constitutional.  The agency has failed all three of those.

2         After its termination of the DACA program, we

3    proposed to amend our complaint in order to bring claims,

4    statutory claims and constitutional claims.  Our statutory

5    claims arise under the Administrative Procedure Act and the

6    Regulatory Flexibility Act.  And our constitutional claims

7    arise under the equal protection guarantee of the Fifth

8    Amendment along with the due process clause of the Fifth

9    Amendment.

10        And I can describe the claims in more depth if you

11   would like, Your Honor.

12        THE COURT:  Well, briefly speaking, you are

13   proposing to amend the complaint, according to your letter, to

14   make certain claims for individuals who are not yet plaintiffs

15   in the case, right?

16        MS. EVARTS:  That is correct, Your Honor.

17        THE COURT:  And also to make claims on behalf of a

18   class or a number of classes.

19        MS. EVARTS:  That is correct, Your Honor.

20        THE COURT:  Can you describe the class or classes

21   that you propose to include in your amended complaint.

22        MS. EVARTS:  Yes, Your Honor.  We propose a

23   nationwide class that would be nationwide.  And I can get into

24   more detail.  We also expect in our class certification

25   motion, if you grant us leave to amend our complaint, that we

1    will also more fully flesh out the particular aspects of the

2    class that we propose.

3            THE COURT:  When could you have this second amended

4    complaint filed so we can move along with this case, and as

5    the government -- as the Attorney General has established

6    certain deadlines for making application to extend these

7    permits.

8            Just state your name for the court reporter.

9            MS. TUMLIN:  Absolutely.  Karen Tumlin for

10   plaintiffs.  Your Honor, the plaintiffs are prepared to file

11   our second amended complaint on Tuesday, the 19th, if that

12   would work for the Court.

13           THE COURT:  All right.  And so you are pretty far

14   along then in preparing your second amended complaint.

15           MS. TUMLIN:  We're working diligently, Your Honor.

16           THE COURT:  Okay, well, that's what weekends are

17   for.

18           MS. TUMLIN:  Turns out.

19           THE COURT:  Let me just ask the government --

20   welcome, first of all, sir.

21           MR. SHUMATE:  Thank you, Your Honor.

22           THE COURT:  Let me just ask you, are you the career

23   person in your position at the justice department or are you

24   the political appointee?

25           MR. SHUMATE:  I'm the political appointee, Your

1    Honor.

2             THE COURT:  Which means you know more about what the

3    President is thinking than a career person would.

4             MR. SHUMATE:  I don't think you should assume that,

5    Your Honor, but --

6             THE COURT:  Okay.

7             MR. SHUMATE:  -- I'm the Deputy Assistant Attorney

8    General for the Federal Programs.

9             THE COURT:  Well, it is nice to have you here.

10            MR. SHUMATE:  Thank you.

11            THE COURT:  So I take it from your correspondence

12   that you don't object to the filing of the second amended

13   complaint.

14            MR. SHUMATE:  That's correct, Your Honor.

15            First of all, I just wanted to say that we recognize

16   the importance of this case, the significance of the issues

17   that are presented, and the public interest in the case.  So

18   we obviously have no objection to the filing of the amended

19   complaint.  We see it makes perfect sense to move this case

20   along quickly, so we're not opposing the amended complaint.

21            What the government would be willing to do is file a

22   motion to dismiss within 30 days of when we see the amended

23   complaint.  Even though we typically have 60 days, we're

24   willing to move very quickly to put the Court in a position to

25   address what we think are fundamental flaws in the claims that

1    the plaintiffs propose to bring by the end of the year.  And

2    as you know, there is a March deadline in DHS's memorandum.

3    In the event the Court does not dismiss the case, we feel the

4    Court should do that, the Court will be able to take some

5    action and we can move to PI briefing potentially next year if

6    the plaintiffs so choose to do so.

7         But we think the best course of action would be, for

8    example, if the plaintiffs were to file the amended complaint

9    next week, we would file a motion to dismiss within 30 days,

10   say October 20th, the plaintiffs could have another 30 days or

11   so to file an opposition, which we would propose

12   November 17th, we would file a reply on December 15th and then

13   the Court could hold a hearing, if it decided to do so, at the

14   end of the year and the Court would be in a position to make

15   the decision on our motion to dismiss end of this year, early

16   next year.  So that would --

17        THE COURT:  Okay.  Let me just ask you this.  Isn't

18   there -- there's a first deadline that was set forth by the

19   Attorney General in his statement and that I think was

20   October 5th.  What was that deadline for?

21        MR. SHUMATE:  So it's actually -- October 5th,

22   that's correct, it is actually a DHS deadline for renewal

23   applications for certain categories of individuals whose

24   permits expire.  So, yes, that deadline is upcoming.

25        One thing the plaintiffs had asked us to consider is

1     whether DHS would consider extending that deadline in light of

2     the hurricanes in Texas and Florida.  We took that issue very

3     seriously, we took it to DHS, they have considered our

4     request.  Their position right now is that that deadline will

5     remain October 5th as of now, but I am authorized to say that

6     they are actively considering whether to extend the deadline

7     in light of the hurricanes.  So that's what I know about the

8     October 5th deadline.  As of right now, it still stands.

9                THE COURT:  I'm more concerned about the October 5th

10    deadline in terms of how it might prejudice the rights of

11    certain persons who are already covered by the DACA

12    certificates or permits, work permits and so on that have

13    already been issued.  And so I'm not worried -- I mean, we're

14    all concerned about what has happened with the hurricanes, but

15    if you're living in Michigan or in Oregon or in Vermont, you

16    don't have a problem with the hurricane, you've got a problem

17    with the fact that based on this deadline you may be preempted

18    from making an application to extend the benefit that you

19    received under DACA.  So since this is a nationwide program, I

20    think we should just not focus on people in the impacted areas

21    from the hurricanes, we need to focus on everybody.  If this

22    is going to be an application for a nationwide class, we have

23    to think of the whole country, so -- and then there's also the

24    question of whether DHS and the immigration officials have the

25    latitude, absent DACA, to grant certain applications

1   irrespective of whether DACA exists and whether this, in

2   effect, creates a legislative rule on the part of DHS that

3   bars people, based on their classification, from being

4   considered for this kind of benefit or remedy or exception to

5   the general rule.

6          I'm just wondering, have you all thought about the

7   question of whether that kind of hard and fast deadline for

8   certain categories of individuals covered by DACA would, in

9   effect, constitute a legislative rule, irrespective of whether

10  the creation of DACA violated that in effect the requirement

11  that legislative rules not be established.

12         MR. SHUMATE:  Thank you, Your Honor.  We certainly

13  understand the plaintiffs' concern about the October 5th

14  deadline.  In DHS's judgment, 30 days was a sufficient amount

15  of time to allow individuals to complete the paperwork to file

16  for renewals.  I think there is a virtue in having a clear

17  deadline that people know about, that's clear and why we're

18  reporting.  So in their discretion they thought that was

19  appropriate and, in their defense, Your Honor, this is a

20  decision that has been made to wind down the program.  It was

21  not an abrupt decision, so the program is not ending

22  immediately.  Nobody is losing their DACA benefits

23  immediately.  The opportunity has been provided to renew

24  certain applications and so we think that is eminently

25  reasonable.

1           And our position in the case is that this decision

2    to rescind DACA is not subject to judicial review of the APA

3    at all.  So it is not subject to the arbitrary and capricious

4    decision-making requirement, it's not subject to notice in

5    common rule making, so this was an eminently reasonable

6    decision that, you know, it's an exercise of prosecutorial

7    discretion.  We had to decide how to wind it down in some way,

8    so they felt this was just a reasonable way to establish some

9    deadlines so folks would have clear notice of what the

10   deadlines would be.

11           THE COURT:  Well, the Attorney General said in his

12   statement that DACA is unconstitutional and yet in this

13   process you're allowing people to renew, certain people, whose

14   coverage ends by a certain time to renew even though it is an

15   allegedly unconstitutional procedure.  Is that what -- do I

16   get that right or do I get that wrong?

17           MR. SHUMATE:  That is right.  The Attorney General

18   and DHS both decided that this is an unlawful program and what

19   they decided was -- it was a decision based on litigation

20   risk.  That if we did not wind down the program in a

21   responsible way it was very likely that the other states were

22   going to go to the Southern District of Texas and ask for an

23   immediate preliminary injunction in which case the program

24   could have been ended immediately.  So in their judgment what

25   they decided to do is we're going to have a responsible way to

1    wind this program down that gives folks a chance to know when

2    the deadlines are, gives an opportunity to apply for renewal

3    permits so people aren't losing their benefits immediately.

4    So it was a decision based on litigation risk that if we

5    didn't wind this down in a responsible way, then the District

6    Court in Texas would do it for us.

7            MS. TUMLIN:  If I may speak briefly to the

8    October 5th and the notice issue.  Leaving aside the

9    tremendous turmoil that states and individuals impacted by the

10   hurricanes but looking at the entire country, one of the

11   things that we're greatly troubled by as plaintiffs and would

12   like to address to the Court is, the renewal process for DACA

13   how it has worked traditionally is 180 days before someone's

14   work authorization in DACA is set to expire they get a notice

15   and that notice directs them to file the renewal application

16   between 120 and 150 days.  And those notices -- and I think

17   the government can of course correct me if this is not the

18   case -- have continued to go out, but what that means with the

19   hard and fast October 5th deadline is, individuals whose DACA

20   is expiring between February and March, have received notices

21   that are false and misleading in this context that has

22   changed.  They don't state that you only have until

23   October 5th and our understanding is there is no plan to

24   provide individualized notice that provides the right date and

25   provide a warning to individuals that if they don't submit

1     their renewal applications three weeks from today, not in the

2     120- or 150-day window, that they risk losing their chance to

3     renew.

4          THE COURT:  I see.  So let me just move on to the

5     next question, which is after you file your second amended

6     complaint, assuming that the problem isn't resolved

7     legislatively by the political branches, if you will, of the

8     federal government, between now and October 5th --

9          MS. TUMLIN:  Correct.

10          THE COURT:  -- then do you anticipate requesting

11     some kind of preliminary injunctive relief?  What can we

12     expect, what can the Court expect from the plaintiffs, the

13     new -- the current plaintiff and any additional plaintiffs at

14     that point.  I'm just trying to plan for what may happen.  My

15     hope would be, frankly, that the executive branch would put a

16     voluntary halt to this, the termination process, to permit

17     Congress and the President to find a legislative solution so

18     the courts are not involved.

19          There are apparently 800,000 individuals who are

20     affected potentially by what's happening with DACA, and that

21     doesn't even cover family members of those people who are also

22     potentially affected.  There are people who are working

23     supporting families.  We're not talking about people who are

24     children, we're talking about people who are grown and in the

25     work force many, many of them, and they support families, they

1    support their parents, they support their own children some of

2    them.  This is a much wider situation than just the

3    individuals.  And this affects others as well.  They pay

4    taxes, they pay rent, they pay for mortgages, they support

5    their communities, and so I'm concerned, the Court is

6    concerned that the government if it proceeds with these

7    arbitrary deadlines, which is what they are, they are just

8    arbitrary deadlines, that the consequence will be far greater

9    in scope than simply you can't apply and down the road some

10   judge or the Congress will solve the problem and all will be

11   well, all right.  We can't expect that in this environment

12   that is a likely outcome.  It's a hoped for outcome.  And from

13   what the President has said in the last 24 hours, I'm

14   encouraged that this can be resolved by a legislative

15   solution.  But you're here because you anticipate that it may

16   not be resolved by a legislative solution.  So I'm just

17   wondering whether you have a plan since you're plaintiffs.

18            MS. TUMLIN:  Yes.

19            THE COURT:  So tell us, give us a little bit of a

20   hint as to where we're going to go from here apart from the

21   filing of a second amended complaint.

22            MS. TUMLIN:  Absolutely, Your Honor, I appreciate

23   that.  And I'd like to do that in two tracks:  One, talking

24   about what the Court might anticipate what plaintiffs' plan

25   might be for the October 5th and then we can turn to the other

1    deadline, which is the March deadline.

2         So with respect to whether any type of injunctive

3    relief or temporary restraining order would be sought in

4    advance of the October 5th deadline, a couple of things would

5    be useful.  I think having, first and foremost, a date certain

6    by when the defendants can provide an answer whether the

7    government will voluntarily extend that deadline and perhaps

8    coming back and having another conference when we're closer to

9    that date, perhaps around September the 25th would be amenable

10   to plaintiffs or 26th.  We're sitting three weeks today from

11   the deadline for October 5th.  But at that point we can make a

12   determination and be ready to set a schedule if we were still

13   in a situation where the defendants had not moved the

14   October 5th date and it became necessary to seek immediate

15   relief.  So that would be one plan, Your Honor.

16        We could -- if that became necessary, a need for

17   temporary restraining order that's something we could file on

18   Monday, October the 2nd.

19        THE COURT:  So you're saying something like

20   Thursday, September 28th might be a good date?

21        MS. TUMLIN:  I was suggesting the Monday or Tuesday,

22   the 25th or 26th for a conference, Your Honor, to see the

23   defendants may have more information at that time and then if

24   we're in resolution, terrific, we can focus on the March 5th

25   date.  If not, we could proceed to set a schedule for a

1    temporary restraining order if that's still necessary.

2              THE COURT:  Let me hear from the deputy assistant

3    attorney general.

4              MR. SHUMATE:  Thank you, Your Honor.  We obviously

5    have no objection to coming back for another status

6    conference.  I think we can also just engage with the

7    plaintiffs and let them know the government's position or file

8    a letter with the Court letting the Court know what DHS has

9    decided on the October 5th deadline.  It may obviate the need

10   for a status conference, I can't speak to that now, it's still

11   actively under consideration.

12             THE COURT:  Well, let me say this with great respect

13   for the Department of Homeland Security, that it would be

14   helpful if we could try to avoid judicial intervention in this

15   case if all that it takes, at least at this point, is to

16   extend one deadline, the reason for which is unknown to me and

17   probably unknown to many people, but which is so close in time

18   that taking into account the President's comments where he

19   said in a tweet today -- I do follow the President's tweets --

20   Does anybody really want to throw out good, educated and

21   accomplished young people who have jobs, some serving in the

22   military, question mark.  Really.  And I think that the

23   message that's being sent is that there is room for a solution

24   and to set -- to keep a deadline that is so close in time to

25   today while a solution is being engineered -- and it's

1    difficult to engineer these solutions for reasons that I need

2    not go into, you can read about them in the media -- that it

3    would be useful to take some of the pressure off the various

4    parties, particularly those who are affected, these people,

5    these good, educated and accomplished young people who the

6    President speaks about with admiration, so that way at least

7    we wouldn't have to deal with a potential judicial

8    intervention at this early stage and we would give the

9    Congress and the President the opportunity to work through

10   some of the difficulties that they may face in engineering the

11   solution.  And that's really -- that's the Court's hope.  The

12   Court can stay out of this and that the political branches of

13   the government can resolve this.  And it would appear there is

14   some progress being made in that regard and DHS I believe

15   would be well served by giving that process the chance to bear

16   fruit.

17            So I wish you would take that back to your client.

18            Who is the secretary of DHS now that General Kelly

19   has become Chief of Staff?

20            MR. SHUMATE:  Acting Secretary Duke.

21            THE COURT:  You know, General Kelly, according to

22   the Daily News at least, was at the dinner last night at the

23   White House with the democratic leaders of the House and the

24   Senate where the President and leadership, the minority

25   leadership had a discussion about this very issue, so he's

 1  very familiar with this situation and I'm sure he could be

 2  helpful as well.

 3          MR. SHUMATE:  Yes, Your Honor, we will absolutely

 4  take your concerns back to our clients.

 5          I think one thing to keep in mind is if the

 6  plaintiffs intend to move for a TRO or a preliminary

 7  injunction so close to that October 5th deadline, we do have

 8  serious concerns about the merits of their claims.  That they

 9  are going to ask for that type of emergency relief, they are

10  going to have a show a likelihood of success in the merits,

11  so --

12          THE COURT:  I know all the rules.

13          MR. SHUMATE:  Right.  We think it really makes sense

14  to initiate a briefing schedule on our motion to dismiss so we

15  can get moving quickly to put the Court in a position to

16  address what we think are substantial defects in their claims.

17  So what we would propose --

18          THE COURT:  But that motion to dismiss goes beyond

19  October 5th, right?

20          MR. SHUMATE:  Yes.

21          THE COURT:  The schedule -- we don't even have a

22  motion until when, according to your schedule?

23          MR. SHUMATE:  October 20th.  But the plaintiffs have

24  not yet indicated whether they for certain intend to move for

25  a TRO or a preliminary injunction before that October 5th

1    deadline.  So I think barring some kind of a commitment that

2    they intend to do that, it would be well served and Court

3    would be to go ahead and initiate a briefing schedule on our

4    motion to dismiss.

5           THE COURT:  What is the injury to the government in

6    moving the date by which someone would have to apply for a

7    continuation of a work permit, for instance, from October 5th

8    to December 15th for instance, just for the sake of argument?

9    What is the harm that's done in that situation when all it

10   basically does is it affords the Congress during the latter

11   part of this session and the White House to draw up and enact

12   a legislative solution.

13          MR. SHUMATE:  The harm would be, Your Honor,

14   interference with a decision that is committed to the

15   executive branch.  This is all about prosecutorial discretion.

16   The deferred action is a restraint on deportation.  It's a

17   decision not to deport.

18          So if an Article III Court were to second guess the

19   decisions of the executive branch has made about how to

20   exercise its prosecutorial discretion, that would be

21   interference with the executive branch's prerogatives in terms

22   of how it exercises discretion under the immigration laws.

23          THE COURT:  Well, I understand that argument and I

24   even made that argument when I was chief counsel of the FAA in

25   Washington from time to time, but the flip side of that is

1    that the President has said that he doesn't want to throw out

2    good, educated and accomplished young people who have jobs,

3    some serving in the military.  And so it might appear to be

4    arbitrary and capricious to establish a hard and fast policy

5    that would throw these people out of the country even though

6    they meet all of these wonderful standards that he recognizes

7    and he is, after all, not the Secretary of Homeland Security,

8    he's the president.  So his own statements would belie any

9    effort to throw these people out without good cause and it

10   would just seem to be arbitrary and I'm not concluding that,

11   but it could be argued with some merit that it constitutes an

12   arbitrary and capricious act if it doesn't afford the DHS with

13   flexibility where it is a hard and fast rule.  And so that's

14   one of my concerns.

15          So take that back to your clients so that they

16   understand that the Court has deep concerns about how this

17   would play out if there isn't some flexibility and movement

18   with regard to this date that's been established for

19   October 5th.  That's the only date that I'm concerned about

20   right now.

21          The ultimate outcome of this case should not be in a

22   Court of law in my opinion.  It should be handled by the

23   political branches.  But if it can't be handled by the

24   political branches, I have an obligation within the law to

25   protect the 800,000 people or at least those who are within my

1   jurisdiction, which could be tens of thousands of people, from

2   any arbitrary and capricious implementation of legislative

3   rule, which this may or may not be.

4           I just want you to understand that in view of where

5   we are today, this afternoon, I don't know about tomorrow,

6   this afternoon it would make sense in my view to be more

7   flexible about the cutoff date so that we could actually

8   resolve this in a more orderly and appropriate way.

9           That's what I would like you to take back to the

10  acting secretary.

11          MR. SHUMATE:  Absolutely, Your Honor.

12          THE COURT:  Thank you.  Judge Orenstein.

13          JUDGE ORENSTEIN:  Thank you, Judge Garaufis.  I

14  wanted to jump in only because you teed up the issue and it's

15  going to affect something that I'll be addressing when we get

16  to other pretrial matters.

17          I want to understand the harm relating to the

18  October 5th deadline.  Are you saying the harm that you're

19  seeking to avoid is not necessarily related to the deadline

20  itself but to judicial control of the deadline?

21          MR. SHUMATE:  I would also say that there is a

22  concern that if we start pushing this October 5th deadline

23  back we're going to jam officials at the DHS who process the

24  applications.

25          JUDGE ORENSTEIN:  Right.

1          MR. SHUMATE:  So they need a certain amount of time

2     to process the flood of applications.  I'm not sure exactly

3     how much time they need, but that's something we can talk

4     about --

5          JUDGE ORENSTEIN:  That's a separate issue.

6          MR. SHUMATE:  Separate issue.

7          JUDGE ORENSTEIN:  In terms of the harm arising from

8     the wrong branch of government making the decision, I'm just

9     having trouble understanding what you're saying.  Is it that

10    the harm is infringing on the Executive's exercise of

11    prosecutorial discretion as to when to discontinue its

12    exercise of prosecutorial discretion that it believes to be an

13    unconstitutional exercise of that discretion?

14         MR. SHUMATE:  That's correct, Your Honor.

15         JUDGE ORENSTEIN:  You want to control how long you

16    do something that you believe to be unconstitutional.

17         MR. SHUMATE:  Because this is a matter -- the

18    enforcement and --

19         JUDGE ORENSTEIN:  Why are you doing something that's

20    unconstitutional at all?

21         MR. SHUMATE:  Because the Attorney General decided

22    that it would be harsh -- we'd be in a much different

23    situation if the Attorney General had decided we need to end

24    this program now.  We need to wind this down in an orderly

25    fashion.  So it wasn't just a decision that DACA is

1    unconstitutional, it was also a policy judgment that in light

2    of the importance of this issue that really Congress should

3    make this decision, we're going to wind this down in an

4    orderly manner rather than just cutting it off tomorrow, which

5    would be -- you know, I'm sure we would be arguing about TRO

6    in a different matter, so --

7              JUDGE ORENSTEIN:  But if the judiciary says it's

8    appropriate under applicable law for that process that you

9    believe to be unconstitutional to go longer, that itself is an

10   unconstitutional intrusion on the President.

11             MR. SHUMATE:  I think it would be a violation of

12   separation of powers or --

13             JUDGE ORENSTEIN:  Thank you.

14             MR. SHUMATE:  Yes, Judge.

15             THE COURT:  And the other question is, with regard

16   to those whose DACA status expires after March 5th, 2018,

17   those individuals would be barred from applying for a renewal.

18   I don't know where that date came from but that's the other

19   piece of this.

20             MR. SHUMATE:  I think --

21             THE COURT:  So, in other words, it would be okay to

22   extend someone's coverage by DACA if their status expires

23   before March 5th that would be okay, but it would be

24   unconstitutional and improper to extend someone whose coverage

25   expires after March 5th, 2018.

1          MR. SHUMATE:  These are decisions that are committed

2     to the executive branch and the Attorney General and DHS

3     decided that in the exercise of their discretion, they're

4     going to wind down this program that had substantial

5     litigation risk, that they believe as a policy matter really

6     Congress should make this decision.  Let's give a six-month

7     window to wind this down in an orderly fashion.

8          Yes, they may seem arbitrary, but these are

9     decisions that are best left by the -- decisions best made by

10    the executive branch because these are competing policy

11    interests.  So while they may seem arbitrary in the abstract,

12    these are decisions that have to be committed to the executive

13    branch or else courts are going to be second guessing.  If

14    October 5th is arbitrary what's to say that November 5th isn't

15    arbitrary or December 5th isn't arbitrary.  So it's entirely

16    reasonable for the government to set a hard deadline, that is,

17    everybody knows about, that folks have 30 days to meet that

18    deadline.

19         So, again, we will go back to DHS and absolutely

20    express the Court's concern about that deadline.  But I do

21    believe that that is an eminently reasonable decision to make

22    by the executive branch in their discretion.  We're going to

23    wind this down in an orderly fashion, let's set October 5th as

24    the deadline for these renewal applications and March 5th as

25    the deadline to wind down the program altogether.

1           THE COURT:  Now you've got a president who has

2    basically said that this is going to affect all these

3    wonderful people and we have to find a legislative solution

4    and you're putting the President, in effect, up against the

5    wall and he's got to solve this problem by a date that's been

6    set by a bureaucrat at the Department of Homeland Security.  I

7    don't understand how that makes sense if the President has

8    already stated he's committed to finding a political solution,

9    meaning that the political branches, Congress and the

10   President would find a solution.  Isn't it time to go back --

11   and you said you will, but it's not just -- you're not just

12   doing it for the Court, you're doing it for the administration

13   that -- and there are people who, obviously, oppose this kind

14   of solution that the President is hinting at and there's going

15   to be give and take, and the concern of the Court is that

16   October 5th is three weeks away and the date that was set was

17   set before the president made his statements and it would make

18   a lot of sense from various vantage points to extend this

19   deadline.  And you know something about deadlines, they can be

20   extended.  No one will be harmed by extending this deadline.

21   Certainly not the $800,000 people who are sweating over

22   whether someone is going to knock on their door and send them

23   to a country they don't even know, where they speak a language

24   they don't even speak.

25           So, on the one hand, those are the only -- they are

1    really the only people who are going to be injured here.  The

2    other people who are going to be injured are people who have a

3    political axe to grind or they have a philosophical

4    disagreement or whatever it happens to be, but you can

5    always -- the fact is you can always deport them later if you

6    can't reach an agreement and the courts let you do it.  You

7    can always deport them later.  And they're not going to object

8    to being here an extra six months or an extra year while you

9    find them.

10            So I don't see what the -- there is no harm done, in

11   the Court's view, by allowing this legislative process to play

12   out and not establishing this October 5th deadline and also

13   barring people whose permits expire after, what is it,

14   March 5th from applying.  You can always deny them.  You have

15   discretion.  And that's another point that has to be made.

16            Even without DACA, the Department of Homeland

17   Security would still have discretion to allow people to remain

18   in the United States.  So you don't need DACA for that.  DACA

19   established a protocol that helped the people at Homeland

20   Security understand what the priorities of the prior

21   administration were, that's what DACA did.  It was not a

22   statute, it wasn't even a formal rule making.  So that's

23   another concern -- just add that to my concern for your

24   clients.

25            Is there anything else before we set your schedule

1   for your motion to dismiss?

2           Anything else from the plaintiff?

3           MS. TUMLIN:  No, Your Honor, we'd be happy to move

4   on to scheduling on the motion to dismiss and then class cert.

5           THE COURT:  Okay.  On the motion to dismiss, tell me

6   what your schedule is.

7           MR. SHUMATE:  So our thought was as soon as they

8   file the amended complaint we would file our motion to dismiss

9   within 30 days, I think that would probably put us around

10  October 20.  The plaintiffs could have 30 days to file an

11  opposition, so around November 17th, and then we could file a

12  reply December 15th and the Court could hold a hearing after

13  that.

14          THE COURT:  All right, any disagreement over that,

15  that schedule?

16          MS. TUMLIN:  No, Your Honor, that's workable.  The

17  one thing plaintiffs would be interested perhaps preceding

18  around the October 20th date would be a meet and confer with

19  the government on a Rule 26 discovery schedule, and then a

20  date to present a report to the Court.

21          JUDGE ORENSTEIN:  We'll take that up separately and

22  that's on the agenda for today.

23          THE COURT:  Okay.  And judge Orenstein will be

24  handling that whole discovery process and he'll go over that

25  with you in a few minutes.

1            MS. TUMLIN:  Your Honor, just to clarify, we did

2      have a chance to confer with the defendants that under these

3      dates we think it would be efficient for plaintiffs to be

4      moving on those same dates for our class cert.  So on the

5      October 20th date you would receive the motion for class

6      certification from the plaintiffs with the defendants' motion

7      under Rule 12 and then we would oppose and reply on the same

8      dates.

9            THE COURT:  Is that agreeable?

10            MR. SHUMATE:  Yes, Your Honor.

11            THE COURT:  So both sides will be sending me

12      Christmas presents in December.

13            MS. TUMLIN:  Many.

14            THE COURT:  I want to thank you all.

15            All right.  Which brings us to the discovery issue.

16            JUDGE ORENSTEIN:  Right.  You want to be heard,

17      Mr. Shumate?

18            MR. SHUMATE:  Sure.

19            JUDGE ORENSTEIN:  Go ahead.

20            MR. SHUMATE:  Oh, no, I'm sorry.

21            JUDGE ORENSTEIN:  Let me just frame the issue.  So

22      as Ms. Tumlin was saying, the issue comes with a Rule 26

23      conference and let me ask you, have the parties conferred

24      already about just the threshold issue of whether there is

25      discovery and what discovery is appropriate at this stage?

1           MR. SHUMATE:  Yes, we have.

2           THE COURT:  What have you come up with?

3           MR. SHUMATE:  Our position is that no discovery is

4    appropriate in this case.  The primary claims that are being

5    brought are APA claims, which typically are not susceptible to

6    discovery they're -- the Court makes a decision based on the

7    record that is before the Court, we don't look behind that

8    record.  So we have decisions, the Court -- you know, assuming

9    the claims survive a motion to dismiss, the Court will decide

10   whether this action on its face is arbitrary and capricious.

11   So at least for the APA claims we don't think discovery is

12   appropriate.

13          On the constitutional claims, again, we don't think

14   discovery is appropriate.  We think those claims are

15   susceptible to a motion to dismiss.

16          JUDGE ORENSTEIN:  But typically at least my cases, I

17   know Ms. Riley knows this because I've had the U.S. Attorney's

18   Offices in many cases and some of her colleagues are here,

19   typically the mere fact that the motion to dismiss is not in

20   itself a reason to postpone discovery and, as we've been

21   talking about it at some length today, the parties on both

22   sides, obviously the plaintiffs and the class that they hope

23   to represent and the many government officials who have

24   administrative tasks, they all have an interest in knowing

25   what's coming on October 5th and March 5th.  It strikes me

1   that if there is going to be discovery there's going to be

2   little enough time to do it to allow an orderly resolution of

3   the merits.

4           So here's what I'm going to propose.  I really don't

5   anticipate we can give you all a fair chance to argue the

6   issue much less have resolve today, but I would like to very

7   quickly we'll set a schedule very quickly to confer about this

8   and tee up with your respective positions in letters two

9   things:  One, the threshold issue of whether discovery should

10  proceed and, second, this will require a real meet and confer,

11  assuming that it does, what it should look like, what

12  deadlines we should set, how if at all it should be phased.

13  To the extent it goes forward there are going to be, I'm sure,

14  some very contentious issues because I know you want to rely

15  on a very concrete administrative record, I imagine you want

16  to get into the intent of various actors and that will

17  implicate the question of depositions.  Please identify the

18  issues that are going to divide you and come up with a

19  proposal for getting done what you would agree has to be done

20  if discovery goes forward and what issues need to be resolved,

21  because we need to address them quickly.

22          MR. SHUMATE:  Your Honor, we will certainly do that.

23  I would just say here that the government will strongly oppose

24  any discovery here and to the extent the Court wants to move

25  quickly and plaintiffs want to move quickly, any attempt to

1    get discovery of cabinet officials is going to be strongly

2    opposed by the government.

3            JUDGE ORENSTEIN:  I anticipate that there are a lot

4    of contentious issues here, I'm not making an assumption one

5    way or the other about how they play out, but if the parties

6    are going to get the rulings that they need in time to have a

7    practical effect, we're going to have to have those discovery

8    issues resolved quickly.  So I want you to get started on

9    meeting and conferring.

10           Unless there's an objection to this schedule I'd

11   like to have your respective positions, I don't care if it's

12   two letters or one, your respective positions on the threshold

13   issue of whether it should go forward by next Friday and so I

14   guess that would be the 23rd, a week from tomorrow.

15           MS. TUMLIN:  Twenty-second.

16           MR. SHUMATE:  Twenty-second.

17           THE COURT:  The 22nd.

18           JUDGE ORENSTEIN:  The 22nd, okay.  Thank you.  I was

19   looking at the wrong date.

20           So by September 22nd your respective positions and

21   accompanying that either a joint proposal or competing

22   proposals for a schedule.  To the extent you can identify

23   issues that you agree would need to be decided within a

24   discovery regime and you want to propose dates for getting

25   those done, all the better.  And then let's -- I don't know if

1     you want to do this as a joint conference.

2                 THE COURT:  Yes, what I'm going to do here is I'm

3     setting a status conference for Tuesday, September 26th at

4     4:00 p.m.  It would be earlier but I have a -- I'm spending a

5     great deal of time with the criminal division in Washington on

6     a fraud trial next week and the week after and the week after

7     and the week after.  So my trial day ends at 4:00 p.m. and

8     we'll take you promptly at 4:00 o'clock.

9                 JUDGE ORENSTEIN:  We'll address these issues there

10    as well.

11                MR. SHUMATE:  Just to be clear, what are we prepared

12    to discuss on the status conference, the discovery issues, the

13    October 5th deadline as well.

14                THE COURT:  Oh, yes, absolutely.

15                You're going to tell me all about your discussions

16    with your client, about how cooperative your client is going

17    to be with my suggestion.

18                MR. SHUMATE:  I will.

19                JUDGE ORENSTEIN:  Anything else that we thought we

20    needed to address in terms of discovery issues that have to be

21    resolved early on.

22                THE COURT:  Anything else from the plaintiff?

23                MS. TUMLIN:  No, Your Honor.

24                JUDGE ORENSTEIN:  Thank you.

25                MS. TUMLIN:  Your Honors.

```
 1              THE COURT:  Does the plaintiff have anything else

 2    for today?

 3              MS. TUMLIN:  No, thank you, Your Honors.

 4              THE COURT:  All right.  Is there anything else from

 5    the defense?

 6              MR. SHUMATE:  No, Your Honor, thank you both.

 7              THE COURT:  Thank you very much everyone.

 8              (Matter concluded.)

 9

10                     *     *     *     *     *

11

12    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
13

14    s/ Georgette K. Betts              September 15, 2017

15    GEORGETTE K. BETTS                 DATE

16

17

18

19

20

21

22

23

24

25
```