UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARTÍN JONATHAN BATALLA VIDAL et al.,

                Plaintiffs,

      -against-

KIRSTJEN M. NIELSEN, Secretary, Department of
Homeland Security, et al.,

                Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                Plaintiffs,

      -against-

DONALD TRUMP, President of the United States, et al.,

                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

     In 2012, the Department of Homeland Security created the Deferred Action for

Childhood Arrivals ("DACA") program. That program permitted certain individuals without

lawful immigration status who entered the United States as children to obtain "deferred

action"— contingent, discretionary relief from deportation—and authorization to work legally in

this country. Since 2012, nearly 800,000 DACA recipients have relied on this program to work,

study, and keep building lives in this country.

On September 5, 2017, Defendants announced that they would gradually end the DACA program.[1] (Letter from Jefferson B. Sessions III to Elaine C. Duke (Admin. R. (Dkt. 77-1)[2] 251) ("Sessions Ltr."); Mem. from Elaine C. Duke, Acting Sec'y, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (Admin. R. 252) ("DACA Rescission Memo").) The Department of Homeland Security ("DHS") would consider pending DACA applications and renewal requests, as well as promptly filed renewal requests by DACA beneficiaries whose benefits were set to expire within six months, but would reject all other applications and renewal requests. (DACA Rescission Memo at 4.) Plaintiffs in the above-captioned cases promptly challenged Defendants' decision on a number of grounds, including, most relevant for purposes of this Memorandum and Order, that the decision violated the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (the "APA"). (2d Am. Compl. (Dkt. 60)); Compl. (Dkt. 1, No. 17-CV-5228).) Plaintiffs now seek a preliminary injunction barring Defendants from ending the DACA program pending a final adjudication of these cases on the merits. (Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 123-1) ("BV Pls. Mot."); Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 96-1, No. 17-CV-5228) ("State Pls. Mot.").)

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate

---

[1] Plaintiffs have named as defendants President Donald J. Trump, Secretary of the Department of Homeland Security Kristjen Nielsen, and Attorney General Jefferson B. Sessions III. Plaintiffs allege that the President terminated the DACA program because of unlawful discriminatory animus, in violation of the Fifth Amendment to the U.S. Constitution. (3d Am. Compl. (Dkt. 113, No. 16-CV-4756) ¶¶ 89-100, 195-98; Am. Compl. (Dkt. 54, No. 17-CV-5228) ¶¶ 57-70, 233-39.) Because the APA does not permit direct review of Presidential decisionmaking, Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992), only the Attorney General and Secretary Nielsen are defendants with respect to Plaintiffs' substantive APA claims, which are the focus of this opinion. (3d Am. Compl. (Dkt. 113, No. 16-CV-4756) at ECF p.40.)

[2] All record citations refer to the docket in Batalla Vidal v. Nielsen, No. 16-CV-4756, except as otherwise noted.

policies that can be justified by neutral principles." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in part and in the judgment). To that end, the APA authorizes parties harmed by federal agencies to obtain judicial review of agency decisions. 5 U.S.C. § 702. The reviewing court must set aside "action, findings, [or] conclusions" that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A).[3] Review under this "arbitrary and capricious" standard is "narrow," and the court may not "substitute its judgment for that of the agency"; instead, the court considers only whether the agency's decision "was the product of reasoned decisionmaking." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 52 (1983) ("State Farm"). If the agency decision "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" the court will uphold the agency's decision. Id. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). If, however, the agency's decision "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," that decision must be set aside. Id.

Review under the arbitrary-and-capricious standard is generally limited to the agency's stated rationale for its decision, State Farm, 463 U.S. at 43; Camp v. Pitts, 411 U.S. 138, 143 (1973) (per curiam), and to the "full administrative record that was before the [agency] at the time [it] made [its] decision," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

---

[3] On November 9, 2017, the court rejected Defendants' arguments that judicial review under the APA was unavailable because the decision to rescind the DACA program was "committed to agency discretion by law." (Nov. 9, 2017, Mem. & Order (Dkt. 104) at 20-28.)

420 (1971) ("Overton Park"). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("Chenery II")); SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("Chenery I"). Nor may the court uphold agency action based on "post hoc rationalizations of agency action." State Farm, 463 U.S. at 50; see also Williams Gas Processing – Gulf Coast Co., L.P. v. FERC, 373 F.3d 1335, 1345 (D.C. Cir. 2004) (Roberts, J.) ("It is axiomatic that [the court] may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review; post hoc rationalizations by agency counsel will not suffice." (internal quotation marks and citation omitted)).

The APA thus sometimes places courts in the formalistic, even perverse, position of setting aside action that was clearly within the responsible agency's authority, simply because the agency gave the wrong reasons for, or failed to adequately explain, its decision. E.g., State Farm, 463 U.S. at 42-43, 48-56; Overton Park, 401 U.S. at 416, 420. Based on the present record, these appears to be just such cases.

Defendants indisputably can end the DACA program. Nothing in the Constitution or the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. (the "INA"), requires immigration authorities to grant deferred action or work authorization to individuals without lawful immigration status. The DACA program, like prior deferred-action and similar discretionary relief programs, simply reflected the Obama Administration's determination that DHS's limited enforcement resources generally should not be used to deport individuals who were brought to the United States as children, met educational or military-service requirements, and lacked meaningful criminal records. (Mem. from Janet Napolitano, Sec'y, DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children

4

at 1-2 (June 15, 2012) (Admin. R. 1-2) (the "2012 DACA Memo").) New Administrations may, however, alter or abandon their predecessors' policies, even if these policy shifts may impose staggering personal, social, and economic costs.[4]

The question before the court is thus not whether Defendants could end the DACA program, but whether they offered legally adequate reasons for doing so. Based on its review of the record before it, the court concludes that Defendants have not done so. First, the decision to end the DACA program appears to rest exclusively on a legal conclusion that the program was unconstitutional and violated the APA and INA. Because that conclusion was erroneous, the decision to end the DACA program cannot stand. Second, this erroneous conclusion appears to have relied in part on the plainly incorrect factual premise that courts have recognized "constitutional defects" in the somewhat analogous Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program. Third, Defendants' decision appears to be internally contradictory, as the means by which Defendants chose to "wind down" the program (namely, by continuing to adjudicate certain DACA renewal applications) cannot be reconciled with their stated rationale for ending the program (namely, that DACA was unconstitutional). Any of these flaws would support invalidating the DACA rescission as arbitrary and capricious.

Before this court, Defendants have attempted to reframe their decision as motivated by "litigation risk." They contend that the decision to end the DACA program was reasonable in light of the prospect that Texas and several other states would seek to amend their complaint in Texas v. United States, No. 14-CV-254 (S.D. Tex.), to challenge the DACA program; that the

---

[4] These costs are detailed in greater length in the exhibits to Plaintiffs' motions for preliminary injunction, and in the many helpful briefs filed by amici in these cases. (See, e.g., Brief of Amici Curiae 114 Companies (Dkt. 160) (estimating the costs of the DACA rescission over the next decade at $460.3 billion in lost GDP and $24.6 billion in lost Social Security and Medicare tax contributions).)

U.S. District Court for the Southern District of Texas would issue a nationwide injunction ending the program; and that the U.S. Court of Appeals for the Fifth Circuit and the U.S. Supreme Court would affirm that injunction. (Defs. Opp'n to Pls. Mots. for Prelim. Inj. (Dkt. 239) at 1, 10-11, 21-24.) The Administrative Record does not support Defendants' contention that they decided to end the DACA program for this reason. Even if it did, reliance on this "litigation risk" rationale would have been arbitrary and capricious, in light of Defendants' failure to explain their decision or to consider any factors that might have weighed against ending the DACA program. And even if this "litigation risk" rationale were both supported by the Administrative Record and a reasonable basis for rescinding the DACA program, the court would nevertheless likely set Defendants' decision aside, as the court cannot say that any of the aforementioned errors were harmless, for purposes of review under the APA.

Accordingly, the court concludes that Plaintiffs are likely to succeed on the merits of their substantive APA claims. Because Plaintiffs also satisfy the remaining requirements for the court to issue a preliminary injunction, the court ENJOINS Defendants from rescinding the DACA program, pending a decision on the merits of these cases. Defendants thus must continue processing both initial DACA applications and DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to the limitations described below. The scope of this preliminary injunction conforms to that previously issued by the U.S. District Court of the Northern District of California. See Order Denying Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction and Granting Provisional Relief (Dkt. 234), Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec., No. 3:17-CV-5211 (N.D. Cal. Jan. 9, 2018) ("Regents") (Alsup, J.), pet. for cert. before judgment filed, No. 17-1003.

The court makes clear, however, what this order is not.

- **This order does not hold that the rescission of DACA was unlawful.** That question is for summary judgment, not motions for a preliminary injunction. Cf. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953) ("[A] preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.").

- **This order does not hold that Defendants may not rescind the DACA program.** Even if the court ultimately finds that Defendants' stated rationale for ending the DACA program was legally deficient, the ordinary remedy is for the court to remand the decision to DHS for reconsideration. See Chenery I, 318 U.S. at 94-95. On remand, DHS "might later, in the exercise of its lawful discretion, reach the same result for a different reason." FEC v. Akins, 524 U.S. 11, 25 (1998).

- **This order does not require Defendants to grant any particular DACA applications or renewal requests.** Restoring the DACA program to the status quo as of September 4, 2017, does not mean that every DACA recipient who requests renewal of his or her deferred action and work authorization will receive it. The DACA program identified "criteria [that] should be satisfied before an individual is considered for an exercise of prosecutorial discretion." (2012 DACA Memo at 1.) It did not require immigration officials to defer action against any individuals who met these criteria; to the contrary, the 2012 DACA Memo stated that DHS would exercise prosecutorial discretion "on an individual basis" and would not "provide any assurance that relief will be granted in all cases." (Id. at 2-3.) Preserving the status quo means only that Defendants must continue considering DACA applications and renewal requests, not that they must grant all such applications and requests. (See U.S. Citizenship & Immigration Servs., Frequently Asked Questions at Q6 (Apr. 25, 2017) ("Apr. 25 DACA FAQs"), Ex. 41 to State Pls. Mot. (Dkt. 97-2, No. 17-CV-5228) at ECF p.186.)

- **This order does not prevent Defendants' from revoking individual DACA recipients' deferred action or work authorization.** Under the 2012 DACA Memo, DHS may terminate a DACA recipient's deferred action "at any time, with or without a Notice of Intent to Terminate, at [its] discretion." (Apr. 25 DACA FAQs at Q27.) Maintaining the status quo does nothing to alter that.

Because the court issues the preliminary injunction requested by Plaintiffs, the Batalla Vidal Plaintiffs' Motion for Class Certification (Dkt. 124) is DENIED as moot. The court will address by separate order Defendants' motions to dismiss Plaintiffs' operative complaints.

(Defs. Mot. to Dismiss Third Am. Compl. (Dkt. 207); Defs. Mot. to Dismiss (Dkt. 71, No. 17-CV-5228).)

## I. BACKGROUND

The court provides a brief history of immigration authorities' use of "deferred action" and similar discretionary-relief programs, the DACA and DAPA programs, and this litigation to offer context for the discussion that follows. For further background, the reader may consult this court's prior orders (see Oct. 3, 2017, Order (Dkt. 72); Oct. 17, 2017, Mem. & Order (Dkt. 86); Oct. 19, 2017, Mem. & Order (Dkt. 90); Nov. 9, 2017, Mem. & Order (Dkt. 104); Nov. 20, 2017, Order (Dkt. 109); Dec. 15, 2017, Order (Dkt. 122); Jan. 8, 2018, Mem. & Order (Dkt. 233)), the Northern District of California's opinion in Regents, 2018 WL 339144, at *1-8, and the opinion of the Office of Legal Counsel regarding DAPA (see The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) (Admin. R. 4) ("OLC Op.")).

### A. History of Deferred Action

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 567 U.S. 387, 394 (2012). That power derives from the Constitution, which authorizes Congress "[t]o establish a uniform Rule of Naturalization," U.S. Const. art. I., § 8, cl. 4, and from the Government's "inherent power as sovereign to control and conduct relations with foreign nations." Arizona, 567 U.S. at 395. Acting under this authority, the Government has created an "extensive and complex" statutory and regulatory regime governing, among other things, who may be admitted to the United States, who may work here, and who may be removed from the country. Id.; see id. at 395-97.

Not all "removable" aliens are, in fact, deported from this country. Immigration officials "cannot act against each technical violation of the statute[s they are] charged with enforcing,"

but must determine which enforcement actions are worthwhile. Heckler v. Chaney, 470 U.S. 821, 831 (1985); Arpaio v. Obama, 797 F.3d 11, 15-16 (D.C. Cir. 2015). "A principal feature of the removal system is the broad discretion exercised by immigration officials," who "as an initial matter, must decide whether it makes sense to pursue removal at all," and, "[i]f removal proceedings commence," may decide whether removable aliens warrant asylum or "other discretionary relief allowing them to remain in the country or at least to leave without formal removal." Arizona, 567 U.S. at 396; see also Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999) ("AAADC") (observing that throughout the removal process, immigration officials have "discretion to abandon the endeavor"). Immigration officials' enforcement discretion is a practical necessity as well as a legal reality: By one recent estimate, there are approximately 11.3 million undocumented aliens present in the United States, of whom DHS has the resources to remove fewer than 400,000 per year—about 3.5 percent of the total. (OLC Op. at 1.)

Over the years, Congress and the Executive Branch have developed a number of means by which immigration officials may exercise their discretion not to deport removable aliens. "Some of these discretionary powers have flowed from statute," such as "parole," see 8 U.S.C. § 1182(d)(5)(A), and "temporary protected status," see id. § 1254a. Regents, 2018 WL 339144, at *2; see also, e.g., 8 U.S.C. § 1229b (cancellation of removal); id. § 1229c (voluntary departure). Others, such as "deferred enforced departure" or "extended voluntary departure," have been ad hoc exercises of executive authority, grounded in the Executive Branch's responsibility for conducting foreign relations and enforcing immigration laws, rather than in express congressional authorization. Regents, 2018 WL 339144, at *2; OLC Op. at 12 & n.5.

The cases before this court concern one such form of discretionary relief. "Deferred action" is a longstanding practice by which the Executive Branch exercises its discretion to abandon, or to decline to undertake, deportation proceedings "for humanitarian reasons or simply for its own convenience." AAADC, 525 U.S. at 484; see also Arpaio, 797 F.3d at 16 ("'[D]eferred action' . . . entails temporarily postponing the removal of individuals unlawfully present in the United States."). By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States. Additionally, recipients of deferred action may apply for authorization to work legally in the United States, provided that they "establish[] an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); see also 8 U.S.C. § 1324a(h)(3) (excluding from the definition of "unauthorized aliens," who may not be knowingly employed in the United States, aliens "authorized to be . . . employed . . . by the Attorney General"). Deferred action does not, however, confer lawful immigration status, a pathway to citizenship, or a defense to removal, and is revocable by immigration authorities. United States v. Arrieta, 862 F.3d 512, 514 (5th Cir. 2017); Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1058 (9th Cir. 2014). (2012 DACA Memo at 3.)

"Although the practice of granting deferred action 'developed without express statutory authorization,' it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court." (OLC Op. at 13 (quoting AAADC, 525 U.S. at 484).) DHS and its predecessor, the Immigration and Naturalization Service, have employed deferred action and similar discretionary-relief programs, such as "nonpriority status"

and "extended voluntary departure," since at least the 1960s. Arpaio, 797 F.3d at 16 (citing OLC Op. at 7-8, 12-13). (Br. of Amicus Curiae Former Federal Immigration and Homeland Security Officials (Dkt. 198-1) ("Former Fed. Officials Amicus Br.") at 6-11; Andorra Bruno et al., Cong. Res. Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 20-23 (July 13, 2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ("CRS Rep.").) These programs were used to provide relief to, among dozens of examples, refugees from war-torn and communist countries; spouses and children of aliens granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; aliens eligible for relief under the Violence Against Women Act ("VAWA") or the Victims of Trafficking and Violence Protection Act of 2000; foreign students affected by Hurricane Katrina; and certain widows and widowers of U.S. citizens. (OLC Op. at 14-17; Former Fed. Officials Amicus Br. at 8-10.)

Congress has repeatedly ratified immigration officials' practice of according deferred action to certain aliens without lawful immigration status. See, e.g., 8 U.S.C. § 1151 note (certain immediate family members of certain alien U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); id. § 1154(a)(1)(D)(i)(II) (VAWA petitioners "eligible for deferred action and work authorization"); id. § 1227(d)(2) (denial of administrative stay of removal "shall not preclude the alien from applying for . . . deferred action"); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (certain immediate family members of lawful permanent residents killed in the terrorist attacks of September 11, 2001, "may be eligible for deferred action and work authorization").

## B. DACA and DAPA

On June 15, 2012, then-DHS Secretary Janet Napolitano issued the 2012 DACA Memo, which stated that DHS would consider granting deferred action to certain individuals without lawful immigration status who entered the United States as children. (2012 DACA Memo at 1.) Secretary Napolitano stated that DHS was implementing this program as an "exercise of prosecutorial discretion" in the enforcement of immigration laws, to "ensure that . . . enforcement resources are not expended on . . . low priority cases." (Id.) Under the 2012 DACA Memo, individuals were eligible for consideration for deferred action if they (1) "came to the United States under the age of sixteen"; (2) had "continuously resided in the United States for a[t] least five years preceding the date of this memorandum and [were] present in the United States" on that date; (3) were "in school," had "graduated from high school," had obtained GEDs, or were honorably discharged veterans of the Armed Forces or Coast Guard; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, or been deemed to "otherwise pose[] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) DACA applications from individuals meeting these criteria would be evaluated "on an individual" or "case-by-case" basis and would not necessarily be "granted in all cases." (Id. at 2.) The 2012 DACA Memo "confer[red] no substantive right, immigration status or pathway to citizenship." (Id. at 2-3.)

In late 2014, DHS announced the DAPA program, which would have granted deferred action to certain parents of U.S. citizens and lawful permanent residents. (Mem. from Jeh Charles Johnson, Sec'y of DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (Admin. R. 40).) As part of that program, then-DHS Secretary Jeh Johnson directed U.S.

Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain individuals who, among other things, lacked formal immigration status and had a son or daughter who was a U.S. citizen or lawful permanent resident. (Id. at 1.) Secretary Johnson also announced that the DACA program would be expanded by (1) removing the requirement that DACA applicants be under the age of 30 as of June 2012; (2) extending the duration of the deferred action and work authorization obtained through the program from two to three years; and (3) adjusting the date-of-entry requirement to open DACA to individuals brought to the United States between June 15, 2007, and January 1, 2010. (Id. at 3-4 (the "DACA Expansion").)

### C. The Texas Litigation

Following DHS's issuance of the 2014 DAPA Memo, Texas and 25 other states filed suit in the U.S. District Court for the Southern District of Texas, alleging that the DAPA program violated the APA and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3. See Texas v. United States, 86 F. Supp. 3d 591, 598 (S.D. Tex. 2015). On February 16, 2015, after concluding that Texas and its fellow plaintiffs had standing to sue, Judge Andrew Hanen determined that they were likely to succeed on the merits of their claim that DAPA constituted a "legislative" or "substantive" rule that, under the APA, should have been made through notice-and-comment rulemaking procedures. Id. at 664-72. In particular, Judge Hanen found that the 2014 DAPA Memo, "[a]t a minimum, . . . 'severely restrict[ed]' any discretion that Defendants argue exists" in the adjudication of DAPA applications, and that DHS had not genuinely exercised discretion in reviewing DACA applications. Id. at 669 & n.101. The court issued a nationwide injunction against the implementation of both the DAPA program and the DACA Expansion. Id. at 677-78.

13

The Fifth Circuit denied a stay of the preliminary injunction, 787 F.3d 733, 743 (5th Cir. 2015), and affirmed the district court on two independent, alternative grounds, 809 F.3d 134, 178 (5th Cir. 2015) (revised). First, the Fifth Circuit upheld the district court's ruling that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was invalid because it was not developed through notice-and-comment rulemaking. See id. at 170-78. In particular, the Fifth Circuit found that Judge Hanen did not clearly err in finding that "[n]othing about DAPA genuinely leaves the agency and its [employees] free to exercise discretion," based partly on evidence that supposedly showed that USCIS exercised little case-by-case discretion in adjudicating DACA applications. Id. at 172 (quoting 86 F. Supp. 3d at 670 (alterations in original)); see id. at 172-78.

Second, the Fifth Circuit concluded that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was substantively arbitrary and capricious because, in that court's view, the program was contrary to the INA. See id. at 178-86. The Fifth Circuit observed that "Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," in the form of family-preference visas, id. at 179, and cancellation of removal and adjustment of status, id. at 180. While admitting that DAPA did not "confer the full panoply of benefits that a visa gives," the Fifth Circuit held that DAPA nevertheless conflicted with these statutory forms of relief by permitting "illegal aliens to receive the benefits of lawful presence" without meeting the stringent requirements applicable to these provisions. See id. at 180. Similarly, the Fifth Circuit held that DAPA conflicted with the INA by providing an easier path to "lawful presence" and work authorization for approximately four million undocumented immigrants—a question of great national importance that Congress could not have intended to delegate implicitly to DHS.

14

See id. at 180-81. The Fifth Circuit acknowledged that there was a long history of discretionary-relief programs but held that past practice was not dispositive of DAPA's legality and distinguished DAPA from past programs on the grounds that such programs were "'done on a country-specific basis, usually in response to war, civil unrest, or natural disasters,'" id. at 184 (quoting CRS Rep. at 9); used as a "bridge[] from one legal status to another," id.; or "interstitial to a statutory legalization scheme," such as the Family Fairness program enacted by the Reagan and George H.W. Bush Administrations, id. at 185. Accordingly, "DAPA [wa]s foreclosed by Congress's careful plan . . . and therefore was properly enjoined." Id. at 186.

The Supreme Court granted the Government's petition for a writ of certiorari, 136 S. Ct. 906 (2016), and affirmed the decision of the Fifth Circuit by an equally divided court, 136 S. Ct. 2271 (Mem.).

### D. The DACA Rescission

On January 25, 2017, the newly inaugurated President Donald Trump issued an executive order stating that "[i]t is the policy of the executive branch to . . . [e]nsure the faithful execution of the immigration laws of the United States," and that "[w]e cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), 82 Fed. Reg. 8799. Shortly thereafter, then-DHS Secretary John F. Kelly issued a memorandum implementing this executive order by rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John F. Kelly, Sec'y, DHS, Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (Admin. R. 230).)

Four months later, Secretary Kelly issued another memorandum rescinding DAPA and the DACA Expansion in light of "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (Admin. R. 237).) This memo left the original DACA program in place and did not affect the remaining three-year grants of deferred action that were issued under the DACA Expansion prior to Judge Hanen's issuance of a preliminary injunction in Texas. (Id. at 2 & n.3).

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton, joined by the attorneys-general of ten other states, wrote to Attorney General Jefferson B. Sessions to insist that the Executive Branch rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Tex., to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) (Admin. R. 238).) Paxton threatened that if DHS did not stop issuing or renewing deferred action and work authorization under DACA or the DACA Expansion, the plaintiff states would amend their complaint in the Texas litigation "to challenge both the DACA program and the remaining Expanded DACA permits." (Id. at 2.) If, however, Defendants agreed to rescind the 2012 DACA Memo and to cease "renew[ing] or issu[ing] any new DACA or Expanded DACA permits in the future," the plaintiffs would voluntarily dismiss their complaint. (Id.)

On September 5, 2017, Defendants announced that the DACA program would be brought to a gradual end. In an undated letter (the "Sessions Letter"), the Attorney General wrote to then-Acting DHS Secretary Elaine C. Duke to "advise that [DHS] should rescind" the 2012

16

DACA Memo.[5] (Sessions Ltr.) The Attorney General opined that DACA was unlawful, unconstitutional, and likely to be invalidated in court:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. Then Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

(Id. (citation omitted).)

Thereafter, Acting Secretary Duke issued a memorandum (the "DACA Rescission Memo") instructing her subordinates to "execute a wind-down of the program." (DACA Rescission Memo at 1.) Acting Secretary Duke briefly summarized the creation of the DACA and DAPA programs and stated that, although the DACA program "purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis," "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the [2012 DACA Memo] but still had his or her application denied based solely upon discretion." (Id. at 2 & n.1.) Acting Secretary Duke then described the history of the Texas litigation, noting that the Fifth Circuit had affirmed the injunction against the implementation of the DAPA program based on the finding

---

[5] While the Sessions Letter is not dated, the bookmarks in the electronic PDF file of the Administrative Record ascribe a date of September 4, 2017, to this letter.

"that DACA decisions were not truly discretionary," and observed that Secretary Kelly had acted to end categorical or class-based exemptions of aliens from potential enforcement of the immigration laws and to rescind the DAPA program while leaving the DACA program "temporarily . . . in place." (Id. at 2; see id. at 2-3.)

The Acting Secretary then noted that Texas and several other states had threatened to challenge the DACA program, and she briefly summarized the Attorney General's opinion that DACA was unconstitutional, unlawful, and likely to be struck down because it shared "the same legal and constitutional defects that the courts recognized as to DAPA." (Id. at 3 (quoting Sessions Ltr.).) "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General," she concluded, "it is clear that the June 15, 2012, DACA program should be terminated." (Id. at 4.)

In light of "the complexities associated with winding down the program," however, Acting Secretary Duke directed that the program should be wound down gradually. (Id.) Initial applications, renewal requests, and associated applications for work authorization that had been "accepted" by DHS by September 5, 2017, would be adjudicated "on an individual, case-by-case basis." (Id.) Likewise, all DACA renewal requests and associated applications for work authorization submitted by "current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018," would be adjudicated, provided that these requests were "accepted by [DHS] as of October 5, 2017." (Id.) DHS would, however, "reject all DACA initial requests and associated applications for [work authorization] filed after the date of this memorandum" and "all DACA renewal requests and associated applications for [work authorization] filed outside of the[se] parameters." (Id.) Existing DACA benefits would not be terminated

immediately but would not be renewed, and DHS would no longer approve further applications for advance parole." (Id.)

### E. Procedural History

The court will not restate the procedural history of these cases prior to November 2017, which is set forth in the court's November 9 Memorandum and Order. The court will, however, provide the following timeline of recent developments in these cases.

On December 11, 2017, the Batalla Vidal Plaintiffs filed their Third Amended Complaint (Dkt. 113), which largely tracked their Second Amended Complaint but added a claim that Defendants Nielsen and Sessions violated the Due Process Clause of the Fifth Amendment by rejecting DACA renewal applications that (1) were promptly mailed but received by USCIS after October 5, 2017, due to U.S. Postal Service delays; (2) were delivered to USCIS by October 5, 2017, but rejected because they arrived too late in the day; or (3) contained "minor perceived or actual clerical errors." (Third Am. Compl. (Dkt. 113) ¶ 203; see id. ¶¶ 199-205.)

On December 20, 2017, the Supreme Court vacated the decision of the U.S. Court of Appeals for the Ninth Circuit denying Defendants' petition for a writ of mandamus to the Northern District of California in similar litigation challenging Defendants' decision to end the DACA program. In re United States, No. 17-801 (U.S. Dec. 20, 2017) (per curiam). The Supreme Court held that the "Government [has made] serious arguments that at least portions of the District Court's order are overly broad" and that, "[u]nder the specific facts of [that] case," the district court should have resolved the Government's arguments that the decision to rescind the DACA program was not subject to judicial review before ordering the Government to produce a complete administrative record. Id. (slip op. at 3). The Court suggested that the district court "may consider certifying that ruling for interlocutory appeal under 28 U.S.C. § 1292(b) if appropriate." Id. (slip op. at 4).

One week later, the U.S. Court of Appeals for the Second Circuit denied Defendants' petition for a writ of mandamus to this court and lifted its stay of record-related orders entered by this court and by Magistrate Judge James Orenstein. (Dec. 27, 2017, USCA Order (Dkt. 210).) The Second Circuit rejected Defendants' position that they could unilaterally determine which portions of the administrative record the court could consider, and determined that, in light of the "strong suggestion that the record before the [District Court] was not complete," plaintiffs were entitled to discovery as to whether Defendants had produced a full administrative record. (Id. at 2 (quoting Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982)) (alteration in original).) Rejecting Defendants' contention that compliance with this court's and Judge Orenstein's record-related orders would burden the Executive Branch, the Second Circuit noted that this court had repeatedly limited the scope of those orders, such that, as the Government conceded, "the number of documents, covered by the order, as modified, is approximately 20,000, a far smaller number than the Government's papers led this court to believe." (Id. at 3-4.) The Second Circuit distinguished In re United States on the grounds that this court had already considered and rejected Defendants' jurisdictional arguments, clarified that the orders in question did not apply to White House documents, and limited the orders to apply to dramatically fewer documents than were at issue in the cases before the Northern District of California. (Id. at 4-5.)

Defendants then moved for the court to certify its November 9 Memorandum and Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (Mot. to Certify Order for Appeal (Dkt. 219).) They argued that certification would "materially advance the disposition of the litigation" by either "terminat[ing] the litigation" or "clarify[ing] the rights of the parties" and "limiting the claims going forward in this litigation." (Mem. in Supp. of Mot. to Certify Order for Appeal (Dkt. 219-1) at 14.) On January 8, 2018, the court granted Defendants' motion to

certify the November 9 Memorandum and Order for interlocutory appeal because, among other things, there was "substantial ground for difference of opinion" on the question of whether the DACA rescission was committed to agency discretion by law. (Jan. 8, 2018, Mem. & Order (Dkt. 233) at 4-6.) Defendants then argued that the court should delay an oral argument scheduled for January 18, 2018, pending the Second Circuit's consideration of the interlocutory appeal, as "all (or at least most) of [the] district-court proceedings [regarding Defendants' motions to dismiss, Plaintiffs' motions for a preliminary injunction, and the Batalla Vidal Plaintiffs' motion for class certification] will be unnecessary if the Second Circuit accepts some or all of the government's arguments on jurisdiction and justiciability." (Defs. Jan. 11, 2018, Ltr. (Dkt. 236) at 1.) Before the Second Circuit, however, Defendants abruptly changed tack, agreeing with Plaintiffs "that holding the petition [for interlocutory appeal] in abeyance would be the most efficient course of action," pending this court's consideration of Defendants' motion to dismiss and Plaintiffs' motions for preliminary relief and class certification. (Reply in Supp. of Pet. for Permission to Appeal (Dkt. 28, Nielsen v. Vidal, No. 18-122 (2d Cir.)) at 2.)[6]

On January 9, 2018, the Northern District of California denied Defendants' motion to dismiss Regents and its companion cases and granted the plaintiffs a preliminary injunction. (Nov. 9, 2018, Order Denying FRCP 12(b)(1) Dismissal and Granting Provisional Relief (Dkt. 234, Regents).) Like this court, Judge William Alsup rejected Defendants' contentions that the decision to end the DACA program was committed to agency discretion by law and that 8 U.S.C. § 1252(g) barred judicial review of that decision. (Id. at 18-23.) Judge Alsup further concluded

---

[6] Defendants' new litigation position is thus directly at odds with its arguments for why this court should certify the November 9 Memorandum and Order. The court is uncertain whether the inconsistency in Defendants' position should be ascribed to lack of coordination between the Department of Justice's Federal Programs Branch and Civil Appellate staff, or instead to a deliberate attempt to delay the resolution of these cases. In any event, the court is not pleased that Defendant have requisitioned judicial resources to decide a motion for relief that they seem not to have actually wanted.

that the plaintiffs were entitled to a preliminary injunction because they were likely to prevail on the merits of their claim that the decision to rescind the DACA program was substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because that decision "was based on a flawed legal premise" that the DACA program was illegal. (Id. at 29; see id. at 29-38.) Judge Alsup rejected Defendants' argument that "DHS acted within its discretion in managing its litigation exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the program so as to avoid a potentially disastrous injunction in the Fifth Circuit" as a "classic post hoc rationalization" and, in any event, insufficient to support the decision to rescind the DACA program because Defendants had neither considered defenses to Texas's potentially imminent suit nor weighed supposed litigation risks against "DACA's programmatic objectives as well as the reliance interests of DACA recipients." (Id. at 38-43.)

## II. LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles A. Wright et al., Federal Practice and Procedure § 2948, at 130 (2d ed. 1995)) (emphasis omitted). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).[7] To establish a likelihood of success on the merits, the

---

[7] The Second Circuit has, at times, formulated this standard differently. For example, a party seeking a preliminary injunction may demonstrate the existence of "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [its] favor," rather than a likelihood of success on the merits. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see

party seeking an injunction "need only make a showing that the probability of his prevailing is better than fifty percent." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988); see also Nken v. Holder, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be 'better than negligible.'" (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999))). When an injunction is "mandatory," however—that is, when the injunction "alter[s] the status quo by commanding some positive act"—the movant must demonstrate a "clear" or "substantial" showing of likelihood of success. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). To obtain a mandatory injunction, a movant must also "make a strong showing of irreparable harm." State of New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citations omitted).

## III. DISCUSSION

For the reasons that follow, Plaintiffs have demonstrated that they are entitled to a preliminary injunction against implementation of the DACA Rescission Memo.

### A. Likelihood of Success on the Merits

First, Plaintiffs are substantially likely to succeed on the merits of their claim that Defendants' decision to end the DACA program was substantively arbitrary and capricious.[8]

---

also id. at 35-38 (holding that this "serious questions" standard survives Winter and other Supreme Court cases applying a "likelihood of success on the merits" standard). The Second Circuit's "serious questions" standard does not apply, however, "[w]hen . . . a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme." Friends of the East Hampton Airport, Inc. v. Town of East Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (internal quotation marks and citation omitted). The court need not decide whether the more permissive "serious questions" standard applies here, as Plaintiffs concede that the "likelihood of success" standard applies here and have met this standard. See generally Haitian Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1338-39 (2d Cir. 1992) ("serious questions" standard applies when challenged governmental action is not specifically authorized by statute or regulation), cert. granted and judgment vacated as moot, Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 918 (1993).

[8] The court need not decide whether the injunction sought by Plaintiffs is "mandatory," in that it would compel Defendants to take affirmative acts to adjudicate DACA applications and renewal requests, or non-mandatory, in that it would only preserve the status quo as of September 4, 2017. Because Plaintiffs have demonstrated a "clear" or "substantial" likelihood of success on the merits, they are entitled to a preliminary injunction regardless of the standard that applies.

Plaintiffs contend that this decision violated APA § 706(2)(A) because, among other things, it was based on an erroneous legal conclusion that DACA was unlawful, failed to consider important aspects of the problem, and was internally contradictory. (BV Pls. Mot. at 11-20, 23-27; State Pls. Mot. at 5-13.) Defendants aver, however, that the decision reflects a reasonable assessment of litigation risk. (Defs. Opp'n at 1, 10-13, 15-24.) Based on the record before it, the court concludes that Plaintiffs, not Defendants, are substantially likely to be correct.

1. The Stated Rationale for Rescinding DACA Appears To Be Arbitrary and Capricious

Plaintiffs have identified at least three respects in which Defendants' decision to rescind the DACA program appears to be arbitrary, capricious, and an abuse of discretion. First, the decision rests on the erroneous legal conclusion that the DACA program is unlawful and unconstitutional. Second, the decision rests on the erroneous factual premise that courts have determined that the DACA program violates the Constitution. Third, the stated rationale for that decision is internally contradictory, as Defendants have continued to grant DACA renewal requests despite ending the DACA program on the grounds that it is, by their lights, unconstitutional. The court addresses each of these reasons in turn.

a. *The Decision Relies on the Legally Erroneous Premise that DACA Is Illegal*

An agency decision that is based on an erroneous legal premise cannot withstand arbitrary-and-capricious review. See 5 U.S.C. § 706(2)(A). It is well-established that when "[agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." Chenery I, 318 U.S. at 94. Accordingly, numerous courts have recognized that agency action based on a misconception of the applicable law is arbitrary and capricious in substance. See, e.g., Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 86-87 (2d Cir. 2006); Transitional Hosps.

Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (Garland, J.); see also

Planned Parenthood Fed. of Am., Inc. v. Heckler, 712 F.2d 650, 666 (D.C. Cir. 1983) (Bork, J.,

concurring in part and dissenting in part) ("If a regulation is based on an incorrect view of

applicable law, the regulation cannot stand as promulgated . . . ." (internal quotation marks and

citation omitted)). That is no less true when an agency takes some action based on an erroneous

view that the action is compelled by law, notwithstanding that the agency could have taken the

same action on policy grounds. "An agency action, however permissible as an exercise of

discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an

erroneous view of the law.'" Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C.

Cir. 1998) (quoting Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985)). This rule is consistent

with cases from outside the administrative-law context, which make clear that a decision based

on "an erroneous view of the law" is "by definition" or "necessarily" an abuse of discretion.

Koon v. United States, 518 U.S. 81, 100 (1996); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,

405 (1990). This rule also ensures that agencies are accountable for their decisions: If an agency

makes a decision on policy grounds, it must say so, not act as if courts have tied its hands. The

court therefore considers whether Defendants' decision to rescind the DACA program relied on

an erroneous view of the law. This review is de novo. 5 U.S.C. § 706; J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000).[9]

Fairly read, the Sessions Letter and DACA Rescission Memo indicate only that Defendants decided to end the DACA program because they believed that it was illegal. (While Defendants now argue that the decision was based on "litigation risk," the record does not support this contention, as the court explains below.) The DACA Rescission Memo offers no independent legal reasoning as to why Defendants believed the DACA program to be unlawful, so the court turns to the Sessions Letter. In that letter, the Attorney General offered two discernible bases for his opinion that the DACA program violated the law and should end: first, that it was unconstitutional, and second, that it "has the same legal and constitutional defects that the courts recognized as to DAPA." (Sessions Ltr.) Neither conclusion is sustainable.

---

[9] While in other contexts, an agency's interpretation of a statute it is charged with administering may be entitled to deference, Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), Defendants have not argued that their interpretation of the legality of the DACA program is entitled to formal or controlling deference. That is for good reason. Because neither the Sessions Letter nor the DACA Rescission Memo carry the "force of law," they do not warrant Chevron deference. United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). Moreover, Defendants' views about the legality of the DACA program turn not only on whether that program was consistent with the INA (their interpretations of which are entitled to deference, see INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999)), but also whether that program constituted a "substantive rule" under the APA. Because Defendants are not charged with implementing the APA, their views about whether the DACA program should have been implemented through notice-and-comment rulemaking are not entitled to deference. See Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 627 (5th Cir. 2001). Finally, it almost goes without saying that, to the extent Defendants determined that the DACA program was unconstitutional, that determination does not warrant Chevron deference.

Some academic commentators have offered interesting arguments as to why courts should review deferentially Defendants' decision to end the DACA program. See, e.g., Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM), https://www.lawfareblog.com/understanding-sessionss-justification-rescind-daca (arguing, based on an "admittedly charitable" reading of the Sessions Letter, that Regents erred by, among other things, failing to consider how the Attorney General's independent duty to defend the Constitution supported his decision to recommend ending the DACA program); Zachary Price, Why Enjoining DACA's Cancellation Is Wrong, Take Care Blog (Jan. 12, 2018), https://takecareblog.com/blog/why-enjoining-daca-s-cancellation-is-wrong (arguing that "[i]nsofar as DACA was simply an exercise of enforcement discretion, any explanatory burden with respect to its reversal must be minimal"). Defendants themselves have not pressed these arguments before this court, arguing instead that, if their decision is indeed subject to judicial review, it should be reviewed under the ordinary arbitrary-and-capricious standard of APA § 706(2)(A). (Defs. Opp'n at 10-11.)

i. The Attorney General Erred in Concluding that DACA Is Unconstitutional

As noted above, the Attorney General concluded that DACA was unconstitutional because it "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result" and "an open-ended circumvention of immigration laws." (Sessions Ltr.) This conclusory statement does not support the proposition that DACA is unconstitutional.

DACA is not unconstitutional simply because it was implemented by unilateral, executive action without express congressional authorization. The Executive Branch has wide discretion not to initiate or pursue specific enforcement actions. Chaney, 470 U.S. at 831-32. Immigration officials have particularly "broad discretion" in deciding whom to deport, deriving both from the considerations specific to the Executive Branch in the foreign-policy arena, Arizona, 567 U.S. at 396, and from the fact that far more removable aliens reside in this country than DHS has resources to deport, OLC Op. at 1; see also Adam B. Cox & Cristina M. Rodríguez, The President and Immigration Law, 119 Yale L.J. 458, 510-19 (2009). Every modern presidential administration has relied on extra-statutory discretionary-relief programs to shield certain removable aliens from deportation. Far from cabining this authority, Congress has amended the INA in ways that expressly acknowledge the Executive Branch's power to decline to initiate removal proceedings against certain removable aliens. It thus cannot be the case that, by recognizing that certain removable aliens represented lower enforcement priorities than others, the DACA program violates the Constitution.

Nor is DACA unconstitutional because it identified a certain category of removable aliens—individuals who were brought to the United States as children, lacked meaningful

criminal histories, and had met educational or military-service requirements—as eligible for favorable treatment. The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action. It is surely within DHS's discretion to determine that certain categories of removable alien—felons and gang members, for example—are better uses of the agency's limited enforcement resources than law-abiding individuals who entered the United States as children. Indeed, unless deferred-action decisions are to be entirely random, they necessarily must be based at least in part on "categorical" or "class-based" distinctions. See Arpaio v. Obama, 27 F. Supp. 3d 185, 210 (D.D.C. 2014) (DACA "helps to ensure that the exercise of deferred action is not arbitrary and capricious, as might be the case if the executive branch offered no guidance to enforcement officials. It would make little sense for a Court to strike down as arbitrary and capricious guidelines that help ensure that the Nation's immigration enforcement is not arbitrary but rather reflective of congressionally-directed priorities."). The court cannot see how the use of such distinctions to define eligibility for a deferred-action program transforms such a program from discretionary agency action into substantive lawmaking and (somehow) an encroachment on the separation of powers.

Lastly, DACA is not unconstitutional because, as the Attorney General put it, that program was implemented "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." (Sessions Ltr.) The "proposed legislation" to which the Attorney General referred would not have "accomplished a similar result" to DACA. The DREAM Act, in its many variations, would have offered its beneficiaries a formal immigration status and a pathway to lawful permanent residency. See, e.g., Development, Relief, and

Education for Alien Minors Act of 2011, S. 952 (112th Cong.); <u>Regents</u>, 2018 WL 339144, at 20 n.15 (collecting proposed legislation). DACA, on the other hand, offers only forbearance from deportation, along with work authorization, and does <u>not</u> provide an immigration status or a pathway to citizenship. (2012 DACA Memo at 4.)

Even if the DREAM Act had offered benefits similar to those conveyed by DACA, it does not follow that Congress's failure to enact a DREAM Act precluded the Executive Branch from enacting the DACA program. The court does not see how executive action, taken either "pursuant to an express or implied authorization of Congress" or "in the absence of either a congressional grant or denial of authority," becomes unconstitutional simply because Congress has considered and failed to enact legislation that would accomplish similar ends. <u>See</u> <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 635-37 (1952) (Jackson, J., concurring). Fruitless congressional consideration of legislation is not itself law, <u>see</u> U.S. Const. art. I, § 7, cl. 2, and is an unconvincing basis for ascertaining the "implied will of Congress" to oust the President from acting in the space contemplated by the proposed but un-enacted legislation, <u>see</u> <u>Youngstown Sheet & Tube</u>, 343 U.S. at 637 (Jackson, J., concurring). It strikes the court as improbable that, if the President has some authority, any Member of Congress can divest the President of that authority by introducing unsuccessful legislation on the same subject.

To the extent the decision to end the DACA program was based on the Attorney General's determination that the program is unconstitutional, that determination was legally erroneous, and the decision was therefore arbitrary and capricious. The court does not address whether the DACA program might be unconstitutional on grounds other than those identified by the Attorney General, as any such grounds are not fairly before the court.

ii.  The Attorney General Erred in Concluding that DACA Has the "Same Legal and Constitutional Defects that the Courts Recognized as to DAPA"

Nor can the Attorney General's determination that DACA is unlawful rest on the ground that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." (Sessions Ltr.) That rationale is arbitrary and capricious not only because it is premised on an obvious factual mistake that courts had recognized "constitutional defects" in DAPA, as the court explains in the next subsection, but also because it is legally erroneous. The Southern District of Texas enjoined the implementation of the DAPA program on the grounds that DAPA was not promulgated through notice-and-comment rulemaking, and the Fifth Circuit affirmed, adding the additional ground for affirmance that DAPA was substantively arbitrary and capricious because it conflicted with the INA. The court is unpersuaded that either ground applies to DACA.

*(1) DACA Was Not a Legislative Rule.*

DACA does not appear to have been a "legislative" rule that was subject to notice-and-comment rulemaking. The APA generally requires agencies to make "rules" through notice-and-comment procedures, but provides an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553. The line between legislative rules (which are subject to notice and comment) and non-legislative rules (which are not) is not always clear. See Chrysler Corp. v. Brown, 441 U.S. 281, 301-03 (1979); Noel v. Chapman, 508 F.2d 1013, 1029-30 (2d Cir. 1975) (characterizing this distinction as "enshrouded in considerable smog"). In general, however, "legislative rules are those that 'create new law, rights, or duties, in what amounts to a legislative act.'" Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000) (quoting White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993)). A rule is

legislative if it creates a "binding norm." Bellarno Int'l Ltd. v. FDA, 678 F. Supp. 410, 412

(E.D.N.Y. 1988) (quoting Am. Bus Ass'n v. United States, 627 F.2d 525, 529 (D.C. Cir. 1980)).

General statements of policy, on the other hand, do not "change 'existing rights and obligations'"

of those regulated, but instead state the agency's "general policy" or "are rules directed primarily

at the staff of an agency describing how it will conduct agency discretionary functions." Noel,

508 F.2d at 1030 (quoting Lewis-Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir. 1972))

(internal quotation marks and additional citation omitted); see also Chrysler, 441 U.S. at 302

n.31 ("General statements of policy are statements issued by an agency to advise the public

prospectively of the manner in which the agency proposes to exercise a discretionary power."

(internal quotation marks and citation omitted)).

On its face, the 2012 DACA Memo is plainly a "general statement of policy," not a

substantive rule. That memo described how, as a matter of agency policy, DHS would exercise

its prosecutorial discretion with respect to a discrete class of individuals without lawful

immigration status, and directed DHS staff to implement procedures to facilitate that exercise of

discretion. Most importantly, the memo stated that it created no substantive right, that all DACA

applications would be adjudicated on an individualized basis, and that the agency retained

discretion to deny or revoke deferred action or work authorization. Based on the text of the 2012

DACA Memo, the court cannot say that the creation of the DACA program either "imposed any

rights and obligations" on DHS or the public, or did not "genuinely [leave] the agency and its

decisionmakers free to exercise discretion." Clarian Health W., LLC v. Hargan, 878 F.3d 346,

357 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

To determine whether a rule is properly classed as "legislative" or as a "general statement

of policy," some courts have also considered whether the agency has characterized or treated the

rule as binding. Id. In determining that the DAPA program constituted a legislative rule, the Southern District of Texas focused on the purportedly binding effect that DAPA would have on the agency. Texas, 86 F. Supp. 3d at 668-72. Judge Hanen reached that conclusion by determining that DACA had been implemented in such a way as to deprive agency employees of true discretion to evaluate DACA applications on a case-by-case basis, including that (1) the "operating procedures" for implementing DACA were quite long; (2) DACA applications were adjudicated by service-center staff, not field-office employees, using a check-the-box form; (3) certain DACA denials were subject to review by a supervisor; (4) "there is no option for granting DAPA to an individual who does not meet each criterion"; and (5) nearly all DACA applications were granted, and those that were denied were uniformly denied for mechanical reasons or fraud. Id. at 669 & nn.98-101.

The court respectfully finds the Southern District of Texas's analysis unpersuasive. First, that court appears to have conflated the discretion of the agency with that of individual USCIS employees. (See Br. for the United States at 68-71, Texas v. United States, 136 S. Ct. 2271 (2016) (No. 15-674).) The 2012 DACA Memo indicated how DHS would exercise its discretion by treating certain individuals as lower priorities for removal. Because the 2012 DACA Memo created no substantive rights, it in no way constrained the agency's discretion in the enforcement of immigration laws, even if it might have affected how rank-and-file USCIS employees reviewed specific requests for deferred action. (See id.) Second, even accepting that the relevant focus of this inquiry is the discretion of rank-and-file employees, the court views the first four factors on which the Southern District of Texas relied as insufficient to support an inference that DHS did not exercise discretion in adjudicating DACA applications. As for the fifth factor—that DHS supposedly granted too many DACA applications—the court finds persuasive the

32

observation by the dissenting judge in the Fifth Circuit that the district court appears to have erroneously conflated rejections of DACA applications, which were made on intake for mechanical reasons, and denials, which were made "when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met." Texas, 809 F.3d at 210 (King, J., dissenting). To the contrary, as of December 2014, DHS had denied nearly 40,000 DACA applications out of the more than 700,000 applications accepted for processing at USCIS service centers, and rejected more than 40,000 applications for administrative reasons. Id. at 210 n.44. This rejection rate hardly "suggests an agency on autopilot" and is "unsurprising given the self-selecting nature of the program." Id. at 210 & n.44; see also Arpaio, 27 F. Supp. 3d at 209 n.13 (noting that similar statistics "reflect that . . . case-by-case review is in operation"). To the extent Defendants rely on Texas for the proposition that the DACA program (which was not challenged in that litigation) was illegal because it was not made through notice-and-comment rulemaking, such reliance is arbitrary and capricious.

*(II) DACA Does Not Conflict with the INA*

Nor may Defendants rely on Texas for the proposition that the DACA program conflicts with the INA. As noted above, the Fifth Circuit held that the DAPA program was not only procedurally invalid, but also substantively arbitrary and capricious because it conflicted with the INA. Texas, 809 F.3d at 178-86. That is because, in the view of the Fifth Circuit, the INA prescribes the exclusive means by which aliens may obtain "lawful immigration classification from their children's immigration status," and because Congress could not have intended to delegate to DHS the authority to designate approximately four million undocumented

immigrants as lawfully present and able to work in this country. See id. To the extent
Defendants relied, without additional explanation, on this decision as grounds for ending the
DACA program, they acted arbitrarily and capriciously, for two reasons.

First, not all the grounds on which the Fifth Circuit decided that DAPA was substantively
arbitrary and capricious apply to the DACA program. For example, the Fifth Circuit inferred
that by creating procedures by which alien parents of U.S. citizens may obtain lawful status,
Congress implicitly prohibited the Executive Branch from granting deferred action and work
authorization to such individuals based on more permissive criteria. Even if the court were to
accept that dubious logic, it would not apply to DACA, because there is no analogous procedure
by which aliens brought to the United States as children may seek to obtain lawful status on that
basis. (BV Pls. Mot. at 25; Br. of Amicus Curiae Legal Services Organizations (Dkt. 193) at 6.)
The Fifth Circuit also relied extensively on the magnitude of the DAPA program, reasoning that
Congress could not have intended the Executive Branch to decide whether more than four
million undocumented immigrants could obtain deferred action and work authorization. Texas,
809 F.3d at 179, 181-82, 184 & n.197. Again, even accepting that proposition, it is not clear
why it would apply to the DACA program, which is open to far fewer individuals than DAPA
would have been, and which is roughly the same scale as the Family Fairness program enacted
by the Reagan and George H.W. Bush Administrations in the 1980s.

Second, to the extent that the Fifth Circuit's rationale applies to the DACA program, the
court finds it unpersuasive. It does not follow that by prescribing procedures by which some
aliens may obtain lawful status, Congress implicitly barred the Executive Branch from granting
those or other aliens deferred action and work authorization, a relatively meager and unstable set
of benefits (if, indeed, they can even be described as such). Nor is the court convinced that by

expressly recognizing that certain discrete populations of aliens are eligible for deferred action, Congress implicitly precluded the Executive Branch from according deferred action to other aliens; to the contrary, the court views these enactments as ratifying the Executive Branch's longstanding historical practice, rooted in the INA, of forbearing from pursuing deportation proceedings against particular aliens and categories of alien. The court respectfully finds the Fifth Circuit's attempts to distinguish DAPA from prior discretionary-relief programs unpersuasive, as this court does not see what in the INA permits immigration officials to accord discretionary relief "on a country-specific basis," as a "bridge[] from one legal status to another," or as an adjunct to "a statutory legalization scheme," id. at 184, but not to generally law-abiding parents of U.S. citizens or lawful permanent residents—or, for that matter, individuals who were brought to the United States as children.

For these reasons, and for the reasons stated by the Office of Legal Counsel, the dissent in Texas, and by the Office of the Solicitor General in its brief to the U.S. Supreme Court in Texas, the court concludes that DACA is lawful and not arbitrary, capricious, or contrary to the INA. See Texas, 809 F.3d at 214-18 (King, J., dissenting); OLC Op.; Br. for the United States at 61-65, Texas v. United States, 136 S. Ct. 2271 (2016) (No. 15-674). Defendants acted arbitrarily and capriciously by ending the DACA program based on the erroneous legal conclusion that DACA is either unconstitutional or "has the same legal and constitutional defects that the courts recognized as to DAPA."

> b. *The Decision Relies on a Factually Erroneous Premise that Courts Have Determined that DACA Is Unconstitutional*

This conclusion was also arbitrary and capricious because it is based on an obvious factual mistake. In concluding that the Southern District of Texas and Fifth Circuit would enjoin the continued operation of the DACA program, Defendants appear to have relied on the premise

that those courts have recognized "constitutional defects . . . as to DAPA." (Sessions Ltr.; DACA Rescission Memo at 3.) This premise is flatly incorrect. The Southern District of Texas enjoined the implementation of DAPA, and the Fifth Circuit affirmed that injunction, on the grounds that DAPA violated the APA. 809 F.3d at 170-86; 86 F. Supp. 3d at 665-72. Both courts expressly declined to reach the plaintiffs' constitutional claim that DAPA violated the Take Care Clause of the U.S. Constitution, see U.S. Const. art. II, § 3, or the separation of powers. 809 F.3d at 154; 86 F. Supp. 3d at 677. Defendants do not attempt to defend this factual premise as correct. (Cf. Defs. Opp'n at 26-27.)

This error alone is grounds for setting aside Defendants' decision. "[A]n agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect." Mizerak v. Adams, 682 F.2d 374, 376 (2d Cir. 1982); see also State Farm, 463 U.S. at 43 (agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before the agency"); City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev., 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."). Because neither the Southern District of Texas nor the Fifth Circuit "recognized" any "constitutional defects" in the DAPA policy, Defendants' reliance on this erroneous factual premise was arbitrary and capricious.

Nor was this error harmless. Although judicial review under the APA takes "due account . . . of the rule of prejudicial error," 5 U.S.C. § 706, "the standard for demonstrating lack of prejudicial error is strict. 'Agency mistakes constitute harmless error [under APA § 706] only where they clearly had no bearing on the procedure used or the substance of decision reached.'"

N.Y. Pub. Interest Research Grp. v. Whitman, 321 F.3d 316, 334 n.13 (2d Cir. 2003) (alteration

in original) (quoting Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 444 (5th Cir.

2001)). That cannot be said here, as the Attorney General's opinion that DACA was unlawful

appears to have been based in significant part on his judgment that the program was

unconstitutional and on the Texas courts' decision to enjoin implementation of DAPA. The

current record furnishes no basis for this court to conclude that the Attorney General would have

reached the same conclusion had he correctly understood the holdings of the Texas courts.

### c. The Decision's Rationale Is Internally Contradictory

Finally, Defendants' decision to rescind the DACA program was arbitrary and capricious

because it appears to be internally inconsistent. See, e.g., Nat'l Res. Def. Council v. U.S.

Nuclear Regulatory Comm'n, — F.3d —, 2018 WL 472547, at *9 (D.C. Cir. 2018) ("Of course,

it would be arbitrary and capricious for the agency's decision making to be 'internally

inconsistent.'" (citation omitted)); Gen. Chem. Corp. v. United States, 817 F.2d 844, 846 (D.C.

Cir. 1978) (per curiam) (vacating decision based on "internally inconsistent and inadequately

explained" analysis). Defendants clearly ended the DACA program at least partly because the

Attorney General viewed the program as unconstitutional.[10] (Sessions Ltr.; DACA Rescission

---

[10] It is not clear that the Attorney General's views are those of the Administration he serves. On September 5, 2017, President Trump tweeted that "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" (Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 5, 2017, 7:38 PM), https://twitter.com/realdonaldtrump/status/905228667336499200.) It is not clear how the President would "revisit" the decision to rescind the DACA program if the DACA program were, as the Attorney General has stated, "an unconstitutional exercise of authority by the Executive Branch." (Sessions Ltr.) See Josh Blackman, Trump's DACA Decision Defies All Norms: The President's Incompetence Continues to Temper His Malevolence, Foreign Policy (Sept. 7, 2017, 1:26 PM), http://foreignpolicy.com/2017/09/07/trumps-daca-decision-defies-all-norms/. Defendants' contention that the President simply "emphasized the need for legislative action and expressed [his] intention to revisit Administration policies on childhood arrivals—not the legality and defensibility of the DACA program—if Congress did not timely act" (Defs. Opp'n at 33) is unsupported by the text of the President's tweet.

Memo at 3.)[11]  Rather than terminating the program forthwith, however, Acting Secretary Duke directed her subordinates to begin a phased "wind-down of the program," under which DHS would continue to renew DACA applications that were set to expire in the next six months and would honor existing DACA benefits until they expired.  The means by which Defendants ended the DACA program thus appear to conflict with their stated rationale for doing so.  If the DACA program was, in fact, unconstitutional, the court does not understand (nor have Defendants explained) why Defendants would have the authority to continue to violate the Constitution, albeit at a reduced scale and only for a limited time.

It is true but immaterial that the DACA Rescission memo provided that DHS would adjudicate all remaining DACA applications and renewal requests "on an individual, case-by-case basis." (DACA Rescission Memo at 4.)  The 2012 DACA Memo also stated that all DACA applications and renewal requests would be considered on an individual, case-by-case basis (2012 DACA Memo at 1-3), but, in Defendants' view, that was insufficient to render the program lawful.  More importantly, if DHS could render the DACA program constitutional by adjudicating the remaining DACA applications and renewal requests on an "individual, case-by-case" basis, then there was nothing inherently unconstitutional about the DACA program—only how rank-and-file USCIS employees were implementing that program—and a key reason for ending that program would disappear.

Defendants attempt to sidestep this problem by arguing that there was nothing inherently contradictory about Acting Secretary Duke's decision to allow the DACA program "to gradually sunset" despite having "concern[s] about [the program]'s legality." (Defs. Opp'n at 30.)  The

---

[11] Defendants' arguments that "Plaintiffs identify nothing contradictory about the Acting Secretary's stated justification for the [decision to rescind the DACA program]" (cf. Defs. Opp'n at 29-30) are thus once again belied by the record.

record makes clear, however, that Defendants ended the program because they believed it to be unconstitutional and unlawful, not because they had "concern[s]" about its legality. (Sessions Ltr.; DACA Rescission Memo at 3-4.) Defendants' post hoc rationalization is thus unavailing. At the very least, Defendants' failure to acknowledge and explain the apparent conflict between their determination that the DACA program was unconstitutional and their plan to continue adjudicating a subset of DACA renewal requests renders their decision arbitrary and capricious.

2. Defendants' Alternative Grounds for Upholding the DACA Rescission Are Unpersuasive

Defendants offer two reasons why the court should uphold the decision to end the DACA program. First, they argue, that decision was reasonable in light of the risk that the plaintiffs in the Texas litigation would amend their complaint to challenge the DACA program and that the Southern District of Texas would strike down the DACA program. (E.g., Defs. Opp'n at 11.) Second, they argue that the court should construe the Attorney General's legal judgment that the DACA program was unlawful as an "independent policy judgment . . . that immigration decisions of this magnitude should be left to Congress." (Defs. Opp'n at 25.) Neither argument is persuasive.

a. The DACA Rescission Cannot Be Sustained on the Basis of Defendants' "Litigation Risk" Argument

Defendants frame the decision to end the DACA program as motivated primarily by "litigation risk." (Id. at 1, 10-13, 15-24.) In their view, Acting Secretary Duke considered the Government's losses in the Texas v. United States litigation and the threat by some of the plaintiffs in that litigation to challenge the DACA program and ultimately "concluded that maintaining the DACA [program] would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty."

(Id. at 11.) That decision, they argue, was reasonable, not arbitrary or capricious, "particularly in view of the near-certain litigation loss in the pending Texas lawsuit." (Id.)

The record does not support Defendants' contention that they based their decision on a reasonable assessment of litigation risk. As the court has previously noted, the record, fairly read, indicates that Defendants ended the DACA program because they believed it to be illegal. The only basis for Defendants' "litigation risk" argument is the Attorney General's statement that, because DACA shared the flaws of the DAPA program, "it is likely that potentially imminent litigation would yield similar results with respect to DACA." (Sessions Ltr.) This is too thin a reed to bear the weight of Defendants' "litigation risk" argument. While the court must uphold an agency decision "of less than ideal clarity . . . if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), the court cannot discern a reasoned assessment of "litigation risk" in this conclusory statement. See also Chenery II, 332 U.S. at 196-97 (stating that the grounds on which an agency reaches its decision "must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."). The Administrative Record does not indicate, for example, that the Attorney General made any reasoned assessment of the likelihood that DACA would be struck down in light of its similarities to, or differences from DAPA; that he considered any potential defenses to the "potentially imminent litigation"; that he acknowledged contrary rulings by other courts; or that he assessed whether Department of Justice resources would be better spent elsewhere. The court thus cannot conclude that the Attorney General actually considered "litigation risk" in any

meaningful sense. Absent Defendants' post hoc explanations, the court would not have guessed that Defendants made their decision for this reason.

The court views this "litigation risk" rationale as a mere post hoc rationalization, which is insufficient to withstand arbitrary-and-capricious review. State Farm, 463 U.S. at 50; Burlington Truck Lines, 371 U.S. at 168-69. Indeed, it is telling that, to substantiate their argument that the DACA rescission was motivated by concern for DACA recipients and a desire to avoid a disorderly shut-down of the program, Defendants resort to a press release, issued by Acting Secretary Duke, that fleshes out her reasons for ending the DACA program. (Defs. Opp'n at 12 (quoting Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca).) That press release is not in the record, however, so the court may not consider it. See Overton Park, 401 U.S. at 419-20. While Defendants assert that this rationale is reasonably discernible because Plaintiffs addressed it in their briefs (Defs. Opp'n at 12), Plaintiffs cannot be faulted for responding to an argument that Defendants have made throughout this litigation.[12]

Even if the record indicated that Defendants made their decision based on "litigation risk," they acted arbitrarily and capriciously in doing so. The Attorney General's conclusory statement that it was "likely that potentially imminent litigation would yield similar results with respect to DACA" falls well short of the APA's "requirement that an agency provide reasoned explanation for its action." Fox Television Stations, 556 U.S. at 516. For example, the record

---

[12] Judge Alsup found in Regents that "[n]owhere in the administrative record did the Attorney General or [DHS] consider whether defending the program in court would (or would not) be worth the litigation risk." Regents, 2018 WL 339144, at *23. As such, "[t]he new spin by government counsel is a classic post hoc rationalization," which "alone is dispositive of the new 'litigation risk' rationale." Id.

before the court offers no indication that Defendants considered <u>why</u> the Southern District of

Texas would strike down the DACA program (which was not initially challenged in <u>Texas</u> and

which lacked certain attributes of the DAPA program that were critical to the Fifth Circuit's

decision that that program was contrary to the INA). Nor does the record indicate that

Defendants considered—independent of their opinion that DACA was illegal—why litigating the

rescission of DACA was preferable to litigating the decision to maintain the program. <u>See</u>

<u>Organized Vill. of Kake v. U.S. Dep't of Agric.</u>, 795 F.3d 956, 970 (9th Cir. 2015) (en banc)

(litigation-risk rationale was arbitrary and capricious where agency's decision "predictably led to

. . . lawsuit" and "[a]t most . . . deliberately traded one lawsuit for another"). To the extent that

Defendants now argue that their decision was based on a desire to avoid the harms that could

result to DACA beneficiaries from a disorderly end to the program, the record offers absolutely

no indication that Defendants considered these impacts. While Defendants ask the court to infer

a persuasive rationale from their conclusory statements and from the Southern District of Texas's

and Fifth Circuit's opinions in <u>Texas,</u> it is not the court's job to "supply a reasoned basis for the

agency's action that the agency itself has not given." <u>State Farm</u>, 463 U.S. at 43. Even

accepting for the sake of argument that the record provides some support for Defendants'

"litigation risk" rationale, that rationale is so inscrutable and unexplained that reliance upon it

was arbitrary and capricious.

Even accepting for the sake of argument that "litigation risk" furnished a discernible,

reasoned basis for Defendants' decision to end the DACA program, Defendants nevertheless

acted arbitrarily and capriciously by ending that program without taking any account of reliance

interests that program has engendered. To withstand review under the APA's arbitrary-and-

capricious standard, an agency that is changing its policy need not explain why the reasons for

the new policy are better than the reasons for the old policy. <u>Fox Television Stations</u>, 556 U.S. at 514-15. The agency must nevertheless engage in reasoned decisionmaking, which, among other things, means that the agency must consider "serious reliance interests" engendered by the previous policy. <u>Id.</u> at 515; <u>see also</u> <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125-27 (2016).

Plaintiffs identify a number of reliance interests engendered by the DACA program, including that, in reliance on the continued existence of the program, DACA recipients have "raised families, invested in their education, purchased homes and cars, and started careers" (BV Pls. Mot. at 16; State Pls. Mot. at 9-10); employers have hired, trained, and invested time in their DACA-recipient employees (BV Pls. Mot. at 17; State Pls. Mot. at 10); educational institutions have enrolled DACA recipients who, if they lose their DACA benefits, may be forced to leave the United States or may see little need to continue pursuing educational opportunities (BV Pls. Mot. at 17; State Pls. Mot. at 10); and states have expended resources modifying their motor-vehicle and occupational licensing regimes to accommodate DACA recipients (State Pls. Mot. at 10 & n.18). The record does not indicate that Defendants acknowledged, let alone considered, these or any other reliance interests engendered by the DACA program. That alone is sufficient to render their supposedly discretionary decision to end the DACA program arbitrary and capricious.

Defendants' arguments to the contrary are unpersuasive. First, Defendants appear to argue that they did not need to discuss reliance interests because "controlling legal precedent" had changed. (Defs. Opp'n at 15.) That argument confuses the requirement that the agency show "that there are good reasons for the new policy" with the requirement that it not ignore "serious reliance interests that must be taken into account" when amending or rescinding an

existing policy. <u>Fox Television Stations,</u> 556 U.S. at 515. In any event, it is hard to reconcile this argument—in effect, that Defendants were compelled to terminate the DACA program—with their insistence elsewhere that the decision to end the DACA program was discretionary and the product of reasoned deliberation.

Next, Defendants appear to contend that they did not need to consider reliance interests engendered by the DACA policy because those interests were not "longstanding" or serious, to the extent they existed. (Defs. Opp'n at 16-17.) It is true that DACA recipients received deferred action and work authorization for only two years at a time, that DHS retained discretion to revoke those benefits at any time, and that the 2012 DACA Memo "confer[red] no substantive right." (2012 DACA Memo at 3; Defs. Opp'n at 17.) As a practical matter, however, it is obvious that hundreds of thousands of DACA recipients and those close to them planned their lives around the program. It is unrealistic to suggest that these reliance interests were not "serious" or "substantial" simply because DHS retained the ability to terminate DACA recipients' deferred action at its discretion.

Moreover, the court does not see why the contingent, discretionary nature of DACA benefits means that, as Defendants argue, DACA recipients had no "legally cognizable reliance interests—and certainly not beyond the stated duration" in the continued existence of the DACA program. (Defs. Opp'n at 17.) In so contending, Defendants cross-reference their argument, made in their October 27 Motion to Dismiss, that DACA beneficiaries had no "'protected entitlement' <u>for due process purposes</u>" because "'government officials may grant or deny [DACA benefits] in their discretion.'" (Defs. Oct. 27, 2017, Mot. to Dismiss (Dkt. 95) ("Defs. Oct. 27 MTD") at 35 (quoting <u>Town of Castle Rock v. Gonzales,</u> 545 U.S. 748, 756 (2005)) (emphasis added).) Even accepting for the sake of argument that DACA recipients had no

constitutionally protected liberty or property interests in the continued existence of the DACA

program and the renewal of their particular DACA applications, it does not follow that they had

no reliance interests therein, such that Defendants were free to end the DACA program without

considering such interests. Encino Motorcars is instructive: A car dealer may have not have a

Fifth Amendment entitlement to the Department of Labor's hewing to a particular interpretation

of the Fair Labor Standards Act, but that does not mean that the Department is free to disregard

reliance interests engendered by the longstanding interpretation of the Act when it alters its

regulations. See 136 S. Ct. at 2124-26.

Finally, Defendants argue that Acting Secretary Duke effectively considered the relevant

reliance interests by adopting a policy that resulted in an orderly wind-down, rather than an

immediate shut-down of the DACA program. (Defs. Opp'n at 17-18.) This is sleight-of-hand

and further post hoc rationalization. The record does not indicate that the Acting Secretary

actually considered how the end of the DACA program would affect DACA recipients. That her

chosen policy may, in practice, ameliorate the impact of the DACA rescission on DACA

recipients, as compared to an immediate and disorderly shut-down of the program following a

hypothetical injunction in the Texas litigation, does not mean that she actually considered this

possibility. While the Acting Secretary stated that she "[r]ecogniz[ed] the complexities

associated with winding down the program," the Sessions Letter makes clear that these

complexities referred to the burdens on DHS of winding down the DACA program. (Compare

DACA Rescission Memo at 4, with Sessions Ltr. ("In light of the costs and burdens that will be

imposed on DHS associated with rescinding this policy, DHS should consider an orderly and

efficient wind-down process." (emphasis added)).)

Accordingly, even if the record were to support Defendants' "litigation risk" rationale, that rationale would be arbitrary and capricious. Finally, even if this rationale were not arbitrary and capricious, the court would nevertheless likely vacate Defendants' decision because it is tainted by the errors discussed in Section III.A.1 above. "When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" Mail Order Ass'n of Am. v. U.S. Postal Serv., 2 F.3d 408, 434 (D.C. Cir. 1993) (quoting Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989)). To the extent that Defendants' "litigation risk" rationale can be discerned from the Administrative Record and the parties' submissions in these cases, that rationale appears to be intertwined with Defendants' erroneous legal conclusion that the DACA program was unlawful. Because the court cannot say that Defendants clearly would have made the same decision even had they correctly understood the law and the holdings of the Texas courts, that decision is nevertheless likely arbitrary and capricious. See also N.Y. Pub. Interest Research Grp., 321 F.3d at 334 n.13.

### b. The Court Cannot Construe This Decision as an "Independent Policy Judgment"

Defendants also contend that, even if the court disagrees with the Attorney General's conclusion that DACA is unconstitutional, the court may nevertheless uphold the decision to end the DACA program because the same facts that led the Attorney General to conclude that the DACA program is unconstitutional "equally support a policy judgment by the Acting Secretary that deferred action should be applied only on an individualized case-by-case basis rather than used as a tool to confer certain benefits that Congress had not otherwise acted to provide by law." (Defs. Opp'n at 25 (internal quotation marks and citation omitted).) The record, however, offers no support for the notion that Defendants based their decision on any "policy judgment

that immigration decisions of this magnitude should be left to Congress." (Id.) Defendants' argument therefore conflicts with fundamental principles of judicial review of agency action—namely that the court reviews the agency's stated reasons for its decision and "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43; see also Chenery II, 332 U.S. at 196; Chenery I, 318 U.S. at 87.

Defendants' only authority for this novel argument, Syracuse Peace Council, 867 F.2d at 654, is inapposite. In that case, the D.C. Circuit held that when an agency bases its decision on both a judgment about constitutionality and policy reasons, the reviewing court may uphold the decision if the agency clearly would have reached the same decision for policy reasons alone, even if the agency stated that its constitutional and policy rationales were "intertwined." Id. at 655-57. Syracuse Peace Council does not stand for the proposition that, when an agency bases its decision on constitutional grounds, a reviewing court may, in the first instance, construe that decision as having been based on a "policy judgment" found nowhere in the administrative record.

*   *   *

For the reasons stated above, the court concludes that Plaintiffs are substantially likely to prevail on the merits of their claim that the decision to rescind the DACA program was arbitrary, capricious, and an abuse of discretion.

## B. Irreparable Harm

Plaintiffs have also demonstrated that they are likely to suffer irreparable harm if the court does not enjoin Defendants from fully implementing the DACA rescission.

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve

the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)

(quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)). Irreparable harm

"cannot be remedied by an award of monetary damages." State of New York ex rel.

Schneiderman, 787 F.3d at 660.

Plaintiffs have extensively documented the irreparable harms they will suffer if the

DACA program ends. Each day, approximately 122 DACA recipients who failed (or were

unable) to renew their DACA status before October 5, 2017, lose their deferred action and work

authorization. (BV Pls. Mot at 1-2, 35; State Pls. Mot. at 28.) If the implementation of the

DACA Rescission Memo is not enjoined, approximately 1,400 DACA recipients will lose

deferred action each work day, beginning on March 5, 2018. (State Pls. Mot. at 28.) As a result,

these individuals will face the possibility of deportation from the country. While this possibility

of deportation is clearly extremely worrisome to DACA recipients, the court declines to grant a

preliminary injunction on this basis. See Winter, 555 U.S. at 21-22; see also Carlsson v. U.S.

Citizenship & Immigration Servs., No. 12-CV-7893 (CAS), 2012 WL 4758118, at *9 (C.D. Cal.

Oct. 3, 2012) (risk of deportation speculative, not imminent, when there were no pending

removal proceedings against the plaintiffs).[13] Nor may the court grant a preliminary injunction

on the grounds that DACA recipients may, for fear of deportation, suffer from anxiety or

depression, lose the "abilit[y] to plan for the future and make commitments, whether familial,

career-based, academic, or otherwise" (BV Pls. Mot. at 37-38), or be required to turn their U.S.

citizen children over to the care of the State Plaintiffs' child welfare systems, or that public

---

[13] The court notes that Secretary Nielsen recently stated that, even if the DACA program ended, DHS would not prioritize the removal of DACA recipients who had not committed crimes. See Louis Nelson, DHS Chief: Deporting Dreamers Won't Be a Priority for ICE If Talks Fail, Politico (Jan. 16, 2018, 8:30 AM), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681.

safety will be harmed because former DACA recipients will be less likely to report crimes and other harms to the community (State Pls. Mot. at 28). Because deportation is, at this point, not sufficiently "likely" for purposes of establishing irreparable harm, harms accruing from the fear of deportation are also too speculative to support the grant of a preliminary injunction.

Concomitant with the loss of deferred action, however, DACA recipients will also lose their work authorization. As a result, they will be legally unemployable in this country. Some DACA recipients will lose their employer-sponsored healthcare coverage, which will endanger DACA recipients and their families (BV Pls. Mot. at 36-37) and impose tremendous burdens on the State Plaintiffs' public health systems (State Pls. Mot. at 31-32). Other DACA recipients, due to the imminent loss of their employment, may lose their homes or need to drop out of school. (BV Pls. Mot. at 37.) Employers will suffer due to the inability to hire or retain erstwhile DACA recipients, affecting their operations on an ongoing basis and causing them to incur unrecoverable economic losses. (Id. at 38; State Pls. Mot. at 29-30.) Finally, the DACA rescission will result in "staggering" adverse economic impacts, including, by the State Plaintiffs' best lights, $215 billion in lost GDP over the next decade, and $797 million in lost state and local tax revenue. (State Pls. Mot. at 33 & nn.77-78.) Thus, while it may be true that "[l]oss of employment does not in and of itself constitute irreparable injury," Savage v. Gorski, 850 F.2d 64, 67 (2d Cir. 1988), these cases present a "genuinely extraordinary situation" warranting injunctive relief, Sampson v. Murray, 415 U.S. 61, 92 n.68 (1974).

While the above is sufficient to demonstrate irreparable harm, the court also notes the obvious fact that the decision to rescind DACA, if carried into effect, will have profound and irreversible economic and social implications. That decision "will profoundly disrupt the lives of hundreds of thousands of people." In re United States, 875 F.3d 1200, 1210 (9th Cir. 2017)

(Watford, J., dissenting). It may force one out of every four hundred U.S. workers out of the lawful workforce. See Jie Zong et al., "A Profile of Current DACA Recipients by Education, Industry, and Occupation," Migration Policy Institute (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation. Former DACA recipients will be separated from their families and communities. It is impossible to understand the full consequences of a decision of this magnitude. If the decision is allowed to go into effect prior to a full adjudication on the merits, there is no way the court can "unscramble the egg" and undo the damage caused by what, on the record before it, appears to have been a patently arbitrary and capricious decision.

Moreover, it is also impossible for the court to adjudicate this dispute on the merits before March 5, 2018, when these harms will begin to materialize in earnest. Defendants set an aggressive timetable for ending the DACA program and have pursued various dilatory tactics throughout this litigation. Notably, they have yet to produce a plausible administrative record in these cases, without which the court cannot render a merits decision. Overton Park, 401 U.S. at 420. For these reasons, it is clear that Plaintiffs will suffer substantial and imminent irreparable harm if the court does not preliminarily enjoin the DACA rescission.

Defendants argue that Plaintiffs have not shown that irreparable harm is "imminent, or even likely, given the preliminary injunction recently issued" in Regents. (Defs. Opp'n at 48.) Defendants are, however, vigorously contesting that injunction before both the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court. If Judge Alsup or the Ninth Circuit were to lift the injunction in Regents, then Plaintiffs would no doubt suffer irreparable harm. Defendants cite no authority for the proposition that Plaintiffs cannot establish irreparable harm simply because another court has already enjoined the same challenged action.

## C. Balancing the Equities and the Public Interest

Finally, the court must consider whether "the balance of equities tips in [Plaintiffs'] favor" and if "an injunction is in the public interest." Winter, 555 U.S. at 20. To make this decision, the court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences of employing the extraordinary remedy of injunction." Id. at 24 (internal quotation marks and citation omitted). "These factors merge when the Government is the opposing party." Nken, 556 U.S. at 435. The court concludes that these factors weigh firmly in Plaintiffs' favor.

The court need not restate at length the consequences of the DACA rescission for Plaintiffs, other DACA recipients, those close to them, and the public at large. Allowing the DACA rescission to take immediate effect would quickly cost many DACA recipients the opportunity to work legally in this country, and hence to support themselves and their families. Enjoining the implementation of the DACA Rescission Memo would also preserve the status quo, enabling a full resolution of this matter on the merits, rather than allowing severe social dislocations to unfold based on an agency decision that, as noted above, strongly appears to have been arbitrary and capricious. The public interest is not served by allowing Defendants to proceed with arbitrary and capricious action.

Against these considerations, the court weighs the effect on Defendants of initiating a wind-down of the DACA program on their predetermined timetable. The court does not step in this area lightly. Defendants have broad discretion to set immigration-enforcement priorities. Arizona, 567 U.S. at 394. Moreover, the DACA program was originally created by the Executive Branch, and the Trump Administration should be able to alter the policies and priorities set by its predecessor.

There are, however, several factors that lead the court to conclude that the balance of the equities favors granting an injunction. Defendants do not appear to have rescinded the DACA program as an exercise of their discretion, or because of a reasoned policy judgment, but instead, at least in significant part, because they erroneously concluded that the program was unconstitutional and unlawful. Enjoining Defendants from rescinding the DACA program on erroneous legal grounds therefore does not intrude on their discretion or well-established authority to set immigration-enforcement policies. Moreover, although the Government generally has a substantial interest in the speedy deportation of removable aliens because their presence here "permit[s] and prolong[s] a continuing violation of United States law," Nken, 556 U.S. at 436 (quoting AAADC, 525 U.S. at 490), the court finds that the Government's interest in ending the DACA program is not so compelling. For one thing, the President has stated his support for keeping DACA recipients in the country (albeit preferably pursuant to legislation rather than executive action). Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 14, 2017 3:28 AM), https://twitter.com/realdonaldtrump/status/908276308265795585 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....."). The current DHS Secretary has also stated that the erstwhile DACA recipients would not be a priority for immigration enforcement. Louis Nelson, DHS Chief: Deporting Dreamers Won't Be a Priority for ICE If Talks Fail, Politico (Jan. 16, 2018), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681. Even if deporting DACA recipients were a priority of the Administration, an injunction against the end of the DACA program would not impede this policy, as, under the 2012 DACA

Memo, DHS retains discretion to revoke specific DACA recipients' deferred action and work authorization.[14]

Accordingly, the court finds that the balance of the equities tip decidedly in Plaintiffs' favor, and that the public interest would be well-served by an injunction.

### D. Scope of Relief

For the foregoing reasons, the court finds that Plaintiffs have demonstrated that they are entitled to a preliminary injunction. Defendants are therefore ORDERED to maintain the DACA program on the same terms and conditions that existed prior to the promulgation of the DACA Rescission Memo, subject to the following limitations. Defendants need not consider new applications by individuals who have never before obtained DACA benefits; need not continue granting "advanced parole" to DACA beneficiaries; and, of course, may adjudicate DACA renewal requests on a case-by-case, individualized basis. See Regents, 2018 WL 339144, at *28.

Plaintiffs contend that the court should require Defendants to restore the DACA program as it existed on September 4, 2017, in particular by requiring Defendants to adjudicate initial DACA applications submitted by individuals who only became eligible for DACA after that date. (Jan. 30, 2018, Hr'g Tr. (Dkt. Number Pending) 8:24-25.) As in Regents, however, the court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications. While the court is sympathetic to the plight of individuals who were unable to apply for DACA before September 5, 2017, it cannot say that Plaintiffs have demonstrated either that these individuals would be

---

[14] The court expresses no view as to whether the revocation of existing DACA benefits would be consistent with the Due Process Clause or other potentially applicable protections.

irreparably harmed without injunctive relief or that the balance of equities favors these individuals to the same extent it favors existing DACA beneficiaries.

The court enjoins rescission of the DACA program on a universal or "nationwide" basis. Again, it does not do so lightly. As Defendants correctly note, equitable principles provide that the court should not enter an injunction that is broader than "necessary to provide complete relief to the plaintiffs." (Defs. Opp'n at 50 (quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994)).) See also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 72 (2d Cir. 2016) ("[I]njunctive relief should be no broader than necessary to cure the effects of the harm caused by the violation . . . ." (internal quotation marks and citations omitted)). Moreover, several academic commentators have insightfully observed various problems with the practice of granting nationwide injunctions against the Government, including that such injunctions thwart the development of law in different courts, encourage forum-shopping, and create the possibility that different courts will issue conflicting nationwide injunctions. See Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417 (2017); Michael T. Morley, Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts, 97 B.U. L. Rev. 611 (2017); Zayn Siddique, Nationwide Injunctions, 117 Colum. L. Rev. 2095 (2017); Getzel Berger, Note, Nationwide Injunctions Against the Federal Government: A Structural Approach, 92 N.Y.U. L. Rev. 1068 (2017).

Nevertheless, the court finds that a nationwide injunction is warranted in these cases. First, it is hard to conceive of how the court would craft a narrower injunction that would adequately protect Plaintiffs' interests. Plaintiffs include not only several individuals and a nonprofit organization, but also sixteen states and the District of Columbia. To protect the State Plaintiffs' interests, the court would presumably need to enjoin Defendants from rescinding the

DACA program with respect to the State Plaintiffs' residents and employees, including the employees of any instrumentalities of the state, such as public hospitals, schools, and universities. Such an injunction would be unworkable, partly in light of the simple fact that people move from state to state and job to job, and would likely create administrative problems for Defendants. Furthermore, there is a strong federal interest in the uniformity of federal immigration law. See U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish a uniform Rule of Naturalization"); Texas, 809 F.3d at 187-88. Because the decision to rescind the DACA program had a "systemwide impact," the court will preliminarily impose a "systemwide remedy." Lewis v. Casey, 518 U.S. 343, 359 (1996) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977)).

## IV.    CONCLUSION

Plaintiffs' motions for a preliminary injunction (Dkt. 123 in No. 16-CV-4756; Dkt. 96 in No. 17-CV-5228) are GRANTED. The Batalla Vidal Plaintiffs' motion for class certification (Dkt. 124) is DENIED as moot.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      February **13**, 2018

NICHOLAS G. GARAUFIS
United States District Judge