1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                            :
MARTIN JONATHAN        :16-CV-04756 (NGG)
BATALLA VIDAL, ET AL,    :
                            :
        Plaintiffs,      :
                            : United States Courthouse
                            : Brooklyn, New York
    -against-         :
                            :
                            : Tuesday, January 30, 2018
KIRSTJEN M. NIELSEN, ET AL.,  : 11:00 a.m.
                            :
        Defendants.      :
                            :
                            :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

FOR PLAINTIFFS:       JEROME N. FRANK LEGAL SERVICES
                    ORGANIZATION
                     133 Wall Street
                     New Haven, Connecticut 06511
                 BY:MICHAEL J. WISHNIE, ESQ.
                     MUNEER I. AHMAD, ESQ.
                     MARISOL ORIHUELA, ESQ.
                     DAVID CHEN, LAW STUDENT INTERN

2

A P P E A R A N C E S:   (CONTINUED)


FOR PLAINTIFFS:          NATIONAL IMMIGRATION LAW CENTER
                             1121 14th Street
                             Suite 200
                             Washington, D.C. 20005
                         BY:KAREN TUMIN, ESQ.
                            JOSHUA ROSENTHAL, ESQ.
                            MAYRA JOACHIN, ESQ,
                            JUSTIN COX, ESQ.


FOR THE STATE OF         NEW YORK STATE
NEW YORK:                OFFICE OF THE ATTORNEY GENERAL
                             120 Broadway
                             New York, New York 10271
                         BY: LOURDES ROSADO, ESQ.
                             SANIA KHAN, ESQ.




FOR THE                  THE COMMONWEALTH OF MASSACHUSETTS
COMMONWEALTH OF          OFFICE OF THE ATTORNEY GENERAL
MASSACHUSETTS:           One Ashburton Place, 19th Floor
                         Boston, MA  02108
                         BY: ABIGAIL B. TAYLOR, ESQ.
                             GENEVIEVE NADEAU, ESQ.




FOR THE STATE OF         BOB FERGUSON, ESQ.
WASHINGTON:              ATTORNEY GENERAL OF WASHINGTON
                         800 5th Avenue
                         Suite 2000, Mallstop TB-14
                         Seattle, Washington  98104
                         BY:  COLLEEN M. MELODY, ESQ.

3

For the Defendants:     CHAD READLER, ESQ.
                        Acting Assistant Attorney General
                        for the Civil Division
                        U.S. DEPARTMENT OF JUSTICE


                        U.S. DEPARTMENT OF JUSTICE
                          Civil Division
                          Federal Programs Branch
                          20 Massachusetts Avenue NW
                          Washington, D.C. 20530
                        BY: BRETT A. SHUMATE, ESQ.
                          STEPHEN M. PEZZI, ESQ.
                          BRAD P. ROSENBERG, ESQ.
                          JOHN TYLER, ESQ.
                          KATE BAILEY, ESQ.
                          RACHEL WESTMORELAND, ESQ.


For the Defendants:     RICHARD DONOGHUE, ESQ.
                        UNITED STATES ATTORNEY
                        EASTERN DISTRICT OF NEW YORK
                        271 Cadman Plaza East
                        Brooklyn, New York  11201
                        BY: JOSEPH A. MARUTOLLO, ESQ.


Court Reporter:         HOLLY DRISCOLL, CSR, FCRR
                        Chief Court Reporter
                        225 Cadman Plaza East
                        Room 374N
                        Brooklyn, NY 11201
                        **hdrisc@aol.com**


Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

25                          *     *     *

4

1          THE COURT:  Please be seated.

2          THE COURTROOM DEPUTY:  Civil cause for a motion

3   hearing.

4          Counsel, please state your appearances.

5          MR. CHEN:  David Chen, law student intern,

6   Jerome N. Frank Legal Services Organization, for Batalla Vidal

7   Plaintiffs.

8          MR. WISHNIE:  Michael Wishnie, Yale Law School, for

9   Batalla Vidal Plaintiffs.

10          MS. TUMLIN:  Good morning, Your Honor, Karen Tumlin

11   with the National Immigration Law Center for the plaintiffs.

12   I'd also like to introduce the named plaintiffs who are in the

13   courtroom today, Martin Batalla Vidal.

14          THE COURT:  Just stand up please when your name is

15   called.

16          MS. TUMLIN:  Antonio Alarcon.

17          Eliana Fernandez.

18          Carlos Vargas.

19          And Carolina Fung Feng.

20          THE COURT:  Welcome to you all.

21          MR. COX:  Good morning, Your Honor, Justin Cox,

22   National Immigration Law Center, for the Batalla Vidal

23   Plaintiffs.

24          MS. JOACHIN:  Good morning, Your Honor, Mayra

25   Joachin, National Immigration Law Center, for the Batalla

5

1    Vidal Plaintiffs.

2           MS. ORIHUELA:  Good morning, Your Honor, Marisol

3    Orihuela, Jerome N. Frank Legal Services Organization, for the

4    Batalla Vidal Plaintiffs.

5           MR. FOLETTA:  Good morning, Your Honor, Scott

6    Foletta of Make the Road New York for the Batalla Vidal

7    Plaintiffs.

8           MR. AHMAD:  Good morning, Your Honor, Muneer Ahmad,

9    Jerome N. Frank Legal Services, for the Batalla Vidal

10   Plaintiffs.

11          MS. TAYLOR:  Good morning, Your Honor, Abigail

12   Taylor from the State of Massachusetts for the Plaintiff

13   States.

14          MS. ROSADO:  Good morning, Your Honor, Lourdes

15   Rosado from the New York Attorney General's Office also on

16   behalf of the Plaintiff States.  Good morning.

17          MS. MELODY:  Good morning, Colleen Melody from the

18   State of Washington on behalf of the Plaintiff States.

19          MS. NADEAU:  Good morning, Genevieve Nadeau from the

20   Commonwealth of Massachusetts on behalf of the Plaintiff

21   States.

22          THE COURT:  Very well.  Good morning to you all.

23          For the defendants?

24          MR. SHUMATE:  Good morning, Your Honor, Brett

25   Shumate from the Department of Justice on behalf of the United

6

1  States.  I'd like to introduce the rest of our table here:
2  Stephen Pezzi from the Department of Justice, he's going to be
3  taking the first two segments of the argument, I'll take the
4  third part and be happy to answer any of the other questions
5  the Court may have; John Tyler, Brad Rosenberg, Joe Marutollo
6  from the U.S. Attorney's Office here, Kate Bailey, Rachel
7  Westmoreland, and I'd like to introduce Chad Readler.
8  Mr. Readler is the Acting Assistant Attorney General for the
9  Civil Division of the Department of Justice who wanted to be
10  here today.
11       THE COURT:  Nice to meet you.  Congratulations.
12       Very well.  Before going into the argument, I'd like
13  to ask the question as to the cert petition that's pending
14  before the U.S. Supreme Court in DHS versus Regents of the
15  University of California.  If the Supreme Court were to grant
16  cert, should this Court stay any decision on any of these
17  issues until we see what the Supreme Court decides to do?
18       Mr. Shumate, do you have a view on that?
19       MR. SHUMATE:  Your Honor, if I may, I'd like
20  Mr. Pezzi to answer that question.
21       THE COURT:  Oh, that's fine.
22       MR. SHUMATE:  Okay.
23       THE COURT:  Yes, sir.
24       MR. PEZZI:  Good morning, Your Honor.
25       THE COURT:  Good morning.

1          MR. PEZZI:  So, it is obviously impossible to

2   predict how the Supreme Court is going to handle that petition

3   but I do think it would be prudent if the Supreme Court does

4   grant the petition, for Your Honor to await further guidance

5   from the Supreme Court.  We expect that if the Supreme Court

6   resolves that case, the issues at a minimum will affect these

7   proceedings and it is very possibly that they'd be completely

8   dispositive.

9          Our understanding is that that petition will be

10  fully briefed in a matter of days and is to be considered at

11  the Court's February 16th, 2018 conference.  Beyond that, of

12  course, I can't speculate about how the Court will react.

13         THE COURT:  Well, you haven't requested a stay of

14  Judge Alsup's injunction in connection with that cert

15  petition, is that right?

16         MR. PEZZI:  That is correct, we are pursuing

17  appellate relief both in the Ninth Circuit and in the

18  Supreme Court.  We have not sought a stay pending appeal.

19  As explained in the cert petition, the reason for that, at

20  least in part, is consistent with the reasons laid out in the

21  decision in this case is to try to avoid abrupt swings back

22  and forth in a short time but we have not sought a stay and do

23  not intend to seek a stay pending appeal.

24         THE COURT:  I see.  Thank you very much.

25         Mr. Shumate, do you have any objection to the

8

1  student from the Yale Law School speaking on any of the issues

2  at this hearing?

3          MR. SHUMATE:  Not at all, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          What's the position of the plaintiffs with regard to

6  the question I just asked the Government?

7          MS. TUMLIN:  Thank you, Your Honor.  Karen Tumlin

8  for the National Immigration Law Center on behalf of the

9  Batalla Vidal Plaintiffs.

10          THE COURT:  Yes.

11          MS. TUMLIN:  And I think Ms. Rosado will address

12  this for the States.

13          Your Honor, if the Supreme Court grants the petition

14  for cert, we do not believe a stay of proceedings is

15  appropriate in this matter for a couple of reasons.

16          First and foremost, the legal claims and legal

17  theories of the plaintiffs in this case and in this courtroom

18  diverge and are different from those that are pending before

19  the Supreme Court right now in the UC Regents case.

20          Secondly, the nationwide injunction that is in place

21  from Judge Alsup's ruling excludes and does not cover all of

22  the plaintiffs, at least in the Batalla Vidal matter.  We have

23  plaintiffs who have been unable to apply for DACA who have

24  either aged in or met the educational requirements since

25  September the 5th, they're not covered by Judge Alsup's order

1   and they need relief now, Your Honor.

2           THE COURT:  All right.  Thank you.

3           Yes.

4           MS. ROSADO:  Thank you, Your Honor.  Lourdes Rosado

5   on behalf of the Plaintiff States.

6           We agree with the position of the Batalla Vidal

7   Plaintiffs.  We would also add that, Your Honor, the Supreme

8   Court would also benefit from a complete record of the

9   proceedings in this case in making a difficult decision

10  regarding this key legal question.  Thank you.

11          THE COURT:  All right.  Thank you.

12          I had one other question.  I was puzzled that there

13  was a desire on the part of the parties for this Court to

14  render an opinion on an interlocutory appeal from its decision

15  on jurisdiction for the Second Circuit to review that

16  promptly.  I think when the Second Circuit denied the mandamus

17  petition, they also suggested, the panel suggested that this

18  Court rule on any application for interlocutory appeal and

19  then last Friday I received a letter saying that the parties

20  had no intention to seek interlocutory relief on the

21  jurisdictional issue.

22          Now, this may seem a minor matter but when I'm asked

23  by the parties and by the circuit to do something, I take it

24  very seriously.  We put a lot of effort into it.  We ruled, we

25  granted the application and then the application was in effect

1   withdrawn and I'm just wondering what caused everybody to have

2   a change of heart on this subject.

3          Can you tell me in 25 words or less?

4          Yes, sir.

5          MR. PEZZI:  Your Honor, just to clarify, I think

6   there may have been a miscommunication or misinterpretation of

7   the letter that plaintiffs filed.  We have not withdrawn our

8   petition for an interlocutory appeal.  We filed it, we

9   explained why the Second Circuit should grant the petition.

10  In response to our petition, plaintiffs suggested in their

11  opposition that the Second Circuit may wish to hold the

12  petition in abeyance pending Your Honor's forthcoming decision

13  on the preliminary injunction motion and in our reply brief we

14  didn't object to that proposal but proceedings are continuing

15  in the Second Circuit and the petition remains before them and

16  it is our position that it should be granted whenever they

17  consider it.

18         THE COURT:  So, let me understand, when the

19  plaintiffs indicated that they would like the circuit to

20  forbear on a interlocutory review on jurisdiction, you then

21  responded that you didn't object to their position; what does

22  that mean?

23         MR. PEZZI:  I think we --

24         THE COURT:  How does anyone divine what your actual

25  position is based on that statement?

11

1          MR. PEZZI:  To be clear, Your Honor, it may have

2    been a bit more than we didn't object.  I actually think we

3    agreed with them that the most efficient course moving forward

4    would be for the Second Circuit to hold that petition in

5    abeyance pending Your Honor's decision on the preliminary

6    injunction motion that we're here for today based on the

7    timing of how this all played out.  Ultimately, of course, it

8    is up to the Second Circuit and they haven't yet decided.

9          THE COURT:  Anything else on that?  We don't have to

10   spend a lot of time on it.

11         MS. TUMLIN:  Just briefly, plaintiffs' position was

12   always we oppose the interlocutory review here when we were in

13   the District Court, also at the Second Circuit.  Our position

14   has been consistent, Your Honor.

15         THE COURT:  Yes, ma'am.

16         MS. ROSADO:  Your Honor, on behalf of the Plaintiff

17   States, we similarly did not have any change of heart, we've

18   always felt that this case should proceed forward.

19         THE COURT:  Well, I wouldn't want to put the

20   Second Circuit to the trouble of deciding a motion for an

21   interlocutory -- to grant the motion for an interlocutory

22   appeal if there's a belief on the part of the parties that

23   perhaps we should just go ahead with the underlying motions

24   and resolve them here.  So, if there's any way that you can be

25   more lucid in stating your views to the Second Circuit so that

12

1   they don't have to do any work that they don't need to, please

2   feel free to do so, I'm sure they would deeply appreciate it.

3   I've sat by designation on the circuit a number of times and

4   there have been occasions when the circuit has been concerned

5   about the lack of clear understanding of the parties'

6   positions in certain matters, so I just mention that to you

7   going forward.

8           Now, we're going to start with the argument on the

9   application for a preliminary injunction.  I take it we'll

10  start with the makers of the motion.  Who will be speaking on

11  that issue?

12          MR. CHEN:  I will be, Your Honor.

13          THE COURT:  Okay.  So, just step right up to that

14  microphone over there.  I'm giving your side 15 minutes.  I've

15  read all of the materials.  I've also read all of the

16  decisions in the California case and I've been keeping abreast

17  of what everyone has been doing.  It's been a challenge.

18          Go ahead.

19          MR. CHEN:  Absolutely, Your Honor.  The Batalla

20  Vidal and the state plaintiffs will split their time evenly on

21  the motion for preliminary injunction with the Batalla Vidal

22  Plaintiffs going first.

23          I would like to start on the arbitrary and

24  capricious claim and focus on two particular reasons why the

25  agency action is arbitrary and capricious; first, the

1  Government's failure to acknowledge any reliance interests in

2  this matter and, second, its failure to set out any rationale

3  with clarity in the termination memo.

4       So, on to the reliance interests.  The arbitrary and

5  capricious standard forbids an agency from upending the lives

6  of nearly 700,000 individuals without publicly reckoning with

7  that decision and where there are serious reliance interests

8  at stake an agency is required to provide a more substantial

9  justification but the Government here abruptly reversed its

10  course with cursory statements and ignores the interests of

11  people like Plaintiff Batalla Vidal who has enrolled in

12  LaGuardia Community College in reliance on scholarships that

13  he qualifies for through DACA and Plaintiff Fernandez who

14  purchased a home and relies on a job possible through DACA to

15  afford a mortgage.  In fact, individuals across the country

16  have structured their lives around the possibility of being

17  considered for the DACA program.

18       THE COURT:  Didn't Secretary Duke simply take the

19  Attorney General's reference on the question of illegality and

20  implement the recision based on that and the likelihood that

21  there would be litigation in the Southern District of Texas

22  which would result in a nationwide injunction against DACA?

23  Those are the two prongs I think of what the Government has

24  indicated.  Isn't this sufficient to justify the action that

25  the Secretary took?

1        MR. CHEN:  We don't think so, Your Honor.  Regarding

2   the reliance interests, I think the Supreme Court has

3   essentially said that when the stakes are this high, an agency

4   can't simply upend lives with such opaque statements as the

5   Government has been giving and in fact we don't think that the

6   Government has set out any rationale with clarity, not the

7   legal determination rationale, nor the litigation risk

8   rationale upon which they rely.  This leaves really the Court

9   to guess at the underlying theory behind the agency action

10  which is exactly what administrative law forbids.

11       So, if you take a look at the termination

12  memorandum, Your Honor, it provides only a single opaque

13  sentence stating that three documents were considered and that

14  it is "clear" that DACA should be terminated but this

15  memorandum unfortunately is devoid of analysis and

16  explanation, it is forcing the Court to essentially connect

17  the dots between the documents that were considered and the

18  conclusion that was drawn.

19       THE COURT:  Yes, but can't litigation risk supplant

20  all other arguments if it's a serious risk?  We already have

21  the record from the Southern District of Texas and the Fifth

22  Circuit on the DAPA case with the nationwide injunction.

23  Wouldn't that be enough to -- and we have a letter from the

24  Attorneys General of eleven states telling the Attorney

25  General that they're going to -- threatening to amend their

15

 1    complaint in Texas; isn't it likely that that would be

 2    sufficient, a sufficient risk to justify what the Secretary

 3    felt disposed to do?

 4              MR. CHEN:  Well, Your Honor, there's several

 5    responses.  The first is that, as the Court has already noted

 6    in its November 9th order, the litigation rationale the

 7    Government provides is a post hoc rationalization that this

 8    Court shouldn't accept, but even if the Court were to accept

 9    that rationale, we believe that it relies on a decision on a

10    separate program without application, without reasoning its

11    application to DACA and, Your Honor, out of respect for the

12    Court's order on timing, I'd like to hand it over to my

13    colleague, Ms. Tumlin, to address notice and comment.

14              THE COURT:  Sure, please.

15              MS. TUMLIN:  Thank you, Your Honor.

16              So, turning to plaintiffs' notice and comment claim

17    under the APA, the Duke Memo radically altered the lives of

18    not only the named plaintiffs but upwards of 700,000 putative

19    class members by mandating an end to DACA without input from

20    the public as required by Congress.

21              Now, certainly a president or a cabinet officer can

22    change a policy of a prior administration, they just have to

23    do so following the boundaries set by Congress.  Our position

24    is that was not done here.  And you can think of --

25              THE COURT:  What should they have done?

16

1          MS. TUMLIN:  They should have, if they wanted to not

2     go through notice and comment, they should have issued a

3     memorandum that absolutely retained discretion at the hands of

4     USCIS adjudicators when they are greeted with an incoming DACA

5     application.  That's really the hallmarks of what you need in

6     order to have a general statement of policy, which is what the

7     Government claims, it has to fall in the category of

8     memorandum that sends a message to a government adjudicator,

9     take this in mind as guidance but at the end of the day take a

10    certain action if you feel that it's right.

11         THE COURT:  So, if as a result of today's argument

12    the gentlemen from the Justice Department go back and advise

13    the new Secretary of Homeland Security that the Secretary

14    should rescind the prior decision and to implement what you

15    have suggested, this case would be over?

16         MS. TUMLIN:  Well, a couple of responses to that

17    quickly, Your Honor; the proper remedy if the Court believes

18    we're likely to succeed on our notice and comment claim is, of

19    course, we're here for provisional relief, is to enjoin the

20    Duke Memorandum.  That would bring us back to the world before

21    September 5th.  I don't know if the case would ultimately go

22    away, I think we'd proceed to final relief.

23         THE COURT:  I see.  Go ahead.

24         MS. TUMLIN:  Okay.  So, Your Honor, when we're

25    looking at the notice and comment claim, the first place that

17

1    the Court needs to look, number one, is at the text of the

2    Duke Memorandum itself.  Turning only to the four corners of

3    that memorandum, there are at least four instances of binding

4    mandatory language repeated over and over that agents are to

5    reject certain applications.  That doesn't leave the door open

6    to discretion.  Judge Alsup found in his -- when he reviewed

7    this document as well that it was plainly binding language.

8           Secondly, the Court is directed to look at the

9    actual agency practice in applying the memo and that also is

10   patently clear here.  We have evidence, and it is at Exhibit P

11   of our motion for preliminary injunction, that 4,000 DACA

12   renewals came in after October the 5th but before October

13   the 18th.  They were all rejected categorically and solely

14   based on notice and comment.  Those two things alone are

15   sufficient to find in favor of the plaintiffs on our notice

16   and comment claim here.

17          Finally, Your Honor, I would like to point out that

18   the Alsup order on notice and comment which denied, in fact

19   dismissed the claim of the plaintiffs in the UC Regents case

20   makes a couple of critical errors.  First, it looks not only

21   at the text of the Duke Memorandum but attempts to argue that

22   because the prior predecessor policy did not go through notice

23   and comment, that notice and comment is not required here.

24   There is no such carve-out under the APA.  Instead, what this

25   Court is faced with is looking at the text of the Duke

1  Memorandum and its actual applications.

2          THE COURT:  Okay.  Thank you.

3          MS. TUMLIN:  Okay.

4          THE COURT:  Mr. Pezzi.

5          MS. TAYLOR:  Your Honor.

6          THE COURT:  Oh, sorry.

7          MS. TAYLOR:  Your Honor, the State Plaintiffs would

8  like a few minutes to address some additional items.

9          With regard to our notice and comment claim in

10  particular, I'd just like to say one thing that you're likely

11  to hear from Mr. Pezzi or his colleagues which is that there

12  might be some alternative form of relief that might be

13  available to DACA recipients somewhere within the Department.

14  That is simply irrelevant, frankly, to the notice and comment

15  analysis.  It also strains credulity to think that there is

16  any meaningful relief that might be available to DACA

17  grantees.

18          It is irrelevant to the APA analysis because the

19  question is not whether there might be some form of relief

20  somewhere else within the agency, the question is with regard

21  to this rule and in the application of this rule whether the

22  agency officials retain any discretion when they receive DACA

23  applications and the answer is no.

24          As my colleague, Ms. Tumlin pointed out, the agency

25  will reject every single DACA application without any sort of

19

1    individualized discretion.

2         It also strains credulity to think that when we're

3    dealing with 700,000 young people that somehow the agency has

4    some future plan to provide them some sort of relief that has

5    not been made clear to us yet.  If that were the case, that

6    would be clear from the face of the termination memo or from

7    some other statements of the Department and it simply doesn't

8    exist here.

9         So, I urge you, Your Honor, to look carefully at

10   this claim that somehow the agency will later change the rule

11   or will offer some other form of relief and that that has

12   bearing on their notice and comment claim.

13        THE COURT:  All right.  Is anyone at plaintiffs'

14   table going to discuss the information use policy and how that

15   affects the Court's consideration of this proposed injunction?

16        MS. TAYLOR:  So, I think the information use policy,

17   I'm not sure we were planning on addressing the information

18   use policy but if you have particular questions.

19        THE COURT:  Well, we've got five or six DACA

20   plaintiffs here who provided a great deal of information in

21   connection with their applications some of which might be used

22   for the purpose of future immigration enforcement actions, I'm

23   sure they'd like to know and certainly I'd like to know.

24        MS. TAYLOR:  That's true, Your Honor.  I think that

25   goes to the Batalla Vidal's procedural due process claim which

20

 1  they will be addressing in response to the motion to dismiss.

 2              THE COURT:  Okay.  Thank you.

 3              MS. TAYLOR:  Thank you, Your Honor.  With that, I

 4  would turn the microphone over to Lourdes Rosado to argue

 5  regarding our substantive APA claims.

 6              THE COURT:  Yes, briefly.

 7              MS. ROSADO:  Very briefly, Your Honor, thank you.  I

 8  just want to spend a moment talking about what the States'

 9  reliance interests are in the DACA program and then offer an

10  alternative ground for finding that the termination was

11  arbitrary and capricious and that is that the defendants'

12  proffered reasons for the termination that were indeed

13  pretextual.

14              So, briefly on our reliance interests, the States

15  and their residents also have a significant reliance interest

16  in the DACA program because grantees are integrated into our

17  communities.  State and municipal agencies employ DACA

18  grantees to serve the public, teach our children, to take care

19  of the sick.  We have many DACA grantees who are members of

20  mixed status families that include U.S. citizens and legal

21  permanent residents and many of those folks rely on the DACA

22  grantee to be the family's primary wage earner and provide

23  health insurance and if those individuals are no longer able

24  to do that, it is going to fall on the States to step in.

25              THE COURT:  And you're from the State of?

21

1          MS. ROSADO:  New York, Your Honor.

2          THE COURT:  All right.  Do you have a sense, have

3   you done any kind of investigation or survey as to how many

4   individuals, not just the grantees, the DACA grantees but also

5   their families would be affected if the DACA recipients of the

6   DACA grant that has been used in the past were to be

7   terminated, how many people would be affected in New York?

8   Forget about the rest of country.

9          MS. ROSADO:  We have some preliminary numbers but

10  I'm sure those numbers are small compared to the full impact.

11  I would say, first of all, we have an expert report in the

12  States' submissions that includes an assessment of the impact

13  of all of the DACA grantees losing their health insurance by

14  state, what impact that will have on the States having to make

15  up for that loss of insurance on behalf of the grantee and

16  their family members.

17          We don't have really good numbers I don't think and

18  won't for a while as to how many people are going to lose

19  their jobs and then how many families are going to be impacted

20  by that but those are the kinds of serious concerns that we

21  have and why we do have a reliance interest here, a reliance

22  interest that was absolutely not considered by the defendants

23  in terminating that program.

24          THE COURT:  Have you considered how this would

25  affect medical facilities, hospitals?

1            MS. ROSADO:  Absolutely, Your Honor.

2            THE COURT:  Research facilities and universities?

3            MS. ROSADO:  Yes, Your Honor, we have DACA grantees

4     who work and study in many of our public universities which

5     are major research centers for the country.  DACA grantees

6     work in our communities, particularly in our underserved

7     communities providing medical care.  We have DACA grantees who

8     serve as teachers in Teach of America, again going into some

9     of our lowest performing schools.  So, this is going to have

10    an impact.

11           In addition, Your Honor, the States also shape their

12    regulatory schemes to allow the DACA grantees, for example, to

13    become doctors and nurses, to get driver's licenses so they

14    can get to their job, so that they can fully participate in

15    our communities and it is going to be a grave loss to the

16    States if they're not able to do so.

17           Just to spend one minute to flag the pretext

18    argument, Your Honor, because that is an independent ground by

19    which this Court can find that the decision was arbitrary and

20    capricious; there are at least four bodies of evidence I would

21    point the Court to in our papers that support a finding that

22    the proffered reasons for the termination that DACA is

23    unlawful because the executive branch lacks the authority to

24    promulgate such a program and keep it running and the

25    purported litigation risk.

1           First is that we've seen some shifting rationales

2    from defendants as to why the program was terminated and the

3    chosen method for termination.  One example, because I'm

4    running out of time, in the motion to dismiss the defendants

5    state for the first time that the termination was a policy

6    judgment by the then Acting Secretary, that immigration

7    decisions of this magnitude should be left to Congress.  This

8    is completely a post hoc rationale, it was no where in the

9    administrative record.

10          Second, Your Honor, President Trump has publicly

11   acknowledged on many occasions his authority to continue the

12   DACA program.  It started on the night of the termination when

13   he Tweeted that he would, quote, revisit the issue if Congress

14   didn't pass appropriate legislation, and most recently in the

15   last couple of weeks we've continued to see Tweets from the

16   President that he's ready, willing and able to continue with

17   DACA in exchange for border security issues or building the

18   wall and all of this directly contradicts the proffer in the

19   administrative record that the executive lacks the authority.

20          Third, we have also seen unsubstantiated statements

21   about DACA grantees that are also further evidence of pretext

22   and that is that the Attorney General, for example, has made

23   comments that DACA-s steal jobs and commit crimes, all of

24   which are untrue.

25          And, finally, there are also many statements of

24

1  animus towards Latino immigrants by the President and others

2  in his administration that are further evidence of pretext and

3  my colleague, Ms. Melody, will go a little further into that

4  when she discusses our equal protection claim.

5         THE COURT:  All right.  Thank you.

6         MS. ROSADO:  Thank you, Your Honor.

7         THE COURT:  Thank you very much.

8         MR. PEZZI:  Good morning, Your Honor.

9         THE COURT:  Why don't you stand over there.  No one

10  will hurt you.

11         MR. PEZZI:  Happy to, Your Honor.

12         THE COURT:  Welcome.

13         MR. PEZZI:  Great to be here, Your Honor.  Thanks

14  for having me.  I heard two primary rationales from my friends

15  on the other side as to why this decision was arbitrary and

16  capricious.  The first was about reliance interests and the

17  second was about the clarity of the decision memo.

18         On the issue of clarity, I think the Supreme Court

19  has squarely foreclosed the argument that because with the

20  benefit of hindsight an agency's decision could have been

21  written more clearly, that that is a basis to set it aside

22  under the APA.  In Bowman Transportation and even in the State

23  Farm case that sets out the arbitrary and capricious standard,

24  it is very clear that even an agency decision that is not a

25  model of clarity, as long as the agency's path can be

25

1   reasonably discerned, it should be upheld by the court.  I

2   think that standard is easily satisfied here notwithstanding

3   the clarity concern.  The parties have submitted to Your Honor

4   hundreds of pages of briefs about the precise rationales

5   offered by the Secretary, we think they're sufficient, they

6   think they're insufficient but there's no clarity problem.

7            THE COURT:  Well, if the Attorney General's position

8   that the DACA program is unconstitutional, illegal, why

9   wouldn't he have instructed that the program be terminated

10  forthwith, because the Government cannot impose a program that

11  is unconstitutional, and he argues and you argue that one of

12  the reasons why the Attorney General and the Secretary felt

13  that it was important to terminate it at some point was the

14  likelihood that if the case were reviewed by the Southern

15  District of Texas, it would impose an injunction against the

16  program based on its illegality; why is there this

17  unwillingness to do what the Attorney General says is clearly

18  illegal, to deal with something that is clearly illegal?  Is

19  this out of sympathy?  I don't know that the Government

20  operates out of sympathy, according to this Attorney General.

21           MR. PEZZI:  Your Honor, the Department of Homeland

22  Security after receiving the Attorney General's letter and

23  relying on the Attorney General's conclusion and the

24  Department of Homeland Security's conclusion that the program

25  was unlawful decided to institute an orderly wind-down over a

1  two and a half year period.  I'm not aware of any authority,

2  and plaintiffs certainly haven't cited anything, that concerns

3  about a program's legality required the Government to

4  immediately and completely shut down the program on that very

5  day.  I think an orderly wind-down of the program based on

6  concerns about its legality is consistent with the law and the

7  Constitution.  Had the Department continued the program

8  indefinitely, that might raise some problems that Your Honor

9  is suggesting but I don't think that that's what we have here

10  and I actually think this dovetails directly into what I had

11  intended to say about the reliance arguments that my friends

12  on the other side make.

13          It is clear that to the extent there are any legally

14  cognizable reliance interests here, and if the program is

15  unlawful I don't think there are, but if there are legally

16  cognizable reliance interests at stake, they were accommodated

17  by the Department of Homeland Security's decision to wind the

18  program down in an orderly fashion.

19          Now, a program of enforcement discretion like this

20  one that was always intended to be, in President Obama's

21  words, a temporary stopgap measure, I think certainly cannot

22  induce any reasonable reliance interests beyond the stated

23  two-year periods of these DACA grants.  And the Department of

24  Homeland Security did not truncate those two-year periods,

25  anyone who had DACA as of September 5th can continue for the

1    full duration of those two-year periods and, indeed, those

2    whose DACA status was about to expire imminently got an

3    opportunity for an additional two-year renewal.

4         THE COURT:  That's interesting, let me just pursue

5    that for a moment.  How about those who applied to have their

6    DACA status extended but the Homeland Security didn't receive

7    the applications until after the -- what was it, the September

8    5th deadline?

9         MR. PEZZI:  So, there was an October 5th deadline.

10        THE COURT:  October 5th.

11        MR. PEZZI:  That's right.  If your DACA status was

12   going to expire after or during this period, you had until

13   October 5th to get an application to the Department of

14   Homeland Security.  As Your Honor knows from the last time I

15   was here in Brooklyn, plaintiffs and others pointed to some

16   issues with how the Postal Service had handled some of those

17   applications and even how the Department of Homeland Security

18   had processed those applications and those issues were

19   remedied by a voluntary process that was not required by law

20   in our view, but the Department of Homeland Security decided

21   for individuals who sent their application three weeks early

22   and it got lost in the post office in Chicago, we're going to

23   let that individual re-submit.

24        THE COURT:  How many people were covered by that

25   voluntary act of grace?

28

1     MR. PEZZI:  I don't have a precise number to offer

2  you unfortunately, Your Honor.  I will say, regardless of the

3  significance of those issues in the October 5th deadline,

4  those issues have now been further overtaken by events, of

5  course, even setting aside the decision by the Department of

6  Homeland Security to fix the problem, pursuant to the

7  injunction that is in place in the Northern District of

8  California, anyone can renew today.  If you have ever had DACA

9  status before, you can submit a renewal request and it is

10  being processed by the Department of Homeland Security.  So,

11  if you missed the October 5th deadline and even if you missed

12  the October 5th deadline and the process set forth by the

13  Department of Homeland Security was somehow insufficient to

14  cure the problem, those individuals can and presumably are now

15  renewing.

16     In fact, to my knowledge, at least several of the

17  individuals named in plaintiffs' papers have submitted renewal

18  requests.  I'm not exactly sure the status of all of those

19  requests but, in other words, regardless of the merits of such

20  a claim, I think those issues have now been overtaken by

21  events.

22     On the notice and comment issues that were raised, I

23  think it is a simpler issue than is presented by the other

24  side.  There's a Second Circuit case called Noel v. Chapman

25  that analyzes a set of facts that is remarkably similar to

29

1   what we have here, it is about the recision of a policy of the

2   former Immigration and Naturalization Service by which they

3   previously as a matter of grace had treated more favorably

4   certain requests for voluntary departure and a memo comes down

5   from the INS to the local New York district and says, hey, the

6   way you're treating those applications is inconsistent with

7   how we want them treated and from now on exercise general

8   case-by-case discretion instead of granting all of the

9   requests that meet certain criteria.

10          The Second Circuit rejected the idea that that sort

11   of ruling needed to go through notice-and-comment rulemaking.

12   That was not a -- there was actually a split on that issue in

13   some courts across the country.  There's an Eastern District

14   of Pennsylvania decision that plaintiffs rely on that

15   explicitly refuses to follow the Second Circuit's authority

16   but, of course, Your Honor is bound by that Second Circuit

17   decision and I think that resolves the question of whether the

18   recision of DACA is a general statement of policy for purposes

19   of this Court at least.

20          In any event, even if we're wrong about all of that,

21   I don't think Your Honor can enter the injunction that

22   plaintiffs are requesting on a notice and comment theory

23   because their theory would compel the conclusion that DACA

24   itself was unlawful for failure to go through notice and

25   comment, of course DACA did not go through notice and comment,

1 and an equitable remedy like an injunction is not available in

2 that circumstance.

3          THE COURT:  Oh, and the cases that say that are

4 what?

5          MR. PEZZI:  There is a Fourth Circuit case that says

6 precisely that thing, Your Honor, forgive me, it is not cited

7 in our brief in this case but in the District of Maryland case

8 we did cite it, it is 48 F.3d 1331, it is a 1995 decision of

9 the Fourth Circuit called Chen Zhou Chai and it holds quite

10 logically, separate and apart from the authority I think it is

11 a logical proposition consistent with general equitable

12 principles that if plaintiffs are asking this Court to enter

13 an order that would confirm the thing that they are seeking is

14 itself unlawful, it would be inappropriate to enter such an

15 order.

16          THE COURT:  So, your position is that the initial

17 creation of this program was unlawful and that therefore I

18 should review that in order to find that the recision was not

19 unlawful?

20          MR. PEZZI:  No, I don't think that's our position,

21 Your Honor.  I think Your Honor may agree or disagree with the

22 Attorney General's conclusion that the program is unlawful,

23 the Secretary of Homeland Security's conclusion.

24          THE COURT:  I get to make my own decision about

25 that, is that right?  Are you saying I do or I don't?  Because

1   he seems to think I don't.  I read his comments at The

2   Heritage Foundation and he seems to think that the courts

3   cannot have an opinion because he ruled that it was unlawful.

4   That's what I read.  I don't know what you read.

5            MR. PEZZI:  Certainly --

6            THE COURT:  He didn't bring that up with me.  He's

7   not here, is he?

8            MR. PEZZI:  The Attorney General is not here, Your

9   Honor.

10           THE COURT:  It's better that he's not.

11           MR. PEZZI:  Absolutely Your Honor may have an

12  opinion and may disagree with the Attorney General and the

13  Fifth Circuit about the question of DACA's illegality.

14  However, I don't think --

15           THE COURT:  Has the Fifth Circuit ruled on DACA's

16  illegality too?

17           MR. PEZZI:  The Fifth Circuit has affirmed an

18  injunction of not just the DACA policy but also the expanded

19  DACA policy.

20           THE COURT:  But you're overstating what the Fifth

21  Circuit did.  I mean I know what the Fifth Circuit did but

22  they did not terminate the DACA program.

23           MR. PEZZI:  They did --

24           THE COURT:  What they did was they returned it to

25  its prior iteration, instead of a three-year period for the

32

1    DREAMers, it went back to being a two-year period for the DACA
2    recipients.
3              MR. PEZZI:  That is right, Your Honor, but every
4    reason offered by the Fifth Circuit, more or less every reason
5    offered by the Fifth Circuit in that opinion applies directly
6    to DACA and the Fifth Circuit opinion really makes that clear.
7    I mean the plaintiffs in that case hadn't yet challenged the
8    original DACA policy directly, so the holding in that case
9    didn't strike down the original DACA policy.
10             THE COURT:  Right.
11             MR. PEZZI:  But I think it is quite clear from a
12   fair reading of that opinion that if the same question were
13   before the Fifth Circuit as to the legality of the original
14   DACA policy, it would have come out the exact same way.
15             THE COURT:  So, you decided to appeal from Judge
16   Alsup's decision to both the Supreme Court and the Court of
17   Appeals for the Ninth Circuit, so you decided in effect not to
18   let the issue percolate through the intermediate courts but to
19   jump in effect the Ninth Circuit and go directly to the
20   Supreme Court which has only happened a couple of times in the
21   past, as I understand.
22             MR. PEZZI:  That's right.
23             THE COURT:  You weren't interested in what the Ninth
24   Circuit had to say.
25             MR. PEZZI:  Well, we do have a pending appeal before

33

1   the Ninth Circuit.

2           THE COURT:  Yes, but you're up in the Supreme Court

3   so you must care more about the Supreme Court and you don't

4   want to hear from the Ninth Circuit potentially.  I'd like to

5   hear from the Ninth Circuit.

6           MR. PEZZI:  I think the --

7           THE COURT:  You like hearing from the Fourth

8   Circuit.

9           Go ahead.

10          MR. PEZZI:  The rationale offered by the Solicitor

11  General's Office in that filing, Your Honor, I think makes a

12  lot of sense which is that this is an issue that is almost

13  certain to reach the Supreme Court at some point and there's

14  twelve cases in six different courts, so that's the argument

15  offered.  Maybe the Supreme Court will find it persuasive,

16  maybe they will not.  I don't think that -- no issue that Your

17  Honor has to decide today turns on whether that was an

18  appropriate decision or not.

19          But returning to the question of Your Honor's view

20  of the legality of the DACA policy, again, I think even if

21  Your Honor disagrees, even disagrees strongly with the

22  Attorney General's view and the Fifth Circuit's view, that

23  doesn't mean that the Acting Secretary's decision was

24  irrational or arbitrary and capricious.  I think it was

25  certainly rational in the face of the adverse precedent

34

1    against the Government with respect to a materially

2    indistinguishable policy to institute an orderly wind-down of

3    the DACA policy.  As to the --

4                THE COURT:  Why was it unnecessary to go through the

5    APA process before deciding to terminate the program?

6                MR. PEZZI:  The APA has a textual exception for

7    general statements of policy that are not required to go

8    through notice-and-comment rulemaking.  DHS has issued many

9    deferred action policies over the years almost never without

10   going through notice-and-comment rulemaking and the Supreme

11   Court has described a general statement of policy as a

12   statement issued by an agency to advise the public

13   prospectively of the manner in which the agency proposes to

14   exercise a discretionary enforcement power.

15               That's exactly what we have here.  The recision memo

16   institutes an orderly wind-down of the DACA policy and a

17   return to a more traditional, truly case-by-case discretionary

18   consideration of deferred action.

19               THE COURT: Does size matter in this situation?  Does

20   the range of consequences of a determination by the Secretary

21   that affects literally millions of individuals, I'm talking

22   about the DACA recipients, their families, their employers,

23   their educational institutions, their hospitals, does that put

24   a special burden on the Secretary to be more fulsome in

25   considering the potential risks of engaging in this kind of a

35

1    termination of this policy?

2         MR. PEZZI:  The short answer is no, Your Honor.

3    There is no special burden for particularly important or

4    significant agency decisions.

5         THE COURT:  You don't think a court should establish

6    that there is --

7         MR. PEZZI:  I think the Supreme Court --

8         THE COURT:  -- as a matter of law?

9         MR. PEZZI:  The Supreme Court has decided that

10   courts do not have the authority to raise the bar provided

11   that Congress set out in the Administrative Procedure Act.  In

12   a case called Vermont Yankee the Supreme Court holds that the

13   procedures set forth in the APA are the maximum procedures

14   that courts are authorized to impose and they specifically

15   reject the argument that because the court in that decision

16   was faced with an issue of, I think it was great public import

17   was the language the Supreme Court used, that some higher

18   standard applies or some additional procedures are

19   appropriate.

20        THE COURT:  What about litigation risk, isn't that

21   just a backdoor to evading APA review of decisions to rescind

22   rules that you don't like?  And there's always a litigation

23   risk.  We get thousands of cases every year in this court,

24   civil cases, and around the country there must be thousands of

25   APA review cases, we don't just rule on these cases based on a

1    litigation risk, litigation is part of the process, and to do

2    so might be arbitrary on the part of the Court.

3             Are you saying that this was a decision based on

4    litigation risk because of the Southern District of Texas and

5    the Fifth Circuit that you didn't want to take a risk that

6    some court somewhere else in the country would view this

7    differently from let's say Judge Alsup or some judge in

8    Maryland?

9             MR. PEZZI:  I don't think relying in part on

10   litigation risk is any sort of end run about the APA's

11   requirements.  The Court, of course, still reviews whether any

12   agency decision is arbitrary and capricious and I don't think

13   there's anything at all irrational about relying on litigation

14   risk particularly in the somewhat unusual facts presented here

15   wherein a materially indistinguishable policy had already been

16   enjoined on a nationwide basis, that decision was affirmed by

17   a Court of Appeals and that decision too was affirmed by a 4-4

18   Supreme Court.  I recognize that Your Honor is not --

19             THE COURT:  Which was not precedential in nature.

20             MR. PEZZI:  Absolutely, does not set any precedent.

21             THE COURT:  I'd like to add that because a 4-4

22   decision does not have the effect of precedent.

23             MR. PEZZI:  Your Honor is certainly not bound by

24   that Supreme Court decision.  The Department of Homeland

25   Security --

37

1          THE COURT:  I call that a Supreme Court non-decision

2    because they didn't reach a conclusion.

3          MR. PEZZI:  Respectfully, Your Honor, that may be

4    true as to parties other than the Department of Homeland

5    Security but that was very much a decision that bound the

6    Department of Homeland Security and binds them to this day.

7    That was why the Department had no choice but to rescind the

8    DAPA policy and the expanded DACA policy that -- it has no

9    differences whatsoever other than a three-year rather than a

10   two-year renewal window, the age cap and the date of entry

11   requirements were different.

12         THE COURT:  All right.  Thank you.

13         MR. PEZZI:  Thank you.

14         THE COURT:  Is there anything you'd like to say

15   about the motion to dismiss?

16         MR. PEZZI:  I'm happy to address whatever Your Honor

17   thinks is most efficient, the motion to dismiss arguments

18   either after plaintiffs raise more arguments about that or I

19   can talk about it now.  Since Your Honor wanted to hear about

20   the preliminary injunction first, there are some issues unique

21   to the preliminary injunction motion that I think are worth

22   getting out quickly.

23         THE COURT:  Quickly.

24         MR. PEZZI:  Even if Your Honor disagrees with the

25   Government on all of the preliminary injunction factors,

38

1    thinks there's a likelihood of success on the merits, balance

2    of equities all favors plaintiffs, even if Your Honor comes to

3    that conclusion, I still think a preliminary injunction under

4    the circumstances that are faced with us today would be

5    inappropriate.  I don't think plaintiffs can show irreparable

6    harm that is actual or imminent in light of an injunction

7    being entered by the Northern District of California that

8    provides them nearly all of the relief they are seeking here

9    and certainly the thrust of the relief that is the focus of

10   their papers.

11          The Supreme Court's decision in Winter I think

12   requires a showing of irreparable harm and I think any harm

13   here, certainly again as to the majority of their papers, is

14   very speculative and far off in light of the injunction

15   entered by Judge Alsup and the fact that the Department isn't

16   seeking a stay of that decision pending appeal.

17          So, you know, all of the reliance interests we heard

18   about and the importance of the program, they may all file

19   renewal requests now and presumably are being advised to do so

20   by their counsel and so I think that's important to Your

21   Honor's consideration.

22          THE COURT:  Let me ask you a question having nothing

23   to do with the arguments here today necessarily, but you have

24   a new Secretary of Homeland Security, all right, and has the

25   Secretary of Homeland Security, who's been nominated by the

1   President and confirmed by the Senate, had the opportunity to

2   reconsider the decision of his Duke in connection with DACA?

3           MR. PEZZI:  I can't speak to what is in the mind of

4   the current Secretary of Homeland Security.  I'm not aware of

5   any intent to reconsider this decision and we, of course,

6   represent the Department of Homeland Security.

7           THE COURT:  Well, that's why I asked you.

8           MR. PEZZI:  We are continuing to defend that

9   decision in court and I have no reason to think that that is

10  going to change any time soon.  I will say the new Secretary

11  on this issue testified before Congress about two weeks ago

12  and she testified, and I believe it was under oath, that

13  regardless of the outcome of this litigation, whether there's

14  legislation in Congress, whether this program continues or

15  not, that DACA recipients are not likely to be a priority of

16  the Secretary of Homeland Security but beyond that, I don't

17  want to speak out of turn with respect to what's going on in

18  her head other than to say, of course, we represent them and

19  we are here defending a decision that was made on

20  September 5th and we expect to continue to do so.

21          THE COURT:  All right.  Thank you.

22          MR. PEZZI:  Thank you, Your Honor.

23          THE COURT:  All right.  On the Government's motion

24  to dismiss, let me hear -- if you would like to reply, that

25  would be fine.

1              MR. PEZZI:  That works for me.

2              THE COURT:  On the opposition to the motion to

3     dismiss, is there anything?

4              MS. ROSADO:  I'm sorry, Your Honor, are you asking

5     whether we are prepared to do a rebuttal to the preliminary

6     injunction motion?

7              THE COURT:  No.  This is about the Government's

8     motion to dismiss the case and I'm wondering whether anyone

9     would like to speak to that.  We've had a wide-ranging

10    discussion but I'm just wondering whether there's anything

11    more that the plaintiffs would like to say about the

12    Government's motion to dismiss and whether there are any

13    particular aspects of the motion that has been made that the

14    plaintiffs would like to bring to the Court's attention?

15             MS. MELODY:  Good morning, Your Honor, I'm Colleen

16    Melody from the State of Washington.  I'm going to briefly

17    address the zone of interests argument that's made in the

18    Government's 12(b)(6) motion and also the equal protection

19    issues in this case.

20             Very briefly on the zone of interests, the

21    Defendants and the Plaintiff States all agree that the INA is

22    the applicable statute with which to evaluate the zone of

23    interests argument.  There are three ways that the Plaintiff

24    States, all of them, fall within the zone of interests of the

25    INA.  The first is that we're all employers and the INA

1    contains detailed statutory and regulatory provisions

2    governing how we may recruit and employ immigrants.  So,

3    because we all employ or want to employ the most qualified

4    people, our interests are regulated by the INA.

5              Second, we operate colleges and universities and

6    colleges and universities rely on the employment provisions in

7    the INA in order to do their work, to hire faculty, to hire

8    graduate students who can teach and do research, many graduate

9    students require employment authorization in order to do

10   clinical research, to work in labs, to teach other students

11   and that is regulated interests for purpose of the INA.

12             And third, every state operates benefit systems that

13   are specifically regulated by the INA.  The Fifth Circuit

14   decision on which the Attorney General exclusively relied in

15   terminating DACA speaks exactly to this issue when it found

16   that each state, in that case all of them were regulated by

17   the INA for purposes of the zone of interests.

18             There's a specific federal statute that requires

19   states to determine benefits eligibility with reference to

20   immigration status, we can't get out of that, we are regulated

21   in that way and so we all fall into the zones of interests for

22   purposes of credential standing.

23             Moving to the equal protection arguments, Your

24   Honor, the evidence of animus towards Latino immigrants, even

25   on a record with limited discovery here, is truly remarkable.

42

1    The Government's motion to dismiss should be denied and the

2    Plaintiff States' motion for preliminary relief on that ground

3    should be granted for two reasons.

4            First, the record contains significant direct and

5    circumstantial evidence of defendants' animus statements

6    toward Latino immigrants and animus infected the decision to

7    terminate DACA.

8            THE COURT:  The animus that you're talking about,

9    that wasn't animus by the Secretary of Homeland Security, was

10   it?

11           I mean is there any evidence of animus on the part

12   of the Secretary, the Acting Secretary or the current

13   Secretary of Homeland Security against Latinos, Mexicans,

14   other foreigners who have availed themselves of the DACA

15   program?

16           MS. MELODY:  Not directly, Your Honor, but that

17   argument is a strawman for two reasons; one is that as to the

18   equal protection claim, Acting Secretary Duke's decision

19   making or intent are not the only intentions relevant, that's

20   true for APA too.  This Court has already found that Attorney

21   General Sessions -- correctly found that Attorney General

22   Sessions was a decision-maker as to DACA based on defendants'

23   representations.

24           THE COURT:  Representations to me I would add at our

25   first hearing.

43

1          MS. MELODY:  Twice, Your Honor.

2          THE COURT:  Well, with all due respect, that's not

3    the current position of the Government, that it was the

4    Secretary who made the decision and it was not the Attorney

5    General.

6          MS. MELODY:  Respectfully, no, Your Honor, in

7    footnote 16 of their brief, in their 12(b)(6) brief they make

8    the same concession again to this Court in writing.

9          THE COURT:  Okay.

10         MS. MELODY:  So, Secretary Duke's intentions are not

11   the only ones that matter legally and also as a matter of

12   common sense and the Federal Rules of Evidence.  We have

13   statements from the President himself the day that DACA was

14   terminated through Twitter, through White House press releases

15   owning and taking responsibility for the decision; the

16   Attorney General himself announced the termination of DACA on

17   live television, and those statements cannot be separated from

18   the decision itself when Secretary Duke relied on those

19   statements and those decisions in her decision.

20         And so, I would point you to footnote 16 of the

21   Government's brief on 12(b)(6) where they say, yes, they were

22   involved but the Court should treat that as a legal fiction.

23   There's no basis, there's no citation how that could be

24   dispositive, particularly in a constitutional equal protection

25   analysis.

44

1          And so, with respect to discriminatory intent then,

2     this Court conducts a sensitive, factual analysis under the

3     very familiar Arlington Heights standard where the Court looks

4     at all of the factors together and those are going to be

5     several years now of a drumbeat of anti-Latino statements made

6     by the President and his administration, that's going to be

7     the overwhelming and conceded disproportionate impact that the

8     termination of DACA will have on Latinos and the tremendously

9     unusual process by which this decision was reached.

10          To say that litigation risk is something that this

11     administration considers in making decisions is not consistent

12     with the path of litigation that we've seen this

13     administration pursue in many of its most controversial and

14     sort of well publicized policies.

15          It's also very unusual for the administration to

16     throw aside years and years of considered legal analysis and

17     issue a one-page letter reaching conclusory legal decisions

18     about a program affecting this many folks.

19          Notably, Your Honor, the Court -- excuse me,

20     notably, the defendants don't even address or dispute the idea

21     that the President and the Attorney General's statements

22     constitute evidence of animus.  Instead, they just ask the

23     Court to disregard them relying exclusively on a presumption

24     of regularity but a presumption of regularity in this context

25     would be tantamount to a presumption of no liability ever no

45

1    matter what any policy maker or elected official said.  That

2    would apply a lower standard of constitutional rigor to the

3    President of the United States than applies to any mayor or

4    city council member anywhere in this country when courts

5    across this country conduct the Arlington Heights analysis.

6    That cannot be the law.

7             Finally, Your Honor, instead of taking on or

8    addressing the animus-based arguments, the Government has

9    asked to reframe this as a selective enforcement argument.

10   This Court has twice found correctly that this is not a

11   selective enforcement claim.

12            Most recently in the January 8th ruling granting

13   defendants' motion to certify the Court stated:  This is not

14   an enforcement decision or a nonenforcement decision, it is a

15   non-nonenforcement decision.

16            That's right.  It is a categorical, across the board

17   policy decision affecting 700,000 people.  That is not the

18   kind of individualized prosecute this individual, not

19   prosecute this one kind of decision to which selective

20   enforcement claims speak.

21            The Court's November 9th order on the motion to

22   dismiss for 12(b)(1) issues says the same thing:  "This

23   affirmative decision to constrain DHS's prosecutorial

24   discretion cannot be analogized to an exercise of

25   prosecutorial discretion."  The Court was right then and still

1   is.

2          So, at the end, Your Honor, after setting aside all

3   of these legal excuses for why we shouldn't consider the

4   President and Attorney General's public statements, we're left

5   with a question:  Would this same decision have been made in

6   the absence of a discriminatory motive?  Or stated another

7   way:  Would the same outcome have been reached if the group of

8   affected young people had been children and young adults from

9   Norway instead of children and young adults primarily from

10  Mexico?

11         THE COURT:  Do those people tend to be white?

12         MS. MELODY:  My understanding is yes, Your Honor.

13         THE COURT:  Well, I hate to make a statement based

14  on my own observations; I was in Norway last year and most of

15  the people I ran into were white.  So, unlike your Secretary

16  of Homeland Security whose name is what?  What's her name?

17         MR. PEZZI:  The current Secretary is Kirstjen

18  Nielsen.

19         THE COURT:  Kirstjen Nielsen.  I just wish to point

20  out that my observation was that most of the people that I ran

21  into in Norway when I was there were white.

22         MS. MELODY:  And that's the analysis that the Court

23  conducts, would the outcome on the total evidence in this

24  record be the same.  The answer is no and the Government's

25  motion to dismiss should be denied and the States' motion for

47

1   preliminary relief on the equal protection claim should be

2   granted.

3           THE COURT:  Okay.  Thank you.

4           MS. MELODY:  You're welcome.

5           THE COURT:  All right.

6           Mr. Pezzi, do you want to speak to that?

7           Oh, is there something else?

8           MS. TUMLIN:  Yes, Your Honor.

9           THE COURT:  Briefly.

10          MS. TUMLIN:  Yes, I'm going to address the

11  procedural due process claim on the motion to dismiss, Your

12  Honor.

13          THE COURT:  Go ahead.

14          MS. TUMLIN:  So, the plaintiffs' procedural due

15  process claim is very simple, it is that the plaintiffs, DACA

16  recipients, have the right to have their application for

17  renewal adjudicated, processed under the terms of the Duke

18  Memorandum.  Instead what has occurred, and what we have

19  adequately pled, is the procedures put in place by USCIS to

20  implement that memorandum were arbitrary, a significant break

21  from ABC practice and did not actually comport with basic

22  notions of due process.

23          Let me point out just two clear cut examples and the

24  reason I want to do that, Your Honor, is because it speaks not

25  only to the sufficiency of the pleadings here but to the clear

48

1  ongoing irreparable harm that have come to these DACA

2  recipients, New Yorkers, today.

3          So, two cases that are in our pleadings; first,

4  Fernando Hernandez Cordero, he is one of those individuals who

5  did his ever best, sent in his renewal application, it was

6  received at 6:01 p.m. on October the 5th but USCIS had already

7  checked the mail for that day, denied his application.

8          After some discussion here, and also this being

9  reported in the press, the procedures were changed.  He

10  reapplied.  We raised this case as early as November the 7th.

11  His DACA expired on December 21st, Your Honor, and currently

12  his application for renewal is still pending.  That alone is

13  reason that we have adequately pled this claim.

14          Secondly, Jonathan Morin Juarez, also a member of

15  Make the Road New York, also in our pleadings; he mailed his

16  application for renewal on September 28th, 2017, trying to

17  follow the rules of the one month scramble that was set in

18  place by the Duke Memorandum.  That was received on October

19  the 10th.  Again, he was denied his right to have that

20  adjudicated.  The reason it was late was well documented

21  postal delays by the U.S. Postal Service.  He also has

22  reapplied but his DACA expired on December 28, 2017.

23          For these reasons alone, the process set up by the

24  Government has deprived plaintiffs and members of Make the

25  Road New York of a protected liberty interest in having their

1  application adjudicated.

2          Make no mistake, they're not saying they have a

3  protected right to get DACA, to have it granted to them.

4  They're simply asking for the opportunity to be considered

5  under the process put in place by the Duke Memorandum, Your

6  Honor.

7

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*50*

1          THE COURT:  Let me just go back to the equal

2   protection question.  Is it plaintiff's position that because

3   Mr. Trump, when he was a candidate, made incendiary,

4   insensitive, irresponsible, and untrue statements about

5   Mexicans that the Trump administration could never rescind

6   DACA now that he's the president?

7          MS. TUMLIN:  My colleague is going to speak to the

8   equal protection question.

9          MR. CHEN:  I can answer that question, your Honor.

10         I think the equal protection inquiry looks to the

11  totality of the circumstances and depends upon the facts of

12  each challenged action.

13         So, for example, under the *Arlington* framework, we

14  look to whether there are differences in terms of the

15  statements made, contemporary statements, and the irregularity

16  of the process.  So it may differ depending upon the action

17  that President Trump has taken.

18         However, in this particular instance, there is clear

19  evidence that is consistent and long running from

20  President Trump's beginnings as announcing his presidency up

21  until when he has become president, and then just several

22  weeks ago when he made those comments.

23         So, as to this particular action, there is a clear

24  connection between President Trump's and Attorney General

25  Sessions' comments and remarks as well as the irregularities,

*51*

1    the way that the DACA termination was conducted, that go to

2    the equal protection analysis.

3            THE COURT:  Thank you.

4            MR. CHEN:  If I may really answer your question

5    about the information sharing policy that was posed earlier?

6            So just to clarify.  The information sharing policy

7    goes to the Batalla Vidal's plaintiffs arbitrary and

8    capricious claim.  In that sense, the plaintiffs here have

9    also relied upon the information sharing policy that the

10   Government presented.

11           Now, the Government's position is that that

12   information sharing policy hasn't changed but, your Honor, we

13   believe that's incorrect.  There are textual changes in the

14   policy.  So, for example, prior to September 5th, the

15   Government had represented that DACA applicants' information

16   would be protected from disclosure to ICE.  And that now has

17   changed to that the information policy would generally would

18   not be proactively provided.  Nor is there any inclusion of

19   protections for family members and guardians which it was a

20   protection prior to September 5th.

21           So those are clear changes in the information policy

22   and individual applicants have certainly relied upon this

23   assurance given the fact that they are individuals who may be

24   vulnerable to deportation.  They came out of the shadows and

25   applied for DACA with the understanding that the Government

1    would not then use this policy that is meant to benefit them

2    in order to find them and put them in removal proceedings,

3    your Honor.

4          THE COURT:  That's a policy and policies can be

5    changed.  Is there any obligation on the part of the federal

6    government to expunge or not consider information which has

7    been provided in order to fulfill the Government's other

8    responsibilities under the law?

9          MR. CHEN:  No, not necessarily, your Honor.

10          I want to clarify our argument on reliance interest.

11   I think this goes back to our original argument about DACA

12   termination itself.  Plaintiffs' view is not that the

13   Government could never terminate DACA or never change the

14   information policy, but rather, given the significance of

15   reliance at stake, as the Supreme Court has said, the agency

16   must provide more substantial justification when it is

17   reversing its position.

18          So as to the information policy, if the Government

19   wanted to change that policy, it needed to provide some

20   rationale or some reasoned decision making.  The Government

21   here has not done so and, in fact, has not even acknowledged

22   that it has changed its policy which is arbitrary and

23   capricious, your Honor.

24          THE COURT:  Thank you.

25          Mr. Pezzi, let me just ask you a question about

*53*

1    something you said earlier.

2           You indicated earlier that the DHS had no choice but

3    to rescind the DACA policy in light of the *Texas v.*

4    *United States* litigation.  Now, are you saying that the

5    defendants were legally compelled to rescind DACA in the

6    Attorney General's view, or that it may -- that this was a

7    discretionary decision to do so in light of the assessment of

8    the litigation risk.  Which was it?  Were you compelled or was

9    it discretionary?

10          MR. PEZZI:  We were not compelled in the sense that

11   there was no order from the Court in Texas that required the

12   original DACA policy to be wound down.  In the face of the

13   litigation risk presented by those proceedings, and the

14   Department of Homeland Security's determination about the

15   legality of the policy, it was decided to wind down the

16   program.  And our burden in this case, and in APA cases, show

17   that that decision was at least rational.

18          THE COURT:  So you had 11 attorneys general threaten

19   to amend their complaint, and that if they amended their

20   complaint the Judge Hanen.

21          MR. PEZZI:  I believe it was Judge Hanen.

22          THE COURT:  Judge Hanen down in Texas, who is a

23   district judge like me, might rule and issue an injunction

24   that the Circuit might or might not affirm.

25          MR. PEZZI:  That's --

*54*

1          THE COURT:  And if the Supreme Court might or might

2     not affirm.  So there's a lot of steps there.  So you chose to

3     view that as manifest destiny, if I might use a term that I

4     learned in elementary school about how big this country is.

5          MR. PEZZI:  Your Honor --

6          THE COURT:  You really care about the other states

7     or their residents down there in Washington these days?  Do we

8     count?  Does California count?  Does the Eastern District of

9     New York count?  That's rhetorical, don't answer.

10          MR. PEZZI:  Understood, your Honor.

11          I think it was at least rational to -- I think it

12     was an absolutely reasonable prediction about how the

13     proceedings in Texas were going to play out.  Judge Hanen was

14     bound by the Fifth Circuit's decision which had struck down a

15     materially and distinguishable policy.  The next Fifth Circuit

16     panel to review Judge Hanen's decision would have been also

17     bound by prior Fifth Circuit precedent.  And so, it would have

18     required some sort of -- you would have to come to the

19     conclusion that it was irrational to think that the way the

20     proceedings played out in Texas with the materially and

21     distinguishable policy would have played out the same way and

22     I don't think that was.

23          THE COURT:  Did you appeal to the Supreme Court on

24     this concept of a nationwide injunction in that case?

25          MR. PEZZI:  On the nationwide injunction issue,

*55*

1  specifically, I don't think that was a focus of the cert

2  petition in the Texas proceedings.

3  　　　　　THE COURT:  It wasn't your petition, it was the

4  other side's petition, right?  Who petitioned the Supreme

5  Court?

6  　　　　　MR. PEZZI:  The Government filed a cert petition in

7  response to the Fifth Circuit's decision in Texas.

8  　　　　　THE COURT:  The Government filed it?

9  　　　　　MR. PEZZI:  That's right, yes.  I think that's

10  right.

11  　　　　　THE COURT:  What did the Fifth Circuit do?

12  　　　　　MR. PEZZI:  The Fifth Circuit affirmed the

13  nationwide injunction that had been entered by Judge Hanen of

14  the expanded DACA and the DAPA policies, and the Government

15  appealed that decision to the Supreme Court.  When the

16  Government lost at the Supreme Court, and the judgment was

17  affirmed in the Circuit, they actually brought a rehearing

18  petition to have it reconsidered upon the confirmation of the

19  ninth justice and that petition was denied.

20  　　　　　So it is not the case, and this appears in some of

21  plaintiffs' papers that the Government sort of rolled over.

22  That was an issue that was fought vigorously, unsuccessfully

23  ultimately, and Department of Homeland Security was pound by

24  that judgment.

25  　　　　　THE COURT:  We have now have a different government.

*56*

1      MR. PEZZI:  Certainly there has been a change in

2  administration.

3      THE COURT:  I think that's a fair statement.  It's a

4  different government.

5      MR. PEZZI:  Your Honor, if I can speak to the

6  information sharing issue.

7      THE COURT:  Briefly.

8      MR. PEZZI:  I think it actually is very important

9  for your Honor, and frankly, everyone in this courtroom to be

10  aware.  Here is a quote from the Citizenship and Immigration

11  Services.

12      THE COURT:  From whom?

13      MR. PEZZI:  From USCIS, Citizenship and Immigration

14  Services.

15      THE COURT:  Go ahead.

16      MR. PEZZI:  "The information sharing policy has not

17  changed in any way since it was first announced, including as

18  a result of the September 5, 2017, memo starting a wind down

19  of the DACA policy."

20      I don't know how the Government can be clearer than

21  that.  The information sharing policy, in fact, has not

22  changed.  The adverbs "proactively" and "generally" that my

23  friends on the other side express so much concern about do not

24  actually appear, and have never appeared to my knowledge on

25  the actual instructions to submit a DACA request.  Nor do they

*57*

1    appear on current instructions.

2              So when you go on the USCIS website, there is now a

3    page devoted to Judge Alsop's injunction and it says, Here is

4    the process to apply for a renewal as a result of the

5    Judge Alsop's injunction.  The instructions there use the same

6    language that plaintiffs claim that we have abandoned or

7    changed, we have not.

8              To the extent there was confusion about the prior

9    policy, USCIS reacted to that and put out that clear statement

10   that I just read to make sure there was no confusion going

11   forward.

12             THE COURT:  The information use policy remains same?

13             MR. PEZZI:  That is correct, your Honor.

14             THE COURT:  And can you provide the Court with the

15   policy.  Can you file the policy with the Court so I know

16   exactly what the Department of Homeland Security says the

17   policy is, so that there would be no question in this

18   litigation about the policy that DHS is following.

19             MR. PEZZI:  Absolutely willing to get those

20   instructions on file and I think that will resolve the issue.

21             THE COURT:  That would be very helpful and I deeply

22   appreciate your assistance.

23             MR. PEZZI:  On the procedural due process claim.

24             THE COURT:  Yes, go ahead.

25             MR. PEZZI:  I think my friends on the other side

*58*

1    essentially just confirmed that they do not have, or at least

2    no longer have, any viable procedural due process claim.  They

3    confirmed what I had suspected which is that all of the

4    affected individuals have submitted renewal applications now

5    either as a result of DHS's voluntary decision to treat the

6    October 5th deadline with some flexibility or as a result of

7    Judge Alsop's injunction.

8              But if their claim is they want those requests to be

9    adjudicated, and that's what I heard my friends on the other

10   side saying, they are being processed by all accounts and they

11   conceded appropriately they don't have any right, certainly

12   not a constitutional right, to have those granted or

13   considered in any certain way.  If they're being considered,

14   there's no claim.  There's no money damages claim, for

15   example, at issue because it took a little bit longer than

16   they would have like for those to be processed.  So I think

17   that resolves the procedural due process claim among other

18   reasons.

19             THE COURT:  Okay.  Did you want to talk about --

20   well, I think Mr. Shumate was going to say something about

21   class certification.

22             Do you have something else you'd like to say?

23             MR. PEZZI:  I was just going to say very briefly on

24   the animus claim if you don't mind, your Honor.

25             I do think the implications of the plaintiff's

*59*

1    theory of their equal protection claim are quite remarkable

2    based on the fact that there is a statistically significant

3    disparate impact of this decision on Latinos.  If plaintiffs

4    are right that the President's statements, the vast majority

5    of which were, you know, on the campaign before he took the

6    oath of office, plaintiffs are right that those are sufficient

7    to make a triable issue over whether the Constitution of the

8    United States was violated on an equal protection theory.

9         That would mean at any time any agency within the

10   Executive Branch, and it would not be limited to the

11   Department of Homeland Security because they claim the theory

12   has nothing to do with the Elaine Duke.  Any time a Government

13   takes a decision with a statistically disparate impact on

14   Latinos that the Equal Protection Clause has been violated and

15   I just think that's a remarkable theory.

16        THE COURT:  Well, the fact of the matter is, that

17   the statements that were made during the election cycle were

18   extremely volatile and many of them completely erroneous and

19   they were intended to have a political outcome.  And there was

20   no concern on the part of the candidate as to how that would

21   affect the groups that were being attacked.

22        And then the activity of the administration after

23   January 20th of 2017 could be construed as having confirmed

24   the bias of the leadership.  So it's not just an ad hoc

25   comment that was overheard on an open mic.  It was a

*60*

1    recurring, redundant, drum beat of anti-Latino commentary that

2    was unjustified by facts to a tremendous extent.

3              So it's not just a comment.  It's not just that

4    somebody at INS said something derogatory about Mexicans, this

5    came from the top.  This isn't ordinary.  In this country, in

6    over 230 years, it's not ordinary.  It's extreme, it's

7    recurring, it's vicious.  It's a different kind of commentary.

8    It's not what we see from our leaders, hopefully.

9              And so, you're asking to wipe the slate clean and

10   treat this situation like any other decision.  How is it

11   possible to do that in my position as an Article III judge who

12   was sworn to uphold the Constitution of the United States?

13   How do I do that without taking into account the commentary,

14   which is so injurious and harmful and unfair to particular

15   ethnic groups, by the person who sits in the Oval Office.

16   That's the question.

17             And I'm not sure what the answer is, and I'm not

18   making an answer, but it's not a simple question.  It's not a

19   question sort of ignoring a few offhand comments that were

20   made by some bureaucrat in Washington or in New York on a bad

21   hair day.  There's a lot more going on here potentially.  So I

22   don't accept the premise that this is something we can just

23   ignore.  This is something we must consider, and how we end up

24   is the question.

25             MR. PEZZI:  Your Honor, I took that same oath and

1   it's something that I take very seriously.  I think even if

2   your Honor is inclined to consider those issues in analyzing

3   plaintiffs' equal protection claim and I'm not sure that you

4   do, in fact, I don't think you do.  None of the statements are

5   about rescission of DACA.  None of the statements are by

6   Elaine Duke who made the decision in question.  When the

7   President has spoken about DACA recipients, he has been

8   generally supportive.

9          THE COURT:  I appreciate that.  Thank you.

10          MR. PEZZI:  Thank you, your Honor.

11          THE COURT:  Do we need to talk about class

12   certification?

13          Why don't we just have a brief statement from the

14   plaintiffs and then from the Government and that will close it

15   out.

16          MS. ROSADO:  Your Honor, if I may?  I wanted to --

17   during one of your earlier questions I was negligent in

18   alerting the Court to the fact that my boss is here, the

19   New York State Attorney General.

20          THE COURT:  I've been looking at him the whole time.

21          MS. ROSADO:  So you've been waving.  I just didn't

22   want to get in trouble with my boss for not letting you know.

23          THE COURT:  There have been other occasions when

24   I've wanted your boss to be here, but at this time I'm

25   delighted to see you here, Mr. Schneiderman.  Thank you for

1  joining us.  And your assistant is doing an excellent job.  So

2  next time you're reviewing --

3          MS. ROSADO:  Thank you, your Honor.

4          THE COURT:  Yes, okay.

5          Go ahead.

6          MR. CHEN:  Thank you, your Honor.

7          Just a few brief comments on the motion for class

8  certification.  So, as a threshold matter, the Batalla Vidal

9  Plaintiffs maintain that this court has authority to issue a

10  nationwide relief without certifying class.  And so,

11  plaintiffs are moving for class cert out of prudence, merely

12  out of prudence for plaintiffs because the Government

13  continues to assert that nationwide relief is inappropriate

14  without a class.  They have made that same argument up to the

15  Supreme Court on the certiorari petition in the California

16  cases.

17          So nothing in our argument is meant to constrain the

18  Court's authority in any way, but rather just to gift the

19  Court greater comfort in fashioning broader relief if the

20  Court finds it to be necessary.

21          So I can quickly go over the two proposed

22  alternatives for a motion for class certification --

23          THE COURT:  Go ahead.

24          MR. CHEN:  -- and address even of them in turn.

25          So the first one, just to recap, is to modify the

*63*

1    class definition to exclude individual plaintiffs in parallel

2    litigation.  And the second is to maintain the broader class

3    that we ask the Court to certify and allow members to opt out.

4              So on to the definitional approach.  I'm going to

5    address the Government's arguments, and essentially, the

6    Government makes an argument about how there's an interference

7    concern with parallel litigation.  But that interference

8    concern is overblown, your Honor.

9              So the Batalla Vidal Plaintiffs are certifying a

10   class of only individual plaintiffs.  So DACA recipients who

11   had DACA as of September 5, 2017, and those who may -- who

12   qualify, or may qualify, for DACA under the 2012 guidance.

13             This does not interfere with the other cases because

14   those don't specifically interfere with the institutions

15   litigating in parallel actions since they also have

16   institutional interest.

17             So, for example, the State of California asserts

18   state-specific injuries of, for example, losing tax revenue

19   and the Regents University of California claimed loss of

20   enrollment, so those are injuries and they have standing

21   specific to their institutional interests.

22             But moreover, there are, as the Government claims,

23   about 12 cases challenging the DACA termination and the court

24   s across the country have been comfortable with matters

25   proceeding simultaneously.  So no court has found a problem

*64*

1    with the potentially overlapping the plaintiffs that the

2    Government says is unacceptable in this case.  So because the

3    Government here is citing a theoretical problem that's not a

4    reason to deny class certification here, your Honor.

5            THE COURT:  Well, but going back to my first

6    question.

7            If the Supreme Court accepts the California case for

8    decision, it wouldn't be necessary for me to rule on the class

9    cert issue at that point.  I could stay proceedings, right?

10            MR. CHEN:  Well, your Honor, on just the class

11    certification issue, we don't think that -- we maintain that

12    it's not necessary to rule on it in order to grant relief.

13    Our position is certainly that the Court should continue to --

14    should grant the preliminary injunction on a nationwide basis.

15            THE COURT:  Thank you very much.  Mr. Shumate, you

16    get the last word.

17            MR. SHUMATE:  Thank you, your Honor.

18            May it please the Court.  I'll be very brief on the

19    class certification question.

20            Our position is that the Court should deny the

21    motion for a class certification with respect to a nationwide

22    class.  I don't think the plaintiffs have really grappled with

23    the implications of what it would look like for the Court to

24    grant a nationwide class and then enter a final judgment.

25    Because the plaintiffs are seeking a (b)(2) class action, if

*65*

1    the Court were to enter a final judgment in this case that

2    would bind all class members, including absent class members,

3    and it would preclude the plaintiffs in other cases from

4    bringing their claims before those courts.

5            So if the Court, for example, were to enter a final

6    judgment, or the Second Circuit were to enter a final

7    judgment, that would preclude the plaintiffs in the other

8    cases from bringing their own individual claims.  I think they

9    haven't grappled with the fact that a (b)(2) class action is a

10   mandatory class action.  All members of the class are bound by

11   that.  And they haven't grappled with the Walmart case.

12           So I just want the Court to keep that in mind that

13   we don't think it would be appropriate in this case to certify

14   a (b)(2) class that would necessarily interfere with other

15   cases going around the courts.  I think the Court is well

16   aware there are 12 cases.  So I just wanted the Court to keep

17   that in mind.

18           THE COURT:  Thank you.  I just have one additional

19   question for the Assistant Attorney General.  I wouldn't want

20   his trip here to be for naught.

21           The question really is will the administration

22   continue to honor DACA benefits that are being granted during

23   the pendency of Judge Alsop's injunction?

24           MR. RADLER:  I would defer to my to my colleague.

25           THE COURT:  You're going to disappoint me.

*66*

1        MR. RADLER:  My career colleagues are really

2   terrific at the department to rely on to do the heavy lifting

3   among these cases.

4        THE COURT:  I hope you can hold on to them.

5        MR. PEZZI:  Your Honor, I wish I could offer a more

6   concrete answer to that question.  It is something that I and

7   others have thought about.  Until we get a decision, whether

8   it's from the Ninth Circuit or the Supreme Court or both, it's

9   impossible to know exactly what the lay of the land is going

10  to look like for the DACA policy.

11        So, for example, one possibility is the Supreme

12  Court enters an opinion that says not only is DACA unlawful

13  but it needs to be stopped immediately.  If something like

14  that happened that might affect how the Department of Homeland

15  Security considers those issues.

16        But more importantly --

17        THE COURT:  If the Supreme Court leaves the details

18  to the administration, and doesn't require that you terminate

19  the DACA program forthwith, what is the intention of the

20  administration with regard to these individuals who are

21  applying for continuation of their DACA status as a result of

22  the injunction?

23        MR. PEZZI:  Your Honor, although I'm unable to make

24  a firm representation about that because a final decision

25  won't be able to be made until the litigation proceeds I can

*67*

1   say, and I think this is important, in the Solicitor General's

2   filings with the Supreme Court, the reason the Government did

3   not seek a stay of Judge Alsop's injunction was to avoid

4   abrupt swings back and forth in our nation's immigration

5   policy and how this particular policy is carried forth.

6           So I can certainly assure you that the Department of

7   Homeland Security is aware of the issues and is something it

8   takes very seriously.  Beyond that, we'll have to wait and see

9   how the litigation precedes and someone at the Department of

10  Homeland Security will ultimately make that decision.

11          THE COURT:  Yes, ma'am.

12          MS. TUMLIN:  Your Honor, very briefly to close on

13  this point for plaintiffs.

14          Your Honor, the plaintiffs in this courtroom today,

15  the young people from New York who have DACA, who brought this

16  case here, respectfully ask the Court to not wait to issue a

17  ruling on the preliminary injunction motions in this case for

18  three reasons.

19          First, the individual plaintiffs, of course, deserve

20  prompt resolution of their claims.  And secondly, and this is

21  incredibly important, your Honor, neither the deliberations on

22  Capitol Hill nor Judge Alsop's current injunction, the relief

23  provided is neither adequate nor is it stable for these young

24  people.

25          It is not adequate for a couple of reasons.  First,

*68*

1    as we discussed today, we have different legal theories and

2    claims brought by these plaintiffs that are not up and pending

3    before the U.S. Supreme Court.  There are plaintiffs that are

4    left out of Judge Alsop's order including the young people

5    who, after the magic date of September the 5th aged into the

6    program for the first time and are absolutely excluded.

7    They've brought their case here and should not be forced to

8    wait.

9           And really importantly, there's a very different

10   record developed in this case on those legal claims and legal

11   theories with evidence and the Supreme Court, whatever it

12   decides, deserves to have these plaintiffs, that record,

13   before it.

14          Additionally, your Honor, the Circuit appears that

15   it may be waiting for this court to rule expeditiously on the

16   pending interlocutory appeal.  And what I want to say, your

17   Honor, as a matter of what is before this court is no matter

18   what happens, and none of us have a crystal ball in what's

19   happening in Congress or the various courts across this

20   country.  We know what's happening in this courtroom in the

21   Eastern District of New York.  We know that Carolina and

22   Antonio and Martin and all of the plaintiffs and members of

23   Make The Road New York whose lives are built around DACA, and

24   who are integral to this community, are seeking relief from

25   this court, have fully brought the matter to the Court's

*69*

1    attention, and -- but they want more than anything is to have

2    some stability that they can go on and continue to contribute

3    to their New York community and continue fulfilling their

4    dreams, your Honor.

5              THE COURT:  Thank you.  Thank you, everyone.

6              (WHEREUPON, this matter was adjourned.)

7

8                           *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 0

**02108** [1] - 2:15
**06511** [1] - 1:21

## 1

**10271** [1] - 2:9
**10th** [1] - 48:19
**11** [1] - 53:18
**11201** [2] - 3:13, 3:18
**1121** [1] - 2:3
**11:00** [1] - 1:8
**12** [2] - 63:23, 65:16
**12(b)(1** [1] - 45:22
**12(b)(6** [1] - 40:18, 43:7, 43:21
**120** [1] - 2:9
**133** [1] - 1:20
**1331** [1] - 30:8
**14th** [1] - 2:3
**15** [1] - 12:14
**16** [2] - 43:7, 43:20
**16-CV-04756** [1] - 1:4
**16th** [1] - 7:11
**18th** [1] - 17:13
**1995** [1] - 30:8
**19th** [1] - 2:14

## 2

**20** [1] - 3:6
**200** [1] - 2:4
**2000** [1] - 2:20
**20005** [1] - 2:4
**2012** [1] - 63:12
**2017** [5] - 48:16, 48:22, 56:18, 59:23, 63:11
**2018** [2] - 1:8, 7:11
**20530** [1] - 3:6
**20th** [1] - 59:23
**21st** [1] - 48:11
**225** [1] - 3:17
**230** [1] - 60:6
**25** [1] - 10:3
**271** [1] - 3:13
**28** [1] - 48:22
**28th** [1] - 48:16

## 3

**30** [1] - 1:8
**374N** [1] - 3:17

## 4

**4,000** [1] - 17:11
**4-4** [2] - 36:17, 36:21
**48** [1] - 30:8

## 5

**5** [2] - 56:18, 63:11
**5th** [18] - 2:20, 8:25, 16:21, 17:12, 26:25, 27:8, 27:9, 27:10, 27:13, 28:3, 28:11, 28:12, 39:20, 48:6, 51:14, 51:20, 58:6, 68:5

## 6

**6:01** [1] - 48:6

## 7

**700,000** [4] - 13:6, 15:18, 19:3, 45:17
**7th** [1] - 48:10

## 8

**800** [1] - 2:20
**8th** [1] - 45:12

## 9

**98104** [1] - 2:21
**9th** [2] - 15:6, 45:21

## A

**a.m** [1] - 1:8
**abandoned** [1] - 57:6
**ABC** [1] - 47:21
**abeyance** [2] - 10:12, 11:5
**Abigail** [1] - 5:11
**ABIGAIL** [1] - 2:15
**able** [4] - 20:23, 22:16, 23:16, 66:25
**abreast** [1] - 12:16
**abrupt** [2] - 7:21, 67:4
**abruptly** [1] - 13:9
**absence** [1] - 46:6
**absent** [1] - 65:2
**absolutely** [2] - 12:19, 16:3, 21:22, 22:1, 31:11, 36:20, 54:12, 57:19, 68:6
**accept** [3] - 15:8, 60:22
**accepts** [1] - 64:7
**accommodated** [1] - 26:16
**according** [1] - 25:20
**account** [1] - 60:13
**accounts** [1] - 58:10
**acknowledge** [1] -

13:1
**acknowledged** [2] - 23:11, 52:21
**Act** [1] - 35:11
**act** [1] - 27:25
**Acting** [6] - 3:1, 6:8, 23:6, 33:23, 42:12, 42:18
**action** [12] - 12:25, 13:24, 14:9, 16:10, 34:9, 34:18, 50:12, 50:16, 50:23, 64:25, 65:9, 65:10
**actions** [2] - 19:22, 63:15
**activity** [1] - 59:22
**actual** [5] - 10:24, 17:9, 18:1, 38:6, 56:25
**ad** [1] - 59:24
**add** [2] - 9:7, 36:21, 42:24
**addition** [1] - 22:11
**additional** [4] - 18:8, 27:3, 35:18, 65:18
**additionally** [1] - 68:14
**address** [9] - 8:11, 15:13, 18:8, 37:16, 40:17, 44:20, 47:10, 62:24, 63:5
**addressing** [3] - 19:17, 20:1, 45:8
**adequate** [2] - 67:23, 67:25
**adequately** [2] - 47:19, 48:13
**adjourned** [1] - 69:6
**adjudicated** [4] - 47:17, 48:20, 49:1, 58:9
**adjudicator** [1] - 16:8
**adjudicators** [1] - 16:4
**administration** [12] - 15:22, 24:2, 44:6, 44:11, 44:13, 44:15, 50:5, 56:2, 59:22, 65:21, 66:18, 66:20
**administrative** [3] - 14:10, 23:9, 23:19
**Administrative** [1] - 35:11
**adults** [2] - 46:8, 46:9
**adverbs** [1] - 56:22
**adverse** [1] - 33:25
**advise** [2] - 16:12, 34:12
**advised** [1] - 38:19
**affect** [4] - 7:6, 21:25, 59:21, 66:14

**affected** [4] - 21:5, 21:7, 46:8, 58:4
**affecting** [2] - 44:18, 45:17
**affects** [2] - 19:15, 34:21
**affirm** [2] - 53:24, 54:2
**affirmed** [5] - 31:17, 36:16, 36:17, 55:12, 55:17
**afford** [1] - 13:15
**age** [1] - 37:10
**aged** [2] - 8:24, 68:5
**agencies** [1] - 20:17
**agency** [18] - 12:25, 13:5, 13:8, 14:3, 14:9, 17:9, 18:20, 18:22, 18:24, 19:3, 19:10, 24:24, 34:12, 34:13, 35:4, 36:12, 52:15, 59:9
**agency's** [2] - 24:20, 24:25
**agents** [1] - 17:4
**ago** [2] - 39:11, 50:22
**agree** [3] - 9:6, 30:21, 40:21
**agreed** [1] - 11:3
**ahead** [9] - 11:23, 12:18, 16:23, 33:9, 47:13, 56:15, 57:24, 62:5, 62:23
**Ahmad** [1] - 5:8
**AHMAD** [2] - 1:22, 5:8
**AL** [2] - 1:4, 1:8
**Alarcon** [1] - 4:16
**alerting** [1] - 61:18
**allow** [2] - 22:12, 63:3
**almost** [2] - 33:12, 34:9
**alone** [3] - 17:14, 48:12, 48:23
**Alsop's** [7] - 57:3, 57:5, 58:7, 65:23, 67:3, 67:22, 68:4
**Alsup** [4] - 17:6, 17:18, 36:7, 38:15
**Alsup's** [4] - 7:14, 8:21, 8:25, 32:16
**altered** [1] - 15:17
**alternative** [2] - 18:12, 20:10
**alternatives** [1] - 62:22
**amend** [2] - 14:25, 53:19
**amended** [1] - 53:19
**America** [1] - 22:8
**analogized** [1] - 45:24
**analysis** [9] - 14:15,

18:15, 18:18, 43:25, 44:2, 44:16, 45:5, 46:22, 51:2
**analyzes** [1] - 28:25
**analyzing** [1] - 61:2
**animus** [10] - 24:1, 41:24, 42:5, 42:6, 42:8, 42:9, 42:11, 44:22, 45:8, 58:24
**animus-based** [1] - 45:8
**announced** [2] - 43:16, 56:17
**announcing** [1] - 50:20
**answer** [11] - 6:4, 6:20, 18:23, 35:2, 46:24, 50:9, 51:4, 54:9, 60:17, 60:18, 66:6
**anti** [2] - 44:5, 60:1
**anti-Latino** [1] - 44:5, 60:1
**Antonio** [2] - 4:16, 68:22
**APA** [12] - 15:17, 17:24, 18:18, 20:5, 24:22, 34:5, 34:6, 35:13, 35:21, 35:25, 42:20, 53:16
**APA's** [1] - 36:10
**apart** [1] - 30:10
**appeal** [11] - 7:18, 7:23, 9:14, 9:18, 10:8, 11:22, 32:15, 32:25, 38:16, 54:23, 68:16
**appealed** [1] - 55:15
**Appeals** [2] - 32:17, 36:17
**appear** [2] - 56:24, 57:1
**appearances** [1] - 4:4
**appeared** [1] - 56:24
**appellate** [1] - 7:17
**applicable** [1] - 40:22
**applicants** [1] - 51:22
**applicants'** [1] - 51:15
**application** [17] - 9:18, 9:25, 12:9, 15:10, 15:11, 16:5, 18:21, 18:25, 27:13, 27:21, 47:16, 48:5, 48:7, 48:12, 48:16, 49:1
**applications** [9] - 17:5, 18:1, 18:23, 19:21, 27:7, 27:17, 27:18, 29:6, 58:4
**applied** [2] - 27:5,

51:25

**applies** [3] - 32:5,
35:18, 45:3
**apply** [3] - 8:23, 45:2,
57:4
**applying** [2] - 17:9,
66:21
**appreciate** [3] - 12:2,
57:22, 61:9
**approach** [1] - 63:4
**appropriate** [5] - 8:15,
23:14, 33:18, 35:19,
65:13
**appropriately** [1] -
58:11
**arbitrary** [13] - 12:23,
12:25, 13:4, 20:11,
22:19, 24:15, 24:23,
33:24, 36:2, 36:12,
47:20, 51:7, 52:22
**argue** [3] - 17:21,
20:4, 25:11
**argues** [1] - 25:11
**argument** [17] - 6:3,
6:12, 12:8, 16:11,
22:18, 24:19, 33:14,
35:15, 40:17, 40:23,
42:17, 45:9, 52:10,
52:11, 62:14, 62:17,
63:6
**arguments** [8] - 14:20,
26:11, 37:17, 37:18,
38:23, 41:23, 45:8,
63:5
**Arlington** [3] - 44:3,
45:5, 50:13
**Article** [1] - 60:11
**Ashburton** [1] - 2:14
**aside** [4] - 24:21, 28:5,
44:16, 46:2
**aspects** [1] - 40:13
**assert** [1] - 62:13
**asserts** [1] - 63:17
**assessment** [2] -
21:12, 53:7
**assistance** [1] - 57:22
**Assistant** [3] - 3:1,
6:8, 65:19
**assistant** [1] - 62:1
**Assisted** [1] - 3:24
**assurance** [1] - 51:23
**assure** [1] - 67:6
**attacked** [1] - 59:21
**attempts** [1] - 17:21
**attention** [2] - 40:14,
69:1
**ATTORNEY** [4] - 2:8,
2:14, 2:19, 3:12
**Attorney** [27] - 3:1,
5:15, 6:8, 13:19,

14:24, 23:22, 25:7,
25:12, 25:17, 25:20,
25:22, 25:23, 30:22,
31:8, 31:12, 33:22,
41:14, 42:20, 42:21,
43:4, 43:16, 44:21,
46:4, 50:24, 53:6,
61:19, 65:19
**Attorney's** [1] - 6:6
**attorneys** [1] - 53:18
**Attorneys** [1] - 14:24
**authority** [9] - 22:23,
23:11, 23:19, 26:1,
29:15, 30:10, 35:10,
62:9, 62:18
**authorization** [1] -
41:9
**authorized** [1] - 35:14
**available** [3] - 18:13,
18:16, 30:1
**availed** [1] - 42:14
**Avenue** [2] - 2:20, 3:6
**avoid** [2] - 7:21, 67:3
**await** [1] - 7:4
**aware** [5] - 26:1, 39:4,
56:10, 65:16, 67:7

**B**

**b)(2** [3] - 64:25, 65:9,
65:14
**backdoor** [1] - 35:21
**bad** [1] - 60:20
**BAILEY** [1] - 3:9
**Bailey** [1] - 6:6
**balance** [1] - 38:1
**ball** [1] - 68:18
**bar** [1] - 35:10
**based** [12] - 10:25,
11:6, 13:20, 17:14,
25:16, 26:5, 35:25,
36:3, 42:22, 45:8,
46:13, 59:2
**basic** [1] - 47:21
**basis** [4] - 24:21,
36:16, 43:23, 64:14
**BATALLA** [1] - 1:4
**Batalla** [18] - 4:6, 4:9,
4:13, 4:22, 4:25, 5:4,
5:6, 5:9, 8:9, 8:22,
9:6, 12:19, 12:21,
13:11, 19:25, 51:7,
62:8, 63:9
**bearing** [1] - 19:12
**beat** [1] - 60:1
**become** [2] - 22:13,
50:21
**BEFORE** [1] - 1:14
**beginnings** [1] - 50:20
**behalf** [8] - 5:16, 5:18,

5:20, 5:25, 8:8, 9:5,
11:16, 21:15
**behind** [1] - 14:9
**belief** [1] - 11:22
**believes** [1] - 16:17
**benefit** [4] - 9:8,
24:20, 41:12, 52:1
**benefits** [2] - 41:19,
65:22
**best** [1] - 48:5
**better** [1] - 31:10
**between** [2] - 14:17,
50:24
**beyond** [4] - 7:11,
26:22, 39:16, 67:8
**bias** [1] - 59:24
**big** [1] - 54:4
**bind** [1] - 65:2
**binding** [2] - 17:3,
17:7
**binds** [1] - 37:6
**bit** [2] - 11:2, 58:15
**board** [1] - 45:16
**BOB** [1] - 2:19
**bodies** [1] - 22:20
**border** [1] - 23:17
**boss** [3] - 61:18,
61:22, 61:24
**Boston** [1] - 2:15
**bound** [6] - 29:16,
36:23, 37:5, 54:14,
54:17, 65:10
**boundaries** [1] - 15:23
**Bowman** [1] - 24:22
**BRAD** [1] - 3:8
**Brad** [1] - 6:5
**branch** [1] - 22:23
**Branch** [2] - 3:5, 59:10
**break** [1] - 47:20
**Brett** [1] - 5:24
**BRETT** [1] - 3:7
**brief** [8] - 10:13, 30:7,
43:7, 43:21, 61:13,
62:7, 64:18
**briefed** [1] - 7:10
**briefly** [10] - 11:11,
20:6, 20:7, 20:14,
40:16, 40:20, 47:9,
56:7, 58:23, 67:12
**briefs** [1] - 25:4
**bring** [3] - 16:20, 31:6,
40:14
**bringing** [2] - 65:4,
65:8
**broader** [2] - 62:19,
63:2
**Broadway** [1] - 2:9
**Brooklyn** [4] - 1:6,
3:13, 3:18, 27:15

**brought** [5] - 55:17,
67:15, 68:2, 68:7,
68:25
**building** [1] - 23:17
**built** [1] - 68:23
**burden** [3] - 34:24,
35:3, 53:16
**bureaucrat** [1] - 60:20
**BY** [5] - 1:21, 2:10,
2:15, 3:7, 3:14
**BY:KAREN** [1] - 2:5

**C**

**cabinet** [1] - 15:21
**Cadman** [2] - 3:13,
3:17
**California** [9] - 6:15,
12:16, 28:8, 38:7,
54:8, 62:15, 63:17,
63:19, 64:7
**campaign** [1] - 59:5
**candidate** [2] - 50:3,
59:20
**cannot** [6] - 25:10,
26:21, 31:3, 43:17,
45:6, 45:24
**cap** [1] - 37:10
**Capitol** [1] - 67:22
**capricious** [11] -
12:24, 12:25, 13:5,
20:11, 22:20, 24:16,
24:23, 33:24, 36:12,
51:8, 52:23
**care** [4] - 20:18, 22:7,
33:3, 54:6
**career** [1] - 66:1
**carefully** [1] - 19:9
**Carlos** [1] - 4:18
**Carolina** [2] - 4:19,
68:21
**carried** [1] - 67:5
**carve** [1] - 17:24
**carve-out** [1] - 17:24
**case** [41] - 7:6, 7:21,
8:17, 8:19, 9:9,
11:18, 12:16, 14:22,
16:15, 16:21, 17:19,
19:5, 24:23, 25:14,
28:24, 29:8, 30:5,
30:7, 32:7, 32:8,
34:17, 35:12, 40:8,
40:19, 41:16, 48:10,
53:16, 54:24, 55:20,
64:2, 64:7, 65:1,
65:11, 65:13, 67:16,
67:17, 68:7, 68:10
**case-by-case** [2] -
29:8, 34:17
**cases** [16] - 30:3,

33:14, 35:23, 35:24,
35:25, 48:3, 53:16,
62:16, 63:13, 63:23,
65:3, 65:8, 65:15,
65:16, 66:3
**categorical** [1] - 45:16
**categorically** [1] -
17:13
**category** [1] - 16:7
**CAUSE** [1] - 1:13
**caused** [1] - 10:1
**Center** [4] - 4:11, 4:22,
4:25, 8:8
**CENTER** [1] - 2:3
**centers** [1] - 22:5
**cert** [9] - 6:13, 6:16,
7:14, 7:19, 8:14,
55:1, 55:6, 62:11,
64:9
**certain** [7] - 12:6,
16:10, 17:5, 29:4,
29:9, 33:13, 58:13
**certainly** [14] - 15:21,
19:23, 26:2, 26:21,
31:5, 33:25, 36:23,
38:9, 38:13, 51:22,
56:1, 58:11, 64:13,
67:6
**certification** [8] -
58:21, 61:12, 62:8,
62:22, 64:4, 64:11,
64:19, 64:21
**certify** [3] - 45:13,
63:3, 65:13
**certifying** [2] - 62:10,
63:9
**certiorari** [1] - 62:15
**Chad** [1] - 6:7
**CHAD** [1] - 3:1
**Chai** [1] - 30:9
**challenge** [1] - 12:17
**challenged** [2] - 32:7,
50:12
**challenging** [1] -
63:23
**change** [8] - 10:2,
11:17, 15:22, 19:10,
39:10, 52:13, 52:19,
56:1
**changed** [8] - 48:9,
51:12, 51:17, 52:5,
52:22, 56:17, 56:22,
57:7
**changes** [2] - 51:13,
51:21
**Chapman** [1] - 28:24
**checked** [1] - 48:7
**CHEN** [12] - 1:23, 4:5,
12:12, 12:19, 14:1,
15:4, 50:9, 51:4,

52:9, 62:6, 62:24, 64:10
**Chen** [2] - 4:5, 30:9
**Chicago** [1] - 27:22
**Chief** [1] - 3:16
**children** [3] - 20:18, 46:8, 46:9
**choice** [2] - 37:7, 53:2
**chose** [1] - 54:2
**chosen** [1] - 23:3
**Circuit** [44] - 7:17, 9:15, 9:16, 10:9, 10:11, 10:15, 11:4, 11:8, 11:13, 11:20, 11:25, 14:22, 28:24, 29:10, 29:16, 30:5, 30:9, 31:13, 31:15, 31:17, 31:21, 32:4, 32:5, 32:6, 32:13, 32:17, 32:19, 32:24, 33:1, 33:4, 33:5, 33:8, 36:5, 41:13, 53:24, 54:15, 54:17, 55:11, 55:12, 55:17, 65:6, 66:8, 68:14
**circuit** [4] - 9:23, 10:19, 12:3, 12:4
**Circuit's** [4] - 29:15, 33:22, 54:14, 55:7
**circumstance** [1] - 30:2
**circumstances** [2] - 38:4, 50:11
**circumstantial** [1] - 42:5
**citation** [1] - 43:23
**cite** [1] - 30:8
**cited** [2] - 26:2, 30:6
**citing** [1] - 64:3
**citizens** [1] - 20:20
**Citizenship** [2] - 56:10, 56:13
**city** [1] - 45:4
**CIVIL** [1] - 1:13
**civil** [2] - 4:2, 35:24
**Civil** [3] - 3:2, 3:5, 6:9
**claim** [30] - 12:24, 15:16, 16:18, 16:25, 17:16, 17:19, 18:9, 19:10, 19:12, 19:25, 24:4, 28:20, 42:18, 45:11, 47:1, 47:11, 47:15, 48:13, 51:8, 57:6, 57:23, 58:2, 58:8, 58:14, 58:17, 58:24, 59:1, 59:11, 61:3
**claimed** [1] - 63:19
**claims** [10] - 8:16, 16:7, 20:5, 45:20,

63:22, 65:4, 65:8, 67:20, 68:2, 68:10
**clarify** [3] - 10:5, 51:6, 52:10
**clarity** [7] - 13:3, 14:6, 24:17, 24:18, 24:25, 25:3, 25:6
**class** [25] - 15:19, 58:21, 61:11, 62:7, 62:10, 62:11, 62:14, 62:22, 63:1, 63:2, 63:10, 64:4, 64:8, 64:10, 64:19, 64:21, 64:22, 64:24, 64:25, 65:2, 65:9, 65:10, 65:14
**Clause** [1] - 59:14
**clean** [1] - 60:9
**clear** [16] - 11:1, 12:5, 14:14, 17:10, 19:5, 19:6, 24:24, 26:13, 32:6, 32:11, 47:23, 47:25, 50:18, 50:23, 51:21, 57:9
**clearer** [1] - 56:20
**clearly** [3] - 24:21, 25:17, 25:18
**clinical** [1] - 41:10
**close** [2] - 61:14, 67:12
**cognizable** [2] - 26:14, 26:16
**colleague** [5] - 15:13, 18:24, 24:3, 50:7, 65:24
**colleagues** [2] - 18:11, 66:1
**COLLEEN** [1] - 2:21
**Colleen** [2] - 5:17, 40:15
**College** [1] - 13:12
**colleges** [2] - 41:5, 41:6
**comfort** [1] - 62:19
**comfortable** [1] - 63:24
**comment** [22] - 15:13, 15:16, 16:2, 16:18, 16:25, 17:14, 17:16, 17:18, 17:23, 18:9, 18:14, 19:12, 28:22, 29:11, 29:22, 29:25, 34:8, 34:10, 59:25, 60:3
**commentary** [3] - 60:1, 60:7, 60:13
**comments** [6] - 23:23, 31:1, 50:22, 50:25, 60:19, 62:7
**commit** [1] - 23:23

**common** [1] - 43:12
**Commonwealth** [1] - 5:20
**COMMONWEALTH** [2] - 2:14, 2:13
**communities** [4] - 20:17, 22:6, 22:7, 22:15
**community** [2] - 68:24, 69:3
**Community** [1] - 13:12
**compared** [1] - 21:10
**compel** [1] - 29:23
**compelled** [3] - 53:5, 53:8, 53:10
**complaint** [3] - 15:1, 53:19, 53:20
**complete** [1] - 9:8
**completely** [4] - 7:7, 23:8, 26:4, 59:2
**comport** [1] - 47:21
**Computer** [1] - 3:24
**Computer-Assisted** [1] - 3:24
**conceded** [2] - 44:7, 58:11
**concept** [1] - 54:24
**concern** [5] - 25:3, 56:23, 59:20, 63:7, 63:8
**concerned** [1] - 12:4
**concerns** [3] - 21:20, 26:2, 26:6
**concession** [1] - 43:8
**conclusion** [9] - 14:18, 25:23, 25:24, 29:23, 30:22, 30:23, 37:2, 38:3, 54:19
**conclusory** [1] - 44:17
**concrete** [1] - 66:6
**conduct** [1] - 45:5
**conducted** [1] - 51:1
**conducts** [2] - 44:2, 46:23
**conference** [1] - 7:11
**confirm** [1] - 30:13
**confirmation** [1] - 55:18
**confirmed** [4] - 39:1, 58:1, 58:3, 59:23
**confusion** [2] - 57:8, 57:10
**congratulations** [1] - 6:11
**Congress** [8] - 15:20, 15:23, 23:7, 23:13, 35:11, 39:11, 39:14, 68:19
**connect** [1] - 14:16

**Connecticut** [1] - 1:21
**connection** [4] - 7:14, 19:21, 39:2, 50:24
**consequences** [1] - 34:20
**consider** [5] - 10:17, 46:3, 52:6, 60:23, 61:2
**consideration** [3] - 19:15, 34:18, 38:21
**considered** [10] - 7:10, 13:17, 14:13, 14:17, 21:22, 21:24, 44:16, 49:4, 58:13
**considering** [1] - 34:25
**considers** [2] - 44:11, 66:15
**consistent** [6] - 7:20, 10:14, 26:6, 30:11, 44:11, 50:19
**constitute** [1] - 44:22
**Constitution** [3] - 26:7, 59:7, 60:12
**constitutional** [3] - 43:24, 45:2, 58:12
**constrain** [2] - 45:23, 62:17
**construed** [1] - 59:23
**contains** [2] - 41:1, 42:4
**contemporary** [1] - 50:15
**context** [1] - 44:24
**continuation** [1] - 66:21
**continue** [8] - 23:11, 23:16, 26:25, 39:20, 64:13, 65:22, 69:2, 69:3
**CONTINUED** [1] - 2:1
**Continued** [1] - 49:8
**continued** [2] - 23:15, 26:7
**continues** [2] - 39:14, 62:13
**continuing** [2] - 10:14, 39:8
**contradicts** [1] - 23:18
**contribute** [1] - 69:2
**controversial** [1] - 44:13
**Cordero** [1] - 48:4
**corners** [1] - 17:2
**correct** [2] - 7:16, 57:13
**correctly** [2] - 42:21, 45:10
**council** [1] - 45:4
**counsel** [2] - 4:4,

38:20
**count** [3] - 54:8, 54:9
**country** [12] - 13:15, 21:8, 22:5, 29:13, 35:24, 36:6, 45:4, 45:5, 54:4, 60:5, 63:24, 68:20
**couple** [6] - 8:15, 16:16, 17:20, 23:15, 32:20, 67:25
**course** [12] - 7:12, 11:3, 11:7, 13:10, 16:19, 28:5, 29:16, 29:25, 36:11, 39:5, 39:18, 67:19
**court** [12] - 25:1, 35:5, 35:15, 35:23, 36:6, 39:9, 62:9, 63:23, 63:25, 68:15, 68:17, 68:25
**Court** [94] - 3:16, 3:16, 6:5, 6:14, 6:15, 6:16, 6:17, 7:2, 7:3, 7:5, 7:12, 7:18, 8:13, 8:19, 9:8, 9:13, 9:18, 11:13, 14:2, 14:8, 14:16, 15:5, 15:8, 16:17, 17:1, 17:8, 17:25, 22:19, 22:21, 24:18, 29:19, 30:12, 32:16, 32:20, 33:2, 33:3, 33:13, 33:15, 34:11, 35:7, 35:9, 35:12, 35:17, 36:2, 36:11, 36:17, 36:18, 36:24, 37:1, 42:20, 43:8, 43:22, 44:2, 44:3, 44:19, 44:23, 45:10, 45:13, 45:25, 46:22, 52:15, 53:11, 54:1, 54:23, 55:5, 55:15, 55:16, 57:14, 57:15, 61:18, 62:15, 62:19, 62:20, 63:3, 64:7, 64:13, 64:18, 64:20, 64:23, 65:1, 65:5, 65:12, 65:15, 65:16, 66:8, 66:12, 66:17, 67:2, 67:16, 68:3, 68:11
**COURT** [123] - 1:1, 4:1, 4:14, 4:20, 5:22, 6:11, 6:21, 6:23, 6:25, 7:13, 7:24, 8:4, 8:10, 9:2, 9:11, 10:18, 10:24, 11:9, 11:15, 11:19, 12:13, 13:18, 14:19, 15:14, 15:25, 16:11, 16:23, 18:2, 18:4, 18:6,

19:13, 19:19, 20:2, 20:6, 20:25, 21:2, 21:24, 22:2, 24:5, 24:7, 24:9, 24:12, 25:7, 27:4, 27:10, 27:24, 30:3, 30:16, 30:24, 31:6, 31:10, 31:15, 31:20, 31:24, 32:10, 32:15, 32:23, 33:2, 33:7, 34:4, 35:5, 35:8, 35:20, 36:19, 36:21, 37:1, 37:12, 37:14, 37:23, 38:22, 39:7, 39:21, 39:23, 40:2, 40:7, 42:8, 42:24, 43:2, 43:9, 46:11, 46:13, 46:19, 47:3, 47:5, 47:9, 47:13, 50:1, 51:3, 52:4, 52:24, 53:18, 53:22, 54:1, 54:6, 54:23, 55:3, 55:8, 55:11, 55:25, 56:3, 56:7, 56:12, 56:15, 57:12, 57:14, 57:21, 57:24, 58:19, 59:16, 61:9, 61:11, 61:20, 61:23, 62:4, 62:23, 64:5, 64:15, 65:18, 65:25, 66:4, 66:17, 67:11, 69:5

**Court's** [8] - 7:11, 15:12, 19:15, 38:11, 40:14, 45:21, 62:18, 68:25

**Courthouse** [1] - 1:6

**courtroom** [5] - 4:13, 8:17, 56:9, 67:14, 68:20

**COURTROOM** [1] - 4:2

**courts** [10] - 29:13, 31:2, 32:18, 33:14, 35:10, 35:14, 45:4, 65:4, 65:15, 68:19

**cover** [1] - 8:21

**covered** [2] - 8:25, 27:24

**COX** [2] - 2:6, 4:21

**Cox** [1] - 4:21

**creation** [1] - 30:17

**credential** [1] - 41:22

**credulity** [2] - 18:15, 19:2

**crimes** [1] - 23:23

**criteria** [1] - 29:9

**critical** [1] - 17:20

**crystal** [1] - 68:18

**CSR** [1] - 3:16

**cure** [1] - 28:14

current [6] - 39:4, 42:12, 43:3, 46:17, 57:1, 67:22

**cursory** [1] - 13:10

**cut** [1] - 47:23

**cycle** [1] - 59:17

## D

**D.C** [2] - 2:4, 3:6

**DACA** [95] - 8:23, 13:13, 13:14, 13:17, 13:22, 14:14, 15:11, 15:19, 16:4, 17:11, 18:13, 18:16, 18:22, 18:25, 19:19, 20:9, 20:16, 20:17, 20:19, 20:21, 21:4, 21:5, 21:6, 21:13, 22:3, 22:5, 22:7, 22:12, 22:22, 23:12, 23:17, 23:21, 23:23, 25:8, 26:23, 26:25, 27:2, 27:6, 27:11, 28:8, 29:18, 29:23, 29:25, 31:18, 31:19, 31:22, 32:1, 32:6, 32:8, 32:9, 32:14, 33:20, 34:3, 34:16, 34:22, 37:8, 39:2, 39:15, 41:15, 42:7, 42:14, 42:22, 43:13, 43:16, 44:8, 47:15, 48:1, 48:11, 48:22, 49:3, 50:6, 51:1, 51:15, 51:25, 52:11, 52:13, 53:3, 53:5, 53:12, 55:14, 56:19, 56:25, 61:5, 61:7, 63:10, 63:11, 63:12, 63:23, 65:22, 66:10, 66:12, 66:19, 66:21, 67:15, 68:23

**DACA's** [2] - 31:13, 31:15

**DACA-s** [1] - 23:23

**damages** [1] - 58:14

**DAPA** [3] - 14:22, 37:8, 55:14

**date** [2] - 37:10, 68:5

**David** [1] - 4:5

**DAVID** [1] - 1:23

**days** [2] - 7:10, 54:7

**deadline** [6] - 27:8, 27:9, 28:3, 28:11, 28:12, 58:6

**deal** [2] - 19:20, 25:18

**dealing** [1] - 19:3

**December** [2] - 48:11, 48:22

**decide** [1] - 33:17

**decided** [7] - 11:8, 25:25, 27:20, 32:15, 32:17, 35:9, 53:15

**decides** [2] - 6:17, 68:12

**deciding** [2] - 11:20, 34:5

**decision** [70] - 6:16, 7:21, 9:9, 9:14, 10:12, 11:5, 13:7, 15:9, 16:14, 22:19, 24:15, 24:17, 24:20, 24:24, 26:17, 28:5, 29:14, 29:17, 30:8, 30:24, 32:16, 33:18, 33:23, 35:15, 36:3, 36:12, 36:16, 36:17, 36:22, 36:24, 37:1, 37:5, 38:11, 38:16, 39:2, 39:5, 39:9, 39:19, 41:14, 42:6, 42:18, 42:22, 43:4, 43:15, 43:18, 43:19, 44:9, 45:14, 45:15, 45:17, 45:19, 45:23, 46:5, 52:20, 53:7, 53:17, 54:14, 54:16, 55:7, 55:15, 58:5, 59:3, 59:13, 60:10, 61:6, 64:8, 66:7, 66:24, 67:10

**decision-maker** [1] - 42:22

**decisions** [7] - 12:16, 23:7, 35:4, 35:21, 43:19, 44:11, 44:17

**deeply** [2] - 12:2, 57:21

**defend** [1] - 39:8

**Defendants** [4] - 1:9, 3:1, 3:11, 40:21

**defendants** [6] - 5:23, 21:22, 23:2, 23:4, 44:20, 53:5

**defendants'** [4] - 20:11, 42:5, 42:22, 45:13

**defending** [1] - 39:19

**defer** [1] - 65:24

**deferred** [2] - 34:9, 34:18

**definition** [1] - 63:1

**definitional** [1] - 63:4

**delays** [1] - 48:21

**deliberations** [1] - 67:21

**delighted** [1] - 61:25

**denied** [7] - 9:16, 17:18, 42:1, 46:25,

48:7, 48:19, 55:19

**deny** [2] - 64:4, 64:20

**DEPARTMENT** [2] - 3:2, 3:4

**Department** [30] - 5:25, 6:2, 6:9, 16:12, 18:13, 19:7, 25:21, 25:24, 26:7, 26:17, 26:23, 27:13, 27:17, 27:20, 28:5, 28:10, 28:13, 36:24, 37:4, 37:6, 37:7, 38:15, 39:6, 53:14, 55:23, 57:16, 59:11, 66:14, 67:6, 67:9

**department** [1] - 66:2

**departure** [1] - 29:4

**deportation** [1] - 51:24

**deprived** [1] - 48:24

**DEPUTY** [1] - 4:2

**derogatory** [1] - 60:4

**described** [1] - 34:11

**deserve** [1] - 67:19

**deserves** [1] - 68:12

**designation** [1] - 12:3

**desire** [1] - 9:13

**destiny** [1] - 54:3

**detailed** [1] - 41:1

**details** [1] - 66:17

**determination** [3] - 14:7, 34:20, 53:14

**determine** [1] - 41:19

**developed** [1] - 68:10

**devoid** [1] - 14:15

**devoted** [1] - 57:3

**DHS** [4] - 6:14, 34:8, 53:2, 57:18

**DHS's** [2] - 45:23, 58:5

**differ** [1] - 50:16

**differences** [2] - 37:9, 50:14

**different** [8] - 8:18, 33:14, 37:11, 55:25, 56:4, 60:7, 68:1, 68:9

**differently** [1] - 36:7

**difficult** [1] - 9:9

**direct** [1] - 42:4

**directed** [1] - 17:8

**directly** [6] - 23:18, 26:10, 32:5, 32:8, 32:19, 42:16

**disagree** [2] - 30:21, 31:12

**disagrees** [3] - 33:21, 37:24

**disappoint** [1] - 65:25

**discerned** [1] - 25:1

**disclosure** [1] - 51:16

**discovery** [1] - 41:25

**discretion** [8] - 16:3, 17:6, 18:22, 19:1, 26:19, 29:8, 45:24, 45:25

**discretionary** [4] - 34:14, 34:17, 53:7, 53:9

**discriminatory** [2] - 44:1, 46:6

**discuss** [1] - 19:14

**discussed** [1] - 68:1

**discusses** [1] - 24:4

**discussion** [2] - 40:10, 48:8

**dismiss** [12] - 20:1, 23:4, 37:15, 37:17, 39:24, 40:3, 40:8, 40:12, 42:1, 45:22, 46:25, 47:11

**dismissed** [1] - 17:19

**disparate** [2] - 59:3, 59:13

**disposed** [1] - 15:3

**dispositive** [2] - 7:8, 43:24

**disproportionate** [1] - 44:7

**dispute** [1] - 44:20

**disregard** [1] - 44:23

**distinguishable** [2] - 54:15, 54:21

**district** [2] - 29:5, 53:23

**District** [11] - 11:13, 13:21, 14:21, 25:15, 28:7, 29:13, 30:7, 36:4, 38:7, 54:8, 68:21

**DISTRICT** [4] - 1:1, 1:1, 1:14, 3:12

**diverge** [1] - 8:18

**divine** [1] - 10:24

**Division** [3] - 3:2, 3:5, 6:9

**doctors** [1] - 22:13

**document** [1] - 17:7

**documented** [1] - 48:20

**documents** [2] - 14:13, 14:17

**done** [4] - 15:24, 15:25, 21:3, 52:21

**DONOGHUE** [1] - 3:11

**door** [1] - 17:5

**dots** [1] - 14:17

**dovetails** [1] - 26:10

**down** [14] - 25:25, 26:4, 26:5, 26:18, 29:4, 32:9, 34:2,

*BATALLA VIDAL, ET AL v. NIELSEN, ET AL*   *1/30/18*____5

34:16, 53:12, 53:15, 53:22, 54:7, 54:14, 56:18
**drawn** [1] - 14:18
**DREAMers** [1] - 32:1
**dreams** [1] - 69:4
**DRISCOLL** [1] - 3:16
**driver's** [1] - 22:13
**drum** [1] - 60:1
**drumbeat** [1] - 44:5
**due** [8] - 19:25, 43:2, 47:11, 47:14, 47:22, 57:23, 58:2, 58:17
**Duke** [13] - 13:18, 15:17, 16:20, 17:2, 17:21, 17:25, 39:2, 43:18, 47:17, 48:18, 49:5, 59:12, 61:6
**Duke's** [2] - 42:18, 43:10
**duration** [1] - 27:1
**during** [4] - 27:12, 59:17, 61:17, 65:22

## E

**early** [2] - 27:21, 48:10
**earner** [1] - 20:22
**easily** [1] - 25:2
**East** [2] - 3:13, 3:17
**EASTERN** [2] - 1:1, 3:12
**Eastern** [3] - 29:13, 54:8, 68:21
**educational** [2] - 8:24, 34:23
**effect** [4] - 9:25, 32:17, 32:19, 36:22
**efficient** [2] - 11:3, 37:17
**effort** [1] - 9:24
**either** [3] - 8:24, 37:18, 58:5
**Elaine** [2] - 59:12, 61:6
**elected** [1] - 45:1
**election** [1] - 59:17
**elementary** [1] - 54:4
**eleven** [1] - 14:24
**Eliana** [1] - 4:17
**eligibility** [1] - 41:19
**employ** [4] - 20:17, 41:2, 41:3
**employers** [2] - 34:22, 40:25
**employment** [2] - 41:6, 41:9
**end** [5] - 15:19, 16:9, 36:10, 46:2, 60:23
**enforcement** [7] -

19:22, 26:19, 34:14, 45:9, 45:11, 45:14, 45:20
**engaging** [1] - 34:25
**enjoin** [1] - 16:19
**enjoined** [1] - 36:16
**enrolled** [1] - 13:11
**enrollment** [1] - 63:20
**enter** [7] - 29:21, 30:12, 30:14, 64:24, 65:1, 65:5, 65:6
**entered** [2] - 38:7, 38:15, 55:13
**enters** [1] - 66:12
**entry** [1] - 37:10
**Equal** [1] - 59:14
**equal** [13] - 24:4, 40:18, 41:23, 42:18, 43:24, 47:1, 50:1, 50:8, 50:10, 51:2, 59:1, 59:8, 61:3
**equitable** [2] - 30:1, 30:11
**equities** [1] - 38:2
**erroneous** [1] - 59:18
**errors** [1] - 17:20
**ESQ** [22] - 1:21, 1:22, 1:22, 2:5, 2:5, 2:6, 2:6, 2:10, 2:10, 2:15, 2:16, 2:19, 2:21, 3:1, 3:7, 3:7, 3:8, 3:8, 3:9, 3:9, 3:11, 3:14
**essentially** [4] - 14:3, 14:16, 58:1, 63:5
**establish** [1] - 35:5
**ET** [2] - 1:4, 1:8
**ethnic** [1] - 60:15
**evading** [1] - 35:21
**evaluate** [1] - 40:22
**evenly** [1] - 12:20
**event** [1] - 29:20
**events** [2] - 28:4, 28:21
**evidence** [11] - 17:10, 22:20, 23:21, 24:2, 41:24, 42:5, 42:11, 44:22, 46:23, 50:19, 68:11
**Evidence** [1] - 43:12
**exact** [1] - 32:14
**exactly** [6] - 14:10, 28:18, 34:15, 41:15, 57:16, 66:9
**example** [10] - 22:12, 23:3, 23:22, 50:13, 51:14, 58:15, 63:17, 63:18, 65:5, 66:11
**examples** [1] - 47:23
**excellent** [1] - 62:1
**exception** [1] - 34:6

**exchange** [1] - 23:17
**exclude** [1] - 63:1
**excluded** [1] - 68:6
**excludes** [1] - 8:21
**exclusively** [2] - 41:14, 44:23
**excuse** [1] - 44:19
**excuses** [1] - 46:3
**executive** [2] - 22:23, 23:19
**Executive** [1] - 59:10
**exercise** [3] - 29:7, 34:14, 45:24
**Exhibit** [1] - 17:10
**exist** [1] - 19:8
**expanded** [2] - 31:18, 37:8, 55:14
**expect** [2] - 7:5, 39:20
**expeditiously** [1] - 68:15
**expert** [1] - 21:11
**expire** [2] - 27:2, 27:12
**expired** [2] - 48:11, 48:22
**explained** [2] - 7:19, 10:9
**explanation** [1] - 14:16
**explicitly** [1] - 29:15
**express** [1] - 56:23
**expunge** [1] - 52:6
**extended** [1] - 27:6
**extent** [2] - 26:13, 57:8, 60:2
**extreme** [1] - 60:6
**extremely** [1] - 59:18

## F

**F.3d** [1] - 30:8
**face** [3] - 19:6, 33:25, 53:12
**faced** [3] - 17:25, 35:16, 38:4
**facilities** [2] - 21:25, 22:2
**fact** [13] - 13:15, 14:5, 17:18, 28:16, 38:15, 51:23, 52:21, 56:21, 59:2, 59:16, 61:4, 61:18, 65:9
**factors** [2] - 37:25, 44:4
**facts** [4] - 28:25, 36:14, 50:11, 60:2
**factual** [1] - 44:2
**faculty** [1] - 41:7
**failure** [3] - 13:1, 13:2, 29:24

**fair** [2] - 32:12, 56:3
**fall** [4] - 16:7, 20:24, 40:24, 41:21
**familiar** [1] - 44:3
**families** [4] - 20:20, 21:5, 21:19, 34:22
**family** [2] - 21:16, 51:19
**family's** [1] - 20:22
**far** [1] - 38:14
**Farm** [1] - 24:23
**fashion** [1] - 26:18
**fashioning** [1] - 62:19
**favor** [1] - 17:15
**favorably** [1] - 29:3
**favors** [1] - 38:2
**FCRR** [1] - 3:16
**February** [1] - 7:11
**federal** [2] - 41:18, 52:5
**Federal** [2] - 3:5, 43:12
**felt** [3] - 11:18, 15:3, 25:12
**Feng** [1] - 4:19
**FERGUSON** [1] - 2:19
**Fernandez** [2] - 4:17, 13:13
**Fernando** [1] - 48:4
**few** [3] - 18:8, 60:19, 62:7
**fiction** [1] - 43:22
**Fifth** [19] - 14:21, 31:13, 31:15, 31:17, 31:20, 31:21, 32:4, 32:5, 32:6, 32:13, 33:22, 36:5, 41:13, 54:14, 54:15, 54:17, 55:7, 55:11, 55:12
**file** [3] - 38:18, 57:15, 57:20
**filed** [4] - 10:7, 10:8, 55:6, 55:8
**filing** [1] - 33:11
**filings** [1] - 67:2
**final** [6] - 16:22, 64:24, 65:1, 65:5, 65:6, 66:24
**finally** [3] - 17:17, 23:25, 45:7
**fine** [2] - 6:21, 39:25
**firm** [1] - 66:24
**first** [22] - 6:3, 8:16, 12:22, 12:25, 15:5, 16:25, 17:20, 21:11, 23:1, 23:5, 24:16, 37:20, 40:25, 42:4, 42:25, 48:3, 56:17, 62:25, 64:5, 67:19, 67:25, 68:6

**five** [1] - 19:19
**fix** [1] - 28:6
**flag** [1] - 22:17
**flexibility** [1] - 58:6
**Floor** [1] - 2:14
**focus** [3] - 12:24, 38:9, 55:1
**FOLETTA** [1] - 5:5
**Foletta** [1] - 5:6
**folks** [2] - 20:21, 44:18
**follow** [2] - 29:15, 48:17
**following** [2] - 15:23, 57:18
**footnote** [2] - 43:7, 43:20
**FOR** [6] - 1:13, 1:19, 2:3, 2:8, 2:13, 2:19
**forbear** [1] - 10:20
**forbids** [2] - 13:5, 14:10
**forced** [1] - 68:7
**forcing** [1] - 14:16
**foreclosed** [1] - 24:19
**foreigners** [1] - 42:14
**foremost** [1] - 8:16
**forget** [1] - 21:8
**forgive** [1] - 30:6
**form** [3] - 18:12, 18:19, 19:11
**former** [1] - 29:2
**forth** [5] - 7:22, 28:12, 35:13, 67:4, 67:5
**forthcoming** [1] - 10:12
**forthwith** [2] - 25:10, 66:19
**forward** [4] - 11:3, 11:18, 12:7, 57:11
**fought** [1] - 55:22
**Foundation** [1] - 31:2
**four** [3] - 17:2, 17:3, 22:20
**Fourth** [3] - 30:5, 30:9, 33:7
**framework** [1] - 50:13
**FRANK** [1] - 1:19
**Frank** [3] - 4:6, 5:3, 5:9
**frankly** [2] - 18:14, 56:9
**free** [1] - 12:2
**Friday** [1] - 9:19
**friends** [5] - 24:14, 26:11, 56:23, 57:25, 58:9
**fulfill** [1] - 52:7
**fulfilling** [1] - 69:3
**full** [2] - 21:10, 27:1

**fully** [3] - 7:10, 22:14, 68:25
**fulsome** [1] - 34:24
**Fung** [1] - 4:19
**future** [2] - 19:4, 19:22

## G

**GARAUFIS** [1] - 1:14
**General** [18] - 3:1, 6:8, 14:24, 14:25, 23:22, 25:12, 25:17, 25:20, 31:8, 31:12, 41:14, 42:21, 43:5, 43:16, 50:24, 61:19, 65:19
**GENERAL** [3] - 2:8, 2:14, 2:19
**general** [7] - 16:6, 29:7, 29:18, 30:11, 34:7, 34:11, 53:18
**General's** [12] - 5:15, 13:19, 25:7, 25:22, 25:23, 30:22, 33:11, 33:22, 44:21, 46:4, 53:6, 67:1
**generally** [3] - 51:17, 56:22, 61:8
**GENEVIEVE** [1] - 2:16
**Genevieve** [1] - 5:19
**gentlemen** [1] - 16:12
**gift** [1] - 62:18
**given** [2] - 51:23, 52:14
**governing** [1] - 41:2
**government** [4] - 16:8, 52:6, 55:25, 56:4
**Government** [35] - 8:6, 13:9, 13:23, 14:5, 14:6, 15:7, 16:7, 25:10, 25:19, 26:3, 34:1, 37:25, 43:3, 45:8, 48:24, 51:10, 51:15, 51:25, 52:13, 52:18, 52:20, 55:6, 55:8, 55:14, 55:16, 55:21, 56:20, 59:12, 61:14, 62:12, 63:6, 63:22, 64:2, 64:3, 67:2
**Government's** [11] - 13:1, 39:23, 40:7, 40:12, 40:18, 42:1, 43:21, 46:24, 51:11, 52:7, 63:5
**grace** [2] - 27:25, 29:3
**graduate** [2] - 41:8
**grant** [8] - 6:15, 7:4, 10:9, 11:21, 21:6, 64:12, 64:14, 64:24
**granted** [7] - 9:25,

10:16, 42:3, 47:2, 49:3, 58:12, 65:22
**grantee** [2] - 20:22, 21:15
**grantees** [12] - 18:17, 20:16, 20:18, 20:19, 21:4, 21:13, 22:3, 22:5, 22:7, 22:12, 23:21
**granting** [2] - 29:8, 45:12
**grants** [2] - 8:13, 26:23
**grappled** [3] - 64:22, 65:9, 65:11
**grave** [1] - 22:15
**great** [3] - 19:20, 24:13, 35:16
**greater** [1] - 62:19
**greeted** [1] - 16:4
**ground** [3] - 20:10, 22:18, 42:2
**group** [1] - 46:7
**groups** [2] - 59:21, 60:15
**guardians** [1] - 51:19
**guess** [1] - 14:9
**guidance** [2] - 7:4, 16:9, 63:12

## H

**hair** [1] - 60:21
**half** [1] - 26:1
**hallmarks** [1] - 16:5
**hand** [1] - 15:12
**handle** [1] - 7:2
**handled** [1] - 27:16
**hands** [1] - 16:3
**Hanen** [5] - 53:20, 53:21, 53:22, 54:13, 55:13
**Hanen's** [1] - 54:16
**happy** [3] - 6:4, 24:11, 37:16
**harm** [4] - 38:6, 38:12, 48:1
**harmful** [1] - 60:14
**hate** [1] - 46:13
**Haven** [1] - 1:21
**hdrisc@aol.com** [1] - 3:18
**head** [1] - 39:18
**health** [2] - 20:23, 21:13
**hear** [5] - 18:11, 33:4, 33:5, 37:19, 39:24
**heard** [3] - 24:14, 38:17, 58:9
**hearing** [4] - 4:3, 8:2,

33:7, 42:25
**HEARING** [1] - 1:13
**heart** [2] - 10:2, 11:17
**heavy** [1] - 66:2
**Heights** [2] - 44:3, 45:5
**helpful** [1] - 57:21
**Heritage** [1] - 31:2
**Hernandez** [1] - 48:4
**high** [1] - 14:3
**higher** [1] - 35:17
**Hill** [1] - 67:22
**himself** [2] - 43:13, 43:16
**hindsight** [1] - 24:20
**hire** [2] - 41:7
**hoc** [3] - 15:7, 23:8, 59:24
**hold** [3] - 10:11, 11:4, 66:4
**holding** [1] - 32:8
**holds** [2] - 30:9, 35:12
**HOLLY** [1] - 3:16
**home** [1] - 13:14
**Homeland** [31] - 16:13, 25:21, 25:24, 26:17, 26:24, 27:6, 27:14, 27:17, 27:20, 28:6, 28:10, 28:13, 30:23, 36:24, 37:4, 37:6, 38:24, 38:25, 39:4, 39:6, 39:16, 42:9, 42:13, 46:16, 53:14, 55:23, 57:16, 59:11, 66:14, 67:7, 67:10
**Honor** [117] - 4:10, 4:21, 4:24, 5:2, 5:5, 5:8, 5:11, 5:14, 5:24, 6:19, 6:24, 7:4, 8:3, 8:7, 8:13, 9:1, 9:4, 9:7, 10:5, 11:1, 11:14, 11:16, 12:12, 12:19, 14:1, 14:12, 15:4, 15:11, 15:15, 16:17, 16:24, 17:17, 18:5, 18:7, 19:9, 19:24, 20:3, 20:7, 21:1, 22:1, 22:3, 22:11, 22:18, 23:10, 24:6, 24:8, 24:11, 24:13, 25:3, 25:21, 26:8, 27:14, 28:2, 29:16, 29:21, 30:6, 30:21, 31:9, 31:11, 32:3, 33:11, 33:17, 33:21, 35:2, 36:18, 36:23, 37:3, 37:16, 37:19, 37:24, 38:2, 39:22, 40:4, 40:15,

41:24, 42:16, 43:1, 43:6, 44:19, 45:7, 46:2, 46:12, 47:8, 47:12, 47:24, 48:11, 49:6, 50:9, 51:12, 52:3, 52:9, 52:23, 54:5, 54:10, 56:5, 56:9, 57:13, 58:24, 60:25, 61:2, 61:10, 61:16, 62:3, 62:6, 63:8, 64:4, 64:10, 64:17, 66:5, 66:23, 67:12, 67:14, 67:21, 68:14, 68:17, 69:4
**honor** [1] - 65:22
**Honor's** [4] - 10:12, 11:5, 33:19, 38:21
**HONORABLE** [1] - 1:14
**hope** [1] - 66:4
**hopefully** [1] - 60:8
**hospitals** [2] - 21:25, 34:23
**House** [1] - 43:14
**hundreds** [1] - 25:4
**hurt** [1] - 24:10

## I

**ICE** [1] - 51:16
**idea** [2] - 29:10, 44:20
**ignore** [1] - 60:23
**ignores** [1] - 13:10
**ignoring** [1] - 60:19
**Ill** [1] - 60:11
**illegal** [3] - 25:8, 25:18
**illegality** [4] - 13:19, 25:16, 31:13, 31:16
**immediately** [2] - 26:4, 66:13
**immigrants** [4] - 24:1, 41:2, 41:24, 42:6
**Immigration** [7] - 4:11, 4:22, 4:25, 8:8, 29:2, 56:10, 56:13
**IMMIGRATION** [1] - 2:3
**immigration** [4] - 19:22, 23:6, 41:20, 67:4
**imminent** [1] - 38:6
**imminently** [1] - 27:2
**impact** [7] - 21:10, 21:12, 21:14, 22:10, 44:7, 59:3, 59:13
**impacted** [1] - 21:19
**implement** [3] - 13:20, 16:14, 47:20
**implications** [2] - 58:25, 64:23

**import** [1] - 35:16
**importance** [1] - 38:18
**important** [6] - 25:13, 35:3, 38:20, 56:8, 67:1, 67:21
**importantly** [2] - 66:16, 68:9
**impose** [3] - 25:10, 25:15, 35:14
**impossible** [2] - 7:1, 66:9
**INA** [8] - 40:21, 40:25, 41:4, 41:7, 41:11, 41:13, 41:17
**inappropriate** [3] - 30:14, 38:5, 62:13
**incendiary** [1] - 50:3
**inclined** [1] - 61:2
**include** [1] - 20:20
**includes** [1] - 21:12
**including** [3] - 56:17, 65:2, 68:4
**inclusion** [1] - 51:18
**incoming** [1] - 16:4
**inconsistent** [1] - 29:6
**incorrect** [1] - 51:13
**incredibly** [1] - 67:21
**indeed** [2] - 20:12, 27:1
**indefinitely** [1] - 26:8
**independent** [1] - 22:18
**indicated** [3] - 10:19, 13:24, 53:2
**indistinguishable** [2] - 34:2, 36:15
**individual** [7] - 27:23, 45:18, 51:22, 63:1, 63:10, 65:8, 67:19
**individualized** [2] - 19:1, 45:18
**individuals** [12] - 13:6, 13:15, 20:23, 21:4, 27:21, 28:14, 28:17, 34:21, 48:4, 51:23, 58:4, 66:20
**induce** [1] - 26:22
**infected** [1] - 42:6
**information** [18] - 19:14, 19:16, 19:17, 19:20, 51:5, 51:6, 51:9, 51:12, 51:15, 51:17, 51:21, 52:6, 52:14, 52:18, 56:6, 56:16, 56:21, 57:12
**initial** [1] - 30:16
**injunction** [35] - 7:14, 8:20, 10:13, 11:6, 12:9, 12:21, 13:22, 14:22, 17:11, 19:15,

25:15, 28:7, 29:21, 30:1, 31:18, 37:20, 37:21, 37:25, 38:3, 38:6, 38:14, 40:6, 53:23, 54:24, 54:25, 55:13, 57:3, 57:5, 58:7, 64:14, 65:23, 66:22, 67:3, 67:17, 67:22
**injuries** [2] - 63:18, 63:20
**injurious** [1] - 60:14
**input** [1] - 15:19
**inquiry** [1] - 50:10
**INS** [2] - 29:5, 60:4
**insensitive** [1] - 50:4
**instance** [1] - 50:18
**instances** [1] - 17:3
**instead** [7] - 17:24, 29:8, 31:25, 44:22, 45:7, 46:9, 47:18
**institute** [2] - 25:25, 34:2
**institutes** [1] - 34:16
**institutional** [2] - 63:16, 63:21
**institutions** [2] - 34:23, 63:14
**instructed** [1] - 25:9
**instructions** [4] - 56:25, 57:1, 57:5, 57:20
**insufficient** [2] - 25:6, 28:13
**insurance** [3] - 20:23, 21:13, 21:15
**integral** [1] - 68:24
**integrated** [1] - 20:16
**intend** [1] - 7:23
**intended** [3] - 26:11, 26:20, 59:19
**intent** [3] - 39:5, 42:19, 44:1
**intention** [1] - 9:20, 66:19
**intentions** [2] - 42:19, 43:10
**interest** [6] - 20:15, 21:21, 21:22, 48:25, 52:10, 63:16
**interested** [1] - 32:23
**interesting** [1] - 27:4
**interests** [21] - 13:1, 13:4, 13:7, 13:10, 14:2, 20:9, 20:14, 24:16, 26:14, 26:16, 26:22, 38:17, 40:17, 40:20, 40:23, 40:24, 41:4, 41:11, 41:17, 41:21, 63:21

**interfere** [3] - 63:13, 63:14, 65:14
**interference** [2] - 63:6, 63:7
**interlocutory** [9] - 9:14, 9:18, 9:20, 10:8, 10:20, 11:12, 11:21, 68:16
**intermediate** [1] - 32:18
**INTERN** [1] - 1:23
**intern** [1] - 4:5
**introduce** [3] - 4:12, 6:1, 6:7
**investigation** [1] - 21:3
**involved** [1] - 43:22
**irrational** [3] - 33:24, 36:13, 54:19
**irregularities** [1] - 50:25
**irregularity** [1] - 50:15
**irrelevant** [2] - 18:14, 18:18
**irreparable** [1] - 38:5, 38:12, 48:1
**irresponsible** [1] - 50:4
**issue** [24] - 9:21, 12:11, 23:13, 24:18, 28:23, 29:12, 32:18, 33:12, 33:16, 35:16, 39:11, 41:15, 44:17, 53:23, 54:25, 55:22, 56:6, 57:20, 58:15, 59:7, 62:9, 64:9, 64:11, 67:16
**issued** [3] - 16:2, 34:8, 34:12
**issues** [16] - 6:17, 7:6, 8:1, 23:17, 27:16, 27:18, 28:3, 28:4, 28:20, 28:22, 37:20, 40:19, 45:22, 61:2, 66:15, 67:7
**items** [1] - 18:8
**iteration** [1] - 31:25
**itself** [5] - 17:2, 29:24, 30:14, 43:18, 52:12

## J

**January** [3] - 1:8, 45:12, 59:23
**Jerome** [3] - 4:6, 5:3, 5:9
**JEROME** [1] - 1:19
**JOACHIN** [2] - 2:6, 4:24
**Joachin** [1] - 4:25

**job** [3] - 13:14, 22:14, 62:1
**jobs** [2] - 21:19, 23:23
**Joe** [1] - 6:5
**JOHN** [1] - 3:8
**John** [1] - 6:5
**joining** [1] - 62:1
**JONATHAN** [1] - 1:4
**Jonathan** [1] - 48:14
**JOSEPH** [1] - 3:14
**JOSHUA** [1] - 2:5
**Juarez** [1] - 48:14
**Judge** [20] - 7:14, 8:21, 8:25, 17:6, 32:15, 36:7, 38:15, 53:20, 53:21, 53:22, 54:13, 54:16, 55:13, 57:3, 57:5, 58:7, 65:23, 67:3, 67:22, 68:4
**judge** [3] - 36:7, 53:23, 60:11
**JUDGE** [1] - 1:14
**judgment** [7] - 23:6, 55:16, 55:24, 64:24, 65:1, 65:6, 65:7
**jump** [1] - 32:19
**jurisdiction** [2] - 9:15, 10:20
**jurisdictional** [1] - 9:21
**justice** [1] - 55:19
**JUSTICE** [2] - 3:2, 3:4
**Justice** [4] - 5:25, 6:2, 6:9, 16:12
**justification** [2] - 13:9, 52:16
**justify** [2] - 13:24, 15:2
**JUSTIN** [1] - 2:6
**Justin** [1] - 4:21

## K

**Karen** [2] - 4:10, 8:7
**Kate** [1] - 6:6
**KATE** [1] - 3:9
**keep** [3] - 22:24, 65:12, 65:16
**keeping** [1] - 12:16
**key** [1] - 9:10
**KHAN** [1] - 2:10
**kind** [5] - 21:3, 34:25, 45:18, 45:19, 60:7
**kinds** [1] - 21:20
**Kirstjen** [2] - 46:17, 46:19
**KIRSTJEN** [1] - 1:8
**knowledge** [2] - 28:16, 56:24
**knows** [1] - 27:14

## L

**labs** [1] - 41:10
**lack** [1] - 12:5
**lacks** [2] - 22:23, 23:19
**LaGuardia** [1] - 13:12
**laid** [1] - 7:20
**land** [1] - 66:9
**language** [4] - 17:4, 17:7, 35:17, 57:6
**last** [5] - 9:19, 23:15, 27:14, 46:14, 64:16
**late** [1] - 48:20
**Latino** [5] - 24:1, 41:24, 42:6, 44:5, 60:1
**Latinos** [4] - 42:13, 44:8, 59:3, 59:14
**law** [4] - 4:5, 14:10, 26:6, 27:19, 35:8, 45:6, 52:8
**LAW** [2] - 1:23, 2:3
**Law** [6] - 4:8, 4:11, 4:22, 4:25, 8:1, 8:8
**lay** [1] - 66:9
**leaders** [1] - 60:8
**leadership** [1] - 59:24
**learned** [1] - 54:4
**least** [9] - 7:20, 8:22, 17:3, 22:20, 28:16, 29:19, 53:17, 54:11, 58:1
**leave** [1] - 17:5
**leaves** [2] - 14:8, 66:17
**left** [3] - 23:7, 46:4, 68:4
**legal** [12] - 8:16, 9:10, 14:7, 20:20, 43:22, 44:16, 44:17, 46:3, 68:1, 68:10
**Legal** [4] - 4:6, 5:3, 5:9
**LEGAL** [1] - 1:19
**legality** [5] - 26:3, 26:6, 32:13, 33:20, 53:15
**legally** [4] - 26:13, 26:15, 43:11, 53:5
**legislation** [2] - 23:14, 39:14
**less** [2] - 10:3, 32:4
**letter** [5] - 9:19, 10:7, 14:23, 25:22, 44:17
**letting** [1] - 61:22
**liability** [1] - 44:16
**liberty** [1] - 48:25
**licenses** [1] - 22:13
**lifting** [1] - 66:2
**light** [4] - 38:6, 38:14,

53:3, 53:7
**likelihood** [3] - 13:20, 25:14, 38:1
**likely** [4] - 15:1, 16:18, 18:10, 39:15
**limited** [2] - 41:25, 59:10
**literally** [1] - 34:21
**litigating** [1] - 63:15
**litigation** [23] - 13:21, 14:7, 14:19, 15:6, 22:25, 35:20, 35:22, 36:1, 36:4, 36:10, 36:13, 39:13, 44:10, 44:12, 53:4, 53:8, 53:13, 57:18, 63:2, 63:7, 66:25, 67:9
**live** [1] - 43:17
**lives** [3] - 13:5, 13:16, 14:4, 15:17, 68:23
**local** [1] - 29:5
**logical** [1] - 30:11
**logically** [1] - 30:10
**look** [7] - 14:11, 17:1, 17:8, 19:9, 50:14, 64:23, 66:10
**looking** [1] - 16:25, 17:25, 61:20
**looks** [3] - 17:20, 44:3, 50:10
**lose** [1] - 21:18
**losing** [2] - 21:13, 63:18
**loss** [2] - 21:15, 22:15, 63:19
**lost** [2] - 27:22, 55:16
**LOURDES** [1] - 2:10
**Lourdes** [3] - 5:14, 9:4, 20:4
**lower** [1] - 45:2
**lowest** [1] - 22:9
**lucid** [1] - 11:25

## M

**MA** [1] - 2:15
**ma'am** [2] - 11:15, 67:11
**magic** [1] - 68:5
**magnitude** [1] - 23:7
**mail** [1] - 48:7
**mailed** [1] - 48:15
**maintain** [3] - 62:9, 63:2, 64:11
**major** [1] - 22:5
**majority** [2] - 38:13, 59:4
**maker** [2] - 42:22, 45:1
**makers** [1] - 12:10
**Mallstop** [1] - 2:20

mandamus [1] - 9:16
mandating [1] - 15:19
mandatory [2] - 17:4, 65:10
manifest [1] - 54:3
manner [1] - 34:13
MARISOL [1] - 1:22
Marisol [1] - 5:2
MARTIN [1] - 1:4
Martin [2] - 4:13, 68:22
MARUTOLLO [1] - 3:14
Marutollo [1] - 6:5
Maryland [2] - 30:7, 36:8
MASSACHUSETTS [2] - 2:14, 2:13
Massachusetts [3] - 3:6, 5:12, 5:20
materially [4] - 34:1, 36:15, 54:15, 54:20
materials [1] - 12:15
matter [17] - 7:10, 8:15, 8:22, 9:22, 13:2, 29:3, 34:19, 35:8, 43:11, 45:1, 59:16, 62:8, 68:17, 68:25, 69:6
matters [2] - 12:6, 63:24
maximum [1] - 35:13
mayor [1] - 45:3
Mayra [1] - 4:24
MAYRA [1] - 2:6
mean [6] - 10:22, 31:21, 32:7, 33:23, 42:11, 59:9
meaningful [1] - 18:16
meant [2] - 52:1, 62:17
measure [1] - 26:21
mechanical [1] - 3:23
medical [2] - 21:25, 22:7
meet [2] - 6:11, 29:9
MELODY [10] - 2:21, 5:17, 40:15, 42:16, 43:1, 43:6, 43:10, 46:12, 46:22, 47:4
Melody [5] - 5:17, 24:3, 40:16
member [2] - 45:4, 48:14
members [10] - 15:19, 20:19, 21:16, 48:24, 51:19, 63:3, 65:2, 65:10, 68:22
memo [7] - 13:3, 17:9, 19:6, 24:17, 29:4,

34:15, 56:18
Memo [1] - 15:17
Memorandum [7] - 16:20, 17:2, 17:21, 18:1, 47:18, 48:18, 49:5
memorandum [6] - 14:12, 14:15, 16:3, 16:8, 17:3, 47:20
mention [1] - 12:6
merely [1] - 62:11
merits [2] - 28:19, 38:1
message [1] - 16:8
met [1] - 8:24
method [1] - 23:3
Mexicans [3] - 42:13, 50:5, 60:4
Mexico [1] - 46:10
mic [1] - 59:25
MICHAEL [1] - 1:21
Michael [1] - 4:8
microphone [2] - 12:14, 20:4
might [14] - 18:12, 18:16, 18:19, 19:21, 26:8, 36:2, 53:23, 53:24, 54:1, 54:3, 66:14
millions [1] - 34:21
mind [5] - 16:9, 39:3, 58:24, 65:12, 65:17
minimum [1] - 7:6
minor [1] - 9:22
minute [1] - 22:17
minutes [2] - 12:14, 18:8
miscommunication [1] - 10:6
misinterpretation [1] - 10:6
missed [2] - 28:11
mistake [1] - 49:2
mixed [1] - 20:20
model [1] - 24:25
modify [1] - 62:25
moment [2] - 20:8, 27:5
money [1] - 58:14
month [1] - 48:17
moreover [1] - 63:22
Morin [1] - 48:14
morning [17] - 4:10, 4:21, 4:24, 5:2, 5:5, 5:8, 5:11, 5:14, 5:16, 5:17, 5:19, 5:22, 5:24, 6:24, 6:25, 24:8, 40:15
mortgage [1] - 13:15
most [8] - 11:3, 23:14,

37:17, 41:3, 44:13, 45:12, 46:14, 46:20
motion [30] - 4:2, 10:13, 11:6, 11:20, 11:21, 12:10, 12:21, 17:11, 20:1, 23:4, 37:15, 37:17, 37:21, 39:23, 40:2, 40:6, 40:8, 40:12, 40:13, 40:18, 42:1, 42:2, 45:13, 45:21, 46:25, 47:11, 62:7, 62:22, 64:21
MOTION [1] - 1:13
motions [2] - 11:23, 67:17
motive [1] - 46:6
moving [3] - 11:3, 41:23, 62:11
MR [87] - 4:5, 4:8, 4:21, 5:5, 5:8, 5:24, 6:19, 6:22, 6:24, 7:1, 7:16, 8:3, 10:5, 10:23, 11:1, 12:12, 12:19, 14:1, 15:4, 24:8, 24:11, 24:13, 25:21, 27:9, 27:11, 28:1, 30:5, 30:20, 31:5, 31:8, 31:11, 31:17, 31:23, 32:3, 32:11, 32:22, 32:25, 33:6, 33:10, 34:6, 35:2, 35:7, 35:9, 36:9, 36:20, 36:23, 37:3, 37:13, 37:16, 37:24, 39:3, 39:8, 39:22, 40:1, 46:17, 50:9, 51:4, 52:9, 53:10, 53:21, 53:25, 54:5, 54:10, 54:25, 55:6, 55:9, 55:12, 56:1, 56:5, 56:8, 56:13, 56:16, 57:13, 57:19, 57:23, 57:25, 58:23, 60:25, 61:10, 62:6, 62:24, 64:10, 64:17, 65:24, 66:1, 66:5, 66:23
MS [46] - 4:10, 4:16, 4:24, 5:2, 5:11, 5:14, 5:17, 5:19, 8:7, 8:11, 9:4, 11:11, 11:16, 15:15, 16:1, 16:16, 16:24, 18:3, 18:5, 18:7, 19:16, 19:24, 20:3, 20:7, 21:1, 21:9, 22:1, 23:2, 24:6, 40:4, 40:15, 42:16, 43:1, 43:6, 43:10, 46:12, 46:22,

47:4, 47:8, 47:10, 47:14, 50:7, 61:16, 61:21, 62:3, 67:12
MUNEER [1] - 1:22
Muneer [1] - 5:8
municipal [1] - 20:17
must [4] - 33:3, 35:24, 52:16, 60:23

**N**

Nadeau [1] - 5:19
NADEAU [2] - 2:16, 5:19
name [3] - 4:14, 46:16
named [3] - 4:12, 15:18, 28:17
nation's [1] - 67:4
National [4] - 4:11, 4:22, 4:25, 8:8
NATIONAL [1] - 2:3
nationwide [12] - 8:20, 13:22, 14:22, 36:16, 54:24, 54:25, 55:13, 62:10, 62:13, 64:14, 64:21, 64:24
Naturalization [1] - 29:2
nature [1] - 36:19
naught [1] - 65:20
nearly [2] - 13:6, 38:8
necessarily [3] - 38:23, 52:9, 65:14
necessary [2] - 62:20, 64:8, 64:12
need [4] - 9:1, 12:1, 16:5, 61:11
needed [2] - 29:11, 52:19
needs [2] - 17:1, 66:13
negligent [1] - 61:17
never [5] - 34:9, 50:5, 52:13, 56:24
NEW [4] - 1:1, 2:8, 2:8, 3:12
new [3] - 16:13, 38:24, 39:10
New [20] - 1:6, 1:21, 2:9, 3:13, 5:6, 5:15, 21:1, 21:7, 29:5, 48:2, 48:15, 48:25, 54:9, 60:20, 61:19, 67:15, 68:21, 68:23, 69:3
next [3] - 49:8, 54:15, 62:2
NGG [1] - 1:4
nice [1] - 6:11
NICHOLAS [1] - 1:14
Nielsen [2] - 46:18,

46:19
NIELSEN [1] - 1:8
night [1] - 23:12
ninth [1] - 55:19
Ninth [8] - 7:17, 32:17, 32:19, 32:23, 33:1, 33:4, 33:5, 66:8
Noel [1] - 28:24
nominated [1] - 38:25
non [2] - 37:1, 45:15
non-decision [1] - 37:1
non-nonenforcement [1] - 45:15
none [3] - 61:4, 61:5, 68:18
nonenforcement [2] - 45:14, 45:15
Northern [2] - 28:7, 38:7
Norway [3] - 46:9, 46:14, 46:21
notably [2] - 44:19, 44:20
noted [1] - 15:5
nothing [3] - 38:22, 59:12, 62:17
notice [20] - 15:13, 15:16, 16:2, 16:18, 16:25, 17:14, 17:15, 17:18, 17:22, 17:23, 18:9, 18:14, 19:12, 28:22, 29:11, 29:22, 29:24, 29:25, 34:8, 34:10
notice-and-comment [3] - 29:11, 34:8, 34:10
notions [1] - 47:22
notwithstanding [1] - 25:2
November [3] - 15:6, 45:21, 48:10
number [3] - 12:3, 17:1, 28:1
numbers [3] - 21:9, 21:10, 21:17
nurses [1] - 22:13
NW [1] - 3:6
NY [1] - 3:18

**O**

oath [3] - 39:12, 59:6, 60:25
Obama's [1] - 26:20
object [3] - 10:14, 10:21, 11:2
objection [1] - 7:25

obligation [1] - 52:5
observation [1] - 46:20
observations [1] - 46:14
obviously [1] - 7:1
occasions [3] - 12:4, 23:11, 61:23
occurred [1] - 47:18
October [11] - 17:12, 27:9, 27:10, 27:13, 28:3, 28:11, 28:12, 48:6, 48:18, 58:6
OF [12] - 1:1, 1:13, 2:8, 2:14, 2:19, 2:8, 2:13, 2:14, 2:19, 3:2, 3:4, 3:12
offer [4] - 19:11, 20:9, 28:1, 66:5
offered [5] - 25:5, 32:4, 32:5, 33:10, 33:15
offhand [1] - 60:19
office [2] - 27:22, 59:6
OFFICE [2] - 2:8, 2:14
Office [4] - 5:15, 6:6, 33:11, 60:15
officer [1] - 15:21
official [1] - 45:1
officials [1] - 18:22
one [17] - 9:12, 17:1, 18:10, 22:17, 23:3, 24:9, 25:11, 26:20, 42:17, 44:17, 45:19, 48:4, 48:17, 61:17, 62:25, 65:18, 66:11
One [1] - 2:14
one-page [1] - 44:17
ones [1] - 43:11
ongoing [1] - 48:1
opaque [2] - 14:4, 14:12
open [2] - 17:5, 59:25
operate [1] - 41:5
operates [2] - 25:20, 41:12
opinion [7] - 9:14, 31:3, 31:12, 32:5, 32:6, 32:12, 66:12
opportunity [3] - 27:3, 39:1, 49:4
oppose [1] - 11:12
opposition [2] - 10:11, 40:2
opt [1] - 63:3
order [16] - 8:25, 15:6, 15:12, 16:6, 17:18, 30:13, 30:15, 30:18, 41:7, 41:9, 45:21, 52:2, 52:7, 53:11,

64:12, 68:4
orderly [5] - 25:25, 26:5, 26:18, 34:2, 34:16
ordinary [2] - 60:5, 60:6
ORGANIZATION [1] - 1:20
Organization [2] - 4:6, 5:3
original [5] - 32:8, 32:9, 32:13, 52:11, 53:12
ORIHUELA [2] - 1:22, 5:2
Orihuela [1] - 5:3
outcome [4] - 39:13, 46:7, 46:23, 59:19
Oval [1] - 60:15
overblown [1] - 63:8
overheard [1] - 59:25
overlapping [1] - 64:1
overstating [1] - 31:20
overtaken [2] - 28:4, 28:20
overwhelming [1] - 44:7
own [3] - 30:24, 46:14, 65:8
owning [1] - 43:15

## P

p.m [1] - 48:6
page [3] - 44:17, 49:8, 57:3
pages [1] - 25:4
panel [2] - 9:17, 54:16
papers [5] - 22:21, 28:17, 38:10, 38:13, 55:21
parallel [3] - 63:1, 63:7, 63:15
part [10] - 6:4, 7:20, 9:13, 11:22, 36:1, 36:2, 36:9, 42:11, 52:5, 59:20
participate [1] - 22:14
particular [8] - 12:24, 18:10, 19:18, 40:13, 50:18, 50:23, 60:14, 67:5
particularly [4] - 22:6, 35:3, 36:14, 43:24
parties [6] - 9:13, 9:19, 9:23, 11:22, 25:3, 37:4
parties' [1] - 12:5
pass [1] - 23:14
past [2] - 21:6, 32:21

patently [1] - 17:10
path [2] - 24:25, 44:12
pendency [1] - 65:23
pending [11] - 6:13, 7:18, 7:23, 8:18, 10:12, 11:5, 32:25, 38:16, 48:12, 68:2, 68:16
Pennsylvania [1] - 29:14
people [14] - 13:11, 19:3, 21:7, 21:18, 27:24, 41:4, 45:17, 46:8, 46:11, 46:15, 46:20, 67:15, 67:24, 68:4
percolate [1] - 32:18
performing [1] - 22:9
perhaps [1] - 11:23
period [4] - 26:1, 27:12, 31:25, 32:1
periods [3] - 26:23, 26:24, 27:1
permanent [1] - 20:21
person [1] - 60:15
persuasive [1] - 33:15
petition [21] - 6:13, 7:2, 7:4, 7:9, 7:15, 7:19, 8:13, 9:17, 10:8, 10:9, 10:10, 10:12, 10:15, 11:4, 55:2, 55:3, 55:4, 55:6, 55:18, 55:19, 62:15
petitioned [1] - 55:4
pEZZI [1] - 24:8
Pezzi [6] - 6:2, 6:20, 18:4, 18:11, 47:6, 52:25
PEZZI [64] - 3:7, 6:24, 7:1, 7:16, 10:5, 10:23, 11:1, 24:11, 24:13, 25:21, 27:9, 27:11, 28:1, 30:5, 30:20, 31:5, 31:8, 31:11, 31:17, 31:23, 32:3, 32:11, 32:22, 32:25, 33:6, 33:10, 34:6, 35:2, 35:7, 35:9, 36:9, 36:20, 36:23, 37:3, 37:13, 37:16, 37:24, 39:3, 39:8, 39:22, 40:1, 46:17, 53:10, 53:21, 53:25, 54:5, 54:10, 54:25, 55:6, 55:9, 55:12, 56:1, 56:5, 56:8, 56:13, 56:16, 57:13, 57:19, 57:23, 57:25, 60:25, 61:10,

66:5, 66:23
Place [1] - 2:14
place [6] - 8:20, 16:25, 28:7, 47:19, 48:18, 49:5
plainly [1] - 17:7
Plaintiff [11] - 5:12, 5:16, 5:18, 5:20, 9:5, 11:16, 13:11, 13:13, 40:21, 40:23, 42:2
plaintiff's [2] - 50:2, 58:25
plaintiffs [49] - 4:11, 4:12, 8:5, 8:17, 8:22, 8:23, 10:7, 10:10, 10:19, 12:20, 15:18, 17:15, 17:19, 19:20, 26:2, 27:15, 29:14, 29:22, 30:12, 32:7, 37:18, 38:2, 38:5, 40:11, 40:14, 47:15, 48:24, 51:7, 51:8, 57:6, 59:3, 59:6, 61:14, 62:11, 62:12, 63:1, 63:10, 64:1, 64:22, 64:25, 65:3, 65:7, 67:13, 67:14, 67:19, 68:2, 68:3, 68:12, 68:22
Plaintiffs [14] - 1:5, 4:7, 4:9, 4:23, 5:1, 5:4, 5:7, 5:10, 8:9, 9:7, 12:22, 18:7, 62:9, 63:9
PLAINTIFFS [2] - 1:19, 2:3
plaintiffs' [8] - 11:11, 15:16, 19:13, 28:17, 47:14, 52:12, 55:21, 61:3
plan [1] - 19:4
planning [1] - 19:17
play [1] - 54:13
played [3] - 11:7, 54:20, 54:21
Plaza [2] - 3:13, 3:17
pleadings [3] - 47:25, 48:3, 48:15
pled [2] - 47:19, 48:13
point [9] - 17:17, 22:21, 25:13, 33:13, 43:20, 46:19, 47:23, 64:9, 67:13
pointed [2] - 18:24, 27:15
policies [4] - 34:9, 44:14, 52:4, 55:14
policy [56] - 15:22, 16:6, 17:22, 19:14, 19:16, 19:18, 23:5,

29:1, 29:18, 31:18, 31:19, 32:8, 32:9, 32:14, 33:20, 34:2, 34:3, 34:7, 34:11, 34:16, 35:1, 36:15, 37:8, 45:1, 45:17, 51:5, 51:6, 51:9, 51:12, 51:14, 51:17, 51:21, 52:1, 52:4, 52:14, 52:18, 52:19, 52:22, 53:3, 53:12, 53:15, 54:15, 54:21, 56:16, 56:19, 56:21, 57:9, 57:12, 57:15, 57:17, 57:18, 66:10, 67:5
political [1] - 59:19
posed [1] - 51:5
position [18] - 8:5, 9:6, 10:16, 10:21, 10:25, 11:11, 11:13, 15:23, 25:7, 30:16, 30:20, 43:3, 50:2, 51:11, 52:17, 60:11, 64:13, 64:20
positions [1] - 12:6
possibility [2] - 13:16, 66:11
possible [2] - 13:14, 60:11
possibly [1] - 7:7
post [3] - 15:7, 23:8, 27:22
Postal [2] - 27:16, 48:21
postal [1] - 48:21
potential [1] - 34:25
potentially [2] - 33:4, 60:21, 64:1
pound [1] - 55:23
power [1] - 34:14
practice [2] - 17:9, 47:21
precedent [4] - 33:25, 36:20, 36:22, 54:17
precedential [1] - 36:19
precedes [1] - 67:9
precise [2] - 25:4, 28:1
precisely [1] - 30:6
preclude [2] - 65:3, 65:7
predecessor [1] - 17:22
predict [1] - 7:2
prediction [1] - 54:12
preliminary [15] - 10:13, 11:5, 12:9, 12:21, 17:11, 21:9,

37:20, 37:21, 37:25, 38:3, 40:5, 42:2, 47:1, 64:14, 67:17
**premise** [1] - 60:22
**prepared** [1] - 40:5
**presented** [4] - 28:23, 36:14, 51:10, 53:13
**presidency** [1] - 50:20
**president** [3] - 15:21, 50:6, 50:21
**President** [14] - 23:10, 23:16, 24:1, 26:20, 39:1, 43:13, 44:6, 44:21, 45:3, 46:4, 50:17, 50:20, 50:24, 61:7
**President's** [1] - 59:4
**press** [2] - 43:14, 48:9
**presumably** [2] - 28:14, 38:19
**presumption** [3] - 44:23, 44:24, 44:25
**pretext** [3] - 22:17, 23:21, 24:2
**pretextual** [1] - 20:13
**previously** [1] - 29:3
**primarily** [1] - 46:9
**primary** [2] - 20:22, 24:14
**principles** [1] - 30:12
**priority** [1] - 39:15
**proactively** [2] - 51:18, 56:22
**problem** [5] - 25:6, 28:6, 28:14, 63:25, 64:3
**problems** [1] - 26:8
**procedural** [6] - 19:25, 47:11, 47:14, 57:23, 58:2, 58:17
**Procedure** [1] - 35:11
**procedures** [5] - 35:13, 35:18, 47:19, 48:9
**proceed** [2] - 11:18, 16:22
**proceeding** [1] - 63:25
**proceedings** [10] - 7:7, 8:14, 9:9, 10:14, 52:2, 53:13, 54:13, 54:20, 55:2, 64:9
**Proceedings** [1] - 3:23
**proceeds** [1] - 66:25
**process** [16] - 19:25, 27:19, 28:12, 34:5, 36:1, 44:9, 47:11, 47:15, 47:22, 48:23, 49:5, 50:16, 57:4, 57:23, 58:2, 58:17

**processed** [5] - 27:18, 28:10, 47:17, 58:10, 58:16
**produced** [1] - 3:24
**proffer** [1] - 23:18
**proffered** [2] - 20:12, 22:22
**program** [30] - 13:17, 15:10, 20:9, 20:16, 21:23, 22:24, 23:2, 23:12, 25:8, 25:9, 25:10, 25:16, 25:24, 26:4, 26:5, 26:7, 26:14, 26:18, 26:19, 30:17, 30:22, 31:22, 34:5, 38:18, 39:14, 42:15, 44:18, 53:16, 66:19, 68:6
**program's** [1] - 26:3
**Programs** [1] - 3:5
**prompt** [1] - 67:20
**promptly** [1] - 9:16
**promulgate** [1] - 22:24
**prongs** [1] - 13:23
**proper** [1] - 16:17
**proposal** [1] - 10:14
**proposed** [2] - 19:15, 62:21
**proposes** [1] - 34:13
**proposition** [1] - 30:11
**prosecute** [2] - 45:18, 45:19
**prosecutorial** [2] - 45:23, 45:25
**prospectively** [1] - 34:13
**protected** [3] - 48:25, 49:3, 51:16
**protection** [14] - 24:4, 40:18, 41:23, 42:18, 43:24, 47:1, 50:2, 50:8, 50:10, 51:2, 51:20, 59:1, 59:8, 61:3
**Protection** [1] - 59:14
**protections** [1] - 51:19
**provide** [6] - 13:8, 19:4, 20:22, 52:16, 52:19, 57:14
**provided** [5] - 19:20, 35:10, 51:18, 52:7, 67:23
**provides** [3] - 14:12, 15:7, 38:8
**providing** [1] - 22:7
**provisional** [1] - 16:19
**provisions** [2] - 41:1,

41:6
**prudence** [2] - 62:11, 62:12
**prudent** [1] - 7:3
**public** [6] - 15:20, 20:18, 22:4, 34:12, 35:16, 46:4
**publicized** [1] - 44:14
**publicly** [2] - 13:6, 23:10
**purchased** [1] - 13:14
**purported** [1] - 22:25
**purpose** [2] - 19:22, 41:11
**purposes** [3] - 29:18, 41:17, 41:22
**pursuant** [1] - 28:6
**pursue** [2] - 27:4, 44:13
**pursuing** [1] - 7:16
**put** [7] - 9:24, 11:19, 34:23, 47:19, 49:5, 52:2, 57:9
**putative** [1] - 15:18
**puzzled** [1] - 9:12

### Q

**qualified** [1] - 41:3
**qualifies** [1] - 13:13
**qualify** [2] - 63:12
**questions** [3] - 6:4, 19:18, 61:17
**quickly** [4] - 16:17, 37:22, 37:23, 62:21
**quite** [3] - 30:9, 32:11, 59:1
**quote** [2] - 23:13, 56:10

### R

**RACHEL** [1] - 3:9
**Rachel** [1] - 6:6
**radically** [1] - 15:17
**RADLER** [2] - 65:24, 66:1
**raise** [3] - 26:8, 35:10, 37:18
**raised** [2] - 28:22, 48:10
**ran** [2] - 46:15, 46:20
**range** [1] - 34:19
**ranging** [1] - 40:9
**rather** [3] - 37:9, 52:14, 62:18
**rational** [3] - 33:25, 53:17, 54:11
**rationale** [9] - 13:2, 14:6, 14:7, 14:8,

15:6, 15:9, 23:8, 33:10, 52:20
**rationales** [3] - 23:1, 24:14, 25:4
**rationalization** [1] - 15:7
**re** [1] - 27:23
**re-submit** [1] - 27:23
**reach** [2] - 33:13, 37:2
**reached** [2] - 44:9, 46:7
**reaching** [1] - 44:17
**react** [1] - 7:12
**reacted** [1] - 57:9
**read** [6] - 12:15, 31:1, 31:4, 57:10
**reading** [1] - 32:12
**READLER** [1] - 3:1
**Readler** [2] - 6:7, 6:8
**ready** [1] - 23:16
**really** [10] - 14:8, 16:5, 21:17, 32:6, 51:4, 54:6, 64:22, 65:21, 66:1, 68:9
**reapplied** [2] - 48:10, 48:22
**reason** [9] - 7:19, 32:4, 39:9, 47:24, 48:13, 48:20, 64:4, 67:2
**reasonable** [2] - 26:22, 54:12
**reasonably** [1] - 25:1
**reasoned** [1] - 52:20
**reasoning** [1] - 15:10
**reasons** [12] - 7:20, 8:15, 12:24, 20:12, 22:22, 25:12, 42:3, 42:17, 48:23, 58:18, 67:18, 67:25
**rebuttal** [1] - 40:5
**recap** [1] - 62:25
**receive** [2] - 18:22, 27:6
**received** [3] - 9:19, 48:6, 48:18
**receiving** [1] - 25:22
**recently** [2] - 23:14, 45:12
**recipients** [9] - 18:13, 21:5, 32:2, 34:22, 39:15, 47:16, 48:2, 61:7, 63:10
**recision** [5] - 13:20, 29:1, 29:18, 30:18, 34:15
**reckoning** [1] - 13:6
**recognize** [1] - 36:18
**reconsider** [2] - 39:2, 39:5

**reconsidered** [1] - 55:18
**record** [9] - 9:8, 14:21, 23:9, 23:19, 41:25, 42:4, 46:24, 68:10, 68:12
**recorded** [1] - 3:23
**recruit** [1] - 41:2
**recurring** [2] - 60:1, 60:7
**redundant** [1] - 60:1
**reference** [2] - 13:19, 41:19
**reframe** [1] - 45:9
**refuses** [1] - 29:15
**regard** [4] - 8:5, 18:9, 18:20, 66:20
**regarding** [4] - 9:10, 14:1, 20:5
**regardless** [3] - 28:2, 28:19, 39:13
**Regents** [4] - 6:14, 8:19, 17:19, 63:19
**regularity** [2] - 44:24
**regulated** [5] - 41:4, 41:11, 41:13, 41:16, 41:20
**regulatory** [2] - 22:12, 41:1
**rehearing** [1] - 55:17
**reject** [3] - 17:5, 18:25, 35:15
**rejected** [2] - 17:13, 29:10
**releases** [1] - 43:14
**relevant** [1] - 42:19
**reliance** [18] - 13:1, 13:4, 13:7, 13:12, 14:2, 20:9, 20:14, 20:15, 21:21, 24:16, 26:11, 26:14, 26:16, 26:22, 38:17, 52:10, 52:15
**relied** [4] - 41:14, 43:18, 51:9, 51:22
**relief** [20] - 7:17, 9:1, 9:20, 16:19, 16:22, 18:12, 18:16, 18:19, 19:4, 19:11, 38:8, 38:9, 42:2, 47:1, 62:10, 62:13, 62:19, 64:12, 67:22, 68:24
**relies** [2] - 13:14, 15:9
**rely** [5] - 14:8, 20:21, 29:14, 41:6, 66:2
**relying** [4] - 25:23, 36:9, 36:13, 44:23
**remains** [2] - 10:15, 57:12
**remarkable** [3] -

41:25, 59:1, 59:15
**remarkably** [1] - 28:25
**remarks** [1] - 50:25
**remedied** [1] - 27:19
**remedy** [2] - 16:17, 30:1
**removal** [1] - 52:2
**render** [1] - 9:14
**renew** [1] - 28:8
**renewal** [11] - 27:3, 28:9, 28:17, 37:10, 38:19, 47:17, 48:5, 48:12, 48:16, 57:4, 58:4
**renewals** [1] - 17:12
**renewing** [1] - 28:15
**repeated** [1] - 17:4
**reply** [2] - 10:13, 39:24
**report** [1] - 21:11
**reported** [1] - 48:9
**Reporter** [2] - 3:16, 3:16
**represent** [2] - 39:6, 39:18
**representation** [1] - 66:24
**representations** [2] - 42:23, 42:24
**represented** [1] - 51:15
**request** [2] - 28:9, 56:25
**requested** [1] - 7:13
**requesting** [1] - 29:22
**requests** [6] - 28:18, 28:19, 29:4, 29:9, 38:19, 58:8
**require** [2] - 41:9, 66:18
**required** [8] - 13:8, 15:20, 17:23, 26:3, 27:19, 34:7, 53:11, 54:18
**requirements** [3] - 8:24, 36:11, 37:11
**requires** [2] - 38:12, 41:18
**rescind** [6] - 16:14, 35:21, 37:7, 50:5, 53:3, 53:5
**rescission** [1] - 61:5
**research** [4] - 22:2, 22:5, 41:8, 41:10
**residents** [3] - 20:15, 20:21, 54:7
**resolution** [1] - 67:20
**resolve** [2] - 11:24, 57:20
**resolves** [3] - 7:6, 29:17, 58:17

**respect** [6] - 15:11, 34:1, 39:17, 43:2, 44:1, 64:21
**respectfully** [3] - 37:3, 43:6, 67:16
**responded** [1] - 10:21
**response** [3] - 10:10, 20:1, 55:7
**responses** [2] - 15:5, 16:16
**responsibilities** [1] - 52:8
**responsibility** [1] - 43:15
**rest** [2] - 6:1, 21:8
**result** [7] - 13:22, 16:11, 56:18, 57:4, 58:5, 58:6, 66:21
**retain** [1] - 18:22
**retained** [1] - 16:3
**return** [1] - 34:17
**returned** [1] - 31:24
**returning** [1] - 33:19
**revenue** [1] - 63:18
**reversed** [1] - 13:9
**reversing** [1] - 52:17
**review** [7] - 9:15, 10:20, 11:12, 30:18, 35:21, 35:25, 54:16
**reviewed** [2] - 17:6, 25:14
**reviewing** [1] - 62:2
**reviews** [1] - 36:11
**revisit** [1] - 23:13
**rhetorical** [1] - 54:9
**RICHARD** [1] - 3:11
**rigor** [1] - 45:2
**risk** [15] - 14:7, 14:19, 14:20, 15:2, 22:25, 35:20, 35:23, 36:1, 36:4, 36:5, 36:10, 36:14, 44:10, 53:8, 53:13
**risks** [1] - 34:25
**Road** [4] - 5:6, 48:15, 48:25, 68:23
**rolled** [1] - 55:21
**room** [1] - 3:17
**Rosado** [4] - 5:15, 8:11, 9:4, 20:4
**ROSADO** [4] - 2:10, 5:14, 9:4, 11:16, 20:7, 21:1, 21:9, 22:1, 22:3, 24:6, 40:4, 61:16, 61:21, 62:3
**ROSENBERG** [1] - 3:8
**Rosenberg** [1] - 6:5
**ROSENTHAL** [1] - 2:5
**rule** [9] - 9:18, 18:21,

19:10, 35:25, 53:23, 64:8, 64:12, 68:15
**ruled** [3] - 9:24, 31:3, 31:15
**rulemaking** [3] - 29:11, 34:8, 34:10
**rules** [2] - 35:22, 48:17
**Rules** [1] - 43:12
**ruling** [4] - 8:21, 29:11, 45:12, 67:17
**run** [1] - 36:10
**running** [3] - 22:24, 23:4, 50:19

**S**

**SANIA** [1] - 2:10
**sat** [1] - 12:3
**satisfied** [1] - 25:2
**schemes** [1] - 22:12
**Schneiderman** [1] - 61:25
**scholarships** [1] - 13:12
**school** [1] - 54:4
**School** [2] - 4:8, 8:1
**schools** [1] - 22:9
**Scott** [1] - 5:5
**scramble** [1] - 48:17
**seated** [1] - 4:1
**Seattle** [1] - 2:21
**second** [5] - 13:2, 23:10, 24:17, 41:5, 63:2
**Second** [15] - 9:15, 9:16, 10:9, 10:11, 10:15, 11:4, 11:8, 11:13, 11:20, 11:25, 28:24, 29:10, 29:15, 29:16, 65:6
**secondly** [4] - 8:20, 17:8, 48:14, 67:20
**Secretary** [26] - 13:18, 13:25, 15:2, 16:13, 23:6, 25:5, 25:12, 30:23, 34:20, 34:24, 38:24, 38:25, 39:4, 39:10, 39:16, 42:9, 42:12, 42:13, 42:18, 43:4, 43:10, 43:18, 46:15, 46:17
**Secretary's** [1] - 33:23
**security** [1] - 23:17
**Security** [27] - 16:13, 25:22, 26:24, 27:6, 27:14, 27:17, 27:20, 28:6, 28:10, 28:13, 36:25, 37:5, 37:6, 38:24, 38:25, 39:4,

39:6, 39:16, 42:9, 42:13, 46:16, 55:23, 57:16, 59:11, 66:15, 67:7, 67:10
**Security's** [4] - 25:24, 26:17, 30:23, 53:14
**see** [7] - 6:17, 7:24, 16:23, 23:15, 60:8, 61:25, 67:8
**seek** [3] - 7:23, 9:20, 67:3
**seeking** [5] - 30:13, 38:8, 38:16, 64:25, 68:24
**seem** [1] - 9:22
**segments** [1] - 6:3
**selective** [3] - 45:9, 45:11, 45:19
**Senate** [1] - 39:1
**sends** [1] - 16:8
**SENIOR** [1] - 1:14
**sense** [5] - 21:2, 33:12, 43:12, 51:8, 53:10
**sensitive** [1] - 44:2
**sent** [2] - 27:21, 48:5
**sentence** [1] - 14:13
**separate** [2] - 15:10, 30:10
**separated** [1] - 43:17
**September** [11] - 8:25, 16:21, 26:25, 27:7, 39:20, 48:16, 51:14, 51:20, 56:18, 63:11, 68:5
**serious** [3] - 13:7, 14:20, 21:20
**seriously** [3] - 9:24, 61:1, 67:8
**serve** [2] - 20:18, 22:8
**Service** [3] - 27:16, 29:2, 48:21
**SERVICES** [1] - 1:19
**Services** [5] - 4:6, 5:3, 5:9, 56:11, 56:14
**Sessions** [2] - 42:21, 42:22
**Sessions'** [1] - 50:25
**set** [11] - 13:2, 14:6, 15:23, 24:21, 28:12, 28:25, 35:11, 35:13, 36:20, 48:17, 48:23
**sets** [1] - 24:23
**setting** [2] - 28:5, 46:2
**several** [4] - 15:4, 28:16, 44:5, 50:21
**shadows** [1] - 51:24
**shape** [1] - 22:11
**sharing** [7] - 51:5, 51:6, 51:9, 51:12,

56:6, 56:16, 56:21
**shifting** [1] - 23:1
**short** [2] - 7:22, 35:2
**show** [2] - 38:5, 53:16
**showing** [1] - 38:12
**SHUMATE** [7] - 3:7, 5:24, 6:19, 6:22, 8:3, 58:23, 64:17
**Shumate** [5] - 5:25, 6:18, 7:25, 58:20, 64:15
**shut** [1] - 26:4
**sick** [1] - 20:19
**side** [7] - 12:14, 24:15, 26:12, 28:24, 56:23, 57:25, 58:10
**side's** [1] - 55:4
**significance** [2] - 28:3, 52:14
**significant** [5] - 20:15, 35:4, 42:4, 47:20, 59:2
**similar** [1] - 28:25
**similarly** [1] - 11:17
**simple** [2] - 47:15, 60:18
**simpler** [1] - 28:23
**simply** [5] - 13:18, 14:4, 18:14, 19:7, 49:4
**simultaneously** [1] - 63:25
**single** [2] - 14:12, 18:25
**sits** [1] - 60:15
**situation** [2] - 34:19, 60:10
**six** [2] - 19:19, 33:14
**size** [1] - 34:19
**slate** [1] - 60:9
**small** [1] - 21:10
**solely** [1] - 17:13
**Solicitor** [2] - 33:10, 67:1
**someone** [1] - 67:9
**somewhat** [1] - 36:14
**somewhere** [3] - 18:13, 18:20, 36:6
**soon** [1] - 39:10
**sorry** [2] - 18:6, 40:4
**sort** [8] - 18:25, 19:4, 29:10, 36:10, 44:14, 54:18, 55:21, 60:19
**sought** [2] - 7:18, 7:22
**Southern** [4] - 13:21, 14:21, 25:14, 36:4
**speaking** [2] - 8:1, 12:10
**speaks** [2] - 41:15, 47:24

**special** [2] - 34:24, 35:3
**specific** [3] - 41:18, 63:18, 63:21
**specifically** [4] - 35:14, 41:13, 55:1, 63:14
**speculate** [1] - 7:12
**speculative** [1] - 38:14
**spend** [3] - 11:10, 20:8, 22:17
**split** [2] - 12:20, 29:12
**spoken** [1] - 61:7
**squarely** [1] - 24:19
**stability** [1] - 69:2
**stable** [1] - 67:23
**stake** [3] - 13:8, 26:16, 52:15
**stakes** [1] - 14:3
**stand** [2] - 4:14, 24:9
**standard** [6] - 13:5, 24:23, 25:2, 35:18, 44:3, 45:2
**standing** [2] - 41:22, 63:20
**start** [3] - 12:8, 12:10, 12:23
**started** [1] - 23:12
**starting** [1] - 56:18
**STATE** [3] - 2:8, 2:19, 2:8
**State** [8] - 5:12, 5:18, 18:7, 20:25, 24:22, 40:16, 61:19, 63:17
**state** [8] - 4:4, 12:20, 20:17, 21:14, 23:5, 41:12, 41:16, 63:18
**state-specific** [1] - 63:18
**statement** [9] - 10:25, 16:6, 29:18, 34:11, 34:12, 46:13, 56:3, 57:9, 61:13
**statements** [20] - 13:10, 14:4, 19:7, 23:20, 23:25, 34:7, 42:5, 43:13, 43:17, 43:19, 44:5, 44:21, 46:4, 50:4, 50:15, 59:4, 59:17, 61:4, 61:5
**states** [3] - 14:24, 41:19, 54:6
**STATES** [3] - 1:1, 1:14, 3:12
**States** [20] - 1:6, 5:13, 5:16, 5:18, 5:21, 6:1, 8:12, 9:5, 11:17, 20:14, 20:24, 21:14, 22:11, 22:16, 40:21,

40:24, 45:3, 53:4, 59:8, 60:12
**States'** [4] - 20:8, 21:12, 42:2, 46:25
**stating** [2] - 11:25, 14:13
**statistically** [2] - 59:2, 59:13
**status** [8] - 20:20, 27:2, 27:6, 27:11, 28:9, 28:18, 41:20, 66:21
**statute** [2] - 40:22, 41:18
**statutory** [1] - 41:1
**stay** [9] - 6:16, 7:13, 7:18, 7:22, 7:23, 8:14, 38:16, 64:9, 67:3
**steal** [1] - 23:23
**stenography** [1] - 3:23
**step** [2] - 12:13, 20:24
**STEPHEN** [1] - 3:7
**Stephen** [1] - 6:2
**steps** [1] - 54:2
**still** [4] - 36:11, 38:3, 45:25, 48:12
**stopgap** [1] - 26:21
**stopped** [1] - 66:13
**strains** [2] - 18:15, 19:2
**strawman** [1] - 42:17
**Street** [2] - 1:20, 2:3
**strike** [1] - 32:9
**strongly** [1] - 33:21
**struck** [1] - 54:14
**structured** [1] - 13:16
**STUDENT** [1] - 1:23
**student** [2] - 4:5, 8:1
**students** [3] - 41:8, 41:9, 41:10
**study** [1] - 22:4
**subject** [1] - 10:2
**submissions** [1] - 21:12
**submit** [3] - 27:23, 28:9, 56:25
**submitted** [2] - 25:3, 28:17, 58:4
**substantial** [2] - 13:8, 52:16
**substantive** [1] - 20:5
**succeed** [1] - 16:18
**success** [1] - 38:1
**sufficiency** [1] - 47:25
**sufficient** [6] - 13:24, 15:2, 17:15, 25:5, 59:6
**suggested** [4] - 9:17, 10:10, 16:15

**suggesting** [1] - 26:9
**Suite** [2] - 2:4, 2:20
**supplant** [1] - 14:19
**support** [1] - 22:21
**supportive** [1] - 61:8
**Supreme** [42] - 6:14, 6:15, 6:17, 7:2, 7:3, 7:5, 7:18, 8:13, 8:19, 9:7, 14:2, 24:18, 32:16, 32:20, 33:2, 33:3, 33:13, 33:15, 34:10, 35:7, 35:9, 35:12, 35:17, 36:18, 36:24, 37:1, 38:11, 52:15, 54:1, 54:23, 55:4, 55:15, 55:16, 62:15, 64:7, 66:8, 66:11, 66:17, 67:2, 68:3, 68:11
**survey** [1] - 21:3
**suspected** [1] - 58:3
**swings** [2] - 7:21, 67:4
**sworn** [1] - 60:12
**sympathy** [2] - 25:19, 25:20
**systems** [1] - 41:12

---

**T**

**table** [2] - 6:1, 19:14
**tantamount** [1] - 44:25
**tax** [1] - 63:18
**TAYLOR** [7] - 2:15, 5:11, 18:5, 18:7, 19:16, 19:24, 20:3
**Taylor** [1] - 5:12
**TB-14** [1] - 2:20
**Teach** [1] - 22:8
**teach** [3] - 20:18, 41:8, 41:10
**teachers** [1] - 22:8
**television** [1] - 43:17
**temporary** [1] - 26:21
**tend** [1] - 46:11
**term** [1] - 54:3
**terminate** [6] - 25:13, 31:22, 34:5, 42:7, 52:13, 66:18
**terminated** [5] - 14:14, 21:7, 23:2, 25:9, 43:14
**terminating** [2] - 21:23, 41:15
**termination** [15] - 13:3, 14:11, 19:6, 20:10, 20:12, 22:22, 23:3, 23:5, 23:12, 35:1, 43:16, 44:8, 51:1, 52:12, 63:23

**terms** [2] - 47:17, 50:14
**terrific** [1] - 66:2
**testified** [2] - 39:11, 39:12
**Texas** [12] - 13:21, 14:21, 15:1, 25:15, 36:4, 53:3, 53:11, 53:22, 54:13, 54:20, 55:2, 55:7
**text** [3] - 17:1, 17:21, 17:25
**textual** [2] - 34:6, 51:13
**THE** [130] - 1:14, 2:8, 2:13, 2:19, 2:8, 2:13, 2:14, 4:1, 4:2, 4:14, 4:20, 5:22, 6:11, 6:21, 6:23, 6:25, 7:13, 7:24, 8:4, 8:10, 9:2, 9:11, 10:18, 10:24, 11:9, 11:15, 11:19, 12:13, 13:18, 14:19, 15:14, 15:25, 16:11, 16:23, 18:2, 18:4, 18:6, 19:13, 19:19, 20:2, 20:6, 20:25, 21:2, 21:24, 22:2, 24:5, 24:7, 24:9, 24:12, 25:7, 27:4, 27:10, 27:24, 30:3, 30:16, 30:24, 31:6, 31:10, 31:15, 31:20, 31:24, 32:10, 32:15, 32:23, 33:2, 33:7, 34:4, 35:5, 35:8, 35:20, 36:19, 36:21, 37:1, 37:12, 37:14, 37:23, 38:22, 39:7, 39:21, 39:23, 40:2, 40:7, 42:8, 42:24, 43:2, 43:9, 46:11, 46:13, 46:19, 47:3, 47:5, 47:9, 47:13, 50:1, 51:3, 52:4, 52:24, 53:18, 53:22, 54:1, 54:6, 54:23, 55:3, 55:8, 55:11, 55:25, 56:3, 56:7, 56:12, 56:15, 57:12, 57:14, 57:21, 57:24, 58:19, 59:16, 61:9, 61:11, 61:20, 61:23, 62:4, 62:23, 64:5, 64:15, 65:18, 65:25, 66:4, 66:17, 67:11, 69:5
**themselves** [1] - 42:14
**theoretical** [1] - 64:3
**theories** [3] - 8:17,

68:1, 68:11
**theory** [7] - 14:9, 29:22, 29:23, 59:1, 59:8, 59:11, 59:15
**therefore** [1] - 30:17
**they've** [1] - 68:7
**thinks** [2] - 37:17, 38:1
**third** [3] - 6:4, 23:20, 41:12
**thousands** [2] - 35:23, 35:24
**threaten** [1] - 53:18
**threatening** [1] - 14:25
**three** [6] - 14:13, 27:21, 31:25, 37:9, 40:23, 67:18
**three-year** [2] - 31:25, 37:9
**threshold** [1] - 62:8
**throw** [1] - 44:16
**thrust** [1] - 38:9
**timing** [2] - 11:7, 15:12
**today** [10] - 4:13, 6:10, 11:6, 28:8, 33:17, 38:4, 38:23, 48:2, 67:14, 68:1
**today's** [1] - 16:11
**together** [1] - 44:4
**took** [4] - 13:25, 58:15, 59:5, 60:25
**top** [1] - 60:5
**total** [1] - 46:23
**totality** [1] - 50:11
**toward** [1] - 42:6
**towards** [2] - 24:1, 41:24
**traditional** [1] - 34:17
**TRANSCRIPT** [1] - 1:13
**transcript** [1] - 3:23
**Transcription** [1] - 3:24
**Transportation** [1] - 24:22
**treat** [3] - 43:22, 58:5, 60:10
**treated** [2] - 29:3, 29:7
**treating** [1] - 29:6
**tremendous** [1] - 60:2
**tremendously** [1] - 44:8
**triable** [1] - 59:7
**trip** [1] - 65:20
**trouble** [1] - 11:20, 61:22
**true** [3] - 19:24, 37:4, 42:20

truly [2] - 34:17, 41:25
Trump [4] - 23:10, 50:3, 50:5, 50:17
Trump's [2] - 50:20, 50:24
truncate [1] - 26:24
try [1] - 7:21
trying [1] - 48:16
Tuesday [1] - 1:8
TUMIN [1] - 2:5
TUMLIN [15] - 4:10, 4:16, 8:7, 8:11, 11:11, 15:15, 16:1, 16:16, 16:24, 18:3, 47:8, 47:10, 47:14, 50:7, 67:12
Tumlin [4] - 4:10, 8:7, 15:13, 18:24
turn [3] - 20:4, 39:17, 62:24
turning [2] - 15:16, 17:2
turns [1] - 33:17
Tweeted [1] - 23:13
Tweets [1] - 23:15
twelve [1] - 33:14
twice [2] - 43:1, 45:10
Twitter [1] - 43:14
two [18] - 6:3, 12:24, 13:23, 17:14, 24:14, 26:1, 26:23, 26:24, 27:1, 27:3, 32:1, 37:10, 39:11, 42:3, 42:17, 47:23, 48:3, 62:21
two-year [6] - 26:23, 26:24, 27:1, 27:3, 32:1, 37:10
Tyler [1] - 6:5
TYLER [1] - 3:8

## U

u.S [1] - 3:2
U.S [6] - 3:4, 6:6, 6:14, 20:20, 48:21, 68:3
UC [2] - 8:19, 17:19
ultimately [4] - 11:7, 16:21, 55:23, 67:10
unable [2] - 8:23, 66:23
unacceptable [1] - 64:2
unconstitutional [2] - 25:8, 25:11
under [11] - 15:17, 17:24, 24:22, 38:3, 39:12, 44:2, 47:17, 49:5, 50:13, 52:8, 63:12

underlying [2] - 11:23, 14:9
underserved [1] - 22:6
understood [1] - 54:10
unfair [1] - 60:14
unfortunately [2] - 14:15, 28:2
unique [1] - 37:20
UNITED [3] - 1:1, 1:14, 3:12
United [6] - 1:6, 5:25, 45:3, 53:4, 59:8, 60:12
universities [4] - 22:2, 22:4, 41:5, 41:6
University [2] - 6:15, 63:19
unjustified [1] - 60:2
unlawful [10] - 22:23, 25:25, 26:15, 29:24, 30:14, 30:17, 30:19, 30:22, 31:3, 66:12
unlike [1] - 46:15
unnecessary [1] - 34:4
unsubstantiated [1] - 23:20
unsuccessfully [1] - 55:22
untrue [2] - 23:24, 50:4
unusual [3] - 36:14, 44:9, 44:15
unwillingness [1] - 25:17
up [11] - 4:14, 11:8, 12:13, 21:15, 31:6, 33:2, 48:23, 50:20, 60:23, 62:14, 68:2
upend [1] - 14:4
upending [1] - 13:5
upheld [1] - 25:1
uphold [1] - 60:12
upwards [1] - 15:18
urge [1] - 19:9
USCIS [6] - 16:4, 47:19, 48:6, 56:13, 57:2, 57:9

## V

Vargas [1] - 4:18
various [1] - 68:19
vast [1] - 59:4
Vermont [1] - 35:12
versus [1] - 6:14
viable [1] - 58:2
vicious [1] - 60:7
Vidal [16] - 4:6, 4:9,

4:13, 4:22, 5:1, 5:4, 5:6, 5:9, 8:9, 8:22, 9:6, 12:20, 12:21, 13:11, 62:8, 63:9
VIDAL [1] - 1:4
Vidal's [2] - 19:25, 51:7
view [9] - 6:18, 27:20, 33:19, 33:22, 36:6, 52:12, 53:6, 54:3
views [1] - 11:25
vigorously [1] - 55:22
violated [2] - 59:8, 59:14
volatile [1] - 59:18
voluntary [4] - 27:19, 27:25, 29:4, 58:5
vulnerable [1] - 51:24

## W

wage [1] - 20:22
wait [3] - 67:8, 67:16, 68:8
waiting [1] - 68:15
Wall [1] - 1:20
wall [1] - 23:18
Walmart [1] - 65:11
WASHINGTON [2] - 2:19
Washington [7] - 2:4, 2:21, 3:6, 5:18, 40:16, 54:7, 60:20
waving [1] - 61:21
ways [1] - 40:23
website [1] - 57:2
weeks [4] - 23:15, 27:21, 39:11, 50:22
welcome [3] - 4:20, 24:12, 47:4
WESTMORELAND [1] - 3:9
Westmoreland [1] - 6:7
whatsoever [1] - 37:9
wherein [1] - 36:15
WHEREUPON [1] - 69:6
White [1] - 43:14
white [3] - 46:11, 46:15, 46:21
whole [1] - 61:20
wide [1] - 40:9
wide-ranging [1] - 40:9
willing [2] - 23:16, 57:19
wind [7] - 25:25, 26:5, 26:17, 34:2, 34:16, 53:15, 56:18

wind-down [4] - 25:25, 26:5, 34:2, 34:16
window [1] - 37:10
Winter [1] - 38:11
wipe [1] - 60:9
wish [3] - 10:11, 46:19, 66:5
Wishnie [1] - 4:8
WISHNIE [2] - 1:21, 4:8
withdrawn [2] - 10:1, 10:7
wondering [3] - 10:1, 40:8, 40:10
word [1] - 64:16
words [3] - 10:3, 26:21, 28:19
works [1] - 40:1
world [1] - 16:20
worth [1] - 37:21
wound [1] - 53:12
writing [1] - 43:8
written [1] - 24:21

## Y

Yale [2] - 4:8, 8:1
Yankee [1] - 35:12
year [11] - 26:1, 26:23, 26:24, 27:1, 27:3, 31:25, 32:1, 35:23, 37:9, 37:10, 46:14
years [5] - 34:9, 44:5, 44:16, 60:6
YORK [4] - 1:1, 2:8, 2:8, 3:12
York [18] - 1:6, 2:9, 3:13, 5:6, 5:15, 21:1, 21:7, 29:5, 48:15, 48:25, 54:9, 60:20, 61:19, 67:15, 68:21, 68:23, 69:3
Yorkers [1] - 48:2
young [7] - 19:3, 46:8, 46:9, 67:15, 67:23, 68:4

## Z

Zhou [1] - 30:9
zone [5] - 40:17, 40:20, 40:22, 40:24, 41:17
zones [1] - 41:21