UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARTÍN JONATHAN BATALLA VIDAL et al.,

                  Plaintiffs,

        -against-

KIRSTJEN M. NIELSEN, Secretary, Department of
Homeland Security, et al.,

                  Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                  Plaintiffs,

        -against-

DONALD TRUMP, President of the United States, et al.,

                  Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs in the above-captioned cases challenge Defendants' decisions to end the

Deferred Action for Childhood Arrivals ("DACA") program and, Plaintiffs allege, to relax the

restrictions on federal authorities' use of DACA applicants' personal information for

immigration-enforcement purposes. The court assumes familiarity with the factual and

procedural history of these cases and in particular with its November 9, 2017, Memorandum and

Order (the "November 9 M&O") (Dkt. 104),[1] which granted in part and denied in part

Defendants' motion to dismiss these cases for lack of subject-matter jurisdiction,[2] and its

February 13, 2018, Amended Memorandum and Order (the "February 13 M&O") (Dkt. 254),

which granted Plaintiffs' motions for a preliminary injunction barring Defendants from

terminating the DACA program in its entirety. Before the court are Defendants' motions to

dismiss the Batalla Vidal Plaintiffs' third amended complaint pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure and to dismiss the State Plaintiffs' amended

complaint pursuant to Rule 12(b)(6). (3d Am. Compl. ("BV TAC") (Dkt. 113); Am. Compl.

("State Pls. AC") (Dkt. 71, No. 17-CV-5228); Defs. Mem. in Supp. of Mot. to Dismiss the BV

TAC ("BV MTD") (Dkt. 207-1); Defs. Mem. in Supp. of Mot. to Dismiss the State Pls. AC

("State MTD") (Dkt. 71-1); see also Pls. Mem. in Opp'n to Mot. to Dismiss the BV TAC ("BV

Pls. Opp'n") (Dkt. 240); Pls. Mem. in Opp'n to Mot. to Dismiss the State Pls. AC ("State Pls.

Opp'n) (Dkt. 202, No. 17-CV-5228).) For the reasons that follow, Defendants' motions are

GRANTED IN PART and DENIED IN PART.

---

[1] All record citations refer to the docket in Batalla Vidal v. Nielsen, No. 16-CV-4756 (E.D.N.Y.), except as otherwise noted. For ease of reference, the court refers to the Department of Homeland Security as "DHS," the Department of Justice as "DOJ," and U.S. Citizenship and Immigration Services as "USCIS."

[2] In the November 9 M&O, the court dismissed for lack of standing the fourth claim asserted in the Batalla Vidal Plaintiffs' second amended complaint, which alleged that Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide individualized written notice to certain DACA recipients that they needed to renew their DACA benefits by October 5, 2017. (2d Am. Compl. (Dkt. 60) ¶¶ 160-65; Nov. 9 M&O at 37-38.) The court also dismissed for lack of standing the State Plaintiffs' notice and information-use-policy claims. (Nov. 9 M&O at 38-46.) While the Batalla Vidal Plaintiffs reassert a notice claim in their third amended complaint (3d Am. Compl. ("BV TAC") (Dkt. 113) ¶¶ 188-94), they concede that they do so only to preserve the claim for appeal and that, under the reasoning of the November 9 M&O, this claim should be dismissed (Pls. Mem. in Opp'n to Mot. to Dismiss the BV TAC ("BV Pls. Opp'n") (Dkt. 240) at 4 n.5). Accordingly, the Batalla Vidal Plaintiffs' fourth claim for relief is DISMISSED.

2

# I. LEGAL STANDARDS

## A. Rule 12(b)(1)

A Rule 12(b)(1) motion tests the court's subject-matter jurisdiction to hear a claim or case. See Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), the court must dismiss a claim "when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110,113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239,243 (2d Cir. 2014). Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (quoting Makarova. 201 F.3d at 113).

## B. Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal adequacy of the plaintiff's complaint. To survive a Rule 12(b)(6) motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering the sufficiency of the complaint, the court "accept[s] all [well-pleaded] factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 28 2 F.3d 147, 152 (2d Cir. 2002), but does need not to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," Iqbal, 556 U.S. at 678. Determining "plausibility" is a "context-specific task," id. at 679, which "depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render

plaintiff's inferences unreasonable," L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

The court's review of a Rule 12(b)(6) motion is generally limited to "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as documents "integral" to the complaint. DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010).

## II.    DISCUSSION

The court first analyzes Plaintiffs' claims challenging the decision to end the DACA program, then turns to the Batalla Vidal Plaintiffs' claims challenging Defendants' (1) alleged changes to the policy regarding the protection of DACA applicants' personal information (the "information-use policy") (BV TAC ¶¶ 177-82); and (2) rejections of DACA renewal requests that were delayed due to postal errors, received late in the day on October 5, 2017, or contained "real or perceived clerical errors" (id. ¶¶ 199-205).

### A.    DACA Rescission

Plaintiffs have stated a claim that the decision to end the DACA program was substantively arbitrary and capricious, in violation of Section 706(2)(A) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and substantially motivated by discriminatory animus, in violation of the equal-protection principle inherent in the Fifth Amendment's Due Process Clause.  Plaintiffs have not, however, stated a claim that the rescission of the DACA program was invalid because it was not implemented through notice-and-comment rulemaking, nor have they stated a claim that Defendants violated the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq. ("RFA"), by failing to consider the rescission's impact on small entities.

1. Substantive APA

Plaintiffs challenge the decision to end the DACA program as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (BV TAC ¶¶ 177-82; State Pls. Am. Compl. ¶¶ 253-56.) In its February 13 M&O, the court found that Plaintiffs were likely to succeed on the merits of this claim. For the reasons stated in that opinion, Defendants' motion to dismiss these claims is DENIED.[3] Additionally, the court notes that it would be inappropriate to dismiss Plaintiffs' substantive APA claims at this stage of the litigation, as "there is a strong suggestion" that the administrative record previously produced by Defendants is incomplete, "entitling [Plaintiffs] to discovery regarding the completeness of the record." (Dec. 27, 2017, USCA Order (Dkt. 210) at 2-3 (quoting Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982)).)[4]

---

[3] Defendants have also contested whether Make the Road New York ("MRNY") and the State Plaintiffs fall within the APA's "zone of interests." (BV MTD at 12; State MTD at 20-21.) These Plaintiffs fall within the zone of interests of the Immigration and Nationality Act such that they may bring suit under the APA. DACA recipients are members, clients, and employees of MRNY, an organization that advocates for immigrants' rights. (BV TAC ¶¶ 46, 49-50; BV Pls. Opp'n at 6-7.) At the very least, the State Plaintiffs employ a number of DACA recipients. (Nov. 9 M&O at 38-40; State Pls. Opp'n at 3-6.) Plaintiffs' interests in the decision to end the DACA program are thus not "'so marginally related to or inconsistent with the purposes implicit in the [Immigration and Nationality Act] that it cannot reasonably be assumed that' Congress authorized [those] plaintiff[s] to sue." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1389 (2014) (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)); see also Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). Defendants rely on Federation for American Immigration Reform, Inc. v. Reno, 93 F.3d 897 (D.C. Cir. 1996) ("FAIR"), but that case held only that members of an anti-immigration group lacked statutory standing, based on their generalized objections to immigration, to challenge a decision to accord relief to Cuban immigrants. See id. at 900-04. Unlike in FAIR, Plaintiffs in the above-captioned cases are directly affected by Defendants' actions. See Regents of the Univ. of Calif. v. DHS, 279 F. Supp. 3d 1011, 1036 n.12 (N.D. Cal. 2018).

[4] Record-related discovery remains stayed pending the Second Circuit's ruling on Defendants' interlocutory appeal from the November 9 M&O. (See Jan. 8, 2017, Mem. & Order (Dkt. 233) at 9-10.) The court reiterates that Defendants vigorously sought that interlocutory appeal before reversing course and conceding that the Second Circuit should hold Defendants' petitions for leave to appeal in abeyance pending this court's ruling on Plaintiffs' motions for a preliminary injunction and Defendants' motions to dismiss. (Reply in Supp. of Pet. for Permission to Appeal (Dkt. 28, Nielsen v. Vidal, No. 18-122 (2d Cir.)) at 2; see also Feb. 13 M&O at 21 & n.6.) The Second Circuit thereafter agreed to hold these petitions for leave to file in abeyance pending this court's ruling on the pending motions. (USCA Jan. 31, 2018, Order (Dkt. 249).)

2.      Procedural APA

Plaintiffs next claim that the decision to end the DACA program was procedurally defective, in violation of Section 706(2)(D) of the APA, because the Department of Homeland Security ("DHS") did not use notice-and-comment rulemaking to rescind the program. These claims raise challenging questions but are ultimately unavailing.

Under the APA, an agency generally must use notice-and-comment procedures to make any "rule." 5 U.S.C. § 553.[5] The APA exempts from this requirement, however, "general statements of policy," among other types of rule. Id. § 553(b)(A). The parties dispute whether the memorandum announcing the rescission of the DACA program (the "DACA Rescission Memo") (Mem. from Elaine C. Duke, Acting Sec'y, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Dkt. 77-1 at ECF p.252)) is a "general statement of policy" exempt from notice-and-comment rulemaking requirements or instead a "legislative rule" subject to these requirements. (Compare BV MTD at 18-20, and State MTD at 28-31, with BV Pls. Opp'n at 12-16, and State Pls. Opp'n at 15-19.) The DACA Rescission Memo was not formulated through notice-and-comment rulemaking, so if it is a legislative rule, it is invalid. See 5 U.S.C. §§ 553, 706(2)(D).

As the court has already noted, the line between legislative rules and non-legislative rules "is enshrouded in considerable smog." (Feb. 13 M&O at 30 (quoting Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir. 1975)).) See also Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 251 (D.C. Cir. 2014) (characterizing the inquiry for determining whether an agency action is a

---

[5] The APA defines "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

legislative rule, an interpretive rule, or a general statement of policy as "quite difficult and confused"). There are, however, general principles to guide the court's inquiry. If the rule alters the rights or obligations of regulated parties "or produces other significant effects on private interests," it is legislative. White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993) (citation omitted); see also Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979) (legislative rules "affect[] individual rights and obligations" (citation omitted)); Lewis-Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir. 1972). The D.C. Circuit has summarized what makes a "legislative" rule:

> An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule. An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule.

Nat'l Mining Ass'n, 758 F.3d at 251-52.

If, however, the rule does not alter regulated parties' rights and obligations but instead "educat[es] . . . agency members in the agency's work," or is "directed primarily at the staff of an agency describing how it will conduct agency discretionary functions," the rule is a general policy statement. Noel, 508 F.2d at 1030 (first quoting Henry Friendly, The Federal Administrative Agencies 145-46 (1962), and then quoting Arthur E. Bonfield, Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy Under the APA, 23 Admin. L. Rev. 101, 115 (1971)); see also Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (general statements of policy are "issued by an agency to advise the public prospectively of the manner in which the agency proposed to exercise a discretionary power" (quoting Chrysler, 441 U.S. at 302 n.31)); Nat'l Mining Ass'n, 758 F.3d at 252 ("An agency action that merely explains how the agency will enforce a statute or regulation—in other words,

how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.").

The Second Circuit's decision in Noel helps reveal the uncertain boundary between legislative rules and general statements of policy. In Noel, two Haitian nationals unlawfully present in the United States and subject to orders of deportation married U.S. lawful permanent residents and sought "extended voluntary departure," a form of discretionary relief from deportation that would have enabled them to remain in this country for up to two years while waiting for visas. 508 F.2d at 1024. Between 1968 and 1972, it was the practice of the New York District Director for Immigration and Naturalization Services ("INS") routinely to grant extended voluntary departure to such Western Hemisphere aliens who were present in this country and married to permanent resident aliens. Id. at 1025. In 1972, however, INS issued a directive stating that such aliens "should not routinely be granted extended departure time, but rather should be offered that privilege only in those cases where compelling circumstances warranted the relief." Id. at 1025-26. The plaintiffs argued, among other things, that this directive was a legislative rule that was invalid because it was not made through notice-and-comment rulemaking. Id. at 1029. The Second Circuit rejected this argument, concluding that the directive was a "general statement of policy" exempt from notice-and-comment requirements. Id. First, the Second Circuit noted that the directive did not purport to amend an existing regulation vesting the district director with sole discretion to extend deportable aliens' time in the United States or otherwise to oust him of this discretion. Id. at 1030. Instead, the directive only offered "a statement by the agency of its general policy as a guideline for the District Directors" in their exercise of this discretion. Id. Second, the directive did not "change[] the existing right of the [aliens] to have their applications for extensions of time to

8

depart authorized in the sole discretion of the district director," because those aliens remained eligible to seek deferred voluntary departure, albeit only on the more limited basis of hardship. Id.

Like the directive at issue in Noel, the DACA Rescission Memo appears to be a general statement of policy, not a legislative rule. The DACA Rescission Memo does not deprive individuals of a substantive right to receive deferred action or work authorization, or to have these benefits renewed for additional terms. As the memorandum that launched the DACA program (the "2012 DACA Memo") states clearly, no such rights exist. (Mem. from Janet Napolitano, Sec'y, DHS, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("2012 DACA Memo") (Dkt. 77-1 at ECF p.1).) Instead, the decision to grant or deny an individual deferred action and work authorization continues to lie within immigration authorities' discretion. Like the 2012 DACA Memo, the DACA Rescission Memo offers guidance to DHS employees as to how the agency intends to exercise this discretion prospectively: Whereas the 2012 DACA Memo advises DHS staff to consider exercising prosecutorial discretion with respect to individuals meeting certain identified criteria (such as age of entry into the United States and absence of a meaningful criminal record), the DACA Rescission Memo directs those staff not to consider those criteria when exercising their prosecutorial discretion. The DACA Rescission Memo is thus "directed primarily at the staff of [DHS] describing how it will conduct agency discretionary functions." Noel, 508 F.2d at 1030 (internal quotation marks and citation omitted).

It is true that, if the DACA Rescission Memo were to take effect, hundreds of thousands of individuals would no longer have the opportunity to seek deferred action and work authorization through the DACA program. As Defendants note, however, the DACA Rescission

Memo does not purport to strip immigration authorities of the ability to grant deferred action and work authorization, but only provides that they should not do based on the criteria identified in the 2012 DACA Memo, or on the submission of DACA application materials. (BV MTD at 7 ("[A]s was true before implementation of the DACA Policy in 2012, deferred action remains available on an individualized basis.").) At least in theory, individuals who would have been eligible for deferred action and work authorization under the DACA program may still qualify for those benefits based on their individual circumstances. As a practical matter, the DACA Rescission Memo almost certainly means that fewer individuals will receive for deferred action and work authorization. But the directive at issue in <u>Noel</u> surely reduced the number of aliens eligible for discretionary relief, too, and that did not render the directive a legislative rule. <u>See</u> <u>Noel</u>, 508 F.2d at 1025-26.

Plaintiffs contend that the DACA Rescission Memo nevertheless is a legislative rule because it binds DHS's discretion and requires the agency to reject all DACA applications and renewal requests not meeting certain criteria. (BV Pls. Opp'n at 12-14; State Pls. Opp'n at 15-19.) As Plaintiffs point out, a number of courts outside this circuit—most notably the D.C. Circuit—have determined whether a rule is legislative at least partly by looking to whether the rule constrains the agency's own discretion. <u>See, e.g.</u>, <u>Clarian Health W., LLC v. Hargan</u>, 878 F.3d 346, 357 (D.C. Cir. 2017). In this view, a rule "'cabining . . . an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule' when it 'is in purpose or likely effect one that <u>narrowly limits administrative discretion</u>.'" <u>Ass'n of Irritated Residents v. EPA</u>, 494 F.3d 1027, 1034 (D.C. Cir. 2007) (quoting <u>Cmty. Nutrition Inst. v. Young</u>, 818 F.2d 943, 948 (D.C. Cir. 1987) (per curiam)). Plaintiffs note that the DACA Rescission Memo

mandates the rejection of certain DACA applications, and therefore contend that the memo eliminates DHS's discretion to consider those applications and thus constitutes a legislative rule.

While there is some force to Plaintiffs' arguments, they are unavailing. As an initial matter, it is not clear to this court that an agency's compliance with its stated policy is reason to deem that policy a legislative rule. Because one might expect functional organizations generally to abide by their own policies, treating general compliance with internal policies as evidence that those policies were in fact legislative rules risks writing the "general statements of policy" exception to notice-and-comment rulemaking out of the APA.[6] Moreover, it is important to remember that the DACA Rescission Memo purports to end a program that was itself created by a policy statement. Plaintiffs' view that Defendants must use notice and comment to stop what started without notice and comment is not only counterintuitive, but also at odds with the general principle that the procedures needed to repeal or amend a rule as the same ones that were used to make the rule in the first place. See Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1206 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.") To whatever extent the DACA Rescission Memo is in fact "binding" on DHS, the court cannot agree that this prospective limitation on the agency's exercise of its discretion renders the memo a legislative rule.

Accordingly, Defendants' motion to dismiss Plaintiffs' notice-and-comment claims is GRANTED.

---

[6] For an insightful argument why the "practically binding" standard is inconsistent with the Supreme Court's decision in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519 (1978), see Cass R. Sunstein, "Practically Binding": General Policy Statements and Notice-and-Comment Rulemaking, 68 Admin. L. Rev. 491 (2016).

3.    RFA

Plaintiffs also assert claims under the RFA.  (BV TAC ¶¶ 183-87; State Pls. Am. Compl.
¶¶ 266-73.)  Among other things, that statute provides that when an agency engages in
rulemaking, it must consider the impact of the rule on "small entities."  5 U.S.C. §§ 603(a),
604(a).  The Batalla Vidal Plaintiffs claim that the DACA Rescission Memo violated the RFA
because it failed to consider the impact of the rescission on Plaintiff Make the Road New York
("MRNY") and similar small entities (BV TAC ¶¶ 184-85), while the State Plaintiffs contend
that DHS failed to consider the impact on "small businesses, small nonprofits, and small
governmental jurisdictions."  (State Pls. Am. Compl. ¶¶ 266-73).

These claims are also unavailing.  The RFA only requires an agency to publish an initial
or final regulatory flexibility analysis when the agency is required to use notice-and-comment
rulemaking procedures.  5 U.S.C. §§ 603(a), 604(a); U.S. Telecom Ass'n v. FCC, 400 F.3d 29,
42 (D.C. Cir. 2005).  Because DHS was not required to use notice and comment to rescind the
DACA program, it was not required to conduct a regulatory flexibility analysis in connection
with that decision.

Accordingly, Defendants' motion to dismiss Plaintiffs' RFA claims is GRANTED.

4.    Equal Protection

The court next turns to Plaintiffs' claims that the decision to end the DACA program
violated the U.S. Constitution because it was substantially motivated by racial animus against
Latinos and, in particular, Mexicans.  (BV TAC ¶¶ 195-98; State Pls. Am. Compl. ¶¶ 233-39.)
Defendants move to dismiss these claims on the grounds that Plaintiffs have failed to plausibly
allege that the DACA rescission was motivated by unlawful animus.  (E.g., State MTD at 31-34.)
The court concludes, however, that Plaintiffs have alleged sufficient facts to raise a plausible

inference that the DACA rescission was substantially motivated by unlawful discriminatory purpose.

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution generally prohibits government officials from discriminating on the basis of race. U.S. Const. amend. XIV, § 1. Although the Equal Protection Clause by its terms applies to states, the Supreme Court has long recognized that the Due Process Clause of the Fifth Amendment generally prohibits racial discrimination by the federal government as well. Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954). In order to state an equal-protection claim based on racial discrimination, Plaintiffs must allege "that a government actor intentionally discriminated against them on the basis of race." Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). Where, as here, Plaintiffs challenge facially neutral official action, they may support this claim by alleging either that the facially neutral action "is applied in a discriminatory fashion," or that "it was motivated by discriminatory animus and its application results in a discriminatory effect." Id. (first citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886), and then citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977) ("Arlington Heights")). Only the latter theory is at issue here, as Plaintiffs argue that the DACA Rescission Memo both disadvantages and was intended to disadvantage certain racial groups. (BV TAC ¶ 197; State Pls. Am. Compl. ¶¶ 235-36.) The court discusses each element of an equal-protection claim in turn.

### a)  *Effect*

Plaintiffs allege that the rescission of the DACA program would have a disparate impact on Latinos and especially Mexicans. (BV TAC ¶ 197.) The State Plaintiffs allege that 78 percent of DACA recipients are Mexican nationals. (State Pls. Am. Compl. ¶ 6.) Indeed,

according to USCIS data attached to the State Plaintiffs' amended complaint, of the 793,026 individuals whose initial DACA applications were approved between 2012 and June 30, 2017, more than 78 percent originated in Mexico, and at least 93 percent originated in Latin America as a whole. (USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals (Dkt. 55-1 at ECF p.2).)[7] These allegations are sufficient to raise a plausible inference that the end of the DACA program would have a disproportionally adverse effect on Latinos and especially Mexicans.

Relying heavily on United States v. Armstrong, 517 U.S. 456 (1996), Defendants argue that Plaintiffs bear a "rigorous" or especially "heavy burden" to survive a motion to dismiss, and thus that allegations of the outsized impact of the DACA rescission on Latino/a individuals and especially Mexicans are insufficient to plead discriminatory effect. (BV MTD at 20-21; State MTD at 32 (characterizing the prevalence of Mexican nationals among DACA recipients as "an unsurprising accident of geography, not evidence of discrimination").) Armstrong is, however, inapposite. In that case, the Court considered the initial showing that a criminal defendant asserting a "selective prosecution" claim under the Equal Protection Clause must make before obtaining discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. This is, however, a civil case, the pleading standards for which are set forth in Twombly and Iqbal. Moreover, as the court has previously explained, Plaintiffs are not asserting a "selective-deportation" claim, which might be analogized to the selective-prosecution claim at issue in Armstrong. (Nov. 9 M&O at 28-31.) Rather than alleging that they in particular are being targeted for removal because of their race—in which case judicial review of their suit would

---

[7] This file lists the number of DACA applications approved for the top 25 countries of origin for DACA recipients, not for all countries from which DACA recipients originate. (Id.)

14

presumably be limited by 8 U.S.C. § 1252(g), see Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471 (1999)—Plaintiffs allege that the categorical decision to end the DACA program, which provided them with some limited assurance that they would not be deported, was motivated by unlawful animus. See Regents of the Univ. of Calif. v. DHS, No. 17-CV-5211 (WHA), 2018 WL 401177, at *6 n.3 (N.D. Cal. Jan. 12, 2018) ("Regents 12(b)(6) Order") (rejecting Defendants' attempt to characterize similar challenges as selective-prosecution claims).

Defendants also argue that the court should dismiss the Batalla Vidal Plaintiffs' equal-protection claim because, among other things, it fails to offer particularized allegations of the discriminatory impact of the DACA rescission on Latino/a and especially Mexican individuals. If the court were considering Batalla Vidal Plaintiffs' third amended complaint on its own, the court might agree. The Batalla Vidal Plaintiffs' allegation that "[t]he DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups" (BV TAC ¶ 197) appears to be a fairly conclusory "recital[] of the elements of a cause of action," which the court need not accept as true. Iqbal, 556 U.S. at 678. Their fellow Plaintiffs have, however, alleged particularized facts in support of this allegation. More importantly, the court takes judicial notice of the USCIS data referenced above, which may be considered on a Rule 12(b)(6) motion. Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991). The court declines to dismiss the Batalla Vidal Plaintiffs' equal-protection claim simply because they did not append the same data to their third amended complaint. Both sets of Plaintiffs have adequately alleged that the rescission of the DACA program has a disproportionate impact on Latino/a and especially Mexican individuals.

*b)*     *Purpose*

To establish discriminatory motivation, Plaintiffs must ultimately show that "invidious discriminatory purpose was a motivating factor" in the decision. Arlington Heights, 429 U.S. at 266. In other words, they must show that Defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979). But they "need not prove that the 'challenged action rested solely on racially discriminatory purposes.'" Hayden v. Paterson, 594 F.3d 150, 163 (2d Cir. 2010) (quoting Arlington Heights, 429 U.S. at 265).

"Because discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Id. (quoting Arlington Heights, 429 U.S. at 266). In "extreme" cases, a facially neutral law may have such a "clear" disparate impact, "unexplainable on grounds other than race," that evidence of disparate impact alone may suffice to show discriminatory purpose. Arlington Heights, 429 U.S. at 266 (citing, e.g., Yick Wo, 118 U.S. at 356, and Gomillion v. Lightfoot, 364 U.S. 339 (1960)). In the absence of such a pattern, however, "impact alone is not determinative, and the [c]ourt must look to other evidence" to determine if the challenged action was motivated by discriminatory purpose. Id. This evidence may include, for example, (1) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "[t]he specific sequence of events leading up to the challenged decision"; (3) "[d]epartures from the normal procedural sequence," which "might afford evidence that improper purposes are playing a role"; (4) "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; (5) "[t]he legislative or administrative history . . .

especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"; and (6) "[i]n some extraordinary circumstances," testimony of official decisionmakers. Id. at 266-68; see also Hayden v. Paterson, 594 F.3d at 163.

To establish discriminatory purpose, Plaintiffs identify a disheartening number of statements made by President Donald Trump that allegedly suggest that he is prejudiced against Latinos and, in particular, Mexicans. (BV TAC ¶¶ 89-99; State Pls. Am. Compl. ¶¶ 57-77.) These comments include (1) then-candidate Trump's assertions that Mexican immigrants are not Mexico's "best," but are "people that have lots of problems," "the bad ones," "criminals, drug dealers, [and] rapists" (BV TAC ¶¶ 91-93; State Pls. Am. Compl. ¶¶ 58-59); (2) Trump's characterization of individuals who protested outside a campaign rally as "thugs who were flying the Mexican flag" (State Pls. Am. Compl. ¶ 61); (3) Trump's statements that a U.S.-born federal judge of Mexican descent could not fairly preside over a lawsuit against Trump's for-profit educational company because the judge was "Mexican" and Trump intended to build a wall along the Mexican border (BV TAC ¶ 96; State Pls. Am. Compl. ¶¶ 62); and (4) pre- and post-Inauguration characterizations of Latino/a immigrants as criminals, "animals," and "bad hombres" (BV TAC ¶¶ 97, 99; State Pls. Am. Compl. ¶¶ 65-66, 70).

Accepting Plaintiffs' non-conclusory allegations as true and reading all reasonable inferences in their favor, the court concludes that these allegations are sufficiently racially charged, recurring, and troubling as to raise a plausible inference that the decision to end the DACA program was substantially motivated by discriminatory animus. Although the use of racial slurs, epithets, or other racially charged language does not violate equal protection per se, it can be evidence that official action was motivated by unlawful discriminatory purposes. See, e.g., Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999); Smith v. Thornburg, 136 F.3d 1070,

1089-90 (6th Cir. 1998); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 738 n.6 (9th Cir. 1997), <u>overruled in part on other grounds by Shakur v. Schriro</u>, 514 F.3d 878, 884-85 (9th Cir. 2008); <u>Ali v. Connick</u>, 136 F. Supp. 3d 270, 279-80 (E.D.N.Y. 2015) (collecting cases). The court is aware of no authority holding that this rule does not apply simply because the speaker is, or is running to be, the President of the United States. The court expresses no view as to whether these statements (which as Defendants note, are not directly connected to the DACA rescission) would ultimately suffice to provide that the rescission was motivated by discriminatory animus; that is a question for summary judgment or trial. The court concludes only that Plaintiffs have alleged sufficient facts to raise a plausible inference that the DACA rescission violated equal protection, and thus to withstand a motion to dismiss.[8]

Defendants do not defend the President's comments but argue instead that the court should simply ignore them. First, Defendants suggest that because the President's statements were "almost all made before he took the oath of office and [were not] made in connection with the [DACA rescission]," these comments "do not tend to show the existence of both discriminatory intent and discriminatory effect." (State MTD at 33.) Defendants cite no authority for the proposition that, to state an equal-protection claim, a plaintiff must point to some evidence that simultaneously demonstrates both discriminatory intent and discriminatory effect, or that evinces discriminatory bias directly in connection with the challenged official action. To the contrary, <u>Arlington Heights</u> states that courts may consider the background of

---

[8] Because the comments identified above are sufficient to raise a plausible inference of discriminatory purpose, the court need not decide whether Plaintiffs' remaining allegations support an inference of discriminatory purpose. For example, Plaintiffs allege or argue in their briefs that the President decided to pardon former Maricopa County, Arizona, Sheriff Joe Arpaio (BV TAC ¶ 98; State Pls. Am. Compl. ¶¶ 67-69), that he has made offensive statements about Muslims, Native Americans, transgender individuals, and "shithole countries" (BV Pls. Opp'n at 19-20), and that, during the campaign, then candidate Trump retweeted a post apparently criticizing former Florida governor Jeb Bush for speaking "Mexican" (BV TAC ¶ 95). The court observes, however, that these allegations would seem to offer only weak support, at best, for the notion that the President's alleged decision to end the DACA program was motivated by desire to harm Latinos and especially Mexicans.

facially neutral decisions to smoke out whether they were covertly motivated by discriminatory purposes. 429 U.S. at 267.

The court recognizes that searching for evidence of discriminatory motivation in campaign-trail statements is potentially fraught. Old statements may say little about what lay behind a later decision. Statements made in the throes of a heated race may be "contradictory or inflammatory," and considering them may indeed incentivize litigants in future cases to embark on an "evidentiary snark hunt" in search of past comments indicative of some sort of bias. Washington v. Trump, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski, J., dissenting from denial of reh'g en banc); cf. Regents 12(b)(6) Order, 2018 WL 401177, at *7 (recognizing that consideration of campaign statements "can readily lead to mischief in challenging the policies of a new administration"). Moreover, an equal-protection claim brought against the President raises difficult questions of whether—and, if so, for how long—any Executive action disproportionately affecting a group the President has slandered may be considered constitutionally suspect.

While these are all good reasons to tread lightly, the court does not see why it must or should bury its head in the sand when faced with overt expressions of prejudice. Arlington Heights calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and campaign-trail statements by the official allegedly responsible for a challenged policy would seem to fall squarely within this inquiry. Cf. Int'l Refugee Assistance Project v. Trump, 883 F.3d 233, 266 (4th Cir. 2018) (en banc) (declining to consider pre-election statements while noting that they "certainly provide relevant context when examining the purpose" of a challenged Presidential proclamation suspending entry of individuals from specified countries), pet. for cert. docketed, No. 17-1270. At the very least, one might

reasonably infer that a candidate who makes overtly bigoted statements on the campaign trail might be more likely to engage in similarly bigoted action once in office.

Defendants' attempts to pass the buck to Acting Secretary Duke are no more persuasive. Defendants argue that the President's statements are legally irrelevant because Acting Secretary Duke "was the only official vested with authority . . . to make the decision at issue," and Plaintiffs do not point to similarly objectionable statements by her. (BV MTD at 22; State MTD at 34.) To the extent Defendants argue that Plaintiffs have insufficiently alleged racial animus on the part of Acting Secretary Duke or the Attorney General, the court is inclined to agree: Plaintiffs have not identified statements by Acting Secretary Duke or the Attorney General that would give rise to an inference of discriminatory motive. Although the Batalla Vidal Plaintiffs insinuate that the Attorney General referred to immigrants as "filth" (BV TAC ¶ 100; BV Pls. Opp'n at 20), his prepared remarks make clear that this term was used only to refer to international drug-trafficking cartels and the gang MS-13 (Dep't of Justice, Press Release, Attorney General Jeff Sessions Delivers Remarks Announcing the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed). This comment therefore does not support a plausible inference that the Attorney General was motivated by racial discrimination when he advised that Acting Secretary Duke end the DACA program.

The court rejects, however, Defendants' remarkable argument that the President apparently cannot be liable for rescinding the DACA program because only Acting Secretary Duke had the legal authority to end that program. (State MTD at 34.) Our Constitution vests "executive Power" in the President, not in the Secretary of DHS, who reports to the President

and is removable by him at will. U.S. Const., art. II, § 1, cl. 1. This position appears to be at odds with the stated position of the President himself, who tweeted that if Congress were unable to "legalize DACA," he would "revisit this issue," implying that he (correctly) understands that he has ultimate authority over the program. (Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 5, 2017 7:38 PM), https://twitter.com/realdonaldtrump/status/905228667336499200.) If, as Plaintiffs allege, President Trump himself directed the end of the DACA program (e.g., State Pls. Am. Compl. ¶ 16), it would be surprising if his "discriminatory intent [could] effectively be laundered by being implemented by an agency under his control" (BV Pls. Opp'n at 18). As courts have recognized in far more mundane contexts, liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action. Cf. Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 272-73 (2d Cir. 2016) (discussing "cat's paw" liability, under which an organization may be held liable for employment discrimination when a prejudiced subordinate manipulates an unbiased superior into taking adverse employment action); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 126 & n.18 (2d Cir. 2004) (applying cat's-paw theory to equal-protection claim).

Accordingly, Defendants' motion to dismiss Plaintiffs' equal-protection claims is DENIED.

## B. Information-Use Policy

Next, the court considers whether the Batalla Vidal Plaintiffs state a claim regarding Defendants' alleged changes to DHS's information-use policy.[9] The court concludes that they

---

[9] Although the State Plaintiffs also asserted similar claims under the Fifth Amendment and principles of equitable estoppel (State Pls. Am. Compl. ¶¶ 240-52), the court previously dismissed these claims for lack of standing (Nov. 9 M&O at 41-46).

have not done so, because materials attached to their third amended complaint refute their allegation that Defendants have changed that policy to make it easier to use DACA applicants' information for immigration-enforcement purposes.

The Batalla Vidal Plaintiffs contend that Defendants essentially tricked them into exposing themselves and their family members to a heightened risk of deportation. To apply for DACA, individuals disclosed "extensive sensitive and personal information" about themselves and, often, their family members, to immigration authorities. (BV TAC ¶¶ 77-79.) They did so, the third amended complaint alleges, because "Defendants consistently represented . . . that the information they provided would be protected from disclosure to U.S. Immigrations and Customs Enforcement ("ICE") and Customers and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances." (Id. ¶ 80.)[10] Plaintiffs contend that, as part of the DACA rescission, however, "DHS has changed its policy . . . to remove the limitations on using [this] information for immigration-enforcement purposes." (Id. ¶ 156.) In particular, Plaintiffs attach to the third

---

[10] In particular, the DACA application form provided as follows:

> Information provided in this request is protected from disclosure to ICE and [CBP] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance . . . . The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself [sic], to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.
>
> This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

(Form I-821D, Consideration of Deferred Action for Childhood Arrivals (Dkt. 113-1 at ECF p.6) at ECF p.25 (emphasis added).)

amended complaint a document of frequently asked questions published by USCIS on November 30, 2017 (the "November 30 FAQs"), which states that "[i]nformation provided to USCIS for the DACA process will not make you an immigration priority for that reason alone. That information will only be proactively provided to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance." (USCIS, Frequently Asked Questions: Rejected DACA Requests (Last Reviewed/Updated 11/30/2017) ("Nov. 30 FAQs") (Dkt. 113-1 at ECF p.65) at Q5 (emphasis added).) The Batalla Vidal Plaintiffs contend that this alleged change violated Section 706(2)(A) of the APA. (Id. ¶¶ 179, 181.)

Defendants argue that this claim should be dismissed because they have not, in fact, changed the information-use policy. (BV MTD at 2, 5, 17-18.) Ordinarily, the court would not resolve such a factual dispute on a motion to dismiss. But "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (discussing Rule 12(b)(1) motions); Kardovich v. Pfizer, Inc., 97 F. Supp. 3d 131, 140-41 (E.D.N.Y. 2015). Here, the November 30 FAQs, which are attached to Plaintiffs' complaint, state expressly that the DACA "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." (Nov. 30 FAQs at Q5; see also USCIS, Frequently Asked Questions: Rejected DACA Requests (Last Reviewed/Updated 12/07/2017) ("Dec. 7 FAQs") (Dkt. 113-1 at ECF p.68) at Q5.) While the Batalla Vidal Plaintiffs argue that the court should not credit Defendants' unsworn representation that there has been no change to the information-sharing policy, they do not answer Defendants' argument that they have effectively

23

pleaded themselves out of court by relying on a document that contradicts their otherwise-unsupported allegation of a change to DHS's information-use policy. (Compare BV MTD at 17-18, with BV Pls. Opp'n at 10 n.11.)

Accordingly, Defendants' motion to dismiss the Batalla Vidal Plaintiffs' substantive APA claim, to the extent that claim alleges that Defendants arbitrarily and capriciously changed DHS's information-use policy, is GRANTED.[11]

To be clear, the court holds only that the Batalla Vidal Plaintiffs have not plausibly alleged that DHS actually changed its information-sharing policy. If these Plaintiffs were to allege additional facts giving the lie to Defendants' assertion that there has been no change to this policy, they may have a compelling claim to relief. Two other district courts have already denied Defendants' motions to dismiss similar claims. See CASA de Maryland v. U.S. DHS, — F. Supp. 3d —, 2018 WL 1156769, at *14-15 (D. Md. 2018) (estoppel); Regents 12(b)(6) Order, 2018 WL 401177, at *4-5 (substantive due process). The U.S. District Court for the District of Maryland has specifically enjoined Defendants from using DACA applicants' personal information for immigration-enforcement purposes except as authorized by established DHS policy or in camera review, see Am. Order (Dkt. 49), CASA de Maryland v. U.S. DHS, No. 8:17-CV-2942 (RWT) (D. Md. Mar. 15, 2018).

## C.    Procedural Due Process

Finally, the court turns to the newly asserted claim in the Batalla Vidal Plaintiffs' third amended complaint, in which MRNY challenges Defendants' processing of renewal requests submitted pursuant to the DACA Rescission Memo. MRNY states a claim with respect to some

---

[11] The court notes, however, that two other district courts have denied Defendants' motions to dismiss similar claims. See CASA de Maryland v. U.S. DHS, — F. Supp. 3d —, 2018 WL 1156769, at *14-15 (D. Md. 2018) (estoppel); Regents 12(b)(6) Order, 2018 WL 401177, at *4-5 (substantive due process).

categories of DACA recipients whose renewal requests were allegedly unfairly denied in September or October 2017, but not others.

In the DACA Rescission Memo, Acting Secretary Duke stated that DACA recipients whose deferred action and work authorization were set to expire before March 5, 2018, could request a final two-year extension of their benefits. (DACA Rescission Memo at 4.) In particular, DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.)

According to MRNY, Defendants implemented this directive in a series of unfair ways. First, MRNY alleges, Defendants rejected applications that were delivered to USCIS P.O. boxes late in the day on October 5 but not retrieved by USCIS staff and taken to separate USCIS "lockboxes" until the following day. (BV TAC ¶¶ 115-20.) Second, Defendants allegedly rejected as untimely certain renewal requests that were delivered after October 5 due to unusual U.S. Postal Service delays. (Id. ¶¶ 121-22; see also Liz Robbins, Post Office Fails to Deliver on Time, and DACA Applications Get Rejected, N.Y. Times (Nov. 10, 2017) (Dkt. 113-1 at ECF p.49).) Third, Defendants allegedly rejected renewal requests that were received before October 5 "but had been returned to the applicant due to real or perceived clerical errors." (BV TAC ¶ 123.) For example, USCIS allegedly rejected one MRNY member's DACA renewal request because a USCIS employee misread the date on her application-fee check as "2012," rather than "2017." (Id. ¶ 124.) DHS invited some of these applicants to refile corrected applications, but

when they did so, DHS rejected the refiled requests as untimely. (Id. ¶¶ 123, 127) According to MRNY, this deviated from DHS's prior practice of allowing individuals whose DACA applications were rejected for minor clerical errors to correct those errors or submit further evidence in support of their applications within a given period of time. (Id. ¶ 123)

On November 15, 2017, Defendants indicated that USCIS would reconsider certain applications that were delayed in the mail or improperly rejected. (Id. ¶ 129 (citing Defs. Nov. 15, 2017, Letter Regarding USCIS Guidance (Dkt. 108).) USCIS allegedly stated that it would reach out to individuals whose applications were rejected as untimely due to mail delays and provide them instructions on how to resubmit their applications. (BV TAC ¶¶ 130.) USCIS allegedly has not, however, created an equivalent process for individuals whose applications were rejected due to real or perceived minor clerical errors. (Id. ¶¶ 132-34.) MRNY contends that this "arbitrary and unfair implementation of the October 5, 2017 [DACA renewal request] deadline violates the Due Process Clause of the Fifth Amendment" by depriving DACA recipients of a liberty or property interest without the process to which they are entitled. (Id. ¶¶ 199-205.)

### 1. Standing

Defendants first move to dismiss this claim for lack of standing, arguing that MRNY has not alleged that its clients or members suffered an injury-in-fact because "the injuries on which [it] . . . relies have been remedied." (Id. at 10.)[12] This argument is meritless.

---

[12] Defendants do not contest that MRNY has organizational standing to assert this claim. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). MRNY specifically alleges in the third amended complaint that a number of its members' and clients' DACA renewal requests were denied due to the alleged processing errors discussed above. (BV TAC ¶¶ 54-56, 118-24, 127-29, 134.) Ensuring that DACA renewal requests are adjudicated in a fair and orderly manner is clearly consistent with MRNY's purpose of "empowering immigrant, Latino/a, and working-class communities in New York." (Id. ¶ 45.) The court is not aware of any

As their submissions make clear, Defendants have not, in fact, remedied all injuries incurred by DACA recipients whose renewal requests were allegedly improperly rejected. For MRNY clients and members whose applications arrived late on October 5, "the agency will identify those individuals affected and invite them to resubmit their DACA requests," and "those not yet contacted . . . may affirmatively reach out to the agency, explain their situation, and resubmit their request for reconsideration." (Id. (citing Dec. 7 FAQs at Q3).) For individuals whose requests were delayed due to postal-service errors and subsequently rejected as untimely, "USPS is working with USCIS to identify DACA requests that were received after the deadline due to USPS mail-service delays." (Id. at 11 (quoting Dec. 7 FAQs at Q8).) Once such requests are identified, "USCIS will send affected DACA requestors a letter inviting them to resubmit their DACA request." (Id. (quoting Dec. 7 FAQs at Q8).) And individuals whose requests were rejected due to perceived clerical errors "may contact the agency and explain the error believed to have been made"; "[i]dentification of 'clear error in the processing of a renewal request' may result in the agency 'exercising its discretion to review the request again.'" (Id. (quoting Dec. 7 FAQs at Q7 (emphasis added and alterations adopted)).) Thus, with respect to each category of allegedly wronged MRNY client or member, Defendants' supposed "remedy" is either that USCIS intends to address the injury in the future or that it will allow the injured party to ask it to reconsider its decision. The court commends Defendants for taking steps to redress the allegedly wrongful denials of these DACA renewal requests. But Defendants err to the extent they contend that, because they have stated that they may reconsider these denials, MRNY members and clients whose applications were denied have not suffered injuries-in-fact. See Wong v.

reason why this claim or the relief requested by MRNY requires the participation of individual DACA requestors. Accordingly, the court concludes that MRNY has associational standing to assert this claim.

27

Daines, 582 F. Supp. 2d 475, 479 (S.D.N.Y. 2008) (failure to exhaust administrative remedies does not implicate Article III injury-in-fact).[13] MRNY has standing to assert this claim on behalf of its members and clients who were adversely affected by Defendants' allegedly wrongful adjudication of their DACA renewal requests.

Nor is this claim moot. Although Defendants have reconsidered their denial of at least one MRNY member's DACA renewal request (e.g., BV TAC ¶ 120; BV MTD at 10 n.3), MRNY appears that many of its members and clients still await relief (BV Pls. Opp'n at 17-18). Even if Defendants had taken action to right all these alleged wrongs, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case" unless it is "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174, 189 (2000) (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)). Defendants offer no such assurances here.

Accordingly, Defendants' motion to dismiss the Batalla Vidal Plaintiffs' sixth claim for relief is DENIED, to the extent it seeks to dismiss this claim for lack of subject-matter jurisdiction.

### 2. Merits

Next, Defendants contend that MRNY has failed to state a procedural-due-process claim based on the allegedly wrongful denials of certain DACA recipients' renewal requests. (BV MTD at 22-25.) The court agrees in part and disagrees in part.

---

[13] Defendants also contend that the court should require MRNY to exhaust administrative remedies before filing suit in federal court. (BV MTD at 11-12.) As the Batalla Vidal Plaintiffs note, however (BV Pls. Opp'n at 3, 5), Defendants identify no statute that would require them to exhaust administrative remedies before filing suit. See Darby v. Cisneros, 509 U.S. 137, 153-54 (1993).

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012).

Defendants focus on the first element, contending that MRNY has not identified a constitutionally protected liberty or property interest "for the simple reason that DACA recipients have no . . . interest in deferred action." (BV MTD at 23.) They correctly argue that only benefits to which a person has a "legitimate claim of entitlement" can support a constitutionally protected liberty or property interest. (Id. (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005)).) Because the decision to grant deferred action and work authorization is ultimately discretionary, they say, there can be no constitutionally protected liberty or property interest in receiving DACA benefits. (Id. at 23-24; see also 2012 DACA Memo at 4.)

This argument is partly true. "In determining whether a given benefits regime creates a 'legitimate claim of entitlement' to such benefits, we ask whether the statutes and regulations governing the distribution of benefits 'meaningfully channel[] official discretion by mandating a defined administrative outcome.'" Barrows v. Burwell, 777 F.3d 106, 113 (2d Cir. 2015) (quoting Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005)). The 2012 DACA Memo only sets out criteria for DHS staff's consideration, and there is no guarantee that fulfillment of these criteria will result in a grant of deferred action or work authorization. Under the memo, the decision to grant or deny those benefits is entirely as a matter of DHS's discretion. Because DHS is not effectively required to grant any particular DACA renewal requests, MRNY cannot state a procedural-due-process claim challenging the denial of its members' and clients' requests. Cf. Yuen Jin v. Mukasey, 538 F.3d 143, 156-57 (2d Cir. 2008) (petitioners for asylum lack

liberty or property interest in discretionary relief). While the denial of those requests may affect some DACA recipients' liberty interests (a question the court need not decide), any such liberty interests are ultimately contingent on DACA beneficiaries' receipt of renewed deferred action, to which they have no "legitimate entitlement."

Defendants' argument is also something of a red herring. MRNY contends not only that Defendants improperly denied its members' and clients' renewal requests, but that Defendants' implementation of the October 5 deadline improperly denied MRNY's members and clients of the opportunity to be considered for renewal. (BV Pls. Opp'n at 23.) As MRNY points out, the DACA Rescission Memo clearly stated that USCIS "will adjudicate . . . properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents . . . from current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (DACA Rescission Memo at 4 (emphasis added); see BV Pls. Opp'n at 23.) While the ultimate decision to grant or deny a renewal request is discretionary, this language makes clear that USCIS would at least consider every "properly filed" and timely "accepted" renewal request. MRNY has therefore sufficiently alleged that its affected members and clients had a legitimate entitlement to submit their renewal requests. Cf. Yuen Jin, 538 F.3d at 161 n.1 (Sack, J., concurring in part and in the judgment) ("Although asylum is a discretionary form of relief, and the Due Process Clause does not protect benefits that government officials may grant or deny in their discretion, every asylum applicant is nonetheless entitled to due process in establishing her eligibility for that form of relief." (internal quotation marks and citations omitted and alteration adopted)).

MRNY has also sufficiently alleged that at least some of its members and clients were deprived of cognizable interests in the consideration of their DACA renewal requests without

due process of law. With respect to individuals whose requests were rejected because they were delivered to USCIS P.O. boxes on October 5 but not transferred to the appropriate "lockbox" until the following day, the DACA Rescission Memo was at least ambiguous as to which applications would be deemed "accepted . . . as of October 5, 2017." (DACA Rescission Memo at 4.) The DACA Rescission Memo did not state that applications had to be received at a USCIS P.O. box by mid- to late afternoon to be "accepted," or that only those applications redelivered to a designated USCIS "lockbox" by October 5 would be deemed "accepted," raising the possibility that MRNY may be able to show that the denial of these requests violated due process. See Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 249 (2d Cir. 2014) (stating that, on a Rule 12(b)(6) motion, "dismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief"). Likewise, MRNY has stated a claim on behalf of individuals whose requests were rejected because USCIS staff incorrectly deemed them to be marred by clerical errors. Such applications were, in fact, "properly filed," as the DACA Rescission Memo required, but were only rejected due to errors by USCIS staff. It is hard to see how such denials comport with due process.

MRNY has not stated a claim, however, with respect to DACA recipients whose requests were rejected as untimely after being delayed by the U.S. Postal Service. The court sympathizes with the plight of these individuals and commends Defendants for voluntarily taking steps to address this unfortunate situation. The DACA Rescission Memo states, however, that only "properly filed" and "accepted" requests would be considered. It is common for mailing deadlines to be calculated based on when something is postmarked, not when it is actually delivered to the recipient. But USCIS's stated decision to use a "delivery rule," rather than a

"mailbox rule," to determine which requests were timely does not violate the Due Process Clause.

Likewise, MRNY has not stated a claim with respect to individuals whose renewal requests were rejected due to actual (as opposed to incorrectly perceived) clerical errors. In light of the human consequences of the decision to grant or deny an individual a renewal of DACA benefits, it may seem overparticular to deny a renewal request because someone "forg[ot] to check a box, forg[ot] to sign or sign[ed] in the wrong place, or submitt[ed] a check for what applicants previously had to pay for DACA renewal." (BV TAC ¶ 141.) The court hopes that USCIS will review these applications sympathetically, understanding the gravity of taking away someone's livelihood and tentative protection against deportation simply because he or she forgot to check a box on a multi-page form. The court cannot, however, require USCIS to do so, because due process of law does not require the agency to accept incomplete or incorrect renewal requests.

Accordingly, Defendants' motion to dismiss the Batalla Vidal Plaintiffs' sixth claim for relief for failure to state a claim is GRANTED IN PART and DENIED IN PART. MRNY has adequately alleged that the rejection of DACA renewal requests that arrived late in the day on October 5, 2017, or that were erroneously deemed to contain minor clerical errors, violated procedural due process. MRNY has not, however, stated a procedural-due-process claim on behalf of requestors whose applications arrived after October 5 due to postal delays or actually contained minor clerical errors.

## III.   CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the <u>Batalla Vidal</u> Plaintiffs' third amended complaint and the State Plaintiffs' amended complaint (Dkt. 207 in No. 16-CV-4756; No. 71 in No. 17-CV-5228) are GRANTED IN PART and DENIED IN PART.   The <u>Batalla Vidal</u> Plaintiffs' first, third, and fourth claims for relief are dismissed, and the second claim for relief is dismissed to the extent it alleges that Defendants weakened DHS's information-use policy.   The sixth claim for relief is dismissed in part, as stated above.   The State Plaintiffs' fifth and sixth claims for relief are dismissed.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      March 29, 2018

NICHOLAS G. GARAUFIS
United States District Judge