## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCÓN, ELIANA FERNANDEZ, CARLOS VARGAS, CAROLINA FUNG FENG, M.B.F., by her next friend LUCIA FELIZ, XIMENA ZAMORA, SONIA MOLINA and JOHANA LARIOS SAINZ, )<br><br>On behalf of themselves and all other similarly situated individuals, )<br><br>and MAKE THE ROAD NEW YORK, )<br><br>On behalf of itself, its members, and its clients, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>CHAD WOLF, in his official capacity as the purported Acting Secretary of Homeland Security, JOSEPH EDLOW, in his official capacity as the Deputy Director for Policy, U.S. Citizenship and and Immigration Services, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, and the U.S. DEPARTMENT OF HOMELAND SECURITY, )<br><br>*Defendants*. ) | **FOURTH AMENDED COMPLAINT**<br><br>Case No. 1:16-cv-04756 (NGG)(JO) |

_____

## INTRODUCTION

On June 18, 2020, the United States Supreme Court affirmed what this Court and others around the country had already concluded in virtual unison: the Trump Administration's 2017 attempt to terminate the Deferred Action for Childhood Arrivals ("DACA") program was unlawful.

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. ___, 140 S.

1

Ct. 1891 (2020) ("*Regents*"). In the weeks that followed, Defendants sowed confusion among the more than one million individuals impacted by the Supreme Court's decision, first by denouncing the decision as having "no basis in law" and then by refusing to abide by its directive to return to the *status quo ante*. Less than six weeks after the Supreme Court ruling, Defendants compounded the harm by issuing a new memorandum dismantling the DACA program, thereby prolonging the daily uncertainty faced by those who have, or are eligible for, DACA. This latest assault on DACA is no less unlawful than the first.

Defendant Wolf's July 28, 2020 memorandum ("Wolf Memorandum") requires the Department of Homeland Security ("DHS") to immediately, categorically, and retroactively deny first-time applications for DACA, cut the renewal periods for current DACA recipients in half, and severely limit the availability of advance parole for DACA recipients.[1] This directive is cruel, heartless, and unlawful. Defendants enacted life-altering changes to DACA even though Defendant Wolf was improperly designated as Acting DHS Secretary and thus lacked the authority to issue the Wolf Memorandum. In addition, the Wolf Memorandum and the agency's actions to implement it are arbitrary and capricious. Finally, the Wolf Memorandum and a subsequent implementing directive issued by Defendant Edlow on August 21, 2020 ("Edlow Memorandum") have violated due process by (1) depriving DACA applicants whose applications for deferred action or advance parole were pending between June 30 and July 28, 2020 of a fair opportunity to have their applications adjudicated; (2) failing to provide notice that it would reject first-time applications and most advance parole requests during this timeframe; and (3) changing the terms of renewal without advance notice.

---

[1] Plaintiffs use the terms "first-time" and "initial" applications interchangeably in this amended complaint and subsequent filings to refer to applications made by someone who has never before had DACA.

Plaintiffs Martín Jonathan Batalla Vidal, Antonio Alarcón, Eliana Fernandez, Carlos Vargas, Carolina Fung Feng, M.B.F., Ximena Zamora, Sonia Molina, and Johana Larios Sainz ("Individual Plaintiffs"), on behalf of themselves and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf of itself, its members, and its clients (collectively "Plaintiffs" or "Named Plaintiffs"), bring this action to challenge the Trump Administration's latest unlawful attempt to dismantle the DACA program and eviscerate its protections. The Wolf Memorandum violates the U.S. Constitution, the Administrative Procedure Act, the Federal Vacancies Reform Act, and the Homeland Security Act, and must be set aside. So, too, must the implementing memorandum issued by Defendant Edlow ("Edlow Memorandum"), which violates the U.S. Constitution and the Administrative Procedure Act. The stakes cannot be overstated: over a million young people seek to live securely in the only country they know as home, and the DACA program properly affords them that opportunity, as well as the opportunity to work and support their families, and to travel for humanitarian, educational, or employment reasons. Plaintiffs therefore ask this Court to again enjoin the Trump Administration's unlawful efforts to gut the DACA program.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the Fifth Amendment of the U.S. Constitution; the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*; the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. §§ 3345 *et seq.*; and the Homeland Security Act of 2002 ("HSA"), 6 U.S.C. §§ 112-113.

2.       This Court is authorized to award the requested declaratory and injunctive relief under the APA, 5 U.S.C. § 706; the FVRA, 5 U.S.C. § 3348; the Declaratory Judgment Act, 28 U.S.C. § 2201-2202; and the Court's equitable powers.

3.       Venue properly lies in this district because most Individual Plaintiffs reside in the district, and Plaintiff MRNY operates four of its five community centers in this district in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. 28 U.S.C. § 1391(b).

## PARTIES

**Plaintiff Martín Jonathan Batalla Vidal**

4.       Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA.

5.       Mr. Batalla Vidal was born in Mexico and grew up in Queens, New York. He graduated from Bushwick Leaders High School for Academic Excellence in Brooklyn, New York in June 2008. Mr. Batalla Vidal has a younger brother who has also received DACA, and two brothers who were born in the United States.

6.       Mr. Batalla Vidal obtained DACA on February 17, 2015 with the assistance of MRNY.  Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, which he had previously abandoned due to his concern that he could not get a job in the field without employment authorization. In fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to earn money for school and also received a scholarship for DACA recipients from ASA College. He is trained as a Physical Therapist to a Rehabilitation Certified Nursing Assistant and, prior to the COVID-19 pandemic,

he was working full-time at Park Terrace Rehabilitation and Nursing Center, where he cared for patients with serious health needs.

7.      Through the employment he was able to obtain with DACA, Mr. Batalla Vidal was able to financially support himself, his mother, and his younger siblings. With this new income, Mr. Batalla Vidal rented his first apartment on his own, and, since his mother has osteoarthritis and thyroid issues and cannot work, he provides her financial support as well. Mr. Batalla Vidal's mother contracted COVID-19 early in the pandemic and spent two weeks hospitalized. Her illness worsened her health and continues to negatively impact her. Shortly thereafter, Mr. Batalla Vidal's brother was in a serious car accident and spent two weeks in an Intensive Care Unit.

8.      Since he obtained DACA in 2015, Mr. Batalla Vidal has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on April 23, 2020. Per the Wolf Memorandum, he must now request renewal and pay the application fee every year once his current DACA grant expires. He anticipates seeking a new job in the future and worries that this change will make it more difficult for him to get employment and that, in addition to the increased costs in renewal fees, the Wolf Memorandum will cause him and other DACA holders financial hardship.

9.      The Wolf Memorandum and Defendants' continued attacks on DACA have caused Mr. Batalla Vidal to suffer from significant anxiety and guilt. He feels anxiety over his future ability to obtain employment and to support himself and his family, because the shortened renewal period will necessitate paying more in renewal fees and may make DACA holders less desirable job applicants for employers. He feels guilty because of his efforts to encourage other DACA-eligible youth to apply for the first time following the Supreme Court's decision in June and his efforts to encourage DACA holders to renew their DACA. Since the Wolf Memorandum, he has

been in contact with many people who are negatively impacted by the changes and have expressed tremendous disappointment to him.

10.     Mr. Batalla Vidal would like to obtain advance parole to travel to visit his grandmother, who is in poor health. He has been unable to see her in several years due to the 2017 termination of advance parole for DACA holders. Under Defendants' new guidance, he is unsure if his intended travel would qualify him for advance parole and feels scared to apply and to travel given the uncertainty around DACA.

**Plaintiff Antonio Alarcón**

11.     Plaintiff Antonio Alarcón ("Mr. Alarcón") is a recipient of DACA. He resides in Queens, New York.

12.     Mr. Alarcón was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed in Mexico with his grandparents. When Mr. Alarcón was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcón moved in with his aunt and uncle. His parents and younger brother continue to reside in Mexico.

13.     Mr. Alarcón received DACA on March 26, 2013 with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcón to financially support himself, his aunt, and his uncle as he pursued his education.

14.     Mr. Alarcón graduated from Flushing High School in 2012, and he received his associate's degree from LaGuardia Community College in 2015. He then pursued a Bachelor of Arts degree in Film Studies from Queens College and graduated in May 2018.

15.     Through his employment and volunteer activities, Mr. Alarcón has become a leading voice for youth in his community and beyond. From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States. He currently works as a Civic Engagement Coordinator for MRNY and helps to coordinate the work of a census-outreach team that has contacted over 100,000 New Yorkers to educate them about the importance of completing the 2020 Census. Through this outreach, the team has helped thousands of predominantly immigrant and non-English-speaking New Yorkers complete the census. Mr. Alarcón is also a frequent spokesperson in English- and Spanish-language media helping to encourage participation in the census and debunk common concerns among immigrant New Yorkers.

16.     Since first obtaining DACA in 2013, Mr. Alarcón has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on April 2, 2020. Per the Wolf Memorandum, he must now request renewal every year once his current DACA grant expires. He is worried that this change means additional time in limbo for himself and other DACA recipients, who are anxious and vulnerable to changes in policy while awaiting each renewal, and greater financial expense.

17.     Defendants' failure to process advance parole applications since 2017 has inflicted significant harm on Mr. Alarcón. In 2014 and 2017, Mr. Alarcón obtained and traveled on advance parole. But because of the Administration's attacks on DACA, he has not been able to leave the country or to see his parents and younger brother in Mexico for nearly four years. He was unable to visit them in June 2020 when both of his parents became ill. He is eager to travel on advance

parole to see his family, particularly because his mother now needs surgery, and for educational purposes. But under the Wolf and Edlow Memoranda, he is unsure if travel to see family would qualify as a valid reason to obtain advance parole and does not believe that educational travel would be.

**Plaintiff Eliana Fernandez**

18.       Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides in Suffolk County, New York.

19.       Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years. She has lived in New York since she was fourteen years old. She lives with her two New York-born, U.S. citizen children, entering third and eighth grades this year.

20.       Ms. Fernandez first received DACA on December 11, 2012 and has consistently renewed and maintained her DACA since that time. Because of this Court's February 2018 preliminary injunction, Ms. Fernandez was able to renew her DACA for a two-year period most recently on April 20, 2020. Per the Wolf Memorandum, she must now request renewal every year and will have to spend twice the amount of time and money she expected to maintain her DACA and remain in the country.

21.       Ms. Fernandez has worked hard to build a life for herself and her family. Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College, where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She now works as a Lead Organizer in MRNY's Long Island office, where she was previously an Immigration Case Manager. She is also a homeowner. She has been able to achieve these goals

because of DACA, which allowed her to go back to school, earn a living wage, and purchase a home in which her children can grow up.

22.     The shortening of DACA renewals under the Wolf Memorandum has caused Ms. Fernandez tremendous stress, as she feels a loss of stability and control over her life. Without the stable employment authorization that her DACA provides, she would not be able to afford her mortgage or her family's health insurance. Defendants' attacks on the DACA program also put Ms. Fernandez at risk of being separated from her children, as she was from her parents as a child.

23.     As a result of the Administration's unlawful termination of DACA in 2017, Ms. Fernandez developed anxiety and stress. She began suffering migraines and pain soon after Defendants' 2017 termination, which she attributes to the stress and emotional toll of her uncertain future. She also began attending therapy. Following the issuance of the Wolf Memorandum, her physical symptoms, including migraines and neck pain, returned, because the shortening of the DACA renewal period has once again heightened her anxiety and fear of separation from her family.

24.     Ms. Fernandez is eager to obtain advance parole and travel abroad. Given the uncertainty around DACA and her worries about how a termination of DACA could impact her life and the lives of her children, Ms. Fernandez has begun to explore masters' programs at universities in Toronto as well as job opportunities there and has consulted with an immigration attorney in Canada. But because she has never been to Canada, she does not feel she can uproot and relocate her family without first visiting. She would also need to visit universities and attend job interviews there. Because of this, she is eager to travel on advance parole. With the Supreme Court decision in June, Ms. Fernandez thought she would be able to achieve her goal of traveling

to Canada. However, because of the extremely narrow grounds for advance parole set out in Wolf and Edlow Memoranda, she now fears that her intended travel will be impossible.

**Plaintiff Carlos Vargas**

25.     Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in Staten Island, New York.

26.     Mr. Vargas was born in Puebla, Mexico. He has lived in New York City since he was four, and in Staten Island since he was sixteen. Mr. Vargas began working full-time to help his family at age thirteen. After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree.

27.     Mr. Vargas first obtained DACA on December 13, 2012. DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business from City University of New York ("CUNY") in Staten Island in 2014.

28.     After volunteering for many years in Staten Island for MRNY, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases. Mr. Vargas now works at MRNY, where he assists individuals in applying for DACA and other forms of immigration relief.

In fall 2017, he began attending classes at CUNY School of Law. He plans to become a lawyer so that he can be a more effective advocate for his community.

29.      Mr. Vargas financially supports himself and his elderly mother who is unable to work due to depression, anxiety, vision problems, and other medical issues. Mr. Vargas is his mother's primary caretaker, accompanies her to her many medical appointments, and pays for her medical expenses. He is also financially responsible for multiple mortgages on homes he owns with his brother.

30.      Since first obtaining DACA in 2012, Mr. Vargas has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on February 14, 2020. Per the Wolf Memorandum, he must now request renewal every year once his current DACA grant expires. Mr. Vargas is concerned that the shortened renewal period puts DACA holders like him at heightened risk of losing their DACA, jobs, and health insurance. Shortly after the start of the current pandemic, Mr. Vargas was diagnosed with COVID-19 and hospitalized. The experience caused him to become even more committed to maintaining the DACA program as a means for DACA-eligible individuals like him to be able to access health insurance and basic job protections and security especially during a time of pandemic and economic instability.

31.      Mr. Vargas has traveled on advance parole in the past and would like to be able to travel on advance parole again. His mother, for whom he is the primary caretaker, is planning to travel to Mexico soon and he wants to be able to accompany and support her during the trip. But he is concerned that under Defendants' new guidelines, the standard to obtain advance parole is so narrow that his intended travel will not qualify.

**Plaintiff Carolina Fung Feng**

32.     Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

33.     Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. Ms. Fung Feng first obtained DACA around December 2012. With DACA, Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015. She was also able to support her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study. She currently works in a temporary position as a digital organizer at the Center for Popular Democracy, focusing primarily on their campaign to encourage participation in the 2020 Census.

34.     Since first obtaining DACA in 2012, Ms. Fung Feng has consistently renewed and maintained her DACA. Because of this Court's February 2018 preliminary injunction, she was able to renew her DACA for a two-year period most recently on November 4, 2019. She is very concerned that needing to renew her DACA every year, after her current DACA grant expires, will make future job searches more difficult, because employers prefer to hire people who can be at a job long term. She is also concerned about the impact of shortened renewals on DACA holders' ability to get and renew other forms of identification. Ms. Fung Feng has been unable to renew either her driver's license or New York City identification since the start of the current pandemic and has become fearful to leave the house as a result.

**Plaintiff M.B.F.**

35.     Plaintiff M.B.F., through her next friend Lucia Feliz, is a 17-year-old applicant for DACA whose first-time application was received by USCIS on or around July 7, 2020. She resides in Queens, New York.

36.     M.B.F. was born in the Dominican Republic and has lived in New York continuously since she was four years old. Since arriving in the United States, M.B.F. has never left the country. M.B.F. has attended New York City schools since kindergarten; in June 2020, she graduated from Francis Lewis High School in Queens, New York.

37.     M.B.F. is eligible for DACA under the terms of the 2012 memorandum that established the program. Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("Napolitano Memorandum"). She came to the U.S. prior to June 15, 2007, over a decade before her 16th birthday. On June 15, 2012, she was present in the U.S.—as a fourth grader at her Queens elementary school—and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime. M.B.F. first began preparing to apply for DACA in 2017, in the months leading up to her 15th birthday. However, the program was unlawfully terminated within days of her 15th birthday.

38.     M.B.F.'s lack of immigration status and inability to access the DACA program imposed increasing hardship on her and her family in the years that followed. She was unable to drive; unable to access many forms of financial aid; unable to participate in school programs that involved international travel; and, most difficult for her, unable to work. As a result, M.B.F. had trouble even affording college applications and had to abandon her dream of studying at a college

13

out of state. Instead, she enrolled at a State University of New York ("SUNY") campus near to her home.  Even with her attending SUNY, her family is facing significant financial hardship to afford her tuition. Although M.B.F. has always dreamed of becoming a lawyer, she worries that without DACA it will prove impossible.

39.      In April 2020, as M.B.F. was completing her senior year of high school and applying to college, she received a Notice to Appear in immigration court by mail. M.B.F. became afraid she would be ordered deported and forced to leave the U.S. at any time. She briefly considered abandoning her college plans altogether. But two months later, she learned through her mother and the family's lawyer that she could once again apply for DACA as a result of the Supreme Court's *Regents* decision. Her attorney filed her application in early July; it was received by USCIS on or around July 7, 2020. M.B.F. states that for her, this opportunity "changed everything." She began planning to transfer colleges and was overjoyed at the prospect of knowing with certainty she would someday be able to use her college and law degrees.

40.      As a result of the Wolf and Edlow Memoranda, M.B.F.'s DACA application will now not be processed or adjudicated by Defendants. In addition to her educational and economic harms, M.B.F. faces imminent and irreparable harm through Defendants' failure to adjudicate her DACA application. First, without deferred action, she could be ordered removed and then deported. Second, M.B.F.'s path to lawful status through family members could be foreclosed. M.B.F.'s grandmother is a U.S. citizen and has petitioned for her mother to obtain lawful status. This petition could yield a path to lawful status for M.B.F. But in March 2021, she will reach 18.5 years of age and trigger certain bars to admissibility to the U.S. due to the accrual of unlawful presence. *See* 8 U.S.C. § 1182(a)(9)(B)(i). Neither minors nor individuals with valid deferred action accrue unlawful presence. *Id.* at § (a)(9)(B)(iii); *see* 9 FAM 302.11-3(B)(1)(U) (individuals in deferred

action status do not accrue unlawful presence); USCIS Adjudicator's Field Manual Chapter 40.9.2 (same). With the triggering of these bars, her potential path to lawful status through her family members could be effectively foreclosed. M.B.F. describes obtaining DACA before March 2021 as "the last opportunity I have to be able to stay in this country."

**Plaintiff Johana Larios Sainz**

41.    Plaintiff Johana Larios Sainz is an applicant for DACA whose first-time application was received by USCIS on or around July 27, 2020. She resides in Staten Island, New York with her two children, ages two and six, who are both U.S. citizens.

42.    Ms. Larios Sainz was born in Mexico and has lived in the United States continuously since she was two years old. Since arriving in the United States, Ms. Larios Sainz has never left the country. Ms. Larios Sainz attended New York City public schools from kindergarten through twelfth grade. In August 2014, she graduated from Port Richmond High School in Staten Island, New York.

43.    Ms. Larios Sainz is eligible for DACA under the terms of the Napolitano Memorandum. She came to the U.S. more than ten years before both June 15, 2007 and her 16th birthday. On June 15, 2012, she was present in the U.S. and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime.

44.    Ms. Larios Sainz was preparing to apply for DACA in the summer of 2017 and had an appointment to complete her application scheduled for just a few days after the program was unlawfully terminated on September 5, 2017. At the time, she was a single mother trying to rebuild her life after leaving an unhealthy relationship. With DACA, she hoped to support herself and her son; obtain a driver's license and car; and afford a place to live. But Defendants' unlawful termination of the program dashed her hopes.

15

45.     In June 2020, Ms. Larios Sainz saw on the news that the Supreme Court had restored the DACA program and she could once again apply. She immediately began contacting legal services organizations. Weeks later, with the coronavirus pandemic still keeping many offices closed and none returning her calls, she went in person to MRNY's Staten Island office and knocked on the door. Plaintiff Vargas, who is an accredited legal representative at MRNY, ultimately came out and helped her begin the DACA application process.

46.     With her family's help, Ms. Larios Sainz and Mr. Vargas worked together to gather documents for her DACA application and, on July 24, 2020, mailed it to USCIS. USCIS received the application on or around July 27, 2020.

47.     After the issuance of the Wolf Memorandum the next day, Ms. Larios Sainz learned that her application for DACA would no longer be processed. Ms. Larios Sainz seeks to apply for DACA so that she can better provide for her family and return to school. She dreams of a career in the medical field, a steady income, a car, and the ability to buy her children new clothes and other things that they need.

**Plaintiff Sonia Molina**

48.     Plaintiff Sonia Molina is a DACA holder whose application for renewal was pending with USCIS on July 28, 2020. She resides in Queens, New York.

49.     Ms. Molina was born in Mexico and has lived in the United States continuously since she was eight years old. She graduated from Information Technology High School in Long Island City in 2008. She has had DACA since 2012. DACA opened new professional and intellectual opportunities for her and made it easier for her to afford her college education. She obtained her bachelor's degree from New York City College of Technology ("City Tech") in 2016.

Ms. Molina is currently a Senior Office Manager at MRNY, where she helps to manage operations at the organization's busiest office located in Queens.

50.     Ms. Molina renewed her DACA most recently on May 1, 2019.

51.     Ms. Molina applied to renew her DACA again on April 1, 2020, or 149 days before the filing of this complaint. Although her current DACA does not expire until April 2021, she applied early in the hope of being able to plan for her future and know that she had two years of stability regardless of the outcome of the DACA litigation in the Supreme Court.

52.     Through her work at MRNY, Ms. Molina has seen firsthand the huge impact of the Trump Administration's efforts to end DACA. When DACA was unlawfully terminated in 2017, she had the difficult experience of having to explain to many callers and visitors to MRNY that new applications were no longer possible. With the Supreme Court decision in 2020, Ms. Molina again saw the broad hope that it inspired and the questions that people had in the absence of clear guidance from the government about whether they could apply for DACA for the first time. She allowed herself to feel happy and hopeful about the prospects for DACA recipients like herself and future DACA recipients for the first time since the 2017 unlawful termination years before.

53.     With the Wolf Memorandum and the Edlow Memorandum issued after it, Ms. Molina's hopes of planning for her future and experiencing a two-year period of stability were dashed. She views the shortening of the DACA renewal period as eliminating the time when people can feel secure and relax. Without that, she feels tremendous uncertainty and pressure. The experience, which she calls a "rollercoaster of emotions," has taken a heavy toll on her.

**Plaintiff Ximena Zamora**

54.     Plaintiff Ximena Zamora is 18 years old and qualifies for DACA under the terms of the Napolitano Memorandum. She is a member of MRNY and resides in Queens, New York.

In September 2017 and again in July 2020, she was days away from submitting her first-time application for DACA when the program was unlawfully terminated for first-time applicants.

55.     Ms. Zamora was born in Mexico and has lived in the United States continuously since she was two years old. Since arriving in the United States, Ms. Zamora has never left the country. Ms. Zamora has attended New York City public schools throughout her life and, in June 2020, she graduated from Academy of Finance and Enterprise High School in Queens, New York.

56.     Ms. Zamora is eligible for DACA under the terms of the Napolitano Memorandum. She came to the U.S. prior to June 15, 2007 and long before her 16th birthday. On June 15, 2012, she was present in the U.S.—as a fourth grader at her Queens elementary school—and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime. Ms. Zamora first prepared her application for DACA in the summer of 2017, when she turned 15 years old. The program was unlawfully terminated just days after her family had gotten the check for the filing fee—the last document she needed to submit her application.

57.     In the years that followed, because of the unlawful termination of DACA, Ms. Zamora was unable to get a regular job or save money for college. She was also unable to participate in internship programs through her school; and, for much of her junior year, she did not believe she would be able to attend college at all without a social security number. With the help of a guidance counselor and staff at MRNY, she learned this was not true and was able to gain admission and apply for financial aid to study at Baruch College, a campus within the CUNY system, where she plans to major in finance.

58.     When the Supreme Court decision on DACA was announced in June 2020, Ms. Zamora was excited to apply again. With DACA, she hoped she could now fulfill her dreams of

getting a regular job, transferring to a college in California, and eventually beginning a career in forensic accounting.

59.     Ms. Zamora worked with the legal team at MRNY to prepare her application throughout July 2020. The process was slowed by the coronavirus pandemic, which prevented in-person meetings and meant that she had to send MRNY documents, such as her photos, by mail. Just days after Ms. Zamora had mailed her final signed copies of the application to MRNY to file, DACA was again severely curtailed and closed to her through the unlawful issuance of the Wolf Memorandum and the Edlow Memorandum after that.

**Plaintiff Make the Road New York**

60.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, its members, and its clients. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

61.     MRNY has a legal department staffed by twenty-four attorneys and eighteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as immigrants submitting affirmative applications for immigration relief. MRNY directly helps individuals prepare the documentation and paperwork necessary for DACA applications and renewals, as well as applications for advance parole. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

62.    From June of 2012 until the fall of 2017, MRNY held weekly DACA screening workshops at its Queens office and similar services at its other sites on an as-needed basis, escalating the number of workshops, screenings, and appointments in the final month that U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, accepted DACA renewal applications. From the time that DACA was created until its unlawful termination in 2017, MRNY assisted approximately 8% of all DACA applicants in New York State.

63.    Both before and after Defendants' 2017 attempts to end DACA, MRNY assisted DACA-eligible individuals with renewal applications through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers, and other legal services programs. From October 5, 2017 through July 28, 2020, MRNY staff filed 2,158 DACA renewal applications. On July 28, 2020, the date of the Wolf Memorandum, 166 MRNY clients had renewal applications pending with USCIS, some filed as long ago as March 1, 2020. Of those clients, 32 are members of MRNY.

64.    Following the Supreme Court decision in June 2020, MRNY engaged in significant community outreach and education to advise community members about the decision and address questions. This included sending a bilingual email to all MRNY staff; mass texts to 1,198 of its prior DACA clients and members inviting them to informational sessions; and a Facebook Live explaining the decision, which reached 6,100 individuals.

65.    Following *Regents*, MRNY received over 260 inquiries regarding DACA. Of these, 28 were from current DACA recipients who were interested in applying for advance parole. The remaining 232 individuals were either youth or their parents who wanted to apply for DACA for the first time. To address this outpouring of community interest, MRNY's legal team began holding regular information sessions on DACA and advance parole, in English and Spanish, for

potential applicants and their parents and individuals hoping to obtain DACA or advance parole. MRNY has continued to hold these sessions even after the July 28, 2020 Wolf Memorandum given the large number of questions that individuals have regarding eligibility for DACA and associated benefits following the Supreme Court decision and the Wolf Memorandum, with the most recent held on August 18, 2020. In total, seven of these sessions were held between June 26, 2020, and August 18, 2020, with a total of 201 individuals attending. MRNY expended significant resources in planning these workshops, due to Defendants' failure to establish clear guidelines for how and when the Supreme Court's June 18 decision would be implemented.

66.     In addition, MRNY legal staff began conducting legal clinics for one-on-one follow-up and screening of potential DACA applicants who attended an initial information session and who had begun to gather documents in support of their DACA applications. MRNY held five such clinics from July 8 to July 23, 2020, providing individual assistance to around three dozen applicants. MRNY legal staff completed and filed three first-time DACA applications prior to the Wolf Memo's issuance on July 28, 2020. One, on behalf of Plaintiff Larios Sainz, was received the day before the memo's issuance; two others, filed on behalf of MRNY members, were sent by USPS Priority Mail prior to July 28 but not received by USCIS until July 29, the day after the memo's issuance. One of those, sent by USPS Priority Mail on July 25th and received by USCIS on July 30, 2020, was filed on behalf of a 19-year-old MRNY member on Long Island who had been in the process of gathering the documents necessary to file a first-time DACA application when the program was terminated in September 2017. The second, sent by USPS Priority Mail on July 27th and received by USCIS on July 29, 2020, was filed on behalf of a 17-year-old MRNY member on Long Island who aged into DACA eligibility after the 2017 termination.

21

67.     MRNY also identified numerous individuals among its existing clients who were eligible to submit first-time DACA applications and began working with them to prepare those applications. Some of these individuals present an urgent need for DACA because they are subject to removal orders or ongoing removal proceedings. For instance, MRNY represents a DACA-eligible individual in removal proceedings whose merits hearing is scheduled for 2022. He resides in Westchester County. He has resided continuously in the U.S. since 2003, when he was 14 years old, and qualifies for DACA under the terms of the Napolitano Memorandum. He is married to a U.S. citizen and has three U.S.-citizen children; his parents are also U.S. citizens. Under the Wolf Memorandum, he cannot apply for DACA. Without DACA, he risks being ordered removed and ultimately deported.

68.     MRNY has more than 24,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcón, Fernandez, Vargas, Fung Feng, Molina, and Zamora, along with many other members whose lives have been thrown into uncertainty because of Defendants' repeated attacks on the DACA program.

69.     MRNY does not ask or track the immigration status of its members. But it knows through information collected on behalf of members who are also clients of MRNY's legal department that the organization has, at a minimum, several hundred members who are DACA holders.

70.     Approximately sixteen current MRNY employees have DACA, including Plaintiffs Alarcón, Fernandez, Molina, and Vargas.

71.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved both by Defendants' failure to comply with the Supreme Court decision prior to July 28, 2020 and by their

final agency action on July 28, 2020 and have no administrative remedies available to them.

72.      The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program unlawfully curtailed, and in having their DACA applications, renewals, and advance parole applications considered, are germane to MRNY's purpose of advocating for the rights of low-income immigrant communities and providing survival services that allow its clients and members to achieve stability and success and to avoid separation from their families; and to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

73.      MRNY's clients face hinderances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

74.      MRNY will sustain further injuries because of Defendants' actions as it is forced to devote additional resources to assist its DACA employees, clients, and members to submit renewals on the new yearly schedule. MRNY will also have to continue to divert resources to educate its members, clients, and the broader immigrant communities it serves about the implications of Defendants' actions with respect to DACA, which have confused and misled the public. This diversion of resources includes following up with and advising the large number of individuals who contacted the organization in the wake of the Supreme Court decision in June 2020 and who now are unable to file first-time DACA applications.

75.      MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

76.      These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

**Defendants**

77.     Defendant Chad Wolf is an officer of DHS who was purportedly designated to temporarily exercise the functions of Acting Secretary of Homeland Security. He is sued in his official capacity.

78.     Defendant Joseph Edlow is the Deputy Director for Policy of USCIS. He is sued in his official capacity.

79.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

80.     Defendant United States Citizenship and Immigration Services ("USCIS") is a component of DHS, 6 U.S.C. § 271, and an agency within the meaning of the APA, 5 U.S.C. § 551(1). USCIS is responsible for processing and adjudicating DACA applications.

81.     Defendant United States Department of Homeland Security ("DHS") is an agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is responsible for implementing the DACA program and oversees USCIS.

## STATEMENT OF FACTS

**The DACA Program's Origins and Impact**

82.      On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the creation of the DACA program, which set out guidelines for USCIS to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Napolitano Memorandum at 1. Those granted deferred action also became eligible for employment authorization via a pre-existing regulation. 8 C.F.R. § 274a.12(c)(14).

83.     In her memorandum, then-Secretary Napolitano explained that individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." Napolitano Memorandum at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

84.     In the eight years following the DACA program's announcement, over 800,000 individuals have received deferred action and employment authorization. Approximately 30,000 of those individuals live in New York State alone. As a result of the DACA program, these young people have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients rely on the program to work, study, and live without the constant threat of deportation and family separation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

**The Trump Administration's First Unlawful Termination of the DACA Program**

85.     After more than five years of the DACA program's success—and despite the incalculable benefit and opportunity the program created in those years—then-Secretary of Homeland Security Elaine Duke announced on September 5, 2017 that DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5, 2017 ("Duke Memorandum"). Based

on spurious legal reasoning, the Duke Memorandum directed DHS to categorically reject all first-time DACA applications received after September 5, 2017 and severely limit the renewal-eligible population.

86.     DACA's abrupt and unlawful termination followed Defendant Trump's incessant stream of racist and nativist comments about individuals of Latinx, and especially Mexican, heritage. Both on the campaign trail and in the Oval Office, Defendant Trump did not hesitate to call Latinx and Mexican individuals "criminals, "killers," and even "animals." His policies reflect his animus.

**Ensuing Litigation and the Supreme Court's Decision in *DHS v. Regents***

87.     The same day that the unlawful termination of DACA was announced, many of the Plaintiffs here informed this Court of their intent to sue. ECF No. 46. *See also* Second Amended Complaint, *Batalla Vidal et al. v. Nielsen et al.*, No. 16-cv-4756, ECF. No. 60 (E.D.N.Y. Sept. 19, 2017) ("*Batalla Vidal*").

88.     Defendants' actions also triggered a wave of other lawsuits across the nation by DACA recipients, civil rights organizations, universities, private corporations, labor unions, states, and municipalities. *See State of New York et al. v. Trump et al.*, No. 17-cv-5228 (E.D.N.Y. Sept. 6, 2017); *Regents of the University of California et al. v. Department of Homeland Security et al.*, No. 17-cv-5211 (N.D. Cal. Sept. 8, 2017) ("*UC Regents District Court*"); *State of California et al. v. Department of Homeland Security et al.*, No. 17-cv-5235 (N.D. Cal. Sept. 11, 2017); *County of Santa Clara et al. v. Trump et al.*, No. 17-cv-5813 (N.D. Cal. Oct. 10, 2017); *City of San Jose v. Trump et al.*, No. 17-cv-5329 (N.D. Cal. Sept. 14, 2017); *Garcia et al. v. United States et al.*, No. 17-cv-5380 (N.D. Cal. Sept. 18, 2017); *NAACP et al. v. Trump et al.*, No. 17-cv-1907 (D.D.C. Sept. 18, 2017) ("*NAACP*"); *Trustees of Princeton University et al. v. United States et al.*, No. 17-

cv-2325 (D.D.C. Nov. 3, 2017); *CASA de Maryland et al. v. Trump et al.*, No. 17-cv-2942 (D. Md. Oct. 5, 2017).

89.     The results of this litigation were swift and clear: in every case but one, district courts held that the 2017 DACA termination was likely arbitrary and capricious in violation of the APA, with circuit courts affirming the same. On January 9, 2018, the Northern District of California issued a preliminary injunction requiring USCIS to accept renewal applications. Order, *UC Regents District Court*, ECF No. 234 (N.D. Cal. Jan. 19, 2018). On February 13, 2018, this Court did the same. Memorandum & Order, *Batalla Vidal*, ECF No. 255 (E.D.N.Y. Feb. 13, 2018). And on April 24, 2018, the District Court for the District of Columbia partially granted summary judgment in plaintiffs' favor and vacated the Duke Memorandum, thus restoring the DACA program to its pre-termination status. Order, *NAACP*, ECF No. 22 (D.D.C. Apr. 24, 2018). After staying its decision and allowing then-Secretary Kirstjen Nielsen to submit a memorandum to better explain the reasoning behind the DACA termination ("Nielsen Memorandum"), the district court again held that the DACA termination was arbitrary and capricious despite the additional explanation. Order, *NAACP*, ECF No. 27 (D.D.C. Aug. 3, 2018).

90.     The government appealed all these decisions and also petitioned the U.S. Supreme Court for writs of certiorari before judgment. The Ninth Circuit affirmed the *UC Regents* District Court's preliminary injunction on November 8, 2018. Opinion, *DHS v. Regents*, No. 18-15068, ECF. No. 199-1 (9th Cir. Nov. 8, 2018). The Supreme Court granted certiorari before the Second or D.C. Circuits could rule in those pending appeals. The Supreme Court consolidated the cases and heard oral argument on November 12, 2019.

91.     On June 18, 2020, the Supreme Court—like all courts whose decisions it was reviewing—concluded that Defendants' 2017 termination of the DACA program was arbitrary and

capricious in violation of the APA. *Department of Homeland Security v. Regents of the University of California,* 591 U.S. ___, 140 S. Ct. 1891, 1916 (2020) ("*Regents*"). The Supreme Court explained that Defendants had failed to conduct the reasoned analysis required by the APA and that Defendants did not adequately consider the incredible hardship their decision would inflict on DACA recipients and their communities. *Id.* at 1910-1915. That two-fold error necessitated the vacatur of the 2017 termination. *Id.* at 1916.

92.    By setting aside the Duke Memorandum, *Regents* required Defendants to fully restore the DACA program to the terms of the Napolitano Memorandum—including the acceptance of (1) first-time DACA applications from the approximately 300,000 individuals who had become eligible during the pendency of the litigation and (2) requests for advance parole.[2]

**The Administration's Reaction to *Regents* and Post-*Regents* Proceedings**

93.    On June 18, 2020, Defendant Trump described the *Regents* decision as one of several recent "horrible & politically charged decisions" that were "shotgun blasts into the face of people that are proud to call themselves Republicans or Conservatives."[3] In a similar vein, the day after the *Regents* decision, Defendant Edlow declared on USCIS's official website that the Supreme Court's decision "has no basis in law" and "merely delays the President's lawful ability to end the illegal Deferred Action for Childhood Arrivals amnesty program."[4] In the same statement, Defendant Edlow also falsely stated that DACA allowed recipients to "remain in our country in violation of the laws" and "take jobs" from "Americans."[5]

---

[2] Nicole Prchal Svajlenka et al., *The Trump Administration Must Immediately Resume Processing New DACA Applications*, CENTER FOR AMERICAN PROGRESS (Jul. 13, 2020), https://ampr.gs/32euYw7.
[3] Donald J. Trump (@realDonaldTrump), TWITTER, (June 18, 2020, 11:08 AM), https://twitter.com/realdonaldtrump/status/1273633632742191106.
[4] *See* U.S. Citizenship and Immigration Servs., *USCIS Statement on Supreme Court's DACA Decision* (June 19, 2020), https://www.uscis.gov/news/news-releases/uscis-statement-on-supreme-courts-daca-decision.
[5] *Id.*

94.     At no time after the Supreme Court and prior to the Wolf Memorandum issued its decision in *Regents* did Defendants offer guidance as to how they would comply with the ruling or provide any notice regarding the future of the DACA program. Defendants' own officials disclosed that "they ha[d] yet to receive any guidance in the wake of the DACA decision, including whether or not they should restart processing new applications."[6]

95.     On June 30, 2020, the U.S. Court of Appeals for the Fourth Circuit issued its mandate in a related case in which the Supreme Court denied certiorari following the *Regents* decision. Mandate, *CASA de Maryland v. U.S. Dep't of Homeland Security*, No. 18-1521, ECF No. 71 (4th Cir. June 30, 2020). That mandate effectuated the court's previous holding "that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside." *CASA de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 705 (4th Cir. 2019). As a result, on June 30, 2020, the Fourth Circuit's vacatur of the 2017 DACA termination took effect nationwide.

96.     Pursuant to the issuance of that mandate, the U.S. District Court for the District of Maryland ordered Defendants to reinstate the DACA program as it existed prior to the September 5, 2017 termination. Order, *CASA de Maryland v. DHS*, 8:17-cv-02942-PWG, ECF No. 97 (D. Md. July 17, 2020).

97.     Despite the Fourth Circuit's mandate and the District of Maryland's order, for weeks Defendants failed to provide the public information on the status of the DACA program, including whether first-time DACA applications and advance parole requests would be accepted and processed, or whether there would be any changes to the renewal process. Defendants provided

---

[6] Molly O'Toole, *The Supreme Court Rejected Trump's Attempt to End DACA. Now What?*, L.A. TIMES (June 18, 2020), *available at* https://www.latimes.com/politics/story/2020-06-18/the-supreme-court-rejected-trumps-attempt-to-end-daca-now-what.

no information to applicants, counsel, or the general public regarding the status of the DACA

program except for a perfunctory July 10th response to a Congressional inquiry stating that USCIS

"will work with DHS on next steps." Letter from Joseph Edlow to the Hon. Joaquin Castro, July

10, 2020.[7] As a result, many attorneys and advocates both in New York and nationwide did not

advise clients to file DACA applications immediately and instead chose to advise clients to await

guidance from the agency. Among attorneys and their clients who did file DACA applications and

expected them to be processed according to the Napolitano Memorandum, few, if any, received

receipt notices—leaving them with uncertainty as to the status of their applications and the

program as a whole.

98.     On July 24, 2020, the district court in *CASA de Maryland* held a status conference

on the vacatur of the Duke Memorandum. There, Defendants revealed for the first time that, instead

of complying with the court's order and the Fourth Circuit's mandate, Defendants were "plac[ing]"

first-time DACA applications "into a bucket" without considering them, granting them, or

rejecting them. Tr. of Virtual Status Conference Proceedings at 17-18, *CASA de Maryland v. DHS*,

8:17-cv-02942-PWG (D. Md. Jul. 24, 2020). The court described it as a "distinction without a

difference" to say these "application[s] ha[ve] not been denied." *Id.* at 18. The court also observed

that "the agency ha[d] not found the time or resources to change their website to even accurately

reflect what the status [of DACA] is," which had "impacts" on both "initial applications" and

"advance parole." *Id.* at 19.

99.     On July 29, 2020, the Second Circuit issued its mandate in this case and remanded

---

[7] *See also* Molly O'Toole, *Despite Supreme Court Ruling, Trump Administration Rejects New DACA Applications*, L.A. TIMES (July 16, 2020), https://www.latimes.com/politics/story/2020-07-16/trump-refuses-new-daca-supreme-court ("USCIS employees say they've received no guidance on the Supreme Court ruling or new DACA applications. The agency did not immediately respond to requests for comment Thursday.")

the matter to this Court for further proceedings.[8]

100.     Litigation brought by Texas, nine other states, and two state governors regarding the procedural and substantive legality of the DACA program is also ongoing in the Southern District of Texas. In that case, Judge Andrew Hanen recently denied Plaintiffs' motion for summary judgment with leave to re-file in order to account for the *Regents* opinion's bearing on the Plaintiffs' arguments. Order, *State of Texas et al. v. United States et al.*, No. 1:18-cv-0068, ECF No. 473 (S.D. Tex. Aug. 21, 2020). Judge Hanen had also requested that, by August 25, 2020, the government produce the administrative record that was considered by the agency when it issued the Napolitano Memorandum. Order, *State of Texas et al. v. United States et al.*, No. 1:18-cv-0068, ECF No. 467 (S.D. Tex. Aug. 4, 2020).

**The Wolf Memorandum's Renewed Attack on DACA Recipients**

101.     After more than a month of silence on the status of the DACA program, Defendant Wolf issued the Wolf Memorandum on July 28, 2020, rescinding the Duke and Nielsen Memoranda in their entirety.  Mem. from Chad Wolf, to Mark Morgan, Matthew Albence, Joseph Edlow, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* July 28, 2020. Although the Wolf Memorandum was framed as a "[r]econsideration" of the Napolitano Memorandum, it in fact rescinded core components of the Napolitano Memorandum and made "immediate changes" to the DACA program.

102.     Among those "immediate changes" are instructions for DHS personnel to "reject all pending and future initial requests for DACA, to reject all pending and future applications for

---

[8] The D.C. and Ninth Circuits also issued mandates in their respective cases after receiving certified copies of the *Regents* judgment from the Supreme Court. Mandate, *NAACP et al. v. Trump et al.*, No. 18-5243 (D.C. Cir. Aug. 4, 2020); Mandate, *Regents v. DHS*, No. 18-15068, ECF. No. 217 (9th Cir. Aug. 4, 2020).

advance parole absent 'exceptional circumstances,' and to shorten DACA renewals" from two years to one year. *Id.* at 1-2. The Wolf Memorandum makes no distinction in how the agency is to treat first-time or renewal applications for DACA filed after the Supreme Court's decision in *Regents* (June 18, 2020), after the Fourth Circuit's mandate (June 30, 2020), or after the Wolf Memorandum (June 28, 2020). It retroactively rejects the applications of individuals like Plaintiffs M.B.F. and Larios Sainz, who applied for DACA after the *Regents* decision went into effect and before the Wolf Memorandum was issued.

103.    The Wolf Memorandum orders that renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods, claiming that there are no asserted reliance interests affected by the shortening of renewal periods. There is no rational explanation supporting the reduction in renewal periods besides the Trump Administration's desire to limit the scope of the policy during what is presented as an "interim" period. While Defendant Wolf acknowledged that the change entails an increase in the total amount of renewal fees that applicants will be required to pay, it justifies these fees as "processing costs." *Id.* at 6. *But see Oversight of U.S. Citizenship and Immigration Services: Ensuring Agency Priorities Comply with the Law*, 114th Cong. (2015) (responses of Joseph Moore, Donald Neufeld, and Daniel Renaud) ("[C]urrent fees charged to DACA requestors have been sufficient to recover the full costs of administering the DACA policy.").[9]

104.    Beyond the cursory and abrupt nature of these changes, the Wolf Memorandum also fails to explain why the agency was not bound to return to the *status quo ante* after *Regents* or after the issuance of the Fourth Circuit's mandate. Instead, it merely states that Defendant Wolf froze the program "on an interim basis." *Id.* at 7.

---

[9] *Available at* https://www.judiciary.senate.gov/imo/media/doc/Moore-Neufeld-Renaud%20Responses.pdf.

105.    The Wolf Memorandum again upends the lives of over 800,000 DACA recipients, and their families, communities, and employers.

106.    Additionally, the Wolf Memorandum renders approximately 300,000 putative class members—many of whom became eligible for DACA during the course of the litigation[10]—unable to apply for DACA despite Defendants' unambiguous obligation to accept and process first-time applications. These individuals will continue to face the threat of deportation and, thus, may be forced to leave the only country that many of them have known as home. Like Plaintiffs, many putative class members have grown up in American neighborhoods, attended American schools, nurtured American families, and have structured their lives around living in the United States.

107.    By cutting renewal periods in half—from two years to one year—DACA recipients are now forced to pay double the amount in fees, spend twice as much time preparing renewal applications, and experience increased anxiety and uncertainty, for no rational purpose. These unreasonable renewal costs impose great financial and emotional hardship on Plaintiffs and putative class members.

108.    By severely restricting applications for advance parole to only those that present an undefined category of "exceptional circumstances," Defendants are imposing an unreasonably high threshold requirement for advance parole applications. Under the Napolitano Memorandum and its implementing guidance, DACA recipients were able to obtain advance parole to travel abroad for humanitarian, educational, and employment purposes, as permitted by statute. *See* 8 U.S.C. § 1182(d)(5). The Wolf Memorandum fails to give any reason supporting this drastic change and limiting such an important benefit to unspecified "extraordinary" circumstances.

109.    The Wolf Memorandum also fails to provide any guidance on the new adjudicatory

---

[10] Svajlenka et al., *supra* note 1.

33

standard for advance parole requests. The Wolf Memorandum fails to consider the deterrent effect that this lack of clarity has on DACA recipients hesitant to pay the $575 application fee, and on immigration providers hesitant to counsel their clients to pay such a large amount.

110.    The Wolf Memorandum's mere recitation that DACA recipients have reliance interests fails to engage with the profound and widespread impacts of a decision to deny new applications, severely restrict advance parole, and shorten renewal periods.

111.    On August 21, 2020, Defendant Edlow issued additional guidance on the implementation of the Wolf Memorandum. Mem. from Joseph Edlow, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,* August 21, 2020 ("Edlow Memorandum").[11]

112.    The Edlow Memorandum confirmed that USCIS will reject all first-time DACA applications from individuals who have never received DACA previously, regardless of when they were submitted. The Edlow Memorandum reiterated that the agency will continue to accept requests for renewal and advance parole from individuals who had been previously granted DACA, albeit in limited form: USCIS will (1) limit renewed grants of deferred action and employment authorization under DACA to no more than one year, and (2) impose a stricter threshold on advance parole requests than the relevant statutory provision. *See* 8 U.S.C. § 1182(d)(5)(A) (allowing advance parole "for urgent humanitarian reasons or significant public benefit"). *See also* Form I-131 Instructions (defining "significant public benefit" to include a personal or family emergency or bona fide business reasons).[12] Again, these changes came without any rational explanation.

**The Unlawful Designations at the Department of Homeland Security**

113.    The designation of Defendant Wolf as Acting DHS Secretary was made in

---

[11] *Available at* https://www.uscis.gov/sites/default/files/document/policy-alerts/DACA%20implementation%20memo%20v2%208.21.20%20final.pdf.

[12] *Available at* https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf.

contravention of the Appointments Clause of the U.S. Constitution, the Federal Vacancies Reform Act ("FVRA") and the Homeland Security Act ("HSA"). As a result, Defendant Wolf lacks the authority to revoke critical components to the DACA program purportedly made through the Wolf Memorandum.

***The Appointments Clause***

114.     Under the Appointments Clause, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers, of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const., art II, § 2, cl. 2. Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

115.     The Appointments Clause sets out a scheme for Congress to exercise its oversight power to "curb Executive abuses of the appointments power" and "to promote a judicious choice of persons" for filling positions of vital importance. *Edmond v. United States*, 520 U.S. 651, 659 (1997).

116.     DHS is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security, as a Head of Department, is subject to the Appointments Clause. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. ____, 140 S. Ct. 1649, 1657 (2020).

117.     The Secretary of Homeland Security and other DHS offices—including but not limited to the Deputy Secretary; the Under Secretary for Management; the DHS Under Secretary for Strategy, Policy, and Plans; the Commissioner of U.S. Customs and Border Protection ("CBP"); the Director of USCIS; and the Director of U.S. Immigration and Customs Enforcement ("ICE")— are offices whose officers must be appointed by the President, by and with the advice and consent

of the Senate. 6 U.S.C. § 112(a)(1), § 113(a)(1) (commonly referred to as a "PAS," or "Presidential Appointment needing Senate confirmation," Position).

118.    Acting officials currently purport to exercise the functions of Secretary of Homeland Security, Chief of Staff, and Assistant Secretary of Public Affairs. The positions of Deputy Secretary, General Counsel, Under Secretary for Management, Under Secretary for Science and Technology, Director of USCIS, Commissioner of CBP, and Director of ICE remain vacant, with various individuals exercising the functions of these offices under the novel title of "Senior Official Performing the Duties" of those positions.

119.    Upon information and belief, Congress has not provided for the position of "Senior Official Performing the Duties" of any executive office in any statute.

120.    The President has publicly expressed his inclination to appoint acting officials as a means of evading Senate confirmation. The President has stated:

a.      "Well, I'm in no hurry. I have 'acting' . . . I sort of like 'acting.' It gives me more flexibility."[13]

b.      "It's OK. It's easier to make moves when they're acting." "I like acting because I can move so quickly. It gives me more flexibility."[14]

c.      "Acting gives you much more flexibility. A lot easier to do things."[15]

d.      "I'm generally not going to make a lot of appointments that would normally be – because you don't need them."[16]

---

[13] Felicia Sonmez, *Trump Says He's 'in No Hurry' to Replace Acting Cabinet Members,* WASH. POST (Jan. 6, 2019), https://www.washingtonpost.com/politics/trump-says-hes-in-no-hurry-to-replace-acting-cabinet-members/2019/01/06/afac5fea-11e4-11e9-b6ad-9cfd62dbb0a8_story.html.
[14]    *Transcript: President Trump on "Face the Nation,"* CBS NEWS (Feb. 3, 2019), https://www.cbsnews.com/news/transcript-president-trump-on-face-the-nation-february-3-2019/.
[15]    Editorial Board, *An Administration of Temps,* BLOOMBERG OPINION (Jul. 25, 2019), https://www.bloomberg.com/opinion/articles/2019-07-25/trump-s-washington-has-an-acting-officials-problem.
[16] Randall Lane, *Inside Trump's Head: An Exclusive Interview with the President, and the Single Theory That Explains Everything,* FORBES (Oct. 10, 2017), https://www.forbes.com/donald-trump/exclusive-interview/#501570b4bdec.

121.     The Trump Administration has repeatedly sought to evade Congressional oversight of irresponsible executive appointments.[17] By holding PAS positions vacant for unreasonably long periods of time, and by relying on acting officials to perform the functions of these positions, the Trump Administration has flouted the framework for accountability set up by the Appointments Clause and other statutes.

**The FVRA and the HSA**

122.     Congress enacted the FVRA to "reclaim[]" its "Appointments Clause power" and reassert its authority over temporary appointments. *See Sw. Gen*., *Inc.* v. *NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).

123.     The FVRA was intended to protect the Senate's authority under the Appointments Clause, preventing the Executive from undermining the separation of powers through the manipulation of official appointments. S. REP. No. 105-250, at 4-5 (1998) ("[T]he Senate's confirmation power is being undermined as never before."). *See also Edmond*, 520 U.S. at 659 ("The Appointments Clause is more than a matter of 'etiquette or protocol;' it is among the significant structural safeguards of the constitutional scheme.").

124.     The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the consent of the Senate," unless a statute specifically provides otherwise. 5 U.S.C. § 3347(a). The FVRA limits who may serve as the acting head of an agency "[i]f an officer of an Executive agency . . . whose appointment . . . is required

---

[17] For instance, Kevin McAleenan and Kenneth Cuccinelli avoided Senate oversight since they were not nominated to their positions in accordance with the Appointments Clause and, therefore, were purportedly designated to occupy vacant positions outside the established process by law. *See generally* Government Accountability Office, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650, August 14, 2020.

to be made by the President, by and with the advice and consent of the Senate . . . resigns." *Id.* § 3345(a).

125.    The FVRA provides that, in the event of a resignation from a PAS position, the first assistant assumes the role as the acting head of the agency. 5 U.S.C. § 3345(a)(1). Alternatively, the President may either direct a person who holds a PAS Position to "perform the functions and duties of the vacant office temporarily in an acting capacity," 5 U.S.C. § 3345(a)(2), or may "direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity" if they meet the relevant tenure and salary qualifications under the statute,  5 U.S.C. § 3345(a)(3).[18]

126.    The FVRA stipulates that a person may not serve as an acting officer "for longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a).[19]

127.    If no officer is appointed in a manner consistent with the FVRA, "the office shall remain vacant." 5 U.S.C. § 3348(b)(1).

128.    The FVRA permits amendments to its standard order of succession, as long as they are expressly authorized by another statutory provision. 5 U.S.C. § 3347(a)(1).

129.    The HSA does just this for the order of succession for vacancies arising in the position of Secretary of Homeland Security. 6 U.S.C. § 113(g).

130.    Under the HSA, the order of succession in the event of a vacancy in the office of the DHS Secretary is the Deputy Secretary and then the Under Secretary for Management. 6 U.S.C. § 113(a)(1)(A), (g)(1). The HSA also authorizes the Secretary to designate additional officers "in further order of succession" to serve as Acting Secretary if the top three positions (i.e., Secretary,

---

[18] Because the HSA defines the relevant orders of succession, 5 U.S.C. § 3345(a)(2)-(3) are not applicable to the Department of Homeland Security.
[19] The period may be extended under circumstances that are inapplicable here. *See* 5 U.S.C. § 3346.

Deputy Secretary, and Under Secretary of Management) are vacant. *Id.* § 113(g)(2).

***The February Delegation***

131.     On December 5, 2017, Kirstjen Nielsen was confirmed by the U.S. Senate as DHS Secretary. Secretary Nielsen was the last officer to exercise the functions of DHS Secretary who was appointed with the advice and consent of the Senate.

132.     On February 15, 2019, Secretary Nielsen exercised her power to designate an order of succession under 6 U.S.C. §113(g)(2), issuing HSA Delegation 00106, Revision No. 08.4 ("February Delegation").

133.     The February Delegation stipulates two scenarios in which an officer may assume the position of Acting Secretary: first, in case of the Secretary's death, resignation, or inability to perform the functions of the office, February Delegation § II.A; and second, if the Secretary were unavailable to act during a disaster or catastrophic emergency, February Delegation § II.B. Under the February Delegation, each of these scenarios triggers a different order of succession.

134.     Under the February Delegation, where the Secretary is unavailable to act during a disaster or catastrophic emergency, Annex A to February Delegation ("Annex A") governed the order of succession. February Delegation, § II.B.

135.     Under the February Delegation, where the position of Secretary of Homeland Security becomes vacant because of the Secretary's death, resignation, or inability to perform the functions of the office, the order of succession is governed by Executive Order 13753 ("E.O. 13753"). February Delegation § II.A.

136.     Under E.O. 13753, the next position after the Deputy Secretary and the Under Secretary for Management in the order of succession in the event of resignation is the Administrator of the Federal Emergency Management Agency ("FEMA").

137.     The FEMA Administrator resigned on March 8, 2019, prior to Nielsen's resignation, and the position was vacant until January 14, 2020, when the Senate confirmed Administrator Peter T. Gaynor.

***Secretary Nielsen's Resignation and the April Delegation***

138.     On April 7, 2019, Secretary Nielsen tendered her resignation, "effective April 7th, 2019." Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President, Apr. 7, 2019.[20]

139.     On April 7, 2019, the date Secretary Nielsen's resignation became effective, the office of Deputy Secretary was vacant. Consistent with the 6 U.S.C. § 113(g)(1) and the February Delegation, then-Under Secretary for Management, Claire Grady, assumed the functions of Acting Secretary by operation of law.

140.     Nevertheless, also on April 7, 2019, Defendant Trump announced via Twitter that Kevin McAleenan (then-CBP Commissioner) would actually assume the role of Acting DHS Secretary, even though Mr. McAleenan was seventh in the order of succession under E.O. 13753, which, per the February Delegation, governed in the event of a resignation.[21]

141.     At 10:36 pm that same day, Secretary Nielsen announced via Twitter that she would supposedly remain Secretary until April 10, 2019.[22]

142.     According to DHS, before leaving office on April 10th, Secretary Nielsen updated the February Delegation to again change the order of succession. HSA Delegation 00106, Revision No. 08.5 ("April Delegation").

---

[20] *Available at* https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf.
[21] Donald J. Trump (@realDonaldTrump), TWITTER, (Apr. 7, 2020, 6:02 PM),
https://twitter.com/realDonaldTrump/status/1115011885303312386.
[22] Secretary Kirstjen M. Nielsen (@SecNielsen), TWITTER, (Apr. 7, 2020, 10:36 PM),
https://twitter.com/SecNielsen/status/1115080823068332032.

143.     The April Delegation preserved the two-track order of succession established by the February Delegation. April Delegation § II.A.

144.     The April Delegation only changed the order of succession for vacancies caused by disaster or catastrophic emergency. In those cases, vacancies in the office of Secretary or Deputy Secretary would be governed by amended Annex A.

145.     Under amended Annex A, the order of succession to the position of Acting Secretary in case of disaster or catastrophic emergency is as follows:

(1) Deputy Secretary;

(2) Under Secretary for Management;

(3) CBP Commissioner; and

(4) FEMA Administrator.

April Delegation, Annex A. The April Delegation removed the Director of the Cybersecurity and Infrastructure Security Agency (CISA) from the order of succession and elevated the CBP Commissioner to third in that order, pushing the FEMA Administrator to fourth.

146.     The April Delegation also changed the order of succession for Deputy Secretary, as listed under Annex B. Following the April Delegation, the first four positions in the order of succession to the position of Deputy Secretary were:

(1) Under Secretary for Management,

(2) Administrator of the Transportation Security Administration ("TSA"),

(3) FEMA Administrator, and

(4) Director of CISA.

April Delegation, Annex B.

147.     Importantly, the April Delegation did not alter the applicability of E.O. 13753 for

vacancies caused by the Secretary's death, resignation, or inability to perform the functions of the office. In those instances, the order of succession designated by E.O. 13753 continued to govern.

148.     As a result, the order of succession to the position of Secretary in case of death, resignation, or inability to perform the functions of the office, at the time of Secretary Nielsen's resignation, remained as:

(1) Deputy Secretary,

(2) Under Secretary for Management,

(3) FEMA Administrator, and

(4) Director of CISA.

149.     Thus, if the position of Secretary became vacant on account of a disaster or catastrophic emergency, the order of succession would be governed by the amended Annex A to the April Delegation, April Delegation § II.B, and if the position became vacant on account of death, resignation, or inability to perform the position's functions, the order of succession that governed was set by E.O. 13753. *Compare* April Delegation, Annex A *with* E.O. 13753.

**Kevin McAleenan's Unlawful Installation and the November Delegation**

150.     On April 10, 2020, Under Secretary for Management Claire Grady resigned, leaving that position vacant and making the CISA Director the first Senate-confirmed officer in line to assume the role of Acting Secretary.

151.     Following the resignations of both Secretary Nielsen and the Under Secretary of Management Grady, CBP Commissioner Kevin McAleenan assumed the title of Acting Secretary even though the CISA Director, the Under Secretary for National Protection and Programs, and the Under Secretary for Intelligence and Analysis preceded him in the governing order of succession.

152.    DHS has claimed that Mr. McAleenan took the position of Acting Secretary pursuant to the April Delegation. Had Secretary Nielsen been unable to perform the duties of Secretary because of an emergency or catastrophe, then Mr. McAleenan, would, indeed, have been next in the order of succession under the amended Annex A. *See* April Delegation § II.B. This was not the case, however, as the office of the Secretary became vacant upon the Secretary's *resignation. See id.* § II.A. Under the terms of E.O. 13753—which still governed in this situation— in the absence of a Deputy Secretary, an Under Secretary of Management, and a FEMA Director, the CISA Director—*not* the CBP Commissioner—would assume the functions of Acting Secretary. E.O. 13753 § 1. Consequently, Mr. McAleenan's succession to Acting Secretary was not valid.

153.    On November 8, 2019, the 212th day of his purported designation as Acting Secretary, Mr. McAleenan revised HSA Delegation 00106 to once again change the order of succession. HSA Delegation 00106, Revision No. 08.6 ("November Delegation")

154.    Even if Mr. McAleenan had properly succeeded Nielsen as Acting Secretary of Homeland Security—which he did not—he lacked any statutory authority whatsoever to issue this change because he exceeded the FVRA's 210-day deadline for acting officials, regardless of whether HSA or the FVRA governed his designation.

155.    The November Delegation purported to change the order of succession for vacancies caused by death, resignation, or inability to perform the position's functions, which was governed by E.O. 13753 at the time. The November Delegation attempted to change that order of succession to the order outlined in the April Delegation's Annex A. As a result, both vacancy tracks—those on account of death, resignation, illness, or inability to perform, and those on account of a catastrophe or emergency—now supposedly followed the order of succession outlined in the April Delegation's Annex A.

156.    The November Delegation then purported to change that universal order of succession. The order became: (1) Deputy Secretary; (2) Under Secretary for Management; (3) CBP Commissioner; and (4) Under Secretary for Strategy, Policy, and Plans. November Delegation, Annex A. The revision removed the FEMA Administrator and the CISA Director, replacing them with the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans.

157.    In sum, the November Delegation purported to revise the order of succession for the position of DHS Secretary, and applied that order to both vacancy tracks contemplated by prior iterations of the delegation. But, as Mr. McAleenan was unlawfully exercising the functions of Acting Secretary at the time it was issued, the November Delegation lacks legal force.

### Mr. McAleenan's Purported Resignation and Defendant Wolf's Purported Installment

158.    On November 13, 2019, Defendant Wolf was confirmed by the Senate to the position of DHS Under Secretary for Strategy, Policy, and Plans—the fourth position in the order of succession for DHS Secretary under the unlawful November Delegation's Annex A.

159.    Also, on November 13, 2019, Mr. McAleenan resigned as Acting DHS Secretary and CBP Commissioner. Although the FVRA provides that an acting officer may only serve as Acting Secretary for 210 days since the position becomes vacant, Mr. McAleenan had purportedly held the position of Acting Secretary for a total of 216 days.

160.    At the time of Mr. McAleenan's resignation, the positions of Deputy Secretary of Homeland Security and Under Secretary of Management in the Department of Homeland Security remained vacant. Because the November Delegation was unlawfully issued and E.O. 13753 was still operative, the next positions in the order of succession were the FEMA Administrator and

then the CISA Director. Because the office of the FEMA Administrator was vacant as well, CISA Director Christopher Krebs should have assumed the role of Acting DHS Secretary.

161.     Despite the invalidity of the November Delegation and its order of succession, Defendant Wolf purportedly assumed the role of Acting DHS Secretary when Mr. McAleenan resigned from his purported role on November 13, 2019.

162.     Because Mr. McAleenan could not assume the functions of Acting DHS Secretary, no officer was lawfully appointed Acting Secretary within 210 days of Secretary Nielsen's resignation. Accordingly, neither Defendant Wolf nor any other person can validly assume the position of Acting DHS Secretary now. Only a constitutionally compliant appointment can fill the vacancy. And more than 500 days after Secretary Nielsen's resignation, the President indicated his intent to nominate Defendant Wolf for DHS Secretary on August 25, 2020.[23]

**Defendant Wolf Lacks Legal Authority to Issue the Wolf Memorandum**

163.     The FVRA provides that any action taken in the performance of a function or duty of a vacant office by any person who occupies the position contrary to the FVRA "shall have no force or effect." 5 U.S.C. § 3348(d)(1). Such actions "may not be ratified." 5 U.S.C. § 3348(d)(2).

164.     Establishing national immigration enforcement policies and priorities is a function of the DHS Secretary. 6 U.S.C. § 202(5). The FVRA defines a "function or duty" as any function or duty that is established by statute or regulation, and that is "required by statute [or regulation] to be performed by the applicable officer". 5 U.S.C. § 3348(a)(2).

165.     The Wolf Memorandum purports to set enforcement priorities, a function of the DHS Secretary. Wolf Memorandum at 4.

---

[23] *See supra* note 19.

166.     Because Defendant Wolf lacks the authority to exercise the functions that are legally delegated to the Acting Secretary in accordance with the FVRA, the Wolf Memorandum has no legal force.

167.     Under the FVRA, the Comptroller General of the United States, who is head of the Government Accountability Office ("GAO"), is required to report to Congress any violations of the time limitations on acting service. 5 U.S.C. § 3349.

168.     On August 14, 2020, the GAO issued an opinion reviewing the legality of Defendant Wolf's designation as Acting DHS Secretary and concluded that Wolf was improperly designated. GAO, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650, August 14, 2020.[24]

169.     Since Defendant Wolf never had the legal authority to exercise the functions of Acting Secretary, he cannot issue a memorandum altering enforcement priorities.

**Defendant Edlow Lacks Legal Authority to Implement the Wolf Memorandum**

170.     The Wolf Memorandum is addressed in significant part to Defendant Edlow, who similarly lacks the legal authority to exercise the functions and powers of the office to which he has been designated.

171.     Defendant Wolf purportedly designated Defendant Edlow Deputy Director for Policy at USCIS on February 19, 2020.

---

[24] *Available at* https://www.gao.gov/assets/710/708830.pdf. After DHS requested GAO to rescind its decision, GAO affirmed its decision after concluding that DHS had not shown material errors of fact or law, nor provided information not previously considered that warranted reversal or modification of the decision. *See* GAO, *Department of Homeland Security━Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security━Reconsideration,* B-332451, August 21. 2020.

172.     Because he was not lawfully serving as Acting Secretary, Defendant Wolf lacked any legal authority to designate Defendant Edlow to the position of USCIS Deputy Director for Policy.

173.     Previously, between July 2019 and February 2020, Defendant Edlow served as Chief Counsel of the Office of the Chief Counsel at USCIS, a PAS Position.

174.     Defendant Edlow has not since been confirmed by the Senate to any other senior position.

175.     Despite being unlawfully designated by an individual lacking legal authority to serve Acting DHS Secretary, Defendant Edlow issued the Edlow Memorandum on August 21, 2020, attempting to implement the Wolf Memorandum.

**CLASS ALLEGATIONS**

176.     Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), on behalf of themselves and all other persons for whom Defendants' implementation of the Wolf Memorandum, not least through the Edlow Memorandum, interferes with their ability to apply for DACA, renew DACA, or seek advance parole.

177.     Individual Plaintiffs seek certification of a class (the "DACA Class") (for the claims challenging the appointment of Defendant Wolf and the legality of the Wolf Memorandum and its implementing guidance, including the Edlow Memorandum) consisting of: All persons who are or will be prima facie eligible for deferred action under the terms of the Napolitano Memorandum.

178.     Individual Plaintiffs also seek certification of a subclass (the "Pending Applications Subclass") (for the claims challenging the application of the Wolf Memorandum and its implementing guidance, including the Edlow Memorandum, to certain DACA applications) consisting of: All persons who had an application for deferred action through DACA, whether

first-time or renewal, pending at USCIS on any date between June 30, 2020, and July 28, 2020, that have not been or will not be adjudicated in accordance with the Napolitano Memorandum.

179.    Excluded from the DACA Class and the Pending Applications Subclass are the individuals who are prima facie eligible for deferred action through DACA and who bring a federal lawsuit challenging the Wolf Memorandum.

180.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

181.    The DACA Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The precise number of members of the DACA class is not known, but as of June 30, 2020, USCIS reported that there were 645,610 current DACA recipients.[25] An estimated 1.1 million undocumented immigrants are prima facie eligible for DACA, including an estimated 300,000 individuals who are eligible to submit first-time applications for DACA.[26]

182.    The total number of the members of the Pending Applications Subclass is also unknown. As of June 30, 2020, there were 27,850 DACA applications pending at USCIS.[27] Plaintiff Make the Road New York's legal department on its own had more than 166 clients with renewal applications pending when the Wolf Memorandum was issued.

183.    The claims of the DACA Class members share common issues of law and fact, resolution of which will not require individualized determinations, satisfying Rule 23(a)(2). Some common questions of law and fact include but are not limited to:

---

[25] *See* Quarterly Summary Report, at 12, *Regents of the Univ. of California v. U.S. Dep't. of Homeland Sec*., No. 17-cv-5211 (N.D. Cal. July 1, 2020), ECF No. 299-2.
[26] *See* Nicole Prchal Svajlenka, Tom Jawetz, and Philip E. Wolgin, "The Trump Administration Must Immediately Resume Processing New DACA Applications," CENTER FOR AMERICAN PROGRESS (July 13, 2020), https://ampr.gs/32euYw7.
[27] Quarterly Summary Report, at 12, *Regents of the Univ. of California v. U.S. Dep't. of Homeland Sec.*, No. 17-cv-5211 (N.D. Cal. July 1, 2020), ECF No. 299-2.

(1) Whether Defendant Wolf is serving unlawfully as the Acting Secretary of Homeland Security in violation of the order of succession set out by the Federal Vacancies Reform Act and the Homeland Security Act;

(2) Whether Defendant Wolf lacked legal authority to issue the Wolf Memorandum, and therefore it "must have no force or effect," 5 U.S.C. § 3348(d);

(3) Whether Mr. McAleenan's assumption of the role of Acting Secretary of Department of Homeland Security was unlawful, such that any changes to orders of succession that he made were unlawful;

(4) Whether the Edlow Memorandum is invalid and must be set aside; and

(5) Whether the Wolf Memorandum is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

184.    The claims of the Pending Applications Subclass members share common issues of law and fact, resolution of which will not require individualized determinations, satisfying Rule 23(a)(2).  Some common questions of law and fact include, but are not limited to:

(1) Whether class members are entitled to have their DACA applications adjudicated in accordance with the Napolitano Memorandum;

(2) Whether class members' due process rights were violated by USCIS's failure to adjudicate their requests for deferred action in accordance with the terms of the Napolitano Memorandum; and

(3) Whether Defendants violated the due process rights of class members by applying the terms of the Wolf Memorandum and Edlow Memorandum without providing adequate notice.

185.    The claims or defenses of Individual Plaintiffs are typical of the claims or defenses of the members of the DACA Class, satisfying Rule 23(a)(3). Like other members of the class, Individual Plaintiffs have been harmed, among other things, by Defendants' failure to lawfully abide by statutory limitations on their actions. Individual Plaintiffs have been further harmed by Defendants' unlawful appointment of Defendant Wolf as the Acting Secretary of DHS and will be deprived of the opportunity to access DACA pursuant to the terms of the Napolitano Memorandum.

186.    The claims or defenses of Plaintiffs Johana Larios, Sonia Molina, and M.B.F. are typical of the claims or defenses of the members of the Pending Applications Subclass, satisfying Rule 23(a)(3).  Like other members of the class, these plaintiffs are harmed by Defendants' failure to consider their DACA application under the terms of the Napolitano Memorandum, in violation of the APA and the Due Process Clause.

187.    Individual Plaintiffs will fairly and adequately protect the interests of the DACA Class and Plaintiffs Johanna Larios, Sonia Molina, and M.B.F. will fairly and adequately protect the interests of the Pending Applications Subclass, satisfying Rule 23(a)(4). The Plaintiffs will defend the rights of the proposed DACA Class fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the DACA Class. Plaintiffs Johanna Larios, Sonia Molina, and M.B.F. will defend the rights of the proposed Applications Class fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Applications Class.

188.    The attorneys representing the named Plaintiffs include experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional and statutory litigation. These attorneys should be appointed as class counsel.

189.    The members of the proposed class are readily ascertainable through objective means.

190.    Through the issuance of the Wolf Memorandum at the center of Plaintiffs' Class allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the DACA Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The DACA Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

191.    By adjudicating the Pending Applications Subclass's applications for DACA under the terms of the Wolf and Edlow Memoranda rather than the Napolitano Memorandum, Defendants have acted or will act in a manner generally applicable to the Applications Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The DACA Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Federal Vacancies Reform Act and Homeland Security Act
Unlawful Appointment
By all Plaintiffs against Defendants Trump, Wolf, and DHS**

192.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.    The Secretary of Homeland Security must be appointed by the President with the advice and consent of the Senate. 6 U.S.C. § 112(a)(1).

194.    When the office of the Secretary of Homeland Security is vacant, only a valid Acting Secretary may perform the functions or duties of the position.

195.     The Federal Vacancies Reform Act ("FVRA") is the exclusive means for temporarily filling vacant offices whose appointments must be made by the President, by and with the advice and consent of the Senate.

196.     Under the Homeland Security Act of 2002 ("HSA"), the Secretary of Homeland Security may "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

197.     Establishing national immigration enforcement policies and priorities is a function of the Secretary of Homeland Security. 6 U.S.C. § 202(5).

198.     Mr. McAleenan and subsequently Defendant Wolf both improperly assumed the position of Acting Secretary in violation of the order of succession set forth by the FVRA and the HSA. Neither had legal authority to perform the functions of Secretary of Homeland Security.

199.     In addition, Defendant Wolf improperly assumed the position of Acting Secretary in violation of FVRA and HSA because by the time he purported to assume the office, Mr. McAleenan had already served longer than 210 days as Acting Secretary, in violation of the FVRA's prohibition on acting officers serving for longer than 210 days. As a result, Mr. McAleenan lacked the authority to issue the November Delegation, which issued after the FVRA's 210-day prohibition.

200.     As of no later than November 6, 2019 no individual could lawfully serve as an Acting Secretary of DHS.

201.     Therefore, Defendant Wolf did not have the legal authority to issue the Wolf Memorandum.

202.     At the time that the Wolf Memorandum was issued, the FVRA required that the position of Secretary of Homeland Security remain vacant because the FVRA's 210-day time

period had lapsed. *See* 5 U.S.C. § 3348(b)(1).

203.     As a result, no officer could perform the functions of Acting Secretary of Homeland Security, and no officer had the legal authority to issue the Wolf Memorandum or any other memorandum changing the DACA policy as established under the Napolitano Memorandum.

204.     The Wolf Memorandum was issued by an unlawfully designated officer and thus "must have no force or effect." 5 U.S.C. § 3348(d).

## SECOND CLAIM FOR RELIEF
### Appointments Clause
### Unlawful Appointment
### By all Plaintiffs against Defendants Trump, Wolf, and DHS

205.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.     Under the Appointments Clause of the U.S. Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers, of the United States," though Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., art II, § 2, cl. 2.

207.     The Department of Homeland Security is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security, as a Head of Department, is subject to the Appointments Clause. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. ___, 140 S. Ct. 1649, 1657 (2020).

208.     Defendant Wolf has not been confirmed by the Senate to the position of DHS Secretary.

209.     By holding the position of the DHS Secretary vacant for an unreasonably long period of time and relying on Defendant Wolf to unlawfully perform the functions of Secretary in an acting capacity, the Defendant Trump has flouted the framework for accountability established by the Appointments Clause.

210.     Accordingly, Defendant Wolf is serving in the position of Acting Secretary in violation of the Appointments Clause, and no function taken in his official capacity is lawful.

**THIRD CLAIM FOR RELIEF**
**Administrative Procedure Act**
**Agency Actions that are Arbitrary and Capricious, An Abuse of Discretion, and**
**Otherwise Not In Accordance with Law**
**By all Plaintiffs against Defendants Edlow, Wolf, DHS and USCIS**

211.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.     The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

213.     As Defendants concede, Defendants' issuance of the Wolf Memorandum constitutes final agency action reviewable under the APA. Letter, *Batalla Vidal*, No. 16-cv-4756, ECF No. 304 (E.D.N.Y. Aug. 12, 2020), at 2.

214.     Defendants' issuance of the Edlow Memorandum likewise constitutes final agency action reviewable under the APA.

215.     The Wolf Memorandum is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law, not least because it: (a) lacks a reasoned explanation; (b) failed to consider all relevant factors, including the reliance interests at stake in the DACA

program; and/or (c) was issued by an individual who did not have legal authority to issue the Memorandum because Defendant Wolf was not lawfully serving as Acting DHS Secretary.

216.   The Edlow Memorandum is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, not least because it was issued by an individual who did not have legal authority to issue the Memorandum because Defendant Edlow was designated to serve in his position by Defendant Wolf, who was and is unlawfully serving as Acting DHS Secretary.

217.   Defendants characterize their actions as an "interim" measure, expressly admitting that they did not conduct a full APA-compliant consideration of the contemplated action.

218.   The Wolf Memorandum, and the Edlow Memorandum that followed it, are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A), and must be held unlawful and set aside.

## FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Edlow, Wolf, DHS, and USCIS

### *Refusal to Adjudicate Properly Submitted Applications for DACA and Advance Parole*

219.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.   The hallmark of due process is notice and opportunity to be heard.

221.   The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law. Due process interests are at stake in the adjudication of DACA and advance parole applications, even if the ultimate determination by the agency is discretionary. *See INS v. St. Cyr*,

533 U.S. 289, 307-08 (2001) (finding plaintiff had a right to a ruling, even if the *outcome* of that ruling is discretionary).

222.    Defendants have not provided DACA applicants with the process to which they are entitled.

223.    The Supreme Court's opinion in *Regents* and the Fourth Circuit mandate in *CASA de Maryland* were both applicable nationwide. Both decisions required Defendants to return to the *status quo ante* by adjudicating first-time applications for DACA, continuing to accept two-year renewal requests, and accepting applications for advance parole.

224.    Moreover, under the terms of the DACA guidance as it existed prior to the 2017 termination, "[e]ach request for consideration of DACA will be reviewed on an individual, case-by-case basis."[28]

225.    By their own admission, Defendants refused to adjudicate first-time DACA and advance parole applications filed between June 30, 2020 and July 28, 2020—the period between the issuance of Fourth Circuit mandate and the issuance of the Wolf Memorandum. Instead, Defendants "placed" these first-time applications "into a bucket" pending future action by the agency. Tr. of Virtual Status Conference Proceedings at 17-18, *CASA de Maryland v. DHS*, 8:17-cv-02942-PWG (D. Md. Jul. 24, 2020).

226.    In the Wolf and Edlow Memoranda, Defendants maintained their refusal to adjudicate these first-time applications on an individual, case-by-case basis, instead rejecting them retroactively and categorically.

227.    Defendants continue to refuse to provide individual review of any first-time DACA applications or advance parole requests, and have begun granting DACA renewals for a one-year

---

[28] *Frequently Asked Questions*, U.S. Citizenship and Immigration Services, *available at* https://www.uscis.gov/archive/frequently-asked-questions.

period.

228.    Defendants' failure to adjudicate applications submitted and postmarked prior to July 28, 2020 according to the terms of the Napolitano Memorandum violates the Due Process Clause of the Fifth Amendment.

### *Failure to Provide Notice of Refusal to Adjudicate First-Time Applications*

229.    Defendants' categorical refusal to adjudicate first-time DACA applications after June 30, 2020, contravened the DACA program as it existed prior to Defendants' unlawful 2017 termination.

230.    Between June 30, 2020 and July 24, 2020, Defendants never provided individualized or even general notice to applicants, their counsel, or the public that it had changed the DACA program to refuse to adjudicate new DACA applications.

231.    On July 24, 2020, Defendants articulated this change during a status conference in *CASA de Maryland v. U.S. Dep't of Homeland Security*, before the District of Maryland. To date, despite not issuing the Wolf Memorandum until July 28, 2020, Defendants have not explained when this shift occurred.

232.    Under the terms of the DACA guidance as it existed prior to the 2017 termination, DACA applicants are entitled to individualized review of their applications.

233.    Defendants' failure to provide individualized notice to first-time applicants that their applications would not be adjudicated violates the Due Process Clause of the Fifth Amendment.

234.    Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public

of their eligibility for DACA in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

235.    Defendants' failure to notify applicants' counsel or the public of this policy change likewise violates the Due Process Clause of the Fifth Amendment.

### Failure to Provide Notice of Changes to Renewal Process

236.    The DACA program as it existed both before and after Defendants' unlawful 2017 termination set the DACA grant period at two years from the date of approval.

237.    Under the Wolf Memorandum, no matter when they applied for DACA renewal, individuals whose renewal applications are approved after the date of the memorandum are eligible only for one-year grants. This includes individuals whose renewal applications were pending with Defendants as of the date of the memorandum.

238.    Defendants did not provide individual notice to these individuals that their period of DACA would be limited despite their having already submitted renewal applications.

239.    Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public of the length of renewals in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

240.    Defendants' failure to provide notice to these individuals that their DACA would be limited to one year rather than two violates the Due Process Clause of the Fifth Amendment.

### Failure to Provide Notice of Changes to Advance Parole Standard

241.    The DACA program as it existed before Defendants' unlawful 2017 termination of the program allowed DACA recipients to apply for and receive advance parole if their travel

abroad would further humanitarian purposes, educational purposes, or employment purposes.[29]

242.    Under the Wolf and Edlow Memoranda, no matter when DACA recipients requested advance parole, Defendants intend to reject all applications for advance parole from DACA recipients "absent exceptional circumstances." This includes individuals whose advance parole applications were pending with Defendants as of the date of the Wolf Memorandum.

243.    Defendants did not provide individual notice to these individuals that their pending applications for advance parole would be subject to this new heightened standard.

244.    Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public of their eligibility for advance parole in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

245.    Defendants' failure to provide notice to these individuals that their advance parole applications would be rejected absent exceptional circumstances violates the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Certify a class and subclass consisting, respectively, of: (A) All persons who are or will be prima facie eligible for deferred action under the terms of the 2012 Napolitano Memorandum; and (B) All persons who had an application for deferred action through DACA, whether first-time or renewal, pending at USCIS on any date between June 30, 2020, and July 28, 2020, that have not been or will not be adjudicated in accordance with the 2012 Napolitano Memorandum. Excluded from the class and subclass are: The

---

[29] *Frequently Asked Questions*, *supra* note 20.

individual recipients of, or requestors for, deferred action through DACA who proceed with a challenge to the Wolf Memorandum;

2. Appoint the undersigned counsel as class counsel;

3. Declare that Defendant Wolf is unlawfully serving as Acting Secretary of Homeland Security, in violation of the Federal Vacancies Reform Act, the Homeland Security Act, and the Appointments Clause;

4. Declare that the Wolf Memorandum has no force or effect as an unlawful exercise of authority;

5. Declare that the Wolf Memorandum and actions taken by Defendants to implement the Wolf Memorandum, including the Edlow Memorandum, are void and without force or effect, and cannot be ratified;

6. Declare that the Wolf Memorandum and Edlow Memorandum are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

7. Declare that the Wolf Memorandum, the Edlow Memorandum, and actions taken by Defendants are in violation of the procedural due process guarantee of the Fifth Amendment of the U.S. Constitution;

8. Issue a declaration under 28 U.S.C. § 2201 that the DACA program as established by the Napolitano Memorandum is a lawful exercise of executive power;

9. Vacate and set aside the Wolf Memorandum and any other action, including but not limited to the Edlow Memorandum, taken by Defendants to terminate the DACA program in whole or in part;

10. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and persons in active concert or participation with any of the Defendants, from implementing or

enforcing the Wolf Memorandum and the Edlow Memorandum, and from taking any other action to terminate or curtail first-time applications for DACA, DACA renewals, advance parole for DACA recipients, or other aspects of the DACA program that is not in compliance with applicable law or the U.S. Constitution;

11. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from denying individuals the opportunity, when eligible under the terms of the Napolitano Memorandum, to apply for or to renew their DACA, or to apply for advance parole;

12. Enjoin Defendants to adjudicate all first-time DACA applications filed from June 30, 2020 to the present in accordance with the terms of the Napolitano Memorandum, even if Defendants have heretofore rejected those applications, with appropriate notice to applicants and their counsel;

13. Enjoin Defendants to adjudicate first-time DACA applications from any applicant who can establish that they are eligible for DACA under the terms of the Napolitano Memorandum at any point from September 5, 2017 to the present, and who files such application within a reasonable period of time following the date of decision in this case, notwithstanding any future efforts by Defendants to again terminate the program;

14. Enjoin Defendants to issue a two-year grant of DACA and Employment Authorization Document ("EAD") to all renewal applicants that have received a one-year grant of their DACA or EAD as of July 28, 2020, with appropriate notice to applicants and their counsel;

15. Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

16. Grant such other relief as this Court deems just and proper.

Dated:  August 28, 2020

Respectfully submitted,

<u>/s/ Marisol Orihuela</u>

| | |
|---|---|
| Maria Camila Bustos, Law Student Intern* | Trudy S. Rebert, Esq. (TR 6959) |
| Armando Ghinaglia, Law Student Intern | NATIONAL IMMIGRATION LAW CENTER |
| Edgar A. Melgar, Law Student Intern* | P.O. Box 721361 |
| Ramis Wadood, Law Student Intern | Jackson Heights, NY 11372 |
| Muneer I. Ahmad, Esq. (MA 9360) | (646) 867-8793 |
| Marisol Orihuela, Esq. (*pro hac vice*) | |
| Michael J. Wishnie, Esq. (MW 1952) | Araceli Martínez-Olguín, Esq. (AM 2927) |
| JEROME N. FRANK LEGAL SERVICES ORG. | Mayra B. Joachin, Esq. (*pro hac vice*) |
| muneer.ahmad@yale.edu | NATIONAL IMMIGRATION LAW CENTER |
| P.O. Box 209090 | 3450 Wilshire Blvd. #108-62 |
| New Haven, CT 06520 | Los Angeles, CA 90010 |
| (203) 432-4800 | (213) 639-3900 |

Karen C. Tumlin, Esq. (*pro hac vice*)        Paige Austin, Esq. (PA 9075)
Cooperating Attorney        MAKE THE ROAD NEW YORK
JEROME N. FRANK LEGAL SERVICES ORG.        301 Grove Street
P.O. Box 209090        Brooklyn, NY 11237
New Haven, CT 06520        (718) 418-7690
(323) 316-0944

*Attorneys for Plaintiffs*

\* Motion for law student appearance
forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, a true and correct copy of the foregoing Fourth Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Marisol Orihuela
Marisol Orihuela, Esq. (*pro hac vice*)
JEROME N. FRANK LEGAL SERVICES ORG.
marisol.orihuela@yale.edu
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800