EXHIBIT  D

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents.*

Case No. 1:16-cv-04756
(NGG)(JO)

## SUPPLEMENTAL DECLARATION OF MARTÍN BATALLA VIDAL

I, Martín Batalla Vidal, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2. I am trained as a Physical Therapist to Rehabilitation Certified Nursing Assistant. I have continued to renew and maintain DACA status since my previous declaration. I most recently renewed my DACA status for a period of two years on April 23, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time. This is really stressful, especially because I anticipate applying for new jobs in the future and I know employers want to hire people they can feel confident will work for them for a long time. It will also be hard financially because it is more expensive to renew more often.

3. I have felt a lot of anxiety since the Wolf Memorandum was announced. For me and everyone with DACA, the new memo will reduce our chances of getting a job, of being independent, and being able to accomplish the things we have tried to with DACA—because now we have to renew more and our status is at risk. The memo came during a period that was already extremely stressful. My mother got COVID and was hospitalized for two weeks. She has a lot of

1

health problems already: she has osteoarthritis and thyroid issues. COVID has made her health even worse. Right after my mom got sick, my brother was in a serious car accident and spent two weeks in an Intensive Care Unit. The added anxiety caused by the Wolf Memorandum has been very difficult to handle.

## ADVANCE PAROLE

4. I have traveled on advance parole in the past and would like to be able to travel with advance parole again to visit my maternal grandmother in Mexico. She is in poor health and she is getting older. She called me recently and asked me when I am coming. She told me, "you promised to come back." But I haven't been able to travel since advance parole was ended for DACA recipients in 2017.

5. With the new memoranda and the attacks on DACA, there is a lot to think about before applying for and traveling on advance parole. I'm scared. I want to visit my grandmother for what will probably be the last time. But I am concerned that seeing her would not qualify under the new restrictions on advance parole for DACA recipients and I also don't know if it is safe to take the risk of leaving the country.

## CLASS REPRESENTATIVE

6. I have been a plaintiff in this lawsuit since 2016.

7. I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing any person who is a plaintiff in another lawsuit challenging the Wolf Memorandum.

8. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to

2

represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and because I have always treated this case as being about not only me but about the whole community.

9. It is very important to me to reopen and restore DACA, like we thought we had after the Supreme Court decision. This case has made me someone who is publicly known so a lot of people contacted me after the decision, asking questions like if they could apply for DACA for the first time now. Based on what I know about the decision and talking to my lawyers, I told people they could and to start gathering their documents. And I had also encouraged people with DACA to renew. Now with the Wolf Memorandum, I feel a lot of guilt. People are so disappointed that now they can't apply for DACA for the first time or that their renewals will only be for one year. We thought it was a victory and it should have been.

10. Having to live year to year, now that the renewal period has been shortened, is also very stressful for everyone with DACA. One of my friends who works at a hospital and has DACA is scared now about losing his job.

11. I want to continue in our fight for DACA because I know what DACA does for people who can get it. DACA has given all of us who have it so many opportunities: to come out of the shadows, to have better opportunities, to become a business owner or entrepreneur, to study and get a college degree, and to work in the field we studied. Everyone deserves those same chances.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

3

EXECUTED August 2 7, 2020 in Gaithersburg, MD

Martín Batalla Vidal

EXHIBIT  E

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756 (NGG)
(JO)

## SUPPLEMENTAL DECLARATION OF ANTONIO ALARCÓN

I, Antonio Alarcón, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I graduated from community college in 2015 and got my bachelor's degree from Queens College in May 2018.

3.  I now work as a Civic Engagement Coordinator at Make the Road New York ("MRNY"). The census-outreach team that I coordinate at MRNY has contacted over 100,000 New Yorkers to educate them about the importance of completing the 2020 Census. We focus our outreach on the immigrant and Spanish-speaking communities. Our team has helped thousands of people complete the census.

4.  As part of my community outreach and education, I also do a lot of media appearances. I have written op-eds and I regularly appear in English- and Spanish-language media outlets such as NY1, Univision, and Telemundo to educate the community about the census and to address concerns and fears that exist about the census especially in the immigrant community.

1

5.   I first received DACA in March 2013. I have continued to renew and maintain DACA since that time. I most recently renewed my DACA for a period of two years on April 2, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time. I am worried because this change means more time in limbo for myself and other DACA recipients, since we are vulnerable to changes in policy each time we have to wait for a renewal, and it is also a lot more expensive.

**ADVANCE PAROLE**

6.   It has been very hard for me not to have access to advance parole since 2017. Both my parents live in Mexico with my younger brother. It has been four years since I have seen them and I really miss them. They missed my college graduation in 2018 and I was not able to be there for them in June 2020 when both of them got sick. Now my mom needs surgery, which I really want to be there for. It is hard for me to even think about how much I want to see them. It keeps me up at night.

7.   There are also so many other places I want to travel. I have always wanted to travel to Greece because of its history and all of the culture there that ties into things I studied in school. I have friends who have invited me to travel with them to other countries or to visit and meet their families in other countries, and without advanced parole it has been impossible.

8.   But now the situation as to whether DACA recipients can get permission to safely travel outside of the U.S. keeps shifting from one day to another. Under the new Wolf memorandum, I understand that advance parole for DACA recipients is even more restricted. I am not certain if seeing my parents in Mexico would be considered a valid reason to travel to Mexico or if I should risk leaving the country. I would also like the chance to travel abroad for educational purposes, but I believe that is no longer allowed under the new Wolf memo.

2

**CLASS REPRESENTATIVE**

9.   I have been a plaintiff in this lawsuit since 2017 and I have been an advocate for DACA and DACA holders since long before that.

10. I am willing to serve as the class representatives for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and related guidance. I understand I will not be representing any person who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memorandum.

11. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend the interests of the whole class, not only myself. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and related guidance.

12. I have always thought of my role in this case as representing the interests of more than just myself. I am committed to representing the whole class, including everyone who qualifies for DACA and everyone like me who has DACA but is now harmed by these newest memorandum. Even before these memos, renewing even every two years was a challenge because of the fees and the wait time. During those months of waiting for your renewal, you never know what the administration could do: they could issue a new memorandum, they could end the program all together. You are always in limbo and now, with the shortening of renewals from two years to one, people will be in an even worse limbo. It is also more likely that people who can't afford the fees or don't have help renewing may not be able to renew at all.

3

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Miami, FL.

_____
Antonio Alarcón

4

# EXHIBIT  F

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## SUPPLEMENTAL DECLARATION OF ELIANA FERNANDEZ

I, Eliana Fernandez, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.   I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.   I now work as a Lead Organizer at Make the Road New York. I continue to live with and raise my two U.S.-citizen children, who are starting the third and eighth grades this fall.

3.   I first received DACA on December 11, 2012. I have continued to renew and maintain DACA status since that time. I most recently renewed my DACA for a period of two years on April 20, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

4.   The uncertainty of the last three years and this administration's attacks on DACA have been very traumatic. I began attending therapy to try to better handle and process it all. Unfortunately, since the Wolf Memorandum, the anxiety and physical symptoms of stress that I developed when the government first tried to end DACA in 2017 have returned. The migraines and neck pain that I suffered then are back. These are because of the stress the announcement has made me feel and are causing me a lot of difficulty and discomfort.

**ADVANCE PAROLE**

5.   I was able to travel to Ecuador on advance parole in 2015 to visit my grandmother, who was ill at the time.

6.   I am very eager to apply for advance parole again in order to visit universities and possibly attend job interviews in Canada. Given the uncertainty around DACA and my worries about how a termination of DACA could impact my life and the lives of my kids, I have been exploring the possibility of moving to Canada with my family since earlier this year. I have spoken with an immigration lawyer in Canada and also made plans to take the language examination that is required for admission to Canadian universities. I have also been researching universities where I could get a master's degree as well as job opportunities in or near Toronto, Ontario.

7.   However, I have never been to Canada and uprooting my family to move to another country is a big decision. I do not want to make the decision for us to move there without visiting first.

8.   When DACA was reinstated in June of this year, I thought this would be a great opportunity to access advance parole again for the purpose of exploring educational and work opportunities in Canada. But then when the government issued its new memorandum on July 28, I was not sure if my travel would qualify. And now, reading the memorandum issued on August 21, I think it will be basically impossible to get advance parole. The reasons are just too narrow and challenging. It's upsetting to me to have this opportunity close off again. I want to be able to travel and build a better life for myself and my family.

**CLASS REPRESENTATIVE**

9.   I have been a plaintiff in this lawsuit since 2017.

10. I am willing to serve as the class representatives for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and implementing guidance. I

understand I will not be representing any person is eligible for DACA and proceeds with a federal lawsuit challenging the Wolf Memorandum.

11. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and its implementing guidance.

12. I know from personal experience how much this administration's attacks on DACA are hurting all of us. So many people who qualify and would benefit from DACA cannot apply now. For those of us who already have DACA, the latest memos means we have to renew much more often, but we only the opportunity to have DACA for half the time. The change to one-year renewals makes me feel like I have no control over my life, no stability, and I know that is what others in my situation are feeling too. Through this case, I want to do what I can to help all of us.


I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.


EXECUTED August 27, 2020 in Suffolk County, NY


Eliana Fernandez

EXHIBIT  G

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## SUPPLEMENTAL DECLARATION OF CAROLINA FUNG FENG

I, Carolina Fung Feng, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I am 31 years old and I live in Queens, New York. I currently work at the Center for Popular Democracy as a digital organizer on their census campaign, trying to encourage participation in the 2020 Census, and I also support other advocacy campaigns. This is a temporary position I have until December 2020.

3.  I first received DACA in December 2012. I have continued to renew and maintain DACA status since that time. I most recently renewed my DACA status for a period of two years on November 4, 2019. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

4.  The administration's attacks on DACA have been very stressful for me. Because of my anxiety over DACA and my future and security here, I was diagnosed with high blood pressure and now have to take daily medication. It's upsetting to me that this has happened to me at such a

1

young age. My need for medication also causes me its own worry and stress, because even as I have changed jobs I have to try to ensure I do not have any gaps in health insurance coverage.

**CLASS REPRESENTATIVE**

5.   I have been a plaintiff in this lawsuit since 2017.

6.   I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing any person who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memorandum.

7.   I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012.

8.   As a plaintiff in this case, I have always tried to represent and defend the rights of all people with DACA or who qualify for DACA. The new memorandum in July harmed all the people who now cannot apply for DACA at all and it also created a lot of stress and uncertainty for people like me who will now have to renew every year. I am very concerned that needing to renew every year will impact people DACA holders like me who need to job hunt. My current job is temporary, so I will need to look for a new job soon. But employers often want to hire people who can be at a job long term and now our work authorizations will be very short. I am also worried about the impact that the shorter renewal period may have on DACA holders'

ability to get other identifications. New York State has historically included the period of authorized stay on driver's licenses, so my driver's license shows my renewal period. I have not been able to renew my license or my New York City identification since the pandemic started, because government offices are closed. As a result, I have been scared to go out, because I don't want to carry documents like my passport that show my immigration status.

9.  Through this case, I want to help everyone facing the problems and uncertainties that result from the government's attacks on DACA.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Queens, NY

Carolina Fung Feng

3

EXHIBIT  H

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## SUPPLEMENTAL DECLARATION OF CARLOS VARGAS

I, Carlos Vargas, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I have continued to renew and maintain DACA status since my previous declaration. I most recently renewed my DACA status for a period of two years on February 14, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

## ADVANCE PAROLE

3.  I would like to be able to travel on advance parole again, as I was able to before the 2017 memo. My mom is hoping to be able to travel to Mexico soon and I would like to travel with her. I am her caretaker; she has a lot of mobility issues and I help her with basic things like standing up and sitting. I would also love to be able to experience going back to Mexico with her.

4.  But under the new guidelines, the standard is so narrow that I worry that traveling with her to support her would not qualify me for advance parole.

## CLASS REPRESENTATIVE

1

5. I have been a plaintiff in this lawsuit since 2017.

6. I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing anyone who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memo.

7. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012.

8. I know how important it is to reopen and restore DACA and to keep a renewal period of two years. The COVID pandemic has showed the stakes. I was diagnosed with COVID and had to go to the hospital. While I was there, thinking of my own health and recovery, I also thought a lot about how hard it would be if I did not have health insurance and about all the challenges that being undocumented in the U.S. brings—from access to healthcare, to access to employment and on one's ability to serve the community. With DACA, I have access to health insurance through my employer. That is so important especially during a pandemic. Losing DACA would mean losing these benefits at a time when we are in a pandemic and things are so volatile, economically, emotionally, and for our health.

9. The pandemic has also shown me how important it is for people who can obtain DACA to do so as a way to protect themselves and their communities. A lot of undocumented workers

2

are the essential workers who are putting food on our tables, doing deliveries, stocking our shelves at the supermarket. I can only imagine the risks they are putting themselves in everyday, exposing themselves to the public while working during the pandemic. With DACA, they would be able to have the rights and security that enable them to be able to contribute more to their communities, but also to protect themselves. Access to DACA would help them and also help their mixed status families, because a lot of folks have kids who were born here and family members who are citizens or residents.

10. This case and the opportunity to help everyone who qualifies for DACA is especially important at this time.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 27, 2020 in Staten Island, NY

Carlos Vargas

3

EXHIBIT  I

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

            *Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## DECLARATION OF JOHANA LARIOS SAINZ

I, Johana Larios Sainz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Johana Larios Sainz and I am 26 years old. I was born in Mexico and I have lived in in the United States since I was two years old. I grew up on Staten Island, which is where I live now with my two children who are U.S. citizens.

2.      I do not have lawful immigration status in the United States. In 2017, I was getting ready to apply for Deferred Action for Childhood Arrivals ("DACA") and had made an appointment to fill out my application with the same person who helped my sister get DACA. But a few days before the appointment, in September 2017, DACA was cancelled.

3.      In July 2020, after the Supreme Court decision on the DACA program, I filed a DACA application for the first time. According to the UPS tracking information, the government received it on Monday, July 27. But the next day, the program was cancelled again. I have not received my application back yet, but I still have my hopes up that something good can happen, and that people like me can get DACA and the opportunities it brings.

1

**DACA ELIGIBILITY**

4.      I meet all of the requirements for DACA. I am 26 years old. I arrived in the United States for the first time when I was two years old. That was more than ten years before both June 15, 2007 and my 16th birthday. I have not left the U.S. since arriving.

5.      On June 15, 2012, I was present in the U.S. and did not have lawful status.

6.      I graduated from Port Richmond High School in Staten Island in August 2014.

7.      I have never been arrested or convicted of a crime.

**UPBRINGING & FIRST EFFORTS TO APPLY FOR DACA**

8.      I grew up on Staten Island and attended New York City public schools from kindergarten through high school.

9.      I knew growing up that I was undocumented but I didn't know how important it was until I was in high school. That was when everybody was getting their learner's permits and applying for jobs. I couldn't do those things. But even as I realized how hard it would be, I knew I couldn't leave the U.S. I grew up here. My whole family is here. This has always been my home. Sometimes my family members who are U.S. citizens even forget that I'm not a citizen. They will ask me things like "are you going to vote?" I have to remind them. I feel like I am left out and so many things are easier for my family members who have DACA or are citizens. It's easier for them to get health insurance, go to school, get a job. Still, New York is my home; this is where my family is.

10.      Without work authorization, I could only get part-time jobs. I was able to earn some money but it wasn't enough to provide for myself and my kids. If I had had work authorization, I could have had better working conditions and been paid more. I would have been able to help my family and household.

11.     My son was born in December 2013. I left school after his birth until June 2014 but then I came back and graduated two months later. Around that time, I had just started to hear about DACA. I had cousins who were applying and told me about it. But I was living with my son's father, and he put a lot of pressure on me not to apply. It was not a healthy relationship; he tried to isolate me and I think he probably felt that if I had DACA I would be able to do more than what he was doing. He is a U.S. citizen, so instead he always told me that we would get married and he would apply for me to get status. He said that would be better and faster. He tried to use his immigration status as a way to make me stay with him.

12.     Finally, in May 2017, I got the courage to leave him and move back to Staten Island. My younger sister had DACA by that time and she helped me get ready to apply. It was a hard time for me, trying to transition to get by on my own and take care of my son alone. My son was enrolled in a pre-kindergarten that was far from our house. The school would have been easy to reach by car, but because I couldn't get a driver's license I had to wake us up early and take the bus. I couldn't give my son the stability that he needed—in some ways, I worry that he still remembers that period.

13.     I knew that having DACA would help me. With DACA, my sister was able to get a better job and start building her credit. She works at a pharmacy and she has been able to support her daughter. She was also able to get child support from her daughter's father, a process that I have seen be more difficult for people like me without documents. My cousins who have DACA have also been able to travel and feel safe, which I have never been able to do, even within in the U.S.

14.     With DACA, I thought I could have those opportunities, too. I could get a steady job, a car, and a place to live.

15.     During that summer of 2017, I prepared to apply for DACA. I gathered my school records and I spoke with different relatives to try to collect all the dates I would need for my application, like the dates we came to the U.S. and moved to New York. I made an appointment in September with the same person who had prepared my sister's application. I was hoping that if I had everything ready, I would be able to apply right away.

16.     A few days before the appointment, I remember that I was cleaning a house when my mom called me and she said, "Johana did you hear what happened?" She told me that the government had canceled DACA. I was shocked. I got really sad. I was going through a hard time and trying to restart and trying to do something better for myself and my son. But then DACA was taken away.

17.     In the years since then, I have been able to get an apartment with my family. My daughter was born two years ago and my new partner and I can provide the important things that my children need. But it's still difficult. We still don't have a car, even though we live on Staten Island where driving is really helpful. And my children always wear hand-me-downs. I can't buy them the things that I want to.

**DACA REOPENING & APPLICATION**

18.     In June 2020, I was cooking in my kitchen when I saw on the news that the Supreme Court decided that DACA was going to return to the way that it was again. I couldn't believe it. I didn't want to get my hopes up too much because of what I went through last time, but my understanding from the news was that now I could apply again. Then my mother called me and she was excited too. She said, "did you see the news? You should do it!"

19.     I still really wanted DACA. My biggest reason is to provide for my family. With DACA I would be able to earn a steady income. My family has the necessities that we need, but

there is a lot that we can't do or that we have delayed. I want to be able to buy a car so that I can transport myself and my children. And I want to be able to buy my children things they need, like new clothes. I would love to hear them say "my mommy got me this."

20.     I would also like to go back to school. One of my younger sisters, who is a U.S. citizen, went to college and she always talked about it and how we all deserve an education. She got me interested in jobs in the medical field. With DACA, I could continue my education and have a career.

21.     After the Supreme Court decision, I started calling to try to find a legal organization to help me with the application. But this was during the coronavirus pandemic, so some places weren't open yet. Weeks went by and no one was calling me back. Finally, I decided I would go to one of them, Make the Road New York, in person and see if anyone was there. I knocked on the door of their office in Port Richmond and someone came out. I told him I needed more information on DACA; I wanted to know if it was true I could apply. A few minutes later, Carlos Vargas—who I understand is an accredited legal representative at Make the Road New York and also a plaintiff in this lawsuit—came out and he gave me his card. He said he could help me right away.

22.     After that we were in touch almost every day, as Carlos told me about more documents I needed and helped me get ready to apply. I had to collect documents; my family had to get documents. But we got it done.

23.     Carlos mailed my application on a Friday, July 24, and UPS tracking showed that the government received it on Monday, July 27. But then the next day, Tuesday, was when the government released a memo that they weren't accepting first-time DACA applications anymore. I didn't know if the new announcement meant they wouldn't accept *all* applications or only ones

filed from that point on. But then Carlos told me that for now this meant the government wasn't going to process any applications, even ones they had already received.

24.     I felt sad but at the same time I kept my hopes up. I am still keeping my hopes up that I and other people like me can get DACA.

**CLASS REPRESENTATIVE**

25.     I am willing to serve as a class representative for (1) everyone who is or will be eligible for DACA the way it was when it was first created and who is impacted by the government trying to end DACA; and (2) everyone who had an initial or renewal DACA application pending with the government at any time between June 30 and July 28, 2020 and whose application has not been or will not be processed the way it was supposed to be.

26.     I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who is eligible for DACA and is bringing another federal lawsuit challenging the Wolf Memorandum.

27.     I know I can serve as a class representative for this class because the class members and I all share the same interest of: (1) having the new DACA memorandum from July 28, 2020 set aside; and (2) having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

28.     I want to serve as a class representative because I want to be able to help other people in this situation. The plaintiffs who started this case helped me; and now by participating in this case I want to do that for the benefit of others.

29.    If the government were to put DACA back the way it was in 2012, I know there are a lot of people who would provide even more to this country. There are people with talent— really smart people—who can make this country greater. We just need to give everybody a chance. One of my friends with DACA is a nurse now. I know that there are more people like him who are able to do more and push themselves and strive for more, but they're in the same situation or similar situations to mine. They just need the chance. We all need the chance.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26 , 2020 in Staten Island, NY

Johana Larios Sainz

EXHIBIT  J

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## DECLARATION OF SONIA MOLINA

I, Sonia Molina, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.       My name is Sonia Molina and I am 30 years old. I was born in Mexico and I have lived in Queens, New York since I was eight years old.

2.       I have had DACA since December 2012. I filed my most recent renewal application in April 2020 and it was still pending when the new DACA memorandum came out on July 28, 2020. As a result, I understand that I will only be granted a one-year renewal under the new policy even though when I applied it was for a two-year renewal. I am also aware that another memorandum with guidance on DACA came out on August 21, 2020, and my understanding is that because of this memo my currently pending DACA renewal may be rejected because my current DACA expires over 150 days from when I submitted my renewal.

## DACA STATUS

3.       I grew up with my family in Queens and attended New York City schools. I graduated from Information Technology High School in Long Island City in 2008. I started college after that but it was hard to afford because I didn't get any financial aid and I didn't have work authorization. I started off at Queensborough Community College but it was very expensive, so

1

after a semester I transferred to LaGuardia Community College where I earned my associate's degree.

4.      Before I got DACA, I worked at a supermarket as a cashier for around 5 years. I didn't dislike my job but it was just that: a job to do on a daily basis. When I got DACA and work authorization in 2013, it opened a lot more doors for growth and for learning experiences. DACA gave me the opportunity to develop new skills and grow intellectually. In May 2013, I got a job working at reception at Make the Road New York's Queens office, which is the organization's busiest community center. It was a good feeling. I am now a Senior Office Manager, helping to manage operations there.

5.      I was still unable to get financial aid for college but getting DACA really helped by relieving a lot of the financial pressure on my family. I was able to contribute to more of the bills and to my expenses for school. It made things easier for us. School was still expensive, but now we were able to pay, whereas before I had DACA it was more difficult. My brother also got DACA after me, which was a big relief for our family.

6.      I graduated with my bachelor's degree from New York City College of Technology ("City Tech"), in the City University of New York, in 2016.

**2017 TERMINATION OF DACA**

7.      I was at work at Make the Road when I heard about the government trying to end DACA in 2017. My mind immediately jumped to what I would need to do if I had to leave the United States and how I would make sure that I was okay.

8.      I didn't talk about it with anyone. I was obviously affected by it, but I think my way of handling the stress was by isolating myself. I wasn't as social after the announcement, even with close friends. I think people gave me space. But because of working at reception at Make the

Road, I had to tell a lot of people who called or walked in that they couldn't apply anymore—because the government was no longer accepting applications from people who never had DACA. It was really hard. People contacted us with hope but then found out they couldn't apply.

9.     I always try to plan things. So, for myself and my family I thought, once I know what will happen with DACA, I'll be able to come up with a plan. In the lead up to the Supreme Court decision in 2020, my brother and I both applied to renew our DACA. My last DACA renewal was issued on May 1, 2019, so my current DACA expiration date is in April 2021. However, I filed the renewal on April 1, 2020, in hopes that it would be processed before any Supreme Court decision could come out. I thought this might be our last renewal, so both my brother and I wanted to know that we would have two more years of safety and work authorization. I was calculating for the future thinking about the two-year renewal and the time that would allow me to plan. I was hoping for a positive decision from the Supreme Court but we did what we could to lengthen my stay and to have some certainty about the future—that way at least for two more years we could feel secure and plan.

10.     Also, I have had renewals take a long time before and I did not want to risk having any gap in status.

11.     After submitting my renewal on April 1, 2020, I received a receipt notice and a notice saying USCIS was re-using previous fingerprints. My brother's renewal application, which he filed at the same time, was approved. So I have just been waiting for the approval in my case.

## SUPREME COURT VICTORY & NEW MEMORANDUM

12.     When we won the DACA case in the Supreme Court, I think it was the first time I let myself actually feel happy. For a really long time I had just been holding the emotion from this experience in. But that morning when we learned about the decision, I couldn't hold it in anymore:

I was really happy. Working at Make the Road, I have seen how hard people have fought for this case and for DACA. And for me and my brother, there was that hope now that we could have some security and plan for the future.

13.     After the Supreme Court decision, so many people applied for DACA for the first time or got ready to apply. I know from working at Make the Road how many calls and questions we got. People were hopeful.

14.     But then the July 28 memorandum came out. I was at work again when I heard. It ended my hope that I could plan for the future. Now like everyone with DACA, I can only plan one year at a time. There's no time to relax for a little bit and feel secure. At least with the two-year renewal period, there's one year where you can think, "I'm good until next year." Now there is no cushion. Constantly renewing is going to be hard and also financially difficult for people.

15.     The whole experience has been exhausting with the government's repeated attempts to end DACA—to have to go through this over and over and over again.

**CLASS REPRESENTATIVE**

16.     I am willing to serve as a class representative for everyone who is or will be eligible for DACA the way it was created in 2012 and who is impacted by the government trying to end DACA; and everyone who had an initial or renewal DACA application pending with the government at any time between June 30 and July 28, 2020 and whose application has not been or will not be processed the way it was supposed to be.

17.     I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that

I will not represent anyone who is eligible for DACA and brings another federal lawsuit challenging the Wolf Memorandum.

18.     I know I can serve as a class representative for these classes because the class members and I all share the same interest of having the new DACA memoranda from July 28 and August 21, 2020 set aside; and having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

19.     I want to serve as a class representative because I have seen how harmful the government's efforts to end DACA have been, especially after the Supreme Court decided that DACA should go back to the way it was in 2012.

20.     For those of us with DACA, it feels like we have already done more than enough to prove we are worthy of being here. Even now there are still so many people with questions, who want to know if this is it or if there is a chance we will see something positive happen in the future about DACA. It is hard to not have an answer, because there's not an answer even for me. There's so much uncertainty for everyone who has DACA at the moment. There is so much pressure on all of us. We are all on the edge of our seats thinking about what the next attack is going to be and what will happen next. It's taking a toll on everybody. It's a rollercoaster of emotions. And it's really hard to know there are so many people who could have applied for DACA before the new changes. I want this case to benefit not just me and people who already have DACA but everyone else who hasn't had the opportunity to apply.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Queens, NY

Sonia Molina

6

EXHIBIT  K

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756 (NGG) (JO)

## <u>DECLARATION OF XIMENA ZAMORA</u>

I, Ximena Zamora, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Ximena Zamora and I am 18 years old. I was born in Mexico and I have lived in in the United States since I was two years old. I grew up in Queens, New York. I am about to start college at Baruch College, which is part of the City University of New York ("CUNY"). I plan to major in finance and study forensic accounting.

2.      I do not have lawful immigration status in the United States. I knew that I would qualify for Deferred Action for Childhood Arrivals ("DACA") when I turned 15 in 2017, so beginning that summer my family and I started gathering all the records I would need to apply and I had several appointments to get legal help with my application from Make the Road New York ("MRNY"). My dad had just gotten the check for the filing fee when the program was cancelled for first-time applicants in September 2017.

3.      In June 2020, after the Supreme Court decision on the DACA program, I immediately got back in touch with MRNY, where I am a member, about applying. Even though I already had a lot of what I needed, the process was slower because of coronavirus: I had to mail everything to MRNY, like my signed application and my photos. Then it happened again. Just

1

when MRNY was ready to send in my application in July, DACA was cancelled again for new applicants.

## DACA ELIGIBILITY

4.      I have met all the requirements for DACA since I turned 15 in 2017. I arrived in the United States for the first time when I was two years old in 2004. That was before June 15, 2007 and before my 16th birthday. I have not left the U.S. since arriving.

5.      On June 15, 2012, I was present in the U.S. and did not have lawful status. I was in the fourth grade at P.S. 69 in Jackson Heights, Queens.

6.      I graduated from Academy of Finance and Enterprise High School in Queens in June 2020.

7.      I have never been arrested or convicted of a crime.

## UPBRINGING & FIRST EFFORTS TO APPLY FOR DACA

8.      I have lived in Queens since I was two years old. I attended New York City public schools from kindergarten until I graduated from high school two months ago and now I am going to a CUNY campus in the fall.

9.      I learned about DACA from my dad and my sister. I even went to demonstrations in support of DACA with MRNY, where my dad is a member and I eventually became a member myself. I knew that this was a movement and that people had fought for DACA—not only young people like me but our parents, too.

10.     Going into my sophomore year, I started to get ready to apply for DACA. My dad had a list of all the requirements and already before my 15th birthday he had gone to my doctor's office and my pre-kindergarten to get the documents I would need. He made me request my high

school records. And then in late June, before my birthday, I went to MRNY's Queens office to start the process.

11.     I was excited. My sister has DACA and she has been able to go to a four-year university and major in math. She has done internships to learn to code. I wanted to do those things, too. And I also just wanted a regular job. I really like animals and there was an animal shelter in Jackson Heights where I wanted to work. I went in and told them before I had even applied for DACA, and they said "You have to bring your working permit and do an interview and then you can work here." But I never got the chance. A couple days after my dad had gotten the check for the application fee—the last thing I needed to apply—DACA was cancelled for first-time applicants like me.

12.     It wasn't until a year later, when I was a junior, that I began to realize all of the things I wouldn't be able to do without DACA. My school was focused on business and a lot of my classmates would do internships. I always thought their experiences sounded interesting and wished I could do the same. My teachers would even ask me why I hadn't done any internships. But without a social security number, I couldn't because I couldn't get paid. No one at my school talked about immigration; I wasn't comfortable sharing my status, so none of my teachers knew my situation.

13.     There were also a lot of speakers who came to my high school to talk about how to apply to college, and they always said you have to have your social security number. It made me think I couldn't apply—I assumed it was impossible because I didn't have that number everyone was talking about.

14.     After the first semester of my junior year, I began to give up and let my grades drop. It was settling in for me that, without DACA and without a social security number, college might

not be an option for me. I knew I would graduate but I didn't put much effort in anymore because in my head I thought it didn't really matter. If I couldn't go to college, I would just graduate with low grades. Fortunately one of my counselors saw what was happening and she spoke to me. She was the first person to tell me that I could still apply to college, even after she knew I was undocumented. She helped me a lot. And when I was a senior in high school, I went back to Make the Road to get help with loan applications.

15.     I chose Baruch College in Manhattan because it is close to home and I learned that they are good about supporting their students with financial aid. But what I really wanted, and still want, is to go to school in California. Ever since I was in the 8th grade, I wanted to go to school there; my dream is to go to the University of California at Irvine or Los Angeles.  But without the ability to work, I can't afford going to school in California. If I had had my work authorization for the last three years, I could have been working in better jobs and saving money for college. But I haven't been able to and I can't work to pay my way through school. I also know it is risky to travel without status, especially now that I am 18.

**DACA IN 2020**

16.     In June of this year, I woke up one day and my dad said "it's open again!" I didn't know what he meant, but he explained "they're accepting applications to DACA again." I was very excited. I was about to turn 18 and I thought I would finally be able to get a real job and to earn money for college and to move to California. I got back in touch with MRNY and began preparing my application.

17.     The process took longer because of coronavirus. After I updated my documents, I had to mail MRNY passport photos and then a few days later, I had to sign some documents and

mail those in, too. It was right after I mailed those that the new announcement came: DACA was ended again for people like me.

18.    This time I felt angry, because it was the second time that this had happened. I didn't understand President Trump's reasoning for stopping DACA again, after the Supreme Court decision. It was very frustrating.

19.    What is most upsetting to me is to still not be able to get a real job. I am 18 and I still don't have experience of working a regular, full-time job.

20.    But I'm optimistic. I am hoping that we can find a way to open DACA and that, for me, after two years at CUNY I will be able to transfer to a college in California. My goal is to major in finance and become a Certified Public Account and then, if I can get immigration status, to work in forensic accounting. One of my teachers told me about the field because I was interested in both accounting and criminology—and he explained forensic accounting is like a cross between law enforcement and accounting. You help the government look for fraud. I have to fix my immigration status, but if I can do that, forensic accounting is what I want to do.

**CLASS REPRESENTATIVE**

21.    I am willing to serve as a class representative for everyone like me, who is or will be eligible for DACA the way it was in 2012 when it was first created.

22.    I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who proceeds with a federal lawsuit challenging the Wolf Memorandum.

23.     I know I can serve as a class representative for this class because the class members and I all share the same interest of having the new memorandum from July 28, 2020 ending DACA again and the memorandum that came after in August 21, 2020 set aside and having our applications processed as laid out in the 2012 DACA Memorandum.

24.     I would like to help more people to be able to apply for DACA because the program gives a lot of opportunities. Even just to work would be a great step for people like me. DACA would help young people who want to continue their education so they can achieve their goals. I also want to help people like my sister, who have DACA and will now have to renew every year. It is a big source of worry for her. She is about to graduate and thinks this will affect her in trying to get a job. She would also love to travel, but hasn't been able to.

25.     I want to help everyone in our situation. We all came here when we were young. It would be unfair to make all of us go back to countries we don't know and don't recognize as homes and to take away the opportunities in this country, which is our home.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 27, 2020 in Queens, NY

Ximena Zamora
Ximena Zamora

6

EXHIBIT  L

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BATALLA VIDAL, et al.; | |
| *Plaintiffs*, | Case No. 1:16-cv-04756 (NGG)(JO) |
| v. | |
| WOLF, et al.. | |
| *Respondents*. | |

## **DECLARATION OF M.B.F.**

I, M.B.F., declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.      My initials are M.B.F. and I am 17 years old. My mother, Lucia Feliz, is my next friend in this litigation. I was born in the Dominican Republic but I have lived in Queens, New York since I was four years old. I am about to start college as a freshman at the State University of New York ("SUNY") Old Westbury, where I plan to study criminology.

2.      I do not have lawful immigration status in the United States. In 2017, when I was going into my sophomore year of high school and about to turn 15, my mom and I began preparing my application for Deferred Action for Childhood Arrivals ("DACA"). But I never got a chance to submit it because the program was terminated ███████████████████.

3.      In July 2020, after the Supreme Court decision on the DACA program, I filed a DACA application for the first time. The FedEx delivery confirmation shows it was received by the government on July 7, 2020. My understanding is that the government will now not process or decide on my application because of its new attempts to end DACA.

1

4.      I really need DACA status. Time is running out. Last year, when I was midway through my senior year of high school, I received a Notice to Appear in immigration court by mail. Also, I will turn 18 and a half in March—after that, I will not be able to get status through my family anymore because I will have what my attorney tells me is called a bar due to "unlawful presence." Without DACA, my path to lawful status through my family won't work after that. For me, having DACA by March is the last opportunity I have to be able to stay in this country, which is my home and where my whole life and family are.

## DACA ELIGIBILITY

5.      I met the requirements for DACA as soon as I turned 15. I arrived in the United States for the first time when I was four years old, which was before June 15, 2007 and long before my 16th birthday. I have not left the U.S. since then.

6.      On June 15, 2012, I was present in the U.S. and did not have lawful status. At the time, I was in the fourth grade at P.S. 95Q, which is also called the Eastwood School, in Jamaica, Queens.

7.      I graduated from Francis Lewis High School in Queens in June 2020.

8.      I have never been arrested or convicted of a crime.

## UPBRINGING IN NEW YORK

9.      I grew up in New York with my mom and my grandmother, who is a U.S. citizen. All of my relatives in the U.S. have lawful status. I attended New York City public schools in Queens from kindergarten through my high school graduation.

10.     I have wanted to be a lawyer since I was a kid. I can't remember how I first got the idea but I just knew in my mind that was what I wanted. Then towards the end of middle school a woman at my church told me about her job. She is an intellectual property lawyer; she

does copyright and she helps her clients protect their work. That's when it clicked for me: that was what I wanted to do.

11.     For my electives in high school, I took all law classes: criminology, constitutional law, and criminal justice. I also joined the mock trial team when I was a junior and I participated in a lot of debates in the auditorium and in social studies class. I'm good at defending people and ideas. I think I would be a good lawyer.

**<u>UNDOCUMENTED STATUS</u>**

12.     I found out that I was undocumented when I was starting high school. All my friends were starting to get jobs or talking about getting jobs. I told my mom that I wanted to get a job as well. That's when my mom told me "you can't, you don't have the paperwork."

13.     Finding out I was undocumented and could not work was heart breaking. I had so many dreams built up at that point and out of nowhere she told me I couldn't get a job. It made me think that everything else I had planned was not reachable. Already at the time I thought, "I can't do anything here." But a lot of things I only learned about later: I couldn't get my drivers' permit, I couldn't get federal financial aid from the Free Application for Federal Student Aid ("FAFSA"). As I got older, I found out about more and more things I couldn't do.

14.     My status also impacted me at school. I couldn't go on international trips. There was a moot court program, but they went to debate in Switzerland. So I couldn't sign up, because they needed everyone on the team to go and I couldn't.

15.     My high school was a bit hard to get to. As my friends all started to drive to school, they would always tell me to get my permit. Without status, at the time I couldn't—so I took the bus instead. But the hardest thing was not being able to work. We got out early senior year and everyone else would go to work, but I just went home. I wanted to work so badly so I

could save up for college, pay my phone bill, and help my mom with rent. It was especially hard when I had to pay for college applications.

16.     When it came time to apply to college, the colleges I applied to weren't my top schools. I wanted to go out of state. My dream was to go to college in Florida or California. I have family in Florida and I have a friend who is studying in a really good law program there. And I wanted to try leaving New York.

17.     But I knew I couldn't go to those schools because it costs more to stay in a dorm and I am not able to work. I don't have a social security number and I don't qualify for federal aid. I also can't travel, because I am scared to without immigration status. I have not been on a plane since I came to the U.S. My mom and I used to take trains but we haven't done that since the Trump administration began.

18.     Instead, I am going to a SUNY campus that is near to my house and living at home. Even there, the school has me as an out-of-state student because of my status so I have to pay more. It's going to be very hard to afford.

19.     If I had work authorization, I could work and pay my way through college. I could save money. Instead, my family is really struggling to pay for it. My mom's whole paycheck is going to go towards my tuition. It's already affecting my family. We got rid of our home phone line. My mom called the other day to disconnect our cable—we just had a basic package but we can't pay for that now. We are trying to do everything we can but it's difficult.

**<u>DACA</u>**

20.     I first learned about DACA when I was 14. My mom told me about it. I was going to be eligible when I turned 15. My mom spoke with a woman who was going to help us file the

application and we started gathering the paperwork. It was hard but we were doing it: we had to get my grades from my previous school and other records.

21.     I was really excited. I was thinking I would be able to get a job now. Around my neighborhood there were places that were hiring, and I would go in and tell them "I'll be working here soon."

22.     When DACA ended in September 2017, it was on the news. I didn't really understand but my mom explained it to me: she said I couldn't apply anymore. I turned 15 ▇▇ ▇▇ after the program ended.

23.     I felt like another brick had been thrown at me. But at the same time I still hoped maybe I could get status through my family, because my grandmother is a citizen and had petitioned for my mom. It wasn't until later I found out that, without DACA, there wasn't anything else.

24.     In April 2020, in the middle of my senior year and right as I was applying to college, I got a Notice to Appear in immigration court in the mail. I knew that meant I could be detained or deported at any time. I had no idea what I would do if that happened.

25.     I told my mom, "I'm not even going to apply to colleges anymore—what is the point?" But she tried to stay positive. She got us a new lawyer and then in June, right around the time I graduated, she spoke with him and found out now I could apply for DACA again. I thought this was perfect: I could do the application and get DACA right before I go to college.

26.     Having the opportunity to apply for DACA again changed everything. I had already paid my deposit at the college near my house but I decided I was going to transfer, because I would finally be able to work and travel. I would get to live in a dorm. And with

DACA, I finally knew for sure I could use my bachelor's degree and my law degree once I had them. There wouldn't be that uncertainty anymore.

27.     A few weeks later, DACA got cancelled again. I never even got a receipt for my application and now my understanding from my lawyer is it won't be processed. It feels like things only get worse. Every time I have some sort of hope, nothing gets resolved, nothing changes, it just gets worse.

28.     Without DACA, I could be deported. I always hear stories of people being detained right in the immigration court—and now that could be me. I will also turn 18 and a half soon and if I still don't have DACA then it would become impossible for me to get status through my family. Even if my mom gets her green card through my grandmother, once I turn 18 and a half, I couldn't get status through her because I will have "unlawful presence." Either way, I would have to leave the U.S. I have no idea how I would deal with that. I don't know anyone in the Dominican Republic. I wouldn't be able to start college if I went there; I would have to start over in high school, because I don't know any of their curriculum or history and I haven't taken their high school exams. Everything I was envisioning here, my whole future, I would have to throw in the garbage.

29.     I think about it all the time, especially now as I start college. I think, is it even worth paying this tuition? Will I be able to finish?

30.     Every day, the month of March, 2021 is in my mind. That is when I turn 18 and a half. After that, there won't be any way for me to stay here without DACA. It feels like having DACA by March is my last opportunity to stay in this country.

**CLASS REPRESENTATIVE**

31.     I am willing to serve as a class representative for (1) everyone who is or will be eligible for DACA as it was originally and is impacted by the government trying to end DACA; and (2) for individuals who had an initial or renewal DACA application pending with the government on any date between June 30 and July 28, 2020 that was not or has not been processed as it should have been.

32.     I have spoken with the lawyers who represent me in this case about that means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who is eligible for DACA and brings another federal lawsuit challenging the Wolf Memorandum.

33.     I know I can serve as a class representative for this class because the class members and I all share the same interest of: (1) having the DACA memorandum from July 28, 2020 set aside; and (2) having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

34.     I want to serve as a class representative because I would really like to be able to help save people going through what I went through, and the hardship it puts on their families. There are so many people in this situation who are affected by the end of DACA, like students just now getting into college or thinking about their plans. As a class representative, I will protect and defend our claims for my benefit and the benefit of the class as a whole. If we win, it would be a very heavy weight off their shoulders. I don't feel like anybody should have to bear that weight. It doesn't seem fair when there are so many opportunities here and so many people like me who want to study and work. I hope that with this lawsuit we can make things easier for all of us.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 25 , 2020 in Queens, NY

M.B.F.

8

EXHIBIT  M

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

---

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

       *Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

---

## <u>SUPPLEMENTAL DECLARATION OF JAVIER VALDES</u>

I, Javier Valdes, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am Co-Executive Director at Make the Road New York ("MRNY"), a position I have held since 2012. Before that time, I held the position of Deputy Director at MRNY for over three years. I submit this declaration as a supplement to my previous affidavit in support of this case, which was dated Dec. 14, 2017 and filed as ECF No. 123-13.

2.  MRNY is a non-profit § 501(c)(3) and community-based membership organization, which has been in existence for over 20 years. MRNY is dedicated to building the power of immigrant and working-class communities to achieve dignity and justice through integrating its work in organizing, policy innovation, adult and education, and survival services, including legal and health services. MRNY currently has over 200 staff members, who provide services to thousands of individuals a year, including members, students and clients from the community. Our membership is comprised of more than 24,000 low-income New Yorkers, many of them from immigrant communities. We operate five community centers in the state of New York: in Brooklyn, Queens, Staten Island, Long Island and Westchester County.

3.   MRNY has a legal department staffed by twenty-four attorneys and eighteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as immigrants submitting affirmative applications for immigration relief. MRNY directly helps individuals prepare the documentation and paperwork necessary for Deferred Action for Childhood Arrivals ("DACA") applications and renewals, as well as applications for advance parole. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

4.   MRNY does not ask or track the immigration status of its members. However, we know through records maintained by our immigration legal team that MRNY's legal team has submitted at least 413 initial and renewal DACA applications on behalf of 238 MRNY members since 2012. The vast majority of these applications have been approved. This is likely a significant undercount of MRNY's total number of members with DACA because of changes in how we have tracked data from 2012 to the present and because not all MRNY members apply for or renew their DACA through MRNY's legal team. But at a minimum, it shows that MRNY has several hundred members who are DACA recipients.

5.   MRNY also currently has, according to our best estimate, approximately sixteen staff members who are DACA recipients.

## DACA OUTREACH EFFORTS

6.   As an organization, MRNY has devoted tremendous resources to advocating for, educating the community about, and facilitating access to the DACA program both prior to its creation in 2012 and in the years since.

7.   Our efforts prior to December 2017 are described in my previous declaration in support of this case, dated Dec. 14, 2017 (ECF No. 123-13). These included weekly DACA screening workshops at our Queens office and similar workshops and services at other MRNY sites from June of 2012 until October 2017. We increased our volume of workshops and services in the fall of 2017, in order to meet the USCIS deadline to accept DACA renewal applications under the terms of the administration's 2017 effort to termination DACA. We did so again in the spring and summer of 2020, in anticipation of a Supreme Court decision affecting the DACA program.

8.   Both prior to and following the Trump Administration's efforts to terminate DACA in 2017, MRNY assisted DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers, as well as its other legal programs.

9.   Beginning in early 2020, MRNY staff contacted over 500 past DACA clients to advise them about the pending Supreme Court case and the importance of renewing their DACA. MRNY staff also held four high-volume in-person clinics in late 2019 and early 2020 to help over 80 clients file DACA renewal applications before the issuance of a decision from the Supreme Court. MRNY had three more in-person DACA renewal clinics scheduled, which had to be changed to virtual appointments after MRNY offices closed on March 16, 2020 because of the COVID-19 global pandemic.

10. From October 5, 2017 through July 28, 2020, MRNY staff filed 2,158 DACA renewal applications.

11. On July 28, 2020, the date of the Wolf Memorandum, 166 MRNY clients—whose applications had been filed by members of our legal team—had renewal applications pending with USCIS, with the earliest filed on March 1, 2020. Of those clients, 32 are members of MRNY.

**RESPONSE TO SUPREME COURT DECISION**

12. Following the Supreme Court's DACA decision on June 18, 2020, MRNY engaged in significant community education and outreach efforts to advise people on the significance of the decision and the importance for those who may qualify for DACA of obtaining a prompt screening with a trusted legal service provider. This included sending a bilingual email to all MRNY staff; mass texts to 1,198 of our prior DACA clients and members inviting them to our informational sessions; and a Facebook Live explaining the decision, which reached 6,100 individuals. Because staff throughout all MRNY departments including organizing and adult literacy began to receive a large volume of questions about DACA eligibility in light of the Supreme Court decision, MRNY also set up a system to track individual inquiries about DACA. MRNY legal team responded to each inquiry and invited them to attend a series of workshops and clinics.

13. MRNY received over 260 inquiries from individuals following the Supreme Court decision. Of these, 28 individuals were from current DACA recipients who were interested in applying for advance parole. The remaining 232 individuals were either youth or their parents who wanted to apply for DACA for the first time. To address this outpouring of community interest, MRNY's legal team began holding regular information sessions on DACA and advance parole in English and Spanish for potential DACA applicants and their parents as well as for DACA holders hoping to obtain advance parole. Because of the continued interest in DACA and confusion about the state of the program, MRNY has continued to hold these sessions even after the July 28, 2020 Wolf Memorandum, with the most recent one scheduled held on August 18, 2020. In total, seven of these sessions were held between June 26, 2020 and August 18, 2020 with 201 individuals attending.

14. The planning for these workshops required significant expenditure of resources by MRNY due to Defendants' failure to establish clear guidelines for how and when the Supreme Court's June 18 decision would be implemented. Four attorneys, a supervising paralegal and three organizers facilitated these informational sessions. MRNY staff were in contact with numerous other legal service providers and learned that many other service providers were recommending that their clients hold off on filing DACA applications until USCIS issued clear guidance on its implementation of the Supreme Court's decision. This increased the burden on our legal and organizing staff to carefully consider and develop MRNY's own strategy, messaging and recommendations.

15. In addition to informational workshops, MRNY legal staff began conducting legal clinics for one-on-one screening of potential DACA applicants who had attended an initial information session and who had begun to gather documents in support of their initial DACA applications. MRNY held five such clinics from July 7, 2020 to July 23, 2020 providing comprehensive screening and individualized assistance, including through completing the forms necessary to apply for DACA and organizing supporting documentation, to around three dozen first-time applicants. Approximately fifteen MRNY staff, including five attorneys and ten paralegals/advocates, and six MRNY legal interns worked on these workshops, devoting time and resources that would otherwise have gone to the provision of other legal services.

16. MRNY also identified individuals among our existing clients who were eligible to submit initial DACA applications and began working with them to prepare those applications. Some of these individuals present an urgent need for DACA status because they are subject to removal orders or ongoing removal proceedings. For instance, MRNY represents a DACA-eligible individual in removal proceedings whose merits hearing is scheduled for 2022. He resides in

Westchester County. He has resided continuously in the U.S. since 2003, when he was 14 years old, and qualifies for DACA under the terms of the 2012 Napolitano Memorandum. He is married to a U.S. citizen and has three U.S.-citizen children; his parents are also U.S. citizens. Under the Wolf Memorandum, he cannot apply for DACA. Without DACA, he risks being ordered removed and ultimately deported.

17. MRNY legal staff completed and filed three initial DACA applications after the Supreme Court's decision and prior to the Wolf Memorandum's issuance on July 28, 2020. One, on behalf of Plaintiff Johana Larios-Sainz, was received the day before the memo's issuance. The second was sent by USPS Priority Mail on July 25 and, according to USPS tracking, received by USCIS on July 30, 2020. This application was filed on behalf of a 19-year-old MRNY member on Long Island who had been in the process of gathering the documents necessary to file an initial DACA application when the program was terminated in September 2017. The third application was sent by USPS Priority Mail on July 27 and, according to USPS tracking, received by USCIS on July 29, 2020. It was filed on behalf of a 17-year-old MRNY member on Long Island who aged into DACA eligibility after the 2017 termination. Under the Wolf Memorandum, all three of these applications will be rejected and none of the applicants will be able to access DACA and its accompanying employment authorization.

18. As a result of the Wolf Memorandum, MRNY's legal staff has had to halt the submission of other initial DACA applications even for individuals who attended our informational sessions and one-on-one screening and application preparation sessions. These applications were in various stages of completion including a number of applications that were only days away from being ready to submit. This means that MRNY will not be able to count the significant time our staff spent on these sessions in July and August 2020 towards grants that require submission of an

application as a deliverable, which include all of the grants that fund our legal work outside of New York City. Among the fifteen MRNY staff who dedicated time to our one-one sessions and to follow-up with attendees of those sessions, six are based in our Long Island or Westchester offices. These legal staff members will now have to expend additional time and resources to begin work with new clients so as to meet annual deliverables, because their work with clients on initial DACA applications did not result in submission of an application. If the Wolf Memorandum were set aside, our legal staff could complete initial DACA applications it had begun and its past work would become compensable.

**<u>INJURY TO MRNY</u>**

19. The Federal Government's refusal to comply with the Supreme Court decision in the DACA lawsuit and its subsequent efforts to once again terminate and curtail DACA have harmed MRNY, its staff, its members, and its clients.

20. The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program unlawfully curtailed, and in having their DACA applications, renewals, and advance parole applications considered, go directly to our work in advocating for the rights of low-income immigrant communities and providing survival services that allow our clients and members to achieve stability and success.

21. MRNY is a plaintiff in this lawsuit in part because our members and clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

22. MRNY will sustain further injuries if Defendants' lawless efforts to curtail and terminate the DACA program are allowed to continue, as that forces us to devote additional resources to

assist our staff, clients and members submit DACA renewals on the new yearly schedule. MRNY will also have to continue to divert resources to educate its members, clients and the broader immigrant communities it serves about the implications of Defendants' actions with respect to DACA, which have confused and misled the public. This diversion of resources includes advising the huge number of individuals who contacted the organization in the wake of the Supreme Court decision in June 2020 and who now are unable to file initial DACA applications.

23. MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

24. These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court invaliding the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum, and reestablishing the DACA program as it existed under the 2012 Napolitano Memo and associated guidance.

I, Javier Valdes, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: August 27, 2020
       Queens, N.Y.

_____
Javier Valdes

8