# EXHIBIT A



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

June 15, 2012

MEMORANDUM FOR:  David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:  Janet Napolitano
Secretary of Homeland Security

SUBJECT:  Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner.  They are not designed to be blindly enforced without consideration given to the individual circumstances of each case.  Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language.  Indeed, many of these young people have already contributed to our country in significant ways.  Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal.  No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis.  DHS cannot provide any assurance that relief will be granted in all cases.

1.  With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2.  With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3.  With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

# EXHIBIT B

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status:**
**Aug. 15, 2012-Mar. 31, 2020**



**U.S. Citizenship and Immigration Services**

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year - Total** | | | | | | | |
| 2012 | 152,430 | 5,396 | 157,826 | 3,629 | 1,684 | - | 150,746 |
| 2013 | 427,612 | 16,355 | 443,967 | 1,696 | 470,603 | 11,023 | 96,719 |
| 2014 | 238,897 | 24,890 | 263,787 | 951 | 158,417 | 21,103 | 156,034 |
| 2014 Initial | 122,473 | 19,065 | 141,538 | 487 | 136,182 | 21,100 | 61,850 |
| 2014 Renewal | 116,424 | 5,825 | 122,249 | 463 | 22,235 | D | 94,184 |
| 2015 | 448,844 | 35,504 | 484,348 | 1,781 | 510,341 | 21,551 | 72,888 |
| 2015 Initial | 85,300 | 7,170 | 92,470 | 338 | 90,831 | 19,185 | 37,062 |
| 2015 Renewal | 363,544 | 28,334 | 391,878 | 1,442 | 419,510 | 2,366 | 35,826 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,034 | 198,557 | 14,486 | 119,670 |
| 2016 Initial | 73,347 | 1,151 | 74,498 | 291 | 52,737 | 11,434 | 45,389 |
| 2016 Renewal | 187,354 | 11,166 | 198,520 | 743 | 145,820 | 3,052 | 74,281 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,883 | 461,911 | 13,196 | 117,324 |
| 2017 Initial | 45,593 | 44 | 45,637 | 181 | 47,133 | 9,165 | 34,630 |
| 2017 Renewal | 427,257 | 43,411 | 470,668 | 1,702 | 414,778 | 4,031 | 82,694 |
| 2018 | 260,120 | 29,651 | 289,771 | 1,036 | 319,382 | 12,539 | 45,488 |
| 2018 Initial | 2,060 | D | 2,062 | D | 24,392 | 8,250 | 4,036 |
| 2018 Renewal | 258,060 | 29,649 | 287,709 | 1,028 | 294,990 | 4,289 | 41,452 |
| 2019 | 386,158 | 22,004 | 408,162 | 1,532 | 387,642 | 4,951 | 39,022 |
| 2019 Initial | 1,572 | D | 1,576 | D | 1,781 | 1,605 | 2,216 |
| 2019 Renewal | 384,586 | 22,000 | 406,586 | 1,526 | 385,861 | 3,346 | 36,806 |
| 2020 | 151,298 | 7,921 | 159,219 | 1,220 | 138,426 | 2,240 | 49,641 |
| 2020 Initial | 1,750 | D | 1,752 | 14 | 655 | 376 | 2,932 |
| 2020 Renewal | 149,548 | 7,919 | 157,467 | 1,206 | 137,771 | 1,864 | 46,709 |
| Total Cumulative | 2,798,910 | 197,493 | 2,996,403 | 1,452 | 2,646,963 | 101,089 | 49,641 |
| Total Cumulative Initial | 912,137 | 49,189 | 961,326 | 473 | 825,998 | 82,138 | 2,932 |
| Total Cumulative Renewal | 1,886,773 | 148,304 | 2,035,077 | 979 | 1,820,965 | 18,951 | 46,709 |

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year 2020 by Quarter** | | | | | | | |
| Q1. October - December | 72,371 | 4,176 | 76,547 | 1,167 | 74,079 | 1,036 | 36,270 |
| Q1. October - December Initial | 925 | D | 927 | 14 | 245 | 160 | 2,734 |
| Q1. October - December Renewal | 71,446 | 4,174 | 75,620 | 1,152 | 73,834 | 876 | 33,536 |
| Q2. January - March | 78,927 | 3,745 | 82,672 | 1,273 | 64,347 | 1,204 | 49,641 |
| Q2. January - March Initial | 825 | - | 825 | 13 | 410 | 216 | 2,932 |
| Q2. January - March Renewal | 78,102 | 3,745 | 81,847 | 1,259 | 63,937 | 988 | 46,709 |

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1]Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

    Each request is considered on a case-by-case basis.

    See http://www.uscis.gov/childhoodarrivals.

[2]The number of new requests accepted at a Lockbox during the reporting period.

[3]The number of requests rejected at a Lockbox during the reporting period.

[4]The number of requests that were received at a Lockbox during the reporting period.

[5]The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6]The number of new requests received and entered into a case-tracking system during the reporting period.

[7]The number of requests approved during the reporting period.

[8]The number of requests that were denied, terminated, or withdrawn during the reporting period.

[9]The number of requests awaiting a decision as of the end of the reporting period.

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

    2) The report reflects the most up-to-date estimate available at the time the report is generated.

    3) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn). USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of pending cases.  Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.

    4) The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated.

    5) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases.  Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved"  and "Denied" fields.  The increase in the "Approved" and "Denied" counts has decreased the "Pending" counts.

**Source:**  Department of Homeland Security, U.S. Citizenship and Immigration Services, CLAIMS3 & ELIS, accessed April 2020.

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| | | | | | | |
| **Country** | | | | | | |
| Mexico | 710,049 | 1,492,645 | 2,202,694 | 650,353 | 1,440,861 | 2,091,214 |
| El Salvador | 34,597 | 72,160 | 106,757 | 29,777 | 69,564 | 99,341 |
| Guatemala | 24,978 | 47,999 | 72,977 | 20,981 | 46,195 | 67,176 |
| Honduras | 22,761 | 44,917 | 67,678 | 19,175 | 43,269 | 62,444 |
| South Korea | 9,589 | 22,099 | 31,688 | 9,011 | 21,167 | 30,178 |
| Peru | 9,860 | 21,223 | 31,083 | 9,299 | 20,489 | 29,788 |
| Brazil | 8,675 | 16,294 | 24,969 | 7,650 | 15,769 | 23,419 |
| Ecuador | 7,812 | 15,383 | 23,195 | 6,897 | 14,845 | 21,742 |
| Colombia | 7,312 | 14,592 | 21,904 | 6,757 | 14,146 | 20,903 |
| Philippines | 5,136 | 11,070 | 16,206 | 4,802 | 10,740 | 15,542 |
| Argentina | 5,273 | 10,580 | 15,853 | 4,952 | 10,258 | 15,210 |
| India | 3,791 | 7,838 | 11,629 | 3,263 | 7,538 | 10,801 |
| Jamaica | 4,471 | 7,159 | 11,630 | 3,552 | 6,919 | 10,471 |
| Venezuela | 3,501 | 6,967 | 10,468 | 3,201 | 6,709 | 9,910 |
| Dominican Republic | 3,858 | 6,184 | 10,042 | 3,286 | 6,016 | 9,302 |
| Trinidad And Tobago | 3,105 | 5,254 | 8,359 | 2,647 | 5,100 | 7,747 |
| Uruguay | 2,655 | 5,084 | 7,739 | 2,488 | 4,943 | 7,431 |
| Bolivia | 2,245 | 4,788 | 7,033 | 2,121 | 4,641 | 6,762 |
| Costa Rica | 2,297 | 4,517 | 6,814 | 2,108 | 4,376 | 6,484 |
| Chile | 1,918 | 3,927 | 5,845 | 1,800 | 3,807 | 5,607 |
| Poland | 2,016 | 3,840 | 5,856 | 1,871 | 3,715 | 5,586 |
| Pakistan | 1,958 | 3,839 | 5,797 | 1,737 | 3,706 | 5,443 |
| Nicaragua | 1,917 | 3,682 | 5,599 | 1,671 | 3,553 | 5,224 |
| Nigeria | 1,586 | 2,917 | 4,503 | 1,337 | 2,834 | 4,171 |
| Guyana | 1,501 | 2,822 | 4,323 | 1,308 | 2,709 | 4,017 |
| All Others[3] | 29,276 | 48,993 | 78,269 | 23,954 | 47,096 | 71,050 |
| **Total** | **912,137** | **1,886,773** | **2,798,910** | **825,998** | **1,820,965** | **2,646,963** |

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with a blank in the country of birth field are included in the field "All Others."

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

4) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases. Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved"  and "Denied" fields.

**Source:** Department of Homeland Security, U.S. Citizenship and Immigration Services, CLAIMS3 & ELIS, accessed April 2020.

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| | | | | | | |
| **Residence** | | | | | | |
| California | 256,779 | 541,329 | 798,108 | 238,432 | 522,162 | 760,594 |
| Texas | 150,458 | 306,380 | 456,838 | 134,058 | 296,354 | 430,412 |
| Illinois | 48,072 | 100,053 | 148,125 | 45,002 | 97,003 | 142,005 |
| New York | 46,773 | 86,865 | 133,638 | 40,807 | 83,987 | 124,794 |
| Florida | 38,462 | 73,259 | 111,721 | 32,646 | 70,903 | 103,549 |
| Arizona | 33,430 | 70,425 | 103,855 | 30,358 | 67,571 | 97,929 |
| North Carolina | 31,997 | 69,500 | 101,497 | 29,665 | 67,232 | 96,897 |
| Georgia | 30,383 | 60,720 | 91,103 | 25,743 | 58,323 | 84,066 |
| New Jersey | 25,293 | 49,680 | 74,973 | 22,171 | 48,058 | 70,229 |
| Washington | 20,960 | 45,005 | 65,965 | 19,308 | 43,442 | 62,750 |
| Colorado | 20,433 | 42,704 | 63,137 | 18,555 | 41,107 | 59,662 |
| Nevada | 15,292 | 34,383 | 49,675 | 14,278 | 33,173 | 47,451 |
| Virginia | 13,897 | 28,483 | 42,380 | 12,368 | 27,411 | 39,779 |
| Oregon | 12,795 | 28,616 | 41,411 | 12,060 | 27,595 | 39,655 |
| Indiana | 11,711 | 25,516 | 37,227 | 10,771 | 24,536 | 35,307 |
| Utah | 11,607 | 24,634 | 36,241 | 10,688 | 23,689 | 34,377 |
| Maryland | 11,498 | 23,472 | 34,970 | 9,932 | 22,687 | 32,619 |
| Tennessee | 10,151 | 21,350 | 31,501 | 9,123 | 20,554 | 29,677 |
| Wisconsin | 8,772 | 18,857 | 27,629 | 8,205 | 18,158 | 26,363 |
| Oklahoma | 8,125 | 17,560 | 25,685 | 7,490 | 16,950 | 24,440 |
| Massachusetts | 8,865 | 16,830 | 25,695 | 7,684 | 16,257 | 23,941 |
| Kansas | 7,797 | 16,488 | 24,285 | 7,315 | 15,943 | 23,258 |
| South Carolina | 7,736 | 16,500 | 24,236 | 6,930 | 15,937 | 22,867 |
| New Mexico | 8,266 | 15,506 | 23,772 | 7,616 | 14,994 | 22,610 |
| Minnesota | 7,099 | 15,506 | 22,605 | 6,500 | 14,863 | 21,363 |
| Michigan | 7,124 | 15,413 | 22,537 | 6,443 | 14,823 | 21,266 |
| Pennsylvania | 6,643 | 13,185 | 19,828 | 5,699 | 12,703 | 18,402 |
| Arkansas | 6,019 | 13,242 | 19,261 | 5,479 | 12,773 | 18,252 |
| Connecticut | 5,465 | 10,797 | 16,262 | 4,886 | 10,479 | 15,365 |
| Alabama | 5,283 | 11,021 | 16,304 | 4,707 | 10,623 | 15,330 |
| Ohio | 5,328 | 10,904 | 16,232 | 4,630 | 10,410 | 15,040 |
| Missouri | 4,045 | 8,737 | 12,782 | 3,748 | 8,397 | 12,145 |
| Nebraska | 4,007 | 8,495 | 12,502 | 3,635 | 8,143 | 11,778 |
| Idaho | 3,661 | 7,905 | 11,566 | 3,390 | 7,629 | 11,019 |
| Kentucky | 3,672 | 7,713 | 11,385 | 3,277 | 7,424 | 10,701 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Iowa | 3,228 | 7,374 | 10,602 | 2,920 | 7,054 | 9,974 |
| Louisiana | 2,461 | 4,811 | 7,272 | 2,152 | 4,679 | 6,831 |
| Mississippi | 1,851 | 3,669 | 5,520 | 1,607 | 3,564 | 5,171 |
| Delaware | 1,681 | 3,690 | 5,371 | 1,532 | 3,581 | 5,113 |
| Rhode Island | 1,336 | 2,730 | 4,066 | 1,168 | 2,630 | 3,798 |
| District Of Columbia | 872 | 1,766 | 2,638 | 738 | 1,701 | 2,439 |
| Wyoming | 746 | 1,485 | 2,231 | 662 | 1,431 | 2,093 |
| Hawaii | 448 | 973 | 1,421 | 368 | 935 | 1,303 |
| New Hampshire | 386 | 796 | 1,182 | 330 | 765 | 1,095 |
| South Dakota | 276 | 604 | 880 | 241 | 554 | 795 |
| North Dakota | 94 | 349 | 443 | 72 | 343 | 415 |
| West Virginia | 151 | 292 | 443 | 125 | 280 | 405 |
| Puerto Rico | 272 | 238 | 510 | 165 | 231 | 396 |
| Alaska | 94 | 232 | 326 | 85 | 224 | 309 |
| Montana | 75 | 207 | 282 | 64 | 198 | 262 |
| Maine | 50 | 128 | 178 | 44 | 122 | 166 |
| Virgin Islands | 126 | 91 | 217 | 67 | 88 | 155 |
| Guam | 23 | 49 | 72 | 21 | 47 | 68 |
| Vermont | 17 | 59 | 76 | 12 | 55 | 67 |
| Armed Forces Americas (except Canada) | D | 28 | 36 | D | 27 | 35 |
| Northern Mariana Islands | 27 | 15 | 42 | D | 14 | 21 |
| Armed Forces Pacific | D | 17 | 18 | D | 17 | 18 |
| Federated States Of Micronesia | D | D | D | D | D | D |
| Armed Forces Africa, Canada, Europe, Middle East | - | D | D | - | D | D |
| American Samoa | D | D | D | - | D | D |
| Marshall Islands | - | D | D | - | D | D |
| Not Reported[3] | D | D | D | D | D | D |
| **Total** | **912,137** | **1,886,773** | **2,798,910** | **825,998** | **1,820,965** | **2,646,963** |

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with a blank in the State field are included in the field "not reported."

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

4) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases. Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved" and "Denied" fields.

**Source:**  Department of Homeland Security, U.S. Citizenship and Immigration Services, CLAIMS3 & ELIS, accessed April 2020.

# EXHIBIT C

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCÓN, ELIANA FERNANDEZ, CARLOS VARGAS, CAROLINA FUNG FENG, M.B.F., by her next friend LUCIA FELIZ, XIMENA ZAMORA, SONIA MOLINA and JOHANA LARIOS SAINZ, <br><br> On behalf of themselves and all other similarly situated individuals, <br><br> and MAKE THE ROAD NEW YORK, <br><br> On behalf of itself, its members, and its clients, <br><br> *Plaintiffs,* <br><br> v. <br><br> CHAD WOLF, *in his official capacity as the purported Acting Secretary of Homeland Security,* JOSEPH EDLOW, *in his official capacity as the Deputy Director for Policy, U.S. Citizenship and and Immigration Services,* DONALD J. TRUMP, *in his official capacity as President of the United States* U.S. CITIZENSHIP AND IMMIGRATION SERVICES, and the U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br> *Defendants.* | Case No. 1:16-cv-04756 (NGG)(JO) |

## **DECLARATION OF TOM JAWETZ**

I, Tom Jawetz, declare under penalty of perjury that the following is true and correct:

1. I am over 18 years of age.

2. For the past five years, I have worked as the Vice President for Immigration Policy at the Center for American Progress (CAP), an independent nonpartisan policy institute based

in Washington, DC. From 2009 to 2015, I worked on the Immigration Subcommittee of the Judiciary Committee of the U.S. House of Representatives, first as counsel and later as chief counsel. I graduated from Dartmouth College in 1999 and from Yale Law School in 2003.

3.  As counsel and chief counsel on the Immigration Subcommittee and at CAP, I have been involved in the development and evaluation of immigration laws and policies, including by studying the impact of such policies on directly affected people as well as on society more broadly. Between my time at CAP and my previous work as the Immigration Detention Staff Attorney for the National Prison Project of the American Civil Liberties Union I have testified four times before Members of Congress on issues related to immigration law and policy.

4.  In my role at CAP, I am responsible for all aspects of the organization's work on immigration policy matters, including but not limited to our research pertaining to the Deferred Action for Childhood Arrivals (DACA) initiative. I have authored or co-authored more than 50 columns, issue briefs, or reports and oversaw the research and drafting of the publication, "The Trump Administration Must Immediately Resume Processing New DACA Applications." A true and correct copy of that column is attached hereto as Exhibit 1.

5.  In that column, published nearly one month after the Supreme Court's decision rejecting the Trump administration's attempt to rescind DACA in September 2017 but shortly before the memorandum issued by Chad Wolf, we estimate that more than 300,000 people have been prevented from applying for DACA protections despite being eligible under the terms of the initiative simply because the administration has refused to process the applications of people who have not previously had DACA. Of this number, an estimated 55,500 are undocumented young people who have turned 15 since September 2017 and meet all other DACA eligibility requirements.

6.  In my role at CAP, I have also overseen the research and participated in the drafting of multiple nationwide surveys of DACA recipients, most recently a September 2019 publication titled, "DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November." A true and correct copy of that publication is attached hereto as Exhibit 2.

7.  In that survey we find that 93 percent of DACA recipients who are currently enrolled in schools said that DACA enabled them to pursue educational opportunities that were previously unavailable to them. Additionally, 58 percent of survey respondents reported that after receiving DACA they moved to a job with better pay and more than 50 percent reported that they moved to a job that better matched their education and training, better fit their long-term career goals, or provided them with access to health insurance or other benefits. With DACA, 60 percent of respondents reported purchasing their first car and 19 percent of respondents 25 years of age and older reported purchasing their first home.

2

8. In my role at CAP, I also supervised the publication of the column, "What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition." A true and correct copy of that publication is attached hereto as Exhibit 3.

9. In that publication, we conclude that the average DACA recipient arrived in the United States in 1999, at age 7, and that an estimated 254,000 U.S.-born children have at least one parent who holds DACA. We conclude that each year, DACA recipients and their households pay $5.6 billion in federal taxes and $3.1 billion in state and local taxes. After taxes, these households have $24 billion in spending power that can be put back into their communities. These investments are seen in the 56,000 homes owned by DACA recipients, who pay $556.9 million in mortgage payments annually.

10. In that publication, we additionally present state-level data on DACA recipients. DACA recipients live in all 50 states and the District of Columbia, and half of the states in the country have more than 10,000 people living in households with a DACA recipient. In 42 states and the District of Columbia, DACA recipients and their households pay more than $1 million in state and local taxes and those contributions exceed $50 million in twelve states.

I, Tom Jawetz, declare under penalty of perjury, under 28 U.S.C. § 1746, and the laws of the United States of America, that the foregoing Declaration is true and correct.

Dated: August 28, 2020
Washington, DC

Tom Jawetz

# EXHIBIT 1

Case 1:16-cv-04756-NGG-VMS  Document 310-8  Filed 06/28/20  Page 19 of 231 PageID #: 5293



# Center for American Progress

☰

- DONATE

IMMIGRATION

# The Trump Administration Must Immediately Resume Processing New DACA Applications

By Nicole Prchal Svajlenka, Tom Jawetz, and Philip E. Wolgin   |   July 13, 2020, 9:05 am



Getty/Sandy Huffaker

People hold signs during a rally in support of the U.S. Supreme Court's ruling in favor of Deferred Action for Childhood Arrivals, in San Diego, June 18, 2020.

*Update: July 29, 2020: Rather than follow the law and open new applications, on July 28, 2020, the Department of Homeland Security put out a new DACA memo that partially rescinds the program and severely limits its benefits. While it remains to be seen how the courts will view this memo, the 300,000 people—including 55,500 of the youngest potential applicants—detailed in this column remain locked out of applying for initial grants of DACA.*

Last month, the U.S. Supreme Court ruled that the Trump administration's first attempt to terminate Deferred Action for Childhood Arrivals (DACA), in September 2017, was unlawful. Today, 25 days after the decision, the Supreme Court will certify its judgement in the case, and—under the law—the U.S. Department of Homeland Security (DHS) will have an unambiguous obligation to fully reinstate DACA. As a result, not only must the agency continue processing renewal applications by those who currently hold DACA, but it must also reopen the application process to more than 300,000 new applicants who are eligible under the terms of the program, including 55,500 of the youngest DACA-eligible individuals who have aged into eligibility over the past three years and will now be able to apply for the first time.

Notwithstanding the Supreme Court's decision to vacate the administration's 2017 DACA rescission memorandum, U.S. Citizenship and Immigration Services (USCIS) has taken no public steps to restore DACA to the way it operated pre-rescission. Rather, the agency has been silent—with exception of a post-decision statement that opened by questioning the legitimacy of the Supreme Court itself. As of the date of publication, the Trump administration is in open defiance of the law.

# More than 825,000 immigrants have benefited from DACA's protections

Over the past eight years, more than 825,000 undocumented immigrants who arrived in the United States as children have held protection from deportation and work authorization with DACA. Under DACA's protection, these individuals have made great strides; they have pursued higher education, advanced their careers, enlisted in the military, and become more civically engaged members of their communities. Alongside their neighbors, more than 200,000 DACA recipients are keeping the country safe as front line workers in the COVID-19 pandemic, including the nearly 30,000 recipients who are health care workers. DACA is also immensely popular, with nearly 9 in 10 Americans expressing support for allowing these young people and other Dreamers to remain in the country.

# The stakes of the Supreme Court's ruling

The Center for American Progress estimates that more than 1.1 million undocumented immigrants meet the basic DACA requirements—including being under age 31 as of June 15, 2012. Given that 825,000 immigrants have held DACA at some point during the program's existence, that leaves approximately 300,000 young immigrants who should be able to apply for a first grant of DACA in light of the Supreme Court's recent ruling.

Equally important, these data include 55,500 young people who have turned 15 in the nearly three years since the Trump administration illegally rescinded the initiative, meaning they have now aged into eligibility. This includes nearly 12,000 young people in Texas and 10,500 young people in California alone. Because the Trump administration denied these young people the opportunity to apply for DACA, they never established a direct reliance on DACA's protections. During this time, however, many of them undoubtedly saw opportunities open up for their older siblings, peers, and classmates, as well as other people in their communities. Once they are allowed to apply, the data show that it will not take long for them to see DACA's benefits.

Professor Roberto Gonzales, who has long studied DACA recipients, explains that within the first year after DACA began, DACA recipients were "already taking giant steps. They found new jobs. They increased their earnings. … And they began to build credit through opening bank accounts and obtaining credit cards." Young people who obtained DACA in high school—as would be the case for most of those who have aged into the program since September 2017—experienced an "immediate change in their motivation; attending college and working in their dream fields had become a real option for them." Just as DACA has been a lifeline for hundreds of thousands of young people over the eight years of its existence, it should also be a lifeline for these youngest eligible applicants.

**Table 1**

# 55,500 young people should now have the ability to apply for DACA for the first time

Number of undocumented young people who meet DACA eligibility requirements and have turned age 15 since September 2017

| State | Estimate |
|---|---|
| Arizona* | 1,600 |
| California | 10,500 |
| Colorado* | 1,000 |
| Connecticut* | 500 |
| Florida | 2,500 |
| Georgia | 2,600 |

Case 1:16-cv-04756-NGG-VMS Document 310-3 Filed 08/28/20 Page 22 of 231 PageID #: 5296

| | |
|---|---|
| Illinois* | 2,800 |
| Indiana* | 1,100 |
| Maryland* | 800 |
| Michigan* | 500 |
| Nevada* | 1,100 |
| New Jersey* | 1,900 |
| New Mexico* | 800 |
| New York* | 2,400 |
| North Carolina* | 1,300 |
| Oklahoma* | 700 |
| Oregon* | 900 |
| Pennsylvania* | 700 |
| Tennessee* | 700 |
| Texas | 11,800 |
| Virginia* | 1,400 |
| Washington* | 1,600 |
| **United States** | **55,500** |

** Data marked with an asterisk are based on small sample sizes and may be unreliable. Rows do not sum to the U.S. total of 55,500, as other states, with sample sizes too small to estimate, have the remaining should-age-in DACA recipients.*

Table: Center for American Progress •
Source: Center for American Progress analysis of pooled 2016 1-year, 2017 1-year, and 2018 1-year American Community Survey microdata. Data accessed via Steven Ruggles and others, "Integrated Public Use Microdata Series, U.S. Census Data for Social, Economic, and Health Research, 2016, 2017, and 2018 American Community Surveys: 1-year estimates" (Minneapolis: Minnesota Population Center, 2020), available at https://usa.ipums.org/usa/.
• Get the data

# Conclusion

With public statements indicating that the administration is committed to trying a second time to end DACA and reports that the rescission would take place last week, the Trump administration has yet to comply with the court ruling in any way. Today, the administration should announce that it will end its attacks on DACA recipients and reopen the program to new applicants. Additionally, the Senate should take up and pass H.R. 6, the American Dream and Promise Act, which would provide permanent protections to Dreamers and those with Temporary Protected Status. Passing the bill

would finally give DACA recipients the peace of mind that, after eight years, they—and the country at large—so badly need.

*Nicole Prchal Svajlenka is the associate director of research, Tom Jawetz is the vice president, and Philip E. Wolgin is the managing director for the Immigration Policy team at the Center for American Progress.*

Center for American Progress

© 2020 - Center for American Progress

# EXHIBIT 2

Case 1:16-cv-04756-NGG-VMS Document 310-8 Filed 08/28/20 Page 25 of 231 PageID #: 5299



# Center for American Progress

☰

- DONATE

IMMIGRATION

# DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November

By Tom K. Wong, Sanaa Abrar, Claudia Flores, Tom Jawetz, Ignacia Rodriguez Kmec, Greisa Martinez Rosas, Holly Straut-Eppsteiner, and Philip E. Wolgin  |  September 19, 2019, 5:00 am



Getty/Corbis News/VIEWpress/Kena Betancur

A woman takes part in a New York City march against President Trump's decision to end DACA, September 2017.

Case 1:16-cv-04756-NGG-VMS   Document 310-8   Filed 08/28/20   Page 26 of 231 PageID #: 5300

*Note: The survey results can be found* here. *For more information on the survey, please contact* Tom K. Wong.

Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals (DACA) policy has provided temporary relief from deportation as well as work authorization to approximately 825,000 undocumented young people across the country.

From August 14 to September 6, 2019, Tom K. Wong of the U.S. Immigration Policy Center at the University of California, San Diego; United We Dream; the National Immigration Law Center; and the Center for American Progress fielded a national survey to further analyze the experiences of DACA recipients. This study includes 1,105 DACA recipients in 40 states as well as the District of Columbia.

2019 marks the fifth consecutive year that the authors have surveyed DACA recipients. This research, as with previous surveys, continues to show that DACA recipients are making significant contributions to the economy. In all, 96 percent of respondents are currently employed or enrolled in school.

Moreover, for the first time, the survey provides data about the widespread harms that DACA recipients could endure if they lost their status and faced potential deportation. A full 93 percent of respondents reported concerns about either their or their family's physical safety; ability to access health care or education; food security; or risk of homelessness if they were deported to their respective countries of birth. With the Supreme Court set to hear oral arguments on the legality of DACA's termination on November 12, these data make clear that the stakes could not be higher.

## DACA's impact on employment

Work authorization has been critical in helping DACA recipients participate more fully in the labor force. The data show that 89 percent of respondents are currently employed. Among respondents ages 25 and older, the employment rate jumps to 91 percent.

After receiving DACA:

- 58 percent of respondents moved to a job with better pay.

- 48 percent of respondents moved to a job with better working conditions.

- 53 percent of respondents moved to a job that "better fits [their] education and training."

8/28/2020　　　DACA Recipients' Livelihoods, Families, and Sense of Security Under a Potential 2021 Coverage - Center for American Progress

Case 1:16-cv-04756-NGG-VMS　Document 310-8　Filed 08/28/20　Page 27 of 231 PageID #: 5301

- 52 percent of respondents moved to a job that "better fits [their] long-term career goals."

- 53 percent of respondents moved to a job with health insurance or other benefits.

The data also show that 6 percent of respondents started their own businesses after receiving DACA. Among respondents 25 years and older, this figure increases to 9 percent. As the authors have noted in previous surveys, DACA recipients are outpacing the general population in terms of business creation. DACA business owners with full-time employees (48 percent of all DACA business owners), on average, employ 4 1/2 workers other than themselves.

Moreover, 17 percent have obtained professional licenses after receiving DACA. Among respondents 25 years and older, this figure increases to 20 percent.

## DACA's impact on earnings

Several years of data, including this 2019 survey, make clear that DACA is having a positive and significant effect on wages. Respondents' average hourly wage increased by 86 percent since they received DACA, rising from $10.46 per hour to $19.45 per hour. And among respondents 25 years and older, the average hourly wage increased by 128 percent since receiving DACA. These higher wages are not just important for recipients and their families but also for tax revenues and economic growth at the local, state, and federal levels.

The data also show that respondents' average annual earnings come out to approximately $42,000, and their median annual earnings total $38,000. Among respondents 25 years and older, these figures are $49,790 and $44,583, respectively.

In addition, DACA has led to greater financial independence and security for recipients and their families.

- 79 percent of respondents reported that their increased earnings have "helped [them] become financially independent."

- 79 percent reported that their increased earnings have "helped [their] family financially."

- 25 percent reported that their increased earnings have "helped [them] take care of an elderly parent or relative."

Specifically, among respondents currently in school, 80 percent reported that their increased earnings helped pay for tuition, and among respondents with children, 47 percent reported that their

8/28/2020                DACA Recipients' Livelihoods, Families, and Sense of Security at Stake this November - Center for American Progress
Case 1:16-cv-04756-NGG-VMS   Document 310-8   Filed 08/28/20   Page 28 of 231 PageID #:
5302

increased earnings have helped to pay for child care expenses. Meanwhile, 47 percent of respondents reported that their increased earnings have helped pay for medical expenses, and 46 percent reported being able to move into better or improved housing.

# DACA's impact on the economy

DACA recipients' purchasing power continues to increase. For example, 60 percent of respondents reported buying their first car after receiving DACA. These large purchases contribute to state revenue, as most states collect a percentage of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The data also show that 14 percent of respondents purchased their first home after receiving DACA. Among respondents 25 years and older, this figure increases to 19 percent. The broader positive economic effects of home purchases include increased job creation and the infusion of new spending in local economies.

These effects come on top of the combined $8.8 billion in federal, state, and local taxes paid annually by households with DACA recipients.

# DACA's impact on education

Overall, 40 percent of respondents are currently in school, a large majority—83 percent—of whom are pursuing a bachelor's degree or higher. When it comes to educational attainment, 46 percent of respondents reported already having a bachelor's degree or higher. Importantly, among those who are currently in school, a robust 93 percent said that because of DACA, "[They] pursued educational opportunities that [they] previously could not."

# Potential risks of deporting DACA recipients

As stated earlier, for the first time, the survey reveals DACA recipients' deep fears of return and the potential harms that they could face if they lost their protection and were deported. The results are stark:

- 80 percent reported, "In my country of birth, I would be concerned about the physical safety of myself and my family."

- 75 percent reported, "In my country of birth, I would be concerned about the quality of healthcare for myself and my family."

Case 1:16-cv-04756-NGG-VMS   Document 310-8   Filed 08/28/20   Page 29 of 231 PageID #: 5303

- 77 percent reported, "In my country of birth, I would be concerned about the quality of education for myself and my family."

- 58 percent reported, "In my country of birth, I would be concerned about food insecurity for myself and my family."

- 41 percent reported, "In my country of birth, I would be concerned about homelessness for myself and my family."

Altogether, 93 percent of respondents reported concerns about either their or their family's physical safety, health care, education, food security, or risk of homelessness in their respective countries of birth.

Strikingly, the average age of arrival to the United States among respondents is just 6.1 years old, and more than two-thirds—69 percent—reported not having any immediate family members who still live in their respective countries of birth. These findings make clear that deporting DACA recipients would not only mean sending them to countries they barely know, but it would also put their physical safety, well-being, and livelihood at serious risk.

## Civic engagement of DACA recipients

Despite DACA's uncertainty, the data continue to show tremendous resolve among DACA recipients and suggest that the program is associated with a greater sense of belonging. Fifty-seven percent of respondents reported that they have become more involved in their communities after receiving DACA. After their DACA application was approved, 67 percent reported, "I am no longer afraid of my immigration status," and 67 percent reported, "I feel more like I belong in the U.S." Nearly half of respondents reported that they have become more politically active since receiving DACA.

## The uncertainty of life with DACA

The legal and political uncertainty surrounding DACA continues to weigh heavily on the minds of DACA recipients. For example, 56 percent of respondents reported that they think about either being detained in an immigration detention facility or deported from the United States at least once a day; and an even greater percentage, 69 percent, reported that they think about a family member being detained or deported at least once a day.

Fear of family separation is particularly strong among DACA recipients who are parents. Among those with children, 75 percent reported that they think about "being separated from [their] children

8/28/2020                DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November - Center for American Progress
Case 1:16-cv-04756-NGG-VMS   Document 310-8   Filed 08/28/20   Page 30 of 231 PageID #:
5304

because of deportation" at least once a day, while 72 percent reported thinking about "not being able to see [their] children grow up because of deportation" at least once a day.

# Conclusion

As the Supreme Court prepares to hear arguments on DACA's termination on November 12, 2019, the implications for DACA recipients, their families, and the U.S. economy as a whole are clear. DACA has been a major success, evidenced by recipients' gains in employment outcomes and educational attainment, increased sense of belonging and stability, and contributions to local communities and economies. But now, these gains are on the line. And as the data show, stripping recipients of protections would have potentially disastrous impacts on them and their families, including the nearly 256,000 U.S. citizen children who have a parent with DACA.

*Tom K. Wong is associate professor of political science and founding director of the U.S. Immigration Policy Center at the University of California, San Diego, as well as a senior fellow at the Center for American Progress. Sanaa Abrar is advocacy director at United We Dream. Claudia Flores is the immigration campaign manager at the Center for American Progress. Tom Jawetz is vice president for Immigration Policy at the Center for American Progress. Ignacia Rodriguez Kmec is immigration policy advocate at the National Immigration Law Center. Greisa Martinez Rosas is deputy executive director at United We Dream. Holly Straut-Eppsteiner is research program manager at the National Immigration Law Center. Philip E. Wolgin is managing director for Immigration Policy at the Center for American Progress.*

*The authors would like to thank all those who took and shared the survey for their time and effort in helping to bring these stories to light.*

# Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—people responding who are not undocumented—the authors used two validation tests for undocumented status. Multiple questions were asked about each respondent's migratory history and DACA application history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory

8/28/2020 DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November - Center for American Progress

Case 1:16-cv-04756-NGG-VMS Document 310-8 Filed 08/28/20 Page 31 of 231 PageID #: 5305

history and DACA application history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded.



© 2020 - Center for American Progress

# EXHIBIT 3

Case 1:16-cv-04756-NGG-VMS Document 310-3 Filed 08/28/20 Page 33 of 231 PageID #: 5307



# Center for American Progress

☰

- DONATE

IMMIGRATION

# What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition

## A National and State-by-State Look

By Nicole Prchal Svajlenka and Philip E. Wolgin   |   April 6, 2020, 9:01 am



Getty/Hyoung Chang

Case 1:16-cv-04756-NGG-VMS    Document 310-3    Filed 08/28/20    Page 34 of 231 PageID #: 5308

A DACA recipient is photographed in Colorado, September 2018.

*Note: This column contains updates to the Center for American Progress' September 2019 columns on the national and state-by-state impacts of DACA recipients.*

Since 2012, more than 825,000 people who came to the country at a young age many years ago have been able to take advantage of Deferred Action for Childhood Arrivals (DACA), and the protection from deportation and work permits that the initiative brings. Over the nearly eight years since DACA began, recipients have been able to go back to school; get better and better-paying jobs; buy houses and cars; and start businesses, creating jobs and economic prosperity for all Americans. Even so, and in the midst of the COVID-19 pandemic—as more than 200,000 DACA recipients work on the front lines of the response, serving their communities and the health of the nation—the Trump administration is pushing ahead with its attempt to end DACA.

This column looks at the national and state-by-state demographic and economic impacts of individuals who currently hold DACA. Taken together, this group of people is thriving and giving back to their communities even as their well-being and contributions are at risk.

## Methodology

The data in this column are based on CAP analysis of three years of pooled American Community Survey (ACS) microdata: the 2016 1-year, 2017 1-year, and 2018 1-year ACS, accessed via the University of Minnesota's IPUMS USA. It also contains data on the number of DACA recipients filed as evidence in *Regents of the University of California, et al. v. U.S. Department of Homeland Security, et al.;* the data are on file with the author and show 643,430 active DACA recipients as of March 31, 2020. Some of the numbers presented here are lower than in previous iterations of this analysis, which can likely be attributed to the quarterly decline in the number of active DACA recipients.

More information on the economic contribution calculations can be found in "What We Know About DACA Recipients in the United States" by Nicole Prchal Svajlenka.

# DACA recipients at the national level

8/28/2020 — Know the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition - Center for American Progress

Case 1:16-cv-04756-NGG-VMS Document 310-3 Filed 08/28/20 Page 35 of 231 PageID #: 5309

On average, DACA recipients arrived in the United States in 1999, at age 7. And more than one-third of DACA recipients—37 percent—arrived before age 5. Given this, and the many years that DACA recipients have waited for Congress to come together and pass a solution that would put them on a pathway to citizenship, the average DACA recipient is now 28 years old. Many have started families: 254,000 U.S.-born children have at least one parent who holds DACA. In total, 1.5 million people live with a DACA recipient.

Nationally, according to CAP analysis, DACA recipients and their households pay $5.6 billion in federal taxes, and $3.1 billion in state and local taxes, each year. That money comes on top of the contributions that DACA recipients make to the health of the Social Security and Medicare funds through their payroll tax contributions. After taxes, DACA recipients and their households have a combined $24 billion in spending power to put back into their communities.

Additionally, DACA recipients own 56,000 homes, making an annual $566.9 million in mortgage payments. Other DACA recipients pay $2.3 billion in rental payments each year.

# DACA recipients at the state level

Breaking these data down at the state level shows significant economic activity and contributions in all 50 states.

**TABLE 1**
**Arriving as children, DACA recipients have deep-rooted ties to their communities**
Characteristics of DACA recipients and their households, by state

| State | Number of DACA recipients | Average age at arrival | Average year of arrival | Number of individuals living in households with DACA recipients | Number of U.S.-born children of DACA recipients |
|---|---|---|---|---|---|
| Alabama | 3,970 | 6 | 2000 | 8,800 | 1,800 |
| Alaska | 70 | 9* | 2004* | 300* | N/A |
| Arizona | 23,990 | 6 | 1999 | 54,900 | 10,400 |
| Arkansas | 4,480 | 7 | 1999 | 10,400 | 2,500 |
| California | 183,460 | 7 | 1998 | 462,600 | 66,400 |
| Colorado | 14,520 | 6 | 1999 | 28,700 | 6,700 |
| Connecticut | 3,560 | 8 | 2000 | 6,400 | 900* |
| Delaware | 1,310 | 8* | 2000* | 3,600 * | 1,100 * |
| Florida | 24,810 | 8 | 2000 | 47,900 | 7,100 |
| Georgia | 20,610 | 7 | 2000 | 46,300 | 8,200 |
| Hawaii | 340 | 7 | 1999 | 1,200 | 100 * |
| Idaho | 2,760 | 6 | 1997 | 4,900 | 1,500 |
| Illinois | 33,940 | 7 | 1999 | 76,000 | 14,400 |
| Indiana | 8,870 | 7 | 2001 | 18,900 | 4,400 |
| Iowa | 2,420 | 7 | 2000 | 4,600 | 1,400 * |
| Kansas | 5,550 | 6 | 2000 | 11,300 | 2,900 |
| Kentucky | 2,710 | 7 | 2001 | 5,200 | 1,100 * |

8/28/2020 — Know the Demographic and Economic Impacts of DACA Recipients: Spring 2020 edition - Center for American Progress

Case 1:16-cv-04756-NGG-VMS Document 310-3 Filed 08/28/20 Page 36 of 231 PageID #: 5310

| | | | | | |
|---|---|---|---|---|---|
| Louisiana | 1,730 | 7 | 2000 | 3,200 | 800 * |
| Maine | 50 | N/A | N/A | N/A | N/A |
| Maryland | 7,870 | 8 | 2000 | 19,600 | 2,900 |
| Massachusetts | 5,480 | 8 | 1999 | 8,500 | 1,200 * |
| Michigan | 5,250 | 7 | 1999 | 8,500 | 1,300 |
| Minnesota | 5,180 | 6 | 1999 | 11,700 | 2,200 * |
| Mississippi | 1,310 | 6* | 1999* | 2,400 * | 400 * |
| Missouri | 3,010 | 8 | 2000 | 5,500 | 1,800 |
| Montana | 70 | N/A | N/A | N/A | N/A |
| Nebraska | 2,910 | 6 | 2000 | 7,200 | 1,300 * |
| Nevada | 12,100 | 6 | 1999 | 28,300 | 5,000 |
| New Hampshire | 270 | 7* | 1998* | 700 * | N/A |
| New Jersey | 16,350 | 8 | 2000 | 33,600 | 4,700 |
| New Mexico | 5,690 | 6 | 1999 | 10,600 | 2,500 |
| New York | 28,180 | 8 | 1999 | 62,500 | 7,000 |
| North Carolina | 24,050 | 7 | 2001 | 50,800 | 11,000 |
| North Dakota | 120 | N/A | N/A | N/A | N/A |
| Ohio | 3,860 | 7 | 1999 | 7,000 | 1,600 |
| Oklahoma | 6,110 | 7 | 2000 | 12,700 | 1,700 |
| Oregon | 9,710 | 7 | 1998 | 20,600 | 5,900 |
| Pennsylvania | 4,480 | 7 | 2001 | 7,300 | 1,200 |
| Rhode Island | 890 | 7 | 1999 | 1,500 | 400 * |
| South Carolina | 5,750 | 7 | 2001 | 11,100 | 2,400 |
| South Dakota | 190 | 9* | 2001* | 300 * | N/A |
| Tennessee | 7,650 | 7 | 2001 | 19,100 | 4,900 |
| Texas | 106,090 | 7 | 2000 | 241,500 | 52,000 |
| Utah | 8,490 | 6 | 1999 | 18,000 | 2,400 |
| Vermont | 20 | N/A | N/A | N/A | N/A |
| Virginia | 9,410 | 8 | 2001 | 19,600 | 2,800 |
| Washington | 16,030 | 7 | 2000 | 34,300 | 4,500 |
| Washington, D.C. | 600 | 7* | 1999* | 800 * | N/A |
| West Virginia | 110 | 9* | 2001* | 200 * | 1,300 * |
| Wisconsin | 6,540 | 6 | 1999 | 10,800 | N/A |
| Wyoming | 510 | N/A | N/A | N/A | N/A |
| **United States** | **643,430** | **7** | **1999** | **1,450,900** | **254,300** |

Notes: Unavailable data are due to small sample sizes. Data flagged with an asterisk (*) are based on a small sample size and may be unreliable.
Sources: Center for American Progress analysis of pooled 2016 1-year, 2017 1-year, and 2018 1-year American Community Survey microdata. Data accessed via Steven Ruggles and others, "Integrated Public Use Microdata Series, U.S. Census Data for Social, Economic, and Health Research, 2016, 2017, and 2018 American Community Survey: 1-year estimates" (Minneapolis: Minnesota Population Center, 2020), available at https://usa.ipums.org/usa/. Regents of the University of California, et al. v. U.S. Department of Homeland Security, et al., 3:17-cv-05211-WHA (January 9, 2018). This dataset is filed as an exhibit quarterly, most recently on March 31, 2020, and is on file with the author.



Half of U.S. states have more than 10,000 people living in households with DACA recipients, meaning that the end of DACA would reverberate well beyond recipients themselves.

TABLE 2

**DACA recipients' fiscal and economic contributions boost the economy**
Annual tax contributions, spending power, and housing payments of household, by state

| State | Federal taxes | State and local taxes | Spending power | Number of homes owned | Annual mortgage payments | Annual rental payments |
|---|---|---|---|---|---|---|

| State | taxes | local taxes | power | homes owned | payments | payments |
|---|---|---|---|---|---|---|
| Alabama | $25.3 M | $13.7 M | $131.7 M | 400 | $1.3 M | $9 M |
| Alaska | $1.3 M* | $200,000* | $5 M* | N/A | N/A | N/A |
| Arizona | $159.8 M | $90.2 M | $758.4 M | 2,600 | $21 M | $56.7 M |
| Arkansas | $31.3 M | $20.7 M | $158.1 M | 900 | $6.4 M | $10.3 M |
| California | $2 B | $977.5 M | $7.8 B | 9,500 | $172.9 M | $835.6 M |
| Colorado | $113.5 M | $58.7 M | $524.4 M | 2,000 | $21.8 M | $62 M |
| Connecticut | $35.7 M | $21.8 M | $138.1 M | 200 | $2.4 M | $15.2 M |
| Delaware | $11.7 M* | $4.3 M* | $57.1 M* | N/A | N/A | $7.8 M* |
| Florida | $165.5 M | $72.5 M | $779.6 M | 1,600 | $14.6 M | $86.2 M |
| Georgia | $170.2 M | $92.5 M | $747.5 M | 2,000 | $19.6 M | $67.7 M |
| Hawaii | $6.9 M | $3.1 M | $20.9 M | N/A | N/A | $1 M |
| Idaho | $14.4 M | $8.6 M | $81.4 M | 300 | $2.1 M | $6.6 M |
| Illinois | $293.5 M | $209.5 M | $1.3 B | 4,300 | $42.3 M | $102.9 M |
| Indiana | $63.2 M | $39.3 M | $294.6 M | 1,100 | $5.4 M | $25 M |
| Iowa | $13.8 M | $11.1 M | $79.9 M | 700 | $6 M | $5.4 M |
| Kansas | $29.5 M | $21.1 M | $153.9 M | 700 | $2.9 M | $14.6 M |
| Kentucky | $18.5 M | $11.1 M | $86.6 M | 300 | $1.2 M | $7.3 M |
| Louisiana | $10.1 M | $5.8 M | $49 M | 300 | $1.7 M | $2.5 M |
| Maine | N/A | N/A | N/A | N/A | N/A | N/A |
| Maryland | $90.9 M | $53 M | $359.1 M | 700 | $7.6 M | $30.5 M |
| Massachusetts | $77.5 M | $32.5 M | $260.2 M | 500 | $9.4 M | $27.3 M |
| Michigan | $38.7 M | $21.9 M | $183.5 M | 700 | $4.5 M | $15.3 M |
| Minnesota | $57.5 M | $31.2 M | $236.1 M | 300 | $1.5 M | $25.4 M |
| Mississippi | $5.7 M* | $3.8 M* | $30.7 M* | 100 * | $700,000* | $3.6 M* |
| Missouri | $18 M | $10.9 M | $92.2 M | 400 | $1.8 M | $8.6 M |
| Montana | N/A | N/A | N/A | N/A | N/A | N/A |
| Nebraska | $31.5 M | $16.2 M | $117.7 M | 400 | $2.8 M | $9.1 M |
| Nevada | $91.8 M | $36.5 M | $431.4 M | 1,300 | $12.4 M | $35.3 M |
| New Hampshire | $6.3 M* | $1.8 M* | $21.9 M* | N/A | N/A | $1 M* |
| New Jersey | $204.9 M | $105.2 M | $745.9 M | 700 | $12.8 M | $72.1 M |
| New Mexico | $28.4 M | $18.6 M | $147.7 M | 1,100 | $8.7 M | $12.3 M |
| New York | $374.1 M | $238.8 M | $1.3 B | 800 | $16.4 M | $132.8 M |
| North Carolina | $127.3 M | $80.3 M | $687.6 M | 3,300 | $13.8 M | $62.7 M |
| North Dakota | N/A | N/A | N/A | N/A | N/A | N/A |
| Ohio | $28.7 M | $18.1 M | $131 M | 500 | $3.6 M | $17.6 M |
| Oklahoma | $38.9 M | $25.6 M | $190.9 M | 600 | $3.3 M | $10.8 M |
| Oregon | $72 M | $39.9 M | $341 M | 1,300 | $9.2 M | $34.1 M |
| Pennsylvania | $34.3 M | $19.9 M | $141.3 M | 300 | $3.4 M | $15.7 M |
| Rhode Island | $7.2 M | $3.9 M | $30.7 M | 100 | $1.4 M | $4.3 M |
| South Carolina | $35.8 M | $18.9 M | $177.7 M | 600 | $3.8 M | $14.6 M |
| South Dakota | $1.1 M* | $600,000* | $6 M* | 100 * | $600,000* | $500,000* |
| Tennessee | $45.4 M | $24.2 M | $247.7 M | 1,200 | $7.8 M | $21 M |
| Texas | $705.2 M | $409.9 M | $3.4 B | 10,500 | $80.1 M | $278.6 M |
| Utah | $61 M | $30.6 M | $287.7 M | 900 | $8.3 M | $20.6 M |
| Vermont | N/A | N/A | N/A | N/A | N/A | N/A |
| Virginia | $100.5 M | $48.7 M | $392.9 M | 500 | $6.1 M | $38.4 M |
| Washington | $168.9 M | $90.5 M | $686.4 M | 1,500 | $17.9 M | $62.9 M |
| Washington, D.C. | $5.9 M* | $2.9 M* | $21 M* | N/A | N/A | $3.6 M* |

8/28/2020    What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition - Center for American Progress

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 38 of 231 PageID #: 6812

| | | | | | |
|---|---|---|---|---|---|
| West Virginia | $800,000* | $300,000* | $3.1 M* | N/A | N/A |
| Wisconsin | $38.1 M | $26.5 M | $192.3 M | 700 | $5.9 M | $21 M |
| Wyoming | N/A | N/A | N/A | N/A | N/A |
| United States | $5.6 B | $3.1 B | $24 B | 56,100 | $566.9 M | $2.3 B |

Notes: Unavailable data are due to small sample sizes. Data flagged with an asterisk (*) are based on a small sample size and may be unreliable. Data are in 2018 dollars. Tax and spending power are for households that include DACA recipients. Mortgage and rental payments are for households headed by a DACA recipient or a DACA recipient's partner.

Sources: Center for American Progress analysis of pooled 2016 1-year, 2017 1-year, and 2018 1-year American Community Survey microdata. Data accessed via Steven Ruggles and others, "Integrated Public Use Microdata Series, U.S. Census Data for Social, Economic, and Health Research, 2016, 2017, and 2018 American Community Survey: 1-year estimates" (Minneapolis Minnesota Population Center, 2020), available at https://usa.ipums.org/usa/. Regents of the University of California, et al. v. U.S. Department of Homeland Security, et al., 3:17-cv-05211-WHA (January 9, 2018). This dataset is filed as an exhibit quarterly, most recently on March 31, 2020, and is on file with the author.



In 42 states and Washington, D.C., DACA recipients and their households pay more than $1 million in state and local taxes each year, with significantly higher contributions—more than $50 million—in a dozen states. At a time when state budgets are deeply constrained by the response to the COVID-19 pandemic, this economic activity is critical to their continued functioning.

# Conclusion

In the midst of one of the greatest challenges the nation has ever faced, now is not the time to end DACA and kick recipients out of the workforce. Their families, their communities, and the nation as a whole cannot afford to see DACA end.

*Nicole Prchal Svajlenka is an associate director for research on the Immigration Policy team at the Center for American Progress. Philip E. Wolgin is the managing director of Immigration Policy at the Center.*



© 2020 - Center for American Progress

8/28/2020    What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition - Center for American Progress

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 39 of 231 PageID #: 5313

# EXHIBIT D



🇺🇸 Official website of the Department of Homeland Security



U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner

Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke

Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion
with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the United States as
Children," which established the program known as Deferred Action for Childhood Arrivals
("DACA"). For the reasons and in the manner outlined below, Department of Homeland
Security personnel shall take all appropriate actions to execute a wind-down of the program,
consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a
memorandum on June 15, 2012. The program purported to use deferred action—an act of
prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to
confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by
law.[1] (# ftn1) Specifically, DACA provided certain illegal aliens who entered the United States
before the age of sixteen a period of deferred action and eligibility to request employment
authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the
parameters of DACA and creating a new policy called Deferred Action for Parents of Americans
and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the
coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages
and arrival dates, and lengthening the period of deferred action and work authorization from
two years to three—the November 20, 2014 memorandum directed USCIS "to establish a
process, similar to DACA, for exercising prosecutorial discretion through the use of deferred
action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S.
citizen or lawful permanent resident."

8/26/2020

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum

Case 1:16-cv-04756-NGG-VMS    Document 310-3    Filed 08/28/20    Page 44 of 231 PageID #: 5318

establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 45 of 231 PageID #: 5319

that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course —retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined

8/26/2020      Memorandum on Rescission Of Deferred Action for Childhood Arrivals (DACA) | Homeland Security

in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics: Border Security (/topics/border-security)

Keywords: Deferred Action for Childhood Arrivals (DACA) (/keywords/daca)

Last Published Date: September 5, 2017

# EXHIBIT E

# Presidential Documents

Executive Order 13753 of December 9, 2016

## Amending the Order of Succession in the Department of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Vacancies Reform Act of 1998, 5 U.S.C. 3345, *et seq.,* it is hereby ordered as follows:

**Section 1**. Section 88 of Executive Order 13286 of February 28, 2003 (''Amendment of Executive Orders, and Other Actions, in Connection With the Transfer of Certain Functions to the Secretary of Homeland Security''), is amended by striking the text of such section in its entirety and inserting the following in lieu thereof:

''Sec. 88. Order of Succession.

Subject to the provisions of subsection (b) of this section, the officers named in subsection (a) of this section, in the order listed, shall act as, and perform the functions and duties of the office of, the Secretary of Homeland Security (Secretary), if they are eligible to act as Secretary under the provisions of the Federal Vacancies Reform Act of 1998, 5 U.S.C. 3345 *et seq.* (Vacancies Act), during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary.

(a) Order of Succession.

(i) Deputy Secretary of Homeland Security;

(ii) Under Secretary for Management;

(iii) Administrator of the Federal Emergency Management Agency;

(iv) Under Secretary for National Protection and Programs;

(v) Under Secretary for Science and Technology;

(vi) Under Secretary for Intelligence and Analysis;

(vii) Commissioner of U.S. Customs and Border Protection;

(viii) Administrator of the Transportation Security Administration;

(ix) Director of U.S. Immigration and Customs Enforcement;

(x) Director of U.S. Citizenship and Immigration Services;

(xi) Assistant Secretary for Policy;

(xii) General Counsel;

(xiii) Deputy Under Secretary for Management;

(xiv) Deputy Commissioner of U.S. Customs and Border Protection;

(xv) Deputy Administrator of the Transportation Security Administration;

(xvi) Deputy Director of U.S. Immigration and Customs Enforcement;

(xvii) Deputy Director of U.S. Citizenship and Immigration Services; and

(xviii) Director of the Federal Law Enforcement Training Center.

(b) Exceptions.

(i) No individual who is serving in an office listed in subsection (a) in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this section.

(ii) Notwithstanding the provisions of this section, the President retains discretion, to the extent permitted by the Vacancies Act, to depart from this order in designating an acting Secretary.''

**Sec. 2**. Executive Order 13442 of August 13, 2007 (''Amending the Order of Succession in the Department of Homeland Security''), is hereby revoked.

THE WHITE HOUSE,
*December 9, 2016.*

[FR Doc. 2016–30272
Filed 12–13–16; 11:15 am]
Billing code 3295–F7–P

# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3
    CASA DE MARYLAND, INC., et al.,)
 4                                 )
            Plaintiffs,            )
 5                                 ) Case Number: 8:20-cv-2118-PX
            vs.                    )
 6                                 )
    CHAD F. WOLF, et al.,          )
 7                                 )
            Defendants.            )
 8

 9         TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
             BEFORE THE HONORABLE PAULA XINIS
10              UNITED STATES DISTRICT JUDGE
             FRIDAY, AUGUST 14, 2020; 11:00 A.M.
11                   GREENBELT, MARYLAND

12                   A P P E A R A N C E S

13  FOR THE PLAINTIFFS:

14      INTERNATIONAL REFUGEE ASSISTANCE PROJECT
             BY:  KATHRYN SHU-YENG AUSTIN, ESQUIRE
15                MARIKO HIROSE, ESQUIRE
             ONE BATTERY PARK PLAZA, 4TH FLOOR
16           NEW YORK, NY 10004
             (516) 296-0688
17           (516) 701-4620

18      ASYLUM SEEKER ADVOCACY PROJECT
             BY:  ZACHARY MANFREDI, ESQUIRE
19           228 PARK AVENUE S. #84810
             NEW YORK, NY 10003
20           (305) 484-9260
             (248) 840-0744

21
         ***Proceedings Recorded by Mechanical Stenography***
22           Produced By Computer-Aided Transcription

23   _____

             MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
24           FEDERAL OFFICIAL COURT REPORTER
             6500 CHERRYWOOD LANE, STE 200
25             GREENBELT, MARYLAND 20770
                   (301)344-3499
```

1               A P P E A R A N C E S
                     continued
2

FOR THE DEFENDANTS:
3
        UNITED STATES ATTORNEY'S OFFICE
4       DISTRICT OF MARYLAND
             BY:  JANE ELIZABETH ANDERSEN, ESQUIRE
5            6500 CHERRYWOOD LANE, SUITE 200
             GREENBELT, MARYLAND 20770
6            (301) 344-4422

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2        (Call to Order of the Court.)
 3              THE COURT:  All right.  Good morning, everyone.
 4        Ms. Smith, if you would call the case.
 5              THE COURTROOM DEPUTY:  May I have your attention,
 6   please.
 7        The United States District Court for the District of
 8   Maryland is now in session, the Honorable Paula Xinis
 9   presiding.
10        The matter now pending before this Court is Civil
11   No. PX-20-2118, Casa de Maryland, Inc., et al., versus Chad F.
12   Wolf, et al.  We're here today for the purpose of a motions
13   hearing.
14        Counsel, please identify yourselves for the record.
15              MR. MANFREDI:  Zachary Manfredi from the Asylum
16   Seeker Advocacy Project for Plaintiffs, Your Honor.
17              MS. AUSTIN:  Kathryn Austin from the International
18   Refugee Assistance Project, also for the plaintiffs.
19              MS. HIROSE:  Mariko Hirose from the International
20   Refugee Assistance Project, also for the plaintiffs.
21        Good morning, Your Honor.
22              THE COURT:  Anyone else for the plaintiffs before I
23   turn to the government?
24              MS. HIROSE:  The three of us will be speaking for the
25   plaintiffs today.  Thank you, Your Honor.
```

1          THE COURT:  Okay.  All right, great.

2      And then I see you, Ms. Andersen, for the defendants.  Is

3  that right?

4          MS. ANDERSEN:  Yes.  Good morning, Your Honor.  Jane

5  Andersen on behalf of the government.

6          THE COURT:  All right, great.  Thank you.

7      Okay.  Thank you all for joining me today.  We have a lot

8  to cover, so I expect that we'll be moving this along.

9      A couple of things.  I know that we are joined by many

10  members of the public and that I just want to let -- take a few

11  minutes just to go over the rules of the road in that respect.

12      As -- even though this is a virtual hearing, as my

13  background suggests, we are in court.  So we will be handling

14  this matter just as if we were in court and that means for

15  those of you who are joining us virtually, you may absolutely

16  stay for the entire time, you're more than welcome, but there

17  are no interruptions of any kind; and just as if there were

18  interruptions in my court, then we would be asking the

19  courtroom deputies to escort you out.  So we'll be

20  electronically ejecting anybody who interrupts this proceeding.

21      Secondly, just as if we were in court, there are -- there

22  is no independent recording of this proceeding.  So you cannot

23  record this proceeding by audio or video of any kind.  Doing so

24  would be a violation of my court order.  You could be held in

25  contempt.

1      There is, however, an official court record of today and

2  that is the one taken by Ms. Martin-Kerr, our court reporter.

3      Hi, Ms. Kerr.  If you cannot hear us or if at any point

4  we're talking over one another, making your job harder, just

5  let me know and we will stop.  Okay?

6          THE COURT REPORTER:  Thank you, Judge.  Okay.

7          THE COURT:  All right, great.

8      And with that, I'm going to start us off with -- oh, the

9  only other thing, we seem to all be doing it, is you keep your

10  phones on mute when you are not speaking so that we cut down on

11  just the background noise of, you know, the barking dogs, the

12  crying babies, the dump trucks rolling by.  Although, I do look

13  forward at some point to seeing your pets, because I've seen so

14  many of them, and I feel like I've gotten to know them so well.

15  So if there's a cat that, you know, randomly walks by, it's not

16  a big deal.  We'll just keep our phones on mute so that we

17  minimize the background noise.

18      Okay.  So with that, we have a number of things.  I want

19  to start with -- in the order in which I've received them --

20  the Supplemental Authority, because while I've gotten the

21  notices, I don't quite know for what purposes you've offered

22  them.  So I just want to understand why you've given them to

23  me.  I have my own thoughts but that's not what I'm really

24  interested in.  I want to know what you want.

25      Ms. Andersen, let me start with you.  I'm going to start

1    in order of the Supplemental Authority I have received.  From

2    you I've received, I think very shortly after the opinion came

3    out, the Fourth Circuit opinion in *CASA de Maryland v. Donald*

4    *J. Trump, et al.*  For what purpose are you offering that

5    Supplemental Authority?

6              MS. ANDERSEN:  Yes, Your Honor.  Thank you.

7         I wanted to make sure the Court was aware of it because it

8    seems to be relevant on a number of different points,

9    potentially, and part of it is just to maybe guide this Court

10   when it may make various decisions, you know, relating to the

11   PI motion.

12        So number one, of course, the court found that CASA de

13   Maryland didn't have organizational standing, but, of course,

14   it found that two individuals did have standing, so ended up

15   ruling on the merits.

16        Here, you know, obviously, I did not raise standing in our

17   proceedings, but, of course, the Court needs to satisfy itself

18   that it has standing for jurisdictional purposes.

19              THE COURT:  Let me stop you there.  Are you arguing

20   that any of the plaintiffs do not have standing?

21              MS. ANDERSEN:  I do believe from that case that

22   organizational standing would be inappropriate; however, they

23   may be able to satisfy membership standing based on the members

24   on membership standing, which that's addressed in that case.

25              THE COURT:  Okay.  So put organizational standing to

1    the side.  Representational standing, are you asserting that

2    they have not adequately pled representational standing based

3    on what I see as somewhat robust averment regarding the members

4    of the organization being injured by the rule changes?

5         MS. ANDERSEN:  Not for the purposes of this PI

6    motion, Your Honor.  Obviously, we have the right to raise it

7    at a later date if it becomes appropriate.  And one of the

8    reasons why I think it is important for this Court's analysis,

9    if we assume that they have membership standing but not

10   organizational standing, goes to irreparable harm; and should

11   this Court enter an injunction, how it could narrowly tailor

12   such an injunction.

13        So I just want to make sure that those concepts are -- I

14   think they are relevant even if this Court finds that there is,

15   you know, membership standing or any other form of --

16        THE COURT:  Well, okay, so let me stay on that just a

17   little bit longer.  I'm not quite clear what the government

18   means by "not for purposes of this motion" because the concept,

19   as you know, behind standing is the jurisdictional one; and if

20   I don't have power, I don't have power.  So if the government

21   is taking the position, well, you have power for now but you

22   might not have power later, it may matter later in the

23   conversation about where this case is going; and so that's why

24   I'm pressing on this.

25        If, Ms. Anderson, if you're saying you're going to be

1  challenging representational standing, I may take that up in a

2  separate way; but, again, that's why I'm pressing on it is I

3  want to understand what the argument would be in light of the

4  way in which the allegations have been pled and the factual

5  averments that have been made.

6  MS. ANDERSEN:  Yes, Your Honor.  I think that they

7  would likely be able to establish membership standing at least

8  for some of their claims.  I only just hesitate because, again,

9  you know, in briefing this in a week, I don't want to preclude

10 any other arguments after consulting with, you know, other

11 people within the Department of Justice if there's other people

12 that have different opinions than I did.  So I just didn't want

13 to preclude that.

14 I think it's not a waiveable issue, so I'm aware of that;

15 but, obviously, I would have raised it if I had a strong reason

16 to do so and I did not.

17 THE COURT:  Okay.  So then before we leave this call

18 today, we might revisit this question.

19 So I understand that for purposes of standing, you've

20 given me this opinion.  For what other purposes did you wish

21 for me to review it?

22 MS. ANDERSEN:  Yes, Your Honor.

23 The Fourth Circuit also addressed the irreparable harm

24 prong of a preliminary injunction standard, and I think the

25 case stands for the proposition that however -- that it is

1    important when determining what the irreparable harm is.

2        So, for example, there are a number of allegations, both

3    from the declarations and the complaint, about the burden on

4    the organizations themselves, about the resources that they

5    need to divert because of the rules; and I think that case is

6    very clear that those sorts of concerns are not within the

7    Article III standing, which then goes to irreparable harm.

8        So when the Court is balancing the equities of what the

9    harm is, it should be looking at the members in particular in

10   those harms when it's balancing it.

11       I think that the court in that held that CASA's purported

12   injuries were not the product of the rule's dictates but of its

13   own priorities and choices, and that was within the discussion

14   of the irreparable harm prong as well.

15            THE COURT:  So it kind of goes hand in glove with

16   standing.

17            MS. ANDERSEN:  Yeah, yeah, and that's why, you know,

18   I didn't brief it.  It was a very -- standing would have taken

19   up a lot of pages.  I was trying to keep within that 35.  You

20   know, in hindsight, at least, maybe if I briefed it, just to

21   help frame that issue, that may have been helpful to the Court.

22   So I apologize if that, you know, would have been helpful.

23       But, of course, also this decision came down after that,

24   which I think clarified a lot of things, because the case in a

25   lot of ways is, sort of, you know, similar.  So it's helpful

1    from that perspective.

2        And the final factor, which the Fourth Circuit weighed in

3    on, is when you need to weigh the interests between the harms

4    of the plaintiffs and the harms to the government and the

5    public, and there is just -- again, I think it's important for

6    the Court to be aware of and what the court held on those

7    fronts.

8        So just, for example, the court held that the district

9    court's reasoning that an individual's interest must always

10   trump general interest was incorrect; that the government is

11   asserting in that case a significant interest in not burdening

12   the public; and that the government's interest in that sense

13   has to be considered and weighed with the individual harms.

14           THE COURT:  Are you talking about the aspect of the

15   ruling that dealt with the propriety of a nationwide

16   injunction, as opposed to more circumscribed relief?

17           MS. ANDERSEN:  Well, it was not -- that part of it

18   was just the weighing of whether the irreparable harm prong or

19   the last prong, I guess, of the *Winter's* where you're weighing

20   the plaintiff's harm versus the government's harm or the public

21   interest harm.

22           THE COURT:  Okay.

23           MS. ANDERSEN:  And the court also just noted that in

24   the field of immigration in particular, that the public

25   interest, you know, can be disturbed when there is a

1  legislative expression, you know, from the legislative branch

2  and from the executive branch, and a court disturbing that; and

3  the court did address that within the weighing of the harms,

4  that the harm of just disturbing the executive branch's

5  discretion, especially in this field where the agency is given

6  very broad discretion, is a harm in and of itself.

7      And so that is one harm that the Court would be required

8  to factor into when weighing all the --

9          THE COURT:  Although, it's fair to say -- and we'll

10 get into this more in a moment -- but it's fair to say that the

11 Fourth Circuit opinion didn't have any arguments relating to

12 the authority of the Secretary who will be promulgating these

13 rules.  Am I right?  There is no FVRA claim.

14         MS. ANDERSEN:  Correct.  Correct.  Yeah, yeah, this

15 really just goes to the APA challenge --

16         THE COURT:  Right.

17         MS. ANDERSEN:  -- on the merits, yeah.

18     And last, the court, obviously, did talk about, you know,

19 in that case they rejected the nationwide injunction.  The

20 court, obviously, discusses why injunction is equitable in

21 nature and that it has to be tailored to address the injury of

22 the particular plaintiff.

23     And, again, this is why I think standing does become

24 relevant in this case even if there is some standing for this

25 Court to, you know, deal with the merits, that it is important.

1   And in this case -- and I can address it now or when we're

2   doing it, but I think there are ways, should this Court find

3   that injunction is appropriate, that it could be narrowed in

4   very reasonable ways.

5       You know, and, again, I think the Fourth Circuit just

6   solidifies --

7           THE COURT:  Let me ask you, Ms. Andersen, if you were

8   to take a few more pages and address standing, would you agree

9   that there aren't any -- necessarily any additional facts that

10  you need, that you could address standing based on the

11  pleadings?

12          MS. ANDERSEN:  I believe that would be appropriate,

13  Your Honor, yes.

14          THE COURT:  Okay.  All right.

15      Okay, and I'm intimately aware of the holding regarding

16  national -- a nationwide injunction, and maybe when we get more

17  into the argument today, you can address Judge King's view,

18  which said, in reaching the remedy in that case, it's dicta.

19      But in any event, we'll put that to the side, but I think

20  I understand that you're looking at this case as altering the

21  playing field for standing, irreparable harm, and the scope of

22  relief.  Is that fair?

23          MS. ANDERSEN:  Yes, Your Honor.

24          THE COURT:  Okay, great.  Thanks.

25      Okay.  And then for the plaintiffs, in the last 24 hours

1  I've received two things; one is an opinion from the Northern

2  District of California regarding the Public Charge Rule.  It

3  was a case decided at the -- not on injunctive relief in this

4  opinion but on a 12(b)(1) and 12(b)(6) posture.  For what

5  purpose are you offering this case, Plaintiffs?

6      MR. MANFREDI:  Yes, Your Honor.  Zach Manfredi for

7  Plaintiffs.

8      First, Your Honor, I just wanted to clarify how Plaintiffs

9  have proposed to divide the argument amongst the three of us,

10 if that's helpful for the Court.  I'm prepared to discuss the

11 issue surrounding -- related to Mr. Wolf's appointment as

12 Acting DHS Secretary.  My colleague Kathryn Austin is prepared

13 to discuss the likelihood of success on the merits for any of

14 our other APA claims; and then my colleague Mariko Hirose is

15 prepared to address any other claims or any other issues in

16 relation to our claims.

17     THE COURT:  Okay, great.

18     MR. MANFREDI:  So I'm happy to address the *La Clinica*

19 case's relevance as to the appointment issue, and Ms. Hirose

20 can address it as to the standing issue.

21     THE COURT:  Okay.  So that's helpful because with

22 regard to the question of Acting Secretary Wolf's authority in

23 this respect, *La Clinica* seemed to raise more questions than

24 provided answers, and the subsequent provision of the OAG or

25 the GAO, rather -- I'm dyslexic this morning.  I only had three

1   cups of coffee, so excuse me -- seemed to put to bed a

2   lingering factual question I had.

3        So when I read the *La Clinica* case, it seemed to accept as

4   true that President Trump actually nominated Acting Secretary

5   McAleenan and that it accepted that fact as true and based its

6   decision on that, but I hadn't found any authority for that.

7   And then when I -- and it's not pled that way in your

8   complaint.  And then the GAO -- government accountability -- I

9   did it right -- the GAO advisory opinion assesses it the same

10  way so that Secretary Nielsen's last memorandum on her way out

11  is the operative document.

12       So it did raise for me were you offering this opinion for

13  any insight as to what I do with the FVRA and the HSA

14  assessment?

15            MR. MANFREDI:  Yes, Your Honor.

16       So two points, Your Honor, the first of which is we --

17  first, I mean, we just wanted the Court to be aware since the

18  case did directly address this issue, but we believe the -- the

19  court's opinion there, as well as the GAO report, we do believe

20  strongly supports Plaintiffs' claim that the amendments, which

21  Secretary Nielsen purported to make, never did, in fact, result

22  in secretary -- in Acting Secretary McAleenan lawfully assuming

23  his office.  So insofar as that's the case, we believe that

24  it's correct.

25       It is Plaintiffs' view, in fact, that the -- Mr. McAleenan

1  was not actually designated under the FVRA, which we agree with

2  the GAO, that there is an actual -- so we would disagree with

3  that part of the report.

4      But insofar as the Court does potentially even agree with

5  the *La Clinica* court that Mr. McAleenan's appointment was

6  pursuant to the FVRA, rather than the HSA, we think that also

7  strongly supports Plaintiffs' claims because then it would be

8  indisputable that the Vacancies Act's time limit provisions

9  would apply to his appointment; and in this case, it is also

10  very clear that those have been exceeded when the relevant

11  actions were taken.

12      So in that sense, we think it's helpful to the Court in

13  either respect.

14          THE COURT:  Okay.  Thank you.

15      And so with that, the way I'd like to take up the argument

16  is I actually want to start with the government and talk about

17  the FVRA and the HSA and then I'll turn to Plaintiffs and then

18  we can move on to the APA claims; and the reason why I would

19  like to do it in that order is because if, in fact, I agree

20  that the FVRA provides for sole and exclusive remedy in the

21  event that Acting Secretary Wolf is without authority to

22  promulgate these rules and that sole and exclusive remedy is to

23  set aside -- well, declare the rules as having, quote, no force

24  and effect, that's what the FVRA says, then the rule itself is

25  a nullity whether it is valid or not.  And so I have a question

1   about whether I even need to reach the APA claims in that

2   instance.

3       And, Ms. Andersen, I have to say, in reading the GAO

4   opinion, it's certainly not binding on me but it was tracking

5   quite closely what I was thinking about this issue, as stunning

6   as it is, frankly, to imagine that we're at day 500 and we

7   still don't have a secretary installed that is nominated by the

8   President and confirmed by the Senate.

9       So I wanted to give you the floor first to explain to me

10  how it is that I can find otherwise in this case.

11      MS. ANDERSEN:  Thank you, Your Honor, and I do

12  appreciate that opportunity.

13      Obviously, this decision just came down this morning, so I

14  just will start off by saying that, you know, the Office of

15  Legal Counsel, Department of Justice needs to review that, and

16  we believe they will come to some sort of, you know, opinion on

17  it, you know, once they have a chance to review it.  So I'm

18  sort of in this limbo period right now.

19      But I would like to --

20      THE COURT:  Can I ask a question about that before

21  you move on to the merits?  Is there a possibility, in

22  reviewing that, that there may be some decision on the

23  government's part to delay enforcement of these rules?  In

24  other words, should we check back by the end of the week next

25  week?

1      MS. ANDERSEN:  Again, I am told that they will be

2  reviewing it.  So my assumption means that that means, you

3  know, they will come to some decision one way or another, if

4  it's something they agree with or disagree with, in which case

5  this case could become moot in theory; but right now that's not

6  the case.

7      So I, you know, would like the opportunity to explain the

8  Department's position --

9      THE COURT:  Oh, absolutely.

10      MS. ANDERSEN:  Yeah, yeah.  And it is a position that

11  they put forward before GAO -- you know, I think just as a

12  general matter, you know, GAO, obviously, served a very

13  important function on behalf of Congress but it is not binding

14  on the executive branch.  So there's just always, in any of

15  these cases, that there can be disagreement, and I just don't

16  know yet if there will be, ultimately, once OLC has a chance to

17  review it.

18      THE COURT:  Okay.

19      MS. ANDERSEN:  So just kind of putting that to the

20  side for now, and I, of course, will update the Court, you

21  know, as soon as I -- if there's any sort of official decision,

22  I will let the Court know because it, obviously, you know,

23  could potentially impact this case.

24      And just to, again, frame sort of what's in dispute and

25  what's not in dispute, this particular case, because it's

1   dealing with Secretary Wolf, if this Court agrees that

2   Secretary Nielsen's order did not change the order of

3   succession, then there's no more argument on behalf of the

4   government.  You know, even if the Court adopted the reasoning

5   by the court in Washington that McAleenan was appointed through

6   the FVRA instead, Wolf's appointment would not be proper.  So

7   that's just not an issue that the Court would need to resolve.

8          We would concede at that point that our argument would

9   rely on the Court making two findings and the first has to be

10  that Secretary Nielsen's order on April 9th changed the order

11  of succession for all purposes.  If you find against the

12  government on that point, the Court does not need to reach any

13  further decisions and that is because Secretary McAleenan

14  signed the order on day 214.  So if he was appointed pursuant

15  to the Federal Vacancies Reform Act, he would have exceeded the

16  200-day statutory limitation.

17         The Department's argument is that --

18         THE COURT:  Okay, let me make sure I understand it.

19  The government is not disputing that the order -- the changed

20  order of succession signed by Acting Secretary McAleenan was on

21  214 -- day 214 from when the vacancy first came open.

22         MS. ANDERSEN:  Yes.

23         THE COURT:  Likewise, you're not disputing that the

24  rules in question in this case were promulgated far in excess

25  of the 210-day period that's framed in the FVRA.  That's also

1   not in dispute?

2           MS. ANDERSEN:  That is correct.

3       The argument and the reason why we believe that Secretary

4   Wolf's appointment is legal is because Secretary McAleenan and

5   Secretary Wolf were appointed pursuant to Section 113 of the

6   Homeland Security Act, which does not contain the 210-day

7   limitation.  That would be our second argument that would --

8   that could also address the Court, but the Court doesn't even

9   have to go that far if -- you know, until the Court finds that

10  Secretary Nielsen's order was a lawful and proper order

11  pursuant to the Homeland Security Act.

12      Does that make sense?

13          THE COURT:  No.  Well, no, I get the two steps.  I

14  mean, frankly, I think you can also look at it from the other

15  end of the telescope, which is if I find that I can read the

16  FVRA in harmony with the HSA, meaning I can give every word of

17  both statutes full force and effect, then I could potentially

18  stop at the question of giving the FVRA its full force and

19  effect.  It puts a 210-day time limit on acting secretaries.

20      The HSA is designed to help me figure out who slots in

21  under that first 3345(a)(1), who is the first assistant

22  according to that statute.  The HSA 113, 6 U.S.C. 113, that

23  helps me figure out who's in there, right?  And it could either

24  be by the statutory order of succession, but then if we get to

25  the further order of succession, it tells me I can look to

1  Secretary Nielsen's order, right?

2      So even if I credit your argument that Secretary Nielsen's

3  order didn't -- it is lawful and she did mean to put Acting

4  Secretary McAleenan in, if I can read the statutes in harmony

5  and Acting Secretary Wolf is intending to promulgate these

6  rules at day 499 and day 500 of the vacancy, then don't you

7  lose?  And I can just base it on that, that ruling.  I don't

8  have to do anything else.

9          MS. ANDERSEN:  Yes, Your Honor.  Yes, there are two

10  independent legal arguments that the government's argument

11  rests on.  So, yes, they're independent.  If the Court finds

12  against us on one of them, we would lose.  So I guess it's up

13  to the Court which direction it -- you know, what it wants to

14  address first.

15      I think I was thinking about Secretary Nielsen's order

16  first because that came, you know --

17          THE COURT:  First in time.

18          MS. ANDERSEN:  -- first in time.  So kind of

19  everything flows from there.

20      But because of this case, unlike some other cases, like in

21  the Washington case where the court found an alternative route

22  was appropriate, you know, there were different legal issues

23  involved.  Those just aren't present here.  So I just wanted to

24  make sure that that was clear, that there is no sort of

25  alternative arguments on behalf of the government that, you

1    know, if you find this, you can uphold the rules on these other

2    grounds.  There's no alternative grounds.  So I just wanted to

3    simplify it the best way possible.

4         THE COURT:  So a couple of things in that respect.  I

5    do want you to address, give me your best argument, as to why

6    -- because under what you've just said, the only way the

7    government wins is if I find that the HSA totally replaces the

8    FVRA, it eclipses it.  I can read no other provisions of the

9    FVRA as having any relevancy in this case.  So I want the best

10   argument in that respect.

11        And then, secondly, you are agreeing that unlike the *La

12   Clinica* cases, there isn't -- this analysis only falls under

13   the one of three options under the FVRA for determining the

14   order of succession and that is the first, the default.  There

15   is no presidential selection of Acting Secretary McAleenan at

16   issue.  Am I right about that?

17        Why don't we start with the last one and then --

18        MS. ANDERSEN:  I don't know the answer to that

19   because if the President did select him, like the Washington

20   court held, it doesn't matter because then Wolf was not -- we

21   would concede that his order on day 214 -- that the 200-day

22   date would apply for sure.  The Court need not reach that.  It

23   sort of -- I think that's sort of being worked out as sort of,

24   you know, what should have been the line of succession and how

25   that works out.  So I don't want to take a position because I

1    know that's being determined.  It's not relevant here

2    because --

3              THE COURT:  Okay.  And it's not relevant because even

4    if it were true, you would actually deal with it.  You would

5    say that if that were true, then at least as it applied to this

6    case, it would mean --

7              MS. ANDERSEN:  As applied to Secretary Wolf.

8              THE COURT:  -- Chad Wolf -- got it.  Okay.  All

9    right, then, yeah, let's put that to the side.  It doesn't

10   really -- it may or may not matter, though, for purposes of my

11   analysis.  So my analysis right now, I see no evidence.  I

12   can't take judicial notice of anything right now, unless you

13   tell me otherwise, that the President installed Acting

14   Secretary McAleenan.

15       So the only provision I can look at this under is

16   3345(a)(1).  I can't look to the other two that says the

17   President and only the President.

18       So the reason why I care about that is because I do want

19   us, when we talk about the next part of this conversation,

20   which is how does the HSA fully eclipse the FVRA, I just want

21   to make sure we're in the right FVRA box.

22             MS. ANDERSEN:  Yes.

23             THE COURT:  Okay.

24             MS. ANDERSEN:  Absolutely, yes.  So it's the

25   government's position that Secretary McAleenan was delegated to

1  the acting role pursuant to 113 of the Homeland Security Act

2  and not pursuant to the Federal Vacancies Reform Act and that's

3  why the 210 days does not apply.  So I can walk the Court

4  through that analysis, you know, of why the Court should not

5  incorporate the time limitations that is found in the FVRA into

6  the Homeland Security Act.

7       Is that where you want me to start?

8            THE COURT:  I think so.

9            MS. ANDERSEN:  Okay.  So the FVRA is not the

10  exclusive scheme for acting service when there is an express

11  office-specific statutory provision for succession.  And that's

12  found -- that's contained in the express language of the FVRA,

13  Section 3347.

14       And here, Congress did pass an express office-specific

15  statute in the Defense Authorization Act of 2017, which granted

16  the Homeland Security, for the Secretary, the authority to

17  delegate her order of succession, and that's where we turn to

18  Section 113.

19            THE COURT:  Okay.  Now, before we go there, let's

20  talk about 3347 of the FVRA, because you're saying the

21  authority for me to read the HSA as the exclusive means is that

22  in 3347 there's a carve-out, right, a carve-out for statutes

23  which expressly authorize the President accord, or the head of

24  the executive department, to designate an officer or employee

25  to perform the functions and duties of a specified office.

1    That one?

2             MS. ANDERSEN:  Yes, Your Honor.

3             THE COURT:  Okay.  It goes on to say temporarily in

4    an acting capacity.  Right?

5             MS. ANDERSEN:  Correct.

6             THE COURT:  So what about 6 U.S.C. 113 incorporates

7    temporary or expressly addresses designation temporarily and in

8    an acting capacity?  I get the acting capacity part.  So maybe

9    I'm really focused on the temporarily part.

10            MS. ANDERSEN:  Absolutely, Your Honor.

11        The government acknowledges that any position for any

12   acting service would necessarily have to be temporary.  What

13   the disagreement over is what does "temporary" mean and whether

14   210 days is some magic number or not.  And Congress, of course,

15   when they passed Section 113 in the Homeland Security Act, they

16   could have included a number.  It could have been 200 days; it

17   could have been something different, but they intentionally did

18   not include a number.

19        And, again, these two statutes, I think the plaintiffs are

20   trying to frame it that there's no conflict, but I think the

21   proper analysis is that these are two statutes that

22   cross-reference each other.  They're both clearly aware of each

23   other and, therefore, in the Federal Vacancies Rule Act

24   statute, which specifically designates, you know, particular --

25   like, who exactly the 210-day limitation applies to.

1        So, again, if you look in Section 3346, it specifically

2    says the person serving as an acting officer, as described

3    under Section 3345 -- and, of course, Section 3345 has three

4    people, you know, three sort of groups for somebody to serve as

5    an acting, which is different.  You know, Congress could have

6    said --

7            THE COURT:  Well, it's different and then it isn't.

8    I mean, that's why I wanted us to first make sure we're talking

9    about the right provision.  Right?  Because in this case, we're

10   in 3345(a)(1), right?  And so when we go there --

11           MS. ANDERSEN:  I think I disagree.  We're not in -- I

12   do not agree that we're in 3345(a)(1).

13           THE COURT:  Okay, then are we in (a)(2) or (a)(3)?

14           MS. ANDERSEN:  Your Honor, I don't believe we're in

15   any of that.

16           THE COURT:  Here's why I ask that -- well, I guess

17   here's why I ask that, because -- let's do it this way.  If you

18   pull up 113 and you look at 113, there is a very important part

19   in the beginning which locks very well with the FVRA.  So it

20   can't be that Congress intended for the HSA to eclipse the

21   FVRA.  This is how I read it, at least.

22       Look at the first provision, (a)(1).  It says, "Except as

23   provided under paragraph (2), there are the following officers,

24   appointed by the President, by and with the advice and consent

25   of the Senate."  And the first one is the Deputy Secretary of

1   Homeland Security, who shall be the first assistant for

2   purposes of subchapter III, chapter 33, of title 5.  That's the

3   FVRA, right?  And then you go down and they do the same thing

4   for the Under Secretary of Management.

5        So Congress knows how to write this statute so it fits --

6   right? -- with the FVRA.  The reason why that is important is

7   because it goes on then to give us, when you read it side by

8   side with 3345 -- right? -- it gives us who should then be

9   plugged in, under 3345(a)(1), as the first assistant.  Right?

10  I mean, that's the whole purpose.

11       Go back to 113(a)(1)(A).  "A Deputy Secretary of Homeland

12  Security, who shall be the Secretary's first assistant for

13  purposes of subchapter III, chapter 33 of title 5."  So for

14  purposes of the FVRA, which uses the term "first assistant,"

15  the HSA gives us who this person is.  So with that, just don't

16  go any further from there, how can I read the HSA as eclipsing

17  the FVRA, replacing the FVRA?

18            MS. ANDERSEN:  Yes, Your Honor.

19       Again, I'm not trying to say it eclipses it.  I think they

20  are read together, in conjunction, and there are certain

21  provisions that refer to each other and that directs everybody

22  to know when they do overlap; and then the sections that do not

23  refer to each other are exclusive and do not conflict.

24       So in Section 113(a)(1)(A), for example, that is talking

25  -- that's talking about the language.  So I think where in the

1    Vacancies Act, they refer to the position as first assistant --

2              THE COURT:  Right.

3              MS. ANDERSEN:  -- and in the Homeland Security, that

4    person is the Deputy Secretary.

5         But Secretary McAleenan wasn't serving as Deputy Secretary

6    of Homeland Security or the Under Secretary.  That's not the

7    order of succession.

8              THE COURT:  Right.

9              MS. ANDERSEN:  Those positions were vacant.

10             THE COURT:  Right.

11             MS. ANDERSEN:  So that's when we turn to 3347, which,

12   you know, specifically says that Sections 3345, which is what

13   the Court was referring to, are the exclusive means unless --

14   so I think that "unless" is what's important -- unless a

15   statutory provision expressly, you know, authorizes --

16             THE COURT:  Right.  And then acting in a temporary

17   basis.

18             MS. ANDERSEN:  Right, right.

19             THE COURT:  That's the part, though -- where is the

20   express replacement for this FVRA?  So, in other words --

21   because there's these officer statutes for every agency, right?

22   They say something slightly different but every agency has:

23   Here's the officer that has all of the -- is at the top.

24   Here's the top banana officer.  For us that's 112.  Then we

25   have the second banana, third banana, fourth banana, and

1    that's, for us, 113.  And every agency kind-of, sort-of has

2    this.

3         So if I read it as broadly as you're suggesting, I do run

4    the risk that the FVRA is kind of, you know, written out of its

5    utility; but not even going that far, where do I see expressly

6    in 6 U.S.C. 113 that Congress meant for this provision to be

7    the exclusive means and not the FVRA?

8              MS. ANDERSEN:  Again, if you turn to Section 113(g),

9    which specifically deals with vacancies --

10             THE COURT:  Okay.  I'm there.

11             MS. ANDERSEN:  So it's (g)(2).  It states,

12   "Notwithstanding chapter 33 of title 5," which is the Federal

13   Vacancies Reform Act, "the Secretary may designate" --

14             THE COURT:  Wait-wait-wait-wait, wait-wait-wait-wait.

15   Stop there.  I want to stop you on that one because now the

16   part at the top is really, really important.  Right?  Because

17   the part at the top, when Congress meant to identify the

18   Federal Vacancies Reform Act, they said subchapter III of

19   chapter 33 of title 5.  That's the FVRA.

20        Chapter 33 of title 5 -- and this is my word.  You all can

21   tell me what it's really supposed to be called, but it's the

22   larger civil service statute.  Right?  It's got all of these

23   different provisions about qualifications and how you can get

24   installed and how you can get removed.  And I won't -- I don't

25   want to go through the whole thing with you, but the point

1  being is that I can't agree with your reading on it saying

2  "notwithstanding chapter 33 of title 5" means the FVRA.

3        How do you respond to that difference between how they

4  refer to subchapter III in the first section and they don't

5  refer to it in (g)(2)?

6              MS. ANDERSEN:  I mean, I believe that it's contained

7  within that chapter.  Correct?  So it's a broader statement but

8  it incorporates the Federal Vacancies Reform Act.

9              THE COURT:  But how can I find that that's an express

10  replacement of the Federal Vacancies Reform Act?  Because, this

11  is -- you know, again, if I'm trying to read everything so that

12  I give every word in the statute, under that cannon of

13  statutory construction, that Congress knows what they have

14  already passed when they pass something new, how do I know that

15  what they meant to do here, again, is eclipse the FVRA when

16  they cite the entire sort of civil service statute?

17        And they know how to cite the FVRA in other places because

18  if you go to the next section, actually, very specifically when

19  they don't mean the entire section, they mean 3345 and 3349(b),

20  Congress knew how to cite those directly.

21        So that's why I'm having a very hard time finding that

22  6:113 replaces the FVRA and I'm not to look to any other

23  provisions in it.

24              MS. ANDERSEN:  Again, I don't necessarily want to say

25  it replaces it, but this definitely gives authority to the

1  Secretary to designate such other officers.

2          THE COURT:  Okay.

3          MS. ANDERSEN:  It's a limited category than the FVRA.

4  So it's saying the Secretary has this authority.  It's a more

5  limited group of people that that person can choose from.

6      And, again, because I think these statutes should be read

7  together because they do cross-reference each other.  Because

8  the FVRA is very specific about who the 210 days applies to,

9  and the Homeland Security Act was passed after the FVRA.

10  Congress would absolutely know how to put in paragraph (g)(2)

11  because, to Your Honor's point, it references it clearly within

12  the Homeland Security Act when it wants to.  And it could have

13  said subject to the limitations in Section 3347 and it did not

14  do that, where the Vacancies Reform Act, you know -- again, it

15  doesn't say all vacancies.  It's like a limited subset of

16  vacancies that it applies to.

17      And this group of individuals, which is the Secretary from

18  other offices within the department, is a different subset of

19  individuals that the Secretary can choose from than what is

20  found in the Federal Vacancies Reform Act.

21          THE COURT:  So if I credit that argument that the HSA

22  does provide a -- your word -- a "subset," my word maybe

23  "further line," right, so if you don't have an Acting

24  Secretary, you don't have an Under Secretary of Management, the

25  Secretary can designate who else can act in that capacity, if I

1    credit all of that, doesn't that, once again, though -- if I am

2    to do as you agree I should, read the two statutes in harmony,

3    how do I not incorporate the time limit that is set in the FVRA

4    in this case?

5         Because the Vacancies Act, the purpose of that Act is to

6    make sure that when Congress gives to the President a little

7    bit of wiggle room in terms of nominating for an office for

8    Senate confirmation, that the wiggle room has some limits on

9    it.  Because it is, at its core, a constitutional question.

10        If I have to read them together, 113 doesn't have any

11   timing provision on it, no guardrail whatsoever.  FVRA does and

12   the whole purpose of the FVRA is to put some guardrails on

13   this.

14        What's my authority for not reading -- well, let me ask it

15   this way.  If I credit your argument wholesale, the effect of

16   it is that I'm not reading the remaining provisions of the FVRA

17   as having any import here, right?

18             MS. ANDERSEN:  I mean, with respect to this case, the

19   only thing that's relevant is the 210 days.

20        And to answer Your Honor's argument about, you know, why

21   it shouldn't be incorporated is just a matter of, you know, we

22   should assume that Congress meant that or that, you know, the

23   200 days -- the 210 days by itself, obviously, is not a magic

24   number.  There's not some magic constitutional number.

25        The history of it, it had changed.  It used to be shorter.

1   They've extended it.

2           THE COURT:  Right.

3           MS. ANDERSEN:  And there's certainly reasonable

4   reasons why Congress would, for different agencies, especially

5   like a very important agency like Homeland Security, might not

6   want a position to be vacant, you know, past the 210 days.

7           And just, again, just as a -- more just of a -- some

8   perspective is that even under the Federal Vacancies Rules Act,

9   you know, Congress did envision longer periods of time where it

10  would be vacant.  Of course, those facts aren't present here

11  but just as conceptually that, again, 210 days is not a magic

12  number.

13          THE COURT:  Except those other examples matter

14  because it's when there's a nomination on the floor, right?

15  And so Congress has some -- the Senate has some skin in the

16  game, if you will, as to how long that might take, right?

17  Where what we have here is -- what I'm struggling with is if I

18  credit your argument, what's the limiting principle?  Like,

19  what, what allows the President to -- or what would prevent the

20  President from placing someone in office who must be nominated

21  and confirmed by the Senate to have the authority that he or

22  she has without going through that process?  What in the HSA

23  limits the President's authority and doesn't allow ad infinitum

24  acting secretaries for the entire time of that person's tenure?

25          MS. ANDERSEN:  Thank you, Your Honor.

1      You know, obviously, this has not been litigated.  I can

2  point the Court to two different decisions that kind of shed a

3  little bit of light on this issue, but, again, just to go to

4  the general principle is it is permissible for Congress to

5  choose.  You know, this is their responsibility to devise a

6  consent.  So if they have chosen not to set a defined time

7  limit because they've decided, in their judgment, that they

8  want the executive branch, in particular the Homeland Security,

9  to have more flexibility and it becomes sort of more of a

10  political question, then binding an agency to a particular

11  timeline, that is within Congress' discretion.  So that just

12  kind of answers kind of a more broader question.

13      And, again, the fact that the Homeland Security Act was

14  passed after the Vacancies Act, you know, not every agency is

15  given this authority.  Not every agency head is able to pick

16  their order of succession.  The Homeland Security is one of

17  them.

18      I think when we look at cabinet-level agencies, there are

19  certainly different concerns for why, you know, despite,

20  perhaps, some political issues for getting, you know, a

21  nomination confirmed or for whatever --

22          THE COURT:  Right.

23          MS. ANDERSEN:  -- any other reason that may be, there

24  could be good policy reasons that Congress decided not to

25  incorporate a defined number and leave it to within that realm

1   of, you know, it's a political question.

2       And, again, there's not a whole lot of litigation on this,

3   but just in case it is helpful for the Court.

4           THE COURT:  But isn't it -- is it a political

5   question or a constitutional question?  Because at this point,

6   again, even if I credit that the HSA is ambiguous in this

7   respect, and I still have to read it -- you know, again, moving

8   to another cannon of statutory construction, then I've got to

9   -- if I say, wow, it's ambiguous, I'm not really sure, the

10  government raises a good point here, I then have to read it in

11  a manner that gives the appointments clause -- that would

12  render this decision a constitutional one or render, I'm sorry,

13  the reading of the HSA to be constitutional.  And the only way

14  I can do that is to say there's got to be some way that the

15  appointments clause has meaning here.

16      And that gets me back to, so where do I read in the HSA

17  any limiting principle, even crediting that Homeland Security

18  should have maybe more authority than some other agencies

19  because of the important function it serves?

20          MS. ANDERSEN:  Yes, Your Honor.

21      And I give those examples as just why Congress, you know,

22  they didn't expressly incorporate it in there.

23      And to answer Your Honor's question, the one case that I

24  think --

25          THE COURT:  They did not expressly?  They didn't

1  expressly?

2      MS. ANDERSEN:  They did not put a number in, correct.

3  Correct.

4      THE COURT:  Okay.

5      MS. ANDERSEN:  There's a case from 2018 from the

6  District of Minnesota.  It's *Bhatti v. FHFA.*  And that case

7  involved -- it's at 332 F.Supp 3d 1206, and that case involved

8  an acting director of the Federal Housing Finance Agency who

9  served under President Obama in an acting capacity for four

10 years.

11     THE COURT:  Okay.

12     MS. ANDERSEN:  And there were people that challenged

13 that and saying four years is much longer than the facts that

14 we have here before the Court today, and it was asserted that

15 four years in an acting capacity for a Senate-confirmed

16 position was constitutionally too long.

17     That court, they held that that was a political question,

18 that whether an officer has served for too long is something

19 that the court should not weigh into, and they cited some

20 Supreme Court cases about, you know, non-judicial discretion

21 and those sorts of things.  That's just a premise.

22     I'd like to step back from that because that's, obviously,

23 a tough -- you know, once it gets to that point, that's a tough

24 -- you know, a tough issue to think through.

25     Here, I --

1          THE COURT:  But you haven't argued political

2    question, have you?  I mean, you didn't -- I don't recall you

3    raising that this is a question the Court shouldn't weigh in on

4    when there's a statute at issue.

5          MS. ANDERSEN:  Yeah, I think the issue here is that

6    the -- Secretary Wolf who, you know, number one, was Senate

7    confirmed for a germane position -- so just going back through

8    a little history is when Senate McAleenan had announced he was

9    going to resign, he agreed to stay on, you know, to help

10   transition.  It was at that time that now Acting Secretary

11   Wolf, his nomination for a different position was before the

12   Senate.

13        Senator -- I'm sorry.  Acting Secretary McAleenan had

14   reissued the new order of succession.  Everybody knew.

15   Congress knew.  You know, there were press reports about that,

16   that, you know, it was envisioned that it was Secretary Wolf

17   once he was Senate confirmed.  And I mention that because the

18   fact that he was Senate confirmed for a different position

19   within the agency, if you're thinking about it as a

20   constitutional issue, is important.  So that's one factor.

21        So, again, I guess just the time limit alone is not the

22   only factor if the Court was to, you know, weigh into sort of

23   the constitutional issue.

24        So he was Senate confirmed.  The Senate was aware that he

25   would be next in line as acting and that the other positions

 1  were vacant.

 2      And then, again, just going to the -- if you look at the

 3  actual numbers, I understand there's differences within the

 4  FVRA with the 210 days, that, you know, there's some back and

 5  forth with Congress; but it does, again, envision -- if you're

 6  worried about somebody in an acting position serving beyond the

 7  210 days, it does envision a situation, for example, where

 8  somebody is serving as an acting official for 210 days, the

 9  President nominates somebody, the President then withdraws

10  somebody, you get a whole-nother 210 days.  And that can happen

11  twice.  So you're talking, you know, over 500 days.

12      We're not even at 500 days today.

13          THE COURT:  But that's when the President and only

14  the President decides to nominate, right?  I mean, we're not in

15  that category.  And, again, Congress knew how to give wiggle

16  room when we're in that category but we're not there.

17      I mean, I understand.  I think your argument is that we're

18  a little kind of the functional equivalent of it.  So if,

19  Judge, if you're worried about the spirit of the statute and

20  reading it the way the government suggests, you're not going to

21  run into any constitutional infirmity because Acting Secretary

22  Wolf kind of fell in that category.  Right?

23          MS. ANDERSEN:  Yeah, yeah.  I think -- I think courts

24  are advised not to sort of dive into these constitutional

25  issues unless they have to.  There's a number of steps before

1  we get there and one of them being is that, you know, Secretary

2  Wolf, you know, if you compare it to some history and some

3  other acting positions in various roles, is less than 500 days.

4  From a historical perspective, that is not, I think, so

5  unreasonable that it would kind of fall into that category of

6  any kind of -- reaching a constitutional issue.

7        Now, whether or not -- you know, so I think it more goes

8  to the statutory, you know, argument.

9        And the other case -- just in -- again, it's an old case

10 and it's not from this district, but just because there's not a

11 whole lot on there, I was trying to find more cases -- from the

12 Eastern District of Michigan, *United States v. Lucido*, 373

13 F.Supp 1142, and that's a different statute but it was a DOJ

14 office-specific vacancy.  And there just the court held that an

15 Acting Attorney General could serve beyond what the Vacancies

16 Act at that time, you know, had required.

17           THE COURT:  But that was -- okay, so that was

18 pre-FVRA, right?

19           MS. ANDERSEN:  It was a vacancy.  It was an old one.

20 It was a 30-day time limit.  So it was two different statutes.

21 So I don't know, you know, how great weight it is, but just

22 conceptually, we said there's -- again, there's not one magic

23 number.

24           THE COURT:  And I think some would say, including the

25 amici, that the FVRA was designed to plug up some of those

1  loopholes that were at issue when the FVRA was passed; that

2  there had been -- you know, 20 percent of the relevant offices

3  were empty because the prior Vacancies Act allowed for sort of

4  ad infinitum, if you will -- that's my word -- appointments.

5      And so I'm not really sure.  I mean, I'll take a look at

6  it to see if it, you know, has any relevance here, but would

7  you say -- is the same thing -- it sounds like *Bhatti*, though

8  -- I didn't get the whole cite -- 332 F.Supp 3d, that one is

9  post FVRA.

10      MS. ANDERSEN:  Yes, although it did -- yes.  That is

11  (2018) 332 F.Supp 3d 1206.

12      THE COURT:  1206.  Okay.  Thanks.  All right, great.

13      MS. ANDERSEN:  And, obviously, you know, I read

14  through, obviously, the amici briefs.  You know, I think some

15  of those older cases were housekeeping statutes, which is

16  different than what we're dealing with here, too.  So I just do

17  want to distinguish that.  I think that's different in kind,

18  that this is intentionally Congress expressly saying the

19  Secretary can create an order of succession, which is different

20  than delegation of duties, for whatever that's worth.

21      THE COURT:  Okay.  All right.

22      MS. ANDERSEN:  I would like to address the first

23  point, if Your Honor will allow me to --

24      THE COURT:  Sure.

25      MS. ANDERSEN:  -- Secretary Nielsen's memo, unless

1    you have any other questions about that provision.

2              THE COURT:  No, I'm good.  Thank you.  I appreciate

3    your indulging me.

4              MS. ANDERSEN:  Thank you for indulging me.

5         So, again, before we even get to Secretary Wolf's service

6    as Acting, we have to look necessarily at Acting Secretary

7    McAleenan who, according to the Department of Homeland

8    Security, was appointed through Section 113 and not the Federal

9    Vacancies Reform Act.

10        So if I can ask the Court to look at -- I don't know if

11   you have it in front of you or not -- Exhibit 1 to the

12   declaration of Neal Swartz, which is at ECF 41-2, beginning at

13   page five of that filing.

14             THE COURT:  All right.  So let me go to -- okay.

15   Give me the 24 --

16             MS. ANDERSEN:  41-2.

17             THE COURT:  ECF 41-2.  Okay.  What am I looking for?

18   Because I may have it somewhere else.

19             MS. ANDERSEN:  Sure.  It's the memorandum that

20   Secretary Nielsen signed dated April 9, 2019.  I think we did

21   include it in two different places.

22             THE COURT:  Yeah, because I know I have your

23   exhibits.  At least I want to say it is -- let me find it.

24   But, yeah, I have read it.  I've read part -- in my head, A and

25   B, Section A and B.  So if you want to, while I look for it,

1    I'll -- you can go ahead.

2            MS. ANDERSEN:  Okay.  So before I sort of get into

3    the memo, just two, again, concepts to keep in mind is that,

4    you know, once Congress passed the National Defense

5    Authorization Act for fiscal year 2017, it was at that time

6    that Congress added the Section 113, which gave the Secretary

7    her authority to designate an order of succession, and that was

8    not the case beforehand.

9        But even prior to that, under -- it's 6 U.S.C. Section

10   1-2, that goes to the Secretary of Homeland's ability to

11   delegate specific duties, and, again, that's just a general

12   concept that is applicable in a lot of agencies where you can

13   delegate specific duties for various reasons; and the order of

14   succession is, you know, a distinct concept even though they're

15   oftentimes the same list of people.

16           THE COURT:  Right.

17           MS. ANDERSEN:  And that's just to kind of keep that

18   -- I think it's important, at least it was for me, to kind of

19   keep those two principles in mind when looking at the

20   memorandum that Secretary Nielsen signed.

21       So, again, you know, the government's position is that the

22   Court has to just look at this April 9th memorandum, that this

23   is the operative document.  And, you know, depending on what

24   the Court finds, if it's clear and unambiguous or not, this is

25   what the Court needs to look at.

1           THE COURT:  Well, and so I think I have it up now.

2      It's 41-2, Exhibit 2, correct?

3           MS. ANDERSEN:  Correct.

4           THE COURT:  And the two provisions are under Title

5      II, Succession Order/Delegation.  "A" says, In the event of

6      death, resignation, or inability to perform, I look to the

7      Executive Order 13753, and that was the one in place -- put in

8      place by President Obama.

9          Section B says, In the event of disaster or catastrophic

10     emergency, "I hereby delegate to the officials occupying the

11     identified positions in the order listed (Annex A), my

12     authority."  Right?  I'm looking at the right place?

13          MS. ANDERSEN:  Yes.

14          THE COURT:  Okay.  So what is the argument that this

15     falls in anything other than A, which is resignation -- that's

16     what happened; she resigned -- the orderly succession of

17     officials is governed by the Executive Order.

18          MS. ANDERSEN:  Yes, Your Honor.  So what I actually

19     would like -- so Exhibit 2 is an internal administrative

20     document.  This was actually updated on April 10th, the day

21     after Secretary Nielsen signed the memo, which is found at

22     Exhibit 1.  So it should be a few pages before that.

23          THE COURT:  Okay.

24          MS. ANDERSEN:  And I think this is where the

25     confusion is.  So, obviously, there was confusion and there was

1    an error made but my -- the error was made in amending this DHS

2    order, which was done -- you know, it's an administrative

3    function, but the legal authority for the Secretary was done

4    the day before when she signed the April 9th, 2019 memo.

5            THE COURT:  This is the order of delegation, right?

6    I mean, this says order of -- what document am I supposed to

7    look at for the official order of delegation?  The GAO looked

8    to this document, right?

9            MS. ANDERSEN:  Well, the GAO also looked at

10   Exhibit 1.

11           THE COURT:  Okay.  So let's look at Exhibit 1.

12           MS. ANDERSEN:  Yeah.  As soon as the Secretary makes

13   a decision and decides, this is what the order of delegation

14   is.

15           THE COURT:  Okay.

16           MS. ANDERSEN:  That becomes legal and binding.  So

17   the second she signed this memo, the April 9th, 2019 memo --

18           THE COURT:  At Exhibit 1.

19           MS. ANDERSEN:  -- if something happened a minute

20   later and that was never incorporated into what's Exhibit 2,

21   the DHS orders, I don't think anybody would argue which

22   document controlled and that's because the DHS orders is an

23   internal document, and the basis for that is also set forth in

24   the declaration.

25       But this is an administrative document.  It, in and of

 1   itself, does not have legal effect.  It is the April 9th memo

 2   that has the legal -- that is the legal effect.  So, again, in

 3   a hypothetical, if on April 9th, 2019, the Secretary signed

 4   this and the minute she signed it, she resigned, it would be

 5   this document that controlled.

 6        The confusion, of course, becomes this memorandum refers

 7   to the prior DHS orders.  So that's why we're here today and

 8   that's why there's a dispute.  And what I would like to do is

 9   explain sort of what this memo actually did, what should have

10   happened and then what actually happened.

11             THE COURT:  All right.

12             MS. ANDERSEN:  Because, you know, again, the

13   government concedes that it was not updated appropriately,

14   which was, you know, why there's confusion today.  It was later

15   fixed but that's kind of moot for this case.

16             THE COURT:  I mean, listen, let me stop here because

17   I have to read the black and white on the page, and if I look

18   at Exhibit A, it still refers to what?  I mean, where in

19   Exhibit A or where in Exhibit 1 do I find the authority to say

20   that Secretary McAleenan was the next in line?

21             MS. ANDERSEN:  So if you will bear with me, if you

22   would start from the top of that document of April 9th, so this

23   is a memorandum that is prepared by the general counsel of the

24   department, and, obviously, the subject, it refers to order of

25   succession for Secretary.  It doesn't talk about delegation of

1   duties.  It talks about the order of succession with no

2   limitations.

3          THE COURT:  Okay.

4          MS. ANDERSEN:  In the summary, it does two things.

5   It also, once again, talks about the order of succession.

6   There's no limitations in there.  It also refers to Section 113

7   and, again, 113 talks about order of succession.  It is Section

8   112 that refers to delegation of duties, which is, again, a

9   distinct principle.

10      And then, again, in the action, you know, it states, by

11  approving the attached document, you will designate, again,

12  your desired order of succession with, you know, no

13  qualifications in it.

14         THE COURT:  Okay.

15         MS. ANDERSEN:  So, so far I think it seems -- if you

16  just read this, you were, like, this is what the Secretary is

17  doing.  She's changing the order of succession.  There's no

18  limitations.

19      If you flip to the attachment, so there's the heading --

20         THE COURT:  That's the next page.

21         MS. ANDERSEN:  The next page was an attachment to the

22  memo that the Secretary signed.  So the heading, again, is

23  amending the order of succession.  Again, the first paragraph,

24  it references Section 113 and --

25         THE COURT:  Yep.

1      MS. ANDERSEN:  -- tells us that her intention is to

2  change the order of succession.

3      THE COURT:  Okay.

4      MS. ANDERSEN:  And then it refers to Annex A, which

5  then cross-references the prior DHS order, which is the

6  administrative document, and it says you should amend Annex A

7  and you should insert this new list.  And this new list is

8  where --

9      THE COURT:  Okay, for Annex A.  Okay.

10      MS. ANDERSEN:  So the problem is, is when the next

11  day -- so then this gets signed by the Secretary.  She signs it

12  on the 9th.  She resigns the next day.  Senator McAleenan takes

13  over, assuming that this is -- you know, with the understanding

14  that this was done properly.  Then it goes back to I think it's

15  the general counsel's office at Homeland Security.  They

16  endeavor to update this internal document.

17      And, again, if you read what this document, what the memo

18  clearly did, which was the Secretary invoking her authority

19  pursuant to Section 113 to change the order of succession, what

20  should have happened was not only Exhibit A -- or Annex A

21  should have been included but the first page of the DHS orders,

22  paragraphs IIAB should have been merged together because,

23  again, clearly, number one had governed the order of succession

24  and that should have been updated to actively reflect what the

25  memo does.

1    THE COURT:  But, I mean, it doesn't just -- it's not

2    just a scribner's error.  It's not just a we didn't update the

3    right thing.  I mean, A and B then break that out very

4    specifically.  Which Annex A -- I mean, first, Exhibit 1 deals

5    with invoking 113, changing the order in Annex A.  Right?  I

6    mean, that's fair, clear.  And then the order of Annex A on

7    page two of Exhibit 1 now puts in a new order.

8        Okay.  Now I look to what was updated 4-10, DH Orders of

9    Succession.  This is a legal document, right?  I mean --

10    MS. ANDERSEN:  No.  No, Your Honor.  It is an

11    administrative document.  And, again, the example would be what

12    if the people in the office, you know, took the Secretary's

13    memo and changed it and altered it?  I don't think -- you know,

14    a court would not say, well, that's binding because the

15    Secretary is the only person that has the authority to do it.

16        So if it was incorporated incorrectly by staff, the Court

17    cannot give that legal effect.  The Court has to look only at

18    the April 9th memo, which is what Secretary Nielsen signed.

19    THE COURT:  But I look at the April 9th memo and all

20    it does -- because I'm looking at the next section of it.  It

21    says, I designate the order as follows:  Annex A, Orders of

22    Succession, Delegations of Authorities for Named Positions,

23    Delegation 00106, is hereby amended by striking Annex A and

24    substituting what she substituted.

25    MS. ANDERSEN:  Yes, Your Honor, but if you want to --

1  if you were to give effect to the preceding paragraph, which

2  is, By the authority vested in me, as Homeland Security,

3  pursuant to Section 113, I hereby designate the order of

4  succession, the only reasonable interpretation would be that

5  the folks the next day that were updating the DHS orders

6  necessarily had to merge Section IIA and B in order to give

7  effect to the memo.

8          THE COURT:  But they didn't necessarily -- but they

9  didn't have to because A, A refers to an Executive Order 13753.

10  If her April 9th, what you call the official authority, if that

11  is telling staff what to do, it doesn't even reference, does

12  it, the Executive Order at issue.  It just references Annex A.

13          MS. ANDERSEN:  No, but it --

14          THE COURT:  If she were changing the order of -- the

15  order of succession with respect to the Executive Order as it

16  was written in the original issue date to 12-15-2016 in

17  Exhibit 2, if she was going to change that, she would have

18  referenced it, right?  I mean, how do I just read that she

19  really meant to change both?

20          MS. ANDERSEN:  Your Honor, because of the -- not only

21  in the prior paragraph but in the entire, you know, memorandum

22  of the first page it says that she is designating the order of

23  succession.  So she's not saying I want to change the

24  delegation of my duties in the event of disaster or

25  catastrophic emergency, which is a very, you know, limited kind

1  subset.  Throughout the memo it is expressly clear that her

2  purpose of signing this memo is to change the order of

3  succession and not the delegation of the duties, and there is

4  no qualification anywhere in this memo.

5      So, again, this becomes a problem of --

6          THE COURT:  Well, the qualification --

7          MS. ANDERSEN:  -- execution --

8          THE COURT:  The qualification is "I hereby designate

9  the order of succession for the Secretary of Homeland Security

10 as follows:"  And then the reference is to Annex A.  So the

11 qualification is what I'm changing is Annex A.  I mean, she has

12 the authority and she's using it, no doubt.

13         MS. ANDERSEN:  She has the authority.  She has the

14 authority to issue her order of succession.  Clearly this was

15 the day before she left.  I don't think she was worrying about

16 what would happen in the case of a disaster or catastrophic

17 emergency.

18     So, again, I don't think you can read only what Annex A

19 used to refer to when the preceding paragraph and everything

20 else in the memo talks unambiguously, without any

21 qualification, about order of succession.  And, again, if you

22 replace this with Annex A but then merge the first two

23 paragraphs, that would have accurately reflected what the

24 Secretary was doing on April 9th --

25         THE COURT:  Here's my -- here's my problem with it.

1   I am not here to get in the head of Secretary Nielsen at the

2   time and neither are any of the lawyers.  If I read this, and I

3   don't see a lot of room for an alternative explanation, the

4   first page of Exhibit 1 is, Pursuant to your authority under

5   6:113(g)(2), you're amending the order of succession.

6        And then the second page says, By the authority vested in

7   me, yes, I'm amending the order of succession as follows.  And

8   then it only references Annex A.

9        She does this in light of the memo at Exhibit 2.  That is

10  what was in place for her tenure.

11            MS. ANDERSEN:  That was in place.  And just, you

12  know, again, for some context, I agree with you, you know, the

13  Court needs to find that the April 9th memo, you know, directed

14  as we say it did; but just for context, again, you know, the --

15  for all the other positions -- so, again, when this initial

16  memo, the DHS orders, 106, was first done, this was before the

17  Secretary had the authority to delegate her order of

18  succession, which is why in paragraph A it refers to the

19  Executive Order, because the Secretary didn't have the

20  authority at the time.  That's why that exists.

21       The other provision, Annexes B through AC, which are also

22  included in the exhibit, those are for lower level positions.

23            THE COURT:  Right.

24            MS. ANDERSEN:  All of those positions, you know, for

25  order of succession and delegation of duties is the same list.

1   So, again, the fact that it's referring to Annex A, you know,

2   for both purposes is not -- it's consistent with the rest of

3   the DHS orders.

4       And, again, what would trouble me is how -- if Annex A was

5   not intended to apply to both paragraphs IIA and B, how do you

6   read in, like, that first paragraph of -- you know, that says

7   by the authority vested in me pursuant to Section 113, I hereby

8   designate the order of succession?  You know, if you read that

9   out, then is that appropriate --

10          THE COURT:  No.  No, you read it as the reason why

11  she can change Annex A.  And, again, I mean, it's just -- it's

12  because she has the authority.  She has the authority to change

13  both.  She chooses Annex A, disaster or catastrophic emergency.

14  Again, I am not looking behind why the agency would do what

15  they did at any particular time.  I'm just trying to read it

16  and give the plain language its meaning.

17      So I'm not reading it out.  She has the authority to

18  designate a further order of succession.  That's (g)(2).  And

19  her further order of succession is with respect to those

20  positions in the event of disaster or catastrophic emergency

21  because she's only talking about Annex A.

22      I mean, I want to think -- I want to think more about your

23  argument that it has to mean both A and B because she didn't

24  have that authority back in 2016.  It had to come from the

25  President.  Now she does have that authority and so --

1          MS. ANDERSEN:  Yeah, in Section 1-2, which has -- you

2    know, it just says previously -- does talk about delegation of

3    authorities generally, you know, of when the Secretary can

4    delegate authority.  So, again, delegation -- because, again, I

5    think if you think about, you know, if I am unable to act

6    during disaster or catastrophic emergency, that implies there

7    is a limited period of time I can act.  You know, somebody else

8    can act on my behalf but I'm still the Secretary and I'm going

9    to come back.  That's different than my order of succession

10   meaning I'm going to resign and who is going to replace me.

11         THE COURT:  I see what you're saying.  So you're

12   saying that, basically, order of succession in the first

13   paragraph and second paragraph of Exhibit 1 on page 2 doesn't

14   make any sense if you're only looking at B?

15         MS. ANDERSEN:  Correct.  And I think the fact that

16   there are no --

17         THE COURT:  Because it's not --

18         MS. ANDERSEN:  Yeah.

19         THE COURT:  Because B is not about an order of

20   succession; it's about who's going to step in, in a disaster or

21   catastrophic emergency.  Okay.  I think I get it.  Okay.

22         MS. ANDERSEN:  And that is all I have on that issue

23   unless I can answer anymore questions.

24         THE COURT:  Thank you.

25      All right.  Let's turn then to Mr. Manfredi.  Am I saying

1   your name right?

2          MR. MANFREDI:  (Man-Freddy), yes.

3          THE COURT:  (Man-Freddy).  Okay.

4      All right.  If you would, can you pick up on

5   Ms. Andersen's last point first and then we'll get to the

6   timing provision.  The last point seems to be urging me to read

7   the memorandum as not just referring to Annex A but to the

8   entire order of succession.

9          MR. MANFREDI:  Yes, Your Honor.

10     I mean, we disagree.  We think that the plain text of the

11  memorandum, especially in the portion you cited, is clear that

12  it says "as follows."  That's the only amendment the plain text

13  supports concluding that the Former Secretary Nielsen intended

14  to make at all, and it's clear that in the "as follows," all

15  that is referenced is the order within Annex A.

16     And I would just refer Your Honor to the GAO's finding

17  specifically on this issue.  They determined that these were --

18  they declined to sort of count any of these arguments as post

19  hoc justification, basically, suggesting that they did

20  contradict the plain text and would require basically an extra

21  textural reading about what was required.  We think it's

22  perfectly consistent to read it as being limited to this

23  amendment.

24     And I would just add secondarily that we also would

25  maintain that it's implausible to suggest that the delegation

1    is merely an administrative document and that Secretary

2    Nielsen's directive could have had any independent authority

3    aside from amending the delegation, because by its own plain

4    text, that's all it purports to do is amend the delegation.

5        And, additionally, the delegation is not contrary to what

6    the Swartz declaration suggests; merely the administrative

7    document is signed by Secretary Jeh Johnson and does invoke his

8    statutory authority under both the HSA and FVRA for its

9    changes.  So we think it's quite clear that that is an

10   authoritative legal document.

11       And if there were any doubt, Your Honor, as to the

12   intended effect of Secretary Nielsen's changes, we think

13   Mr. McAleenan's changes that he attempted to make on day 214

14   are quite clear.  He, in fact, does amend the delegation to

15   remove Section A and make Annex A the appropriate document only

16   in the case -- in the case of resignation, excuse me, as well.

17       And it would seem quite clear -- this is what the *La

18   Clinica* court found, as well as the GAO report -- that those

19   amendments would have been superfluous if the government's

20   interpretation that this was a succession order that exceeded

21   delegation --

22       THE COURT:  I see your point.  Yep.  Secretary

23   McAleenan wouldn't have had to do it.

24       MR. MANFREDI:  Absolutely.  Yes.

25       THE COURT:  Got it.  Okay.

1       And then with respect to the argument that under the FVRA,

2  under 3347, I can read the HSA as basically being the exclusive

3  statute, so, you know -- and read in some sort of -- I guess

4  the only way that I can think about this is, best argument for

5  the government is I can read into HSA some reasonableness in

6  terms of a timing provision, that it must have meant to give

7  Homeland Security its own timing -- "reasonableness" is the

8  only word I can think of.  Like, we'll keep it open for a

9  reasonable period so it's not unconstitutional.

10      What's your response to that?

11      MR. MANFREDI:  I have three responses, Your Honor.

12  The first is I would just like to note that what I believe

13  Ms. Andersen stated now is, in fact, different than what the

14  government officially stated in the Federal Register in their

15  response to this argument in the Final Rule.  If you look at 85

16  Federal Register 38557, the government claims that because the

17  HSA supersedes the FVRA, that that authorizes acting

18  secretaries to serve, quote, without time limitation.

19      So the government's view in the APA context -- and we

20  would assume they would be, perhaps, obligated to maintain that

21  view, at least as to these rules -- is that the Secretary --

22  that the HSA, in fact, doesn't impose any time limit at all;

23  that it is, in fact, a statute which authorizes indefinite

24  service for an acting official absent Senate confirmation in

25  their role.

1    THE COURT:  Even though -- and I'm sorry to interrupt

2    you but I just found it quite appropriate.

3        Even though the same agency saw fit to report the vacancy

4    under 3349?

5        MR. MANFREDI:  We think that that supports our

6    position that it must be the case that the FVRA does, in fact,

7    cover the vacancy; and even if you look at the Exhibit 5

8    submitted in the Swartz declaration, that's a signed letter by

9    the general counsel reporting the vacancy, which, quote, says

10   the position is covered by the FVRA.

11       And so insofar as the government is now maintaining that

12   the FVRA is entirely superseded, we think that that's quite

13   odd.  I mean, our foremost arguments are those about what is

14   the most sensible reading of the statute, which I'm happy to go

15   into additional detail, but it does seem clear that the

16   government both reported it, according to the FVRA's reporting

17   requirement --

18       THE COURT:  Right.

19       MR. MANFREDI:  -- and all those instances.

20       So it seems like at least those aspects of the FVRA the

21   government would, perhaps, concede aren't displaced, and that

22   would suggest to us as well that the time limits might also

23   should apply.

24       THE COURT:  Okay.  Right, because I'm not sure how I

25   say, well, 3349, that still applies.

1          MR. MANFREDI:  Absolutely.  Yes, absolutely.

2          THE COURT:  3345, you know, or the timing provision

3    doesn't but the reporting requirements do.  I think I -- I

4    don't know how I do that.

5        Okay.  Go ahead.

6          MR. MANFREDI:  And I would just add, Your Honor, too,

7    that the government makes the point that Section 113(g)(2),

8    which they rely on here, was past -- which postdates the

9    Vacancies Act; but I want to note that in the same Defense

10   Appropriations Authorization that established 113(g), Congress

11   also added 113(a)(1)(F) to the statute which, again,

12   incorporates the FVRA, making the Under Secretary the first

13   assistant to the Deputy.

14         THE COURT:  Right.

15         MR. MANFREDI:  So it seems quite clear that Congress,

16   at least in that instance, intended to maintain FVRA

17   incorporation within the succession orders of DHS on the face

18   of the statute even at the time they gave the Secretary this

19   additional authority.  Just to flag --

20         THE COURT:  Because you're saying at the time (F)

21   was -- what we had read earlier together --

22         MR. MANFREDI:  There are two other explicit

23   incorporations of the FVRA in Section 113.

24         THE COURT:  Okay.  Where is that?

25         MR. MANFREDI:  The first is Section 113(a)(1)(A),

1   which makes the Deputy Secretary the first assistant to the

2   Secretary for purposes of the Vacancies Act, which we think,

3   again, makes it unequivocal that when the Deputy Secretary

4   becomes the first assistant, they serve pursuant to the time

5   limits of the Vacancies Act.  That seems to be, to us, the

6   basis of the statute.

7               THE COURT:  Right.

8               MR. MANFREDI:  But additionally, section -- so that

9   was when the Homeland Security Act was first enacted.  That was

10  in place at the time.

11      But then, again, Section 113(a)(1)(F), which makes the

12  Under Secretary the first assistant to the Deputy for purposes

13  of the FVRA, that was passed in the same appropriations bill

14  that established 113(g)(2).  And so it --

15              THE COURT:  I see your point.  Got it.

16              MR. MANFREDI:  The incorporation, yes, happened

17  simultaneously.

18      So we think it can't be the case that Congress intended to

19  supersede the Vacancies Act and its timelines entirely when

20  they precisely also mandated that it require -- apply to that

21  succession.

22              THE COURT:  And when was that change to the HSA?

23  When did that happen?

24              MR. MANFREDI:  So those changes were -- the exact

25  dates are a little -- I could check on them, but it's the

1   2016/2017 Defense Appropriations Authorization Act that added

2   those changes.

3          THE COURT:  But you're saying they were part of the

4   same amendments?

5          MR. MANFREDI:  They were part of the same amendments.

6   Exactly.

7          THE COURT:  Okay.  That's helpful.  Okay.

8          MR. MANFREDI:  And I just -- if I may, I know the

9   one -- I would add that of the one case the government cited,

10  the *Lucido* case, as Your Honor I think correctly noted, that

11  case was prior to the FVRA and, in fact, we think was one of

12  the reasons the Vacancies Act was passed was precisely to

13  prevent that from happening.

14      But the *Bhatti* case, which the government also mentioned,

15  I would just add we don't -- I think it's only dicta, the

16  political question doctrine in that case.  The case was

17  otherwise decided on standing, we believe, and the court didn't

18  really reach any conclusion at all as to whether the time

19  limits would trigger an appointments clause problem.

20      And also that even insofar as that's the case here, we are

21  talking potentially, we believe, that this is the longest

22  running cabinet-level vacancy in modern history, and so for a

23  position at that level, it does seem that we're much -- insofar

24  as there is a constitutional concern, we're much closer; but

25  that, as a statutory question, interpreting the statute, what

1   you have to look at is not the precise appointments issue

2   arisen by Mr. Wolf's case but by what the government's

3   interpretation of 113(g)(2) would authorize, and here their

4   statement is that it authorizes unlimited service, so without

5   time limitation.

6       And so insofar as the Court is trying to avoid a serious

7   constitutional question in the reading of the statute, we think

8   that's what the Court needs to be apprised of.

9          THE COURT:  Right, right.  I mean, and I would take

10  it that the response to the, you know, executive knows how to

11  be reasonable and so we can import a reasonableness element to

12  113, the way that I -- when I think about that, I think about

13  it very practically, that that would mean that all challenges

14  end up before a court.  Right?  I mean, the whole reason why

15  Congress puts a time limit on it is so it's clear, upfront,

16  predictable, everybody can fall within it.

17         MR. MANFREDI:  Absolutely.

18         THE COURT:  And otherwise, the only guardrail on the

19  interpretation would be it has to be challenged before a judge

20  when whatever, you know, entity believes that the executive has

21  overstepped.  And I'm not sure that's what Congress intended

22  when they said we'll give the President a bit of wiggle room on

23  appointments.  So --

24         MR. MANFREDI:  We agree, Your Honor.

25      And I think that the FVRA enforcement mechanism is also

1  quite clear in the sense of what Congress wanted the

2  consequences to be in instances where there was a violation

3  under Section 3348.

4          THE COURT:  Okay.

5      And what else would you like me to know that we haven't

6  already talked about with respect to the interpretation of --

7  really anything that has to do with the FVRA and HSA?

8          MR. MANFREDI:  Just that we think it's quite clear,

9  Your Honor, in this case that the FVRA's time limits do apply

10  to the position, that Your Honor can give effect to both

11  statutes, that that's the most natural reading, and that the

12  remedy in that case is clear and that even if Your Honor were

13  to find that the appointment -- if Your Honor, excuse me,

14  alternatively found that the appointment was invalid under the

15  HSA, that that itself could trigger an FVRA violation because

16  then they would not serve lawfully under the express statute,

17  which is an exception to the FVRA, which would get us back to

18  the FVRA as the only possible avenue.

19          THE COURT:  Right.

20          MR. MANFREDI:  And so then the FVRA's specific

21  remedial provisions would apply in that context as well.

22          THE COURT:  So let me ask you both, and I'll actually

23  start with Ms. Andersen on this question, and this is the last

24  section in my mind on the FVRA.  Any reason why I should not

25  convert this to a motion for summary judgment?  Any additional

1    facts that are relevant to the (AUDIO GAP) -- way to avoid the

2    whole question of preliminary injunctive relief is not making

3    it preliminary.  Like, if I'm going to decide it, I'll decide

4    it and then you all do what you're going to do based on my

5    decision.

6         So what's your view on that, Ms. Andersen?  What would be

7    the reason to not convert this to summary judgment?

8              MS. ANDERSEN:  Thank you, Your Honor.

9         I cannot conceive of any new facts that would have to be

10   before the Court to decide it.  I guess the only sort of

11   hesitation I would have is to consult with my clients and the

12   Department of Justice to see if there was any additional, you

13   know, briefing or any sort of, you know, legal arguments just

14   to make sure that, you know, we've been heard on everything.

15   Because, obviously, especially with the GAO decision coming

16   down today, like, this has been moving.  So that would be the

17   only thing I think I would ask.

18        But as far as a factual matter, you know, we do believe

19   that with respect to Secretary Nielsen's memo, that the Court

20   really needs -- can only look at that memo.  And the other

21   issues are just pure legal arguments.

22             THE COURT:  Okay.

23        All right.  Would you agree with that, Mr. Manfredi, that

24   really -- I mean, absent maybe some additional time to make

25   sure you all have it, you covered the waterfront on the

1  arguments you want me to consider, this is -- I think you've

2  asked for it, that this is one of those areas where I can

3  convert it pretty quickly to a merits determination.

4       MR. MANFREDI:  Yes, Your Honor.  We do think that's

5  the case, especially as to the time limit provisions of the

6  FVRA.  There's certainly no additional factual development that

7  would be required in that instance.

8       But we would just add that, you know, in our case, we are

9  seeking relief before the effective date of the rules on the

10  21st.  So insofar as Your Honor will be able to move within

11  that time frame, that is the Plaintiffs' request.

12       THE COURT:  And here's the rub.  Right?  It's exactly

13  what the Fourth Circuit opinion talks about.  This is no fault

14  of the plaintiffs.  I know that the notice of the Final Rule

15  just came out in June.  You moved as quickly as you could.  You

16  all have moved as quickly as I've made you to, and you've done,

17  both sides, an admirable job in briefing this.

18       But, you know, this may or may not be able to get decided

19  before they go into effect, although we're going to do it as

20  quickly as we possibly can and make it right, I guess is my

21  thought on that, which leads me to another -- again, before I

22  move on to the APA, because I am acutely aware that the APA --

23  I don't want to decide something that I don't necessarily have

24  to decide in the alternative, and we're going to talk about the

25  APA in a minute.

1      But I am concerned that there is a lingering -- (AUDIO

2  GAP) -- expedited consideration.  I don't -- especially if

3  we're talking about moving one very important aspect of this

4  case to summary judgment.

5      So I am inclined to say in, again, a relatively truncated

6  time, because these are largely, if not exclusively, questions

7  of law, let's get two things briefed and that will be the

8  question of representational or associational standing, in

9  addition to organizational standing.  I mean, you can tell me

10  why you think that the Fourth Circuit opinion doesn't really

11  knock you out of the box on organizational standing, because

12  there's five organizations.  There are different

13  considerations, but there is also what wasn't really addressed

14  in the Fourth Circuit opinion.  So standing, let's button it

15  up.

16      And then two, let's move to considering the question, the

17  FVRA/HSA question on a summary judgment posture, because I'm

18  hearing that there's no additional facts that the Court needs

19  to consider.

20      So we can do this one of two ways.  We can talk a little

21  bit more now about the APA and then brief those other two

22  issues, but you can educate me on some of my outstanding

23  concerns with the APA questions and then we can set a briefing

24  schedule for this; or we can set a briefing schedule for these

25  other two things and then just reconvene a week or so from now

1  and deal with the APA at the same time, because I don't see the

2  APA as one that can be resolved on the record.

3      I think that if I find for injunctive relief, that there's

4  likelihood of success on the merits, I still, looking at this,

5  would see how the government would want your opportunity to

6  develop the factual record if for nothing else so I can look at

7  the underlying comments, the administrative record.  So I just

8  don't see this one getting converted, converted on the merits.

9      And so from a procedural perspective, I'm not -- I almost

10 wonder whether we should take up the question of the HSA and

11 the FVRA first, because I can move to merits a lot more easily

12 than I can on the APA.

13     Government, what's your thought on that?  And then I'll

14 turn to the plaintiffs.

15         MS. ANDERSEN:  That sounds reasonable to do it that

16 way.

17         THE COURT:  Plaintiffs, for -- I can't remember.  Was

18 it Ms. Austin who will be handling the APA question?

19     You know, what's your thought on this wonky idea that I'm

20 having, which is that we move to a merits determination on the

21 FVRA?  We can do it relatively quickly, and we still can reach

22 the APA but it may be on an injunction, as opposed to merits.

23 Or do you think we should just move right to merits on that as

24 well?  Give me the administrative record and -- other than the

25 administrative record, I'm not sure what other facts there

1    would be of relevance.

2            MS. AUSTIN:  If Your Honor doesn't mind, I might put

3    that to my colleague Mariko Hirose.

4            THE COURT:  Okay.

5            MS. HIROSE:  Thank you.

6        So if it's possible, Your Honor, our preference is to

7    begin to address the APA issues today.  To the extent it's

8    possible, we would love for Your Honor to address all of the

9    issues that are ready for decision, just because the stakes are

10   so high for our clients; and should this case go up on appeal,

11   we think it might be more beneficial for the Court of Appeals

12   to have more of your analysis on the various issues rather than

13   less.  But, of course, I understand that we are talking about a

14   short time period and that may not be feasible.

15       In terms of what we're requesting, what's really important

16   to us is trying to get some relief for our clients before

17   August 21st; and with respect to that, I would also like to

18   talk about other potential alternatives, including, of course,

19   a TRO or postponement of the effective dates of the rules under

20   5 U.S.C. 705, which is a specific remedy that's available in

21   this context under the APA and is different from a preliminary

22   injunction.

23       So a lot of the concerns that the government has raised

24   and that were discussed in the Fourth Circuit decision last

25   week really don't apply to that relief.

1          THE COURT:  Can you speak to that?  How is it -- how

2    is it different if I'm -- if I'm getting your argument right,

3    it's that under 705, I'm staying the enforcement of these

4    rules.

5          MS. HIROSE:  You're staying the effective dates which

6    is -- it seems like a minor difference, but I think the Supreme

7    Court has actually said that there is a difference between

8    stays on proceedings in a judiciary context versus an

9    injunction on a person that could lead to contempt.

10         And the other difference is that Congress specifically

11   contemplated this remedy in the case of an APA.  So some of the

12   concerns that have been raised against preliminary injunction,

13   and the Court has brought up exercise of equitable authority,

14   doesn't apply here.  And it would make sense that in the

15   context of an APA, Congress thought that this would be an

16   appropriate remedy because it's -- in most circumstances, as is

17   the case here, it just wouldn't make any sense to postpone

18   effective dates just in some limited manner that would just

19   result in a regulatory scheme that the agencies didn't intend

20   and that would be a burden to the agencies.

21         So it is consistent also with the vacatur remedy at

22   summary judgment that the APA provides for and that, of course,

23   the Supreme Court said in the DACA decision is entirely

24   appropriate at summary judgment.

25         THE COURT:  But, I mean, it may be of a different

1    name but doesn't it have the same effect as a nationwide

2    injunction, which is -- again, if I look at the Fourth

3    Circuit's, at least in this case, clear pronouncement that I've

4    got to be very weary about only using such remedy in

5    extraordinary circumstances, one reading of that opinion is

6    that there's -- (AUDIO GAP) -- extraordinary circumstance.

7         But putting that to the side, you know, how do I reconcile

8    the clear -- you know, that whether I do it under 706 or 705

9    and whether I stay deadlines or I enjoin, what I'm -- the

10   effect of it is that I'm telling DHS to not enforce these

11   regulations when it intended to enforce them.  And isn't that

12   the functional equivalent of a nationwide injunction?

13        MS. HIROSE:  It may be practically similar, but

14   courts have recognized the distinction between saying that the

15   rules do not have effect and that defendants, including

16   individuals, are enjoined from enforcing the rules.

17        So I think that there's similarly some difference between

18   declaratory judgment and preliminary injunction where courts

19   have recognized that there's a difference, although, in effect,

20   they may look very similar.

21        And the same in the case *Nken*, which is about a stay of

22   judicial proceedings, stay in the context of appeal.  The

23   Supreme Court has recognized that there is a difference and

24   that a stay is a lesser exercise of judicial authority than an

25   injunction.

1      So the Fourth Circuit decision didn't address these

2   differences, and it also didn't address the fact that 5 U.S.C.

3   705 explicitly provides for this remedy.

4      In addition, we've cited several cases in which

5   postponement of the effective dates, date of the rules, have

6   been affirmed by courts, including the Supreme Court and in the

7   Fifth Circuit; and like in those cases, defendants haven't

8   articulated a way in which it would be feasible to have more of

9   a narrower remedy given what Plaintiffs have put forward.  It's

10  just a narrower remedy wouldn't face irreparable injury that

11  we've put forward, which is a burden on the organization.  It

12  would just increase the burden, and it would be also, of

13  course, incredibly unfair and, just, I would imagine, a huge

14  burden on the agency as well because this is clearly not how

15  they wanted the regulatory scheme to move forward.

16      So in the context of an APA in particular, postponement of

17  the effective dates of the rules is the most appropriate remedy

18  at this stage.

19          THE COURT:  Remind me, Government, did you address

20  705 in your responsive pleading?

21          MS. ANDERSEN:  Yes, Your Honor.  The courts have used

22  the same balancing test on the same factors under either prong,

23  and I am trying to pull it up now and I have it, but I'm like

24  99 percent sure that in the recent Fourth Circuit decision, in

25  a footnote, it did address this argument and rejected it, that

1  705 gives the court broader authority than an injunction would,

2  that it really goes to the ultimate, like on the merits, you

3  know, if you can vacate an order or not but doesn't talk about

4  preliminary relief.

5       If I can pull it up, I will.  In my memory, it's in a

6  footnote.

7            THE COURT:  Well, they asked for it; you're right.  I

8  mean, the plaintiffs in that case moved for an order pursuant

9  to 705 postponing the effective date.  So I wouldn't be -- I

10  mean, the problem that I'm having, again, is trying to move as

11  quickly as the parties are requesting, and seeing no practical

12  difference, I'd be hesitant to say, you know, that one remedy

13  is foreclosed pursuant to the Fourth Circuit opinion but the

14  other, which is the functional equivalent, isn't without a lot

15  more consideration and thought.

16       So I'm going to put that on the short list of, perhaps,

17  additional things you want to tell me about in another round of

18  truncated pleadings, because I'm not necessarily seeing 705

19  working differently.

20       So with regard to the APA, though, I'll tell you, I have a

21  hard stop of about 1:15, so I'm going to go right to where I

22  see the weaknesses of the likelihood of success on the merits.

23       I am more persuaded by the argument that the 30-day

24  Timeline Rule is arbitrary and capricious if for nothing else

25  than I find it implausible to say that the rule needs to be

1   amended to address the *Rosario* problem of 78 percent of the

2   applications can be processed within 60 days and the lion's

3   share within 90 days.  It seems irrational and implausible to

4   say that the fix for that is to take away the timeline

5   completely.

6          And when you think about the whole purpose of *Rosario* was

7   about accountability and that's the only reason it was before

8   the court the way it was, and when I look at the administrative

9   record that there isn't a whole lot of support for this notion

10  that at once the government can say we can't predict the

11  future, that's why we can't have a Timeline Rule, but we can

12  predict, don't worry, asylees, because most of them we will get

13  to in 60 days, that just seems to be illogical.  So that's

14  where I am on the 30-day Timeline Rule.

15         On the question of the interaction of the two rules, on

16  this record, I have to say I'm not yet persuaded that enacting

17  the Broader EAD Rules is arbitrary and capricious based on the

18  rationale that the plaintiffs -- the rationales that the

19  plaintiffs have given me.  And where I am on that -- and I'm

20  going to turn to you first, Ms. Austin -- is that I'm not

21  terribly persuaded that this really falls into, first, you

22  know, content restriction like what they were talking about in

23  *United Farm Workers* and that, more specifically, some of the

24  characterizations of the comment and responses that the

25  plaintiffs give me don't really line up with the record.

1    So there were some -- the arguments about the agency

2  failing to consider the harmful effect on bona fide asylum

3  seekers point me to a back and forth about the intent of the

4  rule but not really the effect, and that the effect, while the

5  agency's, you know, response wasn't -- it left me wanting more,

6  it's not irrational or so implausible that I can find, given

7  the deference that I have to accord this matter on this record

8  with, you know, time ticking, can find it arbitrary and

9  capricious.

10    However, I am looking at the fact that there have been

11  some larger rationales for why do we need these rules at all,

12  and those rationales, I'm wrestling with them because they

13  still don't seem to hold water; like, these rules need to be

14  put in place to reduce fraudulent application.  Based on the

15  historical data, I'm not quite seeing the statistics the way

16  that the government is.

17    So that's a lot.  I know I threw a lot at you but that's

18  what I'm wrestling with right now.  What would you like me to

19  know about your argument that I haven't understood?

20    MS. AUSTIN:  Just to begin, to harms, the government

21  in some ways makes it easy for you by saying affirmatively and

22  absolutely that the Broader EAD Rule will not harm bona fide

23  asylum seekers, and it says that in many ways throughout the

24  preamble and that's the explanation that their policy making

25  has to be judged by.  You know, that was the DACA case, but

1   this recent explanation requirement is not a mere formality;

2   it's what enables judicial review.  It's what enables the

3   public to understand why an agency makes the decisions it

4   makes.

5        And so on the face of the government's explanation, it

6   says no bona fide asylum seekers will be harmed -- will be

7   deterred -- I'm sorry.  I think I may have misspoken.  They

8   said that no bona fide asylum seekers will be deterred from

9   pursuing their asylum claims.  And that was a conclusory

10  assertion.  There is no support for that and, in fact, there

11  were commenters that pointed them to evidence that that wasn't

12  actually true.

13       Commenters pointed out that absent work authorization, an

14  asylum seeker might not be able to pay for transportation to

15  get to their hearing.  Commenters pointed out that they might

16  not be able to afford counsel.  And the agency itself even

17  acknowledged that absent work authorization, asylum seekers

18  might be homeless, but that's tough luck.  If that's a concern,

19  they should look up the homelessness resources of their state.

20       So I think, based on the information that the agency had

21  before it, you know, *State Farm* tells us that in order to

22  be reasoned, agency -- in order -- excuse me.  In order for

23  their decisions to be reasoned, agencies have to connect the

24  facts found with the choice that they made.  And here, the

25  decision that the agency made was contradicted by the

1    information before it.

2        It might have been a more difficult case if the agency

3    hadn't said so absolutely bona fide asylum seekers will not be

4    deterred from pursuing their claims, but it said that.  And so

5    we have to --

6            THE COURT:  But it doesn't say that, does it?  I

7    mean, I'm looking at least at one part of the record where it

8    says DHS acknowledged that these reforms will also apply to

9    aliens with meritorious asylum claims and that these applicants

10   may experience some degree of economic hardship as a result of

11   heightened requirements; however, the ultimate goal is to

12   maintain integrity of the asylum process, and DHS has

13   determined that sustaining an underregulated administrative

14   regime is no longer feasible.

15       So the way that I read it in a number of places in this

16   record is they are making a judgment that based on the

17   evidence, they need to make these changes to deter frivolous

18   and fraudulent claims and that they acknowledge that it may

19   burden -- in my view, regrettably burden -- bona fide asylum

20   seekers; but they have made -- that it's an opportunity cost

21   that the agency has to acknowledge but that they believe the

22   deterrence factor in the fraudulent applications is paramount

23   right now given the strains on the agency.

24           MS. AUSTIN:  Your Honor, and I think I may have

25   misspoken when I first got up to the podium, so to speak.  The

1   harm that we are pointing to that the agency does not

2   acknowledge is that bona fide asylum seekers will be deterred

3   or prevented from pursuing their asylum claims.  And we don't

4   have to go through it now, but I will just give you a few cites

5   where I think the evasiveness of the government is quite

6   glaring where they just say the opposite or respond by saying

7   this doesn't change the asylum standard, therefore, this could

8   not, you know, deter or prevent someone from pursuing their

9   claims.

10          So I think pages 38555 of Exhibit 3, and that's page 25 of

11  the exhibit if it's easier for you to go by that.

12              THE COURT:  Okay.

13              MS. AUSTIN:  And then another place -- I do find that

14  it's very instructive to follow, to trace their response to the

15  comments that are put forward.

16          And then the other one is 3858 -- excuse me, 38590 to

17  38592.  In 38590, for example, somebody raised the problem that

18  the rule will force many bona fide asylum seekers, who do not

19  have the means to go without employment, to abandon their

20  meritorious claims.

21          And then, you know, tracing the government's response --

22  and, you know, I welcome Ms. Andersen's input because I don't

23  want to, you know, misrepresent; but as I read it, their only

24  response is asylum applicants will not be impacted in their

25  pursuit of their asylum claims because this rule does not

1   change any eligibility criteria for asylum.

2        And there's a similar exchange in 38591 to 38592.

3             THE COURT:  And so run by me again what the argument

4   is.

5             MS. AUSTIN:  That given that the purpose of the

6   asylum system is to respond to the needs of asylum seekers --

7             THE COURT:  Right.

8             MS. AUSTIN:  -- given that asylum seekers have the

9   right to apply for asylum, any change to the work authorization

10  rules that would impinge on this right to apply for asylum and

11  make it more -- and deter people from seeking protection from

12  persecution or force them to abandon their claims would be a

13  significant issue for the agency; and that, at the very least,

14  the agency should have grappled with that problem before making

15  policy.

16       But what the agency did was ignore the problem by either

17  asserting, in a conclusory fashion, that it did not exist,

18  which I will also say is irrational on the basis of the rule

19  because the agency said that it would be deterring people, just

20  somehow it would prune away all -- you know, that somehow the

21  effectiveness would be to prune away all non-meritorious claims

22  but somehow the meritorious claims would survive this blunt

23  instrument.  You know, it's irrational on its face.

24       But the agency, you know, didn't grapple with the issue,

25  notwithstanding the fact that commenters brought the issue to

1  their attention again and again.

2      THE COURT:  But let me ask you this, the part that I

3  just read to you, I mean, did it not say, listen, we know this.

4  We know it's going to have an affect not only on work

5  applications -- it said bona fide asylum seekers -- but we're

6  making the choice that we have to change the rules to deal with

7  what they call the underregulated administrative regime that's

8  no longer feasible.

9      So it's, in sum and substance, saying we know this is

10  going to adversely affect aliens with meritorious asylum

11  claims.  They may experience some degree of economic hardship;

12  however, the ultimate goal, which is to reduce false and

13  fraudulent applications and lessen the burden on the agency is

14  what we have to consider.

15      And so to me that's the -- that's like the flash point is

16  does that make any sense?  And the statistics that I'm seeing

17  don't necessarily bear that out.

18      MS. AUSTIN:  I agree with you, Your Honor, on that

19  point, but -- and to your question about whether their

20  acknowledgment of monetary impacts -- because they very -- you

21  know, if you look at -- if you trace their responses, they are

22  very careful.  They say that we acknowledge there could be some

23  monetary impacts, some qualitative impacts; but what they

24  refuse to acknowledge is that this will actually impinge on a

25  person's right to apply for asylum, and we think that that's

 1   irrational.

 2       And to the extent that the agency based its decision on an

 3   assumption that no asylum seekers would be prevented from

 4   actually pursuing protection, that explanation can't support

 5   this policy that we would --

 6               THE COURT:  Okay.  Okay.

 7       Let me then turn, since our time is short.  Ms. Andersen,

 8   Ms. Austin invited you to comment.  I'm inviting you to

 9   comment.  Tell me why this -- the agency did consider the

10   adverse impact on bona fide asylum seekers if they did; and if

11   not, do they have to.

12               MS. ANDERSEN:  Thank you, Your Honor.

13       And I want to address this and if I can also address the

14   Timeframe Rule, because it seems like that's Your Honor's most

15   concern and I want to make sure --

16               THE COURT:  Sure.

17               MS. ANDERSEN:  But just very quickly, I think there's

18   a few sort of assumptions in Plaintiffs' argument that I just

19   want to address.  So I think the most important being that it

20   was Congress that has authorized -- that has expressly stated

21   that there is no entitlement to work authorization while an

22   asylum application is pending, and that's extremely important

23   because Congress can do that.  So if we're talking about harm

24   such as, well, I need to hire a lawyer, I need housing, I need

25   food, these are all things Congress could provide and maybe

1  they should but they don't, and, you know, those are harms that

2  currently exist.

3      So I think, you know, when we're looking at the rules, the

4  question is did this particular rule -- what are the harms that

5  this rule does for the change.  So in the current system,

6  people already cannot obtain work authorization by mandate, by

7  statutory mandate for 180 days.  So what this is doing is, you

8  know, it's extending it.  And I think that's just important

9  when you're trying to look at what harms did the agency

10  consider, what harms are they required to consider.

11      So, yes, they absolutely acknowledge, and I cite through

12  the brief all the areas where they acknowledge that, you know,

13  this may delay some people from getting work authorization for

14  a longer period of time; but when you go down the rabbit hole

15  into, well, then they can't get counsel and, therefore, they're

16  not going to actually get their asylum application approved

17  when they really do deserve it, I think you've gone too far as

18  to sort of the, you know, the harm.

19      I think what the rule is trying to say is that these rules

20  don't govern asylum eligibility.  They govern work

21  authorization while your asylum application is pending.  Those

22  are two distinct things and those are two concepts that

23  Congress intentionally delineated, and they did this in 1996,

24  and they did this expressly because they wanted to separate

25  work authorization as a separate process from the asylum

1  application process because there was evidence at that time

2  that there were people that were using the system fraudulently

3  to be able to work.  Because there was backlog, they knew that

4  if you submitted an application, you could delay the process

5  long enough and you could maintain, you know, your work

6  authorization.

7      So when this started back in I think the '80s, anyone who

8  filed an asylum application, they were authorized to work

9  within 60 days if their application had not been acted upon;

10 and that is when it proved unworkable first by regulation in

11 1994 but then by congressional mandate in 1996 where Congress

12 determined that the work authorization should be separated.

13     So, again, I think when there's -- when the plaintiffs

14 point to certain comments about this is not going to affect an

15 asylum, a person's eligibility, it's because it's not affecting

16 their eligibility under the law.  What hurdles there might be

17 as far as, you know, financial burdens, those have always

18 existed.

19     You know, it's similar to our civil litigation system.

20 There is no right to counsel, you know, but, you know, those

21 analogies --

22         THE COURT:  But you will agree -- I mean, I hear you

23 that, you know, this is against the statutory backdrop that

24 Congress said you have no right to work, but there has been a

25 20-year history of certain regulations that now the rationale

1  -- because this is the rationale that the agency is using --

2  saying, well, we have to deter fraudulent and frivolous

3  applications, they're not talking about work applications,

4  right?  They're talking about asylum applications, right?

5          MS. ANDERSEN:  There are people using the asylum

6  process to obtain --

7          THE COURT:  Right.

8          MS. ANDERSEN:  -- the work authorization, yep.  So

9  that was one of the roles was to reduce incentives, to remove

10 incentives.

11     So currently, under this system, somebody can submit an

12 application, you know, obtain the work authorization in

13 180 days and then can delay the process through appeals even if

14 they don't have a meritorious claim, but they can remain to

15 work.  So it's sort of two-prong; one, trying to deter that,

16 because you're going to have to wait a little bit longer; and

17 number two, trying to streamline the entire process so

18 everybody gets through the system faster.  So it's a dual

19 purpose.

20          THE COURT:  And I guess the point, the larger point

21 is that, you know, you say, on the one hand, they're really

22 separate but, on the other hand, they are the very reason --

23 it's the very -- the interconnectedness of the two is the very

24 reason why the agency is saying these changes must be put in

25 place.

1          And that's the plaintiffs' point, right, is, well, then,

2     if you're going to say that, agency, you've got to address the

3     harms it will cost to the bona fide applications because you're

4     saying that the work -- changing the work authorization is

5     going to reduce fraudulent ones.  Well, what are they going to

6     do to the folks who are legitimately seeking asylum?

7          So what's -- what in the record says you've considered

8     that; not just saying, well, they're two separate things?

9               MS. ANDERSEN:  And I should be clear.  They

10    absolutely did address that and they acknowledge the harms.  I

11    just want to make sure we're separating what harms, you know,

12    we're talking about.

13         And, you know, number one, it established the problem that

14    it addressed, but I'll go to the -- so, for example, on 38584,

15    it talked about -- well, this is addressing a problem about the

16    longstanding critical and growing crisis.  Let me get to harm.

17         Okay.  On page 38598, I think it's in 38598 where it talks

18    about -- it explains why the 365-day was picked, based upon the

19    average adjudication time, and it was not feasible to determine

20    a more precise time.  And then it goes on to addressing some of

21    the harms, and the agency, you know, noted that if people are

22    fleeing from prosecution [sic], they would be willing to wait a

23    longer period of time, if necessary, or that same motivation

24    would not be present for people that, you know, were not bona

25    fide asylum seekers.

1          THE COURT:  Okay, 38598 for me has -- I see it.

2     Okay, got it.

3          MS. ANDERSEN:  I think in our brief we cited some

4     more examples but --

5          THE COURT:  Okay, but 38598 is a -- it just is a

6     table, right?  I mean, 38598 -- I'm looking at 85 FR 38598 and

7     mine is a table.  It doesn't -- it's not a response to any

8     particular comment.

9          MS. ANDERSEN:  Sure.  Okay, so let me go back.  I

10    think I was in the wrong section.  So initially on page --

11    let's see -- you know, the primary purpose generally is to

12    mitigate the ongoing harms, and that's sort of the -- if you

13    look at the broader picture, because if we can deter, you know,

14    more people and we have more meritorious applications, it will

15    be able to be processed faster.  So that's just one way it

16    addresses that.  It will balance sort of any harms that are

17    associated with any delay in employment and that's because the

18    ultimate goal of all of this is let's actually decide the

19    underlying employment applications faster than we currently

20    are.  The agency wants to do that better and that will help

21    everyone, including bona fide asylum seekers.

22         You know, currently, it can take up to two years.  Some

23    people can get it much faster.  So, again, if you look at broad

24    strokes, if that number can get down, as soon as you are

25    granted asylum, you can work right away.  So, again, that's the

1  ultimate goal, right, is let's get everyone's asylum

2  adjudication fast.  That was always the goal.  Once somebody is

3  granted asylum, they can work, and we're not even worrying

4  about the, you know, 365 days or anything.  So that's just

5  broad strokes of what the overall goal or one of the overall

6  goals is to do.

7      And starting at 38565, DHS expressly noted and considered

8  the impact on asylum applicants, and they provided the detailed

9  reason in that section.  So it begins, DHS recognizes that this

10 rule may have a substantial impact on asylum applicants but

11 does not agree that the 365-day waiting period for employment

12 authorization is overly burdensome, cruel, or precludes aliens

13 from being self-sufficient.  And it continues.

14     But I think I just want to address that because I do think

15 that's important, and part of it is just understanding what the

16 change actually does.  So if you indulge me a little bit, and

17 I'll go quickly, the current rule is what's known as the

18 180-day Clock, but that day includes delays, applicant-based

19 delays.  The 365-day Rule is currently a calendar day clock.

20     So it's not appropriate in all cases, at least, to just

21 say it's going to delay by six months for every individual.  So

22 I think it's actually made clear in the plaintiffs' own

23 declaration.  It is not uncommon for asylum applicants to

24 submit an asylum application and then request a postponement of

25 their hearing because they want to either get an attorney, they

1   want additional time.  That happens routinely and I think

2   plaintiffs will agree on that, and that's their right to do to

3   get more time.

4        When they do that, when an asylum applicant asks for

5   postponement of a hearing, the clock, that 180-day clock stops

6   under the current rule and then it doesn't begin again until

7   you actually appear for that hearing that you postponed.  So,

8   for example, if a hearing is scheduled on day 45, you ask for

9   postponement, you know, it's rescheduled and --

10            THE COURT:  Right.  No, I get it, but aren't there --

11  but aren't there other changes?  I mean, this is such a broad

12  -- you know, there's many different changes in that many of the

13  other changes have to do with when and how an application is

14  actually complete.  Right?  So when the clock, the 365-day

15  clock would even start ticking.  Am I right?  So isn't it just

16  sort of a shift of these administrative -- or am I getting that

17  wrong?

18            MS. ANDERSEN:  Yeah, actually, the rule -- you know,

19  the other thing that kind of goes broadly to show that the

20  agency acted appropriately within APA is that in the Broader

21  Rule, they made a lot of significant modifications based on the

22  comments, and that's shown throughout, and one of it was for

23  the 365-day waiting period.  Initially it was based upon if

24  there were delays at the adjudication, but now, as long as at

25  the end of the year there are no applicant-caused delays, the

1    application can go forward; and that was like a modification

2    that they made, you know, to the comments.

3         So again --

4         THE COURT:  And what's considered an applicant-caused

5    delay has changed, right?  I mean, let me say this, for the

6    interest of time, I'm not sure that at this stage, for

7    preliminary relief, unless I find on its face, given the

8    Federal Register, that it's arbitrary and capricious, which is

9    a high standard -- you know, I can't second guess this stuff at

10   this stage, which is why, I'll tell you, I'm not wholly yet

11   knowing which way I'm going on the APA Rules.

12        But maybe in the minutes that we have left, Ms. Andersen,

13   can you address for me how it's at all rational to say -- to

14   address the problem of a too-tight timeline on the Timeline

15   Repeal Rule, which is going to take it away completely, how is

16   that rational?

17        MS. ANDERSEN:  Your Honor, thank you.

18        Well, number one, I want to address Your Honor's concern

19   about the *Rosario* court.  Keep in mind that that was only a

20   decision that told the agency it had to abide by its own

21   self-imposed regulation.  So the only reason why it was, you

22   know, held to that standard was because in 1994, the agency

23   itself imposed that deadline.  So that deadline is not by

24   statute; it's not a mandate by Congress.  There is no mandate

25   and that's important because the agency has every right to

1   change its own regulations, and the standard is no different,

2   you know, than if it never had one in the first instance.

3            THE COURT:  I don't know if I agree with that, number

4   one; and number two, it still doesn't make the decision

5   rational.  You know, what's clearly rational is the agency

6   doesn't like *Rosario.*  Okay.  And they don't like *Rosario*

7   because they can't get it done and that they actually have

8   statistics that show what a push it was to get it done within

9   30 days.

10           But those same statistics show they can get the lion's

11  share done within 60 and, even better, 90 but reject any

12  timeline, and the reason is because they can't predict.  They

13  can't predict what the ebbs and flows would be but they've

14  already predicted it.  So I'm just -- that's where I'm kind of

15  chasing my tail on how is this rational.

16           MS. ANDERSEN:  Again, it goes to that there are other

17  provisions within immigration law where there are no similar

18  deadlines, just as, you know, the courts don't have deadlines

19  on when they have to issue decisions by, you know, by mandate.

20  So just conceptually, there's nothing problematic.  There's no

21  requirement to have a deadline of when any adjudicator

22  adjudicates things.

23           The 30-day time limit was set 20 years ago.  Things were

24  extremely different, and that's set out in the rules.  There

25  were adjudicating local INS officers.  There were not the same

1   sort of national security and background checks that are

2   required today, which necessarily takes longer.  I think

3   there's data in there, at least from 2013, about just the

4   influx of applications, a whole host of that which I think Your

5   Honor is aware of.

6       So the question was -- and they did expressly address

7   whether a 45-day or a 90-day deadline would be a reasonable

8   alternative, and, again, I think it's just a very, you know,

9   rational sort of result of saying, listen, 20 years ago, the

10  agency thought 30 days was totally sufficient, and it was for

11  some period of time, and that changed and it was changes we

12  couldn't foresee.

13      So if we're going to go through the notice and rule

14  comment period, issue a new rule that may also be on the books

15  for another 20 years, and we have no idea what 10 years from

16  now is going to look like, what challenges this country may be

17  facing or not or what's happening around the world, you know,

18  why box us in when there's zero, you know, mandate by Congress?

19      And there are other things in place to hold -- you know,

20  USCIS is very transparent with all of their deadlines.  You can

21  go on their website, put in any application, and you can see

22  what the average waiting time is.  So they do try to hold

23  themselves to an accountability, things they're trying to get

24  better at --

25          THE COURT:  Which is different than saying -- which

1   are different than what they say in the Federal Register, by

2   the way.  I mean, it's kind of a -- it's a moving target

3   because USCIS says, well, this can take anywhere from a month

4   to a year.  That's not really helpful to an applicant, and it's

5   certainly not helpful to the court to figure out what -- how

6   this is a rational fix to this problem, especially in light of

7   -- and, again, you all have much bigger brains than I do so --

8   and you've been doing this for a lot -- you know, this is your

9   thing, and you're helping me bring me along.

10       Tell me why it's rational in light of the 365-day change.

11  Right?  So before it was only six months you had to wait, and

12  there was a 30-day adjudication process.  Now it's a year you

13  have to wait and there is no timeline for the agency, and the

14  agency has already come out and said, well, we've got to double

15  the time that you have to wait to reduce the administrative

16  cost on the agency.

17       I'm finding those two rules together to work serious harm

18  on the ayslee's ability to work at all.

19           MS. ANDERSEN:  And, Your Honor, I would start again

20  from the premise that explicit in the statute itself it says

21  that no asylee applicant has a right to work, and that's by

22  Congress' mandate and they say that and then they actually put

23  limitations.  They, themselves, say 160 days.

24           THE COURT:  This is not a right to work.  It's an

25  opportunity to work that the agency gives them and with that

1    document that's so critical.  So that's the part that -- no

2    right to work doesn't move me.  You give the opportunity.

3              MS. ANDERSEN:  It's not the right to work.  I

4    probably misphrased that.  But what Congress did say is that --

5    and I don't have the exact language, but they said that there

6    is no -- it's a discretionary benefit and that is mandated by

7    Congress.

8         And, again, that's just why -- so, you know, Congress has

9    delegated two classes of people, people that have been --

10   received asylum and people who are pending asylum, and it was

11   Congress' prerogative to address that, and they chose that they

12   wanted to separate the process out.  They did not want to

13   provide work authorization immediately, and they didn't want to

14   provide it, at a minimum, for six months.  And then they gave

15   the complete discretion for the executive agency to figure out

16   the best way to execute that.

17        So while I agree with you the agency has to articulate a

18   reasonable basis for changing its rule before --

19             THE COURT:  Right.

20             MS. ANDERSEN:  But I think it's not just irrational

21   as a minor policy.  So I would just say that that is a rational

22   policy choice.  Did they explain it well, I think, is the

23   question under the APA of why they needed it, and I just -- I

24   have a hard time, like, if -- in history we have seen how

25   things have changed.  I don't think in 1994, you know, we knew

1   some of the security things that we, you know, dealt with after

2   September 11.  We don't know what's going to happen 10 years

3   from now.

4        And, again, there's other areas in immigration law that

5   don't have these same timelines.

6        So you're asking why are we treating, you know, this one

7   benefit, which is a discretionary benefit differently than

8   others.  And the *Rosario* is really -- I think that's just to

9   highlight that the agency was required to divert resources.  So

10  that is a harm to the agency that if the agency -- it's their

11  prerogative to sort of figure out, you know, where should we

12  sort of divert our sources.  And, you know, they comply with

13  the court order, absolutely, but it has, you know, to divert

14  resources.

15       So even an injunction would be extremely harmful for the

16  agency today where they're really facing, you know, a huge

17  crisis ahead of them with funding.

18            THE COURT:  Well, and, you know, I can credit

19  everything you say but then it still just doesn't align with no

20  timeline whatsoever.  I mean, because taking that to its

21  logical extension, then let's throw out the Federal Rules of

22  Procedure.  Why do we need timelines at all?  Like, let's just

23  everybody is on the honor system.  We don't work that way and

24  government accountability, especially in this context with a

25  20-year history of some accountability, does matter.  That's

1   number one.

2       And number two, you're right, you don't -- the agency has

3   to give me a rational basis.  I don't have to agree with it but

4   it does have to have some rational basis.

5       And the thing that I struggle with is the agency saw fit

6   repeatedly to tell the public, Don't worry, asylees, you know,

7   we will stay within that 60-day timeline more often than not.

8   It's simply irrational to think that that's relevant to tell

9   asylees and the public when it, at once, shouldn't matter and

10  doesn't matter.

11      And so that's -- you know, that's the part that I'm still

12  really wrestling with when an agency didn't need to do that and

13  they did do it.

14      So in any event, okay, I'm sorry to have to cut this

15  short.  This has been extremely helpful.  This is what I would

16  like to talk about as next steps.  I don't really see how

17  practically we're going to get this done by next Friday, as

18  much as I have tried, but we're still going to move as quickly

19  as I can.

20      So what I propose is this, between now and next Friday,

21  that I give you all an opportunity for simultaneous letter

22  pleadings not to exceed 10 pages each, exclusive of exhibits,

23  if you need exhibits, on the following questions:  Standing,

24  the propriety of converting the FVRA/HSA questions, which I

25  think are Counts Four and -- well, you know what counts they

1  are.  HSA and FVRA challenges to motions for summary judgment.

2  If so, tell me anything else you wish for me to know with

3  regard to the law; alternatively, if not, tell me what other

4  facts you need that would preclude summary judgment.  And then,

5  thirdly, the question of a 705 remedy on the APA.  How is it

6  different than 706 or -- not 706 necessarily but the nationwide

7  injunction question that was raised in the *CASA* case that just

8  came down last week.  Those are the three areas that I need

9  additional help from you all on.

10       Talk amongst yourselves.  Ms. Andersen, if it turns out

11  that after, you know, talking to your people and looking at

12  this more closely you are not going to make a standing

13  challenge to associational standing or representational

14  standing and you all have narrowed the basis of standing, use

15  your 10 pages on something else, because there's lots of issues

16  here.

17       And if, in fact, you need a little wider berth on either

18  side, just pen me a quick line that says, Judge, we need to

19  exceed the pages because this other issue really does need to

20  be briefed.  I'm not going to be unreasonable about it.  I'm

21  just trying to cabin that this doesn't get so long and unwieldy

22  that I can't decide it in a timely manner and putting the onus

23  on you all to be as efficient as possible.  So that will be

24  simultaneous by next Friday.

25       And then I suggest that we find another time shortly

1    thereafter to get together again so that if there's anything

2    that we didn't address on the APA question, you think I'm

3    getting it all wrong and there are other arguments to be made

4    on the follow-up issues, you have the opportunity to do that.

5    And I would suggest we do that the following week, so that will

6    mean Friday, August 28th.

7         Can you all do a one o'clock follow-up Zoom on Friday,

8    August 28th?  Does anyone -- let me do it this way, can anyone

9    not do a follow-up on Friday, August 28th, at one o'clock?

10        (No response.)

11             THE COURT:  Okay.  Now, I do appreciate that this may

12   result in some push and pull in terms of the effect of these

13   rules, the rules taking effect next week.  I just simply see

14   these issues as too important and too in need of further

15   thought and reflection from you all to just pull the trigger

16   before then; but, Plaintiffs, if you have an alternative

17   proposal, let me hear it now and then I've got to run.

18             MS. HIROSE:  Sure, Your Honor.  Thank you.

19        I just wanted to clarify when I was talking about the 705

20   relief and TRO possibilities earlier, I had meant it could be

21   up until the time that this Court is ready to rule on summary

22   judgment on the issues that are ready for summary judgment.  So

23   that could be a very short stay or postponement, which would be

24   different in kind and scope from -- certainly from what the

25   Fourth Circuit was talking about.

1      And, of course, the government, itself, could agree to

2   that kind of remedy.  I know that it has happened in other

3   cases, so I'll just throw that out there.

4           THE COURT:  I see what you're saying.  So you're

5   saying that the stay can be until some resolution on the

6   merits.

7      Now, this may be important for you all then to talk about

8   if you would like to explore do you want this FVRA ruling or

9   don't you, I guess.  You know, do you want me to reach the

10  merits on that very critical question that the agency is still

11  dealing with?  And if you all resolve that you would prefer to

12  simply press pause on the rules until we work out some of these

13  other issues, you're saying 705 gives you that flexibility, it

14  gives me that flexibility.

15          MS. HIROSE:  Yes, absolutely.

16          THE COURT:  Got it.  All right.  Well, then you all

17  talk about it from your perspectives.

18     I still think that a week to resolve all of these issues

19  is what I'm going to need.  It doesn't preclude me from

20  exercising 705 authority at any point, right, once I get your

21  briefing on it, simply say we're going to stay the rules

22  effective until I reach the merits?

23          MS. HIROSE:  That is our position, that you would

24  still have the authority to do that.  I would love to hear from

25  the government if they are in agreement with that, just to make

```
 1   sure.

 2        And I guess the other issue is if it would be helpful to

 3   have some preliminary briefing before Friday on some of these

 4   issues in case Your Honor thinks --

 5             THE COURT:  Yeah, I think the only -- I think the

 6   only one may be the 705 issue, if the government takes a

 7   different position that, you know, after the rules take effect,

 8   then has the ship sailed.  If the government's position is that

 9   the rule -- if the rule takes effect, then this whole stay

10   thing is mooted, then maybe we do need that sooner rather than

11   later.

12        Ms. Andersen, do you have a position on that?

13             MS. ANDERSEN:  My understanding was that I thought it

14   was the same as the injunction standard.  So I'll have to look

15   into that.  I'm not aware of the -- of what you're referring

16   to, where that authority is.

17             THE COURT:  I think the plaintiffs' position is that

18   they just want to make sure if I give you all until next week,

19   that the government's position isn't going to be, well, Judge,

20   at least, you know, the rules have taken effect, therefore, 705

21   is mooted; it doesn't have any legs anymore because you can't

22   stay it; it's already taken effect.

23             MS. ANDERSEN:  Oh, I see.  I will get back to the

24   plaintiffs or the Court on that --

25             THE COURT:  Okay.
```

1      MS. ANDERSEN:  -- on the answer to that.  I don't

2  know the answer to that.

3      THE COURT:  All right.

4      So then let's do this.  I can make it easier for you all

5  so that -- I've got to look at all of these issues anyway.  Why

6  don't you all brief simultaneous three pages, if you need it,

7  the question of 705 by Monday.  The remaining questions, as

8  we've laid them out, by Friday.  Use your good judgment as to

9  how you want to use your ten-ish pages.  You've earned a bit of

10  judicial leniency on that because you really did stick with

11  what I asked you to stick with, and I really do appreciate it.

12      So let's do the first issue, you know, no more than three

13  pages and the rest of it ten-ish pages, and that way, if there

14  is any question, I've got to look at 705 before Friday, then we

15  have your relative positions.

16      Does that work for you all?

17      MS. HIROSE:  Thank you, Your Honor.

18      MS. ANDERSEN:  Yes.

19      MS. HIROSE:  And just to clarify, double-spaced

20  pages?

21      THE COURT:  Nope.  No, I was actually giving you

22  single-spaced.

23      MS. HIROSE:  Oh, single-spaced.  Okay.

24      THE COURT:  I think it's just a psychological thing

25  for me that when I get a letter and it's only two pages, even

1    though it's single-spaced, it was really four pages.  It just

2    makes me feel better.

3        So it's single-spaced.

4            MS. HIROSE:  Okay.  Thank you.  I'm glad you

5    clarified.

6            THE COURT:  At least 12-point font, though.  Despite

7    my youthful appearance, I cannot read 10-point font.

8        Okay.  We'll get a quick letter order out setting the

9    further briefing.  Any questions about it before we break for

10   the day?

11       (No response.)

12           THE COURT:  Okay, great.

13       Thank you all for your time today.  Really helpful.

14   Appreciate it.  We'll talk the day I said.  I don't have it in

15   front of me, but you all know it.  I think it's the 28th at one

16   o'clock.

17       Okay.  Take care.

18           MS. ANDERSEN:  Thank you.

19           MS. HIROSE:  Thank you, Your Honor.

20           MS. AUSTIN:  Thank you.

21           THE COURTROOM DEPUTY:  This Honorable Court now

22   stands in recess.

23       (Recess taken, 1:30 P.M.)

24

25

1          I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

2     the foregoing is a correct transcript of the stenographic

3     record of proceedings in the above-entitled matter.

4

5                    Dated this 17th day of August, 2020.

6

7                                    /s/
                           Marlene Martin-Kerr
8                      Federal Official Court Reporter

1                         <u>INDEX</u>

2                      AUGUST 14, 2020

3          CASA DE MARYLAND, et al., vs. CHAD WOLF, et al.

4

5                                                      PAGE

6    COMMENCEMENT OF PROCEEDINGS................................ 3

7    PRELIMINARY REMARKS BY THE COURT.......................... 4

8    <u>SUPPLEMENTAL AUTHORITY:</u>

9         By Ms. Andersen...................................... 6
          By Mr. Manfredi..................................... 13
10
     <u>FEDERAL VACANCIES REFORM ACT - HOMELAND SECURITY ACT:</u>
11
          Argument By Ms. Andersen........................... 16
12        Argument By Mr. Manfredi........................... 52

13   <u>ADMINISTRATIVE PROCEDURE ACT:</u>

14        Argument By Ms. Mariko............................. 66
          Argument By Ms. Austin............................. 72
15        Argument By Ms. Andersen...........................78

16   PROCEEDINGS ADJOURNED..................................... 99

17   CERTIFICATE PAGE......................................... 99

18

19

20

21

22

23

24

25

# EXHIBIT G



Remarks by President Trump Before Marine One Departure | The White House

**REMARKS**

# Remarks by President Trump Before Marine One Departure

Issued on: **January 6, 2019**



South Lawn

9:24 A.M. EST

Q   Mr. President, are you losing leverage, sir, as Republicans want to reopen the government?

THE PRESIDENT:  So the job numbers were fantastic.  The best numbers we've had in many years.  It shocked Wall Street analysts.  It didn't shock me.  I know what's going on.  But the job numbers were beyond anybody's expectations.  Really, hundreds of thousands more than your top picks.  So that was a great thing.

One of the elements of job numbers is, if you remember, the past administration said you'd need a wand to bring back manufacturing jobs.  Well, manufacturing jobs are coming back at a very high level.  We had a tremendous manufacturing jobs report, and we're very happy to see that.  We've worked very hard.

We have many companies coming back into the United States; many car companies going to Michigan, going to Pennsylvania, going to Ohio, and other places.  But they're coming back into the United States.  In most cases, they've left, and now they're coming back in.  So we're very happy about that.

I'm going to Camp David.  We'll be discussing many topics: North Korea; the China trade deal, which is coming along very well.  Both of those subjects coming along very, very well.  We'll obviously be

discussing the wall, which is desperately needed, even if you read some of the papers that don't report accurately, of which there are many.  But a couple in particular, they say that the surge to come into our country has never been stronger.  And it's very unfair to people that want to come in legally.  But the surge has never been stronger.  And we have to build a wall, or we have to build a barrier.

The barrier, or the wall, can be of steel instead of concrete, if that helps people.  It may be better.  But I'm willing to do that so our great steel companies — which are now back in business — they were very, very — they were doing very poorly when I took office, and now they're doing very well.  A lot of steel workers working that never had a chance of getting a job in the steel industry again.  Our steel industry was dying, and now it's very vibrant.

I intend to call the head of United States Steel and a couple of other of our great steel companies to have them come up with a plate or a design of a beautiful steel product, which we now make here, and we'll use that as our barrier.

So we're trying to do everything possible to get money to our incredible people, but many of those incredible people agree with me and they say, "Make sure you win this battle."  This is a very important battle to win, from the standpoint of safety, number one; defining our country and who we are; also from the standpoint of dollars.  This wall will pay for itself many times during the course of a year.  The money we're talking about is very small compared to the return.  You'll receive a return many times during the course of the year.  That's the kind of numbers we're talking about.

But most importantly, it's about safety; it's about security for our country.  It's about stopping human traffickers.  It's about stopping drugs.  So we have to have it.  Got to have it.  But we have no choice.  It's not a question.  You think I like doing this?  I don't like doing this.  But we have no choice.  We have to have it.

Q   Mr. President, do you relate to the pain of federal workers who can't pay their bills?

THE PRESIDENT:  I can relate.  And I'm sure that the people that are on the receiving end will make adjustment.  They always do.  And they'll make adjustment.  People understand exactly what's going on.  But many of those people that won't be receiving a paycheck, many of those people agree 100 percent with what I'm doing.

And I will tell you, I just saw a poll — 75 percent — it was on Fox.  But I just a saw a poll — 75 percent, that immigration is so important.  And it is.  It's a very big issue.

Q   (Inaudible.)

THE PRESIDENT:  I can't hear you.

Q   If you think you can declare a national emergency, what is the point of having a shutdown?

THE PRESIDENT:  I may declare a national emergency dependent on what's going to happen over the next few days.  We have a meeting.  Vice President Pence and a group will be going to a certain location that you know where that is, and they'll be having another meeting.  I don't expect to have anything happen at that meeting, but I think we'll have — nor does the Vice President.  But I think we're going to have some very serious talks come Monday, Tuesday, Wednesday.

We have to have border security.  If we don't have border security, we're going to be crime-ridden, and it's going get worse and worse.  It was so sad watching the funeral of the slain police officer yesterday — Officer Singh.  That was a very sad thing.  But this is going on in many places.  Over the course of — if you go back to the year 2000, we have thousands of people that have been killed by illegal immigration, by people coming into the country illegally, and killing our citizens.  We can't have it.  We can't have it.

Q   Will federal workers get paid on January 11?

THE PRESIDENT:  We'll see what happens.  We'll see whether or not it's settled.

Q   (Inaudible) Republican senators (inaudible)?

THE PRESIDENT:  I will say this: I have tremendous support within the Republican Party.  If you look at Congress, you saw — with all of the numbers, you saw just a very small group of people voting.  And it wasn't really against; it was a vote to open.  It wasn't against.  Because I think everybody agrees — frankly, the Democrats agree that you need border security.  They agree that you need a barrier.

I put out a quote this morning of Barack Obama; I put out a quote this morning of Hillary Clinton in 2015 — that was a few years ago — strongly saying that you need a border to keep illegals out.  And that's what you have to have.

But it's not just illegals.  It's criminals.  It's drugs.  It's the new phenomena that's been age-old, been going on for thousands of years, but it's never been worse than now because of the Internet.  Human trafficking — where they grab women, put tape over their mouth, come through our border, and sell them.  And they go both ways, in both directions.  Now, they don't go through a port of entry.  They'd be caught.  But they go up where there's no wall.  They make a right; they go to Mexico.

Look, we better get smart.  Human trafficking is a big business.  It's a big deal.  Dealing in children is a big deal.  Children are probably the most harmed by not having the wall or its equivalent.

But if you look at the human trafficking, they come in, they nab women, they grab them, they put tape over their mouth, they ties their hands, and they take them to another country, and they go right over that border.  If we had a powerful wall, or its equivalent, they wouldn't be able to do it because they'd have to go through ports of entry.

Q    Mr. President, how will a compromise look?  How do you envision a compromise (inaudible)?

THE PRESIDENT:  Look, I can say this: Everybody is playing games.  But I can say this: I think that the Democrats want to make a deal.  I really do.  I feel that.

Q    What is the deal?  Will you come down from $5.6 billion?

THE PRESIDENT:  We'll call it something different.  I don't think I have to.  That's for this year.  We'll call it — excuse me.  We'll call it something different.  A lot of work has been done on the wall.  There's been tremendous renovation.  And if you look in San Diego, there's been new wall built, which doesn't get reported.  I don't know why.  You don't want to report it.  But take a look at San Diego and other areas.  We've had new wall built.  But we can do much more if they give us the money to do it.

But a lot of work has already been done.  You know, when they say "build the wall," I don't say that anymore.  I say "finish the wall."  Because we have done a lot of work.  If you know, the billion-six

and a billion-six, for two years, it had language in that really allows you to build a certain amount of wall, but mostly renovate existing wall.  We've renovated a lot of walls, and they've done a very good job.

Q   (Inaudible) DACA?

THE PRESIDENT:  So we'll see what DACA — what happens with DACA.  DACA is, right now, before the United States Supreme Court.  If the Court does what most great legal scholars think they'll do, they won't give President Obama, or President Trump, the power to do what President Obama did.  And if that happens, it will be a great thing for our country.  You know why?  Because we'll work out a deal very fast with the Democrats, on DACA.  We'll work out a deal very quickly with Democrats, on DACA.

Q   Are you waiting for that to happen?

THE PRESIDENT:  We're waiting for the Supreme Court decision.

Q   Will you keep the shutdown going on until the Supreme Court decides?

THE PRESIDENT:  We'll see how long the shutdown goes on.  Look, this shutdown could end tomorrow, and it could also go on for a long time.  It depends — it's really dependent on the Democrats.

Q   What are the chances it could end tomorrow?

THE PRESIDENT:  It's really depending on the Democrats.

Q   What would have to happen for (inaudible).  What are you looking for —

THE PRESIDENT:  Well, we're going to see how we do here.  And everybody knows — all you have to do is read today's Washington Post.  And you see where big surges of people are coming in and trying to get through the border.  Some of that — a lot of that is my fault.  You know why.  Because I've created such a great economy that people are pouring up to try and get jobs.  So you could say it's my fault.  And I want people to come in, but they have to come in legally.  They have to come in

legally. They can't come in the way they're coming in. Because criminals are coming in; human traffickers are coming in; drug dealers are coming in. We can't have it.

Q    (Inaudible) impacts the economy. So the longer the shutdown goes, (inaudible).

THE PRESIDENT: Our economy is doing so well. Nobody understands how well our economy is doing. Our economy is doing so well. And don't forget, I'm paying interest. I didn't have funny money to play with. President Obama had zero interest. I have interest to pay. And now, a lot of people that weren't getting interest in their money for many years — you understand — they're now actually getting interest on their money.

But he was playing with funny money because there was no interest. We're playing with paying interest, like, in all fairness, you're supposed to be doing.

Q    Mr. President, what do you expect out of the China talks on trade this week in Beijing?

THE PRESIDENT: The China talks are going very well. I spoke to President Xi recently. I really believe they want to make a deal. The tariffs have absolutely hurt China very badly. But our country is taking in a lot of money through tariffs. A lot of money. A lot of tariffs; steel-dumping tariffs and others.

But I think China wants to get it resolved. Their economy is not doing well. They're down close to 38 percent. That's a lot. And I think that gives them a great incentive to negotiate. But we're doing very well with China. My relationship with President Xi is as good as any relationship that a President here has had with a president or leader in China. And I think good things are going to happen.

Now, I say this: North Korea, we're doing very well. And again, no rockets. There's no rockets. There's no anything. We're doing very well. I've indirectly spoken to Chairman Kim. And when I came here, this country was headed to war with North Korea. And now we have a very good dialogue going. Very good. We have — with North Korea, we have a very good dialogue. I'm going to not go any further than that. I'm just going to say it's very special.

And anybody else but me, you'd be in war right now. And I can tell you, the previous administration would have been in war right now if that was extended. You would, right now, be in a nice, big, fat

war in Asia with North Korea if I wasn't elected President.

Q   Do you have a place in mind for your next summit with Kim Jong Un?  Do you have a place in mind for the next summit?  Could it be in Europe?

THE PRESIDENT:  We're negotiating a location.  It will be announced probably in the not-too-distant future.  They have made it very clear — in fact, they've actually said to the media that they would like to meet.  And they do want to meet, and we want to meet, and we'll see what happens.

But the sanctions remain in full force, in effect.  And they will until we have some very positive proof.  But I will tell you, we are doing very well with North Korea, and we're also doing very well with China, on trade.

The other one is Iran.  Iran is doing very poorly, once I took the horrible Iran nuclear deal off.  It's had a massive effect in Iran.  They're pulling back troops all over the place.  They're not doing well.  They want to talk.

Q   What about Syria?  How long will the troops stay in Syria?

THE PRESIDENT:  In Syria, we've had a tremendous impact.  When I went there — don't forget, when they went to Syria five years ago, they were supposed to be there for three to four months, and they never came out.  We are pulling back in Syria.  We're going to be removing our troops.  I never said we're doing it that quickly.  But we're decimating ISIS.

When I was elected President two years ago, ISIS was all over Syria and all over Iraq.  We've wiped out ISIS in Iraq.  We've wiped out ISIS.  And we're doing it for two reasons.  We're really doing it because we don't want them coming here, just so we understand.  But we're doing it for a number of reasons.

Now, we're helping other countries when we do that too.  You have to remember, Iran hates ISIS more than we do, if that's possible.  Russia hates ISIS more than we do.  Turkey hates ISIS, maybe not as much as we do.  But these are countries that hate ISIS.  And they can do a little of the fighting in their neighborhood also, because we're fighting them in their neighborhood.

But with that being said, we're pulling out of Syria, but we're doing it and we won't be finally pulled out until ISIS is gone.

Q   How long is the pull-out period?

THE PRESIDENT: It's going quickly.

Q   (Inaudible) agreement with Turkey (inaudible). John Bolton said today the withdrawal (inaudible).

THE PRESIDENT: John Bolton is, right now, over there, as you know. And I have two great stars. And John Bolton is doing a great job, and Mike Pompeo is doing a great job. They're very strong and they work hard. And, as you know, they're doing things that are very — very good. We're coming up with some very good results.

Q   (Inaudible.)

THE PRESIDENT: Well, I'm in no hurry. I have Acting. And my Actings are doing really great. David is doing great at Interior. Mick Mulvaney is doing great as Chief of Staff. But I sort of like Acting. It gives me more flexibility. Do you understand that? I like Acting. So we have a few that are Acting. We have a great, great Cabinet. If you look at my Cabinet, we have a fantastic Cabinet. Really good.

Q   Is Pence doing a good job on the shutdown negotiation?

THE PRESIDENT: I think we're doing a great job in the shutdown negotiation. We have no choice. Look, there will be — there will be —

Q   Do you need to be more involved, sir?

THE PRESIDENT: Excuse me. I'm totally involved, but I'm involved with principals. Because ultimately, it's going to be solved by the principals. Schumer and Nancy Pelosi and myself can solve this in 20 minutes, if they want to. If they don't want to, it's going to go on for a long time.

I will tell you this: If we don't find a solution, it's going to go on for a long time. There's not going to be any bend right here. And the people that voted for Donald Trump, which are a lot of people —

one of the great elections ever — those people are for it so much.  And let me tell you: People that didn't vote for Donald Trump are for it also.  They want border security.  They want to stop human trafficking.  They want to stop drugs.  They want to stop crime.

Q    Have you accepted Speaker Pelosi's invitation to deliver the State of the Union?  (Inaudible) on the 29th?

THE PRESIDENT:  I will be making the State of the Union on January 29th.  And I look forward to it.  I look forward to it.  And I look forward to speaking, really, before the world.  We have a lot of great things to say.  Our country is doing better than any country in the world, right now.  Our military is almost completely rebuilt.  When I took it over, it was a mess.  It was depleted.  Our trade deals are going great.  We have a deal with Mexico, with Canada, with South Korea.  We're negotiating with Europe, the European Union.  We're negotiating with China, which is, by far, the biggest of them all.  We're doing very, very well.  Very, very well.

Q    (Inaudible) Russia — Paul Whelan (inaudible)?

THE PRESIDENT:  Yeah, we're looking into that.  We're looking into that.  Yeah.

Q    Mr. President, what should be done about federal workers who are calling out sick right now?

THE PRESIDENT:  Look, they have to do what they have to do. But many of those workers agree with me.  And I think, frankly, there's been very little of that so far, as you know.  Very, very little.

Okay, any more?  Thank you, everybody.

Q    (Inaudible.)

THE PRESIDENT:  I don't like doing this.  I have no fun doing this.  I was elected to protect our country.  That's what I'm doing.  And Presidents before me have all voted for this, or many of them.  And many of the senators that I'm negotiating with right now have voted for this.

But let me tell you something: They didn't have the guts do it, just like they didn't have the guts to move the embassy to Jerusalem, in Israel.  They didn't have the guts to do things that they should have done.  Just like they didn't take out ISIS.  Just like so many other things.  I was voted 306 to

223 — or something like that — by a lot.  I was voted to be your President, partially because of security.  It's a big part of what I talked about.  Not only the wall; the military and lots of other things.  I think — I think I've done a great job.

Q    (Inaudible.)

THE PRESIDENT:  I think I've done a great job.  I'm getting credit from the real news for doing a great job.  But border security is a big part of that.  We also have to stop drugs.

Q    (Inaudible.)

THE PRESIDENT:  Listen.  We also have to stop drugs.  If we don't stop drugs soon — there has never been a time, over the last 10 years — and it's gotten worse and worse over the last five.  There has never been a time when our country was so infested with so many different drugs coming from so many different locations.  And I believe that President Xi, in China, when he made the pledge to me to criminalize fentanyl, I believe that's going to go a long way to helping us.

I'm going to Camp David.  Thank you.

END            9:44 A.M. EST

# EXHIBIT H

Case 1:16-cv-04756-NGG-VMS Document 310-3 Filed 08/28/20 Page 163 of 231 PageID #: 5437



# PN1095 — Kirstjen Nielsen — Department of Homeland Security

115th Congress (2017-2018)

**Description**

Kirstjen Nielsen, of Virginia, to be Secretary of Homeland Security, vice John F. Kelly, resigned.

**Organization**

Department of Homeland Security

**Latest Action**

12/05/2017 - Confirmed by the Senate by Yea-Nay Vote. 62 - 37. Record Vote Number: 305.

**Date Received from President**

10/16/2017

**Committee**

Senate Homeland Security and Governmental Affairs

Sort by [ Newest to Oldest ▾ ]

| Date | Senate Actions |
| --- | --- |
| 12/05/2017 | Confirmed by the Senate by Yea-Nay Vote. 62 - 37. Record Vote Number: 305. |
| 12/05/2017 | By unanimous consent agreement, vote 12/5/2017. |
| 12/05/2017 | Considered by Senate. |
| 12/04/2017 | By unanimous consent agreement, debate 12/5/2017. |
| 12/04/2017 | Cloture invoked in Senate by Yea-Nay Vote. 59 - 33. Record Vote Number: 304. |
| 12/04/2017 | Considered by Senate. |
| 12/02/2017 | By unanimous consent agreement, debate 12/4/2017. |
| 12/02/2017 | By unanimous consent agreement, mandatory quorum required under Rule XXII waived. |
| 12/02/2017 | Cloture motion presented in Senate. |
| 12/02/2017 | Motion to proceed to executive session to consideration of nomination in Senate by Voice Vote. |
| 11/14/2017 | Placed on Senate Executive Calendar. Calendar No. 495. Subject to nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate. |
| 11/14/2017 | Reported by Senator Johnson, Committee on Homeland Security and Governmental Affairs, without printed report. |
| 11/14/2017 | Committee on Homeland Security and Governmental Affairs. Ordered to be reported favorably. |
| 11/08/2017 | Committee on Homeland Security and Governmental Affairs. Hearings held. Hearings printed: S.Hrg. 115-392. (TXT | PDF) |
| 10/16/2017 | Received in the Senate and referred to the Committee on Homeland Security and Governmental Affairs. |

# EXHIBIT I

 **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC  20548**

# Decision

**Matter of:**  **Department of Homeland Security**—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security

**File:**  B-331650

**Date:**  August 14, 2020

---

## DIGEST

The Federal Vacancies Reform Act of 1998 (Vacancies Reform Act) provides for temporarily filling vacant executive agency positions that require presidential appointment with Senate confirmation.  5 U.S.C. § 3345.  GAO's role under the Vacancies Reform Act is to collect information agencies are required to report to GAO, and GAO uses this information to report to Congress any violations of the time limitations on acting service imposed by the Vacancies Reform Act. 5 U.S.C. § 3349.  As part of this role, we issue decisions on agency compliance with the Vacancies Reform Act when requested by Congress.  The Vacancies Reform Act is generally the exclusive means for filling a vacancy in a presidentially appointed, Senate confirmed position unless another statute provides an exception. 5 U.S.C. § 3347.  The Homeland Security Act of 2002 provides an order of succession outside of the Vacancies Reform Act when a vacancy arises in the position of Secretary of the Department of Homeland Security (DHS). 6 U.S.C. § 113(g).

Upon Secretary Kirstjen Nielsen's resignation on April 10, 2019, the official who assumed the title of Acting Secretary had not been designated in the order of succession to serve upon the Secretary's resignation.  Because the incorrect official assumed the title of Acting Secretary at that time, subsequent amendments to the order of succession made by that official were invalid and officials who assumed their positions under such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to an invalid order of succession.  We have not reviewed the legality of other actions taken by these officials; we are referring the matter to the Inspector General of DHS for review.

**DECISION**

This responds to a request from the Chairman of the Committee on Homeland Security and the Acting Chairwoman of the Committee of Oversight and Reform regarding the legality of the appointment of Chad Wolf as Acting Secretary of the Department of Homeland Security (DHS) and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary.  Letter from Chairman, Committee on Homeland Security, U.S. House of Representatives and Acting Chairwoman, Committee on Oversight and Reform, U.S. House of Representatives to Comptroller General (Nov. 15, 2019).  Specifically, we consider whether the appointments were authorized pursuant to the Secretary's designation of an order of succession under the Homeland Security Act of 2002 (HSA).  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), *as amended by* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000, 2672 (Dec. 23, 2016), *codified at* 6 U.S.C. § 113(g)(2).

As explained below, we conclude that in the case of vacancies in the positions of Secretary, Deputy Secretary, and Undersecretary for Management, HSA provides a means for an official to assume the title of Acting Secretary pursuant to a designation of further order of succession by the Secretary.  However, upon the resignation of Secretary Kirstjen Nielsen, the express terms of the then existing designation required the Director of the Cybersecurity and Infrastructure Security Agency (CISA) to assume that title instead of the Commissioner of Customs and Border Protection (CBP), Kevin McAleenan.  As such, the subsequent appointments of Under Secretary for Strategy, Policy, and Plans, Chad Wolf and Principal Deputy Director of U.S. Citizenship and Immigration Services (USCIS) Ken Cuccinelli were also improper because they relied on an amended designation made by Mr. McAleenan.[1]

Under the Federal Vacancies Reform Act of 1998 (Vacancies Reform Act), GAO collects information agencies are required to report to GAO, and GAO uses this information to report to Congress any violations of the time limitations on acting service imposed by the Vacancies Reform Act.  5 U.S.C. § 3349.  As part of this

---

[1] We have only been asked to address the designation of Messers. Wolf and Cuccinelli, so we do not otherwise address the consequences of any official's improper service.  We are referring that question to the DHS Inspector General for his review.  In that regard, we are aware that certain actions taken by Acting Secretary Wolf and his authority to take them are currently the subject of litigation.  *See, e.g. A.B-B v. Morgan*, Docket No. 1:20-cv-0846 (D.D.C. 2020); *Casa De Maryland v. Wolf*, Docket No. 8:20-cv-02118 (D. Md. 2020); *Don't Shoot Portland v. Wolf*, Docket No. 1:20-cv-02040 (D.D.C. 2020).  We are also aware that in March, 2020, the U.S. District Court for the District of Columbia ruled that Mr. Cuccinelli's separate appointment as acting director of USCIS was illegal.  *See L.M.-M v. Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020).  That question was not before us.

role, we issue decisions on agency compliance with the Vacancies Reform Act when requested by Congress.  Our practice when rendering decisions is to contact the relevant agencies and obtain their legal views on the subject of the request.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 5, 2006), *available at* www.gao.gov/products/GAO-06-1064SP.  We contacted DHS to obtain the agency's views.  Letter from Managing Associate General Counsel, GAO, to General Counsel, DHS (Dec. 6, 2019).  We received DHS's response on December 20, 2019.  Letter from Associate General Counsel for General Law, DHS, to Managing Associate General Counsel, GAO (Dec. 20, 2019) (Response Letter).

BACKGROUND

The Vacancies Reform Act permits certain individuals to serve as acting officials in vacant presidentially appointed, Senate confirmed positions (PAS) for limited periods of time.  5 U.S.C. §§ 3345, 3346.  The Vacancies Reform Act is generally the exclusive means for filling a vacancy in a PAS position unless another statute provides an exception.[2]  Pursuant to the Vacancies Reform Act, the first assistant to a PAS position automatically becomes the acting official in case of a vacancy unless the President designates another individual who meets the Vacancies Reform Act's eligibility requirements.  5 U.S.C. § 3345.

HSA created DHS to prevent terrorist attacks within the United States and reduce the nation's vulnerabilities to such attacks, among other critical missions. Pub. L. No. 107-297, title I, § 101.  At the head of the department, HSA created the position of Secretary of Homeland Security who is vested with all the functions of all officers, employees, and organizational units of DHS.  HSA, Pub. L. No. 107-296, title I, § 102.  HSA also created the position of Deputy Secretary and made the Deputy Secretary the first assistant for purposes of the Vacancies Reform Act. Pub. L. No. 107-297, title I, § 103.

On December 23, 2016, HSA was amended to establish an order of succession outside the Vacancies Reform Act for the position of Secretary.  National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, div. A, title XIX, § 1903, 130 Stat. 2000, 2672 (2016).  Under the amendment, the Under Secretary for Management is next in line to be Acting Secretary in the case of absence, disability, or vacancy in the positions of Secretary and Deputy Secretary.  6 U.S.C. § 113(g)(1).  Beyond this mandated order, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting

---

[2] A statute only qualifies as an exception if the statutory provision expressly authorizes the President or the head of an executive department to designate an official to perform the functions and duties of a specified office temporarily in an acting capacity or it designates an acting official.  5 U.S.C. § 3347(a)(1).

Secretary."[3] 6 U.S.C. § 113(g)(2).  These succession provisions take effect "[n]otwithstanding" the provisions of the Vacancies Reform Act. [4]  6 U.S.C. § 113(g).

On December 5, 2017, Kirstjen Nielsen was confirmed as Secretary of DHS.  On April 10, 2019, Secretary Nielsen resigned from her position.  At this time, the Deputy Secretary position had been vacant since April 14, 2018, and the Under Secretary for Management resigned on April 10, 2019, as well, leaving that position vacant.  GAO, *Federal Executive Vacancy System Database*, *available at* https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act.[5]  Upon the Secretary's resignation, the Commissioner of Customs and Border Protection, Kevin McAleenan, assumed the title of Acting Secretary.

On November 13, 2019, Acting Secretary McAleenan resigned, and the Under Secretary for Strategy, Policy, and Plans, Chad Wolf assumed the title of Acting Secretary.  The same day, Mr. Wolf designated the Principal Deputy Director of USCIS, Kenneth Cuccinelli, as the Senior Official Performing the Duties of Deputy Secretary of Homeland Security (Deputy Secretary).[6]

DISCUSSION

Article II of the U.S. Constitution provides that "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. Const. art. II, § 2.  As noted previously, when there is a vacancy in these presidentially appointed, Senate confirmed (PAS) positions, the Vacancies Reform Act is generally the exclusive means for filling them temporarily with an acting official, unless another statute provides an exception.

---

[3] The amendment did not impose time limitations on an individual serving as Acting Secretary under HSA.

[4] HSA does not establish an order of succession outside the Vacancies Reform Act for the position of Deputy Secretary.  However, HSA establishes the Under Secretary for Management as the first assistant to the Deputy Secretary for purposes of the Vacancies Reform Act.  6 U.S.C. § 113(a)(1)(F).

[5] Under the Vacancies Reform Act, agencies are required to report to GAO certain information regarding vacancies in PAS positions.  5 U.S.C. § 3349(a).  GAO compiles the information from these reports and makes them available to the public through its Executive Vacancy System.

[6] Regarding Mr. Cuccinelli, this decision only addresses his service as the Senior Official Performing the Duties of Deputy Secretary and does not address any other positions which he may also hold.

Here, HSA provides such an exception.  HSA requires the Under Secretary for Management to serve as Acting Secretary if there is a vacancy in the offices of Secretary and Deputy Secretary.  6 U.S.C. § 113.  By providing an initial order of succession for the Secretary and allowing the Secretary to make further designations, HSA qualifies as an exception to the Vacancies Reform Act's exclusivity provision.

At the time the Secretary resigned, the positions specified in HSA were vacant as well, permitting DHS to turn to the Secretary's designation of further officials to serve as Acting Secretary when Secretary Nielsen resigned and the position of Secretary became vacant.  6 U.S.C. § 113(g)(1), (2).  Hence, to determine whether Chad Wolf and Ken Cuccinelli are properly serving, we must examine whether DHS adhered to the order of succession in the Secretary's delegation in force at the time Mr. McAleenan and Mr. Wolf each assumed the title of Acting Secretary.  As explained further below, we conclude DHS did not.

<u>HSA Delegation 00106</u>

In its response to us, DHS stated that Secretary Nielsen had exercised the HSA power to designate an order of succession through Delegation 00106.  *See* Response Letter.  Secretary Nielsen issued this delegation on February 15, 2019 (February Delegation).[7]  In this February Delegation, there were two grounds for assuming the position of Acting Secretary.  The first ground was in the case of the Secretary's death, resignation, or inability to perform the functions of the office.  February Delegation § II.A.  The second ground was if the Secretary was unavailable to act during a disaster or catastrophic emergency.  *Id.* § II.B.

Each ground had its own order of succession.  In cases of the Secretary's death, resignation, or inability to perform the functions of the office, the February Delegation stated the order of succession was governed by Executive Order 13753 (E.O. 13753).  *Id.* § II.A.  E.O. 13753 included an order of succession for officers who would act and perform the duties of the Secretary during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the Office of Secretary.  In cases where the Secretary is unavailable to act during a disaster or catastrophic emergency, Annex A to the February Delegation governed the order of succession.  *Id.* § II.B.  At that time, the orders of succession found in E.O. 13753 and Annex A were the same.  The figure in appendix 1 attached to this decision illustrates the legal framework that could be used to designate an Acting Secretary at the time of the February Delegation.

---

[7] DHS, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.4 (Feb. 15, 2019).

Under E.O. 13753 and Annex A, the first four positions in the order of succession were as follows:  (1) Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of the Federal Emergency Management Agency (FEMA), and (4) Director of CISA.[8]

The February Delegation also listed positions in an order of succession for Deputy Secretary in Annex B.  The first four positions were as follows:  (1) Under Secretary for Management, (2) Administrator of FEMA, (3) Director of CISA, and (4) Under Secretary of Science and Technology. [9]

The February Delegation further stated acting officials in the listed positions are ineligible to serve and, therefore, the order of succession would fall to the next designated official in the approved order of succession.  *Id.* § II.G.

Nielsen's Resignation

According to DHS, on April 9, 2019, the day before her resignation, Secretary Nielsen established a new order of succession.  Delegation 00106 was updated the following day, reflecting the changes (April Delegation).[10]  The April Delegation on its face maintained the two separate grounds for designation.  Vacancies due to the Secretary's death, resignation, or inability to perform the functions of the office were still governed by the order of succession under E.O. 13753, and vacancies due to the Secretary's unavailability to act during a disaster or catastrophic emergency were still governed by Annex A to the Delegation.  April Delegation §§ II.A, II.B.  Secretary Nielsen did however amend the orders of succession for the Secretary and Deputy Secretary in Annexes A and B, respectively.  The figure in appendix 1 attached to this decision illustrates the legal framework that could be used to designate an Acting Secretary at the time of the April Delegation.

---

[8] Both E.O 13753 and Annex A list more positions than those indicated here.  However, they are not relevant for purposes of this decision. Public Law 115-278 renamed the position of Under Secretary for National Protection and Programs to be Director of the Cybersecurity and Infrastructure Security Agency.  Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, § 2(a), 132 Stat. 4168, 4169 (Nov. 16, 2018), *codified at* 6 U.S.C. § 652(a), (b).

[9] The Secretary may provide for an order of succession for the Deputy position under general management authorities granted the Secretary in HSA.  6 U.S.C. § 112.  However, any order of succession for the Deputy position must reflect that the Under Secretary for Management is the first assistant for purposes of the Vacancies Act, in accordance with HSA.  6 U.S.C. § 113(a)(1)(F).

[10] DHS, *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019).

The first four positions in the order of succession for Acting Secretary in revised Annex A (disaster or catastrophic emergency) were as follows:  (1) Deputy Secretary, (2) Under Secretary for Management, (3) Commissioner of CBP, and (4) Administrator of FEMA.  April Delegation Annex A.  The April Delegation removed the CISA director from for the order of succession.  The April Delegation added the Commissioner to be third in the order, making the Administrator fourth in the order.

In amending Annex A, the Secretary effectively established two different orders of succession.  Annex A only applies to the Secretary's unavailability as a result of a disaster or catastrophic emergency.  Because the Secretary did not amend the order of succession established in E.O. 13753 otherwise, the Delegation maintained the order set out therein whenever the position became vacant as a result of the Secretary's death, resignation, or inability to perform the functions of the office: (1) Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of FEMA, and (4) Director of CISA.

Secretary Nielsen also changed the order of succession for Deputy Secretary in Annex B.  The first four positions in the order of succession were changed to be:  (1) Under Secretary for Management, (2) Administrator of the Transportation Security Administration (TSA), (3) Administrator of FEMA, and (4) the Director of CISA.  *Id.* Annex B.

On April 10, Secretary Nielsen and the Under Secretary for Management resigned.  The Deputy Secretary had resigned a year earlier.  In its response to us, DHS stated that it referred to the April Delegation to fill the Acting Secretary position.   *See* Response Letter.  Apparently, DHS mistakenly referred to Annex A, rather than E.O. 13753.  Mr. McAleenan served as the previously confirmed Commissioner of U.S. Customs and Border Protection at the time.  Mr. McAleenan would have been the appropriate official had Secretary Nielsen been unavailable to act during a disaster or catastrophic emergency.  That was not the case here.  Secretary Nielsen resigned.  A Secretary's resignation is addressed in E.O. 13753, not Annex A.

Applying the plain language of the April Delegation, the governing order of succession therefore, should have been that provided under E.O. 13753 and not Annex A.  The April Delegation explicitly stated, "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016." April Delegation § II.A (emphasis added).  Annex A only applied to when the Secretary was unavailable to act during a disaster or catastrophic emergency.  *Id.* § II.B.

The first previously confirmed official in the order of succession in E.O. 13753 was the Director of CISA.[11]  However, instead of following the order of succession in E.O. 13753, DHS applied the one in Annex A.  If DHS had invoked the April Delegation due to the Secretary's unavailability to act during a disaster or catastrophic emergency, then Mr. McAleenan would have been the designated official.  However, here the vacancy was due to Secretary Nielsen's resignation.  Accordingly, under the express terms of Delegation 00106, the incorrect individual assumed the position of Acting Secretary.

In its response to us, DHS stated that Secretary Nielsen used the authority provided by HSA to establish an order of succession with Mr. McAleenan's position—the Commissioner of Customs and Border Protection—as next in the order of succession, after the positions of Deputy Secretary and Under Secretary for Management.  Response Letter.  DHS further stated that the order of succession was not governed by E.O. 13753 because the executive order was superseded when the Secretary established an order of succession pursuant to HSA.  *Id.*

DHS asserted that the direction from the Secretary to change the order of succession applied to any vacancy in the position of the Secretary.  In support, DHS provided a memorandum from the DHS General Counsel to Secretary Nielsen.  Memorandum from General Counsel, DHS, to Secretary of Homeland Security (Apr. 9, 2019) (Memorandum).

The Memorandum included the revised order of succession for Annex A which provides:

> "By the authority vested in me as Secretary of Homeland Security, including [HSA], 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:  Annex A of . . . Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof."

*Id.*  This Memorandum includes additional text from the then-General Counsel summarizing Secretary Nielsen's desire to "designate certain officers of [DHS] in order of succession to serve as Acting Secretary," and that "[b]y approving the attached document, you will designate your desired order of succession for the Secretary . . . in accordance with your authority pursuant to [HSA]."  *Id.*  A discussion section in this memorandum was redacted before DHS provided it to us.

---

[11] The confirmed Director of CISA at the time of Secretary Nielsen's resignation was Christopher Krebs.  GAO, *Federal Executive Vacancy System Database*, *available at* https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act.  The Administrator of FEMA was listed third in the order of succession, but the Administrator resigned on March 3, 2019, before Secretary Nielsen resigned.  *Id.*

Notwithstanding the General Counsel's statement in the Memorandum asserting the Secretary's intentions in amending the April Delegation, the plain language of the delegation controls, and it speaks for itself.  When Secretary Nielsen issued the April Delegation, she only amended Annex A, placing the Commissioner of U.S. Customs and Border Protection as the next position in the order of succession in cases of the Secretary's unavailability to act during a disaster or catastrophic emergency.  April Delegation Annex A.  She did not change the ground for which Annex A would apply.  DHS did not provide evidence of Secretary Nielsen's designation under HSA in the case of her death, resignation, or inability to perform the functions of the office.

We are mindful that the timing of Secretary Nielsen's resignation the next day and the subsequent actions and statements of officials—such as Secretary Nielsen's farewell message to DHS[12]—may suggest that she intended for Mr. McAleenan to become the Acting Secretary upon her resignation.  However, it would be inappropriate, in light of the clear express directive of the April Delegation, to interpret the order of succession based on post-hoc actions.  *See N.L.R.B. v. SW General, Inc*., 137 S. Ct. 929, 941–42 (2017) (providing that when the text is clear, the court need not consider post-enactment practice); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.") (internal citations omitted); *Weinberger v. Rossi*, 456 U.S. 25, 35 (1982) ("Such *post hoc* statements of a congressional Committee are not entitled to much weight.") (internal citations omitted).  The April Delegation was the only existing exercise of the Secretary's authority to designate a successor pursuant to HSA.  As such, Mr. McAleenan was not the designated Acting Secretary because, at the time, the Director of CISA was designated the Acting Secretary under the April Delegation.

McAleenan's Resignation

On November 8, 2019, shortly before he resigned, Mr. McAleenan revised the Delegation (November Delegation).[13]  The November Delegation maintained the two grounds for serving, but substituted Annex A for E.O. 13753 as governing the order of succession in cases of the Secretary's death, resignation, or inability to perform the functions of the office.  November Delegation §§ II.A, II.B.  This change meant Annex A governed both grounds for assuming the title of Acting Secretary, including the Secretary's inability to act during a disaster or catastrophic emergency.  The figure in the appendix illustrates the legal framework that could be used to designate an Acting Secretary at the time of the November Delegation.

---

[12] Press Release, DHS, *Farewell Message from Secretary Kirstjen M. Nielsen* (Apr. 10, 2019), *available at* https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen.

[13] DHS, *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.6 (Nov. 8, 2019).

Mr. McAleenan also changed the officials listed in the order of succession found in Annex A as follows:  (1) Deputy Secretary, (2) Under Secretary for Management, (3) Commissioner of CBP; and (4) Under Secretary for Strategy, Policy, and Plans.  *Id.* Annex A.  As a consequence, the revision removed the FEMA Administrator and CISA Director from the order of succession, replacing them with the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans respectively.

On November 13, Mr. McAleenan resigned as both Acting Secretary and Commissioner of U.S. Customs and Border Protection.  In its response to us, DHS stated Mr. Wolf became the Acting Secretary pursuant to the November Delegation. Response Letter.  At this time, the positions of Secretary, Deputy Secretary, Under Secretary for Management, and Commissioner of CBP were all vacant.  Mr. Wolf was serving as the previously confirmed Under Secretary for Strategy, Policy, and Plans at the time he assumed the title of Acting Secretary.  DHS told us this was the first position that was filled with a previously confirmed official in the order of succession.  *Id.*  Mr. Wolf currently serves as the Acting Secretary.

On November 13, 2019, Mr. Wolf amended the order of succession for Deputy Secretary in Annex B, as follows:  (1) Under Secretary for Management, (2) Principal Deputy Director of USCIS, (3) Administrator of TSA, and (4) Administrator of FEMA. *Id.*; November Delegation Annex B.  The revision removed the CISA Director from the order of succession, installed the Principal Deputy Director of USCIS next in the order, and shifted TSA and FEMA to third and fourth.  Subsequently, Mr. Cuccinelli assumed the title of the Senior Official Performing the Duties of Deputy Secretary, as he was the Principal Deputy Director of USCIS.  Mr. Cuccinelli currently serves as the Senior Official Performing the Duties of Deputy Secretary.

Under HSA, the Secretary, or properly serving Acting Secretary, has the authority to designate the order of succession for Acting Secretary.  6 U.S.C. § 113(g)(2). Based on the analysis above, Mr. McAleenan was not the proper Acting Secretary which means he did not have the authority to amend the April Delegation.  When Mr. McAleenan issued the November Delegation, he did so without the proper authority. *See generally Utility Air Regulatory Group v. EPA,* 573 U.S. 302 (2014) (holding agency actions exceeding statutory authority are invalid).  Because Mr. Wolf draws his authority to serve as Acting Secretary from the November Delegation, Mr. Wolf cannot, therefore, rely upon it to serve as the Acting Secretary.

Mr. Wolf altered the order of succession for Deputy Secretary in the November Delegation to permit Mr. Cuccinelli to serve as the Senior Official Performing the Duties of Deputy Secretary.[14]  According to DHS, Mr. Wolf did this under his

---

[14] Because the Vacancies Reform Act governs the Deputy Secretary, the 210-day limitation on acting service had already passed.  This means the position had to remain vacant and no one could serve as Acting Deputy Secretary.  However, under the Vacancies Reform Act, the department could designate an official to perform the

authority as Acting Secretary.  Response Letter.  As discussed previously, Mr. McAleenan did not have the authority to alter the order of succession; therefore, Mr. Wolf also does not have the authority to alter it as well.    The last valid order of succession to serve in that capacity was Annex B to the April Delegation, which did not include Mr. Cuccinelli's position.

CONCLUSION

In the case of vacancy in the positions of Secretary, Deputy Secretary, and Under Secretary for Management, the HSA provides a means for an official to assume the title of Acting Secretary pursuant to a designation of further order of succession by the Secretary.  Mr. McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen, but the express terms of the existing designation required another official to assume that title.  As such, Mr. McAleenan did not have the authority to amend the Secretary's existing designation.  Accordingly, Messrs. Wolf and Cuccinelli were named to their respective positions of Acting Secretary and Senior Official Performing the Duties of Deputy Secretary by reference to an invalid order of succession.

In this decision we do not review the consequences of Mr. McAleenan's service as Acting Secretary, other than the consequences of the November delegation, nor do we review the consequences of Messers. Wolf and Cuccinelli service as Acting Secretary and Senior Official Performing the Duties of Deputy Secretary respectively. We are referring the question as to who should be serving as the Acting Secretary and the Senior Official Performing the Duties of Deputy Secretary to the DHS Office of Inspector General for its review. We also refer to the Inspector General the question of consequences of actions taken by these officials, including consideration of whether actions taken by these officials may be ratified by the Acting Secretary and Senior Official Performing the Duties of Deputy Secretary as designated in the April Delegation.

Thomas H. Armstrong
General Counsel

---

duties of the Deputy Secretary so long as the official does not perform any non-delegable duties of the position.  DHS indicated to us that, to the department's knowledge, no one performed any of the position's non-delegable duties.  Response Letter.

Appendix 1: Figure Illustrating the Legal Framework for Designating an Acting Secretary of Homeland Security, Calendar Year 2019



Source: GAO analysis of DHS documents.   |   B-331650.

[a] The Federal Vacancies Reform Act of 1998 (Vacancies Reform Act) is the default framework to designate acting officials for presidentially appointed, Senate confirmed positions.  5 U.S.C. §§ 3345–3349d.

[b] The Homeland Security Act of 2002, as amended, (HSA) provides an order of succession outside of the Vacancies Reform Act when a vacancy arises in the position of Secretary of Homeland Security (Secretary).  6 U.S.C. § 113(g).  This includes authority for the Secretary to designate officers to serve as Acting Secretary, which the Secretary implemented through DHS Delegation 00106 and its various revisions.

[c] The President issued Executive Order 13753 providing an order of succession to serve as Acting Secretary under the Vacancies Reform Act.  Exec. Order 13753, *Amending the Order of Succession in the Department of Homeland Security*, 81 Fed. Reg. 90,667 (Dec. 9, 2016).

**EXHIBIT J**

TLP:WHITE



# ABOUT CISA

CISA is the Nation's risk advisor, working with partners to defend against today's threats and collaborating to build more secure and resilient infrastructure for the future.

# Quick Links

**Cybersecurity**
**Emergency Communications**
**Contact Us**
**Infrastructure Security**
**CISA Office of the Chief Economist**
**Subscribe**
**Leadership**
**National Risk Management Center**
**CISA Training**
**CISA Office of Privacy**
**CISA Regional Offices**
**Reporting Employee and Contractor Misconduct**
**Critical Infrastructure Partnership Advisory Council**
**CISA Events**
**CISA Careers**

TLP:WHITE

TLP:WHITE

CISA builds the national capacity to defend against cyber attacks and works with the federal government to provide cybersecurity tools, incident response services and assessment capabilities to safeguard the '.gov' networks that support the essential operations of partner departments and agencies.

We coordinate security and resilience efforts using trusted partnerships across the private and public sectors, and deliver technical assistance and assessments to federal stakeholders as well as to infrastructure owners and operators nationwide.

CISA enhances public safety interoperable communications at all levels of government to help partners across the country develop their emergency communications capabilities.

Working with stakeholders across the country, CISA conducts extensive, nationwide outreach to support and promote the ability of emergency response providers and relevant government officials to continue to communicate in the event of a natural disaster, act of terrorism, or other man-made disaster.

The National Risk Management Center (NRMC) is housed within the Cybersecurity and Infrastructure Security Agency (CISA). NRMC is a planning, analysis, and collaboration center working to identify and address the most significant risks to our nation's critical infrastructure.

NRMC works in close coordination with the private sector and other key stakeholders in the critical infrastructure community to: Identify; Analyze; Prioritize; and Manage the most strategic risks to our National Critical Functions—the functions of government and the private sector so vital to the United States that their disruption, corruption, or dysfunction would have a debilitating impact on security, national economic security, national public health or safety, or any combination.

# Leadership

For additional information on CISA's structure, please visit our leadership page or view our organizational structure.

### Director, Cybersecurity and Infrastructure Security Agency (CISA), Christopher C. Krebs

Christopher Krebs serves as the first Director of the Cybersecurity and Infrastructure Security Agency (CISA). Mr. Krebs was originally sworn in on June 15, 2018 as the Under Secretary for the predecessor of CISA, the National Protection and Programs Directorate (NPPD). Mr. Krebs was nominated for that position by the President of the United States in February 2018. As Director, Mr. Krebs oversees CISA's efforts to defend civilian networks, secure federal facilities, manage systemic risk to National Critical Functions, and work with stakeholders to raise the security baseline of the Nation's cyber and physical infrastructure.

### Deputy Director, Matthew Travis

TLP:WHITE

# EXHIBIT K



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

Mr. President,

I hereby resign from the position of Secretary of the U.S. Department of Homeland Security (DHS), effective April 7th 2019. It has been my great honor to lead the men and women of the Department as its sixth Secretary. I could not be prouder of and more humbled by their service, dedication, and commitment to keep our country safe from all threats and hazards. I join all Americans in thanking them for their sacrifices and those of their families.

For more than two years of service beginning during the Presidential Transition, I have worked tirelessly to advance the goals and missions of the Department. I am immensely proud of our successes in transforming DHS to keep pace with our enemies and adversaries — whether it is in cyberspace or against emerging threats from new technologies.

Despite our progress in reforming homeland security for a new age, I have determined that it is the right time for me to step aside. I hope that the next Secretary will have the support of Congress and the courts in fixing the laws which have impeded our ability to fully secure America's borders and which have contributed to discord in our nation's discourse. Our country - and the men and women of DHS - deserve to have all the tools and resources they need to execute the mission entrusted to them.

I can say with confidence our homeland is safer today than when I joined the Administration. We have taken unprecedented action to protect Americans. We have implemented historic efforts to defend our borders, combat illegal immigration, obstruct

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

the inflow of drugs, and uphold our laws and values. We have responded decisively to record-breaking natural disasters and helped Americans rebuild. We have prevented the disruption of U.S. elections and guarded against foreign interference in our democracy. We have replaced complacency with consequences in cyberspace, we are holding digital intruders accountable, and we are stepping up our protection of American networks. We have thwarted terrorist plotting against our homeland and launched new efforts to block terrorists and criminals from reaching our shores. And we have ramped up security measures to make it harder for our enemies and adversaries to attack us, whether it is with drones, chemical and biological weapons, or through other means.

Thank you again for the privilege to serve the American people and to lead the outstanding men and women of the Department of Homeland Security. Supporting these patriots has been the honor of a lifetime.

Sincerely,

Kirstjen M. Nielsen
Secretary of Homeland Security

# EXHIBIT L



**Donald J. Trump** ✔
@realDonaldTrump

....I am pleased to announce that Kevin McAleenan, the current U.S. Customs and Border Protection Commissioner, will become Acting Secretary for @DHSgov. I have confidence that Kevin will do a great job!

6:02 PM · Apr 7, 2019 · Twitter for iPhone

# EXHIBIT M



**Secretary Kirstjen M. Nielsen** ✔
@SecNielsen

⌄

I have agreed to stay on as Secretary through Wednesday, April 10th to assist with an orderly transition and ensure that key DHS missions are not impacted.

10:36 PM · Apr 7, 2019 · Twitter Web Client

# EXHIBIT N



Official website of the Department of Homeland Security

**U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Claire M. Grady

Claire M. Grady became the Under Secretary for Management (USM) on August 8, 2017. In this role, she was the third-in-command of the Department and oversaw a budget of $60 billion and a workforce of 240,000 dedicated homeland security professionals.



As USM, Ms. Grady was responsible for the Department's management and administration, with a focus on integrating and unifying the third largest department in the Federal Government. She oversaw all aspects of the Department's management programs in support of homeland security operations, including financial management, human capital, information technology, procurement, security, and asset management.

Ms. Grady has also served as the Senior Official Performing the Duties of the Deputy Secretary. She has more than 20 years of experience in acquisition, previously serving as the Director of Defense Procurement and Acquisition Policy for the Department of Defense (DOD). Prior to joining DOD, she served in several positions within DHS.

From 2013 to 2015, she served as the United States Coast Guard (USCG) Deputy Assistant Commandant for Acquisition, and Director of Acquisition Services. She also served as USCG's Head of Contracting Activity from 2007-2013, where she led the development and implementation of procurement policy and operations supporting the diverse portfolio of USCG. In addition, Ms. Grady previously served as the Director of Strategic Initiatives in the Management Directorate's Office of the Chief Procurement Officer. There she provided strategic direction impacting DHS's multibillion-dollar contracting and financial assistance

Case 1:16-cv-04756-NGG-VMS   Document 210-3   Filed 08/28/20   Page 189 of 231 PageID #: 5463

programs through a broad portfolio of initiatives, including contracting policy, grants policy and oversight, strategic sourcing, competitive sourcing, and acquisition systems.

In 2010, Ms. Grady was recognized with the Presidential Rank Award of meritorious executive.

She received a Bachelor of Arts from Trinity University, a Master of Business Administration from the University of Maryland, and a Master of Science in national resource strategy from National Defense University's Industrial College of the Armed Forces.

Last Published Date: August 8, 2017

# EXHIBIT O



Official website of the Department of Homeland Security

U.S. Department of
Homeland Security

# Message from Secretary Kirstjen M. Nielsen on Acting Deputy Secretary Claire Grady

**Release Date:** April 9, 2019

Today, Claire M. Grady, Acting Deputy Secretary offered the President her resignation effective tomorrow. For the last two years, Claire has served this Department with excellence and distinction. She has been an invaluable asset to DHS – a steady force and a knowledgeable voice.

In addition to serving as the Department's Deputy for the last year, she served as the Under Secretary for Management overseeing all aspects of the Department's management programs, including financial, human capital, information technology, procurement, physical security and asset management. Claire has led the men and women of DHS who support our operational personnel by providing the overarching business management structure for the Department, while eliminating redundancies and reducing costs. Her sound leadership and effective oversight have impacted every DHS office and employee and made us stronger as a Department.

Clair has led a remarkable career in public service – 28 years at the Departments of Homeland Security and Defense – that is coming to a close.  I am thankful for Claire's expertise, dedication and friendship and am filled with gratitude for her exemplary service to DHS and to our country. I wish her all the best in her future endeavors.

Warmest regards,


Kirstjen M. Nielsen
Secretary of Homeland Security

*With honor and integrity, we will safeguard the American people, our homeland, and our values.*

Topics:  <u>Secretary of Homeland Security</u> <u>(/topics/secretary-homeland-security)</u>

Keywords:  <u>Deputy Secretary</u> <u>(/keywords/deputy-secretary)</u> , <u>Leadership</u> <u>(/keywords/leadership)</u>

Last Published Date: April 10, 2019

# EXHIBIT P

Case 1:16-cv-04756-NGG-VMS Document 110-3 Filed 08/28/20 Page 194 of 231 PageID #: 5468


Official website of the Department of Homeland Security

U.S. Department of
Homeland Security

# Message from Acting Secretary Kevin K. McAleenan

**Release Date:** April 10, 2019

As I assume the role of Acting Secretary of Homeland Security, I look forward to working to support the men and women of the Department of Homeland Security (DHS) as they carry out the critical missions that keep our country safe. I'd also like to extend my sincere thanks to Secretary Kirstjen Nielsen for her service to the country as the sixth Secretary of Homeland Security, and for her tireless work on behalf of the people and organizations of DHS. She deserves our enduring respect and appreciation for her leadership, and I'm personally grateful for it.

In many roles in my career at U.S. Customs and Border Protection, I've had the opportunity to work with virtually every component of DHS, and have witnessed the extraordinary commitment and steadfast resolve of the men and women across this Department. While we face many challenges, including a growing crisis on our southern border, I know that, working together, we can overcome them. I've also learned that the true strength of DHS is our people, and during my time as Acting Secretary, I pledge to be an aggressive advocate for you.

I look forward to working alongside you to accomplish the vast mission of securing our homeland with honor, integrity and vigilance. Let's power on. The American people are counting on us.

Kevin K. McAleenan
Acting Secretary of Homeland Security

*With honor and integrity, we will safeguard the American people, our homeland, and our values.*

Topics: Homeland Security Enterprise (/topics/homeland-security-enterprise) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 195 of 231 PageID #: 5469

Keywords: <u>Acting Secretary Kevin K. McAleenan</u> <u>(/keywords/acting-secretary-kevin-k-mcaleenan)</u> , <u>Leadership</u>

<u>(/keywords/leadership)</u>

Last Published Date: April 10, 2019

# EXHIBIT Q

 **Donald J. Trump** ✔
@realDonaldTrump

⌄

I am pleased to inform the American Public that Acting Secretary Chad Wolf will be nominated to be the Secretary of Homeland Security. Chad has done an outstanding job and we greatly appreciate his service!

12:30 PM · Aug 25, 2020 · Twitter for iPhone

# EXHIBIT R

**Department of Homeland Security**
**DHS Delegation Number: 00106**
**Revision Number: 08.5**
**Issue Date: 12/15/2016**
**Updated Date: 04/10/2019**

# DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS

## I.     Purpose

This is a succession order for named positions and a delegation of authority for the continuity of essential functions of officials at the Department of Homeland Security (DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic emergencies, or vacancies in offices.

## II.     Succession Order/Delegation

A.      In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016.

B.      I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency.

C.      The order of succession for the named positions, other than the Office of the Secretary, are provided in Annexes B through AC.

D.      I hereby delegate authority to the officials occupying the identified positions in the orders listed in Annexes B through AC to exercise the powers and perform the functions and duties of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency until that condition ceases.

E.      In terms of named positions in which appointment is required to be made by the President, by and with the advice and consent of the Senate (PAS), if positions are vacant as that term is used in the Federal Vacancies Reform Act of 1998, the First Assistant shall act as the incumbent until a successor is appointed, unless otherwise designated by the President.  The individual serving in the position identified as the first to succeed is designated the "First Assistant" for the purposes of the Federal Vacancies Reform Act of 1998.  If the First Assistant position is vacant, the next designated official in the order of succession may exercise all the powers, duties, authorities, rights, and functions authorized by law to be exercised by the incumbent, but may not perform any function or duty required by law to be performed exclusively by the office holder.

F.      For all other positions that are not subject to the Federal Vacancies Reform Act of 1998, any official in the order provided for in the succession order may exercise all the powers, duties, authorities, rights, and functions authorized to be performed by the incumbent, to the extent not otherwise limited by law.

G.      Only officials specifically designated in the order of succession for each of the named positions in Annexes B through AC are eligible, subject to modification in accordance with Section II.I.  Unless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession.

H.      The prohibition on any re-delegation of powers, authorities, functions, and duties contained in Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents is not applicable to restrict the authority of any individual who is exercising the authority of a vacant position under this Delegation.  Such an individual shall, however, be bound by such Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents, and shall not further re-delegate powers to any individual.

I.      Each Annex may be updated separately.  A Component Head seeks modification of his/her order of succession by forwarding a proposed updated Annex to the Office of Operations Coordination (OPS), Continuity Division and the Office of the Under Secretary for Management (MGMT), Program Manager, Delegations and Directives; Annexes are processed by MGMT, in consultation with the Office of the General Counsel (OGC), for approval of the Secretary.  At a minimum, the Annex is coordinated with OGC and the White House Liaison.  Where possible, Component orders of succession should be at least three positions deep and geographically dispersed.

J.      The Office of the Executive Secretary, MGMT, and OPS are responsible for maintaining a current list of incumbents holding all positions identified in Annexes B through AC.

2

Delegation # 00106
Revision # 08.5

K.      Nothing in this delegation is intended to limit my discretion as Secretary to depart from this delegation.

# III.   Authorities

A.      Title 5, United States Code (U.S.C.) §§ 3345-49 (Federal Vacancies Reform Act of 1998, as amended)

B.      Title 6, U.S.C., § 112 (Secretary; functions)

# IV.   Office of Primary Interest

OPS and MGMT is the office of primary interest for maintaining and updating the Annexes to this Delegation.

_____
Jeh Charles Johnson
Secretary of Homeland Security

Dec 15 2016
Date

**Legend**

| | |
|---|---|
| Career | C |
| Limited Term Appointment | L |
| Military Officer | M |
| Non-Career in the Senior Executive Service or Schedule C | N |
| Presidential Appointee | P |
| Presidential Appointee with Senate Confirmation | S |
| Scientific Professional | T |
| First Assistant pursuant to the Federal Vacancies Reform Act | * |

3

Delegation # 00106
Revision # 08.5

ATTACHMENT 1

# DHS ORDERS OF SUCCESSION AND ORDERS FOR DELEGATIONS OF AUTHORITIES

| Annex | Title | Issue Date |
|---|---|---|
| Annex A | Order For Delegation of Authority by the Secretary of the Department of Homeland Security | Revision 08.5, 04/10/2019 |
| Annex B | Deputy Secretary, Office of the | Revision 08.5, 04/10/2019 |
| Annex C | Citizenship and Immigration Service Ombudsman | Revision 06, 09/14/2016 |
| Annex D | Citizenship and Immigration Services, United States | Revision 06, 09/14/2016 |
| Annex E | Civil Rights and Civil Liberties, Office for | Revision 06, 09/14/2016 |
| Annex F | Coast Guard, United States | Revision 06, 09/14/2016 |
| Annex G | Countering Weapons of Mass Destruction Office | Revision 08.2, 05/21/2018 |
| Annex H | Customs and Border Protection, United States | Revision 06, 09/14/2016 |
| Annex I | Executive Secretariat | Revision 06, 09/14/2016 |
| Annex J | Federal Emergency Management Agency | Revision 06, 09/14/2016 |
| Annex K | Federal Law Enforcement Training Center | Revision 06, 09/14/2016 |
| Annex L | General Counsel, Office of the | Revision 06, 09/14/2016 |
| Annex M | Immigration and Customs Enforcement, United States | Revision 06, 09/14/2016 |
| Annex N | Inspector General, Office of | Revision 06, 09/14/2016 |
| Annex O | Intelligence and Analysis, Office of | Revision 06, 09/14/2016 |
| Annex P | Legislative Affairs, Office of | Revision 06, 09/14/2016 |
| Annex Q | Management Directorate | Revision 06, 09/14/2016 |
| Annex R | National Protection and Programs Directorate | Revision 08, 07/11/2017 |
| Annex S | Operations Coordination, Office of | Revision 06, 09/14/2016 |
| Annex T | Partnership and Engagement, Office of | Revision 06, 09/14/2016 |
| Annex U | Strategy, Policy, and Plans, Office of | Revision 08.4, 02/15/2019 |
| Annex V | Privacy Office, Chief | Revision 06, 09/14/2016 |
| Annex W | Public Affairs, Office of | Revision 06, 09/14/2016 |
| Annex X | Science and Technology | Revision 07, 01/19/2017 |
| Annex Y | Secret Service, United States | Revision 06, 09/14/2016 |
| Annex Z | Transportation Security Administration | Revision 08.3, 10/23/2018 |
| Annex AA | Chief Financial Officer (DHS) | Revision 06, 09/14/2016 |
| Annex AB | Deputy Administrator, Federal Emergency Management Agency (FEMA) | Revision 06, 09/14/2016 |
| Annex AC | Protection and National Preparedness (FEMA) | Revision 06, 09/14/2016 |

Delegation # 00106
Revision # 08.5

ANNEX A

# ORDER FOR DELEGATION OF AUTHORITY BY THE SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY

*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security
2. Under Secretary for Management
3. Commissioner of U.S. Customs and Border Protection
4. Administrator of the Federal Emergency Management Agency
5. Director of the Cybersecurity and Infrastructure Security Agency
6. Under Secretary for Science and Technology
7. Under Secretary for Intelligence and Analysis
8. Administrator of the Transportation Security Administration
9. Director of U.S. Immigration and Customs Enforcement
10. Director of U.S. Citizenship and Immigration Services
11. Under Secretary for Strategy, Policy, and Plans
12. General Counsel
13. Deputy Under Secretary for Management
14. Deputy Commissioner of U.S. Customs and Border Protection
15. Deputy Administrator of the Transportation Security Administration
16. Deputy Director of U.S. Immigration and Customs Enforcement
17. Deputy Director of U.S. Citizenship and Immigration Services
18. Director of the Federal Law Enforcement Training Centers

Delegation # 00106
Revision # 08.5

ANNEX B
ISSUE DATE: 04/10/2019        APPROVAL: 04/10/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Deputy Secretary, Office of the** | |
| 1    Deputy Secretary | S |
| 2    Under Secretary for Management* | S |
| 3    Administrator, Transportation Security Administration | S |
| 4    Administrator, Federal Emergency Management Agency | S |
| 5    Under Secretary, National Programs and Protection Directorate | S |
| 6    Under Secretary, Science and Technology | S |
| 7    Under Secretary, Intelligence and Analysis | S |
| 8    Commissioner, U.S. Customs and Border Protection | S |
| 9    Director, U.S. Immigration and Customs Enforcement | S |
| 10   Director, U.S. Citizenship and Immigration Services | S |
| 11   Under Secretary, Office of Strategy, Policy, and Plans | S |
| 12   General Counsel | S |
| 13   Deputy Under Secretary for Management | C |
| 14   Deputy Commissioner, U.S. Customs and Border Protection | C |
| 15   Deputy Administrator, Transportation Security Administration | C |
| 16   Deputy Director, U.S. Immigration and Customs Enforcement | C |
| 17   Deputy Director, U.S. Citizenship and Immigration Services | C |
| 18   Director, Federal Law Enforcement Training Centers | C |

Delegation # 00106
Revision # 08.5

ANNEX C
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Citizenship and Immigration Services Ombudsman** | |
| 1  Ombudsman | N |
| 2  Deputy Director | C |
| 3  Senior Advisor | L |
| 4  Chief of Staff | C |
| 5  Director of Operations | C |
| 6  Chief of Casework | C |

C-1

ANNEX D
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Citizenship and Immigration Services, United States | |
|---|---|
| 1 | Director | S |
| 2 | Deputy Director* | C |
| 3 | Associate Director, Management Directorate | C |
| 4 | Associate Director, Refugee Asylum and International Operations Directorate | C |
| 5 | Associate Director, Service Center Operations Directorate | C |
| 6 | Associate Director, Field Operations Directorate | C |
| 7 | Director, National Benefits Center | C |

D-1

ANNEX E
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                Career Status

| Civil Rights and Civil Liberties, Office for | |
|---|---|
| 1 | Civil Rights and Civil Liberties Officer | P |
| 2 | Deputy Officer, Programs and Compliance | C |
| 3 | Deputy Officer, Equal Employment Opportunity Programs | C |
| 4 | Executive Officer | C |

E-1

ANNEX F
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                      Career Status

| | Coast Guard, United States | |
|---|---|---|
| 1 | Commandant | M |
| 2 | Vice Commandant | M |
| 3-4 | Deputy Commandant for Mission Support or Deputy Commandant for Operations in precedence of their grade | M |
| 5-6 | Other Vice Admirals in precedence of their grade | M |

F-1

ANNEX G
ISSUE DATE: 05/21/2018          APPROVAL: 05/21/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                        Career Status

| Countering Weapons of Mass Destruction Office | |
|---|---|
| 1   Assistant Secretary | P |
| 2   Deputy Assistant Secretary | C |
| 3   Chief of Staff | C |
| 4   Deputy Director, Domestic Nuclear Detection Office | C |
| 5   Deputy Director, Office of Health Affairs | C |

G-1

Delegation # 00106
Revision # 08.2

ANNEX H
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                        Career Status

| Customs and Border Protection, United States | |
|---|---|
| 1 | Commissioner | S |
| 2 | Deputy Commissioner* | C |
| 3 | Executive Assistant Commissioner, Office of Field Operations | C |
| 4 | Chief, U.S. Border Patrol | C |
| 5 | Executive Assistant Commissioner, Air and Marine Operations | C |
| 6 | Executive Assistant Commissioner, Trade | C |
| 7 | Executive Assistant Commissioner, Operations Support | C |
| 8 | Executive Assistant Commissioner, Enterprise Services | C |

H-1

Delegation # 00106
Revision # 06

ANNEX I
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                        Career Status

| Executive Secretariat | |
|---|---|
| 1   Executive Secretary | N |
| 2   Deputy Executive Secretary | C |
| 3   Assistant Executive Secretary, Briefing Books/Interagency Coordination | C |

I-1

ANNEX J
ISSUE DATE: 9/14/2016            APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| Federal Emergency Management Agency | | |
|---|---|---|
| 1 | Administrator | S |
| 2 | Deputy Administrator* | S |
| 3 | Deputy Administrator, Protection and National Preparedness | S |
| 4 | Associate Administrator, Response and Recovery | N |
| 5 | FEMA Region IX Administrator | C |
| 6 | FEMA Region VI Administrator | C |

J-1

Delegation # 00106
Revision # 06

ANNEX K
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                    Career Status

| **Federal Law Enforcement Training Centers** | | |
|---|---|---|
| 1 | Director | C |
| 2 | Deputy Director for Training | C |
| 3 | Deputy Director for Management | C |
| 4 | Assistant Director, Mission and Readiness Support | C |
| 5 | Assistant Director, Regional and International Training | C |
| 6 | Assistant Director, Chief Financial Officer | C |
| 7 | Assistant Director, Glynco Training | C |
| 8 | Assistant Director, Centralized Training Management | C |
| 8 | Assistant Director, Washington Operations | C |
| 9 | Assistant Director, Chief Information Officer | C |
| 10 | Chief of Staff | C |

K-1

ANNEX L
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **General Counsel, Office of the** | | |
| 1 | General Counsel | S |
| 2 | Principal Deputy General Counsel* | C |
| 3 | Deputy General Counsel    [Senior ranking by time in position and in DHS][1] | N |
| 4 | Deputy General Counsel    [Senior ranking by time in position and in DHS] | N |
| 5 | Deputy General Counsel    [Senior ranking by time in position and in DHS] | N |
| 6 | Chief of Staff | C |
| 7 | Associate General Counsel, Operations and Enforcement | C |
| 8 | Associate General Counsel, General Law | C |
| 9 | Chief Counsel, Transportation Security Administration | C |
| 10 | Chief Counsel, Federal Law Enforcement Training Center | C |

---

[1] For the Deputy General Counsel positions identified in lines 3-5, seniority is determined by length of time in the position.  In the event more than one Deputy General Counsel has the same appointment date, time in service in the Department is the second determining factor for seniority.

L-1

Delegation # 00106
Revision # 06

ANNEX M
ISSUE DATE: 9/14/2016            APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Immigration and Customs Enforcement, United States | |
|---|---|
| 1 | Assistant Secretary | S |
| 2 | Deputy Director* | C |
| 3 | Executive Associate Director,  Homeland Security Investigations | C |
| 4 | Executive Associate Director, Enforcement and Removal Operations | C |
| 5 | Executive Associate Director, Management and Administration | C |
| 6 | Principal Legal Advisor | N |
| 7 | Special Agent in Charge – Denver | C |
| 8 | Field Officer Director – San Antonio | C |

Delegation # 00106
Revision # 06

ANNEX N
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| | Inspector General, Office of | |
|---|---|---|
| 1 | Inspector General | S |
| 2 | Deputy Inspector General* | C |
| 3 | Counsel to the Inspector General | C |
| 4 | Assistant Inspector General, Audits | C |
| 5 | Assistant Inspector General, Inspections | C |
| 6 | Assistant Inspector General, Emergency Management Oversight | C |

N-1

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 217 of 231 PageID #:
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 21 of 71
5491

ANNEX O
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                             Career Status

| | Intelligence and Analysis, Office of | |
|---|---|---|
| 1 | Under Secretary for Intelligence and Analysis/DHS Chief Intelligence Officer | S |
| 2 | Principal Deputy Under Secretary for Intelligence and Analysis* | C |
| 3 | Deputy Under Secretary for Intelligence Operations | C |
| 4 | Deputy Under Secretary for Mission Support | C |
| 5 | Associate Deputy Director, El Paso Intelligence Center/ Strategic Analysis Section | C |

ANNEX P
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Legislative Affairs, Office of** | |
| 1    Assistant Secretary for Legislative Affairs | P |
| 2    Deputy Assistant Secretary (Senate) | N |
| 3    Deputy Assistant Secretary (House) | N |
| 4    Chief of Staff | C |
| 5    Director, Management Team | C |
| 6    Director, FEMA Team | C |
| 7    Director, Borders and Immigration | C |

P-1

ANNEX Q
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Management Directorate** | | |
| 1 | Under Secretary for Management | S |
| 2 | Deputy Under Secretary for Management* | C |
| 3 | Chief Financial Officer | S |
| 4 | Chief Information Officer | P |
| 5 | Chief Human Capital Officer | C |
| 6 | Chief Procurement Officer | C |
| 7 | Chief Readiness Support Officer | C |
| 8 | Chief Security Officer | C |
| 9 | Chief of Staff | C |
| 10 | Deputy Director, Federal Law Enforcement Training Center | C |

Q-1

ANNEX R
ISSUE DATE: 07/11/2017          APPROVAL: 07/11/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **National Protection and Programs Directorate** | | |
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary for NPPD* | N |
| 3 | Assistant Secretary, Office of Infrastructure Protection | P |
| 4 | Assistant Secretary, Office of Cybersecurity and Communications | N |
| 5 | Deputy Assistant Secretary, Office of Infrastructure Protection | C |
| 6 | Deputy Assistant Secretary, Office of Cybersecurity and Communications | C |
| 7 | Director, Management | C |
| 8 | Office of Infrastructure Protection, Regional Director for Region 8 | C |

Delegation # 00106
Revision # 08

ANNEX S
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| Operations Coordination, Office of | |
|---|---|
| 1 | Director | C |
| 2 | Deputy Director | C |
| 3 | Director, Current Operations Division | C |
| 4 | Director, National Operations Center | C |
| 5 | Chief of Staff | C |

Delegation # 00106
Revision # 06

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 222 of 231 PageID #:
5496
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 26 of 71

ANNEX T
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Partnership and Engagement, Office of** | | |
| 1 | Assistant Secretary | N |
| 2 | Assistant Secretary for State and Local Law Enforcement | N |
| 3 | Deputy Assistant Secretary, Intergovernmental Affairs | C |
| 4 | Deputy Assistant Secretary, Private Sector Office | N |
| 5 | Director of Local Affairs | C |

T-1

Delegation # 00106
Revision # 06

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 223 of 231 PageID #:
5497
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 27 of 71

ANNEX U
ISSUE DATE: 2/15/2019          APPROVAL: 2/15/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Strategy, Policy, & Plans, Office of** | |
| 1   Under Secretary | S |
| 2   Assistant Secretary for Strategy, Plans, Analysis, and Risk* | N |
| 3   Deputy Under Secretary | C |
| 4   Assistant Secretary for International Affairs | N |
| 5   Assistant Secretary for Threat Prevention and Security Policy | N |
| 6   Assistant Secretary for Border, Immigration, and Trade | N |
| 7   Assistant Secretary for Cyber, Infrastructure, and Resilience | N |
| 8   Deputy Assistant Secretary for Screening Coordination Office | C |
| 9   Deputy Assistant Secretary for International Affairs | C |

U-1

ANNEX V
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                              Career Status

| Privacy Officer, Chief | |
|---|---|
| 1 | Chief Privacy Officer | N |
| 2 | Deputy Chief Privacy Officer | C |
| 3 | Deputy Chief FOIA Officer | C |
| 4 | Senior Director, Privacy Compliance | C |
| 5 | Chief of Staff | C |

Delegation # 00106
Revision # 06

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 225 of 231 PageID #:
5499
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 29 of 71

ANNEX W
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                        Career Status

| **Public Affairs, Office of** | |
|---|---|
| 1 | Assistant Secretary | P |
| 2 | Principal Deputy Assistant Secretary | C |
| 3 | Deputy Assistant Secretary for Media Operations/Press Secretary | N |
| 4 | Deputy Assistant Secretary for Strategic Communications | N |
| 5 | Director of Communications | N |
| 6 | Chief of Staff | C |
| 7 | Director, Incident Communications | C |

W-1

ANNEX X
ISSUE DATE: 1/19/2017          APPROVAL: 1/19/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                 Career Status

| | Science and Technology | |
|---|---|---|
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary* | C |
| 3 | Chief of Staff | C |
| 4 | Director, Homeland Security Advanced Research Projects Agency | C |
| 5 | Director, Office of Support to the Homeland Security Enterprise and First Responders Division | C |
| 6 | Director, Capability Development Support Division | C |
| 7 | Director, Research and Development Partnerships | C |
| 8 | Director, Finance and Budget Division | C |
| 9 | Director, Administrative Support Division | C |

X-1

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 227 of 231 PageID #:
9501
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 31 of 71

ANNEX Y
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                           Career Status

| Secret Service, United States | | |
|---|---|---|
| 1 | Director | P |
| 2 | Deputy Director | C |
| 3 | Chief Operating Officer | C |
| 4 | Assistant Director - Protective Operations | C |
| 5 | Assistant Director - Investigations | C |
| 6 | Assistant Director - Government and Public Affairs | C |
| 7 | Assistant Director -  Human Resources | C |
| 8 | Assistant Director - Professional Responsibility | C |
| 9 | Assistant Director - Strategic Intelligence and Information | C |
| 10 | Assistant Director - Training | C |
| 11 | Chief - Uniformed Division | C |
| 12 | Chief Counsel | C |
| 13 | Chief Technology Officer | C |
| 14 | Chief Financial Officer | C |
| 15 | Chief - Strategic Planning and Policy | C |
| 16 | Deputy Assistant Director(s) - Protective Operations | C |
| 17 | Deputy Assistant Director(s) - Investigations | C |
| 18 | Deputy Assistant Director(s) - Government and Public Affairs | C |
| 19 | Deputy Assistant Director(s) -  Human Resources | C |
| 20 | Deputy Assistant Director(s) - Professional Responsibility | C |
| 21 | Deputy Assistant Director(s) - Strategic Intelligence and Information | C |
| 22 | Deputy Assistant Director(s) - Training | C |
| 23 | Deputy Assistant Director(s) - Technical Development and Mission Support | C |
| 24 | Deputy Assistant Director(s) - Strategic Planning and Policy | C |
| 25 | Special Agent in Charge - Washington | C |
| 26 | Special Agent in Charge - New York | C |
| 27 | Special Agent in Charge - Miami | C |
| 28 | Special Agent in Charge - Los Angeles | C |

Delegation # 00106
Revision # 06

Case 1:16-cv-04756-NGG-VMS   Document 310-3   Filed 08/28/20   Page 228 of 231 PageID #:
9562
Case 8:20-cv-02118-PX   Document 41-1   Filed 08/03/20   Page 32 of 71

ANNEX Z
ISSUE DATE: 10/23/2018          APPROVAL: 10/23/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Transportation Security Administration** | |
| 1    Administrator | S |
| 2    Deputy Administrator | P |
| 3    Chief of Staff | N |
| 4    Executive Assistant Administrator, Security Operations | C |
| 5    Executive Assistant Administrator, Operations Support | C |
| 6    Executive Assistant Administrator, Law Enforcement/Federal Air Marshal Service | C |
| 7    Executive Assistant Administrator, Enterprise Support | C |
| 8    Regional Director, Atlanta, Security Operations | C |
| 9    Regional Director, Dallas, Security Operations | C |

Z-1

ANNEX AA
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | Career Status |
|---|---|
| **Chief Financial Officer (DHS)** | |
| 1    Chief Financial Officer | S |
| 2    Deputy Chief Financial Officer* | C |

AA-1

Delegation # 00106
Revision # 06

ANNEX AB
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

Position                                                                    Career Status

| | Deputy Administrator, Federal Emergency Management Agency (FEMA) | |
|---|---|---|
| 1 | Deputy Administrator, FEMA | S |
| 2 | Deputy Administrator, Protection and National Preparedness* | S |
| 3 | Associate Administrator, Mission Support | C |
| 4 | Deputy Associate Administrator, Office of Policy and Program Analysis | C |
| 5 | Region IX Administrator | C |
| 6 | Region VI Administrator | C |

AB-1

Delegation # 00106
Revision # 06

ANNEX AC
ISSUE DATE: 09/14/2016          APPROVAL: 09/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Protection and National Preparedness (FEMA)** | | |
| 1 | Deputy Administrator, Protection and National Preparedness | S |
| 2 | Assistant Administrator, National Preparedness Directorate* | C |
| 3 | Assistant Administrator, Grant Programs | P |
| 4 | Assistant Administrator, National Continuity Programs | N |

AC-1

Delegation # 00106
Revision # 06