# EXHIBIT S

8/28/2020                                                                Leadership | Homeland Security

http://dhs.gov/leadership                                          Go

1,024 captures
12 Aug 2012 – 27 Aug 2020

MAR **APR** MAY
◀ **10** ▶
**2018** **2019** **2020**

▼ About this capture

Official website of the Department of Homeland Security

**U.S. Department of Homeland Security**

Enter Search Term

On DHS.gov

# Leadership

List of senior leaders at the Department. For more information about an individual listed, including a biography, click on their name.

- Secretary, Kirstjen M. Nielsen (/web/20190410120732/http://dhs.gov/person/kirstjen-m-nielsen) | Secretary's Corner (/web/20190410120732/http://dhs.gov/secretary)
  - Deputy Secretary (vacant), Claire M. Grady, Senior Official Performing the Duties of the Deputy Secretary
  - Chief of Staff, Miles Taylor
  - Executive Secretary, Christina G. Bobb (/web/20190410120732/http://dhs.gov/person/christina-bobb)
  - General Counsel, John M. Mitnick (/web/20190410120732/http://dhs.gov/person/john-m-mitnick)
  - Military Advisor, Rear Admiral Eric C. Jones (/web/20190410120732/http://dhs.gov/person/rear-admiral-eric-c-jones)

- Under Secretary, Management, Claire M. Grady (/web/20190410120732/http://dhs.gov/person/claire-m-grady)
  - Deputy Under Secretary for Management, Chip Fulghum (/web/20190410120732/http://dhs.gov/person/chip-fulghum)
  - Chief Financial Officer (vacant), Stacy Marcott, Senior Official Performing the Duties of the Chief Financial Officer
  - Chief Human Capital Officer, Angela Bailey
  - Chief Information Officer, Dr. John A. Zangardi (/web/20190410120732/http://dhs.gov/person/dr-john-zangardi)
  - Chief Procurement Officer, Soraya Correa (/web/20190410120732/http://dhs.gov/person/soraya-correa)

http://dhs.gov/leadership                                    Go

**1,024 captures**
12 Aug 2012 – 27 Aug 2020

MAR **APR** MAY
◀ **10** ▶
2018 **2019** 2020

▼ About this capture

(/web/20190410120732/http://dhs.gov/person/richard-d-mccomb)

- Executive Director, Office of Program Accountability and Risk Management, Debra Cox
- Director, Office of Biometric Identity Management (OBIM), Shonnie Lyon (/web/20190410120732/http://dhs.gov/person/shonnie-r-lyon)

- Under Secretary, Science and Technology (vacant), William (Bill) Bryan, Senior Official Performing the Duties of the Under Secretary for Science and Technology
  - Deputy Under Secretary (acting), Andre Hentz

- Under Secretary, Office of Intelligence and Analysis, David J. Glawe (/web/20190410120732/http://dhs.gov/person/david-j-glawe)
  - Principal Deputy Under Secretary for Office of Intelligence and Analysis, Brian J. Murphy (/web/20190410120732/http://dhs.gov/person/brian-murphy)

- Under Secretary, Office of Strategy, Policy, and Plans (vacant), Chad Wolf, Senior Official Performing the Duties of the Under Secretary, Office of Strategy, Policy, and Plans
  - Deputy Under Secretary, James W. McCament (/web/20190410120732/http://dhs.gov/person/james-w-mccament)
  - Assistant Secretary, International Affairs, Dimple Shah (/web/20190410120732/http://dhs.gov/person/dimple-r-shah)
  - Assistant Secretary, Cyber, Infrastructure, and Resilience Policy, Bryan Ware
  - Assistant Secretary, Border, Immigration, and Trade Policy, Michael Dougherty
  - Assistant Secretary, Threat Prevention and Security Policy, Elizabeth Neumann (/web/20190410120732/http://dhs.gov/person/elizabeth-neumann)
  - Assistant Secretary, Strategy, Plans, Analysis & Risk, Chad Wolf (/web/20190410120732/http://dhs.gov/person/chad-wolf)

- Director, U.S. Citizenship and Immigration Services, L. Francis Cissna (https://web.archive.org/web/20190410120732/https://www.uscis.gov/about-us/leadership/l-francis-cissna-director-us-citizenship-and-immigration-services)
  - Deputy Director, U.S. Citizenship and Immigration Services (acting), Tracy Renaud

http://dhs.gov/leadership                    Go

1,024 captures
12 Aug 2012 – 27 Aug 2020

MAR **APR** MAY
◀ **10** ▶
2018 **2019** 2020

About this capture

- Vice Commandant, U.S. Coast Guard, Admiral Charles W. Ray (https://web.archive.org/web/20190410120732/https://www.uscg.mil/Leadership/Senior-Leadership/Vice-Commandant/)

- Commissioner, U.S. Customs and Border Protection, Kevin K. McAleenan (https://web.archive.org/web/20190410120732/https://www.cbp.gov/about/leadership-organization/commissioner)
  - Deputy Commissioner, U.S. Customs and Border Protection, Robert E. Perez (https://web.archive.org/web/20190410120732/https://www.cbp.gov/about/leadership-organization/deputy-commissioner)
  - Chief Operating Officer, John P. Sanders

- Director, Cybersecurity and Infrastructure Security Agency (CISA), Christopher C. Krebs (/web/20190410120732/http://dhs.gov/person/christopher-c-krebs)
  - Deputy Director, Matthew Travis (/web/20190410120732/http://dhs.gov/person/matthew-travis)
  - Assistant Director for Cybersecurity Division (CSD), Jeanette Manfra (/web/20190410120732/http://dhs.gov/person/jeanette-manfra)
  - Assistant Director for Infrastructure Security Division (ISD), Brian Harrell (/web/20190410120732/http://dhs.gov/person/brian-harrell)
  - Assistant Director for Emergency Communications (ECD), Ronald Hewitt (/web/20190410120732/http://dhs.gov/person/ronald-t-hewitt)
  - Director, Federal Protective Service (FPS), L. Eric Patterson (/web/20190410120732/http://dhs.gov/person/l-eric-patterson)
  - Director, National Risk Management Center (NRMC), Bob Kolasky (/web/20190410120732/http://dhs.gov/person/bob-kolasky)

- Administrator, Federal Emergency Management Agency (acting), Pete T. Gaynor
  - Deputy Administrator, Pete T. Gaynor (https://web.archive.org/web/20190410120732/https://www.fema.gov/peter-gaynor)
  - Deputy Administrator for Resilience, Daniel Kaniewski (https://web.archive.org/web/20190410120732/https://www.fema.gov/daniel-kaniewski)

8/28/2020                                    Leadership | Homeland Security

http://dhs.gov/leadership                          Go

1,024 captures
12 Aug 2012 – 28 Aug 2020

MAR **APR** MAY
◀ **10** ▶
**2018** 2019 2020

About this capture

- Director, Federal Law Enforcement Training Centers, Thomas J. Walters
  (https://web.archive.org/web/20190410120732/https://www.fletc.gov/our-leadership)
  - Deputy Director, Federal Law Enforcement Training Centers, William Fallon

- Director, U.S. Immigration and Customs Enforcement (ICE), (vacant), Ronald D. Vitiello
  (https://web.archive.org/web/20190410120732/https://www.ice.gov/leadership) , Deputy Director and
  Senior Official Performing the Duties of the Director, U.S. Immigration and Customs
  Enforcement
  - Deputy Director, Matthew T. Albence, Executive Associate Director for
    Enforcement and Removal Operations and Senior Official Performing the Duties
    of ICE Deputy Director

- Director, U.S. Secret Service, Randolph D. Alles
  (https://web.archive.org/web/20190410120732/https://www.secretservice.gov/about/leadership/#director)
  - Deputy Director, U.S. Secret Service, William J. Callahan
    (https://web.archive.org/web/20190410120732/https://www.secretservice.gov/about/leadership/#deputy

- Administrator, Transportation Security Administration, David P. Pekoske
  (https://web.archive.org/web/20190410120732/https://www.tsa.gov/leader-bios/administrator)
  - Deputy Administrator (acting), Transportation Security Administration, Patricia
    F.S. Cogswell

- Assistant Secretary, Countering Weapons of Mass Destruction Office, James F.
  McDonnell (/web/20190410120732/http://dhs.gov/person/james-f-mcdonnell)
  - Principal Deputy Assistant Secretary, Countering Weapons of Mass Destruction
    Office, Andre Watson
  - Chief Medical Officer, Dr. Duane Caneva

- Assistant Secretary, Office of Legislative Affairs, Christine Ciccone
  - Deputy Assistant Secretary, David Wonnenberg (Senate)
  - Deputy Assistant Secretary, Uyen Dinh (House)

- Assistant Secretary, Office of Partnership and Engagement, John H. Hill
  (/web/20190410120732/http://dhs.gov/person/john-h-hill)

http://dhs.gov/leadership          Go

1,024 captures                          MAR  APR  MAY
12 Aug 2012 – 27 Aug 2020                ◀  10  ▶
                                        2018  2019  2020
                                        ▼ About this capture

- Deputy Assistant Secretary, Office for State and Local Law Enforcement, Brian Dorow
  - Deputy Assistant Secretary, Intergovernmental Affairs, Alaina Clark
  - Deputy Assistant Secretary, Private Sector Office, Matt Hayden
  - Executive Director, Homeland Security Advisory Council, Matt Hayden
  - Executive Director, Campaigns and Office of Academic Engagement, Trent Frazier
  - Director, Committee Management Office, Traci Silas
  - Director, Office of Terrorism Prevention Partnerships (acting), David Gersten

- Assistant Secretary, Office of Public Affairs, Jonathan Rath Hoffman
  (/web/20190410120732/http://dhs.gov/person/jonathan-rath-hoffman)
  - Deputy Assistant Secretary, Press, Tyler Houlton
  - Deputy Assistant Secretary, Strategic Communications (vacant)

- Executive Director, Joint Requirements Council, Joseph D. Wawro
  (/web/20190410120732/http://dhs.gov/person/joseph-d-wawro)
- Director, Operations Coordination (acting), Frank DiFalco
- Chief Privacy Officer (acting), Jonathan Cantor
- Citizenship and Immigration Services Ombudsman, Julie Kirchner
  (/web/20190410120732/http://dhs.gov/person/julie-kirchner)
- Officer for Civil Rights & Civil Liberties, Cameron Quinn
  (/web/20190410120732/http://dhs.gov/person/cameron-quinn)
- Inspector General (acting), John V. Kelly

Last Published Date: March 20, 2019

# EXHIBIT T

**Department of Homeland Security**
**DHS Delegation Number: 00106**
**Revision Number: 08.6**
**Issue Date: 12/15/2016**
**Updated Date: 11/14/2019**

# DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS

## I.    Purpose

This is a succession order for named positions and a delegation of authority for the continuity of essential functions of officials at the Department of Homeland Security (DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic emergencies, or vacancies in offices.

## II.    Succession Order/Delegation

A.    In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A.

B.    I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency.

C.    The order of succession for the named positions, other than the Office of the Secretary, are provided in Annexes B through AC.

D.    I hereby delegate authority to the officials occupying the identified positions in the orders listed in Annexes B through AC to exercise the powers and perform the functions and duties of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency until that condition ceases.

1

Delegation # 00106
Revision # 08.6

E.      In terms of named positions in which appointment is required to be made by the President, by and with the advice and consent of the Senate (PAS), if positions are vacant as that term is used in the Federal Vacancies Reform Act of 1998, the First Assistant shall act as the incumbent until a successor is appointed, unless otherwise designated by the President.  The individual serving in the position identified as the first to succeed is designated the "First Assistant" for the purposes of the Federal Vacancies Reform Act of 1998.  If the First Assistant position is vacant, the next designated official in the order of succession may exercise all the powers, duties, authorities, rights, and functions authorized by law to be exercised by the incumbent, but may not perform any function or duty required by law to be performed exclusively by the office holder.

F.      For all other positions that are not subject to the Federal Vacancies Reform Act of 1998, any official in the order provided for in the succession order may exercise all the powers, duties, authorities, rights, and functions authorized to be performed by the incumbent, to the extent not otherwise limited by law.

G.      Only officials specifically designated in the order of succession for each of the named positions in Annexes B through AC are eligible, subject to modification in accordance with Section II.I.  Unless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession.

H.      The prohibition on any re-delegation of powers, authorities, functions, and duties contained in Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents is not applicable to restrict the authority of any individual who is exercising the authority of a vacant position under this Delegation.  Such an individual shall, however, be bound by such Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents, and shall not further re-delegate powers to any individual.

**I.**      Each Annex may be updated separately.  A Component Head seeks modification of his/her order of succession by forwarding a proposed updated Annex to the Office of Operations Coordination (OPS), Continuity Division and the Office of the Under Secretary for Management (MGMT), Program Manager, Delegations and Directives; Annexes are processed by MGMT, in consultation with the Office of the General Counsel (OGC), for approval of the Secretary.  At a minimum, the Annex is coordinated with OGC and the White House Liaison.  Where possible, Component orders of succession should be at least three positions deep and geographically dispersed.

J.      The Office of the Executive Secretary, MGMT, and OPS are responsible for maintaining a current list of incumbents holding all positions identified in Annexes B through AC.

Delegation # 00106
Revision # 08.6

K.      Nothing in this delegation is intended to limit my discretion as Secretary to depart from this delegation.

## III.  Authorities

A.      Title 5, United States Code (U.S.C.) §§ 3345-49 (Federal Vacancies Reform Act of 1998, as amended)

B.      Title 6, U.S.C., § 112 (Secretary; functions)

C.      Title 6, U.S.C., § 113(g) (Other Officers)

## IV.  Office of Primary Interest

OPS and MGMT is the office of primary interest for maintaining and updating the Annexes to this Delegation.

_____                    Dec 15 2016
Jeh Charles Johnson                                 Date
Secretary of Homeland Security


**Legend**

| | |
|---|---|
| Career | C |
| Limited Term Appointment | L |
| Military Officer | M |
| Non-Career in the Senior Executive Service or Schedule C | N |
| Presidential Appointee | P |
| Presidential Appointee with Senate Confirmation | S |
| Scientific Professional | T |
| First Assistant pursuant to the Federal Vacancies Reform Act | * |

3

Delegation # 00106
Revision # 08.6

ATTACHMENT 1

# DHS ORDERS OF SUCCESSION AND ORDERS FOR DELEGATIONS OF AUTHORITIES

| Annex | Title | Issue Date |
|-------|-------|-----------|
| Annex A | Order For Delegation of Authority by the Secretary of the Department of Homeland Security | Revision 08.6, 11/08/2019 |
| Annex B | Deputy Secretary, Office of the | Revision 08.6, 11/13/2019 |
| Annex C | Citizenship and Immigration Service Ombudsman | Revision 06, 09/14/2016 |
| Annex D | Citizenship and Immigration Services, United States | Revision 08.6, 06/10/2019 |
| Annex E | Civil Rights and Civil Liberties, Office for | Revision 06, 09/14/2016 |
| Annex F | Coast Guard, United States | Revision 06, 09/14/2016 |
| Annex G | Countering Weapons of Mass Destruction Office | Revision 08.2, 05/21/2018 |
| Annex H | Customs and Border Protection, United States | Revision 08.6, 11/14/2019 |
| Annex I | Executive Secretariat | Revision 06, 09/14/2016 |
| Annex J | Federal Emergency Management Agency | Revision 06, 09/14/2016 |
| Annex K | Federal Law Enforcement Training Center | Revision 06, 09/14/2016 |
| Annex L | General Counsel, Office of the | Revision 06, 09/14/2016 |
| Annex M | Immigration and Customs Enforcement, United States | Revision 06, 09/14/2016 |
| Annex N | Inspector General, Office of | Revision 06, 09/14/2016 |
| Annex O | Intelligence and Analysis, Office of | Revision 06, 09/14/2016 |
| Annex P | Legislative Affairs, Office of | Revision 06, 09/14/2016 |
| Annex Q | Management Directorate | Revision 06, 09/14/2016 |
| Annex R | National Protection and Programs Directorate | Revision 08, 07/11/2017 |
| Annex S | Operations Coordination, Office of | Revision 06, 09/14/2016 |
| Annex T | Partnership and Engagement, Office of | Revision 06, 09/14/2016 |
| Annex U | Strategy, Policy, and Plans, Office of | Revision 08.4, 02/15/2019 |
| Annex V | Privacy Office, Chief | Revision 06, 09/14/2016 |
| Annex W | Public Affairs, Office of | Revision 06, 09/14/2016 |
| Annex X | Science and Technology | Revision 07, 01/19/2017 |
| Annex Y | Secret Service, United States | Revision 06, 09/14/2016 |
| Annex Z | Transportation Security Administration | Revision 08.3, 10/23/2018 |
| Annex AA | Chief Financial Officer (DHS) | Revision 06, 09/14/2016 |
| Annex AB | Deputy Administrator, Federal Emergency Management Agency (FEMA) | Revision 06, 09/14/2016 |
| Annex AC | Protection and National Preparedness (FEMA) | Revision 06, 09/14/2016 |

Delegation # 00106
Revision # 08.6

ANNEX A

# ORDER FOR DELEGATION OF AUTHORITY BY THE SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY

*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security
2. Under Secretary for Management
3. Commissioner of U.S. Customs and Border Protection
4. Under Secretary for Strategy, Policy, and Plans
5. Administrator and Assistant Secretary of the Transportation Security Administration
6. Administrator of the Federal Emergency Management Agency

Delegation # 00106
Revision # 08.6

ANNEX B
ISSUE DATE: 11/13/2019        APPROVAL: 11/13/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Deputy Secretary, Office of the** | | |
| 1 | Deputy Secretary | S |
| 2 | Under Secretary for Management* | S |
| 3 | Principal Deputy Director, U.S. Citizenship and Immigration Services | N |
| 4 | Administrator, Transportation Security Administration | S |
| 5 | Administrator, Federal Emergency Management Agency | S |
| 6 | Director, Cybersecurity and Infrastructure Agency | S |
| 7 | Under Secretary, Science and Technology | S |
| 8 | Under Secretary, Intelligence and Analysis | S |
| 9 | Commissioner, U.S. Customs and Border Protection | S |
| 10 | Director, U.S. Immigration and Customs Enforcement | S |
| 11 | Director, U.S. Citizenship and Immigration Services | S |
| 12 | Under Secretary, Office of Strategy, Policy, and Plans | S |
| 13 | General Counsel | S |
| 14 | Deputy Under Secretary for Management | C |
| 15 | Deputy Commissioner, U.S. Customs and Border Protection | C |
| 16 | Deputy Administrator, Transportation Security Administration | C |
| 17 | Deputy Director, U.S. Immigration and Customs Enforcement | C |
| 18 | Deputy Director, U.S. Citizenship and Immigration Services | C |
| 19 | Director, Federal Law Enforcement Training Centers | C |

Delegation # 00106
Revision # 08.6

ANNEX C
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Citizenship and Immigration Services Ombudsman** | | |
| 1 | Ombudsman | N |
| 2 | Deputy Director | C |
| 3 | Senior Advisor | L |
| 4 | Chief of Staff | C |
| 5 | Director of Operations | C |
| 6 | Chief of Casework | C |

C-1

ANNEX D
ISSUE DATE: 06/10/2019       APPROVAL: 06/10/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Citizenship and Immigration Services, United States | |
|---|---|---|
| 1 | Director | S |
| 2 | Principal Deputy Director* | N |
| 3 | Deputy Director | C |
| 4 | Associate Director, Management Directorate | C |
| 5 | Associate Director, Refugee Asylum and International Operations Directorate | C |
| 6 | Associate Director, Service Center Operations Directorate | C |
| 7 | Associate Director, Field Operations Directorate | C |
| 8 | Director, National Benefits Center | C |

Delegation # 00106
Revision # 08.6

ANNEX E
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|----------|---------------|
| **Civil Rights and Civil Liberties, Office for** | |
| 1    Civil Rights and Civil Liberties Officer | P |
| 2    Deputy Officer, Programs and Compliance | C |
| 3    Deputy Officer, Equal Employment Opportunity Programs | C |
| 4    Executive Officer | C |

E-1

ANNEX F
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Coast Guard, United States | |
|---|---|
| 1 | Commandant | M |
| 2 | Vice Commandant | M |
| 3-4 | Deputy Commandant for Mission Support or Deputy Commandant for Operations in precedence of their grade | M |
| 5-6 | Other Vice Admirals in precedence of their grade | M |

F-1

Delegation # 00106
Revision # 06

ANNEX G
ISSUE DATE: 05/21/2018        APPROVAL: 05/21/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Countering Weapons of Mass Destruction Office** | | |
| 1 | Assistant Secretary | P |
| 2 | Deputy Assistant Secretary | C |
| 3 | Chief of Staff | C |
| 4 | Deputy Director, Domestic Nuclear Detection Office | C |
| 5 | Deputy Director, Office of Health Affairs | C |

G-1

Delegation # 00106
Revision # 08.2

ANNEX H
ISSUE DATE: 11/14/2019      APPROVAL: 11/14/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                               Career Status

| Customs and Border Protection, United States | | |
|---|---|---|
| 1 | Commissioner | S |
| 2 | Chief Operations Officer* | N |
| 3 | Deputy Commissioner | C |
| 4 | Executive Assistant Commissioner, Office of Field Operations | C |
| 5 | Chief, U.S. Border Patrol | C |
| 6 | Executive Assistant Commissioner, Air and Marine Operations | C |
| 7 | Executive Assistant Commissioner, Trade | C |
| 8 | Executive Assistant Commissioner, Operations Support | C |
| 9 | Executive Assistant Commissioner, Enterprise Services | C |

Delegation # 00106
Revision # 08.6

ANNEX I
ISSUE DATE: 9/14/2016        APPROVAL: 9/14/2016

## DHS ORDERS OF SUCCESSION AND
## ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| **Executive Secretariat** | |
|---|---|
| 1 | Executive Secretary | N |
| 2 | Deputy Executive Secretary | C |
| 3 | Assistant Executive Secretary, Briefing Books/Interagency Coordination | C |

I-1

ANNEX J
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| **Federal Emergency Management Agency** | | |
|---|---|---|
| 1 | Administrator | S |
| 2 | Deputy Administrator* | S |
| 3 | Deputy Administrator, Protection and National Preparedness | S |
| 4 | Associate Administrator, Response and Recovery | N |
| 5 | FEMA Region IX Administrator | C |
| 6 | FEMA Region VI Administrator | C |

J-1

Delegation # 00106
Revision # 06

ANNEX K
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Federal Law Enforcement Training Centers | |
|---|---|---|
| 1 | Director | C |
| 2 | Deputy Director for Training | C |
| 3 | Deputy Director for Management | C |
| 4 | Assistant Director, Mission and Readiness Support | C |
| 5 | Assistant Director, Regional and International Training | C |
| 6 | Assistant Director, Chief Financial Officer | C |
| 7 | Assistant Director, Glynco Training | C |
| 8 | Assistant Director, Centralized Training Management | C |
| 8 | Assistant Director, Washington Operations | C |
| 9 | Assistant Director, Chief Information Officer | C |
| 10 | Chief of Staff | C |

K-1

Delegation # 00106
Revision # 06

ANNEX L
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                    Career Status

| **General Counsel, Office of the** | | |
|---|---|---|
| 1 | General Counsel | S |
| 2 | Principal Deputy General Counsel* | C |
| 3 | Deputy General Counsel | [Senior ranking by time in position and in DHS][1] | N |
| 4 | Deputy General Counsel | [Senior ranking by time in position and in DHS] | N |
| 5 | Deputy General Counsel | [Senior ranking by time in position and in DHS] | N |
| 6 | Chief of Staff | C |
| 7 | Associate General Counsel, Operations and Enforcement | C |
| 8 | Associate General Counsel, General Law | C |
| 9 | Chief Counsel, Transportation Security Administration | C |
| 10 | Chief Counsel, Federal Law Enforcement Training Center | C |

---

[1] For the Deputy General Counsel positions identified in lines 3-5, seniority is determined by length of time in the position.  In the event more than one Deputy General Counsel has the same appointment date, time in service in the Department is the second determining factor for seniority.

L-1

Delegation # 00106
Revision # 06

ANNEX M
ISSUE DATE: 9/14/2016        APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| **Immigration and Customs Enforcement, United States** | | |
|---|---|---|
| 1 | Assistant Secretary | S |
| 2 | Deputy Director* | C |
| 3 | Executive Associate Director, Homeland Security Investigations | C |
| 4 | Executive Associate Director, Enforcement and Removal Operations | C |
| 5 | Executive Associate Director, Management and Administration | C |
| 6 | Principal Legal Advisor | N |
| 7 | Special Agent in Charge – Denver | C |
| 8 | Field Officer Director – San Antonio | C |

M-1

ANNEX N
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| Inspector General, Office of | |
|---|---|
| 1 | Inspector General | S |
| 2 | Deputy Inspector General* | C |
| 3 | Counsel to the Inspector General | C |
| 4 | Assistant Inspector General, Audits | C |
| 5 | Assistant Inspector General, Inspections | C |
| 6 | Assistant Inspector General, Emergency Management Oversight | C |

N-1

Delegation # 00106
Revision # 06

ANNEX O
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                    Career Status

| | Intelligence and Analysis, Office of | |
|---|---|---|
| 1 | Under Secretary for Intelligence and Analysis/DHS Chief Intelligence Officer | S |
| 2 | Principal Deputy Under Secretary for Intelligence and Analysis* | C |
| 3 | Deputy Under Secretary for Intelligence Operations | C |
| 4 | Deputy Under Secretary for Mission Support | C |
| 5 | Associate Deputy Director, El Paso Intelligence Center/ Strategic Analysis Section | C |

O-1

Delegation # 00106
Revision # 06

ANNEX P
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Legislative Affairs, Office of** | |
| 1  Assistant Secretary for Legislative Affairs | P |
| 2  Deputy Assistant Secretary (Senate) | N |
| 3  Deputy Assistant Secretary (House) | N |
| 4  Chief of Staff | C |
| 5  Director, Management Team | C |
| 6  Director, FEMA Team | C |
| 7  Director, Borders and Immigration | C |

P-1

Delegation # 00106
Revision # 06

ANNEX Q
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Management Directorate** | | |
| 1 | Under Secretary for Management | S |
| 2 | Deputy Under Secretary for Management* | C |
| 3 | Chief Financial Officer | S |
| 4 | Chief Information Officer | P |
| 5 | Chief Human Capital Officer | C |
| 6 | Chief Procurement Officer | C |
| 7 | Chief Readiness Support Officer | C |
| 8 | Chief Security Officer | C |
| 9 | Chief of Staff | C |
| 10 | Deputy Director, Federal Law Enforcement Training Center | C |

Q-1

Delegation # 00106
Revision # 06

ANNEX R
ISSUE DATE: 07/11/2017        APPROVAL: 07/11/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **National Protection and Programs Directorate** | | |
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary for NPPD* | N |
| 3 | Assistant Secretary, Office of Infrastructure Protection | P |
| 4 | Assistant Secretary, Office of Cybersecurity and Communications | N |
| 5 | Deputy Assistant Secretary, Office of Infrastructure Protection | C |
| 6 | Deputy Assistant Secretary, Office of Cybersecurity and Communications | C |
| 7 | Director, Management | C |
| 8 | Office of Infrastructure Protection, Regional Director for Region 8 | C |

R-1

Delegation # 00106
Revision # 08

ANNEX S
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| **Operations Coordination, Office of** | |
|---|---|
| 1 | Director | C |
| 2 | Deputy Director | C |
| 3 | Director, Current Operations Division | C |
| 4 | Director, National Operations Center | C |
| 5 | Chief of Staff | C |

S-1

Delegation # 00106
Revision # 06

ANNEX T
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Partnership and Engagement, Office of** | | |
| 1 | Assistant Secretary | N |
| 2 | Assistant Secretary for State and Local Law Enforcement | N |
| 3 | Deputy Assistant Secretary, Intergovernmental Affairs | C |
| 4 | Deputy Assistant Secretary, Private Sector Office | N |
| 5 | Director of Local Affairs | C |

T-1

ANNEX U
ISSUE DATE: 2/15/2019          APPROVAL: 2/15/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Strategy, Policy, & Plans, Office of** | |
| 1   Under Secretary | S |
| 2   Assistant Secretary for Strategy, Plans, Analysis, and Risk* | N |
| 3   Deputy Under Secretary | C |
| 4   Assistant Secretary for International Affairs | N |
| 5   Assistant Secretary for Threat Prevention and Security Policy | N |
| 6   Assistant Secretary for Border, Immigration, and Trade | N |
| 7   Assistant Secretary for Cyber, Infrastructure, and Resilience | N |
| 8   Deputy Assistant Secretary for Screening Coordination Office | C |
| 9   Deputy Assistant Secretary for International Affairs | C |

U-1

ANNEX V
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| Privacy Officer, Chief | | |
|---|---|---|
| 1 | Chief Privacy Officer | N |
| 2 | Deputy Chief Privacy Officer | C |
| 3 | Deputy Chief FOIA Officer | C |
| 4 | Senior Director, Privacy Compliance | C |
| 5 | Chief of Staff | C |

Delegation # 00106
Revision # 06

ANNEX W
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Public Affairs, Office of** | | |
| 1 | Assistant Secretary | P |
| 2 | Principal Deputy Assistant Secretary | C |
| 3 | Deputy Assistant Secretary for Media Operations/Press Secretary | N |
| 4 | Deputy Assistant Secretary for Strategic Communications | N |
| 5 | Director of Communications | N |
| 6 | Chief of Staff | C |
| 7 | Director, Incident Communications | C |

Delegation # 00106
Revision # 06

ANNEX X
ISSUE DATE: 1/19/2017        APPROVAL: 1/19/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Science and Technology | |
|---|---|---|
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary* | C |
| 3 | Chief of Staff | C |
| 4 | Director, Homeland Security Advanced Research Projects Agency | C |
| 5 | Director, Office of Support to the Homeland Security Enterprise and First Responders Division | C |
| 6 | Director, Capability Development Support Division | C |
| 7 | Director, Research and Development Partnerships | C |
| 8 | Director, Finance and Budget Division | C |
| 9 | Director, Administrative Support Division | C |

X-1

Delegation # 00106
Revision # 07

ANNEX Y
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                              Career Status

| | Secret Service, United States | |
|---|---|---|
| 1 | Director | P |
| 2 | Deputy Director | C |
| 3 | Chief Operating Officer | C |
| 4 | Assistant Director - Protective Operations | C |
| 5 | Assistant Director - Investigations | C |
| 6 | Assistant Director - Government and Public Affairs | C |
| 7 | Assistant Director -  Human Resources | C |
| 8 | Assistant Director - Professional Responsibility | C |
| 9 | Assistant Director - Strategic Intelligence and Information | C |
| 10 | Assistant Director - Training | C |
| 11 | Chief - Uniformed Division | C |
| 12 | Chief Counsel | C |
| 13 | Chief Technology Officer | C |
| 14 | Chief Financial Officer | C |
| 15 | Chief - Strategic Planning and Policy | C |
| 16 | Deputy Assistant Director(s) - Protective Operations | C |
| 17 | Deputy Assistant Director(s) - Investigations | C |
| 18 | Deputy Assistant Director(s) - Government and Public Affairs | C |
| 19 | Deputy Assistant Director(s) -  Human Resources | C |
| 20 | Deputy Assistant Director(s) - Professional Responsibility | C |
| 21 | Deputy Assistant Director(s) - Strategic Intelligence and Information | C |
| 22 | Deputy Assistant Director(s) - Training | C |
| 23 | Deputy Assistant Director(s) - Technical Development and Mission Support | C |
| 24 | Deputy Assistant Director(s) - Strategic Planning and Policy | C |
| 25 | Special Agent in Charge - Washington | C |
| 26 | Special Agent in Charge - New York | C |
| 27 | Special Agent in Charge - Miami | C |
| 28 | Special Agent in Charge - Los Angeles | C |

Delegation # 00106
Revision # 06

ANNEX Z
ISSUE DATE: 10/23/2018        APPROVAL: 10/23/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Transportation Security Administration** | | |
| 1 | Administrator | S |
| 2 | Deputy Administrator | P |
| 3 | Chief of Staff | N |
| 4 | Executive Assistant Administrator, Security Operations | C |
| 5 | Executive Assistant Administrator, Operations Support | C |
| 6 | Executive Assistant Administrator, Law Enforcement/Federal Air Marshal Service | C |
| 7 | Executive Assistant Administrator, Enterprise Support | C |
| 8 | Regional Director, Atlanta, Security Operations | C |
| 9 | Regional Director, Dallas, Security Operations | C |

Z-1

Delegation # 00106
Revision # 08.3

ANNEX AA
ISSUE DATE: 9/14/2016        APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Chief Financial Officer (DHS)** | | |
| 1 | Chief Financial Officer | S |
| 2 | Deputy Chief Financial Officer* | C |

AA-1

ANNEX AB
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

Position                                                                 Career Status

| | Deputy Administrator, Federal Emergency Management Agency (FEMA) | |
|---|---|---|
| 1 | Deputy Administrator, FEMA | S |
| 2 | Deputy Administrator, Protection and National Preparedness* | S |
| 3 | Associate Administrator, Mission Support | C |
| 4 | Deputy Associate Administrator, Office of Policy and Program Analysis | C |
| 5 | Region IX Administrator | C |
| 6 | Region VI Administrator | C |

AB-1

Delegation # 00106
Revision # 06

ANNEX AC
ISSUE DATE: 09/14/2016        APPROVAL: 09/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Protection and National Preparedness (FEMA)** | | |
| 1 | Deputy Administrator, Protection and National Preparedness | S |
| 2 | Assistant Administrator, National Preparedness Directorate* | C |
| 3 | Assistant Administrator, Grant Programs | P |
| 4 | Assistant Administrator, National Continuity Programs | N |

AC-1

# EXHIBIT U

 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

# Chad Wolf Confirmed as Under Secretary of Homeland Security Office of Strategy, Policy, and Plans

**Release Date:**  November 13, 2019

WASHINGTON- Today the United States Senate confirmed Chad F. Wolf to become the Under Secretary of the Department of Homeland Security (DHS) Office of Strategy, Policy, and Plans (PLCY) with a bipartisan vote of 54-41.  President Donald J. Trump nominated Wolf to the position in February 2019.  Under Secretary Wolf has served at the Department in various senior leadership positions since its inception and he brings more than 20 years of experience in the government and private sector to the position.

"I want to thank the President for nominating me to this critical position and for the U.S. Senate for taking action. I have served the Department since inauguration day and am honored to serve as the first Under Secretary for Policy," said Under Secretary Wolf.  "I am continually inspired by the tireless and exemplary work of the men and women of the Office of Policy in support of the Department's mission."

Topics:  Homeland Security Enterprise (/topics/homeland-security-enterprise)

Keywords:  Planning (/keywords/planning), Policy (/keywords/policy), Strategy (/keywords/strategy)

Last Published Date: November 13, 2019

**EXHIBIT V**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CASA DE MARYLAND, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:20-cv-2118 |
| | ) | |
| CHAD F. WOLF, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JULIANA BLACKWELL

I, Juliana Blackwell, make the following declaration.

1.  I am the Deputy Executive Secretary, within the Office of the Executive Secretary, U.S. Department of Homeland Security (DHS). I have worked in this office since February 2007.  I am responsible for maintaining official documents approved or signed by the Secretary and Deputy Secretary of Homeland Security. I also know when a Secretary of Homeland Security vacates the office, and when a new Secretary of Homeland Security begins service as the Secretary.  This declaration is based on my personal knowledge and on information that I reviewed in the course of my official duties as an employee of DHS.

2.  The document, attached as Exhibit 1, is a true and correct copy of DHS Delegation Number 00106, Revision Number 08.5 titled "DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS", issued December 15, 2016, and updated April 10, 2019.

3.  The document, attached as Exhibit 2, is a true and correct copy of DHS Delegation Number 00106, Revision Number 08.6 titled "DHS ORDERS OF SUCCESSION AND

DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS", issued December 15, 2016, and updated November 14, 2019.

4. The document, attached as Exhibit 3, is a true and correct copy of a memorandum titled "Designation of an Order of Succession for the Secretary", issued by then General Counsel John M. Mitnick and dated April 9, 2019, signed by then Secretary Kirstjen Nielsen on April 9, 2019.

5. The document, attached as Exhibit 4, is a true and correct copy of the "Amendment to the Order of Succession for the Secretary of Homeland Security" issued by then Acting Secretary Kevin K. McAleenan and dated November 8, 2019.

6. Kirstjen Nielsen was confirmed as the Secretary of Homeland Security on December 5, 2017 and remained as the Secretary until she vacated the position on April 10, 2019.

7. Kevin K. McAleenan resigned as Acting Secretary of Homeland Security on November 13, 2019.

In accordance with 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of August, 2020 in Washington, D.C.


Juliana Blackwell
Deputy Executive Secretary
Office of the Executive Secretary
Department of Homeland Security

# EXHIBIT W

https://www.dhs.gov/leadership   Go

1,024 captures
12 Aug 2012 – 27 Aug 2020

OCT **NOV** DEC
◀ **13** ▶
**2018** 2019 2020

▼ About this capture

Official website of the Department of Homeland Security



**U.S. Department of
Homeland Security**

# Leadership

List of senior leaders at the Department. For more information about an individual listed, including a biography, click on their name.

- Secretary (acting), <u>Kevin K. McAleenan</u> (/web/20191113112609/https://www.dhs.gov/person/kevin-k-mcaleenan) | <u>Secretary's Corner</u> (/web/20191113112609/https://www.dhs.gov/secretary)
  - Deputy Secretary (vacant), <u>David P. Pekoske</u> (https://web.archive.org/web/20191113112609/https://www.tsa.gov/leader-bios/administrator), Senior Official Performing the Duties of the Deputy Secretary
  - Chief of Staff (acting), Brandon Wales
  - Executive Secretary (acting), Juliana Blackwell
  - General Counsel (acting), Joseph B. Maher
  - Military Advisor, <u>Rear Admiral Brendan C. McPherson</u> (/web/20191113112609/https://www.dhs.gov/person/rear-admiral-brendan-c-mcpherson)

- Under Secretary, Management (vacant), Randolph D. "Tex" Alles, Senior Official Performing the Duties of the Under Secretary for Management
  - Deputy Under Secretary for Management, <u>Randolph D. "Tex" Alles</u> (/web/20191113112609/https://www.dhs.gov/person/randolph-d-tex-alles)
  - Chief Financial Officer (acting), Stacy Marcott
  - Chief Human Capital Officer, <u>Angela Bailey</u> (/web/20191113112609/https://www.dhs.gov/person/angela-bailey)
  - Chief Information Officer, <u>Dr. John A. Zangardi</u> (/web/20191113112609/https://www.dhs.gov/person/dr-john-zangardi)
  - Chief Procurement Officer, <u>Soraya Correa</u> (/web/20191113112609/https://www.dhs.gov/person/soraya-correa)
  - Chief Readiness Support Officer, Tom Chaleki

https://www.dhs.gov/leadership      Go

1,024 captures
12 Aug 2012 – 27 Aug 2020

OCT **NOV** DEC
◀ **13** ▶
2018 **2019** 2020

▼ About this capture

- Executive Director, Office of Program Accountability and Risk Management, Debra Cox
  - Director, Office of Biometric Identity Management (OBIM), Shonnie Lyon
    (/web/20191113112609/https://www.dhs.gov/person/shonnie-r-lyon)
  - Director, Federal Protective Service (FPS), L. Eric Patterson
    (/web/20191113112609/https://www.dhs.gov/person/l-eric-patterson)

- Under Secretary, Science and Technology (vacant), William (Bill) Bryan, Senior Official Performing the Duties of the Under Secretary for Science and Technology
  - Deputy Under Secretary (acting), Andre Hentz

- Under Secretary, Office of Intelligence and Analysis, David J. Glawe
  (/web/20191113112609/https://www.dhs.gov/person/david-j-glawe)
  - Principal Deputy Under Secretary for Office of Intelligence and Analysis, Brian J. Murphy (/web/20191113112609/https://www.dhs.gov/person/brian-murphy)

- Under Secretary, Office of Strategy, Policy, and Plans (vacant), Chad Wolf, Senior Official Performing the Duties of the Under Secretary, Office of Strategy, Policy, and Plans
  - Deputy Under Secretary, James W. McCament
    (/web/20191113112609/https://www.dhs.gov/person/james-w-mccament)
  - Assistant Secretary, International Affairs, Valerie Boyd
  - Assistant Secretary, Cyber, Infrastructure, and Resilience Policy, Bryan Ware
    (/web/20191113112609/https://www.dhs.gov/person/bryan-s-ware)
  - Assistant Secretary, Border, Immigration, and Trade Policy, Scott Glabe
  - Assistant Secretary, Threat Prevention and Security Policy, Elizabeth Neumann
    (/web/20191113112609/https://www.dhs.gov/person/elizabeth-neumann)
  - Assistant Secretary, Strategy, Plans, Analysis & Risk, Chad Wolf
    (/web/20191113112609/https://www.dhs.gov/person/chad-wolf)

- Director, U.S. Citizenship and Immigration Services (acting), Ken Cuccinelli
  - Deputy Director, U.S. Citizenship and Immigration Services, Mark Koumans
    (https://web.archive.org/web/20191113112609/https://www.uscis.gov/about-us/leadership/mark-koumans-deputy-director-us-citizenship-and-immigration-services)

https://www.dhs.gov/leadership                              Go    OCT  **NOV**  DEC

1,024 captures                                                  ◀ **13** ▶
12 Aug 2012 – 27 Aug 2020                                   2018 **2019** 2020

- Vice Commandant, U.S. Coast Guard, <u>Admiral Charles W. Ray</u>
  <u>(https://web.archive.org/web/20191113112609/https://www.uscg.mil/Leadership/Senior-</u>
  <u>Leadership/Vice-Commandant/)</u>

- Commissioner, U.S. Customs and Border Protection, <u>Kevin K. McAleenan</u>
  <u>(https://web.archive.org/web/20191113112609/https://www.cbp.gov/about/leadership-</u>
  <u>organization/commissioner)</u> (currently serving as Acting Secretary, Department of Homeland
  Security)
  - Chief Operating Officer and Senior Official Performing the Duties of the
    Commissioner, U.S. Customs and Border Protection, <u>Mark A. Morgan</u>
    <u>(https://web.archive.org/web/20191113112609/https://www.cbp.gov/about/leadership-organization)</u>
  - Deputy Commissioner, U.S. Customs and Border Protection, <u>Robert E. Perez</u>
    <u>(https://web.archive.org/web/20191113112609/https://www.cbp.gov/about/leadership-</u>
    <u>organization/deputy-commissioner)</u>

- Director, Cybersecurity and Infrastructure Security Agency (CISA), <u>Christopher C. Krebs</u>
  <u>(/web/20191113112609/https://www.dhs.gov/person/christopher-c-krebs)</u>
  - Deputy Director, <u>Matthew Travis</u>
    <u>(/web/20191113112609/https://www.dhs.gov/person/matthew-travis)</u>
  - Assistant Director for Cybersecurity Division (CSD), <u>Jeanette Manfra</u>
    <u>(/web/20191113112609/https://www.dhs.gov/person/jeanette-manfra)</u>
  - Assistant Director for Infrastructure Security Division (ISD), <u>Brian Harrell</u>
    <u>(/web/20191113112609/https://www.dhs.gov/person/brian-harrell)</u>
  - Assistant Director for Emergency Communications (ECD), <u>Ronald Hewitt</u>
    <u>(/web/20191113112609/https://www.dhs.gov/person/ronald-t-hewitt)</u>
  - Assistant Director, National Risk Management Center (NRMC), <u>Bob Kolasky</u>
    <u>(/web/20191113112609/https://www.dhs.gov/person/bob-kolasky)</u>

- Administrator, Federal Emergency Management Agency (acting), Pete T. Gaynor
  - Deputy Administrator, <u>Pete T. Gaynor</u>
    <u>(https://web.archive.org/web/20191113112609/https://www.fema.gov/peter-gaynor)</u>
  - Deputy Administrator for Resilience, <u>Daniel Kaniewski</u>
    <u>(https://web.archive.org/web/20191113112609/https://www.fema.gov/daniel-kaniewski)</u>

https://www.dhs.gov/leadership                                    Go      OCT **NOV** DEC

1,024 captures                                                        ◀ **13** ▶
12 Aug 2012 - 27 Aug 2020                                          2018 **2019** 2020

- Director, Federal Law Enforcement Training Centers, Thomas J. Walters
  (https://web.archive.org/web/20191113112609/https://www.fletc.gov/our-leadership)
  - Deputy Director, Federal Law Enforcement Training Centers, William Fallon

- Director, U.S. Immigration and Customs Enforcement (ICE), (vacant), Matthew T.
  Albence, Senior Official Performing the Duties of the Director, U.S. Immigration and
  Customs Enforcement
  - Deputy Director, Matthew T. Albence
    (https://web.archive.org/web/20191113112609/https://www.ice.gov/leadership)

- Director, U.S. Secret Service, James M. Murray
  (https://web.archive.org/web/20191113112609/https://www.secretservice.gov/about/leadership/#director)
  - Deputy Director, U.S. Secret Service, Leonza "Leon" Newsome III

- Administrator, Transportation Security Administration, David P. Pekoske
  (https://web.archive.org/web/20191113112609/https://www.tsa.gov/leader-bios/administrator)
  - Deputy Administrator (acting), Transportation Security Administration, Patricia
    F.S. Cogswell

- Assistant Secretary, Countering Weapons of Mass Destruction Office (acting), Gary
  Rasicot
  - Principal Deputy Assistant Secretary, Countering Weapons of Mass Destruction
    Office, Andre Watson
  - Chief Medical Officer, Dr. Duane Caneva

- Assistant Secretary, Office of Legislative Affairs, Christine M. Ciccone
  (/web/20191113112609/https://www.dhs.gov/person/christine-m-ciccone)
  - Deputy Assistant Secretary, David Wonnenberg
    (/web/20191113112609/https://www.dhs.gov/person/david-wonnenberg) (Senate)
  - Deputy Assistant Secretary, Uyen Dinh
    (/web/20191113112609/https://www.dhs.gov/person/uyen-dinh-esq) (House)

- Assistant Secretary, Office of Partnership and Engagement, John H. Hill
  (/web/20191113112609/https://www.dhs.gov/person/john-h-hill)

https://www.dhs.gov/leadership   Go

1,024 captures
12 Aug 2012 – 27 Aug 2020

OCT **NOV** DEC
◀ **13** ▶
**2018** **2019** 2020

▾ About this capture

- Deputy Assistant Secretary, Intergovernmental Affairs, Cherie N. Short
    - Deputy Assistant Secretary, Private Sector Office, Matt Hayden
    - Executive Director, Homeland Security Advisory Council, Matt Hayden
    - Executive Director, Campaigns and Office of Academic Engagement, Trent Frazier
    - Director, Committee Management Office, Traci Silas

- Assistant Secretary, Office of Public Affairs (acting), Heather N. Swift
    - Deputy Assistant Secretary, Media Operations, Vacant
    - Deputy Assistant Secretary, Strategic Communications, Michael Bars

- Executive Director, Joint Requirements Council, Joseph D. Wawro
  (/web/20191113112609/https://www.dhs.gov/person/joseph-d-wawro)

- Director, Operations Coordination, Christopher J. Tomney
  (/web/20191113112609/https://www.dhs.gov/person/rear-admiral-christopher-j-tomney-uscg-ret)

- Chief Privacy Officer (acting), Jonathan Cantor

- Citizenship and Immigration Services Ombudsman, Michael T. Dougherty
  (/web/20191113112609/https://www.dhs.gov/person/michael-t-dougherty)

- Officer for Civil Rights & Civil Liberties, Cameron Quinn
  (/web/20191113112609/https://www.dhs.gov/person/cameron-quinn)

- Inspector General, Joseph V. Cuffari

Last Published Date: November 8, 2019

# EXHIBIT X

 Official website of the Department of Homeland Security

**U.S. Department of
Homeland Security**

# Chad F. Wolf

On November 13, 2019, Chad F. Wolf was designated as the Acting Secretary of Homeland Security by President Donald J. Trump and was also confirmed as the first Under Secretary of the U.S. Department of Homeland Security's (DHS) Office of Strategy, Policy, and Plans (PLCY). Previously, he served as the Acting Under Secretary.

As the senior official for PLCY, Mr. Wolf leads the Department's policymaking process to develop and coordinate strategies and policies that advance the homeland security mission and protect the American public.



*Chad F. Wolf*

Since his selection by the President, Mr. Wolf has advanced many of the Administration's critical priorities across the entire homeland security mission. Mr. Wolf oversaw the completion of the recently released DHS Strategic Plan, which establishes the Department's long-term strategic goals and objectives to inform key leadership decisions. Additionally, he led several significant initiatives to counter international and domestic terrorism, prevent terrorist travel, safeguard the U.S. electoral process, and protect American trade interests. As part of his duties, Mr. Wolf led and coordinated the Department's engagement with international partners to protect American homeland security interests at home and abroad.

During his tenure, Mr. Wolf has made significant progress to strengthen U.S. border security, address the humanitarian crisis on the U.S. Southwest Border, and improve the integrity of the U.S. immigration system. As a result of these efforts, Mr. Wolf and his staff have implemented policies that protect American communities from transnational criminal organizations and safeguard American workers.

With over 20 years of policy development and management experience in both the public and private sectors, Mr. Wolf is an effective leader and policymaker on a variety of complex issues. During the Trump Administration, he served as the Chief of Staff for the Transportation Security Administration (TSA), Deputy Chief of Staff and Chief of Staff for the Department. For his leadership and management of complex national issues, Mr. Wolf received the U.S.

Secretary of Homeland Security Distinguished Service Medal. Shortly after the terrorist attack on September 11, 2001, Mr. Wolf served as the Assistant Administrator of Transportation Security Policy in which he played a leading role in establishing the Transportation Security Administration.

Beyond his service in the executive branch, Mr. Wolf served as Vice President and Senior Director at Wexler & Walker, a bipartisan public policy consultancy, and held staff positions in the U.S. Senate.

Mr. Wolf earned his Bachelor of Arts in History from Southern Methodist University, and holds a Master's Certificate in Government Contract Management from Villanova University.

- Download a high resolution photo of Acting Secretary Wolf
  (/sites/default/files/images/opa/acting-secretary-wolf-official-photo.jpg)

Last Published Date: May 18, 2020

**EXHIBIT Y**



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:    Chad F. Wolf
Acting Secretary

SUBJECT:    **Reconsideration of the June 15, 2012 Memorandum
Entitled "Exercising Prosecutorial Discretion with Respect to
Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy
known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled
"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States
as Children." Ever since, the policy has been subject to substantial controversy. In recent years,
Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security
Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional
memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority
of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined
that the 2017 and 2018 memoranda had not complied with certain requirements for doing so.
See Department of Homeland Security v. Regents of the University of California, Nos. 18-587,
18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and
remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain
immediate changes to the DACA policy to facilitate my thorough consideration of how to
address DACA in light of the Supreme Court's decision. For the reasons outlined below,
pending my full reconsideration of the DACA policy, I direct DHS personnel to take all
appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy. The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria. The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal. Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization. The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so. The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA. The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect. In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA). In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote. On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well. The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy. On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy. The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Page 3

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies.  Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy.  To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy.  More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission.  At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration.  Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission.  Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:**  There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy.  And yet, although various proposals have been advanced to do that, Congress has so far declined to take action.  Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

Page 5

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

Page 6

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients. They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients. They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide. And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy. And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please. In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist. Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole. Accordingly, that has been the status quo for more than two years. It makes sense to continue that approach while I reconsider whether to rescind or revise the policy. If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time. And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year. Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it. And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal. They will merely have to seek renewal on an annual, rather than biannual, basis. In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis. Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period. But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS. DHS personnel should consider whether it is possible to

Page 7

reduce renewal fees during this interim period of reconsideration.  In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency.  Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.  Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1]  Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps.  I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty.  Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis.  Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period.  Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1]     Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied.  Many were rejected, while some were accepted and receipted.  To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

Page 8

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

* * * * *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

**EXHIBIT Z**



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

August 21, 2020

# Memorandum

TO:        Associate Directors and Program Office Chiefs

FROM:      Joseph Edlow
           Deputy Director for Policy

SUBJECT:   Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,
           "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial
           Discretion with Respect to Individuals Who Came to the United States as
           Children'"

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum
entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children.'" In light of
the U.S. Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents
of the University of California, et al.* Nos. 18-587, 18-588, 18-589, Acting Secretary Wolf
rescinded memoranda issued by former Acting Secretary Elaine Duke in 2017 and former
Secretary Kirstjen Nielsen in 2018 that had concluded that the Deferred Action for Childhood
Arrivals (DACA) policy established on June 15, 2012 by former Secretary Janet Napolitano[1]
(hereafter "the Napolitano memorandum") should be rescinded after an orderly wind-down
process.

Acting Secretary Wolf's memorandum (hereafter "the Wolf Memorandum") also set forth
departmental action to effect certain immediate changes to limit the scope of the DACA policy
pending a full and careful reconsideration of the DACA policy. Through this memorandum, I am
providing additional guidance to facilitate implementation of the specific changes to the DACA
policy that are within the purview of USCIS.

The Wolf Memorandum directed the following actions, effective immediately:

- Reject all initial DACA requests and associated applications for Employment
  Authorization Documents, and refund all associated fees, without prejudice to re-filing

---

[1] Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, Re:
Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June
15, 2012) ("Napolitano memorandum").

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 2

such requests should DHS determine to begin accepting initial requests again in the future;

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries;

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year;

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances;

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate; and

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum changes that policy.

To facilitate implementation of the Wolf Memorandum, I am providing additional guidance to USCIS personnel as follows:

> **Reject all initial DACA requests and associated applications for Employment Authorization Documents, and return all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.**

The Wolf Memorandum makes clear that these changes should apply to all initial DACA requests submitted by aliens who have never before received DACA, whether submitted after the issuance of his memorandum or pending before USCIS at the time his memorandum was issued. In accordance with the Wolf Memorandum, USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA.*  Since the Supreme Court's decision in

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 3

*Regents*, these requests, if properly filed, have generally been on hold at the USCIS filing location pending further action by USCIS.[2]

Historically, USCIS policy on DACA renewals has permitted DACA recipients to request renewal of DACA for up to one year after their underlying DACA grant has expired.  DACA recipients who failed to submit their renewal requests within the one-year time period following expiration have generally been permitted to request DACA anew.  Given the lapse of time between these aliens' last DACA period and their subsequent request to again receive DACA, however, USCIS has treated such requests as requests for "initial" DACA for required evidence, processing, and adjudication purposes.  Likewise, DACA recipients whose most recent period of DACA has been terminated by USCIS (rather than expired on its own terms) have also been permitted to request DACA anew, but such requests are treated as requests for "initial" DACA (even if the lapse of time between the termination of their most recent period of DACA and their subsequent request to receive DACA again is less than one year).

Under the preliminary injunctions issued in January and February of 2018,[3] USCIS has accepted and adjudicated DACA requests from aliens who have previously received grants of DACA *at any time*—including requests that are treated as "initial" requests for the reasons described above.  Given the Acting Secretary's desire to maintain the status quo of the past few years, USCIS will continue to accept and adjudicate such requests notwithstanding any language in the Wolf Memorandum about rejecting "all" requests for initial DACA.

> ➢ **Adjudicate all pending and future DACA renewal requests and associated applications for Employment Authorization Documents from DACA recipients.**

USCIS shall continue to adjudicate all pending DACA renewal requests and renewal requests received after the Wolf Memorandum, as well as certain initial requests as discussed above, under the general adjudicative guidelines in place for DACA. USCIS will continue to reject, without prejudice to re-submission, DACA renewal requests that are not properly filed in accordance with form instructions and USCIS filing guidance, as it has done since USCIS first started accepting DACA renewal requests.  While USCIS will continue to adjudicate DACA requests under the same general adjudicative guidelines, USCIS is implementing certain immediate changes to DACA processing consistent with and in furtherance of the Wolf Memorandum.

Since June 2014 when DHS and USCIS announced the DACA renewal process, USCIS has consistently instructed DACA recipients to file renewal requests between 150 days and 120 days

---

[2] Initial DACA requests that were properly filed prior to September 5, 2017, should be adjudicated to completion in the event that any of these requests still remain pending with USCIS.  This guidance to reject and return the fees for pending initial DACA requests does not apply to initial DACA requests properly filed prior to September 5, 2017.

[3] See https://www.uscis.gov/humanitarian/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 4

prior to their DACA expiration.[4]  Previously, USCIS has accepted renewal requests filed in advance of that period.  In furtherance of the directives in the Wolf Memorandum, USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period.  The Wolf Memorandum expressed concerns with the scope of the DACA policy during the interim period the policy is under review.  Exercising discretion to generally reject DACA renewal requests received more than 150 days prior to the expiration of the alien's current period of DACA is more consistent with our long-existing guidance to DACA recipients and serves other important operational interests to improve USCIS's processing and operational efficiencies as a whole.  Additionally, implementing these case intake procedures recognizes that the DACA policy is under comprehensive legal and policy review and may be modified or entirely rescinded by the Acting Secretary once DHS's review of the DACA policy is complete.  Therefore, USCIS believes that it is more prudent to generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period as the DACA policy may be revised or rescinded before USCIS would normally take final adjudicative action on these early filed renewal requests.

USCIS understands that applicants, petitioners, and requestors have an interest in timely adjudications.  This is particularly true for aliens granted temporary authorization to work in the United States who then apply to USCIS to renew their employment authorization documents before their temporary employment authorization expires.  The interim adjustment discussed in this memorandum with respect to early filed DACA renewals balances concerns with the scope of the DACA policy during this interim period with the interests DACA recipients have in preventing gaps in DACA and associated employment authorization.  Further, this guidance reflects an understanding that USCIS processes millions of requests for immigration benefits every year in addition to DACA requests, and therefore USCIS must also balance the interests of all other individuals requesting immigration benefits from the agency.  Of course, this balancing of interests must be done with consideration given to available resources.

USCIS has seen thousands of instances of current DACA recipients filing for DACA renewal when they still have more than 150 days remaining in their current DACA validity.  USCIS data shows that as of June 30, 2020, there were over 11,000 active DACA recipients with DACA renewals pending before USCIS whose current DACA was not set to expire until after January 1, 2021; further, there were nearly 400 active DACA recipients with pending renewal requests whose DACA was not set to expire until the year 2022.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date.  USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.  However, permitting and accepting DACA renewal requests filed many months in advance of

---

[4] See DACA FAQ 50; https://www.uscis.gov/archive/frequently-asked-questions#renewal; See also; https://www.dhs.gov/news/2014/06/05/secretary-johnson-announces-process-daca-renewal

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 5

DACA expiration only to be preliminarily processed by USCIS and placed on hold is not an efficient use of agency resources.

In assessing whether USCIS should exercise its discretion to begin generally rejecting DACA renewal requests filed more than 150 days prior to expiration, I considered the interests DACA renewal requestors may have in being permitted to file for renewal more than 150 days prior to DACA expiration.  In consideration of these potential interests, I examined DACA renewal processing times.  USCIS data shows that from August 1, 2019 to August 1, 2020, approximately ninety-six percent of DACA renewal requests processed were completed in 120 or fewer days.

The data demonstrate that in the overwhelming majority of DACA renewal cases, it is not necessary to accept DACA renewal requests more than 150 days before the alien's current DACA period expires in order to facilitate timely processing and minimize gaps in DACA and associated employment authorization.  For those aliens, the only effect of this change will be for those early requesters either to wait until the specified period to request renewal or to re-file an early-filed renewal request at the appropriate time.  In cases where the requestor may not continue to meet the DACA guidelines, including concerns that arise from background check results, renewal processing may require more time, but these outliers do not reasonably justify permitting routine acceptance of early filings during this interim period while the DACA policy is under review given USCIS's other policy and operational concerns.

Lastly, nothing precludes USCIS from exercising its discretion to accept a DACA renewal request filed 150 days or more in advance of expiration if there are legitimate reasons for doing so, and nothing precludes USCIS from again modifying recommended filing timelines either during this interim period or should DHS announce changes to the DACA policy in the future.

> **Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.**

As described in the Wolf Memorandum, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one year.[5]

The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one year minus one day from the date of approval.  Also consistent with past practices, the associated employment authorization validity period shall end on the same date that the DACA validity period ends.

The Wolf Memorandum acknowledged that shortening validity periods to one year during this interim period will have the effect of increasing the total amount of fees DACA requestors would pay over a multi-year period and asked USCIS to consider whether it is possible to reduce renewal fees during this time.  USCIS is currently considering the merits and feasibility of

---

[5] 8 CFR 274a.12(c) states in pertinent part that "USCIS, in its discretion, may establish a specific validity period for an employment authorization document . . ."

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 6

reducing DACA-related fees during the interim period the DACA policy is under review. Pursuant to INA Section 286(m), DHS may set fees at a level that will "ensure recovery of full costs" of providing adjudication services.  While USCIS has never charged a fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, all DACA requestors are required to file Form I-765, Application for Employment Authorization, which does require a fee with very limited exemptions. DACA requestors are also required to pay a biometrics fee.

USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being. Lastly, as noted above, USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period, which may lessen some of the economic impact from shortened DACA renewal validity periods.

> **Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.**

Notwithstanding the prospective changes made by the Wolf Memorandum, USCIS will allow previous two-year grants of DACA and associated employment authorization to remain undisturbed during their existing two-year validity periods (unless USCIS terminates an alien's DACA and associated employment authorization for other reasons).  Consistent with this guidance, two-year DACA recipients who apply for a replacement EAD due to loss, theft, or the mutilation of their prior EAD will receive a replacement EAD with the same expiration date based on the original two-year validity period, assuming the application is otherwise approvable.

> **Reject all pending and future Form I-131 applications for advance parole from DACA recipients and refund all associated fees, absent exceptional circumstances.**

Acting Secretary Wolf states the following in his memorandum with respect to advance parole:

> "In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist."

Because USCIS will not be able to determine whether Form I-131 applications already received at the DACA-specific filing location fit within Secretary Wolf's stated parole policy without adjudicating the applications, and applicants who filed their Form I-131 before the Wolf Memorandum was issued did not have prior knowledge of the guidance in the memorandum, USCIS has determined that it would be more efficient and fair if applicants refile their applications under the new guidance.  Therefore, USCIS shall reject and return the fees for all Form I-131 applications received at the DACA specific filing location that have been held since July 24, 2020.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 7

If those DACA recipients still wish to submit a request for advance parole, they may submit their Form I-131 applications consistent with filing instructions that will be announced on the USCIS website. The Form I-131 rejection notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

Regarding Form I-131 applications filed by DACA recipients at non-DACA filing locations before the Wolf Memorandum was issued and therefore accepted, USCIS will treat these applications similarly to those that have been on hold at the DACA-specific filing location. USCIS will administratively close these cases and refund the fees. USCIS will issue notices informing these applicants that their application has been administratively closed consistent with the Wolf Memorandum. The notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

USCIS will continue to maintain the current policy for DACA recipients who apply for advance parole in association with other non-DACA immigration requests. For instance, if a DACA recipient has a pending Form I-485 Application to Register Permanent Residence or Adjust Status and requests advance parole on the basis of his or her pending Form I-485, USCIS will adjudicate the advance parole request under the existing policies for Form I-485-based advance parole requests. USCIS will not apply this memorandum to a parole request by a DACA recipient if the request is associated with another underlying immigration benefit (i.e., other than DACA) as described in the instructions to Form I-131 or in USCIS policy guidance.

DACA recipients who have no separate basis for requesting advance parole as described in the instructions to Form I-131 may request advance parole if they have valid DACA and can demonstrate that they warrant the extraordinary privilege of being permitted to return to the United States after traveling abroad, even without a lawful immigration status, pursuant to a valid advance parole travel document.

The Wolf Memorandum sets forth new agency guidance with respect to management of the adjudication of advance parole applications submitted by DACA recipients who do not have a non-DACA basis for advance parole. For nearly three years, advance parole applications submitted by DACA recipients were rejected or denied by USCIS (the applications that were accepted and then denied were accepted solely because they were submitted to an incorrect filing location).

The Wolf Memorandum does not revive the prior DACA-based advance parole standards[6] or add a supplementary exceptional circumstances test to those standards. Rather, the Wolf

---

[6] The prior policy for granting advance parole based on DACA stated that USCIS would generally only grant advance parole if the DACA recipient's travel abroad would be in the furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- Educational purposes, such as semester-abroad programs and academic research, or;

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum Page 8

Memorandum institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards during an interim period while DHS conducts a full review of the DACA policy. As Acting Secretary Wolf noted, it makes sense to continue this approach while he reconsiders whether to rescind or revise the prior policy. The only difference is that the Wolf Memorandum permits USCIS to process advance parole applications submitted by DACA recipients consistent with INA Section 212(d)(5) and based on a full consideration of all the discretionary factors presented in the alien's application.

Such grants of advance parole should, as a threshold matter, be consistent with the statutory description of parole under INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefit. Accordingly, I am directing USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with the statute and take into consideration all other discretionary factors present in the case under the totality of circumstances.

Secretary Wolf's memorandum providing for "exceptional circumstances" should be understood in the context of this existing high statutory standard for parole found in INA Section 212(d)(5). Therefore, in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole under Secretary Wolf's interim policy regarding the discretionary exercise of parole for urgent humanitarian reasons or significant public benefit. Additionally, as USCIS has noted since DACA recipients were first permitted to apply for advance parole, travel for vacation is not a valid basis for advance parole.

While the determination of whether to grant advance parole to a DACA recipient based on exceptional circumstances is a case-by-case assessment involving the assessment of the totality of factors presented, some examples of travel that may fit within the statutory standard for parole include, but are not limited to the following:

- Travel to support the national security interests of the United States including U.S. military interests;

- Travel in furtherance of U.S. federal law enforcement interests;

- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States;

- Travel needed to support the immediate safety, well-being, or care of an *immediate* relative, particularly minor children of the alien.

The burden shall be on the alien to establish eligibility for parole pursuant to INA section 212(d)(5).

---

- Employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 9

USCIS will consider all discretionary factors presented in the application before making a decision on the advance parole request. The advance permission to travel abroad and return to the United States pursuant to an advance parole travel document is an extraordinary privilege. It is a particularly extraordinary privilege when conferred to an alien who has resided in the United States contrary to our immigration laws (irrespective of when the alien arrived in the United States). The June 15, 2012 Napolitano memorandum itself contained no directive to provide this extraordinary benefit to DACA recipients, and USCIS has not granted this benefit to DACA recipients since the issuance of the September 5, 2017, Duke memorandum.

To ensure compliance with this interim policy, I am directing that any applications for advance parole preliminarily assessed to be approvable by the Service Center(s) designated to adjudicate such applications, receive concurrence from no lower than the Deputy Associate Director for Service Center Operations Directorate (SCOPS) prior to final approval. SCOPS will develop a process to facilitate this review in a timely manner.

SCOPS shall immediately work with the Office of Intake and Document Production (OIDP) and the External Affairs Directorate (EXA) to develop public guidance consistent with this memorandum. The public guidance shall make clear that any applications for advance parole submitted by DACA recipients and received at the designated filing location will be considered a DACA-based application for advance parole based on the Wolf Memorandum.

The public guidance shall make clear that USCIS will accept the application if properly completed and process the fee prior to making an adjudicative determination on whether advance parole should be granted. The public guidance shall also make clear that any applications denied by USCIS because USCIS finds that the application does not merit approval, in the exercise of its discretion, under INA Section 212(d)(5), are not appealable and shall not receive a refund of application fees.

As noted above, INA Section 286(m) gives USCIS authority to collect application fees that "ensure recovery of the full costs of providing [adjudication services]." The determination of whether to grant advance parole under INA Section 212(d)(5) must be made by a trained Immigration Officer after required background checks and other processing requirements are completed. Those services cost money which USCIS recoups from the application fee. As those services must be completed prior to a final determination on whether the alien merits a grant of advance parole USCIS will not refund the application fees on advance parole applications that USCIS denies, consistent with USCIS standard practice.

SCOPS will work with the Office of Policy and Strategy (OP&S) and the Office of the Chief Counsel (OCC) to develop additional training or guidance materials to assist officers in the adjudication of these applications consistent with this memorandum.

> **Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.**

USCIS shall not terminate any previously approved advance parole documents issued to DACA recipients during the stated validity period of the existing advance parole document, absent a

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 10

valid, separate legal basis distinct from the directives in the Wolf Memorandum for terminating advance parole.[7]

> **Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.**

Based on the immediate review of the DACA policy, including the immediate interim changes to the policy discussed in the Wolf Memorandum and this memorandum, I am directing SCOPS to immediately review the internal guidance document referred to as the DACA SOP last revised on August 28, 2013. SCOPS should work with OCC and OP&S to immediately update the DACA SOP consistent with the Wolf Memorandum and this memorandum. The updated DACA SOP shall make clear that it is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress.

SCOPS should also review other internal DACA operational guidance and training materials currently in use to ensure that they are consistent with the Wolf Memorandum and this memorandum.

USCIS must continue to follow the DACA termination procedures required by all relevant court orders as long as they remain in effect.

> **Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.**

USCIS shall continue to operate under the DACA information sharing policy described above. Nothing in this memorandum or the Wolf Memorandum makes any change to that policy.

**Use**

This memorandum is intended solely for the instruction of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to, create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[7] USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017.

# EXHIBIT AA

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528



August 17, 2020

Dear Mr. Armstrong:

Under the Homeland Security Act of 2002 (HSA), Acting Secretary Chad F. Wolf and Senior Official Performing the Duties of Deputy Secretary (SOPDDS) Kenneth T. Cuccinelli II are lawfully performing their current roles at DHS. We request that the GAO immediately rescind its Report claiming otherwise, as the Report's conclusion is fundamentally erroneous.

*

In response to congressional requests from Democrat leadership in the House of Representatives, on August 14, 2020, the GAO issued a Report concerning the appointments of Acting Secretary Wolf and SOPDDS Cuccinelli.[1] The Report does not allege that Acting Secretary Wolf and SOPDDS Cuccinelli are ineligible, unfit, unqualified, unable, or incapable of serving in their current roles. Rather, the GAO claims, based on its preferred (but not exclusive) reading of an internal DHS document, that former Secretary Kirstjen M. Nielsen's order of succession required the appointment of a different successor than the one that she designated in that order, personally swore into office, and announced to the public, and whom DHS, as directed by then-Secretary Nielsen, actually and ultimately installed. In doing so, the GAO neglects relevant evidence and subsequent designations.

The GAO's conclusions are baseless and baffling. Baseless because the GAO glosses over the import of DHS's unique order-of-succession authority found in the HSA; disregards key statements made by then-Secretary Nielsen; and ignores each piece of evidence that makes clear whom then-Secretary Nielsen was choosing as her successor, including express statements by Secretary Nielsen and President Trump that then-U.S. Customs and Border Protection (CBP) Commissioner Kevin K. McAleenan had been selected to serve as Acting Secretary and Secretary Nielsen's swearing-in of Commissioner McAleenan to serve in that role. Baffling because the GAO staff admitted that even if then-Secretary Nielsen's April 9, 2019, memorandum is considered in isolation, DHS's interpretation of its own internal memorandum was "a possible interpretation." Yet, despite the obvious fact that the agency is entitled to interpret its own internal memoranda, the GAO improperly rejected DHS's reading. Instead, the GAO decided that its preferred interpretation should displace that of everyone else's at DHS, including both the Agency head and the Agency's highest-ranking attorney.

*

---

[1] *Matter of: Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland* Security, GAO, File: B-331650 (Aug. 14, 2020).

August 17, 2020

As an initial matter, GAO's authority to issue the Report is questionable. As its source of authority, the GAO states that the Report was issued pursuant to 5 U.S.C. § 3349, a section of the Federal Vacancies Reform Act of 1998 (FVRA) that gives the GAO the authority to report to Congress if "an officer [designated under the FVRA] is serving longer than the 210-day period" maximum allowed under the FVRA.[2] The GAO confirmed the claim to this source of authority by posting its Report on its website under the section for the FVRA.[3] The Report, however, did not concern an appointment under the FVRA and the GAO is not claiming that any official at DHS exceeded the 210-day maximum. Instead, the Report concerned an appointment under § 103 of the HSA.[4] The GAO has no authority under § 3349 to opine on the application of the HSA. For this reason alone, the Report should be rescinded.

\*

The Report is premised on multiple errors. Most prominently, it rests on the faulty contention that when then-Secretary Nielsen stated that then-Commissioner McAleenan would be her successor and swore him in as her successor, those actions had no legal significance in determining whom she actually chose as her successor. That error doomed the Report.

Then-Secretary Nielsen legally changed the succession order for the Secretary in April 2019 as evidenced by three official acts. First, on April 9, 2019, then-Secretary Nielsen issued a document designating the order of succession for any and all vacancies in the position of the Secretary, which provided that then-Commissioner McAleenan would be her successor (the Nielsen Memorandum). Second, then-Secretary Nielsen reaffirmed this change in a message to the entire agency when she stated that "Kevin McAleenan will now lead DHS as your Acting Secretary." Finally, then-Secretary Nielsen personally executed her order of succession when she swore in then-Commissioner McAleenan as the Acting Secretary.

The relevant statute in this area is the HSA. Section 103(g)(2) of the HSA allows the Secretary of Homeland Security "to designate such other officers of the Department in further order of succession to serve as Acting Secretary." This statute vests *exclusive* authority in the Secretary—not in the GAO—to determine the order of succession.

The order of succession established by then-Secretary Nielsen provided that then-Commissioner McAleenan was to serve as Acting Secretary when she resigned. In the Nielsen Memorandum, then-Secretary Nielsen designated as follows: "By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows," after which she listed the order of succession for any and all vacancies in the position of the Secretary.

---

[2] Chapter 33 of Title 5.

[3] https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act#violation_letters.

[4] Homeland Security Act of 2002, Pub. L. No. 107-296, § 103, 116 Stat. 2135 (Nov. 25, 2002), *as amended by* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000, 2672 (Dec. 23, 2016), codified at 6 U.S.C. § 113.

August 17, 2020

For context, on December 15, 2016, then Secretary Jeh Johnson published an order of succession/delegation—before 6 USC §§ 113(g)(1) and (2) were added to the HSA—which distinguished between the two different scenarios that occurred under the FVRA —an order of succession and an order of delegation.  First, in section II.A, he provided for an order of succession consistent with 5 U.S.C. § 3345(a), which stated that the *order of succession* in case of the Secretary's death, resignation, or inability to perform followed Executive Order 13753.  This was necessary because under the existing law at the time (the FVRA), only the President could provide for an order of succession in these circumstances.  Second, in section II.B and Annex A, Secretary Johnson provided a separate *order for delegation of authority*, which would apply during a disaster or catastrophic emergency—circumstances not covered by the FVRA.

Although the Nielsen Memorandum did not expressly revoke the language in section II.A that referred to an order of succession issued by the President under the FVRA in December 2016, it did supersede both aspects of Secretary Johnson's order by creating a single list, designated by the Secretary, of the officials who would be both in the "order of succession for the Secretary" (superseding section II.A) and recipients of the delegation of authority (revising Annex A).  This was possible because 6 USC §§ 113(g)(1) and (2) now allowed Secretary Nielsen to change her order of succession in all circumstances, not just during a disaster or catastrophic emergency.

Four aspects of the text of Nielsen's one-page Memorandum establish that, contrary to the conclusion in the GAO Report, she changed both the *order of succession* and *order for delegation of authority*—not just the *order for delegation of authority*.  First, the title of the document said it was "Amending the Order of Succession."  That title makes no sense if she was only amending the *order for delegation of authority*.  Second, the first line invoked the Secretary's authority under 6 U.S.C. § 113(g)(2), which is a power to designate officials in "order of succession to serve as Acting Secretary," notwithstanding the FVRA, thus demonstrating her intention to supersede the FVRA, not simply to revise a delegation of secretarial authority for use when there is not a vacancy for FVRA purposes.  Third, she said "I hereby designate *the order of succession* for the Secretary of Homeland Security as follows."  And fourth, the decision document attached to the Nielsen Memorandum, which Secretary Nielsen signed, makes this unambiguously clear: "By approving the attached document, you will designate *your desired order of succession for the Secretary* . . . in accordance with your authority pursuant to the [HSA]."  Accordingly, consistent with the HSA, then-Secretary Nielsen established a single order of succession for all vacancies that may arise.  Under this amended order of succession the Commissioner of CBP was to become the Acting Secretary in case of a vacancy.[5]

Then-Secretary Nielsen's designation of then-Commissioner McAleenan to serve as Acting Secretary was subsequently confirmed by her official statements and actions.  As part of her

---

[5] The source of the Report's confusion appears to be that the "follow[ing]" list of officials was then preceded by a separate introductory clause noting that Annex A — the list associated with the delegation — was also being "amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof."  In context, however, the two different introductory clauses for the same list of officials simply showed that Secretary Nielsen was creating one list that would serve both the order-of-succession purposes of section II.A and the delegation-of-authority purposes of section II.B.  This is supported by all of the other evidence about Secretary Nielsen's intention at the time.

August 17, 2020

amendment to the order of succession, then-Secretary Nielsen clearly and unambiguously articulated her intent when she stated in her farewell message to the entire agency: "Kevin McAleenan will now lead DHS as your Acting Secretary." This was consistent with the public announcement from President Trump that "Kevin McAleenan, the current U.S. Customs and Border Protection Commissioner, will become Acting Secretary."[6] Further, on April 10, 2019, Secretary Nielsen made her designation unambiguous and clear when she personally swore in Commissioner McAleenan to serve as the new Acting Secretary.[7]



Posted on DHS's Twitter account (@DHSgov) on April 10, 2019

Few things constitute a more unambiguous designation of a successor than personally swearing your successor in. Even if the GAO were correct that the Nielsen Memorandum did not designate then-Commissioner McAleenan as then-Secretary Nielsen's successor—which it is not—the swearing in of then-Commissioner McAleenan (and the accompanying announcement) unequivocally supplanted that prior designation.

It follows, then, that Acting Secretary Wolf and SOPDDS Cuccinelli are lawfully performing their current roles at DHS. Invoking the HSA, then-Acting Secretary McAleenan later amended the order of succession, resulting in Acting Secretary Wolf's taking office. Acting Secretary Wolf subsequently amended the order of succession for Deputy Secretary, enabling Ken Cuccinelli to assume the role of the SOPDDS. The Report does not contend these subsequent actions were unlawful, and if the GAO had not ignored then-Secretary Nielsen's words and actions, then this letter would be unnecessary.

---

[6] https://twitter.com/realDonaldTrump/status/1115011885303312386
[7] https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/

4

August 17, 2020

*

The moment that Secretary Nielsen invoked her authority, she overrode all past designations, including Former Secretary Jeh C. Johnson's 2016 order of succession, which had been issued under the FVRA, *not* the HSA. This intentional and deliberate act by Secretary Nielsen was understood by all at DHS and across the Administration to have the scope that DHS has understood it to have. The GAO must accept this permissible interpretation. The GAO cannot ignore that interpretation to choose a different, preferred interpretation of its own in order to suit partisan ends. In reaching a contrary conclusion, the Report commits several egregious errors.

First, the GAO erred in failing to defer to DHS's interpretation of its own internal memorandum. The Nielsen memorandum is a wholly internal DHS document that does not have the binding effect of law, like a regulation governing the public, nor is its interpretation subject to challenge. Rather, the proper interpretation of the memorandum is solely within the authority of the Agency.[8] To that end, courts have found that not only do "the internal guidelines of a federal agency . . . not confer substantive rights on any party,"[9] but also it would be inappropriate for anyone "to second guess the Government['s]" interpretation of its own policies and internal memoranda "or demand that the Government" comply with its own "non-binding manual[s]" or internal memoranda.[10]

However, at a minimum, the GAO should have at least followed the Supreme Court's reasoning in *Kisor v. Wilkie* (2019)[11] and afforded the Department's interpretation deference. In fact, the Supreme Court explicitly held in *Kisor* and *Ford Motor Credit Co. v. Milhollin* (1980)[12] that such deference was owed *even to* official staff memoranda "never approved by the agency head."[13] This principle undergirding the Supreme Court's prevailing precedents entitles DHS in this matter to even more robust deference because the Nielsen Memorandum was, for the reasons DHS has given, "approved by the agency head" herself.[14]

At a minimum, DHS's interpretation of the Nielsen Memorandum should have received "'controlling weight'" unless it was plainly erroneous or inconsistent with internal DHS regulations or federal law.[15] Yet, as the GAO admitted, DHS's interpretation was neither plainly erroneous nor inconsistent with regulations or laws. Indeed, during a telephonic briefing with GAO staff on August 14, 2020, GAO officials responsible for the Report's drafting conceded that DHS's construction of the Nielsen Memorandum was a "possible interpretation." It was more than just a

---

[8] *See California. v. F.C.C.*, 39 F.3d 919, 925 (9th Cir. 1994) (citations omitted).

[9] *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir. 1990), *cert. denied*, 498 U.S. 1015 (1990); *see also United States v. Ivic*, 700 F.2d 51, 64 (2d Cir. 1983) (stating that "non-compliance with internal departmental guidelines is not, of itself, a ground of which defendants can complain").

[10] *United States v. Cason*, 2015 WL 4988206, *8 (N.D. W. Va. Aug. 19, 2015); *see also Northwest Motorcycle Assoc. v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1479 (9th Cir. 1994) (concluding that an agency's decision should be upheld even if it is "of less than ideal clarity," as long as "the agency's path may be reasonably discerned").

[11] 139 S. Ct. 2400.

[12] 444 U.S. 555.

[13] *Kisor*, 139 S. Ct. at 2417 (citing *Ford Motor Credit Co.*, 444 U.S. at 566, n. 9).

[14] *Id.* (citing *Ford Motor Credit Co.*, 444 U.S. at 566, n. 9).

[15] *Id*. at 2416 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

August 17, 2020

possible interpretation—it remains the *only* interpretation given by senior political and career officials at DHS. This key concession should have ended the inquiry.

Second, the Report refused to consider the official acts or statements of the key decision-maker: then-Secretary Nielsen. The HSA confers the Secretary with the exclusive authority to "designate such other officers of the Department . . . as Acting Secretary." Based on the statute, one would expect that the words and actions of then-Secretary Nielsen would be highly relevant to determining whom she was "designat[ing] . . . as Acting Secretary." Not, however, for the GAO. Relying on Supreme Court cases discussing post-enactment legislative history in the context of *statutory* interpretation, the Report claims that it would be inappropriate to consider then-Secretary Nielsen's words and actions.[16] This analysis misses a key distinction: The GAO was not interpreting a statute; it was interpreting an *internal agency memorandum* about whom then-Secretary Nielsen designated as her successor. Then-Secretary Nielsen was acting through that memorandum under a statute that gave her exclusive authority to set the order of succession. To ignore her words and her acts about the meaning of her memorandum was inexcusable and indefensible error.

Lastly, even if the GAO were correct that the Nielsen Memorandum did not designate Commissioner McAleenan as the successor—certainly, GAO is gravely mistaken in this view—then-Secretary Nielsen twice confirmed her designation when she sent her farewell message and when she swore in then-Commissioner McAleenan. Apart from confirming her intent, those acts, if somehow seen as inconsistent with the Nielsen Memorandum, would have *supplanted* the Nielsen Memorandum as Secretary Nielsen's designation. Thus, although the most logical interpretation of these three actions is that they were all done consistently and together, even if the GAO continues to unreasonably deny it, then the GAO still must concede that the last designation in time—Secretary Nielsen's direction to DHS that "Kevin McAleenan will now lead DHS as your Acting Secretary" and swearing in Commissioner McAleenan as the Acting Secretary—controlled.

\*

Regrettably, the GAO's actions surrounding the issuance of the Report could cause an objective observer to question its motivations.

First, the timing of the Report is suspect. The Report was released a mere 80 days before the Presidential election—but 274 days after the GAO had been asked by congressional Democrats to investigate the matter.[17] Although the Report argues that the purported illegality of Acting Secretary Wolf's appointment is "clear,"[18] the GAO took more than nine months to determine it. Clear and obvious legal answers do not take 274 days to divine, particularly for an agency like the GAO, which has approximately 3,000 employees and a \$706 million annual budget.[19]

---

[16] Report at p. 9.

[17] Letter from Chairman, Committee on Homeland Security, U.S. House of Representatives and Acting Chairwoman, Committee on Oversight and Reform, U.S. House of Representatives to Comptroller General (Nov. 15, 2019).

[18] Report at p. 9.

[19] Fiscal Year 2021 Budget Request, U.S. Government Accountability Office (THE GAO), *available at* https://www.gao.gov/assets/710/704924.pdf.

6

August 17, 2020

Second, GAO's staffing of this Report is suspect.  In an August 14, 2020, call between the GAO and DHS staff, GAO held out a junior staffer as the "author" of the Report.  This staffer appears to have limited experience practicing law—having graduated from law school only three years ago.  He also previously worked on a Democratic campaign and the partisan Senate Democratic Steering and Outreach Committee.  Surely, few things could be more significant than the appointment of the head of a cabinet-level agency.  It should have been easy to find a more seasoned attorney (whose past political work would not have created even the appearance of impropriety) among the GAO's 3,000 employees.

Third, the GAO's recent history is suspect.  The GAO is frequently criticized[20] for its "substantive legal and methodological errors."[21]  Indeed, a private-sector analysis found that the GAO had "inappropriately conducted, analyzed and reported" information.[22]  However, and most problematically, the GAO has recently come under fire for allegedly partisan behavior.  The GAO was accused of inappropriately participating in the attempted impeachment of the President and of changing a decades-long legal opinion in order to intentionally disfavor the President.[23]  Unfortunately, the issuance of this most recent Report exacerbates legitimate concerns of political partisanship at the GAO.

*

The Report takes the reader on a march through a marsh.  At each refusal to rely on key evidence, the morass thickens and the water deepens, as crucial questions lurking just underneath the surface begin to emerge: Is the ignored evidence and failure to afford DHS deference more than just a good faith disagreement?  Does the timing of this Report suggest that something else is motivating this opinion?  Does the GAO's unfortunate recent history of issuing partisan and inaccurate reports perhaps explain what is going on?  As the reader reaches the Report's conclusion, he is left with the sinking and inescapable feeling that something is afoot in the swamp.

---

[20] *See, e.g.*, Lisa Snell, *Why the GAO Study on Special Education in Charter Schools Gets It Wrong*, Reason Foundation, June 20, 2012, *available at* https://reason.org/commentary/why-the-GAO-study-on-special-educat/.
[21] CURTIS W. COPELAND, ERRORS AND INCONSISTENCIES IN THE GAO'S REPORTS ON THE CONGRESSIONAL REVIEW ACT, Harvard Law School: Environmental and Energy Law Program, July 10, 2018, *available at* http://eelp.law.harvard.edu/wp-content/uploads/GAO-and-the-CRA.pdf.
[22] Jean Norris, *GAO bias evident in report on for-profit college industry*, The Hill, Jan. 14, 2011, *available at* https://thehill.com/blogs/congress-blog/education/137995-gao-bias-evident-in-report-on-for-profit-college-industry.
[23] https://www.newsmax.com/scotfaulkner/government-accountability-office-trump-report-ukraine/2020/01/17/id/950282/.

7

August 17, 2020

The GAO should rescind its erroneous report immediately.

Very Truly Yours,

Chad Mizelle
Senior Official Performing the Duties of the General Counsel

# EXHIBIT BB

# GAO

**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

441 G St. N.W.
Washington, DC  20548

Comptroller General
of the United States

# Decision

| | |
|---|---|
| **Matter of:** | Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security—Reconsideration |
| **File:** | B-332451 |
| **Date:** | August 21, 2020 |

---

## DIGEST

The Department of Homeland Security's (DHS) request that we rescind our August 14, 2020, decision is denied, as DHS has not shown that our decision contains either material errors of fact or law, nor has DHS provided information not previously considered that warrants reversal or modification of the decision.

---

## DECISION

The Department of Homeland Security (DHS) requests reconsideration of our decision in Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security, B-331650, August 14, 2020 (Decision), asking that we rescind the decision.  Letter from Senior Official Performing the Duties of the General Counsel to General Counsel, GAO (Aug. 17, 2020).  In our decision, we concluded that the appointments of both officials were issued under an invalid order of succession. GAO will modify or reverse a prior decision only if it contains a material error of fact or law.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* https://www.gao.gov/products/GAO-06-1064SP.  As explained below, DHS did not identify any material errors of fact or law and we decline to reverse or modify the decision.

BACKGROUND

The Homeland Security Act (HSA) provides a means for an official to assume the title of Acting Secretary pursuant to a designation of further order of succession by the Secretary.  6 U.S.C. § 113(g)(2).  Secretary Kirstjen Nielsen exercised this power on April 9, 2019, the day before her resignation, when she established a new order of

succession for Acting Secretary as reflected in DHS 00106 (April Delegation).[1] However, upon her resignation, the official who assumed the title of Acting Secretary—Mr. Kevin McAleenan—was not the official designated in the April Delegation order of succession to serve upon the Secretary's resignation.  As a result, we concluded Mr. McAleenan's subsequent amendments to the April Delegation order of succession were invalid and the subsequent appointments of Chad Wolf and Kenneth Cuccinelli who assumed their positions under such amendments were also improper.

While we concluded the appointments were improper, we did not review or make conclusions regarding the consequences of actions taken by these officials.  We referred this question to the DHS Office of Inspector General.  In that regard, we specifically suggested consideration of whether actions taken by these officials could be ratified by properly serving individuals as designated in the April Delegation to be the Acting Secretary and Senior Official Performing the Duties of the Deputy Secretary.

DECISION

In its August 17, 2020, letter, DHS asserts that our decision is "fundamentally erroneous," but in doing so did not point to any facts which we relied upon that were in error or provide any new facts for us to consider.  DHS does assert legal error, arguing that our decision failed to properly defer to its interpretation of the Memorandum which it relied upon to demonstrate that the Secretary designated Mr. McAleenan to serve as Acting Secretary. The memorandum to which DHS refers is the April 9, 2019 Memorandum to Secretary Nielsen from the then-General Counsel requesting the Secretary's approval of the revised order of succession for Annex A.  DHS letter, at 5-6.

In our decision, we addressed DHS's focus on the Memorandum.  Decision, at 8-9. DHS argues that the Memorandum introduces ambiguity and that this requires us to defer to its interpretation of the order of succession.  However, given that the plain language of the April Delegation is clear, there is no need to refer to the Memorandum. Any contrary interpretation of the April Delegation by DHS would not be entitled to any deference given its clarity.  An agency's interpretation is not entitled to deference unless the controlling language is ambiguous, nor is deference available to an agency's "*post hoc* rationalization advanced [to] defend past agency action."  *See, generally*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415, 2417 (2019) (a court should not afford deference unless the regulation is genuinely ambiguous).

In addition to its insistence on deference, DHS accused this office of political partisanship.  In our oversight role, GAO produces hundreds of written products annually, including legal decisions, that examine agency programs and operations throughout the government.  DHS's demand for deference in these circumstances is not

---

[1] The Secretary also changed the order of succession for Deputy Secretary pursuant to her general management authorities under 6 U.S.C. § 112.

only legally unsupported but also ignores the public and Constitutional imperative of oversight to ensure transparency and accountability of governmental actions.

Our August 14, 2020, decision and all of our written products represent the work of numerous professionals, each taking care to remain independent and mindful of GAO's obligation to provide nonpartisan service to the American people. All GAO products also undergo a multi-level review to assure they are intellectually sound and free from bias. Rather than trying to reach a particular conclusion, our legal decisions, this one included, are the result of a dispassionate application of the relevant law to facts, not advocacy, and are subject to rigorous legal review and signature of GAO's General Counsel.

CONCLUSION

GAO will modify or reverse a prior decision or opinion only if it contains a material error of fact or law.  DHS has not demonstrated that our prior decision contains errors of either fact or law, nor has DHS presented information not previously considered that warrants reversal or modification of our decision.  Therefore, we decline to reverse or modify the decision.

Thomas H. Armstrong
General Counsel

# EXHIBIT CC

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BATALLA VIDAL, et al.; | |
| *Plaintiffs*, | Case No. 1:16-cv-04756 |
| v. | (NGG)(JO) |
| WOLF, et al.. | |
| *Respondents*. | |

## SUPPLEMENTAL DECLARATION OF MARTÍN BATALLA VIDAL

I, Martín Batalla Vidal, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I am trained as a Physical Therapist to Rehabilitation Certified Nursing Assistant. I have continued to renew and maintain DACA status since my previous declaration. I most recently renewed my DACA status for a period of two years on April 23, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time. This is really stressful, especially because I anticipate applying for new jobs in the future and I know employers want to hire people they can feel confident will work for them for a long time. It will also be hard financially because it is more expensive to renew more often.

3.  I have felt a lot of anxiety since the Wolf Memorandum was announced. For me and everyone with DACA, the new memo will reduce our chances of getting a job, of being independent, and being able to accomplish the things we have tried to with DACA—because now we have to renew more and our status is at risk. The memo came during a period that was already extremely stressful. My mother got COVID and was hospitalized for two weeks. She has a lot of

1

health problems already: she has osteoarthritis and thyroid issues. COVID has made her health even worse. Right after my mom got sick, my brother was in a serious car accident and spent two weeks in an Intensive Care Unit. The added anxiety caused by the Wolf Memorandum has been very difficult to handle.

**ADVANCE PAROLE**

4.   I have traveled on advance parole in the past and would like to be able to travel with advance parole again to visit my maternal grandmother in Mexico. She is in poor health and she is getting older. She called me recently and asked me when I am coming. She told me, "you promised to come back." But I haven't been able to travel since advance parole was ended for DACA recipients in 2017.

5.   With the new memoranda and the attacks on DACA, there is a lot to think about before applying for and traveling on advance parole. I'm scared. I want to visit my grandmother for what will probably be the last time. But I am concerned that seeing her would not qualify under the new restrictions on advance parole for DACA recipients and I also don't know if it is safe to take the risk of leaving the country.

**CLASS REPRESENTATIVE**

6.   I have been a plaintiff in this lawsuit since 2016.

7.   I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing any person who is a plaintiff in another lawsuit challenging the Wolf Memorandum.

8.   I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to

2

represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and because I have always treated this case as being about not only me but about the whole community.

9.   It is very important to me to reopen and restore DACA, like we thought we had after the Supreme Court decision. This case has made me someone who is publicly known so a lot of people contacted me after the decision, asking questions like if they could apply for DACA for the first time now. Based on what I know about the decision and talking to my lawyers, I told people they could and to start gathering their documents. And I had also encouraged people with DACA to renew. Now with the Wolf Memorandum, I feel a lot of guilt. People are so disappointed that now they can't apply for DACA for the first time or that their renewals will only be for one year. We thought it was a victory and it should have been.

10. Having to live year to year, now that the renewal period has been shortened, is also very stressful for everyone with DACA. One of my friends who works at a hospital and has DACA is scared now about losing his job.

11. I want to continue in our fight for DACA because I know what DACA does for people who can get it. DACA has given all of us who have it so many opportunities: to come out of the shadows, to have better opportunities, to become a business owner or entrepreneur, to study and get a college degree, and to work in the field we studied. Everyone deserves those same chances.


I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

3

EXECUTED August 27, 2020 in Gaithersburg, MD

Martín Batalla Vidal
Martín Batalla Vidal

# EXHIBIT DD

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

　　　　　*Respondents*.

Case No. 1:16-cv-04756 (NGG)
(JO)

## **SUPPLEMENTAL DECLARATION OF ANTONIO ALARCÓN**

I, Antonio Alarcón, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

　　1.　I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

　　2.　I graduated from community college in 2015 and got my bachelor's degree from Queens College in May 2018.

　　3.　I now work as a Civic Engagement Coordinator at Make the Road New York ("MRNY"). The census-outreach team that I coordinate at MRNY has contacted over 100,000 New Yorkers to educate them about the importance of completing the 2020 Census. We focus our outreach on the immigrant and Spanish-speaking communities. Our team has helped thousands of people complete the census.

　　4.　As part of my community outreach and education, I also do a lot of media appearances. I have written op-eds and I regularly appear in English- and Spanish-language media outlets such as NY1, Univision, and Telemundo to educate the community about the census and to address concerns and fears that exist about the census especially in the immigrant community.

1

5.  I first received DACA in March 2013. I have continued to renew and maintain DACA since that time. I most recently renewed my DACA for a period of two years on April 2, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time. I am worried because this change means more time in limbo for myself and other DACA recipients, since we are vulnerable to changes in policy each time we have to wait for a renewal, and it is also a lot more expensive.

**ADVANCE PAROLE**

6.  It has been very hard for me not to have access to advance parole since 2017. Both my parents live in Mexico with my younger brother. It has been four years since I have seen them and I really miss them. They missed my college graduation in 2018 and I was not able to be there for them in June 2020 when both of them got sick. Now my mom needs surgery, which I really want to be there for. It is hard for me to even think about how much I want to see them. It keeps me up at night.

7.  There are also so many other places I want to travel. I have always wanted to travel to Greece because of its history and all of the culture there that ties into things I studied in school. I have friends who have invited me to travel with them to other countries or to visit and meet their families in other countries, and without advanced parole it has been impossible.

8.  But now the situation as to whether DACA recipients can get permission to safely travel outside of the U.S. keeps shifting from one day to another. Under the new Wolf memorandum, I understand that advance parole for DACA recipients is even more restricted. I am not certain if seeing my parents in Mexico would be considered a valid reason to travel to Mexico or if I should risk leaving the country. I would also like the chance to travel abroad for educational purposes, but I believe that is no longer allowed under the new Wolf memo.

2

**CLASS REPRESENTATIVE**

9.  I have been a plaintiff in this lawsuit since 2017 and I have been an advocate for DACA and DACA holders since long before that.

10. I am willing to serve as the class representatives for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and related guidance. I understand I will not be representing any person who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memorandum.

11. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend the interests of the whole class, not only myself. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and related guidance.

12. I have always thought of my role in this case as representing the interests of more than just myself. I am committed to representing the whole class, including everyone who qualifies for DACA and everyone like me who has DACA but is now harmed by these newest memorandum. Even before these memos, renewing even every two years was a challenge because of the fees and the wait time. During those months of waiting for your renewal, you never know what the administration could do: they could issue a new memorandum, they could end the program all together. You are always in limbo and now, with the shortening of renewals from two years to one, people will be in an even worse limbo. It is also more likely that people who can't afford the fees or don't have help renewing may not be able to renew at all.

3

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Miami, FL.

_____
Antonio Alarcón

4

**EXHIBIT EE**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

　　　　　*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## <u>SUPPLEMENTAL DECLARATION OF ELIANA FERNANDEZ</u>

I, Eliana Fernandez, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I now work as a Lead Organizer at Make the Road New York. I continue to live with and raise my two U.S.-citizen children, who are starting the third and eighth grades this fall.

3.  I first received DACA on December 11, 2012. I have continued to renew and maintain DACA status since that time. I most recently renewed my DACA for a period of two years on April 20, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

4.  The uncertainty of the last three years and this administration's attacks on DACA have been very traumatic. I began attending therapy to try to better handle and process it all. Unfortunately, since the Wolf Memorandum, the anxiety and physical symptoms of stress that I developed when the government first tried to end DACA in 2017 have returned. The migraines and neck pain that I suffered then are back. These are because of the stress the announcement has made me feel and are causing me a lot of difficulty and discomfort.

**ADVANCE PAROLE**

5.   I was able to travel to Ecuador on advance parole in 2015 to visit my grandmother, who was ill at the time.

6.   I am very eager to apply for advance parole again in order to visit universities and possibly attend job interviews in Canada. Given the uncertainty around DACA and my worries about how a termination of DACA could impact my life and the lives of my kids, I have been exploring the possibility of moving to Canada with my family since earlier this year. I have spoken with an immigration lawyer in Canada and also made plans to take the language examination that is required for admission to Canadian universities. I have also been researching universities where I could get a master's degree as well as job opportunities in or near Toronto, Ontario.

7.   However, I have never been to Canada and uprooting my family to move to another country is a big decision. I do not want to make the decision for us to move there without visiting first.

8.   When DACA was reinstated in June of this year, I thought this would be a great opportunity to access advance parole again for the purpose of exploring educational and work opportunities in Canada. But then when the government issued its new memorandum on July 28, I was not sure if my travel would qualify. And now, reading the memorandum issued on August 21, I think it will be basically impossible to get advance parole. The reasons are just too narrow and challenging. It's upsetting to me to have this opportunity close off again. I want to be able to travel and build a better life for myself and my family.

**CLASS REPRESENTATIVE**

9.   I have been a plaintiff in this lawsuit since 2017.

10. I am willing to serve as the class representatives for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and implementing guidance. I

understand I will not be representing any person is eligible for DACA and proceeds with a federal lawsuit challenging the Wolf Memorandum.

11. I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012 and its implementing guidance.

12. I know from personal experience how much this administration's attacks on DACA are hurting all of us. So many people who qualify and would benefit from DACA cannot apply now. For those of us who already have DACA, the latest memos means we have to renew much more often, but we only the opportunity to have DACA for half the time. The change to one-year renewals makes me feel like I have no control over my life, no stability, and I know that is what others in my situation are feeling too. Through this case, I want to do what I can to help all of us.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 27, 2020 in Suffolk County, NY

_____
Eliana Fernandez

# EXHIBIT FF

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BATALLA VIDAL, et al.; <br><br> *Plaintiffs*, <br><br> v. <br><br> WOLF, et al.. <br><br> *Respondents*. | Case No. 1:16-cv-04756 <br> (NGG)(JO) |

## SUPPLEMENTAL DECLARATION OF CARLOS VARGAS

I, Carlos Vargas, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2.  I have continued to renew and maintain DACA status since my previous declaration. I most recently renewed my DACA status for a period of two years on February 14, 2020. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

## ADVANCE PAROLE

3.  I would like to be able to travel on advance parole again, as I was able to before the 2017 memo. My mom is hoping to be able to travel to Mexico soon and I would like to travel with her. I am her caretaker; she has a lot of mobility issues and I help her with basic things like standing up and sitting. I would also love to be able to experience going back to Mexico with her.

4.  But under the new guidelines, the standard is so narrow that I worry that traveling with her to support her would not qualify me for advance parole.

## CLASS REPRESENTATIVE

1

5.   I have been a plaintiff in this lawsuit since 2017.

6.   I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing anyone who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memo.

7.   I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012.

8.   I know how important it is to reopen and restore DACA and to keep a renewal period of two years. The COVID pandemic has showed the stakes. I was diagnosed with COVID and had to go to the hospital. While I was there, thinking of my own health and recovery, I also thought a lot about how hard it would be if I did not have health insurance and about all the challenges that being undocumented in the U.S. brings—from access to healthcare, to access to employment and on one's ability to serve the community. With DACA, I have access to health insurance through my employer. That is so important especially during a pandemic. Losing DACA would mean losing these benefits at a time when we are in a pandemic and things are so volatile, economically, emotionally, and for our health.

9.    The pandemic has also shown me how important it is for people who can obtain DACA to do so as a way to protect themselves and their communities. A lot of undocumented workers

2

are the essential workers who are putting food on our tables, doing deliveries, stocking our shelves at the supermarket. I can only imagine the risks they are putting themselves in everyday, exposing themselves to the public while working during the pandemic. With DACA, they would be able to have the rights and security that enable them to be able to contribute more to their communities, but also to protect themselves. Access to DACA would help them and also help their mixed status families, because a lot of folks have kids who were born here and family members who are citizens or residents.

10. This case and the opportunity to help everyone who qualifies for DACA is especially important at this time.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 21, 2020 in Staten Island, NY

Carlos Vargas

3

# EXHIBIT GG

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

          *Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

### <u>SUPPLEMENTAL DECLARATION OF CAROLINA FUNG FENG</u>

I, Carolina Fung Feng, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Plaintiff in this lawsuit and submit this declaration as a supplement to my previous declaration, dated December 13, 2017 and submitted as ECF No. 123-13.

2. I am 31 years old and I live in Queens, New York. I currently work at the Center for Popular Democracy as a digital organizer on their census campaign, trying to encourage participation in the 2020 Census, and I also support other advocacy campaigns. This is a temporary position I have until December 2020.

3. I first received DACA in December 2012. I have continued to renew and maintain DACA status since that time. I most recently renewed my DACA status for a period of two years on November 4, 2019. However, due to the Wolf Memorandum, in the future I will only be able to renew for one year at a time.

4. The administration's attacks on DACA have been very stressful for me. Because of my anxiety over DACA and my future and security here, I was diagnosed with high blood pressure and now have to take daily medication. It's upsetting to me that this has happened to me at such a

1

young age. My need for medication also causes me its own worry and stress, because even as I have changed jobs I have to try to ensure I do not have any gaps in health insurance coverage.

**CLASS REPRESENTATIVE**

5.  I have been a plaintiff in this lawsuit since 2017.

6.  I am willing to serve as a class representative for all the people who are or will be eligible for DACA as it was created in the 2012 DACA Memorandum and its implementing guidance. I understand I will not be representing any person who is eligible for DACA and brings a federal lawsuit challenging the Wolf Memorandum.

7.  I have spoken with the lawyers who represent me in this case about what it means to be a class representative. I know that being a representative in a class action means that I have to represent and defend not only my own interests but also those of the class members. I know I can serve as a class representative for this class because the class members and I all share the same interest of having the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum set aside and having our applications processed as they are supposed to be under the terms that DACA was created in 2012.

8.  As a plaintiff in this case, I have always tried to represent and defend the rights of all people with DACA or who qualify for DACA. The new memorandum in July harmed all the people who now cannot apply for DACA at all and it also created a lot of stress and uncertainty for people like me who will now have to renew every year. I am very concerned that needing to renew every year will impact people DACA holders like me who need to job hunt. My current job is temporary, so I will need to look for a new job soon. But employers often want to hire people who can be at a job long term and now our work authorizations will be very short. I am also worried about the impact that the shorter renewal period may have on DACA holders'

2

ability to get other identifications. New York State has historically included the period of authorized stay on driver's licenses, so my driver's license shows my renewal period. I have not been able to renew my license or my New York City identification since the pandemic started, because government offices are closed. As a result, I have been scared to go out, because I don't want to carry documents like my passport that show my immigration status.

9. Through this case, I want to help everyone facing the problems and uncertainties that result from the government's attacks on DACA.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Queens, NY

Carolina Fung Feng

3

# EXHIBIT HH

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

     *Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## DECLARATION OF SONIA MOLINA

I, Sonia Molina, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    My name is Sonia Molina and I am 30 years old. I was born in Mexico and I have lived in Queens, New York since I was eight years old.

2.    I have had DACA since December 2012. I filed my most recent renewal application in April 2020 and it was still pending when the new DACA memorandum came out on July 28, 2020. As a result, I understand that I will only be granted a one-year renewal under the new policy even though when I applied it was for a two-year renewal. I am also aware that another memorandum with guidance on DACA came out on August 21, 2020, and my understanding is that because of this memo my currently pending DACA renewal may be rejected because my current DACA expires over 150 days from when I submitted my renewal.

## DACA STATUS

3.    I grew up with my family in Queens and attended New York City schools. I graduated from Information Technology High School in Long Island City in 2008. I started college after that but it was hard to afford because I didn't get any financial aid and I didn't have work authorization. I started off at Queensborough Community College but it was very expensive, so

1

after a semester I transferred to LaGuardia Community College where I earned my associate's degree.

4. Before I got DACA, I worked at a supermarket as a cashier for around 5 years. I didn't dislike my job but it was just that: a job to do on a daily basis. When I got DACA and work authorization in 2013, it opened a lot more doors for growth and for learning experiences. DACA gave me the opportunity to develop new skills and grow intellectually. In May 2013, I got a job working at reception at Make the Road New York's Queens office, which is the organization's busiest community center. It was a good feeling. I am now a Senior Office Manager, helping to manage operations there.

5. I was still unable to get financial aid for college but getting DACA really helped by relieving a lot of the financial pressure on my family. I was able to contribute to more of the bills and to my expenses for school. It made things easier for us. School was still expensive, but now we were able to pay, whereas before I had DACA it was more difficult. My brother also got DACA after me, which was a big relief for our family.

6. I graduated with my bachelor's degree from New York City College of Technology ("City Tech"), in the City University of New York, in 2016.

**2017 TERMINATION OF DACA**

7. I was at work at Make the Road when I heard about the government trying to end DACA in 2017. My mind immediately jumped to what I would need to do if I had to leave the United States and how I would make sure that I was okay.

8. I didn't talk about it with anyone. I was obviously affected by it, but I think my way of handling the stress was by isolating myself. I wasn't as social after the announcement, even with close friends. I think people gave me space. But because of working at reception at Make the

Road, I had to tell a lot of people who called or walked in that they couldn't apply anymore—because the government was no longer accepting applications from people who never had DACA. It was really hard. People contacted us with hope but then found out they couldn't apply.

9.     I always try to plan things. So, for myself and my family I thought, once I know what will happen with DACA, I'll be able to come up with a plan. In the lead up to the Supreme Court decision in 2020, my brother and I both applied to renew our DACA. My last DACA renewal was issued on May 1, 2019, so my current DACA expiration date is in April 2021. However,  I filed the renewal on April 1, 2020, in hopes that it would be processed before any Supreme Court decision could come out. I thought this might be our last renewal, so both my brother and I wanted to know that we would have two more years of safety and work authorization. I was calculating for the future thinking about the two-year renewal and the time that would allow me to plan. I was hoping for a positive decision from the Supreme Court but we did what we could to lengthen my stay and to have some certainty about the future—that way at least for two more years we could feel secure and plan.

10.     Also, I have had renewals take a long time before and I did not want to risk having any gap in status.

11.     After submitting my renewal on April 1, 2020, I received a receipt notice and a notice saying USCIS was re-using previous fingerprints. My brother's renewal application, which he filed at the same time, was approved. So I have just been waiting for the approval in my case.

**SUPREME COURT VICTORY & NEW MEMORANDUM**

12.     When we won the DACA case in the Supreme Court, I think it was the first time I let myself actually feel happy. For a really long time I had just been holding the emotion from this experience in. But that morning when we learned about the decision, I couldn't hold it in anymore:

3

I was really happy. Working at Make the Road, I have seen how hard people have fought for this case and for DACA. And for me and my brother, there was that hope now that we could have some security and plan for the future.

13.     After the Supreme Court decision, so many people applied for DACA for the first time or got ready to apply. I know from working at Make the Road how many calls and questions we got. People were hopeful.

14.     But then the July 28 memorandum came out. I was at work again when I heard. It ended my hope that I could plan for the future. Now like everyone with DACA, I can only plan one year at a time. There's no time to relax for a little bit and feel secure. At least with the two-year renewal period, there's one year where you can think, "I'm good until next year." Now there is no cushion. Constantly renewing is going to be hard and also financially difficult for people.

15.     The whole experience has been exhausting with the government's repeated attempts to end DACA—to have to go through this over and over and over again.

**CLASS REPRESENTATIVE**

16.     I am willing to serve as a class representative for everyone who is or will be eligible for DACA the way it was created in 2012 and who is impacted by the government trying to end DACA; and everyone who had an initial or renewal DACA application pending with the government at any time between June 30 and July 28, 2020 and whose application has not been or will not be processed the way it was supposed to be.

17.     I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that

I will not represent anyone who is eligible for DACA and brings another federal lawsuit challenging the Wolf Memorandum.

18.    I know I can serve as a class representative for these classes because the class members and I all share the same interest of having the new DACA memoranda from July 28 and August 21, 2020 set aside; and having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

19.    I want to serve as a class representative because I have seen how harmful the government's efforts to end DACA have been, especially after the Supreme Court decided that DACA should go back to the way it was in 2012.

20.    For those of us with DACA, it feels like we have already done more than enough to prove we are worthy of being here. Even now there are still so many people with questions, who want to know if this is it or if there is a chance we will see something positive happen in the future about DACA. It is hard to not have an answer, because there's not an answer even for me. There's so much uncertainty for everyone who has DACA at the moment. There is so much pressure on all of us. We are all on the edge of our seats thinking about what the next attack is going to be and what will happen next. It's taking a toll on everybody. It's a rollercoaster of emotions. And it's really hard to know there are so many people who could have applied for DACA before the new changes. I want this case to benefit not just me and people who already have DACA but everyone else who hasn't had the opportunity to apply.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26, 2020 in Queens, NY

_____
Sonia Molina

# EXHIBIT II

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

          *Respondents*.

Case No. 1:16-cv-04756 (NGG) (JO)

## <u>DECLARATION OF XIMENA ZAMORA</u>

I, Ximena Zamora, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Ximena Zamora and I am 18 years old. I was born in Mexico and I have lived in in the United States since I was two years old. I grew up in Queens, New York. I am about to start college at Baruch College, which is part of the City University of New York ("CUNY"). I plan to major in finance and study forensic accounting.

2.      I do not have lawful immigration status in the United States. I knew that I would qualify for Deferred Action for Childhood Arrivals ("DACA") when I turned 15 in 2017, so beginning that summer my family and I started gathering all the records I would need to apply and I had several appointments to get legal help with my application from Make the Road New York ("MRNY"). My dad had just gotten the check for the filing fee when the program was cancelled for first-time applicants in September 2017.

3.      In June 2020, after the Supreme Court decision on the DACA program, I immediately got back in touch with MRNY, where I am a member, about applying. Even though I already had a lot of what I needed, the process was slower because of coronavirus: I had to mail everything to MRNY, like my signed application and my photos. Then it happened again. Just

1

when MRNY was ready to send in my application in July, DACA was cancelled again for new applicants.

**DACA ELIGIBILITY**

4.      I have met all the requirements for DACA since I turned 15 in 2017. I arrived in the United States for the first time when I was two years old in 2004. That was before June 15, 2007 and before my 16th birthday. I have not left the U.S. since arriving.

5.      On June 15, 2012, I was present in the U.S. and did not have lawful status. I was in the fourth grade at P.S. 69 in Jackson Heights, Queens.

6.      I graduated from Academy of Finance and Enterprise High School in Queens in June 2020.

7.      I have never been arrested or convicted of a crime.

**UPBRINGING & FIRST EFFORTS TO APPLY FOR DACA**

8.      I have lived in Queens since I was two years old. I attended New York City public schools from kindergarten until I graduated from high school two months ago and now I am going to a CUNY campus in the fall.

9.      I learned about DACA from my dad and my sister. I even went to demonstrations in support of DACA with MRNY, where my dad is a member and I eventually became a member myself. I knew that this was a movement and that people had fought for DACA—not only young people like me but our parents, too.

10.     Going into my sophomore year, I started to get ready to apply for DACA. My dad had a list of all the requirements and already before my 15th birthday he had gone to my doctor's office and my pre-kindergarten to get the documents I would need. He made me request my high

school records. And then in late June, before my birthday, I went to MRNY's Queens office to start the process.

11.     I was excited. My sister has DACA and she has been able to go to a four-year university and major in math. She has done internships to learn to code. I wanted to do those things, too. And I also just wanted a regular job. I really like animals and there was an animal shelter in Jackson Heights where I wanted to work. I went in and told them before I had even applied for DACA, and they said "You have to bring your working permit and do an interview and then you can work here." But I never got the chance. A couple days after my dad had gotten the check for the application fee—the last thing I needed to apply—DACA was cancelled for first-time applicants like me.

12.     It wasn't until a year later, when I was a junior, that I began to realize all of the things I wouldn't be able to do without DACA. My school was focused on business and a lot of my classmates would do internships. I always thought their experiences sounded interesting and wished I could do the same. My teachers would even ask me why I hadn't done any internships. But without a social security number, I couldn't because I couldn't get paid. No one at my school talked about immigration; I wasn't comfortable sharing my status, so none of my teachers knew my situation.

13.     There were also a lot of speakers who came to my high school to talk about how to apply to college, and they always said you have to have your social security number. It made me think I couldn't apply—I assumed it was impossible because I didn't have that number everyone was talking about.

14.     After the first semester of my junior year, I began to give up and let my grades drop. It was settling in for me that, without DACA and without a social security number, college might

not be an option for me. I knew I would graduate but I didn't put much effort in anymore because in my head I thought it didn't really matter. If I couldn't go to college, I would just graduate with low grades. Fortunately one of my counselors saw what was happening and she spoke to me. She was the first person to tell me that I could still apply to college, even after she knew I was undocumented. She helped me a lot. And when I was a senior in high school, I went back to Make the Road to get help with loan applications.

15.     I chose Baruch College in Manhattan because it is close to home and I learned that they are good about supporting their students with financial aid. But what I really wanted, and still want, is to go to school in California. Ever since I was in the 8th grade, I wanted to go to school there; my dream is to go to the University of California at Irvine or Los Angeles.  But without the ability to work, I can't afford going to school in California. If I had had my work authorization for the last three years, I could have been working in better jobs and saving money for college. But I haven't been able to and I can't work to pay my way through school. I also know it is risky to travel without status, especially now that I am 18.

**DACA IN 2020**

16.     In June of this year, I woke up one day and my dad said "it's open again!" I didn't know what he meant, but he explained "they're accepting applications to DACA again." I was very excited. I was about to turn 18 and I thought I would finally be able to get a real job and to earn money for college and to move to California. I got back in touch with MRNY and began preparing my application.

17.     The process took longer because of coronavirus. After I updated my documents, I had to mail MRNY passport photos and then a few days later, I had to sign some documents and

mail those in, too. It was right after I mailed those that the new announcement came: DACA was ended again for people like me.

18.     This time I felt angry, because it was the second time that this had happened. I didn't understand President Trump's reasoning for stopping DACA again, after the Supreme Court decision. It was very frustrating.

19.     What is most upsetting to me is to still not be able to get a real job. I am 18 and I still don't have experience of working a regular, full-time job.

20.     But I'm optimistic. I am hoping that we can find a way to open DACA and that, for me, after two years at CUNY I will be able to transfer to a college in California. My goal is to major in finance and become a Certified Public Account and then, if I can get immigration status, to work in forensic accounting. One of my teachers told me about the field because I was interested in both accounting and criminology—and he explained forensic accounting is like a cross between law enforcement and accounting. You help the government look for fraud. I have to fix my immigration status, but if I can do that, forensic accounting is what I want to do.

**CLASS REPRESENTATIVE**

21.     I am willing to serve as a class representative for everyone like me, who is or will be eligible for DACA the way it was in 2012 when it was first created.

22.     I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who proceeds with a federal lawsuit challenging the Wolf Memorandum.

23.    I know I can serve as a class representative for this class because the class members and I all share the same interest of having the new memorandum from July 28, 2020 ending DACA again and the memorandum that came after in August 21, 2020 set aside and having our applications processed as laid out in the 2012 DACA Memorandum.

24.    I would like to help more people to be able to apply for DACA because the program gives a lot of opportunities. Even just to work would be a great step for people like me. DACA would help young people who want to continue their education so they can achieve their goals. I also want to help people like my sister, who have DACA and will now have to renew every year. It is a big source of worry for her. She is about to graduate and thinks this will affect her in trying to get a job. She would also love to travel, but hasn't been able to.

25.    I want to help everyone in our situation. We all came here when we were young. It would be unfair to make all of us go back to countries we don't know and don't recognize as homes and to take away the opportunities in this country, which is our home.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 27, 2020 in Queens, NY

_Ximena Zamora_
Ximena Zamora

6

**EXHIBIT JJ**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

　　　　　*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

**DECLARATION OF M.B.F.**

I, M.B.F., declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.　　My initials are M.B.F. and I am 17 years old. My mother, Lucia Feliz, is my next friend in this litigation. I was born in the Dominican Republic but I have lived in Queens, New York since I was four years old. I am about to start college as a freshman at the State University of New York ("SUNY") Old Westbury, where I plan to study criminology.

2.　　I do not have lawful immigration status in the United States. In 2017, when I was going into my sophomore year of high school and about to turn 15, my mom and I began preparing my application for Deferred Action for Childhood Arrivals ("DACA"). But I never got a chance to submit it because the program was terminated ████████████████████.

3.　　In July 2020, after the Supreme Court decision on the DACA program, I filed a DACA application for the first time. The FedEx delivery confirmation shows it was received by the government on July 7, 2020. My understanding is that the government will now not process or decide on my application because of its new attempts to end DACA.

1

4.      I really need DACA status. Time is running out. Last year, when I was midway through my senior year of high school, I received a Notice to Appear in immigration court by mail. Also, I will turn 18 and a half in March—after that, I will not be able to get status through my family anymore because I will have what my attorney tells me is called a bar due to "unlawful presence." Without DACA, my path to lawful status through my family won't work after that. For me, having DACA by March is the last opportunity I have to be able to stay in this country, which is my home and where my whole life and family are.

**DACA ELIGIBILITY**

5.      I met the requirements for DACA as soon as I turned 15. I arrived in the United States for the first time when I was four years old, which was before June 15, 2007 and long before my 16th birthday. I have not left the U.S. since then.

6.      On June 15, 2012, I was present in the U.S. and did not have lawful status. At the time, I was in the fourth grade at P.S. 95Q, which is also called the Eastwood School, in Jamaica, Queens.

7.      I graduated from Francis Lewis High School in Queens in June 2020.

8.      I have never been arrested or convicted of a crime.

**UPBRINGING IN NEW YORK**

9.      I grew up in New York with my mom and my grandmother, who is a U.S. citizen. All of my relatives in the U.S. have lawful status. I attended New York City public schools in Queens from kindergarten through my high school graduation.

10.      I have wanted to be a lawyer since I was a kid. I can't remember how I first got the idea but I just knew in my mind that was what I wanted. Then towards the end of middle school a woman at my church told me about her job. She is an intellectual property lawyer; she

does copyright and she helps her clients protect their work. That's when it clicked for me: that was what I wanted to do.

11.    For my electives in high school, I took all law classes: criminology, constitutional law, and criminal justice. I also joined the mock trial team when I was a junior and I participated in a lot of debates in the auditorium and in social studies class. I'm good at defending people and ideas. I think I would be a good lawyer.

**UNDOCUMENTED STATUS**

12.    I found out that I was undocumented when I was starting high school. All my friends were starting to get jobs or talking about getting jobs. I told my mom that I wanted to get a job as well. That's when my mom told me "you can't, you don't have the paperwork."

13.    Finding out I was undocumented and could not work was heart breaking. I had so many dreams built up at that point and out of nowhere she told me I couldn't get a job. It made me think that everything else I had planned was not reachable. Already at the time I thought, "I can't do anything here." But a lot of things I only learned about later: I couldn't get my drivers' permit, I couldn't get federal financial aid from the Free Application for Federal Student Aid ("FAFSA"). As I got older, I found out about more and more things I couldn't do.

14.    My status also impacted me at school. I couldn't go on international trips. There was a moot court program, but they went to debate in Switzerland. So I couldn't sign up, because they needed everyone on the team to go and I couldn't.

15.    My high school was a bit hard to get to. As my friends all started to drive to school, they would always tell me to get my permit. Without status, at the time I couldn't—so I took the bus instead. But the hardest thing was not being able to work. We got out early senior year and everyone else would go to work, but I just went home. I wanted to work so badly so I

3

could save up for college, pay my phone bill, and help my mom with rent. It was especially hard when I had to pay for college applications.

16.     When it came time to apply to college, the colleges I applied to weren't my top schools. I wanted to go out of state. My dream was to go to college in Florida or California. I have family in Florida and I have a friend who is studying in a really good law program there. And I wanted to try leaving New York.

17.     But I knew I couldn't go to those schools because it costs more to stay in a dorm and I am not able to work. I don't have a social security number and I don't qualify for federal aid. I also can't travel, because I am scared to without immigration status. I have not been on a plane since I came to the U.S. My mom and I used to take trains but we haven't done that since the Trump administration began.

18.     Instead, I am going to a SUNY campus that is near to my house and living at home. Even there, the school has me as an out-of-state student because of my status so I have to pay more. It's going to be very hard to afford.

19.     If I had work authorization, I could work and pay my way through college. I could save money. Instead, my family is really struggling to pay for it. My mom's whole paycheck is going to go towards my tuition. It's already affecting my family. We got rid of our home phone line. My mom called the other day to disconnect our cable—we just had a basic package but we can't pay for that now. We are trying to do everything we can but it's difficult.

**DACA**

20.     I first learned about DACA when I was 14. My mom told me about it. I was going to be eligible when I turned 15. My mom spoke with a woman who was going to help us file the

application and we started gathering the paperwork. It was hard but we were doing it: we had to get my grades from my previous school and other records.

21.     I was really excited. I was thinking I would be able to get a job now. Around my neighborhood there were places that were hiring, and I would go in and tell them "I'll be working here soon."

22.     When DACA ended in September 2017, it was on the news. I didn't really understand but my mom explained it to me: she said I couldn't apply anymore. I turned 15 ███ ███ after the program ended.

23.     I felt like another brick had been thrown at me. But at the same time I still hoped maybe I could get status through my family, because my grandmother is a citizen and had petitioned for my mom. It wasn't until later I found out that, without DACA, there wasn't anything else.

24.     In April 2020, in the middle of my senior year and right as I was applying to college, I got a Notice to Appear in immigration court in the mail. I knew that meant I could be detained or deported at any time. I had no idea what I would do if that happened.

25.     I told my mom, "I'm not even going to apply to colleges anymore—what is the point?" But she tried to stay positive. She got us a new lawyer and then in June, right around the time I graduated, she spoke with him and found out now I could apply for DACA again. I thought this was perfect: I could do the application and get DACA right before I go to college.

26.     Having the opportunity to apply for DACA again changed everything. I had already paid my deposit at the college near my house but I decided I was going to transfer, because I would finally be able to work and travel. I would get to live in a dorm. And with

DACA, I finally knew for sure I could use my bachelor's degree and my law degree once I had them. There wouldn't be that uncertainty anymore.

27.    A few weeks later, DACA got cancelled again. I never even got a receipt for my application and now my understanding from my lawyer is it won't be processed. It feels like things only get worse. Every time I have some sort of hope, nothing gets resolved, nothing changes, it just gets worse.

28.    Without DACA, I could be deported. I always hear stories of people being detained right in the immigration court—and now that could be me. I will also turn 18 and a half soon and if I still don't have DACA then it would become impossible for me to get status through my family. Even if my mom gets her green card through my grandmother, once I turn 18 and a half, I couldn't get status through her because I will have "unlawful presence." Either way, I would have to leave the U.S. I have no idea how I would deal with that. I don't know anyone in the Dominican Republic. I wouldn't be able to start college if I went there; I would have to start over in high school, because I don't know any of their curriculum or history and I haven't taken their high school exams. Everything I was envisioning here, my whole future, I would have to throw in the garbage.

29.    I think about it all the time, especially now as I start college. I think, is it even worth paying this tuition? Will I be able to finish?

30.    Every day, the month of March, 2021 is in my mind. That is when I turn 18 and a half. After that, there won't be any way for me to stay here without DACA. It feels like having DACA by March is my last opportunity to stay in this country.

## CLASS REPRESENTATIVE

31.     I am willing to serve as a class representative for (1) everyone who is or will be eligible for DACA as it was originally and is impacted by the government trying to end DACA; and (2) for individuals who had an initial or renewal DACA application pending with the government on any date between June 30 and July 28, 2020 that was not or has not been processed as it should have been.

32.     I have spoken with the lawyers who represent me in this case about that means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who is eligible for DACA and brings another federal lawsuit challenging the Wolf Memorandum.

33.     I know I can serve as a class representative for this class because the class members and I all share the same interest of: (1) having the DACA memorandum from July 28, 2020 set aside; and (2) having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

34.     I want to serve as a class representative because I would really like to be able to help save people going through what I went through, and the hardship it puts on their families. There are so many people in this situation who are affected by the end of DACA, like students just now getting into college or thinking about their plans. As a class representative, I will protect and defend our claims for my benefit and the benefit of the class as a whole. If we win, it would be a very heavy weight off their shoulders. I don't feel like anybody should have to bear that weight. It doesn't seem fair when there are so many opportunities here and so many people like me who want to study and work. I hope that with this lawsuit we can make things easier for all of us.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 25 , 2020 in Queens, NY

M.B.F.

8

# EXHIBIT KK

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

*Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## DECLARATION OF JOHANA LARIOS SAINZ

I, Johana Larios Sainz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Johana Larios Sainz and I am 26 years old. I was born in Mexico and I have lived in in the United States since I was two years old. I grew up on Staten Island, which is where I live now with my two children who are U.S. citizens.

2.      I do not have lawful immigration status in the United States. In 2017, I was getting ready to apply for Deferred Action for Childhood Arrivals ("DACA") and had made an appointment to fill out my application with the same person who helped my sister get DACA. But a few days before the appointment, in September 2017, DACA was cancelled.

3.      In July 2020, after the Supreme Court decision on the DACA program, I filed a DACA application for the first time. According to the UPS tracking information, the government received it on Monday, July 27. But the next day, the program was cancelled again. I have not received my application back yet, but I still have my hopes up that something good can happen, and that people like me can get DACA and the opportunities it brings.

1

**DACA ELIGIBILITY**

4.      I meet all of the requirements for DACA. I am 26 years old. I arrived in the United States for the first time when I was two years old. That was more than ten years before both June 15, 2007 and my 16th birthday. I have not left the U.S. since arriving.

5.      On June 15, 2012, I was present in the U.S. and did not have lawful status.

6.      I graduated from Port Richmond High School in Staten Island in August 2014.

7.      I have never been arrested or convicted of a crime.

**UPBRINGING & FIRST EFFORTS TO APPLY FOR DACA**

8.      I grew up on Staten Island and attended New York City public schools from kindergarten through high school.

9.      I knew growing up that I was undocumented but I didn't know how important it was until I was in high school. That was when everybody was getting their learner's permits and applying for jobs. I couldn't do those things. But even as I realized how hard it would be, I knew I couldn't leave the U.S. I grew up here. My whole family is here. This has always been my home. Sometimes my family members who are U.S. citizens even forget that I'm not a citizen. They will ask me things like "are you going to vote?" I have to remind them. I feel like I am left out and so many things are easier for my family members who have DACA or are citizens. It's easier for them to get health insurance, go to school, get a job. Still, New York is my home; this is where my family is.

10.      Without work authorization, I could only get part-time jobs. I was able to earn some money but it wasn't enough to provide for myself and my kids. If I had had work authorization, I could have had better working conditions and been paid more. I would have been able to help my family and household.

11.     My son was born in December 2013. I left school after his birth until June 2014 but then I came back and graduated two months later. Around that time, I had just started to hear about DACA. I had cousins who were applying and told me about it. But I was living with my son's father, and he put a lot of pressure on me not to apply. It was not a healthy relationship; he tried to isolate me and I think he probably felt that if I had DACA I would be able to do more than what he was doing. He is a U.S. citizen, so instead he always told me that we would get married and he would apply for me to get status. He said that would be better and faster. He tried to use his immigration status as a way to make me stay with him.

12.     Finally, in May 2017, I got the courage to leave him and move back to Staten Island. My younger sister had DACA by that time and she helped me get ready to apply. It was a hard time for me, trying to transition to get by on my own and take care of my son alone. My son was enrolled in a pre-kindergarten that was far from our house. The school would have been easy to reach by car, but because I couldn't get a driver's license I had to wake us up early and take the bus. I couldn't give my son the stability that he needed—in some ways, I worry that he still remembers that period.

13.     I knew that having DACA would help me. With DACA, my sister was able to get a better job and start building her credit. She works at a pharmacy and she has been able to support her daughter. She was also able to get child support from her daughter's father, a process that I have seen be more difficult for people like me without documents. My cousins who have DACA have also been able to travel and feel safe, which I have never been able to do, even within in the U.S.

14.     With DACA, I thought I could have those opportunities, too. I could get a steady job, a car, and a place to live.

15.     During that summer of 2017, I prepared to apply for DACA. I gathered my school records and I spoke with different relatives to try to collect all the dates I would need for my application, like the dates we came to the U.S. and moved to New York. I made an appointment in September with the same person who had prepared my sister's application. I was hoping that if I had everything ready, I would be able to apply right away.

16.     A few days before the appointment, I remember that I was cleaning a house when my mom called me and she said, "Johana did you hear what happened?" She told me that the government had canceled DACA. I was shocked. I got really sad. I was going through a hard time and trying to restart and trying to do something better for myself and my son. But then DACA was taken away.

17.     In the years since then, I have been able to get an apartment with my family. My daughter was born two years ago and my new partner and I can provide the important things that my children need. But it's still difficult. We still don't have a car, even though we live on Staten Island where driving is really helpful. And my children always wear hand-me-downs. I can't buy them the things that I want to.

**DACA REOPENING & APPLICATION**

18.     In June 2020, I was cooking in my kitchen when I saw on the news that the Supreme Court decided that DACA was going to return to the way that it was again. I couldn't believe it. I didn't want to get my hopes up too much because of what I went through last time, but my understanding from the news was that now I could apply again. Then my mother called me and she was excited too. She said, "did you see the news? You should do it!"

19.     I still really wanted DACA. My biggest reason is to provide for my family. With DACA I would be able to earn a steady income. My family has the necessities that we need, but

there is a lot that we can't do or that we have delayed. I want to be able to buy a car so that I can transport myself and my children. And I want to be able to buy my children things they need, like new clothes. I would love to hear them say "my mommy got me this."

20.     I would also like to go back to school. One of my younger sisters, who is a U.S. citizen, went to college and she always talked about it and how we all deserve an education. She got me interested in jobs in the medical field. With DACA, I could continue my education and have a career.

21.     After the Supreme Court decision, I started calling to try to find a legal organization to help me with the application. But this was during the coronavirus pandemic, so some places weren't open yet. Weeks went by and no one was calling me back. Finally, I decided I would go to one of them, Make the Road New York, in person and see if anyone was there. I knocked on the door of their office in Port Richmond and someone came out. I told him I needed more information on DACA; I wanted to know if it was true I could apply. A few minutes later, Carlos Vargas—who I understand is an accredited legal representative at Make the Road New York and also a plaintiff in this lawsuit—came out and he gave me his card. He said he could help me right away.

22.     After that we were in touch almost every day, as Carlos told me about more documents I needed and helped me get ready to apply. I had to collect documents; my family had to get documents. But we got it done.

23.     Carlos mailed my application on a Friday, July 24, and UPS tracking showed that the government received it on Monday, July 27. But then the next day, Tuesday, was when the government released a memo that they weren't accepting first-time DACA applications anymore. I didn't know if the new announcement meant they wouldn't accept *all* applications or only ones

5

filed from that point on. But then Carlos told me that for now this meant the government wasn't going to process any applications, even ones they had already received.

24.     I felt sad but at the same time I kept my hopes up. I am still keeping my hopes up that I and other people like me can get DACA.

**CLASS REPRESENTATIVE**

25.     I am willing to serve as a class representative for (1) everyone who is or will be eligible for DACA the way it was when it was first created and who is impacted by the government trying to end DACA; and (2) everyone who had an initial or renewal DACA application pending with the government at any time between June 30 and July 28, 2020 and whose application has not been or will not be processed the way it was supposed to be.

26.     I have spoken with the lawyers who represent me in this case about being a class representative. I understand what being a class representative means and I know that as part of that responsibility I have to think about the whole group's interest, not only my own. I understand that I will not represent anyone who is a named plaintiff in another lawsuit that is challenging any DACA memo.

27.     I know I can serve as a class representative for this class because the class members and I all share the same interest of: (1) having the new DACA memorandum from July 28, 2020 set aside; and (2) having our applications, which were pending at USCIS on a date between June 30, 2020 and July 28, 2020, processed as they should have been.

28.     I want to serve as a class representative because I want to be able to help other people in this situation. The plaintiffs who started this case helped me; and now by participating in this case I want to do that for the benefit of others.

29.     If the government were to put DACA back the way it was in 2012, I know there are a lot of people who would provide even more to this country. There are people with talent—really smart people—who can make this country greater. We just need to give everybody a chance. One of my friends with DACA is a nurse now. I know that there are more people like him who are able to do more and push themselves and strive for more, but they're in the same situation or similar situations to mine. They just need the chance. We all need the chance.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED August 26 , 2020 in Staten Island, NY

Johana Larios Sainz

# EXHIBIT LL

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

BATALLA VIDAL, et al.;

*Plaintiffs*,

v.

WOLF, et al..

        *Respondents*.

Case No. 1:16-cv-04756
(NGG)(JO)

## <u>SUPPLEMENTAL DECLARATION OF JAVIER VALDES</u>

I, Javier Valdes, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.  I am Co-Executive Director at Make the Road New York ("MRNY"), a position I have held since 2012. Before that time, I held the position of Deputy Director at MRNY for over three years. I submit this declaration as a supplement to my previous affidavit in support of this case, which was dated Dec. 14, 2017 and filed as ECF No. 123-13.

    2.  MRNY is a non-profit § 501(c)(3) and community-based membership organization, which has been in existence for over 20 years. MRNY is dedicated to building the power of immigrant and working-class communities to achieve dignity and justice through integrating its work in organizing, policy innovation, adult and education, and survival services, including legal and health services. MRNY currently has over 200 staff members, who provide services to thousands of individuals a year, including members, students and clients from the community. Our membership is comprised of more than 24,000 low-income New Yorkers, many of them from immigrant communities. We operate five community centers in the state of New York: in Brooklyn, Queens, Staten Island, Long Island and Westchester County.

1

3.   MRNY has a legal department staffed by twenty-four attorneys and eighteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as immigrants submitting affirmative applications for immigration relief. MRNY directly helps individuals prepare the documentation and paperwork necessary for Deferred Action for Childhood Arrivals ("DACA") applications and renewals, as well as applications for advance parole. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

4.   MRNY does not ask or track the immigration status of its members. However, we know through records maintained by our immigration legal team that MRNY's legal team has submitted at least 413 initial and renewal DACA applications on behalf of 238 MRNY members since 2012. The vast majority of these applications have been approved. This is likely a significant undercount of MRNY's total number of members with DACA because of changes in how we have tracked data from 2012 to the present and because not all MRNY members apply for or renew their DACA through MRNY's legal team. But at a minimum, it shows that MRNY has several hundred members who are DACA recipients.

5.   MRNY also currently has, according to our best estimate, approximately sixteen staff members who are DACA recipients.

**DACA OUTREACH EFFORTS**

6.   As an organization, MRNY has devoted tremendous resources to advocating for, educating the community about, and facilitating access to the DACA program both prior to its creation in 2012 and in the years since.

7.   Our efforts prior to December 2017 are described in my previous declaration in support of this case, dated Dec. 14, 2017 (ECF No. 123-13). These included weekly DACA screening workshops at our Queens office and similar workshops and services at other MRNY sites from June of 2012 until October 2017. We increased our volume of workshops and services in the fall of 2017, in order to meet the USCIS deadline to accept DACA renewal applications under the terms of the administration's 2017 effort to termination DACA. We did so again in the spring and summer of 2020, in anticipation of a Supreme Court decision affecting the DACA program.

8.   Both prior to and following the Trump Administration's efforts to terminate DACA in 2017, MRNY assisted DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers, as well as its other legal programs.

9.   Beginning in early 2020, MRNY staff contacted over 500 past DACA clients to advise them about the pending Supreme Court case and the importance of renewing their DACA. MRNY staff also held four high-volume in-person clinics in late 2019 and early 2020 to help over 80 clients file DACA renewal applications before the issuance of a decision from the Supreme Court. MRNY had three more in-person DACA renewal clinics scheduled, which had to be changed to virtual appointments after MRNY offices closed on March 16, 2020 because of the COVID-19 global pandemic.

10. From October 5, 2017 through July 28, 2020, MRNY staff filed 2,158 DACA renewal applications.

11. On July 28, 2020, the date of the Wolf Memorandum, 166 MRNY clients—whose applications had been filed by members of our legal team—had renewal applications pending with USCIS, with the earliest filed on March 1, 2020. Of those clients, 32 are members of MRNY.

**RESPONSE TO SUPREME COURT DECISION**

12. Following the Supreme Court's DACA decision on June 18, 2020, MRNY engaged in significant community education and outreach efforts to advise people on the significance of the decision and the importance for those who may qualify for DACA of obtaining a prompt screening with a trusted legal service provider. This included sending a bilingual email to all MRNY staff; mass texts to 1,198 of our prior DACA clients and members inviting them to our informational sessions; and a Facebook Live explaining the decision, which reached 6,100 individuals. Because staff throughout all MRNY departments including organizing and adult literacy began to receive a large volume of questions about DACA eligibility in light of the Supreme Court decision, MRNY also set up a system to track individual inquiries about DACA. MRNY legal team responded to each inquiry and invited them to attend a series of workshops and clinics.

13. MRNY received over 260 inquiries from individuals following the Supreme Court decision. Of these, 28 individuals were from current DACA recipients who were interested in applying for advance parole. The remaining 232 individuals were either youth or their parents who wanted to apply for DACA for the first time. To address this outpouring of community interest, MRNY's legal team began holding regular information sessions on DACA and advance parole in English and Spanish for potential DACA applicants and their parents as well as for DACA holders hoping to obtain advance parole. Because of the continued interest in DACA and confusion about the state of the program, MRNY has continued to hold these sessions even after the July 28, 2020 Wolf Memorandum, with the most recent one scheduled held on August 18, 2020. In total, seven of these sessions were held between June 26, 2020 and August 18, 2020 with 201 individuals attending.

14. The planning for these workshops required significant expenditure of resources by MRNY due to Defendants' failure to establish clear guidelines for how and when the Supreme Court's June 18 decision would be implemented. Four attorneys, a supervising paralegal and three organizers facilitated these informational sessions. MRNY staff were in contact with numerous other legal service providers and learned that many other service providers were recommending that their clients hold off on filing DACA applications until USCIS issued clear guidance on its implementation of the Supreme Court's decision. This increased the burden on our legal and organizing staff to carefully consider and develop MRNY's own strategy, messaging and recommendations.

15. In addition to informational workshops, MRNY legal staff began conducting legal clinics for one-on-one screening of potential DACA applicants who had attended an initial information session and who had begun to gather documents in support of their initial DACA applications. MRNY held five such clinics from July 7, 2020 to July 23, 2020 providing comprehensive screening and individualized assistance, including through completing the forms necessary to apply for DACA and organizing supporting documentation, to around three dozen first-time applicants. Approximately fifteen MRNY staff, including five attorneys and ten paralegals/advocates, and six MRNY legal interns worked on these workshops, devoting time and resources that would otherwise have gone to the provision of other legal services.

16. MRNY also identified individuals among our existing clients who were eligible to submit initial DACA applications and began working with them to prepare those applications. Some of these individuals present an urgent need for DACA status because they are subject to removal orders or ongoing removal proceedings. For instance, MRNY represents a DACA-eligible individual in removal proceedings whose merits hearing is scheduled for 2022. He resides in

Westchester County. He has resided continuously in the U.S. since 2003, when he was 14 years old, and qualifies for DACA under the terms of the 2012 Napolitano Memorandum. He is married to a U.S. citizen and has three U.S.-citizen children; his parents are also U.S. citizens. Under the Wolf Memorandum, he cannot apply for DACA. Without DACA, he risks being ordered removed and ultimately deported.

17. MRNY legal staff completed and filed three initial DACA applications after the Supreme Court's decision and prior to the Wolf Memorandum's issuance on July 28, 2020. One, on behalf of Plaintiff Johana Larios-Sainz, was received the day before the memo's issuance. The second was sent by USPS Priority Mail on July 25 and, according to USPS tracking, received by USCIS on July 30, 2020. This application was filed on behalf of a 19-year-old MRNY member on Long Island who had been in the process of gathering the documents necessary to file an initial DACA application when the program was terminated in September 2017. The third application was sent by USPS Priority Mail on July 27 and, according to USPS tracking, received by USCIS on July 29, 2020. It was filed on behalf of a 17-year-old MRNY member on Long Island who aged into DACA eligibility after the 2017 termination. Under the Wolf Memorandum, all three of these applications will be rejected and none of the applicants will be able to access DACA and its accompanying employment authorization.

18. As a result of the Wolf Memorandum, MRNY's legal staff has had to halt the submission of other initial DACA applications even for individuals who attended our informational sessions and one-on-one screening and application preparation sessions. These applications were in various stages of completion including a number of applications that were only days away from being ready to submit. This means that MRNY will not be able to count the significant time our staff spent on these sessions in July and August 2020 towards grants that require submission of an

6

application as a deliverable, which include all of the grants that fund our legal work outside of New York City. Among the fifteen MRNY staff who dedicated time to our one-one sessions and to follow-up with attendees of those sessions, six are based in our Long Island or Westchester offices. These legal staff members will now have to expend additional time and resources to begin work with new clients so as to meet annual deliverables, because their work with clients on initial DACA applications did not result in submission of an application. If the Wolf Memorandum were set aside, our legal staff could complete initial DACA applications it had begun and its past work would become compensable.

**INJURY TO MRNY**

19. The Federal Government's refusal to comply with the Supreme Court decision in the DACA lawsuit and its subsequent efforts to once again terminate and curtail DACA have harmed MRNY, its staff, its members, and its clients.

20. The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program unlawfully curtailed, and in having their DACA applications, renewals, and advance parole applications considered, go directly to our work in advocating for the rights of low-income immigrant communities and providing survival services that allow our clients and members to achieve stability and success.

21. MRNY is a plaintiff in this lawsuit in part because our members and clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

22. MRNY will sustain further injuries if Defendants' lawless efforts to curtail and terminate the DACA program are allowed to continue, as that forces us to devote additional resources to

assist our staff, clients and members submit DACA renewals on the new yearly schedule. MRNY will also have to continue to divert resources to educate its members, clients and the broader immigrant communities it serves about the implications of Defendants' actions with respect to DACA, which have confused and misled the public. This diversion of resources includes advising the huge number of individuals who contacted the organization in the wake of the Supreme Court decision in June 2020 and who now are unable to file initial DACA applications.

23. MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

24. These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court invaliding the July 28, 2020 Wolf Memorandum and the August 21, 2020 Edlow Memorandum, and reestablishing the DACA program as it existed under the 2012 Napolitano Memo and associated guidance.

I, Javier Valdes, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: August 27, 2020
       Queens, N.Y.

                                       _____
                                       Javier Valdes