# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

MARTÍN BATALLA VIDAL, *et al.*,

        *Plaintiffs*,

        v.

CHAD WOLF, Acting Secretary, Department of Homeland Security, *et al.*,

        *Defendants*.

Case No. 1:16-cv-04756 (NGG) (JO)

---

STATE OF NEW YORK, *et al.*,

        *Plaintiffs*,

        v.

DONALD TRUMP, President of the United States, *et al.*,

        *Defendants*.

Case No. 1:17-cv-05228 (NGG) (JO)

September 1, 2020

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

ELIZABETH B. WYDRA
BRIANNE J. GOROD
DAVID H. GANS
BRIAN R. FRAZELLE
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
david@theusconstitution.org

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICUS CURIAE*................................................................................... 1

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.    The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch ......................................................................................... 3

II.    Chad Wolf Is Violating the FVRA by Serving as Acting Secretary of Homeland Security........................................................................................................ 5

      A.    Wolf Never Lawfully Became the Acting Secretary ................................... 7

      B.    The FVRA's Time Limits on Acting Service for the Secretary's Office Have Expired ................................................................................ 12

III.    Because Chad Wolf Is Not Validly Serving as Acting Secretary, His DACA Memo Is Void and Must Be Set Aside.................................................... 18

      A.    The DACA Memo Is Void Under the FVRA ............................................. 18

      B.    The DACA Memo Must Be Set Aside Under the APA.............................. 21

CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*,
  139 F.3d 203 (D.C. Cir. 1998) ................................................................ 4

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................................ 3

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020) ................................................................ 1, 3

*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ................................................................ 3

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
  816 F.3d 550 (9th Cir. 2016) ................................................................ 22

*In re United States*,
  10 F.3d 931 (2d Cir. 1993) ................................................................ 20

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
  534 U.S. 124 (2001) ................................................................ 15

*La Clínica de La Raza v. Trump*,
  No. 19-4980, 2020 WL 4569462 (N.D. Cal. 2020) ................................................................ 11, 12

*L.M.-M. v. Cuccinelli*,
  442 F. Supp. 3d 1 (D.D.C. 2020) ................................................................ 19, 20, 21

*Morton v. Mancari*,
  417 U.S. 535 (1974) ................................................................ 15

*New York Gaslight Club, Inc. v. Carey*,
  447 U.S. 54 (1980) ................................................................ 14

*NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) ................................................................ *passim*

*SW Gen., Inc. v. NLRB*,
  796 F.3d 67 (D.C. Cir. 2015) ................................................................ 22

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019) ................................................................ 17

*United States v. Eaton*,
    169 U.S. 331 (1898) ................................................................. 14

*United States v. Giordano*,
    416 U.S. 505 (1974) ................................................................. 20

*United States v. Menasche*,
    348 U.S. 528 (1955) ................................................................. 14

*United States v. Smith*,
    962 F.3d 755 (4th Cir. 2020) .................................................... 14

*Williams v. Taylor*,
    529 U.S. 362 (2000) ................................................................. 14


CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

U.S. Const. art. II, § 2, cl. 2 ........................................................ 3

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415 ................................... 4

Pub. L. No. 114-328, 130 Stat. 2000 (2016) ............................... 16

5 U.S.C. § 706 ................................................................ 2, 21, 22, 23

5 U.S.C. § 3345 .................................................................. 15

5 U.S.C. § 3345(a) ............................................................ 5, 6, 7, 12

5 U.S.C. § 3346(a) ............................................................ 5, 12, 16, 17

5 U.S.C. § 3347(a) ............................................................ 8, 17, 18, 23

5 U.S.C. § 3348(a) ............................................................ 18, 19, 20, 21, 22

5 U.S.C. § 3348(b) ............................................................ 5, 12

5 U.S.C. § 3348(d) ............................................................ *passim*

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

6 U.S.C. § 112 .................................................................................... 19, 20

6 U.S.C. § 113(a) ................................................................................ *passim*

6 U.S.C. § 113(a)(1)(F) (2016) ............................................................... 16

6 U.S.C. § 113(g) ............................................................................... *passim*

6 U.S.C. § 202 .......................................................................................... 19

8 U.S.C. § 1103 ....................................................................................... 19

12 U.S.C. § 5491 ..................................................................................... 15

S. Rep. No. 105-250 (1998) ...................................................................... 5


OTHER AUTHORITIES

Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the
Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) ......... 10, 11

Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*,
2017 Cato Sup. Ct. Rev. 151 .................................................................... 4, 5

DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and
Delegations of Authorities for Named Positions* (Apr. 10, 2019) ............................ 7, 8, 9

DHS Delegation No. 00106 (Revision No. 08.6), *DHS Orders of Succession and
Delegations of Authorities for Named Positions* (Nov. 14, 2019) ........................... 11

Exec. Order No. 13753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) ...................................... 6, 8

85 Fed. Reg. 38,557 (June 26, 2020) ............................................................... *passim*

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................. 3

*Memorandum for the Secretary from John M. Mitnick, General Counsel,
Department of Homeland Security* (Apr. 9, 2019) .................................................. 8, 10

iv

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Memorandum from Chad F. Wolf, Acting Secretary, Department of Homeland Security* (July 28, 2020) ........................................................................   2, 19, 20

*Memorandum from Janet Napolitano, Secretary of Homeland Security* (June 15, 2012) ........................................................................   19

Mem. in Opp. to Pls.' Mot. for Prelim. Injunction, *CASA de Maryland v. Wolf*, No. 20-2118 (D. Md. Aug. 3, 2020) ........................................   9, 10, 16, 18

Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (1998) ..............   3

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .........................................   15

U.S. Government Accountability Office, B-331650, *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020) .......................   7

*The Vacancies Act*, 22 Op. O.L.C. 44 (1998) ..............................................   4

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC has a strong interest in preserving the checks and balances set out in our nation's charter, as well as the proper interpretation of laws that help maintain that balance.

## INTRODUCTION

The Secretary of Homeland Security is empowered to make a range of decisions that have enormous consequences for those affected. To help ensure that the Secretary wields those powers responsibly, the Constitution requires that he or she be appointed by the President with the advice and consent of the Senate. "By limiting the appointment power in this fashion," the Constitution seeks to make the officers who exercise the authority of the federal government "accountable to political force and the will of the people." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (quotation marks omitted). But despite that, the Department of Homeland Security (DHS) has operated without a Senate-confirmed Secretary for more than a year. Instead, lower-level officials, who were never vetted by the Senate for the Secretary's role, have run the Department and steered its policies.

In July 2020, the purported Acting Secretary of DHS, Chad Wolf, issued a memorandum making sweeping changes to the Department's policy known as Deferred Action for Childhood Arrivals (DACA), a policy established eight years ago by a Senate-confirmed DHS Secretary.

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

Among other things, Wolf's memo orders DHS to stop accepting new DACA applications, to cut in half the renewal period for existing DACA participants, and to retroactively impose these changes on people who had already filed their applications before the memo was issued. *Memorandum from Chad F. Wolf, Acting Secretary, Department of Homeland Security*, at 7 (July 28, 2020). Wolf's changes to DHS policy have "an immediate and severe impact on hundreds of thousands of individuals who were eligible to apply for DACA," as well as on more than thirty thousand people with pending applications for renewal. Pls.' Letter at 2, *Batalla Vidal v. Wolf*, No. 16-4756 (Aug. 6, 2020) (Dkt. No. 302).

Chad Wolf, however, has no legal authority to hold the position of Acting Secretary, and he therefore lacked the power to alter DHS policy through his memorandum. Federal laws, including the Federal Vacancies Reform Act of 1998 (FVRA), place careful limits on service by acting officials in order to preserve the Senate's constitutional power over appointments. Under the FVRA and the Department's organic statute, Wolf never lawfully became the Acting Secretary of DHS. And at the time he issued his memo in July, *no one* was eligible to serve as Acting Secretary, because the period during which the Secretary's office could be filled by acting officials under the FVRA had long expired.

The consequences of this illegality are twofold. Because Wolf unlawfully exercised the powers of a vacant office when he changed DHS policy through his memo, the FVRA demands that his action "shall have no force or effect." 5 U.S.C. § 3348(d)(1). And because Wolf acted without legal authority in issuing the memo, the Administrative Procedure Act (APA) also requires that the memo be set aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). For these reasons, Plaintiffs' motions for partial summary judgment should be granted.

2

## ARGUMENT

**I.  The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch.**

"Article II of the Constitution requires that the President obtain 'the Advice and Consent of the Senate' before appointing 'Officers of the United States.'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 934 (2017) (quoting U.S. Const. art. II, § 2, cl. 2).  The Framers imposed that requirement as a check on the President, recognizing that giving him the "sole disposition of offices" would result in a Cabinet "governed much more by his private inclinations and interests" than by the public good.  *The Federalist No. 76*, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Indeed, "the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism," and "[t]he manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (quotation marks omitted).

Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'"  *SW Gen.*, 137 S. Ct. at 935 (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)).  And the Appointments Clause, "like all of the Constitution's structural provisions, is designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty." *Id*. at 949 (Thomas, J., concurring) (quotation marks omitted); *see Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 140 S. Ct. at 1657 ("the Appointments Clause helps to preserve democratic accountability").

"Over the years, Congress has established a legislative scheme to protect the Senate's constitutional role in the confirmation process."  Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative*, at 5 (1998).  Indeed, "[s]ince President Washington's first term, Congress has given

the President limited authority to appoint acting officials to temporarily perform the functions of a vacant . . . office without first obtaining Senate approval." *SW Gen.*, 137 S. Ct. at 935; *see Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 209-11 (D.C. Cir. 1998).

"[F]rom the beginning," however, "Congress limited how long the President's designee could serve." *Doolin*, 139 F.3d at 210; *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415, 415 (empowering the President to authorize persons "to perform the duties" of vacant offices, but providing that "no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months"). In the 1860s, "Congress repealed the existing statutes on the subject of vacancies and enacted in their stead a single statute," the Vacancies Act, which has been in force since then, with modifications. *Doolin*, 139 F.3d at 210. "The Federal Vacancies Reform Act of 1998 . . . is the latest version of that authorization." *SW Gen.*, 137 S. Ct. at 934.

Congress enacted the FVRA in response to the executive branch's increasing refusal to comply with the Vacancies Act and the Appointments Clause. Beginning in the 1970s, the Justice Department took the position that the Vacancies Act was not "the exclusive statutory authority for temporarily assigning the duties and powers of a Senate-confirmed office," and that "statutes vesting an agency's powers in the agency head and allowing delegation to subordinate officials" could be used as an alternative during a vacancy, enabling agencies to avoid complying with the limits of the Vacancies Act. *The Vacancies Act*, 22 Op. O.L.C. 44, 44 (1998). Because virtually all federal departments are governed by such "vesting-and-delegation" statutes, *id.* at 2, individuals "who were ineligible for appointment as acting officers under the terms of the Vacancies Act were frequently 'delegated' the title and duties of precisely the same office, meaning the act's restrictions had become largely toothless." Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 155.

4

Dismayed that "acting service beyond the time limitations in the act was widespread," *id.* at 154, Congress enacted the FVRA "to create a clear and exclusive process to govern the performance of duties of offices in the Executive Branch that are filled through presidential appointment by and with the consent of the Senate."   S. Rep. No. 105-250, at 1 (1998). Accordingly, the FVRA carefully limits who may serve as an acting officer when a vacancy arises. By default, the "first assistant" to the vacant office must perform the functions and duties of that office.   5 U.S.C. § 3345(a)(1).   The President "may override that default rule by directing [a different person] to become the acting officer instead," *SW Gen.*, 137 S. Ct. at 935, but the President's choice of whom to select is limited.  *See* 5 U.S.C. § 3345(a)(2), (3).

Further, to prevent acting officers from filling vacancies for "constitutionally unacceptable" periods of time, S. Rep. No. 105-250, at 8, the FVRA also limits the length of their service.  Relevant here, unless the President sends a nomination to the Senate to fill a vacancy permanently, acting officials may perform the functions and duties of the vacant office "for no longer than 210 days beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  Once that period runs out, "the office shall remain vacant."  *Id.* § 3348(b)(1).

To encourage compliance with the FVRA's mandates, Congress provided that an agency action "shall have no force or effect" if it was taken by a person performing a function or duty of a vacant office without authorization by the FVRA.  *Id.* § 3348(d)(1).  These void actions "may not be ratified" by other officials.  *Id.* § 3348(d)(2).

## II.    Chad Wolf Is Violating the FVRA by Serving as Acting Secretary of Homeland Security.

In creating DHS and the office of its Secretary, Congress incorporated the FVRA while supplementing its provisions.  Congress incorporated the FVRA by establishing a Deputy Secretary who "shall be the Secretary's first assistant for purposes of subchapter III of chapter 33

of Title 5," which includes the FVRA.  6 U.S.C. § 113(a)(1)(A).  Congress further incorporated the FVRA by creating a third-in-line official, the Under Secretary for Management, who "shall be first assistant to the Deputy Secretary . . . for purposes of subchapter III of chapter 33 of Title 5." *Id.* § 113(a)(1)(F).

Congress then departed from some of the FVRA's rules concerning who may serve as Acting Secretary during a vacancy.  Under the FVRA, only the Secretary's "first assistant" (i.e., the Deputy Secretary) would be able to serve by default as the Acting Secretary.  *See* 5 U.S.C. § 3345(a)(1).  Congress modified this rule in DHS's organic statute, establishing that, in the absence of a Deputy, the Department's third-in-line officer may serve as the Acting Secretary by default: "Notwithstanding chapter 33 of Title 5, the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary." 6 U.S.C. § 113(g)(1).  Congress also empowered the Department to establish a further line of default succession to fill the Secretary's office when the top three positions are all vacant: "Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.* § 113(g)(2).

Thus, DHS's organic statute prescribes a specific order of succession that automatically goes into effect when the Secretary's office is vacant—first, Deputy Secretary, and then Under Secretary for Management—and it empowers the Department to expand upon that list by extending this default line of succession beyond those two officials in a further line of succession.  Executive Order 13753 currently provides that further line of succession.  After the Deputy Secretary and the Under Secretary for Management, the executive order lists sixteen additional DHS officials who are empowered to take over as Acting Secretary in the sequence provided.  *See* Exec. Order

6

No. 13753, § 1, 81 Fed. Reg. 90,667 (Dec. 9, 2016).  The Department's internal regulation on vacancies incorporates this line of succession: "In case of the Secretary's . . . resignation, . . . the orderly succession of officials is governed by Executive Order 13753."  DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions*, § II.A (Apr. 10, 2019).[2]

In sum, the Department's organic statute both incorporates and supplements the FVRA.  It incorporates the FVRA by relying on the Act's "first assistant" rule as the means of authorizing temporary service as Acting Secretary.  6 U.S.C. § 113(a)(1)(A).  And it supplements the FVRA by modifying this "first assistant" rule: contemplating the possibility that there will be no first assistant, the statute allows other DHS officials to serve by default in lieu of the Deputy Secretary when that position is unoccupied.  *Id.* § 113(g).  Through this arrangement, the statute prevents a gap in service in the Secretary's office, avoiding the need for the President to quickly select someone eligible to take over as Acting Secretary under the FVRA whenever a vacancy arises and no first assistant is in place.  *See* 5 U.S.C. § 3345(a)(2), (3).

### A.    Wolf Never Lawfully Became the Acting Secretary.

Chad Wolf purportedly became the Acting Secretary of DHS by virtue of an order signed by the previous Acting Secretary, Kevin McAleenan, shortly before McAleenan left government. McAleenan himself, however, was never a valid Acting Secretary.  As a result, he had no power

---

[2] When President Obama issued Executive Order 13753, DHS had not yet been given the statutory power to establish a further line of succession for the Secretary's office, and the President's authority to issue the executive order came from his discretionary power under the FVRA to select specific officials to fill a vacancy.  *See* 5 U.S.C. § 3345(a)(2), (3).  Soon after, however, DHS's organic statute was amended to add 6 U.S.C. § 113(g), which designates a third in line for the Secretary's office and allows DHS to establish a further line of succession. Nevertheless, when DHS first exercised this new power in February 2020, it adopted the line of succession provided in Executive Order 13753.  *See* U.S. Gov't Accountability Office, B-331650, *Legality of Service of Acting Secretary of Homeland Security*, at 5 (Aug. 14, 2020).

to issue any such order, and his attempt to install Wolf as his successor is void and without effect.

1.  The last Senate-confirmed DHS Secretary was Kirstjen Nielsen, who resigned in April 2019.  At that point, Kevin McAleenan was the Commissioner of U.S. Customs and Border Protection (CBP).  Under Executive Order 13753, the CBP Commissioner is *seventh* in line to become Acting Secretary following a resignation.  *See* Exec. Order No. 13753, *supra*, § 1.  Nevertheless, McAleenan purported to take over as Acting Secretary, even though other officials higher in the line of succession were available to serve.  In doing so, McAleenan departed from the "further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(2), that was set forth in the executive order and in DHS's internal regulation.  And because he lacked authority to serve under DHS's organic statute, his tenure violated the FVRA, which is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" unless an agency-specific statute like § 113(g)(2) applies.  5 U.S.C. § 3347(a).

Despite this clear-cut violation of the law, DHS has elsewhere defended the validity of McAleenan's tenure (and by extension, Wolf's) based on an order signed by Kirstjen Nielsen on April 9, 2019.  This order stated that it was revising Annex A to the internal DHS regulation that provides the line of succession for the Department's various offices.  *See Memorandum for the Secretary from John M. Mitnick, General Counsel*, at 1 (Apr. 9, 2019) (memorializing Nielsen's "approval of the attached document," identified as "Annex A"); *id.* at 2 (the attached document, which reads: "Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof").  Notably, however, Annex A governs who may exercise the Secretary's powers during a disaster or catastrophic emergency, *not* who may exercise the Secretary's powers upon her resignation.  *See* DHS Delegation No. 00106, *supra*,

§ II.B ("I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office . . . in the event I am unavailable to act during a disaster or catastrophic emergency.").

The following day, DHS updated its internal regulation accordingly.  Consistent with Nielsen's order, Annex A of the updated regulation now contained a new line of succession for cases of "disaster or catastrophic emergency," DHS Delegation No. 00106, *supra*, § II.B, which matched the line of succession approved by Nielsen, *see id.*, Annex A.  Also consistent with Nielsen's order, the updated regulation left intact the line of succession for cases involving "the Secretary's . . . resignation," which were still "governed by Executive Order 13753."  *Id.* § II.A. DHS claims that this was an "inadvertent, ministerial error" which failed to implement Nielsen's order correctly, *see* Mem. in Opp. to Pls.' Mot. for Prelim. Injunction at 26 n.10, *CASA de Maryland v. Wolf*, No. 20-2118 (D. Md. Aug. 3, 2020) (Dkt. No. 41) (hereinafter "*CASA de Maryland* PI Opp."), but DHS personnel did exactly what Nielsen's order told them to do: they replaced Annex A as directed, and made no other changes.

In short, Nielsen's order and DHS's subsequently revised internal regulation are consistent with each other and perfectly clear: Nielsen altered the line of succession for cases of disaster or catastrophic emergency, but she did not alter the line of succession for resignations, which remained governed by Executive Order 13753.  And under that executive order, Kevin McAleenan was not entitled to become Acting Secretary when Nielsen resigned.

Contrary to these unambiguous documents, DHS claims that Nielsen established a new line of succession for *all* scenarios, including cases of resignation, and that in doing so she departed from the executive order.  As DHS has put it: "On April 9, 2019, then-Secretary Nielsen . . . establish[ed] the order of succession for the Secretary of Homeland Security.  This change to the

9

order of succession applied to any vacancy . . . . [and it] superseded the FVRA and the order of succession found in E.O. 13753." 85 Fed. Reg. 38,557 (June 26, 2020). That, however, is simply not what Nielsen's order says. Rather, it states: "I hereby designate the order of succession for the Secretary of Homeland Security *as follows*." *Memorandum for the Secretary*, *supra*, at 2 (emphasis added). The only thing that "follows" is a change to the text of Annex A, and that annex governs only vacancies during a disaster or catastrophic emergency.

Ultimately, DHS's position requires adding text to Nielsen's order that it does not contain (language specifying that she was creating a single line of succession to govern all vacancies, eschewing further reliance on Executive Order 13753), while ignoring text that the order *does* contain (language specifying that the only change being made was to Annex A).[3]

In reality, DHS is attempting to conflate what Secretary Nielsen did in April 2019 with what Kevin McAleenan later purported to do in November of that year. That month, McAleenan signed an order that ostensibly changed the Secretary's line of succession. Unlike Nielsen, however, McAleenan replaced the executive order with the line of succession set forth in Annex A: "Section II.A of DHS Delegation No. 00106 . . . is amended hereby to state as follows: 'In case of the Secretary's . . . resignation, . . . the order of succession of officials is governed by Annex A.'" Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the Order of*

---

[3] In an effort to supply the missing language, DHS has argued that it can be inferred from the mere fact that Nielsen's order uses the term "order of succession." *CASA de Maryland* PI Opp. at 26. The premise of this argument is that an "order of succession" covers only situations in which an officer resigns or otherwise leaves office. But that is not correct, as the order itself confirms: after announcing that it is designating an "order of succession" for the Secretary's office, Nielsen's order prescribes who may serve as Acting Secretary during disasters or catastrophic emergencies. *Memorandum for the Secretary*, *supra*, at 2. Indeed, the very statute invoked as the basis for Nielsen's action, *see id.*, authorizes the Secretary to establish an "order of succession" governing "[a]bsence, disability, or vacancy," 6 U.S.C. § 113(g)(2), (1). Nielsen's use of the term "order of succession," therefore, does not carry the implication that DHS now suggests. Much less can that choice of phrasing, standing alone, credibly be taken as overriding the order's unambiguous text.

*Succession for the Secretary of Homeland Security*, at 1 (Nov. 8, 2019). The Department's internal regulation was then changed accordingly. *See* DHS Delegation No. 00106 (Revision No. 08.6), *DHS Orders of Succession and Delegations of Authorities for Named Positions*, § II.A (Nov. 14, 2019). This change was not the belated correction of a mistake made seven months earlier, as DHS claims. Rather, as the records plainly show, "McAleenan amended Delegation No. 00106 . . . to cross-reference Annex A but Nielsen did not." *La Clínica de La Raza v. Trump*, No. 19-4980, 2020 WL 4569462, at *14 (N.D. Cal. Aug. 7, 2020).

In sum, when the Secretary's office became vacant in April, Executive Order 13753 still prescribed who would serve as Acting Secretary following a resignation. *Id.* And for that reason, no legal authority permitted Kevin McAleenan—who, again, was *seventh* in the line of succession—to become the Acting Secretary.

2. Notwithstanding his lack of authority to do so, Kevin McAleenan purported to serve as Acting Secretary from April to November 2019. Exercising the powers of the Secretary, McAleenan purported to amend the line of succession for the Secretary's office shortly before he left that office, as noted above. *See Amendment to the Order of Succession*, *supra* (Nov. 8, 2019). Specifically, his order purported to amend DHS Delegation No. 00106 so that, upon the Secretary's resignation, the line of succession would no longer be governed by Executive Order 13753. Instead, it would be governed by Annex A to Delegation No. 00106. *Id.* at 1. McAleenan's order also amended Annex A itself, elevating the Under Secretary for Strategy, Policy, and Plans to be fourth in the line of succession. *Id.*

Days later, Chad Wolf was confirmed as Under Secretary for Strategy, Policy, and Plans. By virtue of holding that position, he purported to become the new Acting Secretary of DHS when McAleenan resigned from government the same day.

11

Wolf's claim to be Acting Secretary, therefore, rests entirely on the November 2019 order signed by Kevin McAleenan amending the line of succession.  *See* 85 Fed. Reg. 38,557 (June 26, 2020) (defending the legitimacy of Wolf's tenure on the basis of that order alone).  But because McAleenan served as the Acting Secretary of DHS illegally and without statutory authorization, the official actions he took in that role "have no force or effect" under the FVRA.  5 U.S.C. § 3348(d)(1).  And that includes his attempt to install Wolf as the next Acting Secretary.[4]

## B. The FVRA's Time Limits on Acting Service for the Secretary's Office Have Expired.

Even if Chad Wolf could have validly become the Acting Secretary of Homeland Security under the Department's line of succession, any authority he might have had to perform that role expired long before he issued his DACA memorandum.

The FVRA limits the amount of time during which a vacant office may be filled by an acting official.  Except in the case of vacancies caused by sickness, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  This time limit is extended if the President nominates someone to fill the office permanently, *id.* § 3346(a)(2), but in the absence of such a nomination, the outer limit on acting service is 210 days from the beginning of the vacancy.  After that period expires, "the office shall remain vacant."  *Id.* § 3348(b)(1).  The office of DHS Secretary became

---

[4] Rejecting the government's untenable reading of the DHS orders, one district court has already held that McAleenan did not become Acting Secretary under DHS's line of succession. *See La Clínica de La Raza*, 2020 WL 4569462, at *14.  That court went on, however, to hold that McAleenan was eligible to be designated as Acting Secretary by the President under the FVRA. *See id.*; 5 U.S.C. § 3345(a)(2), (3).  Notably, the court failed to address whether President Trump actually designated McAleenan to perform that role under the FVRA, and significantly, DHS has never claimed that he did.  More importantly, if McAleenan *were* designated under the FVRA, then the FVRA's time limits unquestionably applied to his tenure as Acting Secretary.  And that, in turn, would make Chad Wolf's tenure illegal, because the 210-day time limit for acting service expired before McAleenan approved the order that purported to make Wolf his successor.

vacant no later than April 10, 2019, and because President Trump had not nominated anyone to fill the office, the FVRA's time limits for the office expired no later than November 6, 2019.

In response to this objection, DHS has argued that the FVRA's time limits do not apply to the Secretary's office. The Department points to the provision in DHS's organic statute that allows it to designate a "further order of succession to serve as Acting Secretary" beyond the Deputy Secretary and the Under Secretary for Management. 6 U.S.C. § 113(g)(2). According to DHS, this provision displaces the entire FVRA—not merely its rules affecting *who* may serve as the Acting Secretary, but also its time limits on acting service. *See* 85 Fed. Reg. 38,557 (June 26, 2020) (asserting that DHS's designation of an order of succession under § 113(g)(2) "superseded the FVRA" and that Kevin McAleenan "served as Acting Secretary without time limitation").

The implication of this argument is that DHS may operate indefinitely without ever having a Senate-confirmed Secretary. Because no time limits on acting service apply to the Secretary's office, and because DHS itself can modify its line of succession at will, a series of Acting Secretaries can run the Department in perpetuity. Not only that, but these Acting Secretaries can choose their own successors, as long as the offices of Deputy Secretary and Under Secretary for Management remain vacant. Before leaving office, all a departing Secretary has to do is revise the line of succession, as Kevin McAleenan did, to put his chosen replacement at the top of the list. Moreover, the individuals who make up this chain of Acting Secretaries need not have been confirmed by the Senate to *any* position in DHS. That is because § 113(g)(2) permits any "officers of the Department" to be included in the Secretary's line of succession, not merely those whose offices require Senate confirmation. In short, a self-perpetuating sequence of Acting Secretaries, some of whom may have been selected for their underlying positions in the Department without presidential nomination or Senate confirmation, may run the Department indefinitely.

Even if such a system were constitutional,[5] it is plainly impermissible under the relevant statutes, which preserve the FVRA's time limits on acting service for the Secretary's office.

Far from displacing the FVRA entirely, DHS's organic statute explicitly *incorporates* the FVRA. It does so by providing that the Deputy Secretary "shall be the Secretary's first assistant for purposes of subchapter III of chapter 33 of Title 5," 6 U.S.C. § 113(a)(1)(A), and by similarly providing that the Under Secretary for Management "shall be first assistant to the Deputy Secretary of Homeland Security for purposes of subchapter III of chapter 33 of Title 5," *id.* § 113(a)(1)(F). If DHS were correct that § 113 displaces all of the FVRA, these two provisions would serve no purpose. "It is, however, a cardinal principle of statutory construction that [courts] must 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). The Department's view that § 113 displaces the FVRA entirely would "render the words . . . a complete nullity." *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 62 (1980).

Moreover, none of the conceivable bases for DHS's interpretation withstands scrutiny. To start, DHS has pointed out that § 113(g)(2) permits the Secretary to designate a further order of succession "[n]otwithstanding chapter 33 of Title 5." 6 U.S.C. § 113(g)(2). Because chapter 33 of Title 5 includes the entire FVRA (in addition to other provisions), the Department argues that this "notwithstanding" clause displaces the FVRA's time limits for Acting Secretaries who are serving pursuant to a further order of succession under § 113(g)(2).

This argument, however, misinterprets the meaning of the word "notwithstanding." That

---

[5] Courts have held that "the temporary nature" of acting service is what prevents it from violating the Appointments Clause. *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020); *see United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official.").

word "shows which provision prevails *in the event of a clash*." *SW Gen.*, 137 S. Ct. at 939 (quoting Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 126-27 (2012)) (emphasis added); *id.* ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" (quoting dictionaries)).  "A 'notwithstanding' clause," in short, "just shows which of two or more provisions prevails in the event of a conflict." *Id.* at 940.  When two provisions do not conflict, there is nothing for a "notwithstanding" clause to resolve.  Here, there is no conflict between § 113(g)(2) and the FVRA's time limits: nothing in § 113(g)(2) addresses how long Acting Secretaries may serve or refers to time limits at all.  And Congress knows how to address such matters when it wants to.  *See, e.g.*, 12 U.S.C. § 5491(c)(2) (permitting officer to serve "until a successor has been appointed and qualified").

Nor is there any implicit conflict between the two statutes.  Section 113(g)(2) permits DHS officers to serve as Acting Secretary by default even though they are not the "first assistant" to the Secretary's office—an arrangement that the FVRA would otherwise forbid, *see* 5 U.S.C. § 3345.  Allowing such officers to serve automatically as Acting Secretary does not conflict with the FVRA's imposition of a time limit on how long they may serve.  And "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

To appreciate just how untenable DHS's position is, recall that § 113(a)(1)(A), which addresses acting service by the Deputy Secretary, does not contain a "notwithstanding" clause or supersede any part of the FVRA.  To the contrary, it incorporates the FVRA by designating the Deputy Secretary as the "first assistant" to the Secretary's office for FVRA purposes.  6 U.S.C. § 113(a)(1)(A).  There is no conceivable textual basis, therefore, for claiming that a Deputy

15

Secretary who is serving as the Acting Secretary is exempt from the FVRA's time limits.  But although the Senate-confirmed Deputy Secretary is clearly bound by those time limits, DHS insists that lower-level, non-Senate-confirmed officers who are listed in an order of succession that the Department can revise at will are permitted to serve as Acting Secretary "without time limitation." 85 Fed. Reg. 38,557 (June 26, 2020).  To state the proposition is to refute it.

This conclusion is especially obvious because the very legislation that created subsection § 113(g)(2)—indeed, the very same section of that legislation—*increased* the statute's reliance on the FVRA.  Previously, § 113 identified the Under Secretary for Management as one of the Department's Senate-confirmed officers but said nothing more about that position.  *See* 6 U.S.C. § 113(a)(1)(F) (2016).  In the same legislation that added subsection (g) to § 113, Congress also amended subsection (a)(1)(F), inserting the text that makes this position the "first assistant" to the Deputy Secretary for FVRA purposes.  *See* Pub. L. No. 114-328, § 1903(a), 130 Stat. 2000, 2672 (Dec. 23, 2016).  The fact that Congress further incorporated the FVRA into the framework of § 113 forecloses any argument that Congress meant to displace the FVRA in its entirety.

Nor does the FVRA itself support the Department's position.  The FVRA's time limits apply to every "person serving as an acting officer as described under section 3345."  5 U.S.C. § 3346(a).  DHS has argued that when acting officials serve as Secretary under its order of succession, they serve "not pursuant to the FVRA and its 210-day timeline, but instead pursuant to 6 U.S.C. § 113(g)(2)."  *CASA de Maryland* PI Opp. at 27.  But that dichotomy is false: an Acting Secretary serves pursuant to *both* statutes, which are not rivals but rather complementary parts of an interlocking scheme.

As explained above, under the Department's organic statute, the Deputy Secretary is the "first assistant" to the Secretary *for purposes of the FVRA*.  6 U.S.C. § 113(a)(1)(A).  In other

words, subsection (a)(1)(A) incorporates the FVRA's "first assistant" rule as the means of authorizing temporary service as Acting Secretary.  Subsection (g) then modifies the "first assistant" rule, accounting for the possible absence of a first assistant by permitting automatic service, without presidential involvement, by other officers.  While this arrangement departs from what the FVRA would otherwise allow, it is ultimately an extension of the "first assistant" rule, which is triggered in the first instance when a vacancy arises.  6 U.S.C. § 113(a)(1)(A).

Thus, a Deputy Secretary who takes the reins during a vacancy is clearly "serving as an acting officer as described under section 3345," 5 U.S.C. § 3346(a), which is the section containing the FVRA's first assistant rule.  And that means the FVRA's time limits unquestionably apply. Imposing those time limits on a Senate-confirmed Deputy Secretary, while exempting lower-level officials chosen unilaterally by the agency, would be an "absurd" result.  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462 (2019).  And as a textual matter, it requires ignoring the connections among the three relevant provisions of § 113:  Under subsection (a)(1)(A), Deputy Secretaries are first in line, due to their position as "first assistant" to the Secretary.  But if there is no Deputy Secretary available, subsection (g)(1) permits the Under Secretary for Management to step in.  And if no Under Secretary is available either, then the further order of succession established under subsection (g)(2) fills out the scheme.  The three provisions work with each other, and with the FVRA, to form a single unified sequence.

The only other textual support DHS has cited for its view comes from 5 U.S.C. § 3347. Under that section, the FVRA is generally "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office," but it becomes non-exclusive if another statute "expressly" provides for the filling of an office "temporarily in an acting capacity." *Id.* § 3347(a).  According to DHS, because Section 113(g) permits certain officials to fill the

17

Secretary's office by default when there is no first assistant, "[t]he FVRA is not the exclusive scheme for acting service." *CASA de Maryland* PI Opp. at 27.

That, however, does not answer the real question, which is whether this non-exclusivity, standing alone, erases the FVRA's limits on how long an acting official may serve. There is no reason to think that it does. The FVRA does not suggest that its time limits vanish whenever another statute provides a supplementary means of selecting an acting officer. On the contrary, it says that statutes like § 113(g)(2) may be used only to designate someone "to perform the functions and duties of a specified office *temporarily*." 5 U.S.C. § 3347(a)(1)(A) (emphasis added). According to DHS, however, the Department may utilize § 113(g)(2) to designate a person to perform those functions and duties "without time limitation." 85 Fed. Reg. 38,557 (June 26, 2020). Nothing in the FVRA or in the Department's organic statute supports that interpretation.

### III. Because Chad Wolf Is Not Validly Serving as Acting Secretary, His DACA Memo Is Void and Must Be Set Aside.

#### A. The DACA Memo Is Void Under the FVRA.

The FVRA imposes severe penalties on certain violations of its limits. If "any person" who is not validly filling a vacant office under the FVRA performs any "function or duty" of that office, this person's actions "shall have no force or effect." 5 U.S.C. § 3348(d)(1). Such actions also "may not be ratified." *Id.* § 3348(d)(2). For purposes of these penalties, the FVRA defines a "function or duty" as including "any function or duty of the applicable office that is established by statute and is required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A) (punctuation and headings omitted).

When Chad Wolf issued his DACA memo, he purported to change Department-wide policies concerning deferred action for childhood arrivals, and he ordered the heads of three DHS agencies to implement these new policies. In doing so, Wolf performed a function that is "required

by statute to be performed by the [DHS Secretary] (and only that officer)." *Id.* "The Secretary is the head of the Department and shall have direction, authority, and control over it." 6 U.S.C. § 112(a)(2). The Secretary is also "[r]esponsible for . . . [e]stablishing national immigration enforcement policies and priorities," *id.* § 202(5), and is "charged with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1). Consistent with these exclusive assignments of authority to the Secretary, the DACA policy was established by a prior Secretary in a memorandum "setting forth how, in the exercise of our prosecutorial discretion, the Department . . . should enforce the Nation's immigration laws." *Memorandum from Janet Napolitano, Secretary of Homeland Security*, at 1 (June 15, 2012). And in purporting to alter this policy, Chad Wolf expressly relied on the Secretary's unique statutory authority. *See Memorandum from Chad F. Wolf*, *supra*, at 4 ("in the exercise of my authority and discretion in establishing national immigration policies and priorities, *see* 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am . . . making certain immediate changes to the DACA policy").

To resist the application of § 3348, DHS has elsewhere argued (unsuccessfully) that the term "function or duty" in that section "includes only 'non-delegable duties'—that is, only those duties . . . that may not be reassigned." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 31 (D.D.C. 2020) (quoting brief). And working from that premise, DHS has put forth the sweeping view that no action performed by anyone in the Department can ever be void under § 3348(d). That view is based on the "vesting and delegation" provision of DHS's organic statute, which vests the Secretary with the functions of all DHS personnel and generally permits delegation of the Secretary's functions to other Department personnel. 6 U.S.C. § 112(a)(3), (b)(1). In other words, as DHS sees it, this vesting-and-delegation statute makes every function of the Department "delegable," which in turn means that no function is assigned by statute to a single officer "and

19

only that officer." 5 U.S.C. § 3348(a)(2)(A)(ii). And that, in turn, means that no action carried out by *any* DHS official can be subject to § 3348's penalties.

The implications do not stop there. "[E]very cabinet-level department has some version of [the Department's] vesting and delegation statutes." *L.M.-M.*, 442 F. Supp. 3d at 31 (quotation marks omitted); *see id.* n.11 (listing statutes). And so "the logic of this position would cover all (or almost all) departments subject to the FVRA," *id.*, even though "[i]t was the pervasive use of those vesting-and-delegation statutes" to avoid vacancies legislation "that convinced Congress of the need to enact the FVRA" in the first place, *id.* at 34; *see supra* at 4-5. Thus, "the mere fact that a department head is also vested with all functions specifically vested in other department officers and employees cannot, standing alone, defeat the enforcement mechanisms found in the FVRA's vacant-office provision." *Id.* at 32.[6]

In sum, when Chad Wolf invoked the statutory powers of the Secretary to change the Department's DACA policy, and when he "direct[ed] DHS personnel" to take actions implementing his new policy, *Memorandum from Chad F. Wolf*, *supra*, at 1, he acted "in the performance of [a] function or duty of a vacant office," 5 U.S.C. § 3348(d)(1). And because he did so without legal authority under the FVRA, his actions "have no force or effect." *Id.*

---

[6] Even if DHS were correct about the role of vesting-and-delegation statutes under § 3348, that would be of no avail here, because the Department's organic statute does not permit delegation of the Secretary's leadership responsibilities to lower-level personnel. Although the Secretary, as a general matter, may delegate functions "to any officer, employee, or organizational unit of the Department," that option is available only "except as otherwise provided by this chapter." 6 U.S.C. § 112(b)(1). Congress clearly did not intend DHS Secretaries to be able to delegate their status as "the head of the Department" or their "direction, authority, and control over it," *id.* § 112(a)(2), to "any . . . employee . . . of the Department," *id.* § 112(b)(1). Exceptions to general grants of delegation authority need not be explicit, but rather, as here, can be inferred from structure and context. *See United States v. Giordano*, 416 U.S. 505, 514 (1974) (explaining that the question is whether the statute, "fairly read, was intended to limit the power," even if "precise language forbidding delegation was not employed"); *In re United States*, 10 F.3d 931, 937 (2d Cir. 1993) (applying "[t]he same approach" and likewise finding delegation foreclosed).

**B.     The DACA Memo Must Be Set Aside Under the APA.**

Even if the unique penalties set forth in 5 U.S.C. § 3348(d) did not apply here, Wolf's adoption of the new DACA policy still violated the substantive restrictions set forth in the previous sections of the FVRA.  And when a person's tenure as an acting officer violates the FVRA, agency actions taken by that person are "not in accordance with law" and therefore must be "set aside" under the APA.  5 U.S.C. § 706(2)(A); *see L.M.-M.*, 442 F. Supp. 3d at 34 ("The Court . . . is also persuaded by Plaintiffs' alternative theory—that, because Cuccinelli was exercising the authority of the USCIS Director in violation of the FVRA, the directives were not issued 'in accordance with law,' and must, accordingly, be set aside under the APA.").

Significantly, therefore, actions taken by an illegally serving official must be set aside under the APA even if the function in question is not assigned exclusively to the vacant office. While 5 U.S.C. § 3348 provides that a "function or duty" of a vacant office is—for *purposes of that section*—limited to those "required by statute [or regulation] to be performed by the applicable officer (and only that officer)," 5 U.S.C. § 3348(a)(2), the meaning of "functions and duties" under the rest of the FVRA is broader.  The text makes this clear:  Section 3348 explicitly states that its narrower definition of that term applies only "[i]n this section."  *Id*. § 3348(a).  That definition, therefore, governs the use of this term only for purposes of whether the penalties in § 3348 apply. It does not govern the meaning of "functions and duties" in the rest of the Act.

The FVRA uses phrases like "in this section" with precision and intent, as the Supreme Court has explained:

> Now add "under this section."  The language clarifies that subsection (b)(1) applies to all persons serving under § 3345.  Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line.  Congress used that structure in the FVRA and relied on it to make precise cross-references.  When Congress wanted to refer only to a particular subsection or paragraph, it said so.

*SW Gen.*, 137 S. Ct. at 938-39 (citations omitted).  By specifying that § 3348's definition of "function or duty" applies only "[i]n this section," Congress "ma[d]e [a] precise cross-reference[]," *SW Gen.*, 137 S. Ct. at 939, to clarify that this definition does not apply elsewhere in the FVRA.

The upshot is that demonstrating a violation of § 3345, § 3346, or § 3347 does not require showing that the challenged action was, by statute or regulation, an action which "only that officer" could take.  5 U.S.C. § 3348(a)(2).  This means that the action can be illegal, and therefore grounds for invalidation under the APA, even if it is not an action that is exclusively assigned to the vacant office.  Thus, the normal remedies for unlawful agency action under the APA remain available even when the unique penalties of § 3348 do not apply.

The D.C. Circuit explained this point in *SW General*.  The court concluded that an official who took a challenged action was illegally serving in violation of the FVRA, but it also concluded that § 3348 did not apply because the office in question was expressly exempt from that section.  *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 78-79 (D.C. Cir. 2015).  The court therefore proceeded on the assumption that, "in the event of an FVRA violation," the inapplicability of § 3348 made the challenged action "*voidable*, not void," and therefore subject to invalidation under the APA.  *Id.* at 79, 80-81.  The only other court of appeals to address the issue has agreed.  *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016).

In short, regardless of whether § 3348 applies, it violates the rest of the FVRA when someone performs the functions and duties of a vacant office without complying with the Act's restrictions.  Because such actions are "not in accordance with law" and are "in excess of statutory jurisdiction, authority, or limitations," this Court must "hold [them] unlawful and set [them] aside" under the APA.  5 U.S.C. § 706(2)(A), (C).

Wolf's issuance of the new DACA memo as the Department's Acting Secretary violated

5 U.S.C. § 3345 because he was not eligible to serve as Acting Secretary under that provision.  His action violated 5 U.S.C. § 3346 because, by July 2020, no one could serve as Acting Secretary under that provision.  And because Wolf had no right to serve as Acting Secretary under either provision, his approval violated 5 U.S.C. § 3347, which makes those two provisions "the exclusive means" for authorizing someone to exercise the powers of a vacant office, *id.* § 3347(a), unless that person is validly serving under an agency-specific succession statute—which Wolf was not. Under the APA, therefore, Wolf's "unlawful" actions must be "set aside."  5 U.S.C. § 706(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for partial summary judgment should be granted.

Respectfully submitted,

*/s/ David H. Gans*
DAVID H. GANS  (DG 6677)

ELIZABETH B. WYDRA
BRIANNE J. GOROD
DAVID H. GANS
BRIAN R. FRAZELLE
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
david@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: September 1, 2020