

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:     Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:          Chad F. Wolf
Acting Secretary

SUBJECT:       **Reconsideration of the June 15, 2012 Memorandum**
**Entitled "Exercising Prosecutorial Discretion with Respect to**
**Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy
known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled
"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States
as Children." Ever since, the policy has been subject to substantial controversy. In recent years,
Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security
Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional
memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority
of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined
that the 2017 and 2018 memoranda had not complied with certain requirements for doing so.
See Department of Homeland Security v. Regents of the University of California, Nos. 18-587,
18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and
remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain
immediate changes to the DACA policy to facilitate my thorough consideration of how to
address DACA in light of the Supreme Court's decision. For the reasons outlined below,
pending my full reconsideration of the DACA policy, I direct DHS personnel to take all
appropriate actions to reject all pending and future initial requests for DACA, to reject all

**AR0001**

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy. The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria. The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal. Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization. The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so. The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA. The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect. In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA). In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote. On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well. The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy. On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy. The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

**AR0002**

Litigation challenging the Duke Memorandum promptly ensued. As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia. The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy. The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects. Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus. Slip op. at 9. But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy." Id. at 11. Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA. Id. And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy." Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem. In making that determination, the Court declined to consider the Nielsen Memorandum. Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action." Id. at 14. As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26. The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew." Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York. Id.

**AR0003**

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies. Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy. To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy. More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission. At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration. Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission. Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:** There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy. And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

**AR0004**

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients. They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients. They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide. And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy. And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please. In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist. Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole. Accordingly, that has been the status quo for more than two years. It makes sense to continue that approach while I reconsider whether to rescind or revise the policy. If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time. And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year. Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it. And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal. They will merely have to seek renewal on an annual, rather than biannual, basis. In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis. Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period. But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS. DHS personnel should consider whether it is possible to

**AR0006**

reduce renewal fees during this interim period of reconsideration. In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1] Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

* * * * *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

**AR0008**



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

June 15, 2012

MEMORANDUM FOR:   David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:   Janet Napolitano
Secretary of Homeland Security

SUBJECT:   Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

**AR0009**

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

**AR0010**

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

**AR0011**

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

September 5, 2017

MEMORANDUM FOR:    James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

FROM:    Elaine C. Duke
Acting Secretary

SUBJECT:    **Rescission of the June 15, 2012 Memorandum Entitled "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the
United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children," which established
the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the
manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to
execute a wind-down of the program, consistent with the parameters established in this memorandum.

**AR0012**

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 2

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] *Id.*

AR0013

Re: Rescission of June 15, 2012 DACA Memorandum
Page 3

with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

---

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).
[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).
[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

AR0014

Re: Rescission of June 15, 2012 DACA Memorandum
Page 4

**Rescission of the June 15, 2012 DACA Memorandum**

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course— retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

**AR0015**

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 5

      This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

**AR0016**



🇺🇸 Official website of the Department of Homeland Security

**U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

WASHINGTON - This Administration's decision to terminate DACA was not taken lightly.  The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws. Given the Supreme Court's decision on DAPA, they do not believe DACA is legally viable, and thus the program should be ended.

As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the

**AR0017**

program down completely and immediately.  The Administration chose the least disruptive option.

I am very aware of the consequences of this action, and I sympathize with the DACA recipients whose futures may now be less certain.  But I am also frustrated on their behalf.  DACA was never more than deferred action—a bureaucratic delay—that never promised the rights of citizenship or legal status in this country.  The program did not grant recipients a future, it was instead only a temporary delay until a day of likely expiration. And for that reason, DACA was fundamentally a lie.

I believe President Obama had genuine intentions for DACA, and was clearly frustrated by his inability to maneuver through the legislative process.  But a Secretarial memo – even if intended to be temporary - is not a substitute for a law passed by Congress and signed by the President.

For several years before becoming the Acting Secretary, I taught civics to people who were going through the naturalization process.  I taught them the principles of American democracy, like the three branches of government, the separation of powers, and how our system of checks and balances works.

I taught them that the Constitution was the supreme law of the land.

And I taught them the rule of law: How everyone in our country must follow the law, no matter who they are.

The DACA program violates those basic civics lessons that are fundamental to our country and our citizens.

It is a dangerous precedent to systematically ignore the law, regardless of one's intent or purpose.  It is also dangerous to encourage and reward illegal immigration.

We must find a better way.  And we must do so within the Constitution of the United States.

If our current laws do not reflect our country's values, then I urge Congress to use its Constitutional authority to write and pass legislation that does.  I believe the President shares my confidence in the Congress.

**AR0018**

Case 1:16-cv-04756-NGG-VMS   Document 319-2   Filed 09/04/20   Page 19 of 46 PageID #: 6008

DHS would be glad to provide Congress with data and information to help them consider the situation, and find a legislative solution.  There is much wrong with our current immigration system—not just DACA—and this is an opportunity to make it better, fairer, and more beneficial for the nation.

What this decision makes clear is that we are overdue for real answers.  No more stopgap measures, no more temporary options, and no more kicking the tough decisions down the road in the hope they become too painful to ignore for someone else.

We need to do this the right way. And we need to do this now.

Topics:  Border Security (/topics/border-security)

Keywords:  Acting Secretary Elaine Duke (/keywords/acting-secretary-elaine-duke) , Deferred Action for Childhood Arrivals (DACA) (/keywords/daca)

Last Published Date: September 5, 2017

**AR0019**

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



June 22, 2018

### MEMORANDUM FROM SECRETARY KIRSTJEN M. NIELSEN

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke memorandum") rescinding the enforcement policy known as Deferred Action for Childhood Arrivals (DACA). Acting Secretary Duke concluded that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation [over the enforcement policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)], and the September 4, 2017 letter from the Attorney General [concerning DACA], it is clear that the June 15, 2012 DACA program should be terminated." Accordingly, "in the exercise of [her] authority in establishing national immigration policies and priorities," she "rescind[ed] the June 15, 2012 memorandum," subject to certain exceptions.

On April 24, 2018, the U.S. District Court for the District of Columbia held that the Duke memorandum was subject to judicial review under the Administrative Procedure Act and that it provided insufficient justification for rescinding the DACA policy. The court vacated the Duke memorandum and remanded to the Department of Homeland Security (DHS). The court issued a 90-day stay of vacatur, however, to afford DHS an opportunity to provide further explanation for rescinding the DACA policy.

Because the D.C. district court has requested further explanation, I am providing such explanation here. Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy, and it is my understanding that the Department of Justice will continue to seek appellate review of preliminary injunctions that restrict DHS from implementing the Duke memorandum and rescinding the DACA policy. This explanation reflects my understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound.

The Secretary of Homeland Security is vested with authority over "the administration and enforcement" of the immigration laws, 8 U.S.C. § 1103(a)(1), including the discretion to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The DACA policy of deferred action was cast as an exercise of enforcement discretion to forbear from removing a certain class of aliens who are subject to removal under law. DHS also had concluded that under pre-existing statutory and regulatory provisions a grant of deferred action would trigger certain collateral benefits for such aliens, such as eligibility for employment authorization. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons.

**AR0020**

First, as the Attorney General concluded, the DACA policy was contrary to law.  The Fifth Circuit ruled that DAPA should be enjoined on a nationwide basis on the ground, among other things, that it likely was contrary to the statutory scheme of the Immigration and Nationality Act (INA).  As the Fifth Circuit held, "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas v. United States*, 809 F.3d 134, 186 n.202 (5th Cir. 2015). An equally divided Supreme Court affirmed that decision.  In light of those decisions and other factors, Secretary Kelly rescinded the DAPA policy in June 2017.  Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.

The memorandum announcing the DAPA policy both expanded the DACA policy by loosening the age and residency criteria and adopted a similar deferred action policy for parents of U.S. citizens and lawful permanent residents.  The Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had).  Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme.  The Attorney General concluded that the DACA policy has the same statutory defects that the Fifth Circuit identified with DAPA—a determination and ruling by the Attorney General that, in any event, I am bound by pursuant to 8 U.S.C. § 1103(a)(1).

Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality.  A central aspect of the exercise of a discretionary enforcement policy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy.  Like Acting Secretary Duke, I lack sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not.

There are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable.  Those reasons include the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work.   The fact that some courts have recently held or suggested that the DACA policy is legal does not change my view that the DACA policy's legality is too questionable to warrant continuing the policy, especially in light of the Attorney General's contrary determination and ruling about the DACA policy and the contrary implication of the decisions of the Fifth Circuit Court of Appeals and the Supreme Court invalidating the DAPA policy.

Third, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect.  Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law.  DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

AR0021

Accordingly, I agree with Acting Secretary Duke and the Attorney General that if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively.

In addition, DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis.  While the DACA policy on its face did allow for individual considerations, a categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case.  Without the DACA policy, DHS may consider deferred action on a case-by-case basis, consistent with the INA.  Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens.  All of those considerations lead me to conclude that Acting Secretary Duke's decision to rescind the DACA policy was, and remains, sound as a matter of both legal judgment and enforcement policy discretion.

I do not come to these conclusions lightly.  I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives.  Nevertheless, in considering DHS enforcement policy, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above.  That is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options.  In contrast, the DACA policy was announced as a temporary stopgap measure, not a permanent fix; it was expressly limited to two-year renewal periods, it expressly conferred no substantive rights, and it was revocable at any time.  In my judgment, neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress, a status that the DACA non-enforcement policy did not change.  And in all events, the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant.

For these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy.

Kirstjen M. Nielsen
Secretary

3

**AR0022**

| Approximate Active DACA Recipients: As of  March 31, 2020 | | |
|---|---|---|
| Month/Year Current DACA Expires | Number (Rounded) | Number with Renewal Pending (Rounded) |
| Apr-20 | 8,770 | 4,730 |
| May-20 | 15,070 | 7,410 |
| Jun-20 | 18,700 | 7,380 |
| Jul-20 | 20,370 | 5,110 |
| Aug-20 | 27,380 | 3,370 |
| Sep-20 | 34,040 | 3,810 |
| Oct-20 | 29,620 | 2,520 |
| Nov-20 | 33,360 | 1,780 |
| Dec-20 | 23,690 | 840 |
| Jan-21 | 33,640 | 460 |
| Feb-21 | 30,410 | 290 |
| Mar-21 | 33,990 | 250 |
| Apr-21 | 38,490 | 210 |
| May-21 | 31,060 | 150 |
| Jun-21 | 27,270 | 110 |
| Jul-21 | 36,700 | 120 |
| Aug-21 | 29,870 | 90 |
| Sep-21 | 36,210 | 130 |
| Oct-21 | 30,720 | 130 |
| Nov-21 | 17,710 | 50 |
| Dec-21 | 22,390 | 60 |
| Jan-22 | 23,120 | 70 |
| Feb-22 | 22,840 | 40 |
| Mar-22 | 18,170 | 30 |
| Grand Total | 643,560 | 39,130 |

**Note:**

This report reflects the most up-to-date data available at the time the report is generated.

Number of Individuals with DACA Expiration on or after Mar. 31, 2020 as of Mar. 31, 2020.

Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

Totals may not sum due to rounding.

Counts less than 10 are notated with the letter "D."

**AR0023**

| Approximate DACA Renewals Pending with Expired DACA As of March 31, 2020 | |
|---|---|
| Number (Rounded) | 8,210 |

**NOTE:**

This report reflects the most up-to-date data available at the time the report is generated. Number of Individuals with a DACA renewal pending whose current DACA has expired as of Mar. 31, 2020.

Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

USCIS previously discovered that the query code used to generate this report had some flaws, such that the data was under inclusive because it only pulled cases from Electronic Immigration System (ELIS) and not also from Computer Linked Application Information Management System (CLAIMS 3). CLAIMS 3 and ELIS are electronic case management systems that USCIS uses to process certain immigration requests. From the inception of DACA until early 2016, DACA requests were ingested into and processed in CLAIMS 3. In early 2016, USCIS transitioned to ELIS for DACA requests, and newly received DACA requests were ingested into and then processed in ELIS. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of pending renewal DACA requests for individuals with expired DACA. Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect under inclusive data.

| Approximate DACA Initials Pending As of March 31, 2020 | |
|---|---|
| Number (Rounded) | 3,110 |

**NOTE:**

This report reflects the most up-to-date data available at the time the report is generated.

Number of Individuals with a DACA initials pending as of March 31, 2020.

USCIS previously discovered that the query code used to generate this report had some flaws, such that the data was under inclusive because it only pulled cases from Electronic Immigration System (ELIS) and not also from Computer Linked Application Information Management System (CLAIMS 3). CLAIMS 3 and ELIS are electronic case management systems that USCIS uses to process certain immigration requests. From the inception of DACA until early 2016, DACA requests were ingested into and processed in CLAIMS 3. In early 2016, USCIS transitioned to ELIS for DACA requests, and newly received DACA requests were ingested into and then processed in ELIS. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of pending initial DACA requests. Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect under inclusive data.

**AR0024**

| Approximate Count of DACA Receipts: Since January 10, 2018, As of March 31, 2020 | Adjudicative Status | | | |
|---|---|---|---|---|
| **I-821D Receipts grouped by date previous DACA expires** | **Approved** | **Denied** | **Pending** | **Grand Total** |
| Current DACA expires prior to Sept. 5, 2016 | 4,510 | 920 | 570 | 6,010 |
| Current DACA expires between Sept. 5, 2016 and Sept. 4, 2017 | 9,190 | 420 | 370 | 9,980 |
| Current DACA expires between Sept. 5, 2017 and Mar. 5, 2018 | 9,290 | 390 | 280 | 9,960 |
| Current DACA expires after Mar. 5, 2018 | 689,600 | 4,990 | 47,160 | 741,750 |
| No match | 20 | D | 0 | 30 |
| **Grand Total** | **712,610** | **6,730** | **48,390** | **767,730** |

**NOTE:**

This report reflects the most up-to-date data available at the time the report is generated.

Count of I-821D receipts with a receipt date on or after Jan. 10, 2018 as of March 31, 2020.

Previous DACA expiration found based on matching A Number.

Receipts grouped by date of previous DACA expiration.

No match means there is no record of a previous DACA approval by matching A Number.

Totals may not sum due to rounding.

Counts less than 10 are notated with the letter "D."

**AR0025**

| Approximate Active DACA Recipients: Country of Birth As of March 31, 2020 | |
|---|---|
| **Country of Birth** | **Number (rounded)** |
| **Grand Total** | **643,560** |
| Mexico | 517,460 |
| El Salvador | 24,830 |
| Guatemala | 16,840 |
| Honduras | 15,450 |
| Peru | 6,250 |
| Korea, South | 6,210 |
| Brazil | 5,060 |
| Ecuador | 4,780 |
| Colombia | 4,240 |
| Argentina | 3,360 |
| Philippines | 3,270 |
| Jamaica | 2,250 |
| India | 2,220 |
| Venezuela | 2,100 |
| Dominican Republic | 1,990 |
| Uruguay | 1,700 |
| Trinidad And Tobago | 1,500 |
| Bolivia | 1,430 |
| Costa Rica | 1,340 |
| Nicaragua | 1,270 |
| Chile | 1,190 |
| Poland | 1,150 |
| Pakistan | 1,150 |
| Nigeria | 910 |
| Guyana | 850 |
| Belize | 700 |
| Indonesia | 650 |
| Canada | 640 |
| China | 600 |
| Kenya | 600 |
| Bangladesh | 440 |
| United Kingdom | 440 |
| Portugal | 430 |
| Mongolia | 420 |
| Ghana | 410 |
| Panama | 380 |
| Italy | 320 |
| Israel | 290 |
| Bahamas, The | 260 |
| Albania | 230 |
| Saint Lucia | 210 |
| Taiwan | 210 |
| Turkey | 190 |
| Jordan | 190 |

**AR0026**

| | |
|---|---|
| Paraguay | 190 |
| Germany | 180 |
| Zambia | 170 |
| Thailand | 170 |
| Saudi Arabia | 160 |
| South Africa | 160 |
| Egypt | 150 |
| United Arab Emirates | 150 |
| Armenia | 150 |
| France | 140 |
| Hong Kong | 140 |
| Ukraine | 140 |
| Malaysia | 130 |
| Haiti | 130 |
| Lithuania | 130 |
| Russia | 130 |
| Senegal | 120 |
| Guinea | 120 |
| Sri Lanka | 120 |
| Cameroon | 120 |
| Japan | 110 |
| Zimbabwe | 110 |
| Grenada | 110 |
| Liberia | 110 |
| Côte D'Ivoire | 110 |
| Morocco | 100 |
| Saint Vincent And The Grenadines | 100 |
| Greece | 100 |
| Gambia, The | 100 |
| Lebanon | 90 |
| Romania | 90 |
| Suriname | 90 |
| Sierra Leone | 90 |
| Spain | 90 |
| Barbados | 80 |
| Fiji | 80 |
| Czech Republic | 80 |
| Dominica | 80 |
| Hungary | 70 |
| Malawi | 70 |
| Macedonia | 70 |
| Antigua And Barbuda | 70 |
| Tanzania | 70 |
| New Zealand | 60 |
| Uganda | 60 |
| Nepal | 60 |
| Kuwait | 60 |
| Bulgaria | 50 |
| Iran | 50 |
| Tonga | 50 |
| Vietnam | 50 |

**AR0027**

| | |
|---|---:|
| Cabo Verde | 50 |
| Montenegro | 50 |
| Netherlands | 50 |
| Australia | 50 |
| Angola | 40 |
| Democratic Republic Of Congo | 40 |
| Cambodia | 40 |
| Mali | 40 |
| Singapore | 40 |
| Qatar | 30 |
| Slovakia | 30 |
| Ethiopia | 30 |
| Uzbekistan | 30 |
| Virgin Islands, British | 30 |
| Turks And Caicos Islands | 30 |
| Saint Kitts And Nevis | 30 |
| Serbia | 30 |
| Sweden | 30 |
| Togo | 30 |
| Yemen | 30 |
| Belgium | 30 |
| Estonia | 30 |
| Samoa | 30 |
| Bahrain | 20 |
| Gabon | 20 |
| Austria | 20 |
| Yugoslavia | 20 |
| Congo | 20 |
| Netherlands Antilles | 20 |
| Botswana | 20 |
| Syria | 20 |
| Ireland | 20 |
| Western Samoa | 20 |
| Cayman Islands | 20 |
| Bermuda | 20 |
| Kosovo | 10 |
| Laos | 10 |
| Switzerland | 10 |
| Algeria | 10 |
| Burundi | 10 |
| Georgia | 10 |
| Belarus | 10 |
| Benin | 10 |
| Croatia | 10 |
| Denmark | 10 |
| Kazakhstan | 10 |
| Niger | 10 |
| Oman | 10 |
| Ussr | 10 |
| Azerbaijan | 10 |
| Burkina Faso | 10 |

AR0028

| | |
|---|---|
| Libya | 10 |
| Afghanistan | D |
| Montserrat | D |
| Iraq | D |
| Latvia | D |
| Madagascar | D |
| Namibia | D |
| Slovenia | D |
| Somalia | D |
| Cyprus | D |
| Kyrgyzstan | D |
| Moldova | D |
| Lesotho | D |
| Norway | D |
| Zaire | D |
| Aruba | D |
| Central African Republic | D |
| French Guiana | D |
| Macau | D |
| Mauritius | D |
| Rwanda | D |
| Bosnia And Herzegovina | D |
| Brunei | D |
| Chad | D |
| Luxembourg | D |
| Marshall Islands | D |
| Mauritania | D |
| Bhutan | D |
| Guadeloupe | D |
| Guinea-Bissau | D |
| Martinique | D |
| Mozambique | D |
| Sudan | D |
| Tunisia | D |
| Tuvalu | D |
| Equatorial Guinea | D |
| Micronesia, Federated States Of | D |
| Palau | D |
| Swaziland | D |
| Turkmenistan | D |
| Andorra | D |
| Anguilla | D |
| Burma | D |
| Cuba | D |
| Eritrea | D |
| Finland | D |
| French Polynesia | D |
| Germany, West | D |
| Iceland | D |
| Malta | D |
| New Caledonia | D |

AR0029

| | |
|---|---|
| Palestine | D |
| Papua New Guinea | D |
| Tajikistan | D |
| Not available | 330 |

1)  The report reflects the most up-to-date data available at the time the report is generated.

2)  The Active DACA population are individuals who have an approved I-821D with validity as of Mar. 31, 2020.

3)  Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4)  Totals may not sum due to rounding.

5)  Countries with fewer than 10 active DACA recipients are notated with the letter "D."

6)  Not available means the data is not available in the electronic systems.

**AR0030**

| Approximate Active DACA Recipients: State or Territory of Residence As of March 31, 2020 | |
|---|---|
| **State or Territory of Residence** | **Number (rounded)** |
| **Grand Total** | **643,560** |
| California | 183,460 |
| Texas | 106,090 |
| Illinois | 33,940 |
| New York | 28,180 |
| Florida | 24,810 |
| North Carolina | 24,050 |
| Arizona | 23,990 |
| Georgia | 20,610 |
| New Jersey | 16,350 |
| Washington | 16,030 |
| Colorado | 14,520 |
| Nevada | 12,100 |
| Oregon | 9,710 |
| Virginia | 9,410 |
| Indiana | 8,870 |
| Utah | 8,490 |
| Maryland | 7,870 |
| Tennessee | 7,650 |
| Wisconsin | 6,540 |
| Oklahoma | 6,110 |
| South Carolina | 5,750 |
| New Mexico | 5,690 |
| Kansas | 5,550 |
| Massachusetts | 5,480 |
| Michigan | 5,250 |
| Minnesota | 5,180 |
| Arkansas | 4,480 |
| Pennsylvania | 4,480 |
| Alabama | 3,970 |
| Ohio | 3,860 |
| Connecticut | 3,560 |
| Missouri | 3,010 |
| Nebraska | 2,910 |
| Idaho | 2,760 |
| Kentucky | 2,710 |
| Iowa | 2,420 |
| Louisiana | 1,730 |
| Mississippi | 1,310 |
| Delaware | 1,310 |
| Rhode Island | 890 |
| District Of Columbia | 600 |
| Wyoming | 510 |
| Hawaii | 340 |
| New Hampshire | 270 |

**AR0031**

| | |
|---|---|
| South Dakota | 190 |
| North Dakota | 120 |
| West Virginia | 110 |
| Puerto Rico | 80 |
| Montana | 70 |
| Alaska | 70 |
| Maine | 50 |
| Virgin Islands | 30 |
| Vermont | 20 |
| Guam | 10 |
| Armed Forces Americas (except Canada) | 10 |
| Northern Mariana Islands | D |
| Federated States Of Micronesia | D |
| Armed Forces Pacific | D |
| Marshall Islands | D |
| American Samoa | D |
| Not available | D |

1)  The report reflects the most up-to-date data available at the time the report is generated.

2)  The Active DACA population are individuals who have an approved I-821D with validity as of Mar. 31, 2020.

3)  Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4)  Totals may not sum due to rounding.

5)  States/Territories with fewer than 10 active DACA recipients are notated with the letter "D."

**AR0032**

| Approximate Active DACA Recipients: Core Based Statistical Area As of March 31, 2020 | |
|---|---|
| **Core Based Statistical Area** | **Number (rounded)** |
| **Grand Total** | **643,560** |
| Los Angeles-Long Beach-Anaheim, CA | 79,890 |
| New York-Newark-Jersey City, NY-NJ-PA | 41,310 |
| Dallas-Fort Worth-Arlington, TX | 34,770 |
| Houston-The Woodlands-Sugar Land, TX | 32,450 |
| Chicago-Naperville-Elgin, IL-IN-WI | 32,350 |
| Riverside-San Bernardino-Ontario, CA | 22,740 |
| Phoenix-Mesa-Scottsdale, AZ | 20,830 |
| Atlanta-Sandy Springs-Roswell, GA | 14,570 |
| San Francisco-Oakland-Hayward, CA | 13,490 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 12,060 |
| San Diego-Carlsbad, CA | 10,440 |
| Las Vegas-Henderson-Paradise, NV | 9,700 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 9,620 |
| Denver-Aurora-Lakewood, CO | 9,180 |
| San Jose-Sunnyvale-Santa Clara, CA | 8,450 |
| Austin-Round Rock, TX | 7,260 |
| Seattle-Tacoma-Bellevue, WA | 7,170 |
| McAllen-Edinburg-Mission, TX | 7,000 |
| Sacramento--Roseville--Arden-Arcade, CA | 5,700 |
| Portland-Vancouver-Hillsboro, OR-WA | 5,680 |
| Charlotte-Concord-Gastonia, NC-SC | 5,660 |
| San Antonio-New Braunfels, TX | 5,030 |
| Bakersfield, CA | 4,920 |
| Fresno, CA | 4,860 |
| Salt Lake City, UT | 4,490 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 4,240 |
| Boston-Cambridge-Newton, MA-NH | 4,170 |
| Minneapolis-St. Paul-Bloomington, MN-WI | 4,090 |
| Indianapolis-Carmel-Anderson, IN | 3,840 |
| Oxnard-Thousand Oaks-Ventura, CA | 3,820 |
| Raleigh, NC | 3,670 |
| Visalia-Porterville, CA | 3,450 |
| Kansas City, MO-KS | 3,440 |
| Stockton-Lodi, CA | 3,350 |
| Nashville-Davidson--Murfreesboro--Franklin, TN | 3,200 |
| Tampa-St. Petersburg-Clearwater, FL | 3,110 |
| Modesto, CA | 2,920 |
| Santa Maria-Santa Barbara, CA | 2,900 |
| Salinas, CA | 2,900 |
| Oklahoma City, OK | 2,800 |
| Albuquerque, NM | 2,700 |
| Milwaukee-Waukesha-West Allis, WI | 2,650 |
| Orlando-Kissimmee-Sanford, FL | 2,630 |

**AR0033**

| | |
|---|---:|
| Santa Rosa, CA | 2,440 |
| Detroit-Warren-Dearborn, MI | 2,290 |
| Baltimore-Columbia-Towson, MD | 2,180 |
| Winston-Salem, NC | 2,180 |
| Brownsville-Harlingen, TX | 2,080 |
| Salem, OR | 2,040 |
| Greensboro-High Point, NC | 1,960 |
| Yakima, WA | 1,950 |
| Tucson, AZ | 1,890 |
| Merced, CA | 1,840 |
| Tulsa, OK | 1,830 |
| Kennewick-Richland, WA | 1,820 |
| Bridgeport-Stamford-Norwalk, CT | 1,820 |
| Columbus, OH | 1,810 |
| Memphis, TN-MS-AR | 1,790 |
| Durham-Chapel Hill, NC | 1,760 |
| Fayetteville-Springdale-Rogers, AR-MO | 1,700 |
| Provo-Orem, UT | 1,680 |
| Reno, NV | 1,680 |
| El Paso, TX | 1,550 |
| North Port-Sarasota-Bradenton, FL | 1,480 |
| Vallejo-Fairfield, CA | 1,480 |
| Omaha-Council Bluffs, NE-IA | 1,440 |
| Cape Coral-Fort Myers, FL | 1,420 |
| Grand Rapids-Wyoming, MI | 1,390 |
| Birmingham-Hoover, AL | 1,370 |
| Greenville-Anderson-Mauldin, SC | 1,350 |
| Gainesville, GA | 1,310 |
| Santa Cruz-Watsonville, CA | 1,300 |
| Ogden-Clearfield, UT | 1,260 |
| Providence-Warwick, RI-MA | 1,230 |
| Wichita, KS | 1,220 |
| Laredo, TX | 1,220 |
| Lakeland-Winter Haven, FL | 1,190 |
| Boise City, ID | 1,180 |
| Elkhart-Goshen, IN | 1,160 |
| Richmond, VA | 1,090 |
| Naples-Immokalee-Marco Island, FL | 1,030 |
| Louisville/Jefferson County, KY-IN | 1,010 |
| Des Moines-West Des Moines, IA | 1,010 |
| Cincinnati, OH-KY-IN | 1,000 |
| Other CBSA | 94,090 |
| Not available | 1,330 |
| Non CBSA | 14,270 |

AR0034

1)  The report reflects the most up-to-date data available at the time the report is generated.

2)  The Active DACA population are individuals who have an approved I-821D with validity as of Mar. 31, 2020.

3)  Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4)  Core Based Statistical Areas (CBSA) at the time of most recent application. CBSAs are defined by the Office of Management and Budget.

5)  CBSA with less than 1,000 individuals are included in Other CBSA.

6)  Not available means the data is not available in the electronic systems.

7)  Totals may not sum due to rounding.

**AR0035**

| Approximate Active DACA Recipients: Gender As of March 31, 2020 | |
| --- | --- |
| Sex | Number (rounded) |
| **Grand Total** | **643,560** |
| Female | 342,680 |
| Male | 300,820 |
| Not available | 60 |

1) The report reflects the most up-to-date data available at the time the report is generated.

2) The Active DACA population are individuals who have an approved I-821D with validity as of Mar. 31, 2020.

3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4) Totals may not sum due to rounding.

5) Not available means the data is not available in the electronic systems.

| Approximate Active DACA Recipients: Age Group As of March 31, 2020 | |
| --- | --- |
| Age as of March 31, 2020 | Number (rounded) |
| **Grand Total** | **643,560** |
| Under 16 | 70 |
| 16-20 | 74,570 |
| 21-25 | 240,890 |
| 26-30 | 191,840 |
| 31-35 | 108,390 |
| 36-38 | 27,800 |
| Not available | D |
| Average Age | 26.2 |
| Median Age | 26 |
| Interquartile Range | 22 to 30 |

1) The report reflects the most up-to-date data available at the time the report is generated.

2) The Active DACA population are individuals who have an approved I-821D with validity at as of Mar. 31, 2020.

3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4) Totals may not sum due to rounding.

5) Not available means the data is not available in the electronic systems.

6) Counts less than 10 active DACA recipients are notated with the letter "D."

**AR0036**

| Approximate Active DACA Recipients: Marital Status As of March 31, 2020 | |
|---|---|
| **Marital Status** | **Number (rounded)** |
| **Grand Total** | **643,560** |
| Single | 482,100 |
| Married | 148,190 |
| Divorced | 10,640 |
| Widowed | 360 |
| Not available | 2,270 |

1) The report reflects the most up-to-date data available at the time the report is generated.

2) The Active DACA population are individuals who have an approved I-821D with validity as of Mar. 31, 2020.

3) Individuals who have obtained Lawful Permanent Resident Status or U.S. Citizenship are excluded.

4) Totals may not sum due to rounding.

5) Not available means the data is not available in the electronic systems.

**AR0037**



**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Dec. 31, 2019**

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year - Total** | | | | | | | |
| 2012 | 152,430 | 5,396 | 157,826 | 3,629 | 1,684 | - | 150,746 |
| 2013 | 427,612 | 16,355 | 443,967 | 1,696 | 470,603 | 11,023 | 96,719 |
| 2014 | 238,897 | 24,890 | 263,787 | 951 | 158,417 | 21,103 | 156,034 |
| 2014 Initial | 122,473 | 19,065 | 141,538 | 487 | 136,182 | 21,100 | 61,850 |
| 2014 Renewal | 116,424 | 5,825 | 122,249 | 463 | 22,235 | D | 94,184 |
| 2015 | 448,843 | 35,504 | 484,347 | 1,781 | 510,342 | 21,551 | 72,886 |
| 2015 Initial | 85,301 | 7,170 | 92,471 | 338 | 90,832 | 19,185 | 37,062 |
| 2015 Renewal | 363,542 | 28,334 | 391,876 | 1,442 | 419,510 | 2,366 | 35,824 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,034 | 198,558 | 14,486 | 119,667 |
| 2016 Initial | 73,347 | 1,151 | 74,498 | 291 | 52,738 | 11,435 | 45,387 |
| 2016 Renewal | 187,354 | 11,166 | 198,520 | 743 | 145,820 | 3,051 | 74,280 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,883 | 461,911 | 13,196 | 117,321 |
| 2017 Initial | 45,593 | 44 | 45,637 | 181 | 47,133 | 9,165 | 34,628 |
| 2017 Renewal | 427,257 | 43,411 | 470,668 | 1,702 | 414,778 | 4,031 | 82,693 |
| 2018 | 260,120 | 29,651 | 289,771 | 1,036 | 319,493 | 12,540 | 45,373 |
| 2018 Initial | 2,060 | D | 2,062 | D | 24,423 | 8,250 | 4,003 |
| 2018 Renewal | 258,060 | 29,649 | 287,709 | 1,028 | 295,070 | 4,290 | 41,370 |
| 2019 | 386,159 | 22,003 | 408,162 | 1,532 | 387,723 | 4,952 | 38,826 |
| 2019 Initial | 1,567 | D | 1,571 | D | 1,783 | 1,605 | 2,176 |
| 2019 Renewal | 384,592 | 21,999 | 406,591 | 1,526 | 385,940 | 3,347 | 36,650 |
| 2020 | 72,377 | 4,170 | 76,547 | 1,167 | 74,124 | 1,040 | 36,031 |
| 2020 Initial | 911 | D | 913 | 14 | 245 | 160 | 2,680 |
| 2020 Renewal | 71,466 | 4,168 | 75,634 | 1,152 | 73,879 | 880 | 33,351 |
| Total Cumulative | 2,719,989 | 193,741 | 2,913,730 | 1,458 | 2,582,855 | 99,891 | 36,031 |
| Total Cumulative Initial | 911,294 | 49,189 | 960,483 | 488 | 825,623 | 81,923 | 2,680 |
| Total Cumulative Renewal | 1,808,695 | 144,552 | 1,953,247 | 969 | 1,757,232 | 17,968 | 33,351 |

**AR0038**

| Period | Requests by Intake and Case Status | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year 2020 by Quarter** | | | | | | | |
| Q1. October - December | 72,377 | 4,170 | 76,547 | 1,167 | 74,124 | 1,040 | 36,031 |
| Q1. October - December Initial | 911 | D | 913 | 14 | 245 | 160 | 2,680 |
| Q1. October - December Renewal | 71,466 | 4,168 | 75,634 | 1,152 | 73,879 | 880 | 33,351 |

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1]Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

Each request is considered on a case-by-case basis.

See http://www.uscis.gov/childhoodarrivals.

[2]The number of new requests accepted at a Lockbox during the reporting period.

[3]The number of requests rejected at a Lockbox during the reporting period.

[4]The number of requests that were received at a Lockbox during the reporting period.

[5]The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6]The number of new requests received and entered into a case-tracking system during the reporting period.

[7]The number of requests approved during the reporting period.

[8]The number of requests that were denied, terminated, or withdrawn during the reporting period.

[9]The number of requests awaiting a decision as of the end of the reporting period.

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the report is generated.

3) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn). USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of pending cases.  Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.

4) The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated.

5) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases.  Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved"  and "Denied" fields.  The increase in the "Approved" and "Denied" counts has decreased the "Pending" counts.

**Source:**  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Report Tool, accessed January 2020.

**AR0040**

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| | | | | | | |
| **Country** | | | | | | |
| Mexico | 709,301 | 1,430,647 | 2,139,948 | 649,987 | 1,390,316 | 2,040,303 |
| El Salvador | 34,569 | 69,081 | 103,650 | 29,762 | 67,001 | 96,763 |
| Guatemala | 24,941 | 45,914 | 70,855 | 20,963 | 44,400 | 65,363 |
| Honduras | 22,741 | 43,226 | 65,967 | 19,164 | 41,773 | 60,937 |
| Korea, South | 9,582 | 20,925 | 30,507 | 9,008 | 20,225 | 29,233 |
| Peru | 9,848 | 20,400 | 30,248 | 9,297 | 19,843 | 29,140 |
| Brazil | 8,668 | 15,609 | 24,277 | 7,647 | 15,227 | 22,874 |
| Ecuador | 7,811 | 14,831 | 22,642 | 6,893 | 14,389 | 21,282 |
| Colombia | 7,310 | 14,047 | 21,357 | 6,751 | 13,691 | 20,442 |
| Philippines | 5,133 | 10,550 | 15,683 | 4,799 | 10,340 | 15,139 |
| Argentina | 5,270 | 10,173 | 15,443 | 4,950 | 9,943 | 14,893 |
| India | 3,788 | 7,487 | 11,275 | 3,262 | 7,250 | 10,512 |
| Jamaica | 4,462 | 6,892 | 11,354 | 3,551 | 6,732 | 10,283 |
| Venezuela | 3,499 | 6,656 | 10,155 | 3,199 | 6,493 | 9,692 |
| Dominican Republic | 3,851 | 5,977 | 9,828 | 3,280 | 5,824 | 9,104 |
| Trinidad And Tobago | 3,099 | 5,067 | 8,166 | 2,642 | 4,972 | 7,614 |
| Uruguay | 2,654 | 4,907 | 7,561 | 2,488 | 4,785 | 7,273 |
| Bolivia | 2,243 | 4,632 | 6,875 | 2,121 | 4,512 | 6,633 |
| Costa Rica | 2,296 | 4,348 | 6,644 | 2,108 | 4,260 | 6,368 |
| Chile | 1,916 | 3,797 | 5,713 | 1,799 | 3,706 | 5,505 |
| Poland | 2,010 | 3,677 | 5,687 | 1,871 | 3,590 | 5,461 |
| Pakistan | 1,956 | 3,707 | 5,663 | 1,736 | 3,614 | 5,350 |
| Nicaragua | 1,915 | 3,532 | 5,447 | 1,671 | 3,420 | 5,091 |
| Nigeria | 1,585 | 2,803 | 4,388 | 1,337 | 2,718 | 4,055 |
| Guyana | 1,498 | 2,703 | 4,201 | 1,304 | 2,636 | 3,940 |
| All Others[3] | 29,348 | 47,107 | 76,455 | 24,033 | 45,572 | 69,605 |
| **Total** | **911,294** | **1,808,695** | **2,719,989** | **825,623** | **1,757,232** | **2,582,855** |

**AR0041**

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with a blank in the country of birth field are included in the field "All Others."

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

4) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases. Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved"  and "Denied" fields.

**Source:**  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Report Tool, accessed January 2020.

**AR0042**

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| | | | | | | |
| **Residence** | | | | | | |
| California | 256,509 | 519,073 | 775,582 | 238,353 | 504,477 | 742,830 |
| Texas | 150,327 | 293,191 | 443,518 | 134,001 | 285,578 | 419,579 |
| Illinois | 48,029 | 96,428 | 144,457 | 44,975 | 93,787 | 138,762 |
| New York | 46,728 | 83,635 | 130,363 | 40,790 | 81,387 | 122,177 |
| Florida | 38,424 | 70,320 | 108,744 | 32,631 | 68,475 | 101,106 |
| Arizona | 33,400 | 67,184 | 100,584 | 30,344 | 65,132 | 95,476 |
| North Carolina | 31,983 | 66,833 | 98,816 | 29,652 | 65,106 | 94,758 |
| Georgia | 30,372 | 58,274 | 88,646 | 25,732 | 56,131 | 81,863 |
| New Jersey | 25,270 | 47,806 | 73,076 | 22,154 | 46,505 | 68,659 |
| Washington | 20,914 | 43,221 | 64,135 | 19,283 | 41,936 | 61,219 |
| Colorado | 20,413 | 40,942 | 61,355 | 18,548 | 39,597 | 58,145 |
| Nevada | 15,276 | 32,926 | 48,202 | 14,271 | 32,041 | 46,312 |
| Virginia | 13,889 | 27,374 | 41,263 | 12,362 | 26,557 | 38,919 |
| Oregon | 12,789 | 27,361 | 40,150 | 12,058 | 26,542 | 38,600 |
| Indiana | 11,696 | 24,422 | 36,118 | 10,768 | 23,550 | 34,318 |
| Utah | 11,597 | 23,476 | 35,073 | 10,684 | 22,766 | 33,450 |
| Maryland | 11,493 | 22,523 | 34,016 | 9,932 | 21,874 | 31,806 |
| Tennessee | 10,149 | 20,455 | 30,604 | 9,119 | 19,802 | 28,921 |
| Wisconsin | 8,755 | 18,000 | 26,755 | 8,194 | 17,514 | 25,708 |
| Oklahoma | 8,116 | 16,819 | 24,935 | 7,481 | 16,379 | 23,860 |
| Massachusetts | 8,855 | 16,159 | 25,014 | 7,683 | 15,722 | 23,405 |
| Kansas | 7,794 | 15,805 | 23,599 | 7,314 | 15,335 | 22,649 |
| South Carolina | 7,733 | 15,830 | 23,563 | 6,926 | 15,393 | 22,319 |
| New Mexico | 8,257 | 14,851 | 23,108 | 7,609 | 14,444 | 22,053 |
| Minnesota | 7,090 | 14,791 | 21,881 | 6,498 | 14,265 | 20,763 |
| Michigan | 7,121 | 14,695 | 21,816 | 6,440 | 14,229 | 20,669 |
| Pennsylvania | 6,637 | 12,582 | 19,219 | 5,699 | 12,230 | 17,929 |
| Arkansas | 6,019 | 12,699 | 18,718 | 5,480 | 12,340 | 17,820 |
| Connecticut | 5,459 | 10,381 | 15,840 | 4,883 | 10,126 | 15,009 |
| Alabama | 5,283 | 10,521 | 15,804 | 4,704 | 10,242 | 14,946 |
| Ohio | 5,326 | 10,377 | 15,703 | 4,628 | 9,983 | 14,611 |
| Missouri | 4,042 | 8,321 | 12,363 | 3,742 | 8,050 | 11,792 |
| Nebraska | 4,004 | 8,095 | 12,099 | 3,639 | 7,807 | 11,446 |
| Idaho | 3,657 | 7,633 | 11,290 | 3,385 | 7,388 | 10,773 |
| Kentucky | 3,672 | 7,364 | 11,036 | 3,275 | 7,125 | 10,400 |

**AR0043**

| | | | | | | |
|---|---|---|---|---|---|---|
| Iowa | 3,227 | 6,965 | 10,192 | 2,921 | 6,722 | 9,643 |
| Louisiana | 2,458 | 4,643 | 7,101 | 2,148 | 4,511 | 6,659 |
| Mississippi | 1,845 | 3,520 | 5,365 | 1,604 | 3,425 | 5,029 |
| Delaware | 1,677 | 3,531 | 5,208 | 1,529 | 3,448 | 4,977 |
| Rhode Island | 1,335 | 2,610 | 3,945 | 1,169 | 2,520 | 3,689 |
| District Of Columbia | 869 | 1,648 | 2,517 | 735 | 1,595 | 2,330 |
| Wyoming | 745 | 1,426 | 2,171 | 661 | 1,382 | 2,043 |
| Hawaii | 448 | 915 | 1,363 | 368 | 885 | 1,253 |
| New Hampshire | 386 | 766 | 1,152 | 330 | 736 | 1,066 |
| South Dakota | 276 | 560 | 836 | 240 | 526 | 766 |
| North Dakota | 96 | 335 | 431 | 74 | 328 | 402 |
| West Virginia | 151 | 281 | 432 | 125 | 269 | 394 |
| Puerto Rico | 271 | 227 | 498 | 165 | 221 | 386 |
| Alaska | 94 | 234 | 328 | 85 | 218 | 303 |
| Montana | 76 | 194 | 270 | 65 | 183 | 248 |
| Maine | 50 | 119 | 169 | 44 | 117 | 161 |
| Virgin Islands | 126 | 88 | 214 | 68 | 85 | 153 |
| Guam | 23 | 49 | 72 | 21 | 46 | 67 |
| Vermont | 17 | 51 | 68 | 12 | 44 | 56 |
| Armed Forces Americas (except Canada) | D | 29 | 36 | D | 26 | 33 |
| Armed Forces Pacific | D | 18 | 19 | D | 18 | 19 |
| Northern Mariana Islands | 27 | 15 | 42 | D | 12 | 19 |
| Armed Forces Africa, Canada, Europe, Middle East | - | D | D | - | D | D |
| Federated States Of Micronesia | D | D | D | D | D | D |
| Marshall Islands | - | D | D | - | D | D |
| American Samoa | D | D | D | - | D | D |
| Not Reported[3] | D | D | D | D | D | D |
| **Total** | **911,294** | **1,808,695** | **2,719,989** | **825,623** | **1,757,232** | **2,582,855** |

**AR0044**

**Table Key**

D  Data withheld to protect petitioners' privacy.

- Represents zero.

**Footnotes**

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with a blank in the State field are included in the field "not reported."

**NOTE:** 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

4) USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Approved" and "Denied" fields, such that the data in this field was under reported because it did not include certain history action codes that are counted as approvals or denials. USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of approved and denied cases. Note that if this report is compared to versions prior to the March 31, 2019 version that USCIS has published on its website, the prior versions reflect under reported data in the "Approved"  and "Denied" fields.

**Source:**  Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Report Tool, accessed January 2020.

**AR0045**



# Office of the Attorney General
## Washington, D. C. 20530

June 30, 2020

The Honorable Chad F. Wolf
Acting Secretary of Homeland Security
Washington, DC 20528

Dear Acting Secretary Wolf:

On September 4, 2017, then-Attorney General Jefferson B. Sessions sent a letter to then-Acting Secretary of Homeland Security Elaine Duke that, among other things, expressed his view that the Department of Homeland Security (DHS) policy known as Deferred Action for Childhood Arrivals (DACA) was unlawful. Acting Secretary Duke expressly considered that letter, among other factors, in reaching her decision on September 5, 2017, that the DACA policy should be rescinded.

On June 18, 2020, the U.S. Supreme Court affirmed a lower court judgment vacating Acting Secretary Duke's rescission of the DACA policy. See *Department of Homeland Security v. Regents of the University of California*, Nos. 18-587, 18-588, 18-589. The Supreme Court noted that "[a]ll parties agree" that "DHS may rescind DACA," slip op. at 9, but held that Acting Secretary Duke's decision failed to provide a reasoned explanation as to both the scope of her discretion to rescind DACA and the manner in which she exercised it, *id.* at 29. Accordingly, the Court remanded the matter to DHS so that the agency may consider the issue anew. *Id.*

In order to facilitate that consideration, I am hereby withdrawing Attorney General Sessions's September 4, 2017, letter to Acting Secretary Duke. Without regard to whether I agree with the views expressed in that letter, I withdraw it because I do not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion you otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA. In other words, I wish to wipe the slate clean to make clear beyond doubt that you are free to exercise your own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court. For the same reason, I also have directed the Office of Legal Counsel at the Department of Justice to withdraw an opinion that addressed the legality of DACA and related deferred-action policies, see *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op O.L.C. __ (Nov. 19, 2014), as well as any other guidance it has provided to DHS on that topic.

Sincerely,

William P. Barr
Attorney General

**AR0046**