Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF HOMELAND SECURITY ET AL. *v.* REGENTS OF THE UNIVERSITY OF CALIFORNIA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–587.   Argued November 12, 2019—Decided June 18, 2020*

In 2012, the Department of Homeland Security (DHS) issued a memorandum announcing an immigration relief program known as Deferred Action for Childhood Arrivals (DACA), which allows certain unauthorized aliens who arrived in the United States as children to apply for a two-year forbearance of removal.  Those granted such relief become eligible for work authorization and various federal benefits.  Some 700,000 aliens have availed themselves of this opportunity.

Two years later, DHS expanded DACA eligibility and created a related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  If implemented, that program would have made 4.3 million parents of U. S. citizens or lawful permanent residents eligible for the same forbearance from removal, work eligibility, and other benefits as DACA recipients.  Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation of both the DACA expansion and DAPA.  The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act (INA), which carefully defines eligibility for benefits.  This Court affirmed by an equally divided vote, and

——————

*Together with No. 18–588, *Trump, President of the United States, et al.* v. *National Association for the Advancement of Colored People et al.*, on certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit, and No. 18–589, *Wolf, Acting Secretary of Homeland Security, et al.* v. *Batalla Vidal et al.*, on certiorari before judgment to the United States Court of Appeals for the Second Circuit.

Syllabus

the litigation then continued in the District Court.

In June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities. That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

Several groups of plaintiffs challenged Duke's decision to rescind DACA, claiming that it was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California (*Regents*, No. 18–587), New York (*Batalla Vidal*, No. 18–589), and the District of Columbia (*NAACP*, No. 18–588) all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal*, the District Courts further held that the equal protection claims were adequately alleged, and they entered coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful. Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded to the court's order. She declined to disturb or replace Duke's rescission decision and instead explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission. The Government moved for the District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale.

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 3 of 405 PageID #: 6300

before judgment. Following the Ninth Circuit affirmance in *Regents*, this Court granted certiorari.

*Held*: The judgment in No. 18–587 is vacated in part and reversed in part; the judgment in No. 18–588 is affirmed; the February 13, 2018 order in No. 18–589 is vacated, the November 9, 2017 order is affirmed in part, and the March 29, 2018 order is reversed in part; and all of the cases are remanded.

No. 18–587, 908 F. 3d 476, vacated in part and reversed in part; No. 18–588, affirmed; and No. 18–589, February 13, 2018 order vacated, November 9, 2017 order affirmed in part, and March 29, 2018 order reversed in part; all cases remanded.

THE CHIEF JUSTICE delivered the opinion of the Court, except as to Part IV, concluding:

1. DHS's rescission decision is reviewable under the APA and is within this Court's jurisdiction. Pp. 9–13.

(a) The APA's "basic presumption of judicial review" of agency action, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140, can be rebutted by showing that the "agency action is committed to agency discretion by law," 5 U. S. C. §701(a)(2). In *Heckler* v. *Chaney*, the Court held that this narrow exception includes an agency's decision not to institute an enforcement action. 470 U. S. 821, 831–832. The Government contends that DACA is a general non-enforcement policy equivalent to the individual non-enforcement decision in *Chaney*. But the DACA Memorandum did not merely decline to institute enforcement proceedings; it created a program for conferring affirmative immigration relief. Therefore, unlike the non-enforcement decision in *Chaney*, DACA's creation—and its rescission—is an "action [that] provides a focus for judicial review." *Id.,* at 832. In addition, by virtue of receiving deferred action, 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare. Access to such benefits is an interest "courts often are called upon to protect." *Ibid.* DACA's rescission is thus subject to review under the APA. Pp. 9–12.

(b) The two jurisdictional provisions of the INA invoked by the Government do not apply. Title 8 U. S. C. §1252(b)(9), which bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien," is inapplicable where, as here, the parties do not challenge any removal proceedings. And the rescission is not a decision "to commence proceedings, adjudicate cases, or execute removal orders" within the meaning of §1252(g). Pp. 12–13.

2. DHS's decision to rescind DACA was arbitrary and capricious under the APA. Pp. 13–26.

(a) In assessing the rescission, the Government urges the Court to consider not just the contemporaneous explanation offered by Acting Secretary Duke but also the additional reasons supplied by Secretary

AR0311

Syllabus

Nielsen nine months later.  Judicial review of agency action, however, is limited to "the grounds that the agency invoked when it took the action."  *Michigan* v. *EPA*, 576 U. S. 743, 758.  If those grounds are inadequate, a court may remand for the agency to offer "a fuller explanation of the agency's reasoning *at the time of the agency action*," *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654 (emphasis added), or to "deal with the problem afresh" by taking *new* agency action, *SEC* v. *Chenery Corp.,* 332 U. S. 194, 201.  Because Secretary Nielsen chose not to take new action, she was limited to elaborating on the agency's original reasons.  But her reasoning bears little relationship to that of her predecessor and consists primarily of impermissible "*post hoc* rationalization."  *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 420.  The rule requiring a new decision before considering new reasons is not merely a formality.  It serves important administrative law values by promoting agency accountability to the public, instilling confidence that the reasons given are not simply convenient litigating positions, and facilitating orderly review.  Each of these values would be markedly undermined if this Court allowed DHS to rely on reasons offered nine months after the rescission and after three different courts had identified flaws in the original explanation.  Pp. 13–17.

(b)  Acting Secretary Duke's rescission memorandum failed to consider important aspects of the problem before the agency.  Although Duke was bound by the Attorney General's determination that DACA is illegal, see 8 U. S. C. §1103(a)(1), deciding how best to address that determination involved important policy choices reserved for DHS.  Acting Secretary Duke plainly exercised such discretionary authority in winding down the program, but she did not appreciate the full scope of her discretion.  The Attorney General concluded that the legal defects in DACA mirrored those that the courts had recognized in DAPA.  The Fifth Circuit, the highest court to offer a reasoned opinion on DAPA's legality, found that DAPA violated the INA because it extended eligibility for benefits to a class of unauthorized aliens.  But the defining feature of DAPA (and DACA) is DHS's decision to defer removal, and the Fifth Circuit carefully distinguished that forbearance component from the associated benefits eligibility.  Eliminating benefits eligibility while continuing forbearance thus remained squarely within Duke's discretion.  Yet, rather than addressing forbearance in her decision, Duke treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefit and forbearance, without explanation.  That reasoning repeated the error in *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm*— treating a rationale that applied to only part of a policy as sufficient to rescind the entire policy.  463 U. S. 29, 51.  While DHS

AR0312

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 5 of 405 PageID #: 6302

Syllabus

was not required to "consider all policy alternatives," *ibid.*, deferred action was "within the ambit of the existing" policy, *ibid.*; indeed, it was the centerpiece of the policy.  In failing to consider the option to retain deferred action, Duke "failed to supply the requisite 'reasoned analysis.'"  *Id., at* 57.

That omission alone renders Duke's decision arbitrary and capricious, but it was not the only defect.  Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum.  *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742.  Certain features of the DACA policy may affect the strength of any reliance interests, but those features are for the agency to consider in the first instance.  DHS has flexibility in addressing any reliance interests and could have considered various accommodations.  While the agency was not required to pursue these accommodations, it was required to assess the existence and strength of any reliance interests, and weigh them against competing policy concerns.  Its failure to do so was arbitrary and capricious.  Pp. 17–26.

THE CHIEF JUSTICE, joined by JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN, concluded in Part IV that respondents' claims fail to establish a plausible inference that the rescission was motivated by animus in violation of the equal protection guarantee of the Fifth Amendment.  Pp. 27–29.

ROBERTS, C. J., delivered the opinion of the Court, except as to Part IV.  GINSBURG, BREYER, and KAGAN, JJ., joined that opinion in full, and SOTOMAYOR, J., joined as to all but Part IV.  SOTOMAYOR, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part.  THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which ALITO and GORSUCH, JJ., joined.  ALITO, J., and KAVANAUGH, J., filed opinions concurring in the judgment in part and dissenting in part.

AR0313

Cite as: 591 U. S. ____ (2020)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–587, 18–588, and 18–589

————

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587          *v.*

### REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT


## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588          *v.*

### NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


## CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589          *v.*

### MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

AR0314

2   DEPARTMENT OF HOMELAND SECURITY *v.* REGENTS OF UNIV. OF CAL.

Opinion of the Court

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part IV.

In the summer of 2012, the Department of Homeland Security (DHS) announced an immigration program known as Deferred Action for Childhood Arrivals, or DACA. That program allows certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. Those granted such relief are also eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Five years later, the Attorney General advised DHS to rescind DACA, based on his conclusion that it was unlawful. The Department's Acting Secretary issued a memorandum terminating the program on that basis. The termination was challenged by affected individuals and third parties who alleged, among other things, that the Acting Secretary had violated the Administrative Procedure Act (APA) by failing to adequately address important factors bearing on her decision. For the reasons that follow, we conclude that the Acting Secretary did violate the APA, and that the rescission must be vacated.

I

A

In June 2012, the Secretary of Homeland Security issued a memorandum announcing an immigration relief program for "certain young people who were brought to this country as children." App. to Pet. for Cert. in No. 18–587, p. 97a (App. to Pet. for Cert.). Known as DACA, the program applies to childhood arrivals who were under age 31 in 2012; have continuously resided here since 2007; are current students, have completed high school, or are honorably discharged veterans; have not been convicted of any serious crimes; and do not threaten national security or public

Opinion of the Court

safety. *Id.*, at 98a. DHS concluded that individuals who meet these criteria warrant favorable treatment under the immigration laws because they "lacked the intent to violate the law," are "productive" contributors to our society, and "know only this country as home." *Id.*, at 98a–99a.

"[T]o prevent [these] low priority individuals from being removed from the United States," the DACA Memorandum instructs Immigration and Customs Enforcement to "exercise prosecutorial discretion[] on an individual basis . . . by deferring action for a period of two years, subject to renewal." *Id.*, at 100a. In addition, it directs U. S. Citizenship and Immigration Services (USCIS) to "accept applications to determine whether these individuals qualify for work authorization during this period of deferred action," *id.*, at 101a, as permitted under regulations long predating DACA's creation, see 8 CFR §274a.12(c)(14) (2012) (permitting work authorization for deferred action recipients who establish "economic necessity"); 46 Fed. Reg. 25080–25081 (1981) (similar). Pursuant to other regulations, deferred action recipients are considered "lawfully present" for purposes of, and therefore eligible to receive, Social Security and Medicare benefits. See 8 CFR §1.3(a)(4)(vi); 42 CFR §417.422(h) (2012).

In November 2014, two years after DACA was promulgated, DHS issued a memorandum announcing that it would expand DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to three years. App. to Pet. for Cert. 106a–107a. In the same memorandum, DHS created a new, related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. That program would have authorized deferred action for up to 4.3 million parents whose children were U. S. citizens or lawful permanent residents. These parents were to enjoy the same forbearance, work eligibility, and other benefits as DACA

recipients.

Before the DAPA Memorandum was implemented, 26 States, led by Texas, filed suit in the Southern District of Texas. The States contended that DAPA and the DACA expansion violated the APA's notice and comment requirement, the Immigration and Nationality Act (INA), and the Executive's duty under the Take Care Clause of the Constitution. The District Court found that the States were likely to succeed on the merits of at least one of their claims and entered a nationwide preliminary injunction barring implementation of both DAPA and the DACA expansion. See *Texas* v. *United States*, 86 F. Supp. 3d 591, 677–678 (2015).

A divided panel of the Court of Appeals for the Fifth Circuit affirmed the preliminary injunction. *Texas* v. *United States*, 809 F. 3d 134, 188 (2015). In opposing the injunction, the Government argued that the DAPA Memorandum reflected an unreviewable exercise of the Government's enforcement discretion. The Fifth Circuit majority disagreed. It reasoned that the deferred action described in the DAPA Memorandum was "much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Id.*, at 166. From this, the majority concluded that the creation of the DAPA program was not an unreviewable action "committed to agency discretion by law." *Id.*, at 169 (quoting 5 U. S. C. §701(a)(2)).

The majority then upheld the injunction on two grounds. It first concluded the States were likely to succeed on their procedural claim that the DAPA Memorandum was a substantive rule that was required to undergo notice and comment. It then held that the APA required DAPA to be set aside because the program was "manifestly contrary" to the INA, which "expressly and carefully provides legal designations allowing defined classes" to "receive the benefits" associated with "lawful presence" and to qualify for work

AR0317

tecnología

authorization, 809 F. 3d, at 179–181, 186 (internal quotation marks omitted). Judge King dissented.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote, which meant that no opinion was issued. *United States* v. *Texas*, 579 U. S. ___ (2016) (*per curiam*). For the next year, litigation over DAPA and the DACA expansion continued in the Southern District of Texas, while implementation of those policies remained enjoined.

Then, in June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum. In explaining that decision, DHS cited the preliminary injunction and ongoing litigation in Texas, the fact that DAPA had never taken effect, and the new administration's immigration enforcement priorities.

Three months later, in September 2017, Attorney General Jefferson B. Sessions III sent a letter to Acting Secretary of Homeland Security Elaine C. Duke, "advis[ing]" that DHS "should rescind" DACA as well. App. 877. Citing the Fifth Circuit's opinion and this Court's equally divided affirmance, the Attorney General concluded that DACA shared the "same legal . . . defects that the courts recognized as to DAPA" and was "likely" to meet a similar fate. *Id.*, at 878. "In light of the costs and burdens" that a rescission would "impose[] on DHS," the Attorney General urged DHS to "consider an orderly and efficient wind-down process." *Ibid.*

The next day, Duke acted on the Attorney General's advice. In her decision memorandum, Duke summarized the history of the DACA and DAPA programs, the Fifth Circuit opinion and ensuing affirmance, and the contents of the Attorney General's letter. App. to Pet. for Cert. 111a–117a. "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the "letter from the Attorney General," she concluded that the "DACA program should be terminated." *Id.*, at 117a.

6      DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of the Court

Duke then detailed how the program would be wound down: No new applications would be accepted, but DHS would entertain applications for two-year renewals from DACA recipients whose benefits were set to expire within six months. For all other DACA recipients, previously issued grants of deferred action and work authorization would not be revoked but would expire on their own terms, with no prospect for renewal. *Id.*, at 117a–118a.

## B

Within days of Acting Secretary Duke's rescission announcement, multiple groups of plaintiffs ranging from individual DACA recipients and States to the Regents of the University of California and the National Association for the Advancement of Colored People challenged her decision in the U. S. District Courts for the Northern District of California (*Regents*, No. 18–587), the Eastern District of New York (*Batalla Vidal*, No. 18–589), and the District of Columbia (*NAACP*, No. 18–588). The relevant claims are that the rescission was arbitrary and capricious in violation of the APA and that it infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause.[1]

All three District Courts ruled for the plaintiffs, albeit at different stages of the proceedings.[2] In doing so, each court rejected the Government's threshold arguments that the

---

[1] Plaintiffs also raised notice and comment claims, which uniformly failed below, and assorted due process challenges, some of which survived motions to dismiss. Those claims are not before us.

[2] In a related challenge not at issue here, the District Court for the District of Maryland granted partial summary judgment in favor of the Government. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 284 F. Supp. 3d 758 (2018). After the Government filed petitions for certiorari in the instant cases, the Fourth Circuit reversed that decision and vacated Acting Secretary Duke's rescission as arbitrary and capricious. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684 (2019), cert. pending, No. 18–1469. The Fourth Circuit has since stayed its mandate.

AR0319

Opinion of the Court

claims were unreviewable under the APA and that the INA deprived the court of jurisdiction. 298 F. Supp. 3d 209, 223–224, 234–235 (DC 2018); 279 F. Supp. 3d 1011, 1029–1033 (ND Cal. 2018); 295 F. Supp. 3d 127, 150, 153–154 (EDNY 2017).

In *Regents* and *Batalla Vidal*, the District Courts held that the equal protection claims were adequately alleged. 298 F. Supp. 3d 1304, 1315 (ND Cal. 2018); 291 F. Supp. 3d 260, 279 (EDNY 2018). Those courts also entered coextensive nationwide preliminary injunctions, based on the conclusion that the plaintiffs were likely to succeed on the merits of their claims that the rescission was arbitrary and capricious. These injunctions did not require DHS to accept new applications, but did order the agency to allow DACA recipients to "renew their enrollments." 279 F. Supp. 3d, at 1048; see 279 F. Supp. 3d 401, 437 (EDNY 2018).

In *NAACP*, the D. C. District Court took a different course. In April 2018, it deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, holding that Acting Secretary Duke's "conclusory statements were insufficient to explain the change in [the agency's] view of DACA's lawfulness." 298 F. Supp. 3d, at 243. The District Court stayed its order for 90 days to permit DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.*, at 245.

Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded via memorandum. App. to Pet. for Cert. 120a–126a. She explained that, "[h]aving considered the Duke memorandum," she "decline[d] to disturb" the rescission. *Id.*, at 121a. Secretary Nielsen went on to articulate her "understanding" of Duke's memorandum, identifying three reasons why, in Nielsen's estimation, "the decision to rescind the DACA policy was, and remains, sound." *Ibid.* First, she reiterated that, "as the Attorney

General concluded, the DACA policy was contrary to law." *Id.*, at 122a. Second, she added that, regardless, the agency had "serious doubts about [DACA's] legality" and, for law enforcement reasons, wanted to avoid "legally questionable" policies. *Id.*, at 123a. Third, she identified multiple policy reasons for rescinding DACA, including (1) the belief that any class-based immigration relief should come from Congress, not through executive non-enforcement; (2) DHS's preference for exercising prosecutorial discretion on "a truly individualized, case-by-case basis"; and (3) the importance of "project[ing] a message" that immigration laws would be enforced against all classes and categories of aliens. *Id.*, at 123a–124a. In her final paragraph, Secretary Nielsen acknowledged the "asserted reliance interests" in DACA's continuation but concluded that they did not "outweigh the questionable legality of the DACA policy and the other reasons" for the rescission discussed in her memorandum. *Id.*, at 125a.

The Government asked the D. C. District Court to revise its prior order in light of the reasons provided by Secretary Nielsen, but the court declined. In the court's view, the new memorandum, which "fail[ed] to elaborate meaningfully" on the agency's illegality rationale, still did not provide an adequate explanation for the September 2017 rescission. 315 F. Supp. 3d 457, 460, 473–474 (2018).

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. In November 2018, while those appeals were pending, the Government simultaneously filed three petitions for certiorari before judgment. After the Ninth Circuit affirmed the nationwide injunction in *Regents*, see 908 F. 3d 476 (2018), but before rulings from the other two Circuits, we granted the petitions and consolidated the cases for argument. 588 U. S. ___ (2019). The issues raised here are (1) whether the APA claims are reviewable, (2) if so,

Opinion of the Court

whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim.

## II

The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin* v. *Massachusetts*, 505 U. S. 788, 796 (1992). It requires agencies to engage in "reasoned decisionmaking," *Michigan* v. *EPA*, 576 U. S. 743, 750 (2015) (internal quotation marks omitted), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U. S. C. §706(2)(A). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513 (2009) (internal quotation marks omitted), but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416 (1971).

But before determining whether the rescission was arbitrary and capricious, we must first address the Government's contentions that DHS's decision is unreviewable under the APA and outside this Court's jurisdiction.

## A

The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (quoting §702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review,

§701(a)(1), or that the "agency action is committed to agency discretion by law," §701(a)(2). The latter exception is at issue here.

To "honor the presumption of review, we have read the exception in §701(a)(2) quite narrowly," *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. ___, ___ (2018) (slip op., at 12), confining it to those rare "administrative decision[s] traditionally left to agency discretion," *Lincoln* v. *Vigil*, 508 U. S. 182, 191 (1993). This limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings, *Heckler* v. *Chaney*, 470 U. S. 821, 831–832 (1985), and it is on that exception that the Government primarily relies.

In *Chaney*, several death-row inmates petitioned the Food and Drug Administration (FDA) to take enforcement action against two States to prevent their use of certain drugs for lethal injection. The Court held that the FDA's denial of that petition was presumptively unreviewable in light of the well-established "tradition" that "an agency's decision not to prosecute or enforce" is "generally committed to an agency's absolute discretion." *Id.*, at 831. We identified a constellation of reasons that underpin this tradition. To start, a non-enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies." *Ibid.* The decision also mirrors, "to some extent," a prosecutor's decision not to indict, which has "long been regarded as the special province of the Executive Branch." *Id.*, at 832. And, as a practical matter, "when an agency refuses to act" there is no action to "provide[] a focus for judicial review." *Ibid.*

The Government contends that a general non-enforcement policy is equivalent to the individual non-enforcement decision at issue in *Chaney*. In each case, the Government argues, the agency must balance factors peculiarly within

Case 1:16-cv-04756-NGG-VMS Document 319-4 Filed 09/04/20 Page 16 of 405 PageID #: 6313

its expertise, and does so in a manner akin to a criminal prosecutor. Building on that premise, the Government argues that the rescission of a non-enforcement policy is no different—for purposes of reviewability—from the adoption of that policy. While the rescission may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action. Applying this logic to the facts here, the Government submits that DACA is a non-enforcement policy and that its rescission is therefore unreviewable.

But we need not test this chain of reasoning because DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. *Ibid.* Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U. S., at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

The benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy. As described above, by virtue of receiving deferred action, the 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare. See *supra*, at 3. Unlike an agency's refusal to take requested enforcement action, access to these

types of benefits is an interest "courts often are called upon to protect." *Chaney*, 470 U. S., at 832. See also *Barnhart* v. *Thomas*, 540 U. S. 20 (2003) (reviewing eligibility determination for Social Security benefits).

Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA.

### B

The Government also invokes two jurisdictional provisions of the INA as independent bars to review. Neither applies.

Section 1252(b)(9) bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien." 66 Stat. 209, as amended, 8 U. S. C. §1252(b)(9). That targeted language is not aimed at this sort of case. As we have said before, §1252(b)(9) "does not present a jurisdictional bar" where those bringing suit "are not asking for review of an order of removal," "the decision . . . to seek removal," or "the process by which . . . removability will be determined." *Jennings* v. *Rodriguez*, 583 U. S. ___, ___–___ (2018) (plurality opinion) (slip op., at 10–11); *id.*, at ___ (BREYER, J., dissenting) (slip op., at 31). And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings.

Section 1252(g) is similarly narrow. That provision limits review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders." §1252(g). We have previously rejected as "implausible" the Government's suggestion that §1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 482 (1999). The rescission, which revokes a deferred action program with associated benefits, is not a decision to "commence proceedings," much less to "adjudicate" a case or "execute" a

Opinion of the Court

removal order.

With these preliminary arguments out of the way, we proceed to the merits.

### III

### A

Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation. The natural starting point here is the explanation provided by Acting Secretary Duke when she announced the rescission in September 2017. But the Government urges us to go on and consider the June 2018 memorandum submitted by Secretary Nielsen as well. That memo was prepared after the D. C. District Court vacated the Duke rescission and gave DHS an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." 298 F. Supp. 3d, at 245. According to the Government, the Nielsen Memorandum is properly before us because it was invited by the District Court and reflects the views of the Secretary of Homeland Security—the official responsible for immigration policy. Respondents disagree, arguing that the Nielsen Memorandum, issued nine months after the rescission, impermissibly asserts prudential and policy reasons not relied upon by Duke.

It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Michigan*, 576 U. S., at 758. If those grounds are inadequate, a court may remand for the agency to do one of two things: First, the agency can offer "a fuller explanation of the agency's reasoning *at the time of the agency action*." *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654 (1990) (emphasis added). See also *Alpharma, Inc.* v.

*Leavitt*, 460 F. 3d 1, 5–6 (CADC 2006) (Garland, J.) (permitting an agency to provide an "amplified articulation" of a prior "conclusory" observation (internal quotation marks omitted)). This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. *Camp* v. *Pitts*, 411 U. S. 138, 143 (1973) (*per curiam*). Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. *SEC* v. *Chenery Corp.*, 332 U. S. 194, 201 (1947) (*Chenery II*). An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

The District Court's remand thus presented DHS with a choice: rest on the Duke Memorandum while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons absent from the Duke Memorandum. Secretary Nielsen took the first path. Rather than making a new decision, she "decline[d] to disturb the Duke memorandum's rescission" and instead "provide[d] further explanation" for that action. App. to Pet. for Cert. 121a. Indeed, the Government's subsequent request for reconsideration described the Nielsen Memorandum as "additional explanation for [Duke's] decision" and asked the District Court to "leave in place [Duke's] September 5, 2017 decision to rescind the DACA policy." Motion to Revise Order in No. 17–cv–1907 etc. (D DC), pp. 2, 19. Contrary to the position of the Government before this Court, and of JUSTICE KAVANAUGH in dissent, *post*, at 4 (opinion concurring in judgment in part and dissenting in part), the Nielsen Memorandum was by its own terms not a new rule implementing a new policy.

Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation "must be viewed critically" to

Opinion of the Court

ensure that the rescission is not upheld on the basis of impermissible "*post hoc* rationalization." *Overton Park*, 401 U. S., at 420. But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears little relationship to that of her predecessor. Acting Secretary Duke rested the rescission on the conclusion that DACA is unlawful. Period. See App. to Pet. for Cert. 117a. By contrast, Secretary Nielsen's new memorandum offered three "separate and independently sufficient reasons" for the rescission, *id.*, at 122a, only the first of which is the conclusion that DACA is illegal.

Her second reason is that DACA is, at minimum, legally *questionable* and should be terminated to maintain public confidence in the rule of law and avoid burdensome litigation. No such justification can be found in the Duke Memorandum. Legal uncertainty is, of course, related to illegality. But the two justifications are meaningfully distinct, especially in this context. While an agency might, for one reason or another, choose to do nothing in the face of uncertainty, illegality presumably requires remedial action of some sort.

The policy reasons that Secretary Nielsen cites as a third basis for the rescission are also nowhere to be found in the Duke Memorandum. That document makes no mention of a preference for legislative fixes, the superiority of case-by-case decisionmaking, the importance of sending a message of robust enforcement, or any other policy consideration. Nor are these points included in the legal analysis from the Fifth Circuit and the Attorney General. They can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before us.

The Government, echoed by JUSTICE KAVANAUGH, protests that requiring a new decision before considering Nielsen's new justifications would be "an idle and useless formality." *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 766,

n. 6 (1969) (plurality opinion). See also *post*, at 5. Procedural requirements can often seem such. But here the rule serves important values of administrative law. Requiring a new decision before considering new reasons promotes "agency accountability," *Bowen* v. *American Hospital Assn.*, 476 U. S. 610, 643 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. 142, 155 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review," *SEC* v. *Chenery Corp.,* 318 U. S. 80, 94 (1943), forcing both litigants and courts to chase a moving target. Each of these values would be markedly undermined were we to allow DHS to rely on reasons offered nine months after Duke announced the rescission and after three different courts had identified flaws in the original explanation.

JUSTICE KAVANAUGH asserts that this "foundational principle of administrative law," *Michigan*, 576 U. S., at 758, actually limits only what lawyers may argue, not what agencies may do. *Post*, at 5. While it is true that the Court has often rejected justifications belatedly advanced by advocates, we refer to this as a prohibition on *post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker. The functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves. See *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."); *Overton*

Opinion of the Court

*Park*, 401 U. S., at 419 (rejecting "litigation affidavits" from agency officials as "merely '*post hoc*' rationalizations").[3]

Justice Holmes famously wrote that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co.* v. *United States*, 254 U. S. 141, 143 (1920). But it is also true, particularly when so much is at stake, that "the Government should turn square corners in dealing with the people." *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting). The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted. This is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision.

## B

We turn, finally, to whether DHS's decision to rescind DACA was arbitrary and capricious. As noted earlier, Acting Secretary Duke's justification for the rescission was succinct: "Taking into consideration" the Fifth Circuit's conclusion that DAPA was unlawful because it conferred benefits in violation of the INA, and the Attorney General's conclusion that DACA was unlawful for the same reason, she concluded—without elaboration—that the "DACA program should be terminated." App. to Pet. for Cert. 117a.[4]

————————
[3] JUSTICE KAVANAUGH further argues that the contemporaneous explanation requirement applies only to agency adjudications, not rule-makings. *Post*, at 5–6 (opinion concurring in judgment in part and dissenting in part). But he cites no authority limiting this basic principle—which the Court regularly articulates in the context of rulemakings—to adjudications. The Government does not even raise this unheralded argument.

[4] The Government contends that Acting Secretary Duke also focused on litigation risk. Although the background section of her memo references a letter from the Texas Attorney General threatening to challenge DACA, the memo never asserts that the rescission was intended to avert litigation. And, given the Attorney General's conclusion that the policy was unlawful—and thus presumably could not be maintained or defended in its current form—it is difficult to see how the risk of litigation

Respondents maintain that this explanation is deficient for three reasons. Their first and second arguments work in tandem, claiming that the Duke Memorandum does not adequately explain the conclusion that DACA is unlawful, and that this conclusion is, in any event, wrong. While those arguments carried the day in the lower courts, in our view they overlook an important constraint on Acting Secretary Duke's decisionmaking authority—she was *bound* by the Attorney General's legal determination.

The same statutory provision that establishes the Secretary of Homeland Security's authority to administer and enforce immigration laws limits that authority, specifying that, with respect to "all questions of law," the determinations of the Attorney General "shall be controlling." 8 U. S. C. §1103(a)(1). Respondents are aware of this constraint. Indeed they emphasized the point in the reviewability sections of their briefs. But in their merits arguments, respondents never addressed whether or how this unique statutory provision might affect our review. They did not discuss whether Duke was required to explain a legal conclusion that was not hers to make. Nor did they discuss whether the current suits challenging Duke's rescission decision, which everyone agrees was within her legal authority under the INA, are proper vehicles for attacking the Attorney General's legal conclusion.

Because of these gaps in respondents' briefing, we do not evaluate the claims challenging the explanation and correctness of the illegality conclusion. Instead we focus our attention on respondents' third argument—that Acting Secretary Duke "failed to consider . . . important aspect[s] of the problem" before her. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983).

———————

carried any independent weight.

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 24 of 405 PageID #:
6321

Whether DACA is illegal is, of course, a legal determination, and therefore a question for the Attorney General. But deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA. Those policy choices are for DHS.

Acting Secretary Duke plainly exercised such discretionary authority in winding down the program. See App. to Pet. for Cert. 117a–118a (listing the Acting Secretary's decisions on eight transition issues). Among other things, she specified that those DACA recipients whose benefits were set to expire within six months were eligible for two-year renewals. *Ibid.*

But Duke did not appear to appreciate the full scope of her discretion, which picked up where the Attorney General's legal reasoning left off. The Attorney General concluded that "the DACA policy has the same legal . . . defects that the courts recognized as to DAPA." App. 878. So, to understand those defects, we look to the Fifth Circuit, the highest court to offer a reasoned opinion on the legality of DAPA. That court described the "core" issue before it as the "Secretary's decision" to grant "eligibility for benefits"— including work authorization, Social Security, and Medicare—to unauthorized aliens on "a class-wide basis." *Texas*, 809 F. 3d, at 170; see *id.*, at 148, 184. The Fifth Circuit's focus on these benefits was central to every stage of its analysis. See *id.*, at 155 (standing); *id.*, at 163 (zone of interest); *id.*, at 164 (applicability of §1252(g)); *id.*, at 166 (reviewability); *id.*, at 176–177 (notice and comment); *id.*, at 184 (substantive APA). And the Court ultimately held that DAPA was "manifestly contrary to the INA" precisely because it "would make 4.3 million otherwise removable aliens" eligible for work authorization and public benefits. *Id.*, at 181–182 (internal quotation marks omitted).[5]

————————
[5]As the Fifth Circuit noted, DAPA recipients were eligible for Social

**AR0332**

But there is more to DAPA (and DACA) than such bene-fits.  The defining feature of deferred action is the decision to defer removal (and to notify the affected alien of that de-cision).  See App. to Pet. for Cert. 99a.  And the Fifth Circuit was careful to distinguish that forbearance component from eligibility for benefits.  As it explained, the "challenged por-tion of DAPA's deferred-action program" was the decision to make DAPA recipients eligible for benefits.  See *Texas*, 809 F. 3d, at 168, and n. 108.  The other "[p]art of DAPA," the court noted, "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a class of what he deem[ed] to be low-priority illegal al-iens."  *Id.*, at 166.  Borrowing from this Court's prior de-scription of deferred action, the Fifth Circuit observed that "the states do not challenge the Secretary's decision to 'de-cline to institute proceedings, terminate proceedings, or de-cline to execute a final order of deportation.'"  *Id.*, at 168 (quoting *Reno*, 525 U. S., at 484).  And the Fifth Circuit un-derscored that nothing in its decision or the preliminary in-junction "requires the Secretary to remove any alien or to alter" the Secretary's class-based "enforcement priorities."  *Texas*, 809 F. 3d, at 166, 169.  In other words, the Secre-tary's forbearance authority was unimpaired.

Acting Secretary Duke recognized that the Fifth Circuit's holding addressed the benefits associated with DAPA.  In her memorandum she explained that the Fifth Circuit con-

--------------

Security and Medicare benefits because they had been designated "law-fully present." *Texas*, 809 F. 3d, at 168.  Lawful presence is a statutory prerequisite for receipt of certain benefits.  See *id.,* at 148 (citing 8 U. S. C. §1611)  It is not the same as forbearance nor does it flow inexo-rably from forbearance.  Thus, while deferred action recipients have been designated lawfully present for purposes of Social Security and Medicare eligibility, see 8 CFR §1.3; 42 CFR §417.422(h), agencies can also exclude them from this designation, see 45 CFR §152.2(8) (2019) (specifying that DACA recipients are not considered lawfully present for purposes of cov-erage under the Affordable Care Act).

**AR0333**

Opinion of the Court

cluded that DAPA "conflicted with the discretion authorized by Congress" because the INA "'flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization.'" App. to Pet. for Cert. 114a (quoting *Texas*, 809 F. 3d, at 184). Duke did not characterize the opinion as one about forbearance.

In short, the Attorney General neither addressed the forbearance policy at the heart of DACA nor compelled DHS to abandon that policy. Thus, removing benefits eligibility while continuing forbearance remained squarely within the discretion of Acting Secretary Duke, who was responsible for "[e]stablishing national immigration enforcement policies and priorities." 116 Stat. 2178, 6 U. S. C. §202(5). But Duke's memo offers no reason for terminating forbearance. She instead treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation.

That reasoning repeated the error we identified in one of our leading modern administrative law cases, *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.* There, the National Highway Traffic Safety Administration (NHTSA) promulgated a requirement that motor vehicles produced after 1982 be equipped with one of two passive restraints: airbags or automatic seatbelts. 463 U. S., at 37–38, 46. Four years later, before the requirement went into effect, NHTSA concluded that automatic seatbelts, the restraint of choice for most manufacturers, would not provide effective protection. Based on that premise, NHTSA rescinded the passive restraint requirement in full. *Id.*, at 38.

We concluded that the total rescission was arbitrary and capricious. As we explained, NHTSA's justification supported only "disallow[ing] compliance by means of" automatic seatbelts. *Id.*, at 47. It did "not cast doubt" on the

**AR0334**

22          DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of the Court

"efficacy of airbag technology" or upon "the need for a passive restraint standard." *Ibid.* Given NHTSA's prior judgment that "airbags are an effective and cost-beneficial lifesaving technology," we held that "the mandatory passive restraint rule [could] not be abandoned without any consideration whatsoever of an airbags-only requirement." *Id.*, at 51.

While the factual setting is different here, the error is the same. Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only "disallow[ing]" benefits. *Id.*, at 47. It did "not cast doubt" on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals. *Ibid.* Thus, given DHS's earlier judgment that forbearance is "especially justified" for "productive young people" who were brought here as children and "know only this country as home," App. to Pet. for Cert. 98a–99a, the DACA Memorandum could not be rescinded in full "without any consideration whatsoever" of a forbearance-only policy, *State Farm*, 463 U. S., at 51.[6]

The Government acknowledges that "[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands." Reply Brief 21. It insists, however, that "DHS was not required to consider whether DACA's illegality could be addressed by separating" the

———————

[6]The three-page memorandum that established DACA is devoted entirely to forbearance, save for one sentence directing USCIS to "determine whether [DACA recipients] qualify for work authorization." App. to Pet. for Cert. 101a. The benefits associated with DACA flow from a separate regulation. See 8 CFR §1.3(a)(4)(vi); see also 42 CFR §417.422(h) (cross-referencing 8 CFR §1.3). Thus, DHS could have addressed the Attorney General's determination that such benefits were impermissible under the INA by amending 8 CFR §1.3 to exclude DACA recipients from those benefits without rescinding the DACA Memorandum and the forbearance policy it established. But Duke's rescission memo shows no cognizance of this possibility.

two. *Ibid.* According to the Government, "It was not arbitrary and capricious for DHS to view deferred action and its collateral benefits as importantly linked." *Ibid.* Perhaps. But that response misses the point. The fact that there may be a valid reason not to separate deferred action from benefits does not establish that DHS considered that option or that such consideration was unnecessary.

The lead dissent acknowledges that forbearance and benefits are legally distinct and can be decoupled. *Post*, at 21–22, n. 14 (opinion of THOMAS, J). It contends, however, that we should not "dissect" agency action "piece by piece." *Post,* at 21. The dissent instead rests on the Attorney General's legal determination—which considered only benefits—"to supply the 'reasoned analysis'" to support rescission of both benefits and forbearance. *Post,* at 22 (quoting *State Farm*, 463 U. S., at 42). But *State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]." *Id.*, at 51. Here forbearance was not simply "within the ambit of the existing [policy]," it was the centerpiece of the policy: DACA, after all, stands for "*Deferred Action* for Childhood Arrivals." App. to Pet. for Cert. 111a (emphasis added). But the rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits. Duke "entirely failed to consider [that] important aspect of the problem." *State Farm*, 463 U. S., at 43.

That omission alone renders Acting Secretary Duke's decision arbitrary and capricious. But it is not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742 (1996). When an agency changes course, as DHS did here, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. ___, ___ (2016)

AR0336

(slip op., at 9) (quoting *Fox Television*, 556 U. S., at 515). "It would be arbitrary and capricious to ignore such matters." *Id.*, at 515. Yet that is what the Duke Memorandum did.

For its part, the Government does not contend that Duke considered potential reliance interests; it counters that she did not need to. In the Government's view, shared by the lead dissent, DACA recipients have no "legally cognizable reliance interests" because the DACA Memorandum stated that the program "conferred no substantive rights" and provided benefits only in two-year increments. Reply Brief 16–17; App. to Pet. for Cert. 125a. See also *post*, at 23–24 (opinion of THOMAS, J). But neither the Government nor the lead dissent cites any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any. These disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review. There was no such consideration in the Duke Memorandum.

Respondents and their *amici* assert that there was much for DHS to consider. They stress that, since 2012, DACA recipients have "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the DACA program. Brief for Respondent Regents of Univ. of California et al. in No. 18–587, p. 41 (Brief for Regents). The consequences of the rescission, respondents emphasize, would "radiate outward" to DACA recipients' families, including their 200,000 U. S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. See *id.*, at 41–42; Brief for Respondent State of New York et al. in No. 18–589, p. 42 (Brief for New York). See also Brief for 143 Businesses as *Amici Curiae* 17 (estimating that hiring and training replacements would cost employers $6.3 billion).

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 30 of 405 PageID #: 6327

In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years.  Brief for Regents 6. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year.  *Ibid.*

These are certainly noteworthy concerns, but they are not necessarily dispositive.  To the Government and lead dissent's point, DHS could respond that reliance on forbearance and benefits was unjustified in light of the express limitations in the DACA Memorandum.  Or it might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight.  And, even if DHS ultimately concludes that the reliance interests rank as serious, they are but one factor to consider.  DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests.  Making that difficult decision was the agency's job, but the agency failed to do it.

DHS has considerable flexibility in carrying out its responsibility.  The wind-down here is a good example of the kind of options available.  Acting Secretary Duke authorized DHS to process two-year renewals for those DACA recipients whose benefits were set to expire within six months.  But Duke's consideration was solely for the purpose of assisting the agency in dealing with "administrative complexities."  App. to Pet. for Cert. 116a–118a.  She should have considered whether she had similar flexibility in addressing any reliance interests of DACA recipients.  The lead dissent contends that accommodating such interests would be "another exercise of unlawful power," *post*, at 23 (opinion of THOMAS, J.), but the Government does not make that argument and DHS has already extended benefits for purposes other than reliance, following consultation with the Office of the Attorney General.  App. to Pet. for Cert. 116a.

AR0338

Had Duke considered reliance interests, she might, for example, have considered a broader renewal period based on the need for DACA recipients to reorder their affairs. Alternatively, Duke might have considered more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen. Or she might have instructed immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion.

To be clear, DHS was not required to do any of this or to "consider all policy alternatives in reaching [its] decision." *State Farm*, 463 U. S., at 51. Agencies are not compelled to explore "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 551 (1978). But, because DHS was "not writing on a blank slate," *post,* at 22, n. 14 (opinion of THOMAS, J.), it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.

The lead dissent sees all the foregoing differently. In its view, DACA is illegal, so any actions under DACA are themselves illegal. Such actions, it argues, must cease immediately and the APA should not be construed to impede that result. See *post*, at 19–23 (opinion of THOMAS, J.).

The dissent is correct that DACA was rescinded because of the Attorney General's illegality determination. See *ante*, at 20. But nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests. Acting Secretary Duke should have considered those matters but did not. That failure was arbitrary and capricious in violation of the APA.

**AR0339**

Opinion of ROBERTS, C. J.

## IV

Lastly, we turn to respondents' claim that the rescission violates the equal protection guarantee of the Fifth Amendment.

The parties dispute the proper framing of this claim. The Government contends that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim. Such a claim, the Government asserts, is barred by our decision in *Reno* v. *American-Arab Anti-Discrimination Committee*. See 525 U. S., at 488 (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). Respondents counter that their claim falls outside the scope of that precedent because they are not challenging individual enforcement proceedings. We need not resolve this debate because, even if the claim is cognizable, the allegations here are insufficient.

To plead animus, a plaintiff must raise a plausible inference that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977). Possible evidence includes disparate impact on a particular group, "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decisionmaking body." *Id.*, at 266–268. Tracking these factors, respondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. Brief for New York 54–55.

None of these points, either singly or in concert, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized

share of recipients of any cross-cutting immigration relief program.  See B. Baker, DHS, Office of Immigration Statistics, Population Estimates, Illegal Alien Population Residing in the United States: January 2015, Table 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf.  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.

Second, there is nothing irregular about the history leading up to the September 2017 rescission.  The lower courts concluded that "DACA received reaffirmation by [DHS] as recently as three months before the rescission," 908 F. 3d, at 519 (quoting 298 F. Supp. 3d, at 1315), referring to the June 2017 DAPA rescission memo, which stated that DACA would "remain in effect," App. 870.  But this reasoning confuses abstention with reaffirmation.  The DAPA memo did not address the merits of the DACA policy or its legality.  Thus, when the Attorney General later determined that DACA shared DAPA's legal defects, DHS's decision to reevaluate DACA was not a "strange about-face." 908 F. 3d, at 519.  It was a natural response to a newly identified problem.

Finally, the cited statements are unilluminating.  The relevant actors were most directly Acting Secretary Duke and the Attorney General.  As the *Batalla Vidal* court acknowledged, respondents did not "identif[y] statements by [either] that would give rise to an inference of discriminatory motive." 291 F. Supp. 3d, at 278.  Instead, respondents contend that President Trump made critical statements about Latinos that evince discriminatory intent.  But, even as interpreted by respondents, these statements—remote in time and made in unrelated contexts—do not qualify as "contemporary statements" probative of the decision at issue.  *Arlington Heights*, 429 U. S., at 268.  Thus, like respondents' other points, the statements fail to

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 34 of 405 PageID #: 6331

raise a plausible inference that the rescission was motivated by animus.

\*     \*     \*

We do not decide whether DACA or its rescission are sound policies. "The wisdom" of those decisions "is none of our concern." *Chenery II*, 332 U. S., at 207. We address only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action. Here the agency failed to consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients. That dual failure raises doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner. The appropriate recourse is therefore to remand to DHS so that it may consider the problem anew.

The judgment in *NAACP*, No. 18–588, is affirmed.[7] The judgment in *Regents*, No. 18–587, is vacated in part and reversed in part. And in *Batalla Vidal*, No. 18–589, the February 13, 2018 order granting respondents' motion for a preliminary injunction is vacated, the November 9, 2017 order partially denying the Government's motion to dismiss is affirmed in part, and the March 29, 2018 order partially denying the balance of the Government's motion to dismiss is reversed in part. All three cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[7] Our affirmance of the *NAACP* order vacating the rescission makes it unnecessary to examine the propriety of the nationwide scope of the injunctions issued by the District Courts in *Regents* and *Batalla Vidal*.

**AR0342**

Cite as: 591 U. S. ____ (2020)        1

Opinion of SOTOMAYOR, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–587, 18–588, and 18–589

————

DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

18–587                   *v.*

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS

18–588                   *v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT


CHAD WOLF, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

18–589                   *v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE SOTOMAYOR, concurring in part, concurring in
the judgment in part, and dissenting in part.

**AR0343**

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 36 of 405 PageID #: 6333

The majority rightly holds that the Department of Homeland Security (DHS) violated the Administrative Procedure Act in rescinding the Deferred Action for Childhood Arrivals (DACA) program.  But the Court forecloses any challenge to the rescission under the Equal Protection Clause. I believe that determination is unwarranted on the existing record and premature at this stage of the litigation.  I would instead permit respondents to develop their equal protection claims on remand.

Respondents' equal protection challenges come to us in a preliminary posture.  All that respondents needed to do at this stage of the litigation was state sufficient facts that would "allo[w a] court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678 (2009).  The three courts to evaluate respondents' pleadings below held that they cleared this modest threshold.  908 F. 3d 476, 518–520 (CA9 2018) (affirming the District Court's denial of the Government's motion to dismiss); see also *Batalla Vidal* v. *Nielsen*, 291 F. Supp. 3d 260, 274 (EDNY 2018).

I too would permit respondents' claims to proceed on remand.  The complaints each set forth particularized facts that plausibly allege discriminatory animus.  The plurality disagrees, reasoning that "[n]one of these points, either singly or in concert, establishes a plausible equal protection claim." *Ante*, at 27.  But it reaches that conclusion by discounting some allegations altogether and by narrowly viewing the rest.

First, the plurality dismisses the statements that President Trump made both before and after he assumed office. The *Batalla Vidal* complaints catalog then-candidate Trump's declarations that Mexican immigrants are "people that have lots of problems," "the bad ones," and "criminals, drug dealers, [and] rapists."  291 F. Supp. 3d, at 276 (internal quotation marks omitted).  The *Regents* complaints ad-

AR0344

Opinion of SOTOMAYOR, J.

ditionally quote President Trump's 2017 statement compar-
ing undocumented immigrants to "animals" responsible for
"the drugs, the gangs, the cartels, the crisis of smuggling
and trafficking, [and] MS13." 298 F. Supp. 3d 1304, 1314
(ND Cal. 2018) (internal quotation marks omitted).  The
plurality brushes these aside as "unilluminating," "remote
in time," and having been "made in unrelated contexts."
*Ante*, at 28.

But "nothing in our precedent supports [the] blinkered
approach" of disregarding any of the campaign statements
as remote in time from later-enacted policies.  *Trump* v. *Ha-
waii*, 585 U. S. ___, ___, n. 3 (2018) (SOTOMAYOR, J., dis-
senting) (slip op., at 11, n. 3).  Nor did any of the statements
arise in unrelated contexts.  They bear on unlawful migra-
tion from Mexico—a keystone of President Trump's cam-
paign and a policy priority of his administration—and, ac-
cording to respondents, were an animating force behind the
rescission of DACA. Cf. *ibid.* (noting that Presidential Proc-
lamation No. 9645, 82 Fed. Reg. 45161 (2017), which barred
entry of individuals from several Muslim-majority coun-
tries, was an outgrowth of the President's campaign state-
ments about Muslims).  Taken together, "the words of the
President" help to "create the strong perception" that the
rescission decision was "contaminated by impermissible
discriminatory animus."   585 U. S., at ___ (opinion of
SOTOMAYOR, J.) (slip op., at 13).  This perception provides
respondents with grounds to litigate their equal protection
claims further.

Next, the plurality minimizes the disproportionate im-
pact of the rescission decision on Latinos after considering
this point in isolation.  *Ante*, at 28 ("Were this fact sufficient
to state a claim, virtually any generally applicable immi-
gration policy could be challenged on equal protection
grounds").  But the impact of the policy decision must be
viewed in the context of the President's public statements
on and off the campaign trail.  At the motion-to-dismiss

AR0345

stage, I would not so readily dismiss the allegation that an executive decision disproportionately harms the same racial group that the President branded as less desirable mere months earlier.

Finally, the plurality finds nothing untoward in the "specific sequence of events leading up to the challenged decision." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 267 (1977). I disagree. As late as June 2017, DHS insisted it remained committed to DACA, even while rescinding a related program, the Deferred Action for Parents of Americans and Lawful Permanent Residents. App. 718–720. But a mere three months later, DHS terminated DACA without, as the plurality acknowledges, considering important aspects of the termination. The abrupt change in position plausibly suggests that something other than questions about the legality of DACA motivated the rescission decision. Accordingly, it raises the possibility of a "significant mismatch between the decision . . . made and the rationale . . . provided." *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 26). Only by bypassing context does the plurality conclude otherwise.

*        *        *

The facts in respondents' complaints create more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U. S., at 678. Whether they ultimately amount to actionable discrimination should be determined only after factual development on remand. Because the Court prematurely disposes of respondents' equal protection claims by overlooking the strength of their complaints, I join all but Part IV of the opinion and do not concur in the corresponding part of the judgment.

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–587, 18–588, and 18–589

————

DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

18–587                     *v.*

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS

18–588                     *v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT


CHAD WOLF, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

18–589                     *v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE THOMAS, with whom JUSTICE ALITO and
JUSTICE GORSUCH join, concurring in the judgment in part
and dissenting in part.

2          DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

Between 2001 and 2011, Congress considered over two dozen bills that would have granted lawful status to millions of aliens who were illegally brought to this country as children. Each of those legislative efforts failed. In the wake of this impasse, the Department of Homeland Security (DHS) under President Barack Obama took matters into its own hands. Without any purported delegation of authority from Congress and without undertaking a rulemaking, DHS unilaterally created a program known as Deferred Action for Childhood Arrivals (DACA). The three-page DACA memorandum made it possible for approximately 1.7 million illegal aliens to qualify for temporary lawful presence and certain federal and state benefits. When President Donald Trump took office in 2017, his Acting Secretary of Homeland Security, acting through yet another memorandum, rescinded the DACA memorandum. To state it plainly, the Trump administration rescinded DACA the same way that the Obama administration created it: unilaterally, and through a mere memorandum.

Today the majority makes the mystifying determination that this rescission of DACA was unlawful. In reaching that conclusion, the majority acts as though it is engaging in the routine application of standard principles of administrative law. On the contrary, this is anything but a standard administrative law case.

DHS created DACA during the Obama administration without any statutory authorization and without going through the requisite rulemaking process. As a result, the program was unlawful from its inception. The majority does not even attempt to explain why a court has the authority to scrutinize an agency's policy reasons for rescinding an unlawful program under the arbitrary and capricious microscope. The decision to countermand an unlawful agency action is clearly reasonable. So long as the agency's determination of illegality is sound, our review should be at an end.

**AR0348**

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 41 of 405 PageID #: 6338

Today's decision must be recognized for what it is: an effort to avoid a politically controversial but legally correct decision. The Court could have made clear that the solution respondents seek must come from the Legislative Branch. Instead, the majority has decided to prolong DHS' initial overreach by providing a stopgap measure of its own. In doing so, it has given the green light for future political battles to be fought in this Court rather than where they rightfully belong—the political branches. Such timidity forsakes the Court's duty to apply the law according to neutral principles, and the ripple effects of the majority's error will be felt throughout our system of self-government.

Perhaps even more unfortunately, the majority's holding creates perverse incentives, particularly for outgoing administrations. Under the auspices of today's decision, administrations can bind their successors by unlawfully adopting significant legal changes through Executive Branch agency memoranda. Even if the agency lacked authority to effectuate the changes, the changes cannot be undone by the same agency in a successor administration unless the successor provides sufficient policy justifications to the satisfaction of this Court. In other words, the majority erroneously holds that the agency is not only permitted, but required, to continue administering unlawful programs that it inherited from a previous administration. I respectfully dissent in part.[1]

## I
### A

In 2012, after more than two dozen attempts by Congress to grant lawful status to aliens who were brought to this country as children,[2] the then-Secretary of Homeland Security Janet Napolitano announced, by memorandum, a new

_____
[1] I concur in the judgment insofar as the majority rejects respondents' equal protection claim.

[2] See Immigrant Children's Educational Advancement and Dropout

**AR0349**

4        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

"prosecutorial discretion" policy known as DACA.  App. to Pet. for Cert. in No. 18–587, p. 97a.  The memorandum directed immigration enforcement officers not to remove "certain young people who were brought to this country as children" that met delineated criteria.  *Id.*, at 97a–98a.  In the Secretary's view, the program was consistent with "the framework of the existing law."  *Id.*, at 101a.

DACA granted a renewable 2-year period of "deferred action" that made approximately 1.7 million otherwise removable aliens eligible to remain in this country temporarily.[3]  By granting deferred action, the memorandum also made recipients eligible for certain state and federal benefits, including Medicare and Social Security.  See 8 U. S. C. §§1611(b)(2)–(4); 8 CFR §1.3(a)(4)(vi) (2020); 45 CFR §152.2(4)(vi) (2019).  In addition, deferred action enabled the recipients to seek work authorization.  8 U. S. C.

---

Prevention Act of 2001, H. R. 1582, 107th Cong., 1st Sess.; Student Adjustment Act of 2001, H. R. 1918, 107th Cong., 1st Sess.; DREAM Act, S. 1291, 107th Cong., 1st Sess. (2001); DREAM Act, S. 1545, 108th Cong., 1st Sess. (2003); Student Adjustment Act of 2003, H. R. 1684, 108th Cong., 1st Sess.; DREAM Act, S. 2863, 108th Cong., 2d Sess., Tit. XVIII (2003); DREAM Act of 2005, S. 2075, 109th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong., 2d Sess., Tit. VI, Subtitle C; American Dream Act, H. R. 5131, 109th Cong., 2d Sess. (2006); DREAM Act of 2007, S. 774, 110th Cong., 1st Sess.; DREAM Act of 2007, S. 2205, 110th Cong., 1st Sess.; STRIVE Act of 2007, H. R. 1645, 110th Cong., 1st Sess., Tit. VI, Subtitle B; Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong., 1st Sess., Tit. VI, Subtitle C; DREAM Act of 2009, S. 729, 111th Cong., 1st Sess.; American Dream Act, H. R. 1751, 111th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2010, S. 3932, 111th Cong., 2d Sess., Tit. V, Subtitle D; DREAM Act of 2010, S. 3827, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3962, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3963, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3992, 111th Cong., 2d Sess.; DREAM Act of 2010, H. R. 6497, 111th Cong., 2d Sess.; DREAM Act of 2011, S. 952, 112th Cong., 1st Sess.

[3]See J. Passel & M. Lopez, Pew Research Center, Up to 1.7 Million Unauthorized Immigrant Youth May Benefit From New Deportation Rules (Aug. 14, 2012).

§1324a(h)(3)(B); 8 CFR §274a.12(c)(14). Despite these changes, the memorandum contradictorily claimed that it "confer[red] no substantive right [or] immigration status," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. to Pet. for Cert. in No. 18–587, at 101a.

In 2014, then-Secretary of Homeland Security Jeh Johnson broadened the deferred-action program in yet another brief memorandum. This 2014 memorandum expanded DACA eligibility by extending the deferred-action period to three years and by relaxing other criteria. It also implemented a related program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). DAPA allowed unlawfully present parents to obtain deferred action derivatively through their children who were either citizens or lawful permanent residents. Approximately 4.3 million aliens qualified for DAPA and, as with DACA, these individuals would have become eligible for certain federal and state benefits upon the approval of their DAPA applications. See *Texas* v. *United States*, 809 F. 3d 134, 181 (CA5 2015). Nevertheless, the 2014 memorandum repeated the incongruous assertion that these programs "d[id] not confer any form of legal status in this country" and added that deferred action "may be terminated at any time at the agency's discretion." App. to Pet. for Cert. in No. 18–587, at 104a.

B

Twenty-six States filed suit to enjoin the implementation of these new programs, DAPA and "expanded DACA," maintaining that they violated the Constitution, the Administrative Procedure Act (APA), and the Immigration and Naturalization Act (INA). The States contended that, because the 2014 memorandum allowed aliens to receive deferred action and other benefits, it amounted to a legislative rule that had to comply with the APA's notice and

6        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of Thomas, J.

comment procedures.  The States also argued that DHS' decision to recategorize an entire class of aliens from "unlawfully present" to "lawfully present" exceeded its statutory authority under the federal immigration laws.  According to the States, these defects rendered the 2014 memorandum arbitrary, capricious, or otherwise not in accordance with law.

The District Court preliminarily enjoined DAPA and expanded DACA.  The Fifth Circuit affirmed, rejecting DHS' claim that the programs were an exercise of prosecutorial discretion.  *Texas*, 809 F. 3d, at 167, 188.  The court concluded that the States were likely to succeed on their claim that the 2014 memorandum was a legislative rule that had to be adopted through notice and comment rulemaking.  *Id.*, at 171–178.  The court further concluded that the 2014 memorandum was "substantively contrary to law" because the INA did not grant DHS the statutory authority to implement either program.  *Id.*, at 170, 178–186.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote.  *United States* v. *Texas*, 579 U. S. ___ (2016) (*per curiam*).

### C

The 2014 memorandum was rescinded on June 15, 2017, before taking effect.  Shortly after that rescission, several of the plaintiff States sent a letter to then-Attorney General Jefferson Sessions III.  They contended that the 2012 DACA memorandum was also legally defective because, "just like DAPA, DACA unilaterally confers eligibility for . . . lawful presence without any statutory authorization from Congress."  App. 873.  The States wrote that they would amend their complaint to challenge DACA if the administration did not rescind the 2012 memorandum creating DACA by September 5, 2017.

On September 4, then-Attorney General Sessions wrote to then-Acting Secretary of Homeland Security Elaine

Opinion of THOMAS, J.

Duke, advising her to rescind DACA. Sessions stated that, in his legal opinion, DACA took effect "through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id.*, at 877. The letter also stated that DACA was infected with the "same legal . . . defects that the courts recognized as to DAPA," *id.*, at 878, and thus DACA would likely be enjoined as well.

Then-Acting Secretary Duke rescinded DACA the next day, also through a memorandum. Her memorandum began by noting that DACA "purported to use deferred action . . . to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." App. to Pet. for Cert. in No. 18–587, at 112a. It described the history of the Fifth Circuit litigation, noting that the court had concluded that DAPA "conflicted with the discretion authorized by Congress" because "the [INA] flatly does not permit the reclassification of millions of illegal aliens as lawfully present." *Id.*, at 114a (internal quotation marks omitted). Finally, the memorandum accepted then-Attorney General Sessions' legal determination that DACA was unlawful for the same reasons as DAPA. See §1103(a)(1). In light of the legal conclusions reached by the Fifth Circuit and the Attorney General, then-Acting Secretary Duke set forth the procedures for winding down DACA.

These three cases soon followed. In each, respondents claimed, among other things, that DACA's rescission was arbitrary and capricious under the APA. Two District Courts granted a preliminary nationwide injunction, while the third vacated the rescission.

## II

"'[A]n agency literally has no power to act . . . unless and

8        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

until Congress confers power upon it.'" *Arlington* v. *FCC*, 569 U. S. 290, 317 (2013) (ROBERTS, C. J., dissenting) (quoting *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355, 374 (1986)).  When an agency exercises power beyond the bounds of its authority, it acts unlawfully.  See, *e.g.*, *SAS Institute Inc.* v. *Iancu*, 584 U. S. ___, ___, n. (2018) (slip op., at 11, n.).  The 2012 memorandum creating DACA provides a poignant illustration of ultra vires agency action.

DACA alters how the immigration laws apply to a certain class of aliens.  "DACA [recipients] primarily entered the country either by overstaying a visa or by entering without inspection, and the INA instructs that aliens in both classes are removable." *Texas* v. *United States*, 328 F. Supp. 3d 662, 713 (SD Tex. 2018) (footnote omitted).  But DACA granted its recipients deferred action, *i.e.*, a decision to "decline to institute [removal] proceedings, terminate [removal] proceedings, or decline to institute a final order of [removal]." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 484 (1999) (internal quotation marks omitted).  Under other regulations, recipients of deferred action are deemed lawfully present for purposes of certain federal benefits.  See *supra*, at 4.  Thus, DACA in effect created a new exception to the statutory provisions governing removability and, in the process, conferred lawful presence on an entire class of aliens.

To lawfully implement such changes, DHS needed a grant of authority from Congress to either reclassify removable DACA recipients as lawfully present, or to exempt the entire class of aliens covered by DACA from statutory removal procedures.  No party disputes that the immigration statutes lack an express delegation to accomplish either result.  And, an examination of the highly reticulated immigration regime makes clear that DHS has no implicit discretion to create new classes of lawful presence or to grant relief from removal out of whole cloth.  Accordingly, DACA is substantively unlawful.

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 47 of 405 PageID #: 6344

This conclusion should begin and end our review. The decision to rescind an unlawful agency action is *per se* lawful. No additional policy justifications or considerations are necessary. And, the majority's contrary holding—that an agency is not only permitted, but required, to continue an ultra vires action—has no basis in law.

## A

Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions.

### 1

I begin with lawful presence. As just stated, nothing in the federal immigration laws expressly delegates to DHS the unfettered discretion to create new categories of lawfully present aliens. And, there is no basis for concluding that Congress implicitly delegated to DHS the power to reclassify categories of aliens as lawfully present. The immigration statutes provide numerous ways to obtain lawful presence, both temporary and permanent. The highly detailed nature of these provisions indicates that Congress has exhaustively provided for all of the ways that it thought lawful presence should be obtainable, leaving no discretion to DHS to add new pathways.

For example, federal immigration laws provide over 60 temporary nonimmigrant visa options, including visas for ambassadors, full-time students and their spouses and children, those engaged to marry a United States citizen within 90 days of arrival, athletes and performers, and aliens with specialized knowledge related to their employers. See §§1101(a)(15)(A)–(V), 1184; 8 CFR §214.1; see also Congressional Research Service, J. Wilson, Nonimmigrant and Immigrant Visa Categories: Data Brief 1–6 (2019) (Table 1). In addition, the statutes permit the Attorney General to grant temporary "parole" into the United States "for urgent

AR0355

10          DEPARTMENT OF HOMELAND SECURITY *v.*
                    REGENTS OF UNIV. OF CAL.

                       Opinion of THOMAS, J.

humanitarian reasons or [a] significant public benefit," 8 U. S. C. §1182(d)(5)(A); provide for temporary protected status when the Attorney General finds that removal to a country with an ongoing armed conflict "would pose a serious threat to [an alien's] personal safety," §1254a(b)(1)(A); and allow the Secretary of Homeland Security (in consultation with the Secretary of State) to waive visa requirements for certain aliens for up to 90 days, §§1187(a)–(d).

The immigration laws are equally complex and detailed when it comes to obtaining lawful permanent residence. Congress has expressly specified numerous avenues for obtaining an immigrant visa, which aliens may then use to become lawful permanent residents.  §§1201, 1255(a). Among other categories, immigrant visas are available to specified family-sponsored aliens, aliens with advanced degrees or exceptional abilities, certain types of skilled and unskilled workers, "special immigrants," and those entering the country to "engag[e] in a new commercial enterprise."  §§1153(a)–(b), 1154; see also Congressional Research Service, Nonimmigrant and Immigrant Visa Categories, at 6–7 (Table 2).  Refugees and asylees also may receive lawful permanent residence under certain conditions, §1159; 8 CFR §§209.1, 209.2.[4]  As with temporary lawful presence, each avenue to lawful permanent residence status has its own set of rules and exceptions.[5]

As the Fifth Circuit held in the DAPA litigation, a conclusion with which then-Attorney General Sessions agreed, "specific and detailed provisions[ of] the INA expressly and

_____

[4]The immigration statutes also provide for conditional lawful permanent residence status.  See §1186a(b)(1)(A)(i) (two years for spouses to demonstrate that the marriage "was [not] entered into for the purpose of procuring an alien's admission as an immigrant"); §1186b (qualifying business entrepreneurs).

[5]For instance, Congress has carved out rules for aliens who served in the Armed Forces, §§1438–1440, and alien spouses who have been subject to domestic abuse, §§1186a(c)(4)(C)–(D).

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 49 of 405 PageID #: 6346

carefully provid[e] legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F. 3d, at 179. In light of this elaborate statutory scheme, the lack of any similar provision for DACA recipients convincingly establishes that Congress left DHS with no discretion to create an additional class of aliens eligible for lawful presence. Congress knows well how to provide broad discretion, and it has provided open-ended delegations of authority in statutes too numerous to name. But when it comes to lawful presence, Congress did something strikingly different. Instead of enacting a statute with "broad general directives" and leaving it to the agency to fill in the lion's share of the details, *Mistretta* v. *United States*, 488 U. S. 361, 372 (1989), Congress put in place intricate specifications governing eligibility for lawful presence. This comprehensive scheme indicates that DHS has no discretion to supplement or amend the statutory provisions in any manner, least of all by memorandum. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 125 (2000) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted" (internal quotation marks omitted)); see also *ETSI Pipeline Project* v. *Missouri*, 484 U. S. 495, 509–510 (1988).

                          2

    The relief that Congress has extended to removable aliens likewise confirms that DACA exceeds DHS' delegated authority. Through deferred action, DACA grants temporary relief to removable aliens on a programmatic scale. See *Texas*, 328 F. Supp. 3d, at 714. But as with lawful presence, Congress did not expressly grant DHS the authority to create categorical exceptions to the statute's removal requirements. And again, as with lawful presence, the intricate level of detail in the federal immigration laws regarding relief from removal indicates that DHS has no discretionary authority to supplement that relief with an

AR0357

entirely new programmatic exemption.

At the outset, Congress clearly knows how to provide for classwide deferred action when it wishes to do so. On multiple occasions, Congress has used express language to make certain classes of individuals eligible for deferred action. See 8 U. S. C. §§1154(a)(1)(D)(i)(II), (IV) (certain individuals covered under the Violence Against Women Act are "eligible for deferred action"); Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1522 ("'Any individual described in subclause (I) is eligible for deferred action'"); Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, §423(b), 115 Stat. 361 ("Such spouse, child, son, or daughter may be eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, §§1703(c)(1)(A), (2), 117 Stat. 1694–1695 ("Such spouse or child shall be eligible for deferred action").[6] Congress has failed to provide similar explicit provisions for DACA recipients, and the immigration laws contain no indication that DHS can, at will, create its own categorical policies for deferred action.

Other provisions pertaining to relief from removal further demonstrate that DHS lacked the delegated authority

———————

[6] In the DAPA litigation, DHS noted that some deferred-action programs have been implemented by the Executive Branch without explicit legislation. But "'past practice does not, by itself, create [executive] power.'" *Medellín* v. *Texas*, 552 U. S. 491, 532 (2008) (quoting *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981)). If any of these programs had been challenged, it would seem that they would be legally infirm for the same reasons as DACA. Moreover, if DHS had the authority to create new categories of aliens eligible for deferred action, then all of Congress' deferred-action legislation was but a superfluous exercise. *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001). Finally, whereas some deferred-action programs were followed by legislation, DACA has existed for eight years, and Congress is no closer to a legislative solution than it was in 2012. See, *e.g.*, American Dream and Promise Act of 2019, H. R. 6, 116th Cong., 1st Sess.

to create DACA.  As with lawful presence, Congress has provided a plethora of methods by which aliens may seek relief from removal.  For instance, both permanent and temporary residents can seek cancellation of removal if they meet certain residency requirements and have not committed certain crimes.  §§1229b(a)–(b).  And certain nonpermanent residents may have their status adjusted to permanent residence during these proceedings. §1229b(b)(2).  Aliens can apply for asylum or withholding of removal during removal proceedings unless they have committed certain crimes.  §§1158, 1231(b)(3).  Applicants for certain nonimmigrant visas may be granted a stay of removal until the visa application is adjudicated.  §1227(d). And, aliens may voluntarily depart rather than be subject to an order of removal.  §1229c.

In sum, like lawful presence, Congress has provided for relief from removal in specific and complex ways.  This nuanced detail indicates that Congress has provided the full panoply of methods it thinks should be available for an alien to seek relief from removal, leaving no discretion to DHS to provide additional programmatic forms of relief.[7]

3

Finally, DHS could not appeal to general grants of authority, such as the Secretary's ability to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," §1103(a)(3), or to "[e]stablis[h] national immigration enforcement policies and priorities," 6 U. S. C. §202(5).  See also 8 U. S. C. §1103(g)(2).  Because we must interpret the statutes "as a

––––––––––

[7] It is uncontested that deferred action frequently occurs on a case-by-case basis, often justified on the grounds that the agency lacks resources to remove all removable aliens.  Even assuming that these ad hoc exercises of discretion are permissible, however, we have stated that "[a]n agency confronting resource constraints may change its own conduct, but it cannot change the law." *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 327 (2014).

AR0359

14          DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569 (1995), these grants of authority must be read alongside the express limits contained within the statute. Basing the Secretary's ability to completely overhaul immigration law on these general grants of authority would eviscerate that deliberate statutory scheme by "allow[ing the Secretary of DHS] to grant lawful presence . . . to any illegal alien in the United States." *Texas*, 809 F. 3d, at 184. Not only is this "an untenable position in light of the INA's intricate system," *ibid.*, but it would also render many of those provisions wholly superfluous due to DHS' authority to disregard them at will, *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001). And in addition to these fatal problems, adopting a broad interpretation of these general grants of authority would run afoul of the presumption that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). And it would also conflict with the major questions doctrine, which is based on the expectation that Congress speaks clearly when it delegates the power to make "decisions of vast economic and political significance." *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014) (*UARG*) (internal quotation marks omitted); see also *Texas*, 787 F. 3d, at 760–761.

Read together, the detailed statutory provisions governing temporary and lawful permanent resident status, relief from removal, and classwide deferred-action programs lead ineluctably to the conclusion that DACA is "inconsisten[t] with the design and structure of the statute as a whole." *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 353 (2013). As the District Court stated in the DAPA litigation and as then-Attorney General Sessions agreed, "[i]nstead of merely refusing to enforce the INA's removal laws against an individual, the DHS has enacted a wide-reaching program that awards legal presence . . . to

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 53 of 405 PageID #: 6350

individuals Congress has deemed deportable or removable." *Texas* v. *United States*, 86 F. Supp. 3d 591, 654 (SD Tex. 2015).  The immigration statutes contain a level of granular specificity that is exceedingly rare in the modern administrative state.  It defies all logic and common sense to conclude that a statutory scheme detailed enough to provide conditional lawful presence to groups as narrowly defined as "alien entrepreneurs," §1186b, is simultaneously capacious enough for DHS to grant lawful presence to almost two million illegal aliens with the stroke of a Cabinet secretary's pen.

## B

Then-Attorney General Sessions concluded that the initial DACA program suffered from the "same legal . . . defects" as DAPA and expanded DACA, finding that, like those programs, DACA was implemented without statutory authority.  App. 877–878.  Not only was this determination correct, but it is also dispositive for purposes of our review. "It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress."  *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988).  DHS had no authority here to create DACA, and the unlawfulness of that program is a sufficient justification for its rescission.

The majority opts for a different path, all but ignoring DACA's substantive legal defect.  See *ante*, at 18–19.  On the majority's understanding of APA review, DHS was required to provide additional policy justifications in order to rescind an action that it had no authority to take.  This rule "has no basis in our jurisprudence, and support for [it] is conspicuously absent from the Court's opinion."  *Massachusetts* v. *EPA*, 549 U. S. 497, 536 (2007) (ROBERTS, C. J., dissenting).

The lack of support for the majority's position is hardly

AR0361

16        DEPARTMENT OF HOMELAND SECURITY *v.*
                    REGENTS OF UNIV. OF CAL.

                    Opinion of THOMAS, J.

surprising in light of our Constitution's separation of powers.  No court can compel Executive Branch officials to exceed their congressionally delegated powers by continuing a program that was void *ab initio*.  Cf. *Clinton* v. *City of New York*, 524 U. S. 417 (1998); *INS* v. *Chadha*, 462 U. S. 919 (1983); see also *EPA* v. *EME Homer City Generation, L. P.*, 572 U. S. 489, 542, n. 5 (2014) (Scalia, J., dissenting); *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 487 (1989) (Kennedy, J., concurring in judgment).  In reviewing agency action, our role is to ensure that Executive Branch officials do not transgress the proper bounds of their authority, *Arlington*, 569 U. S., at 327 (ROBERTS, C. J., dissenting), not to perpetuate a decision to unlawfully wield power in direct contravention of the enabling statute's clear limits, see *UARG*, 573 U. S., at 327–328; *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 462 (2002).

Under our precedents, DHS can only exercise the authority that Congress has chosen to delegate to it.  See *UARG*, 573 U. S., at 327.  In implementing DACA, DHS under the Obama administration arrogated to itself power it was not given by Congress.  Thus, every action taken by DHS under DACA is the unlawful exercise of power.  Now, under the Trump administration, DHS has provided the most compelling reason to rescind DACA: The program was unlawful and would force DHS to continue acting unlawfully if it carried the program forward.

                                III

The majority's demanding review of DHS' decisionmaking process is especially perverse given that the 2012 memorandum flouted the APA's procedural requirements—the very requirements designed to prevent arbitrary decisionmaking.  Even if DHS were authorized to create DACA, it could not do so without undertaking an administrative rulemaking.  The fact that DHS did not engage in this process likely provides an independent basis for rescinding

DACA.  But at the very least, this procedural defect compounds the absurdity of the majority's position in these cases.

As described above, DACA fundamentally altered the immigration laws.  It created a new category of aliens who, as a class, became exempt from statutory removal procedures, and it gave those aliens temporary lawful presence.  Both changes contravened statutory limits.  DACA is thus what is commonly called a substantive or legislative rule.[8]  As the name implies, our precedents state that legislative rules are those that "have the force and effect of law."  *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 295 (1979) (internal quotation marks omitted).

Our precedents allow the vast majority of legislative rules to proceed through so-called "informal" notice and comment rulemaking.  See *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224, 237–238 (1973).[9]  But under our precedents, an agency must engage in certain procedures mandated by the APA before its rule carries legal force.  *Kisor* v. *Wilkie*, 588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 23) ("[A] legislative rule, . . . to be valid[,] must go through notice and comment"); *id.*, at ___ (GORSUCH, J., concurring in judgment) (slip op., at 17) (same); *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 96 (2015); cf. *Azar* v. *Allina Health Services*, 587 U. S. ___, ___ (2019) (slip op., at 1) (same with respect to materially identical procedures under the Medicare Act).  These procedures specify that the agency "shall" publish a notice of proposed rulemaking in

——————
[8]The majority tacitly acknowledges as much, as it must.  See *ante*, at 11–12.  Otherwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would make its rescission unreviewable.  See *Heckler* v. *Chaney*, 470 U. S. 821, 831 (1985).

[9]As I have previously pointed out, "the APA actually contemplated a much more formal process for most rulemaking."  *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 128, n. 5 (2015) (opinion concurring in judgment).

the Federal Register, justify the rule by reference to legal authority, describe "the subjects and issues involved" in the rule, and allow interested parties to submit comments. 5 U. S. C. §§553(b)–(c); see also *Kisor*, 588 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 17). As we have recognized recently, use of the word "shall" indicates that these procedures impose mandatory obligations on the agency before it can adopt a valid binding regulation. See *Maine Community Health Options* v. *United States*, 590 U. S. ___, ___ (2020) (slip op., at 12). After undergoing notice and comment, the agency then publishes the final rule, which must "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (internal quotation marks omitted). Only after completing this process is the legislative rule a valid law. See *Kisor*, 588 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 17).[10]

Because DACA has the force and effect of law, DHS was required to observe the procedures set out in the APA if it wanted to promulgate a legislative rule. It is undisputed, however, that DHS did not do so. It provided no opportunity for interested parties to submit comments regarding the effect that the program's dramatic and very significant change in immigration law would have on various aspects of society. It provided no discussion of economic considerations or national security interests. Nor did it provide any substantial policy justifications for treating young people

---

[10]The APA also provides certain exceptions from notice and comment rulemaking. For example, an agency may promulgate a legally binding rule without notice and comment if good cause exists to do so. 5 U. S. C. §553(b)(B). This text would become a nullity if the agency could achieve the same effect by simply dispensing with notice and comment procedures altogether.

Opinion of THOMAS, J.

brought to this country differently from other classes of aliens who have lived in the country without incident for many years. And, it did not invoke any law authorizing DHS to create such a program beyond its inexplicable assertion that DACA was consistent with existing law. Because DHS failed to engage in the statutorily mandated process, DACA never gained status as a legally binding regulation that could impose duties or obligations on third parties. See *id.*, at ___ (plurality opinion) (slip op., at 23); *id.*, at ___ (opinion of GORSUCH, J.) (slip op., at 17).

Given this state of affairs, it is unclear to me why DHS needed to provide any explanation whatsoever when it decided to rescind DACA. Nothing in the APA suggests that DHS was required to spill *any* ink justifying the rescission of an invalid legislative rule, let alone that it was required to provide policy justifications beyond acknowledging that the program was simply unlawful from the beginning. And, it is well established that we do not remand for an agency to correct its reasoning when it was required by law to take or abstain from an action. See *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. 527, 544–545 (2008). Here, remand would be futile, because no amount of policy explanation could cure the fact that DHS lacked statutory authority to enact DACA in the first place.

Instead of recognizing this, the majority now requires the rescinding Department to treat the invalid rule as though it were legitimate. As just explained, such a requirement is not supported by the APA.[11] It is also absurd, as evidenced by its application to DACA in these cases. The majority insists that DHS was obligated to discuss its choices regarding benefits and forbearance in great detail, even

_____

[11] Thus, it is not that the APA "*should* not" be construed to support the majority's result, *ante*, at 26 (emphasis added), it is that the APA does not and *cannot* support that result.

20        DEPARTMENT OF HOMELAND SECURITY *v.*
            REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

though no such detailed discussion accompanied DACA's issuance.  And, the majority also requires DHS to discuss reliance interests at length, even though deferred action traditionally does not take reliance interests into account and DHS was not forced to explain its treatment of reliance interests in the first instance by going through notice and comment.  See *infra*, at 23–24.  The majority's demand for such an explanation here simply makes little sense.

At bottom, of course, none of this matters, because DHS *did* provide a sufficient explanation for its action.  DHS' statement that DACA was ultra vires was more than sufficient to justify its rescission.[12]  By requiring more, the majority has distorted the APA review process beyond recognition, further burdening all future attempts to rescind unlawful programs.  Plaintiffs frequently bring successful challenges to agency actions by arguing that the agency has impermissibly dressed up a legislative rule as a policy statement and must comply with the relevant procedures before functionally binding regulated parties.  See, *e.g.*, *Mendoza* v. *Perez*, 754 F. 3d 1002 (CADC 2014); *Natural Resources Defense Council* v. *EPA*, 643 F. 3d 311 (CADC 2011); *National Family Planning & Reproductive Health Assn.*, *Inc.* v. *Sullivan*, 979 F. 2d 227 (CADC 1992).  But going forward, when a rescinding agency inherits an invalid legislative rule that ignored virtually every rulemaking requirement of the APA, it will be obliged to overlook that reality.  Instead of simply terminating the program because it did not go through the requisite process, the agency will be compelled to treat an invalid legislative rule as though it were legitimate.[13]

––––––––––

[12] I express no view on what other reasons would justify an agency's decision to rescind a procedurally unlawful action.  I merely point out that correctly concluding that the program was illegal is sufficient.

[13] In my view, even if DACA were permitted under the federal immigration laws and had complied with the APA, it would still violate the Constitution as an impermissible delegation of legislative power.  See

Opinion of THOMAS, J.

### IV

Even if I were to accept the majority's premise that DACA's rescission required additional policy justifications, the majority's reasons for setting aside the agency's decision still fail.

### A

First, the majority claims that the Fifth Circuit discussed only the legality of the 2014 memorandum's conferral of benefits, not its "forbearance component"—*i.e.*, the decision not to place DACA recipients into removal proceedings. *Ante*, at 20. The majority, therefore, claims that, notwithstanding the then-Attorney General's legal conclusion, then-Acting Secretary Duke was required to consider revoking DACA recipients' lawful presence and other attendant benefits while continuing to defer their removal. *Ante*, at 22–23. Even assuming the majority correctly characterizes the Fifth Circuit's opinion, it cites no authority for the proposition that arbitrary and capricious review *requires* an agency to dissect an unlawful program piece by piece, scrutinizing each separate element to determine whether it would independently violate the law, rather than just to rescind the entire program.[14]

––––––––––

*Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 77 (2015) (THOMAS, J., concurring in judgment). Putting aside this constitutional concern, however, the notice and comment process at least attempts to provide a "surrogate political process" that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process. Asimow, Interim-Final Rules: Making Haste Slowly, 51 Admin. L. Rev. 703, 708 (1999).

[14] The majority's interpretation of the Fifth Circuit's opinion is highly questionable. Because a grant of deferred action renders DACA recipients eligible for certain benefits and work authorization, it is far from clear that the Department could separate DACA's "forbearance component" from the major benefits it conferred without running into yet another APA problem. The majority points to the fact that, under the Patient Protection and Affordable Care Act of 2010, relevant regulations exclude those receiving deferred action through DACA from coverage.

AR0367

The then-Attorney General reviewed the thorough deci-
sions of the District Court and the Fifth Circuit. Those
courts exhaustively examined the INA's text and structure,
the relevant provisions of other federal immigration stat-
utes, the historical practice of deferred action, and the gen-
eral grants of statutory authority to set immigration policy.
Both decisions concluded that DAPA and expanded DACA
violated the carefully crafted federal immigration scheme,
that such violations could not be justified through reference
to past exercises of deferred action, and that the general
grants of statutory authority did not give DHS the power to
enact such a sweeping nonenforcement program. Based on
the reasoning of those decisions, then-Attorney General
Sessions concluded that DACA was likewise implemented
without statutory authority. He directed DHS to restore
the rule of law. DHS followed the then-Attorney General's
legal analysis and rescinded the program. This legal con-
clusion more than suffices to supply the "reasoned analysis"
necessary to rescind an unlawful program. *State Farm*, 463
U. S., at 42.

The majority has no answer except to suggest that this
approach is inconsistent with *State Farm*. See *ante*, at 21–
22. But in doing so, the majority ignores the fact that, un-
like the typical "prior policy" contemplated by the Court in

--------

*Ante*, at 19, n. 5. But that misses the point. Those regulations were
promulgated before "anyone with deferred action under the DACA pro-
cess applie[d]" for those benefits. See 77 Fed. Reg. 52616 (2012). By
contrast, DACA recipients have been eligible for and have received Med-
icare, Social Security, and work authorization for years. DHS therefore
is not writing on a blank slate. Under the majority's rule, DHS would
need to amend all relevant regulations and explain why *all* recipients of
deferred action who have previously received such benefits may no longer
receive them. Alternatively and perhaps more problematically, it would
need to provide a reason why other recipients of deferred action should
continue to qualify, while DACA recipients should not. It thus seems
highly likely that the majority's proposed course of action would be sub-
ject to serious arbitrary and capricious challenges.

Opinion of THOMAS, J.

*State Farm*, DACA is unlawful.  Neither *State Farm* nor any other decision cited by the majority addresses what an agency must do when it has inherited an unlawful program. It is perhaps for this reason that, rather than responding with authority of its own, the majority simply opts to excise the "unlawful policy" aspect from its discussion.

## B

Second, the majority claims that DHS erred by failing to take into account the reliance interests of DACA recipients. *Ante*, at 23–26.  But reliance interests are irrelevant when assessing whether to rescind an action that the agency lacked statutory authority to take.  No amount of reliance could ever justify continuing a program that allows DHS to wield power that neither Congress nor the Constitution gave it.  Any such decision would be "not in accordance with law" or "in excess of statutory . . . authority."  5 U. S. C. §§706(2)(A), (C).  Accordingly, DHS would simply be engaging in yet another exercise of unlawful power if it used reliance interests to justify continuing the initially unlawful program, and a court would be obligated to set aside that action.[15]

Even if reliance interests were sometimes relevant when rescinding an ultra vires action, the rescission still would not be arbitrary and capricious here.  Rather, as the majority does not dispute, the rescission is consistent with how deferred action has always worked.  As a general matter, deferred action creates no rights—it exists at the Government's discretion and can be revoked at any time.  See App.

––––––––––

[15]The majority contends that this argument does not carry force because the rescission implemented a winddown period during which recipients would continue to receive benefits.  But whether DHS' decision to wind down DACA was lawful is a separate question from whether DHS was required to consider reliance interests before discontinuing an unlawful program.

24        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

to Pet. for Cert. in No. 18–587, at 104a (DACA and expanded DACA); 8 CFR §214.11(j)(3) (T visas); §214.14(d)(2) (U visas); 62 Fed. Reg. 63249, 63253 (1997) (discussing Exec. Order No. 12711 for certain citizens of the People's Republic of China). The Government has made clear time and again that, because "deferred action is not an immigration status, no alien has the right to deferred action. It is used solely in the discretion of the [Government] and confers no protection or benefit upon an alien." DHS Immigration and Customs Enforcement Office of Detention and Removal, Detention and Deportation Officers' Field Manual §20.8 (Mar. 27, 2006); see also Memorandum from D. Meissner, Comm'r, INS, to Regional Directors et al., pp. 11–12 (Nov. 17, 2000); Memorandum from W. Yates, Assoc. Director of Operations, DHS, Citizenship and Immigration Servs., to Director, Vt. Serv. Center, p. 5 (2003). Thus, contrary to the majority's unsupported assertion, *ante,* at 23, this longstanding administrative treatment of deferred action provides strong evidence and authority for the proposition that an agency need not consider reliance interests in this context.[16]

Finally, it is inconceivable to require DHS to study reliance interests before rescinding DACA considering how the program was previously defended. DHS has made clear since DACA's inception that it would not consider such reliance interests. Contemporaneous with the DACA memo, DHS stated that "DHS can terminate or renew deferred action at any time at the agency's discretion." Consideration

---

[16]The majority's approach will make it far more difficult to change deferred-action programs going forward, which is hardly in keeping with this Court's own understanding that deferred action is an "exercise in administrative discretion" used for administrative "convenience." *Reno* v. *American-Arab Anti-Discrimination Comm.,* 525 U. S. 471, 484 (1999). Agencies will likely be less willing to grant deferred action knowing that any attempts to undo it will require years of litigation and time-consuming rulemakings.

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 63 of 405 PageID #: 6360

of Deferred Action for Childhood Arrivals Process, 89 Interpreter Releases 1557, App. 4, p. 2 (Aug. 20, 2012). In fact, DHS repeatedly argued in court that the 2014 memorandum was a valid exercise of prosecutorial discretion in part *because* deferred action created no rights on which recipients could rely. Before the Fifth Circuit, DHS stated that "DHS may revoke or terminate deferred action and begin removal proceedings at any time at its discretion." Brief for Appellants in *Texas* v. *United States*, No. 15–40238, p. 7; see also *id.*, at 45–46. And before this Court, in that same litigation, DHS reiterated that "DHS has absolute discretion to revoke deferred action unilaterally, without notice or process." Brief for United States in *United States* v. *Texas*, O. T. 2015, No. 15–674, p. 5; see also *id.*, at 37. If that treatment of reliance interests was incorrect, it provides yet one more example of a deficiency in DACA's issuance, not its rescission.

*     *     *

President Trump's Acting Secretary of Homeland Security inherited a program created by President Obama's Secretary that was implemented without statutory authority and without following the APA's required procedures. Then-Attorney General Sessions correctly concluded that this ultra vires program should be rescinded. These cases could—and should—have ended with a determination that his legal conclusion was correct.

Instead, the majority today concludes that DHS was required to do far more. Without grounding its position in either the APA or precedent, the majority declares that DHS was required to overlook DACA's obvious legal deficiencies and provide additional policy reasons and justifications before restoring the rule of law. This holding is incorrect, and it will hamstring all future agency attempts to undo actions that exceed statutory authority. I would

AR0371

26        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

therefore reverse the judgments below and remand with instructions to dissolve the nationwide injunctions.

**AR0372**

Cite as:  591 U. S. ____ (2020)          1

Opinion of ALITO, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 18–587, 18–588, and 18–589

————————

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587                    *v.*

## REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588                    *v.*

## NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

## CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589                    *v.*

## MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE ALITO, concurring in the judgment in part and
dissenting in part.

Anyone interested in the role that the Federal Judiciary

now plays in our constitutional system should consider
what has happened in these cases. Early in the term of the
current President, his administration took the controver-
sial step of attempting to rescind the Deferred Action for
Childhood Arrivals (DACA) program. Shortly thereafter,
one of the nearly 700 federal district court judges blocked
this rescission, and since then, this issue has been mired in
litigation. In November 2018, the Solicitor General filed
petitions for certiorari, and today, the Court still does not
resolve the question of DACA's rescission. Instead, it tells
the Department of Homeland Security to go back and try
again. What this means is that the Federal Judiciary, with-
out holding that DACA cannot be rescinded, has prevented
that from occurring during an entire Presidential term.
Our constitutional system is not supposed to work that way.

I join JUSTICE THOMAS's opinion. DACA presents a deli-
cate political issue, but that is not our business. As JUSTICE
THOMAS explains, DACA was unlawful from the start, and
that alone is sufficient to justify its termination. But even
if DACA were lawful, we would still have no basis for over-
turning its rescission. First, to the extent DACA repre-
sented a lawful exercise of prosecutorial discretion, its re-
scission represented an exercise of that same discretion,
and it would therefore be unreviewable under the Adminis-
trative Procedure Act. 5 U. S. C. §701(a)(2); see *Heckler* v.
*Chaney*, 470 U. S. 821, 831–832 (1985). Second, to the ex-
tent we could review the rescission, it was not arbitrary and
capricious for essentially the reasons explained by JUSTICE
KAVANAUGH. See *post*, at 4–6 (opinion concurring in the
judgment in part and dissenting in part).

Cite as:  591 U. S. ____ (2020)          1

Opinion of KAVANAUGH, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–587, 18–588, and 18–589

————

### DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587          *v.*

### REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

### DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588          *v.*

### NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

### CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589          *v.*

### MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE KAVANAUGH, concurring in the judgment in part
and dissenting in part.

**AR0375**

For the last 20 years, the country has engaged in consequential policy, religious, and moral debates about the legal status of millions of young immigrants who, as children, were brought to the United States and have lived here ever since. Those young immigrants do not have legal status in the United States under current statutory law. They live, go to school, and work here with uncertainty about their futures. Despite many attempts over the last two decades, Congress has not yet enacted legislation to afford legal status to those immigrants.

In 2012, exercising its view of the Executive's prosecutorial discretion under Article II and the immigration laws, President Obama's administration unilaterally instituted a program known as Deferred Action for Childhood Arrivals, or DACA. Under DACA, eligible young immigrants may apply for and receive deferred action. They must renew their DACA status every two years. Under the program, the Executive Branch broadly forbears from enforcing certain immigration removal laws against DACA recipients. And by virtue of the forbearance, DACA recipients also become eligible for work authorization and other benefits.

Since 2017, President Trump's administration has sought to rescind DACA based on its different and narrower understanding of the Executive's prosecutorial discretion under Article II and the immigration laws. In its view, the Executive Branch legally may not, and as a policy matter should not, *unilaterally* forbear from enforcing the immigration laws against such a large class of individuals. The current administration has stated that it instead wants to work with Congress to enact comprehensive legislation that would address the legal status of those immigrants together with other significant immigration issues.

The question before the Court is whether the Executive Branch acted lawfully in ordering rescission of the ongoing DACA program. To begin with, all nine Members of the Court accept, as do the DACA plaintiffs themselves, that

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 69 of 405 PageID #: 6366

Opinion of KAVANAUGH, J.

the Executive Branch possesses the legal authority to rescind DACA and to resume pre-DACA enforcement of the immigration laws enacted by Congress. Having previously adopted a policy of prosecutorial discretion and nonenforcement with respect to a particular class of offenses or individuals, the Executive Branch has the legal authority to rescind such a policy and resume enforcing the law enacted by Congress. The Executive Branch's exercise of that rescission authority is subject to constitutional constraints and may also be subject to statutory constraints. The narrow legal dispute here concerns a statutory constraint—namely, whether the Executive Branch's action to rescind DACA satisfied the general arbitrary-and-capricious standard of the Administrative Procedure Act, or APA.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. As the Court has long stated, judicial review under that standard is deferential to the agency. The Court may not substitute its policy judgment for that of the agency. The Court simply ensures that the agency has acted within a broad zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision. See *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502 (2009); *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29 (1983).

The Executive Branch explained its decision to rescind DACA in two sequential memorandums by successive Secretaries of Homeland Security: the 2017 Duke Memorandum and the 2018 Nielsen Memorandum. The Duke Memorandum focused on DACA's perceived legal flaws. The Court today finds the Duke Memorandum insufficient under the APA's arbitrary-and-capricious standard.

But regardless of whether the Court is correct about the Duke Memorandum, the Nielsen Memorandum more fully explained the Department's legal reasons for rescinding

AR0377

DACA, and clarified that even if DACA were lawful, the Department would still rescind DACA for a variety of policy reasons. The Nielsen Memorandum also expressly addressed the reliance interests of DACA recipients. The question under the APA's deferential arbitrary-and-capricious standard is not whether we agree with the Department's decision to rescind DACA. The question is whether the Nielsen Memorandum reasonably explained the decision to rescind DACA. Under ordinary application of the arbitrary-and-capricious standard, the Nielsen Memorandum—with its alternative and independent rationales and its discussion of reliance—would pass muster as an explanation for the Executive Branch's action.

The Nielsen Memorandum was issued nine months after the Duke Memorandum. Under the Administrative Procedure Act, the Nielsen Memorandum is itself a "rule" setting forth "an agency statement of general . . . applicability and future effect designed to implement . . . policy." 5 U. S. C. §551(4). Because it is a rule, the Nielsen Memorandum constitutes "agency action." §551(13). As the Secretary of Homeland Security, Secretary Nielsen had the authority to decide whether to stick with Secretary Duke's decision to rescind DACA, or to make a different decision. Like Secretary Duke, Secretary Nielsen chose to rescind DACA, and she provided additional explanation. Her memorandum was akin to common forms of agency action that follow earlier agency action on the same subject—for example, a supplemental or new agency statement of policy, or an agency order with respect to a motion for rehearing or reconsideration. Courts often consider an agency's additional explanations of policy or additional explanations made, for example, on agency rehearing or reconsideration, or on remand from a court, even if the agency's bottom-line decision itself does not change.

Yet the Court today jettisons the Nielsen Memorandum by classifying it as a *post hoc* justification for rescinding

DACA. *Ante*, at 14–16.  Under our precedents, however, the
*post hoc* justification doctrine merely requires that courts
assess agency action based on the official explanations of
the agency decisionmakers, and not based on after-the-fact
explanations advanced *by agency lawyers during litigation*
(or by judges).  See, *e.g., State Farm*, 463 U. S., at 50
("courts may not accept appellate counsel's *post hoc* ration-
alizations for agency action"); *FPC* v. *Texaco Inc.*, 417 U. S.
380, 397 (1974) (same); *NLRB* v. *Metropolitan Life Ins. Co.*,
380 U. S. 438, 443–444 (1965) (same); *Burlington Truck
Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962)
(same).  As the D. C. Circuit has explained, the *post hoc* jus-
tification doctrine "is not a time barrier which freezes an
agency's exercise of its judgment after an initial decision
has been made and bars it from further articulation of its
reasoning.  It is a rule directed at reviewing courts which
forbids judges to uphold agency action on the basis of ra-
tionales offered by anyone other than the proper deci-
sionmakers."  *Alpharma, Inc.* v. *Leavitt*, 460 F. 3d 1, 6
(2006) (Garland, J.) (internal quotation marks omitted).

    Indeed, the ordinary judicial remedy for an agency's in-
sufficient explanation is to remand for further explanation
by the relevant agency personnel.  It would make little
sense for a court to exclude official explanations by agency
personnel such as a Cabinet Secretary simply because the
explanations are purportedly *post hoc*, and then to turn
around and remand for further explanation by those same
agency personnel.  Yet that is the upshot of the Court's ap-
plication of the *post hoc* justification doctrine today.  The
Court's refusal to look at the Nielsen Memorandum seems
particularly mistaken, moreover, because the Nielsen
Memorandum shows that the Department, back in 2018,
considered the policy issues that the Court today says the
Department did not consider.  *Ante,* at 20–26.

    To be sure, cases such as *Overton Park* and *Camp* v. *Pitts*
suggest that courts reviewing certain agency *adjudications*

AR0379

may in some circumstances decline to examine an after-the-fact agency explanation.  See *Camp* v. *Pitts*, 411 U. S. 138, 142–143 (1973) (*per curiam*); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 419–421 (1971).  But agency adjudications are "concerned with the determination of past and present rights and liabilities," Attorney General's Manual on the Administrative Procedure Act 14 (1947), and implicate the due process interests of the individual parties to the adjudication.  Judicial review of an adjudication therefore ordinarily focuses on what happened during the agency's adjudication process of deciding that individual case.

Even if certain agency adjudications have a slightly more stringent restriction on *post hoc* explanations, the APA is "based upon a dichotomy between rule making and adjudication," *ibid*., and this case involves an ongoing agency rule that has future effect—the rescission of DACA.  The Nielsen Memorandum implements and explains the rescission of DACA.  I am aware of no case from this Court, and the Court today cites none, that has employed the *post hoc* justification doctrine to exclude an agency's official explanation of an agency rule.  For purposes of arbitrary-and-capricious review, it does not matter whether the latest official explanation was two years ago or three years ago.  What matters is whether the explanation was reasonable and followed the requisite procedures.  In my view, the Court should consider the Nielsen Memorandum in deciding whether the Department's rescission of DACA satisfies the APA's arbitrary-and-capricious standard.

Because the Court excludes the Nielsen Memorandum, the Court sends the case back to the Department of Homeland Security for further explanation.  Although I disagree with the Court's decision to remand, the only practical consequence of the Court's decision to remand appears to be some delay.  The Court's decision seems to allow the Department on remand to relabel and reiterate the substance

of the Nielsen Memorandum, perhaps with some elaboration as suggested in the Court's opinion. *Ante,* at 23–26.*

\*       \*       \*

The Court's resolution of this narrow APA issue of course cannot eliminate the broader uncertainty over the status of the DACA recipients. That uncertainty is a result of Congress's inability thus far to agree on legislation, which in turn has forced successive administrations to improvise, thereby triggering many rounds of relentless litigation with the prospect of more litigation to come. In contrast to those necessarily short-lived and stopgap administrative measures, the Article I legislative process could produce a sturdy and enduring solution to this issue, one way or the other, and thereby remove the uncertainty that has persisted for years for these young immigrants and the Na-

————————

*Because I conclude that the Executive Branch satisfied the APA's arbitrary-and-capricious standard, I need not consider whether its prosecutorial enforcement policy was "committed to agency discretion by law" and therefore not subject to APA arbitrary-and-capricious review in the first place. 5 U. S. C. §701(a)(2). Several judges have advanced arguments suggesting that DACA—at least to the extent it was simply an exercise of forbearance authority—and the repeal of DACA are decisions about whether and to what extent to exercise prosecutorial discretion against a class of offenses or individuals, and are therefore unreviewable under the APA as "committed to agency discretion by law." *Ibid.*; see *Casa De Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684, 709–715 (CA4 2019) (Richardson, J., concurring in part and dissenting in part); *Regents of Univ. Cal.* v. *United States Dept. of Homeland Security*, 908 F. 3d 476, 521–523 (CA9 2018) (Owens, J., concurring in judgment); see also *Texas* v. *United States*, 809 F. 3d 134, 196–202 (CA5 2015) (King, J., dissenting); *Texas* v. *United States*, 787 F. 3d 733, 770–776 (CA5 2015) (Higginson, J., dissenting); cf. *Heckler* v. *Chaney*, 470 U. S. 821, 831–835 (1985); *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 277–284 (1987); *United States* v. *Nixon*, 418 U. S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *In re Aiken County*, 725 F. 3d 255, 262–264 (CADC 2013).

tion's immigration system.  In the meantime, as to the nar-
row APA question presented here, I appreciate the Court's
careful analysis, but I ultimately disagree with its treat-
ment of the Nielsen Memorandum.  I therefore respectfully
dissent from the Court's judgment on plaintiffs' APA claim,
and I concur in the judgment insofar as the Court rejects
plaintiffs' equal protection claim.

**684**          **924 FEDERAL REPORTER, 3d SERIES**

For the reasons stated above, the Court should hold that the First Amendment right of public access extends to documents submitted in connection with motions for summary judgment. In light of the contemporary trend toward disposing of civil cases through summary judgment, the public should have a qualified right to view the documents submitted by parties in connection with motions for summary judgment. As the Supreme Court has stated, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The public can only have confidence in the propriety of summary judgment procedure—which plays an increasingly important role in civil litigation—if the documents that form the bases of district courts' decisions to grant summary judgment are open for review and inspection, rather than shielded from public scrutiny.

### III.

In sum, I respectfully disagree with the majority's application of the doctrine of constitutional avoidance, which should only be invoked by a federal court when the court can decide a case on a "*dispositive* nonconstitutional ground." *Hagans*, 415 U.S. at 547, 94 S.Ct. 1372 (emphasis added). The doctrine of constitutional avoidance is prudential in nature, yet its invocation in this case may lead to the imprudent result of piecemeal litigation while constitutional rights potentially are being violated on a continual basis. Therefore, it is not only appropriate, but also *necessary*, for the Court to address the First Amendment issues raised by the plans at this juncture, and I would resolve the First Amendment

issues in favor of transparency and broader public access to the federal courts.



CASA DE MARYLAND; Coalition for Humane Immigrant Rights (CHIRLA); Fair Immigration Movement (FIRM); One America; Promise Arizona; Make the Road Pennsylvania; Michigan United; Arkansas United Community Coalition; Junta for Progressive Action, Inc.; Angel Aguiluz; Estefany Rodriguez; Heymi Elvir Maldonado; Nathaly Uribe Robledo; Eliseo Mages; Jesus Eusebio Perez; Josue Aguiluz; Missael Garcia; Jose Aguiluz; Maricruz Abarca; Annabelle Martines Herra; Maria Joseline Cuellar Baldelomar; Brenda Moreno Martinez; Luis Aguilar; J.M.O., a minor child; Adriana Gonzales Magos, next of friend to J.M.O.; A.M., a minor child; Isabel Cristina Aguilar Arce, next of friend to A.M., Plaintiffs - Appellants,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; U.S. Customs and Border Protection; Donald J. Trump, in his official capacity as President of the United States; William P. Barr, in his official capacity as Attorney General of the United States; Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security; L. Francis Cissna, in his official capacity as Director of U.S. Citizenship and Immigration Services; Ronald D. Vitiello, in his offi-

cial capacity as Acting Director of U.S. Immigration and Customs Enforcement; Kevin K. McAleenan, in his official capacity in his official capacity as Acting Commissioner of Custom and Border Protection; United States of America, Defendants - Appellees.

Casa De Maryland; Coalition for Humane Immigrant Rights (CHIRLA); Fair Immigration Movement (FIRM); One America; Promise Arizona; Make the Road Pennsylvania; Michigan United; Arkansas United Community Coalition; Junta for Progressive Action, Inc.; Angel Aguiluz; Estefany Rodriguez; Heymi Elvir Maldonado; Nathaly Uribe Robledo; Eliseo Mages; Jesus Eusebio Perez; Josue Aguiluz; Missael Garcia; Jose Aguiluz; Maricruz Abarca; Annabelle Martines Herra; Maria Joseline Cuellar Baldelomar; Brenda Moreno Martinez; Luis Aguilar; J.M.O., a minor child; Adriana Gonzales Magos, next of friend to J.M.O.; A.M., a minor child; Isabel Cristina Aguilar Arce, next of friend to A.M., Plaintiffs - Appellees,

v.

U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; U.S. Customs and Border Protection; Donald J. Trump, in his official capacity as President of the United States; William P. Barr, in his official capacity as Attorney General of the United States; Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security; L. Francis Cissna, in his official capacity as Director of U.S. Citizenship and Immigration Services; Ronald D. Vitiello, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; Kevin K.

McAleenan, in his official capacity in his official capacity as Acting Commissioner of Custom and Border Protection; United States of America, Defendants - Appellants.

No. 18-1521, No. 18-1522

United States Court of Appeals, Fourth Circuit.

Argued: December 11, 2018

Decided: May 17, 2019

**Background:** Noncitizens who received forbearance of their removal from the country under the Deferred Action for Childhood Arrivals (DACA) policy brought action against Department of Homeland Security (DHS), challenging Acting Secretary of Homeland Security's decision to rescind DACA as a violation of the Fifth Amendment, the Administrative Procedure Act (APA), and common law principles of estoppel. The United States District Court for the District of Maryland, Roger W. Titus, Senior District Judge, 284 F.Supp.3d 758, granted in part and denied in part DHS's motion for summary judgment. DADA recipients appealed.

**Holdings:** The Court of Appeals, Diaz, Circuit Judge, held that:

(1) Immigration and Nationality Act's (INA) jurisdictional bar did not preclude judicial review of Acting Secretary's decision to rescind the DACA policy;

(2) Acting Secretary's decision to rescind DACA policy was not an unreviewable agency action that was committed to agency discretion by law;

(3) Acting Secretary's decision to rescind DACA policy was a general statement of policy that was not subject to notice and comment rulemaking;

(4) DHS failed to give a reasoned explanation for its change in policy when it

**AR0384**

rescinded DACA policy, and thus such decision was arbitrary and capricious; and

(5) government was not equitably estopped from sharing DACA applicant information.

Affirmed in part, reversed in part, vacated in part, dismissed in part, and remanded.

Richardson, Circuit Judge, wrote opinion concurring in part and dissenting in part.

### 1. Aliens, Immigration, and Citizenship ⇔254, 271

Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law.

### 2. Aliens, Immigration, and Citizenship ⇔211

Because of the practical fact that the government can't possibly remove all removable aliens, the Secretary of Homeland Security has discretion to prioritize the removal of some and to deprioritize the removal of others.

### 3. Courts ⇔89

Although not binding on courts, Department of Justice's Office of Legal Counsel's opinions reflect the legal position of the executive branch and are generally viewed as providing binding interpretive guidance for executive agencies.

### 4. Federal Courts ⇔3604(4)

The Court of Appeals reviews a district court's grant of summary judgment de novo.

### 5. Federal Courts ⇔3604(4)

The Court of Appeals can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

### 6. Federal Courts ⇔3616(1)

The Court of Appeals reviews a district court's grant of an injunction for abuse of discretion.

### 7. Federal Courts ⇔3581(1)

The Court of Appeals considers the argument that claims are not justiciable de novo.

### 8. Aliens, Immigration, and Citizenship ⇔392

Immigration and Nationality Act (INA) provision limiting judicial review of actions of the Secretary of Homeland Security, which applied only to Secretary's decisions or actions to commence proceedings, adjudicate cases, or execute removal orders, did not preclude judicial review of Acting Secretary's decision to rescind the Deferred Action for Childhood Arrivals (DACA) policy, as the rescission was not a commencement of a proceeding, adjudication of a case, or execution of a removal order. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

### 9. Aliens, Immigration, and Citizenship ⇔392

Final order of removal of an alien was not required before judicial review of Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrivals (DACA) policy was permitted under INA's jurisdictional bar, which precluded judicial review of Secretary's decision or action to commence proceedings, adjudicate cases, or execute removal orders; rescission of DACA was not an initial action in the commencement of removal proceedings against any individual alien. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

### 10. Aliens, Immigration, and Citizenship ⇔385

Decisions to open an investigation or to surveil the suspected violator are not

encompassed by Immigration and Nationality Act's jurisdictional bar, even though these decisions may be part of the deportation process. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**11. Federal Courts ⟀3409**

A party may challenge subject matter jurisdiction for the first time on appeal.

**12. Aliens, Immigration, and Citizenship ⟀392**

Immigration and Nationality Act (INA) provision that limited judicial review to final orders of the Secretary of Homeland Security did not apply to action challenging Acting Secretary's decision to rescind Deferred Action for Childhood Arrivals (DACA) policy, as such provision only applied to review of an order of removal. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(b)(9).

**13. Aliens, Immigration, and Citizenship ⟀155**

Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrival (DACA) policy was not an unreviewable agency action that was committed to agency discretion by law, where Acting Secretary was rescinding a general enforcement policy that had been in existence for over five years and affected hundreds of thousands of enrollees based on the view that the policy was unlawful. 5 U.S.C.A. § 701(a)(2).

**14. Administrative Law and Procedure ⟀1664(1)**

Although there is a strong presumption in favor of judicial review of agency action, the Administrative Procedure Act bars judicial review of agency action committed to agency discretion by law. 5 U.S.C.A. § 701(a)(2).

**15. Administrative Law and Procedure ⟀1655**

Where an agency expresses a broad or general enforcement policy, different considerations than those driving the *Heckler v. Chaney*, 470 U.S. 821, presumption that agency enforcement decisions are unreviewable are at play; as general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion.

**16. Administrative Law and Procedure ⟀1854**

An agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review.

**17. Administrative Law and Procedure ⟀1973**

The Court of Appeals reviews de novo a district court's determination that an agency decision was not subject to notice and comment rulemaking under the Administrative Procedure Act. 5 U.S.C.A. §§ 551(4)-(5), 553(a)-(c).

**18. Administrative Law and Procedure ⟀1169, 1263**

Rules issued through the Administrative Procedure Act's notice-and-comment process are often referred to as legislative rules because they have the force and effect of law. 5 U.S.C.A. §§ 551(4)-(5), 553(a)-(c).

**19. Aliens, Immigration, and Citizenship ⟀155**

Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrival (DACA) policy was a general statement of policy that was not

**AR0386**

subject to notice and comment rulemaking under the Administrative Procedure Act (APA), where rescission memorandum removed a mechanism under which individuals could receive deferred action, but placed on limitations on other lawful enforcement prerogatives of the Department of Homeland Security (DHS), memorandum did not create rights or benefits enforceable by any party, and memorandum did not bind subsequent Secretaries.  5 U.S.C.A. § 553(a)-(c).

**20. Administrative Law and Procedure**
&#9758;**1169, 1171, 1192**

The critical question in distinguishing between legislative rules and general statements of policy is whether the statement is of present binding effect; if it is, then the Administrative Procedure Act calls for notice and comment.  5 U.S.C.A. § 553(a)-(c).

**21. Administrative Law and Procedure**
&#9758;**1263**

Substantive or legislative rules, pursuant to properly delegated authority, have the force of law and create new law or impose new rights or duties.  5 U.S.C.A. § 553(a)-(c).

**22. Administrative Law and Procedure**
&#9758;**1169, 1192**

A rule is "legislative," and thus subject to notice and comment rulemaking under Administrative Procedure Act, if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy.  5 U.S.C.A. § 553(a)-(c).

**23. Administrative Law and Procedure**
&#9758;**1171, 1231**

General statements of policy, which are not subject to notice and comment rulemaking under Administrative Procedure Act, advise the public prospectively of

the manner in which the agency proposes to exercise a discretionary power.  5 U.S.C.A. § 553(b)(A).

**24. Administrative Law and Procedure**
&#9758;**1171, 1231**

A directive that does not establish a binding norm and leaves agency officials free to exercise their discretion qualifies as a general statement of policy, which is not subject to notice and comment rulemaking under Administrative Procedure Act.  5 U.S.C.A. § 553(b)(A).

**25. Administrative Law and Procedure**
&#9758;**1745, 1901**

The Administrative Procedure Act's arbitrary and capricious standard renders judicial oversight highly deferential, with a presumption in favor of finding the agency action valid.  5 U.S.C.A. § 706(2)(A).

**26. Administrative Law and Procedure**
&#9758;**1743**

The arbitrary and capricious standard does not reduce judicial review to a rubber stamp of agency action; rather, courts must engage in a searching and careful inquiry of the administrative record, so that they may consider whether the agency considered the relevant factors and whether a clear error of judgment was made.  5 U.S.C.A. § 706(2)(A).

**27. Administrative Law and Procedure**
&#9758;**1743**

Where agency action qualifies as unreasonable as a matter of law, it is likely to have been arbitrary and capricious.  5 U.S.C.A. § 706(2)(A).

**28. Administrative Law and Procedure**
&#9758;**1973**

The Court of Appeals evaluates the issue of whether agency action was arbitrary or capricious de novo, on appeal from a district court's review of the action.  5 U.S.C.A. § 706(2)(A).

CASA DE MARYLAND v. U.S. DEPT. OF HOMELAND SEC.   **689**
Cite as 924 F.3d 684 (4th Cir. 2019)

**29. Administrative Law and Procedure ☞1453**

To comply with the Administrative Procedure Act's arbitrary and capricious standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. 5 U.S.C.A. § 706(2)(A).

**30. Administrative Law and Procedure ☞1206**

The giving of adequate reasons for an agency's decision is one of the basic procedural requirements of administrative rulemaking.

**31. Administrative Law and Procedure ☞1932**

In a challenge under the Administrative Procedure Act's arbitrary and capricious standard, an agency's action must be upheld, if at all, on the basis articulated by the agency itself. 5 U.S.C.A. § 706(2)(A).

**32. Administrative Law and Procedure ☞1453**

An agency satisfactorily explains a decision when it provides enough clarity that its path may reasonably be discerned.

**33. Administrative Law and Procedure ☞1743**

If the agency provides a satisfactory explanation for a decision, the court will uphold its decision.

**34. Administrative Law and Procedure ☞1206, 1262**

Where an agency has failed to provide even a minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law. 5 U.S.C.A. § 706(2)(A).

**35. Administrative Law and Procedure ☞1287**

In changing policies, agencies must provide a reasoned explanation for the change; at a minimum, an agency must display awareness that it is changing position and show that there are good reasons for the new policy.

**36. Administrative Law and Procedure ☞1287**

The agency's explanation for a change in policy must address the facts and circumstances that underlay or were engendered by the prior policy, including any serious reliance interests; an unexplained inconsistency in agency policy indicates that the agency's action is arbitrary and capricious and therefore unlawful. 5 U.S.C.A. § 706(2)(A).

**37. Aliens, Immigration, and Citizenship ☞155**

Department of Homeland Security (DHS) failed to give a reasoned explanation for its change in policy when it rescinded the Deferred Action for Childhood Arrivals (DACA) policy, and thus such decision was arbitrary and capricious in violation of the Administrative Procedure Act, where DHS's rescission memorandum stated that the policy was rescinded because it was unlawful, but did not identify any statutory provision with which it conflicted, Office of Legal Counsel had provided DHS with a reasoned analysis supporting DACA's legality, DACA policy was not identical to Deferred Action for Parents of Americans (DAPA) policy that had been struck down in court and was cited by DHS as a reason for rescinding DACA, and DHS did not account for reliance interests that would have been affected by the rescission. 5 U.S.C.A. § 706(2)(A).

**38. Estoppel ☞62.2(4)**

Noncitizens who participated in Deferred Action for Childhood Arrivals

(DACA) program could not have reasonably believed that the information they provided to government as part of their DACA applications would never be used for immigration enforcement purposes, and thus government was not equitably estopped from sharing DACA applicant information, where government had warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met and warned that its policies governing the sharing of applicant information could be modified at any time.

### 39. Estoppel ⌒52(2)

Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another.

### 40. Estoppel ⌒52.15

To establish equitable estoppel, it is only necessary to show that the person sought to be estopped, by statements or conduct, misled another to his prejudice.

### 41. Estoppel ⌒62.1

As against the government, estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents.

### 42. Constitutional Law ⌒976

It is well established that normally the court will not decide a constitutional question if there is some other ground upon which to dispose of the case.

———

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:17-cv-02942-RWT)

ARGUED: John A. Freedman, Emily Newhouse Dillingham, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellants/Cross-Appellees. Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees/Cross-Appellants. ON BRIEF: Elizabeth J. Bower, Kevin B. Clark, Priya R. Aiyar, WILLKIE FARR & GALLAGHER LLP, Washington, D.C.; Dennis A. Corkery, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C.; Ajmel A. Quereshi, HOWARD UNIVERSITY SCHOOL OF LAW, Washington, D.C., for Appellants/Cross-Appellees. Chad A. Readler, Acting Assistant Attorney General, Mark B. Stern, Abby C. Wright, Thomas Pulham, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees/Cross-Appellants.

Before KING, DIAZ, and RICHARDSON, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, dismissed in part, and remanded by published opinion. Judge Diaz wrote the majority opinion, in which Judge King joined. Judge Richardson wrote an opinion concurring in part and dissenting in part.

DIAZ, Circuit Judge:

In 2012, the Secretary of Homeland Security established the Deferred Action for Childhood Arrivals ("DACA") policy. Under this policy, certain noncitizens who came to the United States as children could receive deferred action—a decision forbearing their removal from the country. Hundreds of thousands of individuals, in-

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 82 of 405 PageID #: 6379

cluding those who appear as Plaintiffs in these appeals, applied for and received grants of deferred action under DACA.

In 2017, the Acting Secretary of Homeland Security rescinded DACA, which prompted a flurry of lawsuits across the country challenging the action. Plaintiffs in these appeals (a group of individuals and organizations) allege that the government's decision to rescind DACA (and its changes to policies governing the use of information provided by DACA applicants) violates the Fifth Amendment to the U.S. Constitution, as well as the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, and common law principles of estoppel.

On the government's motion for summary judgment, the district court determined that Plaintiffs' challenges were subject to judicial review, that the rescission of DACA and changes to the government's policies on use of DACA applicant information did not violate the APA, that the constitutional claims were without merit, and that DACA's rescission did not violate principles of estoppel. The court, however, ordered the government (on grounds of estoppel) to comply with the policies promulgated in 2012 on the use of information provided by DACA applicants and enjoined it from altering these policies.

As we explain, we agree with the district court that Plaintiffs' challenges are subject to judicial review. We also agree with the district court that the government's decision to rescind DACA did not require notice and comment under the APA. But the decision nonetheless violated the APA because—on the administrative record before us—it was not adequately explained and thus was arbitrary and capricious. We also conclude that the district court erred in ordering the government to comply with its policies promulgated in 2012 on the use of information provided by DACA appli-

cants and enjoining it from altering those policies.

Given our resolution, we decline, under the doctrine of constitutional avoidance, to decide whether Plaintiffs' Fifth Amendment rights were violated. Nor do we address Plaintiffs' remaining arguments challenging the district court's grant of summary judgment.

## I.

### A.

**[1]**   Before turning to the record material, some context is in order. The Secretary of Homeland Security is "charged with the administration and enforcement" of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1103(a)(1). One of the enforcement tools available under the INA is the removal of aliens from the United States. "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); *see* 8 U.S.C. §§ 1182(a), 1227(a) (listing classes of deportable and inadmissible aliens).

**[2]**   Because of the "practical fact," however, that the government can't possibly remove all such aliens, the Secretary has discretion to prioritize the removal of some and to deprioritize the removal of others. *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015); *see* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). One form of discretion the government exercises is deferred action, which "is a decision by Executive Branch officials not to pursue

deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country." *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 487 (9th Cir. 2018), *petition for cert. filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5 & 19, 2018) (No. 18-587).

[3] Immigration authorities have granted deferred action and related forms of relief from deportation or removal since at least the early 1960s. *See id.* at 487-89; The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ——, 2014 WL 10788677, at *10-13 (Nov. 19, 2014) ("2014 OLC Opinion")[1] (addressing the Department's practices of granting deferred action ad hoc and through broad policies making relief from removal available to particular groups of aliens). The Supreme Court also has recognized deferred action by name, describing it as the executive branch's "regular practice . . . of exercising . . . discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

### B.

Turning now to the record material, the essential undisputed facts are as follows. To ensure government resources were not spent on the "low priority cases" of "certain young people who were brought to [the United States] as children and know only this country as home," J.A. 129, then Secretary of Homeland Security Janet Napolitano announced in a June 15, 2012, memorandum the policy that has become known as DACA. The DACA Memo made renewable two-year terms of deferred action from removal and authorization for employment available to individuals who came to the United States as children, satisfied certain other eligibility criteria,[2] and passed background checks.

To be considered for deferred action under DACA, applicants had to submit to biometric screening and provide extensive personal information to the Department of Homeland Security. The Department informed applicants that the information provided was "protected from disclosure . . . for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence

---

**1.** The Office of Legal Counsel, or OLC, is an office within the U.S. Department of Justice that drafts legal opinions of the Attorney General and provides its own written opinions and other advice in response to requests from various agencies within the executive branch. *See* 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating Attorney General's authority to render legal advice to OLC); "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc (saved as ECF opinion attachment). Although not binding on courts, OLC opinions "reflect[ ] the legal position of the executive branch" and "are generally viewed as providing binding interpretive guidance for executive agencies." *United*

*States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) (internal quotation marks omitted) (Bea, J., concurring in part and dissenting in part), *aff'd in part, rev'd in part*, 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012).

**2.** In its original form, deferred action was available to individuals who were under age 16 when they came to the United States, were not above age 30, had continuously (Continued) resided in the United States for at least five years preceding June 15, 2012, and were present in the country on June 15, 2012, and satisfied certain other requirements relative to public safety and education or military service.

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 84 of 405 PageID #: 6381

removal proceedings.[3] J.A. 1004. The Department warned, however, that these policies could be "modified, superseded, or rescinded at any time without notice" and were "not intended to" and did not "create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.*

The DACA Memo made clear that it "confer[red] no substantive right, immigration status[,] or pathway to citizenship." J.A. 131. DACA recipients, however, were eligible to receive a host of other benefits under preexisting statutes and regulations, including advance parole allowing reentry into the United States after travel abroad, social security benefits, and certain forms of public assistance. *See* 8 U.S.C. §§ 1182(d)(5)(A), 1611(b)(1), 1621(b)(1), (d); 8 C.F.R. §§ 1.3(a)(4)(vi), 212.5. DACA recipients also were eligible to receive employment authorization on a showing of economic necessity. *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

In November 2014, then Secretary of Homeland Security Jeh Johnson announced a separate deferred action policy for certain parents of United States citizens and lawful permanent residents that became known as Deferred Action for Parents of Americans ("DAPA").[4] The DAPA memorandum also expanded DACA by (1) extending the deferred action and employment authorization terms from two to three years; (2) removing the "age cap" that previously excluded certain individuals from DACA eligibility; and (3) reducing the period of time that someone needed to

be physically present in the United States to be eligible for DACA. *See* J.A. 167-68.

A coalition of states led by Texas sued to block implementation of the DAPA policy (and its proposed expansions to DACA) on the grounds that it violated the APA and the Take Care Clause of the Constitution, U.S. Const. art. II, § 3 (the "*Texas* litigation"). *See Texas v. United States*, 86 F.Supp.3d 591, 604 & n.1, 607 (S.D. Tex. 2015). The district court in that case granted injunctive relief, *id.* at 671-72, 677-78 & n.111, and the Fifth Circuit affirmed, *Texas v. United States*, 809 F.3d 134, 178-79, 186, 188 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States v. Texas*, — U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam).

In June 2017 (approximately five months after the Trump administration took office), then Secretary of Homeland Security John Kelly rescinded DAPA but left in place DACA and the deferred action relief and employment authorizations granted between the issuance of the DAPA Memo and the district court's decision in the *Texas* litigation.

On September 4, 2017, Attorney General Jefferson Sessions wrote to then Acting Secretary Elaine Duke, advising her to rescind DACA. According to the Attorney General:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and

---

**3.**   Separately, the Department noted that the information provided could be shared with national security and law enforcement agencies "for purposes other than removal." J.A. 1004.

**4.**   The 2014 OLC Opinion concluded that DAPA "would constitute a permissible exercise of [the Department of Homeland Security]'s enforcement discretion under the INA." J.A. 162; 2014 WL 10788677, at *23. While

the opinion doesn't directly address the Department's authority to implement DACA, it does recount that, before DACA was announced, the OLC had "orally advised" the Department that the policy would be permissible "provided that immigration officials retained discretion to evaluate each application on an individualized basis." J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related . . . DAPA . . . policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. . . . Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.[5]

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

J.A. 379 (internal citations omitted).

The next day, Acting Secretary Duke rescinded DACA and instructed Department personnel to "wind-down" the policy. J.A. 380, 383. The Secretary's Rescission Memo recounts in a "Background" section the DACA and DAPA policies, the *Texas* litigation, Secretary Kelly's rescission of DAPA, the letter to Attorney General Sessions from the plaintiffs in the *Texas* litigation, and General Sessions's September 4 letter. The Rescission Memo then states:

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017[,] letter from the Attorney General, it is clear that the June 15,

2012[,] DACA program should be terminated.

J.A. 383.

The Rescission Memo—which issued without notice or an opportunity for public comment—did not end DACA outright. Rather, it allowed for a case-by-case basis adjudication of initial applications for deferred action and employment authorization accepted by September 5, 2017, and renewal requests accepted by October 5, 2017, from current DACA beneficiaries whose benefits would expire between September 5, 2017, and March 5, 2018.

The Memo stated that the Department would not terminate existing grants of deferred action and employment authorization under DACA "solely based on the directives" in the Memo and would "generally honor" approved applications for advanced parole. *Id.* But it made clear that the Department would reject all other DACA applications, including initial applications filed after September 5, 2017, and all pending and future applications for advance parole under DACA. *Id.* The Memo, however, explicitly placed "no limitations" on the Department's "otherwise lawful enforcement . . . prerogatives." J.A. 384.

The Department also announced that once an individual's deferred action under DACA expired, information provided by applicants would not be "proactively provided to [law enforcement agencies] for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1142. For individuals whose pending DACA requests were denied, the

---

**5.** Plaintiffs in the *Texas* litigation had written to General Sessions in June 2017, requesting that the Secretary of Homeland Security rescind DACA and prohibit new grants and re-
newals of deferred action. The letter warned that, if the Executive Branch failed to so act, plaintiffs there would amend their complaint to challenge DACA.

announcement stated that "[g]enerally, information provided in DACA requests will not be proactively provided to other law enforcement entities . . . for the purpose of immigration enforcement proceedings" unless the requestor posed "a risk to national security or public safety" or met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1143.

Nearly 800,000 individuals have received deferred action under DACA since its inception.

### C.

Plaintiffs' complaint raises a host of challenges to the government's decision to rescind DACA. First, the complaint alleges that the rescission is a substantive rule and thus requires notice-and-comment rulemaking under the APA. Next, it asserts that the government's decisions to rescind DACA and change the way the government proposed to share personal information collected from DACA applicants were arbitrary, capricious, and contrary to law, in violation of the APA, and violated the substantive and procedural due process protections of the Fifth Amendment. Plaintiffs also allege that the decision to rescind DACA violates the equal protection guarantee of the Fifth Amendment. Finally, Plaintiffs say that the government should be equitably estopped from rescinding DACA or using information provided by DACA applicants for immigration enforcement purposes beyond those first announced in 2012, when the government's information-sharing policies were first implemented.

The district court granted partial summary judgment to the government. The court found (contrary to the government's contention) that Plaintiffs' claims were jus-

ticiable. *Casa De Maryland v. DHS*, 284 F.Supp.3d 758, 768-71 (D. Md. 2018). But on the merits, the court determined that DACA's rescission and the government's changes to its policies on information-sharing did not violate the APA and that Plaintiffs' constitutional claims lacked merit. *Id.* at 771-77. The court also determined that DACA's rescission did not violate the doctrine of estoppel. *Id.* at 777-78.

The court, however, granted summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to the sharing of DACA applicant information. The court ordered the government to comply with the policies as originally announced in 2012 and enjoined it from altering these policies. *Id.* at 778-79; J.A. 1531-33.

[4–6] These appeals followed. We review a district court's grant of summary judgment de novo. *Roland v. USCIS*, 850 F.3d 625, 628 (4th Cir. 2017). "We can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889-90 (4th Cir. 2015) (internal quotation marks omitted). We review a district court's grant of an injunction for abuse of discretion. *South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018).

### II.

[7] We begin with the government's argument that Plaintiffs' claims are not justiciable, an issue we consider de novo. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014); *Angelex Ltd. v. United States*, 723 F.3d 500, 505 (4th Cir. 2013).

### A.

The government contends that Plaintiffs' claims are immune from judicial review

under 8 U.S.C. § 1252(g), a provision of the INA stating, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

[8] According to the government, § 1252(g) bars review here in two ways. First, noting that the Supreme Court in *AAADC* observed that § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations," 525 U.S. at 485, 119 S.Ct. 936,[6] the government contends that this section bars review because DACA's rescission is a "no deferred action" decision. But this contention ignores both the plain language of § 1252(g) and the Supreme Court's determination in *AAADC* that this section "applies *only* to three discrete actions that the [Secretary of Homeland Security] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.' " *Id.* at 482, 119 S.Ct. 936 (first emphasis added). In rescinding DACA, the Acting Secretary did none of these things.

[9, 10] Second, the government says that § 1252(g) precludes review because DACA's rescission is an initial "action" in the commencement of removal proceedings. As the government would have it, review of its decision to rescind DACA must await a final order of removal. The Supreme Court in *AAADC* though "specifically rejected a broad reading of the three discrete actions listed in [§] 1252(g)." *Regents*, 908 F.3d at 504. Specifically, "decisions to open an investigation, [or] to surveil the suspected violator" are not encompassed by § 1252(g)'s jurisdictional bar, even though these decisions "may be part of the deportation process." *AAADC*, 525 U.S. at 482, 119 S.Ct. 936; *see Jennings v. Rodriguez*, — U.S. —, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (Alito, J., plurality) ("[In *AAADC*, w]e did not interpret [§ 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions. . . . Instead, we read the language to refer *to just those three specific actions themselves*." (emphasis added)).

And while we accept that § 1252(g) "is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings," *AAADC*, 525 U.S. at 487, 119 S.Ct. 936, the government hasn't moved to remove any of the Plaintiffs. The two Circuit decisions on which the government relies to support the proposition that judicial review of DACA's rescission is available only through review of a final order of removal—*Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016), and *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999)—are inapposite. Those cases involved challenges to individual "no deferred action" decisions by aliens adjudicated removable. *Vasquez*, 639 F. App'x at 901; *Botezatu*, 195 F.3d at 314. The government's reliance on *AAADC* is therefore misplaced, and we reject its argument that § 1252(g) bars review of Plaintiffs' claims.[7]

---

6. The Supreme Court said as much after reviewing a treatise describing the practice of deferred action and litigation that would result when it was not granted. *AAADC*, 525 U.S. at 484-85, 119 S.Ct. 936. That treatise, however, referred explicitly to "[e]fforts to (Continued) challenge the refusal to exercise [deferred action] *on behalf of specific aliens*."

*Id.* at 485, 119 S.Ct. 936 (emphasis added). Plaintiffs don't challenge the refusal to grant deferred action to a particular individual.

7. *Accord Regents*, 908 F.3d at 504 (holding § 1252(g) doesn't deprive courts of jurisdiction to review DACA's rescission); *NAACP v. Trump*, 298 F.Supp.3d 209, 224 (D.D.C. 2018)

B.

**[11]** The government argues that another provision of the INA—8 U.S.C. § 1252(b)(9)—bars review of Plaintiffs' claims. The government did not press this argument in the district court. But because a party may challenge subject matter jurisdiction for the first time on appeal, *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003), we consider this issue.

**[12]** Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). But that provision doesn't help the government here because it "applies *only* with respect to review of an *order of removal* under [8 U.S.C. § 1252(a)(1)]." *INS v. St. Cyr*, 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (emphases added; internal quotation marks and alteration omitted); *see Calcano-Martinez v. INS*, 232 F.3d 328, 340 (2d Cir. 2000) ("Congress enacted [§ 1252(b)(9)] for the important purpose of consolidating all claims that *may be brought in removal proceedings* into one final petition for review of a final order in the court of appeals." (emphasis added)), *aff'd*, 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).

The government's contention that § 1252(b)(9) bars review thus is without merit.

C.

**[13]** Next, the government contends that judicial review is foreclosed under the APA because the decision to rescind DACA is committed to agency discretion by law. We do not agree.

**[14]** "Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)), the APA bars judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government says that the Acting Secretary's decision to rescind DACA is a type of agency enforcement decision that is presumptively unreviewable under the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).[8] Invoking the "broad discretion exercised by immigration officials" that is a "principal feature of the removal system," *Arizona*, 567 U.S. at 396, 132 S.Ct. 2492, the government urges that the concerns driving *Chaney*'s presumption of unreviewability apply

---

(rejecting as "misplaced" government's reliance on *AAADC* and finding § 1252(g) didn't bar review of challenges to DACA's rescission), *appeals docketed*, Nos. 18-5243, 18-5245 (D.C. Cir. Aug. 10 & 13, 2018), *petition for cert. before judgment filed*, 87 U.S.L.W. 3204 (U.S. Nov. 5, 2018) (No. 18-588); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 152-54 (E.D.N.Y. 2017) (rejecting government's § 1252(g) argument in challenge to DACA's rescission), *appeals docketed*, Nos. 18-1985, 18-1986 (2d Cir. July 5, 2018), *petition for*

*cert. before judgment filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5, 2018) (No. 18-589).

**8.** The government doesn't appear to seriously contest that Plaintiffs' procedural APA claim challenging the decision to rescind DACA is subject to judicial review. *Accord Lincoln v. Vigil*, 508 U.S. 182, 195-98, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements, regardless of reviewability of the substance of the rule).

with "particular force" in the removal context, a context in which allowing delay would result in ordering the government to allow a "continuing violation" of federal law, *AAADC*, 525 U.S. at 490, 119 S.Ct. 936.

And while conceding that an agency's expression of a legal interpretation announced in a broad or general enforcement policy may be reviewable, the government says that the decision to rescind DACA is distinguishable because it rested on discretionary enforcement concerns and expressed the Department of Homeland Security's view about the scope of its enforcement authority, not the substantive unlawfulness of the policy. Finally, relying on the Supreme Court's post-*Chaney* decision in *ICC v. Bhd. of Locomotive Eng'rs* ("*BLE*"), 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), the government argues that, even if the sole rationale for the rescission decision was the view that DACA was unlawful, such rationale cannot provide a "hook" to support review of the decision.

Because the government relies so heavily on *Chaney* for its argument, we turn to that decision. There, a group of death row inmates petitioned the Food and Drug Administration to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. 470 U.S. at 823-24, 105 S.Ct. 1649. The agency refused to act, based on its view that its jurisdiction to act under the substantive law was unclear and, even if it had jurisdiction, it would decline to exercise that jurisdiction under its inherent discretion to do so. *Id.* at 824-25, 105 S.Ct. 1649. The petitioners filed suit, seeking an order directing the agency to act. *Id.* at 825, 105 S.Ct. 1649.

Without addressing the jurisdictional issue, the Court held that the agency's discretionary decision not to enforce the substantive law was unreviewable under the APA. *Id.* at 828, 837-38, 105 S.Ct. 1649. As the Court explained, such decisions "often involve[ ] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action ... best fits the agency's overall policies." *Id.* at 831, 105 S.Ct. 1649.

Nonenforcement decisions, the Court observed, generally do not involve the exercise of "*coercive* power over an individual's liberty or property rights," and, accordingly, do "not infringe upon areas that courts often are called upon to protect." *Id.* at 832, 105 S.Ct. 1649. Such decisions also "share[ ] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* For these reasons, the Court found, such decisions have "traditionally been committed to agency discretion," and Congress, in "enacting the APA[,] did not intend to alter that tradition." *Id.* (internal quotation marks omitted). Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Id.*

Here, however, the Department of Homeland Security's decision to rescind DACA is not a "*Chaney*-type enforcement action[ ]." *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996). For starters, the Acting Secretary did not exercise her discretion in an individual case.[9] Nor did

**9.** The government correctly observes that an agency's discretionary decision to enforce the

law may be unreviewable under § 701(a)(2). *See Speed Mining*, 528 F.3d at 311, 317-18

she identify a violation of the INA against which to act, determine whether government resources would be best spent enforcing one violation over another, or decide whether the Department would succeed if it pursued a particular violation. Rather, Acting Secretary Duke rescinded a general enforcement policy in existence for over five years and affecting hundreds of thousands of enrollees based on the view that the policy was unlawful.

[15] Major agency policy decisions are "quite different from day-to-day agency [ ]enforcement decisions." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Where an agency expresses a broad or general enforcement policy, different considerations than those driving *Chaney*'s presumption are at play. "As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

[16] Accordingly, as courts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 811-12 (D.C. Cir. 1998) (holding courts had jurisdiction under APA because challenged agency action was a general policy of refusing to enforce provision of substantive law and not a "sin-gle-shot non-enforcement decision" (citing *Crowley*, 37 F.3d at 674-76)); *see Kenney*, 96 F.3d at 1123-24 (concluding *Chaney* applies to "individual, case-by-base determinations of when to enforce existing [law] rather than permanent policies or standards" and did not encompass agency's adoption of general policies stating standards agency deemed acceptable to implement statutory goals); *Crowley*, 37 F.3d at 672-73, 675 (*Chaney*'s presumption applies if "agency bases its refusal to enforce in an individual case solely on a legal interpretation without explicitly relying on its enforcement discretion"); *see also Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (holding challenge to agency's interpretation of law and regulations advanced in enforcement policy statement was "not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from judicial review"); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 767, 773 (D.C. Cir. 1992) (holding *Chaney*'s presumption "is inapplicable or at least rebutted [where plaintiff] raise[d] a facial challenge to the [agency's] statutory interpretation embodied in [a regulation] and d[id] not contest a particular enforcement decision" and citing authority in support). DACA's rescission fits well within this rubric.[10]

The government attempts to distinguish this authority, but its efforts are unavailing. It claims DACA's rescission involved discretionary balancing because it was based on concerns about its legality and "litigation risk," a term that appears to

---

(holding agency's discretionary decision to enforce substantive law by issuing citations for safety violations was committed to agency discretion and therefore unreviewable). But *Speed Mining* is distinguishable because it involved a discretionary enforcement decision in an individual case.

**10.**  Our dissenting colleague contends that decisions from the D.C. Circuit supporting our view that DACA's rescission is reviewable don't explain how they can be reconciled with *Chaney*. Dis. op. at 712–14. We disagree. *See Crowley*, 37 F.3d at 675-77; *Nat'l Wildlife Fed'n*, 980 F.2d at 772-73.

refer to the likelihood the policy would have been invalidated had it been challenged in the *Texas* litigation. But the Rescission Memo doesn't identify the "risk" of litigation as a "consideration" on which the Acting Secretary relied in rescinding the policy. Rather, the Memo relies on the Attorney General's conclusion that DACA needed to be rescinded because it was unlawful.[11] True, the Attorney General's letter also proffers the conclusion that "potentially imminent litigation" would invalidate DACA, as was the case with DAPA in the *Texas* litigation. But we agree with the determination of our district court colleague Judge Bates in his opinion resolving challenges to DACA's rescission that this justification "was too closely bound up with [the Attorney General's] evaluation of DACA's legality," *NAACP*, 298 F.Supp.3d at 234, and thus cuts against *Chaney*'s presumption of unreviewability.

Nor are we persuaded by the government's claim that DACA's rescission rested on the Department's view of the scope of its enforcement authority, not the substantive unlawfulness of the policy. As Judge Bates aptly noted when presented

with the same argument, "this strikes the [c]ourt as a distinction without a difference. To say that a particular agency action is 'without statutory authority' is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply." *Id.* at 232. We, like Judge Bates, "fail[ ] to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision." *Id.*[12]

The government also relies on the Supreme Court's decision in *BLE* as further support for the view that Plaintiffs' claims are unreviewable. But there, the Supreme Court held only that "where a party petitions an agency for reconsideration on the ground of material error, *i.e.*, on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of the prior order is not itself reviewable." 482 U.S. at 280, 107 S.Ct. 2360 (internal quotation marks, ellipsis, and alteration omitted). The government is correct that the Court also rejected the principle that, if an

---

**11.** *See* 8 U.S.C. § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling [on the Secretary of Homeland Security]."); *see Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 n.6 (4th Cir. 2015) (finding Attorney General's position controlling where Department of Homeland Security and Attorney General had conflicting views about applicability of a legal doctrine).

**12.** Our dissenting colleague notes that Acting Secretary Duke didn't say in the Rescission Memo "that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program." Dis. op. at 715. It is true that Acting Secretary Duke wrote only that it was clear DACA "should" be terminated. J.A. 383. Standing alone, however, "should" can express the notion of re-

quirement or obligation. *Should*, Webster's Third New International Dictionary Unabridged (2002) ("used … to express duty, obligation, [or] necessity"). Given the Attorney General's evaluation of DACA's legality and the absence of any reference to litigation risk in the Rescission Memo's list of considerations, this use of the word "should" supports our conclusion, *ante*, at 698–99, 699–700, that the Secretary rescinded DACA based on her view that the policy was unlawful. Contrary to our dissenting colleague's view, our decision today does not intrude on discretionary prerogatives of the Executive Branch (*see* Dis. op. at 713–14); rather, it "preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons," *NAACP*, 298 F.Supp.3d at 234.

"agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable," citing as an example a prosecutor's refusal to institute criminal proceedings based on the belief that the law will not sustain a conviction. *Id.* at 283, 107 S.Ct. 2360. But *BLE* still does not advance the government's argument.

For one thing, Plaintiffs here filed a timely challenge to the government's *original* decision to rescind DACA. *BLE* doesn't bar review of that type of challenge. Moreover, as the government itself concedes, Appellees' Opening & Response Br. at 19, *BLE* addressed the scope of judicial review in the context of agency non-enforcement action in an individual case. *See Crowley*, 37 F.3d at 675-77 (explaining the basis for distinguishing—for purposes of judicial review—between individual enforcement decisions and implementation of broad enforcement policies). DACA's rescission involves a broad enforcement policy, not an individual decision.[13]

In sum, we hold that Plaintiffs' claims are reviewable.[14]

### III.

### A.

[17]   We turn now to the merits and consider first whether the district court erred in granting summary judgment to the government on Plaintiffs' procedural APA claim. The court determined that DACA's rescission was akin to a policy statement and thus was not subject to notice and comment under the APA. *Casa*, 284 F.Supp.3d at 772. We review this determination de novo. *Children's Hosp. of the King's Daughters, Inc. v. Azar* ("*CHKD*"), 896 F.3d 615, 619 (4th Cir. 2018).

[18]   The APA generally requires that agencies provide notice of proposals to create, amend, or repeal a rule[15] and an opportunity for interested persons to comment on the proposal. *See* 5 U.S.C. §§ 551(4)-(5), 553(a)-(c). "Rules issued through the notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." *Perez v. Mortg. Bankers Ass'n*, — U.S. ——, 135 S.Ct. 1199, 1203, 191 L.Ed.2d 186 (2015) (internal quotation marks omitted). "[T]he APA provides[, however,] that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Id.* at 1203-04 (quoting 5 U.S.C. § 553(b)(A)).

[19]   Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo

---

**13.**  We accept that agency action doesn't become reviewable simply because "the agency gives a 'reviewable' reason for otherwise unreviewable action." *BLE*, 482 U.S. at 283, 107 S.Ct. 2360. But, as we've explained, DACA's rescission is not such an unreviewable decision. *See NAACP*, 298 F.Supp.3d at 231 ("[A]n otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.").

**14.**  The government has not cross-appealed from the district court's additional determina-

tion that all Plaintiffs had standing, *Casa*, 284 F.Supp.3d at 771, and the parties have not briefed this issue on appeal. Nonetheless, reviewing this issue de novo, *Bostic*, 760 F.3d at 370, we agree with the district court that the individual DACA recipient Plaintiffs have standing to sue. We consequently need not consider whether the other Plaintiffs have standing. *See id.* at 370-71.

**15.**  The parties don't dispute that DACA's rescission qualifies as a "rule" for APA purposes. *See* 5 U.S.C. § 551(4).

is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy. We agree with the government.[16]

**[20–22]** The critical question in distinguishing between legislative rules and general statements of policy is whether the statement "is of present binding effect; if it is, then the APA calls for notice and comment." *Elec. Privacy Info. Ctr. v. DHS* ("*EPIC*"), 653 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks and ellipsis omitted). "[S]ubstantive or legislative rule[s], pursuant to properly delegated authority, ha[ve] the force of law, and create[] new law or impose[] new rights or duties." *CHKD*, 896 F.3d at 620 (internal quotation marks omitted); *see Nat'l Latino Media Coal. v. FCC*, 816 F.2d 785, 788 (D.C. Cir. 1987) ("A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute."). "To that end, a rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *CHKD*, 896 F.3d at 620 (internal quotation marks and alteration omitted).

**[23, 24]** By contrast, general statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197, 113 S.Ct. 2024 (internal quotation marks omitted). A directive that doesn't establish a "binding norm" and leaves agency officials free to exercise their discretion qualifies as a general statement of policy. *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995) (citing *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987), and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1015 (9th Cir. 1987)).

The Rescission Memo removes a mechanism under which individuals could receive deferred action but places "no limitations" on other lawful enforcement prerogatives of the Department of Homeland Security. J.A. 384. As the district court observed, *Casa*, 284 F.Supp.3d at 772, the Memo doesn't curtail the Department's discretion to make deferred action available on a case-by-case or ad hoc basis. Nor does the Memo, by its terms, create "right[s] or benefit[s]" enforceable "by any party." J.A. 384.

Additionally, although DACA was rescinded based on the government's view that the policy was unlawful, the Rescission Memo doesn't bind subsequent Secretaries who might disagree with this reasoning or bar the Department from implementing other deferred action policies in the future. Contrary to Plaintiffs' arguments, the Memo doesn't "replace[] agency discretion with a new binding rule of substantive law," *Mada-Luna*, 813 F.2d at 1014 (internal quotation marks omitted), affecting the rights of people regulated by the Department, *see EPIC*, 653 F.3d at 7 (agency's statement "cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences" qualifies as binding on those subject to it (internal quotation marks omitted)). It therefore falls on the

**16.** *Accord Regents*, 908 F.3d at 512-14 (holding DACA's rescission is not a binding rule of substantive law); *NAACP*, 298 F.Supp.3d at 237 ("[T]he rescission of DACA was exempt from notice and comment as a general statement of agency policy."); *Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 270-73 (E.D.N.Y. 2018) (dismissing notice-and-comment claims because Rescission Memo is not a legislative rule), *appeals docketed*, Nos. 18-1521, 18-1525, 18-1986 (2d Cir. May 21 & July 5, 2018).

policy "end of the spectrum," *CHKD*, 896 F.3d at 620-21 (internal quotation marks omitted), and thus was exempt from notice and comment under the APA.

## B.

We consider next whether the district court erred in granting summary judgment to the government on Plaintiffs' claim that DACA's rescission is substantively invalid under the APA.

## 1.

[25–28] The APA requires a reviewing court to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). These "criteria render our oversight highly deferential, with a presumption in favor of finding the agency action valid." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (internal quotation marks omitted). This standard, however, "does not reduce judicial review to a rubber stamp of agency action." *Id.* (internal quotation marks omitted). Rather, "we must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* (internal quotation marks omitted). Where agency action qualifies as "unreasonable as a matter of law, it is likely to have been arbitrary and capricious." *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 n.23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). "We evaluate [this issue] de novo[.]" *Id.*

[29–31] To comply with § 706(2)(A), an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connec-

tion between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The giving of "adequate reasons" for an agency's decision is "[o]ne of the basic procedural requirements of administrative rulemaking." *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). In a challenge under § 706(2)(A), "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50, 103 S.Ct. 2856; *see Jimenez–Cedillo v. Sessions*, 885 F.3d 292, 299 (4th Cir. 2018) ("[A] reviewing court may not speculate on reasons that might have supported a change in agency position [ ]or supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotation marks and citation omitted)).

[32–34] An agency satisfactorily explains a decision when it provides "enough clarity that its 'path may reasonably be discerned.'" *Jimenez–Cedillo*, 885 F.3d at 297 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). If the agency provides such an explanation, "we will uphold its decision." *Id.* at 297-98, 95 S.Ct. 438. "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 136 S.Ct. at 2125.

[35, 36] These principles apply with equal force to a change in agency position. *Jimenez–Cedillo*, 885 F.3d at 298. Thus, in changing policies, agencies "must 'provide a reasoned explanation for the change.'" *Id.* (quoting *Encino Motorcars*, 136 S.Ct. at 2125). "At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons

for the new policy.' " *Id.* (quoting *Encino Motorcars*, 136 S.Ct. at 2126). The agency's explanation must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." *Encino Motorcars*, 136 S.Ct. at 2126 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009)). "An 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez–Cedillo*, 885 F.3d at 298 (quoting *Encino Motorcars*, 136 S.Ct. at 2125).

2.

[37]  Plaintiffs argue that DACA's rescission was arbitrary and capricious because the Department of Homeland Security failed to give a reasoned explanation for the change in policy, particularly given the significant reliance interests involved. We agree.[17]

As we have explained, DACA was rescinded based on the Department's view that the policy was unlawful. But neither the Attorney General's September 4 letter nor the Department's Rescission Memo identify any statutory provision with which the DACA policy conflicts. *Cf. Encino Motorcars*, 136 S.Ct. at 2127 (rejecting as insufficient agency statement regarding statutory exemption proffered in support of policy change where agency did not "analyze or explain" why statute should be interpreted as agency suggested).

The Attorney General's letter does mention that the Fifth Circuit affirmed the injunction against the DAPA policy on "multiple legal grounds" in the *Texas* litigation, J.A. 379, and the Rescission Memo

cites to this ruling. The Fifth Circuit's ruling was based in part on its determination that the DAPA policy likely ran counter to the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179. There is no dispute here, however, that "DACA has no analogue in the INA." *NAACP*, 298 F.Supp.3d at 239 (internal quotation marks omitted). Further, as the Fifth Circuit explained in reaching its conclusion, "DACA and DAPA are not identical." *Texas*, 809 F.3d at 174.

The Attorney General's letter also asserts that DACA suffered from the same "constitutional defects that the courts recognized as to DAPA." J.A. 379. The courts in the *Texas* litigation, however, did not address constitutional claims. And while the Attorney General urged in his letter that his office had a duty to "defend the Constitution" and "faithfully execute the laws passed by Congress," J.A. 379, he does not explain how allowing the DACA policy to remain in effect would violate that duty.

The Attorney General's letter and the Rescission Memo also proffer the concern—based on the Attorney General's determination that the DAPA and DACA policies share the same legal defects—that "potentially imminent" litigation would result in a ruling in the *Texas* litigation enjoining DACA. Entirely absent, however, is an explanation why it was likely that the district court in the *Texas* litigation would have enjoined DACA.

Further, the 2014 OLC Opinion outlining the Department's authority to implement the DAPA policy identified "from the

---

17.  Plaintiffs also assert that (1) the district court failed to consider evidence of "bad faith" and "animus" underlying the decision to rescind DACA presented in their complaint

and (2) the Department's conclusions about DACA's legality are substantively incorrect. Given our disposition, we decline to address these arguments.

nature of the Take Care duty" at least "four general . . . principles governing the permissible scope of enforcement discretion," J.A. 137-38; 2014 WL 10788677, at *5-6, and noted that concerns "animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion," J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

The point is that the Department had before it at the time it rescinded DACA a reasoned analysis from the office tasked with providing legal advice to all executive branch agencies that supported the policy's legality. Yet the Department changed course without any explanation for why that analysis was faulty. *Cf. Fox Television Stations*, 556 U.S. at 516, 129 S.Ct. 1800 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.").

Nor did the Department adequately account for the reliance interests that would be affected by its decision. Hundreds of thousands of people had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind. Although the government insists that Acting Secretary Duke[18] considered these interests in connection with her decision to rescind DACA, her Memo makes no mention of them.

Accordingly, we hold that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside.

## IV.

[38] We turn next to the district court's rulings (1) granting summary judg-

ment to Plaintiffs on the portion of their estoppel claim pertaining to sharing of DACA applicant information, and (2) ordering the government to comply with the information-sharing policies promulgated in 2012 and enjoining it from altering those policies.

[39–41] "Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another." *United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y.*, 402 F.2d 893, 897 (4th Cir. 1968) (internal footnote omitted). To establish equitable estoppel, "[i]t is only necessary to show that the person [sought to be] estopped, by . . . statements or conduct, misled another to his prejudice." *Id.* at 898 (quoting *United States ex rel. Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938)). As against the government, "estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

In enjoining the government, the district court determined that estoppel "potentially would apply to any use for immigration enforcement of the information collected . . . during DACA registrations" because "the Government promised not to transfer or use the information gathered from [DACA applicants] for immigration enforcement." *Casa*, 284 F.Supp.3d at 778.

We disagree with the district court. The government did not make such a promise or suggest in any other way that its policies governing the sharing of information provided by DACA applicants would never

---

**18.** The government urges us to consider the June 2018 memorandum from former Secretary of Homeland Security Kirstjen Nielsen belatedly proffered by the government as a basis for upholding DACA's rescission. We

decline to do so because the memorandum was not part of the administrative record in this appeal. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

AR0404

change. Rather, the government warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met. It also warned that its policies governing the sharing of applicant information could be "modified, superseded, or rescinded at any time without notice" and created no "right or benefit." J.A. 1004. In view of these clear and unequivocal warnings, Plaintiffs could not reasonably believe that the information they provided as part of their DACA application would never be used for immigration enforcement purposes. *Cf. Volvo Trucks of N. Am., Inc. v. United States*, 367 F.3d 204, 212 (4th Cir. 2004) ("Equitable estoppel requires reasonable reliance."). Plaintiffs' equitable estoppel claim thus necessarily fails.

## V.

[**42**]  We turn finally to Plaintiffs' constitutional claims, which were dismissed by the district court. We decline to decide whether DACA's rescission violates the Fifth Amendment's due process and equal protection guarantees under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally the [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984)

(per curiam). Because we have determined that DACA's rescission violates the APA, we need go no further. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016).

We also decline to decide whether Plaintiffs' Fifth Amendment rights were violated by the policies announced on September 5, 2017, regarding the sharing of personal information from DACA applicants.[19] *McMillan*, 466 U.S. at 51, 104 S.Ct. 1577. Our decision today restores DACA to its pre-September 5, 2017, status, rendering a nullity the information-sharing policies announced on September 5. It therefore is unnecessary to address Plaintiffs' constitutional challenge to these policies. *See Veasey*, 830 F.3d at 265.[20]

## VI.

To sum up: We affirm the district court's rulings that Plaintiffs' claims are justiciable and that DACA's rescission did not require notice and comment under the APA. We reverse the district court's ruling sustaining the rescission of the policy as valid under 5 U.S.C. § 706(2)(A). DACA's rescission is vacated as arbitrary and capricious, and the matter is remanded for further proceedings consistent with this opinion. We reverse the district court's ruling finding Plaintiffs entitled to injunctive relief on equitable estoppel grounds, reverse the grant of summary judgment in Plaintiffs' favor, and vacate the injunction. Because we find it unnecessary to decide Plaintiffs' constitutional challenges to

---

**19.**  Although the district court found Plaintiffs' due process claims lacked merit, its analysis addressed DACA's rescission, not information-sharing. *Casa*, 284 F.Supp.3d at 775-77.

**20.**  Plaintiffs also contend that the district court misapplied Fed. R. Civ. P. 56 by failing to (1) afford them a reasonable opportunity for discovery on their claims, (2) consider or address their statement of material facts in dispute, and (3) view the facts in the light

most favorable to them. They allege further that the district court misapplied the APA by granting summary judgment to the government without addressing their (Continued) contention that the administrative record was incomplete and by failing to consider evidence of "bad faith and improper behavior" by government officials. Given our disposition, we find it unnecessary to address these issues.

DACA's rescission and the related changes to the Department's policies governing use of information provided by DACA applicants, we vacate the district court's judgment on these issues and dismiss those claims.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, DISMISSED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, concurring in part and dissenting in part:

The plaintiffs ask this Court to invalidate the rescission of DACA, a seven-year-old program explained at its inception as an act of prosecutorial discretion. The Majority's opinion grants this request, reasoning that the Department of Homeland Security behaved in an arbitrary and capricious manner by giving what my good colleagues decide are faulty legal reasons for rescinding the discretionary policy.

I disagree with the premise that the Administrative Procedure Act permits this review of the Executive Branch's rescission of DACA. Enforcement discretion lies at the heart of executive power. The Executive may decide to prosecute, or not prosecute, an individual or a group so long as the reasons for that decision are constitutionally sound and the decision does not violate or abdicate the Executive's statutory duties. Here, the Executive's proper exercise of that discretion to rescind DACA is judicially unreviewable under the Administrative Procedure Act, regardless of one's view of the policy questions underlying DACA. To hold otherwise permits the Judicial Branch to invade the province of the Executive and impair the carefully constructed separation of powers laid out in our Constitution.

## I. Background

The Secretary of Homeland Security is charged by statute with enforcing the na-tion's immigration laws. *See* 8 U.S.C. § 1103(a); 6 U.S.C. § 202(5). Among those responsibilities is removing individuals subject to removal under federal law. *See Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* At each stage of the process—from investigation to execution of a removal order—the Secretary has the discretion to pursue removal or forbear doing so. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

The Secretary has used this discretion to prioritize the removal of certain categories of aliens and deprioritize others. *See, e.g.*, Memorandum from Doris Meissner, Commissioner, Dep't of Justice, Immigration & Naturalization Service, "Exercising Prosecutorial Discretion" 7–9 (Nov. 17, 2000) (deprioritizing the removal of aliens who, for instance, resided in the United States for a long time, had little to no criminal history, and had greater ties to the United States than another country); Memorandum from John Morton, Director, Dep't of Homeland Sec., Immigration & Customs Enforcement, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" 2 (June 17, 2011) (deprioritizing the removal of veterans, minors, elderly individuals, pregnant women, and various other groups). On top of these general, department-wide enforcement policies, individual agents have been empowered to exercise enforcement discretion based on specific circumstances. *See, e.g.*, Meissner Memorandum at 1–2. Just as a highway patrolman has discretion whether to pull over a given driver (and even after pulling someone over, whether to give that person a ticket), im-

**AR0406**

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 99 of 405 PageID #: 6396

migration agents can weigh individual and country-specific humanitarian circumstances when deciding whether to exercise their prosecutorial discretion. *See* Morton Memorandum at 4.

Relying on this broad enforcement discretion to set enforcement priorities and to guide agents in rendering their individualized enforcement decisions, the Secretary of Homeland Security established the DACA program. Memorandum from Janet Napolitano, Secretary, Dep't of Homeland Sec., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). DACA authorized agents to grant deferred action[1] to certain people brought illegally to the United States as children. Under DACA, aliens who applied and satisfied certain gateway criteria were "granted" or "denied" deferred action, ostensibly on an individualized, case-by-case basis. *Id.* Even when granted, deferred action could be revoked unilaterally by the Department. *See AAADC*, 525 U.S. at 484–85, 119 S.Ct. 936. The DACA memorandum stated expressly that it conferred upon recipients of deferred action "no substantive right, immigration status or pathway to citizenship." Napolitano Memorandum at 3.

Two years later, the Secretary expanded DACA by loosening some restrictions and extending the period of deferred action from two years to three. Memorandum from Jeh Johnson, Secretary, Dep't of Homeland Sec., "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (Nov. 20, 2014). In the same action, the Secretary also created a new enforcement policy, known as "DAPA," extending "deferred action, on a case-by-case basis," to parents of American citizens and lawful permanent residents. *Id.* at 4.

Led by Texas, a coalition of states challenged this new policy in federal court, arguing that DAPA (and the DACA expansion) violated the Administrative Procedure Act as well as the President's Article II duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The district court preliminarily enjoined DAPA, holding that the Department had "legislated a substantive rule without complying with the procedural requirements under the" APA. *Texas v. United States*, 86 F.Supp.3d 591, 677 (S.D. Tex. 2015). The Fifth Circuit affirmed the district court, finding that the Department had promulgated DAPA in violation of the APA and that it was "manifestly contrary" to the Immigration and Nationality Act ("INA"). *Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015).[2]

The Supreme Court granted certiorari and directed the parties to brief not only the issues decided by the Fifth Circuit, but also whether "the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." *United States v. Texas*, —— U.S. ——, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016). But after oral argument, the Fifth Circuit decision was summarily affirmed by an equally divided Court. *United States v. Texas*, —— U.S. ——, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016).

---

1. "Deferred action" means "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14).

2. In finding DAPA subject to review under the APA, the Fifth Circuit held that deferred action "is much more than nonenforcement."

*Texas,* 809 F.3d at 166. The court reasoned that since recipients are conferred "lawful presence" and may receive associated benefits such as driver's licenses and unemployment insurance, deferred action was not an exercise of enforcement discretion. *Id.* at 168, 168 n.108.

**AR0407**

In response, the Secretary rescinded the enjoined DAPA program and DACA expansion. Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Rescission of November 20, 2014 Memorandum" (June 15, 2017). And several months later, after Texas threatened to challenge the original DACA policy, the Acting Secretary similarly rescinded DACA. Memorandum from Elaine Duke, Acting Secretary, Dep't of Homeland Sec., "Rescission of the June 15, 2012 Memorandum" (Sept. 5, 2017).

In justifying her decision to rescind DACA, the Acting Secretary referred to the Supreme Court and Fifth Circuit decisions in the DAPA litigation. She also relied on a letter from the Attorney General that asserted that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id.* at 3–4. The Acting Secretary nonetheless ordered that DACA be wound down in stages over a six-month period. *Id.*

## II. Administrative Procedure Act Review

The plaintiffs primarily contend that the rescission of DACA violates the APA. Because I find that immigration enforcement decisions are committed to the discretion of the Department, I part with my colleagues and conclude that the rescission of DACA is judicially unreviewable under the APA.[3]

### A. Discretionary enforcement decisions are presumptively unreviewable.

The APA regulates the decisionmaking process of federal agencies. As such, the statute provides for the judicial review of a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Even so, the statute does not permit review of agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision applies to a variety of agency decisions that are unsuitable for judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). One essential category of decisions "generally committed to an agency's absolute discretion" consists of enforcement decisions, both in the civil and criminal arenas. *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

Discretion in prosecutorial enforcement is deeply rooted in the Constitution's separation of powers. *See, e.g., In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013); Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 537–63 (2005). Indeed, the division of labor with respect to enforcement is among the most critical protections the Constitution affords: The Executive Branch decides whether and when to begin enforcement actions while the Judicial Branch adjudicates the government's claims. This division reflects the Framers' recognition that, "in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

Encroachment by the judiciary into enforcement decisions upsets this constitutional balance. If judges could decide which cases to prosecute, that would combine the role of prosecutor and judge in one branch of government, seriously risk-

---

**3.** The plaintiffs' constitutional claims are, of course, reviewable, and I address them separately below.

ing individual liberty. *See In re United States*, 345 F.3d 450, 454 (7th Cir. 2003); *see also* 1 BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 154 (Thomas Nugent trans., 6th ed. 1792) ("[T]here is no liberty, if the judiciary power be not separated from the legislative and executive."). And if the judiciary could decide which meritorious cases *not* to prosecute, that would improperly divest the President, who unlike judges is elected by the people, of the executive authority that the Constitution affords to protect public safety and enhance public welfare. Thus, in "the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)); *see also United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). The judiciary's role is to protect individuals by properly adjudicating the charges against them—for example, by dismissing meritless enforcement actions after they are filed. It is normally neither appropriate nor necessary for judges to involve themselves in the decision to bring, or not to bring, enforcement actions.

Though perhaps more often discussed in the criminal context, this broad enforcement discretion also encompasses civil enforcement decisions. *See Speed Mining, Inc. v. Federal Mine Safety*, 528 F.3d 310, 317 (4th Cir. 2008); *see also Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 448, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). Indeed, the Supreme Court

has recognized that the concerns that counsel against reviewing criminal enforcement decisions are even stronger in the context of immigration removal decisions. *AAADC*, 525 U.S. at 490, 119 S.Ct. 936 (noting that the "systemic costs" of judicial supervision of enforcement decisions are "greatly magnified in the deportation context"); *see also Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

The nature of civil enforcement discretion led the Supreme Court in *Heckler v. Chaney* to hold that an agency's nonenforcement decision was presumptively unreviewable under the APA. In that case, the Food and Drug Administration refused to take civil enforcement action against a class of drug manufacturers and others who produced and distributed drugs used by states to perform executions. The FDA explained its decision not to institute any enforcement action as a product of concerns that it lacked jurisdiction to address the use of drugs in such a way. Yet even if it could, the FDA noted that it would decline to exercise jurisdiction over those manufacturers under its inherent enforcement discretion. The Court found the decision to be presumptively unreviewable under the APA because agency enforcement decisions "involve[ ] a complicated balancing of a number of factors," like allocating resources and prioritizing policies, that "are peculiarly within [the FDA's] expertise" and are thus generally unsuitable for judicial review. *Chaney*, 470 U.S. at 831, 105 S.Ct. 1649; *cf. Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (noting that the factors that underlie prosecution decisions are of the type that courts are not competent to evaluate).

While civil enforcement decisions are presumptively unreviewable, Congress can overcome that presumption by "circum-

scrib[ing] agency enforcement discretion" through a substantive statute. *Chaney*, 470 U.S. at 834, 105 S.Ct. 1649; *see also id.* at 830, 105 S.Ct. 1649 (noting that judicial review is unavailable under the APA if the statute provides "no judicially manageable standards ... for judging how and when an agency should exercise its discretion"). In this way, Congress retains the ability to restrict the Executive's enforcement discretion. In *Chaney*, to decide whether the FDA was so restricted, the Court examined the relevant statutory provisions and determined that the statutes provided no dictate about when enforcement discretion must be exercised. Since the FDA's enforcement discretion was both statutorily authorized and unconstrained, the Court held that the enforcement decision was not subject to APA review.

*Chaney* also noted, without deciding, two other possible bases for judicial review of civil nonenforcement decisions: if (1) the decision was based "solely on belief that [the agency] lacked jurisdiction"; or (2) an agency expressly adopted a "general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4, 105 S.Ct. 1649. The Supreme Court later rejected the first possibility in *I.C.C. v. Brotherhood of Locomotive Engineers*, finding that an agency's reliance on a "reviewable reason" for an otherwise unreviewable discretionary decision did not transform the decision into one subject to APA review. 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). The second, which might be thought related to the Take Care Clause, U.S. Const. art II, § 3, remains a narrow exception theoretically permitting judicial review of agency enforcement decisions in some rare cases.

## B.  The rescission of DACA is not reviewable.

The decision to rescind DACA is precisely the sort of enforcement decision that is "traditionally ... 'committed to agency discretion'" and not reviewable by the courts. *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649. None of the recognized exceptions to that limitation apply, and so the rescission of DACA is not reviewable under the APA.

The Supreme Court has recognized that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Indeed, executive decisions about immigration enforcement are even further beyond the capacity of judicial review than criminal enforcement decisions, which are otherwise thought to represent the peak of executive discretion. *AAADC*, 525 U.S. at 489–90, 119 S.Ct. 936.

As a result, with or without DACA, government agents have discretion to grant deferred action in individual cases. *Id.* at 483–84, 484 n.8, 119 S.Ct. 936. At least by its own terms, DACA did not eliminate the individualized discretion over enforcement decisions: it created procedural and substantive scaffolding to guide that discretion. *See* Napolitano Memorandum at 2. Rescinding DACA took away the scaffolding but left the underlying core—individualized discretion—untouched. Thus, insofar as DACA is merely a programmatic enforcement decision, so is its rescission, and both are unreviewable.

The best argument in favor of reviewability is that DACA itself was something other than an enforcement decision. Once granted, deferred action makes recipients eligible for benefits such as the ability to work legally in the country. These are subsidiary or collateral benefits that arise from other legal provisions not challenged here. *See* 8 U.S.C. § 1324a(h)(3) (" '[U]nauthorized alien' means ... that the alien is not at that time ... authorized to be so

employed by this chapter or by the Attorney General."); *see also* 8 C.F.R. § 274a.12(c)(14). Yet the Fifth Circuit found DAPA reviewable because it "would affirmatively confer 'lawful presence' and associated benefits." *Texas*, 809 F.3d at 166. Moreover, some have argued that DACA only masquerades as a program involving individualized discretion and in fact amounts to an entitlement of benefits for the class of aliens who meet the program's threshold criteria. Again, the Fifth Circuit reached a similar conclusion about DAPA. *See id.* at 171–76.

But neither side presses such an argument in this case, and for good reason. The government does not because it claims DACA's rescission is unreviewable. Nor do the plaintiffs, because if they did, their case would be much harder on the merits. DACA relied on identified individualized enforcement as a necessary predicate for the program's existence. *See* The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ——, 2014 WL 10788677, at *13 n.8 (Nov. 19, 2014). If that predicate was false, then DACA was almost surely procedurally and substantively invalid. And that would mean one of the Department's proffered explanations for rescinding DACA—that it was likely unlawful—was valid. Unsurprisingly then, the plaintiffs do not rely on this point, giving us no occasion to consider whether DACA might be anything other than what it claimed to be: a program for a specific exercise of prosecutorial discretion.

No other exception makes the plaintiffs' APA claims reviewable. In particular, nothing in the INA overcomes *Chaney*'s presumption of unreviewability. That presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832–33, 105 S.Ct. 1649; *see also Webster v. Doe*, 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based[.]"). Nothing in the INA cabins the government's broad immigration enforcement discretion. To the contrary, the INA expansively vests the Secretary of Homeland Security with authority for "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Our nation's immigration laws do not limit the Secretary's authority to enforce those laws by removing illegal aliens. As a result, the INA does not overcome the presumptive unreviewability of the DACA rescission.

## C. The generalized nature of DACA does not render its rescission reviewable.

The Majority adopts a new exception, contending that general enforcement policies, unlike individual enforcement decisions, are reviewable. While this exception has some support in out-of-circuit precedent, I would reject it.

This exception is grounded in dictum from *Chaney*, which left open the possibility of review when an agency adopts a "general policy *that is so extreme as to amount to an abdication of its statutory responsibilities*." *Chaney*, 470 U.S. at 833 n.4, 105 S.Ct. 1649 (emphasis added). That is, a general policy that licensed illegal conduct across the board or that categorically excluded a class of individuals from complying with the law might well be reviewable. But nobody here is arguing that the *rescission* of DACA should be so characterized. Nor could they. A return to the pre-DACA regime would increase the De-

partment's enforcement of the immigration laws, not abandon it.

A few cases from the D.C. Circuit seem to stretch *Chaney*'s dictum to encompass any "general enforcement policy," as opposed to a "single-shot nonenforcement decision." *E.g.*, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)). The facts of these cases suggest this principle may be narrower than it appears at first blush. For example, in some cases, the agency's policy was promulgated as a binding regulation after notice-and-comment rulemaking, which would of course be much more amenable to judicial review than a program like DACA, announced by an informal memorandum. *See National Wildlife Federation v. EPA*, 980 F.2d 765 (D.C. Cir. 1992). It also appears that these cases did not involve programs that, like DACA, were expressly predicated on the agency's exercise of individualized discretion.

To the extent that the D.C. Circuit *has* embraced the broad principle that *any* "general enforcement policy" is judicially reviewable, that principle simply cannot be reconciled with *Chaney*. There, the Supreme Court held unreviewable the FDA's categorical decision not to take enforcement action against a *class of actors* (drug manufacturers, prison administrators, and others in the drug distribution chain). 470 U.S. at 824–25, 837–38, 105 S.Ct. 1649. The fact that the decision was made by the FDA Commissioner made no difference. *See id.* at 824, 105 S.Ct. 1649. The D.C. Circuit's decisions in this area do not even attempt to explain how this sweeping principle can be reconciled with the facts of *Chaney*. *See, e.g.*, *Crowley*, 37 F.3d at 675–77. Indeed, they often have no reasoning, simply reciting language (often dicta) from earlier circuit cases.

Such a broad exception for "generalized enforcement policies" would also unduly trammel the Executive Branch in carrying out its duties. The head of an agency has every right to exercise enforcement discretion. Standardizing (*i.e.*, generalizing) how agents use their prosecutorial discretion does not alter its character. Whether the Secretary exercises her discretion over an individual case or provides guidance for how discretion should be applied in a class of cases, the decision is unreviewable as one "committed to agency discretion by law." Under the plaintiffs' view, a line agent's decision not to remove a cancer-stricken alien would be unreviewable, but a front-office policy directing line agents to consider whether an alien is terminally ill would be reviewable. That distinction is untenable. *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period).

As anyone who has exercised enforcement discretion knows, supervisory control over that discretion is necessary to avoid arbitrariness and ensure consistency. Supervision through generalized guidance that directs the exercise of enforcement discretion cannot transform the enforcement directive into a reviewable action. To find that discretionary enforcement decisions are unreviewable only when inferior officers exercise single-shot enforcement decisions also brushes aside the separation of powers that the Constitution lays out. The President is empowered by Article II to "take Care that the Laws be faithfully executed," and thus may hire officers to assist in these duties. But the constitutional responsibility remains firmly at the President's feet, and therefore, the President remains responsible for his subordinates' exercise of executive power. *Free*

*Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them.").[4]

DACA—at least on its face—was just such an unreviewable exercise of supervisory enforcement discretion. It was issued by the Secretary and instructed her subordinates when and how to exercise their discretion, emphasizing that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." Napolitano Memorandum at 2. Such general decisions on enforcement policy, no less than the individual decisions that flow from them, cannot be reviewed by the courts without intruding on the prerogatives of the Executive Branch. And that is necessarily true of DACA's rescission, which merely removed one avenue for exercising individualized discretion. As a result, the rescission is an even less viable candidate for judicial review than is the promulgation of DACA.

**D.  The Acting Secretary's use of legal reasoning in rescinding DACA does not render her decision reviewable.**

The plaintiffs also argue that the Acting Secretary's use of legal reasoning in deciding to rescind DACA makes the decision subject to judicial review. In their view, courts can evaluate legal determinations.

This argument is foreclosed by Supreme Court precedent. The Supreme Court has matter-of-factly explained that there is no "principle that if the agency gives a reviewable reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283, 107 S.Ct. 2360 (internal quotation marks omitted). Enforcement decisions are often intertwined with legal reasoning, most obviously "the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction." *Id.* The Court found it "entirely clear" that this "reviewable" proposition cannot render the prosecutor's "refusal to prosecute" subject to judicial review. *Id.*

Efforts to distinguish *BLE* factually cannot avoid its holding. In *BLE*, an agency had refused to reconsider a prior decision on the ground of material error. The Court found that such denials of reconsideration have "traditionally been 'committed to agency discretion by law.' " *Id.* at 282, 107 S.Ct. 2360 (quoting *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649). As here, the plaintiffs argued that the particular decision before the Court should be reviewable anyway, because the agency had based its refusal on a reviewable issue of law. The Court

---

**4.** The supervisory use of prosecutorial discretion is not a novel phenomenon. *See, e.g., Treasury Department Circular to the Supervisors of the Revenue* (Sept. 30, 1791), in 9 PAPERS OF ALEXANDER HAMILTON 248–49 (Harold C. Syrett ed., 1965) (advising Treasury officials that "a great relaxation appears unavoidable" in enforcing provisions for seizing spirits without required certificates); Ruth Wedgewood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 YALE L.J. 229, 278, 339–53 (1990) (describing President Adams's decision to direct the federal prosecutor to enter a *nolle prosequi* for an allegedly mutinous sailor and describing then-Representative John Marshall's floor speech defending

the Executive's prosecutorial discretion, *see* 10 ANNALS OF CONG., 6th Cong. 1st Sess. 614–17 (Mar. 7, 1800)); DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS. THE JEFFERSONIANS: 1801–1829, at 5–6 (2001) (noting President Jefferson's "decision to pardon two individuals who had been convicted under the Sedition Act and to quash the pending prosecution of a third"); Letter from Thomas Jefferson to William Duane (May 23, 1801), in 8 THE WRITINGS OF THOMAS JEFFERSON 54, 55 (Paul Leicester Ford ed., 1897) (explaining that whenever President Jefferson should be met with a prosecution under the Sedition law he would treat it as a nullity and order a *nolle prosequi*).

disagreed and held, as noted, that an unreviewable decision does not become reviewable by virtue of the reasons provided. *Id.* at 280–81, 107 S.Ct. 2360. That holding is plainly not limited to cases involving requests for reconsideration. After *BLE*, the scope of permissible judicial review must be determined by the type of agency action at issue and not the agency's reasons for acting.

Just as in *BLE*, there is a nonsensical implication in the plaintiffs' position: that the Executive's discretion is more constrained when it gives a "reviewable" reason for its actions than when it gives no reason at all. If the Acting Secretary was wrong about the likely illegality of DACA,[5] then this might mean that she had provided *no lawful reason* for the rescission. But in the context of the Executive's enforcement discretion, this is perfectly appropriate. The Executive need not explain why it makes particular enforcement and non-enforcement decisions. The Judicial Branch cannot bootstrap review of decisions committed to the discretion of the other branches simply because the reasons provided are of a type that judges consider themselves competent to evaluate.

In any event, the Acting Secretary's rescission memorandum was not a mere statement on the legality of DACA. Instead, the memorandum considered various court rulings as well as the Attorney General's letter before concluding that the "DACA program *should* be terminated." Duke Memorandum at 4 (emphasis added). She did not say that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program. And in declaring the rescission of DACA after a six-month wind-down period, the Acting Secretary invoked her statutory authority to "establish[ ] national immigration policies and priorities." *Id.* The Acting Secretary's legal analysis was only one aspect of her reasoning for rescinding DACA, and, of course, a prosecutor may consider beliefs about the law when setting enforcement policy, *see BLE*, 482 U.S. at 283, 107 S.Ct. 2360.

For these reasons, I conclude that the plaintiffs' APA claims are not reviewable and would dismiss them.

### III.   Constitutional Claims

Because they rule for the plaintiffs under the APA, my colleagues in the Majority decline to address the plaintiffs' constitutional claims. But because I find the plaintiffs' APA claims to be unreviewable, I must briefly address their claims that the rescission of DACA also violates the Fifth Amendment's guarantees of Due Process and Equal Protection.[6] I have little trouble concluding that it did not.

### A.   Due Process

The plaintiffs' due process claim fails to articulate a constitutionally protected life,

---

**5.**  Evaluating the actual legality of DACA requires considering whether and how a court may adjudicate an alleged violation of the Take Care Clause. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613, 9 L.Ed. 1181 (1838). But it also requires addressing the distinct question of whether and how one presidential administration may determine that a previous administration's policy was inconsistent with the constitutional obligation to take care that the nation's immigration laws be faithfully executed. *Cf.* Letter from President George Washington to Sec'y Alexander Hamilton, U.S. Dep't of the Trea-

sury (Sept. 7, 1792) in 32 Writings of George Washington 144 (John C. Fitzpatrick ed., 1939) (writing in 1792 about enforcing unpopular tax laws, President Washington explained that it was his "duty to see the Laws executed: to permit them to be trampled upon with impunity would be repugnant to it").

**6.**  Of course, courts may review the exercise of enforcement discretion for compliance with the Constitution. *See Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480.

liberty, or property interest impacted by the rescission of DACA. And without a protected interest, there can be no unconstitutional deprivation.

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 4. A plaintiff raising a due process claim must thus begin by identifying a relevant liberty or property interest. *Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 554 (4th Cir. 1981). While a government benefit may create such an interest, "a person clearly must have more than an abstract need or desire for [the benefit] . . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

While the plaintiffs argue that DACA created such a claim of entitlement, it did not. On its face, DACA explicitly conferred no protected property or liberty interest, making deferred action putatively available on a discretionary case-by-case basis for two-year periods that could be terminated at any time at the Secretary's discretion. *See* Napolitano Memorandum at 2–3; *AAADC*, 525 U.S. at 484–85, 119 S.Ct. 936. The memorandum itself acknowledged that such rights could be conferred only by "Congress, acting through its legislative authority." *Id.* at 3; *see also Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002) (noting that for a statute to create a liberty or property interest, "it must confer more than a mere expectation (even one

supported by consistent government practice) of a benefit"). Having failed to show a protected interest, the plaintiffs' due process claim fails.

The plaintiffs may have serious concerns about our nation's immigration laws and the Department's policy of enforcing those laws. But an understandable policy concern is not a legally cognizable right. The rescission of DACA simply does not generate a due process claim.

**B.   Equal Protection**

The plaintiffs also argue that the rescission of DACA violates the Fifth Amendment's guarantee of equal protection by targeting a class of aliens for removal based on their race and national origin. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). They have failed to plausibly allege such a claim.

As both parties acknowledge, DACA is an enforcement policy, and so the plaintiffs' challenge to its rescission is necessarily a selective-prosecution claim.[7] In an ordinary selective-prosecution case, the plaintiffs would have to show that the government's conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *see also Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (noting that "the decision whether to prosecute may not be *based on* 'an unjustifiable standard such as race, religion, or other arbitrary classification' ") (emphasis added) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct.

---

7.   The plaintiffs assert that they are not claiming selective prosecution "but instead that the Government violated the Equal Protection Clause by rescinding the DACA program in order to target a class defined by race and national origin." Appellants' Response Brief at 30. This attempted rewording makes no difference. The rescission of DACA reset the

agency's enforcement policies to no longer channel the exercise of enforcement discretion in a certain way. As the plaintiffs cannot dispute that the government has the statutory authority to enforce the immigration laws against them, any equal protection claim in this context must necessarily be a selective-prosecution claim.

501, 7 L.Ed.2d 446 (1962)). There is also a "presumption that a prosecutor has acted lawfully," which can be displaced only by "clear evidence." *AAADC*, 525 U.S. at 489, 119 S.Ct. 936. But the plaintiffs' burden is even higher in this case, because the rescission of DACA only applies to aliens who are in this country illegally. Such an alien "has no constitutional right to assert selective enforcement as a defense against his deportation," with a possible exception for "rare" cases of particularly "outrageous" discrimination. *Id.* at 488, 491, 119 S.Ct. 936.

Here, both DACA and its rescission are, on their face, neutral policies. Logically, the presumption of lawfulness that applies in individual selective-prosecution cases is at least as strong when applied to neutral policies promulgated by senior Executive Branch officials. And the plaintiffs must allege facts that, if true, plausibly suggest that this presumption can be overcome and replaced with an inference of outrageous discrimination.

The plaintiffs have alleged two sets of facts to support their claim of discrimination. First, they argue that since 93% of DACA recipients are Latino, the program's rescission had a disparate impact. A selective-prosecution claim normally requires differential treatment of "similarly situated individuals of a different race." *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480. Yet who is "similarly situated" to DACA recipients except other DACA recipients? Setting aside the closely related and now-rescinded DAPA program, DACA stands alone as a unique exercise of Executive authority. While there are other deferred action programs (many of which are statutory), none resembles DACA. And the Department rescinded DACA for all recipients, not just for those of a particular ethnicity or nationality.

Second, the plaintiffs rely on presidential campaign tweets, which they claim show invidious animus. But the plaintiffs must create a plausible inference that the same animus allegedly underlying these statements also motivated the Attorney General and the Acting Secretary to take the official government actions at issue. Their complaint simply lacks the connective tissue required to draw that inference. There is also an "obvious alternative explanation" for these officials' actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). As the record shows, DACA has long been politically controversial. It "should come as no surprise," *id.*, that well-known policy differences would lead cabinet officials in a new administration to change a controversial government policy. *See* Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Enforcement of the Immigration Laws to Serve the National Interest" 2 (Feb. 20, 2017) (setting out the Administration's new enforcement policies and stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement"). Changes in government policy are perfectly lawful, and for a selective-prosecution claim, we must presume that the Attorney General and the Acting Secretary were motivated by such a lawful purpose. *AAADC*, 525 U.S. at 489, 119 S.Ct. 936. The plaintiffs allege no facts plausibly displacing that presumption.

In short, the plaintiffs have presented no evidence that racial motivations played any part in either the former Attorney General's advice or the former Acting Secretary's decision to rescind DACA. Therefore, I would dismiss the equal protection claim.

## IV. Information-Sharing Policy

The Majority is correct that the plaintiffs' estoppel claim against the Depart-

ment is baseless. The availability of equitable estoppel against the government is controversial under any circumstances. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419–21, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The issue remains unresolved by the Supreme Court. *See id.* at 423, 110 S.Ct. 2465. And we have recognized that if such a doctrine is ever justified in this context, there must be "affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) (citing *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973)).

In any case, the mere fact that the Department explicitly told applicants that its information-sharing policy "may be modified, superseded, or rescinded at any time" and that the policy "may not be relied upon to create any right or benefit," J.A. 1004, is enough to end our analysis. There was nothing for the plaintiffs to rely on for the proposition that their information was immune from disclosure.

Additionally, even if the doctrine of estoppel applied here, that would not justify the district court's nationwide injunction. *See Gill v. Whitford*, —— U.S. ——, 138 S.Ct. 1916, 1930–31, 1934, 201 L.Ed.2d 313 (2018); *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) (abrogated on other grounds). This potent judicial tool was largely unheard-of until the mid-twentieth century. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 428 (2017). These broad injunctions pose many drawbacks that can quickly outweigh their benefits, particularly when they are overused (and overused repeatedly). Among other things, such injunctions sharpen plaintiffs' incentives to forum-shop while inhibiting the proper ventilation of difficult legal issues by deterring other lower courts from grappling with them. *See id.* at 460–61. Under our decentralized and multifaceted judicial system, judges must scrutinize the scope of the injunctive remedies they fashion. Even assuming a nationwide injunction could be appropriate in some case, an injunction that is limited to the plaintiffs should generally suffice.

\* \* \*

We in the Judicial Branch have a narrowly circumscribed role. It is not our place to second-guess the wisdom of the discretionary decisions made by the other Branches. The rescission of DACA was a controversial and contentious decision, but one that was committed to the Executive Branch. For this reason, I respectfully dissent.



### Glenda W. WESTMORELAND, Plaintiff - Appellee,

v.

### TWC ADMINISTRATION LLC, d/b/a Time Warner Cable, Defendant - Appellant.

### No. 18-1600

United States Court of Appeals, Fourth Circuit.

Argued: March 21, 2019

Decided: May 22, 2019

**Background:** Employee brought action against employer alleging she was fired due to age discrimination, in violation of the Age Discrimination in Employment Act (ADEA). Following trial, the jury found in favor of employee, and the United States District Court for the Western District of North Carolina, 5:16-cv-00024-MOC-DSC, Max O. Cogburn, Jr., J., 2018

**AR0417**

REGENTS OF THE UNIVERSITY OF CALIFORNIA; Janet Napolitano, in her official capacity as President of the University of California, Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security, Defendants-Appellants.

State of California; State of Maine; State of Minnesota; State of Maryland, Plaintiffs-Appellees,

v.

U.S. Department of Homeland Security; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security; United States of America, Defendants-Appellants.

City of San Jose, Plaintiff-Appellee,

v.

Donald J. Trump, President of the United States, in his official capacity; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security; United States of America, Defendants-Appellants.

Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Jirayut Latthivongskorn; Norma Ramirez, Plaintiffs-Appellees,

v.

United States of America; Donald J. Trump, in his official capacity as President of the United States; U.S. Department of Homeland Security;

Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security, Defendants-Appellants.

County of Santa Clara; Service Employees International Union Local 521, Plaintiffs-Appellees,

v.

Donald J. Trump, in his official capacity as President of the United States; Jefferson B. Sessions III, Attorney General; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security; U.S. Department of Homeland Security, Defendants-Appellants.

Regents of the University of California; Janet Napolitano, in her official capacity as President of the University of California; State of California; State of Maine; State of Minnesota; State of Maryland; City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Jirayut Latthivongskorn; Norma Ramirez; County of Santa Clara; Service Employees International Union Local 521, Plaintiffs-Appellees,

v.

United States of America; Donald J. Trump, in his official capacity as President of the United States; U.S. Department of Homeland Security; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security, Defendants-Appellants.

Regents of the University of California; Janet Napolitano, in her official capacity as President of the University of California; State of California; State of Maine; State of Minnesota;

REGENTS OF UNIV. CALIFORNIA v. U.S. HOMELAND SEC. **477**
Cite as 908 F.3d 476 (9th Cir. 2018)

State of Maryland; City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Jirayut Latthivongskorn; Norma Ramirez, Plaintiffs-Appellants,

v.

United States of America; Donald J. Trump, in his official capacity as President of the United States; U.S. Department of Homeland Security; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security, Defendants-Appellees.

Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; County of Santa Clara; Service Employees International Union Local 521, Plaintiffs-Appellants,

v.

United States of America; Donald J. Trump, in his official capacity as President of the United States; U.S. Department of Homeland Security; Kirstjen Nielsen, in her official capacity as Acting Secretary of the Department of Homeland Security, Defendants-Appellees.

No. 18-15068, No. 18-15069, No. 18-15070, No. 18-15071, No. 18-15072, No. 18-15128, No. 18-15133, No. 18-15134

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 2018 Pasadena, California

Filed November 8, 2018

**Background:** States, state university, county, city, union, and individuals brought action against United States Department of Homeland Security (DHS) for, among other things, declaratory relief, alleging Administrative Procedure Act (APA), due process, and equal protection claims based on rescission of Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal. The United States District Court for the Northern District of California, William Alsup, J., 279 F.Supp.3d 1011, entered preliminary injunctive relief requiring DHS to adjudicate renewal applications for existing DACA recipients and, 298 F.Supp.3d 1304, partially granted government's motion to dismiss for failure to state a claim. Parties appealed.

**Holdings:** The Court of Appeals, Wardlaw, Circuit Judge, held that:

(1) APA's jurisdictional bar to judicial review of agency action committed to agency discretion by law did not apply to action;

(2) Immigration and Nationality Act (INA) provision barring jurisdiction for judicial review of claims arising from a decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien did not deprive court of jurisdiction over action;

(3) jurisdiction-stripping provision of REAL ID Act did not bar jurisdiction over action;

(4) plaintiffs were likely to succeed on merits of their claim, as element of preliminary injunction, that DHS to decision to rescind DACA was based on Acting Secretary of DHS's incorrect belief that DACA was illegal and had to be rescinded;

(5) District Court did not abuse its discretion by issuing nationwide preliminary injunction;

(6) memorandum rescinding DACA program constituted a "general statement of policy" that did not require notice

AR0419

and comment rulemaking under the APA;

(7) illegal immigrants did not possess any liberty or property interest in continuation of DACA, thereby precluding Due Process claim;

(8) plaintiffs stated equal protection claim.

Affirmed.

Owens, Circuit Judge, issued opinion concurring in the judgment.

## 1. Aliens, Immigration, and Citizenship ⌐116

Recipients of deferred action, which is a decision by Executive Branch officials not to pursue deportation proceedings against individual or class of individuals otherwise eligible for removal, enjoy no formal immigration status. 6 U.S.C. § 202(5).

## 2. Aliens, Immigration, and Citizenship ⌐123

Deferred Action for Childhood Arrivals (DACA) recipients, which permitted noncitizens to apply for two-year renewable periods of deferred action, are required to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain productive members of society. 8 U.S.C.A. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

## 3. Federal Courts ⌐3616(2)

The Court of Appeals reviews the district court's decision to grant or deny a preliminary injunction for abuse of discretion, and within the inquiry, reviews the district court's legal conclusions de novo and the factual findings underlying its decision for clear error.

## 4. Federal Courts ⌐3581(1), 3587(1)

A district court's decision on a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim is reviewed de novo by the Court of Appeals. Fed. R. Civ. P. 12(b)(1), (b)(6).

## 5. Administrative Law and Procedure ⌐701

Administrative Procedure Act (APA) bar to judicial review of agency action that is committed to agency discretion by law is a very narrow exception to judicial review of agency action, one that comes into play only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply. 5 U.S.C.A. § 701(a)(2).

## 6. Public Employment ⌐64
### United States ⌐1325

The Constitution's Appointments Clause was designed to ensure public accountability for the making of a bad appointment. U.S. Const. art. 2, § 2, cl. 2.

## 7. Aliens, Immigration, and Citizenship ⌐155

Acting Secretary of Department of Homeland Security (DHS) based its rescission of Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, solely on belief that DACA was effectuated and beyond power of DHS to institute or maintain and, thus, Administrative Procedure Act's (APA) jurisdictional bar to judicial review of agency action committed to agency discretion by law did not apply to action under APA to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, DHS's decision to rescind DACA. 5 U.S.C.A. §§ 701(a)(2), 706(2)(A).

## 8. Aliens, Immigration, and Citizenship ⌐155

Immigration and Nationality Act (INA) provision barring jurisdiction for ju-

dicial review of claims arising from a decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien did not deprive court of jurisdiction over action challenging, under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law the Department of Homeland Security's (DHS) rescission of the Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 242(g), 8 U.S.C.A. § 1252(g).

**9. Aliens, Immigration, and Citizenship**
 ⌾155, 385

Jurisdiction-stripping provision of REAL ID Act did not bar jurisdiction over action challenging, under Administrative Procedure Act (APA) as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, the Department of Homeland Security's (DHS) rescission of the Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; the provision applied only to those claims seeking judicial review of orders of removal. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 242(b)(9), 8 U.S.C.A. § 1252(b)(9).

**10. Injunction** ⌾1092

A plaintiff seeking a preliminary injunction must establish: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest.

**11. Administrative Law and Procedure**
 ⌾753

In an arbitrary-and-capricious challenge to agency action under Administrative Procedure Act (APA), an agency's action must be upheld, if at all, on the basis articulated by the agency itself. 5 U.S.C.A. § 706(2)(A).

**12. Administrative Law and Procedure**
 ⌾435

Deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress.

**13. Administrative Law and Procedure**
 ⌾382.1

The critical factor to determine whether a directive announcing a new policy constitutes a rule requiring notice or comment rulemaking, or a general statement of policy not requiring rulemaking, is the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case. 5 U.S.C.A. § 553(b)(3)(A).

**14. Statutes** ⌾1377

The court does not read the enumeration of one case under statute to exclude another, unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.

**15. Aliens, Immigration, and Citizenship**
 ⌾413

States, state university, county, city, union, and individuals were likely to succeed on merits of their claim, as element of preliminary injunction, that the Department of Homeland Security's (DHS) decision to rescind Deferred Action for Child-

hood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, was based on Acting Secretary of DHS's incorrect belief that DACA was illegal and had to be rescinded, such that DHS's decision was arbitrary and capricious, as required to set aside rescission under Administrative Procedure Act (APA); DACA was a permissible exercise of executive discretion, and was being implemented in a manner that reflected discretionary, case-by-case review.   5 U.S.C.A. § 706(2)(A); 6 U.S.C.A. § 202(5); Immigration and Nationality Act § 103, 8 U.S.C.A. § 1103.

### 16. Aliens, Immigration, and Citizenship ⇦413

District Court did not abuse its discretion by issuing nationwide preliminary injunction, rather than relief only for plaintiff States or individual plaintiffs in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, the Department of Homeland Security's (DHS) decision to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; such relief was commonplace in APA actions, promoted uniformity in immigration enforcement, and was necessary to provide plaintiffs with complete redress.   5 U.S.C.A. § 706(2)(A).

### 17. Injunction ⇦1081

The general rule regarding the scope of preliminary injunctive relief is that it should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.

### 18. Injunction ⇦1767

There is no general requirement that an injunction affect only the parties in the suit.

### 19. Administrative Law and Procedure ⇦816

When a reviewing court determines that agency regulations are arbitrary and capricious, in violation of Administrative Procedure Act (APA), the ordinary result is that the rules are vacated, not that their application to the individual petitioners is proscribed.  5 U.S.C.A. § 706(2)(A).

### 20. Aliens, Immigration, and Citizenship ⇦155

Memorandum rescinding the Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, constituted a "general statement of policy" that did not require notice and comment rulemaking under the Administrative Procedure Act (APA); memorandum left in place the background principle that deferred action on removal was available on a case-by-case basis.  5 U.S.C.A. § 553(b)(3)(A).

See publication Words and Phrases for other judicial constructions and definitions.

### 21. Constitutional Law ⇦3869

A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution. U.S. Const. Amends. 5, 14.

### 22. Constitutional Law ⇦3874(3), 3894

It is possible to have a property interest in a government benefit, but a person clearly must have more than an abstract need or desire for the benefit to assert a

substantive or procedural due process claim; he or she must have more than a unilateral expectation of it and, instead, must have a legitimate claim of entitlement to it. U.S. Const. Amends. 5, 14.

**23. Constitutional Law ⟷3874(3)**

Although a benefit is not a protected entitlement under Due Process Clause if government officials may grant or deny it in their discretion, a legitimate claim of entitlement may exist where there are rules or mutually explicit understandings that support a plaintiff's claim of entitlement to the benefit. U.S. Const. Amend. 5.

**24. Aliens, Immigration, and Citizenship ⟷318**

**Constitutional Law ⟷4437**

Illegal immigrants did not possess any liberty or property interest in continuation of Deferred Action for Childhood Arrivals (DACA) program which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, thereby precluding Due Process claim; United States Citizenship and Immigration Services (US-CIS) had retained ultimate discretion under DACA to determine whether deferred action as to removal was appropriate in any given case, even if DACA guidelines were met, and any individual's deferred action could be terminated at any time, with or without notice, at discretion of Department of Homeland Security (DHS). U.S. Const. Amend. 5.

**25. Aliens, Immigration, and Citizenship ⟷121**

**Constitutional Law ⟷4437**

States, state university, county, city, union, and individuals alleged a mutually explicit understanding giving rise to a protected interest in confidentiality of personal information of applicants for Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, as required for due process claims against Department of Homeland Security (DHS) based on alleged change in policy as to such confidentiality, by alleging that throughout DACA's existence DHS had made affirmative representations that information provided by DACA applicants would not be used for immigration enforcement absent special circumstance, and that federal government changed policy to only refrain from proactively providing such information. U.S. Const. Amends. 5, 14.

**26. Constitutional Law ⟷3896**

In order to state a substantive due process claim, plaintiffs must allege conduct that shocks the conscience and offends the community's sense of fair play and decency. U.S. Const. Amend. 14.

**27. Aliens, Immigration, and Citizenship ⟷154**

**Constitutional Law ⟷3113(1)**

County and individuals adequately alleged discriminatory purpose for rescission of Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, as required to state equal protection claim against Department of Homeland Security (DHS) due to rescission, by alleging that rescission had a disproportionate impact on Latinos and individuals of Mexican heritage, who accounted for 93 percent of DACA recipients, that President had on multiple occasions, including during presidential campaign, expressed racial animus towards Latinos and individuals of Mexican heri-

tage, that President had directed decision to end DACA, and that DACA had received reaffirmation by DHS just three months before being rescinded on what seemed to have been a contrived excuse, its purported illegality. U.S. Const. Amend. 14.

———————

Appeal from the United States District Court for the Northern District of California, William Alsup, District Judge, Presiding, D.C. Nos. 3:17-cv-05211-WHA, 3:17-cv-05235-WHA, 3:17-cv-05329-WHA, 3:17-cv-05380-WHA, 3:17-cv-05813-WHA, 3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA, 3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA, 3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA

Hashim M. Mooppan (argued), Deputy Assistant Attorney General; Thomas Pulham, Abby C. Wright, and Mark B. Stern, Appellate Staff; Alex G. Tse, Acting United States Attorney; Chad A. Readler, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Michael J. Mongan (argued), Deputy Solicitor General; Samuel P. Siegel, Associate Deputy Solicitor General; James F. Zahradka II, Deputy Attorney General; Michael L. Newman, Supervising Deputy Attorney General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Plaintiff-Appellee State of California.

Susan P. Herman, Deputy Attorney General; Janet T. Mills, Attorney General; Office of the Attorney General, Augusta, Maine; for Plaintiff-Appellee State of Maine.

Jacob Campion, Assistant Attorney General; Lori Swanson, Attorney General; Office of the Attorney General, St. Paul, Minnesota; for Plaintiff-Appellee State of Minnesota.

Leah J. Tullin, Assistant Attorney General; Steven M. Sullivan, Solicitor General; Brian E. Frosh, Attorney General; Attorney General's Office, Baltimore, Maryland; for Plaintiff-Appellee State of Maryland.

Jeffrey Michael Davidson (argued), Breanna K. Jones, David S. Watnick, Erika Douglas, and Mónica Ramírez Almadani, Covington & Burling LLP, San Francisco, California; Ivano M. Ventresca, Megan A. Crowley, Alexander A. Berengaut, Mark H. Lynch, and Robert A. Long, Covington & Burling LLP, Washington, D.C.; for Plaintiff-Appellee The Regents of the University of California, et al.

Brian Danitz, Tamarah Prevost, and Justin T. Berger, Cotchett Pitre & McCarthy LLP, Burlingame, California, for Plaintiff-Appellee City of San José.

Mark D. Rosenbaum (argued), Malhar Shah, and Judy London, Public Counsel, Los Angeles, California; Haley S. Morrisson, Matthew S. Rozen, and Nicole A. Saharsky, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kelsey J. Helland, Jonathan N. Soleimani, Kirsten Galler, Ethan D. Dettmer, and Theodore J. Boutrous Jr., Gibson Dunn & Crutcher LLP, Los Angeles, California; Luis Cortes Romera, Barrera Legal Group PLLC, Kent, Washington; Erwin Chemerinsky, Berkeley, California; Laurence H. Tribe, Cambridge, Massachusetts; Leah M. Litman, Irvine, California; for Plaintiffs-Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Virdiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn.

Andrew Kushner, Eric P. Brown, and Stacey M. Leyton, Altshuler Berzon LLP,

San Francisco, California, for Plaintiff-Appellee County of Santa Clara and Service Employees International Union Local 521.

Marcelo Quiñones, Laura S. Trice, Greta S. Hansen, and James R. Williams, Office of the County Counsel, County of Santa Clara, San Jose, California, for Plaintiff-Appellee County of Santa Clara.

Jessica Levin, Melissa Lee, Lorraine K. Bannai, and Robert S. Chang, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington, for Amici Curiae 42 Historians and the Fred T. Korematsu Center for Law and Equality.

Leo Gertner, Deborah L. Smith, and Nicole G. Berner, Service Employees International Union, Washington, D.C.; Deepak Gupta, Gupta Wessler PLLC, Washington, D.C.; David J. Strom, American Federation of Teachers, Washington, D.C.; Judith Rivlin, American Federation of State, County, and Municipal Employees, Washington, D.C.; Patricia M. Shea, Communications Workers of America, Washington, D.C.; Bradley Raymond, International Brotherhood of Teamsters, Washington, D.C.; Joseph E. Kolick Jr., International Union of Painters and Allied Trades, Hanover, Maryland; Mario Martínez, Martínez Aguilasocho & Lynch APLC, Bakersfield, California; for Amici Curiae Service Employees International Union; American Federation of Teachers; American Federation of State, County and Municipal Employees; Communications Workers of America; International Brotherhood of Teamsters; International Union of Painters and Allied Trades; and United Farm Workers of America.

Geoffrey S. Brounell and Peter Karanjia, Davis Wright Tremaine LLP, Washington, D.C., for Amicus Curiae United We Dream.

Sean Goldhammer, Lubna A, Alam, Jason Walta, Emma Leheny, and Alice O'Brien, National Education Association, Washington, D.C.; Andra M. Donovan, San Diego Unified School District, San Diego, California; Abhas Hajela, Capitol Advisors Group LLC, Sacramento, California; Eric E. Stevens, Girard Edwards Stevens & Tucker LLP, Sacramento, California; Kathryn M. Sheffield, California Faculty Association, Sacramento, California; Glenn Rothner, Rothner Segall & Greenstone, Pasadena, California; D. Michael Ambrose and Elaine M. Yama-Garcia, California School Boards Association Education Legal Alliance, Sacramento, California; Jean Shin and Laura P. Juran, California Teachers Association, Burlingame, California; Vibiana M. Andrade, Los Angeles County Office of Education, Downey, California; Devora Navera Reed and David Holmquist, Los Angeles Unified School District, Los Angeles, California; Sonja H. Trainor and Francisco Negrón, National School Boards Association, Alexandria, Virginia; Michael L. Smith, Oakland Unified School District, Oakland, California; Raoul Bozio, Sacramento City Unified School District, Sacramento, California; for Amici Curiae Public Education Groups.

Caryn C. Lederer, Chirag G. Badlani, and Matthew J. Piers, Hughes Socol Piers Resnick & Dym Ltd., Chicago, Illinois; Daniel B. Rice and Joshua A. Geltzer, Institute for Constitutional Advocacy and Protection, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders.

Zachary Kolodin, Michael N. Fresco, Adeel A. Mangi, and Steven A. Zalesin, Patterson Belknap Webb & Tyler LLP, New York, New York; Juvaria Khan, Sirine Shebaya, and Jonathan Smith, Muslim Advocates, Washington, D.C.; for Amici Curiae 119 Religious Organizations.

Jennifer J. Yun, Ishan Bhabha, Lindsay C. Harrison, and Thomas J. Perrelli, Jenner & Block LLP, Washington, D.C., for Amici Curiae Institutions of Higher Education.

Jennifer B. Sokoler and Anton Metlitsky, O'Melveny & Myers LLP, New York, New York, for Amicus Curiae Eighteen Universities.

Lauren R. Goldman and Karen W. Lin, Mayer Brown LLP, New York, New York; Andrew J. Pincus, Mayer Brown LLP, Washington, D.C.; Ari Holzblatt, Patrick J. Carome, and Seth Waxman, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; for Amici Curiae 102 Companies and Associations.

John-Paul S. Deol and Daniel J. McCoy, Fenwick & West LLP, Mountain View, California; Mark S. Ross, James L. McGinnis, and Neil A.F. Popović, Sheppard Mullin Richter & Hampton LLP, San Francisco, California; for Amicus Curiae The Bar Association of San Francisco.

Juan P. Valdivieso, Boies Schiller Flexner LLP, Oakland, California; Albert Giang, Boies Schiller Flexner LLP, Los Angeles, California; J. Wells Harrell and Joshua Riley, Boies Schiller Flexner LLP, Washington, D.C.; for Amici Curiae Former Federal Immigration and Homeland Security Officials.

Kaitland M. Kennelly and William J. Schwartz, Cooley LLP, New York, New York, for Amici Curiae Partnership for Educational Justice, DelawareCAN: The Delaware Campaign for Achievement Now, HawaiiKidsCAN, NewMexicoKidsCAN, and Virginia Excels.

Matthew Scherb, Michael Dundas, Valerie L. Flores, Leela A. Kapur, James P. Clark, and Michael N. Feuer, City Attorney, Office of the City Attorney, Los Angeles, California; Donna R. Ziegler, Alameda County Counsel, Oakland, California; Anne L. Morgan, City Attorney, Austin, Texas; Eugene O'Flaherty, City Corporation Counsel, Boston, Massachusetts; Cheryl Watson Fisher, City Solicitor, Chelsea, Massachusetts; Kimberly M. Foxx, States Attorney for Cook County, Chicago, Illinois; Jeremy Berry, City Attorney, Atlanta, Georgia; Farimah F. Brown, City Attorney, Berkeley, California; Nancy E. Glowa, City Solicitor, Cambridge, Massachusetts; Edward N. Siskel, City Corporation Counsel, Chicago, Illinois; Larry E. Casto, City Attorney, Dallas, Texas; Kristin M. Bronson, City Attorney of the City and County of Denver, Denver, Colorado; Gregory L. Thomas, City Attorney, Gary, Indiana; Ronald C. Lewis, City Attorney, Houston, Texas; Eleanor M. Dilkes, City Attorney, Iowa City, Iowa; Jennifer Vega-Brown, City Attorney, Las Cruces, New Mexico; Karl A. Racine, Attorney General, District of Columbia, Washington, D.C.; Donna Y. L. Leong, Corporation Counsel, Honolulu, Hawaii; Aaron O. Lavine, City Attorney, Ithaca, New York; Daniel T. Satterberg, King County Prosecuting Attorney, Seattle, Washington; Charles Parkin, City Attorney, Long Beach, California; Margaret L. Carter, O'Melveny & Myers LLP, Los Angeles, California; Susan Segal, City Attorney, Minneapolis, Minnesota; John Rose Jr., Corporation Counsel, New Haven, Connecticut; Barbara J. Parker, City Attorney, Oakland, California; Tracy P. Reeve, City Attorney, Portland, Oregon; Michael P. May, City Attorney, Madison, Wisconsin; Charles J. McKee, Monterey County Counsel, Salinas, California; Zachary W. Carter, City Corporation Counsel, New York, New York; Marcel S. Pratt, Acting City Solicitor, Philadelphia, Pennsylvania; Jeffrey Dana, City Solicitor, Providence, Rhode Island; Timothy R. Curtin, City Corporation Counsel, Rochester, New York; Dennis J. Herrera, City Attorney for the City and County of San

Francisco, San Francisco, California; Lane Dilg, City Attorney, Santa Monica, California; Francis X. Wright Jr., City Solicitor, Somerville, Massachusetts; Matthew D. Ruyak, Interim City Attorney, Sacramento, California; Kelley A. Brennan, City Attorney, Santa Fe, New Mexico; Peter S. Holmes, City Attorney, Seattle, Washington; Mike Rankin, City Attorney, Tucson, Arizona; Michael Jenkins, West Hollywood City Attorney, Jenkins & Hogan LLP, Manhattan Beach, California; John Daniel Reaves, General Counsel, The U.S. Conference of Mayors, Washington, D.C.; for Amici Curiae 40 Cities and Counties, The National League of Cities, and The United States Conference of Mayors.

Jennifer Chang Newell and Katrina L. Eiland, ACLU Foundation Immigrants' Rights Project, San Francisco, California; David Hausman, Michael K.T. Tan, and Lee Gelernt, ACLU Foundation Immigrants' Rights Project, New York, New York; Julia Harumi Mass, ACLU Foundation of Northern California, San Francisco, California; Ahilan T. Arulanantham, ACLU Foundation of Southern California, Los Angeles, California; David Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Amici Curiae American Civil Liberties Union Foundation, ACLU Foundation of Northern California, ACLU Foundation of Southern California, and ACLU Foundation of San Diego & Imperial Counties.

Claire M. Blakey, Johanna S. Dennehy, and Harry Lee, Steptoe & Johnson LLP, Washington, D.C.; Christopher W. Smith, Steptoe & Johnson, Los Angeles, California; for Amici Curiae Immigration Law Scholars.

Avi Zevin, Jack Lienke, and Richard L. Revesz, Institute for Policy Integrity, New York, New York, for Amicus Curiae Institute for Policy Integrity at New York University School of Law.

Anna-Rose Mathieson and Ben Feuer, California Appellate Law Group LLP, San Francisco, California; Daniel Hemel, Chicago, Illinois; Seth Davis, Irvine, California; for Amici Curiae Twenty-Four Law Professors.

Philicia Hill, Dorian Spence, Dariely Rodriguez, and Jon Greenbaum, The Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Sameer P. Sheikh, Martin L. Saad, John F. Cooney, and William D. Coston, Venable LLP, Washington, D.C.; for Amici Curiae The Lawyers' Committee for Civil Rights Under Law, Anti-Defamation League, and Social Justice Organizations.

Joan R. Li, Kara C. Wilson, Monique R. Sherman, and Maureen P. Alger, Cooley LLP, Palo Alto, California, for Amici Curiae Legal Services Organizations.

Mary Kelley Persyn, Persyn Law & Policy, San Francisco, California, for Amici Curiae American Professional Society on the Abuse of Children and California Professional Society on the Abuse of Children.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae The Immigration Reform Law Institute.

Before: Kim McLane Wardlaw, Jacqueline H. Nguyen, and John B. Owens, Circuit Judges.

Concurrence by Judge Owens

## OPINION

WARDLAW, Circuit Judge:

It is no hyperbole to say that Dulce Garcia embodies the American dream. Born into poverty, Garcia and her parents shared a San Diego house with other families to save money on rent; she was even homeless for a time as a child. But she studied hard and excelled academically in high school. When her family could not

afford to send her to the top university where she had been accepted, Garcia enrolled in a local community college and ultimately put herself through a four-year university, where she again excelled while working full-time as a legal assistant. She then was awarded a scholarship that, together with her mother's life savings, enabled her to fulfill her longstanding dream of attending and graduating from law school. Today, Garcia maintains a thriving legal practice in San Diego, where she represents members of underserved communities in civil, criminal, and immigration proceedings.

On the surface, Dulce Garcia appears no different from any other productive—indeed, inspiring—young American. But one thing sets her apart. Garcia's parents brought her to this country in violation of United States immigration laws when she was four years old. Though the United States of America is the only home she has ever known, Dulce Garcia is an undocumented immigrant.

Recognizing the cruelty and wastefulness of deporting productive young people to countries with which they have no ties, the Secretary of Homeland Security announced a policy in 2012 that would provide some relief to individuals like Garcia, while allowing our communities to continue to benefit from their contributions. Known as Deferred Action for Childhood Arrivals, or DACA, the program allows those noncitizens who unwittingly entered the United States as children, who have clean criminal records, and who meet various educational or military service requirements to apply for two-year renewable periods of deferred action—a revocable decision by the government not to deport an otherwise removable person from the country. DACA also allows recipients to apply for authorization to work in this country legally, paying taxes and operating in the above-ground economy. Garcia, along with hundreds of thousands of other young people, trusting the government to honor its promises, leapt at the opportunity.

But after a change in presidential administrations, in 2017 the government moved to end the DACA program. Why? According to the Acting Secretary of Homeland Security, upon the legal advice of the Attorney General, DACA was illegal from its inception, and therefore could no longer continue in effect. And after Dulce Garcia—along with other DACA recipients and affected states, municipalities, and organizations—challenged this conclusion in the federal courts, the government adopted the position that its fundamentally legal determination that DACA is unlawful is unreviewable by the judicial branch.

With due respect for the Executive Branch, we disagree. The government may not simultaneously both assert that its actions are legally compelled, based on its interpretation of the law, and avoid review of that assertion by the judicial branch, whose "province and duty" it is "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The government's decision to rescind DACA is subject to judicial review. And, upon review, we conclude that plaintiffs are likely to succeed on their claim that the rescission of DACA—at least as justified on this record—is arbitrary, capricious, or otherwise not in accordance with law. We therefore affirm the district court's grant of preliminary injunctive relief.[1]

## I.

### A. *History of Deferred Action*

The central benefit available under the DACA program is deferred action. Be-

---

1. We also affirm in part the district court's partial grant and partial denial of the government's motion to dismiss for failure to state a claim.

cause much of this dispute revolves around the legitimacy of that practice, we begin by reviewing the Executive Branch's historical use of deferred action.

The basic concept is a simple one: deferred action is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country. *See* 6 Charles Gordon et al., Immigration Law & Procedure § 72.03[2][h] (2018) ("To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to execute a final order of deportation. This commendable exercise in administrative discretion . . . is now designated as deferred action."); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) ("Deferred action refers to an exercise of administrative discretion by the [immigration agency] under which [it] takes no action to proceed against an apparently deportable alien based on a prescribed set of factors generally related to humanitarian grounds." (internal quotation marks omitted) ); Hiroshi Motomura, Immigration Outside the Law 29 (2014) (noting that "deferred action is usually granted only for limited periods of time and does not provide a path to lawful permanent resident status or citizenship").

[1] Unlike most other forms of relief from deportation, deferred action is not expressly grounded in statute. It arises instead from the Executive's inherent authority to allocate resources and prioritize cases. *Cf.* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). As such, recipients of deferred action "enjoy no formal immigration status." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 964 (9th Cir. 2017) (*Brewer II* ). But de-

spite its non-statutory origins, Congress has historically recognized the existence of deferred action in amendments to the Immigration and Nationality Act (INA), as well as other statutory enactments. *See* 8 U.S.C. § 1227(d)(2) ("The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]"); REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2), 119 Stat. 231, 313 (2005) (listing proof of "approved deferred action status" as sufficient "evidence of lawful status" for the issuance of a driver's license). The Supreme Court has also recognized deferred action by name, describing the Executive's "regular practice (which ha[s] come to be known as 'deferred action') of exercising discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC* ). Thus, "it is well settled that the Secretary [of Homeland Security] can exercise deferred action." *Brewer II*, 855 F.3d at 967.

Official records of administrative discretion in immigration enforcement date at least back to the turn of the twentieth century, not long after the enactment of the nation's first general immigration statute in 1882. *See* Act of Aug. 3, 1882, ch. 376, 22 Stat. 214. A 1909 Department of Justice circular regarding statutorily authorized denaturalization instructed that "as a general rule, good cause is not shown for the institution of proceedings . . . unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country." U.S. Dep't of Justice, Circular Letter No. 107 (Sept. 20, 1909) (quoted in Memorandum from Sam Bernsen, Gen. Counsel, INS, *Legal Opinion Regarding Service Exercise*

488 **FEDERAL REPORTER, 3d SERIES**

*of Prosecutorial Discretion* at 4 (Jul. 15, 1976) (Bernsen Memorandum) ).

The government's exercise of deferred action in particular first came to light in the 1970s, as a result of Freedom of Information Act litigation over the government's efforts to deport John Lennon and Yoko Ono, apparently based on Lennon's "British conviction for marijuana possession." Motomura, *supra*, at 28; *see generally* Shoba Sivaprasad Wadhia, Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases 2–27 (2015). Then known as "nonpriority status," the practice had been observed in secret within the former Immigration and Naturalization Service (INS) since at least the 1950s, but INS officials had publicly denied its existence. *See* Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 San Diego L. Rev. 42, 52–53 (1976); Wadhia, *supra*, at 16. After the Lennon case revealed the practice, the INS issued its first public guidance on the use of deferred action, stating that "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for nonpriority." Immigration and Naturalization Service, Operations Instructions § 103.1(a)(1)(ii) (1975) (quoted in Wadhia, *supra*, at 17). Although the 1975 guidance was rescinded in 1997, DHS officials continue to apply the same humanitarian factors in deciding whether to grant an individual deferred action. 6 Gordon et al., *supra*,

§ 72.03[2][h] & nn.133–34; *see also AADC*, 525 U.S. at 484 n.8, 119 S.Ct. 936.

In addition to case-by-case adjudications, the Executive Branch has frequently applied deferred action and related forms of discretionary relief programmatically, to entire classes of otherwise removable noncitizens. Indeed, the Congressional Research Service has compiled a list of twenty-one such "administrative directives on blanket or categorical deferrals of deportation" issued between 1976 and 2011. Andorra Bruno et al., Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children 20–23 (July 13, 2012); *see also id.* at 9 ("The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years.").

To take one early example, in 1956 President Eisenhower extended immigration parole to over thirty thousand Hungarian refugees who were otherwise unable to immigrate to the United States because of restrictive quotas then in existence. *See* White House Statement on the Termination of the Emergency Program for Hungarian Refugees (Dec. 28, 1957). The power to parole—that is, to allow a noncitizen physically to enter the country, while treating that person as "at the border" for purposes of immigration law—is established by statute, but the version of the INA in existence when President Eisenhower acted did not explicitly authorize programmatic exercises of the parole power.[2] Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188. *See generally* 6 Gordon et

---

**2.** Indeed, there is evidence that "Congress originally intended that parole would be used on a case-by-case basis on behalf of individual aliens." Cong. Research Serv., Review of U.S. Refugee Resettlement Programs & Policies 8 (1980); *see also* S. Rep. No. 89-748, at 17

(1965). The statute was amended in 1980 to expressly prohibit categorical grants of parole. Refugee Act of 1980, Pub. L. No. 96-212, § 203(f), 94 Stat. 102, 108; *see* 8 U.S.C. § 1182(d)(5).

al., *supra*, § 62.01. Subsequent presidents made use of similar categorical parole initiatives. Wadhia, *supra*, at 30.

Another salient example is the Family Fairness program, established by the Reagan Administration and expanded under President George H.W. Bush. The Immigration Reform and Control Act of 1986 (IRCA) had provided a pathway to legal status for hundreds of thousands of undocumented noncitizens, but did not make any provision for their close relatives unless those individuals separately qualified under the Act's criteria. *See generally* 3 Gordon et al., *supra*, § 38.06. President Reagan's INS Commissioner interpreted IRCA not to authorize immigration benefits for anyone outside the statutory criteria, but nevertheless exercised executive discretion to defer the deportation of the minor children of noncitizens legalized under the statute. Alan C. Nelson, Comm'r, INS, *Legalization & Family Fairness: An Analysis* (Oct. 21, 1987). And in 1990, the INS instituted "significant liberalizations" of the policy by granting one-year periods of extended voluntary departure to children and spouses of individuals legalized under IRCA who could establish admissibility, continuous residency, and a clean criminal record. *INS Reverses Family Fairness Policy*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990); *see also* 3 Gordon et al., *supra*, § 38.06. Contemporary estimates by INS officials of the number of people potentially eligible ranged as high as 1.5 million.[3] *See Immigration Act of 1989 (Part 2): Hearings Before the Subcomm. on Immigration, Refugees & Int'l Law of the H. Comm. on the Judiciary*, 101st Cong. 49, 56 (1990) (testimony of Gene McNary, Comm'r, INS). Extended voluntary departure, the mechanism through which these individuals were allowed to remain in the United States is, like deferred action, a creature of executive discretion not specifically authorized by statute. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.).

Since then, the immigration agency has instituted categorical deferred action programs for self-petitioners under the Violence Against Women Act; applicants for T and U visas (which are issued to victims of human trafficking and of certain crimes, respectively); foreign students unable to fulfill their visa requirements after Hurricane Katrina; and widowed spouses of United States citizens who had been married less than two years. None of these deferred action programs was expressly authorized by statute at the time they were initiated.

**B.   The DACA Program**

DACA was announced in a June 15, 2012, memorandum from Secretary of Homeland Security Janet Napolitano,[4] entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Secretary Napolitano explained that the nation's immigration laws "are not designed ... to remove productive young people to countries where they may not have lived or even speak the language," especially where

---

**3.**   There is some controversy surrounding this number. *See generally Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the House Comm. on the Judiciary*, 114th Cong. 84–85 (2015) (written testimony of Professor Stephen H. Legomsky). But even the lowest reported contemporary estimate was that 100,000 people would actu-

ally benefit from the program, indicating a major policy initiative. *See INS Reverses Family Fairness Policy, supra*.

**4.**   Napolitano is a party to this appeal in her current capacity as President of the University of California.

"many of these young people have already contributed to our country in significant ways," and, because they were brought here as children, "lacked the intent to violate the law." She therefore determined that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here."

The Napolitano memorandum thus laid out the basic criteria of the DACA program, under which a noncitizen will be considered for a grant of deferred action if he or she:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, nor otherwise poses a threat to national security or public safety; and
- is not above the age of thirty [on June 15, 2012].[5]

DACA applicants must submit extensive personal information to DHS, along with fees totaling nearly $500. Applicants also submit to biometric screening in which

they are photographed and fingerprinted, enabling extensive biographical and biometric background checks. If those checks come back clean, each application is then evaluated for approval by DHS personnel on a case-by-case basis.

**[2]** If approved into the DACA program, an applicant is granted a renewable two-year term of deferred action—again, "a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States." *Brewer II*, 855 F.3d at 967. In addition to the deferral of removal itself, pre-existing DHS regulations allow all deferred-action recipients to apply for employment authorization, enabling them to work legally and pay taxes. 8 U.S.C. § 1324a(h)(3) (empowering the Executive Branch to authorize the employment of noncitizens); 8 C.F.R. § 274a.12(c)(14) (providing that "[a]n alien who has been granted deferred action" is eligible for work authorization upon a showing of "economic necessity for employment"). Indeed, "DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain 'productive' members of society." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (*Brewer I*) (emphasis in original). Finally, DHS does not consider deferred-action recipients, including those benefitting from DACA, to accrue "unlawful presence" for purposes of the INA's reentry bars.[6] 8 U.S.C. § 1182(a)(9)(B)(ii); *see Brewer I*, 757 F.3d at 1059.

---

**5.** This criterion became known as the "age cap."

**6.** 8 U.S.C. §§ 1182(a)(9)(B)(i)(I)–(II) establish a three-year and ten-year bar on admission after specified periods of "unlawful presence." Additionally, 8 U.S.C. § 1182(a)(9)(C) provides a permanent bar on admission for immigrants who have accrued an aggregate

of more than one year of "unlawful presence" and who later attempt to cross the border clandestinely. As the district court noted below, DHS "excludes recipients of deferred action from being 'unlawfully present' because their deferred action is considered a period of stay authorized by the government." *Regents of Univ. of Cal. v. DHS*, 279 F. Supp.

In an attempt to build on the success of the DACA program, in 2014 Secretary of Homeland Security Jeh Johnson issued a separate memorandum that both announced the related Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA), which allowed deferred action for certain noncitizen parents of American citizens and lawful permanent residents, and expanded DACA by (1) removing the age cap, (2) extending the term of deferred-action and related work-authorization grants from two to three years, and (3) moving up the cutoff date by which an applicant must have been in the United States to January 1, 2010. Twenty-six states challenged this extension in federal court, arguing that DAPA is unconstitutional. All of the policies outlined in the Johnson memorandum were enjoined nationwide in a district court order upheld by the Fifth Circuit and affirmed by an equally divided Supreme Court. *See United States v. Texas*, ⸺ U.S. ⸺, 136 S. Ct. 2271, 195 L.Ed.2d 638 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015); *see also Neil v. Biggers*, 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (affirmance by an equally divided court has no precedential value). The original DACA program remained in effect.

In 2017, a new presidential administration took office, bringing with it a change in immigration policy. On February 20, 2017, then-Secretary of Homeland Security John Kelly issued a memorandum that set out the administration's new enforcement priorities, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement." However, the memorandum explicitly left DACA and DAPA in place. In a second memorandum issued June 15, 2017, after "consider[ing] a number of factors, including the preliminary injunction in the [*Texas*] matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities," Secretary Kelly rescinded DAPA as an "exercise of [his] discretion."

Then, on June 28, 2017, Texas Attorney General Ken Paxton wrote to United States Attorney General Jefferson B. Sessions III threatening that if the federal government did not rescind DACA by September 5, 2017, Paxton would amend the complaint in the *Texas* litigation to challenge DACA as well as DAPA.

On September 4, 2017, the day before Paxton's deadline, Attorney General Sessions sent his own letter to Acting Secretary of Homeland Security Elaine Duke. The Attorney General's letter "advise[d] that the Department of Homeland Security . . . should rescind" the DACA memorandum based on his legal opinion that the Department lacked statutory authority to

---

3d 1011, 1039 (N.D. Cal. 2018). As DHS noted in its DACA Frequently Asked Questions (FAQs), "[f]or purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect." Importantly, however, "deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."

The FAQs are attached as an exhibit to the *Regents* complaint, and are cited pervasively throughout the *Garcia* complaint. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (explaining that for purposes of a motion to dismiss, "[c]ertain written instruments attached to pleadings may be considered part of the pleading. Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." (internal citation omitted) ).

AR0433

have created DACA in the first place. He wrote:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The Attorney General further opined that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

The very next day, following the Attorney General's directive, Acting Secretary Duke issued a memorandum rescinding DACA. The memorandum begins with a "Background" section that covers DACA, DAPA, the *Texas* litigation, Secretary Kelly's previous memoranda, Texas Attorney General Paxton's threat, and the Attorney General's letter. Then, in the section titled "Rescission of the June 15, 2012 DACA Memorandum," the Duke memorandum states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The Duke memorandum further states that although DHS would stop accepting initial DACA requests effective immediately, the agency would provide a one-month window in which renewal applications could be filed for current DACA beneficiaries whose benefits were set to expire before March 5, 2018. It also states that DHS would not terminate existing grants of deferred action under DACA "solely based on the directives in this memorandum." Thus, beginning on March 5, 2018, each DACA recipient's grant of deferred action would be allowed to expire at the end of its two-year term. As of September 4, 2017—the day before the rescission— approximately 689,800 individuals were enrolled in DACA.

*C. Procedural History*

The rescission of DACA instantly sparked litigation across the country, including the cases on appeal here. Suits were filed in the Northern District of California by the Regents of the University of California, a group of states led by California, the City of San Jose, the County of Santa Clara and Service Employees International Union Local 521, and a group of individual DACA recipients led by Dulce Garcia. The complaints included claims that the rescission was arbitrary and capricious under the Administrative Procedure Act (APA); that it was a substantive rule requiring notice-and-comment rulemaking under the APA; that it violated the due process and equal protection rights protected by the U.S. Constitution; and that DHS was equitably estopped from using the information provided on DACA applications for enforcement purposes. The cases were consolidated before Judge William Alsup in the District Court for the Northern District of California and proceeded to litigation.

On October 17, 2017, the district court ordered the government to complete the administrative record, holding that the record proffered by the government was in-

complete in several respects. Seeking to avoid providing additional documents, the government filed a petition for mandamus. In arguing its mandamus petition, the government took the position that the legality of the rescission should stand or fall based solely on the reasons and the record already provided by the government. We denied the mandamus petition, stating that "the notion that the head of a United States agency would decide to terminate a program giving legal protections to roughly 800,000 people based solely on 256 pages of publicly available documents is not credible, as the district court concluded." *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017) (footnotes omitted).

The government next petitioned the Supreme Court for the same mandamus relief; the Court did not reach the merits of the administrative record dispute, but instead instructed the district court to rule on the government's threshold arguments challenging reviewability of its rescission decision before requiring the government to provide additional documents. *In re United States*, —— U.S. ——, 138 S.Ct. 443, 445, 199 L.Ed.2d 351 (2017). Thus, the administrative record in this case still consists of a scant 256 publicly available pages, roughly three-quarters of which are taken up by the three published judicial opinions from the *Texas* litigation.

Returning to the district court, the government moved to dismiss the consolidated cases on jurisdictional grounds and for failure to state a claim, while the plaintiffs moved for a preliminary injunction. The district court granted the request for a nationwide preliminary injunction, holding that most of the plaintiffs had standing;[7] that neither the APA nor the INA barred judicial review; and that plaintiffs were

likely to succeed on their claim that the decision to rescind DACA was arbitrary and capricious. The district court therefore entered a preliminary injunction requiring DHS to adjudicate renewal applications for existing DACA recipients.

In a separate order, the court partially granted and partially denied the government's motion to dismiss. The court dismissed plaintiffs' notice-and-comment and Regulatory Flexibility Act claims; a due process claim premised on an entitlement to deferred action; and the equitable estoppel claim. The court denied the motion as to plaintiffs' equal protection claim and a due process claim premised on an alleged change in DHS's information-sharing policy.

The district court certified the issues addressed in both its orders for interlocutory review under 28 U.S.C. § 1292(b). We granted the government's petition for permission to appeal the orders. Plaintiffs cross-appealed, asserting that the district court erroneously dismissed their notice-and-comment and due process claims.

## II.

[3, 4] "We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017) (quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam)). Within this inquiry, "[w]e review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error." *Id.* (quoting *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015)). A district court's decision on a motion to dismiss for lack of subject mat-

---

**7.** Two states were dismissed from the case with leave to amend. That decision is not

challenged on appeal.

494          908 FEDERAL REPORTER, 3d SERIES

ter jurisdiction or for failure to state a claim is also reviewed de novo. *See, e.g., Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2017).

## III.

The threshold question in this case is in many ways also the most pivotal: is Acting Secretary Duke's decision to rescind the DACA program reviewable by the courts at all? The government contends that both the APA and the INA bar judicial review; we address each statute in turn.

### A.  *Reviewability under the APA*

The APA provides for broad judicial review of agency action: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Thus, as a general matter, the Supreme Court has consistently articulated "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, —— U.S. ——, 135 S.Ct. 1645, 1651, 191 L.Ed.2d 607 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) ); *see also, e.g., Lincoln v. Vigil*, 508 U.S. 182, 190, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) ("[W]e have read the APA as embodying a 'basic presumption of judicial review.' ") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ).

[5] However, the APA also forecloses judicial review under its procedures to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[8] "This is a very narrow exception" that comes into play only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (internal quotation marks omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *see also Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.").

In *Heckler v. Chaney*, the Supreme Court analyzed this exception in considering "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the [APA]." 470 U.S. at 823, 105 S.Ct. 1649. In *Chaney*, the Commissioner of the Food and Drug Administration (FDA) declined to take investigatory and enforcement action against state prison officials' use of drugs, which had been FDA-approved for medical use, in human executions. *Id.* at 823–24, 105 S.Ct. 1649. A group of prisoners on death row had petitioned the FDA, arguing that using the drugs to execute humans was unlawful because they were only approved for medical use, and not for executions. *Id.* Responding to the petition, the Commissioner questioned whether the FDA had jurisdiction

---

**8.**  This bar does not affect a plaintiff's ability to bring freestanding constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 601–05, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987) ("[E]ven where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." (quoting *Doe v. Casey,* 796 F.2d 1508, 1517–18 n.33 (D.C. Cir. 1986), *aff'd in part, rev'd in part on other grounds, Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ) ).

to prohibit the use of drugs in executions, but went on to conclude that even if the agency did have jurisdiction, it would "decline to exercise it under [the agency's] inherent discretion to" do so. *Id.* at 824, 105 S.Ct. 1649. The inmates then sued the FDA, attempting to invoke the APA's framework for judicial review. *Id.* at 825, 105 S.Ct. 1649.

The Supreme Court held that the FDA Commissioner's discretionary decision not to enforce the Food, Drug, and Cosmetic Act against state prison officials was unreviewable under the APA. *Chaney,* 470 U.S. at 837–38, 105 S.Ct. 1649. The Court identified a pre-APA "tradition" under which "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," and concluded that "the Congress enacting the APA did not intend to alter that tradition." *Id.* at 831–32, 105 S.Ct. 1649. As the Court summed up its holding, "[t]he general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Id.* at 838, 105 S.Ct. 1649 (citation omitted). That is, the normal presumption in favor of judicial review is reversed when the agency action in question is a refusal to enforce the substantive law.

Importantly for present purposes, the Court explicitly left open the question whether "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction" might be reviewable notwithstanding this general rule. *Chaney,* 470 U.S. at 833 n.4, 105 S.Ct. 1649 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2). . . .").[9] This reservation makes perfect sense. It is one thing to read the APA's exception for "agency action [ ] committed to agency discretion by law" as including the Executive's discretionary decisions to decline enforcement, given a pre-existing legal tradition that had treated those decisions as unreviewable. It would be quite another to say that an agency's *non*-discretionary belief that it lacked the *power* to enforce the law was similarly "committed to agency discretion." 5 U.S.C. § 701(a)(2); *see Chaney,* 470 U.S. at 833 n.4, 105 S.Ct. 1649 ("[W]e note that in those situations [involving a belief that the agency lacked discretion,] the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.' ").

Several years after *Chaney,* our court directly addressed the question that the Supreme Court had left open. In *Montana Air Chapter No. 29 v. Federal Labor Relations Authority,* a union representing civilian Air National Guard employees filed an unfair labor practice charge against the National Guard Bureau, but the Federal Labor Relations Authority (FLRA) re-

---

**9.** *Chaney*'s footnote 4 reads in its entirety:

We do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction. *Nor* do we have a situation where it could justifiably be found that the agency has "consciously and expressly adopted a general policy" that is so extreme as to amount to an abdication of its statutory responsibilities. *See, e.g., Adams v. Richardson,* 156 U.S. App. D.C. 267, 480 F.2d

1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable under § 701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion."

*Heckler v. Chaney,* 470 U.S. 821, 833 n.4, 105 S.Ct. 1649 (emphasis added).

fused to issue a complaint. 898 F.2d 753, 755 (9th Cir. 1990). The opinion letters issued by FLRA's general counsel indicated that he had "determined, according to his interpretation of the statutes and regulations, that he lacked jurisdiction to issue an unfair labor practice complaint" under the circumstances. *Id.* at 757.

Acknowledging *Chaney*'s rule that "[a]n agency's decision not to take enforcement action . . . is presumed to be immune from judicial review," we noted that the Supreme Court had nevertheless "suggested that discretionary nonenforcement decisions may be reviewable when" the refusal to enforce is based on a supposed lack of jurisdiction. *Id.* at 756 (citing *Chaney*, 470 U.S. at 833 n.4, 105 S.Ct. 1649). We took the next logical step, holding that *Chaney*'s presumption of nonreviewability "may be overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction." *Id.* at 754. Because "the General Counsel's decision not to issue an unfair labor practice complaint was based on his belief that he lacked jurisdiction to issue such a complaint," we proceeded to "examine the General Counsel's statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct." *Id.* at 757.[10]

The final piece of the APA reviewability puzzle is the Supreme Court's decision in *City of Arlington v. FCC*, 569 U.S. 290, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). There,

the Court was faced with the question whether an agency's determination of its own jurisdiction is entitled to the same deference as any other agency interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Writing for the Court, Justice Scalia explained in no uncertain terms that in the context of administrative agencies, "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage." *City of Arlington*, 569 U.S. at 297, 133 S.Ct. 1863. With respect to courts, the jurisdictional/nonjurisdictional divide is a real and consequential one, because "[a] court's power to decide a case is independent of whether its decision is correct. . . . Put differently, a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires." *Id.* But the same is not true with respect to agencies: "Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *Id.* Thus, the Court concluded, "[t]he reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *Id.* at 299, 133 S.Ct. 1863 (emphasis in original).[11]

---

**10.** We reject the government's reading of *Montana Air*, under which the *Chaney* presumption would be overcome only if the agency action is based on a belief in a lack of jurisdiction, *and* the refusal to enforce is so extreme as to become an abdication of the agency's statutory responsibilities. Both *Chaney* and *Montana Air* make clear that these are two independent exceptions to the narrow rule of nonreviewability, not two elements of a single test. *Chaney*, 470 U.S. at 833 n.4, 105 S.Ct. 1649; *Montana Air*, 898 F.2d at 756.

**11.** The opinion is replete with equally emphatic—and equally quotable—formulations of the same point. *See, e.g., City of Arlington*, 569 U.S. at 301, 133 S.Ct. 1863 ("In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.' Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not.'').

## REGENTS OF UNIV. CALIFORNIA v. U.S. HOMELAND SEC. 497
Cite as 908 F.3d 476 (9th Cir. 2018)

To summarize, *Chaney* holds that an agency's refusal to enforce the substantive law is presumptively unreviewable because that discretionary nonenforcement function is "committed to agency discretion" within the meaning of the APA. *Montana Air* builds upon the question left open by *Chaney*'s footnote four, explaining that a nonenforcement decision is reviewable notwithstanding *Chaney* if the decision was based solely on the agency's belief that it lacked jurisdiction to act. And *City of Arlington* teaches that there is no difference between an agency that lacks jurisdiction to take a certain action, and one that is barred by the substantive law from doing the same; the question "is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington*, 569 U.S. at 297, 133 S.Ct. 1863 (emphasis omitted). The rule that emerges is this: an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based solely on a belief that the agency lacked the lawful authority to do otherwise. That is, where the agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law, the APA's "committed to agency discretion" bar to reviewability, 5 U.S.C. § 701(a)(2), does not apply.

This rule is fully consistent with the Supreme Court's decision in *ICC v. Brotherhood of Locomotive Engineers* (*BLE*), which rejected the notion that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). We have no quarrel with that statement in the abstract, but as applied it simply begs the question: is the agency action in question "otherwise unreviewable"?

The *BLE* case concerned the reviewability of the Interstate Commerce Commission's denial of a motion to reopen proceedings on grounds of material error. *Id.* at 280, 107 S.Ct. 2360. The Supreme Court held that category of agency action presumptively unreviewable because it "perceive[d] . . . a similar tradition of nonreviewability" to the one it had found in *Chaney* for nonenforcement decisions. *Id.* at 282, 107 S.Ct. 2360. In reaching its holding, the Court rejected an argument that there was nevertheless "law to apply"—and that therefore the action was not committed to agency discretion—as the agency's order had discussed the legal merits at length. *Id.* at 280–81, 107 S.Ct. 2360. What mattered was that the agency's "formal action" was one for which a tradition of nonreviewability was discernable, regardless of how the agency explained its action.[12] *Id.*

*BLE* thus stands for the proposition that if a particular type of agency action is presumptively unreviewable, the fact that the agency explains itself in terms that are judicially cognizable does not change the categorical rule. Fair enough. But the categorical rule announced in *Chaney* does not encompass nonenforcement decisions

---

**12.** The Court gave as an example a prosecutor's refusal to institute criminal proceedings based on her "belief . . . that the law will not sustain a conviction." *BLE*, 482 U.S. at 283, 107 S.Ct. 2360. Such a belief is not equivalent to a conclusion that the government lacked the power to institute a prosecution in the first place. For one colorful example, in *Bond v. United States*, prosecutors made the "surprising" decision to charge "an amateur attempt by a jilted wife to injure her husband's lover" under the federal statute implementing the international Convention on Chemical Weapons. 572 U.S. 844, 134 S.Ct. 2077, 2083–84, 189 L.Ed.2d 1 (2014). While the Court ultimately interpreted the statute not to encompass the charged conduct, *id.* at 2093–94, no one suggested that the government's aggressive decision to institute the prosecution was itself ultra vires.

based solely on the agency's belief that it lacked power to take a particular course; instead, the Court explicitly declined to extend its rule to that situation. *Chaney*, 470 U.S. at 833 n.4, 105 S.Ct. 1649. And in *Montana Air*, we held that such decisions *are* reviewable. 898 F.2d at 754. *BLE*'s statement about "otherwise unreviewable" agency decisions, 482 U.S. at 283, 107 S.Ct. 2360, therefore has no application to the category of agency action at issue here.

We believe the analysis laid out above follows necessarily from existing doctrine. And, just as importantly, this approach also promotes values fundamental to the administrative process.

First, the *Montana Air* rule does not impermissibly encroach on executive discretion; to the contrary, it empowers the Executive. If an agency head is mistaken in her assessment that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate. That is, if an administrator chooses option *A* for the sole reason that she believes option *B* to be beyond her legal authority, a decision from the courts putting option *B* back on the table allows a reasoned, discretionary policy choice between the two courses of action. And if the agency's view of the law is instead confirmed by the courts, no injury to discretion results because the status quo is preserved.

[6] Moreover, allowing judicial review under these circumstances serves the critical function of promoting accountability within the Executive Branch—not accountability to the courts, but democratic accountability to the people. Accountability in this sense is fundamental to the legitimacy of the administrative system: although they are "unelected . . . bureaucrats," *City of Arlington*, 569 U.S. at 305,

133 S.Ct. 1863, the heads of cabinet-level departments like DHS "are subject to the exercise of political oversight and share the President's accountability to the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 886, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Indeed, the Constitution's "Appointments Clause was designed to ensure public accountability for . . . the making of a bad appointment. . . ." *Edmond v. United States*, 520 U.S. 651, 660, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2251–52 (2001) ("[A]ccountability" is one of the two "principal values that all models of administration must attempt to further."); 1 Richard J. Pierce, Jr., Administrative Law Treatise 114 (5th ed. 2010) ("Agencies are politically accountable because the President is accountable for the actions of agencies.").

This democratic responsiveness is especially critical for agencies exercising prosecutorial functions because, as Justice Scalia explained in his oft-cited dissent in *Morrison v. Olson*, "[u]nder our system of government, the primary check against prosecutorial abuse is a political one." 487 U.S. 654, 728, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). This check works because "when crimes are not investigated and prosecuted fairly, nonselectively, with a reasonable sense of proportion, the President pays the cost in political damage to his administration." *Id.* at 728–29, 108 S.Ct. 2597. In other words, when prosecutorial functions are exercised in a manner that is within the law but is nevertheless repugnant to the sensibilities of the people, "the unfairness will come home to roost in the Oval Office." *Id.* at 729, 108 S.Ct. 2597.

But public accountability for agency action can only be achieved if the electorate knows how to apportion the praise for

good measures and the blame for bad ones. Without knowing the true source of an objectionable agency action, "the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (quoting The Federalist No. 70, at 476 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) ). In then-Professor Kagan's words, "the degree to which the public can understand the sources and levers of bureaucratic action" is "a fundamental precondition of accountability in administration." Kagan, *supra*, at 2332.

The *Montana Air* rule promotes accountability by ensuring that the public knows where to place blame for an unpopular measure. When an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress (for making the law in question) or the courts (for construing it).

If the Executive is correct in its interpretation of the law, then the public is correct to blame the other two branches for any resulting problems. But if the Executive is wrong, then it avoids democratic accountability for a choice that was the agency's to make all along. Allowing the judiciary—the branch ultimately responsible for interpreting the law, *see Marbury*, 5 U.S. (1 Cranch) at 177—to review such decisions prevents this anti-democratic and untoward outcome. As Judge Bates of the District Court for the District of Columbia aptly put the point in confronting the very issue we face here, "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both." *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).

We therefore must determine whether the Acting Secretary's decision to end DACA was based solely on a belief that the program was unlawful, such that the *Chaney* presumption does not apply.[13]

---

**13.** Because we take this doctrinal course, we need not decide whether the rescission of DACA would be reviewable absent the exception reflected in *Montana Air* and *Chaney*'s footnote four. But we do note several points. First, a literal reading of *Chaney*'s language would not even encompass the decision to rescind DACA, since *Chaney* by its own terms applies only to "*agency decisions not to undertake* enforcement action." 470 U.S. at 832, 105 S.Ct. 1649 (emphasis added). Nowhere does the opinion suggest the broader proposition that any decision simply related to enforcement should be presumed unreviewable. Our court's dicta in *Morales de Soto v. Lynch*, 824 F.3d 822, 827 n.4 (9th Cir. 2016), which addressed a completely separate issue of jurisdiction under the INA, is not to the contrary. Thus, to the extent that the *Montana Air* exception might not seem a perfect fit for the rescission of DACA—which was not exactly a decision not to enforce—the *Chaney* presumption itself shares the same defect. There is no daylight between the *Chaney* rule and the

*Montana Air* exception in terms of the type of agency action to which they apply. So if the rescission of DACA were outside the *Montana Air* exception by virtue of not being strictly a nonenforcement decision, it would also fall outside the *Chaney* presumption of unreviewability in the first place.

Second, the D.C. Circuit has developed a line of cases explaining that while *Chaney* bars judicial review of a "single-shot nonenforcement decision," on the other hand, "an agency's adoption of a general enforcement policy is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 674–75 (D.C. Cir. 1994) ); *see also Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496–97 (D.C. Cir. 1988).

Thus, every one of the four courts that has considered the question has held that the rescission of DACA is reviewable under the APA, although each has employed slightly dif-

We take Attorney General Sessions literally at his word when he wrote to Acting Secretary Duke that "DACA was effectuated ... without proper statutory authority," and that DACA "was an unconstitutional exercise of authority by the Executive Branch." These are the reasons he gave for advising Acting Secretary Duke to rescind DACA. We therefore agree with the district court that the basis for the rescission was a belief that DACA was unlawful, and that the discretionary "litigation risk" rationale pressed by the government now is a mere posthoc rationalization put forward for purposes of this litigation.[14] Acting Secretary Duke's September 5, 2017, rescission memorandum contains exactly one sentence of analysis:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.

In the next sentence, the Acting Secretary went on to announce the rescission itself:

> In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The easy rejoinder to the government's insistence that the Acting Secretary rescinded DACA due to "litigation risks" is that the Acting Secretary did not mention "litigation risks" as a "consideration." And both "consideration[s]" actually enumerated by the Acting Secretary are most naturally read as supporting a rationale based on DACA's illegality. The "ongoing litigation" referenced is of course *Texas v. United States*, in which the Fifth Circuit upheld a preliminary injunction against the related DAPA policy, and the Supreme Court affirmed by an equally divided vote.[15] *See Texas*, 136 S. Ct. 2271 (2016); *Texas*, 809 F.3d 134 (5th Cir. 2015). The "rulings" in that case are propositions of law—taken alone, they are more readily understood as supporting a legal conclusion (DACA is illegal) than a pragmatic one (DACA might be enjoined). The pragmatic interpretation requires extra analytical steps (someone might sue to enjoin DACA, and they might win) that are entirely absent from the list of factors that the Acting Secretary stated she was "taking into consideration" in making her decision. Acting Secretary Duke easily could have included "the prospect of litigation challenging DACA" in her list of considerations; had she done so, then perhaps the reference to the *Texas* litigation could be read as supporting a practical worry about an injunction.[16] Absent that, however, the

---

ferent reasoning for that conclusion. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 226–34 (D.D.C. 2018); *Casa de Md. v. DHS*, 284 F. Supp. 3d 758, 769–70 (D. Md. 2018); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1029–31 (N.D. Cal. 2018) (decision below); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 147–52 (E.D.N.Y. 2017).

**14.** After hundreds of pages of briefing and over an hour of oral argument, it remains less than clear how "litigation risk" differs from a substantive belief that DACA is illegal. We take the term to refer to a concern that DACA would be abruptly enjoined, regardless of

whether the program was illegal or not. Of course, such a concern is not independent of an on-the-merits assessment of DACA's legality.

**15.** This conclusion is only bolstered by the fact that the government's production of the "administrative record" in this case includes the entirety of the three published judicial opinions in the *Texas* litigation.

**16.** The Acting Secretary did reference Texas Attorney General Ken Paxton's threat to amend the *Texas* suit to include DACA, but

mention of the courts' "rulings" is best read as referencing the courts' legal conclusions.

Attorney General Sessions's September 4, 2017, letter likewise focuses on the supposed illegality of DACA, rather than any alleged "litigation risk." Its substantive paragraph states

> DACA was effectuated . . . *without proper statutory authority* and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was *an unconstitutional exercise of authority* by the Executive Branch.

(emphases added).

These sentences unmistakably reflect the Attorney General's belief that DACA was illegal and therefore beyond the power of DHS to institute or maintain. The letter goes on to opine that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA [in the *Texas* litigation], it is likely that potentially imminent litigation would yield similar results with respect to DACA." But in the context of the full paragraph, the reference to "similar results" is best read not as an independent reason for rescinding DACA, but as a natural consequence of DACA's supposed illegality—which is the topic of the paragraph as a whole. In the words of Judge Garaufis of the District Court for the Eastern District of New York, that reference "is too thin a reed to bear the weight of Defendants' 'litigation risk' argument." *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 429 (E.D.N.Y. 2018).

In any event, the Attorney General's letter is relevant only to the extent it illuminates whether Acting Secretary Duke—the official who actually rescinded the DACA program—did so as an exercise of her discretion or because she understood her hand to be forced by the law. In this connection, it is helpful to compare the operative language used by Acting Secretary Duke to rescind DACA with that used by her predecessor, Secretary John Kelly, to rescind DAPA just months before. In his June 15, 2017, memorandum, Secretary Kelly wrote:

> After consulting with the Attorney General, and *in the exercise of my discretion* in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum [that established DAPA].

(emphasis added). Placed alongside Acting Secretary Duke's language, the parallels—and the differences—are stark. Acting Secretary Duke's memorandum reads:

> *In the exercise of my authority* in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum [that established DACA].

(emphasis added).

The obvious similarities between the two passages strongly suggest that Acting Secretary Duke modeled her language after that of Secretary Kelly's memo. And indeed, we *know* that the Acting Secretary considered the Kelly memorandum in reaching her decision, because the government has told us so. *See* Petition for Writ of Mandamus, *In re United States*, No. 17-72917 (9th Cir. Oct. 20, 2017) (stating that the government's proffered administrative record in this case, which includes the

---

she did so in the "Background" section of her memorandum. If anything, the inclusion of the threat in the background portion renders

its omission from the list of factors the Acting Secretary was actually "[t]aking into consideration" all the more stark.

Kelly memorandum, "consist[s] of the non-privileged materials considered by the Acting Secretary in reaching her decision to rescind the DACA policy"); *id.* at 18 (taking the position that only materials personally reviewed by the Acting Secretary herself, not by subordinates, are "considered" by the Secretary).

Given that Acting Secretary Duke hewed so closely to Secretary Kelly's language in general, it is appropriate to draw meaning from the one major difference between the two sentences: Secretary Kelly exercised his "*discretion*" in ending DAPA; Acting Secretary Duke merely exercised her "*authority*." *Cf., e.g., Jama v. ICE*, 543 U.S. 335, 357, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). The point is that with the example set by the Kelly memorandum in front of her, Acting Secretary Duke clearly would have known how to express that the rescission was a discretionary act—if that were indeed the case.[17] Furthermore, the near-verbatim language of the two rescission memoranda suggests that the Acting Secretary adopted the majority of Kelly's wording, but actively rejected describing the DACA rescission as an act of discretion. This difference in language cuts strongly against any suggestion that the rescission was discretionary.

The government counters that the memorandum "focused from beginning to end principally on litigation concerns, not the legality of DACA *per se*." But as the State plaintiffs point out, the memorandum's references to these supposed "litigation concerns" were limited to a simple summary of the *Texas* litigation's procedural history; appeared only in the "Background" section of the memorandum; and were not referenced in the Acting Secretary's statement of what she was "[t]aking into consideration." *See also* note 16, *supra*.

The government also asserts that because the Acting Secretary wrote that DACA "should" rather than *must* be ended, she did not view herself as bound to act. But even on its face, "should" is fully capable of expressing obligation or necessity. *See, e.g., Should*, New Oxford American Dictionary (3d ed. 2010) ("used to indicate obligation, duty, or correctness"); *cf. Should*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("should . . . is sometimes used to create mandatory standards"). The Acting Secretary's use of "should" instead of "must" cannot overcome the absence of any discussion of potential litigation or the "risks" attendant to it from the rescission memorandum's statement of reasons, and the discrepancy between the rescission of DAPA as an act of "discretion" and the rescission of DACA as an act of "authority."

Finally, the government takes a quote from the Supreme Court to the effect that courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), and contorts it into an argument that the district court's "narrow reading of the Acting Secretary's rationale is *hardly the only one* that 'may reasonably be discerned' from the Acting Secretary's memorandum." But *Bowman* is about finding a reviewable rationale in an agency's action versus finding *no* articula-

---

**17.** Secretary Kelly's references to the factors he considered, which included obviously discretionary considerations such as "our new immigration enforcement priorities," provided a further model for how to describe a discretionary decision, which Acting Secretary Duke also chose not to follow.

tion of that rationale. *Bowman* does not say—and it certainly does not logically follow—that a court must ignore the most natural reading of an agency's statement of reasons just because it may also be "reasonably susceptible" to a (less compelling) reading that the government would prefer. The government is in effect asking the court to defer to agency counsel's post-hoc rationalization, as long as there is some reading of the rescission memorandum—never mind how strained—that would support it. *Bowman* does not require this incongruous result.

[7] We agree with the district court that the Acting Secretary based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS. Under *Montana Air* and *Chaney*'s footnote four, this conclusion brings the rescission within the realm of agency actions reviewable under the APA. Unless the INA itself deprives the courts of jurisdiction over this case, we must proceed to evaluate the merits of plaintiffs' arbitrary-and-capricious claim.

## B. *Jurisdiction under the INA*

[8] The government contends that the INA stripped the district court of its jurisdiction in a provision that states:

Except as provided in this section [which sets out avenues of review not applicable here] . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The Supreme Court has explicitly held that this section "applies only to three discrete actions that the [Secretary] may take: her 'decision or action' to '*commence*

proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482, 119 S.Ct. 936 (emphasis in original). As the Court put it, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *Id.*

The government attempts to expand Section 1252(g) to encompass this case in two ways. First, it points out that the *AADC* Court read that provision as Congress's effort to shield executive decisions not to grant deferred action from review outside the procedures prescribed by the INA. The Court quoted a treatise describing the practice of deferred action and the litigation that would result when the government declined to grant deferred action: "Efforts to challenge the refusal to exercise such discretion on behalf of specific aliens sometimes have been favorably considered by the courts. . . ." *Id.* at 484–85, 119 S.Ct. 936 (quoting 6 Charles Gordon et al., Immigration Law and Procedure § 72.03[2][h] (1998) ). Having reviewed these developments, the Court concluded: "Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations. . . ." *Id.* at 485, 119 S.Ct. 936.

The government argues that *AADC*'s reasoning—and therefore Section 1252(g)—applies to the rescission of DACA, which is itself in some sense a "no deferred action" decision. It seems quite clear, however, that *AADC* reads Section 1252(g) as responding to litigation over *individual* "no deferred action" decisions, rather than a programmatic shift like the

**504**    **908 FEDERAL REPORTER, 3d SERIES**

DACA rescission. For example, the treatise passage *AADC* quotes to set the scene for Congress's action refers explicitly to "[e]fforts to challenge the refusal to exercise [deferred action] *on behalf of specific aliens . . . .*" *Id.* (emphasis added). And in any case, the holding of *AADC* was explicit: "The provision applies only to [the] three discrete actions" mentioned in the statute. *Id.* at 482, 119 S.Ct. 936.

The government's fallback argument is thus to cast the rescission of DACA as an initial "action" in the agency's "commence[ment] [of] proceedings." 8 U.S.C. § 1252(g). But *AADC* specifically rejected a broad reading of the three discrete actions listed in Section 1252(g). "[D]ecisions to open an investigation, [or] to surveil the suspected violator" are *not* included in Section 1252(g)'s jurisdictional bar, *AADC*, 525 U.S. at 482, 119 S.Ct. 936, even though these actions are also "part of the deportation process," *id.*, and could similarly be construed as incremental steps toward an eventual "commence[ment] [of] proceedings," 8 U.S.C. § 1252(g).

Indeed, in a case closely on point, our court rejected the application of Section 1252(g) and allowed to proceed a challenge to INS guidance narrowly interpreting the terms of a "one-time legalization program" for undocumented immigrants. *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1141 (9th Cir. 2000). We noted that "[a]s interpreted by the Supreme Court in [*AADC*], [Section 1252(g)] applies only to

the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings," and held that the challenge was not barred. *Id.* at 1150. The panel did not appear concerned by the fact that it was possible to conceptualize that policy choice by INS as an ingredient in a subsequent decision to commence proceedings against particular individuals.

**[9]** The government cites no cases applying the Section 1252(g) bar to a programmatic policy decision about deferred action; the two cases it does cite were challenges to individual "no deferred action" decisions—that is, they fall exactly within Section 1252(g) as interpreted by the Court in *AADC*. *See Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016); *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999). Especially in light of the " 'strong presumption in favor of judicial review of administrative action' governing the construction of jurisdiction-stripping provisions of IIRIRA,"[18] *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) (quoting *INS v. St. Cyr*, 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ), we hold that Section 1252(g) does not deprive courts of jurisdiction to review the DACA rescission order.[19]

### IV.

**[10]** Having concluded that neither the APA nor the INA precludes judicial review, we turn to the merits of the prelimi-

---

18.  Section 1252(g) is one such provision. *See AADC*, 525 U.S. at 475, 119 S.Ct. 936 (describing § 1252(g)'s passage as part of IIRIRA).

19.  In its response and reply brief, the government appears to argue that another provision of the INA, 8 U.S.C. § 1252(b)(9), also stripped the district court of jurisdiction. Although ordinarily an argument not raised in the opening brief would be waived, this argument is jurisdictional so we must consider it.

*See, e.g., Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 n.3 (9th Cir. 2010) ("[C]hallenges to subject matter jurisdiction cannot be waived[.]"). But Section 1252(b)(9) does not bar jurisdiction here, because it "appl[ies] only to those claims seeking judicial review of orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007) (citing *St. Cyr*, 533 U.S. at 313, 121 S.Ct. 2271).

nary injunction. The district court held that plaintiffs satisfied the familiar four-factor preliminary injunction standard [20] with respect to their claim under the APA that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). The government takes issue with the district court's conclusion on only one of the preliminary injunction factors: the likelihood of success on the merits.

[11] In an arbitrary-and-capricious challenge, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (*Chenery II* ) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (*Chenery I* ) ) ).

Similarly, it is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action *could* have been justified as an exercise of discretion. That principle goes back at least as far as the Supreme Court's seminal decision in *Chenery I*, in which the Court stated:

> If [agency] action rests upon an administrative determination—an exercise of judgment in an area which Congress has

entrusted to the agency—of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, *an order may not stand if the agency has misconceived the law.*

*Chenery I*, 318 U.S. at 94, 63 S.Ct. 454 (emphasis added).

This holding of *Chenery I* remains good law. *See, e.g., United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017) ("Where a statute grants an agency discretion but the agency erroneously believes it is bound to a specific decision, we can't uphold the result as an exercise of the discretion that the agency disavows."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (setting aside agency action that was justified on a "legally erroneous" basis, and remanding for further consideration under other justifications). As the D.C. Circuit flatly put it, "An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law." *Sea-Land Serv., Inc. v. DOT*, 137 F.3d 640, 646 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985) ).

[12] Thus, if the DACA rescission was based solely on an erroneous legal premise, it must be set aside under 5 U.S.C. § 706(2)(A). We have already concluded, in our discussion of reviewability, that the rescission was indeed premised on the belief that the DACA program was unlawful.

---

**20.** "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

We next must decide whether that legal conclusion was correct.[21]

Attorney General Sessions's September 4, 2017, letter expresses several possible bases for the agency's ultimate conclusion that DACA was unlawful. First, the Attorney General states that "DACA was effectuated by the previous administration through executive action . . . after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result." But our court has already explained that "Congress's failure to pass the [DREAM] Act does not signal the illegitimacy of the DACA program," partly because "the DREAM Act and the DACA program are not interchangeable policies because they provide different forms of relief": the DREAM Act would have provided a path to lawful permanent resident status, while DACA simply defers removal. *Brewer II*, 855 F.3d at 976 n.10; *see* Motomura, *supra*, at 175 ("DACA is not the DREAM Act; as an interim executive measure, it is limited in duration and provides no durable immigration status.") (footnote omitted); *see also, e.g.*, DREAM Act of 2011, S. 952, 112th Cong. (2011). Moreover, there is nothing inherently problematic about an agency addressing a problem for which Congress has been unable to pass a legislative fix, so long as the particular action taken is properly within the agency's power. This argument therefore provides no independent reason to think that DACA is unlawful.

The Attorney General's primary bases for concluding that DACA was illegal were that the program was "effectuated . . . without proper statutory authority" and that it amounted to "an unconstitutional exercise of authority." More specifically, the Attorney General asserted that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA" in the *Texas* litigation.

The claim of "constitutional defects" is a puzzling one because as all the parties recognize, no court has ever held that DAPA is unconstitutional. The Fifth Circuit and district court in *Texas* explicitly declined to address the constitutional issue. *See Texas*, 809 F.3d at 154 ("We decide this appeal . . . without resolving the constitutional claim."); *Texas*, 86 F. Supp. 3d at 677 ("[T]he Court is specifically not addressing Plaintiffs' likelihood of success on . . . their constitutional claims. . . ."). Indeed, the government makes no attempt in this appeal to defend the Attorney General's assertion that the DACA program is unconstitutional. We therefore do not address it further.

With respect to DACA's alleged "legal . . . defects," the district court explained in great detail the long history of deferred action in immigration enforcement, including in the form of broad programs; the fact that the Supreme Court and Congress have both acknowledged deferred action as a feature of the immigration system; and the specific statutory responsibility of the Secretary of Homeland Security for "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The government does not contest any of these propositions, which themselves go a long way toward establishing DACA's legality. Instead, the government argues that the Fifth Circuit's reasons for striking down the related DAPA policy would also apply to DACA.

---

**21.** The government does not argue that its conclusion is entitled to *Chevron* deference, likely because "[d]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.' " *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1149 (9th Cir. 2013) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) ).

**AR0448**

The Fifth Circuit concluded that DAPA was unlawful on two grounds: first, that DAPA was in fact a legislative rule and therefore should have been promulgated through notice-and-comment rulemaking; and second, that DAPA was substantively inconsistent with the INA. *See Texas*, 809 F.3d at 171–78, 178–86.

**[13]** With respect to the first holding, notice-and-comment procedures are not required where the agency pronouncement in question is a "general statement[ ] of policy." 5 U.S.C. § 553(b)(3)(A). "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original) (internal quotation marks omitted).

On its face, DACA obviously allows (and indeed requires) DHS officials to exercise discretion in making deferred action decisions as to individual cases: Secretary Napolitano's memorandum announcing DACA specifically states that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." The Fifth Circuit in *Texas* held that DAPA was a substantive rule notwithstanding similar discretionary language, based primarily on statistics regarding the approval rates of DACA applications. The court read those statistics as revealing that DACA was discretionary in name only—that is, that DHS personnel had no discretion to deny deferred action if the DACA criteria were met. *Texas*, 809 F.3d at 172–73.

But as the dissenting judge in *Texas* pointed out, DACA's (then) 5% denial rate—which did not include applications rejected for administrative deficiencies—is consistent with a discretionary program given that applicants self-select: "It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigration status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee)." *Texas*, 809 F.3d at 210 (King, J., dissenting).

Moreover, the denial rate has risen as the DACA program has matured. DHS statistics included in the record reveal that in fiscal year 2016, for example, the agency approved 52,882 initial DACA applications and denied 11,445; that is, 17.8% of the applications acted upon were denied.[22] As Judge King concluded, "Neither of these numbers suggests an agency on autopilot." *Texas*, 809 F.3d at 210 n.44 (King, J., dissenting); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 n.13 (D.D.C. 2014) (noting that these same statistics "reflect that . . . case-by-case review is in operation").[23] In light of these differences, we do not agree that DACA is a legislative rule

---

**22.** U.S. Citizenship & Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012–2017 (March 31, 2017). The number of initial applications is the relevant metric because renewal applications are by definition limited to the pool of those already approved for DACA at least once. Therefore, one would expect an even lower denial rate for renewals.

**23.** Judge King's dissent also makes the critical observation that, according to the declarations filed in that case, the reason DHS could not point to specific instances in which DACA applicants met the program criteria but were denied as a matter of discretion was that DHS did not have the ability to track and sort the reasons for DACA denials. *Texas*, 809 F.3d at 211 (King, J., dissenting).

AR0449

that would require notice-and-comment rulemaking.

As to the substantive holding in *Texas*, the Fifth Circuit concluded that DAPA conflicted with the INA largely for a reason that is inapplicable to DACA. Specifically, the Fifth Circuit reasoned that the INA provides "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status" but that "DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the requirements . . . that Congress has deliberately imposed." *Texas*, 809 F.3d at 179–80. As the district court in this case noted, there is no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children. One of the major problems the Fifth Circuit identified with DAPA is therefore not present here.

In resisting this conclusion, the government flips the Fifth Circuit's reasoning on its head, arguing that "[i]nsofar as the creation of pathways to lawful presence was relevant, the fact that Congress had legislated only for certain individuals similarly situated to DAPA beneficiaries—and not DACA recipients—would make DACA *more* inconsistent with the INA than DAPA." To the extent the government meant to draw on the *Texas* court's analysis, it gets it exactly backwards: the whole thrust of the Fifth Circuit's reasoning on this point was that DHS was without authority because "Congress has 'directly addressed the precise question at issue.' " *Texas*, 809 F.3d at 186 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52, 131 S.Ct. 704, 178 L.Ed.2d 588 (2011) ). There is no argument that Congress has similarly occupied the field with respect to DACA; as

the Attorney General himself noted, Congress has repeatedly rejected Dreamer legislation.

The second major element of the Fifth Circuit's analysis on the substantive issues was that the INA itself "prescribes . . . which classes of aliens can achieve deferred action and eligibility for work authorization." *Texas*, 809 F.3d at 186. The court drew the implication that the statute must therefore preclude the Executive Branch from granting these benefits to other classes. *Id.* (pairing this notion with the pathway-to-lawful-presence argument as the keys to its conclusion).

[14] But "[t]he force of any negative implication . . . depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013). Indeed, "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). Here, the express grants of deferred action cited by the Fifth Circuit were not passed together as part of the original INA; rather, they were added to the statute books piecemeal over time by Congress. *See* Violence Against Women Act of 2000, Pub. L. No. 106-386, div. B, sec. 1503, § 1154(a)(1)(D)(i), 114 Stat. 1491 (codified at 8 U.S.C. § 1154(a)(1)(D)(i) ) (specifying deferred action for certain VAWA self-petitioners); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (same, for family members of lawful permanent residents killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694–95 (same, for relatives of noncitizens killed in combat and posthumously granted citizenship).

Given this context, we find it improbable that Congress "considered the . . . possibility" of all other potential uses for deferred action "and meant to say no" to any other application of that tool by the immigration agency. *Barnhart*, 537 U.S. at 168, 123 S.Ct. 748. We think the much more reasonable conclusion is that in passing its seriatim pieces of legislation, instructing that this and that "narrow class[ ]" of noncitizens should be eligible for deferred action, *Texas*, 809 F.3d at 179, Congress meant to say nothing at all about the underlying power of the Executive Branch to grant the same remedy to others. We do not read an "and no one else" clause into each of Congress's individual express grants of deferred action.

Another element in the Fifth Circuit's analysis was that "DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits, and 'we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" *Id.* at 181 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ). DACA, on the other hand, had 689,800 enrollees as of September 2017. The government asserts that this difference in size is "legally immaterial," but that response is unconvincing. If the point is that the "economic and political magnitude" of allowing 4.3 million people to remain in the country and obtain work authorization is such that Congress would have spoken to it directly, then surely it makes a difference that one policy has less than one-sixth the "magnitude" of the other. *Id.* As the district court laconically put it, "there is a difference between 4.3 million and 689,800."

Finally, the government finds "an insurmountable obstacle to plaintiffs' position" in that "the district court's injunction affirmed by the Fifth Circuit covered both DAPA and *expanded DACA*." It is true that the *Texas* court also enjoined the expansions of DACA that were announced in the same memorandum as the DAPA program. *See Texas*, 809 F.3d at 147 n.11 ("The district court enjoined implementation of the following three DACA expansions, and they are included in the term 'DAPA' in this opinion . . . ."). But no analysis was devoted to those provisions by either the Fifth Circuit or the *Texas* district court, and one of the keys to the Fifth Circuit's reasoning—that Congress had supposedly occupied the field with respect to obtaining immigration benefits through one's children—does *not* apply to either the original DACA program or its expansions. Under these circumstances, we do not find the *Texas* courts' treatment of the DACA expansions to be strong persuasive authority, much less an "insurmountable obstacle." *Cf.* Bryan A. Garner et al., The Law of Judicial Precedent 170 (2016) ("An authority derives its persuasive power from its ability to convince others to go along with it.").

In sum, the reality is (and always has been) that the executive agencies charged with immigration enforcement do not have the resources required to deport every single person present in this country without authorization. *Compare* Bernsen Memorandum, *supra*, at 1 (stating, in 1976, that "[t]here simply are not enough resources to enforce all of the rules and regulations presently on the books"), *with* Memorandum from John Morton, Assistant Secretary, DHS, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens*, at 1 (June 30, 2010) (estimating that ICE has enough resources to deport only 4% of the undocumented population in any given

year, and concluding that "ICE must prioritize the use of its … removal resources to ensure the removals the agency does conduct promote the agency's highest enforcement priorities") *and* Motomura, *supra*, at 26 ("The letter of the law creates a large removable population, but whether an individual is actually targeted for removal has long depended on government discretion and bad luck." (footnote omitted) ). Recognizing this state of affairs, Congress has explicitly charged the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

It is therefore no surprise that deferred action has been a feature of our immigration system—albeit one of executive invention—for decades; has been employed categorically on numerous occasions; and has been recognized as a practical reality by both Congress and the courts. *See, e.g.,* *Brewer II*, 855 F.3d at 967 ("[I]t is well settled that the Secretary [of Homeland Security] can exercise deferred action" as part of her statutory authority "to administer and enforce all laws relating to immigration and naturalization."). In a world where the government can remove only a small percentage of the undocumented noncitizens present in this country in any year, deferred action programs like DACA enable DHS to devote much-needed resources to enforcement priorities such as threats to national security, rather than

blameless and economically productive young people with clean criminal records.

[15] We therefore conclude that DACA was a permissible exercise of executive discretion, notwithstanding the Fifth Circuit's conclusion that the related DAPA program exceeded DHS's statutory authority. DACA is being implemented in a manner that reflects discretionary, case-by-case review, and at least one of the Fifth Circuit's key rationales in striking down DAPA is inapplicable with respect to DACA. With respect for our sister circuit, we find the analysis that seemingly compelled the result in *Texas* entirely inapposite. And because the Acting Secretary was therefore incorrect in her belief that DACA was illegal and had to be rescinded, plaintiffs are likely to succeed in demonstrating that the rescission must be set aside. *Chenery I*, 318 U.S. at 94, 63 S.Ct. 454; *Safe Air for Everyone*, 488 F.3d at 1101–02.

To be clear: we do not hold that DACA *could not* be rescinded as an exercise of Executive Branch discretion. We hold only that here, where the Executive *did not* make a discretionary choice to end DACA—but rather acted based on an erroneous view of what the law required—the rescission was arbitrary and capricious under settled law. The government is, as always, free to reexamine its policy choices, so long as doing so does not violate an injunction or any freestanding statutory or constitutional protection.[21]

---

**24.** The government has submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), informing us that the current Secretary of Homeland Security, Kirstjen Nielsen, issued a new memorandum regarding the DACA rescission on June 22, 2018. In the memorandum, Secretary Nielsen "provide[d] additional explanation of the basis for the DACA rescission," in response to an order filed in a parallel lawsuit. The government's letter does not argue that the Nielsen memorandum represents fresh agency action that

could possibly moot this appeal. We therefore leave it to the district court in the first instance to determine the admissibility of Secretary Nielsen's letter given that it cannot possibly be a part of the administrative record in this case, and its impact, if any, on this case. And to the extent the Nielsen memorandum is offered as an additional justification of the original DACA rescission, we do not consider it in our review of Acting Secretary Duke's decision because it is well-settled that "we will not allow the agency to supply post-hoc

## V.

**[16]**  Having concluded that the district court was correct in its APA merits holding, we now turn to the question of the appropriate remedy. The district court preliminarily enjoined the rescission of DACA with respect to existing beneficiaries on a nationwide basis. The government asserts that this was error, and that a proper injunction would be narrower.

**[17, 18]**  The general rule regarding the scope of preliminary injunctive relief is that it "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (internal citation omitted). But "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987); *see also id.* at 1170–71 ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.") (emphasis in original).

**[19]**  It is also important to note that the claim underlying the injunction here is an arbitrary-and-capricious challenge under the APA. In this context, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citation omitted). As Justice Blackmun explained while "writing in dissent but apparently expressing the view of all nine Justices on this question," *id.*:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (Blackmun, J., dissenting) (citation omitted).

A final principle is also relevant: the need for uniformity in immigration policy. *See Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, —— U.S. ——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."). As the Fifth Circuit stated when it affirmed the nationwide injunction against DAPA, "the Constitution requires an *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas*, 809 F.3d at 187–88 (emphases in original) (citations and internal quotation marks omitted). Allowing uneven application of nationwide immigration policy flies in the face of these requirements.

---

rationalizations for its actions. . . ." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

F.3d 581, 603 (9th Cir. 2014).

In its briefing, the government fails to explain how the district court could have crafted a narrower injunction that would provide complete relief to the plaintiffs, including the entity plaintiffs. *Cf. Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) ("[T]he Government has not proposed a workable alternative form of the TRO . . . that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders."). Nor does it provide compelling reasons to deviate from the normal rule in APA cases, or to disregard the need for uniformity in national immigration policy. The one argument it does offer on this latter point—that "[d]eferred action is itself a departure from vigorous and uniform enforcement of the immigration laws," and that "enjoining the rescission of DACA on a nationwide basis . . . increases rather than lessens that departure"—is a red herring. DACA *is* national immigration policy, and an injunction that applies that policy to some individuals while rescinding it as to others is inimical to the principle of uniformity.

We therefore conclude that the district court did not abuse its discretion in issuing a nationwide injunction. Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress.

## VI.

We turn next to the district court's treatment of the government's motion to dismiss for failure to state a claim. The government moved to dismiss all of plaintiffs' claims; the district court dismissed some claims and denied the government's

motion as to others. We take each claim in turn.[25]

### A.   APA: Arbitrary-and-Capricious

For the reasons stated above in discussing plaintiffs' likelihood of success on the merits, the district court was correct to deny the government's motion to dismiss plaintiffs' claim that the DACA rescission was arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A).

### B.   APA: Notice-and-Comment

[20]   Plaintiffs also assert that the rescission of DACA is in fact a substantive rule under the APA, and that it therefore could not be validly accomplished without notice-and-comment procedures.

As touched on above with respect to DACA itself, an agency pronouncement is excluded from the APA's requirement of notice-and-comment procedures if it constitutes a "general statement[ ] of policy." 5 U.S.C. § 553(b)(3)(A). General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna*, 813 F.2d at 1012–13 (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947) ). "To qualify as a general statement of policy . . . a directive must not establish a binding norm and must leave agency officials free to consider the individual facts in the various cases that arise and to exercise discretion." *Id.* at 1015 (internal quotation marks omitted); *see also id.* at 1013 ("The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to

---

**25.**   Plaintiffs do not challenge the district court's dismissal of their equitable estoppel

claim.

exercise discretion to follow, or not to follow, the [announced] policy in an individual case." (alterations in original) (internal quotation marks omitted) ).

The district court held that because DACA itself was a general statement of policy that did not require notice and comment, it could also be rescinded without those procedures. This proposition finds support in *Mada-Luna*, in which "we conclude[d] that [a deferred-action Operating Instruction] constituted a general statement of policy, and thus could be validly repealed and superseded without notice-and-comment proceedings." *Id.* at 1017. Plaintiffs contest this conclusion, arguing that the DACA *rescission* was a binding rule, even though DACA's *adoption* was a general statement of policy. They provide two bases for this assertion.

First, plaintiffs argue that the rescission is binding because it requires DHS officials to reject new DACA applications and (after a certain date) renewal applications. It is true that Acting Secretary Duke's rescission memorandum makes rejections of DACA applications mandatory. But the relevant question under the rescission memorandum is not whether DHS officials retained discretion to accept applications for a program that no longer existed; instead, the question is whether DHS officials retained discretion *to grant deferred action* and collateral benefits outside of the (now-cancelled) DACA program.

For its part, the government asserts that the rescission memorandum made clear that, despite the rescission, "future deferred action requests will be 'adjudi-

cat[ed] . . . on an individual, case-by-case basis.'" Mildly put, this assertion mischaracterizes the memorandum. The quoted language refers to the treatment of only (a) initial applications pending on the date of the rescission, and (b) renewal applications filed within the one-month wind-down period. It does *not* refer to how future requests for deferred action outside the DACA program would be handled. Still, the rescission memorandum also did not forbid the agency from granting such requests, and it acknowledged the background principle of deferred action as "an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis." And the memorandum closed by stating that "no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS"—presumably including granting deferred action on a case-by-case basis to some people who would have been eligible for DACA.

If allowed to go into effect, the rescission of DACA would undoubtedly result in the loss of deferred action for the vast majority of the 689,800 people who rely on the program. But the rescission memorandum does not mandate that result because it leaves in place the background principle that deferred action is available on a case-by-case basis.[26] Plaintiffs' primary argument against this conclusion is a citation to *United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977), which is said to be "the only other decision to address an Executive Branch decision to terminate a deferred-action program without undergoing notice-and-comment rulemaking."

---

**26.** The Regents argue that "the agency's discretion to grant deferred action on the basis of the DACA criteria has been eliminated." This is not quite right either. DHS's authority to grant deferred action *under the DACA program* has been eliminated, but the DACA criteria themselves are some of those that have

traditionally guided immigration enforcement discretion. *See* Wadhia, *supra*, at 57 ("DHS used traditional humanitarian factors to outline the parameters for the DACA program, such as tender age and longtime residence in the United States.").

But as the district court noted, the key factor in that case was the contention that under the policy at issue, " 'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *Parco*, 426 F. Supp. at 984. DACA, by contrast, explicitly contemplated case-by-case discretion, and its rescission appears to have left in place background principles of prosecutorial discretion.

Plaintiffs also argue that the DACA rescission is not a general policy statement because it is binding as a legal interpretation that a DACA-like program would be illegal. But again, this argument answers the wrong question. The Acting Secretary's legal conclusion that a DACA-like program is unlawful does not constrain the discretion of line-level DHS employees to grant deferred action on a case-by-case basis, and those employees lack authority to institute such an agency-wide program in the first place. And plaintiffs do not point to any reason why *this* Acting Secretary's legal conclusion about DACA would bind subsequent Secretaries if they were to disagree with its reasoning—just as Acting Secretary Duke reversed course from previous Secretaries who concluded DACA was legal. This is not a "new 'binding rule of substantive law,' " *Mada-Luna*, 813 F.2d at 1014, affecting the rights of the people and entities regulated by the agency; it is an interpretation of the agency's own power, and plaintiffs do not explain why it should be read as binding future DHS Secretaries. The district court correctly dismissed plaintiffs' notice-and-comment claims.

### C.  Due Process: Deferred Action

The *Garcia* plaintiffs—individual DACA recipients—have brought a substantive due process claim alleging that the rescission deprived them of protected interests in their DACA designation, including the renewal of their benefits. The district court dismissed this claim, holding that there is no protected entitlement in either the initial grant of deferred action under DACA or the renewal of benefits for existing DACA enrollees. On appeal, the *Garcia* plaintiffs challenge this ruling only as it applies to the renewal of DACA benefits, not as to the initial grant.

**[21–23]**  "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994). It is possible to have a property interest in a government benefit, but "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Although "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), a legitimate claim of entitlement may exist where there are "rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to the benefit...." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *see also, e.g., Gerhart v. Lake Cty.*, 637 F.3d 1013, 1020 (9th Cir. 2011). The dispute here focuses on whether such "mutually explicit understandings" existed between the government and DACA recipients with respect to the renewal of DACA benefits.

**[24]**  The *Garcia* plaintiffs assert that they and the government " 'mutually' understood that DACA recipients would be

able to renew their benefits and protection on an ongoing basis so long as they fulfilled the program's criteria." But this argument is undercut by the DACA FAQs published by DHS, which explicitly state that "USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the [renewal] guidelines are met." The FAQs also state that any individual's "deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion," and Secretary Napolitano's DACA memorandum claims that it "confers no substantive right, immigration status or pathway to citizenship." Whether or not these provisions are legally operative, they do not indicate that the government shared plaintiffs' expectation of presumptive renewal.

Attempting to overcome this facially discretionary language, plaintiffs emphasize several factors. First, they say, the very nature of the DACA project was such that presumptive renewal was required to encourage people to participate; a two-year term with no presumption of renewal would not have been attractive enough to outweigh the risks to the applicants. Moreover, Secretary Napolitano's DACA memorandum itself states that grants of deferred action under DACA will be "subject to renewal," and the actual criteria for renewal were "nondiscretionary" in nature.[27] Finally, the plaintiffs point to a more than 99% approval rate for adjudicated DACA renewal applications. This, they assert, is powerful evidence of a mutual understanding of presumptive renewal.

All these points might have revealed a question of fact as to whether a mutually explicit understanding of presumptive renewal existed—thereby avoiding dismissal on the pleadings—if plaintiffs were bringing a claim that, for example, their individual DACA renewals were denied for no good reason. But it is hard to see how an expectation of renewal within the confines of the existing DACA policy could have created a mutually explicit understanding that the DACA program *itself* would not be terminated wholesale. That is, a 99% renewal rate under DACA provides no evidence that the government shared an understanding that the DACA program would continue existing indefinitely to provide such renewals. None of plaintiffs' cited authorities appear to address this kind of claim.

While we may agree with much of what plaintiffs say about the cruelty of ending a program upon which so many have come to rely, we do not believe they have plausibly alleged a "mutually explicit understanding" that DACA—created by executive action in a politically polarized policy area and explicitly couched in discretionary language—would exist indefinitely, including through a change in presidential administrations. *See Gerhart*, 637 F.3d at 1020 ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government."). On that basis, we affirm the district court's dismissal.

---

**27.** DHS's DACA FAQs state that "[y]ou may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you: [1] Did not depart the United States on or after Aug. 15, 2012, without advance parole; [2] Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and [3] Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety."

*D.  Due Process: Information-Sharing*

**[25]**  Several of the complaints allege a different due process theory: DACA recipients had a protected interest based on the government's representations that the personal information they submitted with their applications would not be used for enforcement purposes, and the government violated this interest by changing its policy to allow such use. The district court held that the plaintiffs had plausibly alleged facts that state a claim under this theory.

As with their other due process claim, the question whether DACA recipients enjoy a protected due process right protecting them from having the government use their information against them for enforcement purposes turns on the existence of a "mutually explicit understanding[ ]" on that point between the government and DACA recipients. *Perry*, 408 U.S. at 601, 92 S.Ct. 2694; *see also Gerhart*, 637 F.3d at 1020. The DACA FAQs published by DHS state the following information-use policy:

> Information provided in this request *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members

and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

(emphasis added). The statement that applicant information "is protected from disclosure" to the enforcement arms of DHS is a strong commitment, and plaintiffs plausibly allege that DACA recipients reasonably relied on it.

The government of course points to the express caveat that the information-sharing policy "may be modified, superseded or rescinded at any time." But as the district court held, this qualifier is ambiguous as to whether it allows the government to change its policy only prospectively, or also with respect to information already received—and this ambiguity presents a fact question not amenable to resolution on the pleadings. Plaintiffs' interpretation that a policy change would only apply prospectively is a plausible one, given that the policy is written in terms of what will happen to "[i]nformation provided in *this request*," rather than DACA-derived information generally. (emphasis added). It is at least reasonable to think that a change in the policy would apply only to those applications submitted after that change takes effect. And while the government also relies on the language stating that the policy does not create enforceable rights, such a disclaimer by an agency about what its statements do and do not constitute as a legal matter are not dispositive. *See, e.g., Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (declining to give legal effect to agency statement that its guidance did "not represent final Agency action, and cannot be relied upon to

create any rights....""). Plaintiffs have plausibly alleged a mutually explicit understanding that DACA applicants' information would be protected from disclosure.

The government argues in the alternative that plaintiffs have failed to plausibly allege that DHS actually changed its policy. Plaintiffs' allegations rest on a set of FAQs about the DACA rescission that DHS published the same day it issued the rescission memorandum, September 5, 2017. In those rescission FAQs, the previous language stating that personal information "is protected from disclosure" has been replaced with the following:

> Information provided to USCIS in DACA requests *will not be proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).

(emphasis added).

The government's first response—that the differing language in the two FAQs does not actually reflect a difference in policy—is hard to swallow. It does not take much parsing of the text to see the significant difference between "protect[ing]" something from "disclosure" on the one hand, and merely declining to "proactively provide[ ]" it on the other. This is especially so when the entities in question (and to which USCIS presumably *would* now provide information *re*actively) are fellow components of the same umbrella agency.

Changing gears, the government also points to yet a third set of FAQs, published months after the rescission and not part of the record in this case, which state:

> Information provided to USCIS for the DACA process will not make you an immigration priority for that reason alone. That information *will only be*

*proactively provided* to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). *This information-sharing policy has not changed in any way since it was first announced,* including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy.

USCIS, Guidance on Rejected DACA Requests: Frequently Asked Questions (Nov. 30, 2017) (emphases added). The government notes that a district court relied on FAQs containing this language in parallel litigation to dismiss a nearly identical information-use due process claim. *See Batalla Vidal v. Nielsen,* 291 F. Supp. 3d 260, 279–81 (E.D.N.Y. 2018).

But this case is critically different because in *Batalla Vidal* the plaintiffs had attached the new version of the FAQs to their complaint. As the court there explained, "Plaintiffs ... have effectively pleaded themselves out of court by relying on a document that contradicts their otherwise-unsupported allegation of a change to DHS's information-use policy." *Id.* at 280. By contrast, here the most recent FAQs were not attached to or referenced in any of the complaints—indeed, they postdate the filing of the complaints. Therefore, the normal rule applies: materials outside the complaint cannot be considered on a motion to dismiss. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003).

Even if it could be considered, this newest FAQ would not conclusively resolve the question of fact surrounding DHS's current information-sharing policy because it still contains the language that suggests a change from the pre-rescission policy. *See* USCIS, Guidance, *supra* ("[I]nformation will only be *proactively provided* to ICE or

CBP if the requestor meets the criteria for the issuance of a Notice To Appear[.]") (emphasis added).[28] Plaintiffs have plausibly alleged that DHS has changed its policy.

**[26]**   Finally, in order to state a substantive due process claim, plaintiffs must allege conduct that "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *March v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012) ). The government makes a passing argument that this standard is not satisfied because the information-sharing policy has always contained some exceptions, but as the *Garcia* plaintiffs put it, "[a]pplicants accepted those limited, acknowledged risks when they applied for DACA. They did not accept the risk that the government would abandon the other assurances that were 'crucial' to 'inducing them to apply for DACA.'" (alterations incorporated). We agree. *Cf. Raley v. Ohio*, 360 U.S. 423, 437–39, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) (holding that "convicting a citizen for exercising a privilege which the State had clearly told him was available to him" was "the most indefensible sort of entrapment by the State" and violated due process); *Cox v. Louisiana*, 379 U.S. 559, 568–71, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (due process violation where defendant was convicted for leading a demonstration in a location where the police chief had given him permission to do so). Plaintiffs have stated a due process

claim based on the alleged change in DHS's information-sharing policy.

*E.   Equal Protection*

The district court also held that plaintiffs stated a viable equal protection claim by plausibly alleging that the DACA rescission disproportionately affected Latinos and individuals of Mexican descent and was motivated by discriminatory animus. *See Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (holding a facially neutral action unconstitutional where "its enactment or the manner in which it was enforced were motivated by a discriminatory purpose," and reviewing the *Arlington Heights* factors for assessing discriminatory purpose) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ).

Because the district court denied the government's motion to dismiss plaintiffs' equal protection claim at the pleading stage, we take all of the complaints' allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and construe them in the light most favorable to the plaintiffs, *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We agree with the district court that plaintiffs plausibly alleged an equal protection claim.

**[27]**   Most significantly, plaintiffs allege that the rescission of DACA disproportionately impacts Latinos and individuals of Mexican heritage, who account for 93% of DACA recipients. *See Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. The complaints also allege a history of animus toward persons of Hispanic descent [29] evi-

---

**28.**  Astonishingly, this sentence—which appears to represent a change from the prior policy of affirmatively protecting information from disclosure—is *immediately adjacent* to DHS's assurance that nothing has changed. *Cf.* George Orwell, Nineteen Eighty-Four (1949), at 175 ("Oceania was at war with

Eastasia: Oceania had always been at war with Eastasia.").

**29.**  The government argues that the statements by the President cited in the complaints do not provide sufficient evidence to plausibly allege discriminatory intent. The government first submits that nationality, as opposed to evi-

REGENTS OF UNIV. CALIFORNIA v. U.S. HOMELAND SEC.   **519**
Cite as 908 F.3d 476 (9th Cir. 2018)

denced by both pre-presidential and post-presidential [30] statements by President Trump, who is alleged to have decided to end DACA, even though the directive to the Acting Secretary was issued from Attorney General Sessions. Finally, the district court properly considered "the unusual history behind the rescission," all of which appeared in the record submitted by the government. *See Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555. As the district court noted, "DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality). This strange about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed."

The government contends that the equal protection claim is foreclosed by *AADC*, in which the Supreme Court stated that "as a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." 525 U.S. at 488, 119 S.Ct. 936. But in the context of this case, the challenge to the rescission of DACA is not raised "as a defense against [ ] deportation," and is not a claim of "selective enforcement." *Id.* Rather, it is a freestanding claim that the Executive Branch, motivated by animus, ended a program that overwhelmingly benefits a cer-

tain ethnic group. Thus, the equal protection claim does not implicate the concerns motivating the Court in *AADC* and underscored by the government: inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations. The two cases cited by the government do not support its position, as both of them involved an individual noncitizen making an equal protection argument in an attempt to avoid his own deportation. *See Kandamar v. Gonzales*, 464 F.3d 65, 72–74 (1st Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006). Plaintiffs' challenge to the rescission of DACA—which is itself discretionary—is not such a case.

The government also contends that even if not totally barred by *AADC*, plaintiffs' claims must be subject to the heightened pleading standard applied to selective-prosecution claims in the criminal context. *See United States v. Armstrong*, 517 U.S. 456, 463–65, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). But this argument meets the same objection: as the district court held, plaintiffs' challenge is not a selective-prosecution claim. We are therefore not persuaded by the government's arguments.

The Supreme Court's recent decision in *Trump v. Hawaii*, —— U.S. ——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), does not foreclose this claim. There, statements by the President allegedly revealing religious

---

ethnicity, is not an invidious classification, and that many of the cited comments go only to Mexican nationality. "Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Brennan, J., concurring). And plaintiffs allege discriminatory intent not only toward "Mexican nationals," but also toward "individuals of Mexican heritage, and Latinos."

**30.** The district court took judicial notice of one such statement by the President: "[o]n December 29, 2017, President Trump tweeted: 'The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our Country at all cost!' " There were many similar statements made by the President after he took the oath of office leading up to the DACA rescission on September 5, 2017.

animus against Muslims were "[a]t the heart of plaintiffs' case...." *Hawaii*, 138 S. Ct. at 2417. The Court assumed without deciding that it was proper to rely on the President's statements, but nevertheless upheld the challenged executive order under rational basis review. *Id.* at 2420, 2423. Here, by contrast, plaintiffs provide substantially greater evidence of discriminatory motivation, including the rescission order's disparate impact on Latinos and persons of Mexican heritage, as well as the order's unusual history. Moreover, our case differs from *Hawaii* in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, *see Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc), the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised.

Therefore, we conclude that plaintiffs have stated a plausible equal protection claim.

### VII.

The rescission of DACA—based as it was solely on a misconceived view of the law—is reviewable, and plaintiffs are likely to succeed on their claim that it must be set aside under the APA. We therefore affirm the district court's entry of a preliminary injunction.[31] The district court also properly dismissed plaintiffs' APA notice-and-comment claim, and their claim that the DACA rescission violates their substantive due process rights. The district court also properly denied the gov-

ernment's motion to dismiss plaintiffs' APA arbitrary-and-capricious claim, their claim that the new information-sharing policy violates their due process rights, and their claim that the DACA rescission violates their right to equal protection.

\* \* \*

The Executive wields awesome power in the enforcement of our nation's immigration laws. Our decision today does not curb that power, but rather enables its exercise in a manner that is free from legal misconceptions and is democratically accountable to the public. Whether Dulce Garcia and the hundreds of thousands of other young dreamers like her may continue to live productively in the only country they have ever known is, ultimately, a choice for the political branches of our constitutional government. With the power to make that choice, however, must come accountability for the consequences.

### AFFIRMED.

OWENS, Circuit Judge, concurring in the judgment:

As I believe that Plaintiffs' Equal Protection claim has some "likelihood of success on the merits," I concur in the judgment affirming the preliminary injunction. The extraordinary practical impact of allowing DACA's rescission to take effect before a final adjudication of its legality far outweighs the minimal practical impact of keeping the program in place a bit longer. For that reason, it is better now to risk incorrectly preserving the status quo than to risk incorrectly disrupting it.[1]

---

**31.** We do not disagree with the reasoning of Judge Owens's concurring opinion that the likelihood of success on plaintiffs' equal protection claim is a second, alternative ground for affirming the entry of the injunction.

**1.** The government appears to share this view. In its petition for certiorari before judgment,

the government asserted that "a primary purpose of the Acting Secretary's orderly wind-down of the DACA policy was to avoid the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws. Inviting more changes before final resolution of this litigation would not further that interest."

However, I disagree with the portion of the majority's opinion that we may review the rescission of DACA for compliance with the APA.[2]

Under 5 U.S.C. § 701(a)(2), "agency action [that] is committed to agency discretion by law" is not subject to judicial review for compliance with the APA. Since *Heckler v. Chaney*, courts read § 701(a)(2) to preclude judicial review of certain types of administrative action that are "traditionally . . . 'committed to agency discretion.'" 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (holding unreviewable the decision not to institute enforcement proceedings); *Lincoln v. Vigil*, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (same for the allocation of funds from a lump-sum appropriation); *Webster v. Doe*, 486 U.S. 592, 599–600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (same for decisions of the Director of the Central Intelligence Agency to terminate an employee due to national security interests); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 281–82, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) (*BLE*) (same for an agency's refusal to grant reconsideration of an action due to material error).

An agency decision to rescind a non-enforcement policy in the immigration context is this type of administrative action. From *Heckler*, we know that agency actions that "involve[ ] a complicated balancing of a number of factors," like allocating agency resources and prioritizing agency policies, "are peculiarly within [the agency's] expertise," and are therefore "general[ly] unsuitab[le] for judicial review." 470 U.S. at 831, 105 S.Ct. 1649. And in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC*), the Supreme Court made clear that Executive Branch decisions that implicate enforcement priorities in the context of immigration are among those that judges are least equipped to review. *Id.* at 489–90, 119 S.Ct. 936. In *AADC*, the Court explained that the concerns necessitating the Executive's "broad discretion" in criminal prosecutions are "greatly magnified in the deportation context." *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ).

In deciding to rescind an immigration policy of nonenforcement, DHS thus acts with broad discretion that courts cannot review absent clear congressional authorization. Here, rather than authorize judicial review, the broad, discretion-granting language of the enabling statute reinforces that DHS's enforcement decision is not subject to APA review. *See* 6 U.S.C. § 202(5) ("The Secretary shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."); *see also Webster*, 486 U.S. at 599–600, 108 S.Ct. 2047.

Perhaps recognizing that immigration enforcement decisions exhibit the characteristics of unreviewable agency actions, the majority decides that we should nonetheless review the rescission of DACA because these features are not actually at work here: Acting Secretary Duke ex-

---

**2.**  As for the government's appeal from the motions to dismiss, I dissent, for reasons stated here, from the majority's holding to affirm the district court's denial of the motion to dismiss Plaintiffs' APA arbitrary-and-capricious claim (Part VI-A). However, I concur in the majority's holding to affirm the district court's dismissal of Plaintiffs' APA notice-and-comment claim (Part VI-B). I also concur in the judgment to affirm the district court's ruling on Plaintiffs' Due Process claims (Part VI-C; Part VI-D). And, as explained here as well, I agree with the majority's decision to affirm the district court's denial of the motion to dismiss the Equal Protection claim (Part VI-E) and hold that the Equal Protection claim offers an alternative ground to affirm the preliminary injunction.

plained that DACA was rescinded based on DHS's belief that the program was unlawful. The majority points to *Heckler*'s footnote 4, where the Court left open the question whether courts may review agency action if "a refusal by the agency to institute proceedings [is] based solely on the belief that it lacks jurisdiction." *Heckler*, 470 U.S. at 833 n.4, 105 S.Ct. 1649 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2)...."). The majority concludes that the Supreme Court has not yet answered this question, and that our court, in *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753, 756–57 (9th Cir. 1990), has answered it in the affirmative: that otherwise unreviewable agency action is reviewable when the agency justifies its action by reference to its understanding of its jurisdiction. I respectfully disagree.

In *Montana Air*, we confronted the question left open in *Heckler*'s footnote 4. Specifically, we held that a decision by the Federal Labor Relations Authority's General Counsel not to issue an unfair labor practice complaint was reviewable only because his decision was "based solely on his belief that he lacks jurisdiction to issue such a complaint." *Id.* at 756. But what we held reviewable were the General Counsel's "statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct." *Id.* at 757. Applying *Chevron*, we found "impermissible" the General Counsel's interpretations of the statute under which he acted. *Id.* at 758.

Here, by contrast, Plaintiffs do not ask that we apply *Chevron* to review whether Acting Secretary Duke impermissibly interpreted 6 U.S.C. § 202(5) in concluding

that the statute authorized the rescission of DACA.[3] Instead, Plaintiffs ask that we review for arbitrariness and capriciousness the *procedures* the agency used to rescind DACA. But nothing in *Montana Air* suggests that *Heckler*'s footnote 4 authorizes arbitrary-and-capricious, rather than *Chevron*, review of agency action simply because the agency acted based on its understanding of its enabling statute. And, despite Plaintiffs' arguments to the contrary, *BLE* plainly prohibits us from doing so.

In *BLE*, the Supreme Court held that an agency's refusal to reconsider a prior adjudicative decision was unreviewable even where the agency based its refusal on its interpretation of its enabling statute. 482 U.S. at 278–84, 107 S.Ct. 2360. In so holding, the Court explained that the agency's refusal to reconsider was unreviewable because it was the *type* of action that "has traditionally been 'committed to agency discretion,' " *id.* at 282, 107 S.Ct. 2360 (quoting *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649); thus any inquiry into its *reasons* for acting was inappropriate, *id.* at 280–81, 107 S.Ct. 2360. "It is irrelevant that the [agency's] order refusing reconsideration discussed the merits of the unions' claim at length," the Court explained, as "[i]t would hardly be sensible to say that the [agency] can genuinely deny reconsideration only when it gives the matter no thought." *Id. BLE* thus makes clear that when determining the scope of permissible judicial review, courts consider only the *type* of agency action at issue, not the agency's *reasons* for acting.

Finally, Plaintiffs argue that even if *BLE* precludes review of *some* types of agency action regardless of the agency's

---

**3.** This is not surprising: § 202(5) makes the Secretary "responsible for ... [e]stablishing national immigration enforcement policies and priorities." If we accept that this broad,

discretion-granting statute authorized DACA's implementation, it surely also sanctions DACA's termination.

reason for acting, that rule only applies to single-shot enforcement decisions, not to general statements of policy. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 227–36 (D.D.C. 2018) (discussing *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), and permitting APA review on this ground). In other words, Plaintiffs would have us hold that general statements of policy—but not single-shot enforcement decisions—are subject to APA review when the agency's sole reason for acting is its understanding of its jurisdiction. While the majority acknowledges Plaintiffs' argument without reaching its merits, I believe that such a distinction collapses *Heckler* on its head: In deciding whether agency action is reviewable, the first question we ask is what type of agency action is before us—whether it is agency action that courts typically review or agency action "traditionally . . . 'committed to agency discretion.'" *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649. This initial inquiry includes consideration of whether the action is a single-shot non-enforcement decision or a general statement of policy. It would beg the question to conclude that unreviewable agency action is in fact reviewable because it is the type of action that courts typically review.

I would therefore hold that § 701(a)(2) precludes us from subjecting DACA's rescission to arbitrary-and-capricious review.

At the same time, as the government concedes, DACA's rescission may be reviewed for compliance with the Constitution. I would hold that Plaintiffs have plausibly alleged that the rescission of DACA was motivated by unconstitutional racial animus in violation of the Equal Protection component of the Fifth Amendment, and that the district court correctly denied the government's motion to dismiss this claim.

Notably, Plaintiffs did not seek a preliminary injunction on their Equal Protection claim, instead relying solely on their APA argument. Nonetheless, this court may affirm a preliminary injunction on any basis supported by the record. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1021 (9th Cir. 2013). And because a preliminary injunction preserves the court's power to render a meaningful decision on the merits, we can affirm an injunction issued on legally erroneous grounds where remand for consideration of alternative grounds is warranted. *See Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 754 (9th Cir. 2001) ("It is possible that [the challenged law] violates the Due Process Clause, but the district court did not reach that issue, and it is not fully developed in the record or in the briefs presented to this court. We leave the preliminary injunction in place in order to give the district court an opportunity to consider whether Plaintiffs are likely to succeed on the merits."); *see also United States v. Hovsepian*, 359 F.3d 1144, 1157 (9th Cir. 2004) (en banc) (holding that the district court erred in entering an injunction but leaving "the injunction in place . . . pending the conclusion of all proceedings in this case, in aid of the court's jurisdiction"). Accordingly, I would affirm the preliminary injunction and remand for consideration whether Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

As the majority details, the record assembled at this early stage is promising. Plaintiffs highlight (1) the disproportionate impact DACA's rescission has on "individuals of Mexican heritage, and Latinos, who together account for 93 percent of approved DACA applications"; (2) a litany of statements by the President and high-ranking members of his Administration that plausibly indicate animus toward undocumented immigrants from Central

America;[4] and (3) substantial procedural irregularities in the challenged agency action.

Such evidence—plus whatever additional evidence Plaintiffs muster on remand—may well raise a presumption that unconstitutional animus was a substantial factor in the rescission of DACA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also Hawaii*, 138 S. Ct. at 2420 (holding that courts "may consider plaintiffs' extrinsic evidence" as permitted by the applicable level of scrutiny). If the government fails to rebut that presumption, Plaintiffs will have demonstrated a likelihood of success on the merits. *See Arlington Heights*, 429 U.S. at 270 & n.21, 97 S.Ct. 555 (noting that proof that an action was motivated by a discriminatory purpose shifts to the government the burden of establishing that the same decision would have resulted without the impermissible purpose); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (affirming the injunction where the government failed to meet its burden at preliminary injunction stage, because "the burdens at the preliminary injunction stage track the burdens at trial"). As such, I believe that Plaintiffs have plausibly alleged an Equal Protection violation and that the district court should decide whether it is an alternative ground to grant the preliminary injunction.

Moreover, the balance of equities here weighs heavily in favor of affirming the preliminary injunction. A merits decision from the district court concluding that the Executive rescinded DACA because of unconstitutional racial animus would be little more than an advisory opinion if by that time thousands of young people had lost their status due to the lack of an injunction preserving it. Preliminary injunctive relief exists precisely for circumstances like these: "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Thus, on these facts, the district court was correct to issue a preliminary injunction. *See Ashcroft v. ACLU*, 542 U.S. 656, 670, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (affirming injunction where "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (granting preliminary relief because "otherwise a favorable final judgment might well be useless"); *Brown v. Chote*, 411 U.S. 452, 457, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *cf. Winter v. NRDC, Inc.*, 555 U.S. 7, 26, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (reversing injunction without addressing likelihood of success on the merits where "the balance of equities and consideration of the overall public interest in this case tip strongly in favor of [defendants]").

Accordingly, while I would remand for the district court to evaluate the Plaintiffs' likelihood of success on the merits of their Equal Protection claim as an alternative basis for preliminary relief in the first instance, I join the majority in affirming the preliminary injunction to preserve the

---

**4.** Like the majority, I do not interpret *Trump v. Hawaii*, — U.S. ——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), to preclude review of the President's statements when applying the *Arlington Heights* standard. At the merits stage, the district court can still decide whether, or to what degree, the President's statements betray a discriminatory animus behind DACA's rescission.

IN RE TWELVE GRAND JURY SUBPOENAS      525
Cite as 908 F.3d 525 (9th Cir. 2018)

status quo while Plaintiffs attempt to prove up that claim.



**IN RE TWELVE GRAND JURY SUBPOENAS, Grand Jury Panel 17-02,**

**No. 17-17213**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted September 5, 2018, San Francisco, California

Filed November 8, 2018

**Background:** After records custodian for various corporations and limited liability companies (LLC) failed to comply with grand jury subpoenas and court order to produce the records of those entities, the United States District Court for the District of Arizona, David G. Campbell, Senior District Judge, No. 2:17-mc-00056-DGC, issued an order holding custodian in contempt. Custodian appealed.

**Holding:** The Court of Appeals, in a matter of first impression, held that Fifth Amendment privilege against self-incrimination did not apply to allow custodian for a corporate or other collective entity's records to resist production of the entity's documents.

Affirmed.

**1. Criminal Law ⚷1139**

The Court of Appeals reviews de novo the legal question of whether any exception exists to the general rule that a corporate records custodian may not assert a Fifth Amendment privilege against self-incrimination to refuse production of corporate documents. U.S. Const. Amend. 5.

**2. Criminal Law ⚷393(1)**

In some cases, the question of whether a Fifth Amendment privilege against self-incrimination applies involves a mixed question of law and fact. U.S. Const. Amend. 5.

**3. Criminal Law ⚷393(1)**

The Fifth Amendment privilege against self-incrimination extends only to compelled incriminating communications that are testimonial in character. U.S. Const. Amend. 5.

**4. Witnesses ⚷298**

The "act of production doctrine" recognizes that the act of producing documents in response to a subpoena may have a compelled testimonial aspect, in the context of the Fifth Amendment privilege against self-incrimination, in that the act may implicitly communicate statements of fact, such as that the papers existed, were in the producer's possession or control, and were authentic. U.S. Const. Amend. 5.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Criminal Law ⚷393(1)**

The collective entity doctrine reflects the fact that the Fifth Amendment right to resist compelled self-incrimination is a personal privilege. U.S. Const. Amend. 5.

**6. Criminal Law ⚷393(1)**

The Fifth Amendment privilege against self-incrimination applies to individuals and to sole proprietorships, which do not, as a legal matter, exist separately from the individuals who comprise them, but corporations and other collective entities do not enjoy the privilege. U.S. Const. Amend. 5.

**1304**               298 FEDERAL SUPPLEMENT, 3d SERIES

stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....”). This Court and other courts have stayed all claims in an action even if only some of the claims will be arbitrated. *See Marchand v. Northrop Grumman Corp.*, No. 16-CV-06825-BLF, 2017 WL 2633132, at *13 (N.D. Cal. June 19, 2017); *Trinchitella v. Am. Realty Partners, LLC*, No. 15-CV-02365-KJM, 2016 WL 4041319, at *13 (E.D. Cal. July 27, 2016); *Mohebbi v. Khazen*, No. 13-CV-03044-BLF, 2014 WL 6845477, at *12 (N.D. Cal. Dec. 4, 2014); *Gunawan v. Randstad Gen. Partner (US) LLC*, No. 13-CV-01464-CJC, 2013 WL 12142565, at *3 (C.D. Cal. Dec. 16, 2013). A stay of all claims is particularly warranted in the class-action context because the complaint admits that common questions of fact and law predominate. *See Morales v. Lexxiom, Inc.*, No. 09-CV-06549-SVW, 2010 WL 11507515, at *11 (C.D. Cal. Jan. 29, 2010); *Bischoff v. DirecTV, Inc.*, 180 F.Supp.2d 1097, 1114 (C.D. Cal. 2002). In the instant case, Plaintiffs do not dispute that the Court should stay all proceedings if it orders arbitration as to any Plaintiff. Accordingly, the Court STAYS this action pending the completion of arbitration.

**IV.   ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Samsung's motion to compel arbitration and to dismiss class-action claims is GRANTED as to Plaintiffs Martin, Atebar (as to the S7), Esther Vega, Holzworth, Kouyoumdjian, and Raymond. Samsung's motion to compel arbitration and to dismiss class-action claims is DENIED as to Plaintiffs Atebar (as to the Note5), Jesus Vega, Anguiano, Hernandez, Robison, Pirverdian, Salmasian, Dee, and Sanchez. Samsung's motion to stay all proceedings pending the outcome of arbitration is GRANTED. Within seven days of the resolution of the arbitration, the parties shall file a joint status

report advising the Court of the resolution of the matter and any further action required by the Court.



The REGENTS OF the UNIVERSITY OF CALIFORNIA and Janet Napolitano, in her official capacity as President of the University of California, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY and Kirstjen Nielsen, in her official capacity as Secretary of the Department of Homeland Security, Defendants.

No. C 17–05211 WHA, No. C 17–05235 WHA, No. C 17–05329 WHA, No. C 17–05380 WHA, No. C 17–05813 WHA

United States District Court, N.D. California.

Signed 01/12/2018

**Background:** States, state university, county, city, union, and individuals brought action against United States Department of Homeland Security (DHS) for, among other things, declaratory relief, alleging Administrative Procedure Act (APA), Regulatory Flexibility Act (RFA), due process, equitable estoppel, and equal protection claims based on rescission of Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal. DHS moved to dismiss for failure to state a claim.

**Holdings:** The District Court, William Alsup, J., held that:

AR0468

(1) DACA rescission had not needed to follow notice and comment rulemaking under APA and RFA;

(2) due process did not protect any interest in continuation of DACA;

(3) plaintiffs stated due process claims based on alleged policy change regarding handling of information provided by DACA recipients;

(4) plaintiffs failed to state equitable estoppel claims; but

(5) county and individuals stated equal protection claims.

Motion granted in part and denied in part.

### 1. Administrative Law and Procedure ☞382.1

A "general statement of policy" under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA) advises the public prospectively of the manner in which an agency proposes to exercise a discretionary power. 5 U.S.C.A. § 553(b)(A).

> See publication Words and Phrases for other judicial constructions and definitions.

### 2. Administrative Law and Procedure ☞382.1

Policies in general statements of policy under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA) serve to educate and provide direction to an agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases. 5 U.S.C.A. § 553(b)(A).

### 3. Administrative Law and Procedure ☞382.1

The critical factor in determining whether a directive constitutes a general statement of policy under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA) is the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case. 5 U.S.C.A. § 553(b)(A).

### 4. Administrative Law and Procedure ☞382.1

For a directive to qualify as a statement of policy under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA), two requirements must be satisfied: (1) the policy must operate only prospectively, and (2) the policy must not establish a binding norm and must not be finally determinative of the issues or rights to which it addresses, but instead leave officials free to consider the individual facts in the various cases that arise. 5 U.S.C.A. § 553(b)(A).

### 5. Aliens, Immigration, and Citizenship ☞153

The memorandum that rescinded the Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal is a general statement of policy under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA). 5 U.S.C.A. § 553(b)(A).

### 6. Constitutional Law ☞3869

To assert a due process claim, a plaintiff must first show that he or she has an interest in liberty or property protected by the Constitution. U.S. Const. Amend. 5.

### 7. Constitutional Law ☞4438

Because discretionary immigration relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process Clause. U.S. Const. Amend. 5.

### 8. Constitutional Law ☞4438

Aliens have no fundamental right to discretionary relief from removal for pur-

**AR0469**

poses of due process. U.S. Const. Amend. 5.

**9. Aliens, Immigration, and Citizenship** ⚙️**318**

**Constitutional Law** ⚙️**4438**

Due process did not protect any interest in continuation of Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal; under DACA, United States Citizenship and Immigration Services (USCIS) had retained ultimate discretion to determine whether deferred action was appropriate in any given case even if DACA guidelines were met. U.S. Const. Amend. 5.

**10. Constitutional Law** ⚙️**3874(3)**

A benefit is not an entitlement protected by due process where government officials may grant or deny it in their discretion. U.S. Const. Amend. 5.

**11. Constitutional Law** ⚙️**3874(3)**

An individual has a protected property right in public benefits where the rules conferring those benefits greatly restrict the discretion of the people who administer them. U.S. Const. Amend. 5.

**12. Constitutional Law** ⚙️**3869**

Due process claims of entitlement can be defined by rules or mutually explicit understandings. U.S. Const. Amend. 5.

**13. Constitutional Law** ⚙️**3874(3)**

A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a protected right if that belief is not mutually held by the government. U.S. Const. Amend. 5.

**14. Constitutional Law** ⚙️**3874(3)**

An agency's past practice of generally granting a government benefit is insufficient to establish a legal due process entitlement. U.S. Const. Amend. 5.

**15. Aliens, Immigration, and Citizenship** ⚙️**121**

**Constitutional Law** ⚙️**4438**

States, state university, county, city, union, and individuals adequately alleged mutually explicit understanding giving rise to protected interest in confidentiality of personal information of applicants for Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal, as required for due process claims against United States Department of Homeland Security (DHS) based on alleged change in policy on such confidentiality, by alleging that throughout DACA's existence DHS had made affirmative representations that information provided by DACA applicants would not be used for immigration enforcement absent special circumstance, and that federal government now only refrained from proactively providing such information. U.S. Const. Amend. 5.

**16. Federal Civil Procedure** ⚙️**1831**

Issue of whether under alleged policy United States Department of Homeland Security (DHS) could change how it treated confidentiality of information provided by applicants for Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal could not be resolved at motion to dismiss phase of claim by states, state university, county, city, union, and individuals alleging that change in treatment violated due process; factual dispute existed as to meaning of ambiguous language in alleged policy's caveat providing that it could "be modified, superseded, or rescinded at any time." U.S. Const. Amend. 5.

**17. Estoppel** ⚙️**62.2(4)**

States, state university, county, city, union, and individuals failed to plausibly

allege affirmative instances of misrepresentation or concealment, and thus failed to state equitable estoppel claims against United States Department of Homeland Security (DHS) based on rescission of Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal, where plaintiffs alleged merely that rescission was change in policy.

**18. Estoppel ⬅62.2(3)**

To state an equitable estoppel claim against the federal government, a party must show that (1) the government engaged in affirmative conduct going beyond mere negligence, and (2) the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage if the requested relief is granted.

**19. Estoppel ⬅62.2(3)**

Neither the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct as an element of an equitable estoppel claim against the federal government.

**20. Estoppel ⬅62.2(3)**

Equitable estoppel against the federal government does not require that the government intend to mislead a party.

**21. Aliens, Immigration, and Citizenship ⬅154**

  **Constitutional Law ⬅3112**

County and individuals adequately alleged discriminatory purpose for rescission of Deferred Action for Childhood Arrivals (DACA) program which had provided certain aliens discretionary relief from removal, as required to state equal protection claim against United States Department of Homeland Security (DHS) for such rescission, by alleging that rescission had disproportionate impact on Latinos and Mexican nationals, that President had on multiple occasions, including during presidential

campaign, expressed racial animus towards Latinos and Mexicans, that President had directed decision to end DACA, and that DACA had been reaffirmed just three months before being rescinded. U.S. Const. Amend. 14.

**22. Constitutional Law ⬅3040**

Determining whether discrimination is a motivating factor for an action challenged under the Equal Protection Clause demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. U.S. Const. Amend. 14.

**23. Constitutional Law ⬅3040**

A plaintiff challenging an action under the Equal Protection Clause need not show that a discriminatory purpose was the sole purpose of the challenged action, but only that it was a motivating factor. U.S. Const. Amend. 14.

**24. Constitutional Law ⬅3040, 3043**

In analyzing under the Equal Protection Clause whether a facially-neutral policy was motivated by a discriminatory purpose, district courts must consider factors such as whether the policy creates a disparate impact, the historical background and sequence of events leading up to the decision, and any relevant legislative or administrative history. U.S. Const. Amend. 14.

**25. Constitutional Law ⬅3040**

A disparate impact of a facially-neutral rule, standing alone, cannot establish discriminatory intent under the Equal Protection Clause. U.S. Const. Amend. 14.

**26. Aliens, Immigration, and Citizenship ⬅154**

  **Constitutional Law ⬅3112**

City failed to state equal protection claim against United States Department of Homeland Security (DHS) based on rescission of Deferred Action for Childhood Ar-

rivals (DACA) program which had provided certain aliens discretionary relief from removal, where city alleged only that actions of DHS had targeted individuals for discriminatory treatment based on their national origin without lawful justification. U.S. Const. Amend. 14.

**27. Civil Rights ⚌1409**

Circumstantial evidence of intent, including statements by a decisionmaker, may be considered in evaluating whether government action challenged under the Equal Protection Clause was motivated by a discriminatory purpose. U.S. Const. Amend. 14.

―――――――

Greta Suzanne Hansen, Office of the County Counsel, San Jose, CA, James Robyzad Williams, Laura Susan Trice, Marcelo Quinones, Santa Clara County Counsel's Office, San Jose, CA, Jonathan David Weissglass, Stacey M. Leyton, Eric Prince Brown, Altshuler Berzon LLP, San Francisco, CA, for Plaintiffs.

Brad Prescott Rosenberg, U.S. Department of Justice, Washington, DC, Jonathan David Weissglass, Altshuler Berzon LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6)**

William Alsup, United States District Judge

**INTRODUCTION**

In these challenges to the government's rescission of the Deferred Action for Childhood Arrivals program, the government moves to dismiss plaintiffs' complaints for failure to state a claim. For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

This order incorporates the statement set forth in the order dated January 9, 2018, largely denying dismissal under FRCP 12(b)(1) and largely granting plaintiffs' motion for provisional relief (Dkt. No. 234). This order, however, addresses a separate motion by the government to dismiss all claims for failure to state a claim for relief under FRCP 12(b)(6). This order sustains three claims for relief but finds that the rest fall short.

**ANALYSIS**

**1. APA CLAIMS UNDER 5 U.S.C. § 706(2)(A).**

For the same reasons that plaintiffs are likely to succeed on their claim that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act, as explained in the January 9 order, the government's motion to dismiss plaintiffs' APA claims under 5 U.S.C. § 706(2)(A) is **DENIED**.

**2. APA CLAIMS UNDER 5 U.S.C. § 706(2)(D).**

The original DACA program began in 2012 without any notice or opportunity for public comment. Likewise, the rescission in question ended DACA without notice or opportunity for public comment. One issue now presented is whether the rescission is invalid for having been carried out without notice-and-comment procedures.

Under the APA, an agency action must be set aside if it was done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). An agency is required to follow prescribed notice-and-comment procedures before promulgating certain rules. 5 U.S.C. § 553. The Regulatory Flexibility Act further requires that notice-

and-comment rulemaking include an assessment of the impact on small entities. 5 U.S.C. § 604(a). These requirements do not apply, however, to general statements of policy. 5 U.S.C. § 553(b)(A).

**[1–5]** A general statement of policy "advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1012–13 (9th Cir. 1987). Such policies also "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases." *Id.* at 1013 (quotes and citations omitted). "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Ibid.* Thus, to qualify as a statement of policy two requirements must be satisfied: (1) the policy operates only prospectively, and (2) the policy does "not establish a binding norm," and is not "finally determinative of the issues or rights to which [it] address[es]," but instead leaves officials "free to consider the individual facts in the various cases that arise." *Id.* at 1014 (quotes and citations omitted). Under this standard, the rescission memorandum is a general statement of policy.

This order rejects plaintiffs' contention that the rescission could only be done through notice and comment. For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment.

Almost this exact problem was addressed in *Mada–Luna*. There, our court of appeals held that the repeal of an INS policy under which applicants could seek deferred action was not subject to notice and comment. It rejected the argument

that the repeal could not constitute a general statement of policy because it diminished the likelihood of receiving deferred action for a class of individuals. *Id.* at 1016. Rather, because the original policy allowed for discretion and failed to establish a "binding norm," the repeal of that policy also did not require notice and comment. *Id.* at 1017. So too here. The DACA program allowed but did not require the agency to grant deferred action, and upon separate application, travel authorization, on a case-by-case basis at the agency's discretion. Therefore, neither its promulgation nor its rescission required notice and comment.

*Parco v. Morris*, 426 F.Supp. 976 (E.D. Pa. 1977), on which plaintiffs heavily rely, does not warrant the conclusion that the rescission policy is a substantive rule. *Parco* also addressed whether the rescission of an INS policy required notice and comment. Notably, the government in *Parco* stipulated that the policy's precipitous rescission was the sole reason for denial of the plaintiff's application for immigration relief. *Id.* at 984. The district court determined that the repeal therefore left no discretion, explaining that "discretion" was stripped of all meaning where "one contends that under a certain regulation 'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *Ibid.* Here, by contrast, plaintiffs do not allege that all deferred action applications under DACA were approved but now, after the rescission, all requests for deferred action will be denied.

Plaintiffs argue that the rescission memorandum is more than a policy because it creates a blanket prohibition against granting deferred action to DACA applicants. Plaintiffs are correct that the rescission policy contains mandatory language on its face. It is also true that the rescis-

sion memorandum categorically eliminates advance parole for DACA recipients. This comes closer to resembling a substantive rule. However, it remains the case that because the original promulgation of the discretionary program did not require notice and comment, a return to the status quo ante also does not require notice and comment. *Mada–Luna*, 813 F.2d at 1017.

Defendants' motion to dismiss plaintiffs' claims pursuant to Section 706(2)(D) of the APA and the Regulatory Flexibility Act is accordingly **Granted**.

### 3. Due Process Claims.

[6]  To assert a due process claim, a plaintiff must first show that he or she has an interest in liberty or property protected by the Constitution. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs fail to make the threshold showing that they have a protected interest in the continuation of DACA and, accordingly, their due process claims based on the rescission must be dismissed. Plaintiffs have adequately alleged, however, that the agency's changes to its information-sharing policy are "fundamentally unfair."

#### A.  Deferred Action.

[7–9]  Because discretionary immigration relief "is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause." *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003) (citing *INS v. Yang*, 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ). Moreover, "aliens have no fundamental right to discretionary relief from removal" for purposes of due process. *Tovar–Landin v. Ashcroft*, 361 F.3d 1164, 1167 (9th Cir. 2004). Our court of appeals has accordingly held there is no

protected interest in temporary parole, since such relief is "entirely within the discretion of the Attorney General." *Kwai Fun Wong v. United States*, 373 F.3d 952, 967–68 (9th Cir. 2004). Nor did an INS policy which allowed the agency to recommend deferred action as "an act of administrative choice" create substantive liberty interests. *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985). These authorities foreclose any argument that plaintiffs have a protected interest in continued deferred action or advance parole under DACA.[1]

[10, 11]  Plaintiffs reply that even absent a protected interest in the initial, discretionary grant of deferred action, there is a protected interest in the *renewal* of DACA and its associated benefits. Yet a benefit is not a "protected entitlement" where "government officials may grant or deny it in their discretion." *Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005). Rather, an individual has a protected property right in public benefits where the rules conferring those benefits "greatly restrict the discretion" of the people who administer them. *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015). Plaintiffs' authorities confirm that the same principle applies in the context of renewing or retaining existing benefits. *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 64 (9th Cir. 1994); *Stauch v. City of Columbia Heights*, 212 F.3d 425, 430 (8th Cir. 2000). No such limitations on agency discretion are alleged to have applied under DACA. Rather, the USCIS DACA FAQs referenced by plaintiffs in their complaints make clear that "USCIS retain[ed] the ultimate discretion to determine whether deferred ac-

---

1.  Plaintiffs' attempt to distinguish *Romeiro de Silva* on the ground that the INS policy there involved "unfettered discretion," whereas the

exercise of prosecutorial discretion under DACA was guided by standard operating procedures, is unconvincing.

tion [was] appropriate in any given case even if the guidelines [were] met" (Garcia Compl. ¶ 24 n.16; Santa Clara Compl. ¶ 58; UC Compl., Exh. B; State Compl., Exh. E).

Next, plaintiffs argue that once DACA status was conferred, and recipients organized their lives in reliance on the program's protections and benefits, they developed interests protected by the Constitution. Plaintiffs' authorities, however, stand only for the uncontroversial proposition that once in possession of a particular benefit, the alteration, revocation or suspension of that benefit may implicate due process.[2] Such a principle has no application where, as here, extant benefits are *not* impacted by a change in policy. *Indeed, there is no dispute that the rescission acts only prospectively.* That is, all existing DACA recipients will receive deferred action through the end of their two-year terms. What they will not receive, if the rescission endures, will be DACA renewal, thereafter. For this reason, *Ixcot v. Holder*, 646 F.3d 1202 (9th Cir. 2011), and *Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003), which addressed whether amendments to the INA were impermissibly retroactive, do not compel a different result.

[12–14]  Plaintiffs contend that the government's communications with plaintiffs regarding renewals, its operation of the program, and the public promises of government officials "together created an understanding that DACA recipients were entitled to the continued benefits of the program so long as they met the renewal criteria" (Dkt. No. 205 at 29). Plaintiffs are correct, of course, that claims of entitlement can be defined by "rules or mutually explicit understandings." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33

L.Ed.2d 570 (1972). Importantly, however, a person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a protected right if that belief is not mutually held by the government. *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1020 (9th Cir. 2011). An agency's past practice of generally granting a government benefit is also insufficient to establish a legal entitlement. *Ibid.*

This order empathizes with those DACA recipients who have built their lives around the expectation that DACA, and its associated benefits, would continue to be available to them if they played by the rules. That expectation, however, remains insufficient to give rise to a constitutional claim under the Fifth Amendment. Because plaintiffs have failed to allege facts demonstrating a protected interest in DACA's continuation or the renewal of benefits thereunder, defendants' motion to dismiss plaintiffs' due process claims based on the rescission must be GRANTED.

**B. Information–Sharing Policy.**

[15]  Plaintiffs fare better with their substantive due process claim that DHS allegedly changed its policy with respect to the personal information provided by DACA recipients during the application process. Plaintiffs allege that the government repeatedly represented that information provided by DACA applicants would not be used for immigration enforcement purposes absent special circumstances, and that DACA recipients relied on these promises in submitting the extensive personal information needed to meet the program's requirements.

Defendants insist that the agency's information-sharing policy remains un-

---

**2.**  *See Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Gallo v. U.S. Dist. Court For Dist. of Arizona*, 349 F.3d 1169, 1179 (9th Cir. 2003); *Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017).

changed. On a motion to dismiss, however, the well-pled factual allegations in a complaint must be accepted as true. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Plaintiffs have clearly alleged that DHS changed its information-sharing policy such that now, rather than affirmatively protecting DACA recipients' information from disclosure, the government will only refrain from "proactively" providing their information for purposes of immigration enforcement proceedings (Garcia Compl. ¶ 126; Santa Clara Compl. ¶ 58; State Compl. ¶ 122).

[16]   Plaintiffs have also adequately alleged a "mutually explicit understanding" giving rise to a protected interest in the confidentiality of DACA recipients' personal information. They allege that throughout DACA's existence, DHS made affirmative representations as to how this information would (and would not) be used. The policy stated (Garcia Compl. ¶ 126; Santa Clara Compl. ¶ 58; State Compl. ¶ 121 (citing USCIS DACA FAQs) ):

> Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members

and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

The language contained in the policy's caveat, that it could "be modified, superseded, or rescinded at any time," is ambiguous. One reading advanced by the government is that this caveat allows the agency to change how it treats information already received from DACA applicants. Another reading, however, is that it simply allows the government to change its policy in connection with future applicants. Secretary of Homeland Security Jeh Johnson's December 2016 letter to United States Representative Judy Chu supports the later reading. He stated that, "[s]ince DACA was announced in 2012, DHS has consistently made clear that information provided by applicants . . . will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law" (Garcia Compl. ¶¶ 36–37; State Compl. ¶ 98, Exh. F). This ambiguity presents a question of fact that cannot be resolved on the pleadings.

Taken as true at this stage, as must be done on a FRCP 12(b)(6) motion, plaintiffs' allegations regarding the government's broken promise as to how DACA recipients' personal information will be used— and its potentially profound consequences—"shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Marsh v. County of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)

(quotes and citations omitted). Defendants' motion to dismiss plaintiffs' due process claims based on changes to the government's information-use policy is **DENIED**.

**4. EQUITABLE ESTOPPEL.**

[17]   Plaintiffs bring claims for equitable estoppel, arguing that the government should not be permitted to terminate DACA or use the information collected from applicants for immigration enforcement purposes.

Defendants first contend that plaintiffs' equitable estoppel claims fail because there is no recognized claim for relief based on estoppel. The Supreme Court has refused to adopt, however, "a flat rule that estoppel may not in any circumstances run against the Government," noting that "the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Moreover, our court of appeals has addressed such claims on the merits, and has held that the government may be subject to equitable estoppel if it has engaged in "affirmative misconduct." *Watkins v. U.S. Army*, 875 F.2d 699, 706–07 (9th Cir. 1989).

[18, 19]   To state an equitable estoppel claim against the government, a party must show (1) that the government engaged in "affirmative conduct going beyond mere negligence"; and (2) "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted. *Id.* at 707. "Neither the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative mis-

conduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). Moreover, our court of appeals has defined "affirmative misconduct" to mean a "deliberate lie" or "a pattern of false promises." *Socop–Gonzalez v. I.N.S.*, 272 F.3d 1176, 1184 (9th Cir. 2001). The allegations in the complaints fail to meet this standard, inasmuch as no affirmative instances of misrepresentation or concealment have been plausibly alleged.

[20]   Plaintiffs are correct that estoppel "does not require that the government *intend* to mislead a party," *Watkins*, 875 F.2d at 707, but plaintiffs fail to explain how contradictory policies under two different administrations add up to "affirmative misconduct beyond mere negligence."

Plaintiffs fail to allege, for example, that the government's past statements regarding DACA's legality were a "deliberate lie" or more than mere negligence. Nor have plaintiffs pleaded that the alleged change in the agency's information-use policy was the result of an affirmative misrepresentation. Rather, they have merely alleged a change in policy. Under plaintiffs' theory new administrations would almost never be able to change prior policies because someone could always assert reliance upon the old policy. Defendants' motion to dismiss plaintiffs' equitable estoppel claims is **GRANTED**.

**5. EQUAL PROTECTION CLAIMS.**

[21–24]   To state an equal protection claim plaintiffs must show that the rescission was motivated by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (2015) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ). Determining whether discrimination is a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. A plaintiff need not show that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor." *Ibid.* In analyzing whether a facially-neutral policy was motivated by a discriminatory purpose, district courts must consider factors such as whether the policy creates a disparate impact, the historical background and sequence of events leading up to the decision, and any relevant legislative or administrative history. *Id.* at 266–68, 97 S.Ct. 555.[3]

[25, 26] *First*, Individual Plaintiffs and Santa Clara clearly allege that the rescission had a disproportionate impact on Latinos and Mexican nationals. Indeed, such individuals account for 93 percent of DACA recipients (Garcia Compl. ¶¶ 100, 151; Santa Clara Compl. ¶¶ 9, 75). Defendants reply that this disparate impact is an accident of geography, not evidence of discrimination. True, a disparate impact of a facially-neutral rule, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Individual Plaintiffs and Santa Clara, however, have alleged a discriminatory impact only as a starting point. They also allege a history of bias leading up to the rescission of DACA in the form of campaign statements and other public comments by President Trump, as next discussed.[4]

*Second*, plaintiffs allege that President Trump has, on multiple occasions since he announced his presidential campaign, expressed racial animus towards Latinos and Mexicans. When President Trump announced his candidacy on June 16, 2015, for example, he characterized Mexicans as criminals, rapists, and "people that have lots of problems." Three days later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?" During the first Republican presidential debate, President Trump claimed that the Mexican government "send[s] the bad ones over because they don't want to pay for them." And in August 2017, he referred to undocumented immigrants as "animals" who are responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, MS 13" (Garcia Compl. ¶¶ 102–13, 124; Santa Clara Compl. ¶¶ 75–76).

[27] Circumstantial evidence of intent, including statements by a decisionmaker, may be considered in evaluating whether government action was motivated by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555. These statements were not about the rescission (which came later) but they still have relevance to show racial animus against people south of our border.

**3.** The Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), which addressed the showing necessary for a defendant to be entitled to discovery on a selective-prosecution claim, has no application here. Plaintiffs' claims cannot fairly be characterized as selective-prosecution claims because they do not "implicate the Attorney General's prosecutorial discretion—that is, in this context, his discretion to choose to deport one person rather than another among those who are illegally in the country." *Kwai Fun Wong*, 373 F.3d at 970. Rather, plaintiffs allege that

the agency's decision to end a nationwide deferred action program was motivated by racial animus towards a protected class.

**4.** The City of San Jose's equal protection claim falls a little short. Rather than alleging a disparate impact on a protected class, it alleges only that "[d]efendants' actions target individuals for discriminatory treatment based on their national origin, without lawful justification" (San Jose Compl. ¶ 54). For this reason, defendants' motion to dismiss San Jose's equal protection claim is **GRANTED**.

Should campaign rhetoric be admissible to undermine later agency action by the victors? This order recognizes that such admissibility can readily lead to mischief in challenging the policies of a new administration. We should proceed with caution and give wide berth to the democratic process. Yet are clear cut indications of racial prejudice on the campaign trail to be forgotten altogether?

Our court of appeals recently confirmed that "evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017). *Washington* found that President Trump's statements regarding a "Muslim ban" raised "serious allegations and presented significant constitutional questions," although it ultimately reserved consideration of plaintiffs' equal protection claim. *Id.* at 1167–68. Citing to *Washington*, at least two district courts have since considered President Trump's campaign statements in finding a likelihood of success on Establishment Clause claims. *See, e.g., Aziz v. Trump*, 234 F.Supp.3d 724, 736 (E.D. Va. 2017) (Judge Leonie Brinkema); *Hawai'i v. Trump*, 245 F.Supp.3d 1227, 1236 (D. Haw. 2017) (Judge Derrick Watson). This order will follow these decisions and hold that, at least at the pleading stage, campaign rhetoric so closely tied to the challenged executive action is admissible to show racial animus.

*Third*, a final consideration is the unusual history behind the rescission. DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality). This strange about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed (Garcia Compl. ¶ 154; Santa Clara Compl. ¶¶ 8, 77).

That President Trump has at other times shown support for DACA recipients cannot wipe the slate clean as a matter of law at the pleading stage. Although the government argues that these allegations fail to suggest that the Acting Secretary (as the purported decisionmaker) terminated DACA due to racial animus, plaintiffs have alleged that it was President Trump himself who, in line with his campaign rhetoric, directed the decision to end the program (Garcia Compl. ¶¶ 11, 124; Santa Clara Compl. ¶ 21).

Construed in the light most favorable to plaintiffs, as must be done at the pleading stage, these allegations raise a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA. The fact-intensive inquiry needed to determine whether defendants acted with discriminatory intent cannot be made on the pleadings. Accordingly, defendants' motion to dismiss Santa Clara's and Individual Plaintiffs' equal protection claims must be **DENIED**.

State Plaintiffs allege an equal protection claim on the alternative theory that the rescission "violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education" (State Compl. ¶¶ 172–77). Plaintiffs do not respond to the government's arguments that this theory fails to state a claim under FRCP 12(b)(6). Defendants' motion to dismiss State Plaintiffs' equal protection claim is accordingly **GRANTED**.

### 6. DECLARATORY RELIEF.

Defendants move to dismiss the Individual Plaintiffs' claim for declaratory relief. Individual Plaintiffs' request for declarato-

**1316**        **298 FEDERAL SUPPLEMENT, 3d SERIES**

ry relief is also contained in their prayer for relief and, accordingly, the standalone claim is superfluous. Defendants' motion to dismiss this claim is GRANTED.

## CONCLUSION

Consistent with the foregoing, defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART as follows:

- Plaintiffs' APA claims are sustained, except for the following: Garcia Complaint—Fifth Claim for Relief; UC Complaint—Second Claim for Relief; State Complaint—Second Claim for Relief; San Jose Complaint—Second Claim for Relief.

- Plaintiffs' Regulatory Flexibility Act claims are dismissed.

- Plaintiffs' due process claims are sustained, except for the following: UC Complaint—Third Claim for Relief; Garcia Complaint—First Claim for Relief (to the extent based on the rescission); Santa Clara Complaint—First Claim for Relief (to the extent based on the rescission).

- Plaintiffs' equal protection claims are sustained, except for the following: State Complaint—Sixth Claim for Relief; San Jose Complaint—First Claim for Relief.

- Plaintiffs' equitable estoppel claims are dismissed.

- Individual Plaintiffs' declaratory relief claim is dismissed.

Plaintiffs may seek leave to amend and will have **21 CALENDAR DAYS** from the date of this order to file motions, noticed on the normal 35–day track, seeking leave to amend solely as to the claims dismissed above. Proposed amended complaints must be appended to each motion and plaintiffs must plead their best case. Any such motion should clearly explain how the amendments to the complaints cure the deficiencies identified herein and should include as an exhibit a redlined or highlighted version of the complaints identifying all changes.

## CERTIFICATION UNDER
## 28 U.S.C. § 1292(b)

The district court hereby certifies for interlocutory appeal the issues of whether (i) President Trump's campaign statements are properly considered in evaluating plaintiffs' equal protection claims, (ii) whether the Individual Plaintiffs' and County of Santa Clara's allegations as pleaded state an equal protection claim, (iii) whether plaintiffs' allegations concerning changes to the government's information-sharing policy state a due process claim; (iv) whether plaintiffs have failed to state a claim under 5 U.S.C. § 553; and (v) whether plaintiffs have failed to state a due process claim based on the rescission of DACA. This order finds that these are controlling questions of law as to which there is substantial ground for difference of opinion and that their resolution by the court of appeals will materially advance the litigation.

**IT IS SO ORDERED.**



PRIME HEALTHCARE SERVS., et al.

v.

HUMANA INS. CO.

Case No. EDCV 16–1097–VAP (JEMx)

United States District Court,
C.D. California.

Signed 03/21/2018

**Background:** Hospitals brought action against Medicare Advantage Organization (MAO) for violation of California's Unfair Competition Law and breaches of written contract, oral contract, implied-in-fact contract, and covenant of good faith and fair dealing, alleging that MAO underpaid and

**AR0480**

sory allegations that Wells Fargo acted either willfully or negligently and does not contain any allegation of actual damages. *See, e.g.,* FAC ¶ 39 (Wells Fargo's actions "were willful . . . because Defendant was aware of the FCRA's prohibitions on impermissibly pulling consumers' credit reports").

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Wells Fargo's motion to dismiss with leave to amend. Despite the deficiencies identified above, the Court cannot say at this stage that amending the complaint would be futile. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Accordingly, Plaintiffs may, consistent with their Rule 11 obligations, file an amended complaint within 21 days from the date of this Order.

**IT IS SO ORDERED.**



The REGENTS OF the UNIVERSITY OF CALIFORNIA and Janet Napolitano, in her official capacity as President of the University of California, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY and Kirstjen Nielsen, in her official capacity as Secretary of the Department of Homeland Security, Defendants.

No. C 17–05211 WHA, No. C 17–05235 WHA, No. C 17–05329 WHA, No. C 17–05380 WHA, No. C 17–05813 WHA

United States District Court, N.D. California.

Signed January 9, 2018

**Background:**  States, a state university, a county, a city, a union, and individuals brought actions against Acting Secretary of Department of Homeland Security (DHS) under the Constitution and the Administrative Procedure Act (APA), seeking to enjoin the rescission of Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children. The United States District Court for the Northern District of California, William Alsup, J., 2017 WL 4642324, entered order requiring government to complete the administrative record. Government petitioned for writ of mandamus, requesting permanent stay of District Court's order. The Court of Appeals, 875 F.3d 1200, denied the petition. Government filed emergency motion for a stay of that order. The Court of Appeals, 875 F.3d 1177, dismissed the motion. Government petitioned for writ of mandamus or writ of certiorari. The Supreme Court, 138 S.Ct. 443, granted certiorari, vacated the judgment, and remanded. The Court of Appeals, 877 F.3d 1080, remanded. Plaintiffs moved for provisional relief and government moved to dismiss for lack of subject matter jurisdiction.

**Holdings:**  The District Court, William Alsup, J., held that:

(1) APA's jurisdictional bar to judicial review of agency action committed to agency discretion by law did not apply;

(2) INA did not bar judicial review;

(3) two states lacked prudential standing; and

(4) plaintiffs were likely to succeed on merits of claim that agency action was based on flawed legal premise that DHS had lacked authority to implement DACA.

Motion to dismiss granted in part and denied in part; motion for preliminary injunction granted.

**1. Aliens, Immigration, and Citizenship**
   **☞211**

   A principal feature of the INA's removal system is the broad discretion exercised by immigration officials. Immigration and Nationality Act § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**2. Aliens, Immigration, and Citizenship**
   **☞249**

   Under the INA, in any given case, immigration officials must decide whether it makes sense to pursue removal at all, and at each stage of the removal process, they have discretion to abandon the endeavor. Immigration and Nationality Act § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**3. Aliens, Immigration, and Citizenship**
   **☞329**

   Deferred action is one way that immigration officials exercise their discretion under the INA to decide whether it makes sense to pursue removal at all, by postponing, seemingly indefinitely, the removal of individuals unlawfully present in the United States for humanitarian reasons or simply for the Executive's own convenience. Immigration and Nationality Act § 237(d)(2), 8 U.S.C.A. § 1227(d)(2).

**4. Aliens, Immigration, and Citizenship**
   **☞123**

   In the INA, Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States. Immigration and Nationality Act § 274A(h)(3), 8 U.S.C.A. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

**5. Courts ☞90(2)**

   An affirmance by an equally divided Supreme Court has no precedential value.

**6. Administrative Law and Procedure**
   **☞701**

   The Administrative Procedure Act's (APA) jurisdictional bar to judicial review of agency action that is committed to agency discretion by law is very narrow and is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. 5 U.S.C.A. § 701(a)(2).

**7. Aliens, Immigration, and Citizenship**
   **☞413**

   Jurisdictional bar under Administrative Procedure Act (APA), to judicial review of agency action committed to agency discretion by law, did not apply to suit under APA to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind the Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; main, if not exclusive, rationale of DHS for ending DACA was its supposed illegality, but determining illegality was a quintessential role of the courts. 5 U.S.C.A. §§ 701(a)(2), 706(2)(A).

**8. Administrative Law and Procedure**
   **☞651**

   Agency action that is presumptively unreviewable under the Administrative Procedure Act (APA) does not become reviewable simply because the agency gives a reviewable reason for otherwise unreviewable action. 5 U.S.C.A. § 551 et seq.

**9. Aliens, Immigration, and Citizenship**
   **☞397**

   Courts owe substantial deference to the immigration determinations of the political branches.

**AR0482**

REGENTS OF UNI. OF CAL. v. U.S. DEPT. OF HOMELAND  **1013**
Cite as 279 F.Supp.3d 1011 (N.D.Cal. 2018)

**10. Aliens, Immigration, and Citizenship** ⟜384

There is a strong presumption in favor of judicial review of administration action in the immigration context.

**11. Aliens, Immigration, and Citizenship** ⟜385

INA provision barring jurisdiction for judicial review of claims arising from a decision or action by Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under the INA did not apply to action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, across-the-board rescission, by Department of Homeland Security (DHS), of Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children.  5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 242(g), 8 U.S.C.A. § 1252(g).

**12. Federal Civil Procedure** ⟜103.2, 103.3

To establish standing, Article III requires plaintiffs to show: (1) they suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision.  U.S. Const. art. 3, § 2, cl. 1.

**13. Federal Civil Procedure** ⟜103.2

The Article III standing inquiry is focused on whether the plaintiff has a sufficient personal stake in the outcome of the controversy to ensure that the parties will be truly adverse and their legal presentations sharpened.  U.S. Const. art. 3, § 2, cl. 1.

**14. Federal Civil Procedure** ⟜103.2

Article III standing must be assessed on a claim-by-claim basis.  U.S. Const. art. 3, § 2, cl. 1.

**15. Aliens, Immigration, and Citizenship** ⟜413

State and local governments sufficiently alleged that they suffered an injury in fact, as element for Article III standing to bring action under Administrative Procedure Act (APA) to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; governments alleged that they employed DACA recipients in whom they had invested substantial resources for hiring and training and that they would lose significant specifically-identified tax revenues, and states alleged injury to their public universities through harm to their educational missions and loss of students and teachers, and that many DACA recipients would lose their employer-based health insurance, imposing higher health care costs on states.  U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 706(2)(A).

**16. Aliens, Immigration, and Citizenship** ⟜413

State university sufficiently alleged that it suffered an injury in fact, as element for Article III standing to bring action under Administrative Procedure Act (APA) to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided

**AR0483**

protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; university alleged that its proprietary interests would be injured because students who were DACA recipients had cancelled their enrollment or would be at risk of dropping out, that students who were DACA recipients could no longer travel outside of United States for research and educational conferences, and that university had invested resources to recruit and retain DACA recipients as employees.  U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 706(2)(A).

**17. Aliens, Immigration, and Citizenship** ☞413

**Labor and Employment** ☞1982

Union had associational standing to bring action on behalf of its members, under Administrative Procedure Act (APA), to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; union had members who were DACA recipients, part of its mission was to provide members with a voice in larger community and ensure that members were treated equally with dignity regardless of immigration status or national origin, and participation of individual members would not be necessary. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 706(2)(A).

**18. Associations** ☞20(1)

An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit.

**19. Administrative Law and Procedure** ☞666, 668

For prudential standing under the Administrative Procedure Act (APA), a plaintiff must show that it has suffered or will suffer sufficient injury-in-fact and that the interests sought to be protected by the plaintiff are arguably within the zone of interests to be protected or regulated by the statute in question.  5 U.S.C.A. § 551 et seq.

**20. Administrative Law and Procedure** ☞666

A plaintiff that is not itself the subject of the contested regulatory action lacks prudential standing under the Administrative Procedure Act (APA) only where its interests are so marginally related to or inconsistent with the purposes implicit in the statute in question that it cannot reasonably be assumed that Congress intended to permit the suit; this test is not meant to be especially demanding, and it must be applied in keeping with Congress's evident intent when enacting the APA to make agency action presumably reviewable.  5 U.S.C.A. § 551 et seq.

**21. Aliens, Immigration, and Citizenship** ☞413

Interests of two states were so marginally related to purposes implicit in the INA that those states lacked prudential standing to bring action under Administrative Procedure Act (APA) to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration sta-

tus who had entered the United States as children; states did not contend that DACA recipients who were students at state universities or were state employees qualified for student– and employment-related immigrant visas, nor did they point to any INA provisions indicating a protected interest in enrolling students with deferred action or indicating that Congress intended to protected states' interests in maintaining income tax revenue or avoiding increased health care costs. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

## 22. Aliens, Immigration, and Citizenship
### ⟳413

Interests of state and local governments, and of state university, were sufficiently related to purposes implicit in INA, as required for prudential standing to bring action under Administrative Procedure Act (APA) to enjoin, as arbitrary and capricious, an abuse of discretion, or otherwise not accordance with law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; INA gave Executive Branch broad discretion to determine when noncitizens could work in United States, regulations allowed DACA recipients to apply for work authorization if they could demonstrate an economic necessity for employment, and INA contained detailed provisions subjecting employers to criminal and civil liability for knowingly hiring unauthorized aliens. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 274A(a)(1)(A), (a)(2), (h)(3), 8 U.S.C.A. § 1324a(a)(1)(A), (a)(2), (h)(3); 8 C.F.R. § 274a.12(c)(14).

## 23. Injunction ⟳1092

To support a preliminary injunction, plaintiffs must establish four elements: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest.

## 24. Aliens, Immigration, and Citizenship
### ⟳413

Challengers were likely to succeed on merits, as element for preliminary injunction, of claim that decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children, was based on flawed legal premise that DHS had lacked authority to implement DACA, so that the decision was not in accordance with law, as grounds for invalidity under Administrative Procedure Act (APA); in initially providing deferred action based on enforcement discretion and policymaking, DHS had found that DACA enrollees represented low priority cases for removal. 5 U.S.C.A. § 706(2)(A); 6 U.S.C.A. § 202(5); Immigration and Nationality Act § 103, 8 U.S.C.A. § 1103.

## 25. Aliens, Immigration, and Citizenship
### ⟳249, 299

In making immigration enforcement decisions, the Executive considers a variety of factors such as the danger posed to the United States by an individual's unlawful presence, the impact of removal on the nation's international relations, and the human concerns of whether the individual has children born in the United States, long ties to the community, or a record of distinguished military service. Immigra-

tion and Nationality Act § 103, 8 U.S.C.A. § 1103.

### 26. Aliens, Immigration, and Citizenship
⇔155

Government engaged in post hoc rationalization, which could not be accepted on judicial review of agency action, by asserting that Department of Homeland Security (DHS) had made a reasonable judgment call, which was not arbitrary or capricious or an abuse of discretion, to manage litigation risk and agency resources when it decided to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; reason actually given in administrative record was Attorney General's advice that DACA was illegal, and under INA's allocation of immigration power and duties among DHS Secretary, Attorney General, and Secretary of State, DHS Secretary had lacked any choice but to follow Attorney General's controlling legal advice, so that any weighing of litigation risk and agency resources by DHS Secretary was moot.   Immigration and Nationality Act § 103(a)(1), 8 U.S.C.A. § 1103(a)(1); 5 U.S.C.A. § 706(2)(A).

### 27. Administrative Law and Procedure
⇔753

Courts may not accept post hoc rationalizations for agency action, nor may they supply a reasoned basis for the agency's action that the agency itself has not given; rather, an agency's action must be upheld, if at all, on the basis articulated by the agency itself.

### 28. Administrative Law and Procedure
⇔502

A change in agency policy requires the agency to have good reasons for it.

### 29. Administrative Law and Procedure
⇔502

When an agency reverses policy, it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one, but where an agency abruptly changes course and terminates a program on which many people rely, the Administrative Procedure Act (APA) requires a more detailed justification; in such cases, it is not that further justification is demanded by the mere fact of policy change but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.   5 U.S.C.A. § 706(2)(A).

### 30. Aliens, Immigration, and Citizenship
⇔413

Individual plaintiffs who were beneficiaries of Deferred Action for Childhood Arrivals program (DACA) showed irreparable injury, as element for preliminary injunction, in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of Department of Homeland Security (DHS) to rescind DACA, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; plaintiffs faced tough set of life and career choices turning on comparative probabilities of being deported versus remaining in United States, they faced prolonged separation from family members, and DACA gave them a more tolerable set of choices, including joining the workforce.   5 U.S.C.A. § 706(2)(A).

### 31. Aliens, Immigration, and Citizenship
⇔413

States that employed beneficiaries of Deferred Action for Childhood Arrivals

program (DACA), and state university for which DACA beneficiaries were employees or students, showed irreparable injury, as element for preliminary injunction, in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of Department of Homeland Security (DHS) to rescind DACA, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; states and state university would lose valuable students and employees in whom they had invested, university's harms regarding diversity and quality were not compensable with monetary damages, and loss of DACA recipients from workforce would have detrimental impact on organization interests, economic output, public health, and safety. 5 U.S.C.A. § 706(2)(A).

### 32. Aliens, Immigration, and Citizenship ⟺413

Public interest favored preliminary injunction in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; phase-out of DACA would result in an average of one thousand individuals per day losing work authorization and deferred action status, tearing them from nation's economy, prejudicing their ability to support themselves and their families, causing loss of tax payments, and placing greater burden on emergency health care services when DACA recipients lost employer-provided health care. 5 U.S.C.A. § 706(2)(A).

### 33. Aliens, Immigration, and Citizenship ⟺413

Balance of hardships favored preliminary injunction in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; the only hardship raised by government was interference with agency's judgment on how best to allocate its resources and interference with agency's judgment to phase-out DACA, and those judgments were based on mistake of law regarding authority of DHS to enact DACA, rather than a policy change. 5 U.S.C.A. § 706(2)(A).

### 34. Injunction ⟺1097, 1109

If a likelihood of irreparable injury is shown and an injunction is in the public interest, a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits are raised and the balance of hardships tips sharply in the plaintiff's favor.

### 35. Injunction ⟺1011, 1012

A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.

### 36. Aliens, Immigration, and Citizenship ⟺413

Hardship to beneficiaries of Deferred Action for Childhood Arrivals program

(DACA), from professional disadvantage in being unable to travel internationally, did not warrant inclusion of requirement that Department of Homeland Security (DHS) resume its acceptance of applications for advance parole, when District Court granted preliminary injunction in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of DHS to rescind DACA, which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 212(d)(5)(A), 8 U.S.C.A. § 1182(d)(5)(A); 8 C.F.R. § 212.5(f).

### 37. Aliens, Immigration, and Citizenship ⚖413

Nationwide scope for preliminary injunction, as opposed to providing relief only for plaintiff States or individual plaintiffs, was warranted, in action challenging under Administrative Procedure Act (APA), as arbitrary and capricious, an abuse of discretion, and as otherwise contrary to law, decision of Department of Homeland Security (DHS) to rescind Deferred Action for Childhood Arrivals program (DACA), which provided protections from deportation and work authorization for certain individuals without lawful immigration status who had entered the United States as children; nation had strong interest uniform application of immigration law and policy, and the problem affected every state and territory of the United States. 5 U.S.C.A. § 706(2)(A).

———————

Greta Suzanne Hansen, James Robyzad Williams, Laura Susan Trice, Marcelo Quinones, Office of the County Counsel, Santa Clara County, San Jose, CA, Stacey M. Leyton, Eric Prince Brown, Altshuler Berzon LLP, San Francisco, CA, for Plaintiffs.

Brad Prescott Rosenberg, U.S. Department of Justice, Washington, DC, for Defendants.

Jonathan David Weissglass, Altshuler Berzon LLP, San Francisco, CA

### ORDER DENYING FRCP 12(b)(1) DISMISSAL AND GRANTING PROVISIONAL RELIEF

William Alsup, United States District Judge

### INTRODUCTION

In these challenges to the government's rescission of the Deferred Action for Childhood Arrivals program, plaintiffs move for provisional relief while the government moves to dismiss for lack of jurisdiction. For the reasons below, dismissal is DENIED and some provisional relief is GRANTED.

### STATEMENT

In 2012, the United States Department of Homeland Security adopted a program to postpone deportation of undocumented immigrants brought to America as children and, pending action in their cases, to assign them work permits allowing them to obtain social security numbers, pay taxes, and become part of the mainstream economy. This program received the title "Deferred Action for Childhood Arrivals"—DACA for short. In 2017, however, after the national election and change in administrations, the agency eventually reversed itself and began a phase-out of DACA. All agree that a new administration is entitled to replace old policies with new policies so long as they comply with the law. One question presented in these related actions is whether the new administration terminated DACA based on a

Case 1:16-cv-04756-NGG-VMS   Document 319-4   Filed 09/04/20   Page 181 of 405 PageID #: 6478

mistake of law rather than in compliance with the law.

### 1. HISTORY OF DEFERRED ACTION.

At the core of these cases is an administrative practice known as "deferred action." A primary question presented concerns the extent to which the Department of Homeland Security could lawfully use deferred action to implement DACA, and so it is important to review the history of deferred action as well as of other features of the DACA program.

Congress has the constitutional power to "establish an uniform Rule of Naturalization." Art. I, § 8, cl. 4. Pursuant thereto, Congress has established a comprehensive scheme governing immigration and naturalization through the Immigration and Nationality Act. 8 U.S.C. §§ 1101, *et seq.* The Secretary of Homeland Security is "charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). The Secretary is further charged with "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

**[1, 2]**   One of the key enforcement tools under the INA is removal, *i.e.,* deportation. In turn, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States,* 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). As an initial matter, in any given case, immigration officials "must decide whether it makes sense to pursue removal at all." *Ibid.* At each stage of the removal process, they have "discretion to abandon the endeavor." *Reno v. Am.–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("*AADC*").

**[3]**   Beginning as early as 1975, one way to exercise this discretion became "deferred action." By deferred action, immigration officials could postpone, seemingly indefinitely, the removal of individuals unlawfully present in the United States "for humanitarian reasons or simply for [the Executive's] own convenience." *Id.* at 483–84, 119 S.Ct. 936. Immigration officials could also grant parole, temporary protected status, deferred enforced departure, or extended voluntary departure.

Some of these discretionary powers have flowed from statute. Parole, for example, has allowed otherwise inadmissible aliens to temporarily enter the United States "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Temporary protected status, also created by statute, has been available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. 8 U.S.C. § 1254a.

Some of these discretionary powers, however, have flowed from nonstatutory powers. Deferred enforced departure had no statutory basis but, instead, grew out of "the President's constitutional powers to conduct foreign relations." USCIS, *Adjudicator's Field Manual* § 38.2(a) (2014). Nor has extended voluntary departure been anchored in any statute. Rather, it has been recognized as part of the discretion of the Attorney General. *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc).

Deferred action, originally known as "nonpriority" status, also began "without express statutory authorization" but has since been recognized by the Supreme Court as a "regular practice." *AADC,* 525 U.S. at 484, 119 S.Ct. 936. Congress has also acknowledged deferred action by explicit reference to it in the INA (8 U.S.C. § 1227(d)(2)):

> The denial of a request for an administrative stay of removal under this

**AR0489**

subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

Another federal statute, the REAL ID Act, also acknowledged deferred action. REAL ID Act of 2005, Pub. L. No. 109–13, div. B, 119 Stat. 231. This law provided that states could issue a temporary driver's license or identification card to persons who can demonstrate an "authorized stay in the United States." *Id.* §§ 202(c)(2)(C)(i)-(ii). Persons with "approved deferred action status" were expressly identified as being present in the United States during a "period of authorized stay," for the purpose of issuing state identification cards. *Id.* §§ 202(c)(2)(B)(viii), (C)(ii).

[4]  Congress has also given the Executive Branch broad discretion to determine when noncitizens may work in the United States. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) ("*Brewer I*"); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither a legal permanent resident nor "authorized to be … employed by [the INA] or by the [Secretary of Homeland Security]"). Pursuant to this statutory authority, regulations promulgated in the 1980s allowed recipients of deferred action to apply for work authorization if they could demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14).

The George W. Bush Administration began to use deferred action to mitigate a harsh statutory provision involving "unlawful presence." The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 created three– and ten-year bars on the admission of aliens who departed or were removed from the United States after periods of "unlawful presence" of between 180 days and one year, or more than one year, respectively. 8 U.S.C. § 1182(a)(9)(B)(i). It also imposed a permanent bar on the admission of any alien who, without being admitted, entered or attempted to reenter the United States after having been unlawfully present for an aggregate period of more than one year. 8 U.S.C. § 1182(a)(9)(C)(i). Beginning in 2007, however, DHS regulations and policy guidance provided that deferred action recipients did not accrue "unlawful presence" for purposes of the INA's bars on re-entry. 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009). DHS excluded recipients of deferred action from being "unlawfully present" because their deferred action is a period of stay authorized by the government. *Brewer I*, 757 F.3d at 1059 (citing 8 U.S.C. § 1182(a)(9)(B)(ii)). This nonaccrual practice arose well before DACA.[1]

DACA grew out of a long agency history of discretionary relief programs. In 1956, the Eisenhower Administration paroled roughly one thousand foreign-born orphans who had been adopted by American citizens but were precluded from entering the United States because of statutory quotas. That same administration later granted parole to tens of thousands of Hungarian refugees after the unsuccessful Hungarian revolution. Both programs

---

**1.** Undocumented aliens do not begin to accrue "unlawful presence" for purposes of Section 1182(a)(9)(B)(i) until they reach the age of eighteen. 8 U.S.C. § 1182(a)(9)(B)(iii).

REGENTS OF UNI. OF CAL. v. U.S. DEPT. OF HOMELAND **1021**
Cite as 279 F.Supp.3d 1011 (N.D.Cal. 2018)

flowed from presidential statements, and the programs later ended (in 1959 and 1958, respectively) when Congress passed laws enabling the paroled individuals to become lawful permanent residents (App. 1602–03, 1948–57; AR 33).[2]

In 1987, President Ronald Reagan instituted the Family Fairness Program, a nonstatutory program that provided extended voluntary departure to children whose parents were in the process of legalizing their immigration status under the Immigration Reform and Control Act of 1986. President George H.W. Bush extended the non-statutory program in 1990 to cover spouses of such legalized aliens, and the program ultimately provided immigration relief to approximately 1.5 million people. The need for the program ended with the passage of the Immigration Act of 1990 (App. 1607, 1612–13, 1703).

On at least four occasions prior to the creation of DACA, immigration officials have extended deferred action programs to certain classes of aliens, none of which programs was expressly authorized by statute:

- In 1997, INS established a deferred action program for individuals self-petitioning for relief under the Violence Against Women Act of 1994. This program is still in place today. As originally enacted, the Act did not mention deferred action, but instead provided a pathway to lawful permanent residency. Deferred action allowed applicants to remain in the country pending a decision on their applications. Congress later expanded the deferred action program in the 2000 VAWA reauthorization legislation (App. at 1640–46).

- In 2002 and 2003, INS issued memoranda instructing officers to make deferred action assessments for T visa applicants (victims of human trafficking) and U visa applicants (victims of crimes such as domestic violence) (App. 1650–58). These programs have since been codified in regulations promulgated by INS and DHS. 8 C.F.R. §§ 214.11(k)(1), (k)(4), (m)(2); 8 C.F.R. § 214.14(d)(2).

- After Hurricane Katrina in 2005, USCIS announced a deferred action program for certain foreign students (F–1 visa holders) who, because of the hurricane, could not satisfy the requirements of their student visas. In announcing the program, USCIS stated that "[t]he interim relief [would] remain in effect until February 1, 2006" (App. 1661–62).

- In 2009, to fill a gap under the law, USCIS established a deferred action program for widowed spouses who had been married to United States citizens for less than two years. Congress later eliminated the statutory requirement that an alien be married to a United States citizen for at least two years at the time of the citizen's death to retain eligibility for lawful immigration status, and USCIS accordingly withdrew the deferred action program as "obsolete" (App. 1664–82).

In sum, by the time DACA arrived in 2012, deferred action programs had become a well-accepted feature of the execu-

---

2. "App." refers to the appendix submitted in support of plaintiffs' motion for provisional relief (Dkt. Nos. 113, 117–19, 121, 124). In connection with their motion for provisional relief, plaintiffs seek judicial notice of thirty-nine exhibits submitted with the appendix

(Dkt. No. 111–2). The request is unopposed. These exhibits consist of congressional testimony and government publications, memoranda, and press releases. Plaintiffs' request for judicial notice is **Granted**.

tive's enforcement of our immigration laws, recognized as such by Congress and the Supreme Court.

## 2. DACA.

On June 15, 2012, Secretary of Homeland Security Janet Napolitano issued a memorandum establishing Deferred Action for Childhood Arrivals. Under DACA, immigrants brought to the United States as children could apply for deferred action for a two-year period, subject to renewal. To qualify for DACA, an individual must: (1) have come to the United States before the age of sixteen and been under the age of thirty-one on June 15, 2012; (2) have been present in the United States on June 15, 2012; (3) have been continuously residing in the United States for at least the prior five years; (4) have been enrolled in school, graduated from high school, obtained a GED, or been honorably discharged from the United States military or Coast Guard; and (5) not pose a threat to national security or public safety (AR 1).

The 2012 DACA memo described the program as an exercise of "prosecutorial discretion." Secretary Napolitano found leniency "especially justified" for the DACA-eligible, whom she described as "productive young people" who "have already contributed to our country in significant ways." The memo further stated that these individuals "lacked the intent to violate the law" and were low priority cases for deportation (AR 1–2).

DACA applicants had to pass a DHS background check and applications had to be "decided on a case by case basis." To apply for DACA, eligible individuals completed USCIS Form I–821D. The application called for substantial personal information, such as biographical information, date of entry into the United States, immigration status or lack thereof, educational history, and all prior residential addresses since entering the United States.

Form I–821D also required substantial documentary support, including proof of identity and proof of continuous residence in the United States through rent receipts, utility bills, employment documents, or similar records. Applicants also appeared at a USCIS field office to provide fingerprints, photographs, and signatures. The form's instructions stated (App. 1820):

> Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.

The form's instructions also stated (App. 1808):

> Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral.

DACA applicants also submitted a Form I–765, Application for Employment Authorization, a Form I–765WS, Worksheet, and the accompanying fees. To determine

an applicant's eligibility for work authorization, USCIS reviewed the applicant's current annual income, current annual expenses, and the total current value of his or her assets (App. 1762, 1801–21, 2067–87).

If approved, the recipient received a Form I–797, Notice of Action, stating (App. 585):

> USCIS, in the exercise of its prosecutorial discretion, has decided to defer action in your case. Deferred action is an exercise of prosecutorial discretion by USCIS not to pursue the removal of an individual from the United States for a specific period. Deferred action does not confer or alter any immigration status.

Significantly, DHS could terminate a recipient's deferred action at any time, at the agency's discretion, and DACA paved no pathway to lawful permanent residency, much less citizenship (App. 1774, 1808). Secretary Napolitano concluded her DACA memorandum (AR 1–3):

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

But DACA did provide important benefits. *First*, under pre-existing regulations, DACA recipients became eligible to receive employment authorization for the period of deferred action, thereby allowing them to obtain social security numbers and to become legitimate taxpayers and contributing members of our open economy. 8 C.F.R. § 274a.12(c)(14). *Second*, deferred action provided a measure of safety for a period of two years from detention and removal, albeit always subject to termination at any time in any individual case. *Third*, DACA recipients could apply for "advance parole" to obtain permission to travel overseas and be paroled back into the United States. 8 C.F.R. § 212.5(f). *Fourth*, also pursuant to pre-existing regulations, DACA recipients avoided accrual of time for "unlawful presence" under the INA's bar on re-entry. 8 U.S.C. § 1182(a)(9)(B)–(C) (establishing three-year, ten-year, and permanent bars on the admission of aliens after specified periods of "unlawful presence").

USCIS "strongly encourage[d]" DACA recipients to submit renewal requests between 120 and 150 days before the expiration date-stamped on the recipient's Form I–797. According to the "Frequently Asked Questions" posted on the agency's website, recipients were eligible for renewal under DACA so long as they: (1) did not depart the United States on or after August 15, 2012, without advance parole; (2) continuously resided in the United States since submitting their most recent DACA request; and (3) had not received criminal convictions (with minor exceptions). Renewal requests did not require additional documentary support (App. 1756–57).

The agency adopted DACA without any notice or opportunity for public comment.

According to data published by USCIS, 793,026 applicants received deferred action under DACA since its inception. As of September 2017, there remained approximately 689,800 active DACA recipients. Their average age was 23.8. Based on a survey completed by Associate Professor Tom K. Wong in August 2017, 91 percent of DACA recipients had jobs, and 45 percent of DACA recipients were enrolled in school (App. 1494–1522, 1533–52).

### 3. THE DAPA LITIGATION.

In 2014, DHS announced a different deferred action program for parents of Unit-

ed States citizens or lawful permanent residents, titled "Deferred Action for Parents of Americans and Lawful Permanent Residents"—shortened to the confusingly-similar acronym DAPA.

For our purposes, DAPA is important because the United States Court of Appeals for the Fifth Circuit promptly held that DAPA exceeded the statutory authority of DHS, a holding that eventually moved Attorney General Jeff Sessions to rule that DACA too had exceeded the agency's authority. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

The 2014 DAPA memo directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," for aliens who had a son or daughter who was a United States citizen or lawful permanent resident and: (1) were not an enforcement priority under DHS policy; (2) had continuously resided in the United States since before January 1, 2010; (3) had been physically present in the United States both when DHS announced DAPA and at the time of application to the program; and (4) presented "no other factors that, in the exercise of discretion, [made] the grant of deferred action inappropriate" (AR 37–41).

That same 2014 announcement also expanded DACA in three minor ways: (1) allowing otherwise eligible immigrants to apply for DACA even if they were older than 31 on the day DACA was earlier announced; (2) extending DACA renewals and work authorizations from two– to three-year periods; and (3) adjusting DACA's date-of-entry requirement from June 15, 2007, to January 1, 2010 (AR 37–41).

DAPA was also adopted without notice or opportunity for public comment.

A coalition of twenty-six states immediately filed suit in the United States District Court for the Southern District of Texas to challenge DAPA. The district court preliminarily enjoined its implementation on the ground that DHS had failed to comply with the APA's notice-and-comment requirements. *Texas v. United States*, 86 F.Supp.3d 591 (S.D. Tex. 2015). The district court's order stated that "with three minor exceptions," the case did not involve DACA (*id.* at 606):

> The Complaint in this matter does not include the actions taken by Secretary Napolitano, which have to date formalized the status of approximately 700,000 teenagers and young adults. Therefore, those actions are not before the Court and will not be addressed by this opinion. Having said that, DACA will necessarily be discussed in this opinion as it is relevant to many legal issues in the present case. For example, the States maintain that the DAPA applications will undergo a process identical to that used for DACA applications and, therefore, DACA's policies and procedures will be instructive for the Court as to DAPA's implementation.

In holding that DAPA violated notice-and-comment procedures, the district court held that it constituted "a new rule that substantially change[d] both the status and employability of millions" and inflicted "major costs on both states and federal government." It therefore should have been issued, the district court held, after notice and opportunity for public comment. *Id.* at 671. Though the order focused on DAPA, it also preliminarily enjoined everything in the 2014 memorandum, including the three minor ways in which DACA had been modified (but left alone the 2012 DACA program).

**[5]** The Fifth Circuit affirmed in a split decision but added a further ground for affirmance. *Texas*, 809 F.3d at 178. Over a dissent, the appellate panel added the

ground that DAPA was substantively foreclosed by statute because the INA contained "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," and that DAPA, by providing "the benefits of lawful presence" to undocumented immigrants "solely on account of their children's immigration status," was inconsistent with this statutory scheme, which provided its own pathway for lawful presence to parents of children lawfully in the United States. *Id.* at 179–80, 186. The Fifth Circuit's holding was also based on its observation that "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 186 n.202. The decision was later affirmed without opinion by an equally divided Supreme Court. *United States v. Texas,* —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam).[3]

In February 2017, DHS Secretary John Kelly issued guidance regarding the Trump Administration's immigration enforcement priorities. Although the guidance rescinded "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," the 2012 DACA memo and 2014 DAPA memo were explicitly left in place. The guidance also said that the 2014 DAPA memo would "be addressed in future guidance" (AR 229–34).

In June 2017, Secretary Kelly rescinded the 2014 DAPA memo, which rescission included the 2014 expansions of DACA. He explained:

> I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the

fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014, memorandum.

Again, however, Secretary Kelly declared that the 2012 DACA memo would remain in effect (AR 235–37).

#### 4. RESCISSION OF DACA.

Also in June 2017, ten of the twenty-six plaintiffs from the DAPA litigation wrote to Attorney General Jeff Sessions to demand rescission of the 2012 DACA memo. Their letter stated that if DACA was rescinded by September 5, they would dismiss the still-pending DAPA litigation. Otherwise, the letter threatened to try to amend their complaint to additionally challenge the legality of DACA (AR 238–40).

A day before the deadline, the Attorney General advised Acting Secretary of Homeland Security Elaine Duke via a short letter that the Obama Administration had created DACA "without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," and that therefore the program was an "unconstitutional exercise of authority by the Executive Branch." The Attorney General's letter also referenced the preliminary injunction against DAPA, then stated that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA" (AR 251).

---

**3.** Such an affirmance has no precedential value. *Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The following day, without prior notice, the Acting Secretary rescinded DACA. The rescission was not based on any policy criticism. Instead, it was based on the legal determination by the Attorney General. The Acting Secretary explained that after "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012, DACA program should be terminated." She said that "[r]ecognizing the complexities associated with winding down the program," DHS would "provide a limited window" in which it would adjudicate certain requests, but that new DACA requests and applications for employment authorization would be rejected starting immediately. DHS would adjudicate, on a case-by-case basis, DACA renewal requests received within thirty days from beneficiaries whose DACA status would expire before March 5, 2018. She also instructed DHS to immediately stop approving new applications for advance parole. The rescission left in place all extant grants of deferred action and work authorizations for the remainder of their validity periods (AR 252–56). Consequently, starting in March 2018, the DACA population will, over two years, dwindle down to zero.

On the night of the rescission, President Trump called upon Congress specifically to enact DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" During an interview earlier in 2017, President Trump had stated "we are not after the dreamers, we are after the criminals" and that "the dreamers should rest easy" (App. 1852–53, 1958).

In sum, the new administration didn't terminate DACA on policy grounds. It terminated DACA over a point of law, a pithy conclusion that the agency had exceeded its statutory and constitutional authority. An important question now presented is whether that conclusion was a mistake of law.

## 5. THE INSTANT LITIGATION.

Plaintiffs herein filed five related non-class lawsuits in this district, all now before the undersigned judge. The first commenced on September 8, brought by The Regents of the University of California, on its own behalf and on behalf of its students, and Janet Napolitano, in her official capacity as President of the University. UC Plaintiffs allege they have invested considerable resources in recruiting students and staff who are DACA recipients, and that these individuals make important contributions to the University. As DACA recipients lose their work authorizations, UC Plaintiffs allege that the University will lose significant intellectual capital and productivity. They further allege that students who lose DACA protections will be unable "to plan for the future, apply for and obtain internships and certain financial aid and scholarships, study abroad, or work to pay their tuition and other expenses," and as a result may withdraw from the University altogether (UC Compl. ¶¶ 4–6, 34–37, 48–49).[4]

On September 11, the States of California, Maine, Maryland, and Minnesota filed suit. Plaintiff States allege that they are home to more than 238,000 DACA recipients, and that the loss of their residents' DACA status and work authorizations will injure their public colleges and universities, upset the States' workforces, disrupt

4. Two additional DACA lawsuits proceed in the Eastern District of New York before Judge Nicholas Garaufis, *State of New York v.* *Trump,* Case No. 17–cv–05228 NGG, and *Vidal v. Baran,* Case No. 16–cv–04756 NGG.

the States' statutory and regulatory interests, cause harm to hundreds of thousands of their residents, damage their economies, and hurt companies based in Plaintiff States (States Compl. ¶¶ 1–10).

The City of San Jose, on its own behalf and on behalf of its employees who are DACA recipients, filed its action on September 14. San Jose alleges that it has hired DACA recipients into vital City jobs, that substantial resources were invested in training these employees, and that the City will be harmed when these employees are forced to leave the workforce (when they lose their work authorizations). San Jose further alleges that it will continue to lose tax revenue as DACA recipients lose work authorizations and can no longer contribute to the City's tax base (San Jose Compl. ¶¶ 10, 28, 49–51).

On September 18, Individual DACA recipients Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn brought suit to challenge the termination of DACA. Individual Plaintiffs work and study in the fields of law, medicine, education, and psychology. They allege that the loss of DACA will frustrate their professional goals and accomplishments. They further allege that as a result of the rescission, they will lose access to numerous federal and state benefits, and may not be able to reside in the United States with their families. They applied for DACA in reliance on the government's representations that information provided under the program would not be used for purposes of immigration enforcement (Garcia Compl. ¶¶ 4–9, 55, 59, 72, 78, 85, 95, 128).

Finally, the County of Santa Clara and the Service Employees International Union Local 521 filed their complaint on October 10. The County alleges that it employs DACA recipients, including union members, in key positions, such as in its In-

Home Supportive Services Program and New Americans Fellowship Program. The County alleges that it has expended time and money in training these employees, and that it relies on them to provide important services. As DACA recipients leave the workforce, the County will lose important employees, will incur harm to its economy and suffer decreased tax revenue, and will incur the costs of increased dependency on subsidized health care and other County services. Local 521 sues as an associational plaintiff on behalf of its members who are DACA recipients, and alleges that the Union's organizational mission is to organize, represent, and empower employees, as well as mobilize immigration reform (Santa Clara Compl. ¶¶ 1, 15–20, 32, 37, 43–52).

Collectively, plaintiffs assert the following claims:

- The rescission violated the Administrative Procedure Act because it was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (UC Compl. ¶¶ 50–58; State Compl. ¶¶ 152–55; Garcia Compl. ¶¶ 165–84; Santa Clara Compl. ¶¶ 67–73).

- The rescission violated the APA because it was a substantive rule that did not comply with the APA's notice-and-comment requirements or the Regulatory Flexibility Act's mandate under 5 U.S.C. § 604 that an agency publish analysis of a rule's impact on small businesses (UC Compl. ¶¶ 59–66; State Compl. ¶¶ 146–63; San Jose Compl. ¶¶ 59–63; Garcia Compl. ¶¶ 177–84).

- The rescission deprived DACA recipients of constitutionally-protected property and liberty interests without due process of law. Plaintiffs also allege that the rescission violated due process because the government

**1028**          **279 FEDERAL SUPPLEMENT, 3d SERIES**

changed its policy regarding agency use of DACA-related information (UC Compl. ¶¶ 67–73; State Compl. ¶¶ 141–45; Garcia Compl. ¶¶ 133–47; Santa Clara Compl. ¶¶ 59–66).

- The rescission violates equal protection of the law because it was motivated by discriminatory animus and because it deprived DACA grantees of their substantial interests in supporting themselves and furthering their education (State Compl. ¶¶ 172–77; San Jose Compl. ¶¶ 52–58; Garcia Compl. ¶¶ 148–59; Santa Clara Compl. ¶¶ 74–78).

- The rescission violates equitable estoppel. DACA recipients provided detailed personal information to the government and rearranged their lives based on the government's representations, but now face the possibility of removal. Plaintiffs argue that the government should therefore be equitably estopped from terminating DACA or from using their DACA information for immigration enforcement purposes (State Compl. ¶¶ 164–71; Garcia Compl. ¶¶ 192–99; Santa Clara Compl. ¶¶ 79–86).

- Plaintiffs seek a declaration that the rescission was unlawful and an order restoring DACA (UC Compl. at 16, State Compl. at 35–36; San Jose Compl. at 15–16; Garcia Compl. at 43; Santa Clara Compl. at 26–27).

On September 21, an initial case management conference occurred for all DACA actions in our district. At the conference, all counsel, including government counsel, presented a joint proposal whereby the government would file the administrative record by October 13. Significantly, although the government argued that discovery would be premature, it agreed to submit the administrative record without any condition that it be done before any decision on its threshold jurisdictional motion (presumably because it knew its jurisdictional motion would be premised on the administrative record) (*see* Dkt. No. 114 at 16; Tr. at 17:3, 22:2). The Court made only slight revisions to the joint proposal, all in aid of a stated goal of providing a full record and final decision for our court of appeals prior to the March 5 expiration date. Pursuant to FRCP 26, a case management order then set a October 6 deadline for the government to file the administrative record, set a briefing schedule for the parties' motions to dismiss, for provisional relief, or for summary judgment, and permitted the parties to proceed with reasonable, limited, and narrowly-directed discovery (Dkt. No. 49).

The government filed an administrative record on October 6. It was merely, however, fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation, and all of which already resided in the public domain. All non-public materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged (Dkt. No. 71). In other words, of the ninety-eight DACA-related documents personally considered by the decisionmaker, all but the fourteen already known to the public were withheld as privileged. Although government counsel further indicated, upon inquiry by the district judge, that the decisionmaker had also likely received verbal input, nothing was included in the administrative record to capture this input. Nor were there any materials regarding the agency's earlier, recent decisions to leave DACA in place.

On October 9, plaintiffs moved to require the government to complete the administrative record, seeking all materials considered directly or indirectly by the Acting Secretary in reaching her decision to rescind DACA, which motion was granted in part and denied in part. The govern-

ment, having earlier consented to filing the administrative record, was ordered to keep its word and to file a complete administrative record (Dkt. Nos. 65, 79–80).

Instead, the government filed a petition for writ of mandamus with our court of appeals, seeking relief from having to complete the administrative record until after its jurisdictional arguments were determined, a turnabout from its earlier voluntary proposal and stipulation to file the administrative record as part of an agreed-upon schedule. After full briefing and oral argument, our court of appeals denied the government's mandamus petition and vacated the stay (over one dissent).[5]

The government was again ordered to complete the administrative record, this time by November 22, later extended to December 22 to accommodate the government's claim of burden. On December 1, however, the government filed a petition for writ of mandamus and application for a stay in the United States Supreme Court. Ultimately, the Supreme Court did not reach the merits of the government's petition but required that defendants' jurisdictional defenses be adjudicated prior to consideration of discovery or completing the administrative record (Dkt. Nos. 86, 188, 197, 214, 224), a decision the district judge himself might have made at the outset save for the government's own proposal and agreement to file the administrative record in October.

Consequently, this action has proceeded on the incomplete administrative record initially filed by the government. Plaintiffs have been forced to draw on other materi-als. Ironically, even the government in these motions relies on material outside of the administrative record to defend the agency decision (Dkt. No. 204 at 10, 12, 19–20). The parties have now fully briefed motions to dismiss and a motion for provisional relief, all argued on December 20 (Dkt. Nos. 111, 114). This order now follows.

## ANALYSIS

### 1. MOTION TO DISMISS.

Defendants raise three jurisdictional arguments under FRCP 12(b)(1). *First*, they argue that the decision to rescind DACA was a discretionary act barred from judicial review under the APA. *Second*, they contend that the INA bars judicial review. *Third*, although defendants concede that Individual Plaintiffs have standing, they contend that no others do. Each is now addressed in turn. A separate order will consider defendants' motion to dismiss under FRCP 12(b)(6).

### A. The DACA Rescission Was Not Committed To Agency Discretion by Law.

Congress has instructed our district courts to review and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, however, our district courts lack subject-matter jurisdiction to review agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

---

**5.** Recently, the United States Court of Appeals for the Second Circuit denied the government's petition for a writ of mandamus to stay an order to supplement the same administrative record. The court of appeals found that there was "a strong suggestion that the record before the District Court was not complete" and, noting that nearly 200 pages of the record consisted of published opinions from various federal courts, "[i]t is difficult to imagine that a decision as important as whether to repeal DACA would be made based upon a factual record of little more than 56 pages, even accepting that litigation risk was the reason for repeal." *In Re: Kirstjen M. Nielsen*, No. 17–3345 (2d. Cir. Dec. 27, 2017).

**AR0499**

**[6]**  In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court explained that the jurisdictional bar of Section 701(a)(2) is "very narrow" and "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." The Supreme Court held that because the statute there at issue contained "clear and specific directives" guiding the agency's decision, there was " 'law to apply,' so the exemption for action 'committed to agency discretion' [was] inapplicable." *Id.* at 411–13, 91 S.Ct. 814 (quotations and citations omitted).

When it next revisited the exception in *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court reiterated that the exception applies only where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." There, condemned inmates asked the FDA to bring an enforcement action to prevent purported violations of the Federal Food, Drug, and Cosmetic Act through the administration of death-penalty drugs. The FDA Commissioner, however, refused to do so on the ground that the FDA lacked jurisdiction and otherwise should not interfere with the state criminal justice system. Skipping over the agency jurisdiction issue, the Supreme Court held that such decisions not to prosecute or initiate enforcement actions are generally not reviewable as they are "committed to an agency's absolute discretion." *Id.* at 824–25, 831, 105 S.Ct. 1649.

*Chaney* identified several characteristics of non-enforcement decisions as key to its holding. *First*, non-enforcement decisions require a complicated balancing of factors "peculiarly within [the agency's] expertise," including whether "resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831, 105 S.Ct. 1649. *Second*, in refusing to act, an agency "does not exercise its coercive power over an individual's liberty" and accordingly "does not infringe upon areas that courts often are called upon to protect." *Id.* at 832, 105 S.Ct. 1649. When an agency *does* act to enforce, however, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. *Third*, a refusal to institute enforcement proceedings is similar to a prosecutor's decision not to indict, which decision "has long been regarded as the special province of the Executive Branch." *Ibid.*

**[7]**  Our case is different from *Chaney*. There, the agency simply refused to initiate an enforcement proceeding. Here, by contrast, the agency has ended a program which has existed for five years affecting 689,800 enrollees. Importantly, major policy decisions are "quite different from day-to-day agency nonenforcement decisions." *National Treasury Employees Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Rather, broad enforcement policies "are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994). Even defendants concede that where "the agency's interpretation of a statute is embedded in a non-reviewable enforcement policy, the former may be reviewable as such" (Dkt. No. 218 at 3 n.4). Although they contend that the rescission memorandum "does not contain an embedded interpretation of the INA,"

that assertion is incompatible with the Acting Secretary's explicit references to the INA and the Attorney General's determination that DACA was effectuated without "statutory authority." The first and third *Chaney* factors, accordingly, do not apply to the instant case.[6]

*Chaney* is also distinguishable because, unlike there, here the government reversed course after five years of inviting DACA recipients out of the shadows. In contrast to nonenforcement decisions, "rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made." *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985). Through DACA, the government has invited undocumented aliens who meet threshold criteria to step forward, disclose substantial personal information, pay a hefty fee, and comply with ongoing conditions, all in expectation of (though not a right to) continued deferred action. DACA allows enrollees to better plan their careers and lives with a reduced fear of removal. DACA work authorizations, for example, allow recipients to join in the mainstream economy (and pay taxes). DACA covers a class of immigrants whose presence, seemingly all agree, pose the least, if any, threat and allows them to sign up for honest labor on the condition of continued good behavior. This has become an important program for DACA recipients and their families, for the employers who hire them, for our tax treasuries, and for our economy. An agency action to terminate it bears no resemblance to an agency decision not to regulate something never before regulated.

[8]  Finally, there *is* law to apply. The main, if not exclusive, rationale for ending DACA was its supposed illegality. But determining illegality is a quintessential role of the courts.[7]

## B.  The INA Does Not Bar Review.

[9, 10]  The principle that courts owe substantial deference to the immigration determinations of the political branches is important and undisputed. *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017). That deference, however, does not remove the decision to rescind DACA from the ambit of judicial review. Rather, the Supreme Court has applied the "strong presumption in favor of judicial review of administration action" in the immigration context. *See INS v. St. Cyr*, 533 U.S. 289, 298–99, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

[11]  In this connection, defendants raise two arguments. *First*, they contend that review of discretionary enforcement decisions results in the inappropriate delay of removal, and accordingly prolongs violations of our immigration laws. This argument, however, again ignores that plaintiffs do not challenge any particular

---

6.  Contrary to defendants, *Perales v. Casillas*, 903 F.2d 1043, 1050 (5th Cir. 1990), is distinguishable on its facts. There, the Fifth Circuit addressed a class action stemming from the Immigration and Naturalization Service's failure to adjudicate requests for voluntary departure. The court of appeals determined that the district court had improperly issued an injunction directing INS to consider particular grounds in deciding individual requests for voluntary departure and employment authorization. *Id.* at 1046.

7.  Defendants are correct, of course, that a presumptively unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). As discussed above, however, the rescission of DACA was not such an unreviewable decision.

removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program. In any individual case, DACA allows DHS to revoke deferred status and to deport. *Second*, defendants assert that review of such decisions may involve disclosure of law enforcement priorities and foreign-policy objectives. Neither concern is implicated here, as defendants' stated reasons for the rescission all relate to the across-the-board cancellation of DACA based on supposed illegality, not to the facts particular to any proposed removal.

Nor does Section 1252(g) bar judicial review of the agency action in question. 8 U.S.C. § 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

As explained by the Supreme Court, this provision applies only to the three discrete decisions or actions named in Section 1252(g). *AADC*, 525 U.S. at 482, 119 S.Ct. 936. Plaintiffs' claims do not involve such decisions, but rather the challenge here is to the across-the-board cancellation of a nationwide program.[8]

Defendants recognize that these actions were brought prior to the commencement of any removal proceedings. Nevertheless, they argue that Section 1252(g) precludes review of plaintiffs' claims because the decision to discontinue deferred action is "an ingredient to the commencement of enforcement proceedings." It is true that eliminating DACA draws its enrollees one

step closer to deportation, but the Supreme Court rejected the argument that Section 1252(g) somehow precludes review of the "many other decisions or actions that may be part of the deportation process." As *AADC* emphasized, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." *Ibid.*

Defendants cite two decisions. *Importantly, however, both stemmed from already-commenced deportation or removal proceedings. See Botezatu v. I.N.S.*, 195 F.3d 311, 312 (7th Cir. 1999) (declining to review a decision to deny deferred action after plaintiff had been found deportable); *Vasquez v. Aviles*, 639 Fed.Appx. 898, 899–900 (3d Cir. 2016) (district court lacked jurisdiction to hear habeas corpus petition that claimed plaintiff was improperly denied DACA relief).

By comparison, our court of appeals has held, following *AADC*, that Section 1252(g) does not bar review of actions that occur "prior to any decision to 'commence proceedings.' " *Kwai Fun Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004). The claims in *Kwai Fun Wong* challenged the revocation of the plaintiff's parole without first deciding her application for immigration relief, conduct which "*resulted in* the INS's decision to commence removal proceedings and ultimately to remove" the plaintiff from the United States. *Id.* at 959, 964. Contrary to defendants, it is immaterial that *Kwai Fun Wong* did not involve deferred action, as both the revocation of parole and the revocation of deferred action are "an ingredient" to the commencement of enforcement proceedings. The jurisdictional limits of Section 1252(g) were

---

**8.**  The district court in *Batalla Vidal* also concluded that Section 1252(g) did not bar judicial review of challenges to the DACA rescission. *Batalla Vidal v. Duke*, 2017 WL 5201116, at \*13.

instead "directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." *AADC*, 525 U.S. at 482, 119 S.Ct. 936.

### C. Most Plaintiffs Have Standing.

**[12–14]** To establish standing, Article III of the United States Constitution requires plaintiffs to show "(1) they suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The standing inquiry is focused on whether the plaintiff has a sufficient personal stake in the outcome of the controversy to ensure that the parties will be truly adverse and their legal presentations sharpened. *Massachusetts v. EPA*, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). Standing must be assessed on a claim-by-claim basis. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

Defendants do not dispute that the Individual Plaintiffs have standing. Rather, they argue in brief that the entity plaintiffs (the state and local governments, UC Plaintiffs, and SEIU Local 521) lack Article III standing because the rescission does not regulate or restrict them in any way. Defendants therefore posit that the entity plaintiffs' claimed injuries are due only to "incidental effects" of the rescission, which defendants contend are insufficient to establish injury-in-fact. As set forth below, these arguments lack merit.

**[15]** *First*, California, Maryland, the City of San Jose, and the County of Santa Clara each employ DACA recipients, in connection with whom they have invested substantial resources in hiring and training. Plaintiffs allege that they will not only lose these employees as work authoriza-

tions expire, but that they will also need to expend additional resources to hire and train replacements. San Jose further alleges that as a result of the rescission, the City has had decreased productivity, and that it has had to expend time and resources to deal with decreased employee morale (States Compl. ¶¶ 26–27, 32, 53; San Jose Compl. ¶¶ 49–50; Santa Clara Compl. ¶¶ 32–37; App. 11, 95–97, 706–07, 798, 1575–76).

*Second*, Plaintiff States, including Maine and Maryland, stand to lose significant tax revenue as a result of the rescission (States Compl. ¶¶ 28–30, 37, 49–50, 70–71). Although general allegations of injury to a state's economy and the associated decline in general tax revenues may not be sufficient to establish standing, here, Plaintiff States sufficiently allege a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). They allege, for example, that Maine stands to lose $96,000 in annual state and local taxes as DACA recipients leave the workforce (States Compl. ¶¶ 30, 38). Evidence submitted by plaintiffs supports these allegations, and demonstrates that DACA's rescission would reduce state and local tax contributions by DACA-eligible individuals by at least half (App. 68–74, 218–30).

**[16]** *Third*, the University of California has also established that it will suffer injury to its proprietary interests. As declarations submitted by the University demonstrate, the rescission has harmed the University in multiple ways. Because DACA recipients can no longer seek advance parole, these students are unable to travel outside of the United States for research and educational conferences. DACA recipients have also decided to cancel their enrollment in the University, and additional recipients are at risk of dropping out, because they would not be able

**AR0503**

to pay the cost of attendance without work authorizations. The University has also invested resources in recruiting and retaining DACA recipients as employees in various roles, including as teaching assistants and health care providers. Such investments would be lost should these employees lose their ability to work in the United States.

California, Maryland, and Minnesota also allege injury to their public universities through harm to their educational missions and the loss of students and teachers. According to the declarations filed by plaintiffs, the rescission, and the resulting loss of work authorization and potential for deportation, will adversely impact the diversity of the talent pool of potential students, which will make it more difficult for the universities to fulfill their missions of increasing diversity (States Compl. ¶¶ 27, 55, 64–66; App. 12–16, 496–514, 884–90). Our court of appeals recently affirmed the standing of two state governments to challenge an immigration policy that similarly harmed the plaintiffs' public universities. *Washington v. Trump*, 847 F.3d 1151, 1160–01 (9th Cir. 2017). These injuries accordingly give the University of California and the States of California, Maryland, and Minnesota Article III standing. *Ibid.* (citing *Singleton v. Wulff*, 428 U.S. 106,

114–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).[9]

*Fourth*, State Plaintiffs Maryland and Minnesota further allege that the rescission will negatively impact their public health programs. In particular, Maryland and Minnesota allege that rescinding DACA will cause many DACA grantees to lose their employer-based health insurance, imposing higher healthcare costs on the state (State Compl. ¶¶ 51, 62). These injuries are also sufficient to confer Article III standing.[10]

**[17, 18]**  *Finally*, SEIU Local 521 has associational standing to bring its claims on behalf of its members who are DACA recipients. An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97

9.   The public universities of California, Maryland, and Minnesota are branches of the states under state law. *Campbell v. Regents of Univ. of California*, 35 Cal. 4th 311, 321, 25 Cal.Rptr.3d 320, 106 P.3d 976 (2005); *Hanauer v. Elkins*, 217 Md. 213, 219, 141 A.2d 903, 906 (Md. 1958); *Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 683 (Minn. 2001).

10.   Although not discussed by the parties, the District of Columbia Circuit held that Joe Arpaio, Sheriff of Maricopa County, Arizona, lacked Article III standing to challenge DACA. *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015). While the court of appeals found that the plaintiff's alleged harm—increased spending on criminal investigation, apprehension, and incarceration—was sufficiently concrete,

his theory that DACA would lead to an increased number of undocumented immigrants committing crimes in his jurisdiction was too speculative. *Id.* at 19–20. Here, by contrast, plaintiffs allege that the rescission will cause DACA recipients to lose their work authorizations, and that plaintiffs will lose employees and students, suffer decreased tax revenue, and otherwise incur increased costs as a direct result. This case is also different from *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015), where the Fifth Circuit held that Mississippi lacked standing to challenge DACA because it failed to submit evidence that DACA eligible immigrants resided in the state. Defendants do not dispute State Plaintiffs' allegations that hundreds of thousands of DACA recipients live in Plaintiff States.

S.Ct. 2434, 53 L.Ed.2d 383 (1977)). SEIU has established all three elements here. SEIU has members who are DACA recipients. Its constitution states that part of its mission is to provide its members with a voice in the larger community, and that its members should be treated equally with dignity regardless of immigration status or national origin. SEIU has also formed a Committee on Comprehensive Immigration Reform, a member-based committee that engages in organizing, advocacy, and education to help undocumented workers. Its members' interests in these actions are therefore germane to SEIU's stated purpose (App. 801–09). Furthermore, this action does not require the participation of SEIU's individual members.

Defendants, in arguing that the entity plaintiffs lack standing, rely solely on *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). There, the plaintiff lacked standing to challenge a Texas state court's interpretation of a child support statute. *Ibid.* The Supreme Court held that, although the plaintiff had alleged an injury, she had not shown "a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws" because the relationship between the state's decision not to prosecute and the father's decision not to pay under the statute could "at best, be termed only speculative." *Id.* at 618–19. *Linda R.S.* has no application here. As explained above, the entity plaintiffs have alleged harm to their proprietary interests as a direct result of defendants' decision to terminate the DACA program, most notably through its termination of work authorizations. Accordingly, the entity plaintiffs have sufficiently alleged injury-in-fact traceable to the termination of DACA, and

have demonstrated that these harms are redressable by their requested relief.[11]

**[19]** Turning to prudential standing under the APA, a plaintiff must show that it has suffered or will suffer sufficient injury-in-fact, and that "the interest[s] sought to be protected by the complainant [are] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998).

**[20]** A plaintiff that is not itself the subject of the contested regulatory action lacks prudential standing only where its interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). This test is "not meant to be especially demanding," and must be applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumably reviewable." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012) (quotations and citations omitted).

The parties' briefs include only a cursory discussion of plaintiffs' prudential standing under the APA. Again, defendants do not dispute that the Individual Plaintiffs also have statutory standing. SEIU, which asserts the rights of its members who are DACA recipients, likewise seeks the protection of interests regulated by the INA. Not all of the entity plaintiffs, however, have established prudential standing to proceed on their APA claims.

---

**11.** Because defendants' conduct imposes direct injury on the State Plaintiffs' proprietary interests, this order need not reach defendants' argument that the State Plaintiffs lack standing as *parens patriae.*

**AR0505**

**[21]** Plaintiffs primarily rely on our court of appeals' recent decision in *Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), as well as on various provisions of the INA which provide for student– and employment-related immigrant visas. Plaintiffs do not contend, however, that their DACA-recipient students or employees qualify for such visas. Nor do plaintiffs point to any provisions of the INA which indicate a protected interest in enrolling students with deferred action in their schools or universities. Plaintiffs are also unable to point to any provision of the INA indicating that Congress intend to protected Plaintiff States' interests in maintaining income tax revenue or avoiding increased healthcare costs.

**[22]** By contrast, local and state governments San Jose, Santa Clara, California, and Maryland, as well as the University of California, have all identified injuries resulting from their status as employers, and allege harm caused by their employees' future loss of deferred action and associated work authorization. The INA gives the Executive Branch broad discretion to determine when noncitizens may work in the United States, 8 U.S.C. § 1324a(h)(3), and regulations promulgated pursuant to this authority allow recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14). Moreover, the INA contains detailed provisions which subject employers to criminal and civil liability for knowingly hiring unauthorized aliens, *see* 8 U.S.C. § 1324a(a)(1)(A), and for "continu[ing] to employ the alien in the United States knowing the alien is (or has

become) an unauthorized alien with respect to such employment," *id.* § 1324a(a)(2). The work authorization document that the agency issues to DACA recipients is one of the documents that is acceptable for Form I–9, Employment Eligibility Verification, which employers must complete and retain for each individual they hire for employment in the United States (App. 2061–62). Plaintiffs' interest in their employees' continued authorization to work in the United States is therefore "arguably within the zone of interests" that the INA protects. *Hawaii*, 859 F.3d at 765; *Nat'l Credit Union Admin.*, 522 U.S. at 488, 118 S.Ct. 927.[12]

Accordingly, even though the zone of interests inquiry is not demanding, this order concludes that Maine and Minnesota's interests are "so marginally related" to the purposes implicit in the INA that it cannot reasonably be assumed that Congress intended to permit the suit. Maine and Minnesota's APA claims are accordingly DISMISSED WITH LEAVE TO AMEND. The remaining entity plaintiffs, however, have established that their interests that support Article III standing also satisfy the APA's zone of interests test.

\* \* \*

Apart from the holding that Maine and Minnesota do not have statutory standing, the foregoing rejects all of the government's jurisdictional arguments to dismiss plaintiffs' challenges under the Administrative Procedure Act.

## 2.  PROVISIONAL RELIEF.

**[23]** Plaintiffs seek a preliminary injunction to restore DACA. To support a

---

**12.** Defendants' sole argument against the entity plaintiffs' prudential standing is that no provision of the INA protects the entity plaintiffs from "bearing the incidental effects" of a denial of deferred action. The case on which defendants rely, however, dealt with a private anti-immigration organization whose members were not impacted by the immigration policy at issue. *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996).

preliminary injunction, plaintiffs must establish four elements: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). As now explained, the record warrants most of the provisional relief requested.

### A. Likelihood of Success on the Merits.

Plaintiffs have shown a likelihood of success on their claim that the rescission was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law. Specifically, plaintiffs are likely to succeed on their claims that: (1) the agency's decision to rescind DACA was based on a flawed legal premise; and (2) government counsel's supposed "litigation risk" rationale is a post hoc rationalization and would be, in any event, arbitrary and capricious.

#### (1) The Rescission was Based on a Flawed Legal Premise.

[24] The agency action was "not in accordance with law" because it was based on the flawed legal premise that the agency lacked authority to implement DACA. When agency action is based on a flawed legal premise, it may be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Massachusetts*, 549 U.S. at 532, 127 S.Ct. 1438 (setting aside the EPA's denial of a petition for rulemaking under the Clean Air Act for supposed lack of authority); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007). This order holds that DACA fell within the agency's enforcement authority. The contrary conclusion was flawed and should be set aside.

The administrative record includes the 2014 determination of the Office of Legal Counsel of the United States Department of Justice that programmatic deferred action is a permissible exercise of DHS's enforcement discretion. OLC noted that deferred action programs such as DACA are permissible so long as immigration officials retain discretion to evaluate each application on an individualized basis and so long as the concerns animating the program were consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion. OLC recognized that the "practice of granting deferred action date[d] back several decades," and that "Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice." Indeed, not only has Congress not limited the practice, but it has "enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens" (AR 15–27).

As explained in OLC's opinion, each feature of the DACA program is anchored in authority granted or recognized by Congress or the Supreme Court. Because this is the heart of the problem, and with apology for some repetition, this order will now examine each feature in turn.

[25] The Secretary of Homeland Security is responsible under the INA for "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The Secretary is also charged with the administration and enforcement of the INA. 8 U.S.C. § 1103. In making immigration enforcement decisions, the executive "considers a variety of factors such as the danger posed to the United States of an individual's unlawful presence, the impact of removal on the nation's interna-

tional relations, and the 'human concerns' of whether the individual 'has children born in the United States, long ties to the community, or a record of distinguished military service.' " *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citing *Arizona v. United States*, 567 U.S. 387, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012)). In instituting DACA, Secretary Napolitano explained that the program was "necessary to ensure that [DHS's] enforcement resources are not expended on [ ] low priority cases but are instead appropriately focused on people who meet our enforcement priorities" (AR 1).[13]

As set forth above, deferred action originated without any statutory basis apart from the discretion vested by Congress in connection with the agency's enforcement of the immigration laws. Over the decades, however, deferred action became such a fixture that Congress referred to it by name in several INA amendments. *See, e.g.*, 8 U.S.C. § 1227(d)(2) (stating that U visa and T visa applicants who were denied an administrative stay of removal were not precluded from applying for "deferred action"); 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating that eligible derivatives of VAWA petitioners were eligible for "deferred action" and work authorization); 8 U.S.C. § 1151 note (stating that certain immediate family members of certain United States citizens "shall be eligible for deferred action"). Congress has also acknowledged deferred action in enactments outside of the INA. *See, e.g.*, 49 U.S.C. § 30301 note (specifying that evidence of lawful status includes proof of "deferred action status"); USA PATRIOT Act of 2001, Pub. L. No. 107–56,

§ 423(b), 115 Stat. 272, 361 (stating that immediate family members of legal permanent residents killed on September 11, 2001 "may be eligible for deferred action"). Congress has been free to constrain DHS's discretion with respect to granting deferred action, but it has yet to do so.

The Supreme Court has recognized the authority of DHS to grant relief from removal, *Arizona*, 567 U.S. at 396, 132 S.Ct. 2492, and has specifically recognized deferred action as a way to exercise that discretion—"for humanitarian reasons or simply for [the Executive's] own convenience." *AADC*, 525 U.S. at 484, 119 S.Ct. 936. Notably, our court of appeals has said that "the exercise of prosecutorial discretion in deferred action flows from the authority conferred on the Secretary by the INA." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 968 (9th Cir. 2017) ("*Brewer II*").[14]

In extending programmatic deferred action to DACA enrollees, the agency acted within the scope of this long and recognized practice. In the exercise of its enforcement discretion and policy-making, the agency simply found that DACA enrollees represented low priority cases for removal and instituted DACA to manage that population while it redirected its resources elsewhere. Even for enrollees approved under the program, DHS expressly retained the authority to terminate their deferred action at any time, in the agency's discretion. DACA provided no guarantee against removal.

Nevertheless, DACA has provided recipients with a major benefit, namely work

---

13. The United States Court of Appeals for the District of Columbia Circuit did not reach the merits of Sheriff Joe Arpaio's challenges to DACA and DAPA but instead dismissed the case for lack of Article III standing. *Arpaio*, 797 F.3d at 15.

14. In *Brewer II*, our court of appeals denied a petition for rehearing en banc. Circuit Judge Kozinski, joined by five other Circuit Judges, filed a dissent to the denial of the petition, expressing the view that DACA did not preempt Arizona's law refusing to issue drivers' licenses to DACA recipients. 855 F.3d at 958–62.

authorizations for the period of deferral upon a demonstration of economic need. This has allowed DACA recipients to become part of the mainstream workforce and contribute openly to our economy. Significantly, Section 1324a(h)(3) defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither a legal permanent resident nor "authorized to be . . . employed by [the INA] or by the [Secretary of Homeland Security]." In turn, the Secretary of Homeland Security has allowed work authorizations in cases of deferred action under 8 C.F.R. § 274a.12(c)(14). As our court of appeals has stated, "the Executive Branch has determined that deferred action recipients—including DACA recipients—are ordinarily authorized to work in the United States." *See Brewer I*, 757 F.3d at 1062.

It is also within the lawful authority of the agency to determine that DACA recipients do not accrue "unlawful presence" for purposes of the INA's bars on re-entry. Pursuant to pre-existent DHS regulations and policy guidance, deferred action recipients already avoided accrual of "unlawful presence." 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009). Importantly, DHS excludes recipients of deferred action from being "unlawfully present" because their deferred action is considered a period of stay authorized by the government. *See* 8 U.S.C. § 1182(a)(9)(B)(ii) (an alien is deemed to be unlawfully present if the alien is present "in the United States after the expiration of the period of stay authorized by the Attorney General [and now the Secretary of Homeland Security]"); *Brewer I*, 757 F.3d at 1059.

Allowing DACA recipients to apply for and obtain advance parole to travel overseas and return to the United States is also in accord with pre-existing regulations. 8 C.F.R. § 212.5(f); 8 U.S.C. § 1182(d)(5)(A) (the Attorney General [and now the Secretary of Homeland Security] may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

In short, what exactly is the part of DACA that oversteps the authority of the agency? Is it the granting of deferred action itself? No, deferred action has been blessed by both the Supreme Court and Congress as a means to exercise enforcement discretion. Is it the granting of deferred action via a program (as apposed to ad hoc individual grants)? No, programmatic deferred action has been in use since at least 1997, and other forms of programmatic discretionary relief date back to at least 1956. Is it granting work authorizations coextensive with the two-year period of deferred action? No, aliens receiving deferred action have been able to apply for work authorization for decades. Is it granting relief from accruing "unlawful presence" for purposes of the INA's bars on reentry? No, such relief dates back to the George W. Bush Administration for those receiving deferred action. Is it allowing recipients to apply for and obtain advance parole? No, once again, granting advance parole has all been in accord with pre-existing law. Is it combining all these elements into a program? No, if each step is within the authority of the agency, then how can combining them in one program be outside its authority, so long as the agency vets each applicant and exercises its discretion on a case-by-case basis?

Significantly, the government makes no effort in its briefs to challenge any of the

foregoing reasons why DACA was and remains within the authority of the agency. Nor does the government challenge any of the statutes and regulations under which deferred action recipients obtain the foregoing benefits.

Instead, the administrative record shows that the Attorney General told the Acting Secretary that DACA was illegal. *First*, the Attorney General said that DACA had been improperly adopted by the Obama Administration after "Congress' repeated rejection of proposed legislation that would have accomplished a similar result." But the proposals rejected by Congress markedly differ from DACA. *Importantly, while the proposed legislation would have offered Dreamers the ability to become lawful permanent residents, no comparable pathway was offered by DACA*. Our court of appeals recognized this distinction, noting that "the DREAM Act and the DACA program are not interchangeable policies because they provided different forms of relief." *Brewer II*, 855 F.3d at 976 n.10. In fact, the 2012 DACA memo made explicit that DACA offered no pathway to lawful permanent residency, much less citizenship. Secretary Napolitano concluded her memo by stating that DACA "confer[ed] no substantive right, immigration status or pathway to citizenship." To claim that DACA was rejected by Congress, therefore, is unfair.[15]

*Second*, another criticism of DACA was that applications received mechanical, routine approval without individualized consideration. In her rescission memorandum, the Acting Secretary indicated that "[United States Citizenship and Immigration Services] has not been able to identify specific denial cases where an applicant

appeared to satisfy the programmatic categorical criteria as outlined in the [original DACA] memorandum, but still had his or her application denied based solely upon discretion." The simple answer to this, if true, would be for the agency to instruct its adjudicators to exercise discretion, on a individualized basis, to make sure applicants do not pose a threat to national security or public safety and are otherwise deserving of deferred action.

It appears, moreover, that the Acting Secretary was in error when she said that USCIS has been unable to identify discretionary denials of DACA applications. She cited no evidence for this fact, and none is found in the administrative record. Possibly, the Acting Secretary relied on findings made in the DAPA litigation. There, the majority panel noted that USCIS could not produce any applications that satisfied the guidelines of the original DACA memorandum but were nonetheless refused through an exercise of discretion. *Texas*, 809 F.3d at 172. As the dissent pointed out, however, the district court may have conflated *rejections* of DACA applications with *denials*, and as a result suggested that most denials were made for mechanical, administrative reasons. *Id.* at 210 (King, J., dissenting). A declaration submitted in that case by Donald Neufeld, then-Associate Director for Service Center Operations for USCIS, pointed to several instances of discretionary denials. *Id.* at 175. That same declaration explained that while a DACA application was *rejected* when it was "determined upon intake that the application [had] a fatal flaw," an application was *denied* when a USCIS adjudicator, on a case-by-case basis, determined that the requestor either had not demonstrated that they

---

**15.** *See, e.g.,* S. 1291, 107th Congress (2001); S. 1545, 108th Congress (2003); S. 2075, 109th Congress (2005); H.R. 5131, 109th Congress (2006); H.R. 1275, 110th Congress (2007); S. 2205, 110th Congress (2007); H.R. 1751, 111th Congress (2009); S. 3827, 111th Congress (2010); S. 3962, 111th Congress (2010); S. 3992, 111th Congress (2010); H.R. 6497, 111th Congress (2010); S. 952, 112th Congress (2011).

satisfied the guidelines for DACA *or* when an adjudicator determined that deferred action should be denied even though the threshold guidelines were met. *Id.* at 210–11 (dissent). The United States District Court for the District of Columbia, in addressing nearly identical statistics, recognized the distinction. The district court noted that as of December 2014, 36,860 requests for deferred action under DACA were denied and another 42,632 applicants were rejected as not eligible, and concluded that such statistics "reflect that [ ] case-by-case review is in operation." *Arpaio*, 27 F.Supp.3d at 209 n.13. The administrative record tendered in our case completely fails to explain this apparent discrepancy.

*Third*, the main ground given by the Attorney General for illegality was the Fifth Circuit's decision in the DAPA litigation. DACA, the Attorney General said, suffered from the same "legal and constitutional defects" leveled against DAPA in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Upon consideration of the full history of that case, however, this was an overstatement.

In the DAPA litigation, the district court held that DAPA violated the APA's notice-and-comment procedures because it constituted "a new rule that substantially change[d] both the status and employability of millions" and inflicted "major costs on both states and federal government." The district court found that the discretionary aspects of DAPA were "merely pretext," based on its finding that DACA had been implemented in such a mechanical way as to prevent the exercise of discretion on a case-by-case basis, and DAPA would therefore be implemented in the same manner. Notice and opportunity for public comment, it held, should have accordingly been given. *Texas*, 86 F.Supp.3d at 671.

Although the Fifth Circuit recognized that "there was conflicting evidence on the degree to which DACA allowed discretion," because the government had failed to produce any applications that satisfied all of the criteria but were refused deferred action by an exercise of discretion, it was "not error—clear or otherwise—" for the district court to have concluded that DHS had only issued denials under mechanical formulae. The appellate court also pointed to DACA's Operating Procedures, which contained "nearly 150 pages of specific instructions for granting or denying deferred action," as supporting the conclusion that DACA did not leave the agency free to exercise discretion.

It cautioned, however, that "*[f]or a number of reasons, any extrapolation from DACA must be done carefully.*" *Texas*, 809 F.3d at 173 (emphasis added). In particular, the appellate court recognized that DACA involved self-selecting applicants, and those who expected to be denied relief were unlikely to apply. *Id.* at 174. The court also recognized that "*DACA and DAPA are not identical*" and that because eligibility for DACA was restricted to a younger and less numerous population, DACA applicants were less likely to have backgrounds that would warrant a discretionary denial. *Ibid.*

In addition to affirming the notice-and-comment holding (over one dissent), two of the judges on the Fifth Circuit panel went a large step further and held that DAPA conflicted with the INA. The majority pointed out that the INA already had a specific provision through which aliens could derive lawful status from their children's immigration status. *Id.* at 180 n.167 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). DAPA, the majority said, circumvented this statutory pathway.

The Fifth Circuit also pointed out that the INA had specific provisions through which aliens could be classified as "lawfully present," could obtain discretionary relief

from removal, or could obtain eligibility for work authorization. Because DAPA could make 4.3 million removable aliens eligible for lawful presence, employment authorization, and associated benefits, the Fifth Circuit concluded that DAPA implicated "questions of deep 'economic and political significance' that are central to [the INA's] statutory scheme," and therefore had Congress wished to assign that decision to an agency, "it surely would have done so expressly."

The Fifth Circuit rejected the argument that various provisions of the INA, such as the broad grant of authority to the agency in 6 U.S.C. § 202(5) (providing that the Secretary "shall be responsible for establishing national immigration enforcement policies and priorities"), provided the authority to implement DAPA. Rather, it found that such grants of authority could not reasonably be construed as assigning the agency decisions of such massive "economic and political significance." Such an interpretation, the majority said, would allow the agency to grant lawful presence and work authorization to any illegal alien in the United States. It concluded that "even with 'special deference' to the Secretary," the INA did not permit the reclassification of 4.3 million aliens as "lawfully present," thereby making them newly eligible for a host of federal and state benefits, including work authorization.

The majority also rejected the argument that DAPA was moored in historical practice, finding that such historical practice "does not, by itself, create power," and that in any event, previous deferred-action programs were not analogous to DAPA because most discretionary deferrals had been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters, or had been bridges from one legal status to another. It found that "[n]othing like DAPA, which alters the status of more than four million aliens,

has ever been contemplated absent direct statutory authorization."

The majority concluded that Congress had "directly addressed the precise question at issue" in DAPA because the INA "prescribes how parents may derive an immigration classification on the basis of their child's status and which classes of aliens can achieve deferred action and eligibility for work authorization." *Texas*, 809 F.3d at 186. Because it found that DAPA was foreclosed by Congress's "careful plan," the majority held that the program was "manifestly contrary to the statute."

While at least some of the majority's reasons for holding DAPA illegal would apply to DACA, fairness requires saying that DACA and DAPA were different, as the panel opinion stated. An important criticism against DAPA would *not* apply against DACA, namely the fact that Congress had already established a pathway to lawful presence for alien parents of citizens (so that DAPA simply constituted a more lenient substitute route). DACA, by contrast, has no such analogue in the INA. And, there is a difference between 4.3 million and 689,800. Finally, the criticism that DACA had been mechanically administered without the exercise of discretion in individual cases, if true, could be fixed by simply insisting on exercise of discretion. In sum, the DAPA litigation was not a death knell for DACA.

This order holds that, in light of our own court of appeals' reasoning in *Brewer I* and *Brewer II*, in light of the analysis of the Office of Legal Counsel of the United States Department of Justice, and the reasoning set forth above, our court of appeals will likely hold that DACA was and remains a lawful exercise of authority by DHS. Plaintiffs are therefore likely to succeed on the merits of their claim that the rescission was based on a flawed legal premise and must be set aside as "arbi-

trary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Massachusetts*, 549 U.S. at 528, 127 S.Ct. 1438; *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Safe Air for Everyone*, 488 F.3d at 1101.[16]

**(2) Government Counsel's Alternative Rationale Is Post Hoc and, in Any Event, Arbitrary, Capricious, and an Abuse of Discretion.**

[26]  Government counsel now advances an alternative rationale for the Secretary's decision to rescind DACA. Counsel contends that DHS acted within its discretion in managing its litigation exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the program so as to avoid a potentially disastrous injunction in the Fifth Circuit. This, they say, constituted a reasonable judgment call involving management of litigation risk and agency resources.

[27]  Courts, of course, may not accept post hoc rationalizations for agency action, *see Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), nor may they "supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.–Best Freight Sys.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *see also Cal. Pub. Util. Comm'n v. Fed. Energy Regulatory Comm'n*, No. 16–70481 at 15, 879 F.3d 966, 2018 WL 315575 (9th Cir. Jan. 8, 2018). Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The reason actually given in the administrative record for the rescission was DACA's purported illegality. The Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore, be ended*, the best course was "an orderly and efficient wind-down process," rather than a potentially harsh shutdown in the Fifth Circuit. Nowhere in the administrative record did the Attorney General or the agency consider whether defending the program in court would (or would not) be worth the litigation risk. The new spin by government counsel is a classic post hoc rationalization. That alone is dispositive of the new "litigation risk" rationale.

Significantly, the INA itself makes clear that once the Attorney General had determined that DACA was illegal, the Acting Secretary had to accept his ruling as "controlling." Section 1103(a)(1) of Title 8, a provision that allocates immigration power and duties among the Secretary of Homeland Security, the Secretary of State, and the Attorney General, provides that "determinations and rulings by the Attorney General with respect to all questions of law shall be controlling." Therefore, once the Attorney General advised the Acting Secretary that DACA was illegal, that ruling became "controlling" upon her. She had no

---

16.  Defendants argue that if the Acting Secretary *had relied* on DACA's purported illegality in terminating the program, that reliance should be presumed to be a "reasonable policy judgment that immigration decisions of this magnitude should be left to Congress." This argument finds no support in the administrative record. In *Syracuse Peace Council v. F.C.C.*, upon which defendants rely, the agency explicitly based its decision on the in-

dependent grounds that a policy was both unconstitutional and contrary to the public interest. 867 F.2d 654, 656 (D.C. Cir. 1989). Although the court of appeals elected to review only the agency's policy determination under the APA, it noted that "if the Commission had written its opinion in purely constitutional terms, we would have no choice but to address the constitutional issue." *Id.* at 659.

choice other than to end DACA. She had no room to push back with arguments for the program, to weigh litigation risks, or to consider whether DACA recipients warranted fighting for. The ruling of law by the Attorney General, controlling upon her, made all such considerations moot. Therefore, the new spin by government counsel that the decisionmaker here indulged in a litigation risk assessment and, out of caution, chose not to fight for the program in favor of an orderly wind-down is foreclosed by the INA itself. Her wind-down references plainly presuppose that DACA had to end and the only question was how.

Nevertheless, this order now indulges government counsel's new explanation and addresses whether it holds up even if taken as authentic. In that event, two major criticisms can and should be made of the "litigation risk management" rationale.

*First*, even as to the risk in the Fifth Circuit, the administrative record mentions only similarities between DAPA and DACA (and even then only in an exceedingly conclusory way). No mention appears concerning the *differences* between DAPA and DACA that might have led to a different result. In addition to the distinctions made above, one powerful consideration should have been the doctrine of laches. Unlike the DAPA challenge filed immediately after DAPA was announced, the threatened DACA challenge by ten states would have come *five years after the program began and after hundreds of thousands of young adults had enrolled and entered the workforce. See Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 155, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (adopting laches in APA context); *see also Arpaio v. Obama*, 27 F.Supp.3d 185, 210 (D.D.C. 2014), aff'd, 797 F.3d 11 (D.C. Cir. 2015) (noting that even if plaintiff did have standing he could not demonstrate irreparable harm since he waited two years to challenge DACA). Another difference was that DACA was precisely the kind of interstitial program of deferred action seemingly approved even by the Fifth Circuit, *Texas*, 809 F.3d at 185, given that both sides of the aisle and our two most recent presidents have called for Dreamer legislation. Nor was there any mention of our own circuit's more recent decision in *Brewer II* that favored DACA, or of recognition by the district court in the District of Columbia that DACA had, contrary to the Fifth Circuit, involved discretionary denials of DACA relief.

*Second*, if we are to indulge the spin that the decision to end DACA rested on a litigation-management assessment (rather than on a ruling of illegality), then the Acting Secretary committed a serious error. Against the litigation risk the Acting Secretary should have—but did not—weigh DACA's programmatic objectives as well as the reliance interests of DACA recipients. *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 136 S.Ct. 2117, 2126–27, 195 L.Ed.2d 382 (2016). This responsibility lay with the Acting Secretary, not the Attorney General. That is, once the Acting Secretary was informed of the supposed litigation risk, it remained her responsibility to balance it against competing policy considerations. It remained her responsibility to recognize the litigation risk, yet still ask whether the program was worth fighting for. The administrative record is utterly silent in this regard.

The agency reversed over five years of DHS policy, did so only one day after the Attorney General's letter, and did so just three months after Secretary Kelly had continued the program (despite the Fifth Circuit's decision and affirmance). The Acting Secretary failed to provide a "reasoned explanation" as to why she was "disregarding facts and circumstances which underlay or were engendered by the prior

policy." *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).

*Encino Motorcars* seems very close on point. There, the Supreme Court addressed the Department of Labor's reversal of an interpretive regulation construing the Fair Labor Standard Act's minimum wage and overtime provisions for car dealership employees. Our court of appeals gave *Chevron* deference to the new interpretation. The Supreme Court reversed. In determining whether the regulation was "procedurally defective"—and accordingly whether the agency's regulation warranted *Chevron* deference—the Supreme Court evaluated whether the agency had given adequate reasons for its decision to reverse course. *Encino Motorcars*, 136 S.Ct. at 2125 (citing *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. 2856). The Supreme Court explained (at page 2126) that while agencies are free to change their existing policies, they must provide a reasoned explanation for a change (quotes and citations omitted):

> In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy. It follows that an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.

Because the agency "gave almost no reason at all" for its change in position, the Supreme Court concluded that the agency had failed to provide the sort of reasoned explanation required in light of the "significant reliance issues involved." *Id.* at 2126–27.

So too here.

As there, the agency here reversed its interpretation of its statutory authority. As there, the administrative record here includes no analysis of the "significant reliance issues involved." The parallel is striking. In terminating DACA, the administrative record failed to address the 689,800 young people who had come to rely on DACA to live and to work in this country. These individuals had submitted substantial personal identifying information to the government, paid hefty fees, and planned their lives according to the dictates of DACA. The administrative record includes no consideration to the disruption a rescission would have on the lives of DACA recipients, let alone their families, employers and employees, schools and communities.[17]

Ironically, government counsel now cite material *outside* of the administrative record in an attempt to show the Acting Secretary considered the plight of DACA recipients (Dkt. 204 at 10, 12, 19–20). This press release came after the fact and was not part of the administrative record, and therefore cannot now rescue the agency. In that respect, *Cal. Pub. Util. Comm'n*, No. 16–70481 at 17 n.4 is analogous. There, our court appeals refused to consider an agency's position which was not advanced in connection with the decision under review but, rather, was offered for the first time afterwards.

[28] Defendants next argue that because no statute here dictated the factors

---

**17.** Here, perhaps in light of *Encino Motors*, the government does not argue that *Chevron* deference should be afforded to the Attorney General's legal conclusion that DACA exceeded the agency's authority.

for an agency to consider in granting or rescinding deferred action, the agency need not have given weight to the benefits of the DACA program or the harm that would be caused to its recipients upon its rescission. The Supreme Court has recognized, however, that "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decision." *Michigan v. EPA*, —— U.S. ——, 135 S.Ct. 2699, 2707, 192 L.Ed.2d 674 (2015). While defendants attempt to distinguish *Michigan* on the ground that the text of the statute required regulation there to be "appropriate and necessary," they ignore that a change in agency policy requires the agency to have "good reasons for it." *Fox TV Stations, Inc.*, 556 U.S. at 515, 129 S.Ct. 1800.

[29]   Defendants, of course, are correct that when an agency reverses policy it "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." *Ibid.* Where, however, an agency abruptly changes course and terminates a program on which so many people rely, the APA requires "a more detailed justification." *Ibid.* Indeed, "[i]t would be arbitrary and capricious to ignore such matters." *Ibid.* In such cases, "it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16, 129 S.Ct. 1800. Defendants' attempt to portray DACA as a program that did not generate reliance interests is unconvincing. As plaintiffs' evidence shows, DACA recipients, their employers, their colleges, and their communities all developed expectations based on the possibility that DACA recipients could renew their deferred action and work authorizations for additional two-year periods.

In sum, government counsel's alternative spin on the administrative record is just a post hoc rationalization. But, even if it had been the actual rationale, it was arbitrary, capricious, and an abuse of discretion under *Encino Motors*.

\* \* \*

Accordingly, plaintiffs have shown that they are likely to succeed on the merits of their claim that the rescission was arbitrary and capricious and must be set aside under the APA.

**B.   Irreparable Harm.**

[30]   Plaintiffs have clearly demonstrated that they are likely to suffer serious irreparable harm absent an injunction. Before DACA, Individual Plaintiffs, brought to America as children, faced a tough set of life and career choices turning on the comparative probabilities of being deported versus remaining here. DACA gave them a more tolerable set of choices, including joining the mainstream workforce. Now, absent an injunction, they will slide back to the pre-DACA era and associated hardship.

[31]   The University of California and other entity plaintiffs have also demonstrated that they face irreparable harm as they begin to lose valuable students and employees in whom they have invested, and that loss of DACA recipients from the workforce will have a detrimental impact on their organization interests, economic output, public health, and safety.

Our court of appeals recently confirmed that "prolonged separation from family members" and "constraints to recruiting and retaining faculty members to foster diversity and quality within the University community" are harms which are not compensable with monetary damages and therefore weigh in favor of finding irreparable harm. *Hawaii v. Trump*, No. 17-17168, 878 F.3d 662, 2017 WL 6554184, at \*22 (9th Cir. Dec. 22, 2017). These show-

ings accordingly demonstrate that preliminary relief is appropriate. *Ibid.*; *see also Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013).

Defendants do not dispute that plaintiffs are likely to suffer such harms. Rather, they argue that these harms will not happen *before* the phase-out begins on March 5, 2018, the date by which the undersigned judge had wanted to present a final record and final decision for appellate review.

Delays in this case, however, have made it impossible to send a final judgment to our court of appeals by March 5. To take only one example, it would be unfair to reach a conclusion without giving plaintiffs an opportunity to examine the complete administrative record. Government counsel, however, succeeded in obtaining an order from the Supreme Court postponing proceedings on completing the administrative record until after ruling on its FRCP 12(b)(1) motion to dismiss. As a result, we have yet to receive a complete administrative record. Although plaintiffs are likely to prevail on even the truncated administrative record, as set forth above, our appellate court might disagree with that conclusion or the agency might seek to cure the flaws in its process via a fresh agency action. Plaintiffs are entitled to learn of all flaws, if any more there be, lurking in the whole record. One such possibility suggested by plaintiffs is that the rescission was contrived to give the administration a bargaining chip to demand funding for a border wall in exchange for reviving DACA. A presidential tweet after our hearing gives credence to this claim. Another possibility raised by plaintiffs is racial animus. These theories deserve the benefit of the full administrative record. It will be impossible to litigate this case to a fair and final conclusion before March 5.[18]

## C. Balance of Equities and Public Interest.

**[32]**  On provisional relief motions, district judges must consider whether (or not) such relief would be in the public interest. On this point, we seem to be in the unusual position wherein the ultimate authority over the agency, the Chief Executive, publicly favors the very program the agency has ended. In September, President Trump stated his support for DACA, tweeting: "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really! ...." He has also called upon Congress to ratify DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" (App. 1958).

For the reasons DACA was instituted, and for the reasons tweeted by President Trump, this order finds that the public interest will be served by DACA's continuation (on the conditions and exceptions set out below). Beginning March 5, absent an injunction, one thousand individuals per day, on average, will lose their DACA protection. The rescission will result in hundreds of thousands of individuals losing their work authorizations and deferred action status. This would tear authorized workers from our nation's economy and would prejudice their being able to support themselves and their families, not to mention paying taxes to support our nation.

---

**18.**  On December 29, 2017, President Trump tweeted: "The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our

Country at all cost!" (Dkt. No. 227–2). Plaintiffs separately request judicial notice of this tweet. Defendants object to judicial notice on various relevancy grounds, but do not argue that it is not properly subject to judicial notice under FRE 201 (Dkt. Nos. 227, 230). Plaintiffs' request is accordingly **GRANTED**.

**1048**          **279 FEDERAL SUPPLEMENT, 3d SERIES**

Too, authorized workers will lose the benefit of their employer-provided healthcare plans and thus place a greater burden on emergency healthcare services.

**[33, 34]**  On provisional relief motions, district judges must also weigh the balance of hardships flowing from a grant versus denial of provisional relief. The hardship to plaintiffs need not be repeated. The only hardship raised by defendants is interference with the agency's judgment on how best to allocate its resources in keeping our homeland secure, as well as its judgment in phasing out DACA. Significantly, however, the agency's judgment here was not based on a policy change. It was based on a mistake of law. If the instant order is correct that DACA fell within the statutory and constitutional powers of the Executive Branch, then a policy supported as high up as our Chief Executive has been the victim of a colossal blunder. A preliminary injunction will set that right without imposing any policy unwanted by the Executive Branch.[19]

### D.  Scope of Provisional Relief.

For the foregoing reasons, defendants ARE HEREBY ORDERED AND ENJOINED, pending final judgment herein or other order, to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application.

Nothing in this order prohibits the agency from proceeding to remove any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed. Nor does this order bar the agency from granting advance parole in individual cases it finds deserving, or from granting deferred action to new individuals on an ad hoc basis.

**[35]**  The agency shall post reasonable public notice that it will resume receiving DACA renewal applications and prescribe a process consistent with this order. The agency shall keep records of its actions on all DACA-related applications and provide summary reports to the Court (and counsel) on the first business day of each quarter.[20]

---

**19.** If a likelihood of irreparable injury is shown and an injunction is in the public interest, a preliminary injunction is also appropriate when a plaintiff demonstrates that serious questions going to the merits are raised and the balance of hardships tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Because plaintiffs have clearly demonstrated a likelihood of irreparable injury and that the balance of hardships tips sharply in plaintiffs' favor, preliminary relief would also be appropriate under this alternative standard of review.

**20.** A mandatory injunction orders a responsible party to take action, while "[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Brewer I*, 757 F.3d at 1060. The relevant status quo is the legally relevant relationship between the parties before the controversy arose. *Id.* at 1061. Here, plaintiffs contest the validity of defendants' rescission of DACA, the status quo before which was that DACA was fully implemented. Accordingly, plaintiffs' requested preliminary injunction is not mandatory. But even if it were, plaintiffs have demonstrated that sufficiently serious irreparable harm would result to warrant even a mandatory injunction.

By way of explanation, while plaintiffs have demonstrated that DACA recipients, as well as their families, schools, employers, and communities, are likely to suffer substantial, irreparable harm as a result of the rescission, they have not made a comparable showing as to individuals who have never applied for or obtained DACA.

[36] This order will not require advance parole. Unlike the widespread harm to plaintiffs and our economy that would result were the 689,800 DACA enrollees to lose their ability to work in this country, plaintiffs have not demonstrated that comparable harm will occur as a result of DACA recipients' inability to travel abroad. True, Individual Plaintiffs Jirayut Latthivongskorn and Norma Ramirez describe professional disadvantages that may result if they are unable to travel internationally. These, however, do not amount to hardships justifying a provisional injunction requiring DHS to resume accepting applications for advance parole. However, as stated, nothing in this order would bar individuals from asking for such agency relief or bar the agency from granting it in deserving cases.

[37] With respect to geographical scope, this order finds a nationwide injunction is appropriate. Our country has a strong interest in the uniform application of immigration law and policy. Plaintiffs have established injury that reaches beyond the geographical bounds of the Northern District of California. The problem affects every state and territory of the United States.

In February 2017, our court of appeals considered this very issue in *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017), and upheld a nationwide injunction imposed by a single district court, observing that limiting the geographic scope of an injunction on an immigration enforcement policy "would run afoul of the constitutional and statutory requirements for uniform immigration law and policy" and that, as here, "the government ha[d] not proposed a workable alternative." Indeed, the Fifth Circuit reached the same conclusion in determining the appropriate scope of an injunction over DAPA, *Texas*, 809 F.3d at 187–88, holding that uniform application of the immigration laws justified a nationwide injunction. So too here.[21]

Limiting relief to the States in suit or the Individual Plaintiffs would result in administrative confusion and simply provoke many thousands of individual lawsuits all over the country. The most practical relief is to maintain DACA in the same manner to which the agency and recipients are accustomed, subject to the exceptions above noted.

## CONCLUSION

Defendants' motion to dismiss under FRCP 12(b)(1) is Granted in part only to the limited extent stated above and is otherwise Denied. Maine and Minnesota's APA claims are hereby Dismissed. Maine or Minnesota may seek leave to amend and will have **21 calendar days** from the date of this order to file a motion, noticed on

---

21. Oddly, the government's contrary authority is *Bresgal v. Brock*, 843 F.2d 1163, 1169–70 (9th Cir. 1987), a decision in which our court of appeals upheld a nationwide injunction and held, "[t]here is no general requirement that an injunction affect only the parties in the suit," and "nationwide relief in federal district or circuit court [is permitted] when it is appropriate." *Bresgal* merely observed that "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Id.* at 1170. Here, it cannot be so structured. Nor are any of the government's other authorities, which restate the general proposition that a remedy should match the injury alleged, *see, e.g., Town of Chester v. Laroe Estates, Inc.*, —— U.S. ——, 137 S.Ct. 1645, 1650, 198 L.Ed.2d 64 (2017), to the contrary.

AR0519

**1050**           **279 FEDERAL SUPPLEMENT, 3d SERIES**

the normal 35–day track, for leave to file an amended complaint. A proposed amended complaint must be appended to the motion and plaintiffs must plead their best case. Any such motion should clearly explain how the amendments to the complaint cure the deficiencies identified herein. To the extent stated above, plaintiffs' motion for provisional relief is GRANTED. A separate order will address defendants' motion to dismiss pursuant to FRCP 12(b)(6).

## CERTIFICATION UNDER
## 28 U.S.C. § 1292(b)

Pursuant to our court of appeals' order dated December 21, 2017, the district court hereby certifies for interlocutory appeal the issues decided herein (i) whether (or not) the rescission of DACA is unreviewable as committed to agency discretion or by reason of 8 U.S.C. § 1252(g), (ii) whether (or not) plaintiffs have standing, and (iii) all other questions interposed by the government in its motion to dismiss under FRCP 12(b)(1). This order finds that these are controlling questions of law as to which there is substantial ground for difference of opinion and that their resolution by the court of appeals will materially advance the litigation. This order realizes that the same issues are reviewable upon appeal of this injunction. Nevertheless, out of caution and to avoid any problem concerning scope of review, the district court so certifies.

### IT IS SO ORDERED.



---

**UNITED STATES of America,
Plaintiff,**

**v.**

**$295,726.42 IN ACCOUNT FUNDS
SEIZED, et al., Defendant.**

**Case No.: SACV 17–00954–CJC(JCGx)**

United States District Court,
C.D. California, Southern Division.

Signed 01/04/2018

**Background:** Government initiated civil forfeiture action against defendant currency. After claimant filed motion to claim defendant currency, government moved to strike claim based on claimant's incomplete and evasive response to special interrogatory.

**Holdings:** The District Court, Cormac J. Carney, J., held that:

(1) claimant's response to Special Interrogatory was evasive and incomplete, and thus insufficient to establish standing to contest civil forfeiture, and

(2) claimant waived his right to invoke privilege against self-incrimination.

Motion granted.

**1. Forfeitures ⟊95**

In order to contest a forfeiture, a claimant must demonstrate both statutory and Article III standing.  U.S. Const. art. 3, § 2, cl. 1.

**2. Forfeitures ⟊95, 103(2)**

A claimant contesting a civil forfeiture bears the burden of establishing Article III standing, the threshold function of which is to ensure that the Government is put to its proof only where someone acting with a legitimate interest contests the forfeiture; a claimant must therefore demonstrate that he has a sufficient interest in

**AR0520**

Case 2:17-cv-01907-JDB   Document 32   Filed 08/17/18   Page 1 of 9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-1907 (JDB)** |
| **DONALD J. TRUMP, et al.,** | |
| **Defendants.** | |
| **TRUSTEES OF PRINCETON UNIVERSITY, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2325 (JDB)** |
| **UNITED STATES OF AMERICA, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Before the Court is [82] the government's motion for a stay pending appeal of [69] the April 24, 2018 order vacating the rescission of the Deferred Action for Childhood Arrivals ("DACA") program and [77] the August 3, 2018 order denying reconsideration of the April 24, 2018 order. Also before the Court is [81] the government's unopposed motion for clarification that the August 3, 2018 order was a final, appealable judgment.

The government seeks a stay of the Court's orders in their entirety or, in the alternative, at least insofar as they require the Department of Homeland Security ("DHS") to begin accepting applications for initial grants of DACA benefits and for advance parole under the DACA program. See Defs.' Mot. for a Stay Pending Appeal ("Gov't Mot.") [ECF No. 82] at 1–2. Plaintiffs

**AR0521**

Case 1:16-cv-04756-NGG-JO Document 318-4 Filed 09/04/18 Page 214 of 405 PageID #:
Case 2:17-cv-01907-JDB Document 32 Filed 08/17/18 Page 2 of 9
6511

oppose the government's motion in part, urging the Court not to stay its orders in their entirety,
but agreeing that a stay as to initial DACA applications would be proper.  See Pls.' Partial Opp'n
to Defs.' Mot. for Stay Pending Appeal ("Pls.' Opp'n") [ECF No. 83] at 1 (recognizing that "an
imperfect 'status quo'—no new applicants, but renewals continue—has developed").  For the
reasons that follow, the government's motion to clarify will be granted, and its motion for a stay
pending appeal will be granted in part.  The Court will stay its order as to new DACA applications
and applications for advance parole, but not as to renewal applications.

The Court is mindful that continuing the stay in this case will temporarily deprive certain
DACA-eligible individuals, and plaintiffs in these cases, of relief to which the Court has concluded
they are legally entitled.  But the Court is also aware of the significant confusion and uncertainty
that currently surrounds the status of the DACA program, which is now the subject of litigation in
multiple federal district courts and courts of appeals.  Because that confusion would only be
magnified if the Court's order regarding initial DACA applications were to take effect now and
later be reversed on appeal, the Court will grant a limited stay of its order and preserve the status
quo pending appeal, as plaintiffs themselves suggest.

## I.      MOTION FOR STAY PENDING APPEAL

Under Federal Rule of Civil Procedure 62(c), district courts generally have the authority to
stay their orders pending appeal.  Hilton v. Braunskill, 481 U.S. 770, 776 (1987).  In determining
whether to grant such a stay, courts consider four factors: "(1) whether the stay applicant has made
a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be
irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other

AR0522

parties interested in the proceeding; and (4) where the public interest lies." Id.; see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 842–43 (D.C. Cir. 1977).

Traditionally, courts in this Circuit have considered these factors on a "'sliding scale,' whereby 'a strong showing on one factor could make up for a weaker showing on another.'" Cigar Ass'n of Am. v. FDA, Civil Action No. 16-1460, 2018 WL 3304627, at *3 (D.D.C. July 5, 2018) (quoting Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011)). Although recent decisions of the Supreme Court have called this approach into question,[1] "the district judges in this Circuit continue to adhere to binding precedent and apply the sliding scale approach to determine whether a movant is entitled to an injunction pending resolution of its appeal," id. (collecting cases), and plaintiffs do not dispute the propriety of that approach here, see Pls.' Opp'n at 2 n.1. Thus, if "the three other factors strongly favor issuing" a stay, then the government "need only raise a 'serious legal question' on the merits" for that stay to issue. Cigar Ass'n of Am., 2018 WL 3304627, at *3 (quoting Aamer, 742 F.3d at 1043); see also Holiday Tours, 559 F.2d at 843 ("[A] court, when confronted with a case in which the other three factors strongly favor interim relief[,] may exercise its discretion to grant a stay if the movant has made a substantial case on the merits.").

As to the first factor, the Court finds that the government's appeal raises "serious legal question[s]." Aamer, 742 F.3d at 1043. Those questions include whether DHS's decision to rescind DACA was subject to judicial review under the Administrative Procedure Act ("APA"), see 5 U.S.C. § 701(a)(2) (exempting from APA review "agency action [that] is committed to agency discretion by law"), and, if so, whether that decision was arbitrary and capricious, see 5

---

[1] See id. (noting that, following the Supreme Court's decision in Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), a case that dealt with preliminary injunctive relief, "it remains an open question whether the 'likelihood of success' factor is an 'independent, free-standing requirement'" (quoting Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014)).

U.S.C. § 706(2)(A). Of course, this Court has already answered both questions in the affirmative: as the Court has explained at length elsewhere, DACA's rescission was both reviewable and unlawful because it was based chiefly on a "virtually unexplained" conclusion that DACA was unlawful. NAACP v. Trump, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). Nevertheless, the government has assembled a "substantial case on the merits," Holiday Tours, 559 F.2d at 843, and the fact that the Court has thus far been unpersuaded by that case does not preclude the issuance of a stay, see id. ("The court . . . may grant a stay even though its own approach may be contrary to [the] movant's view of the merits."); see also Jewish War Veterans of the U.S., Inc. v. Gates, 522 F. Supp. 2d 73, 79 (D.D.C. 2007) (granting a stay pending appeal where the nonmovant argued that a D.C. Circuit decision was "directly on point and controls the outcome of this case").[2]

The remaining factors lend sufficient support to plaintiffs' proposal for a limited stay pending appeal (i.e., as to initial DACA applications and applications for advance parole only) to render that stay appropriate in light of the government's "substantial" legal case. See Cigar Ass'n of Am., 2018 WL 3304627, at *4. But they do not support the government's request for a stay of the Court's order in its entirety.

---

[2] Many of the defects in the government's merits case are apparent even in its motion for a stay pending appeal. For example, the government reiterates its illogical reading of Crowley Caribbean Transport, Inc. v. Peña, 37 F.3d 671 (D.C. Cir. 1994), whereby a court could reject "an enforcement decision's supporting rationale" and yet be powerless to remedy the unlawful "enforcement decision itself," Gov't's Mot. at 6. Similarly, the government relies on United Automobile Workers v. Brock, a decision that expressly acknowledged that "review might be available even for a nonenforcement decision" where, as here, "that decision is predicated solely on the agency's interpretation of a statute" or other law. 783 F.2d 237, 245 n.10 (D.C. Cir. 1986) (emphasis added); see id. at 245 n.9 (declining to review the decision at issue in that case because there, unlike here, the agency's "decision not to take enforcement action . . . was predicated on a combination of both statutory and discretionary grounds"). The government also continues to advance the flawed premise that Texas v. United States, 809 F.3d 134 (5th Cir. 2015), supports DACA's rescission, this time "direct[ing]" the Court to the Fifth Circuit's opinion as though it were somehow that court's responsibility—and not DHS's—to explain DHS's decision to rescind the DACA program. Gov't's Mot. at 7.

AR0524

The second factor—the risk of irreparable injury to DHS—favors a stay, but only as to initial DACA applications and applications for DACA-based advance parole. The Court is unmoved by the government's assertion of injury resulting from its being "enjoined from implementing an act of Congress." Gov't's Mot. at 8. As the Court has already explained, DHS has been implementing that act of Congress (the Immigration and Nationality Act) under an ill-considered (and hence possibly incorrect) understanding of its enforcement authority. See NAACP, 298 F. Supp. 3d at 249. Unlike an injunction prohibiting the exercise of statutory authority altogether, see New Motor Veh. Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (concluding "that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"), this Court's order simply corrects the improper exercise of that authority. To the extent that such an injury is cognizable at all, it is insufficient to justify staying the Court's order here.

The Court accepts, however, that the additional staff and other resources required for DHS to process initial DACA applications would constitute a cognizable injury. DHS estimates that full implementation of the Court's order would lead to the filing of over 100,000 initial DACA applications and 30,000 requests for advance parole, which would in turn require the hiring of 72 temporary employees and the reassignment or hiring of 60 full-time employees. See Gov't's Mot. at 9–10. But these burdens apply only as to initial DACA applications, since DHS has been accepting renewal applications since mid-2012, with the exception of a brief period in late 2017

AR0525

and early 2018.  See NAACP, 298 F. Supp. 3d at 218–20.[3]  The second factor therefore favors plaintiffs' proposed limited stay, not the government's full stay.

The third factor, the risk of injury to plaintiffs, again favors continuing the stay as to initial DACA applications and applications for advance parole, but not as to renewal applications. Although the government maintains that the termination of existing DACA benefits—which would immediately end DACA beneficiaries' work authorizations and could lead to their removal from the United States—is not an irreparable harm, this untenable proposition has been rejected by this Court and by several others.  See NAACP, 298 F. Supp. 3d at 245 (noting in the stay-of-vacatur context that "each day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action"); see also Regents of the U. of Cal. v. DHS, 279 F. Supp. 3d 1011, 1046–47 (N.D. Cal. 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 434–35 (E.D.N.Y. 2018).  And although there are currently two preliminary injunctions in place requiring DHS to continue accepting renewal applications, as the Court has previously noted, "those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future."  NAACP, 298 F. Supp. 3d at 245.  This Court's order—which, unlike the preliminary injunctions entered in parallel litigation, is a final judgment—will therefore prevent irreparable harm to plaintiffs and all current DACA beneficiaries should those other injunctions be reversed.  Hence, it will not be stayed as to renewal applications.

By contrast, the Court agrees with the district court in Regents that "while plaintiffs have demonstrated that DACA recipients . . . are likely to suffer substantial, irreparable harm as a result

---

[3] When DHS rescinded DACA in September 2017, it immediately stopped accepting new DACA applications but continued to accept certain renewal applications that were filed within the next thirty days.  Id. at 218.  Then, in January 2018, a district court in California ordered DHS to resume accepting renewal applications.  Id. at 220.

AR0526

Case 1:16-cv-04756-NGG-JO    Document 219-1    Filed 09/04/29    Page 219 of 405 PageID #:
6516
Case 2:17-cv-01907-JDB    Document 32    Filed 08/17/18    Page 7 of 9

of the rescission, they have not made a comparable showing as to individuals who have never applied for or obtained DACA" benefits.  279 F. Supp. 3d at 1049; accord Batalla Vidal, 279 F. Supp. 3d at 437 ("As in Regents, . . . the court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications.").  The same is true of advance parole.  See Regents, 279 F. Supp. 3d at 1049 (concluding that "inability to travel abroad . . . do[es] not amount to [a] hardship[] justifying a provisional injunction requiring DHS to resume accepting applications for advance parole"); Batalla Vidal, 279 F. Supp. 3d at 437 (citing Regents, 279 F. Supp. 3d at 1048–49).  Thus, like the second factor, the third factor supports a stay as to initial DACA applications and applications for advance parole, but not as to renewal applications.

The fourth and final factor—the public interest—also favors this limited stay.  The Court has already recognized the disruption that would ensue if DHS were to begin accepting initial DACA applications pursuant to the Court's order but that order were later reversed on appeal.  See NAACP, 298 F. Supp. 3d at 244–45 (citing Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).  Just as this potential for disruption previously counseled in favor of a 90-day stay of the Court's order of vacatur, see id., it now suggests that the public interest would be served by a stay pending appeal as to initial DACA applications.  Like the second and third factors, however, this fourth factor does not support a stay as to renewal applications, since DHS is already accepting those applications.

In sum, because the government's appeal raises "serious legal questions," and because the remaining factors—harm to DHS, harm to DACA beneficiaries, and the public interest—favor a

**AR0527**

stay of the Court's order of vacatur as to initial DACA applications and applications for DACA-based advance parole, the Court will grant the government's request for a stay as to those applications. But because the three equitable factors do not favor a stay as to applications for the renewal of DACA benefits, pursuant to the "sliding scale" approach employed in this Circuit, Cigar Ass'n of Am., 2018 WL 3304627, at *3, the Court will not stay its order as to renewal applications. And the Court notes again that plaintiffs agree to this limited stay of the Court's order pending appeal. See Pls.' Opp'n at 15–16.

## II.   MOTION FOR CLARIFICATION

Finally, the government has moved for clarification that the Court's August 3, 2018 order was a final, appealable judgment. See Defs.' Mot. for Clarification Regarding Entry of Final Judgment ("Gov't's Mot. for Clarification") [ECF No. 81] at 2–3. The government also seeks an order dismissing plaintiffs' constitutional challenges to DACA's rescission as moot. See id. at 3. Plaintiffs oppose the dismissal of their constitutional claims but agree that the Court's August 3, 2018 order is final and appealable. See id. at 3 n.2.

Initially, the Court deferred ruling on plaintiffs' constitutional challenges to DACA's rescission pending DHS's response to the April 24, 2018 order vacating DACA's rescission on administrative grounds. See NAACP, 298 F. Supp. 3d at 246 (explaining that DHS "could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims"). Because the Court has since declined to reconsider its April 24, 2018 order, a decision on plaintiffs' constitutional challenges to DACA's rescission is unnecessary. See Alabama Power Co. v. EPA, 40 F.3d 450, 456 (D.C. Cir. 1994) (declining to address a claim rendered moot by the court's vacatur of the agency's action). Moreover, the Court has already entered final judgment

8

**AR0528**

Case 1:16-cv-04756-NGG-VMS Document 210-4 Filed 09/04/20 Page 221 of 405 PageID #:
6518
Case 2:17-cv-01907-JDB Document 32 Filed 08/17/18 Page 9 of 9

on plaintiffs' remaining administrative and constitutional claims. See NAACP, 298 F. Supp. 3d

at 249. Thus, the Court's August 3, 2018 order denying reconsideration "adjudicat[ed] all the

claims and all the parties' rights and liabilities" in this action and was therefore a final, appealable

order. Fed. R. Civ. P. 54(b).

*   *   *

For the foregoing reasons, the government's motion for a stay pending appeal will be

granted in part, and the Court will stay its order of vacatur as it applies to initial DACA applications

and applications for DACA-based advance parole. The government's motion to clarify will also

be granted. A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: August 17, 2018

9

AR0529

Mᴜɴ. Rᴇɢs. tit. 5, § E501.6-.7 (2018); see also Public Education Reform Amendment Act of 2007, D.C. L. No. 17-9 (2007); D.C. Cᴏᴅᴇ § 38-171 (2007); D.C. Cᴏᴅᴇ § 38-174 (2016); 54 D.C. Reg. 11622 (Nov. 30, 2007).

Mr. Dickerson has also alleged a series of adverse employment actions taken by and at the direction of Chancellor Rhee, a person with delegated policymaking authority under D.C. regulations, including the authority to direct and supervise all employees of the public schools and take all personnel actions affecting them. He has alleged that these adverse employment actions were targeted not only at himself, but at other African-American school administrators. Mr. Dickerson has not simply alleged a "single incident" of discriminatory conduct. See Reed v. District of Columbia, 474 F.Supp.2d at 168 (citing Monell v. Dep't of Soc. Servs., 436 U.S. at 694, 98 S.Ct. 2018). He has set forth sufficient facts to allege a policy of replacing African-American administrators with non-African American administrators within the D.C. public school system, implemented through the actions of Chancellor Rhee. See Baker v. District of Columbia, 326 F.3d at 1306 (explaining that "the action of a policy maker within the government" is one of "a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983"). In doing so, he has adequately pleaded the existence of a discriminatory policy of the District of Columbia, by and through its policymaker, Chancellor Rhee. See Dickerson v. District of Columbia, 70 F.Supp.3d at 326-27 (citing Dickerson v. District of Columbia, 806 F.Supp.2d at 120); see also Monell v. Dep't of Soc. Servs., 436 U.S. at 694, 98 S.Ct. 2018; Reed v. District of Columbia, 474 F.Supp.2d at 168.

## IV.  CONCLUSION

For the reasons set forth in this opinion, the Court will deny the District of Columbia's motion to dismiss. An order consis-

tent with this opinion shall issue this same day.

SO ORDERED.



## NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,

v.

### Donald J. TRUMP, et al., Defendants.

### Trustees of Princeton University, et al., Plaintiffs,

v.

### United States of America, et al., Defendants.

### Civil Action No. 17-1907 (JDB), Civil Action No. 17-2325 (JDB)

United States District Court, District of Columbia.

Signed 08/03/2018

**Background:** Civil rights organization, undocumented alien, and others brought consolidated actions challenging the Department of Homeland Security's (DHS) decision to rescind the Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for undocumented aliens who were brought to the United States as children, alleging that the decision was both unconstitutional and unlawful under the Administrative Procedure Act (APA). The District Court, John D. Bates, J., 298 F.Supp.3d 209, found the decision unlawful under the APA as inadequately supported, but stayed its order of vacatur for 90 days to provide DHS op-

AR0530

portunity to remedy inadequacies. Before 90-day period expired, DHS issued new memorandum purporting to offer further explanation for its decision and declined to disturb its decision to rescind DACA program. Government moved for reconsideration of Court's prior order.

**Holdings:** The District Court, Bates, J., held that:

(1) it would consider DHS's new memorandum even though it already found decision to rescind DACA program unlawful;

(2) new memorandum did not present impermissibly post hoc rationalizations, with one exception;

(3) memorandum did not warrant reconsideration of Court's earlier determination that decision to rescind DACA program was subject to judicial review; and

(4) memorandum did not warrant reconsideration of Court's earlier determination that decision to rescind DACA program was arbitrary and capricious.

Motion denied.

**1. Administrative Law and Procedure**
�document⟨753

An agency's action must be upheld, if at all, on the basis articulated by the agency itself.

**2. Aliens, Immigration, and Citizenship**
⟨155

District Court would consider new memorandum Department of Homeland Security (DHS) issued purporting to offer further explanation for its decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for undocumented aliens who were brought to the United States as children, after Court found decision unlawful under the Administrative Procedure Act (APA) as inadequately supported, even

though Court anticipated that DHS would issue new rescission decision, rather than simply adopt and further explain its prior decision, where Court stayed its order of vacatur for 90 days to provide DHS opportunity to remedy inadequacies, and new memorandum formed basis for DHS's motion for reconsideration seeking revision of Court's nonfinal order. 5 U.S.C.A. § 551 et seq.; Fed. R. Civ. P. 54(b).

**3. Aliens, Immigration, and Citizenship**
⟨154

New memorandum Department of Homeland Security (DHS) issued purporting to offer further explanation for its decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for undocumented aliens who were brought to the United States as children, after District Court found decision unlawful under the Administrative Procedure Act (APA) as inadequately supported, did not present impermissibly post hoc rationalizations for DACA program's rescission, with exception of rationale concerning pattern of illegal immigration by minors, where arguments based on doubts about DACA's legality and policy justifications were permitted amplifications expanding on original explanations for DHS's decision, but memorandum's discussion, raised for first time, of pattern of illegal immigration by minors did not relate back to original explanations. 5 U.S.C.A. § 551 et seq.

**4. Administrative Law and Procedure**
⟨753

The rule that post hoc rationalization provide an inadequate basis for review of agency decisions does not prohibit an agency from submitting an amplified articulation of the reasons for its decision following a remand.

**5. Administrative Law and Procedure**
☞**753**

The purpose of the rule that post hoc rationalizations are an inadequate basis for review of agency decisions is simply to prevent courts from considering rationales offered by anyone other than the proper decisionmakers, such as those appearing for the first time in litigation affidavits and arguments of counsel; it is not meant to be a time barrier that freezes an agency's exercise of its judgment and bars it from further articulation of its reasoning.

**6. Administrative Law and Procedure**
☞**753**

When faced with an explanation offered for the first time on remand, a court must determine whether it is an amplified articulation of the agency's prior reasoning, which must be considered, or instead a new reason for why the agency could have taken the action, which must be disregarded as a post hoc rationalization.

**7. Administrative Law and Procedure**
☞**701**

The exception to the Administrative Procedure Act (APA) section barring judicial review of agency action that was committed to agency discretion by law, for general enforcement policies that rely solely on the agency's view of what the law requires, reflects the common sense notion that an otherwise reviewable legal interpretation does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion. 5 U.S.C.A. § 701(a)(2).

**8. Administrative Law and Procedure**
☞**701**

Although reviewable legal rulings may not be carved out from the middle of non-reviewable actions, an agency action is not non-reviewable in the first place if it is based entirely on its interpretation of a statute.

**9. Aliens, Immigration, and Citizenship**
☞**155**

New memorandum Department of Homeland Security (DHS) issued purporting to offer further explanation for its decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for undocumented aliens who were brought to the United States as children, after District Court found decision unlawful under the Administrative Procedure Act (APA) as inadequately supported, did not warrant reconsideration of Court's earlier determination that decision to rescind DACA program was subject to judicial review despite APA's exception for agency action that was committed to agency discretion by law, where purported discretionary enforcement policy rationales set forth in memorandum were predicated on DHS's otherwise reviewable legal determination of DACA's lawfulness. 5 U.S.C.A. § 701(a)(2).

**10. Aliens, Immigration, and Citizenship**
☞**155**

New memorandum Department of Homeland Security (DHS) issued purporting to offer further explanation for its decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections from deportation and work authorization for undocumented aliens who were brought to the United States as children, after District Court found decision unlawful under the Administrative Procedure Act (APA) as inadequately supported, did not warrant reconsideration of Court's earlier determination that decision to rescind DACA program was arbitrary and capricious, where memorandum provided almost no meaningful elaboration on DHS's earlier assertion that DACA was unlawful, and failed to provide substantial justification for ending

**AR0532**

prior policy under DACA program other than conclusory statement that reliance interests engendered by prior policy were outweighed by DACA's questionable legality and other reasons for ending program. 5 U.S.C.A. § 706(2)(A).

**11. Administrative Law and Procedure**
       ⇨753

When an agency has set out multiple independent grounds for a decision, courts will uphold that decision so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.

**12. Administrative Law and Procedure**
       ⇨502

When an agency changes its existing position, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.

————

Thomas J. Perrelli, Jenner & Block LLP, Douglas James McNamara, Joseph M. Sellers, Julia Horwitz, Julie S. Selesnick, Cohen Milstein Sellers & Toll, PLLC, Washington, DC, Lauren R. Goldman, Pro Hac Vice, Mayer Brown LLP, New York, NY, for Plaintiffs.

Gerald Brinton Lucas, Kate Bailey, Kathryn Celia Davis, Rachael Lynn Westmoreland, Stephen M. Pezzi, U.S. Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

JOHN D. BATES, United States District Judge

This litigation concerns the Department of Homeland Security's ("DHS") September 5, 2017 decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program. In April 2018, this Court held that decision unlawful and set it aside, concluding both that it was reviewable under the Administrative Procedure Act ("APA") and that the reasons given to support it were inadequate. See NAACP v. Trump, 298 F.Supp.3d 209, 249 (D.D.C. 2018). However, because the Court also determined that DHS could possibly remedy the decision's inadequacies—at least in theory—the Court stayed its order of vacatur for a period of ninety days. See id.

That ninety-day period has now expired. In the interim, DHS has issued a new memorandum "concur[ring] with and declin[ing] to disturb" its September 2017 rescission decision. Mem. from Sec'y Kirstjen M. Nielsen ("Nielsen Memo") [ECF No. 71-1] at 3.[1] Also, the government has now moved the Court to revise its April 2018 order, arguing that the Nielsen Memo demonstrates that DACA's rescission was neither unlawful nor subject to judicial review. See Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Mot.") [ECF No. 74].

For the reasons explained below, the government's motion will be denied. Although the Nielsen Memo purports to offer further explanation for DHS's decision to rescind DACA, it fails to elaborate meaningfully on the agency's primary rationale for its decision: the judgment that

———

**1.** Although NAACP v. Trump, Civil Action No. 17-1907, was filed first, at the Court's direction most of the papers in these two cases were filed in Princeton v. United States, Civil Action No. 17-2325. See Min. Order, Princeton (D.D.C. Jan. 18, 2018). Thus, unless otherwise noted, references to the docket refer to the Princeton action.

the policy was unlawful and unconstitutional. And while the memo offers several additional "policy" grounds for DACA's rescission, most of these simply repackage legal arguments previously made, and hence are "insufficiently independent from the agency's evaluation of DACA's legality" to preclude judicial review or to support the agency's decision. NAACP, 298 F.Supp.3d at 235. Finally, the memo does offer what appears to be one bona fide (albeit logically dubious) policy reason for DACA's rescission, but this reason was articulated nowhere in DHS's prior explanation for its decision, and therefore cannot support that decision now.

[1] By choosing to stand by its September 2017 rescission decision, DHS has placed itself in a dilemma. On the one hand, it cannot rely on the reasons it previously gave for DACA's rescission, because the Court has already rejected them. On the other, because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), DHS also cannot rely on new reasons that it now articulates for the first time. The government's attempt to thread this needle fails. The motion to revise the Court's April 2018 order will therefore be denied, and the Court's vacatur of DACA's rescission will stand.

## BACKGROUND [2]

The DACA program offers renewable, two-year grants of deferred action to certain undocumented aliens who were brought to the United States as children. See NAACP, 298 F.Supp.3d at 216 (describing DACA's eligibility criteria in greater detail). A grant of deferred action

under DACA guarantees not only that the recipient will not be removed from the United States during the relevant time period, but also that she will be able to live, work, and contribute to society in various ways. See id. at 216–17 (discussing DACA's ancillary benefits). Since DACA's implementation in 2012, nearly 800,000 individuals have received grants of deferred action under the program. Id. at 17.

In 2014, DHS implemented a similar program, Deferred Action for Parents of Americans ("DAPA"), which would have offered renewable grants of deferred action to the noncitizen parents of U.S. citizens or lawful permanent residents. Id. at 217. Before DAPA could take effect, however, several states—led by Texas—challenged it in federal court. Id. A district court preliminarily enjoined DAPA in 2015, and the following year the Supreme Court affirmed the district court's preliminary injunction by an equally divided vote. See id. at 217–18 (citing United States v. Texas, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (mem) ). Litigation over DAPA continued until June 2017, when, following the election of President Trump, DHS rescinded the program. Id. at 18.

On September 5, 2017, purportedly in response to threats from the plaintiffs in the Texas litigation, DHS rescinded the DACA program as well. Id. at 218–19. A flurry of court challenges followed, each of whose procedural history is described more fully in the Court's prior opinion. See id. at 219–22. For present purposes, it suffices to say that DACA's rescission has been preliminarily enjoined by two district courts, one in California and one in New York, and that the government's appeals of those injunctions are currently pending. See Regents of the Univ. of Cal. v. U.S.

---

**2.** Because the facts and procedural history of this case were recounted at length in the Court's prior opinion, see NAACP, 298

F.Supp.3d at 216–223, the Court will review them here only briefly.

Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1048 (N.D. Cal. 2018), appeal docketed, No. 18-15068 (9th Cir. Jan. 16, 2018); Batalla Vidal v. Nielsen, 279 F.Supp.3d 401, 437–38 (E.D.N.Y. 2018), appeal docketed, No. 18-485 (2d Cir. Feb. 20, 2018). Also currently pending before the Fourth Circuit is an appeal of a Maryland district court's dismissal of a challenge to DACA's rescission. Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F.Supp.3d 758, 779 (D. Md. 2018), appeal docketed, No. 18-1522 (4th Cir. May 8, 2018).

The cases before this Court, which present challenges to DACA's rescission on both administrative and constitutional grounds, were filed in late 2017 and consolidated for purposes of the dispositive motions filed in each. See NAACP, 298 F.Supp.3d at 222–23. After holding a hearing on those motions, the Court entered judgment in plaintiffs' favor on their APA claims. See id. at 223, 249. The Court held, among other things, that: (1) DHS's September 5, 2017 decision to rescind DACA was reviewable under the APA because it was predicated chiefly on the agency's legal judgment that DACA was unlawful, see id. at 226–235; and (2) the decision was arbitrary and capricious because (a) DHS's legal judgment was inadequately explained, see id. at 238–240, and (b) the other reasons offered for DACA's rescission—mainly, the purported "litigation risk" that DACA would be preliminarily

enjoined by the district court in Texas— were insufficiently reasoned, see id. at 241–243. Hence, the Court vacated DACA's rescission on administrative grounds, see id. at 243–46, and deferred ruling on the bulk of plaintiffs' constitutional claims, id. at 246.

However, because the Court's decision was based in large part on its conclusion that DHS's legal judgment was "virtually unexplained," the Court stayed its order of vacatur for 90 days to allow DHS "to better explain its view that DACA is unlawful." Id. at 249. During that 90-day period, the Court explained,

> the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its entirety, and the original DACA program will be restored in full.

Id. at 245–46. The order accompanying the Court's opinion directed the parties to inform the Court before the stay expired as to "whether DHS has issued a new decision rescinding DACA and whether the parties contemplate the need for further proceedings in this case." Apr. 24, 2018 Order [ECF No. 69] at 2.[3]

---

**3.** Soon after this Court issued its decision, several of the plaintiffs in the Texas litigation filed a new case challenging DACA in a federal district court in Texas. See Texas v. United States, No. 1:18-cv-68, 2018 WL 2042244 (S.D. Tex. filed May 1, 2018) ("Texas II"). The Texas II plaintiffs assert that DACA is procedurally and substantively invalid under the APA and that it violates the Constitution's Take Care Clause, U.S. Const. art. II, § 3. See Compl. ¶¶ 351–56, Texas II (S.D. Tex. May 1, 2018). The plaintiffs have filed a motion for a preliminary injunction in that case, see Pls.' Mot. for a Prelim. Inj., Texas II (S.D. Tex. May 2, 2018), which is currently pending. The

government opposes the motion only insofar as it seeks nationwide relief. See Fed. Defs.' Response to Pls.' Mot. for a Prelim. Inj. at 17, Texas II (S.D. Tex. June 8, 2018). Otherwise, although the government acknowledges that "[i]n similar situations, courts have typically held that the appropriate course is for a district court to refrain from issuing a conflicting injunction," id. at 17 (citations omitted), it nonetheless suggests that, assuming "that preliminary injunctive relief is appropriate," the district court should stay its order for fourteen days to allow the government to seek emergency relief from the Supreme Court, id.

In late June, Secretary of Homeland Security Kirstjen M. Nielsen issued a memorandum responding to the Court's order. See Nielsen Memo at 1. Instead of issuing a new decision rescinding DACA, as the Court's order had contemplated, Secretary Nielson simply "declin[ed] to disturb" the earlier decision to rescind the program by then-Acting Secretary of Homeland Security Elaine C. Duke.[4] Id. Secretary Nielsen then went on to offer several reasons why "the decision to rescind the DACA policy was, and remains, sound." Id.

Specifically, Secretary Nielsen opined that: (1) "the DACA policy was contrary to law"; (2) regardless of whether DACA was in fact contrary to law, the program "was appropriately rescinded ... because there are, at a minimum, serious doubts about its legality"; and (3) other "sound reasons of enforcement policy" supported DACA's rescission. Id. at 2. The reasons in this last category included that: (a) DHS "should not adopt public policies of non-enforcement of [federal] laws for broad classes and categories of aliens," particularly aliens whom "Congress has repeatedly considered but declined to protect"; (b) "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis"; and (c) "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." Id. at 2–3. Finally, Secretary Nielsen wrote that

although she was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country," she nonetheless "do[es] not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons [given] for ending [it]." Id. at 3.

In July, following the issuance of the Nielsen Memo, the government filed the instant motion to revise the Court's April 24, 2018 order. According to the government, the Nielsen Memo demonstrates that DHS's September 2017 decision to rescind DACA was neither subject to judicial review nor arbitrary and capricious. See Gov't's Mot. at 1–2. This is so, the government contends, because Secretary Nielsen's articulation of "serious doubts" regarding DACA's legality, see id. at 5–13, as well as her "additional" discussion of enforcement-policy concerns, see id. at 14–16, "confirm[ ]" that the rescission was both an exercise of enforcement discretion (as opposed to a legal judgment) and, at a minimum, reasonable, id. at 1. Thus, the government asks the Court either to dismiss all of plaintiffs' claims (including their constitutional claims) or to enter judgment in its favor. See id. at 18–19. Finally, the government states that, if the Court denies the motion, it intends to seek "a further continuation of the stay of the vacatur order," either "to consider seeking a stay pending appeal or to give DHS time to appropriately prepare" to accept new DACA applications, "which DHS has generally not accepted since September 5, 2017." Id. at 19 n.4.

---

at 17–18. Other parties, including the State of New Jersey, have intervened as defendants and opposed the plaintiffs' preliminary injunction motion in full. See, e.g., Def.–Intervenor State of N.J.'s Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj., Texas II (S.D. Tex. July 21, 2018). A hearing on the plaintiffs'

motion is currently set for Wednesday, August 8, 2018.

**4.** Secretary Nielsen replaced Acting Secretary Duke as Secretary of Homeland Security on December 6, 2017.

Plaintiffs offer several arguments in response. First, they contend, the Court should not even consider Secretary Nielsen's memorandum, because it is not "the new agency action [the] Court anticipated [DHS] might take" during the ninety-day stay-of-vacatur period. See Pls.' Opp'n to Defs.' Mot. to Revise the Court's Apr. 24, 2018 Order ("Pls.' Opp'n") [ECF No. 75] at 3–8. Second, they argue that if the Court considers the Nielsen Memo at all, it should consider only the memorandum's legal analysis, because the remainder of the memorandum offers impermissible post hoc rationalizations of DHS's rescission decision. See id. at 8–10 (citing Food Mktg. Inst. v. ICC, 587 F.2d 1285, 1290 (D.C. Cir. 1978) ). Third, they contend that even if the Court considers the Nielsen Memo in full, its arguments present no reason to reconsider the Court's prior determination that DACA's rescission was both judicially reviewable, see id. at 10–14, and arbitrary and capricious, see id. at 15–20. Therefore, plaintiffs ask the Court to deny DHS's motion and to allow the vacatur of DACA's rescission to take effect. See id. at 20.

## ANALYSIS

### I. THE COURT WILL CONSIDER THE NIELSEN MEMO

[2]   As a threshold matter, plaintiffs argue that the Court should refuse to consider the Nielsen Memo it its entirety, because instead of issuing a new rescission decision, the memo simply adopts and further explains DHS's September 2017 rescission decision. See Pls.' Opp'n at 3–8.[5] The government objects that this argument "inappropriately elevate[s] form over substance" and that agencies "routinely

rectify decisions that are deemed inadequately supported on remand without vacatur." Reply in Supp. of Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Reply") [ECF No. 76] at 1 (citations omitted). Here, the Court agrees with the government. It will therefore consider the Nielsen Memo.

As the government correctly points out, courts regularly remand challenges to agency action for further "elaboration of [the agency's] reasoning." A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995). Nonetheless, relying on Judge Silberman's separate opinion in Checkosky v. SEC, 23 F.3d 452 (D.C. Cir. 1994), plaintiffs appear to suggest that courts can consider such further explanations only before holding an agency action unlawful— and that, consequently, this Court is powerless to consider the Nielsen Memo's explanation of DHS's rescission decision because it has already held that decision unlawful. See Pls.' Opp'n at 4 ("[W]hile courts do sometimes solicit further explanation of an action before deciding whether it is arbitrary and capricious, that is not what this Court did here.").

But neither Judge Silberman's opinion in Checkosky nor any of the other cases on which plaintiffs rely go so far. Rather, Judge Silberman explained that "courts will often . . . pause before exercising full judicial review and remand to the agency for a more complete explanation" and noted that "[i]n many of these cases"—but not all of them—courts "make clear" that they "have not found the agency action to be arbitrary and capricious." Checkosky, 23 F.3d at 463 (opinion of Silberman, J.) (emphasis added); see, e.g., City of Charlottes-

---

**5.**   Plaintiffs brand DHS's failure to issue a new agency action as a "litigation tactic" that seeks to avoid "major consequences for the litigation pending in the Second and Ninth Circuits—which could potentially include, among other things, triggering remands to the district courts or raising possible mootness questions and prompting new complaints." Pls.' Opp'n at 1, 8.

ville v. FERC, 661 F.2d 945, 954 (D.C. Cir. 1981) (reversing an agency's orders because they "were not based upon substantial evidence" and remanding for further proceedings); id. at 955 (Wald, J., concurring) (urging the agency "on remand to attempt a clearer articulation and reconciliation of its" apparently contradictory explanations for its orders). Thus, although it may be true that courts <u>usually</u> consider additional explanation before invalidating an agency's action, plaintiffs cite no authority for the proposition that courts <u>must</u> maintain this order of operations. Indeed, such a rule would be inconsistent with the district courts' broad discretion to reconsider their decisions before they become final. See Fed. R. Civ. P. 54(b); <u>AARP v. EEOC</u>, 292 F.Supp.3d 238, 241 n.1 (D.D.C. 2017) ("[A] district court order remanding a case to an agency for significant further proceedings is not final." (quoting <u>Pueblo of Sandia v. Babbitt</u>, 231 F.3d 878, 880 (D.C. Cir. 2000) ) ).

Here, the Court gave DHS ninety days to remedy the deficiencies in its September 2017 rescission decision. Although plaintiffs are correct that the Court's opinion and order anticipated that DHS would do so by way of a new agency action (if it did so at all),[6] the Court will not disregard Secretary Nielsen's memorandum simply because she chose a somewhat different path. Instead, the Court will treat the memo as what it purports to be: a "further explanation" of the rescission decision, Nielsen Memo at 1, which the government contends forms a basis for revising the Court's April 2018 order. Likewise, the Court will construe the government's motion for a revised order as a motion for reconsideration of the Court's April 2018 decision. See Gov't's Reply at 3 n.2 (proposing that, "[a]t a minimum, the Court could simply reconsider its [April 2018] Order"); Fed. R. Civ. P. 54(b) (district courts may "revise[ ]" nonfinal decisions "at any time" prior to the entry of final judgment).

## II. MOST OF THE NIELSEN MEMO'S ARGUMENTS ARE NOT POST HOC RATIONALIZATIONS

[3] Next, plaintiffs contend that the Court should disregard "nearly the entire Nielsen Memo" because none of the justifications it offers—aside from DACA's purported illegality—were articulated by Acting Secretary Duke in her initial September 5, 2017 memorandum rescinding the DACA program (the "Duke Memo"), J.A. [ECF No. 60] at 252–56. Pls.' Opp'n at 8–10. With one notable exception, the Court disagrees. Although many of the Nielsen Memo's rationales are quite attenuated from those offered in the Duke Memo and its supporting documentation, only one is so far afield as to constitute an impermissibly <u>post hoc</u> rationalization for DACA's rescission.

[4–6] Although "<u>post hoc</u> rationalizations 'have traditionally been found to be an inadequate basis for review' of agency decisions," the D.C. Circuit has clarified that this rule "does not prohibit [an agency] from submitting an amplified articulation" of the reasons for its decision following a remand. <u>Alpharma, Inc. v. Leavitt</u>, 460 F.3d 1, 6 (D.C. Cir. 2006)

---

**6.** See Apr. 24, 2018 Order at 2 (directing the parties to inform the court as to whether DHS had "issued a new decision rescinding DACA"); <u>NAACP</u>, 298 F.Supp.3d at 246 (deferring ruling on plaintiffs' constitutional claims in part because DHS "could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims"); <u>see also</u> Pls.' Opp'n at 5 ("[T]he import of this Court's stay was not that the agency should take another crack at defending the Duke Memo, but that the agency should be afforded an opportunity to replace its void decision seamlessly with a new one.").

**AR0538**

(citations omitted). Indeed, the rule's purpose is simply to prevent courts from considering "rationales offered by anyone other than the proper decisionmakers," such as those appearing "for the first time in litigation affidavits and arguments of counsel"; it is not meant to be "a time barrier which freezes an agency's exercise of its judgment . . . and bars it from further articulation of its reasoning." Id. (citation omitted). Hence, when faced with an explanation offered for the first time on remand, a court must determine whether it is an "amplified articulation" of the agency's prior reasoning (which must be considered), Alpharma, 460 F.3d at 6 (citation omitted), or instead "a new reason for why the agency could have" taken the action (which must be disregarded), Delta Air Lines, Inc. v. Export–Import Bank of U.S., 85 F.Supp.3d 436, 453 (D.D.C. 2015); see Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013) (stating that an agency's further explanation on remand "must be more than a barren exercise of supplying reasons to support a pre-ordained result" (citation omitted) ).

Here, plaintiffs argue that the bulk of the Nielsen Memo falls in the latter category. Specifically, they contend, Secretary Nielsen's assertion of "serious doubts" about DACA's legality "does not amplify or explicate" the Duke Memo's prediction that DACA would be abruptly enjoined in the Texas litigation; rather, "it silently abandons it." Pls.' Opp'n at 10. Similarly, plaintiffs argue that the various "purported 'reasons of enforcement policy' " raised in the Nielsen Memo "have no foundation in the Duke Memo at all." See id.

Plaintiffs overstate the novelty of the Nielsen Memo's arguments. Although the Nielsen Memo certainly expands on the Duke Memo's points, most of its arguments are not so detached from the earlier document as to appear post hoc. For ex-

ample, the Nielsen Memo contends that "serious doubts" about DACA's legality could "undermine public confidence in . . . the rule of law" and lead to "burdensome litigation." Nielsen Memo at 2. Similarly, the Duke Memo expressly relied on a September 4, 2017 letter from Attorney General Jeff Sessions (the "Sessions Letter"), see J.A. at 254–55, which cited "the costs and burdens" associated with rescinding DACA in response to "potentially imminent litigation," and opined that "[p]roper enforcement of our immigration laws is . . . critical . . . to the restoration of the rule of law in our country," J.A. at 251. The Nielsen Memo's "serious doubts" rationale strikes this Court as a permitted amplification, rather than a prohibited post hoc rationalization, of these statements in the Sessions Letter.

The same is true of the Nielsen Memo's remaining "policy" justifications (again, save one). Like the Nielsen Memo, which faults DACA for protecting a class of aliens whom Congress has "repeatedly considered but declined to protect," Nielsen Memo at 2, the Duke Memo relied on "Congress's repeated rejection of proposed legislation that would have accomplished a similar result" as DACA, J.A. at 254. Similarly, the Nielsen Memo's concerns about "individualized, case-by-case" discretion, Nielsen Memo at 3, parallel the Duke Memo's observation that DACA was "meant to be applied only on an individualized case-by-case basis" and that DHS "has not been able to identify specific denial cases . . . based solely upon discretion," J.A. at 253.

The same cannot be said, however, about the Nielsen Memo's concern with "project[ing] a message" to noncitizen children (and their parents) who would attempt to enter the United States unlawfully. Nielsen Memo at 3. Nothing in the Duke Memo or the Sessions Letter even

remotely parallels the Nielsen Memo's discussion of a "pattern" of illegal immigration by minors, and neither document mentions the "tens of thousands of minor aliens [who] have illegally crossed or been smuggled across our border in recent years," id. Indeed, the closest either document comes is the Sessions Letter's assertion that "[p]roper enforcement of our immigration laws is . . . critical to the national interest," J.A. at 251, but this statement is far too vague—on some level, nearly any policy statement could be seen as an explication of an agency's view of the "national interest." Consequently, the Court will decline to consider the Nielsen Memo's "messaging" rationale, which appears for the first time on remand and is therefore impermissibly post hoc. See Food Mktg. Inst., 587 F.2d at 1290 ("Post-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review.").[7]

In sum, although none of the Nielsen Memo's rationales for DACA's rescission relate back perfectly to the Duke Memo's, only one—the messaging rationale—is so attenuated as to comprise "a new reason for why the agency could have" rescinded DACA. Delta Air Lines, 85 F.Supp.3d at 453. The Court will therefore consider all of the Nielsen Memo except its messaging rationale.

### III. THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER DETERMINATION THAT DACA'S RESCISSION WAS SUBJECT TO JUDICIAL REVIEW

[7] This Court previously held that DHS's September 2017 decision to rescind the DACA program was subject to judicial review despite the APA's exception for "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see NAACP, 298 F.Supp.3d at 234. This was so, the Court explained, because although the Supreme Court has held enforcement decisions to be "presumptively unreviewable," NAACP, 298 F.Supp.3d at 234 (citing Heckler v. Chaney, 470 U.S. 821, 832–33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ), the D.C. Circuit recognizes an exception for "general enforcement polic[ies]" that "rel[y] solely on the agency's view of what the law requires," id. (first citing OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 812 (D.C. Cir. 1998); and then citing Crowley Caribbean Transp., Inc. v. Peña, 37 F.3d 671, 676–77 (D.C. Cir. 1994) ).[8] This rule reflects the commonsense notion that "an otherwise reviewable" legal interpretation "does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion." Id. at 231.

[8] The Court held that DACA's rescission was reviewable under this exception because it was "predicated on DHS's legal determination that the program was invalid when it was adopted." Id. at 233. The Court rejected what it took to be the government's attempt to distinguish between an agency's "interpretation of a specific statutory provision" (which the government conceded was reviewable) and its "conclusion that it lacks statutory authority" (which the government contended was unreviewable), explaining that "[t]o say that a particular agency action is 'without

---

7.  Of course, had Secretary Nielsen opted to issue a new decision rescinding DACA, the explanations offered in her memorandum would be contemporaneous and, consequently, not post hoc. She did not do this, however.

8.  The D.C. Circuit's recent decision in CREW v. FEC confirms this Court's reading of Circuit law. See 892 F.3d 434, 441 n.11 (D.C. Cir. 2018) ("[I]f [an agency] declines to bring an enforcement action on the basis of its interpretation of [a statute], the [agency's] decision is subject to judicial review.").

statutory authority' is simply to say that no statutory provision authorizes that action." Id. at 232 (citing City of Arlington v. FCC, 569 U.S. 290, 299–300, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) ).[9] The Court also rejected the government's reliance on what it had termed "litigation risk"—that is, the adverse consequences that would follow if DACA were struck down in litigation—explaining that "Crowley would be a dead letter" if an agency "could insulate from judicial review any legal determination simply by framing it as an enforcement policy" and then tacking on a boilerplate assertion that "a court would likely agree with the agency's interpretation." Id. at 233.

[9]   Neither the Nielsen Memo nor the government's motion provides a sufficient basis for reconsidering the Court's earlier determination that DACA's rescission was judicially reviewable. To start with, Secretary Nielsen makes clear that her decision not to disturb DACA's rescission is predicated first and foremost on her view that "the DACA policy was contrary to law." Nielsen Memo at 2. Thus, this case continues to be like Crowley and OSG: at bottom, it involves an enforcement policy that is predicated on the agency's view of what the law requires.

Nor do the Nielsen Memo's remaining rationales immunize from judicial review DHS's decision to rescind DACA. The first of these revolves around Secretary Nielsen's "serious doubts about [DACA's] legality," which she says would lead her to rescind the policy regardless of "whether the courts would ultimately uphold it or not." Id. These doubts, Secretary Nielsen explains, raise concerns like "the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." Id. According to the government, this rationale renders DACA's rescission unreviewable because it "cannot be meaningfully distinguished from other 'bona fide discretionary reasons' that this Court found acceptable" in its prior opinion, "such as an agency's fear that 'negative publicity . . . would undermine the policy's effectiveness.'" Gov't's Mot. at 7 (quoting NAACP, 298 F.Supp.3d at 233).

But as the Court's opinion explained in the very next paragraph, it is difficult to conclude that such policy assertions are "bona fide" when they are accompanied by an assertion from the agency that its longstanding policy is "unlawful." NAACP, 298 F.Supp.3d at 233.[10] In this respect, the

9.   In its present motion, DHS attempts to relitigate this issue, contending that "Secretary Nielsen's further explanation of DACA's questionable legality also underscores why Crowley does not permit judicial review of an enforcement decision simply because that decision rests on a legal rationale." Gov't's Mot. at 7. Once again, DHS attempts to draw a "distinction between the non-reviewability of an enforcement decision, and the potential reviewability of the supporting rationale on its own terms," id. at 8, and contends that "even if a general legal rationale in the Duke or Nielsen Memos could be carved out for review on its own terms, that would not justify reviewing the enforcement decision to rescind DACA itself," id. at 9. But the Court rejects this novel proposition. As

the D.C. Circuit has recently confirmed, although "[t]he law of this circuit 'rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions,'" CREW, 892 F.3d at 442 (citation omitted), an agency action is not "non-reviewable" in the first place if it is "based entirely on its interpretation of the statute," id. at 441 n.11.

10.   While the Court's opinion did not suggest that an agency cannot rescind a policy in response to an adverse court judgment notwithstanding the agency's continued belief in the policy's legality, it did suggest that where (as here) the agency rescinds a policy after doing an about-face as to its legality, "there are reasons to be more suspicious." NAACP, 298 F.Supp.3d at 233.

"serious doubts" rationale suffers from the same defect as the "litigation risk" rationale: accepting it here would permit agencies to insulate their legal judgments from judicial review simply by couching them as enforcement policies and then adding a boilerplate assertion that any other course of action would lead to litigation and undermine confidence in the rule of law. Judicial review of agency legal determinations cannot be so easily evaded.

Next, the Nielsen Memo asserts a handful of "sound reasons of enforcement policy" that it argues would justify DACA's rescission "regardless of whether . . . the DACA policy [is] illegal or legally questionable." Nielsen Memo at 2. First among these is the memo's claim that, "if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively." Id. at 3. But the Court rejected the government's reliance on this argument in its prior opinion, concluding that the government had failed to explain why "an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion." NAACP, 298 F.Supp.3d at 243 n.28. Like the litigation-risk and substantial-doubts rationales, then, this legislative-inaction rationale is simply another legal determination dressed up as a policy judgment, and it cannot render DACA's rescission immune from judicial review.

The memo's second "policy" justification asserts that "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis." Nielsen Memo at 3. This is so, Secretary Nielsen claims, not because "a categorical deferred-action policy" like DACA raises legal or constitutional concerns—as previously argued—but rather because such a policy "tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case." Id. In essence, the Secretary claims that even though DACA "on its face . . . allow[s] for individual considerations," id., it should nonetheless be rescinded because its programmatic nature somehow misleads those charged with its implementation into applying it categorically.

As an initial matter, this rationale strikes the Court as specious. It would be one thing for a challenger other than DHS to claim that although DACA calls for case-by-case discretion in theory, its application is categorical in practice. Indeed, this argument was made by the plaintiffs in the Texas litigation. See Texas v. United States, 809 F.3d 134, 171–72 (5th Cir. 2015), aff'd by an equally divided Court, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (mem). But when made by the agency itself, the argument becomes a non sequitur: if Secretary Nielsen believes that DACA is not being implemented as written, she can simply direct her employees to implement it properly. An agency head cannot point to her own employees' misapplication of a program as a reason for its invalidity.

Specious though it may be, this rationale nonetheless presents as the sort of policy consideration that, when offered as an independent reason for adopting a general enforcement policy, might foreclose judicial review. When viewed in the broader context of this litigation, however, this rationale reveals itself to be yet another attempt to disguise an objection to DACA's legality as a policy justification for its rescission.

Throughout the litigation over DAPA and DACA, the programs' challengers have consistently claimed that although DACA "facially purports to confer discretion," in practice deferred action was categorically granted to anyone who met the

program's eligibility criteria. Texas, 809 F.3d at 171–72. This argument was offered by the Texas plaintiffs as a reason that DAPA should have undergone notice-and-comment rulemaking, see id., and by the government in this case as a reason to uphold DHS's conclusion that DACA was unlawful, see Reply in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. [ECF No. 55] at 22 ("While [the Fifth Circuit's] finding [that DACA was applied categorically] had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself . . . ." (citation omitted) ). Likewise, the Duke Memo cast DACA's alleged categorical application as an issue of lawfulness, explaining that deferred action was "meant to be applied only on an individualized case-by-case basis," not to "confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." See J.A. at 253. Even a 2014 memorandum by the Office of Legal Counsel (the "OLC Memo") cautioned that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." J.A. at 21 n.8.

Taken in context, then, Secretary Nielsen's claim that rescinding DACA would further her policy objective of ensuring the distribution of deferred action grants on a "case-by-case" basis is simply a repackaging in policy terms of an oft-repeated objection to DACA's lawfulness. And while a remand provides an agency the opportunity to elaborate on its prior positions in good faith, it is not an opportunity for the agency to alter those positions—particularly where the chief design of doing so appears to be to defeat judicial review. The Court therefore concludes that the Nielsen Memo's individualized-discretion rationale does not preclude judicial review here.

Finally, the memo asserts that "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." Nielsen Memo at 3. As the Court has already explained, this rationale is a post hoc rationalization and hence is not entitled to consideration on remand. See Food Mktg. Inst., 587 F.2d at 1290. But even if the Court were to consider this rationale, it would not immunize DACA's rescission from judicial review.

With this messaging rationale, Secretary Nielsen finally articulates (albeit in a single sentence) what might be properly characterized as a policy reason for DACA's rescission: a judgment that DACA's benefits—whatever they may be—are outweighed by the fact that, in Secretary Nielsen's view, the policy encourages noncitizen children and their parents to enter the United States illegally. Of course, this rationale is not without its logical difficulties: after all, DACA is available only to those individuals who have lived in the United States since 2007, see NAACP, 298 F.Supp.3d at 216, so the "tens of thousands of minor aliens" who Secretary Nielsen asserts have illegally entered the United States "in recent years" would not even be eligible under the program. But no matter. The question for reviewability purposes is not whether the rationale makes sense, but rather whether it transforms DACA's rescission from a decision based "solely on [DHS's] belief that it lacks jurisdiction," Chaney, 470 U.S. at 833 n.4, 105 S.Ct. 1649, into a decision based on "factors which are peculiarly within [DHS's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies," id. at 831, 105 S.Ct. 1649.

NAT. ASSOC. FOR ADV. OF COLORED PEOPLE v. TRUMP    **471**
Cite as 315 F.Supp.3d 457 (D.D.C. 2018)

Even if the messaging rationale were sufficiently grounded in the Duke Memo so as to be an amplification rather than a post hoc rationalization, ultimately it would still be too little, too late. Although the Nielsen Memo states several paragraphs earlier that each of its reasons is "separate and independently sufficient" to support DACA's rescission, Nielsen Memo at 1, the document's cursory discussion of the messaging rationale—which is articulated in a single sentence on the last page of the three-page memorandum—does not support this assertion. See NAACP, 298 F.Supp.3d at 233–34 (noting that, in Chaney, the agency took the position that "even if it had jurisdiction, it would still decline to act pursuant to its 'inherent discretion to decline to pursue certain enforcement matters'" (quoting Chaney, 470 U.S. at 824–25, 105 S.Ct. 1649)). The Court would not conclude that this solitary sentence in the Nielsen Memo wholly transmutes the explanation for DACA's rescission from an issue of law into an issue of policy.

In any case, the Court need not reach this conclusion because, as it has already explained, the messaging rationale is merely a post hoc rationalization of DACA's rescission. And because, as explained above, the other rationales offered by the Nielsen Memo are "insufficiently independent from the agency's evaluation of DACA's legality" to defeat review, id. at 235, the Court declines to reverse its prior conclusion that DACA's rescission is reviewable. The government's motion for reconsideration will therefore be denied as to reviewability.

## IV. THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER DETERMINATION THAT DACA'S RESCISSION WAS ARBITRARY AND CAPRICIOUS

[10] The Court now turns to whether the Nielsen Memo provides a basis for revising the Court's prior determination that DACA's rescission was arbitrary and capricious. See id. at 237–43. As explained below, it does not.

Most glaringly, the Nielsen Memo provides almost no meaningful elaboration on the Duke Memo's assertion that DACA is unlawful. The Nielsen Memo again ignores the 2014 OLC Memo laying out a comprehensive framework for evaluating the lawfulness of nonenforcement policies in the immigration context, see J.A. at 4–36—an omission that plaintiffs properly characterize as "mystifying," Pls.' Opp'n at 18, given the Court's prior emphasis on the document, see NAACP, 298 F.Supp.3d at 239 & n. 22.[11] Instead, like the Duke Memo before it, the Nielsen Memo relies primarily on the one-page Sessions Letter and on

---

**11.** As was true with respect to the Duke Memo, the mere fact that the OLC Memo appears in the administrative record, even when combined with the Nielsen Memo's statement that Secretary Nielsen has "considered ... the administrative record," Nielsen Memo at 1, does not amount to meaningful consideration for purposes of the APA. Nor does the Court agree that "the OLC Memo has little significance, especially given that its analysis as to DAPA was later rejected by the Fifth Circuit (in a decision affirmed by an equally divided Supreme Court) as well as by the Attorney General." Gov't's Mot. at 13. For one thing, the Fifth Circuit did not expressly disapprove the OLC Memo; indeed, the one time it mentioned the memo, it cited it as an authoritative source. See Texas, 809 F.3d at 184 n.197. And in any case, to the extent that the panel majority's analysis in Texas was inconsistent with OLC Memo, its decision was affirmed by an equally divided Supreme Court and so is not binding outside of the Fifth Circuit. See Nichols v. United States, 511 U.S. 738, 750, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (Souter, J., concurring in the judgment) (noting that "a decision ... by an equally divided [Supreme] Court" is "entitled to no precedential value"). Similarly, the one-page Sessions Letter did not directly address the OLC Memo or expressly overrule its analysis. J.A. at 251.

the Fifth Circuit's ruling in the DAPA litigation. See Nielsen Memo at 2. But as this Court has already said, the Sessions Letter's conclusory legal assertions are themselves inadequately explained, and the Fifth Circuit's analysis in the DAPA case is "inapposite" here given the meaningful distinctions between DAPA and DACA, which include DAPA's open-ended nature, broad scope, and apparent conflict with express provisions of the INA. See NAACP, 298 F.Supp.3d at 238–40 (citing Texas, 809 F.3d at 179).

In response, Secretary Nielsen states that "[a]ny arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful." Nielsen Memo at 2. But she does not explain why. Secretary Nielsen also asserts that the Fifth Circuit's DAPA ruling was based not on any particular statutory conflict, but rather on DAPA's "incompatibility . . . with the INA's comprehensive scheme." Id. But as plaintiffs correctly point out, see Pls.' Opp'n at 15–16, even if this were an accurate characterization of the Fifth Circuit's opinion,[12] the Nielsen Memo offers no clue as to how an agency official, a court, or anyone else would go about determining whether a particular nonenforcement policy meets Secretary Nielsen's test for "compatibility" with the overall statutory scheme. Thus, like the Duke Memo before it, the Nielsen Memo offers nothing even remotely approaching a considered legal assessment that this Court could subject to judicial review.

[11] Nor do the Nielsen Memo's remaining rationales persuade the Court to revise its prior conclusion that DACA's rescission was arbitrary and capricious. As the Court has already indicated, those rationales carry varying degrees of persuasive force, and some may fall below the APA's standard of rationality. But as the D.C. Circuit has explained, "[w]here . . . an agency has set out multiple independent grounds for a decision," courts will uphold that decision "so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec., 769 F.3d 1127, 1149 (D.C. Cir. 2014) (citation omitted).

Here, Secretary Nielsen states in a somewhat conclusory fashion that each of the grounds offered in her memo is "independently sufficient" to support DACA's rescission. Nielsen Memo at 1. The Court is skeptical of this assertion, particularly given its conclusion that three of those grounds—the substantial-doubts, legislative-inaction, and individualized-discretion rationales—simply recapitulate the Secretary's inadequately explained legal assessment, and that the remaining ground—projecting a message to would-be illegal immigrants—appears nowhere in the Duke Memo and is therefore post hoc. Even assuming that these rationales are indeed independent and that at least one is sufficiently rational to survive APA review, however, DACA's rescission would still be arbitrary and capricious because the Nielsen Memo—like the Duke Memo before it—fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program. See NAACP, 298 F.Supp.3d at 240.

---

**12.** But see Texas, 809 F.3d at 184 n. 197 ("[O]ur conclusion turns on whether the INA gives DHS the power to create and implement a sweeping class-wide rule changing the immigration status of the affected aliens without full notice-and-comment rulemaking, especially where—as here—the directive is flatly contrary to the statutory text." (emphasis added) ).

**[12]** Although this time around the Nielsen Memo at least "acknowledge[s] how heavily DACA beneficiaries had come to rely on" the program, id., it does little more than that. Instead of considering DACA's benefits to DACA recipients and to society at large, see Pls.' Opp'n at 19–20, Secretary Nielsen simply states that "the asserted reliance interests" are outweighed by DACA's "questionable legality . . . and the other reasons for ending the policy," and then goes on to suggest that she should not even have to consider those interests. See id. (asserting that "issues of reliance would be best considered by Congress"). However, it is not up to Secretary Nielsen—or even to this Court—to decide what she should or should not consider when reversing agency policy. Rather, the requirements are set by the APA, as interpreted by the Supreme Court: "When an agency changes its existing position, it . . . must . . . be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.' " Encino Motorcars, LLC v. Navarro, ––– U.S. ––––, 136 S.Ct. 2117, 2125–26, 195 L.Ed.2d 382 (2016).

Like the Duke Memo, the Nielsen Memo demonstrates no true cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are. "It would be arbitrary and capricious to ignore such matters," Perez v. Mortg. Bankers Ass'n, ––– U.S. ––––, 135 S.Ct. 1199, 1209, 191 L.Ed.2d 186 (2015) (citation omitted), and it is so here. Nor, given the inadequacy of the Nielsen Memo's explanation of why DACA is unlawful, can the Court accept as sufficient its bare determination that any reliance interests are outweighed by "the questionable legality of the DACA policy and the other" fatally intertwined reasons listed in the memo. Nielsen Memo at 3. Because the Nielsen Memo fails to provide an adequate justification for the decision to rescind DACA—much less the "more

substantial justification" that the APA requires when an agency's "prior policy has engendered serious reliance interests," Perez, 135 S.Ct. at 1209—the Court sees no reason to change its earlier determination that DACA's rescission was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court again concludes that DHS's September 2017 decision to rescind the DACA program, as now explained in the Duke and Nielsen Memos, was both subject to judicial review and arbitrary and capricious. The Court has already once given DHS the opportunity to remedy these deficiencies—either by providing a coherent explanation of its legal opinion or by reissuing its decision for bona fide policy reasons that would preclude judicial review—so it will not do so again. Consequently, the government's motion to reconsider the Court's April 24, 2018 order will be denied. Per the government's request, however, the Court will continue the stay of its order of vacatur for a brief period—twenty days—to permit the government to determine whether it intends to appeal the Court's decision and, if so, to seek a stay pending appeal. In all other respects, the Court's April 24, 2018 order will remain in force.

Finally, a few words about the nature of the relief being granted by this Court. The Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program. Rather, the Court simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision. See 5 U.S.C. § 706(2). A conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or post hoc

**474**     **315 FEDERAL SUPPLEMENT, 3d SERIES**

policy assertions, simply will not do. The Court therefore reaffirms its conclusion that DACA's rescission was unlawful and must be set aside.[13] A separate order has been issued on this date.



**Jane DOE 2, et al., Plaintiffs**

**v.**

**Donald J. TRUMP, et al., Defendants**

**Civil Action No. 17-1597 (CKK)**

United States District Court,
District of Columbia.

Filed 08/06/2018

**Background:** Transgender individuals currently serving or aspiring to serve in the military brought action for declaratory and injunctive relief against the President, Secretary of Defense, and other government officials, alleging Presidential Memorandum that generally prohibited openly transgender individuals from accession into the military, authorized the discharge of transgender individuals, and generally prohibited the use of Department of Defense (DoD) or Department of Homeland Security (DHS) resources to fund sex-reassignment surgical procedures for military personnel violated their Fifth Amendment

rights to equal protection and due process. After a preliminary injunction was granted enjoining enforcement of the Memorandum's accession and retention directives, 275 F.Supp.3d 167, defendants moved to dismiss and to dissolve the injunction.

**Holdings:** The District Court, Colleen Kollar-Kotelly, J., held that:

(1) current service members who had been diagnosed with gender dysphoria had Article III standing to sue;

(2) prospective service members who had already undergone, or were currently undergoing, gender transition, and were also actively taking steps toward enlistment had Article III standing to sue;

(3) current transgender service member who did not yet have a diagnosis of gender dysphoria had Article III standing to sue;

(4) transgender university student prevented from joining university's Reserve Officer Training Corps (ROTC) program had Article III standing to sue;

(5) issuance of Secretary of Defense's plan to implement Presidential Memorandum did not moot the action; and

(6) issuance of Secretary of Defense's plan to implement Presidential Memoran-

---

**13.** The Court also notes that the propriety of so-called nationwide injunctions, such as the ones issued by district courts in California and New York in related litigation, has recently been called into question. See, e.g., Trump v. Hawaii, —— U.S. ——, 138 S.Ct. 2392, 2423, —— L.Ed.2d —— (2018) (noting but declining to address the issue); City of Chicago v. Sessions, 888 F.3d 272, 293 (7th Cir. 2018) (concluding that the district court did not ''abuse[ ] its discretion in determining that the scope of the injunction should be nationwide''), reh'g granted, No. 17-2991 (7th Cir. June 4, 2018) (granting rehearing en banc ''only as to the geographic scope of the preliminary injunction entered by the district

court''). That debate is not implicated here, however, where the Court is vacating an agency action pursuant to the APA, as opposed to enjoining it as a violation of the Constitution or other applicable law. See 5 U.S.C. § 706(2)(A) (''The reviewing court shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.''); Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (''When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed.'').

Taken together, the private-interest factors clearly weigh in favor of transfer. To the extent the first factor tips against transfer, it is vastly outweighed by the second and third.

### C.  Public–Interest Factors

**[9]**  Public-interest considerations relevant to a transfer-of-venue analysis include: "(1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home." *Mazzarino*, 955 F.Supp.2d at 28.

The parties agree that the first factor is neutral. *See* Def.'s Br. at 8; Pl.'s Opp'n at 11.

The parties also agree that the second factor, congestion of the courts, favors transfer. *See* Def.'s Br. at 8; Pl.'s Opp'n at 11–12. Defendant attaches an exhibit showing that, while the Northern District of Georgia has a higher caseload, civil matters proceed much more quickly there than in this District. *See* ECF No. 8–1.

The third factor, the "local interest in deciding local controversies," weighs strongly in favor of transfer. Plaintiff disagrees, arguing that he "seeks the restoration of his firearm rights, which have been banned not just locally in Georgia but throughout the United States." Pl.'s Opp'n at 12. But Plaintiff conveniently ignores the fact that he brings an as-applied, not facial, challenge to the statute. He wishes to own firearms "for sport and for self-defense within his own home." Compl. ¶ 7. Clearly, those most affected by the outcome of this case will be Plaintiff, his family, and the surrounding community in the Northern District of Georgia. Therefore, this factor strongly favors transfer.

Together, the public-interest factors weigh in favor of transfer. And when they are combined with the private-interest factors, the case for transfer is overwhelming.

### III.  Conclusion and Order

Therefore, the Court hereby **ORDERS** that Defendant's motion (ECF No. 8) is **GRANTED**. The action shall be transferred to the U.S. District Court for the Northern District of Georgia.

**SO ORDERED.**



**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,**

**v.**

**Donald J. TRUMP, et al., Defendants.**

**Trustees of Princeton University, et al., Plaintiffs,**

**v.**

**United States of America, et al., Defendants.**

**Civil Action No. 17–1907 (JDB), Civil Action No. 17–2325 (JDB)**

United States District Court, District of Columbia.

Signed 04/24/2018

**Background:**  Civil rights organization, undocumented alien, and others brought actions challenging the Department of Homeland Security's (DHS) rescission of the Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens, asserting both constitutional claims and claims under the Administrative Procedure Act (APA). DHS moved to dismiss. Plaintiffs moved for summary judgment on APA claim or for preliminary injunctive relief.

**Holdings:** The District Court, John D. Bates, J., held that:

(1) Immigration and Nationality Act did not divest district court of subject-matter jurisdiction;

(2) alien had Article III standing;

(3) organization had associational standing;

(4) rescission was not exempt from review under APA;

(5) rescission was not subject to notice-and-comment procedures under APA;

(6) DHS failed to adequately explain its conclusion that DACA program for undocumented aliens was unlawful;

(7) DHS conclusion regarding litigation risk was arbitrary and capricious; and

(8) vacatur of rescission was proper remedy, but vacatur would be stayed for 90 days to allow DHS to issue fuller explanation for its determination.

Motions granted in part and denied in part.

**1. Aliens, Immigration, and Citizenship**
    **⟺385**

Rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens was neither commencement of a proceeding, the adjudication of a case, nor the execution of a removal order, and thus INA did not divest district court of subject-matter jurisdiction over civil rights organization's and alien's challenges to the Department of Homeland Security's (DHS) rescission of DACA; even if denial of deferred action was a step toward the commencement of removal proceedings against an alien, there were no pending removal proceedings with which challenges to rescission might interfere. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g); 8 C.F.R. § 274a.12(c)(14).

**2. Aliens, Immigration, and Citizenship**
    **⟺155**

Undocumented alien had Article III standing to bring action challenging the Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program, and thus no further analysis of any other plaintiff's standing was necessary; alien's inability to renew her DACA benefits was an injury in fact, which was concrete and particularized as well as actual or imminent, not conjectural or hypothetical, it was fairly traceable to DHS's decision to rescind DACA, and it was likely to be redressed by a decision invalidating DACA's rescission. U.S. Const. art. 3, § 2, cl. 1; 8 C.F.R. § 274a.12(c)(14).

**3. Associations ⟺20(1)**

Associational standing requires association to plead that: (1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit.

**4. Associations ⟺20(5)**

Civil rights organization's complaint adequately named a specific member with standing, as required for its associational standing to bring action challenging the Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens, where organization provided an anonymous affidavit from one of its members stating that the member was a DACA beneficiary.

**5. Associations ⟺20(1)**

"Germaneness requirement" for associational standing is undemanding and re-

quires mere pertinence between litigation subject and organizational purpose.

> See publication Words and Phrases for other judicial constructions and definitions.

**6. Associations ⟐20(1)**

Civil rights organization adequately alleged that rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens was germane to organization's purposes, as required for its associational standing to bring action challenging rescission of DACA by the Department of Homeland Security (DHS); organization's alleged purpose was to ensure political, educational, social, and economic equality of all persons, particularly people of color, nearly all DACA registrants—more than 95%—were alleged to be people of color, and DACA allegedly conferred various educational, social, and economic benefits on those individuals.

**7. Administrative Law and Procedure ⟐701**

**Federal Civil Procedure ⟐1741**

Complaint seeking review of agency action "committed to agency discretion by law" failed to state a claim under the Administrative Procedure Act (APA) and, therefore, should be dismissed for failure to state a claim, not for lack of subject-matter jurisdiction.   5   U.S.C.A. § 701(a)(2);  Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**8. Administrative Law and Procedure ⟐701**

In determining whether a particular agency action is committed to agency discretion by law and thus exempt from review under Administrative Procedure Act (APA), courts ask whether statutes are drawn in such broad terms that in a given case there is no law to apply.  5 U.S.C.A. § 701(a)(2).

**9. Aliens, Immigration, and Citizenship ⟐155**

Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens was not committed to agency discretion by law, and thus it was not exempt from review under Administrative Procedure Act (APA); DACA's rescission was general enforcement policy that was based at least in significant part on agency's view that it lacked proper statutory authority, which was not meaningfully different from an agency's judicially reviewable specific statutory interpretation, and agency's additional justification of litigation risk was too closely bound with its evaluation of DACA's legality to insulate rescission from review.   5   U.S.C.A. § 701(a)(2); 8 C.F.R. § 274a.12(c)(14).

**10. Administrative Law and Procedure ⟐706**

Agency's decision whether to take an enforcement action is presumptively unreviewable under Administrative Procedure Act (APA), and that presumption can normally be rebutted only by pointing to statutory language that constrains the agency's exercise of its enforcement discretion. 5 U.S.C.A. § 701(a)(2).

**11. Administrative Law and Procedure ⟐706**

Agency's enforcement decision is exempt from presumption of unreviewability under Administrative Procedure Act (APA) if: (1) it is expressed as a general enforcement policy; and (2) it relies solely on the agency's view of what the law requires.  5 U.S.C.A. § 701(a)(2).

**12. Federal Civil Procedure ⟐103.2**

For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, court need not consider the standing of the other plaintiffs to raise that claim.

AR0550

**13. Aliens, Immigration, and Citizenship** ⟳155

Undocumented alien's interests fell within zone regulated by INA, and thus she had prudential standing to bring action challenging the Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program, and no further analysis of any other plaintiff's standing was necessary; as a DACA beneficiary, alien was herself the subject of the contested regulatory action. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.; 8 C.F.R. § 274a.12(c)(14).

**14. Associations** ⟳20(1)

Interests of civil rights organization's members fell within zone of interests protected by INA, as required for organization to have prudential standing to bring action challenging the Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens, where organization had members who were DACA beneficiaries. U.S.C.A. § 1101 et seq.; 8 C.F.R. § 274a.12(c)(14).

**15. Administrative Law and Procedure** ⟳665.1

Regulatory Flexibility Act (RFA) extends standing to seek judicial review of final agency action only to a small entity. 5 U.S.C.A. § 611(a)(1).

**16. Associations** ⟳20(5)
**Labor and Employment** ⟳1982

Civil rights organization and unions failed to adequately allege that they were small entities, and thus they lacked prudential standing to bring claim under Regulatory Flexibility Act (RFA) to challenge Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens; organization and unions made only single conclusory allegation that they fall within RFA's definition of small entity, and any factual support for that claim was missing from, and arguably contradicted by, declarations submitted in support of their motion for summary judgment, which stated that organization was nation's largest and that unions each had over 1 million members. 5 U.S.C.A. §§ 601(4), 601(6); 8 C.F.R. § 274a.12(c)(14).

**17. Aliens, Immigration, and Citizenship** ⟳155

Department of Homeland Security's (DHS) rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens had no present binding effect, but rather was general statement of policy regarding how DHS would exercise its enforcement discretion, and thus rescission was not subject to notice-and-comment procedures under Administrative Procedure Act (APA); rescission memo stated DHS's intent to prospectively reject all DACA initial requests filed after certain date and not to approve any new applications for advance parole, and memo expressly stated it placed no limitations on DHS's otherwise lawful enforcement or litigation prerogatives. 5 U.S.C.A. § 553(b)(A).

**18. Administrative Law and Procedure** ⟳394, 416.1

The key question in distinguishing between legislative rules, which must undergo notice and comment under the Administrative Procedure Act (APA), and general statements of policy, which need not, is whether the statement in question has a present binding effect. 5 U.S.C.A. § 553(b)(A).

**19. Administrative Law and Procedure** ⟳394, 416.1

Agency pronouncement will be considered binding as a practical matter, and thus subject to Administrative Procedure Act's (APA) notice-and-comment proce-

dures, if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding. 5 U.S.C.A. § 553(b)(A).

**20. Administrative Law and Procedure**
   **⬤394, 416.1**

While any general statement of agency policy will presently bind the agency's employees, the question in determining whether the policy is subject to notice and comment under the Administrative Procedure Act (APA) is whether the statement purports to bind those subject to it. 5 U.S.C.A. § 553(b)(A).

**21. Administrative Law and Procedure**
   **⬤507**

To satisfy the arbitrary or capricious standard under the Administrative Procedure Act (APA), an agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. 5 U.S.C.A. § 706(2)(A).

**22. Administrative Law and Procedure**
   **⬤753**

If an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable.

**23. Administrative Law and Procedure**
   **⬤753**

Because a reviewing court must judge the propriety of agency action solely by the grounds invoked by the agency, post hoc explanations that the agency did not articulate when it acted are insufficient to sustain the action.

**24. Aliens, Immigration, and Citizenship**
   **⬤155**

Department of Homeland Security (DHS) failed to adequately explain its conclusion that Deferred Action for Childhood Arrivals (DACA) program for undocu-

mented aliens was unlawful, and thus DHS's conclusion did not provide basis for rescinding DACA; DHS purported to identify both statutory and constitutional defects with DACA, but it cited no statutory provision with which DACA was in conflict, it did not explain how DACA breached President's constitutional duty to take care that laws be faithfully executed, and it failed to even acknowledge how heavily DACA beneficiaries had come to rely on expectation they would be able to renew their DACA benefits. U.S. Const. art. 2, § 3; 8 C.F.R. § 274a.12(c)(14).

**25. Administrative Law and Procedure**
   **⬤507**

One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions.

**26. Administrative Law and Procedure**
   **⬤502**

When an agency reverses a prior decision, it must provide a reasoned explanation for the change.

**27. Administrative Law and Procedure**
   **⬤502**

Agency's explanation for reversing prior decision need not be more detailed than what would suffice for a new policy created on a blank slate, but it must address the facts and circumstances that underlay or were engendered by the prior policy, including any serious reliance interests.

**28. Aliens, Immigration, and Citizenship**
   **⬤154**

Department of Homeland Security's (DHS) conclusion regarding litigation risk was arbitrary and capricious under Administrative Procedure Act (APA) and thus could not provide basis for rescinding Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens;

**AR0552**

DHS was concerned that nationwide injunction in pending litigation would abruptly shut down DACA program, but there was good reason to doubt that result of that case would be immediate injunction rather than remand for notice-and-comment rulemaking or at least orderly winddown of DACA program. 5 U.S.C.A. § 706(2)(A).

**29. Administrative Law and Procedure**
**☞816**

Unsupported agency action normally warrants vacatur.

**30. Administrative Law and Procedure**
**☞816, 817.1**

Courts have discretion to remand unsupported agency action without vacatur if there is at least a serious possibility that the agency will be able to substantiate its decision and if vacating would be disruptive.

**31. Administrative Law and Procedure**
**☞816**

Court may vacate unlawful agency action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified.

**32. Aliens, Immigration, and Citizenship**
**☞155**

Vacatur of Department of Homeland Security's (DHS) unsupported rescission of Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens was appropriate remedy, but vacatur would be stayed for 90 days to allow DHS to issue fuller explanation for its determination DACA lacked statutory and constitutional authority; substantive flaws in DACA's rescission were curable in theory, and vacatur could lead to influx of initial DACA applications that could be avoided if DHS did provide sufficient explanation for rescission, but remand without any vacatur could invite delays with troubling consequence that could be exposed to removal

because of unlawful agency action. 8 C.F.R. § 274a.12(c)(14).

**33. Administrative Law and Procedure**
**☞811**

While a court has discretion to craft preliminary injunctive relief based on a number of equitable factors, its discretion in fashioning administrative remedies is somewhat more limited.

**34. Injunction ☞1092**

To secure preliminary injunctive relief, plaintiffs must establish: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest.

**35. Aliens, Immigration, and Citizenship**
**☞413**

**Civil Rights ☞1457(7)**

Civil rights organization and undocumented alien failed to establish likelihood of irreparable harm from Department of Homeland Security's (DHS) rescission of the Deferred Action for Childhood Arrivals (DACA) program, as required for preliminary injunction on due process grounds against DHS's use of DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, which it previously stated it would not do; DHS reaffirmed that its information-sharing policy had not changed, and court in other litigation had granted injunctive relief sought in instant action. U.S. Const. Amend. 5; 8 C.F.R. § 274a.12(c)(14).

**36. Evidence ☞48**

District court would take judicial notice of Department of Homeland Security (DHS) memorandum stating its information-sharing policy had not changed, when determining whether civil rights organiza-

tion and undocumented alien established likelihood of irreparable harm from DHS's rescission of the Deferred Action for Childhood Arrivals (DACA) program, as required for preliminary injunction on due process grounds against DHS's use of DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, which it previously stated it would not do so; memorandum did not appear in administrative record but it was not subject to reasonable dispute because it could be accurately and readily determined from sources whose accuracy could not reasonably be questioned. U.S. Const. Amend. 5; Fed. R. Evid. 201(b)(2); 8 C.F.R. § 274a.12(c)(14).

### 37. Aliens, Immigration, and Citizenship ⟿142, 369

Civil rights organization and undocumented alien failed to state claim that Department of Homeland Security (DHS), in rescinding Deferred Action for Childhood Arrivals (DACA) program, could not consistent with due process use DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, which it previously stated it would not do so; DHS reaffirmed that its information-sharing policy had not changed after rescission. U.S. Const. Amend. 5; 8 C.F.R. § 274a.12(c)(14).

————

Douglas James McNamara, Julia Horwitz, Julie S. Selesnick, Joseph M. Sellers, Cohen, Milstein, Sellers & Toll, Washington, DC, for Plaintiffs.

Kate Bailey, Rachael Lynn Westmoreland, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

JOHN D. BATES, United States District Judge

These cases present an array of administrative and constitutional challenges to the Department of Homeland Security's ("DHS") rescission of the Deferred Action for Childhood Arrivals ("DACA") program. Though the government disputes these challenges on the merits, its primary defenses concern the Court's authority to hear the cases: the government contends that most plaintiffs lack standing, that the Immigration and Nationality Act ("INA") deprives the Court of subject-matter jurisdiction, and that the Department's decision to rescind DACA is not subject to review under the Administrative Procedure Act ("APA") because it was committed to agency discretion by law. The government has moved to dismiss the complaint in its entirety, and plaintiffs have moved for summary judgment only on their APA claims.

These are just two of a series of challenges to the September 2017 rescission of DACA that have already been before several district courts, two circuit courts of appeals, and the Supreme Court on two occasions. At this time, two preliminary injunctions are in place that require DHS to accept applications for the renewal of DACA benefits, but not to accept new DACA applications. Here, through their pending motions, plaintiffs seek permanent injunctive relief, although only on their APA claims. And the relief they seek would reach new as well as renewal DACA applications.

For the reasons that follow, the Court concludes that it has both jurisdiction and statutory authority to hear plaintiffs' APA and constitutional claims. The Court further concludes that, under the APA, DACA's rescission was arbitrary and capricious because the Department failed ad-

equately to explain its conclusion that the program was unlawful. Neither the meager legal reasoning nor the assessment of litigation risk provided by DHS to support its rescission decision is sufficient to sustain termination of the DACA program. Thus, plaintiffs' motion for summary judgment will be granted in part, and the decision to rescind DACA will be vacated and remanded to DHS. Vacatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications. The Court will stay its order of vacatur for ninety days, however, to allow the agency an opportunity to better explain its rescission decision.

**BACKGROUND**

**I.   THE IMPLEMENTATION AND RESCISSION OF DACA**

**A.   Deferred Action for Childhood Arrivals**

In 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program, which allowed certain undocumented aliens [1] who had been brought to the United States as children to be treated as low priorities for removal under the federal immigration laws. *See* AR 1.[2] According to the Secretary's memorandum (the "DACA Memo"), these young people generally "lacked the intent to violate the law" when they entered the United States as children and, in many cases, "kn[e]w only this country as home" and had "contributed to [the] country in significant ways." AR 1–2.

DACA was therefore undertaken as "an exercise of . . . prosecutorial discretion" to "ensure that our enforcement resources are not expended on these low priority cases." AR 1.

DACA was available to any undocumented alien who: (1) came to the United States when she was under the age of sixteen; (2) had lived in the United States continuously since at least June 15, 2007; (3) was enrolled in school or had graduated from high school or been honorably discharged from the military; (4) had not been convicted of certain criminal offenses and posed no threat to national security or public safety; and (5) was under the age of thirty. AR 1. Aliens who met these criteria were eligible for renewable, two-year grants of "deferred action" on their removal from the United States. AR 2–3; *see* 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some [removal] cases lower priority"). As the DACA Memo was careful to point out, however, the program "confer[red] no substantive right, immigration status or pathway to citizenship," as "[o]nly the Congress, acting through its legislative authority, can confer these rights." AR 3.

Individuals who received deferred action under DACA were also eligible for a host of other benefits under preexisting statutes and DHS regulations. These benefits included work authorization, 8 C.F.R. § 274a.12(a)(11), social security numbers,

---

**1.**   Some courts, including the Supreme Court, have referred to aliens who are unlawfully present in the United States as "illegal" instead of "undocumented." *See, e.g.,* Texas v. United States, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (explaining that this "is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law" (citation omitted) ); but see Mohawk Indust., Inc. v. Carpenter, 558 U.S. 100, 103, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009) (using

the term "undocumented immigrants"). Because both terms appear in the record materials here, and because, as at least one court has noted, "there is a certain segment of the population that finds the phrase 'illegal alien' offensive," Texas v. United States, 86 F.Supp.3d 591, 605 n.2 (S.D. Tex. 2015), the Court will use the term "undocumented."

**2.**   Citations to "AR" refer to the administrative record. *See* Joint Appendix [ECF No. 60].

id. § 1.3(a)(4)(vi), advance parole (i.e., preauthorization to travel to the United States without a visa), id. § 212.5, and a limited class of public assistance, such as state and federal aid for medical emergencies, 8 U.S.C. §§ 1611(b)(1), 1621(b)(1). Benefits like these allowed DACA recipients to work, travel abroad, access credit, and otherwise lead productive lives during their periods of deferred action.

To be considered for deferred action under DACA, an applicant had to provide DHS with certain identifying information, including her name, mailing address, and contact information. See Decl. of Maria De La Cruz Perales Sanchez ("Perales Decl.") [ECF No. 28–8] ¶ 11; see also Form I–821D, U.S. Citizenship and Immigration Servs., Consideration for Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d. Although many applicants feared that this information would later be used to initiate removal proceedings against them, see Perales Decl. ¶¶ 10, 24, the Department assured applicants that their information would in most cases be "protected from disclosure to [U.S. Immigration and Customs Enforcement ("ICE") ] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings." See U.S. Citizenship and Immigration Servs., Instructions for Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d. Relying on these representations, hundreds of thousands of undocumented aliens applied for and received deferred action under the DACA program. See, e.g., Perales Decl. ¶ 10; Decl. of John Doe # 1 ¶ 6; Decl. of John Doe # 2 ¶ 5. By late 2017, nearly 800,000

individuals had been granted deferred action under DACA. AR 242.

## B.  Deferred Action for Parents of Americans

Two years after DACA's implementation, DHS issued a second memorandum, this time purporting to establish a deferred-action program called Deferred Action for Parents of Americans ("DAPA"). AR 37–41. As its name suggests, DAPA would have offered deferred action to parents of U.S. citizens or lawful permanent residents who were themselves unlawfully present in the United States.[3] AR 40–41. The DAPA memorandum also purported to expand the DACA program in certain respects: it would have removed the thirty-year age cap, made the deferred-action grants last for three years instead of two, and required that an alien need only have been present in the United States since January 1, 2010 to be eligible. AR 39–40.

Before DAPA took effect, a coalition of states, led by Texas, sued to block its implementation on grounds that it violated both the APA and the Take Care Clause of the Constitution. See Texas, 86 F.Supp.3d at 604 & n.1, 607 (citing U.S. Const. art. II, § 3). The district court granted the states' motion for a preliminary injunction, concluding that they were likely to succeed on their procedural APA claim that DAPA (including its expansion of DACA) should have been promulgated using notice and comment. Id. at 671–72; see 5 U.S.C. § 553. In part, this was because the Department's implementation of DACA suggested that DAPA would not "genuinely leave[ ] the agency and its employees free

---

**3.**  DAPA would have applied to any alien who: (1) had a son or daughter who was a U.S. citizen or lawful permanent resident; (2) had continuously resided in the United States since before January 1, 2010; (3) was physically present in the United States both on November 20, 2014 and the date of her appli-

cation; (4) had no lawful basis to be present in the United States on November 20, 2014; (5) did not meet certain enforcement priorities; and (6) did not otherwise raise concerns that would make deferred action inappropriate in the agency's discretion. See AR 40.

to exercise discretion." Texas, 86 F.Supp.3d at 604 at 670 (emphasis, alterations, and internal quotation marks omitted). The district court found that only about 5% of all DACA applications had been denied, and the government could not say how many of those had been denied for discretionary reasons. Id. at 609. This led the court to conclude that the DAPA Memo's suggestion that immigration officers could exercise case-by-case discretion was "merely pretext." Id. at 669 n. 101; see Texas, 809 F.3d at 173 (agreeing that although "[t]he DACA and DAPA Memos purport to grant discretion, . . . there was evidence from DACA's implementation that DAPA's discretionary language was pretextual").

The Fifth Circuit affirmed, holding that the states had demonstrated a likelihood of success on the merits not only of their procedural APA claim, but also on their substantive APA claim, because DAPA seemed to conflict with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." [4] Texas, 809 F.3d at 179. But the court expressly declined to address the states' constitutional challenges. See id. at 146 n.3 (finding it "unnecessary" to address those claims "at this early stage of the proceedings"). It also rejected the government's threshold arguments—similar to the ones offered

here—that the states lacked standing, see id. at 150–63, that the INA deprived the court of subject-matter jurisdiction, see id. at 164–65, and that DAPA's implementation was unreviewable under the APA, see id. at 165–72.[5] The government petitioned for certiorari, and in June 2016, an eight-Justice Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. See United States v. Texas, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (mem).

On January 20, 2017, President Donald J. Trump was sworn into office, and his nominee for Secretary of Homeland Security, John F. Kelly, was confirmed that same day. Six months later, Secretary Kelly issued a memorandum rescinding DAPA, including its expansion of DACA, but leaving the original DACA program in place. AR 235–236. The Texas plaintiffs voluntarily dismissed their challenge to DAPA a few months later. See Pls.' Stipulation of Voluntary Dismissal, Texas v. United States, No. 14–CV–254, 2017 WL 5476770 (S.D. Tex. Sep. 12, 2017), ECF No. 473.

### C.  The Rescission of DACA

On September 5, 2017, three months after DAPA's rescission, then-Acting Secretary of Homeland Security Elaine C. Duke issued a five-page memorandum rescinding DACA (the "Rescission Memo").[6]

---

4.  According to the Fifth Circuit, under the INA, the parent must generally "(i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limited number of family-preference visas from a United States consulate." Texas, 809 F.3d at 179–80.

5.  All parties agreed that DAPA was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), to the extent that it "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a class of what he deems to be low-priority

illegal aliens," Texas, 809 F.3d at 166 ("[Plaintiffs] have not challenged the priority levels [the Secretary] has established, and neither the [district court's] preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities"). But the Fifth Circuit nonetheless found DAPA to be reviewable because it was "much more than nonenforcement: [i]t would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." Id.

6.  Secretary Kelly had since been appointed to serve as President Trump's chief of staff.

See AR 252–56. The Rescission Memo began by canvassing the procedural history of the Texas litigation, and then noted that "[a]lthough the original DACA policy was not challenged in [that] lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum." AR 253. Specifically, the memorandum noted that "[t]he Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary," and that "[b]oth the district court and the Fifth Circuit concluded that implementation of the program did not comply with the [APA] because the Department did not implement it through notice-and-comment rulemaking." AR 253–54.

The memorandum also stated that in June 2017, after DAPA had been rescinded but before the Texas litigation was voluntarily dismissed, Texas and the other state plaintiffs in that case had sent a letter to Attorney General Jeff Sessions threatening to challenge DACA in court unless he rescinded the program by September 5, 2017. AR 254; see AR 238–240 (Texas's demand letter). Attorney General Sessions then sent a one-page letter to Acting Secretary Duke (the "Sessions Letter") instructing her to rescind DACA. AR 251. The Sessions Letter explained that the program had been "effectuated by the previous administration through executive action, without proper statutory authority and . . . after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." Id. The letter also noted that because DACA suffered from "the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Id. The letter instructed Acting Secretary Duke to "consider" implementing "an orderly and efficient wind-down process" for the program. Id.

In light of the Texas litigation and the Sessions Letter, the Rescission Memo concluded, "it is clear that the . . . DACA program should be terminated." AR 255. Given "the complexities associated with winding down the program," however, the Department decided to "provide a limited window in which it will adjudicate certain requests for DACA and associated applications." Id. Thus, the Department would adjudicate any properly filed DACA applications that were pending as of September 5, 2017, as well as any new applications for the renewal of DACA benefits that were filed on or before October 5, 2017 by persons whose benefits were set to expire on or before March 5, 2018. It would also honor (in most cases) existing grants of deferred action, work authorization, and advance parole. But it would reject all other DACA applications, including any initial applications filed after September 5, 2017, and all pending and future applications for advance parole under the DACA program. Effectively, then, DACA benefits were made unavailable to any alien who had not already applied, and existing DACA grants would be allowed to expire permanently beginning in March 2018. Finally, like the earlier DACA and DAPA memorandums, the Rescission Memo stated that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." AR 256.

## II. LEGAL CHALLENGES TO DACA'S RESCISSION

Since September 2017, legal challenges to DACA's rescission have been filed in federal district courts throughout the country. Two of these challenges have made their way to the federal courts of

appeals, and one has been to the Supreme Court. Because these challenges generally involve similar administrative and constitutional claims, the Court will not address the plaintiffs' assertions in each case in detail. Nevertheless, a brief overview of this pending litigation landscape will be useful to understand the state of DACA's rescission today.[7]

## A.  Regents of the University of California v. DHS

The first set of challenges to DACA's rescission was filed in September 2017 in federal district court in California. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1026 (N.D. Cal. 2018). The plaintiffs in those cases are the University of California, the State of California and several other states, a group of individual DACA recipients, two California municipalities, and a labor union. See id. Though not formally consolidated, the cases were all assigned to U.S. District Judge William H. Alsup. See Case Management Scheduling Order, Regents, No. 17–5211 (N.D. Cal. Sept 22, 2017), ECF No. 49.

Shortly after the actions were filed, the government filed an administrative record consisting of "fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation." Regents, 279 F.Supp.3d at 1028. "All non-public materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged." Id. (citation omitted). The district court ordered the government to complete the record, denying many of the government's claims of privilege. Id. at 1028–29. The government petitioned the Ninth Circuit for a writ of mandamus, but the court of appeals denied the petition. See In re

United States, 875 F.3d 1200 (9th Cir. 2017). The government then sought the same relief from the Supreme Court, which construed the government's mandamus petition as a petition for a writ of certiorari, granted it, vacated the Ninth Circuit's order, and directed the district court to "first resolve[ ] the Government's threshold arguments," since those arguments, "if accepted, likely would eliminate the need for the District Court to examine a complete administrative record." In re United States, —— U.S. ——, 138 S.Ct. 443, 444–45, 199 L.Ed.2d 351 (2017) (per curiam).

While the litigation over the administrative record was pending, the plaintiffs filed a motion for preliminary injunctive relief, and the government moved to dismiss the plaintiffs' complaints both for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). See Regents, 279 F.Supp.3d at 1029. Then, following the Supreme Court's instruction to first address the government's threshold arguments, the district court denied the government's Rule 12(b)(1) motion and granted the plaintiffs' motion for a preliminary injunction. Id. at 1036–37. The injunction directed DHS to resume accepting applications for the renewal of DACA benefits, although it did not require the agency to accept new DACA applications or to afford current DACA beneficiaries advance parole. See id. at 1048–49.

In a separate order entered a few days later, the district court denied the government's Rule 12(b)(6) motion except as to the plaintiffs' notice-and-comment and Regulatory Flexibility Act claims. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No 17-CV-05211, 2018 WL 401177, at *2 (N.D. Cal. Jan. 12, 2018). The

---

**7.**  One case, Park v. Sessions, No. 17–cv–1332 (E.D. Va. filed Nov. 21, 2017), was dismissed pursuant to a stipulation by all parties on

March 1, 2018, before any relief was granted. The Court will not discuss that case further.

government appealed both orders, and the Ninth Circuit set an expedited briefing schedule. See Order, Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No. 18–15068 (9th Cir. Jan. 17, 2018), ECF No. 2. The government also petitioned the Supreme Court for a writ of certiorari before judgment, but the Supreme Court denied the petition. See Order, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., No. 17–1003 (U.S. Feb. 26, 2018). The government's appeal is currently pending before the Ninth Circuit.

**B.  Batalla Vidal v. Duke**

The second challenge also came about in September 2017 when Martin Batalla Vidal, an individual DACA beneficiary who was already engaged in litigation with the Department over the revocation of his employment authorization, amended his complaint to assert a challenge to DACA's rescission. See Batalla Vidal v. Duke, No. 16-CV-4756, 2017 WL 5201116, at *4 (E.D.N.Y. Nov. 9, 2017). His challenge was later consolidated with two others before Judge Nicholas G. Garaufis of the U.S. District Court for the Eastern District of New York. Id. The plaintiffs in the three cases include Mr. Batalla Vidal, the State of New York, fourteen other states and the District of Columbia, and Make the Road New York, a nonprofit. See id. at *4 & n.5.

Shortly after the consolidation of the three actions, another dispute arose regarding the scope of the administrative record. The district court ordered the government to produce certain documents, see id. at *6–7, and, on the government's petition for mandamus, the Second Circuit stayed discovery pending the district court's resolution of "issues of jurisdiction and justiciability." Id. at *8. The government then filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). Id.

The district court denied the government's Rule 12(b)(1) motion (except as to some plaintiffs that the court found lacked standing), see id. at *20, but it later certified its decision for an interlocutory appeal, see Batalla Vidal v. Nielsen, 16–CV–4756, 2018 WL 333515, at *1 (E.D.N.Y. Jan. 8, 2018). The Second Circuit then held the government's petition for leave to file an interlocutory appeal in abeyance pending the district court's resolution of the government's Rule 12(b)(6) motion and the plaintiffs' motion for a preliminary injunction, which the plaintiffs had filed while issues related to the interlocutory appeal were being litigated. See Certified Order, Nielsen v. Vidal, No. 18–122 (2d Cir. Jan. 31, 2018), ECF No. 46.

A few weeks later, the district court granted the plaintiffs' motion for a preliminary injunction. See Batalla Vidal v. Nielsen, 279 F.Supp.3d 401, 437–38 (E.D.N.Y. 2018). The scope of the court's injunction was the same as in Regents: it required the Department to resume consideration of renewal applications but did not require the consideration of initial applications or applications for advance parole. Id. at 437–38. The government took an interlocutory appeal, and the next day, the Second Circuit denied the mandamus petition that it had previously held in abeyance and vacated its earlier discovery stay. See Certified Order, In re Nielsen, No. 17–3345 (2d Cir. Feb. 21, 2018), ECF No. 181. The Second Circuit thereafter granted the government's motion to expedite the appeal, which is pending at this time. See Certified Order, Vidal v. Nielsen, No. 18–485 (2d Cir. Mar. 8, 2018), ECF No. 62.

While the expedited appeal was pending, the district court granted in part and denied in part the government's pending 12(b)(6) motion.[8] See Batalla Vidal v. Niel-

---

**8.** That motion also sought dismissal under

Rule 12(b)(1) (on standing and mootness

sen, No. 16-cv-4756, 2018 WL 1532370, at *1 (E.D.N.Y. Mar. 29, 2018). The court denied the motion as to plaintiffs' substantive APA claims for substantially the same reasons that it had previously found a substantial likelihood of success on the merits of those claims, id. at *3, but granted the motion as to their procedural APA and Regulatory Flexibility Act ("RFA") claims. Id. at *5–6. The court also denied the motion as to the plaintiffs' equal protection claims, id. at *6–10, although it granted the motion as to their information-sharing claim, concluding that the plaintiffs had "not plausibly alleged that DHS actually changed its information-sharing policy," id. at *11. Finally, the court granted the motion as to plaintiffs' procedural due process claim, except as to certain plaintiffs who alleged that their renewal applications had been improperly rejected as untimely or were erroneously deemed to contain minor clerical errors. Id. at *14.

## C.  Casa de Maryland v. DHS

The plaintiffs in the third case, CASA de Maryland v. U.S. Dep't of Homeland Security, 284 F.Supp.3d 758 (D. Md. 2018), are individual DACA recipients and several nonprofit organizations. In March 2018, the district court (Judge Roger W. Titus) ruled that although DACA's rescission was reviewable, it did not violate the APA or the Equal Protection or Due Process Clauses. See id. at 770, 773–77, 779. The district court summarized its decision to depart from the Regents and Batalla Vidal courts on the substantive APA claim as follows:

The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is

necessarily arbitrary and capricious. Respectfully, this Court considers the appropriate inquiry is whether or not DHS made a reasoned decision to rescind DACA based on the Administrative Record . . . . Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

Id. at 767–768 (citation omitted). However, the district court did grant one form of relief not granted by the courts in Regents or Batalla Vidal: it enjoined DHS from "using information provided by Dreamers through the DACA program for enforcement purposes," explaining that so doing would violate applicable principles of equitable estoppel. Id. at 779. As of the date of this decision, neither party has appealed the district court's order, although the time in which to do so has not yet expired. See Fed. R. App. P. 4 (a)(1)(B).

## III.  THE PRESENT CHALLENGES TO DACA'S RESCISSION

The cases currently before this Court, NAACP v. Trump and Princeton v. United States, were filed in September and November 2017, respectively, and have been consolidated for purposes of the dispositive motions pending in each. The plaintiffs in the Princeton action are Princeton University, Microsoft Corporation, and Maria de la Cruz Perales Sanchez, a DACA beneficiary and Princeton undergraduate. See Compl. ("Princeton Compl.") [ECF No. 1] at 12. The plaintiffs in the NAACP action

---

grounds) of the Batalla Vidal plaintiffs' procedural due process claim, which had been presented for the first time in their third amend-

ed complaint. Batalla Vidal, 2018 WL 1532370, at *12–13. The court denied the motion to dismiss on that ground.

are the National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union ("UFCW"). See First Amended Complaint at 3–5, NAACP, No. 17–cv–1907 (D.D.C. Oct. 24, 2017), ECF No. 10 ("NAACP FAC"). Both sets of plaintiffs challenge DACA's rescission on various administrative and constitutional grounds, including that it was arbitrary and capricious, see Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. ("Princeton MSJ") at 11–38; that it should have undergone notice-and-comment procedures, see id. at 38–41; that its effects on "small entities" should have been analyzed pursuant to the RFA, 5 U.S.C. §§ 601–12, see NAACP FAC 16–17; and that it violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments, see Princeton Compl. at 35–40.

The government has filed motions to dismiss in both actions. It argues: (1) that plaintiffs' APA claims should be dismissed because DACA's rescission was "committed to agency discretion by law" and is therefore unreviewable under 5 U.S.C. § 701(a)(2), see Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Princeton MTD") [ECF No. 8] at 14–21; (2) that a provision of the INA, 8 U.S.C. § 1252(g), deprives the Court of subject-matter jurisdiction, see id. at 21–24; (3) that all plaintiffs but Ms. Perales Sanchez lack Article III and prudential standing, see id. at 24–25; Mem. in Supp. of Defs.' Mot. to Dismiss, No. 17–cv–1907 (D.D.C. Nov. 8, 2018) ("NAACP MTD") at 14–18; and (4) that plaintiffs have failed to state a claim under the APA, the RFA, and the Constitution, Princeton MTD at 27–44.

Plaintiffs have moved for summary judgment only on their APA claims, or alternatively, for preliminary injunctive relief "[t]o the extent the Court wishes to see [the discovery] issues [in Regents and Batalla Vidal] litigated before granting final judgment to the Plaintiffs." Princeton MSJ at 3 & n.1. Unlike the plaintiffs in Regents and Batalla Vidal, however, plaintiffs here have not challenged the completeness of the administrative record, see 5 U.S.C. § 706 (providing that, in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party" (emphasis added) ), and the government urges the Court to decide the pending motions on the current record, see Princeton MTD at 3 ("[T]he Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees."). Finally, plaintiffs have also moved for a preliminary injunction preventing DHS from sharing or otherwise using DACA beneficiaries' personal information for immigration enforcement purposes. See Princeton MSJ at 48–53.

The Court initially set a motions hearing in this case for February 2018, but the hearing was continued at the parties' request pending the government's petition for certiorari before judgment in the Regents case. See January 26, 2018 Min. Order. That petition was denied in late February, and the Court held a motions hearing in mid-March. The parties' motions are now ripe for decision.

## DISCUSSION

### I. SUBJECT-MATTER JURISDICTION

#### A. The Immigration and Nationality Act

[1] The government argues that the Court lacks jurisdiction over all of plaintiffs' claims—administrative and constitutional—under 8 U.S.C. § 1252(g), a provision of the INA that states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attor-

ney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." On its face, that language removes jurisdiction only as to the three listed actions of the Attorney General. The government argues that "[t]he denial of deferred action is a step toward the commencement of removal proceedings against an alien" and that "the INA's careful scheme for [removal] proceedings" suggests that such denials may be challenged only through individual removal proceedings, and hence § 1252(g) strips the Court of jurisdiction over plaintiffs' challenge here. Defs.' Reply in Supp. of their Mot. to Dismiss ("Defs.' Reply") [ECF No. 56] at 10.

The government's position contradicts not only the plain language of § 1252(g) but also the Supreme Court's interpretation of that language in Reno v. American–Arab Anti–Discrimination Committee ("AAADC"), where the Court specifically rejected the argument that "the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). Rather, the Court explained, § 1252(g) applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" Id. (listing "part[s] of the deportation process" that fall outside of § 1252(g)'s scope, including "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). Because the rescission of DACA is neither the commencement of a proceeding, the adjudication of a case, nor the execution of a removal order, § 1252(g) is inapplicable

here pursuant to the provision's plain language.

The government's only response is that DACA's rescission is a "step toward" the removal of specific aliens. See Defs.' Reply at 10; but see id. at 2 (stressing elsewhere that rescission "does not, in itself, exert the agency's coercive power over any individual"). True, the Supreme Court said in AAADC that § 1252(g) was "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." 525 U.S. at 487, 119 S.Ct. 936. But there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which plaintiffs' challenge might interfere. Cf. id. (concluding that § 1252(g) stripped jurisdiction over selective deportation claims brought by six aliens who were then in removal proceedings). Thus, the government's reliance on AAADC is misplaced, and § 1252(g) does not bar review here. Accord Regents, 279 F.Supp.3d at 1031–1033 (rejecting the government's § 1252(g) argument); Batalla Vidal, 2017 WL 5201116, at *12–13 (same).

### B.   Article III Standing

The government also asks the Court to dismiss the claims brought by Princeton and Microsoft, Princeton MTD at 24–25, and by all plaintiffs in the NAACP action, see NAACP MTD at 14–17, for lack of Article III standing. In so moving, the government urges the Court to conduct a "claim-by-claim analysis" of each plaintiff's standing as to each claim. Defs.' Reply 11.

**[2]**   Such a detailed analysis is unnecessary, however, at least in Princeton. The government does not dispute that the individual plaintiff, Ms. Perales Sanchez, has Article III standing to assert each claim in the complaint.[9] See Princeton MTD 24–25

---

**9.** Nor could they. Ms. Perales Sanchez clearly   satisfies the "irreducible constitutional mini-

(seeking dismissal only as to the "[n]on-[i]ndividual [p]laintiffs"); Princeton Compl. 30–38 (listing Ms. Perales Sanchez as a plaintiff on each count). And as the Supreme Court has recently reaffirmed, Article III requires only that "[a]t least one plaintiff ...have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., —— U.S. ——, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). In Princeton, that "one plaintiff" is Ms. Perales Sanchez, and no further analysis of any other plaintiff's standing is necessary.

[3]  In NAACP, however, there is no individual plaintiff. The organizational plaintiffs—the NAACP and two labor unions—therefore must rely on their own standing to survive the government's motion to dismiss. These plaintiffs assert that they have "associational standing," which requires each of them to plead that "(1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim

asserted nor the relief requested requires the participation of an individual member of the organization in the suit." AARP v. EEOC, 226 F.Supp.3d 7, 16 (D.D.C. 2016) (citation omitted). As in Princeton, if one of the three NAACP plaintiffs has standing, then an analysis of the remaining plaintiffs' standing is unnecessary.

[4]  The parties do not dispute that the NAACP plaintiffs meet the third prong of the test for representational standing—they do. See NAACP MTD at 16–17 (not arguing that the participation of individual members should be required). And although the government contends that the NAACP plaintiffs fail the first prong because their complaint does not "name a specific member with standing," see id. at 16, each plaintiff provided an anonymous affidavit from at least one of its members stating that the member was a DACA beneficiary, see, e.g., Princeton MSJ, Ex. W [ECF No. 28–17] (declaration of NAACP member), and the government does not seriously dispute—nor could it—that these affidavits are sufficient.[10] Thus,

---

mum" of standing as to DACA's rescission: her inability to renew her DACA benefits is (1) an "injury in fact," which is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical"; it is (2) "fairly traceable" to DHS's decision to rescind DACA; and it is (3) "likely to be redressed" by a decision of this Court invalidating DACA's rescission. Spokeo, Inc. v. Robins, —— U.S. ——, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016) (internal quotation marks omitted). And although the Court ultimately concludes that plaintiffs fail to state a claim as to DHS's alleged plans to share DACA beneficiaries' information with immigration enforcement agencies, the Court concludes—and the government does not dispute—that Ms. Perales Sanchez has standing to assert that claim as well. See Princeton Compl. ¶ 108 (alleging that DHS has "revised [its] assurances about information sharing" and now "offer[s] only to prevent personal information from being provided 'proactively' to agencies responsible for facilitating remov-

al"); cf. Clapper v. Amnesty Int'l, 568 U.S. 398, 411, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (finding that the plaintiffs' asserted injury was too speculative when it relied on a hypothetical sequence of government actions that culminated in their communications being monitored).

10.  The government initially argued that the organizational plaintiffs had to name these members. See NAACP MTD at 16. The authority for that proposition is tenuous, however, see Young Am.'s Found. v. Gates, 560 F.Supp.2d 39, 49 (D.D.C. 2008) ("[I]t is not clear that [associational standing] actually requires a name-specific identification."), aff'd, 573 F.3d 797 (D.C. Cir. 2009); Doe v. Stincer, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought ...."), and the government did not renew the argument in its reply brief, see Defs.' Reply at 12–13.

AR0564

the only remaining issue is whether the rescission of DACA is germane to the organizational plaintiffs' purposes.

[5, 6]  The germaneness requirement is "undemanding" and requires "mere pertinence between litigation subject and organizational purpose." Humane Soc. of the U.S. v. Hodel, 840 F.2d 45, 58 (D.C. Cir. 1988). Here, the NAACP has alleged that its purpose is to "ensure the political, educational, social, and economic equality of all persons," particularly "people of color." NAACP Compl. at 3–4. This mission is "pertinent" to the subject of the litigation here, because plaintiffs have alleged that "[n]early all of the DACA registrants—more than 95%—are people of color," id. at 12, and that DACA confers various educational, social, and economic benefits on those individuals, see id. at 2. At this stage of the litigation, these allegations are sufficient to establish the NAACP's standing—which, in turn, is sufficient to establish the standing of the other two plaintiffs in NAACP action. See Hodel, 840 F.2d at 59 (concluding that an association's "members' aesthetic interest in viewing live animals and birds" was sufficiently germane to a lawsuit whose purpose was "keeping animals and birds alive and well"). Thus, at least one plaintiff has standing to assert every claim in both of the actions currently before the Court, and the government's motions to dismiss for lack of standing will be denied.

## II. ADMINISTRATIVE CHALLENGES

[7]  As noted above, plaintiffs assert various administrative challenges to DACA's rescission, including that it was arbitrary and capricious, that it required notice and comment, and that it ran afoul of RFA's requirement that an agency consider the effects of its actions on small entities. The government raises two threshold arguments that apply only to plaintiffs' administrative claims: first, that DACA's rescission was unreviewable under the APA's carve-out for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2);[11] and second, that plaintiffs fall outside the "zone of interests" protected by the APA and RFA. The Court will first address the government's threshold arguments and then proceed to the merits of plaintiffs' claims.

### A. Reviewability

[8]  The APA "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has explained the difference between § 701(a)(1) and (a)(2) as follows:

> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have 'committed' the decision-making to the agency's judgment absolutely.

Heckler v. Chaney, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (emphasis added). Thus, in determining whether a particular agency action is "committed to agency discretion by law," courts ask whether "statutes are drawn in such broad

---

11.  "[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." Sierra Club v. Jackson, 648 F.3d 848, 854 (D.C. Cir. 2011) (citations omitted).

terms that in a given case there is no law to apply." Id. (citations and internal quotation marks omitted); see also Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002) ("[T]he 'no law to apply' formula has come to refer to the search for substantive legal criteria against which an agency's conduct can be seriously evaluated.").

One category of agency action that the Court has held to be "presumptively unreviewable" under § 701(a)(2) is an agency's decision "not to institute enforcement proceedings." Lincoln v. Vigil, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (citing Chaney, 470 U.S. at 831, 105 S.Ct. 1649). The Supreme Court first identified this presumption in Chaney, a case in which a group of death-sentenced prisoners petitioned the Food and Drug Administration ("FDA") to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. See 470 U.S. at 823, 105 S.Ct. 1649. The FDA refused, explaining not only that was it "unclear" that it had "jurisdiction over the unapproved use of approved drugs for human execution," but also that given the absence of any "danger to the public health or a blatant scheme to defraud," even if the agency did have jurisdiction, it would "decline to exercise [that jurisdiction] under [its] inherent discretion to decline to pursue certain enforcement matters." Id. at 824–25, 105 S.Ct. 1649. The plaintiffs filed suit, seeking an order directing the FDA to take enforcement action. The district court granted summary judgment for the agency, holding that its decision not to act was unreviewable under § 701(a)(2), but the court of appeals reversed with instructions to order the agency to "fulfill its statutory function." Id. at 825–27, 105 S.Ct. 1649.

The Supreme Court granted certiorari and reversed. "[A]gency decisions to refuse enforcement," the Court explained, are "general[ly] unsuit[able] for judicial review" for several reasons. Id. at 831, 105 S.Ct. 1649. Such decisions call for "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies." Id. Moreover, nonenforcement decisions generally do not involve the exercise of "coercive power over an individual's liberty or property rights"; they provide no "focus for judicial review"; and they "share[ ] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." Id. at 832, 105 S.Ct. 1649. For these reasons, such decisions have "traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition." Id. Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Id. The Court was careful to note, however, that this presumption of unreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833, 105 S.Ct. 1649. Critically for purposes of this case, moreover, the Court reserved judgment on whether the presumption applies where an agency "refuse[s] . . . to institute proceedings based solely on the belief that it lacks jurisdiction." Id. at 833 n.4, 105 S.Ct. 1649 (internal quotation marks omitted).

Although the Supreme Court has not yet answered the question reserved in Chaney, the D.C. Circuit has addressed it. In Crowley Caribbean Transport, Inc. v. Pena, for example, the issue was whether Chaney's presumption of unreviewability applied to

the Maritime Administration's refusal to take an enforcement action under a provision of the Merchant Marine Act of 1936 (the "1936 Act") that the agency thought was inapplicable as a matter of law. See 37 F.3d at 672–73. The D.C. Circuit began by noting that Chaney had reserved judgment on almost exactly this issue and then observed that two intervening circuit decisions seemed to have answered the question in contradictory ways. See id. at 675–76 (citing Safe Energy Coal. of Mich. v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477 (D.C. Cir. 1989) (presumption of unreviewability applied to the agency's refusal, based on its interpretation of its own regulations, to take enforcement action against a nuclear reactor); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 244–45 (D.C. Cir. 1986) (presumption of unreviewability did not apply to the Department of Labor's refusal, based on its interpretation of the labor laws, to take enforcement action in response to a union complaint) ).

After noting that "[a]s a circuit, we seem to have no explicit rule on how to proceed when we have inconsistent precedents," id. at 675, the court relied on language from an intervening Supreme Court decision, ICC v. Brotherhood of Locomotive Engineers ("BLE"), 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), to resolve the intra-circuit split. BLE held that an agency's refusal to reconsider a decision on the basis of "material error"—that is, because it was erroneous when made, not because of changed circumstances or newly discovered evidence—is "committed to agency discretion by law" under § 701(a)(2), even

if it is based on the agency's interpretation of a statute. Id. at 278–84, 107 S.Ct. 2360. In reaching this conclusion, the Supreme Court rejected what it took to be the concurrence's suggestion that "if [an] agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." [12] Id. at 283, 107 S.Ct. 2360. To refute this proposition, the Court explained,

> it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

Id. Citing this passage, the Crowley court concluded that BLE, "though not in the Chaney context, squarely rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions." Crowley, 37 F.3d at 676. Thus, the court held, there was "no basis for review of the Maritime Administrator's single-shot non-enforcement decision." Id.

The D.C. Circuit in Crowley was careful to preserve another line of circuit precedent, however, which holds that Chaney's presumption of unreviewability does not apply to "an agency's announcement of its interpretation of a statute, even when that interpretation is advanced in the context of a decision not to take enforcement action." Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993) (citations and internal

---

**12.** The concurrence disputed this characterization of its argument. See id. at 290 n.2, 107 S.Ct. 2360 (Stevens, J., concurring in the judgment). Its point was that because an agency's action can be sustained only on the grounds invoked by the agency, "when an agency explains that it has denied a petition

for reopening based on … its reading of a statute or a constitutional provision, its decision cannot be sustained on the conjecture that it has the discretion to deny reopening on a variety of grounds." BLE, 482 U.S. at 290–291, 107 S.Ct. 2360 (Stevens, J., concurring in the judgment).

quotation marks omitted).[13] The key difference, the Crowley court explained, was that while the case before it involved an agency's refusal to act on a single complaint, those prior cases involved "an agency's statement of a general enforcement policy" that was either "expressed . . . as a formal regulation after the full rulemaking process . . . or . . . otherwise articulated . . . in some form of universal policy statement." Crowley, 37 F.3d at 676. The court then pointed out the "ample reasons for distinguishing the two":

[First,] general statements [of enforcement policy] . . . are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,' a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy . . . .

Id. at 677 (quoting Chaney, 470 U.S. at 833 n.4, 105 S.Ct. 1649). Thus, the court concluded in Crowley, that an individual nonenforcement decision is presumptively unre-

viewable even if it is based solely on legal grounds, even though "an agency's statement of a general enforcement policy may be reviewable for legal sufficiency." Id. at 676–677.

The D.C. Circuit has applied Crowley only once, in OSG Bulk Ships, Inc. v. United States, 132 F.3d 808 (D.C. Cir. 1998). In that case, a plaintiff challenged the Maritime Administration's longstanding policy of refusing to enforce a different provision of the 1936 Act against certain vessels. See id. at 811 (explaining that the agency had "long allowed" vessels built with the aid of a federal subsidy that was reserved for ships that would be operated exclusively in foreign trade to enter the domestic shipping market at the end of their economic lives). Citing Crowley for the proposition that while "agencies' nonenforcement decisions are generally unreviewable . . . , an agency's adoption of a general enforcement policy is subject to review," the court concluded that the Maritime Administration's policy was not presumptively unreviewable because it was not a "single-shot non-enforcement decision." Id. at 812 (citation omitted).

[9] The government contends that Chaney's presumption of unreviewability applies here. See Princeton MTD at 17. Like the FDA's refusal to take the enforcement actions at issue in Chaney, the government argues, DHS's decision to rescind a deferred-action policy like DACA involves a "complicated balancing" of the agency's enforcement and resource-allocation priorities, and it resembles the "[c]hanges in policy as to criminal prosecu-

---

13.  See id. (holding that the presumption of unreviewability did not apply to the agency's determination that a statutory requirement applied to the plaintiffs, even though that determination was made in a policy statement that communicated the agency's intent not to enforce that requirement); Nat'l Wildlife Fed'n v. EPA, 980 F.2d 765, 773 (D.C. Cir.

1992) ("[T]he presumption of unreviewability of agency nonenforcement decisions is inapplicable or at least rebutted [where a plaintiff] raises a facial challenge to [an agency's] statutory interpretation embodied in [a regulation] and does not contest a particular enforcement decision.").

torial discretion" that "regularly occur within and between presidential administrations." Defs.' Reply at 2–3, 26. Moreover, the Supreme Court has said that the concerns that counsel against judicial review in the criminal context are "greatly magnified in the deportation context," where delaying removal "is often the principal object of resistance to a deportation proceeding" and where delays "permit and prolong a continuing violation" of the federal immigration laws. AAADC, 525 U.S. at 490, 119 S.Ct. 936. Nor do Crowley and OSG apply here, the government argues, because those cases involved an agency's interpretation of a specific statutory provision, whereas this case involves the agency's evaluation of its overall statutory authority.

Plaintiffs resist the application of Chaney's presumption on two grounds. First, they argue, Chaney itself involved a decision not to enforce a statute, whereas DACA's rescission was, in essence, a decision to resume enforcing the immigration laws. Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") [ECF No. 23] at 6. This matters because two of Chaney's reasons for its presumption apply "unique[ly] to non-enforcement decisions": the absence of the exercise of "coercive power" over any person, and the lack of any "focus for judicial review." Id.

This distinction is unpersuasive. For one thing, the rescission of DACA does not actually require the Department to initiate removal proceedings against any specific alien; rather, it simply removes a mechanism by which certain aliens otherwise could have been considered for deferred action. Thus, like the FDA's nonenforcement decision in Chaney, there are no agency proceedings here to provide a "focus for judicial review," 470 U.S. at 832, 105 S.Ct. 1649, and DACA's rescission does not itself involve the exercise of coercive power over any person.[14]

Moreover, Chaney's remaining rationales apply here with equal force. An agency's decision to revoke a nonenforcement policy involves the same prioritization and resource-allocation considerations as its decision to implement such a policy. See Chaney, 470 U.S. at 831, 105 S.Ct. 1649. And both types of decisions are substantially immunized from judicial review in the criminal context. See United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("[T]he decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion[,] . . . subject to constitutional constraints." (citations omitted) ). Thus, although the D.C. Circuit has at times warned against extending Chaney "outside of [the] context" of "decisions not to take enforcement action," Robbins v. Reagan, 780 F.2d 37, 46 (D.C. Cir. 1985) (rejecting Chaney's application to a decision to withhold federal funding from a homeless shel-

---

**14.** True, there is an element of coercion in the revocation of work authorization and other benefits associated with DACA. But the revocation of those benefits is not itself an enforcement decision and is therefore not properly analyzed under Chaney. See 470 U.S. at 832, 105 S.Ct. 1649. Indeed, at least one other court has concluded that the withholding of work authorization and similar discretionary benefits is unreviewable under § 701(a)(2) simply because "[t]here are no statutory standards . . . to apply." See Perales v. Casillas, 903 F.2d 1043, 1048 (5th Cir.

1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office of the then-Immigration and Naturalization Service to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period); cf. Texas, 809 F.3d at 166–68 (holding that conferring such benefits, especially "in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization," was a nondiscretionary determination sufficient to permit APA review).

ter), this Court has little difficulty concluding that Chaney extends to the revocation of nonenforcement decisions.

Second, plaintiffs contend that under Crowley and OSG, any general enforcement policy is exempt from Chaney's presumption of unreviewability, regardless of whether it is premised on a legal interpretation. See Pls.' Opp'n at 7; Tr. Of Mots. Hr'g [ECF No. 64] ("Oral Arg. Tr.") at 21:6–11. Concededly, there is some language in the post-Crowley case law to support this view. See, e.g., OSG, 132 F.3d at 812 (stating that "an agency's adoption of a general enforcement policy is subject to review"); Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth., 283 F.3d 339, 343 (D.C. Cir. 2002) (noting "our assumption in Crowley that a district court might have jurisdiction over an agency's articulation of its general enforcement policy").

But plaintiffs' reading of this language is unpersuasive for at least two reasons. First, it is in substantial tension with Chaney itself, where the plaintiffs had asked the FDA to take "various investigatory and enforcement actions" against drug manufacturers, state prisons, and "all those in the chain of distribution who knowingly distribute or purchase the drugs [at issue] with intent to use them for human execution." 470 U.S. at 824, 105 S.Ct. 1649; see id. at 842, 105 S.Ct. 1649 (Marshall, J., concurring in the judgment) (noting that "the number of people currently affected by the alleged misbranding is around 200"). These facts suggest that the FDA's refusal to act in that case was more than just a one-off nonenforcement decision.[15] Second, plaintiffs' broad reading of Crowley and OSG is unnecessary to support the holdings of those cases, which

both involved nonenforcement decisions based solely on agency statutory interpretation. See Crowley, 37 F.3d at 672–73; OSG, 132 F.3d at 810 Better, then, to adhere to the lines that the D.C. Circuit and the Supreme Court have actually drawn: between legal interpretations couched as broad enforcement policies (which are reviewable, as in OSG), individual enforcement decisions (which are presumptively unreviewable, as in Crowley), and discretionary enforcement policies (which are presumptively unreviewable, as in Chaney itself).

Indeed, the government's reading of Crowley and OSG proceeds essentially along these lines. In the government's view, those cases stand for the proposition that "if [an] agency's interpretation of a statute is embedded in a non-reviewable enforcement policy, the former may be reviewable as such," but "the enforcement policy itself" is presumptively insulated from review. Defs.' Reply at 6 (emphasis added). Thus, according to the government, Crowley and OSG address the "flip-side" of the Supreme Court's dictum in BLE: just as an otherwise unreviewable agency action (like a refusal to reconsider an earlier decision, as in BLE, or a nonenforcement decision, as in Chaney and Crowley) does not become reviewable simply because the agency acts on the basis of its interpretation of a statute, an otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion. See Oral Arg. Tr. at 15:5–13.

The Court has no quarrel with this statement of the law as a general matter, but it is unpersuaded by the government's

---

15.  Justice Brennan joined the Court's opinion on the understanding that it applied only to "[i]ndividual, isolated nonenforcement decisions." Id. at 839, 105 S.Ct. 1649 (Brennan, J., concurring). Seven other justices joined the majority opinion in full, however, and none of them took Justice Brennan's view.

attempt to apply that law to this case. The government contends that the Crowley/OSG exception does not apply here because the Rescission Memo "does not contain an embedded interpretation of the INA (or any other statute)." Defs.' Reply at 6. But the Sessions Letter makes clear that DACA's rescission was based (at least in significant part) on the Attorney General's view that the program lacked "proper statutory authority." AR 251.

As best the Court can tell, the government's response is that Crowley and OSG are distinguishable because they involved an agency's determination that a specific statutory provision applied to a particular course of conduct, whereas this case—like Chaney—involves an agency's determination as to the scope of its statutory (and here, also constitutional) authority. See Oral Arg. Tr. at 57:24–58:9 (arguing that Crowley applies only "where there's an interpretation of a substantive provision of the statute"); id. at 8:12–15 ("Plaintiffs nowhere point to any provision in the INA that would substantively constrain the Secretary's decision . . . to rescind or discontinue DACA."). But this strikes the Court as a distinction without a difference. To say that a particular agency action is "without statutory authority" is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply. See, e.g., 6 U.S.C. § 202(5) (authorizing the Department to "[e]stablish[ ] national immigration enforcement policies and priorities"). The Court fails to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision. See City of Arlington v. FCC, 569 U.S. 290, 299–300, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (rejecting, for purposes of determining the proper standard of judicial review, a similar distinction between "jurisdictional" and "nonjurisdictional" agency interpretations and concluding that "there is no difference, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has"). The government's attempt to avoid Crowley and OSG on these grounds therefore fails.

The government's reliance on BLE is equally unavailing. For one thing, as Crowley recognized, BLE addressed the reviewability of enforcement decisions only in dictum; its actual holding concerned the reviewability of an agency's refusal to reconsider a prior decision. See Crowley, 37 F.3d at 676; BLE, 482 U.S. at 278–84, 107 S.Ct. 2360. Moreover, the best account of BLE is the one that the D.C. Circuit actually gave in Crowley, where the court relied on BLE to conclude that Chaney's presumption of unreviewability applies to individual nonenforcement decisions. See Crowley, 37 F.3d at 676–77. In the same breath, however, the D.C. Circuit reaffirmed its view that general enforcement policies are exempt from Chaney's presumption of unreviewability where they are predicated solely on the agency's view of what the law requires. See id. This treatment of BLE by the Crowley court is not only sensible—after all, BLE's dictum concerned a prosecutor's decision not to bring a single criminal charge—but it is also binding on this Court.

Nor do the concerns that counsel against judicial review in the immigration context carry much force where, as here, a party seeks judicial review of a legal judgment embedded in an immigration enforcement policy. Unlike judicial review of individual removal proceedings, review of an enforcement policy does not itself delay the removal of any specific alien. See AAADC, 525 U.S. at 490–91, 119 S.Ct. 936 (noting that delay "is often the principal object of

resistance to a deportation proceeding" and that it prolongs "an ongoing violation of United States law"). And there is no danger of "chilling law enforcement by subjecting the [agency's] motives ... to outside inquiry," since the court need only examine the immigration authority's legal reasoning. Id. at 490, 119 S.Ct. 936 (alteration omitted). Although many immigration decisions touch on subjects that courts are ill-equipped to consider, such as diplomacy or national security, see id. at 491, 119 S.Ct. 936, an agency's interpretation of a statute is a much more natural subject for judicial review. Thus, while immigration policies are generally "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference," there are good reasons to scrutinize a policy more carefully when it is based solely on an agency's reading of domestic statutory law. Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).

Properly understood, then, the Crowley/OSG exception to Chaney's presumption of unreviewability applies to a legal interpretation phrased as a general enforcement policy, even if that interpretation concerns the scope of the agency's lawful enforcement authority. And that is essentially what we have here.

But the government has one final line of defense. According to the government, DACA was rescinded not only because of its supposed illegality, but also because of the Attorney General's assessment of what the government now calls "litigation risk"—that is, the likelihood that DACA would have been invalidated had it been challenged in the Texas litigation. See Defs.' Reply at 17; AR 254–55. At first blush, this seems to be a "discretionary" consideration that makes this case more like Chaney, where the agency refused to take enforcement action not only because it thought that it lacked jurisdiction (a

legal reason), but also because the alleged violations did not implicate the agency's enforcement priorities (a discretionary reason). See 470 U.S. at 824–25, 105 S.Ct. 1649.

It is not difficult to imagine a case where a court's preliminary disapproval of an agency's nonenforcement policy could lead the agency to rescind that policy for bona fide discretionary reasons. See Chaney, 470 U.S. at 831, 105 S.Ct. 1649 (identifying "whether the agency is likely to succeed if it acts" as one of several such reasons). For example, the agency could conclude that the costs of defending the policy in court would outweigh its benefits to the public, or that the negative publicity that would surround the litigation would undermine the policy's effectiveness. In such cases, the decision to rescind would be "discretionary" in a meaningful sense: the agency would have weighed the policy's costs and benefits and decided that the former outweighed the latter.

But where an agency asserts that a nonenforcement policy is unlawful and then asserts "litigation risk" as a separate ground for the policy's rescission, there are reasons to be more suspicious. After all, if an agency could insulate from judicial review any legal interpretation simply by framing it as an enforcement policy and then offering as an additional, "discretionary" justification the assertion that a court would likely agree with the agency's interpretation, then Crowley would be a dead letter. Moreover, because such an assertion would depend (at least in part) on the correctness of the agency's view of the policy's unlawfulness, it would be unlike the independent discretionary ground that triggered the presumption of unreviewability in Chaney itself. See 470 U.S. at 824–25, 105 S.Ct. 1649 (noting the FDA's statement that even if it had jurisdiction, it would still decline to act pursuant to its

"inherent discretion to decline to pursue certain enforcement matters"). For these reasons, litigation-strategy justifications deserve closer scrutiny when they are accompanied by agency assertions of unlawfulness.

Here, the Department rescinded DACA for legal reasons—its purported statutory and constitutional defects—and then offered as an additional reason the fact that a federal court of appeals had held that DAPA, a related but distinct deferred-action program, likely suffered from similar defects. See Defs.' Reply at 17 (citing the "litigation risk posed by the proceedings in Texas and the consequent potential for massive disruption were the policy [to be] immediately enjoined"). Although this additional justification was not a bare assertion that a court would likely agree with the agency's view of the law—since it relied on an actual court's view of a concededly similar legal issue—it nonetheless raises many of the same concerns. The Crowley/OSG rule would be seriously undermined if an agency could insulate from judicial review any legal interpretation stated as a general enforcement policy simply by pointing to one case where one court tentatively agreed with the agency on a similar legal issue. Moreover, the Department's conclusion that the Fifth Circuit's decision to uphold a preliminary injunction of DAPA suggests that a court would likely also impose a preliminary injunction of DACA necessarily relies on the Department's legal analysis of the similarities between the two policies—which, like the Department's view of DACA's legality itself, does not qualify for Chaney's presumption of unreviewability. Thus, the Court concludes that the Department's litigation-risk justification was too closely bound up with its evaluation of DACA's legality to trigger Chaney's presumption of unreviewability here.

When the litigation-risk justification falls away, all that is left to support DACA's rescission is the Department's determination that the program was implemented without proper statutory and constitutional authority—a legal determination which, when made in the context of a general enforcement policy, is not subject to Chaney's presumption of unreviewability. Thus, like every other court that has considered the question thus far, the Court concludes that DACA's rescission was not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Regents, 279 F.Supp.3d at 1029–31; Batalla Vidal, 2017 WL 5201116, at *9–12; Casa De Maryland, 284 F.Supp.3d at 770. The Court will therefore proceed to the merits of plaintiffs' APA claims.

* * *

[10, 11]   To summarize: an agency's decision whether to take an enforcement action is presumptively unreviewable, and that presumption can normally be rebutted only by pointing to statutory language that constrains the agency's exercise of its enforcement discretion. See Chaney, 470 U.S. at 832–33, 105 S.Ct. 1649. Under circuit precedent, however, an enforcement decision is exempt from the presumption of unreviewability if: (1) it is expressed as a general enforcement policy; and (2) it relies solely on the agency's view of what the law requires. See OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–677. This rule not only accords with the applicable case law, but it also preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons.

Here, DACA's rescission was a general enforcement policy predicated on DHS's legal determination that the program was invalid when it was adopted. And although

the government has sought to cast the Department's assessment of "litigation risk" as a discretionary justification that brings this case within Chaney's ambit, that justification is insufficiently independent from the agency's evaluation of DACA's legality to trigger Chaney's presumption of unreviewability. Thus, the Crowley/OSG exemption applies, and the government's motions to dismiss will be denied to the extent that they assert § 701(a)(2) as a bar to APA review.

### B. Whether Plaintiffs Possess a Cause of Action Under the APA and RFA

[12–14] The government also argues that the non-individual plaintiffs "lack a cause of action under the APA" because they "cannot meet the zone-of-interest test" used to determine prudential standing. Defs.' Reply at 13–14; see also NAACP MTD at 18 (framing this argument as one of "prudential standing"). However, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." Mt. States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Thus, because it is undisputed that Ms. Perales Sanchez's interests fall within the zone regulated by the INA,[16] the Court need not consider prudential standing in Princeton. And the NAACP plaintiffs have prudential standing for essentially the same reason as Ms. Perales Sanchez: each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA. See Hodel,

840 F.2d at 61 (concluding that, "[f]or similar reasons [that the court found Article III standing], the interests of [the association's] members also fall within the zone of interests protected by the Endangered Species Act").

[15, 16] The NAACP plaintiffs' RFA claims are another matter. See NAACP FAC 75–82 (alleging that the Department failed to conduct an analysis of the effect of DACA's rescission on "small entities," as required by the RFA). "The RFA provides that 'a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review . . . .'" Nw. Min. Ass'n v. Babbitt, 5 F.Supp.2d 9, 13 (D.D.C. 1998) (quoting 5 U.S.C. § 611(a)(1) ); see also 5 U.S.C. § 601(6) (defining a "small entity" to mean, as relevant here, a "small organization"); id. § 601(4) (defining a "small organization" to be "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field"). Given this statutory language, "the RFA extends standing to seek judicial review only to a 'small entity.'" Babbitt, 5 F.Supp.2d at 13. But as the government points out, the NAACP plaintiffs' complaint "contains only a single conclusory allegation that [they] fall within the statutory definition, and any factual support for that claim is missing from (and arguably contradicted by) the declarations submitted in support of their motion for summary judgment." Defs.' Reply at 14 (citation omitted) (quoting Princeton MSJ, Ex. R at 2595 [ECF No. 28–17] (declaration from the president of the AFT, stating that "[t]he AFT is a national labor union representing approximately 1.7 million members"); id. at 2618 (declaration from

---

**16.** Nor could there be any dispute. As a DACA beneficiary, Ms. Perales Sanchez is "[her]self the subject of the contested regulatory action." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("The 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff

should be heard to complain of a particular agency decision. . . . [It] denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.").

the president of the NAACP, stating that "[t]he NAACP is the nation's largest . . . civil rights organization"); id. at 2639–40 (declaration from the president of the UFCW, stating that the union "is a labor organization" representing "1.3 million members") ). Thus, the NAACP plaintiffs have not established prudential standing on their RFA claim, and that claim will be dismissed.

### C. Procedural Validity

[17] The Court turns now to the merits of plaintiffs' administrative claims, beginning with their argument that DACA's rescission should have undergone notice-and-comment rulemaking. The APA generally requires notice-and-comment procedures whenever an agency creates, amends, or repeals a rule.[17] See 5 U.S.C §§ 551(5), 553(b)–(c). A rule is exempt from this requirement, however, if it is an "interpretative rule[ ], general statement[ ] of policy, or rule[ ] of agency organization, procedure, or practice." Id. § 553(b)(A). Here, plaintiffs assert that DACA's rescission was a "substantive" or "legislative" rule that should have undergone notice and comment, Princeton MSJ at 38–41, while the government contends that DACA's rescission was "a general statement of policy regarding how DHS will exercise its enforcement discretion," Defs.' Reply at 27. On this point, the government has the better of the argument. Accord Regents, 2018 WL 401177, at *2 (dismissing the notice-and-comment challenge to DACA's rescission); Batalla Vidal, 2018 WL 1532370, at *5–6 (same); Casa De Maryland, 284 F.Supp.3d at 772 (same).

[18, 19] The key question in distinguishing between legislative rules (which must undergo notice and comment) and general statements of policy (which need not) is whether the statement in question has a "present binding effect." Elec. Privacy Info. Ctr. (EPIC) v. DHS, 653 F.3d 1, 7 (D.C. Cir. 2011). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." Id. (citation omitted); see Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (describing general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power" (citation omitted) ).

[20] Plaintiffs contend that DACA's rescission has a present binding effect because it "presently bars DACA beneficiaries from obtaining advance parole or applying to renew DACA relief" and "presently bars DHS officials from exercising their prior discretion in reviewing DACA applications or advance-parole applications." Princeton MSJ at 40. But this characterization of DACA's rescission is misleading. The Rescission Memo states the Department's intent to "reject all DACA initial requests" filed after September 5, 2017 and "not [to] approve any new . . . applications for advance parole," AR 255; thus, its binding effect is "prospective[ ]," Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (citation omitted), rather than "present," EPIC, 653 F.3d at 7 (citation omitted).[18] Moreover, the memo expressly

---

17. The parties do not dispute that DACA's rescission is a "rule" for APA purposes. See 5 U.S.C. § 551(4) (defining a "rule," in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or prac-

tice requirements of an agency"); see also Texas, 809 F.3d at 171 n.122 (noting that the government likewise did not dispute that DAPA was a rule).

18. Although technically the memo does "presently bar DHS officials" from considering DACA and advance-parole applications,

states that it places "no limitations . . . on the otherwise lawful enforcement or litigation prerogatives of DHS," AR 255, which further suggests that it is without present binding effect, cf. McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1319 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion . . . so that he, she, or they will automatically decline to entertain challenges to the statement's position, then the statement is binding . . . .").

Finally, the fact remains that the Rescission Memo withdrew a prior memorandum, which was itself issued without notice and comment, regarding how DHS intended to "exercise [its] prosecutorial discretion." AR 1. The Rescission Memo is therefore a clear example of a "statement[ ] by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (citation omitted); see Regents, 2018 WL 401177, at *2 ("For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment."). Hence, the rescission of DACA was exempt from notice and comment as a general statement of agency policy.[19]

## D.  Substantive Validity

[21–23]   The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Encino Motorcars, LLC v. Navarro, —— U.S. ——, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ). "[I]f an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable." Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989). However, because "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," post hoc explanations that the agency did not articulate when it acted are insufficient. SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947).

Here, the Department never stated, and the government does not now contend, that DACA's rescission reflected a change in the agency's immigration enforcement priorities. Instead, the government points to two reasons for DACA's rescission: first, the Department's legal conclusion that DACA was unconstitutional and without statutory authority; and second, its assessment of what it now calls "litigation risk"—the likelihood that DACA would

---

Princeton MSJ at 40, this argument proves too much. Any general statement of agency policy will presently bind the agency's employees; the question, rather, is whether the statement "purport[s] to bind those subject to it." EPIC, 653 F.3d at 7 (citation omitted). The Rescission Memo does not.

**19.**  Plaintiffs also argue that DACA's rescission " 'alter[s] the rights or interests of parties' " (and hence is not a rule of "agency organiza-

tion, procedure, or practice") and "makes a 'substantive change' to the statutory or regulatory regime" (and hence is not an interpretive rule). Princeton MSJ at 39–40 (quoting EPIC, 653 F.3d at 5–7). The government does not contend that DACA falls under either of these alternative exceptions to the notice-and-comment requirement, however, and the Court therefore will not address these arguments.

have been abruptly enjoined in the <u>Texas</u> litigation. Because these were the only reasons given by the agency, DACA's rescission can be sustained only on those grounds, even if the agency could have validly rescinded DACA as an exercise of its enforcement discretion. <u>See</u> <u>Sea-Land Serv., Inc. v. Dep't of Transp.</u>, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" (citation omitted) ).

### 1. The Department's Conclusion that DACA Was Unlawful

[24]   Plaintiffs first attack DHS's reliance on DACA's purported unlawfulness as a reason to rescind DACA. They argue both that DHS failed adequately to explain its legal conclusion, <u>see</u> <u>Princeton</u> MSJ at 11–17, and that even if DHS's explanation were adequate, its conclusion was erroneous, <u>see</u> <u>id.</u> at 17–27. The Court agrees that DHS's decision was inadequately explained, and hence it need not address the alternative argument that DHS's conclusion was substantively incorrect.

[25–27]   "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." <u>Encino Motorcars</u>, 136 S.Ct. at 2125. Thus, when an agency reverses a prior decision, it must "provide a reasoned explanation for the change." <u>Id.</u> That explanation need not be "more detailed . . . than what would suffice for a new policy created on a blank slate," but it must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." <u>Id.</u> at 2125–26 (quoting <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ); <u>see also</u> <u>id.</u> at 2126 ("[A]n 'unexplained inconsistency' in agency policy 'is a reason for holding an interpreta-

tion to be an arbitrary and capricious change . . . .'" (alterations and citation omitted) ).

In concluding that DACA was unlawful, DHS purported to identify both statutory and constitutional defects with the program. For its part, the Rescission Memo pointed to "the Supreme Court's and the Fifth Circuit's rulings" in the <u>Texas</u> litigation and then cited the Sessions Letter, <u>see</u> AR 255, which stated that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress's repeated rejection of proposed legislation that would have accomplished a similar result." AR 251. The Sessions Letter also stated that "[s]uch an open-ended circumvention of the immigration laws was an unconstitutional exercise of authority by the Executive Branch," and later, in its concluding paragraph, it cited the Executive's duty to "faithfully execute the laws passed by Congress." <u>Id.</u> It also opined that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." <u>Id.</u>

This scant legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful. In concluding that DACA was implemented "without statutory authority," neither the Sessions Letter nor the Rescission Memo cited any statutory provision with which DACA was in conflict. <u>Cf.</u> <u>Encino Motorcars</u>, 136 S.Ct. at 2127 (rejecting as inadequate an agency's statement that a particular statutory exemption "does not include [certain] positions and the [agency] recognizes that there are circumstances under which the requirements for the exemption would not be met"). True, both documents pointed to the Fifth Circuit's decision in <u>Texas</u>, which held that DAPA likely conflicted with the

INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." Texas, 809 F.3d at 179. But the government does not meaningfully dispute that, unlike DAPA, "DACA has 'no analogue in the INA.'" Defs.' Reply at 22 (quoting Regents, 279 F.Supp.3d at 1042). Thus, the Fifth Circuit's statutory analysis is inapposite.[20] The Department's conclusion that DACA was implemented without statutory authority—based only on an incongruous reference to the Fifth Circuit's decision on DAPA—therefore cannot support the program's rescission.

The Department's explanation for its conclusion that DACA was unconstitutional was equally opaque. The Sessions Letter

made a fleeting reference to the Attorney General's "duty to . . . faithfully execute the laws passed by Congress," AR 251, which could be read to invoke the President's constitutional duty to "take Care that the Laws be faithfully executed." See U.S. Const. art. II, § 3. But the letter made no attempt to explain why DACA breached that duty.[21] This failure was particularly acute in light of a thirty-three page memorandum prepared in 2014 by the Office of Legal Counsel ("OLC"), which deduced "from the nature of the Take Care duty" no fewer than "four general . . . principles governing the permissible scope of enforcement discretion" and concluded that DAPA, a similar deferred-action program, was consistent with all of them. AR 9–10, 14–36.[22] And although the

---

**20.** The Fifth Circuit also concluded that "there was evidence from DACA's implementation that DAPA's discretionary language was pretextual." Texas, 809 F.3d at 173; see id. at 172–176 (upholding the district court's factual finding that although "the DACA Memo instructed applicants to review applications on a case-by-case basis and exercise discretion, . . . those statements were 'merely pretext' because only about 5% of [DACA] applications . . . had been denied" and because the government could not identify how many of those had been denied for discretionary reasons (footnote omitted) ). But the Fifth Circuit relied on that finding only to conclude that DAPA should have been promulgated using notice-and-comment rulemaking, not that it conflicted substantively with the INA. See id. at 171–178. And although OLC had orally advised the Department that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria," AR 21 n.8, neither the Rescission Memo nor the Sessions Letter identified this purported flaw as a reason for DACA's invalidity.

**21.** At least one commentator has identified a second possible constitutional argument in the Sessions Letter: "The Obama administra-

tion's open-ended reading of certain definitional provisions of the Immigration and Nationality Act (INA) would run afoul of the nondelegation doctrine." See Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM) https://www.lawfareblog.com/understanding-sessions-justification-rescind-daca; see also Texas, 809 F.3d at 150 (noting that the plaintiffs there had asserted "constitutional claims under the Take Care Clause" and the "separation of powers doctrine"). The government does not raise these arguments, however, so the Court will not consider them.

**22.** The OLC memorandum did not directly address the Department's authority to implement DACA. See AR 5–14 (discussing the agency's authority to "prioritize the removal of certain categories of aliens over others"); AR 14–36 (discussing the agency's authority to implement DAPA). However, the memo did state that OLC had "orally advised" the Department that DACA was lawful so long as "immigration officials retained discretion to evaluate each application on an individualized basis." AR 21 n.8 ("[T]he concerns animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.").

Sessions Letter asserted that DACA suffered from "the same . . . constitutional defects that the courts recognized as to DAPA," AR 251, the Fifth Circuit's decision in Texas did not actually identify any such defects. Indeed, it expressly declined to address the plaintiffs' constitutional claims. See 809 F.3d at 146 n.3. Like its evaluation of its statutory authority to implement DACA, then, the Department's analysis of DACA's constitutionality was so barebones that the Court cannot "discern[ ]" the "path" that the agency followed. Encino Motorcars, 136 S.Ct. at 2125 (citation omitted).[23] Thus, it too cannot support DACA's rescission.

The Department's failure to give an adequate explanation of its legal judgment was particularly egregious here in light of the reliance interests involved. See Encino Motorcars, 136 S.Ct. at 2126. The Rescission Memo made no mention of the fact that DACA had been in place for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits.[24] The Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here. See, e.g., Encino Motorcars, 136 S.Ct. at 2126 (setting aside the Department of Labor's interpretation of a statutory exemption from the Fair Labor Standards Act's overtime-pay requirements, in part because the agency had failed to address "decades of industry reliance" on its prior view that the exemption applied to a particular class of employees). Because DHS failed to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission.

**23.** Neither Encino Motorcars nor any of its predecessor cases explicitly required an agency to address its prior views on the legality of its prior policy. See, e.g., Fox, 556 U.S. at 515, 129 S.Ct. 1800 (explaining that "[a]n agency may not . . . depart from a prior policy sub silentio" (first emphasis added)). But where, as here, the OLC provides an agency with an opinion that suggests a legal framework for evaluating the legality of a particular program and the agency later rescinds that policy on legal grounds, failure to even consider OLC's thorough analysis is arbitrary and capricious. See Trevor W. Morrison, Stare Decisis in the Office of Legal Counsel, 110 Colum. L. Rev. 1448, 1464 (2010) ("OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled."); Hispanic Affairs Project v. Acosta, 263 F.Supp.3d 160, 178 (D.D.C. 2017) (concluding that an "agency's non-consideration of [certain] OLC memoranda—whether deliberate or inadvertent—is all the more reason to consider them in reviewing the agency's action," because "[a] contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices").

**24.** See, e.g., Perales Decl. ¶¶ 21–22 (if DACA were rescinded, Ms. Perales Sanchez would have to abandon her plans of conducting postgraduate research in Mexico and then applying to law school, because she could no longer travel abroad, take out student loans, or work lawfully in the United States); Decl. of Jane Doe # 2, Ex. S to Princeton MSJ [ECF No. 28–17] ¶¶ 11–13 (current special education teacher and DACA beneficiary would lose her job and would have to abandon her plans of pursuing a doctorate in audiology); Decl. of Jane Doe # 5, Ex. X to Princeton MSJ [ECF No. 28–17] ¶ 11 (current undergraduate student and DACA beneficiary would have to abandon her plans of attending law school). Plaintiffs filed a motion for leave to file pseudonymous declarations with their summary judgment motion. See Pls.' Mot. for Leave to Allow Three Declarants to Proceed by Pseudonym [ECF No. 22]. The government did not oppose the motion, so the Court will treat it as conceded and grant it. See Local Civ. R. 7(b).

### 2. Litigation Risk

[28] The Department's second justification for DACA's rescission was its conclusion that, if DACA were challenged in the Texas litigation, the district court there would enter a "nationwide injunction" that "would have prompted an immediate—and chaotic—end to the policy." Defs.' Reply at 15. Plaintiffs contend that this "litigation risk" conclusion was arbitrary and capricious and hence cannot sustain DACA's rescission. Princeton MSJ at 28–36. They are correct.

As an initial matter, plaintiffs assert that the government's litigation-risk argument is an "impermissible post hoc rationalization" of the Department's decision to rescind DACA. Princeton MSJ at 28. Here, plaintiffs miss the mark. Although both the Rescission Memo and the Sessions Letter focused primarily on DACA's statutory and constitutional defects, the Sessions Letter did state that DAPA was "enjoined on a nationwide basis" and that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." AR 251. Moreover, the Rescission Memo went on to cite this concern as grounds for its decision to "wind [DACA] down in an efficient and orderly manner." AR 254. Together, these statements were sufficient to express the Department's concern that a nationwide injunction in the Texas litigation would abruptly shut down the DACA program. See Chenery, 332 U.S. at 196, 67 S.Ct. 1760.

Nevertheless, this concern does not withstand review under the familiar arbitrary and capricious standard. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856. First,

as already noted, there was good reason to doubt that the second of the Fifth Circuit's holdings in Texas—that DAPA conflicted with the express provisions of the INA, see 809 F.3d at 178–86—would extend to DACA, because the INA does not prescribe a statutory naturalization process for DACA-eligible individuals. And although the Fifth Circuit's holding that DAPA should have undergone notice-and-comment rulemaking likely would have extended to DACA,[25] see id. at 170–78, it simply does not follow that the district court in Texas was likely to issue an injunction bringing DACA to an abrupt halt.

For one thing, it is black-letter administrative law that when a court sets aside an agency action as procedurally invalid, the proper remedy is to remand the action to allow the agency an opportunity to conduct the required notice-and-comment procedures. See Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (observing that "[w]e have previously remanded without vacating when the agency failed to follow notice-and-comment procedures"); C. & S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where the agency "may well be able to justify its decision . . . and it would be disruptive to vacate [the challenged] rule"). It is true, as the government points out, that in Texas the district court preliminarily enjoined DAPA based solely on the program's failure to have undergone notice-and-comment rulemaking. See Texas, 86 F.Supp.3d at 677. DAPA was challenged before it took effect, however. See Texas, 809 F.3d at 149. By contrast, as of September 5, 2017 (the date by which the Texas plain-

---

**25.** Because DAPA had not yet been implemented, the Fifth Circuit relied in large part on "extrapolation" from evidence regarding DACA's implementation to conclude that DAPA would not "genuinely leave the agency and its employees free to exercise discretion" and hence was a substantive rule that should

have undergone notice and comment. Texas, 809 F.3d at 171–176. The government is correct that "[w]hile that finding had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself," at least as far as notice and comment are concerned. Defs.' Reply at 22 (citations omitted).

tiffs had threatened to challenge DACA, see AR 239), DACA would have been in place for over five years, and hundreds of thousands of applicants would have already been granted deferred action under the program. Thus, assuming that the district court in the Texas litigation would have found DACA defective only on procedural grounds (as a fair reading of the Fifth Circuit's opinion would suggest), it seems doubtful that the court would have preliminarily enjoined DACA instead of remanding it to the Department, perhaps without vacatur, to undergo notice-and-comment rulemaking.

On the other hand, if the Texas district court were to find that DACA was substantively invalid—or indeed, unconstitutional—injunctive relief rather than remand may have been the more likely remedy. But it still does not follow that the district court's injunction would have brought the DACA program to an "immediate" and "chaotic" halt. Defs.' Reply at 15. As the Fifth Circuit has repeatedly recognized, district courts have "broad discretion" to "fashion[ ] equitable relief," Crawford v. Silette, 608 F.3d 275, 278 (5th Cir. 2010), including injunctive relief,

see ODonnell v. Harris County, 882 F.3d 528, 537 (5th Cir. 2018) (noting that a district court's injunction is reviewed for abuse of discretion). In light of this discretion, it strains credulity to suggest that the district court would have enjoined DACA immediately and completely without allowing DHS any opportunity to wind the program down. Thus, regardless of the grounds on which the district court in Texas might have ultimately invalidated DACA, the Department's insistence that an "immediate—and chaotic—end to the policy" would have resulted, Defs.' Reply at 15, is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," State Farm, 463 U.S. at 43, 103 S.Ct. 2856, and was therefore arbitrary and capricious.

* * *

If, as the Court has concluded, see supra Part II.A, an agency's general enforcement policy is reviewable to the extent that it is premised on a legal judgment, it follows that the agency must explain that judgment in sufficient detail to permit meaningful judicial review.[26] See Encino

26. The parties dispute the standard of review that would apply to the agency's statutory and constitutional analysis had it been adequately explained. The government maintains that it would be reviewed for a "clear error of judgment"—that is, under the ordinary test for arbitrary and capricious agency action. State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (citation omitted); see Oral Arg. Tr. at 68:5–18. Plaintiffs contend that review would be de novo. See Teva Pharm. USA, Inc. v. FDA, 441 F.3d 1, 5 (D.C. Cir. 2006) (finding agency action arbitrary and capricious where the agency "mistakenly thought itself bound" by certain D.C. Circuit precedent); Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law."). The district court in Batalla Vidal has suggested a third option: because "neither the Sessions

Letter nor the DACA Rescission Memo carry the 'force of law,' " that court concluded, the Department's "interpretation of the legality of the DACA program is [not] entitled to formal or controlling deference." Batalla Vidal, 279 F.Supp.3d at 421 n.9 (E.D.N.Y. 2018) (quoting Mead, 533 U.S. at 226–27, 121 S.Ct. 2164). Rather, it would be treated only as persuasive. See Mead, 533 U.S. at 234–35, 121 S.Ct. 2164 (explaining that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the Chevron pale" and instead deserve "respect proportional to [their] 'power to persuade' " (quoting Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); then Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Because the Court does not reach the merits of the Department's conclusions that DACA lacked statutory and con-

Motorcars, 136 S.Ct. at 2127. Here, the Department's conclusory statements were insufficient to explain the change in its view of DACA's lawfulness.[27] Moreover, the agency's prediction regarding the outcome of threatened litigation over DACA's validity—specifically, that the district court in the Texas litigation would immediately halt the program, without any opportunity for a wind-down—was so implausible that it fails even under the deferential arbitrary and capricious standard. DACA's rescission will therefore be set aside.[28]

### E. Remedy

Having concluded that DACA's rescission violated the APA, the question of remedy remains. As an initial matter, the Court will reject the government's invitation to confine its grant of relief strictly to the plaintiffs in this action. See Defs.' Reply at 44–45. As plaintiffs point out, the D.C. Circuit has previously rejected an agency's suggestion that "the named plaintiffs alone should be protected by [an] injunction," explaining that "[w]hen a reviewing court determines that agency reg-

ulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Moreover, as the Fifth Circuit noted in Texas, the immigration context counsels strongly in favor of nationwide relief: "the Constitution requires 'an uniform Rule of Naturalization,' " 809 F.3d at 187 (quoting U.S. Const. art. I, § 8), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly,' " id. at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384), "and the Supreme Court has described immigration policy as 'a comprehensive and unified system,' " id. at 188 (quoting Arizona v. United States, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ). Thus, the Court concludes that nationwide relief is appropriate here.

[29–31] The only remaining issue, then, is what form the Court's relief should

---

27. The district court in Casa de Maryland reached the opposite conclusion. See 284 F.Supp.3d at 772 (finding that DHS had a "reasonable basis" to conclude that DACA was unlawful based on "the DAPA litigation, the threatened legal challenge, and the Attorney General's advisory letter"). But that court's brief discussion of the issue failed to address the limited applicability of the Fifth Circuit's Texas decision to DACA, the inadequacy of the Sessions Letter itself, DHS's failure to address DACA beneficiaries' reliance interests, and the implausibility of an injunction issuing in the Texas litigation that would put an immediate end to DACA. Therefore, this Court respectfully disagrees with the Casa de Maryland court's analysis.

28. The government also urges the Court to construe the Department's statement that

DACA was "unconstitutional in part because it was an 'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected" as an "independent policy judgment" that "immigration decisions of [DACA's] magnitude should be left to Congress." Defs.' Reply at 21 (quoting AR 251 and citing Syracuse Peace Council, 867 F.2d at 657–58 (holding that if an agency offers two justifications for its decision, one constitutional and one discretionary, and if a court is "persuaded" that the agency would have reached the same result on discretionary grounds had it "foregone its ruminations on the constitutional issue," the court may avoid the constitutional issue and uphold the agency action only on the discretionary ground) ). But the government offers no support for the proposition that an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion. Cf. Chaney, 470 U.S. at 831, 105 S.Ct. 1649 (listing such assessments).

---

stitutional authority, however, it expresses no opinion as to what standard of review would apply.

AR0582

take. "[U]nsupported agency action normally warrants vacatur." Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005). But courts have discretion to remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision," and if "vacating would be disruptive." Radio–TV News Directors Ass'n v. FCC, 184 F.3d 872, 888 (D.C. Cir. 1999) (alteration in original) (citation omitted); see Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("The decision whether to vacate depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed." (citation omitted) ). Alternatively, a court may vacate the unlawful action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified. See Friends of Earth, Inc. v. EPA, 446 F.3d 140, 148 (D.C. Cir. 2006) (remanding to the district court with instructions to vacate an agency rule but noting that the district court possessed "remedial discretion . . . to stay [its] order on remand"); Nat. Res. Def. Council, Inc. v. EPA, Civ. Action No. 16-1861 (JDB), 2018 WL 1568882, at *8 (D.D.C. Mar. 30, 2018) (vacating a rule but staying the order of vacatur until such time as the agency promulgated a replacement); see also A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding and providing for "automatic[ ]" vacatur unless the agency justified its decision within 90 days); Rodway v. USDA, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding and giving the agency 120 days to complete the rulemaking process).

[32] Here, the first Allied–Signal factor—the seriousness of the action's defects—favors remand without vacatur, although not unequivocally. On the one hand, it is certainly possible that the De-partment could articulate a valid reason for DACA's rescission. For example, it could offer a coherent legal argument that DACA conflicts with the INA or violates the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, or it could explain why, as a matter of policy, DACA-eligible individuals should no longer be low-priority targets for removal. Accord Batalla Vidal, 279 F.Supp.3d at 408 ("Defendants indisputably can end the DACA program."). But there is some evidence in the record to suggest that the Department would not have rescinded DACA but for its supposed illegality. See, e.g., Ex. 119 to Princeton MSJ [ECF No. 28–15] at 2003 (congressional testimony of DHS officials that DACA beneficiaries are "a benefit to the country" and that "[w]e need to regularize their status through some legal means"). And although it seems that no court has yet passed judgment on DACA's constitutionality, at least one court in this district has concluded that DACA was likely "consistent with, rather than contrary to, congressional policy." Arpaio v. Obama, 27 F.Supp.3d 185, 208–09 (D.D.C. 2014) (concluding that the plaintiff's substantive APA challenge to DACA was unlikely to succeed on the merits), aff'd, 797 F.3d 11 (D.C. Cir. 2015) (affirming only on standing grounds). Thus, although the substantive flaws in DACA's rescission are curable in theory, the Department may face practical obstacles when attempting to remedy them. Nonetheless, there remains a "non-trivial likelihood" that the agency could justify DACA's rescission on remand, WorldCom, Inc. v. FCC, 288 F.3d 429, 434 (D.C. Cir. 2002), so the first Allied–Signal factor supports remand without vacatur.

[33] The second Allied–Signal factor—the risk of disruption—also tips slightly in favor of remand without vacatur. On the one hand, two courts have already prelimi-

narily enjoined DACA's rescission, see Regents, 279 F.Supp.3d at 1047–50; Batalla Vidal, 279 F.Supp.3d at 437–38, which suggests that vacatur would cause little disruption, at least initially.[29] On the other hand, neither injunction applies to initial DACA applications, which the Department has stopped accepting. Thus, vacating DACA's rescission could lead to "an interim change"—an influx of initial DACA applications—"that may itself be changed" if DHS later provides a sufficient explanation for DACA's rescission.[30] Allied–Signal, 988 F.2d at 150–151 (citation omitted). On balance, therefore, the two Allied–Signal factors tend to favor remand without vacatur.

However, the Court is also mindful that, as several judges of the D.C. Circuit have noted, remand without vacatur "sometimes invites agency indifference." In re Core Comm'n, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); see Nat. Res. Def. Council v. EPA, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). This concern is particularly acute here, where each day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action. Moreover, although the preliminary injunctions in Regents and Batalla Vidal currently protect aliens who have already received DACA grants, those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future. These concerns suggest that time is of the essence here, and the Court need not ignore this reality in crafting a remedy. Cf. Rodway, 514 F.2d at 817–18 (ordering that regulations concerning the food stamp system be revised "with expedition"—that is, within 120 days—because "[i]n matters as vital as basic nutrition there is no excuse for delay").

In light of the Allied–Signal factors, which tip in favor of remand without vacatur, and the troubling humanitarian consequences of the delays that remedy might invite, the Court will adopt an intermediate course: it will vacate DACA's rescission but stay its order of vacatur for 90 days. During that time, the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its

---

**29.** True, both preliminary injunctions are currently the subjects of expedited appeals. This fact actually favors vacatur, however, because if both injunctions are overturned, then this Court's order of vacatur would preserve DACA pending the Department's revised explanation for the program's rescission, thereby maintaining the status quo.

**30.** Nor would it be proper for the Court to vacate DACA's rescission except as to initial applications. While a court has discretion to craft preliminary injunctive relief based on a number of equitable factors, see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), its discretion in fashioning administrative remedies is somewhat more limited, see Harmon, 878 F.2d at 494–95 ("Courts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule . . . [or to] draw[ ] a line which the agency itself has never drawn."). Here, there is no principled basis to distinguish between initial DACA applications and renewal applications, since the Rescission Memo's substantive invalidity stems chiefly from its inadequately explained rationale. The Court therefore will not fashion an ad hoc order of vacatur along these lines.

entirety, and the original DACA program will be restored in full. This means, among other things, that the agency will be required to resume accepting initial DACA applications and applications for advanced parole.

## III. CONSTITUTIONAL CHALLENGES

The government has also moved under Rule 12(b)(6) to dismiss the three constitutional claims asserted in plaintiffs' complaints for failure to state a claim. See Princeton MTD 37–44; NAACP MTD 37–43. Two of these claims—one grounded in equal protection, see Pls.' Opp'n at 24–27, and the other in due process, id. at 27–32—are challenges to DACA's rescission itself. The third argues that the Department may not, consistent with applicable due process principles, use DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, and plaintiffs seek a preliminary injunction to that effect. Id. at 32–35.

In light of its decision to vacate DACA's rescission, the Court will defer ruling on the government's motion to dismiss plaintiffs' first two constitutional challenges. Because plaintiffs have failed to plausibly allege facts to support their information-sharing claim, however, that claim will be dismissed without prejudice.

### A.  Challenges to DACA's Rescission

As noted, plaintiffs' constitutional challenges to DACA's rescission proceed along two lines. First, plaintiffs argue that DACA's rescission violates the equal protection guarantee of the Fifth and Fourteenth Amendments, because it deprives undocumented aliens of certain benefits that remain available to aliens who are lawfully present in the United States. Pls.' Opp'n at 24–27 (citing Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); then Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ). Second, plaintiffs maintain that DACA's rescission deprives existing DACA beneficiaries of their liberty and property interests in renewing their DACA benefits without due process of law. Id. at 27–31.

The Court will defer ruling on the government's motions to dismiss these two constitutional claims. To begin with, because the Court has already concluded that DACA's rescission violates the APA, it is not necessary to address plaintiffs' constitutional claims now. See Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (noting that courts generally avoid deciding constitutional issues unnecessarily); Texas, 809 F.3d at 146 n.3 (declining to reach plaintiffs' constitutional challenges to DAPA and instead affirming only on APA grounds). Moreover, litigation over similar constitutional issues has either reached or progressed past the motion-to-dismiss stage in three other cases, see Regents, 2018 WL 401177, at *2–7; Batalla Vidal, 2018 WL 1532370, at *6–14; Casa de Maryland, 284 F.Supp.3d at 773–777, and the Court is especially reluctant unnecessarily to address constitutional issues that have already been thoroughly considered by other courts. Finally, the Department could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims.[31] At this stage of the proceedings, then, the Court will defer ruling on the government's motion to dismiss plaintiffs' constitutional challenges to DACA's rescission.

---

**31.** For example, the Department might provide for procedures through which an existing DACA recipient could contest the revocation of her DACA benefits—something that the current Rescission Memo does not do. Such procedures could, at least in theory, be relevant to plaintiffs' procedural due process claim.

## B. Information–Sharing Claim

Plaintiffs seek a preliminary injunction preventing DHS from sharing DACA beneficiaries' personal information with immigration enforcement authorities or otherwise using it for immigration enforcement purposes. See Princeton MSJ at 48–53; Pls.' Opp'n at 32–35. The government has moved to dismiss plaintiffs' information-sharing claim, arguing primarily that DHS had previously stated its intent not to use DACA beneficiaries' personal information in this way and that plaintiffs have not plausibly alleged that the agency has since changed its policy. See Princeton MTD at 41–42; Defs.' Reply at 36–37. The government also contends that even if the Department had changed its information-sharing policy, there would be no due-process violation, because that policy has always stated that it "may be modified, superseded, or rescinded at any time." Princeton MTD at 43 (citation omitted); Defs.' Reply at 37–39 (citation omitted).

[34] To secure preliminary injunctive relief, plaintiffs "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest." Winter, 555 U.S. at 20, 129 S.Ct. 365. Here, the third and fourth prongs of this test—the equities and the public interest—clearly favor plaintiffs, who allege that the Department intends to use DACA beneficiaries' identifying information against them despite its earlier assurances that it would not do so, which induced the beneficiaries to provide the information in the first place.

Plaintiffs have also demonstrated a likelihood of success on the merits—at least as to their legal theory. Plaintiffs rely on two cases, Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), and Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), for the general proposition that "[d]ue process forbids the Government from making and then breaking promises about the legal consequences of a specific action." Princeton MSJ at 48. In Raley, the Supreme Court found a due process violation where four individuals were convicted of failing to answer questions posed by Ohio's Un–American Activities Commission after the chairman of that commission had specifically represented to the individuals that they could refuse to answer pursuant to a state-law privilege. See 360 U.S. at 437–38, 79 S.Ct. 1257; see also id. at 438, 79 S.Ct. 1257 ("[T]o sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."). And in Cox, the Court, relying on Raley, held that it violated due process to convict demonstrators under a statute that prohibited demonstrating "near" a courthouse where "the highest police officials of the city . . . in effect told the demonstrators that they could meet where they did." 379 U.S. at 571, 85 S.Ct. 476; see also Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (recognizing a substantive due process right to enforce the terms of a plea agreement). This argument is sufficiently persuasive to support preliminary injunctive relief.

[35, 36] The sticking point here is the second prong—the likelihood of irreparable harm. Several factors convince the Court that the harm to DACA beneficiaries of having their information shared with immigration enforcement authorities, though likely irreparable, is insufficiently imminent to justify preliminary injunctive relief. League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016)

(harm is irreparable only if it is "so 'imminent that there is a clear and present need for equitable relief . . . .' " (alterations and citation omitted) ). For one thing, the Department has recently reaffirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." USCIS, DHS, Frequently Asked Questions: Rejected DACA Requests Q5, https://www.uscis.gov/daca2017/mail-faqs (last updated Feb. 14, 2018).[32] This fact was enough to persuade one other district court to dismiss a similar information-sharing claim. See Batalla Vidal, 2018 WL 1532370, at *10–11. On the other hand, two courts have reached the opposite conclusion, see Regents, 2018 WL 401177, at *4–5; Casa de Maryland, 284 F.Supp.3d at 777–79, and one of those courts has already granted the injunctive relief that plaintiffs seek here, see Amended Order, Casa de Maryland, No. 17–cv–2942 (D. Md. Mar. 15, 2018), ECF No. 49 (enjoining the Department from (1) using or sharing DACA beneficiaries' personal information except as originally specified on the DACA application forms and instructions and (2) changing its information-sharing policy without the Court's preapproval). But that injunction now in place further belies any suggestion that irreparable harm to DACA beneficiaries is imminent—their information cannot now be used as they fear. Hence, the Court concludes that plaintiffs have failed to demonstrate that they are entitled to preliminary injunctive relief on their information-sharing claim, and their motion for preliminary injunctive relief will be denied.

[37] The Court also concludes that plaintiffs have failed to state a claim. See Fed. R. Civ. P. 12(b)(6). Plaintiffs point to a discrepancy between a prior statement by the Department that DACA beneficiaries' information would be "protected from disclosure" and a later statement issued on the date of DACA's rescission that the information would not be "proactively" provided to immigration enforcement authorities. See Princeton Compl. ¶ 51. Even if this discrepancy were sufficient to plausibly allege that DACA beneficiaries' information has been or will be used inconsistently with DHS's stated information-sharing policy, the agency has since reaffirmed its commitment to that prior policy, and the Court may take judicial notice of that fact in ruling on the government's motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); Vasser v. McDonald, 228 F.Supp.3d 1, 10 (D.D.C. 2016) ("Courts may take judicial notice of matters of a general public nature without converting the motion to dismiss into one for summary judgment." (alterations and citation omitted) ).[33] Thus, the government's Rule 12(b)(6) motion will be granted as to plaintiffs' information-sharing claim.

---

**32.** This document does not appear in the administrative record, but the Court takes judicial notice of it. See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

**33.** For similar reasons, the Court will not address the argument made by amici Latino-Justice PRLDEF (and others) that DHS's breach of the information-sharing policy would violate the Privacy Act of 1974, 5 U.S.C. § 552a, and the agency's own privacy rules. See Br. of LatinoJustice PRLDEF, et al., as Amicus Curiae [ECF No. 36–2].

**NAACP v. TRUMP**   **249**
Cite as 298 F.Supp.3d 209 (D.D.C. 2018)

## CONCLUSION

Executive Branch officials possess relatively unconstrained authority to enforce the law against certain violators but not others. Ordinarily, the exercise of that authority is subject to review not in a court of law, but rather in the court of public opinion: members of the public know how their elected officials have used their enforcement powers, and they can hold those officials accountable by speaking out, by petitioning their representatives, or ultimately at the ballot box. When an official claims that the law requires her to exercise her enforcement authority in a certain way, however, she excuses herself from this accountability. Moreover, if her view of the law is incorrect, she may needlessly forego the opportunity to implement appropriate enforcement priorities and also to demonstrate those priorities to the public.

Fortunately, neither Supreme Court nor D.C. Circuit precedent compels such a result. Rather, the cases are clear that courts have the authority to review an agency's interpretation of the law if it is relied on to justify an enforcement policy, even when that interpretation concerns the lawful scope of the agency's enforcement discretion. See Chaney, 470 U.S. at 832–33, 105 S.Ct. 1649; OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–77. Under this rule, an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both.

Here, the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful. That legal judgment was virtually unexplained, however, and so it cannot support the agency's decision. And although the government suggests that DACA's rescission was also predicated on the Department's assessment of litigation risk, this consideration is insufficiently distinct from the agency's legal judgment to alter the reviewability analysis. It was also arbitrary and capricious in its own right, and thus likewise cannot support the agency's action. For these reasons, DACA's rescission was unlawful and must be set aside.

For the reasons given above, then, the Court will vacate the Department's September 5, 2017 decision to rescind the DACA program. The Court will stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful. The Court will also deny the government's motion to dismiss for lack of subject-matter jurisdiction, its motion to dismiss plaintiffs' APA claims on reviewability grounds, and its motion to dismiss plaintiffs' substantive APA claim; grant the government's motion to dismiss plaintiffs' procedural APA claim, the NAACP plaintiffs' RFA claim, and plaintiffs' information-sharing claim; and defer ruling on the government's motion to dismiss plaintiffs' remaining constitutional claims. Finally, the Court will also grant plaintiffs' motion for partial summary judgment as to their substantive APA claim, deny that motion as to their procedural APA claim, and deny their motion for preliminary injunctive relief on their information-sharing claim. A separate order has been issued on this date.



**758**        **284 FEDERAL SUPPLEMENT, 3d SERIES**

she was detained at Riverside. FAC ¶¶ 12, 18, 117. On breach, she alleges that he ignored her complaints of severe pain and swelling, denied or delayed her access to an orthopedic specialist, and failed to adequately document her treatment history and needs in Riverside records. FAC ¶ 120. Regarding causation and damages, she alleges that his inadequate care caused her unnecessary pain, an improperly healed wrist, and continuing pain and limited mobility. *See* FAC ¶ 120(i). Based on these allegations, I easily conclude that Plaintiff has stated a claim for medical malpractice against Dr. Cohen and is entitled to discovery.

<u>**ORDER**</u>

This 5th day of January, 2018, it is hereby **ORDERED** that the Motions to Dismiss filed by Defendants City of Philadelphia (ECF No. 7) and Dr. Jonathan Cohen (ECF No. 18) are **DENIED**, except that any claim by Plaintiff against the City of Philadelphia that is based on a theory of vicarious liability is **DISMISSED** with prejudice.



**CASA DE MARYLAND, et al., Plaintiffs**

v.

**U.S. DEPARTMENT OF HOMELAND SECURITY, et al., Defendants**

**Civil No. RWT–17–2942**

United States District Court, D. Maryland.

Signed March 5, 2018

**Background:** Special interest groups focused on aiding immigrants and their communities and participants in Deferred Action for Childhood Arrivals (DACA) program brought action against President, Attorney General, Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), Customs and Border Protection (CBP), and agency leaders alleging that proposed rescission of DACA program violated Administrative Procedure Act (APA) and Fifth Amendment. Government moved to dismiss or for summary judgment.

**Holdings:** The District Court, Roger W. Titus, J., held that:

(1) Illegal Immigration Reform and Immigrant Responsibility Act's (IIRIRA) exclusive jurisdiction provision did not bar suit;

(2) action presented justiciable controversy;

(3) groups had associational standing to bring action;

(4) DACA program and its rescission were not subject to Administrative Procedure Act's (APA) notice-and-comment requirements;

(5) DHS did not act arbitrarily or capriciously in deciding to wind down DACA program;

(6) DHS did not violate Fifth Amendment's equal protection component;

(7) DACA program did not create entitlement to any individual immigrant particular benefit protected by Due Process Clause;

(8) DHS did not violate program participants' substantive due process rights;

(9) DHS was not equitably estopped from winding down DACA program; and

(10) DHS was estopped from using information provided by participants for immigration enforcement.

Motion granted in part and denied in part.

**1. Constitutional Law ⬦2423**

Although Constitution reserves power to enact immigration policy to legislative branch, supervision of admission of aliens into United States may be entrusted by Congress to executive branch. U.S. Const. art. 1, § 8.

**2. Federal Courts ⬦2015**

Federal courts are courts of limited jurisdiction, and possess only that power authorized by Constitution and statute.

**3. Constitutional Law ⬦3841**

**Federal Courts ⬦2020**

Although Congress has authority to expand or limit federal district court jurisdiction by statute, federal courts possess inherent jurisdiction under Article III and fundamental principles of due process over certain cases relating to enforcement of Constitution that cannot be limited by Congress. U.S. Const. art. 3, § 1 et seq.; U.S. Const. Amend. 5.

**4. Constitutional Law ⬦2580**

Case may lack justiciability when it involves political question and implicates concerns regarding separation of powers between judiciary and another branch of government.

**5. Federal Courts ⬦2321**

While executive actions may often involve otherwise unreviewable political questions, federal courts always retain power to review matters of constitutional violations.

**6. Aliens, Immigration, and Citizenship ⬦155**

Illegal Immigration Reform and Immigrant Responsibility Act's (IIRIRA) exclusive jurisdiction provision, barring courts from hearing any cause or claim by or on behalf of any alien arising from decision or action by Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under Immigration and Nationality Act, except as provided, did not deprive federal district court of jurisdiction over action by participants in Deferred Action for Childhood Arrivals (DACA) program alleging that proposed rescission of program violated Administrative Procedure Act (APA) and Fifth Amendment. U.S. Const. Amend. 5; 5 U.S.C.A. § 701(a); Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**7. Aliens, Immigration, and Citizenship ⬦155**

Claim that procedures followed by Department of Homeland Security (DHS) in reaching decision to unwind Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, did not comply with Administrative Procedure Act (APA) presented justiciable controversy. 5 U.S.C.A. § 701 et seq.

**8. Federal Civil Procedure ⬦103.2, 103.3**

Direct standing exists for plaintiffs who have injury-in-fact that is traceable to defendants and is redressable through adjudication.

**9. Federal Civil Procedure ⬦103.4**

Injury required to establish standing must be more than generalized grievance, which is ideological objection or injury widely shared by all members of public.

**10. Associations ⬦20(1)**

Organizations have direct standing when government action has impaired organization's own legal rights.

**11. Associations ⬦20(1)**

Association standing exists for organizational plaintiffs when (1) its members would otherwise have standing to sue in their own right, (2) interests it seeks to protect are germane to organization's pur-

AR0590

pose, and (3) neither claim asserted nor relief requested requires participation of individual members in lawsuit.

**12. Associations** ⟜**20(1)**

Special interest groups focused on aiding immigrants and their communities had associational standing to bring action challenging Department of Homeland Security's (DHS) decision to unwind Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, where groups had been assisting their members with tens of thousands of DACA initial and renewal applications, groups identified number of their members who participated in DACA, and one of groups' purposes was to assist immigrants in complying with immigration procedures.

**13. Aliens, Immigration, and Citizenship** ⟜**155**

Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, and its rescission were akin to non-binding policy statements, and thus were not subject to Administrative Procedure Act's (APA) notice-and-comment requirements; DACA program was deferral of action, and its rescission was not immediately binding, but rather statement of intended policy.  5 U.S.C.A. § 553.

**14. Aliens, Immigration, and Citizenship** ⟜**154**

Department of Homeland Security (DHS) did not act arbitrarily or capriciously in deciding to wind down Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, where

Attorney General informed DHS that DACA was likely unlawful and subject to imminent litigation, and acting secretary of DHS opted for six-month wind-down period instead of chaotic possibility of immediate termination.  5 U.S.C.A. § 706(2).

**15. Constitutional Law** ⟜**3043**

In reviewing legislation that creates disparate impacts as applied under Fifth Amendment's equal protection component, courts review whether action is covertly based on suspect classification or if it can be plausibly explained on neutral grounds, taking into consideration history of hostility towards group, sequence of events leading to government action, departures from previous policies, and legislative history. U.S. Const. Amend. 5.

**16. Aliens, Immigration, and Citizenship** ⟜**154**

**Constitutional Law** ⟜**3112**

Department of Homeland Security's (DHS) decision to wind down Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, did not violate Fifth Amendment's equal protection component, despite program participants' contention that decision had discriminatory impact and was motivated by President's discriminatory animus, where decision to rescind program was premised on legitimate belief that DACA was unlawful and should be wound down in orderly manner, while giving Congress window to act and adopt appropriate legislative solution.  U.S. Const. Amend. 5.

**17. Constitutional Law** ⟜**3867**

Procedural due process ensures that government must satisfy certain procedures prior to depriving person of his or her rights.  U.S. Const. Amend. 5.

**18. Constitutional Law** ⚐3867

Procedural due process applies whenever government seeks to deprive person of liberty or property interest. U.S. Const. Amend. 5.

**19. Constitutional Law** ⚐3873

Liberty interests protected by Due Process Clause include physical restraint, substantial infringement of fundamental right, harm to one's reputation affecting another tangible interest, or unjustified intrusion of one's personal security. U.S. Const. Amend. 5.

**20. Constitutional Law** ⚐3874(1)

Property interests protected by Due Process Clause include real property, personal property, intellectual property, or any legitimate claim of entitlement. U.S. Const. Amend. 5.

**21. Constitutional Law** ⚐3912

In determining amount of process owed prior to deprivation of protected right, courts balance (1) importance of right that individual is trying to preserve, (2) risk of erroneous deprivation of that right given existing level of due process, and (3) level of governmental burden for additional levels of due process sought. U.S. Const. Amend. 5.

**22. Constitutional Law** ⚐3867

Procedural due process only applies to individualized deprivations, not policy-based deprivations for entire class. U.S. Const. Amend. 5.

**23. Aliens, Immigration, and Citizenship** ⚐154

**Constitutional Law** ⚐4438

Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, did not create entitlement to any individual immigrant particular benefit protected by Due Process Clause, and thus Department of Homeland Security's (DHS) decision to wind down DACA program did not violate program participants' procedural due process rights. U.S. Const. Amend. 5.

**24. Constitutional Law** ⚐3867, 3893

While procedural due process outlines manner by which government may deprive person of his or her rights, substantive due process bars government from depriving person of right altogether. U.S. Const. Amend. 5.

**25. Constitutional Law** ⚐3895, 3901

In reviewing substantive due process claim, if right being deprived is fundamental right, courts apply strict scrutiny; if right being deprived is not fundamental, courts apply rational basis. U.S. Const. Amend. 5.

**26. Constitutional Law** ⚐3896

For denial of fundamental fairness to rise to level of substantive due process violation, it must be so egregious and so outrageous as to shock contemporary conscience. U.S. Const. Amend. 5.

**27. Aliens, Immigration, and Citizenship** ⚐154

**Constitutional Law** ⚐4438

Department of Homeland Security's (DHS) decision to wind down Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, did not shock contemporary conscience, and thus did not violate program participants' substantive due process rights, despite participants' allegation of discriminatory intent in DACA's rescission, where, absent congressional action, benefits given by DACA were in potential violation of congressional immigration laws, and only thing that had changed was that their deferred status

**762**          **284 FEDERAL SUPPLEMENT, 3d SERIES**

would expire, and enforcement of immigration laws might recommence in absence of action by Congress.   U.S. Const. Amend. 5.

### 28. Estoppel ⟰52.15

In general, equitable estoppel is comprised of three basic elements: (1) voluntary misrepresentation of one party, (2) that is relied on by other party, (3) to other party's detriment.

### 29. Aliens, Immigration, and Citizenship ⟰153

Department of Homeland Security (DHS) was not equitably estopped from winding down Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation; DACA was promulgated with express disclaimer that it was not conferring any rights, nothing in DACA Memo or in DACA's implementation suggested that program was permanent, and individuals in program were aware that their protections were subject to renewal every two years.

### 30. Aliens, Immigration, and Citizenship ⟰142, 369

Department of Homeland Security (DHS) was estopped from using for immigration enforcement information provided by participants in its Deferred Action for Childhood Arrivals (DACA) program, which permitted certain otherwise removable aliens who had entered United States as children to remain in United States without fear of deportation, where government induced participants to share their personal information under guise of immigration protections, and government was unable to provide any assurance that it would not make changes in its information-sharing policy.

Dennis A. Corkery, Matthew Keith Handley, Washington Lawyers Cmte for Civil Rights and Urban Affairs, John Arak Freedman, Nancy Perkins, Ronald A. Schechter, Arnold and Porter Kaye Scholer LLP, Ajmel Quereshi, NAACP Legal Defense Fund, Elizabeth J. Bower, Kevin B. Clark, Priya R. Aiyar, Willkie Farr and Gallagher LLP, Washington, DC, for Plaintiffs.

Brett Shumate, Kathryn C. Davis, Rachael Westmoreland, US DOJ, Washington, DC, for Defendants.

### MEMORANDUM OPINION

ROGER W. TITUS, UNITED STATES DISTRICT JUDGE

On October 5, 2017, Plaintiffs filed a Complaint seeking to enjoin rescission of a program known as Deferred Action for Childhood Arrivals ("DACA"), asserting a variety of claims as to why the rescission was unlawful. *See* ECF No. 1. Plaintiffs are a number of individual participants in that program known as "Dreamers," as well as a series of special interest organizations that deal with immigration policy issues and work directly with immigrants in the community. *Id.* at 11–21. Defendants are President Donald Trump, Attorney General Jeff Sessions, and a series of government agencies—the Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP")—as well as each agency's acting leader (secretary, director, or commissioner). Defendants collectively will be referred to as the "Government." Each individual defendant is being sued in his or her official capacity. *Id.* at 21–22.

Plaintiffs' Complaint alleges a number of causes of action—both administrative and constitutional—which they believe are proper grounds for relief. Plaintiffs assert

that rescission of the DACA program was unlawful under the Administrative Procedure Act ("APA") both (1) as an arbitrary and capricious decision and (2) for failure to follow notice-and-comment procedures. *Id.* at 54–58. Plaintiffs further allege that the DACA rescission was a violation of the Fifth Amendment on the grounds of procedural due process, substantive due process, and equal protection. *Id.* at 49–54. Plaintiffs seek injunctive relief on the basis of equitable estoppel both as to the DACA rescission itself and its information sharing policy. *Id.* at 58–59. Lastly, Plaintiffs seek declaratory relief that the DACA program is lawful. *Id.* at 59–60.

On November 1, 2017, the Court held an in-person status conference in order to resolve the scheduling and logistical issues of this case. ECF No. 19. Thereafter on November 15, 2017, the Government filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 27. On November 28, 2017, Plaintiffs responded in opposition, ECF No. 29, and on December 5, 2017, the Government replied in support of its Motion, ECF No. 30. The Court issued an Order on December 11, 2017 giving notice to the parties in accordance with Rule 56(f) that it may grant summary judgment for the non-moving party. *See* ECF No. 31. On December 15, 2017, the Court held a hearing on the Motion. ECF No. 34.

## I.  BACKGROUND

### *"Can we all get along?"—Rodney King* [1]

In recent years, many Americans have found themselves sharing Mr. King's sentiment. This Court previously noted, albeit in the context of congressional gerryman-

dering, that "[n]ever before has the United States seen such deep political divisions as exist today, and while the courts are struggling in their efforts to find a standard [for the adjudication of gerrymandering claims], the fires of excessive partisanship are burning and our national government is encountering deadlock as never before." *Fletcher v. Lamone*, 831 F.Supp.2d 887, 905 (D. Md. 2011) (Titus, J., concurring), *aff'd*, 567 U.S. 930, 133 S.Ct. 29, 183 L.Ed.2d 671 (2012). Unfortunately, that 2011 observation still holds true today—perhaps even more so.

This case is yet another example of the damaging fallout that results from excessive political partisanship. The highly politicized debate surrounding the DACA program has thus far produced only rancor and accusations. During the recent debate over the rescission of DACA, the program even turned into a bargaining chip that resulted in a brief shutdown of the entire federal government earlier this year.[2] In order to adequately resolve the legal issues of this case, it is important to step back from the heated rhetoric and understand the context under which DACA was promulgated and rescinded.

### *The Dream Act—a Lengthy History of Failed Legislation*

[1]  The Constitution reserves the power to enact immigration policy to the legislative branch. U.S. Const. art. I, § 8 ("[T]o establish a uniform rule of naturalization"). However, the "supervision of the admission of aliens into the United States may be intrusted by [C]ongress" to the executive branch. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). For over a decade at

---

**1.**  *See* Richard A. Serrano, *Rodney King: 'Truth will come out'*, L.A. Times (May 2, 1992), http://www.latimes.com/local/california/la-me-king-case-aftermath-city-in-crisis-19920502-story.html.

**2.**  *See* Gregory Krieg, *The DACA shutdown is over. Now What?*, CNN (Jan. 22, 2018), https://www.cnn.com/2018/01/22/politics/shutdown-immigration-daca-outcomes/index.html.

the start of the 21st century, Congress quarreled over policies regarding illegal aliens who entered the country as children, and who may have no memory or connection with their country of origin. Would the world's beacon of freedom—a nation founded by immigrants—cast out an immigrant population that was likely brought here without choice and who likely now knows no other home? While "no" would seem to be the obvious answer, ordinary logic has eluded our Congress.

"Dreamers" are neither constitutionally nor statutorily defined. Rather, the concept of protection for "Dreamers" arises from repeated congressional failures to act, and presidential action taken in their wake. A series of congressional sessions marked by bitter strife and inaction left the country without any protections for persons brought here illegally as children. The first attempt at a Development, Relief, and Education for Alien Minors ("DREAM") Act came in 2001, and although it took on many names in subsequent years, the repeated attempts to pass this legislation were filibustered, abandoned, or defeated on the floor.[3] As illustrated by the frequency of bills proposed, Dreamer legislation reached its zenith during late 2010 in the 111th Session of Congress. On December 8, 2010, the House of Representatives actually passed the DREAM Act.[4] However, like all other iterations of this controversial legislation, its fate was doomed—this time, less than two weeks later on the Senate floor.[5]

### DACA—an Act of Desperation Born of Frustration with a Paralyzed Congress

President Obama's administration, faced with the reality that Congress could do little more than squabble regarding the Dreamers, decided to take action on its own. On June 15, 2012, then-Secretary of Homeland Security, Janet Napolitano, issued a memorandum promulgating by executive action what is now known as DACA ("DACA Memo").[6] DACA protections were afforded to the same class of immigrants foreseen by the various failed iterations of Dreamer legislation. The primary qualifications for DACA protections were that an individual must (1) have come to the U.S. before the age of sixteen, (2) meet various education or military service requirements, (3) not have a criminal record, and (4) register prior to the age of thirty.[7]

DACA was issued under a theory of "prosecutorial discretion" and "deferred

---

**3.**  *See* Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H.R. 1582, 107th Cong. (2001); Student Adjustment Act of 2001, H.R. 1918, 107th Cong. (2001); DREAM Act, S. 1291, 107th Cong. (2002); DREAM Act, S. 1545, 108th Cong. (2003); DREAM Act of 2005, S. 2075, 109th Cong. (2005); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (2006); American Dream Act, H.R. 5131, 109th Cong. (2006); DREAM Act, S. 2205, 110th Cong. (2007); Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong. (2007); DREAM Act of 2009, S. 729, 111th Cong. (2009); DREAM Act of 2010, S. 3827, 111th Cong. (2010); DREAM Act of 2010, S. 3962, 111th Cong. (2010); DREAM Act of 2010, S. 3963, 111th Cong. (2010); DREAM Act of 2010, S. 3992, 111th Cong. (2010); DREAM Act of 2010, H.R. 6497, 111th Cong.

(2010); DREAM Act of 2011, S. 952, 112th Cong. (2011).

**4.**  *See* John Brandt, *House Passes DREAM Act Immigration Measures,* Fox News (Dec. 8, 2010), http://www.foxnews.com/politics/2010/12/08/house-passes-dream-act-immigration-measures.html.

**5.**  *See DREAM* Act *Goes Down in Flames in Senate,* Fox News (Dec. 18, 2010), http://www.foxnews.com/politics/2010/12/18/senate-tries-pass-dream-act.html.

**6.**  Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

**7.**  *See id.*

action" and essentially permitted otherwise illegal aliens to remain in the United States without fear of deportation.[8] While some heralded DACA as a victory, others decried it as executive overreach—usurping the powers of Congress to promulgate immigration policy.[9] Over the course of the next five years, approximately 800,000 Dreamers registered for DACA protections.

### Phase II: DAPA

Soon thereafter, the executive branch sought to expand its use of deferred action beyond the Dreamers. On November 20, 2014, then-Secretary of Homeland Security, Jeh Charles Johnson, issued a pair of memoranda in an attempt to promulgate what is now known as Deferred Action for Parents of Americans ("DAPA"), as well as a series of minor expansions for DACA.[10]

Less than a month later, DAPA was met with a legal challenge when Texas and twenty-five other states sued to enjoin implementation of the program. *See generally Texas v. United States*, 86 F.Supp.3d 591 (S.D. Tex. 2015). In that case, DAPA was struck down by the district court, *see id.*, and a divided Fifth Circuit panel affirmed the decision, *see* 809 F.3d 134 (5th Cir. 2015). In June 2016, an equally divided Supreme Court affirmed the decision. *See United States v. Texas*, ––– U.S. –––, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016). In addition to finding DAPA and

the expansions of DACA unlawful, the judicial decisions throughout the DAPA litigation illustrate two key realities: (1) challenges to DAPA or analogous immigration programs promulgated by DHS without approval by Congress are justiciable; and (2) reasonable legal minds may differ regarding their lawfulness.

Aside from the classes of immigrants to which each applies, DACA and DAPA are largely similar programs addressing different classes or subcategories of immigrants. While DACA affects a population of approximately 800,000 otherwise illegal aliens, DAPA would have affected nearly half of the 11,000,000 immigrants currently in the United States unlawfully. *See Texas v. United States*, 787 F.3d 733, 745 (5th Cir. 2015). DAPA was challenged and defeated before the program was ever successfully promulgated, while DACA has run for approximately half of a decade before the threat of any litigation.

### A Change in Administration and a Corresponding Change in Immigration Philosophy

The 2016 presidential election brought a change in leadership of the executive branch and, with it, significant changes in immigration views and philosophies.[11] In June of 2017, and with the defeat of DAPA directly in the rear-view mirror, Texas and other state plaintiffs sent a letter threatening to challenge DACA if it were not rescinded by September 6, 2017.[12] Attorney

---

**8.** *See id.*

**9.** *See Obama suspends deportation for thousands of illegals, tells GOP to pass DREAM Act*, Fox News (June 15, 2012), http://www.foxnews.com/politics/2012/06/15/obama-administration-to-offer-immunity-to-younger-immigrants.html.

**10.** Memorandum from U.S. Dep't of Homeland Sec., Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014); Memorandum from U.S. Dep't of Homeland Sec., Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014).

**11.** *See, e.g.*, Tessa Berenson, *Middle Schoolers in Michigan Chant 'Build That Wall' After Trump Victory*, TIME (Nov. 11, 2016), http://time.com/4567812/donald-trump-middle-school-build-wall/.

**12.** *See* Admin. R., ECF No. 26–1 at 238–40.

General Jeff Sessions advised the Acting Secretary of Homeland Security, Elaine Duke, that DACA was likely unlawful and headed for another legal battle.[13] On September 5, 2017, Acting Secretary Duke issued a memorandum ("DACA Rescission Memo") outlining a six-month wind down of DACA to expire March 5, 2018.[14]

According to the Administrative Record, the basis for the decision to rescind DACA was its presumed unlawfulness in the wake of the DAPA litigation and the threat of imminent legal challenge. The agency's reasoning is substantiated by the legal advice of the Attorney General and the fact that the memorandum was issued the day before the state parties had threatened to act. A six-month wind down period was provided to avoid the potential for chaos if a court decision resulted in immediate termination, and the President urged Congress to pass Dreamer-protection legislation.[15]

Complicating the picture for some observers is the unfortunate and often inflammatory rhetoric used by President Trump during the campaign, as well as his Twitter pronouncements, both before and after his election. Thoughtful and careful judicial review is not aided when the President lobs verbal hand grenades at the

federal courts, the Department of Justice, and anyone else with whom he disagrees.

As disheartening or inappropriate as the President's occasionally disparaging remarks may be, they are not relevant to the larger issues governing the DACA rescission. The DACA Rescission Memo is clear as to its purpose and reasoning, and its decision is rationally supported by the Administrative Record. *See generally Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ("[W]hen the Executive exercises [a congressionally delegated power of immigration policies and rules for the exclusion of aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion."); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) ("We have not heretofore, in evaluating the legality of executive action, deferred to comments made by such officials to the media.").[16]

The executive branch may have the authority to exercise or not exercise prosecutorial discretion as it sees fit, and an agency certainly may refrain from action it reasonably believes to be unlawful. Under the Constitution, it is the responsibility of

---

13. *See* Admin. R., ECF No. 26–1 at 251.

14. Memorandum from U.S. Dep't of Homeland Sec., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

15. *See* Michael D. Shear & Julie Hirschfeld Davis, *Trump Moves to End DACA and Calls on Congress to Act*, N.Y. Times (Sept. 5, 2017), https://www.nytimes.com/2017/09/05/us/politics/trump-daca-dreamers-immigration.html.

16. *See also Washington v. Trump*, 858 F.3d 1168, 1174 (9th Cir. 2017) (Kozinski, J., dissenting):

Even if a politician's past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result—namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all ("just kidding!") and try again? Or would we also need a court to police the sincerity of that mea culpa—piercing into the public official's "heart of hearts" to divine whether he really changed his mind, just as the Supreme Court has warned us not to? *See McCreary*, 545 U.S. at 862, 125 S.Ct. 2722.

Congress to determine immigration policy, and the executive branch must only act within its constitutional and delegated legislative authority. Although Congress has repeatedly failed to pass Dreamer legislation in the past, the ball is again in its court. And with 87 percent of Americans favoring some sort of DACA-esque protections, the elected members of Congress should understandably feel the pressure now that the President has deferred to them—in short, Congress needs to get the job done now that their authority has been recognized by court decisions and the President.[17]

### Other DACA Litigation

Various plaintiffs have filed lawsuits seeking to enjoin the DACA rescission throughout the country—specifically in this Court, the Eastern District of New York, the Northern District of California, and the District of the District of Columbia. These cases are at various stages, but preliminary injunctions have already been granted by the Eastern District of New York and the Northern District of California.[18] With regard to the California case, the Government attempted to bypass the Ninth Circuit and directly petitioned the Supreme Court for a writ of certiorari before judgment.[19] On February 26, 2018, the Supreme Court denied the petition without prejudice, and noted that "[i]t is assumed that the Court of Appeals [for the Ninth Circuit] will proceed expeditiously to decide this case." [20]

All courts reviewing the DACA rescission would benefit from a prior generation's wisdom regarding the separation of powers: "A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, to 'take Care that the Laws be faithfully executed.'" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 709, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).[21]

The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious. Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a reasoned

---

**17.** *See* Jennifer De Pinto, Fred Backus, Kabir Khanna & Anthony Salvanto, *Most Americans support DACA, but oppose border wall*, CBS News (Jan. 20, 2018), https://www.cbsnews.com/news/most-americans-support-daca-but-oppose-border-wall-cbs-news-poll/.

**18.** *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F.Supp.3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, No. CV 16-4756 NGG JO, 279 F.Supp.3d 401 (E.D.N.Y. 2018).

**19.** *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F.Supp.3d 1011 (N.D. Cal. 2018), *petition for cert. before judgment filed*, 2018 WL 509822 (U.S. Jan 18, 2018) (No. 17–1003).

**20.** Docket, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 17–1003, ——

U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2018 WL 1037642 (U.S. Feb. 26, 2018).

**21.** Or, more directly, as Judge Niemeyer notes in his recent dissent in the "travel ban" case.

> The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues. But public respect for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives.

*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 376–77, 2018 WL 894413, at *104 (4th Cir. 2018) (Niemeyer, J., dissenting).

decision to rescind DACA based on the Administrative Record. Any alternative inquiry would impermissibly require a court to "substitute its judgment for that of the agency." *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

## II. STANDARD OF REVIEW

**Motion to Dismiss.** The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Supreme Court has further articulated the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3, 127 S.Ct. 1955. To survive a motion to dismiss, a complaint must put forth "plausible claim[s] for relief." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 (quoting Fed. R. Civ. P. 8(a)(2) ).

**Motion for Summary Judgment.** Summary judgment is proper under Fed. R. Civ. P. Rule 56(a) if there is no genuine dispute over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party. *Id.* When considering a summary judgment motion, the court has "an affirmative obligation ... to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548). Thus, the court may only rely on facts supported in the record, not assertions made in the pleading. *Id.* Moreover, the court must view all facts and make all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must present more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact that would preclude summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. ANALYSIS

### a. Justiciability

[2, 3] "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Congress has the authority to expand or limit federal district court jurisdiction by statute. However, federal courts possess an inherent jurisdiction (under Article III and the fundamental principles of due process) over certain cases relating to the enforce-

ment of the Constitution that cannot be limited by Congress. *See, e.g., Webster v. Doe*, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (permitting federal district court jurisdiction when necessary "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.").

[4, 5] The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."

U.S. Const. art. III, § 2. However, federal courts may only review "cases and controversies" if they are justiciable. *See generally Flast v. Cohen*, 392 U.S. 83, 94–99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (discussing the doctrine of justiciability as "a blend of constitutional requirements and policy considerations"). A case may lack justiciability when it involves a political question and implicates concerns regarding the separation of powers between the judiciary and one of the other branches of government. *See, e.g., Baker v. Carr*, 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed . . . is a responsibility of this Court as ultimate interpreter of the Constitution."). While executive actions may often involve otherwise unreviewable political questions, federal courts always retain the power to review matters of constitutional violations. *See id.* Accordingly, the Court need not reach back to *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803), to support the conclusion that

Plaintiffs' constitutional claims are justiciable.

Turning to Plaintiffs' remaining claims, the Court is required to determine if judicial review has been limited by Congress under the APA. The plain language of the APA—specifically, 5 U.S.C. §§ 701, 702—indicates a presumption for judicial review, at least to the procedures surrounding agency decision-making (but not necessarily to the substance of those decisions). *See generally Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (restating "the basic presumption of judicial review" for APA claims "so long as no statute precludes such relief or the action is not one committed by law to agency discretion").[22] Under 5 U.S.C. § 701(a), the only two exceptions are when: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

The Government argues both exceptions—that 8 U.S.C. § 1252(g) precludes judicial review, and that the DACA rescission is "committed to agency discretion" because it is a matter of prosecutorial discretion, *see United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), immigration enforcement, *see Arizona v. United States*, 567 U.S. 387, 396–97, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), and deferred action generally, *see Reno v. Am.–Arab Anti–Discrimination Comm. (AADC)*, 525 U.S. 471, 485, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). *See* ECF No. 27–1 at 29–30.

[6] However, the notion that 8 U.S.C. § 1252(g) precludes judicial review has been rejected repeatedly. *See, e.g., AADC*, 525 U.S. at 482, 119 S.Ct. 936 (explicitly

---

**22.** *abrogated on other grounds by statute*, Pub. L. 94–574, 90 Stat. 2721, *as recognized in Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (finding the statutory amendment to "eliminate the require-

ment of a specified amount in controversy as a prerequisite to the maintenance of any (§ 1331) action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity").

rejecting that § 1252(g) serves as a zipper clause that functions to prohibit all judicial review). Furthermore, while DHS possesses specified delegated authority over immigration enforcement, Congress never explicitly granted DHS a blanket authority to disparately enforce policies.

[7]   Plaintiffs' APA claims are justiciable because they relate to *the procedures* followed by DHS—not to *the substance* of its policy or its decision of a specific case. The Court may review whether the repeal of DACA followed the correct APA procedures. Furthermore, it is important to note that the Government's explanation for rescinding DACA was the Secretary's belief that the program was unlawful and would face lengthy legal challenges. The similarities between DACA and DAPA support justiciability in this case because review of DAPA was also found to be justiciable. *See Texas v. United States*, 809 F.3d 134, 155–64 (5th Cir. 2015) ("Congress has expressly limited or precluded judicial review of many immigration decisions . . . but DAPA is not one of them."), *aff'd*, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016).[23]

Accordingly, the Court finds all claims in Plaintiffs' Complaint are justiciable.

### b.   Standing

[8–11]   Direct standing exists for plaintiffs who have an injury-in-fact that is traceable to the defendants and which is redressable through adjudication. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury must be more than a generalized grievance, which is an ideological objection or an injury widely shared by all members of the public. *See id.* at 575, 112 S.Ct. 2130. Organizations have direct standing when government action has impaired the organization's own legal rights. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (U.S. 1977). However, association standing also exists for organizational plaintiffs when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the purpose of the organization, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See id.* at 343, 97 S.Ct. 2434.

The Government does not contest the standing of the individual plaintiffs. How-

---

**23.**   *See also Texas v. United States,* 809 F.3d 134, 165–170 (5th Cir. 2015), *aff'd*, —— U.S. ——, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016).

Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens in a way that imposes substantial costs on states that have relied on the protections conferred by § 1621 . . . .

[*Heckler v.*] *Chaney* [470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ]'s presumption against judicial review of agency inaction [exists] because there are no meaningful standards against which to judge the agency's exercise of discretion. But where there is affirmative agency action—as with DAPA's issuance of lawful presence and employment authorization—and in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization, the ac-

tion at least can be reviewed to determine whether the agency exceeded its statutory powers . . . .

At its core, this case is about the Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis. The states properly maintain that DAPA's grant of lawful presence and accompanying eligibility for benefits is a substantive rule that must go through notice and comment, before it imposes substantial costs on them, and that DAPA is substantively contrary to law. The federal courts are fully capable of adjudicating those disputes. Because the interests that Texas seeks to protect are within the INA's zone of interests, and judicial review is available, we address whether Texas has established a substantial likelihood of success on its claim that DAPA must be submitted for notice and comment.

ever, it argues that the organizational plaintiffs lack direct standing because they are not "the object of any government policy" and are merely seeking to "vindicate their own value preferences." *See* ECF No. 27–1 at 38–39 (equating the organizational plaintiffs' injury to a mere "generalized grievance"). The Government also argues that the organizational plaintiffs lack representational standing for failing to identify members of their organizations who are directly harmed by the repeal of DACA, *see id.* at 41–42, or reside within DACA's zone-of-interests, *see id.* at 42 (citing *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395–96, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ).

[12] The Government's challenges to the standing of the organizational plaintiffs miss the mark. Casa De Maryland and the rest of the organizational plaintiffs are special interest groups directly focused on aiding immigrants and their communities. The fact that one of their primary functions has been assisting their members with "tens of thousands of DACA initial and renewal applications" is sufficient for standing in and of itself. *See* ECF No. 29 at 33. In addition to direct standing, the organizational plaintiffs possess association standing. Each organization has identified a number of its members who are Dreamers, and who unquestionably would have standing in this case. Furthermore, the purpose of these organizations is to aid and represent immigrants in their communities, including compliance with immigration procedures. Therefore, the rescission of DACA has an absolute nexus to the organizations' purpose. Additionally, the relief sought is injunctive and declaratory relief—not damages or any other remedy requiring the individual Dreamers. Hence, these organizational plaintiffs are the prototypical examples of possessing association standing.

Accordingly, the Court finds all Plaintiffs have standing in the instant case.

## c. *APA Claims*

Rulemaking is a common method federal agencies use to promulgate decisions. *See generally Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385, 28 S.Ct. 708, 52 L.Ed. 1103 (1908). Informal rulemaking is standardized under the APA and requires notice-and-comment procedures. *See* 5 U.S.C. § 553; *e.g.*, *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 253 (2d Cir. 1977). Informal rulemaking does not include non-legislative rulemaking, such as procedural rules, interpretive rules, or policy statements. *See* 5 U.S.C. § 553(b); *e.g.*, *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1324–25 (D.C. Cir. 1988).

After the notice-and-comment requirements, if applicable, have been met, courts must take a hard look at whether the decision to promulgate or repeal a rule is "arbitrary or capricious"—which is to say that there must be a rational correlation between the facts reviewed and the decision made. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (explaining that an agency must examine relevant data, articulate a satisfactory explanation contemporaneously with its decision, using rationale that comes from the agency (and not from a court inferring after the fact logic that is not explicitly stated in the record) ). *See id.* However, even when notice-and-comment requirements do not apply, agency decisions are subject to judicial review under 5 U.S.C. § 706. By statute, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**[13]**  The DACA program is a deferral of action, which by definition is an exercise of discretion rather than a rule with the force of law. Furthermore, the DACA Rescission Memo was not immediately binding, but rather a statement of intended policy beginning March 5, 2018. To the extent that Plaintiffs aver that, in practice, immigration reviews absent DACA protections lack individualized discretion, their dispute is merely with how the agency applies its policy, and not with the policy itself.[24] Although a substantial paradigm shift, the DACA Rescission Memo neither curtails DHS's discretion regarding individual immigration reviews, nor does it prevent the agency from granting Dreamers deferred action status again in the future. Hence, DACA and its rescission are more akin to non-binding policy statements, and thus not subject to notice-and-comment requirements.

Plaintiffs argue that the decision to rescind DACA must be arbitrary and capricious because the Administrative Record is "insufficient" to make a decision of such magnitude. *See* ECF No. 29 at 35–39 (noting that the Administrative Record is only 256 pages long—192 of which are court opinions related to DAPA); *see also In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017) ("The notion that the head of a United States agency would decide to terminate a program giving legal protection to roughly 800,000 people based on 256 pages of publicly available documents is not credible.").

**[14]**  However, based on the historical and political context outlined in the introductory pages of this Opinion, the decision to rescind DACA was neither arbitrary

nor capricious, but rather was a carefully crafted decision supported by the Administrative Record. It is well established that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Therefore, it is irrelevant whether this Court, a judge in California or New York, or even a justice on the Supreme Court might have made a different decision while standing in the shoes of DHS on September 5, 2017. Rather, the relevant inquiry is whether the decision was made with a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotations omitted).

DHS's rationale provided in the DACA Rescission Memo was a belief, based on recent court decisions and the advice of the Attorney General, that DACA was unlawful. Assuming that a reasonable basis for that belief exists in the Administrative Record, how could trying to avoid unlawful action possibly be arbitrary and capricious? Quite simply, it cannot. Regardless of whether DACA is, in fact, lawful or unlawful, the belief that it was unlawful and subject to serious legal challenge is completely rational.

DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself. The same plaintiffs who defeated DAPA threatened to challenge DACA imminently. The Attorney General of the United States—the nation's chief legal officer—provided legal advice that DACA was likewise unlawful and likely ill-

---

**24.**  Plaintiffs' APA claim regarding DACA's information sharing policy also lacks merit. Nothing in the DACA Rescission Memo outlines any change—let alone implements a substantive rule—with regard to the use of any individual's information gathered during DACA's implementation.

fated against a legal challenge. All of this is in the Administrative Record—the remnants of the DAPA litigation,[25] the threatened legal challenge,[26] and the Attorney General's advisory letter.[27]

Therefore, what did the Acting Secretary of DHS do? She opted for a six-month wind-down period instead of the chaotic possibility of an immediate termination, which would come at a time known only to the judge resolving a future challenge to the DACA program. This decision took control of a pell-mell situation and provided Congress—the branch of government charged with determining immigration policy—an opportunity to remedy it. Given the reasonable belief that DACA was unlawful, the decision to wind down DACA in an orderly manner was rational.

Accordingly, the Court finds Plaintiffs' APA claims to lack merit; the rescission of DACA neither required notice-and-comment procedures, nor was it decided arbitrarily or capriciously.

#### d. Equal Protection

[15] Equal protection is the legal mechanism by which the law prevents disparate treatment between groups. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A violative statute or action may provide for disparate treatment facially or in its application. *See id.* at 447–48, 105 S.Ct. 3249. In reviewing legislation, which creates disparate impacts 'as applied,' courts review whether the action is covertly based on a suspect classification or if it can be plausibly explained on neutral grounds. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Probative considerations include a history of hostility towards the group, the

sequence of events leading to the government action, departures from previous policies, and the legislative history. *See id.* at 265–67, 97 S.Ct. 555. The level of judicial scrutiny depends on the nature of the class targeted for disparate treatment.

The Complaint asserts that strict scrutiny should apply because the disparate treatment allegedly involves suspect classes—race, alienage, and national origin. *See, e.g., Ambach v. Norwick*, 441 U.S. 68, 84, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (finding alienage as a suspect class). When strict scrutiny applies, the government has the burden to demonstrate a compelling state interest, for which the governmental action is narrowly tailored and the least restrictive means. *See, e.g., Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013).

The Government's equal protection argument analogizes the rescission of DACA to "selective prosecution"—which is afforded a presumption of non-discriminatory motives absent "clear evidence to the contrary." *See* ECF No. 27–1 at 58–61 (citing *United States v. Armstrong*, 517 U.S. 456, 463–68, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) where the court denied discovery on a selective prosecution claim regarding 24 drug-trafficking offenses (all of which were against African–American defendants) ). Plaintiffs correctly note that the *Armstrong* court accepted the proposition that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480 (1996). Plaintiffs aver that the DACA rescission was "a discriminatory policy decision (not a challenge to a particular prosecution) that has a discriminatory impact and was motivated by dis-

---

**25.** *See* Admin. R., ECF No. 26–1 at 42–228.

**26.** *See* Admin. R., ECF No. 26–1 at 238–40.

**27.** *See* Admin. R., ECF No. 26–1 at 251.

criminatory animus." *See* ECF No. 29 at 55 (noting that Hispanics comprise 93 percent of the 800,000 immigrants affected by DACA). To substantiate their claim, Plaintiffs cite to some of President Trump's unfortunate, less-than-politically-correct, statements. *See* ECF No. 29 at 54.

**[16]** Both sides miss the mark. While DACA was promulgated under a theory of prosecutorial discretion, its rescission was not based on an exercise of that discretion. Rather, its rescission was premised on a legitimate belief that DACA was unlawful and should be wound down in an orderly manner, while giving Congress a window to act and adopt an appropriate legislative solution. The Administrative Record—the basis from which the Court must make its judicial review—does not support the notion that it was targeting a subset of the immigrant population, and it does not support any supposition that the decision was derived on a racial animus. That is where the judicial inquiry should end.

The Court rejects Plaintiffs' reliance on the President's misguided, inconsistent, and occasionally irrational comments made to the media to establish an ulterior motive. *See generally Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (finding that courts should defer to any "facially legitimate and bona fide reason" for executive action and not "look behind the exercise of that discretion"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (noting that courts have never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media"); *County of McCreary v. ACLU of Kentucky*, 545 U.S. 844, 845, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (warning courts, albeit in the context of the First Amendment, to refrain from "scrutinizing purpose" when it requires "judicial psychoanalysis of a drafter's heart of hearts").[28]

Although the DACA Rescission Memo is facially clear as to its purpose and reasoning, Plaintiffs urge the Court to look behind it and find an allegedly discriminatory motivation—one that Plaintiffs attempt to establish with some of the President's remarks and statements. However, Plaintiffs here fail to make the necessary factual showing to permit this Court to do so. Albeit in the context of an Establishment Clause challenge, the Fourth Circuit recently explained in the "travel ban" case that there is "a heavy burden on Plaintiffs, but not an insurmountable one [in seeking to introduce such statements]. [Precedent] clearly affords the political branches substantial deference," but "also accounts for those very rare instances in which a challenger plausibly alleges that a government action runs so contrary to the basic premises of our Constitution as to warrant more probing review." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 264, 2018 WL 894413, at *12 (4th Cir. 2018) (reviewing the standard set forth in *Kleindienst v.*

---

**28.** *See also Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 374, 2018 WL 894413, at *102 (4th Cir. 2018) (Niemeyer, J., dissenting):

Because of their nature, campaign statements and other similar statements, including Tweets, are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often susceptible to multiple interpretations, depending on the outlook of the recipient. . . .

At bottom, the danger of this new rule is that it will enable a court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the official reasons given for a subsequent executive action and thereby pronounce that the official reasons were a pretext.

## CASA DE MARYLAND v. U.S. DEPT. OF HOMELAND SEC.   775
Cite as 284 F.Supp.3d 758 (D.Md. 2018)

*Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) "through the lens of Justice Kennedy's [concurring] opinion in" *Kerry v. Din*, —— U.S. ——, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) ).

In that case, Chief Judge Gregory, writing for the majority, explained that *Mandel* requires courts to "first ask whether the proffered reason for the Proclamation is 'facially legitimate and bona fide.' " *Id.* (citing *Mandel*, 408 U.S. at 770, 92 S.Ct. 2576). Under *Din*, however, a district court "may 'look behind' the Government's proffered justification for its action" upon "an 'affirmative showing of bad faith,' which [plaintiffs] must 'plausibly allege with sufficient particularity.' " *Id.* (citing *Din*, 135 S.Ct. at 2139–41 (Kennedy, J., concurring) ). However, while the plaintiffs in the "travel ban" case offered "undisputed evidence" of an "anti-Muslim bias," *see id.* at 264, 2018 WL 894413 at *13, the Plaintiffs cannot here make a similarly substantial showing. The Fourth Circuit found that then-candidate Trump regularly disparaged Islam as a religion and repeatedly proposed banning Muslims from the United States. *See id.* at 264–69, 2018 WL 894413 at *13–*16. Implicit to the issue was a direct nexus between the discriminatory statements and the executive action in question in that case—a travel ban targeting predominantly Muslim nations.

The instant case is factually very different. The President certainly made statements of his strong views on immigration policy, including advocacy for the rescission of the DACA program.[29] However, his statements have frequently shifted but have moderated since his election. He has referred to the Dreamers as "terrific people;" he has pledged to "show great heart;" and he has referred to Dreamers as "incredible kids."[30] He referred to the "DACA situation" as a "very difficult thing for me. Because, you know, I love these kids."[31] He added that "the existing law is very rough. It's very, very rough."[32]

The rescission of the DACA program merely fulfills the duty of the executive branch to faithfully enforce the laws passed by Congress. Accordingly, no affirmative showing of bad faith can follow. In fact, the President actually urged Congress to pass Dreamer-protection legislation during DACA's wind down period[33]—simply put, this case is wholly dissimilar to the "extraordinary case" regarding the recent "travel ban."[34] As a result, the Court need not go further than the facially legitimate motivation offered in the DACA Rescission Memo and supported by the Administrative Record.

Accordingly, the Court finds Plaintiffs' equal protection claims to lack merit

### e. *Procedural Due Process*

[17–21] Procedural due process ensures that the government must satisfy certain procedures prior to depriving a person of his or her rights. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33, 96 S.Ct.

---

**29.** *See* Gregory Krieg, *Trump's many shifting positions on DACA, from the campaign to right now*, CNN (Jan. 25, 2018), https://www.cnn.com/2018/01/25/politics/donald-trump-positions-daca/index.html.

**30.** *See id.*

**31.** *See id.*

**32.** *See id.*

**33.** *See supra* Note 15.

**34.** *Accord Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 264, 2018 WL 894413, at *13 (4th Cir. 2018) ("In the extraordinary case before us, resolution of that question [regarding pretext] presents little difficulty. Unlike *Din* and *Mandel*, in which the Government had a ''bona fide factual basis'' for its actions, *Din*, 135 S.Ct. at 2140 (Kennedy, J., concurring in the judgment), here the Government's proffered rationale for the Proclamation lies at odds with the statements of the President himself.'').

893, 47 L.Ed.2d 18 (1976). Procedural due process applies whenever the government seeks to deprive a person of a liberty or property interest. *See id.* Liberty interests include physical restraint, a substantial infringement of a fundamental right, harm to one's reputation affecting another tangible interest, or the unjustified intrusion of one's personal security. *See, e.g., Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Property interests include real property, personal property, intellectual property, or any legitimate claim of entitlement. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Entitlements—rights to things like education, public employment, and welfare—are grounded in the law and cannot be removed except for cause. *See id.* In determining the amount of process owed, courts balance (1) the importance of the right the individual is trying to preserve, (2) the risk of erroneous deprivation of that right given the existing level of due process, and (3) the level of governmental burden for the additional levels of due process sought. *See Eldridge*, 424 U.S. at 334–35, 96 S.Ct. 893.

Plaintiffs allege that under DACA, Dreamers were afforded, and are now being deprived of, a number of protected interests, including the ability to (1) obtain employment authorization, (2) travel internationally, (3) attend schools, (4) pay into and receive payment from Social Security and disability, (5) secure other opportunities like obtaining bank accounts or credit cards, and (6) otherwise be considered "lawfully present." *See* ECF No. 29 at 58.

[22] First, Plaintiffs' claim fails because procedural due process only applies to individualized deprivations, not policy-based deprivations for an entire class. *See Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (holding that individualized hearings are unnecessary when im-practical and when the challenged policy affects a large number of people; in these instances, the political process serves as an effective alternative).

[23] Second, even assuming *arguendo* that due process did attach to class-wide policy deprivations, Plaintiffs' due process claim would fail because DACA did not create an entitlement. Facially, the June 15, 2012 DACA Memo explicitly denied the creation of any such rights:

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

While entitlements are not always self-labeled or created with bright flashing lights, the exercise or restraint of prosecutorial discretion is not traditionally the sort of governmental action that creates substantive rights. The DACA Memo did not guarantee any individual immigrant particular benefits, and the DACA Rescission Memo did not curtail DHS's discretion regarding individual immigration reviews. Therefore, even if due process could attach to DACA, no *de facto* entitlements were created by the program itself.

Accordingly, the Court finds Plaintiffs' procedural due process claim to lack merit.

### f. Substantive Due Process

[24, 25] While procedural due process outlines the manner by which the government may deprive a person of his or her rights, substantive due process bars the

government from depriving a person of a right altogether. *See, e.g., Roe v. Wade,* 410 U.S. 113, 167–68, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (Stewart, J., concurring). If the right being deprived is a "fundamental right," courts apply strict scrutiny; if the right being deprived is not fundamental, courts apply rational basis.

Certain rights have been adjudicated formally as fundamental (right to associate, right to educate one's children, right to procreate, right to marry, etc.). *E.g., Griswold v. Connecticut,* 381 U.S. 479, 482–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In determining whether a non-previously-adjudicated right is fundamental, courts have applied different approaches— whether the absence of the right would make other fundamental rights "less secure," *see id.* at 482–83, 85 S.Ct. 1678, whether the right is "deeply rooted in this Nation's history and tradition," *see Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting *Moore v. City of E. Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ), and whether the right is a basic value "implicit in the concept of ordered liberty," *see Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. 2258 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) ).

**[26, 27]** In the instant case, Plaintiffs claim a "denial of fundamental fairness." *See* ECF No. 29 at 63–64. However, for the "denial of fundamental fairness" to rise to the level of a substantive due process violation, it must be "so egregious" and "so outrageous" as "to shock the contemporary conscience." *See Manion v. N. Carolina Med. Bd.,* 693 Fed.Appx. 178, 181 (4th Cir. 2017) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8, 850, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), *abrogated on other grounds by Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ). Plaintiffs believe they have met

this burden by alleging a discriminatory intent in DACA's rescission—an allegation unsupported by the record before this Court.

The rescission of a policy relating to prosecutorial discretion does not shock the conscience of this Court. Absent congressional action, the benefits given to Dreamers by DACA were in potential violation of congressional immigration laws; the only thing that has changed is that deferred status will expire, and enforcement of immigration laws may recommence in the absence of action by Congress, which the President has requested. There is nothing surprising or unfair about policies, laws, or enforcement thereof changing with an election cycle. Furthermore, the election process, and not federal litigation, is the appropriate method for resolving any fairness implicated in DACA's rescission.

Accordingly, the Court finds Plaintiffs' substantive due process claim to lack merit.

#### g. Estoppel

**[28]** The doctrine of estoppel is traditionally founded in the principles of fraud as applied in contract law, but the doctrine may be applied elsewhere in the law as well. *See generally W. Augusta Dev. Corp. v. Giuffrida,* 717 F.2d 139, 141 (4th Cir. 1983) (discussing the outgrowth of the doctrine of estoppel as a claim against the government). In general, "equitable estoppel is comprised of three basic elements: (1) a voluntary misrepresentation of one party, (2) that is relied on by the other party, (3) to the other party's detriment." *Chawla v. Transamerica Occidental Life Ins. Co.,* 440 F.3d 639, 646 (4th Cir. 2006). In this Circuit, when raising such a claim against the government, there is a heightened standard for the first element, and an additional showing of "affirmative miscon-

duct" by the government actors. *See Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

[29]  As with Plaintiffs' substantive due process claim, estoppel cannot apply to DACA's rescission. The rescission of a policy relating to prosecutorial discretion does not amount to a misrepresentation by the government. DACA was promulgated with an express disclaimer that it was not conferring any rights. Nothing in the DACA Memo or in DACA's implementation suggested to Dreamers that the program was permanent, and individuals in the program were aware that their protections were subject to renewal every two years. DACA's rescission lacks any serious injustice—let alone, affirmative misconduct by any of the defendants.

[30]  However, while estoppel does not apply to DACA's rescission, it potentially would apply to any use for immigration enforcement of the information collected from Dreamers during DACA registrations. With regard to this narrow issue, and based on the evidence before it, the Court finds that the Government promised not to transfer or use the information gathered from Dreamers for immigration enforcement. *See* ECF No. 29 at 42–44, 60–61; ECF No. 29–3 at 15–27, 32–41, 52–76, 96–98, 109–13. And now that the government is in possession of this information, the potential for use or sharing of it is theoretically possible.

On the one hand, the Government claims that no changes have been made to the information-sharing policy. However, at oral argument, counsel for the Government was unable to provide any assurance that the Government would not make changes.

[*Mr. Shumate:*] The rescission policy that is being challenged here says noth-ing about the sharing of information for enforcement purposes. There's nothing more that the plaintiffs have raised other than a speculative fear that this might happen in the future. But DHS has been quite clear and they said on the FAQ section—

*The Court:* Are you prepared to say that from representing the defendants that there is no intention of changing the information-sharing assurances that were given in connection with DACA?

*Mr. Shumate:* No. I'm not making that representation, Your Honor. Even from the beginning, DHS has been quite clear that this policy on information-sharing can change. . . . But they also I think take liberties with what that policy is. There has never been a promise or assurance that that information would never be changed. FAQ 19 quite clearly says that the information is generally protected and will not be shared for enforcement purposes, but there may be circumstances where it will be to adjudicate a DACA application or for law enforcement purposes if the individual meets the status of the test for notice to appear. But also quite clearly, DHS has said from the start that the information policy—sharing policy can change, but it has not. So that really should be the end of the debate about the information-sharing.

Tr. of Mot. Hr'g (Dec. 15, 2017) at 16–17.

The Court disagrees that this "should be the end of the debate about the information-sharing." *Id.* Logic would dictate that it is possible that the government, having induced these immigrants to share their personal information under the guise of immigration protections, could now use that same information to track and remove them. This potentially would be "affirma-

CASA DE MARYLAND v. U.S. DEPT. OF HOMELAND SEC.  **779**
Cite as 284 F.Supp.3d 758 (D.Md. 2018)

tive misconduct" by the government, and the Dreamers' detrimental reliance would be self-evident in the information-sharing itself.

Therefore, while the Government will not be enjoined from rescinding DACA, given the substantial risk for irreparable harm in using Dreamers' DACA-provided information, the Court will enjoin the Government from using information provided by Dreamers through the DACA program for enforcement purposes. In the event that the Government needs to make use of an individual Dreamer's information for national security or some purpose implicating public safety or public interest, the Government may petition the Court for permission to do so on a case-by-case basis with *in camera* review.

## IV. CONCLUSION

In concluding this Opinion, the Court notes the recent opinion of Judge Gonzalo P. Curiel, of the Southern District of California, in which he made observations that aptly apply to this case. In a case involving a challenge to President Trump's proposed "border wall," he noted that the case was "currently the subject of heated political debate," but that in its review of the case, "the Court cannot and does not consider whether underlying decisions . . . are politically wise or prudent." *In re Border Infrastructure Envtl. Litig.*, No. CV 17-1215 GPC (WCG), 284 F.Supp.3d 1092, 1102, 2018 WL 1071702, at *1 (S.D. Cal. Feb. 27, 2018). For this proposition, he cited the opinion of his fellow Indiana native, Chief Justice Roberts, in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012):

"Court[s] are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices."

The result of this case is not one that this Court would choose if it were a member of a different branch of our government. An overwhelming percentage of Americans support protections for "Dreamers," yet it is not the province of the judiciary to provide legislative or executive actions when those entrusted with those responsibilities fail to act. As Justice Gorsuch noted during his confirmation hearing, "a judge who likes every outcome he reaches is probably a pretty bad judge, stretching for the policy results he prefers rather than those the law compels." [35]

This Court does not like the outcome of this case, but is constrained by its constitutionally limited role to the result that it has reached. Hopefully, the Congress and the President will finally get their job done.



---

**35.** Neil Gorsuch, Transcript of Opening Remarks at Confirmation Hearing, Comm. on the Judiciary (Mar. 20, 2017), https://www. judiciary.senate.gov/imo/media/doc/03-20-17% 20Gorsuch% 20Testimony.pdf.

**260**                **291 FEDERAL SUPPLEMENT, 3d SERIES**

tion 296(6). *See Griffin*, 835 F.3d at 283 (certifying three unresolved questions of New York law).

Moreover, Plaintiffs cannot point to any previously unavailable evidence nor any new developments in the law to justify their delay in asserting this claim. Plaintiffs waited more than six years to raise the attempt claim for the first time—years after a jury verdict had undermined their previously asserted theory of liability.[13] Therefore, Plaintiffs have failed to establish good cause. Accordingly, the Court declines to consider Plaintiffs' new attempt claim.[14] *See Lyman v. CSX Transp., Inc.*, 364 Fed.Appx. 699, 701 (2d Cir. 2010) (affirming district court's decision not to consider new claims raised for the first time in opposition to summary judgment (citations omitted) ).

### III.  Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' cross-motion for summary judgment.

SO ORDERED.



Martín Jonathan **BATALLA VIDAL** et al., Plaintiffs,

v.

**Kirstjen M. NIELSEN, Secretary, Department of Homeland Security, et al., Defendants.**

**State of New York et al., Plaintiffs,**

v.

**Donald Trump, President of the United States, et al., Defendants.**

**16-CV-4756 (NGG) (JO)**
**17-CV-5228 (NGG) (JO)**

United States District Court, E.D. New York.

Signed 03/29/2018

**Background:** Sixteen states, individuals, and nonprofit organization brought action against President, Secretary of Department of Homeland Security (DHS), and Attorney General, asserting claims under Equal Protection Clause, Due Process Clause, and Administrative Procedure Act (APA), relating to decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, as well as alleged relaxation of restrictions on federal authorities' use of DACA applicants' personal information for immigration-enforcement purposes, and rejection by United States Citizenship and Immigration Services (USCIS) of some applications for final extension of DACA benefits. Defendants filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim.

---

**13.** More than a year and a half had passed even from the January 10, 2012 deadline to amend and the August 15, 2013 deadline for the summary judgment briefing.

**14.** Because the Court grants Defendants' motion for the reasons discussed *supra*, the Court declines to consider Defendants' law of the case doctrine and preemption arguments.

**Holdings:** The District Court, Nicholas G. Garaufis, J., held that:

(1) decision to rescind DACA was not a legislative rule that was subject to notice-and-comment rulemaking under APA;

(2) plaintiffs stated an equal protection claim that rescission of DACA was substantially motivated by racially discriminatory animus against Latinos and, in particular, Mexicans;

(3) plaintiffs did not plausibly allege that DHS had relaxed the restrictions on use of DACA applicants' personal information;

(4) alleged errors in processing DACA extension applications had not been remedied by USCIS;

(5) extension applicants had an interest in submitting their applications that was protected by procedural due process; and

(6) plaintiffs stated a procedural due process claim as to rejection of extension applications that were received late in the day on deadline for submitting applications.

Motions granted in part and denied in part.

**1. Federal Courts** ⟜**2086**

On a motion to dismiss for lack of subject matter jurisdiction, the court must dismiss a claim when the court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1).

**2. Federal Courts** ⟜**2081**

When considering a motion to dismiss for lack of subject matter jurisdiction, the court must take all uncontroverted facts in the complaint as true and draw all reasonable inferences in favor of the party asserting jurisdiction, but nevertheless, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Fed. R. Civ. P. 12(b)(1).

**3. Federal Civil Procedure** ⟜**1772**

Determining plausibility, on a motion to dismiss for failure to state a claim, is a context-specific task, which depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable. Fed. R. Civ. P. 12(b)(6).

**4. Associations** ⟜**20(1)**

Nonprofit organization that advocated for immigrants' rights fell within zone of interests of Immigration and Nationality Act (INA) and therefore had statutory standing to bring suit under Administrative Procedure Act (APA), alleging that Executive Branch's decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, was substantively arbitrary and capricious, in violation of Administrative Procedure Act (APA); DACA recipients were members, clients, and employees of the organization. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**5. States** ⟜**190**

State fell within zone of interests of Immigration and Nationality Act (INA) and therefore had statutory standing to bring suit under Administrative Procedure Act (APA), alleging that Executive Branch's decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration

status who had entered the United States as children, was substantively arbitrary and capricious, in violation of Administrative Procedure Act (APA); at the very least, State employed a number of DACA recipients.  5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**6.  Federal Civil Procedure** ☞1828

In light of strong suggestion that administrative record previously produced by Executive Branch defendants was incomplete, thereby entitling plaintiffs to discovery regarding completeness of record, dismissal for failure to state a claim would be inappropriate, in action alleging that decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, was substantively arbitrary and capricious, in violation of Administrative Procedure Act (APA).  5 U.S.C.A. § 706(2)(A); Fed. R. Civ. P. 12(b)(6).

**7.  Aliens, Immigration, and Citizenship** ☞155

Executive Branch's decision, which was announced in a memorandum, to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, was not a legislative rule that was subject to notice-and-comment rulemaking under Administrative Procedure Act (APA), and instead was a general statement of policy that was exempt from notice-and-comment rulemaking; memorandum did not deprive individuals of a substantive right to receive deferred action or work authorization, or to have those benefits renewed for a final additional term, since memorandum that launched DACA program stated clearly that no such rights existed, the decision to

grant or deny deferred action and work authorization continued to lie within immigration authorities' discretion after the rescission memorandum, and rescission memorandum offered guidance to Department of Homeland Security (DHS) employees as to how the agency intended to exercise its discretion prospectively.  5 U.S.C.A. §§ 551(4), 553(b)(A), 706(2)(D).

**8.  Administrative Law and Procedure** ☞382.1, 394

If an administrative agency's action alters the rights or obligations of regulated parties or produces other significant effects on private interests, it is a "legislative rule" that is subject to notice-and-comment rulemaking under the Administrative Procedure Act (APA).  5 U.S.C.A. §§ 551(4), 553(b)(A).

See publication Words and Phrases for other judicial constructions and definitions.

**9.  Administrative Law and Procedure** ☞382.1, 394

An agency action that purports to impose legally binding obligations or prohibitions on regulated parties, and that would be the basis for an enforcement action for violations of those obligations or requirements, is a "legislative rule" that is subject to notice-and-comment rulemaking under the Administrative Procedure Act (APA). 5 U.S.C.A. §§ 551(4), 553(b)(A).

See publication Words and Phrases for other judicial constructions and definitions.

**10.  Administrative Law and Procedure** ☞382.1, 394

An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a "legislative rule" that is subject to notice-and-comment rulemaking under the Adminis-

trative Procedure Act (APA).   5 U.S.C.A.
§§ 551(4), 553(b)(A).

> See publication Words and Phrases
> for other judicial constructions and
> definitions.

### 11. Administrative Law and Procedure ∞382.1, 394

Agency rule that does not alter regulated parties' rights and obligations but instead educates agency members in the agency's work, or is directed primarily at the staff of an agency and describes how the agency will conduct discretionary functions, is a general policy statement that is exempt from notice-and-comment rulemaking under the Administrative Procedure Act (APA).  5 U.S.C.A. § 553(b)(A).

### 12. Administrative Law and Procedure ∞420, 421

The view that notice and comment under the Administrative Procedure Act (APA) must be used to stop what started without notice and comment is not only counterintuitive but also at odds with the general principle that the procedures needed to repeal or amend a rule are the same ones that were used to make the rule in the first place.  5 U.S.C.A. § 553.

### 13. Aliens, Immigration, and Citizenship ∞155

Executive Branch's decision, which was announced in a memorandum, to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, was not subject to Regulatory Flexibility Act's (RFA) requirement of considering the impact on small entities; RFA required an agency to publish an initial or final regulatory flexibility analysis only when the agency was required to use notice-and-comment rulemaking under the Administrative Procedure Act (APA), and the memorandum was a general statement of policy that was exempt from notice-and-comment rulemaking.  5 U.S.C.A. §§ 553(b)(A), 603(a), 604(a).

### 14. Aliens, Immigration, and Citizenship ∞154

### Constitutional Law ∞3112

Challengers to Executive Branch's decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, stated an equal protection claim that the decision was substantially motivated by racially discriminatory animus against Latinos and, in particular, Mexicans, by plausibly alleging that rescission would have disparate impact on Latinos and especially Mexicans, and that the President had made a disheartening number of statements, including campaign-trail statements, suggesting he was prejudiced against Latinos and, in particular, Mexicans.  U.S. Const. Amend. 5.

### 15. Constitutional Law ∞3861

Although the Equal Protection Clause of the Fourteenth Amendment, by its terms, applies to states, the Due Process Clause of the Fifth Amendment generally prohibits racial discrimination by the federal government as well.  U.S. Const. Amends. 5, 14.

### 16. Constitutional Law ∞3251

In order to state an equal-protection claim based on racial discrimination, plaintiffs must allege that a government actor intentionally discriminated against them on the basis of race.  U.S. Const. Amend. 5.

### 17. Constitutional Law ∞3045

Where plaintiffs challenge facially neutral official action on equal protection grounds, they may support their claim by

alleging either that the facially neutral action is applied in a discriminatory fashion, or that it was motivated by discriminatory animus and its application results in a discriminatory effect.  U.S. Const. Amend. 5.

**18. Evidence** ⟺**12**

Judicial notice of data from United States Citizenship and Immigration Services (USCIS), regarding countries and regions for origination of applications for Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, would be taken by district court on Executive Branch's motion to dismiss for failure to state a claim, in action alleging that the decision to rescind DACA was substantially motivated by racially discriminatory animus against Latinos and, in particular, Mexicans, in violation of equal protection.  U.S. Const. Amend. 5; Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201.

**19. Constitutional Law** ⟺**3040**

To establish discriminatory motivation, when challenging facially neutral official action on equal protection grounds, plaintiffs must ultimately show that invidious discriminatory purpose was a motivating factor in the decision; in other words, they must show that defendants selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group, but they need not prove that the challenged action rested solely on racially discriminatory purposes.  U.S. Const. Amend. 5.

**20. Constitutional Law** ⟺**3040, 3251**

In challenging facially neutral official action on equal protection grounds, because discriminatory intent is rarely susceptible to direct proof, litigants may make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available, and in extreme cases, a facially neutral law may have such a clear disparate impact, unexplainable on grounds other than race, that evidence of disparate impact alone may suffice to show discriminatory purpose.  U.S. Const. Amend. 5.

**21. Constitutional Law** ⟺**3040**

Evidence that the challenged official action, which was facially neutral, was motivated by discriminatory purpose, in violation of equal protection, may include, for example: (1) the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence, which might afford evidence that improper purposes are playing a role; (4) substantive departures, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; (5) the legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports; and (6) in some extraordinary circumstances, testimony of official decisionmakers.  U.S. Const. Amend. 5.

**22. Constitutional Law** ⟺**3251**

Although the use of racial slurs, epithets, or other racially charged language does not violate equal protection per se, it can be evidence that official action was motivated by unlawful discriminatory purposes.  U.S. Const. Amend. 5.

**23. United States** ⟺**250, 259**

The Constitution vests executive power in the President, not in the Secretary of the Department of Homeland Security (DHS), who reports to the President and is

removable by him at will.  U.S. Const. art. 2, § 1, cl. 1.

### 24. Aliens, Immigration, and Citizenship ⚮154

Applicants for Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, and relatives of beneficiaries, failed to plausibly allege that Department of Homeland Security (DHS) had relaxed the restrictions on federal authorities' use of DACA applicants' personal information for immigration-enforcement purposes, and they therefore failed to state a claim that the putative relaxation was arbitrary and capricious under Administrative Procedure Act (APA) because applicants had disclosed information in their applications in reliance on restrictions on use of that information; complaint's allegations were contradicted by a document attached to the complaint, i.e. a frequently asked questions (FAQ) document from United States Citizenship and Immigration Services (US-CIS), issued after rescission decision was announced, and stating that DACA information-sharing policy had not changed in any way since it had been first announced. 5 U.S.C.A. § 706(2)(A).

### 25. Federal Civil Procedure ⚮629, 1835

On a motion to dismiss for failure to state a claim, where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.  Fed. R. Civ. P. 12(b)(6).

### 26. Associations ⚮20(1)

An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

### 27. Constitutional Law ⚮885

Nonprofit organization that advocated for immigrants' rights had associational standing to bring procedural due process claim regarding processing of applications for final extension of benefits after announcement of decision to rescind Deferred Action for Childhood Arrivals (DACA) program which provided protections for certain individuals without lawful immigration status who had entered the United States as children; organization alleged a number of its members' and clients' DACA extension requests had been denied due to alleged processing errors, the action, which was brought by organization to ensure that DACA extension requests were adjudicated in fair and orderly manner, was clearly consistent with organization's purpose of empowering immigrant, Latino and Latina, and working-class communities in the State, and court was not aware of any reason why the claims asserted or the relief requested by organization required the participation of individual applicants.  U.S. Const. Amend. 5.

### 28. Constitutional Law ⚮885

Alleged injuries had not been remedied by United States Citizenship and Immigration Services (USCIS), as would defeat injury-in-fact element for Article III standing to assert procedural due process claims based on allegations relating to processing of applications for final extension of benefits after announcement of decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children; the supposed remedy offered by USCIS was its

statement that it either intended to address the injury in the future or that it would allow the injured party to ask it to reconsider its decision.  U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 5.

**29. Federal Courts ⟺2114**

A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

**30. Constitutional Law ⟺3867**

A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived, and (2) deprivation of that interest without due process.  U.S. Const. Amend. 5.

**31. Constitutional Law ⟺3869**

Only benefits to which a person has a legitimate claim of entitlement can support a liberty or property interest that is protected by procedural due process.  U.S. Const. Amend. 5.

**32. Constitutional Law ⟺3869**

In determining whether a given benefits regime creates a legitimate claim of entitlement to such benefits, which is protected by procedural due process, the court asks whether the statutes and regulations governing the distribution of benefits meaningfully channel official discretion by mandating a defined administrative outcome.  U.S. Const. Amend. 5.

**33. Aliens, Immigration, and Citizenship ⟺318**

**Constitutional Law ⟺4438**

Memorandum that launched the Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the

United States as children, merely set out criteria for consideration by staff of Department of Homeland Security (DHS), without a guarantee that fulfillment of the criteria would result in a grant of deferred action or work authorization, and thus, DACA recipients did not have a legitimate entitlement to DACA benefits that could support a liberty or property interest protected by procedural due process, with respect to being granted a final extension of benefits after announcement of decision to rescind DACA.  U.S. Const. Amend. 5.

**34. Aliens, Immigration, and Citizenship ⟺318**

**Constitutional Law ⟺4438**

Under language of memorandum for rescission of Deferred Action for Childhood Arrivals (DACA) program which provided protections for certain individuals without lawful immigration status who had entered the United States as children, stating that United States Citizenship and Immigration Services (USCIS) "will adjudicate" properly filed and timely accepted applications for final extension of DACA benefits, applicants had a legitimate entitlement to submit the extension applications for processing, which supported a liberty or property interest protected by procedural due process, though the ultimate decision to grant or deny an extension application was discretionary.  U.S. Const. Amend. 5.

**35. Aliens, Immigration, and Citizenship ⟺318**

**Constitutional Law ⟺4438**

Applicants for final extension of benefits after announcement of decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, stated a claim for a procedural due process viola-

tion arising from United States Citizenship and Immigration Services (USCIS) rejecting extension applications that were received late in the day on deadline for submitting applications; memorandum announcing decision to rescind DACA was at least ambiguous as to which applications would be deemed "accepted" as of the deadline day, and some applications were rejected because they were delivered to post office (PO) boxes for USCIS on day of deadline but were not transferred to the appropriate lockbox until the following day. U.S. Const. Amend. 5.

**36. Aliens, Immigration, and Citizenship**
⇔318

**Constitutional Law** ⇔4438

With respect to extension applications rejected by United States Citizenship and Immigration Services (USCIS) based on USCIS incorrectly deeming them to be marred by clerical errors, and therefore incorrectly deeming them not to have been properly filed, applicants for final extension of benefits after announcement of decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, stated a claim for a procedural due process violation; memorandum announcing rescission stated that properly filed applications would be adjudicated. U.S. Const. Amend. 5.

**37. Aliens, Immigration, and Citizenship**
⇔318

**Constitutional Law** ⇔4438

With respect to extension applications rejected by United States Citizenship and Immigration Services (USCIS) based on USCIS correctly deeming them to be marred by clerical errors, and therefore correctly deeming them not to have been properly filed, applicants for final exten-

sion of benefits after announcement of decision to rescind Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, failed to state a claim for a procedural due process violation; due process of law did not require the agency to accept incomplete or incorrect applications. U.S. Const. Amend. 5.

⸻

Amy S. Taylor, Brooklyn, NY, Justin B. Cox, National Immigration Law Center, Atlanta, GA, Marisol Orihuela, Michael J. Wishnie, Muneer Ahmad, Jerome N. Frank Legal Services Organization, Inc. Yale Law School, New Haven, CT, Clement Lee, Scott Allen Foletta, Trudy Rebert, National Immigration Law Center, Jackson Heights, NY, Jessica Hanson, Karen C. Tumlin, Mayra B. Joachin, National Immigration Law Center, Los Angeles, CA, Joshua Rosenthal, National Immigration Law Center, Washington, DC, Alexia R. Schapira, New York, NY, for Plaintiffs.

Rachael Westmoreland, Kate Bailey, Stephen M. Pezzi, U.S. Department of Justice, Washington, DC, Joseph Anthony Marutollo, U.S. Attorney's Office, Brooklyn, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge

Plaintiffs in the above-captioned cases challenge Defendants' decisions to end the Deferred Action for Childhood Arrivals ("DACA") program and, Plaintiffs allege, to relax the restrictions on federal authorities' use of DACA applicants' personal information for immigration-enforcement

purposes. The court assumes familiarity with the factual and procedural history of these cases and in particular with its November 9, 2017, Memorandum and Order (the "November 9 M&O") (Dkt. 104),[1] which granted in part and denied in part Defendants' motion to dismiss these cases for lack of subject-matter jurisdiction,[2] and its February 13, 2018, Amended Memorandum and Order (the "February 13 M&O") (Dkt. 254), which granted Plaintiffs' motions for a preliminary injunction barring Defendants from terminating the DACA program in its entirety. Before the court are Defendants' motions to dismiss the Batalla Vidal Plaintiffs' third amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and to dismiss the State Plaintiffs' amended complaint pursuant to Rule 12(b)(6). (3d Am. Compl. ("BV TAC") (Dkt. 113); Am. Compl. ("State Pls. AC") (Dkt. 71, No. 17-CV-5228); Defs. Mem. in Supp. of Mot. to Dismiss the BV TAC ("BV MTD") (Dkt. 207-1); Defs. Mem. in Supp. of Mot. to Dismiss the State Pls. AC ("State MTD") (Dkt. 71-1); see also Pls. Mem. in Opp'n to Mot. to Dismiss the BV TAC ("BV Pls. Opp'n") (Dkt. 240); Pls. Mem. in Opp'n to Mot. to Dismiss the State Pls. AC ("State Pls. Opp'n") (Dkt. 202, No. 17-CV-5228).) For the reasons

that follow, Defendants' motions are GRANTED IN PART and DENIED IN PART.

## I. LEGAL STANDARDS

### A. Rule 12(b)(1)

**[1, 2]**  A Rule 12(b)(1) motion tests the court's subject-matter jurisdiction to hear a claim or case. See Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), the court must dismiss a claim "when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239,243 (2d Cir. 2014). Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (quoting Makarova, 201 F.3d at 113).

### B. Rule 12(b)(6)

**[3]**  A Rule 12(b)(6) motion tests the legal adequacy of the plaintiff's complaint. To survive a Rule 12(b)(6) motion, the

---

1.  All record citations refer to the docket in Batalla Vidal v. Nielsen, No. 16-CV-4756 (E.D.N.Y.), except as otherwise noted. For ease of reference, the court refers to the Department of Homeland Security as ''DHS,'' the Department of Justice as ''DOJ,'' and U.S. Citizenship and Immigration Services as ''US-CIS.''

2.  In the November 9 M&O, the court dismissed for lack of standing the fourth claim asserted in the Batalla Vidal Plaintiffs' second amended complaint, which alleged that Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide individualized written notice to certain DACA recipients that they needed to renew their

DACA benefits by October 5, 2017. (2d Am. Compl. (Dkt. 60) ¶¶ 160-65; Nov. 9 M&O at 37-38.) The court also dismissed for lack of standing the State Plaintiffs' notice and information-use-policy claims. (Nov. 9 M&O at 38-46.) While the Batalla Vidal Plaintiffs reassert a notice claim in their third amended complaint (3d Am. Compl. ("BV TAC") (Dkt. 113) ¶¶ 188-94), they concede that they do so only to preserve the claim for appeal and that, under the reasoning of the November 9 M&O, this claim should be dismissed (Pls. Mem. in Opp'n to Mot. to Dismiss the BV TAC (''BV Pls. Opp'n'') (Dkt. 240) at 4 n.5). Accordingly, the Batalla Vidal Plaintiffs' fourth claim for relief is DISMISSED.

complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In considering the sufficiency of the complaint, the court "accept[s] all [well-pleaded] factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 28 2 F.3d 147, 152 (2d Cir. 2002), but does need not to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Determining "plausibility" is a "context-specific task," id. at 679, 129 S.Ct. 1937, which "depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable," L-7 Designs. Inc. v. Old Navy. LLC, 647 F.3d 419, 430 (2d Cir. 2011).

The court's review of a Rule 12(b)(6) motion is generally limited to "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as documents "integral" to the complaint. DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010).

## II.  DISCUSSION

The court first analyzes Plaintiffs' claims challenging the decision to end the DACA program, then turns to the Batalla Vidal Plaintiffs' claims challenging Defendants'

(1) alleged changes to the policy regarding the protection of DACA applicants' personal information (the "information-use policy") (BV TAC ¶¶ 177-82); and (2) rejections of DACA renewal requests that were delayed due to postal errors, received late in the day on October 5, 2017, or contained "real or perceived clerical errors" (id. ¶¶ 199-205).

### A.  DACA Rescission

Plaintiffs have stated a claim that the decision to end the DACA program was substantively arbitrary and capricious, in violation of Section 706(2)(A) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and substantially motivated by discriminatory animus, in violation of the equal-protection principle inherent in the Fifth Amendment's Due Process Clause. Plaintiffs have not, however, stated a claim that the rescission of the DACA program was invalid because it was not implemented through notice-and-comment rulemaking, nor have they stated a claim that Defendants violated the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq. ("RFA"), by failing to consider the rescission's impact on small entities.

#### 1.  Substantive APA

[4–6]  Plaintiffs challenge the decision to end the DACA program as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (BV TAC ¶¶ 177-82; State Pls. Am. Compl. ¶¶ 253-56.) In its February 13 M&O, the court found that Plaintiffs were likely to succeed on the merits of this claim. For the reasons stated in that opinion, Defendants' motion to dismiss these claims is DENIED.[3] Additionally, the court notes that

---

**3.** Defendants have also contested whether Make the Road New York ("MRNY") and the State Plaintiffs fall within the APA's "zone of

interests." (BV MTD at 12; State MTD at 20-21.) These Plaintiffs fall within the zone of interests of the Immigration and Nationality

it would be inappropriate to dismiss Plaintiffs' substantive APA claims at this stage of the litigation, as "there is a strong suggestion" that the administrative record previously produced by Defendants is incomplete, "entitling [Plaintiffs] to discovery regarding the completeness of the record." (Dec. 27, 2017, USCA Order (Dkt. 210) at 2-3 (quoting Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982)).) [4]

## 2. Procedural APA

[7]  Plaintiffs next claim that the decision to end the DACA program was procedurally defective, in violation of Section 706(2)(D) of the APA, because the Department of Homeland Security ("DHS") did not use notice-and-comment rulemaking to rescind the program. These claims raise challenging questions but are ultimately unavailing.

Act such that they may bring suit under the APA. DACA recipients are members, clients, and employees of MRNY, an organization that advocates for immigrants' rights. (BV TAC ¶¶ 46, 49-50; BV Pls. Opp'n at 6-7.) At the very least, the State Plaintiffs employ a number of DACA recipients. (Nov. 9 M&O at 38-40; State Pls. Opp'n at 3-6.) Plaintiffs' interests in the decision to end the DACA program are thus not "'so marginally related to or inconsistent with the purposes implicit in the [Immigration and Nationality Act] that it cannot reasonably be assumed that' Congress authorized [those] plaintiff[s] to sue." Lexmark Int'l, Inc. v. Static Control Components. Inc., ―― U.S. ――, 134 S.Ct. 1377, 1389, 188 L.Ed.2d 392 (2014) (quoting Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012)); see also Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Defendants rely on Federation for American Immigration Reform. Inc. v. Reno, 93 F.3d 897 (D.C. Cir. 1996) ("FAIR"), but that case held only that members of an anti-immigration group lacked statutory standing, based on their generalized objections to immigration, to challenge a decision to accord relief to Cuban immigrants. See id. at 900-04. Unlike in FAIR, Plaintiffs in the above-captioned cases are directly affect-

Under the APA, an agency generally must use notice-and-comment procedures to make any "rule." 5 U.S.C. § 553.[5] The APA exempts from this requirement, however, "general statements of policy," among other types of rule. Id. § 553(b)(A). The parties dispute whether the memorandum announcing the rescission of the DACA program (the "DACA Rescission Memo") (Mem. from Elaine C. Duke, Acting Sec'y, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Dkt. 77-1 at ECF p.252)) is a "general statement of policy" exempt from notice-and-comment rulemaking requirements or instead a "legislative rule" subject to these requirements. (Compare BV MTD at 18-20, and State MTD at

ed by Defendants' actions. See Regents of the Univ. of Calif. v. DHS, 279 F.Supp.3d 1011, 1036 n.12 (N.D. Cal. 2018).

4.  Record-related discovery remains stayed pending the Second Circuit's ruling on Defendants' interlocutory appeal from the November 9 M&O. (See Jan. 8, 2017, Mem. & Order (Dkt. 233) at 9-10.) The court reiterates that Defendants vigorously sought that interlocutory appeal before reversing course and conceding that the Second Circuit should hold Defendants' petitions for leave to appeal in abeyance pending this court's ruling on Plaintiffs' motions for a preliminary injunction and Defendants' motions to dismiss. (Reply in Supp. of Pet. for Permission to Appeal (Dkt. 28, Nielsen v. Vidal, No. 18-122 (2d Cir.)) at 2; see also Feb. 13 M&O at 21 & n.6.) The Second Circuit thereafter agreed to hold these petitions for leave to file in abeyance pending this court's ruling on the pending motions. (USCA Jan. 31, 2018, Order (Dkt. 249).)

5.  The APA defines "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

28-31, with BV Pls. Opp'n at 12-16, and State Pls. Opp'n at 15-19.) The DACA Rescission Memo was not formulated through notice-and-comment rulemaking, so if it is a legislative rule, it is invalid. See 5 U.S.C. §§ 553, 706(2)(D).

**[8–10]** As the court has already noted, the line between legislative rules and non-legislative rules "is enshrouded in considerable smog." (Feb. 13 M&O at 30 (quoting Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir. 1975)).) See also Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 251 (D.C. Cir. 2014) (characterizing the inquiry for determining whether an agency action is a legislative rule, an interpretive rule, or a general statement of policy as "quite difficult and confused"). There are, however, general principles to guide the court's inquiry. If the rule alters the rights or obligations of regulated parties "or produces other significant effects on private interests," it is legislative. White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993) (citation omitted); see also Chrysler Corp. v. Brown, 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (legislative rules "affect[ ] individual rights and obligations" (citation omitted)); Lewis–Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir. 1972). The D.C. Circuit has summarized what makes a "legislative" rule:

> An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule. An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule.

Nat'l Mining Ass'n, 758 F.3d at 251-52.

**[11]** If, however, the rule does not alter regulated parties' rights and obligations but instead "educat[es] . . . agency members in the agency's work," or is "directed primarily at the staff of an agency describing how it will conduct agency discretionary functions," the rule is a general policy statement. Noel, 508 F.2d at 1030 (first quoting Henry Friendly, The Federal Administrative Agencies 145-46 (1962), and then quoting Arthur E. Bonfield, Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy Under the APA, 23 Admin. L. Rev. 101, 115 (1971)); see also Lincoln v. Vigil, 508 U.S. 182, 197, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (general statements of policy are "issued by an agency to advise the public prospectively of the manner in which the agency proposed to exercise a discretionary power" (quoting Chrysler, 441 U.S. at 302 n.31, 99 S.Ct. 1705)); Nat'l Mining Ass'n, 758 F.3d at 252 ("An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.").

The Second Circuit's decision in Noel helps reveal the uncertain boundary between legislative rules and general statements of policy. In Noel, two Haitian nationals unlawfully present in the United States and subject to orders of deportation married U.S. lawful permanent residents and sought "extended voluntary departure," a form of discretionary relief from deportation that would have enabled them to remain in this country for up to two years while waiting for visas. 508 F.2d at 1024. Between 1968 and 1972, it was the practice of the New York District Director for Immigration and Naturalization Services ("INS") routinely to grant extended voluntary departure to such Western Hemisphere aliens who were present in this country and married to permanent

resident aliens. Id. at 1025. In 1972, however, INS issued a directive stating that such aliens "should not routinely be granted extended departure time, but rather should be offered that privilege only in those cases where compelling circumstances warranted the relief." Id. at 1025-26. The plaintiffs argued, among other things, that this directive was a legislative rule that was invalid because it was not made through notice-and-comment rulemaking. Id. at 1029. The Second Circuit rejected this argument, concluding that the directive was a "general statement of policy" exempt from notice-and-comment requirements. Id. First, the Second Circuit noted that the directive did not purport to amend an existing regulation vesting the district director with sole discretion to extend deportable aliens' time in the United States or otherwise to oust him of this discretion. Id. at 1030. Instead, the directive only offered "a statement by the agency of its general policy as a guideline for the District Directors" in their exercise of this discretion. Id. Second, the directive did not "change [ ] the existing right of the [aliens] to have their applications for extensions of time to depart authorized in the sole discretion of the district director," because those aliens remained eligible to seek deferred voluntary departure, albeit only on the more limited basis of hardship. Id.

Like the directive at issue in Noel, the DACA Rescission Memo appears to be a general statement of policy, not a legislative rule. The DACA Rescission Memo does not deprive individuals of a substantive right to receive deferred action or work authorization, or to have these benefits renewed for additional terms. As the memorandum that launched the DACA program (the "2012 DACA Memo") states clearly, no such rights exist. (Mem. from Janet Napolitano, Sec'y, DHS, "Exercising Prosecutorial Discretion with Respect to

Individuals Who Came to the United States as Children" ("2012 DACA Memo") (Dkt. 77-1 at ECF p.1).) Instead, the decision to grant or deny an individual deferred action and work authorization continues to lie within immigration authorities' discretion. Like the 2012 DACA Memo, the DACA Rescission Memo offers guidance to DHS employees as to how the agency intends to exercise this discretion prospectively: Whereas the 2012 DACA Memo advises DHS staff to consider exercising prosecutorial discretion with respect to individuals meeting certain identified criteria (such as age of entry into the United States and absence of a meaningful criminal record), the DACA Rescission Memo directs those staff not to consider those criteria when exercising their prosecutorial discretion. The DACA Rescission Memo is thus "directed primarily at the staff of [DHS] describing how it will conduct agency discretionary functions." Noel, 508 F.2d at 1030 (internal quotation marks and citation omitted).

It is true that, if the DACA Rescission Memo were to take effect, hundreds of thousands of individuals would no longer have the opportunity to seek deferred action and work authorization through the DACA program. As Defendants note, however, the DACA Rescission Memo does not purport to strip immigration authorities of the ability to grant deferred action and work authorization, but only provides that they should not do based on the criteria identified in the 2012 DACA Memo, or on the submission of DACA application materials. (BV MTD at 7 ("[A]s was true before implementation of the DACA Policy in 2012, deferred action remains available on an individualized basis.").) At least in theory, individuals who would have been eligible for deferred action and work authorization under the DACA program may still qualify for those benefits based on their

individual circumstances. As a practical matter, the DACA Rescission Memo almost certainly means that fewer individuals will receive for deferred action and work authorization. But the directive at issue in Noel surely reduced the number of aliens eligible for discretionary relief, too, and that did not render the directive a legislative rule. See Noel, 508 F.2d at 1025-26.

Plaintiffs contend that the DACA Rescission Memo nevertheless is a legislative rule because it binds DHS's discretion and requires the agency to reject all DACA applications and renewal requests not meeting certain criteria. (BV Pls. Opp'n at 12-14; State Pls. Opp'n at 1519.) As Plaintiffs point out, a number of courts outside this circuit—most notably the D.C. Circuit—have determined whether a rule is legislative at least partly by looking to whether the rule constrains the agency's own discretion. See, e.g., Clarian Health W., LLC v. Hargan, 878 F.3d 346, 357 (D.C. Cir. 2017). In this view, a rule " 'cabining . . . an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule' when it 'is in purpose or likely effect one that narrowly limits administrative discretion.' " Ass'n of Irritated Residents v. EPA, 494 F.3d 1027, 1034 (D.C. Cir. 2007) (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 948 (D.C. Cir. 1987) (per curiam)). Plaintiffs note that the DACA Rescission Memo mandates the rejection of certain DACA applications, and therefore contend that the memo eliminates DHS's discretion to consider those applications and thus constitutes a legislative rule.

**[12]** While there is some force to Plaintiffs' arguments, they are unavailing. As an initial matter, it is not clear to this court that an agency's compliance with its stated policy is reason to deem that policy a legislative rule. Because one might expect functional organizations generally to abide by their own policies, treating general compliance with internal policies as evidence that those policies were in fact legislative rules risks writing the "general statements of policy" exception to notice-and-comment rulemaking out of the APA.[6] Moreover, it is important to remember that the DACA Rescission Memo purports to end a program that was itself created by a policy statement. Plaintiffs' view that Defendants must use notice and comment to stop what started without notice and comment is not only counterintuitive, but also at odds with the general principle that the procedures needed to repeal or amend a rule as the same ones that were used to make the rule in the first place. See Perez v. Mortg. Bankers Ass'n, —— U.S. ——, 135 S.Ct. 1199, 1206, 191 L.Ed.2d 186 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.") To whatever extent the DACA Rescission Memo is in fact "binding" on DHS, the court cannot agree that this prospective limitation on the agency's exercise of its discretion renders the memo a legislative rule.

Accordingly, Defendants' motion to dismiss Plaintiffs' notice-and-comment claims is GRANTED.

---

**6.** For an insightful argument why the "practically binding" standard is inconsistent with the Supreme Court's decision in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), see Cass R. Sunstein, "Practically Binding": General Policy Statements and Notice-and-Comment Rulemaking, 68 Admin. L. Rev. 491 (2016).

### 3. RFA

**[13]** Plaintiffs also assert claims under the RFA. (BV TAC ¶¶ 183-87; State Pls. Am. Compl. ¶¶ 266-73.) Among other things, that statute provides that when an agency engages in rulemaking, it must consider the impact of the rule on "small entities." 5 U.S.C. §§ 603(a), 604(a). The Batalla Vidal Plaintiffs claim that the DACA Rescission Memo violated the RFA because it failed to consider the impact of the rescission on Plaintiff Make the Road New York ("MRNY") and similar small entities (BV TAC ¶¶ 184-85), while the State Plaintiffs contend that DHS failed to consider the impact on "small businesses, small nonprofits, and small governmental jurisdictions." (State Pls. Am. Compl. ¶¶ 266-73).

These claims are also unavailing. The RFA only requires an agency to publish an initial or final regulatory flexibility analysis when the agency is required to use notice-and-comment rulemaking procedures. 5 U.S.C. §§ 603(a), 604(a); U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 42 (D.C. Cir. 2005). Because DHS was not required to use notice and comment to rescind the DACA program, it was not required to conduct a regulatory flexibility analysis in connection with that decision.

Accordingly, Defendants' motion to dismiss Plaintiffs' RFA claims is GRANTED.

### 4. Equal Protection

**[14]** The court next turns to Plaintiffs' claims that the decision to end the DACA program violated the U.S. Constitution because it was substantially motivated by racial animus against Latinos and, in particular, Mexicans. (BV TAC ¶¶ 195-98; State Pls. Am. Compl. ¶¶ 233-39.) Defendants move to dismiss these claims on the grounds that Plaintiffs have failed to plausibly allege that the DACA rescission was motivated by unlawful animus. (E.g., State MTD at 31-34.) The court concludes, however, that Plaintiffs have alleged sufficient facts to raise a plausible inference that the DACA rescission was substantially motivated by unlawful discriminatory purpose.

**[15–17]** The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution generally prohibits government officials from discriminating on the basis of race. U.S. Const. amend. XIV, § 1. Although the Equal Protection Clause by its terms applies to states, the Supreme Court has long recognized that the Due Process Clause of the Fifth Amendment generally prohibits racial discrimination by the federal government as well. Bolling v. Sharpe, 347 U.S. 497, 498-500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). In order to state an equal-protection claim based on racial discrimination, Plaintiffs must allege "that a government actor intentionally discriminated against them on the basis of race." Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). Where, as here, Plaintiffs challenge facially neutral official action, they may support this claim by alleging either that the facially neutral action "is applied in a discriminatory fashion," or that "it was motivated by discriminatory animus and its application results in a discriminatory effect." Id. (first citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), and then citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("Arlington Heights")). Only the latter theory is at issue here, as Plaintiffs argue that the DACA Rescission Memo both disadvantages and was intended to disadvantage certain racial groups. (BV TAC ¶ 197; State Pls. Am. Compl. ¶¶ 235-36.) The court discusses each element of an equal-protection claim in turn.

#### a) Effect

Plaintiffs allege that the rescission of the DACA program would have a disparate

impact on Latinos and especially Mexicans. (BV TAC ¶ 197.) The State Plaintiffs allege that 78 percent of DACA recipients are Mexican nationals. (State Pls. Am. Compl. ¶ 6.) Indeed, according to USCIS data attached to the State Plaintiffs' amended complaint, of the 793,026 individuals whose initial DACA applications were approved between 2012 and June 30, 2017, more than 78 percent originated in Mexico, and at least 93 percent originated in Latin America as a whole. (USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals (Dkt. 55-1 at ECF p.2).) [7] These allegations are sufficient to raise a plausible inference that the end of the DACA program would have a disproportionally adverse effect on Latinos and especially Mexicans.

Relying heavily on United States v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), Defendants argue that Plaintiffs bear a "rigorous" or especially "heavy burden" to survive a motion to dismiss, and thus that allegations of the outsized impact of the DACA rescission on Latino/a individuals and especially Mexicans are insufficient to plead discriminatory effect. (BV MTD at 20-21; State MTD at 32 (characterizing the prevalence of Mexican nationals among DACA recipients as "an unsurprising accident of geography, not evidence of discrimination").) Armstrong is, however, inapposite. In that case, the Court considered the initial showing that a criminal defendant asserting a "selective prosecution" claim under the Equal Protection Clause must make before obtaining discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. This is, however, a civil case, the pleading standards for which are set forth in Twombly and Iqbal. Moreover, as the court has

previously explained, Plaintiffs are not asserting a "selective-deportation" claim, which might be analogized to the selective-prosecution claim at issue in Armstrong. (Nov. 9 M&O at 28-31.) Rather than alleging that they in particular are being targeted for removal because of their race—in which case judicial review of their suit would presumably be limited by 8 U.S.C. § 1252(g), see Reno v. Am.-Arab Anti–Discrimination Comm., 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999)—Plaintiffs allege that the categorical decision to end the DACA program, which provided them with some limited assurance that they would not be deported, was motivated by unlawful animus. See Regents of the Univ. of Calif. v. DHS, No. 17-CV-5211 (WHA), 2018 WL 401177, at *6 n.3 (N.D. Cal. Jan. 12, 2018) ("Regents 12(b)(6) Order") (rejecting Defendants' attempt to characterize similar challenges as selective-prosecution claims).

[18] Defendants also argue that the court should dismiss the Batalla Vidal Plaintiffs' equal-protection claim because, among other things, it fails to offer particularized allegations of the discriminatory impact of the DACA rescission on Latino/a and especially Mexican individuals. If the court were considering Batalla Vidal Plaintiffs' third amended complaint on its own, the court might agree. The Batalla Vidal Plaintiffs' allegation that "[t]he DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups" (BV TAC ¶ 197) appears to be a fairly conclusory "recital[ ] of the elements of a cause of action," which the court need not accept as true. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Their fellow Plaintiffs have, however, alleged particularized facts in support of this alle-

**7.** This file lists the number of DACA applications approved for the top 25 countries of origin for DACA recipients, not for all countries from which DACA recipients originate. (Id.)

gation. More importantly, the court takes judicial notice of the USCIS data referenced above, which may be considered on a Rule 12(b)(6) motion. Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991). The court declines to dismiss the Batalla Vidal Plaintiffs' equal-protection claim simply because they did not append the same data to their third amended complaint. Both sets of Plaintiffs have adequately alleged that the rescission of the DACA program has a disproportionate impact on Latino/a and especially Mexican individuals.

### b)   Purpose

[19]   To establish discriminatory motivation, Plaintiffs must ultimately show that "invidious discriminatory purpose was a motivating factor" in the decision. Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. In other words, they must show that Defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). But they "need not prove that the 'challenged action rested solely on racially discriminatory purposes.' " Hayden v. Paterson, 594 F.3d 150, 163 (2d Cir. 2010) (quoting Arlington Heights, 429 U.S. at 265, 97 S.Ct. 555).

[20, 21]   "Because discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " Id. (quoting Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555). In "extreme" cases, a facially neutral law may have such a "clear" disparate impact, "unexplainable on grounds other than race," that evidence of disparate impact alone may suffice to show discriminatory purpose. Arlington Heights,

429 U.S. at 266, 97 S.Ct. 555 (citing, e.g., Yick Wo, 118 U.S. at 356, 6 S.Ct. 1064, and Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)). In the absence of such a pattern, however, "impact alone is not determinative, and the [c]ourt must look to other evidence" to determine if the challenged action was motivated by discriminatory purpose. Id. This evidence may include, for example, (1) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "[t]he specific sequence of events leading up to the challenged decision"; (3) "[d]epartures from the normal procedural sequence," which "might afford evidence that improper purposes are playing a role"; (4) "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; (5) "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"; and (6) "[i]n some extraordinary circumstances," testimony of official decisionmakers. Id. at 266-68, 97 S.Ct. 555; see also Hayden v. Paterson, 594 F.3d at 163.

To establish discriminatory purpose, Plaintiffs identify a disheartening number of statements made by President Donald Trump that allegedly suggest that he is prejudiced against Latinos and, in particular, Mexicans. (BV TAC ¶¶ 89-99; State Pls. Am. Compl. ¶¶ 57-77.) These comments include (1) then-candidate Trump's assertions that Mexican immigrants are not Mexico's "best," but are "people that have lots of problems," "the bad ones," "criminals, drug dealers, [and] rapists" (BV TAC ¶¶ 91-93; State Pls. Am. Compl. ¶¶ 58-59); (2) Trump's characterization of individuals who protested outside a cam-

paign rally as "thugs who were flying the Mexican flag" (State Pls. Am. Compl. ¶ 61); (3) Trump's statements that a U.S.-born federal judge of Mexican descent could not fairly preside over a lawsuit against Trump's for-profit educational company because the judge was "Mexican" and Trump intended to build a wall along the Mexican border (BV TAC ¶ 96; State Pls. Am. Compl. ¶¶ 62); and (4) pre- and post-Inauguration characterizations of Latino/a immigrants as criminals, "animals," and "bad hombres" (BV TAC ¶¶ 97, 99; State Pls. Am. Compl. ¶¶ 65-66, 70).

[22]   Accepting Plaintiffs' non-conclusory allegations as true and reading all reasonable inferences in their favor, the court concludes that these allegations are sufficiently racially charged, recurring, and troubling as to raise a plausible inference that the decision to end the DACA program was substantially motivated by discriminatory animus. Although the use of racial slurs, epithets, or other racially charged language does not violate equal protection per se, it can be evidence that official action was motivated by unlawful discriminatory purposes. See, e.g. Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999); Smith v. Thornburg, 136 F.3d 1070, 1089-90 (6th Cir. 1998); Freeman v. Arpaio, 125 F.3d 732, 738 n.6 (9th Cir. 1997), overruled in part on other grounds by Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008); Ali v. Connick, 136 F.Supp.3d 270, 279-80 (E.D.N.Y. 2015)

(collecting cases). The court is aware of no authority holding that this rule does not apply simply because the speaker is, or is running to be, the President of the United States. The court expresses no view as to whether these statements (which as Defendants note, are not directly connected to the DACA rescission) would ultimately suffice to provide that the rescission was motivated by discriminatory animus; that is a question for summary judgment or trial. The court concludes only that Plaintiffs have alleged sufficient facts to raise a plausible inference that the DACA rescission violated equal protection, and thus to withstand a motion to dismiss.[8]

Defendants do not defend the President's comments but argue instead that the court should simply ignore them. First, Defendants suggest that because the President's statements were "almost all made before he took the oath of office and [were not] made in connection with the [DACA rescission]," these comments "do not tend to show the existence of both discriminatory intent and discriminatory effect." (State MTD at 33.) Defendants cite no authority for the proposition that, to state an equal-protection claim, a plaintiff must point to some evidence that simultaneously demonstrates both discriminatory intent and discriminatory effect, or that evinces discriminatory bias directly in connection with the challenged official action. To the contrary, Arlington Heights states that courts may

---

8.   Because the comments identified above are sufficient to raise a plausible inference of discriminatory purpose, the court need not decide whether Plaintiffs' remaining allegations support an inference of discriminatory purpose. For example, Plaintiffs allege or argue in their briefs that the President decided to pardon former Maricopa County, Arizona, Sheriff Joe Arpaio (BV TAC ¶ 98; State Pls. Am. Compl. ¶¶ 67-69), that he has made offensive statements about Muslims, Native Americans, transgender individuals, and "shithole

countries" (BV Pls. Opp'n at 19-20), and that, during the campaign, then candidate Trump retweeted a post apparently criticizing former Florida governor Jeb Bush for speaking "Mexican" (BV TAC ¶ 95). The court observes, however, that these allegations would seem to offer only weak support, at best, for the notion that the President's alleged decision to end the DACA program was motivated by desire to harm Latinos and especially Mexicans.

consider the background of facially neutral decisions to smoke out whether they were covertly motivated by discriminatory purposes. 429 U.S. at 267, 97 S.Ct. 555.

The court recognizes that searching for evidence of discriminatory motivation in campaign-trail statements is potentially fraught. Old statements may say little about what lay behind a later decision. Statements made in the throes of a heated race may be "contradictory or inflammatory," and considering them may indeed incentivize litigants in future cases to embark on an "evidentiary snark hunt" in search of past comments indicative of some sort of bias. Washington v. Trump, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski, J., dissenting from denial of reh'g en banc); cf. Regents 12(b)(6) Order, 2018 WL 401177, at *7 (recognizing that consideration of campaign statements "can readily lead to mischief in challenging the policies of a new administration"). Moreover, an equal-protection claim brought against the President raises difficult questions of whether—and, if so, for how long—any Executive action disproportionately affecting a group the President has slandered may be considered constitutionally suspect.

While these are all good reasons to tread lightly, the court does not see why it must or should bury its head in the sand when faced with overt expressions of prejudice. Arlington Heights calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and campaign-trail statements by the official allegedly responsible for a challenged policy would seem to fall squarely within this inquiry. Cf. Int'l Refugee Assistance Project v. Trump, 883 F.3d 233, 266 (4th Cir. 2018) (en banc) (declining to consider pre-election statements while noting that they "certainly provide relevant context when examining the purpose" of a challenged Presidential proclamation suspending entry of individuals from specified countries), pet. for cert. docketed, No. 17-1270. At the very least, one might reasonably infer that a candidate who makes overtly bigoted statements on the campaign trail might be more likely to engage in similarly bigoted action once in office.

Defendants' attempts to pass the buck to Acting Secretary Duke are no more persuasive. Defendants argue that the President's statements are legally irrelevant because Acting Secretary Duke "was the only official vested with authority . . . to make the decision at issue," and Plaintiffs do not point to similarly objectionable statements by her. (BV MTD at 22; State MTD at 34.) To the extent Defendants argue that Plaintiffs have insufficiently alleged racial animus on the part of Acting Secretary Duke or the Attorney General, the court is inclined to agree: Plaintiffs have not identified statements by Acting Secretary Duke or the Attorney General that would give rise to an inference of discriminatory motive. Although the Batalla Vidal Plaintiffs insinuate that the Attorney General referred to immigrants as "filth" (BV TAC ¶ 100; BV Pls. Opp'n at 20), his prepared remarks make clear that this term was used only to refer to international drug-trafficking cartels and the gang MS-13 (Dep't of Justice, Press Release, Attorney General Jeff Sessions Delivers Remarks Announcing the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://www.justice.gov/opa/ speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed). This comment therefore does not support a plausible inference that the Attorney General was motivated by racial discrimination when he advised that Acting Secretary Duke end the DACA program.

**[23]**  The court rejects, however, Defendants' remarkable argument that the President apparently <u>cannot</u> be liable for rescinding the DACA program because only Acting Secretary Duke had the legal authority to end that program. (State MTD at 34.) Our Constitution vests "executive Power" in the President, not in the Secretary of DHS, who reports to the President and is removable by him at will. U.S. Const., art. II, § 1, cl. 1. This position appears to be at odds with the stated position of the President himself, who tweeted that if Congress were unable to "legalize DACA," he would "revisit this issue," implying that he (correctly) understands that he has ultimate authority over the program. (Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 5, 2017 7:38 PM), https://twitter.com/realdonaldtrump/status/905228667336499200.) If, as Plaintiffs allege, President Trump himself directed the end of the DACA program (<u>e.g.</u>, State Pls. Am. Compl. ¶ 16), it would be surprising if his "discriminatory intent [could] effectively be laundered by being implemented by an agency under his control" (BV Pls. Opp'n at 18). As courts have recognized in far more mundane contexts, liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action. Cf. <u>Vasquez v. Empress Ambulance Serv., Inc.</u>, 835 F.3d 267, 272-73 (2d Cir. 2016) (discussing "cat's paw" liability, under which an organization may be held liable for employment discrimination when a prejudiced subordinate manipulates an unbiased superior into taking adverse employment action); <u>Back v. Hastings on</u> <u>Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 126 & n. 18 (2d Cir. 2004) (applying cat's-paw theory to equal-protection claim).

Accordingly, Defendants' motion to dismiss Plaintiffs' equal-protection claims is DENIED.

## B.  Information-Use Policy

**[24]**  Next, the court considers whether the <u>Batalla Vidal</u> Plaintiffs state a claim regarding Defendants' alleged changes to DHS's information-use policy.[9] The court concludes that they have not done so, because materials attached to their third amended complaint refute their allegation that Defendants have changed that policy to make it easier to use DACA applicants' information for immigration-enforcement purposes.

The <u>Batalla Vidal</u> Plaintiffs contend that Defendants essentially tricked them into exposing themselves and their family members to a heightened risk of deportation. To apply for DACA, individuals disclosed "extensive sensitive and personal information" about themselves and, often, their family members, to immigration authorities. (BV TAC ¶¶ 77-79.) They did so, the third amended complaint alleges, because "Defendants consistently represented . . . that the information they provided would be protected from disclosure to U.S. Immigrations and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances." (<u>Id.</u> ¶ 80.)[10] Plaintiffs contend that, as part of

---

**9.**  Although the State Plaintiffs also asserted similar claims under the Fifth Amendment and principles of equitable estoppel (State Pls. Am. Compl. ¶¶ 240-52), the court previously dismissed these claims for lack of standing (Nov. 9 M&O at 41-46).

**10.**  In particular, the DACA application form provided as follows:

> <u>Information provided in this request is protected from disclosure to ICE and [CBP] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Ap-</u>

the DACA rescission, however, "DHS has changed its policy . . . to remove the limitations on using [this] information for immigration-enforcement purposes." (<u>Id.</u> ¶ 156.) In particular, Plaintiffs attach to the third amended complaint a document of frequently asked questions published by USCIS on November 30, 2017 (the "November 30 FAQs"), which states that "[i]nformation provided to USCIS for the DACA process will not make you an immigration priority for that reason alone. That information will only be <u>proactively provided</u> to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance." (USCIS, Frequently Asked Questions: Rejected DACA Requests (Last Reviewed/Updated 11/30/2017) ("Nov. 30 FAQs") (Dkt. 113-1 at ECF p.65) at Q5 (emphasis added).) The <u>Batalla Vidal</u> Plaintiffs contend that this alleged change violated Section 706(2)(A) of the APA. (<u>Id.</u> ¶¶ 179, 181.)

[25] Defendants argue that this claim should be dismissed because they have not, in fact, changed the information-use policy. (BV MTD at 2, 5, 17-18.) Ordinarily, the court would not resolve such a factual dispute on a motion to dismiss. But "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true."

<u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (discussing Rule 12(b)(1) motions); <u>Kardovich v. Pfizer, Inc.</u>, 97 F.Supp.3d 131, 140-41 (E.D.N.Y. 2015). Here, the November 30 FAQs, which are attached to Plaintiffs' complaint, state expressly that the DACA "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." (Nov. 30 FAQs at Q5; <u>see also</u> USCIS, Frequently Asked Questions: Rejected DACA Requests (Last Reviewed/Updated 12/07/2017) ("Dec. 7 FAQs") (Dkt. 113-1 at ECF p.68) at Q5.) While the <u>Batalla Vidal</u> Plaintiffs argue that the court should not credit Defendants' unsworn representation that there has been no change to the information-sharing policy, they do not answer Defendants' argument that they have effectively pleaded themselves out of court by relying on a document that contradicts their otherwise-unsupported allegation of a change to DHS's information-use policy. (<u>Compare</u> BV MTD at 17-18, <u>with</u> BV Pls. Opp'n at 10 n.11.)

Accordingly, Defendants' motion to dismiss the <u>Batalla Vidal</u> Plaintiffs' substantive APA claim, to the extent that claim alleges that Defendants arbitrarily and capriciously changed DHS's information-use policy, is GRANTED.[11]

---

pear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance . . . . The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself [sic], to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. <u>The above information sharing clause covers family members and guardians, in addition to the requestor.</u>

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.
(Form I-821D, Consideration of Deferred Action for Childhood Arrivals (Dkt. 113-1 at ECF p.6) at ECF p.25 (emphasis added).)

11. The court notes, however, that two other district courts have denied Defendants' mo-

To be clear, the court holds only that the Batalla Vidal Plaintiffs have not plausibly alleged that DHS actually changed its information-sharing policy. If these Plaintiffs were to allege additional facts giving the lie to Defendants' assertion that there has been no change to this policy, they may have a compelling claim to relief. Two other district courts have already denied Defendants' motions to dismiss similar claims. See CASA de Maryland v. U.S. DHS, 284 F.Supp.3d 758, 777-79, 2018 WL 1156769, at *14-15 (D. Md. 2018) (estoppel); Regents 12(b)(6) Order, 2018 WL 401177, at *4-5 (substantive due process). The U.S. District Court for the District of Maryland has specifically enjoined Defendants from using DACA applicants' personal information for immigration-enforcement purposes except as authorized by established DHS policy or in camera review, see Am. Order (Dkt. 49), CASA de Maryland v. U.S. DHS, No. 8:17-CV-2942 (RWT), 284 F.Supp.3d 758, 779, 2018 WL 1156769 (D. Md. Mar. 15, 2018).

**C. Procedural Due Process**

Finally, the court turns to the newly asserted claim in the Batalla Vidal Plaintiffs' third amended complaint, in which MRNY challenges Defendants' processing of renewal requests submitted pursuant to the DACA Rescission Memo. MRNY states a claim with respect to some categories of DACA recipients whose renewal requests were allegedly unfairly denied in September or October 2017, but not others.

In the DACA Rescission Memo, Acting Secretary Duke stated that DACA recipients whose deferred action and work authorization were set to expire before March 5, 2018, could request a final two-year extension of their benefits. (DACA Rescission Memo at 4.) In particular, DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.)

According to MRNY, Defendants implemented this directive in a series of unfair ways. First, MRNY alleges, Defendants rejected applications that were delivered to USCIS P.O. boxes late in the day on October 5 but not retrieved by USCIS staff and taken to separate USCIS "lockboxes" until the following day. (BV TAC ¶¶ 115-20.) Second, Defendants allegedly rejected as untimely certain renewal requests that were delivered after October 5 due to unusual U.S. Postal Service delays. (Id. ¶¶ 121-22; see also Liz Robbins, Post Office Fails to Deliver on Time, and DACA Applications Get Rejected, N.Y. Times (Nov. 10, 2017) (Dkt. 113-1 at ECF p.49).) Third, Defendants allegedly rejected renewal requests that were received before October 5 "but had been returned to the applicant due to real or perceived clerical errors." (BV TAC ¶ 123.) For example, USCIS allegedly rejected one MRNY member's DACA renewal request because a USCIS employee misread the date on her application-fee check as "2012," rather than "2017." (Id. ¶ 124.) DHS invited some of these applicants to refile corrected applications, but when

tions to dismiss similar claims. See CASA de Maryland v. U.S. DHS, 284 F.Supp.3d 758, 777-79, 2018 WL 1156769, at *14-15 (D. Md.

2018) (estoppel); Regents 12(b)(6) Order, 2018 WL 401177, at *4-5 (substantive due process).

they did so, DHS rejected the refiled requests as untimely. (Id. ¶¶ 123, 127) According to MRNY, this deviated from DHS's prior practice of allowing individuals whose DACA applications were rejected for minor clerical errors to correct those errors or submit further evidence in support of their applications within a given period of time. (Id. ¶ 123)

On November 15, 2017, Defendants indicated that USCIS would reconsider certain applications that were delayed in the mail or improperly rejected. (Id. ¶ 129 (citing Defs. Nov. 15, 2017, Letter Regarding USCIS Guidance (Dkt. 108).) USCIS allegedly stated that it would reach out to individuals whose applications were rejected as untimely due to mail delays and provide them instructions on how to resubmit their applications. (BV TAC ¶¶ 130.) USCIS allegedly has not, however, created an equivalent process for individuals whose applications were rejected due to real or perceived minor clerical errors. (Id. ¶¶ 132-34.) MRNY contends that this "arbitrary and unfair implementation of the October 5, 2017 [DACA renewal request] deadline violates the Due Process Clause of the Fifth Amendment" by depriving DACA recipients of a liberty or property interest without the process to which they are entitled. (Id. ¶¶ 199-205.)

### 1. Standing

[26, 27] Defendants first move to dismiss this claim for lack of standing, arguing that MRNY has not alleged that its clients or members suffered an injury-in-fact because "the injuries on which [it] . . . relies have been remedied." (Id. at 10.) [12] This argument is meritless.

[28] As their submissions make clear, Defendants have not, in fact, remedied all injuries incurred by DACA recipients whose renewal requests were allegedly improperly rejected. For MRNY clients and members whose applications arrived late on October 5, "the agency will identify those individuals affected and invite them to resubmit their DACA requests," and "those not yet contacted . . . may affirmatively reach out to the agency, explain their situation, and resubmit their request for reconsideration." (Id. (citing Dec. 7 FAQs at Q3).) For individuals whose requests were delayed due to postal-service errors and subsequently rejected as untimely, "USPS is working with USCIS to identify DACA requests that were received after the deadline due to USPS mail-service delays." (Id. at 11 (quoting Dec. 7 FAQs at Q8).) Once such requests are identified, "USCIS will send affected DACA requestors a letter inviting them to resubmit their DACA request." (Id. (quoting Dec. 7 FAQs at Q8).) And individuals whose requests were rejected due to perceived clerical errors "may contact the agency and explain the error believed to

**12.** Defendants do not contest that MRNY has organizational standing to assert this claim. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). MRNY specifically alleges in the third amended complaint that a number of its members' and clients' DACA renewal requests were denied due to the alleged processing errors discussed above. (BV TAC ¶¶ 54-56, 118-24, 127-29, 134.) Ensuring that DACA renewal requests are adjudicated in a fair and orderly manner is clearly consistent with MRNY's purpose of "empowering immigrant, Latino/a, and working-class communities in New York." (Id. ¶ 45.) The court is not aware of any reason why this claim or the relief requested by MRNY requires the participation of individual DACA requestors. Accordingly, the court concludes that MRNY has associational standing to assert this claim.

have been made"; "[i]dentification of 'clear error' in the processing of a renewal request' may result in the agency 'exercising its discretion' to review the request again.'" (Id. (quoting Dec. 7 FAQs at Q7 (emphasis added and alterations adopted)).) Thus, with respect to each category of allegedly wronged MRNY client or member, Defendants' supposed "remedy" is either that USCIS intends to address the injury in the future or that it will allow the injured party to ask it to reconsider its decision. The court commends Defendants for taking steps to redress the allegedly wrongful denials of these DACA renewal requests. But Defendants err to the extent they contend that, because they have stated that they may reconsider these denials, MRNY members and clients whose applications were denied have not suffered injuries-in-fact. See Wong v. Daines, 582 F.Supp.2d 475, 479 (S.D.N.Y. 2008) (failure to exhaust administrative remedies does not implicate Article III injury-in-fact).[13] MRNY has standing to assert this claim on behalf of its members and clients who were adversely affected by Defendants' allegedly wrongful adjudication of their DACA renewal requests.

[29] Nor is this claim moot. Although Defendants have reconsidered their denial of at least one MRNY member's DACA renewal request (e.g., BV TAC ¶ 120; BV MTD at 10 n.3), MRNY appears that many of its members and clients still await relief (BV Pls. Opp'n at 17-18). Even if Defendants had taken action to right all these alleged wrongs, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case" unless it is "'absolutely clear that the allegedly wrongful behavior could not rea-

sonably be expected to recur.'" Friends of the Earth. Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). Defendants offer no such assurances here.

Accordingly, Defendants' motion to dismiss the Batalla Vidal Plaintiffs' sixth claim for relief is DENIED, to the extent it seeks to dismiss this claim for lack of subject-matter jurisdiction.

2.  Merits

Next, Defendants contend that MRNY has failed to state a procedural-due-process claim based on the allegedly wrongful denials of certain DACA recipients' renewal requests. (BV MTD at 22-25.) The court agrees in part and disagrees in part.

[30] "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012).

[31] Defendants focus on the first element, contending that MRNY has not identified a constitutionally protected liberty or property interest "for the simple reason that DACA recipients have no . . . interest in deferred action." (BV MTD at 23.) They correctly argue that only benefits to which a person has a "legitimate claim of entitlement" can support a constitutionally protected liberty or property interest. (Id. (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S.Ct.

---

**13.** Defendants also contend that the court should require MRNY to exhaust administrative remedies before filing suit in federal court. (BV MTD at 11-12.) As the Batalla Vidal Plaintiffs note, however (BV Pls. Opp'n

at 3, 5), Defendants identify no statute that would require them to exhaust administrative remedies before filing suit. See Darby v. Cisneros, 509 U.S. 137, 153-54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

2796, 162 L.Ed.2d 658 (2005)).) Because the decision to grant deferred action and work authorization is ultimately discretionary, they say, there can be no constitutionally protected liberty or property interest in receiving DACA benefits. (Id. at 23-24; see also 2012 DACA Memo at 4.)

[32, 33]  This argument is partly true. "In determining whether a given benefits regime creates a 'legitimate claim of entitlement' to such benefits, we ask whether the statutes and regulations governing the distribution of benefits 'meaningfully channel[ ] official discretion by mandating a defined administrative outcome.' " Barrows v. Burwell, 777 F.3d 106, 113 (2d Cir. 2015) (quoting Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005)). The 2012 DACA Memo only sets out criteria for DHS staff's consideration, and there is no guarantee that fulfillment of these criteria will result in a grant of deferred action or work authorization. Under the memo, the decision to grant or deny those benefits is entirely as a matter of DHS's discretion. Because DHS is not effectively required to grant any particular DACA renewal requests, MRNY cannot state a procedural-due-process claim challenging the denial of its members' and clients' requests. Cf. Yuen Jin v. Mukasey, 538 F.3d 143, 156-57 (2d Cir. 2008) (petitioners for asylum lack liberty or property interest in discretionary relief). While the denial of those requests may affect some DACA recipients' liberty interests (a question the court need not decide), any such liberty interests are ultimately contingent on DACA beneficiaries' receipt of renewed deferred action, to which they have no "legitimate entitlement."

[34]  Defendants' argument is also something of a red herring. MRNY contends not only that Defendants improperly denied its members' and clients' renewal requests, but that Defendants' implementation of the October 5 deadline improperly denied MRNY's members and clients of the opportunity to be considered for renewal. (BV Pls. Opp'n at 23.) As MRNY points out, the DACA Rescission Memo clearly stated that USCIS "will adjudicate . . . properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents . . . from current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (DACA Rescission Memo at 4 (emphasis added); see BV Pls. Opp'n at 23.) While the ultimate decision to grant or deny a renewal request is discretionary, this language makes clear that USCIS would at least consider every "properly filed" and timely "accepted" renewal request. MRNY has therefore sufficiently alleged that its affected members and clients had a legitimate entitlement to submit their renewal requests. Cf. Yuen Jin, 538 F.3d at 161 n.1 (Sack, J., concurring in part and in the judgment) ("Although asylum is a discretionary form of relief, and the Due Process Clause does not protect benefits that government officials may grant or deny in their discretion, every asylum applicant is nonetheless entitled to due process in establishing her eligibility for that form of relief." (internal quotation marks and citations omitted and alteration adopted)).

[35, 36]  MRNY has also sufficiently alleged that at least some of its members and clients were deprived of cognizable interests in the consideration of their DACA renewal requests without due process of law. With respect to individuals whose requests were rejected because they were delivered to USCIS P.O. boxes on October 5 but not transferred to the appropriate "lockbox" until the following day, the DACA Rescission Memo was at least ambiguous as to which applications would

be deemed "accepted . . . as of October 5, 2017." (DACA Rescission Memo at 4.) The DACA Rescission Memo did not state that applications had to be received at a USCIS P.O. box by mid—to late afternoon to be "accepted," or that only those applications redelivered to a designated USCIS "lock-box" by October 5 would be deemed "accepted," raising the possibility that MRNY may be able to show that the denial of these requests violated due process. See Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 249 (2d Cir. 2014) (stating that, on a Rule 12(b)(6) motion, "dismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief). Likewise, MRNY has stated a claim on behalf of individuals whose requests were rejected because USCIS staff incorrectly deemed them to be marred by clerical errors. Such applications were, in fact, "properly filed," as the DACA Rescission Memo required, but were only rejected due to errors by USCIS staff. It is hard to see how such denials comport with due process.

MRNY has not stated a claim, however, with respect to DACA recipients whose requests were rejected as untimely after being delayed by the U.S. Postal Service. The court sympathizes with the plight of these individuals and commends Defendants for voluntarily taking steps to address this unfortunate situation. The DACA Rescission Memo states, however, that only "properly filed" and "accepted" requests would be considered. It is common for mailing deadlines to be calculated based on when something is postmarked, not when it is actually delivered to the recipient. But USCIS's stated decision to use a "delivery rule," rather than a 31 "mailbox rule," to determine which requests were timely does not violate the Due Process Clause.

[37] Likewise, MRNY has not stated a claim with respect to individuals whose renewal requests were rejected due to actual (as opposed to incorrectly perceived) clerical errors. In light of the human consequences of the decision to grant or deny an individual a renewal of DACA benefits, it may seem overparticular to deny a renewal request because someone "forg[ot] to check a box, forg[ot] to sign or sign[ed] in the wrong place, or submitt[ed] a check for what applicants previously had to pay for DACA renewal." (BV TAC ¶ 141.) The court hopes that USCIS will review these applications sympathetically, understanding the gravity of taking away someone's livelihood and tentative protection against deportation simply because he or she forgot to check a box on a multi-page form. The court cannot, however, require USCIS to do so, because due process of law does not require the agency to accept incomplete or incorrect renewal requests.

Accordingly, Defendants' motion to dismiss the Batalla Vidal Plaintiffs' sixth claim for relief for failure to state a claim is GRANTED IN PART and DENIED IN PART. MRNY has adequately alleged that the rejection of DACA renewal requests that arrived late in the day on October 5, 2017, or that were erroneously deemed to contain minor clerical errors, violated procedural due process. MRNY has not, however, stated a procedural-due-process claim on behalf of requestors whose applications arrived after October 5 due to postal delays or actually contained minor clerical errors.

## III. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Batalla Vidal Plaintiffs' third amended complaint and the State Plaintiffs' amended complaint (Dkt. 207 in No. 16-CV-4756; No. 71 in No. 17-CV-5228) are GRANTED IN PART

**286**          **291 FEDERAL SUPPLEMENT, 3d SERIES**

and DENIED IN PART. The <u>Batalla Vidal</u> Plaintiffs' first, third, and fourth claims for relief are dismissed, and the second claim for relief is dismissed to the extent it alleges that Defendants weakened DHS's information-use policy. The sixth claim for relief is dismissed in part, as stated above. The State Plaintiffs' fifth and sixth claims for relief are dismissed.

SO ORDERED.



ILLINOIS UNION INSURANCE
COMPANY, Plaintiff,

v.

US BUS CHARTER & LIMO INC.,
doing business as US Coachways,
and James Bull, Defendants.

Case No. 1:16–cv–06602–FB–RLM

United States District Court,
E.D. New York.

Signed March 8, 2018

**Background:** Consumers, who settled putative class action claims against insured bus charter brokerage company based on violation of Telephone Consumer Protection Act (TCPA), brought action as assignee against company's insurer, seeking to recover under insurance policy for class action judgment. Consumers' action was transferred from the Northern District of Illinois, and consolidated with insurer's declaratory judgment action, which sought declaration that insurer did not owe coverage under policy. Consumers moved to dismiss for lack of personal jurisdiction and both insurer and consumers moved for partial summary judgment on the issue of coverage.

**Holdings:** The District Court, Block, Senior District Judge, held that:

(1) insured's TCPA violation was within scope of insurance policy's coverage for performance of professional services under New York law;

(2) insured's TCPA violation was within scope of insurance policy's coverage for performance of travel agency operations under New York law;

(3) under New York law, as predicted by the District Court, policy's definition of damages did not exclude coverage for consumer's judgment against insured.

Consumers' motion for partial summary judgment granted; insurer's motion for partial summary judgment denied.

**1. Insurance** ⟜1863

Construction of an insurance contract is generally a matter of law to be determined by the court, under New York law.

**2. Contracts** ⟜143(1)

When a motion for summary judgment turns on interpretation of the language in a contract, a court accords that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish.

**3. Federal Civil Procedure** ⟜2492

Where contract language is unambiguous, the court may construe it as a matter of law and grant summary judgment accordingly.

**4. Contracts** ⟜176(2)

Whether a contract is ambiguous is a threshold question of law to be determined by the court.

AR0637

ernment's view, that the individual defendants are immune from suit under the CPIUN and IOIA. Consequently, the Court lacks subject-matter jurisdiction over the claims against them.[4]

### III. Conclusion

For these reasons, this case is dismissed for lack of subject-matter jurisdiction. Plaintiffs' letter-motion to file a sur-reply and to open discovery (Dkt. No. 24) is denied as moot. The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**



**Martín Jonathan BATALLA VIDAL et al., Plaintiffs,**

**v.**

**Kirstjen M. NIELSEN, Secretary, Department of Homeland Security, et al., Defendants.**

**State of New York et al., Plaintiffs,**

**v.**

**Donald Trump, President of the United States, et al., Defendants.**

**16–CV–4756 (NGG) (JO)**
**17–CV–5228 (NGG) (JO)**

United States District Court,
E.D. New York.

Signed 02/13/2018

**Background:** Sixteen states, individuals, and nonprofit organization brought action against President of the United States, Secretary of Department of Homeland Security (DHS), and United States Attorney General, alleging that decision to end Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, violated Administrative Procedure Act (APA) and the Due Process Clause of the Fifth Amendment. Plaintiffs moved for preliminary injunction barring defendants from ending DACA program pending a final adjudication of cases on the merits.

**Holdings:** The District Court, Nicholas G. Garaufis, J., held that:

(1) plaintiffs were substantially likely to succeed on merits of claim that decision to end DACA was arbitrary and capricious in violation of APA;

(2) plaintiffs were likely to suffer irreparable harm if court did not issue preliminary injunction; and

(3) balance of equities and public interest weighed in favor of issuing preliminary injunction.

Motion granted.

**1. Administrative Law and Procedure**
⚖**301, 381**

Congress passed the Administrative Procedure Act (APA) to ensure that agencies follow constraints even as they exercise their powers; one of these constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles.  5 U.S.C.A. § 702.

---

**4.** In addition to immunity for their official acts, the Government contends that defendants Soares and Mulet have diplomatic immunity by virtue of their current positions at the UN. In light of the above, however, the Court does not reach this issue or any other ground for dismissal raised by the Government. *See Meintanas v. Hutomo*, No. 98-CV-2370 (LMM), 1999 WL 349628, at *2 n.1 (S.D.N.Y. May 28, 1999).

**2. Administrative Law and Procedure**
   **☞760, 763**

Review under the Administrative Procedure Act's (APA) arbitrary and capricious standard is narrow, and the court may not substitute its judgment for that of the agency; instead, the court considers only whether the agency's decision was the product of reasoned decisionmaking. 5 U.S.C.A. § 702.

**3. Administrative Law and Procedure**
   **☞763**

If the agency decision examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made, the court will uphold the agency's decision under the Administrative Procedure Act (APA). 5 U.S.C.A. § 702.

**4. Administrative Law and Procedure**
   **☞763**

If the agency's decision relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, that decision must be set aside under the Administrative Procedure Act (APA). 5 U.S.C.A. § 702.

**5. Administrative Law and Procedure**
   **☞676, 753**

Review under the Administrative Procedure Act's (APA) arbitrary-and-capricious standard is generally limited to the agency's stated rationale for its decision and to the full administrative record that was before the agency at the time it made its decision; the court may not supply a reasoned basis for the agency's action that the agency itself has not given. 5 U.S.C.A. § 702.

**6. Administrative Law and Procedure**
   **☞753**

Under the Administrative Procedure Act (APA), the court may not uphold agency action based on post hoc rationalizations of agency action. 5 U.S.C.A. § 702.

**7. Aliens, Immigration, and Citizenship**
   **☞101, 690**

The government of the United States has broad, undoubted power over the subject of immigration and the status of aliens; that power derives from the Constitution, which authorizes Congress "to establish a uniform Rule of Naturalization," and from the government's inherent power as sovereign to control and conduct relations with foreign nations. U.S.C.A. Const. Art. 1, § 8, cl. 4.

**8. Aliens, Immigration, and Citizenship**
   **☞318**

"Deferred action" is a longstanding practice by which the Executive Branch exercises its discretion to abandon, or to decline to undertake, deportation proceedings for humanitarian reasons or simply for its own convenience.

   See publication Words and Phrases for other judicial constructions and definitions.

**9. Aliens, Immigration, and Citizenship**
   **☞318**

Deferred action does not confer lawful immigration status, a pathway to citizenship, or a defense to removal, and is revocable by immigration authorities.

**10. Injunction ☞1075, 1572**

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.

**11. Injunction ☞1092**

A party seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest.

**12. Injunction ☞1096**

To establish a likelihood of success on the merits, the party seeking an injunction need only make a showing that the probability of his prevailing is better than fifty percent.

**13. Injunction ☞1012, 1096**

When an injunction is mandatory, that is, when the injunction alters the status quo by commanding some positive act, the movant must demonstrate a clear or substantial showing of likelihood of success.

**14. Injunction ☞1046**

To obtain a mandatory injunction, a movant must make a strong showing of irreparable harm.

**15. Aliens, Immigration, and Citizenship ☞413**

Attorney General's conclusion that Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, was unconstitutional because it "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," was legally erroneous, and thus states and individual plaintiffs were substantially likely to succeed on merits of claim that decision to end DACA was arbitrary and capricious in violation of Administrative Procedure Act (APA), warranting

preliminary injunction barring defendants from ending DACA program pending final adjudication on the merits; executive branch had wide discretion not to initiate or pursue specific enforcement actions, and it was within that discretion to determine that certain categories of removable alien were better uses of limited enforcement resources.  APA § 706(2)(A).

**16. Administrative Law and Procedure ☞796**

An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law.  5 U.S.C.A. § 706(2)(A).

**17. Aliens, Immigration, and Citizenship ☞413**

Attorney General's conclusion that Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, was unlawful because DACA policy had same legal and constitutional defects that courts recognized as to Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), was arbitrary and capricious under Administrative Procedure Act (APA), and thus states and individual plaintiffs were substantially likely to succeed on merits of claim challenging decision to end DACA, warranting preliminary injunction barring defendants from ending DACA program pending final adjudication on the merits; courts enjoined implementation of DAPA program on grounds that it was not promulgated through notice-and-comment rulemaking and that it was substantively arbitrary and capricious, and DACA was general statement of policy rather than "legislative" rule that was subject to notice-and-comment rulemaking,

and courts expressly declined to reach claim that DAPA was unconstitutional. 5 U.S.C.A. §§ 553, 706(2)(A).

**18. Administrative Law and Procedure**
      ☞763

An agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect.

**19. Administrative Law and Procedure**
      ☞764.1

Agency mistakes constitute harmless error under the Administrative Procedure Act (APA) only where they clearly had no bearing on the procedure used or the substance of decision reached. 5 U.S.C.A. § 706.

**20. Aliens, Immigration, and Citizenship**
      ☞413

Decision to end Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, was internally inconsistent, and thus states and individual plaintiffs were substantially likely to succeed on merits of claim challenging decision to end DACA as arbitrary and capricious under Administrative Procedure Act (APA), warranting preliminary injunction barring defendants from ending DACA program pending final adjudication on the merits; one stated reason for rescission of DACA program was because it was unconstitutional, and rather than terminating program, Secretary of Department of Homeland Security (DHS) began phased "wind-down of the program," under which DHS would continue to renew DACA applications that were set to expire in the next six months and would honor existing DACA benefits until they expired, potentially continuing to violate Constitution. 5 U.S.C.A. § 706(2)(A).

**21. Aliens, Immigration, and Citizenship**
      ☞413

Attorney General's conclusion that rescission of Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, was based on reasonable assessment of litigation risk, was arbitrary and capricious under Administrative Procedure Act (APA), and thus states and individual plaintiffs were substantially likely to succeed on merits of claim challenging decision to end DACA, warranting preliminary injunction barring defendants from ending DACA program pending final adjudication on the merits; there was no evidence that defendants considered why litigating rescission of DACA was preferable to litigating decision to maintain program, and there was no evidence that defendants considered reliance interests engendered by DACA program. 5 U.S.C.A. § 706(2)(A).

**22. Administrative Law and Procedure**
      ☞502, 763

To withstand review under the Administrative Procedure Act's (APA) arbitrary-and-capricious standard, an agency that is changing its policy need not explain why the reasons for the new policy are better than the reasons for the old policy; the agency must nevertheless engage in reasoned decisionmaking, which, among other things, means that the agency must consider "serious reliance interests" engendered by the previous policy. 5 U.S.C.A. § 706(2)(A).

**23. Administrative Law and Procedure**
      ☞753

When a court reviews an agency action, the court reviews the agency's stated reasons for its decision and may not supply a reasoned basis for the agency's action that the agency itself has not given.

**AR0641**

**24. Aliens, Immigration, and Citizenship** ⚖413

States and individuals challenging decision by Department of Homeland Security (DHS) to end Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, were likely to suffer irreparable harm if court did not issue preliminary injunction barring defendants from ending DACA program pending final adjudication of cases on the merits; concomitant with loss of deferred action, DACA recipients would lose their work authorization, rendering them legally unemployable in the United States, some DACA recipients would lose employer-sponsored healthcare coverage, endangering recipients and their families and imposing tremendous burdens on state public health systems, employers would suffer due to inability to hire or retain erstwhile DACA recipients, affecting their operations on an ongoing basis and causing them to incur unrecoverable economic losses, and DACA rescission could result in "staggering" adverse economic impacts.

**25. Injunction** ⚖1103, 1106

To satisfy the irreparable harm requirement for a preliminary injunction, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

**26. Injunction** ⚖1106

For purposes of a preliminary injunction, irreparable harm cannot be remedied by an award of monetary damages.

**27. Injunction** ⚖1100, 1109

To make the decision whether the balance of equities tips in plaintiffs' favor and if an injunction is in the public interest, for preliminary injunction purposes, the court balances the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences of employing the extraordinary remedy of injunction.

**28. Injunction** ⚖1099, 1100

The preliminary injunction factors of whether the balance of equities tips in plaintiffs' favor and whether an injunction is in the public interest merge when the government is the opposing party.

**29. Aliens, Immigration, and Citizenship** ⚖413

Balance of equities and public interest weighed in favor of issuing preliminary injunction barring Department of Homeland Security (DHS) from ending Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, pending final adjudication of cases on the merits; although DHS had broad discretion to set immigration-enforcement priorities, allowing DACA rescission to take immediate effect would cost many DACA recipients opportunity to work legally in United States, enjoining implementation of DACA rescission would preserve status quo, enabling a full resolution of matter on the merits, agency decision strongly appeared to have been arbitrary and capricious, and public interest was not served by allowing defendants to proceed with arbitrary and capricious action, and enjoining rescission of DACA program on erroneous legal grounds did not intrude on government's discretion or well-established authority to set immigration-enforcement policies.

**30. Aliens, Immigration, and Citizenship** ⟷**413**

Nationwide preliminary injunction was warranted requiring Department of Homeland Security (DHS) to maintain Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered United States as children, on same terms and conditions that existed prior to promulgation of DACA rescission memo, pending final adjudication of cases challenging DACA rescission on the merits, where plaintiffs included several individuals, a nonprofit organization, sixteen states and the District of Columbia, and to protect states' interests, court would need to enjoin defendants from rescinding DACA program with respect to states' residents and employees, including employees of any instrumentalities of state, and such an injunction would be unworkable and would likely create administrative problems, and there was strong federal interest in uniformity of federal immigration law.

**31. Injunction** ⟷**1016**

Equitable principles provide that the court should not enter an injunction that is broader than necessary to provide complete relief to the plaintiffs.

―――――――

Ajay Saini, New York State Office of the Attorney General, Brooklyn, NY, Lourdes Maria Rosado, Sania Waheed Khan, New York State Office of the Attorney General, Diane Omotayo Lucas, New York, NY, Genevieve C. Nadeau, Abigail Taylor, Pro Hac Vice; Massachusetts Office of the Attorney General, Jonathan B. Miller, Office of the Attorney General, Boston, MA, Marsha Chien, Colleen Melody, Pro Hac Vice; Washington State Attorney General's Office, Seattle, WA, Robert W. Ferguson, Pro Hac Vice; Washington State Attorney General's Office Olympia, WA, Mark F. Kohler, Pro Hac Vice; Hartford, CT, Aaron R. Goldstein, Aleine M. Cohen, Pro Hac Vice; Delaware Department of Justice, Wilmington, DE, Donna H. Kalama, Pro Hac Vice; Department of the Attorney General, Honolulu, HI, Anna P. Crane, Pro Hac Vice; Chicago, IL, Nathanael Blake, Pro Hac Vice; Office of the Iowa Attorney General, Des Moines, IA, Tania Maestas, Pro Hac Vice; Ari Biernoff, New Mexico Attorney General's Office, Santa Fe, NM, Sarah Weston, Scott Kaplan, Pro Hac Vice; Brian Alexander De Haan, Oregon Department of Justice, Portland, OR, Michael Fischer, Jonathan Goldman, Pro Hac Vice; Office of Attorney General, Harrisburg, PA, Adam Roach, Pro Hac Vice; Michael Field, Rebecca Partington, Rhode Island Attorney General, Providence, RI, Julio A. Thompson, Pro Hac Vice; Benjamin Daniel Battles, Vermont Attorney General's Office, Montpelier, VT, Matthew R. McGuire, Pro Hac Vice; Office of the Attorney General, Richmond, VA, for Plaintiffs.

Brad Rosenberg, Rachael Westmoreland, Kate Bailey, Stephen M. Pezzi, U.S. Department of Justice, Washington, DC, Joseph Anthony Marutollo, U.S. Attorney's Office, Brooklyn, NY, for Defendants.

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District Judge.

In 2012, the Department of Homeland Security created the Deferred Action for Childhood Arrivals ("DACA") program. That program permitted certain individuals without lawful immigration status who entered the United States as children to obtain "deferred action"—contingent, discretionary relief from deportation—and

authorization to work legally in this country. Since 2012, nearly 800,000 DACA recipients have relied on this program to work, study, and keep building lives in this country.

On September 5, 2017, Defendants announced that they would gradually end the DACA program.[1] (Letter from Jefferson B. Sessions III to Elaine C. Duke (Admin. R. (Dkt. 77–1)[2] 251) ("Sessions Ltr."); Mem. from Elaine C. Duke, Acting Sec'y, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (Admin. R. 252) ("DACA Rescission Memo").) The Department of Homeland Security ("DHS") would consider pending DACA applications and renewal requests, as well as promptly filed renewal requests by DACA beneficiaries whose benefits were set to expire within six months, but would reject all other applications and renewal requests. (DACA Rescission Memo at 4.) Plaintiffs in the above-captioned cases promptly challenged Defendants' decision on a number of grounds, including, most relevant for purposes of this Memorandum and Order, that the decision violated the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (the "APA"). (2d Am. Compl. (Dkt. 60) ); Compl. (Dkt. 1, No. 17–CV–5228).) Plaintiffs now seek a preliminary injunction barring Defendants from ending the DACA program pending a final adjudication of these cases on the merits. (Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 123–1) ("BV Pls. Mot."); Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 96–1, No. 17–CV–5228) ("State Pls. Mot.").)

**[1–4]** "Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 537, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (Kennedy, J., concurring in part and in the judgment). To that end, the APA authorizes parties harmed by federal agencies to obtain judicial review of agency decisions. 5 U.S.C. § 702. The reviewing court must set aside "action, findings, [or] conclusions" that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A).[3] Review under this "arbitrary and capricious" standard is "narrow," and the court may not "substitute its judgment for that of the agency"; instead, the court considers only whether the agency's decision "was the product of reasoned decision-

---

**1.** Plaintiffs have named as defendants President Donald J. Trump, Secretary of the Department of Homeland Security Kristjen Nielsen, and Attorney General Jefferson B. Sessions III. Plaintiffs allege that the President terminated the DACA program because of unlawful discriminatory animus, in violation of the Fifth Amendment to the U.S. Constitution. (3d Am. Compl. (Dkt. 113, No. 16–CV–4756) ¶¶ 89–100, 195–98; Am. Compl. (Dkt. 54, No. 17–CV–5228) ¶¶ 57–70, 233–39.) Because the APA does not permit direct review of Presidential decisionmaking, Franklin v. Massachusetts, 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), only the Attorney General and Secretary Nielsen are defendants with respect to Plaintiffs' substantive APA claims, which are the focus of this opinion. (3d Am. Compl. (Dkt. 113, No. 16–CV–4756) at ECF p.40.)

**2.** All record citations refer to the docket in Batalla Vidal v. Nielsen, No. 16–CV–4756, except as otherwise noted.

**3.** On November 9, 2017, the court rejected Defendants' arguments that judicial review under the APA was unavailable because the decision to rescind the DACA program was "committed to agency discretion by law." (Nov. 9, 2017, Mem. & Order (Dkt. 104) at 20–28.)

making." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("<u>State Farm</u>"). If the agency decision "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" the court will uphold the agency's decision. <u>Id.</u> at 43, 103 S.Ct. 2856 (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). If, however, the agency's decision "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," that decision must be set aside. <u>Id.</u>

**[5, 6]**   Review under the arbitrary-and-capricious standard is generally limited to the agency's stated rationale for its decision, <u>State Farm</u>, 463 U.S. at 43, 103 S.Ct. 2856; <u>Camp v. Pitts</u>, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam), and to the "full administrative record that was before the [agency] at the time [it] made [its] decision." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("<u>Overton Park</u>"). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given." <u>State Farm</u>, 463 U.S. at 43, 103 S.Ct. 2856 (citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ("<u>Chenery II</u>")); <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 1943) ("<u>Chenery I</u>"). Nor may the court uphold agency action based on "<u>post hoc</u> rationalizations of agency action." <u>State Farm</u>, 463 U.S. at 50, 103 S.Ct.

2856; <u>see also</u> <u>Williams Gas Processing—Gulf Coast Co., L.P. v. FERC</u>, 373 F.3d 1335, 1345 (D.C. Cir. 2004) (Roberts, J.) ("It is axiomatic that [the court] may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review; <u>post hoc</u> rationalizations by agency counsel will not suffice." (internal quotation marks and citation omitted)).

The APA thus sometimes places courts in the formalistic, even perverse, position of setting aside action that was clearly within the responsible agency's authority, simply because the agency gave the wrong reasons for, or failed to adequately explain, its decision. <u>E.g.</u>, <u>State Farm</u>, 463 U.S. at 42–43, 48–56, 103 S.Ct. 2856; <u>Overton Park</u>, 401 U.S. at 416, 420, 91 S.Ct. 814. Based on the present record, these appears to be just such cases.

Defendants indisputably can end the DACA program. Nothing in the Constitution or the Immigration and Nationality Act, 8 U.S.C. § 1101 <u>et seq.</u> (the "INA"), requires immigration authorities to grant deferred action or work authorization to individuals without lawful immigration status. The DACA program, like prior deferred-action and similar discretionary relief programs, simply reflected the Obama Administration's determination that DHS's limited enforcement resources generally should not be used to deport individuals who were brought to the United States as children, met educational or military-service requirements, and lacked meaningful criminal records. (Mem. from Janet Napolitano, Sec'y, DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 1–2 (June 15, 2012) (Admin. R. 1–2) (the "2012 DACA Memo").) New Administrations may, however, alter or abandon their predecessors' policies, even if these

policy shifts may impose staggering personal, social, and economic costs.[4]

The question before the court is thus not whether Defendants could end the DACA program, but whether they offered legally adequate reasons for doing so. Based on its review of the record before it, the court concludes that Defendants have not done so. First, the decision to end the DACA program appears to rest exclusively on a legal conclusion that the program was unconstitutional and violated the APA and INA. Because that conclusion was erroneous, the decision to end the DACA program cannot stand. Second, this erroneous conclusion appears to have relied in part on the plainly incorrect factual premise that courts have recognized "constitutional defects" in the somewhat analogous Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program. Third, Defendants' decision appears to be internally contradictory, as the means by which Defendants chose to "wind down" the program (namely, by continuing to adjudicate certain DACA renewal applications) cannot be reconciled with their stated rationale for ending the program (namely, that DACA was unconstitutional). Any of these flaws would support invalidating the DACA rescission as arbitrary and capricious.

Before this court, Defendants have attempted to reframe their decision as motivated by "litigation risk." They contend that the decision to end the DACA program was reasonable in light of the prospect that Texas and several other states would seek to amend their complaint in Texas v. United States, No. 14–CV–254 (S.D. Tex.), to challenge the DACA pro-

gram; that the U.S. District Court for the Southern District of Texas would issue a nationwide injunction ending the program; and that the U.S. Court of Appeals for the Fifth Circuit and the U.S. Supreme Court would affirm that injunction. (Defs. Opp'n to Pls. Mots. for Prelim. Inj. (Dkt. 239) at 1, 10–11, 21–24.) The Administrative Record does not support Defendants' contention that they decided to end the DACA program for this reason. Even if it did, reliance on this "litigation risk" rationale would have been arbitrary and capricious, in light of Defendants' failure to explain their decision or to consider any factors that might have weighed against ending the DACA program. And even if this "litigation risk" rationale were both supported by the Administrative Record and a reasonable basis for rescinding the DACA program, the court would nevertheless likely set Defendants' decision aside, as the court cannot say that any of the aforementioned errors were harmless, for purposes of review under the APA.

Accordingly, the court concludes that Plaintiffs are likely to succeed on the merits of their substantive APA claims. Because Plaintiffs also satisfy the remaining requirements for the court to issue a preliminary injunction, the court ENJOINS Defendants from rescinding the DACA program, pending a decision on the merits of these cases. Defendants thus must continue processing both initial DACA applications and DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to the limitations described below. The scope of this preliminary injunction conforms to that previously issued by the U.S. District Court of the Northern District of Califor-

---

**4.** These costs are detailed in greater length in the exhibits to Plaintiffs' motions for preliminary injunction, and in the many helpful briefs filed by amici in these cases. (See, e.g., Brief of Amici Curiae 114 Companies (Dkt.

160) (estimating the costs of the DACA rescission over the next decade at $460.3 billion in lost GDP and $24.6 billion in lost Social Security and Medicare tax contributions).)

nia. See Order Denying Defendants' Motion to Dismiss for Lack of Subject–Matter Jurisdiction and Granting Provisional Relief (Dkt. 234), Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec., No. 3:17–CV–5211, 279 F.Supp.3d 1011, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018) ("Regents") (Alsup, J.), pet. for cert. before judgment filed, No. 17–1003.

The court makes clear, however, what this order is not.

- **This order does not hold that the rescission of DACA was unlawful.** That question is for summary judgment, not motions for a preliminary injunction. Cf. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953) ("[A] preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-being-ness.").

- **This order does not hold that Defendants may not rescind the DACA program.** Even if the court ultimately finds that Defendants' stated rationale for ending the DACA program was legally deficient, the ordinary remedy is for the court to remand the decision to DHS for reconsideration. See Chenery I, 318 U.S. at 94–95, 63 S.Ct. 454. On remand, DHS "might later, in the exercise of its lawful discretion, reach the same result for a different reason." FEC v. Akins, 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).

- **This order does not require Defendants to grant any particular DACA applications or renewal requests.** Restoring the DACA program to the status quo as of September 4, 2017, does not mean that every DACA recipient who requests

renewal of his or her deferred action and work authorization will receive it. The DACA program identified "criteria [that] should be satisfied before an individual is considered for an exercise of prosecutorial discretion." (2012 DACA Memo at 1.) It did not require immigration officials to defer action against any individuals who met these criteria; to the contrary, the 2012 DACA Memo stated that DHS would exercise prosecutorial discretion "on an individual basis" and would not "provide any assurance that relief will be granted in all cases." (Id. at 2–3.) Preserving the status quo means only that Defendants must continue considering DACA applications and renewal requests, not that they must grant all such applications and requests. (See U.S. Citizenship & Immigration Servs., Frequently Asked Questions at Q6 (Apr. 25, 2017) ("Apr. 25 DACA FAQs"), Ex. 41 to State Pls. Mot. (Dkt. 97–2, No. 17–CV–5228) at ECF p.186.)

- **This order does not prevent Defendants' from revoking individual DACA recipients' deferred action or work authorization.** Under the 2012 DACA Memo, DHS may terminate a DACA recipient's deferred action "at any time, with or without a Notice of Intent to Terminate, at [its] discretion." (Apr. 25 DACA FAQs at Q27.) Maintaining the status quo does nothing to alter that.

Because the court issues the preliminary injunction requested by Plaintiffs, the Batalla Vidal Plaintiffs' Motion for Class Certification (Dkt. 124) is DENIED as moot. The court will address by separate order Defendants' motions to dismiss Plaintiffs' operative complaints. (Defs. Mot. to Dismiss Third Am. Compl. (Dkt. 207); Defs.

Mot. to Dismiss (Dkt. 71, No. 17–CV–5228).)

## I.  BACKGROUND

The court provides a brief history of immigration authorities' use of "deferred action" and similar discretionary-relief programs, the DACA and DAPA programs, and this litigation to offer context for the discussion that follows. For further background, the reader may consult this court's prior orders (see Oct. 3, 2017, Order (Dkt. 72); Oct. 17, 2017, Mem. & Order (Dkt. 86); Oct. 19, 2017, Mem. & Order (Dkt. 90); Nov. 9, 2017, Mem. & Order (Dkt. 104); Nov. 20, 2017, Order (Dkt. 109); Dec. 15, 2017, Order (Dkt. 122); Jan. 8, 2018, Mem. & Order (Dkt. 233)), the Northern District of California's opinion in Regents, 279 F.Supp.3d at 1018–27, 2018 WL 339144, at *1–8, and the opinion of the Office of Legal Counsel regarding DAPA (see The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) (Admin. R. 4) ("OLC Op.")).

### A.  History of Deferred Action

[7]  "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 567 U.S. 387, 394, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). That power derives from the Constitution, which authorizes Congress "[t]o establish a uniform Rule of Naturalization," U.S. Const. art. I., § 8, cl. 4, and from the Government's "inherent power as sovereign to control and conduct relations with foreign nations." Arizona, 567 U.S. at 395, 132 S.Ct. 2492. Acting under this authority, the Government has created an "extensive and complex" statutory and regulatory regime governing, among other things, who may be admitted to the United States, who may work here, and who may be removed from the country. Id.; see id. at 395–97, 132 S.Ct. 2492.

Not all "removable" aliens are, in fact, deported from this country. Immigration officials "cannot act against each technical violation of the statute[s they are] charged with enforcing," but must determine which enforcement actions are worthwhile. Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); Arpaio v. Obama, 797 F.3d 11, 15–16 (D.C. Cir. 2015). "A principal feature of the removal system is the broad discretion exercised by immigration officials," who "as an initial matter, must decide whether it makes sense to pursue removal at all," and, "[i]f removal proceedings commence," may decide whether removable aliens warrant asylum or "other discretionary relief allowing them to remain in the country or at least to leave without formal removal." Arizona, 567 U.S. at 396, 132 S.Ct. 2492; see also Reno v. Am.–Arab Anti-Discrimination Comm., 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("AAADC") (observing that throughout the removal process, immigration officials have "discretion to abandon the endeavor"). Immigration officials' enforcement discretion is a practical necessity as well as a legal reality: By one recent estimate, there are approximately 11.3 million undocumented aliens present in the United States, of whom DHS has the resources to remove fewer than 400,000 per year—about 3.5 percent of the total. (OLC Op. at 1.)

Over the years, Congress and the Executive Branch have developed a number of means by which immigration officials may exercise their discretion not to deport removable aliens. "Some of these discretionary powers have flowed from statute," such as "parole," see 8 U.S.C. § 1182(d)(5)(A), and "temporary protected

status," see id. § 1254a. Regents, 279 F.Supp.3d at 1019, 2018 WL 339144, at *2; see also, e.g., 8 U.S.C. § 1229b (cancellation of removal); id. § 1229c (voluntary departure). Others, such as "deferred enforced departure" or "extended voluntary departure," have been ad hoc exercises of executive authority, grounded in the Executive Branch's responsibility for conducting foreign relations and enforcing immigration laws, rather than in express congressional authorization. Regents, 279 F.Supp.3d at 1019–20, 2018 WL 339144, at *2; OLC Op. at 12 & n.5.

[8, 9]   The cases before this court concern one such form of discretionary relief. "Deferred action" is a longstanding practice by which the Executive Branch exercises its discretion to abandon, or to decline to undertake, deportation proceedings "for humanitarian reasons or simply for its own convenience." AAADC, 525 U.S. at 484, 119 S.Ct. 936; see also Arpaio, 797 F.3d at 16 (" '[D]eferred action'. . . entails temporarily postponing the removal of individuals unlawfully present in the United States."). By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States. Additionally, recipients of deferred action may apply for authorization to work legally in the United States, provided that they "establish[ ] an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); see also 8 U.S.C. § 1324a(h)(3) (excluding from the definition of "unauthorized aliens," who may not be knowingly employed in the United States, aliens "authorized to be . . . em-

ployed . . . by the Attorney General"). Deferred action does not, however, confer lawful immigration status, a pathway to citizenship, or a defense to removal, and is revocable by immigration authorities. United States v. Arrieta, 862 F.3d 512, 514 (5th Cir. 2017); Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1058 (9th Cir. 2014). (2012 DACA Memo at 3.)

"Although the practice of granting deferred action 'developed without express statutory authorization,' it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court." (OLC Op. at 13 (quoting AAADC, 525 U.S. at 484, 119 S.Ct. 936).) DHS and its predecessor, the Immigration and Naturalization Service, have employed deferred action and similar discretionary-relief programs, such as "nonpriority status" and "extended voluntary departure," since at least the 1960s. Arpaio, 797 F.3d at 16 (citing OLC Op. at 7–8, 12–13). (Br. of Amicus Curiae Former Federal Immigration and Homeland Security Officials (Dkt. 198–1) ("Former Fed. Officials Amicus Br.") at 6–11; Andorra Bruno et al., Cong. Res. Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 20–23 (July 13, 2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ("CRS Rep.").) These programs were used to provide relief to, among dozens of examples, refugees from war-torn and communist countries; spouses and children of aliens granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, 100 Stat. 3359; aliens eligible for relief under the Violence Against Women Act ("VAWA") or the Victims of Trafficking and Violence Protection Act of 2000; foreign students affected by Hurricane Katrina; and certain widows

and widowers of U.S. citizens. (OLC Op. at 14–17; Former Fed. Officials Amicus Br. at 8–10.)

Congress has repeatedly ratified immigration officials' practice of according deferred action to certain aliens without lawful immigration status. See, e.g., 8 U.S.C. § 1151 note (certain immediate family members of certain alien U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); id. § 1154(a)(1)(D)(i)(II) (VAWA petitioners "eligible for deferred action and work authorization"); id. § 1227(d)(2) (denial of administrative stay of removal "shall not preclude the alien from applying for ... deferred action"); USA PATRIOT Act of 2001, Pub. L. No. 107–56, § 423(b), 115 Stat. 272, 361 (certain immediate family members of lawful permanent residents killed in the terrorist attacks of September 11, 2001, "may be eligible for deferred action and work authorization").

## B.  DACA and DAPA

On June 15, 2012, then-DHS Secretary Janet Napolitano issued the 2012 DACA Memo, which stated that DHS would consider granting deferred action to certain individuals without lawful immigration status who entered the United States as children. (2012 DACA Memo at 1.) Secretary Napolitano stated that DHS was implementing this program as an "exercise of prosecutorial discretion" in the enforcement of immigration laws, to "ensure that ... enforcement resources are not expended on ... low priority cases." (Id.) Under the 2012 DACA Memo, individuals were eligible for consideration for deferred action if they (1) "came to the United States under the age of sixteen"; (2) had "continuously resided in the United States for a[t] least five years preceding the date of this memorandum and [were] present in the United States" on that date; (3) were "in

school," had "graduated from high school," had obtained GEDs, or were honorably discharged veterans of the Armed Forces or Coast Guard; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, or been deemed to "otherwise pose[ ] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) DACA applications from individuals meeting these criteria would be evaluated "on an individual" or "case-by-case" basis and would not necessarily be "granted in all cases." (Id. at 2.) The 2012 DACA Memo "confer[red] no substantive right, immigration status or pathway to citizenship." (Id. at 2–3.)

In late 2014, DHS announced the DAPA program, which would have granted deferred action to certain parents of U.S. citizens and lawful permanent residents. (Mem. from Jeh Charles Johnson, Sec'y of DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (Admin R. 40).) As part of that program, then-DHS Secretary Jeh Johnson directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain individuals who, among other things, lacked formal immigration status and had a son or daughter who was a U.S. citizen or lawful permanent resident. (Id. at 1.) Secretary Johnson also announced that the DACA program would be expanded by (1) removing the requirement that DACA applicants be under the age of 30 as of June 2012; (2) extending the duration of the deferred action and work authorization obtained through the program from two to three years; and (3) adjusting the date-of-entry requirement to open DACA to indi-

viduals brought to the United States between June 15, 2007, and January 1, 2010. (Id. at 3–4 (the "DACA Expansion").)

### C. The Texas Litigation

Following DHS's issuance of the 2014 DAPA Memo, Texas and 25 other states filed suit in the U.S. District Court for the Southern District of Texas, alleging that the DAPA program violated the APA and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3. See Texas v. United States, 86 F.Supp.3d 591, 598 (S.D. Tex. 2015). On February 16, 2015, after concluding that Texas and its fellow plaintiffs had standing to sue, Judge Andrew Hanen determined that they were likely to succeed on the merits of their claim that DAPA constituted a "legislative" or "substantive" rule that, under the APA, should have been made through notice-and-comment rulemaking procedures. Id. at 664–72. In particular, Judge Hanen found that the 2014 DAPA Memo, "[a]t a minimum, . . . 'severely restrict[ed]' any discretion that Defendants argue exists" in the adjudication of DAPA applications, and that DHS had not genuinely exercised discretion in reviewing DACA applications. Id. at 669 & n.101. The court issued a nationwide injunction against the implementation of both the DAPA program and the DACA Expansion. Id. at 677–78.

The Fifth Circuit denied a stay of the preliminary injunction, 787 F.3d 733, 743 (5th Cir. 2015), and affirmed the district court on two independent, alternative grounds, 809 F.3d 134, 178 (5th Cir. 2015) (revised). First, the Fifth Circuit upheld the district court's ruling that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was invalid because it was not developed through notice-and-comment rulemaking. See id. at 170–78. In particular, the Fifth Circuit found that Judge Hanen did not

clearly err in finding that "[n]othing about DAPA genuinely leaves the agency and its [employees] free to exercise discretion," based partly on evidence that supposedly showed that USCIS exercised little case-by-case discretion in adjudicating DACA applications. Id. at 172 (quoting 86 F.Supp.3d at 670 (alterations in original) ); see id. at 172–78.

Second, the Fifth Circuit concluded that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was substantively arbitrary and capricious because, in that court's view, the program was contrary to the INA. See id. at 178–86. The Fifth Circuit observed that "Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," in the form of family-preference visas, id. at 179, and cancellation of removal and adjustment of status, id. at 180. While admitting that DAPA did not "confer the full panoply of benefits that a visa gives," the Fifth Circuit held that DAPA nevertheless conflicted with these statutory forms of relief by permitting "illegal aliens to receive the benefits of lawful presence" without meeting the stringent requirements applicable to these provisions. See id. at 180. Similarly, the Fifth Circuit held that DAPA conflicted with the INA by providing an easier path to "lawful presence" and work authorization for approximately four million undocumented immigrants—a question of great national importance that Congress could not have intended to delegate implicitly to DHS. See id. at 180–81. The Fifth Circuit acknowledged that there was a long history of discretionary-relief programs but held that past practice was not dispositive of DAPA's legality and distinguished DAPA from past programs on the grounds that such programs were " 'done on a country-specific basis, usually in response to war, civil unrest, or natural disasters,' "

id. at 184 (quoting CRS Rep. at 9); used as a "bridge[ ] from one legal status to another," id.; or "interstitial to a statutory legalization scheme," such as the Family Fairness program enacted by the Reagan and George H.W. Bush Administrations, id. at 185. Accordingly, "DAPA [wa]s foreclosed by Congress's careful plan . . . and therefore was properly enjoined." Id. at 186.

The Supreme Court granted the Government's petition for a writ of certiorari, —— U.S. ——, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016), and affirmed the decision of the Fifth Circuit by an equally divided court, 136 S.Ct. 2271 (Mem.).

**D.   The DACA Rescission**

On January 25, 2017, the newly inaugurated President Donald Trump issued an executive order stating that "[i]t is the policy of the executive branch to . . . [e]nsure the faithful execution of the immigration laws of the United States," and that "[w]e cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), 82 Fed. Reg. 8799. Shortly thereafter, then-DHS Secretary John F. Kelly issued a memorandum implementing this executive order by rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John F. Kelly, Sec'y, DHS, Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (Admin. R. 230).)

Four months later, Secretary Kelly issued another memorandum rescinding DAPA and the DACA Expansion in light of "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (Admin. R. 237).) This memo left the original DACA program in place and did not affect the remaining three-year grants of deferred action that were issued under the DACA Expansion prior to Judge Hanen's issuance of a preliminary injunction in Texas. (Id. at 2 & n.3).

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton, joined by the attorneys-general of ten other states, wrote to Attorney General Jefferson B. Sessions to insist that the Executive Branch rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Tex., to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) (Admin. R. 238).) Paxton threatened that if DHS did not stop issuing or renewing deferred action and work authorization under DACA or the DACA Expansion, the plaintiff states would amend their complaint in the Texas litigation "to challenge both the DACA program and the remaining Expanded DACA permits." (Id. at 2.) If, however, Defendants agreed to rescind the 2012 DACA Memo and to cease "renew[ing] or issu[ing] any new DACA or Expanded DACA permits in the future," the plaintiffs would voluntarily dismiss their complaint. (Id.)

On September 5, 2017, Defendants announced that the DACA program would be brought to a gradual end. In an undated letter (the "Sessions Letter"), the Attorney General wrote to then-Acting DHS Secretary Elaine C. Duke to "advise that [DHS]

should rescind" the 2012 DACA Memo.[5] (Sessions Ltr.) The Attorney General opined that DACA was unlawful, unconstitutional, and likely to be invalidated in court:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. Then Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

(Id. (citation omitted).)

Thereafter, Acting Secretary Duke issued a memorandum (the "DACA Rescission Memo") instructing her subordinates to "execute a wind-down of the program." (DACA Rescission Memo at 1.) Acting Secretary Duke briefly summarized the creation of the DACA and DAPA programs and stated that, although the DACA program "purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-

by-case basis," "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the [2012 DACA Memo] but still had his or her application denied based solely upon discretion." (Id. at 2 & n.1.) Acting Secretary Duke then described the history of the Texas litigation, noting that the Fifth Circuit had affirmed the injunction against the implementation of the DAPA program based on the finding "that DACA decisions were not truly discretionary," and observed that Secretary Kelly had acted to end categorical or class-based exemptions of aliens from potential enforcement of the immigration laws and to rescind the DAPA program while leaving the DACA program "temporarily . . . in place." (Id. at 2; see id. at 2–3.)

The Acting Secretary then noted that Texas and several other states had threatened to challenge the DACA program, and she briefly summarized the Attorney General's opinion that DACA was unconstitutional, unlawful, and likely to be struck down because it shared "the same legal and constitutional defects that the courts recognized as to DAPA." (Id. at 3 (quoting Sessions Ltr.).) "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General," she concluded, "it is clear that the June 15, 2012, DACA program should be terminated." (Id. at 4.)

In light of "the complexities associated with winding down the program," however, Acting Secretary Duke directed that the program should be wound down gradually. (Id.) Initial applications, renewal requests, and associated applications for work authorization that had been "accepted" by

---

**5.** While the Sessions Letter is not dated, the bookmarks in the electronic PDF file of the

Administrative Record ascribe a date of September 4, 2017, to this letter.

DHS by September 5, 2017, would be adjudicated "on an individual, case-by-case basis." (Id.) Likewise, all DACA renewal requests and associated applications for work authorization submitted by "current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018," would be adjudicated, provided that these requests were "accepted by [DHS] as of October 5, 2017." (Id.) DHS would, however, "reject all DACA initial requests and associated applications for [work authorization] filed after the date of this memorandum" and "all DACA renewal requests and associated applications for [work authorization] filed outside of the[se] parameters." (Id.) Existing DACA benefits would not be terminated immediately but would not be renewed, and DHS would no longer approve further applications for advance parole." (Id.)

### E. Procedural History

The court will not restate the procedural history of these cases prior to November 2017, which is set forth in the court's November 9 Memorandum and Order. The court will, however, provide the following timeline of recent developments in these cases.

On December 11, 2017, the Batalla Vidal Plaintiffs filed their Third Amended Complaint (Dkt. 113), which largely tracked their Second Amended Complaint but added a claim that Defendants Nielsen and Sessions violated the Due Process Clause of the Fifth Amendment by rejecting DACA renewal applications that (1) were promptly mailed but received by USCIS after October 5, 2017, due to U.S. Postal Service delays; (2) were delivered to USCIS by October 5, 2017, but rejected because they arrived too late in the day; or (3) contained "minor perceived or actual clerical errors." (Third Am. Compl. (Dkt. 113) ¶ 203; see id. ¶¶ 199–205.)

On December 20, 2017, the Supreme Court vacated the decision of the U.S. Court of Appeals for the Ninth Circuit denying Defendants' petition for a writ of mandamus to the Northern District of California in similar litigation challenging Defendants' decision to end the DACA program. In re United States, —— U.S. ——, 138 S.Ct. 443, 199 L.E.2d 351 (2017) (per curiam). The Supreme Court held that the "Government [has made] serious arguments that at least portions of the District Court's order are overly broad" and that, "[u]nder the specific facts of [that] case," the district court should have resolved the Government's arguments that the decision to rescind the DACA program was not subject to judicial review before ordering the Government to produce a complete administrative record. Id. at 445. The Court suggested that the district court "may consider certifying that ruling for interlocutory appeal under 28 U.S.C. § 1292(b) if appropriate." Id. at 445.

One week later, the U.S. Court of Appeals for the Second Circuit denied Defendants' petition for a writ of mandamus to this court and lifted its stay of record-related orders entered by this court and by Magistrate Judge James Orenstein. (Dec. 27, 2017, USCA Order (Dkt. 210).) The Second Circuit rejected Defendants' position that they could unilaterally determine which portions of the administrative record the court could consider, and determined that, in light of the "strong suggestion that the record before the [District Court] was not complete," plaintiffs were entitled to discovery as to whether Defendants had produced a full administrative record. (Id. at 2 (quoting Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982) ) (alteration in original).) Rejecting Defendants' contention that compliance with this court's and Judge Orenstein's record-related orders would burden the Executive

Branch, the Second Circuit noted that this court had repeatedly limited the scope of those orders, such that, as the Government conceded, "the number of documents, covered by the order, as modified, is approximately 20,000, a far smaller number than the Government's papers led this court to believe." (Id. at 3–4.) The Second Circuit distinguished In re United States on the grounds that this court had already considered and rejected Defendants' jurisdictional arguments, clarified that the orders in question did not apply to White House documents, and limited the orders to apply to dramatically fewer documents than were at issue in the cases before the Northern District of California. (Id. at 4–5.)

Defendants then moved for the court to certify its November 9 Memorandum and Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (Mot. to Certify Order for Appeal (Dkt. 219).) They argued that certification would "materially advance the disposition of the litigation" by either "terminat[ing] the litigation" or "clarify[ing] the rights of the parties" and "limiting the claims going forward in this litigation." (Mem. in Supp. of Mot. to Certify Order for Appeal (Dkt. 219–1) at 14.) On January 8, 2018, the court granted Defendants' motion to certify the November 9 Memorandum and Order for interlocutory appeal because, among other things, there was "substantial ground for difference of opinion" on the question of whether the DACA rescission was committed to agency discretion by law. (Jan. 8, 2018, Mem. & Order (Dkt. 233) at 4–6.) Defendants then argued that the court

should delay an oral argument scheduled for January 18, 2018, pending the Second Circuit's consideration of the interlocutory appeal, as "all (or at least most) of [the] district-court proceedings [regarding Defendants' motions to dismiss, Plaintiffs' motions for a preliminary injunction, and the Batalla Vidal Plaintiffs' motion for class certification] will be unnecessary if the Second Circuit accepts some or all of the government's arguments on jurisdiction and justiciability." (Defs. Jan. 11, 2018, Ltr. (Dkt. 236) at 1.) Before the Second Circuit, however, Defendants abruptly changed tack, agreeing with Plaintiffs "that holding the petition [for interlocutory appeal] in abeyance would be the most efficient course of action," pending this court's consideration of Defendants' motion to dismiss and Plaintiffs' motions for preliminary relief and class certification. (Reply in Supp. of Pet. for Permission to Appeal (Dkt. 28, Nielsen v. Vidal, No. 18–122 (2d Cir.) ) at 2.) [6]

On January 9, 2018, the Northern District of California denied Defendants' motion to dismiss Regents and its companion cases and granted the plaintiffs a preliminary injunction. (Nov. 9, 2018, Order Denying FRCP 12(b)(1) Dismissal and Granting Provisional Relief (Dkt. 234, Regents).) Like this court, Judge William Alsup rejected Defendants' contentions that the decision to end the DACA program was committed to agency discretion by law and that 8 U.S.C. § 1252(g) barred judicial review of that decision. (Id. at 18–23.) Judge Alsup further concluded that the plaintiffs were entitled to a preliminary injunction because they were likely to prevail on the

**6.** Defendants' new litigation position is thus directly at odds with its arguments for why this court should certify the November 9 Memorandum and Order. The court is uncertain whether the inconsistency in Defendants' position should be ascribed to lack of coordination between the Department of Justice's

Federal Programs Branch and Civil Appellate staff, or instead to a deliberate attempt to delay the resolution of these cases. In any event, the court is not pleased that Defendant have requisitioned judicial resources to decide a motion for relief that they seem not to have actually wanted.

merits of their claim that the decision to rescind the DACA program was substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because that decision "was based on a flawed legal premise" that the DACA program was illegal. (Id. at 29; see id. at 29–38.) Judge Alsup rejected Defendants' argument that "DHS acted within its discretion in managing its litigation exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the program so as to avoid a potentially disastrous injunction in the Fifth Circuit" as a "classic post hoc rationalization" and, in any event, insufficient to support the decision to rescind the DACA program because Defendants had neither considered defenses to Texas's potentially imminent suit nor weighed supposed litigation risks against "DACA's programmatic objectives as well as the reliance interests of DACA recipients." (Id. at 38–43.)

## II. LEGAL STANDARD

[10–14] "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d

162 (1997) (per curiam) (quoting 11A Charles A. Wright et al., Federal Practice and Procedure § 2948, at 130 (2d ed. 1995) ) (emphasis omitted). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).[7] To establish a likelihood of success on the merits, the party seeking an injunction "need only make a showing that the probability of his prevailing is better than fifty percent." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988); see also Nken v. Holder, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) ("It is not enough that the chance of success on the merits be 'better than negligible.' " (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999) ) ). When an injunction is "mandatory," however—that is, when the injunction "alter[s] the status quo by commanding some positive act"—the movant must demonstrate a "clear" or "substantial" showing of likelihood of success. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). To obtain a mandatory injunction, a movant

---

7. The Second Circuit has, at times, formulated this standard differently. For example, a party seeking a preliminary injunction may demonstrate the existence of "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [its] favor," rather than a likelihood of success on the merits. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see also id. at 35–38 (holding that this "serious questions" standard survives Winter and other Supreme Court cases applying a "likelihood of success on the merits" standard). The Second Circuit's "serious questions" standard does not apply, however, "[w]hen ... a preliminary injunction will affect government action taken in the public

interest pursuant to a statute or regulatory scheme." Friends of the East Hampton Airport, Inc. v. Town of East Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (internal quotation marks and citation omitted). The court need not decide whether the more permissive "serious questions" standard applies here, as Plaintiffs concede that the "likelihood of success" standard applies here and have met this standard. See generally Haitian Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1338–39 (2d Cir. 1992) ("serious questions" standard applies when challenged governmental action is not specifically authorized by statute or regulation), cert. granted and judgment vacated as moot, Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993).

must also "make a strong showing of irreparable harm." State of New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citations omitted).

## III.  DISCUSSION

For the reasons that follow, Plaintiffs have demonstrated that they are entitled to a preliminary injunction against implementation of the DACA Rescission Memo.

### A.  Likelihood of Success on the Merits

**[15]**  First, Plaintiffs are substantially likely to succeed on the merits of their claim that Defendants' decision to end the DACA program was substantively arbitrary and capricious.[8] Plaintiffs contend that this decision violated APA § 706(2)(A) because, among other things, it was based on an erroneous legal conclusion that DACA was unlawful, failed to consider important aspects of the problem, and was internally contradictory. (BV Pls. Mot. at 11–20, 23–27; State Pls. Mot. at 5–13.) Defendants aver, however, that the decision reflects a reasonable assessment of litigation risk. (Defs. Opp'n at 1, 10–13, 15–24.) Based on the record before it, the court concludes that Plaintiffs, not Defendants, are substantially likely to be correct.

### 1.  The Stated Rationale for Rescinding DACA Appears To Be Arbitrary and Capricious

Plaintiffs have identified at least three respects in which Defendants' decision to rescind the DACA program appears to be arbitrary, capricious, and an abuse of discretion. First, the decision rests on the erroneous legal conclusion that the DACA program is unlawful and unconstitutional. Second, the decision rests on the erroneous factual premise that courts have determined that the DACA program violates the Constitution. Third, the stated rationale for that decision is internally contradictory, as Defendants have continued to grant DACA renewal requests despite ending the DACA program on the grounds that it is, by their lights, unconstitutional. The court addresses each of these reasons in turn.

### a.  The Decision Relies on the Legally Erroneous Premise that DACA Is Illegal

**[16]**  An agency decision that is based on an erroneous legal premise cannot withstand arbitrary-and-capricious review. See 5 U.S.C. § 706(2)(A). It is well-established that when "[agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." Chenery I, 318 U.S. at 94, 63 S.Ct. 454. Accordingly, numerous courts have recognized that agency action based on a misconception of the applicable law is arbitrary and capricious in substance. See, e.g., Yale–New Haven Hosp. v. Leavitt, 470 F.3d 71, 86–87 (2d Cir. 2006); Transitional Hosps. Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (Garland, J.); see also Planned Parenthood Fed. of Am., Inc. v. Heckler, 712 F.2d 650, 666 (D.C. Cir. 1983) (Bork, J., concurring in part and dissenting in part) ("If a regulation is based on an incorrect view of applicable law, the regu-

---

**8.**  The court need not decide whether the injunction sought by Plaintiffs is "mandatory," in that it would compel Defendants to take affirmative acts to adjudicate DACA applications and renewal requests, or non-mandatory, in that it would only preserve the status quo as of September 4, 2017. Because Plaintiffs have demonstrated a "clear" or "substantial" likelihood of success on the merits, they are entitled to a preliminary injunction regardless of the standard that applies.

lation cannot stand as promulgated . . . ." (internal quotation marks and citation omitted) ). That is no less true when an agency takes some action based on an erroneous view that the action is compelled by law, notwithstanding that the agency could have taken the same action on policy grounds. "An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" Sea–Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C. Cir. 1998) (quoting Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985) ). This rule is consistent with cases from outside the administrative-law context, which make clear that a decision based on "an erroneous view of the law" is "by definition" or "necessarily" an abuse of discretion. Koon v. United States, 518 U.S. 81,

100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). This rule also ensures that agencies are accountable for their decisions: If an agency makes a decision on policy grounds, it must say so, not act as if courts have tied its hands. The court therefore considers whether Defendants' decision to rescind the DACA program relied on an erroneous view of the law. This review is de novo. 5 U.S.C. § 706; J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000).[9]

Fairly read, the Sessions Letter and DACA Rescission Memo indicate only that Defendants decided to end the DACA program because they believed that it was illegal. (While Defendants now argue that the decision was based on "litigation risk,"

---

**9.** While in other contexts, an agency's interpretation of a statute it is charged with administering may be entitled to deference, Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), Defendants have not argued that their interpretation of the legality of the DACA program is entitled to formal or controlling deference. That is for good reason. Because neither the Sessions Letter nor the DACA Rescission Memo carry the "force of law," they do not warrant Chevron deference. United States v. Mead Corp., 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Moreover, Defendants' views about the legality of the DACA program turn not only on whether that program was consistent with the INA (their interpretations of which are entitled to deference, see INS v. Aguirre–Aguirre, 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ), but also whether that program constituted a "substantive rule" under the APA. Because Defendants are not charged with implementing the APA, their views about whether the DACA program should have been implemented through notice-and-comment rulemaking are not entitled to deference. See Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 627 (5th Cir. 2001). Finally, it almost goes without saying that, to the extent Defendants determined that the DACA program was unconstitutional, that determination does not warrant Chevron deference.

Some academic commentators have offered interesting arguments as to why courts should review deferentially Defendants' decision to end the DACA program. See, e.g., Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM), https://www.lawfareblog.com/understanding-sessions-justification-rescind-daca (arguing, based on an "admittedly charitable" reading of the Sessions Letter, that Regents erred by, among other things, failing to consider how the Attorney General's independent duty to defend the Constitution supported his decision to recommend ending the DACA program); Zachary Price, Why Enjoining DACA's Cancellation Is Wrong, Take Care Blog (Jan. 12, 2018), https://takecareblog.com/blog/why-enjoining-daca-s-cancellation-is-wrong (arguing that "[i]nsofar as DACA was simply an exercise of enforcement discretion, any explanatory burden with respect to its reversal must be minimal"). Defendants themselves have not pressed these arguments before this court, arguing instead that, if their decision is indeed subject to judicial review, it should be reviewed under the ordinary arbitrary-and-capricious standard of APA § 706(2)(A). (Defs. Opp'n at 10–11.)

the record does not support this contention, as the court explains below.) The DACA Rescission Memo offers no independent legal reasoning as to why Defendants believed the DACA program to be unlawful, so the court turns to the Sessions Letter. In that letter, the Attorney General offered two discernible bases for his opinion that the DACA program violated the law and should end: first, that it was unconstitutional, and second, that it "has the same legal and constitutional defects that the courts recognized as to DAPA." (Sessions Ltr.) Neither conclusion is sustainable.

### i. The Attorney General Erred in Concluding that DACA Is Unconstitutional

As noted above, the Attorney General concluded that DACA was unconstitutional because it "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result" and "an open-ended circumvention of immigration laws." (Sessions Ltr.) This conclusory statement does not support the proposition that DACA is unconstitutional.

DACA is not unconstitutional simply because it was implemented by unilateral, executive action without express congressional authorization. The Executive Branch has wide discretion not to initiate or pursue specific enforcement actions. Chaney, 470 U.S. at 831–32, 105 S.Ct. 1649. Immigration officials have particularly "broad discretion" in deciding whom to deport, deriving both from the considerations specific to the Executive Branch in the foreign-policy arena, Arizona, 567 U.S. at 396, 132 S.Ct. 2492, and from the fact that far more removable aliens reside in this country than DHS has resources to deport,

OLC Op. at 1; see also Adam B. Cox & Cristina M. Rodríguez, The President and Immigration Law, 119 Yale L.J. 458, 510–19 (2009). Every modern presidential administration has relied on extra-statutory discretionary-relief programs to shield certain removable aliens from deportation. Far from cabining this authority, Congress has amended the INA in ways that expressly acknowledge the Executive Branch's power to decline to initiate removal proceedings against certain removable aliens. It thus cannot be the case that, by recognizing that certain removable aliens represented lower enforcement priorities than others, the DACA program violates the Constitution.

Nor is DACA unconstitutional because it identified a certain category of removable aliens—individuals who were brought to the United States as children, lacked meaningful criminal histories, and had met educational or military-service requirements—as eligible for favorable treatment. The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action. It is surely within DHS's discretion to determine that certain categories of removable alien—felons and gang members, for example—are better uses of the agency's limited enforcement resources than law-abiding individuals who entered the United States as children. Indeed, unless deferred-action decisions are to be entirely random, they necessarily must be based at least in part on "categorical" or "class-based" distinctions. See Arpaio v. Obama, 27 F.Supp.3d 185, 210 (D.D.C. 2014) (DACA "helps to ensure that the exercise of deferred action is not arbitrary and capricious, as might be the case if the executive branch offered no guidance to

enforcement officials. It would make little sense for a Court to strike down as arbitrary and capricious guidelines that help ensure that the Nation's immigration enforcement is not arbitrary but rather reflective of congressionally-directed priorities."). The court cannot see how the use of such distinctions to define eligibility for a deferred-action program transforms such a program from discretionary agency action into substantive lawmaking and (somehow) an encroachment on the separation of powers.

Lastly, DACA is not unconstitutional because, as the Attorney General put it, that program was implemented "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." (Sessions Ltr.) The "proposed legislation" to which the Attorney General referred would not have "accomplished a similar result" to DACA. The DREAM Act, in its many variations, would have offered its beneficiaries a formal immigration status and a pathway to lawful permanent residency. See, e.g., Development, Relief, and Education for Alien Minors Act of 2011, S. 952 (112th Cong.); Regents, 279 F.Supp.3d at 1040 n.15, 2018 WL 339144, at *20 n.15 (collecting proposed legislation). DACA, on the other hand, offers only forbearance from deportation, along with work authorization, and does not provide an immigration status or a pathway to citizenship. (2012 DACA Memo at 4.)

Even if the DREAM Act had offered benefits similar to those conveyed by DACA, it does not follow that Congress's failure to enact a DREAM Act precluded the Executive Branch from enacting the DACA program. The court does not see how executive action, taken either "pursuant to an express or implied authorization of Congress" or "in the absence of either a congressional grant or denial of authority," becomes unconstitutional simply because Congress has considered and failed to enact legislation that would accomplish similar ends. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Fruitless congressional consideration of legislation is not itself law, see U.S. Const. art. I, § 7, cl. 2, and is an unconvincing basis for ascertaining the "implied will of Congress" to oust the President from acting in the space contemplated by the proposed but un-enacted legislation, see Youngstown Sheet & Tube, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring). It strikes the court as improbable that, if the President has some authority, any Member of Congress can divest the President of that authority by introducing unsuccessful legislation on the same subject.

To the extent the decision to end the DACA program was based on the Attorney General's determination that the program is unconstitutional, that determination was legally erroneous, and the decision was therefore arbitrary and capricious. The court does not address whether the DACA program might be unconstitutional on grounds other than those identified by the Attorney General, as any such grounds are not fairly before the court.

ii.   The Attorney General Erred in Concluding that DACA Has the "Same Legal and Constitutional Defects that the Courts Recognized as to DAPA"

[17] Nor can the Attorney General's determination that DACA is unlawful rest on the ground that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." (Sessions Ltr.) That rationale is arbitrary and capricious not only because it is premised on an obvious factual mistake that courts had recognized "constitutional defects" in DAPA, as the court explains in

the next subsection, but also because it is legally erroneous. The Southern District of Texas enjoined the implementation of the DAPA program on the grounds that DAPA was not promulgated through notice-and-comment rulemaking, and the Fifth Circuit affirmed, adding the additional ground for affirmance that DAPA was substantively arbitrary and capricious because it conflicted with the INA. The court is unpersuaded that either ground applies to DACA.

*(I)   DACA Was Not a Legislative Rule.*

DACA does not appear to have been a "legislative" rule that was subject to notice-and-comment rulemaking. The APA generally requires agencies to make "rules" through notice-and-comment procedures, but provides an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553. The line between legislative rules (which are subject to notice and comment) and non-legislative rules (which are not) is not always clear. See Chrysler Corp. v. Brown, 441 U.S. 281, 301–03, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); Noel v. Chapman, 508 F.2d 1023, 1029–30 (2d Cir. 1975) (characterizing this distinction as "enshrouded in considerable smog"). In general, however, "legislative rules are those that 'create new law, rights, or duties, in what amounts to a legislative act.'" Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000) (quoting White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993) ). A rule is legislative if it creates a "binding norm." Bellarno Int'l Ltd. v. FDA, 678 F.Supp. 410, 412 (E.D.N.Y. 1988) (quoting Am. Bus Ass'n v. United States, 627 F.2d 525, 529 (D.C. Cir. 1980) ). General statements of policy, on the other hand, do not "change 'existing rights and obligations'" of those regulated, but instead state the agency's "general policy" or "are rules directed primarily at the staff

of an agency describing how it will conduct agency discretionary functions." Noel, 508 F.2d at 1030 (quoting Lewis–Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir. 1972) ) (internal quotation marks and additional citation omitted); see also Chrysler, 441 U.S. at 302 n.31, 99 S.Ct. 1705 ("General statements of policy are statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." (internal quotation marks and citation omitted) ).

On its face, the 2012 DACA Memo is plainly a "general statement of policy," not a substantive rule. That memo described how, as a matter of agency policy, DHS would exercise its prosecutorial discretion with respect to a discrete class of individuals without lawful immigration status, and directed DHS staff to implement procedures to facilitate that exercise of discretion. Most importantly, the memo stated that it created no substantive right, that all DACA applications would be adjudicated on an individualized basis, and that the agency retained discretion to deny or revoke deferred action or work authorization. Based on the text of the 2012 DACA Memo, the court cannot say that the creation of the DACA program either "imposed any rights and obligations" on DHS or the public, or did not "genuinely [leave] the agency and its decisionmakers free to exercise discretion." Clarian Health W., LLC v. Hargan, 878 F.3d 346, 357 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

To determine whether a rule is properly classed as "legislative" or as a "general statement of policy," some courts have also considered whether the agency has characterized or treated the rule as binding. Id. In determining that the DAPA program constituted a legislative rule, the Southern District of Texas focused on the purport-

edly binding effect that DAPA would have on the agency. Texas, 86 F.Supp.3d at 668–72. Judge Hanen reached that conclusion by determining that DACA had been implemented in such a way as to deprive agency employees of true discretion to evaluate DACA applications on a case-by-case basis, including that (1) the "operating procedures" for implementing DACA were quite long; (2) DACA applications were adjudicated by service-center staff, not field-office employees, using a check-the-box form; (3) certain DACA denials were subject to review by a supervisor; (4) "there is no option for granting DAPA to an individual who does not meet each criterion"; and (5) nearly all DACA applications were granted, and those that were denied were uniformly denied for mechanical reasons or fraud. Id. at 669 & nn.98–101.

The court respectfully finds the Southern District of Texas's analysis unpersuasive. First, that court appears to have conflated the discretion of the agency with that of individual USCIS employees. (See Br. for the United States at 68–71, Texas v. United States, 136 S.Ct. 2271 (2016) (No. 15–674).) The 2012 DACA Memo indicated how DHS would exercise its discretion by treating certain individuals as lower priorities for removal. Because the 2012 DACA Memo created no substantive rights, it in no way constrained the agency's discretion in the enforcement of immigration laws, even if it might have affected how rank-and-file USCIS employees reviewed specific requests for deferred action. (See id.) Second, even accepting that the relevant focus of this inquiry is the discretion of rank-and-file employees, the court views the first four factors on which the Southern District of Texas relied as insufficient to support an inference that DHS did not exercise discretion in adjudicating DACA applications. As for the fifth factor—that DHS supposedly granted too many DACA applications—the court finds persuasive

the observation by the dissenting judge in the Fifth Circuit that the district court appears to have erroneously conflated rejections of DACA applications, which were made on intake for mechanical reasons, and denials, which were made "when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met." Texas, 809 F.3d at 210 (King, J., dissenting). To the contrary, as of December 2014, DHS had denied nearly 40,000 DACA applications out of the more than 700.0 applications accepted for processing at USCIS service centers, and rejected more than 40.0 applications for administrative reasons. Id. at 210 n.44. This rejection rate hardly "suggests an agency on autopilot" and is "unsurprising given the self-selecting nature of the program." Id. at 210 & n.44; see also Arpaio, 27 F.Supp.3d at 209 n.13 (noting that similar statistics "reflect that . . . case-by-case review is in operation"). To the extent Defendants rely on Texas for the proposition that the DACA program (which was not challenged in that litigation) was illegal because it was not made through notice-and-comment rulemaking, such reliance is arbitrary and capricious.

### (II)  DACA Does Not Conflict with the INA

Nor may Defendants rely on Texas for the proposition that the DACA program conflicts with the INA. As noted above, the Fifth Circuit held that the DAPA program was not only procedurally invalid, but also substantively arbitrary and capricious because it conflicted with the INA. Texas, 809 F.3d at 178–86. That is because, in the view of the Fifth Circuit, the INA prescribes the exclusive means by which aliens may obtain "lawful immigration clas-

sification from their children's immigration status," and because Congress could not have intended to delegate to DHS the authority to designate approximately four million undocumented immigrants as lawfully present and able to work in this country. See id. To the extent Defendants relied, without additional explanation, on this decision as grounds for ending the DACA program, they acted arbitrarily and capriciously, for two reasons.

First, not all the grounds on which the Fifth Circuit decided that DAPA was substantively arbitrary and capricious apply to the DACA program. For example, the Fifth Circuit inferred that by creating procedures by which alien parents of U.S. citizens may obtain lawful status, Congress implicitly prohibited the Executive Branch from granting deferred action and work authorization to such individuals based on more permissive criteria. Even if the court were to accept that dubious logic, it would not apply to DACA, because there is no analogous procedure by which aliens brought to the United States as children may seek to obtain lawful status on that basis. (BV Pls. Mot. at 25; Br. of Amicus Curiae Legal Services Organizations (Dkt. 193) at 6.) The Fifth Circuit also relied extensively on the magnitude of the DAPA program, reasoning that Congress could not have intended the Executive Branch to decide whether more than four million undocumented immigrants could obtain deferred action and work authorization. Texas, 809 F.3d at 179, 181–82, 184 & n.197. Again, even accepting that proposition, it is not clear why it would apply to the DACA program, which is open to far fewer individuals than DAPA would have been, and which is roughly the same scale as the Family Fairness program enacted by the Reagan and George H.W. Bush Administrations in the 1980s.

Second, to the extent that the Fifth Circuit's rationale applies to the DACA program, the court finds it unpersuasive. It does not follow that by prescribing procedures by which some aliens may obtain lawful status, Congress implicitly barred the Executive Branch from granting those or other aliens deferred action and work authorization, a relatively meager and unstable set of benefits (if, indeed, they can even be described as such). Nor is the court convinced that by expressly recognizing that certain discrete populations of aliens are eligible for deferred action, Congress implicitly precluded the Executive Branch from according deferred action to other aliens; to the contrary, the court views these enactments as ratifying the Executive Branch's longstanding historical practice, rooted in the INA, of forbearing from pursuing deportation proceedings against particular aliens and categories of alien. The court respectfully finds the Fifth Circuit's attempts to distinguish DAPA from prior discretionary-relief programs unpersuasive, as this court does not see what in the INA permits immigration officials to accord discretionary relief "on a country-specific basis," as a "bridge[ ] from one legal status to another," or as an adjunct to "a statutory legalization scheme," id. at 184, but not to generally law-abiding parents of U.S. citizens or lawful permanent residents—or, for that matter, individuals who were brought to the United States as children.

For these reasons, and for the reasons stated by the Office of Legal Counsel, the dissent in Texas, and by the Office of the Solicitor General in its brief to the U.S. Supreme Court in Texas, the court concludes that DACA is lawful and not arbitrary, capricious, or contrary to the INA. See Texas, 809 F.3d at 214–18 (King, J., dissenting); OLC Op.; Br. for the United States at 61–65, Texas v. United States, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d

AR0663

638 (2016) (No. 15–674). Defendants acted arbitrarily and capriciously by ending the DACA program based on the erroneous legal conclusion that DACA is either unconstitutional or "has the same legal and constitutional defects that the courts recognized as to DAPA."

b. *The Decision Relies on a Factually Erroneous Premise that Courts Have Determined that DACA Is Unconstitutional*

This conclusion was also arbitrary and capricious because it is based on an obvious factual mistake. In concluding that the Southern District of Texas and Fifth Circuit would enjoin the continued operation of the DACA program, Defendants appear to have relied on the premise that those courts have recognized "constitutional defects . . . as to DAPA." (Sessions Ltr.; DACA Rescission Memo at 3.) This premise is flatly incorrect. The Southern District of Texas enjoined the implementation of DAPA, and the Fifth Circuit affirmed that injunction, on the grounds that DAPA violated the APA. 809 F.3d at 170–86; 86 F.Supp.3d at 665–72. Both courts expressly declined to reach the plaintiffs' constitutional claim that DAPA violated the Take Care Clause of the U.S. Constitution, see U.S. Const. art. II, § 3, or the separation of powers. 809 F.3d at 154; 86 F.Supp.3d at 677. Defendants do not attempt to defend this factual premise as correct. (Cf. Defs. Opp'n at 26–27.)

**[18]** This error alone is grounds for setting aside Defendants' decision. "[A]n agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect." Mizerak v. Adams, 682 F.2d 374, 376 (2d Cir. 1982); see also State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before the agency"); City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev., 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."). Because neither the Southern District of Texas nor the Fifth Circuit "recognized" any "constitutional defects" in the DAPA policy, Defendants' reliance on this erroneous factual premise was arbitrary and capricious.

**[19]** Nor was this error harmless. Although judicial review under the APA takes "due account . . . of the rule of prejudicial error," 5 U.S.C. § 706, "the standard for demonstrating lack of prejudicial error is strict. 'Agency mistakes constitute harmless error [under APA § 706] only where they clearly had no bearing on the procedure used or the substance of decision reached.'" N.Y. Pub. Interest Research Grp. v. Whitman, 321 F.3d 316, 334 n.13 (2d Cir. 2003) (alteration in original) (quoting Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 444 (5th Cir. 2001) ). That cannot be said here, as the Attorney General's opinion that DACA was unlawful appears to have been based in significant part on his judgment that the program was unconstitutional and on the Texas courts' decision to enjoin implementation of DAPA. The current record furnishes no basis for this court to conclude that the Attorney General would have reached the same conclusion had he correctly understood the holdings of the Texas courts.

c. *The Decision's Rationale Is Internally Contradictory*

**[20]** Finally, Defendants' decision to rescind the DACA program was arbitrary and capricious because it appears to be

internally inconsistent. See, e.g., Nat'l Res. Def. Council v. U.S. Nuclear Regulatory Comm'n, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" (citation omitted)); Gen. Chem. Corp. v. United States, 817 F.2d 844, 846 (D.C. Cir. 1987) (per curiam) (vacating decision based on "internally inconsistent and inadequately explained" analysis). Defendants clearly ended the DACA program at least partly because the Attorney General viewed the program as unconstitutional.[10] (Sessions Ltr.; DACA Rescission Memo at 3.)[11] Rather than terminating the program forthwith, however, Acting Secretary Duke directed her subordinates to begin a phased "wind-down of the program," under which DHS would continue to renew DACA applications that were set to expire in the next six months and would honor existing DACA benefits until they expired. The means by which Defendants ended the DACA program thus appear to conflict with their stated rationale for doing so. If the DACA program was, in fact, unconstitutional, the court does not understand (nor have Defendants explained) why Defendants would have the authority to continue to violate the Constitution, albeit at a reduced scale and only for a limited time.

It is true but immaterial that the DACA Rescission memo provided that DHS would adjudicate all remaining DACA applications and renewal requests "on an individual, case-by-case basis." (DACA Rescission Memo at 4.) The 2012 DACA Memo also stated that all DACA applications and renewal requests would be considered on an individual, case-by-case basis (2012 DACA Memo at 1–3), but, in Defendants' view, that was insufficient to render the program lawful. More importantly, if DHS could render the DACA program constitutional by adjudicating the remaining DACA applications and renewal requests on an "individual, case-by-case" basis, then there was nothing inherently unconstitutional about the DACA program—only how rank-and-file USCIS employees were implementing that program—and a key reason for ending that program would disappear.

Defendants attempt to sidestep this problem by arguing that there was nothing inherently contradictory about Acting Secretary Duke's decision to allow the DACA program "to gradually sunset" despite having "concern[s] about [the program]'s legality." (Defs. Opp'n at 30.) The record

---

**10.** It is not clear that the Attorney General's views are those of the Administration he serves. On September 5, 2017, President Trump tweeted that "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" (Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 5, 2017, 7:38 PM), https://twitter.com/realdonaldtrump/status/9052286673364 99200.) It is not clear how the President would "revisit" the decision to rescind the DACA program if the DACA program were, as the Attorney General has stated, "an unconstitutional exercise of authority by the Executive Branch." (Sessions Ltr.) See Josh Blackman, Trump's DACA Decision Defies All Norms: The President's Incompetence Continues to Temper His Malevolence, Foreign Policy

(Sept. 7, 2017, 1:26 PM), http://foreignpolicy.com/2017/09/07/trumpsdaca-decision-defies-all-norms/. Defendants' contention that the President simply "emphasized the need for legislative action and expressed [his] intention to revisit Administration policies on childhood arrivals—not the legality and defensibility of the DACA program—if Congress did not timely act" (Defs. Opp'n at 33) is unsupported by the text of the President's tweet.

**11.** Defendants' arguments that "Plaintiffs identify nothing contradictory about the Acting Secretary's stated justification for the [decision to rescind the DACA program]" (cf. Defs. Opp'n at 29–30) are thus once again belied by the record.

makes clear, however, that Defendants ended the program because they believed it to be unconstitutional and unlawful, not because they had "concern[s]" about its legality. (Sessions Ltr.; DACA Rescission Memo at 3–4.) Defendants' post hoc rationalization is thus unavailing. At the very least, Defendants' failure to acknowledge and explain the apparent conflict between their determination that the DACA program was unconstitutional and their plan to continue adjudicating a subset of DACA renewal requests renders their decision arbitrary and capricious.

### 2. Defendants' Alternative Grounds for Upholding the DACA Rescission Are Unpersuasive

Defendants offer two reasons why the court should uphold the decision to end the DACA program. First, they argue, that decision was reasonable in light of the risk that the plaintiffs in the Texas litigation would amend their complaint to challenge the DACA program and that the Southern District of Texas would strike down the DACA program. (E.g., Defs. Opp'n at 11.) Second, they argue that the court should construe the Attorney General's legal judgment that the DACA program was unlawful as an "independent policy judgment . . . that immigration decisions of this magnitude should be left to Congress." (Defs. Opp'n at 25.) Neither argument is persuasive.

### a. The DACA Rescission Cannot Be Sustained on the Basis of Defendants'"Litigation Risk" Argument

Defendants frame the decision to end the DACA program as motivated primarily by "litigation risk." (Id. at 1, 10–13, 15–24.) In their view, Acting Secretary Duke considered the Government's losses in the Texas v. United States litigation and the threat by some of the plaintiffs in that litigation to challenge the DACA program and ultimately "concluded that maintaining

the DACA [program] would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty." (Id. at 11.) That decision, they argue, was reasonable, not arbitrary or capricious, "particularly in view of the near-certain litigation loss in the pending Texas lawsuit." (Id.)

The record does not support Defendants' contention that they based their decision on a reasonable assessment of litigation risk. As the court has previously noted, the record, fairly read, indicates that Defendants ended the DACA program because they believed it to be illegal. The only basis for Defendants' "litigation risk" argument is the Attorney General's statement that, because DACA shared the flaws of the DAPA program, "it is likely that potentially imminent litigation would yield similar results with respect to DACA." (Sessions Ltr.) This is too thin a reed to bear the weight of Defendants' "litigation risk" argument. While the court must uphold an agency decision "of less than ideal clarity . . . if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), the court cannot discern a reasoned assessment of "litigation risk" in this conclusory statement. See also Chenery II, 332 U.S. at 196–97, 67 S.Ct. 1760 (stating that the grounds on which an agency reaches its decision "must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."). The Administrative Record does not indicate, for example, that the Attorney General made any reasoned assessment of the

likelihood that DACA would be struck down in light of its similarities to, or differences from DAPA; that he considered any potential defenses to the "potentially imminent litigation"; that he acknowledged contrary rulings by other courts; or that he assessed whether Department of Justice resources would be better spent elsewhere. The court thus cannot conclude that the Attorney General actually considered "litigation risk" in any meaningful sense. Absent Defendants' post hoc explanations, the court would not have guessed that Defendants made their decision for this reason.

The court views this "litigation risk" rationale as a mere post hoc rationalization, which is insufficient to withstand arbitrary-and-capricious review. State Farm, 463 U.S. at 50, 103 S.Ct. 2856; Burlington Truck Lines, 371 U.S. at 168–69, 83 S.Ct. 239. Indeed, it is telling that, to substantiate their argument that the DACA rescission was motivated by concern for DACA recipients and a desire to avoid a disorderly shut-down of the program, Defendants resort to a press release, issued by Acting Secretary Duke, that fleshes out her reasons for ending the DACA program. (Defs. Opp'n at 12 (quoting Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-dukerescission-deferred-action-childhood-arrivals-daca).) That press release is not in the record, however, so the court may not consider it. See Overton Park, 401 U.S. at 419–20, 91 S.Ct. 814. While Defendants assert that this rationale is reasonably discernible because Plaintiffs addressed it in their briefs (Defs. Opp'n at 12), Plaintiffs cannot be faulted for responding to an argument that Defendants have made throughout this litigation.[12]

[21] Even if the record indicated that Defendants made their decision based on "litigation risk," they acted arbitrarily and capriciously in doing so. The Attorney General's conclusory statement that it was "likely that potentially imminent litigation would yield similar results with respect to DACA" falls well short of the APA's "requirement that an agency provide reasoned explanation for its action." Fox Television Stations, 556 U.S. at 516, 129 S.Ct. 1800. For example, the record before the court offers no indication that Defendants considered why the Southern District of Texas would strike down the DACA program (which was not initially challenged in Texas and which lacked certain attributes of the DAPA program that were critical to the Fifth Circuit's decision that that program was contrary to the INA). Nor does the record indicate that Defendants considered—independent of their opinion that DACA was illegal—why litigating the rescission of DACA was preferable to litigating the decision to maintain the program. See Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (litigation-risk rationale was arbitrary and capricious where agency's decision "predictably led to . . . lawsuit" and "[a]t most . . . deliberately traded one lawsuit for another"). To the extent that Defendants now argue that their decision was based on a desire to avoid the harms that could result to DACA beneficiaries from a disorderly end to the program, the record offers absolutely no indication that Defendants con-

---

**12.** Judge Alsup found in Regents that "[n]owhere in the administrative record did the Attorney General or [DHS] consider whether defending the program in court would (or would not) be worth the litigation risk." Regents, 279 F.Supp.3d at 1043, 2018 WL 339144, at *23. As such, "[t]he new spin by government counsel is a classic post hoc rationalization," which "alone is dispositive of the new 'litigation risk' rationale." Id.

Case 1:16-cv-04756-NGG-VMS  Document 319-4  Filed 09/04/20  Page 360 of 405 PageID #: 6657

sidered these impacts. While Defendants ask the court to infer a persuasive rationale from their conclusory statements and from the Southern District of Texas's and Fifth Circuit's opinions in Texas, it is not the court's job to "supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43, 103 S.Ct. 2856. Even accepting for the sake of argument that the record provides some support for Defendants' "litigation risk" rationale, that rationale is so inscrutable and unexplained that reliance upon it was arbitrary and capricious.

[22] Even accepting for the sake of argument that "litigation risk" furnished a discernible, reasoned basis for Defendants' decision to end the DACA program, Defendants nevertheless acted arbitrarily and capriciously by ending that program without taking any account of reliance interests that program has engendered. To withstand review under the APA's arbitrary-and-capricious standard, an agency that is changing its policy need not explain why the reasons for the new policy are better than the reasons for the old policy. Fox Television Stations, 556 U.S. at 514–15, 129 S.Ct. 1800. The agency must nevertheless engage in reasoned decisionmaking, which, among other things, means that the agency must consider "serious reliance interests" engendered by the previous policy. Id. at 515, 129 S.Ct. 1800; see also Encino Motorcars, LLC v. Navarro, —— U.S. ——, 136 S.Ct. 2117, 2125–27, 195 L.Ed.2d 382 (2016).

Plaintiffs identify a number of reliance interests engendered by the DACA program, including that, in reliance on the continued existence of the program, DACA recipients have "raised families, invested in their education, purchased homes and cars, and started careers" (BV Pls. Mot. at 16; State Pls. Mot. at 9–10); employers have hired, trained, and invested time in their DACA-recipient employees (BV Pls. Mot. at 17; State Pls. Mot. at 10); educational institutions have enrolled DACA recipients who, if they lose their DACA benefits, may be forced to leave the United States or may see little need to continue pursuing educational opportunities (BV Pls. Mot. at 17; State Pls. Mot. at 10); and states have expended resources modifying their motor-vehicle and occupational licensing regimes to accommodate DACA recipients (State Pls. Mot. at 10 & n.18). The record does not indicate that Defendants acknowledged, let alone considered, these or any other reliance interests engendered by the DACA program. That alone is sufficient to render their supposedly discretionary decision to end the DACA program arbitrary and capricious.

Defendants' arguments to the contrary are unpersuasive. First, Defendants appear to argue that they did not need to discuss reliance interests because "controlling legal precedent" had changed. (Defs. Opp'n at 15.) That argument confuses the requirement that the agency show "that there are good reasons for the new policy" with the requirement that it not ignore "serious reliance interests that must be taken into account" when amending or rescinding an existing policy. Fox Television Stations, 556 U.S. at 515, 129 S.Ct. 1800. In any event, it is hard to reconcile this argument—in effect, that Defendants were compelled to terminate the DACA program—with their insistence elsewhere that the decision to end the DACA program was discretionary and the product of reasoned deliberation.

Next, Defendants appear to contend that they did not need to consider reliance interests engendered by the DACA policy because those interests were not "longstanding" or serious, to the extent they existed. (Defs. Opp'n at 16–17.) It is true that DACA recipients received deferred

action and work authorization for only two years at a time, that DHS retained discretion to revoke those benefits at any time, and that the 2012 DACA Memo "confer[red] no substantive right." (2012 DACA Memo at 3; Defs. Opp'n at 17.) As a practical matter, however, it is obvious that hundreds of thousands of DACA recipients and those close to them planned their lives around the program. It is unrealistic to suggest that these reliance interests were not "serious" or "substantial" simply because DHS retained the ability to terminate DACA recipients' deferred action at its discretion.

Moreover, the court does not see why the contingent, discretionary nature of DACA benefits means that, as Defendants argue, DACA recipients had no "legally cognizable reliance interests—and certainly not beyond the stated duration" in the continued existence of the DACA program. (Defs. Opp'n at 17.) In so contending, Defendants cross-reference their argument, made in their October 27 Motion to Dismiss, that DACA beneficiaries had no " 'protected entitlement' for due process purposes" because " 'government officials may grant or deny [DACA benefits] in their discretion.' " (Defs. Oct. 27, 2017, Mot. to Dismiss (Dkt. 95) ("Defs. Oct. 27 MTD") at 35 (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) ) (emphasis added).) Even accepting for the sake of argument that DACA recipients had no constitutionally protected liberty or property interests in the continued existence of the DACA program and the renewal of their particular DACA applications, it does not follow that they had no reliance interests therein, such that Defendants were free to end the DACA program without considering such interests. Encino Motorcars is instructive: A car dealer may have not have a Fifth Amendment entitlement to the Department of Labor's hewing to a particular interpretation of the Fair Labor Standards Act, but that does not mean that the Department is free to disregard reliance interests engendered by the long-standing interpretation of the Act when it alters its regulations. See 136 S.Ct. at 2124–26.

Finally, Defendants argue that Acting Secretary Duke effectively considered the relevant reliance interests by adopting a policy that resulted in an orderly wind-down, rather than an immediate shut-down of the DACA program. (Defs. Opp'n at 17–18.) This is sleight-of-hand and further post hoc rationalization. The record does not indicate that the Acting Secretary actually considered how the end of the DACA program would affect DACA recipients. That her chosen policy may, in practice, ameliorate the impact of the DACA rescission on DACA recipients, as compared to an immediate and disorderly shut-down of the program following a hypothetical injunction in the Texas litigation, does not mean that she actually considered this possibility. While the Acting Secretary stated that she "[r]ecogniz[ed] the complexities associated with winding down the program," the Sessions Letter makes clear that these complexities referred to the burdens on DHS of winding down the DACA program. (Compare DACA Rescission Memo at 4, with Sessions Ltr. ("In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process." (emphasis added) ).)

Accordingly, even if the record were to support Defendants' "litigation risk" rationale, that rationale would be arbitrary and capricious. Finally, even if this rationale were not arbitrary and capricious, the court would nevertheless likely vacate Defendants' decision because it is tainted by the errors discussed in Section III.A.1

above. "When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" Mail Order Ass'n of Am. v. U.S. Postal Serv., 2 F.3d 408, 434 (D.C. Cir. 1993) (quoting Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989) ). To the extent that Defendants' "litigation risk" rationale can be discerned from the Administrative Record and the parties' submissions in these cases, that rationale appears to be intertwined with Defendants' erroneous legal conclusion that the DACA program was unlawful. Because the court cannot say that Defendants clearly would have made the same decision even had they correctly understood the law and the holdings of the Texas courts, that decision is nevertheless likely arbitrary and capricious. See also N.Y. Pub. Interest Research Grp., 321 F.3d at 334 n.13.

### b. The Court Cannot Construe This Decision as an "Independent Policy Judgment"

**[23]** Defendants also contend that, even if the court disagrees with the Attorney General's conclusion that DACA is unconstitutional, the court may nevertheless uphold the decision to end the DACA program because the same facts that led the Attorney General to conclude that the DACA program is unconstitutional "equally support a policy judgment by the Acting Secretary that deferred action should be applied only on an individualized case-by-case basis rather than used as a tool to confer certain benefits that Congress had not otherwise acted to provide by law." (Defs. Opp'n at 25 (internal quotation marks and citation omitted).) The record, however, offers no support for the notion that Defendants based their decision on any "policy judgment that immigration de-

cisions of this magnitude should be left to Congress." (Id.) Defendants' argument therefore conflicts with fundamental principles of judicial review of agency action—namely that the court reviews the agency's stated reasons for its decision and "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43, 103 S.Ct. 2856; see also Chenery II, 332 U.S. at 196, 67 S.Ct. 1760; Chenery I, 318 U.S. at 87, 63 S.Ct. 454.

Defendants' only authority for this novel argument, Syracuse Peace Council, 867 F.2d at 654, is inapposite. In that case, the D.C. Circuit held that when an agency bases its decision on both a judgment about constitutionality and policy reasons, the reviewing court may uphold the decision if the agency clearly would have reached the same decision for policy reasons alone, even if the agency stated that its constitutional and policy rationales were "intertwined." Id. at 655–57. Syracuse Peace Council does not stand for the proposition that, when an agency bases its decision on constitutional grounds, a reviewing court may, in the first instance, construe that decision as having been based on a "policy judgment" found nowhere in the administrative record.

\* \* \*

For the reasons stated above, the court concludes that Plaintiffs are substantially likely to prevail on the merits of their claim that the decision to rescind the DACA program was arbitrary, capricious, and an abuse of discretion.

### B. Irreparable Harm

**[24]** Plaintiffs have also demonstrated that they are likely to suffer irreparable harm if the court does not enjoin Defendants from fully implementing the DACA rescission.

[25, 26] "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) ). Irreparable harm "cannot be remedied by an award of monetary damages." State of New York ex rel. Schneiderman, 787 F.3d at 660.

Plaintiffs have extensively documented the irreparable harms they will suffer if the DACA program ends. Each day, approximately 122 DACA recipients who failed (or were unable) to renew their DACA status before October 5, 2017, lose their deferred action and work authorization. (BV Pls. Mot at 1–2, 35; State Pls. Mot. at 28.) If the implementation of the DACA Rescission Memo is not enjoined, approximately 1,400 DACA recipients will lose deferred action each work day, beginning on March 5, 2018. (State Pls. Mot. at 28.) As a result, these individuals will face the possibility of deportation from the country. While this possibility of deportation is clearly extremely worrisome to DACA recipients, the court declines to grant a preliminary injunction on this basis. See Winter, 555 U.S. at 21–22, 129 S.Ct. 365; see also Carlsson v. U.S. Citizenship & Immigration Servs., No. 12-CV-7893 (CAS), 2012 WL 4758118, at *9 (C.D. Cal. Oct. 3, 2012) (risk of deportation speculative, not imminent, when there were no pending removal proceedings against the plaintiffs).[13] Nor may the court grant a

preliminary injunction on the grounds that DACA recipients may, for fear of deportation, suffer from anxiety or depression, lose the "abilit[y] to plan for the future and make commitments, whether familial, career-based, academic, or otherwise" (BV Pls. Mot. at 37–38), or be required to turn their U.S. citizen children over to the care of the State Plaintiffs' child welfare systems, or that public safety will be harmed because former DACA recipients will be less likely to report crimes and other harms to the community (State Pls. Mot. at 28). Because deportation is, at this point, not sufficiently "likely" for purposes of establishing irreparable harm, harms accruing from the fear of deportation are also too speculative to support the grant of a preliminary injunction.

Concomitant with the loss of deferred action, however, DACA recipients will also lose their work authorization. As a result, they will be legally unemployable in this country. Some DACA recipients will lose their employer-sponsored healthcare coverage, which will endanger DACA recipients and their families (BV Pls. Mot. at 36–37) and impose tremendous burdens on the State Plaintiffs' public health systems (State Pls. Mot. at 31–32). Other DACA recipients, due to the imminent loss of their employment, may lose their homes or need to drop out of school. (BV Pls. Mot. at 37.) Employers will suffer due to the inability to hire or retain erstwhile DACA recipients, affecting their operations on an ongoing basis and causing them to incur unrecoverable economic losses. (Id. at 38; State Pls. Mot. at 29–30.) Finally, the DACA rescission will result in "staggering" adverse economic impacts, including,

---

**13.** The court notes that Secretary Nielsen recently stated that, even if the DACA program ended, DHS would not prioritize the removal of DACA recipients who had not committed crimes. See Louis Nelson, DHS Chief: Deport-   ing Dreamers Won't Be a Priority for ICE If Talks Fail, Politico (Jan. 16, 2018, 8:30 AM), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681.

by the State Plaintiffs' best lights, $215 billion in lost GDP over the next decade, and $797 million in lost state and local tax revenue. (State Pls. Mot. at 33 & nn.77–78.) Thus, while it may be true that "[l]oss of employment does not in and of itself constitute irreparable injury," Savage v. Gorski, 850 F.2d 64, 67 (2d Cir. 1988), these cases present a "genuinely extraordinary situation" warranting injunctive relief, Sampson v. Murray, 415 U.S. 61, 92 n.68, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

While the above is sufficient to demonstrate irreparable harm, the court also notes the obvious fact that the decision to rescind DACA, if carried into effect, will have profound and irreversible economic and social implications. That decision "will profoundly disrupt the lives of hundreds of thousands of people." In re United States, 875 F.3d 1200, 1210 (9th Cir. 2017) (Watford, J., dissenting). It may force one out of every four hundred U.S. workers out of the lawful workforce. See Jie Zong et al., "A Profile of Current DACA Recipients by Education, Industry, and Occupation," Migration Policy Institute (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation. Former DACA recipients will be separated from their families and communities. It is impossible to understand the full consequences of a decision of this magnitude. If the decision is allowed to go into effect prior to a full adjudication on the merits, there is no way the court can "unscramble the egg" and undo the damage caused by what, on the record before it, appears to have been a patently arbitrary and capricious decision.

Moreover, it is also impossible for the court to adjudicate this dispute on the merits before March 5, 2018, when these harms will begin to materialize in earnest. Defendants set an aggressive timetable for ending the DACA program and have pursued various dilatory tactics throughout this litigation. Notably, they have yet to produce a plausible administrative record in these cases, without which the court cannot render a merits decision. Overton Park, 401 U.S. at 420, 91 S.Ct. 814. For these reasons, it is clear that Plaintiffs will suffer substantial and imminent irreparable harm if the court does not preliminarily enjoin the DACA rescission.

Defendants argue that Plaintiffs have not shown that irreparable harm is "imminent, or even likely, given the preliminary injunction recently issued" in Regents. (Defs. Opp'n at 48.) Defendants are, however, vigorously contesting that injunction before both the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court. If Judge Alsup or the Ninth Circuit were to lift the injunction in Regents, then Plaintiffs would no doubt suffer irreparable harm. Defendants cite no authority for the proposition that Plaintiffs cannot establish irreparable harm simply because another court has already enjoined the same challenged action.

## C. Balancing the Equities and the Public Interest

[27, 28] Finally, the court must consider whether "the balance of equities tips in [Plaintiffs'] favor" and if "an injunction is in the public interest." Winter, 555 U.S. at 20, 129 S.Ct. 365. To make this decision, the court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences of employing the extraordinary remedy of injunction." Id. at 24, 129 S.Ct. 365 (internal quotation marks and citation omitted). "These factors merge when the Government is the opposing party." Nken, 556 U.S. at 435, 129 S.Ct. 1749. The court concludes that these factors weigh firmly in Plaintiffs' favor.

**AR0672**

[29]  The court need not restate at length the consequences of the DACA rescission for Plaintiffs, other DACA recipients, those close to them, and the public at large. Allowing the DACA rescission to take immediate effect would quickly cost many DACA recipients the opportunity to work legally in this country, and hence to support themselves and their families. Enjoining the implementation of the DACA Rescission Memo would also preserve the status quo, enabling a full resolution of this matter on the merits, rather than allowing severe social dislocations to unfold based on an agency decision that, as noted above, strongly appears to have been arbitrary and capricious. The public interest is not served by allowing Defendants to proceed with arbitrary and capricious action.

Against these considerations, the court weighs the effect on Defendants of initiating a wind-down of the DACA program on their predetermined timetable. The court does not step in this area lightly. Defendants have broad discretion to set immigration-enforcement priorities. Arizona, 567 U.S. at 394, 132 S.Ct. 2492. Moreover, the DACA program was originally created by the Executive Branch, and the Trump Administration should be able to alter the policies and priorities set by its predecessor.

There are, however, several factors that lead the court to conclude that the balance of the equities favors granting an injunction. Defendants do not appear to have rescinded the DACA program as an exercise of their discretion, or because of a reasoned policy judgment, but instead, at least in significant part, because they erroneously concluded that the program was unconstitutional and unlawful. Enjoining Defendants from rescinding the DACA program on erroneous legal grounds therefore does not intrude on their discretion or well-established authority to set immigration-enforcement policies. Moreover, although the Government generally has a substantial interest in the speedy deportation of removable aliens because their presence here "permit[s] and prolong[s] a continuing violation of United States law," Nken, 556 U.S. at 436, 129 S.Ct. 1749 (quoting AAADC, 525 U.S. at 490, 119 S.Ct. 936), the court finds that the Government's interest in ending the DACA program is not so compelling. For one thing, the President has stated his support for keeping DACA recipients in the country (albeit preferably pursuant to legislation rather than executive action). Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 14, 2017 3:28 AM), https://twitter.com/realdonaldtrump/status/908276308265795585 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!.....". The current DHS Secretary has also stated that the erstwhile DACA recipients would not be a priority for immigration enforcement. Louis Nelson, DHS Chief: Deporting Dreamers Won't Be a Priority for ICE If Talks Fail, Politico (Jan. 16, 2018), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681. Even if deporting DACA recipients were a priority of the Administration, an injunction against the end of the DACA program would not impede this policy, as, under the 2012 DACA Memo, DHS retains discretion to revoke specific DACA recipients' deferred action and work authorization.[14]

Accordingly, the court finds that the balance of the equities tip decidedly in Plain-

---

14.  The court expresses no view as to whether the revocation of existing DACA benefits would be consistent with the Due Process Clause or other potentially applicable protections.

tiffs' favor, and that the public interest would be well-served by an injunction.

### D. Scope of Relief

**[30]** For the foregoing reasons, the court finds that Plaintiffs have demonstrated that they are entitled to a preliminary injunction. Defendants are therefore ORDERED to maintain the DACA program on the same terms and conditions that existed prior to the promulgation of the DACA Rescission Memo, subject to the following limitations. Defendants need not consider new applications by individuals who have never before obtained DACA benefits; need not continue granting "advanced parole" to DACA beneficiaries; and, of course, may adjudicate DACA renewal requests on a case-by-case, individualized basis. See Regents, 279 F.Supp.3d at 1048–49, 2018 WL 339144, at *28.

Plaintiffs contend that the court should require Defendants to restore the DACA program as it existed on September 4, 2017, in particular by requiring Defendants to adjudicate initial DACA applications submitted by individuals who only became eligible for DACA after that date. (Jan. 30, 2018, Hr'g Tr. (Dkt. Number Pending) 8:24–25.) As in Regents, however, the court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications. While the court is sympathetic to the plight of individuals who were unable to apply for DACA before September 5, 2017, it cannot say that Plaintiffs have demonstrated either that these individuals would be irreparably harmed without injunctive relief or that the balance of equities favors these individuals to the same extent it favors existing DACA beneficiaries.

**[31]** The court enjoins rescission of the DACA program on a universal or "nationwide" basis. Again, it does not do so lightly. As Defendants correctly note, equitable principles provide that the court should not enter an injunction that is broader than "necessary to provide complete relief to the plaintiffs." (Defs. Opp'n at 50 (quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).) See also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 72 (2d Cir. 2016) ("[I]njunctive relief should be no broader than necessary to cure the effects of the harm caused by the violation.…" (internal quotation marks and citations omitted)). Moreover, several academic commentators have insightfully observed various problems with the practice of granting nationwide injunctions against the Government, including that such injunctions thwart the development of law in different courts, encourage forum-shopping, and create the possibility that different courts will issue conflicting nationwide injunctions. See Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417 (2017); Michael T. Morley, Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts, 97 B.U. L. Rev. 611 (2017); Zayn Siddique, Nationwide Injunctions, 117 Colum. L. Rev. 2095 (2017); Getzel Berger, Note, Nationwide Injunctions Against the Federal Government: A Structural Approach, 92 N.Y.U. L. Rev. 1068 (2017).

Nevertheless, the court finds that a nationwide injunction is warranted in these cases. First, it is hard to conceive of how the court would craft a narrower injunction that would adequately protect Plaintiffs' interests. Plaintiffs include not only several individuals and a nonprofit organization, but also sixteen states and the Dis-

**438**                          **279 FEDERAL SUPPLEMENT, 3d SERIES**

trict of Columbia. To protect the State Plaintiffs' interests, the court would presumably need to enjoin Defendants from rescinding the DACA program with respect to the State Plaintiffs' residents and employees, including the employees of any instrumentalities of the state, such as public hospitals, schools, and universities. Such an injunction would be unworkable, partly in light of the simple fact that people move from state to state and job to job, and would likely create administrative problems for Defendants. Furthermore, there is a strong federal interest in the uniformity of federal immigration law. See U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish a uniform Rule of Naturalization"); Texas, 809 F.3d at 187–88. Because the decision to rescind the DACA program had a "systemwide impact," the court will preliminarily impose a "systemwide remedy." Lewis v. Casey, 518 U.S. 343, 359, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) ).

## IV.  CONCLUSION

Plaintiffs' motions for a preliminary injunction (Dkt. 123 in No. 16–CV–4756; Dkt. 96 in No. 17–CV–5228) are GRANTED. The Batalla Vidal Plaintiffs' motion for class certification (Dkt. 124) is DENIED as moot.

SO ORDERED.



---

**William H. MERRILL, Plaintiff,**

v.

**Sgt. Mike SCHELL and Chris Felice, Defendants.**

**11–CV–720(LJV)(LGF)**

United States District Court,
W.D. New York.

Signed 08/30/2017

**Background:** Arrestee brought § 1983 action against two police officers, alleging that they unlawfully used excessive force against him in violation of the Fourth Amendment. Officers moved for judgment on the pleadings.

**Holdings:** The District Court, Lawrence J. Vilardo, adopting in part the report and recommendation of Leslie G. Foschio, United States Magistrate Judge, held that:

(1) allegations were sufficient to state a plausible excessive force claim;

(2) arrestee sufficiently alleged that officer was a tacit collaborator in excessive force used against him, as required to state a failure to intervene claim; and

(3) officers' qualified immunity claim was precluded because their alleged actions were objectively unreasonable and a violation of the Fourth Amendment.

Motion denied.

---

**1. Federal Civil Procedure ⟐1041**

A motion for judgment on the pleadings is decided under the same standard as a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6), (c).

**2. Civil Rights ⟐1304**

To state a claim under § 1983, the plaintiff must allege that (1) while acting under color of state law, (2) the defendants deprived the plaintiff of a right, privilege,

# 156, # 175) are GRANTED in part and DENIED in part. The motions are DE-NIED except to the extent that the punitive damages award shall be reduced to $250,000. Plaintiff's motion for costs and fees (Doc. # 174) is GRANTED in part and DENIED in part. Defendant shall pay plaintiff costs and fees in the amount of $139,106.72. The Clerk of Court shall enter an amended judgment reducing the punitive damages award to $250,000 and adding the Court's award of $127,835 in attorney's fees and $11,271.72 in costs.

It is so ordered.



**Martin Jonathan BATALLA VIDAL et al., Plaintiffs,**

**v.**

**Elaine C. DUKE, Acting Secretary, Department of Homeland Security, et al., Defendants.**

**State of New York et al., Plaintiffs,**

**v.**

**Donald Trump, President of the United States, et al., Defendants.**

**16–CV–4756 (NGG) (JO)**
**16–CV–5228 (NGG) (JO)**

United States District Court, E.D. New York.

Signed 11/09/2017

**Background:** Several states, individuals, and nonprofit organization brought action against President of the United States, Secretary of Department of Homeland Security (DHS), and United States Attorney General, challenging the decision to end Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, as well as other actions that defendants have allegedly taken in connection with the rescission of that program, under the Administrative Procedure Act (APA), the Due Process Clause of the Fifth Amendment, and the Regulatory Flexibility Act (RFA). Defendants moved to dismiss.

**Holdings:** The District Court, Nicholas G. Garaufis, J., held that:

(1) there was law to apply, permitting meaningful judicial review, of substantive APA claims and procedural APA and RFA claims;

(2) decision to eliminate the DACA program was not a presumptively unreviewable exercise of enforcement discretion;

(3) individual DACA recipients had standing to challenge the decision to rescind DACA, as well as the process by which defendants decided to end it;

(4) individual DACA recipients had standing to challenge alleged changes to DHS's information-use policy;

(5) individual DACA recipients and nonprofit organization did not have standing to challenge the lack of individualized notice provided to them regarding DACA renewal deadlines in connection with its rescission;

(6) states had Article III standing to challenge the decision to rescind the DACA and procedures by which decision was made and implemented, based on decision's impacts to states' proprietary interests; and

(7) states did not have standing to challenge the notice provided to DACA recipients regarding procedures and timeline for renewing their DACA sta-

AR0676

**128**                    **295 FEDERAL SUPPLEMENT, 3d SERIES**

tus and general termination of the program, or to challenge the alleged change in DHS's information-use policy.

Ordered accordingly.

### 1. Aliens, Immigration, and Citizenship ⬅211

Because of the practical fact that it cannot deport all of the individuals unlawfully present in the United States, the Executive Branch has significant discretion to prioritize the removal of some and to deprioritize the removal of others.

### 2. Aliens, Immigration, and Citizenship ⬅318

One form of discretion the Secretary of Homeland Security exercises is "deferred action," which entails temporarily postponing the removal of individuals unlawfully present in the United States.

> See publication Words and Phrases for other judicial constructions and definitions.

### 3. Aliens, Immigration, and Citizenship ⬅318

"Deferred action," sometimes referred to as nonpriority status, is in effect, an informal administrative stay of deportation, by which immigration authorities decide not to initiate, or decide to halt, removal proceedings for humanitarian reasons or simply for convenience.

> See publication Words and Phrases for other judicial constructions and definitions.

### 4. Federal Courts ⬅2073

The court must dismiss a claim for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1).

### 5. Federal Courts ⬅2081, 2082

When considering a motion to dismiss for lack of subject-matter jurisdiction, the court must take all uncontroverted facts in the complaint as true, and draw all reasonable inferences in favor of the party asserting jurisdiction; nevertheless, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Fed. R. Civ. P. 12(b)(1).

### 6. Federal Courts ⬅2080

Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. Fed. R. Civ. P. 12(b)(1).

### 7. Administrative Law and Procedure ⬅651, 668

Under the Administrative Procedure Act (APA), a party aggrieved by agency action is generally entitled to judicial review thereof; there is a strong presumption favoring judicial review of administrative action. 5 U.S.C.A. § 702.

### 8. Administrative Law and Procedure ⬅701

The exception to judicial review for agency action that is committed to agency discretion by law is a very narrow exception to the presumption of reviewability of agency action under the Administrative Procedure Act (APA), and it applies in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply. 5 U.S.C.A. § 701(a)(2).

### 9. Administrative Law and Procedure ⬅701

To determine whether there is law to apply that provides judicially manageable standards for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and

AR0677

informal agency guidance that govern the agency's challenged action; these enactments supply law to apply because they may govern the agency's exercise of its own discretion.  5 U.S.C.A. § 701(a)(2).

**10. Administrative Law and Procedure**
⬱797

The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable.

**11. Aliens, Immigration, and Citizenship**
⬱155

**United States** ⬱254

There was law to apply, permitting meaningful judicial review, of procedural Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA) claims brought by several states, individuals, and nonprofit organization, against the President of the United States, Secretary of Department of Homeland Security (DHS), and United States Attorney General, challenging the decision to end Deferred Action for Childhood Arrivals (DACA) program, as well as other actions that defendants have allegedly taken in connection with the rescission of that program; the relevant law to apply was found within the APA and RFA themselves, both of which specified procedures that agencies must follow when engaging in substantive or legislative rulemaking.  5 U.S.C.A. §§ 553, 604.

**12. Aliens, Immigration, and Citizenship**
⬱155

**United States** ⬱254

Several states, individuals, and nonprofit organization, identified law to apply, permitting meaningful judicial review of their substantive Administrative Procedure Act (APA) claims against the President of the United States, Secretary of Department of Homeland Security (DHS),

and United States Attorney General, challenging the decision to end Deferred Action for Childhood Arrivals (DACA) program; in deciding to rescind the DACA program, defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court, so the court could review that rationale in light of, inter alia, the text of the Immigration and Nationality Act and other statutes, and the history of the use of deferred action by immigration authorities.  5 U.S.C.A. §§ 701(a)(2), 706(2)(a).

**13. Administrative Law and Procedure**
⬱701, 763

In order to satisfy provision of the Administrative Procedure Act (APA) requiring a court to set aside arbitrary and capricious agency actions, findings, and conclusions, plaintiffs must identify some source of law, other than the APA's arbitrary and capricious standard, against which the court can review their claims; if agency actions could be challenged as arbitrary and capricious, without reference to any other standard, then the exception to judicial review for agency action committed to agency discretion by law would amount to no limitation at all, and nothing would ever be committed to agency discretion by law.  5 U.S.C.A. §§ 701(a)(2), 706(2)(a).

**14. Administrative Law and Procedure**
⬱651

Unreviewable agency action does not become reviewable simply because the agency gives a reviewable reason for otherwise unreviewable action.  5 U.S.C.A. § 701(a)(2).

**15. Aliens, Immigration, and Citizenship**
⬱155

Decision to eliminate the Deferred Action for Childhood Arrivals (DACA) pro-

gram was not a presumptively unreviewable exercise of enforcement discretion; states, individuals, and nonprofit organization did not challenge an agency's failure or refusal to prosecute or take enforcement action with respect to certain violations of law, but instead challenged the affirmative decision to eliminate a program by which the Department of Homeland Security (DHS) exercised prosecutorial discretion with respect to a large number of undocumented immigrants, plaintiffs did not challenge non-enforcement decisions, which did not subject individuals to the coercive power of state, and decision to rescind DACA was not motivated by a complicated balancing of factors peculiarly within the agency's expertise.  5 U.S.C.A. § 701(a)(2).

**16. Aliens, Immigration, and Citizenship �business155**

Exception to judicial review for agency action committed to agency discretion by law did not preclude judicial review of due process and equal protection claims by states, individuals, and nonprofit organization, challenging decision to end Deferred Action for Childhood Arrivals (DACA) program, which provided protections for certain individuals without lawful immigration status who had entered the United States as children, as well as other actions taken in connection with the rescission of that program, absent an express indication that Congress intended to preclude judicial review of such actions; although the Department of Homeland Security (DHS) exercised wide discretion in the enforcement of immigration laws, that was insufficient to preclude review of such constitutional claims.  U.S. Const. Amend. 5; 5 U.S.C.A. § 701(a)(2).

**17. Administrative Law and Procedure ⟱701**

Even where agency action is committed to agency discretion by law, review is

still available to determine if the Constitution has been violated.  5 U.S.C.A. § 701(a)(2).

**18. Aliens, Immigration, and Citizenship ⟱155**

**Constitutional Law ⟱2553**

Deference to the Executive Branch on immigration matters did not deprive the district court of subject-matter jurisdiction to consider challenge to decision to end Deferred Action for Childhood Arrivals (DACA) program, and other actions taken in connection with rescission of program; individuals in removal proceedings were already precluded from delaying removal proceedings by claiming that they were improperly denied deferred action, stated rationale for rescinding DACA turned on questions of constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues, and vague speculation that judicial review might implicate foreign-policy concerns would be insufficient to justify a presumption that immigration cases were not subject to judicial review.  5 U.S.C.A. § 701(a)(2); Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**19. Aliens, Immigration, and Citizenship ⟱385**

Provision of the INA limiting judicial review of certain actions by or on behalf of any alien arising from certain deportation proceedings, applies only to three discrete actions that the Attorney General may take: her decision or action to commence proceedings, adjudicate cases, or execute removal orders.  Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**20. Aliens, Immigration, and Citizenship ⟱155**

Termination of the Deferred Action for Childhood Arrivals (DACA) program did not by itself commence proceedings,

adjudicate cases, or execute removal orders against any alien, and thus, district court was not deprived of jurisdiction to challenge termination of program by provision of the INA limiting judicial review of certain actions by or on behalf of any alien arising from certain deportation proceedings; decision to rescind DACA did not, by itself, trigger any specific enforcement proceedings, and individuals challenging decision brought broad, programmatic challenges to the decisions to end DACA, to provide limited notice of that decision to DACA recipients, and to change the Department of Homeland Security's (DHS) information-use policy.  Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**21. Aliens, Immigration, and Citizenship �171155**

Provision of the INA limiting judicial review of certain actions by or on behalf of any alien arising from certain deportation proceedings did not preclude judicial review of claims brought by nonprofit organization or states, challenging the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program, and actions taken in connection with that decision; neither nonprofit nor states were suing on behalf of any alien in removal proceedings or subject to an order of removal, but instead, nonprofit sued in its own right, because it claimed that the rescission of DACA had interfered with its operations, and states sued not on behalf of any alien, but instead to vindicate their own proprietary and quasi-sovereign interests.  Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**22. States �171190**

While a parens patriae suit is in some sense brought by a state on behalf of its citizens, the asserted quasi-sovereign interests will be deemed sufficiently implicated to support parens patriae standing only if the injury alleged affects the general population of a state in a substantial way.

**23. Federal Civil Procedure �171103.2**

Because the standing issue goes to the district court's subject matter jurisdiction, it can be raised sua sponte.

**24. Federal Civil Procedure �171103.2**
    **Federal Courts �171�1712101**

Article III's case-or-controversy requirement means that a plaintiff must have standing, or a sufficient interest in a live dispute, to sue in federal court.  U.S. Const. art. 3, § 2, cl. 1.

**25. Federal Civil Procedure �171103.2, 103.3**

At its irreducible constitutional minimum, standing consists of three elements: (1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest, (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant, and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief.  U.S. Const. art. 3, § 2, cl. 1.

**26. Federal Civil Procedure �171103.2**

The first and foremost of the three requirements to constitutional standing, injury-in-fact requires a plaintiff to show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.  U.S. Const. art. 3, § 2, cl. 1.

**27. Federal Civil Procedure �171103.2**

For purposes of constitutional standing, to be "imminent," an injury must be certainly impending; allegations of possible

future injury are not sufficient. U.S. Const. art. 3, § 2, cl. 1.

See publication Words and Phrases for other judicial constructions and definitions.

**28.  Federal Civil Procedure ⇚103.3**

The second and third requirements to constitutional standing, causation and redressability, require a plaintiff to demonstrate that the injury-in-fact he or she suffers is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision; a plaintiff need not, however, demonstrate that the defendant was the proximate or but-for cause of the injury-in-fact. U.S. Const. art. 3, § 2, cl. 1.

**29.  Federal Civil Procedure ⇚103.2**
**       Federal Courts ⇚2101**

The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement with respect to each claim and form of relief sought. U.S. Const. art. 3, § 2, cl. 1.

**30.  Aliens, Immigration, and Citizenship ⇚155**

Individual recipients of deferred action pursuant to Deferred Action for Childhood Arrivals (DACA) program had standing to challenge the decision to rescind DACA; if DACA were to end, individuals almost certainly would lose their work authorization, the availability of which turned on their status as recipients of deferred action, they also would be subject to removal from the United States, such harms were fairly traceable to the termination of DACA, and would be redressed by vacatur of that decision. U.S. Const. art. 3, § 2, cl. 1.

**31.  Aliens, Immigration, and Citizenship ⇚155**
**       Associations ⇚20(1)**
**       United States ⇚254**

Individual recipients of deferred action pursuant to Deferred Action for Childhood Arrivals (DACA) program and nonprofit organization had standing to challenge the process by which the President of the United States, Secretary of Department of Homeland Security (DHS), and United States Attorney General decided to end DACA, under the Administrative Procedure Act (APA) and Regulatory Flexibility Act (RFA); there was some possibility that if the defendants had subjected the decision to rescind DACA to notice and comment and analyzed the impact of that decision on small entities, they would have reached a different outcome. U.S. Const. art. 3, § 2, cl. 1.

**32.  Federal Civil Procedure ⇚103.2**

Plaintiffs have standing to assert procedural rights so long as the procedures in question are designed to protect some threatened concrete interest that is the ultimate basis of their standing. U.S. Const. art. 3, § 2, cl. 1.

**33.  Federal Civil Procedure ⇚103.3**

When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.

**34.  Aliens, Immigration, and Citizenship ⇚155**

Individual recipients of deferred action pursuant to Deferred Action for Childhood Arrivals (DACA) program had standing to challenge alleged changes to Department of Homeland Security's (DHS) information-use policy; to obtain deferred action and work authorization, applicants provided United States Citizenship and Immigration Services (USCIS) with extensive personal information, including home address, height, weight, hair

and eye color, fingerprints, photograph, and signature, and submitted to background checks, and routinely provided other information, such as school records, pay stubs, bank statements, passports, birth certificates, and similar records, and individuals alleged that such information would enable DHS to deport them more easily upon expiration of deferred action. U.S. Const. art. 3, § 2, cl. 1.

### 35. Aliens, Immigration, and Citizenship ⟸155

**Associations ⟸20(1)**

Individual recipients of deferred action pursuant to Deferred Action for Childhood Arrivals (DACA) program and nonprofit organization did not have standing to challenge the lack of individualized notice provided to them regarding DACA renewal deadlines in connection with its rescission; individuals never alleged that they missed renewal deadline or suffered other adverse effects from not receiving individualized notice, and nonprofit's allegation that it was unable to reach four DACA recipients to inform them that they needed to renew did not support the reasonable inferences that they failed to apply for renewal or that such failure was fairly traceable to the lack of notice, and was not sufficient to show that nonprofit was injured by the lack of notice. U.S. Const. art. 3, § 2, cl. 1.

### 36. States ⟸190

The ordinary rules of standing are somewhat different when a state is a plaintiff: states are not normal litigants for the purposes of invoking federal jurisdiction, and they are entitled to special solicitude when they seek to vindicate their proprietary or quasi-sovereign interests; this does not mean, however, that states have unbridled license to sue. U.S. Const. art. 3, § 2, cl. 1.

### 37. States ⟸192

A state's "proprietary interests," which would weigh in favor of Article III standing, are those that it may have akin to a private party, such as ownership of land or participation in a business venture. U.S. Const. art. 3, § 2, cl. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

### 38. States ⟸190

A state's "sovereign interests," which would weigh in favor of Article III Standing, are interests it has in its capacity as a state, such as the exercise of sovereign power over individuals and entities within the relevant jurisdiction and the demand for recognition from other sovereigns. U.S. Const. art. 3, § 2, cl. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

### 39. States ⟸190

A state's "quasi-sovereign interests," which weigh in favor of its Article III standing, consist of a set of interests that it has in the well-being of its populace. U.S. Const. art. 3, § 2, cl. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

### 40. States ⟸192

States had Article III standing to challenge the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program and procedures by which decision was made and implemented, based on decision's impacts to states' proprietary interests; states amply alleged and documented that the rescission of DACA would harm their proprietary interests as employers and in the operation of state-run colleges and universities, for example, state of Washington alleged that it employed DACA residents within state government, and if DACA were rescinded,

such employees would lose work authorization and Washington would incur expenses in replacing them, and there was some possibility that if the Department of Homeland Security complied with rule-making procedures, it might reconsider decision. U.S. Const. art. 3, § 2, cl. 1.

**41. States** ⟜**190**

 Stated, like other associations and private parties, may have a variety of proprietary interests that they may vindicate in court.

**42. States** ⟜**192**

A state has proprietary interests that weigh in favor of Article III standing, for example, in its ownership of land and in its relationships with its employees; a state also has proprietary interests in its participation in a business venture and in the operation of state-run institutions, such as state colleges and universities. U.S. Const. art. 3, § 2, cl. 1.

**43. Federal Courts** ⟜**2011**

Jurisdiction is a prerequisite to a ruling on the merits.

**44. States** ⟜**192**

States failed to assert a proprietary interest that would give them standing to bring a claim challenging the lack of individualized notice provided to Deferred Action for Childhood Removal (DACA) recipients regarding procedures and timeline for renewing their DACA status, about the general termination of the DACA program, or of the renewal deadline; states did not provide a sufficient basis for the court to conclude that any failures to renew by the deadline were fairly traceable to the decision not to provide each DACA recipient with individualized notice of the change in application procedures and timelines, or that such failures to renew harmed any state's proprietary interests, for example, by depriving a state employee

of work authorization. U.S. Const. art. 3, § 2, cl. 1.

**45. States** ⟜**190**

State plaintiffs need not demonstrate that the individuals they seek to protect must themselves meet the injury-in-fact, causation, and redressability requirements of Article III. U.S. Const. art. 3, § 2, cl. 1.

**46. States** ⟜**192**

States failed to assert a cognizable proprietary interest harmed by the alleged change to the Department of Homeland Security's (DHS) information-use policy, as would give them standing to challenge such alleged change; even assuming that such changes would facilitate the deportation of applicants for Deferred Action for Childhood Arrivals (DACA), states did not identify any cognizable harm to their proprietary interests that would result from the removal of their undocumented residents. U.S. Const. art. 3, § 2, cl. 1.

**47. States** ⟜**190**

States may bring parens patriae, i.e., parent of the country, suits to vindicate quasi-sovereign interests.

**48. States** ⟜**190**

There are no bright-line rules for which interests qualify as quasi-sovereign, such that a state could bring a parens patriae suit to vindicate the interest; there are, however, at least two notable limitations on states' parens patriae standing. U.S. Const. art. 3, § 2, cl. 1.

**49. States** ⟜**190**

To be quasi-sovereign, a state's interests must be sufficiently generalized that the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of its individual residents; a state cannot sue parens patriae when it is mere-

ly litigating as a volunteer the personal claims of its citizens.

**50. States ☞190**

Special considerations are present when a state brings a parens patriae suit against the federal government: while the state, under some circumstances, may sue in a parens patriae capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government; in that field it is the United States, and not the state, which represents them as parens patriae.

**51. States ☞190**

States may sue the federal government parens patriae to enforce rights guaranteed by a federal statute; however, a state may not sure parens patriae to protect her citizens from the operation of federal statutes.

**52. States ☞190**

States lacked standing to bring parens patriae claims challenging the lack of individualized notice provided to Deferred Action for Childhood Arrivals (DACA) recipients, regarding the rescission of DACA and renewal deadlines, or the alleged change to Department of Homeland Security's (DHS) information-use policy; states did not argue or demonstrate that the alleged failure to provide adequate notice actually harmed the health and well-being of state residents or any other cognizable quasi-sovereign interest, and challenge to both lack of notice and change in information-use would be challenging federal enforcement of federal immigration laws, as unconstitutional. U.S. Const. art. 3, § 2, cl. 1.

**53. Administrative Law and Procedure ☞666**

To bring suit under the Administrative Procedure Act (APA), a plaintiff must satisfy not only Article III's standing requirements, but an additional test: the interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated; this test is not meant to be especially demanding and forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 551 et seq.

**54. Federal Civil Procedure ☞103.2**
**Federal Courts ☞2028**

The question of whether a plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue of prudential standing, but is instead an issue of whether a legislatively conferred cause of action encompasses a particular plaintiff's claim; that issue goes not to the court's jurisdiction—that is, power—to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim.

———

Ajay Saini, Brooklyn, NY, Diane Omotayo Lucas, Sania Waheed Khan, Lourdes Maria Rosado, New York State Office of the Attorney General, New York, NY, Genevieve C. Nadeau, Pro Hac Vice, Abigail Taylor, Pro Hac Vice, Jonathan B. Miller, Massachusetts Attorney General's Office, Boston, MA, Marsha Chien, Pro Hac Vice, Colleen Melody, Pro Hac Vice, Robert W. Ferguson, Pro Hac Vice, Washington State Attorney General's Office, Seattle, WA, Lourdes Maria Rosado, Sania Waheed Khan New York State Office of the Attorney General, New York, NY, Aaron R. Goldstein, Pro Hac Vice, Aleine M. Cohen, Pro Hac Vice, Delaware Department of Justice, Wilmington, DE, Valerie

M. Nannery, Pro Hac Vice, Office of the Attorney General for the District of Columbia, Washington, DC, Donna H. Kalama, Pro Hac Vice, Department of the Attorney General State Of Hawaii, Honolulu, HI, Anna P. Crane, Pro Hac Vice, Illinois Attorney General, Chicago, IL, Nathanael Blake, Pro Hac Vice, Office of the Iowa Attorney General, Des Moines, IA, Tania Maestas, Pro Hac Vice, Ari Biernoff, New Mexico Attorney General's Office, Santa Fe, NM, Brian Alexander De Haan, Oregon Department of Justice Oregon Department of Justice, Sarah Weston, Pro Hac Vice, Scott Kaplan, Pro Hac Vice, Oregon Department of Justice, Portland, OR, Michael Fischer, Office of Attorney General, Jonathan Goldman, Pro Hac Vice, Pennsylvania Office of Attorney General, Harrisburg, PA, Adam Roach, Pro Hac Vice, Michael Field, Rebecca Partington, Rhode Island Attorney General, Providence, RI, Julio A. Thompson, Pro Hac Vice, Benjamin Daniel Battles, Vermont Attorney General's Office, Montpelier, VT, Matthew R. McGuire, Pro Hac Vice, Office of the Attorney General, Richmond, VA, for Plaintiffs.

Brad Rosenberg, Rachael Westmoreland, Joseph Anthony Marutollo, Kate Bailey, Stephen M. Pezzi, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District Judge

Plaintiffs in the above-captioned cases challenge the rescission of the Deferred Action for Childhood Arrivals ("DACA") program, as well as other actions that Defendants are alleged to have taken in connection with the rescission of that program. Defendants have moved to dismiss these cases for lack of subject-matter jurisdiction and for failure to state a claim. (See Defs. Mot. to Dismiss (Dkt. 95)[1]; Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. 95–1).) For the reasons that follow, the court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss for lack of subject-matter jurisdiction and RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

## I.   BACKGROUND

The court begins by providing some background on the DACA program, the steps Defendants have taken to end it, and the increasingly complicated procedural history of these cases.

### A.   Factual Background

#### 1.   Deferred Action

[1]   The DACA program originates in a mismatch between the number of individuals unlawfully present in the United States and DHS's ability to remove these individuals from the country. As of 2014, for example, approximately 11.3 million removable individuals were present in the United States.[2] (The Department of Homeland Security's Authority to Prioritize Re-

---

**1.**   Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16–CV–4756 (E.D.N.Y.). For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs"; Plaintiff Make the Road New York as "MRNY"; the Plaintiffs in New York v. Trump, No. 17–CV–5228 (E.D.N.Y.), as the "State Plaintiffs"; the U.S. Department of Homeland Security as

"DHS"; U.S. Customs and Border Protection as "CBP"; U.S. Citizenship and Immigration Services as "USCIS"; U.S. Immigration and Customs Enforcement as "ICE"; and the U.S. Department of Justice as "DOJ."

**2.**   "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria

moval of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) ("OLC Op.") (Admin. R. ("AR") (Dkt. 77–1) at 4).) DHS has the resources to remove only a small percentage of these individuals—specifically, about 400,000 per year, or less than four percent of the total, as of 2014. (Id. at 1; DHS, 2015 Yearbook of Immigration Statistics tbl. 39 (2016) (listing 333,341 removals and 129,122 "returns" for the year 2015).) Because of the "practical fact" that it cannot deport all these individuals, the Executive Branch has significant discretion to prioritize the removal of some and to deprioritize the removal of others. See Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015).

[2, 3]  "One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." Id. "Deferred action," sometimes referred to as "nonpriority status," is "in effect, an informal administrative stay of deportation," Lennon v. INS, 527 F.2d 187, 191 n.7 (2d Cir. 1975), by which immigration authorities decide not to initiate, or decide to halt, removal proceedings "for humanitarian reasons or simply for . . . convenience," Reno v. Am.–Arab Anti–Discrimination Comm., 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("AAADC"). Immigration authorities have used deferred action and similar policies on numerous occasions since at least the early 1960s. Arpaio, 797 F.3d at 16 (citing OLC Op. at 7–8, 12–13). Although deferred action was initially "developed without express statutory authorization," AAADC, 525 U.S. at 484, 119 S.Ct. 936 (quoting 6 C. Gordon et al., Immigration Law and Procedure

set by federal law." Arizona v. United States, 567 U.S. 387, 396, 132 S.Ct. 2492, 183

§ 72.03(2)(h) (1998) ), it has since been referenced in the Immigration and Nationality Act ("INA") and in DHS regulations, see 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (making certain individuals "eligible for deferred action and work authorization"); 8 C.F.R. § 274a.12(c)(14) (authorizing certain recipients of deferred action to apply for work authorization).

### 2.  DACA and DAPA

In 2012, the Obama Administration created the DACA program by issuing a memorandum stating that DHS would consider according deferred action to certain undocumented immigrants who entered the United States as children. (Mem. from Janet Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) (the "2012 DACA Memo") (AR 1).) The 2012 DACA Memo directed CBP, USCIS, and ICE to consider exercising prosecutorial discretion with respect to individuals without lawful immigration status who (1) were under the age of sixteen when they entered the United States; (2) had been continuously present in the United States for at least the five years leading up to June 15, 2012; (3) were currently in school, had graduated from high school or obtained GEDs, or were honorably discharged veterans; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, and did not "otherwise pose[ ] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) Individuals who met these criteria, passed a background check, and were granted relief "on a case by case basis" were shielded from removal and

L.Ed.2d 351 (2012) (citing 8 U.S.C. § 1227).

eligible to apply for work authorization, subject to renewal every two years. (Id. at 2–3.) The 2012 DACA Memo made clear, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship," but only "set forth policy for the exercise of discretion within the framework of the existing law." (Id. at 3.) Following the issuance of the 2012 DACA Memo, approximately 800,000 individuals have been granted deferred action and work authorization under the program. (Second Am. Compl. ("SAC") (Dkt. 60) ¶ 73; USCIS, Number of Form I–821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year 2012–2017 (June 30, 2017) (Am. Compl. ("State Pls. Am. Compl."), Ex. 1 (No. 17–CV–5228, Dkt. 55–1) ).)

In 2014, the Obama Administration announced a new deferred action program for the parents of U.S. citizens and lawful permanent residents, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). (Mem. from Jeh Charles Johnson, Sec'y of DHS, to Leon Rodriguez, Dir., USCIS., et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (AR 37).) The 2014 DAPA Memo also expanded the DACA program by (1) permitting individuals born before June 15, 1981, to apply for deferred action; (2) extending the term of the benefits obtained under the DACA program from two to three years; and (3) adjusting the date-of-entry requirement so that individuals who entered the United States before January 1, 2010, could obtain deferred action and work authorization. (Id. at 3–4.) The court refers to these changes to the DACA program as the "DACA Expansion."

Following the issuance of the 2014 DAPA Memo, twenty-six states, led by Texas, filed suit in the U.S. District Court for the Southern District of Texas, claiming that the DAPA program violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq., and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3. See Texas v. United States, 86 F.Supp.3d 591, 598 (S.D. Tex. 2015). On February 16, 2015, the district court concluded that those states had standing to sue and were likely to succeed on the merits of their procedural APA claim that the 2014 DAPA Memo was invalid because it constituted a "substantive rule," not a "general statement of policy," and thus should have been promulgated through notice-and-comment rulemaking. Id. at 671–72. The court issued a nationwide injunction against the implementation of the DAPA program, id. at 677–78, and the DACA Expansion, id. at 678 n.111. The Fifth Circuit affirmed that decision, finding that the plaintiff states were likely to succeed both on their claim that the 2014 DAPA Memo should have been made through notice-and-comment procedures and on their claim that the memo was substantively Contrary to the INA. Texas v. United States, 809 F.3d 134, 178, 186 (5th Cir. 2015) (as revised). The Fifth Circuit declined to reach the plaintiff states' Take Care Clause claim. Id. at 146 n.3. The decision was affirmed by an equally divided Supreme Court. See —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (Mem.).

### 3. DAPA Rescission

The Executive Branch's immigration-enforcement priorities shifted with the election of President Donald Trump. Shortly after his Inauguration, President Trump issued an executive order that cast doubt on the exemption of "classes or categories

of removable aliens from potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017). The following month, then-Secretary of DHS John Kelly implemented that order by issuing a memorandum rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John Kelly, Sec'y, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al., Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (AR 230).) Four months later, Secretary Kelly issued another memorandum, which rescinded the DAPA program and the DACA Expansion based on "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, to Kevin K. McAleenan, Acting Comm'r, CBP, et al., Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (AR 235).) That memorandum did not, however, rescind the original DACA program or revoke the three-year-long deferred action and work authorization issued between the announcement of the DACA Expansion and the Southern District of Texas's issuance of a preliminary injunction against that program. (Id. at 2 & n.3).

### 4. DACA Rescission

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton wrote on behalf of eleven states to Attorney General Jeff Sessions to demand that the "Executive Branch" rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Texas, to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) at 2 (AR 239).) Paxton warned that, if DHS did not act to end the DACA program, the plaintiff states would amend their complaint in Texas v. United States to challenge the DACA program and the remaining work permits issued under the DACA Expansion. (Id. at 2.)

Thereafter, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to "advise that [DHS] should rescind" the 2012 DACA Memo.[3] (Letter from Jefferson B. Sessions, III, Att'y Gen. of the U.S., to Elaine C. Duke, Acting Sec'y, DHS (the "Sessions Letter") (AR 251).) The Attorney General opined that DACA was unconstitutional and that the Texas plaintiffs would likely prevail in their anticipated challenge to the program:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects

**3.** While the letter is not dated, the PDF of the AR dates the letter September 4, 2017. (See also Defs. Mem. at 9.)

that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

(Id. (citation omitted).)

On September 5, 2017, Defendants rescinded the DACA program.[4] The Attorney General announced the decision at a press conference, and Acting Secretary Duke implemented the decision by issuing a memorandum (the "DACA Rescission Memo") to her subordinates. (DOJ, Press Release, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca; Mem. from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252).) Duke pointed to the rulings of the Fifth Circuit and the Supreme Court in the Texas litigation, as well as to the Attorney General's "legal determination" that DACA was " 'an open-ended circumvention of immigration laws' " and " 'an unconstitutional exercise of authority' ":

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15,

2012[,] DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

(Id. at 3–4 (quoting Sessions Letter).)

Rather than terminating the DACA program outright, the DACA Rescission Memo provided for a phased "wind down" of the program. First, DHS would consider initial applications for deferred action and work authorization that it had received as of September 5, 2017. (DACA Rescission Memo at 4.) Second, DHS would "adjudicate—on an individual, case by case basis" requests for renewal of deferred action and work authorization "from current beneficiaries whose benefits will expire between [September 5, 2017,] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.) DHS would not consider other applications for deferred action or work authorization under the DACA program. (Id.) Existing grants of deferred action and work authorization would remain in effect "for the remaining duration of their validity periods," though DHS would retain the authority to terminate or deny deferred action when it deemed appropriate. (Id.) Under the DACA Rescission Memo, the benefits granted as part of the DACA program will

---

**4.** Defendants maintain that, as a legal matter, Acting Secretary Duke is solely responsible for the decision to rescind the DACA program. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 3–4.) As the court has noted, however, Defendants previously represented to the court that the Attorney General and Acting Secretary Duke jointly decided to end the DACA program. (Tr. of Sept. 14, 2017, Hr'g (Docket Number Pending) 13:17–14:06, 24:21–24, 26:1–6; Oct. 17, 2017, Mem. & Order (Dkt. 86) at 9–10.) De-

fendants had not then, and still have not, presented this court with any reason why it should disregard their earlier representations as to who decided to end the DACA program. (See Oct. 17, 2017, Mem. & Order at 10; Oct. 19, 2017, Mem. & Order at 10–11.) For purposes of this motion, however, nothing turns on the question of whether Acting Secretary Duke acted alone or with the Attorney General and the President when terminating the DACA program, so the court simply refers to the actions of "Defendants" in this regard.

**AR0689**

therefore expire gradually over the next two years.

### B.  Procedural Background

#### 1.  Prior to the DACA Rescission

The first of the above-captioned cases, Batalla Vidal v. Duke, No. 16–CV–4756 (E.D.N.Y.), predates the Trump Administration's decision to rescind the DACA program. In that case, Plaintiff Martin Batalla Vidal initially challenged DHS's compliance with the nationwide injunction issued by the Southern District of Texas in Texas v. United States. Batalla Vidal applied for deferred action and work authorization in November 2014 and, in February 2015, was notified that he had received deferred action and work authorization for the next three years under the terms of the DACA Expansion. (Compl. (Dkt. 1) ¶ 32.) On May 14, 2015, however, DHS revoked his three-year work authorization, citing the Texas injunction, and replaced it with a two-year permit. (Id. ¶¶ 34–36.) Batalla Vidal challenged that decision, contending that the Texas plaintiffs lacked standing to seek, and the Southern District of Texas lacked jurisdiction to issue, a nationwide injunction. (Id. ¶¶ 43–47.) Batalla Vidal subsequently amended his complaint to add the nonprofit organization MRNY as a plaintiff and name then-Director of USCIS Leon Rodriguez as a defendant. (Am. Compl. (Dkt. 29).) In November 2016, the Batalla Vidal Plaintiffs moved with Defendants' consent to stay briefing in the case "[d]ue to uncertainty regarding the future of the [DACA] program." (Pls. Nov. 21, 2016, Mot. to Stay (Dkt. 35); Apr. 4, 2017, Joint Mot. to Stay (Dkt. 40).)

#### 2.  Following the DACA Rescission

Following Defendants' announcement of the decision to rescind the DACA program, Plaintiffs brought these actions challenging that decision and certain other actions that Defendants have taken relating to that decision. On September 6, 2017, fifteen states and the District of Columbia [5] filed suit challenging both the rescission of the DACA program and DHS's alleged changes in its policy regarding the use of DACA applicants' information for immigration-enforcement purposes. (State Pls. Compl. (No. 17–CV–5228, Dkt. 1) ¶¶ 269–301.) The State Plaintiffs asserted claims under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the APA, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12 (the "RFA"). (Id.) Two weeks later, the Batalla Vidal Plaintiffs again amended their complaint to assert certain claims similar to those brought by the State Plaintiffs, as well as a claim that Defendants violated the Due Process Clause by failing to notify DACA recipients that they needed to renew their deferred action and work authorization by October 5, 2017. (SAC ¶¶ 160–66.) Finally, the State Plaintiffs amended their complaint to add claims (1) challenging the notice provided to DACA recipients of the rescission of the DACA program; and (2) further challenging the change in DHS's information-use policy. (State Pls. Am. Compl. (No. 17–CV–5228, Dkt. 54) ¶¶ 246–52, 274–80.) Together, Plaintiffs now assert the following claims:

**Equal Protection.** Both sets of Plaintiffs allege that the decision to rescind the DACA program violated the equal-protection principles incorporated in the Due

---

**5.**  The State Plaintiffs were initially comprised of the States of North Carolina, Hawaii, New York, Washington, Iowa, Oregon, Rhode Island, Vermont, Illinois, Connecticut, New Mexico, and Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District of Columbia. (State Pls. Compl. (No. 17–CV–5228, Dkt. 1).) Colorado has since joined the case. (State Pls. Am. Compl. (No. 17–CV–5228, Dkt. 54).)

Process Clause of the Fifth Amendment to the U.S. Constitution, see Bolling v. Sharpe, 347 U.S. 497, 498–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954), because that decision was motivated by improper considerations. (SAC ¶¶ 167–70; State Pls. Am. Compl. ¶¶ 233–39.) The State Plaintiffs allege that the DACA Rescission Memo "target[s] individuals for discriminatory treatment, without lawful justification" and that it was "motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group." (State Pls. Am. Compl. ¶¶ 235–36.) The Batalla Vidal Plaintiffs allege that President Trump, Attorney General Sessions, and Acting Secretary Duke violated the Due Process Clause in deciding to rescind the DACA program because that decision "targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups," and "was substantially motivated by animus toward Latinos and, in particular, Mexicans." (SAC ¶¶ 169–70.)

**Due Process—Individualized Notice.** Both sets of Plaintiffs also contend that Defendants violated the Fifth Amendment's Due Process Clause by failing to provide DACA recipients with adequate notice of the decision to rescind the DACA program. (SAC ¶¶ 160–66; State Pls. Am. Compl. ¶¶ 274–80.) In particular, the Batalla Vidal Plaintiffs allege that, prior to the DACA Rescission Memo, DHS advised DACA recipients to submit applications to renew their deferred action and work authorization "as soon as possible" and, in particular, 120–150 days before expiration, to ensure that those benefits did not expire before DHS could process the renewal applications. (SAC ¶ 164.) Following the issuance of the DACA Rescission Memo, Defendants did not send individual revised notices to alert DACA recipients who were eligible to renew their deferred action and work authorization (i.e., individuals whose benefits expired before March 5, 2018) that

they only had until October 5, 2017, to do so. (Id. ¶ 165.) The State Plaintiffs allege that Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide DACA recipients with "adequate notice" about "the procedures and timeline for renewing their DACA status," "the general termination of the DACA program after March 5, 2018," or "their inability to apply for renewal of their DACA status after March 5, 2018." (State Pls. Am. Compl. ¶¶ 276–77.)

**Due Process—Information–Use Policy.** Both sets of Plaintiffs assert that DHS impermissibly backtracked on its representations that it would use information gleaned from DACA applications for immigration-enforcement purposes only in limited circumstances. (SAC ¶¶ 151, 153; State Pls. Am. Compl. ¶¶ 240–45.) While, as discussed below, the Batalla Vidal Plaintiffs fold this challenge into their substantive APA claim, the State Plaintiffs challenge this decision as "fundamentally unfair," in violation of the Due Process Clause of the Fifth Amendment. (State Pls. Am. Compl. ¶ 243.)

**Equitable Estoppel—Information–Use Policy.** The State Plaintiffs argue that the doctrine of equitable estoppel bars DHS from changing its policy regarding the use of DACA applicants' information. (Id. ¶¶ 246–52.) The State Plaintiffs allege that Defendants, having "made repeated affirmative statements about the protections that would be given to the personal information provided by DACA applicants" and "placed affirmative restrictions on the use of such information for purposes of immigration enforcement" (id. ¶ 248), are now estopped from using that information for immigration-enforcement purposes (id. ¶¶ 250–51). The court refers to this claim, together with Plaintiffs' constitutional information-use policy claims, as Plaintiffs' "information-use policy claims."

**APA—Arbitrary and Capricious.** Both sets of Plaintiffs challenge the decision to end the DACA program under the APA as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (SAC ¶¶ 149–54; State Pls. Am. Compl. ¶¶ 253–56.) The Batalla Vidal Plaintiffs contend that Attorney General Sessions and Acting Secretary Duke acted arbitrarily and capriciously by deciding to end the DACA program and by changing DHS's policy regarding the confidentiality of DACA applicants' information because those decisions "(a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors." (SAC ¶ 151.) The State Plaintiffs argue that the implementation of the DACA Rescission Memo and termination of the DACA program "with minimal formal guidance" constituted arbitrary, capricious, and unlawful action in violation of Section 706 of the APA. (State Pls. Am. Compl. ¶ 254–55.) The court refers to these claims together as Plaintiffs' "substantive APA claims."

**APA—Notice and Comment.** Both sets of Plaintiffs also contend that DHS's implementation of the DACA Rescission Memo constitutes a substantive or legislative "rule" for purposes of the APA, and thus needed to be made through notice-and-comment rulemaking procedures. See 5 U.S.C. § 553. (SAC ¶¶ 144–48; State Pls. Am. Compl. ¶¶ 257–65.) In particular, the Batalla Vidal Plaintiffs argue that the DACA Rescission Memo is a substantive rule, "as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria." (SAC ¶ 146.) The State Plaintiffs, on the other hand, argue that the promulgation and implementation of the DACA Rescission Memo "categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States," impacting those beneficiaries' "substantive rights." (State Pls. Am. Compl. ¶ 261.) The court refers to these claims together as Plaintiffs' "procedural APA claims."

**RFA.** Finally, both sets of Plaintiffs assert claims under the RFA. Plaintiffs claim that Defendants violated the RFA by issuing the DACA Rescission Memo without conducting an analysis of the rescission's impact on "small entities." (SAC ¶¶ 155–59; State Pls. Am. Compl. ¶¶ 266–73.) MRNY alleges that it is a "small organization" that is directly affected by the DACA Rescission Memo and thus has a cause of action under the RFA. (SAC ¶ 156.) The State Plaintiffs assert that they and their "small governmental jurisdictions, nonprofits, and businesses, and their residents" are harmed by Defendants' failure to conduct such a regulatory impact analysis. (State Pls. Am. Compl. ¶ 273.) The court refers to these claims as Plaintiffs "RFA claims."

The following chart summarizes these claims:

*a. Table: Claims Presented*

| Challenged Action | Cause of Action | Batalla Vidal v. Duke[6] | New York v. Trump[7] |
|---|---|---|---|
| Termination of the DACA program | Due Process Clause | Fifth claim, ¶¶ 167-70 | First claim, ¶¶ 233-39 |
| | APA (substantive) | Second claim, ¶¶ 149-54 | Fourth claim, ¶¶ 253-56 |
| | APA (procedural) | First claim, ¶¶ 144-48 | Fifth claim, ¶¶ 257-65 |
| | RFA | Third claim, ¶¶ 155-59 (MRNY only) | Sixth claim, ¶¶ 266-73 |
| Notification of DACA recipients of (1) the termination of the DACA program and (2) revised renewal deadlines | Due Process Clause | Fourth claim, ¶¶ 160-66 (notice of revised renewal deadlines only) | Seventh claim, ¶¶ 274-80 |
| Changes to DHS policy regarding the use of DACA applicants' information for immigration-enforcement purposes | Due Process Clause | | Second claim, ¶¶ 240-45 |
| | APA (substantive) | Second claim, ¶¶ 149-51, 153-54 | |
| | Equitable estoppel | | Third claim, ¶¶ 246-52 |

[**Editor's Note:** The preceding image contains the reference for footnotes [6, 7]]

### 3. District Court Proceedings

The parties have vigorously litigated these actions before this court. Although the full procedural history can be discerned from the relevant dockets, the court provides the following limited summary of the proceedings to date.

Consistent with the regular practice of courts in this district in civil cases, discovery matters were referred to the magistrate judge assigned to the case, Magistrate Judge James Orenstein, to decide in the first instance. See 28 U.S.C. § 636(b)(1)(A); Local Civ. R. 72.2. After soliciting the views of the parties as to whether discovery should proceed (Sept. 15, 2017, Order (Dkt. 58) ), Judge Orenstein authorized discovery to proceed over Defendants' objections (Tr. of Sept. 26, 2017, Hr'g (Docket Number Pending) 26:21–27:22). Judge Orenstein then issued a case management and scheduling order (the "Case Management Order"), which confirmed the previously announced discovery schedule. (Sept. 27, 2017, Order (Dkt. 67).) Of particular relevance to these proceedings, the Case Management and Scheduling Order required Defendants to produce, by October 6, 2017, an adminis-trative record as well as a privilege log describing "every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such . . . record to be part of the official administrative record." (Id. ¶¶ II(c) (the "Privilege Log Requirement").)

Defendants promptly challenged the Case Management Order. On September 29, 2017, Defendants filed a motion before this court "seek[ing] relief from" the Privilege Log Requirement, which, they argued, "raise[d] substantial separation-of-powers concerns," to the extent it could be read as applying to White House communications, and required Defendants to assert privilege with respect to documents that were not properly included in the administrative record. (Sept. 29, 2017, Defs. Mot. to Vacate (Dkt. 69) ("Defs. Sept. 29 Mot.") at 2–5.) Defendants also argued that it would be impossible to comply with the Privilege Log Requirement within the deadline set by the Case Management Order (id. at 5), and that the court should

**6.** All citations refer to the SAC.

**7.** All citations refer to the State Plaintiffs' Amended Complaint.

consider threshold arguments for dismissal of these cases before allowing discovery to proceed (id. at 5–6). Defendants did not specifically argue that discovery was inappropriate, although they reincorporated arguments against discovery by reference to a letter they had filed with Judge Orenstein a week earlier and briefly outlined three "threshold dismissal arguments." (Id. at 1, 5–6; see also Defs. Sept. 22, 2017, Ltr. Regarding Discovery (Dkt. 65).)

The court issued two orders in response to Defendants' objections. The first order extended the deadline for complying with the Privilege Log Requirement by two weeks, so that the court could consider whether the as-yet-unproduced administrative record was adequate and whether Defendants retained the presumption that they had correctly compiled the record. (Oct. 3, 2017, Order (Dkt. 72).) Defendants subsequently asked the court to narrow the Privilege Log Requirement or vacate it entirely. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 2.) At the same time, Defendants also asked the court to stay discovery pending resolution of Defendants' anticipated dispositive motions, which Defendants averred would "raise arguments that are strong, purely legal, and completely dispositive of Plaintiffs' claims." (Id. at 4.) Defendants did not, however, specifically identify what those arguments were (instead cross-referencing their September 29 Motion and string-citing to authority discussed below) or address any of the factors that courts in this district consider in analyzing whether a party has demonstrated "good cause" to stay discovery. See Fed. R. Civ. P. 26(c); Richards v. N. Shore Long Island Jewish Health Sys., No. 10-CV-4544 (LDW) (ETB), 2011 WL 4407518, at *1 (E.D.N.Y. Sept. 21, 2011).

The court then issued its second order, which narrowed the scope of the Privilege Log Requirement but denied Defendants' request to stay discovery. (Oct. 17, 2017 Mem. & Order (the "Oct. 17 M & O") (Dkt. 86).) With respect to Defendants' arguments that discovery outside the administrative record was inappropriate, the court noted that Defendants had not identified any reason why its review of Plaintiffs' information-use policy and notice claims should be limited to an administrative record that only purported to document the decision to rescind the DACA program. (Id. at 3–5.) The court declined to vacate the Privilege Log Requirement before Judge Orenstein decided whether the administrative record was complete. (Oct. 17 M & O at 5–6.) The court agreed, however, that the Privilege Log Requirement should be narrowed to exclude materials other than DHS and DOJ communications. (Id. at 7–9.) Finally, the court declined to exempt DOJ from the Privilege Log Requirement, as Defendants had failed to explain their apparent reversal in position regarding whether Attorney General Sessions was responsible for the decision to rescind the DACA program. (Id. at 9–10.)

The following evening, Defendants renewed their motion to stay discovery, this time threatening to seek mandamus review if the court did not address their objections by 2 p.m. the following day. (Defs. Oct. 18, 2017, Mot. to Stay (Dkt. 87).) The court ruled expeditiously on these requests. On October 19, 2017, Judge Orenstein issued an order granting Plaintiffs' motion to compel Defendants to produce a complete administrative record. (Oct. 19, 2017, Order Granting Motion to Produce (Dkt. 89).) The same day, this court issued another memorandum and order, granting in part and denying in part Defendants' motion for a stay. (Oct. 19, 2017, Mem. & Order (the "Oct. 19 M & O") at 9–11.) In light of Defendants' ongoing (and, this time, factually substantiated) concerns about the burdens of complying with the

Privilege Log Requirement, the court agreed to stay the Privilege Log Requirement except with respect to documents directly considered by the Attorney General, Acting Secretary Duke, and their subordinates who directly advised them on the decision to end the DACA program. (Id.) The court concluded, however, that Defendants had not demonstrated "good cause" warranting a stay of discovery (id. at 4–9), nor that they were entitled to a stay pending mandamus review (id. at 11–12).

On October 20, 2017, the U.S. Court of Appeals for the Second Circuit issued an emergency stay of discovery and record supplementation in proceedings before this court, contingent on Defendants' filing a full petition for a writ of mandamus by 3 p.m. on October 23, 2017. (Oct. 20, 2017, USCA Order (Dkt. 91).) Four days later, the Second Circuit issued a second order, which extended the stay pending determination of the mandamus petition but deferred ruling on that petition "until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." (Oct. 24, 2017, USCA Order (Dkt. 99).) In light of that order, the court directed the parties to file supplemental briefs as to whether the court "lacks jurisdiction to consider the claims raised in [these cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.) In response to that order, Defendants filed the motion to dismiss currently before the court. That motion not only argues that the court lacks jurisdiction to hear these cases, but also contends that Plaintiffs fail to state a claim upon

which relief should be granted and that the court should not grant a nationwide injunction, should it decide that Plaintiffs are entitled to relief.[8]

## II.  LEGAL STANDARDS

Pursuant to the Second Circuit's direction, the court addresses only "issues of jurisdiction and justiciability" at this point in the proceedings. (Oct. 24, 2017, USCA Order; Oct. 27, 2017, Order (Dkt. 98).) Accordingly, the court will consider only those portions of Defendants' motion to dismiss that challenge the court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

[4–6]  Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (quoting Makarova, 201 F.3d at 113). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by

---

**8.**  Prior to filing their Motion to Dismiss, Defendants requested and received leave to file an overlong brief "in order . . . to fully present their dismissal arguments in these cases." (Defs. Oct. 25, 2017, Appl. for Leave to File Excess Pages (Dkt. 94); Oct. 26, 2017, Order Granting Defendants' Application for Leave to File Excess Pages.) That application did not expressly indicate that Defendants intended to

present arguments for dismissal for failure to state a claim under Rule 12(b)(6), as opposed to just the "jurisdiction and justiciability" arguments specifically referenced by the Second Circuit's and this court's October 24, 2017, orders. Defendants would not have required these excess pages had they confined their briefing to those issues. (See Oct. 27, 2017, Order (Dkt. 98).)

reference to evidence outside the pleadings, such as affidavits." Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) ).

## III.  DISCUSSION

Defendants raise four challenges to the court's authority to hear the above-captioned cases. First, Defendants argue, these cases are not justiciable under the APA because the decision to rescind the DACA program was "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2). (Defs. Mem. at 12–17.) Second, Defendants contend that the decision to terminate the DACA program constitutes a denial of deferred action, judicial review of which is barred by Section 1252(g) of the INA. See 8 U.S.C. § 1252(g). (Id. at 17–19.) Third, they maintain, the Batalla Vidal Plaintiffs lack standing to bring certain claims (id. at 28–29, 34–35, 37), and the State Plaintiffs lack Article III standing to bring any claims (id. at 19–21). Fourth, Defendants assert, the State Plaintiffs and MRNY cannot bring claims under the APA because they assert interests that fall outside the "zone of interests" protected by the INA. (Id. at 19–20.) The court addresses each argument in turn.

### A.  Committed to Agency Discretion by Law

Defendants first argue that these cases are non-justiciable because the decision to end the DACA program was committed to DHS's exclusive discretion by law. The court disagrees. Certain agency decisions, including decisions not to institute enforcement action, are presumptively immune from judicial review under the APA be-

cause they are "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). But the rescission of the DACA program was not such a decision, nor have Defendants explained why Section 701(a)(2) precludes review of Plaintiffs' constitutional claims or other claims challenging actions other than the decision to rescind the DACA program.[9]

#### 1.   Statutory and Equitable Claims

[7–9]  Section 701(a)(2) of the APA does not preclude judicial review of Plaintiffs' statutory and equitable claims. "Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.'" Westchester v. U.S. Dep't of Hous. and Urban Dev., 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action." Salazar v. King, 822 F.3d 61, 75 (2d Cir. 2016). Judicial review is not available, however, "to the extent that … statutes preclude judicial review," 5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law," § 701(a)(2). The latter is "a very narrow exception" to the presumption of reviewability of agency action under the APA, and it applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945) ), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); see also Chaney, 470 U.S. at 830,

---

**9.** It is not clear whether Section 701(a)(2) limits the court's jurisdiction or instead forms an "essential element" of a claim for relief under the APA. Sharkey v. Quarantillo, 541 F.3d 75, 87–88 (2d Cir. 2008); accord Conyers

v. Rossides, 558 F.3d 137, 143 n.8 (2d Cir. 2009). Nothing turns on this distinction here, however, because Section 701(a)(2) does not shield Defendants' actions from judicial review.

105 S.Ct. 1649 (agency action is unreviewable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." Salazar, 822 F.3d at 76 (quoting Chaney, 470 U.S. at 830, 105 S.Ct. 1649). These enactments supply "law to apply" because they may govern the agency's exercise of its own discretion. See id. at 76–77 (citing INS v. Yueh–Shaio Yang, 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ); Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 158–59 (D.C. Cir. 2006).

a. *"Law to Apply"*

[10, 11]   Here, there is "law to apply," permitting meaningful judicial review of Plaintiffs' statutory claims. Plaintiffs assert statutory claims under the APA and RFA. With respect to Plaintiffs' procedural APA and RFA claims, the relevant "law to apply" is found in the APA and RFA themselves, both of which specify procedures that agencies must follow when engaging in "substantive" or "legislative" rulemaking. See 5 U.S.C. §§ 553, 604. The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable. See Lincoln v. Vigil, 508 U.S. 182, 195–98, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); Am. Med. Ass'n v.

Reno, 57 F.3d 1129, 1134 (D.C. Cir. 1995); N.Y.C. Employees' Ret. Sys. v. SEC, 45 F.3d 7, 11 (2d Cir. 1995).

[12, 13]   There is also "law to apply" permitting meaningful judicial review of Plaintiffs' substantive APA claims. In order to satisfy Section 706(2)(a), Plaintiffs must identify some source of law, other than the APA's "arbitrary and capricious" standard, against which the court can review their claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.' " Lunney v. United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003). The court agrees that Plaintiffs have identified "law to apply" to these claims. In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court. (Sessions Letter, AR 251; DACA Rescission Memo, AR 253–55.) The court may review that rationale in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion.[10] While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary "balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of 'potentially imminent litigation' that could throw DACA into immediate turmoil" (Defs. Mem. at 15), that argument is unsupported

---

10.  The State Plaintiffs also assert a claim for equitable estoppel. (State Pls. Am. Compl. ¶¶ 246–52.) With respect to the State Plaintiffs' equitable estoppel claim, the court assumes for the sake of argument that the relevant "law to apply" may be found in DHS's past statements and practices regarding the

use of DACA applicants' information. See Salazar, 822 F.3d at 76–77. (See State Pls. Am. Compl. ¶¶ 39–44.) The court need not decide this question, however, because, as discussed below, the State Plaintiffs lack standing to assert this claim. (See infra Section III.C.2.b.)

by the text of the Sessions Letter and the DACA Rescission Memo.

**[14]** Defendants' argument that the decision to rescind the DACA program is unreviewable, notwithstanding the "substantive legal" rationale given for that decision (Defs. Mem. at 15), is unpersuasive. Defendants correctly note that unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action." (Defs. Mem. at 13 (quoting ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) ("BLE")).) See BLE, 482 U.S. at 283, 107 S.Ct. 2360 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief … that the law will not sustain a conviction. That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."). That argument simply begs the question, however, of whether the decision to rescind DACA is actually unreviewable. While it may be true that a presumptively unreviewable decision does not become subject to judicial review simply because the decision-maker expresses a "reviewable" rationale," see id., the decision to rescind the DACA program was not inherently such a decision, as the following section discusses in detail.

### b. Prosecutorial Discretion

**[15]** Nor does the decision to end the DACA program fall within a class of decisions traditionally regarded as presumptively immune from judicial review under Section 701(a)(2) of the APA. (Defs. Mem. at 12–14.) Defendants assert that the decision to rescind the DACA program constitutes "an exercise of enforcement discretion" that is "entrusted to the agency alone" and immune from judicial review. (Id. at 15.) The court concludes, however, that the decision to eliminate the DACA program—a program by which certain undocumented immigrants could request immigration authorities to exercise prosecutorial discretion with respect to them—was not itself a presumptively unreviewable exercise of enforcement discretion.

Defendants rely in particular on Chaney, which held that decisions not to take enforcement action were presumptively not subject to judicial review under the APA. In Chaney, the Court rejected an attempt by a group of prisoners awaiting execution by lethal injunction to force the Food and Drug Administration to take enforcement action to prevent the use of certain drugs for capital punishment. See Chaney, 470 U.S. at 823–25, 830–33, 105 S.Ct. 1649. The Court held that a regulator's refusal to take enforcement action was presumptively unreviewable, because decisions not to take enforcement action typically "involve[ ]a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," id. at 831, 105 S.Ct. 1649, and do not implicate the agency's exercise of "coercive power over an individual's liberty or property rights, and thus do[ ] not infringe upon areas that courts often are called to protect," id. at 832, 105 S.Ct. 1649.

The decision to rescind DACA is unlike the non-enforcement decision at issue in Chaney. First, Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants. The DACA Rescission Memo curtails (if it does not eliminate outright)

DHS's ability to exercise prosecutorial discretion with respect to individuals previously eligible to request deferred action. Although the DACA Rescission Memo notes that it does not limit DHS's "otherwise lawful enforcement or litigation prerogatives," it makes clear that DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after [September 5, 2017]" and "[w]ill reject all DACA renewal requests and associated applications for Employment Authorization Documents" inconsistent with the terms of the Memo. This affirmative decision to constrain DHS's prosecutorial discretion cannot be analogized to an exercise of prosecutorial discretion, which would be presumptively immune from judicial review. Cf. Texas, 809 F.3d at 165–69 (creation of the DAPA program was reviewable because it was a "affirmative agency action," not an exercise of enforcement discretion). Second, Plaintiffs do not challenge non-enforcement decisions, which do not subject individuals to the "coercive power" of the state. Chaney, 470 U.S. at 831, 105 S.Ct. 1649. To the contrary, the rescission of the DACA program subjects individuals who previously enjoyed some protection from removal to coercive state authority. Third, Defendants' decision to rescind the DACA program does not appear to have been motivated by a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." See id. Instead, Defendants stated that they were required to rescind the DACA program because it was unlawful, which suggests both that Defendants did not believe that they were exercising discretion when rescinding the program and that their reasons for doing so are within the competence of this court to review. (Sessions Letter; DACA Rescission Memo at 4.) The decision to rescind the DACA pro-

gram is thus manifestly unlike the non-enforcement decision at issue in Chaney. While courts have also held that agency decisions to take (as opposed to refrain from taking) enforcement action are also unreviewable under the APA when there are no judicially manageable standards for reviewing the agency's discretion in choosing to bring an enforcement action, see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n, 528 F.3d 310, 316–19 (4th Cir. 2008); Twentymile Coal, 456 F.3d at 155–59, those cases are inapposite because there is "law to apply" to review the decision to rescind DACA.

Finally, Defendants' arguments that Section 701(a)(2) precludes judicial review of Plaintiffs' suits focus on the decision to rescind the DACA program. Defendants do not explain why the alleged decision to change DHS's policy regarding the use of DACA applicants' information should be immune from judicial review. To the contrary, there is "law to apply" in reviewing that decision (namely, DHS's prior statements about the uses of DACA applicants' information), and the court does not understand how the change in that policy can be analogized to the sorts of decisions, such as enforcement and non-enforcement decisions, that courts have recognized as presumptively exempt from judicial review. Accordingly, to the extent the Batalla Vidal Plaintiffs also challenge DHS's alleged change in information-use policy as part of their substantive APA claim, that claim is reviewable. (SAC ¶¶ 151, 153–54.)

### 2. Constitutional Claims

**[16, 17]** Nor does Section 701(a)(2) preclude judicial review of Plaintiffs' constitutional claims. It is well-established that "even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." Padula v. Webster, 822 F.2d 97, 101 (D.C. Cir. 1987); accord Inova

Alexandria Hosp. v. Shalala, 244 F.3d 342, 347 (4th Cir. 2001); Woodward v. United States, 871 F.2d 1068, 1072–73 (Fed. Cir. 1989).

In Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Court rejected the Government's argument that Section 701(a)(2) barred a former CIA employee from bringing constitutional claims challenging his termination from the agency. Because the National Security Act of 1947 vested the CIA Director with authority over firing decisions, the decision to fire the plaintiff because of his sexual orientation had been "committed to agency discretion by law," and he could not challenge that decision under the APA. Id. at 594–95, 599–601, 108 S.Ct. 2047. The National Security Act did not expressly preclude review of constitutional claims, however, so the Court would not presume that such claims were unreviewable. Id. at 603–04, 108 S.Ct. 2047 (noting that the Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," in order to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) ) ). Similarly, Defendants identify no express indication that Congress intended to preclude judicial review of the actions at issue in these cases. While DHS undoubtedly exercises "wide discretion . . . in the enforcement of the immigration laws" (Defs. Mem. at 16), that is insufficient to preclude review of Plaintiffs' constitutional claims.

### 3. Deference to the Executive Branch on Immigration Matters Does Not Counsel a Different Result

[18] Lastly, Defendants contend that the court should read Section 701(a)(2) broadly in light of the Executive Branch's wide discretion to enforce the immigration laws. (Id. at 16–17.) The Supreme Court, however, has applied the "strong presumption in favor of judicial review of administrative action" in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 299, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Defendants' specific arguments for a broad reading of Section 701(a)(2) likewise unavailing. While Defendants argue that judicial review of these cases is inappropriate because review could slow down the Executive Branch's removal of undocumented immigrants from this country, 8 U.S.C. § 1252(g) already precludes individuals in removal proceedings from delaying those proceedings by claiming that they were improperly denied deferred action. See AAADC, 525 U.S. at 485, 119 S.Ct. 936. In any event, those concerns do not apply to these cases, as the court discusses in Section III.B below. Defendants also argue that judicial review of immigration decisions is inappropriate because judicial review "may involve 'not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives' or other sensitive matters." (Defs. Mem. at 16 (quoting AAADC, 525 U.S. at 490, 119 S.Ct. 936).) Defendants' stated rationale for rescinding the DACA program, however, turns wholly on questions of U.S. constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues. In any event, vague speculation that judicial review might somehow implicate foreign-policy concerns is insufficient to justify a presumption that immigration cases are not subject to judicial review. See Washington v. Trump, 847 F.3d 1151, 1161 (9th Cir. 2017) ("[T]he Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration. . . ."), re-

**152**          **295 FEDERAL SUPPLEMENT, 3d SERIES**

consid. en banc denied, 853 F.3d 933 (9th Cir. 2017), superseded by 858 F.3d 1168 (9th Cir. 2017). While the court is sensitive to the deference warranted to the Executive Branch in this sphere, Defendants' claims for deference cannot substitute for the "clear and convincing evidence" that Congress intended to restrict judicial review of administrative action. Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008) (internal quotation marks and citation omitted).

**B.  INA Jurisdictional Bar**

Nor does the INA divest the court of jurisdiction to hear this case. That Act contains a provision, 8 U.S.C. § 1252(g), that limits judicial review of certain actions "by or behalf of any alien arising from" certain deportation proceedings. 8 U.S.C. § 1252(g); see AAADC, 525 U.S. at 472, 119 S.Ct. 936. As explained below, that provision has no bearing on these cases, which do not arise from one of the three specifically enumerated actions by immigration authorities that trigger application of the statute. Moreover, by its terms, Section 1252(g) does not apply to claims brought by MRNY or the State Plaintiffs.

**1.  Programmatic Challenges to DACA–Related Decisions**

**[19]**  First, the court considers whether Section 1252(g) strips the court of jurisdiction to hear Plaintiffs' challenges to the decision to rescind the DACA program. The court begins, as usual, with the text of

the statute. In relevant part, Section 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

(emphasis added). As the Court has stated, this "provision applies only to three discrete actions that the Attorney General make take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" AAADC, 525 U.S. at 482, 119 S.Ct. 936. Accordingly, the court must consider whether Plaintiffs' suits "arise from [a] decision or action by [DHS [11]] to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g).

**[20]**  They do not. Defendants' termination of the DACA program does not, by itself, "commence proceedings, adjudicate cases, or execute removal orders against any alien." Id. By rescinding the DACA program, Defendants eliminated a set of guidelines identifying a discrete class of undocumented immigrants who were eligible to apply for deferred action. (See 2012 DACA Memo.) That decision, by itself, did not trigger any specific enforcement proceedings.[12] Nor do the individual Batalla

---

**11.**  As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of DHS, the Homeland Security Act of 2002 provides that statutory references "to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary [of DHS], other official, or component of [DHS] to which such function is so transferred." 6

U.S.C. § 557; Shabaj v. Holder, 718 F.3d 48, 51 n.3 (2d Cir. 2013).

**12.**  Defendants have represented publicly that no action will be taken against DACA recipients prior to March 5, 2018. (See, e.g., Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 7, 2017, 6:42 a.m.), https://twitter.com/realdonaldtrump/status/9057884 59301908480 ("For all of those (DACA) that are concerned about your status during the 6

Vidal Plaintiffs attack decisions by DHS to "commence proceedings, adjudicate cases, or execute removal orders" against them or any other specific individuals. Each of those Plaintiffs has received deferred action (see SAC 3–42), and the record does not suggest that any are currently in removal proceedings and seek to challenge the end of the DACA program as a means of obstructing those proceedings. Instead, Plaintiffs bring broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to provide limited notice of that decision to DACA recipients; and (3) to change DHS's information-use policy. None of those constitutes a "decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g); cf. Texas, 809 F.3d at 164 (creation of DAPA reviewable because "decision to grant lawful presence to millions of [undocumented immigrants] on a class-wide basis" was not enumerated in the text of Section 1252(g) ). Accordingly, Section 1252(g) does not bar judicial review of challenges to those decisions.

This conclusion comports with both the plain meaning of the statute and with the Supreme Court's decision in AAADC. First, AAADC makes clear that Section 1252(g) only limits judicial review with respect to suits arising from certain enumerated decisions by immigration authorities. Writing for the Court, Justice Scalia specifically rejected the notion that Section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'" 525 U.S. at 482, 119 S.Ct. 936. Instead, "[t]he provision applies only to [the] three discrete actions" referenced above. Id. While "[t]here are of course many other decisions or actions that may be part of the deportation process," the

Court stated, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." Id. Defendants' argument that Section 1252(g) encompasses challenges to the decision to end the DACA program because "[t]he denial of continued deferred action is a necessary step in commencing enforcement proceedings at some later date" (Defs. Mem. at 18), is thus at odds with AAADC.

Second, the reasoning of AAADC does not support extending Section 1252(g) to encompass challenges to the decision to rescind DACA. In AAADC, the Court reasoned that Section 1252(g) must have been intended to limit judicial review of denials of deferred action:

> Section 1252(g) seems clearly designed to give some measure of protection to "no deferred action" decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases of separate rounds of judicial intervention outside the streamlined process that Congress has designed [ (i.e., for judicial review of final orders of removal) ].

525 U.S. at 485, 119 S.Ct. 936. These limits were "entirely understandable" in order to prevent "the deconstruction, fragmentation, and hence prolongation of removal proceedings" that could result if immigrants were allowed to attack in-process removal proceedings by claiming that they were singled out by immigration authorities for adverse treatment. Id. at 487, 119 S.Ct. 936; see id. at 487–92, 119 S.Ct. 936. Because the Batalla Vidal Plaintiffs challenge the programmatic decision to rescind DACA, rather than attempting to obstruct their specific removal proceedings by claiming that they were improperly denied

month period, you have nothing to worry     about—No action!'").)

**154**            **295 FEDERAL SUPPLEMENT, 3d SERIES**

deferred action, these cases do not impli-
cate the concern raised in AAADC.

Accordingly, Section 1252(g) does not
preclude review of these actions.

### 2.  Claims by MRNY and the State Plaintiffs

[21, 22]  Moreover, Section 1252(g) does
not preclude judicial review of the claims
brought by MRNY or the State Plaintiffs
in particular. Again, the court begins with
the text of the statute. Section 1252(g) only
bars suits "by or on behalf of any alien"
arising from the decision or action . . . to
commence proceedings, adjudicate cases,
or execute removal orders against any
alien." (emphasis added). But neither
MRNY nor the State Plaintiffs are suing
"on behalf of any alien" in removal pro-
ceedings or subject to an order of removal.
Instead, MRNY sues in its own right, be-
cause it claims that the rescission of
DACA has interfered with its operations.
(SAC ¶¶ 54–57.) Likewise, the State Plain-
tiffs sue not "on behalf of any alien," but
instead to vindicate their own proprietary
and quasi-sovereign interests.[13] (State Pls.
Opp'n to Mot. to Dismiss ("State Pls.
Opp'n") (No. 17–CV–5228, Dkt. 82) at 19–
22.) MRNY and the State Plaintiffs seek to
assert their own rights and the rights of
the general public, not those of individual
immigrants in removal proceedings or sub-
ject to orders of removal. There is no
reason why Section 1252(g) would deprive
the court of jurisdiction over their claims,
brought on their own behalf.

### C.  Standing

[23]  The court next considers whether
Plaintiffs have established that they have
standing to sue. Defendants only cursorily
raise Article III standing defenses. (Defs.
Mem. at 19–20, 34, 37.) "Because the
standing issue goes to this [c]ourt's subject
matter jurisdiction," however, "it can be
raised sua sponte." Cent. States Se. & Sw.
Areas Health & Welfare Fund v. Merck–
Medco Managed Care, L.L.C., 433 F.3d
181, 198 (2d Cir. 2005).

[24–28]  Under the U.S. Constitution,
federal courts may hear only certain
"cases" or "controversies." U.S. Const. art.
III, § 2. This "case-or-controversy re-
quirement" means that a plaintiff must
have "standing," or a sufficient interest in
a live dispute, to sue in federal court. See
Spokeo, Inc. v. Robins, —— U.S. ——, 136
S.Ct. 1540, 1546–47, 194 L.Ed.2d 635
(2016). At its "irreducible constitutional
minimum," Lujan v. Defenders of Wildlife,
504 U.S. 555, 560, 112 S.Ct. 2130, 119
L.Ed.2d 351 (1992), standing consists of
three elements:

> To establish Article III standing, [Plain-
> tiffs] must demonstrate: "(1) injury-in-
> fact, which is a concrete and particular-
> ized harm to a legally protected interest;
> (2) causation in the form of a fairly
> traceable connection between the assert-
> ed injury-in-fact and the alleged actions
> of the defendant; and (3) redressability,

---

**13.**  While a parens patriae suit is in some
sense brought by a state "on behalf of" its
citizens, "[t]he asserted quasi-sovereign inter-
ests will be deemed sufficiently implicated to
support parens patriae standing only if 'the
injury alleged affects the general population
of a State in a substantial way.'" Puerto Rico
ex rel. Quiros v. Bramkamp, 654 F.2d 212,
215 (2d Cir. 1981) (emphasis added) (quoting
Maryland v. Louisiana, 451 U.S. 725, 738,
101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). A
state cannot sue parens patriae simply to as-

sert its citizens' personal claims. See Pennsyl-
vania v. New Jersey, 426 U.S. 660, 665–66, 96
S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per cu-
riam) (collecting cases). To the extent the
State Plaintiffs attempt to bring parens patri-
ae claims based on harm to their quasi-sover-
eign interests, those claims are not "on behalf
of" specific immigrants, but instead seek to
protect the general welfare of their residents.
In any event, as the court discusses below, the
State Plaintiffs lack parens patriae standing to
bring these claims.

**AR0703**

or a non-speculative likelihood that the injury can be remedied by the requested relief."

Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95 (2d Cir. 2017) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106–07 (2d Cir. 2008) ); accord Lujan, 504 U.S. at 560–61, 112 S.Ct. 2130. The "first and foremost" of these three requirements, "injury-in-fact" requires a plaintiff to "show that he or she suffered an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (internal quotation marks and citation omitted) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). To be "imminent," the injury must be "certainly impending"; "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (internal quotation marks, alteration, and citation omitted). The second and third requirements, "causation" and "redressability," require a plaintiff to demonstrate that the "injury-in-fact" he or she suffers is "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1386, 188 L.Ed.2d 392 (2014) (citing Lujan, 504 U.S. at 560, 112 S.Ct. 2130). A plaintiff need not, however, demonstrate that the defendant was the proximate or "but-for" cause of the injury-in-fact. Id. at 1391 n.6; Rothstein v. UBS AG, 708 F.3d 82, 91–92 (2d Cir. 2013).

[29]  The court considers standing separately with respect to each claim raised in each case. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" with respect to each claim and form of relief sought. Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 53 n.3, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) ("FAIR"). The court therefore considers whether, for each claim raised in each of these two actions, at least one plaintiff has standing to sue.

### 1. Batalla Vidal Plaintiffs
#### a. DACA Rescission Claims

[30]  Defendants unsurprisingly do not contest that the Batalla Vidal Plaintiffs have standing to challenge the decision to rescind the DACA program. If the DACA program ends, the individual Batalla Vidal Plaintiffs almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action. See 8 C.F.R. § 274a.l2(c)(14). Loss of their ability to work in the United States is clearly an "injury-in-fact" fairly traceable to the rescission of the DACA program. Additionally, if they were to lose their deferred action, the individual Batalla Vidal Plaintiffs would be subject to removal from the United States. There is nothing "speculative" about the possibility that they would actually be removed. See Hedges v. Obama, 724 F.3d 170, 195–97 (2d Cir. 2013) (to establish standing, a plaintiff who is clearly in violation of a "recent and not moribund" statute need not affirmatively demonstrate the government's intent to enforce the statute, absent "a disavowal by the government or another reason to conclude that no such intent exist[s]" (quoting Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973))); cf. Amnesty Int'l, 568 U.S. at 410–16, 133 S.Ct. 1138 (no standing where alleged injury-in-fact rested on a "speculative" "chain of contingencies"). Those harms are "fairly traceable" to the termination of the DACA program and

would be redressed by the vacatur of that decision. The Batalla Vidal Plaintiffs thus have Article III standing to challenge the decision to rescind the DACA program.

[31–33] The Batalla Vidal Plaintiffs also have standing to challenge the process by which Defendants decided to end the DACA program. Plaintiffs have standing to assert procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of [their] standing." Lujan, 504 U.S. at 573 n.8, 112 S.Ct. 2130. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). Here, there is "some possibility" that if Defendants had subjected the decision to rescind the DACA program to notice and comment and analyzed the impact of that decision on small entities, they would have reached a different outcome. Accordingly, the Batalla Vidal Plaintiffs also have Article III standing to assert their procedural APA claim, and MRNY has Article III standing to assert its RFA claim.

Defendants contend that Plaintiffs cannot assert procedural APA claims because, if the decision to rescind the DACA program was a "substantive" or "legislative" rule requiring notice-and-comment rulemaking, then, "a fortiori so was enacting the policy in the first place," and the DACA program itself was thus "void ab initio—leaving Plaintiffs without a remedy." (Defs. Mem. at 28–29.) It does not follow, however, that if the rescission of the DACA program required notice and comment, the program's creation necessarily required notice and comment as well. (See Defs. Mem. at 29 n.7.) While Defen-

dants might be correct on the merits (an issue that the court does not consider or resolve at this time), all that Article III requires is that Plaintiffs show that their alleged injury would be redressed by the ruling they seek—i.e., that the decision to rescind DACA should be vacated because it was procedurally defective.

*b. Information–Use Policy Claim*

[34] The Batalla Vidal Plaintiffs also have standing to challenge the alleged changes to DHS's information-use policy. To obtain deferred action and work authorization under DACA, an applicant was required to provide USCIS with extensive personal information, including his or her home address, height, weight, hair and eye color, fingerprints, photograph, and signature, and submit to a background check. (See USCIS, Form I–821D: Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60–1)) at ECF pp.6–8; USCIS, Instructions for Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60–1)) at ECF p.3.) The Batalla Vidal Plaintiffs also allege that DACA applicants "routinely provided" other personal information, "including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records," in support of their applications. (SAC ¶ 70.) They contend that this information will enable DHS to deport them more easily once their deferred action expires. (Id. ¶ 127.) The court agrees. It is not difficult to infer that this information would facilitate DHS's ability to remove these individuals from the country. This increased likelihood of removal is sufficiently concrete, imminent, and traceable to Defendants' alleged conduct to establish standing.

Defendants argue that Plaintiffs lack standing to pursue their information-use policy claims because "[n]o Plaintiff plausibly alleges that the agency has in fact used his DACA information for any enforce-

ment purpose, much less initiated enforcement proceedings against him as a result, or that there is any imminent threat of this occurring." (Defs. Mem. at 37.) The individual Batalla Vidal Plaintiffs need not wait, however, until they are deported to have standing to press this claim. Once their deferred action expires, they will be subject to removal from the United States, and the court will presume that Defendants will enforce the immigration laws against them. See Hedges, 724 F.3d at 197. Nor will the court ignore the obvious reality that many DACA recipients will be removed from the country when their deferred action expires. (See, e.g., State Pls. Am. Compl. ¶ 71 (quoting a statement by Acting Director of ICE Thomas Homan that undocumented immigrants "should be uncomfortable" and "should look over [their] shoulder[s]" and "be worried").) The threat of removal based on information provided to DHS is sufficiently imminent as to constitute injury-in-fact.

*c. Notice Claim*

[35] The Batalla Vidal Plaintiffs lack standing, however, to assert their notice claim. In their Second Amended Complaint, the Batalla Vidal Plaintiffs allege that, following the enactment of the DACA Rescission Memo, Defendants failed to send DACA recipients whose status expired by March 5, 2018, individualized no-

tices "advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status." (SAC ¶ 165; see id. at 3, 48, 103–05, 160–66.) As Defendants correctly note, however, the Batalla Vidal Plaintiffs have not alleged that any of them missed the October 5, 2017, deadline or suffered other adverse effects from not receiving such individualized notice. (Defs. Mem. at 34–35.) Nor, even drawing all reasonable inferences in Plaintiffs' favor, does the Second Amended Complaint show that MRNY was injured by Defendants' failure to provide DACA recipients with individualized notice of the renewal deadline.[14] While the Second Amended Complaint alleges that "MRNY has not been able to reach four DACA recipients to inform them that they need to renew now" (SAC ¶ 48), that does not support the reasonable inferences either that those individuals failed to apply for renewal or that such failure was "fairly traceable" to Defendants' actions.[15] In the absence of a showing that anyone has been harmed by a failure to receive notice of the change to the application deadline, the Batalla Vidal Plaintiffs have not demonstrated that they have Article III standing to bring this claim.

## 2. State Plaintiffs

[36–39] The court next considers whether the State Plaintiffs have Article

---

**14.** The court also notes that the renewal deadline provided by the DACA Rescission Memo was not significantly different than that provided by existing DHS policy. The State Plaintiffs allege that "[p]rior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120–150 days prior to expiration . . . in order to avoid a lapse in deferred action and employment authorization." (State Pls. Am. Compl. ¶ 93.) Under the DACA Rescission Memo, a DACA recipient whose deferred action and work authorization was set to expire

on March 4, 2018, was required to file an application for renewal by October 5, 2018—i.e., 150 days before those benefits were set to expire.

**15.** Even if those conditions were met, it is not clear that MRNY would have organizational standing to bring this claim. See Summers v. Earth Island Inst., 555 U.S. 488, 498, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("[O]ur prior cases . . . have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.")

III standing. As the Court has noted, the ordinary rules of standing are somewhat different when a state is a plaintiff. States are "not normal litigants for the purposes of invoking federal jurisdiction," and they are entitled to "special solicitude" when they seek to vindicate their "proprietary" or "quasi-sovereign" interests.[16] Massachusetts v. EPA, 549 U.S. at 518, 127 S.Ct. 1438. This does not mean, however, that states have unbridled license to sue.

### a.  The State Plaintiffs Have Standing to Challenge the DACA Rescission

[40–42]  The State Plaintiffs have Article III standing to challenge Defendants' decision to rescind the DACA program, as well as the procedures by which that decision was made and implemented, based on that decision's impacts to the State Plaintiffs' proprietary interests. States, "like other associations and private parties," may have a "variety of proprietary interests" that they may vindicate in court. Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601–02, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("Snapp"). A state has proprietary interests, for example, in its ownership of land, id. at 601, 102 S.Ct. 3260, and in its relationships with its employees, see Indiana v. IRS, 38 F. Supp. 3d 1003, 1009 (S.D. Ind. 2014) ("The Defendants recognize, as they must, that a State and its political subdivisions may sue in their capacity as employ-

ers."). A state also has proprietary interests in its "participat[ion] in a business venture," Snapp, 458 U.S. at 601, 102 S.Ct. 3260, and in the operation of state-run institutions, such as state colleges and universities, Washington, 847 F.3d at 1159–61; Aziz v. Trump, 231 F.Supp.3d 23, 32–33 (E.D. Va. 2017).

Here, the State Plaintiffs have amply alleged and documented that the rescission of DACA would harm the states' proprietary interests as employers and in the operation of state-run colleges and universities. (State Pls. Am. Compl. ¶ 190 (states employ "[m]any DACA recipients").) For example, the State of Washington represents that it employs DACA recipients within state government (e.g., Decl. of Paul Quinonez ¶¶ 1–6 (State Pls. Am. Compl., Ex. 56 (Dkt. 55–56) ); Decl. of E. Alexandra Monroe ¶ 3–4 (State Pls. Am. Compl., Ex. 62 (Dkt. 55–62) ) ) and at state-run colleges and universities (e.g., Decl. of Lucila Loera ¶ 4 (State Pls. Am. Compl., Ex. 58 (Dkt. 55–58) ) ). If DACA were rescinded, these employees would lose their work authorization, and the State of Washington would incur expenses in identifying, hiring, and training their replacements. (State Pls. Am. Compl. ¶ 190.) Accordingly, the State of Washington has standing to assert equal protection and substantive APA claims challenging the decision to end the DACA program. Moreover, Washington has standing to

---

**16.**  The Court has categorized a state's litigation interests using the trichotomy of "sovereign," "quasi-sovereign," and "proprietary" interests. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("Snapp"). Proprietary interests are those that a state may have akin to a private party, such as ownership of land or participation in a business venture. Id. at 601, 102 S.Ct. 3260. Sovereign interests are interests the state has in its capacity as a state, such as "the exercise of sovereign power over individuals and enti-

ties within the relevant jurisdiction" and "the demand for recognition from other sovereigns." Id. "Quasi-sovereign" interests are harder to define but "consist of a set of interests that the State has in the well-being of its populace." Id. at 602, 102 S.Ct. 3260; see also id. at 607, 102 S.Ct. 3260 ("[T]he articulation of [quasi-sovereign] interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract....").

challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment and RFA rulemaking procedures, it might "reconsider the decision." See Massachusetts v. EPA, 549 U.S. at 518, 127 S.Ct. 1438. Because Washington has established its standing to assert substantive and procedural APA and RFA claims, the State Plaintiffs therefore have Article III standing to bring these claims. See FAIR, 547 U.S. at 53 n.3, 126 S.Ct. 1297.

[43] Defendants' arguments that State Plaintiffs lack Article III standing because they would be only "incidentally" harmed by the rescission of the DACA program are without merit. (See Defs. Mem. at 19.) Defendants protest that "[i]t would be extraordinary to find Article III standing" based on a state's assertions of "alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities," as "virtually any administration of federal law by a federal agency could have such effects." (Id.) That a federal policy may have sweeping, adverse effects on states and state-run institutions is not, however, a convincing argument that states should not have standing to challenge that policy. Moreover, Defendants' position is irrecon-

cilable with their own stated rationale for rescinding the DACA program. Defendants have stated that they rescinded the DACA program because it suffered from the same legal flaws as the DAPA program and could not be defended in court against the threatened challenge by Texas and other state plaintiffs. That necessarily assumes that at least one of the plaintiff states in the Texas litigation has standing to challenge the existence of the DACA program. Cf. Texas, 809 F.3d at 150–62 (finding standing based on the likely costs of having to issue drivers licenses to DAPA beneficiaries). Defendants offer no convincing reason why states should have standing to challenge the DACA program but not to challenge the decision to end that program.[17]

### b. The State Plaintiffs Lack Standing to Bring Notice and Information–Use Policy Claims

Whether the State Plaintiffs can assert their notice or information-use policy claims, however, is a close question. In order to assert these claims, the State Plaintiffs must identify some cognizable proprietary or quasi-sovereign interest that was harmed by Defendants' challenged conduct—i.e., (1) with respect to the notice claim, Defendants' communica-

---

**17.** Defendants' arguments to the contrary are unpersuasive. (Defs. Mem. at 21.) First, Defendants argue that neither the Acting Secretary nor the Attorney General "expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings." (Id.) Jurisdiction is, however, a prerequisite to a ruling on the merits, so the plaintiff states could prevail in their threatened challenge to the DACA program only if they had standing. Second, Defendants argue that "it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place," and that the Executive Branch has "an independent duty to consider the legality of . . . policies regardless of whether they are judicially reviewable." (Id.) The DACA Rescission Memo does not indicate, however, that Defendants actually considered these issues when deciding to rescind the DACA program. Finally, Defendants argue that the adoption of the DACA program could have been reviewed as an abdication of DHS's statutory responsibilities—a grounds for justiciability that would not apply to the decision to rescind the program. (Id. at 21–22.) The Fifth Circuit expressly did not rely on that theory of standing, 809 F.3d at 150, nor is there any indication that the Attorney General or Acting Secretary considered it in rescinding the DACA program.

AR0708

tion of its decision to rescind the DACA program and impose an October 5, 2017, renewal deadline; and (2) with respect to the information-use policy claims, the alleged change in DHS policy regarding the use of DACA applicants' information. In the court's view, the State Plaintiffs have not identified any interests harmed by these actions that they can sue the federal government to redress, and so they lack standing to bring these claims.

i.   *Proprietary Interests*

[44, 45]   While the State Plaintiffs allege that their proprietary interests will be harmed by the termination of DACA (State Pls. Am. Compl. ¶¶ 15, 100), they do not identify any proprietary interests that have been or will be harmed by Defendants' alleged failure to provide DACA recipients with "adequate notice" of the "procedures and timeline for renewing their DACA status," "about the general termination of the DACA program after March 5, 2018," or "of [DACA recipients'] inability to apply for renewal of their DACA status after March 5, 2018" (id. ¶¶ 276–78; cf. State Pls. Mem. at 19–21). It is certainly conceivable that many DACA recipients who were eligible to renew their deferred action and work authorization under the DACA Rescission Memo failed to do so before the October 5, 2017 deadline. (State Pls. Am. Compl. ¶ 96 (noting that "up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the . . . deadline").) The State Plaintiffs' Amended Complaint does not provide a sufficient basis for the court to conclude, however, that (1) such failures to renew were "fairly traceable" to Defendants' decision not to provide each DACA

recipient with individualized notice of the change in application procedures and timelines; or (2) that these failures to renew harmed any State Plaintiff's proprietary interests (for example, by depriving a state employee of work authorization). See Amnesty Int'l, 568 U.S. at 410–16, 133 S.Ct. 1138. Accordingly, the State Plaintiffs fail to assert a proprietary interest that would give them standing to bring their notice claim.[18]

[46]   Nor do the State Plaintiffs identify a cognizable proprietary interest harmed by the alleged change to DHS's information-use policy. The State Plaintiffs' information-use policy claims challenge not the decision to rescind DACA itself, but the alleged changes in DHS's information-use policy, which, Plaintiffs allege, will facilitate the deportation of DACA applicants. As discussed above, the court accepts that these changes (if true) will likely result in more undocumented immigrants' removal from the United States. (See State Pls. Am. Compl. ¶ 86.) The State Plaintiffs have not, however, identified any cognizable harm to their proprietary interests that would result from the removal of their undocumented residents. The State Plaintiffs have proffered evidence that the removal of DACA beneficiaries would grievously affect state economies. (See Decl. of Dr. Ike Brannon ¶¶ 12, 14 (State Pls. Am. Compl., Ex. 4 (Dkt. 55–4) ) (estimating that the removal of DACA recipients from the United States "would cost . . . the economy as a whole $215 billion in lost GDP," with impacts falling hardest on states with the largest number of DACA recipients).) Despite the scale of these impacts, the State

---

**18.**   In this circuit, the State Plaintiffs need not demonstrate, however, that the individuals they seek to protect must themselves meet the injury-in-fact, causation, and redressability requirements of Article III. See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 338–39 (2d Cir. 2009), aff'd in relevant part by an equally divided court, 564 U.S. 410, 420, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011).

Plaintiffs' own authority makes clear that states lack standing to bring a "claim . . . that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues." Wyoming v. Oklahoma, 502 U.S. 437, 448, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Absent some showing of injury to their own proprietary interests (for example, "direct injury in the form of a loss of specific tax revenues," id.), the State Plaintiffs cannot maintain their information-use policy claims based on alleged harms to their proprietary interests.

### ii. Quasi–Sovereign Interests

[47, 48]  Accordingly, the court will consider whether the State Plaintiffs can assert these claims parens patriae to vindicate their quasi-sovereign interests. States may bring parens patriae (literally, "parent of the country") suits to vindicate what the Court has characterized as "quasi-sovereign" interests. See Snapp, 458 U.S. at 600–02, 102 S.Ct. 3260. There are no bright-line rules for which interests qualify as "quasi-sovereign." See id. at 600, 607, 102 S.Ct. 3260; 13B Charles A. Wright et al., Federal Practice and Procedure § 3531.11.1, at 117 (3d ed. 2008) ("Wright & Miller"). In general, however, the Court has recognized that a state has quasi-sovereign interests in the "health and well-being—both physical and economic—of its residents in general," in protecting state "residents from the harmful effects of discrimination," and in challenging the discriminatory denial of a state's "rightful status within the federal system." Id. at 607, 609, 102 S.Ct. 3260. There are, however, at least two notable limitations on states' parens patriae standing.

[49]  First, to be "quasi-sovereign," the state's interests must be sufficiently generalized that the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of its individual residents. See id. at 607, 102 S.Ct. 3260 ("[M]ore must be alleged than injury to an identifiable group of individual residents . . . ."). A state cannot sue parens patriae when it is "merely litigating as a volunteer the personal claims of its citizens." Pennsylvania v. New Jersey, 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976).

[50, 51]  Second, special considerations are present when a state brings a parens patriae suit against the federal government. See 13B Wright & Miller § 3531.11.1, at 96. In Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Court rejected Massachusetts's attempt to bring a parens patriae suit challenging a federal statute as unconstitutional. See id. at 485–86, 43 S.Ct. 597. "While the state, under some circumstances, may sue in [a parens patriae] capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae . . . ." Id. (emphasis added); see also Snapp, 458 U.S. at 609 n.16, 102 S.Ct. 3260 ("A State does not have standing as parens patriae to bring an action against the Federal Government."). The Court has rejected the argument, however, that Massachusetts v. Mellon bars all state parens patriae claims against the federal government. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, —— U.S. ——, 135 S.Ct. 2652, 2664 n.10, 192 L.Ed.2d 704 (2015) (observing that "[t]he cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances" (quoting Richard Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 263–66 (6th ed. 2009))).

Compare Massachusetts v. EPA, 549 U.S. at 520 n.17, 127 S.Ct. 1438, with id. at 538–39, 127 S.Ct. 1438 (Roberts, C.J., dissenting). Instead, states may sue the federal government parens patriae to enforce rights guaranteed by a federal statute. See Massachusetts v. EPA, 549 U.S. at 520 n.17, 127 S.Ct. 1438; see also New York v. Sebelius, No. 1:07-CV-1003 (GLS) (DRH), 2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) (collecting cases). Massachusetts v. EPA expressly did not disturb the settled rule, however, that a state may not sue parens patriae to "protect her citizens from the operation of federal statutes." Massachusetts v. EPA, 549 U.S. at 520 n.17, 127 S.Ct. 1438 (quoting Georgia v. Penn. R. Co., 324 U.S. 439, 447, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) ).

[52]   The court concludes that the State Plaintiffs lack standing to bring either their notice and information-use policy claims. With respect to their notice claim, the State Plaintiffs have not argued or demonstrated that Defendants' alleged failure to provide DACA applicants with adequate notice of changes in the DACA program and renewal deadline has actually harmed "the health and well-being" of state residents or any other cognizable quasi-sovereign interest. See Snapp, 458 U.S. at 607, 102 S.Ct. 3260. (Cf. State Pls. Am. Compl. 15, 100; State Pls. Opp'n at 21–22.) Even if they had done so, they would be challenging federal enforcement of federal immigration laws as unconstitutional, which Massachusetts v. Mellon prohibits. See Massachusetts v. EPA, 549 U.S. at 520 n.17, 127 S.Ct. 1438 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."). For the same reason, the State Plaintiffs also lack standing to

assert their information-use policy claims. Even assuming, as discussed above, that the change in information-use policy will facilitate the removal of undocumented immigrants from these states, and that this removal will harm the "health and well-being—both physical and economic" of state residents, see Snapp, 458 U.S. at 607, 102 S.Ct. 3260, the thrust of the State Plaintiffs' information-use policy claims is to challenge as fundamentally unfair a change in federal policy that will facilitate the federal government's enforcement of the immigration laws.

The State Plaintiffs' argument that they merely seek to "enforce—as opposed to overturn or avoid—application of a federal statute" is unpersuasive. (State Pls. Opp'n at 21 n.11) Plaintiffs plainly seek to invalidate federal action as unconstitutional. Such claims more closely resemble constitutional challenges to application of federal statutes, which Massachusetts v. Mellon prohibits states from asserting parens patriae, than suits to enforce compliance with federal statutory law, which Massachusetts v. EPA permits states to bring parens patriae. When challenging federal action on constitutional grounds, "it is no part of [the state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." Massachusetts v. Mellon, 262 U.S. at 485–86, 43 S.Ct. 597. But see Aziz, 231 F.Supp.3d at 31–32 (concluding that "a state is not be barred by the Mellon doctrine from a parens patriae challenge to executive action when the state has grounds to argue that the executive action is contrary to federal statutory or constitutional law" (emphasis added) ).

The court concludes, therefore, that the State Plaintiffs lack standing to assert their notice and information-use policy claims.

**AR0711**

BATALLA VIDAL v. DUKE **163**
Cite as 295 F.Supp.3d 127 (E.D.N.Y. 2017)

**D.  Whether State Plaintiffs Have Cause of Action under the APA**

**[53]** Lastly, Defendants assert that neither MRNY's nor the State Plaintiffs' claims are justiciable because those Plaintiffs do not assert interests that are "arguably within the zone of interests . . . protected or regulated by the statute . . . in question." (Defs. Mem. at 21 (quoting Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 395, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (first alteration added)).) To bring suit under the APA, a plaintiff "must satisfy not only Article Ill's standing requirements, but an additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012) ("Match–E–Be–Nash") (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ). This test "is not meant to be especially demanding' " and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " Id. (quoting Secs. Indus. Ass'n, 479 U.S. at 399, 107 S.Ct. 750).

**[54]** Critically, for the court's current purposes, whether MRNY and the State Plaintiffs assert interests falling within the "zone of interests" protected by the APA is not a question of "jurisdiction" or "justiciability." As the Supreme Court has explained, the question of whether a plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue of "prudential standing," but is instead an issue of "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l, 134 S.Ct. at 1387. That issue "goes not to the court's jurisdiction—that is, 'power'— to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim." Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 201 (2d Cir. 2014) (citing Lexmark Int'l, 134 S.Ct. at 1387 n.4, 1389 n.5); see also Casper Sleep, Inc. v. Mitcham, 204 F.Supp.3d 632, 637–38 (S.D.N.Y. 2016) (arguments for dismissal for lack of "prudential standing" were appropriately addressed under Rule 12(b)(6), not Rule 12(b)(1), of the Federal Rules of Civil Procedure). Because this argument does not raise an issue of "jurisdiction or justiciability," the court does not address it here.

**IV.  CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed:

- Batalla Vidal v. Duke, No. 16–CV– 4756:

  - Fourth claim for relief (Due Process Clause—Notice)

- New York v. Trump, No. 17–CV– 5228:

  - Second claim for relief (Due Process Clause—Information–Use Policy)

  - Third claim for relief (Equitable Estoppel—Information–Use Policy)

  - Seventh claim for relief (Due Process Clause—Notice)

Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims. The court RE-

**AR0712**

**164**            **295 FEDERAL SUPPLEMENT, 3d SERIES**

SERVES RULING on Defendants' motion to dismiss for failure to state a claim.

SO ORDERED.



**Larry JACKSON, Plaintiff,**

**v.**

**Jesus TELLADO, Stanley MacNear, John Czulada, James T. Gherardi, Ryann Dunn, Robert J. Deferrari, Kenneth Braumann, Ben Kurian, Peter Boneta, Thomas E. Reo, Michael Failla, and Brian E. Heerey, Defendants.**

**11–CV–3028 (PKC) (SMG)**

United States District Court, E.D. New York.

Signed 03/22/2018

**Background:** City police officer brought § 1983 action against fellow officers alleging false arrest and excessive force. After a jury verdict for plaintiff, defendants moved for judgment as a matter of law and new trial.

**Holdings:** The District Court, Pamela K. Chen, held that:

(1) certain defendants were not liable for failing to intervene in false arrest;

(2) evidence was sufficient to establish that certain defendants used excessive force;

(3) evidence was sufficient to establish that other defendants failed to intervene in use of excessive force;

(4) defendants were not entitled to new trial based on purported inconsistency between jury's special verdict answers and verdict; and

(5) defendants were not entitled to new trial based on jury's purported failure to consider each defendant's liability individually.

Motion for judgment as a matter of law granted in part and denied in part; motion for new trial denied.

**1. Federal Civil Procedure ⬗2127, 2609**

In determining a motion for judgment as a matter of law, the court should review the record as a whole but must draw all reasonable inferences in favor of the non-moving party and disregard all evidence favorable to the moving party that the jury is not required to believe. Fed. R. Civ. P. 50.

**2. Federal Civil Procedure ⬗2608.1, 2609**

A court may grant a motion for judgment as a matter of law only if, after viewing the evidence in the light most favorable to the non-movant, it concludes that a reasonable juror would have been compelled to accept the view of the moving party. Fed. R. Civ. P. 50.

**3. Federal Civil Procedure ⬗2608.1, 2609**

Where a jury has deliberated in a case and actually returned its verdict in favor of a non-movant for judgment as a matter of law, the moving party's burden is especially heavy; the court must, in these circumstances, give deference to all credibility determinations and reasonable inferences of the jury and may set aside a verdict only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair