U.S. Department of Homeland Security
Washington, DC 20528



Homeland Security

February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Thomas D. Homan
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Lori Scialabba
                   Acting Director
                   U.S. Citizenship and Immigration Services

                   Joseph B. Maher
                   Acting General Counsel

                   Dimple Shah
                   Acting Assistant Secretary for International Affairs

                   Chip Fulghum
                   Acting Undersecretary for Management

FROM:              John Kelly
                   Secretary

SUBJECT:           **Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

www.dhs.gov

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

### A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

AR 00000230
**AR1079**

### B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

AR 00000231

**AR1080**

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C.  Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D.  Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## II. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

6

AR 00000234

AR1083

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

June 15, 2017

MEMORANDUM FOR:     Kevin K. McAleenan
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    James W. McCament
                    Acting Director
                    U.S. Citizenship and Immigration Services

                    Thomas D. Homan
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Joseph B. Maher
                    Acting General Counsel

                    Michael T. Dougherty
                    Assistant Secretary for Border, Immigration, and Trade Policy

FROM:               John F. Kelly

SUBJECT:            Rescission of November 20, 2014 Memorandum Providing for
                    Deferred Action for Parents of Americans and Lawful Permanent
                    Residents ("DAPA")

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued an implementing memorandum, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

**www.dhs.gov**

AR 00000235

**AR1084**

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2]. After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3] The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident." This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria: (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate." The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time. I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

AR 00000236

AR1085

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3

**Rescission of November 20, 2014 DAPA Memorandum**

I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

AR 00000237

**AR1086**

Appeal: 18-1521-cv-04756-NGG-VMS Filed: 07/03/2018-6 Pg: 10 of 175 PageID #: 7076
Case 1:16-cv-04756-NGG-VMS Document 336-6 Filed 09/04/20 Page 10 of 175

Case 8:17-cv-02942-RWT Document 26-1 Filed 11/15/17 Page 238 of 256



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

     Re:    *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.

Post Office Box 12548, Austin, Texas 78711-2548 • (512) 463-2100 • www.texasattorneygeneral.gov

AR 00000238

AR1087



### KEN PAXTON
ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

Post Office Box 12548, Austin, Texas 78711-2548 • (512) 463-2100 • www.texasattorneygeneral.gov

AR 00000239

AR1088



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Jeff Landry
Attorney General of Louisiana

Steve Marshall
Attorney General of Alabama

Doug Peterson
Attorney General of Nebraska

Leslie Rutledge
Attorney General of Arkansas

Alan Wilson
Attorney General of South Carolina

Lawrence G. Wasden
Attorney General of Idaho

Herbert Slatery III
Attorney General and Reporter of Tennessee

C.L. "Butch" Otter
Governor of Idaho

Patrick Morrisey
Attorney General of West Virginia

Derek Schmidt
Attorney General of Kansas



**JOHN LEWIS**
5th District, Georgia

SENIOR CHIEF DEPUTY
DEMOCRATIC WHIP

COMMITTEE ON
WAYS AND MEANS

RANKING MEMBER
OVERSIGHT SUBCOMMITTEE

HUMAN RESOURCES

SCANNED/RECEIVED
BY ESEC SEC

2017 AUG -2

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515-1005**
August 1, 2017

WASHINGTON OFFICE:
343 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1005
(202) 225-3801
FAX: (202) 225-0351

DISTRICT OFFICE:
THE EQUITABLE BUILDING
100 PEACHTREE STREET, N.W.
SUITE # 1920
ATLANTA, GA 30303
(404) 659-0116
FAX: (404) 331-0947

The Honorable Elaine Duke
Acting Secretary
Department of Homeland Security
500 12th Street, SW
Washington, DC 20528

Dear Acting Secretary Duke:

I write to express my strong support for the Deferred Action for Childhood Arrivals (DACA) program and respectfully request that the Department continue to support and defend this key humanitarian initiative.

As you know, the DACA program protects certain immigrant youth who came to our country as children from deportation. Since President Obama established this program in 2012, nearly 800,000 young people who call the United States home have benefited from the initiative. After passing a significant background check and paying fees, participants receive authorization to work and study in the U.S. DACA allows these *DREAMers* to bring their talents out of the shadows and apply them in service of our country.

Unfortunately, ongoing legal cases are constant threats to DACA. The Federal government has a responsibility to honor its commitments to thousands of young people who aspire towards life, liberty, and the pursuit of happiness in every corner of our country. The administration – especially the Department of Homeland Security and the Department of Justice – must be proactive in standing for those who contribute to our nation and strive towards realizing the American Dream.

For these reasons, I join my congressional colleagues in reiterating our appreciation of former Secretary Kelly's leadership in retaining the DACA program. Ending the DACA program through proactive decisions or passive inaction would negatively affect our economy. Employers would face huge costs, businesses owned by *DREAMers* would close, and the Social Security trust funds would lose millions of tax dollars. As you know, it is impossible, however, to calculate what the societal and humanitarian impact of ending DACA would be on the hundreds of thousands of young people who call America home.

As always, I thank you for your service and for your consideration of my concerns on this grave matter.

Sincerely,

John Lewis
Member of Congress

cc: The Honorable John F. Kelly, Chief of Staff, the White House

AR 00000241
**AR1090**

# Congress of the United States
## Washington, DC 20515

August 1, 2017

President Donald J. Trump
The White House
1600 Pennsylvania Ave., NW
Washington, D.C. 20500

Dear Mr. President:

We respectfully request that you continue Deferred Action for Childhood Arrivals (DACA) and engage in a vigorous legal defense of DACA in light of the renewed threat of litigation. Along with continuing to accept requests for DACA, we ask that you direct your administration to: (a) oppose any efforts to challenge DACA in the ongoing *Texas v. United States* litigation;[1] (b) ask the court to dismiss the complaint in *United States v. Texas;* and (c) refuse any settlement that would end DACA.

On June 29, the Texas Attorney General, along with nine other attorney generals, in an attempt to usurp your authority, delivered to you an ultimatum threatening a legal challenge to DACA unless you ended the program by September 5, 2017. DOJ has already made problematic decisions in choosing not to oppose Texas' request to stay the proceedings.[2] We are further disturbed by Secretary Kelly's comments that he does not believe DACA is legally or constitutionally defensible.[3] Finally, we are concerned that Attorney General Jeff Sessions, who has historically opposed DACA, is now trying to abrogate your authority and set the Administration's immigration policies, when, ultimately, you hold that authority. You have stated, you "understand the situation very well" and that the future of DACA is "a decision that [you] make," not your subordinates.[4] Furthermore, as you are aware, there is substantial legal support for the constitutionality of DACA.[5] We commend your Administration's continuation of DACA and encourage you to keep DACA in place until Congress enacts a permanent legislative solution for this population.

As you know, over 787,000 individuals currently possess a grant of DACA, all of whom were thoroughly vetted for national security and criminal backgrounds.[6] Ending DACA would increase the nation's undocumented population, profoundly and negatively impact our nation's economy, contracting the nation's GDP by $ 460.3 billion.[7] Additionally, this reduces federal tax contributions to Social Security and Medicare by $24.6 billion over a decade, and costs businesses $3.4 billion in unnecessary turnover costs.[8]

---

[1] *Texas v. United States,* 86 F. Supp. 3d 591 (S.D. Tex. 2015).
[2] Motion to Stay Merits Proceedings, Texas v. United States, No. 14-CV-00254 (S.D. Tex. July 7, 2017).
[3] Ted Hesson, *Kelly won't commit to defending DACA in court,* Politico, July 12, 2017, *available at* http://www.politico.com/story/2017/07/12/john-kelly-daca-legal-challenge-240470.
[4] David Lauter, *Trump says he'll make the final call on DACA, not subordinates,* L.A. Times, July 13, 2017, *available at* http://www.latimes.com/politics/washington/la-na-essential-washington-updates-president-trump-says-he-not-1499977334-htmlstory.html.
[5] Letter from Hiroshi Motomura, Professor of Law, University of California, Los Angeles School of Law, et. al, to Barack H. Obama, President, United States. Nov. 25, 2014, *available at* https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/executive-action-law-prof-letter.pdf.
[6] U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2017, 1 (March 31, 2017), *available at* https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.
[7] Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez , *A New Threat to DACA Could Cost States Billions of Dollars,* Center for American Progress, July 21, 2017, https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/
[8] Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA,* Immigrant Legal Resource Center, Dec. 2016, *available at* https://www.ilrc.org/report-daca-economic-cost.

PRINTED ON RECYCLED PAPER

AR 00000242

AR1091

Letter to President Trump
Page 2

Ultimately, you set the government's immigration policy, including your Administration's position in regards to DACA. We urge you to respond to Texas's threat to your executive authority by directing the Attorney General to use all legal options to defend DACA and ensure that nearly one million DREAMers continue to contribute to our nation.

Thank you for your time and consideration. We look forward to your response.

Sincerely,

Raúl M. Grijalva
Member of Congress

Nancy Pelosi
Democratic Leader

Steny H. Hoyer
Minority Whip

Judy Chu
Member of Congress

Yvette D. Clarke
Member of Congress

Michelle Lujan Grisham
Member of Congress

Jim McGovern
Member of Congress

Pete Aguilar
Member of Congress

Nanette Diaz Barragán
Member of Congress

Karen Bass
Member of Congress

Ami Bera
Member of Congress

Donald S. Beyer Jr.
Member of Congress

Sanford D. Bishop, Jr.
Member of Congress

Earl Blumenauer
Member of Congress

Suzanne Bonamici
Member of Congress

Brendan F. Boyle
Member of Congress

Anthony G. Brown
Member of Congress

Julia Brownley
Member of Congress

Michael E. Capuano
Member of Congress

Salud O. Carbajal
Member of Congress

Tony Cárdenas
Member of Congress

André Carson
Member of Congress

Matt Cartwright
Member of Congress

Kathy Castor
Member of Congress

AR 00000243

AR1092

Letter to President Trump
Page 3

Joaquin Castro
Member of Congress

David N. Cicilline
Member of Congress

Alma Adams
Member of Congress

Katherine Clark
Member of Congress

Wm. Lacy Clay
Member of Congress

Steve Cohen
Member of Congress

John Conyers, Jr.
Member of Congress

Jim Cooper
Member of Congress

Lou Correa
Member of Congress

Jim Costa
Member of Congress

Joe Courtney
Member of Congress

Charlie Crist
Member of Congress

Joe Crowley
Member of Congress

Elijah E. Cummings
Member of Congress

Josh Gottheimer
Member of Congress

Danny K. Davis
Member of Congress

Susan A. Davis
Member of Congress

Peter A. DeFazio
Member of Congress

Diana DeGette
Member of Congress

Rosa L. DeLauro
Member of Congress

Suzan K. DelBene
Member of Congress

Val Butler Demings
Member of Congress

Mark DeSaulnier
Member of Congress

Ted Deutch
Member of Congress

Debbie Dingell
Member of Congress

Lloyd Doggett
Member of Congress

Keith Ellison
Member of Congress

Letter to President Trump
Page 4

Eliot L. Engel
Member of Congress

Anna G. Eshoo
Member of Congress

Adriano Espaillat
Member of Congress

Dwight Evans
Member of Congress

Bill Foster
Member of Congress

Lois Frankel
Member of Congress

Marcia L. Fudge
Member of Congress

Tulsi Gabbard
Member of Congress

Ruben Gallego
Member of Congress

Jimmy Gomez
Member of Congress

Vicente Gonzalez
Member of Congress

Al Green
Member of Congress

Gene Green
Member of Congress

Luis V. Gutiérrez
Member of Congress

Colleen Hanabusa
Member of Congress

Denny Heck
Member of Congress

Jared Huffman
Member of Congress

Pramila Jayapal
Member of Congress

Hakeem Jeffries
Member of Congress

Eddie Bernice Johnson
Member of Congress

Marcy Kaptur
Member of Congress

William R. Keating
Member of Congress

Joseph P. Kennedy, III
Member of Congress

Ro Khanna
Member of Congress

Ruben J. Kihuen
Member of Congress

James R. Langevin
Member of Congress

Rick Larsen
Member of Congress

John B. Larson
Member of Congress

Barbara Lee
Member of Congress

Sander Levin
Member of Congress

AR 00000245

AR1094

Letter to President Trump
Page 5

Ted W. Lieu
Member of Congress

Daniel W. Lipinski
Member of Congress

Zoe Lofgren
Member of Congress

Alan Lowenthal
Member of Congress

Nita M. Lowey
Member of Congress

Ben Ray Luján
Member of Congress

Alcee L. Hastings
Member of Congress

Carolyn Maloney
Member of Congress

Sean Patrick Maloney
Member of Congress

Doris Matsui
Member of Congress

Betty McCollum
Member of Congress

A. Donald McEachin
Member of Congress

Jerry McNerney
Member of Congress

Grace Meng
Member of Congress

Gwen Moore
Member of Congress

Seth Moulton
Member of Congress

Stephanie Murphy
Member of Congress

Ann McLane Kuster
Member of Congress

Jerrold Nadler
Member of Congress

Grace F. Napolitano
Member of Congress

Donald Norcross
Member of Congress

Eleanor Holmes Norton
Member of Congress

Tom O'Halleran
Member of Congress

Beto O'Rourke
Member of Congress

Frank Pallone, Jr.
Member of Congress

Jimmy Panetta
Member of Congress

William Pascrell
Member of Congress

AR 00000246
**AR1095**

**J.A. 374**

Letter to President Trump
Page 6

Donald M. Payne, Jr.
Member of Congress

Ed Perlmutter
Member of Congress

Chellie Pingree
Member of Congress

Mark Pocan
Member of Congress

Jared Polis
Member of Congress

David E. Price
Member of Congress

Mike Quigley
Member of Congress

Jamie Raskin
Member of Congress

Jacky Rosen
Member of Congress

Lucille Roybal-Allard
Member of Congress

Dutch Ruppersberger
Member of Congress

Tim Ryan
Member of Congress

Cedric Richmond
Member of Congress

Linda T. Sánchez
Member of Congress

John Sarbanes
Member of Congress

Jan Schakowsky
Member of Congress

Adam Schiff
Member of Congress

Bradley Scott Schneider
Member of Congress

Kurt Schrader
Member of Congress

Bobby Scott
Member of Congress

José E. Serrano
Member of Congress

Brad Sherman
Member of Congress

Albio Sires
Member of Congress

Louise Slaughter
Member of Congress

Adam Smith
Member of Congress

Darren Soto
Member of Congress

Jackie Speier
Member of Congress

Eric Swalwell
Member of Congress

Mark Takano
Member of Congress

Mike Thompson
Member of Congress

Letter to President Trump
Page 7

Dina Titus
Member of Congress

Paul D. Tonko
Member of Congress

Norma J. Torres
Member of Congress

Niki Tsongas
Member of Congress

Juan Vargas
Member of Congress

Marc Veasey
Member of Congress

Filemon Vela
Member of Congress

Nydia M. Velázquez
Member of Congress

Tim Walz
Member of Congress

Gregorio Kilili Camacho Sablan
Member of Congress

Debbie Wasserman Schultz
Member of Congress

Bonnie Watson Coleman
Member of Congress

Peter Welch
Member of Congress

John Yarmuth
Member of Congress

Gregory Meeks
Member of Congress

Sheila Jackson Lee
Member of Congress

James E. Clyburn
Member of Congress

Scott Peters
Member of Congress

Derek Kilmer
Member of Congress

Cc: The Honorable Jeff Sessions, Attorney General, U.S. Department of Justice

# SCANNED/RECEIVED Congress of the United States
## BY ESEC SEC Washington, DC 20515

2017 SEP -1 PM 12: 13

August 22, 2017

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20502

Dear President Trump:

We write to express our support for maintaining the protections of Deferred Action for Childhood Arrivals (DACA) for current recipients of the policy. We understand and deeply respect the rule of law, and firmly believe that those who have violated the law must face fair consequences. We also have a responsibility to apply the law in the manner required by the circumstances.

Children brought to the United States at a young age did not have a choice in the matter. They did not willingly seek to violate American statutes when they traveled with their families across our borders, as the alternative was often life without primary caregivers. Such cases require careful and thoughtful analysis about what is in the best interests of our country. For many, the United States is the only country they know or remember. They speak English, educate themselves at American schools, and may be starting careers. They have already passed a background check to qualify for DACA status. Because they now have work permits, they are making immediate contributions to our society and our economy. They are paying taxes, receiving driver's licenses, and buying cars and first homes, all of which generates revenue for federal, state, and local governments.

Targeting those with deferred status would also divert massive resources away from enforcement actions against criminals who pose the greatest threat to law and order. We strongly support your commitment to deporting those who have broken our laws, and we believe the resources that might be directed towards targeting those with DACA status would be better spent on targeting criminals.

According to a recent study by the CATO Institute, deporting the approximately 750,000 people registered in the program would cost over $60 billion in lost tax revenue and result in a $280 billion reduction in economic growth over the next decade.

It is in the best interest of our nation to continue DACA until we can pass a permanent legislative solution, such as the Republican-backed *Recognizing America's Children Act*.

Thank you for your continued work to improve and defend our great country.

PRINTED ON RECYCLED PAPER

AR 00000249
**AR1098**

Respectfully,

Daniel M. Donovan, Jr.
Member of Congress

Carlos Curbelo
Member of Congress

David G. Valadao
Member of Congress

Jeff Denham
Member of Congress

Don Bacon
Member of Congress

Ileana Ros-Lehtinen
Member of Congress

AR 00000250

**AR1099**



# Office of the Attorney General
## Washington, D. C. 20530

Dear Acting Secretary Duke,

 I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

 DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

 In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

 As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

AR 00000251

AR1100

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528


**Homeland Security**

September 5, 2017

MEMORANDUM FOR:      James W. McCament
                                   Acting Director
                                   U.S. Citizenship and Immigration Services

                                   Thomas D. Homan
                                   Acting Director
                                   U.S. Immigration and Customs Enforcement

                                   Kevin K. McAleenan
                                   Acting Commissioner
                                   U.S. Customs and Border Protection

                                   Joseph B. Maher
                                   Acting General Counsel

                                   Ambassador James D. Nealon
                                   Assistant Secretary, International Engagement

                                   Julie M. Kirchner
                                   Citizenship and Immigration Services Ombudsman

FROM:                                      Elaine C. Duke
                                     Acting Secretary

SUBJECT:                                  **Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

      This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

Re: Rescission of June 15, 2012 DACA Memorandum
Page 2

**Background**

The Department of Homeland Security established DACA through the issuance of a
memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial
discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits
to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided
certain illegal aliens who entered the United States before the age of sixteen a period of deferred action
and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters
of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful
Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria
under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and
lengthening the period of deferred action and work authorization from two years to three—the
November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for
exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to
certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies
announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District
of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies
nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the
DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the
other states had demonstrated a substantial likelihood of success on the merits and satisfied the other
requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA
policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the
court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of
millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal
and state benefits, including work authorization." According to the court, "DAPA is foreclosed by
Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly
enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and
appellate court decisions relied on factual findings about the implementation of the 2012 DACA
memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly
discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both
the district court and the Fifth Circuit concluded that implementation of the program did not comply

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of
USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic
categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely
upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] *Id.*

Re: Rescission of June 15, 2012 DACA Memorandum
Page 3

with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

---

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

AR 00000254
**AR1103**

Re: Rescission of June 15, 2012 DACA Memorandum
Page 4

**Rescission of the June 15, 2012 DACA Memorandum**

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course— retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

Re: Rescission of June 15, 2012 DACA Memorandum
Page 5

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

Appeal: 18-1521 Doc: 39-2 Filed: 07/03/2018 Pg: 393 of 520
Case 1:16-cv-04756-NGG-VMS Document 313-6 Filed 09/04/20 Page 29 of 175 PageID #: 7095

Case 8:17-cv-02942-RWT   Document 27   Filed 11/15/17   Page 1 of 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

                *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                *Defendants*.

No. 17-cv-2942 (RWT)

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants

respectfully move the Court to dismiss this action or, in the alternative, to grant summary

judgment to Defendants. *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 15, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/  Kathryn C. Davis*
KATHRYN C. DAVIS
*/s/  Rachael Westmoreland*
RACHAEL WESTMORELAND
Trial Attorneys

AR1106

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 396 of 520
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 30 of 175 PageID #: 7096

Case 8:17-cv-02942-RWT   Document 27   Filed 11/15/17   Page 2 of 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

AR1107

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

CASA DE MARYLAND, *et al.*,

               *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

               *Defendants*.

No. 17-cv-2942 (RWT)

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

BACKGROUND ...................................................................................................5

   A.  Deferred Action Generally..........................................................................5

   B.  DACA and DAPA.........................................................................................7

   C.  The *Texas* Litigation ...................................................................................8

   D.  Rescission of DACA....................................................................................9

   E.  The Instant Action......................................................................................11

LEGAL STANDARDS ........................................................................................12

ARGUMENT .......................................................................................................14

   I.   THIS CASE IS NOT JUSTICIABLE.......................................................15

      A.  The Rescission Policy Is Not Justiciable Because this Immigration
         Enforcement Policy Is a Matter Committed to Agency Discretion
         by Law ...................................................................................................15

      B.  The INA Deprives District Courts of Jurisdiction over Challenges to
         Denials of Deferred Action ..................................................................21

      C.  The Plaintiff-Organizations' Claims Are Not Cognizable...........................25

         1.   Plaintiffs Lack Article III Standing.......................................................25

            a.   Plaintiffs lack organizational standing............................................ 25

            b.   Plaintiffs lack representational standing. ........................................ 28

         2.   Plaintiffs Lack a Cause of Action Under the APA ...............................29

      D.  The Government's Justiciability Objections Are Not Inconsistent
         with the Acting Secretary's Reliance on the Fifth Circuit's Decision........................30

   II.  PLAINTIFFS FAIL TO STATE A CLAIM................................................30

      A.  Plaintiffs Fail to State an APA Claim .......................................................31

J.A. 388

**AR1109**

Appeal: 18-1521   Doc: 29   Filed: 07/03/2018   Pg: 397 of 720
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 33 of 175 PageID #: 7099
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 3 of 72

1.  The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction. ..................................................................................................31

B.  The Rescission Policy Is Exempt from Notice and Comment.....................................41

C.  Plaintiffs Fail to State an Equal Protection Claim ........................................................45

D.  Plaintiffs Fail to State a Procedural Due Process Claim................................................48

E.  Plaintiffs Fail to State a Substantive Due Process Claim. ............................................52

F.  Plaintiffs' Equitable Estoppel Claims Fail....................................................................54

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE ...........................................................................................................57

CONCLUSION..................................................................................................................59

J.A. 389

AR1110

## TABLE OF AUTHORITIES

CASES                                                                                        PAGE(S)

*Aetna Life Ins. Co. of Hartford v. Haworth,*
    300 U.S. 227 (1937) .................................................................................................. 57

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) .................................................................................................. 54

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,*
    367 F.3d 212 (4th Cir. 2004) ................................................................................... 13

*Am. Legal Found. v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987) ................................................................................... 26

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) .................................................................................................... 48

*Angeles v. Dist. Dir., INS,*
    729 F. Supp. 479 (D. Md. 1990) ............................................................................. 55

*Arizona v. United States,*
    567 U.S. 387 (2012) ....................................................................................... 5, 17, 47

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ......................................................................... *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................. 13

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.,*
    524 F. Supp. 2d 642 (D. Md. 2007) .................................................................. 13, 30

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) .................................................................................................. 48

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) ................................................................................... 12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................. 13

*Bennett v. Spear,*
    520 U.S. 154 (1997) .................................................................................................. 38

**J.A. 390**

**AR1111**

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ................................................................................................ 50

*Botezatu v. INS*,
    195 F.3d 311 (7th Cir. 1999) ........................................................................... 23, 24

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974), *reh'g denied*, 420 U.S. 956 (1975) ................................. 33, 34

*Califano v. Sanders*,
    430 U.S. 99 (1977) ................................................................................................ 16

*Camp v. Pitts*,
    411 U.S. 138 (1973) .............................................................................................. 32

*Chaudhry v. Holder*,
    705 F.3d 289 (7th Cir. 2013) ................................................................................. 6

*Chavez v. Martinez*,
    538 U.S. 760 (2003) ......................................................................................... 52, 53

*Chen Zhou Chai v. Carroll*,
    48 F.3d 1331 (4th Cir. 1995) ............................................................................ 41, 43

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ............................................................................................... 33

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................................. 42

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*,
    802 F. Supp. 1325 (D. Md. 1991),
    *aff'd*, No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992) ............................. 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ......................................................................................... 16, 31

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................................... 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................. 25

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) ............................................................................................. 29

iv

*Cmty. Nutrition Inst. v. Young,*
   818 F.2d 943 (D.C. Cir. 1987) .................................................................................. 43

*Conn. Bd. of Pardons v. Dumschat,*
   452 U.S. 458 (1981) .......................................................................................... 52

*Consumer Energy Council of Am. v. FERC,*
   673 F.2d 425 (D.C. Cir. 1982) .................................................................................. 42

*Cty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998) .......................................................................................... 53

*Dawkins v. Witt,*
   318 F.3d 606 (4th Cir. 2003) ........................................................................... 55, 56

*Dawson v. Winter,*
   No. 06-cv-2885-CCB, 2007 WL 1610905 (D. Md. May 21, 2007),
   *aff'd,* 277 F. App'x. 297 (4th Cir. 2008) ..................................................................... 14

*Decatur Liquors, Inc. v. Dist. of Columbia,*
   478 F.3d 360 (D.C. Cir. 2007) .................................................................................. 50

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   No. 17-1320, 2017 WL 3141907 (D.D.C. July 24, 2017) ....................................................... 40

*Elgharib v. Napolitano,*
   600 F.3d 597 (6th Cir. 2010) .................................................................................. 22

*Elk Grove Unified Sch. Dist. v. Newdow,*
   542 U.S. 1 (2004) ........................................................................................... 26

*Emery Min. Corp. v. Sec'y of Labor,*
   744 F.2d 1411 (10th Cir. 1984) ................................................................................ 54

*Fares v. U.S. Immigration & Naturalization Service,*
   50 F.3d 6 (4th Cir. 1995) .................................................................................... 39

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ......................................................................................... 32

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) .................................................................................. 29

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ......................................................................................... 32

J.A. 392

AR1113

Appeal: 18-1521   Doc: 29-5   Filed: 07/02/2018   Pg: 401 of 720
Case 1:16-cv-04756-NGG-VMS   Document 313-6   Filed 09/04/20   Page 37 of 175 PageID #: 7103
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 7 of 72

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ................................................................................. 25

*Gibraltar, P.R., Inc. v. Otoki Group, Inc.*,
    104 F.3d 616 (4th Cir. 1997) ................................................................... 57

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................. 26

*Hawkins v. Freeman*,
    195 F.3d 732 (4th Cir. 1999) ................................................................... 53

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .......................................................................... *passim*

*Heckler v. Cmty. Health Servs.*,
    467 U.S. 51 (1984) ................................................................................... 55

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ................................................................................. 28

*ICC v. Bhd. of Locomotive Eng'rs* (*BLE*),
    482 U.S. 270 (1987) ................................................................... 15, 18, 21

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) ................................................................... 39

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
    874 F.2d 205 (4th Cir. 1989) ................................................................... 42

*Johnson v. Sessions*,
    No. 15-cv-3317-RDB, 2017 WL 1207537 (D. Md. Apr. 3, 2017) ........... 57

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989) ................................................................................. 49

*Lewis* v. Casey,
    518 U.S. 343 (1996) ................................................................................. 58

*Lexmark Int'l, Inc. v. Static Control Components*,
    134 S. Ct. 1377 (2014) ............................................................................ 26

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................. 15

J.A. 393

**AR1114**

Appeal: 18-1521   Doc: 00752895   Filed: 07/03/2018   Pg: 400 of 520   Page 38 of 175 PageID #:
7104
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 8 of 72

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 12, 41

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ............................................................................................. 17

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................................................ 58

*Marsh v. United States*,
   No. 14-cv-3559-TDC, 2016 WL 247563 (D. Md. Jan. 20, 2016) ........................................... 13

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ............................................................................................ 14

*McBurney v. Cuccinelli*,
   616 F.3d 393 (4th Cir. 2010) ................................................................................................ 27

*Md. Highways Contractors Ass'n v. Maryland*,
   933 F.2d 1246 (4th Cir. 1991) ................................................................................. 26, 27, 28

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) ................................................................................................................ 30

*Mondragon v. Holder*,
   706 F.3d 535 (4th Cir. 2013) ................................................................................................ 52

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................................................................ 58

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ................................................................................................................ 31

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988) ............................................................................................ 44

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................................................ 42

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir 1995) ............................................................................................ 26

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ................................................................................................................ 54

J.A. 394

AR1115

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ............................................................................................... 27

*Omar v. McHugh*,
   646 F.3d 13 (D.C. Cir. 2011) ............................................................................... 49

*OPM v. Richmond*,
   496 U.S. 414 (1990) ............................................................................................... 54

*Pac. Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) ......................................................................... 42, 43

*Perales v. Casillas*,
   903 F.2d 1043 (5th Cir. 1990), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990) ......................... 17

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ........................................................................................... 55

*Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*),
   525 U.S. 471 (1999) ..................................................................................... *passim*

*Romiero De Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) ............................................................................. 49

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013) ................................................................. 25, 28, 29

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
   484 F.3d 700 (4th Cir. 2007) ............................................................................... 13

*Sierra Club v. Larson*,
   882 F.2d 128 (4th Cir. 2011) ......................................................................... 15, 16

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ............................................................................................... 26

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ......................................................................................... 26, 28

*Smith v. Ashcroft*,
   295 F.3d 425 (4th Cir. 2002) ............................................................................... 49

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................... 28

J.A. 395

AR1116

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) ............................................................................... 43

*Syracuse Peace Council v. FCC,*
   867 F.2d 654 (D.C. Cir. 1989) ............................................................................ 35

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ....................................................................... *passim*

*Town of Castle Rock v. Gonzales,*
   545 U.S. 748 (2005) ............................................................................................ 48

*Town of Chester v. Laroe Estates, Inc.,*
   137 S. Ct. 1645 (2017) ........................................................................................ 58

*Troy Corp. v. Browner,*
   120 F.3d 277 (D.C. Cir. 1997), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997) ..................... 32

*United States v. Armstrong,*
   517 U.S. 456 (1996) ..................................................................................... *passim*

*United States v. Browning,*
   630 F.2d 694 (10th Cir. 1980) ............................................................................ 55

*United States v. Owens,*
   54 F.3d 271 (6th Cir. 1995) ................................................................................ 54

*United States v. Texas,*
   136 S. Ct. 2271 (2016) .......................................................................................... 9

*United States v. Texas,*
   137 S. Ct. 285 (2016) ............................................................................................ 9

*Vance v. CHF Int'l,*
   914 F. Supp. 2d 669 (D. Md. 2012) .................................................................. 12

*Vasquez v. Aviles,*
   639 F. App'x 898 (3d Cir. 2016) ....................................................................... 22

*Veasey v. Perry,*
   29 F. Supp. 3d 896 (S.D. Tex. 2014) ................................................................ 46

*Velasco-Gutierrez v. Crossland,*
   732 F.2d 792 (10th Cir. 1984) ............................................................................ 49

J.A. 396

AR1117

Appeal 18-1521, Document 89, 07/03/2018, 2335720, Page 41 of 175
Case 1:16-cv-04756-NGG-VMS Document 91-6 Filed 05/04/20 Page 41 of 175 PageID #: 7107
Case 8:17-cv-02942-RWT Document 27-1 Filed 11/15/17 Page 11 of 72

*Warth v. Seldin*,
  422 U.S. 490 (1975)...................................................................................... 25

*Washington v. Davis*,
  426 U.S. 229 (1976)................................................................................ 46, 47

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)...................................................................................... 52

*Watkins v. U.S. Army*,
  875 F.2d 699 (9th Cir. 1989) ................................................................... 55, 56

*Yassini v. Crosland*,
  618 F.2d 1356 (9th Cir. 1980) ................................................................. 50, 51


STATUTES

5 U.S.C. § 552 .................................................................................................. 39

5 U.S.C. § 553 ......................................................................................... 3, 41, 42

5 U.S.C. § 701 ......................................................................... 15, 16, 17, 24

5 U.S.C. § 702 .................................................................................................. 29

5 U.S.C. § 704 .................................................................................................. 38

5 U.S.C. § 706 .................................................................................................. 31

6 U.S.C. § 202 .................................................................................................. 22

6 U.S.C. § 251 .................................................................................................. 22

6 U.S.C. § 557 .................................................................................................. 22

8 U.S.C. § 1103 .................................................................................................. 5

8 U.S.C. § 1154 .................................................................................................. 6

8 U.S.C. § 1158 .................................................................................................. 5

8 U.S.C. § 1182 .................................................................................................. 5

8 U.S.C. § 1227 .................................................................................................. 5

J.A. 397

AR1118

8 U.S.C. § 1229b ............................................................................................................. 5

8 U.S.C. § 1252 ..................................................................................................... *passim*

28 U.S.C. § 2201 ............................................................................................................. 57

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 ............................................................... 40, 41


REGULATIONS

8 C.F.R. § 274a.12(c)(14) ................................................................................................ 6


CONSTITUTION

U.S. Const. amend. V ...................................................................................................... 48


FEDERAL RULES

Fed. R. Civ. P. 8(c) ........................................................................................................ 54

Fed. R. Civ. P. 12 ......................................................................................... 12, 13, 14, 20, 29


OTHER AUTHORITIES

2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (5th ed. 2010) ................................. 50

Attorney General's Manual on the Administrative Procedure Act (1947) ............................ 42, 43

DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals*,
    (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-
    rescission-deferred-action-childhood-arrivals-daca) ............................................................. 38

DHS, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals
(*DACA*)* (Aug. 15, 2012),
    https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf ............. 39

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ............................................................................................... 33

USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,
    (last updated Oct. 6, 2017), https://go.usa.gov/xngCd ..................................................... *passim*

J.A. 398

AR1119

USCIS, Policy Memorandum (Nov. 7, 2011),
   https://go.usa.gov/xncPK. ...................................................................................... 8, 38

U.S. Dep't of Justice, Office of Legal Counsel,
   *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
   Unlawfully Present*, 38 Op. O.L.C. 1 (Nov. 19, 2014),
   https://www.justice.gov/file/179206/download ................................................. 21, 36

J.A. 399

AR1120

Appeal: 18-1521   Doc: 29-1   Filed: 07/03/2018   Pg: 400 of 520
Case 1:16-cv-04756-NGG-VMS   Document 55-6   Filed 09/04/20   Page 44 of 175 PageID #: 7110

Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 14 of 72

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals.  DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time— available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans.  DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed ("Fifth Circuit"), declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to

AR1121

current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this case, Plaintiffs—numerous organizations and a group of individual former and current DACA recipients—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.- Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C.

AR1122

§ 1252(g).  At a minimum, the Plaintiff-organizations cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Plaintiffs' claim that DHS's change in its policy regarding the use of DACA-related information is arbitrary and capricious and contrary to law under the APA is even more misguided.  Not only have Plaintiffs failed to allege sufficient facts to show a change in the information-sharing policy, but the policy is also clearly compliant with the Privacy Act and E-Government Act.  Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, filed contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, DHS and the former

Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican, Central American, and Latino immigrants—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996). They have failed to do so. Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012. Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government. And even if they could, Plaintiffs fail to allege facts sufficient to make

AR1124

out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

This case should be dismissed.

## BACKGROUND

### A.      Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely.

J.A. 404

**AR1125**

Appeal: 18-1521 Case 1:16-cv-04756-NGG-VMS Doc: 47-1 Document 313-6 Filed: 07/03/2018 Filed 09/04/20 Pg: 49 of 120 Page 49 of 175 PageID #: 7115

Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 19 of 72

*AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has

J.A. 405

AR1126

discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time.  *See AADC*, 525 U.S. at 484–85.

###   B.   DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals.  *See* Admin. R. (AR) 1–3 (DACA Memo), ECF No. 26-1.  DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws.  DACA Memo at 1 (AR 1).  Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal.  *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2).  Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 3 (AR 3).

In public guidance published on the USCIS website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,

Appeal: 18-1521   Doc: 47-2   Filed: 07/03/2018   Pg: 15 of 520   Case 1:16-cv-04756-NGG-VMS   Document 119-6   Filed 09/04/20   Page 51 of 175 PageID #: 7117

Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 21 of 72

No. 19 (last updated Oct. 6, 2017), https://go.usa.gov/xngCd (DHS DACA FAQ).[1] *see* USCIS, Policy Memorandum (Nov. 7, 2011), https://go.usa.gov/xncPK (Notice to Appear Guidance). DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39-40).

### C.    The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional

---

[1] The DHS DACA FAQ has been incorporated by reference in Plaintiffs' Complaint.  *See, e.g.*, Pls.' Compl. ¶ 81, ECF No. 1.

J.A. 407                                                        AR1128

nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place.    On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]."   Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

**D.    Rescission of DACA**

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on

September 5, 2017, to wind down the DACA policy in an orderly fashion.  *See* AR 252–56 (Rescission Policy or Policy).  As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy at 4 (AR 255).  Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods."  *Id.* at 4 (AR 255)

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date.  *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017.  Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017."  *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does

10

**AR1130**

not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).  The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.     The Instant Action

Plaintiffs in this lawsuit raise seven overlapping claims.  First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis.  *See* Pls.' Compl ¶¶ 162-66 (Count 4), ECF No. 1.  Plaintiffs also claim that the alleged decision to change the information-sharing policy is contrary to law, as it purportedly violates the Privacy Act and E-Government Act. *See id.* ¶ 165(c).  Finally, Plaintiffs incorporate by reference their constitutional claims under the rubric of the APA.  *See id.* ¶ 165(a).

Second, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without notice and comment.  *See id.* ¶¶ 167-73 (Count 5).

Third, Plaintiffs allege that the rescission, as well as the alleged change to the information-sharing policy, violate procedural due process because DACA recipients will be deprived of their interests in their DACA status and in the protection of personal information provided with their DACA requests from alleged impermissible sharing without notice or an opportunity to be heard. *See id.* ¶¶ 129-43 (Count 1); *id.* 144-53 (Count 2).

Fourth, Plaintiffs suggest that the rescission, including the alleged change to the information-sharing policy, violate DACA recipients' substantive due process rights because those

J.A. 410

AR1131

decisions were arbitrary and thus not "fundamentally fair." *See id.* ¶¶ 142, 152.

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican, Central American, and Latino immigrants. *See id.* ¶¶ 154-61 (Count 3).

Sixth, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation. *See id.* ¶¶ 174-81 (Count 6). On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA and from using DACA information for enforcement purposes except as previously authorized under DACA. *See id.* ¶ 179.

Finally, Plaintiffs seek a declaratory judgment that DACA was lawful. *See id.* ¶¶ 182-85 (Count 7).

Plaintiffs seek declaratory and injunctive relief on their claims, as well as any further relief the Court deems just and proper. *See id.* at 60, Relief Requested.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When considering such a motion, the Court must "accept as true . . . allegations for which there is sufficient factual matter to render them plausible on their face." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (brackets and citation omitted), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017). The Court need not, however, "apply the same presumption of truth to conclusory statements and legal conclusions contained in . . . [the] complaint." *Id.* (citation omitted). In evaluating subject-matter jurisdiction, the court may, when

J.A. 411

AR1132

Appeal: 18-1521  Doc: 47-2  Filed: 07/03/2018  Pg: 120 of 520
Case 1:16-cv-04756-NGG-VMS  Document 319-6  Filed 09/04/20  Page 56 of 175 PageID #: 7122
Case 8:17-cv-02942-RWT  Document 27-1  Filed 11/15/17  Page 26 of 72

necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider any "matters of public record" of which the court may take judicial notice, *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citations omitted), as well as evidence attached to the motion to dismiss "[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alteration in original) (citation omitted).

With respect to Plaintiffs' APA claims, a court may adjudicate the issues on either a motion to dismiss under Rule 12(b)(6) or on a motion for summary judgment. *See Marsh v. United States*, No. 14-cv-3559-TDC, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (construing defendants' motion as it relates to plaintiff's APA claims as a Rule 12(b)(6) motion where, beyond the

AR1133

Appeal: 18-1521    Doc: 47-1    Filed: 07/03/2018    Pg: 425 of 520    Case 1:16-cv-04756-NGG-VMS    Document 319-6    Filed 09/04/20    Page 57 of 175 PageID #: 7123

Case 8:17-cv-02942-RWT    Document 27-1    Filed 11/15/17    Page 27 of 72

complaint and its attachments, the only documents submitted were matters of public record); *see also Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (finding that, because APA claims are adjudicated on the basis of an existing administrative record, without a trial or discovery, such claims can also be properly decided on summary judgment). "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage . . . and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted). Under these circumstances, judicial review is based on the agency record and presents primarily a legal question. *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,* No. 91-1267, 1992 WL 180138, (4th Cir. July 29, 1992); *see also Dawson v. Winter*, No. 06-cv-2885-CCB, 2007 WL 1610905, at *4 (D. Md. May 21, 2007) ("Like appellate courts, district courts . . . address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'") (citation omitted), *aff'd*, 277 F. App'x 297 (4th Cir. 2008).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

J.A. 413

AR1134

Appeal: 18-1521    Doc: 47-5    Filed: 07/03/2018    Pg: 122 of 520
Case 1:16-cv-04756-NGG-VMS    Document 93-6    Filed 09/04/20    Page 58 of 175 PageID #: 7124
Case 8:17-cv-02942-RWT    Document 27-1    Filed 11/15/17    Page 28 of 72

here.  At a minimum, the Plaintiff-organizations lack standing.  And in all events, Plaintiffs fail to state a claim.  This case should therefore be dismissed.

## I.    THIS CASE IS NOT JUSTICIABLE.

### A.    The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law.

**1.**  The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas.  *Chaney*, 470 U.S. at 830; *see Sierra Club v. Larson*, 882 F.2d 128, 133 (4th Cir. 1989) (applying *Chaney* in precluding review of an agency's discretionary decision not to seek enforcement of a statute).  This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

Among the decisions committed to executive discretion are "an agency's exercise of enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.  As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)."  *Id.* at 830, 832.

For instance, an "agency[] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id.* at 831

15

AR1135

(citation omitted).  After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Chaney*, 470 U.S. at 831–32; *see Sierra Club*, 882 F.2d at 133 (recognizing separation of powers underpinning of the presumption of the unreviewability of agency decisions not to pursue enforcement).  Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to the use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable.  Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny.  Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to

J.A. 415

AR1136

immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5-6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial

17

Case 1:16-cv-04756-NGG-VMS   Document 318-6   Filed 09/04/20   Page 61 of 175 PageID #: 7127
Appeal 18-1521   Document 89   Filed 07/03/2018   Page 125 of 220

Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 31 of 72

review" under § 701(a)(2)).

**2.** As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on the one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283. For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

18

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively

AR1139

unreviewable exercise of enforcement discretion." Mem. & Order at 23, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (*Batalla Vidal* Mem. & Order) (granting in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants' Rule 12(b)(6) motion). In so holding, however, the court incorrectly labeled the Acting Secretary's decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals who previously enjoyed some protection from removal to coercive state authority," *id.* at 25. To the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of itself, which is best described as reordering the agency's enforcement priorities in light of litigation risk. *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'"). It is, therefore, equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement cases that the Supreme Court has found are committed to executive discretion. *See, e.g.*, *Chaney*, 470 U.S. at 832-33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that DACA was unlawful, a rationale for which the court held there was "law to apply." *Batalla Vidal* Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253-55 (Rescission Policy)). The Attorney General's determination that DACA was unconstitutional was but one factor that the Acting Secretary considered. As the Rescission Policy makes clear, in determining to wind down the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as well as the self-evident complexities associated with ending DACA, a policy that impacts nearly

J.A. 419

AR1140

Appeal: 18-1521    Doc: 47-2      Filed: 07/03/2018      Pg: 128 of 520
Case 1:16-cv-04756-NGG-VMS   Document 91-6   Filed 09/04/20   Page 64 of 175 PageID #: 7130
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 34 of 72

800,000 individuals. Rescission Policy at 2-4 (AR 253-55). The balancing of those considerations
is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory
text, the history of the use of deferred action, or the Office of Legal Counsel (OLC) opinion.[2]
*Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement
decisions are committed to agency discretion even where they rest on broad legal policy judgments
rather than individualized considerations. *Id.* at 283. *BLE* specifically gave the example of a
criminal prosecutor's decision not to prosecute a certain category of crimes based on the
prosecutor's view of the legal merits of the prosecution. *Id.* Although a court may be qualified to
consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject
of judicial review." *Id.* Just as in the analogy provided in *BLE*, the Acting Secretary's
consideration, among other things, of the lawfulness of the DACA policy merely explains how she
plans to exercise her discretion to rescind the policy and that decision, regardless of the court's
ability to review the legal merits of DACA, is nonreviewable. *Id. BLE*'s point applies *a fortiori*
in the immigration context where the Supreme Court has emphasized the problems with
questioning the government's exercise of its broad discretion. *See AADC*, 525 U.S. at 489-90.

**B.    The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.**

Not only is the denial of deferred action committed to agency discretion under the APA,
but the INA itself deprives federal district courts of jurisdiction over challenges to such denials
altogether. As the Supreme Court explained in *AADC*, the Executive's "exercise of [its]
discretion" in granting deferred action in some circumstances had "opened the door to litigation

---

[2] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

. . . where" the Executive had "chose[n] *not* to exercise it." *Id.* at 484. Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." *Id.* at 485 (citation omitted). To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g). *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

AR1142

action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28-31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29-30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence

J.A. 422

AR1143

Appeal: 18-1521   Doc: 47-5   Filed: 07/03/2018   Pg: 431 of 729   Case 1:16-cv-04756-NGG-VMS   Document 91-6   Filed 09/04/20   Page 67 of 175 PageID #: 7133

Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 37 of 72

proceedings," and thereby sweeps in the Rescission Policy. (emphasis added).[4]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

---

[4] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien. *Batalla Vidal* Mem. & Order at 31. However, the fundamental concerns of § 1252(g) apply no matter if the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien). *See AADC*, 525 U.S. at 485. In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended. *Id.* Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the Plaintiff-organizations in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiffs and all other DACA recipients. To the extent the Plaintiff-organizations would benefit from an order setting aside the Rescission Policy, *but see infra* § I.C.1(a), their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

C.     **The Plaintiff-Organizations' Claims Are Not Cognizable.**

1.     **Plaintiffs Lack Article III Standing.**

The Plaintiff-organizations do not expressly identify the capacity in which they bring this suit.  Regardless, they make little or no attempt to identify any injury whatsoever to their own interests as organizations, nor do they specifically identify any individual members on whose behalf the organizations are suing.  Their allegations are, therefore, patently insufficient to establish standing.

a.     **Plaintiffs lack organizational standing.**

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  As the parties invoking the Court's jurisdiction, the Plaintiff-organizations bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Plaintiffs' Complaint fails at the first step of the analysis.  Here, the Plaintiff-organizations were not the object of any government policy.  Instead, a generous reading of the Complaint reveals, at most, their dissatisfaction with the alleged effects of a policy decision on undocumented immigrants who came to the United States as children.  Pls.' Compl. ¶¶ 1-2; *see also* ¶¶ 23-24, 26.

But the federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing. *Sierra Club*, 405 U.S. at 739. Accordingly, an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor do the Plaintiff-organizations show any injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* (alteration and citation omitted). Here, the vast majority of the Plaintiff-organizations do not even try to meet this test. *See* Pls.' Compl. ¶¶ 30-37. They point to no interference with any immigration-related

26

Appeal: 18-1521  Doc: 48-2  Filed: 07/02/2018  Pg: 130 of 220
Case 1:16-cv-04756-NGG-VMS  Document 91-6  Filed 09/04/20  Page 70 of 175 PageID #: 7136
Case 8:17-cv-02942-RWT  Document 27-1  Filed 11/15/17  Page 40 of 72

programming and allege no new expenditure of funds. The Plaintiff-organizations thus fall well short of their burden to establish a cognizable injury to their own interests. Their claims of organizational standing should be rejected out of hand.

Only Plaintiff CASA de Maryland, Inc. (CASA) attempts to allege an injury to its own activities, claiming that, as a result of the Rescission Policy, it "reallocate[d] significant resources" to "counsel and assist" eligible individuals to renew their DACA by the October 5, 2017 deadline, "depriving community members of access to other vital legal services." Pls.' Compl. ¶ 29. Even assuming this allegation of injury is sufficient for purposes of organizational standing, it fails to allege an ongoing injury that would entitle CASA to the injunctive relief it seeks. *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010) ("to maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[ ] ongoing injury" (emphasis omitted)). To satisfy the case or controversy requirement of Article III in an action seeking only *prospective* relief through an injunction or declaratory judgment, a plaintiff must show exposure to illegal conduct accompanied by "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen"). Here, the sole allegation of injury that may entitle CASA to organizational standing relates to an alleged diversion of resources to assist individuals with DACA renewal requests, a purported injury that necessarily ceased once that October 5 renewal deadline set forth in the Rescission Policy passed. In the absence of an ongoing injury to its own activities, consisting of more than harm to its "abstract concern" for immigrant rights, CASA lacks organizational standing to obtain the prospective injunctive relief it seeks. *Md. Highways Contractors Ass'n,* 933 F.2d at 1251; *McBurney*, 616 F.3d at 411.

AR1147

Appeal: 18-1521   Doc: 39   Filed: 07/03/2018   Pg: 435 of 730
Case 1:16-cv-04756-NGG-VMS   Document 313-6   Filed 09/04/20   Page 71 of 175 PageID #: 7137
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 41 of 72

### b.   Plaintiffs lack representational standing.

Because the Plaintiff-organizations do not sufficiently allege injury to themselves in their own right, "they can establish standing only as representatives of those of their members who have been injured in fact." *Simon*, 426 U.S. at 40 (citation omitted). But the organizations fail to identify any particular member allegedly harmed by the policy change, and that alone dooms any claim of representational standing.

To plead representational standing, the Plaintiff-organizations must allege that "(1) [their] own members would have standing to sue in their own right; (2) the interests the organization[s] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n,* 933 F.2d at 1251 (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)). To satisfy the first of these prongs, an association must at the very least name a specific member with standing for each claim it asserts. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184 (association must "identify a single *specific member*" who was injured).

Here, most of the Plaintiff-organizations make no mention whatsoever of any member allegedly harmed by the Rescission Policy, let alone identifying any such specific member. *See* Pls.' Compl. ¶¶ 30-32, 34-37. Only CASA and OneAmerica even broach the topic, alleging that CASA "counts more than 2,300 DACA beneficiaries as members," *id.* ¶ 29, and that "many [DACA recipients] are active OneAmerica . . . members," *id.* ¶ 33. These general allegations, however, do not name any particular member or members and, thus, also do not rise to the specificity required to plead representational standing. *See Summers*, 555 U.S. at 498. Moreover,

CASA and OneAmerica's allegations establish that neither organization would meet the limited exception to *Summers'* identification requirement for cases in which all members of an organization are harmed.  *See id.* at 498-99; *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184.  *See also* Pls.' Compl. ¶ 29 (claiming that only 2,300 of more than 90,000 members are DACA recipients); *id.* ¶ 33 (stating "many" but not all One America members are DACA recipients).  Accordingly, the Court should likewise reject any claim of representational standing.

### 2.    Plaintiffs Lack a Cause of Action Under the APA.

Even if the Plaintiff-organizations could establish Article III standing, they would lack a cause of action under the APA.  The APA does not "allow suit by every person suffering [an] injury in fact."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question."  *Clarke*, 479 U.S. at 396 (brackets and citation omitted).  Here, no provision of the INA even arguably protects the Plaintiff-organizations from bearing any incidental effects of a denial of deferred action.[5]  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

---

[5] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing properly addressed under Rule 12(b)(6).  *Batalla Vidal* Mem. & Order at 46-47.  Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

29

AR1149

D.     **The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.**

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.   First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.   Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.   *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.   After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.   Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.

II.     **PLAINTIFFS FAIL TO STATE A CLAIM.**

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety

J.A. 429

AR1150

Appeal 18-1521, Document 315-6, 07/03/2018, 2436020, Page 74 of 175
Case 1:16-cv-04756-NGG-VMS   Document 318-6   Filed 09/04/20   Page 74 of 175 PageID #: 7140
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 44 of 72

for failure to state a claim.[6]

### A.    Plaintiffs Fail to State an APA Claim.

#### 1.    The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.[7]  Pls.' Compl. ¶ 165. Plaintiffs' allegations misapprehend the nature of the inquiry under the APA.  It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

---

[6] In the alternative, however, the Court may, if it wishes, convert this motion to one for summary judgment.  *Audubon*, 524 F. Supp. 2d at 660.
[7] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 165.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra*.

J.A. 430

AR1151

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id*. And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted). If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission

J.A. 431

AR1152

Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible ... liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She

J.A. 432

AR1153

explained her reasonable decision to rescind DACA, and the APA requires no more.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"), *reh'g denied*, 420 U.S. 956 (1975).[8]  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.** Plaintiffs nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the Acting Secretary considered the Attorney General's views regarding the legality of DACA, which are views Plaintiffs contend "contradict" "the prior Department of Justice OLC analysis concluding that the program was constitutional."  Pls.' Compl. ¶¶ 120, 165.[9] Plaintiffs' argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.  Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 3 (AR 254).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.  *See Bowman*, 419 U.S. at 286.

---

[8] For these same reasons, Plaintiffs' allegations that the relevant dates chosen by the Acting Secretary in the wind-down process are arbitrary and capricious fails to state a claim under the APA.  *See* Pls.' Compl. ¶ 165.

[9] Plaintiff also alleges that the Acting Secretary's decision is "directly contravene[ed]" by statements made by President Trump, none of which actually address the litigation risk surrounding DACA.  *See id.* ¶¶ 125, 165.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision. If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court should, therefore, sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*, which was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was

J.A. 434

AR1155

"informed by analysis of the implementation of DACA" itself.  *Id.* at 172.  On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id.* at 172–73.  Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id.* at 176—which supports the Attorney General's view that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as it was actually implemented in practice, as found by the Fifth Circuit.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  OLC Op. 18 n.8.  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria").  Further, the original DACA program largely shares the relevant defects of

AR1156

the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

**4.** Plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "provide a reasoned analysis sufficient to justify its change of policy in light of the serious reliance interests created by DACA." Pls.' Compl. ¶ 165(b). As set forth in pages 7-8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time. And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether. Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would. *See* 9-10, *supra*. Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

**5.** Plaintiffs also allege that DHS changed its information-sharing policy and that such a change was both arbitrary and capricious as well as contrary to law. *See* Pls.' Compl. ¶ 165. This claim is unreviewable under the APA because DHS has not changed its information-sharing policy, and has thus not engaged in any final agency action with respect to such policy. Moreover, Plaintiffs' assertions that the alleged change in policy violated the Privacy Act and the E-Government Act fail as a matter of law.

Plaintiffs do not allege facts sufficient to show that there has actually been a substantive change in policy regarding information sharing. Plaintiffs merely allege that the Rescission Memorandum "provides no assurance to Dreamers" that personal information will not be used in

J.A. 436

AR1157

immigration enforcement proceedings.  Pls.' Compl. ¶ 107.  And while they cite language in the Rescission FAQs indicating that information "[g]enerally . . . will not be proactively provided to other law enforcement entities," Pls.' Compl. ¶ 108 (emphasis omitted) (quoting DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) (Rescission FAQs),  https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca), that language is entirely consistent with DHS's policy regarding the protection of DACA information, including its many exceptions that Plaintiffs largely gloss over.  *See* Pls.' Compl. ¶ 90 (characterizing "[t]he government's representations that information provided by a DACA applicant would not be used against him" as "unequivocal").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of DACA information for enforcement purposes, *see* Pls.' Compl. ¶ 90, the agency's information-sharing policy in fact contains (and has always contained) a number of exceptions.  For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance.  While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy purports to change it, and it currently remains in effect.

As there has been no substantive change in DHS's information-sharing policy, there is no "final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that "final agency action" must "mark the consummation of the agency's decisionmaking

38

J.A. 437

AR1158

process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action"). Accordingly, the Court should dismiss Plaintiffs' APA claims for lack of jurisdiction to the extent that they concern an alleged change in the information-sharing policy. *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (holding that district court should have dismissed APA claim without final agency action for lack of subject matter jurisdiction).

Even were the Court to find that DHS somehow changed its long-standing information-sharing policy, any "new" policy does not violate the Privacy Act or the E-Government Act. As a threshold matter, records containing personal information about DACA recipients are not protected by the Privacy Act. The Privacy Act applies to records pertaining to "individual[s]," who are defined as "citizen[s] of the United States or [] alien[s] lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2). By definition, DACA recipients are neither. As explained above, DACA is a form of prosecutorial discretion known as deferred action, and DHS has consistently advised applicants that DACA "does not confer lawful permanent resident status or a path to Citizenship." DHS DACA FAQ No. 68. To the extent that DHS previously extended protections to individuals who fell outside of the scope of the statute, the practice was rescinded in February 2017. *See* Memorandum from John F. Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) (AR 229-34). Moreover, that DHS's internal policy once provided additional protections for DACA recipients does not create a statutory right to coverage under the Privacy Act. *See* Department of Homeland Security, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals (DACA)* 16 (Aug. 15, 2012) (noting that DHS policy "does not extend or create a right of judicial review for non-U.S. persons"), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf

J.A. 438

AR1159

Appeal: 18-1521   Doc: 29   Filed: 07/03/2018   Pg: 467 of 720
Case 1:16-cv-04756-NGG-VMS   Document 118-6   Filed 09/04/20   Page 83 of 175 PageID #: 7149
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 53 of 72

(Privacy Impact Assessment)[10]; *see also Fares v. U.S. Immigration & Naturalization Service*, 50 F.3d 6 (4th Cir. 1995) (affirming district court's holding that Plaintiff whose work authorization had expired "was not protected by the Privacy Act"). Plaintiffs attempt to manufacture a cause of action under the Privacy Act by bringing this claim under the Administrative Procedure Act highlights the frivolous nature of their argument. Accordingly, Plaintiffs' claim that DHS's information-sharing policy violates the Privacy Act fails as a matter of law.

Plaintiffs also argue that DHS's information-sharing policy does not comply with the E-Government Act. *See* Pls.' Compl. ¶ 165. Though the E-Government Act itself does not provide a cause of action, *see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320, 2017 WL 3141907, at *1 (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017), the Act requires federal agencies to conduct privacy impact assessments before collecting new information. *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899. Plaintiff's argument that DHS is in violation of the E-Government Act suffers from two major flaws. First, as explained above, DHS has not substantively changed its information-sharing policy regarding DACA applicants' personal information. Plaintiffs mischaracterize DHS's policy as a "promise" that information from DACA applicants would never be shared. *See* Pls.' Compl. ¶ 165. But, as consistently represented in the DACA FAQs and the DACA Rescission FAQS, the Privacy Impact Assessment provides for a number of exceptions, including when applicants "meet[] the guidelines for the issuance of a Notice to Appear," for "national security purposes", and for the "investigation or prosecution of a criminal offense." Privacy Impact Assessment 13. Second, Plaintiffs allege that DHS "violate[d] the E-Government Act provision requiring an agency abide by its Privacy Impact Assessment," Pls.' Compl. ¶

---

[10] This Privacy Impact Assessment is incorporated by reference in Plaintiffs' Complaint. *See* Pls.' Compl. ¶ 84.

AR1160

165(c)(ii), but fail to include a citation to any specific provision of the E-Government act requiring such action.  The E-Government Act requires only that an agency conduct a privacy impact assessment, ensure review of the assessment by the Chief Information Officer of the Agency, and make the assessment publically available.  *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(B).  Thus, once DHS properly created and disclosed its Privacy Impact Assessment in August 2012, it was in full compliance, and Plaintiffs cannot properly state any violation of this Act.  *Id.*

*       *       *       *

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.  Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

### B.     The Rescission Policy Is Exempt from Notice and Comment.

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶ 169; *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy.  *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 n.9 (4th Cir. 1995) (noting that if the interim rule at issue were a substantive rule, as the plaintiff claimed, then it would have been invalid from the date of its issuance for failure to comply with the APA's notice requirements; finding that interim rule was a policy statement not subject to notice and comment).  That is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561

41

J.A. 440

AR1161

(plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing) (citation omitted).[11]

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b)(3).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) ("[A] substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.").  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

AR1162

30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252.  It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38.  Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted); *see Chen Zhou Chai*, 48 F.3d at 1341 (policy statements announce "tentative intentions for the future without binding [an agency]", they do not "establish a binding norm and leave[] agency officials free to exercise their discretion").

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again.  It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255).  It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831.  It does not immediately deprive any DACA recipients of their current deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis."  Rescission Policy at 4 (AR 255).  It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an

43

J.A. 442

Appeal: 18-1521 Case 1:16-cv-04756-NGG-VMS Filed: 07/03/2018 Document 319-6 Pg: 451 of 720 Filed 09/04/20 Page 87 of 175 PageID #: 7153

Case 8:17-cv-02942-RWT Document 27-1 Filed 11/15/17 Page 57 of 72

individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id*. at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice-and-comment process.[12]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S. at 832.

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

44

### C. Plaintiffs Fail to State an Equal Protection Claim.

If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal protection challenge under *AADC*, *but see supra* Section I.B, it nonetheless should dismiss it for failure to state a claim. In *Armstrong*, the Supreme Court considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim arising under the Equal Protection Clause. 517 U.S. at 463–64. The Court recognized that such claims, like the discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function." *Id.* at 464-65 (citations omitted). Given these considerations, a "presumption of regularity supports" such enforcement decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* at 464 (citation omitted). Applying this "rigorous standard," *id.* at 468, the Court refused to allow discovery in support of the selective prosecution claim before it, even though the claimants had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that were closed by the federal defender's office in a single year, the defendant was African-American, *id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome the presumption that Defendants have faithfully enforced the laws. *Id.* at 464. As in *Armstrong*, Plaintiffs here ask this Court to "exercise judicial power over a 'special province' of the Executive," with the associated risk of "impair[ing] the performance of a core executive

constitutional function." *Id.* at 464–65 (citations omitted). Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims. *Id.* at 464. And that is especially true given that they allege an unlawful enforcement of the *immigration* laws. Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*. As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* Section I.B. Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here. Their allegations consist of the assertion that 93 percent of DACA recipients were Mexican, Central American, or Latino, *see* Pls.'Compl. ¶¶ 157, 159 and selected references to statements by the President and other administration officials relating to immigrants, Mexicans, and Latinos, *see* Pls.' Compl. ¶¶ 94-96, 125. These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 93 percent of approved DACA recipients are Mexican, Central American, or Latino is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws. Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014). Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were

46

African-American was not enough to justify discovery.  517 U.S. at 459.  *A fortiori*, the fact that approximately 93 percent of DACA recipients are Mexican, Central American, or Latino provides no basis for setting aside the Rescission Policy, especially given the heightened deference owed to the political branches on immigration matters, where sensitive considerations of relations and proximity to particular foreign nations necessarily plays a role.[13]

Nor do the President's statements—most of which were made before he took the oath of office—indicate that the rescission of DACA is a clear case of discrimination.  The President's statements are largely unrelated to DACA.  Plaintiffs themselves emphasize that when the President has spoken on this issue, he has shown support for DACA recipients.[14]  More importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due to animus towards Mexican nationals.  Given that the statements at issue have no connection to either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration laws in a way that has a statistically significant disparate impact on Mexicans, Central Americans, or Latinos, the agency would be subject to challenges that it violated Fifth Amendment equal protection principles.  That would set a dangerous precedent, and it would freeze the enforcement

---

[13] Plaintiffs allege that other classes of immigrants, presumably classes that include less than 93% Mexican, Central American, or Latino individuals, remain eligible for deferred action.  *See* Pls.' Compl. ¶ 159.  That other classes of immigrants who received deferred action include less Mexican, Central American, and Latino individuals does not provide any evidence of discriminatory intent, and, as discussed above, a mere disproportionate impact on one group is insufficient to show discriminatory animus.  *See Washington*, 426 U.S. at 242.

[14] *See* Pls.' Compl ¶ 124 (alleging that the President "stated…that he would find an accommodation for dreamers… 'that's going to make people happy and proud;'" alleging that the President stated that his plan for DACA would "have a lot of heart;'' alleging that the President "confirmed that his Administration's policy is not to deport Dreamers, and suggested that they 'should rest easy'").

AR1167

Appeal 18-1521 Document 55 Filed 07/02/2018 Page 91 of 175 PageID #:
Case 1:16-cv-04756-NGG-VMS Document 113-6 Filed 09/04/20 Page 91 of 175 PageID #:
7157
Case 8:17-cv-02942-RWT Document 27-1 Filed 11/15/17 Page 61 of 72

discretion of the entire Executive Branch. That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397. In all events, Plaintiffs' inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

### D. Plaintiffs Fail to State a Procedural Due Process Claim

**1.** Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard. *See* Pls.' Compl. ¶ 138. This claim fails on the merits for the simple reason that DACA recipients have no protected liberty interest or property interest in deferred action entitling them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits." *Roth*, 408 U.S. at 577.

AR1168

A benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted); *see also Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (holding that the INA does not create a protected interest in seeking waiver of deportation proceedings because the statute grants "broad discretion" to grant or deny relief). The DACA policy contains no such "explicitly mandatory language." *Id.* at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3). Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law. *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with

49

unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectable liberty interest in deferred action, nor does it create a protectable interest in being considered for deferred action status").

**2.** Even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim would fail because changes in agency policy do not require individualized process. Due process doctrine recognizes a "distinction between individualized deprivations, [which] are protected by procedural due process, and policy-based deprivations of the interests of a class, [which] are not protected by procedural due process." 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 (5th ed. 2010). The rescission of DACA falls squarely in the latter category.

Plaintiffs allege that, under DACA, termination required "a Notice of Intent to Terminate which thoroughly explains the grounds for termination" and that recipients of such a notice would have an opportunity to respond prior to termination. Pls.' Compl. ¶ 78. But Plaintiffs' theory is not that individual DACA applications were adjudicated incorrectly (for example, due to factual error)—the sort of mistake that notice and a hearing could conceivably help correct. Instead, Plaintiffs' claim appears to be that DHS cannot alter the DACA policy, even on a prospective basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required. The Supreme Court held long ago that where a government policy "applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," and thus due process does not require individualized pre-deprivation notice. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-board to a large number of people, so "[n]ot only would individualized hearings be impractical,

J.A. 449

AR1170

they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard. There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability. *Id*. at 1359. Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days. *Id*. Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure." *Yassini*, 618 F.2d at 1363. "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required." *Id*. (citing, *inter alia*, *Bi-Metallic*). So too here.

**3.** Plaintiffs also allege that DHS's alleged change in its information-sharing policy violates procedural due process norms to the extent that DACA recipients have been deprived of their interest in the protection of personal information provided with their DACA requests from alleged impermissible sharing without a right to be heard or other individualized procedural protections. *See* Pls.' Compl. ¶ 151. As previously explained, *supra* Section II.A, Plaintiffs have failed to allege sufficient facts that DHS substantively changed its information-sharing policy. In any event, Plaintiffs fail to state a claim that such a change violates procedural due process because they cannot identify an actual deprivation of "sensitive personal information," much less show that this "information" is somehow a protected interest under the Due Process Clause.

No plaintiff alleges that personal information contained in a DACA application has in fact been impermissibly shared. Nor have Plaintiffs alleged facts indicating a new threat of information

sharing beyond the exceptions that have been consistently part of the policy since DACA was implemented in 2012, including in cases of threats to national security. Although the court in *Batalla Vidal* found (incorrectly) that, once DACA recipients' status expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them, *see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their status.

Even if Plaintiffs had, in fact, alleged an actual deprivation of liberty or property, to the extent that personal information was shared in a manner inconsistent with the information-sharing policy, or if the information-sharing policy had, in fact, changed, Plaintiffs were consistently advised that the policy "may be modified, superseded, or rescinded at any time" and creates no legal rights. DHS DACA FAQ No. 19; *see supra* Section I.B. Accordingly, no party has a liberty or property right as a result of the information-sharing policy. *See Mondragon v. Holder*, 706 F.3d 535, 541 (4th Cir. 2013) (It is a "well-established proposition that 'a constitutional entitlement [*i.e.*, one protected by the Due Process clause] cannot 'be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past.'") (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

**E.    Plaintiffs Fail to State a Substantive Due Process Claim.**

Plaintiffs allege that both the rescission of DACA and the alleged change in DHS's information-sharing policy violate substantive due process because these actions are not "fundamentally fair." Pls.' Compl. ¶¶ 142, 152. Neither of these claims has merit.

Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim." *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Conduct can be said to "shock the conscience" when it involves intentionally "abusing executive power, or employing it as an instrument of oppression" in a manner that is "unjustifiable by any government interest." *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (emphasis and citations omitted). By contrast, "simple negligence . . . can [never] support a claim of substantive due process violation by executive act." *Id.*

Nothing about the Rescission Policy meets this extraordinarily high standard, and certainly not with respect to the subject of information sharing. Plaintiffs have failed to put forth any allegations suggesting that the Acting Secretary's memorandum contained "any element of vindictiveness or of power exercised simply to oppress," particularly when compared with the "legitimate governmental interests" she identified. *See id.* at 746. Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be

Appeal: 18-1521   Doc: 29-3   Filed: 07/02/2018   Pg: 401 of 520
Case 1:16-cv-04756-NGG-VMS   Document 111-6   Filed 09/04/20   Page 97 of 175 PageID #: 7163
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 67 of 72

modified, superseded, or rescinded at any time" and it therefore creates no judicially enforceable rights. DHS DACA FAQ No. 19. And, most importantly, the Rescission Policy nowhere purports to alter DHS's information-sharing policy, and even if it did, Plaintiffs were on notice that it could be subject to change.

### F.  Plaintiffs' Equitable Estoppel Claims Fail.

Plaintiffs have also brought equitable estoppel claims, alleging that DACA recipients provided sensitive personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA. *See* Pls.' Compl. ¶¶ 176, 178. On that basis, Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *See id.* ¶ 179.

Plaintiffs' equitable estoppel claims cannot succeed for several reasons. As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel. The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Congress has created no such cause of action for estoppel. This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action. *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context. Assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the *policy* decisions of the federal government. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the

J.A. 453

AR1174

result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation"). Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with any applicable procedures. *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015). Here, the Acting Secretary issued a memorandum rescinding DACA, which is a matter committed to agency discretion by law.

Finally, even if a cause of action for estoppel were available to challenge the policy here (and it is not), Plaintiffs could not satisfy the elements of that claim. Even in situations where an estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-policy actions), courts "invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as any other litigant). In other words, estoppel can only be invoked against the government "where justice and fair play require it." *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc). In the rare circumstances in which equitable estoppel may apply against the government, a party must show "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS*, 729 F. Supp. 479, 485 (D. Md. 1990); *see Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) ("estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents"). Plaintiffs cannot meet this standard.

First, Plaintiffs have failed to plausibly allege that the government engaged in any "affirmative misconduct going beyond mere negligence." *Angeles*, 729 F. Supp. at 485 (finding

J.A. 454

AR1175

that INS was not estopped from deporting the plaintiff where immigration officers and a government brochure incorrectly advised her that her permanent resident status would remain valid so long as she did not stay outside the country for more than one year). To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins*, 875 F.2d at 707 (estopping government from barring a soldier's reenlistment where the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records). Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct. Instead, they have merely pleaded that there was a change in policy (an erroneous allegation vis-a-vis the information-sharing policy).

Second, estoppel for individual claims is only available where the government's act will cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer undue damage." *Watkins*, 875 F.2d at 707 (quotation omitted). Plaintiffs have failed to sufficiently plead facts that would support these necessary threshold elements. To the contrary, as reflected in documents incorporated by reference in Plaintiffs' Complaint, DHS made clear in its FAQs that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27. Moreover, nothing in the 2012 DACA Memorandum, the form used to request DACA (USCIS Form I-821D), or in the DACA FAQs generally could be construed to represent to DACA recipients that the DACA policy was permanent and not subject to change. There is therefore no "serious injustice" that Plaintiffs can point to relating to the rescission of this discretionary policy.[15]

---

[15] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an individualized bases: "(1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel

J.A. 455

AR1176

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges. Equitable estoppel, however, is unavailable for such broad-based challenges. And even if the Court were to review Plaintiffs' claims on an individualized basis, those claims still fail. While Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that Plaintiffs have alleged that there is a "serious injustice," much less a circumstance involving "affirmative misconduct" in which estoppel should apply. For these reasons, Plaintiffs' equitable estoppel claims should be dismissed.

### III.   NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission policy, Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful." *See* Pls.' Compl. ¶¶ 182-85 (Count 7). The Declaratory Judgment Act, however, provides a remedy, not a source of rights independent of substantive federal law. *Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 618-19 (4th Cir. 1997); *see Johnson v. Sessions*, No. 15-cv-3317-RDB, 2017 WL 1207537, at *6 & n.6 (D. Md. Apr. 3, 2017) (noting that the court would not consider declaratory judgment claim, even if it had jurisdiction, because the request for declaratory relief was duplicative of relief sought through the plaintiff's APA claims). Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief. 28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna*, 300 U.S. at 240-41.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might

---

had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel." *Dawkins*, 318 F.3d at 611 n.6. Plaintiffs have failed to plausibly allege facts in support of these elements as well.

J.A. 456

AR1177

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 465 of 520
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 101 of 175 PageID #: 7167
Case 8:17-cv-02942-RWT   Document 27-1   Filed 11/15/17   Page 71 of 72

provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part I.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief preventing Defendants "from implementing or enforcing the Rescission" and "from disclosing any DACA applicant information [for] immigration enforcement activities in a manner inconsistent with their prior commitments." Pls.' Compl. at 60, Relief Requested. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health*

AR1178

*Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case or, in the alternative, should grant summary judgment in Defendants favor on all of Plaintiffs' claims.

Dated: November 15, 2017        Respectfully submitted,

       CHAD A. READLER
       Acting Assistant Attorney General

       BRETT A. SHUMATE
       Deputy Assistant Attorney General

       JENNIFER D. RICKETTS
       Director

       JOHN R. TYLER
       Assistant Branch Director

       */s/ Kathryn C. Davis*
       KATHRYN C. DAVIS
       */s/ Rachael Westmoreland*
       RACHAEL WESTMORELAND
       Trial Attorneys
       United States Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Avenue NW
       Washington, DC 20530
       Phone: (202) 616-8298
       Fax: (202) 616-8470
       Email: Kathryn.C.Davis@usdoj.gov

       *Counsel for Defendants*

AR1179

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

      *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

      *Defendants*.

No. 17-cv-2942 (RWT)

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For Summary Judgment, and any response or reply thereto, it is hereby

    **ORDERED** that this motion is **GRANTED**; and it is

    **FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

    This is a final, appealable order.  *See* Fed. R. App. P. 4(a).

**SO ORDERED**.

Dated: _____

          _____
          ROGER W. TITUS
          United States District Judge

AR1180

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

**ROGER W. TITUS**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0052

### M E M O R A N D U M

TO:          Counsel of Record

FROM:      Judge Roger W. Titus

RE:          *Casa De Maryland, et al., v. United States Dept. of Homeland Security, et al.*
               Civil No. RWT-17-2942

DATE:      November 21, 2017

\* \* \* \* \* \* \* \* \*

The Court takes notice of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [ECF No. 27]. If Plaintiffs desire to not only oppose this Motion, but also file a cross-motion, their cross-motion should be included with the response due by November 28, 2017 at 5:00 p.m.

In the event of a cross-motion, Defendants shall include their opposition to that cross-motion with their reply due December 5, 2017 at 5:00 p.m. Plaintiffs may file a reply, if any, in support of their cross-motion by December 8, 2017 at 5:00 p.m.

The page limit for Plaintiffs' November 28, 2017 opposition and any cross-motion is a total of sixty pages. The page limit for Defendants' December 5, 2017 reply and any opposition to a cross-motion is a total of twenty-five pages. The page limit for Plaintiffs' December 8, 2017 reply in support of any cross-motion is a total of ten pages.

Despite the informal nature of this ruling, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

_____/s/_____
Roger W. Titus
United States District Judge

Appeal: 18-1521   Doc: 29-3   Filed: 07/02/2018   Pg: 106 of 159
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 105 of 175 PageID #: 7171
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 1 of 70

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Case No. 17-cv-2942 (RWT) |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

AR1182

Appeal: 18-1521    Case 1:16-cv-04756-NGG-VMS    Document 319-6    Filed 07/02/2018    Filed 09/04/20    Doc: 70    Page 106 of 175 PageID #:
7172
Case 8:17-cv-02942-RWT    Document 29    Filed 11/28/17    Page 2 of 70

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL ALLEGATIONS NOT ADDRESSED IN GOVERNMENT'S MOTION AND
STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE
DISPUTE .......................................................................................................... 2

LEGAL STANDARDS ....................................................................................... 5

ARGUMENT ..................................................................................................... 7

I.    THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(1). ..... 7

  A.    The Claims Asserted in the Complaint Are Justiciable ............................... 7

    1.    The Government's Justiciability Arguments Do Not Apply to the Non-APA Claims ... 7

    2.    The APA Claims Are Justiciable ................................................. 9

  B.    Plaintiffs Have Standing ........................................................... 17

    1.    The Individual Plaintiffs Indisputably Have Standing ......................... 18

    2.    The Organizational Plaintiffs Have Standing ................................. 19

II.   THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6) ... 24

  A.    The Complaint Alleges Multiple Violations of the Administrative Procedures Act . 24

    1.    Plaintiffs Have Stated a Claim Under the APA ................................ 24

    2.    The DACA Rescission Memo is a Substantive Rule Subject to Notice-and-Comment
      Rulemaking. ..................................................................... 35

  B.    The Complaint States a Claim for Violations of the Equal Protection Clause ......... 41

  C.    The Complaint States Claims for Violations of the Due Process Clause .................. 46

    1.    The Complaint Alleges Violations of Procedural Due Process ................... 47

    2.    The Complaint Alleges Violations of Substantive Due Process ................. 52

  D.    The Complaint States a Claim for Equitable Estoppel ............................... 54

III.  DEFENDANTS' ARGUMENTS REGARDING A NATIONWIDE INJUNCTION
    ARE PREMATURE AND LEGALLY INCORRECT ................................. 56

CONCLUSION ................................................................................................ 58

AR1183

Appeal: 18-1521 Case 1:18-cv-04756-NGG-VMS Filed: 07/02/2018 Document 319-6 Pg: 473 of 520 Filed 09/04/20 Page 107 of 175 PageID #: 7173

Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 3 of 70

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abourezk v. Reagan,*
 785 F.2d 1043 (D.C. Cir. 1986)..................................................................23, 24

*Alaska v. U.S. Dep't of Transp.,*
 868 F.2d 441 (D.C. Cir. 1989)...........................................................................38

*Albino v. United States,*
 78 F. Supp. 3d 148, 163 (D.D.C. 2015)............................................................11

*Am. Bus Ass'n v. United States.,*
 627 F.2d 525 (D.C. Cir. 1980).....................................................................37, 38

*Am. Legal Found. v. FCC.,*
 808 F.2d 84 (D.C. Cir. 1987).............................................................................21

*Am. Med. Ass'n v. Reno,*
 57 F.3d 1129 (D.C. Cir. 1995)...........................................................................10

*Am. Tel. & Tel. Co. v. FCC,*
 974 F.2d 1351 (D.C. Cir. 1992).........................................................................34

*Amfac Resorts, LLC v. U.S. Dep't of Interior,*
 143 F. Supp. 2d 7 (D.D.C. 2001).......................................................................27

*Angeles v. Dist. Dir., INS,*
 729 F. Supp. 479 (D. Md. 1990).........................................................................55

*Arpaio v. Obama,*
 797 F.3d 11, 17 (D.C. Cir. 2015).......................................................................13

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009).............................................................................................6

*Batalla Vidal v. Duke,*
 No. 1:16-cv-04756-NGG-JO ............................................................................26

*Batalla Vidal v. Duke,*
 No. 16-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) .......................... *passim*

*Bd. of Regents of State Colleges v. Roth,*
 408 U.S. 564 (1972)......................................................................................48, 49

*Beck v. McDonald,*
 848 F.3d 262 (4th Cir. 2017) ..............................................................................6

AR1184

Appeal: 18-1521 Doc: 28-1 Filed: 07/02/2018 Pg: 108 of 175
Case 1:16-cv-04756-NGG-VMS Document 319-6 Filed 09/04/20 Page 108 of 175 PageID #: 7174
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 4 of 70

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
   239 U.S. 441 (1915)...................................................................................52

*Bostic v. Shaefer*,
   760 F.3d 352 (4th Cir. 2014) ..............................................................5, 18

*Botezatu v. INS*,
   195 F.3d 311 (7th Cir. 1999) ...................................................................17

*Bowen v. Mass.*,
   487 U.S. 879 (1988)..................................................................................57

*Bowen v. Mich. Acad. of Family Physicians*,
   476 U.S. 667 (1986)....................................................................................9

*Brown Express, Inc. v. United States*,
   607 F.2d 695 (5th Cir. 1979) ...................................................................37

*by the Univ. of Tex. Sw Med. Ctr. V. Nassar*,
   133 S. Ct. 2517 (2013)................................................................................7

*Chamber of Commerce of U.S. v. U.S. Dept. of Labor*,
   174 F.3d 206 (D.D.C. 1993) ....................................................................37

*Chen Zhou Chai v. Carroll*,
   48 F.3d 1331 (4th Cir. 1995) ..............................................................37, 41

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)............................................................................36, 39

*Clarke v. Secs. Indus. Ass'n*,
   479 U.S. 388 (1987)..................................................................................23

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ............................................................38, 39

*Consumer Energy Council v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ............................................................40, 41

*Cox v. Louisiana*,
   379 U.S. 559 (1965)..................................................................................54

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1988)......................................................................52, 53, 54

*Dawkins v. Witt*,
   318 F.3d 606 (4th Cir. 2003) ...................................................................56

J.A. 464

AR1185

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 109 of 175
Case 1:18-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 109 of 175 PageID #: 7175
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 5 of 70

*Dep't of Commerce v. U.S. House of Representatives*,
  525 U.S. 316 (1990)......................................................................5, 16, 17, 44

*Elec. Privacy Info. Ctr. v. U.S. Dep't. of Homeland Sec.*,
  653 F.3d 1 (D.C. Cir. 2011) .........................................................................39

*Equal Rights Ctr. v. Equity Residential*,
  798 F. Supp. 2d 707 (D. Md. 2011) .............................................................19

*Fares v. U.S. Immigration and Naturalization Service*,
  50 F.3d 6 (4th Cir. 1995) .............................................................................35

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).....................................................................................29

*Fed'n of Am. Immig. Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) .......................................................................24

*Ford Motor Co. v. NLRB*,
  305 U.S. 364 (1939).....................................................................................41

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).......................................................................................8

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
  681 F.3d 581 (4th Cir. 2012) .......................................................................25

*Garcia v. Neagle*,
  660 F.2d 983 (4th Cir. 1981) .........................................................................8

*Gardner v. City of Balt. Mayor & City Council*,
  969 F.2d 63 (4th Cir. 1992) .........................................................................49

*Gay v. Wall*,
  761 F.2d 175 (4th Cir. 1985) .........................................................................6

*Goldfarb v. Mayor & City Council of Balt.*,
  791 F.3d 500 (4th Cir. 2015) .........................................................................6

*Greater Bos. Television Corp. v. FCC*,
  444 F.2d 841 (D.C. Cir. 1970) .....................................................................28

*Greene v. Carson*,
  256 F. Supp. 2d 411 (S.D.N.Y. 2017)..........................................................28

*Guardian Fed. Sav. and Loan Ass'n v. Fed.l Sav. & Loan Ins. Corp.*,
  589 F.2d 658 (D.C. Cir. 1978) .....................................................................38

Appeal: 18-1521 Case 1:18-cv-04756-NGG-VMS Doc: 72-6 Filed: 07/02/2018 Document 319-6 Filed 09/04/20 Pg: 479 of 529 Page 110 of 175 PageID #: 7176

Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 6 of 70

*Harris v. McRae,*
    448 U.S. 297 (1980) .......................................................................................42

*Harrods Ltd. v. Sixty Internet Domain Names,*
    302 F.3d 214 (4th Cir. 2002) ...........................................................................6

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................19, 21

*Hawkins v. Freeman,*
    195 F.3d 732 (4th Cir. 1999) ....................................................................53, 54

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ....................................................................12, 13, 14, 15

*Heckler v. Cmty Health Serv's of Crawford Cty., Inc.,*
    467 U.S. 51 (1984) .........................................................................................55

*Hill v. Lockheed Martin,*
    354 F.3d 277 (4th Cir. 2004) (en banc) ...........................................................7

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .......................................................................................22

*I.C.C. v. Brotherhood Of Locomotive Engineers,*
    482 U.S. 270 (1987) .......................................................................................12

*In re United States,*
    No. 17-72917, 2017 WL 5505730 (9th Cir. Nov. 16, 2017) .................26, 27, 29

*Inova Alexandria Hosp. v. Shalala,*
    244 F.3d 342 (4th Cir. 2001) ...........................................................................8

*INS v. St. Cyr.,*
    533 U.S. 289 (2001) ....................................................................................9, 15

*Int'l Ass'n of Machinists & Aerospace Workers v. Haley,*
    482 F. App'x 759 (4th Cir. 2012) ..................................................................53

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 554 (4th Cir. June 15, 2017) ......................................................44, 46

*Int'l Refugee Assistance Project v. Trump,*
    No. 17-0361, 2017 WL 4674314 (D. Md. Oct. 17, 2017) ........12, 13, 21, 22, 23, 24, 46

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n,*
    874 F.2d 205 (4th Cir. 1989) ....................................................................36, 37

Appeal: 18-1521   Case 1:18-cv-04756-NGG-VMS   Doc: 22-1   Document 319-6   Filed: 05/01/2018   Filed 09/04/20   Pg: 111 of 175   Page 111 of 175 PageID #: 7177

Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 7 of 70

*Kapps v. Wing,*
    404 F.3d 105 (2d Cir. 2005) ................................................................52

*Kenney v. Glickman,*
    96 F.3d 1118 (8th Cir. 1996) ..............................................................12

*Kent v. Dulles,*
    357 U.S. 116 (1958) ............................................................................19

*Kerr v. Marshall Univ. Bd. of Gov.,*
    824 F.3d 62 (4th Cir. 2016) ................................................................52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S.Ct. 1377 (2014) ...................................................................23, 24

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ............................................................................10

*Mach Mining, L.L.C. v. E.E.O.C.,*
    135 S. Ct. 1645 (2015) .........................................................................9

*Mada-Luna v. Fitzpatrick*
    813 F.2d 1006 (9th Cir. 1987) ......................................................13, 40

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................58

*Mallette v. Arlington Cty. Emp's Supplemental Ret. Sys. II,*
    91 F.3d 630 (4th Cir. 1996) ................................................................51

*Martin v. Saint Mary's Dep't of Social Serv's,*
    346 F.3d 502 (4th Cir. 2000) ..............................................................53

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.,*
    545 U.S. 844 (2005) ............................................................................46

*McNary v. Haitian Refugee Ctr.,*
    498 U.S. 479 (1991) .................................................................9, 16, 19

*Md. Highways Contractors Ass'n, Inc. v. Maryland,*
    933 F.2d 1246 (4th Cir. 1991) ............................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) .........................................................28, 31, 32, 40

*Municipality of Anchorage v. United States,*
    980 F.2d 1320 (9th Cir. 1992) ............................................................38

J.A. 467

AR1188

*N. Carolina Growers' Ass'n v. United Farm Workers,*
702 F.3d 755 (4th Cir. 2012) ...................................................................................38

*Nat'l Association of Regulatory Utility Commissioners v. Dep't of Energy,*
851 F.2d 1424, 1431 (D.C. Cir. 1988) .....................................................................37

*Nat'l Min. Ass'n v. McCarthy,*
758 F.3d 243 (D.C. Cir. 2014) .................................................................................38

*Nat'l Taxpayers Union, Inc. v. United States.,*
68 F.3d 1428 (D.C. Cir. 1995) .................................................................................21

*Office of Pers. Mgt. v. Richmond,*
496 U.S. 414 (1990)..................................................................................................55

*Organized Vill. Of Kake v. U.S. Dep't of Agric.,*
795 F.3d 956 (9th Cir. 2015) ...................................................................................31

*Ostergren v. Cuccinelli,*
615 F.3d 263 (4th Cir. 2010) ...................................................................................58

*Otsuka Pharm. Co. v. Burwell,*
No. 15-852, 2015 WL 1579127 (D. Md. Apr. 8, 2015)...........................................27

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.,*
No. 16-1015, 2017 WL 3189446 (D. Md. July 27, 2017) ................................26, 27

*Perales v. Casillas*
903 F.2d 1043 (5th Cir. 1990) .................................................................................15

*Perry v. Sindermann,*
408 U.S. 593 (1972)..................................................................................................49

*Petroleum Comm'ns, Inc. v. FCC,*
22 F.3d 1164 (D.C. Cir. 1994) .................................................................................34

*Plyler v. Doe,*
457 U.S. 202 (1982)..................................................................................................43

*Quinteros-Mendoza v. Holder,*
556 F.3d 159 (4th Cir. 2009) ...................................................................................10

*Raley v. Ohio,*
360 U.S. 423 (1959)..................................................................................................54

*Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,*
673 F.3d 294 (4th Cir. 2012) .....................................................................................7

J.A. 468

AR1189

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 113 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 113 of 175 PageID #: 7179
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 9 of 70

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471(1999) ............................................................................16, 17, 44

*Retail, Wholesale & Dep't Store Union v. NLRB*,
    466 F.2d 380 (D.C. Cir.1972) .........................................................................34

*Richardson v. Town of Eastover*,
    922 F.2d 1152 (4th Cir. 1991) ........................................................................51

*Richmond Tenants Org., Inc. v. Kemp*,
    956 F.2d 1300 (4th Cir. 1992) ........................................................................58

*Robbins v. Reagan*
    780 F.2d 37, 47 (D.C. Cir. 1985) ...................................................................15

*Romer v. Evans*,
    517 U.S. 620 (1996) ........................................................................................54

*Royster v. Bd. of Tr's of Anderson Cty. Sch. Dist. No. Five*,
    774 F.2d 618 (4th Cir. 1985) ..........................................................................49

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) .......................................................................................5, 18

*Ruttenberg v. Jones*,
    No. 07-1037, 2008 WL 2436157 (4th Cir. June 17, 2008) ............................49

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ..........................................................................51

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) .................................................................31

*Sierra Club v. Larson*
    882 F.2d 128, 132 (4th Cir. 1989) .................................................................14

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................................. *passim*

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) .............................................................26

*Thompson v. Dep't of Labor*,
    885 F.2d 551 (9th Cir. 1989) ..........................................................................29

*Tri-County Paving, Inc. v. Ashe County*,
    281 F.3d 430 (4th Cir. 2002) ..........................................................................47

*U.S. DHS, 2007-01: DHS* ....................................................................................35

AR1190

*U.S. Steel Corp. v. EPA,*
    649 F.2d 572 (8th Cir. 1981) ................................................................41

*U.S. v. Mitchell,*
    39 F.3d 465 (4th Cir. 1994) .................................................................36

*United States ex rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ........................................................41

*United States v. Armstrong,*
    517 U.S. 456 (1996)..............................................................8, 44, 45

*United States v. Batchelder,*
    442 U.S. 114 (1979)..............................................................................9

*United States. v. Cox,*
    964 F.2d 1431 (4th Cir. 1992) .............................................................56

*United States v. Lopez-Collazo,*
    824 F.3d 453 (4th Cir. 2016) ...............................................................48

*United States v. Penn. Indus. Chem. Corp.*
    411 U.S. 655, 675 (1973) .....................................................................56

*United States v. Texas,*
    136 S. Ct. 2271 (2016).................................................................26, 29

*Vasquez v. Aviles,*
    639 F. App'x 898 (3d Cir. 2016) .........................................................17

*Velasquez-Garcia v. Holder,*
    760 F.3d 571 (7th Cir. 2014) ...............................................................34

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977).........................................................42, 43, 46

*Wade v. United States,*
    504 U.S. 181 (1992)..............................................................................9

*Washington v. Davis,*
    426 U.S. 229 (1976).......................................................................42, 45

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) .............................................................14

*Watkins v. U.S. Army,*
    875 F.2d 699 (9th Cir. 1989) .........................................................55, 56

J.A. 470

AR1191

*Webster v. Doe*,
   486 U.S. 592 (1988) ......................................................................................................8

*White Tail Park, Inc. v. Stroube*,
   413 F.3d 451 (4th Cir. 2005) ....................................................................................6, 20

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) (Gov. Br. 51) ...............................................................52

*Zadvydas v. Davis*,
   533 U.S. 678 (2011) ..........................................................................................16, 44, 48

**STATUTES**

5 U.S.C. § 551(5) ...................................................................................................................36

5 U.S.C. §§ 553 ........................................................................................................... *passim*

5. U.S.C. § 604 ...............................................................................................................10, 25

5 U.S.C. §§ 701(a) ...................................................................................................8, 9, 10, 12

5 U.S.C. § 702 ............................................................................................................8, 9, 23

5 U.S.C. § 706(2)(A) ........................................................................................................25, 57

8 U.S.C. § 1182(a)(9)(B)(v) .....................................................................................................17

8 U.S.C. § 1226a(b)(1) .............................................................................................................17

8 U.S.C. § 1229c(e) ..................................................................................................................17

8 U.S.C. § 1252 (2005) .............................................................................................................9

8 U.S.C. § 1252(g) ..................................................................................................... *passim*

28 U.S.C. § 2201 ......................................................................................................................57

E-Government Act of 2002,
   Pub. L. No. 107-347, 116 Stat. 2899 ...........................................................................33, 35

**OTHER AUTHORITIES**

DEPT. OF JUS., OFFICE OF PRIVACY AND CIVIL LIBERTIES, PRIVACY IMPACT
   ASSESSMENTS: OFFICIAL GUIDANCE (last revised Mar. 2012),
   https://www.justice.gov/opcl/docs/2012-doj-pia-manual.pdf...................................35

MEMORANDUM, M-03-22, OMB GUIDANCE FOR IMPLEMENTING THE PRIVACY
   PROVISIONS OF THE E-GOVERNMENT ACT OF 2002 (Sept. 26, 2003) .....................35

J.A. 471

**AR1192**

## INTRODUCTION

On September 5, with the stroke of a pen ending DACA, senior Government officials upended the lives of 800,000 immigrants who were brought to this country as children, stripping them of their right to work and visit family members living overseas, impairing their ability to pursue an education, and putting all in fear that they will soon be deported separating many from U.S. citizen family members.  This action was the culmination of a long series of threats and derogatory statements by senior Government officials against persons of Mexican, Central American, and Latino heritage, and the Government readily acknowledges that 93 percent of the affected individuals have such ancestry.  While the Government decided to rescind DACA, it maintains other deferred action programs that do not have similar demographics.

Under well-established legal principles, the Government's actions violate both the Equal Protection and Due Process Clauses of the Constitution; and the manner in which the Government rescinded DACA violates federal laws (including the Administrative Procedure Act (APA)) and basic principles of fairness and equity.  Courts have found similar challenges justiciable and comparable government action to be illegal and unconstitutional.

The Government's motion is little more than a bald request to insulate the September 5 action and immunize the Government officials who made this discriminatory decision from scrutiny.  Ignoring the correct pleading standards, the Government has submitted a trial brief masquerading as a Rule 12 motion predicated on (i) factual proffers found nowhere in the Complaint raising contested issues of fact, (ii) a bowdlerized presentation of the Complaint that simultaneously omits material allegations and mischaracterizes Plaintiffs' claims, and (iii) a misleading discussion of the key legal principles (the "Motion" or the "Government's Motion").

Our Constitution and laws specifically provide for judicial review under these circumstances—where there is patent evidence that the Government is proceeding outside of

**AR1193**

Appeal: 18-1521   Doc: 47-5   Filed: 07/02/2018   Pg: 117 of 175
Case 1:18-cv-04753-NGG-VMS   Document 311-6   Filed 09/04/20   Page 117 of 175 PageID #: 7183
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 13 of 70

constitutional norms and in violation of the law.  It is for this reason that Judge Garaufis in the Eastern District of New York, hearing a similar challenge to the DACA rescission, rejected the Government's arguments, *see Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116, at *8-13 (E.D.N.Y. Nov. 9, 2017) (attached as Freedman Decl.  Ex. 1)[1], and no court has found that the Government's arguments have merit.  This Court should not be the first.  The motion should be denied.

### FACTUAL ALLEGATIONS NOT ADDRESSED IN GOVERNMENT'S MOTION AND STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE DISPUTE

Under the relevant pleading standards (discussed below), (i) the Court's consideration of the Government's 12(b)(6) motion must be based on the well-pled allegations in the Complaint, and (ii) the Government's motion for summary judgment must be denied if there are material facts in dispute.  The Government's Motion fails to address the following facts:

1.  In promoting DACA, the Government promised that Dreamers would be able to obtain employment authorization, travel outside the United States for educational, employment, or humanitarian purposes, attend educational institutions, be eligible for Social Security and disability, and be present in the United States.  Compl. ¶¶ 10, 72-78, 135-136.

2.  In actively promoting DACA, the Government promised Dreamers that the personal information they submitted with their applications would not be shared with immigration enforcement authorities such as ICE or CBP, with very limited exceptions for specifically described circumstances.  Compl. ¶¶ 10-16, 79-91.  To reinforce this Commitment, DHS (i) adopted a Privacy Impact Assessment specifically prohibiting such sharing other than those limited

---

[1] The Declaration of John A. Freedman ("Freedman Decl.") in Opposition to the Government's Motion to Dismiss or For Summary Judgment is filed herewith.  All Exhibits to the Freedman Declaration will be designated as "Ex."

J.A. 473                                                                              **AR1194**

specified circumstances and making clear that the protections of the Privacy Act would extend to DACA recipients, and (ii) senior DHS officials affirmed that the commitment "must continue to be honored."  Compl. ¶¶ 82-88.

3.  93 percent of the over 800,000 individuals who have received DACA are of Mexican, Central American, or Latino descent.  Compl. ¶¶ 24, 157, 159.

4.  The Government recognized that DACA created certain rights that could not be taken away without due process, and adopted a comprehensive set of Standard Operating Procedures to administer the DACA program the ("SOP") (Ex. 23).  Compl. ¶¶ 78, 137.   The SOP contained procedures to safeguard DACA applicant information.  Compl. ¶ 88.

5.  Pursuant to the SOP, the Government routinely sent renewal notices (referred to as "180-day notices") to DACA recipients starting 180 days prior to their expiration.  *See Batalla Vidal* Interrogatory Response No. 9 (Ex. 2).

6.  On February 20, 2017, DHS Secretary Kelly announced new enforcement priorities, but specifically left DACA intact.  Compl. ¶ 111 n.64 (Ex. 3).

7.  On June 15, 2017, DHS Secretary Kelly announced further changes to enforcement priorities, but again specifically left DACA intact.  (Ex. 4).

8.  On or about July 15, 2017, the Government stopped sending 180-day renewal notices to DACA recipients to inform them that their DACA was expiring.  *See Batalla Vidal* Interrog. Resp. No. 9 (Ex. 2).

9.  The decision to rescind DACA followed a long series of threats and derogatory statements by senior Government officials against persons of Mexican, Central American, and Latino heritage.  The Complaint identifies a sample of 18 such statements and four threats, which have continued to the present.  Compl. ¶¶ 25, 94-96 & 111.

Appeal: 18-1521   Doc: 47-3   Filed: 07/02/2018   Pg: 109 of 520
Case 1:18-cv-04753-NGG-VMS   Document 319-6   Filed 09/04/20   Page 119 of 175 PageID #: 7185
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 15 of 70

10. In August 2017, approximately 15 DHS employees participated in a meeting to discuss the rescission of DACA. Hamilton 10/20/17 Tr. 94-96 (Ex. 5). Other than from Duke, there are no materials from any of these individuals in the Administrative Record.

11. Also in August 2017, representatives of DHS, the Department of Justice, and the White House participated in a meeting to discuss the rescission of DACA. Hamilton 10/20/17 Tr. 102-105 (Ex. 5). Other than from Duke, there are no materials from any of these individuals in the Administrative Record.

12. The decision to rescind DACA was jointly made by the Department of Justice and DHS. Sept. 14, 2017 *Batalla Vidal* Tr. 13, 26 (Ex. 6).

13. When the Government rescinded DACA, it left numerous other deferred action programs in place. Compl. ¶¶ 5, 68, 159. None of these programs benefit the number of Mexican, Central American, or Latino individuals who are beneficiaries of DACA. Compl. ¶¶ 68, 157-60.

14. The Government did not follow notice-and-comment procedures in rescinding DACA, nor did it follow the SOP. Compl. ¶¶ 118-119, 121.

15. As detailed in the Complaint, the Government has revoked the prohibition on sharing DACA applicant data with immigration enforcement officials. This is evident from the number of instances in which deportation proceedings have been started against Dreamers, as well as (i) the April 27, 2017 DHS memorandum purporting to rescind all privacy commitments to Dreamers, (ii) the DHS guidance on the Rescission, and (iii) Acting Secretary Duke's public denial that there was any information sharing prohibition. Compl. ¶¶ 108-112.

16. Following September 5, the Government did not send notices to DACA recipients eligible to renew their DACA status advising them that their DACA renewal applications must be received by October 5, 2017. *See Batalla Vidal* Interrog. Resp. No. 9. (Ex. 2).

17. Of the approximately 154,200 individuals who were eligible to renew their DACA prior to the October 5, 2017 deadline, only approximately half (78,975) submitted renewals. The Government has been rejecting more than half of the renewal requests. *Batalla Vidal* Interrog. Resp. No. 7. (Ex. 2).

18. The Government has not been following the SOP or otherwise providing DACA recipients the opportunity to be heard concerning the termination of their DACA status, their work authorizations, or their advance parole requests. Compl. ¶¶ 97-106, 134-139.

19. Both before and following the September 5 decision, the President stated that he had the authority to reinstate DACA without congressional authorization. Compl. ¶¶ 123-124.

## LEGAL STANDARDS

The Government's summary of the relevant legal standards, Gov. Br. 12-14, omits certain important points governing the Court's review of the motion.

1. The Government's Rule 12(b)(1) motion is a partial one, in that its justiciability arguments do not address certain counts in the complaint (Counts I-III, VI & VII) and it does not contest the standing of the Individual Plaintiffs. The partial nature of the motion is fatal to the Government's 12(b)(1) arguments, as courts have held that the presentation of a single justiciable claim is sufficient to deny a Rule 12(b)(1) motion. *See, e.g.*, *Bostic v. Shaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 330 (1990) ("a case is justiciable if. . . plaintiffs have standing as to a particular defendant"); *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement"). Beyond these threshold issues, in deciding a Rule 12(b)(1) challenge, "the plaintiff is afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration," and thus the Court must accept the facts alleged in the complaint as true. *Beck v. McDonald*, 848 F.3d 262,

AR1197

Appeal: 18-1521   Doc: 29-2   Filed: 07/02/2018   Pg: 121 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 05/04/20   Page 121 of 175 PageID #: 7187
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 17 of 70

270 (4th Cir. 2017) (internal quotation marks omitted). In determining a Rule 12(b)(1) motion, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (relying on affidavits to find plaintiffs have standing). The Court must deny a Rule 12(b)(1) motion "if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Beck*, 848 F.3d at 270.

2. In deciding a Rule 12(b)(6) motion, a court must assess whether the Complaint contains sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* The Court's review is limited to "'well-pled facts in the complaint[, which it must view] in the light most favorable to the plaintiff.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

3. Citing the same grounds as its Rule 12(b)(6) motion, the Government has also moved for summary judgment under Rule 56. Gov. Br. 31 n.6. A court may convert a Rule 12(b)(6) motion into one for summary judgment only if the nonmoving party has had "a reasonable opportunity to present all the material that is pertinent to the motion." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). A nonmoving party may file a declaration under Rule 56(d) to demonstrate that a reasonable opportunity for discovery has not been afforded. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Plaintiffs are submitting a Rule 56(d) declaration with this opposition identifying the specific areas where facts essential to the opposition are not available. *See* Declaration of Elizabeth J. Bower ("Rule 56(d) Decl.").

AR1198

On the merits, a court may enter summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," and in conducting the review, the court must "construe the evidence in the light most favorable" to the non-moving party and "draw all reasonable inferences in [the non-moving party's] favor." *Hill v. Lockheed Martin*, 354 F.3d 277 (4th Cir. 2004) (en banc), *abrogated on other grounds by the Univ. of Tex. Sw Med. Ctr. V. Nassar,* 133 S. Ct. 2517 (2013).  Here, the Government has not supported the Motion with a Rule 56(c) statement of material facts as to which there is no dispute.  "[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).

## ARGUMENT

## I.   THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(1).

The Government's partial Rule 12(b)(1) motion is without merit.  This is evident because (i) the Government's arguments regarding justiciability do not apply to most of the claims in the Complaint (Counts I-III, VI and VII); (ii) the Government does not contest the standing of many of the Plaintiffs, and (iii) the District Court for Eastern District of New York decisively rejected these arguments in a parallel case involving a similar challenge to DACA.  *See Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116, at *8-13 (E.D.N.Y. Nov. 9, 2017).  Under well-established legal principles, the claims are justiciable and Plaintiffs have standing.

### A.   The Claims Asserted in the Complaint Are Justiciable

#### 1.   The Government's Justiciability Arguments Do Not Apply to the Non-APA

<u>Claims</u>

The Government spends the first ten pages of its argument contending that the DACA rescission is presumptively unreviewable under the APA and the INA.  Gov. Br. 15-21 (citing 5 U.S.C. § 702(a)(2)); *Id.* 21-24 (citing 8 U.S.C. § 1252(g)).  As discussed below, the Government is wrong.  In any event, this argument does not apply to Plaintiffs' non-APA claims.  "[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations."  *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981).  Moreover, "even if agency action is committed to its discretion by law, a court may still determine whether the action is constitutional . . . because the Due Process Clause provides a manageable standard that allows for review."  *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347 (4th Cir. 2001).[2] This review exists to ensure that agencies do not exercise discretion in an unconstitutional manner.

To the extent the Government argues that principles of prosecutorial discretion render the DACA rescission unreviewable, Gov. Br. 15-21, such an argument ignores the Supreme Court's clear statement that "a prosecutor's discretion is 'subject to constitutional constraints.'"  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)); *see also Wade v. United States*, 504 U.S. 181, 185-86 (1992) ("[A] prosecutor's discretion when exercising that power is subject to constitutional limitations that district courts can

---

[2] Even where a decision is committed to agency discretion, the Supreme Court has repeatedly declined to find that constitutional claims are presumptively unreviewable.  *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (rejecting the government's assertion that § 701(a)(2) precluded judicial review over individual's constitutional challenge despite the fact that action was a matter "committed to agency discretion by law" and emphasizing that "where Congress intends to preclude judicial review of constitutional claims its intent so must be clear" in order "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.") (citation omitted); *Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992) (holding constitutional claims justiciable even though the claims were not reviewable under the APA).

enforce. . . . Thus, a defendant would be entitled to relief if a prosecutor refused to file" a motion and "the refusal was based on an unconstitutional motive.").

To the extent the Government argues, that in enacting 8 U.S.C. § 1252(g), Congress stripped courts of the ability to hear constitutional challenges in the immigration context, Gov. Br. 21-24, courts have decisively rejected that argument. *See, e.g.*, *Texas v. United States*, 809 F.3d 134 at 155-64 (5th Cir. 2015) ("Congress has expressly limited or precluded judicial review of many immigration decisions . . . but DAPA is not one of them."), *aff'd by an equally divided court* No. 15-674, 136 S. Ct. 2271 (2016); *Batalla Vidal*, 2017 WL 5201116, at *12-13. There is no evidence—and the Government has not offered any—that Congress intended to abrogate review of the constitutional claims through Section 1252(g). *See INS v. St. Cyr.*, 533 U.S. 289, 300 n.12 (2001) (courts should "not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it"), *superseded by statute on other grounds*, 8 U.S.C. § 1252 (2005).

2.     The APA Claims Are Justiciable

With regard to the APA claims (Counts IV and V), courts have repeatedly rejected the Government's arguments. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also id.* § 701(a)(1). Courts apply a strong presumption supporting judicial review of agency decisions. *See Mach Mining, L.L.C. v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). This principle extends to the immigration context. *See, e.g.*, *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 483-84 (1991) ("[G]iven the absence of clear congressional language mandating preclusion of federal jurisdiction . . . the District Court had jurisdiction to hear respondents' constitutional and statutory challenges to INS procedures.").

Although Congress may overcome the presumption by committing agency action "to agency discretion by law" or by enacting an express jurisdiction-stripping provision, neither of those exceptions is applicable here. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162 (4th Cir. 2009); 5 U.S.C. §§ 701(a)(1)-(2).

a. *The DACA rescission is not an action which was committed to agency discretion by law*. *Batalla Vidal* 2017 WL 5201116, at *9-12. Courts have interpreted the agency discretion exception "extremely narrowly, applying it only 'in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Quinteros-Mendoza*, 556 F.3d at 162 (citing *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Here there is clear procedural and substantive law, as well as a "meaningful standard," against which to judge the agency's decision to rescind DACA.

For Plaintiffs' APA claims, the relevant procedural law for this Court to apply comes from the APA. This Court can and should evaluate whether the rescission of DACA complies with the procedural requirements of the APA. *See* 5 U.S.C. §§ 553, 604. Regardless of whether the substance of an agency action is reviewable, the agency's process in making that decision must still be reviewed for compliance with procedural requirements (e.g., for notice and comment and reasoned explanation of departure from prior policy). As the Supreme Court explained in *Lincoln v. Vigil*, whether the agency "was required to abide by the familiar notice and comment provisions of the APA" is a question "quite apart from the matter of substantive reviewability." 508 U.S. at 195-98; *see also Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) ("under the APA the ultimate availability of substantive judicial review is distinct from the question of whether the basic rulemaking strictures of notice and comment and reasoned explanation apply.") (emphasis removed).

**AR1202**

The Government's position is also contradicted by the relevant substantive law that the Government cited as the basis for the rescission.  In claiming that the termination was grounded on DACA's alleged illegality, the Government cited judicially manageable standards by which a court can evaluate Plaintiffs' APA claims:  Attorney General Sessions explicitly stated that his recommendation to rescind DACA was mandated by his determination that the program was unlawful.  AR 251.  As the *Batalla Vidal* court recently found, the Government "did not believe that they were exercising discretion when rescinding the program" and thus "their reasons for doing so are within the competence of this court to review." *Batalla Vidal*, 2017 WL 5201116, at *11.  The inclusion of legal analysis (albeit limited) in the Administrative Record—reflected in Defendants' submission of the Office of Legal Counsel's DAPA opinion and the court decisions in *Texas v. United States* (AR 4-36, 42-228)—confirms that the decision to rescind DACA is squarely within the competence of this Court to review.  Reviewing an agency decision predicated on a legal conclusion clearly is within the purview of this Court.

In response, the Government makes three arguments, none of which is availing.  First, the Government avers that the Acting Secretary engaged in discretion in purportedly balancing "costs and benefits" of maintaining or rescinding the programs.  Gov. Br. 18.  The Government cites *nothing* in the Administrative Record analyzing such costs and benefits, and evidence of "balancing" is entirely missing from the Administrative Record. *See Albino v. United States*, 78 F. Supp. 3d 148, 163 (D.D.C. 2015) ("[T]he Court's review is limited to the administrative record.")  In any event, any such analysis is predicated on assuming a "substantive legal" conclusion about DACA, which makes the decision "reviewable."  Gov. Br. 18.

Defendants fail in their effort to rely on *I.C.C. v. Brotherhood Of Locomotive Engineers*, 482 U.S. 270, 283 (1987) *("BLE")*, which rejected the proposition that in "giv[ing] a reviewable

reason for otherwise unreviewable action, the action becomes reviewable." *BLE* does not, as Defendants suggest, flip the burden on judicial review. Its reasoning applies only when a court is *already* satisfied that one of the two narrow exceptions in 5 U.S.C. § 701(a) applies, and that the challenged decision is unambiguously discretionary and unreviewable. *See id.* at 283. In deciding in the first instance whether a matter is committed to agency discretion by law, or whether there is instead relevant law to apply, *BLE* does not require this Court to disregard the agency's asserted basis for its decision.

Second, the Government argues that the rescission of DACA is an unreviewable exercise of enforcement discretion entrusted to DHS. Gov. Br. 15-21. The Government, however, identifies no case holding that implementation of a broad agency enforcement policy is an exercise of enforcement discretion immune from judicial review. On the contrary, courts have consistently concluded such broad policies are reviewable. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, No. 17-0361, 2017 WL 4674314, at *13 (D. Md. Oct. 17, 2017) ("*IRAP*") (attached as Ex. 7) (subjecting to judicial review Presidential Proclamation indefinitely barring entry of nationals from six countries); *Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996) (agency's adoption of policy setting forth change in enforcement criteria was reviewable). Instead, Defendants rely primarily on cases like *Heckler v. Chaney*, 470 U.S. 821 (1985), challenging decisions to take or refrain from taking specific enforcement actions against particular individuals.[3] As the *Batalla Vidal*, *Texas*, and *IRAP* courts noted, those cases are inapposite for two reasons: first, they involve highly individualized decisions, and second, many of them involve agency *inaction*, rather than

---

[3] Although Defendants cite *Mada-Luna v. Fitzpatrick*, that case undermines Defendants' own contention because although the court stated in dicta that the denial of the individual's request was not reviewable, the court considered the APA challenge to the deferred action operation instructions on the merits. 813 F.2d 1006 (9th Cir. 1987).

AR1204

Appeal: 18-1521   Doc: 47-5   Filed: 07/02/2018   Pg: 409 of 589
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 128 of 175 PageID #: 7194
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 24 of 70

the affirmative decision to rescind a program. *See Batalla Vidal*, 2017 WL 5201116, at *11 (recognizing that rescinding DACA is an "affirmative decision to constrain DHS's prosecutorial discretion [which] cannot be analogized to an exercise of prosecutorial discretion"); *Texas*, 809 F.3d at 165-68 ("Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens," and that the Government failed to rebut "the strong presumption of reviewability with clear and convincing evidence that, *inter alia*, it is making case-by-case decisions here"); *IRAP*, 2017 WL 4674314, at *17 (finding jurisdiction to review claims "asserting statutory and constitutional claims challenging a broader policy as opposed to individual . . . determinations").[4]

*Chaney,* and cases following it, are based on the recognition that courts are not well placed to second-guess an agency's "balancing of . . . factors which are particularly within its expertise" as to an individual enforcement matter. *Chaney*, 470 U.S. at 831. The DACA rescission is the opposite of the decisions that *Chaney* found unreviewable.[5] It is a broad policy that changes the immigration status of approximately 800,000 individuals and *prevents* the Government from engaging in the type of individualized exercise of prosecutorial discretion that might be unreviewable under *Chaney*. The DACA Rescission Memo:

- *requires* Defendants to stop accepting DACA applications;

---

[4] Defendants' reliance on *Arpaio v. Obama* for the proposition that a grant of deferred action is "discretionary and reversible" is misplaced. 797 F.3d 11, 17 (D.C. Cir. 2015). In reviewing DAPA, *Texas v. United States* recognized that "[r]evocability . . . is not the touchstone for whether agency action is reviewable. Likewise, to be reviewable agency action, DAPA need not confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" 809 F.3d at 167 (quoting *Chaney*, 470 U.S. at 832). Moreover, the court dismissed Sheriff Arpaio's claims on standing grounds since he possessed a "non-justiciable generalized grievance." *Arpaio*, 797 F.3d at 18.

[5] *Cf. e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017) ("The present case, by contrast, is not about the application of a . . . policy to the particular facts presented in an individual visa application. Rather, the States are challenging the President's *promulgation* of sweeping immigration policy.").

AR1205

- *requires* Defendants to only issue renewals for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018, *only if* they apply for renewal by October 5, 2017;
- *requires* Defendants to reject renewals for recipients whose permits expire after March 5, 2018; and
- *requires* Defendants to reject new or pending applications for advance parole for DACA recipients.

AR 255. The DACA Rescission Memo removes discretion from the process. The Government has instructed its agents to abandon the exercise of discretion and judgment in individual cases— and mandated that there will be no further deferred action for this class of predominantly Latino individuals. In imposing a blanket policy that conclusively alters the status of 800,000 young people, the Government has not engaged in any "balancing" of individualized factors.[6]

In addition, *Chaney* relied on the fact that plaintiffs in that case were attempting to obtain judicial review of an agency decision *not* to act, which the Supreme Court carefully distinguished from when an agency does act. 470 U.S. at 832 ("when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights . . . when an agency *does* act to enforce, that action itself provides a focus for judicial review") (emphasis in original). The court in *Robbins v. Reagan*, which concerned an APA challenge of a government decision to rescind its commitment to renovate a homeless shelter, emphasized the importance of this distinction:

> Decisions not to take enforcement action generally do not involve exercise of coercive power over individual's liberty or property rights, and thus do not infringe upon areas that courts are called upon

---

[6] *Sierra Club v. Larson*, cited by Defendants, clarifies that "the relevant question here is whether the [statute] provides standards for ascertaining when the [agency] should recommend formal enforcement proceedings be commenced or when the secretary is *required* to make a determination of compliance or non-compliance or to initiate an enforcement action. As to these points, the statute is silent. Therefore, there is no law to apply and appellant has failed to overcome the presumption of unreviewability." 882 F.2d 128, 132 (4th Cir. 1989). Conversely, DACA is a broad policy, not an enforcement action, and the APA properly provides numerous standards against which to assess the policy.

14

**AR1206**

> to protect. By contrast, rescissions of commitments, whether or not
> they technically implicate liberty and property interests as defined
> under the fifth and fourteenth amendments, exert much more direct
> influence on the individuals or entities to whom the repudiated
> commitments were made.

780 F.2d 37, 47 (D.C. Cir. 1985) (citations omitted). As the court in Robbins concluded,

"[r]escissions of prior obligations clearly fall into the 'focused action' category," giving courts a

"specific affirmative action to be reviewed." Id. Here, Plaintiffs seek judicial review of an

affirmative agency action rescinding protected interests that have been granted to Dreamers,

providing a clear focus for judicial review.[7]

Third, the Government asserts that its arguments about enforcement discretion must be

read with "particular force" in the immigration context. Gov. Br. 16-17. This is wrong. The

Supreme Court has noted that the "strong presumption in favor of judicial review of administration

action" applies even in immigration cases. St. Cyr, 533 U.S. at 298 (holding that AEDPA and the

IIRIRA did not deprive court of jurisdiction to review an alien's habeas petition); McNary, 498

U.S. at 483-84 (finding jurisdiction to hear constitutional and statutory challenges to INS

procedures); Zadvydas v. Davis, 533 U.S. 678, 696 (2011) (rejecting the government's invocation

of a "foreign policy" rationale to preclude judicial review of a detained noncitizen's removal

proceeding).

In response, the Government cites Reno v. American-Arab Anti-Discrimination Committee,

525 U.S. 471(1999) ("AADC") to argue that review is inappropriate because it could "delay" the

removal of aliens from the United States. Gov. Br. 19. The court in AADC based its decision on

---

[7] Defendants' reliance on Perales v. Casillas is unavailing because it relies on plaintiffs seeking
status that they do not already have. 903 F.2d 1043 (5th Cir. 1990) (finding decision of whether
to affirmatively grant voluntary departure and work authorization was committed to agency
discretion by law). This does not, however, cover the present situation where Defendants seek to
remove rights and interests that it has already granted.

AR1207

Appeal: 18-1521    Case 1:18-cv-04753-NGG-VMS    Document 29-6    Filed 07/02/2018    Filed 05/04/20    Page 131 of 175 PageID #:
7197
Case 8:17-cv-02942-RWT    Document 29    Filed 11/28/17    Page 27 of 70

8 U.S.C. § 1252(g), which precludes *individuals* in removal proceedings from seeking judicial review unless there is evidence of "outrageous . . . discrimination." *AADC*, 525 U.S. at 491. Review of a policy determination to eliminate discretion in awarding deferred action for an entire class of predominantly Latino immigrants will not delay or otherwise have any effect on individual removal proceedings. This litigation is proceeding prior to the March 5, 2018 DACA expiration, and Plaintiffs are not challenging any active individual removal proceedings.

b. *Congress has not enacted any statute that strips jurisdiction from this Court*. To the extent the Government argues that 8 U.S.C. § 1252(g) precludes review, Gov. Br. 21-24, that (i) has been rejected by the Courts, and (ii) is demonstrably incorrect. *See, e.g.*, *Batalla Vidal.*, 2017 WL 5201116, at *12-13.

This case raises none of the concerns Section 1252(g) is intended to address: Plaintiffs are challenging the class-wide, policy decision to terminate DACA. Plaintiffs are not attempting to obstruct or collaterally attack any ongoing removal proceedings. The plain text of Section 1252(g) limits judicial review of actions "by or on behalf of *any alien* arising from" certain deportation proceedings in three specifically enumerated circumstances: cases "arising from the decision or action by the Attorney General to *commence* proceedings, *adjudicate* cases, or *execute* removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added).[8] The Supreme Court has explained that § 1252(g) is not "a sort of 'zipper' clause that says 'no judicial

---

[8] In contrast to this case, the cases cited by the Government at pages 22-23 of its brief both involve challenges by individual aliens to removal proceedings in which the petitioner sought deferred action as a means to prevent their removal. *See Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) (collateral attack on government's failure to grant deferred action by individual contesting removal proceedings); *Botezatu v. INS*, 195 F.3d 311, 311-12, 314 (7th Cir. 1999) (challenge to government's decision not to grant deferred action after a removal order was already issued).

**AR1208**

Appeal: 18-1521    Doc: 28-1    Filed: 07/02/2018    Pg: 466 of 589
Case 1:16-cv-04756-NGG-VMS    Document 319-6    Filed 09/04/20    Page 132 of 175 PageID #: 7198
Case 8:17-cv-02942-RWT    Document 29    Filed 11/28/17    Page 28 of 70

review in deportation cases unless this section provides judicial review.'" *AADC,* 525 U.S. at 482.

As Justice Scalia stated in his majority opinion:

> [Section 1252(g)] applies only to three discrete actions that the Attorney General may take[]. . . . There are of course many other decisions that may be part of the deportation process – such as the decision to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order. It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.

*Id.* In light of this, it is not surprising that Defendants' argument has repeatedly been rejected by other courts considering large-scale grants of deferred action status. For example, the Fifth Circuit held that Section 1252(g) did not preclude judicial review of DAPA, noting that such an expansive reading of Section 1252(g) would render numerous other jurisdiction-stripping provisions of the INA "superfluous." *See Texas*, 809 F.3d at 756-63.[9] Similarly, the Eastern District of New York ruled that § 1252(g) did not preclude the court from considering Defendants' termination of the DACA program because the rescission of DACA was not "[a] decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien." *See Batalla Vidal*, 2017 WL 520116, at *12 (quoting 8 U.S.C. § 1252(g)). As the Eastern District held, the decision to rescind DACA does not fall within the specifically delineated scope of § 1252(g).[10]

### B.    Plaintiffs Have Standing

---

[9] There are a number of other specific jurisdiction stripping provisions in the INA. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); *Id.* § 1226a(b)(1) (limiting judicial review of detention of terrorist aliens); *Id.* § 1229c(e) (barring judicial review of regulations limiting eligibility for voluntary departure).

[10] Even if § 1252(g) precluded the Individual Plaintiffs' claims – which it does not – the Organizational Plaintiffs could still bring their claims because §1252(g) applies only to suits "*by or on behalf of any alien*." 8 U.S.C. § 1252(g) (emphasis added). The Organizational Plaintiffs are clearly not aliens and are pursuing these claims in their own right. *See infra* Section I.B.2.

**AR1209**

Appeal: 18-1521

The Court must consider standing with respect to each separate claim asserted in the Complaint, not with regard to each plaintiff. *Bostic*, 760 F.3d at 371. "[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. at 53 n.2 (no further inquiry necessary where one plaintiff had standing to pursue all claims); *Bostic*, 760 F.3d at 370-71.

### 1. The Individual Plaintiffs Indisputably Have Standing

The Government has not contested that the Individual Plaintiffs have standing with respect to each claim. Gov. Br. 25-29. On this basis alone, the Court should deny the Government's standing challenges.

In any event, the Individual Plaintiffs easily meet the standard to establish standing. The Government acknowledges the Individual Plaintiffs include current and former DACA recipients. Compl. ¶¶ 38-55; Gov. Br. 2. Their claims arise out of the Government's decision to rescind the DACA Program (Counts I, III, IV, V & VII) and the revocation of the prohibition on sharing DACA applicant information with enforcement authorities (Counts II, III, IV, V & VI). The Individual Plaintiffs have suffered injury-in-fact because, among other reasons:

- "If the DACA program ends, the [Individual Plaintiffs] almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action." *Batalla Vidal*, 2017 WL 5201116, at *15. "Loss of the[] ability to work in the United States is clearly an 'injury in fact.'" *Id.; see also McNary*, 498 U.S. at 491 ("the impact of a denial on the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the application process").

- The Rescission Memorandum impaired the ability of the Individual Plaintiffs' to travel abroad by terminating the advance parole option for DACA recipients. Compl. ¶ 18. Loss of the freedom to travel is an injury in fact. *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (right to travel is a liberty that cannot be taken without due process of law).

- The loss of their deferred action status would make the Individual Plaintiffs subject to removal from the country and their risk of deportation is significantly heightened

**AR1210**

Appeal: 18-1521   Doc: 47-2   Filed: 07/02/2018   Pg: 409 of 520
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 134 of 175 PageID #: 7200
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 30 of 70

by the rescission of the information nondisclosure policy. *Batalla Vidal*, 2017 WL 5201116, at *16.

- The Rescission Memorandum will soon deprive the Individual Plaintiffs of vital benefits such as driver's licenses, bank accounts, financial aid, home ownership, and disability and health benefits.  Compl. ¶¶ 101-03, 105-06.

Defendants do not contest these injuries, all of which are directly traceable to the Defendants' decision to rescind DACA and revoke the information sharing prohibition.  Compl. ¶¶ 97-128. The entry of an order declaring these actions to be illegal or enjoining them would restore the status quo.  *Id*.

2.      The Organizational Plaintiffs Have Standing

The Organizational Plaintiffs have standing both directly and in a representational capacity. With regard to the claims brought on their own behalf, an organization has standing to bring a claim where a defendant's actions have "perceptibly impaired" an organizational plaintiff's ability to carry out its established mission by creating a "drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 725 (D. Md. 2011) (expenditure and diversion of resources to investigate agency's action sufficient to show standing).   The Complaint alleges how Organizational Plaintiffs have been directly injured by the DACA rescission.  Compl. ¶¶ 29-37. For example, Plaintiffs allege that CASA had to "suspend[] the majority of [its] work to assist DACA renewal applicants" and "reprioritized [its] work to engage with the community and educate them about the rescission of DACA."  Compl. ¶ 29.  The Complaint further alleges that the DACA rescission has "impaired CASA's mission, as DACA members and their families who live in our communities face an uncertain future that may include loss of employment and potential

AR1211

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 135 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 135 of 175 PageID #: 7201
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 31 of 70

permanent separation from their families." Compl. ¶ 29. In opposition to the Motion, Plaintiffs are submitting declarations[11] that establish:

- The Organizational Plaintiffs are devoted to improving the lives of individuals in immigrant communities and have had to devote significant resources in response to the rescission of DACA, to the detriment of their other programs. (CASA Decl. ¶¶ 4-5, 8-12 ; OneAmerica Decl. ¶¶ 2-6, 15, 16, 18; Junta Decl. ¶¶ 2-5, 9, 13.)

- The Organizational Plaintiffs have provided services to assist individuals relating to their DACA status, which services are ongoing following the Rescission, and these services have been overwhelmed since the rescission of DACA. (CASA Decl. ¶¶ 8-12; OneAmerica Decl. ¶ 15; Junta Decl. ¶¶ 9-14.)

- The Organizational Plaintiffs lack the capacity to respond to this need and also maintain their other programs. (CASA Decl. ¶¶ 8-12; OneAmerica Decl. ¶¶ 15-16; Junta Decl. ¶ 9-14, 16-18.) For example, CASA was forced to suspend most of its programming (CASA Decl. ¶ ¶ 8-12); OneAmerica had to stay its environmental justice advocacy programming (OneAmerica Decl. ¶ 16); and Junta was forced to abandon its legal permanent resident campaign (Junta Decl. ¶ 9).

In sum, the Organizational Plaintiffs' programming has been "perceptibly impaired," indeed much of their vital programming has been halted altogether. Thus, the Organizational Plaintiffs have sufficiently alleged injury to their own activities to allow them to pursue declaratory and injunctive relief under the *Havens* line of cases.

In response, the Government ignores this factual proffer and argues the Organizational Plaintiffs suffer nothing other than "generalized grievances" which should be "rejected out of hand." Gov. Br. 25-27. This contention both ignores Plaintiffs' allegations and factual proffer and misstates the law. *See, e.g.*, *IRAP*, 2017 WL 4674314, at *13 (standing where defendants' actions

---

[11] On a motion to dismiss for lack of standing, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *White Tail Park, Inc.*, 413 F.3d at 459 (relying on affidavits to find organization had standing).

AR1212

"imped[ed organizational plaintiffs'] efforts to accomplish their missions by disrupting their ability to raise money, train staff, and convene programs").[12]

The Government also contends that one of the Organizational Plaintiffs (CASA) cannot establish injury because they purportedly have no "ongoing injury," Gov. Br. 27, but this misconstrues the evidence of ongoing injury to the Organizations. The Government's argument ignores that the rescission of the DACA program will be implemented between the present and March 5, 2020 (when deferred action will end for the last recipient), and that all DACA recipients, as they face the loss of their right to work and risk of deportation will need to assess whether they have other bases to remain in the United States and will need to be counseled on difficult questions, including whether to keep their family together. (CASA Decl. ¶ ¶ 13-17; OneAmerica Decl. ¶¶ 10-12, 15; Junta Decl. ¶ ¶ 7-10). CASA and the other Organizational Plaintiffs have and will continue to need to dedicate tremendous resources to this effort. Moreover, the Government's contention ignores that several of the Organizational Plaintiffs employ DACA recipients in critical roles and their missions will be impacted by their inability to legally employ these valued employees once their DACA expires, and to have to expend resources to recruit, hire, and train replacements. See Compl. ¶ 53; CASA Decl. ¶ 15; OneAmerica Decl. ¶ 17; Junta Decl. ¶ 16.

In addition to the claims they bring on their own behalf, several of the Organizational Plaintiffs bring claims on behalf of their members, who include DACA recipients. To invoke associational standing on behalf of its members, an organization must establish that (1) "its

---

[12] Defendants cases are inapposite. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) (dismissed for mootness; in dicta, association offered no evidence of injury); *Nat'l Taxpayers Union, Inc. v. United States.*, 68 F.3d 1428, 1433-34 (D.C. Cir. 1995) (no injury because mere "frustrated" objectives and speculation as to potential impact on fundraising); *Am. Legal Found. v. FCC.*, 808 F.2d 84, 92 (D.C. Cir. 1987) (no injury where nonprofit had an "'institutional interest' in 'seeing to it that [an agency's] policies are enforced'").

AR1213

Appeal: 18-1521  Doc: 28-1  Filed: 07/02/2018  Pg: 137 of 175  Filed: 09/04/20  Page 137 of 175 PageID #:
7203
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 33 of 70

members would otherwise have standing to sue in their own right;" (2) "the interest [the organization] seeks to protect are germane to [its] purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants do not contest that the Organizational Plaintiffs meet the second and third prongs. Gov. Br. 28-29[13]

Rather, the Government contends that the Organizational Plaintiffs lack associational standing because they fail to identify "a specific member with standing for each claim it asserts." Gov. Br. 28. This is a makeweight argument and demonstrably incorrect. The Complaint identifies Jose Aguilar, who is a CASA member and who risks losing his DACA status and work authorization when it expires in March 2019. Compl. ¶ 53. Furthermore, many of the Individual Plaintiffs are CASA members. CASA Decl. ¶ ¶ 13-17. And the record references specific members of CASA, OneAmerica, and Junta who have standing to challenge the DACA rescission and the revocation of the information-sharing prohibition in their own right. CASA Decl. ¶ ¶ 13-17; OneAmerica Decl. ¶¶ 11-12; Junta Decl. ¶¶ 7-8.)[14] Moreover, the Organizational Plaintiffs allege that they assisted on tens of thousands of DACA initial and renewal applications (Compl. ¶¶ 29, 30, 31, 35, 36, 37), engage in community education relating to DACA (Compl. ¶¶ 29, 32, 36), and advocate for a legislative solution for Dreamers (Compl. ¶¶ 33, 34, 37). There can be no

---

[13] Nor could they. The Organizational Plaintiffs are all dedicated to the advancement of immigrants' rights and the empowerment of immigrant communities (*see* Compl. ¶¶ 29-37), making the rescission of DACA clearly germane to their purpose. And there is no reason the Organizational Plaintiffs, as representatives for their members and constituents, cannot effectively prosecute the statutory, constitutional, or common law claims that seek to vacate the unlawful Rescission Memorandum and related agency actions, and enjoin the Defendants from violating the law or disclosing DACA-applicants' personal information to immigration enforcement officials. *See IRAP*, 2017 WL 4674314, at *14 (recognizing that statutory and constitutional challenges to a law could be effectively litigated by representative organizations).

[14] *See IRAP*, 2017 WL 4674314, at *14 (finding declarations describing an individual and another providing only a first name to be sufficient).

AR1214

serious doubt that the Organizational Plaintiffs have members, on whose behalf they provide these services and advocacy efforts, who have been injured by Defendants' actions. Thus, the Organizational Plaintiffs also have representational standing to pursue these claims.

The Organizations also have standing to bring an action under the APA. The APA confers a cause of action on persons "adversely affected or aggrieved by agency action." 5 U.S.C. § 702; *see also Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986); *IRAP*, 2017 WL 4674314, at *17. A plaintiff is "aggrieved by agency action" where the interest at issue "*arguably*" falls "within the zone of interests" sought to be protected. *Abourezk*, 785 F.2d at 1050 (emphasis added). "[I]n the APA context," the zone of interests test required to bring a claim is "not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1389 (2014).[15] Under this "lenient approach," "the benefit of any doubt goes to the plaintiff," and suit is "'foreclose[d] . . . only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.*

In contending that the Organizational Plaintiffs "lack a cause of action under the APA," Gov. Br. 29, the Government again mischaracterizes the Organizational Plaintiffs' claims. The Organizational Plaintiffs are all dedicated to immigrants and immigrant communities. Compl. ¶¶ 29-37. As discussed *supra*, the Organizations collectively assisted with tens of thousands of DACA initial and renewal applications, employ DACA recipients, advocate on behalf of Dreamers, provide community outreach, education, and support services to undocumented

---

[15] *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388 (1987) is not in conflict. It recites the same lenient test as *Lexmark*, *id*. at 400, and held that a trade association representing securities brokers, dealers, and underwriters was within the zone of interest to challenge a decision of the Comptroller of the Currency to grant national banks permission to open competing discount securities brokerage offices. *Id.* at 403.

AR1215

Appeal: 18-1521   Doc: 47-6   Filed: 07/02/2018   Pg: 509 of 589
Case 1:16-cv-04756-NGG-VMS   Document 39-6   Filed 09/04/20   Page 139 of 175 PageID #: 7205
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 35 of 70

childhood immigrants, and provide ongoing support and counseling to DACA recipients who face injury because of the rescission.  The Organizations have alleged and described the drain on resources caused by the rescission of DACA, as well as the impact the rescission has and will have on their employees, volunteers, members, and programming.  CASA alone "counts 2,300 DACA beneficiaries as members."  Compl. ¶ 29; CASA Decl. ¶ 12.  These interests of these organizations plainly fall within those directly protected by the INA—far exceeding the standard that they "arguably" fall within the INA's zone of interests–allowing them a cause of action under the APA. Under similar circumstances, courts have not hesitated to find that organizational plaintiffs are within the zone of interests protected by the INA and have a cause of action under the APA.  *See, e.g.*, *Abourezk*, 785 F.2d at 1050 (finding standing for an organization that invites foreign nationals to speak at rallies); *IRAP*, 2017 WL 4674314, at *13 (finding standing for organizations that employ or collaborate with foreign nationals affected by President Trump's travel ban).[16]

## II.    THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6)

### A.    The Complaint Alleges Multiple Violations of the Administrative Procedures Act

#### 1.    Plaintiffs Have Stated a Claim Under the APA

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Friends of Back*

---

[16] Defendants' reliance on *Fed'n of Am. Immig. Reform, Inc. v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996), ("*F.A.I.R.*") is misplaced.  *F.A.I.R.* held that claims asserted by an anti-immigration reform group were not within the zone of interests of the INA because the purported harms—generic, negative effects on employment opportunities, and public services and facilities, on existing members of communities where immigrants may settle—are mere "incidental effects" of the challenged immigration policy.  By contrast, the Organizational Plaintiffs seek redress for specific harms to the people directly affected by the agency's behavior, the DACA candidates and recipients.

AR1216

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 140 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 140 of 175 PageID #: 7206
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 36 of 70

*Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586-87 (4th Cir. 2012), (quoting 5 U.S.C. § 706(2)(A)).  Count IV of the Complaint alleges that Defendants violated the APA because their rescission of DACA and revocation of the prohibition on sharing DACA applicants' personal information with enforcement authorities are arbitrary and capricious, contrary to prior determinations of DHS, and unsupported by a reasoned analysis.  In support of this claim, the Complaint contains detailed factual allegations concerning the establishment of DACA and the Government's commitment not to share applicant information with enforcement authorities.  Compl. ¶¶ 4-6, 9-16, 67-70, 79-91.  The Complaint also states detailed facts regarding the Government's efforts to induce Plaintiffs and other Dreamers to rely on these commitments, Compl. ¶¶ 9-17, 71-91, and the irregularities in the revocation of these programs and related commitments.  Compl. ¶¶ 18, 21-25, 92-128, 162-166.  For a host of reasons, Count IV pleads a violation of the APA.

a. *The rescission of DACA is not supported by the Administrative Record*.  As an initial matter, the Administrative Record (ECF No.26)—which consists of fourteen documents comprising a total of 256 pages, all of which are publicly available, and 192 of which relate to a wholly separate immigration policy[17]—is woefully incomplete.

It bears emphasis that two other courts considering the Government's decision to rescind DACA have concluded that this Administrative Record is incomplete.  As the Ninth Circuit recently found, "[t]he notion that the head of a United States agency would decide to terminate a program giving legal protection to roughly 800,000 people based on 256 pages of publicly

---

[17] Those 192 pages are the Supreme Court, Fifth Circuit, and district court opinions in a suit challenging a distinct deferred action policy, Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA.  *United States v. Texas*, 136 S. Ct. 2271 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

**J.A. 496**

**AR1217**

Appeal: 18-1521 Doc: 47-6 Filed: 07/02/2018 Pg: 141 of 175
Case 1:16-cv-04756-NGG-VMS Document 319-6 Filed 05/04/20 Page 141 of 175 PageID #: 7207
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 37 of 70

available documents is not credible." *In re United States*, No. 17-72917, 2017 WL 5505730, at *2 (9th Cir. Nov. 16, 2017) (citations omitted) (denying mandamus). Similarly, the Eastern District of New York held that "plaintiffs . . . have adequately established that the administrative record produced to date is manifestly incomplete." *Batalla Vidal v. Duke*, No. 1:16-cv-04756-NGG-JO, Mem. & Order at 3, Dkt. No. 89 (E.D.N.Y. Oct. 19, 2017) (Ex. 8).

The insufficiency of the Administrative Record is clear from the face of the Government's certification, which states the submitted documents are "a complete copy of the non-privileged documents that were actually considered by Elaine C. Duke . . . in connection with her September 5, 2017 decision to rescind" DACA. That "complete" set of documents is far from the complete record in this case: "[A] complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision." *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, No. 16-1015, 2017 WL 3189446, at *13 (D. Md. July 27, 2017) (citation and quotation omitted). The Administrative Record must include "all documents and materials directly or indirectly considered by the agency. . . . The agency may not . . . skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question" nor may an agency "exclude . . . unfavorable information . . . on the ground that it did not 'rely' on that information in its final decision." *Id.* at *8 (collecting cases).[18] The Record is woefully

---

[18] For this very reason, guidance promulgated by the Department of Justice requires that agencies compiling an administrative record must "include all documents and materials prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, even though the final decision-maker did not actually review or know about the documents or materials" and should include "communications to the agency received from other agencies…[and] documents and materials that support or oppose the challenged agency decision." U.S. DEP'T OF JUST., ENV'T AND NAT. RES. DIV., GUIDANCE TO FEDERAL AGENCIES ON COMPILING THE ADMINISTRATIVE RECORD 3-4 (Jan. 1999).

AR1218

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 609 of 520
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 142 of 175 PageID #: 7208
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 38 of 70

inadequate. [19] *See generally* Rule 56(d) Decl. ¶ 9(a)&(b).  For this reason alone, the Motion must

be denied.  *See, e.g., Greene v. Carson*, 256 F. Supp. 2d 411, 431-32 (S.D.N.Y. 2017) (where

administrative record is patently deficient, the government's Rule 12 and 56 motions must be

denied).

In any event, the proffered explanation is implausible and not supported by the Record

submitted.  Under the APA, an action is arbitrary and capricious if the agency "offered an

---

[19] By way of example only, the Record contains no documents:

- from Acting Secretary Duke's subordinates, despite sworn deposition testimony that at least fifteen DHS employees were involved in the decision to terminate DACA, and that Acting Secretary Duke based her decision in part on the work and recommendation of those employees.  Hamilton Dep. at 95; *see In re United States*, 2017 WL 5505730, at *3 ("it strains credulity to suggest that the Acting Secretary decided to terminate DACA without consulting one advisor or subordinate within DHS") (internal quotation omitted); *Otsuka Pharm. Co. v. Burwell*, No. 15-852, 2015 WL 1579127, at *2 (D. Md. Apr. 8, 2015) ("[i]f the agency decision maker based his decision on the work and recommendations of subordinates, those materials should be included as well") (citing *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (collecting cases));

- from the Department of Justice or the White House other than a one-page letter from Attorney General Sessions and a 2014 Office of Legal Counsel opinion concluding that DACA was legal.  The idea that no additional records exist defies credulity, given:  (1) sworn deposition testimony that the White House Chief of Staff, two Deputy Chiefs of Staff, four Presidential advisors, the Attorney General, and three other DOJ representatives participated in the decision to terminate DACA (Hamilton Dep. at 103); (2)  representations by the Government at a hearing that "the Attorney General and DHS both decided that this was an unlawful program" and "the Attorney General and DHS decided that . . . they're going to wind down this program," Sept. 14, 2017 Tr. *Battala Vidal*, 16-cv-4756 at 13, 26 (Ex. 9); (3) a press release from the President taking credit for the decision (Ex. 10)         ; and (4) a press conference at which the Attorney General claimed that DACA led to an increase in unaccompanied minors entering the United States and resulted in American citizens losing job opportunities, and that termination of the program would "strengthen[] the constitutional order and the rule of law in America" (Ex. 11); or

- explaining why Defendants are allowing a program it claims it is unconstitutional to remain in effect until March 2020, nor why DHS will continue to adjudicate applications filed by October 5, 2017.  Nor does it explain why President Trump tweeted, the same day Acting Secretary Duke issued the Rescission Policy, that if Congress could not "legalize DACA" within six months, he would "revisit this issue!" (Ex. 12) suggesting that the President believes the Executive Branch *does* have authority to continue the program.

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 143 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 143 of 175 PageID #: 7209
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 39 of 70

explanation for its decision that runs counter to the evidence before the agency" or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

The Government purportedly based the rescission of DACA on "the imminent risk of a nationwide injunction." Gov. Br. 31. Among other things, this explanation ignores that the Government previously averred—both internally and before other courts—that DACA was a lawful exercise of the Executive Branch's immigration enforcement authority. Specifically, in 2014, the Department of Justice Office of Legal Counsel concluded that DACA was a lawful exercise of the Executive Branch's "discretion to enforce the immigration laws." AR000004-36. More recently, the Government represented that programs such as DACA are "lawful exercise[s]" of the Executive Branch's "broad statutory authority" to administer and enforce the INA.[20] And the current Administration determined in February and June that DACA should be maintained. Decl. Exs. 3 & 4. Reasoned agency decision-making "ordinarily demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). As the Ninth Circuit found, "[t]he materials considered by Secretary Kelly in the course of deciding against ending DACA in February 2017 did not cease to be 'before the agency' for purposes of the administrative

---

[20] Brief for Petitioners at 42, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758 at *42.

AR1220

record during that seven-month evolution in policy." *In re United States*, 2017 WL 5505730, at *4 (*quoting Thompson v. Dep't of Labor*, 885 F.2d 551, 556-56 (9th Cir. 1989)). Nonetheless, Defendants have not provided any explanation, let alone a reasoned analysis, for this change in position.

There was nothing imminent about risk to DACA: No litigation ever sought to enjoin DACA, no litigant has successfully challenged DACA, no litigant has filed a brief demonstrating imminent harm from DACA, and no Court ever enjoined DACA. The Fifth Circuit's ruling in *Texas*, upon which Defendants almost exclusively rely for this assertion of "imminent risk," involved no such challenge. Contrary to Defendants' erroneous suggestion that the Fifth Circuit found DACA "invalid[] . . . as it was actually implemented in practice," Gov. Br. 36, the Fifth Circuit never ruled on the validity of DACA—nor has any other court. Rather the Fifth Circuit decision in the *Texas* litigation concerned the "Deferred Action for Parents of Americans," or "DAPA," an entirely different immigration program.

Indeed the Administrative Record confirms "the original DACA policy was not challenged in the [Texas] lawsuit." AR00000253. Additionally, as Defendants concede, DAPA "was *enjoined before its implementation*," Gov. Br. 35 (emphasis added), meaning the equities at issue in challenging DAPA are very different than those presented for DACA. DACA has been in place for five years and has extended protected interests to more than 800,000 individuals; DAPA was never implemented and protected no one. In light of these critical factual differences (discussed nowhere in the Administrative Record or the Government's brief), it is entirely speculative for the Government to conclude that the Court would enjoin DACA.[21]

---

[21] Press Release, Dep't of Homeland Security, *Statement from Acting Secretary Duke on the Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xncuM.

AR1221

By hailing the Fifth Circuit's DAPA decision, the Government is hoisted by its own petard. The Fifth Circuit explicitly concluded that DAPA was both justiciable and a substantive rule that should have gone through notice-and-comment. *Texas,* 809 F.3d at 146-48. It is implausible that the Government grounded its decision to rescind DACA on the alleged "litigation risk" created by the Fifth Circuit opinion if, as the Government now claims, its justiciability and notice-and-comment holdings were wrong.

The Government also avers (even more speculatively) that rescission of DACA would be more "orderly," and "less disruptive," or result in less "litigation risk" than defending another suit seeking an injunction. Gov. Br. 2, 10, 20, 30, 33. These assumptions are belied by the confusion, fear and disruption experienced by the more than 800,000 DACA recipients and their families as a result of Defendants' actions; indeed, the "orderly" termination of DACA—which involved renewal and application deadlines with no rationale—were so poorly executed that USCIS was forced to revise its procedures for the acceptance of renewal applications between the filing of the Complaint and the deadline for this response brief.[22] The presumed reduced "litigation risk" is belied by the ten lawsuits filed across the country by individuals, states, universities, cities, counties, civil rights groups, non-profit organizations, major corporations, and others. "[A]t, most, the Department deliberately traded one lawsuit for another." *Organized Vill. Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (agency's desire to avoid litigation did not satisfy its obligation to provide a reasoned explanation for its change in policy); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (rejecting the "litigation risk" explanation for an action and finding action to be arbitrary and capricious).

---

[22]USCIS, USCIS GUIDANCE ON DACA RENEWAL REQUESTS AFFECTED BY MAIL SERVICE ISSUES (last updated Nov. 17, 2017), ( Ex. 13).

AR1222

In short, the Government's reasons for rescinding DACA are fundamentally permeated by speculation, unsupported by facts and undocumented in the Administrative Record. The APA, at a minimum, establishes that speculation cannot substitute for reasoned decision-making, nor can it justify jettisoning a policy on which over 800,000 people have relied. After all, "an agency changing its course must provide a reasoned analysis." *State Farm*, 463 U.S. at 57.

b. *In altering DHS's information-sharing prohibition, the Government "entirely failed to consider an important aspect of the problem" and therefore failed to support the revocation with a "reasoned analysis." State Farm*, 463 U.S. at 43. Nor does the Government attempt to provide such an explanation now. The only response is to deny that there has been a "substantive change in DHS's information-sharing policy." Gov. Br. 38. That response strains credulity, and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (citation omitted).

In promoting the DACA program, the Government invited hundreds of thousands of highly vulnerable young people to offer their personal information, information that, if provided to immigration enforcement officials, could have severe consequences. The Government assured Plaintiffs and others like them that, in providing such personal information as part of their DACA applications, they had nothing to fear as long as they were honest in their applications, did not engage in subsequent criminal activity, and were not otherwise subject to deportation based on a previously obtained record. Specifically, the DACA application instructions stated unequivocally that:

> **Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings** unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for

AR1223

purposes *other* than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.[23]

DHS made the same assurances in its Frequently Asked Questions regarding DACA:

> Information provided in [an application for DACA] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). **Individuals whose cases are deferred pursuant to DACA will not be referred to ICE.**[24]

In the DHS notice of approval granting deferred action under DACA, the same message was conveyed: the only grounds cited for violating the information sharing prohibition are "fraud or misrepresentation" and "[s]ubsequent criminal activity."[25]

Not only did the Government make these representations in outreach to DACA applicants; pursuant to its obligations under the e-Government Act, DHS also documented the information-sharing prohibition in its 2012 Privacy Impact Assessment for DACA (the "2012 PIA").[26] In the 2012 PIA, DHS declared that "information provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear ("NTA") or a referral to ICE under [USCIS NTA guidance]."

This commitment to prohibit sharing DACA applicant information with enforcement authorities was essential to the successful implementation of the program. DACA could work only if eligible young persons were willing to disclose the highly sensitive personal information needed

---

[23] *See* INSTRUCTIONS FOR CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, USCIS FORM I-821D 13 (Jan. 9, 2017 ed.) (emphasis added)) (Ex. 14).
[24] *See* USCIS DACA FAQS, RESPONSE TO QUESTION 19  (Ex. 15) (emphasis added)).
[25] *See* Ex. 16 (DACA APPROVAL SAMPLE).
[26] *See* Ex. 17 (DHS/USCIS/PIA-045 ).

AR1224

to process their applications.  The Government had to engage in aggressive outreach to build the trust of such vulnerable persons, and doing so required making a promise of grave significance: they induced hundreds of thousands of young individuals to turn over information that could be used to destroy the futures for which those individuals hoped to attain through DACA.  Compl. ¶¶ 10-16, 79-81, 91.

While the Government contends there has been no "*substantive* change" to the information-sharing prohibition, Gov. Br. 37, 38 (emphasis added), that disingenuous factual averment is disputed, *see* Compl. ¶¶ 79-91, and is an area where discovery is appropriate.  *See* 56(d) Decl. ¶¶ 7, 8, 9(c) & 10.   Notably, the Government does not address the specific allegations in the Complaint including that (i) the April 27, 2017 memorandum purports to rescind all privacy commitments by declaring that "agencies may no longer extend the protections of the Privacy Act to those other than U.S. Citizens and Lawful Permanent Residents,"  Ex. 18, (ii) the Government changed the information policy when it issued the DACA rescission to say that "[g]*enerally*, information provided in DACA requests will not be *proactively* provided [by DHS] to other law enforcement entities [for purposes other than those permitted under the exceptions],"[27] or (iii) Acting Secretary Duke's publicly denied that there was any information sharing prohibition. Compl. ¶¶ 108-112.

Having denied that there has been a "substantive change," the Government does not attempt to explain or otherwise defend the change.  This omission is fatal: "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we

---

[27] DHS, FREQUENTLY ASKED QUESTIONS: RESCISSION OF DACA Q8 (Ex. 19).

AR1225

must undo its action." *Petroleum Comm'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994); *see also Am. Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) (same).[28]

c. *The revocation of the information-sharing prohibition is contrary to law*.  In issuing the 2012 PIA, DHS followed its longstanding policy to treat any personally identifiable information collected, used, maintained and/or disseminated by DHS, *regardless of whether such information pertains to U.S. citizen, legal permanent resident, visitor or alien*, as subject to the Privacy Act.[29] Thus, even if the Privacy Act would not otherwise apply, as the Government now contends, Gov. Br. 39, the Government expressly waived that statutory argument in the PIA.  Compl. ¶¶ 83-89.[30]

The Government's E-Government Act argument, Gov. Br. 39-41, is equally unavailing. The E-Government Act requires agencies to update existing PIAs, or to conduct new PIAs, when a change in practices regarding information collection and use, business processes, or other information systems changes create privacy risks or otherwise effect individuals' privacy.[31]  By

---

[28] Even if the Government had proffered an explanation, the revocation of the information-sharing prohibition would be impermissible by virtue of its retroactive, punishing impact.  *See*, *e.g.*, *Velasquez-Garcia v. Holder*, 760 F.3d 571 (7th Cir. 2014) (holding rule to be impermissibly retroactive because the agency "'had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted.'") (quoting *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 391 (D.C. Cir.1972)).

[29] Guidance Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. *DHS, 2007-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons* (Jan. 7, 2009) (Ex.20).

[30] The Government's citation of *Fares v. U.S. Immigration and Naturalization Service*, 50 F.3d 6 (4th Cir. 1995), Gov. Br. 40, is inapposite.  The Government fails to note that *Fares* is an unpublished disposition, which means the decision has no precedential value.  Moreover, *Fares* was decided almost 15 years before DHS declared its policy to treat all personally identifiable information the same under the Privacy Act, regardless of the immigration status of the individual to whom the information pertained.  *See* DHS Guidance Memorandum of January 7, 2009 (cited in preceding footnote).  And as relevant to DACA, *Fares* preceded DHS' decision to waive the Privacy Act limitation with respect to DACA applicants' personal information in the 2012 PIA.  *See* 2012 PIA (Ex. 17) at 16, § 7.1.

[31] *See* DEPT. OF JUS., OFFICE OF PRIVACY AND CIVIL LIBERTIES, PRIVACY IMPACT ASSESSMENTS: OFFICIAL GUIDANCE (last revised Mar. 2012), https://www.justice.gov/opcl/docs/2012-doj-pia-

AR1226

Appeal: 18-1521 Doc: 28-1 Filed: 07/02/2018 Pg: 150 of 529
Case 1:16-cv-04756-NGG-VMS Document 319-6 Filed 09/04/20 Page 150 of 175 PageID #: 7216
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 46 of 70

altering the information sharing prohibition, a policy change related to DACA that contradicts the findings and representations made in the 2012 PIA without updating or replacing the 2012 PIA, DHS has violated the E-Government Act. Because DHS has not acted in accordance with applicable law, its challenged actions were arbitrary and capricious in violation of the APA. 5 U.S.C. §§ 702-706.

2. <u>The DACA Rescission Memo is a Substantive Rule Subject to Notice-and-Comment Rulemaking.</u>

Count V of the Complaint alleges that Defendants violated the APA because the rescission of DACA was a substantive rule and failed to go through notice-and-comment rulemaking. In support of this claim, the Complaint contains detailed factual allegations concerning the substantive impact DACA and its rescission had on Dreamers, Compl. ¶¶ 7, 17, 20, 71-78, 92, 97-106, and the irregularities in the revocation of these programs. Compl. ¶¶ 18, 21-25, 92-128, 162-166.

The DACA Rescission Memo is a substantive rule that prevents DHS from exercising discretion in a class of cases and substantively limits Dreamers' ability to work, live, attend school, and travel. Therefore, DHS was required to comply with notice-and-comment procedures in promulgating the DACA Rescission Memo. It undisputedly failed to do so.

a. Under the § 553 of the APA, all substantive (or legislative) rules must go through the notice-and-comment rulemaking process before they become effective. See *Chrysler Corp. v.*

---

manual.pdf; *see also* OFFICE OF MANAGEMENT AND BUDGET ("OMB") MEMORANDUM, M-03-22, OMB GUIDANCE FOR IMPLEMENTING THE PRIVACY PROVISIONS OF THE E-GOVERNMENT ACT OF 2002 (Sept. 26, 2003).

35

Appeal: 18-1521   Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 07/02/2018   Filed 09/04/20   Pg: 505 of 589   Page 151 of 175 PageID #:
7217
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 47 of 70

*Brown*, 441 U.S. 281, 314 (1979); *see also* 5 U.S.C. § 551(5) (the definition of "rule making"
includes "the process of formulating, amending, or *repealing* a rule") (emphasis added).[32]

In determining whether a rule is substantive, a court must analyze whether the rule "has
the force of law, and creates new law or imposes new rights or duties." *Jerri's Ceramic Arts, Inc.
v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989); *see also U.S. v. Mitchell*,
39 F.3d 465, 470 (4th Cir. 1994). A rule is subject to notice and comment when it has a substantial
impact on those it seeks to regulate.[33] *Brown Express, Inc. v. United States*, 607 F.2d 695, 702
(5th Cir. 1979). Conversely, general statements of policy are exempted from notice-and-comment
procedures pursuant to § 553(b)(3)(A). *See* 5 U.S.C. § 553(b)(3)(A); *Chamber of Commerce of
U.S. v. U.S. Dept. of Labor*, 174 F.3d 206, 213 (D.D.C. 1993). A rule or regulation is "a general
statement of policy if it does not establish a binding norm and leaves agency officials free to
exercise their discretion." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995); *Texas*,
86 F.Supp. 3d at 666 (A "general statement of policy," which is exempt from APA's notice-and-
comment requirements for rulemaking, "is best characterized as announcing the agency's tentative
intentions for the future.").

---

[32] When engaged in such rulemaking, the agency must: (1) publish a general notice of proposed
rulemaking in the Federal Register that includes "the terms or substance of the proposed rule or a
description of the subjects and issues involved;" (2) give "interested persons an opportunity to
participate in the rule making through submission of written data, views, or arguments;" and (3)
"[a]fter consideration of the relevant matter presented . . . incorporate in the rules adopted a concise
general statement of their basis and purpose." 5 U.S.C. § 553(b)-(c).
[33] Defendants cherry-pick language from *National Association of Regulatory Utility
Commissioners v. United States Department of Energy* indicating it would have been
"cumbersome and time-consuming" to require the agency to comply with full notice-and-comment
rulemaking procedures. 851 F.2d 1424, 1431 (D.C. Cir. 1988). Defendants decline, however, to
mention that the Department of Energy had still solicited public comments, was in the process of
responding to comments, and prepared a methodology for publication on the Federal Register. By
contrast, Defendants solicited *no* outside input before rescinding DACA.

**AR1228**

Appeal: 18-1521   Doc: 44-2   Filed: 07/02/2018   Pg: 56 of 179
Case 1:18-cv-04753-NGG-VMS   Document 39-6   Filed 09/04/20   Page 152 of 175 PageID #: 7218
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 48 of 70

Although the agency may characterize a rule as a general statement of policy, the "agency's statement . . . does not preclude our finding that is something more." *Jerri's Ceramic Arts, Inc.*, 874 F.2d at 207. An "agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy." *Am. Bus Ass'n v. United States.*, 627 F.2d 525, 529 (D.C. Cir. 1980) (citation omitted). Exceptions to notice and comment requirements "are not to be used to escape the requirements of section 553." *See id.*; *see also Chamber of Commerce of U.S. v. U.S. Dept. of Labor*, 174 F.3d 206, 213 (D.D.C. 1999) (finding rule was not a general policy statement and required notice and comment rulemaking where the "effect of the rule is . . . not to announce the agency's tentative intentions for the future, but to inform employers of a decision already made").[34] Exceptions to notice-and-comment are narrowly construed and, if a rule is substantive, all "notice-and-comment requirements must be adhered to scrupulously."[35] *Texas*, 787 F.3d at 762.

b. Here, the Rescission Memo is a substantive rule that should have complied with the APA's notice-and-comment requirements because it binds DHS and substantially affects the rights of DACA recipients.

The "cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("CNI"); *see Municipality of Anchorage v. United States*, 980 F.2d 1320, 1324 (9th Cir. 1992) (The "critical factor" in evaluating the substantive nature of an agency action is "the extent to

---

[34] *Compare Am. Bus Ass'n v. United States.*, 627 F.2d 525, 532 (D.C. Cir. 1980) (use of "will" indicates statement is in fact a binding norm) *with Guardian Fed. Sav. and Loan Ass'n v. Fed.l Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978) (use of "may" indicates statement is a "general statement of policy").

[35] As the Fourth Circuit has recognized, "[t]he important purposes of . . . notice and comment procedure cannot be overstated." *N. Carolina Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).

**J.A. 508**

**AR1229**

Appeal: 18-1521   Doc: 47-6   Filed: 07/02/2018   Pg: 153 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 153 of 175 PageID #: 7219
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 49 of 70

which the challenged [rule or regulation] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case."); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 441 (D.C. Cir. 1989) (holding that agency order with "mandatory language cabining DOT's enforcement discretion" was a substantive rule); *cf. Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (finding agency guidance was "meaningless" legally since it "imposes no obligations or prohibitions on regulated entities" and because authorities "are free to ignore it").[36]

Here, the DACA Rescission Memo creates a binding norm and categorically curtails DHS's discretion to grant Dreamers deferred action status—and accordingly, it is a "substantive" rule that should have complied with the requisite rulemaking procedures under § 553. Specifically, the DACA Rescission Memo mandates that (1) Defendants will immediately cease accepting applications under DACA; (2) Defendants will issue renewals only for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018, *only if* they apply for renewal by October 5, 2017; (3) Defendants will not issue renewals for recipients whose permits expire after March 5, 2018; and (4) Defendants will not approve any new or pending applications for advance parole for DACA recipients. Defendants' assertion that DHS "does not categorically forbid the

---

[36] *CNI* is instructive: in that case, organizations and private citizens challenged the promulgation of a FDA statement that established "action levels" to notify food producers of the allowable levels of unavoidable contaminants in food. *See* 818 F.2d at 945. Although the *CNI* court gave some deference to the agency's characterization of the statement as a general statement of policy, it concluded the rule was substantive and vacated it for failure to comply with the requisite notice-and-comment procedures because (1) the language used in creating and describing "action levels" suggested a present effect and was binding; (2) the present, binding effect was confirmed by the fact that the FDA considered the "action levels" as necessary for food producers to secure exceptions to the action levels; and (3) the FDA had made statements indicating that the action levels established a binding norm. *See id.* at 947.

**AR1230**

Appeal: 18-1521   Doc: 28-1   Filed: 07/02/2018   Pg: 154 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 154 of 175 PageID #: 7220
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 50 of 70

agency from continuing to defer enforcement action against DACA recipients," Gov. Br. 43, is contradicted by the clear terms of the DACA Rescission Memo.[37]

In addition, the DACA Rescission Memo also has the "force and effect of law" on Dreamers. *See Chrysler Corp.*, 441 U.S. at 282; *see also Elec. Privacy Info. Ctr. v. U.S. Dep't. of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) (finding that a rule which allowed the Transportation Security Administration to screen airline passengers by using advanced imaging technology could not be exempt from rulemaking requirements, since the change substantially changed the experience of airline passengers with regard to privacy and security "to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking").

The DACA Rescission Memo fundamentally and substantively changes the ability of Dreamers to work, live, attend school, obtain credit, and travel in the United States. For example, the DACA Rescission banned current DACA recipients from receiving advance parole based on their DACA eligibility. *See* AR 255 (DHS *"[w]ill not approve* any Form I-131 applications for advance parole under standards associated with the DACA program" and "*[w]ill administratively close all pending Form I-131 applications*" filed under the DACA program.) (emphasis added). This is more than a suggested policy—this is a mandated action preventing DACA recipients from traveling. Because DHS has failed to comply with the APA's procedures in promulgating this substantive rule, the Rescission must be set aside.

---

[37] The sole reference to DHS's discretion in the DACA Rescission Memo relates to the ability of DHS to continue early termination of deferred action. *See* AR 255 ("[DHS] will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.") Thus, it is clear that DHS has promulgated a substantive rule that eliminates discretion to grant deferred action status without complying with the APA's notice-and-comment requirements.

AR1231

Finally, Defendants' assertion that the promulgation of the 2012 DACA Memorandum without notice-and-comment excuses the failure to conduct notice-and-comment for its rescission because the program was "void ab initio," Gov. Br. 41, is legally without merit. It is well-established that the APA's notice-and-comment requirement attaches to the rescission of a substantive rule regardless of whether the rule initially went through this procedure. *See State Farm*, 463 U.S. 29 at 41 (When an agency rescinds a substantive rule, it is "obligated to supply a reasoned analysis for the change beyond what may be required when the agency does not act in the first instance."); *Mada-Luna,* 813 F.2d at 1018 n.12 ("[W]hen the government seeks to repeal a regulation, it is generally not bound for [notice-and-comment] purposes by the way it classified that regulation at the time of its promulgation."). The rescission of a substantive rule requires notice and comment even if the original process was defective. *See Consumer Energy Council v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("The argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided."). This requirement is necessary to prevent Defendants from circumventing the APA. *See id. at* 447 n.79 ("The Commission's argument that notice and comment requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation.").[38] The requirement helps ensure that an agency like DHS is not able to

---

[38] Defendants' reliance on *Chen Zhou Chai*, 48 F.3d at 1341 n.9, for the proposition that the interim rule would have had been invalid from the date of issuance if it were substantive is unpersuasive. As an initial matter, the statement was merely dicta contained in a footnote that does not address the question of whether notice-and-comment rule making is needed for the rescission of a rule. Moreover, *Chen Zhou Chai* ignores the fact that a court can use its equitable powers to protect challenged rules from immediate invalidation. *See, e.g.*, *U.S. Steel Corp. v. EPA*, 649 F.2d 572,

"undo all that it accomplished" through a program "without giving all parties an opportunity to comment on the wisdom" of that action. *Id.* at 446;[39] *see also United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977) (holding the rescission of voluntary departure status required notice-and-comment procedures even though the program itself was adopted without such procedures).

Because the DACA Rescission Memo is a substantive rule revoking existing discretion of immigration officials, DHS is obligated to follow notice-and-comment procedures, regardless of whether DACA should have gone through such procedures.


**B.     The Complaint States a Claim for Violations of the Equal Protection Clause**

Count III of the Complaint alleges that the Government violated the Equal Protection Clause.  In support of this Count, the Complaint contains detailed factual allegations concerning the Government's disparate treatment of allowing non-predominantly Latino deferred action programs to continue, the discriminatory impact of ending DACA (*i.e.,* that over ninety percent of DACA recipients were Mexican, Central American, or Latino), and considerable evidence of senior Government officials exhibiting their animus towards Mexicans, Central Americans, and Latinos, including eighteen distinct, detailed examples of statements exhibiting discriminatory animus.  Compl. ¶¶ 24-25, 68, 94-96.

---

575-77 (8th Cir. 1981) (leaving rule in effect pending completion of further administrative proceedings); *W. Oil & Gas Ass'n*, 633 F.2d at 812-13 (same).

[39] Moreover, a court considering a petition for review on an agency action "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939).

AR1233

Appeal: 18-1521   Doc: 47-2   Filed: 07/02/2018   Pg: 159 of 589
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 157 of 175 PageID #: 7223
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 53 of 70

In an equal protection case, disparate impact evidence may be considered alongside the following non-exhaustive list of "subjects of proper inquiry in determining whether racially discriminatory intent existed":

[1] The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes.

[2] The sequence of events leading up [to] the challenged decision . . . .

[3] Departures from the normal procedural sequence . . . . [and]

[4] The legislative or administrative history . . . especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.  In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action . . . .

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977); *see also Washington v. Davis*, 426 U.S. 229, 241-242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact that the law bears more heavily on one race than another").  The Supreme Court has repeatedly recognized that the Fifth Amendment's "equal protection component," *see Harris v. McRae*, 448 U.S. 297, 321 (1980), applies to non-citizens like DACA recipients.  *See Plyler v. Doe*, 457 U.S. 202, 210 (1982).

Under this standard, Count III more than adequately states a claim.  Plaintiffs allege the Government's rescission of DACA is based on discrimination based on race, national origin, and ethnicity, as demonstrated by all of the non-exhaustive factors listed by the Court in *Arlington Heights*.  Specifically, the complaint identifies the discriminatory impact of the decision on Mexicans, Central Americans, and Latinos (Compl. ¶¶ 24, 157, 159), and it sets forth the historical background of DACA Rescission and the sequence of events leading up to it (*id.* ¶¶ 2-17, 93), the many ways in which the DACA Rescission was a departure from normal procedures (*id.* ¶¶ 18, 21-22, 118-128), and the ongoing pattern of statements revealing a discriminatory intent.  The latter includes:

AR1234

Appeal: 18-1521 Doc: 47-6 Filed: 07/02/2018 Pg: 159 of 509
Case 1:18-cv-04756-NGG-VMS Document 29-6 Filed 09/04/20 Page 158 of 175 PageID #: 7224
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 54 of 70

- Candidate Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in February 2015 ("criminals"), June 2015 ("rapists"), August 2015 ("the bad ones"), May 2016 ("criminals" and "thugs"), June 2016 (Judge Gonzalo Curiel was "Hispanic," "pro-Mexican," and "a very hostile judge to me"), August 2016 ("illegal workers draw much more out from the system than they can ever possibly pay back … no one will be immune or exempt from enforcement"), and October 2016 ("bad hombres" and "we're going to get them out"). Compl. ¶¶ 25, 94;

- President-elect Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in December 2016 (people from Central America are "killing and raping everybody out there. They're illegal. And they are finished."). Compl. ¶ 94; and

- President Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in 2017 (January: "We are going to get the bad ones out. . . The criminals and the drug deals, and gangs. . ." and "tough hombres"), (February: "They're rough and they're tough…. So we're getting them out"), (June: "true animals" and "bad people"). *Id.*

The Complaint also identifies statements reflective of discriminatory intent from other officials, including the Attorney General and White House Senior Policy Advisor Stephen Miller. *Id.*

Only by ignoring the actual factual allegations of the Complaint and misstating the law does the Government challenge Plaintiffs' Equal Protection claims on three flawed grounds. *First*, the Government erroneously contends that an Equal Protection challenge is non-reviewable under *AADC* and *Armstrong*, Gov. Br. at 45-47; for the reasons described above, that is incorrect. *AADC*, which concerns the right of individuals to challenge interim decisions under 8 U.S.C. §1252(g), says nothing to suggest the Government has unreviewable authority to intentionally discriminate in the administration of immigration laws in violation of the Equal Protection Clause; rather the Supreme Court has consistently held that the Equal Protection Clause extends "to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent." *Zadvydas*, 533 U.S. at 694-95; *see also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 597 n.19 (4th Cir. June 15, 2017) (rejecting argument that *AADC* insulates

AR1235

Appeal: 18-1521   Doc: 28   Filed: 07/02/2018   Pg: 159 of 175
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 159 of 175 PageID #: 7225
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 55 of 70

"the President and other executive officials from judicial scrutiny" when their "official acts violate the Constitution.") (*IRAP II*), *vacated as moot*, *Trump v. Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017).[40]   Similarly *Armstrong*, which concerns an individual criminal defendant's assertion that their prosecution was "selective," says nothing to suggest the Government's conduct is unreviewable.  Rather, *Armstrong* states unequivocally that the government decision "may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification."  517 U.S. at 464 (internal quotations and citation omitted).  Here, the challenged decision is a discriminatory policy decision (not a challenge to a particular prosecution) that has a discriminatory impact and was motivated by discriminatory animus.[41]

Second, the Government contends that the strong "disparate impact"—which the Government concedes, Gov. Br. at 46 (acknowledging that 93 percent of affected individuals are Mexican, Central American, or Latino)—is insufficient to allege an Equal Protection violation under *Davis*, 426 U.S. at 242.  *See* Gov. Br. 46-47.  Again, the Government ignores the allegations in the Complaint about discriminatory motive.  The Complaint pleads in great detail an actual and specific discriminatory intent on the basis of race, national origin, and ethnicity, as established by numerous statements of the individuals who influenced, designed, and implemented the Rescission decision.  *See* Compl. ¶¶ 24-25, 94-96, 154-161.  And this is an area where additional discovery is warranted.  *See* Rule 56(d) Decl. ¶¶ 5 & 9(d).

---

[40] Indeed, even for individuals contesting removal proceedings, the *AADC* court noted that its holding did not address cases which contested deportation "in which the alleged basis of discrimination is . . . outrageous." 525 U.S. at 492.

[41] For example, the Complaint identifies 18 separate statements by senior Government officials exhibiting animus towards Mexicans, Central Americans, and Latinos leading up to the rescission decision. Compl. ¶¶ 94-96. There were no equivalent statements presented in *Armstrong*.

AR1236

Appeal: 18-1521  Doc: 28-1  Filed: 07/02/2018  Pg: 534 of 589
Case 1:16-cv-04756-NGG-VMS  Document 319-6  Filed 09/04/20  Page 160 of 175 PageID #: 7226
Case 8:17-cv-02942-RWT  Document 29  Filed 11/28/17  Page 56 of 70

Third, the Government dismissively mischaracterizes the statements of animus by suggesting that "most were before the [President] took the oath of office" and did not come out of the mouth of the "decisionmaker ultimately responsible for the Rescission Policy." Gov. Br. 47. Again, the Government ignores the allegations of the Government's animus against Mexicans, Central Americans, and Latinos (i) continuing after the President assumed office and has been exhibited in at least nine separate statements, *see* Compl. ¶¶ 25, 94, 96, and (ii) demonstrated by other senior Government officials. *See id.* ¶ 96 (alleging statements made by officials in March and July 2017). It also ignores the allegations that the decision to rescind DACA was collectively made by numerous government officials, including the President, the Attorney General, and the Acting DHS Secretary. Compl. ¶¶ 60-66, 157-161. To the extent the Government contends that Acting Secretary Duke is solely responsible for the decision, that is a contested issue of fact that should not be resolved on a Rule 12(b) motion. *See* Exs. 2, 5, 8, 9. *See also* Rule 56(d) Decl. ¶¶ 9(a)(iii)&(iv) (discussing evidence of the other individuals involved in the decision to rescind DACA). Moreover, the Government's argument that the President's expressions of racial animus prior to assuming office are irrelevant is legally wrong: the "historical background of the decision. . . particularly if it reveals a series of official actions taken for invidious purposes" is the "subject[ ] of proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 266-67; *see also McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) ("[T]he world is not made brand new every morning," and courts should not "turn a blind eye to the context in which [the] policy arose"). It is for this reason that both the Fourth Circuit and Judge Chuang held in the Travel Ban litigation that President Trump's campaign statements are unmistakably relevant in evaluating whether the government's actions

**AR1237**

are motivated by impermissible considerations. *See IRAP*, 2017 WL 4674314, at *5-6; *IRAP II*, 857 F.3d at 598-601.

There are sufficient allegations of discriminatory animus that the burden shifts to the Government to show that the Rescission was in service of a compelling governmental interest and narrowly tailored. That issue cannot be resolved in favor of the Government on a motion to dismiss, and the Government makes no attempt to argue otherwise. Indeed, the Administrative Record here shows the Government likely will never be able to sufficiently justify the policy, with virtually no consideration of the human and economic costs and no consideration at all of alternatives to the deportation of 800,000 individuals, and that the Rescission was motivated by racial and national origin animus. The Government's request to dismiss the Third Count of the complaint should be denied.

**C.    The Complaint States Claims for Violations of the Due Process Clause**

Counts I and II of the Complaint allege that Defendants violated Plaintiffs' procedural and substantive due process rights when it stripped Plaintiffs of their ability to work, raise a family, maintain family integrity, and pursue their educations (Count I), and disregarded the protections afforded the critically sensitive personal information they shared when they applied for DACA (Count II). Compl. ¶¶ 129-153. In support of these Counts, the Complaint contains detailed factual allegations concerning the various interests and commitments the Government made to DACA applicants to induce them to participate in the program, Compl. ¶¶ 10-16, 19-20, 71-91, the irregular process the Government has used to strip these interests from DACA recipients, Compl. ¶¶ 97-128, and the actions taken by the Government to strip these interests from DACA recipients because of the discriminatory animus of the individuals who influenced, designed, and implemented the rescission decision. *See* Compl. ¶¶ 24-25, 94-96.

AR1238

Appeal: 18-1521 Doc: 47-6 Filed: 07/02/2018 Pg: 56 of 69
Case 1:18-cv-04753-NGG-VMS Document 31-6 Filed 09/04/20 Page 162 of 175 PageID #: 7228
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 58 of 70

Defendants contend Plaintiffs fail to state either a procedural or substantive due process claim. Gov. Br. 48-54. This remarkable contention is premised on a complete disregard for bedrock constitutional principles and wholesale revision of Plaintiffs' Complaint. Under the actual law and actual well-pled allegations, these claims are more than adequately stated.

### 1. The Complaint Alleges Violations of Procedural Due Process

To state a claim of a violation of procedural due process, Plaintiffs must demonstrate that: (1) they had a constitutionally protected interest; (2) of which the government deprived them by its sudden and arbitrary action; (3) without due process of law. *See*, *e.g.*, *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002). The Government makes two arguments against Plaintiffs' procedural due process claims. Neither has merit.

a. It is axiomatic that "the Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *United States v. Lopez-Collazo*, 824 F.3d 453, 460–61 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 628 (2017) (quoting *Zadvydas*, 533 U.S. at 693 (2001)) (internal quotations omitted). Yet, the Government argues that plaintiffs have no "protected interests." Gov. Br. at 48-50, 52. Plaintiffs specifically allege a host of property and liberty interests impugned by the DACA rescission: the ability, among others, to obtain employment authorization (Compl. ¶ 72), travel outside of the United States (*id*. ¶ 73), attend educational institutions (*id*. ¶ 74), to pay into and be eligible for certain benefit programs such as Social Security and disability (*id*. ¶ 75); to secure access to other opportunities on which Americans depend, such as opening bank accounts and obtaining credit cards (*id*. ¶ 77); and to be considered "lawfully present" by DHS (*id*. ¶ 78). It is undisputed that the panoply of work, travel, educational and family benefits that flowed from DACA are protected interests. *See*, *e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (protected interests include, "without doubt, . . . the right of the individual to contract, to engage in any of the

AR1239

Appeal: 18-1521   Doc: 28-2   Filed: 07/02/2018   Pg: 537 of 589
Case 1:18-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 163 of 175 PageID #: 7229
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 59 of 70

common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men").

Instead of addressing these protected interests, the Government contorts the Complaint to portray the interest at issue as limited to "deferred action" status. Gov. Br. 49-50. This is nonsense. The Government's abrupt decision to terminate DACA deprived Plaintiffs not only of an immigration status, but more fundamentally the panoply of attendant interests identified in the Complaint that Dreamers have relied on to build their lives in this country.

Without this fundamental misconstruction of the Complaint, the Government's argument that Plaintiffs fail to allege a protected interest unravels. All of the Government's arguments and authority rely on a need to create a source for protected interests. *See* Gov. Br. at 48 (averring that only "statutes or regulations" can bestow protected interests), 49-50 (no protected interest where "government officials may grant or deny it in their discretion"). In any event, they are wrong. Property and liberty interests "are not limited by a few rigid, technical forms," and are "secured by 'existing rules or understandings.'" *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (quoting *Roth*, 408 U.S. at 577). The Fourth Circuit has repeatedly recognized that "rules or understandings" encompasses a wide variety of governmental actions that provide specific benefits to particular individuals, including everything from statutes, regulations, city charters, contracts, and permits.[42] Such is the case here: with promises that DACA recipients would enjoy interests

---

[42] *See, e.g.*, *Gardner v. City of Balt. Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992) (property interests created by a city's charter and its planning commission's subsequent regulations); *Royster v. Bd. of Tr's of Anderson Cty. Sch. Dist. No. Five*, 774 F.2d 618, 620 (4th Cir. 1985) (contracts are "the independent source for the property interest"); *Ruttenberg v. Jones*, No. 07-1037, 2008 WL 2436157, at *6 n.2 (4th Cir. June 17, 2008) (property interest created by a conditional use permit).

AR1240

Appeal: 18-1521 Doc: 47-6 Filed: 07/02/2018 Pg: 539 of 589 Total Pages:(164 of 175)
Case 1:16-cv-04756-NGG-VMS Document 31-6 Filed 09/04/20 Page 164 of 175 PageID #: 7230
Case 8:17-cv-02942-RWT Document 29 Filed 11/28/17 Page 60 of 70

enjoyed by legal residents of the United States, the government enticed hundreds of thousands of vulnerable young people to step forward; in short, it was precisely the type of "mutual understanding" that the Supreme Court held creates interests protectable by the Due Process clause. *Perry*, 408 U.S. at 601.

For the same reason, the Government's contention that Plaintiffs have no protected interest in having their application data protected from disclosure to enforcement officials fails. Gov. Br. 51-52. The Government ignores Plaintiffs' allegations of the Government's (i) unequivocal assurances not to share applicant data with immigration enforcement authorities, and (ii) express recognition of this commitment for purposes of the Privacy Act. *See* Compl. ¶¶ 79-91. It was precisely these assurances that created a protected interest in Plaintiffs' sensitive personal information.

Instead, the Government makes a contested factual averment that DACA applicants were "consistently advised" that this protection could be "modified, superseded, or rescinded" at any time. Gov. Br. 52. This averment is improper in a Rule 12(b) motion, dooms the Government's alternative Rule 56 motion, and is inaccurate. For example, the following image is taken from the DHS PowerPoint described in paragraph 81 of the Complaint:



Protecting Your Information

We will not share any information about you with ICE or U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for:
- the issuance of an NTA; or
- a referral to ICE under the criteria set forth in our NTA guidance.

AR1241

Contrary to the Government's averment, this slide (Ex. 21) contains no representation that the information sharing policy could be changed. Similarly, the general guidance on the USCIS website similarly reassured applicants that their applications would be submitted to a "lockbox" and would not be shared with immigration enforcement, and contained no warning that the policy could be modified or rescinded. Likewise, when the DHS Secretary wrote to Congress on December 30, 2016 that DHS had "consistently made clear that information provided by applicants . . . will not later be used for immigration enforcement," Compl. ¶ 89, it contained no suggestion that the information sharing policy could be changed (Ex. 22).[43] There are undoubtedly further instances of unqualified commitments in the Government's files, and this is an area where further discovery is appropriate. *See* Rule 56(d) Decl. ¶¶ 7, 8, 9(b)&(c) & 10.

The well-pled facts alleged in the Complaint, which the Court must accept as true, demonstrate that the Defendants created and guaranteed (and then improperly deprived) protected interests for Plaintiffs in their ability to work, travel, attend school, maintain family integrity, and that their sensitive information would not be shared with ICE or CBP. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

---

[43] In an apparent attempt to argue that no right has been deprived, the Government repeats its false claim that DHS has not substantively changed its sensitive information protection policy. Gov. Br. 51-52. As discussed *supra* at Argument II.A.1.b, it has. The Government also submits that no personal information "has in fact been impermissibly shared" to date since no Plaintiff or Dreamer has lost their status yet. *Id.* at 51. This ignores that the Complaint identifies six specific instances where the Government has commenced enforcement proceedings against Dreamers. Compl. ¶ 111. Moreover, courts have roundly rejected the "mechanical and simplistic" distinction between those whose benefits have already been deprived and those whose benefits are expected to be deprived in the future. *See Mallette v. Arlington Cty. Emp's Supplemental Ret. Sys. II*, 91 F.3d 630, 639-640 (4th Cir. 1996) (collecting cases). As *Batalla Vidal* found, changes in DHS's information use-policy "will likely result in more undocumented immigrants' removal from the United States." 2017 WL 5201116, at *18. To do so, the government will necessarily need to rely on the sensitive information shared by the DACA recipients—their name, address, family members—to locate, detain and deport them.

AR1242

b.  The Government's contention that the deprivation of these protected interests does "not require individualized process" is specious.  Gov. Br. 50-51.  Due process, at a minimum, requires that a person be given notice of impending action and afforded a hearing.  *Richardson v. Town of Eastover*, 922 F.2d 1152, 1159 (4th Cir. 1991).  DACA's internal procedures established that there would be both notice and an opportunity to be heard.  Compl. ¶ 78.  Plaintiffs were afforded no such notice or opportunity to be heard.  Compl. ¶¶ 118, 138, 151.

Individualized process *is* required where, as here, there is no process that would provide a group of individuals an opportunity to be heard.  *See Kapps v. Wing*, 404 F.3d 105, 118 (2d Cir. 2005) (where an administrator's rules arbitrarily denied a group of applicants an opportunity to appeal, those applicants *were* entitled to individualized notice and an opportunity to be heard because there was no other outlet for review).  The Government's cases are inapt.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441 (1915) (Gov. Br. 50), examined whether a state tax commission was authorized to increase the tax rates of a group without providing individualized notice or an opportunity to be heard;  the Court found that individualized notice was not required because the affected individuals were "protected" by the political process."  *Id*.  *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) (Gov. Br. 51), emphasized that no hearing was constitutionally required especially where, *inter alia*, "*there [was] a post-decision review*." *Id. at 1363* (citations omitted and emphasis added).  Neither process is available to Plaintiffs.

In short, the law is clear—it remains unconstitutional to deprive individuals of protected interests without due process of law.  *Kerr v. Marshall Univ. Bd. of Gov.*, 824 F.3d 62, 80 (4th Cir. 2016).  As alleged, Plaintiffs were not afforded such notice and are entitled to challenge that deprivation.  Because the Government disputes this, this an area where further discovery is appropriate.  *See* Rule 56(d) Decl. ¶ 6.

AR1243

Appeal: 18-1521   Case 1:18-cv-04753-NGG-VMS   Document 319-6   Filed 07/02/2018   Filed 09/04/20   Page 167 of 175 PageID #:
7233
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 63 of 70

*2.*      The Complaint Alleges Violations of Substantive Due Process

To state a claim for a violation of substantive due process, Plaintiffs must allege that:  (1) the interest at issue is protected by the substantive due process clause and (2) the government's deprivation of that protected interest "shocks the conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 848 (1988).  The "touchstone of due process" is "protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Id.* at 845–46 (citations omitted).

Although the Government concedes that a denial of fundamental fairness constitutes a violation of substantive due process rights, Gov. Br. 53, they contend that the substantive due process claims should be dismissed because Plaintiffs do not provide a sufficiently detailed description of their fundamental rights, and do not allege actions by the Defendants that "shock the conscience."  Gov. Br. 52-53.  Again, the Government ignores the core of Plaintiffs' allegations—that they have been targeted for deprivation of protected interests based on the shocking discriminatory animus of senior Government officials against Mexicans, Central Americans, and Latinos.  Compl. ¶¶ 94-96.

The discriminatory motivation underlying the DACA rescission is the definition of conduct that shocks the conscience.  To shock the conscience "the conduct must be 'intended to injure in some way *unjustifiable by any government interest.*'" *Hawkins v. Freeman*, 195 F.3d 732, 738,742 (4th Cir. 1999) (quoting *Lewis*, 523 U.S. at 849).  Conduct is unjustifiable by any "government interest" and can be fairly said to shock the conscience if it "involves abusing executive power, or employing it as an instrument of oppression."  *Int'l Ass'n of Machinists & Aerospace Workers v. Haley*, 482 F. App'x 759, 766 (4th Cir. 2012) (quoting *Martin v. Saint Mary's Dep't of Social Serv's*, 346 F.3d 502, 511 (4th Cir. 2000)); *Hawkins*, 195 F.3d at 741–42.  Defendants' actions and

Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 168 of 175 PageID #:
7234
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 64 of 70

statements were loaded with shocking generalizations of all Mexicans and Latin Americans as "criminals," "thugs," "rapists," and "bad hombres." Complaint ¶ 94. It was on the heels of those statements about the national origin of 93% of DACA recipients that the program was rescinded, creating the strong conclusion that the policy change was based on race or national origin. Taken as true, the facts alleged point clearly to an "abuse of executive power" that is "unjustifiable by any government interest." *Cf. Romer v. Evans*, 517 U.S. 620, 634–35 (1996) ("[A] bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (emphasis added).

Similarly, the Government's breaking of their unequivocal promise to DACA applicants that their most personal information would not be used for enforcement purposes is shocking. This unconstitutional bait-and-switch violates Plaintiffs' right to due process. *See*, *e.g.*, *Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *Raley v. Ohio*, 360 U.S. 423, 438-39 (1959).

Plaintiffs are entitled to a subjective assessment of these factual allegations. Courts have continually noted the "shocks-the-conscience" test is "no calibrated yard stick" and is "laden with subjective assessments." *Hawkins*, 195 F.3d at 741–42 (quoting *Lewis*, 523 U.S. at 847, 857). "[B]ecause specific conduct that in one context would meet the test might not in another, application of this standard demands an exact analysis of circumstances." *Hawkins*, 195 F.3d at 742 (citations omitted). Plaintiffs are entitled to such a review of these factual allegations to determine whether the termination of a program relied on by 800,000 people constitutes an action "fatally arbitrary in the constitutional sense" or "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 738, 742. To the extent that Defendants disagree with those factual allegations, their disagreement is unavailing on a motion to dismiss. Accordingly, Defendants' motion to dismiss these claims must fail.

AR1245

Case 1:18-cv-04753-NGG-VMS   Document 319-6   Filed 09/04/20   Page 169 of 175 PageID #:
7235
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 65 of 70

**D.      The Complaint States a Claim for Equitable Estoppel**

Count VI of the Complaint alleges that the Government should be estopped from abandoning its commitment not to share DACA applicant information with immigration enforcement authorities.  In support of this Count, the Complaint alleges that since the DACA program was announced in 2012, the Government—in numerous publications and statements by officials at the highest levels—repeatedly and affirmatively assured DACA applicants that the Government would not use the personal information provided in the DACA application process for enforcement purposes.  Compl. ¶¶ 79-91.  Because the Government intended to (and did) induce participants to apply to DACA based on these commitments, and because DACA applicants did indeed rely on these commitments to protect their personal information, the Government is estopped from now using this information for enforcement purposes.

The Government again misstates the law and allegations of the Complaint to oppose Plaintiffs' estoppel claim.  Contrary to the Government's argument, Gov. Br. 54-55, a cause of action in estoppel may lie against the Government where, as here, the Government acts in a manner that violates the "interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government," *Heckler v. Cmty Health Serv's of Crawford Cty., Inc.,* 467 U.S. 51, 60-61 (1984), or where "justice and fair play require it."  *Watkins v. U.S. Army,* 875 F.2d 699, 706 (9th Cir. 1989); *see also Office of Pers. Mgt. v. Richmond,* 496 U.S. 414, 423 (1990) (rejecting a "sweeping rule" establishing that "no estoppel claim could ever succeed against the Government.").

It is well-established that the Government may be estopped when it engages in "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS,* 729 F. Supp. 479, 485 (D. Md. 1990).  The Complaint alleges well-pled facts that the Government's action here goes beyond

AR1246

mere negligence:  the Government has intentionally abandoned its commitment that it would not take enforcement actions against individuals who relied upon assurances by the Government that their personal information would not be used in furtherance of enforcement proceedings.  Compl. ¶¶ 108, 111, 112.

The Government's conduct here satisfies all of the elements of estoppel.[44]  The Government affirmatively intended DACA recipients to rely on the promise not to use personal information for enforcement purposes.  *See* Compl. ¶¶  9-16, 79-81.  The Government itself has publicly acknowledged that this information was "most assuredly relied" upon by DACA applicants to their detriment.  Compl. ¶¶ 84-89.  The Government, and not the DACA participants, are aware of the true nature of the Government's bait-and-switch policy regarding personal information.   Compl. ¶¶ 21-22, 84-88, 107-112.  This is an area where further discovery is appropriate.  *See* Rule 56(d) Decl. ¶¶ 7, 8, 9(b)&(c) & 10.

Contrary to the Government's suggestion, Gov. Br. 54, estoppel is available where individuals have relied to their detriment on government policy.   Indeed, the Government's violation of its commitment to DACA applicants is similar in kind to other instances where the Government has been estopped from taking action against individuals who relied, to their detriment, on prior official policies by the Government.  For example, in *United States v. Penn. Indus. Chem. Corp. ("PICCO"),* the Supreme Court found that a plaintiff charged with violating pollution laws must have the opportunity to bring evidence that it reasonably relied on the regulations in force at the time of its action as a defense to prosecution.  411 U.S. 655, 675 (1973).

---

[44] These elements are:  "(1) the party to be estopped knew the true acts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel." *Dawkins v. Witt,* 318 F.3d 606, 611, n. 6 (4th Cir. 2003).

**AR1247**

Similarly, in *Watkins v. U.S. Army,* the court found that the Army was estopped from discharging a homosexual officer on the basis of a regulation barring homosexuals from serving in the military after allowing him to reenlist numerous times with full awareness of his sexual orientation. 875 F. 2d at 710-11; *see also United States. v. Cox,* 964 F.2d 1431, 1434-35 (4th Cir. 1992) (finding that Government was estopped from refusing to pay court-appointed psychiatrist after agreeing to do so).

Finally, the Government contends it would not constitute a "serious injustice" if DACA applicant information was used for immigration enforcement proceedings because the Government has made the factual averment that "nothing" about the commitment "could be construed to represent to DACA recipients that DACA policy was permanent and not subject to change." Gov. Br. 56. This factual averment is disputed and belied by the well-pled factual allegations in the Complaint. *See* Compl. ¶¶ 21-22, 84-88, 107-112 & Section II.C.

## III.  DEFENDANTS' ARGUMENTS REGARDING A NATIONWIDE INJUNCTION ARE PREMATURE AND LEGALLY INCORRECT

The Government's arguments that declaratory relief and a nationwide injunction are not available remedies to Plaintiffs, Gov. Br.57-59, are premature and more appropriately addressed in conjunction with Plaintiffs' motion for injunctive relief. Moreover, they are predicated on incorrect statements of the law. Declaratory relief is available under the APA, *see Bowen v. Mass.,* 487 U.S. 879 (1988), and under the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs claim that the Government's decision to rescind DACA is, among other things, unconstitutional. Compl. ¶¶ 129-161. The APA provides relief for government decisions that are, among other reasons, contrary to law and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A). The Government based its rescission of DACA on its belief that the program is unlawful. Gov. Br. 20. Accordingly, a declaratory judgment that DACA is lawful is entirely within

Appeal: 18-1521   Doc: 47-5   Filed: 07/02/2018   Pg: 506 of 509
Case 1:16-cv-04756-NGG-VMS   Document 319-6   Filed 09/04/20   Page 172 of 175 PageID #: 7238
Case 8:17-cv-02942-RWT   Document 29   Filed 11/28/17   Page 68 of 70

the scope of the Court's authority.  The Government also asserts that any injunctive relief ordered by the court should be limited to the individual Plaintiffs and should not be nationwide in scope. Gov. Br. 58-59.  Plaintiffs here include both national organizations and organizations from across the country.  Moreover, the Government's position is not consistent with prevailing Fourth Circuit principles.  District Courts "have broad discretion when fashioning injunctive relief."  *Ostergren v. Cuccinelli,* 615 F.3d 263, 288 (4th Cir. 2010); *see also Richmond Tenants Org., Inc. v. Kemp,* 956 F.2d 1300, 1308 (4th Cir. 1992) (discretion of district court to issue injunction extends to litigation in other federal courts); *Texas,* 809 F.3d at 187-88 (asserting that the power of the district court "is not limited to the district wherein the court sits but extends across the country.")

Approving a nationwide injunction under the facts here is consistent with the broad principles justifying national injunctions.  First, Plaintiffs reside throughout the United States; the actions by the Government challenged here would violate the rights of DACA recipients in jurisdictions throughout the country.  *See Richmond Tenants Org.,* 956 F.2d at 1308-09 (upholding nationwide injunction against evictions of tenants in public housing without due process due to national scope of eviction issue).  Second, the need for national uniformity and consistency in the application of the law is particularly important in addressing immigration policy.  *See Texas,* 809 F.3d at 187-88 (upholding a nationwide injunction on the DAPA program due to the need for the immigration laws of the U.S. to be "enforced vigorously and uniformly").  A more limited injunction would necessarily mean that the fate of DACA recipients would be tied to the accident of their geography, rather than to the merits of their case.  Finally, enjoining the rescission of DACA only as to Plaintiffs would not address the underlying Constitutional issue facing the Government's action; only a nationwide injunction can provide "complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (internal citations omitted).

AR1249

## CONCLUSION

For the reasons set forth in the accompanying memorandum of law, Plaintiffs respectfully move the Court to deny Defendants' Motion to Dismiss or, in the Alternative for Summary Judgment.

Dated:  November 28, 2017                    Respectfully submitted,


   /s/ Dennis A. Corkery                     John A. Freedman[†]
Matthew K. Handley (D. Md. 18636)            Gaela Gehring Flores (D. Md.14559)
Dennis A. Corkery (D. Md. 19076)             Ronald A. Schechter (pro hac vice
WASHINGTON LAWYERS'                          forthcoming)
   COMMITTEE FOR CIVIL RIGHTS                Nancy L. Perkins[†]
AND                                          Jeremy Karpatkin (pro hac vice forthcoming)
   URBAN AFFAIRS                             ARNOLD & PORTER KAYE SCHOLER LLP
11 Dupont Circle, Suite 400                  601 Massachusetts Ave., NW
Washington, DC 20036                         Washington, DC  20001-3743
(202) 319-1000                               (202) 942-5000
matthew_handley@washlaw.org                  John.Freedman@apks.com
dennis_corkery@washlaw.org

Elizabeth J. Bower[†]                        Steven L. Mayer (pro hac vice forthcoming)
Kevin B. Clark (D. Md. Bar No. 04771)        ARNOLD & PORTER KAYE SCHOLER LLP
Priya Aiyar[†]                               10th Floor
WILLKIE FARR & GALLAGHER LLP                 Three Embarcadero Center
1875 K Street, NW                            San Francisco, CA 94111-4024
Washington, DC  20006-1238                   +1 415.471.3100
EBower@willkie.com
                                             Ajmel Quereshi (D. Md. 28882)
Nicholas Katz (pro hac vice forthcoming)     HOWARD UNIVERSITY SCHOOL OF
CASA DE MARYLAND                               LAW CIVIL RIGHS CLINIC
8151 15th Ave.                               2900 Van Ness Street, NW
Hyattsville, MD 20783                        Washington, DC 20008
(240) 491-5743                               (202) 806-8000
NKatz@wearecasa.org                          aquereshi@law.howard.edu


[†]*Appearing* pro hac vice                  *Attorneys for Plaintiffs*

AR1250

Appeal: 19-1524    Doc: 47-2    Filed: 07/02/2019    Pg: 509 of 589
Case 1:16-cv-04756-NGG-VMS    Document 319-6    Filed 09/04/20    Page 174 of 175 PageID #: 7240
Case 8:17-cv-02942-RWT    Document 29    Filed 11/28/17    Page 70 of 70

CERTIFICATE OF SERIVCE

I hereby certify that on November 28, 2017, a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Dennis A. Corkery
Dennis A. Corkery
(D. Md. Bar. No. 19076)

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2018, I electronically filed the foregoing Joint Appendix with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  July 2, 2018                              /s/  John A. Freedman
                                                 John A. Freedman

**AR1252**