**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

---

MARTÍN JONATHAN BATALLA VIDAL, )
ANTONIO ALARCÓN, ELIANA FERNANDEZ, )
CARLOS VARGAS, CAROLINA FUNG FENG, )
M.B.F., by her next friend LUCIA FELIZ, )
XIMENA ZAMORA, SONIA MOLINA )
and JOHANA LARIOS SAINZ, )
)
      On behalf of themselves and all other )
      similarly situated individuals, )
)
and MAKE THE ROAD NEW YORK, )
)
      On behalf of itself, its members, and its )
      clients, )
)
      *Plaintiffs*, )
)
      v. )
)
CHAD WOLF, in his official capacity as the )
purported Acting Secretary of Homeland Security, )
et al., )
)
)
      *Defendants*. )

Case No. 1:16-cv-04756 (NGG)(JO)

September 30, 2020

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

STATEMENT OF INTERVENING FACTS ...................................................................... 3

ARGUMENT..................................................................................................................... 4

I. THE FVRA'S FRAMEWORK REQUIREMENTS APPLY AND ARE NOT REPEALED BY THE HSA'S
AUTHORITY TO ISSUE AN ALTERNATIVE ORDER OF SUCCESSION ........................................ 4

    A. The Plain Text and Agency Practice Confirm That the FVRA and the HSA are Co-existing
and Intersecting Statutes................................................................................................ 4

    B. Defendants' Reliance on the FVRA's Legislative History is Misplaced.............................. 8

    C. Reading the HSA to Exclude Any Limits on Acting Tenures Would Raise Serious
Constitutional Questions ............................................................................................. 10

    D. Reading the HSA to Permit Acting Secretaries to Appoint Other Acting Secretaries Would
Raise Major Constitutional Concerns............................................................................ 11

II. DEFENDANT WOLF DID NOT PROPERLY ASSUME THE POSITION OF ACTING SECRETARY UNDER
ANY LAWFUL ORDER OF SUCCESSION .............................................................................. 13

    A. The Plain Language of the Nielsen Designation and the April Delegation Make Clear that
McAleenan was Improperly Designated ......................................................................... 14

    B. Prior Agency Practice Confirms That Delegations Control Changes in the Order of
Succession .................................................................................................................. 17

III. THE SEPTEMBER 2020 GAYNOR ORDER IS NOT A VALID ORDER OF SUCCESSION. .............. 19

    A. The FVRA 210-Day Limit Precludes Mr. Gaynor or Defendant Wolf From Assuming the
Role of Acting Secretary For the Purposes of Ratifying the Wolf Memorandum .................... 20

    B. Mr. Gaynor's Failure to Properly Assume or Leave the Role of Acting Secretary Renders
the Gaynor Order Invalid ............................................................................................. 22

IV. THE FVRA PROHIBITS DEFENDANT WOLF FROM RATIFYING THE WOLF MEMORANDUM. ... 23

    A. Even if the Gaynor Order is Valid, Defendant Wolf, as the Nominee for Secretary, Cannot
Serve as Acting Secretary............................................................................................ 24

    B. Even if Defendant Wolf is the Acting Secretary, the FVRA Bars Him From Ratifying Prior
Actions...................................................................................................................... 25

V. VACATING THE WOLF MEMORANDUM AND ENJOINING DEFENDANT WOLF FROM FURTHER
INTERFERING WITH DACA ARE BOTH APPROPRIATE AND NECESSARY REMEDIES ................. 28

A.   Vacatur Under the FVRA Is Required ................................................................ 28

B.   Even if the HSA Governs, the Appropriate Remedy for an Unlawful Appointment Under the HSA Is to Apply 5 U.S.C. § 3348(d)(1) ................................................................. 29

C.   Nationwide injunctive relief is Appropriate and Necessary ............................... 30

CONCLUSION ....................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

<span style="text-align:center">CASES</span>

*Arpaio v. Obama*, 27 F.Supp.3d 185 (D.D.C. 2014) ...................................................... 29

*Auer v. Robbins*, 519 U.S. 452 (1997) ......................................................................... 21

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ................................... 34

*Boyle v. United States*, 1857 WL 4155 (Ct. Cl. Jan. 19, 1857) ..................................... 16

*Bullock v. Bureau of Land Mgmt.*, 4:20-CV-00062-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020) .......................................................................................................................... 32

*CASA de Maryland v. Wolf*, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *32 (D. Md. Sept. 11, 2020) ............................................................................................................... 10, 19, 22

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ........................................................ 9

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ........................................... 34

*Clark v. Martinez*, 543 U.S. 371 (2005) ....................................................................... 14

*Edmond v. United States*, 520 U.S. 651 (1997) ............................................................ 16

*English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018) ............................................. 8, 10

*EPIC Systems v. Lewis*, 138 S. Ct. 1612 (2018) ............................................................. 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...... 11

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................................... 20

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir.) ................. 31

*Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550 (9th Cir. 2016) ..................... 10, 32

*Immigrant Legal Resource Center v. Wolf*, 4:20-cv-05883-JSW (N.D. Cal. Sept. 29, 2020) 19, 27, 28, 35

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ............................................................. 21

*J.E.M. Ag Supply Inc. v. Pioneer Hi-Bred Int'l Inc.*, 534 U.S. 124 (2001) .................... 13

*Kingdomware Tech., Inc. v. United States*, 579 U.S. ____, 136 S. Ct. 1969 (2016) ......... 19

*Kisor v. Wilkie*, 588 U.S. ____, 139 S. Ct. 2400 (2019) ................................................ 21

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) ........................................ 29, 31

*La Clinica De La Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) .......................................................................................................................... 19

*Loughran v. Mayor and Aldermen of Jersey City*, 92 A. 55 (N.J. 1914) ........................ 22

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ......................................................... 12

*Morton v. Mancari*, 417 U.S. 533 (1974) ...................................................................... 9

*New York v. DHS*, 969 F.3d 42 (2d Cir. 2020) ....................................................... 34, 35

*NLRB v. SW General, Inc.,* 580 U.S. ____, 137 S. Ct. 929 (2017) ........................... 16, 25

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ..................................................................... 20

*SW Gen v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015) .......................................................... 12

*Texas Crushed Stone Co. v. United States*, 35 F.3d 1535 (Fed. Cir. 1994) ................... 21

*United States v. Eaton*, 169 U.S. 331 (1898) .......................................................... 14, 16

*United States v. Smith*, 962 F.3d 755 (4th Cir. 2020) .............................................. 14, 16

*Village of Bald Head Island v. U.S. Army Corps of Engineers,* 714 F.3d 186 (4th Cir. 2013) .......... 22

*Watt v. Alaska*, 451 U.S. 259 (1974) ............................................................................. 9

*Whitman v. Am. Trucking Assocs.*, 531 U.S. 457 (2001) .............................................. 20

*Williams v. Taylor,* 529 U.S. 362 (2000) ..................................................................... 20

<span style="text-align:center">STATUTES</span>

28 U.S.C. § 546 ............................................................................................................ 13

5 U.S.C. § 3345(b)(1) ................................................................................ 9, 27
5 U.S.C. § 3346(a) ........................................................................................ 25
5 U.S.C. § 3346(a)(1) ..................................................................................... 9
5 U.S.C. § 3347(a)(1) ....................................................................... 9, 13, 33
5 U.S.C. § 3348 .............................................................................................. 9
5 U.S.C. § 3348(a)(2)(A)(ii) ........................................................................ 29
5 U.S.C. § 3348(d) ....................................................................................... 32
5 U.S.C. § 3348(d)(1) .............................................................................. 29, 32
5 U.S.C. § 3348(d)(2) ................................................................................... 29
5 U.S.C. § 3349 .............................................................................................. 8
5 U.S.C. § 3349(a) ................................................................................... 11, 23
5 U.S.C. § 3349(a)(1) ................................................................................... 33
6 U.S.C. § 112(b)(1) ..................................................................................... 30
6 U.S.C. § 113(a)(1)(A) ................................................................................ 10
6 U.S.C. § 113(a)(1)(F) ................................................................................ 10
6 U.S.C. § 113(g)(2) ............................................................................. 8, 9, 15
6 U.S.C. § 113(g)(3) .................................................................................. 8, 11
6 U.S.C. § 112(a)(3) ..................................................................................... 30
Pub. L. 114–328, div. A, title XIX, § 1903(a), Dec. 23, 2016 ........................ 12

OTHER AUTHORITIES

H. Rep. 107-609 (2002) ................................................................................ 13
Office of Legal Counsel, *Designating an Acting Attorney General* (Nov. 14, 2018) ........................ 16
Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op.
   O.L.C. (Mar. 22, 1999) .......................................................................... 12

REGULATIONS

8 C.F.R. § 2.1 ............................................................................................... 30

CONSTITUTIONAL PROVISIONS

U.S. Const. Art. II, § 2, cl. 2 ........................................................................ 15
U.S. Const. Art. II, § 2, cl. 2 ........................................................................ 16

BRIEFS

Br. of Defs., *CASA de Maryland v. Wolf*, No. 8:20-CV-02118-PX, (D. Md. Aug. 3, 2020) ............. 19
CATO Institute Am. Br., *ILRC v. Wolf*, 4:20-cv-05883 (N.D. Cal. Aug. 20, 2020) .......................... 15

**INTRODUCTION**

Statutory and constitutional safeguards require the Secretary of Homeland Security to be appointed with the advice and consent of the Senate. Yet, according to Defendants, a President could designate serial Acting Secretaries indefinitely for four or even eight years, while circumventing entirely Congressional oversight. In the present case, Defendants' shell-game appointments of Acting Secretaries have culminated in an unlawfully installed official, Defendant Wolf, dismantling DACA, a program that directly impacts the lives of nearly one million young people. Because Wolf's appointment was unlawful, his DACA policy must be set aside.

Defendants advance one meritless argument after another in their attempt to justify Defendant Wolf's exercise of authority as Acting Secretary of the Department of Homeland Security ("DHS"). First, Defendants propose a strained reading of the statutory text to argue that the Homeland Security Act ("HSA") and the Federal Vacancies Reform Act ("FVRA") are mutually exclusive statutes. They contend that Congress intended the HSA to repeal important requirements in the FVRA that curb executive power, such as the FVRA's 210-day limit on acting officials, restrictions on simultaneous service, and remedial provisions, but Defendants are unable to identify any language in the HSA to support this argument. Moreover, Defendants' reading of the HSA creates two Appointments Clause problems: it would allow the President to hold the office of Secretary artificially vacant through an indefinite series of Acting Secretaries—exactly as he has done here—and it runs afoul of the Appointments Clause's limitation on the appointment of inferior officers. Defendants also invent a distinction between a "delegation" and a "designation" to try to correct the failure by then-Secretary Nielsen to amend an order of succession for her resignation. The facts remain straightforward: Mr. McAleenan's assumption of

the office of Acting Secretary was unauthorized and unlawful, and therefore Defendant Wolf's subsequent installation was unlawful, too.

Defendants' latest ploy does nothing to cure the problems with Defendant Wolf's appointment and service. In a tacit admission that Defendant Wolf's designation as Acting Secretary was legally flawed, Defendants recently cast Peter Gaynor, the Federal Emergency Management Agency ("FEMA") Administrator, in the role of phantom Acting Secretary of DHS, so that Gaynor could issue yet another order of succession attempting to legitimize Defendant Wolf's designation. Defendant Wolf then notified the Court that he was ratifying "each of [his] delegable prior actions as Acting Secretary . . . ." Dkt. No. 327-1, at *1. This is the fourth time that Defendants have attempted to abruptly alter the order of succession to shore up the designation of a politically-favored officer, while subverting statutorily-required, constitutionally-designed legislative processes. Defendant Wolf's purported ratification is void under the plain language of the FVRA and because Peter Gaynor's order of succession was invalid.

The statutory and constitutional requirements for appointment are not mere procedural niceties that can be cured through further invalid appointment. They are essential for the democratic protection of vulnerable members of our society. The impact of Defendant Wolf's violations is unquestionably severe: his decision to gut the DACA program affects the nearly one million individuals who would benefit from DACA, their families, and their communities. This Court should reaffirm that presidential appointments are subject to the rule of law; declare that Defendant Wolf holds no legal authority to make or enforce these actions because his appointment is unlawful; and hold that the Wolf Memorandum has no force or effect.

## STATEMENT OF INTERVENING FACTS

After Defendant Wolf had served for over 300 days without nomination or confirmation to the position of Secretary, Defendants finally acknowledged the legality of his appointment was, at best, questionable. On September 10, 2020, Peter Gaynor, the FEMA Administrator, purported to exercise the functions of Acting Secretary and issue yet another change to the order of succession at DHS. Plaintiffs' Supplemental Statement Of Undisputed Material Facts ("Supp. SOUF") ¶ 2. The Gaynor Order stipulated an order of succession identical to Kevin McAleenan's November 2019 order of succession, placing Defendant Wolf above Mr. Gaynor in the order of succession. *Id.* ¶¶ 3-4. Upon issuing the Gaynor Order, Mr. Gaynor did not claim to vacate his office, but purported to trigger the succession order and dissolve his own authority to perform the duties and functions of the Secretary. *Id.* ¶¶ 5-6. In Defendants' view, the Gaynor Order "confirmed [Defendant Wolf's] authority to continue to serve as the Acting Secretary." Dkt. 327-1 at *2. The same day as the Gaynor Order was issued, Defendant Trump formally nominated Defendant Wolf to serve as Secretary of DHS. Supp. SOUF ¶ 7. Despite the FVRA's clear provision that a nominee may not serve as Acting Secretary, 5 U.S.C. 3345(b)(1)(B), to this day, Defendant Wolf continues to claim that he is Acting Secretary. *See* Supp. SOUF ¶ 8.

On September 18, 2020, Defendants notified the Court and Plaintiffs that on September 17, 2020, Defendant Wolf issued a statement purporting to "affirm[] and ratify[] each of [his] delegable prior actions as Acting Secretary . . . out of an abundance of caution because of . . . [the General Accountability Office ("GAO") opinion] and recent actions filed in federal court." *Id.* ¶ 9. The purported ratification ("Wolf Ratification") would apply to "any and all actions involving

delegable duties that [Defendant Wolf] ha[d] taken from November 13, 2019, through September 10, 2020, the date of the execution of the Gaynor Order." *Id.* ¶ 10.[1]

## ARGUMENT

I. **The FVRA's Framework Requirements Apply and Are Not Repealed by the HSA's Authority to Issue an Alternative Order of Succession**

The Wolf Memorandum is unlawful under both the FVRA and the HSA, two interlocking statutes that each impose requirements on appointments in DHS. The FVRA is the primary statute governing orders of succession for federal agencies, while the HSA supplements one component of the broader statutory framework: orders of succession. Defendants' argument—that the HSA removes the FVRA's limits on Defendant Wolf's designation as Acting Secretary—suffers from three main flaws. First, it lacks support in the text or legislative history of the HSA. Second, their construction of the HSA would permit indefinite seriatim appointment, raising serious concerns of a violation of the Appointments Clause. Third, Defendants' interpretation of the HSA also raises significant constitutional concerns relating to the Appointments Clause's restrictions on the appointment of inferior officers.

A. **The Plain Text and Agency Practice Confirm That the FVRA and the HSA are Co-existing and Intersecting Statutes**

The FVRA and the HSA are co-existing statutes. The FVRA sets a general framework for filling vacancies, while the HSA supplements the FVRA in certain circumstances—namely with regard to orders of succession. *See* 6 U.S.C. § 113(g)(2) (providing authority to designate a "further

---

[1] Defendants' counsel provided Plaintiffs with notice of this ratification only after filing the parties' Joint Status Report on September 18. Supp. SOUF ¶ 11.

order of succession"); § 113(g)(3) (supplementing FVRA's vacancy notification requirements).[2]

The FVRA is meant to "apply alongside agency-specific statutes, rather than be displaced by them." *English v. Trump* ("*English*"), 279 F. Supp. 3d 307, 319 (D.D.C. 2018). Like the statute at issue in *English v. Trump*, the HSA's specific provision on designating acting officers operates within the general framework established by the FVRA. Two statutes are "capable of co-existence . . . absent a clearly expressed congressional intention to the contrary." *Morton v. Mancari*, 417 U.S. 533, 551 (1974). Furthermore, "a party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the burden of showing a clearly expressed congressional intention," that is "clear and manifest." *EPIC Systems v. Lewis*, 138 S. Ct. 1612, 1624 (2018). Defendants, in claiming that the invocation of the HSA in authorizing an order of succession relieves the agency of complying with the FVRA wholesale, fail to carry this burden.

Nothing in the HSA indicates an intent to repeal *sub silentio* provisions of the FVRA imposing limits on temporary appointments, 5 U.S.C. § 3346(a)(1), restricting simultaneous service, *id.* § 3345(b)(1), or establishing remedies, *id.* § 3348. Agency-specific statutes only displace provisions of the FVRA if they do so "expressly." 5 U.S.C. § 3347(a)(1). Where it perceived a tension between the HSA and the FVRA, Congress explicitly stated whether the HSA would displace a provision of the FVRA. Accordingly, the HSA grants the DHS Secretary the authority to designate an order of succession "notwithstanding" the FVRA's specific provisions that provide a different scheme for designating acting officers beyond the officer's first assistant. 6 U.S.C. § 113(g)(2) ("Notwithstanding chapter 33 of title 5, the Secretary shall designate such

---

[2] 5 U.S.C. § 3349 requires reporting a covered vacancy to the Comptroller General and to Congress, while 6 U.S.C. § 113(g)(3) requires notifying the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives. These different, yet complementary, notification requirements evince Congressional intent for the FVRA and HSA to work concurrently, rather than at odds with each other.

other officers of the Department in further order of succession").[3] But this carveout only pertains to the FVRA's provision for *designating* "such other officers" in the order of succession, and nothing more. *Id.* Designation according to a specified order of succession for temporary appointment says nothing about other requirements in the FVRA, such as the *duration* or other limitations of such a designation.

When an agency-specific statute like the HSA speaks to succession, the FVRA remains "a means" of governing such acting appointments, even if it is no longer the exclusive means for the authorization of acting officials in that agency. *See CASA de Maryland v. Wolf* ("*CASA de Maryland*"), No. 8:20-CV-02118-PX, 2020 WL 5500165, at *32 (D. Md. Sept. 11, 2020) (citing *Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016); *see also English*, 279 F. Supp. 3d at 319 ("[B]y its own terms, the FVRA is not the 'exclusive means' for filling the vacancy [if an agency-specific statute exists, but] remains a nonexclusive means to do so."). Because the FVRA still operates on the acting officer, it follows that the FVRA's requirements, such as the 210-day time limit, still apply. Defendants fail to offer contrary support for their proposition that, if an acting officer is designated under the HSA's alternative order, *none* of the FVRA's limits on acting officers apply.

The text of the HSA itself demonstrates Congressional acknowledgment of the relevance and importance of the FVRA's time limits. Provisions of the HSA plainly subject certain officials in the HSA's order of succession—such as the Deputy Secretary and the Under Secretary for Management—to the FVRA's 210-day limit. *See* 6 U.S.C. § 113(a)(1)(A), (F) (providing that the

---

[3] Courts understand a "notwithstanding" clause as "signaling the drafter's intention that provisions of the 'notwithstanding' section override *conflicting* provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (emphasis added). Where the FVRA and HSA do not conflict, a court should "read statutes to give effect to each." *Watt v. Alaska*, 451 U.S. 259, 267 (1974). As the HSA does not provide any explicit time limits on acting appointments, there is no conflict between the HSA and the FVRA on this issue.

Deputy Secretary is "the Secretary's first assistant" and that the Under Secretary for Management is the "first assistant to the Deputy Secretary" for FVRA purposes, including its 210-day limit). Defendants' reading of Sections 113(g)(1) and (g)(2) of the HSA—as supplanting the FVRA's time limits—places those sections in tension with Sections § 113(a)(1)(A) and (F). Defendants' interpretation invites a result that would remove agency officials from Congressionally-enacted limits, allowing the office of Acting Secretary to be occupied indefinitely. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (explaining the "fundamental canon of statutory construction that the words of a statute must be read in their context" "with a view to their place in the overall statutory scheme" and to "fit, if possible, all parts into an harmonious whole") (internal quotation marks omitted).

Furthermore, Defendants' own actions reveal that DHS has understood the FVRA and the HSA to co-exist, thus maintaining applicability of the FVRA's requirements to officers designated under the HSA. Upon Secretary Nielsen's departure from office, DHS's Office of the General Counsel notified Vice President Michael Pence, in his capacity as President of the Senate, of the vacancy and designation of an acting officer in accordance with the notification requirement of the FVRA, writing: "On behalf of the department, I submit the attached form for a notice of a vacancy and designation of an acting officer *for a position covered by the Federal Vacancies Reform Act of 1998 . . . .*" Dkt. No. 324-1, at *10 (emphasis added); *see also id.*, at *11 ("Submission Under the Federal Vacancies Reform Act"). Indeed, the HSA does not require DHS to report vacancies to the Senate leadership—only the FVRA does. *See* 5 U.S.C. § 3349(a) (requiring reporting of vacancies "to the Comptroller General of the United States and to each House of Congress").

The HSA specifically acknowledges this FVRA requirement, and also imposes additional requirements to notify other bodies of a vacancy. *See* 6 U.S.C. § 113(g)(3) ("The Secretary shall

notify the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives of any vacancies that require notification under [the FVRA].”). Defendants ask this Court to ignore DHS's *own* understanding of its governing statutes and instead accept a tenuous, unsupported, *post-hoc* rationale that favors Defendants' litigation position.

### B.  Defendants' Reliance on the FVRA's Legislative History is Misplaced

Nothing in the legislative history of the HSA indicates congressional intent to repeal *sub silentio* any requirements of the FVRA on which the HSA is silent, most notably the 210-day limit on temporary appointments. Under Defendants' theory, if an individual is designated Acting Secretary pursuant to the HSA, that designation carries no limit on tenure because the HSA is silent on tenure term limits. Dkt. No. 323, at *15. Yet, instead of supporting their interpretation of the HSA through that statute's legislative history, Defendants ask the Court to rely on legislative history of the previously-enacted FVRA to determine whether Congress intended for the HSA to repeal the FVRA's limits on tenure. That approach is backwards.

Defendants primarily rely on the 1998 Senate Report accompanying the FVRA to support their argument that Congress did not intend the FVRA's time limits to displace those of agency-specific statutes. *Id.*, at *17. But that report could only have considered statutes that were extant at the time the FVRA was enacted.[4] The HSA, which was enacted in 2002 and was not amended to include the relevant acting officer provisions until 2016,[5] was not one of those statutes. Since the HSA is the later-in-time statute, the question is not whether Congress intended the FVRA to displace the subsequently enacted agency-specific statute, but whether Congress, when amending

---

[4] Moreover, the Senate Report on which Defendants rely relates to an earlier version of the FVRA that differed in significant ways. *See SW Gen v. NLRB*, 796 F.3d 67, 77 (D.C. Cir. 2015) (rejecting reliance on the Senate Report on this basis).
[5] Pub. L. 114–328, div. A, title XIX, § 1903(a), Dec. 23, 2016 (adding subsection (g) to Section 113).

the HSA in 2016, sought to exclude the time limits set by the FVRA when it provided an alternative procedure for acting appointments. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").[6]

Looking to the HSA's legislative history bears no fruit for Defendants either. Nothing in the legislative record suggests that designations under the HSA are exempt from the time limits imposed by the FVRA or that Congress intended for the HSA to impose no time limit whatsoever on the service of acting officers. *See* H. Rep. 107-609 (2002). In fact, the House Report stresses that Congress intended that DHS be led by a Secretary whose appointment would be subject to "the advice and consent of the Senate." *Id.*, at *63. If Congress intended to depart from this principle and deviate from the FVRA's default time limits, it could have done so in HSA itself, as it has in other post-FVRA agency-specific statutes in which it included specific time limits.[7]

Finally, Defendants' reading of the HSA suffers from another fatal flaw: It would eviscerate the FVRA's requirement that agency-specific statutes only permit acting officers to serve "temporarily." 5 U.S.C. § 3347(a)(1). Because the FVRA only permits alternative orders of succession for *temporary* service, and given the HSA's silence on time limits, the FVRA's time limits on acting service must be read to apply to designations authorized by the HSA. *See J.E.M. Ag Supply Inc. v. Pioneer Hi-Bred Int'l Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clear congressional intention to the

---

[6] Defendants also point to an opinion by the Office of Legal Counsel ("OLC") to support its argument that the "FVRA's time limits 'do not apply' to office-specific vacancy statutes." Dkt. No. 323, at *16. Yet at no point does the cited OLC opinion suggest the FVRA's limits on acting officers would never apply to an officer appointed under an agency-specific statute. Instead, the OLC opinion reaches the much more modest—and unrelated—conclusion that "the time limits of the [FVRA] do not apply to vacancies caused by sickness." Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 66-67 & n.3 (Mar. 22, 1999).

[7] *See, e.g.*, 28 U.S.C. § 546 (2007) (providing that acting U.S. Attorney may serve until the earlier of the "qualification of a United States attorney for such district appointed by the President . . . . Or the expiration of 120 days after appointment by the Attorney General").

contrary, to regard each as effective."). Accordingly, this Court should give effect to both statutes by applying the FVRA's 210-day limit to acting appointments made pursuant to the HSA.

### C.  Reading the HSA to Exclude Any Limits on Acting Tenures Would Raise Serious Constitutional Questions

The FVRA's express limits on the service of acting officials comport with the constitutional prohibition on indefinite acting appointments.[8] Defendants' proposed reading of the HSA—permitting indefinite acting designations simply because the HSA is silent on time limits—would raise serious constitutional questions under the Appointments Clause. This is especially true with respect to serial acting appointments, as is the case here. When "[a] statute is found to be susceptible of more than one construction," a court should "choos[e] between them" with an eye towards avoiding a construction that poses a serious constitutional problem. *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Faced here with such a choice, this Court should reject Defendants' interpretation and adopt a reading of the HSA that incorporates the FVRA's time limits and avoids a conflict with the Appointments Clause.

The HSA can be squared with the Appointments Clause's requirements by recognizing that the FVRA's time limits on acting service apply to designations made under the HSA's order of succession.[9] *See supra* Section I.A-B. Temporary service is precisely what allows acting service to comport with the Appointments Clause. *See United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and *temporary* conditions, he is not thereby transformed into the superior and permanent official.") (emphasis added); *see also United States v. Smith,* 962 F.3d

---

[8] Without any time limitation on acting appointments, Defendant Wolf's designation would violate the Appointments Clause. *See* Dkt. No. 311 at *21-22.

[9] The existence of time limits in other post-FVRA agency-specific statutes reinforces Plaintiffs' position. *See supra* note 7.

755, 765 (4th Cir. 2020) ("*Eaton* stands for the basic principle that acting heads of departments are not principal officers *because* of the temporary nature of the office") (emphasis added). Accepting Defendants' interpretation of the HSA would instead render it incompatible with the Appointments Clause's explicit limitations on Executive power, and Congress's intent to establish a Department led by a Secretary whose nomination would be subject to "advice and consent of the Senate."[10] Therefore, this Court should reject Defendants' dangerous reasoning and confirm that the FVRA's time limit applies to designations under the HSA.

### D. Reading the HSA to Permit Acting Secretaries to Appoint Other Acting Secretaries Would Raise Major Constitutional Concerns

An interpretation of the HSA that permits Acting Secretaries to appoint other Acting Secretaries would raise additional significant constitutional concerns. The HSA provides that "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). Defendants' argument, that Defendant Wolf lawfully was authorized to issue the Wolf Memorandum, can only prevail if the HSA is interpreted to permit Acting Secretaries to designate others, such as Defendant Wolf, to serve as Acting Secretaries. Doing so would raise a serious constitutional concern under the Appointments Clause, which prohibits inferior officers, such as the Acting Secretary of Homeland Security, from appointing other inferior officers.

---

[10] As a further attempt to evade any scrutiny, Defendants invoke the non-justiciability doctrine to prevent this Court from weighing in on the constitutional limits that the Appointments Clause places on Defendants and all executive agencies and from finding indefinite service to be constitutionally untenable. Defendants' reasoning permits a "brazen end-run[] around advice and consent." *See* CATO Institute Am. Br., *ILRC v. Wolf*, 4:20-cv-05883 (N.D. Cal. Aug. 20, 2020), ECF 39 at 10. This reading also permits an alteration of the constitutional framework by ignoring a circumvention of the confirmation process without a "clear statement" of legislative intent. *Id.* at 9-16; *see also supra* Section I.C. Plaintiffs do not ask this Court to determine the precise boundaries of the constitutional limit on temporary appointments. Rather, Plaintiffs request that this Court enforce the applicable law to determine that Defendant Wolf's service as supposed Acting Secretary cannot be characterized as temporary under any reasonable statutory or constitutional standard.

The Appointments Clause provides that both principal and inferior officers are generally subject to the formal constitutional process of Presidential nomination and Senate confirmation. U.S. Const. Art. II, § 2, cl. 2. However, for inferior officers, the Clause carves out an exception that allows for Congress to authorize the President, a court of law, or "Heads of Departments" to appoint inferior officers without the advice and consent of the Senate. *Id.* Acting officers are designated pursuant to this exception, either by the President or by the Head of Department, thereby clearly rendering acting officers "inferior" within the meaning of the Appointments Clause.[11] *See NLRB v. SW General, Inc.,* 580 U.S. ____, 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring) ("When the President 'direct[s]' a person to serve as an acting officer, he is 'assign[ing]' or 'designat[ing]' that person to serve as an officer."). As the Fourth Circuit has stated, "[*United States v.*] *Eaton* stands for the basic principle that acting heads of departments are not principal officers because of the temporary nature of the office." *United States v. Smith,* 962 F.3d at 765 (4th Cir. 2020).

To propose that an Acting Secretary may designate future orders of succession assumes that an Acting Secretary takes on the constitutional role of "Head[] of Department[]." U.S. Const. Art. II, § 2, cl. 2. This assumption is faulty. Performing the functions or duties of the Secretary as an Acting Secretary does not transform the Acting Secretary into a constitutional Head of

---

[11] Defendants may argue that because an Acting Secretary is not "directed or supervised" by another officer, the Acting Secretary is not an "inferior officer." *Edmond v. United States*, 520 U.S. 651, 652 (1997) ("Inferior officers" are those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the Senate's advice and consent."). Yet the fact alone that an acting officer is—by virtue of their "acting" status—not confirmed with the Senate's advice and consent renders the acting officer "inferior." *See United States v. Eaton*, 169 U.S. 331, 343 (1898) ("The manifest purpose of congress in classifying and defining the grades of consular offices … was to so limit the period of duty to be performed by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word."); *see also Boyle v. United States*, 1857 WL 4155, at *3 (Ct. Cl. Jan. 19, 1857) ("We do not consider that the mere fact that the duties of both offices are the same makes the offices themselves identical. The office of Secretary ad interim is temporary in its character, whilst that of Secretary is of a more permanent nature."); Office of Legal Counsel, *Designating an Acting Attorney General*, slip op. at 22 (Nov. 14, 2018) (assuming that "for constitutional purposes the official designated as acting head of an agency would need to be an inferior officer"), *available at* https://www.justice.gov/olc/file/1112251/download.

Department. *See Boyle v. United States*, 1857 WL 4155, at *3 (Ct. Cl. Jan. 19, 1857) ("The [Secretary] is emphatically the head of his department, whilst the [Secretary ad interim] is only authorized to perform the duties of the Secretary [under certain circumstances.] The [latter] may be considered inferior to the other."). Rather, the term "Head[] of Department[]," as used in the Appointments Clause carries a requirement of Senate confirmation.  Given this requirement, an acting official may never be the Head of Department unless that official is formally nominated by the President and confirmed by the Senate in compliance with requirements of the Appointments Clause. And because only a Head of Department can appoint inferior officers, an inferior officer like the Acting Secretary cannot appoint other inferior officers.

This Court need not decide this constitutional question. By construing the HSA to allow only a Senate-confirmed Secretary, a principal officer, to invoke § 113(g)(2) in order to issue orders of succession, the Court would obviate any Appointments Clause concern. Such a reading is consistent with the plain language of the statute, which authorizes only a "Secretary"—and not an Acting Secretary—to make designations to serve as "Acting Secretary." "Secretary," therefore, should be read to mean Secretary. And with this reading, it is clear that the changes Mr. McAleenan and Mr. Gaynor made to the order of succession—both so that Defendant Wolf could assume the role of Acting Secretary—are void. As a result, Wolf never properly assumed the role of Acting Secretary and the Wolf Memorandum must be held void *ab initio*.

II.     **Defendant Wolf Did Not Properly Assume the Position of Acting Secretary Under Any Lawful Order of Succession**

Defendants have concocted an artificial distinction between a "delegation" and a "designation" in order to argue that this Court should ignore the plain language of Secretary Nielsen's April 2019 changes to HSA Delegation No. 00106. But Defendants cannot point to any

language in either document or to any sustained agency practice that supports their mischaracterization of the scope and purpose of those changes.

Defendants produced an April 9, 2019 order issued by Secretary Nielsen amending Annex A of Delegation No. 00106. Dkt. 324-1 at *2-3 (the "Nielsen Designation"). They claim that this order, and not the text of Delegation No. 00106 issued on April 10th (what Plaintiffs referred to as the April Delegation in their opening brief) should govern. Dkt. 323 at *8. But such a distinction is a mere distraction. Both the Nielsen Designation and the later April Delegation reflect the same incontrovertible fact: Secretary Nielsen modified *only* Annex A, governing vacancies by reason of disaster or catastrophic emergency—not the order of succession governing vacancies resulting from resignation. The office of Secretary became vacant upon Secretary Nielsen's *resignation*, and therefore the designation of Mr. McAleenan under the amended Annex A did not apply. The text of the Nielsen Designation and the April Delegation—not to mention prior agency practice—unquestionably demonstrate that Mr. McAleenan, and by extension Defendant Wolf, did not lawfully assume the position of Acting Secretary.

## A. The Plain Language of the Nielsen Designation and the April Delegation Make Clear that McAleenan was Improperly Designated

Mr. McAleenan was improperly designated as, and could not fill the role of, Acting Secretary under both the plain text of the Nielsen Designation and the subsequent April Delegation. The Nielsen Designation unambiguously makes a single substitution to Annex A of Delegation No. 00106, and Defendants fail to explain why this Court should ignore the operative language of this substitution, which reads as follows:

> Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof: Annex A. Order for Delegation of Authority by the Secretary of the Department of Homeland

14

Security.

Dkt. No. 324-1, at *3. Defendants do not dispute that Annex A of Delegation No. 00106 applied exclusively to vacancies resulting from disaster or catastrophic emergency, nor do they dispute that the April Delegation explicitly invoked *only* Annex A, and made no mention of any other provision of Delegation No. 00106. In related litigation, Defendants have conceded that the April Delegation left intact Section II.A of the prior DHS Delegation No. 00106, which governs vacancies resulting from death, resignation, or inability to perform the functions of the office. Br. of Defs. At *26, n.10, *CASA de Maryland v. Wolf*, No. 8:20-CV-02118-PX, (D. Md. Aug. 3, 2020), Dkt. No. 41. In that same litigation, Defendants insisted that their failure to update Section II.A was "an inadvertent, ministerial error.*" Id.* Here, as in *CASA*, Defendants' arguments are unavailing. Defendants rely only on prefatory language in the Nielsen Designation, and extrinsic statements made after Annex A was amended, to distort the explicit meaning of the Nielsen Designation.

Defendants proffer a specious position that "does nothing to undermine the basic proposition that 'the plain language [of the Order] . . . controls [and] speaks for itself.'" *CASA de Maryland*, 2020 WL 5500165 at *22 (citing *Kingdomware Tech., Inc. v. United States*, 579 U.S. ____, 136 S. Ct. 1969, 1978 (2016) ("[P]refatory clauses or preambles cannot change the plain meaning of the operative clause.")). *See also La Clinica De La Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 4569462, at *14 (N.D. Cal. Aug. 7, 2020) ("[A]t the time of Nielsen's resignation, Executive Order 13753 governed the order of succession."); *accord Immigrant Legal Resource Center v. Wolf* ("*ILRC*"), 4:20-cv-05883-JSW, slip op. at 14-15 (N.D. Cal. Sept. 29, 2020) ("The Court finds the reasoning set forth in *La Clinica de la Raza* and *Casa de Maryland* on the succession issue highly persuasive . . ."). Nor have Defendants cited any authority for the

proposition that the Court may look to public statements or press releases to determine the intent of Secretary Nielsen's unambiguous language in the April Delegation. Moreover, Defendants' position violates multiple canons of construction.

First, Defendants' erroneous interpretation of the Nielsen Designation as amending more than Annex A is inconsistent with the presumption against redundancy, as this interpretation requires incorrectly collapsing the clear distinction between §§ II.A and II.B of Delegation No. 00106. In doing so, the government renders superfluous the distinction between the 'resignation' and the 'emergency' scenarios. Courts "must interpret" texts "to give effect to both provisions where possible." *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). Defendants' reading renders § II.B superfluous, by arguing that the amendment to Annex A has the effect of displacing the entire Delegation. *Williams v. Taylor,* 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."). The agency's own update to Delegation No. 00106 plainly *does not* treat § II.B as superfluous. Defendants cannot overcome this presumption.

In addition, the government's position would have the Nielsen Designation alter "the fundamental details of a regulatory scheme" in "vague terms or ancillary provisions." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001). Establishing orders of succession for the Secretary of a vast and powerful executive agency is a fundamental, if not the most fundamental, detail of the regulatory scheme at issue. But nowhere did the document and attached amendment even mention such a fundamental restructuring of the orders of succession and delegation of authority at DHS.[12]

---

[12] Changes in the April Delegation applied exclusively to Section II.B—that is, to vacancies resulting from disaster or catastrophic emergency. Christopher Krebs, the Director of the Cybersecurity and Infrastructure Security Agency, should have become Acting Secretary upon Secretary Nielsen's resignation in April 2019. See Dkt. No. 310-3, at

16

**B. Prior Agency Practice Confirms That Delegations Control Changes in the Order of Succession**

Despite the confusion Defendants attempt to sow between the Nielsen Designation and the April Delegation, prior agency practice provides this Court with straightforward guidance. Defendants' characterization of Delegation No. 00106 as a forceless "administrative document," *see* Dkt. No. 323, at *14, contravenes years of agency practice enshrining Delegation No. 00106 as the authoritative record of governing orders of succession. Defendants' reading of the April Delegation is inconsistent with DHS practice, does not deserve deference,[13] and is not controlling.

Prior agency practice is instructive in determining whether to afford deference to an agency's novel practice or interpretation. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."). An agency's prior practice reflects that earlier interpretation. *See Texas Crushed Stone Co. v. United States*, 35 F.3d 1535, 1541 n.7 (Fed. Cir. 1994) ("Prior agency practice is relevant in determining the amount of deference due an agency's interpretation.").

---

*203. Since Mr. McAleenan did not properly succeed Secretary Nielsen, his attempt to alter the order of succession is improper, rendering Defendant Wolf unlawfully appointed.

[13] An agency's interpretation of its own ambiguous regulations is entitled to deference when the interpretation is reasonable, related to the agency's particular expertise in resolving regulatory ambiguities, and reflects the agency's fair and considered judgement. *See Kisor v. Wilkie*, 588 U.S. ____, 139 S. Ct. 2400, 2415-17 (2019). All of these conditions are required, yet none are present in this case, and thus DHS does not deserve deference in its interpretation of the Nielsen Designation. First, the documents in question are not agency regulations. Second, the text is not genuinely ambiguous, *see supra* Section II.A. Third, even if the text were ambiguous, DHS's interpretation is unreasonable for the reasons noted, *see supra id*. Fourth, even if the interpretation were reasonable, DHS's interpretation is unrelated to any particular expertise DHS might have in resolving regulatory ambiguities. *See Kisor*, 139 S. Ct. at 2417 (finding that DHS has no such subject matter expertise in "interpretative issues" that "fall more naturally into a judge's bailiwick").Even if the interpretation at issue did relate to DHS's particular expertise, it does not reflect DHS's fair and considered judgment. Indeed, DHS's interpretation of this deficient document is contradictory and a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

DHS confirmed it did not regard the April Designation as replacing Delegation No. 00106, when it subsequently updated Delegation No. 00106. The Nielsen Designation was issued on April 9, 2019. *See* Dkt. No. 324-1, at *2. DHS updated Delegation No. 00106 the very next day, on April 10, 2019. *See* Dkt. No. 310-3, at *202. The agency's update reveals that at that time DHS interpreted the Nielsen Designation as amending *only* Annex A since no other broader changes were made—certainly not the wholesale, sweeping changes to the Delegation now alleged by Defendants in their litigation positions.[14]

Delegation No. 00106 controls despite Defendants' claim that Delegation No. 00106 is "administrative" and "non-binding" because it was not signed by Nielsen herself. Dkt. No. 323, at *14. On this point, "the Government cites no authority—*none*—for its position." *CASA de Maryland*, 2020 WL 5500165, at *22. The Delegation is indisputably "the only written repository that memorializes . . . changes to the succession orders." *Id.* Secretary Nielsen could have taken a straightforward, procedurally acceptable step to accomplish her goals: overwriting or repealing the existing text of the Delegation in her amendment to the Delegation. She did not.

Therefore, both by its plain text and by DHS's consistent previous interpretations, the updated Delegation No. 00106 controls who succeeded Secretary Nielsen—assuming she was still Secretary—on April 10, 2019.[15] Under Delegation No. 00106, McAleenan was not authorized to

---

[14] Defendants cite *Village of Bald Head Island v. U.S. Army Corps of Engineers* in support of their proposition that an agency's "formal approval" of a project was the final agency action, not the agency's "subsequent activities in carrying it out." 714 F.3d 186, 195 (4th Cir. 2013). Defendants' citation is misplaced, and in any case, they mischaracterize Plaintiffs' argument. The portion of *Village of Bald Head Island* to which Defendants cite dealt only with whether a court could review an agency action as final in a suit under the Administrative Procedure Act. *See id.* at 194. No such controversy is present here. Even if Delegation No. 00106 were "project implementation" of the kind at issue in *Village of Bald Head Island*, it nevertheless reflects the agency's original interpretation of what Ms. Nielsen had accomplished through her Designation the day before. *See also ILRC*, at *n.10 (N.D. Cal. Sept. 29, 2020).

[15] Additionally, as a matter of law, Ms. Nielsen's April 7, 2019 resignation, prior to issuing the Nielsen Designation on April 9, 2019, renders the April Delegation unlawful. Ms. Nielsen's resignation letter, "effective April 7, 2019," made her resignation effective once offered. Ex. K to Declaration of Marisol Orihuela, Dkt. No. 310-3, at *181-82. *See, e.g.*, *Loughran v. Mayor and Aldermen of Jersey City*, 92 A. 55, 55 (N.J. 1914) (holding resignations of public officials effective as of the first possible moments of the effective date). Because Ms. Nielsen legally resigned on

18

assume the role of Acting Secretary, and therefore Wolf's appointment, based on an order of succession purportedly set by McAleenan, was unlawful.

### III.        The September 2020 Gaynor Order Is Not a Valid Order of Succession

The Gaynor Order is an invalid attempt to cure Defendant Wolf's unlawful appointment, by an officer who has never properly assumed or relinquished the functions of Acting Secretary. Prior to issuing the Gaynor Order, Mr. Gaynor was never designated as Acting Secretary, never exercised any role or function of the Acting Secretary, and never reported his designation to Congress, as required under the notice requirements of the FVRA. *See* 5 U.S.C. § 3349(a). Nevertheless, in his one phantom action taken on the basis of "any authority vested in [him] as Acting Secretary of Homeland Security," Dkt. No. 324-1, at *18, Mr. Gaynor purported to reissue Mr. McAleenan's November Delegation so as to validate Defendant Wolf's appointment as Acting Secretary. Defendants may not swap Acting Secretaries at will, simply to comport with their litigation strategy at a given moment. The Gaynor Order must be seen for what it is: a contrived and belated effort to cover the agency's tracks.

Defendants' recent maneuver fails to cure Defendant Wolf's illegal service as purported Acting Secretary. First, by the time Mr. Gaynor attempted to issue the Gaynor Order, the office of DHS Secretary had been vacant far beyond the 210-day limit prescribed by the FVRA, and could only be held by a Senate-confirmed officer at that point. Second, Mr. Gaynor had no vested authority as Acting Secretary of Homeland Security, as he was never appointed to the role and he continued to simultaneously occupy another office. Even if Mr. Gaynor was properly serving as Acting Secretary on September 10, 2020, his failure to resign or otherwise leave office precludes Defendant Wolf from assuming the role of Acting Secretary pursuant to the Gaynor Order.

---

April 7, 2019, she did not have the authority to withdraw her resignation after it took effect or, later on, to issue the Nielsen Designation or make any amendments to Delegation No. 00106.

A.  **The FVRA 210-Day Limit Precludes Mr. Gaynor or Defendant Wolf From Assuming the Role of Acting Secretary For the Purposes of Ratifying the Wolf Memorandum**

As the office of Secretary of DHS has remained vacant for more than 210 days, no one, including Mr. Gaynor and Defendant Wolf, may lawfully hold the position of Acting Secretary unless confirmed by the Senate. The FVRA's 210-day period began when Secretary Nielsen left office in April 2019. Over a year has passed since Secretary Nielsen's resignation—far beyond the FVRA's tenure limits. The Gaynor Order invokes "any authority vested in [him] as Acting Secretary," but the FVRA plainly precludes service by acting officials after a 210-day vacancy. Defendant Wolf's September 10, 2020 nomination, on the same day as the Gaynor Order, does not rectify Defendant Wolf's prior unlawful service because the vacancy had already exceeded the time allowed under the FVRA.

Neither Mr. Gaynor nor Defendant Wolf could lawfully assume the role of Acting Secretary on September 10, 2020. Both the FVRA and the Government Accountability Office's interpretation of the FVRA make clear that there has been no valid Acting Secretary in office since Secretary Nielsen's resignation in April 2019. Between April 2019 and September 2020, pursuant to the only valid order of succession for vacancies resulting from resignation—E.O. 13753, *see supra* Section II.A—Christopher Krebs was the only individual who could have held the proper authority to assume the role of Acting Secretary. Because Mr. Krebs never assumed this role, and consequently, never left the office of Acting Secretary, there was no "vacancy" that could be filled according to the procedures prescribed by the FVRA. Defendants fail to provide any evidence to explain, under the GAO's view and the FVRA, how or when, between April 2019 and September 2020, any "vacancy" occurred that could have allowed Mr. Gaynor to properly assume the role of Acting Secretary under the FVRA. *See infra* Section III.B (describing notification requirements

under § 3349 and Defendants' failure to provide any documentation evincing that there was a vacancy or that Defendants complied with the FVRA notification requirement).

Neither does submission of a nominee to the Senate re-start the clock on the FVRA's 210-day limit on Acting Officers. A new nominee does not create a "vacancy" and reset the clock on acting officers. Instead, § 3346(a)(2) only functions to restart the FVRA 210-day limit when the nomination of an officer "as described under section 3345" is "submitted to the Senate." Mr. Gaynor and Defendant Wolf, allegedly designated pursuant to the HSA, are not Acting Officers "under section 3345," *see* 5 U.S.C. § 3346(a), and thus the 210-day clock did not restart upon Defendant Wolf's nomination. *See also NLRB v. SW Gen., Inc.*, 137 S. Ct. at 936 (2017) (holding that while the FVRA clock is "tolled" during the nomination process for a person already serving, only a "reject[ion], withdraw[al], or return[]" will "start[] a new clock."). Section 3345(a) provides for acting officers where the original officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," not simply where a nomination occurs. Neither § 3345(a) nor § 3346(a)(2) create a "vacancy" and thus Mr. Gaynor and Defendant Wolf were both precluded from assuming the role of Acting Secretary on September 10, 2020.

At a minimum, the timing of Defendants' actions raises serious doubts as to whether Defendant Wolf's nomination resets the clock for vacancies under the FVRA. Even so, given that the FVRA renders impermissible Mr. Gaynor's purported assumption of the role of Acting Secretary, any action that Mr. Gaynor took as purported Acting Secretary—including the Gaynor Order—is invalid.

**B. Mr. Gaynor's Failure to Properly Assume or Leave the Role of Acting Secretary Renders the Gaynor Order Invalid**

Defendants offer no evidence that Mr. Gaynor ever properly assumed office as Acting DHS Secretary. *Cf.* Dkt. 324-1, at *11, 13 (providing evidence of DHS notice of designation of acting officials in compliance with the FVRA). Further, Defendants fail to submit any evidence that Mr. Gaynor performed any actions in the role of Acting Secretary beyond issuing the Gaynor Order, further undermining any claim to the role of Acting Secretary. Additionally, Defendants present no evidence that Mr. Gaynor ever left his post as FEMA Administrator, either on a temporary or permanent basis. Yet, Mr. Gaynor's invalid order purports to set an order of succession that includes his *own* post as FEMA Administrator, Dkt. No. 324-1, at *18, suggesting that he *has* relinquished that position. However, this order cannot itself constitute evidence that Mr. Gaynor has left his FEMA position in the absence of any formal resignation or other documentation.

While arguing incorrectly that Mr. Gaynor ever assumed the office of Acting Secretary, Defendants also present no evidence that he has left *that* office, as is required before the next available officer in an order of succession can assume that office. Even if Mr. Gaynor lawfully assumed the office of DHS Secretary and validly issued the Gaynor Order, his failure to resign or otherwise leave office would preclude Defendant Wolf's subsequent assumption of the office of Acting Secretary.[16]

Defendants have not complied with any FVRA requirements pertaining to notice of vacancy. The only support for Defendants' contention that Mr. Gaynor both properly assumed and then left office is language within the Gaynor Order itself. The order declares that upon his

---

[16] For example, even after Secretary Nielsen resigned, Mr. McAleenan purportedly assumed office as Acting Secretary only after then-Under Secretary for Management Grady also resigned. Dkt. No. 310-1, at *6 ¶¶ 20-22. Past practice indicates Defendants acknowledge a proper resignation must become effective in order to trigger the order of succession.

signature, Mr. Gaynor's authority "will terminate because 6 U.S.C. § 113(g)(2) applies." *See* Dkt. No. 324-1, at *18. Mr. Gaynor could not lawfully invoke the authority of a Secretary and § 113(g)(2) allows only a "Secretary" to designate a "further order of succession" for a vacancy. Notably, Defendants fail to point to any authority that Gaynor could amend or reissue the orders of succession. But even assuming that Mr. Gaynor could, act as Secretary pursuant to 5 U.S.C. § 3345(a)(2), § 113(g)(2) would only empower him to designate a "further order of succession" in the event of a vacancy, not to terminate the authority of an acting officer under 5 U.S.C. § 3345(a)(2). Mr. Gaynor had no power to terminate his own, improperly vested, authority as an acting officer.

Defendants' orchestration of Mr. Gaynor's purported appointment to produce an alternative justification for Defendant Wolf's service as Acting DHS Secretary is but one more vain effort by Defendants to salvage this unlawful assumption of office. Mr. Gaynor is not and never was Acting Secretary and had no authority to issue the Gaynor Order, which is therefore void. Since Defendants have failed to demonstrate that Mr. Gaynor either properly assumed or vacated the office, Defendant Wolf cannot validly succeed Mr. Gaynor under the Gaynor Order.

**IV.     The FVRA Prohibits Defendant Wolf from Ratifying the Wolf Memorandum**

Defendant Wolf's purported ratification of prior actions since the beginning of his "term" is Defendants' latest attempt to remedy the legal deficiencies of the Wolf Memorandum. *See* Dkt. 327-1. Ratification fails, even if the Gaynor Order were valid, for two reasons. First, Defendant Wolf cannot ratify his actions because 5 U.S.C. § 3345(b) prohibits a nominee from serving as acting secretary, and thus he is not Acting Secretary under the statute. Second, even if Defendant Wolf were Acting Secretary under the FVRA, § 3348 bars ratification here because the Wolf

Memorandum has no lawful force or effect under the statute. *See ILRC*, slip op. at 16 (N.D. Cal. Sept. 29, 2020).

### A.  Even if the Gaynor Order is Valid, Defendant Wolf, as the Nominee for Secretary, Cannot Serve as Acting Secretary

The FVRA expressly prohibits nominees, like Defendant Wolf, from holding an acting position while their nomination is pending. *See* 5 U.S.C. § 3345(b)(1) (stating that "a person may not serve as an acting officer" if "the President submits a nomination of such person to the Senate for appointment to such office"); *see also ILRC*, slip op. at 16 (N.D. Cal. Sept. 29, 2020). Defendants maintain their erroneous reading of the HSA, arguing that the FVRA's prohibition on a nominee's acting service is irrelevant because the HSA provides for an alternative order of succession,. Dkt. 323, at *21 n.17; Dkt. 327, at *1. This is incorrect, for two reasons.

First, where the HSA does not expressly supplant a vacancy requirement of the FVRA, the FVRA still applies. *See supra* Section I. Because the HSA does not expressly supplant the § 3345(b)(1) bar on nominees, the FVRA remains applicable and plainly prohibits Defendant Wolf from serving while his nomination before the Senate is pending. Second, Defendants' reading cannot pass muster when Defendants themselves relied upon authority under the FVRA to make legal arguments in support of the validity of Defendant Wolf's prior actions. *See ILRC*, slip. op. at 16 (N.D. Cal. Sept. 29, 2020) (noting that despite the government's assertion that "Mr. Wolf is not serving pursuant to the FVRA . . . the Gaynor order suggests that President Trump submitted Mr. Wolf's nomination pursuant to the FVRA"). In his September 17 ratification memorandum, Defendant Wolf cites 5 U.S.C. § 3348(a)(2) as the authority under which Mr. Gaynor purportedly assumed the role of Acting Secretary. Dkt. 327, at *2. Defendants cannot oscillate between the FVRA and the HSA whenever it is more convenient for their litigation position.

24

Because Defendant Wolf was not properly serving as Acting Secretary at the time of the September 17 ratification memorandum, he is prohibited from ratifying the Wolf Memorandum. *See ILRC*, slip op. at 16  (holding that plaintiffs were likely to succeed on their claim that Mr. Wolf could not ratify an earlier action because "[t]he effectiveness of [r]atification depends upon a valid appointment").

## B.  Even if Defendant Wolf is the Acting Secretary, the FVRA Bars Him From Ratifying Prior Actions

The FVRA's remedial provision, which prohibits ratification of agency actions that have no force or effect, also prevents Defendant Wolf from ratifying the Wolf Memorandum. 5 U.S.C. § 3348(d)(2). The FVRA plainly states that any action that constitutes a "function or duty" of the office within the meaning of the FVRA, taken by a person improperly acting in violation of the FVRA, shall have no force or effect. *Id.* § 3348(d)(1). A "function or duty" includes duties "required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A)(ii). Defendants claim that § 3348 only prevents ratification of nondelegable duties—i.e. duties that are barred from reassignment—of the office. Dkt. 323, at *25. That reading is flatly wrong.

The authority to issue the Wolf Memorandum is an exclusive "function or duty" within the meaning of the FVRA. Section 3348 only requires "that the statute or regulation at issue provide that the function or duty at issue is assigned to one particular office." *L.M.-M. v. Cuccinelli* ("*L.M.-M*"), 442 F. Supp. 3d 1, 31 (D.D.C. 2020). Defendant Wolf invokes his purported "authority and discretion in establishing national immigration policies and priorities" pursuant to 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202(5). *See* Ex. Y to Declaration of Marisol Orihuela (Wolf Memorandum), Dkt. No. 314, at *4; *see also Arpaio v. Obama*, 27 F.Supp.3d 185, 192 (D.D.C.

2014) (noting that the DHS Secretary is provided authority under 8 U.S.C. § 1103(a)(3) to establish regulations and that the "Secretary of DHS is specifically charged with 'establishing national immigration enforcement policies and priorities'" at 6 U.S.C. § 202(5)). In issuing the Wolf Memorandum, Defendant Wolf purported to discharge the exclusive Secretary function of instructing various subagency components of DHS, including U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"). Ex. Y to Declaration of Marisol Orihuela (Wolf Memorandum), Dkt. No. 314, at *1.

Defendants have previously indicated their own understanding that the role of Secretary of Homeland Security uniquely encompasses the varying and often divergent goals and functions of the many components of DHS. For instance, per Defendants' recent contention that Mr. Gaynor was a lawfully-designating Acting Secretary, it is clear by the plain purpose of the Wolf Memorandum that the FEMA Administrator would lack the capacity to both coordinate among numerous subagencies and properly direct FEMA itself.

It is also unquestionable that Defendant Wolf intended to discharge instruction to a number of DHS subagencies in the Wolf Memorandum.  The memorandum is addressed directly to the highest-ranking officials within each subagency, respectively; moreover, the initial Napolitano Memorandum explicitly directed CBP and ICE to "exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States" and USCIS to implement the DACA memo. Ex. A to Declaration of Marisol Orihuela (Napolitano Memorandum), Dkt. No. 310-3, at *2. Thus, any revocation or change to the Napolitano Memorandum through the Wolf Memorandum necessarily implicates the

activities of CBP, ICE, and USCIS. Due to the inter-subagency nature of the authority Defendant Wolf invoked in the Wolf Memorandum, this authority was exclusive to the office of the Secretary.

Defendants argue that, pursuant to the DHS Secretary's general "vesting and delegation" authority,[17] the Wolf Memorandum was not a "function or duty" under the FVRA. Dkt. 323, at *25. This sweeping, and incorrect, reading of the FVRA would insulate nearly every function of the DHS Secretary, since the vesting and delegation authority does not, on its face, limit the reassignment of the Secretary's functions. By extension, this would mean that any action by any official in an agency governed by the FVRA would be beyond the reach of the § 3348 remedy. *See L.M.-M.*, 442 F. Supp. 3d at 31 ("Every cabinet-level department has some version of [the Department's] vesting and delegation statutes" and so "the logic of [the Government's] position would cover all (or almost all) departments subject to the FVRA"); *see also id.* n.11 (listing examples). Defendants' interpretation of "function or duty" is insupportable, as it would not only render ineffective any penalties imposed by the FVRA, but also ignores the very purpose for which the FVRA was created. *See LM.-M.,* 442 F. Supp. 3d at 34 (reasoning that the FVRA was enacted to *limit* the exploitation of vesting-and-delegation statutes in order to avoid vacancies legislation).

No court has accepted Defendants' argument that a "function or duty" as defined by 5 U.S.C. § 3348(a)(2)(A)(ii) must be completely foreclosed from reassignment. As the *L.M.-M.* court noted, such an argument could not be reconciled with § 3348(b)(2), under which only the head of an executive agency can perform the functions or duties of a subcabinet office. Indeed, this argument would "[require] the department head to perform the functions of [a] vacant [subcabinet]

---

[17] *See* 6 U.S.C. §§ 112(a)(3), (b)(1); 8 C.F.R. § 2.1.

office," but "would apply only in those circumstances in which the department head lacks statutory authority to perform" those exact functions. *LM.-M.,* 442 F. Supp. 3d at 32.[18]

Accordingly, the FVRA's enforcement provisions apply and prohibit ratification of the Wolf Memorandum.[19]

## V.   <u>Vacating the Wolf Memorandum and Enjoining Defendant Wolf from Further Interfering with DACA Are Both Appropriate and Necessary Remedies</u>

Defendants ask the Court to ignore the remedy Congress has explicitly provided for actions by unlawfully designated acting officers. 5 U.S.C. § 3348(d)(1) expressly provides vacatur as the remedy for actions taken by unlawfully designated acting officers, such as Defendant Wolf. Furthermore, as Defendants do not dispute, the significant equities at stake in this case merit a nationwide injunction.

### A.  Vacatur Under the FVRA Is Required

Section 3348(d) of the FVRA stipulates that "[a]n action taken by any person who is not acting under section 3345, 3346, *or 3347* . . . in the performance of any function or duty of a vacant office *to which this section and* sections 3346, *3347,* 3349, 3349a, 3349b, and 3349 apply shall have no force or effect . . . [a]n action that has no force or effect . . . may not be ratified" (emphases added). 5 U.S.C. § 3348(d). This FVRA provision is not only applicable but required in this circumstance. In the presence of agency-specific statutes that concern orders of succession, such as the HSA, the FVRA may no longer be the *exclusive* means for the authorization of acting officials in that agency, but it *remains* "a means" of governing such acting appointments. *See*

---

[18] While the D.C. Circuit stated in dicta that § 3348(d)(1)-(2) "only [prohibits] the ratification of nondelegable duties," that court did not reach the question of whether nondelegable duties are only duties that cannot be reassigned. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019), and *cert. denied*, 140 S. Ct. 789, 206 L. Ed. 2d 266 (2020).

[19] Should the Court not grant summary judgment to Plaintiffs on their statutory claim, it should nevertheless grant summary judgment in Plaintiffs' favor because Defendant Wolf's prolonged tenure and appointment by an inferior officer violate the Appointments Clause.

*Bullock v. Bureau of Land Mgmt.*, 4:20-CV-00062-BMM, 2020 WL 5746836, at *12 (D. Mont. Sept. 25, 2020) (granting relief under § 3348(d) of the FVRA); *CASA de Maryland,* 2020 WL 5500165, at *32 (D. Md. Sept. 11, 2020, *citing Hooks v. Kitsap Tenant Support Servs*., 816 F.3d 550, 556 (9th Cir. 2016). Section 3348(d) of the FVRA is unambiguous in prescribing that actions taken by unlawfully designated acting officials, including officials whose designations are partially governed by agency-specific statutes, should be vacated in order to have no force or effect.

## B. Even if the HSA Governs, the Appropriate Remedy for an Unlawful Appointment Under the HSA Is to Apply 5 U.S.C. § 3348(d)(1)

Even if this Court finds that Defendants violated only the HSA, the HSA interacts with the FVRA such that the remedy still resides in 5 U.S.C. § 3348(d)(1) (indicating that such actions "shall have no force or effect."). 5 U.S.C. § 3347(a)(1) acknowledges that some acting officials may be designated through agency-specific statutes such as the HSA, rather than the FVRA. In subsequent sections, the FVRA also explicitly acknowledges the possibility of unlawful appointments under the agency-specific statutes referenced in § 3347 and provides for the same remedy in the case of such unlawful appointments as provided for unlawful appointments under the FVRA itself.

By incorporating § 3347 into § 3348(d), the FVRA unambiguously applies the § 3348 remedy of rendering void *ab initio* actions taken by officials who are unlawfully appointed under the agency-specific statutes referenced in § 3347, including the HSA. The FVRA also incorporates appointments under agency-specific statutes to its § 3349(a)(1) provision on the reporting of vacancies: "[t]he head of such Executive agency . . . shall submit to the Comptroller General of the United States and to each House of Congress . . . notification of a vacancy in an office to which this section *and sections* 3345, 3346, *3347*, 3348, 3349a, 3349b, 3349c, and 3349d apply. . ." 5

U.S.C. § 3349(a)(1) (emphasis added). The intent of the FVRA's repeated references to appointments under § 3347 is unmistakable: even appointments authorized by agency-specific statutes are subject to remedies and procedures contained in the FVRA, at least insofar as § 3347 appointments are explicitly referenced in other sections of the FVRA. In the specific case of DHS appointments, there is no conflict in reading sections of the FVRA that unambiguously refer to § 3347 appointments as governing those appointments simultaneously with the agency-specific HSA, since the HSA provides no other remedy for actions taken by unlawfully appointed officials.

Even if Defendant Wolf's appointment is understood to be governed primarily by the HSA, his appointment under the HSA is unlawful. In circumstances like these, the remedy in 5 U.S.C. § 3348(d), which explicitly incorporates appointments authorized by agency-specific statute, applies to any actions taken by Defendant Wolf. The Wolf Memorandum thus should be held void *ab initio.*

### C.  Nationwide injunctive relief is Appropriate and Necessary

This Court may exercise its equitable powers to enjoin Defendant Wolf from taking any further unlawful action to alter the DACA program. Defendants do not dispute this fact.[20] Nor do they address the propriety of prospective injunctive relief, which Plaintiffs reiterate is necessary to "address the dire constitutional concerns posed by Defendant Wolf's continued occupation of the Office of DHS Secretary without valid appointment." Dkt. No. 311, at *25.

Plaintiffs here seek to certify a class that reaches individuals nationwide. Such a class assuages concerns about the outsized impact of nationwide injunctions. *See City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018), *vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018) (Manion, J., concurring) ("Requiring a class action has the benefit of dealing with the one-way-

---

[20] Defendants also do not dispute Plaintiffs' standing in seeking the relief requested. *See* Dkt. No. 323, at *24 n.21.

ratchet nature of the nationwide injunction."). Defendants concede in their brief that relief should run to members of this class, if certified. Dkt. No. 323, at *24 ("[T]he Court should simply set aside the Memorandum as . . . to any certified class."). A nationwide permanent injunction against future unlawful action by Defendant Wolf is necessary to address the prospective harm to all class members.

Instead of disputing the merits of an injunction, Defendants recite this Court's earlier concerns about "the practice of granting nationwide injunctions against the Government." *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018). Defendants also cite the recent decision, *New York v. DHS* ("*New York*"), 969 F.3d 42 (2d Cir. 2020), in which the Second Circuit took expressed similar skepticism toward nationwide injunctions. But these concerns arose in the context of *preliminary* injunctions. *See New York*, 969 F.3d at 88 ("[W]e encourage district courts to consider crafting *preliminary* injunctions that anticipate the possibility of conflict with other courts . . . .") (emphasis added)). The parties in this case are seeking *permanent* relief based on summary judgment, a final determination of the legal issues presented to this Court, and thus concerns about premature interference with ongoing litigation in other jurisdictions do not weigh equally. Moreover, courts have continued to uphold certain nationwide injunctions, noting that "cases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." *See ILRC*, slip op. at 33. . For each of these reasons, a nationwide injunction is merited here.

## **CONCLUSION**

Defendants' actions gut the lives and livelihood of nearly one million individuals who have or would receive DACA, along with those of their families and their communities. In addition, they threaten such foundational constitutional principles as the rule of law and government

accountability. For the reasons set forth above, and to protect these core values, this Court should declare Defendant Wolf's appointment unlawful and hold that the Wolf Memorandum has no force or effect.

Dated:  September 30, 2020

Respectfully submitted,

/s/ Marisol Orihuela
Maria Camila Bustos, Law Student Intern*
Armando Ghinaglia, Law Student Intern
Angie Liao, Law Student Intern*
Edgar A. Melgar, Law Student Intern*
Medha Swaminathan, Law Student Intern*
Ramis Wadood, Law Student Intern
Muneer I. Ahmad, Esq. (MA 9360)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SERVICES ORG.
muneer.ahmad@yale.edu
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

Karen C. Tumlin, Esq. (*pro hac vice*)
Cooperating Attorney
JEROME N. FRANK LEGAL SERVICES ORG.
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

Trudy S. Rebert, Esq. (TR 6959)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

Araceli Martínez-Olguín, Esq. (AM 2927)
Mayra B. Joachin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
(213) 639-3900

Paige Austin, Esq. (PA 9075)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

*Attorneys for Plaintiffs*

* Motion for law student appearance forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2020, a true and correct copy of the foregoing Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment and Opposition to Defendants' Cross-Motion for Partial Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Marisol Orihuela
Marisol Orihuela, Esq. (*pro hac vice*)
JEROME N. FRANK LEGAL SERVICES ORG.
marisol.orihuela@yale.edu
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800