**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *et al.*,<br><br>Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *et al.*,<br><br>Defendants. | No. 17-cv-5228 (NGG) (JO) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 1

I.      Acting Secretary Wolf is serving lawfully under the Homeland Security Act .................. 1

      A.      Ms. Nielsen lawfully designated an order of succession under 6 U.S.C. § 113(g)(2). ...................................................................................................... 2

      B.      The FVRA's 210-day time limit does not apply because Acting Secretary Wolf is serving under the HSA. .......................................................................... 9

      C.      Acting Secretary Wolf's service does not violate the Appointments Clause ....... 12

II.     The Wolf Memorandum has been ratified by the Acting Secretary. ................................ 15

      A.      Acting Secretary Wolf's ratification of the Wolf Memorandum cures any defect caused by his appointment. ....................................................................... 16

      B.      Section 3348(d) of the FVRA does not apply to the Wolf Memorandum. ........... 19

III.    Plaintiffs' requested relief is overbroad. .......................................................................... 21

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**

*Austin v. Saul*,
 No. 19-CV-3017-CJW, 2020 WL 5229540 (N.D. Iowa May 12, 2020) ................................ 14

*Batalla Vidal v. Nielsen*,
 279 F. Supp. 3d 401 (E.D.N.Y. 2018), *vacated on other grounds sub. nom.*,
 *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) .................................... 22, 23

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) .............................................................................................................. 24

*Casa de Maryland, Inc. v. Wolf*,
 ___F. Supp. 3d___, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ...................................... *passim*

*CFPB v. Gordon*,
 819 F.3d 1179 (9th Cir. 2016) .............................................................................................. 16

*City of Hartford v. Chase*,
 942 F.2d 130 (2d Cir. 1991) .................................................................................................... 7

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ................................................................................................................ 25

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ........................................................................................................ 24, 25

*Conn. Bar Ass'n v. United States*,
 620 F.3d 81 (2d Cir. 2010) .................................................................................................... 13

*DHS v. New York*,
 140 S. Ct. 599 (2020) ............................................................................................................ 22

*Edwards v. United States*,
 103 U.S. 471 (1880) ................................................................................................................ 8

*Gill v. Whitford*,
 138 S. Ct. 1916 (2018) .......................................................................................................... 24

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) ................................................................................................................ 7

*Guedes v. ATF*,
 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) .................................. 16, 19

*Harmon v. Dept. of Defense*,
 50 M.S.P.R. 218 (1991) ........................................................................................................... 8

*Hecht Co. v. Bowles*,
　321 U.S. 321 (1944) ............................................................................ 24

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
　816 F.3d 550 (9th Cir. 2016) ...................................................... 10, 11

*Immigrant Legal Res. Ctr. v. Wolf*,
　___F. Supp. 3d___, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ........................ 10

*In re Grand Jury Investigation*,
　315 F. Supp. 3d 602 (D.D.C. 2018) .............................................. 14

*In re Grand Jury Investigation*,
　916 F.3d 1047 (D.C. Cir. 2019) .................................................... 14

*INS v. Cardoza-Fonseca*,
　480 U.S. 421 (1987) ........................................................................ 7, 8

*Kisor v. Wilkie*,
　139 S. Ct. 2400 (2019), *remanded*, 969 F.3d 1333 (Fed. Cir. 2020) ........................ 7

*L.M.-M. v. Cuccinelli*,
　442 F. Supp. 3d 1 (D.D.C. 2020) ................................................ 21

*Lewis v. Casey*,
　518 U.S. 343 (1996) ........................................................................ 24

*McFadden v. United States*,
　576 U.S. 186 (2015) ........................................................................ 13

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
　145 F.3d 1399 (D.C. Cir. 1998) .................................................. 23

*New York v. DHS*,
　969 F.3d 42 (2d Cir. 2020) .................................................. 22, 23, 24

*NLRB v. SW Gen., Inc.*,
　137 S. Ct. 929 (2017) .................................................. 9, 11, 17, 19

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
　241 F.3d 232 (2d Cir. 2001) ........................................................ 25

*Sash v. Zenk*,
　428 F.3d 132 (2d Cir. 2005) .......................................................... 8

*SW Gen., Inc. v. NLRB*,
　796 F.3d 67 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017) .................................... 11

*Tex. Crushed Stone Co. v. United States*,
    35 F.3d 1535 (Fed. Cir. 1994) ............................................................. 8

*Trump v. Pennsylvania*,
    No. 19-454, 2020 WL 1433996 (2017) ............................................... 24

*United States v. Concord Mgmt. & Consulting LLC*,
    317 F. Supp. 3d 598 (D.D.C. 2018) .................................................... 14

*United States v. Eaton*,
    169 U.S. 331 (1898) ............................................................................ 12

*United States v. Harris Cty.*,
    No. 4:16-CV-2331, 2017 WL 7692396 (S.D. Tex. Apr. 26, 2017) ......... 19, 20

*United States v. Libby*,
    429 F. Supp. 2d 27 (D.D.C. 2006) ...................................................... 14

*United States v. Manafort*,
    321 F. Supp. 3d 640 (E.D. Va. 2018) ................................................. 14

*United States v. Smith*,
    962 F.3d 755 (4th Cir. 2020) .............................................................. 10

*Va. Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019) ....................................................................... 12

*Weiss v. United States*,
    510 U.S. 163 (1994) ............................................................................ 13

*Whitman v. Am. Trucking Ass'ns. Inc.*,
    531 U.S. 457 (2001) .............................................................................. 7

**STATUTES**

5 U.S.C. § 706 ............................................................................................ 24

5 U.S.C. § 3345 ................................................................................... 3, 17, 18

5 U.S.C. § 3346 ..................................................................................... 9, 16

5 U.S.C. § 3347 ............................................................................................ 10

5 U.S.C. § 3348 ................................................................................... 19, 25

5 U.S.C. § 3449 ............................................................................................ 11

5 U.S.C. § 5535 ............................................................................................ 18

6 U.S.C. § 112 .................................................................................................. 5, 20

6 U.S.C. § 113 .......................................................................................... *passim*

10 U.S.C. § 132 .................................................................................................. 13

20 U.S.C. § 3412 ................................................................................................ 13

28 U.S.C. § 508 .................................................................................................. 13

31 U.S.C. § 301 .................................................................................................. 13

31 U.S.C. § 502 .................................................................................................. 13

31 U.S.C. § 1344 ................................................................................................ 20

38 U.S.C. § 304 .................................................................................................. 13

National Defense Authorization Act for Fiscal Year 2017,
    Pub. L. No. 114-328, 130 Stat. 2000 (2016)(codified at 6 U.S.C. § 113(g) (Dec. 23, 2016) ..... 3

## REGULATIONS

8 C.F.R. § 2.1 .................................................................................................... 20

## OTHER AUTHORITIES

@SecNielsen, Twitter (April 7, 2019, 10:36PM),
    https://twitter.com/SecNielsen/status/1115080823068332032 .................................................. 8

*Guidance on Application of Federal Vacancies Reform Act*,
    23 Op. O.L.C. 60 (1999) ................................................................................ 4

S. Rep. No. 105-250 ............................................................................ 4, 11, 17, 20

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
    131 Harv. L. Rev. 417 (2017) .......................................................................... 23

## **INTRODUCTION**

Over four separate briefs in two different cases, Plaintiffs have tried and failed to call into question the validity of Chad F. Wolf's service as Acting Secretary of Homeland Security. All of their arguments continue to misinterpret the text of the agency's own internal documents and ignore the contemporaneous actions that then-Secretary Nielsen took when she exercised her congressionally delegated authority to modify the order of succession for the office of the Secretary. Plaintiffs also fail to grapple with the plain text of both the Federal Vacancies Reform Act and the Homeland Security Act, and have no answer to the robust historical precedent for temporary acting service under the Appointments Clause. They offer no persuasive reason to do anything other than give effect to the plain text of Secretary Nielsen's order, which would resolve these motions in Defendants' favor.

But even if Plaintiffs' proposed interpretations of the agency's internal documents and the relevant statutes were correct, the result would be the same. That is because, under Plaintiffs' own interpretation of the order of succession, Peter Gaynor, the Administrator of the Federal Emergency Management Agency, became Acting Secretary of Homeland Security upon Mr. Wolf's nomination for the office of the Secretary in August 2020. Mr. Gaynor then invoked the very authority that Plaintiffs' theory would provide him to amend the order of succession—as specifically authorized by Congress—in a way that would now result, on Plaintiffs' theory, in Mr. Wolf serving lawfully as Acting Secretary while his nomination is pending. And in that capacity, Acting Secretary Wolf has now ratified the Wolf Memorandum, removing any doubt concerning the legality of the Wolf Memorandum.

The Court should enter summary judgment for Defendants on all of Plaintiffs' unlawful-appointment claims.

## **ARGUMENT**

### I. **Acting Secretary Wolf is serving lawfully under the Homeland Security Act.**

In April 2019, then-Secretary of Homeland Security Kirstjen M. Nielsen exercised her power under the Homeland Security Act ("HSA"), 6 U.S.C. § 113(g)(2), to designate a new order

of succession in the event of a vacancy: "By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the *order of succession* for the Secretary of Homeland Security as follows . . . ." *See Batalla Vidal* ECF No. 324-1, Ex. 1 at 2, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order") (emphasis added). Her signed order states *five times* that she designated a succession order for the office of the Secretary, without qualification as to the reason for the vacancy. *Id.* The April 2019 Order supplied a single list of offices to control the "order of succession," and made no mention of either "catastrophic emergency" or "disaster." *Id.* The April 2019 Order placed this order of succession into Annex A, a document that likewise has never included the words "catastrophic emergency" or "disaster." *Id.* at 2; *see also id.*, Ex. 7 ("Revision 8").

As Defendants explained in their opening brief, that April 2019 Order created an order of succession under Section 113(g)(2) that made the Commissioner of U.S. Customs and Border Protection third in line to serve as Acting Secretary of Homeland Security. *See* April 2019 Order at 2; *see also Batalla Vidal* ECF No. 323, at 7-14 ("Defs.' Mem."). That is why, under her own signed order, Ms. Nielsen swore in then-CBP Commissioner McAleenan as Acting Secretary mere hours after announcing her own resignation, and why Mr. Wolf in turn became Acting Secretary under the new order of succession Mr. McAleenan set prior to his own resignation. Plaintiffs' counterarguments fail to overcome the plain text of Secretary Nielsen's April 2019 Order.[1]

### A. Ms. Nielsen lawfully designated an order of succession under 6 U.S.C. § 113(g)(2).

Plaintiffs do not dispute that in April 2019, Secretary Nielsen had the power to designate an order of succession applying in cases of resignations or vacancies; that she invoked the source

---

[1] The *State of New York* Plaintiffs suggest that DHS believes the April 2019 Order "implicitly" amended the order of succession in instances of resignation. *See State of New York* ECF No. 291 at 7 ("*State of New York* Opp'n"). That is wrong. The April 2019 Order expressly states that it will designate the Secretary's "desired order of succession for the Secretary of Homeland Security in accordance with [her] authority pursuant to Section 113(g)(2) of title 6, United States Code." April 2019 Order at 1.

of that power—the HSA, in particular 6 U.S.C. § 113(g)(2)—in her April 2019 Order; or that the April 2019 Order is the only relevant document signed by the Secretary. Nor do Plaintiffs dispute what the April 2019 Order *says*, only what it *does*. Faced with these facts, Plaintiffs dwell at length in their oppositions on various clues that they believe show that the April 2019 Order does not mean what it says, and instead only modifies Annex A, as it previously operated within Revision 8 of Delegation 00106. *See State of New York* Opp'n 6-16; *Batalla Vidal* ECF No. 330 at 13-16 ("*Batalla Vidal* Opp'n"). But each of these arguments depends on an erroneous reading of the April 2019 Order, by claiming Secretary Nielsen failed to do what she plainly set out to do: designate an unqualified order of succession.

*First*, Plaintiffs rely extensively on the fact that, prior to the April 2019 Order, Revision 8 of Delegation 00106 distinguished between cases of resignation, vacancy, or inability to serve— in which case the Federal Vacancies Reform Act (FVRA) and Executive Order 13753 set an order of succession—and instances of catastrophic emergency or disaster—in which case a series of delegations of authority under Section 112(b)(1) occurred. *See State of New York* Opp'n 7-9; *Batalla Vidal* Opp'n 14-15. That argument ignores critical context: at the time then-Secretary Johnson signed Revision 8, the Secretary of Homeland Security had no power to alter the order of succession. Instead, at that time, only the President, under the FVRA, could designate an order of succession for cases of vacancy, resignation, or inability to serve. *See* 5 U.S.C. § 3345(a)(2)-(3); *see also* Defs.' Mem. 9-10. Revision 8 therefore (unsurprisingly) distinguishes between the presidentially-set order of succession and the Secretary's own delegation of authority in cases of emergency.

But Congress expanded the Secretary's authority in 2016—after Mr. Johnson signed Revision 8—to give the Secretary the power to set her own order of succession notwithstanding the FVRA. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)). The April 2019 Order used this new power to set a "desired order of succession for the Secretary of Homeland Security" under Section 113(g)(2). And it is unremarkable that, in exercising this new power for

the first time, Secretary Nielsen chose to *harmonize* the relevant lists of priority for both (1) the order of succession in cases of vacancy, resignation, or inability to serve under Section 113(g)(2); and (2) the delegation of authority under Section 112(b)(1) for cases of catastrophic emergency or disaster. *See* Defs.' Mem. 8-12. Plaintiffs' reliance on the prior structure of the succession order, before the Secretary first exercised her designation authority under Section 113(g)(2), ignores this legislative context, the plain text of the April 2019 Order, and its undisputed purpose.

The *State of New York* Plaintiffs' *second* alleged clue is that prior versions of Delegation 00106 used the term "order of succession" in the context of delegations of authority for sub-Secretary positions when the relevant officer is unavailable to act during a disaster or catastrophic emergency. *See State of New York* Opp'n 10. At best, this argument elevates form over substance, and again ignores the relevant statutory context. Prior to Congress's enactment of Section 113(g)(2), the Secretary could not *designate* an order of succession for the *Secretary's office*, but could only *delegate* the ability to exercise his powers under Section 112(b)(1). That was no longer true by the time Secretary Nielsen set an order of succession *under* Section 113(g)(2). *See* April 2019 Order at 1. The *State of New York* Plaintiffs' reference to prior delegations for sub-Cabinet positions is inapposite, particularly since the Secretary's vesting-and-delegation powers under Section 112(b)(1) permit her to set such orders of succession for non-Senate-confirmed positions and the FVRA permits her to designate a first assistant for Senate-confirmed positions in the absence of a statutorily-designated first assistant. See S. Rep. No. 105-250, at 12; *Guidance on Application of Federal Vacancies Reform Act*, 23 Op. O.L.C. 60, 63 (1999). These prior instances of the term "order of succession" therefore offer no reason to narrow Secretary Nielsen's unqualified order.[2]

_____

[2] The *State of New York* Plaintiffs also misread the use of "order of succession" in reference to sub-Cabinet officers. Section II.C of both Revision 8 and Revision 8.5 of DHS Delegation 00106 provide for an "order of succession" for certain offices; it is a separate provision, Section II.D, that "delegate[s] authority . . . of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency." *See Batalla Vidal* ECF No. 324-1, Ex. 7 at 1; *id.*, Ex. 11 at 1 ("Revision 8.5").

*Third*, the *State of New York* Plaintiffs argue that because Section 113(g)(2) permits the Secretary to set an order of succession *either* in the event of a resignation *or* when the Secretary has not resigned but is absent or unable to serve, the April 2019 Order must have done only the latter but not the former. *See State of New York* Opp'n 10-12. That argument misreads the plain text of the April 2019 Order, contending that Secretary Nielsen's *unqualified* order of succession was in fact only meant to apply in *limited* circumstances.[3] If Secretary Nielsen intended to designate an order of succession for limited circumstances, she would have said so. The argument further requires adopting the baseless assumption that Secretary Nielsen implicitly invoked Section 113(g)'s references to "absence" and "disability" in reference to "catastrophic emergency" or "disaster" specifically. But none of these words appear in the April 2019 Order.

*Fourth*, the *State of New York* Plaintiffs allege that Defendants' position depends upon an overbroad reading of Section 112(b)(1) that would permit the Secretary to choose *any* "officer" or "employee" as Acting Secretary. *See State of New York* Opp'n 11-12. But Defendants do not *anywhere* make such an argument. Section 112(b)(1) is relevant here chiefly because it explains why prior versions of Delegation 00106 bifurcated the *designation* of an order of succession (into Section II.A) and the *delegation* of the Secretary's authority in cases of emergency (into Section II.B).[4] *See* Defs.' Mem. 9-12. Secretary Nielsen's April 2019 Order both set an order of succession under Section 113(g)(2) and a delegation of authority under Section 112(b)(1) using a

---

[3] The *State of New York* Plaintiffs' assertion that DHS "does not dispute" that "Annex A only governed the succession order when the Secretary is unavailable to act during a disaster or catastrophic emergency" is therefore incorrect. *See State of New York* Opp'n 2. Secretary Nielsen's order amended Annex A to include a common list of offices that would apply in cases of resignation and vacancy, as well.

[4] The *State of New York* Plaintiffs appear to urge a reading of Section 112(b)(1) that would only permit "the Secretary to delegate particular functions she possess to other DHS officers *while she is serving, and continues to serve,* as Secretary." *State of New York* Opp'n 12 (emphasis original). That narrow reading finds no support in Section 112(b)(1), which says only that the Secretary "may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department." 6 U.S.C. § 112(b)(1). And as discussed *infra* in Section III, many routine delegations carry over between administrations and remain in effect even when the Secretary's office is vacant.

single harmonized list of offices. In delegating authority under Section 112(b)(1), she went no further than her predecessor did in signing Revision 8, which Plaintiffs rely upon here. *See* Def.'s Mem. 11-12.

*Fifth*, the *State of New York* Plaintiffs point to earlier revisions that Secretary Nielsen made to Delegation 00106 to suggest that she adopted the existing order of succession for the Secretary's office under E.O. 13753 and intended to maintain it in her April 2019 Order. *See State of New York* Opp'n 12-15. But as explained, in each case Secretary Nielsen did nothing more than sign an order of designation and delegation orders for various sub-Cabinet offices; she never signed these versions of Delegation 00106 or endorsed the existing order of succession for the office of the Secretary. *See* Defs.' Mem. 13-14. It was only in the April 2019 Order, one day before her resignation, that she first exercised her congressionally delegated authority to designate an order of succession under Section 113(g)(2) of the HSA.

Plaintiffs likewise misrepresent then-Acting Secretary McAleenan's revision to the order of succession within Delegation 00106 in November 2019 to further suggest that Secretary Nielsen knew that she was only modifying Annex A within Delegation 00106. *See State of New York* Opp'n 15. According to Plaintiffs, Mr. McAleenan's revision would be superfluous if Secretary Nielsen's April 2019 Order revised Annex A to govern the order of succession in cases of vacancy. As an initial matter, it would not be "superfluous" for Mr. McAleenan to amend Secretary Nielsen's order as a precautionary matter to address the alleged deficiencies that are now in dispute in various lawsuits. But Plaintiffs' argument further ignores the fact that Mr. McAleenan's revision *changed the list of offices* in the order of succession previously set by Secretary Nielsen. *Compare Batalla Vidal* ECF No. 324-1, Ex. 5 *with id.*, Ex. 1. His November 2019 revision was therefore an independent alteration of the order of succession under Section 113(g)(2).

In their final bid to overcome the text of the April 2019 Order, the *State of New York* Plaintiffs contend that Secretary Nielsen's conduct after issuing the order "cannot defeat the plain language of the April 2019 Memorandum . . . ." *State of New York* Opp'n 15-16. But it is telling that Plaintiffs otherwise have no response to the fact that Secretary Nielsen—and the entire

Department of Homeland Security—clearly understood the April 2019 Order to effect an order of succession that resulted in Mr. McAleenan becoming Acting Secretary mere hours later.

For their part, the *Batalla Vidal* Plaintiffs suggest that reading the plain text of the April 2019 to mean what it says violates "multiple canons of construction," including a presumption against redundancy. *See Batalla Vidal* Opp'n 16. As an initial matter, there is no more fundamental canon of construction than giving meaning to the plain text of the Secretary's order, which the agency itself is in the best position to interpret. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining that the Court "ha[s] deferred to 'official staff memoranda'") (citation omitted), *remanded,* 969 F.3d 1333 (Fed. Cir. 2020); *City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991) (holding that the "plain meaning of the words" controls interpretation of a confidentiality order). Furthermore, no such redundancy exists—the April 2019 Order sets a single list of offices to govern the order of succession for vacancies under Section 113(g)(2) and the delegation of authorities in cases of disaster or catastrophic emergency under Section 112(b)(1). *See supra* at 1-6; Defs.' Mem. 9-12.

The *Batalla Vidal* Plaintiffs' next "canon" argument—that a regulatory scheme may not be altered "in vague terms of ancillary provisions," *see Batalla Vidal* Opp'n 16-17—also fails. Secretary Nielsen set an unambiguous order of succession under an unambiguous grant of statutory power to do so under Section 113(g)(2). This is not a case where "Congress . . . hid[] elephants in mouseholes," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (quoting *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001)), but rather an unremarkable example of the Secretary exercising a power that no one disputes Congress gave to her. Nor can it be claimed that the April 2019 Order itself hides the ball—it clearly sets out that Secretary Nielsen intended to designate an order of succession under Section 113(g)(2), and sets out that new order in plain terms. *See* April 2019 Order. Secretary Nielsen, and everyone else at DHS, acted consistently with that understanding of the order in the days that followed. *See* Defs.' Mem. 12.

The *Batalla Vidal* Plaintiffs next argue that Secretary Nielsen's order is contrary to prior agency practice. *See Batalla Vidal* Opp'n 17-19 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421,

446 n.30 (1987); *Tex. Crushed Stone Co. v. United States*, 35 F.3d 1535, 1541 n.7 (Fed. Cir. 1994)). But Secretary Nielsen's clear exercise of statutory authority under Section 113(g)(2) governs over any alleged "prior agency practice," particularly in view of the fact that Section 113(g)(2) was enacted *after* the last version of Delegation 00106 to set an order of succession. Moreover, the *Batalla Vidal* Plaintiffs' reliance on *Chevron*-deference cases have no bearing here, where the Secretary acted under an unambiguous grant of congressionally delegated authority. *See Sash v. Zenk*, 428 F.3d 132, 135 (2d Cir. 2005) ("If the statute is unambiguous, of course, our inquiry ends with the statute's plain meaning.").[5]

The *State of New York* Plaintiffs also offer one final argument that the April 2019 Order, separate and apart from its text and purpose, was *ultra vires* because it was signed after Secretary Nielsen's purported resignation date of April 7, 2019. *See State of New York* Opp'n 16-17. But Secretary Nielsen's resignation became effective on April 10, 2019, the day after she signed the April 2019 Order. *See Batalla Vidal* ECF No. 324-1, Ex. 13 at 2. Further, even if Secretary Nielsen had initially intended to resign on April 7, 2019, her resignation did not become effective until midnight, and she retained the right to withdraw or modify her resignation up until that time (barring a direction by the President that she immediately resign) and then carry out her resignation three days later. *Cf. Harmon v. Dept. of Defense*, 50 M.S.P.R. 218, 220 (1991) (resignations are presumptively effective at the end of the day on which they are to take effect). On the same day she signed her initial resignation later, she subsequently stated her intent "to stay on as Secretary through Wednesday, April 10th to assist with an orderly transition…." *See @SecNielsen*, Twitter (April 7, 2019, 10:36PM), https://twitter.com/SecNielsen/status/1115080823068332032. In any case, regardless of the date on the Secretary's resignation letter, the common law rule is that a resignation is not effective until accepted. *See Edwards v. United States*, 103 U.S. 471, 473 (1880). And for all relevant purposes, Secretary Nielsen's resignation was not accepted until after she

---

[5] The *Batalla Vidal* Plaintiffs' suggestion (only in a footnote) that Defendants' reading of the April 2019 Order is a "post-hoc rationalization" cannot be squared with the agency's execution and interpretation of the April 2019 Order after it was signed.

signed the April 2019 Order and swore in Mr. McAleenan. There is no serious dispute that Secretary Nielsen lawfully exercised her power under Section 113(g)(2).

At bottom, Plaintiffs' various arguments are all attempts to distract from the unambiguous text of the order signed by Secretary Nielsen: "By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows." April 2019 Order at 2. The Court need only apply that plain text to resolve this issue.

### B. The FVRA's 210-day time limit does not apply because Acting Secretary Wolf is serving under the HSA.

Because Mr. Wolf serves as Acting Secretary under an HSA order of succession, the FVRA's separate 210-day time limit has no application. *See* Defs.' Mem. 15-21; *see also Casa de Maryland, Inc. v. Wolf*, ___F. Supp. 3d___, 2020 WL 5500165, at *16 (D. Md. Sept. 11, 2020) ("Congress thus tied the timing provision of section 3346 only to offices filled under section 3345, and no others."). The *Batalla Vidal* Plaintiffs offer no persuasive reason to ignore the plain text of both the FVRA and HSA or to set aside Congress's reasoned judgment that no express time limit should govern acting service under the HSA. *See Batalla Vidal* Opp'n 4-10.[6]

The statutory text resolves this issue. The FVRA places a 210-day time limit only on "the person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a) (emphasis added). The phrase "under section 3345" cabins the application of the time limit to those serving under that subsection of the FVRA. *Cf. NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938–39 (2017) (explaining that the language "under this section" clarifies "that subsection (b)(1) [of § 3345] applies to all persons serving under § 3345"); *id.* at 939 (discussing FVRA's "precise cross-references"). This Court should join the two courts that have recently addressed this exact issue; both concluded that the 210-day time limit of the FVRA is not incorporated in the HSA. *See Casa de Maryland*, 2020 WL 5500165, at *19 ("Sections 3346 and 3348 are cabined to those acting

---

[6] The *State of New York* Plaintiffs do not argue that the FVRA's 210-day time limit provision applies to service under the HSA, nor do they join the *Batalla Vidal* Plaintiffs' arguments that the absence of such an express time limit in the HSA raises constitutional issues.

officers serving under section 3345, and neither statute authorizes this Court to extend the FVRA's timing provision to selections made pursuant to the 'further order of succession' in section 113(g)(2)."); *Immigrant Legal Res. Ctr. v. Wolf*, ___F. Supp. 3d___, 2020 WL 5798269, at *11 (N.D. Cal. Sept. 29, 2020) (adopting the "persuasive" reasoning of *Casa de Maryland* on this issue). The text of the FVRA also expressly exempts agency-specific vacancy statutes from Section 3346's time limit, providing that "Sections 3345 and 3346 are the exclusive means" for authorizing acting service "*unless* a statutory provision expressly authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specific[] office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(A) (emphasis added).

The Homeland Security Act is such a statute. *See* 6 U.S.C. § 113(g)(1)-(2). It provides no express time limit on acting service, and the Secretary's authority to designate an officer applies "*notwithstanding* chapter 33 of Title 5," which includes the FVRA. *Id.*[7] The HSA is thus merely one of numerous office-specific statutes that serve as alternatives to the FVRA for designating acting officers. *See, e.g.*, *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute exist as "statutory alternatives to designate" acting officer); *United States v. Smith*, 962 F.3d 755, 763 n.1 (4th Cir. 2020) (same).

The vague policy arguments offered by the *Batalla Vidal* Plaintiffs do not overcome the unambiguous statutory text. Plaintiffs are correct that the FVRA and HSA "co-exist," *see Batalla Vidal* Opp'n 4-5, but they co-exist as *alternative* means for designating an order of succession for the Secretary. *See Hooks*, 816 F.3d at 556.[8] The *Batalla Vidal* Plaintiffs likewise err in suggesting

_____

[7] The *Batalla Vidal* Plaintiffs suggest this "notwithstanding" language in Section 113(g)(2) applies only to the FVRA's provision for "designating" officers in the order of succession under Section 3345(a). *See Batalla Vidal* Opp'n 5-6. That is plainly not so, as Section 113(g)(2) permits the Secretary to designate an order of succession notwithstanding "chapter 33 of Title 5," which includes the FVRA in its entirety.

[8] The *Batalla Vidal* Plaintiffs cite to *Casa de Maryland* to support their argument that "[w]hen an agency-specific statute like the HSA speaks to succession, the FVRA remains 'a means' of governing such appointments, even if it is no longer the exclusive means for the authorization of acting officials in that agency," and thus "it follows that the FVRA's requirements,

(at 5) that the HSA would *sub silentio* repeal portions of the FVRA if the 210-day time limit was not applicable; it is *the FVRA's own text* that limits the applicability of its time limit provision.[9] *See supra* at 9-10; Defs.' Mem. 15-16.

Contrary to the *Batalla Vidal* Plaintiffs' various arguments for grafting the FVRA's time limit onto the HSA, Congress knew what it was doing at the time it passed both the FVRA and, later, the HSA. Congress recognized when passing the FVRA that many existing agency-specific vacancy statutes did "not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17.[10] But rather than draft the FVRA in a way to eliminate those provisions, the Senate Report indicated that Congress "may choose in the future to reexamine" such statutes. *Id.* Its decision to cabin the FVRA's time limit to service under the FVRA was purposeful. Congress then enacted the HSA against this backdrop, choosing not to supply a specific time limit under Section 113(g)(2).[11] Had Congress wanted to include such a time limit, it could have expressly

_____

such as the 210-day time limit, still apply." *Batalla Vidal* Opp'n 6. But that court's decision on this point could not be clearer in rejecting that conclusion: "Congress [] tied the timing provision of section 3346 only to offices filled under section 3345, and no others." *Casa de Maryland*, 2020 WL 5500165, at *16.

[9] The plain text also overcomes the *Batalla Vidal* Plaintiffs' argument that the FVRA's time limit must apply to Section 113(g)(2) of the HSA because Section 113(a) of the HSA designates the Deputy Secretary as "first assistant" for purposes of the FVRA. *See Batalla Vidal* Opp'n 6-7. Regardless of whether Plaintiffs find Congress's scheme intuitive or not, their misgivings cannot overcome the unambiguous text of Section 113(g)(2). *See Casa de Maryland*, 2020 WL 5500165, at *19 (finding the argument "intuitively appealing" but "ultimately unavailing" in view of Section 113(g)(2)'s plain text).

[10] In a footnote, the *Batalla Vidal* Plaintiffs suggest that Defendants may not rely upon this Senate Report because it concerns an earlier version of the bill. *See Batalla Vidal* Opp'n 8 n.4. The D.C. Circuit credited that argument in *Southwest General* because the party there cited the report regarding a specific statutory provision that *changed* in the final bill. *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 77 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017). But the court in turn *relied* upon the same report repeatedly throughout its decision for other issues unrelated to specific changes in phraseology, just as Defendants do here. *See id.*, at 70, 71, 71 n.2, 78 n.7.

[11] By contrast, Congress chose to include a provision requiring the Secretary to provide notice to Congress for "any vacancies that require notification under sections 3345 through 3349d of Title 5." 6 U.S.C. § 113(g)(3); *see also* 5 U.S.C. § 3449. Defendants have never argued that the FVRA is wholly inapplicable to the office of Secretary, only that the HSA provides an *alternative* method for designating an order of succession. *See Hooks*, 816 F.3d at 556. That Congress chose to expressly include a provision requiring Congressional notice for vacancies in

included one—as it has in numerous other agency-specific vacancy statutes. *See Casa de Maryland*, 2020 WL 5500165, at *18 n.12 (collecting examples of such statutes).[12]  Congress's decision not to do so must be respected.  *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (noting the duty of courts to "respect not only what Congress wrote but, as importantly, what it didn't write").

### C.    Acting Secretary Wolf's service does not violate the Appointments Clause.

Unable to overcome the statutory text, the *Batalla Vidal* Plaintiffs reiterate their argument that Congress's decision to not include a specific time limit on acting service in HSA runs afoul of the Appointments Clause of the U.S. Constitution.  *See Batalla Vidal* Opp'n 10-11.  These arguments fail.  *See* Defs.' Mem. 21-23.

Although acting service must, by definition, be "temporary," *United States v. Eaton*, 169 U.S. 331, 343 (1898), the Appointments Clause provides no express time limit on acting service. *See* Defs.' Mem. 21-23.  The *Batalla Vidal* Plaintiffs offer no authority or manageable standard for pinpointing a specific constitutionally-mandated time limit on acting service, leaving the Court to simply guess when lawful temporary acting service becomes unconstitutional.  This Court should decline that bold invitation, as others have done.  *See Casa de Maryland, Inc.*, 2020 WL 5500165, at *18 (declining to determine how long acting service as Acting Secretary may continue under Section 113(g)(2)).  As Defendants' memorandum explained, this is a question reserved for the political branches; Congress has frequently modified the bounds of acting service, including

---

offices to which the FVRA *may* apply is only further evidence that it made a similar decision *not* to include a time limit provision, *contra* the *Batalla Vidal* Plaintiffs' argument at 7-8.

[12] The *Batalla Vidal* Plaintiffs attack Defendants' reliance on the FVRA's legislative history.  *See Batalla Vidal* Opp'n 8-10.  Defendants agree that no resort to legislative history is necessary here because the text of the FVRA and HSA is unambiguous.  *See* Def.'s Mem. 15-16. But what the Senate Report shows is that Congress was fully aware of the existence of agency-specific vacancy statutes at the time it passed the FVRA, yet chose not to eliminate them. *See supra* at 11-12; Def.'s Mem at 17.  Plaintiffs' argument that the report "could only have considered statutes that were extant at the time the FVRA was enacted" is nonsensical.  *Batalla Vidal* Opp'n 8.  Having made itself aware of the existence of such statutes, Congress could have either (1) drafted the FVRA to expressly eliminate such provisions; or (2) drafted future agency-specific statutes, like the HSA, to include express time limits.  It did neither.

by repeatedly changing the period of time in which acting officers may serve under various vacancy statutes. *See* Defs.' Mem. 21-23.[13] And the fact that Congress chose to include no time limit in the HSA is not remarkable, as it frequently chooses to omit such provisions from agency-specific statutes. *See, e.g.*, 10 U.S.C. § 132(b) (office-specific vacancy statute for Secretary of Defense); 20 U.S.C. § 3412(a) (Secretary of Education); 28 U.S.C. § 508(a)-(b) (Attorney General); 31 U.S.C. § 301(c)(2) (Secretary of Treasury); 31 U.S.C. § 502(b), (f) (Director of Office of Management and Budget) 38 U.S.C. § 304 (Secretary of Veterans Affairs).

This case also does not present the spectral example of Executive overreach that the *Batalla Vidal* Plaintiffs suggest; Acting Secretary Wolf has been serving in his current role for approximately eleven months, and was previously appointed and confirmed as Under Secretary for the Office of Strategy, Policy, and Plans—a position that is "germane" to the Secretary role. *See Weiss v. United States*, 510 U.S. 163, 176 (1994). Mr. Wolf's Senate confirmation also came at a time when it was expected that he would assume the Acting Secretary position, and the President recently submitted Mr. Wolf's nomination to serve as Secretary to the Senate, further diminishing any suggestion of Executive overreach. *See* Defs.' Mem. 22.

The *Batalla Vidal* Plaintiffs also use their reply to press a new constitutional argument for the very first time—that permitting an Acting Secretary to appoint another Acting Secretary would "raise additional significant constitutional concerns." *See Batalla Vidal* Opp'n 11. As an initial matter, this argument is forfeited. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

---

[13] Though the *Batalla Vidal* Plaintiffs do not expressly invoke the "constitutional avoidance" canon, their arguments are sometimes couched in such language. *See Batalla Vidal* Opp'n 10-11. But that canon has no application where, as here, the statutory language is unambiguous. *See McFadden v. United States*, 576 U.S. 186, 187 (2015) ("[T]he canon of constitutional avoidance has no application in the interpretation of an unambiguous statute such as this one." (citation omitted)); *see also Casa de Maryland*, 2020 WL 5500165, at *19 ("[T]he Court disagrees that the doctrine of constitutional avoidance is triggered here. The doctrine applies only where a statute is ambiguous, or subject to more than one meaning . . . . That is not this case.").

But even if the Court were to consider it, this novel argument fails on the merits. The *Batalla Vidal* Plaintiffs contend it would be "faulty" to assume that an acting head of a Department may appoint other officers under the Appointments Clause, but do not cite a single authority for this contention. *See Batalla Vidal* Opp'n 11-13. By contrast, the D.C. Circuit has squarely held that an Acting Secretary "becomes the head of the Department when acting in that capacity because an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019).[14] That authority extends to duties under the Appointments Clause. *Id.* at 1054-1055 ("Acting Attorney General Rosenstein was the 'Head of Department' *under the Appointments Clause* as to the matter on which the Attorney General was recused." (emphasis added)); *see also Austin v. Saul*, No. 19-CV-3017-CJW, 2020 WL 5229540, at *15 (N.D. Iowa May 12, 2020) (concluding that the Acting Social Security Commissioner had the authority to appoint ALJs "because that is one of the 'functions and duties' of the office she was fulfilling in her capacity as Acting Commissioner of Social Security"). Indeed, courts have routinely faced cases where an Acting Secretary appoints an inferior officer without ever mentioning the alleged constitutional deficiency that the *Batalla Vidal* Plaintiffs now belatedly claim to have identified. *See, e.g.*, *United States v. Libby*, 429 F. Supp. 2d 27, 28, 31 (D.D.C. 2006) (appointment of an inferior officer by Acting Attorney General); *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 607 (D.D.C. 2018) (similar); *United States v. Manafort*, 321 F. Supp. 3d 640, 657 (E.D. Va. 2018) (similar).

---

[14] Although *In re Grand Jury* addressed this question in the context of the Deputy Attorney General serving as Acting Attorney General, the underlying statutory scheme governing the Deputy Attorney General's acting service is not materially different from similar agency-specific statutes, such as Section 113(g)(2) of the HSA. *See In re Grand Jury*, 916 F.3d at 1056 (explaining that "[o]ther statutes may temporarily authorize an officer or employee to perform the functions and duties of a specific office," and suggesting that the statute governing the order of succession for the Attorney General is one such statute); *see also In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 663 (D.D.C. 2018) (acknowledging that the statute's "language is of the sort recognized to authorize the service of *acting officers*" (emphasis added)).

**II.    The Wolf Memorandum has been ratified by the Acting Secretary.**

Even if Plaintiffs were right about the April 2019 Order, their claims would still fail.  That is because, under Plaintiffs' theory, Secretary Nielsen never set an order of succession for cases of vacancy, meaning that E.O. 13753 continues to govern in such instances.  *See Batalla Vidal* Opp'n 15, 20; *State of New York* Opp'n 6-8.  That is wrong, for the reasons explained at length above. But if Plaintiffs are right, then when Mr. Wolf was nominated by the President to serve as Secretary of Homeland Security on September 10, 2020, Mr. Peter Gaynor, the Senate-confirmed Administrator of the Federal Emergency Management Agency (FEMA), became the President's designated Acting Secretary under the FVRA as the senior-most successor under E.O. 13753.  *See* Revision 8 at A-1.

In that capacity, and "out of an abundance of caution," Mr. Gaynor recently exercised "any authority" he might have as Acting Secretary and designated an order of succession for the office under Section 113(g)(2), which applies "[n]otwithstanding" the FVRA.  *See Batalla Vidal* ECF No. 324-1, Ex. 6 ("Gaynor Order").  Under *that* order of succession, Mr. Wolf—as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans—was the senior-most successor, and would have immediately begun serving as Acting Secretary under the HSA on September 10, 2020.  As the newly-minted Acting Secretary under Plaintiffs' own theory, Mr. Wolf then "affirm[ed] and ratif[ied] any and all actions involving delegable duties that [he had] taken from November 13, 2019, through September 10, 2020."  *See Batalla Vidal* ECF No. 327-1 at 3 ("Wolf Ratification").

These events are consistent with Plaintiffs' claim that the FVRA applies when there is no governing HSA order of succession.  Any doubts Plaintiffs have raised about Mr. Wolf's earlier service are now gone in view of Mr. Wolf's lawful ratification.  Plaintiffs' attacks now on Mr. Gaynor's service under their *own theory* of succession depend on misreadings of the FVRA that are easily set aside.

**A.** **Acting Secretary Wolf's ratification of the Wolf Memorandum cures any defect caused by his appointment.**

Mr. Wolf's ratification cures any alleged service-related defects on the merits. As courts have repeatedly recognized, an agency head's "valid appointment, coupled with . . . ratification, cures any initial" service-related deficiencies in a challenged action. *CFPB v. Gordon*, 819 F.3d 1179, 1190-92 (9th Cir. 2016); *see also Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019) (the D.C. Circuit has "repeatedly held" that a "properly appointed official's ratification of an allegedly improper official's prior action . . . resolves the claim on the merits by 'remedy[ing] [the] defect' (if any) from the initial appointment" (alterations in original and citations omitted)), *cert. denied*, 140 S. Ct. 789 (2020).

The *Batalla Vidal* Plaintiffs' suggestion (at 19) that this is a "belated effort to cover the agency's tracks" is simply wrong. Mr. Wolf was properly designated as Acting Secretary under Acting Secretary McAleenan's November 2019 Order, but even if Plaintiffs' interpretation is correct, the agency has now ratified its earlier actions out of an abundance of caution and in a manner that courts have "repeatedly held" to be a proper curative. *See Guedes*, 920 F.3d at 13. Such "ratification purges any residual taint or prejudice . . . from the allegedly invalid appointment" based on an FVRA violation. *Id.* Rather than an after-the-fact rationalization, the Wolf Ratification merely serves as a prudent belt-and-suspenders affirmation of a policy that Defendants maintain was lawfully issued to begin with. *See* Defs.' Mem. 7-15.

Plaintiffs' remaining arguments are limited. The *Batalla Vidal* Plaintiffs argue that Mr. Wolf may not now ratify his prior actions because Mr. Gaynor could not lawfully set a new order of succession more than 210 days after Ms. Nielsen's resignation. *See Batalla Vidal* Opp'n 20-21. But the FVRA provides that an acting Secretary "may serve in the office . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2). Mr. Wolf was nominated on September 10, 2020, permitting Mr. Gaynor to serve as acting Secretary for the pendency of Mr. Wolf's nomination. *Id.* The Senate Report confirms that this is a permissible

manner of acting service, explaining that "[u]nder new section 3346(a)(2)," an acting officer may serve "even if the nomination is submitted" after the period of time prescribed in Section 3346(a)(1) and "may serve while that nomination is pending from the date the nomination is submitted." *See* S. Rep. 105-250 at 14. The Report further explains that this was a deliberate feature of Section 3346(a)(2), intended to "create an incentive for the President to submit a nomination," as happened here. *Id.*

The *Batalla Vidal* Plaintiffs further argue that no vacancy existed between April 2019 and September 2020 that could have allowed Mr. Gaynor to assume the role of Acting Secretary under the FVRA and E.O. 13753. *See Batalla Vidal* Opp'n 20. That is wrong: as all parties acknowledge, the office of Secretary remained vacant after Ms. Nielsen's resignation; the nomination of Mr. Wolf on September 10, 2020 thus would have triggered Section 3346(a)(2) of the FVRA, and created a permissible period for acting service by the *then* senior-most officer under the FVRA's order of succession: Mr. Gaynor. *See* Revision 8.[15]

The *State of New York* Plaintiffs also question whether Mr. Gaynor ever became Acting Secretary, on the basis that the President never designated him as Acting Secretary under 5 U.S.C. § 3345(a)(2). *See State of New York* Opp'n 23-24. That argument misses the point. If Plaintiffs are correct about the April 2019 Order, then the President had no need to specifically designate Mr. Gaynor as Acting Secretary under Section 3345(a)(2) because Mr. Gaynor lawfully became Acting Secretary by operation of E.O. 13753—which the *State of New York* Plaintiffs argue controls Secretary Nielsen's succession. *See State of New York* Opp'n 6-8. And E.O. 13753 is, of course, an Executive Order issued by the President of the United States on this precise subject, as

---

[15] The *Batalla Vi*dal Plaintiffs put misplaced reliance on *NLRB v. Southwest General, Inc.*, 137 S. Ct. 929, 936 (2017), which explained as general background in *dicta* that the time period in Section 3346(a)(1) is "tolled" during a nomination by Section 3346(a)(2), and then may be reset by a rejection, withdrawal, or return. It did not purport to explain the applicability of Section 3346(a)(2) when the nomination is submitted after the time period provided in Section 3346(a)(1). As explained, *see supra* at 16-17, the Senate Report reflects Congress's understanding that Section 3346(a)(2) could provide for acting service even beyond the time limit proscribed in Section 3346(a)(1), provided it was triggered by a nomination, such as Mr. Wolf's here.

an advance exercise of the President's authority under the FVRA to designate officials to act in vacant offices. As the notes to Section 3345 of the FVRA show, there are numerous Executive Orders that operate automatically when vacancies arise. That the President did not specifically point to Mr. Gaynor by name is immaterial—that is the purpose of the Executive Order.

That Mr. Gaynor never resigned as Administrator of FEMA is also irrelevant. *See Batalla Vidal* Opp'n 22-23. Under Plaintiffs' theory, Mr. Gaynor became Acting Secretary under the FVRA and E.O. 13753. Invoking § 113(g)(2), Mr. Gaynor then set a *new* order of succession under *the HSA*. *See* Gaynor Order. That order of succession was triggered immediately— regardless of Mr. Gaynor's continued service as Administrator of FEMA—because it applied "[n]otwithstanding" the FVRA, and because the roles of Secretary, Deputy Secretary, and Under Secretary for Management were vacant. *See* 6 U.S.C. § 113(g)(1)-(2). Once Mr. Gaynor set an order of succession under § 113(g)(2), his own basis for service under the FVRA was superseded. And there is nothing problematic about a Senate-confirmed officer temporarily serving in an acting capacity while still holding another office; indeed, that is how acting service under the FVRA, the HSA, and other office-specific vacancies statutes work. *See, e.g.*, 5 U.S.C. § 3345(a)(2) (authorizing the President to direct someone "who serves" in a presidentially appointed, Senate-confirmed office to "perform the functions and duties of the vacant office"); 5 U.S.C. § 5535(a) (providing that "[a]n officer may not receive pay in addition to the pay for his regular office for performing the duties of a vacant office as authorized by sections 3345-3347 of this title").

Mr. Wolf is also free to serve as Acting Secretary during the pendency of his nomination in the Senate because he is serving under the HSA—whether (as Defendants argue) under Acting Secretary McAleenan's November 2019 Order or (as Plaintiffs' theory dictates) under the Gaynor Order, both of which set orders of succession under Section 113(g)(2) of the HSA. The prohibition on active service during pendency of a nomination in Section 3345(b)(1)(B) of the FVRA applies only for service "as an acting officer for an office *under this section*," 5 U.S.C. § 3345(b)(1) (emphasis added); that is, under § 3345 of the FVRA. The Supreme Court's decision in *Southwest General* explains that the "under this section" language "clarifies that subsection (b)(1) applies to

all persons *serving under § 3345.*" 137 S. Ct. at 938 (emphasis added). The *Batalla Vidal* Plaintiffs insist that Section 3345(b)(1)(B) of the FVRA must nonetheless be grafted onto the HSA, but that argument ignores the "under this section" language Congress chose to include in Section 3345(b)—language the *Batalla Vidal* Plaintiffs entirely ignore in their reply. *See Batalla Vidal* Opp'n 24-25.

**B.      Section 3348(d) of the FVRA does not apply to the Wolf Memorandum.**

The FVRA provides that an act is void and "may not be ratified," if performed by an officer who, acting in a manner inconsistent with the FVRA, executed a "function or duty of a vacant office" under the FVRA. *See* 5 U.S.C. § 3348(d). As Defendants have explained, the issuance of the Wolf Memorandum was not a "function or duty," as those terms are narrowly defined in Section 3348 because it is not the kind of action assigned by statute *exclusively* to the office of the Secretary. *See* Defs.' Mem. 24-25. Plaintiffs' arguments to the contrary cannot overcome the fact that Deferred Action for Childhood Arrivals (DACA) stems from no statute at all, and thus by definition cannot be a "function or duty of the applicable office that . . . is established by statute" *and* "is required by statute to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2). For the same reason, the Wolf Memorandum is not a "function or duty" even under Plaintiffs' preferred interpretation of that term.

**1.** The definition of "function or duty" in Section 3348(d) of the FVRA applies only to non-delegable functions that are made exclusive to a particular office by statute or regulation. *See Guedes*, 920 F.3d at 12 (citing § 3348(d) as "only prohibiting the ratification of nondelegable duties"); *United States v. Harris Cty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017) (authorization of complaint by Principal Deputy Assistant Attorney General was not "function or duty" under FVRA because "the relevant duties of the [office] are delegable"). That conclusion is compelled by the plain text. If a function or duty is lawfully delegable, then necessarily, the statute or regulation creating that function or duty does not "require" it to be performed only by the vacant office. Rather, the statute or regulation permits other individuals to perform that function or duty by delegation.

That plain-text reading is confirmed by the Senate Committee Report accompanying the bill that became the FVRA. That Report, addressing a definition of "function or duty" materially identical to that now found in § 3348(a)(2), provides that "functions or duties of the office" are "defined as the non-delegable functions or duties of the officer." S. Rep. No. 105-250, at 18 (emphasis added). The narrowness of that definition ensures that "[d]elegable functions of the [vacant] office could still be performed by other officers or employees," such that "[a]ll the normal functions of government thus could still be performed." *Id.*; *accord id.* at 31 (views of supporting Senators); *id.* at 36 (views of opposing Senators).

Here, no statute *requires* that the Wolf Memorandum (or any memorandum like it) be issued only by the Secretary himself. To the contrary: no statute explicitly authorizes the creation (or, likewise, the rescission or modification) of DACA at all. So, for example, as Defendants explained, and as Plaintiffs did not dispute, any such authority to create (or rescind) a policy like DACA could be exercised by other DHS officials, including, for example, the Deputy Secretary of Homeland Security. *See, e.g.*, Ex. 10, DHS Delegation No. 0100.2 ¶ II.G (June 23, 2003); *accord* 8 C.F.R. § 2.1. Plaintiffs' failure to dispute that reality dooms their heavy reliance on the unremarkable fact that DACA, in its current form, involves multiple components of DHS. But so do many DHS policies that are implemented by the Secretary's subordinates, including but not limited to the Deputy Secretary. Congress has explicitly authorized as much, by generally permitting delegation of the Secretary's authority, 6 U.S.C. § 112(b)(1) (general authorization of delegations), except when Congress has specified to the contrary, *see, e.g.*, 31 U.S.C. § 1344(d)(3) (specifying that a particular authority "may not be delegated").

The *Batalla Vidal* Plaintiffs assert that no court has ever adopted the plain text reading of Section 3348(d) put forward by Defendants. *Batalla Vidal* Opp'n 27. That is wrong. *See, e.g.*, *Harris Cty.*, 2017 WL 7692396, at *3 n.5 (authorization of complaint by Principal Deputy Assistant Attorney General was not a "function or duty" under the FVRA because "the relevant duties of the [office] are delegable"); *United States v. Vill. of Tinley Park*, No. 16 C 10848 (N.D.

Ill. July 17, 2017), Order at 5, ECF No. 55 (holding that "function or duty" under FVRA "does not include a delegable duty that could be performed by another officer").

**2.** To support their reading of Section 3348(d), both groups of Plaintiffs rely heavily on the district court opinion in *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020), in which one court held—for reasons otherwise unrelated to this lawsuit—that Kenneth Cuccinelli II served unlawfully as the Acting Director of USCIS. Although Defendants respectfully disagree with the holding of that case and with much of its reasoning, its treatment of Section 3348(d) is not inconsistent with Defendants' position here. In *L.M.-M.*, the court interpreted Section 3348(d) to "simply 'require that the statute or regulation at issue provide that the function or duty at issue is assigned to *one* particular office.' *L.M.-M.*, 442 F. Supp. 3d at 31." *State of New York* Opp'n 18 (emphasis added).[16] But even if that is the right test, neither the creation of DACA nor the rescission (or modification) of DACA would satisfy it: no statute or regulation assigns that specific authority to *any* particular office—because there is no such specific statutory authority *at all*. Accordingly, even if *L.M.-M.* were binding in the Second Circuit, it would not change the outcome here, and the Wolf Memorandum would still be subject to ratification.

## III. Plaintiffs' requested relief is overbroad.

Even if Plaintiffs were correct both that (1) Acting Secretary Wolf's service was unlawful on the date of the Wolf Memorandum, and (2) the Wolf Ratification is somehow invalid, the relief they request is still overbroad. As explained in Defendants' opening brief, at most, the Court should set aside the Wolf Memorandum under the Administrative Procedure Act, and only as to plaintiffs in these cases who have demonstrated Article-III standing (and, if a class is ultimately certified in *Batalla Vidal*, to any certified class). None of Plaintiffs' responses has merit.

---

[16] The court in *L.M.-M.* further explained that "function or duty" refers to when "a statute assigns a function to a single PAS office, and where, as here, the department head did not reassign that function using his vesting-and-delegation authority or any other authority at least 180 days before the vacancy occurred." *L.M.-M.*, 442 F. Supp. 3d at 34. Plaintiffs' attack on the Wolf Memorandum fails under this articulation of "function or duty" as well because there is no dispute that the relevant delegation to the Deputy Secretary occurred *years*, never mind 180 days, before the Wolf Memorandum was issued. *See* DHS Delegation No. 0100.2.

**1.** Both this Court and the Second Circuit have raised serious concerns with nationwide injunctions that provide relief to non-parties, particularly in cases against the federal government. *See* Defs.' Br. 23-24. And as the Second Circuit put it recently, "[t]he issuance of unqualified nationwide injunctions" is particularly concerning "where, as here, numerous challenges to the same agency action are being litigated simultaneously in district and circuit courts across the country." *New York v. DHS*, 969 F.3d 42, 88 (2d Cir. 2020). This Court made the same point earlier in this same litigation. *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018) ("[S]everal academic commentators have insightfully observed various problems with the practice of granting nationwide injunctions against the Government, including that such injunctions thwart the development of law in different courts, encourage forum-shopping, and create the possibility that different courts will issue conflicting nationwide injunctions." (citations omitted)), *vacated and remanded on other grounds sub nom. DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, (2020).

Citing no supporting authority, both groups of Plaintiffs now assert without explanation that the current partial-summary-judgment posture of these cases somehow means that all of these concerns with nationwide injunctions can be ignored. *See State of New York* Opp'n 25; *Batalla Vidal* Opp'n 30-31. That is wrong. For example, even in the context of a final judgment, and even in the context of an order of vacatur under the APA, it is still the case that a rule in which "the court that imposes the most sweeping injunction should control the nationwide legal landscape" is inconsistent with bedrock Article III principles and longstanding principles of equity, *New York*, 969 F.3d at 88—to say nothing of the practical problems, *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("[T]he routine issuance of universal injunctions is patently unworkable."). It makes no difference that the Second Circuit's most recent discussion of these issues happens to have occurred in the context of a motion for a preliminary injunction. The Second Circuit in *New York* offered no indication that that precise procedural posture was material, and in fact questioned the propriety of "nationwide injunctions" as a general category. 969 F.3d at 87-89; *see also, e.g.*, Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,

131 Harv. L. Rev. 417, 418 (2017) ("Federal district judges have taken to an odd practice: they are issuing *injunctions* that apply across the nation, controlling the defendant's behavior with respect to nonparties." (emphasis added) (cited in *Batalla Vidal*, 279 F. Supp. 3d at 437)).

The *Batalla Vidal* Plaintiffs suggest that the objections to nationwide injunctions can be ignored because this case presents immigration-related issues. *See Batalla Vidal* Opp'n 31. The Second Circuit rejected this precise argument, lamenting the fact that "a district judge issuing a nationwide injunction may in effect override contrary decisions from co-equal and appellate courts"—a result that "may well be more unseemly than the application of inconsistent interpretations of immigration law across the circuits." *New York*, 969 F.3d at 88 (citation omitted). In fact, some geographic variance (even on immigration-related issues) is "a situation that is hardly unusual, and may well persist without injustice or intolerable disruption." *Id.* (citation omitted).

The *Batalla Vidal* Plaintiffs also point out that they have moved for class-certification, claiming that this "assuages concerns about the outsized impact of nationwide injunctions." *Batalla Vidal* Opp'n 30. In one sense, they are right: if properly certified under Rule 23, a class action *is* the appropriate procedural mechanism, authorized by the Federal Rules of Civil Procedure, through which a district court may award relief that sweeps beyond the named parties. But if anything, that is another reason why plaintiffs' *additional* request for a nationwide injunction is inappropriate: it is a second bite at the same nationwide-relief apple, and offers an end-run around the strict procedural protections imposed by Rule 23.

Finally, the *State of New York* Plaintiffs cite the Second Circuit's opinion in *New York* as support for the proposition that "vacatur has nationwide effect," implying that the mere fact that this is an APA case somehow resolves the nationwide-injunction question. *State of New York* Opp'n 24 (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). It does not.

Nothing in the APA's directive to "set aside" unlawful "agency action" mandates that "agency action" shall be set aside globally, rather than as applied to the plaintiffs. 5 U.S.C.

§ 706(2). And Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); Amicus Brief for Nicholas Bagley and Samuel L. Bray, *Trump v. Pennsylvania*, No. 19-454, 2020 WL 1433996, at \*11-17 (2017) (Mar. 9, 2020) (noting APA left traditional equity practice undisturbed). In that tradition, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In any event, any fair reading of the relevant passage in *New York* makes clear that the Second Circuit was *not* adopting the contrary position as its own, but was simply recounting the arguments on both sides of the question. *See* 969 F.3d at 87 ("[B]oth DHS and the Plaintiffs marshal persuasive points to support their arguments."). That reading of the opinion is confirmed by the fact that, just a few paragraphs later, the Second Circuit *vacated* the overbroad portions of the nationwide injunction at issue in that case. *Id.* at 88-89.

**2.** The *Batalla Vidal* Plaintiffs (but not the *State of New York* Plaintiffs) also request *prospective* injunctive relief, in the form of a "nationwide permanent injunction against *future* unlawful action by Defendant Wolf." *Batalla Vidal* Opp'n 31 (emphasis added). But "standing is not dispensed in gross," so a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (citation omitted)). So the fact that at least some plaintiffs have standing to seek an order vacating the Wolf Memorandum—as Defendants do not dispute—does not also provide standing to seek *prospective* injunctive relief for purely hypothetical *future* allegedly unlawful actions by Defendant Wolf. To the extent they make that *separate* request, the *Batalla Vidal* Plaintiffs *do* lack standing, because of the absence of any plausible allegation (let alone evidence) that they face some "certainly impending" future injury caused by some unidentified, hypothetical, future action by Defendant Wolf. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983) (past constitutional violations do not provide Article-III standing to seek prospective

injunctive relief).  Apart from standing, Plaintiffs' generalized demand that Mr. Wolf obey the law in the future also fails to provide the degree of specificity necessary for this Court to even issue an injunction under Rule 65.  *See S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.").

**3.**  The *Batalla Vidal* Plaintiffs also try to rehash another version of their argument as to why they believe an injunction under the FVRA (rather than vacatur under the APA) is somehow required by the text of the FVRA itself.  *See Batalla Vidal* Opp'n 30-31.  But, as explained at length above, *see supra* at 19-21, Plaintiffs misread the scope of Section 3348 of the FVRA.  *See Casa de Maryland*, 2020 WL 5500165, at *19 ("Sections 3346 and 3348 are cabined to those acting officers serving under section 3345").  In any event, even if it were applicable, the statutory command in the FVRA that certain actions taken by unlawfully appointed officials "shall have no force or effect," 5 U.S.C. § 3348(d)(1), says nothing at all about the choice of vacatur versus an injunction—let alone about the appropriate *scope* of either form of relief.

## CONCLUSION

For these reasons, Plaintiffs' motions for partial summary judgment should be denied, and Defendants' motion for partial summary judgment should be granted.

Dated: October 7, 2020

Respectfully submitted,

JOHN V. COGHLAN
Deputy Assistant Attorney General

SETH D. DuCHARME
Acting United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

 /s/   *Stephen M. Pezzi*
GALEN N. THORP
  Senior Trial Counsel
STEPHEN M. PEZZI
RACHAEL L. WESTMORELAND
  Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Phone:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Attorneys for Defendants*