1

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - -  X

4    MARTIN JONATHAN BATALLA VIDAL,    16-CV-4756 (NGG)
     et al.,
5
             Plaintiffs,
6
             -against-
7
     KRISTJEN M. NIELSEN, et al.,
8
             Defendants.
9    - - - - - - - - - - - - - - X
     STATE OF NEW YORK, et al.,        17-CV-5228 (NGG)
10
             Plaintiffs,
11
             -against-                 United States Courthouse
12                                     Brooklyn, New York

13   DONALD TRUMP, et al.,
                                       December 10, 2020
14           Defendants.              2:30 p.m.

15   - - - - - - - - - - - - - - X

16
         TRANSCRIPT OF STATUS CONFERENCE VIA VIDEOCONFERENCE
17          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
                UNITED STATES SENIOR DISTRICT JUDGE
18

19   APPEARANCES:

20
     For the Plaintiffs        NATIONAL IMMIGRATION LAW CENTER
21   Batalla Vidal, et al.:    Women's Rights Project
                               3450 Wilshire Blvd., #108-62
22                             Los Angeles, CA 91011

23                             BY:  ARACELI MARTINEZ-OLGUIN, ESQ.
                                    MAYRA B. JOACHIN, ESQ.
24                                  TRUDY SUMIKO REBERT, ESQ.

25

```
1    APPEARANCES: (Continued)

2
     For the Plaintiffs
3    Batalla Vidal, et al.:    JEROME N. FRANK LEGAL SERVICES
                               ORGANIZATION
4                              Yale Law School
                               P.O. Box 209090
5                              New Haven, CT 06520

6                              BY:  MUNEER AHMAD, ESQ.
                                    MARISOL ORIHUELA, ESQ.
7                                   KAREN TUMLIN, ESQ.

8
     For the Plaintiffs
9    State of New York:        NEW YORK STATE OFFICE OF THE ATTORNEY
                               GENERAL
10                             28 Liberty Street
                               New York, NY 10005
11
                               BY:  MATTHEW B. COLANGELO, ESQ.
12                                  ANISHA S. DASGUPTA, ESQ.

13
     For the Defendants:       U.S. DEPARTMENT OF JUSTICE
14                             Civil Division, Federal Programs
                               Branch
15                             20 Massachusetts Avenue Nw
                               Washington, DC 20530
16
                               BY:  STEPHEN M. PEZZI, ESQ.
17                                  BRAD ROSENBERG, ESQ.

18
     Court Reporter:           Andronikh M. Barna
19                             225 Cadman Plaza East
                               Brooklyn, New York
20                             (718) 613-2178

21   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

22

23

24

25
```

3

1              THE CLERK:  This is the DACA matter, on both DACA

2       matters.

3              Beginning with the plaintiffs, please state your

4       appearances for the record.

5              MS. MARTINEZ-OLGUIN:  Good afternoon.  This is

6       Araceli Martinez-Olguin of the National Immigration Law Center

7       for the Batalla Vidal plaintiffs.

8              MS. REBERT:  Trudy Rebert of the National

9       Immigration Law Center.

10             MS. JOACHIN:  Good afternoon.  Mayra Joachin, also

11      with the National Immigration Law Center for the Batalla Vidal

12      plaintiffs.

13             MS. TUMLIN:  Good afternoon.  Karen Tumlin with the

14      Jerome N. Frank Legal Services Organization at Yale Law School

15      for the plaintiffs.

16             MS. ORIHUELA:  Good afternoon.  Marisol Orihuela,

17      also from the Jerome N. Frank Legal Services Organization for

18      the plaintiffs.

19             MR. AHMAD:  Good afternoon, Your Honor.  Muneer

20      Ahmad, also with the Jerome N. Frank Legal Services

21      Organization.

22             THE COURT:  Is that everyone on the plaintiffs'

23      side?  Okay.

24             MR. COLANGELO:  I'm sorry, Your Honor.  Good

25      afternoon.  This is Matthew Colangelo for the State of New

4

1  York in the New York matter.  Thank you, Your Honor.

2          MS. DASGUPTA:  And Anisha Dasgupta for the State of

3  New York.

4          THE COURT:  And for the government?

5          MR. PEZZI:  Good afternoon, Your Honor.  Stephen

6  Pezzi from the U.S. Department of Justice on behalf of

7  defendants.

8          MR. ROSENBERG:  Good afternoon, Your Honor.  This is

9  Brad Rosenberg, an assistant director in the Federal Programs

10  Branch, also on behalf of the defendants.

11          THE COURT:  Anyone else from the government?

12          I think we are set then.  We can go ahead?

13          All right.  Thank you, everybody.

14          First of all, I want to thank you all for meeting

15  and making considerable progress as reflected in your joint

16  status report which I have read and reviewed.  I am heartened

17  to see that the government is making a good faith effort to

18  provide individualized notice to the class members.

19          I also want to thank the government for making the

20  change to the language on the DHS public notice earlier this

21  week, but I would like to register my concern with the

22  original notice as it was posted.  I would just like to say

23  briefly that this is not about me, it is about the courts and

24  the law.  There is a reason why multiple district courts and

25  the Government Accountability Office looked at the underlying

5

1  issue that I dealt with originally regarding the status of the

2  Acting Secretary and came to a similar or same conclusion.

3  After the government's first notice, my chambers received a

4  number of messages directing criticism at the court, and

5  certainly the public has every right to disagree with judicial

6  decisions.  And although I do not blame the government for

7  those comments made by the general public, I think it

8  underscores why it is so inappropriate to treat the work of

9  the court as if it is just the work of or the opinion of one

10 judge.  So I urge the Justice Department to more carefully

11 oversee future notices of this type; not just in this case,

12 but generally speaking.  And frankly, it bears on one of the

13 topics we are going to discuss today, which is whether the

14 government needs to seek prior approval by a court or this

15 court in issuing individual notices.

16       Having said all this, let me discuss with you the

17 outstanding issues.  As I understand it, they fall into two

18 categories, and I would like to hear from the parties on each.

19       The first is the content and timing of

20 individualized notices to be mailed and the second is whether

21 new employment authorization documents known as EADs with

22 updated expiration dates must be mailed in addition to the

23 individualized notices.  And I want to hear from both parties

24 on the issue of the notices to be mailed, and I would like you

25 to address several points.  First, how many different versions

6

1   of the notice do the parties envision, how targeted will the
2   notices be based on the individual circumstances of the
3   recipient, also what should the deadline for issuing the
4   notices be.  As I understand it, class counsel wants them out
5   by December 31st and the government believes that they need a
6   month, which would make the deadline for sending them out
7   January 8th.  And also, should the government bring the text
8   of the notice or notices to the class counsel or the Court for
9   distribution.
10          So let's start with the issue of the individualized
11  notices and then we will move on to the EADs.  Who would like
12  to start the discussion?
13          Don't all jump in at once.
14          MS. MARTINEZ-OLGUIN:  I will, Your Honor.
15          THE COURT:  Okay.
16          MS. MARTINEZ-OLGUIN:  This is Araceli Martinez
17  Olguin for the Batalla Vidal plaintiffs.
18          Based on the conversations that we've had with the
19  government, my sense is that we are envisioning at least three
20  different notices.  And I would direct you to the stipulations
21  that are on page 2 of the joint status report because I think
22  that there is one notice -- well, ostensively, I -- it isn't
23  clear to us whether the government intends for the notices in
24  1 and 2 to be the same, but they could be.  They go to the
25  same people, right?  And then we envision that there will be a

7

1    second notice that goes -- that is issued to those who had

2    first-time requests for consideration of DACA rejected.  And

3    then ostensively, there would be a similar but different

4    notice that would be sent to individuals who submitted

5    applications for advance parole and had them rejected.  So I

6    envision at least those three.

7           In terms of the timing, part of the issue here is

8    really a matter of plaintiffs' understanding that the Court

9    has already spoken on this.  We took your December 4th order

10   saying that notices would be mailed to all class members by

11   December 31st as having already determined this issue.  And

12   for that reason, and because we think that it is important for

13   our class members to get these notices as soon as possible,

14   that's one of the reasons that we are holding firm to the idea

15   of getting these out by December 31st.

16          THE COURT:  Okay.  Can we just --

17          MS. MARTINEZ-OLGUIN:  To the final -- go ahead, sir.

18          THE COURT:  Go ahead.  Go ahead, please.

19          MS. MARTINEZ-OLGUIN:  Okay.  To the final point of

20   whether the -- about the content of the notices, it's our

21   understanding, from our experience, it is common for the

22   government to negotiate some of this language for immigrants

23   who have benefits denied and then the Court say that they

24   shouldn't have been denied those benefits.  We are interested

25   in looking at them because also in our experience there is

1   value in having plaintiffs' counsel review them and fine tune

2   them and make sure that ultimately our class members receive

3   notices that are clear to them about what it is that's

4   happened and what it is that they can now do, that they can

5   resubmit, what rights have been determined by the courts.  And

6   so our interest is ultimately in just -- in looking at it, we

7   are not interested in slowing down this process, we are not

8   looking to bring back or to either complain to the government

9   or to the Court about commas and periods or insignificant

10  matters.  Instead, we're hoping simply to try and ensure that

11  the language that goes out to the clients is sufficiently

12  clear.  And from our correspondence and exchanges with

13  Mr. Pezzi, our sense is that he thinks that it has everything

14  that we would expect.  If that's the case, I can't imagine

15  that we couldn't turn that around to him in a very swift time

16  frame.  In fact, I understood from the joint status report

17  that the government has a notice ready now.  And if that's the

18  case, I think we could get him comments back by tomorrow,

19  noon.

20          THE COURT:  All right.  Before I turn to you,

21  Mr. Pezzi, let me just remind everyone on this conference that

22  under Local Rule 1.8 of the Rules of the Eastern District of

23  New York, you are not permitted to record in any way this

24  conference.  Failure to adhere to this rule could result in

25  sanctions.

9

1          So I think that what the Court wanted DOJ to do to

2     get the wheels in motion, had December 31st in mind and to get

3     out the notices as quickly as possible, but also to make sure

4     that the notices would be appropriately crafted so that the

5     Court -- the Court, I will just say this, did not see

6     December 31st as an absolute cutoff date, we were just

7     shooting for an early date.  And I am inclined -- having

8     worked in the federal government once, in the executive

9     branch, I am aware of some of the difficulties, practical

10    difficulties that exist in moving the process along.  So I do

11    not have a rigid view on this, but if there is a good reason

12    why the government needs the extra week, I would like to hear

13    about it.  And perhaps the extra week should be provided with

14    the ability of the parties to consult on the contents of the

15    notices.  So, understand that I am sensitive to the mechanical

16    problems of getting things done in government agencies, and so

17    I have a little bit of sympathy for the difficulties of the

18    government when it is acting in good faith to get things

19    finished.  That would not be an excuse, but it could be a

20    reason for moving this to the 8th.

21          So, let me hear from Mr. Pezzi.

22          MR. PEZZI:  Thank you, Your Honor.  Stephen Pezzi

23    from the Department of Justice.

24          First of all, I'm remarkably appreciative of

25    Your Honor's sympathies with respect to the practicalities of

1    moving something along like this within the federal

2    government.  It is a massive logistical challenge and will be

3    a massive logistical challenge whether the deadline is

4    December 31st or January 8th.  We're talking about mailings at

5    least upwards of 65,000 individualized notices through the

6    U.S. mail.  I have gotten assurances from the agency clients

7    that I've been working with that although it will be a huge

8    challenge, they believe they can meet a January 8th deadline

9    as long as there aren't any unexpected difficulties.  I have

10   asked for but not been able to get those same assurances, as

11   of today at least, with respect to December 31st, and that's

12   the reason we are asking for the additional time, because the

13   agency has real concerns about its actual ability to meet that

14   deadline.

15          With respect to the content of the notices, so,

16   first of all, to answer Your Honor's question, plaintiffs are

17   correct that the government is contemplating three different

18   notices here.  What are listed as paragraphs 1 and 2 in the

19   parties' agreement would be combined in a single document

20   which would be individualized paper notice on secured paper

21   with secured features.  You know, Your Honor might be familiar

22   with when you look at a check, for example, there might be a

23   watermark or some micro-printing.  To be clear, this is not

24   just, you know, a letter somebody prints out on their home

25   computer.  And that individualized document would provide

1    notice that the one-year employment authorization document has

2    been extended for two years, as well as that the period of

3    deferred action granted under the DACA policy has been

4    extended for an additional year.

5         Paragraphs 3 and 4 of the status report go to

6    individuals who had either first-time DACA requests or

7    requests for DACA-based advance parole rejected pursuant to

8    the Wolf memorandum that Your Honor has now vacated.  Those

9    individuals would fall into two separate buckets with two

10   separate notices, you know, simply making clear that that

11   individual can and should resubmit their application and it

12   would be adjudicated under the terms that are now in effect.

13   I would also note that to the extent the application had

14   already been submitted and remains pending before the agency

15   but had not yet received a final adjudication, and I

16   understand there are some of those, that those applications

17   would not need to be resubmitted and instead they would just

18   now be adjudicated pursuant to the terms and conditions of the

19   policies that were in effect prior to September 5th, 2017.

20        And I think we have broad agreement with the

21   plaintiffs on more or less everything that I just said.

22   That's part of the reason the government has opposed the

23   additional step of sharing those drafts with plaintiffs and

24   engaging in a back-and-forth process.  From our perspective,

25   the parties have reached agreement on the important substance

12

1   of these documents and it's now a wordsmithing exercise

2   followed by a very substantial logistical and IT effort on the

3   government's side to actually get these documents printed

4   with, you know, 70,000 correct names and addresses on secured

5   paper and out the door.

6           Certainly, to be clear, that remains our position.

7   Although if Your Honor was inclined to order some sort of back

8   and forth with plaintiffs on actually reviewing drafts of the

9   notice, plaintiffs are correct.  And I informed them before

10  this status conference that, I mean, there are already drafts

11  working their way through the approval process within the

12  government and if we were ordered to share those with

13  plaintiffs, again, that's not our preference --

14          THE COURT:  Right.

15          MR. PEZZI:  We certainly appreciate their ability to

16  get comments back to us by noon tomorrow because every day

17  that goes by at this point will require pushing out the

18  schedule to some degree.

19          THE COURT:  Yes.  Having had the experience of

20  seeing the original notice on the website, I am inclined to --

21  I am concerned that if there is something substantial that the

22  plaintiffs feel is extremely serious, that, you know, for you

23  to send everything out and then have the discussion about

24  whether something needs to be changed is really something that

25  should be avoided.

1          Could you all put your computers on mute for the

2     moment?  Thanks.

3          So I am going to order that you provide the drafts

4     to the plaintiffs and that they respond to you by

5     5:00 tomorrow afternoon.  And only on something really, really

6     serious that they believe is so consequential that you would

7     want to come to me on a Saturday morning about it.  And, you

8     know, weekends for judges are work days, but I would rather

9     not be working on this this Saturday.  So, I mean, that is

10    really my view.  You know, I appreciate the good faith efforts

11    of the government to get this done and ready to process

12    promptly next week.  So I am just going to order that there be

13    the back and forth and that by the end of the day tomorrow,

14    the plaintiffs advise the Court as to whether there is any

15    significant objection to any of the contents of these notices.

16    You know, a few words here or there that are not consequential

17    should not be the subject of a letter to the Court.  All

18    right?

19          MS. MARTINEZ-OLGUIN:  Your Honor?

20          THE COURT:  Yes?

21          MS. MARTINEZ-OLGUIN:  Apologies.  Araceli

22    Martinez-Olguin for the Batalla Vidal plaintiffs.

23          Could we just get some clarity about when to expect

24    the government's draft?  I think we're fine with the 5:00, I

25    appreciate the few extra hours, but should we expect that to

1  you from you all?

2          THE COURT:  Can you provide it today, Mr. Pezzi?

3          MR. PEZZI:  My preference would be to avoid a

4  specific deadline, but my expectation is that I will be able

5  to provide something before 11:59 p.m. tonight.  As a

6  practical matter, I will get it to you all as soon as I

7  possibly can.

8          THE COURT:  Thank you very much.  Thank you.

9          And so I take it we do not have to go through, at

10  this point, the issue of privilege?  I mean, if there is

11  something that is missing that you believe is privileged, you

12  are going to bring that to my attention when it is brought to

13  my -- the government will bring that issue to my attention if

14  the plaintiffs are raising an issue, a question that may raise

15  the specter of privilege; is that right?

16          MR. PEZZI:  That works from the government's

17  perspective, Your Honor.  My expectation is we will do

18  everything we can to actually finalize the drafts within the

19  government today and get it as close to that point as we can

20  and then share that document with plaintiffs.  I will do

21  everything that I can to make that happen.

22          THE COURT:  And if all goes well, I believe that the

23  January 8th deadline is appropriate and will be sufficient for

24  the members of the class to receive these materials in a

25  timely fashion.  So I am going to order that the notices be

1   sent to the members of the class in each of the categories on

2   or before January 8th, 2021.  It's so ordered.  All right?

3         Is that all we have on the first item?  Because

4   there is the issue of the second item and on the new EADs.

5   And let me tell you just to cut to the chase, I understand the

6   government's problem in terms of issuing a new EAD for two

7   years when the one-year EAD may not have expired already.  In

8   other words, there would be two valid EADs at the same moment

9   in the hands of the same DACA recipient.  And the government

10  is concerned that it can provide the additional material, a

11  document that extends the EAD that can be shown to an employer

12  with the one-year EAD.  Is that your basic position,

13  Mr. Pezzi?

14        MR. PEZZI:  Yes, Your Honor.  As a legal matter, the

15  notice that we are talking about, when combined with the

16  one-year EAD, would be identical to the EAD.

17        THE COURT:  Let me hear from plaintiffs on that

18  issue, because I don't want to reach any conclusions without

19  hearing from the plaintiffs as to why that may not be

20  sufficient.

21        MS. MARTINEZ-OLGUIN:  Yes, Your Honor.

22        Apologies, I am getting a little bit of feedback.

23        This is what is at the heart of our dispute -- ah,

24  thank you.  Essentially, Your Honor, the question here is

25  about whether or not having a one-year EAD and that extra, you

1    know, secure but essentially piece of paper from the

2    government really suffices to make our class whole, and in

3    particular, the 65,800 individuals who right now have those

4    one-year EADs.  You have in front of you declarations from

5    some of our named plaintiffs, from Carolina Fung Feng and from

6    Martin Batalla Vidal.  You have from them declarations that

7    speak to the additional employment discrimination that

8    presents itself when you are an EAD holder, much less someone

9    who is holding an EAD and then bringing this additional piece

10   of paper to an employer.  And so I think in the end, because

11   of some of the additional challenges that it will present to

12   folks, both it will subject them to -- it will open them up to

13   additional employment discrimination, as well as just make it

14   more difficult to do things like -- the EADs are used for many

15   more things, including for the issuance of driver's licenses,

16   to secure a driver's license, to open bank accounts, to get

17   mortgages.  But the EAD is the primary -- is a primary

18   identification document for many DACA recipients.  And so

19   walking around with an expired document or something that

20   could be expiring and then saying that it's extended,

21   ultimately, we think, doesn't make our clients whole and

22   leaves them with perhaps something that is swift but not

23   sufficiently effective.  And our goal ultimately is to get

24   both -- is to get something that is both swift and effective.

25   We appreciate the swiftness with which the government is

1    offering to put out these notices, we absolutely do want that

2    for them.  In all candor, if it were possible to get the

3    second correct EAD out to everyone quickly, that would have

4    been the end of the dispute.  We very much recognize that the

5    government, though is in this position in part through their

6    own making because ultimately these were issued under an

7    unlawful policy adopted by Mr. Wolf, we do appreciate that at

8    this point to correct it will require time and energy from

9    them, which is why ultimately we are asking for both these

10   notices that we've been discussing as well as an EAD that

11   comes some time later.

12          I noted in the joint status report that at the -- I

13   believe it's at the bottom of page 8 in footnote 4.  The

14   government notes that if the Court does order them to provide

15   updated EADs, they would ask that that deadline be no earlier

16   than nine months into their current validity periods.  And I

17   just want to note for the Court that plaintiffs are amenable

18   to that, or at least the Batalla Vidal plaintiffs are amenable

19   to that timeline.

20          MR. PEZZI:  Your Honor, you're on mute.

21          THE COURT:  That the EADs, the updated EADs would be

22   issued no earlier than nine months into the validity period of

23   the one-year EADs?  Well, I think that is a solution so

24   that -- but I also think that it is possible that for some of

25   the holders of the EADs, having the letter or the extension

1   document will be sufficient.  And if there is some way of

2   informing the EAD holders that if they have a problem

3   utilizing their EADs, that there is a process for issuing an

4   EAD for the full two-year period.  In other words, not having

5   to issue an EAD to everyone for the two-year period, but

6   issuing it on a priority basis to those who are applying for a

7   mortgage with some bank that, you know, makes all kind of

8   demands and says this piece of paper is not good enough for

9   us.  So I am just concerned that it is not so easy to prepare

10  these EADs and I just have to give some thought to how to

11  manage this in a way that achieves the objective but does not

12  create a bigger problem.  There are some people who are going

13  to need these two-year EADs because for whatever reason the

14  bank or the employer, if it is a big employer or a small

15  employer, has very rigid rules about accepting these

16  documents.  And there are others who are just going along and

17  they are doing just fine and no one cares.  So I am just

18  wondering how we can deal with the magnitude of issuing all

19  these new EADs promptly when some people need them right away

20  and some people do not.  So I just think that is -- that is my

21  concern.

22          MS. MARTINEZ-OLGUIN:  Judge, the other thing that I

23  would point out, I've listed a few examples and to the extent

24  that you're thinking about all of the potential ways that the

25  one-year EAD could pose -- and the extension notice could pose

1   a problem, I think I would like to add a few more things and

2   register them with you in terms the way EADs are used.  I've

3   mentioned driver's licenses and bank accounts, right?  But

4   folks also use them to register for utilities, to access

5   healthcare programs, for domestic travel, right?  One of our

6   named plaintiffs, Antonio Alarcon in Georgia, needed his EAD

7   just to be able to do some of that travel.  And for

8   educational purposes, to show that, that you can access

9   scholarship money.  And I think the piece that I would leave,

10  that I would highlight for you here is that it is -- with some

11  of these things, the time that it would take to have to get

12  the new EAD, if -- what I hear you suggesting is registering

13  that you've had a problem so that you can get a priority

14  document sometime thereafter, I think leaves -- would likely

15  leave people harmed still by the Wolf memo because they would

16  need -- they would have to experience an additional harm,

17  register that problem, then get their second EAD.  And I worry

18  that ultimately -- mm-hm.

19          THE COURT:  Let me hear from the defendant, the

20  government.

21          MR. PEZZI:  Thank you, Your Honor.

22          I'd say a few things about the additional request

23  for EAD documents.

24          So, first of all, I entirely sympathize and

25  understand plaintiff's concern that there might be someone out

1    there, some employer, some bank, somebody that, you know,

2    looks at the one-year EAD and looks at the government's notice

3    and is either confused or for some reason inappropriately, you

4    know, doesn't respect the documents in the way that they

5    should.  That's part of the reason that the government

6    proposed what ultimately became No. 5 in the parties'

7    agreement, which is that by January 8th, 2020 -- or 2021,

8    excuse me, the government would prepare and publish and

9    distribute guidance on this precise subject, making clear to

10   anyone who reads that guidance, whether it be private

11   employers or state agencies or anyone in between, that from

12   the perspective of the Department of Homeland Security, a

13   one-year EAD plus this individualized notice on secure paper

14   is to be treated for all purposes identically to a two-year

15   EAD.  And so the very purpose of that proposal was to mitigate

16   some of these very concerns.

17          I will also note that the government -- I mean, the

18   Department of Homeland Security is first and foremost a

19   national security and a law enforcement agency.  And so for

20   obvious reasons that I'm sure Your Honor and plaintiffs

21   understand, they try very hard to avoid a situation like we're

22   talking about here where there's even, you know, a small

23   possibility or even a short window where the same person could

24   be issued two different validity -- or two different documents

25   that, you know, verify their identity.  And so as a practical

1  matter, what we would have to do would be something like send

2  everyone a new two-year EAD or, you know, any individuals that

3  were entitled to this relief, a new two-year EAD along with a

4  letter saying, you know, please return your old EAD and we'll

5  shred it when it gets back to the agency.  As a practical

6  matter, in some prior instances where the agency has had to do

7  that for one reason or another, they never receive all of them

8  back, of course, as a practical matter, and so there's some

9  number that are just out there in the world.  And that,

10  understandably, makes a law enforcement agency and a national

11  security agency nervous.

12            As for --

13            THE COURT:  Well, you know, let me just look at it

14  this way.  If you get a new driver's license from -- you mail

15  in an application or send one in by e-mail or online, make an

16  application online, you get a new license, but you still have

17  the old license which may be valid for another 30 days or

18  another 60 days, so you've got two licenses, the same -- it is

19  the same problem, in effect.  So if the Court orders that DHS

20  supply a new EAD no later than 30 days before the expiration

21  of the old EAD, extending the time for the extra year let's

22  say, then that would mitigate that problem, would it not?  Are

23  you capable of doing that?

24            MR. PEZZI:  I certainly agree it would mitigate the

25  problem; it would not solve the problem, for the reasons that

1    we have identified.

2         And the last thing I would say is, I mean,

3    plaintiffs' discussion about, you know, making everyone whole,

4    obviously the government is trying very hard to implement

5    Your Honor's order in a way that addresses plaintiffs'

6    concerns and Your Honor's concerns about the effects of the

7    Wolf memorandum.  I do think it's important to remind

8    Your Honor that as a legal matter, I mean, it's not like a

9    contract claim where you're, you know, entitled to be made

10   whole or get the benefit of your bargain.  On an APA claim,

11   the typical remedy is limited to vacating the agency memo, not

12   to trying to restore every individual plaintiff into exactly

13   the world that they were in.  And so, you know, we're

14   obviously making significant strides and have reached a lot of

15   agreements with plaintiffs to address some of these concerns.

16   We don't think there's any legal basis for this request and we

17   have some significant practical concerns that we've already

18   worked very hard to address with the other relief that we have

19   agreed to.

20        THE COURT:  Well, let me just take it one step

21   forward.  What happens if a DACA recipient with an EAD goes to

22   the Motor Vehicles in some state, I don't know where, and

23   presents the EAD which is current, or not current, and the

24   letter which is on, you know, some sort of, you know,

25   watermarked government paper and the clerk, because there is

1   going to be a clerk, who has never seen this before says,

2   well, you know, the EAD is expired and you've got this letter,

3   but why don't you have a new EAD?  What happens then is that

4   the person is going to be turned away because it is

5   just clerks who have never seen this before.  Look, I have had

6   clerks who have turned me away when everything is valid,

7   everything is good, but they just do not seem to think it is

8   just right.  And so now we have these DACA recipients who are

9   trying to, you know, negotiate these situations with

10  government agencies or with a bank, which I think can be worse

11  than being with a government agency, dealing with a government

12  agency, and they have a problem.  What do they do then?  If I

13  leave it the way you recommend it, and you make a good

14  argument, how do they address that problem?  We would need to

15  tell them what they can do to get a new EAD so that they can

16  do the business that they have the right to do, and that would

17  take time.  So I am just wondering whether this is becoming

18  very much more complicated than it needs to be.

19          MR. PEZZI:  And, Your Honor, very quickly on that.

20          I would just say again, first of all, I mean, the

21  guidance that we're talking about preparing could be, and I

22  think we intend to make it accessible to, you know, state

23  government agencies.  There's a federal government database

24  that is specifically designed for state benefit agencies, for

25  example, to be able to, you know, receive updates from the

24

1   Department of Homeland Security about these very sorts of

2   things.

3           The sort of concerns that Your Honor is raising

4   regrettably already exist with respect to, you know, normal --

5   I mean, if you're a DACA recipient with any EAD -- I know the

6   plaintiffs have detailed in declarations -- there's always

7   some risk that someone in some DMV in some state is not going

8   to understand federal law.  And I don't think that's a problem

9   that, you know, either DHS or Your Honor is going to be able

10  to solve, regrettably.  And so to be clear, for purposes of

11  federal law and for any purpose by which any entity, public or

12  private, using an EAD as a form of verification, the proposal

13  that we are offering would be identical in every way to a

14  two-year EAD.  And so the only concern is someone who is

15  either, you know, not following the rules and the

16  understanding that is set forth by DHS.  And that's a concern

17  that exists even with the status quo.

18          So, I mean, I wish there was an easier solution that

19  did not present the same concerns with respect to fraud, for

20  example, but those are the reasons why the government felt as

21  to oppose to this request.

22          MR. COLANGELO:  Your Honor, this is Matthew

23  Colangelo for the State of New York.

24          If I can chime in, Your Honor, just on the point

25  that Mr. Pezzi just --

1           THE COURT:  Sure, please do.

2           MR. COLANGELO:  Thank you, Your Honor.

3           On the point Mr. Pezzi just raised regarding fraud

4    and from the perspective of a law enforcement agency, the

5    New York Attorney General's Office is also quite obviously a

6    law enforcement agency as well, and so we take seriously the

7    concerns about fraud.  But we think those risks here are

8    exceedingly minimal for a range of reasons, including for all

9    of the impressive security features in the new notice

10   documents that Mr. Pezzi just described, as well as more

11   fundamentally, the fact that these identification documents

12   are -- you know, contain each individual's biometric

13   information and photograph.  These are not documents that are

14   particularly susceptible to fraud for the same reason

15   Your Honor already identified.  And so we'd have to balance

16   that against the quite significant and quite obvious, we

17   believe, advantages in increased utility and administrability

18   to state government agencies of having a replacement EAD for

19   individuals who should have received a two-year EAD in the

20   first place.

21          THE COURT:  All right.  I'm sorry, Mr. Colangelo,

22   the system bogged out on me, so start your statement again.

23   You have practiced it now, so let me hear from you.  Sorry

24   about that.

25          MR. COLANGELO:  No problem, Your Honor.  Let me see

1   how close I can get to saying it the same way.

2        As a law enforcement agency ourselves, the New York

3   Attorney General is sympathetic to and takes quite seriously

4   the concerns about fraud.  We think those concerns are quite

5   low here because these documents are secure.  They contain

6   photo identification and biometric information and are not

7   susceptible to fraud.  And as state governments ourselves,

8   whose agencies rely on EADs for driver's license applications,

9   nondriver identification cards, other public benefit

10  applications, we are balancing what we believe is the very low

11  risk of fraud against a pretty significant increased utility

12  to the recipients and the increased administrability to our

13  agencies of making sure that DACA recipients who should have

14  received a two-year EAD in the first place ultimately get one,

15  and we think the compromise proposal in the joint status

16  report accomplishes that goal and mitigates the risk of fraud.

17        Thank you, Your Honor.

18        THE COURT:  Do you know how many of these EADs will

19  expire in the next month, for instance?

20        MS. MARTINEZ-OLGUIN:  None, Your Honor.  From the

21  declaration that was submitted by the federal government,

22  Mr. Edlow's declaration, they won't expire -- the first of

23  these won't expire until August.

24        MR. PEZZI:  And that's correct, Your Honor.

25  Remember, these were one-year EADs that were issued pursuant

1   to the Wolf memorandum which came out on July 28th, so the

2   earliest EADs we're talking about were issued in early

3   August of 2020.  And so the earliest expiration dates are

4   early August of 2021.

5           THE COURT:  So I am going to simply direct that no

6   later than 30 days before the expiration of the one-year EADs,

7   that a new EAD be provided extending the EAD for a year so as

8   to make them two-year EADs.  And so there is plenty of time to

9   achieve that; we are not up against an immediate deadline.

10  And this will facilitate clarity for the recipients of the

11  EADs.  And consequently, the government will not have to send

12  out certificates, they will simply send out the new EADs no

13  later than 30 days before the expiration of the old ones.

14          MS. MARTINEZ-OLGUIN:  Judge, I'm sorry, can I ask

15  you to clarify that?  Are you suggesting that that's instead

16  of the notices that folks would get in 30 days or in addition

17  to?  In addition to?

18          THE COURT:  They could get the notices, but the

19  notices would be clear that the notices would expire at the

20  time that the new EADs would become valid, in other words.

21          I know it sounds complicated, but they will

22  understand how to do it.  They are very capable.  DHS has very

23  capable administrators who are career employees who know how

24  to do these things.  I am sure that they can achieve the

25  extension to the two years by sending out a new EAD within

1  30 days, no later than 30 days before the expiration of the

2  old one.

3            So, I mean, that is how I would resolve it.  I

4  thought these were going to expire in the next month.  But if

5  they are not expiring until August of 2021, then I do not see

6  that there is a major administrative difficulty in getting out

7  the new EADs.  That is really what I am saying to you all.

8            MS. MARTINEZ-OLGUIN:  Your Honor, could I ask you to

9  also clarify that that will be at no cost?

10            THE COURT:  I will put it in an order on ECF so

11  that, you know, it is clear what my position is on this.

12            And if you need me to clarify it, Mr. Pezzi, I am

13  happy to do that.  But I think this is something that can be

14  achieved within the next seven and a half months.  It is

15  really seven and a half months.

16            But I also made clear that I appreciate and am

17  concerned about your admission regarding people who -- or

18  losing an EAD.  But on the other hand, I think that this will

19  solve the problem.

20            Yes, ma'am?

21            MS. MARTINEZ-OLGUIN:  And, Judge, just to be clear,

22  that second EAD will be at no cost to the current one-year EAD

23  holders?

24            THE COURT:  No -- yes, well, because it is now a

25  two-year EAD, they have already paid for it.

1          MS. MARTINEZ-OLGUIN:  Thank you.

2          (Pause.)

3          MS. MARTINEZ-OLGUIN:  Judge, I think we're done,

4     yeah.

5          THE COURT:  What else do we have for today?

6          Anything from you, Mr. Pezzi?

7          MR. PEZZI:  One minor housekeeping, Your Honor.

8          Your Honor issued an order, a minute order a few

9     weeks ago making clear that the government's obligation to

10    answer or otherwise respond to plaintiffs' latest amended

11    complaints was stayed pending our working on these issues.  If

12    we could just get some additional clarity from your Your Honor

13    that that obligation remains stayed pending further order of

14    the Court.  I don't think --

15         THE COURT:  Yes, that obligation is stayed pending

16    further order of the Court.  And hopefully, the Court will

17    never have to deal with it.

18         MR. PEZZI:  That works for the government,

19    Your Honor.

20         THE COURT:  Okay.

21         Mr. Colangelo, you are smiling.  Did you bring

22    something to the meeting?

23         MR. COLANGELO:  No, Your Honor.  I just was

24    commiserating with the Court's interest in never having to

25    deal with that particular issue.  Thank you, Your Honor.

30

1      THE COURT:  Anything else from the class at this

2  point?

3      MS. MARTINEZ-OLGUIN:  No, Your Honor.  Thank you.

4      THE COURT:  Well, let me again say that I really do

5  appreciate the efforts of all the participants in this process

6  to achieve closure on some of these issues without help from

7  me and so you do have my thanks for that.

8      And I have an admonition.  You are to wear a mask,

9  you are to socially distance, and you are to stay in your

10  pods, you know, so that the next time we meet, should that be

11  necessary, you will all be here with me.

12      So, thank you very much.  Have a good holiday.

13      Let me know if there is anything I need to do on

14  Saturday morning.  But I am going to issue an order on the

15  items that we have discussed today just so that it is as clear

16  as can be.  All right?

17      Thank you, everyone.

18      MS. MARTINEZ-OLGUIN:  Thank you, Your Honor.

19      MR. PEZZI:  Thank you, Your Honor.

20      (Matter concluded.)

21          *      *      *      *      *

22  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
23

24    /s/ Andronikh M. Barna          December 10, 2020
   _____    _____
25     ANDRONIKH M. BARNA                DATE

Andronikh M. Barna, Official Court Reporter, RPR, CRR