**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCÓN, ELIANA FERNANDEZ, CARLOS VARGAS, CAROLINA FUNG FENG, M.B.F., by her next friend LUCIA FELIZ, XIMENA ZAMORA, SONIA MOLINA and JOHANA LARIOS SAINZ, ) ) ) ) ) ) ) | Case No. 1:16-cv-04756 (NGG)(VMS) |
| On behalf of themselves and all other similarly situated individuals, ) ) | April 25, 2022 |
| and MAKE THE ROAD NEW YORK, ) ) | |
| On behalf of itself, its members, and its clients, ) ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security, et al., ) ) ) ) | |
| *Defendants*. ) ) | |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR MODIFICATION**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   STATEMENT OF FACTS .............................................................. 2

   A.   THIS COURT'S DECEMBER 2020 ORDER ............................. 2

   B.   THE *TEXAS II* ORDER .............................................................. 3

   C.   USCIS POLICY AND PROCEDURES ......................................... 5

      1.   USCIS's Ramp-Up Period for Processing First-Time DACA Applications ................. 5

      2.   USCIS Treats Certain DACA Renewals as First-Time Requests Barred by *Texas II* .... 6

   D.   DACA-RELATED FEDERAL LEGISLATION AND REGULATIONS ........................ 7

      1.   Congress Has Failed to Act ........................................................ 7

      2.   The Proposed DACA Rule's Uncertain Timeline ........................................ 7

   E.   CLASS MEMBERS STUCK IN LIMBO ...................................... 8

III.  LEGAL STANDARD ................................................................... 8

IV.  ARGUMENT ................................................................................. 9

   A.   THIS COURT HAS AUTHORITY TO MODIFY ITS REMEDIAL ORDER ................. 9

   B.   THIS COURT SHOULD MODIFY ITS ORDER TO DIRECT DHS TO PROVIDE INTERIM RELIEF FOR FIRST-TIME APPLICANTS ........................................................... 12

      1.   The *Texas II* Order Changed the Factual Conditions for First-Time Applicants, Warranting Modification ..................................................................... 12

      2.   Interim Relief Is Appropriate for First-Time Applicants, and this Court Has the Power to Direct Defendants to Issue Such Relief ........................................................ 14

      3.   Interim Relief Does Not Conflict with the *Texas II* Order ........................... 16

   C.   THE COURT SHOULD MODIFY ITS ORDER TO REQUIRE PROCESSING OF PENDING FIRST-TIME APPLICATIONS TO THE POINT OF ADJUDICATION ........... 18

   D.   THIS COURT SHOULD ORDER DEFENDANTS TO ADJUDICATE EXTENDED RENEWAL APPLICATIONS ......................................................................... 20

V.   CONCLUSION ............................................................................. 21

# TABLE OF AUTHORITIES

## Cases

*Bakery Machinery & Fabrication v. Traditional Baking*, 570 F.3d 845 (7th Cir. 2009) ............. 10

*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) ......................................................... 11

*Briscoe v. City of New Haven*, 2010 WL 2794231 (D. Conn. July 12, 2010) ............................. 20

*Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594 (5th Cir. 1963) ................................. 10

*Brown v. Plata*, 563 U.S. 493 (2011) ................................................................. 9, 16

*Conn. Off. Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. Educ.*, 464 F.3d 229 (2d Cir. 2006) ........................................................................................... 9

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc*., 628 F.2d 500 (5th Cir. 1980) ................... 10

*Freeman v. Pitts*, 503 U.S. 467 (1992) ................................................................ 11

*Garamendi v. Henin,* 683 F.3d 1069 (9th Cir. 2012) .................................................. 20

*Hutto v. Finney*, 437 U.S. 678 (1978) ................................................................ 10

*In re Marc Rich & Co. A.G.,* 739 F.2d 834 (2d Cir. 1984) ............................................. 20

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) ............................ 9

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31 (2d Cir. 1969) ................. 8, 11, 14

*Klapprott v. U.S.*, 335 U.S. 601 (1949) .............................................................. 10

*Matter of Emergency Beacon Corp.*, 666 F.2d 754 (2d Cir. 1981) ...................................... 10

*Paddington Partners v. Bouchard,* 34 F.3d 1132 (2d Cir. 1994) ....................................... 20

*Panama Processes, S.A. v. Cities Service Co.,* 789 F.2d 991 (2d Cir. 1986) .......................... 20

*Rose v. Maggio Corp.*, No. 13-CV-2649, 2013 WL 5774862 (E.D.N.Y. Oct. 24, 2013) ................... 10

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) .................................. 13, 14, 19

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Leavitt*, 408 F. Supp. 2d 1073 (D. Or. 2005) .... 11

*Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529 (11th Cir. 1986) ...... 10

*Stevens v. Miller*, 676 F.3d 62 (2d Cir. 2012) ...................................................... 10

*Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642 (1961) ................................................... 11

*Texas v. United States*, 549 F. Supp. 3d 572 (S.D. Tex. 2021) ............................... 8, 16, 20

*Texas v. United States*, No. 1:18-cv-00068, 2021 WL 3022434 (S.D. Tex. July 16, 2021).. *passim*

*United States v. Field*, 193 F.2d 92 (2d Cir. 1951) ...................................................................... 11

*United States v. New York Tel. Co.*, 434 U.S. 159 (1977) ............................................................ 11

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ................................................................ 8, 10

*United States v. United Shoe Machinery*, 391 U.S. 244 (1968) .................................................. 10

**STATUTES**

8 U.S.C. § 1182(d)(5) ................................................................................................................ 17

8 U.S.C. § 1101(a)(27)(J) .......................................................................................................... 14

8 U.S.C. § 1153(b)(4) ................................................................................................................ 14

8 U.S.C. § 1255 .......................................................................................................................... 14

**RULES**

Fed. R. Civ. P. 60(a) ........................................................................................................ 9, 19, 20

Fed. R. Civ. P. 60(b)(6) ..................................................................................................... 8, 10, 11

**REGULATIONS**

Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53736 (Sept. 28, 2021) ........................... 7

Special Immigrant Juvenile Petitions, 87 Fed. Reg. 13066 (Mar. 8, 2022) ................................ 15

8 C.F.R. § 245.1(e)(3) ............................................................................................................... 14

8 C.F.R. § 204.11 ...................................................................................................................... 14

**OTHER AUTHORITIES**

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2961 (3d ed. 2021) .......................................... 10

*Consideration of Deferred Action for Childhood Arrivals (DACA), Frequently Asked Questions, Initials*, USCIS at No. 14 ........................................................................................................ 3

Notice of Appeal, *Texas v. United States*, No. 21-40680, ECF 00516017367 (5th Cir. Sept. 16, 2021) ................................................................................................................................... 3

*Number of Form I 821D, Consideration of Deferred Action for Childhood Arrivals Requests by Intake and Case Status, Current Fiscal Year by Quarter*, USCIS (Oct. 1, 2020-Sept. 30, 2021) ........................................................................................................................................ 3

*Number of Form I 918, Petition for U Nonimmigrant Status - By Fiscal Year, Quarter, and Case Status Fiscal Years 2009-2021*, USCIS .............................................................................. 15

Order Granting Summary Judgment, *Batalla Vidal v. Wolf*, No. 1:16-cv-04756, ECF 354 (E.D.N.Y. Dec. 4, 2020) ...................................................................................................... *passim*

Plaintiffs' Motion for Summary Judgment, *Texas v. United States*, No. 18-cv-00068, ECF 486 (S.D. Tex. Oct. 9, 2020) ................................................................................................... 8

Second Amended Complaint, *L.F.O.P. v. Mayorkas*, No. 4:21-cv-11556, ECF 26 (D. Mass. Jan. 4, 2022) ................................................................................................................................ 14

*Special Immigrant Juvenile Classification and Deferred Action*, USCIS (Mar. 7, 2022)............ 15

Transcript of Pre-Motion Conference, *Batalla Vidal v. Mayorkas*, No. 16-cv-4756 (E.D.N.Y. Apr. 4, 2022) ..................................................................................................................... 7

*U Nonimmigrant Status Bona Fide Determination Process FAQs*, USCIS ................................ 15

## I.      INTRODUCTION

Nearly ten years after the creation of the Deferred Action for Childhood Arrivals (DACA) program, the United States retains its substantial obligation to America's immigrant youth. In its December 2020 order, this Court reaffirmed those obligations, reopening DACA for the first time in three years and paving the way for tens of thousands of class members to seek work, pursue education, and remain in the country they have called home since childhood. In the following months, and in reliance on that order, class members like Plaintiff Johana Larios Sainz—a New Yorker who was raised and resides in Staten Island—compiled applications, paid filing fees, and allowed the government to capture their biometrics. Defendants implemented this Court's order slowly. Just as the United States Citizenship and Immigration Services (USCIS) started issuing decisions more quickly, a Texas court in July 2021 vacated the DACA memorandum.

Misapprehending the interaction between the *Texas II* order and the order previously issued by this Court, the government suspended its processing of first-time DACA applications, cancelled scheduled biometrics appointments, and in some cases, withdrew grants of DACA that had already been issued. As a result, more than 80,000 first-time applicants (First-Time Applicants) hang in limbo. These are applicants like Ms. Larios Sainz, who submitted her application within days of this Court's December 2020 order and has waited 16 months for a decision.

In fact, this Court ordered USCIS to "accept" new DACA applications, and the *Texas II* order forbids USCIS from "granting" DACA to new applicants. Neither Court has addressed, however, what is to happen to applications between the time that USCIS "accepts" them and the time that USCIS makes a final decision whether to "grant." On this motion, Plaintiffs request that the Court modify its prior remedial order to direct Defendants to fashion interim relief for First-Time Applicants like Ms. Larios Sainz, and in addition, that Defendants process her application

and that of other First-Time Applicants up to the point of decision, when the *Texas II* order forbids Defendants from finally granting or denying the application.

Further, USCIS is wrongfully relying on the *Texas II* order to treat renewal applications as first-time applications where the applicant's DACA expired more than one year prior (Extended Renewal Applicants). First-Time Applicants and Extended Renewal Applicants (collectively, Pending Applicants) are languishing at USCIS, with foreseeable delays of many more months as the *Texas II* order proceeds through appeals to the Fifth Circuit and, likely, the Supreme Court.

This Court has the power to order Defendants to (1) craft interim relief, (2) process First-Time Applicants to the point of decision, and (3) adjudicate Extended Renewal Applicants without conflicting with the *Texas II* order. This Court's prior order, equitable authority, and ongoing jurisdiction over the nationwide *Batalla Vidal* class action all authorize it to afford this additional relief to the Pending Applicants.

## II.     STATEMENT OF FACTS

### A.  THIS COURT'S DECEMBER 2020 ORDER

On December 4, 2020, this Court ordered Defendants to accept first-time requests for DACA, renewal requests, and advance parole requests, based on the terms of the 2012 DACA program. ECF No. 354 at 4. The Court ordered Defendants to post notice that USCIS was "accepting first-time requests for consideration of deferred action under DACA," *id.*, but did not elaborate on the meaning of "accepting" and "consideration."

Following this Court's order, Defendants began accepting, processing, and adjudicating first-time DACA requests to final decisions. As of July 21, 2021, USCIS had received over 94,000

first-time DACA applications and had approved nearly 8,000.[1]

## B. THE *TEXAS II* ORDER

On July 16, 2021, a judge of the Southern District of Texas entered a nationwide injunction directing the government to halt adjudication of both first-time DACA applications and DACA renewals. *Texas v. United States*, No. 1:18-cv-00068, 2021 WL 3022434, at *3-4 (S.D. Tex. July 16, 2021) (*Texas II*). The *Texas II* order permanently enjoins Defendants from "administering the DACA program and from implementing DACA without compliance with the [Administrative Procedure Act (APA)]." *Id.*, at *4. However, the court partially stayed its order to permit the government to renew DACA for recipients who obtained DACA on or before the date of the order. *Id.* Moreover, with regard to first-time applications, the *Texas II* order specifies that the Department of Homeland Security (DHS) "may continue to accept applications as it has been ordered to do by [this Court's December 2020 order, ECF 354], but it may not *grant* these applications until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court." *Texas II*, 2021 WL 3022434, at *4 (emphasis added).[2]

Defendants went much further, however, and ceased processing biometrics or taking any other intermediate steps leading up to final adjudication—with the exception of cashing and keeping class members' $495 money orders.[3] Plaintiffs understand Defendants' intermediate steps

---

[1] *Number of Form I 821D, Consideration of Deferred Action for Childhood Arrivals Requests by Intake and Case Status, Current Fiscal Year by Quarter*, USCIS (Oct. 1, 2020-Sept. 30, 2021), https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr4.pdf [hereinafter USCIS Initial DACA Statistics, Oct. 2020-Sept. 2021].

[2] The government appealed the *Texas II* order to the United States Court of Appeals for the Fifth Circuit. *See Texas v. United States*, No. 21-40680, ECF 00516017367 (5th Cir. Sept. 16, 2021) (Notice of Appeal). Briefing was completed on March 30, 2022, and oral argument has yet to be set as of April 25, 2022.

[3] *See, e.g.*, *Consideration of Deferred Action for Childhood Arrivals (DACA), Frequently Asked Questions, Initials*, USCIS at No. 14 (last updated on Aug. 31, 2021), https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions ("I filed an initial DACA request and am scheduled for a biometrics appointment after July 16, 2021.  What should I do?"  [A:] "As a result of the [*Texas II*] order, all biometrics appointments for initial DACA requestors have been cancelled."); *id.* at No. 15 ("Will USCIS issue me a refund if I have filed an initial DACA request?"  [A:] "At this time, USCIS is not issuing refunds for pending initial DACA requests that remain on hold while the court order is in effect.").

to include depositing the filing fee; sending notice of receipt of application to the applicant; scheduling biometrics; capturing biometrics; processing biometrics by pulling data from federal and state law enforcement and other databases; upon completion of biometrics, evaluating the applicant's criminal history, if any; assessing eligibility for DACA and work authorization according to the 2012 DACA Memo; assessing whether both DACA and work authorization are authorized for a given case; and engaging in an individualized and holistic review of the application. Finally, after these intermediate steps, the agency issues an adjudication of "grant" or "deny" for DACA and work authorization as an exercise of agency discretion. Other than collecting fees, USCIS has halted its processing of the pending first-time DACA applications of approximately 80,000 class members who filed between December 4, 2020 and July 16, 2021. No provision of the *Texas II* order prevents Defendants from taking these intermediate steps.

Several *Batalla Vidal* class members, despite each submitting applications for DACA soon after this Court's December 2020 order, experienced inconsistent treatment of those applications, based on whether USCIS had already captured their biometrics. Plaintiff Johana Larios Sainz, a New York resident, is among those pending First-Time Applicants awaiting further processing. She filed her first-time DACA application on December 9, 2020—just five days after this Court's prior order—and had biometrics scheduled for and taken on May 27, 2021, nearly six months later. Exh. A, DACA Application Documents, Johana Larios Sainz. Because of the delay in capturing her biometrics, her application remains pending. Plaintiff M.B.F., on the other hand, filed a first-time DACA application on December 14, 2020. Exh. B, DACA Documents, M.B.F. Because she had already completed biometrics by that time, in support of another application for status, USCIS notified her on December 17, 2020, that it would re-use her completed biometrics in considering her DACA application. *Id.* With her application materials in place, M.B.F. was granted DACA on

May 5, 2021, before the issuance of the Texas II order. *Id.* Had USCIS scheduled Ms. Larios Sainz and other class members for biometrics earlier, or completed them in a separate process, they might have received grants of DACA before the window elapsed.

### C.   USCIS POLICY AND PROCEDURES

#### 1.   USCIS's Ramp-Up Period for Processing First-Time DACA Applications

Public statistics regarding USCIS's processing of first-time DACA applications between December 2020 and July 2021 show that USCIS had an approximately four-month-long "ramp-up period" before the agency began issuing a high volume of first-time DACA adjudications. As shown in the below table, in the first four months after this Court's December 2020 order, over 50,000 first-time DACA applications were received, but only 1,663 were adjudicated (i.e., granted or denied). In the following four months, however, approximately 41,000 first-time applications were received and 7,483 were adjudicated. During the ramp-up period, USCIS deposited applicants' filing fees, captured biometrics, processed biometrics, determined eligibility and exercised discretion in making final adjudications.

*Table: First-Time DACA Applications Received, Approved, Denied, and Pending*[4]

| Time Period | Total First-Time DACA Requests Received | Approved | Denied | Remained Pending |
|---|---|---|---|---|
| Oct. 1, 2020 – Dec. 31, 2020 | 3,274 | 400 | 301 | 6,640 |
| Jan. 1, 2021 – Mar. 31, 2021 | 49,892 | 763 | 169 | 55,564 |
| Apr. 1, 2021 – June 30, 2021 | 33,255 | 4,605 | 511 | 83,653 |
| July 1, 2021 – Sept. 30, 2021 | 8,063 | 2,226 | 141 | 89,336 |

These statistics further demonstrate that USCIS has the ability to meaningfully process, but not adjudicate to final decision, first-time DACA applications. Completing these ramp-up

---

[4] *See supra* note 1, USCIS Initial DACA Statistics, Oct. 2020-Sept. 2021.

procedures in advance could prepare the agency to swiftly adjudicate pending first-time applications should DACA be reopened for these applicants in the future.

### 2. USCIS Treats Certain DACA Renewals as First-Time Requests Barred by *Texas II*

USCIS has chosen to treat certain DACA renewal requests as first-time DACA requests, which the agency claims it is "prohibited from approving" while the *Texas II* "order remains in effect."[5] Specifically, if class members submit a DACA renewal request more than one year after their current DACA expired, USCIS treats them like First-Time Applicants,[6] even though the *Texas II* order itself allows renewals by "DACA recipients who obtained that status on or before the date of this injunction and DACA renewal applications for these existing recipients (*regardless of when the renewal applications are submitted*)[.]" *Texas II*, 2021 WL 3022434, at *2 (emphasis added). USCIS has not explained why it cannot treat these Extended Renewal Applicants' applications as renewals and adjudicate them, as allowed by the *Texas II* order.

Prior to the *Texas II* order, USCIS had been accepting and adjudicating DACA requests from applicants whose DACA expired more than one year ago and from applicants that had their DACA previously terminated.[7] There is nothing in the *Texas II* order that directed USCIS to change this long-standing practice.

---

[5] *Consideration of Deferred Action for Childhood Arrivals (DACA), Frequently Asked Questions, Initials*, USCIS at No. 21 (last updated on Aug. 31, 2021), https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions.
[6] *Id.*
[7] *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (archived), USCIS (last updated on Aug. 24, 2021), https://www.uscis.gov/archive/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction.

## D.  DACA-RELATED FEDERAL LEGISLATION AND REGULATIONS

### 1.  Congress Has Failed to Act

For over twenty years, Congress has failed to pass any legislation aimed at providing a permanent solution and pathway to citizenship for immigrant youth, including the Dream Act and the Dream and Promise Act. In the past year, while Congress has made serious attempts to include immigration provisions that would provide permanent relief for *Batalla Vidal* class members through the budget reconciliation process, that process has stalled, and the inclusion of any immigration provisions in future legislation remains highly uncertain.[8] Advocates continue to urge Congress to pass a permanent solution, but class members cannot wait for congressional action that remains unlikely and has proven elusive.

### 2.  The Proposed DACA Rule's Uncertain Timeline

On September 28, 2021, DHS published a proposed rule that would codify the DACA program in federal regulations. Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53736 (Sept. 28, 2021). At the April 4, 2022 pre-motion conference before this Court, counsel for Defendants could not provide a timeline for the publishing of the final rule, only stating that DHS was still in the process of considering over 16,000 comments submitted through November 2021. Exh. C, Transcript of Pre-Motion Conference (Excerpt) at 18:12-19:8, *Batalla Vidal v. Mayorkas*, No. 16-cv-4756 (E.D.N.Y. Apr. 4, 2022).

Even if the final rule were published in the next several months and Defendants interpreted that rule as allowing them to further process and adjudicate DACA for First-Time Applicants, including granting DACA when appropriate, it would almost certainly be subject to legal

---

[8] *See* Emily Cochrane & Luke Broadwater, *Biden Concedes Social Policy Bill is Stalled as Immigration Plan Falters,* N.Y. TIMES (Dec. 16, 2021), https://www.nytimes.com/2021/12/16/us/politics/biden-immigration-build-back-better.html.

challenge. *See* Pls.' Mot. Summ. J., *Texas v. United States*, No. 18-cv-00068, ECF 486 at 34-45 (S.D. Tex. Oct. 9, 2020) (arguing that DACA is substantively invalid because it lacks statutory authorization and violates the Constitution); *Texas v. United States*, 549 F. Supp. 3d 572, 603-21 (S.D. Tex. 2021) (concluding that DACA violates the substantive provisions of the APA).

### E.  CLASS MEMBERS STUCK IN LIMBO

The *Texas II* order and Defendants' erroneous interpretation of its interaction with this Court's orders have significantly changed the factual conditions for First-Time Applicants who filed DACA applications after this Court's December 2020 order but before the *Texas II* order, as well as for Extended Renewal Applicants whose DACA expired more than one year ago. To date, Defendants have not provided interim relief for class members like Plaintiff Johana Larios Sainz, who has waited 16 months for a decision on her application and must wait many more pending the *Texas II* appeals. Given the continuing uncertainty surrounding the DACA program, these class members are once again stuck in limbo. This harm is likely to continue for months or even years if this Court does not modify or clarify its order to direct Defendants to provide relief that is permitted by both this Court's order and the *Texas II* order.

### III.    LEGAL STANDARD

This Court has inherent power to modify an injunction it has entered. *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions . . . ."). The Second Circuit has long recognized the broad power of an issuing court to modify its injunctions, including in "cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969) (Friendly, J.). Federal Rule of Civil Procedure 60(b)(6) provides an additional basis for this power, allowing for modification of orders "for any other reason that justifies relief."

This Court also has the inherent power to clarify its prior order, as it acknowledged when it "reserve[d] the right to impose further remedies if they become necessary" and "retain[ed] jurisdiction of the matter for purposes of construction, modification, and enforcement of this Order." ECF 354 at 5-6; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) ("Courts independently must be vested with power to impose . . . submission to their lawful mandates") (internal quotation marks omitted); Fed. R. Civ. P. 60(a) (authorizing courts to clarify prior orders).

## IV.   ARGUMENT

### A.  THIS COURT HAS AUTHORITY TO MODIFY ITS REMEDIAL ORDER

In December 2020, this Court ordered DHS to "accept" new DACA applications, ECF 354 at 2, 4, and in July 2021 the *Texas II* court ordered DHS to cease "grant[ing]" new applications, *Texas II*, 2021 WL 3022434, at *4. In the space between "accepting" and "granting," this Court has well-established authority under its equitable powers and Rule 60 to modify or clarify its December 2020 order so as to vindicate the rights of Plaintiff Johana Larios Sainz and other First-Time Applicants, as well as to order Defendants to treat Extended Renewal Applicants' applications as DACA renewals and adjudicate them. Moreover, with foresight, this Court expressly retained jurisdiction to adjust its remedial order, as Plaintiffs now request. *See* ECF 354 at 5 ("reserv[ing] the right to impose further remedies if they become necessary").

District courts have broad equitable authority and significant discretion to fashion appropriate remedies that redress harms. *See Conn. Off. Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. Educ.*, 464 F.3d 229, 245 (2d Cir. 2006). This authority is especially expansive when a court has already determined that rights have been violated. *Brown v. Plata*, 563 U.S. 493, 538 (2011) ("Courts have substantial flexibility when making these judgments. Once invoked, 'the scope of a district court's equitable powers . . . is broad, for breadth and flexibility

are inherent in equitable remedies.'") (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).[9] Accordingly, a district court may modify a judgment or issue additional relief to protect or effectuate a prior judgment, particularly where—as here—the court has expressly retained jurisdiction "for purposes of construction, modification, and enforcement." ECF 354 at 6.

This Court's broad equitable powers are also reflected in Rule 60(b)(6), which allows for modification of orders for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This provision is "a grand reservoir of equitable power to do justice in a particular case." *Rose v. Maggio Corp.*, No. 13-CV-2649 (NGG), 2013 WL 5774862, at *2 (E.D.N.Y. Oct. 24, 2013) (quoting *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012)); *see also Klapprott v. U.S.*, 335 U.S. 601, 609 (1949) (noting the broader power available to federal courts to modify judgments under amended Rule 60(b)); *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981) (explaining that a district court's discretion is especially broad when relief is sought under subsection (b)(6); *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009) (noting district courts' great latitude in making Rule 60(b) ruling because that decision "is discretion piled on discretion").[10]

Subsection (b)(6) reflects fundamental principles of equity that inform considerations of whether to modify prior orders. *See, e.g.*, *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 608

---

[9] This is especially true when a court has ordered prospective relief. *Swift*, 286 U.S. at 114 ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2961 (3d ed. 2021) ("Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to ensure that the decree accomplishes its intended result.").

[10] Although the text of Rule 60(b) refers to relief *from* a judgment, the Supreme Court made clear in *United States v. United Shoe Machinery* that district courts may modify an order at the request of plaintiffs. 391 U.S. 244, 251-52 (1968); *see also Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 503 (5th Cir. 1980) ("*United Shoe Machinery* indicates that an injunction may be modified to impose more stringent requirements on the defendant when the original purposes of the injunction are not being fulfilled in any material respect.") (quoting Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2961 (1973)); *Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1539 (11th Cir. 1986) (same).

(5th Cir. 1963) (the catch-all provision in subsection (b) permits modification of an order on "those grounds which equity has long recognized as a basis for relief"); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Leavitt*, 408 F. Supp. 2d 1073, 1080 (D. Or. 2005) (explaining that a motion premised on Rule 60(b)(6) "untethers the discretion of judges from the constraints of common law remedies and grants broad remedial power" to modify a judgment).

Revision of an injunction is often justified by a change in "circumstances, whether of law or fact," because "an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961); *see also Freeman v. Pitts*, 503 U.S. 467, 487 (1992) ("The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way.").[11] The *Texas II* order, and its interaction with this Court's order, is one such changed circumstance.

As a court of equity and pursuant to Rule 60(b)(6), this Court is empowered to fashion particularized relief that responds to the specific needs of class members over which it retains jurisdiction. It should exercise that power to modify the December 2020 order and provide the additional relief Plaintiffs request.[12]

---

[11] The Second Circuit has held that modification may also be proper "where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *E.g.*, *King-Seeley Thermos Co.*, 418 F.2d at 35; *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985) ("Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt.").

[12] The All Writs Act, 28 U.S.C. § 1651, provides still further authority. The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained . . . ." *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977). Accordingly, district courts possess authority to craft remedies, where jurisdiction is proper. *E.g.*, *United States v. Field*, 193 F.2d 92, 96 (2d Cir. 1951) (discussing the All Writs Act and noting that "it is fundamental that federal courts . . . have inherent power to do all things that are reasonably necessary for the administration of justice, within the scope of their jurisdiction").

**B.  THIS COURT SHOULD MODIFY ITS ORDER TO DIRECT DHS TO PROVIDE INTERIM RELIEF FOR FIRST-TIME APPLICANTS**

This Court's authority to adjust its prior order is well-established, and it should exercise that authority to modify its December 2020 order to direct Defendants to provide interim relief for First-Time Applicants. At a minimum, that interim relief should include an opportunity to work, as well as forbearance from deportation, and it should be issued on a case-by-case basis to pending DACA applicants able to make a prima facie showing of eligibility. Such relief should last only until USCIS makes a final decision on the underlying DACA application. Defendants have fashioned schemes for interim relief in other immigration programs beset by delays, and nothing in the *Texas II* order prevents DHS from implementing temporary, limited interim relief measures for qualifying First-Time Applicants.

Plaintiff Johana Larios Sainz filed her DACA application on December 9, 2020, and as of this filing has waited 16 months for a decision. *Supra* Section II.B. Because the *Texas II* order is subject to appeal in the Fifth Circuit, and likely thereafter in the Supreme Court, it will be many more months, at minimum, before her application is adjudicated. The pending DHS rulemaking could lead to further litigation and delay. *Supra* Section II.D.2. And there are nearly 80,000 other pending First-Time Applicants who, like Ms. Larios Sainz, are months or years from an adjudication of the application they submitted in reliance on this Court's prior order. To give full effect to this Court's December 2020 order in light of the changed factual conditions after the *Texas II* order, this Court should order the requested relief, which fits within this Court's broad discretion, comports with the particular necessities of this case, and does not violate *Texas II*.

**1.  The *Texas II* Order Changed the Factual Conditions for First-Time Applicants, Warranting Modification**

The impacts of the *Texas II* order and Defendants' erroneous interpretation of its interaction with this Court's orders constitute "a significant change in . . . factual conditions" warranting

modification of this Court's December 2020 order. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992). When this Court issued its order reopening DACA in December 2020, the relief contemplated by the Court was to allow First-Time Applicants to apply for and receive grants of DACA if eligible. *E.g.*, ECF 354 at 2 ("In light of the vacatur, all parties agree that the DACA program is currently governed by its terms as they existed prior to the attempted rescission of September 2017."). Class-members began submitting DACA applications to USCIS, and the government accepted, processed, and began adjudicating those applications, as this Court expected and intended. *Supra* Section II.A, C.1. The government's compliance was slow at first—adjudicating only 763 applications in the first three months of 2021—but by early July, USCIS was adjudicating new DACA requests for thousands of applicants per month. *Supra* Section II.C.1.

The *Texas II* order in July 2021 enjoined the government from *granting* DACA to pending First-Time Applicants. *Texas II*, 2021 WL 3022434, at *4. But Defendants went much further than required under the *Texas II* order, interpreting it to also bar them from scheduling and taking biometrics (even those class members who submitted applications in reliance on this Court's order) and from taking all other intermediate steps leading up to final adjudication—with the exception of cashing class members' checks. *Supra* Section II.B. In nearly all cases, the government cancelled scheduled biometrics appointments. *Id.*; *see also supra* note 3. As a result, first-time DACA applications were unnecessarily stalled long before the final adjudication stage.

This is a "significant change" in "factual conditions" from this Court's December 2020 order, which required Defendants to accept first-time DACA requests for *consideration*—not simply take applicants' filing fees and do nothing else. *Rufo*, 502 U.S. at 384. The parties now have "a better appreciation of the facts in light of experience," which indicate that this Court's December 2020 order is not properly adapted to accomplishing its purposes and should be

modified. *King-Seeley Thermos Co.*, 418 F.2d at 35. Indeed, modification is appropriate here as

the Court's order has "prove[n] to be unworkable because of unforeseen obstacles" and because

not modifying the order "would be detrimental to the public interest . . . ." *Rufo*, 502 U.S. at 384.

Defendants' refusal to process up to the point of adjudication the 80,000 pending applications filed

by members of the *Batalla Vidal* class represents a straightforward change in circumstances that

disturbs the implementation of this Court's prior order. *Supra* Section II.E.

### 2. Interim Relief Is Appropriate for First-Time Applicants, and this Court Has the Power to Direct Defendants to Issue Such Relief

This Court undoubtedly has the authority to order the government to provide interim relief.

Indeed, this Court has enormous latitude to craft relief that meets the particularized needs of the

parties to this complex litigation. *Supra* Section IV.A. Interim relief that provides protection from

deportation and an opportunity to work, on a case-by-case basis, is a familiar practice for DHS.

The government has fashioned interim relief for pending applicants stuck waiting long periods for

adjudication of other immigration applications, in a manner similar to what Plaintiffs request here.

For instance, a recent USCIS policy provides that individuals with pending Special

Immigrant Juvenile (SIJ)[13] applications can receive protection from deportation and eligibility for

work authorization on a temporary basis, until a final decision has been made on their underlying

application. SIJ applicants with approved special immigrant petitions have spent years in limbo

due to annual employment-based visa limits. Unveiled earlier this year, the new policy, which

came largely as a result of the class action suit *L.F.O.P. v. Mayorkas*, No. 4:21-cv-11556, ECF 26

(D. Mass. Jan. 4, 2022) (challenging USCIS refusal to approve or issue Employment Authorization

Documents (EADs)), provides deferred action and related employment authorization on a case-

---

[13] The SIJ program protects individuals under 21 years of age who have been abused, neglected, or abandoned by one or both parents. SIJ recipients may apply for adjustment of status to lawful permanent resident status. *See* 8 U.S.C. §§ 1101(a)(27)(J), 1153(b)(4), 1255; 8 C.F.R. §§ 245.1(e)(3), 204.11.

by-case basis for noncitizens with approved I-360 SIJ petitions who are as yet unable to apply for adjustment of status to lawful permanent resident.[14] Plaintiffs in *L.F.O.P.* relied on Defendants' use of "other administrative alternatives to provide EAD eligibility to categories of noncitizens who are not listed in their EAD regulations, such as permitting the submission of an application for status to be held in abeyance pending a formal filing." *Id.* at 13 ¶ 44.

The SIJ interim relief policy was neither specifically authorized by any statute or regulation, nor was it promulgated through a new rulemaking. Instead, DHS based these temporary protections on its inherent authority to grant deferred action and work authorization through "an individualized, case-by-case, discretionary determination."[15] A similar approach could be used to provide interim relief for *Batalla Vidal* class members whose applications remain pending.

In a second recent example, in June 2021, USCIS began offering interim relief to noncitizens with pending, bona fide U nonimmigrant status petitions. The bona fide determination process "was created with the goal of conducting initial reviews of U nonimmigrant status petitions more efficiently and providing eligible victims of qualifying crimes with employment authorization and deferred action while they await a final adjudication of their petition for U nonimmigrant status under the annual statutory cap."[16] Recipients receive four-year work authorization and deferred action while they wait for full adjudication. *Id.* When the program was implemented, there were about 270,000 individuals with pending U-visa applications.[17] Applicants

---

[14] *Special Immigrant Juvenile Classification and Deferred Action*, USCIS (Mar. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.
[15] Special Immigrant Juvenile Petitions, 87 Fed. Reg. 13066, 13095 (Mar. 8, 2022) (discussing why new policy did not need to be promulgated through rulemaking).
[16] *U Nonimmigrant Status Bona Fide Determination Process FAQs*, USCIS (last updated on Sept. 23, 2021), https://www.uscis.gov/records/electronic-reading-room/u-nonimmigrant-status-bona-fide-determination-process-faqs.
[17] *Number of Form I 918, Petition for U Nonimmigrant Status - By Fiscal Year, Quarter, and Case Status Fiscal Years 2009-2021*, USCIS, https://www.uscis.gov/sites/default/files/document/reports/I918u_visastatistics_fy2021_qtr2.pdf.

had originally been able to get EADs and deferred action once they were added to the U-visa waitlist, but even the process for getting on the waitlist could take years. Like class members here, U-visa petitioners had little to no protection while their applications were pending until they were provided interim relief through the bona fide determination process.

Plaintiffs request an order directing Defendants to consider the 80,000 pending First-Time Applicants for some form of appropriate interim relief, as described further below. The interim relief would be temporary, lasting only until a final decision on the underlying DACA application; it would be narrow, limited to protection from removal and an opportunity to work; and it would be available only to those applicants who make a prima facie showing of eligibility for DACA, determined on a case-by-case basis.[18]

### 3. Interim Relief Does Not Conflict with the *Texas II* Order

For two reasons, the interim relief program contemplated here is consistent with the orders of both this Court and the *Texas II* court. First, the interim relief requested here is not DACA. The *Texas II* order "prohibits the government from granting DACA status to First-Time Applicants." *Texas II*, 2021 WL 3022434, at *4. However, that court remanded consideration of this issue to the government and in doing so, took "no position on how DHS . . . should resolve" the various considerations as to DACA's legality. *Texas v. United States*, 549 F. Supp. 3d 572, 623-24 (S.D. Tex. 2021). Under the Napolitano Memorandum and its implementing guidance, DACA recipients are protected from deportation, provided work permits, authorized to apply for a Social Security Number and driver's license, and can obtain advance parole to travel abroad for humanitarian,

---

[18] The Court could direct Defendants to propose an interim relief remedy in the first instance. *See, e.g., Brown v. Plata*, 563 U.S. 493, 510 (2011) (after district court found legal violation, affirming further order that government defendants formulate remedial plan and submit it for court approval). It might also order the Defendants to implement a program for interim relief, and then refer the parties to judicial mediation to develop jointly the details of the program.

educational, and employment purposes, as permitted by statute, *see* 8 U.S.C. § 1182(d)(5).[19] DACA recipients can renew their status every two years, and the program confers no substantive right, immigration status, or pathway to citizenship.[20]

Additionally, the forms of interim relief proposed are more limited in substantive offerings to protection from removal and an opportunity to work, and are both temporary in nature and non-renewable. The interim relief requested does not entail the broader abilities enabled by DACA, as listed above. For example, unlike a DACA recipient, an applicant granted interim relief would *not* be eligible to apply for advance parole. And while DACA is awarded in two-year increments, any interim protection would conclude once applications meet final resolution—which could be triggered by a final rule, an appellate decision on the *Texas II* order, resumed government adjudication, or congressional action. If a court decision permanently ends the DACA program, the government could immediately terminate the work authorization for an applicant with interim relief, even while allowing work authorization for DACA recipients themselves to continue until their individual expiration dates during a wind-down period.

Thus, interim relief ordered by this Court would be consistent with both this Court's prior order and the *Texas II* order. Because of the tangible benefits to Plaintiff Johana Larios Sainz and the 80,000 similarly situated members of the *Batalla Vidal* class, this Court should exercise its equitable authority and modify its prior order to direct Defendants to issue interim relief on a case-by-case basis to eligible First-Time Applicants, including temporary protection from deportation and an opportunity to work.

---

[19] *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, DHS (June 5, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.
[20] *Id.* at 3.

### C.  THE COURT SHOULD MODIFY ITS ORDER TO REQUIRE PROCESSING OF PENDING FIRST-TIME APPLICATIONS TO THE POINT OF ADJUDICATION

This Court ordered Defendants to "accept" first-time applications, and the *Texas II* order prohibits only the "granting" of DACA. Nevertheless, Defendants ceased processing of requests for DACA (Form I-821D) submitted by First-Time Applicants, as well as their attendant requests for EADs (Form 1-765). *Supra* Section II.B. The *Texas II* order did not require this course of action. Given the changed factual circumstances in this case, *see supra* Section IV.B.1, this Court should modify its December 2020 order and require Defendants to resume processing pending first-time DACA applications and requests for EADs up until the point of granting DACA.

As discussed above, USCIS engaged in a roughly four-month ramp-up period of processing first-time applications after this Court's December 2020 order. *See supra* Section II.C.1. Resuming all processing steps up to final adjudication for First-Time Applicants would provide meaningful relief because months of processing would already be completed should DACA be opened again in the future, whether based on a final rule, new legislation, or an appellate ruling.

The tangible difference that additional processing can make is evident by comparing the application experiences of Plaintiff Larios Sainz and Plaintiff M.B.F. Plaintiff Johana Larios Sainz filed her first-time DACA application on December 9, 2020, and had biometrics scheduled for and taken on May 27, 2021. *Supra* Section II.B. Ms. Larios Sainz filed her application within five days of this Court's December 2020 order, but still had to wait nearly six months for the government to schedule a biometrics appointment and advance her application. By the time the *Texas II* order was issued in July 2021, USCIS had still not finished processing or adjudicating her application; it has now been 16 months since submission. *Id.* In contrast, Plaintiff M.B.F. had already had her biometrics captured and processed as part of a different application for immigration relief when she applied for DACA on December 14, 2020, after Ms. Larios Sainz. As a result, she did not have

to go through those steps again, and she received an approval for first-time DACA on May 5, 2021, before the government even sought to capture Ms. Larios Sainz's biometrics. *Id.*

Accordingly, Plaintiffs request that the Court modify its order to require Defendants to accept and process up to, but not including, final adjudication of first-time DACA requests so long as the *Texas II* order remains in effect. This "proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

In the alternative, this Court is also empowered by Rule 60(a) to clarify its December 2020 order to correct an unintended ambiguity that has led Defendants to completely halt all processing of pending applications, including the running of biometrics, which is a required early step in the adjudication process, *supra* Section II.B. This Court should also correct Defendants' refusal to adjudicate applications from Extended Renewal Applicants because they fail to process them as renewals, *supra* Section II.C.2; *infra* Section IV.D. This Court knows best its own intent in having ordered USCIS to "accept" new applications, but its prior order appears to have been premised on an expectation that USCIS compliance was not complete upon the moment it accepted a new application. *See* ECF 354 at 4 (requiring Defendants to post notice that it was "accepting first-time requests for *consideration* of deferred action under DACA . . . based on the terms of the DACA program prior to September 5, 2017") (emphasis added); *id.* at 5 (ordering status report by Defendants showing "[t]he number of first-time DACA applications received, *adjudicated, approved, denied, and rejected*" since holding Chad Wolf was not lawfully serving as Acting Secretary of Homeland Security) (emphasis added). To the extent that the Court intended DHS

also to *process* applications that it accepted, at least to the point of grant or denial, *see Texas II*, 2021 WL 3022434, at *4, then clarification would be appropriate under Rule 60(a).[21]

### D.  THIS COURT SHOULD ORDER DEFENDANTS TO ADJUDICATE EXTENDED RENEWAL APPLICATIONS

Defendants erroneously treat Extended Renewal Applicants—DACA renewal applicants whose previous grants of DACA expired more than a year prior to the renewal request—as First-Time Applicants and therefore have taken the position that the *Texas II* order bars it from adjudicating these applications *as renewals*. Defendants' problem is of their own making, as they have chosen to treat Extended Renewal Applicants as First-Time Applicants with no explanation. The *Texas II* order allows Defendants to grant DACA renewal applicants "regardless of when the renewal applications are submitted[.]" *Texas II*, 2021 WL 3022434, at *2. Further, Extended Renewal Applicants have previously held DACA and therefore have the same reliance interests on DACA that the *Texas II* court took into account when staying its own vacatur and injunction with respect to DACA renewals. *See, e.g.*, *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021) ("[T]hese rulings do not resolve the issue of the hundreds of thousands of DACA recipients and others who have relied upon this program for almost a decade. That reliance has not diminished and may, in fact, have increased over time."). Plaintiffs therefore request that the Court order Defendants to treat Extended Renewal Applicants like the renewal applicants they are and adjudicate them to final decision as allowed by the *Texas II* order.

---

[21] Rule 60(a) provides for the correction of mistakes "arising from oversight or omission." These are not limited to "errors arising from transcription or copying." *In re Marc Rich & Co. A.G.*, 739 F.2d 834, 836 (2d Cir. 1984); *id.* at 837 (district courts may clarify an ambiguity, especially one that conforms a prior order to "the contemporaneous intent of the court"); *see also Panama Processes, S.A. v. Cities Service Co.*, 789 F.2d 991, 992-93 (2d Cir. 1986) (same); *Garamendi v. Henin*, 683 F.3d 1069, 1079 (9th Cir. 2012) ("Rule 60(a) allows for clarification and explanation, consistent with the intent of the original judgment, even in the absence of ambiguity, if necessary for enforcement."); *Briscoe v. City of New Haven*, 2010 WL 2794231, at *4 (D. Conn. July 12, 2010); *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1140 (2d Cir. 1994).

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion to modify, or in the alternative, to clarify, the Court's December 2020 Order.

Respectfully submitted,

/s/ Muneer I. Ahmad
Kevin Cheng, Law Student Intern
Aaron Bryce Lee, Law Student Intern
Daniel Ocampo, Law Student Intern
Aasha Shaik, Law Student Intern
Medha Swaminathan, Law Student Intern
Muneer I. Ahmad, Esq. (MA 9360)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SERVICES ORG.
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

Karen C. Tumlin, Esq. (*pro hac vice*)
Cooperating Attorney
JEROME N. FRANK LEGAL SERVICES ORG.
New Haven, CT 06520
(323) 316-0944

Araceli Martínez-Olguín, Esq. (AM 2927)
Jessica R. Hanson, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
(213) 639-3900

Paige Austin, Esq. (PA 9075)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

Jessica Young, Esq.
MAKE THE ROAD NEW YORK
9210 Roosevelt Avenue
Jackson Heights, NY 11372
(917) 821-0292

*Attorneys for Plaintiffs*

21