**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*, | |
| Plaintiffs, | |
| v. | No. 16-cv-4756 (NGG) (VMS) |
| ALEJANDRO MAYORKAS, *et al.*, | May 27, 2022 |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR MODIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT ................................................................................................................. 7

I.   There is no legal basis for granting additional injunctive relief ......................... 7

    A.   Plaintiffs have received complete relief on their invalid appointment claim ......... 8

    B.   Plaintiffs have failed to allege any legal defect in Defendants' implementation of the *Texas* injunction ................................................. 11

II.  This Court should not enter an injunction that would conflict with the *Texas* injunction ........................................................................................... 12

    A.   Plaintiffs' proposed "interim relief" would conflict with the *Texas* injunction ................................................................................... 14

    B.   Changing the definition of "initial" requests for DACA would conflict with the *Texas* injunction ...................................................... 18

III. This Court should not order pre-adjudication of pending initial requests for DACA ........................................................................................................... 21

IV.  This case would not benefit from mediation............................................... 22

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Brown v. Plata*,
    563 U.S. 493 (2011) ........................................................................................................ 7

*California ex rel. Lockyer v. USDA*,
    710 F. Supp. 2d 916 (N.D. Cal. 2008) ...................................................................... 13

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F. 3d 114 (2d Cir. 2011) ......................................................................... 7, 11

*Colby v. J.C. Penney Co.*,
    811 F.2d 1119 (7th Cir. 1987) ................................................................................ 13

*Cooper v. U.S. Postal Serv.*,
    577 F.3d 479 (2d Cir. 2009) ........................................................................... 7, 11

*Dayton Bd. of Ed. v. Brinkman*,
    433 U.S. 406 (1977) ........................................................................................................ 7

*Department of Homeland Security v. Regents of the University of California*,
    140 S. Ct. 1891 (2020) .............................................................................................. 20

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ........................................................................... 12, 13

*Ford Motor Co. v. NLRB*,
    305 U.S. 364 (1939) ...................................................................................................... 3

*GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*,
    445 U.S. 375 (1980) .................................................................................................... 12

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................................................... 22

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ................................................................................................ 9

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ......................................................................................... 7, 9, 10

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless ShoeSource, Inc.*,
    No. 11-cv-1892, 2012 WL 3277222 n.4 (N.D. Cal. Aug. 9, 2012) ......................... 13

*O. A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) .......................................................................... 3

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................... 20

*Ryder v. United States*,
   515 U.S. 177 (1995) ..................................................................................................... 9

*Shakhnes v. Berlin*,
   689 F.3d 244 (2d Cir. 2012) ...................................................................................... 7

*Texas v. United States*,
   No. 1:18-cv-00068, 2021 WL 3022434 (S.D. Tex. July 16, 2021) .............. 5, 18, 19

*United States v. Mendoza*,
   464 U.S. 154 (1984) ................................................................................................... 14

*Whitcraft v. Brown*,
   570 F.3d 268 (5th Cir. 2009) .................................................................................... 17

*Zambrana v. Califano*,
   651 F.2d 842 (2d Cir. 1981) ..................................................................................... 14

**Statutes**

5 U.S.C. § 701 ............................................................................................................ 22

5 U.S.C. § 706 ................................................................................................... *passim*

6 U.S.C. § 202 ............................................................................................................ 17

8 U.S.C. § 1103 .......................................................................................................... 18

8 U.S.C. § 1182 .......................................................................................................... 16

**Regulations**

8 C.F.R. § 1.3 ............................................................................................................. 16

8 C.F.R. § 212.5 ......................................................................................................... 16

8 C.F.R. § 274.12 ....................................................................................................... 16

42 C.F.R. § 417.422 ................................................................................................... 16

45 C.F.R. § 152.2 ....................................................................................................... 17

Deferred Action for Childhood Arrivals (Proposed Rulemaking),
   86 Fed. Reg. 53,736 (Sept. 28, 2021). ...................................................................... 7

**<u>Other Authorities</u>**

*Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction*,
   USCIS (last updated Aug. 24, 2020),
   https://www.uscis.gov/archive/deferred-action-for-childhood-arrivals-response
   -to-january-2018-preliminary-injunction ............................................................... 20

*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the
   United States as Children*, DHS (June 5, 2012),
   https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-
   individuals-who-came-to-us-as-children.pdf ......................................................... 16

Proposed Rulemaking Comments, Deferred Action for Childhood Arrivals,
   https://www.regulations.gov/document/USCIS-2021-0006-0001............................................ 7

USCIS, *Form I-131, Instructions for Application for Travel Document* 4-5,
   https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf ............................ 16

## **INTRODUCTION**

Defendants strongly support the Deferred Action for Childhood Arrivals ("DACA") policy and are vigorously defending it from challenge in Texas.  If Defendants were able to grant DACA to eligible new applicants, they would be doing so.  But Defendants respectfully submit that there is no basis for the relief that Plaintiffs seek in the present motion.  The sweeping relief Plaintiffs request—which would in large measure mirror DACA itself—is not a proper remedy for the sole claim on which this Court has entered judgment and would conflict with the order of the Texas district court.  Plaintiffs' motion therefore should be denied.

In the closing months of 2020, this Court ruled that Chad Wolf was not validly serving as Acting Secretary of Homeland Security.  As a consequence of that decision, this Court entered an order vacating the "Wolf Memorandum."  That memorandum made certain changes to the DACA policy, as established in a 2012 Memorandum from then-Secretary of Homeland Security Janet Napolitano ("the 2012 Memorandum").  This Court also ordered injunctive relief that was limited to ensuring that the Plaintiff class was notified of the Court's decision and not penalized by the Wolf Memorandum that the Court had just vacated.

Subsequently, the U.S. District Court for the Southern District of Texas ruled that DACA is unlawful and entered a permanent injunction prohibiting Defendants from administering DACA. Significantly, however, that court temporarily stayed its order with regard to current DACA recipients, permitting the Department of Homeland Security ("DHS") to consider and adjudicate their renewal requests, pending further order from that court, the Fifth Circuit Court of Appeals, or the Supreme Court.  Plaintiffs now ask this Court to modify—and significantly expand—its prior remedial order, hoping to limit the scope of the Texas injunction.  But Plaintiffs have already received all the relief they are entitled to on their invalid-appointment claim, and there is no dispute that the Texas injunction, not Mr. Wolf's appointment, is the source of any current injuries.  This Court's remedial power is limited to the scope of the violation on which it entered judgment, and does not support any of the additional relief Plaintiffs now seek.

Moreover, much if not all of the relief that Plaintiffs seek would directly conflict with the Texas injunction.  The Texas injunction prohibits DHS from "administering the DACA program and from reimplementing DACA without compliance with the APA."  That order is temporarily stayed only for existing DACA recipients.  Plaintiffs' requested relief would plainly run afoul of that injunction by requiring Defendants to implement a nearly identical policy of "interim" deferred action in DACA's place, and to change the agency's longstanding definition of what qualifies as a "renewal" request to allow more individuals to be granted DACA than the Texas injunction allows.  This Court should decline Plaintiffs' invitation to subject Defendants to contradictory legal obligations and instead allow Defendants—who wholeheartedly support the DACA policy—to address the Texas injunction through the proper channels of appeal and rulemaking.

## STATEMENT OF FACTS

DACA, as announced in the 2012 Memorandum, allowed certain noncitizens who entered the United States as children to apply for renewable two-year periods of forbearance from removal and, if eligible, for work authorization.  On July 28, 2020, Chad Wolf, as Acting Secretary of Homeland Security, issued the Wolf Memorandum, instructing DHS personnel to reject all pending and future initial requests for DACA and all pending and future applications for advance parole by DACA recipients, and to grant future DACA renewals for periods of only one year, rather than two.

On November 14, 2020, this Court ruled that Chad Wolf "was not lawfully serving as Acting Secretary of Homeland Security under the Homeland Security Act ('HSA') when he issued the July 28, 2020 memorandum" purporting to modify DACA.  ECF 342 at 2.  The Court accordingly granted Plaintiffs' motion for summary judgment "as to their claims under the HSA." *Id.*  The Court entered a remedial order on December 4, 2020 ("the Remedial Order").  *See* ECF 354.  In that order, the Court exercised its power under the Administrative Procedure Act ("APA")

2

to "hold unlawful and set aside agency actions . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and vacated the Wolf Memorandum on the ground that "Mr. Wolf was without lawful authority to serve as Acting Secretary of DHS." *Id.* at 2 (quoting 5 U.S.C. § 706(2)(C)). The Court noted that, as "all parties agree," the result of the vacatur was that "the DACA program is currently governed by its terms as they existed prior to the attempted rescission of September 2017." *Id.*

The Court also ordered "additional remedies." ECF 354 at 5. The Court recognized that "[u]nder normal circumstances, vacatur alone is the proper remedy for unlawful agency action," and that "the 'Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would have a meaningful practical effect independent of its vacatur.'" *Id.* (quoting *O.A. v. Trump*, 404 F. Supp. 3d 109, 153-54 (D.D.C. 2019) (internal citation and quotation marks omitted)). Nevertheless, the Court also noted that, acting "within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case." *Id.* (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)). "With those principles in mind," the Court ordered limited additional relief:

- It ordered DHS "to post a public notice, within 3 calendar days of this Order, to be displayed prominently on its website and on the websites of all other relevant agencies, that it is accepting first-time requests for consideration of deferred action under DACA, renewal requests, and advanced parole requests, based on the terms of the DACA program prior to September 5, 2017, and in accordance with this court's Memorandum & Order of November 14, 2020. The notice must also make clear that deferred action and employment authorization documents ('EADS') granted for only one year are extended to two years, in line with the pre-Wolf Memorandum policy."

3

- It ordered the parties "to continue discussions with regard to notices to be mailed to individual class members."

- It ordered the Government to submit "a status report on the DACA program to the court by January 4, 2021," including data on the processing of initial DACA applications, renewal requests, and advance parole requests, both under the Wolf Memorandum and for the period from November 14, 2020, to December 31, 2020.

*Id.* at 3-5.

The Court "reserve[d] the right to impose further remedies if they become necessary," and "retain[ed] jurisdiction of the matter for purposes of construction, modification, and enforcement of this Order." *Id.* at 5-6.

Defendants timely complied with the order to post a notice on DHS's website. *See* ECF 355. The Court subsequently ordered Defendants to amend the notice language, *see* ECF 356, and Defendants timely complied with the Court's order, *see* ECF 358. Defendants likewise timely complied with the Court's order requiring the submission of a status report on DACA, including the information required by the Court. *See* ECF 361. Defendants also fully and timely complied with the Court's order directing them to confer with Plaintiffs regarding notices to be mailed to individual class members, *see* ECF 357, and with the Court's subsequent order setting a deadline to mail such notices, *see* ECF 359, ECF 362. Finally, after considering the parties' respective positions, *see generally* ECF 357, the Court ordered Defendants to mail new EADs "with expiration dates that reflect the lawful two-year period for which they should have been issued, no later than 30 days before the unlawful expiration dates with which they were issued, and at no additional cost to the recipient." ECF 359 at 2. Defendants have fully and timely complied with that order; when an inadvertent coding error resulted in a small number of individuals not receiving

4

updated EADs at least 30 days before the expiration date of their one-year EADs, Defendants immediately notified the Court, *see* ECF 371, and corrected the error before any affected individuals' one-year EADs expired, *see* ECF 372 at 1.

On February 2, 2021, President Biden, with the advice and consent of the Senate, appointed Alejandro Mayorkas as Secretary of Homeland Security.  He has validly been serving in that role since then, and Plaintiffs make no allegation to the contrary.

On July 16, 2021, the United States District Court for the Southern District of Texas ruled that DACA violated the APA, and entered an order vacating the 2012 "DACA Memorandum . . . and the DACA program that it created."  *Texas v. United States*, No. 1:18-cv-00068, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021).  It also entered a permanent injunction prohibiting the government, on a nationwide basis, "from administering the DACA program and from reimplementing DACA without compliance with the APA."  *Id.*  The court specified that "[w]ith respect to new (those not already granted by the date of this order) DACA applications received by DHS, the order of vacatur and remand is effective immediately," and that, while "DHS may continue to accept applications . . . it may not grant these applications."  *Id.*  Thus, DHS is "permanently enjoined from granting DACA status for any new applicants."  *Id.*

The court temporarily stayed the order of vacatur and the injunction as to "DACA recipients who obtained that status on or before the date of this injunction and DACA renewal applications for these existing recipients (regardless of when the renewal applications are submitted)."  *Id.*

That court also "retain[ed] jurisdiction of the matter for purposes of construction, modification, and enforcement of this Permanent Injunction."  *Id.*

Consistent with its obligations under the *Texas* injunction, on July 16, 2021, USCIS instructed DACA adjudicators to cease granting initial DACA requests and related work authorization requests, and to cease scheduling biometrics appointments for initial DACA requestors.  *See* Renaud Decl. ¶ 5, *Texas v. United States*, No. 1:18-cv-00068, ECF 578-1 at 3 (S.D. Tex. July 27, 2021) (attached as Exhibit B).  USCIS also instructed its workforce that it could continue to accept both initial and renewal DACA requests, and that it could continue adjudicating renewal DACA requests from those individuals who had obtained DACA on or before July 16, 2021.  *Id.* ¶¶ 6, 7.  As USCIS explained to the district court in Texas, it applies longstanding DACA policy and practice, in place since 2014, to distinguish between initial and renewal DACA requests for purposes of compliance with the *Texas* injunction.  *Id.* ¶¶ 8, 9.  Specifically, USCIS treats requests from individuals who previously held DACA and file for renewal within one year of the expiration date of their prior grant of DACA as renewal requests, and it treats requests from individuals (i) who have never been granted DACA, (ii) whose most recent grant of DACA expired more than one year before the filing date of their subsequent request, or (iii) whose most recent grant of DACA was terminated at any time, as initial DACA requests.  *Id.*

The government appealed the *Texas* decision to the Fifth Circuit, where it is challenging every aspect of the court's ruling, including its holdings on standing, the procedural and substantive requirements of the APA and the Immigration and Nationality Act, and the scope of the injunction, both in terms of its geographic reach and its invalidation of DACA in its entirety rather than considering each aspect of the policy.  *See generally* Br. for Federal Appellants, *Texas v. United States*, No. 21-40680, ECF 00516123005 (5th Cir. Dec. 8, 2021).  Briefing was completed on March 30, 2022, and the Fifth Circuit has scheduled argument for July 6, 2022.  *See* "Case Calendared" Notice, *Texas v. United States*, No. 21-40680, (5th Cir. May 27, 2022).

On September 28, 2021, DHS published a Notice of Proposed Rulemaking to promulgate a new DACA rule that would supersede the 2012 DACA memorandum.  *See* 86 Fed. Reg. 53,736 (Sept. 28, 2021).  During the public comment period, which closed on November 29, 2021, DHS received 16,363 comments on the proposed rule.[1]

## ARGUMENT

### I.    There is no legal basis for granting additional injunctive relief

Plaintiffs are not entitled to the relief that they seek.  As this Court recognized when it initially crafted the Remedial Order, "[u]nder normal circumstances, vacatur alone is the proper remedy for unlawful agency action."  ECF 354 at 3.  "An injunction is a drastic and extraordinary remedy," and "no recourse to [such] additional and extraordinary relief . . . [i]s warranted" if vacatur is "sufficient to redress [plaintiffs'] injuries."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

Even where limited recourse to equitable relief is warranted, the remedy must "correspond to the scope of the violation and the resulting harm."  *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 496 (2d Cir. 2009).  It is thus "impermissibl[e]" for a court to "reach[] out to control the treatment of persons or institutions beyond the scope of the violation."  *Brown v. Plata*, 563 U.S. 493, 531 (2011) (citing *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977)).  An injunction is overbroad not only if it "restrains defendants from engaging in legal conduct," *Shakhnes v. Berlin*, 689 F.3d 244, 257 (2d Cir. 2012), but also if it prohibits defendants from engaging even in "illegal conduct that was not fairly the subject of the litigation."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011).

---

[1] https://www.regulations.gov/document/USCIS-2021-0006-0001.

Those principles of equity foreclose the additional relief Plaintiffs now seek.  None of the relief Plaintiffs request has any connection to remedying the HSA violation that remains the only claim on which this Court has entered judgment, and Plaintiffs have not alleged or argued that Defendants have otherwise violated applicable law in any way that could provide an alternative basis for relief.

### A.    Plaintiffs have received complete relief on their invalid appointment claim

This Court has already provided complete relief to Plaintiffs on the only claim on which it has entered judgment; namely, that Chad Wolf was not validly serving as Acting Secretary of Homeland Security and that the Wolf Memorandum purporting to modify the DACA policy was therefore invalid.  *See* ECF 354 at 1.  Aside from vacating what it determined to be unlawful agency action, the Court entered limited injunctive relief to ensure that class members received notice of the Court's order and did not have their employment authorizations under the DACA policy curtailed due to what the Court found to be unlawful action.  *Id.* at 4-5.

As the Court and "all parties" recognized, the result of vacating the Wolf Memorandum was that the DACA policy was "currently"—as of the date of the Remedial Order—"governed by its terms as they existed prior to the attempted rescission of September 2017."  ECF 354 at 2.  With no valid agency action having altered the terms of the DACA policy as set forth in the 2012 Memorandum, DHS automatically resumed "accepting first-time requests for consideration of deferred action under DACA, renewal requests, and advance parole requests, based on the terms of the DACA program prior to September 5, 2017, and in accordance with this court's Memorandum & Order of November 14, 2020."  *Id.* at 4.  The Court thus ordered DHS to "post a public notice . . . to be displayed prominently on its website" stating that fact.  *Id.*

Plaintiffs' current motion rests on the premise that "this Court ordered Defendants to accept first-time requests for DACA, renewal requests, and advance parole requests, based on the terms

of the 2012 DACA program." Pls.' Motion for Modification at 2; *see also* New York Pls.' Br. in Support of Motion for Modification ("New York Br.") at 5 (asserting that the Court issued an "injunction requiring defendants to 'accept[] first-time requests for consideration'"). That characterization fundamentally misunderstands the Remedial Order: This Court vacated as unlawful the Wolf Memorandum's attempted modification of the 2012 DACA Memorandum, but it did not purport to establish the 2012 Memorandum as permanent DHS policy by judicial fiat, or to impose an ongoing affirmative obligation on DHS, under validly appointed leadership, to continue accepting DACA applications under the terms as set forth in 2012 in perpetuity.

Nor could the Court have done so based only on its judgment that Mr. Wolf's service violated the HSA's provision governing the order of succession. *See* ECF 342 at 20. Having determined that the Wolf Memorandum was invalid, the Court's remedial authority under the APA was limited to "hold[ing] unlawful and set[ting] aside" that "agency action," 5 U.S.C. § 706(2), and entering only such injunctive relief as necessary to effectuate that remedy, *Monsanto*, 561 U.S. at 165-66. The Court's judgment that Mr. Wolf was not validly appointed as Acting Secretary gave no occasion for it to enter a remedy restricting the authority of any subsequent, validly appointed Secretary of Homeland Security. *Cf., e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) (the "'appropriate' remedy for an adjudication" by an improperly appointed officer "is a new 'hearing before a properly appointed' official," not an order requiring any particular outcome of the new hearing (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995))).

The relief Plaintiffs now seek has nothing to do with the HSA violation this Court found. Instead, Plaintiffs are seeking relief from the operation of the *Texas* injunction, and the decisions made by DHS's current, undisputedly validly serving officers, to comply with that injunction. *See, e.g.*, Pls.' Mot. at 8 ("The *Texas II* order and Defendants' erroneous interpretation of its interaction

9

with this Court's orders have significantly changed the factual conditions for First-Time Applicants who filed DACA applications after this Court's December 2020 order but before the *Texas II* order, as well as for Extended Renewal Applicants whose DACA expired more than one year ago.").  As a result of that injunction, DHS cannot currently grant any initial DACA requests (a prohibition that, under longstanding DACA policy, includes requests from former DACA recipients whose grant of DACA expired more than one year before their request and requests from former DACA recipients whose prior DACA was terminated), and it has ceased conducting intermediate processing steps between receipt and final adjudication of such requests.  Those restrictions on DACA, however, have nothing to do with Mr. Wolf's tenure at DHS, or with the Wolf Memorandum; even if Mr. Wolf had never purported to take any actions as Acting Secretary, the *Texas* injunction would bind DHS until modified or reversed, and the validly appointed officers currently leading DHS would have responded to the injunction in the same fashion.

Plaintiffs point to cases such as that of named plaintiff Johanna Larios Sainz, who "might have received [a] grant[] of DACA before" the *Texas* injunction "[h]ad USCIS scheduled [her] and other class members for biometrics earlier." Pls.' Mot. at 5.  But for the Wolf Memorandum, Ms. Larios Sainz and others in the same position may (but also may not) have received grants of DACA before entry of the *Texas* injunction. Even so, Ms. Larios Sainz and all others similarly situated have received all the relief from the Wolf Memorandum that law or equity permit, and there is no basis for this Court to craft additional mandatory injunctive relief.  Under the APA, relief is limited to "set[ting] aside" unlawful agency action, 5 U.S.C. § 706(2), and to entering injunctive relief only as necessary to redress the plaintiff's injury, *see Monsanto*, 561 U.S. at 166. It does not extend to "compel[ling] agency action" that *might* have happened but for the unlawful agency action; instead, a court may compel agency action only when it is "unlawfully withheld or

10

unreasonably delayed."  5 U.S.C. § 706(1).  That is why this Court, in its Remedial Order, could not have ordered (and did not order) DHS to grant DACA to all who may have received it but for the Wolf Memorandum, rather than merely setting aside the Wolf Memorandum and allowing the adjudicative process to carry on from there.[2]

Plaintiffs thus miss the point when they invoke the various potential sources of equitable authority for this Court to modify its Remedial Order.  All of those sources of authority—whether the Court's inherent equitable powers, Rule 60(b)(6), Rule 60(a), or the All Writs Act—are subject to the fundamental rule that equitable relief is limited to redressing "the scope of the violation and the resulting harm," *Cooper*, 577 F.3d at 496, and may not extend even to "illegal conduct that was not fairly the subject of the litigation," *Mickalis Pawn Shop*, 645 F. 3d at 145.  None of the relief that Plaintiffs now seek is necessary "to protect or effectuate [the Court's] prior judgment," Pls.' Br. at 10, that Mr. Wolf's service violated the HSA's succession provisions, and any relief beyond that judgment would require fresh litigation, not modification of the existing Remedial Order.

**B.    Plaintiffs have failed to allege any legal defect in Defendants' implementation of the *Texas* injunction**

The Court afforded Plaintiffs the opportunity to amend their complaint to raise a challenge to DHS's current implementation of the DACA policy.  *See* Minute Entry for April 4, 2022.  But Plaintiffs have declined to do so.  Plaintiffs make no argument that DHS's actions to comply with the *Texas* injunction are "arbitrary [or] capricious" or "not in accordance with law" under the APA,

---

[2] In any case, even if the Court were to decide now that complete relief from the Wolf Memorandum required applying Plaintiffs' proposals to everyone who would currently have DACA but for the Wolf Memorandum, that would not support the class-wide relief Plaintiffs seek; instead, case-by-case fact-finding would be necessary to determine whether the individual in question would have requested DACA before December 4, 2020, and would have had that request granted before July 16, 2021.

5 U.S.C. § 706(2)(A).  Such an argument would fail, because "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order."  *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980) (citations omitted).

Plaintiffs likewise do not identify any affirmative legal obligation for DHS to afford the particular relief Plaintiffs now seek, aside from the argument, discussed above, that it is necessary to effectuate this Court's Remedial Order.  Indeed, there is no basis to contend that DHS was legally obligated to provide that relief.  It is reasonable for DHS to decline to carry out intermediate administrative steps that cannot result in any grant of DACA, particularly when much of that work would need to be repeated if the *Texas* injunction is reversed.  *See infra* p. 22.  It is also reasonable for DHS to adhere to its longstanding policy and practice, in place since 2014, for distinguishing between initial and renewal DACA requests.  And it is certainly reasonable for DHS not to provide deferred action to pending initial DACA requestors, an attempt by Plaintiffs to recreate a version of DACA via "interim relief," when DHS is under a permanent injunction prohibiting it from administering DACA or reimplementing it, without—at minimum—engaging in notice and comment rulemaking.

## II.    This Court should not enter an injunction that would conflict with the *Texas* injunction

Even if there were any basis for this Court to consider exercising its equitable discretion to provide any of the relief that Plaintiffs now seek, it should nevertheless decline to do so to avoid creating a conflict with the *Texas* injunction.

"Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders."  *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986); *see also Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the

defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless ShoeSource, Inc.*, No. 11-cv-1892, 2012 WL 3277222, at *9 n.4 (N.D. Cal. Aug. 9, 2012) (declining to issue an injunction against litigation in another federal district court out of concern that "conflicting injunctions [could] make compliance with both an impossibility for the parties affected"); *California ex rel. Lockyer v. USDA*, 710 F. Supp. 2d 916, 921–24 (N.D. Cal. 2008) (partially staying an injunction that reinstated an agency rule, in order to reduce the conflict with a subsequently issued injunction by another federal district court that forbade the use of the rule).

The Fourth Circuit's decision in *Feller* is instructive. There, the Department of Labor ("DOL") was faced with litigation regarding the rate paid to certain apple pickers under a temporary foreign worker program managed by DOL. *Feller*, 802 F.2d at 722. Plaintiffs in a District of Columbia lawsuit obtained an injunction prohibiting DOL from "certifying" apple growers who were allegedly underpaying apple pickers. *Id.* at 724-25. But as DOL began complying with the District of Columbia injunction, a group of West Virginia apple growers brought suit in West Virginia, and obtained an injunction *requiring* certification of the same class of apple growers. *Id.* at 725. The Fourth Circuit reversed the West Virginia injunction, finding it "was an abuse of discretion" for the federal court in West Virginia to issue a preliminary injunction that conflicted with an existing federal court order. *Id.* at 727. The Fourth Circuit concluded that "there is an underlying policy of judicial administration which counsels against the creation of conflicts such as the one at bar." *Id.* at 728. As the court explained, "issuance of the preliminary injunction did a grave disservice to the public interest in the orderly administration of justice. Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders." *Id.* at 727-28; *cf also, e.g.*, *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981)

13

("Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts.").

The threat of conflicting relief is particularly acute in cases in which the federal government is a defendant.  The federal government litigates in every federal district and circuit, in a significant number of cases, many of which raise novel and challenging legal questions regarding important and controversial public-policy issues.  *See United States v. Mendoza*, 464 U.S. 154, 159 (1984) ("We have long recognized that the Government is not in a position identical to that of a private litigant, both because of the geographic breadth of government litigation and also, most importantly, because of the nature of the issues the government litigates.").  The government is therefore uniquely susceptible to being placed in a position of peril, where it could be subjected to conflicting injunctive commands from different federal courts, and would face a significant risk of contempt proceedings from at least one of them.

Nor do Plaintiffs identify any countervailing equitable considerations that weigh in favor of creating a conflict with another court's injunction, or suggest that Defendants have unclean hands.  The government is vigorously opposing the *Texas* injunction on appeal, and Plaintiffs do not contend that the government has neglected to make any reasonably available argument before the Fifth Circuit.  DHS is also engaged in notice and comment rulemaking to place the DACA policy on a more secure procedural footing.  Plaintiffs are dissatisfied with the pace of proceedings, *see* Pls.' Mot. at 7-8, but that is not sufficient reason for this Court to attempt to short-circuit those ongoing efforts and order DHS to do what *Texas* prohibits.

## A.    Plaintiffs' proposed "interim relief" would conflict with the *Texas* injunction

Plaintiffs' first and most aggressive request is for the Court to direct DHS to employ its inherent, discretionary authority to create an "interim relief" program for pending initial DACA requestors.  Plaintiffs demand that such relief, "[a]t a minimum," must  "include an opportunity to

14

work" and "forbearance from deportation," to last indefinitely "until USCIS makes a final decision on the underlying DACA application"—which Plaintiffs admit could take "months or years." Pls.' Mot. at 12. Eligibility is to be determined using the same criteria as for requesting DACA, but subject to a lower standard of proof, requiring only "a prima facie showing of eligibility for DACA, determined on a case-by-case basis." *Id.* at 16.

Plaintiffs assert that "the interim relief requested here is not DACA," Pls.' Mot. at 16, but that assurance does not withstand scrutiny. Indeed, Plaintiffs' suggested "interim relief" is nearly *identical* to DACA. Plaintiffs identify only two ways in which their proposed relief would differ from DACA. First, they note that their proposed interim relief would be "temporary in nature and non-renewable," and "would conclude once the applications meet final resolution." Pls.' Mot. at 17. But that is not a substantive difference, given that there is no circumstance in which an individual would need indefinite interim relief to be renewable—if DACA is ultimately upheld, interim relief would last as long as it takes to receive a final determination on the individual's initial DACA request, and any final ruling vacating DACA would likewise be conclusive on the legality of interim relief pending DACA. For the same reason, the "temporary" interim relief Plaintiffs propose would offer at least as much assurance of stability and predictability to the individual as DACA itself, because interim relief would end only if DACA is ultimately struck down, or if the individual is determined not to have warranted DACA in the first place.

Plaintiffs' second distinction between DACA and their proposed "interim relief" fares no better. They claim that interim relief would be "more limited" than DACA, but their sole example of such a limitation is that "an applicant granted interim relief would *not* be eligible for advance parole." Pls.' Mot. at 17. Even if Plaintiffs were correct that DHS could grant their proposed interim relief without permitting advance parole, advance parole is so peripheral to the DACA

policy that it is not even mentioned in the 2012 Memorandum that established DACA.[3]  The absence of that single aspect of the policy would not meaningfully distinguish "interim relief" from DACA.

In any case, Plaintiffs do not explain on what basis they propose to exclude recipients of interim relief from advance parole.  By statute, any alien applying for admission to the United States may be paroled into the country "temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A) (emphasis added).  By regulation, DHS permits noncitizens currently in the United States to request parole in advance, which confers a practical expectation that they will be paroled into the country after travelling abroad (unless there is a subsequent determination to deny parole).  *See* 8 C.F.R. § 212.5(f).  Advance parole is not specific to DACA recipients, and DACA does not guarantee an individual advance parole.[4]  Plaintiffs' proposal to create a wholesale categorical exclusion from eligibility to apply for advance parole for a group subject to forbearance from removal would be all but certain to give rise to litigation under the APA.

Moreover, because "interim relief" would be a form of deferred action—an "administrative convenience to the government which gives some cases lower priority," 8 C.F.R. § 274.12(c)(14)—recipients would also be considered "lawfully present" for purposes of, and therefore eligible to apply for, Social Security and Medicare benefits.  *See* 8 C.F.R. § 1.3(a)(4)(vi); 42 C.F.R. § 417.422(h).  In at least some respects, "interim relief" recipients would actually be better off than DACA recipients.  *See, e.g.*, 45 C.F.R. § 152.2(8) (specifying that DACA recipients,

---

[3] *See generally Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, DHS (June 5, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf

[4] See USCIS, *Form I-131, Instructions for Application for Travel Document* 4-5, https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf

but not other recipients of deferred action, are not considered lawfully present for purposes of coverage under the Affordable Care Act).

Plaintiffs, in short, are demanding deferred action and work authorization for the DACA-eligible population, subject to the same criteria as DACA, but subject to a lower burden of proof, to last indefinitely until a final decision can be made on the underlying initial DACA request, which may take months or years, rather than for two years subject to renewal. As with DACA, recipients of such "interim relief" would be eligible to apply for Social Security and Medicare benefits, and advance parole (absent specific agency action to exclude interim relief recipients from advance parole eligibility). And unlike DACA recipients, "interim relief" recipients would be eligible for coverage under the Affordable Care Act. The proposed "interim relief," in other words, would be identical to DACA in almost all respects, superior to DACA in terms of eligibility for certain benefits, and no worse than DACA, as a practical matter, in terms of duration.

Creating such a program could readily be characterized as "reimplementing" DACA without compliance with the APA and "administering" DACA in direct violation of the *Texas* injunction. The risk of contempt is obvious. *See, e.g.*, *Whitcraft v. Brown*, 570 F.3d 268, 271-72 (5th Cir. 2009) (setting out civil contempt standard in the Fifth Circuit, and noting that "good faith is not a defense to a civil contempt order").

Even aside from the conflict such interim relief would create with the *Texas* injunction, Plaintiffs have offered no basis for this Court to seize control from the Executive Branch of its statutory discretion to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). For the reasons discussed above, *see supra* pp. 8-11, the proposed interim relief is not necessary to effectuate this Court's judgment under the HSA's succession provisions. Nor can it be justified by analogy to recent policy decisions to provide deferred action to individuals

with approved Special Immigrant Juvenile ("SIJ") petitions or to those with pending bona fide U nonimmigrant status ("U-visa") petitions.  *See* Pls.' Mot. at 14-15.  That DHS has chosen to exercise its discretion to grant deferred action to these particular populations says nothing about whether DHS is *required* to grant discretionary interim relief to other populations.  *See* 8 U.S.C. § 1103(a)(1), (a)(3) (conferring upon the Secretary broad authority to administer the immigration laws).  Of course, DHS has exercised its enforcement discretion to grant deferred action to the DACA population, but its ability to do so remains the subject of ongoing litigation.

## B.   Changing the definition of "initial" requests for DACA would conflict with the *Texas* injunction

Plaintiffs also ask this Court to require DHS to treat all DACA requests from individuals who have ever had DACA as renewal requests, regardless of how much time may have passed since the requestor's most recent grant of DACA expired, or whether the previous grant of DACA was terminated.  Because DHS's longstanding policy and practice since 2014 has been to treat requests from individuals who previously had DACA, but whose DACA either (i) expired more than one year before the date of the subsequent request or (ii) was terminated, as "initial" rather than "renewal" DACA requests that carry additional evidentiary requirements, complying with this requested relief would also violate the *Texas*  injunction.

The stay of the *Texas* injunction permits DHS to keep DACA in place for "DACA recipients who obtained that status on or before" July 16, 2021, and to grant "DACA renewal applications for these existing recipients (regardless of when the renewal applications are submitted)."  *Texas*, 2021 WL 3022434, at *2.  The permanent injunction is in force, however, to prevent DHS "from granting DACA status for any new applicants," which the court parenthetically defined to mean "those not already granted by the date of this order," i.e., July 16, 2021.  *Id.*

18

Even if the *Texas* injunction's reference to "existing recipients" could be read to include all those who ever "obtained [DACA] on or before" July 16, 2021, *Texas*, 2021 WL 3022434, at *2, DHS has never treated a DACA request from an individual whose previous grant of DACA expired more than one year before the date of the subsequent request as a "renewal" request, *see* Renaud Decl. ¶¶ 8, 9, *Texas v. United States*, No. 1:18-cv-00068, ECF 578-1 at 3 (S.D. Tex. July 27, 2021). The partial stay of the *Texas* injunction permitting DHS to accept "renewal" requests from "existing recipients" thus does not encompass requests from individuals whose previous grant of DACA expired more than one year before the request without changing and expanding DHS's longstanding and consistent definition of "renewal" requests. To do so now would be inconsistent with the understanding of the *Texas* injunction.

Taking such action would be particularly perilous for the hundreds of thousands of current DACA recipients whose continued work authorization and temporary forbearance from removal depend on the Texas court's partial stay of its own permanent injunction—a stay which the Texas court could lift if it believed that Defendants were changing their long-standing practice regarding renewal requests.

Plaintiffs argue that this is a "problem of [Defendants'] own making," claiming that DHS arbitrarily chose to treat requests more than one year after the expiration of a previous grant of DACA as initial requests "with no explanation." Pls.' Mot. at 20. But Defendants' position has been consistent since 2014, *see* Renaud Decl. ¶ 9, *Texas v. United States*, No. 1:18-cv-00068, ECF 578-1 at 3 (S.D. Tex. July 27, 2021)—in other words, since before the possibility of an request from an individual whose last grant of DACA expired more than a year previously first emerged.

Both the Plaintiffs in this case and the New York Plaintiffs suggest that USCIS's implementation of this Court's February 13, 2018, preliminary injunction, and a related

preliminary injunction issued the U.S. District Court for the Northern District of California, ignored the distinction between "initial" and "renewal" requests that Defendants now rely on. *See* Pls.' Mot. at 6; New York Br. at 9-10. As the New York Plaintiffs put it, "for some time following this Court's February 13, 2018, order, USCIS was adjudicating applications" from applicants whose previous grant of DACA had expired more than one year previously "even though the agency was *not* adjudicating first-time, initial applications." New York Br. at 10.

That is true, but taken out context. Both this Court and the California court issued injunctions in early 2018 requiring DHS to maintain DACA despite the attempted rescission that the Supreme Court ultimately vacated in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1901 (2020). Each injunction, however, specified that DHS need not process "new applications by individuals who have never before" received DACA. ECF 255 at 53; *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018) (same). USCIS implemented those injunctions as written: it ceased accepting initial DACA requests from individuals who "ha[d] never before been granted deferred action under DACA," but it went on to explain that it was "**only** accepting *initial* DACA requests from individuals who previously received DACA and whose DACA expired before Sept. 5, 2016"—i.e., more than one year before the September 2017 attempted rescission of DACA— "or whose most recent DACA grant was previously terminated."[5] USCIS's guidance further clarified that "[i]f you previously received DACA and your DACA expired before Sept. 5, 2016, or your most recent grant of DACA was previously terminated, *you cannot request DACA as a*

---

[5] *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction*, USCIS (last updated Aug. 24, 2020), https://www.uscis.gov/archive/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction (second emphasis added).

*renewal*, but may instead submit a new initial DACA request with evidence that you meet the initial DACA guidelines."[6]

Defendants have thus consistently adhered to the distinction between "initial" and "renewal" requests for DACA, a distinction of which the *Texas* court was well aware.  To abandon that distinction now would risk jeopardizing DACA for hundreds of thousands of members of the Plaintiff class who currently have DACA and rely on the partial stay of the *Texas* injunction.

**III.    This Court should not order pre-adjudication of pending initial requests for DACA**

The *Texas* injunction may also prevent Defendants from carrying out intermediate processing steps short of adjudicating new DACA applications.  As a general matter, the *Texas* court enjoined Defendants "from administering the DACA program."  The Court's partial stay permits Defendants to "continue to accept applications" from new DACA applicants.  The scope of the *Texas* injunction is within the *Texas* court's purview, and the injunction may be read as preventing Defendants from carrying out intermediate processing steps short of final adjudication of initial DACA requests.

In any case, regardless of the *Texas* injunction's requirements,  this Court should nevertheless refrain from ordering such relief.

As discussed above, *see supra* p. 12, Plaintiffs make no claim that it is unreasonable for an agency to decline to devote scarce resources to processing applications that it is currently, and for the indefinite future, powerless to grant.  Absent specific direction from Congress, decisions about allocation of agency resources are "committed to agency discretion by law."  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting 5 U.S.C. § 701(a)(2)).   Nor is such pre-adjudication necessary to provide relief from the Wolf Memorandum.

---

[6] *Id.* (emphasis added).

Plaintiffs suggest that Defendants should have devoted additional resources to processing initial DACA applications between this Court's Remedial Order in December, 2020, and the *Texas* injunction in July 2021, which might have resulted in Ms. Larios Sainz, and others similarly situated, receiving DACA before the *Texas* decision. *See* Pls.' Br. at 18. Even if true, however, that has no relevance to the resource allocation decision facing USCIS *now*, particularly at a time when USCIS faces lengthy backlogs in many adjudication types.

Indeed, embarking on pre-adjudication at this point would be an inefficient use of limited agency resources and may well provide no benefit to many class members, because some adjudicative steps are valid only for a limited period. Background checks for DACA applicants, for example, remain valid for only 180 days, while FBI fingerprint check results remain valid only for fifteen months. *See* Declaration of Connie L. Nolan ¶ 7 (attached as Exhibit A). If USCIS were to start pre-adjudication now with those requests that have been pending longest, but the *Texas* injunction were to remain in place past the expiration date of the background checks and FBI fingerprint check results for the earliest-processed requestors, USCIS would have to re-run those background and fingerprint checks at the time of final adjudication, which, given finite agency resources, would mean delaying those steps for other requestors.

Decisions over such trade-offs are committed by law to the discretion of agencies, who best know their own resources and processes. There is no reason for this Court to second guess Defendants' decisions in this area—particularly when those decisions are completely unrelated to the HSA succession violation on which this Court's remedial power ultimately rests.

## IV.    This case would not benefit from mediation

Plaintiffs suggest in a footnote that this Court could refer their proposal for "interim relief" to mediation "to develop jointly the details of the program." Pls.' Mot. at 16 n.18. The New York

Plaintiffs echo the suggestion, and add that the Court could consider ordering the President and the Secretary of Homeland Security personally to attend the mediation, and to come ready to share specific details of DHS's internal administrative processes and to "justify their position with citations to legal authority."  New York Br. at 7 & n.6.[7]

Defendants respectfully submit that this case is not a good candidate for mediation. Defendants, like Plaintiffs, are fully committed to preserving and fortifying DACA. *See, e.g.*, ECF 365.  But Defendants are bound by the *Texas* injunction.  The disagreement between the parties over what that injunction does and does not permit is not fit for resolution in mediation, or indeed in this Court at all.  Only the Texas district court, the Fifth Circuit, and the Supreme Court have the power to determine the scope of that injunction or to provide relief from its strictures.  No agreement between the parties in mediation in this district can excuse Defendants from compliance with that injunction, or avert the risk of contempt sanctions if that injunction is violated.

To that end, Defendants intend to notify the Texas court when Plaintiffs' motion is fully briefed and filed on this Court's docket.  Should the Court be inclined to order any of the relief that Plaintiffs seek, Defendants respectfully request that the Court first permit them to seek

---

[7] Specifically, the New York Plaintiffs "request that the Court order either the named defendants or other senior officials with decision-making authority . . . appear from the Department of Justice and DHS (including USCIS)."  *Id.*  The named defendants in the currently operative Fourth Amended Complaint are the Secretary of Homeland Security, the Deputy Director for Policy of USCIS, and the President of the United States, all sued in their official capacities.  *See* ECF 308 at 24, ¶¶ 77-79.  Setting aside the impropriety of ordering the President or a cabinet-level official to personally attend mediation, it would be impossible to identify, in advance, the specific individuals with "decision-making authority," as multiple officials at the Departments of Justice and Homeland Security, among others, would need to confer regarding any topics proposed in the mediation.  Moreover, the information that the Plaintiffs seek—internal administrative processes and citations to legal authority regarding the steps that the government believes it needs to take to comply with the Texas court's injunction—may be covered by a combination of the attorney-client privilege, work product doctrine, or deliberative process privilege.

clarification in the Southern District of Texas as to whether providing the relief in question would violate that Court's injunction.

## **CONCLUSION**

For these reasons, Plaintiffs' motion for modification of this Court's Remedial Order should be denied.

Dated: May 27, 2022                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       BREON PEACE
                                       United States Attorney

                                       BRAD P. ROSENBERG
                                       Assistant Branch Director

                                        /s/   *Cormac A. Early*
                                       GALEN N. THORP
                                       Senior Trial Counsel
                                       CORMAC A. EARLY
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW
                                       Washington, DC 20005
                                       Phone: (202) 616-7420
                                       Fax: (202) 616-8470
                                       Email: cormac.a.early@usdoj.gov

                                       JOSEPH A. MARUTOLLO
                                       Assistant U.S. Attorney
                                       United States Attorney's Office
                                       Eastern District of New York
                                       271-A Cadman Plaza East, 7th Floor
                                       Brooklyn, NY  11201
                                       Phone:  (718) 254-6288
                                       Fax:  (718) 254-7489
                                       Email:  joseph.marutollo@usdoj.gov

                                       *Attorneys for Defendants*