UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
MARTÍN JONATHAN BATALLA VIDAL, *et al.*,

                              Plaintiffs,

          -against-

ALEJANDRO MAYORKAS, *et al.*,

                              Defendants.
_____

STATE OF NEW YORK, *et al.*,

                              Plaintiffs,

          -against-

JOSEPH BIDEN, *et al.*,

                              Defendants.
_____

**MEMORANDUM & ORDER**
**16-CV-4756 (NGG) (VMS)**

**17-CV-5228 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs seek clarification of the court's prior orders in this litigation concerning Deferred Action for Childhood Arrivals. Now ten years after its creation, that policy remains in limbo after this and other courts have ordered successive vacaturs of the Department of Homeland Security's administrative attempts to first rescind and then reinstate it.

Plaintiffs ask this court to modify its previous remedial order to clarify (indeed, direct) what the government can and cannot do in light of a Texas district judge's recent order suspending much of the policy. Because Plaintiffs seek relief that sweeps well beyond the purpose of this court's prior injunction, their motion is DENIED.

## I.   BACKGROUND

The court assumes general familiarity with the Deferred Action for Childhood Arrivals ("DACA") policy, the recission of which this court enjoined in 2018 when it found that Plaintiffs were

1

"substantially likely to succeed on the merits of their claim that" the government's first attempt to end the policy was arbitrary and capricious, in violation of the Administrative Procedure Act (the "APA"). *Batalla Vidal v. Nielsen,* 279 F. Supp. 3d 401, 420 (E.D.N.Y. 2018). The Supreme Court largely affirmed the reasoning of that decision in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). In response to the Court's decision, the Department of Homeland Security ("DHS") tried again to rescind the policy, purportedly under the authority of then-Acting Secretary of Homeland Security Chad Wolf. This court found that Wolf, however, was not lawfully serving in that position, and so again vacated DHS's action. *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 138 (E.D.N.Y. 2020). The court's order had the effect of leaving in place the previously enacted policy, the 2012 "Napolitano Memorandum" which first created DACA. The court also certified a class of people who were *prima facie* eligible for deferred action at the time of that memorandum, *id.* at 137-38, and then, a few weeks later, went on to enter a limited remedial order to ensure that certain steps focused on notice and reporting would be taken in accordance with the reimplementation of the policy. *Batalla Vidal v. Wolf*, No. 16-CV-4756 (NGG) (VMS), 2020 WL 7121849, at *2 (E.D.N.Y. Dec. 4, 2020). The United States Citizenship and Immigration Services ("USCIS") re-opened DACA and soon received more than 90,000 "first-time" applications.

The reinstatement of the Napolitano Memorandum prompted a coalition of states to object to the administrative process originally used to implement DACA a decade earlier. Soon a Texas district judge agreed, embracing a range of theories including that DHS had violated the APA by failing to undergo notice and comment rulemaking; that DHS had not been delegated authority by Congress to adopt DACA; that even if it had, DHS's interpretation of the Immigration and Nationality Act would not warrant *Chevron* deference; and that, even though none of the

parties had made the argument, the policy would "likely be found to be arbitrary and capricious" as well, for at least eight different possible reasons, though those were "just a few" and not "by any means . . . an exhaustive list." *Texas v. United States*, 549 F. Supp. 3d 572, 597-621, 623 (S.D. Tex. 2021) ("*Texas I*"). The judge, Andrew S. Hanen, ordered vacatur of the Napolitano Memorandum and a permanent injunction enjoining DHS "from administering the DACA program and from reimplementing DACA without compliance with the APA." *Texas v. United States*, No. 18-CV-68, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021) ("*Texas II*"). The doors to DACA were closed once more.

Nevertheless, the Texas court importantly found that "equity will not be served by a complete and immediate cessation of DACA," and given the reliance interests of DACA recipients and this court's earlier order, it permitted DHS to "continue to accept applications as it has been ordered to do by the court in *Batalla Vidal v. Wolf* . . . but . . . not grant these applications until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court." *Id.* The court also temporarily stayed its order for DACA recipients who had already "obtained that status on or before the date of [its] injunction and DACA renewal applications for th[o]se existing recipients." *Id.* In other words: DHS could accept but not grant new applications, and those already benefitting from DACA status could continue to renew it.

DHS appealed the district court's decision to the Fifth Circuit, which heard oral argument on July 6, 2022. *See Texas v. United States*, No. 21-40680 (5th Cir. 2021). In the meantime, in an effort to comply with the *Texas II* order and for reasons (it says) of resource allocation, DHS canceled pending biometrics appointments and apparently entirely ceased to perform the whole range of administrative steps it would otherwise take in processing first-

3

time applications, including scanning and reviewing forms, verifying eligibility, running background checks, and checking travel history. (*See* Nolan Decl. (Dkt. 385-6) at ¶ 5-7, 11.)[1] The sudden cessation caused some otherwise similarly situated pending applicants who had submitted their requests around the same time before the *Texas II* order – including members of the certified class in this case – but who received different appointment dates, to have their applications either granted just in time before the *Texas II* order, or be left to linger after it, now for more than a year. (*See* Ahmad Decl., Ex. A-B (Dkt 385-3) at ECF p. 2-9.)

## II.  PLAINTIFFS' MOTION TO MODIFY

In the motion before the court, Plaintiffs argue that DHS's response to the *Texas II* order "[m]isapprehend[s]" it and its relationship with this court's December 2020 remedial order. (Mot. (Dkt. 385-1) at 1.)

First, they claim that the two orders together create ambiguity about how DHS should adjudicate applications in the time between applying for DACA (as required by this court) and being granted DACA status (as prohibited by the Texas court). Plaintiffs ask this court to clear up the ambiguity by requiring the government to process applications "up to the point of decision." (*Id.* at 1-2.)

Second, Plaintiffs claim that DHS has arbitrarily chosen to treat certain renewal applications – those where DACA status expired more than a year prior to reapplication, called "Extended Renewal Applicants" – as if they were first-time applications, effectively denying that group the protection of the partial *Texas II* stay. (*Id.* at 2.) Plaintiffs ask the court to direct DHS to process and continue to renew applications in that category on the

---

[1] All record citations refer to the docket in *Batalla Vidal v. Mayorkas*, No. 16-CV-4756.

grounds that this court's order required it, and the Texas court's order did not prohibit it. (*Id.*)

Finally, and more generally, Plaintiffs ask the court to equitably craft broader, interim relief that would provide pipeline DACA applicants with some stronger measure of legal certainty while the sprawling litigation concerning the policy drags on.

DHS responds that this court does not have the power to issue a modified injunction along the lines Plaintiffs seek because it would necessarily be overbroad: Plaintiffs already won "complete relief" on the claim the injunction addressed, *i.e.*, the validity of Wolf's appointment. (Gov't Opp'n (Dkt. 385-5) at 7-11.) And even if it did have such authority, the government argues that the court should not exercise it because to do so would necessarily put this court in conflict with the Texas court. (*Id.* at 12-21.)

### A.   Legal Standard

Like its broad authority to enter an injunction, the court has inherent authority to modify one. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). As when entering an injunction, the Supreme Court has recognized "the power of a court of equity to modify [it] in adaptation to changed conditions." *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932). The authority to modify, like the power to enter, is "long-established, broad, and flexible." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 n.6 (1992). Although codified by Federal Rule of Civil Procedure 60, the court's power is inherent, and not displaced by the rule. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984) ("Rule 60 . . . state[s] [the court's] inherent power as a rule").

Modification of an injunction may work in either direction. In many cases, a plaintiff will seek relief *from* a previously entered injunction because its terms, over time and when unchanged, turn out to be "no longer equitable." Fed. R. Civ. P. 60(b)(5). Courts likewise may order modifications *of* previously entered injunctions in order to give them continuing vitality. *See, e.g., United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249 (1968) (permitting equitable modification "to achieve the purposes of the provisions of the decree, [rather than for a party] to escape their impact").

Where a party seeks modification of an injunction under Rule 60, it must show "a significant change either in factual conditions or in law" that equitably justifies the change and generally was not "anticipated at the time" of the order. *Rufo*, 502 U.S. at 384-85 (considering Rule 60 in the context of a prison reform litigation consent decree). In addition to changed circumstances, the court must consider "whether the objective of the injunction has been achieved," *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 644 F. App'x 98, 106 (2d Cir. 2016) (summary order), and whether the public interest would be served. *Rufo*, 502 U.S. at 392; *see also Aurelius*, 644 F. App'x at 108 (considering the public interest in sovereign debt litigation).

Although guided by these considerations, the court must "adopt[] a flexible approach . . . allowing alterations for any other reason that justifies relief." *United States v. Apple, Inc.*, 791 F.3d 290, 336 (2d Cir. 2015). "[A] party seeking an alteration under this catch-all provision bears the burden of establishing that a significant change in circumstances warrants the modification." *Id.* Where that showing is made, a court abuses its discretion by not making a modification. *See Horne v. Flores*, 557 U.S. 433, 447 (2009).

6

### B. Discussion

This motion requires the court to answer two basic questions. First, what were the purposes of its December 2020 remedial order? Second, would modifying its order as Plaintiffs suggest equitably serve those ends?

To answer those questions, the court need not demarcate the precise outer boundaries of its equitable authority. Quite apart from whether the court could issue the relief Plaintiffs seek, it is not persuaded that on this motion it should.

### 1. The Court's December 2020 Remedial Order

Plaintiffs return to this court after a period of relative quiescence in this litigation, a year and a half after the court (1) granted Plaintiffs' motion for summary judgment on claims brought under the Homeland Security Act (the "HSA"), concluding that Chad Wolf was not then lawfully serving as Acting Secretary of DHS, *Batalla Vidal*, 501 F. Supp. 3d at 138; and (2) ordered relief stemming from that conclusion, *i.e.*, principally (but not exclusively) the vacatur of the "Wolf Memorandum," which had been issued under Wolf's putative authority, *Batalla Vidal*, 2020 WL 7121849 at *2. After receiving additional briefing from the parties as to the appropriate remedy, the court issued its remedial order two weeks after the court found the substantive HSA violation.

The parties' remedial proposals differed significantly.

Plaintiffs urged the court, "[i]n addition to the typical APA remedy of vacatur, . . . [to] order. . . declaratory, injunctive, and other equitable relief." (Pls.' Remedial Mot. (Dkt. 349) at 1.) Plaintiffs especially sought a permanent injunction requiring the reimplementation of the DACA policy in accordance with the Napolitano Memorandum, arguing that DHS had failed to administer that policy after its first attempt to rescind DACA was held arbitrary and capricious by the Supreme Court in *Regents*. Without stern

injunctive medicine, Plaintiffs argued, DHS might defy the implications of a vacatur of the Wolf Memorandum while it sought rescission anew. Plaintiffs argued that "given Defendants' repeated and continuing efforts to avoid administering DACA as it existed before the unlawful September 2017 rescission, there is no guarantee that Defendants will comply with the Court's Order absent an injunction compelling them to do so." (*Id.* at 15.)

Plaintiffs further sought other orders that would enjoin DHS from seeking to reimplement or ratify the Wolf Memorandum, and to undo the consequences the memo had while it was purportedly in effect. (*Id.* at 17.) In order "[t]o provide complete relief," Plaintiffs asked the court to retroactively extend the shorter grants of deferred action that some recipients had received during the life of the Wolf Memorandum and to order the recalculation of dates that determined how certain applicants had accrued "unlawful presence." (*Id.* at 18-19.) Finally, Plaintiffs sought an injunction requiring DHS to provide notice to the class members and the public of the court's order, as well as require reporting to the court regarding compliance with the orders. (*Id.* at 19-21.)

DHS opposed most of these proposals, while acknowledging that vacatur was appropriate in light of the court's holding as to the HSA. (Gov't Remedial Mot. (Dkt. 350) at 1.) Maintaining that vacatur was the only remedy directly "connect[ed] to the discrete and technical legal issue on which Plaintiffs prevailed," DHS opposed a permanent injunction; opposed an order to reissue work authorizations, which it claimed it could achieve on its own more efficiently; opposed declaratory relief as duplicative of the court's opinion; opposed the recalculation of the accrual of unlawful presence; opposed individualized notice to the class members; and opposed the nature and frequency of the suggested reporting requirements. (*Id.* at 2-3, 6-15.)

The court sided, on balance, with DHS. The court's ruling first held, as both parties agreed, that vacatur was required under the

APA, which mandated that a "reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Batalla Vidal*, 2020 WL 7121849 at *1 (quoting 5 U.S.C. § 706(2)(C)). Acknowledging that "[u]nder normal circumstances, vacatur alone is the proper remedy for unlawful agency action," the court went on to explain that it would "adjust its relief to the exigencies of the case." *Id.* at *2 (citing *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)). It ordered three "additional," "reasonable" remedies. *Id.* Those injunctions (1) directed DHS to post public notice of the vacatur; (2) directed DHS to prepare to send individualized notices to the class members;[2] and (3) directed DHS to provide the court with a status update the following month reporting various data. *Id.*

The court did not, however, go further. The court declined to "enter an *ex ante* declaration" as to the question of unlawful presence accrual. *Id.* at *3. It did not enter a permanent injunction alongside the vacatur, nor issue separate declaratory relief. Although the court "reserve[d] the right to impose further remedies if they [became] necessary . . . [,] retain[ing] jurisdiction of the matter for purposes of construction, modification, and enforcement" of the remedial order, Plaintiffs did not seek modification before this motion. *Id.*

In sum, the court's December 2020 remedial order fashioned narrow relief: the traditional APA remedy of vacatur, alongside limited notice and reporting requirements. Because it never entered a permanent injunction, even though Plaintiffs requested one, the court expressly did not "reimpose" or "mandate" DACA itself. Rather, it entered a vacatur that indirectly allowed DACA

---

[2] The court later required that the notices be sent, along with new work authorization certifications to reverse a change in their expiration dates that had been enacted pursuant to the Wolf Memorandum. (*See* December 10, 2020 Order (Dkt. 359).)

to go back into effect. Though that may seem like a legal techni-
cality, the procedural history suffices at least to demonstrate that
the court might have done more – indeed, was urged to do so at
the time – but did not. The court's purposes were two-fold: (1)
to remedy the HSA violation with vacatur; and (2) to ensure that
the vacatur was abided by, *i.e.*, that DHS would return to admin-
istering the previous policy in good-faith. But the court always
acknowledged that the policy could lawfully change again in the
future, and likely would. *See Batalla Vidal,* 279 F. Supp. 3d at
410 ("[the court] does not hold that Defendants may not rescind
the DACA program").

2.    The Proposed Modification of the Remedial Order

The key development since these proceedings has been the *Texas
II* order, which was handed down just as DHS had begun to
ramp-up its processing of new applications. (*See* Mot. at 5.)[3]
More than 80,000 people had by that time applied for, but not
yet been granted, deferred action, even though in some cases the
applications were submitted only days after this court's Decem-
ber 2020 order. (*Id*. at 12.) The gravamen of Plaintiffs' motion
now is that the *Texas II* order created a "changed circumstance"
for this group, thus warranting equitable intervention. (*Id.* at 11.)
Plaintiffs argue that this court's order had "created reasonable
expectations among class members that the 2012 DACA memo-
randum would be fully reinstated," (Reply (Dkt. 385-8) at 3.),
and therefore the remedial order should now be modified to re-
store those expectations.

The problem is, although that group – comprised of members of
the *Batalla Vidal* class certified by this court – has no doubt been

---

[3] Although a new federal rulemaking is expected to be completed this year,
the Napolitano Memo remains in effect as DHS policy until a final rule is
issued. *See Deferred Action for Childhood Arrivals,* 86 Fed. Reg. 53736
(Sept. 28, 2021) (to be codified at C.F.R. pts. 106, 236, 274a). Congres-
sional action remains stalled.

tangibly harmed by the *Texas II* order, their change in position is not directly linked to the "objective of the injunction" this court entered: vacatur of the Wolf Memorandum, without a permanent injunction mandating the full reinstatement of DACA itself. *Aurelius,* 644 F. App'x at 106. Equitable modification requires showing not just any changed factual or legal circumstances, but specifically those that "make compliance with the decree substantially more onerous" or that render "the decree . . . unworkable because of unforeseen obstacles," or that "would be detrimental to the public interest." 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 2961 (3d ed. 2022).

Of these, Plaintiffs have really only the public interest on their side. If this court *had* ordered a "full reinstatement" of DACA, the *Texas II* injunction would no doubt have made compliance with this court's competing order onerous and unworkable for DHS. Had that been the case, renewed equitable intervention may have been warranted, even at the cost of potentially conflicting district court injunctions. Indeed, that possibility has emerged in this very case before, and this court has already indicated that it would not hesitate to follow the law, rather than a Texas district court. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 418, 462-64 (2017) (cataloging historical conflicts and using this litigation as a contemporary example). Fortunately we need not go down that road, because this court – notably unlike the Texas court – responsibly crafted narrow relief. *Compare Batalla Vidal*, 2020 WL 7121849, at *1 (ordering vacatur), *with Texas II*, 2021 WL 3022434, at *2 (ordering vacatur and imposing a permanent injunction).

Defendants, of course, have appealed the Texas order and hope to resume enforcement of the DACA policy. But Plaintiffs contend DHS could be doing more to speed up the processing of applications' "intermediate steps leading up to the final adjudication,"

(Mot. at 13), so that approvals can be quickly resumed again should the Texas order be reversed (or a new rule be finalized, or legislation passed). They also seek an order requiring USCIS to treat "Extended Renewal" applications as renewals, rather than first-time applications, so that those people may benefit from the partial *Texas II* stay. (*Id.* at 20.) Those are both policy proposals DHS may want to consider, but are not ones this court should demand. They might advance the objective of granting deferred action to as many deserving people as possible, but that was not, and could not have been, the objective of this court's remedial order.

Moreover, even if it was, it is not clear that the public interest would be served by the specific relief Plaintiffs seek: essentially, an injunction directing DHS to change its procedures for processing DACA applications.[4] The Department has offered strong practical reasons to explain why it is hamstrung in advancing the "intermediate steps" of application processing, and Plaintiffs have not articulated compelling alternatives. (*See* Nolan Decl. ¶ 7 (noting that intermediate steps like background checks might have to be repeated several times over before an ultimate adjudication decision can be made); Hearing Tr. at 26:5-6 (acknowledging that Plaintiffs have not identified "specific steps or ordering of steps that need to take place"); Gov't Opp'n at 12 (arguing that "[i]t is reasonable for DHS to decline to carry out

---

[4] Plaintiffs also seek far more sweeping relief, asking the court to "[a]t a minimum" order interim relief that would "include an opportunity to work[] as well as forbearance from deportation." (Mot. at 12-17.) But even if this court was persuaded that the changed circumstances since the *Texas II* order directly undermined the objective of its remedial order, the court would also be required to "consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. Judicially mandating interim relief that would mirror DACA – itself a policy of discretionary interim relief from deportation that must be regularly renewed by those receiving deferred action – would plainly not be "tailored."

intermediate administrative steps that cannot result in any grant of DACA, particularly when much of that work would need to be repeated if the *Texas* injunction is reversed.").) DHS has also defended its treatment of Extended Renewal applicants as consistent with its prior practice, including at the time of this court's remedial order and the Texas court's later injunction. (Gov't Opp'n at 18-21.)

Enjoining DHS's longstanding practices now would have the plain objective of subverting the Texas court's order, rather than advancing this court's. Although the State Plaintiffs in this litigation's companion case have proposed mediation to encourage the parties to find common ground on these internal procedures, the court is not persuaded there is any to be had. (New York Pls. Mem. (Dkt. 385-4) at 9-10.) DHS's decision to halt intermediate processing was not an attempt to avoid the implications of the vacatur this court ordered in 2020; it was made in light of the Texas court's order, not this court's. Although ordering DHS to schedule new biometrics appointments or conduct background investigations in advance would provide Plaintiffs some measure of relief if the DACA policy went back into effect at some time in the future, the relief would be from the *Texas II* injunction alone – not anything DHS did to undermine this court's order entered seven months before. And even if the court could quibble with the seemingly arbitrary and paradoxical way DHS treats Extended Renewal applicants (designating them as "initial" applications, something they are colloquially not), ordering DHS to change its definition has the purpose only of skirting the *Texas II* stay, not effectuating this court's command.

For these reasons, Plaintiffs' motion is therefore DENIED.

## III.  CONCLUSION

DACA remains a vital program that protects hundreds of thousands of people who were brought to the United States as

children, and who know no other country as their home. It brings this court no pleasure to be unable to offer them the certainty they need and the justice they deserve to plan their lives in America. But this court cannot do so acting alone.

SO ORDERED.


Dated:      Brooklyn, New York
            August 3, 2022

                                        s/Nicholas G. Garaufis

                                        _____
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge